# MCCAMPBELL AND ASSOCIATES, INC.

1880 CRESTVIEW WAY
NAPLES, FLORIDA 34119-3302
TELEPHONE: 239.597.5906
EMAIL: SUSANMCCAMPBELL@MCCAMPBELLASSOC.COM

September 20, 2010

The Honorable Virginia M. Kendall
United States District Court
Northern District of Illinois
Everett McKinley Dirksen United States Courthouse
219 South Dearborn Street
Chicago, Illinois 60604

> Re:    Monitor's Report USA v. Cook County et. al. (Cook County Jail)
>         Civil No. 10 C 2946

Dear Judge Kendall:

I herein submit to you my first report to the Court regarding conditions in the Cook County Jail based upon the Agreed Order of May 13, 2010. This report focuses on paragraphs in the Agreed Order addressing correctional practices. The parties reviewed a draft of this report, and I considered their comments as I finalized this document.

In my view, Cook County officials, Cermak, and the Sheriff are working diligently to comply the elements of the Agreed Order. All those with whom I work are very responsive and transparent in their communications. There appears to be a genuine desire to not only work to gain compliance but to make substantial changes in the Jail, to assure long-term, sustainable reform.

The scope of the Agreed Order touches aspects of daily operational practices of the Cook County Department of Corrections, Cermak, and the Cook County Department of Facilities Management, some of which inextricably intertwined. As the process of assessing and documenting substantial compliance moves forward, the monitors will work together to assure that the best information is provided to the jurisdiction and the Court regarding those areas of intersection.

The Honorable Virginia M. Kendall
September 20, 2010
Page two

I am pleased to respond to any questions of the Court.

Respectfully yours,

Susan W. McCampbell

Attachment:    Summary of Compliance As of September 20, 2010

Copies:

Patrick Johnson, Assistant United States Attorney
U. S. Dept. of Justice
Everett McKinley Dirksen United States Courthouse
219 South Dearborn Street
Chicago, Illinois 60604

Corey Sanders
David Deutsch
Kerry Krentler Dean
U. S. Dept. of Justice
Civil Rights Division, Special Litigation Section
601 D Street, NW, Room 5422
Washington, D. C. 20004

Matthew Burke, Esq.
Office of the Sheriff of Cook County

Paul O'Grady, Esq.
Daniel F. Gallagher, Esq.
Querrey & Harrow, Ltd.

Donald J. Pechous
Deputy Chief, Civil Actions Bureau
Cook County State's Attorney's Office
500 Richard J. Daley Center
Chicago, Ill 60602

**UNITED STATES OF AMERICA VS. COOK COUNTY, ET. AL.**
**Civil No. CV-02946**
Summary As of September 20, 2010

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| **A.** | **Protection from Harm** | | | |
| **31.** | **Use of Force by Staff** | | | |
| A. 31. a. (14) | CCDOC shall maintain comprehensive and contemporary policies and procedures, in accordance with generally accepted correctional standards, surrounding the use of force and with particular emphasis regarding permissible and impermissible uses of force. | | x | |
| A.31. b. (15) | CCDOC shall maintain use of force policies and pre-service and in-service training programs for correctional officers and supervisors that address the following impermissible uses of force:<br><br>1. use of force as a response to verbal insults or inmate threats where there is no immediate threat to the safety of the institution, inmates, or staff;<br>2. use of force as a response to inmates' failure to follow instructions where there is no immediate threat to the safety of the institution, inmates, or staff, unless CCDOC has attempted a hierarchy of nonphysical alternatives that are documented;<br>3. use of force as punishment or retaliation;<br>4. use of force involving striking, hitting, or punching a restrained and non-combative inmate;<br>5. use of force against an inmate after the inmate has ceased to offer resistance and is under control;<br>6. use of choke holds on an inmate, unless lethal force is justified; and<br>7. use of inappropriate or excessive force. | | x | |
| A.31.c. (16) | CCDOC shall maintain a policy to ensure that staff adequately and promptly report all uses of force, in accordance with generally accepted correctional standards. | | x | |
| A.31.d. (18) | CCDOC shall require that use of force reports:<br>1. be written in specific terms in order to capture the details of the incident<br>2. contain an accurate account of the events leading to the use of force incident;<br>3. include a description of the instrument(s) of restraint or control, if any, and the manner in which it was used;<br>4. note whether an inmate disciplinary report was completed in connection with the incident that prompted the use of force;<br>5. describe the nature and extent of apparent and reported injuries sustained both by the inmate and staff member; | | x | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|:---:|:---:|:---:|
| | 6.     contain the date and time medical attention was actually provided; <br> 7.     describe, in detailed, factual terms, the type and amount of force used as well as the precise actions taken in a particular incident; and <br> 8.     note whether a use of force was videotaped.  If the use of force is not videotaped, the reporting correctional officer and supervisor will provide an explanation as to why it was not videotaped. | | | |
| A.31.e. (19) | CCDOC shall continue to require prompt review by the shift commander of all use of force reports.  The shift commander's review of use of force reports shall include review for completeness and procedural errors, as well as review of the substantive content.  If the use of force report does not comply with provision 31.d. of this Agreed Order, the shift commander shall return it to the reporting officer for revision and resubmission until it is compliant.  If the shift commander believes a use of force may have been inappropriate or excessive, he or she shall immediately refer the incident for investigation. | | x | |
| A.31.f. (21) | CCDOC shall ensure that senior management review of uses of force includes: <br> 1.  a timely review of medical documentation of inmate injuries, if any is submitted, as provided by Qualified Medical Staff, including documentation surrounding the initial medical encounter, an anatomical drawing that depicts the areas of sustained injury, and information regarding any further medical care; Coordinate with Dr. Shansky <br> 2.  the inmate disciplinary report, if any, associated with the use of force; and <br> 3.  the incident report, if any, associated with the use of force. | | x | |
| A. 31.g. (22) | CCDOC [and Cermak] shall establish criteria that trigger referral for inappropriate or excessive use of force investigations, including but not limited to, documented or known injuries that are extensive or serious; injuries involving fractures or head trauma; injuries of a suspicious nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.); and injuries that require treatment at outside hospitals. | | | x |
| A. 31. h. (23) | When CCDOC review of use of force reports, and supporting records if applicable, reveals that reports of a use of force are materially inconsistent, conflicting, or suspicious, CCDOC shall refer that use of force incident for internal investigation. | | x | |
| A.31.i. (24) | CCDOC shall develop and implement a system to track all incidents of use of force that, at a minimum, includes the following information: <br> 1.  a tracking number; <br> 2.  the inmate(s) name; <br> 3.  housing assignment; <br> 4.  date; | | x | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | 5. type of incident;<br>6. injuries (if applicable);<br>7. medical care provided (if applicable);<br>8. staff involved;<br>9. reviewing supervisor;<br>10. external reviews and results (if applicable);<br>11. remedy taken (if appropriate); and<br>12. administrative sign-off. | | | |
| A.31.j. (26) | CCDOC shall ensure that, promptly following a use of force incident, video or photographs are taken of any and all reported or apparent injuries sustained by inmates and staff. The video or photographs will be maintained and will be included in the investigation package, if applicable. Coordinate with Dr. Shansky. See 31. F. | | x | |
| A.31.k. (27) | CCDOC shall establish an "early warning system" that will document and track correctional officers who are involved in use of force incidents and any complaints related to the inappropriate or excessive use of force, in order to alert CCDOC administration to any potential need for retraining, discipline, problematic policies, or supervision lapses. Appropriate CCDOC leadership, supervisors, and investigative staff shall have access to this information and monitor the occurrences. CCDOC senior management shall use information from the early warning system to improve quality management practices, identify patterns and trends, and take necessary corrective action both on an individual and systemic level. | | x | |
| A.31.l. (29) | CCDOC shall ensure that a supervisor is present during all pre-planned uses of force, such as cell extractions. | | x | |
| A.31.m. (31) | Where there is evidence of staff misconduct related to inappropriate or unnecessary use of force against inmates, CCDOC shall initiate personnel actions and seek disciplinary action appropriately for any correctional officer found to have:<br>1. engaged in inappropriate or excessive use of force;<br>2. failed to report or report accurately the use of force;<br>3. retaliated against an inmate or other staff member for reporting an inappropriate or excessive use of force; or<br>4. interfered or failed to cooperate with an internal investigation regarding use of force in a manner inconsistent with the staff member's statutory or contractual rights. | | x | |
| A.31.n. (33) | Where there is evidence of staff misconduct related to inappropriate or unnecessary use of force against inmates, CCDOC shall consider, develop, and initiate systemic remedies as appropriate. | | x | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| A.31.o (35) | CCDOC shall maintain accountability policies and procedures for the effective and accurate maintenance, inventory, and assignment of chemical and other security equipment, in accordance with generally accepted correctional standards. | | x | |
| A.31.p. (37) | CCDOC shall continue to conduct use of force training in accordance with generally accepted correctional standards, including:<br>1. CCDOC shall maintain an effective and comprehensive use of force training program.<br>2. CCDOC shall continue to ensure that correctional officers receive adequate training in CCDOC's use of force policies and procedures, including de-escalation and defensive tactics relating to use of force.<br>3. CCDOC shall continue to ensure that correctional officers receive pre-service and in-service training on reporting use of force and completing use of force reports. | | x | |
| A.31.q. (39) | CCDOC shall provide a process for inmates to report allegations of the inappropriate or excessive use of force orally to any CCDOC staff member; said staff member shall give the inmate the opportunity to reduce his or her report to writing through a grievance or complaint form without discouragement. | | x | |
| A.31.r. (42) | Following a use of force, when CCDOC staff transport an inmate to receive medical care by Cermak, as necessary, the CCDOC staff member shall inform the Cermak staff member that the inmate was involved in a use of force. Coordinate with Dr. Shansky. | | x | |
| A.31.s. (43) | Cermak shall ensure that, when providing medical treatment or assessment to an inmate following a use of force, Qualified Medical Staff document the inmate's injuries, if any, and any medical care provided. Cermak shall provide CCDOC senior management [OPR] with a brief summary documenting the initial medical encounter following a use of force, including an anatomical drawing that depicts the areas of sustained injury, if any, and information regarding any further medical care. Coordinate with Dr. Shansky. See 31.f. | | x | |
| A.31.t. (44) | Cermak shall ensure that Qualified Medical Staff question, outside the hearing of other inmates or correctional officers if appropriate, each inmate who reports for medical care with an injury, regarding the cause of the injury. If, in the course of the inmate's medical encounter, a health care provider suspects staff-on-inmate or inmate-on-inmate abuse, that health care provider shall immediately:<br>1. report the suspected abuse to the Executive Director of the Office of Professional Review or other appropriate CCDOC administrator; and<br>2. adequately document the matter in the inmate's medical record. | | | x |
| **32.** | **Safety and Supervision** | | | |
| 32. a. | CCDOC shall maintain security and control-related policies, procedures, and practices that will result | | x | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| (45) | in a reasonably safe and secure environment for all inmates and staff, in accordance with generally accepted correctional standards. Coordinate with Grenawitzke | | | |
| 32.b. (46) | CCDOC shall maintain policies, procedures, and practices to ensure the adequate supervision of inmate work areas and trustees, in accordance with generally accepted correctional standards. Coordinate with Grenawitzke | | | x |
| 32.c. (47) | CCDOC shall ensure that security staff conduct appropriate rounds with sufficient frequency to provide inmates with reasonable safety. Rounds shall be conducted at least once every half hour, at irregular intervals, inside each housing unit. In the alternative, CCDOC may provide direct supervision of inmates by posting a correctional officer inside the day room area of a housing unit to conduct constant surveillance. More frequent rounds shall be conducted for special management inmates who require more intensive supervision for security and safety reasons. All security rounds shall be documented on forms or logs that do not contain pre-printed rounding times. Video surveillance may be used to supplement, but must not be used to replace, rounds by correctional officers. | | x | |
| 32.d. (49) | CCDOC shall ensure that security supervisors conduct daily rounds in the inmate housing units, and document the results of their inspections. | | | x |
| 32.e. (50) | Cook County shall increase the use of overhead video surveillance and recording cameras to provide adequate coverage throughout the common areas of the Facility, including the RCDC, all division intake areas, mental health units, special management units, inmate housing units, and in common areas of the divisions. | | x | |
| 32.f. (52) | CCDOC shall maintain a procedure to prevent inmates from possessing or having access to dangerous contraband, including conducting regular inspections of cells and common areas of the housing units to identify and prevent rule violations by inmates. | | x | |
| 32.g. (55) | CCDOC shall review, and revise as applicable, all General Orders ("GOs"), Standard Operating Procedures ("SOPs"), and Post Orders on an annual basis, or more frequently as needed. | | x | |
| 32.h. (56) | CCDOC shall revise policies, SOPs, and post orders for all armed posts to include proper use and safe handling of weapons and provide specific instructions on use of deadly force and when and under what circumstances such force should be used, in accordance with generally accepted correctional standards. | | x | |
| 32.i. (57) | CCDOC shall standardize security policies, procedures, staffing reports, and post analysis reports across the divisions, to the extent possible, taking into account the different security levels and different physical layouts in the various divisions. | | x | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| 32.j. (58) | CCDOC shall provide formal training on division-specific SOPs to correctional officers in accordance with their assignments, and shall provide further specialized training for officers assigned to Special Management Units. Cermak Hospital shall provide Specialized training for officers assigned to psychiatric units. Coordinate with Drs. Shansky and Metzner. See also 44.f., 44.g., 44.h., 46.b., 46.e.,68. | | x | |
| 32.k. (60) | CCDOC shall maintain in working order all monitoring equipment at the Facility that is under CCDOC's direct control, including cameras, alarms, radios (hand held), interior and exterior lighting, x-ray and other screening equipment, and walk-through metal detectors. To the extent that the maintenance of any Facility monitoring equipment is under the control of DFM, CCDOC shall promptly report any maintenance needs and DFM shall prioritize its services to ensure that all monitoring equipment is maintained in working order. Coordinate with Grenawitzke | | x | |
| 32.l. (61) | Absent exigent circumstances, CCDOC: (i) shall house each inmate assigned to a division that is celled to one permanent bed in a cell and shall not house any inmates (including those assigned to dormitory divisions) such that they are sleeping on the floor, on a mattress on the floor, or in any area not designed or redesigned as sleeping quarters; (ii) shall not house more than two inmates to a single cell (triple-bunking); and (iii) shall not hot-bunk any inmates. | | | NA at this time |
| 32.m. (62) | When exigent circumstances give rise to triple-bunking, CCDOC shall provide the third inmate in the triple-bunked cell a "boat," stackable bunk, moveable platform, or cot, so that the inmate is not required to lay down directly on the cell floor or on a mattress on the floor. | | | NA at this time |
| **33.** | **Security Staffing.** **The parties agree that correctional officer staffing and supervision levels at the Facility must be appropriate to adequately supervise inmates, to carry out the requirements of this Agreed Order, and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards. Cook County and CCDOC shall take such actions as shall ensure that correctional officer staffing and supervision at the Facility are sufficient to achieve these purposes. These actions shall include the following:** | | | |
| 33.a. (63) | In the fiscal year 2010 budget, Cook County shall allocate funds sufficient to allow for 210 additional correctional officer positions at the Facility. Consistent with provision 33.c, such funding may occur on a rolling basis, as appropriate in light of the time required to hire, train, and put on duty the additional 210 new correctional officers. | X | | |
| 33.b. (64) | CCDOC shall use its best efforts (through the maintenance of the written staffing plan required by provision 33.h and otherwise) to ensure that the number of correctional officer vacancies is kept to the minimum practicable number at all times, taking into account that the timing of terminations and | | x | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | resignations and the resulting rate of attrition may, in ordinary course, result in there being some vacancies at any given time. | | | |
| 33.c.i.ii (69) | CCDOC shall fill the 210 additional correctional officer slots provided for in provision 33.a; fill the 285 correctional officer vacancies that existed at the Facility as of July 17, 2009; and fill any correctional officer vacancies coming into existence after that date in the following manner: i. By December 31, 2010, CCDOC shall hire, train, and put on duty at the Facility at least 448 [381] newly qualified correctional officers (in addition to those on duty as of December 31, 2009). ii. By March 30, 2011, CCDOC shall hire, train, and put on duty at the Facility at least 174 [107] newly qualified correctional officers (in addition to those on duty as of December 31, 2010). | | | x |
| 33.d. (71) | The parties agree that for 30 months following the effective date of this Agreed Order, Cook County and CCDOC shall not be required to provide additional correctional officer staffing and supervision at the Facility beyond that which is necessary to ensure that correctional officer staffing and supervision are sufficient to achieve the purposes set out in the introductory paragraph of provision 33 and to comply with provisions 33.a-c above. | | | NA at this time |
| 33.e. (72) | Within 30 months of the effective date of this Agreed Order, the CCDOC Monitor shall assess and make a recommendation on whether the correctional officer staffing and supervision levels are appropriate to adequately supervise inmates at the Facility, in accordance with generally accepted correctional standards. If the CCDOC Monitor determines that staffing is inadequate, the CCDOC Monitor will make a recommendation regarding the appropriate number of correctional officer staff. If the parties do not accept the CCDOC Monitor's staffing recommendation, CCDOC and Cook County shall agree to an independent, comprehensive study to determine the appropriate correctional officer staffing and supervision. The parties agree that the results of this staffing study shall provide guidance as to the sufficient number of qualified correctional officers necessary to operate the Facility safely and to carry out the requirements of this Agreed Order. | | | NA at this time |
| 33.f. (73) | If the staffing study requires additional correctional officers, Cook County shall allocate funds sufficient to maintain correctional officer staffing levels necessary to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards. | | | NA at this time |
| 33.g. (74) | If the staffing study requires additional correctional officers, and consistent with Cook County's allocation of funds for security staffing, CCDOC shall hire and train sufficient number of qualified correctional officers and other staff to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards, including: | | | NA at this time |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | 1. Investigative staffing sufficient to meet the internal investigation responsibilities outlined in this Agreed Order;<br>2. Correctional officer staffing sufficient to provide inmates requiring treatment with adequate access to appropriate medical and mental health care by providing timely movement of inmates to medical units, transport of inmates who have been referred for outside specialty care, and escort, if necessary, to Qualified Medical and Mental Health Staff on housing units; and  [Coordinate with Shansky, Metzner]<br>3. Qualified staff sufficient to monitor security cameras in real time and allow for supervisory viewing and retrieving at any time. | | | |
| 33.h. (76) | CCDOC shall maintain a written staffing plan that requires sufficient staffing to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards. | | | x |
| 33.i. (77) | Absent exigent circumstances, CCDOC shall maintain a practice that does not allow for scheduled, planned, or expected cross-watching (a CCDOC practice of allowing one correctional officer to simultaneously supervise two housing units from the control center of one of the units) at any time on all maximum security and Special Management Units, and during first and second shifts throughout the Facility. | | | NA at this time |
| 33.j. (78) | CCDOC may permit cross-watching on third shift in housing units that are not maximum security or Special Management Units only if the Monitor does not object after consultation and review.  The Monitor's review of the appropriateness of third-shift cross-watching on a particular housing unit shall be guided by the sufficiency of sightlines between the units being cross-watched, the adequacy of video and/or audio technologies in place, and/or other factors that bear on the safety and security of inmates and staff.  If the Monitor later objects to any cross-watching that is in effect because of the Monitor's concerns that cross-watching on a particular housing unit presents an undue risk to the safety and security of inmates and staff, CCDOC shall immediately cease such cross-watching.  CCDOC may renew cross-watching on that unit again if, after further consultation with and review by the Monitor, the Monitor does not object to such renewal.  Although cross-watching is permitted under the limited circumstances described herein, CCDOC will work to eliminate the practice at the Facility. | | | NA at this time |
| **34.** | **Incidents and Referrals** | | | |
| 34. a. (79) | CCDOC shall continue to ensure that staff adequately and promptly document all reportable incidents, including inmate fights, rule violations, inmate injuries, suicides and suicide attempts, cell extractions, medical emergencies, contraband, vandalism, escapes and escape attempts, fires, and | | x | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | other incidents causing a disruption to standard CCDOC practice, in accordance with generally accepted correctional standards. | | | |
| 34.b. (80) | CCDOC shall continue to ensure that correctional officers receive formal pre-service and in-service training on proper incident reporting policies and procedures, in accordance with generally accepted correctional standards. | | x | |
| 34.c. (81) | CCDOC shall maintain a system to track all reportable incidents (as described in provision 34.a) that, at a minimum, includes the following information: 1. incident tracking number; 2. the inmate(s) name; 3. housing assignment; 4. date; 5. type of incident; 6. injuries (if applicable); 7. medical care (if applicable); 8. primary and secondary staff involved; 9. reviewing supervisor; 10. external reviews and results (if applicable); 11. remedy taken (if appropriate); and 12. administrative sign-off. | | x | |
| 34.d. (82) | CCDOC shall require prompt administrative review of incident reports. Such reviews shall include a case-by-case review of individual incidents as well as a systemic review in order to identify patterns of incidents. CCDOC shall incorporate such information into quality management practices and take necessary corrective action. | | x | |
| 34.e. (84) | CCDOC shall ensure that incident reports, use of force reports and inmate grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria, that it is referred for investigation. | | x | |
| 34.f. (85) | CCDOC shall maintain policies, procedures and practices requiring investigations to resolve issues identified during review of incident reports, disciplinary hearings, or inmate grievances, and determine appropriate remedies, in accordance with generally accepted correctional standards. At a minimum, CCDOC shall require timely and appropriate investigations of all suicides, serious suicide attempts, inmate-on-inmate violence resulting in serious injury, inmate-on-staff violence, inmate injuries requiring treatment by an outside hospital, inmate injuries of a suspicious nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.), sexual misconduct between inmates, sexual misconduct involving staff, fires, escapes, escape attempts, and deaths. | | x | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| 34.g. (87) | CCDOC shall ensure that any investigation reports indicating possible criminal behavior will be referred to the appropriate law enforcement authority. | | x | |
| 35. | **Investigations:** **Investigations at the Facility are conducted by independent departments under the Cook County Sheriff's Office, including the Office of Professional Review, the Criminal Investigations Unit, and the Sheriff's Police Department. The Cook County Sheriff will assume responsibility for requiring these investigatory units to comply with the relevant provisions of this Agreed Order.** | | | |
| 35.a. (88) | CCDOC [OPR] shall maintain comprehensive policies, procedures, and practices for the timely and thorough investigation of alleged staff misconduct, in accordance with generally accepted correctional standards. | | x | |
| 35.b. (90) | Internal investigations [OPR] shall be conducted by persons who do not have supervisory responsibility for the staff member(s) being investigated. | | x | |
| 35.c. (92) | CCDOC [OPR] shall ensure that all internal investigations will include timely, thorough, and documented interviews of all relevant staff and inmates who were involved in, or witnessed, the incident in question. | x | | |
| 35.d. (93) | CCDOC [OPR] shall ensure that internal investigation reports shall include all supporting evidence, including witness and participant statements, policies and procedures relevant to the incident, physical evidence, video or audio recordings, and relevant logs. | x | | |
| 35.e. (94) | CCDOC [OPR] shall ensure that all investigatory staff will receive pre-service and in-service training on appropriate investigations policies and procedures, the investigations tracking process, investigatory interviewing techniques, and confidentiality requirements. | | x | |
| 35.f. (95) | CCDOC [OPR] shall provide all investigators who will be assigned to conduct investigations of use of force incidents with specialized training in investigating use of force incidents and allegations. | | x | |
| 35.g. (96) | CCDOC [OPR] shall ensure that the results of each internal investigation shall be documented in an investigation report. CCDOC administration shall review the investigation reports, along with the underlying documentation, and take appropriate action. CCDOC shall implement appropriate remedies based upon the results of internal investigations. | | x | |
| 36. | **Inmate Disciplinary Process** | | | |
| 36.a. (97) | CCDOC shall maintain policies, procedures, and practices for a formal disciplinary process, including prompt issuance of written disciplinary citations, administrative review and disciplinary reports for alleged minor rule violations, and due process for alleged major rules violations, in accordance with | | x | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | generally accepted correctional standards. | | | |
| 36.b. (98) | CCDOC shall ensure that inmate disciplinary hearings are conducted in a reasonably private and secure setting. | | x | |
| 36.c. (99) | CCDOC shall ensure that all inmates placed in lock down status are provided with appropriate due process that has been developed and implemented in policies and procedures, in accordance with generally accepted correctional standards.<br><br>In an emergency, the Executive Director of CCDOC may order a lock down of entire areas of the Facility in order to control the situation and address serious security concerns. In such circumstances, it is not necessary to provide disciplinary hearings to each inmate affected by the lock down. However, lock downs of this nature shall be limited to only the time and scope necessary to address the emergency.<br><br>For the purposes of this Agreed Order, a "lock down" shall not include the routine instances in which inmates are confined to their cells, including periods of count, over night, shift change, movement, and routine contraband sweeps. | | x | |
| 36.d. (100) | CCDOC shall ensure that the disciplinary board's written record accurately reflects the testimony and discussion from the disciplinary hearing, including any recommendations from a mental health professional regarding the extent to which disciplinary charges are related to an inmate's serious mental illness or suggestions for minimizing the deleterious effect of disciplinary measure on the mental health status of the inmate. * Coordinate with Dr. Metzner | | | x |
| 36.e. (101) | CCDOC shall alert Cermak when inmates are placed in disciplinary segregation or protective custody. * Coordinate with Dr. Shansky | | x | |
| 36.f. (102) | CCDOC shall permit a Cermak Qualified Mental Health Staff member to serve on the disciplinary board.<br>* Coordinate with Dr. Metzner | | | x |
| 37. | Classification | | | |
| 37.a. (104) | CCDOC shall maintain policies and procedures for an appropriate, objective classification system that separates inmates in housing units by classification levels in order to protect inmates from unreasonable risk of harm. The system shall include consideration of an inmate's security level, severity of current charge, types of prior commitments, suicide risk, history of escape attempts, history of violence, and special needs. CCDOC shall use best efforts to anticipate periods of unusual intake volume and schedule sufficient classification staff to timely classify inmates. | | x | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|:---:|:---:|:---:|
| 37.b. (109) | CCDOC shall ensure that classification staff have sufficient access to current information regarding cell availability on each division. | | x | |
| 37.c. (110) | CCDOC shall include information on each inmate's assignment to the Special Incarceration Unit "level system" at the Facility in the new Jail Management System, starting with the date the new Jail Management System becomes operational. | x | | |
| 37.d. (111) | CCDOC shall provide training and access to all correctional officer supervisors on the full capabilities of the new Jail Management System's classification and inmate tracking system (or any replacement system). | | x | |
| 37.e. (112) | CCDOC shall provide ongoing internal and external review and validation of the inmate classification system to ensure its reliability and objectivity. | | | x |
| **38.** | **Inmate Grievance Procedure** | | | |
| 38.a. (113) | CCDOC shall maintain policies and procedures to ensure inmates have access to an adequate grievance process and to ensure that grievances may be accessed and filed confidentially, without requiring the intervention of a correctional officer, in accordance with generally accepted correctional standards.  These policies and procedures should be applicable and standardized across all the Facility divisions. | | x | |
| 38.b. (115) | CCDOC shall ensure that the grievances receive appropriate follow-up, including informing the grievant of the outcome, providing a timely written response, and tracking implementation of resolutions. | | x | |
| 38.c. (116) | CCDOC shall ensure that grievance forms are available on all units and are available in Spanish.  CCDOC shall ensure that there is adequate opportunity for illiterate inmates and inmates who have physical or cognitive disabilities to access the grievance system. | | x | |
| 38.d. (117) | CCDOC shall ensure that inmate grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria, are referred for investigation.  A member of the management staff shall review the grievance tracking system regularly in order to identify areas of concern. | | | x |
| **39.** | **Access to Information** | | | |
| 39.a. (118) | CCDOC shall ensure that newly admitted inmates receive information, through an inmate handbook or orientation video, regarding the following areas:  facility rules and regulations; how to report misconduct; how to report sexual abuse or assault; the process for accessing medical and mental health care; emergency procedures; rules for sending and receiving mail; the visitation process; facility schedule; the disciplinary process; and how to seek redress of grievances. | | x | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| 39.b. (120) | CCDOC shall ensure that materials on facility rules and services are available for non-literate and non-English speaking inmates. | | x | |
| 40. (121) | CCDOC shall provide training and supervision to all correctional officers and supervisors sufficient to implement the provisions of this Agreed Order. | | x | |
| 41. (122) | Inter-Agency Agreement<br><br>a.  CCDOC shall enter into a written Inter-Agency Agreement with Cermak that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility.  The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order.<br><br>b.  Cermak shall enter into a written Inter-Agency Agreement with CCDOC that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility.  The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order. | | | x |
| 69. (123) | CCDOC shall ensure that security staff posts will be equipped, as appropriate, with readily available, safely secured, suicide cut-down tools. *Coordinate with Dr. Metzner | | | x |

**DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010**

**PROVISION**

31. Use of Force

a.  CCDOC shall maintain comprehensive and contemporary policies and procedures, in accordance with generally accepted correctional standards, surrounding the use of force and with particular emphasis regarding permissible and impermissible uses of force.

**Compliance Status**:  Partial Compliance

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

Draft policy/procedure prepared and in final stages of review to guide CCSO office-wide operations.  Any necessary changes/refinement to CCDOC policies will begin when office-wide policy effective.  Revised draft policies regarding batons, OC spray, and conducted energy device (CED) (AKA "Taser") are also being finalized.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

Draft policies and procedures are nearing completion.  I have reviewed and provided comments/recommendations on the four drafts noted above.

**Monitor's Recommendations:**

Continue work to finalize policies.  Revise related/corresponding CCDOC's directives as appropriate.

**DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010**

**PROVISION**

31. Use of Force

b.      CCDOC shall maintain use of force policies and pre-service and in-service training programs for correctional officers and supervisors that address the following impermissible uses of force:

1.      use of force as a response to verbal insults or inmate threats where there is no immediate threat to the safety of the institution, inmates, or staff;
2.      use of force as a response to inmates' failure to follow instructions where there is no immediate threat to the safety of the institution, inmates, or staff, unless CCDOC has attempted a hierarchy of nonphysical alternatives that are documented;
3.      use of force as punishment or retaliation;
4.      use of force involving striking, hitting, or punching a restrained and  non-combative inmate;
5.      use of force against an inmate after the inmate has ceased to offer resistance and is under control;
6.      use of choke holds on an inmate, unless lethal force is justified; and
7.      use of inappropriate or excessive force.

**Compliance Status**:      Partial compliance

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

Training lesson plans need updating when revised CCSO office-wide use of force policy completed (and related policies, see 31.a); inclusion of instructional input (e.g. exactly what is instructed) is needed. Although policy is not yet finalized, defendants making efforts to ensure compliance with this section of the order.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

Training Institute personnel are updating lesson plans to revise training based on updated policies and procedures.

**Monitor's Recommendations:**

Continue work to finalize policies and revise lesson plans.  Provide lesson plans for my review before finalizing.

## DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

**PROVISION**

31. Use of Force

c.      CCDOC shall maintain a policy to ensure that staff adequately and promptly report all uses of force, in accordance with generally accepted correctional standards.

**Compliance Status**:      Partial compliance.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

Defendants are revising CCSO-wide use of force policies. Although policy is not yet finalized, defendants are making efforts to ensure compliance with this section of the order. The CCDOC corresponding general order on use of force must be updated after this agency-wide policy is finalized.

Data provided by CCDOC:

|  | **2008** | **2009** | **2010 (YTD Through 5/31/10)/(Annualized)** |
|---|---|---|---|
| Serious Incidents | 711 | 1,141 | 707 (1,697) |
| Fights | 1,382 | 1,317 | 534 (1,282) |
| Use of Force | 376 | 464 | 184 (442) |
| Response to Resistance | 240 | 202 | 78 (187) |

Data provided by OPR was provided in three reports; Open OPR Federal Lawsuit Allegations – some of which are use of force; Investigative Branch Monthly Case Statistics; and Open OPR Excessive Force Allegations.  The Federal Lawsuit Allegation list points to the issue of CCSO only becoming aware of some allegations of use of force when a lawsuit is filed.  Reviewing these reports points to a need to ensure that there is a database capable (and designated by policy) of reconciling CCDOC and OPR reports in some consolidated format (as well as the lawsuit report, inmate grievances and inmate disciplinary actions). Draft use of force policy requires the immediate notification of on-and-off duty officer involves uses of force (IX. A.1.c.d.)

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

See 31.a., above.

There are provisions in the draft use of force policy requiring notification by officers when force is used. The concern I have extends to how the data is captured, reported, and analyzed, particularly in the jail setting.

In order to ensure that all uses of force are reported and acted upon in accordance with policy, there needs to be a means of capturing and verifying the data regarding reports made to the superintendents and reports reaching OPR. [See above: numbers of CCDOC do not correspond to the data in IAPro at this time.] As not all uses of forces are categorized as "excessive" [those that will be investigated by ORP] there needs to be a database and leadership oversight to ensure all uses of force accounted for. At this time, OPR records in the IAPRO database all use of force reports that reach them, even those not categorized as excessive [thus triggering an investigation.] During the tour of the week of August 16th, in inmate interviews (female, mental health unit) the inmates reported 4 allegations of use of force. To date, one has been identified (Inmate TS). Recognizing the mental health concerns for the population, it is possible that there is a credibility issue.

It appears that the agency is committed to assuring accountability, but the logistics and definitions needs to be addressed, along with leadership oversight to ensure all data is accounted for.

**Monitor's Recommendations:**

See 31.a., above.

As discussed on August 17th, OPR and CCDOC are finalizing policy to ensure that all uses of force are recorded, tracked, and analyzed. Missing reports will be less likely to escape identification, and trend data can be maintained and reviewed.

See also recommendations in 34.e., 38.b., regarding capturing and documenting information from incident reports, inmate grievance reports, and inmate disciplinary reports. See also 31.q. regarding oral reports from inmates. These should be addressed in the same policy directive(s), general orders. Tracking the sources of the information would be helpful to documenting compliance with this provision.

DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

**PROVISION**

31. Use of Force

d.    CCDOC shall require that use of force reports:

1.    Be written in specific terms in order to capture the details of the incident;
2.    Contain an accurate account of the events leading to the use of force incident;
3.    Include a description of the instrument(s) of restraint or control, if any, and the manner in which it was used;
4.    Note whether an inmate disciplinary report was completed in connection with the incident that prompted the use of force;
5.    Describe the nature and extent of apparent and reported injuries sustained both by the inmate and staff member;
6.    Contain the date and time medical attention was actually provided;
7.    Describe, in detailed, factual terms, the type and amount of force used as well as the precise actions taken in a particular incident; and
8.    Note whether a use of force was videotaped.  If the use of force is not videotaped, the reporting correctional officer and supervisor will provide an explanation as to why it was not videotaped.

**Compliance Status**:        Partial compliance.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

CCSO's draft use of force policy, IX., b., 4 a – h specifically includes the elements noted above.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

As soon as this policy is implemented, the defendants will be in compliance with this provision.  Follow-up review of the incident reports will be secondary proof of compliance.

**Monitor's Recommendations:**

None at this time.

**DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010**

**PROVISION**

31. Use of Force

e.      CCDOC shall continue to require prompt review by the shift commander of all use of force reports.  The shift commander's review of use of force reports shall include review for completeness and procedural errors, as well as review of the substantive content.  If the use of force report does not comply with provision 31.d. of this Agreed Order, the shift commander shall return it to the reporting officer for revision and resubmission until it is compliant.  If the shift commander believes a use of force may have been inappropriate or excessive, he or she shall immediately refer the incident for investigation.

**Compliance Status**:       Partial compliance

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

See 31.a., above. Although policy is not yet finalized, defendants are making efforts to ensure compliance with this section of the order, pending completion of final policy. The CCDOC corresponding general order on use of force must be updated/eliminated after this agency-wide policy is finalized.

Section IX. B., 4 of the draft use of force office-wide directive  states, in part "If the Response to Resistance/Use of Force Forms does not comply with the provisions of this order the supervisor shall return it to the reporting officer for revision and resubmission until it is compliant. If the supervisor believes a use of force may have been inappropriate or excessive, he shall immediately refer the incident to the watch commander."  The draft enumerates eight minimum requirements for the use of force report.

I could not locate a CCDOC general order on the specific title of ***report writing*** in the table of contents.  I reviewed the Training Institute's course syllabus entitled "The Fundamentals of Report Writing" dated January 2010, but the lesson plan did not reference a CCSO or CCDOC policy/procedure/directive on which the lesson plan was based. This was a pre-service lesson plan so it did not address supervisory responsibilities as described in this provision.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

The specific provisions are addressed in the use of force report draft.  It would be helpful to have these same conditions apply to all incident reports, and be contained in a CCDOC or CCSO directive entitled "report writing".  As incident reports other than those titled "use of force" may have information related to

allegations of use of force contained in them, the same requirement regarding the accuracy of reports is necessary.

**Monitor's Recommendations:**

Complete the office-wide use of for policy (and related policies, see 31.a.). Consider developing (or updating if such a directive exists) a written directive entitled "report writing". Ensure that all lesson plans at the Training Institute cite the relevant CCSO or CCDOC policies/directives. Ensure that IMACS input and directions are consistent with the provision (Chapter 12). The CCDOC corresponding general order on use of force must be updated/eliminated after this agency-wide policy is finalized.

**DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010**

**PROVISION**

31. Use of Force

f.        CCDOC shall ensure that senior management review of uses of force includes:

1.        A timely review of medical documentation of inmate injuries, if any is submitted, as provided by Qualified Medical Staff, including documentation surrounding the initial medical encounter, an anatomical drawing that depicts the areas of sustained injury, and information regarding any further medical care; coordinate with Dr. Shansky

2.        The inmate disciplinary report, if any, associated with the use of force; and

3.        The incident report, if any, associated with the use of force.

**Compliance Status**:        Partial compliance

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

Use of force investigations are reviewed by the CCDOC senior management via the command channel reviews initiated by OPR. The incident report would be part of the investigative file.

Per Dr. Hart, there is a draft policy under discussion by which Cermak will provide relevant medical encounter information to OPR including redacting information not directly pertinent to the alleged use of force.  Should OPR wish to see the entire medical file, there are means in place to do that.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

Awaiting finalization of policy; additional assessment after policy implemented. The review of the associated inmate disciplinary report, is undefined in policy.

**Monitor's Recommendations:**

Continue with finalizing and implementing policies.   Convene an inter-disciplinary committee to address these specific policy/operational issues needing coordination between Cermak and OPR/CCDOC if any arise out of the policy currently under development.  OPR may need to update/rewrite the relevant section(s) of the OPR standard operating procedures so that this matter can be resolved via written policy.  Ensure that policy is revised to ensure that any inmate disciplinary report is evaluated when associated with a use of force allegation.  See also 34.f.

## DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

**PROVISION**

31. Use of Force

g.      CCDOC shall establish criteria that trigger referral for inappropriate or excessive use of force investigations, including but not limited to, documented or known injuries that are extensive or serious; injuries involving fractures or head trauma; injuries of a suspicious nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.); and injuries that require treatment at outside hospitals.

**Compliance Status**:        Non-compliance.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

The Office of Professional Responsibility (OPR) is empowered to investigate allegations of excessive force, and other allegations of staff misconduct.   I was unable to locate in the draft use of force policy, in CCDOC written directives, or in OPR's SOPs any criteria that trigger investigations.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

CCSO is very sensitive and responsive to use of force allegations.  I am unaware of any criteria in policy (and thus in training) that address these provisions.  It is necessary to coordinate the provisions of this paragraph with Cermak – so they may provide direction to their first responders and treating staff.  Cermak must also be able to convey this information to the treating/admitting hospital.  While developing these "triggers" Cermak and treating hospitals should also pay attention to signs and symptoms of sexual abuse/assault.

**Monitor's Recommendations:**

Develop criteria to guide both internal CCDOC/Cermak referrals as well as OPR investigations.  Ensure that treating hospitals are aware of criteria.  Considering including in the criteria the signs and symptoms of sexual abuse/assault.

DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

**PROVISION**

31. Use of Force

h.      When CCDOC review of use of force reports, and supporting records if applicable, reveals that reports of a use of force are materially inconsistent, conflicting, or suspicious, CCDOC shall refer that use of force incident for internal investigation.

**Compliance Status**:        Partial compliance.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

Draft use of force policy, section V. Definitions, W. Sheriff's Office Supervisory Review – "A review of all reports pertaining to a Response to Resistance/Use of Force Report along with the underlying documentation.  The form ensures proper review of the incident by the chain of command and that department policy is followed or any inconsistencies with this policy is documented and reported to the Office of Professional Review.  All Response to Resistance/Use of Force Supervisory Review required four levels; e.g., immediate supervisor, watch commander, exempt member and department head. "

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

The policy will be in place when the draft order is issued.

**Monitor's Recommendations:**

It would be beneficial to code and track investigations that result from employees who submit reports which are materially inconsistent, conflicting, or suspicious.  This information could be used to refine policy, training and supervision.

**DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010**

<u>PROVISION</u>

31. Use of Force

i.      CCDOC shall develop and implement a system to track all incidents of use of force that, at a minimum, includes the following information:

1.      a tracking number;
2.      the inmate(s) name;
3.      housing assignment;
4.      date;
5.      type of incident;
6.      injuries (if applicable);
7.      medical care provided (if applicable);
8.      staff involved;
9.      reviewing supervisor;
10.     external reviews and results (if applicable);
11.     remedy taken (if appropriate); and
12.     administrative sign-off.

**Compliance Status**:      Partial compliance

**Status Update:** Briefly describe the actions taken by the Defendants to address the provision:

OPR  has an electronic database (IAPro) that can track all employee misconduct reporting including use of force.  This system can manipulate the data to produce management report.  OPR SOP 102.5. F. requires all use of force incidents to be entered into the IAPro database and tracked for early warning and intervention purposes.  CCDOC's IMACS incident reporting module will be implemented by the end of the year.

See also status, assessment and recommendation in 31.c., regarding a unified database tracking all uses of force.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

The IAPro system was viewed but I did not determine if all 12 of the elements noted above are recorded for each use of force incident.   See also 31.c  The IMACS incident reporting system needs to be guided by policy regarding use of force incident reporting by employees.  How those reach OPR and which entity is responsible for the singe database regarding use of force reports/excessive use of force allegations.  There needs to also be agreement on what

administrative sign-off is necessary, CCDOC Executive Director, OPR Director, or both.

**Monitor's Recommendations:**

Finalize and complete use of force policy.  See also 31.c.  Determine via policy the single database for use of force reports/allegations of excessive use of force. Ensure that either the IAPRO database or IMACS database tracks the data elements noted in this provision.

## DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

**PROVISION**

31. Use of Force

j.        CCDOC shall ensure that, promptly following a use of force incident, video or photographs are taken of any and all reported or apparent injuries sustained by inmates and staff.  The video or photographs will be maintained and will be included in the investigation package, if applicable.  Coordinate with Dr. Shansky.

**Compliance Status**:        Partial compliance

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

Draft use of force policy requires that when a supervisor arrives at the scene of a use of force, he/she will ensure that photographing and video recording takes place of all subject(s) and officer(s) involved, regardless if injured.  (IX.B.2.h.)

See also 31.f.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

See 31.f.

I believe the intent exists for the CCDOC to photograph or digitally record the aftermaths of use of force incidents, but unless it is a planned use of force, employees may not have ready access to the equipment needed.

**Monitor's Recommendations:**

See 31. f.

CCDOC should consider a general order/directive that directs jail supervisory personnel to the location of equipment that can be used to photograph and/or digitally record the aftermath of uses of force (outside of a planned use of force incident).  The CCDOC may wish to purchase and locate inexpensive cameras in the watch commander/shift supervisors' offices for such purposes, as well as provide internal controls to ensure the equipment is in working order at all times.

**DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010**

**PROVISION**

31. Use of Force

k.      CCDOC shall establish an "early warning system" that will document and track correctional officers who are involved in use of force incidents and any complaints related to the inappropriate or excessive use of force, in order to alert CCDOC administration to any potential need for retraining, discipline, problematic policies, or supervision lapses.  Appropriate CCDOC leadership, supervisors, and investigative staff shall have access to this information and monitor the occurrences.  CCDOC senior management shall use information from the early warning system to improve quality management practices, identify patterns and trends, and take necessary corrective action both on an individual and systemic level.

**Compliance Status**:      Partial compliance

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

OPR's database tracks uses of force by employee for the purposes of early warning (OPR SOP 102.5. F.).  Partial compliance noted until use of force policy finalized and policies regarding the early warning system finalized.  The draft revision to the use of force policy assigns the responsibility for maintaining the early warning system to OPR [IX. E. 5.h.]. There is no policy regarding the early warning system or employee remediation.

The Sheriff's weekly accountability meeting provides one means for improve quality management practices, identify patterns, etc.  This process is not now guided by policy.

OPR SOP 103.14, Procedural Reform Recommendations, requires that investigators and unit directors review each completed OPR investigation to assess if there are systemic weaknesses identified.  If any such elements are identified, they are transmitted to the Executive Director.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

IAPro database capable of tracking employees' uses of force [see 31.c. for single point of data regarding uses of force, including those not categorized as "excessive"].  Early warning system specifications remain under development.  Criteria for when counseling and/or remediation are triggered and how remediation accomplished are under development.

There will need to be coordination between OPR and CCDOC to exchange this information as well as set up a system to track the outcomes of counseling/remediation. There is concern that the union may see counseling/remediation as discipline, so negotiations may be needed. The form of the remediation – whether re-training, counseling, etc. has yet to be determined. If re-training is an option, lesson plans and measures of knowledge gained will also need to be developed.

See also 31.c. about concerns of having a single database to contain all relevant information.

The CCSO and/or CCDOC need to establish policy regarding the quality management strategies – see 31.n.

**Monitor's Recommendations:**

Policy is required to guide the early warning system and employee remediation as a result of any intervention. Continue development of early warning system; develop criteria to guide when interventions are needed, develop database to track the employees for whom intervention is provided, view outcomes of interventions. If re-training is a remediation/intervention option, develop lesson plans, measures of knowledge gained, etc. Work with the unions as necessary over the matter of whether intervention/remediation is counseling or discipline.

See also 31.n.

DATE OF STATUS UPDATE: SEPTEMBER 20, 2010

**PROVISION**

31. Use of Force

I.      CCDOC shall ensure that a supervisor is present during all pre-planned uses of force, such as cell extractions.

**Compliance Status**:      Partial compliance

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

Draft use of force procedures (VII. M.) provides that a supervisor will be assigned and respond to a planned use of force incident.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

Review of incident and investigative reports when policy is completed will determine substantial compliance.

I reviewed two videos of planned cell extractions.  My opinion regarding those two cell extractions is that they were carried out professionally, and demonstrated appropriate use of force.  I did, however, make recommendations and provided a resource of another agency's planned use of force recording policy.

**Monitor's Recommendations:**

I recommended to CCDOC changes to the policy governing planned cell extractions including:  having all extraction team members' and supervising officials, introduce themselves (seeing faces) - recorded on the digital video in their own voices, including their assignments once the cell is entered (e.g. Office Smith, right arm; Officer Jones, left arm); train /orient the camera operator to move in closer to record the event more thoroughly; as resources permit, have medical personnel standing by, and introduced on the video;  record any negotiation with the inmate(s) prior to cell extractions with officers, mental health workers, medical workers, and/or CRWs; to the extent possible, when the inmate is secured, allow the inmate to walk under his/her own power out of the housing area;  assign the supervising officer the responsibility of talking to the inmate as he/she is moved so that the recording demonstrates the inmates' ability to talk, breathe, and exhibits medical or no medical distress;  if OC or CED is used, ensure that medical personnel are standing by and consider showing the decontamination of the inmate from OC; and continue to recording until the medical evaluation begins.   CCDOC should consider physically attaching a

small instruction laminated card to the camera to assist those who may not be familiar with operation. CCDOC should ensure that the superintendent of the facility promptly review the recording (not delaying transmission to OPR) to ensure that the mechanical/logistics/quality control/policy requirements of the procedures are assessed, and any remedial action(s) taken immediately (e.g. instruction to camera user, introduction of team members). The superintendent should be required by policy to provide a memorandum to the Executive Director which includes the superintendent's assessment of the mechanics/policy compliance with the planned use for force; not their assessment of the appropriateness of the use of force.

Complete and implement use of force policy. Refine procedures for use of video in the CCDOC written directive governing planned uses of force and use of video.

## DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

**PROVISION**

31. Use of Force

m.     Where there is evidence of staff misconduct related to inappropriate or unnecessary use of force against inmates, CCDOC shall initiate personnel actions and seek disciplinary action appropriately for any correctional officer found to have:

1.     engaged in inappropriate or excessive use of force;
2.     failed to report or report accurately the use of force;
3.     retaliated against an inmate or other staff member for reporting an inappropriate or excessive use of force; or
4.     interfered or failed to cooperate with an internal investigation regarding use of force in a manner inconsistent with the staff member's statutory or contractual rights.

**Compliance Status**:       Partial compliance.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

OPR SOP 102.5 F. (6) outlines the procedures for referral/recommendation of disciplinary actions as a result of completed investigations.   The CCSO policy directives for the provisions noted above 1. and 2. are:  draft use of force directive V. G. H., V. L.  Draft use of force policy, section IX, D.4.c.d provides that: "Where there is evidence of staff misconduct related to inappropriate or unnecessary use of force against subjects, Sheriff's Office department exempt members in coordination with OPR may initiate personnel actions, e.g., reassignment under investigation, temporary transfer and/or disciplinary action by notifying and consulting with OPR. In addition a separate To/From Memorandum must be submitted to the Executive Director of OPR for any officer found to have: . . . c.     *retaliated against a subject or other staff member for reporting the use of inappropriate or excessive force; or d. interfered or failed to cooperate with an internal investigation regarding use of force in a manner inconsistent with the staff member's statutory or contractual rights.*"

Also see 35.a.   Data provided by CCDOC (Duran Term/With Cause) show that of from 2005 – through 2009 58 CCDOC employees were terminated, two for excessive force.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

The draft policy is responsive to these issues.

Regarding disciplinary actions and terminations, the Sheriff is paying particular attention to the Merit Board's deliberations/actions regarding discipline in use of force cases, hoping to educate the Merit Board to the seriousness of excessive force, and correspondingly documenting that employees are subject to discipline for the above enumerated actions. The Merit Board process can take up to a year, depending on the case's complexity, plus any appeals by the employee or the Sheriff to the courts. Data describing these outcomes for serious allegations can be tracked in IAPro.

**Monitor's Recommendations:**

Complete use of force directive.

**DATE OF STATUS UPDATE: SEPTEMBER 20, 2010**

**PROVISION**

31. Use of Force

n.      Where there is evidence of staff misconduct related to inappropriate or unnecessary use of force against inmates, CCDOC shall consider, develop, and initiate systemic remedies as appropriate.

**Compliance Status**:      Partial compliance.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

The draft use of force policy, provides in part: IX, E. 5.h, "The CCSO shall use information from the early warning system to improve quality management practices, identify patterns and trends, and take necessary corrective action both on an individual and systematic level."  The Sheriff's weekly accountability meetings also serve this purpose, but these meetings are not guided by written policy at this time.

The draft use of force policy requires that in Section XI. C. 6.  The Training Division's Executive Director to establish a committee that will review quarterly all uses of force and provide recommendations based on the evaluations, results, and outcomes to update policy, procedures or training.

See also 31.k.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

The language in the draft use of force policy is adequate to meet the provisions, above, but the CCSO/CCDOC should prepare directives/guidance that describes how this will, practically, occur, along with how this is documented (e.g., Sheriff's weekly accountability meeting, memos, changes in written directives, training updates).  The Sheriff's accountability meetings are an excellent forum for surfacing issues, but as the meetings mature, it may be helpful to have a brief written directive to guide the meetings, set expectations, and define how information is used in the furtherance of this provision.

**Monitor's Recommendations:**

Complete draft use of force policy.  Develop CCDOC procedures for implementation of policy that includes how these systemic remedies, if any, are documented.

Develop written directive to guide Sheriff's accountability meetings. Identify those issues that have been addressed as improvements to issues identified as 'systemic' (for example, the meetings currently underway between CCDOC and Cermak). See also 35.g.

Consider amending Section XI. C. 6. Of the draft use of force policy to specify to whom the recommendations are provided.

**DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010**

**PROVISION**

31. Use of Force

o.      CCDOC shall maintain accountability policies and procedures for the effective and accurate maintenance, inventory, and assignment of chemical and other security equipment, in accordance with generally accepted correctional standards.

**Compliance Status**:      Partial compliance.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

Defendants are working to complete relevant policies/procedures, in several cases cancelling CCDOC policies and implementing CCSO agency wide policies.

- 9.15 Control of Firearms and Other Security Equipment (4/01/84)
- 9.15A Use and Control of Chemical Agents (7/1/96)
- 9.17 The Use of Oleoresin Capsicum (O.C.) Spray/Gel (11/7/08) – Draft order CCSO agency-wide
- 9.33 Canine (K-9) Unit (7/27/07)
- 9.38 Use of an Electronic Restraining Device (11/4/08)
- Response to Resistance/Use of Force (draft) agency-wide policy
- Use of Baton (draft) CCSO agency-wide policy
- Use of OC Spray (draft) CCSO agency-wide policy
- Deployment of Conducted Energy Devices (CED) (draft) CCSO agency-wide policy (AKA as Taser)

Those drafts don't address in sufficient detail the maintenance, inventory, assignment of batons, electronic restraining devices, OC Spray or CEDs.   It may be the intention to provide those specifics in Departmental level written directives, but that needs to be defined by CCDOC.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

Defendants working to complete relevant policies/procedures.   No assessment was made of the maintenance, inventory, assignment of security equipment/chemicals due to this policy transition period

**Monitor's Recommendations:**

Continue working to complete draft and implement procedures.
For those directives that will remain CCDOC directives, ensure that the provisions of this section are met.  Ensure that these are forms (or in IMACS) that can account for missing equipment, equipment needing repair, inventories, controls on issuance, etc.

**DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010**

**PROVISION**

31. Use of Force

p.      CCDOC shall continue to conduct use of force training in accordance with generally accepted correctional standards, including:

1.      CCDOC shall maintain an effective and comprehensive use of force training program.
2.      CCDOC shall continue to ensure that correctional officers receive adequate training in CCDOC's use of force policies and procedures, including de-escalation and defensive tactics relating to use of force.
3.      CCDOC shall continue to ensure that correctional officers receive pre-service and in-service training on reporting use of force and completing use of force reports.

**Compliance Status**:        Partial compliance.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

Defendants are providing pre-service and in-service training regarding use of force.  The lesson plans will be modified based upon the updated use of force policy, including de-escalation and defensive tactics, and reporting concerning use of force.  Defendants provided a lesson plan for the use of force training dated September 1, 2010.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

Defendants are providing training.  The lesson plans need to be reviewed following revision to ensure that they cover the specific language/content/intent of the consent agreement.   Although I did not have sufficient time to review the draft training lesson plan recently provided, I do not think it has sufficient detail for this topic.

Lesson plans are maintained at the Training Institute.

I was unable to evaluate how the Training Institute tracks employee training to ensure that the employees are provided training on the schedule set by the CCSO.

**Monitor's Recommendations:**

Continue to update lesson plans based upon completed updated policy on use of force.

I will further review the training and lesson plans, as well as observe training when the updated policy is completed.  I recommend further refining the lesson plan draft (9/1/2010) to provide more specificity to ensure that all those who participate in the training hear, to the extent possible, the same information.  I will evaluate how the CCSO maintains information on the training  of employees to meet the CCSO's requirements for pre-service and in-service training hours.

**DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010**

**PROVISION**

31. Use of Force

q.      CCDOC shall provide a process for inmates to report allegations of the inappropriate or excessive use of force orally to any CCDOC staff member; said staff member shall give the inmate the opportunity to reduce his or her report to writing through a grievance or complaint form without discouragement.

**Compliance Status**:        Partial Compliance.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

The draft use of force order provides direction in section IV. J. and K. Guidelines, that employees must report officers who they suspect of using excessive force. This policy does not address CDOC employees taking an oral report from an inmate.  There is a grievance process (General Order 14.5 Detainee Grievance Procedure (2/21/1997) in place that provides a means for inmates to provide allegations of use of force/excessive force.  CCDOC detainee grievance general order does not address the ability of inmates to provide their grievance provided orally.

The defendants provided to me on September 15, 2010, an amended CCDOC General Order (9.1B), dated 9/8/2010 (unsigned), which provides that "All allegations of inappropriate or excessive use of force reported orally to any CCDOC staff member by an inmate shall be documented on an Incident Report and reported to the Incident Tracking Line receiving a tracking number. Staff members shall give the inmate the opportunity to submit his/her allegations in writing through a grievance or complaint form without discouragement." Accompanying this amendment to the general order is a memo from the Executive Director, Office of Policy and Accountability, regarding a CCDOC Inmate Hotline Proposal.  The telephone is to be monitored M-F, 7:00 a.m. to 3:00 p.m. by CRWs.  The hotline is to be located in the Program Services Office.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

While I appreciate the CCDOC's responsiveness to this provision, I don't believe that the process proposed is well thought-out.  For example, how will inmates get to the Program Service office to call the number; and if they get to the office, why not just talk to the CRW who would answer the phone if they called? Many corrections organizations use toll-free numbers for inmates to use to report allegations of sexual assault/misconduct, and then receive other misconduct reports via the same telephones.  In this model, the telephone line is recorded,

and an investigator (in most organizations) is assigned to listen to the recorded line *daily,* and complete the paperwork required by what they hear. Because these '800' numbers are directly available from the telephones that the inmates generally use; the inmates remain anonymous – as there is little probability that someone will see or overhear the conversation. This strategy also provides a single point of accountability for logging inmate allegations/complaints. Organizations which use "800" numbers report that they do not experience an overwhelming response, outstripping resources. They do find that friends/family of inmates use the line to report allegations, as well as employees using the line to report misconduct of their peers.

I urge CCDOC to rethink this provision to ensure that the process is more universally available, that the line is recorded, and that an experienced investigator is assigned to review the calls each day (including weekends and holidays). I don't believe the process proposed in the Memo of September 7th will achieve what the CCDOC is seeking; and in fact, may be counterproductive.

Training lesson plans should also include this requirement. See also 38.a., b., c., d. regarding inmate Grievance Procedures. Directives should also cover CRWs who have responsibility in the inmate grievance process. Training includes how officers access services for inmates with LEP and who have disabilities (or appear to have disabilities which might not be noted in the inmate's record).

I'm noting partial compliance, reluctantly, based on the production of the amendment to CCDOC general order, albeit, unsigned. More work is required.

**Monitor's Recommendations:**

CCDOC needs to have a process in place, via policy/practice that identifies inmates who may need assistance in all phases of their incarceration, including developmental disabilities, limited English proficiency (LEP), limited sight (blindness), deaf or hard-of-hearing, mobility impairment. For example, finding a deaf female inmate that the Superintend appeared not to know was housed, was troubling. This should be assessed and noted in the inmate's record during the initial classification process (although that current process may not identify these needs given the rush to complete the process and move inmates to housing), as well as having their files updated during the emerging re-classification process. The challenge for jails is that a disability or LEP is NOT a classification, and should not be the sole determination of the inmates' housing (in other words, there is no classification status 'disabled' or 'LEP' ). LEP or disabled inmates have a classification, and should be housed with like classified inmates, unless there is an overriding, objective reason, consistent with policy, to change that housing to provide for the safety of the inmate, other inmates, and/or employees. At this time, it appears that identifying and assisting disabled or LEP inmates are falling through the cracks, and addressing these matters are

not assigned to a specific person/post. The identification of inmates in these categories also requires collaboration between CCDOC and Cermak as Cermak may identify inmates in these categories who were not identified in CCDOC's initial classification screening process.

CCDOC policy (and Cermak) policy needs to comply with ADA requirements for TDD and other aid devices (prosthesis, glasses, etc.). See also http://www.ada.gov/lawenfmodpolicy.pdf regarding hearing impaired arrestees. The Disability Rights Section of the U. S. Civil Rights Division has guidance on their web site.

When an inmate is identified as potentially needing assistance to access programs, medical care, mental health care, grievances, disciplinary processes, or any other phase of incarceration, the CRWs should be invested with the authority to follow-up with those specific inmates periodically, at least monthly, ideally, weekly. Officers working in housing units should be proactive in seeking help for inmates they observe as having issues assessing services, help, etc. Pointing again to the example of the deaf inmate who claimed that she had not had TDD for six months, the CWR, officer, and management staff in that facility should have been aware she was housed, and obviously had special needs. A series of checks and balances should seek to ensure that inmates with disabilities are accommodated and assisted in filing grievances, and during disciplinary proceedings (as well as accessing services and programs). Policy should provide that sign language and other interpretation are provided to eligible inmates to participate in programs for which they are otherwise eligible, including access to the grievance system.

As noted above, an '800' number accessible through the inmate telephone system is one means of increased communication for all inmates who can use a telephone.

Re-evaluate the process described in the September 7th Memo. Complete the use of force policy; amend/update any CCDOC's general order; amend the grievance order to address this provision; update lesson plans. Develop a policy guiding identifying that inmate allegations of use of force come via oral reports to employees that are forwarded per policy. The directive should also address how inmates with limited English proficiency, and disabilities submit grievances based on the recommendations above. The inter-agency committee might be a vehicle through which to surface the policy and operational issues surrounding this provision and develop recommendations.

**DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010**

**PROVISION**

31. Use of Force

r.      Following a use of force, when CCDOC staff transport an inmate to receive medical care by Cermak, as necessary, the CCDOC staff member shall inform the Cermak staff member that the inmate was involved in a use of force. Coordinate with Dr. Shansky.

**Compliance Status**:        Partial compliance.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

Defendants completing revised use of force policy.  Current practice appears to be that inmates are transported to medical.
Per Dr. Hart, form is in draft and being finalized that will document exchange of information that the inmate was involved in a use of force.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

There appears to be agreement that this provision is important and will be addressed.

**Monitor's Recommendations:**

Defendants complete policy; ensure compliance with language as noted in the provision.  Execute memo of agreement with Cermak for this, and related policies.

Convene an inter-disciplinary committee to address these specific policy/operational issues needing coordination between Cermak and CCDOC.

See also 31.f.

DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

**PROVISION**

31. Use of Force

s.      Cermak shall ensure that, when providing medical treatment or assessment to an inmate following a use of force, Qualified Medical Staff document the inmate's injuries, if any, and any medical care provided.  Cermak shall provide CCDOC senior management with a brief summary documenting the initial medical encounter following a use of force, including an anatomical drawing that depicts the areas of sustained injury, if any, and information regarding any further medical care. Coordinate with Dr. Shansky.

**Compliance Status**:        Partial compliance.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

I am unaware of the status of Cermak's policies/procedures.  It is evident that Cermak is documenting inmate injuries. Information is provided by Cermak to investigators at OPR, but it is not specifically guided by Cermak policy, nor could I identify procedures within OPR's SOP.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

See 31.f.  There is agreement that Cermak will make a copy of the medical encounter (redacted) to OPR when there is an allegation of excessive force that OPR is investigating.  Cermak and OPR policies need amendment.

**Monitor's Recommendations:**

Convene a meeting of the parties and discuss the relevant policies/procedures for each party. Agree to language; complete procedures; train.  If it is envisioned that CCS Police will get involved in allegations of excessive force, procedures should cover their access to inmate medical records specific to the incident.

DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

**PROVISION**

31. Use of Force Coordinate with Dr. Shansky.

t.      Cermak shall ensure that Qualified Medical Staff question, outside the hearing of other inmates or correctional officers if appropriate, each inmate who reports for medical care with an injury, regarding the cause of the injury.  If, in the course of the inmate's medical encounter, a health care provider suspects staff-on-inmate or inmate-on-inmate abuse, that health care provider shall immediately:

1.      report the suspected abuse to the Executive Director of the Office of Professional Review or other appropriate CCDOC administrator; and
2.      adequately document the matter in the inmate's medical record.

**Compliance Status**:       Non-compliance.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

I am unaware of the status of Cermak's policies/procedures.  Checking with Dr. Shansky, he was unaware as well.  This provision may be in partial or substantial compliance, but in the absence of this information, I am making this as non-compliance.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

See 31.f.  There is agreement that Cermak will make a copy of the medical encounter (redacted) to OPR when there is an allegation of excessive force. Cermak and OPR policies need amendment.

**Monitor's Recommendations:**

Convene a meeting of the parties and discuss the relevant policies/procedures for each party. Agree to language; complete procedures; train.
Convene an inter-disciplinary committee to address these specific policy/operational issues needing coordination between Cermak and CCDOC(and CCS Police, if necessary).

Ensure that data is captured to document when Cermak notifies OPR or the Executive Director CCDOC and a use of  force incident report has NOT been made.  Ensure that if this situation is documented, there are appropriate actions by OPR and by the Executive Director CCDOC.

DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

**PROVISION**

32.    Safety and Security

a.    CCDOC shall maintain security and control-related policies, procedures, and practices that will result in a reasonably safe and secure environment for all inmates and staff, in accordance with generally accepted correctional standards. Coordinate with Grenawitzke, Shansky, Metzner.

**Compliance Status**:    Partial compliance.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

Defendants are completing an updated policy and procedure manual both at the Sheriff's Office and departmental levels.  There are a large number of directives and practices which when developed in policy, provided in training, and conducted in daily operational practice which result in the "reasonably safe and secure environment" most likely envisioned by this provision.  Data is being maintained that identifies indicators of disorder that point to an unsafe environment via the Sheriff's weekly accountability meetings.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

To satisfy this provision there needs to a definition of what constitutes a "reasonably safe and security environment for inmates and staff".  In addition to written directives and employee training, factors that might be included are: adequate supervision of inmates, routine inspections of environmental health and sanitation, removal of hazards, prompt response by maintenance, repairs using materials and methods which are consistent with security, routine meetings between DFM, CCDOC and/or Cermak.   The data reviewed in the Sheriff's weekly accountability meeting also provide the means to ensure that trends and emerging issues are addressed.

**Monitor's Recommendations:**

In fairness to the defendants, and to provide objective measures of compliance, there needs to be consultation among the court monitors and CCDOC to define what constitutes compliance with this specific provision in terms of written directives, practices, training, outcomes.  The totality of actions result in a safe and secure environment for inmates and staff.

## DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

**PROVISION**

32.     Safety and Security

b.      CCDOC shall maintain policies, procedures, and practices to ensure the adequate supervision of inmate work areas and trustees, in accordance with generally accepted correctional standards.  Coordinate with Grenawitzke

**Compliance Status**:  Non-compliance.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

Defendants are drafting an office-wide policy/updating existing CCDOC directive(s) on Sanitation Procedure and Inspection (24.11.1.0).  The draft requires training be provided to inmate sanitation workers, and that the required sanitation plan address the equipment needed by inmate workers who perform specific duties (e.g. lawn care, cleaning with chemicals).  At this time, the draft policy exists, but a sanitation plan does not.  Because I saw inmate workers being supervised by officers, I have assessed this as partial compliance at this time.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

Defendants taking specific actions to comply with this provision.  Attention needs to be paid to OSHA requirements to orient/train inmate workers, and provide protective clothing, etc.  Policy should require that this information is captured/logged as proof that the CCDOC is following their policies (e.g., orientation checklists for inmate workers, list of protective clothing issued, logged, tracked, repaired, etc., records of reported inmate worker injuries).  The defendants are preparing a sanitation plan that, when completed, should address these provisions.

**Monitor's Recommendations:**

Ensure 24.11.1.0 is consistent with the recommendations above.  Ensure that the to-be-drafted sanitation plan addresses the recommendations, above.     See also any recommendations made by Harry Grenawitzke regarding inmate worker safety.   Awaiting the sanitation plan.

DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

**PROVISION**

32.      Safety and Security

c.      CCDOC shall ensure that security staff conduct appropriate rounds with sufficient frequency to provide inmates with reasonable safety.  Rounds shall be conducted at least once every half hour, at irregular intervals, inside each housing unit.   In the alternative, CCDOC may provide direct supervision of inmates by posting a correctional officer inside the day room area of a housing unit to conduct constant surveillance.   More frequent rounds shall be conducted for special management inmates who require more intensive supervision for security and safety reasons.  All security rounds shall be documented on forms or logs that do not contain pre-printed rounding times. Video surveillance may be used to supplement, but must not be used to replace, rounds by correctional officers.

**Compliance Status**:       Partial compliance

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

I believe that rounds are being completed, but cannot identify the documentation/policies that requires the rounds as noted in the provision above.   The CCDOC is using a "watchman" system in some facilities which document that an employee passed one of the recording points at times during their tour of duty.   The CCDOC provided a Division II "Divisional Procedures" dated March 17, 2009, revised March 10, 2010, Living Unit Inspections "Morse Watchman".  The procedure requires that Officers assigned to inmate living areas conduct rounds every 30 minutes, as recorded by the Morse Watchman system.

The defendants also provided completed Officers' Living Unit Logs, but did not include the procedures that guided how the logs are completed.  Also provided as evidence of rounds CCDOC General Order 9.22, effective 10/1/1997, stating that sergeants will include their tier/wing logs during their tour of duty, but not a specified time interval.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

IMACS will provide electronic logging of rounds as part of the electronic housing unit log, including a "reverse" log that will notify supervisors and management staff when requirements are not being met.   The "watchman" systems identify when employees have recorded their tours pass the scanning devices; although it does not ensure/prove that employees were looking inside the

inmate cell during their tour. The vigilance of these tours in terms of checking on the health and safety of inmates can be verified via any surveillance cameras in the units, as well as frequent supervisory tours.

The current written directives do not adequately proscribe the rounds required of line staff, supervisors, and managers. The mandates need to be able to be audited, ensuring accountability of the rounds.

Based on the Division II directive, I provide a, reluctant, partial compliance, but clearly more work needs to be done.

**Monitor's Recommendations:**

Ensure that these requirements are included in all relevant post orders and governed by written policy. Ensure that supervisors/managers are monitoring the conduct of rounds; and leaders are monitoring rounds by management staff.

**DATE OF STATUS UPDATE: SEPTEMBER 20, 2010**

<u>**PROVISION**</u>

32.    Safety and Security

d.    CCDOC shall ensure that security supervisors conduct daily rounds in the inmate housing units, and document the results of their inspections.

**Compliance Status**:   Non-compliance

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

See 32.c.

The defendants provided additional information as noted in 32.c.  However, no documentation was produced directly responsive or clarifying to this provision.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

See 32.c.

**Monitor's Recommendations:**

See 32.c.

## DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

**PROVISION**

32.     Safety and Security

e.     Cook County shall increase the use of overhead video surveillance and recording cameras to provide adequate coverage throughout the common areas of the Facility, including the RCDC, all division intake areas, mental health units, special management units, inmate housing units, and in common areas of the divisions.

**Compliance Status**:        Partial compliance.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

Defendants have increased video surveillance and plan to open control centers that provide locations for observation and recording of cameras (video monitoring/security center Building V).  A report dated July 8, 2010 indicates that CCDOC believes that 2,786 cameras are required; and 760 have been installed. According to the information provided, CCDOC is "to review the operation of all cameras on a weekly basis, determine if the video quality acceptable, and to review the historical footage when required."   The staffing of the video command room is being developed as the video project moves toward completion.  A spreadsheet was provided of the buildings in which the cameras will be installed as well as the location within the building.  A Programming Document, Volume 1 was also provided which further defined where cameras will be located.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

The CCDOC is moving forward with plans to install video surveillance as noted above.  A draft directive has been prepared along with post orders. The defendants need to ensure that there are employees who will be assigned the responsibilities to provide real-time, live, review of all cameras.  It would be insufficient to allow misconduct, assaults, etc. to occur, record those occurrences, and have not immediate intervention.  I am unable to determine from the list provided of the buildings in which cameras will be/are installed if these include the specific areas noted above.   I have requested this information from CCDOC.

**Monitor's Recommendations:**

Complete policies/procedures and post orders for monitoring, supervision, and maintenance functions.  Ensure that the location of the cameras matches the

requirements of the locations noted above. Ensure that there are staff in place to review all cameras and intervene as necessary.

DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

**PROVISION**

32.     Safety and Security

f.      CCDOC shall maintain a procedure to prevent inmates from possessing or having access to dangerous contraband, including conducting regular inspections of cells and common areas of the housing units to identify and prevent rule violations by inmates.

**Compliance Status**:        Partial compliance.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

CCDOC general order 9.7.1 Contraband, effective, 1/29/07 establishes the procedures for contraband control in all divisions and the list of what is considered contraband.  All visitors, employees, contractors are pat searched when entering a facility, and their property subject to x-ray and search. Additionally, CCDOC established a "weapons free" committee which meets the first Friday of every month.  The committee tests out new strategies to prevent introduction of contraband and reviews proposed maintenance solutions (such as light fixtures) with an eye toward contraband production. The committee reported that it had seized two weapons in the last 18 months in all divisions. The committee also generates a "hot sheet" for the division with newly developed information regarding contraband seized and its possible source(s).  The committee also produces a "shank/weapon identification and inventory" list which is circulated to superintendents and the Sheriff's accountability meeting. CCDOC employs canines and the emergency response team to conduct searches for contraband based on information, or routinely.   Superintendents are also reported to be conducting routine searches for contraband. Also CCDOC reclassifies/re-houses inmates who are found in weapons in their possession are placed in administration segregation -  "Weapons in My Possession" "WIMP DECK" – housed in Division IX.  Their status has reviewed weekly.  They are placed in lime green jump suits to be identified on sight.

There is a draft directive (Special Management – Custody Placement) that is intended to guide placement of inmates in the "WIMP" deck, and reference to these inmates is included in the Division IX training block for officers assigned to Special Management areas.   The description in the Division IX training block notes that this area also will house inmates who have been identified as high profile or security threats to the jail.

The Sheriff's weekly accountability meetings discuss weapons/shanks recovered during the previous week.

DFM, that provides maintenance functions in the buildings, while stating their support for security operations, **do not engage** in tool control, based on accepted correctional practice.  DFM employees do not receive any security-related orientation training or retraining (as is done with ARAMARK and other construction sub-contractors) upon beginning work inside the security perimeter.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

Contraband is a critical issue in any correctional facility. The Sheriff expressed his discomfort with the lack of oversight of seized contraband/weapons prior to his taking office.  CCDOC has placed an appropriate high priority on contraband control.  Cooperation with DFM has caused issues with contraband control regarding maintenance and repair of broken security fixtures and hardware with appropriate security grade materiel.  The weapons free committee is a good addition to the strategies to control contraband, establish accountability and provide information.  The committee does not have a general order or policy governing its establishment, membership, meetings, communications, or authority.  The placement of inmates found with weapons in their possession is a good management strategy, and the impact is that inmates may be hiding weapons in common areas rather then their individual cells, and not transporting weapons.

The weapon's free committee noted that it has found weapons/contraband identified as DFM tools.  I inquired of DFM workers with tools on a cart inside Division VI if they had an inventory of the tools on the cart.  After some discussion, they acknowledged that they did not. It was pointed out that when DFM workers are inside inmate housing living areas making repairs that the inmates are locked down.  While a good practice, this does not ensure that all tools are collected and accounted for when workers leave these housing units, or other areas of the divisions. Additionally, DFM maintains locked storage areas/work areas inside divisions that CCDOC does not have keys to and presumable for which there is not a tool and/or hazardous materials logs. CCDOC reports DFM's cooperating in cleaning those areas and removing items no longer used.  At this time, DFM workers who realize that they have "misplaced" any tools or other items that can be manufactured into weapons by inmates, have no incentive to timely report the missing item to CCDOC.

**Monitor's Recommendations:**

CCDOC is making a credible effort, consistent with accepted correctional practice in controlling contraband.  Consider developing a policy formalizing the weapons free committee addressing the issues noted above.

Ensure vigilance regarding DFM's plans for replacement/repair of security areas where the replacements, if not security grade, potentially endanger inmates and staff.  Update the general order 9.7.1 as it hasn't been updated since 1997.

Accepted correctional practice includes orientation/training for maintenance workers inside any secure setting.  This should be done for all DFM workers who will be assigned inside any CCDOC security perimeter.  Accepted practice also requires inventories of tools and related hazardous materials.  DFM should be required to maintain, update, and open for inspection all storage areas now under their control.  DFM should be required to maintain inventories on all parts or otherwise transported by DFM workers inside a security perimeter.  DFM policy should mandate that employees who even suspect that a tool or other item are missing, report it immediately to the nearest correctional officer.  CCDOC should have access to all areas inside the security perimeter, including those work areas now controlled/locked by DFM. A periodic joint inspection of these areas should be conducted, and results, including any remedial action needed/taken, documented.

Ensure that there are written policies/procedures for re-classifying inmates to the "WIMP" deck, including their supervision, re-assessment, and removal from that classification.

DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

**PROVISION**

32.     Safety and Security

g.      CCDOC shall review, and revise as applicable, all General Orders ("GOs"), Standard Operating Procedures ("SOPs"), and Post Orders on an annual basis, or more frequently as needed.

**Compliance Status**:      Partial compliance.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

Sheriff's Order 11.1.1.0, Written Directives System:  Written Directives, effective date February 8, 2010 provides in section VIII. 6:

"6.      All directives outlined in this order will be reviewed on an annual basis, from the effective date, to determine if the order requires editing, updating or any other action."

The CCDOC is re-evaluating/updating all written directives.  This process includes identifying which CCDOC directives will become CCSO general orders. The CCDOC is awaiting the assignment of staff (post-Shakman) to assist with this important function.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

As this directive was put into place in February 2010 I have not been able to determine if policies/procedures have fallen within the review period.  I was unable, due to time constraints to determine this in June.

The directive provides excellent oversight to the CCSO's written directive system. I believe CCSO has an effective strategy in place, providing that staffing resources are devoted as soon as possible.  A schedule of when policies/procedures will be updated will be furnished to me when the staffing is provided and a realistic assessment of the work to be done concluded.

**Monitor's Recommendations:**

Ensure process in place that identifies and documents policy reviews per this CCSO directive.  Continue to update/review policies/procedures at the office-wide and CCDOC level.

**DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010**

**PROVISION**

32.      Safety and Security

h.      CCDOC shall revise policies, SOPs, and post orders for all armed posts to include proper use and safe handling of weapons and provide specific instructions on use of deadly force and when and under what circumstances such force should be used, in accordance with generally accepted correctional standards.

**Compliance Status**:      Partial compliance.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

Use of force policy draft will address those posts with access to deadly force. CCDOC reports these are all external posts, working on the complex's perimeter.  CCDOC general order 9.15, Control of Firearms and Other Security Equipment, effective date 4/01/84, provides direction regarding availability, storage, issuing, inventory, and load/unloading firearms.   These CCDOC policies and post orders will be evaluated and updates as necessary (see 32. g.) Defendants provided a draft of a CCSO post order addressing this provision

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

I received a list of all posts, but did not specifically request the post orders for those posts which are armed; or if specialized training is provided to individuals assigned to these posts.  The CCDOC policy dates from 1984 and would benefit from updating, and addressing the issues in this provision.  As noted above, all CCDOC written directives are under review/updating process at this time.

**Monitor's Recommendations:**

Complete updated use of force policy; update post order for all posts where carrying weapons is mandated/allowed; review minimum qualifications for assignment to these posts, review lesson plans for individuals with these assignments.

## DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

**PROVISION**

32.    Safety and Security

i.    CCDOC shall standardize security policies, procedures, staffing reports, and post analysis reports across the divisions, to the extent possible, taking into account the different security levels and different physical layouts in the various divisions.

**Compliance Status**:    Partial compliance.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

CCDOC is reviewing and updating all policies, procedures, post orders – all written directives.  Each division has its own SOPs. It is the goal of this initiative (Capt. Milka and Lt. Zerbes) to consolidate directives that are the same across all divisions, while allowing for different directives based on the division's mission, architecture, etc.   Staffing for this function within CCDOC is pending (Post-Shakman).

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

This is a time consuming and meticulous initiative.  The work is on-going with no time table provided.  The timetable will be provided to me when staffing is assigned to this function and a realistic assessment made. The CCDOC has a good strategy in place to meet this provision.

**Monitor's Recommendations:**

A timetable for development, review, finalization, updating, [and training lesson plan updates] will be helpful in evaluating this process.  CCDOC will provide this as noted above.

**DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010**

**PROVISION**

32.     Safety and Security

j.      CCDOC shall provide formal training on division-specific SOPs to correctional officers in accordance with their assignments, and shall provide further specialized training for officers assigned to Special Management Units. Cermak Hospital shall provide specialized training for officers assigned to psychiatric units. [From Consent agreement "Special Management Units" means those housing units of the Facility designated for inmates in administrative or disciplinary segregation, in protective custody, on suicide precautions, or with mental illness."] Coordinate with Drs. Shansky and Metzner.

**Compliance Status**:        Partial compliance.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

Formal Training on Division-Specific SOPS:  Division IX has specific training (4 hours) for officers and supervisors to their divisional SOP.  See below.

Psychiatric Units:  Defendants are providing Training Institute-based formal in-service training that may partially address this provision inasmuch as this training will be delivered to all newly hired officers.  Defendants report that roll-call training is also provided to address division-specific post requirements.  Training for employees assigned to psychiatric units is coordinated with Cermak.  Dr. Hart, in my meeting with he and his staff on June 24th indicated that Cermak's involvement needs to be placed in policy/procedure and lesson plans developed.  Dr. Hart reported that he personally observed the training at the Training Institute to assess it.  The Training Institute has hired former Cermak psychologist Dr. Carl Alimo [and Dr. Deere] to conduct this training.  Director Kurtovich reported to me in a meeting on August 20th that the Training Institute is proceeding with lesson plans that they will offer to Cermak for review.

CCDOC reports that employees who bid to work in the mental health must commit to a two year tour.  But practically speaking, employees may cycle through that unit more frequently, indicating a need for a training response for newly assigned officers when formal classroom training may not be available.

Special Management  Units:  Division IX has established it's own 4-hour training programs for officers and supervisors who will be assigned there.  These include outlines for separate trainings for sergeants and for officers.  Sign-off sheets were provided noting those attending the training.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

Psychiatric Units:  The defendants are moving toward providing and documenting training through lesson plans and documentation in employees' files.  There needs to be coordination between the Training Institute and Cermak to ensure that the provisions, above, are addressed, and that roles and responsibilities for development, review, and instruction are clear.

Special Management Units:  Division IX appears to be providing a 4-hour training to officers and supervisors assigned.   If inmates who meet the definition of special management noted above are housed outside of Cermak or Division IX, further evaluation of specialized training is needed.

Formal Training on Division-Specific SOPS: I am unaware of division-specific SOP training except for Division IX.  The newly implemented field-training program for officers completing training addresses some of these issues, but Chief Howell indicated that the specifics of each division are not included in the FTO program due to the two-week length of the program.

**Monitor's Recommendations:**

Psychiatric Units: A suggested approach – use a training committee strategy to oversee and coordinate training.  Ensure lesson plans are completed, and that there is evidence of employees' knowledge gained during the training.  The policy/strategy should also address how soon following assignment to posts training must be completed, as well as remedial training, if any, that is proposed for employees whose compliance with policies/procedures is documented as violating CCSO rules.  See also Dr. Metzner's recommendation in 59.d. Dr. Metzner indicates he has nothing to add to this recommendation.

Convene an inter-disciplinary committee to address these specific policy/operational issues needing coordination between Cermak and CCDOC.

Special Management Units:  Division IX should coordinate their training with the Training Institute, place their training outlines in appropriate lesson plan formats, and develop a means to measure knowledge gained in the training (based on the goals).   Ensure that those providing instruction are qualified and trained to do so.  Ensure that completed training is noted in the employee's agency training file.

Formal Training on Division-Specific SOPS: CCDOC needs to develop an orientation/training program for officers newly assigned to each of the divisions. This work will also benefit the FTO program.  The challenge will be to address the results of the bidding process that results in movement of officers through the complex at least annually.

**DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010**

**PROVISION**

32.     Safety and Security

k.      CCDOC shall maintain in working order all monitoring equipment at the Facility that is under CCDOC's direct control, including cameras, alarms, radios (hand held), interior and exterior lighting, x-ray and other screening equipment, and walk-through metal detectors.  To the extent that the maintenance of any Facility monitoring equipment is under the control of DFM, CCDOC shall promptly report any maintenance needs and DFM shall prioritize its services to ensure that all monitoring equipment is maintained in working order. Coordinate with Grenawitzke.

**Compliance Status**:      Partial compliance

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

Coordination of these activities is vested in Jay Rutili who oversees the equipment.  (See also 32.e.)  It is reported that the CCSO Police do maintenance for the radios that is noted in a logbook.  Personal body alarms are linked to a computer system that tracks any activations.  Any equipment overseen by DFM is repaired by a DFM employed technician, or outside vendor/contractor depending if there is a contract for service.   CCSO reports plans to link the jail's IMACS to the new DFM web-based work order system (WIZARD).

**Monitor's Assessment**:  Describe the monitor's assessment of the status and documentation for the compliance status.

Documentation of compliance will be the policies/procedures for the above; along with evidence of timely reporting, repair of monitoring equipment; and a written agreement between CCSO and DFM.

**Monitor's Recommendations:**

Prepare policy/procedure regarding this provision, assuring accountability and oversight.

## DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

<u>**PROVISION**</u>

32.     Safety and Security

I.      Absent exigent circumstances, CCDOC:  (i) shall house each inmate assigned to a division that is celled to one permanent bed in a cell and shall not house any inmates (including those assigned to dormitory divisions) such that they are sleeping on the floor, on a mattress on the floor, or in any area not designed or redesigned as sleeping quarters; (ii) shall not house more than two inmates to a single cell (triple-bunking); and (iii) shall not hot-bunk any inmates.

**Compliance Status**:      Not applicable at this time.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

Defendants report that these circumstances do not exist at this time.

Defendants prepared a memorandum, authored by 1st Assistant Executive Director Hickerson, dated September 8, 2010, that incorporates the language of this provision.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

Defendants are committed to this provision as evidenced by Mr. Hickerson's memo.

**Monitor's Recommendations:**

A policy statement has been developed.

**DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010**

**PROVISION**

 32.     Safety and Security

m.     When exigent circumstances give rise to triple-bunking, CCDOC shall provide the third inmate in the triple-bunked cell a "boat," stackable bunk, moveable platform, or cot, so that the inmate is not required to lay down directly on the cell floor or on a mattress on the floor.

**Compliance Status**:        Not applicable at this time.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

Defendants prepared a memorandum, authored by 1st Assistant Executive Director Hickerson, dated September 8, 2010, that incorporates the language of this provision.

See 32. l.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

Defendants report that these circumstances do not exist at this time.
See 32. l.

**Monitor's Recommendations:**

A policy statement has been developed.

## DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

**PROVISION**

33.      Security Staffing.  The parties agree that correctional officer staffing and supervision levels at the Facility must be appropriate to adequately supervise inmates, to carry out the requirements of this Agreed Order, and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards.  Cook County and CCDOC shall take such actions as shall ensure that correctional officer staffing and supervision at the Facility are sufficient to achieve these purposes. These actions shall include the following:

a.      In the fiscal year 2010 budget, Cook County shall allocate funds sufficient to allow for 210 additional correctional officer positions at the Facility. Consistent with provision 33.c, such funding may occur on a rolling basis, as appropriate in light of the time required to hire, train, and put on duty the additional 210 new correctional officers.

**Compliance Status**:       Compliance

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

Defendants have budgeted for 210 correctional officer positions in the FY 2010 budget.  Documentation was provided on August 3, 2010.  CCDOC has requested that 67 correctional officer positions be reclassified to civilian positions, allowing those officers to be moved to security operations.  The Court was petitioned on July 2, 2010 to amend this order.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

The defendants have satisfied this provision by including positions in the FY 2010 budget request and seeking permission of the Court to allow reallocation of officer positions to civilian positions.

**Monitor's Recommendations:**

Work to implement the provisions noted above, conversion of positions and additional hires of officers.

## DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

**PROVISION**

33.     Security Staffing.  The parties agree that correctional officer staffing and supervision levels at the Facility must be appropriate to adequately supervise inmates, to carry out the requirements of this Agreed Order, and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards.  Cook County and CCDOC shall take such actions as shall ensure that correctional officer staffing and supervision at the Facility are sufficient to achieve these purposes. These actions shall include the following:

b.     CCDOC shall use its best efforts (through the maintenance of the written staffing plan required by provision 33.h and otherwise) to ensure that the number of correctional officer vacancies is kept to the minimum practicable number at all times, taking into account that the timing of terminations and resignations and the resulting rate of attrition may, in ordinary course, result in there being some vacancies at any given time.

**Compliance Status**:       Partial compliance

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

Defendants do not have a hiring plan or a staffing plan that has been updated since the MGT study of 2005 – 2006.  In 2008 the defendants updated their hiring processes for corrections officers.  Among the changes are addition of a pre-employment psychological screening and a pre-employment polygraph examination.  CCDOC reported that between 6/1/2005 and 6/1/2010 1,154 employees were hired (unspecified if all or some were officers); and of that number hired, 818 left CCDOC.  Since 2008, 317 officers have been hired.  In that same period, 177 sworn employees have left due to resignation (126), retirement (112), deceased (21), and terminated (18).  The rate at which sworn officers are leaving has declined since 2005 (drop of 37% from 2005 – 2009), which is a shared experience among public sector employers, attributed to general economic conditions.   As of 5/29/2010, CCDOC reported 444 vacancies, including supervisory and management ranks, of which were 397 correctional officer vacancies.  It is not clear if those vacancies include the positions mandated by the consent agreement.  There are seven (7) employees with more than 30 years of service who may retire.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

The CCSO will reach the hiring as required in the consent agreement although not on the required schedule.  In fact, the process is yielding, according to the Training Institute staff and the superintendents, good quality candidates.

However, the process through which candidates travel is in need of review and updating.  Current economic realities ensure a pool of candidates, but as the economy improves, current employees opt for retirement, and/or as other public services organizations (e.g. the Chicago Police) resume hiring, the pool may not be as deep as needed long-term.  There also appears to be wasted resources as a result of not analyzing and updating hiring processes.   The absence of a hiring plan – perhaps with a 5 year or 10 year focus would also be beneficial to guiding recruitment and hiring.

Until I asked for data used in this assessment, there was, to the best of my knowledge, no details were collected and analyzed regarding the hiring process from the time of application through job offer.  This is, however, critical information to managing the resources associated with recruitment, hiring and retention.  Tracking data provides insight into modifications needed in the process, ensures no adverse impact in the various steps in the process, and helps ensure quality candidates are hired; and stay on the job.

The Merit Board:  The bi-furcated hiring process for corrections officers is potentially problematic to keeping a current pool of qualified candidates to fill vacancies.  The recruitment, screening, testing, and background investigations for candidates are handled by the Merit Board. For the period January 1, 2009 through July 31, 2010, the Merit Board received 20,558 applications (requiring a $25 fee).  Of those 11,651 (43%) participated in the written examination.   There is no data maintained as to why 47% of candidates did not take the written examination.  To assist candidates to pass the written examination, the Merit Board offers a pre-test seminar.  During this period, 5,560 participated in the pre-test seminar, of those 4,337 (78%) took the test, of which 1,735 (31%of pre-test seminar participants) passed the test.   Of the total of 11,651 taking the written test, 5,571 (48%) passed the test.

The next step in the Merit Board's process is a physical agility test (PAT).  Of the 5,571 taking the test, 3,946 letters were sent notifying candidates of this step.  It is unknown why fewer letters were sent than the number passing the test.  Of those taking the PAT, 69% passed the test.

The next step in the Merit Board's process is the background investigation.  During this period, the Merit Board reports that 2,147 investigations were completed.  Again, it is unknown why there were fewer investigation than the 2,725 passing the PAT.  Of the background investigations, 54% failed.  No data is apparently maintained as to why candidates are disqualified.  The names of 1,149 were forwarded to The CCSO's Human Resources section for further evaluation.

The Merit Board reports that the process from application through forwarding the name to CCSO Human Resources can take six months.

The Merit Board does not maintain and/or analyze data regarding the sex or race of individuals coming through those processes; thus any adverse impact of other related issues cannot identified.

CCSO Human Resources:  Of the 1,149 names provided to Human Resources, 1,795 (no explanation for the difference in the numbers) letters were sent to invite candidates to another physical agility test, of which 1,750 appeared; and 51% passed.  Reasons for those not passing (N=893) were reported as:  30% were no shows; 50% failed all or part of the test; 3% were late; 18% lack required documentation.   Re-testing was offered to 1,034 candidates (no explanation of differences in the numbers), with 31% passed.

The next step in the process for Human Resources is the polygraph examination.  Of the 877 candidates tested, 79% were rated as acceptable.  Next, 821 candidates moved onto the pre-employment psychological screening; of which 60% were recommended (N=493).  The interview process screened 619 candidates, with only 1.3% rated as not acceptable.  A final background screening of the candidates excluded less than 1%.  There were no candidates excluded by the substance abuse testing.

The pre-employment psychological examination has been validated by the vendor for CCDOC and the vendors have also followed up with the Training Institute staff to assess the impact of their recommended selections.

Human Resources maintains data on the race/sex of candidates and can assess adverse impact for each step in the process.  Human Resources estimates that the hiring process takes 90 days, at a minimum.

Since the updated hiring process was put in place, 14 officers have left within one month of hiring.  This is reported as a much lower rate than before the updated process was put in place.

CCSO is able to conduct three pre-service Training Institute overlapping programs simultaneously (approximately 35-40 in each class). The data as provided by CCSO is as follows for pre-service graduates:  2008 = 21;  2009 = 86; and for 2010 year to date =  183.

The CCDOC has also implemented a field-training program that provides two weeks of post-Training Institute structured learning and evaluation.  This program is in its infancy, and has received good reviews from the Superintendents.   The field-training officers (FTOs) receive 40 hours of training and there is a draft policy/procedure governing the processes.  The program's supervisors hopes to train an additional 25 FTOs in the near future.

**Monitor's Recommendations:**

I spent time learning about and analyzing the recruitment and hiring process as it is critical to not only filling the vacancies required in the consent agreement, but to the long-term health of the organization – keeping vacancies filled with qualified candidates.   The concerns I have are as follows:

- A $25 fee is collected in order for a candidate to take the entry-level test. The Merit Board reports that waivers can be requested; although finding that information on the web site was not successful.  The questions are:  is the fee meant to off-set costs ($25 * 20,558 = $513,950); or as an assessment of how serious candidates are?  If the Merit Board chooses to continue the fee, the waiver request process should be prominently displayed/identified on the website and in written materials, along with the criteria to grant a waiver, in order not to have an impact on economically disadvantaged populations in the hiring process.

- The Merit Board should collect race/sex/age data for candidates in order to ensure that no steps in the process have adverse impact.   The Merit Board should consider collecting data bout why candidates do not pass specific steps in their parts of the hiring process.

- The Merit Board does not keep data regarding how candidates learned about job openings.  This is important information in developing a hiring plan, along with assessing various strategies (e.g., what works? Newspaper advertising, Internet presence, employee referrals, college job fairs?).

- While a pre-testing seminar is a good strategy, the Merit Board should examine why 31% of those participating in the seminar actually pass the test.

- The need to have two physical agility tests should be reviewed.   The Merit Board had a 69% passing rate for the Merit Board's PAT (N = 2,725) and the CCSO's Human Resources PAT had a 51% pass rate (N = 857).  Said another way, only 31% of those passing the Merit Board's PAT pass the CCSO's PAT.   This review may present resource reallocation options, or avoidance of costs.

- The  Merit Board's pre-testing seminar should be reviewed.  As noted above, 31% of candidates who participated in this step passed the written test.  Perhaps this is good news in terms of identifying those candidates with the skills needed for this job; but assessing what part of the test is not being passed, along with reviewing data regarding adverse impact should be undertaken.

- The Merit Board should consider updating their application and allowing candidates to apply on-line. The Merit Board (along with CCSO) should clearly list the specific disqualifers (e.g., drug use, criminal record, gang affiliation, driving record, employment history) at the start of the hiring process, on-line, and allow potential candidates to self-select out. The notion that somehow there is an advantage to candidates in the hiring process who know the disqualifiers is not supported by any research or documentation. Obviously, the Merit Board and the Sheriff should agree on what those disqualifers are.

- No tour of the jail is offered until after a candidate is hired. While this does not seem to have an impact on the number of candidates; it is not accepted practice. Candidates (and their parents/family) should be offered a tour of the facilities at the beginning of the hiring process.

- The six-month period of time (optimistically) to get through the Merit Board's initial stages of the hiring process is too long. While in the current economy there is a pool of candidates, if and when the economy changes, this lag will result in qualified candidates taking jobs elsewhere or just giving up. Whether the time needed to screen a candidate is due to process or resources needs to be reviewed. Additionally, if other public service organizations begin hiring (e.g., Chicago Police Dept.) additional strain on the system will result both in terms of candidates and CCDOC employees who may wish to move to law enforcement jobs.

- The value of the candidate interview should be reviewed with only 1.3% of candidates screened out. The purpose of the interview should be defined (e.g., allow CCDOC employees/superintendents to meet candidates, or provide more information/insight to candidates about the job). Perhaps, when the goals of the interview are defined, other more timely and less resource-intensive strategies can be developed.

- Human Resources should work to shorten their part of the hiring process. All told, a candidate can wait nine months or more [most likely more] for a hiring decision. Given what is known about the new generation of workers, they are likely to accept other positions, or just give up. A suggestion to survey the last 125 correctional officer hires about their experience in the process may inform and guide any revisions.

- Human Resources should maintain data (as described herein) about the hiring process. The Merit Board and the CCSO should know how many candidates need to take the entry-level test in order to result in one hire. Given the data known at this time, if there are 20,558 applicants, and approximately 609 appear ready for hire – 34 applications to hire one employee.

- The Training Institute reports that the quality of applicants has improved as measured by in-class work and passing the state test. The Training Institute staff should continue to provide feedback to Human Resources regarding applicants.

- The implementation of a field-training program is a good step, and an agency of the CCDOC would be expected to have such a program. While a two-week program is a good first step, accepted practice are field training programs of up to 12 weeks in length. While not advocating 12 – weeks, two weeks may not enough time given the complexity and size of CCDOC's operations, especially with the consent agreement's requirement that CCDOC provide formal divisional training (paragraph 32.j.) The FTO program needs to be linked to the pre-service Training Institute by means of monthly meetings in order for the Training Institute staff to update FTOs about curricula, and for FTOs to give feedback to the Training Institute in terms of the new employees they are training.

- A hiring plan should be developed that will address current and future anticipated vacancies, based on the data mined from the process. This data will also help evaluate the steps in the hiring process and the effectiveness of each step. Be developing a specific plan, accountability can be established for the recruiting, hiring, pre-service and probationary year. There is a document entitled "Employment Plan" which provides the internal procedures for Human Resources. This, of course, is needed, but does not constitute a hiring plan.

## DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

**PROVISION**

33.     Security Staffing.  The parties agree that correctional officer staffing and supervision levels at the Facility must be appropriate to adequately supervise inmates, to carry out the requirements of this Agreed Order, and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards.  Cook County and CCDOC shall take such actions as shall ensure that correctional officer staffing and supervision at the Facility are sufficient to achieve these purposes. These actions shall include the following:

c.     CCDOC shall fill the 210 additional correctional officer slots provided for in provision 33.a; fill the 285 correctional officer vacancies that existed at the Facility as of July 17, 2009; and fill any correctional officer vacancies coming into existence after that date in the following manner:
          i.     By December 31, 2010, CCDOC shall hire, train, and put on duty at the Facility at least 448 [381] newly qualified correctional officers (in addition to those on duty as of December 31, 2009).
          ii.     By March 30, 2011, CCDOC shall hire, train, and put on duty at the Facility at least 178 [107] newly qualified correctional officers (in addition to those on duty as of December 31, 2010).

**Compliance Status**:        Non-compliance

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

See 33.b.  The CCSO is making steady progress in hiring.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

See 33.b. for assessment and recommendations.  My opinion is that the strategies now in place will yield qualified and trained correctional officers. Operating more than three pre-service academies simultaneously will overly strain resources and endanger accountability and quality.

**Monitor's Recommendations:**

See 33.b.

## DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

**PROVISION**

33.      Security Staffing.  The parties agree that correctional officer staffing and supervision levels at the Facility must be appropriate to adequately supervise inmates, to carry out the requirements of this Agreed Order, and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards.  Cook County and CCDOC shall take such actions as shall ensure that correctional officer staffing and supervision at the Facility are sufficient to achieve these purposes. These actions shall include the following:

d.      The parties agree that for 30 months following the effective date of this Agreed Order, Cook County and CCDOC shall not be required to provide additional correctional officer staffing and supervision at the Facility beyond that which is necessary to ensure that correctional officer staffing and supervision are sufficient to achieve the purposes set out in the introductory paragraph of provision 33 and to comply with provisions 33.a-c above.

**Compliance Status**:       Not applicable at this time.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

**Monitor's Recommendations:**

Review of the current staffing plan should be performed on a regular basis so that staffing and supervisory issues are identified well ahead of the 30-month milestone noted in this provision.

## DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

**PROVISION**

33.      Security Staffing.  The parties agree that correctional officer staffing and supervision levels at the Facility must be appropriate to adequately supervise inmates, to carry out the requirements of this Agreed Order, and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards.  Cook County and CCDOC shall take such actions as shall ensure that correctional officer staffing and supervision at the Facility are sufficient to achieve these purposes. These actions shall include the following:

e.      Within 30 months of the effective date of this Agreed Order, the CCDOC Monitor shall assess and make a recommendation on whether the correctional officer staffing and supervision levels are appropriate to adequately supervise inmates at the Facility, in accordance with generally accepted correctional standards.  If the CCDOC Monitor determines that staffing is inadequate, the CCDOC Monitor will make a recommendation regarding the appropriate number of correctional officer staff.  If the parties do not accept the CCDOC Monitor's staffing recommendation, CCDOC and Cook County shall agree to an independent, comprehensive study to determine the appropriate correctional officer staffing and supervision.  The parties agree that the results of this staffing study shall provide guidance as to the sufficient number of qualified correctional officers necessary to operate the Facility safely and to carry out the requirements of this Agreed Order.

**Compliance Status**:      Not applicable at this time.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

**Monitor's Recommendations:**

Review of the current staffing plan should be performed on a regular basis so that staffing and supervisory issues are identified well ahead of the 30-month milestone noted in this provision.

## DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

**PROVISION**

33.     Security Staffing.  The parties agree that correctional officer staffing and supervision levels at the Facility must be appropriate to adequately supervise inmates, to carry out the requirements of this Agreed Order, and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards.  Cook County and CCDOC shall take such actions as shall ensure that correctional officer staffing and supervision at the Facility are sufficient to achieve these purposes. These actions shall include the following:

f.     If the staffing study requires additional correctional officers, Cook County shall allocate funds sufficient to maintain correctional officer staffing levels necessary to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards.

**Compliance Status**:      Not applicable at this time.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

**Monitor's Recommendations:**

None at this time.

**DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010**

<u>**PROVISION**</u>

33.     Security Staffing.  The parties agree that correctional officer staffing and supervision levels at the Facility must be appropriate to adequately supervise inmates, to carry out the requirements of this Agreed Order, and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards.  Cook County and CCDOC shall take such actions as shall ensure that correctional officer staffing and supervision at the Facility are sufficient to achieve these purposes. These actions shall include the following:

g.     If the staffing study requires additional correctional officers, and consistent with Cook County's allocation of funds for security staffing, CCDOC shall hire and train sufficient number of qualified correctional officers and other staff to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards, including:

1.     Investigative staffing sufficient to meet the internal investigation responsibilities outlined in this Agreed Order;

2.     Correctional officer staffing sufficient to provide inmates requiring treatment with adequate access to appropriate medical and mental health care by providing timely movement of inmates to medical units, transport of inmates who have been referred for outside specialty care, and escort, if necessary, to Qualified Medical and Mental Health Staff on housing units; and

3.     Qualified staff sufficient to monitor security cameras in real time and allow for supervisory viewing and retrieving at any time.

**Compliance Status**:     Not applicable at this time.  However, see below.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

Based on the evaluation of Drs. Metzner and Shansky, there are insufficient security staff to assist with medically related functions such as medication administration.

OPR is awaiting hiring 10 new employees, 2 of which are supervisors.  As of the week of August 16th, Human Resources indicated that interviews would begin shortly.

**Monitor's Recommendations:**

Re: medication administration - Establish an inter-disciplinary committee to identify the problem(s) and develop specific solutions, including indicators that will assess if the solutions are effective.

Re:  OPR **-** Maintaining staffing levels in OPR should be a priority.

### DATE OF STATUS UPDATE: SEPTEMBER 20, 2010

**PROVISION**

33.     Security Staffing.  The parties agree that correctional officer staffing and supervision levels at the Facility must be appropriate to adequately supervise inmates, to carry out the requirements of this Agreed Order, and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards.  Cook County and CCDOC shall take such actions as shall ensure that correctional officer staffing and supervision at the Facility are sufficient to achieve these purposes. These actions shall include the following:

h.     CCDOC shall maintain a written staffing plan that requires sufficient staffing to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards.

**Compliance Status**:     Non-compliance.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

A staffing study by MGT of America was completed in 2006.  There was a companion in-house study conducted prior to the MGT study.  A review has not yet been finalized regarding the staffing needs for the new reception center, due to be completed in two years.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

A staffing plan, updated at least annually, is necessary to ensure adequate staff, address overtime, reevaluate staffing when functions change for various buildings/facilities/missions; and inform a hiring plan.  Staffing plans produce highly charged discussions/analysis due to the financial implications of the outcomes.

**Monitor's Recommendations:**

The defendants should develop a strategy for how the staffing plan will be updated, along with the timetable.

## DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

**PROVISION**

33.     Security Staffing.  The parties agree that correctional officer staffing and supervision levels at the Facility must be appropriate to adequately supervise inmates, to carry out the requirements of this Agreed Order, and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards.  Cook County and CCDOC shall take such actions as shall ensure that correctional officer staffing and supervision at the Facility are sufficient to achieve these purposes. These actions shall include the following:

i.     Absent exigent circumstances, CCDOC shall maintain a practice that does not allow for scheduled, planned, or expected cross-watching (a CCDOC practice of allowing one correctional officer to simultaneously supervise two housing units from the control center of one of the units) at any time on all maximum security and Special Management Units, and during first and second shifts throughout the Facility.

**Compliance Status**:       Not applicable at this time.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:
In a memorandum from Gary Hickerson dated September 8, 2010, the CCDOC has indicated it will establish the necessary policies and procedures to address both 33.i. and 33.j.  These procedures will define the elements of what will constitute cross-watching.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

Policy direction provided.

**Monitor's Recommendations:**

Policy direction provided;  suggest having the CCDOC Executive Director issue this order.   Ensure that this information is referenced in the CCDOC classification procedures and housing plan.

**DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010**

**PROVISION**

33.     Security Staffing.  The parties agree that correctional officer staffing and supervision levels at the Facility must be appropriate to adequately supervise inmates, to carry out the requirements of this Agreed Order, and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards.  Cook County and CCDOC shall take such actions as shall ensure that correctional officer staffing and supervision at the Facility are sufficient to achieve these purposes. These actions shall include the following:

j.     CCDOC may permit cross-watching on third shift in housing units that are not maximum security or Special Management Units only if the Monitor does not object after consultation and review.  The Monitor's review of the appropriateness of third-shift cross-watching on a particular housing unit shall be guided by the sufficiency of sightlines between the units being cross-watched, the adequacy of video and/or audio technologies in place, and/or other factors that bear on the safety and security of inmates and staff.  If the Monitor later objects to any cross-watching that is in effect because of the Monitor's concerns that cross-watching on a particular housing unit presents an undue risk to the safety and security of inmates and staff, CCDOC shall immediately cease such cross-watching.  CCDOC may renew cross-watching on that unit again if, after further consultation with and review by the Monitor, the Monitor does not object to such renewal.  Although cross-watching is permitted under the limited circumstances described herein, CCDOC will work to eliminate the practice at the Facility.

**Compliance Status**:      Not applicable at this time.

**Status Update:** Briefly describe the actions taken by the Defendants to address the provision:

See 33.i.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

**Monitor's Recommendations:**

Policy direction provided;  suggest having the CCDOC Executive Director issue this order.  Ensure that this information is referenced in the CCDOC classification procedures and housing plan.

## DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

**PROVISION**

34.     Incidents and Referrals

a.     CCDOC shall continue to ensure that staff adequately and promptly document all reportable incidents, including inmate fights, rule violations, inmate injuries, suicides and suicide attempts, cell extractions, medical emergencies, contraband, vandalism, escapes and escape attempts, fires, and other incidents causing a disruption to standard CCDOC practice, in accordance with generally accepted correctional standards.

**Compliance Status**:        Partial compliance

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

CCDOC general order 9.1A, Reporting Unusual Incidents, effective date 4/10/09, includes the procedures for employee reporting and documenting unusual events.  The general order references specifically inmate fights, inmate injuries, inmate injuries as the result of stabbings, deaths/suicides, contraband, escapes/escape attempts, fires.  The order does not specifically mention rule violations (as a whole), cell extractions, all medical emergencies (exclusive of those noted in the previous sentence), or vandalism.  Reporting regarding use of force is also addressed in the office-wide policy being completed at this time. This policy is being evaluated along with all other written directives of CCDOC. The CCDOC is currently planning to evaluate then implement the incident-reporting module of the IMACS system.  This will capture the information noted in the provision, above.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

Currently the process of preparing reports is not automated.  The written directive governing reporting is also under review/updating.  Plans call for employees to begin using IMACS on an evaluative trial period for all incident reports,  parallel to the pen/paper system.  When the results are reviewed, the IMACS module will be implemented.  There are still issues about how reports, automated or not, are referred to OPR.

**Monitor's Recommendations:**

Amend the general order to address the provisions noted above.  Amend lesson plans.  Implement the incident reporting module of IMACS as soon as testing indicates employees are trained and ready.
See also 31.d., 31.e., 34.a., 34. b.

**DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010**

<u>**PROVISION**</u>

34.     Incidents and Referrals

b.     CCDOC shall continue to ensure that correctional officers receive formal pre-service and in-service training on proper incident reporting policies and procedures, in accordance with generally accepted correctional standards.

**Compliance Status**:       Partial compliance

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

Defendants providing pre-service and in-service training, and planning a system of remedial training that addresses proper and expected reporting procedures. The general order in CCDOC needs amending to address the provisions of 34.a.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

Substantial compliance will be achieved when the final use of force policy is implemented, the CCDOC general order updated, lesson plans updated, and a review of reports undertaken.
See also 34.a.

**Monitor's Recommendations:**

Completion of use of force policy; updating CCDOD general order, updating lesson plans to reflect report writing for all reportable incidents; ensure system of identify employees with report writing deficiencies and provision of remedial training.
See also 31.d., 31.e., 34.a., 34.b.

DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

**PROVISION**

34.    Incidents and Referrals

c.    CCDOC shall maintain a system to track all reportable incidents (as described in provision 34.a) that, at a minimum, includes the following information:

1.    incident tracking number;
2.    the inmate(s) name;
3.    housing assignment;
4.    date;
5.    type of incident;
6.    injuries (if applicable);
7.    medical care (if applicable);
8.    primary and secondary staff involved;
9.    reviewing supervisor;
10.    external reviews and results (if applicable);
11.    remedy taken (if appropriate); and
12.    administrative sign-off.

**Compliance Status**:    Partial compliance

**Status Update:** Briefly describe the actions taken by the Defendants to address the provision:

CCDOC general order 9.1A, Reporting Unusual Incidents, effective date 4/10/09 describes a manual system.  The new IMACS has an incident-reporting module that includes most of the information noted above.   A review of Chapter 12: Incident Reporting System of the IMACS Manual indicates that all elements noted above, <u>except</u> that I was unable to evaluate the incident titles (type of incident); medical care is in Cermak files, not CCDOC files (system appears to allow medication notification field along with name of medical person and ID number of medical person, date/time service provided); "remedy taken" because the terms are undefined; and "administrative sign off" as that is also undefined. The system does track the alleged inmate infraction, suspects, witnesses, victims, description of incident, whether force was used, whether a hearing was held, sanctions or discipline as a result of the incident.  The system allows a report to be "submitted forward".

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

IMACS will be a significant improvement to manually-produced and tracked reports.

**Monitor's Recommendations:**

Continue implementation and training regarding IMACS.

## DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

**PROVISION**

34.    Incidents and Referrals


d.    CCDOC shall require prompt administrative review of incident reports. Such reviews shall include a case-by-case review of individual incidents as well as a systemic review in order to identify patterns of incidents.  CCDOC shall incorporate such information into quality management practices and take necessary corrective action.


**Compliance Status**:      Partial compliance


**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:


CCDOC general order 9.1A, Reporting Unusual Incidents, effective date 4/10/09, does not require administrative review of incident reports.  Use of Force reports are governed by the draft use of force policy and will be reviewed.  The Sheriff's accountability meetings address some reports, but as noted, this process is not governed by written policy and procedure.
OPR SOP 103.14, Procedural Reform Recommendations, requires that investigators and unit directors review each completed OPR investigation to assess if there are systemic weaknesses identified.  If any such elements are identified, they are transmitted to the Executive Director.
Defendants provided a draft of a CCDOC general order entitled "Accountability Meetings" undated).


**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.


CCDOC is moving in this direction as evidenced by the draft use of force policy and the Sheriff's accountability meetings.  I believe administrative review is being done, but the process is not governed by policy and procedure.  IMACS provides for moving the report forward in the system to obtain the required supervisory sign-off.  Automated incident reporting system will generate weekly/monthly reports by incident title, and on-demand reports, that will allow quality management practices, identification of trends and issues, and engage in problem-solving.


OPR's requirement of reviewing investigations to identify policy, procedure or other failures is potentially very valuable, and not often seen in corrections/law enforcement.


The Sheriff's weekly accountability meetings are providing the leadership oversight and direction to continue reforms at CCDOC.  The draft directive is

needed to formally codify this process. I believe this draft needs more work to address issues such as (for example), who is responsible for maintaining the meetings' records and summary minutes, and how follow-up issues are monitored for compliance/change.

**Monitor's Recommendations:**

Complete the written directive governing the accountability processes, including the sheriff's weekly accountability meetings.

If OPR provides any Procedural Reform Recommendations to CCDOC, tracking those, as well as any remedial action would be valuable, especially as related to use of force.

## DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

**PROVISION**

34.     Incidents and Referrals

e.     CCDOC shall ensure that incident reports, use of force reports and inmate grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria, that it is referred for investigation.

**Compliance Status**:        Partial compliance.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

See 34.d.  Incident report screening results in use of force incidents being referred to OPR for logging and investigation if appears incident is excessive force.  See also 38 a. – d. reference inmate grievances.   There is no specific policy regarding the requirements of this provision, other than for incident reports.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

See 34.d.

**Monitor's Recommendations:**

Revise/update appropriate policy guidance within CCDOC and OPR.  Identify/track the investigations which are the result of information from incident reports, use of force reports and inmate grievances.  Develop the criteria, include in policy, that guides the elements of this provision.

## DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

**PROVISION**

34.     Incidents and Referrals

f.     CCDOC [OPR] shall maintain policies, procedures and practices requiring investigations to resolve issues identified during review of incident reports, disciplinary hearings, or inmate grievances, and determine appropriate remedies, in accordance with generally accepted correctional standards.  At a minimum, CCDOC shall require timely and appropriate investigations of all suicides, serious suicide attempts, inmate-on-inmate violence resulting in serious injury, inmate-on-staff violence, inmate injuries requiring treatment by an outside hospital, inmate injuries of a suspicious nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.), sexual misconduct between inmates, sexual misconduct involving staff, fires, escapes, escape attempts, and deaths.

**Compliance Status**:        Partial compliance

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

There are three CCDOC general orders governing internal investigations, which will be eliminated because of the creation of OPR.  [These orders are:  4.1 Internal Investigations, effective date 12/01/96;  4.1A Internal Investigations, effective date 09/01/00; and 4.1A Internal Investigations, effective date 12/01/96.]  The creation of OPR and the promulgation of that unit's standard operating procedures on 4/1/10 results in assigning responsibilities for various investigations to either OPR or the Department based on seriousness of the allegation/offense.  OPR must receive all use of force reports, and allegations of excessive force.  OPR's SOP 101.12 defines "serious incident", but the above elements are not so defined in that directive. They also may receive grievances directly from inmates.  There is not a process by which OPR would routinely review inmate disciplinary reports.  Allegations of criminal conduct (inmate/inmate, staff/inmate) are referred to the Cook County Sheriff's Police for investigation.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

OPR's creation is a significant event in CCSO.  The challenge now is to collaborate and revise the written directives in CCDOC to align with the authority and responsibility given to both OPR and CCDOC.  The directives governing CCDOC are being updated.

**Monitor's Recommendations:**

CCDOC/OPR/Cermak should confer regarding how the elements of this provision will be practically implemented, included in policy, trained, and documented as well as defining the circumstances under which grievances, incident reports, and disciplinary reports are forwarded/reviewed by OPR. Align the internal CCDOC general orders regarding investigations with OPR's responsibilities and standard operating procedures. Train the employees in CCDOC who will have responsibilities for investigations assigned as Department Head investigations by OPR. IMACS may provide a means for summary data to be transferred to OPR by CCDOC in order for OPR to review grievances, incidents, disciplinary reports and determine if follow-ups are necessary. There needs to be a check and balance system to ensure that information is reaching OPR regarding the incidents described in this provision.

**DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010**

**PROVISION**

34.     Incidents and Referrals

g.     CCDOC [OPR] shall ensure that any investigation reports indicating possible criminal behavior will be referred to the appropriate law enforcement authority.

**Compliance Status**:        Partial compliance

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

OPR's standard operating procedures provide guidance on referral for prosecution of allegations of criminal behavior.  There is an experienced supervisor in OPR with the responsibilities to coordinate with the prosecutor and the Merit Board.  OPR investigators have law enforcement authority.  In circumstances were crimes are alleged inside CCDOC facilities, the Cook County Sheriff's Police will investigate.  Prosecutors may decline prosecution and OPR strives to document that from the prosecutor in the appropriate file.

See also 31.n., 35.a.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

This provision will be in substantial compliance when the draft use of force policy is finalized along with amendments/deletion to CCDOC's internal affairs general orders.

**Monitor's Recommendations:**

Complete the use of force directive, office wide – and amend/delete CCDOC policies as appropriate. There needs to also be data maintained about the opening and closing of criminal investigations (either by OPR or CCSP), as well as outcomes, if outside the scope and capability of IAPRO.

See also 31.n., 35.a.

## DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

**PROVISION**

35.    Investigations - Investigations at the Facility are conducted by independent departments under the Cook County Sheriff's Office, including the Office of Professional Review, the Criminal Investigations Unit, and the Sheriff's Police Department.  The Cook County Sheriff will assume responsibility for requiring these investigatory units to comply with the relevant provisions of this Agreed Order.

a.    CCDOC [OPR] shall maintain comprehensive policies, procedures, and practices for the timely and thorough investigation of alleged staff misconduct, in accordance with generally accepted correctional standards.

**Compliance Status**:       Partial Compliance

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

The defendants have established the Office of Professional Review (OPR) that has developed the office's own set of policies and procedures guiding investigations which cover all employees, inmates, arrestees of the CCSO [Office of Professional Review, Standard Operating Procedure, dated April 1, 2010]. The OPR director and staff of this unit are specifically selected for their expertise and provided training.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

The defendants have established a very credible internal investigations process. The strategy, which would enhance operations and improve outcomes, while assuring allegations are investigated, is the designation of, and training for individuals in the jail who will handle the investigations which are deemed less serious and referred back to the Dept. of Corrections for a "department head's investigation".

I have accessed this partial compliance until the CCDOC's written directives are updated/deleted, etc.

**Monitor's Recommendations:**

The procedures will be further enhanced by training selected/designated supervisors/managers who will be assigned investigations inside CCDOC.  The investigative procedures of OPR may also be improved relative to the mandates of the Prison Rape Elimination Act of 2003 when the National Institute of

Corrections' on-site technical assistance is provided.  CCDOC directives need to be revamped based on the existence of OPR and their SOPs.

## DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

**PROVISION**

35.     Investigations - Investigations at the Facility are conducted by independent departments under the Cook County Sheriff's Office, including the Office of Professional Review, the Criminal Investigations Unit, and the Sheriff's Police Department.  The Cook County Sheriff will assume responsibility for requiring these investigatory units to comply with the relevant provisions of this Agreed Order.

b.     Internal investigations shall be conducted by persons who do not have supervisory responsibility for the staff member(s) being investigated.

**Compliance Status**:        Partial compliance.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

Defendants have established a process by which serious allegations (internal investigations) are investigated by the Office of Professional Review.  Allegations that are determined not to rise to a serious level are returned to the Executive Director of the Dept. of Correction for investigation and tracked by OPR.   The CCDOC Executive Director may return investigations that he believes are not appropriate for review inside the Dept. of Corrections.

OPR standard operating procedure 102.5 provides for six classes of complaints (1.  OPR investigations – allegations likely to result in criminal prosecution if sustained;  2. department head investigations – allegations appear unfounded or of a less serious nature – rule violations;  3. information only – no allegations against an employee or contractor or lack substance; 4. summary discipline – regarding performance of employees generally initiated by the employee's department for which OPR responsibilities are to process/log, review employee's past discipline history, communicate with the employee's unit director, forward final disposition to Administrative Section for processing, update the data base in OPR (IAPRO);  5. use of force; and 6. Correspondence log – information that lack sufficient information to determine if misconduct is present).

CCDOC has general orders regarding internal investigations that need updating/eliminating or conforming to the OPR role and standard operating procedures.

Defendants provided on September 14th an unsigned amendment to CCDOC General Order # 4.1, dated 9/8/2010, that incorporates the language included in this provision.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

The defendants have a process in place to evaluate allegations and determine where to invest resources of OPR.  This process will be enhanced by training those command level/supervisory staff who will be assigned reviews from OPR.  CCDOC general orders on these topics need to be updated.

As noted above, defendants have produced an amendment to a CCDOC General Order #4.1 incorporating the language of this provision.  Perhaps this language needs to be added to OPR's Standard Operating Procedures, so OPR can monitor this provision when they review department head investigative results, or when they enter data regarding other investigations into IAPro, or other database.

**Monitor's Recommendations:**

Providing training to the individuals in the CCDOC who will be conducting "department head's investigation" to ensure that they are skilled in the techniques required, and know from whom at OPR to seek assistance, and when to refer the review back to OPR if additional allegations are revealed.  We discussed these training lesson plans being retained on file at the Training Institute.  Update CCDOC's general orders on relevant topics.  Consider amending OPR's SOP to include the language in this provision.

## DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

**PROVISION**

35.     Investigations - Investigations at the Facility are conducted by independent departments under the Cook County Sheriff's Office, including the Office of Professional Review, the Criminal Investigations Unit, and the Sheriff's Police Department.  The Cook County Sheriff will assume responsibility for requiring these investigatory units to comply with the relevant provisions of this Agreed Order.

c.     CCDOC [OPR] shall ensure that all internal investigations will include timely, thorough, and documented interviews of all relevant staff and inmates who were involved in, or witnessed, the incident in question.

**Compliance Status**:     Substantial compliance.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:


**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

I reviewed 10 files and found them to be in order, meaning they were consistent with the policy in effect at the time; those done since April 2010 better organized than those completed before.  The files were organized per OPR policy for the investigations since April 2010.  Based on policy, this provision is met.  Supervisors review files and require additional work as necessary.

OPR investigation files were reviewed.   OPR Standard Operations Procedures provide clear guidance regarding how files will be prepared, monitored, as well as supervisory review.


**Monitor's Recommendations:**
None at this time.

### DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

**PROVISION**

35.     Investigations - Investigations at the Facility are conducted by independent departments under the Cook County Sheriff's Office, including the Office of Professional Review, the Criminal Investigations Unit, and the Sheriff's Police Department.  The Cook County Sheriff will assume responsibility for requiring these investigatory units to comply with the relevant provisions of this Agreed Order.

d.     CCDOC [OPR]  shall ensure that internal investigation reports shall include all supporting evidence, including witness and participant statements, policies and procedures relevant to the incident, physical evidence, video or audio recordings, and relevant logs.

**Compliance Status**:          Substantial compliance.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

Defendants have established policy that provides that the OPR will conduct investigations into serious allegations.  As such, their standard operating procedure manual is completed.  There are systems in place to track investigations (Monthly Case Statistics).  The Director reports that training is provided.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

The defendants have a credible system.  I reviewed ten files during the last tour, including files for cases before the OPR's standard operation procedures were put in place in April 2010.  I found the files contained the information noted above; and as would be anticipated, the files for investigations after April 2010 are more organized.

**Monitor's Recommendations:**

Continue supervisory review of investigative files to ensure compliance with OPR's standard operating procedures.

## DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

**PROVISION**

35.    Investigations - Investigations at the Facility are conducted by independent departments under the Cook County Sheriff's Office, including the Office of Professional Review, the Criminal Investigations Unit, and the Sheriff's Police Department.  The Cook County Sheriff will assume responsibility for requiring these investigatory units to comply with the relevant provisions of this Agreed Order.

e.    CCDOC [OPR] shall ensure that all investigatory staff will receive pre-service and in-service training on appropriate investigations policies and procedures, the investigations tracking process, investigatory interviewing techniques, and confidentiality requirements.

**Compliance Status**:        Partial compliance.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

Defendants have established policy that provides that the OPR will conduct investigations into serious allegations.  As such, their standard operating procedure manual is completed. The OPR Director reports that training is provided to OPR employees.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

OPR Director reports that training is provided.  I did not have an opportunity to review the lesson plans.  Also, when NIC's Technical Assistance is provided there will be recommendations regarding training for investigators who are charged with investigating institutional sexual assault.  These cases are handled by the Cook County Sheriff's Police, so a review of their training will also be needed.  See also recommendations in 35.b. regarding CCDOC management who will be assigned Department Head Investigations.

**Monitor's Recommendations:**

To gain substantial compliance, provide lesson plans; evidence of training completed; and await assessment and implementation of recommendations regarding investigations of institutional sexual misconduct.

**DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010**

**PROVISION**

35.     Investigations - Investigations at the Facility are conducted by independent departments under the Cook County Sheriff's Office, including the Office of Professional Review, the Criminal Investigations Unit, and the Sheriff's Police Department.  The Cook County Sheriff will assume responsibility for requiring these investigatory units to comply with the relevant provisions of this Agreed Order.

f.     CCDOC shall provide all investigators who will be assigned to conduct investigations of use of force incidents with specialized training in investigating use of force incidents and allegations.

**Compliance Status**:        Partial compliance.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

See 35.e.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

See 35.e.

**Monitor's Recommendations:**

See 35.e.

## DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

**PROVISION**

35.    Investigations - Investigations at the Facility are conducted by independent departments under the Cook County Sheriff's Office, including the Office of Professional Review, the Criminal Investigations Unit, and the Sheriff's Police Department.  The Cook County Sheriff will assume responsibility for requiring these investigatory units to comply with the relevant provisions of this Agreed Order.

g.    CCDOC [OPR] shall ensure that the results of each internal investigation shall be documented in an investigation report.  CCDOC administration shall review the investigation reports, along with the underlying documentation, and take appropriate action.  CCDOC shall implement appropriate remedies based upon the results of internal investigations.

**Compliance Status**:        Partial compliance.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

OPR standard operating procedure 103.7 prescribes the Official Case Folder for internal investigations that includes the Memorandum of Investigation.  The procedure requires a "command channel review" allowing for the CCDOC Executive Director to review appropriate actions, including discipline, prosecution, termination.  There is no specific written directive that requires the CCDOC to take remedial action, if indicated,  regarding the results of internal investigations.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

OPR SOP requires the command channel review.  This, along with the Sheriff's Accountability meetings provide the opportunities to assess systemic issues and address these.  Written directives that guide how CCDOC will review and use the information are needed.  CCDOC related general orders/directives need to be updated.

**Monitor's Recommendations:**

Develop CCDOC policy regarding systemic assessments and remedial action.  Update CCDOC directives related to internal investigations.

See also 31.n.

## DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

**PROVISION**

36.     Inmate Disciplinary Process

a.      CCDOC [OPR] shall maintain policies, procedures, and practices for a formal disciplinary process, including prompt issuance of written disciplinary citations, administrative review and disciplinary reports for alleged minor rule violations, and due process for alleged major rules violations, in accordance with generally accepted correctional standards.

**Compliance Status**:         Partial compliance.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

CCDOC General Order 14.8A, effective date 2/21/97, Detainee Disciplinary Hearing and Detention, provides an inmate disciplinary process which meets generally accepted correctional practice. This written directive is under review at this time.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

An inmate disciplinary hearing was observed during the tour in June '10.  The inmate in that hearing agreed that he had been provided notice of the hearing, charges, and allowed to call witnesses (which he had declined).  Trend data is maintained by each Division regarding the number of incidents and this information is reviewed at the Sheriff's weekly accountability meeting. Use of IMACS will also provide the ability track incidents by a variety of factors.

**Monitor's Recommendations:**

Per the CCSO's written directive policy all policies will be reviewed annually.  This will ensure that this policy is kept current with case law.  CCDOC is tracking incidents by Division.  See previous recommendations regarding assuring that information from disciplinary reports is screened/reviewed relating to employee misconduct and/or use of force.

## DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

**PROVISION**

36.    Inmate Disciplinary Process

b.    CCDOC shall ensure that inmate disciplinary hearings are conducted in a reasonably private and secure setting.

**Compliance Status**:    Partial compliance.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

CCDOC General Order 14.8A, effective date 2/21/97, Detainee Disciplinary Hearing and Detention, does not address the conduct of inmate disciplinary hearings in a reasonably private and secure setting.  This written directive is under review.

**Monitor's Assessment:**  Describe the monitor's assessment of the status and documentation for the compliance status.

The disciplinary hearing I observed was held in a quiet corner of the inmate library.  While staff may try to find a private and secure setting, this is not a policy mandate.

**Monitor's Recommendations:**

Amend the directive and training to instruct staff to, as security circumstances permit, provide a private setting for disciplinary hearings.

DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

**PROVISION**

36.      Inmate Disciplinary Process

c.      CCDOC shall ensure that all inmates placed in lock down status are provided with appropriate due process that has been developed and implemented in policies and procedures, in accordance with generally accepted correctional standards.

In an emergency, the Executive Director of CCDOC may order a lock down of entire areas of the Facility in order to control the situation and address serious security concerns.  In such circumstances, it is not necessary to provide disciplinary hearings to each inmate affected by the lock down.  However, lock downs of this nature shall be limited to only the time and scope necessary to address the emergency.  For the purposes of this Agreed Order, a "lock down" shall not include the routine instances in which inmates are confined to their cells, including periods of count, over night, shift change, movement, and routine contraband sweeps.

**Compliance Status**:        Partial compliance.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

As described by those who negotiated this consent agreement, the concerns addressed by this provision relate to a prior practice of locking down units over weekends to search for contraband, etc.  The CCDOC states that this practice is no longer followed, except in emergency situations.

Defendants provided on September 14, 2010, an unsigned amendment, effective 9/8/2010, to a CCDOC General Order #9.35 that partially incorporates the language of this provision.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

CCDOC states the practice that precipitated this provision no longer occurs. Direction to superintendents regarding this policy would provide proof of compliance to this provision.  I have not been able to evaluate the effect of the amendment dated 9/8/2010 regarding lockdown levels.

**Monitor's Recommendations:**
Rather than produce this amendment, review the entire General Order to ensure that all Divisions are in compliance with the language of this provision.

**DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010**

**PROVISION**

36.     Inmate Disciplinary Process

d.     CCDOC shall ensure that the disciplinary board's written record accurately reflects the testimony and discussion from the disciplinary hearing, including any recommendations from a mental health professional regarding the extent to which disciplinary charges are related to an inmate's serious mental illness or suggestions for minimizing the deleterious effect of disciplinary measure on the mental health status of the inmate. Coordinate with Dr. Metzner

**Compliance Status**:      Non-compliance

**Status Update:** Briefly describe the actions taken by the Defendants to address the provision:

CCDOC General Order 14.8A, effective date 2/21/97, Detainee Disciplinary Hearing and Detention Section III. E. 7 describes the record that the Disciplinary Hearing Board must create.  Neither that section, nor section F., Disciplinary Decisions, addresses the issue of the mental health status of the inmate.   Both CCDOC and Cermak indicate their willingness to develop policy guiding this matter.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

The defendants, both CCDOC and Cermak seem amendable to assuring that the mental health status of inmates is a consideration in the inmate disciplinary process. The policy direction must be developed that will guide the final decisions of both parties in how this provision is operationalized, tracked, documented, evaluate.

**Monitor's Recommendations:**

Amend this order (needs updating from 1997) and include the above provisions. Consider establishing an inmate management team approach in each Division that will consolidate security, mental health, and medical representatives to manage inmates who are mental health clients.

Dr. Metzner indicates that he agrees with this recommendation, please see his report to the Court, page 21.

**DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010**

<u>**PROVISION**</u>

36.     Inmate Disciplinary Process

e.     CCDOC shall alert Cermak when inmates are placed in disciplinary segregation or protective custody. Coordinate with Dr. Shansky

**Compliance Status**:     Partial Compliance

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

CCDOC General Order 14.8A, effective date 2/21/97, Detainee Disciplinary Hearing and Detention Section does not address notification to Cermak when inmates are placed in disciplinary housing.  The policy provides that inmates are visited three times a week by a qualified health care official unless more frequent care is needed.   General Order (Draft) Special Management – Custody Placement governs inmates classified into Protective Custody status, but does not address alerting Cermak of the placement.   Dr. Hart reports that Cermak does receive some incident reports via fax, but doesn't always know the purpose of the fax being sent.  Dr. Shansky did not have an opportunity to review this provision.

Defendants provided on September 14, 2010:  a memorandum from Elli Montgomery, Medical Advocate, dated 1/13/2010, to superintendents in Divisions 4, 9, and 11 notifying them to fax the names of inmates/detainees who are placed in segregation;  an unsigned memorandum dated September 9, 2010, from 1st Assistant Executive Director Gary Hickerson to all superintendents requiring that Cermak be notified when an inmate is placed in Disciplinary Segregation/Protective Custody/Administrative Segregation; and Special Incarceration Medical Notification Form (unnumbered and undated).

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

I assume that the purpose of this notification is for Cermak to be timely notified if one of their medical and/or mental health clients has been involved as a result of some incident requiring reclassification/re-housing; and to ensure that adjustments to medication management are made. Both CCDOC and Cermak are amendable to this change.  This process can be facilitated by CCDOC providing Cermak with a movement report generated via IMACS each day (or sooner).  CCODC will need policy governing this, as will Cermak.

While I appreciate the CCDOC's responsiveness in addressing areas noted as non-compliance, I an unable to evaluate if this approach will be effective in this

instance, especially as I am unable to review Cermak's response to receiving these notifications and Cermak's subsequent action(s). The process needs to be organized so that Cermak also receives notifications, or is able to timely learn in some other way (for example accessing IMACS) when inmates are re-housed, generally, and specifically moved out of specialized housing.

**Monitor's Recommendations:**

While the general order was amended, the process needs to be evaluated so that the results are what are envisioned by this provision; including Cermak's policies. I, with some reluctance, changed the compliance noted from non-compliance to partial compliance based on my preliminary review; but noting that more work needs to be done.

I renew my recommendation for CCDOC and Cermak to convene an inter-disciplinary committee to address these specific policy/operational issues needing coordination between Cermak and CCDOC as well as identify the goals of this notification process and expected outcomes.

**DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010**

**PROVISION**

36.    Inmate Disciplinary Process

f.    CCDOC shall permit a Cermak Qualified Mental Health Staff member to serve on the disciplinary board.  Coordinate with Dr. Metzner

**Compliance Status**:    Non-compliance

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

CCDOC General Order 14.8A, effective date 2/21/97, Detainee Disciplinary Hearing and Detention Section does not address this provision.  Dr. Metzner did not evaluate, other than to offer advice to Cermak.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

All parties appear amenable to this provision, although there have been discussions about the purposes of a qualified mental health staff serving on the board – to provide information/advocate for clients; and/or act as a voting member; or some other objectives.  These philosophical differences need to be resolved, and appropriate policies implemented.  These other issues require discussion/resolution:   if Cermak has the mental health resources to attend all hearings involving their mental health clients, how Cermak will be notified, the timeliness of the notifications, what is the policy if the Cermak representation wishes to be present but is unable to for whatever reason, and what information will be provided to Cermak before the hearing.  There may be other strategies to ensure mental health input than serving on the disciplinary board, including implementation of an inmate management team approach.

**Monitor's Recommendations:**

The parties need to reach a resolution on this matter including identifying the objectives of having this policy, develop written directives, and implement.  Part of the directive should address how this involvement is tracked and evaluated. There is the inmate disciplinary information in IMACS which may provide the means for notification, but, of course, this doesn't address the other issues noted above.

Dr. Metzner indicates that he agrees with this recommendation.

**DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010**

**PROVISION**

37.    Classification

a.    CCDOC shall maintain policies and procedures for an appropriate, objective classification system that separates inmates in housing units by classification levels in order to protect inmates from unreasonable risk of harm. The system shall include consideration of an inmate's security level, severity of current charge, types of prior commitments, suicide risk, history of escape attempts, history of violence, and special needs.  CCDOC shall use best efforts to anticipate periods of unusual intake volume and schedule sufficient classification staff to timely classify inmates.

**Compliance Status**:        Partial compliance.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

In 2006, Dr. Jim Austen provided technical assistance to CCDOC [through the National Institute of Corrections] and those recommendations are not yet fully implemented, due in part to awaiting the implemented IMACS system. The classification instrument (and re-classification instrument) severity scale developed in 2006, is used within IMACS to designate an inmate's classification (by way of an additive point scale), and then assigning housing.  Development of new housing plan was recommended by Dr. Austin in 2006.   The NIC (through Dr. Patricia Van Voorhis) is now working with Women's Justice Services to develop a gender–responsive classification instrument. [See undated report "A Review of Classification Models for Women Offenders Technical Assistance Report Prepared for the Cook County Sheriff's Department, Department of Women's Services"]  The inmate classification system has never been validated, a process that analyzes data regarding inmate classification and indicators of disorder in a facility.   The classification unit does not maintain data what would facilitate a validation study.  There is very limited re-classification activity.

An inmate's classification is established during the intake process in the receiving area.  The inmates are moved directly from the receiving area to the housing indicated by their classification process.  CCDOC reports that it averages 6.5 hours to move inmates from the reception area to their housing.

While most inmates who come to CCDOC have had prior opportunities to bond out or have another form of release, CCDOC reports that as many as 25% are released within 72 hours of coming to the CCDOC.

A formal re-classification process is pending implementation, and CCDOC has yet to define the purpose and process.  CCDOC reports that it does not always

flag when an in-custody inmate has upgraded or downgraded criminal charges, which should trigger a re-classification. [See also Cook County Sheriff's Objective Classification Instructions Manual.]

**Monitor's Assessmen**t: Describe the monitor's assessment of the status and documentation for the compliance status.

The current inmate classification and re-classification processes are very problematic for the following reasons:

- At this time an unknown number of incoming new inmates/arrestees may doe not have their criminal history records transmitted/carried from their arresting agency to be used in the CDDOC reception process. The impact of this is that inmates may be under-classified because the CCDOC does not currently have the capacity to query criminal histories due to lack of certified employees, available employee resources, and lack of time in the accelerated process to move income arrestees out of the reception/booking areca to cells. The instrument used by CCDOC requires current offense, severity of prior criminal convictions, prior felony convictions, history of escape or attempts to escape, and history of institutional violence as the primary bases for classification. Practically, a number (unknown) of these incoming inmates are known in the system; and some will have bonds and current charges that would place them in maximum custody. The IMACS system will, at some time in the near future (unknown at this time) allow a link to the state's criminal history record systems which will provide the critical information (assuming that the inmate is accurately identified). In the absence of this link to the state's CCH, CCDOC reports that it does not have the resources to run this information for incoming inmates, and that doing so would substantially slow down the processing of in-coming inmates. Past attempts to ask arresting agencies or prosecutors to include the inmate's CCH in the in-coming paperwork have not been successful. Chicago Police Department does include this information with the incoming arrestee.

- As noted above, the classification instrument has not been validated, and in fact, has some glaring issues, such as use of gang affiliation as an over-ride rather than a rated criteria, especially given the gang issues in Cook County and in the CCDOC. The rating instrument appears to be overly-simplistic given the size of the CCDOC, which is a function of the lack of validation which would provide the specific criteria linked to good or bad inmate behaviors for this system. CCDOC accepted good advice from Dr. Austen, but that does not relieve CCDOC of further developing the classification system based on the agency's specific needs.

- The atmosphere in which classification interviews are taking place is unacceptable. The inmate's classification interview takes place in the

September 20, 2010                                                                                      105

receiving area in less than private booths. The noise, crowding, and general disruptive atmosphere is not conducive to the type of classification interviews that constitutes acceptable correctional practice. Acknowledging that the CCDOC is breaking ground on a new reception center, to be open in two years (best scenario) does not mitigate the current atmosphere. The "classification" interview currently done could best be categorized as a preliminary screening, not a full classification process, especially considering the potential gap in critical information (CCH) for a large number on inmates.

- The CCDOC does not have a classification housing unit, which means that inmates go directly from the receiving area into the facility, even with incomplete classification information. In systems of this size, it would be expected to have a classification housing unit, and in fact, CCDOC reports having one in the past, which was abandoned due to a variety of reasons, including crowding and the staffing resources to move inmates from the classification unit to their assigned housing. The purposes of classification housing are several, including but not limited to:
  - o house inmates who have a high probability of being released within 72 hours (based on criteria developed from historical data in CCDOC) thus saving the resources to move them to the divisions and further preventing movement of contraband;
  - o house inmates to ensure that sufficient information has been developed to accurately classify, including but not limited to institutional history in IDOC (for example), follow-up medical and/or mental health screening, gang affiliation input etc. While it is now necessary to move inmates rapidly out of reception, this compromises the classification process;
  - o observe and assess inmates' institutional adjustment and behaviors if they are unknown to CCDOC; and
  - o allow the classification interview, and related screening – including but not limited to PREA and mental/health to take place in a private atmosphere in which the officer can probe for more information, have relevant information at the time of the interview, and not have a premium placed on moving inmates rapidly through the process.
  - o The use of classification housing also can consolidate medical/mental health resources and avoid rushing inmates through mental health and medical evaluations.

- As noted above, incoming new inmates with serious criminal charges and/or high bonds can be moved directly to maximum custody housing, not needing to be held in classification housing; but with the classification interview conducted at their housing location.

- Currently, data regarding past institutional adjustment, disciplinary actions, etc. inside the CCDOC is not available during the classification process. With IMACS going forward, this data will be available, but past information is not now available unless the inmate is known to the screener or the employees in the division to which the inmate is assigned. This is one factor in the classification instrument.

- The CCDOC does not have a formal inmate housing plan. A classification process and housing plan are two separate elements of inmate management. A housing plan, a flexible and frequently updated document, identifies how bed space in the system will be used to accommodate the various inmate classifications to facilitate safe management. A housing plan is the result of knowing the accurate classifications of the inmates in custody – over time. The housing plan also anticipates how crowding, should it occur, will be managed (e.g., what housing areas will be double-bunked, etc.). The classification system should drive the housing plan, not the other way around.

- There appears to be no coordination between the plans for a gender-specific classification system under developed by the Women's Justice Services and the current inmate classification system. Generally, nationwide women inmates are over-classified because all current classification instruments are male-based. The impact of implementing a gender-responsive classification system on CCDOC will be positive and wide-spread. This is a potentially very good step for the women inmates, but it must be coordinated with all stakeholders.

- Current CCDOC policy allows inmates to be moved within a division with the approval of the superintendent or on-duty highest-ranking officer, with notification to Classification to ensure that the housing information is adjusted to ensure an accurate inmate count. This process needs to be better defined so that information is gathered regarding why inmates are moved, and whether this is related to the accuracy of the initial classification. For example, if an inmate is moved because he/she can't get along with other inmates, that perhaps relates to accuracy of the initial classification screening; of if the inmate has an issue with the employees assigned to that housing unit, that is a supervisory/training issue. Further evaluation of this process will assess whether inmates are moved for violations that are not resulting in a disciplinary infraction. While officers and supervisors need to have flexibility in housing inmates for security and safety issues, the implications of CCDOC's current practices are broad for the classification, inmate management, and employee supervision perspectives.

- Events involving inmates who need to be moved are also related to the re-classification issue. If an inmate is unable to function in his/her assigned

housing, this should trigger a re-classification interview.  If an inmate is given a disciplinary infraction, this should trigger a re-classification.  If an inmate receives upgraded or downgraded criminal charges, this should trigger a re-classification.  When an inmate is being released for special management housing, this should trigger a re-classification. Without these re-classifications, validating the current system will be difficult, and accepted correctional practice is not followed.

**Monitor's Recommendations:**

The entire classification system needs immediate re-examination and updating. The positive information is that the indicators of disorder in the divisions (e.g., weapons, fights, fires, disciplinary reports) support that the environment is generally safe.  However, the classification system and processes are well outside accepted correctional practice, from the initial screening, to the lack of classification housing, to lack of re-classifications (including upgraded or downgraded criminal charges), to the ability of employees to move inmates within divisions without triggering a re-classification.  The fact that as many as 34,000 inmates are under-classified is troubling.  The instrument itself needs to reflect the realities for CCDOC (i.e., impact of gang affiliation).

There needs to be coordination between the gender-specific classification initiatives underway and the inmate classification as a whole.

The status of the current classification process, along with the absence of historical data will render a validation study more difficult, but none-the-less critical.

The system also needs to be reviewed in terms of the pros and cons of re-establishing a classification housing unit.

Staffing for the classification function needs review.

The new receiving facility will provide more appropriate, private initial screening. But until that facility is done, the physical plant should be examined to determine if there is a better place and time to conduct the classification (really preliminary screening) interview.

The system needs to be validated, and for systems of this size, accepted practice suggests that should be an annual process.  However, the data to conduct this validation study should be generated in-house, and the capacity to do this, in-house.  Periodic assistance from outside experts should be considered to ensure that the process is objectively critiqued.

### DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

**PROVISION**

37.    Classification

b.    CCDOC shall ensure that classification staff have sufficient access to current information regarding cell availability on each division.

**Compliance Status**:    Partial compliance

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

The CCDOC currently produces Daily Open Cells report several times each day. It is planned that the IMACS system will produce the information to classification staff about cell availability.  I was unable to identify a policy that guides this process in terms of production, updating/amendment, and management oversight of this process.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

The information is currently available in making housing decisions.  The policy/procedure that guides this data entry and updating process is undefined.

**Monitor's Recommendations:**

Develop policy guidance. Once completed, ensure periodic quality control checks to ensure that the information (cells not to be used, and cells which have had repairs)are timely updated in the system.

**DATE OF STATUS UPDATE: SEPTEMBER 20, 2010**

**PROVISION**

37.    Classification

c.    CCDOC shall include information on each inmate's assignment to the Special Incarceration Unit "level system" at the Facility in the new Jail Management System, starting with the date the new Jail Management System becomes operational.

**Compliance Status**:       Substantial compliance.

**Status Update:** Briefly describe the actions taken by the Defendants to address the provision:

Information is included in IMACS regarding the inmate's assignment. Policy/procedure need to be updated.

**Monitor's Assessmen**t: Describe the monitor's assessment of the status and documentation for the compliance status.

I do not know what "information on each inmate's assignment to the Special Incarceration Unit "level system" mean? If it means that the CCDOC is aware of the housing location of inmates in the level system, IMACS provides and tracks this information.

**Monitor's Recommendations:**

If further definition of the issues which precipitated this provision are identified, I will re-evaluate compliance.

DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

**PROVISION**

37.    Classification

d.    CCDOC shall provide training and access to all correctional officer supervisors on the full capabilities of the new Jail Management System's classification and inmate tracking system (or any replacement system).

**Compliance Status**:        Partial compliance.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

Training regarding the IMACS system is included as part of pre-service and in-service training.  The system is gradually becoming fully operational.  Additional training is provided at those posts where knowledge of IMACS is critical (e.g. booking, classification).

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

Implementing a new information management system in a jail this size is a time consuming and long-term process.  The administration is committed to the job and appears to have the vendor and in-house resources for training employees. Compliance will include review of the lesson plans, measure of employee knowledge, and how mistakes in the data entry and management of IMACS will be identified and involved staff remediated.

**Monitor's Recommendations:**

None at this time.  Further recommendations pending review of how implementation proceeds.

**DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010**

**PROVISION**

37.    Classification

e.    CCDOC shall provide ongoing internal and external review and validation of the inmate classification system to ensure its reliability and objectivity.

**Compliance Status**:        Non-compliance.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

See 37.a.  There has been no validation study of the system.  CCDOC has had discussions with Loyola University to have a criminal justice professor work as a partner with CCDOC to design and implement a validation study, as well as provide on-going assistance in the annual revalidation of the system.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

The defendants are amenable to this work.  Further review of the current process is needed prior to proceeding.  I have collected several classification validation studies so that the CCDOC can see the outcomes.  A system the size of CCDOC needs to develop the in-house capacity to conduct annual validation studies of the classification system; with periodic oversight/review by a qualified academician, consultant, etc.   The initiatives in Women's Justice Services must also be incorporated.

**Monitor's Recommendations:**

Need for planning to review the current system and planning to implement a validation system in place in CCDOC.

DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

**PROVISION**

38.    Inmate Grievance Process

a.    CCDOC shall maintain policies and procedures to ensure inmates have access to an adequate grievance process and to ensure that grievances may be accessed and filed confidentially, without requiring the intervention of a correctional officer, in accordance with generally accepted correctional standards.   These policies and procedures should be applicable and standardized across all the Facility divisions.

**Compliance Status**:        Partial compliance.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

CCDOC General Order 14.5 Detainee Grievance Procedure, effective date, 2/21/97, outlines procedures that are consistent with generally accepted correctional practice, and apply to all divisions.   CCDOC indicates that inmate grievances can be provided orally to officers and counselors (CRWs – Correctional Rehabilitation Workers).   Grievance boxes are emptied on each shift by the superintendent's designee, generally a sergeant. The forms are processed by the program office in each division. Grievances are tracked using an access data base program.  Correctional counselors are available to assist illiterate inmates.  The inmate orientation video in Spanish and English provides information to in-coming inmates regarding grievance procedures.   OPR states that it receives up to 30 inmate grievances a month, either forwarded by the division or by inmates.   See also 31.q. inmate reporting allegations of use of force.   CCDOC compiles a monthly Divisional Grievance Activity summary report that includes assessment of the responsiveness per policy.  CCDOC graphs annual grievance data by division.  For 2008:  total of 2,329; 2009 total of 2,717 [increase of 16%]

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

The policy doesn't address:  an inmate's ability to orally file a grievance, access by non-English speaking inmates; illiterate inmates; or disabled inmates.  The policy does not address the centralized function of gathering inmate grievance data and analyzing the data.  The policy does not address medical grievances, or coordination with Cermak or food services.  As would be expected the largest percentage of grievances are medically related (70% for May 2010). The process designates the CRWs as having primarily responsibility for collecting and logging the grievance forms, but informal policy appears to involve the designated sergeant.  The policy doesn't address inmates' use of an inmate

request form as a grievance. The policy doesn't address how inmates who file multiple, continual grievances are managed; although staff indicated that such a situation doesn't stop the grievance process.

The general order does not specifically address that grievance forms will be available in all housing locations. The directive does allow inmates to submit grievances on plain paper if forms are not available.

**Monitor's Recommendations:**

This is a good opportunity for review and updating of the grievance general order. The tracking of inmate grievances, and periodic, monthly reporting by division and topic should be included in the sheriff's accountability meeting as an indicator of facility health and tracking resolutions. The issues created by the large number of medically-related grievances which appear not to be addressed in a timely to the satisfaction of the inmates, is a problem. CCDOC and Cermak need to jointly address how the medically-related grievances will be addressed in order to be timely and satisfy inmates (to the extent inmates will be satisfied). The medical grievances are a concern to the inmates that must take time from the nurses and CCDOC staff in the every day management of the housing units. Address who is responsible for stocking the grievance forms in each inmate housing area.

See also 31.q., 34.e.

DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

**PROVISION**

38.     Inmate Grievance Process

b.     CCDOC shall ensure that the grievances receive appropriate follow-up, including informing the grievant of the outcome, providing a timely written response, and tracking implementation of resolutions.

**Compliance Status**:        Partial compliance.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

CCDOC General Order 14.5 Detainee Grievance Procedure, effective date, 2/21/97, addresses this provision

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

The general order needs updating; which would result in this provision marked as substantial compliance.   The timely response to medical grievances from Cermak remains an issue.

**Monitor's Recommendations:**

Update the general order;  ensure that information and data captured is used as management information. Cermak and CCDOC need to identify a better way to more effectively and timely respond to inmate medically-related grievances.

**DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010**

<u>**PROVISION**</u>

38.     Inmate Grievance Process

c.     CCDOC shall ensure that grievance forms are available on all units and are available in Spanish.  CCDOC shall ensure that there is adequate opportunity for illiterate inmates and inmates who have physical or cognitive disabilities to access the grievance system.

**Compliance Status**:        Partial compliance.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

The general order does not specifically state that forms are available in all housing units, in English or Spanish, nor who is responsible for this function.  The general order does not address non-English speakers, nor illiterate inmates, nor inmates with physical or cognitive disabilities.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

See 38 a. CCDOC indicated that Cermak had procedures in place for inmates with disabilities to file grievances, but I was not able to verify this.
The order does not address the remaining language in this provision.
The CCDOC general order states that it will be audited at least annually.  I did not see any annual audit of the system.

**Monitor's Recommendations:**

See 38.a.  Also coordinate grievance procedures with Cermak, food services, and ensure there is a procedure in place for inmates with disabilities to grieve.

Revise/update order to comply with this provision.

## DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

**PROVISION**

38.    Inmate Grievance Process

d.    CCDOC shall ensure that inmate grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria, are referred for investigation.  A member of the management staff shall review the grievance tracking system regularly in order to identify areas of concern.

**Compliance Status**:    Non-compliance

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

While this may being done, it is not in policy.  OPR does receive grievances, and acts on them when received.

Defendants provided as documentation of compliance, letters sent to complainants regarding investigation of inmate grievances.  Also provided was a listing what appear to be inmate grievances, including notations that some have been referred for investigation, not identifying the source of the listing.  The policy that guides this process was not provided/identified.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

Tracking system, along with analysis of data is vital for improved incident management.  Coordination with food service and Cermak – most likely the two areas where for which grievances are received – are necessary, along with the creation of the policy guidance.  The policy guidance should assign the responsibilities to implement this provision, including management/administrative oversight and collaboration between OPR and CCDOC.

**Monitor's Recommendations:**

Address this provision in policy.  Develop a system for documenting the review procedures that trigger reporting to OPR.  Document how many incidents of allegations of staff misconduct come from inmate grievances rather than incident reports.

See also 31.q., 34.e.

**DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010**

<u>**PROVISION**</u>

39.    Access to Information

a.    CCDOC shall ensure that newly admitted inmates receive information, through an inmate handbook or orientation video, regarding the following areas:  facility rules and regulations; how to report misconduct; how to report sexual abuse or assault; the process for accessing medical and mental health care; emergency procedures; rules for sending and receiving mail; the visitation process; facility schedule; the disciplinary process; and how to seek redress of grievances.

**Compliance Status**:        Partial compliance.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

The Inmate handbook (dated July 27, 2007) provides inmates with written information including (but not limited to): general rules, rights and responsibilities, prevention of sexual assault, reporting of sexual assault, treatment re: sexual assault, disciplinary procedures, specific rules and penalties for violation if found guilty;  grievance procedure; request program information, requesting health care services, requesting social services, law library, religious services, educational programs, substance abuse treatment, female furlough program, mandatory furlough, mail, meals, and visiting procedures.  I do not see a specific reference to mental health care.

CCDOC supplied me with a video in which an officer reads the rules in English and Spanish. The videos approach an hour in length.

CCDOC notes that rules are posted in each housing unit.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

I saw inmates in the receiving area with copies of the inmate handbook.  Hopefully these copies were more readable that the one I have, which is too small in print and difficult to see.   It is not well organized; nor, in my opinion, at an acceptable grade level.  The provisions regarding prevention and reporting of sexual assault were adequate, but more information is needed.  Mental health care is missing.

CCDOC General Order 13.1, Classification; Procedures for Intake Processing of New Inmates and Court, does not address the inmate orientation process.

The videos are too long, and certainly would not retain the inmates' attention for one hour as the officers read from the inmate handbook.   It is unclear where this video is played, and if it is played in the reception area, the atmosphere there is not conducive to hearing or understanding it.

This is another reason to consider classification housing.  In that environment a well-produced video can play in English and other-than-English in a quiet atmosphere, with staff available to answer questions.  Inmates should sign for their handbook after the elements have been explained to them, or after they have viewed a video with employees available to answer questions.

I did observe the handbook/rules taped onto the glass in the housing units; which is a way to disrupt surveillance.

I did not observe policy regarding providing orientation for individuals with visual or hearing impairments, developmentally disabled, non-English speaking, or illiterate inmates.

**Monitor's Recommendations:**

See recommendation regarding classification.  The entire intake process needs to be rethought.  The Handbook needs to be updated, placed in grade appropriate language, and produced so it can be easily seen/read.  The current video is difficult to watch for an hour and, if no staff are present, there is no way for inmates to ask questions.  I have not located procedures guiding orientation to the populations noted above.  There was discussion about placing an orientation/rule video on an internal cable system so that it can be played daily in each housing unit.  Orientation, and review of rules, accessing medical/mental health, grievances, are important and if that information is intended to be imparted in the reception process, it would be very difficult to assimilate.

**DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010**

<u>**PROVISION**</u>

39.     Access to Information

b.     CCDOC shall ensure that materials on facility rules and services are available for non-literate and non-English speaking inmates.

**Compliance Status**:        Partial compliance.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

See 39.a.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

See 39.a

I did not see the policy that guided orientation of inmates who are non-English speakers, illiterate or disabled.

**Monitor's Recommendations:**

See 39.a.

**DATE OF STATUS UPDATE: SEPTEMBER 20, 2010**

**PROVISION**

40.      CCDOC shall provide training and supervision to all correctional officers and supervisors sufficient to implement the provisions of this Agreed Order.

**Compliance Status**:      Partial compliance.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

Pre-service and in-service training is provided (40 hours of in-service training year, exclusive of specialized training).
Defendants provided on September 14, 2010, "State Curriculum Lesson Plans 2010" which appears to be an index.  The index lists under Use of Force, the USDOJ order.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

The Defendants report that the Agreed order is included as part of in-service training for employees, and provided a list of lesson plans that include such.  I have not reviewed that lesson plan, nor observed the instruction.  I was unable to identify how this information is included in pre-service training.

**Monitor's Recommendations:**

Track pre-service and in-service training related to the provisions of this Agreed Order.  It was suggested that the consent agreement be placed on the CCDOC's intra-net so that interested employees can review the document.  Prepare a lesson plan that addresses this topic and provide for my review.

## DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010

**PROVISION**

41.    Inter-Agency Agreement

a.    CCDOC shall enter into a written Inter-Agency Agreement with Cermak that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility.  The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order.

b.    Cermak shall enter into a written Inter-Agency Agreement with CCDOC that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility.  The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order.

**Compliance Status**:        Non-compliance.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

Agreements under development.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

None at this time.

**Monitor's Recommendations:**

It would be beneficial if the same arrangements can be concluded with DFM to help ensure that when substantial compliance is obtained, it is sustainable. The agreement should also resolve the related training issues.

**DATE OF STATUS UPDATE:  SEPTEMBER 20, 2010**

**PROVISION**

69.     CCDOC shall ensure that security staff posts will be equipped, as appropriate, with readily available, safely secured, suicide cut-down tools. Coordinate with Dr. Metzner

**Compliance Status**:        Non-compliance.

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

CCDOC is working on a proposal, policy and lesson plans.  The draft general order dated 6/15/2010 was provided for review on September 14, 2010.

**Monitor's Assessmen**t:  Describe the monitor's assessment of the status and documentation for the compliance status.

CCDOC described their current proposal to me, placing cut-down tools on the individual post's key ring.

**Monitor's Recommendations:**

Continue with development and implementation plan, policy, training lesson plans, and training.  Coordinate with Cermak.  Ensure that there are accountability measures and audits provided in the order.