# Grenawitzke & Associates LLC

## Environmental Health & Food Safety Consulting

September 20, 2010

The Honorable Virginia M. Kendall
United States District Court
Northern District of Illinois
Everett McKinley Dirksen United States Courthouse
219 South Dearborn Street
Chicago, Illinois 60604

> Re: Monitor Report United States of American vs. Cook County, et.al , Civil No. 10 C 2946
>
> FIRE AND LIFE SAFETY
> SANITATION AND ENVIRONMENTAL CONDITIONS

This initial report outlines the actions taken by Cook County Department of Corrections (CCDOC), Department of Facilities Management (DFM) and Cermak Health Systems (Cermak) taken to address the consent agreement between the United States Department of Justice and Cook County to protect the constitutional rights of inmates detained at the Cook County Jail located at 2700 South California Avenue, Chicago, Illinois. The focus of this report is on the issues of Fire and Life Safety and Sanitation and Environmental Conditions. In deference to the number of issues included in the reports of the three other monitors, there is extensive work to done just in the areas for which this report is written. While I recognize the considerable amount of time and dedicated effort to address these issues, I need to recognized the commitment and the dedication of Sheriff Dart and the staff, James D'Amico, of the Department of Facilities Management and his staff, and Dr. Avery Hart of Cermak Health Services and his staff to not only resolve specific issues, but to improve the facility as a whole creating a secure and healthy environment for inmates and employees.

Specifically in this report, I would like to highlight some of the early steps taken by DFM, CCDOC and Cermak to address the Consent Agreement.

1. There is now a formal process in place to begin addressing fire safety and emergency response for the facility. It actively involves all three parties to review and make changes to current efforts and will result, when completed a safer environment.
2. The provision of timely and hot food to inmates has taken a dramatic change from my first visit in June with CCDOC and the food service provider working together to reduce the amount of time from meal preparation to delivery from almost four hours to approximately 45 minutes, thus assuring that inmates receive hot meals that are actually hot.

manufacturers to construct lighting fixtures that are virtually tamper proof and will improve safety in housing areas by not allowing inmates to hot wire sockets, cover light bulbs and creating a potential fire safety issue, and provide essential lighting needed for security and inmates.

4. CCDOC is improving its laundry service by eliminating its contracted service and provide an in-house laundry that will serve as a program for veterans serving time.

5. CCDOC has developed a video for inmates regarding the need for clean and sanitary housing areas.

6. DFM has created an educational program to assist CCDOC staff in understanding ventilation issues in housing areas and the need maintain non-obstructed vents.

These represent only a few highlighted issues that are underway. There remains a long way to go to address all of the provisions of the Consent Agreement. However, I am pleased with the progress to date and I am most pleased with the leadership displayed by the management staff of all three organizations and their commitment to improve and make it sustainable.

Respectfully submitted,

Harry E. Grenawitzke, RS, MPH, DAAS

Attachment: Summary of Compliance as of September 20, 2010

Copies:
Patrick Johnson, Assistant United States Attorney
Corey Sanders, Attorney Civil Rights Division
David Deutsch, Attorney, Civil Rights Division
Kerry Krentler Dean, Attorney Civil Rights Division
Matthew Burke, ESQ, Office of the Sheriff of Cook County
Paul O'Grady Esq., Querrey & Harrow, Ltd.
Daniel F. Gallagher, Querrey & Harrow, Ltd.
Donald J. Pechous, Deputy Chief, Civil Actions Bureau, Cook Co. State's Attorney's Office

Summary August 20, 2010

| Section | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---------|----------|------------------------|--------------------|----------------|
| **C.** | **Medical Care** | | | |
| **C. 53.** | **Treatment and Management of Communicable Disease** | | | |
| C. 53. e. | Cermak shall ensure that the negative pressure and ventilation systems function properly. Following CDC guidelines, Cermak shall test daily for rooms in-use and monthly for rooms not currently in-use. Cermak shall document results of such testing. | | X | |
| C53. f. | Cermak shall notify DFM, in a timely manner, of routine and emergency maintenance needs, including plumbing, lighting and ventilation problems. | | | X |
| **F** | **Fire and Life Safety** | | | |
| F. 71. | CCDOC and DFM shall work together to develop and implement a fire safety program and ensure compliance is appropriately documented. The initial fire safety plan shall be approved by the fire prevention authority having jurisdiction. The fire safety plan shall be reviewed thereafter by the appropriate fire prevention authority at least every two years, or within six months of any revisions to the plan, whichever is sooner. Fire safety and emergency procedures shall be standardized across divisions, to the extent possible given differences in physical plant and security levels. | | X | |
| F. 72 | CCDOC shall develop and implement an evacuation plan for inmates and staff and ensure that comprehensive fire drills are conducted every three months on each shift. CCDOC shall document these drills, | | Not Assessed | |

1

| Section | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | including start and stop times and the number and location of inmates who were moved as part of the drills. | | | |
| F. 73. | DFM shall ensure that the Facility has adequate fire and life safety equipment, including installation and maintenance of fire alarms and smoke detectors in all housing areas according to applicable fire codes.  Maintenance and storage areas shall be equipped with sprinklers or fire resistant enclosures in accordance with City of Chicago Fire Code (13-76-010). | | X | |
| F. 74 | . DFM shall ensure that all fire and life safety equipment is properly maintained and routinely inspected.  DFM shall develop and implement a program related to the testing, maintenance and inspection of the Life Safety Equipment. | | X | |
| F. 75 | CCDOC shall continue to ensure that emergency keys are appropriately marked and identifiable by touch and consistently stored in a quickly accessible location, and that staff are adequately trained in use of the emergency keys | | X | |
| F. 76 | . CCDOC shall ensure that staff are able to manually unlock all doors (without use of the manual override in the event of an emergency in which the manual override is broken), including in the event of a power outage or smoke buildup where visual examination of keys is generally impossible.  CCDOC shall conduct and document random audits to test staff proficiency in performing this task on all shifts, a minimum of three times per year.  CCDOC shall conduct regular security inspections of all locking mechanisms.  CCDOC shall communicate with DFM via the Work Order System regarding lock-related issues and maintenance. | | x | |
| F. 77 | DFM shall develop and implement an annual preventative maintenance program concerning security devices such as doors | | Not | |

2

| Section | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | locks, fire and smoke barrier doors, and manual unlocking mechanisms to ensure these devices function properly in the event of an emergency. | | Assessed | |
| F. 78 | CCDOC shall implement competency-based testing for staff regarding fire and emergency procedures. | | | X |
| F. 79 | CCDOC shall promptly notify DFM of all electrical hazards, including maintenance and repair of electrical outlets, devices, and exposed electrical wires. | | X | |
| F. 80 | .  DFM shall promptly repair all known electrical hazards, including maintenance and repair of electrical outlets, devices, and exposed electrical wires and will document repairs by the Work Order System. | | X | |
| F. 81 | . .  CCDOC shall ensure that combustibles are controlled and eliminate hi8ghly flammable materials throughout the facility and inmate living areas (e.g., inmates 'use of paper bags as trash receptacles, ripped fire-retardant mattress covers, improvised cell light covers, blankets on cell floors, and improperly stored and labeled flammable liquids and other chemicals). | | | X |
| F. 82 | CCDOC shall ensure that fire safety officers are trained in fire safety and have knowledge in basic housekeeping, emergency preparedness, basic applicable codes, and use of fire extinguishers and other emergency equipment. | | Not Assessed | |
| G | SANITATION AND ENVIRONMENTAL CONDITIONS | | | |
| G. 83 | Sanitation and Maintenance of Facilities | | | |
| G. 83. a | DFM shall maintain an adequate written staffing plan and sufficient staffing levels to provide          for adequate maintenance of the Facility. | | X | |
| G. 83. b | CCDOC shall revise and implement written housekeeping and sanitation plans to ensure the proper routine cleaning of housing, shower, and medical areas, in accordance with generally accepted | | X | |

| Section | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | correctional standards. Such policies should include oversight and supervision, including meaningful inspection processes and documentation, as well as establish routine cleaning requirements for toilets, showers, and housing units. | | | |
| G.83. c | DFM shall implement a preventive maintenance plan to respond to routine and emergency maintenance needs, including ensuring that shower, toilet, and sink units are adequately maintained and installed. | | X | |
| G. 83. d | CCDOC shall notify DFM, in a timely manner, of routine and emergency maintenance needs, including plumbing, lighting, and ventilation problems. | | | X |
| G.83. e | DFM shall ensure adequate ventilation throughout the Facility to ensure that inmates receive an adequate supply of air flow and reasonable levels of heating and cooling. DFM staff shall review and assess compliance with this requirement on a daily basis for automated systems and on and annual basis for non-automated systems. | | X | |
| G. 83. f | CCDOC shall notify DFM of any visible obstructions to the ventilation system. | | | X |
| G. 83. g | Cook County shall ensure adequate lighting in all inmate housing and work areas. | | X | |
| G. 83. h | CCDOC shall ensure adequate pest control throughout the housing units, medical units, RCDC, RTU, and food storage areas. CCDOC shall maintain a contract for professional exterminator services for each division, food services areas, and the Cermak hospital. Services should provide for routine pest control spraying and additional spraying as needed. | | X | |
| G. 83. i | CCDOC shall ensure that all inmates have access to needed hygiene supplies. | | NOT ASSESSED | |

4

| Section | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---------|----------|------------------------|--------------------|----------------|
| G. 83. j | CCDOC shall develop and implement policies and procedures for cleaning, handling, storing, and disposing of biohazardous materials, in accordance with generally accepted correction standards. CCDOC shall ensure that any inmate or staff utilized to clean a biohazardous area are properly trained in universal precautions, are outfitted with protective materials, and receive proper supervision when cleaning a biohazardous area. | | NOT ASSESSED | |
| G. 83. k | DFM shall develop a policy on hazardous materials, in accordance with generally accepted correctional standards, and insure that all DFM staff is properly trained on the procedure. | | | X |
| G.83. l | CCDOC shall provide and ensure the use of cleaning chemicals that sufficiently destroy the pathogens and organisms in biohazard spills. | | NOT ASSESSED | |
| G.83. m | CCDOC shall inspect and replace as often as needed all frayed and cracked mattresses. CCDOC shall destroy any mattress that cannot be sanitized sufficiently to kill any possible bacteria. CCDOC shall ensure that mattresses are properly sanitized between uses. | | | X |
| G.83. n | CCDOC shall ensure adequate control and observation of all housing units, including distribution and collection of razors and cleaning supplies. All cleaning tools and hazardous chemical shall be removed from housing areas after use. | | X | |
| G. 83. o | CCDOC shall ensure that Facility sanitarians receive training from a relevant state, national, or professional association with emphasis on assessment of environmental health practices and emerging environmental issues in correctional settings. Facility sanitarians should also have training on and access to testing equipment to ensure sanitary conditions. | | X | |
| **G. 84** | **Sanitary Laundry Procedures** | | | |
| G. 84. a | CCDOC shall develop and implement policies and procedures for laundry procedures to protect inmates from risk of exposure to communicable disease, in accordance with generally accepted | | X | |

5

| Section | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---------|----------|------------------------|--------------------|----------------|
| | correctional standards. To limit the spread of communicable disease, CCDOC shall ensure that clothing and linens returned from off-site laundry facility are clean, sanitized, and dry. | | | |
| G. 84. b | CCDOC shall ensure that inmates are provided adequate clean clothing, underclothing and bedding, consistent with generally accepted correctional standards, and that the laundry exchange schedule provides consistent distribution and pickup service to all housing areas. | | | X |
| G. 84. c | CCDOC shall train staff and educate inmates regarding laundry sanitation policies. | | | X |
| G.84. d | CCDOC shall ensure that laundry delivery procedures protect inmates from exposure to communicable diseases by preventing clean laundry from coming into contact with dirty laundry or contaminated surfaces. | | X | |
| G.84. e | CCDOC shall require inmates to provide all clothing and linens for laundering and prohibit inmates from washing and drying laundry outside the formal procedures. | | X | |
| **G. 85** | **Food Service** | | | |
| G. 85. a | CCDOC shall ensure that all food service at the Facility is operated in a safe and hygienic manner and that foods are served and maintained at safe temperatures. | | | X |
| G. 85. b | CCDOC shall ensure that all food service staff, including inmate staff, must be trained in food service operations, safe food handling procedures, and appropriate sanitation. | | X | |
| G. 85. c | CCDOC shall ensure that the Central Kitchen and Division XI kitchen are staffed with a sufficient number of appropriately supervised and | | X | |

| Section | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---------|----------|------------------------|--------------------|----------------|
|  | trained personnel. |  |  |  |
| G. 85. d | CCDOC shall ensure that dishes and utensils, food preparation and storage areas, and vehicles and containers used to transport food are appropriately cleaned and sanitized. |  | X |  |
| G. 85. e | CCDOC shall check and record, on a regular basis, the temperatures in the refrigerators, coolers, walk-in-refrigerators, the dishwasher water, and all other kitchen equipment with temperature monitors to ensure proper maintenance of food service equipment. |  | X |  |

**STATUS REPORT**

**DATE OF STATUS REPORT:  9/20/10**

**PROVISION:  C. MEDICAL CARE**

53. Treatment and Management of Communicable Disease

e. Cermak shall ensure that the negative pressure and ventilation systems function properly. Following CDC guidelines, Cermak shall test daily for rooms in-use and monthly for rooms not currently in-use.  Cermak shall document results of such testing.

**COMPLIANCE STATUS: Partial Compliance**

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

Both DFM and Cermak currently have established monitoring programs for regular testing of negative pressures in isolation rooms.   I have not had the opportunity to review monitoring logs for any significant length of time to determine if there issues and if and how they are resolved.  DFM is monitoring rooms, but there is some question as to whether all rooms are being assessed.

**Monitor's Assessment:**  Describe the monitor's assessment of the status and documentation for the compliance status.

Other than discussing the issue with both Cermak and DFM, I have not reviewed monitoring records to document the frequency of monitoring or whether the data collected is collated in a form that could provide some useful information that could benefit Cermak other than assuring that the ventilation systems are functioning as designed.

**Monitor's Recommendations:**

1.   Cermak and DFM need to assess each other's programs and make a decision as to who will take responsibility for assessing negative pressure ventilation system functionality.  There are far too many issues for a duplicative program.  That said, there needs to be a formal plan to share data on this issue daily so that there is no opportunity for an inmate having a communicable disease would be placed in an isolation cell that is not properly ventilated.  This could impact other inmates or employees of Cermak, CCDOC or possibly DFM.  If, as the consent agreement is written, Cermak has the responsibility, DFM should no longer continue to monitor.  However, DFM will have the responsibility to address any ventilation issues for the isolation cells.

**STATUS REPORT**

**DATE OF STATUS REPORT: 9/20/10**

**PROVISION: C. MEDICAL CARE**

53. Treatment and Management of Communicable Disease

> f. Cermak shall notify DFM, in a timely manner, of routine and emergency maintenance needs, including plumbing, lighting and ventilation problems.

**COMPLIANCE STATUS: Partial Compliance**

**Status Update:** Briefly describe the actions taken by the Defendants to address the provision:

Cermak maintains a manual system to track work orders filed with DFM. Cermak does receive confirmation fax from DFM identifying the Work Order Number assigned from "Facility Wizard." However, there is no process within either DFM or Cermak for communication to follow the progress or lack of it for getting emergency maintenance needs address.

**Monitor's Assessment:** Describe the monitor's assessment of the status and documentation for the compliance status.

As discussed later in this report, there is a need for one work order request and tracking system for the entire facility including Cermak. Following my June visit, Cermak is has met with and is evaluating the purchase of the same system. This would allow the environmental staff at Cermak to visually track the resolution of issues. As of now, even if a work order is closed by DFM, there is no electronic or manual system to notify appropriate staff within Cermak. It leads to frustration among staff of both organizations and a perception by Cermak staff that there is not a timely response to Cermak work orders. As discussed above both Cermak and DFM are both monitoring negative pressure for isolation rooms. There is no need for duplication of effort here, if one or the other would simply communicate their program and provide data confirming monitoring results and corrective actions taken when issues are found.

**Monitor's Recommendations:**

1.  Establish a schedule for regular meetings between Cermak environmental staff and designated DFM staff to discuss open work orders, and progress made in both efficiently and effectively resolving emergency maintenance needs at Cermak and the clinics located in the Divisions of CCDOC.

2.  Cermak clinical staff must file work orders immediately upon identification of plumbing, electrical, ventilation, and lighting issues. They seem to have a reluctance to file work order requests only when an incident becomes major.

9

3. Cermak needs to complete their assessment of the "Facility Wizard" system and make a decision whether to purchase it or try to develop one independently that can interface with it. My recommendation is that there be one work order request and tracking system for the entire complex.

4. DFM should offer to meet with key clinic supervisors and Cermak staff in an effort to open communications between both parties and work in harmony to resolve issues rather than point fingers. The regular meetings of DFM, CCDOC, and Cermak should establish the communication mechanism and initiate a positive relationship that needs to spread throughout both organizations at all levels. For example, if Cermak does not believe that the DFM's solution to resolve an issue there needs to be a open forum to discuss and resolve the disagreement.

**STATUS REPORT**

**DATE OF STATUS REPORT: 9/20/10**

**PROVISION: F. FIRE AND LIFE SAFETY**

71. CCDOC and DFM shall work together to develop and implement a fire safety program and ensure compliance is appropriately documented. The initial fire safety plan shall be approved by the fire prevention authority having jurisdiction. The fire safety plan shall be reviewed thereafter by the appropriate fire prevention authority at least every two years, or within six months of any revisions to the plan, whichever is sooner. Fire safety and emergency procedures shall be standardized across divisions, to the extent possible given differences in physical plant and security levels.

**COMPLIANCE STATUS: Partial Compliance**

**Status Update:** Briefly describe the actions taken by the Defendants to address the provision:

CCDOC does have elements of a comprehensive fire safety program. However it is in need of a comprehensive review. Following my August visit, CCDOC, DFM, and Cermak established a Fire and Life Safety Subcommittee to address this provision. They had their organizational meeting on September 3, 2010 and their next meeting is scheduled for September 20th.

**Monitor's Assessment:** Describe the monitor's assessment of the status and documentation for the compliance status.

During my June visit, I participated in lengthy meetings with CCDOC and DFM regarding the development of a comprehensive fire safety and emergency response plan that would include a review and acceptance by the City of Chicago Fire Department. At that meeting, we outlined the elements that needed to be included in a fire safety plan. At the August visit, CCDOC, DFM and I discussed the best

approach to develop the plan and developed an overall goal and objectives to the system. The oversight group will have representatives of Cermak, CCDOC, and DFM, along with selected key participants that will add value to the process. It is only just getting started and I will continue to monitor the progress. The next step is for the groups to meet and discuss and agree upon a deadline for completion, and the series of steps necessary to draft the document. The process will have review steps along the way to monitor progress, and make sure all components are included in the plan.

**Monitor's Recommendations:**

1.   None at this time.

**STATUS REPORT**

**DATE OF STATUS REPORT:  9/20/10**

**PROVISION**

72.  CCDOC shall develop and implement an evacuation plan for inmates and staff and ensure that comprehensive fire drills are conducted every three months on each shift.  CCDOC shall document these drills, including start and stop times and the number and location of inmates who were moved as part of the drills.

**COMPLIANCE STATUS: Not yet assessed**

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

**Monitor's Assessment:**  Describe the monitor's assessment of the status and documentation for the compliance status.

**Monitor's Recommendations:**

**STATUS REPORT**

**DATE OF STATUS REPORT:  9/20/10**

**PROVISION**

**73.**  DFM shall ensure that the Facility has adequate fire and life safety equipment, including installation and maintenance of fire alarms and smoke detectors in all housing areas according to applicable fire codes.  Maintenance and storage areas shall be equipped with sprinklers or fire resistant enclosures in accordance with City of Chicago Fire Code (13-76-010).

**COMPLIANCE STATUS: Partial Compliance**

11

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

DFM has filed a capital project request for fire alarm testing for fiscal year 2011 on July 12, 2010.

**Monitor's Assessment:**  Describe the monitor's assessment of the status and documentation for the compliance status.

DFM explained that there must be a full test of all Cook County fire alarms and fire suppression systems including CCDEOC.  Because of the $125,000 annual cost for this testing, DFM must fire a capital request each year.  I have not yet reviewed the results of the 2010 fire alarm test for CCDOC.

I need to confirm with DFM and the City of Chicago that sprinklers are required in maintenance and storage areas.  DFM notified the Director of the Office of Capital Planning & Policy that as of January 1, 2009, requiring that sprinklers in high rise buildings (defined as those buildings 80feet or taller.DFM did provide a memo from the Cook County Office of Capital Planning and Policy indicating that the only CCDOC building that had a concern was Division VII which is unoccupied.  The memorandum further stated that the Office of Capital Planning has a project in the planning stages to completely renovate the building and install sprinklers.  As of Oct. 2008 that project has yet to start.

I have not yet reviewed the codes with regards to smoke detectors in all housing areas, nor have I verified that all housing areas are equipped with fire alarms.

**Monitor's Recommendations:**

1.  DFM needs to provide documentation of the results of the 2010 fire alarm test and how all non-conformities, if any, were resolved.

2.  DFM needs to provide evidence that all housing areas are equipped with fire alarms, and which housing areas are provided with smoke detectors.

3.  DFM needs to provide me with documentation of any requirements including Chicago Fire Code 13-76-010 for sprinkler systems for any area of CCDOC including chemical storage areas, laundries, food service, and/or maintenance areas.


**STATUS REPORT**

**DATE OF STATUS REPORT:  9/20/10**

**PROVISION**

74.  DFM shall ensure that all fire and life safety equipment is properly maintained and routinely inspected.  DFM shall develop and implement a program related to the testing, maintenance and inspection of the Life Safety Equipment.

**COMPLIANCE STATUS: Partial Compliance**

**Status Update:** Briefly describe the actions taken by the Defendants to address the provision:

DFM has developed and begun implementing policy # 10-01-01 that defines the procedure required for testing, inspection and maintenance of all life safety systems and the documentation to support the policy. It includes weekly and monthly generator testing, monthly fire department connections, monthly fire pump churn test, annual fire pump testing, annual fire alarm test, main drain annual test and the annual elevator test. All tests are completed in conformance with the State Fire Code and have been approved by the City of Chicago Fire Department.

DFM has developed and implemented a fire extinguisher testing program through Policy # 10-07-02. It includes a monthly inspection. It is being revised to include a currently implemented annual inspection, a six year and twelve year maintenance program conducted by a licensed inspector and contracted with DFM.

**Monitor's Assessment:** Describe the monitor's assessment of the status and documentation for the compliance status.

I have reviewed the policies and have reviewed limited documentation demonstrating that the inspection and testing program is implemented. On future visits, I will witness the testing being performed.

I have also reviewed and provided suggestions for the fire extinguisher inspection program and policy and have reviewed the tracking system that has been established for it. It is included in the Preventative Maintenance schedule for DFM. My limited review of fire extinguishers in several Divisions, Cermak and food service show that the tags are marked monthly by the DFM inspector. All fire extinguishers are managed on a log showing the specific location of every extinguisher by type and date of installation.

**Monitor's Recommendations:**

1. Continue the monitoring program and begin tracking non-conformities. At a future visit, I would like to review corrective action logs for and documentation demonstrating the work orders created as a result of non-conformities, showing how and when they were closed and measuring and recording the time from work order initiation to resolution.

2. The fire extinguisher program is well established and there are no further recommendations regarding it at this time.

**STATUS REPORT**

**DATE OF STATUS REPORT: 9/20/10**

**PROVISION**

75.  CCDOC shall continue to ensure that emergency keys are appropriately marked and identifiable by touch and consistently stored in a quickly accessible location, and that staff are adequately trained in use of the emergency keys.

**COMPLIANCE STATUS: Partial Compliance**

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

DFM has initiated the program to issue emergency keys that are marked and identifiable by touch. Divisions I, II and III are complete with keys provided to the respective Superintendents.  One set of keys is kept on the Superintendents key ring and a back-up emergency set is stored in a DFM issued red box either in the Superintendent's office or designated location.

**Monitor's Assessment:**  Describe the monitor's assessment of the status and documentation for the compliance status.

I have not viewed the emergency keys in any of the Divisions at this point to demonstrate that they are stored in a "quickly accessible location."  However, I intend to review CCDOC's policy/order regarding Division storage and testing of the emergency back-up keys.

**Monitor's Recommendations:**

1.  Complete the emergency key distribution to all remaining Divisions.

2.   CCDOC needs to develop a master register of the locations of all emergency keys showing the number of keys on each ring and what they open, the red box location within each Division, and the process for transferring the back-up set to designated officers during shift change.

3.  CCDOC needs to develop and implement Division specific quarterly program to test the emergency keys and a documented training program on their location and use.  This is imperative as Correction Officers are rotated among Divisions based on vacancies.

**STATUS REPORT**

**DATE OF STATUS REPORT: 9/20/10**

**PROVISION**

76.  CCDOC shall ensure that staff are able to manually unlock all doors (without use of the manual override in the event of an emergency in which the manual override is broken), including in the event of a power outage or smoke buildup where visual examination of keys is generally impossible.  CCDOC shall conduct and document random audits to test staff proficiency in performing this task on all shifts, a minimum of three times per year.  CCDOC shall conduct regular security inspections of all locking mechanisms.  CCDOC shall communicate with DFM via the Work Order System regarding lock-related issues and maintenance.

**COMPLIANCE STATUS: Partial Compliance**

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

Each Division has a Division specific policy to test door locks on a schedule and to submit work orders when deficiencies are noted.

DFM has issued a request for proposal and has a contract to go to the County Board  on September 11, 2010 to replace critical cell locks, doors, frames, and retrofit control panels for Divisions I, III, IV, V, VI, IX, X

**Monitor's Assessment:**  Describe the monitor's assessment of the status and documentation for the compliance status.

I have reviewed documentation showing that Division I has a weekly door lock inspection.  I have also reviewed documentation showing that Division XI has a monthly door lock inspection, as does most other Divisions.  I believe the door lock inspection program should be a department wide general order and consistent for all Divisions.  Based on the number of faulty locks identified by inspection in Division I, a weekly program should be completed in all Divisions.

Division I DFM has a capital project request filed on July 1, 2010 to replace 533 cell door locking mechanisms including both electric and manual components, as the existing internal and external hardware are beyond their life expectancy primarily because of continual vandalism.  The estimated cost for this replacement is approximately $625,000.  The Division inspection logs reviewed showed that work orders are produced when non-functioning door and locks are identified.  The tracking of the work orders demonstrates timely closure of the work orders.

I have not assessed whether CCDOC has an established and implemented a program to test staff proficiency to manually open all doors without the use of the manual override.  The development should include measuring their ability to do it and measure and track the amount of time it takes to open all locks.  At a minimum This needs to be done three times per year on all shifts.

15

The Division Ten inspection report is a typed report. Why? There is always an opportunity for typographical errors when information is transferred to a typed report. A handwritten legible report should be adequate.

In reviewing the monthly Division VI inventory of keys and Doors, the report is not dated nor signed. Because the other reports were for the month of August, 2010, I am assuming this one is as well. However, in the report it shows that for the Courtyard Security doors, that the A-well has been removed, the B-well door will not open with a work order filed on 10/22/07, the C-well south door does not open with a work order filed 10/22/07 and the D-well 2x doors will not open with a work order filed on 10/22/07. Is there some reason that in almost 3 years that this issue has yet to be resolved and there has been no documented follow-up?

In reviewing reports that were requested prior to my exit interview for the August visit, not all Divisions responded with the same information. The question is whether the request for information was not clear or did the Divisions not understand or know what information to provide, or did they not have the information requested. I am not sure of the answer, but Division I, II, V, and VI, submitted the correct information. Division IX submitted their emergency evacuation plan, along with "Division Procedure 1010" and emergency numbers, and Division IV submitted their emergency evacuation procedures and egress key system for cell locks and exists. Neither submitted their weekly/monthly key inspection results. Are they conducting the required inspection?

I believe this example points to the need for a CCDOC Fire and Emergency Safety Officer with responsibility to manage and oversee the necessary Division specific fire and emergency policies, inspections, tests, and drills.

**Monitor's Recommendations:**

1. Develop and implement a weekly door and door lock inspection program that is consistent for all Divisions. The program should be routinely reviewed by either the Division specific fire safety officer or Superintendent to track trends on which door locks consistently fail. This will help identify which locks may need replacement rather than repair.

2. The door and door lock inspection report forms and layout are inconsistent from Division to Division. While I recognize that there will be variance because of the uniqueness of each Division, the basic structure of the form should be consistent as officers are transferred from Division to Division. Having a CCDOC wide consistent form would eliminate training each time a new officer is assigned to a new Division. Wherever possible there should be departmental forms that are consistent throughout CCDOC.

3. Provide documentation that each shift in each Division has implemented a program at an approved frequency to test staff proficiency to manually open all doors without the use of the manual override. An administrative review of this program should be overseen by the CCDOC Fire Safety Officer.

4. Because of the number of responsibilities for fire and life safety provisions of this agreement, CCDOC should designate an administrative Fire and Emergency Safety Officer. Each of the Division Fire Safety Officers should have a dual reporting structure to both the Division Superintendent and to the CCDOC Fire Safety Officer.

**STATUS REPORT**

**DATE OF STATUS REPORT: 9/20/10**

**PROVISION**

77. DFM shall develop and implement an annual preventative maintenance program concerning security devices such as doors locks, fire and smoke barrier doors, and manual unlocking mechanisms to ensure these devices function properly in the event of an emergency.

**COMPLIANCE STATUS: N/A**

**Status Update:** Briefly describe the actions taken by the Defendants to address the provision:

I have not assessed this provision.

**Monitor's Assessment:** Describe the monitor's assessment of the status and documentation for the compliance status.

**Monitor's Recommendations:**

**STATUS REPORT**

**DATE OF STATUS REPORT: 9/20/10**

**PROVISION**

78. CCDOC shall implement competency-based testing for staff regarding fire and emergency procedures.

**COMPLIANCE STATUS: Not assessed**

**Status Update:** Briefly describe the actions taken by the Defendants to address the provision:

**Monitor's Assessment:**  Describe the monitor's assessment of the status and documentation for the compliance status.

**Monitor's Recommendations:**


### STATUS REPORT

### DATE OF STATUS REPORT:  9/20/10

**PROVISION**

79.  CCDOC shall promptly notify DFM of all electrical hazards, including maintenance and repair of electrical outlets, devices, and exposed electrical wires.

**COMPLIANCE STATUS: Partial Compliance**

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

CCDOC is filing work orders using their work order system, but at this point I am unable to assess whether it is done routinely, or only when the problem is acute.

As discussed in Provision F-80 DFM has a work order system, named "Facility Wizard"  implemented and has established a priority system for electrical hazards requiring work orders.

**Monitor's Assessment:**  Describe the monitor's assessment of the status and documentation for the compliance status.

DFM and CCDOC have independent work order systems that do not interface.  Cermak tracks their work orders manually based on a fax received from DFM identifying the work order number.   CCDOC, Cermak and DFM need to be on the same work order management system so that work orders can be effectively tracked and that response times can be measured to assure timely response to the work order request.  I have had little time to review the CCDOC system, but enough to know based on issues needing DFM response that work orders generally are not being initiated on a timely basis or when a problem is first detected.  This is true in the kitchen, Divisions, and Cermak.

**Monitor's Recommendations:**

1.  Establish one work order system for the entire Jail complex or at a minimum establish a system that interfaces with "Facility Wizard."  Once that system is implemented, training on its use will be necessary to assure officers understand the importance of filing work order requests as issues arise and not when the issue becomes a major problem.

2. Work to develop tracking mechanisms to measure initial response times to work order requests tracking open work orders by type i.e. water supply, leaks, plugged drains, broken toilets, sinks, faucets, showers etc. Work order requests need to be filed based on inspections of housing units on every shift, and not just during normal business hours.

3. In the interim trends, CCDOC, DFM and Cermak need to review response times and issues from work order system to identify common issues at their regular meetings.

**STATUS REPORT**

**DATE OF STATUS REPORT:  9/20/10**

**PROVISION**

80.   DFM shall promptly repair all known electrical hazards, including maintenance and repair of electrical outlets, devices, and exposed electrical wires and will document repairs by the Work Order System.

**COMPLIANCE STATUS: Partial Compliance**

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

DFM has purchased and implemented a work order processing system identified as "Facility Wizard" to manage all facility work orders including electrical issues.  As work orders are submitted from CCDOC, Cermak, and Aramark, it is submitted by fax to the DFM work order coordinator liaison, who assigns a priority to the order.  The priority established by DFM dated 8/12/10 identifies the following order:

| WORK ORDER REQUEST | PRIORITY |
|---|---|
| Exit light(s) require re-lamping | 1 |
| Exit Light housing requires repair/replacement | 1 |
| Light Fixture is damaged | 1 |
| Gate requires adjustment/won't function | 1 |
| Exposed wire | 1 |
| Switch cover requires attention | 1 |
| Power Outage –Reset Breaker | 1 |
| Air Conditioning unit requires repair | 1 |

19

| | |
|---|---|
| Generators are not functioning properly | 1 |
| Roof Exhaust Fan(s)require repair | 1 |
| Re-Lamp | 2 |
| Water Damage to light fixture | 2 |
| Outlet cover requires attention | 2 |
| Install additional outlets | 2 |
| Other | 2 |

**Monitor's Assessment:**  Describe the monitor's assessment of the status and documentation for the compliance status.

This priority system is new and it will take some experience to determine if the current priority is appropriate and responsive.  It appears to be an effective priority system as long as it is used by CCDOC staff.  An improvement to the priorities would be to establish a maximum response time to each of the priorities.  My sense is that currently there is a lack of communication between DFM and CCDOC Division employees regarding how all work order requests are processed by DFM.  This needs to be addressed early to improve effective handling of all electrical problems.  If Division employees understand the process for work orders, they may be more motivated to request issues be resolved.

**Monitor's Recommendations:**

1. Within 90 days of implementation DFM should review the priority system with CCDOC and Cermak at their regular meeting and make any adjustments to the priority system as needed.  I recommend that a maximum response time be established for first and second priority electrical hazards.  Provide me with a summary of the results of the review.

2. Assure that designated CCDOC staff including Division Superintendents and Cermak environmental staff is provided with the assigned priority for electrical issues.

3. Division Superintendent's are responsible to train affected staff within each Division regarding how electrical priorities are addressed.

**STATUS REPORT**

**DATE OF STATUS REPORT: 9/20/10**

**PROVISION**

81.  CCDOC shall ensure that combustibles are controlled and eliminate highly flammable materials throughout the facility and inmate living areas (e.g., inmates 'use of paper bags as trash receptacles, ripped fire-retardant mattress covers, improvised cell light covers, blankets on cell floors, and improperly stored and labeled flammable liquids and other chemicals).

**COMPLIANCE STATUS: Non-Compliant**

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

CCDOC has revised General Order 11.1.0 "Sanitation Procedure and Inspection."  The revised order specifies requirements for inspections of housing areas to measure inmate conformance with eliminating combustibles from cells, dormitories and dayrooms.  Specifically the order specifies that, "Trash and debris will be placed in the appropriate receptacle until removed during trash collection times.  Inmates will not be permitted to accumulate trash or debris within the cells."  Further, " Items and articles related to food service, e.g., trays, milk cartons, juice bottles, and Styrofoam trays, sporks shall be removed from living areas within one hour of meal service."  Also, inmate issued clothing, bedding, and linen is not permitted in excess of the allotted amount.

However, the revised Order has not yet been issued.

**Monitor's Assessment:**  Describe the monitor's assessment of the status and documentation for the compliance status.

The revisions to General Order 11.1.0 have not been finalized primarily because of the administrative reorganization and the number of Consent Agreement issues currently under review.  The Order will be issued once the Sanitation Plan for the facility is completed, and as discussed further in this report that plan is in the process of development.  At that point, Division Superintendents will be expected to comply with the Order and routine inspections specified in the Order should begin.

The pilot implementation of inspection of Division I was only somewhat effective.  I believe it is because correction employees assigned to the housing unit are reluctant to create a disturbance with inmates by demanding compliance with the order.  My August tour of four wings in Division I showed somewhat less trash in cells.  However to assure elimination of flammable materials in housing units requires a commitment of the officers in charge and consistent enforcement through vigilant and thorough inspections on each shift.

**Monitor's Recommendations:**

1.  Issue the revised General Order 11.1.0.

2.  Establish an effective date as to when correction officers are expected to begin consistent enforcement of the policy in all housing units.

3.  Training of officers on all shifts must emphasize the importance of eliminating trash and debris in cells for fire safety, as well as for pest control, and general hygiene.  The training of officers must also include the minimum acceptable standards that officers are expected to meet. The success of this initiative will be consistent and regular enforcement in all Divisions on all shifts. Officers need to understand that this is not a one-time program, but it is the way that the Divisions will be managed going forward.  Cell maintenance and cleanliness  to eliminate fire hazards needs to be the culture of the jail, not the exception.

4.  CCDOC Superintendents are key in the administration of this revised Order and should establish a mechanism to measure the improvement based on the number of violations found during inspection rounds.


**STATUS REPORT**

**DATE OF STATUS REPORT:  9/20/10**

**PROVISION**

82.  CCDOC shall ensure that fire safety officers are trained in fire safety and have knowledge in basic housekeeping, emergency preparedness, basic applicable codes, and use of fire extinguishers and other emergency equipment.

**COMPLIANCE STATUS:  This provision has not been assessed.**

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

**Monitor's Assessment:**  Describe the monitor's assessment of the status and documentation for the compliance status.

I need to assess whether there are regular meetings of the Divisional Fire Safety Officers with the designated CCDOC Fire and Emergency Safety Officer to review status of fire safety , results of drills and findings of housing unit inspections.  Meeting summaries should be maintained and provided to CCDOC management and Division Superintendents.

**Monitor's Recommendations:**

1.    None at this time

**STATUS REPORT**

**DATE OF STATUS REPORT:  9/20/10**

**PROVISION:  G. SANITATION AND ENVIRONMENTAL CONDITIONS**

83.  Sanitation and Maintenance of Facilities

> a. DFM shall maintain an adequate written staffing plan and sufficient staffing levels to provide for adequate maintenance of the Facility.

**COMPLIANCE STATUS:  Partial Compliance**

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

DFM has established a documented staffing plan for specific trades and general maintenance.  The plan is tiered with supervisors, trades and first responders.

**Monitor's Assessment:**  Describe the monitor's assessment of the status and documentation for the compliance status.

As CCDOC implements regular and consistent inspections of all areas of the jail, DFM should anticipate a significant increase in the number of work order requests from the Divisions.  This is based on the number of plumbing issues alone that I observed during limited tours of housing units, food service, storage areas and etc. Once the regular inspections begin, DFM will need to reassess the allocation of resources to assure timely response to maintenance issues.

DFM using the "Facility Wizard" system is monitoring the type of work order requests received.  They have a documented staffing plan by trade.  While the system is newly implemented, they are already beginning to use it to identify where staffing priorities need to change.  It is still far too early in its implementation to expect to see staffing changes made as a result of their categorization of work orders.

**Monitor's Recommendations:**

1. DFM should review and assess the need to revise the staffing plan 60 to 90 days following the implementation of regular and thorough inspections throughout the facility

**STATUS REPORT**

**DATE OF STATUS REPORT:  9/20/10**

**PROVISION:  G. SANITATION AND ENVIRONMENTAL CONDITIONS**

83.  Sanitation and Maintenance of Facilities

> b. CCDOC shall revise and implement written housekeeping and sanitation plans to ensure the proper routine cleaning of housing, shower, and medical areas, in accordance with generally accepted correctional standards.  Such policies should include oversight and supervision, including meaningful inspection processes and documentation, as well as establish routine cleaning requirements for toilets, showers, and housing units.

**COMPLIANCE STATUS: Partial Compliance**

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

Prior to my first visit in June little has been done to improve the level of sanitation at the Jail. During that visit, CCDOC initiated a process to review and revise its General Order 11.1 that was dated 11/22/97. The latest draft, like to former one specifies that a Sanitation Plan be developed and implemented.  That corresponding plan has not yet been drafted.  The order provides for mandatory daily inspections for each housing unit by designated officers.  The next step in the process is the development and implementation of the Sanitation Plan.  Development of that plan is assigned to Superintendent Dave Gomez.  At this point no expected completion date has been established.

The responsibility for medical areas including Divisional clinics and the Cermak Health Center are the responsibility of Cermak.  They have revised their Policy # D-03-a, Management of Clinical Space, Equipment and Supplies.  It includes the sanitation policy and plan for both clinics and the medical dormitory.  The policy will have an effective date of 9/1/10.  It establishes that standardized cleaning schedules be established for routine cleaning and that interval cleaning based on accidents or spillages be scheduled as needed.  It also provides for a bi-monthly environmental inspection be conducted in each clinical area and the findings report provided to their quality committee.

CCDOC has developed a sanitation video to educate inmates on the expectations and the need for maintaining their personal areas clean and organized to assist in protecting their health, eliminating fire safety hazards and eliminating harborage for insects and rodents.

Cermak has developed a controlled policy D-03a addressing cleaning, equipment and clinic maintenance It is due to be released September 1, 2010.  It includes a specific area cleaning schedule with a performance standard.

**Monitor's Assessment:**  Describe the monitor's assessment of the status and documentation for the compliance status.

CCDOC staff in Division I have piloted the revised sanitation inspection program and have worked to eliminate trash accumulation in the cells.  There is somewhat less trash and linens in cells in the August visit when compared with my visit in June.  CCDOC has developed a written tool to be used by Division officers completing their shift inspections. That inspection tool, if used consistently will provide data to measure improvement in the housing units' sanitation and to identify plumbing and electrical issues needing repairs/replacement.  However, the physical condition of the showers in some housing areas of Division I is poor with rusted and peeling paint that it's virtually impossible to clean and disinfect.  DFM is aware of the issue and has a capital request to repair/replace the showers especially the ceilings to make them cleanable.

I have reviewed one round of the required inspections that were conducted in May and June of 2010.  It continues to be a work in progress to make sure that it is followed and to assure that non-conformities are identified and resolved.

**Monitor's Recommendations:**

1. Establish a completion date and complete the development and implementation of the sanitation plan for all housing units, security post areas, food service, laundry, tunnels, administrative offices and staff toilet facilities and outside ground areas especially near refuse collection stations, inmate recreational areas roadways, and inmate housing buildings .

2. Initiate the daily inspection program to all housing units in all Divisions and Cermak.  Provide for a weekly review of all reports at the administrative level and take appropriate action when deemed necessary to assure that Divisions Superintendents are complying with the General Order.  Further implement unannounced administrative inspections of all housing areas on a bi-monthly basis to verify that housing, food service, laundry, administrative offices, staff toilet facilities, recreational yards, refuse, post areas, and medical areas are being maintained clean and free of refuse.  This is an imperative  to assure that the pest control program can be effective, eliminate fire safety hazards, and protect the health of inmates and staff.  If all correction staff are required to maintain their offices, toilets and lavatory facilities clean, and sanitary, they would begin to have the same expectation of inmates.

3. Implement an inmate educational program regarding hygiene and the requirements to maintain all cells and dayrooms clean and orderly both for their health and welfare as well as their fellow inmates and also to control insects and rodents from finding harborage in their respective cells or dorms.  The video that you have developed is an excellent tool to meet this recommendation. It should be shown to all inmates upon admittance and regularly throughout their stay.

4. Continue implementing the Cermak policy and review of monthly area inspections for all clinics, pharmacy, dental areas etc.

**STATUS REPORT**

**DATE OF STATUS REPORT: 9/20/10**

**PROVISION: G. SANITATION AND ENVIRONMENTAL CONDITIONS**

83. Sanitation and Maintenance of Facilities

> c. DFM shall implement a preventive maintenance plan to respond to routine and emergency maintenance needs, including ensuring that shower, toilet, and sink units are adequately maintained and installed.

**COMPLIANCE STATUS: Partial Compliance**

**Status Update:** Briefly describe the actions taken by the Defendants to address the provision:

Department of Facilities Management has purchased, installed and implemented a work order tracking system named "Facility Wizard" for all preventative maintenance requirements and to handle requests work requests for plumbing, electrical, fire safety issues from CCDOC, food service, and Cermak. While the system is an excellent and effective tool for DFM to manage work their work orders, at the present time neither CCDOC nor Cermak have access to the system to monitor the status of their work order requests. Both CCDOC and Cermak have participated in meetings with representatives of "Facility Wizard" to investigate how the system functions and whether CCDOC would have to discard their existing system or if there is a way for the two systems to interface. Cermak currently has a manual system for tracking work orders filed with DFM. DFM has established a documented system to prioritize work order requests based on safety and health of inmates and CCDOC staff. Further, DFM has established a specific system to address emergency requests for both CCDOC and Cermak.

**Monitor's Assessment:** Describe the monitor's assessment of the status and documentation for the compliance status.

At my initial visit in June I reviewed in detail the work order system implemented by DFM. I found the system to be an effective and efficient way to log work orders from CCDOC and Cermak and to track each of those work orders through completion. On that same initial visit, I identified several issues in housing units and food service that needed maintenance repairs including plumbing leaks, plugged drains, electrical issues, jammed locks etc. Regarding the jammed locks specifically in Division XI I specifically asked CCDOC staff to show me the Work Order. After over 40 minutes of searching in the Division Superintendent's office, no one could locate a work order. This example highlights the ineffectiveness of the CCDOC work order system and the need for a coordinated system for all parties. In some cases CCDOC work orders requests had been filed. However, because there is no interface between CCDOC work order number and DFM's it was virtually impossible to manually follow through to determine if they were actually forwarded to DFM for action. It is clear that both Cermak and CCDOC review and either adopt the DFM work order system or develop and implement a system whereby the CCDOC work order system can interface with DFM's. Cermak currently has no electronic work order

tracking system and as a result other than getting a confirming fax from DFM  that a work order number has been issued cannot follow any progress in resolving a plumbing, electrical, emergency, and etc problem.  The ideal process would be for DFM, CCDOC and Cermak to utilize the same system and be able to monitor repairs, and emergencies.

In some cases, when there was what were perceived as small plumbing leaks, correction officers would often ignore the problem until it became a major issue.  When plumbing leaks occur no matter how small or intentional damage to plumbing or electrical devices, it is imperative to notify DFM to assure timely and effective repairs are completed.

**Monitor's Recommendations:**

1. CCDOC and Cermak need to continue the process to evaluate the "Facility Wizard" system and in the next two months make a decision.  The process may have slowed because of the reorganization.

2. DFM should continue to use and monitor its system and see if it can be used to identify trends of specific issues by Division that may assist them in developing an effective preventative maintenance system.

3. CCDOC and Cermak staff needs specific training and procedures or a policy developed that establishes the responsibility to assure that any abnormal conditions occurring with their area of responsibly are addressed through the work order system.  When a work order is filed, it needs to be noted so that duplicate work orders are not filed.  Officers should have a process to know the status of the work orders they requested.

4. If there will not be a single work order system for the entire facility, CCDOC and Cermak will need to develop an effective and timely system to process an d track work orders.


**STATUS REPORT**

**DATE OF STATUS REPORT:  9/20/10**

**PROVISION:  G. SANITATION AND ENVIRONMENTAL CONDITIONS**

83.  Sanitation and Maintenance of Facilities

   d. CCDOC shall notify DFM, in a timely manner, of routine and emergency maintenance needs, including plumbing, lighting, and ventilation problems.

**COMPLIANCE STATUS: Non-Compliance**

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

27

DFM has developed a system and process for CCDOC to file work order requests. However, the work order requests are typically initiated with each Division and for some reasons, not yet understood by me, do not as a routine file a work order request as soon as a problem is discovered. As stated earlier in this report, CCDOC is investigating the DFM "Facility Wizard" system.

Since my August visit, CCDOC has created an automated work order data base and has scheduled training for their work order coordinators on September 16, 2010. The new system, I am told, can communicate with DFM's "Facility Wizard."

**Monitor's Assessment:** Describe the monitor's assessment of the status and documentation for the compliance status.

CCDOC administration needs to establish the expectation and the requirement to all Division Superintendents that work order requests for routine and emergency maintenance be initiated immediately upon discovery of a problem. In turn, the Superintendents need to establish the expectation and responsibility for all officers to follow that direction. I will be reviewing the CCDOC system during future visits.

**Monitor's Recommendations:**

1. This issue could be resolved simply with regular meetings of Division Superintendents with CCDOC administration. Likewise Division superintendents need to establish written policy and explain to their officers the requirement to follow that policy for filing work order requests, and take appropriate corrective action when the policy is not followed.

2. Timely and effective response from DFM for routine and emergency issues demand that CCDOC Division staff cooperate to get issues resolved.


**STATUS REPORT**

**DATE OF STATUS REPORT: 9/20/10**

**PROVISION: G. SANITATION AND ENVIRONMENTAL CONDITIONS**

83. Sanitation and Maintenance of Facilities

  e. DFM shall ensure adequate ventilation throughout the Facility to ensure that inmates receive an adequate supply of air flow and reasonable levels of heating and cooling. DFM staff shall review and assess compliance with this requirement on a daily basis for automated systems and on and annual basis for non-automated systems.

**COMPLIANCE STATUS: Partial Compliance**

**Status Update:** Briefly describe the actions taken by the Defendants to address the provision:

DFM has developed and has begun implementation of their Policy # 10-07-01, "Monitoring of Temperature Range at CCDOC. The engineering staff will conduct rounds daily on each of the three shifts to insure temperatures remain in the acceptable range of 68°F and 77°F. The inspection procedure includes a visual inspection confirming that the equipment is operating according to specifications, and if not, a corrective action work order submitted. Temperatures are measured at four points within all living quarters, two points closest to the fan discharge and two points at the farthest end of the riser. The policy includes a progressive series of reviews to assure resolution. The monitoring will require the development of Division specific equipment check forms.

DFM has also developed an educational PowerPoint presentation to show to Divisional CCDOC staff that explains how HVAC systems function and identify reasons why the systems fail to operate according to specification. The presentation also provides information on how they can assist in maintaining the system at optimum conditions such as preventing inmates from blocking vents in the cells and dayrooms.

DFM has implemented a program to clean and unclog all vents in cells and dayrooms. The program has been completed in Division. Their plan is to complete the vent cleaning program within one month.

DFM has drafted Policy #10-01-02 "Monitoring of Temperature Range at CCDOC." It is a policy to define the procedure for monitoring temperature control and notification to Cermak and CCDOC of temperature control issues that cannot be remediated within an acceptable time frame. The policy is in a review stage with both CCDOC and Cermak.

**Monitor's Assessment:** Describe the monitor's assessment of the status and documentation for the compliance status.

I have reviewed the initial draft policy10-07-01 and made suggested changes as necessary. All recommendations were incorporated into the latest draft.

I have had the opportunity to provide input to the training PowerPoint and received some independent confirmation that it is a worthwhile program, along with an opportunity to answer questions. In order fro DFM to effectively manage heating, ventilation and air conditioning, it is imperative that CCDOC and Cermak follow the notification system that DFM has established. When temperatures are approaching outer limits, DFM must be notified. It is also just as important that DFM provide CCDOC and Cermak with the results of their assessment even if it is believed the issue is resolved. Communication is important to assure the person making the initial call as well as the person from CCDOC and/or Cermak responsible for the building be kept informed of the progress and ultimate resolution so they can inform inmates, housing officers, etc.

The vent cleaning program conducted in Division 1 has had mixed success. About one half of the vents in the four wings I toured in August continued to be blocked, most by Styrofoam lunch trays and some by toothpaste and toilet paper. It is clear that inmates need to know that they cannot block vents and if

it continues to be blocked, they will be held accountable to clean the vents immediately or face further discipline.

The Monitoring Temperature Range at CCDOC is being review by all three parties and is a topic of discussion and resolution at the weekly meetings of CCDOC, DFM and Cermak.

**Monitor's Recommendations:**

1. CCDOC housing unit officers should **c**ontinue implementation of the daily inspections for all divisions. DFM should continue daily rounds to measure temperatures in all housing units and take appropriate action when acceptable temperature ranges are exceeded. On my next visit I will review records.

2. Implement education and information training presentation to Divisional Superintendents and further to correction officers on all three shifts. Provide documented evidence of attendance at the training sessions. The goal is to have 100% of correction officers assigned to housing to view the presentation and have an opportunity to have their questions answered. Progress will be measured as to the percentage of correction officers receiving the information training.

3. DFM needs to complete the vent cleaning program as soon as feasible. CCDOC with assistance from DFM should prepare and implement written information or even a short video about the need to keep vents open for inmates. Housing unit officers must insist that vents are not to be blocked.

4. Continue work on the policy and the notification procedures to assure that any inmates needing to be moved because of a medical issue are identified and steps taken to accommodate them.


**STATUS REPORT**

**DATE OF STATUS REPORT:  9/20/10**

**PROVISION:  G. SANITATION AND ENVIRONMENTAL CONDITIONS**

83. Sanitation and Maintenance of Facilities

f. CCDOC shall notify DFM of any visible obstructions to the ventilation system.

**COMPLIANCE STATUS:  Non-Compliance**

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

DFM with input from CCDOC has begun a Division by Division program to clean and unplug all vents in cells dormitories and dayrooms. In addition DFM is searching the vents for contraband. As of my visit in August, none had been found in the vents.

**Monitor's Assessment:**  Describe the monitor's assessment of the status and documentation for the compliance status.

General Order 11.1.0 as currently revised and about to be authorized does provide that "Inmates are responsible for the maintenance of sanitary conditions in their respective cells and living areas and are governed by the following guidelines.  1. Nothing will be placed over windows, lights, vents, walls, bars, or grilles."   However, this order has yet to be authorized and no formal direction has been provided to Division Superintendents regarding the issue.  It should be noted that this same requirement was in the original General Order 11.1.0 dated 12/22/97 and it apparently continues not to be followed.  An order with no follow through is of no value.  At a meeting of the Division Superintendents with me at my initial visit in June, we did discuss the need to keep all vents free of blockage to assist in ventilation.  There were no questions regarding the issue from Superintendents. However, as discussed in this report under Provision 81, the pilot round of cell inspections in Division I had little effect in keeping vents open.  Since my August visit, a CCDOC memorandum has been issued and the command staff and officers now have the responsibility to remove visible obstructions to the ventilation system.

 As discussed earlier in this report, DFM does have a viable work order system to record and resolve vent blocking issues.

**Monitor's Recommendations:**

1. Authorize General Order 11.1.0 and provide direction and assess the conformance to the memorandum and General Order.

2. After discussions between CCDOC's Executive Director and DFM Director decide whether it would be more appropriate to have CCDOC staff require inmates to maintain their vents open, and if they are plugged require them to clean and unplug them.  Implement the decision.


**STATUS REPORT**

**DATE OF STATUS REPORT: 9/20/10**

**PROVISION:  G. SANITATION AND ENVIRONMENTAL CONDITIONS**

83.  Sanitation and Maintenance of Facilities

> g. Cook County shall ensure adequate lighting in all inmate housing and work areas.

**COMPLIANCE STATUS: Partial Compliance**

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

DFM has the responsibility to repair and/or replace all lighting throughout CCDOC.  Inmates routinely destroy new lights within a few days of installation.  In May, 2010 DFM installed 90 new Kendall fixtures

31

of a new design in Divisions IX and X with a purchase price of approximately $22,000. Inmates were unable to destroy them. As a result, 24 were ordered and installed in the newly constructed intake area(formerly the commissary.)

Capital project requests were submitted in July to replace all lights in stairwells and catwalks in Division I, all cells and catwalk lighting in Division VI, all cells, catwalk and high bay lighting in all eight pods of Division XI, and complete the replacement of lighting in Division IX. The total cost for these projects is estimated to be approximately $2,200,000.

**Monitor's Assessment:** Describe the monitor's assessment of the status and documentation for the compliance status.

The new lights that have been installed provide adequate lighting for safety and sanitation in the housing areas where they have been installed. Just as important, inmates thus far have been unable to tamper with them. This is key to resolving this issue, as in many cells, inmates routinely use the existing lights and incandescent bulbs to start fires, cover the lights with paper milk cartons to darken the cells, thus creating a fire hazard and removing the light bulbs completely creating a security risk to other inmates and staff. DFM anticipates approval of this capital project for the new fiscal year beginning December 1, 2010 with installation in the first quarter of 2011.

**Monitor's Recommendations:**

1. Once approved, proceed with this project

### STATUS REPORT

### DATE OF STATUS REPORT: 9/20/10

**PROVISION: G. SANITATION AND ENVIRONMENTAL CONDITIONS**

83. Sanitation and Maintenance of Facilities

> h. CCDOC shall ensure adequate pest control throughout the housing units, medical units, RCDC, RTU, and food storage areas. CCDOC shall maintain a contract for professional exterminator services for each division, food services areas, and the Cermak hospital. Services should provide for routine pest control spraying and additional spraying as needed.

**COMPLIANCE STATUS:** Partial Compliance

**Status Update:** Briefly describe the actions taken by the Defendants to address the provision:

CCDOC, Cermak, and Food Service each have separate contracts to manage pest control throughout the Cook County Jail. Currently CCDOC and Aramark are using Orkin as their contract service provider. Cermak has a separate provider. Effectively controlling insects and rodents is dependent upon

32

maintaining all areas within Divisions, food service, and Cermak both internally and externally clean and sanitary, free of food debris, standing water, clean drains, and sealing cracks and crevices in walls, floors and ceilings so as to eliminate breeding and harborage. CCDOC is in the process of developing the sanitation plan, utilizing General Order 11.1.0 as the basis to require correction officers to assure that the sanitation levels in the Divisions are maintained.

**Monitor's Assessment:** Describe the monitor's assessment of the status and documentation for the compliance status.

On my initial visit in June, I participated in lengthy meetings to address what I perceive to be a very ineffective pest control program by both CCDOC and Orkin. For example, Orkin has not made any attempt to trap rodents outside of the buildings; they have done an ineffective program to attract and trap insects and rodents internally; are not meeting contract specifications for time spent at the facility by spending only 50-60% of required time assessing and treating areas; providing illegible reports that provide no value to CCDOC staff in what correction officers need to do to eliminate harborage and breeding areas; doing little to control the breeding of drain flies in the shower and toilet drains throughout the complex and not providing documentation of target pests throughout the complex.

As a result of discussions held during my June visit several new initiatives have begun:

   a.  Orkin is in the process of developing a comprehensive plan that correctly places and emphasis on baiting and trapping rodents externally.

   b.  DFM has started a drain cleaning project in Division IV and V to scour the drains to remove the accumulation of organic mat used as breeding nests for drain flies and cockroaches, and treat the drain with an Orkin product that prevents the build-up of organic mat. This program will need to be repeated every six months as part of standard maintenance of the facility.

   c.  DFM has cleared grass and debris in a three foot perimeter around all structures on the compound to provide clear space to place rodent bait traps. Orkin has placed approximately 150 traps externally. More are on order.

   d.  DFM, through inspections is identifying and sealing all building penetrations that rodents are using to access the buildings. It is imperative that this be completed before fall when rodents will be seeking a warmer climate as outside temperatures drop.

   e.  CCDOC has pilot tested its revised General Order 11.01.01 mandating inmates maintain their cells and housing areas clean and free of food waste, open containers of food from the commissary, and keeping all personal items including food from commissary in their property box. This must be implemented and continually monitored consistently throughout the complex. Future visits will verify whether correction staff are consistently following the policy.

33

f.  CCDOC has created a short educational video to be shown to inmates explaining the need to maintain housing areas and personal belongings orderly, clean, with no open containers of food, and free of debris to prevent the harborage and breeding of insects and rodents. CCDOC should provide documentation of where and how frequently it will be played. All incoming inmates must see the video before assigned to Division and before they receive food and other goods from the commissary.

g.  CCDOC is in the process of bidding out the pest control contract for the next two years, as the current contract will expire. I have reviewed the contract and made numerous recommendations as to changes in the request for proposal. They were all accepted and the county is in the process of proposal review. If a new provider is selected, I have offered to meet with them to assure that steps taken to date will continue and that CCDOC will not fall back to previous practices. CCDOC has accepted that offer.

h.  CCDOC has also implemented a program to clean pipe chases in all housing areas. Once clean, Orkin is placing glue traps in them to trap and monitor pest activity. This needs to be completed.

i.  Orkin is in the process of providing maps showing the location of all external bait traps. This includes food service areas as well as housing Divisions. The maps are intended to document the location of all traps so that future pest control operators will be able to effectively monitor all bait stations. The maps also need to be completed for internal bait stations as well. The pest control operator is required to monitor all stations on a yet to be provided schedule.

**Monitor's Recommendations:**

1.  Continue mapping of all internal and external locations of bait traps, and create the monitoring frequency program and provide a copy to CCDOC.

2.  Demand that the pest control contractor provide legible reports that include findings, new locations of bait traps, and any recommendations that CCDOC, Aramark, and Cermak must take to prevent future infestations. Assure that CCDOC, Aramark, and Cermak follow those recommendations and provide documentation to the facility superintendent as to how and when the recommendations were implemented. Vigorous oversight of those recommendations should be done by the Facility Superintendent.

3.  If a new contractor is selected, arrange an early meeting with them to establish the expectation and the requirement that the entire complex be free of rodents and that insects known to carry disease causing bacteria are minimized and controlled. Inmates and staff should not have to be exposed to pests that can negatively impact their health.

34

4. Assure through reports and independent monitoring that all bait stations are checked and re-baited as necessary on a developed and approved schedule. CCDOC, Aramark, and Cermak need to review and approve the schedule.

5. Because food service, CCDOC and Cermak may use different pest control contractors, I suggest quarterly, all pest control operators working in the facility meet with administrative leadership of CCDOC, Aramark, and Cermak to discuss findings, sanitation progress, successes, areas for improvement, and integrate future direction of specific pest control activities based upon facility assessment. It is important that these suggested quarterly meetings include all pest control operators in one meeting so that there is a coordinated approach.

**STATUS REPORT**

**DATE OF STATUS REPORT: 9/20/10**

**PROVISION: G. SANITATION AND ENVIRONMENTAL CONDITIONS**

83. Sanitation and Maintenance of Facilities

i. CCDOC shall ensure that all inmates have access to needed hygiene supplies.

**COMPLIANCE STATUS: Not yet assessed**

**Status Update:** Briefly describe the actions taken by the Defendants to address the provision:

**Monitor's Assessment:** Describe the monitor's assessment of the status and documentation for the compliance status.

Due to time limitations and the extent of issues at the complex, I have not yet reviewed and assessed this provision.

**Monitor's Recommendations:**

**STATUS REPORT**

**DATE OF STATUS REPORT: 9/20/10**

**PROVISION: G. SANITATION AND ENVIRONMENTAL CONDITIONS**

83. Sanitation and Maintenance of Facilities

j. CCDOC shall develop and implement policies and procedures for cleaning, handling, storing, and disposing of biohazardous materials, in accordance with generally accepted correction standards. CCDOC shall ensure that any inmate or staff utilized to clean a biohazardous area are properly trained in universal precautions, are outfitted with protective materials, and receive proper supervision when cleaning a biohazardous area.

**COMPLIANCE STATUS: Not yet assessed**

**Status Update:** Briefly describe the actions taken by the Defendants to address the provision:

**Monitor's Assessment:** Describe the monitor's assessment of the status and documentation for the compliance status.

Due to time limitations and the extent of issues at the Cook County Jail complex, I have not reviewed and assessed this provision. Future monitoring will include CCDOC policy and a review of training documentation, along with implementation of Division specific procedures and training against the procedures

**Monitor's Recommendations:**

**STATUS REPORT**

**DATE OF STATUS REPORT:  9/20/10**

**PROVISION:  G. SANITATION AND ENVIRONMENTAL CONDITIONS**

83.  Sanitation and Maintenance of Facilities

k. DFM shall develop a policy on hazardous materials, in accordance with generally accepted correctional standards, and insure that all DFM staff is properly trained on the procedure.

**COMPLIANCE STATUS: Non-compliant**

**Status Update:** Briefly describe the actions taken by the Defendants to address the provision:

I recognize that this Provision only applies to DFM.  However, DFM at the present time does not control all chemicals used at the Jail.  As a result of my assessment, unless DFM will be assigned responsibility for all chemicals, the issue needs resolution by DFM, CCDOC and Cermak.   DFM has the responsibility to control tools, chemicals, and hazardous materials utilized by the trades in plumbing, electrical, fire, life safety, HVAC repairs including tool carts and storage areas.  CCDOC also has the responsibility to control all cleaning and sanitation chemicals stored in each Division and the central maintenance area located in Division 5.  Cermak has the responsibility to control any and all chemicals utilized in the Division clinics and the medical care facility.  CCDOC has not taken any steps to assure that Material Safety Data Sheets

are current and available for all hazardous materials being stored there. They include cleaning and disinfection products, motor oils, gasoline, pest chemicals, lubricants, etc.

The Cook County Sheriff's Institute for Law Enforcement Education and Training has developed a "Hazardous Materials Awareness Level course syllabus dated Jan. 2010. It is an eight hour course for recruits, Department of Corrections and Court Services.

**Monitor's Assessment:** Describe the monitor's assessment of the status and documentation for the compliance status.

CCDOC has a General Order 8.1, "Control and Use of Hazardous Materials" dated 12/22/97. It establishes requirements for safe storage, use, monitoring, and tracking all chemicals both in the central maintenance area as well as in the Divisions. It establishes the position of Safety Officer with specific responsibilities. That person is not identified. It also provides for inspections and reports to be conducted by the CCDOC Sanitarian, a position that as of this report is vacant. CCDOC has received approval to hire two Sanitarian positions and the process to recruit candidates is started. However, my limited review of Division I and Division V chemical storage closets demonstrated that General Order is not being followed by the Divisions or Facility Superintendent. Because of the recent reorganization the Facility Superintendent has only been in that role for a short time and I would not expect him to have all areas of his responsibility controlled. Moreover, the General Order needs to be reviewed and revised to reflect current expectations and requirements. Once that is completed, specific assignments and responsibilities can be established.

Based on a question to a DFM employee working in a cell area, there is no inventory of what is on the work carts, as to tools or chemicals. This will need to be addressed by DFM. I have not yet reviewed and addressed DFM's program. I believe that the approach and policies for DFM, Cermak, and CCDOC must be coordinated, as each maintains a supply of hazardous materials.

The training syllabus identified above was established in January 2010. It is not yet clear whether all current DDCOC officers or specifically which officers are required to take the course. In future visits I will be reviewing documentation that should be available documenting specifically who has received this training and the results of the 45 question examination. I want to know among other information such as an acceptable passing score, the basis for establishing the passing score and what remedial training is provided for those who do not meet or exceed the acceptable passing score. The frequency of this training is also not specified.

There is no verifiable training available to demonstrate that officers responsible for handling and using chemicals receive documented and training and are competent to know what to do in case of an emergency. All training for CCDOC, DFM, Cermak, and Aramark employees must be verifiable.

I will assess DFM and Cermak's chemical control systems on a future visit.

37

**Monitor's Recommendations:**

1. Review and revise General Order 8.1, "Control and Use of Hazardous Materials" to reflect current regulations, and CCDOC requirements to maintain and inventory chemicals on a daily and weekly schedule. This includes the store room located in the basement of Division V, and any chemical storage closets and all areas where chemicals are stored in each of the Divisions.

2. Review, establish and implement a documented procedure for maintaining Material Safety Data Sheets that are current in the location where any hazardous chemicals are stored.

3. Provide a process and documentation including frequency for training of all officers and inmates using chemicals. The documentation needs to include safe chemical use, mixing, handling, storing, disposal and all emergency procedures.

4. In the central maintenance room in Division V, organize the room segregating chemicals by type. For example cleaning and disinfection chemicals should be stored separate from other hazardous chemicals such as flammables, oil, etc. Discard in accordance with Federal, state and local regulations all chemicals no longer used.

5. Establish a process where all chemicals for the Divisions are obtained only from the Division V central store room and only chemicals that have been pre-mixed or diluted are dispensed to the Divisions in a controlled safe manner. The Divisions do not have facilities that can safely dilute chemicals and assure that they are diluted specifically following the chemical manufacturer's instructions.

6. Establish and implement a documented procedure on how chemical use will be logged showing specifically what chemicals are permitted in the Divisions, the amount and a tracking system for chemical use. The procedure needs to include mechanism for Divisions to order and receive needed cleaning supplies. It needs to also establish a process for systematic monthly audits of all chemical storage areas with provisions for addressing non-conformities to the General Order and./or misuse of chemicals and failure to log chemical use.


**STATUS REPORT**

**DATE OF STATUS REPORT: 9/20/10**

**PROVISION:  G. SANITATION AND ENVIRONMENTAL CONDITIONS**

83.  Sanitation and Maintenance of Facilities

l. CCDOC shall provide and ensure the use of cleaning chemicals that sufficiently destroy the pathogens and organisms in biohazard spills.

**COMPLIANCE STATUS:  Not Assessed**

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

**Monitor's Assessment:**  Describe the monitor's assessment of the status and documentation for the compliance status.

CCDOC has a General Order 8.5, "Universal Precautions to Bloodborne pathogens.  The policy is dated 7/1/96.

**Monitor's Recommendations:**

1.   Review the policy to confirm that it meets best available technology as the current policy is 14 years old and may not meet current regulatory requirements.

2.  Review the training program for officers to make sure they are trained in accordance with General Order 8.5, and trained at the frequency required by Federal and/or state laws and regulations.


**STATUS REPORT**

**DATE OF STATUS REPORT: 9/20/10**

**PROVISION:  G. SANITATION AND ENVIRONMENTAL CONDITIONS**

83.  Sanitation and Maintenance of Facilities

> m. CCDOC shall inspect and replace as often as needed all frayed and cracked mattresses. CCDOC shall destroy any mattress that cannot be sanitized sufficiently to kill any possible bacteria.  CCDOC shall ensure that mattresses are properly sanitized between uses.

**COMPLIANCE STATUS: Non-Compliance**

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

CCDOC does not have a practice to repair mattresses.  When a mattress is torn or cracked, the mattress is taken out of service and sent to the central warehouse for recycling.  Between uses mattresses are cleaned and disinfected in each of the Divisions' clothing and linen store room.

**Monitor's Assessment:**  Describe the monitor's assessment of the status and documentation for the compliance status.

I have assessed mattress cleaning and disinfection process only in Division I.  Upon questioning, staff correctly described an effective process that they follow.  However, there were three mattresses in storage that were torn or cracked and in the stack to be assigned to a new inmate.  Upon questioning,

all three mattresses were taken from inventory; the covers stripped off and set aside for pick-up. Future visits will assess this provision in remaining Divisions.

I was given an unsigned CCDOC memorandum dated August 16, 2010 from Supt. Reyes to all shift commanders advising that when detainees are discharged or transferred, their mattresses are to be returned to the (Division?) clothing room officers to be sprayed with disinfectant and wiped down prior to being placed in storage.  Because the issue date of the memorandum coincided with the first day of my August visit, I have been unable to assess if it was distributed or if it is being implemented. Memorandums such as this need to be controlled documents with an assigned reference number and they need to be signed and issued to the specifically identified shift commanders.

Since my August visit, CCDOC Superintendent of Operations and Communications has directed the Division Superintendents to remove and replaced all frayed and cracked mattresses.  In Division I approximately 100 mattresses have been replaced thus far.  A new Standard Operating Procedure has been developed and is being issued to all Divisions requiring them to remove all frayed and cracked mattresses.

**Monitor's Recommendations:**

1. There is no General Order that specifies the effective procedure for the cleaning and disinfection of mattresses,   It should either be specified in General Order 11.1, "Sanitation Inspections and Procedures" or General Order 11.3, "Clothing Bedding, Linen and Misc. Supplies."  Both policies need to be reviewed and revised to reflect current practices and expectations.

2. If there is no written policy for officers to follow, they do not know what constitutes an acceptable/unacceptable mattress and as a result, in some Divisions, mattresses that should be discarded are continuing to be used.

3. Determine the authenticity of the August 16, 2010 memorandum and discuss with CCDOC staff how to develop a controlled document system whereby policy and procedures are developed, reviewed, approved, and issued.  All policies and procedures to be effective need to be monitored at a frequency and procedure as should be specified in the document and evaluated at least once per year.  The memorandum does not even address who is responsible to assure that all shift commanders follow the memorandum.

4. Complete development of a uniform system either at the Divisional level or facility wide for cleaning and sanitizing mattresses between uses

5. Further recommendations may be made based on future assessments of this provision.

40

**STATUS REPORT**

**DATE OF STATUS REPORT: 9/20/10**

**PROVISION:  G. SANITATION AND ENVIRONMENTAL CONDITIONS**

83.  Sanitation and Maintenance of Facilities

n. CCDOC shall ensure adequate control and observation of all housing units, including distribution and collection of razors and cleaning supplies.  All cleaning tools and hazardous chemical shall be removed from housing areas after use.

**COMPLIANCE STATUS: Partial Compliance**

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

CCDOC General Order 11.1.0 does not address provisions that storage of cleaning tools or hazardous chemicals must be removed from housing areas after use.

**Monitor's Assessment:**  Describe the monitor's assessment of the status and documentation for the compliance status.

My limited review of housing areas in selected Divisions demonstrated that mops, brooms, buckets, squeegees are stored in janitorial closets located on floors or outside of pods in locked rooms.  However, there are no racks on which to hang mops to allow them to dry. As a result, wet damp mops can harbor bacteria that will be spread throughout cells and dayrooms the next time they are used.

I have not observed the practice of distribution and collection of razors in inmate areas in my first two tours.

**Monitor's Recommendations:**

1.  Either modify General Order 11.1.0 Sanitation Inspections and Procedures to address the storage of cleaning supplies or include a provision in the Sanitation Plan.  It should also include a provision for mop head exchange, as mop heads are currently laundered in the central laundry.

2.  Establish a documented inventory program for what Divisions are permitted to maintain in each janitorial closet.  It should include the number of brooms, mops, buckets, dust pans, power washers, carts, etc permitted and he procedure to exchange or replenish supplies.

3.  Provide an adequate number of racks in each janitorial closet so that brooms, mops, squeegees can be stored off the floor and allowed to air dry.  Make sure that all chemicals are stored in the chemical storage room and not in the janitorial supply closets unless CCDOC wants to establish a second inventory control process and chemical use log for them.

41

**STATUS REPORT**

**DATE OF STATUS REPORT: 9/20/10**

**PROVISION: G. SANITATION AND ENVIRONMENTAL CONDITIONS**

83. Sanitation and Maintenance of Facilities

> o. CCDOC shall ensure that Facility sanitarians receive training from a relevant state, national, or professional association with emphasis on assessment of environmental health practices and emerging environmental issues in correctional settings. Facility sanitarians should also have training on and access to testing equipment to ensure sanitary conditions.

**COMPLIANCE STATUS: Partial Compliance**

**Status Update:** Briefly describe the actions taken by the Defendants to address the provision:

The Sanitarian position for CCDOC is currently vacant. CCDOC has requested and was granted two Sanitarian positions by Cook County. CCDOC has rewritten the job description.

**Monitor's Assessment:** Describe the monitor's assessment of the status and documentation for the compliance status.

I was asked to develop and provide a draft job description by CCDOC. It was provided for review and acceptance. It was used to obtain approval for two positions from Cook County. The positions have been posted internally and there were no internal candidates that met the minimum requirements. CCDOC is presently advertising for external candidates. I have offered to review applications and/or participate in the interview process, if staff believes it would add value to the process. My role would only serve to develop and ask key questions that would help CCDOC in assessing the qualifications and capabilities of candidates. I cannot, for objectivity purposes as a monitor, be part of the selection.

**Monitor's Recommendations:**

1. There needs to be a discussion and resolution on the specific roles of the two sanitarian positions and to whom they will report. Their roles need to include among other duties providing for independent audits of numerous areas of the jail including housing units, chemical storage and control, food service (not only sanitation, but monitoring the deliver and service of meals to the inmates,) tool control, pest control, and maintenance of plumbing and follow-up on work orders. The position can also be used to monitor HVAC issues pertaining to negative air pressure in isolation cells.

2. The positions can also be utilized to assist Division Superintendents and the Facility Superintendent to effectively implement the General Orders and assure compliance to the Consent Agreement.

3. Develop the role for these positions that can effectively assist Aramark, Cermak, Pest Control contractor, and others as deemed necessary and appropriate.

4. Develop an applicable and effective and progressive training program for these two positions so that following certain training modules can be productive members of the management team within the Jail.

5. Appropriate employees with whom the Sanitarians will work need to understand the responsibilities and the authorities that these positions will have to monitor and assist others to operate a clean, sanitary and safe facility.


**STATUS REPORT**

**DATE OF STATUS REPORT: 9/20/10**

**PROVISION: G. SANITATION AND ENVIRONMENTAL CONDITIONS**

84. Sanitary Laundry Procedures

a. CCDOC shall develop and implement policies and procedures for laundry procedures to protect inmates from risk of exposure to communicable disease, in accordance with generally accepted correctional standards. To limit the spread of communicable disease, CCDOC shall ensure that clothing and linens returned from off-site laundry facility are clean, sanitized, and dry.

**COMPLIANCE STATUS: Partial Compliance**

**Status Update:** Briefly describe the actions taken by the Defendants to address the provision:

CCDOC Office of Professional Review, Contract Performance Review conducted an assessment of the off-site laundry service contractor, Five Star Laundry Service. That assessment found that the current service was inadequate in that it did not provide uniform cleaning that meets jail standards and was more costly than an onsite laundry. As a result of continuing issues, they have received a proposal from Aramark Correctional Services to provide a comprehensive laundry management program for CCDOC. The new laundry will be housed in Division V basement and will include five 150 lb washers and five 170 lb. steam dryers. It will include installation of a secure chemical usage system.

The plan is that the onsite laundry will provide veteran detainees with employment training and actual employment, permit a twice per week exchange of inmate uniforms, provide facility improvement, new commercial grade laundry equipment and save money as compared to an outside contracted laundry service. It is anticipated that the laundry will operate six days per week, eight hours/day. It is conducted in conjunction with the Roosevelt University college preparatory program for US military veterans who are inmates at the Cook County Jail. If the new laundry is successful, CCDOC plans to

43

expand it into a business opportunity by establishing a commercial operation that would accept laundry from the private sector.

**Monitor's Assessment:** Describe the monitor's assessment of the status and documentation for the compliance status.

At my visit to the new laundry facility on August 19th, preparations were underway to begin the dismantling of the former equipment. It is anticipated that the new onsite laundry will be operational by September 7, 2010. As a result, it is premature to assess the present laundry service as it is under transition.

**Monitor's Recommendations:**

1.  Provide a written plan for the use of the washers and dryers that are being removed from Division V outlining where they will be located, and include how the identified 22 washers and dryers already in other Divisions will be utilized. CCDOC needs to have a formal plan to assure safe and hygienic laundry service for clothing and linens that will not be done at the central laundry.

2.  Based on the laundry build out schedule, there will also be a Division XI Satellite laundry renovation plan. No firm date is established for it. Include how this equipment will be utilized in the referenced plan.

**STATUS REPORT**

**DATE OF STATUS REPORT: 9/20/10**

**PROVISION: G. SANITATION AND ENVIRONMENTAL CONDITIONS**

84. Sanitary Laundry Procedures

> b. CCDOC shall ensure that inmates are provided adequate clean clothing, underclothing and bedding, consistent with generally accepted correctional standards, and that the laundry exchange schedule provides consistent distribution and pickup service to all housing areas.

**COMPLIANCE STATUS: Non-Compliance**

**Status Update:** Briefly describe the actions taken by the Defendants to address the provision:

While CCDOC is addressing the laundry service issues appropriately, there is a need to fully address the provision of inmate issued clothing and bedding and the exchange General Order. The current CCDOC General Order No. 11.3, dated 05/01/92 appears out of date and does not reflect current practice. For example, the order identifies the clothing and linen that is provided for both males and females. However, inmates do not receive pillows and pillow cases as specified in the Order. The policy also

establishes that inmates, both male and female, receive one set of underwear per week. However, current practice is to provide two sets. Additional underwear can be purchased by the inmates from commissary. Further the Order requires the use of a Uniform/Linen Exchange Log Book to record all weekly exchanges. It also requires a weekly inventory report form be completed, recording the items logged in the items issued log book and that the inventory report form be submitted to the Superintendent and Special Projects. The Order requires that an internal audit be conducted at least annually. Also the Order is unsigned.

The Illinois Jail Standards Act requires two exchanges per week. One exchange per week is the current practice. CCDOC plans to meet the two exchanges once the new laundry is completed. It will then have the capacity to meet this requirement.

**Monitor's Assessment:** Describe the monitor's assessment of the status and documentation for the compliance status.

While I did not review the laundry procedures in each of the Divisions, staff indicated that inmates currently receive two sets of underclothing per week and one complete uniform (trousers and shirt). I also observed that inmates do not receive pillows and pillowcases as the current mattresses being issued include a raised area for a pillow. I saw no evidence of the log book being utilized.

Two tours of the facility found that inmates continue to launder their personal clothing and towels in their cells and using unauthorized, inmate created clothing lines to dry their personal laundry. Inmates are concerned that when personal laundry is exchanged, they do not receive their own in return. Further the number of bed sheets that were found being used for shower curtains, around inmate toilets and over cell bars indicate that there is an excess of bed sheets distributed throughout the divisions during clothing and linen exchange.

**Monitor's Recommendations:**

1. Review and update General Order 11.3 dated 05/01/92 to reflect current policy. The order needs to address how the log book and inventory forms need to be completed, along with an appendix showing the forms that are required to be used. This should be a facility wide process with implementation and documentation throughout all Divisions including Cermak with a designated officer for each Division.

2. When the Order requires an annual audit, identify who is to conduct the audit, specifically when the audit is to be conducted, how any identified non-conformities are corrected through a documented corrective action format and form, along with who is responsible to review the audit and close out the corrective actions. An audit tool is essential to confirm that Orders are being followed as intended. However, it needs to address what is the result of non-compliance. The annual audit could be a responsibility of one of the new Sanitarian positions once filled.

3. The rewritten order when completed should identify what the Superintendants responsibility for the weekly inventory Report review includes and provide a formal sign off showing that it was reviewed.

4. When completing the Uniform /Linen Exchange Log book, it must accurately reflect that actual collection of returned clothing and linens, along with what is newly issued.   An auditor should be able to balance the amount of clothing in the inventory to the amount of laundry returned from the inmate and new clothing/linen issued.  The total should balance with the amount provided to the Division.   By doing this accurately, correctional staff can assure that inmates do not have additional clothing and linens that can be converted to cloth lines, ropes, privacy curtains, and etc which obstruct an officer's vision of the cells, showers, and toilet areas.

5. Implement the twice weekly clothing exchange.


**STATUS REPORT**

**DATE OF STATUS REPORT:  9/20/10**

**PROVISION:  G. SANITATION AND ENVIRONMENTAL CONDITIONS**

84. Sanitary Laundry Procedures

    c. CCDOC shall train staff and educate inmates regarding laundry sanitation policies.

**COMPLIANCE STATUS:  Non Compliance**

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

Both the current and "Detainee Rules and Regulations" Handbook only state, "Inmates will be given the opportunity to exchange linen and uniforms on a weekly basis."  There is no further information provided to the inmate.

**Monitor's Assessment:**  Describe the monitor's assessment of the status and documentation for the compliance status.

The current effort is to get the new onsite laundry constructed and functioning.  This would be the appropriate time for a working staff committee to review the laundry sanitation policies and current practices including General Order 11.3 referenced above, the wording in the Detainee Rules and Regulations handbook.

As the Order is reviewed and revised, staff may wish to consider the ACA standards referenced below, along with State of Illinois requirements.  American Correctional Association Performance-Based Standards for Adult Local Detention Facilities, Fourth Edition Chapter 4 Care establishes the following:

4-ALDF-4B-2 states, "Inmates are issued suitable, clean bedding and linens, including two sheets, pillow and pillowcase, one mattress, not to exclude a mattress with integrated pillow, and sufficient blankets to provide comfort under existing temperature clothes. There is provision for linen exchange, including towels, at least weekly."

4-ALDF-4B-03 states, "There is needed cleaning and storage of inmate personal clothing and the issue of suitable facility clothing to all inmates. Facility clothing is properly fitted, climatically suitable, durable, and presentable. Standard clothing items issued at intake includes trousers, and shirts, or jumpsuits, undergarments, socks, shoes, and outerwear suitable to the climate."

4-ALDF-4B-04 states, "There is no delay in replacing clothing, linen, and bedding.

Further d-ALDF-4B-05 provides that "Inmates are accountable for clothing and bedding assigned to them."

**Monitor's Recommendations:**

1.  Revise the inmate handbook to reflect not only the laundry exchange timing, but also include the Division specific schedule, a list of the clothing and linen to be provided, a rule that all clothing and linens shall be cleaned at the facility operated laundry and that no clothing or linens are allowed to be washed or dried in housing areas. You may wish to include a statement that inmates are responsible for the condition of all clothing and linens issued and the penalties for misuse and abuse of them. The inmate rules and regulations should also include a statement that clean clothing and linens are provided to help assure personal hygiene is maintained and prevent the transmission of communicable disease to others.

2.  Assure that the inmate handbook and the General Order 11.3 are consistent.

3.  Having seen the sanitation video, you may want to consider a clothing/linen laundry piece to be shown to inmates as they arrive and at designated times on their unit televisions.

4.  Develop and implement a documented training module for training correction officers and other designated staff on laundry policies, procedures, and expectations including the use of logs, inventory forms. Specific training modules should be developed for those responsible for use of the "Issued item log book" "Uniform/Linen exchange log book," and the "weekly inventory report form." All superintendents should receive this training, as well so they know the process in their respective division.

**STATUS REPORT**

**DATE OF STATUS REPORT:  9/20/10**

**PROVISION:  G. SANITATION AND ENVIRONMENTAL CONDITIONS**

84. Sanitary Laundry Procedures

> d. CCDOC shall ensure that laundry delivery procedures protect inmates from exposure to communicable diseases by preventing clean laundry from coming into contact with dirty laundry or contaminated surfaces.

**COMPLIANCE STATUS:  Partial Compliance**

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

The divisions maintain a clean laundry inventory room to store cleaned clothing and linens.  However, there is no documented Standard Operating Procedure that outlines the cleaning and sanitation of tables, storage racks, clean and dirty laundry tubs, and assuring the cleanliness of the floor  and walls around and under the racks.

**Monitor's Assessment:**  Describe the monitor's assessment of the status and documentation for the compliance status.

My review of Division I clothing and mattress storage areas generally found that clothing is placed on racks as they are returned from the laundry.  It did not appear that there was a specific organization to sorting and storing by size.  Each uniform shirt, trousers, underwear, socks, towels, hand towels sheets, blankets should have a designated adequate space for storage and a designated space for returned soiled laundry.  The two areas should assure that clean laundry cannot come in contact with soiled laundry and possibly contaminated surface such as tables used to fold laundry or tubs used to transport laundry.  The procedure should provide for cleaning and sanitation of tables between uses or at the end of each shift and that laundry transport tubs be cleaned and sanitized after each use.  The tubs should be cleaned and sanitized at the onsite laundry before clean clothing is placed in them for return to the divisions.

**Monitor's Recommendations:**

1. A facility wide policy or order needs to be developed for implementation by each division including Cermak regarding the handling, storage, and dispensing of inmate clothing/linens.  It should include requirements for effective storage, sanitary method of sorting and folding items, a procedure for cleaning and sanitizing clothing/linen contact surfaces including the specifying of chemicals, concentration, and their effective application. The order needs to include a documented mechanism for each division to audit/measure its effective implementation by trained designated staff most likely quarterly.   There should also be a provision for the CCDOC Sanitarian to audit the order at least annually at a designated time.

2. Provide a documented training module for inmates assigned to handle both clean and soiled clothing/linen. A short written module that will be provided to any inmate assigned to work in divisional clothing storage areas, as well as for those inmates assigned to work in the new facility laundry and other laundries located either in divisions food service.

**STATUS REPORT**

**DATE OF STATUS REPORT: 9/20/10**

**PROVISION: G. SANITATION AND ENVIRONMENTAL CONDITIONS**

84. Sanitary Laundry Procedures

e. CCDOC shall require inmates to provide all clothing and linens for laundering and prohibit inmates from washing and drying laundry outside the formal procedures.

**COMPLIANCE STATUS: Partial Compliance**

**Status Update:** Briefly describe the actions taken by the Defendants to address the provision:

CCDOC, following my initial tour in June, 2010 has completed a sanitation General Order numbered 11.1.0 which will replace General Order 11.1 dated 12/22/97. The order establishes among general sanitation provisions of what is and is not allowed in inmate living units. This order establishes the requirement for a new detailed "Sanitation Plan" to be developed b y the Operations and Compliance Office to be followed by each division or unit. Specifically to sanitary laundry procedures, it provides that each inmate is allowed CCDOC issued clothing, bedding, linen etc and that inmates will not be permitted CCDOC issued items exceeding the allotted amount. This order once implemented, along with the sanitation plan should eliminate the hording of excess clothing and linens that can be modified to allow inmates to hang housing unit washed clothing and linens within cells. The order also provides for a tiered inspection process for correction officers, superintendents, and watch commanders.

**Monitor's Assessment:** Describe the monitor's assessment of the status and documentation for the compliance status.

On my second onsite tour, I toured Division I which initially tested the inspection order. It was clear that during my assessment, the number of clothes lines being used in cell areas there were far less than in my first visit in June. Future visits will involve far more division assessments to see that clothes lines are removed and that inmates are required to participate in clothing and linen exchange. The resolution of this issue requires a commitment from not only CCDOC administrative staff, but also from each Division Superintendent and Sanitation officers. At a meeting of Superintendents in June, there was unanimous consent that the elimination of the use of ropes as well as general sanitation needed significant improvement and they indicated their support to make that happen.

Effective laundering of inmate clothing and linens with designated detergent and bleach reduces significantly the opportunity for disease causing microorganisms to multiply and cause communicable disease such as MRSA infections, infections from insects that may be harboring in unwashed clothing and linens.  The health and hygiene of inmates and staff is the foremost reason to control laundering of clothing and linens.

**Monitor's Recommendations:**

1. Immediately begin the process of development of the Sanitation Plan with input from the Division staff, CCDOC administrative staff, Superintendent Gomez, and get it implemented as soon as reasonably feasible.  The plan must include the provision giving the authority and the responsibility to Correction Officers and other designated staff to remove ropes anytime they are found and not allow inmates to wash clothing in the housing units.

2. Develop wording for the inmate rules and regulations handbook that clearly state that washing and drying laundry outside of the CCDOC laundry procedures is expressly prohibited and state the penalties for violation of the rules.  Use the handbook to explain the health and hygiene necessities to all inmates.  This could also be included in a video module.

3. Use the housing inspection forms to measure the level of compliance with the Order and the Sanitation Policy possibly by the Sanitarian position.

**STATUS REPORT**

**DATE OF STATUS REPORT:  9/20/10**

**PROVISION:  G. SANITATION AND ENVIRONMENTAL CONDITIONS**

85.  Food Service

a. CCDOC shall ensure that all food service at the Facility is operated in a safe and hygienic manner and that foods are served and maintained at safe temperatures.

**COMPLIANCE STATUS: Non compliance**

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

The process of meal service remains most likely the way it was found during the initial investigation. Two hot meals are provided, breakfast and dinner.  Lunch consists of a cold sandwich.  The meals are prepared by a contractor, Aramark Services, who prepares all meals with approximately 80 employees and ideally about 56 inmate assigned from Division II.  All menus are approved by a Registered Dietician working for CCDOC. Breakfast is served anywhere from 2:30AM until 5:00AM, lunch from 8:30AM to 12:00 Noon and dinner from 3:15 to 6:00PM depending on the location of the division and competing

priorities such as classes, recreation time staff breaks and meals. This is according to discussions with Aramark and CCDOC staff. By example dinner trays for the evening hot meal are prepared and ready to send to each division starting at approximately 12:45 PM. Yet they rarely, if ever leave the kitchen before 3:00PM after shift change. Aramark staff record temperatures of food on the service line and once the food is placed on the trays. However, there is no process to measure and record temperatures of foods from that time throughout the rest of meal service. As a result, CCDOC has no way of knowing whether the hot food continues to be held at safe temperatures and no way of knowing the time from when meals are ready for delivery to the units and the time that the inmates actually are given the meals. However, at best it may be three to three and one half hours. Trays are delivered in brown insulated tray carts that are not heated. Once the tray carts are loaded, sanitation staff transports the food from the kitchen either to a delivery truck or down the elevator to delivery vehicles that transport the food to the various divisions through the tunnel network. Once the deliveries are made, the Division staff takes the responsibility to bring the food to the various floors, verify the accuracy by counting the meals, sort the meals by wing or pod and deliver to the pods for distribution. As a result numerous inmates complained to me that meals are generally cold and do not taste particularly good.

Subsequent to my August visit, CCDOC has implemented a new practice that has reduced the time from tray preparation to inmate service from four hours down to 45 minutes. This new practice began on September 3, 2010. Additionally CCDOC provides congregate meal service where deemed appropriate. I will assess food temperatures at meal service both in the housing units and the congregate dining area to assure that hot meals are in fact served hot.

**Monitor's Assessment:** Describe the monitor's assessment of the status and documentation for the compliance status.

As a result of lengthy discussions including CCDOC and Aramark leadership, a decision was made to change the time that meals for at least the dinner meals are prepared for delivery. Effective Sept 27, the dinner meal will be placed on trays at least two hours later. However, I believe it is necessary for CCDOC staff and Aramark to form a meal service task group to look at the entire process and timing for meal delivery. It is inappropriate to begin breakfast meal service at 2:30AM. The goal should be to serve meals at reasonable hours to accommodate inmate sleeping hours, provision for delivery of medications followed by court appointment times, recreation time, and classes. It is key that special consideration be given to inmates who have medical conditions such as diabetes receive food within the correct time frame to administer insulin medication. The task group should consider meal times to be more like hot breakfast between 5:30AM and 6:30AM, cold lunch between 11:30AM and 12:30PM and hot dinner between 4:30 and 5:30PM. Once the meal time is established, work through the process backwards to see the latest time that food needs to be placed on trays for delivery. At the same time the task group should include Cermak staff to assure that medications are coordinated with the meal services.

The food preparation areas at both the main kitchen and Division XI were generally clean. However, both employee restrooms located in the employee's break room had a significant accumulation of soil,

dust and dirt on the walls and floors.  The men's restroom did not have any method to dry hands, and the lavatory faucet was not correctly installed on the sink.  While the women's restroom did have paper towels, it was also in need of a thorough cleaning.  Apparently there is no documented schedule for routine cleaning and sanitizing.  The inmate toilet facility also was in need of a thorough cleaning and, like the employee's facility needs to be maintained clean and sanitary at all time.  If Aramark believes, as it provides in its own training material for employees, personal hygiene and handwashing are essential components of limiting the spread of microorganisms capable of causing foodborne illness and provide safe food, it is essential that the employee and inmate toilet facilities and lavatories be maintained clean, organized, and regularly maintained and sanitized.

With respect to internal inspections, the CCDOC Lieutenant assigned to the kitchen has the responsibility of conducting an inspection twice per month.  However, there is no training provided as to how to conduct the inspections or what the expectations are and no understanding of food safety. Reports are provided to the Unit Captain, and then sent to Superintendent Gomez.  Any issues not resolved are provided to the Assistant Executive Director.  However, there is no documented General Order or policy that assures that the inspections are actually completed and what needs to occur at each review step.  Aramark also conducts weekly and monthly inspections of its operations.  Their report is submitted to District Director for Aramark and then forwarded to Aramark corporate office.  However, it is not clear that CCDOC or who within Aramark actually reviews the reports and how non-conformities are addressed and documented.

**Monitor's Recommendations:**

1.  Form a task group with the responsibility and authority to review and modify the entire food service delivery process with the objective to provide meal service at reasonable times, reduce the time that staff currently takes to transport food from the central kitchen to the Divisions and serve the inmates.  The goal that I arbitrarily established was thirty minutes.  That goal was based on the knowledge that Aramark has no heated and insulted hot food transport carts.  The currently used insulated carts cannot be expected to hold hot food hot for any extended period of time.  As stated above, the food service delivery must be coordinated with Cermak to assure that inmates receiving medications that are time sensitive to food service are accommodated.

2.  CCDOC staff under written instructions provided by Aramark need to establish and implement a process to measure and record the time and temperatures of hot food on the trays from the time they leave the kitchens, the time the trays are delivered to the Divisions, the beginning and the end of meal service to the inmates.

3.  To prevent food waste from accumulating in cells and dayrooms, inmates should be given a designated timeframe to consume their meal and all food service related items such as trays, sporks, waste products etc, are collected, and sorted for either disposal or return so that returnable trays can be transported back to the kitchen for washing and sanitization prior to the next meal service.

4. Establish a documented facility wide cleaning and sanitation program for both food service facilities with at least daily recorded inspections and follow-up for areas needing extra cleaning to maintain safe and hygienic facilities for both employees and inmates working in the kitchens.

5. CCDOC should develop and implement a General Order or policy requiring a documented independent weekly inspection program for all kitchens. The inspection needs to focus on food handling, processing, personal hygiene and health of employees and inmates, sanitation, refrigerated and non-refrigerated storage temperatures of potentially hazardous foods, maintenance of temperature logs for refrigeration, cooking, meal service, and warewashing. Completed reports outlining any identified non-conformities with the Illinois food code are to be addressed by the responsible party, either Aramark, CCDOC staff, or DFM within a reasonable time based on risk of foodborne illness. A copy of the inspection report is to be submitted to the Monitor. The work-order system shall be utilized for all issues needing services of DFM or CCDOC. Aramark shall provide documented evidence of corrective action for all issues for which they have responsibility. The work order system shall track resolution of remaining issues. Monthly, designated CCDOC staff, Facility Maintenance and Aramark shall meet to review equipment repair or replacement needs, inspection reports and corrective actions. The meeting summary is to be submitted to the Monitor. Also at least monthly, CCDOC and Aramark shall meet with designated Cermak representatives to review and address any issues pertaining to inmates under medication housed either at Cermak or in the Divisions. Reports of those meetings are to be submitted to monitor for review.

**STATUS REPORT**

**DATE OF STATUS REPORT: 9/20/10**

**PROVISION: G. SANITATION AND ENVIRONMENTAL CONDITIONS**

85. Food Service

b. CCDOC shall ensure that all food service staff, including inmate staff, must be trained in food service operations, safe food handling procedures, and appropriate sanitation.

**COMPLIANCE STATUS: Partial Compliance**

**Status Update:** Briefly describe the actions taken by the Defendants to address the provision:

CCDOC's food service contractor Aramark provides training for their employees. Out of 81 total employees of Aramark, 34 including the District Manager and Facility Manager, 7 supervisors, 4 lead supervisors, and 21 hourly employees maintain current Food Manager Certification through an accredited program, Serv-Safe. Current Certification means that the employee has retaken the class and passed the written accredited examination within the previous five years. Unless specified differently in

state or local regulations, five years is the maximum amount of time that a certification is considered current. Aramark has an onsite employee who is registered as a trainer and provides the training at no cost to the employee. Any employee of Aramark can receive this training upon request. It includes a manual and two-eight hour sessions followed by successful completion of an ANSI accredited written examination.

All Aramark employees are also required to complete the Aramark developed, "Operations 101" training program within two weeks of being hired. This training, among other components addresses the basics of food safety sanitation and the importance of health and hygiene in food service.

Inmates assigned to food service each day are provided training at the beginning of each shift. If you are a returning inmate you go through the training every time you enter the kitchen. Other than a short list of topics such as handwashing, a brief question about health, the training is very limited. The training provided each day is not documented in any form, nor is there any evidence that an inmate even had the training or understood what was said. Further inmates assigned to food service receive the same information from Cermak staff every day!

**Monitor's Assessment:** Describe the monitor's assessment of the status and documentation for the compliance status.

My assessment is that while the training of Aramark staff is adequate, there needs to be evidence of the training in each employee's training file, that identifies the training completed (Serv-Safe, Operations 101, tool control, etc), date of completion, identification of the trainer or training mechanism, and a tool to validate that the training was effective and the person is qualified to do specific functions.

A more formalized program for training of inmates needs to be established and implemented. Inmates should only need to go through that training once upon their first assignment to food service. That requires a file be maintained for each inmate assigned to food service. If one gets the same message day after day after day, it becomes a waste of time and ineffective. If an inmate is not following a supervisor's order regarding sanitation procedures, a decision needs to be made as to whether he or she should continue to be assigned to this area.

**Monitor's Recommendations:**

1.  Continue the Serv-Safe program or another accredited food safety certification process for all Aramark supervisory staff and others as deemed important by Aramark

2.  Develop and implement an improved and documented training program for inmates assigned to food service. They need to understand the importance of sanitation and health as it pertains to their assignment which includes placing food on trays for inmates, utensil and equipment cleaning and sanitization, warewashing, general area cleaning, proper use of equipment such as slicers, mixers, etc. Topics should include effective handwashing procedures and frequency, use

of single service gloves, hair restraints, safe and hygienic use of equipment, equipment cleaning and sanitization, proper use of cleaning towels, and employee health issues.

3. Develop a method to assess whether inmates are following Aramark procedures regularly with a provision to return them back to inmate population, when deemed necessary.

4. Create and implement training for CCDOC officers responsible for transportation and distribution of inmate meals.  The training needs to include the importance of assuring food safety, safe and sanitary handling of inmate trays, sanitary handwashing procedures and frequency, and time and temperature recording procedures.  They need to not only understand the responsibilities and the procedures, they need to understand the public health reasons for the procedures and documenting of times and temperatures.


**STATUS REPORT**

**DATE OF STATUS REPORT:  9/20/10**

**PROVISION:  G. SANITATION AND ENVIRONMENTAL CONDITIONS**

85.  Food Service

c. CCDOC shall ensure that the Central Kitchen and Division XI kitchen are staffed with a sufficient number of appropriately supervised and trained personnel.

**COMPLIANCE STATUS:  Partial Compliance**

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

CCDOC is responsible to provide supervisory staff to oversee inmates for security.  Aramark is responsible to provide supervisory staff for their employees.  Aramark staff are trained as described above in 85-b. CCDOC is only responsible to supervise inmates assigned to the kitchen for security. Inmates are supervised by Aramark staff for their specific assignments in the kitchen.  There is lack of control of some tools in the kitchens.  Aramark has eliminated the use of all knives in the kitchens and they have been removed under a controlled process.

**Monitor's Assessment:**  Describe the monitor's assessment of the status and documentation for the compliance status.

Generally, Aramark is operating the kitchens with a sufficient number of supervised and trained staff and inmates for each shift.  However, as the amount of time I have spent in the kitchens on my two visits was limited to several meetings and very little time auditing the facility.  This will continue to be monitored on subsequent visits. Section J shown below addresses tools used in food service.

General Order 9.11 Tool Control last issued 10/02/87 addresses tool control throughout the facility.

J.      Food Service

All class A tools, i.e., knives, cleavers, ice picks, etc., as used by the food service shall be stored in a locked metal cabinet.  These tools are to be kept locked in this cabinet at all times.  No inmate shall be allowed to work in the kitchen.  Only civilian employees, when authorized by the kitchen production manager, or properly authorized supervisor shall authorize an employee to use a knife.  The employee that is issued the knife shall have his identification card locked in the cabinet until the knife is returned.  Any missing knives shall be immediately reported to the investigative section of the department.

Upon review, it is clear that this policy does not reflect current practice as it relates to kitchen staff, as inmates are working in the kitchen and it does not specify the use of a shadow board for kitchen tools. The policy is in need of significant revision to reflect current and expected practice.

The control of tools used in the kitchen currently is a shared responsibility with some tools overseen by Aramark staff and some by CCDOC staff.  CCDOC only control sharp tools such as knives.  This is not in conformance with General Order 9.11 which specifically states that the responsibility of tool control is the direct responsibility of the Assistant Director of Security.  Not all tools are stored on shadow boards which would allow for immediate knowledge if any are missing.  Large tools were being stored in a designated former hot food holding unit.  However, there was no way to show specifically what tools were required to be there or a mechanism to complete an effective inventory.   All tools stored and used in the kitchens need to be under the specific control of CCDOC security staff with a documented log book showing all tool sign outs and returns, the specific Aramark staff or CCDOC staff to whom the tool is issued.  All tools, both large and small shall be included in a documented inventory system.  An inventory of all tools needs to be taken at the beginning and at the end of each shift.   All tools, regardless of size need to be stored on a visible shadow board.

**Monitor's Recommendations:**

1.   Review and revise the General Order 9.11 Tool Control to reflect current practice in the kitchen. The Order must include a provision for regular documented inventory of all tools by a designated CCDOC officer, and clear directions of actions to be taken when any tool is not traceable including who has the responsibility.  The Order should specify at least an annual review of the Order with an assignment responsibility.

2.   All tools must be under the control of CCDOC Security staff assigned to the respective kitchens. Safety and security of inmates and staff go beyond sharp tools.  As a result  it is not appropriate to permit the food service contractor to maintain this responsibility.

3.   Establish a shadow board for all tools utilized in food service.  This would also be a good opportunity to assess whether all tools currently in the kitchen are actually needed.

4.  Establish and implement an inventory monitoring program for all tools that includes a documented inventory at the beginning and at the end of each shift, formal tracking mechanism of all tools removed from the shadow boards showing date and time of removal, to whom the tools are assigned for responsibility, and the date and time that tools are returned.  Inventory monitoring must account for all tools.

5.  CCDOC staff needs to review the role of officer's assigned to food service.  If they are supervising inmates for any food service task beyond security, appropriate training should be provided.

**STATUS REPORT**

**DATE OF STATUS REPORT:  9/20/10**

**PROVISION:  G. SANITATION AND ENVIRONMENTAL CONDITIONS**

85.  Food Service

d. CCDOC shall ensure that dishes and utensils, food preparation and storage areas, and vehicles and containers used to transport food are appropriately cleaned and sanitized.

**COMPLIANCE STATUS:  Partial Compliance**

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

Aramark staff is taking and recording temperature and pressure measurements of the warewashing machines.  Inmate staff under supervision of CCDOC staff clean transport carts.

**Monitor's Assessment:**  Describe the monitor's assessment of the status and documentation for the compliance status.

While I did observe food transport carts being cleaned between meals, I did not observe the cleaning and sanitation of trucks used to deliver meals to selected Divisions.  Food preparation and storage areas were maintained cleaned.  However, there is a need for a written sanitation plan outlining the cleaning schedule and frequency for each piece of fixed equipment, who is responsible and the procedure for cleaning and sanitizing it.  The procedure for cleaning equipment can be obtained from the operational manual provided with the equipment.

**Monitor's Recommendations:**

1.  Establish and implement a written cleaning and sanitation plan and schedule for all fixed equipment,  located in both kitchens, dry and refrigerated storage facilities, transportation vehicles, toilet facilities, handwashing stations, employee break areas, storage areas for tools, warewashing equipment, floors, walls, ceilings, light fixtures, and kitchen laundry facilities.  The cleaning frequency schedule should be as needed to prevent the accumulation of food debris,

grease, and soil.  The plan needs to identify who has the responsibility, the cleaning and sanitizing procedure in conformance with the equipment manufacturer's recommendations, and a requirement for the assigned employee to sign and date the completed assignments.  The plan should a regular review procedure to assure that the plan is being followed.  The plan can be used by CCDOC staff conducting inspections to assure it is being followed.  Aramark corporate office should have sample cleaning and sanitation plans for its units that can be adapted for Cook County.

2. Create an equipment cleaning log for use by employees overseeing the cleaning and sanitizing operation.  Aramark corporate office most likely has model forms that can be used as a guide for the log.

**STATUS REPORT**

**DATE OF STATUS REPORT: 9/20/10**

**PROVISION:  G. SANITATION AND ENVIRONMENTAL CONDITIONS**

85. Food Service

> e. CCDOC shall check and record, on a regular basis, the temperatures in the refrigerators, coolers, walk-in-refrigerators, the dishwasher water, and all other kitchen equipment with temperature monitors to ensure proper maintenance of food service equipment.

**COMPLIANCE STATUS: Partial Compliance**

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

Aramark has implemented a procedure to regularly measure the air temperature of all walk-in refrigerators and freezers, reach-in refrigerators, warewasher equipment, and hot food holding equipment.  It is not clear who reviews the temperature logs and what happens when temperatures are found not to be in conformance with food regulations.  Work orders are being sent to Facilities Management when repairs are needed.

**Monitor's Assessment:**  Describe the monitor's assessment of the status and documentation for the compliance status.

On my first tour in June I found that Aramark had taken a warewasher out of service in Division XI because it could not maintain proper sanitization temperature.  A work order had been filed, but the response was slow.  Immediately following my visit to the Division XI kitchen, Facilities Management made the necessary repairs.  To prevent food waste, there is a need to review the work order priority system to assure that temperature sensitive food service equipment receives immediate attention when monitoring demonstrates non-conformity with standards.

58

**Monitor's Recommendations:**

1.  Facilities Management needs to review and assure that food service equipment that is dependent on temperature to adequately protect food and to clean and sanitize equipment and utensils receives high priority for service and repairs.  All temperature sensitive equipment as well as all fixed equipment in food service should be included on a preventative maintenance schedule to assure performance rather than waiting until a problem arises.  Also CCDOC inspection program should trigger equipment work orders as needed.

2.  Facilities Management should also make sure that when replacing parts on equipment such as warewashers, or refrigerators, that if they are not using the specific equipment manufacturer's replacement parts, the parts being used are fully compatible with the equipment.  If not, it may jeopardize performance and equipment certification.

3.  Aramark needs to develop and implement a Standard Operating Procedure that establishes temperature monitoring requirements, frequencies, and responsibility for monitoring, along with a daily and weekly review to spot when records show that equipment is trending toward non-compliance.