## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **10 C 2946** |
| v. | ) | |
| | ) | **Judge Virginia Kendall** |
| COOK COUNTY, ILLINOIS; | ) | |
| THOMAS DART, COOK COUNTY | ) | |
| SHERIFF; TONI PRECKWINKLE, | ) | |
| COOK COUNTY BOARD | ) | |
| PRESIDENT; COOK COUNTY | ) | |
| BOARD OF COMMISSIONERS, | ) | |
| | ) | |
| **Defendants.** | ) | |

## COOK COUNTY'S STATUS REPORT AND
## RESPONSE TO THE MONITORS' REPORTS

NOW COME the Defendants, TONI PRECKWINKLE, PRESIDENT OF THE COOK COUNTY BOARD OF COMMISSIONERS[1] and the COOK COUNTY BOARD OF COMMISSIONERS, by their attorney ANITA ALVAREZ, State's Attorney of Cook County, through Deputy State's Attorney PATRICK T. DRISCOLL, JR., and Assistant State's Attorney's DONALD J. PECHOUS and COLLEEN B. CAVANAUGH, and state as follows:

Toni Preckwinkle, President of the Cook County Board of Commissioners and the Cook County Board of Commissioners ("the County"), present this Status Report and Response to the reports of the Monitors detailing compliance with the Agreed Order. The County, through its affiliated departments and agencies, and in collaboration with Sheriff Thomas Dart, continues to demonstrate and maintain its dedication to constitutionally sound conditions of pre-trial confinement at the Cook County Department of Corrections ("CCDOC").

---

[1] As of December 6, 2010, Toni Preckwinkle became the duly elected President of the Cook County Board of Commissioners. Pursuant to F.R.C.P. 25(d), President Preckwinkle is automatically substituted as a party in this cause.

Certain provisions of the Agreed Order are directed solely at CCDOC, and thus implicate the Sheriff. Consequently, the County makes no response or comment to those provisions of the Agreed Order. Cook County responds to the provisions which apply to it as follows:

---

**31**. **Use of Force**

> s. *Cermak shall ensure that, when providing medical treatment or assessment to an inmate following a use of force, Qualified Medical Staff document the inmate's injuries, if any, and any medical care provided. Cermak shall provide CCDOC senior management with a brief summary documenting the initial medical encounter following a use of force, including an anatomical drawing that depicts the areas of sustained injury, if any, and information regarding any further medical care.*

**Compliance Status**: Partial compliance.

**Status Update:** Briefly describe the actions taken by the Defendants to address the provision:

I am unaware of the status of Cermak's policies/procedures. It is evident that Cermak is documenting inmate injuries. Information is provided by Cermak to investigators at OPR, but it is not specifically guided by Cermak policy, nor could I identify procedures within OPR's SOP.

**Monitor's Assessmen**t: Describe the monitor's assessment of the status and documentation for the compliance status.

See 31.f. There is agreement that Cermak will make a copy of the medical encounter (redacted) to OPR when there is an allegation of excessive force that OPR is investigating. Cermak and OPR policies need amendment.

**Monitor's Recommendations:**

Convene a meeting of the parties and discuss the relevant policies/procedures for each party. Agree to language; complete procedures; train. If it is envisioned that CCS Police will get involved in allegations of excessive force, procedures should cover their access to inmate medical records specific to the incident.

**COUNTY RESPONSE**

**Cermak administrators have met and have collaborated with CCDOC administrators and have developed a policy for medical evaluation of detainees involved in instances where force was used. Cermak has also developed a referral form for use by CCDOC for these types of referrals.**

**31. Use of Force**

    t.    *Cermak shall ensure that Qualified Medical Staff question, outside the hearing of other inmates or correctional officers if appropriate, each inmate who reports for medical care with an injury, regarding the cause of the injury. If, in the course of the inmate's medical encounter, a health care provider suspects staff-on-inmate or inmate-on-inmate abuse, that health care provider shall immediately: report the suspected abuse to the Executive Director of the Office of Professional Review or other appropriate CCDOC administrator; and adequately document the matter in the inmate's medical record.*

**Compliance Status**: Non-compliance.

**Status Update:** Briefly describe the actions taken by the Defendants to address the provision:

I am unaware of the status of Cermak's policies/procedures. Checking with Dr. Shansky, he was unaware as well. This provision may be in partial or substantial compliance, but in the absence of this information, I am making this as noncompliance.

**Monitor's Assessmen**t: Describe the monitor's assessment of the status and documentation for the compliance status.

See 31.f. There is agreement that Cermak will make a copy of the medical encounter (redacted) to OPR when there is an allegation of excessive force.Cermak and OPR policies need amendment.

**Monitor's Recommendations:**

Convene a meeting of the parties and discuss the relevant policies/procedures for each party. Agree to language; complete procedures; train. Convene an inter-disciplinary committee to address these specific policy/operational issues needing coordination between Cermak and CCDOC(and CCS Police, if necessary). Ensure that data is captured to document when Cermak notifies OPR or the Executive Director CCDOC and a use of force incident report has NOT been made. Ensure that if this situation is documented, there are appropriate actionsby OPR and by the Executive Director CCDOC.

**COUNTY RESPONSE**

    **As stated above, Cermak has developed a policy for medical evaluation of detainees involved in use of force incidents. Evaluation of the policy and further input from the monitor is encouraged.**

**41. Inter-Agency Agreement**

    *a. CCDOC-Written Agreement*

*b. Cermak-Written Agreement*

**Compliance Status**: Partial compliance.

**Findings**

    **Status Update**:  None submitted.

    **Monitor's Findings**:

We have reviewed a nine-page draft inter-agency agreement between the Office of the Sheriff of Cook and the Cook County Health and Hospitals System. This draft forms an excellent basis for continuing dialogue and negotiation between the Office of the Sheriff and the Cook County Health and Hospitals System. We realize that this is an ongoing process and we will await the final product.

**Monitor's Recommendations:**

    1.   Continue the dialogue.

**COUNTY RESPONSE:**

**The County, through Cermak, is actively negotiating a final agreement with the Sheriff.  Agreement on a final version is imminent.**

---

**42. Policies and Procedures**

    *a. Cermak-Medical Care*

    *b. Cermak-Timeliness of Response to Clinician Orders*

**Compliance Status**: Partial compliance.

**Findings**

    **Status Update**:  None submitted.

    **Monitor's Findings**:

We have reviewed ten policies which have been approved by the chief operating officer of Cermak and all of these policies are well written and in good order. We understand that many of the policies relating to key health care operations are still in the development stage in part because the program is in the process of overhauling many of its critical functions, including access to care, medication administration, medical records and intake processing. Thus, this policy development will proceed at a pace consistent with the development of new processes.

Monitor's Recommendations:

1.  Continue the work on policy development and implementation.

2.  Feel free to consult with the Medical Monitor at any time regarding your policy development.

**COUNTY RESPONSE:**

**The Director of Quality Improvement has assumed responsibility for the coordination of policy and procedure formulation. The review and revision of Cermak policies is ongoing. Cermak administrators are pleased to report that 52 policies have been completed. Additionally, 37 policies are on the Continuous Quality Improvement agenda for approval. The remaining policies are under either under review or development. Policies will be available on Cermak's intranet at each visit by the medical monitor for inspection.**

---

**43. Medical Facilities**
  *a. CCDOC -Clinical Space*

  *b. Cermak-Clinical Space*

  *c. CCDOC-Adjustments to Clinical Space*

  *d. Cermak-Cleanliness and Adequacy*

  *e. Cermak-Appropriate Medical Waste Disposal*

  *f. CCDOC-Patient Privacy*

  *g. Cermak-Patient Privacy*

  *h. Adjustments to Space to Provide Privacy*

  *i. Construction of New Clinical Space*

**Compliance Status**: Partial Compliance.

**Findings**

**Status Update**:  None submitted.

**Monitor's Findings**:

a. & b.  CCDOC and Cermak-Clinical Space

CCDOC is working with Cermak to improve clinical space in order to provide adequate health care to inmates. In the short-term, both male and female intake areas are in the process of being renovated, which should promote improved medical and mental health intake evaluations. With respect to long-term planning, a 900-bed residential treatment unit (RTU) for intermediate medical and mentally disordered males and females is being designed and is expected to be completed in three years. However, there are still areas in disrepair, particularly in Division I. CCDOC and Cermak are also working together to bring electronic connectivity to the jail in anticipation of expanding electronic medical record capability.

c.-i.  CCDOC-Adjustments to Clinical Space

Cermak's designated clinical space varies widely in suitability for providing medical and mental health care and is in need of standardization with respect to sanitation, general repair, medical equipment and supplies, lighting, and temperature control. Each area is briefly described, with areas needing improvement highlighted below.

The current intake screening area was never designed for this purpose and is inadequate. There is limited, if any, privacy in both male and female intake areas during medical/mental health interviews and examinations. The current area designated for the performance of male physical examinations is inadequately equipped and supplied. There are three stations in this room but only one examination table. Wall-mounted oto- and ophthalmoscopes are not functional and portable, battery charged oto/ophthalmoscopes did not work when tested. There are no privacy screens in this area. Staff reported that a new male intake area is under renovation and would be ready for use in approximately three weeks. We toured this area and anticipate that it will indeed improve the male medical intake process. However, we have some concerns about the privacy of mental health interviews in this area.

The female intake area is a single room divided up into four stations, two of which are designated for physical examinations. The room was relatively clean and the stations were adequately equipped and supplied, including sinks, personal protective equipment, and biohazardous waste disposal containers. Auditory and perhaps visual privacy is a concern in this area due to its small size.

The Cermak emergency room, in close proximity to the intake area, is a large room with a nurse's station centrally located and examination stations around the perimeter. The room was clean and properly equipped and supplied, including personal protective equipment and biohazardous waste disposal containers. The main inmate waiting room is immediately outside the emergency room. However, within the emergency room there is a bench where maximum-security inmates are seated pending treatment and staff reported that these inmates are able to observe and hear confidential medical information because of the openness of the area and proximity to the nurse's station.

Division I houses 1218 maximum-security inmates. The building is very old. The dispensary has an adequately sized waiting area with benches for the inmates to sit on while awaiting appointments. There is a desk immediately adjacent to the inmate waiting area. We observed a nurse performing assessments at this desk, which provided no visual or auditory privacy. The dispensary has two examination rooms which were properly equipped and supplied, with running sinks, personal protective equipment, and biohazardous waste containers. For years, the dispensary has had problems with water leaks in the ceiling that have not been permanently repaired. During our visit, water was leaking from the ceiling directly onto an examination table. The room was therefore not functional and closed down, pending repairs.

Division II has dormitories that house different types of populations. Dormitory 1 houses 325 male minimum general population and mental health inmates; dormitory 2 houses 433 male intermediate care inmates; dormitory 3 houses 474 male minimum general population inmates and the annex houses 400 minimum and medium general population inmates. All the dormitories were cleaned by the inmates living in the area. The dorms were generally clean. General painting was needed but, otherwise, the dorms were acceptable. The medical areas have an adequately sized waiting area with benches. The actual medical units are of adequate size to large and generally clean, despite the oldness of the building. The examination rooms were well equipped and supplied with sinks with running water, soap, paper towels, bio-hazard containers and personal protective equipment. Some areas had water damage to ceiling tiles, with some having been replaced, others not replaced and others missing. In selected dorms, ceiling air vents were covered with cardboard either to block the vent or redirect the airflow. Environmental temperatures varied from area to area. In each of the medical areas, there are one or two desks where medical staff interview inmates and even provide treatments without the benefit of privacy. The examination rooms were private.

Division III had been closed but was recently reopened, housing 302 male inmates. This area was neither clean nor well maintained. The medical area was cluttered but reasonably organized despite the limited space. There was one small examination room. Again, there was a desk in a common area which afforded no privacy for interviews/assessments or treatments. Hand washing facilities and associated supplies were available as well as personal protective equipment and biohazard containers. There were stained and missing ceiling tile and, again, some ceiling air vents were covered with cardboard either to block or redirect the airflow.

Division IV houses 546 women at the jail, including all security levels. It is staffed with nurses 24 hours, seven days per week. The Division has tiers that are designated as medical or mental health housing units and one to which pregnant women are assigned. The medical area is comprised of two separate areas and an inmate waiting room. On one side of the hall are two examination rooms and a bathroom which is used primarily by clinicians. These examination rooms were relatively clean, properly equipped and supplied, including personal protective equipment, sharps and biohazardous waste disposal containers. On the other side of the hallway is a dispensary where nurses assess inmates, perform treatments, prepare medications, transcribe

orders, etc. The nurses' station is small for its designated purpose and the area is cluttered with medical equipment for lack of storage space. It has significant problems with temperature control, often becoming unbearably hot for staff and inmates. During our visit, the temperature in this area was in the mid-80 degrees Fahrenheit. In Division IV, auditory and visual privacy may be compromised due to the open area in which nurses assess patients. An inmate waiting room is adjacent to this dispensary, with a window through which the nurses administer medications. Due to the small size of the waiting room, there is no auditory privacy for inmates who ask questions of the nurse at the window.

Division V houses 870 minimum-security inmates. It is staffed with an RN on the day shift five days per week and EMT's on the day shift seven days per week. The dispensary is comprised of a large room with examination and storage rooms adjacent to it. It has two examination rooms that are properly equipped and supplied, including sinks, personal protective equipment and biohazardous waste disposal containers. However, the vinyl surface of one examination table was cracked and should be replaced for infection control purposes. The floor has broken or missing floor tiles which should be repaired and it was not uniformly clean, with grime accumulated in some corners of the room. The fronts of storage cabinets are dirty. The medical supply room had a storage cabinet with a broken door that could not be locked. We did not observe clinical encounters in order to assess auditory and visual privacy.

Division VI houses 939 male general population and protective custody inmates. This area was clean, well lighted, organized, and generally well maintained. The medical unit was in good condition. There was an inmate waiting area, two well-equipped, well-supplied examination rooms, a treatment area and staff break-area. Sinks with running water, soap and paper towels were evident. Personal protective equipment and biohazardous waste containers were present.

Division VIII is the infirmary area and is comprised of Cermak 2nd and 3rd floors. The second floor houses 82 acutely mentally ill inmates and the third floor houses 50 male and female acutely ill inmates. These areas were generally clean, well lighted and appropriately maintained.

Division IX has a capacity of 1026 maximum custody men. Health care services are available on site 12 hours each day. The dispensary is located one floor below ground. The dispensary includes a trauma room, several examination rooms, two offices or workrooms used by nursing staff, two offices for health records storage and staff, a medication room, a large workstation or reception desk. These rooms are located off a large L shaped corridor that includes another workstation. The clinical space and equipment is adequate for the limited coverage and number of health care staff currently assigned to service this building. There is no dental operatory in this facility. During observation of medication administration, the most common request for health care attention was for dental care and staff reported long delays in dental care. In Division IX, there were insect traps in the examination areas and a cockroach was

seen at the entrance to the dispensary. Auditory privacy from other detainees is compromised when clinical information is exchanged at the cell front such as during rounds and medication administration. Detainees who share the cell or who are celled nearby are able to hear and in some cases see the exchange. Staff was observed protecting patient privacy by minimizing the amount of information that is exchanged and expressed the ability to have the detainee brought to the dispensary as needed.

Division X has a capacity of 768 intermediate and maximum custody men. This Division provides outpatient level health care services on site 24 hours a day, seven days a week with resulting concentrations of detainees who have medical and/or psychiatric conditions requiring these services. The dispensary consists of a waiting area, nurse's station/work area, three examination rooms/offices (one of these is used by a mental health clinician), an area for health records and staff, a break room, two open work areas and a storage alcove. The waiting room doubles as an area for administration of controlled substances. The nurse's station is used to monitor and administer medication to diabetics as well as conduct sick call and to pre-room patients seeing primary care providers. A dental operatory was being re-installed in an area between the nurse's station and the room used to store health records. Separate from the dispensary, at the end of a corridor, another large room is used to store and prepare medications. In Division X, insufficient patient privacy was afforded when the waiting area in the dispensary was too crowded during the time that the area was used to administer controlled substances. Detainees could hear and see the exchange between nursing staff and other detainees who were receiving medication. This same situation occurred with detainees and correctional staff during diabetic line. The primary care providers and the clinic nurse were observed to arrange visual privacy during encounters that required some unclothing. Custody staff providing security in the clinic was observed to provide auditory privacy for detainees who were seen by providers in the exam rooms. At other times, there was insufficient auditory privacy in the dispensary primarily because of crowding; correctional staff and detainees were observed to overhear information about detainees as nurses, mental health staff, and primary care providers delivered clinical care.

The clinical space is inadequate to meet the needs of the population. The construction of the new RTU may provide some relief to the high medical acuity of the Division; however, this is unclear. Additional clinical examination space is needed, particularly as nurses begin performing sick call and other clinical assessments. There are also opportunities to reallocate use of space, including moving the dental operatory into the record room. There is also a need for office space for the nurse coordinator in Division X, however it does not have to be in the dispensary area, but could be located anywhere in the building. Due to the high medical acuity of the population, the volume of patients is high in this area, resulting in congestion. Health care and custody staff should work collaboratively to control inmate flow and reduce congestion.

Division XI has a capacity of 1500 minimum custody, general population men. This Division provides access to health care services on site during an eight-hour daytime shift. The dispensary includes a waiting area, a large open nurses work station, a medication room, a

trauma and procedure room, several offices housing a health educator, the nursing coordinator, a clinical nurse specialist and several examination rooms for primary care clinicians. The clinical space and equipment is adequate for the limited coverage and number of health care staff currently assigned to service this building. In Division XI, visual privacy was provided during clinical encounters.

**Monitor's Recommendations:**

1. Cermak and CCDOC should assess each Division's medical, mental health and dental clinic space with respect to size, general repair and sanitation, lighting, equipment and supplies, privacy and communications connectivity and then address deficiencies cited in this report as well as in their own assessments and inspections.

2. Cermak and CCDOC should utilize the Continuous Quality Improvement (CQI) process to monitor and provide ongoing feedback regarding medical facility issues.

3. We recommend establishing a dental operatory in Division 9 if it would significantly reduce delays in access to care.

**COUNTY RESPONSE**

The County acknowledges that the previous area used for male intake screenings was inadequate. As the Monitor notes, a new area for intake screenings has recently been renovated and placed into service. The County looks forward to the Monitor's next site visit and subsequent report to the Court regarding the improvements, which include expanded clinical space and increased privacy. Equipment issues in this area have been addressed.

In regards to the female intake area, that area is presently being re-designed and an additional room is being added for mental health evaluations.

The County is pleased to report that the new 900 bed RTU is under construction and should be available for occupancy in approximately three years. The improvements gained from the new facility will be numerous and will provide a significant positive impact to the overall delivery of health care at the CCDOC, particularly during intake and in Division X. Until the time of completion of the new RTU, the County will continue to make cost-effective efforts to improve clinical space while keeping an eye towards the completion of the new facility.

As the Monitor notes, despite continuous repair efforts, Division I, the oldest portion of the jail complex continues to suffer from water leakage issues. The monitor noted that a

nurse was using a reception desk to triage patients. That, however, was merely a temporary situation due to a water leak. CCDOC and Cermak are presently evaluating alternate sites for clinical services.

The Monitor notes that there is no dental clinic in Division IX. There is in fact a dental clinic in this division and the County invites the monitor to inspect it during the next site visit.

As discussed above, the new RTU building is expected to resolve the current problem of clinical space in Division X. Nonetheless, the adequacy of the Division X clinical space is a concern and is the topic of discussions between CCDOC and Cermak administrators who are examining interim solutions.

Cermak and CCDOC administrators have asked the Monitors for a consultation on determining ADA needs within the jail complex. Cermak and CCDOC have identified space for mental health evaluations in female intake. Cermak is working with DFM and CCDOC on the Division I clinic space. The mental health leadership is working on assessing suicide -resistant cells. Cermak has brought up the issue of housing for intermediate medical and mental health patients daily from intake. This problem will be resolved with the construction of the new residential unit; however we continue to manage this process with CCDOC at our quality meetings.

Finally, Cermak has made known to Capital Planning its need for wireless capacity to manage medication administration. We have a meeting being scheduled to discuss this item.

___

**44. Staffing, Training, Supervision and Leadership**
   *a. Cermak-Leadership Team*

   *b. Cermak-Staffing*

   *c. Cermak-Training*

   *d. Cermak-Supervision*

   *e. Cermak-Licensure and Certification*

   *f. Cermak-Training for Correctional Officers*

   *g. CCDOC- Mental Health Training for Correctional Officers*

*h. Cermak-Mental Health Training for Correctional Officers*

*i. Cermak-Health Care Staff Training*

**Compliance Status**: Partial compliance.

**Findings**

 **Status Update:** None submitted.

 **Monitor's Findings:**

 a. Cermak Leadership Team

  The Cermak program has an experienced Chief Operating Officer with excellent credentials in the correctional health field. In addition, it has a Medical Director and Associate Medical Director, both of whom have been in their positions for more than one year. Also, there are five senior physicians, most of who have been in their positions for more than one year. There is a Director of Nursing who has been in her position for more than a year and of eight nurse coordinator positions, the five existing coordinators have been in their positions more than a year and three positions are vacant. The Pharmacy Director has also been in his position more than a year and the Dental Director has been in his position about a year. With regard to the mental health program, the plan is to transition the program from a contract with the Isaac Ray Center to a self-operated program. In that regard, there are plans to bring in an experienced Director of Mental Health Services and to have both a Chief Psychiatrist and Chief Psychologist. Because this is a program in transition, these positions are not yet filled.

 b. Cermak Staffing

  With regard to Cermak staffing, there are a total of 520 budgeted positions, of which 135 are vacant. This is an overall vacancy rate of 26%. However, of the 135 vacancies, 68, or a little more than half, are in the nursing or correctional medical technician category. In addition, besides being in a transition period for its administrative functions, the mental health program is also transitioning from a program that used a significant number of unlicensed staff to one in which all 86 positions will be licensed. This transition should take place within the next fiscal year. In our review of the overall staffing plan and the anticipated direction of the program, it appears that Cermak is investing in higher level credentialed staff to perform clinical activities.

 c. Cermak Training

  All clinical staff, both nursing and clinician, receive an initial orientation. The nursing training is six weeks. The training also includes CPR, First Aid, blood borne pathogen and a variety of other topics. There is also training with regard to the suicide prevention program for nurses and mental health staff. However, the clinician group does not yet receive training with regard to the suicide prevention program. It is planned that this part of the training will be

integrated into the clinicians' curriculum within the next year. There are plans to create a training coordinator position for nursing. There has been developed a continuing education program provided by some of the clinicians for nurses and this entails a monthly clinical topic including chronic diseases, communicable diseases, etc. The nurses also receive training with regard to OSHA requirements, HIPPA requirements, corporate compliance and fire safety. Much of this training is available online.

d. Cermak-Supervision

Although most supervisory positions are filled (there are three Nurse Coordinator vacancies), our initial monitoring visit suggests that, particularly with regard to the nursing program and the non-compliance in the areas of medication management and access to care, the nursing supervisory staff have a substantial amount of progress yet to be made. We should have a better sense of the adequacy of that supervision after we complete our next visit. With regard to the clinician supervision, we have identified areas that appear to have improved since the initial DOJ inspection occurred several years ago. At this most recent visit, we identified at least one clinician whose work warrants careful and intense review and remediation or other action if indicated.

e. Cermak-Licensure and Certification

All of the medical staff are fully licensed, as are the nursing staff. Some of the correctional medical technicians are ERT certified, but this is not a requirement.

f. Cermak-Training for Correctional Officers

We reviewed a sample of 100 records and found that 68% of the officers had received their annual updates within the last 12 months. Another 28%, for a total of 96%, had received their annual updates in the past 18 months. There were 4% who had gone beyond the 18 months and are considered outliers. This is acceptable performance.

g. CCDOC- Mental Health Training for Correctional Officers

Ninety-six percent have received basic mental health training, including the suicide prevention training and also been trained via a DVD that goes into signs and symptoms of mental illness. This is a training rate that is clearly satisfactory.

h. Cermak-Mental Health Training for Correctional Officers

There is currently an outside vendor who provides mental health training, including suicide prevention. This may be ultimately brought in-house. With regard to the officers who work on mental health units, we were able to review a sample of officers who worked in Division 2 on the mental health unit and of the sample we reviewed, eight out of ten had completed special mental health training. On the other hand, with regard to Division 10, only

seven out of 20 or 35% had completed the special mental health training. Clearly, more work needs to be done with regard to insuring that officers who work on mental health units have had the additional training.

i. Cermak-Health Care Staff Training Regarding MOA

The Medical Monitor attended a series of five town hall meetings, covering all three shifts and attended by several hundred of the Cermak staff. These meetings reviewed many of the areas covered in the Memorandum of Agreement and described what the staff could anticipate through the monitoring process. This was, we believe, an effective way to communicate key issues covered in the Memorandum of Agreement.

**Monitor's Recommendations:**

1. Fill the vacant positions as part of your effort to satisfy your staffing plan.

2. Transition the mental health program leadership as expeditiously as possible so as to minimize any negative impacts on the mental health program.

3. Implement the training for clinician staff with regard to the suicide prevention program.

4. Focus on clinician performance review, including the clinician whose work we identified elsewhere in the report.

5. Provide very clear instructions and expectations for the nurse coordinators with regard to the  access to care program as well as the medication management program.

6. Nursing leadership must hold the nurse coordinators accountable and facilitate either their achieving satisfactory performance or face sanctions.

7. Insure that at least 85% of officers who work on special mental health units have had the requisite training to allow them to work with these inmate patients.

**COUNTY RESPONSE:**

**Cermak administrators are working to fill all positions pursuant to their staffing plan.  Presently, 59 of 176 previously vacant positions have been filled.  In regards to the remaining 117 vacant positions, most have been posted and attempts are being made to fill them as soon as possible.**

**Importantly, Cermak has filled three mental health leadership positions.  Dr. Ralph Menezes is Acting Director of Psychiatry, Nneka Jones is the Director of Psychology, and Terre Marshall is the Mental Health Program Director.**

**Price Waterhouse Coopers, a consulting firm, is providing directive and supportive assistance in the Department of Patient Care Services in an attempt to reorganize Patient Care Services.**

**45. Intake Screening**

*a. Cermak-Intake Screens for All Patients*

*b. Cermak-Appropriate Intake Screen Instrument*

*c. Cermak-Appropriate Mental Health Intake Screen Instrument*

*d. Cermak-Proper Training for Intake Screen Process*

*e. Cermak-Supervision of Staff Performing Intake Screen*

*f. Cermak-Timeliness of Intake Screen*

*g. Cermak-Comprehensive Mental Health Evaluation Based on Screen Positives*

*h. Timeliness of Mental Health Screen Incorporation into Medical Record*

*i. Medication Continuity*

**Compliance Status**: Partial compliance.

**Findings**

**Status Update:** None submitted.

**Monitor's Findings:**

We toured the intake screening area and were pleased with the changes we observed. First of all, the female intake screening now is performed by registered nurses, using a much more comprehensive intake screening form, which includes mental health questions. In addition, the screening nurse, where indicated, tests the blood sugar, performs a peak flow exam on asthmatics, collects vital signs and obtains substance use history. This is clearly a greatly improved effort to identify health issues on entry to the institution. We also observed the newly remodeled space, which will temporarily serve as the intake area until the new building is opened (approximately three to four years). The new space should afford much more visual and auditory privacy and allow for a much more professional intake screen to be performed. We also understand that all of the intake screens are to be conducted by registered nurses. However, in order to accomplish these staffing changes, Cermak Health Services will need to hire an additional number of nurses. This hiring effort is in process. The new process will insure that patients are assessed by an appropriately licensed and credentialed health professional.

a. Cermak-Intake Screens for All Patients

We reviewed fifteen records of patients whose names we selected because they have been identified on other lists as having chronic problems. In the records we reviewed, close to one third did not have a medical screen. We identified the reasons that could contribute to the absence of a medical screen. The primary reasons were any individuals who, upon entering the Jail, were entering from any source other than the court, such as sheriff's department hospital takeovers or patients refusing electronic monitoring or some other atypical method of entry to the Jail. These individuals were sent immediately to the emergency room where they were seen by an advanced level provider who performed a very brief assessment in order to determine any ongoing medical problems and any housing needs. The end result was that the questions contained in the new comprehensive screen, including medical and mental health, were not asked of these patients. This is a processing flaw that must be corrected. In addition, on the male side, patients with a positive mental health screen were sent to the emergency room where an assessment was made with regard to their mental health housing needs and as part of a form of medical clearance. Again, the emergency room assessment by the advanced level provider was frequently cursory and in no way covered the health issues that are addressed in the new, comprehensive intake health screening form.

b. Cermak-Appropriate Intake Screen Instrument

The new intake health screening form used in the female intake area is an excellent instrument and when used by nurses for all detainees will greatly improve the quality of the intake process.

d. Cermak-Proper Training for Intake Screen Process

The nurses who are working in the female intake area have been trained and should be receiving ongoing feedback on this process.

e. Cermak-Supervision of Staff Performing Intake Screen

From what we have observed, supervision of all clinical activities conducted by staff under nursing supervision can be enhanced. We are encouraging the nursing program to implement a professional performance enhancement program utilizing systematic review and feedback with staff regarding the performance of their specific activities.

f. Cermak-Timeliness of Intake Screen

Although we identified a significant minority of patients who did not receive an intake screen (in some individuals this may have been the medical screen, in others the mental health screen and in some both) for those who received the screen, in our review, the intake screen was timely, occurring on the day of entry into the institution or within 24 hours.

16

i. Medication Continuity

We identified a few records in which the clinician documented on the initial orders that the medications had been given to the patient in the booking area. However, these were exceptions. In the majority of records in which, based on clinical indication and verification of prior medications, it was appropriate to provide medications, there was an absence of available documentation that patients had received the medication timely.

**Monitor's Recommendations:**

1. Insure that all entries to the jail receive the new intake health screen consisting of medical, mental health and substance use information.

2. Provide a form of supervision and feedback in which nurses who perform the intake screen have their work reviewed and specific records discussed with them on a daily basis until a determination is made that the performance is at an acceptable level.

3. Insure that medication is provided timely and documentation of medication receipt is available or that the clinician has determined that the patient is to be observed pending a decision with regard to medication.

**COUNTY RESPONSE**

As previously discussed, male intake is now performed in a newly constructed area. Mental health and medical screening have been combined in an effort to streamline the intake process. All new intake patients are checked by a flow manager in intake to ensure that they have had all screening elements which are necessary.

In regards to the Monitor's second recommendation concerning nursing supervision and feedback, Nursing has not yet started this process, but looks forward to instituting the Monitor's recommendations in the near future.

The Cermak Pharmacy is working on improving medication delivery by utilizing a Fax and Fill system Monday through Friday to immediately fill medication and to have runners transport medication to inmates before they leave intake. This has not yet been implemented. For Sat-Sun & Holidays, the most commonly used medication will continue to be dispensed by providers from par stock (2-3 day supply). Medication not stocked will rely on existing pharmacy capacity to dispense and nursing capacity to administer medication.

**46. Emergency Care**

> *a. Cermak-Health Care Staff Training*
>
> *b. CCDOC-Correctional Officer Training*
>
> *c. CCDOC-Emergency Transport*
>
> *d. Cermak-Timely Care and/or Transport*
>
> *e. CCDOC-First Responder Training for Correctional Officers*

**Compliance Status**:  Partial compliance.

**Findings**

> **Status Update:**  None submitted.
>
> **Monitor's Findings:**

a.  Cermak-Health Care Staff Training

As indicated previously, there are records of Cermak Health Care Staff having received basic training, which includes emergency care and our review of records did not identify any significant problems other than with one clinician.

b.  CCDOC-Correctional Officer Training

The training records demonstrate 96% of officers have received their updated training within the past 18 months. We did not identify any officer issues in the records we reviewed.

c.  CCDOC-Emergency Transport

It is very difficult to track the timeliness of emergency transport because the Cermak emergency room does not maintain a comprehensive and conscientiously utilized emergency log. This is a requirement in order to determine timeliness of emergency care. In addition, the custody log, which is better than the Cermak medical log, could also be maintained in a more well organized manner. The custody log should include the time that custody was contacted, the patient name, whether the ambulance was called and if so, when the ambulance was called and when the ambulance arrived and when it departed. The medical log should contain date and time, patient's name, presenting complaint and disposition. If the disposition includes emergency transport, the log should include the time custody was contacted, the time emergency response team arrived and the time they departed.

d.  Cermak-Timely Care and/or Transport

As indicated under the emergency transport section, the current logbooks do not facilitate tracking the timeliness of transport. Therefore, currently measuring timeliness is problematic.

e.  CCDOC-First Responder Training for Correctional Officers

The records demonstrate that 96% of correctional officers have had first responder training within the prior 18 months. This is satisfactory.

**Monitor's Recommendations:**

1.  Custody should assiduously maintain a log with the elements described in the findings above.

2.  The medical program in the emergency room should assiduously maintain a log that contains the elements listed in the findings above.

3.  Nursing supervisory staff should review the maintenance of this log each morning to insure that the required fields are correctly filled in and if not, take appropriate action.

4.  Each day, clinician supervisory staff should review this log and sample records to review the quality of the clinician response.

5.  Both nursing and clinician leadership should use the log to provide training for their respective staff by presenting cases with similar presenting complaints.

**COUNTY RESPONSE**

**Cermak is working to implement the Monitor's recommendation regarding a log. Nursing has developed a log but has not yet employed it. The log system should be implemented prior to the Monitor's next DOJ visit and Cermak administrators welcome the Monitor's observations and comments.**

---

**47. Record Keeping**
   *a. Cermak-Adequacy and Maintenance of Records*

   *b. Cermak-Accessibility of Records*

   *c. Cermak-Communication with Offsite Providers*

   *d. Cermak-Unified Medical and Mental Health Records*

**Compliance Status**: Non-compliance.

**Findings**

**Status Update:** None submitted.

**Monitor's Findings:**

Some clinical information is recorded in an electronic record and some clinical information is kept in a paper record. Until recently there were only 30 locations with access to the electronic record. Paper clinical records for inmates housed in Divisions IX, X and XI are stored in the dispensary in each building. All other paper clinical records are centrally stored in the Cermak Health Services Building and provided on request. The Director of Health Information at Cermak is centralizing the storage of health records, establishing productivity and other standards for maintenance of clinical information. They have also had regulations that govern archiving of the health record changed so that there is less volume in the paper record and that it is complete and available to clinicians to support provision of patient care.

The electronic record includes lab, radiology and chart notes. The electronic record used by Cermak is part of the Cerner Health System, so information about clinical care provided to inmates throughout the Cerner system can be accessed by clinicians at Cermak. The electronic record also includes scanned copies of the intake screening form. Prescription information is also available electronically but it requires exiting the other electronic health record.

Cermak received funding and is in the process of implementing a long and short-term plan to use information technology to add capacity and functionality in record keeping. This includes activating 350 electronic connections and installing computer equipment for use by health care staff, replacing the legacy pharmacy system (and adding computerized provider order entry and electronic medication administration documentation), adding health care scheduling, automating forms (short term: health service request, intake, clinical notes; long term: infirmary admission, mental health admission, infection control etc.), creating a problem list, scanning paper records and creating an interface with IMAC, the electronic inmate tracking and management database used by Cook County Jail. IT deliverables are scheduled through September 2010. There is one person identified so far as a trainer on the Cerner system.

At the time of the June site visit, health records were not adequate to assist in providing and managing the health care of inmates. The records were not unified, complete, accurate, accessible and organized.

The only clinicians with sufficient access to the electronic record are the physicians. Physicians were assigned to assist each member of the Monitor's team to access the electronic record for the purpose of reviewing clinical information. Their prowess with the electronic record and the quality of information kept electronically is very good. Physicians have been using clinical information that is available electronically for several years and their expertise is largely self-taught. Physicians were also observed seeing patients and using the electronic record in their delivery of care. Other clinical staff do not have the same access because the locations where they deliver care have not had connectivity to the electronic system. During these clinical

encounters, staff do not have the benefit of the clinical information that is stored electronically when making decisions or providing patient care. They also do not document clinical information in the electronic record at the time of the encounter, if at all. The paper record is the primary source of information used by the other clinical staff. Because other staff cannot access and does not use the electronic system to document patient care, physicians must use the paper record in addition to the electronic record.

Dr. Puisis described in an interview, and provided copies of, a plan to establish an electronic health record and increase the number of locations where clinicians can access clinical information about patients, as well as enter clinical information during the patient care encounter. The plan also automates many of the aspects of care that are now done on paper, such as intake screening and evaluation, the health service request forms and medication management. Another problem being addressed in the IT plan is that the interface between the CCDOC inmate information system, Intellitech IMACS and Cerner is not real time with respect to inmate movement and there are errors in what triggers information to be updated. This means that Cermak staff do not timely know that an inmate has moved or been released and thus provision of care is impeded or prevented.

Electronic and paper health records were reviewed by each of the members of the Monitor's team. Records were selected randomly from lists that were provided of inmates with chronic diseases, including mental illness, from health service requests that had been collected, from primary care appointments scheduled that day and inmates who were seen for urgent or emergent complaints during the site visit. In addition, records of inmates admitted for inpatient care and/or receiving specialty care were reviewed. Requested health records were provided timely to members of the Monitor's team.

The paper records are often incomplete because the information is not yet in the record. Records selected for review by the Monitor's team required the Health Record Technician to go through unfiled health information for additional documentation related to an inmate's care. In the centralized health records area this is reported to be 36 feet of filing. A tour of this area confirmed the report of the problem of unfiled clinical information. In Division X, the HRT had two file box sized stacks of unfiled records to go through. While reviewing the chart of an inmate, the May 2010 Medication Administration Record (MAR) was requested; staff reported that it could not be obtained because all of the May MARs for that unit were in the possession of the Nursing Coordinator, who was conducting the monthly audit on documentation. If it were necessary to review this inmate's medication compliance, for example, the clinician would have to request the MAR from the Nursing Coordinator or wait until it had been returned for filing in the health record. Several records were reviewed that contained information from another inmate with a similar name, so lost or misfiled information is also a problem encountered with the paper record at Cermak.

Based upon the review of the paper records by the Monitor's team, documentation is also incomplete, illegible or not done. Handwritten medication orders were reviewed and were almost always illegible, not dated, timed or signed. The handwritten clinical note accompanying an order was almost always difficult to read and not possible to understand with the degree of certainty needed to accurately deliver patient care. Health Service Requests often did not have the date of review by nursing staff or the disposition documented; sometimes the form was not signed by the person who reviewed the inmate's request and the intent of information recorded on the form was unclear. On 6/14, a nurse who reviewed an inmate's HSR request as written by the inmate to be "…suffering with a lot of head pain. I was assault on 6-3-10…" The nurse documented on the HSR, "Seen 6/5 in sick call. On Rx Gabapentin." When the nurse was asked the relevance of documenting the 6/5 sick call appointment, the reply was that this was the inmate's statement at the time he submitted the current HSR. It was not clear that the nurse's documentation was to record the inmate's statement and easily could have been misunderstood by another clinician as fact. The record review also found examples of care that was ordered but did not take place. One example was a patient with a problem list of cardiomyopathy, kidney transplant and insulin dependent diabetes mellitus who had orders for labs and an EKG written 5/21/10 and a follow up visit to take place in three weeks. As of 6/15/10, the electronic and paper record showed that none of the diagnostic work had taken place nor was the follow up appointment scheduled.

Clinical care takes place that is not documented in the health record. Nurses were observed assessing and evaluating inmate health concerns during medication administration in the units, but documentation of these encounters was not observed taking place contemporaneously or after the fact. A physician was observed seeing a patient and the next day when a member of the Monitor's team followed up, no note of the visit had been made in the paper or electronic record. The physician did change the patient's insulin dosage on the diabetic flow sheet, which is kept separate from the paper and electronic record. There is no documentation of the reason or intent for the change in the order. Further review of the record of the patient who was requesting attention for the complaint of head pain because of an earlier assault found no note in the clinical record of an examination of the patient immediately after the assault was reported. The incident report written by custody staff states that the inmate was taken to the dispensary for medical attention on 6/3/10, the day the assault was reported. If the incident report is correct, then the clinical encounter was not documented in the health record.

Interviews with physicians, nurse practitioners and nursing staff indicated that they did not have confidence that the record would be available when needed or that it would be complete if they did receive it for use in patient care. Records review verified the clinician input. For example, in one record reviewed by the Monitor's team, a patient was seen by a provider on 2/3/10 for follow up related to an orbital fracture and the provider documented that no chart was available. No examination or other care took place at this encounter and the appointment was re-scheduled for 2/17/10. In another example, a patient was seen in sick call by the provider on

5/25/10. The Health Service Request dated 5/13/10 states "I have heart problems and bad circulation and would like crutches." The physician noted that no chart is available at the time of this visit and further documents that the patient is taking Plavix and beta-blockers. Had the chart been available, the provider would know that this patient was seen in vascular clinic a week earlier and was scheduled for further diagnostic work. The provider would also know that the patient had been seen in the ER twice that month for complaints of pain and numbness in his legs. In Division IV, medical staff maintain separate files in addition to the official record in order to ensure access to clinical information necessary to treat patients. These examples illustrate the waste of clinical resources and supplies when complete information is not available at the point of patient care. They also provide a glimpse of the risk of injury or harm to patients from errors and omissions in care because of incomplete or unavailable records.

There is timely exchange of clinical information (lab, radiology, chart notes) when inmates receive care within the Cerner system because Cermak physicians have access to and use the same electronic system. Clinical information about treatment received in other settings, especially prior to admission to CCDOC, is generally obtained verbally from the inmate rather than requesting information directly from the previous provider. (See Dr. Metzner's comments and recommendations in Provision 59 c. of the Agreed Order concerning the receipt of information from other providers, including the Illinois Department of Mental Health. There was evidence of transfer summaries from the Illinois Department of Corrections that were available to clinicians at the time of intake to CCDOC.)

Whether local, federal and state medical record requirements are met was not evaluated directly during the June site visit. There was evidence of record confidentiality, procedures for request and transfer of clinical information, and the program is administered by a Medical Records Director and staffed with health record technicians. The nursing staff uses a communication logbook that is kept on the counter in the dispensary. The logbook contains information about staffing, events that occur during the shift and reminders about preparations for scheduled patient procedures. The logbook contains information about inmates' clinical conditions as well. There are violations of patient privacy that occur when recording clinical information about patients in the logbook; it is not a recognized clinical record and is not subject to the same confidentiality provisions. Many health care programs have abandoned the use of logbooks for this reason and Cermak should consider eliminating the use of the communication logbook as well.

There is an organized and collective effort to develop and revise record keeping forms as part of the process of automation. Nursing staff uses a documentation format that differs from the format used by other clinicians. It is a focus charting method, named DAR, that is an acronym for Data, Action, and Response. It is unusual in a unified record to have different charting formats in use and it is recommended that the charting format be standardized to one used by all clinicians. The implementation of the electronic health record over this next year will resolve

many of the issues described here as problems maintaining a unified record. This effort should reduce errors and omissions in record keeping and clinical care of patients.

**Monitor's Recommendations:**

1. Complete implementation of the plan to automate clinical information and provide electronic access to all health care staff at all locations where patient care takes place. This includes training of staff in the use of the electronic system.

2. Policies and procedures to obtain relevant health information from providers other than the Cerner system should be developed and include tracking of such requests.

3. Standardize and monitor the documentation format used by health care staff.

4. Establish standards and expectations for timely and complete record keeping to include elimination of filing backlog, timeframes for receipt of information and filing in the record. When clinicians see inmates in a patient encounter the record must be present and complete. To the extent that the recommended actions that Cermak is putting in place are not sufficient to ensure that this standard is met, there must be evidence of a process in place that identifies and resolves these problems and that the incidence of incomplete or unavailable records at the time of patient encounters is diminished.

**COUNTY RESPONSE:**

**Cermak administrators acknowledge the importance of implementing an electronic records system. Progress in this regard has been slow, but steady. In that regard Cermak administrators are pleased to report that PharmNet has been implemented and is functioning. Moreover, the intake process is scheduled for electronic records "go-live" imminently, i.e., in late November or early December. The remaining portions of the electronic record system are scheduled for "go-live" in January. A training schedule has been developed and synchronized with the "go-live." Only a portion of wiring remains to be done in Division XI. This however, will not affect activation of the system.**

**The documentation format will be standardized and will be SOAP. This will be the format used in Cerner for nurse documentation.**

**It is expected that once the electronic record is available, paper record use will decline significantly over a 3-month period. Currently, Cermak still has a backlog of un-filed paper. Medical records does provide a record now for dental and medical clinics and tracks charts provided. Mental health had not previously been part of the scheduling process, and as a result, did not have a consistent method of chart requests. Paper chart**

**request standardization will begin for mental health by the time of the Monitor's next site visit. Medical records currently tracks the number of charts requested and provided.**

### 48. Mortality Reviews

> *a. Cermak-Autopsy Retrieval*
> *b. CCDOC-Participate for All Inmate Deaths While in Custody*
> *c. Cermak-Conduct for All Inmate Deaths While in Custody*
> *d. Cermak-Quality Assurance Measures*

**Compliance Status**: Partial compliance.

**Findings**

> **Status Update:** None submitted.

> **Monitor's Findings:**

We reviewed four mortality reviews of the eight deaths since last fall. It appears that the mortality review committee is in the process of refining their format for clinical reviews. We found that the format, which contains a chronology of important clinical events, is probably the most useful format. In addition, the program is to be commended for performing multiple interviews and pursuing documents in order to understand the true details behind some of the events surrounding some of the mortalities. Some of the deaths raised additional questions at the end of the review for which there did not appear to be any easily available answer. One death revealed unacceptable clinical performance by clinician staff and we were informed that action has been taken regarding that clinical staff member. In addition, one case demonstrated a lack of communication between a correctional officer and the medical staff with regard to the patient's presenting complaint. In addition, a memo has been sent out requiring that all patients brought emergently to the Cermak emergency room must be assessed by an advanced level provider who is responsible for the disposition. The mortality review on the suicide did not include a psychological autopsy and thus was of no value. In fact, you could not even determine from the mortality review that the patient, in fact, had expired. We were told that the staff member who drafted this mortality review has been removed from the responsibility for participating in this program.

**Monitor's Recommendations:**

1. Use a format that chronologically documents all of the significant occurrences with regard to the death. In an expected death from a terminal disease, the chronology should include when the disease was first diagnosed and whether this was timely for ascertaining the diagnosis.

2.  Continue to look for opportunities for improvement whether or not the particular opportunity for improvement is directly or indirectly connected to the cause of death.

3.  The mortality review process must be seen by all as an educational exercise that allows staff to learn ways in which processes or clinical performance may be improved.

4.  Link the mortality review program to your quality improvement program with regard to either process improvements to be initiated or professional performance improvement to be initiated.

5.  Require psychological autopsies for all suicides as part of the mortality review process.

**COUNTY RESPONSE:**

**Cermak administrators are following the Monitor's recommendations and are in the process of implementing all of the recommendations.**

**49. Grievances**
*Cermak shall develop and implement policies and procedures for appropriate handling of grievances relating to health care, when such grievances are forwarded from CCDOC.*

**Compliance Status**: Partial compliance.

**Findings**

**Status Update:** None submitted.

**Monitor's Findings:**

We spoke with the person coordinating the grievance responses and she provided the following information. Grievances are now being organized under categories such as medication issues, access issues, interpersonal issues, etc. The grievances are also being tracked by Division of origin and type of service against which the grievance is submitted. The grievance coordinator determines whether grievances are merited or not merited. However, she indicated that less than 1% of grievances are identified as merited. She also indicated that virtually no persons filing a grievance are interviewed. The current grievance process, although beginning to compile and track data, begins with a flawed philosophical approach. In a healthcare setting, a grievance is a reflection of patient satisfaction. And in a correctional setting, that expression of dissatisfaction may be due to factors that are the responsibility of custody or of the healthcare program or potentially of facilities management. It is important, when one is addressing patient satisfaction issues, to resolve the apparent dissatisfaction. It is of no value to attempt to adjudicate the issue. There is value to tracking the grievances by Division, by type of service and by categories, such

as medication issues, access issues, quality of care issues or interpersonal communication issues. But in order to adequately respond and resolve patient dissatisfaction, discussion with the patient is critical. It is our understanding that only a few people are assigned the responsibility of responding to this overwhelming number of grievances. Given the current volume, in part related to broken processes, it would be virtually impossible for one person or two people to talk with these patients. We believe a whole new approach to healthcare grievances needs to be developed.

**Monitor's Recommendations:**

1. Redesign the program as a reflection of patient satisfaction.

2. Continue to track the grievances by location, type of service and category of complaint.

3. Begin tracking the percentage of complaints that get resolved as a result of the healthcare program response.

4. Distribute the responsibility widely enough so that, where indicated, discussions with patients occur.

5. Train all who will be assigned the responsibility of resolving these grievances in how to communicate with and educate patients, including informing the patient when something needs to be and will be corrected.

**COUNTY RESPONSE:**

**Cermak administrators have considered the Monitor's recommendations. At this juncture, it is apparent that the vast majority of grievances are a result of major process problems (e.g. delivery of medication to the detainee). Thus, tracking the percentage of complaints that get resolved as a result of healthcare response is more a measure of Cermak's progress on major initiatives, rather than a summary of individual detainee satisfaction. Cermak has not yet begun a training program of staff who are assigned to discuss grievances with detainees.**

**50. Health Assessments**

> *a. Cermak-Medication Assessment*

> *b. Cermak-Mental Health Positive Assessment*

> *c. Cermak-Drug/Alcohol Withdrawal*

> *d. CCDOC-Observation of New Inmates by Correctional Officers*

*e. Cermak-Timeliness of Assessment*

**Compliance Status**: Partial compliance.

**Findings**

**Status Update:**  None submitted.

**Monitor's Findings:**

a. Cermak-Medication Assessment

We reviewed fifteen records of patients whose records were selected because they were identified as having a chronic problem and were recently, within the last 90 days, admitted to the Cook County Jail. In general, we found that there was a health assessment being conducted timely, that is, certainly within the first few days of entry to the facility and usually within the first 24 hours. However, the quality of these health assessments, in general, did not meet the intent of the Memorandum of Agreement. The health assessments were conducted by qualified health professionals, usually physician assistants and sometimes physicians. There was an effort to determine current medications, including the current regimen, both for medications prescribed for medical problems and for mental health problems. However, we were unable to find documentation that patients received these medications timely (or that there was a decision to observe pending determination of prescription of medication) for most of the patients entering the jail. There were a few patients for whom there was documentation that they received the medications in the emergency room area.

b. See Mental Health Section.

c. Cermak-Drug/Alcohol Withdrawal

There was an effort to identify patients at risk of withdrawal problems and these patients were provided with medications, although there was an absence of an organized approach to monitoring for symptoms. There was no utilization of CIWA scales or other standardized methodologies for monitoring withdrawal symptoms.

d. CCDOC-Observation of New Inmates by Correctional Officers

We were unable to provide enough time to observe the role of the officers and we understand that the screening location is in transition. We will attempt to review this on our next visit.

e. Cermak-Timeliness of Assessment

Frequently, the health assessment consisted of no more than a listing of the chronic problems and the medications and medication regimen on entry to the Jail. In no instances was

there documentation of a review of the screening form or an effort to elaborate on positive symptoms identified during the medical screen. It did not appear that there was an effort to develop a comprehensive problem list. The history taking was frequently minimal. Thus, the quality of the health assessments clearly did not meet the intent of the Memorandum of Agreement.

**Monitor's Recommendations:**

1. Implement a process that insures documentation of receipt of medications where they have been prescribed, either to be received on the date of health assessment or on the following day.

2. Develop a more organized approach to the monitoring and assessment of patients whose use of various substances leaves them likely to develop withdrawal problems.

3. Retrain the staff performing health assessments so that they are obtaining relevant history on positive information derived from the screen as well as on any other relevant information derived from observations.

4. Train the health assessment staff to develop an initial problem list with a plan for each problem.

5. After this retraining, implement a professional performance enhancement review program, so that the staff learns to administer the health assessment correctly early on and get ongoing feedback when this new program is implemented.

**COUNTY RESPONSE**

**Cermak is working towards a process that insures documentation of receipt of medications. For cycle fill and for new orders nurses will reconcile medication with labels against the Medical Administration Record ("MAR") and contact the pharmacy for missing doses on the same day. Nurses will contact the pharmacy for urgent new orders. I pilot program will be initiated in Divisions 4 and 17.**

**Cermak administrators are pleased to report that the training of health staff to develop an initial withdrawal problem list is on track. The Monitor's remaining recommendations are being considered for implementation.**

**51. a Acute Care-Urgent**

*a. Cermak-Provision of Adequate and Timely Care*

*b. Cermak-Care Guidelines*

**Compliance Status**: Partial compliance.

**Findings**

**Status Update:** None submitted.

**Monitor's Findings:**

a. Cermak-Provision of Adequate and Timely Care

Although in general the onsite acute care was adequate, there were some instances of grossly problematic care. This included a patient sent to the emergency room with an asthma exacerbation, in which the emergency room physician wrote a note so brief that it totaled 14 letters of the alphabet and sent the patient back to the infirmary housing with the condition unchanged. In addition, there were instances of inadequate histories and assessments as well as an absence of documentation.

**Monitor's Recommendations:**

1. The quality improvement program should implement a process of selecting specific records for clinician review, looking at documentation prior to arrival in the emergency room, the quality of the service provided in the emergency room and follow up after the patient is discharged from the emergency room.

2. Under the direction of the chief medical officer, professional performance enhancement review should be implemented with the emergency room physician involved in the case referenced in the appendix.

**COUNTY RESPONSE**

**Cermak's Medical Department and Quality Improvement are actively discussing the requirements of this portion of the Agreed Order and the Monitor's recommendations. Cermak administrators look forward to further recommendations from the Monitor regarding this item.**

**51.b Acute Care-Infirmary**

*a. Cermak-Provision of Adequate and Timely Care*

*b. Cermak-Care Guidelines*

**Compliance Status:** Partial Compliance.

## Findings

**Status Update:** None submitted.

**Monitor's Findings:**

The Cook County Detention Center (CCDC) infirmary is located on the Cermak second and third floors. The second floor is currently dedicated to male and female acute and "step-down" mental health units with a total bed capacity of 91 and an average daily census of approximately 80. The third floor houses both male and female acute medical patients, as well as isolation and individuals with chronic, specialized medical needs. The total bed capacity is 76, with an average daily population of approximately 50. Each of the areas is staffed 24/7 by nursing staff. Physicians are assigned to the units during the day with all other hours covered through "call" and the Cermak emergency room physician. Nursing staff assigned to the units relieve each other for their "lunch breaks" thereby leaving each of the units unattended by licensed nursing staff during this "relief period," i.e., when Nurse A relieves Nurse B for lunch, it leaves Nurse A's unit unattended by licensed staff. The same situation occurs when Nurse B relieves Nurse A.

Infirmary policies and procedures are outdated. A random review of 30 records indicated the following: admission order, medical or mental health assessment, nursing assessment, problem list, medical or mental health plan, nursing notes, MAR and discharge notes as applicable. To conduct this review, however, it was necessary to search both the paper medical record and the electronic medical record (EMR), as part of the information is contained in each of the record formats. Additionally, it was noted that medical and mental health practitioners utilize the "SOAP" (Subjective-Objective-Assessment-Plan) format for documentation and nursing staff utilize the "DAR" (Data-Action-Response) format. Interviews with multiple nursing staff members indicated each was knowledgeable regarding their specific unit, knowledgeable regarding the patients and knowledgeable regarding nursing practice as it applied to their respective units. It was difficult, however, to determine knowledge regarding Cermak infirmary policy and procedure. On more than one occasion, it seemed as though nursing staff were quoting nursing practice rather than policy or procedure. Policy and procedure manuals were available in some form on the units. However, on each unit it was stated that the policies were out-dated and in the process of being updated. Upon inquiring, Nursing Administration confirmed the statements. A tour of Cermak second and third floors indicated a generally clean, well maintained and organized area. Environmental temperatures, however, varied widely between cold and warm in the patient areas.

We reviewed the medical records of 20 patients who were housed in the infirmary. The following problems were noted with their care:

    i.    The admission orders often did not contain important information such as frequency of vital signs, criteria for notification of physician, and diet.

ii. There were problems related to the adequacy of care in five of the cases. (See Appendix, Patients 1, 2, 5, 6, and 10).

iii. There were problems related to the timeliness of care in seven of the cases. (See Appendix, Patients 1, 2, 3, 5, 8, 9, and 10).

iv. There were problems related to the documentation in five of the cases. (See Appendix, Patients 2, 3, 4 5, and 7).

v. We reviewed the medical records of 12 patients who had been discharged from the infirmary prior to our visit. In nine of the cases, the physician had not written a discharge note. (See Appendix, Patients 10 to 18).

b. Cermak-Care Guidelines

Cermak currently has a policy, *Infirmary (Acute Medical Care* (Policy 01-08G-10), that defines the scope of care and admission and discharge procedures for the infirmary. Cermak also has a draft policy on *Infirmary Care*, draft policy G-03, that will be implemented in the near future. In addition to covering the same areas as the current policy, the draft policy addresses the daily operations of the infirmary and provides a procedure for reporting utilization.

The draft policy states that the admitting physician and the unit nurse will interview and examine the patient, and that the physician will write orders, within eight hours. This is too long of a time frame. These activities need to happen at the time a patient is admitted to the infirmary. (Review of records indicated that, despite the policy, the notes and orders were being completed in a timely manner).

**Monitor's Recommendations:**

1. Update, standardize, implement and train staff regarding infirmary policies and procedures.

2. Standardize documentation methods between practitioners throughout the facility.

3. Restructure staffing or add staff to accommodate "relief periods" to prevent units from being unattended by nursing staff.

4. Work with maintenance to balance environmental temperatures throughout the infirmary.

5. Transition the paper medical record to the electronic record (EMR).

6. Ensure that the care provided in the infirmary is timely and adequate.

7. Revise the infirmary policy to address the problem identified above with the timeframe for admission notes and orders. Also, include guidance on necessary components of

admission notes, such as frequency of vital signs, criteria for notifying physician, and diet.

**COUNTY RESPONSE**

**Cermak administrators are working to implement the Monitor's recommendations. The nursing staff is to have in-service training on revised policies and procedures by December 1, 2010. The SOAP format will be the standard format for documentation. This will include the electronic record documentation.**

**In regards to staffing, 27 Clinical Nurse I positions have been filled. 19 CN I positions and 11 LPN positions remain to be filled; almost all of the vacant postions have been posted.**

**DFM is working, in an ongoing fashion, to remedy and correct temperature issues.**

**As discussed above, Cermak is working in haste to transition to electronic medical records (EMR).**

**To ensure that infirmary care is provided is timely, a nursing interview is conducted within 60 minutes of admission to the infirmary pursuant to Cermak policy. Cermak staff will receive in-service training on the revised policy and procedures by December 1, 2010. To ensure compliance with the revised policies, nightly, random audits of nursing documentation initiated within the infirmary are being conducted. These audits were begun September 1, 2010.**

---

**52. Chronic care**

 *a. Cermak-Chronic Disease Management Plan*

 *b. Cermak-Written Guidelines*

 *c. Cermak-Tracking System*

 *d. Cermak-Regularly Scheduled Visits*

 *e. CCDOC-Facilities for Special Needs Patients*

 *f. Cermak-Medically Appropriate Care for Special Needs Patients & Communication to CCDOC*

 *g. Facility Modification According to Guidelines*

**Compliance Status**: Partial compliance.

**Findings**

**Status Update:** None submitted.

**Monitor's Findings:**

a. Chronic Disease Management Plan.

Cermak has developed an appropriate, written chronic disease management plan (Policy G-01, *Chronic Disease Services*) that effectively delineates the goals, components, and development of a chronic care program. Dr. Mansour has accepted the responsibility of being the physician coordinator of the program and has been very instrumental in its implementation. Once fully implemented, the chronic disease management plan will provide patient-inmates who suffer from chronic diseases with appropriate diagnosis, treatment, monitoring, and continuity of care consistent with the patient-inmates' expected length of stay.

b. Cermak-Written Guidelines

CHS has developed draft clinical practice guidelines for the more common chronic conditions, including asthma, diabetes, hypertension, dyslipidemia, seizure disorders, HIV disease, heart failure, and anti-coagulation therapy. The draft guidelines are systematic and comprehensive, and will assist the providers in the management of their patients with chronic illnesses. In addition, each guideline presents specific quality improvement measures which can be used to monitor the quality of care being provided for specific diseases. The guidelines are scheduled to be implemented prior to the next monitoring visit. Within the next three to four months, the IT department is expected to develop the capacity to generate reports based on these quality indicators.

c. Cermak-Tracking System

Cermak is in the process of developing a program in Cerner (Cermak's electronic medical record) that will generate disease specific registries based on the problem list. Medical staff have been trained and encouraged to complete the problem list when they see a patient or renew medications. In addition to clinician entry, pharmacy staff has been asked to create medication lists to help identify patients with specific chronic illnesses. These patients will then be added to the list if they are not already on it. Cermak only began to use the problem list six to eight weeks prior to our visit. As a result, the problem list was not up to date in many of the medical records reviewed.

The IT department will periodically generate chronic disease registries from the problem lists. Dr. Mansour reported that the first registry report would be ready in two to three weeks

from the time of our visit. Once the registries are fully implemented, Cermak will be able to effectively track and monitor patients with chronic diseases.

Dr. Zawitz, the Cermak physician responsible for providing care to patients with HIV disease, informed us that there are delays of days to weeks in the referrals in up to 25% of the cases he sees.

d. Cermak-Regularly Scheduled Visits

We reviewed the medical records of 20 patients with chronic medical problems. Many of these patients had multiple chronic illnesses. The problems reviewed included:

    i.    Diabetes – six patients

    ii.    Hypertension – seven patients

    iii.    Seizure Disorder – five patients

    iv.    HIV Disease – six patients

    v.    Asthma – nine patients

    vi.    Patients receiving Coumadin – five patients


The following problems related to timeliness of care were found:

    i.    The initial chronic care visit did not take place in a timely manner. (See Appendix, Patients 1, 3, 4, 5, 7, 9, 1-, 11, and 18)

    ii.    Follow-up visits did not take place in a timely manner. (See Appendix, Patients 3, 6, 7, 8, 12, 16, and 18)

e. CCDOC-Facilities for Special Needs Patients

This area was not reviewed during the site visit.

f. Cermak-Medically Appropriate Care for Special Needs Patients & Communication to CCDOC

We were informed that patients' medical records are often not available when the provider when is seeing them. This was confirmed during chart reviews, where in many encounters, providers wrote "chart not available" in their progress notes. Furthermore, Dr. Zawitz informed us that he never had a patient's chart when he saw them. As a result, very few of his progress notes were filed in the patients' medical records. He kept copies of his notes in separate "shadow" files in his office. We used these files when reviewing the care of HIV

patients. Dr. Zawitz did note that, within the next few weeks, he will begin charting in the electronic medical record.

    i.    Providers are not obtaining an adequate history related to the patients' chronic illnesses. (See Appendix, Patients 1, 4, 5, 6, 7, 8, 10, 11, 12, 13, and 16.)

    ii.    In almost all of the cases, the providers are not noting the degree of control of the patients' chronic illnesses.

    iii.    Providers are not developing an appropriate plan of care including follow-up based on the patient's degree of control. (See Appendix, Patients 1, 2, 4, 5, 6, 8, 9, 15, and 16.)

    iv.    Appropriate monitoring and follow-up of abnormal results is not occurring. (See Appendix, Patients 1, 3, 4, 5, 13, 14, 15, 17, and 18.)

    v.    A problem related to medication continuity was noted in one case. (See Appendix, Patient 6.)

**Monitor's Recommendations:**

1. Implement all aspects of the chronic disease management plan.

2. Develop forms and processes that will facilitate implementation of the chronic care program. The development of a chronic care program helps to ensure routine follow-up and appropriate treatment of patients with serious medical problems. Such programs serve to identify and monitor patients with chronic illnesses in order to initiate appropriate therapeutic regimens that will promote good health and prevent complications, and provide patient education and counseling in order to encourage patients to practice healthy behaviors. In contrast to visits for episodic care, the chronic care visit must address all issues related to the patient's illness since the last visit. In order to facilitate the implementation of a successful chronic care program, and assist providers in developing a "chronic care" mind set, these visits need to be distinguished from routine sick call, which is primarily designed to address acute, self-limited medical problems. Two ways in which many facilities accomplish this are by designating these visits as chronic care encounters and utilizing specific forms for the more common chronic diseases.

3. Finalize the clinical practice guidelines and provide in-service training on their use to the staff, with special emphasis on the history, assessment, and plan.

4.  Continue to reinforce the importance of keeping the problem list up to date with staff. Develop an ongoing system whereby pharmacy staff periodically runs reports that can be used to ensure that all chronic diseases are on the problem list.

5.  Implement a tracking system based on the chronic disease registries to ensure that patients receive timely care and monitoring.

6.  The registries should be generated frequently enough to ensure that patients with serious medical problems do not get lost to follow-up.

7.  Implement usage of the electronic medical record by all clinical staff as soon as possible in order to resolve the problem of charts not being available when patients are being seen.

8.  Implement the use of point of care testing for INR monitoring to improve the timeliness and effectiveness of Coumadin therapy.

9.  Provide counseling by the clinician and obtain refusal forms from patients who refuse clinic visits, medications, and/or monitoring.

**COUNTY RESPONSE:**

Cermak administrators have implemented, or are in the process of implementing, the Monitor's recommendations. Full implementation of the chronic disease management plan and finalization of the clinical practice guidelines, including training, are on track to completion.

Data and reporting mechanisms are in place in Cerner and in productive use by Medical Staff. Medical Staff are refining reports as they learn how to use the data. Methodology is being extended to cover mental health patients.

In addition to migration to EMR, point of care ("POC") equipment has been purchased. Cermak is in the process of obtaining a CLIA license which requires completion of an on-line course for one of our physicians.

Cook County Health and Hospital System policies and procedures are being changed to accommodate Cermak's unique environment. Cermak administrators estimate POC testing will be available sometime in January.

Finally, in regards to counseling, the policy is being revised to reflect counseling for refusals. A tracking log is being developed. A form is being developed for provider notification of refusals.

**53. Treatment and Management of Communicable Disease**

   *a. Cermak-Maintenance of Testing, Monitoring and Treatment Programs*

   *b. CCDOC-Compliance with Infection Control*

   *c. Cermak-Infection Control Policies*

   *d. Cermak-TB Testing According to CDC Guidelines*

   *e. Cermak-Ventilation Systems*

   *f. Cermak-Notify DFM of Maintenance Needs*

   *g. Cermak-Appropriate Wound Care*

   *h. Cermak-Collection of Statistical Data Regarding All Communicable Diseases*

**Compliance Status:** Substantial Compliance.

**Findings**

   **Status Update:** None submitted.

   **Monitor Shansky's Findings:**

   Cermak employs a full-time Infection Control Nurse (RN) and Infectious Disease Specialist. Policies and procedures are in place which detail surveillance and screening programs for TB, HIV, STD, Hepatitis B&C, Ectoparasites, MRSA and seasonal influenzas. The Infection Control Nurse routinely interfaces with the Chicago Department of Public Health (CDPH), the Illinois Department of Public Health (IDPH) and the Illinois Department of Corrections (IDOC) Office of Health Services. A chest x-ray to rule-out active TB is conducted on each individual at the time of booking. Additionally, a full-time RN, trained in skin and wound care, provides treatment for skin and wound infections and tracks skin and wound infections throughout the facility. The Infection Control Nurse additionally obtains grants to supplement/enhance the Cermak infection control program. At the time of the court Monitor visit, Cermak was involved in seven different grants related to infection control/surveillance. Statistics are collected, compiled, reviewed and maintained for all of the surveillance/screening programs detailed above. Due to budget cuts in 2007, no routine and on-going employee health screening occurs at the Training Academy. During the 2009-2010 winter season, the surveillance system was tested through an outbreak of H1N1. The situation was well handled, contained and coordinated with Administration and security, as well as the Cook County Department of Public Health (CDPH) and the Illinois Department of Public Health (IDPH).

   a. Cermak-Maintenance of Testing, Monitoring and Treatment Programs

An Infection Control/Surveillance Program is in place which includes testing, monitoring and treatment programs for the management of communicable diseases, including tuberculosis, skin infections and sexually transmitted diseases.

b. CCDOC-Compliance with Infection Control

Cermak has developed infection control policies, procedures and surveillance programs, consistent with the Chicago Department of Public Health and the Illinois Department of Public Health.

c. Cermak-Infection Control Policies

The infection control policies and procedures are specific to the prevention of the spread of infections or communicable diseases, including TB, skin infections and sexually transmitted diseases. The policies provide guidelines for identification, treatment and containment to prevent transmission of infectious diseases to staff or inmates. Policies are consistent with the Chicago Department of Public Health and the Illinois Department of Health.

d. Cermak-TB Testing According to CDC Guidelines

At the time of booking, each individual receives a chest x-ray for the purpose of detecting active TB disease. Any individual with a positive chest x-ray or any individual exhibiting signs/symptoms of active disease is isolated from the general population. Isolation takes place in negative pressure respiratory isolation rooms located in the Cermak infirmary.

e. Cermak-Ventilation Systems

Appropriate operation of negative pressure respiratory isolation rooms is documented daily when in use and weekly when not in use.

f. Cermak-Notify DFM of Maintenance Needs

Policies and procedures specific to repair and maintenance are being developed.

g. Cermak-Appropriate Wound Care

Policies and procedures specific to wound care and skin infection surveillance have been developed and are in place. Skin infections are assessed, treated and tracked for purposes of identifying, treating and containing the potential spread of Methicillin-resistant Staphylococcus aureus (MRSA).

h. Cermak-Collection of Statistical Data Regarding All Communicable Diseases

Infection control/surveillance statistics are collected and maintained specific to communicable disease screening, identification, treatment and tracking.

**Monitor Shansky's Recommendations:**

1.  Finalize development of policies and procedures specific to repair and maintenance as it pertains to facility infection control measures.

2.  Pursue the addition of infection control surveillance nursing positions in order to provide onsite employee training, academy training, kitchen inspections, housing unit inspections, additional data collection and outbreak investigations.

3.  Continue surveillance, identification, treatment and tracking of skin infections with a focus on identification and containment of potential MRSA infections.

**COUNTY RESPONSE:**

**Cermak respectfully directs the Monitor to review Policies D-03a and D03-b, which address repair and maintenance reporting to DFM.**

**An additional infection control nurse is budgeted and posted.**

---

**Monitor Grenawitzke's Findings**

*e. Cermak shall ensure that the negative pressure and ventilation systems function properly. Following CDC guidelines, Cermak shall test daily for rooms in-use and monthly for rooms not currently in-use. Cermak shall document results of such testing.*

**COMPLIANCE STATUS: Partial Compliance**

**Status Update:** Briefly describe the actions taken by the Defendants to address the provision:

Both DFM and Cermak currently have established monitoring programs for regular testing of negative pressures in isolation rooms. I have not had the opportunity to review monitoring logs for any significant length of time to determine if there issues and if and how they are resolved. DFM is monitoring rooms, but there is some question as to whether all rooms are being assessed.

**Monitor's Assessment:** Describe the monitor's assessment of the status and documentation for the compliance status.

Other than discussing the issue with both Cermak and DFM, I have not reviewed monitoring records to document the frequency of monitoring or whether the data collected is collated in a form that could provide some useful information that could benefit Cermak other than assuring that the ventilation systems are functioning as designed.

**Monitor Grenawitzke's Recommendations:**

1. Cermak and DFM need to assess each other's programs and make a decision as to who will take responsibility for assessing negative pressure ventilation system functionality. There are

far too many issues for a duplicative program. That said, there needs to be a formal plan to share data on this issue daily so that there is no opportunity for an inmate having a communicable disease would be placed in an isolation cell that is not properly ventilated. This could impact other inmates or employees of Cermak, CCDOC or possibly DFM. If, as the consent agreement is written, Cermak has the responsibility, DFM should no longer continue to monitor. However, DFM will have the responsibility to address any ventilation issues for the isolation cells.

## COUNTY RESPONSE

**Cermak and DFM respectfully submit that the program of monitoring negative pressure ventilation is not duplicative. DFM is responsible for the HVAC system and the engineering of the air handling. In this regard, DFM performs system checks three times daily. Cermak also does a daily check of the isolation rooms using a smoke test to verify that the air is pressurized negatively.**

## Monitor Grenawitzke's Findings

*f. Cermak shall notify DFM, in a timely manner, of routine and emergency maintenance needs, including plumbing, lighting and ventilation problems.*

## COMPLIANCE STATUS: Partial Compliance

**Status Update:** Briefly describe the actions taken by the Defendants to address the provision:

Cermak maintains a manual system to track work orders filed with DFM. Cermak does receive confirmation fax from DFM identifying the Work Order Number assigned from "Facility Wizard."
However, there is no process within either DFM or Cermak for communication to follow the progress or lack of it for getting emergency maintenance needs address.

**Monitor Grenawitzke's Assessment:** Describe the monitor's assessment of the status and documentation for the compliance status.

As discussed later in this report, there is a need for one work order request and tracking system for the entire facility including Cermak. Following my June visit, Cermak is has met with and is evaluating the purchase of the same system. This would allow the environmental staff at Cermak to visually track the resolution of issues. As of now, even if a work order is closed by DFM, there is no electronic or manual system to notify appropriate staff within Cermak. It leads to frustration among staff of both organizations and a perception by Cermak staff that there is not a timely response to Cermak work orders. As discussed above both Cermak and DFM are both monitoring negative pressure for isolation rooms. There is no need for duplication of effort here,

if one or the other would simply communicate their program and provide data confirming monitoring results and corrective actions taken when issues are found.

**Monitor Grenawitzke's Recommendations:**

1.      Establish a schedule for regular meetings between Cermak environmental staff and designated DFM staff to discuss open work orders, and progress made in both efficiently and effectively resolving emergency maintenance needs at Cermak and the clinics located in the Divisions of CCDOC.

2.      Cermak clinical staff must file work orders immediately upon identification of plumbing, electrical, ventilation, and lighting issues. They seem to have a reluctance to file work order requests only when an incident becomes major.

3.      Cermak needs to complete their assessment of the "Facility Wizard" system and make a decision whether to purchase it or try to develop one independently that can interface with it. My recommendation is that there be one work order request and tracking system for the entire complex.

4.      DFM should offer to meet with key clinic supervisors and Cermak staff in an effort to open communications between both parties and work in harmony to resolve issues rather than point fingers. The regular meetings of DFM, CCDOC, and Cermak should establish the communication mechanism and initiate a positive relationship that needs to spread throughout both organizations at all levels. For example, if Cermak does not believe that the DFM's solution to resolve an issue there needs to be a open forum to discuss and resolve the disagreement.

**COUNTY RESPONSE**

**Going forward, Cermak will be attending the monthly work order coordinator meetings with DFM and CCDOC.**

**Cermak respectfully disagrees with the monitor's comment implying that Cermak does not file work orders immediately.  Work orders are filed as soon as a problem is recognized.  Cermak administrators encourage the monitor to revisit Cermak's handling of work orders during his next site visit.   In regards to the monitor's recommendation regarding the integration of the work order system, Cermak is in the process of moving to the CCDOC work order system.**

**54. Access to Health Care**
        *a. Jointly Provide Appropriate Accessibility*

        *b. Cermak-Timely and Adequate*

42

   *c. Cermak-Sick Call*

   *d. Cermak-Timely Response to Sick Call Requests*

   *e. Cermak-Prioritizing Sick Call Requests*

   *f. Cermak-Sick Call Response*

   *g. Cermak-Daily Isolation Rounds*

**Compliance Status**: Noncompliance.

**Findings**

   **Status Update:**  None submitted.

   **Monitor's Findings:**

   Cermak is revising policies and procedures related to access to care that will be commented upon in a separate section of this report. In addition, a pilot sick call process is being conducted in Division I to evaluate the draft policy. Current policy is that CCJ inmates access medical care by submitting a written health service request form that is available in English and Spanish. Health care staff is responsible for ensuring that sufficient numbers of forms are available on the housing units. Officers are to distribute the forms to inmates upon request. Lockable boxes with keys accessible only to health care staff have been installed on each housing tier so that inmates can deposit their requests, and staff is to check the boxes and collect the forms daily. A CMT/registered nurse is to review the form, evaluate the patient as indicated, and make referrals as necessary. Currently, there are no written nursing assessment protocols available to guide nursing practice in conducting evaluations and making referrals. Evaluations are to take place in a properly equipped clinical examination room.

   We found that inmates seeking non-emergent health care services do not receive timely access to health care services. The factors that interfere with timely access to care are related to both medical and custody practices.

   a. Jointly Provide Appropriate Accessibility

   The boxes into which health care requests are to be put were evident in Division housing tiers that we randomly inspected. These boxes are in the vestibule outside of the housing tier itself. Inmates on segregation status do not have free access to put a health care request into the designated box and it is unclear how reliably inmates in segregation are able to access services (Division IV, tiers 1M & 1N and Division IX, tiers 2E & 2F).

   Random inspection of boxes found that some Divisions had health care requests that were one to five days old, and others had no health care requests, but instead had slips concerning

non-health related requests. In Division XI, we tried to give them to the officer at the station where the box is located but she would not take them because they had been put into the box for health care requests. On Division IX, both the nurse and the certified medical technician (CMT) were observed to receive health care requests while delivering or administering medication. Nurses were observed passing out health care request forms while administering medication on units in Divisions IX and X. CCDOC and Cermak should ensure that inmates have adequate access to the health request boxes and that request forms are available and collected daily.

During the course of our review, we became aware of a correctional practice that is having an adverse impact on inmates and their access to medical care. Whereas all inmates used to be fed on the housing units, in certain housing areas (Divisions II, IV, and VI) inmates are served their meals in a central mess hall. CCDOC made this change because it was more economical as not all inmates want breakfast; therefore, less food is wasted, saving money. However, inmates complained to us that correctional officers awakened them anywhere between midnight and 2:30 am to ask them if they want breakfast. Beginning at 3:30 am, correctional officers reawaken and escort inmates in small groups to the Central Mess Hall every 20 minutes. Inmates complete breakfast by 4:30 am. Inmates are supposed to receive a minimum of 15 seated minutes to complete their meal. However, sometimes they only have approximately 10 seated minutes.

This has caused a number of problems. First, this schedule is disruptive to normal sleep patterns, particularly for mental health inmates who often suffer from sleep disorders and may be further destabilized by sleep deprivation. Moreover, mental health patients are often prescribed medications that cause drowsiness and are less likely to want to eat breakfast at 3:30 am. Thus, they are forced to choose between eating and sleeping.

In addition, diabetic patients who take insulin must get up even earlier in order to receive their insulin dose at the proper time and then receive breakfast. It is unreasonable and punitive to have someone get up this early to receive medication and meals. It has also been reported that patients are not receiving therapeutic diets. Moreover, the Mess Hall Activity Plan does not permit inmates to take food back to their housing units. Although there may be good reasons for this, for certain inmates exceptions should be made, such as insulin dependent diabetics and pregnant women who require nutritional supplements.

Having less than 15 seated minutes to eat a meal might be challenging to a normal person, but it can be particularly problematic for inmates with chronic medical, dental and/or mental health conditions.

This process is repeated for lunch starting at 9:15 am and at 3:00 pm for dinner. At these times, inmates going to the Mess Hall for lunch may miss their medications and health care appointments or vice versa.

We have since learned that the County Jail Standards [(20 ILAC 701.110 (a)(3)] regarding food service states that "Meals shall be provided at reasonable and proper intervals, that is, adhering to recognized breakfast, lunch and dinner schedules. Meals shall not be served earlier than: 6:30 am for breakfast, 11 am for lunch and 4 pm for supper". However, Cook County Department of Corrections has requested and received a variance permitting them to deviate from the standard. That variance notwithstanding, we find the schedule to be unreasonable, adversely impacting inmate health and interfering with access to health care.

Finally, a related matter affecting access is that patients who are escorted to the Cermak Building in the early morning for pharmacy, radiology or laboratory services are not moved back to their housing units for several hours after the services are completed. As a result, some inmates, including pregnant women, have missed their health care appointments. The delay has been attributed to a lack of transport officers.

b. Cermak-Timely and Adequate Care

We found that patients do not receive timely care from qualified medical staff following submission of their requests. First, not all Divisions are routinely staffed by a registered nurse who triages requests in a timely manner. This includes Divisions V, IX, and X, which are staffed only by CMTs or LPNs. In these Divisions Nurse Supervisors should ensure that a registered nurse triages the forms in a timely manner, but this is not occurring. However, even in Divisions that have assigned registered nurses, we did not find timely access to care. Inmates in Division II, Dorm 2 were quite vocal regarding their having no confidence in the sick call system. Additionally, they vocalized submitting a sick call request slip gained them nothing. They were all in agreement that once they were seen by a mid-level or physician the care/treatment was good and consistent. Additionally, they reported lapses in medication therapy (three to four days) anytime they moved from one area of the facility to another. In this area, the inmate's biggest complaints were the sick call request process and the interruption in medications. The staff's biggest complaints were staffing, medication administration, sick call process and the absence of needed information in the medical record. In Division IV, random inmate interviews in the medical and mental health housing tiers revealed numerous complaints of unresponsiveness to health service requests. When we asked inmates what happened after they submitted their requests, most told us that usually nothing happened, even after repeated requests. In the Division IV dispensary, we found a stack of requests that were collected on 6/10 or before that had not yet been triaged as of 6/14. We also found a drawer that contained health records with unaddressed health services requests going back to April 2010. This included a 39-year-old who complained of right-sided chest pain for six months, and another involving a 40-year-old woman taking Plavix for blood clots who complained of bruising and soreness in her calves. In Division V, we found that once request forms were collected, staff routinely scheduled patients to see a provider in three to four weeks, even when patients complained of symptoms of infection or moderate to severe pain. In Division IX, health care requests dated 6/14 had not been reviewed by the end of the business day 6/15. Of nine health care requests reviewed in Division X and XI,

45

three were reviewed within the 24-hour time frame. Four had no documentation of the date the request was evaluated by nursing staff and two, where there was documentation of review by nursing staff, it was not within the 24 hour time period. Cermak should ensure that in each Division, a registered nurse triages health service requests seven days a week and schedules patient with symptoms for evaluation the following business day (72 hours on weekends) unless the patient requires evaluation sooner. Nurse Managers should initially monitor Divisions on a daily basis to ensure that this reliably occurs, and taper monitoring as performance improves.

c. d. e. f.   Sick Call

- Health care request forms are written in both English and Spanish We observed requests for health care attention that were written in Spanish on Divisions IV, IX and XI. However, staff assigned to review the requests did not understand the Spanish language. When asked, they indicated that they would have colleagues translate as necessary. However, on Division IV, one Spanish-speaking inmate reported that she was only able to successfully access health care when there was another Spanish-speaking inmate in the housing unit where she was assigned. After that inmate left, she was unsuccessful in receiving responses to her health care requests. It is important that Spanish-speaking inmates are provided timely access to translation services, and that written requests for care are translated in a timely manner to ensure that patients with urgent conditions are seen in a timely manner. In addition, as the new sick call process is rolled out across the facility, there will be greater need for communication assistance than at present. The same is true for inmates who are illiterate and require assistance with completing health service request forms. CCDOC/Cermak should evaluate the provision to identify inmates who have a need for communication assistance and to ensure that there are sufficient mechanisms in place to provide that assistance during each patient care encounter.

- Confidential collection The locked boxes into which health care requests are put allows for confidential collection, although it is unclear how this is accomplished in segregation units. These boxes were recently installed, replacing ones that universally were not used before. Inmates seem to be using the boxes, although the boxes are used to request other things that are not health care related and inmates also submit requests directly in writing and verbally for health care attention.

- Logging and tracking seven days a week The only log we found was a Daily Statistic Sheet in Division I that noted the total number of request forms collected on a given day. We found no logs that contained the information required in the agreed order, including the date and summary of each request for care; the date the patient was seen; the name of staff that saw the patient; the disposition of the request; whether follow-up care is needed and the date of the next appointment. The documentation

described in this provision is not routinely done on the health care request form itself or in the health record.

- <u>Timely response by qualified medical staff</u> In addition to problems associated with timely collection and triage of health service requests, patients are not clinically evaluated by a registered nurse or qualified medical staff in a timely manner. Due to the lack of tracking logs, this was difficult to quantify, but virtually none of the health care request forms or health records we reviewed contained adequate nursing assessments of patient complaints. This can be attributed to lack of adequate numbers of registered nurses, lack of training and certification of health assessment skills, and lack of nursing assessment protocols to guide nursing practice.

- <u>Documentation that records timeliness and responsiveness</u> As described above, documentation on the health care request is not consistent with the items listed in the agreed order and no log is kept with this information either. In addition, health care staff does not consistently document the date the form was received, document the disposition, or legibly date, time and sign the form, including credentials.

- <u>The reason for the request and disposition is documented in the health record</u> Although we observed health care request forms that were located in the health record that included the reason for and disposition of the request, we are aware that significant numbers of health documents have not been filed in the record, including health service requests.

- <u>System to screen requests within 24 housed and prioritized</u>  As noted above, there is inconsistency in daily collection of health service requests and documentation of the date received, date triaged, patient disposition with legible signature and credentials. In Divisions IV, V, and IX, health care requests had not been screened and prioritized by the end of the health care staff's workday nor scheduled to see a qualified medical provider in a timely manner. As noted above, we found health care requests in the dispensaries that had been collected more than 24 hours prior that were not dated, triaged and signed by a registered nurse. The nursing coordinator stated that nursing staff were expected to screen and prioritize requests daily and that the immediate supervisor was to do the evaluation if the nurse was not present for some reason. This is not occurring.

- <u>Cermak-Sick Call Response</u> We observed sick call visits scheduled with primary care providers that took place in the dispensary exam rooms in Division I, IV, IX, X, and XI. Nursing staff collect vital signs and record the patient complaint in the nursing station in these Divisions.

g. Cermak-Daily Isolation Rounds

This standard is not met. In Division IV, nurses do not make and document segregation rounds. In Division IX, daily rounds are made by nurses and CMTs. These rounds are documented by custody staff in a logbook kept at the officer's station. When I asked the custody officer, the nurse administering medication and the nursing coordinator who gets seen during these rounds, we were told it is limited to those who receive medication and those who make it known that they wish to be seen while rounds take place. Inmates who do not request health care attention from nursing personnel during rounds are not seen.

**Monitor's Recommendations:**

1. Inmates should not be forced to choose between adequate sleep, meals and health care appointments. Cermak should finalize its sick call policies and procedures. CCDOC and Cermak should reevaluate, collaborate and amend food service practices to serve meals at a reasonable hour, and in a manner that minimizes sleep disruption and ensures reasonable access to health care services.

2. CCDOC and Cermak should jointly monitor inmate access to health service request forms and the ability to confidentially deposit them in a box accessed only by health care staff.

3. CCDOC/Cermak should evaluate the provision to identify inmates who have a need for communication assistance and to ensure that there are sufficient mechanisms in place to provide that assistance during each patient care encounter.

4. In addition to statistical logs that note the number of Health Service Request forms collected each day, Cermak should establish tracking logs that track each request, including: the date of the request, date received, reason for care, the disposition of the request including urgency, the date the patient was seen, the name of staff that saw the patient, whether follow-up care is needed and the date of the next appointment.

5. Cermak should ensure that there are sufficient numbers of RNs assigned to each Division to implement the sick call policy and procedures.

6. Cermak should develop, train and implement nursing assessment protocols.

7. Following implementation of the new policy and procedure, Cermak should perform CQI studies regarding the timeliness and quality of nursing assessments and success of nurse to clinician referrals.

8. CCDOC and Cermak should ensure that segregation rounds occur and are documented daily.

9. Nurse Managers should assume primary responsibility for monitoring implementation of the sick call program.

**COUNTY RESPONSE:**

A health service request form ("HSR") and module was developed in the Cerner electronic record and an electronic scheduling system has been developed which will accommodate all health service requests. The new HSR form was created to simplify tracking. Metrics have been designed but are not yet in place. The manual logging process will be replaced with tracking in Cerner when sufficient staff is available to drive it. The revised HSR form will be initiated in all divisions beginning December 1, 2010. This revised form will be in both English and Spanish.

A pilot HSR project was initiated in Divisions I and II but is not yet fully implemented. HSR secure boxes were completely installed in May of 2010 and the collection of slips is now occurring. Tracking of HSR is being done by nursing; full staffing for this process is not yet in place. Nurses are auditing the pickup of forms from secure boxes. A manual procedure is being implemented in selected divisions that logs all symptom-based HSR forms with reasons and dispositions. Cermak administrators encourage the Monitor to review the pilot project and to make further recommendations before its expansion to the entire Jail campus.

Regarding staffing, and as discussed above, clinical nurse positions have been posted to fully implement the sick call policy and procedures.

Nursing assessment protocols have been developed per the Monitor's recommendations. The protocols are in place in Cerner and will be taught as part of the physical assessment classes targeted to be completed December 15, 2010. After training, the protocols will be used, but will be on paper forms until Cerner is live.

Following the Monitor's recommendation, segregation rounds are conducted and documented in Divisions IV, VI, IX and XI.

In order to monitor the sick call program, an audit tool has been developed and will be submitted for approval by Quality Improvement committee.

## 55. Follow-Up Care

*a. Cermak-Offsite Visit Follow Up*

*b. Cermak-Evaluation and Documentation After Offsite Visit*

**Compliance Status**: Partial compliance.

**Findings**

> **Status Update:** None submitted.

> **Monitor's Findings:**

Overall, the availability of the electronic medical record, which includes services available at John Stroger Hospital, has greatly enhanced the program's ability to provide follow up services. However, we uncovered one case in which the emergency room physician, who saw the patient on return, never addressed the reason for the patient having been sent offsite and did not arrange any follow up. This was despite the fact that the patient had been returned to the Jail AMA, against medical advice. In addition, we are aware that although the information from Stroger Hospital is electronically available, frequently no information is currently available from the other nearby emergency room sites that are used in emergent circumstances. This can clearly compromise the care provided to these patients.

**Monitor's Recommendations:**

1. Work out an arrangement with the nearby hospitals so that they automatically provide the required information. This may require negotiations at the highest levels.

2. Perform a professional enhancement review evaluation of the physician involved in the above referenced case that we will describe in the appendix, as he was also involved in a prior clinically deficient example. (See Appendix).

**COUNTY RESPONSE:**

**Cermak administrators intend to explore arrangements with nearby hospital regarding the provision of information as suggested by the Monitor.**

**In regards to the Monitor's second recommendation, corrective action is ongoing.**

**56. Medication Administration**

> *a. Cermak-Standard of Care*

> *b. Cermak-Accurate Administration and Maintenance of Records*

> *c. Cermak-Hygienic, Appropriate and Concurrently Recorded*

> *d. Cermak-Staffing*

> *e. Cermak-Flagged Medication Procedure*

> *f. CCDOC-Flagged Medication Noted on JMS*

    *g. CCDOC-Discharge Medication*

    *h. Cermak- Discharge Medication*

    *i. CCDOC-Notification of Flagged Inmates Discharged*

    *j. Cermak-Prescription Fill at Stroger*

    *k. CCDOC-Communicate Transfer Info to Cermak*

    *l. Cermak-Medication for Transit*

    *m. CCDOC- Record Transfer Between Facilities*

**Compliance Status**: Non-compliance.

**Findings**

    **Status Update:**  None submitted.

    **Monitor's Findings:**

    The Cermak Pharmacy operates seven days a week, for 16 hours on weekdays and eight hours on weekends and holidays. Prescriptions received at the pharmacy by noon are dispensed and ready for delivery the following morning. There is a legacy electronic pharmacy system, NDC, that records prescription information and order status. This system is being replaced with a program called PharmNet. Computerized provider order entry and an electronic medication administration recording will be added. The pharmacy applications will be integrated with the electronic health record and interfaced with IMAC, the inmate management system used by CCDOC. Inmates whose treatment requires medication administration by qualified nursing staff are in the Cermak Health Services Infirmaries or housed in Division II Dorm 2, Divisions IV, IX, and X. Inmates who are able to self-administer medication are housed in any of the Divisions and labeled, patient specific medication is delivered and distributed to them typically in a seven-day supply. Cermak has a multidisciplinary medication task force which is working to promote changes in medication management to improve patient safety and reduce error.

    a. Cermak-Standard of Care

    The standard of care for pharmacological treatment and administration of medication is not met. Based upon records reviewed, medication orders were often incomplete, especially in the notation of duration. Though policy may stipulate duration in the absence of an explicit order, it assumes the intent of the prescriber. In many cases, medication orders were also illegible, not signed, dated or timed. Frequently, there was no corresponding clinical note in the electronic or paper record to communicate the reason or clinical intent behind the order.

The time from when orders were written to dispensing of the medication by the pharmacy was very timely. The time frame for delivery or administration to the patient varied from Division to Division. The records reviewed showed many patient visits to address clinical concerns about medication that was not received timely. During the visit to Division V, self-administered medication yet to be delivered to inmates was reviewed and included HIV medication that was delivered by pharmacy two days earlier but not yet delivered to the patient. Inmates who were interviewed from Division I reported that they were receiving their medication on time.

Interviews with inmates revealed problems with missed medication corresponding to inmate movement (to and from court, discharge from inpatient treatment to general population, transfer from one housing unit to another or from one Division to another), inmate programming or scheduling, (particularly in Divisions II and IV), and custodial supervision (reducing the number of inmates in the day room at one time). A "real time" accurate interface with IMAC will reduce the frequency of missed or delayed medication dosing that results from inmate movement. CCDOC and Cermak need to resolve the other issues described here that contribute to missed or tardy medication dosing. There are many provider appointments that take place because inmates are not receiving medication as prescribed due to these obstacles.

From interviews conducted by Dr. Metzner with inmates in Division IV, there are reports of nursing staff who failed to administer and/or deliver medication. Review of Medication Administration Records (MAR) of inmates housed in this same Division revealed blanks where there was no notation of medication administration. There was also an inmate complaint in Division X that was partly due to the nurse leaving the assignment before all of the morning medications had been administered. According to the communications log and the Charge Nurse, this did occur. The result of missed medication dosing for this one inmate was an urgent visit to the dispensary and a transfer to the emergency room. An allegation of failure to administer prescribed treatment is a serious professional practice issue that should result in investigation and possible corrective action.

During the site visit, medication administered by nurses was observed at least once in the infirmary, Divisions II, IV, IX and X. "Dose by dose" or nurse administered medication does not meet the standard of practice, except in the infirmary (Cermak 2nd and 3rd floor). The standard of practice for nurses when administering medication is to ensure that the "five rights" are met. The five rights are that it is the right patient, right medication, right dose, right route and right time.

Nurses at Cermak do not adequately ascertain that it is the right patient when administering medications. There was some variation from Division to Division, but generally, the inmate gives some verbal identification (last name, identification number, birth date) which the nurse matches to the MAR. However, nurses were observed administering medication to inmates when they were unable to remember their identification number or who simply appeared in front of the medication cart after a last name was called out by the nurse. On the housing units,

identification cards are kept in the control room but they are not utilized to positively identify inmates before medication administration. On only one occasion during the site visit did we observe any form of independent verification being used to positively identify the patient before medication was administered. This was the evening insulin line that took place in the dispensary in Division X; inmates were required to show their identification cards to the nurse. Independent means to positively identify the right person is fundamental in all patient care settings and should be an even more important step in the correctional setting. The failure to positively identify the patient can easily result in the nurse giving the medication to the wrong person.

At present, nurses administer the majority of medication from stock supplies. Cermak is introducing the use of labeled, patient-specific packaging for nurse-administered medication. Use of patient specific packaging or unit dose is the community standard because it better ensures that the patient receives the correct medication in the correct dose. In Division IV, use of stock medication, except psychotropics, non-legend drugs, controlled substances and refrigerated medications, was eliminated in April 2010. However, at the time of the June site visit, a nurse was observed administering from stock bottles even if the labeled, patient-specific medication was on hand. When asked about it, the nurse said that she routinely returns labeled, patient specific medication to the pharmacy if a stock bottle of the same medication is kept on the medication cart. Her reason was that it takes longer to administer medication from the labeled, patient-specific packages than it does from the stock bottles. The packaging currently used for patient-specific, labeled medication is very time consuming to open. Reliance on stock is a significant departure from the community standard in ensuring that patients receive the right medication in the right dose. Cermak needs to ensure that expectations for use of labeled, patient-specific medications are adhered to and that packaging of unit dose medications does not adversely impact nurses' ability to administer medication safely, accurately and timely.

With the exception of the Cermak infirmaries, "dose by dose" medication is not administered by nurses within the acceptable time frames. Reasons for this are that the inmate is not available because of a schedule conflict (meals, school, a treatment appointment, linen exchange) or because they are locked in their cell and no provision is made for them to obtain their medication during lock down. In these cases, the inmate misses medication entirely or the nurse returns at another time to administer the medication.

Nurses were observed to require four to four and a half hours to administer the morning medications. Each housing unit in Division X took 45 minutes to an hour to complete medication administration. Nurses in Division X are generally assigned four units to administer medications. Because of the security level in Division IX, the nurse administers medication cell by cell. It took 60 minutes to administer medication to 10 men housed on four different units. Interviews with nursing staff in each of the Divisions with nurse administered medication delivery confirmed that this is consistently the amount of time it takes for the morning and evening medications. Inmates reported receiving evening medication sometimes at or just after midnight. The amount of time taken to administer morning and evening medication at CCDOC exposes inmates to both

compressed and lengthened dosing intervals which compromises treatment. This is even more pronounced with medication regimes that require dosing three or four times a day. There were no four dose a day prescriptions observed being administered, but there were several that were three times a day.

The allowable standard for timeliness is within the hour before or after the designated time for medication administration. If, for example, morning medication is scheduled for 9 am it is acceptable to administer the medication anywhere between 8 and 10 am. If the timeframe is not met, the nurse is obligated to document the omission as an error and inform the provider and additional treatment orders need to be obtained as necessary. In order to meet the two-hour timeframe, nurses administering medication should do nothing else. Contributing to delays in timely medication administration is the fact that nurses also distribute and receive Health Service Requests, note inmates who need medication refills, respond to inmate requests for over the counter medications and assess inmate's health concerns. Other traffic in and out of the vestibule (cleaning crew, garbage pickup, and other escorts) was observed to take place during medication administration and contributed to the length of time taken to complete the process on each housing unit. The nurse sometimes also had to wait until another activity took place (count, line movement, meals, etc.) to begin or resume medication administration. Moreover, each inmate locked in their cell while others are using the day room must be individually released from their cell to come to the medication cart, receive medication and return to their cell and be locked in again. In Division IV, inmates who are "locked in" are not released to go to the medication cart because there is not sufficient custody staff to supervise. Nurses must return to the unit at a later time to dose those who have been on "lock in" and are now "locked out" and in the day room. The collective effect is that medication administration is not timely, there is great potential for distraction caused error and it impedes other activities that need to take place.

During the site visit, a meeting took place with officials from CCDOC to discuss issues that affect timeliness of medication administration. It was apparent that there are several viable options available to ensure more timely administration of "dose-by-dose" medication. Cermak is urged to complete these discussions with CCDOC and to take the steps necessary so that nurse administered medication is timely.

b. Cermak-Accurate Administration and Maintenance of Records

Cermak has policy and procedure for administration of medication and maintenance of medication records. These are being reviewed by the Monitor and will be commented on in the provision related to policies and procedures. There is a system in place to notify providers of inmates who need medication reorders, but a lot of nursing time during medication administration was spent noting inmates whose medication needed reordering. This is either lack of confidence in the process used to identify and inform providers of inmates who need medication re-orders or an activity that is remnant of an earlier concern since resolved by automation.

According to "Guidelines for the Administration of Medications," a document provided by nursing administration, nurses are expected to have the inmate complete a refusal form and to notify the prescribing provider by writing a progress note when inmates refuse medication. A copy of the progress note and refusal form is to be stapled to the MAR and placed in the health record. This expectation is cumbersome and not very effective in notifying providers, given issues with access to health record information either electronically or on paper. We asked two nurses in Division IX when the treating psychiatrist was notified of medication non-adherence. Their answers varied, but basically, it was a judgment made by the nurse about the importance of the medication in treating the mental disorder.

Refusal of treatment should be distinguished from patterns of non-adherence. Patients refusing prescribed treatment should be scheduled to see and discuss the refusal with the prescribing provider so that the issues causing refusal can be addressed and the plan of care adjusted accordingly. Non-adherence should be documented on the MAR and these incidents or patterns should be discussed with the patient by the provider at regular follow up visits. The treatment plan should include identification of actions that would increase adherence. Nurses can assist in identifying issues that contribute to non-adherence and can intervene to improve adherence by suggesting ways to manage side effects, providing health information and by counseling.

Cermak has begun a pilot process to delay dose-by-dose medication administration until the pharmacist has reviewed the order, authorized dispensing of the medication, printed and distributed a label. The label is placed on the Medication Administration Record and eliminates the need for nurses to interpret the written order and transpose it to the MAR. This new process identifies errors and omissions in prescribed treatment before the medication reaches the patient. This safety check should be implemented on the other units as soon as possible. Implementation of these improvements must be accompanied by very specific expectations for performance under the new process. There must also be a process in place to identify and quickly resolve problems with implementation. Performance must be supervised closely enough so that practice improvement takes place or there is consequent corrective action for failure to perform.

c. Cermak-Hygienic, Appropriate and Concurrently Recorded

Medication administration is completed in a manner that is hygienic but it is not always recorded correctly and concurrently with its distribution. Nurses were observed during the site visit administering "dose by dose" medication and documenting its administration at the time on Division II dorm 2, Division IV, IX and X. Because of the way the MAR is set up, with hours of administration listed as 9 am, 1 pm, 5 pm and 9 pm, nurses document that the 9 am dose was given even if the actual time medication was administered was at 12 noon or sometime other than between 8 am and 10 am, which is the community standard. This is the same for other times of the day; when medication is actually administered may deviate by more than an hour from the time that it was recorded as given on the MAR.

55

In reviewing MARs during the site visit, frequent blanks in documentation of nurse-administered medication were observed. There is an ongoing monthly audit conducted by Nursing Coordinators pertaining to MAR documentation. Overall compliance for calendar year 2009 was greater than 85%. These results are inconsistent with the review of documentation completeness observed by the Monitor's team. We recommend that rather than continue monthly global auditing, more targeted audits should be used, focusing on specific problem areas, locations or nursing staff with lower audit results.

There is significant variation among Divisions in how delivery and distribution of self-administered medication is documented. Random review of MARs in Division I, IX and XI did not include dates when medication was delivered to inmates for self-administration. There was also variation from Division to Division on how the delivery of self-administered medication was documented. It was not possible to conclude that there was medication continuity for inmates who are able to take their own medication. In Division V, the book containing current MARs could not be located, so documentation of medication continuity could not be confirmed.

A narcotic count was conducted by a member of the Monitor's team in Division X on 6/14/10. Narcotics had been administered that morning but were not signed out of the controlled substances inventory by the nurse, so the inventory could not be reconciled. Two days later, the Monitor's team member returned and was able to complete and reconcile the inventory of controlled substances in Division X.

d. Cermak-Staffing

Dose by dose medication is administered by Qualified Nursing Staff (licensed practical or registered nurses). Certified medical technicians and other health care staff may pick up medication dispensed by the pharmacy and transport it to the Division dispensary. Certified medical technicians may also deliver labeled, patient specific medication for self-administration to inmates. This practice does not violate any regulations pertaining to delivery of medication and is not considered medication administration. It does not therefore conflict with Provision 56 d. of the agreed order.

It is important for the safety and security of inmates and staff in the correctional setting that medication delivery and administration be accomplished in a way that does not result in possession of medication that is unaccounted for. A common measure to accomplish this is to observe each inmate taking the medication so that it is not used for another purpose. This is referred to as "cheeking". "Cheeked" medication may be used for barter with other inmates or may be saved and several taken at once in an effort to get "high" or in a gesture of self-harm or suicide.

Based upon our observations of medication administration during the site visit, there is variation as to whether and how well observation to prevent "cheeking" takes place. In Division IX, for example, the nurse was diligent in observing the inmate's oral cavity after taking

medication. However, the effectiveness of this effort is impeded because of difficulty observing through the windows and cuff ports in the door, poor lighting and noise. In Division X, the mouth check was not explicit but the process used (taking the medication with water and discarding the cup at the medication cart) greatly reduced the likelihood of cheeking. More overt mouth checks will increase the time it takes to administer medication but if the custody officer were to assist with the check, the nurse would not be further delayed in getting the medication ready for the next inmate. There are security risks inherent in providing effective medication treatment and this should be an area of vigorous collaboration between CCDOC and Cermak, particularly in multidisciplinary continuous quality improvement. See comments concerning quality improvement elsewhere in the report.

Provisions e-m.

The system for CCDOC to flag and notify Cermak of inmates who are transferring to another facility, assigned to another housing unit or who are to be discharged is not fully operational. Nor is the system for Cermak to flag and notify CCDOC of inmates who are on medication and need closer monitoring, protection or discharge planning.

Staff reported that the medication alert system is only used for mental health medications and a few other medications for high-risk illnesses. Both staff and inmates interviewed reported that there are only very limited provisions for inmates to receive medication if going out to court or being discharged. Once the interface with IMACs is operational and the pharmacy conversion to PharmNet is compete, the process for notification and transfer of information in order to support and continue medication treatment where inmates are located should be functional. See also the comments made by Dr. Metzner concerning the identification, tracking and notice of discharge regarding inmates who require ongoing medication and other treatment for mental illness.

**Monitor's Recommendations:**

1. Establish and implement a corrective action plan to bring "dose by dose" administration of medication into compliance with the standards of practice for nurse administered medication and patient safety soon, but no later than by the time of the next site survey. This plan should accomplish timely medication administration and appropriate dosing intervals, provide independent verification of the correct patient and eliminate use of stock medication wherever possible.

2. Continue to implement improvements in pharmaceutical management to include waiting to initiate medication treatment until the printed label is received from the pharmacy, eliminating handwritten orders and transcription to the MAR, establishing a labeled, patient-specific method of packaging nurse administered medication that is not as cumbersome and time consuming as the one currently in place and procuring the single dose "urgent" medication administration equipment (i.e. Pyxis-like equipment). These

changes are important for reducing errors and omissions in the delivery of care that result in harm and compromise patient safety.

3. Documentation of the delivery of self-administered medication should be standardized and explicit expectations for timeliness and completeness of documentation established. Global monthly auditing of MAR documentation should be replaced with more targeted auditing, focused on improving specific areas of MAR documentation, such as the locations or nursing staff with lower audit results. Cermak should revisit policy and practice related to documentation of medication refusal. An inmate who refuses a dose of medication should have that dose documented as such on the MAR; a separate refusal form does not need to be used. The criteria for notifying the prescriber of a patient's medication refusal or non-adherence should be revisited so that nursing staff are clear in their understanding of the expectations and that the process is effective for the patient, nurse and prescriber.

4. Automate pharmacy management to include PharmNet and CPOE to increase the accuracy of prescribed treatment. Establish wireless connectivity and EMAR to record medication administration as it occurs in the housing units and create a "real time" interface with IMACs, so that appropriate and necessary communication about inmates can take place that results in medication continuity and improved patient safety.

5. These improvements or corrections in the provision of treatment with medication should evidence the active engagement of all stakeholders and result in clearly stated expectations for change in individual and system performance. In addition, implementation of the changes should evidence active surveillance and supervision to identify, correct or resolve problems related to individual as well as system performance as measured against the expectations that have been set.

**COUNTY RESPONSE:**

**In response to the Monitor's recommendations, the Medical Director, Dr. Avery Hart is reviewing prescribing patterns. In particular, efforts are being directed at the prescribing patterns of benzodiazepines in the mental health setting. Pilot processes have been, and are being tested to remediate these areas, but the problems identified in the June audit still exist. A new pharmacy software system (PharmNet) has been installed; however, outstanding software issues in PharmNet are being worked on. It is believed that the January implementation of Physician Order Entry in Cerner will improve accuracy. The anticipated increase in nursing staff and training of those staff will improve documentation, but the current manual process will always present challenges. We have**

initiated steps to establish wireless connectivity and funds were budgeted to install software to initiate CareMobile -the electronic remote MAR system within Cerner which should significantly address the documentation issues. Nurse Managers are tasked with observing medication administration in all divisions. An audit procedure and tool to be used by managers is being evaluated in Quality Improvement. A test on medication administration is being administered to nurses during orientation. A policy and procedure on testing annually for competency is being developed in coordination with Quality Improvement.

MAR labels are now being distributed with all new patient medications. Complete elimination of the hand-written MAR is dependent on roll out of the Medication Administration pilot. Label and patient specific medication is not universally available at this time.

A nurse MAR audit by Nurse Managers has been narrowed in scope to Divisions II, IV and X and will begin December 1, 2010. Once Cerner is implemented, refusal of medication and the refusal of medication will be documented in the MAR. Pharmacy and Nursing are working on solutions to improve reconciliation of MAR data with PharmNet. A pilot for this will be initiated in Divisions IV and XVII imminently. This will include documentation for both KOP and dose by dose administered medication.

PharmNet is active; debugging of follow up problems is occurring. A request has been made to discuss wireless connectivity with the Office of Capital Planning and Policy. Care Mobile, a remote EMR solution within Cerner has been budgeted for.

---

**57. Specialty Care**

*a. Cermak-Referrals to Specialty Care*

*b. CCDOC-Transport Inmates to Appointments*

*c. Cermak-Timeliness of Scheduling*

*d. Cermak-Specialty Care Log*

*e. Cermak-Pregnant Inmates*

**Compliance Status**: Partial compliance.

**Findings**

**Status Update:** None submitted.

**Monitor's Findings:**

The Cermak specialty referrals offsite are currently limited by the number of available escorts provided by the Department of Corrections. Approximately 10-14 patients per day are able to go to offsite clinics. Because of this, we were told that clinicians may have their decisions regarding a referral influenced by the limited availability. With the limited transport capability, 122 patients were cancelled due to lack of transport staff in the past year. In addition, it is not uncommon for patients to arrive late for their appointments and have their appointments be cancelled as a result. The Cermak Health Services must provide CCDOC with the minimal number of transports needed per day in order to adequately serve the patient population. When the patients were transported timely, we found the services were accessible timely and the reports are generally available in the electronic medical record. We reviewed seven records and in all of those, the reports were available and in all but one, follow up did occur after the visit occurred.

**Monitor's Recommendations:**

1. Cermak is to provide to the CCDOC the estimated minimum number of appointments needed offsite on a daily basis in order to adequately serve the population. This should enable the CCDOC to project the number of resources needed in order to assure timely access.

2. The quality assurance program should at some point monitor the follow up provided onsite by the primary care clinicians after scheduled offsite services have been provided.

**COUNTY RESPONSE:**

**Cermak is now tracking all appointments recommended for transportation to CCDOC. Cermak is then adjusting the number of appointments unable to be taken by prioritizing to the number of available movement slots.**

---

**58. Dental Care**
*a. Cermak-Timely, Adequate Care*

*b. Cermak-Sufficiency of Staff and Hours*

**Compliance Status**: Partial compliance.

**Findings**

**Status Update:** None submitted.

**Monitor's Findings:**

The dental program, which was virtually obliterated a few years ago, is in the process of being rebuilt. We were told that there are currently 4.0 dentist equivalents, along with three dental assistants. There are plans to add two more dentists and four dental assistants, which should result in a total dental staffing of six dentists and seven assistants. However, at the time of this visit, there were only four dentists and we were told that Division X in particular had had significant delays in dental services. We reviewed the records of 10 patients scheduled to see the dentist on 4/18/10 in Division X. On average, these patients had waited between two and three months and some, as long as five months since requesting services for pain. However, we were told that just recently the dental staffing in Division X had increased significantly. At this point, since dental staffing is in transition, going from a low of one dentist and two assistants in 2007, to the current situation of four dentists and three assistants, it is very difficult to determine whether the staffing, which has not yet been implemented, will in fact be adequate. We are also concerned that, given the shortage of dental resources, the currently broken sick call system exacerbates the dental problems. At Cermak, it is expected that the nurse sick call process will be the first line of response to patients with dental problems. The goal is for these nurses to provide temporary analgesia while the patient is waiting to be assessed. With that process remaining to be fixed, it is clear that the dental program is currently unable to provide timely service.

**Monitor's Recommendations:**

1. Cermak must find a way to provide timely analgesia and screening assessment for patients requesting dental services.

2. We recommend that the proposed dental staffing be implemented as soon as possible.

**COUNTY RESPONSE**:

**Cermak intends to ensure timely screening and analgesia through nursing triage of dental complaints. Referral to a provider may be required. In regards to implementation of the staffing plan, Cermak administrators are pleased to report that dental staff have now been hired and are working.**

## D.    MENTAL HEALTH CARE

## 59.    Assessment and Treatment

a.    *Results of mental health intake screenings (see provision 45.c, "Intake Screening") will be reviewed by Qualified Mental Health Staff for appropriate disposition.*

**Compliance Assessment:** partial compliance

**Factual Findings:**

**June 2010 Cermak status update:**

MHS Intake Screenings and Assessments & Crisis/Same-Day Assessments by Month

|  | Denoted Incomplete Data |
|---|---|

INTAKE SCREENING AND ASSESSMENT

|  | Dec-09 | Jan-10 | Feb-10 | Mar-10 | Apr-10 | May-10 |
|---|---|---|---|---|---|---|
| Screening | 6134 | 7091 | 6280 | 6519 |  | 6111 |
| Assessment | 393 | 411 | 370 | 611 |  | 683 |
| % of Positive Screens | 6.41 | 5.80 | 5.89 | 9.37 | #DIV/0! | 11.18 |

SAME-DAY/CRISIS MH ASSESSMENTS

|  | Dec-09 | Jan-10 | Feb-10 | Mar-10 | Apr-10 | May-10 |
|---|---|---|---|---|---|---|
|  | 469 | 504 | 431 | 385 |  | 441 |

**June 2010 Metzner assessment:** There are currently two different processes relevant to the intake process for mental health screening related to a pilot project in the women's division (Division IV). The ongoing three-month pilot mental health intake screening process includes use of an integrated health screening form (i.e., Intake Health Screening Form #863.04- see Appendix II) that is administered by registered nurses. Any positive finding results in completion of the Cermak Health Services Department of Mental Health Services admission/evaluation form (#87410) by a mental health specialist. It was reported that the use of the intake health screening form has doubled the percentage of positive mental health screenings.

Continued use of the "old" form (i.e. Department of Mental Health Services Brief Primary Psychological Screening Tool (RCDC-form #87417- see Appendix III) in the men's intake process, which is administered by mental health specialists, has resulted in the percentage of positive screens being about 11% since December 2009 as reported in the status update section.

The current intake assessment process is problematic as evidenced by the 11% figure relevant to the percentage of positive screens in the context of male inmates receiving healthcare screening

assessments. Positive screens from a mental health perspective would be expected to be in the range of 20-25% of all male inmates receiving intake health care screening. It is unclear to me how much this problem is related to the content of the Brief Primary Psychological Screening Tool versus this form being administered and interpreted by mental health specialists (who are not licensed) in contrast to register nurses.

It was my understanding that pilot screening process will be implemented for male inmates as soon as the renovations of the new intake area for health screening purposes is completed, which was anticipated to occur within the next one or two months.

For various reasons, a significant number of intake mental health assessments are essentially not completed in the intake area, which results in inmates being referred to the mental health infirmary unit for purposes of completing the intake mental health screening process. This results in significant overcrowding in the infirmary area as well as a poor use of mental health staff resources. It is anticipated that this process will cease after the new intake mental health screening process is implemented for male inmates.

**Recommendations:**

1. Implement the new healthcare screening process for male inmates as planned.
2. Review staffing allocations for mental health intake screening process after the new process has been implemented based on the anticipation that demand for mental health screening assessments will significantly increase.
3. Following implementation of the above process, cease the use of the infirmary for essentially intake mental health screening purposes.

**COUNTY RESPONSE:**

The integrated comprehensive screening process for females was implemented late summer of 2010 and the male process changed with the opening of the new male intake area on October, 18, 2010. While RN's are doing the intake for females, CMT's are doing the initial screening for males, rather than RN's, because there are an insufficient number of nurses to carry out the tasks until more RN's are hired and oriented (15 in orientation on-site now). The Chief Psychologist provided training to all CMT's participating in the revised intake process.

Mental health staff complete a secondary screen using a manual form, with the intake and mental health documentation to "go-live" on the EMR (Cerner) by December, 2010. Cerner training is being scheduled for November, 2010 with the Physician Order Entry (POE) to be implemented by February, 2011. With EMR implementation, a detailed

suicide risk assessment will be required for certain affirmative answers by the detainee, prompting the mental health specialist to do further evaluation.

The number of stations available for mental health in the new male intake area limits the number of mental health specialists to provide secondary screening in that there are now only four rooms allocated. An additional room is utilized by psychiatry, based on referral by the mental health specialists, who remain unlicensed at this time. However, the four stations do not seem to have presented a problem with managing the numbers of detainees referred for a secondary mental health screening. The addition of psychiatry in the intake area, now available on a 5-day/evening basis, has decreased the inappropriate intake referrals to the acute mental health infirmaries substantially. The admissions are becoming increasingly more appropriate for an acute crisis intervention and treatment setting. The psychiatry consults for outpatient and intermediate/residential occur within the designated Units of 2, 4 and 10. Psychiatry coverage for intake will be expanded to 7 days upon the hiring of 1 additional FTE (11/22/10) and the hiring of 3 PT psychiatrists (12/10), while recruitment remains underway for the Psych APN's (contact initiated with Rush's Psych APN Program).

We are pleased to report that the census on the acute mental health units, 2N for males and 2W for females, has been declining since the opening of the new intake area and the presence of a psychiatrist. A psychologist has been assigned as Unit Director for each of these two areas and the unit-based psychiatry assignments have been identified for initiation after the start of the remaining full-time psychiatrist in late November.

---

b.   *Cermak shall develop and implement policies and procedures to assess inmates with mental illness; and to evaluate inmates' mental health needs. Said policies shall include definitions of emergent, urgent, and routine mental health needs, as well as timeframes for the provision of services for each category of mental health needs.*

c.   *Cermak shall ensure that any inmate who screens positively for mental illness or suicidal ideation during the intake screening process, through a mental health assessment, or who is otherwise referred for mental health services, receives a clinically appropriate mental health evaluation in a timely manner, based on emergent, urgent, and routine mental health needs, from a Qualified Mental Health Professional, or Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional. Such mental health evaluation shall include a recorded diagnosis section on Axis I, II, and III, using*

*the DSM-IV-TR, or subsequent Diagnostic and Statistical Manual of the American Psychiatric Association. If a Qualified Mental Health Professional, or a Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional, finds a serious mental illness, they shall refer the inmate for appropriate treatment. Cermak shall request and review available information regarding any diagnosis made by the inmate's community or hospital treatment provider, and shall account for the inmate's psychiatric history as a part of the assessment. Cermak shall adequately document the mental health evaluation in the inmate's medical record.*

**Compliance Assessment:** partial compliance

**<u>Factual Findings:</u>**

**June 2010 Cermak status update:** All mental health policies, procedures and forms are being updated. This is expected to be finalized by the end of June 2010.

**June 2010 Metzner assessment:** The following draft policies and procedures have been provided to me for my review:

1. A-02 Health Authority
2. A-03 Medical Autonomy
3. A-06.1 Sentinel Events And Root Cause Analysis
4. A-06 Quality Improvement
5. A-04 Health Training of Officers
6. C-05 Medication Administration Training
7. G-03.2 Mental Health Infirmary Care
8. G-03 Infirmary Care
9. G-04 Levels of Care for Mental Health Services
10. G-04.1 Mental Health Observation Beds
11. G-05.1 Suicide Prevention Training
12. G-05 Suicide Prevention Program
13. E-07, Nonemergency Healthcare Requests and Services (pilot)
14. E-09 Segregated Inmates
15. A-10 Mortality Review
16. A-07.4 Indoor Temperatures
17. D-02.9  Medication Hoarding
18. A-07.4  Indoor Temperatures
19. C-05, Medication Administration Training

I have provided my comments re: these policies to the relevant administrative staff.

Information was obtained from the mental health director, Carlos Quezada-Gomez, Ph.D. relevant to the current practices pertinent to mental health referrals and the above referenced policies and procedures. The current referral process involves several different sources of referrals, which includes the following:

1. self-referrals via an Inmate Health Services Request Form (form #86322-see Appendix IV),
2. custody generated referrals via a CCDOC Request for Health Services form (form #852.28- see Appendix V), and
3. medical department generated referrals via form #852.28.

However, Dr. Quezada-Gomez indicated that the self-referrals form process was infrequently used. The tracking of the custody and medical departments generated referrals were problematic related to incompleteness of the data.

Female inmates in Division IV uniformly reported that the sick call process occurred almost exclusively via the use of the self-referral forms and generally resulted in lack of a response or if a response was received, an untimely response.

Most of the referrals from the male inmates occur via a custody generated CCDOC Request for Health Services form, which is problematic for the following reasons:

1. The information on the form is generally written by the correctional officer, which includes the specific reasons for the referral, which is often a self-referral. Issues relevant to confidentiality are raised with such a process.
2. Most of these referrals are treated as an emergency, which means that the inmate is seen relatively quickly by mental health services staff. Proper use of scarce mental health staff becomes an issue.

A significant percentage of inmates on the mental health roster had received treatment in the past from the Illinois Department of Mental Health. Past and current mental health information relevant to such inmates is generally obtained verbally. Attempts are made to obtain written permission via a release of information authorization form, although it was reported that such permission is not legally required.  Information in written form (e.g., admission and discharge summaries) is generally not obtained.

**Recommendations:**

1. Policies and procedures relevant to intake mental health screening and evaluation need to be developed.
2. Policies and procedures relevant to post-intake mental health referrals and evaluation need to be developed. These policies and procedures need to address the triaging of referrals as well as definitions and timeframe requirements in the context of routine, urgent, and emergency referrals. The current system is very dysfunctional and inefficient.
3. Log books (preferably electronic) relevant to post intake mental health referrals and evaluations need to be kept that include, but are not limited to, date referral was initiated, date referral was received by the mental health services, date that the referral was triaged by mental health staff, type of referral (e.g., routine, urgent, emergent), type of response to referral (e.g., face-to-face assessment, written response, other-specify), date response was implemented, etc.

4. Policies and procedures relevant to obtaining relevant mental health information from providers other than Cermak should be developed and include tracking of such requests. While obtaining information verbally is useful, it is equally important to obtain such information in written form so that information is preserved for subsequent providers to review.

Other essential Mental Health Policies and Procedures should include, but are not limited to the following:

1. Mission and goal
2. Administrative structure
3. Staffing (i.e., job descriptions, credentials, and privileging)
5. Treatment programs available
6. Involuntary treatment including the use of seclusion, restraints, forced medication, and involuntary hospitalization
7. Other medicolegal issues including informed consent and the right to refuse treatment
8. Limits of confidentiality during diagnostic and/or treatment sessions with pertinent exceptions described
9. Mental health record requirements
10. Quality assurance and/or improvement plan
11. Training of mental health staff regarding correctional and/or security issues
12. Formal training of correctional staff regarding mental health issues
13. Research protocols

**COUNTY RESPONSE**:

**The policies and procedures are being finalized for review and approval from the CQI Committee, as well as the Chief Operating Officer, including those for mental health screening and the remainder of the NCCHC standards. The Chief Psychologist has written an intake flow/procedure for male admissions, which is in each station in receiving. She has also written a more detailed policy and procedure.**

**Mental health policies now address these admission and referral issues, however, additional training and orientation is necessary for the mental health specialists regarding policies overall.**

**The implementation of Cerner for intake purposes by December will allow for the collection of the data required. At this time, the number of secondary mental health screens completed by mental health specialists and the number of patients referred to/evaluated by psychiatry are tracked manually on a nightly basis. Since the opening of the new male intake area, approximately 15% of the male detainees received secondary**

mental health evaluations nightly. Approximately 35.1% of the secondary evaluations were referred to psychiatry. During the same time period, an average of 45.5% of the female detainees were referred secondary mental health evaluations, with approximately 41.7% referred to psychiatry.

Psychiatrists have all been oriented to use the Illinois Narcotic Registry for verification of inmates' statements regarding current prescriptions for controlled substances. A policy statement regarding the use of benzodiazapines has been issued to all psychiatrists to eliminate/minimize the use of such controlled drugs. Taper schedules have been established and are to be implemented for new intakes on December 1, 2010, and for remaining patients as they are seen routinely by their attending psychiatrist within the next 90 days. Telephone contact with specific prescription verification at pharmacies is sporadic and the pursuit of hard copy medical records from other jurisdictions is not common at this point. This information is not currently tracked, although the opportunity will exist in the future with full EMR/Cerner operation. Prior Cermak/CCDOC records are reactivated to obtain a patient's prior history. Given the short length of stay for most detainees, it is difficult and often impractical to obtain prior records. The Jail Data Link with the Department of Human Services, Division of Mental Health (DMH) allows DMH to check jail records for admission of their clients and a pilot is being initiated within Cermak's intake process to allow for verification of DMH patient status, any psychiatric hospitalizations and outpatient agencies/providers.

The formulation and implementation of other policies, as suggested by the Monitor, is underway and either being initiated or are in process.

d. *Cermak shall ensure clinically appropriate and timely treatment for inmates whose assessments reveal serious mental illness or serious mental health needs, including timely and regularly scheduled visits with Qualified Mental Health Professionals or with Qualified Mental Health Staff, with appropriate, on-site supervision by a Qualified Mental Health Professional.*

**Compliance Assessment:** partial compliance

**Factual Findings:**

**June 2010 Cermak status update:**

**June 2010 Metzner assessment:** During the morning of June 15, 2010 I visited Division II (minimum and medium security inmates). The first floor of this building housed inmates with various medical problems in a dormitory setting. The second floor consisted of dormitory housing for inmates with serious mental illnesses. Two of the dormitories housed 40 inmates per dorm and the other two housed 48 inmates per dorm. This building did not have an elevator. Space on the first floor was available for sick call assessment purposes. The first floor also included three administrative offices for five mental health staff. There was no space on the first floor for structured therapeutic group programming although a large space was available but not being utilized for such purposes related to security concerns. Renovation of this space could make it suitable for structured therapeutic activities.

There were two suitable interview rooms present on the second floor that were wired but not yet equipped with computer terminals. Each of the four mental health dormitories were staffed by a mental health specialist and a licensed psychologist provided supervision for the entire division. A housing unit on the third floor was used for mental health overflow purposes and staffed on an as needed basis by all the mental health staff within Division II.

There were no health services request drop-off boxes within the second floor according to the nurse who was running medication line. However, I was later informed by a physician not assigned to this unit that this information was inaccurate. Health service request slips were obtainable from the nurses during the medication pass process. Inmates were instructed to complete the health service request form and return it to the nurse who would then triage/process it.

I observed the medication pass process in P House. The MARs were completed as the medication was administered to the inmate.

I talked with many of the inmates on this unit in a community meeting format. These inmates described the environment in Division II as being a safer one as compared to other general population housing units. Structured therapeutic activities within their housing unit were described as minimal in numbers. Specifically, they reported community therapy occurring on a twice per week basis lasting for a brief period of time. Staff indicated that these meetings may last up to 15 minutes. The inmates also indicated that 1-2 groups per week on the unit were generally offered, which was confirmed by staff. As needed individual mental health contacts were available on a very limited basis. Inmates reported generally seeing a psychiatrist every 30 days. Limited access to a social worker for discharge planning was reported.

Many of these inmates had brief experience in the infirmary on Housing Unit 2 North following either a transfer from either the intake area upon admission to CCDOC or from Division II related to an urgent need to see a psychiatrist. They uniformly described such an experience in a negative manner, which appeared to be related to severe restrictions and a perceived harsher environment within this unit as compared to Division II.

Inmates were uniformly vocal in their complaints about a recent change in the food process that has resulted in Division II inmates going to the dining hall for 2 of 3 meals per day during the same time general population inmates are present. Their complaints centered on safety concerns, perceptions of being belittled by GP inmates and the timing of the first meal (i.e., 6 AM). It was

my understanding that this change was related to financial issues as well as some security concerns. Staff also reported that it was not uncommon for psychiatrist lines to be shortened/canceled as well as medication lines if they conflicted with meal times. As a result, some inmates had their medications renewed without being seen by the psychiatrist.
In general, the information summarized above was consistent with information obtained from staff. Limitations specific to the availability of structured therapeutic activities were directly related to staffing allocation issues. The psychiatric coverage was provided by multiple psychiatrists on essentially a scheduled only basis from Tuesday through Thursday. Urgent/emergent psychiatric consultations were generally managed via admission to 2 North.

Treatment plans were not developed and a treatment team concept was minimally present via the presence of the mental health specialists during scheduled appointments with the psychiatrist. Good working relationships between mental health and correctional staffs were reported. Correctional staff has received the basic mental health training but have not received mental health training specific to special mental health housing issues.

It is clear that the residential treatment units for inmates with serious mental illness within Division II serves as a protected environment and are a safer housing unit for such inmates as compared to other housing units without such a similar mission. It is also apparent that the mental health staff is conscientious in attempting to provide adequate treatment with very limited resources from both staffing allocation and physical plant limitation perspectives. Despite their best efforts, adequate treatment is lacking related to the above limitations.

Issues related to the change in meal process have exacerbated problems associated with the above resource limitations.

During the afternoon of June 15, 2010 I interviewed all the inmates via a community group setting in two of the three residential treatment units in Division X. This division includes three maximum security tiers for inmates with serious mental illness requiring an intermediate level of mental health care. Each tier housed 48 inmates. These tiers had 24 cells that were all double celled. Three group therapy rooms were available for these three tiers. Direct supervision in these tiers required at least two correctional officers per housing unit. Each tier had one mental health specialist and there was one clinical psychologist for the whole division. 2.0 FTE crisis workers provided coverage for the rest of the Division.

The inmates in these housing units were uniform in describing them as being safer and more therapeutic than the non-mental health housing units within CCDOC. The vast majority of these inmates described access to structured therapy groups on a three-time per week basis (~one hour per group). In Housing Unit C these groups were primarily of a recreational (e.g. music or art) treatment modality. The groups in the other tier included more focused topic sessions such as anger management and substance abuse. It was unusual to have the same inmates in a specific group on a regular basis. The inmates describe these groups as helpful.

Access to discharge planning was described by these inmates to be very limited. They did not think that discharge medications would be available to them. In general, medication management issues were minimal. Inmates reported that they generally met with the psychiatrist in a private

setting on a monthly basis. Access to a mental health specialist on Unit C for individual sessions was described as being good and was more limited on the other housing unit.

Many inmates in both of these housing units had prior experiences with being housed on Unit 2N. They described this unit as having better access to physicians but being very restrictive in nature. They reported receiving very little out of cell therapy and described their experiences on this unit in a very negative manner. They alleged excessive use of force by various correctional officers working in 2N.

Access to outdoor recreation was reported to occur three times per week for a total of about three hours. Access to dayroom time was very adequate.

A locked sick call collection box was present in the space between the two entrance doors to the housing unit.

Inmates in these housing units demonstrated a respectful attitude towards both other inmates and staff.

During the morning of June 16, 2000 and I visited the Division IV, which is the women's housing unit that includes four tiers of inmates receiving mental health services (either at a intermediate or outpatient level of mental health care.) The women's housing units were moved from Division III to Division IV during April 2010.

Prior to the move to Division IV, the mental health caseload inmates were housed according to level of mental health care (e.g., intermediate treatment program or outpatient level of cares). However, the current housing units are based on security classification in contrast to mental health level of care, which means that inmates requiring different levels of care are housed in the same mental health housing unit.

Mental health staffing for these four mental health housing units was provided by a total of two mental health specialists, one psychologist, one expressive art therapist, and services provided by a social worker and psychiatrist.

The programming area included five interview rooms and two group therapy rooms.
In a community therapy-like setting I spoke to most of the women in two of the four mental health housing units. These units, which consisted of double celled housing on two tiers, housed about 40 women per unit.

In general, inmates reported being offered about two structured group therapeutic activities per weekday with each activity lasting about 0.5 to 1.5 hours per activity. The usual group size was 6-8 women per group although up to 15 women attended some groups. These structured therapeutic activities were not treatment plan driven. There was general consensus that these groups were very helpful. Access to outdoor recreational/gym time was described as being very restricted.

Structured therapeutic activities did not occur after 1:30 PM. Inmates going to school reported that they needed to make a choice about either going to school or structured therapeutic activities because they could not receive both types of programming.

The inmates described very poor access to a psychiatrist. In general, it appeared that appointments with the psychiatrist occurred about every six weeks. Access to the psychiatrist via the sick call process was extremely problematic. The self-referral slips used by many of the women were described as usually resulting in no response from mental health services. They indicated that the referral process through the correctional officers was not available to them unless they engage in self-harming behaviors.

Medication management issues were reportedly prevalent. Problems with a specific nurse on weekends were described and included that the nurse either did not show up on unit for medication administration purposes or limited medication administration to a small number of inmates. Inmates attending school reported that they had a choice of either missing school in order to receive their medications or attending school and not receiving their medications. This choice was reportedly custody driven. Similar issues were described when medications were delivered around lunch time. Inmates also complained that there were wide variations relevant to the timing of the various pill call lines.

Inmates stated that they would receive medications prior to going to court but rarely received medications upon their return to court, which generally occurred after 9 PM. They alleged that the nurses would indicate on the MARs that they had received the evening medications even when they were at court and had not received such medications.

The essential "rolling lunch" schedules have negatively impacted psychiatrists' lines, medication administration and access to mental health programming. For example, one of the psychiatrists had only five of about 20 inmates keep scheduled appointments because they had to make a choice between seeing the psychiatrist or going to lunch.

Most of these inmates had experiences on infirmary unit 2 West. They reported better access to the psychiatrist on this unit but complained about the frequent lockdown status of the unit.

**Recommendations:**

Division II

1. Mental health staffing allocations need to be increased in order to provide adequate therapeutic activities.
2. The inadequate programming space needs to be remedied. Renovation of the first floor large room appears to be the most likely remedy.
3. The current meal process that mingles general population inmates with Division II inmates is not working well from several perspectives. I recommend that it be changed.
4. DOC and Cermak need to jointly develop a lunch schedule that will not interfere with medication administration.

5. The current psychiatric coverage is very problematic, which should be remedied when psychiatrists are assigned via program area in contrast to the current assignment process.

6. A treatment team process should be implemented, which should include correctional staff, but will require additional mental health staffing allocations and implementation of the previously referenced psychiatrists' assignment process.

7. Correctional staff has received the basic mental health training but have not received mental health training specific to special mental health housing issues. Such training is recommended.

Division X

1. Mental health staffing allocations need to be increased in order to provide more hours of structured therapeutic activities.

2. Similar to recommendations made for Division II, a treatment team concept needs to be established within this division. It is encouraging to note the benefits regarding access to increased number of hours of structured therapeutic activities as are obvious when comparing immediate care treatment units in Divisions II & X.

3. Correctional staff has received the basic mental health training but have not received mental health training specific to special mental health housing issues. Such training is recommended.

Division IV

1. Mental health caseload inmates should be housed according to mental health level of care. It is a custody decision whether to additionally house them by security classification level. However, is likely not to be practical to do so.

2. The "rolling lunch" schedule is too disruptive to adequate management of an intermediate care program. This issue needs to be remedied.

3. A treatment team concept needs to be implemented as previously described.

4. The mental health sick call process is clearly not working and needs to be fixed. For example, female inmates reported lack of access to referral slips and/or lack of responsiveness from correctional officers. The mental health sick call process should be assessed via a QI process.

5. The reported medication management issues are very concerning. Reference should be made to paragraph #56.

6. The frequency of appointments with psychiatrists should be further assessed and be consistent with timeframe specified in paragraph #60 b.

7. Correctional staff has received the basic mental health training but have not received mental health training specific to special mental health housing issues. Such training is recommended.

**COUNTY RESPONSE:**

**In regards to all divisions, mental health staffing allocations to the units will not be increased substantially until additional mental health specialists, licensed professionals, are**

hired. They will then be distributed among the divisions for support to the psychologist/Unit Director to provide clinical supervision and oversight.

The treatment team concept is being introduced to the CCDOC in conversation/discussion, with a proposed revision to the CO post order, to the functional job description for the Psychologist/Unit Director, and with the implementation of Cerner documentation in December 2010. When the psychiatrists are fully unit-based and new licensed mental health specialists hired and assigned to the units, the team concept will become operational.

All new CO's hired since December 2009, have received both introductory and advanced psych training and orientation at the Sheriff's Training Institute. Services are contracted by the Sheriff's Department and the curriculum is appropriate. However, further on-site specific training to treatment team involvement is under discussion.

**Division II**

Programming space remains status quo at this time; however, evening coverage is now being provided at least three days per week, to increase patient access to services.

Mental health inmates from Dorm 2, within Division II, are not taken out of their units for meals any longer, nor are they mixed with general population as they are fed in their housing units. Meals are provided on the units prior to nurses arriving to provide medication administration.

Psychiatric coverage is expanding with the additional of 2 full-time psychiatrists and 3 part-time individuals. The unit-based assignments have been identified and are awaiting the hiring of the last FTE of psychiatry for implementation, i.e., November 22, 2010.

**Division X**

In this Division, evening mental health coverage is now provided at least 4 nights to increase patient access to services.

**Division IV**

Women were categorized by mental health level of need by the psychologist/Unit Director and the mental health specialists.  A list of 76 women was provided to the Division Superintendent for movement with the addition of a unit specific for outpatient psychiatric women.   A meeting was held between the CCDOC Executive Director, Division Superintendent and Cermak staff.   All appropriate women were moved on Sunday, October 31, 2010.   Two units are identified as intermediate/residential with up to four additional for women on psychiatric medications on outpatient status.   There are two units for maximum/medium – one intermediate, one outpatient; the remainder of units are for minimum/medium but are broken down by mental health level.   Women from the two intermediate units are still being fed in the gymnasium.

As previously discussed, the entire Health Service Request process is under review and change.  Specific to mental health, the form has been changed to include a self-referral by the detainee to mental health.   The new process will be piloted in one division and mental health specialists will be assigned for sick call duties for units without on-site mental health staffing.

Cermak administrators acknowledge that medication administration remains problematic and the entire process is being revised to be piloted within a specific location in the near future.

Psychiatry clinic scheduling is being transitioned from the mental health specialists to administrative assistants.   With Cerner, the psychiatrist will generate a "Return to Clinic" order for the appropriate timeframe to allow for automated scheduling.

---

> e.    *Cermak shall ensure that treatment plans adequately address inmates' serious mental health needs and that the plans contain interventions specifically tailored to the inmates' diagnoses.*

**Compliance Assessment:** partial compliance

**Factual Findings:**

**June 2010 Cermak status update:**  Policy G-04, Levels of Care for Mental Health Services was reviewed which included the following timelines:

|  |  | Level IV - Infirmary | Level III - Intermediate | Level II – Maintenance |
|---|---|---|---|---|
| Treatment Plan | Initial | Within 24 hours of admission | Within 7 days of 1st encounter | Within 7 days of 1st encounter |
|  | Review; update | Daily; as needed | 30 days; as needed | 90 days; as needed |

**June 2010 Metzner assessment:** A formal treatment plan form currently does not exist. Treatment plans are generally documented via a psychiatrist progress note and are not developed via a formalized treatment team planning process.

**Recommendations:**

1. Treatment plans for inmates requiring either an infirmary level of care (e.g. acute or chronic inpatient mental health care) or an intermediate level of mental health care should be developed via a treatment team planning process.
2. The treatment team should include the treating psychiatrist, treating psychologist/other mental health clinician, nursing and custody staffs. Training will be needed for custody staff relevant to issues of confidentiality.
3. A treatment planning form needs to be developed.
4. I would change required timeframes as follows:

   a. level IV: within 72 hours of admission,
   b. level III: within 30 days of admission and then every 90 days or sooner if clinically indicated,
   c. level II: within 30 days of admission to the mental health caseload and then annually or sooner if clinically indicated, and
   d. the treatment plan needs to be reviewed/updated in a timely manner whenever an inmate's level of mental healthcare is increased.

**COUNTY RESPONSE**

**Treatment plan forms exist but they are brief and lacking in patient specific goals and timelines. The treatment plan within Cerner is improved and allows for better documentation. The unit-based assignments for psychiatry will enhance treatment planning within the team concept as it is now based only on difficult case "staffings." With the hiring of the last full-time psychiatrist on November 22, 2010, the unit-based model will be implemented for psychiatry as is in place now for psychologists/Unit Directors, mental health specialists and others.**

**An organizational chart for the Units and for Cermak Department of Mental Health clearly delineates roles and responsibilities. The revision of the CO Post Order is essential**

and it has been supported verbally by the CCDOC administration.  Treatment plan and team training for CO's has been raised as a necessity and union issues have been identified as potential obstacles.  The psychologists' job descriptions have been revised so that they serve as the Unit Director by Division/unit/area.

Timeframes are being inserted into Cermak policy for treatment plans and team by mental health level of care needed.

f.      *Cermak shall provide 24-hour/7-day psychiatric coverage to meet inmates' serious mental health needs and ensure that psychiatrists see inmates in a timely manner.*

**Compliance Assessment:** partial compliance

**Factual Findings:**

**June 2010 Cermak status update:** Psychiatric staffing currently includes 6.0 FTE psychiatrists and five part-time psychiatrists, who in combination provide 12 hours per day of on-site psychiatric coverage during Saturdays and Sundays. An on call system is in place that provides psychiatric coverage by phone and, if needed, on-site during non-working hours.

7.0 FTE psychiatric nurse practitioner allocations are in the process of receiving finalized approval.

**June 2010 Metzner assessment:** Psychiatrist/psychiatric nurse practitioner allocations *should* be adequate if the 7.0 FTE psychiatric nurse practitioner allocations are approved and hired.

**Recommendations:** Obtain final approval regarding the nurse practitioner allocations and begin the recruitment/hiring process.

**COUNTY RESPONSE:**

Psychiatrists are on-site weekdays from morning through late evening (in receiving). Evening and weekend psychiatrist staffing is occasionally problematic due to existing provider vacancies.  With the hiring of 1 FTE on November 22, 2010, and the posting of the remaining 3 vacant part-time psychiatrists, this issue should be resolved to allow for 7-day on-site psychiatry coverage for receiving, 7-day coverage for inpatient units and unit assignments, in addition to on-call 24/7.

g.      *Cermak shall ensure timely provision of therapy, counseling, and other mental health programs for all inmates with serious mental illness.   This includes*

*adequate number of Qualified Mental Health Staff to provide treatment, and an adequate array of structured therapeutic programming. Cermak will develop and implement policies and procedures defining the various levels of care and identifying the space, staffing, and programming that are appropriate to each identified level of care.*

**Compliance Assessment:** partial compliance

**<u>Factual Findings:</u>**

**June 2010 Cermak status update:** The mental health program is being revamped.  The program will be brought completely in-house as opposed to a separation of contract professional staff and county employed line staff.  As well, the mental health specialists will be upgraded to include licensed staff.  A full time program director will be hired.  Psychiatrists will be unit based instead of having a panel of patients throughout the institution.  Clinical teams will be unit based as well.  Intake will ultimately have licensed staff and mid-level providers who can diagnose newly arriving inmates to avoid the overcrowding on the 2nd floor.  As well, the provider can initiate critical medications for continuity sake for newly arrived inmates.  QI will be re-vamped and the electronic record will be functioning for the mental health staff by September of 2010.

**June 2010 Metzner assessment:**  The average number of hours of structured therapeutic activities being offered to ICP inmates currently ranged from 0.8 to 4.07 hours. Refer to paragraph 59 d.

Most of the structured therapeutic activity offered to inmates in the infirmary setting was not treatment plan driven and did not approach 3-4 hours per day (see paragraph 59 h & p).

Policies and procedures still need to be developed relevant to this required element of the Agreed Order. Significant limitations in providing adequate hours of structured therapeutic activities to inmates in need of such treatment includes staffing allocations, scheduling issues with custody staff and physical plant limitations. For example, it was reported to be common that custody staff restricted access to structured therapeutic activities after 1:30 PM.

Appendix VI is a summary of the submitted staffing plan. Appendix VII is a summary narrative re: the staffing plan. Appendices VIII and IX list the status of the current mental health staffing positions.

Although there are several very positive aspects of the staffing plan submitted, I have significant concerns re: the staffing plan, especially re: the intermediate and infirmary levels of care. The following table summarizes total staffing allocations in the staffing plan with the specific aggregate positions being identified in Appendix IX and allocated positions by program in Appendix VI.

| 2010 Total County and Isaac Ray | 2010 vacant positions | 2010 Filled positions | New reorganization Staffing Model with changes based on |
| --- | --- | --- | --- |

| Positions | | | realignment |
|---|---|---|---|
| 95.50 | 32 | 63.5 | 86 |

Although the total number of allocated positions is decreased, this decrease is mitigated by the following:

1.    The 63 unlicensed mental health specialist positions will be converted to 53 licensed mental health specialist positions.

2.    Although the allocated psychiatrist 7.5 FTE positions will be decreased by a 0.5 FTE position, an additional 7.0 FTE psychiatric nurse practioner positions will be added.

I think the staffing plan for the intake process and the urgent care is a reasonable estimate based on staff's experience at CCDOC and the information in the literature. My opinion assumes that staff allocated for the intake process and urgent care can cross-cover for each other when the need arises. The planned staffing allocations should be reassessed following an adequate period of time after the new intake healthcare screening process has been implemented.

I am concerned about the staffing plan in the context of the infirmary and the intermediate levels of care. However, I am not convinced that the numbers of inmates in each of these levels of care accurately reflect their actual need. For example, it is clear that many infirmary inmates are not in need of an infirmary level of care but are transferred to 2N in order to essentially complete the intake mental screening process, which is not an appropriate use of the infirmary setting and has an obvious impact on the staffing allocation needs. The staffing plan should be revised to compare the current staffing allocations (mental health, nursing, medical correctional staffs, etc.) to the proposed allocations in the staffing plan. This comparison should be both an aggregate comparison (e.g., 3.0 FTE psychiatrists assigned to the Infirmary) and by Unit (e.g., 2N, 2W, etc.).

I have similar concerns re: both the staffing allocations in the intermediate levels of care and the accuracy of the level of care determinations. Specifically, according to Appendix VI, there are 480 inmates requiring an intermediate level of mental health care and 350 inmates requiring an outpatient level of mental healthcare. These numbers are surprising because I would expect that the number of inmates requiring an outpatient level of care would exceed the number requiring an intermediate level of mental health care. This issue has obvious staffing allocation ramifications.

Related to staffing allocation issues that impact the quality of diagnostic assessments and the nature of the environment of many of the general population housing units, it is likely that staff have been very conservative in placing inmates with mental illness in the intermediate level of mental health care housing units as their best housing alternative. Consideration should be given to designating housing units for just inmates who require an outpatient level of care (i.e. "pill call" modules) and housing units that are designated for inmates who require a higher intermediate level of mental health care. It is likely that such designations would not change the total number of beds currently being used for housing of mental health caseload inmates but would redistribute them in a more rational manner that would assist with better use of scarce

mental health staff resources.

The other information that would be helpful in formulating a staffing plan would be statistical information specific to the average daily population over a six-month period of time in the various mental health caseload housing units as well as both the average length of stay and median length of stay for inmates in those housing units on any given day. The nature of treatment needed for inmates in need of an intermediate level mental health care would be different for those with a length of stay of one to two weeks versus those with lengths of stay over several months.

**Recommendations:**

1. Develop relevant policies and procedures.
2. Assess current obstacles in providing adequate treatment and develop a corrective action plan.
3. Please provide me with the above requested information.
4. Consider a needs assessment relevant to level of care as summarized above.

**COUNTY RESPONSE:**

**In regards to licensure of the mental health specialist staff, 3 are currently licensed, 5 are in the licensure process with 3 additional individuals expected to be licensed within six months for a total of 11 individuals. The licensed Mental Health Specialist III positions are posted (42 + 4 Medical Social Workers). The eligibility list should be available shortly and interviews initiated as a priority. A timeline is established for: 1) obtaining the list, 2) interviewing candidates, 3) comparing eligible candidates with current staffing by seniority and education status/licensure, 4) notice to the SEIU for "impact bargaining" and 5) no less than 3-week notice of lay-off for current staff.**

**Although some programming exists and is increasing, the lack of qualified staff prohibits some programs from occurring. Activities are increasing. The acute patient units are increasing both recreational and structured therapy. Once the staff are hired and in place, they will be assigned according to program need priority. Assessment of each detainee upon admission, as well as the assessment of current inmates is essential to determine the level of program need. A revised mental health classification tool will assist in this regard.**

---

h. *Inmates shall have access to appropriate infirmary psychiatric care when clinically appropriate.*

**Compliance Assessment:** partial compliance

**Factual Findings:**

**June 2010 Cermak status update:**

**June 2010 Metzner assessment:** A significant proportion of inmates admitted to the infirmary are not admitted for purposes of needing an acute level of mental healthcare but, instead, are admitted essentially to complete the intake mental health screening process. Subsequently, the infirmary is often overcrowded by the time a weekend has ended. This overcrowding negatively impacts the therapeutic milieu of the infirmary. Admissions to the infirmary for such purposes have occurred related to physical plant limitations within the intake processing area as well as the use of mental health specialists for secondary mental health screening purposes.

It is expected that the intake mental health screening process will significantly change following opening of the almost completed renovated space that will be used during the next two years for intake healthcare screening purposes. When this renovation is completed, the use of the infirmary for intake mental health screening purposes should cease as previously described.

Treatment planning within the infirmary is not completed via a treatment team meeting process. Structured therapeutic activities within the infirmary are generally not treatment plan driven related to the lack of a treatment team planning process and the use of the infirmary for intake mental health screening purposes.

**Recommendation:**

1. See prior recommendations relevant to the use of the infirmary for intake mental health screening purposes.
2. See prior recommendations relevant to the treatment planning process.
3. Structured therapeutic activity should be treatment plan driven.

**COUNTY RESPONSE:**

Patient census on the acute units on the second floor of Cermak has been decreasing, from as high as 35 to 45 (with only 20 to 24 beds per unit) per unit, to as low as the upper teens. The problem remains with the lack of consistent weekend psychiatry coverage for receiving, which results in more admissions from intake and fewer discharges on those weekends. With the appropriate number of patients, and the assignment of Unit Directors, the acute units are increasing out-of-cell time for patients for both structured and unstructured activities including programming and structured recreation.

      i.      *Cermak shall provide the designated CCDOC official responsible for inmate disciplinary hearings with a mental health caseload roster listing the inmates currently receiving mental health care.*

      j.      *When CCDOC alerts Cermak that an inmate is placed in lock down status for disciplinary reasons, a Qualified Mental Health Professional will review the disciplinary charges against inmate to determine the extent to which the charge was related to serious mental illness. The Qualified Mental Health Professional will make recommendations to CCDOC when an inmate's serious mental illness should be considered as a mitigating factor when punishment is imposed on an inmate with a serious mental illness and to minimize any deleterious effect of disciplinary measures on an inmate's mental health status.*

      k.      *In the case of mentally ill inmates in segregation, CCDOC shall consult with Cermak to determine whether continued segregation is appropriate or whether the inmate would be appropriate for graduated alternative based on Cermak's assessment.*

**Compliance Assessment:** partial compliance

**Factual Findings:**

**June 2010 Cermak status update:**

**June 2010 Metzner assessment:** Mental health alerts are placed daily in the IMACS in order to comply with provision (i). However, this system still has some problems related to mental health alerts not showing up when more than one medical type alert has been entered into IMACS. Both CCDOC and Cermak staffs are aware of this problem and are working on an IT solution.

All inmates receive both a medical and a mental health screen, generally in either the intake healthcare screening area or in the emergency room, prior to placement in segregation in order to determine whether there are any healthcare contraindications to such a placement. However, problems remain with this system because mental health staff is not always notified when an inmate is going to be sent to a segregation housing unit, which results in lack of such a mental health screen for such purposes.

At the present time an inmate's treating psychiatrist performs the mental health assessment relevant to provision (j). It was reported to not be uncommon for assessments to include responsibility determinations in contrast to issues of mitigation. There was no standard definition of responsibility among the various psychiatrists forming these assessments.

Problems associated with the mitigation mental health assessments include the following:

      1.   Mental health assessments, at times, include determinations of responsibility in contrast to just mitigation.

2. Psychiatrists are having dual agency roles which are problematic from a therapeutic perspective.

It was my understanding that all inmates in segregation are reviewed on a weekly basis by a committee that reviews levels within the segregation unit. This committee includes a mental health clinician as a member. The presence of a mental health clinician on this committee should serve to satisfy provision (k). I will plan to observe such a committee during a future site visit.

**Recommendations:**
1. The mental health assessments for disciplinary purposes should not include a determination relevant to responsibility.
2. The mental health assessment should be performed by either a psychiatrist or licensed psychologist, who should not be providing treatment to the inmate in question. These evaluating clinicians should obtain information from the treating clinicians as part of the assessment process.
3. The informed consent process that is initiated when an inmate enters the mental health treatment services should include information relevant to the above lack of confidentiality.
4. A policy and procedure needs to be developed that incorporates the above recommendations.

## COUNTY RESPONSE

**Since September 1, 2010, the Chief Psychologist has served as the mental health committee member of the weekly segregation meetings. In each meeting, all detainees housed within the most restricted levels of segregation are reviewed to determine whether continued segregation is appropriate or alternative means of discipline should be initiated. Any detainee with identified behavioral disruption in the segregation setting or other signs of potential mental decompensation is assessed by the Chief Psychologist in a face-to-face interview to determine the need for alternative placement.**

**Currently, the CCDOC Disciplinary Hearing Board provides the Chief Psychologist with a copy of the disciplinary report and requests a review of the detainee's behavior to determine whether a disciplinary hearing should or should not be conducted. The Chief Psychologist, with input from the treating psychiatrist, reviews the disciplinary report and the patient's chart to recommend consideration (or lack thereof) of the detainee's serious mental illness as a mitigating factor. Where the detainee's serious mental illness is considered to be a mitigating factor, the recommendation is made to refrain from conducting a disciplinary hearing and vice versa.**

Prior to placement in disciplinary segregation the detainee is screened by a qualified mental health staff member, with supervision by an on-site qualified mental health professional, to identify any contraindications for placement in segregation. When contraindications are identified the detainee is transferred to the acute care psychiatric unit for stabilization, observation and/or assessment from the treating psychiatrist for determination of appropriate disposition. Within three (3) business days, the Chief Psychologist is provided with notification of placement in disciplinary segregation and completes the mental health assessment. CCDOC and Cermak are in the process of improving the process by which Cermak receives notification of a detainee's placement in disciplinary segregation and Cermak identifies detainees on the mental health caseload.

The process of changing the informed consent for treatment to include limits of confidentiality for disciplinary purposes is being initiated.

When the revised notification process is complete (bilaterally between Cermak and CCDOC), applicable policy and procedure will be established.

---

l.     *Cermak shall ensure that mentally ill inmates in segregation receive timely and appropriate treatment, including completion and documentation of regular rounds in the segregation units at least once per week by adequately trained Qualified Mental Health Professionals or by Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional, in order to assess the serious mental health needs of inmates in segregation. Inmates who are placed in segregation shall be evaluated within 24 hours of placement and thereafter regularly evaluated by a Qualified Mental Health Professional, or by a Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional to determine the inmate's mental health status, which shall include an assessment of the potential effect of segregation on the inmate's mental health. During these regular evaluations, Cermak shall provide CCDOC with its recommendation regarding whether continued segregation is appropriate or whether the inmate would be appropriate for graduated alternative based on the assessment of the Qualified Mental Health Professional, or Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional.*

**Compliance Assessment:** partial compliance

**<u>Factual Findings:</u>**

**June 2010 Cermak status update:** Changes on a daily basis; with an average of 5-10 patients in segregation or protective custody with an active MH case.  Will provide on site

**June 2010 Metzner assessment:** Within recent weeks, mental health rounds by mental health specialists occur in all segregation units on a twice per week basis with supervision by a licensed mental health professional. These rounds include contact with all inmates newly admitted to the segregation units since the last mental health rounds as well as contact with all segregation inmates on the mental health caseload.

During June 14, 2010 the inmate count in the disciplinary segregation unit in Division IX was 161 inmates, which included about 15 inmates on the mental health caseload. The count in the protective custody housing units within Division IX was 165, which included about 45 mental health caseload inmates.

As referenced in provision (j), participation by a mental health clinician on the weekly levels committee review should satisfy the requirement that Cermak will provide CCDOC with its recommendation regarding whether continued segregation is appropriate or whether the inmate would be appropriate for a graduated alternative.

I discussed with attorneys Deutsch and O'Grady my opinion that the intent of provision l relevant to the required mental health assessment within 24 hours of placement in segregation is best accomplished via the pre-placement mental health screening assessment in contrast to a post-placement assessment. Neither attorney had an objection to accepting the pre-placement mental health screening as satisfying this requirement.

Due to time limitations and scheduling logistics I was unable to observe the mental health rounds process in a segregation unit and/or attend a segregation levels committee meeting. I will attempt to so during the next site visit.

**Recommendations:** As above.

**COUNTY RESPONSE**

The CCDOC has revised the form and established a policy for the notice to Cermak of placement of a detainee into segregation, for screening purposes.  This is a new process and one that is inconsistently applied at present.  Although many individuals are reported when they are moved to Divisions IX or XI, some are only identified on mental health rounds, which occur twice per week.  A Mental Health Specialist conducts rounds in the segregation units, to include protective custody, at least twice per week, on the second shift.

The Chief Psychologist serves as the on-site supervisor.  These rounds are currently documented on a Mental Health Segregation Rounds Log, which includes identifying

information, the date the detainee entered segregation (or protective custody), type of visit (initial or follow up), information regarding adjustment to segregation and any comments/stressors identified by the detainee. Documentation of rounds are reviewed and maintained by the Chief Psychologist. Referrals are made when clinically indicated. Individual follow-up to issues identified on rounds twice weekly occurs with either the mental health specialist, a psychologist or a psychiatrist.

Detainees that are placed into the "Level System" for security reasons are also to be screened by mental health staff. There is a weekly meeting between CCDOC and Cermak staff to review all "Level 4" inmates (the highest level of security). Anyone with mental health issues is reviewed and identified at that time if there has been an issue. The Chief Psychologist attends these meetings weekly and intervenes in the situation of mental decompensation. Level 4 placement is generally NOT long-term, although there are voluntary exceptions.

> m.  Cermak shall maintain an updated log of inmates receiving mental health services, which shall include both those inmates who receive counseling and those who receive medication. Cermak shall create such a log within six months of the date this Agreed Order is executed. The log shall include each inmate's name, diagnosis or complaint, and next scheduled appointment. Each clinician shall have ready access to a current log listing any prescribed medication and dosages for inmates on psychotropic medications. In addition, inmate's medical records shall contain current and accurate information regarding any medication changes ordered in at least the past year.

**Compliance Assessment:** partial compliance

**Factual Findings:**

**June 2010 Cermak status update:**

**June 2010 Metzner assessment:** The current system is able to provide the inmates' names, current diagnosis and next scheduled appointment, but only via the use of separate databases. Staff thought that the new Pharm Net will be able to satisfy all the pharmacological data elements of this provision following implementation that was anticipated to occur around September 2010. All of the required elements of this paragraph should be accessible via the Cerner system that is anticipated to be operational during the Fall of 2010.

**Recommendations:**

Implement the Cerner system as planned.

n.    *Cermak shall ensure that a psychiatrist, physician or licensed clinical psychologist conducts an in-person evaluation of an inmate prior to a seclusion or restraint order, or as soon thereafter as possible.  An appropriately credentialed registered nurse may conduct the in-person evaluation of an inmate prior to a seclusion or restraint order that is limited to two hours in duration. Patients placed in medically-ordered seclusion or restraints shall be evaluated on an on-going basis for physical and mental deterioration.  Seclusion or restraint orders should include sufficient criteria for release.*

**Recommendations:**

Implement the Cerner system as planned.

**COUNTY RESPONSE:**

**All mental health staff are scheduled to receive Cerner training, with psychiatrists oriented to Return to Clinic (RTC) methods of order entry for scheduling of patients, as well as an overview of Cerner/introduction for all, and a review of the intake process in its entirety with emphasis for mental health personnel on the PowerForm for secondary mental health specialist screening and PowerNote for psychiatry notes for intake. Although these systems will be implemented by December, the physician order entry remains scheduled for February, 2011 roll-out.  There remain significant issues with the ability to glean information for the Cerner Pharm-Net pharmacy system, which was implemented in the summer of 2010.**

**At this time, the patients identified as mental health are primarily identified through the use of psychotropic medications, review of the MAR's completed by nursing (by the mental health specialists), and staff familiarity with specific detainees that are repeat admissions.  The roster of patients changes very quickly in Divisions 2 and 4 due to lower security level/lower bonds, more minor offenses and shorter lengths of stay.**

**Although the new mental health classification system lists a category of detainees in case management or group counseling only, at present there are extremely few detainees in this category.  Basically, the mental health identification as caseload is based on the prescription of psychotropic medication by a psychiatrist.**

n.    *Cermak shall ensure that a psychiatrist, physician or licensed clinical psychologist conducts an in-person evaluation of an inmate prior to a seclusion*

*or restraint order, or as soon thereafter as possible. An appropriately credentialed registered nurse may conduct the in-person evaluation of an inmate prior to a seclusion or restraint order that is limited to two hours in duration. Patients placed in medically-ordered seclusion or restraints shall be evaluated on an on-going basis for physical and mental deterioration. Seclusion or restraint orders should include sufficient criteria for release*

**Compliance Assessment:** partial compliance

**Factual Findings:**

**June 2010 Cermak status update:**

**June 2010 Metzner assessment:** Staff reported that use of restraints is infrequent (approximately 1 to 2 times per month during the past six months). This was consistent with review of the seclusion log. The use of seclusion is more common. However, a seclusion log is not maintained.

An updated policy and procedure was not yet ready for my review.

**Recommendations:**

1. Develop a revised policy and procedure relevant to the use of restraint and seclusion.
2. The restraint log should be revised to include the following elements: inmate's name, reason for using restraints, date and time of restraint initiation, date and time of restraint termination, total hours in restraints.

3. A restraint log should be developed to include elements similar to the use of restraints.

**COUNTY RESPONSE:**

   **The therapeutic restraint policy has been revised and is in final format for the COO's signature.  The policy was written to standardize practice and to comply with the IL mental health code, as required of Cermak in an existing legal opinion.**

   **Application of therapeutic restraints has been an ongoing training initiative with nurses, as well as mental health staff.  The type of restraint employed is under review, with a demonstration scheduled in early December of a type of restraint other than leather or hard rubber.**

*o.    Cermak shall ensure an adequate array of crisis services to appropriately manage the psychiatric emergencies that occur among inmates. Crisis services shall not be limited to administrative segregation or observation status.*

p. *Cermak shall ensure that inmates have access to appropriate acute infirmary care, comparable to in-patient psychiatric care, within the Cermak facility.*

**Compliance Assessment:** partial compliance

**Factual Findings:**

**June 2010 Cermak status update:** Statistics relevant to the mental health infirmary beds on the second floor of the Cermak building since December 1, 2009 were as follows:

|  | Bed capacity | Average daily census | Occupancy rate | Admissions | Discharges | Average length of stay |
|---|---|---|---|---|---|---|
| **2 N.** | 24 | 10.40 | 43% | 2351 | 1223 | 3.09 |
| **2 W.** | 20 | 9.64 | 48% | 713 | 705 | 4.98 |
| **2 S.** | 26 | 10.78 | 21% | 0 | 754 | 5.20 |
| **2 SE.** | 9 | 5.59 | 62% | 0 | 276 | 7.37 |
| **2 E.** | 12 | 5.55 | 46% | 0 | 72 | 28.08 |
| **Total** | 91 | 41.97 | 48% | 3064 | 3030 | |

**June 2010 Metzner assessment:** All housing units in the infirmary were for male inmates except for 2 West. 2 North predominately housed the most acutely mentally ill inmates. Units 2 South and 2 Southeast were described as step-down units. Unit 2 East was used for chronically mentally ill inmates.

Each of the infirmary units had different psychologists in charge. There was not an identified unit chief for all the infirmary units as a whole.

Issues related to the use of the infirmary for intake mental health screening purposes have already been summarized in other sections of this report.
As previously referenced in paragraph #59, inmates reported significant issues with the custody staff on units 2 W and 2 N in addition to frequently being locked in their cells for prolonged periods of time.

During the morning of June 17, 2010 I visited all of the mental health units within the Cermak healthcare building. I also interviewed inmates on each of the units in a community therapy like-setting.

The inmate census in Unit 2 N was 35 with a capacity of 24 beds, which meant that 11 inmates were sleeping in "boats." Inmates reported that during their time in the dayroom they were restricted to sitting in chairs near the day room television set. They also reported that dayroom time was approximately 3 hours in the morning and less during evening hours. Staff reported their dayroom time to be at least five hours during the day shift and from 3 to 5 hours during the evening shift. Staff also minimized the "sit in the chair" restrictions. It was acknowledged by staff that these inmates do not receive structured therapeutic programming.

Unit 2 N was reported to be essentially an intake unit in which lengths of stay were generally less

than three days.

Nursing staff on this unit reported that it was nursing's responsibility for implementing suicide precautions/watch and indicated that their other job responsibilities interfered in this implementation process.

Unit 2 S had a bed capacity of 26 with account of 34 male inmates. Staff confirmed the inmates' reports that their dayroom time was 4 to 5 hours during the morning shift and from 5 to 6:45 PM during the evening shift. A total of 5-7.5 hours per week of structured therapeutic activities were offered to inmates. Staff also confirmed the inmates' report of the "restricted chair" rule while in the dayroom. These inmates also reported that they were not allowed property such as books when in their rooms.

Unit 2 E had a count of about 12 inmates. Structured therapeutic programming was reported to be about 12 hours per week. Inmates also reported a variant of the "restricted to chair" dayroom rule.

Unit 2 W had a bed capacity of 20 with a count of 22 female inmates (5 inmates were out to court). Dayroom time was reported to be 6-8 hours per day. A "restrict to chair" rule was not in effect. Programming reported by women included a recently initiated art group, community therapy meeting and a weekly letter writing group. Several inmates complained of correctional staff being physically inappropriate with them (i.e., abusive).

Rooms used for suicide prevention purposes met criteria for suicide resistance. Many of the rooms were in need of cleaning.

A treatment team concept involving mental health, nursing, and correctional staff meeting for treatment planning/reviewing purposes was not present on any of these units. In fact, there appeared to be significant tension between nursing and mental health staff.

All the infirmary units provided minimal structured therapeutic programming per week per patient (e.g., 0.18 hours to 12 hours), which means these units did not even approximate care provided in adequate inpatient psychiatric facilities.

**Recommendations:**

1. A designated clinical director position should be created for the Cermak at the health infirmary.
2. The number of therapeutic activities offered to inmates, on average, needs to be significantly increased.
3. Issues related to numerous inmate reports concerning alleged inappropriate behaviors by custody staff need to be further assessed and corrective action, if indicated, be implemented.
4. A treatment team concept needs to be developed and implemented, which should include correctional officers.
5. Implement the new healthcare screening process in the men's division, which

should significantly decrease the use of admissions to the infirmary that are essentially for intake healthcare screening purposes.

**COUNTY RESPONSE:**

A Unit Director has been appointed for the male units on the Cermak second floor, the acute, subacute, and long-term chronic mental health units, and another for the female acute unit. Both individuals are licensed clinical psychologists. All psychologists have been assigned as a Unit Director in one or more areas with mental health services. A detailed job description outlines the responsibilities of the Unit Directors and has been shared with all mental health staff. An organizational chart for each unit has been drafted.

Activities for detainees on the acute units are increasing to include therapeutic and structured recreation. The expressive therapists work with the male and female units (one for each, who also covers a division and its residential programs). Mental Health Specialists are being given specific roles and expectations with regard to patient interaction, increasing the frequency of documentation, and scheduling actual programming. The future availability of licensed mental health professionals will increase this ability to conduct meaningful programming. At present, time out of the cell, whether for structured or unstructured activities, is slowly increasing.

Issues regarding the behavior of custody staff are addressed in several ways. There is a weekly meeting with the Superintendent and any problems are identified there. One Officer has been removed from the psychiatric units and assigned elsewhere as a result of ongoing discussion and patient feedback – due to inability to work well with a psychiatric correctional population. Another mechanism for review is to refer any issues of concern to the Office of Professional Regulation, essentially the Sheriff's internal affairs department. They then initiate and conduct an investigation into any alleged wrongdoing by Officers. There are instances of Officers being charged with offenses for their behavior, although this has not occurred to date on the Cermak second floor.

The Unit Director is responsible to create the treatment team concept. At present, there are routine "supervision" sessions scheduled with all staff to discuss patient issues, problems on the units, group activities, and staff morale. There are also "staffings" on patients, which are beginning to include a multidisciplinary team approach. A type of "report" at the beginning of each shift, to include mental health, nursing and custody, is in

process. Correctional Officers are becoming increasingly involved in providing input to the clinical staff. The Nurse Manager agrees to the routine assignment, to the extent feasible during a significant shortage of nurses, of a stable group of nurses that function well in a mental health environment. She also agrees with the concept of team participation and "report" at shift change to include all disciplines.

CMT's have implemented the comprehensive, integrated screening tool, which includes mental health questions, after having received mental health training by the Chief Psychologist. Nurses will be replacing the role of the CMT's to carry out this screening as positions are filled and nursing staff become available and are assigned. Mental health specialists conduct the secondary screening but everything remains manual at this time. The computer stations are set up but Cerner is not yet in use for intake although it should be in operation by December, 2010.

The assignment of psychiatrists to the receiving area, when available, has had the most significant impact on the use of the second floor of Cermak and the acute infirmary for males. More inmates are being diverted at intake to the Divisions 2 and 10 for residential (intermediate) or outpatient follow-up. This has resulted in a marked reduction in admissions, particularly with regard to those admissions that were basically to allow for the timely completion of a psychiatric evaluation for medication continuity, who were then discharged the next day.

60.     **Psychotherapeutic Medication Administration**

    a. *Cermak shall ensure that psychotropic medication orders are reviewed by a psychiatrist on a regular, timely basis for appropriateness or adjustment. Cermak shall ensure that changes to an inmate's psychotropic medications are clinically justified and documented in the inmate's medical record.*

    b. *Cermak shall ensure timely implementation of physician orders for medication and laboratory tests. Cermak shall ensure that inmates who are being treated with psychotropic medications are seen regularly by a physician to monitor responses and potential reactions to those medications, including movement disorders, and provide treatment where appropriate.*

**Compliance Assessment:** partial compliance

**Factual Findings:**

**June 2010 Cermak status update:** Policy G-04, Levels of Care for Mental Health Services, included the following:

|  | Level IV - Infirmary | Level III - Intermediate | Level II - Maintenance |
|---|---|---|---|
| **Medication Administration** | Daily, BID, TID | Daily, BID | Daily, BID |
| **Psychiatric F/U** | Daily (5-7 days/week) | At least every 30 days | At least every 90 days |

**June 2010 Metzner assessment:**

Refer to paragraph #56. I did not have time during a site visit to assess compliance with the above timeframes or whether appropriate laboratory tests were being obtained.

**Recommendations:** Refer to paragraph #56.

**COUNTY RESPONSE**

Psychotropic medication orders are initiated only by psychiatrists with the exception of one primary care physician who works with the Women's Justice Program, and prescribes basic anti-depressants, consistent with community practice standards. All antipsychotic medications are written and monitored only by a psychiatrist (until such time as the Psychiatric Advanced Practice Nurses (APN's) are hired and available on-site). All orders and documentation are currently manual but will be automated with the implementation of the Electronic Medical Record, Cerner in February of 2011 (when physician order entry (POE) becomes operational for medications).

With the psychiatrist Cerner training on RTC orders for scheduling of next appointments, the scheduling process will be automated. The handling of patient scheduling is now based on medication stop orders/expiration, by the mental health specialist. The shift will be to the generation of a task list for appointment scheduling by the psychiatrist order entry for date of RTC. The responsibility is in transition from mental health staff to administrative assistants as scheduling is a support or clerical duty rather than clinical. This change will free mental health staff time for programming.

### E.    SUICIDE PREVENTION MEASURES

**61.    Suicide Prevention Policy**

      *a.    CCDOC shall participate with Cermak in a jointly established Suicide Prevention Committee charged with developing policies and procedures to ensure the appropriate management of suicidal inmates and with implementing and monitoring a suicide prevention program in accordance with generally accepted correctional standards of care.*

      *b.    Cermak shall participate with CCDOC in a jointly established Suicide Prevention Committee charged with developing policies and procedures to ensure the appropriate management of suicidal inmates and with implementing and monitoring a suicide prevention program in accordance with generally accepted correctional standards of care.*

      *c.    The suicide prevention policy shall include, at a minimum, the following provisions:*

            *(1)    an operational description of the requirements for both pre-service and annual in-service training;*
            *(2)    intake screening/assessment;*
            *(3)    communication;*
            *(4)    housing;*
            *(5)    observation;*
            *(6)    intervention; and*
            *(7)    mortality and morbidity review.*

**Compliance Assessment:** partial compliance

**<u>Factual Findings:</u>**

**June 2010 Cermak status update:**

**June 2010 Metzner assessment:** Policy G-05, Suicide Prevention Program was reviewed. However, this policy and procedure does not reference the establishment of a suicide prevention committee. After reviewing this policy and procedure, I provided relevant comments to the pertinent administrative staff, which included reference to establishing a suicide prevention committee, clarifying constant watch status should be implemented when custody staff initiates a consultation request due to perceived suicide risk until the mental health consultation has been completed and clarifying that mattresses should be provided on a default basis unless clinically contraindicated.

Policy G-05 references training issues for custody staff (see Cermak Policy C-04). In addition, Policy G-05.1, Suicide Prevention Training, directly addresses training issues for health care staff. Policy G-05 addresses intake screening/assessment via Cermak Policy E-02. It also addresses

issues of housing although increase details should be provided regarding housing such as location (e.g., healthcare setting) and observation. It is weak on communication and does references mortality and morbidity review via Cermak Policies A-06.1, "Sentinel Events and Root Cause Analysis," and A-10, "Mortality Review."

**Recommendations:**

1. As above.
2. Need to improve this policy and procedure relevant to the element of communication and housing. It would be helpful to provide at least summary statements regarding the various referenced policies.

**COUNTY RESPONSE**

CCDOC and Cermak now participate in a monthly joint meeting to include mental health quality improvement and suicide prevention. This meeting has been held three times, to date, and Minutes are maintained with action items identified. Senior management of both organizations participate to ensure the availability and accessibility of high-level decision makers. Either the CCDOC Executive Director or First Assistant Deputy Director are involved, as well as Cermak's COO, CMO, Director of Mental Health, and Director of Quality Improvement.

The suicide prevention policy is being redrafted to increase specificity and to elaborate on certain preventive measures. The policy addresses each element within the DOJ recommendations and the NCCHC standards.

---

62. **Suicide Precautions**

   a. *CCDOC shall ensure that, where suicide prevention procedures established jointly with Cermak involve correctional personnel for constant direct supervision of actively suicidal inmates or close supervision of special needs inmates with lower levels of risk (e.g., 15 minute checks), correctional personnel perform and document their monitoring and checks.*

   b. *Cermak shall ensure that, where suicide prevention procedures established jointly with CCDOC involve health care personnel for constant direct supervision of actively suicidal inmates or close supervision of special needs inmates with lower levels of risk (e.g., 15 minute checks), health care personnel perform and document their monitoring and checks.*

   c. *CCDOC shall ensure that when an inmate is identified as suicidal, the inmate shall be searched and monitored with constant direct supervision until the inmate*

*is transferred to appropriate Cermak staff.*

d.      *Cermak shall develop and implement policies and procedures for suicide precautions that will set forth the conditions of the watch, including but not limited to allowable clothing, property, and utensils, in accordance with generally accepted correctional standards of care. These conditions shall be altered only on the written instruction of a Qualified Mental Health Professional, except under emergency circumstances.*

**Compliance Assessment:** Noncompliance

**Factual Findings:**

**June 2010 Cermak status update:**

**June 2010 Metzner assessment:** This provision essentially requires that the suicide prevention policy, which is not yet finalized, be implemented successfully. Policy G-05 should be revised in a manner that charges the Suicide Prevention Committee with ensuring that successful implementation occurs.

**Recommendations:** Finalize Policy G-05 (suicide prevention program) and implement it.

**COUNTY RESPONSE**

**With respect to suicide prevention procedures, the following initiatives have been undertaken in regard to acutely suicidal or self-injurious detainees within the infirmary setting:**

1)   **Installation of the Morse Watchmen system by each room to provide a report that documents every round made by security.**

2)   **The Morse Watchmen rounds documentation will be expanded to mental health specialists and nursing.**

3)   **An observation instruction sheet has been developed to be placed on or next to the door of any patient on observation status or in therapeutic restraints. This door sheet provides information, at a glance, regarding the inmate's status and the allowed property or safety equipment.**

4)   **An observation document sheet was revised from a prior form that was to be utilized by nursing, which was unrealistic. It is now revised for documentation by the CO as well as the MHS and provides a patient status and current activities.**

5) *The observation continuum is identified in three levels, all with appropriate documentation: a. close supervision = 15 minute rounds by security; b. close supervision/high risk = 15-minute rounds by security ALTERNATING with 15-minute rounds by the mental health specialist resulting in patient observation not more than every 10 minutes; and c. constant observation.*

6) *There is camera observation by a mental health specialist for at risk patients as an adjunct to other supervision. However, the camera is not sufficient for the entire room nor is it meant to replace other supervision; rather, the camera system is a check and balance system to supplement other observation.*

7) *Detainees who are identified as suicidal or self-injurious are escorted under CO direct observation to the Cermak basement "ER." There is a mental health specialist routinely assigned there on a 24/7 basis that provides a screening, the on-call psychiatrist is available by telephone, and the patient may be admitted to the acute mental health infirmary. If admitted, the patient is searched by custody prior to placement in a cell designated by mental health.*

8) *The new observation instructions sheet provides detail for the clinician to specify with regard to clothing or safety equipment, visits, recreation, showers and property.*

---

**63.** *Cermak shall ensure that Qualified Mental Health Staff assess and interact with (not just observe) inmates on Suicide Precautions, and document the assessment and interaction on a daily basis.*

**Compliance Assessment:** partial compliance

**Factual Findings:**

**June 2010 Cermak status update:**

**June 2010 Metzner assessment:** Draft policy G-05 needs to be revised to incorporate the above requirement.

**Recommendations:** Revise as above and implement.

**COUNTY RESPONSE**

**Observation of patients identified as "at risk" require an admission note as well as a**

**progress note per shift by the mental health specialist (MHS). The MHS also conducts routine rounds and interacts with patients at their rooms and in the interview or group rooms. They have been provided with written functional job expectations that include charting requirements, observation and restraint duties, programming and interface with security and nursing. The mental health component of Cerner, the EMR, includes PowerForms for documentation by MHS.**

**64.     Suicide Risk Assessments**

*a.      Cermak shall ensure that any inmate showing signs and symptoms of suicide is assessed by a Qualified Mental Health Professional using an appropriate, formalized suicide risk assessment instrument within an appropriate time not to exceed 24 hours of the initiation of Suicide Precautions.*

*b.      Cermak shall ensure that the risk assessment shall include the following:*

*(1)   description of the antecedent events and precipitating factors;*
*(2)   mental status examination;*
*(3)   previous psychiatric and suicide risk history;*
*(4)   level of lethality;*
*(5)   current medication and diagnosis; and*
*(6)       recommendations or treatment plan. Findings from the risk assessment shall be documented on both the assessment form and in the inmate's medical record.*

**Compliance Assessment:** partial compliance

**Factual Findings:**

**June 2010 Cermak status update:**

**June 2010 Metzner assessment:** The hardcopy version of the suicide risk assessment form developed by Cermak was reviewed. It did not contain the following required elements: description of the antecedent events although the precipitating factors element was present; mental status examination; and current medication and diagnosis.

The current paper version is not being used.

It is my understanding that the electronic version will contain all of the above elements except for the antecedent events element. However, it is likely to be at least several months before the electronic version will be rolled out.

**Recommendations:**

1. Revise the suicide risk assessment form to include the above required elements.
2. Begin using the paper version until the electronic version has been rolled out. The electronic version should be revised to include the element of antecedent events.

**COUNTY RESPONSE:**

**The suicide risk assessment tool is established in Cerner and will be a part of the automated process for the secondary mental health evaluation during intake. It will be completed by the MHS during the second phase of intake and will be prompted by an affirmative response to various questions identified in the individual's mental health history. The risk assessment is extremely detailed and lengthy, although it is based on a proven tool. Assessment of the use of the tool over time will determine whether it will need revision or simplification. The intake training is scheduled to be carried out in the next two weeks and use of the PowerForms rolled out in December.**

---

**65.** *Cermak shall ensure that inmates will only be removed from Suicide Precautions after a suicide risk assessment has been performed and approved by a Qualified Mental Health Professional, in consultation with a psychiatrist. A Qualified Mental Health Professional shall write appropriate discharge orders, including treatment recommendations and required mental health follow-up.*

**Compliance Assessment:** noncompliance

**Factual Findings:**

**June 2010 Cermak status update:**

**June 2010 Metzner assessment:** Policy G-05 does not require consultation with a psychiatrist in order to discontinue suicide precautions. This policy needs to be revised in order to be consistent with this provision.

**Recommendations:** See above.

**COUNTY RESPONSE:**

**Current practice is that a psychiatrist conducts an assessment, which includes an unstructured interview, behavioral observation and mental status exam, for each inmate admitted to the acute psychiatric units. An element of this assessment addresses risk and protective factors for suicide. While the American Psychiatric Association 2003 Practice**

Guidelines for the Assessment and Treatment of Patients with Suicidal Behavior guides the assessment, interviews are not standardized and there is variation in how each interview is conducted.

For an inmate who is placed on suicide precautions, the psychiatrist documents the risk factors within the inmate's progress note. The psychiatrist completes a daily assessment (i.e., unstructured interview, behavioral observation, mental status exam) of the inmate to determine any change in suicide risk. These assessments and any noted changes are documented within the inmate's medical record in the form of a progress note. It is through these assessments that a psychiatrist determines whether there has been a significant decrease in suicide risk allowing for the removal from suicide precautions. The psychiatrist writes the discharge orders. In current practice, discharge orders do not include substantial treatment recommendations or required mental health follow-up.

---

66.    **Suicide Prevention Policies**

   a.    *CCDOC shall ensure that suicide prevention policies established jointly with Cermak include procedures to ensure the safe housing and supervision of inmates based on the acuity of their mental health needs, in accordance with generally accepted correctional standards.*

   b.    *Cermak shall ensure that suicide prevention policies established jointly with CCDOC include procedures to ensure the safe housing and supervision of inmates based on the acuity of their mental health needs, in accordance with generally accepted correctional standards.*

**Compliance Assessment:** noncompliance

**Factual Findings:**

**June 2010 Cermak status update:**

**June 2010 Metzner assessment:** Refer to paragraph #60 findings.

**Recommendations:** As per paragraph #60 recommendations.

**COUNTY RESPONSE:**

The suicide prevention policy is being redrafted to increase specificity and to elaborate on certain preventive measures. The policy addresses each element within the

DOJ recommendations and the NCCHC standards.

**67.**     *DFM shall ensure that cells designated by CCDOC or Cermak for housing suicidal inmates shall be retrofitted to render them suicide-resistant (e.g., elimination of protrusive shower heads, unshielded lighting or electrical sockets).  Inmates known to be suicidal shall not be housed in cells with exposed bars.*

**Compliance Assessment:** compliance

**Recommendations:** none

**COUNTY RESPONSE**

Cells or rooms on 2W for women, 2N for acute males, and 2S for subacute males have been identified for therapeutic restraint and observation purposes.   Both Unit Directors, for male and female acute units, participated in the identification of the specific locations, based on visibility to custody, nursing and mental health staff.   Each location has been reviewed and an itemized list made per room – change of bed to moduform, removal of restraint hooks from moduform beds for suicide prevention, use of wooden beds for restraint due to presence of slots for restraint placement.   The rooms have break-away rather than recessed shower heads.   There are no hooks in the rooms.   Although there are 90 degree corners on the sink, the "pick-resistant" caulking is preventative.   The toilet does not go directly to the floor but has all smooth edges.

**68.**     **Suicide Prevention Training**

*a.*     *Cermak shall ensure that the Facility's suicide prevention curriculum for health care staff members, jointly established with CCDOC, addresses the following topics:*

*(1)*     *the suicide prevention policy as revised consistent with this Agreed Order;*

*(2)*     *why facility environments may contribute to suicidal behavior;*

*(3)*     *potential predisposing factors to suicide;*

*(4)*     *high risk suicide periods;*

*(5)*     *warning signs and symptoms of suicidal behavior;*

*(6)*     *observation techniques;*

(7)     searches of inmates who are placed on Suicide Precautions;

(8)     case studies of recent suicides and serious suicide attempts (Serious suicide attempts are typically considered to be those that either were potentially life-threatening or that required medical attention);

(9)     mock demonstrations regarding the proper response to a suicide attempt; and

(10)   the proper use of emergency equipment, including suicide cut-down tools.

**Compliance Assessment:** not assessed

**Factual Findings:**

**June 2010 Cermak status update:**

**June 2010 Metzner assessment:** The facility suicide prevention curriculum for health care staff members has not yet been provided to me

**Recommendations:**

Send me the facility suicide prevention curriculum for health care staff members for review purposes. Please indicate which of the above elements are not addressed in the curriculum and the plans for revisions to the curriculum, if needed,

**COUNTY RESPONSE**

All new CO's hired since late 2009 have received the additional two-week mental health training in addition to the suicide prevention during the regular orientation.  All new hires must attend the Sheriff's Training Institute, which is a separate facility some distance from the CCDOC.  In-service for CO's is also conducted at this location but the need for on-site in-service regarding suicide prevention and other relevant issues that would appropriate for training in a multi-disciplinary environment, i.e. to include custody, nursing, and mental health staff.  The curriculum for both pre-service and in-service is provided by Dr. Carl Alaimo, and his designees, through a contract with the Sheriff's Department.  The curriculum is established by Dr. Alaimo, the former Chief Psychologist of Cermak for many years.  The curriculum for each will be reviewed to determine the inclusion of required elements but the training contract is out to bid and the Request for Proposal for the contract has not yet been issued.  As the current training is contracted,

there is some reluctance to release the training elements or requirements. A clinical psychologist has been designated as responsible for the curriculum review and development as needed. The goal is to provide the suicide prevention in-service training for custody, nursing and mental health in a combined, team environment, on-site within a specified location of the CCDOC by the spring.

The current goal of the Superintendent for Division X, which includes Cermak, and the Cermak Unit Directors for the acute units, is to ensure that all CO's assigned to the second floor have received psych training at the Academy. Any officer hired within the last year has received this training; however, sessions are still ongoing for officers who were hired prior to last year and has not yet received the training. The relief factor for routinely assigned CO's presents the greatest challenge for psych training. While the goal remains to have had psych training for CO's assigned to the acute mental health units, a CQI study will be designed to verify the training against the roster of staff assignments for tracking purposes. This is not presently done.

> b.     Within 24 months of the effective date of this Agreed Order, CCDOC shall train all CCDOC staff members who work with inmates on the Facility's suicide prevention program. Implementation of such training shall begin as soon as possible following the effective date of this Agreed Order. Staff shall demonstrate competency in the verbal and behavioral cues that indicate potential suicide, and how to respond appropriately. Initial and at least annual training shall be provided in accordance with generally accepted professional standards.

**Compliance Assessment:** Refer to the report by Dr. Shansky

**Factual Findings:**

**June 2010 Cermak status update:**

**June 2010 Metzner assessment:** Refer to the report by Dr. Shansky.

**Recommendation:** Refer to the report by Dr. Shansky.

**COUNTY RESPONSE**

See response to #68.a.

> c.      Within 12 months of the effective date of this Agreed Order, Cermak shall train all Cermak staff members who work with inmates on the Facility's suicide prevention program.  Implementation of such training shall begin as soon as possible following the effective date of this Agreed Order.  Staff shall demonstrate competency in the verbal and behavioral cues that indicate potential suicide, and how to respond appropriately.  Initial and at least annual training shall be provided in accordance with generally accepted professional standards.

**Compliance Assessment:** Refer to the report by Dr. Shansky

**Factual Findings:**

**June 2010 Cermak status update:**

**June 2010 Metzner assessment:** Refer to the report by Dr. Shansky.

**Recommendation:** Refer to the report by Dr. Shansky

**COUNTY RESPONSE**

The suicide prevention in-service curriculum for Cermak staff is being developed by one of the doctoral, licensed psychologists assigned the training tasks.  The curriculum addresses each of the issues identified in the DOJ report and recommendations, #61.c.  Physicians and physician assistants are being provided with two hours of suicide prevention training on 11/23 and 30/10.  Their training is geared to primary care providers and includes a psychological autopsy case presentation, suicide risk assessment and prevention, and the appropriate use of the designated "cut-down" tool.  New nurses, approximately 15, received training on the recognition of signs and symptoms of mental illness on 11/18/10, something also provided to all CMT's working in the male intake area.

A one-hour training on the application and use of therapeutic restraints is being scheduled for nursing and mental health specialists within the next month, provided jointly by a psychologist and Nurse Manager.  Existing nurses will be scheduled for two hours of suicide prevention training prior to the end of the calendar year.  Multiple sessions will be offered and a schedule for the remainder of the year will be prepared shortly.  Mental health specialists will be scheduled for the two-hour training within the next month.

**70.**      *Cermak shall document inmate suicide attempts at the Facility, as defined by the Suicide Prevention Committee's policies and procedure in accordance with generally accepted*

*correctional standards, in the inmate's correctional record in CCDOC's new Jail Management System, in order to ensure that both correctional and health care staff will be aware at future intakes of past suicide attempts, if an inmate with a history of suicide attempts is admitted to the Facility again in the future. Cermak will begin to document this information within six months after execution of this Agreement.*

**Compliance Assessment:** partial compliance

**<u>Factual Findings:</u>**

**June 2010 Metzner assessment:** This information is currently being captured via IMACS. However, the definition of suicide attempts has not yet occurred via a suicide prevention committee for reasons previously summarized.

It is my recommendation that an inmate's history of prior suicide attempts at the Facility should also be captured via the electronic record in the form of some type of alert.

**Recommendation:** As above.

**COUNTY RESPONSE**

**The following definitions have been agreed upon for use by Cermak and within the CCDOC:**

**<u>Self-injurious behavior:</u>   A deliberate act that inflicts damage to, or threatens the integrity of one's own body, for which there is no evidence that the individual had any conscious intention to end their life.  Such acts include but are not limited to the following behaviors: hanging, self-strangulation, asphyxiation, cutting, self-mutilation, ingestion of a foreign body, insertion of a foreign body, head banging, jumping and biting.   A determination of the act is the responsibility of the institution's mental health director or their designee.**

**<u>Suicide Attempt:</u>   A conscious, deliberate, self-injurious act intended to take one's own life that has a non-fatal outcome.  Such acts include but are not limited to the following behaviors: hanging, self-strangulation, asphyxiation, cutting, self-mutilation, ingestion of a foreign body, insertion of a foreign body, head banging, jumping and biting.   A determination of the act is the responsibility of the institution's mental health director or their designee.**

**The differentiation between an act of self-injurious behavior versus a suicide attempt will only be made by a clinician, after assessment of the circumstances surrounding**

the situation and a medical record review. The clinician will also interview the detainee to determine if there was intent to harm himself v. end his(her) life.

The IMACS system within the CCDOC currently has only a one-way interface, from IMACS to Cerner and not the reverse. Funds have been identified and set aside for a contract to ensure that the interface becomes bidirectional, which is necessary to ensure that the "alert" is placed into the DOC system to be pulled forward for all subsequent admissions.

The mental health classification tool, to be piloted in receiving, has an indication as to history of suicide attempt or self-injurious behavior (SIB). This mental health ranking will flag anyone with such a history for medical record purposes.

## PROVISION: F. FIRE AND LIFE SAFETY

71. *CCDOC and DFM shall work together to develop and implement a fire safety program and ensure compliance is appropriately documented. The initial fire safety plan shall be approved by the fire prevention authority having jurisdiction. The fire safety plan shall be reviewed thereafter by the appropriate fire prevention authority at least every two years, or within six months of any revisions to the plan, whichever is sooner. Fire safety and emergency procedures shall be standardized across divisions, to the extent possible given differences in physical plant and security levels.*

## COMPLIANCE STATUS: Partial Compliance

**Status Update:** Briefly describe the actions taken by the Defendants to address the provision:

CCDOC does have elements of a comprehensive fire safety program. However it is in need of a comprehensive review. Following my August visit, CCDOC, DFM, and Cermak established a Fire and Life Safety Subcommittee to address this provision. They had their organizational meeting on September 3, 2010 and their next meeting is scheduled for September 20th.

**Monitor's Assessment:** Describe the monitor's assessment of the status and documentation for the compliance status.

During my June visit, I participated in lengthy meetings with CCDOC and DFM regarding the development of a comprehensive fire safety and emergency response plan that would include a review and acceptance by the City of Chicago Fire Department. At that meeting, we outlined the elements that needed to be included in a fire safety plan. At the August visit, CCDOC, DFM and I discussed the best approach to develop the plan and developed an overall goal and objectives to the system. The oversight group will have representatives of Cermak, CCDOC, and DFM, along

with selected key participants that will add value to the process. It is only just getting started and I will continue to monitor the progress.

The next step is for the groups to meet and discuss and agree upon a deadline for completion, and the series of steps necessary to draft the document. The process will have review steps along the way to monitor progress, and make sure all components are included in the plan.

**Monitor's Recommendations:**

1.      None at this time.

## COUNTY RESPONSE

**DFM meets with CCDOC bi-monthly to address fire safety issues.  DFM has emergency response policies in place.  Those policies have been provided to the monitor. DFM stands ready to collaborate with, and assist, CCDOC with the development of CCDOC's Master Fire Plan.**

73.     *DFM shall ensure that the Facility has adequate fire and life safety equipment, including installation and maintenance of fire alarms and smoke detectors in all housing areas according to applicable fire codes. Maintenance and storage areas shall be equipped with sprinklers or fire resistant enclosures in accordance with City of Chicago Fire Code (13-76-010).*

## COMPLIANCE STATUS: Partial Compliance

**Status Update:** Briefly describe the actions taken by the Defendants to address the provision:

DFM has filed a capital project request for fire alarm testing for fiscal year 2011 on July 12, 2010.

**Monitor's Assessment:** Describe the monitor's assessment of the status and documentation for the compliance status.

DFM explained that there must be a full test of all Cook County fire alarms and fire suppression systems including CCDEOC. Because of the $125,000 annual cost for this testing, DFM must fire a capital request each year. I have not yet reviewed the results of the 2010 fire alarm test for CCDOC.

I need to confirm with DFM and the City of Chicago that sprinklers are required in maintenance and storage areas. DFM notified the Director of the Office of Capital Planning & Policy that as of January 1,2009, requiring that sprinklers in high rise buildings (defined as those buildings 80feet or taller.DFM did provide a memo from the Cook County Office of Capital Planning and Policy indicating that the only CCDOC building that had a concern was Division VII which is unoccupied. The memorandum further stated that the Office of Capital Planning has a project in

the planning stages to completely renovate the building and install sprinklers. As of Oct. 2008 that project has yet to start.

I have not yet reviewed the codes with regards to smoke detectors in all housing areas, nor have I verified that all housing areas are equipped with fire alarms.

**Monitor's Recommendations:**

1.    DFM needs to provide documentation of the results of the 2010 fire alarm test and how all nonconformities, if any, were resolved.

2.    DFM needs to provide evidence that all housing areas are equipped with fire alarms, and which housing areas are provided with smoke detectors.

3.    DFM needs to provide me with documentation of any requirements including Chicago Fire Code 13-76-010 for sprinkler systems for any area of CCDOC including chemical storage areas, laundries, food service, and/or maintenance areas.

**COUNTY RESPONSE**
       **DFM has provided the monitor with the Fire Code.  Annual testing of the fire alarm system has been completed and the report will be provided to the monitor upon completion by the contractor.  The fire alarm test report will contain an inventory of the devices and thus provide the monitor with evidence that the housing areas are sufficiently equipped.**

74.    *DFM shall ensure that all fire and life safety equipment is properly maintained and routinely inspected. DFM shall develop and implement a program related to the testing, maintenance and inspection of the Life Safety Equipment.*

**COMPLIANCE STATUS: Partial Compliance**

**Status Update:** Briefly describe the actions taken by the Defendants to address the provision:

DFM has developed and begun implementing policy # 10-01-01 that defines the procedure required for testing, inspection and maintenance of all life safety systems and the documentation to support the policy. It includes weekly and monthly generator testing, monthly fire department connections, monthly fire pump churn test, annual fire pump testing, annual fire alarm test, main drain annual test and the annual elevator test. All tests are completed in conformance with the State Fire Code and have been approved by the City of Chicago Fire Department.

DFM has developed and implemented a fire extinguisher testing program through Policy # 10-07-02. It includes a monthly inspection. It is being revised to include a currently implemented annual inspection, a six year and twelve year maintenance program conducted by a licensed inspector and contracted with DFM.

**Monitor's Assessment:** Describe the monitor's assessment of the status and documentation for the compliance status.

I have reviewed the policies and have reviewed limited documentation demonstrating that the inspection and testing program is implemented. On future visits, I will witness the testing being performed.

I have also reviewed and provided suggestions for the fire extinguisher inspection program and policy and have reviewed the tracking system that has been established for it. It is included in the Preventative Maintenance schedule for DFM. My limited review of fire extinguishers in several Divisions, Cermak and food service show that the tags are marked monthly by the DFM inspector. All fire extinguishers are managed on a log showing the specific location of every extinguisher by type and date of installation.

**Monitor's Recommendations:**

1.      Continue the monitoring program and begin tracking non-conformities. At a future visit, I would like to review corrective action logs for and documentation demonstrating the work orders created as a result of non-conformities, showing how and when they were closed and measuring and recording the time from work order initiation to resolution.

2.      The fire extinguisher program is well established and there are no further recommendations regarding it at this time.

**COUNTY RESPONSE**

**DFM submits that the County is in full compliance with this provision.  DFM encourages the monitor to review testing procedures during his next site visit.**

---

77.      *DFM shall develop and implement an annual preventative maintenance program concerning security devices such as doors locks, fire and smoke barrier doors, and manual unlocking mechanisms to ensure these devices function properly in the event of an emergency.*

**COMPLIANCE STATUS: N/A**

**Status Update:** Briefly describe the actions taken by the Defendants to address the provision:

I have not assessed this provision.

**Monitor's Assessment:** Describe the monitor's assessment of the status and documentation for the compliance status.

**Monitor's Recommendations:**

**COUNTY RESPONSE**

**Fire doors with electro-mechanical releasing devices are inspected during the annual fire alarm testing program. Doors and locks are inspected through the Building Team Initiative Program (BTI). The BTI Program features "sweeps" conducted by tradesman who descend on an area and perform both preventative maintenance and necessary repairs that have not been otherwise addressed through the work order system.**

80.     *DFM shall promptly repair all known electrical hazards, including maintenance and repair of electrical outlets, devices, and exposed electrical wires and will document repairs by the Work Order System.*

**COMPLIANCE STATUS: Partial Compliance**

**Status Update:** Briefly describe the actions taken by the Defendants to address the provision:

DFM has purchased and implemented a work order processing system identified as "Facility Wizard" to manage all facility work orders including electrical issues. As work orders are submitted from CCDOC, Cermak, and Aramark, it is submitted by fax to the DFM work order coordinator liaison, who assigns a priority to the order. The priority established by DFM dated 8/12/10 identifies the following order:

| WORK ORDER REQUEST | PRIORITY |
|---|---|
| Exit light(s) require re-lamping | 1 |
| Exit Light housing requires repair/replacement | 1 |
| Light Fixture is damaged | 1 |
| Gate requires adjustment/won't function | 1 |
| Exposed wire | 1 |
| Switch cover requires attention | 1 |
| Power Outage –Reset Breaker | 1 |
| Air Conditioning unit requires repair | 1 |
| Generators are not functioning properly | 1 |
| Roof Exhaust Fan(s)require repair | 1 |
| Re-Lamp | 2 |
| Water Damage to light fixture | 2 |
| Outlet cover requires attention | 2 |

| | |
|---|---|
| Install additional outlets | 2 |
| Other | 2 |

**Monitor's Assessment:** Describe the monitor's assessment of the status and documentation for the compliance status.

This priority system is new and it will take some experience to determine if the current priority is appropriate and responsive. It appears to be an effective priority system as long as it is used by CCDOC staff. An improvement to the priorities would be to establish a maximum response time to each of the priorities. My sense is that currently there is a lack of communication between DFM and CCDOC Division employees regarding how all work order requests are processed by DFM. This needs to be addressed early to improve effective handling of all electrical problems. If Division employees understand the process for work orders, they may be more motivated to request issues be resolved.

**Monitor's Recommendations:**

1. Within 90 days of implementation DFM should review the priority system with CCDOC and Cermak at their regular meeting and make any adjustments to the priority system as needed. I recommend that a maximum response time be established for first and second priority electrical hazards. Provide me with a summary of the results of the review.

2. Assure that designated CCDOC staff including Division Superintendents and Cermak environmental staff is provided with the assigned priority for electrical issues.

3. Division Superintendent's are responsible to train affected staff within each Division regarding how electrical priorities are addressed.

**COUNTY RESPONSE**

**DFM is reviewing the work order priority system and engages in monthly meetings with CCDOC to identify and correct systemic problems with the work order process.**

**83. Sanitation and Maintenance of Facilities**

　　a.　　*DFM shall maintain an adequate written staffing plan and sufficient staffing levels to provide for adequate maintenance of the Facility.*

**COMPLIANCE STATUS: Partial Compliance**

**Status Update:** Briefly describe the actions taken by the Defendants to address the provision:

DFM has established a documented staffing plan for specific trades and general maintenance. The plan is tiered with supervisors, trades and first responders.

**Monitor's Assessment:** Describe the monitor's assessment of the status and documentation for the compliance status.

As CCDOC implements regular and consistent inspections of all areas of the jail, DFM should anticipate a significant increase in the number of work order requests from the Divisions. This is based on the number of plumbing issues alone that I observed during limited tours of housing units, food service, storage areas and etc. Once the regular inspections begin, DFM will need to reassess the allocation of resources to assure timely response to maintenance issues.

DFM using the "Facility Wizard" system is monitoring the type of work order requests received. They have a documented staffing plan by trade. While the system is newly implemented, they are already beginning to use it to identify where staffing priorities need to change. It is still far too early in its implementation to expect to see staffing changes made as a result of their categorization of work orders.

**Monitor's Recommendations:**

1.      DFM should review and assess the need to revise the staffing plan 60 to 90 days following the implementation of regular and thorough inspections throughout the facility

**COUNTY RESPONSE**

**DFM is currently reviewing its staffing plan in preparation for the FY2011 budget process.**

c.      *DFM shall implement a preventive maintenance plan to respond to routine and emergency maintenance needs, including ensuring that shower, toilet, and sink units are adequately maintained and installed.*

**COMPLIANCE STATUS: Partial Compliance**

**Status Update:** Briefly describe the actions taken by the Defendants to address the provision:

Department of Facilities Management has purchased, installed and implemented a work order tracking system named "Facility Wizard" for all preventative maintenance requirements and to handle requests work requests for plumbing, electrical, fire safety issues from CCDOC, food service, and Cermak. While the system is an excellent and effective tool for DFM to manage work their work orders, at the present time neither CCDOC nor Cermak have access to the system to monitor the status of their work order requests. Both CCDOC and Cermak have participated in meetings with representatives of "Facility Wizard" to investigate how the system functions and whether CCDOC would have to discard their existing system or if there is a way for the two systems to interface. Cermak currently has a manual system for tracking work orders filed with DFM. DFM has established a documented system to prioritize work order requests

based on safety and health of inmates and CCDOC staff. Further, DFM has established a specific system to address emergency requests for both CCDOC and Cermak.

**Monitor's Assessment:** Describe the monitor's assessment of the status and documentation for the compliance status.

At my initial visit in June I reviewed in detail the work order system implemented by DFM. I found the system to be an effective and efficient way to log work orders from CCDOC and Cermak and to track each of those work orders through completion. On that same initial visit, I identified several issues in housing units and food service that needed maintenance repairs including plumbing leaks, plugged drains, electrical issues, jammed locks etc. Regarding the jammed locks specifically in Division XI I specifically asked CCDOC staff to show me the Work Order. After over 40 minutes of searching in the Division Superintendent's office, no one could locate a work order. This example highlights the ineffectiveness of the CCDOC work order system and the need for a coordinated system for all parties.

In some cases CCDOC work orders requests had been filed. However, because there is no interface between CCDOC work order number and DFM's it was virtually impossible to manually follow through to determine if they were actually forwarded to DFM for action. It is clear that both Cermak and CCDOC review and either adopt the DFM work order system or develop and implement a system whereby the CCDOC work order system can interface with DFM's. Cermak currently has no electronic work order tracking system and as a result other than getting a confirming fax from DFM that a work order number has been issued cannot follow any progress in resolving a plumbing, electrical, emergency, and etc problem. The ideal process would be for DFM, CCDOC and Cermak to utilize the same system and be able to monitor repairs, and emergencies.

In some cases, when there was what were perceived as small plumbing leaks, correction officers would often ignore the problem until it became a major issue. When plumbing leaks occur no matter how small or intentional damage to plumbing or electrical devices, it is imperative to notify DFM to assure timely and effective repairs are completed.

**Monitor's Recommendations:**

1.     CCDOC and Cermak need to continue the process to evaluate the "Facility Wizard" system and in the next two months make a decision. The process may have slowed because of the reorganization.

2.     DFM should continue to use and monitor its system and see if it can be used to identify trends of specific issues by Division that may assist them in developing an effective preventative maintenance system.

3.      CCDOC and Cermak staff needs specific training and procedures or a policy developed that establishes the responsibility to assure that any abnormal conditions occurring with their area of responsibly are addressed through the work order system. When a work order is filed, it needs to be noted so that duplicate work orders are not filed. Officers should have a process to know the status of the work orders they requested.

4.      If there will not be a single work order system for the entire facility, CCDOC and Cermak will need to develop an effective and timely system to process and track work orders.

**COUNTY RESPONSE**

**DFM already has a preventative maintenance plan in place and DFM administrators submit that the plan has proven successful.  DFM continues to encourage CCDOC staff to submit work order requests when needed repairs are identified.**

**Cermak has developed two policies which address abnormal conditions and initiating work orders:  Policy D-03a- Management of Clinical Space, Equipment and Supplies and Policy D-03b Identification and Correction of Non-conformances.  Moreover, Cermak is intent on moving to the CCDOC work order system and is in the process of making the change to that system.**

---

**PROVISION: G. SANITATION AND ENVIRONMENTAL CONDITIONS**

**83. Sanitation and Maintenance of Facilities**

e.      *DFM shall ensure adequate ventilation throughout the Facility to ensure that inmates receive an adequate supply of air flow and reasonable levels of heating and cooling. DFM staff shall review and assess compliance with this requirement on a daily basis for automated systems and on and annual basis for non-automated systems.*

**COMPLIANCE STATUS: Partial Compliance**

**Status Update:** Briefly describe the actions taken by the Defendants to address the provision:

DFM has developed and has begun implementation of their Policy # 10-07-01, "Monitoring of Temperature Range at CCDOC. The engineering staff will conduct rounds daily on each of the three shifts to insure temperatures remain in the acceptable range of 68°F and 77°F. The inspection procedure includes a visual inspection confirming that the equipment is operating according to specifications, and if not, a corrective action work order submitted. Temperatures are measured at four points within all living quarters, two points closest to the fan discharge and

two points at the farthest end of the riser. The policy includes a progressive series of reviews to assure resolution. The monitoring will require the development of Division specific equipment check forms.

DFM has also developed an educational PowerPoint presentation to show to Divisional CCDOC staff that explains how HVAC systems function and identify reasons why the systems fail to operate according to specification. The presentation also provides information on how they can assist in maintaining the system at optimum conditions such as preventing inmates from blocking vents in the cells and dayrooms.

DFM has implemented a program to clean and unclog all vents in cells and dayrooms. The program has been completed in Division. Their plan is to complete the vent cleaning program within one month.

DFM has drafted Policy #10-01-02 "Monitoring of Temperature Range at CCDOC." It is a policy to define the procedure for monitoring temperature control and notification to Cermak and CCDOC of temperature control issues that cannot be remediated within an acceptable time frame. The policy is in a review stage with both CCDOC and Cermak.

**Monitor's Assessment:** Describe the monitor's assessment of the status and documentation for the compliance status.

I have reviewed the initial draft policy10-07-01 and made suggested changes as necessary. All recommendations were incorporated into the latest draft.

I have had the opportunity to provide input to the training PowerPoint and received some independent confirmation that it is a worthwhile program, along with an opportunity to answer questions. In order for DFM to effectively manage heating, ventilation and air conditioning, it is imperative that CCDOC and Cermak follow the notification system that DFM has established. When temperatures are approaching outer limits, DFM must be notified. It is also just as important that DFM provide CCDOC and Cermak with the results of their assessment even if it is believed the issue is resolved. Communication is important to assure the person making the initial call as well as the person from CCDOC and/or Cermak responsible for the building be kept informed of the progress and ultimate resolution so they can inform inmates, housing officers, etc.

The vent cleaning program conducted in Division 1 has had mixed success. About one half of the vents in the four wings I toured in August continued to be blocked, most by Styrofoam lunch trays and some by toothpaste and toilet paper. It is clear that inmates need to know that they cannot block vents and if it continues to be blocked, they will be held accountable to clean the vents immediately or face further discipline.

The Monitoring Temperature Range at CCDOC is being review by all three parties and is a topic of discussion and resolution at the weekly meetings of CCDOC, DFM and Cermak.

**Monitor's Recommendations:**

1.      CCDOC housing unit officers should continue implementation of the daily inspections for all divisions. DFM should continue daily rounds to measure temperatures in all housing units and take appropriate action when acceptable temperature ranges are exceeded. On my next visit I will review records.

2.      Implement education and information training presentation to Divisional Superintendents and further to correction officers on all three shifts. Provide documented evidence of attendance at the training sessions. The goal is to have 100% of correction officers assigned to housing to view the presentation and have an opportunity to have their questions answered. Progress will be measured as to the percentage of correction officers receiving the information training.

3.      DFM needs to complete the vent cleaning program as soon as feasible. CCDOC with assistance from DFM should prepare and implement written information or even a short video about the need to keep vents open for inmates. Housing unit officers must insist that vents are not to be blocked.

4.      Continue work on the policy and the notification procedures to assure that any inmates needing to be moved because of a medical issue are identified and steps taken to accommodate them.

**COUNTY RESPONSE**

**A project to clean all vents has been recently completed and has been documented. Unfortunately, the vents continue to be vandalized by the detainees. DFM personnel are performing daily rounds on each shift to monitor living unit temperatures. Documentation of the rounds is being maintained for inspection by the monitor.**

83. Sanitation and Maintenance of Facilities

      g.      *Cook County shall ensure adequate lighting in all inmate housing and work areas.*

**COMPLIANCE STATUS: Partial Compliance**

**Status Update:** Briefly describe the actions taken by the Defendants to address the provision:

DFM has the responsibility to repair and/or replace all lighting throughout CCDOC. Inmates routinely destroy new lights within a few days of installation. In May, 2010 DFM installed 90 new Kendall fixtures 32 of a new design in Divisions IX and X with a purchase price of approximately $22,000. Inmates were unable to destroy them. As a result, 24 were ordered and installed in the newly constructed intake area (formerly the commissary.)

Capital project requests were submitted in July to replace all lights in stairwells and catwalks in Division I, all cells and catwalk lighting in Division VI, all cells, catwalk and high bay lighting in all eight pods of Division XI, and complete the replacement of lighting in Division IX. The total cost for these projects is estimated to be approximately $2,200,000.

**Monitor's Assessment:** Describe the monitor's assessment of the status and documentation for the compliance status.

The new lights that have been installed provide adequate lighting for safety and sanitation in the housing areas where they have been installed. Just as important, inmates thus far have been unable to tamper with them. This is key to resolving this issue, as in many cells, inmates routinely use the existing lights and incandescent bulbs to start fires, cover the lights with paper milk cartons to darken the cells, thus creating a fire hazard and removing the light bulbs completely creating a security risk to other inmates and staff. DFM anticipates approval of this capital project for the new fiscal year beginning December 1, 2010 with installation in the first quarter of 2011.

**Monitor's Recommendations:**

1. Once approved, proceed with this project

**COUNTY RESPONSE**

**As the monitor notes, new light fixtures have proven to be more tamper resistant than previous fixtures. Consequently, DFM has moved forward with a multi-million dollar capital request to purchase and install these fixtures. The identification of tamper resistant light fixtures is an issue that has confounded DFM administrators for many years. Past pilot projects involving fixtures that were touted by the manufacturers as being able to withstand the constant onslaught of detainee vandalism have been unsuccessful. It is therefore encouraging that the latest test has returned positive results and is worthy of expansion.**

**Campus-wide, DFM administrators have observed that vandalism to light fixtures has been reduced, nonetheless, certain Divisions continue to have issues that need to be addressed in an ongoing fashion.**

83. Sanitation and Maintenance of Facilities

> k.  *DFM shall develop a policy on hazardous materials, in accordance with generally accepted correctional standards, and insure that all DFM staff is properly trained on the procedure.*

**COMPLIANCE STATUS: Non-compliant**

**Status Update:** Briefly describe the actions taken by the Defendants to address the provision:

I recognize that this Provision only applies to DFM. However, DFM at the present time does not control all chemicals used at the Jail. As a result of my assessment, unless DFM will be assigned responsibility for all chemicals, the issue needs resolution by DFM, CCDOC and Cermak. DFM has the responsibility to control tools, chemicals, and hazardous materials utilized by the trades in plumbing, electrical, fire, life safety, HVAC repairs including tool carts and storage areas. CCDOC also has the responsibility to control all cleaning and sanitation chemicals stored in each Division and the central maintenance area located in Division 5. Cermak has the responsibility to control any and all chemicals utilized in the Division clinics and the medical care facility. CCDOC has not taken any steps to assure that Material Safety Data Sheets are current and available for all hazardous materials being stored there. They include cleaning and disinfection products, motor oils, gasoline, pest chemicals, lubricants, etc.

The Cook County Sheriff's Institute for Law Enforcement Education and Training has developed a "Hazardous Materials Awareness Level course syllabus dated Jan. 2010. It is an eight hour course for recruits, Department of Corrections and Court Services.

**Monitor's Assessment:** Describe the monitor's assessment of the status and documentation for the compliance status.

CCDOC has a General Order 8.1, "Control and Use of Hazardous Materials" dated 12/22/97. It establishes requirements for safe storage, use, monitoring, and tracking all chemicals both in the central maintenance area as well as in the Divisions. It establishes the position of Safety Officer with specific responsibilities. That person is not identified. It also provides for inspections and reports to be conducted by the CCDOC Sanitarian, a position that as of this report is vacant. CCDOC has received approval to hire two Sanitarian positions and the process to recruit candidates is started. However, my limited review of Division I and Division V chemical storage closets demonstrated that General Order is not being followed by the Divisions or Facility Superintendent. Because of the recent reorganization the Facility Superintendent has only been in that role for a short time and I would not expect him to have all areas of his responsibility controlled. Moreover, the General Order needs to be reviewed and revised to reflect current expectations and requirements. Once that is completed, specific assignments and responsibilities can be established.

Based on a question to a DFM employee working in a cell area, there is no inventory of what is on the work carts, as to tools or chemicals. This will need to be addressed by DFM. I have not yet reviewed and addressed DFM's program. I believe that the approach and policies for DFM, Cermak, and CCDOC must be coordinated, as each maintains a supply of hazardous materials.

The training syllabus identified above was established in January 2010. It is not yet clear whether all current DDCOC officers or specifically which officers are required to take the course. In future visits I will be reviewing documentation that should be available documenting specifically

who has received this training and the results of the 45 question examination. I want to know among other information such as an acceptable passing score, the basis for establishing the passing score and what remedial training is provided for those who do not meet or exceed the acceptable passing score. The frequency of this training is also not specified.

There is no verifiable training available to demonstrate that officers responsible for handling and using chemicals receive documented and training and are competent to know what to do in case of an emergency. All training for CCDOC, DFM, Cermak, and Aramark employees must be verifiable.

I will assess DFM and Cermak's chemical control systems on a future visit.

**Monitor's Recommendations:**
1. Review and revise General Order 8.1, "Control and Use of Hazardous Materials" to reflect current regulations, and CCDOC requirements to maintain and inventory chemicals on a daily and weekly schedule. This includes the store room located in the basement of Division V, and any chemical storage closets and all areas where chemicals are stored in each of the Divisions.

2. Review, establish and implement a documented procedure for maintaining Material Safety Data Sheets that are current in the location where any hazardous chemicals are stored.

3. Provide a process and documentation including frequency for training of all officers and inmates using chemicals. The documentation needs to include safe chemical use, mixing, handling, storing, disposal and all emergency procedures.

4. In the central maintenance room in Division V, organize the room segregating chemicals by type. For example cleaning and disinfection chemicals should be stored separate from other hazardous chemicals such as flammables, oil, etc. Discard in accordance with Federal, state and local regulations all chemicals no longer used.

5. Establish a process where all chemicals for the Divisions are obtained only from the Division V central store room and only chemicals that have been pre-mixed or diluted are dispensed to the Divisions in a controlled safe manner. The Divisions do not have facilities that can safely dilute chemicals and assure that they are diluted specifically following the chemical manufacturer's instructions.

6. Establish and implement a documented procedure on how chemical use will be logged showing specifically what chemicals are permitted in the Divisions, the amount and a tracking system for chemical use. The procedure needs to include mechanism for Divisions to order and receive needed cleaning supplies. It needs to also establish a process for systematic monthly audits of all chemical storage areas with provisions for addressing non-conformities to the General Order and./or misuse of chemicals and failure to log chemical use.

**COUNTY RESPONSE**

DFM has developed and implemented a hazardous materials policy which has been provided to the monitor. Training of DFM staff on the hazardous materials policy was conducted. Accordingly, the County submits that it is in substantial compliance with this provision.

**85. Food Service**

  e.  *CCDOC shall check and record, on a regular basis, the temperatures in the refrigerators, coolers, walk-in-refrigerators, the dishwasher water, and all other kitchen equipment with temperature monitors to ensure proper maintenance of food service equipment.*

**COMPLIANCE STATUS: Partial Compliance**

**Status Update:** Briefly describe the actions taken by the Defendants to address the provision:

Aramark has implemented a procedure to regularly measure the air temperature of all walk-in refrigerators and freezers, reach-in refrigerators, warewasher equipment, and hot food holding equipment. It is not clear who reviews the temperature logs and what happens when temperatures are found not to be in conformance with food regulations. Work orders are being sent to Facilities Management when repairs are needed.

**Monitor's Assessment:** Describe the monitor's assessment of the status and documentation for the compliance status.

On my first tour in June I found that Aramark had taken a warewasher out of service in Division XI because it could not maintain proper sanitization temperature. A work order had been filed, but the response was slow. Immediately following my visit to the Division XI kitchen, Facilities Management made the necessary repairs. To prevent food waste, there is a need to review the work order priority system to assure that temperature sensitive food service equipment receives immediate attention when monitoring demonstrates non-conformity with standards.

**Monitor's Recommendations:**

1. Facilities Management needs to review and assure that food service equipment that is dependent on temperature to adequately protect food and to clean and sanitize equipment and utensils receives high priority for service and repairs. All temperature sensitive equipment as well as all fixed equipment in food service should be included on a preventative maintenance schedule to assure performance rather than waiting until a problem arises. Also CCDOC inspection program should trigger equipment work orders as needed.

2. Facilities Management should also make sure that when replacing parts on equipment such as warewashers, or refrigerators, that if they are not using the specific equipment manufacturer's replacement parts, the parts being used are fully compatible with the equipment. If not, it may jeopardize performance and equipment certification.

3. Aramark needs to develop and implement a Standard Operating Procedure that establishes temperature monitoring requirements, frequencies, and responsibility for monitoring, along with a daily and weekly review to spot when records show that equipment is trending toward non-compliance.

**COUNTY RESPONSE**

**While this provision applies only to CCDOC, it is necessary for the County to respond to the monitor's recommendations and provide clarification. DFM has no role in the maintenance or repair of kitchen equipment. Repairs to kitchen equipment are handled by contractors retained by Aramark. DFM's role is limited to supplying utility service to the wall. Hookups and the equipment itself is the responsibility of Aramark.**

## H.    QUALITY MANAGEMENT AND PERFORMANCE MEASUREMENT

**86.    Quality Management and Performance Measurement**

> *a.    Defendants shall each develop and implement written quality management policies and procedures, in accordance with generally accepted correctional standards, to regularly assess, identify, and take all reasonable measures to assure compliance with each of the provisions of this Agreed Order applicable to that Defendant.*

> *b.    Defendants shall each develop and implement policies to address and correct deficiencies that are uncovered during the course of quality management activities, including monitoring corrective actions over time to ensure sustained resolution, for each of the provisions of this Agreed Order applicable to that Defendant.*

**Compliance Assessment:** partial compliance

**Factual Findings:**

**June 2010 Cermak status update:**

**June 2010 Metzner assessment:** Policy A-06, Continuous Quality Improvement, was reviewed. This policy should be revised to include a standing mental healthcare subcommittee.

Very few quality improvement projects relevant to mental health were available for my review.

121

**Recommendation:**

1.    Revise Policy A-06 to include a standing mental health subcommittee. This policy should also include more specific information relevant to the mission of such a subcommittee.
2.    A robust quality improvement process needs to be initiated.

## COUNTY RESPONSE

**The Mental Health CQI and Suicide Prevention Committees have been combined into one comprehensive monthly meeting, which includes CCDOC and Cermak. Please see the response to paragraph 61.**

---

   c.    *CCDOC shall participate with Cermak and DFM in a jointly established Health Care Quality Improvement Committee, to be charged with developing and implementing a joint quality improvement program. CCDOC shall contribute the time and effort of CCDOC staff members who, by virtue of their authority, current responsibilities, and/or past experience, can provide this committee with needed correctional representation.*

   d.    *Cermak shall participate with CCDOC and DFM in a jointly established Health Care Quality Improvement Committee, to be charged with developing and implementing a joint quality improvement program. Cermak will work with CCDOC and DFM to identify those CCDOC and DFM staff members who, by virtue of their authority, current responsibilities, and/or past experience, can provide this committee with needed correctional representation. Quality management programs related to medical and mental health care will utilize performance measurements to assess quality of care and timely access to care with quantitative and qualitative data analysis and trending over time.*

   e.    *DFM shall participate with CCDOC and Cermak in a jointly established Health Care Quality Improvement Committee, to be charged with developing and implementing a joint quality improvement program. DFM shall contribute the time and effort of DFM staff members who, by virtue of their authority, current responsibilities, and/or past experience, can provide this committee with needed correctional representation.*

**Compliance Assessment:** noncompliance

**Factual Findings:**

**June 2010 Cermak status update:**

**June 2010 Metzner assessment:** Such a policy has not yet been developed.

**Recommendation:** Develop a policy that includes the above elements.

**COUNTY RESPONSE**

CCDOC, Cermak and DFM senior management staff participate in a combined, joint CQI meeting every other Friday at 11:00 a.m.

## 86. Quality Management

a. Develop and Implement Policies and Procedures

b. Address and Correct Deficiencies

c. CCDOC-Participation in Health Care Quality Improvement Committee

d. Cermak-Participation in Health Care QI Committee

e. DFM-Health Care QI Committee

**Compliance Status**: Partial compliance.

**Findings**

**Status Update:** None submitted.

**Monitor's Findings:**

A multidisciplinary quality improvement committee has been created. There is an excellent quality improvement draft plan which appears to move the program in a very positive direction. There have been recent quality improvement committee meetings on a monthly basis. There appears to have been relatively good staff participation at the quality improvement committee meetings. There is a draft of excellent chronic disease quality indicators for use in measuring a variety of chronic disease outcomes. Thus, there is and has been a significant amount of productive infrastructural quality improvement activity. However, challenges remain. The quality improvement committee, at this point, does not include participation by custody which truly is a necessity. There also has not been a jointly established healthcare quality improvement committee that includes CCDOC, Cermak and the Department of Facilities Management. There were discussions during the time of our visit about creating such a committee. However, the current committee also can be substantially improved. Other opportunities for improvement include, in addition to the participation of non-healthcare staff, the integration of the four process improvement team activities into the quality improvement committee meetings. There are currently process improvement teams regarding medication

management, access to care, medical records and intake. We have seen documents generated by these committees and they are very encouraging. However, the minutes of the quality improvement committee meeting reflect none of these activities. Additionally, quality improvement activities and methodology are based on studying problems, using data to determine whether or not a problem exists and if the problem does exist, understanding and analyzing the contributing factors which should lead to the development of improvement strategies. None of this basic process is reflected in any of the quality improvement minutes. Instead, the minutes reflect transcription of narrative interactions between members which are neither focused on a single problem nor data driven. Thus, a greater discipline needs to be introduced to the quality improvement meetings. This health service program is undergoing a complete overhaul and thus in some ways there is substantial process turmoil. However, this create opportunities to understand the problems with the current processes and develop improvement strategies which mitigate those problems and lead to better process efficiency and productivity.

**Monitor's Recommendations:**

1. Integrate the process improvement team activities into the quality improvement committee minutes.

2. Utilizing information from the exit conference, begin to enlist subcommittees to study some of the areas described by the monitoring team.

3. Include regular sustained custody participation in your meeting.

4. Create an oversight CCDOC, Cermak and Department of Facilities Management quality improvement committee which can tackle some of the larger issues that come up to the Cermak quality improvement committee.

5. For nursing and for clinician staff, the quality improvement committee should receive reports regarding the implementation of a professional performance enhancement review program which monitors and helps improve professional performance for both nurses and clinicians on a monthly basis.

6. The professional performance improvement nursing work can initially focus on the nursing performance in their new intake activities and for the clinicians, the initial work can focus on the health assessments, both done in booking or in the emergency room.

**COUNTY RESPONSE**

**The process improvement team provides status reports to QI monthly. Process improvement projects currently exist on health service requests, medication administration, Cerner "go-live", grievance tracking, and chronic care tracking.**

While CCDOC staff do not attend the Cermak Quality meeting, there are other interagency meetings taking place. Interagency Quality meetings and Interagency Medical Quality Improvement meetings have been initiated and Minutes of those meetings are available for review by the Monitor.

The Quality Committee is working with Medical and Nursing to structure reports regarding the implementation of a professional performance enhancement review program.

Nursing has begun a monitoring tool for medication administration which should begin November of 2010. Nurse physical assessment classes have begun. A monitoring methodology has yet to be developed.

Respectfully Submitted,

ANITA ALVAREZ
State's Attorney of Cook County


By:/S/*Donald J. Pechous*
Donald J. Pechous
Deputy Chief
Civil Actions Bureau
500 Richard J. Daley Center
Chicago, IL 60602
(312) 603-3378
#6201774