# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS,
# EASTERN DIVISION

---

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. 10 C 2946 |
| *Plaintiffs,* | ) | |
| v. | ) | Judge Richard A. Posner |
| | ) | Judge Virginia M. Kendall |
| COOK COUNTY, ILLINOIS, *et al.*, | ) | Judge Sharon Johnson Coleman |
| *Defendants.* | ) | |

---

## Opinion of Three-Judge District Court

PER CURIAM. The Sheriff of Cook County, who is the administrator of the Cook County Jail, has moved in this case for the entry of a prisoner release order, pursuant to 18 U.S.C. § 3626. Since at least 1974 the jail has been a target of litigation claiming that conditions in the jail violate the Eighth Amendment's cruel and unusual punishments clause (which has been held applicable to state and local government by interpretation of the due process clause of the Fourteenth Amendment) in the case of convicted criminals, or, in the case of pretrial detainees--the major part of the jail's population—the due process clause directly; but the courts "apply the same legal standards to deliberate indifference claims brought under either the Eighth or Fourteenth Amendment." *Minix v. Canarecci*, 597 F.3d 824, 830–31 (7th Cir. 2010); see *City of Revere v. Massachusetts General Hospital*, 463 U.S. 239, 244 (1983); *Bell v. Wolfish*, 441 U.S. 520, 535 n. 16 (1979). Consent orders in this long-running litigation have included prisoner release provisions premised on the belief that the jail's chronic overcrowding was contributing to the constitutional violations.

The current phase of litigation involving conditions in the jail began in 2008, when the Department of Justice instituted the present suit, complaining of continued unconstitutional conditions of confinement. The suit charges inadequate protection of inmates from violence by other inmates; recourse to excessive force by guards; inadequate medical care, including suicide prevention and other mental-health care; and unacceptable conditions of sanitation. On May 26, 2010, the district court (per Judge Kendall) approved a consent decree (referred to by the parties as the "Agreed Order") between the United States and Cook County. Because the Agreed Order is more comprehensive as well as more up-to-date than

the previous consent decrees concerning conditions at the jail, the Agreed Order will displace them. The present motion seeks to replace the release provisions in the earlier decrees. The need for such an order has been enhanced by provisions of the Agreed Order that forbid triple bunking in tiny cells and other methods by which the jail has sought to accommodate its excess population without releasing prisoners.

Section 3626 of the federal criminal code provides that "prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." 18 U.S.C. § 3626(a)(1)(A). And "no court shall enter a prisoner release order unless—(i) a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order; and (ii) the defendant has had a reasonable amount of time to comply with the previous court orders. § 3626(a)(3)(A). "In any civil action in Federal court with respect to prison conditions, a prisoner release order shall be entered only by a three-judge court," and "only if the court finds by clear and convincing evidence that—(i) crowding is the primary cause of the violation of a Federal right; and (ii) no other relief will remedy the violation of the Federal right." §§ 3626(a)(3)(B), (E).

On the basis of the parties' submissions (which include extensive expert reports and statistical tables), experience gleaned from supervision of the predecessor decrees, and a hearing that this panel conducted on January 7, 2011, we conclude that the criteria for the entry of a prisoner release order have been satisfied but that the order proposed by the Sheriff (and supported by the United States) requires revision in order to comply with the statute. Although there is no opposition to the proposed order, we have an independent responsibility to satisfy ourselves that it complies with the statute. 18 U.S.C. § 3626(c)(1). For the jail and its prisoners are not the only entities that are affected by a release order; the effect on the safety of the law-abiding community must be considered even if no member of that community is a party—and indeed it would be difficult for such a person to establish a right to intervene. See *DeShaney v. Winnebago County*, 489 U.S. 189 (1989); compare 18 U.S.C. § 3626(a)(3)(f).

The absence of such opposition is, however, germane to our consideration of the issue of public safety, an express statutory concern to which we attach particular importance. If the proposed release of prisoners created a public safety

hazard, it would be bound to arouse opposition. Release orders directed at the Cook County Jail go back decades, and had they endangered or been thought to endanger the community they would doubtless have drawn opposition, but, so far as we are aware, they have not either. Moreover, we are insisting that the release order be so configured as to eliminate any well-grounded fear that it might endanger the law-abiding community.

Another statutory criterion for the issuance of a prisoner relief order is also incontestable in this case: a long historical procession of other orders aimed at correcting unconstitutional conditions in the Cook County Jail has failed to correct them, as the voluminous submissions by the Justice Department and others document.

We further, and crucially, find that overcrowding is a primary cause of unconstitutional conditions at the jail. Those conditions, which include as noted earlier resort to excessive force by guards, grossly unsanitary and unhealthy conditions, and grossly inadequate medical (including mental-health) care, might well exist, to an extent, even if the jail were not overcrowded (hence the need for the Agreed Order). But we interpret the statute as authorizing a prisoner release order if overcrowding is a primary cause of unconstitutional violations *beyond* what would exist without overcrowding. Cf. *Hutto v. Finney*, 437 U.S. 678, 688 (1978) ("the order [a 30-day limitation on sentences to punitive isolation] is supported by the interdependence of the conditions producing the violation. The vandalized cells and the atmosphere of violence were attributable, *in part*, to overcrowding and to deep-seated enmities growing out of months of constant daily friction") (emphasis added).

Suppose without overcrowding there would be half as many constitutional violations; then overcrowding would be the primary (maybe the sole) cause of the other half. The number or percentage of violations that can be attributed to overcrowding cannot be estimated, but there is evidence for example that incidents involving recourse to excessive force are more frequent on overcrowded days in the jail. Thus we are told that "the United States' investigation of the [Cook County Jail] found that when the [jail] was overcrowded, there was a corresponding increase in fights, uses of force, and weapons, exposing inmates to harm and depriving them of their constitutional rights to safe and humane conditions of confinement." This makes sense because the larger a rowdy crowd, the likelier guards are to overreact to rowdiness out of fear. Similarly, the chronic overcrowding of the medical facilities at the jail makes it certain that many mentally ill prisoners are not being treated adequately. These unacceptable conditions are actionable constitutional violations because they are consequences of deliberate decisions (as in "deliberate indifference")—namely the decisions to incarcerate persons who by being incarcerated in Cook County Jail are subjected

to unconstitutional conditions of confinement. *County of Sacramento v. Lewis*, 523 U.S. 833, 849–50 (1998); *Daniels v. Williams*, 474 U.S. 327, 331 (1986); *Payne ex rel. Hicks v. Churchich*, 161 F.3d 1030, 1040–41 (7th Cir. 1998); cf. *Washington v. Davis*, 426 U.S. 229 (1976).

We must consider whether the proposed prisoner release order is the least intrusive form of relief for overcrowding, in the sense of interfering with the operation of the jail as little as is consistent with rectifying constitutional violations that are not otherwise correctible. The Agreed Order requires the jail to hire additional staff, but the jail is finding this difficult to do because of a dearth of qualified applicants, and anyway additional staff can ameliorate but cannot eliminate the unconstitutional conditions caused by overcrowding. Adding guards may not even eliminate the risk of excessive force caused by overcrowding, especially if more guards can be hired only by lowering hiring standards. And nothing short of enlarging the medical division of the jail can enable the provision of adequate medical care if the number of prisoners in that division is not reduced—and the expansion of the jail is both very slow and very costly: it is probably, as we'll see, far more costly than a prisoner release order. Because Cook County, like so much of Illinois local government and the state government as well, is operating deep in the red (its deficit is expected to be $400 million this year), considerations of cost loom large in any analysis of alternatives to a prisoner release order. And such an order, as we'll see is, very cheap if there is no danger to the public safety—and there will be no danger if the order is properly configured, as we will require that it be.

The jail is able to "lend" some of its prisoners to other correctional facilities. It has contracts with several county jails, which it pays to house Cook County prisoners; but this is awkward because the jails are at some distance from the Cook County criminal courts, and most of the prisoners are pretrial detainees who are required to be present in those courts for hearings. Distance also imposes inconvenience to their lawyers, and causes possible prejudice to the defense of their clients. In any event, this offloading to the county jails is insufficient to relieve the overcrowding of the Cook County jail.

In an oral deal with Cook County, the Illinois Department of Corrections houses, in Illinois state prisons, parole violators who are being charged with new crimes in Cook County and so, were it not for the deal, would be Cook County's responsibility to detain. There is no written agreement, however, and given the state's fiscal crisis the Department may at any moment decide not to accept detainees from Cook County Jail or may decide to charge a price—maybe a very high one—to accept them. The County might have to agree to pay a very high price lest its officials find themselves in contempt of court for violating the

Agreed Order, which imposes standards that may be impossible to meet unless the current overcrowding of the jail is relieved.

A vital consideration in evaluating a proposed prisoner release order is how many prisoners will be released under it. The prison has 9,800 beds, and on average "only" 9,400 prisoners. But the number of prisoners fluctuates from day to day. Furthermore, the prison is segmented, and the segments are not interchangeable. The prisoners housed in the medical division because they have serious physical or mental ailments cannot be shifted to another division, even if the other division might have unoccupied beds—and the medical division happens to be the most overcrowded. The women's division is not overcrowded, but men cannot be given the unoccupied beds there. Likewise, empty beds in the division that is reserved for the most violent criminals cannot be given to women, the mentally and physically impaired, or timid nonviolent pretrial detainees. The result of this necessary segmentation of the jail is that every division has to have some excess (more precisely, peak-load) capacity if overcrowding is to be avoided, and this excess capacity can be created—unless and until the jail is substantially enlarged at great cost—only by reducing the average number of prisoners. Because, moreover, the jail is very old and prisoners sometimes destroy fixtures and do other damage to the jail's interior, parts of the jail often have to be closed for repairs, further reducing the number of available beds.

At present the jail's average occupancy rate is 91 percent (95 percent for male detainees, and, it seems, more than 100 percent in the medical division). The Sheriff argued at the hearing that a safe margin would require reducing that average to 85 percent, which he estimates would require releasing about 1,000 pretrial detainees a year. (Only pretrial detainees would be eligible for release; they are as we said the major component of the jail's population though there are also convicted criminals serving short sentences.) We are not yet in a position to verify the need for an 85 percent margin (which in the Sheriff's written submission was 75 percent); it will require substantiation. We note, however, that releasing (in the rather special sense of the term discussed below) 1,000 pretrial detainees a year would increase the population of persons charged with crime, but not detained awaiting disposition of the charge, in Cook County by only 2 percent.

This is only one respect in which the proposed release order requires revision and further substantiation. It is illustrative of a lack of specificity that precludes us from approving it in its present form. The decree is only a page and a half in length and is extremely general in terms. The operational portions can be quoted very briefly: "[T]he Sheriff…is permitted to release individuals on their own recognizance and/or on electronic monitoring in such numbers necessary to reduce and relieve overcrowding. The process for release to electronic monitoring and/or other alternative release mechanisms may include the appointment of

a review panel by the sheriff to determine eligibility for release…. [T]he Sheriff…may [also], at his discretion, and without further notice to the Court, transfer to the custody of the [Illinois Department of Corrections] any persons housed at the [Cook County Jail] who have previously been sentenced by a court of law to the [Department of Corrections] for an unexpired sentence of confinement at the [Cook County Jail]." There is more but these are the only provisions that bear on the scope of the proposed order. They are inadequate. Apart from the failure to explain and justify the number of Cook County inmates who would be affected by the order, there is no indication of how many would be affected by the new provision for transfer to state custody—it is not even clear if this is a new deal or a statement of the existing one. There is also no indication of whether the state is willing to accept additional transfers. (A transfer of prisoners to another correctional facility is not a "release," but is germane to release by reducing the number of prisoners who have to be released in order to reduce overcrowding: the more transfers, the fewer releases.)

We are unhappy with the reference in the proposed order to releasing prisoners "on their own recognizance and/or on electronic monitoring." Left unspecified are which class or classes of prisoners is or are eligible and what grounds are to be used to decide whether electronic monitoring should be required, or the prisoner allowed to go free with no restrictions or surveillance of any kind. Yet at the hearing the Sheriff's counsel assured us that only pretrial detainees would be eligible for release, and only if they were not being charged with or have a history of violent crimes, and that all prisoners who were released would be subjected to electronic monitoring, which is actually a variant of home detention. (That is why we said that a release order that we would approve in this case would be ordering "release" only in a special sense.) The monitoring equipment makes an electronic link between the monitored person and an installation inside his home. If he leaves the home, the link is broken, which sends a warning signal to a monitoring center, which first calls the person to make sure the connection wasn't broken accidentally and if there is no answer dispatches sheriff's deputies to find and jail him. So far as we are informed, no pretrial detainee released from Cook County Jail on condition of being electronically monitored has violated the terms of the release.

Release on electronic monitoring of so many of the nonviolent pretrial detainees as must be released to prevent overcrowding and thus reduce the number of constitutional violations is a safe method of relieving overcrowding. It is also inexpensive; it costs roughly half as much as housing a person in Cook County Jail. It presents none of the public-safety concerns at issue in *Coleman v. Schwarzenegger*, 2010 WL 99000 (E.D. & N.D. Cal. Jan. 12, 2010), the decision by a three-judge panel, now awaiting decision on appeal to the Supreme Court (*Schwar-*

*zenegger v. Plata*, No. 09–1233), ordering the release of 27 percent of the entire prison population of California over the opposition of the state.

Many of the pretrial detainees in the Cook County Jail would, moreover, be bailed on their own recognizance, or on bonds small enough to be within their means to pay, were it not for the unexplained reluctance of state judges in Cook County to set affordable terms for bail; apparently these judges consider the release of pretrial detainees to be the Sheriff's responsibility. But whether these judges are complying with the bond clause of the Eighth Amendment is not an issue in the litigation before us, and so we must insist that the prisoner release order specify the limitations that we have just described and indicate, with such substantiation as is reasonably obtainable, how many prisoners can be expected to be released annually. The order should also make clear that only pretrial detainees are eligible for release, and then only if they are not accused of, or have a history of, violent crime; should specify the funding source for electronic monitoring equipment and for the control centers; should specify response times when a center receives a warning signal; should provide assurance that adequate funds will be available for effective electronic monitoring of all prisoners released under the order. The order should also contain a sunset clause (cf. *People Who Care v. Rockford Bd. of Education*, 246 F.3d 1073, 1075–76 (7th Cir. 2001))—we suggest four years—and require annual reports to the court of progress (or regress) toward reducing overcrowding; the reporting can be included in one of the monitor reports required by the Agreed Order.

To summarize, the motion for entry of the proposed release order is denied, but without prejudice, and the parties are directed to submit a revised motion consistent with the discussion in this opinion, plus evidence to support an estimate of the number of prisoners expected to be released if the revised order is approved. The revised order and any supporting materials are due 30 days from the date of this order.

SO ORDERED.

January 11, 2011.