# Executive Summary
## Corrections Monitor Susan W. McCampbell's Report #4
## February 22, 2012

**Summary Overview**

As noted in my July 2011 report, it continues to be my opinion that the Cook County Sheriff's Office (CCSO) and the Cook County Department of Corrections (CCDOC) continue to work diligently, assuring adequate resources are devoted to achieving compliance with the Consent Agreement.   The challenges now facing the CCDOC  are those inherent in achieving internal compliance with newly developed or revised policies and procedures. Additionally, CCDOC is faced with changing the internal culture that has been in place for many years, the "default" culture, that often attempts to passively overcome reforms.  The clear, decisive, and committed leadership initiatives of the agency are needed to outlast the default culture and solidify the changes.

This Executive Summary also addresses the prisoner release order designed as a safety value when the inmate population nears the system's capacity.

**On Site Tour – December 5 – 9, 2011**

During the tour I met with many individuals in CCDOC, DFM, and Cermak.  I toured several of the divisions, and interviewed inmates.  I was briefed by OPR, and reviewed investigative files.  I also met  Human Resources' staff and received their update.  I met with Judge Paul P. Biebel, Jr. Presiding Judge Circuit Court of Cook County in order to discuss the judiciary's awareness and role in aiding CCDOC in managing the inmate population.

**Progress**

The areas in which measurable progress has been achieved include:

- Implementation of the use of force directives;
- Completion of directives governing inmate discipline and inmate grievances;
- Continuing process in drafting and updating portions of the written directive system;
- Progress in revising the current inmate classification system, including plans for resources, training, and the validation of the instruments; and
- Executive level review of use of force incidents.

**Challenges Ahead**

CCDOC's challenges include, but are not limited to:

- Completing the work to revise inmate classification system and initiate the validation study;

- Refining the procedures in the use of force directives, and assuring an effective feed-back loop to update the practices, address training issues, and hold supervisors accountable;
- Promptly providing OPR with reports regarding uses of force so the incidents can be logged, even if CCDOC is still reviewing the paperwork;
- Completing the directives governing department head reviews and assuring training is accomplished for those who will conduct these investigations;
- Improving tracking and accountability for department head investigations;
- Building collaboration with the partners in the justice system to address the increasing inmate population, with fewer inmates eligible for release via the release order;
- Monitoring uses of force data to assure there is not disproportionate uses of force involving inmates who are on the mental health caseload;
- Improving communication with Cermak and DFM;
- Assuring funding to promptly replace fixtures and parts of the physical plant identified as not "corrections-grade" and which are being used now by inmates to fashion weapons;
- Clarifying and enforcing expectations regarding cleanliness of the facilities;
- Holding supervisors accountable for making rounds AND solving problems regarding the physical plant and the inmates at the same time;
- Monitoring the CRWs to assure they are regularly in all housing units when inmates are present (and awake) and that they are addressing grievances per the written directive;
- Revising the field training program as a means to insure that the new general orders and written directives are fully implemented, a priority to help ensure that the applicants hired are performing duties consistent with the directives, and not being captured and sidetracked by the "default", old-time, internal culture;
- Changing the "old" culture in CCDOC; and
- Refining of a staffing plan for CCDOC, including the staffing plan for the existing and new RCDC.

## Achievement of Substantial Compliance

Paragraphs for which I identified substantial compliance are (with paragraphs achieving compliance following the December 2011 tour underlined):

- 31.a.
- 31.b.
- 31.c.
- 31.d.
- 31.f
- 31.g.
- 31.h.
- 31.j.
- 31.l.
- 31.m.

- 31.n.
- 31.o.
- 31.p.
- 31.r.
- 31.s.
- 31.t.
- 32.h.
- 32.g.
- 32.l.
- 32.m.

- 33.a.
- 33.c.i.ii
- 33.i
- 33.j.
- 34.b.
- 34.d.
- 34.g.
- 35.c.
- 35.d.
- 36.b.

- 36.f.
- 37.c.
- 38.a.
- 38.b.
- 38.c.
- 38.d.
- 40.
- 41.
- 69.

The paragraphs designated as "substantial" compliance in the previous reports to the Court have remained in that status.

## Conclusions – Compliance

There is steady progress in achieving compliance with the Consent Agreement.  As noted earlier in this summary, the challenges for CCDOC change as the initiatives move forward, from creating the primary proofs of compliance (e.g. written directives, logs, training curriculum) to assuring that employees are following the directives.  This change process is the most challenging to sustain.  Using a sport analogy – the move toward compliance is a marathon, not a sprint.

The Sheriff and his staff are commended for their hard work and good humor during this process.

## Prisoner Release Order

The critical inmate crowding in the Cook County jail is not just Sheriff Dart's "problem", it must be acknowledged and shared by all components of the criminal justice system in Cook County.  Expecting the Sheriff to solve the crowding will result in failure.   The jail can most effectively operate at 85% of capacity,   allowing for the appropriate housing of inmates by their classification, mental health status, and other special needs.  Just because there might be empty beds in the jail does mean that those beds meet the needs for safety and security of staff and inmates – for example,  there may be minimum custody beds available, but the inmates that need the beds are maximum custody.

The orders of the three-judge district Court provide that the number of inmates who may be released by the Sheriff under the order is capped at 1,500, in toto, and if more releases are needed, the permission of the Court is required.   In the defendants' Second Revised Proposed Release Order it was proposed (and ultimately accepted): "That the Corrections Monitor [EM] appointed by the Court in this case shall file a report with the Court once each year along with any of the reports setting forth the status of the Electronic Monitoring and a statement whether the program has been instrumental in reducing overcrowding at the Cook County Jail."

Status of the Electronic Monitoring Program

The average inmate population in CCDOC since January 2010 is as follows, having increased approximately 6% during this time frame[1]:

---

[1] Provided by CCDOC.

| Month/2011 | Inmate Census on the 1 st of the Month | % of Capacity (Male/Female) | Total % of Capacity | Electronic Monitoring Program Census |
|---|---|---|---|---|
| January | 8,700 | M= 94.05% F= 75.03% | 92.58% | 409 |
| February | 8,789 | M= 94.54% F= 78.05% | 93.26% | 419 |
| March | 8,562 | M= 93.37% F= 78.08% | 92.15% | 410 |
| April | 8,505 | M= 92.37% F= 77.55% | 91.21% | 435 |
| May | 8,695 | M= 94.16% F= 80.05% | 93.04% | 456 |
| June | 8,872 | M= 96.23% F= 80.87% | 95.02% | 471 |
| July | 8,850 | M= 95.54% F= 87.75 | 94.92% | 460 |
| August | 9,109 | M= 93.05 F= 91.63 | 94.99% | 525 |
| September | 9,140 | M= 97.37 F= 85.87 | 98.28% | 628 |
| October | 8,944 | M= 96.80 F= 91.23 | 96.36% | 847 |
| November | 9,153 | M= 98.35 F= 99.46 | 98.53% | 1063 |
| December | 9,224 | M= 95.71 F= 93.67 | 95.55% | 1180 |

If the individuals now on the EM program were incarcerated, the results are clear: unacceptable, and budget breaking crowding, not to mention the potential impact on compliance with the Consent Agreement.

In the coming months tracking the number of inmates on EM as assigned by both the Sheriff, and the judiciary will be needed to help evaluate the impact of the program. Additionally, data about outcomes – such as new crimes committed while on EM, and the failure to appear rates – will help inform the County, Sheriff, and judges as to any needed amendments to the program.

It is my opinion that the release order is a necessary to manage the population in the Cook County jail system. But the order itself is only one part of a larger, systemic, "fix" needed.

Systemic Issues and Recommendations

A shift in a policy in any component of the justice system has ripple effects throughout all agencies comprising the system. For example, the decision to close suburban courthouses

on weekends and holidays to save $2 million, causes all bond hearings to be held in the criminal courts building at 26th and California.[2]  This change means that arrestees might be held longer in local police lock-ups that are most likely ill designed and staffed to evaluate and safely house individuals who are probably under the influence of illegal drugs or alcohol; or require suburban officers to transport arrestees longer distances, posing security and safety threats to all involved; or result in a spike in intakes at CCDOC.  Decisions by the Clerk's office to furlough employees on Mondays and Fridays have a direct bearing on jail crowding of the weekends.  During an election year, those officials in charge of justice agencies don't want to be labeled as "soft on crime" for supporting initiatives little understood by the public that are perceived as releasing dangerous people in the neighborhoods.

Chairperson Toni Preckwinkle's focus on the *systems* that contribute to jail crowding is a refreshing and unique approach by an elected official.[3]  She is in a position to hold the leaders of the various agencies accountable for what they contribute and don't contribute to jail crowding, without compromising public safety.

In this environment the administrative prisoner release order has, by some accounts, changed the behavior of some judges, who are reconsidering their bond decisions for less serious offenders, or placing them on EM - directly influence jail crowding.  Importantly, changes in judicial behavior have resulted in fewer inmates *in custody* who qualify for release on EM to ease crowding.

In terms of the remaining undesirable options open to Sheriff Dart as crowding increases and there are fewer eligible inmate to release: opening of more inmate housing areas which have been closed – costing considerable overtime;  transferring inmates to outlying county jails – costing considerable per diem and transportation;  or, the worse option, violating the various paragraphs of the Consent Agreement in terms of triple bunking.

Collaboration among the criminal justice agencies <u>must</u> increase to find long term solutions.  Among the options that present themselves are[4]:

1. Reconvene and resource the judicial advisory council that has not met for more than a year.  This regularly scheduled meeting of the leaders of the criminal justice agencies is necessary to monitor the jail's population, identify causes, obstacles and processes which contribute to crowding, develop plans to address the needs, and hold each other accountable.  Judge Biebel and Sheriff Dart are amenable to re-

---

[2] "Best Laid Plans", *Riverside – Brookfield Landmark*, January 10, 2012. http://www.rblandmark.com/main.asp?SectionID=3&SubSectionID=46&ArticleID=8483 accessed on 1/24/2012

[3] Mick Dumke, "Toni Preckwinkle's plan to shrink the jail population", December 22, 2011 http://www.chicagoreader.com/Bleader/archives/2011/12/22/toni-preckwinkles-plan-to-shrink-the-jail-population accessed on 1/24/2012

[4] For more information, see *A Second Look at Alleviating Jail Crowding:  A Systems Perspective,* U. S. Dept of Justice, Bureau of Justice Assistance, October 2000, https://www.ncjrs.gov/pdffiles1/bja/182507.pdf accessed on 1/24/2012.

starting this council.  A county the size of Cook must have a centralized, consolidated, and resources focal point for managing their justice system.

2.  Examine the role of pre-trial services.  The Adult Probation Department's programs that directly address the jail population need to be analyzed and modified to be more responsive to the needs.  For example, a credible pre-trial services program must place the workers where the arrestees are, at least four or five hours <u>before</u> their initial court appearance so that the workers can gather/confirm information to inform judges allowing them to make better and more prompt decisions regarding pre-trial release.  This means that pre-trial staff need to be at work in the early hours of the day if their contributions are to mean something to the pre-trial release initiative. If this information isn't collected, efforts made to confirm it, for example, whether the person has a permanent address or is working, in a timely manner – there is diminished worth to the pre-trial services program.

3.  Enhance day reporting.  While electronic monitoring is one option, an effective supervision program involving expanded day reporting has been shown to assure the person's appearance before the court, and address new crimes.  A study about Cook County supports this premise.[5]   A critical part of the day reporting program should be tracking those individuals who are released pending their next court date so that these individuals can be reminded of their court date, thus preventing warrants for failing to appear and the corollary of no bond holds.

4.  Pre-Sentence Investigations (PSIs).  A review should be undertaken (perhaps under the auspices of the newly invigorated judicial advisory council) to identify any nexus between resources and delays in completing PSIs  - resulting in jail crowding.  Focusing on individuals who remain in custody after their trial awaiting a PSI should be reviewed, and the data examined.  If a link is found to exist, data should be routinely provided to the Courts and other decision makers in the County that create a cost benefit between holding people in jail and resourcing the entities responsible for PSIs.

5.  Public Defenders.  The CBA for Public Defenders does not require their presence in the courtroom until an hour before the first appearance.  With the volume of cases for each public defender, coupled with the absence of meaningful information from pre-trial services about the client, first appearances then are not a good place to make decisions about release.  The County should examine how to address effective representation of defendants while keeping an eye on the current processes impact on jail crowding.

6.  Trial delays.  Data should be maintained and shared with the judiciary, public defender and prosecutors regarding trial delays, reasons for continuances, and identifying any chronic bottlenecks in the system.  While fair justice is the goal,

---

[5] Martin, Christine, Arthur J. Lurigio and David E. Owens, *Examination of Rearrests and Reincarceration Among Discharged Day Reporting Clients*, 2003. http://www.ncjrs.gov/app/publications/abstract.aspx?ID=201329

creating a judicial environment in which continuances are routinely granted contributes to jail crowding. CCDOC can keep the judiciary and judicial advisory council informed regarding the trial delays for inmates in custody.

7. Second look court. While no member of the judiciary likes to be "second guessed" a "second look court" should be considered to assure that those arrestees who are eligible for release, are released. Because the current pre-trial services component of the system is likely not providing timely information, this second look court could use that information provided regarding the arrestees criminal history, job history, and ties to the community in confirming, refining or changing the initial bond or pre-trial release decision. Tracking the outcomes such of the "second look" will further inform the judiciary regarding other amendments to the process that might be beneficial.

8. Resourcing the Clerk's Office – Understanding the extreme fiscal situation facing Cook County, furloughing employees is an undesirable, but necessary option. However, being more strategic about when employees are furloughed – avoiding days that when their absence directly impacts jail crowding is essential.

9. Low Bonds – CCDOC is trying to track inmates who are in custody on low bonds to see if the inmate can find a way to gain release before their next court date. While not wanting to jeopardize the public or family safety, perhaps not-for-profit organizations in the County can play a role in posting the lower bonds and then supervising the arrestee. Many jurisdictions have found that inmates on low bonds are held pre-trial longer than they would have been held if sentenced to the crime for which they are charged; and are often those who have mental illness. Other permutations of this theme of involvement of not-for-profits can be examined. CCDOC can keep the courts and the judicial advisory council informed regarding inmates on low bonds.

10. Jail Population Manager – CCDOC is collecting, examining and sharing data about the inmates in its custody as well as looking at trends and decisions made in other components of the County's justice system. Designating a single point of contact in CCDOC for this information management may be a helpful strategy to keeping the focus on crowding and collaboration with the partners in the justice system.

11. Evaluate outcomes of current prisoner release order. The CCDOC and County should be able to tell the Court (and others) about the outcomes of those pre-trial detainee released via the order. This analysis will either relieve concerns that the releasees are not being arrested for committing new crimes and appearing as required before the courts; or if the review points to problems, develop strategies to address any public safety or administrative issues.

These are my observations and suggestions for Cook County's consideration. However, it is critical that a strategic, resourced, and well led initiative be undertaken to address current and anticipated jail crowding; unless the County is willing to build more jail beds and pay for the staff needed to operate those beds.

# Corrections Monitor Susan W. McCampbell's Report # 4

# 02 22 2012

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| **A.** | **Protection from Harm** | | | |
| **31.** | **Use of Force by Staff** | | | |
| A. 31. a. (16) | CCDOC shall maintain comprehensive and contemporary policies and procedures, in accordance with generally accepted correctional standards, surrounding the use of force and with particular emphasis regarding permissible and impermissible uses of force. | x12/11 | x 9/10 x 3/11 x 8/11 | |
| A.31. b. (16) | CCDOC shall maintain use of force policies and pre-service and in-service training programs for correctional officers and supervisors that address the following impermissible uses of force:<br><br>1. use of force as a response to verbal insults or inmate threats where there is no immediate threat to the safety of the institution, inmates, or staff;<br>2. use of force as a response to inmates' failure to follow instructions where there is no immediate threat to the safety of the institution, inmates, or staff, unless CCDOC has attempted a hierarchy of nonphysical alternatives that are documented;<br>3. use of force as punishment or retaliation;<br>4. use of force involving striking, hitting, or punching a restrained and non-combative inmate;<br>5. use of force against an inmate after the inmate has ceased to offer resistance and is under control;<br>6. use of choke holds on an inmate, unless lethal force is justified; and<br>7. use of inappropriate or excessive force. | x12/11 | x 9/10 x 3/11 x 8/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| A.31.c. (17) | CCDOC shall maintain a policy to ensure that staff adequately and promptly report all uses of force, in accordance with generally accepted correctional standards. | x12/11 | x 9/10 x 3/11 x 8/11 | |
| A.31.d. (17) | CCDOC shall require that use of force reports:<br>1.　be written in specific terms in order to capture the details of the incident<br>2.　contain an accurate account of the events leading to the use of force incident;<br>3.　include a description of the instrument(s) of restraint or control, if any, and the manner in which it was used;<br>4.　note whether an inmate disciplinary report was completed in connection with the incident that prompted the use of force;<br>5.　describe the nature and extent of apparent and reported injuries sustained both by the inmate and staff member;<br>6.　contain the date and time medical attention was actually provided;<br>7.　describe, in detailed, factual terms, the type and amount of force used as well as the precise actions taken in a particular incident; and<br>8.　note whether a use of force was videotaped. If the use of force is not videotaped, the reporting correctional officer and supervisor will provide an explanation as to why it was not videotaped. | x12/11 | x 9/10 x 3/11 x 8/11 | |
| A.31.e. (18) | CCDOC shall continue to require prompt review by the shift commander of all use of force reports. The shift commander's review of use of force reports shall include review for completeness and procedural errors, as well as review of the substantive content. If the use of force report does not comply with provision 31.d. of this Agreed Order, the shift commander shall return it to the reporting officer for revision and resubmission until it is compliant. If the shift commander believes a use of force may have been inappropriate or excessive, he or she shall immediately refer the incident for investigation. | | x 9/10 x 3/11 x 8/11 x12/11 | |
| A.31.f. (19) | CCDOC shall ensure that senior management review of uses of force includes:<br>1.　a timely review of medical documentation of inmate injuries, if any is submitted, as provided by Qualified Medical Staff, including documentation surrounding the initial medical encounter, an anatomical drawing that depicts the areas of sustained injury, and information regarding any further medical care;<br>2.　the inmate disciplinary report, if any, associated with the use of force; and<br>3.　the incident report, if any, associated with the use of force. | x12/11 | x 9/10 x 3/11 x 8/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| A. 31.g. (20) | CCDOC [and Cermak] shall establish criteria that trigger referral for inappropriate or excessive use of force investigations, including but not limited to, documented or known injuries that are extensive or serious; injuries involving fractures or head trauma; injuries of a suspicious nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.); and injuries that require treatment at outside hospitals. | x12/11 | x 3/11 x 8/ll | x 9/10 |
| A. 31. h. (20) | When CCDOC review of use of force reports, and supporting records if applicable, reveals that reports of a use of force are materially inconsistent, conflicting, or suspicious, CCDOC shall refer that use of force incident for internal investigation. | x12/11 | x 9/10 x 3/11 x 8/11 | |
| A.31.i. (20) | CCDOC shall develop and implement a system to track all incidents of use of force that, at a minimum, includes the following information: <br> 1. a tracking number; <br> 2. the inmate(s) name; <br> 3. housing assignment; <br> 4. date; <br> 5. type of incident; <br> 6. injuries (if applicable); <br> 7. medical care provided (if applicable); <br> 8. staff involved; <br> 9. reviewing supervisor; <br> 10. external reviews and results (if applicable); <br> 11. remedy taken (if appropriate); and <br> 12. administrative sign-off. | | x 9/10 x 3/11 x 8/11 x12/11 | |
| A.31.j. (21) | CCDOC shall ensure that, promptly following a use of force incident, video or photographs are taken of any and all reported or apparent injuries sustained by inmates and staff. The video or photographs will be maintained and will be included in the investigation package, if applicable. See 31. F. | x12/11 | x 9/10 x 3/11 x 8/11 | |
| A.31.k. (21) | CCDOC shall establish an "early warning system" that will document and track correctional officers who are involved in use of force incidents and any complaints related to the inappropriate or excessive use of force, in order to alert CCDOC administration to any potential need for retraining, discipline, problematic policies, or supervision lapses. Appropriate CCDOC leadership, supervisors, and investigative staff shall have access to this information and monitor the occurrences. CCDOC senior management shall use information from the early warning system to improve quality management practices, identify patterns and trends, and take necessary corrective action both on an individual and systemic level. | | x 9/10 x 3/11 x 8/11 x12/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| A.31.l. (22) | CCDOC shall ensure that a supervisor is present during all pre-planned uses of force, such as cell extractions. | x12/11 | x 9/10 x 3/11 x 8/11 | |
| A.31.m. (22) | Where there is evidence of staff misconduct related to inappropriate or unnecessary use of force against inmates, CCDOC shall initiate personnel actions and seek disciplinary action appropriately for any correctional officer found to have: 1. engaged in inappropriate or excessive use of force; 2. failed to report or report accurately the use of force; 3. retaliated against an inmate or other staff member for reporting an inappropriate or excessive use of force; or 4. interfered or failed to cooperate with an internal investigation regarding use of force in a manner inconsistent with the staff member's statutory or contractual rights. | x12/11 | x 9/10 x 3/11 x 8/11 | |
| A.31.n. (23) | Where there is evidence of staff misconduct related to inappropriate or unnecessary use of force against inmates, CCDOC shall consider, develop, and initiate systemic remedies as appropriate. | x 8/11 x12/11 | x 9/10 x 3/11 | |
| A.31.o (23) | CCDOC shall maintain accountability policies and procedures for the effective and accurate maintenance, inventory, and assignment of chemical and other security equipment, in accordance with generally accepted correctional standards. | x12/11 | x 9/10 x 3/11 x 8/11 | |
| A.31.p. (24) | CCDOC shall continue to conduct use of force training in accordance with generally accepted correctional standards, including: 1. CCDOC shall maintain an effective and comprehensive use of force training program. 2. CCDOC shall continue to ensure that correctional officers receive adequate training in CCDOC's use of force policies and procedures, including de-escalation and defensive tactics relating to use of force. 3. CCDOC shall continue to ensure that correctional officers receive pre-service and in-service training on reporting use of force and completing use of force reports. | x12/11 | x 9/10 x 3/11 x 8/11 | |
| A.31.q. (24) | CCDOC shall provide a process for inmates to report allegations of the inappropriate or excessive use of force orally to any CCDOC staff member; said staff member shall give the inmate the opportunity to reduce his or her report to writing through a grievance or complaint form without discouragement. | | x 9/10 x 3/11 x 8/11 x12/11 | |
| A.31.r. (25) | Following a use of force, when CCDOC staff transport an inmate to receive medical care by Cermak, as necessary, the CCDOC staff member shall inform the Cermak staff member that the inmate was involved in a use of force. | x 8/11 x12/11 | X 9/10 x 3/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| A.31.s. (25) | Cermak shall ensure that, when providing medical treatment or assessment to an inmate following a use of force, Qualified Medical Staff document the inmate's injuries, if any, and any medical care provided. Cermak shall provide CCDOC senior management [OPR] with a brief summary documenting the initial medical encounter following a use of force, including an anatomical drawing that depicts the areas of sustained injury, if any, and information regarding any further medical care. See 31.f. | x 8/11 x12/11 | x 9/10 x 3/11 | |
| A.31.t. (26) | Cermak shall ensure that Qualified Medical Staff question, outside the hearing of other inmates or correctional officers if appropriate, each inmate who reports for medical care with an injury, regarding the cause of the injury. If, in the course of the inmate's medical encounter, a health care provider suspects staff-on-inmate or inmate-on-inmate abuse, that health care provider shall immediately:<br>1. report the suspected abuse to the Executive Director of the Office of Professional Review or other appropriate CCDOC administrator; and<br>2. adequately document the matter in the inmate's medical record. | x 8/11 x12/11 | X 3/11 | x 9/10 |
| **32.** | **Safety and Supervision** | | | |
| 32. a. (26) | CCDOC shall maintain security and control-related policies, procedures, and practices that will result in a reasonably safe and secure environment for all inmates and staff, in accordance with generally accepted correctional standards.<br>Coordinate with Grenawitzke | | x 9/10 x 3/11 x 8/11 x12/11 | |
| 32.b. (27) | CCDOC shall maintain policies, procedures, and practices to ensure the adequate supervision of inmate work areas and trustees, in accordance with generally accepted correctional standards.<br>Coordinate with Grenawitzke | | x 8/11 x12/11 | x 9/10 x 3/11 |
| 32.c. (27) | CCDOC shall ensure that security staff conduct appropriate rounds with sufficient frequency to provide inmates with reasonable safety. Rounds shall be conducted at least once every half hour, at irregular intervals, inside each housing unit. In the alternative, CCDOC may provide direct supervision of inmates by posting a correctional officer inside the day room area of a housing unit to conduct constant surveillance. More frequent rounds shall be conducted for special management inmates who require more intensive supervision for security and safety reasons. All security rounds shall be documented on forms or logs that do not contain pre-printed rounding times. Video surveillance may be used to supplement, but must not be used to replace, rounds by correctional officers. | | x 9/10 x 3/11 X 8/11 x12/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| 32.d. (28) | CCDOC shall ensure that security supervisors conduct daily rounds in the inmate housing units, and document the results of their inspections. | | x 3/11<br>x 8/11<br>x12/11 | x 9/10 |
| 32.e. (28) | Cook County shall increase the use of overhead video surveillance and recording cameras to provide adequate coverage throughout the common areas of the Facility, including the RCDC, all division intake areas, mental health units, special management units, inmate housing units, and in common areas of the divisions. | | x 9/10<br>x 3/11<br>x 8/11<br>x12/11 | |
| 32.f. (29) | CCDOC shall maintain a procedure to prevent inmates from possessing or having access to dangerous contraband, including conducting regular inspections of cells and common areas of the housing units to identify and prevent rule violations by inmates. | | x 9/10<br>x 3/11<br>x 8/11<br>x12/11 | |
| 32.g. (29) | CCDOC shall review, and revise as applicable, all General Orders ("GOs"), Standard Operating Procedures ("SOPs"), and Post Orders on an annual basis, or more frequently as needed. | x 8/11<br>x12/11 | x 9/10<br>x 3/11 | |
| 32.h. (30) | CCDOC shall revise policies, SOPs, and post orders for all armed posts to include proper use and safe handling of weapons and provide specific instructions on use of deadly force and when and under what circumstances such force should be used, in accordance with generally accepted correctional standards. | x12/11 | x 9/10<br>x 3/11<br>x/8/11 | |
| 32.i. (30) | CCDOC shall standardize security policies, procedures, staffing reports, and post analysis reports across the divisions, to the extent possible, taking into account the different security levels and different physical layouts in the various divisions. | | x 9/10<br>x 3/11<br>x 8/11<br>x12/11 | |
| 32.j. (30) | CCDOC shall provide formal training on division-specific SOPs to correctional officers in accordance with their assignments, and shall provide further specialized training for officers assigned to Special Management Units.  Cermak Hospital shall provide Specialized training for officers assigned to psychiatric units. Coordinate with Drs. Shansky and Metzner.  See also 44.f., 44.g., 44.h., 46.b., 46.e.,68. | | x 9/10<br>x 3/11<br>x 8/11<br>x12/11 | |
| 32.k. (31) | CCDOC shall maintain in working order all monitoring equipment at the Facility that is under CCDOC's direct control, including cameras, alarms, radios (hand held), interior and exterior lighting, x-ray and other screening equipment, and walk-through metal detectors.  To the extent that the maintenance of any Facility monitoring equipment is under the control of DFM, CCDOC shall promptly report any maintenance needs and DFM shall prioritize its services to ensure that all monitoring equipment is maintained in working order. Coordinate with Grenawitzke | | x 9/10<br>x 3/11<br>x 8/11<br>x12/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| 32.l. (32) | Absent exigent circumstances, CCDOC: (i) shall house each inmate assigned to a division that is celled to one permanent bed in a cell and shall not house any inmates (including those assigned to dormitory divisions) such that they are sleeping on the floor, on a mattress on the floor, or in any area not designed or redesigned as sleeping quarters; (ii) shall not house more than two inmates to a single cell (triple-bunking); and (iii) shall not hot-bunk any inmates. | x 8/11[1] x12/11 | | |
| 32.m. (32) | When exigent circumstances give rise to triple-bunking, CCDOC shall provide the third inmate in the triple-bunked cell a "boat," stackable bunk, moveable platform, or cot, so that the inmate is not required to lay down directly on the cell floor or on a mattress on the floor. | x 8/11[2] x12/11 | | |
| **33.** | **Security Staffing.** <br> **The parties agree that correctional officer staffing and supervision levels at the Facility must be appropriate to adequately supervise inmates, to carry out the requirements of this Agreed Order, and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards. Cook County and CCDOC shall take such actions as shall ensure that correctional officer staffing and supervision at the Facility are sufficient to achieve these purposes. These actions shall include the following:** | | | |
| 33.a. (33) | In the fiscal year 2010 budget, Cook County shall allocate funds sufficient to allow for 210 additional correctional officer positions at the Facility. Consistent with provision 33.c, such funding may occur on a rolling basis, as appropriate in light of the time required to hire, train, and put on duty the additional 210 new correctional officers. | x 8/11 x12/11 | x 9/10 x 3/11 | |
| 33.b. (33) | CCDOC shall use its best efforts (through the maintenance of the written staffing plan required by provision 33.h and otherwise) to ensure that the number of correctional officer vacancies is kept to the minimum practicable number at all times, taking into account that the timing of terminations and resignations and the resulting rate of attrition may, in ordinary course, result in there being some vacancies at any given time. | | x 9/10 x 3/11 x 8/11 x12/11 | |
| 33.c.i.ii (34) | CCDOC shall fill the 210 additional correctional officer slots provided for in provision 33.a; fill the 285 correctional officer vacancies that existed at the Facility as of July 17, 2009; and fill any correctional officer vacancies coming into existence after that date in the following manner: <br> i. By December 31, 2010, CCDOC shall hire, train, and put on duty at the Facility at least 448 [381] newly qualified correctional officers (in addition to those on duty as of December | x 8/11 x12/11 | | x 9/10 x 3/11 |

---

[1] Noted as "NA" in first two reports.
[2] Noted as "NA" in first two reports.

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | 31, 2009).<br>ii. By March 30, 2011, CCDOC shall hire, train, and put on duty at the Facility at least 174 [107] newly qualified correctional officers (in addition to those on duty as of December 31, 2010). | | | |
| 33.d. (34) | The parties agree that for 30 months following the effective date of this Agreed Order, Cook County and CCDOC shall not be required to provide additional correctional officer staffing and supervision at the Facility beyond that which is necessary to ensure that correctional officer staffing and supervision are sufficient to achieve the purposes set out in the introductory paragraph of provision 33 and to comply with provisions 33.a-c above. | | | NA at this time |
| 33.e. (35) | Within 30 months of the effective date of this Agreed Order, the CCDOC Monitor shall assess and make a recommendation on whether the correctional officer staffing and supervision levels are appropriate to adequately supervise inmates at the Facility, in accordance with generally accepted correctional standards. If the CCDOC Monitor determines that staffing is inadequate, the CCDOC Monitor will make a recommendation regarding the appropriate number of correctional officer staff. If the parties do not accept the CCDOC Monitor's staffing recommendation, CCDOC and Cook County shall agree to an independent, comprehensive study to determine the appropriate correctional officer staffing and supervision. The parties agree that the results of this staffing study shall provide guidance as to the sufficient number of qualified correctional officers necessary to operate the Facility safely and to carry out the requirements of this Agreed Order. | | | NA at this time |
| 33.f. (35) | If the staffing study requires additional correctional officers, Cook County shall allocate funds sufficient to maintain correctional officer staffing levels necessary to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards. | | | NA at this time |
| 33.g. (35) | If the staffing study requires additional correctional officers, and consistent with Cook County's allocation of funds for security staffing, CCDOC shall hire and train sufficient number of qualified correctional officers and other staff to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards, including:<br>1. Investigative staffing sufficient to meet the internal investigation responsibilities outlined in this Agreed Order;<br>2. Correctional officer staffing sufficient to provide inmates requiring treatment with adequate access to appropriate medical and mental health care by providing timely | | | NA at this time |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | movement of inmates to medical units, transport of inmates who have been referred for outside specialty care, and escort, if necessary, to Qualified Medical and Mental Health Staff on housing units; and   [Coordinate with Shansky, Metzner]<br>3.   Qualified staff sufficient to monitor security cameras in real time and allow for supervisory viewing and retrieving at any time. | | | |
| 33.h. (36) | CCDOC shall maintain a written staffing plan that requires sufficient staffing to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards. | | x 8/11<br>x12/11 | x 9/10<br>x 3/11 |
| 33.i. (36) | Absent exigent circumstances, CCDOC shall maintain a practice that does not allow for scheduled, planned, or expected cross-watching (a CCDOC practice of allowing one correctional officer to simultaneously supervise two housing units from the control center of one of the units) at any time on all maximum security and Special Management Units, and during first and second shifts throughout the Facility. | x 8/11[3]<br>x12/11 | | |
| 33.j. (36) | CCDOC may permit cross-watching on third shift in housing units that are not maximum security or Special Management Units only if the Monitor does not object after consultation and review. The Monitor's review of the appropriateness of third-shift cross-watching on a particular housing unit shall be guided by the sufficiency of sightlines between the units being cross-watched, the adequacy of video and/or audio technologies in place, and/or other factors that bear on the safety and security of inmates and staff.  If the Monitor later objects to any cross-watching that is in effect because of the Monitor's concerns that cross-watching on a particular housing unit presents an undue risk to the safety and security of inmates and staff, CCDOC shall immediately cease such cross-watching.  CCDOC may renew cross-watching on that unit again if, after further consultation with and review by the Monitor, the Monitor does not object to such renewal.  Although cross-watching is permitted under the limited circumstances described herein, CCDOC will work to eliminate the practice at the Facility. | x 8/11[4]<br>x12/11 | | |

[3] Noted as "NA" in two previous reports.
[4] Noted as "NA" in two previous reports.

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| **34.** | **Incidents and Referrals** | | | |
| 34. a. (37) | CCDOC shall continue to ensure that staff adequately and promptly document all reportable incidents, including inmate fights, rule violations, inmate injuries, suicides and suicide attempts, cell extractions, medical emergencies, contraband, vandalism, escapes and escape attempts, fires, and other incidents causing a disruption to standard CCDOC practice, in accordance with generally accepted correctional standards. | | x 9/10 x 3/11 x 8/11 x12/11 | |
| 34.b. (37) | CCDOC shall continue to ensure that correctional officers receive formal pre-service and in-service training on proper incident reporting policies and procedures, in accordance with generally accepted correctional standards. | x 8/11 x12/11 | x 9/10 x 3/11 | |
| 34.c. (38) | CCDOC shall maintain a system to track all reportable incidents (as described in provision 34.a) that, at a minimum, includes the following information: 1.  incident tracking number; 2.  the inmate(s) name; 3.  housing assignment; 4.  date; 5.  type of incident; 6.  injuries (if applicable); 7.  medical care (if applicable); 8.  primary and secondary staff involved; 9.  reviewing supervisor; 10. external reviews and results (if applicable); 11. remedy taken (if appropriate); and 12. administrative sign-off. | | x 9/10 x 3/11 x 8/11 x12/11 | |
| 34.d. (38) | CCDOC shall require prompt administrative review of incident reports.  Such reviews shall include a case-by-case review of individual incidents as well as a systemic review in order to identify patterns of incidents.  CCDOC shall incorporate such information into quality management practices and take necessary corrective action. | x 8/11 x12/11 | x 9/10 x 3/11 | |
| 34.e. (39) | CCDOC shall ensure that incident reports, use of force reports and inmate grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria, that it is referred for investigation. | | x 9/10 x 3/11 x 8/11 x12/11 | |
| 34.f. (40) | CCDOC shall maintain policies, procedures and practices requiring investigations to resolve issues identified during review of incident reports, disciplinary hearings, or inmate grievances, | | x 9/10 x 3/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | and determine appropriate remedies, in accordance with generally accepted correctional standards. At a minimum, CCDOC shall require timely and appropriate investigations of all suicides, serious suicide attempts, inmate-on-inmate violence resulting in serious injury, inmate-on-staff violence, inmate injuries requiring treatment by an outside hospital, inmate injuries of a suspicious nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.), sexual misconduct between inmates, sexual misconduct involving staff, fires, escapes, escape attempts, and deaths. | | x 8/11 x12/11 | |
| 34.g. (40) | CCDOC [OPR shall ensure that any investigation reports indicating possible criminal behavior will be referred to the appropriate law enforcement authority. | x 8/11 x12/11 | x 9/10 x 3/11 | |
| 35. | **Investigations:** <br> **Investigations at the Facility are conducted by independent departments under the Cook County Sheriff's Office, including the Office of Professional Review, the Criminal Investigations Unit, and the Sheriff's Police Department. The Cook County Sheriff will assume responsibility for requiring these investigatory units to comply with the relevant provisions of this Agreed Order.** | | | |
| 35.a. (40) | CCDOC [OPR] shall maintain comprehensive policies, procedures, and practices for the timely and thorough investigation of alleged staff misconduct, in accordance with generally accepted correctional standards. | | x 9/10 x 3/11 x 8/11 x12/11 | |
| 35.b. (41) | Internal investigations [OPR] shall be conducted by persons who do not have supervisory responsibility for the staff member(s) being investigated. | | x 9/10 x 3/11 x 8/11 x12/11 | |
| 35.c. (41) | CCDOC [OPR] shall ensure that all internal investigations will include timely, thorough, and documented interviews of all relevant staff and inmates who were involved in, or witnessed, the incident in question. | x 9/10 x 3/11 x 8/11 x12/11 | | |
| 35.d. (41) | CCDOC [OPR] shall ensure that internal investigation reports shall include all supporting evidence, including witness and participant statements, policies and procedures relevant to the incident, physical evidence, video or audio recordings, and relevant logs. | x 9/10 x 3/11 x 8/11 x12/11 | | |
| 35.e. (41) | CCDOC [OPR] shall ensure that all investigatory staff will receive pre-service and in-service training on appropriate investigations policies and procedures, the investigations tracking process, investigatory interviewing techniques, and confidentiality requirements. | | x 9/10 x 3/11 x 8/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | | | x12/11 | |
| 35.f. (42) | CCDOC [OPR] shall provide all investigators who will be assigned to conduct investigations of use of force incidents with specialized training in investigating use of force incidents and allegations. | | x 9/10 x 3/11 x 8/11 x12/11 | |
| 35.g. (42) | CCDOC [OPR] shall ensure that the results of each internal investigation shall be documented in an investigation report. CCDOC administration shall review the investigation reports, along with the underlying documentation, and take appropriate action. CCDOC shall implement appropriate remedies based upon the results of internal investigations. | | x 9/10 x 3/11 x 8/11 x12/11 | |
| **36.** | **Inmate Disciplinary Process** | | | |
| 36.a. (42) | CCDOC shall maintain policies, procedures, and practices for a formal disciplinary process, including prompt issuance of written disciplinary citations, administrative review and disciplinary reports for alleged minor rule violations, and due process for alleged major rules violations, in accordance with generally accepted correctional standards. | | x 9/10 x 3/11 x 8/11 x12/11 | |
| 36.b. (43) | CCDOC shall ensure that inmate disciplinary hearings are conducted in a reasonably private and secure setting. | x 8/11 x12/11 | x 9/10 x 3/11 | |
| 36.c. (43) | CCDOC shall ensure that all inmates placed in lock down status are provided with appropriate due process that has been developed and implemented in policies and procedures, in accordance with generally accepted correctional standards.

In an emergency, the Executive Director of CCDOC may order a lock down of entire areas of the Facility in order to control the situation and address serious security concerns. In such circumstances, it is not necessary to provide disciplinary hearings to each inmate affected by the lock down. However, lock downs of this nature shall be limited to only the time and scope necessary to address the emergency.

For the purposes of this Agreed Order, a "lock down" shall not include the routine instances in which inmates are confined to their cells, including periods of count, over night, shift change, movement, and routine contraband sweeps. | | x 9/10 x 3/11 x 8/11 x12/11 | |
| 36.d. (44) | CCDOC shall ensure that the disciplinary board's written record accurately reflects the testimony and discussion from the disciplinary hearing, including any recommendations from a mental health professional regarding the extent to which disciplinary charges are related to an inmate's serious mental illness or suggestions for minimizing the deleterious effect of disciplinary | | X 3/11 X 8/11 x12/11 | x 9/10 |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | measure on the mental health status of the inmate. | | | |
| 36.e. (45) | CCDOC shall alert Cermak when inmates are placed in disciplinary segregation or protective custody. | | x 9/10 x 3/11 x 8/11 | |
| 36.f. (45) | CCDOC shall permit a Cermak Qualified Mental Health Staff member to serve on the disciplinary board. | x12/11 | x 3/11 x 8/11 | x 9/10 |
| 37. | **Classification** | | | |
| 37.a. (46) | CCDOC shall maintain policies and procedures for an appropriate, objective classification system that separates inmates in housing units by classification levels in order to protect inmates from unreasonable risk of harm.  The system shall include consideration of an inmate's security level, severity of current charge, types of prior commitments, suicide risk, history of escape attempts, history of violence, and special needs.  CCDOC shall use best efforts to anticipate periods of unusual intake volume and schedule sufficient classification staff to timely classify inmates. | | x 9/10 x 3/11 x 8/11 x12/11 | |
| 37.b. (47) | CCDOC shall ensure that classification staff have sufficient access to current information regarding cell availability on each division. | | x 9/10 x 3/11 x 8/11 x12/11 | |
| 37.c. (47) | CCDOC shall include information on each inmate's assignment to the Special Incarceration Unit "level system" at the Facility in the new Jail Management System, starting with the date the new Jail Management System becomes operational. | x 9/10 x 3/11 x 8/11 x12/11 | | |
| 37.d. (47) | CCDOC shall provide training and access to all correctional officer supervisors on the full capabilities of the new Jail Management System's classification and inmate tracking system (or any replacement system). | | x 9/10 x 3/11 x 8/11 x12/11 | |
| 37.e. (48) | CCDOC shall provide ongoing internal and external review and validation of the inmate classification system to ensure its reliability and objectivity. | | | x 9/10 x 3/11 x 8/11 x12/11 |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| **38.** | **Inmate Grievance Procedure** | | | |
| 38.a. (548) | CCDOC shall maintain policies and procedures to ensure inmates have access to an adequate grievance process and to ensure that grievances may be accessed and filed confidentially, without requiring the intervention of a correctional officer, in accordance with generally accepted correctional standards.  These policies and procedures should be applicable and standardized across all the Facility divisions. | X 8/11 x12/11 | x 9/10 x 3/11 | |
| 38.b. (48) | CCDOC shall ensure that the grievances receive appropriate follow-up, including informing the grievant of the outcome, providing a timely written response, and tracking implementation of resolutions. | X 8/11 x12/11 | x 9/10 x 3/11 | |
| 38.c. (48) | CCDOC shall ensure that grievance forms are available on all units and are available in Spanish. CCDOC shall ensure that there is adequate opportunity for illiterate inmates and inmates who have physical or cognitive disabilities to access the grievance system. | x 8/11 x12/11 | x 9/10 x 3/11 | |
| 38.d. (49) | CCDOC shall ensure that inmate grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria, are referred for investigation.  A member of the management staff shall review the grievance tracking system regularly in order to identify areas of concern. | x 8/11 x12/11 | x 3/11 | x 9/10 |
| **39.** | **Access to Information** | | | |
| 39.a. (50) | CCDOC shall ensure that newly admitted inmates receive information, through an inmate handbook or orientation video, regarding the following areas:  facility rules and regulations; how to report misconduct; how to report sexual abuse or assault; the process for accessing medical and mental health care; emergency procedures; rules for sending and receiving mail; the visitation process; facility schedule; the disciplinary process; and how to seek redress of grievances. | | x 9/10 x 3/11 x 8/11 x12/11 | |
| 39.b. (50) | CCDOC shall ensure that materials on facility rules and services are available for non-literate and non-English speaking inmates. | | x 9/10 x 3/11 x 8/11 x12/11 | |
| 40. (51) | CCDOC shall provide training and supervision to all correctional officers and supervisors sufficient to implement the provisions of this Agreed Order. | x 8/11 x12/11 | x 9/10 x 3/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| 41. (51) | Inter-Agency Agreement<br>a.   CCDOC shall enter into a written Inter-Agency Agreement with Cermak that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility. The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order.<br>b.   Cermak shall enter into a written Inter-Agency Agreement with CCDOC that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility. The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order. | x 8/11<br>x12/11 | x 3/11 | x 9/10 |
| 69. (51) | CCDOC shall ensure that security staff posts will be equipped, as appropriate, with readily available, safely secured, suicide cut-down tools. *Coordinate with Dr. Metzner | x 8/11<br>x12/11 | | x 9/10<br>x 3/11 |

## 31. Use of Force

a.     CCDOC shall maintain comprehensive and contemporary policies and procedures, in accordance with generally accepted correctional standards, surrounding the use of force and with particular emphasis regarding permissible and impermissible uses of force.

**December 2011 Status Update:**   Substantial Compliance

**Status Update:**  All relevant policies were implemented effective 9/19/2011.

**Monitor's Assessment:**  The policies and procedures have been implemented. CCDOC is experiencing some implementation issues, particularly around assuring that reports for uses of force are logged at OPR in a timely fashion. CCDOC has initiated a Unit singly responsible for the collection and review of use of force information, not required by this agreement, to oversee the policy compliance, and track and analyze data.  The Unit will be providing quarterly reports to the executive team.

The complete revision of the CCSO's use of force policies has created a substantial challenge to assure that all requirements are met.  For example, a draft flow chart outlining the duties of all components of the CCSO and CCDOS stretches across the width of two legal sized pages; and that didn't include CIU. As the operational challenges arise while trying to adhere to the new directives, the Executive Team and use of force Unit will be busy.

**Monitor's Recommendations:**  Continue to monitor implementation issues and compliance.  Assure that reports are timely provided to OPR for logging.

## 31. Use of Force

b.     CCDOC shall maintain use of force policies and pre-service and in-service training programs for correctional officers and supervisors that address the following impermissible uses of force:
1.     use of force as a response to verbal insults or inmate threats where there is no immediate threat to the safety of the institution, inmates, or staff;
2.     use of force as a response to inmates' failure to follow instructions where there is no immediate threat to the safety of the institution, inmates, or staff, unless CCDOC has attempted a hierarchy of nonphysical alternatives that are documented;
3.     use of force as punishment or retaliation;
4.     use of force involving striking, hitting, or punching a restrained and  non-combative inmate;
5.     use of force against an inmate after the inmate has ceased to offer resistance and is under control;
6.     use of choke holds on an inmate, unless lethal force is justified; and
7.     use of inappropriate or excessive force.

**December 2011 Status Update:**   Substantial compliance.

**Status Update:**  See 31.a.  and the July 2011 report.

CCDOC reports that as of December 2011, 3,316 corrections staff have been trained regarding the new use of force policies. The use of force Unit has been designated and began work in September 2011.

**Monitor's Assessment:** See 31.a.

**Monitor's Recommendations:** See 31.a.

## 31. Use of Force

c.      CCDOC shall maintain a policy to ensure that staff adequately and promptly report all uses of force, in accordance with generally accepted correctional standards.

**December 2011 Compliance Status:** Substantial Compliance

**Status Update:** See 31.a.

**Monitor's Assessment:** Reports are being completed and there is a quality-control review process at the use of force Unit level and CCDOC Executive Director level. This review process has slowed the transmission of the reports to OPR. CCDOC and OPR are aware of this slow down and believe that as employees become more accustomed to the report requirements, the quality of officers' reports, and the supervisory review process, the process will become for routine and timely. All parties have previously agreed that OPR will be the single source of use of force data for CCDOC, and the delays in logging reports at OPR means that current data is not available.

**Monitor's Recommendations:** Assure that the use of force reports are more expeditiously provided to OPR to create an current, accurate log of all uses of force.

## 31. Use of Force

d.      CCDOC shall require that use of force reports:

1.  Be written in specific terms in order to capture the details of the incident;
2.  Contain an accurate account of the events leading to the use of force incident;
3.  Include a description of the instrument(s) of restraint or control, if any, and the manner in which it was used;
4.  Note whether an inmate disciplinary report was completed in connection with the incident that prompted the use of force;
5.  Describe the nature and extent of apparent and reported injuries sustained both by the inmate and staff member;
6.  Contain the date and time medical attention was actually provided;
7.  Describe, in detailed, factual terms, the type and amount of force used as well as the precise actions taken in a particular incident; and
8.  Note whether a use of force was videotaped. If the use of force is not videotaped, the reporting correctional officer and supervisor will provide an explanation as to why it was

not videotaped.

**December 2011 Compliance Status:**  Substantial compliance.

**Status Update:** See 31.a.

**Monitor's Assessment:**  The implementation of the new procedures is being closely reviewed by the use of force Unit and the CCDOC's executive team. These close reviews have resulted in reports being returned to the authors to include all required data, as well as tracking of what updated training may be needed as the process rolls forward.

**Monitor's Recommendations:**  Continue to ensure compliance with relevant written directives;  monitor compliance; and identify training needs.

I recommended to CCDOC that they track uses of force involving mental health clients [as identified by CERMAK] to provide additional information to improve training for employees, to address any operational issues, to assure collaboration between mental health and security staff, and to monitor uses of force for this population.

## 31. Use of Force

e.        CCDOC shall continue to require prompt review by the shift commander of all use of force reports.  The shift commander's review of use of force reports shall include review for completeness and procedural errors, as well as review of the substantive content.  If the use of force report does not comply with provision 31.d. of this Agreed Order, the shift commander shall return it to the reporting officer for revision and resubmission until it is compliant.  If the shift commander believes a use of force may have been inappropriate or excessive, he or she shall immediately refer the incident for investigation.

**December 2011 Compliance Status:**  Partial compliance

**Status Update:**   As noted in the July 2011 report, CCSO policy requires this level of review.

**Monitor's Assessment:**  While the policy is responsive to this requirement, the fact that the use of force Unit and the CCDOC executive team need to review and clarify reports demonstrates that shift commanders are not yet competent in this requirement.  The involved leadership of the CCDOC's executive team and re-training will help improve the outcomes in the future.  At the time of the tour there were approximately 100 reports that were still undergoing review by the executive team.

**Monitor's Recommendations:**  Continue to monitor the shift commanders' effectiveness in ensuring that reports comply with the written directive.  Develop re-training for shift commanders and line staff based on the review of the reports.

## 31. Use of Force

f.        CCDOC shall ensure that senior management review of uses of force includes:

1.        A timely review of medical documentation of inmate injuries, if any is submitted, as provided by Qualified Medical Staff, including documentation surrounding the initial medical encounter, an anatomical drawing that depicts the areas of sustained injury, and information regarding any further medical care;
2.        The inmate disciplinary report, if any, associated with the use of force; and
3.        The incident report, if any, associated with the use of force.

**December 2011 Compliance Status:**  Substantial compliance.

**Status Update:**   See 31.a. d., and e. and July 2011 report.

**Monitor's Assessment:**   The CCDOC has been diligent in reviewing all use of force reports, which had had the unintended consequence of creating a backlog in providing the use of force reports to OPR for entering into IAPro.  We have agreed that IAPro is the repository for all data regarding using of force.

**Monitor's Recommendations**:  Refine the review process; assure that uses of force are promptly logged at OPR.  See recommendations under 31.f.

## 31. Use of Force

g.        CCDOC [and Cermak] shall establish criteria that trigger referral for inappropriate or excessive use of force investigations, including but not limited to, documented or known injuries that are extensive or serious; injuries involving fractures or head trauma; injuries of a suspicious nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.); and injuries that require treatment at outside hospitals.

**December 2011 Compliance Status:**  Substantial compliance.

**Status Update:**  See July 2011 report.

**Monitor's Assessment:**  CCSO, CCDOC and the Interagency Agreement with Cermak address the requirements of this paragraph.   There continues to be a need for better communication between Cermak and OPR regarding allegations referred by Cermak to OPR and the expectations of Cermak's regarding learning the outcomes [as opposed to acknowledging the receipt of the allegation by OPR] of these referrals.

**Monitor's Recommendations**:  Both Cermak and CCDOC need to specifically continue to address any communication issues regarding referrals of allegations of excessive uses of force referred to OPR by Cermak.

As noted earlier, I recommended to CCDOC that they track uses of force

involving mental health clients [as identified by CERMAK] to provide additional options to improve training for employees, to address any operational issues, to assure collaboration between mental health and security staff, and to monitor uses of force for this population.

## 31. Use of Force

h.      When CCDOC review of use of force reports, and supporting records if applicable, reveals that reports of a use of force are materially inconsistent, conflicting, or suspicious, CCDOC shall refer that use of force incident for internal investigation.

**December 2011 Compliance Status:**  Substantial Compliance.

**Status Update:**  See July 2011 report.

**Monitor's Assessment:**  The CCSO policy requires this review.  There are several opportunities to determine that there are inconsistencies or other issues with an incident, including the supervisory review, the executive level review, the use of force Unit's review and the OPR review.   CCDOC is aware that it needs to provide the reports to OPR to be logged in a more timely fashion.  When file review is complete in CCDOC then OPR will review further.

**Monitor's Recommendations**:  Continue to monitor compliance; assure that reports are provided to OPR in a timelier manner.

## 31. Use of Force

i.      CCDOC shall develop and implement a system to track all incidents of use of force that, at a minimum, includes the following information:

1.      a tracking number;
2.      the inmate(s) name;
3.      housing assignment;
4.      date;
5.      type of incident;
6.      injuries (if applicable);
7.      medical care provided (if applicable);
8.      staff involved;
9.      reviewing supervisor;
10.     external reviews and results (if applicable);
11.     remedy taken (if appropriate); and
12.     administrative sign-off.

**December 2011 Compliance Status:**   Partial compliance.

**Status Update:**   See July 2011 report.  The incident reporting module of IMACS has not been implemented.

**Monitor's Assessment:**  CCSO policy and OPR procedures address these

requirements. The incident reporting module is in its final stages of preparation for implementation. The information can be tracked, but not as it will be when the incident reporting module is in place.

**Monitor's Recommendations**: Continue to ensure compliance; provide reports to OPR in a more timely fashion. Implement the incident reporting module in IMACS.

### 31. Use of Force

j.       CCDOC shall ensure that, promptly following a use of force incident, video or photographs are taken of any and all reported or apparent injuries sustained by inmates and staff. The video or photographs will be maintained and will be included in the investigation package, if applicable.

**December 2011 Compliance Status:** Substantial compliance

**Status Update:** See July 2011 report.

**Monitor's Assessmen**t: Policy is consistent with this requirement. The files I reviewed at OPR, where appropriate, had these materials as part of the record.

**Monitor's Recommendations:** Continue to monitor compliance. Review products to assure they are an asset to the investigation; provide any re-training to responders and videographers as necessary.

### 31. Use of Force

k.       CCDOC shall establish an "early warning system" that will document and track correctional officers who are involved in use of force incidents and any complaints related to the inappropriate or excessive use of force, in order to alert CCDOC administration to any potential need for retraining, discipline, problematic policies, or supervision lapses. Appropriate CCDOC leadership, supervisors, and investigative staff shall have access to this information and monitor the occurrences. CCDOC senior management shall use information from the early warning system to improve quality management practices, identify patterns and trends, and take necessary corrective action both on an individual and systemic level.

**December 2011 Compliance Status:** Partial compliance

**Status Update:** CCDOC reports the following  progress to comply with this paragraph, in <u>addition</u> to efforts I reported in July 2011:

- Issued a CCSO general order effective on January 4, 2012 entitled Uses of Force Alert and Early Intervention order;
- Drafted a CCSO Remedial Training General Order; and
- Completed a CCSO Use of Force and Data Collection and Review Unit general order.

**Monitor's Assessmen**t:  CCSO and CCDOC are moving toward compliance with appropriate steps.  The use of force Unit's assessment and analysis of uses of force will report on the individuals involved with uses of force.

CCDOC reported in December that the early warning system had identified four employees who had been referred for intervention and remediation.

**Monitor's Recommendations:**  Continue to finalize relevant directives. Document referrals and outcomes.

## 31. Use of Force

l.        CCDOC shall ensure that a supervisor is present during all pre-planned uses of force, such as cell extractions.

**December 2011 Compliance Status:**  Substantial compliance

**Status Update:**  See July 2011 report

**Monitor's Assessmen**t:  The relevant written directive has been implemented.

**Monitor's Recommendations:**  Continue to evaluate compliance.

## 31. Use of Force

m.        Where there is evidence of staff misconduct related to inappropriate or unnecessary use of force against inmates, CCDOC shall initiate personnel actions and seek disciplinary action appropriately for any correctional officer found to have:

1.        engaged in inappropriate or excessive use of force;
2.        failed to report or report accurately the use of force;
3.        retaliated against an inmate or other staff member for reporting an inappropriate or excessive use of force; or
4.        interfered or failed to cooperate with an internal investigation regarding use of force in a manner inconsistent with the staff member's statutory or contractual rights.

**December 2011 Compliance Status**:  Substantial compliance

**Status Update:**  The CCSO has adopted the necessary written directives to comply.  However, as noted previously  in instances where more than a 30-day suspension, or termination is recommended, the Merit Board must act upon the CCSO's recommendation.

**Monitor's Assessmen**t:  A review of the investigative files supports the CCDOC's commitment to identifying any staff misconduct.

**Monitor's Recommendations**:  Continue to ensure compliance with relevant written directives.  Monitor outcomes of discipline handled by the Merit Board in

relation to use of force investigations and CCSO recommendations.

## 31. Use of Force

n.    Where there is evidence of staff misconduct related to inappropriate or unnecessary use of force against inmates, CCDOC shall consider, develop, and initiate systemic remedies as appropriate.

**December 2011 Compliance Status:** Substantial compliance

**Status Update:** July 2011 update.

**Monitor's Assessmen**t:  The Sheriff's weekly accountability meetings and the documents and data provided for that meeting track uses of force and incidents in all divisions.  These reports are provided to me and I can ask more questions if needed.  The CCDOC has been very responsive to using the data to consider and make changes in operational practices, pinpoint problems, and address issues directly with the superintendents involved.   The designation of a use of force Unit helps ensure data collection, analysis and development of recommendations for the CCDOC and Sheriff's review.

**Monitor's Recommendations:**  Continue to ensure compliance with relevant written directives.   Monitor the changes that result for the weekly accountability meetings and/or information from the use of force Unit.

## 31. Use of Force

o.    CCDOC shall maintain accountability policies and procedures for the effective and accurate maintenance, inventory, and assignment of chemical and other security equipment, in accordance with generally accepted correctional standards.

**December 2011 Compliance Status:** Substantial compliance.

**Status Update:**  The written directives referenced in the July 2011 report have been implemented.

**Monitor's Assessmen**t: CCDOC has the appropriate policies and procedures in place to address this paragraph.  During the July 2012 tour, an assessment of the requirements of this paragraph will be made.   The reporting during the Sheriff's weekly accountability meeting addresses many of these issues (e.g. lost radios, lost keys, etc.) keeping the matters in the forefront for CCDOC.

**Monitor's Recommendations:**  Continue to monitor compliance; assure inspections and inventories occur as scheduled.

## 31. Use of Force

p.      CCDOC shall continue to conduct use of force training in accordance with generally accepted correctional standards, including:

1.      CCDOC shall maintain an effective and comprehensive use of force training program.
2.      CCDOC shall continue to ensure that correctional officers receive adequate training in CCDOC's use of force policies and procedures, including de-escalation and defensive tactics relating to use of force.
3.      CCDOC shall continue to ensure that correctional officers receive pre-service and in-service training on reporting use of force and completing use of force reports.

**December 2011 Compliance Status:**  Substantial compliance.

**Status Update:**   See July 2011 report.  In addition to the efforts described in that report, the Sheriff's office use of force Unit is providing recommendations for changes to training resulting from his review of the use of force reports. CCDOC reports that as of December 2011, 3,316 corrections staff have been trained regarding the new use of force policies.  The use of force Unit has been designated and began work in September 2011.

**Monitor's Assessmen**t:  The agency continues to provide training to new officers, and will update the use of force in-service training as dictated by the findings of the use of force Unit.

The CCDOC has not yet implemented an updated field training program for new employees (or those returning to work after being gone for a time period). This FTO program is essential to reinforcing what was learned in the training academy in terms of use of force and the reporting requirements of the various written directives.  Director Kurtovich and Lt. Greer report that the FTO draft manual has been completed; posting have made for those interested in the positions, and the selection process to begin in the near future.

**Monitor's Recommendations:**  Continue to evolve pre-service and in-service training based on the findings of the executive team and the use of force Unit. Develop, implement, monitor and evaluate a field training program for newly hired and returning officers.

## 31. Use of Force

q.      CCDOC shall provide a process for inmates to report allegations of the inappropriate or excessive use of force orally to any CCDOC staff member; said staff member shall give the inmate the opportunity to reduce his or her report to writing through a grievance or complaint form without discouragement.

**December 2011 Compliance Status:**  Partial compliance.

**Status Update:**  The policies and procedures reported in July 2011 have been

implemented.

**Monitor's Assessment:**  Partial compliance is noted because I am not convinced that there is a regular presence of Correctional Rehabilitation Workers (CRWs) in the housing units, nor comfortable that they are yet proficient in their duties relative to use of force allegations.  During this tour I did find fewer reports from inmates of uses of force, but the sample size is not large enough for me to generalize this to all divisions.  I did, however, find inmates who did not know who their CRW (or social worker) was, or could tell me the last time the CRW was in the unit.

I do believe that Cermak and officers are being diligent in getting inmates' reports to the appropriate place, but believe there is more work that needs to be done.

One data point not included in the draft of the first use of force Unit's quarterly report is the source of the allegation.  Tracking the source will provide additional information to CCDOC (e.g. subject inmate, inmate witnesses, employee involve, other employee(s), family of inmate, CRWs, anonymous source to OPR, etc.).

**Monitor's Recommendation:** Continue to monitor the work of the CRWs and their presence in the housing units (during times when inmates are there and/or awake).  Assure their training is on-going.  Track the source of allegations.

## 31. Use of Force

r.        Following a use of force, when CCDOC staff transport an inmate to receive medical care by Cermak, as necessary, the CCDOC staff member shall inform the Cermak staff member that the inmate was involved in a use of force.

**December 2011 Compliance Status:**  Substantial Compliance.

**Status Update:**  See July 2011 report.

**Monitor's Assessment:** .  In reviewing the materials/documentation from the Sheriff's weekly accountability meetings, the reports clearly indicate that staff are transporting inmates to Cermak for evaluation, even if there are no apparent/visible injuries.

**Monitor's Recommendation:**  Continue to monitor compliance.

## 31. Use of Force

s.        Cermak shall ensure that, when providing medical treatment or assessment to an inmate following a use of force, Qualified Medical Staff document the inmate's injuries, if any, and any medical care provided.  Cermak shall provide CCDOC senior management with a brief

summary documenting the initial medical encounter following a use of force, including an anatomical drawing that depicts the areas of sustained injury, if any, and information regarding any further medical care.

**December 2011 Compliance Status:** Substantial compliance.

**Status Update:** See July 2011 report.

**Monitor's Assessment:** See July 2011 report.

**Monitor's Recommendations:** Continue to monitor compliance with this paragraph.

### 31. Use of Force

t.      Cermak shall ensure that Qualified Medical Staff question, outside the hearing of other inmates or correctional officers if appropriate, each inmate who reports for medical care with an injury, regarding the cause of the injury.  If, in the course of the inmate's medical encounter, a health care provider suspects staff-on-inmate or inmate-on-inmate abuse, that health care provider shall immediately:
1.      report the suspected abuse to the Executive Director of the Office of Professional Review or other appropriate CCDOC administrator; and
2.      adequately document the matter in the inmate's medical record.

**December 2011 Compliance Status:** Substantial Compliance

**Status Update:** See July 2011 report.

**Monitor's Assessment:** See July 2011 report.

**Monitor's Recommendations:** Continue to monitor compliance with this paragraph.

### 32.   Safety and Security

a.      CCDOC shall maintain security and control-related policies, procedures, and practices that will result in a reasonably safe and secure environment for all inmates and staff, in accordance with generally accepted correctional standards. Coordinate with Grenawitzke, Shansky, Metzner.

**December 2011 Compliance Status:**    Partial compliance.

**Status Update:** See July 2011 report.  The CCDOC continues their work to update and implement appropriate policies and procedures.  The Office of Policy and Accountability and the written directive committee are well organized and resourced to keep the process moving forward.  CCDOC is commended for having two outside corrections agencies review CCDOC's security operations and make recommendations.

**Monitor's Assessment:** The work continues in a well-resourced and organized fashion.

**Monitor's Recommendation:** Continue on present course. Update spreadsheets noting the status of all written directives.

## 32.    Safety and Security

b.       CCDOC shall maintain policies, procedures, and practices to ensure the adequate supervision of inmate work areas and trustees, in accordance with generally accepted correctional standards. Coordinate with Grenawitzke.

**December 2011 Compliance Statue:** Partial compliance

**Status Update:** The general order has been issued (11.14.1.0 effective 10/14/11) which provides the primary proof of compliance for this paragraph.

**Monitor's Assessment:** Given the condition of some of the units I inspected, more work needs to be done to insure supervision of workers, including the chemical used, work accomplished, and overall coordination using a cleaning plan and inspection of work. While not expecting that the facilities will be pristine, the visual inspections of the areas, and discussions with inmates identify lapses that allow lack of cleanliness. The new inspection procedures implemented since the December tour should assist compliance.

**Monitor's Recommendations:** Monitor compliance with the directive. Assess the impact of the new inspectors in achieving compliance. Maintain better communication with inmate workers.

## 32.    Safety and Security

c.       CCDOC shall ensure that security staff conduct appropriate rounds with sufficient frequency to provide inmates with reasonable safety. Rounds shall be conducted at least once every half hour, at irregular intervals, inside each housing unit. In the alternative, CCDOC may provide direct supervision of inmates by posting a correctional officer inside the day room area of a housing unit to conduct constant surveillance. More frequent rounds shall be conducted for special management inmates who require more intensive supervision for security and safety reasons. All security rounds shall be documented on forms or logs that do not contain pre-printed rounding times. Video surveillance may be used to supplement, but must not be used to replace, rounds by correctional officers.

**December 2011 Compliance Status:** Partial compliance.

**Status Update:** The directives noted in the July 2011 report have been issued and implemented.

**Monitor's Assessmen**t: The physical condition of the portions of the facilities I inspected, and the content of inmate interviews tells me that the rounds are not achieving the objectives of the written directives. If rounds are conducted per

the order, then supervisors are walking past physical plant problems, and not effectively communicating with inmates. More work needs to be done to clarify what constitutes the rounds, not just that the supervisor was there, but that problems are identified, and solutions addressed, even if the solution lies with DFM.

**Monitor's Recommendations:** Provide specific guidance to the posts required to do rounds. Commanders and superintendents need to make spot checks not only to see if the logs reflect the presence of supervisors, but that there are no apparent physical plant deficiencies, or unaddressed inmate issues.

## 32. Safety and Security

d.      CCDOC shall ensure that security supervisors conduct daily rounds in the inmate housing units, and document the results of their inspections.

**December 2011 Compliance Status:** Partial compliance.

**Status Update:** See 32.c.

**Monitor's Assessmen**t: See 32.c. The condition of the housing units I inspected does not suggest to me that there is an effective outcome of whatever rounds are being conducted by supervisors. They seem to be walking past problems and issues, whether they are physical plant or inmate matters.

**Monitor's Recommendations:** See 32.c.

## 32.     Safety and Security

e.      Cook County shall increase the use of overhead video surveillance and recording cameras to provide adequate coverage throughout the common areas of the Facility, including the RCDC, all division intake areas, mental health units, special management units, inmate housing units, and in common areas of the divisions.

**December 2011 Compliance Status:** Partial Compliance

**Status Update:** The project manager, Joan Kunz, noted that the camera drawings were 95% completed, the budget approved, and the project expected to be bid out in January 2012.

**Monitor's Assessment:** The project has the fiscal support needed, and remains a priority for CCDOC.

**Monitor's Recommendations**: Continue with implementation strategies.

## 32.    Safety and Security

f.       CCDOC shall maintain a procedure to prevent inmates from possessing or having access to dangerous contraband, including conducting regular inspections of cells and common areas of the housing units to identify and prevent rule violations by inmates.

**December 2011 Compliance Status**:  Partial compliance

**Status Update:**  CCDOC has implemented written directives addressing a weapons-free environment, and takes coordinated and effective steps to track, log and determine the source of seized weapons/contraband.  This is a priority during the Sheriff's weekly accountability meeting.  But, as noted by the Weapons' Free Committee's report, the source of many of the weapons continues to be the buildings themselves:  lighting and other physical plant structures and appliances, etc.

**Monitor's Assessmen**t:  Pending is the inter-agency agreement on tool control. Until this is finalized, the gap will exist holding DFM and the County responsible for fixes to the physical plant that significantly contributes to contraband.  Also there is a need to see the DFM's budget requests to replace [granted it will be over time] the parts of the physical plant's infrastructure that are the sources of the weapons. This will, in the end, require additional resources to install/retrofit corrections grade equipment that should, most likely, been installed in the building when they were built (for the new structures) or when they were renovated (for older facilities).   I am impressed by the diligence with which staff are locating contraband.  Inmate are alerting staff about weapons.  Some seized weapons are also medical related items, such as canes, crutches, etc. which also need to be addressed in a collaborative fashion.

**Monitor's Recommendations:**  Work to complete the inter-agency agreements regarding how to fix, update, repair non-corrections grade fixtures.  Provide evidence of DFM's budget requests to replace infrastructure and installations that are allowing inmates to fashion weapons. Continue the good work of monitoring the source of weapons.

## 32.    Safety and Security

g.       CCDOC shall review, and revise as applicable, all General Orders ("GOs"), Standard Operating Procedures ("SOPs"), and Post Orders on an annual basis, or more frequently as needed.

**December 2011 Compliance Status:**  Substantial Compliance

**Status Update:**  See July 2011 report.

**Monitor's Assessmen**t: See July 2011 report.

**Monitor's Recommendations:** Continue to provide the resources and leadership to write new, and update existing directives.

## 32. Safety and Security

h.      CCDOC shall revise policies, SOPs, and post orders for all armed posts to include proper use and safe handling of weapons and provide specific instructions on use of deadly force and when and under what circumstances such force should be used, in accordance with generally accepted correctional standards.

**December 2011 Compliance Status:** Substantial Compliance.

**Status Update:** Appropriate policies, procedures, SOPs and post orders are in place. These documents are part of the annual review process.

**Monitor's Assessmen**t: The work has been completed. The staff in the Office of Policy and Accountability are commended for their diligent work in completing and issuing the post orders.

**Monitor's Recommendations:** Continue to monitor compliance with the review schedule.

## 32. Safety and Security

i.      CCDOC shall standardize security policies, procedures, staffing reports, and post analysis reports across the divisions, to the extent possible, taking into account the different security levels and different physical layouts in the various divisions.

**December 2011 Compliance Status:** Partial compliance

**Status Update:** See July 2011 report.

**Monitor's Assessmen**t: CCDOC is continuing to work on overall staffing based on my discussions with CCDOC before and during the December tour. Each division is continuing to develop and refine operational practices that are relevant to the security in that division. Consideration is being given to providing a field-training-officer specific orientation for employees newly assigned or bid into the division.

**Monitor's Recommendations:** Continue to finalize staffing strategies and assure compliance. Complete and implement division specific operational practices.

## 32. Safety and Security

j.      CCDOC shall provide formal training on division-specific SOPs to correctional officers in accordance with their assignments, and shall provide further specialized training for officers assigned to Special Management Units. Cermak Hospital shall provide specialized training for officers assigned to psychiatric units. [From Consent agreement "Special Management Units"

means those housing units of the Facility designated for inmates in administrative or disciplinary segregation, in protective custody, on suicide precautions, or with mental illness."] Coordinate with Drs. Shansky and Metzner.

**December 2011 Compliance Status:**  Partial Compliance.

**Status Update:**  See 32.i.  Dr. Shansky and Dr. Metzner are satisfied with the training provided to officers working in Cermak.

**Monitor's Assessmen**t: See July 2011 report.   See also 32.i. regarding division-specific SOPs.

Aside from the work involved with division level SOPS, I continue to be concerned about the levels of disorder in the mental health units by which I mean that there seems to be higher than expected (by me) rate of fights and uses of force [as seen in the documents of the Sheriff's accountability meetings]. This may be an interaction of the need for more effective training and better communication skills, more officer stability in working in these units, more proactive supervision of inmates by security staff, better collaboration between mental  health and security staff, and/or improved supervision of officers.  As the working relationships between mental health and security continue to mature, these issues may be addressed, but continue to require attention.  Dr. Metzner commented on some of these same matters in his November 2011 report.

CCDOC provided me with information on the orientation of officers working in the Women's Justice Program.

**Monitor's Recommendations:** Monitor the levels of disorder in the specialized units as a means to develop recommendations to address altercations, etc. Implement the division-specific SOPs, including development of a field-training-officer program specific to each newly assigned officer.  Evaluate this initiative.

## 32.    Safety and Security

k.        CCDOC shall maintain in working order all monitoring equipment at the Facility that is under CCDOC's direct control, including cameras, alarms, radios (hand held), interior and exterior lighting, x-ray and other screening equipment, and walk-through metal detectors.  To the extent that the maintenance of any Facility monitoring equipment is under the control of DFM, CCDOC shall promptly report any maintenance needs and DFM shall prioritize its services to ensure that all monitoring equipment is maintained in working order.  Coordinate with Grenawitzke.

**December 2011 Compliance Status:**  Partial Compliance.

**Status Update:** No change from September 2010 report.

**Monitor's Assessmen**t:

CCDOC needs to develop and implement a consistent and coordinated approach to each requirement of the paragraph. Partial compliance is noted because of the video capital project. There are division/unit inspection directives under development. It is clear from reading the documentation from the Sheriff's accountability meetings that these issues are flagged but a consolidated approach is needed.

**Monitor's Recommendations:** Develop the policies and procedures related to this paragraph.

## 32. Safety and Security

l.      Absent exigent circumstances, CCDOC: (i) shall house each inmate assigned to a division that is celled to one permanent bed in a cell and shall not house any inmates (including those assigned to dormitory divisions) such that they are sleeping on the floor, on a mattress on the floor, or in any area not designed or redesigned as sleeping quarters; (ii) shall not house more than two inmates to a single cell (triple-bunking); and (iii) shall not hot-bunk any inmates.

**December 2011 Compliance Status:** Substantial Compliance.

**Status Update:** The Acting Executive Director reports that there have been no deviations from the July 12, 2011 memo regarding housing inmates. The CCDOC is experiencing a high inmate population [see Executive Summary of this report] that challenges the CCDOC. The prisoner release order from the Federal Courts is resulting in limited relief as the order has apparently changed the pre-trial release behaviors of some judges, leaving fewer arrestees whose circumstances meet the requirements for the Sheriff to release to the Electronic Monitoring (EM) program.

**Monitor's Assessmen**t:  I will continue to monitor the situation with the assistance of the defendants' counsel.

**Monitor's Recommendations:** CCDOC continue to carefully monitor the inmate population and the impact of the release order on the average daily population. See also recommendations in the Executive Summary of this report.

## 32. Safety and Security

m.      When exigent circumstances give rise to triple-bunking, CCDOC shall provide the third inmate in the triple-bunked cell a "boat," stackable bunk, moveable platform, or cot, so that the inmate is not required to lay down directly on the cell floor or on a mattress on the floor.

**December  2011 Compliance Status:**          Substantial Compliance

**Status Update:** See 32. l.

**Monitor's Assessmen**t:  See 32.1.

**Monitor's Recommendations:** See 32.l.

**33.** **Security Staffing.** The parties agree that correctional officer staffing and supervision levels at the Facility must be appropriate to adequately supervise inmates, to carry out the requirements of this Agreed Order, and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards. Cook County and CCDOC shall take such actions as shall ensure that correctional officer staffing and supervision at the Facility are sufficient to achieve these purposes. These actions shall include the following:

a.      In the fiscal year 2010 budget, Cook County shall allocate funds sufficient to allow for 210 additional correctional officer positions at the Facility. Consistent with provision 33.c, such funding may occur on a rolling basis, as appropriate in light of the time required to hire, train, and put on duty the additional 210 new correctional officers.

**December 2011 Compliance Status:** Substantial Compliance

**Status Update:** See July 2011 report.

**Monitor's Assessment:** CCDOC is continuing to hire corrections officers. Attrition due to resignations or retirements has not substantially altered their ability to meet hiring goals. CCDOC anticipated about 10 retirements in CY 2011, and 30 – 50 transfers of corrections officers to court services. Human Resources anticipated 67 vacancies as of 12/31/2011.

CCDOC had yet to complete the staffing analysis for the new reception center/medical housing which may impact the number of officers who need to be hired in 2013. The decisions about how to use the existing RCDC will also impact this calculation.

It should be noted that the newly hired officers are meeting the expectations of the training academy and the superintendents. CCDOC still needs to implement a more robust and aggressive field-training-officer program to ensure that the new hires are proficient, correct behaviors, and, if needed, act as part of the decision making process to retain the new officers at the end of their probationary year.

**Monitor's Recommendation:** Continue to monitor hiring and attrition. Complete the staffing plan, including staffing for the new inmate receiving/housing, and the use, if any of the existing RCDC space. Complete the design and implement a field-training-program.

**33.** **Security Staffing.**

b.      CCDOC shall use its best efforts (through the maintenance of the written staffing plan required by provision 33.h and otherwise) to ensure that the number of correctional officer vacancies is kept to the minimum practicable number at all times, taking into account that the

timing of terminations and resignations and the resulting rate of attrition may, in ordinary course, result in there being some vacancies at any given time.

**December 2011 Compliance Status:** Partial compliance

**Status Update:** CCDOC produced a staffing plan dated July 2011. CCDOC has also implemented centralized roster management which is reported to have saved the agency almost $1 million in this first year of operation by better coordinating the staffing the divisions in real-time. CCDOC is monitoring the leave status of employees to assure staffing is maintained and policies followed by staff.

**Monitor's Assessmen**t: A staffing plan was produced, which I reviewed and was discussed with CCDOC during the December 2011 tour. As a result of that meeting, CCDOC will compute the actual shift relief factor (as opposed to using the one developed in1995); and also determine the shift relief factor for civilian employees. CCDOC will also develop a staffing plan for the new reception/inmate housing area, and work to determine the staffing needs, if any for the "old" RCDC.

**Monitor's Recommendations**: Complete the work discussed at the tour in December and provide for review.

### 33. Security Staffing.

c.      CCDOC shall fill the 210 additional correctional officer slots provided for in provision 33.a; fill the 285 correctional officer vacancies that existed at the Facility as of July 17, 2009; and fill any correctional officer vacancies coming into existence after that date in the following manner:
        i.      By December 31, 2010, CCDOC shall hire, train, and put on duty at the Facility at least 448 [381] newly qualified correctional officers (in addition to those on duty as of December 31, 2009).
        ii.     By March 30, 2011, CCDOC shall hire, train, and put on duty at the Facility at least 178 [107] newly qualified correctional officers (in addition to those on duty as of December 31, 2010).

**December 2011 Compliance Status:** Substantial Compliance.

**Status Update:** See 33.a.

**Monitor's Assessmen**t: See 33.a.

**Monitor's Recommendations:** See 33. a. and 33.b.

### 33. Security Staffing.

d.      The parties agree that for 30 months following the effective date of this Agreed Order, Cook County and CCDOC shall not be required to provide additional correctional officer staffing and supervision at the Facility beyond that which is necessary to ensure that correctional

officer staffing and supervision are sufficient to achieve the purposes set out in the introductory paragraph of provision 33 and to comply with provisions 33.a-c above.

**December 2011 Compliance Status:** Not applicable at this time.

## 33.  Security Staffing.

e.      Within 30 months of the effective date of this Agreed Order, the CCDOC Monitor shall assess and make a recommendation on whether the correctional officer staffing and supervision levels are appropriate to adequately supervise inmates at the Facility, in accordance with generally accepted correctional standards.  If the CCDOC Monitor determines that staffing is inadequate, the CCDOC Monitor will make a recommendation regarding the appropriate number of correctional officer staff.  If the parties do not accept the CCDOC Monitor's staffing recommendation, CCDOC and Cook County shall agree to an independent, comprehensive study to determine the appropriate correctional officer staffing and supervision.  The parties agree that the results of this staffing study shall provide guidance as to the sufficient number of qualified correctional officers necessary to operate the Facility safely and to carry out the requirements of this Agreed Order.

**December 2011 Compliance Status:** Not applicable at this time.

## 33.  Security Staffing.

f.      If the staffing study requires additional correctional officers, Cook County shall allocate funds sufficient to maintain correctional officer staffing levels necessary to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards.

**December 2011 Compliance Status:** Not applicable at this time.

## 33.  Security Staffing.

g.      If the staffing study requires additional correctional officers, and consistent with Cook County's allocation of funds for security staffing, CCDOC shall hire and train sufficient number of qualified correctional officers and other staff to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards, including:
1.      Investigative staffing sufficient to meet the internal investigation responsibilities outlined in this Agreed Order;
2.      Correctional officer staffing sufficient to provide inmates requiring treatment with adequate access to appropriate medical and mental health care by providing timely movement of inmates to medical units, transport of inmates who have been referred for outside specialty care, and escort, if necessary, to Qualified Medical and Mental Health Staff on housing units; and
3.      Qualified staff sufficient to monitor security cameras in real time and allow for supervisory viewing and retrieving at any time.

**December 2011 Compliance Status:** Not applicable at this time.

## 33.    Security Staffing.

h.        CCDOC shall maintain a written staffing plan that requires sufficient staffing to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards.

**December 2011 Compliance Status:**  Partial compliance.

**Status Update:**  See 33.b.   Additionally, the Acting Executive Director has (as of 10/13/11) assigned a Fire Safety officer per shift in each Division/Unit; and (as of 9/7/2011) assigned a Medical Administration Officer(s) for each division to address duties to improve operations as these needs are identified.

**Monitor's Assessmen**t:  See 33.b.

**Monitor's Recommendation:**  See 33.b.

## 33.    Security Staffing.

i.        Absent exigent circumstances, CCDOC shall maintain a practice that does not allow for scheduled, planned, or expected cross-watching (a CCDOC practice of allowing one correctional officer to simultaneously supervise two housing units from the control center of one of the units) at any time on all maximum security and Special Management Units, and during first and second shifts throughout the Facility.

**December 2011 Compliance Status:**  Substantial Compliance

**Status Update:**  See July 2011 report.

**Monitor's Assessmen**t:  The Acting Executive Director reported continuing compliance with this paragraph during the December 2011 tour.

**Monitor's Recommendation:**  CCDOC continue to monitor staffing and inmate safety when and if cross watching is used.

## 33.    Security Staffing.

j.        CCDOC may permit cross-watching on third shift in housing units that are not maximum security or Special Management Units only if the Monitor does not object after consultation and review.  The Monitor's review of the appropriateness of third-shift cross-watching on a particular housing unit shall be guided by the sufficiency of sightlines between the units being cross-watched, the adequacy of video and/or audio technologies in place, and/or other factors that bear on the safety and security of inmates and staff.  If the Monitor later objects to any cross-watching that is in effect because of the Monitor's concerns that cross-watching on a particular housing unit presents an undue risk to the safety and security of inmates and staff, CCDOC shall immediately cease such cross-watching.  CCDOC may renew cross-watching on that unit again if, after further consultation with and review by the Monitor, the Monitor does not object to such renewal.  Although cross-watching is permitted under the limited circumstances described herein, CCDOC will work to eliminate the practice at the Facility.

**December 2011 Compliance Status:** Substantial Compliance

**Status Update:** See 33.i.

**Monitor's Assessmen**t: The Acting Executive Director reported that there is cross watching only on lunch breaks on all three shifts in Division I, keeping six officers to do the vertical cross watching reviewed in July 2011. In Divisions V, VI, and II there is cross watching only on midnights and only for lunch reliefs. The Director reports there is never cross watching in specialized management units; nor have there been any grievances from the unions regarding this matter. Cross watching is on the agenda for every monthly labor/management meeting.

**Monitor's Recommendation:** Continue to assess the implementation of the paragraph's requirements.

## 34.    Incidents and Referrals

a.      CCDOC shall continue to ensure that staff adequately and promptly document all reportable incidents, including inmate fights, rule violations, inmate injuries, suicides and suicide attempts, cell extractions, medical emergencies, contraband, vandalism, escapes and escape attempts, fires, and other incidents causing a disruption to standard CCDOC practice, in accordance with generally accepted correctional standards.

**December 2011 Compliance Status:**   Partial compliance

**Status Update:**   See July 2011 report.

The incident reporting module in IMACS is not fully operational, currently in the test phase and is schedule to "go live" by the end of March 2012.

**Monitor's Assessmen**t  This paragraph will be in substantial compliance with the incident reporting in IMACS is fully implemented.

**Monitor's Recommendation:** Continue implementation of incident reporting module in IMACS.

## 34.    Incidents and Referrals

b.      CCDOC shall continue to ensure that correctional officers receive formal pre-service and in-service training on proper incident reporting policies and procedures, in accordance with generally accepted correctional standards.

**December 2011 Compliance Status:**   Substantial compliance

**Status Update:**   See July 2011 report.

**Monitor's Assessmen**t:   The use of force Unit as well as the executive team is carefully monitoring the reporting on uses of force and making recommendations to the training academy on additional training needed.

**Monitor's Recommendations:**  Continue the assessments of the quality of reports and develop training (individual and agency-wide) as needed.

## 34.    Incidents and Referrals

c.        CCDOC shall maintain a system to track all reportable incidents (as described in provision 34.a) that, at a minimum, includes the following information:

| | | | |
|---|---|---|---|
| 1. | incident tracking number; | 8. | primary and secondary staff involved; |
| 2. | the inmate(s) name; | | |
| 3. | housing assignment; | 9. | reviewing supervisor; |
| 4. | date; | 10. | external reviews and results (if applicable); |
| 5. | type of incident; | | |
| 6. | injuries (if applicable); | 11. | remedy taken (if appropriate); and |
| 7. | medical care (if applicable); | 12. | administrative sign-off. |

**December  2011 Compliance Status:**   Partial Compliance

**Status Update:**  See July 2011 report.

**Monitor's Assessment:**  See 34.a. Awaiting the incident reporting module in IMACS to be implemented.

**Monitor's Recommendation:**  Implementation of the IMACS module.

## 34.    Incidents and Referrals

d.        CCDOC shall require prompt administrative review of incident reports.  Such reviews shall include a case-by-case review of individual incidents as well as a systemic review in order to identify patterns of incidents.  CCDOC shall incorporate such information into quality management practices and take necessary corrective action.

**December 2011 Compliance Status:**  Substantial Compliance.

**Status Update:**  All relevant policies are in place.

**Monitor's Assessment:**  CCDOC is carefully reviewing all use of force reports, which has results in a delay in getting the source documents to OPR to be logged into their system.  As noted earlier, the use of force Unit is providing an additional level of review to these reports, analyzing the data and providing specific operational and training recommendations.

**Monitor's Recommendation:**  Continue to use of force Unit's assessment and analysis of uses of force in making relevant management decisions.

## 34.     Incidents and Referrals

e.      CCDOC shall ensure that incident reports, use of force reports and inmate grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria, that it is referred for investigation.

**December 2011 Compliance Status:**  Partial Compliance.

**Status Update:**  CCDOC has implemented the policies references in the July 2011 report.

**Monitor's Assessment:**  At the operational level, while the written directives are in place, I believe more training and supervision of the CRWs is needed to assure that all reports are forwarded promptly and that amendments to inmate requests and grievance forms not made by the CRWs, particularly as they relate to grievances.   The vast majority of inmate grievances are about medical, dental and mental health care.  I did see evidence that inmate grievances to result in OPR investigations.  The missing link is the presence, supervision and training of the CRWs.

CCDOC reports that the 13-member Grievance Team was fully implemented in December, 2011. The team's job is to collect, process and track inmate grievances.  CCDOC further states that in December 2011, the Team collected and processed 1,992 grievances for the month, which can be contrasted to 2,400 grievances previously processed annually.  As noted previously in this report, CCDOC has provided training to the CRWs and the Grievance Team.

**Monitor's Recommendation:**  Continue to monitor compliance; train and supervision CRWs.

## 34.     Incidents and Referrals

f.      CCDOC [OPR] shall maintain policies, procedures and practices requiring investigations to resolve issues identified during review of incident reports, disciplinary hearings, or inmate grievances, and determine appropriate remedies, in accordance with generally accepted correctional standards.  At a minimum, CCDOC shall require timely and appropriate investigations of all suicides, serious suicide attempts, inmate-on-inmate violence resulting in serious injury, inmate-on-staff violence, inmate injuries requiring treatment by an outside hospital, inmate injuries of a suspicious nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.), sexual misconduct between inmates, sexual misconduct involving staff, fires, escapes, escape attempts, and deaths.

**December 2011 Compliance Status:**  Partial compliance

**Status Update:**  The investigative work of OPR meets all accepted correctional practices.  What is missing is the CCDOC companion policies to the OPR policies/procedures governing investigations referred from OPR.

**Monitor's Assessment:**  CCDOC continues to work on the relevant policies and procedures.  If investigations are referred as a "department head" review to commanders, or others as designated by the Executive Director, there individuals must be trained.  During the December tour it was determined that coordination was needed between OPR and the Executive Director regarding those investigations referred for 'department head' review, some of which were delinquent.  Written policies will address these issues.

**Monitor's Recommendation:**  Complete CCDOC companion policies to OPR policies and procedures.  Assure that anyone assigned a department head investigation has been trained, and that these investigations are completed within the required time period.

### 34.    Incidents and Referrals

g.        CCDOC [OPR] shall ensure that any investigation reports indicating possible criminal behavior will be referred to the appropriate law enforcement authority.

**December 2011 Compliance Status:**  Substantial compliance

**Status Update:**  See July 2011 report.

**Monitor's Assessment:**  See July 2011 report.

**Monitor's Recommendation:**  Monitor compliance with this requirement. Maintain data regarding cases referred to appropriate law enforcement agency and outcomes.

### 35.    Investigations - Investigations at the Facility are conducted by
independent departments under the Cook County Sheriff's Office, including the Office of Professional Review, the Criminal Investigations Unit, and the Sheriff's Police Department.  The Cook County Sheriff will assume responsibility for requiring these investigatory units to comply with the relevant provisions of this Agreed Order.

a.        CCDOC [OPR] shall maintain comprehensive policies, procedures, and practices for the timely and thorough investigation of alleged staff misconduct, in accordance with generally accepted correctional standards.

**December 2011 Compliance Status:**  Partial Compliance

**Status Update:**  No change since March 2011 report.  Awaiting CCDOC companion policies to OPR's for substantial compliance.

**Monitor's Assessmen**t:  The completion of the CCDOC companion written directives will result in substantial compliance.

**Monitor's Recommendations:** Complete CCDOC companion written directive(s).

### 35. Investigations

b.      Internal investigations shall be conducted by persons who do not have supervisory responsibility for the staff member(s) being investigated.

**December 2011 Compliance Status**:  Partial compliance.

**Status Update:**  OPR's procedures are in place;  what is needed is the corresponding CCDOC procedures.

**Monitor's Assessmen**t:   The completion of the CCDOC companion written directives will result in substantial compliance.

**Monitor's Recommendations:**  Complete CCDOC companion written directive(s).

### 35. Investigations

c.      CCDOC [OPR] shall ensure that all internal investigations will include timely, thorough, and documented interviews of all relevant staff and inmates who were involved in, or witnessed, the incident in question.

**December 2011 Compliance Status**:  Substantial compliance.

**Status Update:**  My file reviews in OPR and discussion with the Director and his team confirmed substantial compliance.

### 35. Investigations

d.      CCDOC [OPR] shall ensure that internal investigation reports shall include all supporting evidence, including witness and participant statements, policies and procedures relevant to the incident, physical evidence, video or audio recordings, and relevant logs.

**December 2011 Compliance Status**:  Substantial compliance.

**Status Update:** My file reviews in OPR and discussion with the Director and his team confirmed substantial compliance.

### 35. Investigations

e.      CCDOC [OPR] shall ensure that all investigatory staff will receive pre-service and in-service training on appropriate investigations policies and procedures, the investigations tracking process, investigatory interviewing techniques, and confidentiality requirements.

**December 2011 Compliance Status**:  Partial compliance.

**Status Update:**  See 35.a.  CCDOC reports that there are amendments being made to the investigative process involving Department Head reviews, vesting more authority in OPR.

**Monitor's Assessmen**t:  See 35.a.

**Monitor's Recommendations:**  Complete CCDOC companion policies; train Commander rank individuals in those specific procedures  as required by the processes currently under reconsideration.

## 35.    Investigations

f.        CCDOC shall provide all investigators who will be assigned to conduct investigations of use of force incidents with specialized training in investigating use of force incidents and allegations.

**December 2011 Compliance Status**:  Partial compliance.

**Status Update:**  See 35.a.

**Monitor's Assessmen**t:  See 35.a.  I reviewed the training provided by Director Turner to the Commanders.

**Monitor's Recommendations:**  Complete CCDOC companion policies.

## 35.    Investigations

g.        CCDOC [OPR] shall ensure that the results of each internal investigation shall be documented in an investigation report.  CCDOC administration shall review the investigation reports, along with the underlying documentation, and take appropriate action.  CCDOC shall implement appropriate remedies based upon the results of internal investigations.

**December 2011 Compliance Status:**  Partial Compliance.

**Status Update:**   No change from March 2011 report; awaiting completion of companion CCDOC policies/procedures.

**Monitor's Assessmen**t:  See 35.a.

**Monitor's Recommendations:**  Complete the directive governing Department Head reviews in CCDOC.

## 36.    Inmate Disciplinary Process

a.        CCDOC shall maintain policies, procedures, and practices for a formal disciplinary process, including prompt issuance of written disciplinary citations, administrative review and

disciplinary reports for alleged minor rule violations, and due process for alleged major rules violations, in accordance with generally accepted correctional standards.

**December 2011 Compliance Status:** Partial Compliance

**Status Update:** The revised written directive [11.14.8.0] was effective 12/22/11.

**Monitor's Assessment:** The directive sets up a compound-wide hearing board to ensure consistency and timeliness of hearings. The staffing for the board consists of 2 lieutenants, 2 superintendents as alternates, 4 civilian, and one administrative assistant. Defendants' counsel Bisbee provided training to these individual regarding the order and legal issues.

**Monitor's Recommendations:** Monitor compliance with the order; assure timeliness of hearings. If the directive had been in effect at the time of my December tour, it is likely substantial compliance would be noted for this paragraph.

## 36. Inmate Disciplinary Process

b. CCDOC shall ensure that inmate disciplinary hearings are conducted in a reasonably private and secure setting.

**December 2011 Compliance Status:** Partial Compliance

**Status Update:** Directive 11.14.8.0 provides in Section IX. C. 4. that "All inmate disciplinary hearings shall be conducted in a reasonably private and secure setting." CCDOC notes that the Assistant Executive Director notified all superintends on 4/1/11 that inmate disciplinary hearings are to be held in a location in the division to insure privacy.

**Monitor's Assessment:** If the directive had been in effect at the time of my December tour, it is likely substantial compliance would be noted for this paragraph.

**Monitor's Recommendations:** Monitor compliance with this provision by tracking a sampling of the specific location of hearings.

## 36. Inmate Disciplinary Process

c. CCDOC shall ensure that all inmates placed in lock down status are provided with appropriate due process that has been developed and implemented in policies and procedures, in accordance with generally accepted correctional standards.

In an emergency, the Executive Director of CCDOC may order a lock down of entire areas of the Facility in order to control the situation and address serious security concerns. In such circumstances, it is not necessary to provide disciplinary hearings to each inmate affected by the lock down. However, lock downs of this nature shall be limited to only the time and scope

necessary to address the emergency. For the purposes of this Agreed Order, a "lock down" shall not include the routine instances in which inmates are confined to their cells, including periods of count, over night, shift change, movement, and routine contraband sweeps.

**December 2011 Compliance Status:** Partial Compliance

**Status Update:** The written directive addressing the first paragraph was effective 12/22/2011.

**Monitor's Assessmen**t: As the Agreed Order does not define "lock-down status", and based on information provided by the plaintiffs, "lock-down status" is any circumstance in which an inmate or inmates are locked down for 23 hours a day. CCDOC's written directive governing inmate discipline addresses the procedures for pre-hearing disciplinary segregation in Section IX. B. which meet generally accepted correctional practice. If the order had been in effect at the time of my December 2011 tour, most likely substantial compliance would be noted here.

I have not been informed of any emergencies that have required CCDOC to lock down entire areas of the facility to control inmates or address security concerns.

**Monitor's Recommendations:** Monitor implementation of the written directive. Assure that only inmates meeting the criteria in the order are held in pre-hearing disciplinary segregation. Monitor if Cermak is notified per policy.

## 36.    Inmate Disciplinary Process

d.        CCDOC shall ensure that the disciplinary board's written record accurately reflects the testimony and discussion from the disciplinary hearing, including any recommendations from a mental health professional regarding the extent to which disciplinary charges are related to an inmate's serious mental illness or suggestions for minimizing the deleterious effect of disciplinary measure on the mental health status of the inmate.

**December 2011 Compliance Status:** Partial Compliance

**Status Update:** The written directive was effective 12/22/11.

**Monitor's Assessmen**t: Section IX. H. 2 outlines the documentation that must be prepared following each disciplinary hearing. The process is in place to alert Cermak of those inmates charged with violations of discipline and providing Cermak the opportunity to provide any information regarding the inmate's mental health status.

Officers with the specific task of overseeing the inmate disciplinary process have been selected and trained, effective 12/11/2011. The task of consolidating the discipline process in each of the division is underway (e.g. women's justice, boot

camp, day reporting) to assure that the sanctions are as similar as possible and tracked.

CCDOC provides via fax (IMACS hopefully in the future) notices to Cermak of individuals who are on the mental health caseload and solicits Cermak's advice. CCDOC provided documentation of Dr. Jones' response to these faxes.

**Monitor's Recommendations:** Monitor the effectiveness of the newly designated officers overseeing discipline and the collaboration with mental health for their clients.

## 36. Inmate Disciplinary Process

e. CCDOC shall alert Cermak when inmates are placed in disciplinary segregation or protective custody.

**December 2011 Compliance Status:** Partial Compliance

**Status Update:** The written directive governing inmate discipline Section IX. H. 4 requires the Watch Commander to notify Cermak of inmates sentenced to time in disciplinary segregation. Section IX. B. 4. a – g. provides procedures for CCDOC to notify Cermak of inmates placed in pre-hearing detention.

A draft Cermak policy E -09, Segregated inmates was provided for review that addresses Cermak's procedures when notified of an inmate placed in segregation or protective custody.

**Monitor's Assessmen**t: If the directive had been in effect at the time of my December tour, it is likely substantial compliance would be noted for this paragraph, if CCDOC can identify the written directive that provides that Cermak be notified of inmates placed in protective custody.

**Monitor's Recommendations:** Assess compliance with the new directive; amend directives as necessary to address protective custody.

## 36. Inmate Disciplinary Process

f. CCDOC shall permit a Cermak Qualified Mental Health Staff member to serve on the disciplinary board.

**December 2011 Compliance Status:** Substantial Compliance

**Status Update:** Cermak has declined to place a qualified mental health staff on the disciplinary board.

**Monitor's Assessmen**t: In Appendix IV of Dr. Metzner's November 2011 report, he provides an analysis of the inmates on the mental health caseload involved

in disciplinary infractions.  He points to a need for improve communication regarding what constitutes mitigating factors that might result in disciplinary charges being dropped or sanctions altered.  So, while the primary proofs of compliance are in place for this paragraph, additional work needs to be done regarding collaboration.  This is a new process and the pathway to improvement in procedures and communication have been identified.

**Monitor's Recommendations:**  Address Dr. Metzner's recommendations regarding collaboration and communication about inmates on the mental health caseload who are charged with disciplinary infractions.

## 37.    Classification

a.        CCDOC shall maintain policies and procedures for an appropriate, objective classification system that separates inmates in housing units by classification levels in order to protect inmates from unreasonable risk of harm.  The system shall include consideration of an inmate's security level, severity of current charge, types of prior commitments, suicide risk, history of escape attempts, history of violence, and special needs.  CCDOC shall use best efforts to anticipate periods of unusual intake volume and schedule sufficient classification staff to timely classify inmates.

**December 2011 Compliance Status:**  Partial compliance

**Status Update:**   CCDOC continues to make *impressive* progress toward the overhaul of the inmate classification system, housing plans, procedures and training.

**Monitor's Assessmen**t: These efforts are guided by Dr. Patricia Hardyman's expertise.   I observed a meeting of the Classification Committee in which they divided up the work that remains to be done before the new procedures can be implemented including:  identifying the offense mandatory restrictors; completion and distribution of the classification manuals; town hall meetings with involved staff; training;  modifications to IMACS to accommodate the new procedures;  collaboration between the different programs in CCSO regarding classification changes;  inclusion of disciplinary infractions as part of an inmate's record to be used for initial and re-classification;  development of inmate population management strategies;  selection and retention of classification staff;  development of the audit process and schedule; pilot testing of the revised instruments; and development of validation strategies and timetables.

The success of this enormous undertaking is propelled through buy-in from the stakeholders, which will also be a key to the success of the program.

The 2012 work plan has been set.  Information will be shared electronically with me as the process moves forward.

**Monitor's Recommendations:**  Work the plan developed in December 2011.

**37.    Classification**

b.    CCDOC shall ensure that classification staff have sufficient access to current information regarding cell availability on each division.

**December 2011 Compliance Status**:  Partial compliance.

**Status Update:**  See 37.a.

**Monitor's Assessment:**  See 37. a. Staffing is a consideration in the work plan.

**Monitor's Recommendation:**  See 37.a.

**37.    Classification**

c.    CCDOC shall include information on each inmate's assignment to the Special Incarceration Unit "level system" at the Facility in the new Jail Management System, starting with the date the new Jail Management System becomes operational.

**December 2011 Compliance Status**:  Substantial compliance.

**Status Update:**  No change since March 2011 report.

**37.    Classification**

d.    CCDOC shall provide training and access to all correctional officer supervisors on the full capabilities of the new Jail Management System's classification and inmate tracking system (or any replacement system).

**December 2011 Compliance Status:**  Partial compliance.

**Status Update:**  To the extent that the modules that comprise IMACS has been completed, officers and supervisors have been provided training.  As noted in this report, there are several modules that are not completed, for example, incident reporting, and other which are being altered such as Classification.   A training plan is part of the 2012 work initiatives of the Classification Committee.

**Monitor's Assessment:**  The intent of the paragraph is met in terms of a process to provide training as the modules are rolled out.

**Monitor's Recommendation:**  CCDOC should remain diligent in ensuring that staff needing to understand the more complex modules in IMACS, for example, Classification, is provided training and remedial training as the modules are completed.

## 37. Classification

e.      CCDOC shall provide ongoing internal and external review and validation of the inmate classification system to ensure its reliability and objectivity.

**December 2011 Compliance Status:**  Non-compliance.

**Status Update:** See 37.a.  CCDOC is moving in this direction in a deliberative and credible fashion.

## 38. Inmate Grievance Process

a.      CCDOC shall maintain policies and procedures to ensure inmates have access to an adequate grievance process and to ensure that grievances may be accessed and filed confidentially, without requiring the intervention of a correctional officer, in accordance with generally accepted correctional standards.   These policies and procedures should be applicable and standardized across all the Facility divisions.

**December 2011 Compliance Status:** Substantial Compliance.

**Status Update:** See July 2011 report.  Cermak has issued a companion written directive, A-11, effective 6/15/2011 regarding the handling of grievances and coordination with CRWs.

**Monitor's Assessmen**t:  Continue to monitor the CRWs in their role with inmate grievances to assure that the grievances are handled per the written directives. Documentation was provided of CRW training and the manual guiding their work, but additional supervision and inspection is needed based on the results of my tour.

CCDOC reports that the medical grievances are being returned to inmates in 15 days; as opposed to previously when 30 days was more the norm.

**Monitor's Recommendations:** Assess what additional training and supervision may be needed to ensure that the CRWs continue to play their vital role in the grievance process.

## 38. Inmate Grievance Process

b.      CCDOC shall ensure that the grievances receive appropriate follow-up, including informing the grievant of the outcome, providing a timely written response, and tracking implementation of resolutions.

**December 2011 Compliance Status:** Substantial Compliance.

**Status Update:**  See 38.a.

**Monitor's Assessment**: See 38.a.  Inmates I spoke with were not consistently clear about the grievance process, and some showed me what they claimed to be unanswered grievances.  Changes were made in early December to how CRWs were assigned to units, including a 7 day a week schedule.  While the written policies and procedures are in place, the implementation and resources need to match the requirements.

**Monitor's Recommendations:**  See 38.a.  Follow-up is needed  to ensure that inmates believe they have access to a credible grievance system, that CRWs are visible in the units when inmates are present, and that the data will, perhaps, show an increase in grievances as the system is more available to inmates. Supervision of the work of CRWs needs to be in place regarding changing an inmate grievance to an inmate request.  Evaluation of how many grievances result in a department head and/or OPR investigation regarding use of force also will need to be assessed.

## 38.    Inmate Grievance Process

c.       CCDOC shall ensure that grievance forms are available on all units and are available in Spanish.  CCDOC shall ensure that there is adequate opportunity for illiterate inmates and inmates who have physical or cognitive disabilities to access the grievance system.

**December 2011 Compliance Status:**  Substantial Compliance

**Status Update:**  See 38.a.

**Monitor's Assessment**:   See 38.a.  The inmates with whom I spoke did not indicate a problem with getting a grievance form, but did indicate the process after that, in most discussions, was unsatisfactory.  The inmates indicated they didn't see their CRW (social worker) on a regular basis an felt their grievances were not answered in a timely fashion.

**Monitor's Recommendations:**  See 38.a. The level of activity regarding the new procedures perhaps speaks to the need: to educate the inmate population regarding grievances; to post CRW hours in each unit; and to have supervisory follow-up to ensure those hours are kept.  As the system is fully implemented CCDOC should expect to see an increase in grievances as the system is more accessible to inmates.

## 38.    Inmate Grievance Process

d.       CCDOC shall ensure that inmate grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria, are referred for investigation.  A member of the management staff shall review the grievance tracking system regularly in order to identify areas of concern.

**December 2011 Compliance Status:**  Substantial Compliance

**Status Update:**  See 38.a.  As CCDOC policy prohibits corrections officers from handling inmate grievances, the role of the CRWs is critical in assuring there is a supply of forms, regularly collecting and reading the forms, and logging the information.

**Monitor's Assessmen**t: See 38.a.  The policy is in effect;  but I retain concerns regarding the presence of CRWs in the units needs to be addressed  (see 38.c.) and what that means to prompt identification of allegations.  CCDOC reports that they have initiated a Inmate Grievance Committee to review all issues related to the written directive and it's implementation.

**Monitor's Recommendations:**  See 38.c.  Continue to monitor work of the CRWs, the hours they have in each housing unit, and the logs they maintain.

### 39.    Access to Information

a.        CCDOC shall ensure that newly admitted inmates receive information, through an inmate handbook or orientation video, regarding the following areas:  facility rules and regulations; how to report misconduct; how to report sexual abuse or assault; the process for accessing medical and mental health care; emergency procedures; rules for sending and receiving mail; the visitation process; facility schedule; the disciplinary process; and how to seek redress of grievances.

**December 2011 Compliance Status:**  Partial compliance.

**Status Update:**  The documents/videos to comply with this paragraph remain under development.

**Monitor's Assessmen**t:  Process remains underway.

**Monitor's Recommendations:**  Continue to work on inmate handbook and videos, updating as policies/procedures revised.

### 39.    Access to Information

b.        CCDOC shall ensure that materials on facility rules and services are available for non-literate and non-English speaking inmates.

**December 2011 Compliance Status:**  Partial compliance.

**Status Update:**  See 39. a. and March and July 2011 reports.

**Monitor's Assessmen**t:  See 39.a.

**Monitor's Recommendations:**  See 39.a.

**40.    CCDOC shall provide training and supervision to all correctional officers and supervisors sufficient to implement the provisions of this Agreed Order.**

**December 2011 Compliance Status**: Substantial Compliance.

**Status Update:**  See July 2011 report.

**Monitor's Assessmen**t:  See July 2011 report

**Monitor's Recommendations:** Monitor on-going compliance to determine what other information is needed to implement provisions of the Agreed Order.

**41.    Inter-Agency Agreement**

a.     CCDOC shall enter into a written Inter-Agency Agreement with Cermak that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility.  The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order.

b.     Cermak shall enter into a written Inter-Agency Agreement with CCDOC that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility.  The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order.

**December 2011 Compliance Status**:  Substantial compliance.

**Status Update:**  The agreement is in effect and the CCDOC provided minutes of the meetings held pursuant to the agreement.

**Monitor's Assessmen**t:  The agreement is furthering communication and collaboration; but growth is still expected as the level of trust between the signatories increases over time.

**Monitor's Recommendations:**  Monitor effectiveness of the agreement to increase proactive problem solving and improved communication/collaboration.

**69.**    CCDOC shall ensure that security staff posts will be equipped, as appropriate, with readily available, safely secured, suicide cut-down tools. Coordinate with Dr. Metzner

**December 2011 Compliance Status**:  Substantial Compliance

**Status Update:**  CCDOC reports that the suicide cut-down tool has been used 42 times since the policy/training was implemented.

**Monitor's Assessmen**t:  The policy is in place and effective in saving lives.

**Monitor's Recommendations:**  Continue to monitor and evaluate situations where the cut-down tool is used;  address any training issues that may be presented.