UNITED STATES OF AMERICA VS. COOK COUNTY, ET.AL.

CIVIL NO. 10 C 2946

Fire and Life Safety and Sanitation and Environmental Conditions

Report No. III

Monitor: Harry E. Grenawitzke

August 31, 2011

<u>Executive Summary</u>

The third assessment and report demonstrate considerable progress made by the Cook County Department of Corrections (CCDOC), Department of Facilities Management (DFM) and Cermak Health Systems (Cermak) to achieve compliance by addressing provisions of the consent agreement between the United States Department of Justice and Cook County, to protect the constitutional rights of inmates detained at the Cook County Jail. Both parties reviewed the draft report and provided comments. Their comments are reflected in this final report.

For this report, I toured CCDOC July 25-29, 2011. Throughout the visit, I participated in several meetings with key staff in Facilities Management, CCDOC, and Cermak, including the Fire Safety Committee, Sanitation, Cermak environmental staff, Anderson Pest Control Services, and CCDOC Management Staff. I toured several divisions including housing units, medical clinics, and food service kitchens.

I would like to continue to recognize the outstanding efforts by CCDOC, DFM, and Cermak employees to address each provision. I also would like to acknowledge the leadership of CCDOC, DFM, and Cermak for their responsiveness to my requests for information and documentation throughout my visit, and in between visits, that provided me the opportunity to objectively assess their compliance with the agreed orders and provide suggestions for changes and improvements.

There are several areas in which there was considerable progress over the last six months. They include:

1. The Fire Safety Committee in addressing the many fire safety provisions of the order including training, testing and fire safety, emergency and evacuation plan implementation.

2. The Sanitation leadership and staff for their efforts to develop the CCDOC sanitation plan and division specific plans.

3. DFM staff and leadership for their assistance in working with CCDOC staff to develop and implement the key control policy and procedure.

4. Central Purchasing for significantly improving the handling and use of cleaning chemicals by centralizing the purchasing, mixing, and distribution process to the divisions.

5. The staff leadership of the central laundry and their work to develop tracking systems to monitor use of the laundry by divisions.

6. The remarkable improvement in pest elimination throughout CCDOC and food service by the new pest control service.

7. The decision by CCDOC to purchase the interface software for Facility Wizard so that all areas of CCDOC are on one system, in order to facilitate effective repairs and maintenance.

Of the 39 provisions included in my area of responsibility, this report identifies that 13 are in substantial compliance, 26 are in partial compliance, and there are no provisions shown as non-compliant.  Since the March, 2011, report, no provisions have regressed and CCDOC, DFM, and Cermak have implemented changes that allow for the following provisions to be upgraded:

G78:        from partial compliance to substantial compliance

G83.a:      from partial compliance to substantial compliance

G83.d:      from non-compliance to partial compliance

G83.i:      from not assessed to partial compliance

G83.j:      from partial compliance to substantial compliance

G83.K       from non-compliance to partial compliance

G83.l:      from partial compliance to substantial compliance

G83.m:      from partial compliance to substantial compliance

G83.n:      from partial compliance to substantial compliance

G84.a:      from partial compliance to substantial compliance

G84.c:      from non-compliance to partial compliance

There are also some areas that CCDC, DFM, and Cermak will need to address in the future.  They include:
1. The roll out of all management policies in all divisions, including sanitation, fire safety, use of the laundry by inmates, timely submission of plumbing, electrical, and lighting issues for repair/ replacement, chemical control, and  daily, weekly, and monthly oversight inspections to assure effective implementation.
2. Arrive at a mutual agreement with the food service contractor regarding the effective maintenance and use of all equipment.  Remove all equipment from both kitchens that is no longer used or operational.
3. Establishing and implementing an effective tool control program for all tools used throughout the complex, including DFM, Cermak, and CCDOC and the divisions.  Assure that employees of

all parties understand the need for – and implementation of – changes necessary to control all tools in order to protect inmates and staff.

4. Revising training materials and presentations to recognize the changes made to all affected policies, and provide refresher training to all correction employees. This impacts fire safety, sanitation, tool and key control, food service, inmate supervision, laundry services, maintenance, ventilation, and pest control.

5. Determining the future direction with the food service contractor regarding the maintenance and correct operation of all food service equipment in the kitchens.

6. Assuring that all daily dietary requirements are being met for all inmates.


On the December, 2011, visit, I will be assessing the implementation of all policies and procedures within each of the divisions, on all shifts. As I have indicated in previous reports, the proof of issue resolution rests within the division leadership and dedication to see that all staff under their direction and supervision actually follow through and implement effectively the Orders, Policies, and Procedures. During my next visit I will be looking for proof that will determine if CCDOC, DFM, and Cermak are effectively doing what they say. I expect and anticipate that the progress made to date will continue.


I again want to recognize the leadership of Sheriff Dart, the Management and Staff of CCDOC, Department of Facilities Management, and Cermak, for the progress in resolving the provisions of the agreement. Without their commitment and dedication, the much needed changes would not have occurred.

Sincerely,

Harry E. Grenawitzke, RS, MPH, DAAS

| Section | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| C. | **Medical Care** | | | |
| C. 53 | **Treatment and Management of Communicable Disease** | | | |
| C. 53e | Cermak shall ensure that the negative pressure and ventilation systems function properly. Following CDC guidelines, Cermak shall test daily for rooms in-use and monthly for rooms not currently in-use. Cermak shall document results of such testing. | X 3/11 X 8/11 | X 9/10 | |
| C. 53f | Cermak shall notify DFM, in a timely manner, of routine and emergency maintenance needs, including plumbing, lighting and ventilation problems. | | X 3/11 X8/11 | X 9/10 |
| F. | **Fire and Life Safety** | | | |
| F. 71 | CCDOC and DFM shall work together to develop and implement a fire safety program and ensure compliance is appropriately documented. The initial Fire Safety Plan shall be approved by the fire prevention authority having jurisdiction. The Fire Safety Plan shall be reviewed thereafter by the appropriate fire prevention authority at least every two years, or within six months of any revisions to the plan, whichever is sooner. Fire safety and emergency procedures shall be standardized across divisions, to the extent possible given differences in physical plant and security levels. | | X 9/10 X 3/11 X8/11 | |
| F. 72 | CCDOC shall develop and implement an evacuation plan for inmates and staff and ensure that comprehensive fire drills are conducted every three months on each shift. CCDOC shall document these drills, including start and stop times and the number and location of inmates who were moved as part of the drills. | | Not Assessed 9/10 X 3/11 X 8/11 | |
| F. 73 | DFM shall ensure that the Facility has adequate fire and life safety equipment, including installation and maintenance of fire alarms and smoke detectors in all housing areas according to applicable | | X 9/10 X 3/11 | |

| Section | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | fire codes. Maintenance and storage areas shall be equipped with sprinklers or fire resistant enclosures in accordance with City of Chicago Fire Code (13-76-010). | | X8/11 | |
| F. 74 | DFM shall ensure that all fire and life safety equipment is properly maintained and routinely inspected. DFM shall develop and implement a program related to the testing, maintenance and inspection of the Life Safety Equipment. | X 3/11<br><br>X 8/11 | X 9/10 | |
| F. 75 | CCDOC shall continue to ensure that emergency keys are appropriately marked and identifiable by touch and consistently stored in a quickly accessible location, and that staff are adequately trained in use of the emergency keys. | | X 9/10<br><br>X 3/11<br><br>X 8/11 | |
| F. 76 | CCDOC shall ensure that staff are able to manually unlock all doors (without use of the manual override in the event of an emergency in which the manual override is broken), including in the event of a power outage or smoke buildup where visual examination of keys is generally impossible. CCDOC shall conduct and document random audits to test staff proficiency in performing this task on all shifts, a minimum of three times per year. CCDOC shall conduct regular security inspections of all locking mechanisms. CCDOC shall communicate with DFM via the Work Order System regarding lock-related issues and maintenance. | | X 9/10<br><br>X 3/11<br><br>X 8/11 | |
| F. 77 | DFM shall develop and implement an annual preventative maintenance program concerning security devices such as doors locks, fire and smoke barrier doors, and manual unlocking mechanisms to ensure these devices function properly in the event of an emergency. | X 3/11<br><br>X 8/11 | Not Assessed 9/10 | |
| F. 78 | CCDOC shall implement competency-based testing for staff regarding fire and emergency procedures. | X 8/11 | Not assessed 9/10<br><br>X- 3/11 | |

| Section | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| F. 79 | CCDOC shall promptly notify DFM of all electrical hazards, including maintenance and repair of electrical outlets, devices, and exposed electrical wires. | | X 9/10 <br> X 3/11 <br> X 8/11 | |
| F. 80 | DFM shall promptly repair all known electrical hazards, including maintenance and repair of electrical outlets, devices, and exposed electrical wires and will document repairs by the Work Order System. | X 3/11 <br> X 8/11 | X 9/10 | |
| F. 81 | CCDOC shall ensure that combustibles are controlled and eliminate hi8ghly flammable materials throughout the facility and inmate living areas (e.g., inmates 'use of paper bags as trash receptacles, ripped fire-retardant mattress covers, improvised cell light covers, blankets on cell floors, and improperly stored and labeled flammable liquids and other chemicals). | | X 3/11 <br> X 8/11 | X9/10 |
| F. 82 | CCDOC shall ensure that fire safety officers are trained in fire safety and have knowledge in basic housekeeping, emergency preparedness, basic applicable codes, and use of fire extinguishers and other emergency equipment. | | Not Assessed 9/10 <br> X 3/11 <br> X 8/11 | |
| **G** | SANITATION AND ENVIRONMENTAL CONDITIONS | | | |
| **G. 83** | Sanitation and Maintenance of Facilities | | | |
| G. 83a | DFM shall maintain an adequate written staffing plan and sufficient staffing levels to provide for adequate maintenance of the Facility. | X 8/11 | X 9/10 <br> X 3/11 | |
| G. 83b | CCDOC shall revise and implement written housekeeping and sanitation plans to ensure the proper routine cleaning of housing, shower, and medical areas, in accordance with generally accepted correctional standards.  Such policies should include oversight and supervision, including meaningful inspection processes and | | X 9/10 <br> X 3/11 <br> X 8/11 | |

| Section | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---------|----------|------------------------|--------------------|----------------|
| | documentation, as well as establish routine cleaning requirements for toilets, showers, and housing units. | | | |
| G.83c | DFM shall implement a preventive maintenance plan to respond to routine and emergency maintenance needs, including ensuring that shower, toilet, and sink units are adequately maintained and installed. | X 3/11 X 8/11 | X 9/10 | |
| G. 83d | CCDOC shall notify DFM, in a timely manner, of routine and emergency maintenance needs, including plumbing, lighting, and ventilation problems. | | X 8/11 | X 9/10 X 3/11 |
| G.83e | DFM shall ensure adequate ventilation throughout the Facility to ensure that inmates receive an adequate supply of air flow and reasonable levels of heating and cooling. DFM staff shall review and assess compliance with this requirement on a daily basis for automated systems and on and annual basis for non-automated systems. | X 3/11 X 8/11 | X 9/10 | |
| G. 83f | CCDOC shall notify DFM of any visible obstructions to the ventilation system. | | X 3/11 X 8/11 | X 9/10 |
| G. 83g | Cook County shall ensure adequate lighting in all inmate housing and work areas. | | X 9/10 X 3/11 X 8/11 | |
| G. 83h | CCDOC shall ensure adequate pest control throughout the housing units, medical units, RCDC, RTU, and food storage areas. CCDOC shall maintain a contract for professional exterminator services for each division, food services areas, and the Cermak hospital. Services should provide for routine pest control spraying and additional spraying as needed. | | X 9/10 X 3/11 X 8/11 | |
| G. 83i | CCDOC shall ensure that all inmates have access to needed hygiene supplies. | | Not Assessed 9/10 or | |

| Section | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | | | 3/11<br><br>X 8/11 | |
| G. 83j | CCDOC shall develop and implement policies and procedures for cleaning, handling, storing, and disposing of biohazardous materials, in accordance with generally accepted correction standards. CCDOC shall ensure that any inmate or staff utilized to clean a biohazardous area are properly trained in universal precautions, are outfitted with protective materials, and receive proper supervision when cleaning a biohazardous area. | X 8/11 | Not Assessed 9/10<br><br>X 3/11 | |
| G. 83k | DFM shall develop a policy on hazardous materials, in accordance with generally accepted correctional standards, and insure that all DFM staff is properly trained on the procedure. | | X8/11 | X 9/10<br><br>X 3/11 |
| G. 83l | CCDOC shall provide and ensure the use of cleaning chemicals that sufficiently destroy the pathogens and organisms in biohazard spills. | X 8/11 | Not Assessed 9/10<br><br>X 3/11 | |
| G. 83m | CCDOC shall inspect and replace as often as needed all frayed and cracked mattresses. CCDOC shall destroy any mattress that cannot be sanitized sufficiently to kill any possible bacteria. CCDOC shall ensure that mattresses are properly sanitized between uses. | X 8/11 | X 3/11 | X 9/10 |
| G. 83n | CCDOC shall ensure adequate control and observation of all housing units, including distribution and collection of razors and cleaning supplies. All cleaning tools and hazardous chemical shall be removed from housing areas after use. | X 8/11 | X 9/10<br><br>X 3/11 | |
| G. 83o | CCDOC shall ensure that Facility sanitarians receive training from a relevant state, national, or professional association with emphasis on assessment of environmental health practices and emerging environmental issues in correctional settings. Facility sanitarians should also have training on and access to testing equipment to ensure sanitary conditions. | | X 9/10<br><br>X 3/11<br><br>X 8/11 | |

| Section | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---------|----------|------------------------|--------------------|----------------|
| **G. 84** | **Sanitary Laundry Procedures** | | | |
| G. 84a | CCDOC shall develop and implement policies and procedures for laundry procedures to protect inmates from risk of exposure to communicable disease, in accordance with generally accepted correctional standards. To limit the spread of communicable disease, CCDOC shall ensure that clothing and linens returned from off-site laundry facility are clean, sanitized, and dry. | X 8/11 | X 9/10<br><br>X 3/11 | |
| G. 84b | CCDOC shall ensure that inmates are provided adequate clean clothing, underclothing and bedding, consistent with generally accepted correctional standards, and that the laundry exchange schedule provides consistent distribution and pickup service to all housing areas. | | X 3/11<br><br>X 8/11 | X9/10 |
| G. 84c | CCDOC shall train staff and educate inmates regarding laundry sanitation policies. | | X 8/11 | X9/10<br><br>X3/11 |
| G. 84d | CCDOC shall ensure that laundry delivery procedures protect inmates from exposure to communicable diseases by preventing clean laundry from coming into contact with dirty laundry or contaminated surfaces. | | X 9/10<br><br>X 3/11<br><br>X 8/11 | |
| G. 84e | CCDOC shall require inmates to provide all clothing and linens for laundering and prohibit inmates from washing and drying laundry outside the formal procedures. | | X 9/10<br><br>X 3/11<br><br>X 8/11 | |
| **G. 85** | **Food Service** | | | |
| G. 85a | CCDOC shall ensure that all food service at the Facility is operated in a safe and hygienic manner and that foods are served and maintained at safe temperatures. | | X 3/11<br><br>X 8/11 | X9/10 |
| G. 85b | CCDOC shall ensure that all food service staff, including inmate | | X 9/10 | |

| Section | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | staff, must be trained in food service operations, safe food handling procedures, and appropriate sanitation. | | X 3/11<br><br>X 8/11 | |
| G. 85c | CCDOC shall ensure that the Central Kitchen and Division XI kitchen are staffed with a sufficient number of appropriately supervised and trained personnel. | | X 9/10<br><br>X 3/11<br><br>X8/11 | |
| G. 85d | CCDOC shall ensure that dishes and utensils, food preparation and storage areas, and vehicles and containers used to transport food are appropriately cleaned and sanitized. | | X 9/10<br><br>X 3/11<br><br>X 8/11 | |
| G. 85e | CCDOC shall check and record, on a regular basis, the temperatures in the refrigerators, coolers, walk-in-refrigerators, the dishwasher water, and all other kitchen equipment with temperature monitors to ensure proper maintenance of food service equipment. | | X 9/10<br><br>X 3/11<br><br>X 8/11 | |

DATE OF STATUS REPORT:  8/5/11

**PROVISION:  C. MEDICAL CARE**

**53.** Treatment and Management of Communicable Disease

> **e.** Cermak shall ensure that the negative pressure and ventilation systems function properly.
> Following CDC guidelines, Cermak shall test daily for rooms in-use and monthly for rooms not
> currently in-use.  Cermak shall document results of such testing.

**AUGUST, 2011 COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE**

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

Facilities Management staff and Cermak staff have both established and implemented a routine
program to monitor negative air pressures three times daily.  The program includes appropriate
procedures for corrective action when air handling systems demonstrate non-compliance.  Cermak
Health Services also has established a program to verify – by way of a tissue test – that the air flow
within the designated rooms remains negative compared to the air flow outside those rooms.  In Policy
B-01.2, Cermak Health Services has established daily and weekly monitoring programs, including
observing the monitor vane installed in the anteroom of the "Airborne Infection Isolation Room (AIIR)",
and checking the enunciator panel alarm daily.  These monitoring programs include a notification to the
Nurse Epidemiologist and the Director of Infectious Disease Services if negative pressures are not found
in any room.  Plant Operations and Environmental Services then submit a work order request to
Facilities Management.  On a weekly basis, the infection control staff observes a smoke wand placed
near the floor at the doorway.  Occupational and Environmental Hygiene Services at the Great Lakes
Center for Occupational and Environmental Safety and Health at the University of Illinois, Chicago,
conducts a full testing of the ventilation system in the AIIRs annually.  Copies of those reports are
provided to the Chief Medical Officer.

**Monitor's Assessment:**  I have reviewed negative pressure logs from January through June, 2011.  The
rooms are checked daily during the day shift by Cermak.  There are 18 negative pressure cells of which
14 are in use. Their nurse clinician of infection control is the person monitoring the rooms.  There were
less than ten positives during the first six months of 2011 and each were individual cells.  There were no
instances where all or even several of the rooms on any one day were positive.  In each case, Facilities
Management addressed the issue.  None of those cells were used until repairs were completed. Both
Facilities Management and Cermak Health Services continue to verify compliance with Provision C – 53.
Facilities Management staff check the 14 negative pressure rooms that are currently available for use
and verify that both toilet exhaust fans and general exhaust fans are functioning adequately.
Appropriate notifications were made to mechanical engineers and corrective actions showed that no
non-conformities occurred on subsequent days for any room found out of conformance.  This compares
with 15 room specific incidences of positive pressure in 2010 and over 70 individual cell issues in 2009,

with 23 issues that repeated the following week in the same rooms.  It is noted that in 2009, monitoring was completed weekly rather than daily, as is current practice.  The daily monitoring began in February, 2010.

**Monitor's Recommendations:**

1.  Continue monitoring in accordance with established procedures.  Cermak should consider providing a copy of the annual report to Facilities Management.

2.  Cermak and Facilities Management should consider the need for independent monitoring for negative pressure.  While duplicative monitoring is acceptable, it would be more cost effective for one agency to conduct the monitoring.


**PROVISION:  C. MEDICAL CARE**

**53.** Treatment and Management of Communicable Disease

> **f.** Cermak shall notify DFM, in a timely manner, of routine and emergency maintenance needs, including plumbing, lighting and ventilation problems.

**AUGUST, 2011 COMPLIANCE STATUS: PARTIAL COMPLIANCE**

Status Update: Briefly describe the actions taken by the Defendants to address the provision:

Cermak continues to maintain a manual system to track work orders filed with Facility Management.  Cermak Health Services Director or Assistant Director of Plant Operations/ Environmental Services completes an online work order request through the CCDOC work order system.  A hard copy of the work order request is subsequently faxed to Facility Management, in order to establish a work order tracking number.  Facility Management then faxes the work order back to Cermak Plant Operations with the designated tracking number on it.  Plant Operations maintains a manual file of work orders filed for the month.  However, there is no documented "system" to follow the progress, or lack thereof, for assuring that emergency maintenance issues or other work orders are addressed in a timely fashion.  Beginning in January, 2011, Cermak Plant Operations established an informal process to receive a "closed work order report" from Facility Management.  This is followed by a meeting between Director Dave Badali of Cermak and Facility Management to discuss any outstanding work orders. It was noted during an informal meeting with Facility Management leadership at CCDOC that they were not aware of this "closed work order report" and subsequent meeting.

However, the new interface work order system for Cermak has been purchased, but not yet operational.  There will now be one system for tracking work orders and their completion.

**Monitor's Assessment:** Describe the monitor's assessment of the status and documentation for the compliance status.

The new interface for Facility Wizard, the work order processing system used by Facilities Management has been purchased, but not installed. In the interim each morning D. Badali assesses the Cermak building to assure that all is functioning. He also reviews the CCDOC reports from shifts two and three from the previous day to identify any maintenance issues. Emergency repairs are called into Facilities Management on the dedicated hot line. However, until the new interface is operational, Cermak does not have the ability to electronically track the progress of outstanding work orders as indicated in my previous report.

During the August 2011 tour, I visited several medical clinics within divisions and found all to be clean and well maintained. It was significantly improved from my previous visits.

**Monitor's Recommendations:**

1. Implement the Facility Wizard interface as soon as possible

2. Assure that all needs for maintenance at Cermak are processed through the Facility Management tracking system. This is necessary, not only to assure the work gets completed, but also to document time spent, in order to assure that Facility Maintenance has the justification for necessary staffing resources.

3. Continue daily monitoring of outstanding work orders for maintenance issues.


**PROVISION:  F. FIRE AND LIFE SAFETY**

**71.**  CCDOC and DFM shall work together to develop and implement a fire safety program and ensure compliance is appropriately documented. The initial Fire Safety Plan shall be approved by the fire prevention authority having jurisdiction. The Fire Safety Plan shall be reviewed thereafter by the appropriate fire prevention authority at least every two years, or within six months of any revisions to the plan, whichever is sooner. Fire safety and emergency procedures shall be standardized across divisions, to the extent possible given differences in physical plant and security levels.

**AUGUST, 2011 COMPLIANCE STATUS:  PARTIAL COMPLIANCE**

**Status Update:**

The Fire Safety Committee (FSC) created in August, 2010, continues to meet at least monthly to address the provisions of the consent agreement regarding fire and life safety. The committee consists of representatives from the Office of the Sheriff, Department of Corrections, Cermak Health Services, and

the Department of Facilities Management.  The CCDC division specific fire evacuation and emergency plans have been reviewed by the City of Chicago Fire Department.

The FSC has developed and issued the Interagency Directive, 64.5.30.0 on July 22, 2011 with an effective date of August 19, 2011. The purpose of which is to establish the policy and procedures for Fire Safety Plans, fire emergencies, and evacuations within CCDOC.  It establishes the respective roles and responsibilities of the CCDOC, Cermak, and DFM relating to Fire Safety Plans, emergencies and evacuations.  CCDOC now has a designated fire safety administrator and each division has assigned fire safety officers for each division.  Thirty-three correction officers have received training provided by the Chicago Fire Department.

**Monitor's Assessment:**

Since its inception, I have received the meeting summaries of all meeting of the interagency fire safety committee with an opportunity for input.  I have also reviewed and provided comments to the committee on the draft Fire Safety Plan that resulted in several changes and additions to it.  The Interagency Directive continues to be in effect.  Unfortunately, during July there was a fire emergency within Cermak that resulted in an evacuation of inmates and staff because of a smoke issue from a medical device.  The Chicago Fire Department responded and there has been an after incident briefing to determine if any changes to the Fire Safety Plan or directive were needed. Fire drills for each shift and within each division will begin effective August 25, 2011.

**Monitor's Recommendations:**

1.  Implement the directive within all divisions within CCDOC.

2.  Assure that the results of each drill are reviewed as planned by the CCDOC Sanitarian, with corrective actions taken for any identified non-conformances.

3.  Assure that, through planning and scheduling, there is always a trained fire safety officer on duty at all times for each division and that the fire safety officer is trained on the fire plan for the division he/she is assigned.


**72.**  CCDOC shall develop and implement an evacuation plan for inmates and staff and ensure that comprehensive fire drills are conducted every three months on each shift.  CCDOC shall document these drills, including start and stop times and the number and location of inmates who were moved as part of the drills.

**AUGUST, 2011 COMPLIANCE STATUS:  PARTIAL COMPLIANCE**

**Status Update:**

Based on the correspondence referenced in 71 above, the Fire Evacuation and Emergency Plans specific to all divisions have been reviewed and found to be acceptable by the Chicago Fire Department.  The

Interagency Directive for Fire Safety, Fire Emergency, and Fire Evacuation recently completed will necessitate a review of the each division's plan to assure that it conforms to the new directive. This needs to be the next priority. Fire drills at the frequency specified in the consent agreement need to begin.

**Monitor's Assessment:**

To date, I have not reviewed reports of fire drills for any specific division. However, beginning in December, I will ask to review all fire drill reports, deficiency reports and corrective actions taken as a result of those drills as part of my responsibilities to assure conformance with this provision. I will look for documentation that demonstrates that the division fire safety officers are strictly following the interagency directive and the division specific plans. I anticipate that I will require an unannounced drill while at the facility on some shift.

**Monitor's Recommendations:**

1. Implement a schedule of drills beginning in September, 2011, with documentation that follows the agreed order.

2. Assure that the interagency directive is fully implemented in all divisions and Cermak.

3. Be prepared to demonstrate by records and documentation that the drills occurred, that any non-conformities including lack of training, errors are recorded and corrective actions specifically identified, addressed, and closed out. It is important that this provision be completed as soon as possible.


**73.** DFM shall ensure that the Facility has adequate fire and life safety equipment, including installation and maintenance of fire alarms and smoke detectors in all housing areas according to applicable fire codes. Maintenance and storage areas shall be equipped with sprinklers or fire resistant enclosures in accordance with City of Chicago Fire Code (13-76-010).

**AUGUST, 2011 COMPLIANCE STATUS: PARTIAL COMPLIANCE**

Status Update:

DFM has located applicable fire and life safety equipment including fire alarms and smoke detectors throughout the facility. Those systems are inspected and tested by an independent contractor annually. DFM has installed fire resistant cabinets for all flammables in all maintenance and storage areas. DFM has established a storage procedure policy (09-03-04) for hazardous materials.

**Monitor's Assessment:**

DFM has provided a list of all fire safety and emergency devices including alarms, extinguishers, strobes, pull stations, etc. for each division. During the July visit, I was not able to schedule a time to verify the location of the devices. I was told that hazardous material and non-flammable cabinets were purchased and installed in each maintenance and storage areas where flammable and hazardous material is stored. That policy requires that all hazardous materials be stored in clearly marked and strictly stored in a controlled safety storage area. It also provides that an inventory of all hazardous materials be maintained showing the name, quantity, hazard and location. During the next visit I will verify the location, inventory, storage practices being followed by DFM employees throughout CCDOC.

**Monitor's Recommendations:**

1. DFM should request a specific inspection and report from the Chicago Fire Department demonstrating their acceptance of the storage practices of all maintenance and storage areas for flammable and hazardous materials.

2. Provide and maintain a copy of the location, names of all hazardous chemicals, and designated storage areas to the CCDOC fire safety administrator for review and inspection.

3. DFM should provide documentation that all housing areas are equipped with fire alarms, and which housing areas are provided with smoke detectors.

4. DFM needs to provide me with a copy of the Chicago Fire Code requirements for the storage of all flammable and hazardous chemicals.


**74.** DFM shall ensure that all fire and life safety equipment is properly maintained and routinely inspected. DFM shall develop and implement a program related to the testing, maintenance and inspection of the Life Safety Equipment.

**AUGUST, 2011 COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE**

**Status Update:**

Facilities Management has fully implemented their policy #10-01-01, Required Testing, Inspection, and Maintenance of Life Safety Systems. This policy and procedure outlines required testing in accordance with NFPA requirements. It includes weekly and monthly generator testing, monthly fire department connections inspection, monthly fire pump churn testing, monthly fire extinguisher inspection, annual fire pump testing, annual fire alarm testing, annual main drain testing, and annual elevator testing. Included in the policy is the requirement for documentation and corrective action when non-conformance is identified.

**Monitor's Assessment:**

I randomly reviewed the monitoring records of two divisions for two months, and found that records are accurate, legible, and complete.  Where non-conformance was identified, timely corrective action was completed in every case. During the tour I found no fire extinguishers that had not been inspected as specified.  One fire extinguisher located in Division X control room needed to be mounted on the wall.  I did not have the opportunity on this visit to review the storage area for excess fire extinguishers.  DFM should review with the fire department acceptable storage procedures for the excess extinguishers.  All fire extinguishers – including those in storage – should be shown on the DFM inventory.

**Monitor's Recommendations:**

1.  Continue to maintain the fire and life safety inspection and testing program.  The fire inspection program and records are appropriate and well maintained.

2.  Review with the Fire Marshal the need for securing excess extinguishers and update the inventory as needed.  I will review this on my next tour.

**75.**  CCDOC shall continue to ensure that emergency keys are appropriately marked and identifiable by touch and consistently stored in a quickly accessible location, and that staff are adequately trained in use of the emergency keys.

**AUGUST, 2011 COMPLIANCE STATUS:  PARTIAL COMPLIANCE**

**Status Update:**

The Fire Safety Committee has addressed the easy identification of emergency keys as required.  Each Division has a red emergency key box in the control room.  That box holds the key that opens a second box that contains an emergency key for all housing unit doors.  The key box is locked and has a security seal that has to be broken to gain access.  The draft key control policy requires that any time the seal is broken, including during an emergency, the Watch Commander must be notified, an incident report written, and a work order written requiring DFM locksmith to reseal the box.

All emergency egress keys are color coded and have a two inch glow stick attached to the key ring.  Restricted keys are those specifically assigned to designated personnel with the authority of the division superintendent or DFM's Deputy Director/OEIV.  These keys are color coded differently than the egress keys.  General keys are keys for everyday use such as for the library, classrooms, recreation rooms, etc., and are also color coded.

**Monitor's Assessment:**

The Fire Safety Committee has addressed the easy identification of emergency keys by use of a two inch glow stick that last for several hours.  This appears to be a satisfactory solution rather than notching each key, considering the number of keys that would be notched in a facility this size.  I

reviewed the glow sticks during a meeting of the Fire Safety Committee during this tour. While touring Division X, I noted that the key the day shift Control Officer thought was the key to the emergency key box did not work. After a search he found the correct key. In Division IV, the Control Officer could not find the correct key either. This issue needs to be addressed in all divisions, on all shifts, immediately.

**Monitor's Recommendations:**

1. Install the glow sticks on all emergency keys for all divisions.

2. Establish the effective date for the revised "Security and Control Key Control Interagency Directive issued on May 17, 2011.

3. Complete training of all control room officers and back-ups on all shifts on the location of the emergency keys. There should be no delay in knowing where the key is and have immediate access to the red box containing the emergency keys.

4. The Interagency Committee needs to address and develop a policy allowing CCDOC staff to have emergency only access to all maintenance rooms located within each building where inmates are housed. This includes all mechanical rooms, plumbing shop, sheet metal shop, carpentry shop, and any other room for which access may be necessary in case of a fire, explosion, or other emergency.

**76.** CCDOC shall ensure that staff are able to manually unlock all doors (without use of the manual override in the event of an emergency in which the manual override is broken), including in the event of a power outage or smoke buildup where visual examination of keys is generally impossible. CCDOC shall conduct and document random audits to test staff proficiency in performing this task on all shifts, at a minimum of three times per year. CCDOC shall conduct regular security inspections of all locking mechanisms. CCDOC shall communicate with DFM via the Work Order System regarding lock-related issues and maintenance.

**AUGUST, 2011 COMPLIANCE STATUS: PARTIAL COMPLIANCE**

**Status Update:**

There is no change since the last report. Facilities Management is working through the 2011 capital projects budget, including the Executive Order for a review by the County Board of Commissioners President.

**Monitor's Assessment:**

During this visit, I did not assess each division's process for conducting monthly inspections. This will be assessed in December. Further, this is a topic for review by the Fire Safety Committee. The Fire Safety Interagency Directive does not specifically address testing the egress keys. CCDOC divisional fire plans need to include a check of all locking mechanisms and locks during each fire drill.

**Monitor's Recommendations:**

1.  Develop and implement a door and door lock monitoring program that is consistent for all divisions. Results of those divisional inspections should be submitted to the designated fire safety administrator after each assessment for review along with work orders to DFM for any necessary repairs.

2.  Provide documentation that correction officers on each shift understand the use of the emergency keys, and how to manually open all doors under their jurisdiction without the use of the manual override.

**77.** DFM shall develop and implement an annual preventative maintenance program **concerning security devices such as doors locks, fire and smoke barrier doors, and manual unlocking mechanisms to ensure these devices function properly in the event of an emergency.**

**AUGUST, 2011 COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE**

**Status Update:**

The annual inspection of door locks, fire and smoke barrier doors, and manual unlocking mechanisms, is completed by the same contractor that annually inspects smoke detectors, fire alarms, and smoke detectors.

**Monitor's Assessment:**

Facilities Management is in the process of completing the annual inspection of all door locks, fire and smoke barrier doors, and manual unlocking mechanisms through the use of outside contractor that annually inspects smoke detectors, fire alarms and smoke detectors.  During this visit I reviewed records of the program for 2011 and found that they have been completed as scheduled.

**Monitor's Recommendations:**

1.  Continue the monitoring program as scheduled.

**78.** CCDOC shall implement competency-based testing for staff regarding fire and emergency procedures.

**AUGUST, 2011 COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE**

**Status Update:**

CCDOC has drafted and implemented a competency based fire and emergency evacuation safety test. They plan to give this test first to all Chicago Fire Department trained divisional fire safety officers and

then to all line personnel and shift commanders. The test is based on the Interagency Directive for Fire Safety, Emergency, and Evacuation. The Directive specifically outlines that fire safety orientation for each division is conducted by the Superintendent or designee for any officer new to the division in accordance with the current CCDOC General Order regarding division orientation and handbooks. Following orientation there will be a written test. Any officer failing the test will be required to attend another orientation or receive supplemental training at the Superintendent's discretion.

**Monitor's Assessment:**

The competency based fire and emergency evacuation safety test was first given in August, 2011. The passing score for the exam is 80%. The first exam scores showed that of the 50 officers who took the test, 39 scored 90% or better with only three not passing. They will receive additional competency training. At the fire safety committee meeting during my tour I suggested that the training take place either before a new officer is assigned or no longer than one week after the officer is assigned.

**Monitor's Recommendations:**

1. Continue training and testing until all divisional fire safety officers for all shifts have completed the training and demonstrated their competency.

2. Complete the division specific orientation and handbook within 60 days of the effective date of the Interagency Agreement. Each division's orientation program and handbook must be reviewed and approved by the fire safety administrator with documentation. I will review that documentation on my next visit. I will also review copies of the documents during division tours in December. I will also randomly review copies of the written exams in each division, along with evidence of fire safety training and exam scores for all division officers.

3. Establish a syllabus for the division training program that includes who is providing the training for each division.


**79.** CCDOC shall promptly notify DFM of all electrical hazards, including maintenance and repair of electrical outlets, devices, and exposed electrical wires.

**AUGUST, 2011 COMPLIANCE STATUS:  PARTIAL COMPLIANCE**

**Status Update:**

The Interagency directive for fire safety provides that within each division the safety officer shall conduct weekly fire safety inspections of all housing, administrative areas, medical areas, storerooms, maintenance rooms, classrooms, and common areas. Each week the inspection is conducted by a different shift safety officer. For example, week one is first shift, week two is second shift etc. The weekly reports are submitted to the division superintendents by the end of the inspection week. Any life safety deficiencies or areas of concern are reported immediately to the division superintendent, an

incident report is completed, and DFM is to be notified via the DFM emergency number. The weekly inspection form is completed and includes monitoring of electrical outlets and covers, electrical cords and plugs, fire extinguishers, assuring sprinklers are unobstructed, exit ways are not blocked, exit signs are illuminated, garbage and combustible refuse removed, and assurance that any flammable materials are stored only in designated cabinets.

At the end of each month the second shift safety officers are required to complete and submit a copy of the monthly deficiency report to the division superintendent noting any unresolved deficiencies. Further the safety manager must provide a status report to the Fire Safety Committee at scheduled interagency meetings. If any deficiency is unresolved after 30 days, it is referred to the Executive Directors of CCDOC and DFM for resolution.

**Monitor's Assessment:**

I reviewed the draft Fire Safety Plan. The final directive contained all of the suggestions and recommendations I had made. I met with the Fire Safety Committee during this tour and indicated my support for the provisions. As indicated above, the directive will be effective August 19, 2011. I will review its implementation during the December visit. This includes a review of the weekly and monthly reports from each division, and the reports submitted to the CCDOC fire safety administrator's review. I will also review the corrective action reports of deficiencies to assure the directive is implemented in all divisions.

**Monitor's Recommendations:**

1. Assure that all divisions are implementing the Interagency Directive on Fire Safety including all weekly inspections and follow-up on all deficiencies to assure corrective action was taken and effective.

2. Provide evidence that the monthly reports are actually submitted and reviewed by each division's superintendent. This is by signature of the superintendent accepting the report.

3. Maintain a record within each division of all deficiencies found and the corrective action report demonstrating that they have been successfully resolved.


**80.** DFM shall promptly repair all known electrical hazards, including maintenance and repair of electrical outlets, devices, and exposed electrical wires and will document repairs by the Work Order System.

**AUGUST, 2011 COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE**

**Status Update:**

The priority system established by Facilities Management to address all maintenance requests has worked successfully since implemented in August, 2010. It has worked effectively to assure timely

response to work order requests, including electrical hazards, filed by CCDOC and Cermak. Ongoing Interagency meetings serve as the vehicle to address any outstanding issues including electrical hazards.

**Monitor's Assessment:**

I reviewed work order closure records from Facilities Management, and observed the average time from issuance of the all work orders to resolution is 4.9 days. Electrical and fire safety work order requests were addressed either the same day or the next. Occasionally a weekend or holiday request may be completed the following day. Emergency orders are handled within hours of the request.

**Monitor's Recommendation:**

1. Continue monitoring the time from receipt of a work order to its closure. I will continue to monitor those reports.

**81.** CCDOC shall ensure that combustibles are controlled and eliminate highly flammable materials throughout the facility and inmate living areas (e.g., inmates' use of paper bags as trash receptacles, ripped fire-retardant mattress covers, improvised cell light covers, blankets on cell floors, and improperly stored and labeled flammable liquids and other chemicals).

**AUGUST, 2011 COMPLIANCE STATUS: PARTIAL COMPLIANCE**

**Status Update:**

The revised General Order 11.1.0 "Sanitation Procedure and Inspection" is now complete, as is a CCDOC Master Sanitation Plan for 2010. Division Specific Sanitation Plans for all divisions are completed. As one would expect, this initiative takes considerable time and resources, as each Division is unique when compared to the others. The implementation phase is just beginning. Further, the weekly division specific fire safety inspections reference earlier in this report will begin in August. It also requires an assessment by the division fire safety officers to assess that all garbage and combustible refuse is removed from all areas of the division including housing areas, educational rooms mechanical rooms, etc.

**Monitor's Assessment:**

Since my visit in January, DFM now has all flammables stored inside designated fire safe cabinets throughout the complex. They have fire safety and flammable labels, the Divisional Sanitation Plans, along with inspections, will – when implemented in all Divisions – identify and address inmate's use of excessive paper bags, improvised cell light covers, blankets on cell floors, and improperly stored and labeled flammables and chemicals. A flammable locations log and inventory is the next step for DFM with copies provided to the Fire Safety Administrator and the division specific fire safety officers to be reviewed during weekly inspections. I intend to review the logs and inventory both from DFM, and within each division during the December tour.

**Monitor's Recommendations:**

1. DFM should complete a location, quantity, and type inventory log of all flammables for review by the Fire Safety Committee. The location log and inventory should be updated at least quarterly with a copy provided to the Fire Safety Administrator and the Fire Safety Officer for each Division outlining the location and type of flammables stored there.

2. The Fire Safety Administrator should monitor the locations and inventory at least quarterly and the Division Fire Safety Officers monitor the locations and inventory during their weekly inspections.

3. Deviations found during weekly inspections must be reported to the Fire Safety Administrator, who shall notify DFM management for resolution.


**82.** CCDOC shall ensure that fire safety officers are trained in fire safety and have knowledge in basic housekeeping, emergency preparedness, basic applicable codes, and use of fire extinguishers and other emergency equipment.

**AUGUST, 2011 COMPLIANCE STATUS: PARTIAL COMPLIANCE**

The Interagency Directive for Fire Safety, Fire Emergency, and Fire Evacuation was issued July 22, 2011, with an effective date of August 19, 2011. The policy establishes that all CCDOC employees must receive training and become well-versed in the fire safety, emergency, and evacuation plans of the department and its divisions. Further, the policy explains that "Communication among and between CCDOC, Cermak, and CCDFM employees is key in assuring a safe facility, and all shall work together to implement this directive."

The directive requires the identification and training of all CCDOC fire safety officers for each division at least annually. The training must be provided by or with the approval of the Cook County Sheriff's Office Training Institute, through the CCDOC Safety Office and the Chicago Fire Department, and in accordance with a written course syllabus to be reviewed annually by the Fire Safety Committee.

**Monitor's Assessment:**

As of the July visit 33 Fire Safety Officer have received training by the Chicago Fire Department. The divisional orientation handbooks for officers will be completed by mid August. The Office of Professional Internal Affairs will do an audit of the Interagency Directive within three months to assure that the directive is implemented. I will review that audit on my next visit. It is also my intent, while conducting tours of each division, to ask for evidence of training of the fire safety officers. Further CCDOC needs to develop and have available in each housing unit in each division a readily accessible fire safety "What to do in case of fire or emergency" directive for all divisional staff. The directive needs to provide a step by step procedure for housing officers to follow in case of an emergency. Any officer either permanently assigned or temporarily assigned needs have accessibility to the directive and be familiar with its contents. If an officer is working in a division, I expect, as would the fire safety

administrator or management that he/she has knows the procedure to be followed in case of any emergency including fire or smoke.

**Monitor's Recommendations:**

1. The Fire Safety Administrator needs to assure that all Fire Safety Officers assigned within the Divisions have received the training referenced in the Interagency Directive.  Should a Fire Safety Officer be transferred or leave CCDOC the Superintendent, prior to the transfer or leave shall provide the name of the replacement Fire Safety Officer to the Fire Safety Administrator.  The Division Superintendent must provide evidence that there is always a trained Fire Safety Officer within the division at all times.  So it may be advantageous to train back-up officers for all shifts, holidays, and weekends.

2. Modify the annual fire safety training attendance sheet using the following headings:  Printed name of fire safety officer/safety administrator/other required to attend; Division/Management; Signature of Officer attendee; Date.  The agenda should indicate the length of the training (for example two hours, four hours, etc.).

3. Develop and maintain a current list of all divisional fire safety officers.  That list should be maintained by the Safety Administrator with the approval of management.

4. Develop and have readily available a written procedure in each housing unit in each division so correction officers assigned permanently or temporarily know the correct and expected emergency response including evacuation for the area for which they are assigned.


**PROVISION:  G. SANITATION AND ENVIRONMENTAL CONDITIONS**

**83.**  Sanitation and Maintenance of Facilities

> **a.** DFM shall maintain an adequate written staffing plan and sufficient staffing levels to provide for adequate maintenance of the Facility.

**AUGUST, 2011 COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE**

**Status Update:**

Facilities Management has a written staffing plan for each trade, including response to work order requests, scheduled maintenance, and emergencies; for engineering, plumbing, electrical, painting, carpentry, masons; and the supervision of each.  It is important to note here that they are responsible for the maintenance and repairs of all Cook County owned facilities including CCDOC.

**Monitor's Assessment:**

The budget reductions that were mandated by the Board during budget hearings last January did not occur.  Facilities Management administrators continue to work to assure that CCDC and Cermak

maintenance and repairs continue to receive priority service. This is as a result of the Consent Agreement and continuing requirement for maintaining the numerous facilities necessary to house and service over 9,000 inmates. DFM now tracks completion times for work orders and demonstrates that the average completion time for all repairs to CCDOC average 4.9 days for priority one work orders.  On discussion with Cermak environmental manager and CCDOC, neither shared any of the complaints I heard on previous visits.  DFM continues its program to rehab housing units on a priority schedule.  They were working in Division VI during this tour.  I assessed those units, 6-Q and 6-R and found an amazing amount of work during the day shift.  Inmates were transferred to a designated large room in the lower level of Division so that DFM employees could work unimpeded.  The work in those two units was completed in one day.  The inmates were returned that evening.

That said I did observe several plumbing issues especially regarding shower run times and plumbing leaks on limited housing unit tours on this visit.  I suspect that as the sanitation inspections in each of the division ramp up in the coming months and Corrections Officers learn that they need to file work orders as soon as an issue is discovered, there will be more work orders for a while.  That said, the role of DFM in timely responding to work orders is occurring.

**Monitor's Recommendations:**

1. Review Facility Wizard reports to assure that effective and timely work order processing and resolution is maintained.

2. It may be necessary to review and adjust work order priorities as needed.


**83.** Sanitation and Maintenance of Facilities

> **b.** CCDOC shall revise and implement written housekeeping and sanitation plans to ensure the proper routine cleaning of housing, shower, and medical areas, in accordance with generally accepted correctional standards.  Such policies should include oversight and supervision, including meaningful inspection processes and documentation, as well as establish routine cleaning requirements for toilets, showers, and housing units.

**AUGUST, 2011 COMPLIANCE STATUS:  PARTIAL COMPLIANCE**

**Status Update:**

As of this report, Sanitation plans for the CCDOC Master Sanitation Plan have been completed.  Division specific plans are now completed for all divisions.  Cermak has a sanitation and inspection plan for each of the medical clinics.  The sanitation video referenced earlier in this report is completed and continues to be shown on televisions in each housing unit. Aztec Supply Company, the company providing chemicals, continues to conduct classes for inmates and employees on how to effectively use chemicals for cleaning and disinfection.

**Monitor's Assessment:**

Implementation of an effective sanitation program in the divisions have had mixed results. Clearly – as recommended – the expectations of divisional sanitation officers, housing unit managers, and Division Superintendents must be established from management. Training on the new divisional sanitation plans and the General Sanitation Order will begin in September and be completed for all shifts by October 15, 2011. The CCDOC Sanitarian is assigned to conduct the fire safety and the sanitation inspections for each division, along with the division sanitation officer and divisional superintendent. The CCDOC Accountability Meetings Order requires reporting of sanitation issues to the Sheriff's Executive Office. I expect that once the training is completed, and meaningful inspections are occurring, sanitation will improve dramatically. Division Superintendents will know which officers are taking the responsibility to assure effective sanitation within their assigned responsibilities seriously.

Cermak has the responsibility to clean and maintain the sanitation in the divisional medical clinics. My assessment of selected medical clinics showed that the sanitation level there has greatly improved. The tunnels throughout the complex also continue to be kept free of debris, which is a dramatic improvement from one year earlier. As I continue to assess the divisions during the next tour, I expect to see dramatic improvements from previous reports.

**Monitor's Recommendations:**

1. Initiate the daily review of sanitation duties schedule and daily ordering of all sanitation supplies needed the day. Also assure that the shift watch commanders in all divisions complete their daily inspections to confirm that the scheduled duties were completed.

2. Develop a process to assure sanitation officers within the divisions, and those officers who will be supervising inmates, are actually cleaning and disinfecting the toilet and shower facilities. Apparently, just sitting through the training class is not working.

3. CCDOC may want to consider a practical exercise in a housing unit that staff must complete, in order to demonstrate their knowledge of chemical use and cleaning techniques. Effective cleaning needs to be a part of each officer's initial training. However, because of the number of officers who are already assigned, refresher training is going to be necessary.

4. Cermak should continue their weekly inspections to assure the divisional medical clinics and intake are maintained clean, orderly and in good repair.

5. Utilize the CCDOC Sanitarian to assure divisional responsibilities for sanitation are ongoing and effective. Reports of non-conformance by any sanitation officer or housing unit manager need to be addressed quickly and firmly.

**83.** Sanitation and Maintenance of Facilities

**c.** DFM shall implement a preventive maintenance plan to respond to routine and emergency maintenance needs, including ensuring that shower, toilet, and sink units are adequately maintained and installed.

**AUGUST, 2011 COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE**

**Status Update:**

Facilities Management has implemented the work order tracking system ("Facility Wizard") to track and prioritize all maintenance requests and scheduled preventative maintenance of mechanical and fire safety systems within CCDOC, as well as at all other Cook County facilities.  CCDOC and Cermak, have finally agreed to purchase the Facility Wizard interface that will essentially put all of CCDOC and DFM on one system. Additionally, since August, 2010, Facilities Management has an emergency phone number that is operational 24 hours daily, seven days a week, to handle and respond to emergencies as reported by CCDOC and Cermak.  Facilities Management has adequate staff for data entry of work orders, time management of trades, and timely close out of completed work orders.

**Monitor's Assessment:**

I have reviewed several months' tracking data from Facilities Management Wizard system.  It works effectively to track numbers and progress of work orders.  Management continues to investigate different reporting ideas to improve tracking and benchmarking types of work orders and from which division.  This data will be beneficial to more effectively budget staff time and positions.

The decision by CCDOC to implement Facility Wizard, while a large expense, will now allow CCDOC to routinely monitor priority work orders as necessary. However, if corrections officers are not reporting plumbing issues and a work orders is not filed, those plumbing issues will never be resolved.  It is my belief that DFM promptly responds to work orders following their priority schedule.  CCDOC needs to improve their responsibility to advise DFM of maintenance issues as they are identified rather than wait. I have never, in my career, seen a plumbing or electrical problem resolve itself by ignoring the issue.

**Monitor's Recommendations:**

1.   None for Facilities Management

2.   CCDOC needs to implement the Facility Wizard system and begin tracking progress on outstanding work.

**83.** Sanitation and Maintenance of Facilities

**d.** CCDOC shall notify DFM, in a timely manner, of routine and emergency maintenance needs, including plumbing, lighting, and ventilation problems.

**AUGUST, 2011 COMPLIANCE STATUS:  PARTIAL COMPLIANCE**

**Status Update:**  As discussed above CCDOC and Cermak will by this fall join the Facility Wizard system, which will have the effect of having all areas of CCDOC on the same maintenance tracking system.  The routine housing unit inspections specified in the sanitation plan, when implemented are expected to improve CCDOC's notification to DFM of routine maintenance needs. Emergency notifications are typically reported and response times from DFM are acceptable.

The CCDOC Sanitarian in conjunction with the DFM Liaison Officer was recently empowered to generate the electronic DFM work order requests.  Further, a "work order unit" was created in late May to streamline and expedite the work order process.

**Monitor's Assessment:**

While touring housing units, I continue to find numerous instances of sinks that have little or no water pressure, valves that are stuck and not functioning, showers that will not shut off, or showers that do not maintain a water flow for at least 30 seconds.  Examples on this visit were in Divisions IV and X. This continues to occur because of a lack of daily inspections of all cells, dayrooms, congregate toilet and shower facilities, utility rooms, and officer's toilets.  Once these inspections begin, and assuming they will be effective, Facilities Management will most likely be overwhelmed with work orders until the work is caught up.  Once again, training of the officers as to what is acceptable water pressure, length of time water should flow before the need to reactivate (either in a shower or hand sink) will be required.  The Divisions will need to dramatically improve officers' performance in maintaining their respective housing units.

In assessing the food service kitchens, leaking plumbing fixtures is much improved since my previous visits.  However, more vigilant reporting by Aramark will have the timely effect to eliminate them.

**Monitor's Recommendations:**

1. Establish a training program for all housing officers on how all plumbing fixtures are supposed to function.  Require accountability of the housing unit officers on all shifts to report issues as they are identified.

2. Assure the food service contractor understands that it is their responsibility to report plumbing issues immediately to assure timely response from DFM.

3. Cermak should also establish a training program for their medical clinic personnel to understand what constitutes a plumbing problem and what to do when they have an issue.

4. Aramark will also need to be more responsive to plumbing issues within both kitchens, rather than the present system of waiting until it becomes an emergency.


**83.**  Sanitation and Maintenance of Facilities

**e.** DFM shall ensure adequate ventilation throughout the Facility to ensure that inmates receive an adequate supply of air flow and reasonable levels of heating and cooling. DFM staff shall review and assess compliance with this requirement on a daily basis for automated systems and on and annual basis for non-automated systems.

**AUGUST, 2011 COMPLIANCE STATUS: SUBSTANTIVE COMPLIANCE**

**Status Update**

DFM has fully implemented their Policy for Monitoring Temperature Ranges at CCDOC for all divisions. They are utilizing an inspection form and protocol as specified in the Policy. Monitoring is done once on each shift, seven days per week. To complete one Division takes approximately one hour.

**Monitor's Assessment:**

DFM continues to conduct their "Rounds Monitoring" for all divisions. The monitoring is documented effectively. It includes measuring temperatures of the exhaust and return air fans and temperatures at pre-selected points closest to the exhaust fan and the point farthest from the exhaust fan in the housing units. It also measures the temperature of the hot water heater, checks whether the hot water circulating pump is functioning along with the sewer pumps, storm pumps, and condensate pumps. Function of the generator is verified, including the oil and fuel level. Measurements of PSI for the high, medium, and low pressure systems, city water pumps, and the chilled water pumps for the fire system, are taken. I reviewed some months of the daily logs for various divisions. Where non-conformance was identified, I verified that work orders had been filed and that work was completed and the work order closed in typically one day. The monitoring forms are typically completed by an engineer and reviewed by a supervising chief or assistant chief engineer. The program is functioning as intended.

The ventilation cleaning program for all Divisions started in August, 2010, is continuing. Visits to housing units in Divisions IV, VI, and X continue to show far less blocked vents that found during previous visits. This will improve even more as housing unit officers are more effective in completing their shift rounds.

**Monitor's Recommendations:**

1. Continue the daily rounds inspections on all shifts.

2. Continue the vent cleaning program started in August, 2010. Assure housing unit officers are requiring inmates to keep vents open and not plugged.

**83.** Sanitation and Maintenance of Facilities

**f.** CCDOC shall notify DFM of any visible obstructions to the ventilation system.

**AUGUST, 2011 COMPLIANCE STATUS: PARTIAL COMPLIANCE**

**Status Update:**

As discussed earlier, Facilities Management completed the first round of the ventilation cleaning project. Once started, sanitation inspections in all divisions will reduce the number of blocked vents and improve ventilation throughout each division. A PowerPoint presentation has been developed by Facilities Management to demonstrate to correction officers how the ventilation systems function and stress the importance of maintaining unobstructed vents.  However as of this report, that presentation has not yet been implemented.

**Monitor's Assessment:**

From assessing housing units in Divisions VI and X, I found far fewer blocked vents than during either previous tour.  Sometimes inmates continue to block vents when they are cold, but CCDOC staff has been quite effective so in enforcing unobstructed vents.  The Master Sanitation Plan requires officers to identify and notify Facilities Management should vents become blocked.  As with sanitation, it will be important that Division housing unit managers understand the importance of maintaining the vents to keep them open and functioning.

**Monitor's Recommendations:**

1. CCDOC needs to begin using the ventilation PowerPoint presentation referenced above.  This should be done during the training sessions on sanitation.

2. CCDOC needs to assure that housing unit managers understand the importance of keeping vents open and functioning, and assure that they enforce the policy with inmates.  Verify officers' attendance at the meetings held on all shifts by requiring sign-in sheets, and possibly have them sign off as accepting responsibility for enforcing the provisions of the Sanitation plan as it pertains to ventilation.

**83.** Sanitation and Maintenance of Facilities

     **g.** Cook County shall ensure adequate lighting in all inmate housing and work areas.

**AUGUST, 2011 COMPLIANCE STATUS: PARTIAL COMPLIANCE**

**Status Update:**

Since the lighting replacement began, two tiers of Division IX, specifically 1-E and 2-B, and three tiers in Division IV, specifically M-1, M-2, and N-1, are complete.  The lighting replacement continues as budgeted.  This is a very expensive issue and as a result will take some time to complete in all divisions.

**Monitor's Assessment:**

There continues to be exposed light bulbs in many cells that inmates are covering with used milk cartons to redirect or dim the lights.  This creates a fire hazard for inmates located within those housing units and a safety hazard to inmates that could cause electrocution.  Exposed light bulbs continue to be a

safety hazard to the inmates who are using the glass to cut themselves or others. Based on incident reports, this seems to be a ongoing issue especially in the female housing areas. The project to replace that lighting clearly needs to be completed as soon as is practical. CCDOC has given the responsibility of identifying and reporting all burned out bulbs to the divisional facilities liaison officer who is responsible to submit a work order to DFM. The Sanitarian now has access to a light meter to assure that sufficient light in accordance with Illinois Jail Standards is maintained. The Sanitarian can also submit a work order when necessary.

**Monitor's Recommendation:**

1. Once the severity of the project is understood, and it is approved, the lights must be replaced as soon as possible.

2. Based on the number of self inflicted incidents involving glass from broken light bulbs in the division housing female inmates, establish a higher priority to replace them with secure lamps. In the interim, consider the use of plastic coated shatterproof bulbs.

**83.** Sanitation and Maintenance of Facilities

> **h.** CCDOC shall ensure adequate pest control throughout the housing units, medical units, RCDC, RTU, and food storage areas. CCDOC shall maintain a contract for professional exterminator services for each division, food services areas, and the Cermak hospital. Services should provide for routine pest control spraying and additional spraying as needed.

**AUGUST, 2011 COMPLIANCE STATUS: PARTIAL COMPLIANCE**

**Status Update:**

CCDOC continues to contract with Anderson Pest Solutions for all buildings including Cermak. This contract began in late 2010. Aramark, who is responsible to pest control for both food service kitchens, is now also utilizing Anderson Pest Control. So there is one provider for the entire complex. This is most effective at consistent service.

**Monitor's Assessment:**

In my review of a summary report provided by Anderson Pest Control between January, 2011, and June, 2011, they have captured 238 mice within all divisions, and 13 outside. They have also captured 1 rat inside and 15 rats outside of the buildings. All housing units are serviced every two weeks on a schedule. Anderson has placed over 300 exterior bait stations outside of all of the divisions. The stations contain both mouse and rat snap traps. The previous contractor used no exterior bait stations. Since they received the contract with Aramark, Anderson has captured 83 mice inside the two kitchens and two outside. The kitchens are serviced weekly. Further in the kitchen Anderson is treating for German cockroach activity and fruit flies.

During my visit I received numerous complaints of mouse activity within the female housing units. During inspections I identified one mouse nest in an interior door stairwell and personally observed mice outside in an enclosed atrium. Sanitation officers and I also identified the access point into the division. Sanitation officers will direct Anderson Pest Control on remediation.

The drain cleaning program by DFM for all housing areas has been completed and a second round has begun. Drains are cleaned and scoured in housing areas and treated them with a formulation to prevent a biofilm from building up and creating a breeding area for drain flies. I received fewer complaints by far from inmates regarding insects and rodents. Further, Anderson Pest Control has initiated the placement of glue traps in the pipe chases of all housing units in order to trap and measure pest activity throughout CCDOC. For the pest program to continue being effective, housing unit managers will have to keep their areas clean and free of excess food, and remove trash and garbage on every shift. All food that inmates purchase from commissary must be stored at all times in their personal property boxes.

The computerized bi-monthly reports provided by Anderson offer excellent opportunities for CCDOC staff to monitor activity and also to establish priorities for eliminating access points for insects and rodents into the divisions and food service. Once those are completed this provision should be categorized as substantial compliance.

**Monitor's Recommendations:**

1. Complete recommendations a (from Anderson Pest Control), items e, h and I of the September, 2010, report to assure that all access points for insects and rodents are eliminated.

2. A pest identification log should be posted in key areas of all CCDOC housing units, and by Aramark within each of the food service facilities, for officers and employees to document pest sightings. This log should include what was observed, when, and the specific location. This should then be used by the contractor to target baiting and trapping.


**83.** Sanitation and Maintenance of Facilities

   **i.** CCDOC shall ensure that all inmates have access to needed hygiene supplies.

**AUGUST, 2011 COMPLIANCE STATUS:  PARTIAL COMPLIANCE**

**Status Update:**

Inmates are provided with soap, toothpaste and a toothbrush upon admission to CCDOC. Additionally female inmates are provided with feminine hygiene products as necessary. Standard personal hygiene supplies are provided weekly and in between as needed. Razors are available to inmates daily in accordance with CCDOC policy. Further inmates have access to additional hygiene supplies such as shampoo, deodorant, etc. through the weekly commissary order process.

**Monitor's Assessment:**

CCDOC is completing a new video for explaining inmate rules, requirements, and services. It is anticipated that the new video will be completed by October, 2011. It will be played on televisions located within each housing unit at least daily. The plan is to include an explanation of hygiene items provided and the availability of additional hygiene items through the commissary.

**Monitor's Recommendations:**

1. Complete the new video and begin showing it to all inmates upon admission and regularly each day in the housing units.

2. Assure that each division maintains an adequate supply of replacement hygiene articles within housing units for use between weekly distribution and for newly admitted inmates.

**83.** Sanitation and Maintenance of Facilities

**j.** CCDOC shall develop and implement policies and procedures for cleaning, handling, storing, and disposing of biohazardous materials, in accordance with generally accepted correction standards. CCDOC shall ensure that any inmate or staff utilized to clean a biohazardous area are properly trained in universal precautions, are outfitted with protective materials, and receive proper supervision when cleaning a biohazardous area.

**AUGUST, 2011 COMPLIANCE STATUS: PARTIAL COMPLIANCE**

**Status Update:**

Biohazardous waste from each of the divisional medical clinics is securely stored and placed in red bags for daily pick up by Cermak staff. Cermak has a contract for collection and final disposal. Each division maintains a supply of biohazardous spill kits within the security office and the sanitation office. They are replaced as needed through the warehouse. A new draft model for the Bloodborne Pathogen Decontamination Procedure is currently under review. There is a written syllabus for Bloodborne Pathogen Clean-up Training.

**Monitor's Assessment:**

While biohazardous waste from the medical clinics is handled appropriately, I need to review the process for cleaning and disinfecting biohazardous areas within CCDOC. I have reviewed the course syllabus for biohazardous waste and bloodborne pathogen training program for officers and find that it is acceptable. During divisional visits in December I will review the spill kits use procedure.

**Monitor's Recommendations:**

1. CCDOC should provide me with the final policy and procedure for cleaning and handling biohazardous materials.

2. Assure that the OSHA Bloodborne Pathogen Standard is being met.

3. Assure that any officer or inmate worker involved in biohazardous waste clean-up is trained on the policy and procedure.

**83.** Sanitation and Maintenance of Facilities

 **k.** DFM shall develop a policy on hazardous materials, in accordance with generally accepted correctional standards, and insure that all DFM staff is properly trained on the procedure.

**AUGUST, 2011 COMPLIANCE STATUS: PARTIAL COMPLIANCE**

**Status Update:**

DFM has a policy, 09-03-04 establishing the storage procedure for all hazardous materials. It applies to solvents and any material that can be combustible, flammable, explosive, poisonous, corrosive under pressure or some combination of the above. It establishes a procedure for managing the correct storage practices and requires a composite list of all chemicals being used and stored. It further requires copies of Material Safety Data Sheets for all chemicals. The policy also spells out the storage and handling procedures including marking, controlling, labeling, mixing, and safety precautions.

**Monitor's Assessment:**

During this tour I was not able to tour maintenance shops to verify the new storage practices. The policy referenced above should be reviewed to assure its accuracy and thoroughness by both DFM and also by the CCDOC fire safety officer. It is important that all chemicals be stored safely in accordance with CCDOC requirements and also in compliance with Chicago Fire Safety Code. It is also appropriate that copies of all current Material Safety Data Sheets be provided to the fire safety administrator. At least a quarterly inventory of all chemicals be completed with evidence and maintained by both DFM management and CCDOC fire safety administrator. The fire safety administrator should assure that the fire safety officers assigned to those divisions where DFM hazardous and flammable chemicals are stored know what is there and where it is stored in case of an emergency.

**Monitor's Recommendations:**

1. Department of Facility Management should develop and implement a chemical inventory control program as described above, including sign in and out of any chemicals going to any area of CCDOC where inmates are housed or are working.

2. Facility Management needs to maintain the most current editions of Material Safety Data Sheets for all chemicals in the area in which they are stored. The Material Safety Data Sheets shall be easily accessible in case of an emergency.

3. Facility Management needs to provide documented training of all employees on the safe use of chemicals as required by OSHA.

4. DFM should provide a copy of the quarterly inventory to the CCDOC Fire Safety Administrator.

5. The CCDOC Fire Safety Administrator and committee should review and provide comments on the DFM policy 09-03-04.

6. Assure that division fire safety officers are knowledgeable of the location and types of hazardous chemicals stored in the maintenance and storage shops within their respective divisions.

7. Provide written evidence that the storage practices of all hazardous chemicals under control of DFM are in compliance with the Chicago Fire Safety Code. A copy of their annual inspection would meet this recommendation.


**83.** Sanitation and Maintenance of Facilities

   **I.** CCDOC shall provide and ensure the use of cleaning chemicals that sufficiently destroy the pathogens and organisms in biohazard spills

**AUGUST, 2011 COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE**

**Status Update:**

CCDOC controls the mixing and dilution of all chemicals at a central supply location within Division V and only provides properly mixed and diluted cleaning and disinfecting chemicals to each division as needed. The two chemicals used for all cleaning and disinfection are Marauder and Terminator. Terminator is an effective disinfectant for biohazard spills. Aztec Supply Company, the supplier of all cleaning chemicals conducts regular classes at CCDOC for both CCDOC employees and inmates assigned the responsibility of cleaning showers, toilet facilities, dayrooms, men's intake center, and administrative areas within CCDOC. These are two hour classes daily, over a period of one week. Each person that takes the class and passes a test is presented with a certificate of completion.

**Monitor's Assessment:**

The recently implemented change to centrally mix chemicals and only distribute diluted chemicals appears to be working as planned. CCDOC should be commended for this new approach to assure that

inmates and staff are not exposed to concentrated chemicals that if misused could result in injuries. The training by the chemical supplier is an excellent method to assure that cleaning and disinfecting throughout the facility including clean-up of biohazardous spills is effective. I suggest that CCDOC purchase and maintain a supply of biohazardous spill kits for use when necessary.

**Monitor's Recommendations:**

1. Purchase and maintain a supply, in each division, of biohazardous spill kits to be used in the event of an incident involving biohazards and/or bio-waste.


**83.** Sanitation and Maintenance of Facilities

> **m.** CCDOC shall inspect and replace as often as needed all frayed and cracked mattresses. CCDOC shall destroy any mattress that cannot be sanitized sufficiently to kill any possible bacteria. CCDOC shall ensure that mattresses are properly sanitized between uses.

**AUGUST, 2011 COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE**

**Status Update:**

All mattresses are being replaced. CCDOC has ordered 8,000 new mattresses and approximately 5,000 are now distributed. The new mattresses include a built in pillow. As a result, inmates will no longer be provided with separate pillows and pillowcases. A program has been instituted for replacement, inspection, and cleaning of mattresses within all divisions. After an inmate is released or transferred, his/her mattress is removed from the cell, taken to a divisional clothing and linen storage room to be cleaned and sanitized using Marauder and Terminator as discussed throughout this report. The mattress is then air-dried and returned to the housing unit.

**Monitor's Assessment:**

CCDOC has just submitted an order for an additional 2,000 mattresses. This will complete the changeover to all mattresses with built in pillows and eliminate the need for separate pillows and pillowcases. In visiting housing units in Divisions VI and X I saw very few mattresses in disrepair. In fact, most appeared new, verifying the status update. Each division was provided with a copy of the policy outlining the acceptable process of when and how to effectively clean and sanitize mattresses between uses and when to remove and discard mattresses that are no longer cleanable or not able to be effectively repaired. In future visits, I will observe and assess the cleaning and disinfecting process within the divisions.

**Monitor's Recommendations:**

1. None at this time

**83.** Sanitation and Maintenance of Facilities

**n.** CCDOC shall ensure adequate control and observation of all housing units, including distribution and collection of razors and cleaning supplies.  All cleaning tools and hazardous chemical shall be removed from housing areas after use.

**AUGUST, 2011 COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE**

**Status Update:**

A CCDOC special order establishes the requirements for razor exchange.  This special order was established in December, 2009 as a pilot program.  It is in the process of being revised into a General Order.  Razors used throughout CCDOC are color coded by Division.  Razor inventory for use within the divisions are obtained from the Superintendent of Administration located in the General Order Office on weekdays during the day shift.  Divisions are issued two biohazard containers with disposable plastic liners; one used to transport unused razors and one for transporting used razors.  The date and amount of razors are tracked on a "razor distribution and retrieval log" signed by the officer accepting the razors.  The divisions are also issued puncture resistant gloves for officers handling the razors.  Used razors are placed in a red biohazard container designated for used razors and transported the following weekday to the General Order office.  Unused razors are placed in the biohazard container designated for unused razors and transported to the General Order office like the used razors.  No razors are stored in the housing units. All razors, used and unused, are audited daily to assure complete retrieval.  If there is a discrepancy, and incident report is generated.  If there are no discrepancies, the specific division is issued additional razors as necessary.  All used razors are maintained in a designated receptacle and disposed by the contracted medical waste disposal company.

There are two cleaning solutions used at CCDOC: Marauder and Terminator.  Both are cleaning solutions, but Terminator is also a heavy duty disinfectant.  Cleaning supplies are now controlled by policy where all cleaning chemicals are mixed in a central location within the sanitation office.  The diluted chemicals are then delivered to the divisions for use in cleaning and sanitation.  They are stored in designated cleaning supply rooms within each division. The division sanitation officer is responsible to order chemicals as needed to replace exhausted supplies.  Once daily cleaning of housing units and general areas is finished all mops and buckets are returned to the designated supply rooms and not stored within the housing units.

**Monitor's Assessment:**

The razor exchange program appears to be very effective at controlling storage and use of razors within the housing units.  It presents one less opportunity for inmates to create shanks.  My review of incident reports over the last six months showed no incidents of razors being identified as a source of a shank.  I will review the razor exchange program within divisions on my next visit as I increase housing unit assessments.

The change to centrally control chemical mixing since January, 2011 has resulted in a projected savings of $58,000 by year end.  This demonstrates the misuse of chemical mixing that was occurring.  There is even more savings because central supply now orders chemicals in 55 gallon drums rather than in five

gallon containers.  Moreover, there is considerable less risk of injury to inmates as they no longer have access to improperly mixed chemicals.

Mop heads are now collected after use and sent to the laundry for cleaning.  As a result wet, dirty mops are no longer stored in housing units or in the divisional supply rooms.

**Monitor's Recommendations:**

**1.**   None at this time.


**83.**  Sanitation and Maintenance of Facilities

> **o.** CCDOC shall ensure that Facility Sanitarians receive training from a relevant state, national, or professional association with emphasis on assessment of environmental health practices and emerging environmental issues in correctional settings.  Facility Sanitarians should also have training on and access to testing equipment to ensure sanitary conditions.

**AUGUST, 2011 COMPLIANCE STATUS:  PARTIAL COMPLIANCE**

**Status Update:**

As of July, 2011, CCDOC's full time Registered Sanitarian, Bruce Schroer, is providing solid advice and counsel in a number of areas.  He has played an integral role in the development of division specific policies relative to sanitation and provided direction to the divisional sanitation officers.  He has worked with the sanitation officers in assuring more effective cleaning and sanitation.  He is now monitoring food service both for sanitation and meal serving times.  He also is working with the pest control contractor to monitor their inspections and treatments. The other position remains vacant and recruiting for that position continues.  One person selected did not successfully pass Cook County hiring protocol and based on recent correspondence, the position is again being advertised. It is a challenge for CCDOC, as it is in large institutional facilities, to is that identify Sanitarians who have experience practicing environmental health in that environment.

**Monitor's Assessment:**

During this tour Mr. Schroer accompanied me on housing tours to observe my techniques.  He participated in several meetings with staff regarding tool control, sanitation, and policy establishment. It is clear that his expertise has played an integral role in the improvements within CCDOC.  The employment of the second Sanitarian will allow a division of responsibilities as there is more work here than one person can effectively handle.

**Monitor's Recommendations:**

1.   Once the second Sanitarian is employed and oriented, there will need to be a separation of responsibilities so that each can be effective without overlap.  Consideration to whom they report

should also be decided.  It is important that the Sanitarians are able to provide independent, objective audits and analysis to assure management leadership within CCDOC that issues such as sanitation, food service, pest control, housing density, maintenance, chemical control among others is being effectively managed within the divisions and corporately.

2. The Sanitarians can be an effective management tool to assure that specific General Orders are being effectively administered within the divisions.  It is critically important for employees working in the divisions understand both the oversight responsibilities and authority that the Sanitarians have to monitor and assure a clean, sanitary, safe, and healthy environment for inmates and staff. Although I have not observed it during this visit, consideration should be given to their reporting structure assure that the Sanitarian's objectivity is not compromised.

3. CCDOC, with input from the Sanitarians, should develop specific written directives outlining how they oversee environmental issues with contractors including food service and pest control.  Further CCDOC should also consider their role in assisting Cermak and Facilities Management.

4. Once both Sanitarians are employed it should be their responsibility to create a Sanitarian's Manual that details their responsibilities, authority, and work program so that when replacements are needed, their role in the position is clear.  As indicated in recommendation 2, employees within the divisions need to understand the role of the Sanitarian in the institutional environment both for routine operations and emergency events.


**PROVISION:  G. SANITATION AND ENVIRONMENTAL CONDITIONS**

**84.** Sanitary Laundry Procedures

**a.** CCDOC shall develop and implement policies and procedures for laundry procedures to protect inmates from risk of exposure to communicable disease, in accordance with generally accepted correctional standards.  To limit the spread of communicable disease, CCDOC shall ensure that clothing and linens returned from off-site laundry facility are clean, sanitized, and dry.

**AUGUST, 2011 COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE**

**Status Update:**

The in-house laundry located in Division V continues to be fully operational.  No laundry is handled by an outside contractor.  All laundry, with the exception of female's personal clothing, is washed and dried at the new facility located in Division V.  Women's personal clothing is washed and dried in Division IV. The main laundry consists of five 150-lb Unimac washers and five 170-lb Unimac dryers.  The tubs used to hold and transfer laundry are cleaned and disinfected with Clorox wipes before clean laundry is placed in them. The laundry is operated by US military veterans who are inmates of the jail, through a program operated in conjunction with Roosevelt University. The program has been successful, and has now hired

one inmate through the program.  The laundry is supervised by Sgt. Rodriguez.  CCDOC has developed monitoring forms that include a report demonstrating which divisions are following the General Order for frequency of inmate personal clothing washing and a report that documents the dates and time that inmate's personal clothing is collected and returned.  It further documents the regular washing and drying of mop heads used throughout CCDOC.

**Monitor's Assessment:**

The new laundry has now been operational for eight months.  In that time it is functioning in full compliance with the agreement.  It was originally developed as a turn-key operation with Aramark.  CCDOC has now taken complete control of the laundry from Aramark and is operated effectively by military veteran inmates with CCDOC staff supervision. Chemicals used in the laundry are pre-measured and dispensed in an automated dispensing system.  Inmates do not have access to the chemicals, as they are stored in a locked cage.  Chemicals used are purchased from Ecolab. They include Ecostar Builder C detergent, Ecostar Destainer (Bleach), and Ecostar Sour (a pH adjusting chemical) to prevent skin irritation and fabric browning.  Material Safety Data Sheets (MSDSs) are readily available.

**Monitor's Recommendations:**

1.   None at this time

**84.** Sanitary Laundry Procedures

> **b.** CCDOC shall ensure that inmates are provided adequate clean clothing, underclothing and bedding, consistent with generally accepted correctional standards, and that the laundry exchange schedule provides consistent distribution and pickup service to all housing areas.

**AUGUST, 2011 COMPLIANCE STATUS:  PARTIAL COMPLIANCE**

**Status Update**

Inmates currently receive clothing exchange two times per week throughout the facility on a predetermined schedule.  The schedule is posted on each tier within each of the divisions.  Linen exchange is once per week. Blankets are washed and dried monthly.  However, CCDOC General Order No. 11.3 dated 05/02/07, needs revising to reflect current policy and practice.  For example, the new mattresses come with a raised portion to serve as a pillow.  So a pillow and pillowcase are no longer provided.  Section G needs to be completely rewritten as the schedule has been developed at the CCDOC management level and not the divisions.  As a result, the revised order needs to reflect current practices.  While the laundry program fully operational, not all divisions have directed inmates to make use of the laundry service.

**Monitor's Assessment:**

Inmate outer clothing is currently laundered twice weekly and linens are exchanged weekly for all divisions in accordance with a CCDOC developed schedule. Blankets are laundered monthly. However, in reviewing the new reports created by the central laundry, it is clear that Division IX is not using it for inmate's personal laundry. According to the report, the laundry officer has made attempts to pick up the laundry, but is told that none is available. It was recorded in the laundry logbook. Divisions V, VI, and X are using it, but not twice weekly as is the policy. As CCDOC is no longer providing laundry soap through the commissary, inmates continue to use their sinks and toilets to launder personal clothing. This is not acceptable. In touring parts of Division V, I observed numerous ropes in cells being used to dry personal laundry. CCDOC has provided laundry loops to all divisions for inmates to tie their personal laundry and assure that inmates receive their personal laundry back. Inmates' personal laundry is washed, dried, and returned to the inmates not only on the same day as collected, but in most cases on the same shift.

**Monitor's Recommendations:**

1. Revise General Order 11.3 dated 5/2/07 to reflect current policy. The policy should be developed corporately and implemented within all divisions.

2. The order needs to include a mechanism for monthly audits with a report of deficiencies provided to a designated management with the responsibility and accountability to assure compliance by the divisions. The audit tool is an essential tool to assure the General Order is being implemented as intended.

3. The revised General Order should identify the divisional superintendent's responsibility for regular review to assure compliance.

4. The divisions should maintain a uniform/linen exchange log book to accurately reflect the inventory of all clothing/linens maintained within each division. It should reflect the actual collection of returned clothing and linens, along with that newly issued. By completing the inventory, correctional staff can assure that inmates to not maintain additional clothing and linens that can be converted to ropes, privacy curtains, carpeting, etc. For example, privacy curtains can be used to obstruct an officer's vision of cell and toilets.

5. Assure women's personal laundry is handled is a similar way to the men's to promote effective cleaning.

**84.** Sanitary Laundry Procedures

      **c.** CCDOC shall train staff and educate inmates regarding laundry sanitation policies.

**AUGUST, 2011 COMPLIANCE STATUS:  PARTIAL COMPLIANCE**

**Status Update:**

Inmate Veterans are effectively trained by laundry officers upon assignment to the laundry. When speaking with inmates, they understood the laundry schedule. Several indicated that the schedule was posted and was being followed. However, several inmates continue launder their personal clothing and linens in their cells. The revision of General Order 11.3 should address this. Also the plan to develop a video for inmate viewing should clarify for all inmates the procedure to be followed for inmate laundry.

**Monitor's Assessment:**

The laundry command staff is in the process of drafting a manual for both staff and detainees with laundry operation requirements including the revised order and procedures. While the inmates working in the laundry have been trained on their responsibilities, other inmates have yet to be provided with education on the use of the laundry and the public health significance of continuing to launder their clothing in their cells and not using the provided laundry.

**Monitor's Recommendations:**

1. Review the inmate handbook to reflect the laundry exchange schedule, the list of the clothing and linen provided, and the rule that inmates must use the CCDOC laundry and no longer allow inmates to launder their own clothing.

2. Assure that the inmate handbook and General Order 11.3 are consistent.

3. Implement the laundry procedures and expectations in the developing video for inmate viewing within the housing units.

4. Implement a training program for those correction officers working in divisions not presently regularly requiring inmates to use the CCDOC laundry.

**84.** Sanitary Laundry Procedures

> **d.** CCDOC shall ensure that laundry delivery procedures protect inmates from exposure to communicable diseases by preventing clean laundry from coming into contact with dirty laundry or contaminated surfaces.

**AUGUST, 2011 COMPLIANCE STATUS:  PARTIAL COMPLIANCE**

**Status Update:**

Clean inmate laundry is transferred from the central laundry in containers that are cleaned between uses with a disinfecting bleach wipe. All containers are thoroughly wiped by laundry workers and allowed to air dry before clean clothing and bedding is placed into the containers. There is a designated area within the laundry that separates dirty laundry bins from those that have been cleaned and sanitized between uses. Inmate personal laundry that is cleaned at the central laundry is returned to

inmates usually within the same shift that it was collected, but in all cases on the same day.  This is a dramatic improvement that demonstrates to inmates that the central laundry is an effective service.

**Monitor's Assessment:**

On this tour, I only observed the clothing and linen supply rooms in Division XI.  It was extremely well organized and clean.  As I tour more housing divisions on the next tour, I will assess the cleanliness and operation of all clothing and linen supply rooms.

**Monitor's Recommendations:**

1.  CCDOC should consider developing a general policy for each division to implement outlining the specifics requirements on the cleanliness, maintenance, and operation of the divisional clothing and linen supply rooms.  That policy could be assessed by the sanitation officers as part of their inspection responsibilities.

2.  There continues to be a need to create an inmate training module for use by supply room staff to provide consistent training to inmate workers assigned to those supply rooms on sanitary handling of clean and soiled laundry.  The module should include handwashing, process for sorting, and establishing an inventory of the clothing and linen that is required to be maintained within each division.  This could assist in preventing unauthorized excess linens and clothing being used in housing areas for carpeting, ropes, etc.

**84.** Sanitary Laundry Procedures

> **e.** CCDOC shall require inmates to provide all clothing and linens for laundering and prohibit inmates from washing and drying laundry outside the formal procedures.

**AUGUST, 2011 COMPLIANCE STATUS: PARTIAL COMPLIANCE**

**Status Update:**

CCDOC laundry staff have developed and implemented a documented audit that tracks the divisions that are and are not utilizing the central laundry for inmate personal laundry.  They have also just completed documented audit that tracks the number of uniforms and linens that are sent from the housing units and the number returned. However, it has yet to be implemented.  If this "logbook calculation form" is uniformly used throughout the divisions, it should identify misuse and abuse of laundry by housing units and create a effective clothing and linen balance sheet.  Further laundry soap has been eliminated from the commissary list.

Monitor's Assessment:

It is my belief that the new forms created by the central laundry will be effective tools to demonstrate divisional use of the central laundry.  In reviewing the June audit of inmate's personal clothing shows

that most divisions are utilizing the laundry on most, if not all scheduled days.  Division IX is the one division that has not utilized the central laundry.  Staff indicated to me during this visit that there have been no inmate complaints filed regarding the laundry from any division.  This is a dramatic improvement since my last visit.  However I did note that in my limited tours of Division IX, I did receive several oral complaints about the lack of laundry service for personal clothing.  That should be no surprise. I also noted that it was in Division IX that inmates were observed washing laundry in their cells.  There did seem to be less excess linens in Divisions VI, X, and V.  In my limited tour of random housing units in Divisions X, IX, VI, and V, I did note less ropes with the exception of Division IX and VI.

As I noted in my last report, efficient and effective laundry service will, if promoted will gain increasing acceptance by inmates.  While it may be virtually impossible to get 100% conformance by inmates, the efforts of those divisions utilizing the laundry exchange is working to eliminate laundering outside CCDOC's formal policies.

Women's personal laundry continues to be laundered within their division.  I will asses that process on my next tour.

**Monitor's Recommendations:**

1.  Establish a measurable goal for each division setting the compliance rate of 95% compliance of inmates utilizing central laundry by January 1, 2012.  While seemingly a high bar, it is achievable.

2.  Complete the inmate video on the established laundry process that explains the process for uniforms, linens, and personal laundry.  The video can show that the schedule for inmate laundry pick-up is posted in each housing unit.

3.  The inmate handbook needs to be revised to include the current rules and expectations that clearly state that washing and drying laundry outside of the CCDOC laundry procedures is expressly prohibited and explain the penalties for violations.

4.  The housing unit sanitation inspection forms can and should be used to document compliance by the unit officers and inmates.


**85.** Food Service

>**a.** CCDOC shall ensure that all food service at the Facility is operated in a safe and hygienic manner and that foods are served and maintained at safe temperatures.

**AUGUST, 2011 COMPLIANCE STATUS:  PARTIAL COMPLIANCE**

**Status Update:**

CCDOC and Aramark agreed earlier this year to only serve one hot meal and two cold meals per day.  This is in conformance with State of Illinois requirements.  It was implemented as a method to reduce

the cost of meals. Both the Central Kitchen in Division V and the Division XI kitchen are being used to prepare meals. The Division XI kitchen only prepares and serves one hot meal per day for detainees housed in that division. The Central Kitchens prepares and serves meals to all other divisions including the cold meals for Division XI.. CCDOC continues to improve the delivery time of transporting the food from the Central Kitchen to all divisions. The Sanitarian randomly, but frequently follows and measures not only the delivery time, but also food temperatures to assure that the hot meal is actually served hot.

Regarding safe and hygienic operation of the kitchen, there continue to be several issues that need resolution including the lack of maintenance of equipment used to prepare, hold, and store food, and equipment used to clean trays, ware, and utensils. The list below in the Monitor's assessment will highlight several of the issues that need resolution.

**Monitor's Assessment:**

During my assessment of both kitchens, I found numerous instances of areas that are not being effectively maintained in a clean manner. Moreover, there were several issues that need attention and resolution by CCDOC and/or Aramark. Below is a list of issues identified in both food service facilities:

<u>Central Kitchen</u>:

1. Only one of the three Stero warewashers was functioning. This creates the possibility that if that warewasher becomes inoperable, the only method for cleaning and sanitizing trays, equipment and utensils is the three-compartment sink. While manual warewashing is an acceptable alternative, it would be costly and time consuming. Concerns would be that trays and utensils would not be able to be air dried between uses.

2. On one of the warewashers, insulation around the pipes was exposed making in not cleanable.

3. In the sandwich preparation and wrapping room, oil from the conveyor chain was visibly leaking onto the floor. The cover for the chain drive was missing and needed to be replaced.

4. Aramark staff had placed cardboard sheets on the floor to catch the oil. Cardboard is not an acceptable cleanable surface. I also questioned, with no response, as to whether the oil being used was food grade.

5. Trays of bologna in the sandwich preparation room were stored on top of other trays of bologna with no protection between the meat and the bottom of the tray above, thereby contaminating the bologna below.

6. The thermometer on the wall of the walk-in refrigerator measured the temperature at 44°F. Refrigerated potentially hazardous food must be maintained at 41°F or below.

7. Containers and trays containing bologna sandwiches were not date-marked as to date of preparation and date of discard. All refrigerated potentially hazardous food must be appropriately

date-marked so that employees will know to use older product first.  A practice of First In/First Out (FIFO) must be instituted.

8. Several loaves of bread were stored in the sandwich walk-in refrigerator had the wrappers slit open exposing the bread to the air and possible contamination. Once open the bread must be used or effectively wrapped prior to storage.

9. The walls in the walk-in refrigerator used to store sandwiches were not longer sealed at the floor/wall juncture providing harborage and breeding areas for insects and rodents.  The walk-in is no longer cleanable.

10. The hand sink in the sandwich preparation room was blocked, and as a result no longer available for employees and inmate to wash their hands.

11. The gasket on the inside of the door of the Follet Ice Machine was no longer attached and the stainless steel plate inside the machine was rusted, as a result created a cross contamination issue with ice stored in the machine. Either the equipment needs repair or needs to be replaced.

12. The five drawer file cabinet located in the employee break room which Aramark employees stated was not being used, had chemicals being stored in it in unlabeled containers.

13. In the large two-door portable cabinet in the employee break room there was equipment (scales) that are no longer used and should be removed.  That cabinet is the cabinet used to store large tools.

14. The bowl in the women's employee bathroom was dry possibly indicating a practice of employees not washing their hands after using the bathroom.

15. The portable hand sink for inmates outside of their bathroom does not provide hot water, as it is broken.  It needs to be replaced or repaired.

16. The air curtain over the delivery doors between the kitchen and the delivery room is not functioning and needs to be repaired or replaced.  That door should remain closed when exterior doors are open.

17. The exterior loading doors were not sealed when closed along the bottom and along the sides creating and area for insects and rodents to enter the food service kitchen.

18. Employees were storing personal food in the large walk-in refrigerator near the loading/unloading dock, along with food for inmates.  Personal food must be stored in a designated refrigerator, used only for that purpose.  In another area, three large containers of garlic belonging to an employee were being stored.

19. In the storeroom that houses cleaning chemicals under locked storage, there were several pieces of old equipment that need to be scrapped.  The room was disorganized and needed attention.  Further there were at least 75 5-gallon containers of "RinseDry" by Ecolab that is no longer being

used by Aramark.  Apparently the supplier would not take a return, so it was merely stored there with no plan to discard it.

20. Also stored in that room, a new ice machine and a new hot food holding unit that have never been installed. Aramark employees stated that the hot food holding unit had been stored there for several years as the electrical amperage, as that device was not available in the kitchen.

21. The previous statement possibly explains why the two hot food holding devices currently connected in the kitchen could not maintain minimum temperatures necessary to maintain hot potentially hazardous food at 135°F even though they were operating.  As a result they have been on for apparently several years with no use.

Division XI:

1. The restrooms were now clean and in good repair since my January visit.

2. Consideration should be given to eliminating the use of the large walk-in refrigerator for storing potentially hazardous refrigerated foods.  This would save considerable energy that is now wasted by the current inefficient use.

3. The store room used to store chemicals is virtually inaccessible, as it is used to store three hot food holding units that are no longer functioning.  The cleaning chemicals are being stored in these units, but not organized.  There did not appear to be any logical chemical control inventory available.

4. The rack used to store pots and pans had an accumulation of dirt, food debris and grease.

5. Several of the hotel pans on the racks and observed throughout the kitchen were no longer capable of being effectively cleaned and sanitized because of their disrepair.

6. Between the two tray washers, there was some plastic covering with food debris that needed cleaning.

7. The insulation around the hot water pipes serving the warewashers was exposed and not sealed.  As a result the area is no longer cleanable.

8. Aramark was using large exposed and uncovered trash bins in the kitchen.  The bins are used to transport garbage and refuse from meals from the kitchen to the outside dumpsters.  There was considerable insect activity including flies and ants within the bins.  The containers were not maintained in a clean manner.  There needs to be a designated area for these bins and it should not be in the kitchen.  Garbage containers used in the kitchen need to be maintained and cleaned at least daily and covered when not in active use.

9. The inmate restroom was maintained significantly cleaner than on my previous visit.  However, the toilet seat on one of the stools was broken and in need of replacement.

10. The former dry food storage room, that on my last visit was the source of significant rodent activity, is no longer being used for that purpose. It is used to only store some excess equipment and records. Dry food storage has been relocated to the large walk-in refrigerator, which is an inefficient use.

11. In the mop storage closet, mops were being stored wet in mop bucket and should be hung to allow them to air dry between uses.

12. Water was leaking under the Manitowoc Ice Machine creating both a worker safety issue, but also a source of water for insect breeding and rodents.

13. The hot water hose and real is no longer being used and needs to be removed. It serves as an area to accumulate dust and food debris.

14. The pre-rinse spray arm was below the flood rim of the wash sink creating the possibility of backsiphonage. The spring needs to be replaced and the spray arm connected to the faucet so that it is above the flood rim of the sink.

15. Two of the three large cookers no longer had lids and were no longer operable. The lids need to be replaced or the cookers removed from the kitchen.

16. In the walk-in refrigerator, milk was not stored in an organized manner that would provide employees to practice First In/First Out (FIFO) use. Containers of milk with multiple use-by dates were in the same milk crates.

17. The store room in the Division XI kitchen that is supposed to be used to store chemicals is virtually inaccessible because three, no longer operable, hot food holding units are being stored in them. In fact the chemicals are randomly stored in them with no discernable control of them. Additionally the room was so cluttered that the janitorial sink was not accessible. This room needs organization and the chemical inventory needs to be maintained.

**Monitor's Recommendations:**

1. Using the CCDOC Sanitarian, along with Aramark continue to monitor food temperatures and times from preparation to delivery of meals to the inmates to assure that hot food is served hot.

2. Continue to use the CCDOC Sanitarian to conduct at least weekly inspections of both kitchens. He should create work orders and corrective action plans for any violations of the food code and CCDOC policy and identify who is responsible for taking the corrective action. Further the Sanitarian should monitor and record the completion of all corrective actions identified to assure they have been resolved.

3. Aramark management should also conduct weekly inspections and provide a copy of the inspection report to CCDOC with a corrective action plan for any deficiencies identified. CCDOC should as part

of his inspection responsibilities monitor and record the completion of all corrective actions taken and work orders completed as a result of Aramark's internal inspections.

4. Establish a formal program to assure corrective actions are taken on the issues identified in the monitor's assessment portion of this provision.

5. CCDOC and Aramark need to resolve an apparent contract dispute regarding responsibility for equipment and facility maintenance.

**85.** Food Service

>**b.** CCDOC shall ensure that all food service staff, including inmate staff, must be trained in food service operations, safe food handling procedures, and appropriate sanitation.

**AUGUST, 2011 COMPLIANCE STATUS:  PARTIAL COMPLIANCE**

**Status Update:**

Aramark produced documents demonstrating that 52 inmates assigned to the kitchen had food safety training pertaining to their assigned responsibilities.  Under the food service contract with Aramark, Aramark is responsible to provide food safety training for all Aramark employees including supervisors and managers and provide food safety training to inmates assigned to both kitchens.

**Monitor's Assessment:**

The State of Illinois requires food service managers to successfully complete a state approved food manager certification program.  I did not review the certificates for Aramark employees during this visit. During assessment of both kitchens I observed several practices that demonstrated that Aramark food service staff and supervisors need retraining in safe food handling practices. When you review many of the food safety violations noted in Provision 85-a it should be clear that retraining is needed.  I have seen virtually no change in food safety practices by Aramark employees since my last visit.  When asked specific questions about equipment issues and disrepair, the only response was to blame CCDOC and Facility Maintenance, and assume no responsibility.  Examples of lack of training is clear from issues such as allowing open garbage to be permitted in the Division XI kitchen, lack of apparent handwashing by employees after using the employee bathroom, allowing cardboard to be used as a non-cleanable floor surface, allowing personal food storage in a non-designated refrigerator, improper chemical storage, unlabeled potentially hazardous food, not practicing FIFO for ingredient use or food distribution, lack of maintenance of equipment, etc.

**Monitor's Recommendations:**

1. CCDOC should require Aramark to at least annually provide copies of current certificates of completion of Food Manager Certification for all current managers and certificates for any new

managers employed at CCDOC. Further Aramark should provide documented evidence of food safety training of all Aramark employees regarding their designated areas of responsibility.

2. CCDOC should require Aramark to provide evidence monthly of training that they have provided to inmates assigned to the kitchen. Lack of employee training is a principal reason for errors that could lead to a foodborne illness.

3. Aramark and CCDOC through a joint initiative need to complete an inmate screening to assure that any inmate assigned to foodservice is not suffering from symptoms associated with diseases that are communicable through food. These include sore throat with a fever, vomiting, diarrhea, or specific foodborne diseases.

4. In future inspections, I will be asking employees of Aramark questions to ascertain whether they are knowledgeable in food safety and observe practices and habits that demonstrate they practice safe and sanitary food safety.

**85.** Food Service

 **c.** CCDOC shall ensure that the Central Kitchen and Division XI kitchen are staffed with a sufficient number of appropriately supervised and trained personnel.

**AUGUST, 2011 COMPLIANCE STATUS:  PARTIAL COMPLIANCE**

**Status Update:**

As indicated in the provisions above food service for all inmates is provided by Aramark under contract with CCDOC.  As a result, Aramark determines how many inmates are needed in the kitchen.  CCDOC then provides both the inmates and the CCDOC supervisory employees for security purposes.  Aramark instructs the employees on their specific food service assignments.  CCDOC provides the staff that is responsible for transporting the prepared meals to all divisions either by transport truck or by carts through the tunnel system.  Training of kitchen staff for security is provided by CCDOC; training for inmate staff on food safety, preparation and clean up is provided by Aramark.

Tool control in the kitchen continues to be the responsibility Aramark.  They have implemented a policy and practice to not allow any knives in the kitchen for any purpose.  This is commendable.  However, control of those tools is not effective.

**Monitor's Assessment:**

As reported in previous reports, CCDOC appears to have a sufficient number of staff to supervise the security aspect of inmates assigned to work in the kitchens.  For security purposes, designated CCDOC employees are not involved in the inventory control or distribution of tools.  They merely observe inmates working throughout both food service kitchens.

Aramark provided a copy of a new inmate health screening form that they have implemented which is completed once an employee visibly observes the inmate for grooming, cuts/sores, and flu/illness symptoms. It also requires a check that the inmate had a medical pre-screening date recorded. The medical pre-screening is only done during admissions.

Aramark has also developed an inmate kitchen worker orientation checklist that their employee is required to complete each day for the inmates assigned to the kitchen. However, it only lists the number of inmates trained, the date, and the shift. It does not identify which inmates are trained. So inmates receive the same training each day even though they may have worked there for several days or weeks previously. The form requires the signature of the supervisor providing the training and the signature of the Aramark manager. Aramark could not explain the purpose of the Aramark manager's signature. The form generally highlights the topics including rules of the kitchen, inmate job descriptions, cleaning and equipment safety, personal hygiene, designated eating and drinking areas, and visual check of inmate workers for cuts, sores, and noticeable illnesses.

As I discussed before, tool control in the kitchens should be the responsibility of CCDOC staff. They are responsible for security throughout the complex. This is further evidenced during my inspection of the kitchen on this visit. Aramark, while continuing to maintain a shadow board for small tools used in the kitchen and a large two door cabinet for random storage of those tools too large for the shadow board, clearly does not yet understand the process of tool control inventory and sign-in/sign-out of all tools. For example, the tool control inventory for large tools is not maintained in the cabinet of the large tools; it is maintained in a separately locked shadow board for the small tools and is not readily accessible. Further, Aramark employees continue to not follow standard correction facility tool control protocol. Tools are counted, but they never note during the inventory which tools are not in the inventory because they are being used in the kitchen. I personally explained the acceptable process no less than three times on previous inspection and Aramark's process is still not acceptable.

It was my belief then and it is now, that CCDOC must take control of all tools used in food service. There is a "tool control interagency directive" under development that as currently drafted allows the food service contractor to maintain control of all tools within the kitchens. Further there exists a CCDOC General Order 9.11 that was on my previous visit being revised. The food service contractor should be responsible for providing all meals to inmates and not be responsible for the security of employees and inmates should a tool be used as a weapon. No one other than CCDOC should have the responsibility for tool control in the kitchens or anywhere else in the facility. The use of tools and the control of those tools through an ongoing shift specific inventory and strict sign-in/out are separate issues. While not a part of this provision should also include DFM, unless DFM can demonstrate the development and implementation over time of a security program that is acceptable to CCDOC management. A review of weekly incident reports clearly shows evidence of lack of security with the number of shanks and other material used to make shanks are found. I would hope that the number of shanks found is indicative of improved and increased supervision throughout the housing units. However, tools not controlled provide an unacceptable security risk both for inmates and corrections staff. As a result, the lack of effective tool control in the kitchen must be addressed immediately.

**Monitor's Recommendations:**

1.  CCDOC should establish a management review of the current process for tool control in the kitchen and throughout the complex.  CCDOC, and only CCDOC, should decide the acceptable process of all tools.  While which tools, how they are used, and by whom may be the responsibility of DFM, Food Service Contractor, Cermak, or CCDOC, the security and accountability of those tools remains the responsibility of CCDOC.

2. Train the security officers in the kitchen on techniques to observe the proper use of all tools and assure that all tools, whose use is finished, are returned and logged in the tool control log.

3. The tool control policy must contain a detailed process for identifying and locating any tool found to be missing or broken.

4. Review the inmate orientation checklist and revise as necessary to show the purpose of the manager's signature, and list the names of the inmates trained on each shift.


**85.** Food Service

> **d.** CCDOC shall ensure that dishes and utensils, food preparation and storage areas, and vehicles and containers used to transport food are appropriately cleaned and sanitized.

**AUGUST, 2011 COMPLIANCE STATUS: PARTIAL COMPLIANCE**

**Status Update:**

Aramark continues to clean and maintain insulated carts used to transport meals to the housing units. There are areas within the carts that are virtually impossible to effectively maintain such as near the sliding door tracks. CCDOC Sanitarian is continuing to look at alternative equipment, but to date has not identified anything any better than currently being used.

A larger concern than the container carts is that two of the three tray warewashers are no longer operable.  According to Aramark staff, it is no longer cost effective to make repairs and suggests that the equipment be replaced.  According to the contract Aramark is required to maintain all equipment within the kitchen that belongs to Cook County.  However, they have as of this visit not provided CCDOC the documented evidence from the repair company to support their allegation.  This needs to be addressed immediately, as, if the remaining machine becomes inoperable, there are no effective options to maintain the ability to clean and sanitize meal trays for the hot meals other than manual warewashing utilizing a three compartment sink. Manual warewashing, while acceptable under the food code is most likely not a practical option considering the number of trays, equipment and utensils that need cleaning after each meal.

In Division XI, the former dry food storage room that had significant rodent droppings under and behind the equipment is no longer being used for dry food storage.  Aramark is now using part of the large

walk-in refrigerator for dry food storage.  Less than 25% of the available floor space in the walk-in refrigerator is used for either cold storage or dry food storage.

**Monitor's Assessment:**

As identified in my previous report, in both kitchens I identified numerous instances of areas and equipment that is being adequately cleaned and maintained.  As before, store rooms, utility closets, receiving areas, chemical store rooms, and toilets need regular cleaning and maintenance. The lists under Provision 85-(a) highlight specific examples.  Aramark needs to develop and implement daily inspections of both kitchen facilities and provide copies, along with corrective actions they intend to take to address non-conformances.  For those issues that need DFM response, a work order must be filed for all plumbing leaks, electrical issues etc.  A number of leaks in plumbing and the electrical issue for hot food holding units highlight that the work order system is not effective.

As I indicated in previous reports, it is clear that Aramark does not have nor have implemented a documented cleaning schedule with a completion signoff for each piece of equipment, store rooms, utility rooms, toilet facilities, etc.  If this were in place and enforced by Aramark, both food service kitchens and supporting areas would be clean, equipment would be effectively functioning,  and are would be less likely to have insects and rodents.

**Monitor's Recommendations:**

1. Aramark needs to develop and implement a daily inspection program of areas under their responsibility and authority and provide copies of the report to the CCDOC Sanitarian for review and follow up.

2. CCDOC is conducting independent inspections, but Aramark seems to be not taking responsibility for responding to the inspections.  CCDOC and Aramark need to come to agreement and Aramark needs to follow the provisions of the contract with respect to equipment maintenance responsibilities.  All equipment maintenance should be completed in accordance with the equipment manufacturer's recommendations with evidence and only by a maintenance person trained to perform that maintenance in accordance with the manufacturer's recommendations.

3. Aramark needs to develop and implement a cleaning and maintenance plan and schedule for all equipment, dry and refrigerated storage facilities, transportation vehicles, toilet facilities, handwashing stations, employee break areas, storage areas for tools, cleaning equipment, floors, walls, ceilings, light fixtures, and kitchen laundry facilities.  That schedule should be provided to CCDOC, along with regular reports that demonstrate that it is being followed.  The plan and cleaning frequency should identify who is responsible for the cleaning/maintenance, the procedure for cleaning in accordance with the equipment manufacturer's recommendations and a requirement for the employee to sign and date the completed assignments.  The plan should also include an inspection or procedure to  assure that it is being followed.

4. Create an equipment cleaning log for use by employees overseeing the cleaning and sanitizing operation.

**85.** Food Service

**e.** CCDOC shall check and record, on a regular basis, the temperatures in the refrigerators, coolers, walk-in-refrigerators, the dishwasher water, and all other kitchen equipment with temperature monitors to ensure proper maintenance of food service equipment.

**AUGUST, 2011 COMPLIANCE STATUS: PARTIAL COMPLIANCE**

**Status Update:**

Aramark continues to monitor and record temperatures of all refrigerator and freezer equipment, as well as warewashing equipment temperatures and pressures daily. Logs of the temperature measurements are provided to the CCDOC Sanitarian for review. When repairs are needed on any equipment, under the current agreement with Aramark, it is the responsibility of Aramark and not Facilities Management. Facilities Management is only responsible for the floor, walls, ceiling, and the utilities leading up to the equipment. When Aramark received the contract for food service, they assumed responsibility for maintenance and repairs of all equipment. Within the Central Kitchen, there are three hot food holding units, two of which have electricity. However, there is not enough amperage to allow them to maintain the minimum hot food holding temperature.

**Monitor's Assessment:**

During this tour Aramark was notified that they have been given a six month extension of the current contract and that Cook County intends to seek bids from other providers of food service providers. It is clear that CCDOC is no longer pleased with the food service currently provided by Aramark. The CCDOC Sanitarian provided me with a five and a half page "Food Service Contract Performance Log that identifies numerous issues identified by both him and the CCDOC dietician that have yet to be addressed by Aramark. My assessment of both kitchens identified a number of food safety issues in both kitchens. I have seen no Aramark internal inspection program that identifies issues for repair. CCDOC's inspections clearly identify equipment maintenance repairs needed. The Aramark representative indicated that many of the issues have existed since before the existing contract was executed and as a result, are not their responsibility. This includes non-functioning, leaking faucets, area flooding, plugged drains, hand washing sinks with only cold water, valves on cooking equipment not secured, grill plates on the outside of the ventilation hood not secured, missing faucets, etc. More importantly, two of the three warewashers in the central kitchen are no longer usable as they are broken. Regarding the hot food holding units referenced above, they continue to run because no one has taken the responsibility to either turn them off or repair the electrical service to them. As a result, Aramark is using the large cooking kettles as hot food holding units by placing hotel pans of food in them. This is not an acceptable means of hot food holding.

As Aramark is responsible for the maintenance of all equipment, and without adequate oversight by CCDOC, needed repairs are only made when they become an emergency. Helen Lewis, CCDOC's Registered Dietician has recently retired and CCDOC is in the process of identifying her replacement.  It may be more effective to contract for the dietician services and select a specific person to oversee the food service contract going forward. CCDOC's Sanitarian is currently conducting regular inspections of both kitchens and documenting equipment issues that need to be addressed.  However, Aramark is seemingly stalling in making necessary repairs.  During this tour I repeatedly asked to speak with Mike Anderson, Aramark's designated person for this facility.  Only less than five minutes before my exit interview did he arrive at the CCDOC's Director's office. I did not have the time to meet with him.  However, I asked him to stay for the exit interview and he chose not to participate.  On a separate report, I will provide the results of my assessment of both kitchens.  That report will be provided to both Cook County and Department of Justice.

**Monitor's Recommendations:**

1. While the CCDOC Sanitarian is now conducting regular inspections of both kitchens and those inspections have identified numerous issues that need resolution, there appears to be a conflict at least on Aramark's part as to whether CCDOC or Aramark is responsible to address the issues. CCDOC should pursue contract resolution with Aramark and Cook County legal counsel.

2. CCDOC should continue to pursue other providers for food service within CCDOC.

3. Aramark continues to need a written policy and procedure that assures that temperature monitoring continues throughout all shifts for each day of the week.  The policy also needs to include a review step that assures that when equipment is trending toward non-compliance, it is recognized and immediate corrective action is taken.

4. Two of the three warewashers in the central kitchen are no longer functioning.  Steps need to be taken immediately to either repair or replace at least one of the machines.  If the third warewasher fails to operate effectively, staff will be required to use only single service trays for the hot meal service as there is currently no back-up plan or other effective alternative to manually wash, rinse, and sanitize inmate trays.

5. Either remove the hot food holding units or repair them so that they are able to function effectively.

6. Because of the ongoing maintenance repair disputes with the onsite Aramark management CCDOC needs to pursue resolution with Aramark corporate management.