**B.      HEALTH CARE SERVICES:  ELEMENTS COMMON TO MEDICAL AND MENTAL HEALTH**

## 41.  Inter-Agency Agreement

a.      CCDOC shall enter into a written Inter-Agency Agreement with Cermak that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility. The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order.

b.      Cermak shall enter into a written Inter-Agency Agreement with CCDOC that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility. The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order.

**Compliance Status**: Substantial compliance.

**Findings**

**Status Update:**

**Monitor's Findings:**

We have reviewed the signed Agreement between the agencies and it clearly delineates the responsibilities of each of the major stakeholders. Additionally, regular meetings have been conducted from which we have reviewed minutes. It does appear that these minutes reflect an effort by each of the stakeholders to work collegially with each other.

**Monitor's Recommendations:** None.

## 42. Policies and Procedures

Cermak shall provide adequate services to address the serious medical and mental health needs of all inmates, in accordance with generally accepted professional standards. The term "generally accepted professional standards" means those industry standards accepted by a majority of professionals in the relevant field, and reflected in

the standards of care such as those published by the National Commission on Correctional Health Care ("NCCHC").

a.   Cermak shall develop and implement medical care policies, procedures, and practices to address and guide all medical care and services at the Facility, including, but not limited to the following:

   (1)   access to medical care;
   (2)   continuity of medication;
   (3)   infection control;
   (4)   medication administration;
   (5)   intoxication and detoxification;
   (6)   documentation and record-keeping;
   (7)   disease prevention;
   (8)   sick call triage and physician review;
   (9)   intake screening;
   (10)  chronic disease management;
   (11)  comprehensive health assessments;
   (12)  mental health;
   (13)  women's health;
   (14)  quality management;
   (15)  emergent response;
   (16)  infirmary care;
   (17)  placement in medical housing units;
   (18)  handling of grievances relating to health care;
   (19)  mortality review; and
   (20)  care for patients returning from off-site referrals.

b.   Cermak shall develop and implement policies, procedures, and practices to ensure timely responses to clinician orders including, but not limited to, orders for medications and laboratory tests. Such policies, procedures, and practices shall be periodically evaluated to ensure timely implementation of clinician orders.

**Compliance Status**: Partial compliance.

**Findings**

   **Status Update:**

**Monitor's Findings:**

The program continues to make significant progress in developing and implementing a variety of policies. There are now only seven of the required policies yet to be finalized. On most of these we have seen substantial drafts. The remaining policies to be finalized include a policy on continuity of medication, intoxication and detoxification, documentation and record keeping, disease prevention, sick call triage and physician review, intake screening and comprehensive health assessments. Several of these are close to final version and we have already had an opportunity to provide some input. After approval, staff training and implementation will occur. Once that has happened, the quality improvement program may begin to monitor key elements, especially of the policy topics addressed in the Agreement.

**Monitor's Recommendations:**

1. Continue to work on the promulgation and completion of these policies, as well as the training and implementation.

2. Begin to develop a strategy within the quality improvement program to monitor aspects of selected policies, the topics of which are referenced in the Agreement.

## 43. Medical Facilities

    a. CCDOC will work with Cermak to provide sufficient clinical space, as identified by Cermak staff, to provide inmates with adequate health care to meet the treatment needs of detainees, including:

        (1) intake screening;
        (2) sick call;
        (3) medical and mental health assessment;
        (4) acute, chronic, emergency, and specialty medical care (such as geriatric and pregnant inmates); and
        (5) acute, chronic, and emergency mental health care.

    b. Cermak staff shall make known to CCDOC and Cook County its needs for sufficient clinical space, with access to appropriate utility and communications capabilities, to provide inmates with adequate health care to meet the treatment needs of detainees, including:

        (1) intake screening;
        (2) sick call;

(3)     medical and mental health assessment;

(4)     acute, chronic, emergency, and specialty medical care (such as geriatric and pregnant inmates); and

(5)     acute, chronic, and emergency mental health care.

c.      Cook County shall build out, remodel, or renovate clinical space as needed to provide inmates with adequate health care to meet the treatment needs of detainees, as identified by Cermak staff, including:

(1)     intake screening;

(2)     sick call;

(3)     medical and mental health assessment;

(4)     acute, chronic, emergency, and specialty medical care (such as geriatric and pregnant inmates); and

(5)     acute, chronic, and emergency mental health care.

d.      Cermak shall ensure that medical areas are adequately clean and maintained, including installation of adequate lighting in medical exam rooms. Cermak shall ensure that hand washing stations in medical areas are fully equipped, operational, and accessible.

e.      Cermak shall ensure that appropriate containers are readily available to secure and dispose of medical waste (including syringes and sharp medical tools) and hazardous waste.

f.      CCDOC shall allow operationally for inmates' reasonable privacy in medical and mental health care, and shall respect the confidentiality of inmates' medical status, subject to legitimate security concerns and emergency situations. Reasonable privacy typically includes sight and hearing privacy from other inmates and hearing privacy from staff that are not providing health care.

g.      Cermak shall make known to CCDOC and Cook County the structural and operational requirements for inmates' reasonable privacy in medical and mental health care. Cermak shall provide operationally for inmates' reasonable privacy in medical and mental health care and shall maintain confidentiality of inmates' medical status, subject to legitimate security concerns and emergency situations. Reasonable privacy typically includes sight and hearing privacy from other inmates and hearing privacy from staff that are not providing health care.

h.     Cook County shall build out, remodel, or renovate clinical space as needed to allow structurally for inmates' reasonable privacy in medical and mental health care, as identified by Cermak and CCDOC staff.

i.     Cook County shall begin construction of the new clinical space within three months of the effective date of this Agreed Order. It is expected that the project will be complete within nine months of the effective date of this Agreed Order. Prior to completion of the new clinical space, Cook County and DFM will work with Cermak to address the most serious concerns regarding clinical space, to the extent possible in the current Facility.

**Compliance Status**: Partial Compliance.

**Findings**

**Status Update:** The Monitor did not receive a status update for the most recent review period.

**Monitor's Findings:**

Since our last site visit, CCDOC and Cermak continue to make improvements in providing appropriate clinical space for medical, dental and mental health care. However, there is still a need for improvement in standardization across the jail with respect to sanitation, general repair and temperature control. Each area is briefly described with areas needing improvement highlighted below.

On June 7, 2011 the jail census was 8,872 inmates; housing unit populations in this report are based upon this date.

The male intake area has been modified and appears to provide sufficient space and privacy for its designated purpose. The area was clean, organized and well equipped and supplied. The female intake area is undergoing minor renovations to create privacy and expand mental health space. A work order has been placed to construct additional walls and a second room has been allocated for the mental health specialists. A third space for a psychiatrist has been allocated and a work order has been placed to modify the room.

The Cermak emergency room was generally clean, organized and well equipped with the exception of the medication room. The medication room floor, cabinets, countertops and refrigerator were dirty.

Division I housed 1226 inmates. It is the oldest part of the jail and sanitation and maintenance issues are challenging. Staff reported that ceiling leaks persist, as the source(s) of

the leak has not been repaired. We did not observe active ceiling leaks at the time of our visit. The medical clinic has an adequately sized waiting area with benches for the inmates to sit on while awaiting appointments. It has two examination rooms, which are properly equipped and supplied, with running sinks, personal protective equipment and biohazardous waste containers. We observed a nurse conducting a patient assessment in an examination room. This is an improvement from our last visit, when nurses conducted assessments at a desk adjacent to the inmate waiting room, which lacked privacy. Emergency response equipment and supplies were available, including an automatic external defibrillator (AED); however, we note that the electrodes were expired.

Division II consists of four dormitories. It has a total bed capacity of 1606 and housed 1581 male inmates. Each dormitory is described below.

Dorm 1 has a capacity of 384 and housed 381 minimum security general population inmates on three floors. On the day of the inspection, the area was clean and well-lighted with comfortable temperatures. Due to high outside temperatures, large fans were running to circulate air.

Division II, dorm 2 has a bed capacity of 448 and housed 441 male inmates. It is a "step-down," outpatient mental health housing unit consisting of three floors with four dorms on each floor and approximately forty beds per dorm. CCDOC has allocated space in Division II Dorm 2 for a medication room and mental health programming room on the third floor. CCDOC has also allocated space in the existing medical clinic area of Division II Dorm 2 for renovation for two programming rooms for mental health programming needs. Cermak will submit work orders with DFM to complete this work.

Despite the high foot traffic, the area is generally clean and well-lighted. Cleaning of the inmate dorms on each floor is performed by inmates. A water leak in N-dorm on the first floor had been repaired since the December site visit. On the day of the inspection, environmental temperatures were comfortable throughout the building despite high outside temperatures and heat indices. The dispensary was large, well-lighted, clean and generally well-maintained. The Division II Annex has been closed and, at the time of the inspection, housed no detainees.

Division II, dorm 3 has a bed capacity of 424 and housed 413 general population, minimum and medium security male inmates. It consists of three floors with three tiers per floor. The area was generally clean and well-lighted with all housekeeping performed by the detainees. Due to the excessively high outside temperatures and heat indices, dormitory temperatures were warm. Large fans were in place and running to circulate air.

Division II, dorm 4 has a bed capacity of 350 and housed 346 general population male inmate workers. The area is a large dormitory style unit all on one floor. The area was generally

clean and well-lighted. The temperatures were warm, and large fans were in place to circulate air. All housekeeping duties are performed by detainee housing unit workers.

Division III has a bed capacity of 353 and housed 340 general population, non-gang male inmates on three floors with two dorms per floor. Again, the area was warm and fans were in place to circulate air. The area was generally clean and well-lighted.

Division IV has a bed capacity of 692 and housed 594 female inmates of all security levels. It is staffed with nurses 24 hours, seven days per week. The medical area is comprised of two separate areas and an inmate waiting room. On one side of the hall are two examination rooms and a bathroom which is used primarily by clinicians. These examination rooms were clean, properly equipped and supplied, including personal protective equipment, sharps and biohazardous waste disposal containers. On the other side of the hallway is a dispensary where nurses assess inmates, perform treatments, prepare medications and transcribe orders, etc. The nurses' station is small for its designated purpose, but the area is cleaner and more organized than at our last site visit. It continues to have significant problems with temperature control, often becoming unbearably hot for staff and inmates. On the day of our visit the temperature was 80° F. An inmate waiting room is adjacent to this dispensary, with a window through which the nurses administer medications. Since our last visit, all pregnant women have been moved to Division XVII.

Division V has a bed capacity of 986 and housed 966 minimum security male inmates. It is staffed with an RN on the day shift seven days per week and EMT's on the day shift seven days per week. The dispensary is comprised of a large room with examination and storage rooms adjacent to the room. It has two examination rooms that are properly equipped and supplied, including sinks, personal protective equipment and biohazardous waste disposal containers. The clinic was acceptably clean.

Division VI has a bed capacity of 986 and housed 971 general population male inmates on two floors with six tiers per floor. This Division is by far the cleanest and best maintained. The area has a large, clean, well-lighted medical unit. The hallways, common areas and dorms were clean and well-maintained. Environmental temperatures were, generally, comfortable. The hallways, common areas and medical unit were comfortable. The medical unit had recently been repainted.

Division VIII is the infirmary area and is comprised of Cermak second and third floors. Bed capacity for the two floors was 148 and there were 160 male and female inmates at the time of our visit. It is the only area of the jail in which the population exceeded bed capacity.

Cermak 2 and 3 both consist of four wings; north, south, east and west. The areas are all large, clean and well-lighted. Despite excessively warm outside temperatures and heat indices,

inside environmental temperatures were comfortable, with no excessively cold or warm areas, which is an improvement from the two previous inspections. There were no areas requiring immediate maintenance. General wall painting appeared up-to-date and ceiling tiles were in good condition.

Division IX has a bed capacity of 1000 and housed 929 maximum security male inmates. It remains unchanged from our last report with respect to the physical description and housing capacity. Health care coverage is still provided 12 hours each day. Additional staffing has been allocated to provide medication administration and evaluation of health service requests. One of the offices that previously stored health records has been allocated to the Nurse Coordinator responsible for Division IX. The other office vacated by the centralization of health records is used for clinical encounters, specifically face-to-face evaluation of Health Service Requests.

Nurses began conducting the face-to-face evaluation of Health Service Requests at the cell front in April 2011 so that these requests could be responded to in a timelier and more clinically appropriate manner. Cell side evaluation of health complaints does not provide sufficient privacy and as a result is not clinically appropriate. At the time of the site visit, a room in the vestibule just outside the housing unit was used by the nurse to conduct these evaluations. These rooms are generic, unclean and at most may have a chair in them. These rooms do provide some auditory privacy but are not equipped for the nurse to conduct an evaluation. During the tour of the housing units, Mr. Estrada, Deputy Chief Operating Officer, pointed out the medical treatment rooms in the hallway between units on each floor that will be equipped and used in the near future for clinical care. One of these was opened for inspection and when equipped will be adequate for clinical purposes.

Dr. Mennella, Associate Medical Director and Pia Gustafson, Nursing Coordinator expressed concern about limitations on the number of inmates who could be transported to the clinic in Division IX as well as Cermak for specialty or after-hour services. Several written examples were provided to validate this concern (these also had been reported to the action line). "No show" and cancellation rates tracked via the scheduling system were 28% for Division IX.

Dr. Puisis indicated in a 5/29/2011 email to the Monitor that Cermak and CCDOC are considering moving medical patients from Division X to Division IX. Also being considered is the establishment of a behavioral unit in the basement of Division IX.

Superintendent Moreci was interviewed briefly the day after the site visit. His opinion was that problems with transport of inmates to clinical encounters were being resolved with equipment (different handcuffs) and collaboration with Cermak to bring more services within the Division. These include bringing phlebotomy, extending hours of mental health coverage,

telemedicine connection to the ER, etc. He indicated that housing medical patients transferred from Division X would not result in any change in the custody operation of Division IX.

Previous reports have indicated that the clinical space and equipment in Division IX was adequate given the limited coverage and number of health care staff assigned to service this building. The Monitor's concerns about using Division IX to house medical patients now housed in Division X include:

- 24/7 health services are available for medical and mental health patients housed in Division X. Division IX only provides 12 hours of coverage. Division IX is not staffed to provide services for a more medically compromised population. Given this proposal, how is Division IX going to be staffed and what impact does staffing Division IX have on coverage in other Divisions?

- Division IX is described as housing inmates who are classified as maximum custody. Division X houses both maximum and intermediate custody classified inmates. No show cancellation rates for Division IX are nearly 30% but this is for a fairly healthy male population. Housing medical patients in Division IX will increase the number of medical appointments in the building, at Cermak and at Stroger. If no other operational changes take place, it is likely that no shows/cancellations will increase. Sufficient mechanisms need to be in place so that cancellations and "no shows" are prevented and/or quickly addressed and clinical care not delayed.

Division X has a bed capacity of 768 and houses 720 intermediate and maximum security male inmates. The physical description and housing capacity of Division X is also unchanged from previous reports. Health care coverage is still provided on site 24 hours a day, seven days a week, with resulting concentrations of detainees who have medical and/or psychiatric conditions requiring these services. Since the last visit the waiting room is no longer used as an area for administration of controlled substances and the area used for health records now serves as a separate waiting room for dental patients. The Division X nursing coordinator has yet to be provided office space from which to provide daily supervision of service delivery (this recommendation was made ten months ago). See previous reports describing the inadequacy of clinical space in Division X.

Discussion about the adequacy of clinical space as well as staff safety issues continue, as evidenced by the minutes of the Inter-Agency Health Care Quality Improvement meetings (1-7-2011 and 3-4-2011) and the email from Dr. Puisis referenced in the discussion of Division IX. These include moving medical patients to Division IX, establishment of a safety committee, changes in use of the dispensary during medication administration and identification of office space for psychiatric appointments. However, there has yet to be any evidence of short-term

resolution of the problems previously identified in Division X. The concept of transferring medical patients from Division X to IX is a laudable and big picture solution; however, there are significant concerns that must be mitigated in planning by Cermak and CCDOC for this to be a solution that is safe and an improvement in the care of medically compromised patients.

Division XI has a bed capacity of 1536 and housed 1482 minimum security male inmates. The capacity and description of Division XI is unchanged from previous reports. The clinical space and equipment is adequate for the limited coverage and number of health care staff currently assigned to service this building.

Division XVII, known as Department of Women's Justice, housed 159 residential females including 18 pregnant women. The clinic area was clean, organized and well equipped and supplied. However, during our visit it was unbearably hot and temperatures were reportedly above 90°F. When Dr. Puisis learned of the very high temperatures he closed the clinic for the afternoon.

As noted in our last report, the 900 bed RTU is undergoing construction.

**Monitor's Recommendations:**

1. Cermak and CCDOC, through the CQI process, should continue to assess each Division's medical, mental health and dental clinic space with respect to size, general repair and sanitation, lighting, equipment and supplies, privacy and communications connectivity, and address deficiencies cited in this report as well as in their own assessments and inspections. Temperature control is a significant issue in many Divisions.

2. Cermak and CCDOC should address the Monitor's concerns in planning for the transfer of medical patients from Division X to IX.

3. Cermak and CCDOC should develop a plan to address health care appointment "no shows" and cancellations. The plan should establish a threshold and method of response for cancellations and "no shows" that exceed the threshold. The plan should ensure that reasons for "no shows" and cancellations are identified and are reported to both Cermak and CCDOC and assign responsibility for resolution of issues. The plan should provide guidelines to staff for triaging, prioritizing and rescheduling patients whose appointments did not taken place as soon as possible.

4. Remove the work counter in the center of the dispensary in Division X, install flexible workstations and erect privacy walls like those used in the renovated intake area.

## 44. Staffing, Training, Supervision, and Leadership

a. Cermak shall maintain a stable leadership team that clearly understands and is prepared to move forward toward implementation of the provisions of this Agreed Order, with respect to:

    (1)    Medical care; and
    (2)    Mental health care.

b. Cermak shall maintain an adequate written staffing plan and sufficient staffing levels of health care staff to provide care for inmates' serious health needs, including:

    (1)    Qualified Medical Staff; and
    (2)    Qualified Mental Health Staff.

c. Cermak shall ensure that all Qualified Medical Staff and Qualified Mental Health Staff are adequately trained to meet the serious health care needs of inmates. All such staff shall receive documented orientation and in-service training on relevant topics, including:

    (1)    Provision of health care in a correctional setting and Facility-specific issues; and
    (2)    Suicide prevention, and identification and care of inmates with mental illness.

d. Cermak shall ensure that Qualified Medical Staff receive adequate physician oversight and supervision.

e. Cermak shall ensure that all persons providing health care meet applicable state licensure and/or certification requirements, and practice only within the scope of their training and licensure. Upon hiring and annually, Cermak shall verify that all health care staff have current, valid, and unrestricted professional licenses and/or certifications for:

    (1)    Medical staff; and
    (2)    Mental health staff.

f. Cermak will work with CCDOC to develop and maintain a curriculum for initial and periodic training of correctional officers on recognition and timely referral of

inmates with medical urgencies, including drug and alcohol withdrawal. Cermak will provide adequate initial and periodic training on these topics to all Cermak staff who work with inmates.

g.  CCDOC will provide, to all CCDOC staff who work with inmates, adequate initial and periodic training on basic mental health information, including the identification, evaluation, and custodial care of persons in need of mental health care, as well as recognition of signs and symptoms evidencing a response to trauma; appropriately responding to mental illness; proper supervision of inmates suffering from mental illness; and the appropriate use of force for inmates who suffer from mental illness. Such training shall be conducted by a Qualified Mental Health Professional, registered psychiatric nurse, or other appropriately trained and qualified individual.

h.  Cermak will work with CCDOC to develop and maintain a curriculum for initial and periodic training of correctional officers on basic mental health information, including the identification, evaluation, and custodial care of persons in need of mental health care, as well as recognition of signs and symptoms evidencing a response to trauma; appropriately responding to mental illness; proper supervision of inmates suffering from mental illness; and the appropriate use of force for inmates who suffer from mental illness. Such training shall be conducted by a Qualified Mental Health Professional, registered psychiatric nurse, or other appropriately trained and qualified individual.

g.  Cermak shall ensure that all health care staff receive adequate training to properly implement the provisions of this Agreed Order, including:

(1)  Medical staff; and
(2)  Mental health staff.

**Compliance Status**: Partial compliance.

**Findings**

**Status Update:**

**Monitor's Findings:**

a.  Cermak Leadership Team

1.  The leadership at the Cermak program, with the exception of nursing, not only has appropriate credentials but also has been in place for more than two years. The Chief Operating Officer has been at his assignment two years, the Medical Director more than three years, the Associate Medical Director more than two and a half years, and only the Director of Nursing position is in a state of flux. The former Nursing Director left three to four months ago and there is a newly hired interim Nursing Director who brings to the program a vast amount of nursing and nursing supervisory position leadership. She is, on the other hand, new to the corrections field and will have to adjust to this new environment. However, having met her and worked with her, we are optimistic about her ability to lead the program forward. There is also, on an interim basis, a recently promoted Pharmacy Director who has been working many years as the second in command and she brings a wealth of experience to her position. Additionally, there is an acting Chief Dentist who is quite experienced and appears quite capable. Finally, in the nursing area, there are 11 supervisory positions, of which five are vacant. The filling of most of these vacancies is being delayed because of a reclassification process, which we will discuss shortly.

2.  The new Director of Mental Health appears to be having a very positive impact, as will be discussed in the mental health section. She is still recruiting for a Chief Psychiatrist. On the other hand, the Chief Psychologist is in place and has also been having a positive impact.

b.  Cermak Staffing

The current staffing plan consists of 537 positions, but this will be changed to 501 positions. At the time of our visit, 86 positions are vacant, 42 of which are mental health specialist positions. At my request, the Chief Operating Officer provided a list of the current vacancies and the length of time for which the position has been vacant. Approximately 70 of the 86 vacancies have been vacant more than six months. As we had indicated, we are concerned about the processing time within the Cook County civil service structure. We attended a meeting during this visit which included the interim Bureau Chief for the Bureau of Health Services, the Chief of Human Resources and one of her deputies who is assigned to the Cermak program, the Cermak COO, myself counsel for the Department of Justice, counsel for the Sheriff's Office, counsel for the Bureau of Health Services and counsel for the Cook County Board. The meeting was collegial and both the Chief Executive of the Bureau of Health Services and the Director of Human Resources indicated that they intended to do what was necessary to facilitate the filling of vacancies. The Chief of Human Resources indicated that the reclassification problem was due to lack of action at the Cook County Board bureaucracy but that she was going to be meeting with the new responsible person early in the next week and was hoping to get these reclassifications moved forward, so that nursing administration can fill the positions. The Department of Justice attorney indicated that there is no desire to use the

courts for an order with regard to filling of vacancies. However, if the problem does not get resolved timely, this could be a last resort. The head of Human Resources indicated that with regard to recent hirings into the Cermak program, on average they occurred within 36 days for the month of May. Given the length of time positions were vacant on the data sheets that I reviewed, she may be using a very different starting point when she determines it takes 36 days to fill a position. We all left the meeting with a sense of a shared desire to expedite the filling of vacancies so that the County can come into substantial compliance with this Agreement as quickly as possible. The new County Board President has indicated that she would like to see substantial compliance by January 2013. Given that some issues will not achieve substantial compliance until the new building is being utilized, those elements will not be in substantial compliance by January 2013 but with expedited filling of positions and hiring many if not most of the other elements of the Agreement could quite possibly be in substantial compliance.

c. Cermak Training

In a review of training records, greater than 90% of healthcare staff have had their required orientation and in-service training. This is true both for suicide prevention and care of inmates with mental illness. Greater than 90% of mental health staff also have had the required training with regard to suicide prevention and care of inmates with mental illness. The clinical professional performance enhancement review program is clearly under development. We have not as of yet been able to review the documentation for this program and we were informed that not every clinician's work has been reviewed. We have indicated that the review must include all types of services that a clinician performs, which may include sick call, chronic care, emergency services, infirmary care, etc. We look forward to being able to review this in detail at our next visit.

d. Cermak Supervision

The Associate Medical Director is involved in implementing an annual clinical performance enhancement review program, which has not yet been fully implemented. The Monitor has had a lengthy discussion with the Medical Director and the Associate Medical Director about their need to be clearer with their supervisees regarding clinical expectations in order to facilitate maximal improvement.

e. Cermak Licensure and Certification

We did review the licensure and certification requirements of the healthcare staff and these were, without exception, up to date. We have not seen any National Practitioner Data Bank information nor a letter from the Bureau of Health Services about their query of the National Practitioner Data Bank. We discussed with the Medical Director the need to review the state database for license restrictions. He indicated that the Bureau currently does not do that

and they would have to set up a process to go into the database on an annual basis or attempt to set up a notification system whereby the licensing program would be given a list of names of their staff and if someone received a license restriction, they would be notified. He indicated that he is currently considering both of these options.

f. Cermak Training for Correctional Officers

We have been informed that the new contract for training of correctional officers has been provided to the former vendor. We have not yet seen whether the new curriculum deals adequately with drug and alcohol withdrawal. On the other hand, Cermak Health Services has not yet completed its guidelines and training on this issue.

g. & h. CCDOC and Cermak Mental Health Training for Correctional Officers

The mental health monitor has reviewed and approved the training curriculum for officers with regard to mental health issues. We understand that there is utilization of case studies as part of the training. We found that every officer received the training in the prior 18 months, making this item compliant.

i. Cermak Healthcare Staff Training

Every healthcare staff member recently received a letter describing the Agreement and our upcoming visit. In our interactions with staff across the Divisions, they seemed to be knowledgeable about this process. There have also been town hall meetings and previously we have participated in several. We believe that the leadership is effectively communicating with staff about this process.

**Monitor's Recommendations:**

1. Continue to provide support to the new Director of Nursing and pursue the issue of timely reclassification with regard to the nursing supervisor positions. The Medical Monitor would like a monthly e-mail update on the status of the nursing supervisor positions.

2. The Medical Monitor would like a quarterly tally of the number of positions which have remained vacant for greater than six months.

3. Submit to the monitor the tool to be used for the professional performance review program with an accompanying paragraph that describes the methodology for record selection, etc.

4. Submit a plan that describes your method for monitoring clinician license restrictions.

5. CCDOC should continue efforts to increase the percentage of officers who receive the required training within the time requirements.

## 45. Intake Screening

a. Cermak shall maintain policies and procedures to ensure that adequate medical and mental health intake screenings are provided to all inmates.

b. Cermak shall ensure that, upon admission to the Facility, Qualified Medical Staff or Licensed Correctional Medical Technicians utilize an appropriate medical intake screening instrument to identify and record observable and non-observable medical needs, shall assess and document the inmate's vital signs, and shall seek the inmate's cooperation to provide information, regarding:

    (1) medical, surgical, and mental health history, including current or recent medications, including psychotropic medications;

    (2) history and symptoms of chronic disease, including current blood sugar level for inmates reporting a history of diabetes;

    (3) current injuries, illnesses, evidence of trauma, and vital signs, including recent alcohol and substance use;

    (4) history of substance abuse and treatment;

    (5) pregnancy;

    (6) history and symptoms of communicable disease;

    (7) suicide risk history; and

    (8) history of mental illness and treatment, including medication and hospitalization.

c. Cermak shall ensure that, upon admission to the Facility, Qualified Mental Health Staff, Qualified Medical Staff, or Licensed Correctional Medical Technicians utilize an appropriate mental health intake screening instrument to identify and record observable and non-observable mental health needs, and seek the inmate's cooperation to provide information, regarding:

    (1) past suicidal ideation and/or attempts;

    (2) current ideation, threat, or plan;

    (3) prior mental illness treatment or hospitalization;

    (4) recent significant loss, such as the death of a family member or close friend;

(5)     previously identified suicide risk during any prior confinement at CCDOC;

(6)     any observations of the transporting officer, court, transferring agency, or similar individuals regarding the inmate's potential suicide risk, if such information is communicated to Cermak staff;

(8)     psychotropic medication history; and

(9)     alcohol and other substance use and withdrawal history.

d.     Cermak shall ensure that all Qualified Mental Health Staff, Qualified Medical Staff, or Licensed Correctional Medical Technicians who conduct the medical and mental health intake screenings are properly trained on the intake screening process, instrument, and the requirements and procedures for referring all qualifying inmates for further assessment.

e.     If Cermak assigns Licensed Correctional Medical Technicians to perform intake screening, they shall receive appropriate, on-site supervision by on-site Qualified Medical Staff; information obtained on screening for all inmates will be reviewed by Qualified Medical Staff before the inmate departs the intake area.

f.     Cermak shall ensure that a medical assessment based on the symptoms or problems identified during intake screening is performed within two working days of booking at the Facility, or sooner if clinically indicated, by a Qualified Medical Professional for any inmate who screens positively for any of the following conditions during the medical or mental health intake screenings:

(1)     Past history and symptoms of any chronic disease included on a list specified by Cermak's policies and procedures;

(2)     Current or recent prescription medications and dosage, including psychotropic medications;

(3)     Current injuries or evidence of trauma;

(4)     Significantly abnormal vital signs, as defined by Cermak's policies and procedures;

(5)     Risk of withdrawal from alcohol, opioid, benzodiazepine, or other substances;

(6)     Pregnancy;

(7)     Symptoms of communicable disease; and

(8)     History of mental illness or treatment, including medication and/or hospitalization.

g.  Cermak shall ensure that any inmate who screens positively for mental illness or suicidal ideation during the intake process receives a comprehensive mental health evaluation (see provision 59.c, "Mental Health: Assessment and Treatment") Cermak shall ensure timely access to a Qualified Mental Health Professional for this purpose, based on emergent, urgent, and routine medical or mental health needs.

h.  Cermak shall ensure that the intake health screening information is incorporated into the inmate's medical record in a timely manner.

i.  Cermak shall implement a medication continuity system so that incoming inmates' medication for serious medical and mental needs can be obtained in a timely manner, as medically appropriate. Within 24 hours of an inmate's booking at the Facility, or sooner if medically necessary, a Qualified Medical Professional or Qualified Mental Health Professional, with appropriate prescribing authority, shall decide whether to continue the same or comparable medication for serious medical and mental health needs that an inmate reports during intake screening that she or he has been prescribed. If the inmate's reported medication is discontinued or changed, other than minor dosage adjustments or substitution of a therapeutic equivalent, a Qualified Medical Professional or Qualified Mental Health Professional, with appropriate prescribing authority, shall evaluate the inmate face-to-face as soon as medically appropriate, and within no greater than five working days, and document the reason for the change.

**Compliance Status**: Partial compliance, near substantial.

**Findings**

**Status Update:**

**Monitor's Findings:**

The intake process continues to work extremely well, with one significant exception. Virtually all inmates who go through the standard intake process receive a high quality medical screen along with the required chest x-ray and, where indicated, a peak flow measurement or a finger stick glucose. These screens are generally done by nurses, although sometimes they are done by correctional medical technicians. The exception is the small number of inmates who enter the jail through what we characterize as anomalous pathways. These tend to be either individuals who were assigned to electronic monitoring but then have that process revoked and must spend time in jail, or people who are hospital takeovers from the police department and

come back through the emergency room. Neither of these two groups enter through the routine process and therefore do not always, and in fact usually do not, receive a nurse screen and with a positive nurse screen, a PA assessment. Fixing this hole in the system is a perfect subject for the interagency collaboration. As soon as the County can insure that these inmates will be screened timely with the same quality of screen that all other inmates receive, this element will be in substantial compliance.

Letters (a) thru (h) are otherwise fully complied with.

With regard to medication continuity, a fair amount of medication is provided timely. However, we have seen some exceptions such as with HIV cases. We are aware that Cermak will be implementing Pyxis machines and other strategies in the near future which should improve the timeliness of medication continuity. Particularly for HIV medications or other critical medications, improvements in timeliness are needed. Patients with identified medication needs are seeing an advanced level clinician who performs an assessment to determine the needs. The process is now 100% electronic with regard to both the intake screen and the health assessment. The screens are also, for the overwhelming majority of inmates entering the system, performed timely.

**Monitor's Recommendations:**

1. Work with CCDOC on a process that provides Cermak staff with timely notification of electronic monitoring revocaters and hospital takeover inmates and arrange for both groups to be screened timely and receive a health assessment where indicated.

2. Complete the intake screening policy, building in the elements that are now incorporated into the practice, including medication continuity elements.

3. Begin monitoring medication timeliness, especially for high risk patients such as those on anticoagulants, HIV medications and any others designated by the medical leadership as requiring dose continuity.

## 46.  Emergency Care

a.    Cermak shall train health care staff to recognize and respond appropriately to health care emergencies, including:

(1)    Medical emergencies;
(2)    Mental health emergencies; and
(3)    Drug and alcohol withdrawal.

b.   CCDOC shall train correctional officers to recognize and respond appropriately to health care emergencies, including:

(1)   Medical emergencies;
(2)   Mental health emergencies; and
(3)   Drug and alcohol withdrawal.

c.   CCDOC shall ensure that all inmates with emergency health care needs receive prompt transport, including transport for outside care, for emergencies including:

(1)   Medical emergencies; and
(2)   Mental health emergencies.

d.   Cermak shall ensure that all inmates with emergency health care needs receive timely and appropriate care, with prompt referrals for outside care when medically necessary, and shall notify CCDOC when emergency transport is needed inside or outside the Facility compound, for emergencies including:

(1)   Medical emergencies; and
(2)   Mental health emergencies.

e.   CCDOC shall train all correctional officers to provide first responder assistance (including cardiopulmonary resuscitation ("CPR") and addressing serious bleeding) in emergency situations. CCDOC shall provide all correctional officers with the necessary protective gear, including masks and gloves, to provide first line emergency response.

**Compliance Status**: Partial compliance.

**Findings**

**Status Update:**

**Monitor's Findings:**

a. Cermak Health Care Staff Training

Cermak healthcare staff are trained to recognize and respond to healthcare emergencies, including medical and mental health emergencies. However, the training on drug and alcohol withdrawal has not yet been implemented.

b. CCDOC Correctional Officer Training

CCDOC does train correctional officers to recognize and respond to medical emergencies and mental health emergencies. However, the training on drug and alcohol withdrawal, which is dependent on the collaboration with Cermak, has not yet been implemented.

c. CCDOC Emergency Transport

Our review of emergency transports indicates that CCDOC is responding timely to transport patients to the appropriate outside facility with regard to medical emergencies. For mental health emergencies that end up with a medical complication, they are also transported timely.

d. Cermak Timely Care And/Or Transport

Cermak does insure that inmates with emergency healthcare needs receive timely and appropriate care. We reviewed at least five records of patients sent offsite for emergencies, as well as multiple records of patients responded to onsite, and all appeared to receive appropriate care.

e. CCDOC First Responder Training for Correctional Officers

CCDOC does provide training for better than 90% of its staff with regard to first responder elements, including cardiopulmonary resuscitation. Given the changes in guidelines for first response, the main gear needed by officers are gloves, and they are provided with those gloves.

The requirement that Cermak shall insure that inmates with emergency health needs receive timely and appropriate care with prompt referrals may be hampered by the inadequacy of the maintenance of the emergency room log. Although it is being maintained slightly more completely than we observed at our previous visit, the fields are not utilized consistently for the same information. This then inhibits leadership's ability to quickly review and draw conclusions about timeliness and possibly areas of concern. In fact, in comparing the Cermak emergency log with the CCDOC emergency log over a 10 day period, we found two cases in which there was documentation of a send out by CCDOC that was missing from the Cermak log. Thus, not only was the log not used consistently with the discipline toward filling in every field appropriately, but in fact two cases over a 10 day period were missed.

**Monitor's Recommendations:**

1. Insure that both healthcare staff and CCDOC staff receive training with regard to drug and alcohol withdrawal.

2. Cermak leadership staff should work on revising the log and insuring better consistency in its utilization.

## 47. Record Keeping

   a.   Cermak shall ensure that medical and mental health records are adequate to assist in providing and managing the medical and mental health needs of inmates at the Facility and are maintained consistent with local, federal, and state medical records requirements.

   b.   Cermak shall ensure that medical and mental health records are centralized, complete, accurate, readily accessible, and systematically organized. All clinical encounters and reviews of inmates should be documented in the inmates' records.

   c.   To ensure continuity of care, Cermak shall submit appropriate medical information to outside medical providers when inmates are sent out of the Facility for medical care. Cermak shall appropriately request records of care, reports, and diagnostic tests received during outside appointments in a timely fashion and include such records in the inmate's medical record or document the inmate's refusal to cooperate and release medical records.

   d.   Cermak shall maintain unified medical and mental health records, including documentation of all clinical information regarding evaluation and treatment.

**Compliance Status**: Partial Compliance.

**Findings:**

   **Status Update:** No status update was provided.

   **Monitor's Findings:**

   At the exit conference 6/4/11, we stated that this item was in substantial compliance but upon review and consideration of the areas left to be accomplished, we conclude that this area remains in partial compliance. There were six recommendations in the December

Monitor's report. Items 3 and 4 were accomplished. Item 2 was substantially completed. Problems with Pharm Net are less frequent and a back-up list has been established to identify misses. Item 5 was substantially completed except that a policy and procedure to request records from previous providers has not yet been put in place. Item 1, the bi-directional interface between IMACS and Cerner, has not been accomplished. The specifications for programming have been developed and this work should take place soon. In the meantime, CCDOC provides more frequent updates and a back-up list is run by Cerner to identify misses. Cermak clerical staff input notifications to CCDOC from orders taken from the Cerner system. Item 6, wireless equipment and connectivity to document delivery of care and treatment on the housing units, was not feasible to accomplish and an alternative has been developed.

The following are the Monitor's findings in relation to each of the components listed in Item 47, Record Keeping.

a. Cermak Adequacy and Maintenance of Records

Since the last site visit (December 2010) Cermak implemented the electronic health record (EHR) called Cerner PowerChart. Most aspects of patient care, including treatment orders, are now documented electronically at the time of the patient encounter and are immediately available to all other Cermak health care providers. Patient care services not yet documented electronically include receipt, assessment and disposition of Health Service Requests, patient care logs (close observation, hunger strike, segregation, and suicide watch) and medication administration. Electronic documentation of Health Service Requests and administration of medication is recommended to assist in achieving compliance with items 54, Access to Care, and 56, Medication Administration, in the Agreed Order. Health information that will continue to be scanned into the electronic record include consents/refusals of care, advance directives, consults with providers outside CCHHS and the records of offsite emergency department visits.

The electronic health record resolves many of the problems discussed in previous reports of the Monitor's site visits. These include impeded access to information contained in the electronic and paper record, the requirement to document by hand and in the chart, and illegible handwritten notes and orders.

Problems observed during this site visit with access and documentation of health information can be attributed to the recent roll out of the electronic record (January 2011). For example, clinicians are able to enter their progress notes either through a function known as PowerNote (which uses templates) or as free text. When using PowerNote, the orders automatically appear in the progress note. When a clinician does not use PowerNote, the orders do not appear in the progress note unless the clinician enters them as free text. In most

cases, this is not occurring and it is very difficult to determine what was done during a specific visit. We recommend that if a clinician does not use the PowerNote function, that they be required to enter their orders in the progress note as free text so that there is clear documentation of what was ordered at that visit.

Another problem observed was that different professional groups differ in what they have permission to view in the electronic record. For example, nurses cannot view the patient problem list and providers cannot view the nursing task list. We support restricting data entry but recommend that there be no restriction in health care providers' ability to view any aspect of the electronic health record.

Another problem identified was the number of patient care tasks that are listed in the electronic record as incomplete. The result of not documenting completion of tasks as listed in the EHR is that it produces a record of patient care that was not provided or was untimely. Resolution of undocumented, incomplete or untimely nursing care may require other system changes in the EHR, additional training and support of the nursing coordinators in the monitoring of task lists, and/or standardization of how these tasks are documented by nurses in the EHR.

Since the EHR has successfully replaced the paper record, we recommended that clinical management focus attention on the quality and completeness of health information documented, especially improving the usefulness of information upon which to determine subsequent care. Several of the Monitors observed in their review of records that documentation of care can be sparse, fragmented and not consistent or responsive to the reason for the encounter. Retrospective and concurrent review of clinical documentation should take place regularly both within the interdisciplinary team and by peers. The results of these reviews should be used to modify systems, revise existing forms, develop new electronic forms and modify clinical practice.

The Monitors recommend a number of revisions to existing electronic forms (intake screening form, mental health treatment plan, health service request form) and the development of additional forms or templates (suicide risk assessment, various logs and nursing assessment protocols). These recommendations come as a result of chart review and observation of clinical practice. It is expected that with any health information system there will be an initial and ongoing requirement to revise existing forms and develop new ones based upon monitoring of implementation, ongoing audit and performance review and to support practice consistent with evolving practice guidelines.

Problems interfacing with CCDOC's inmate tracking system, Intellitech IMAC, and Cerner still have not been completely resolved. The Interagency Agreement identifies the responsibility

of each party for timely notifications. A list of requirements has been developed for Intellitech to create a bi-directional interface between IMACS and Cerner to produce these notifications. In the meantime, various work-a-rounds have improved communication between CCDOC and Cermak to ensure inmates receive health care. Clerical staff within Cermak manually enters notifications to CCDOC into IMACS from orders that were entered by providers into Cerner. CCDOC now provides housing and location data to Cerner three times a day. In addition, Richard Blackwell, Project Director, Process Improvement runs lists to help reconcile and identify inmates whose location differs from the list received from CCDOC, so that arrangements to continue care can be made.

Linda Kampe, Director of Health Information Management has responsibility for maintenance of health records and is appropriately credentialed to provide expertise and direction in management of health information. Policies and procedures have been established to define the organization and structure for maintenance of health information, documentation of health information, disclosure of health information and retention of records. These policies and procedures cite relevant regulatory authority (federal and/or state statute) as well as the accreditation standards of the National Commission on Correctional Health Care and the American Corrections Association. The Inter-Agency Agreement, completed in January 2011, defines the disclosure and use of health information by and between Cermak and CCDOC consistent with several controlling state and federal regulations. Based upon the interview with Ms. Kampe, review of written documents concerning health information and observation of practices with regard to health information, the Monitor concludes that records of patients' health information are maintained consistent with local, federal and state medical records requirements.

b. Cermak Accessibility of Records

This item has essentially been accomplished. The centralization of health records had been completed at the time of the December 2010 site visit. Since the last site visit, health records staff have been re-deployed to scan paper records into the electronic record. Scanning takes place on all three shifts and has gone up from 55,000 pages scanned in December 2010 to 131,000 pages scanned in April. At time of the June 2011 site visit, there were no loose records waiting for filing. This is down from just slightly more than 48 feet of loose filing in December 2010.

Since February, health information staff has scanned the paper record into the EHR prior to the next patient appointment. The result is that providers can access the old record electronically rather than having to rely upon delivery of the paper record. This resolves the problem providers reported at the last site visit of the record not being available at the time of the patient encounter. The paper record is scanned into a file within the EHR that is labeled

with the inmate's date of admission, which makes chronological review somewhat difficult. However, with continued use of the HER, the amount of scanned documentation will diminish over time and eventually the discontinuity of information in the record will lessen.

We observed health care providers use the EHR in their care of patients. Their skill in use of the EHR varied based upon how much experience they have had with Cerner. Interviews with staff about the EHR were very positive, even those new to the EHR. Cermak has a plan for ongoing training and support to assist new staff in learning how to use the EHR initially and to continue developing the knowledge and skill of existing users.

Documentation submitted to the Health Information Department will be scanned into the EHR within 48 hours of receipt. Departmental audits of timeframes for scanning support this statement. However, paper health records (Health Service Requests and Medication Administration Records) were in the dispensaries within the units dating back as long as March 2010. Access to the information via the EHR is delayed when paper records are kept in the dispensaries out in the Divisions. We recommend that Health Service Requests, patient care logs (close observation, hunger strike, segregation and suicide watch) and medication administration be documented within the electronic record and not scanned. Cermak should establish within existing policy and procedure timeframes for submitting other paper documentation so that it is received and scanned into the electronic record timely.

There is an organization for the EHR and the paper record. Heath information staff audit the filing and scanning of the paper record to ensure that it is in proper order. There are policies and procedures guiding documentation in the paper and/or EHR (H-01.3). As discussed in section (a) above, there is sufficient variation in how clinical care is documented (PowerNote vs. free text etc.) that it can be awkward to reconstruct the details and chronology of care for ongoing health problems. See recommendations made in section (a).

c. Cermak Communication with Offsite Providers

As noted in the first Monitor's report, there is timely exchange of clinical information (lab, radiology, chart notes) when inmates receive care within the Cook County Health and Hospital System because they all use the Cerner EHR. Access to the Jail Data Link provided by the Department of Human Services, Division of Mental Health (DMH) has been established since the last site visit, which enables the Cermak social workers and case managers to access information about inmates who have received mental health services via community agencies, hospitals or the mental health court. Clinical summary information is exchanged between Cermak and the health care providers in the Illinois DOC. Cermak providers also access the Illinois Narcotic Registry to verify current prescriptions for narcotics.

There was no evidence in records reviewed, interviews or document review that clinical information is obtained from previous providers outside CCDOC and the Illinois DOC. The Monitor continues to recommend (see reports from June 2010 and December 2010) that Cermak establish within policy and procedure an expectation that relevant information from previous providers be obtained if it is not available via the EHR or in a transfer summary.

d.  Cermak Unified Medical and Mental Health Records

In implementing the Cerner system, Cermak has achieved a unified health record. All health and mental health staff have access to the EHR to review patient information as well as to record information. At the current time, there are some restrictions on what information can be viewed based upon an individual's professional discipline or role. These restrictions need to be removed and everyone be given the same access to view health information.

The documentation format has been standardized and various templates have been developed to guide clinical care. We recommend that Cermak eliminate paper documentation and scanning of medication administration, Health Service Requests and various logs to document segregation rounds, suicide watch, close observation, and management of inmates on hunger strike. This recommendation is consistent with Cermak's plan that only consents/refusals, advance directives, and certain off site specialty consults would be maintained as scanned documents in the EHR.

Maintaining uniformity in the EHR requires ongoing evaluation, revision and creation of documentation tools so that the record continues to be a useful tool for clinicians. Revisions to the intake screening form, the mental health treatment plan and the development of a suicide risk assessment are recommended by Dr. Metzner. We also recommended that if clinicians do not use the PowerNote function, that they be required to enter their orders in the progress note as free text so that there is clear documentation of what was ordered at that visit.

**Monitor's Recommendations:**

1.  Establish a real time, two way interface between Cerner and IMACS.

2.  Purchase and install equipment and integrate systems so that monitoring, care and treatment delivered to patients in the housing unit is documented timely in the EHR.

3.  Implement the electronic Health Service Request and develop templates using PowerNote for documentation of nursing assessment.

4.  Establish regular retrospective and concurrent review of clinical documentation and provide proof via CQI that the results were used to modify systems, revise existing forms, develop new electronic forms and modify clinical practice.

5.  Eliminate any restrictions on any health care providers' ability to view any aspect of the electronic health record. Any health care provider should have access to view all of the EHR.

6.  Require clinicians use the PowerNote function. If not, then require clinicians who use free text to also enter their orders in the progress note so that there is clear documentation of what was ordered at that visit.

7.  Revise the intake screening form and mental health treatment plan.

8.  Eliminate paper documentation and scanning; develop forms or templates to electronically document suicide risk assessment, close observation, hunger strike, segregation, and suicide watch.

9.  Establish timeframes for submitting other paper documentation so that it is received and scanned into the electronic record timely.

10. Establish policy and procedure to obtain relevant information from previous providers if it is not available via the EHR or in a transfer summary.

## 48.  Mortality Reviews

a.  Cermak shall request an autopsy, and related medical data, for every inmate who dies while in the custody of CCDOC, including inmates who die following transfer to a hospital or emergency room.

b.  Relevant CCDOC personnel shall participate in Cermak's mortality review for each inmate death while in custody, including inmates who die following transfer to a hospital or emergency room, and a morbidity review for all serious suicide attempts or other incidents in which an inmate was at high risk for death. Mortality and morbidity reviews shall seek to determine whether there was a systemic or specific problem that may have contributed to the incident. At a minimum, CCDOC's contribution to mortality and morbidity reviews shall include:

(1)  critical review and analysis of the correctional circumstances surrounding the incident;

(2)     critical review of the correctional procedures relevant to the incident;

(3)     synopsis of all relevant training received by involved correctional staff;

(4)     possible precipitating correctional factors leading to the incident; and

(5)     recommendations, if any, for changes in correctional policy, training, physical plant, and operational procedures.

c.     Cermak shall conduct a mortality review for each inmate death while in custody, including inmates who die following transfer to a hospital or emergency room, and a morbidity review for all serious suicide attempts or other incidents in which an inmate was at high risk for death. Cermak shall engage relevant CCDOC personnel in mortality and morbidity reviews and shall seek to determine whether there was a pattern of symptoms that might have resulted in earlier diagnosis and intervention. Mortality and morbidity reviews shall occur within 30 days of the incident or death, and shall be revisited when the final autopsy results are available. At a minimum, the mortality and morbidity reviews shall include:

(1)     critical review and analysis of the circumstances surrounding the incident;

(2)     critical review of the procedures relevant to the incident;

(3)     synopsis of all relevant training received by involved staff;

(4)     pertinent medical and mental health services/reports involving the victim;

(5)     possible precipitating factors leading to the incident; and

(6)     recommendations, if any, for changes in policy, training, physical plant, medical or mental health services, and operational procedures.

d.     Cermak shall address any problems identified during mortality and morbidity reviews through timely training, policy revision, and any other appropriate measures.

**Compliance Status**: Partial compliance.

**Findings**

     **Status Update:**

     **Monitor's Findings:**

On 5/31/11, we were able to participate in the mortality review committee meeting. We also had an opportunity to provide input to the newly drafted mortality review policy. We were informed that autopsies are requested on all in-custody deaths. The good news is that there were only two deaths since our last visit. At the meeting on 5/31, both deaths were discussed in some detail. One case was a sudden death and the responses appeared timely, although it was not clear whether CCDOC participated in early resuscitation. The other death occurred in a patient with advanced HIV disease. The case summaries were thorough and the discussion was geared to identifying opportunities for improvement. The major absence was participation by CCDOC personnel. The agreement not only requires this but specifically requires a review by CCDOC leadership that includes (1) critical review and analysis of the correctional circumstances surrounding the incident, (2) critical review of the correctional procedures relevant to the incident, (3) synopsis of all relevant training received by involved correctional staff, (4) possible precipitating correctional factors leading to the incident, and (5) recommendations, if any, for changes in correctional policy, training, physical plant and operational procedures. It would make sense for Cermak, working with CCDOC, to develop a form that has these five items on it and space for the CCDOC reviewer to fill in each section. Overall, I was encouraged by the mortality review meeting, although clearly the participation by CCDOC needs to be fully implemented.

**Monitor's Recommendations:**

1. Include the appropriate CCDOC operations leadership who can address the elements listed under provision 44(b) 1-5.

2. Insure that the mortality review meeting occurs within 30 days of the death.

3. Work with the medical examiner to obtain more timely receipt of toxicological and other data from that office so that that data can be included in a final mortality committee report.

## 49. Grievances

Cermak shall develop and implement policies and procedures for appropriate handling of grievances relating to health care, when such grievances are forwarded from CCDOC.

**Compliance Status**: Partial compliance.

**Findings**

**Status Update:**

**Monitor's Findings:**

The efforts of the Quality Improvement Coordinator in redesigning the grievance process for healthcare grievances continues to bear fruit. In fact, they are now tracking the timeframe between inmates filling out a grievance and receipt of the grievance from custody by health services. This timeframe is now averaging about seven days and we would strongly encourage looking into strategies that may reduce that timeframe. Grievances are being responded to, although 30% are closed after 10 days because the person assigned the grievance has not yet responded. This clearly is an area that cries out for improvement. We remain concerned that all healthcare staff delegated with the task of responding to grievances receive training, particularly with regard to those grievance scenarios that require a face-to-face discussion as well as the attitude that must be utilized in addressing a grievant. It is common, when one's program is being criticized, to instinctively react defensively. However, a defensive reaction is almost invariably counterproductive. Therefore, training on fighting one's internal defensiveness and responding constructively with a view toward resolving the concern is critical to having an effective grievance program. The grievances are sorted by service type, such as medical, dental, etc., and then by subcategory, such as professionalism or quality of care, etc. Both professionalism and quality of care are reviewed by the Associate Medical Director. The other categories, such as timeliness of access or nature of treatment are assigned to the primary care clinician and although they have 10 days to respond, only 70% of the time is such a response received. Currently, the grievance coordinator for Cermak makes the decision about whether a face-to-face interaction is indicated. However, recently, of 25 recommended face-to-face interactions, only eight occurred. A few of those that did occur occurred after 10 days. Despite the existing problems, this process clearly has moved forward.

**Monitor's Recommendations:**

1. Work with custody to facilitate a decrease in the timeframe from an inmate initiating grievance and receipt from custody by healthcare.

2. Provide training for all who are tasked with responding to grievances.

3. Part of that training must be to accomplish the grievance response within 10 days or less.

4. Continue tracking the percent of grievances which result in a face-to-face interaction.

5. Track the rate of appeals by Division to determine whether there are differences in the effectiveness of the individuals tasked with responding to the grievances.

**C.    MEDICAL CARE**

**50.  Health Assessments**

a. Cermak shall ensure that Qualified Medical Professionals attempt to elicit the amount, frequency and time since the last dosage of medication from every inmate reporting that he or she is currently or recently on medication, including psychotropic medication.

b. Cermak shall ensure that incoming inmates who present and are identified by medical personnel as having either a current risk of suicide or other acute mental health needs will be immediately referred for a mental health evaluation by a Qualified Mental Health Professional. Staff will constantly observe such inmates until they are seen by a Qualified Mental Health Professional or Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional. Incoming inmates reporting these conditions will be housed in safe conditions unless and until a Mental Health Professional clears them for housing in a medical unit, segregation, or with the general population.

c. Cermak shall ensure that all inmates at risk for, or demonstrating signs and symptoms of, drug and alcohol withdrawal are timely identified. Cermak shall provide appropriate treatment, housing, and medical supervision for inmates suffering from drug and alcohol withdrawal.

d. CCDOC shall maintain a policy that correctional officers supervising newly arrived inmates physically observe the conduct and appearance of these inmates to determine whether they have a more immediate need for medical or mental health attention prior to or following the intake health screening by Qualified Medical Staff.

e. Cermak shall ensure that the medical assessment performed within two working days of his or her booking at the Facility, or sooner if clinically indicated, for each inmate specified above (provision 45 f, "Intake Screening") shall include a review of the inmate's intake screening form, a medical history, a physical examination, a mental health history, and a current mental status examination. The physical examination shall be conducted by a Qualified Medical Professional. The medical assessment shall also include development or revision of the inmate's problem list and treatment plan to address issues identified during the medical assessment. Records documenting the assessment and results shall become part of each inmate's medical record. A re-admitted inmate or an inmate transferred

from another facility who has received a documented medical assessment within the previous six months and whose receiving screening shows no change in the inmate's health status need not receive a new medical assessment. For such inmates, Qualified Medical Staff shall review prior records and update tests and examinations as needed.

**Compliance Status**: Partial compliance, near substantial.

**Findings**

> **Status Update:**

> **Monitor's Findings:**

Generally speaking, the quality and timeliness of the health assessments is consistent with the requirements of the Agreed Order.

> a. Cermak Medication Assessment

There is an effort to elicit the amount, frequency and time since the last dosage of medication.

> b. Cermak Mental Health Positive Assessment

There is a consistent implementation of a procedure to identify patients at risk for suicide.

> c. Cermak Drug/Alcohol Withdrawal

The guideline on drug and alcohol withdrawal has not yet been published, although we have seen an early draft. There is an effort, nonetheless, to identify individuals at significant risk for withdrawal syndromes and they are monitored, although not yet consistently. This element awaits the completion of the drug and alcohol withdrawal guideline and its training and implementation.

> d. CCDOC Observation of New Inmates by Correctional Officers

Correctional officers do, on occasion, identify inmates to be assessed through screening at a higher priority.

> e. Cermak Timeliness of Assessment

Cermak generally performs their advanced level assessment on the same day as the intake screen is completed. This is performed for all individuals with a positive screen. The

medical assessment is supposed to include development or revision of the inmate's problem list and treatment plan and frequently does. The assessments are now documented through the electronic medical record and the quality is generally adequate. However, we did identify a problem in that when an individual arrives with a complex problem and the intake advanced level provider determines that a referral to the emergency room will be necessary, the advanced level provider tends to shorten and diminish the comprehensiveness of the assessment. However, if they are doing this based on an expectation that a more comprehensive assessment will be performed in the emergency room, our review of records suggests that this expectation is likely to be commonly frustrated. We discussed with the clinical leadership the need to clarify which clinician has the responsibility for the comprehensive assessment and the leadership team was univocal in their instruction that the intake clinician must perform the comprehensive assessment. We reviewed the record of a 24-year-old patient with diabetes and asthma who had also recently been treated for a complex lung problem, ultimately requiring surgery. The intake assessment was abbreviated and the patient was sent to the emergency room. However, the emergency room clinician missed some of the problems and only focused on more urgent issues.

The two problems that must be resolved before substantial compliance is achieved are insuring a comprehensive assessment even in patients with complex problems who are going to be referred to emergency room as well as insuring that patients identified as at risk for a withdrawal syndrome will be monitored and treated consistent with the soon to be developed Cermak guideline.

**Monitor's Recommendations:**

1. Retrain the advanced level clinicians that they must perform a comprehensive assessment on all intakes referred to them, even when they will be referring the patient to the emergency room.

2. Complete the alcohol withdrawal guideline and perform training prior to implementation.

3. The quality improvement program should monitor the performance with regard to alcohol and drug withdrawal after the implementation of the guideline.

4. The quality improvement program should try to identify records of patients sent from intake to the emergency room and review the quality of the intake assessment.

## 51. a  Acute care-Urgent

a. Cermak shall provide adequate and timely acute care for inmates with serious and life-threatening conditions, and ensure that such care adequately addresses the serious medical needs of inmates. Adequate care will include timely medical appointments and follow-up medical treatment.

b. Cermak shall maintain guidelines for the scope of care of acutely ill patients in its on-site designated infirmary units and for transfer of patients when appropriate to outside hospitals.

**Compliance Status**: Substantial compliance.

**Findings**

>
**Status Update:**

**Monitor's Findings:**

a. Cermak Provision of Adequate and Timely Care

We reviewed 10 records of patients receiving acute care. In all 10 records we found that the care was both timely and appropriate and this included follow up appointments where indicated.

b. Cermak Care Guidelines

We have seen guidelines that describe the scope of care that would exceed the capability of the Cermak infirmary and must result in transfer to a facility that provides a higher level of care. This is why this element is now in substantial compliance.

**Monitor's Recommendations:**

1. With the publishing of the guidelines for services that exceed the capability of the Cermak infirmary, insure that training has been provided to all Cermak staff and that when it is identified that such care is needed, patients are in fact transferred to another facility.

## 51. b Acute Care-Infirmary

a. Cermak shall provide adequate and timely acute care for inmates with serious and life-threatening conditions and ensure that such care adequately addresses the serious medical needs of inmates. Adequate care will include timely medical appointments and follow-up medical treatment.

b.    Cermak shall maintain guidelines for the scope of care of acutely ill patients in its onsite designated infirmary units and for transfer of patients when appropriate to outside hospitals.

**Compliance Status:** Partial compliance.

**Findings**

**Status Update:**  We did not receive a status report prior to our visit.

**Monitor's Findings:**

a.  Cermak-Provision of Adequate and Timely Care

There are an inadequate number of infirmary beds. This is largely due to the fact that there are a large number of patients housed in the infirmary who do not require an infirmary level of care. These are patients who require medical appliances such as wheelchairs and CPAP machines. According to the medical staff, these individuals could be housed in other areas of the jail, but custody has mandated that they be housed in the infirmary. As a result, patients with more acute medical issues are often placed on the floor in plastic "boats". On June 6, 2011, there were 26 patients on the floor in "boats." Medical staff informed us that they feel like they are constantly juggling patients and discharging them before they feel they are ready. Staff was not aware of any untoward consequences that resulted from these early discharges.

Discharge notes are being written for patients who are transferred out of the infirmary to other units. They are still not being consistently written, however, for patients who are released from jail to the community. This is due to the fact that medical staff is often not aware that these patients are leaving until after they have been released. Recently, in an attempt to address this issue, medical staff has been placing alerts in the IMAC system to notify custody staff that certain higher risk patients need to be seen by the physician prior to release so that discharge arrangements can be made. According to medical staff, this system is working.

We reviewed the medical records of 25 patients who were housed in the infirmary. The following problems were noted with their care:

i.    The admission orders often did not contain important information such as activity level, criteria for notification of physician and diet. Since our last visit, electronic infirmary admission orders have been developed and implemented in Cerner. At the

time of our current visit, they were not being used by the providers on a consistent basis.

ii. There were problems related to the adequacy of care in 10 of the cases. (See Appendix, Patients 1, 3-6, and 8-12).

iii. There were problems related to the timeliness of care in 15 of the cases. (See Appendix, Patients 2, 3, 5-11, and 13-18). The policy on *Infirmary Care*, Policy G-03, defines two categories for patients admitted to the medical infirmary, acute and non-acute, and provides time frames for initial and follow-up notes from the infirmary physician. In some cases, these time frames are shorter than they need to be. Cermak is in the process of developing additional categories (i.e., observation and boarder) and time frames for these groups of patients. Such a plan is clinically appropriate and would allow for more extended time frames for certain types of patients.

iv. There were problems related to the documentation in two of the cases. (See Appendix, Patients 2 and 6).

b. Cermak-Care Guidelines

The infirmary policies, *Infirmary Care*, policy G-03 and *Medical Infirmary*, policy G-03.1, have been finalized. The policy still states that the physician's admission orders will be completed within eight hours of admission. In practice, the orders are being written at the time the patient is admitted to the infirmary. The policy needs to be revised to reflect the actual practice.

**Monitor's Recommendations:**

1. Encourage providers to use the electronic order set when admitting patients to the infirmary.

2. Revise the infirmary policy to address the problem identified above with the timeframe for admission notes and orders.

3. Revise the infirmary policy to define categories of patients who can be seen less frequently by the infirmary physician.

4. Ensure that the care provided in the infirmary is timely and adequate.

5. Explore other housing options for individuals who require medical appliances such as wheelchairs and CPAP machines.

**51 b. Acute Care-Nursing**

**Compliance Status**:  Substantial compliance.

**Findings**

**Status Update:**

Cermak administrators are working to implement the Monitor's recommendations. The nursing staff is to have in-service training on revised policies and procedures by December 1, 2011. The SOAP format will be the standard format for documentation. This will include the electronic record documentation.

In regards to staffing, 27 Clinical Nurse I positions have been filled. Nineteen Clinical Nurse I positions and 11 LPN positions remain to be filled; almost all of the vacant positions have been posted.

DFM is working, in an ongoing fashion, to remedy and correct temperature issues.

As discussed above, Cermak is working in haste to transition to electronic medical records (EMR).

To ensure that infirmary care is provided timely, a nursing interview is conducted within 60 minutes of admission to the infirmary, pursuant to Cermak policy. Cermak staff will receive in-service training on the revised policy and procedures by December 1, 2011. To ensure compliance with the revised policies, nightly, random audits of nursing documentation initiated within the infirmary are being conducted. These audits were begun September 1, 2010.

**Monitor's Findings:**

b.  Cermak-Care Guidelines

There have been no changes to the physical plant since the December 2010 visit. Cermak second and third floors continue to be a generally clean, well-maintained, well-lighted and organized area. Environmental temperatures at this visit, unlike the June and December 2010 visits, were consistently comfortable throughout the units on both second and third floors, despite the excessively high heat temperatures and indices outside. The Cook County Detention Center (CCDC) infirmary continues to be located on the Cermak second and third floors. The second floor continues to be designated for male and female acute and "step-down" mental health patients, and the third floor continues to be dedicated to male and female acute medical patients, medical isolation patients and those individuals with chronic specialized medical needs. The bedded capacity has not changed since the December 2010 visit. Each of the areas is staffed 24/7 by licensed nursing staff. Physicians are assigned to the units during

the day, with all other hours covered through "call" or by the Cermak emergency room physician. Staffing has been sufficiently increased to allow staff on each unit to relieve each other for lunch breaks without leaving the unit unattended by any staff. At the time of the monitor's visit, during lunch breaks, units were attended by at least a Patient Care Attendant (PCA). Of the 27 Clinical Nurse I positions filled at the time of the December 2010 visit, none had been assigned to Cermak. All of the new nursing positions were assigned to one of the Divisions. Since the December 2010 visit, seven RNs have been hired, with four having started working June 6, 2011, and another three to begin June 20, 2011. Additionally, another eight RN positions have been posted.

Since the December 2010 visit, Cermak has expanded the electronic medical record (EMR) to be fully operational on the third floor, and with the exception of the Medication Administration Record (MAR), fully operational on the second floor where a paper, manual MAR continues to be in use. Additionally, electronic forms for routine activities, such as, "Close Observation," "Suicide Watch," "Hunger Strike" and "Flow Sheets" continue to not be available. At the time of the Monitor's June 2011 visit, observation and multiple nursing staff interviews indicated universal nursing staff knowledge regarding the EMR and universal nursing staff ability in competently navigating the system.

Pursuant to the Monitor's recommendation during a previous visit, the Subjective-Objective-Assessment-Plan (SOAP) method of nursing documentation continues to be utilized throughout Cermak, which creates consistency in the method/style of documentation. Monitor interviews with multiple nursing staff indicated no issues in utilizing the SOAP documentation format. Monitor reviews of nursing documentation indicated such.

Nursing policies and procedures, as recommended, had been revised with in-service training to all nursing staff to have been completed by December 1, 2010. At the time of the June 2011 visit, the Monitor was informed an annual review of the policies and procedures would take place no later than July 31, 2011. On each wing of both Cermak second and third floors, Monitor observation indicated policy and procedure manuals were present and current. Additionally, during the June 2011 visit, the Monitor was informed that a bureau-wide policy defining charting frequency requirements for both physician and nursing staffs had been developed and was awaiting approval, with training to be provided by Stroger Hospital by August 2011.

Random inspections on each wing of Cermak second and third floors indicated controlled medication logs/counts, needle and syringe logs/counts, tool inventories/counts and medication refrigerator temperature documentation were accurate and being conducted at the appropriate intervals. Observation of nursing medication administration in multiple areas indicated appropriate identification of the patient, appropriate explanation of the medication,

appropriate taking of vital signs when warranted, mouth checks for each patient and appropriate documentation.

During the visit, it was noted that on Cermak third floor there were a number of individuals assigned to the infirmary for housing purposes only. These individuals fell primarily into two categories:  individuals with C-PAP units and maximum security inmates confined to a wheel chair. As a result, a number of beds are being utilized by individuals who do not require an acute-care setting. Since CCDC has determined and designated Cermak third floor as the medical acute-care infirmary, efforts should be made to create housing arrangements for mobility impaired individuals and those requiring self-use medical equipment. For example, Cermak 3-North, a 20 bed unit, had a census of 30 patients, 12 of whom were housing only; nine maximum security wheelchair individuals and three with C-PAP units. Likewise, on Cermak 3-West, a 20 bed unit, had a census of 30 patients, eight of whom were dialysis only and four for other types of housing.

Additionally, during the visit, it was learned that admissions to Cermak are generally made through the Cermak emergency room by the physician. Interviews with infirmary staff indicated admissions are ordered with no consultation/input between the emergency room physician and the unit staff physician or nursing "house" supervisor and with no consideration as to unit census, staffing or unit patient acuity level.

**Monitor's Recommendations:**

1. Continue to educate new nursing staff and routinely update existing nursing staff regarding new policies and procedures.

2. Continue to add nursing staff to fill existing vacancies.

3. Continue to monitor and work with the Department of Facilities Management (DFM) to maintain comfortable environmental temperatures throughout the infirmary.

4. Continue to work with Facility Administration for solutions to relocating individuals from the acute care infirmary who are there for housing purposes only.

5. Implement the electronic Medication Administration Record (MAR) for Cermak 2, and develop/implement electronic forms for "Close Observation," "Suicide Watch," "Hunger Strike," "Flow Sheets" and all other routine nursing activities requiring documentation.

6. Develop a system/process for emergency room admissions which requires consultation with either the unit staff physician or nursing "house" supervisor and takes into consideration unit census, patient acuity level, staffing level and number of admissions during the shift.

7. From a multi-disciplinary approach, conduct at least one infirmary patient care Continuous Quality Improvement study.

## 52. Chronic care

a. Cermak shall maintain an appropriate, written chronic care disease management plan, which provides inmates with chronic diseases with timely and appropriate diagnosis, treatment, medication, monitoring, and continuity of care consistent with the inmates' expected length of stay.

b. Cermak shall maintain appropriate written clinical practice guidelines for chronic diseases, such as HIV, hypertension, diabetes, asthma, and elevated blood lipids.

c. Cermak shall maintain an updated registry to track all inmates with serious and/or chronic illnesses and shall monitor this registry to ensure that these inmates receive necessary diagnoses and treatment. Cermak shall keep records of all care provided to inmates diagnosed with chronic illnesses in the inmates' individual medical records.

d. Cermak shall ensure that inmates with chronic conditions are routinely seen by a physician, physician assistant, or advanced practice nurse to evaluate the status of their health and the effectiveness of the medication administered for their chronic conditions.

e. CCDOC shall house inmates with disabilities, or who need skilled nursing services or assistance with activities of daily living, in appropriate facilities, as determined by Cermak. CCDOC shall permit inmates with disabilities to retain appropriate aids to impairment, as determined by Cermak.

f. Cermak shall ensure that inmates with disabilities or who need skilled nursing services or assistance with activities of daily living shall receive medically appropriate care. Cermak shall notify CCDOC of their specific needs for housing and aids to impairment.

g. Cook County shall build out, remodel, or renovate clinical space as needed to provide appropriate facilities for inmates with disabilities in accordance with the timelines set out in provision 43.i. Prior to completion of the new clinical space, Cook County and DFM will work with Cermak to address the most serious

concerns regarding facilities for inmates with disabilities, to the extent possible in the current Facility.

**Compliance Status:** Partial compliance.

**Findings**

> **Status Update:** We did not receive a status report prior to our visit.

> **Monitor's Findings:**

a. Chronic Disease Management Plan.

Cermak has developed a chronic disease management plan (Policy G-01, *Chronic Disease Services*) that effectively delineates the goals, components and development of a chronic care program. A policy is in the process of being finalized that will define the time frame in which patients with chronic diseases need to be seen for their chronic care visits. Another policy is being finalized that will define the time frame in which patients need to be seen for follow-up based on the degree of control of their chronic disease.

Policy I-05, *Informed Consent and Right to Refuse Medical Treatment*, has been finalized and implemented. The policy requires a signed refusal form that documents the service being refused; that the patient has been informed of the potential consequences of the refusal; and the reason for the refusal. It also specifies that the patient must be transported to the point where the appointment would occur in order to refuse. Refusals of certain specific types of services (e.g., therapeutic diets, psychotropic medications, TB screening, life-sustaining treatment, and individual doses of medication) are addressed in separate policies.

b. Cermak-Written Guidelines

The clinical practice guidelines for the more common chronic conditions, including asthma, diabetes, hypertension, dyslipidemia, seizure disorders, HIV disease, heart failure, and anti-coagulation therapy, have been finalized, distributed to staff, and posted on the intranet. The guidelines are systematic and comprehensive, and will assist the providers in the management of their patients with chronic illnesses. Each guideline presents specific quality improvement measures which can be used to monitor the quality of care being provided for specific diseases. In-services have already taken place for a number of the guidelines and the remainder will be completed in the near future.

c. Cermak-Tracking System

Disease specific registries based on the problem list have been developed and are available on Cerner. While the large majority of patients with chronic illnesses are in the registries, we did find some patients with chronic diseases whose illness was not documented on the problem list and therefore not in the corresponding registry.

Cermak has also started to use the registries to monitor the care being provided to patients with chronic illnesses. Reports are currently being generated that document the following clinical parameters:

i.      Number/% of diabetic patients incarcerated more than 45 days who had their hemoglobin A1c measured within the last 180 days.

ii.      Number/%of diabetic patients incarcerated more than 45 days who had there LDL-cholesterol measured within the last year.

iii.      Degree of diabetic control as measured by the hemoglobin A1c for patients incarcerated more than 120 days.

iv.      Degree of LDL-cholesterol control for diabetic patients incarcerated more than 120 days.

v.      Number/% of HIV patients incarcerated more than 30 days who have had CD4 counts

vi.      Severity of HIV infection as measured by the CD4 count for patients incarcerated more than 90 days.

vii.      Number/% of patients on Coumadin with INR measured within 48 hours of incarceration

viii.      Number/% of patients incarcerated for more than 45 days who are receiving Coumadin and have an INR in the therapeutic range.

ix.      Number/% of patients with congestive heart failure who are receiving an ACE inhibitor or an ARB

x.      Number/% of patients with chronic diseases who are seen for follow-up care within the specified interval

xi.      Number/% of patients with chronic diseases who are seen for their initial visit within the specified interval

d. Cermak-Regularly Scheduled Visits

We reviewed the medical records of 54 patients with chronic medical problems. Many of these patients had multiple chronic illnesses. The problems reviewed included:

i.      Diabetes – 15 patients

ii.      Hypertension – 24 patients

iii.      Seizure Disorder – 7 patients

iv.      HIV Disease – 18 patients

v.      Asthma – 17 patients

vi.      Patients receiving Coumadin – 9 patients

vii.      Hyperlipidemia – 9 patients

The following problems related to timeliness of care were found:

i.      The initial chronic care visit did not take place in a timely manner. (See Appendix, Patients 19, 22, 24, and 39)

ii.      Follow-up visits did not take place in a timely manner. (See Appendix, Patients 21, 25, 28, 31, and 42)

e. CCDOC-Facilities for Special Needs Patients

In late January/early February 2011, the Department of Justice's ADA unit visited Cook County Jail and performed a survey to identify any deficiencies. The report of their findings had not been received at the time of our visit. During future visits, we will monitor any deficiencies that were identified during the survey.

f. Cermak-Medically Appropriate Care for Special Needs Patients & Communication to CCDOC

In our prior reports, we noted that medical records were often not available when the provider was seeing a patient and that documentation was often missing when the record was present. These problems have been resolved with implementation of the electronic medical record.

The following problems related to the care of patients with chronic diseases were noted during our review of medical records:

i.      Providers are not obtaining an adequate history related to the patients' chronic illnesses. (See Appendix, Patients 27, 29, 30, 32-35, and 41.)

ii.      While providers are more consistently noting the degree of control of the patients' chronic illnesses, there are still a significant number of cases in which this is not occurring.

iii.      Providers are not developing an appropriate plan of care based on the patient's chronic illness and degree of control. (See Appendix, Patients 26-30, 32-35, 37, 40, 41, and 43.)

iv.      Clinically appropriate monitoring is not occurring. (See Appendix, Patients 19-22, 26, 36, 38, and 44.)

The care of patients with HIV disease warrants special discussion. Overall, these patients are being seen in a timely manner and are receiving appropriate care. In many cases, however, the HIV provider is not documenting an adequate history (just noting "no complaints"), not obtaining vital signs, and not performing a focused physical examination. In these cases, the patients are also being followed by a primary care provider who is addressing their HIV disease, as well as any other health problems they may have. In these cases, the HIV provider focuses primarily on the results of laboratory tests and on medication compliance/side effects, whereas the primary care provider is documenting a complete review of systems and physical examination. This is not an efficient use of resources.

**Monitor's Recommendations:**

1. Implement all aspects of the chronic disease management plan. Revise the policy to state that the initial chronic care visit will occur within one month of entry into the jail and to establish guidelines for follow-up visits based on degree on control.

2. Develop templates that will facilitate implementation of the chronic care program. The development of a chronic care program helps to ensure routine follow-up and appropriate treatment of patients with serious medical problems. Such programs serve to identify and monitor patients with chronic illnesses in order to initiate appropriate therapeutic regimens that will promote good health and prevent complications, and provide patient education and counseling in order to encourage patients to practice healthy behaviors. In contrast to visits for episodic care, the chronic care visit must address all issues related to the patient's illness since the last visit. In order to facilitate the implementation of a successful chronic care program, and assist providers in developing a "chronic care" mind set, these visits need to be distinguished from routine sick call, which is primarily designed to address acute, self-limited medical problems. Two ways in which many facilities accomplish this are by designating these visits as chronic care encounters and utilizing specific templates that serve as reminders about the necessary elements of the history, physical examination, and plan for each specific chronic disease.

3. Continue to reinforce the importance of keeping the problem list up to date with staff. Develop a CQI study to determine what percentage of patients with chronic diseases are listed in the registries.

4. Implement a tracking system based on the chronic disease registries to ensure that patients receive timely care and monitoring. Create a field on the electronic registry that notes the dates of the most recent and pending chronic care visits.

5. Implement the use of point of care testing for INR monitoring to improve the timeliness and effectiveness of Coumadin therapy. We were informed that the equipment is in place for point of care testing, that training of staff would commence in June, and that implementation would occur in July.

6. Redefine the role of the HIV providers so that they function as the primary care provider for their patients.

## 53. Treatment and Management of Communicable Disease

a. Cermak shall maintain adequate testing, monitoring, and treatment programs for management of communicable diseases, including tuberculosis ("TB"), skin infections, and sexually transmitted infections ("STIs").

b. CCDOC shall comply with infection control policies and procedures, as developed by Cermak, that address contact, blood borne, and airborne hazards, to prevent the spread of infections or communicable diseases, including TB, skin infections, and STIs, consistent with generally accepted correctional standards of care.

c. Cermak shall maintain infection control policies and procedures that address contact, blood borne, and airborne hazards, to prevent the spread of infections or communicable diseases, including TB, skin infections, and STIs, consistent with generally accepted correctional standards of care. Such policies should provide guidelines for identification, treatment, and containment to prevent transmission of infectious diseases to staff or inmates.

d. Pursuant to Centers for Disease Control ("CDC") Guidelines, Cermak shall continue to test all inmates for TB upon booking at the Facility and shall follow up on test results as medically indicated. Cermak shall follow current CDC guidelines for management of inmates with TB infection, including providing prophylactic medication when medically appropriate and consistent with the inmate's expected length of stay. Inmates who exhibit signs or symptoms consistent with TB shall be isolated from other inmates, evaluated for contagious TB, and housed in an appropriate, specialized respiratory isolation ("negative pressure") room. Cermak shall notify CCDOC of inmates' specific housing

requirements and precautions for transportation for the purpose of infection control.

e.    Cermak shall ensure that the negative pressure and ventilation systems function properly. Following CDC guidelines, Cermak shall test daily for rooms in-use and monthly for rooms not currently in-use. Cermak shall document results of such testing.

f.    Cermak shall notify DFM, in a timely manner, of routine and emergency maintenance needs, including plumbing, lighting, and ventilation problems.

g.    Cermak shall develop and implement adequate guidelines to ensure that inmates receive appropriate wound care. Such guidelines will include precautions to limit the possible spread of Methicillin-resistant Staphylococcus aureus ("MRSA") and other communicable diseases.

h.    Cermak shall adequately maintain statistical information regarding communicable disease screening programs and other relevant statistical data necessary to adequately identify, treat, and control infectious diseases.

**Compliance Status**:  Substantial compliance.

**Status Update:**

Cermak directed the Monitor to review policies D-03a and D03b, which address repair and maintenance reporting to DFM. Also, an additional infection control nurse is budgeted and posted.

**Monitor's Findings:**

Since the June 2010 visit, the full-time nurse epidemiologist position has become vacant. As of the June 2011 visit, the position has been filled, with the individual starting the same week as the Monitor's visit. The department continues to be directed by a full-time staff physician credentialed in infectious/communicable diseases. The department director indicated policies, procedures and surveillance and screening programs remain in-place for TB, HIV, STDs, Hepatitis B and C, Ectoparasites, MRSA and seasonal influenzas including H1N1. Despite the nurse epidemiologist vacancy, it was reported the department continues to interface with the Chicago Department of Public Health (CDPH), the Illinois Department of Public Health (IDPH) and the Illinois Department of Corrections (IDOC).

It was reported the Infection Control department is participating in five separate HIV-focused grants. Additionally, the department director indicated that in early 2011, the department would begin participating in the Illinois-National Electronic Disease Surveillance System (I-NEDSS). As reported to the Monitor during the June 2011 visit, Cermak began interfacing with I-NEDSS in May 2011.

CCDC continues the policy and practice of conducting a chest x-ray to rule-out active TB on each individual at the time of booking.

The department director reported that new initiatives that have begun since the December 2010 visit are as follows:

1. In April 2011, the "Opt-Out" program for female sexually transmitted infections (STI) was started.

2. New data bases are being built to capture statistics for:
   - TB surveillance
   - Female STI "Opt-Out" program
   - Employee testing for TB and Hepatitis B, the number of flu vaccine doses administered, and blood exposures to needle sticks and bites.

3. Tracking of "outbreaks" for:
   - Influenza
   - Gastroenteritis
   - Ectoparasites
   - Immunizations
   - MRSA (culture proven only)
   - Negative air pressure isolation room usage.

4. Weekly tracking from the Cermak emergency room log of any complaints of skin/tissue infection for MRSA.

As reported in June 2010, due to significant County budget cuts in 2007, no routine or on-going employee health screening occurs at the Training Academy. During the June 2011 visit, it was reported that there continues to be no routine or on-going employee health screening at the Training Academy.

The department director reported, since the last Monitor visit, that the Infectious Disease and Control department has been "downsized" with the loss of three infection control medics. The director reported normally this would not be a problem but will definitely be a

problem in the event of an "outbreak" when staff would need to be redeployed to adequately address the event.

a. Cermak-Maintenance of Testing, Monitoring and Treatment Programs

An infection control/surveillance program is in place which includes testing, monitoring and treatment programs for the management of communicable diseases, including tuberculosis, skin infections, including MRSA, and sexually transmitted diseases.

b. CCDOC-Compliance with Infection Control

Cermak has developed infection control policies, procedures and surveillance programs consistent with the Chicago Department of Public Health and the Illinois Department of Public Health.

c. Cermak-Infection Control Policies

The infection control policies and procedures are specific to the prevention of the spread of infections or communicable diseases, including TB, skin infections and sexually transmitted diseases. The policies provide guidelines for identification, treatment and containment to prevent transmission of infectious diseases to staff and inmates. Policies are consistent with the Chicago Department of Public Health and the Illinois Department of Public Health.

d. Cermak-TB Testing According to CDC Guidelines

At the time of booking, each individual receives a chest x-ray for the purpose of detecting active TB disease. Any individual with a positive chest x-ray or any individual exhibiting signs/symptoms of active disease is isolated from the general population. Isolation takes place in "negative-pressure" isolation rooms located on the third floor of the Cermak infirmary.

e. Cermak-Ventilation Systems

The appropriate operation of "negative-pressure" isolation rooms is documented daily by nursing staff, whether or not the room is in use. It was reported that the maintenance department conducts and documents a monthly test. It was observed that each "negative-pressure" isolation room is equipped with an alarm which indicates immediately when negative pressure has been lost. The room alarms consist of both a visual and auditory indicator.

f. Cermak-Notify DFM of Maintenance Needs

Policies and procedures specific to repair and maintenance have been developed.

g.  Cermak-Appropriate Wound Care

At the time of the June 2010 visit, a nurse under the direction of the department director was monitoring the majority of skin/wound infections with specific attention to the more serious/resistant cases. Since then, the nurse has been assigned to other duties and wound care is the responsibility of each Division physician and nursing staff. The infection control department continues to collect statistics from the Divisions and monitor wound treatment. The director of the department reported the number of wound/skin cultures has decreased as a result of fewer culture/sensitivity tests being conducted. Additionally, the department is tracking weekly from the Cermak emergency room log all complaints of skin/tissue infection for MRSA.

h.  Cermak-Collection of Statistical Data Regarding All Communicable Diseases

Infection control/surveillance statistics are collected and maintained specific to communicable disease screening, identification, and treatment and tracking. New data bases are being built for the purpose of TB-surveillance, Opt-Out female STI tracking, employee testing for TB and Hepatitis B, influenza vaccine doses administered and blood exposures to needle sticks and bites. Additionally, the department is now linked with the Illinois-National Electronic Disease Surveillance System (I-NEDSS).

**Monitor's Recommendations:**

1. Develop a plan for staff reassignment to the Infection Control Department in the event of a major communicable disease event.

2. Pursue the addition of infection control surveillance nursing positions in order to provide onsite employee training, academy training, kitchen inspections, housing unit inspections, additional data collection and outbreak investigations.

3. Continue surveillance, identification, treatment and tracking of skin/wound infections with a focus on identification and containment of potential MRSA infections.

4. Pursue the development of a process/schedule for routinely sanitizing cells.

5. From a multi-disciplinary approach, conduct at least one patient care oriented Infectious Disease Quality Improvement study.

6. Continue to pursue grant studies.

## 54.  Access to Health Care

a. CCDOC will work with Cermak to facilitate timely and adequate accessibility of appropriate health care for inmates, as provided by Cermak.

b. Cermak shall ensure the timely and adequate availability of appropriate health care for inmates.

c. Cermak shall ensure that the medical request ("sick call") process for inmates is adequate and provides inmates with adequate access to medical care. The sick call process shall include:

   (1) written medical and mental health care slips available in English, Spanish, and other languages, as needed;

   (2) opportunity for illiterate inmates and inmates who have physical or cognitive disabilities to access medical and mental health care; and

   (3) opportunity for all inmates, irrespective of primary language, to access medical and mental health care.

d. Cermak shall ensure that the sick call process includes confidential collection, logging, and tracking of sick call requests seven days a week. Cermak shall ensure timely responses to sick call requests by Qualified Medical Staff. The logging procedure shall include documentation of the date and summary of each request for care, the date the inmate was seen, the name of the person who saw him or her, the disposition of the medical or mental health visit (e.g., referral; whether inmate scheduled for acute care visit), and, if follow-up care is necessary, the date and time of the inmate's next appointment. Cermak shall document the reason for and disposition of the medical or mental health care request in the inmate's medical record.

e. Cermak shall develop and implement an effective system for screening medical requests within 24 hours of submission. Cermak shall ensure that sick call requests are appropriately prioritized based upon the seriousness of the medical issue.

f. Cermak shall ensure that evaluation and treatment of inmates in response to a sick call request occurs in a clinical setting.

g.   Cermak shall ensure that Qualified Medical Staff make daily rounds in the isolation areas to give inmates in isolation adequate opportunities to contact and discuss medical and mental health concerns with Qualified Medical Staff in a setting that affords as much privacy as reasonable security precautions will allow. During rounds, Qualified Medical Staff will assess inmates for new clinical findings, such as deterioration of the inmate's condition.

**Compliance Status**: Noncompliance.

**Findings**

**Status Update:**

The Monitoring team did not receive a status update regarding access to care for the most recent monitoring period.

**Monitor's Findings:**

Current policy is that CCJ inmates' access medical care by submitting a written Health Service Request form that is available in English and Spanish. Health care staff is responsible for ensuring that sufficient numbers of forms are available on the housing units. Officers are to distribute the forms to inmates upon request. Lockable boxes with keys accessible only to health care staff have been installed on each housing tier so that inmates can confidentially submit their requests. Staff is to collect the forms daily and document the number collected on a log kept in the box. A CMT/registered nurse is to triage the form, determine the priority of the request and assess the patient in accordance with the urgency of the triage decision. Nurses are to utilize written nursing assessment protocols to guide nursing practice in conducting evaluations and making referrals. Clinical evaluations are to take place in a properly equipped examination room. Cermak is to develop a logging and tracking system for Health Service Requests. The Agreed Order requires that Qualified Medical Staff make and document daily rounds in isolation areas.

We evaluated inmate access to care by reviewing Health Service Request tracking systems, randomly inspecting health care boxes in each Division, reviewing completed Health Service Request forms (HSRs) and health records, interviewing staff and inmates and observing the sick call process.

We found that although improvements have been made in the availability and collection of Health Service Request forms, Cermak does not yet have the infrastructure in place necessary to ensure that inmates receive timely and appropriate health care. The infrastructure necessary to ensure adequate access to care includes:

- Comprehensive policies and procedures related to mechanisms for access to care (routine, urgent, etc).

- Nursing assessment protocols that are symptom-based (as opposed to diagnosis-based) and that provide guidance to staff regarding a systematic approach to the assessment process. The protocols should include measures that the nurse can independently take (e.g., three to seven day supply of over-the counter medications, etc.) and criteria for referral to a higher level provider.

- A nursing assessment and skills training program that teaches a systematic approach to patient evaluation, including obtaining a history of the chief complaint, performing a focused and pertinent physical assessment, formulating a relevant nursing diagnosis, and nursing plan. The training program is targeted towards staff that by scope of practice are permitted to conduct independent nursing assessments.

- Adequate numbers of medical equipped examination rooms that affords patient privacy.

- A tracking system for Health Service Requests (HSRs) that enables health care leadership to evaluate the timeliness and quality of care from the time the patient submits the request until resolution of the complaint.

- A quality improvement program that identifies deficiencies in access to care analyzes root causes and enables leadership and staff to develop an effective corrective action plan to improve the timeliness and quality of care.

We found inconsistencies across Divisions in the distribution, collection, tracking, triaging and disposition of health care requests and our review showed that inmates do not receive timely and appropriate access to care. These findings were supported by inmate reports of significant delays or not being seen in response to their health requests. We wish to note that some inmates expressed appreciation of staff efforts to improve the timeliness of services.

a. Jointly Provide Appropriate Accessibility

In each Division we conducted random inspection of boxes into which health care requests are placed. We found improvements in the availability of Health Service Request forms and with staff collection of forms since our last visit. We evaluated the extent to which inmates could confidentially submit their health care requests. However, we still found inconsistencies in the process across the Divisions.

In Division I, we found that each tier had Health Service Request forms available to inmates which is an improvement since our last visit. Random inspection of 11 tiers and showed

that sick call boxes were installed on each tier; however on two tiers boxes were broken and could not be locked. Each box contained a log that showed the number of health care requests collected each day for the period of 6/1 to 6/6/2011. The 11 logs showed that the boxes were checked each day but there were many days for which no Health Service Requests were collected, particularly on weekends. We inspected 55 pending request forms and found that most were submitted on 6/5 and 6/6, with a few submitted from 6/3 and 6/4/2011. However, staff did not consistently date the forms as to when they were received, which is important to assess timeliness of services.

In Division II, dorm 1, random inspection showed that all boxes had completed logs and no pending health request forms. Consultation with nursing staff revealed that 43 request forms were collected from the previous day, with all noted as having been triaged. A random review of triaged Health Service Requests revealed no correlation between the appointment documented on the form, the computerized schedule or the medical record documentation. According to nursing staff, it would be difficult to impossible to track a request from time of submission to disposition. Nursing staff confirmed there is no practice to notify the inmate as to the receipt or disposition of a form. We estimate that on this unit, nursing staff were referring 90% of medically related request to a primary care provider.

In Division II, dorm 2, first floor, a health care request box was positioned on the wall in the vestibule area. When checked, the box was empty but contained a completed log sheet indicating 10 request forms had been retrieved that morning. The Monitor was able to identify the 10 request forms and noted they had all been triaged; however, it was not possible to determine any status after the initial triage. In Division 2, Dorm 2, second and third floors the sick call request boxes were positioned on the wall in the vestibule area. When checked, the boxes contained no pending request forms but the log sheets indicated forms had been retrieved. Consultation with the clerk/scheduler for all of Dorm 2 revealed that 57 request forms were pending, dated 4/14 through 5/30/11. According to the clerk, all 57 requests had been triaged, with some inmates having already been evaluated. A review of the 57 forms indicated 16 with no triage disposition. Since there is no tracking log/system in place, it is virtually impossible to track a sick call request form from submission to provider contact. Based on conversations with staff, it appeared they thought retrieving the sick call forms and documenting such on the health request log was a tracking system and all that was required. Currently, there is no health care request tracking system for Division II, dorm 2.

Division II, Annex has been closed and detainees are no longer housed in this area.

Division III, Dorm 3 consists of three floors with six tiers. There is a sick call request box for each tier. A check of the boxes indicated no forms, but appropriately completed log sheets. Consultation with nursing staff indicated all the forms had been triaged and all the detainees

had been evaluated the same day. There is no health request tracking log in place, but the process was more organized and easier to follow.

In Division IV, random inspection of tiers found that officers had blank health request forms available to distribute to inmates, although in some tiers there were less than five forms available for distribution. Sick call boxes contained tracking logs, but on tiers I1 and J1 the logs showed that the boxes were not checked on 6/3 and 6/4/2011. Thus, the requirement for daily collection of health requests was not met.

In Division V, random inspection of five tiers showed that all had sick call boxes; however, as noted in our last report, some boxes were unlabeled as to their purpose. One correctional officer we interviewed did not know the correct procedure for inmate submission of Health Service Request forms and we again found completed forms placed on top of the grievance box instead of being placed in the health care box. This does not ensure confidentiality of Health Service Request forms. CMTs had filled out health request logs; however, for the period of 6/1 to 6/8, Division logs showed that on most days, zero forms were collected. On tier 2D, the tracking log showed zero forms were collected from 6/1 to 6/8. We entered the tier and asked a group of inmates how many had submitted a request in the month of June and four inmates raised their hands. This suggests that the log is not being accurately and contemporaneously completed.

Division VI has 24 sick call request form boxes. A random review of 50% of the boxes showed no pending request forms, but appropriately completed log sheets in each box. A random review of 30 health care request forms indicated they had each been triaged within 24 hours of receipt. Staff had face-to-face inmate contact within 72 hours or less of triage. As a point of clarification, NCCHC standards (J-E-07 Non-emergency Health Care Requests and Services) states that health care requests are to be reviewed (i.e. triaged) within 24 hours and the inmate seen by a qualified health care profession within the next 24 hours (72 hours on weekends).

In Division IX, we found that since December 2010, staff have collected and logged health request forms in a manner that complies with management expectations as well as the Agreed Order. At the time of the December site visit, a CMT performed this duty. We opened two of the boxes in Division IX (1A and 1B) and did not find any uncollected HSRs. The log used to record the collection was in the box and had been signed by staff daily. Each log showed that a total of six HSRs had been collected in the first seven days of the month. The previous report commented that the rate HSRs are submitted in Division IX is low; this continues to be the case. A review of the daily log of HSRs for the entire building from 6/1 through 6/6 showed low numbers of HSRs for a population of 1000 high custody men.

| Division IX: Health Services Request Form Log | | | | | | |
|---|---|---|---|---|---|---|
| Date | 6/1/2011 | 6/2/2011 | 6/3/2011 | 6/4/2011 | 6/5/2011 | 6/6/2011 |
| # of HSRs | 26 | 19 | 41 | 19 | 6 | 61 |

"In typical correctional systems, approximately 10% of inmates can be expected to request sick call on a daily basis…" Puisis, M.; *Clinical Practice in Correctional Medicine*, page 50. This Division should plan to review about 100 HSRs daily unless there is some other plausible explanation for low requests. As observed in our previous report, inmates in segregation continue to have impeded access to the request box. It also appears that inmates in Division IX do not have easy access to the forms either and must ask the officer and or the nurse for an HSR.

In Division IX, timely nursing assessment of inmates' health complaints has been impeded by failure to transport inmates and cancellation of nurse visits scheduled to take place in the dispensary. To further explore this issue, we requested data on cancelled visits. The form, Patient Appointment/Encounter Record, is filled with the names of inmates the nurse needs to see and a copy is given to custody so that inmates are escorted to the dispensary. These are handwritten lists and apparently do not appear in the scheduling system; therefore, are not captured in other "Cancellation/No Show" data kept by Cermak. The table at the end of this paragraph shows that the number of cancelled nurse clinics each month through April has increased and that the number of inmates whose care was delayed or rescheduled increased over the same time period.

| Division IX Failure to transport to the dispensary for nurse sick call | | | |
|---|---|---|---|
| Month | Occurrences | # of Patients | Reason |
| 12/2010 | 1 | 4 | No handcuffs |
| 1/2011 | 3 | 15 | No handcuffs x 2, level system conflict |
| 3/2011 | 4 | 17 | No handcuffs, inmates in gym/school, no reason given |
| 4/2011 | 8 | 62 | Officer not available, level system conflict, no reason given |

The records of three inmates who were on lists for nurse visits that were cancelled were reviewed. One was a cancellation on 4/19 after the officer had been called three times. This inmate was not rescheduled. Eleven days later he was seen as an urgent walk-in by the primary care provider and sent to Cermak ER the next day for an abscess on the abdominal wall. This was a delay in care and the ER visit was unnecessary because it duplicated the primary care encounter of the day before. The other two inmates were scheduled for nurse visits on 6/4,

which were cancelled due to a compound wide "lock down." Both these inmates had skin conditions which were addressed the next day by nursing staff. We recommend that each instance of failure to transport be reported and that the patient care encounter takes place within the next 24-48 hours. Each incident, the reason for not transporting and the date of the rescheduled encounter should be reviewed at the Interagency Health Care Quality Improvement Committee.

In Division X a registered nurse is assigned to handle Heath Service Requests, including completion of the logs and other required tracking documentation. This nurse is also a relatively recent transfer from Oak Forest Hospital and has extensive emergency room experience. We looked through the collection of Health Service Request forms the nurse was triaging that day. Compared to our last visit, many more requests are being triaged within 24 hours of receipt . However, the  interval before a face to face evaluation is still not timely. The boxes on the housing units in Division X were not examined by the Monitor's team during this site visit. The nurse administering medication distributed blank Health Service forms to the unit officer. Officers on two units were asked how many HSRs they had and in each case the officer had about six blank forms. Inmates interviewed on the housing unit reported that they had submitted multiple HSRs and had received no response. A few of these records were reviewed and verified the inmate's report.

Division XI had a nurse and CMT assigned to manage HSRs the day of the site visit. The CMT is responsible for the collection and logging of HSRs. However, we learned that inmates do not consistently submit HSRs in the boxes for collection by health care staff. Apparently, officers collect HSRs that are given to them and periodically forward these to Health Services. Review of the log verified periodic receipt of large numbers of HSRs compared to other days of the week. In fact, 75 requests had been received the Friday before the site visit and were still being processed the following Thursday. This practice builds in a delay in access to health care. In Division XI, correctional officers need to be reminded that HSRs they receive should be put into the metal box mounted on the wall outside the housing unit. While in Division XI we had the opportunity to have the kiosk demonstrated and understand that this technology might be used eventually to request health care attention. This technology would eliminate several redundant, non-clinical steps that delay access to health care attention now.

b. Cermak-Timely and Adequate Care

We found that patients do not receive timely and adequate care from qualified health staff following submission of their Health Service Requests. Nursing staff did not triage HSRs and evaluate patients in a timely manner. When nurses made referrals to clinicians, the referrals were often scheduled to take place weeks and sometimes months from the time the patient submitted the request.

The absence of a uniformly implemented health request tracking system limited Cermak's and the Monitors' ability to evaluate the timeliness of triage of health requests for the most recent interval monitoring period (December 2010 to June 2011). Consequently, the sample of HSRs reviewed was generally limited to those submitted just prior to or during the on-site review. Therefore, although we did find improvements in timeliness of staff triage of health requests, we cannot substantiate how recently the improvements took place during the recent interval monitoring period.

With respect to the adequacy of nursing/CMT evaluations, we found that the quality of nursing assessments varied widely. In some divisions (IX, X and XI) staff performed minimally adequate assessments. However, in other divisions (I, II, IV, and V) staff performed minimal assessments or none at all. In many cases reviewed, an encounter with a nurse or CMT was the equivalent of no care at all. Since licensed practical nurses and CMTs are not licensed to make independent nursing assessments, we believe they exceed their scope of practice in this role. The general quality of registered nurse assessments is also in need of improvement.

In many cases, rather than seeing the patient, the nurse/CMT made direct referrals to a provider, scheduling the patient to coincide with another previously scheduled appointment (e.g. chronic disease management), which may not take place for weeks or months. This practice routinely delays access to care.

Although nurses are expected to perform assessments that meet basic standards of nursing practice, the role of nurses in corrections is unusual and challenging. We believe that the generally poor quality of nursing assessments is due in large part to the failure to develop and implement clear expectations through a structured nursing sick call program that includes comprehensive policies and procedures, well developed nursing assessment protocols, an adequate nursing skills training program and ongoing feedback to the nurses through a quality improvement program. In addition, successful access to care also involves communication and collaboration between nurses and clinicians. Cermak clinicians can play an instrumental role in helping nurses to improve their knowledge and clinical assessment skills.

An anecdotal finding related to access to care is that we noted that clinician clinics are sometimes rescheduled. We were not able to document the frequency of rescheduled clinics; however, this appeared to contribute further to delays in access to care.

A description of findings by Division is described below.

In Division I, we reviewed 10 records and found that the registered nurse performed minimal examinations. For example, one patient complained of ear pain but the nurse did not examine his ear. The nurse referred the patient, who had a provider appointment scheduled one month later; this is not timely care. In another case, the patient complained of having a

sore on his leg. The nurse did not perform an assessment, rather simply noted that she gave the patient a band aid. Another staff member failed to assess a patient who complained of having a fractured hand that had not properly healed.

In Division IV, the Unit Manager's Daily Report contains data showing data regarding health care service utilization, including the number of health care requests collected and their disposition. Data from 6/1 to 6/6 showed that 136 health requests had been collected, but only 34 (25%) requests resulted in a face-to-face assessment. When we asked to see the pending health request forms, we were told there were none, which was surprising given these data. While it would be expected that some requests would not result in a face-to-face encounter (e.g. medication refills, non-urgent mental health, etc.), these data indicate that patients are not seen in a timely manner. For example, according to the report, on Wednesday 6/1/, 32 health requests were collected and nursing staff did not see any patients on this day. On Friday 6/3, 54 requests were collected and nurses saw only 10 patients.

In discussions with nursing staff, we learned that many health requests are forwarded directly to a provider. For example, a 45-year-old woman with a history of COPD, myocardial infarction, heart failure and stroke complained of having COPD and needed her inhaler. The nurse did not conduct a patient assessment but instead documented that the patient had a pending chronic disease appointment in 11 days. In another example, a 30-year-old HIV patient complained of peripheral neuropathy and the LPN did not assess the patient and a provider did not see the patient for 30 days. Nursing staff also reported that they forward health requests of patients with dental pain directly to dental staff without assessing patients and providing analgesia. This is not timely access to care and results in unnecessary pain and suffering.

In Division IX, an improvement made since the December site visit is the addition of a registered nurse responsible for the triage of HSRs as well as the face to face assessment. This nurse is a transfer resulting from closure of the Oak Forest Hospital and has extensive emergency room experience. Another improvement is that all health care staff assists with the assessment of these complaints, after completing other duties, and the result is that the response to HSRs is timelier than it was at the last site visit.

In April 2011, the registered nurse and CMT began conducting face-to-face assessments of inmates with health complaints in the housing unit. We observed the nurse performing face-to-face assessments on two of the housing units in Division IX. The nurse has a cart that has been supplied with blank HSRs, examination equipment and other medical supplies. She informed the officer whom she wanted to see and the officer escorted the inmate into the vestibule. The nurse interviewed the inmate, collected vital signs and assessed the inmate's complaint. She was observed to use a small interview room off the vestibule to examine three inmates. One had a dental complaint, another was having some numbness after an orthopedic

surgery and a third was requesting a mental health evaluation. The room she used was dirty and only contained a plastic chair.

The nurse's assessment of each of the inmate's complaints was generally appropriate given that there are no guidelines or protocols for the nurses to use in conducting these evaluations. It is, however, an inefficient use of nursing time. There were long waits between patients awaiting officer escort, she had to go back and forth to the cart for equipment and supplies, she had no solid surface to write on and she had no access to the EMR, so could not consult the patient's record nor document her assessment except on the HSR. If the assessment required an exam table, disrobing or more privacy than could be provided in the room off the vestibule, another appointment was necessary later in the dispensary. If any note was entered in the EMR as a result of the nurse visit to the inmate on the housing unit, then it is a "late entry" and duplicates any contemporaneous notes written during the encounter.

During the tour we were shown rooms designated on each floor that will be equipped as an exam/treatment room and used for nurse visits. Having an appropriately equipped, clean and private area to see patients on each floor will facilitate more timely access to health care attention than exits now in Division IX, as long as sufficient officers are assigned to escort inmates.

Twenty-eight HSRs submitted between February and June 6, 2011 by inmates in Division IX were reviewed. Half of these HSRs were not triaged the next day. Five of the 28 reviewed had not been signed or dated by the health care staff. Problems or concerns noted in the review of HSRs are:

- Many HSRs have multiple entries in different handwriting; it appears that information may be added to the HSR after the original nurse has written the initial evaluation.

- If nurse sick call is not timely, the nurse will still see an inmate even if they have already been previously seen by the primary care provider for the same complaint.

- Inmates are seen by the nurse even when they are making a request that isn't benefitted by a nursing assessment (an optometry appointment or a non-urgent request for mental health services).

- Assessment and treatment documented by the CMT on the HSR may exceed the scope of practice for paramedics.

In Division X, a nurse who transferred from closure of the Oak Forest Hospital and has extensive emergency room experience has been added to the staff and was responsible for Health Service Requests the week of the site visit. Inmates in this Division still do not receive

timely or appropriate access to care. For example, an inmate submitted an HSR dated 3/30 complaining that he fell out of bed and was having pain. The nurse noted that the inmate was to be scheduled for sick call the next week. The request was triaged four days later on 4/ 3, but the face-to-face assessment by a nurse did not occur for 12 more days, on 4/15 (or 18 days after the request was submitted). In the meantime, this inmate went on to submit three more requests regarding the same complaint. Each of these required the nurse to triage, perform a face-to-face evaluation and make a decision about what to do in response to the complaint. The standard of care would be to complete the nursing assessment no later than Friday April 1, 2011.

We observed the nurse using the computer to review patient care information while triaging HSRs and reviewed some of the entries the nurse made in the electronic record. After evaluating the complaint on paper and completing the logs that have already been described, the nurse scheduled inmates for face-to-face evaluation. These evaluations are performed in an exam room in the dispensary in Division X. Use of the exam room is an improvement over the practice of seeing patients at a table out in the open as described at the last site visit.

We reviewed the stack of HSRs the nurse was scheduling for face-to-face evaluation. In several examples, a primary care provider had seen the inmate for the complaint in the time that had elapsed since the HSR was submitted and yet the nurse was required to do the face-to-face evaluation. These are unnecessary nurse encounters and further burden the system.

A few patient records were reviewed in Division X and result in the same conclusions as Division IX. Nurses are more diligent in documenting vital signs on the HSR; but until a reasonable set of nursing protocols are in place, there is no guideline to evaluate the adequacy of the nurse assessment or disposition of the complaint. The nurse assigned to sick call as well as other members of the nursing staff described how hard they work on HSRs and expressed the desire to resolve ongoing problems. It is demoralizing to require face-to-face evaluation when it is so clearly unnecessary; to duplicate documentation from the EMR to the HSR and visa versa; to spend time filling out logs and tracking sheets before seeing patients and assess patient complaints with no guidelines or protocols.

In Division XI, a nurse is assigned to triage HSRs and both the nurse and a CMT review the EMR and complete the face-to-face evaluations. Face-to-face evaluation takes place in an examination area in the dispensary. The nurse demonstrated her knowledge and skill in use of the EMR to note patient information when evaluating Health Service Requests and in charting nursing encounters.

Six patient records were selected from among the Health Service Request Log for review. Triage took place the next day in only one of the examples reviewed. The time from

receipt of the HSR to triage ranged from two to as long as 14 days. The patient who waited 14 days before triage had a complaint of a sharp pain in his heart and wrote that he had heart problems before incarceration. The nurse took a history of the patient's complaint and obtained vital signs but did not examine the inmate. He was, however, seen within the next hour by a primary care provider, who completed a brief exam including EKG, ordered labs, omeprazole and diet modification with a return visit two weeks hence. The standard of care would have been for the nurse to assess this patient the same day the HSR was received. Again, the nurse had no protocol to guide the assessment of a complaint of chest pain, to determine disposition or urgency.

Of the remaining five cases, the nurse had only assessed one patient, an inmate who complained of a skin abscess. By the time the nurse saw him (seven days later) the chief complaint was described instead as an injury to the right toe and hypertension. At the primary care appointment two days later, he was diagnosed with asthma and dry skin. In this chart review there was no relationship between the original complaint, subsequent health care encounters and resulting treatment. Other patient complaints from this sample of six which should have been assessed by the nurse as of 6/9/11 and had not include an inmate with severe itching rash, an inmate with a toothache and swelling and an inmate who was concerned about the presence of blood in his stool.

c. d. e. f.  Sick Call

- <u>Health care request forms are written in both English and Spanish</u> As noted in our last report, we observed that paper Health Service Request forms are written in both English and Spanish. However, it is not clear that Spanish speaking health care staff is readily available to inmates to translate and address their complaints.

- <u>Confidential collection</u> Correctional and health care staff do not ensure that inmates submit their requests into the confidential locked box accessed only by health care staff. Instead, we found that inmates still hand their forms to officers (Division XI) or place them on top of mail/grievance boxes (Division V).

- <u>Logging and tracking seven days a week</u> We found improvements in staff logging of the number of forms collected daily. However, in some housing units we found a high number of days in which staff documented that zero forms were collected. In some cases, inmates in these same tiers reported to us that they had in fact submitted forms. This raises questions regarding the accuracy of the logs. Health care leadership has not developed and implemented a health care request tracking system that contains all elements in the Agreed Order. This does not enable Cermak leadership to readily evaluate timeliness of access to care.

- <u>Timely response by qualified medical staff</u>  As noted above, the absence of a tracking system does not facilitate evaluation of timeliness of care from time of submission of a health complaint until its resolution. Our review showed improvements in staff triage of Health Service Requests in selected Divisions. However, nurses/CMTs did not consistently document the date the health request was received or the urgency of the triage decision (routine, urgent). And, although HSR triage was timelier, nurses/CMTs did often did not assess the patient the next business day, but instead directly referred patients to a higher level provider or another service, often delaying patient evaluation for up a month or even longer. Moreover, the quality of nursing assessments continues to be poor or minimally adequate. This can be attributed to lack of adequate numbers of registered nurses who have been trained and certified in physical assessment skills and use of nursing assessment protocols.

- <u>The reason for the request and disposition is documented in the health record</u> Nurses/CMTs either document on the HSR or in the electronic medical record (EMR). This should be improved with an electronic version of the sick call request form soon to be implemented in the electronic health record.

- <u>System to screen requests within 24 hours and prioritized</u> As noted above, nurses/CMTs do not consistently document the date of receipt on the HSR or the urgency of the triage disposition. Staff also does not consistently date legible signature and credentials.

- <u>Cermak-Sick Call Takes Place in a Clinical Setting</u> We observed some inconsistencies with respect to where nursing sick call is performed. In Division IX, nursing sick call occurred in a vestibule in the housing unit. In Division V, the nurse conducted sick call at a desk in the middle of the room.

g. Cermak-Daily Isolation Rounds

The agreement requires that Cermak ensure that Qualified Medical Staff make daily rounds in isolation areas to give inmates in isolation opportunities to discuss medical and mental health concerns with health care staff with privacy. During rounds, health care staff is to assess inmates for new clinical findings, such as deterioration of the inmate's condition. This standard is not met. The Cermak policy #E-09, Segregated Inmates, is unclear with respect to the frequency of segregation rounds by medical and mental health staff. In any event, the policy does is not consistent with the requirements of the Settlement Agreement.

In Division IV, segregation rounds are conducted by a CMT with no established schedule, such as Monday-Wednesday-Friday. We interviewed the CMT who reported that she conducts

rounds depending on her schedule. Logs of segregation rounds for the month prior to our site visit showed that rounds were not being made three times weekly. This arrangement is person dependent rather than being a true system.

We did not observe segregation rounds in Division IX during this site visit but understand from Pia Gustafson, Nursing Coordinator that they are done the same as in Division XI.

In Division X, we interviewed the CMT/paramedic responsible for conducting segregation rounds. With one exception, the process that is in place in this Division is consistent with agency policy and procedure # E-09. This exception is that the staff person only interacts with those inmates who have a health concern. The policy and procedure on page 3, first paragraph, states that each inmate will be asked whether they have any health concerns. NCCHC accreditation standards require some interaction and assessment of each inmate, not just those who have health concerns. The NCCHC standard would be met as well as agency policy and procedure if health personnel affirm that an inmate does not have a health concern, even if they not made such a concern known by the typical means.

We incidentally note that the requirement in the Agreed Order exceeds NCCHC requirements (See NCCHC Standards for Health Service in Jails J-E-09, Segregated inmates) in which the frequency of rounds is based upon the degree of isolation. We recommend that the parties reevaluate the requirements of the Order so that the frequency of rounds does not exceed three times weekly. After the discussion with the parties based on that outcome, Cermak leadership should insure that the policies and the practice are consistent with the outcome of the discussion with the parties.

**Monitor's Recommendations:**

1. Cermak health care leadership should fully develop the infrastructure necessary to successfully role out a nursing sick call program. A key component of the plan is the development of an initial set of nursing assessment protocols, a training curriculum and plan for phased implementation. We request that this plan is developed by 9/1/2011 and submitted to the Monitor for review prior to implementation. The Monitor is available for assistance as requested.

2. Implement the electronic Health Service Request and develop templates using PowerNote for documentation of nursing assessment. Eliminate entries by multiple personnel on the paper HSR.

3. Following implementation of the plan, Cermak should perform CQI studies regarding the timeliness and quality of nursing assessments and success of nurse to clinician referrals.

4.   CCDOC and Cermak should continue to jointly monitor inmate access to Health Service Request forms and the ability to confidentially deposit them in a box accessed only by health care staff. Broken boxes should be repaired and/or replaced. All health care boxes should be labeled.

5.   CCDOC and Cermak should orient inmates regarding the access to care policy and procedure upon arrival.

6.   Correctional officers should be retrained regarding the proper handling of Health Service Requests.

7.   CCDOC/Cermak should evaluate the provision to identify inmates who have a need for language interpretation and/or communication assistance and to ensure that there are sufficient mechanisms in place to provide that assistance during each patient care encounter.

8.   In addition to statistical logs that note the number of Health Service Request forms collected on the tiers each day, Cermak should establish a tracking system that tracks each request from time of submission until final disposition, including: the date of the request, date received, reason for care, the disposition of the request including urgency, the date the patient was seen, the name of staff that saw the patient, whether follow-up care is needed and the date of the next appointment. The most efficient way to accomplish this may be through the electronic health record; however, it should be done as soon as feasible.

9.   Cermak should ensure that there are sufficient numbers of RNs assigned to each Division to implement the sick call policy and procedure.

10.  CCDOC and Cermak should ensure that nurses have adequate space and medical equipment and supplies to conduct patient assessments and to provide patient privacy during interview and examination.

11.  Establish clear policy and procedure for triage and evaluation of Health Service Requests. Define the conditions that do not require a face-to-face evaluation.

12.  Nurse Managers should provide close clinical and programmatic supervision of the nursing staff responsible for assessment and triage of Health Services Requests.

13.  CCDOC and Cermak should ensure that segregation rounds occur and are documented daily. Every inmate in segregation should have contact with a Health Services professional as part of rounds, not just those inmates with a request. Develop a form or

template to electronically document segregation rounds. The parties should consider modifying the order to meet NCCHC guidelines regarding the frequency of rounds.

14. CCDOC and Cermak should resolve impediments to timely requests for health care attention by inmates in segregation.

15. Establish mechanisms so that each instance of failure to transport is reported and that the patient care encounter takes place within the next 24-48 hours. Each incident, the reason for not transporting and the date of the rescheduled encounter should be reviewed at the Interagency Health Care Quality Improvement Committee.

16. Until Health Service Requests can be responded to timely, Cermak must put measures in place to manage accumulating backlog. These measures may include not requiring a face-to-face evaluation if the inmate has been seen for the same complaint by a primary care provider since the request was submitted, daily reporting of accumulated backlog and with action taken to eliminate backlog, assignment of primary care staff to perform face-to-face evaluation, etc.

## 55. Follow-Up Care

a. Cermak shall provide adequate care and maintain appropriate records for inmates who return to the Facility following hospitalization or outside emergency room visits.

b. Cermak shall ensure that inmates who receive specialty, emergency room, or hospital care are evaluated upon their return to the Facility and that, at a minimum, discharge instructions are obtained, appropriate Qualified Medical Staff reviews the information and documentation available from the visit, this review and the outside provider's documentation are recorded in the inmate's medical record, and appropriate follow-up is provided.

**Compliance Status:** Substantial compliance.

**Findings**

    **Status Update:**

    **Monitor's Findings:**

This element requires that Cermak maintain appropriate records for inmates who return to the facility following hospitalization or outside emergency room visits. We reviewed 10

records of patients who went offsite on an emergency basis and all relevant records were available in the electronic medical record. We also reviewed transport issues and found that transportation to outside hospitals is working quite well.

When patients return from their offsite care, the offsite records are available timely and in the records we reviewed, follow up occurred as indicated. These findings are consistent with a compliance status of substantial compliance.

**Monitor's Recommendations:** None.

## 56. Medication Administration

a.  Cermak shall ensure that treatment and administration of medication to inmates is implemented in accordance with generally accepted correctional standards of care.

b.  Cermak shall develop policies and procedures to ensure the accurate administration of medication and maintenance of medication records. Cermak shall provide a systematic physician review of the use of medication to ensure that each inmate's prescribed regimen continues to be appropriate and effective for his or her condition.

c.  Cermak shall ensure that medicine administration is hygienic, appropriate for the needs of inmates, and is recorded concurrently with distribution.

d.  Cermak shall ensure that medication administration is performed by Qualified Nursing Staff.

e.  When Cermak prescribes medication to address an inmate's serious mental health needs, HIV or AIDS, or thromboembolic disease, Cermak shall alert CCDOC that the inmate in question is on a flagged medication. If the prescription is terminated during an inmate's stay at the Facility, Cermak will notify CCDOC.

f.  When CCDOC receives notice that an inmate is on a flagged medication, CCDOC shall include notation of a medication flag in the inmate's profile on the Facility's Jail Management System.

g.    When an inmate with a medication flag is processed for discharge at the Facility, CCDOC shall escort the inmate to designated Cermak staff in the intake screening area of the Facility for discharge medication instructions.

h.    When CCDOC escorts an inmate with a medication flag to Cermak staff during discharge processing, Cermak staff shall provide the inmate with printed instructions regarding prescription medication and community resources.

i.    Each morning, CCDOC shall provide Cermak with a list of all inmates with medication flags who were discharged the previous day.

j.    Within 24 hours of discharge of an inmate with a medication flag, Cermak shall call in an appropriate prescription to the designated pharmacy on the Stroger Hospital campus to serve as a bridge until inmates can arrange for continuity of care in the community.

k.    CCDOC shall ensure that information about pending transfers of inmates is communicated to Cermak as soon as it is available.

l.    When CCDOC has advance notice and alerts Cermak of the pending transfer to another correctional facility of inmates with serious medical or mental health needs from detention, Cermak shall supply sufficient medication for the period of transit. In such cases, Cermak shall prepare and send with transferring inmates a transfer summary detailing major health problems and listing current medications and dosages, as well as medication history while at the Facility.

m.    CCDOC shall ensure that the transfer summary and any other medical records provided by Cermak will accompany inmates, or will be made available electronically or transmitted by facsimile, when they are transferred from the Facility to another institution.

**Compliance Status:** Partial compliance.

**Findings**

    **Status Update:** No status update was provided.

    **Monitor's Findings:**

To evaluate medication administration we reviewed the following documents:

- the Interagency Agreement Between the Office of the Sherriff of Cook County and the Cook County Health and Hospital System,

- the draft Cook County Interagency Directive on Medication Distribution, minutes of the Inter-Agency Health Care Quality Improvement Committee (January, March and May 2011),

- minutes of the Pharmacy & Therapeutics Committee (January and March 2011),

- agenda and notes from the Nursing Process Meetings (January through May 2011),

- policies and procedures in draft and final form relating to medication orders, medication delivery, documentation of medication delivery and discharge planning.

We also inspected medication storage areas including stock medications and narcotic control; observed the medication administration process (Divisions II, IV, IX, X, XI); reviewed records, reports and logs, including medication administration records; and interviewed staff and inmates.

We found significant improvement in the medication management and delivery and staff is to be commended for these improvements. There are however many more improvements still to be put in place. As a result there are still problems related to medication management, administration, continuity and documentation.

a. Cermak Standard of Care

Cermak has implemented Computerized Provider Order Entry so orders are now legible and submitted instantly to the Pharmacy for verification and filling. Additional officers are being made available within each Division to manage inmates during medication delivery. Cermak leadership visited the Dallas County Jail to look at how medications were managed within this system and have applied information gained to resolve issues back at Cermak. Packaging robots, Pyxis machines and Accuflow still need to be procured, installed and integrated with PharmNet and CPOE before the system will be fully functional and accountability for prescribed treatment achieved.

The following is a description of each Division's status on implementation of standards for medication administration.

Cermak 2 and 3 are inpatient areas and, as a result, all medications are administered by licensed nursing staff. Nursing staff on Cermak 3 have access to a fully functional electronic

health record including e-MAR. Cermak 2 has the same EHR except the e-MAR had not been implemented. It was expected to become available on Cermak 2 this summer.

Observation of medication administration on several units indicated administration at the appropriate times with proper identification of the patient, explanation of medication and, if necessary, the taking of vital signs prior to administration and appropriate documentation on either the e-MAR or paper MAR.

Accountability of controlled medications, needles/syringes/tools and medication refrigerator temperatures were documented and accurate on each unit. No outdated medications were identified.

**Division II**

Dorm 1 is a minimum security, general population unit with a total of 380 beds on three floors. There are only a "handful" of administered medications with all others being keep-on-person (KOP). We did not observe actual nurse administered medications; however, a review of MARs indicated the appropriate documentation and the appropriate times.

Documentation of the delivery of "keep-on-person" (KOP) medications to the patient was inconsistent. Individual staff appeared to use one method consistently but there was no uniform method of documentation used by all staff.

Dorm 2 consists of three floors with four dorms per floor and includes a "step-down" mental health area for inmates discharged from Cermak 2. On Floors 1 and 2 the nurse administers all medication and floor 3 houses inmates on a both nurse administered and KOP medication.

Observation of nurse administered medications in the morning indicated improvement over the two previous inspections. On floor 1 and one dorm of floor 3, the medications were administered within the appropriate two hour time-frame. There was appropriate security staff involvement, and the nurse appropriately identified the patient, administered the medication, performed mouth checks and documented the medication administration.

On floor 2, where there are four dorms, two nursing staff were assigned to administer medications. Even though the two nurses reported for duty at 7 am, medication administration did not begin until 9:15 am. Since this is a mental health step-down unit, the medication load is heavy, and the medications frequently change. Nursing staff reported, due to the frequent medication and dosage changes, they receive a large number of labels every day which have to be affixed to the MARs before medication line can begin. The use of these pharmacy generated labels is to replace transcription of orders by hand on to the MAR.

Between the two nursing staff members, it took until 10:45 am to pass medications for the four dorms. Observation indicated appropriate security involvement, with the nurses appropriately identifying, administering, conducting "mouth checks" and documenting the medications.

When medication administration was completed on second floor, the nurses had to go to the third floor to complete three dorms, which took until between 11:30 and 11:45 am. There were approximately 20 patients on TID medications, which meant their morning and early afternoon doses would be given in close proximity.

Detainees housed on the third floor no longer line-up in the stairway to the second floor to receive their medication. Nursing staff administer the medications on the third floor. On this floor, a room has been identified that nursing staff use to prepare medications and store the medication cart when not in use. It was reported that final renovations to this area would be completed in the near future.

Observation indicated significant improvement in the security involvement during medication lines. Nursing staff did a good job identifying, administering, verifying and documenting medication administration. If the medication lines on second floor could have begun shortly after 8 am, administration of the medications could have been completed within the appropriate timeframe.

Annex has been closed and no longer houses any detainees.

Dorm 3 is a minimum/medium general population dorm consisting of three floors with nine tiers. There is no dispensary and all medications are KOP. As with Dorm 1, there is inconsistency in the documentation of delivered KOP medications.

Dorm 4 is a minimum security, general population inmate worker dorm. All medications for inmates in this dorm are delivered for KOP by dorm 1 staff. Again, there is inconsistency in the documentation concerning the delivery of the KOP medications.

**Division IV**

This Division houses women of all classification levels. Nursing services are available 24 hours a day seven days a week. Medications are both nurse administered dose-by-dose and delivered for inmates to KOP. Since the last monitoring visit in December 2010, improvements have been made in the medication administration process.

In this Division, stock medications are stored in cabinets and on medication carts. We compared the Pharmacy approved list of stock medications with those that were available in the cabinet and found that many were not present. The shelves are not labeled with the names

of medications, so staff is unable to easily identify what stock medications should be available. Staff reported that pharmacy staff is responsible for checking the stock supply. A random check of stock medications showed that none were expired. However, we found vials of medication (e.g., lidocaine) that were initialed as having been opened in November 2010 that should have been discarded. This suggests there is not adequate monitoring of the medication cabinet.

We also checked narcotic/controlled substances counts against logs and found that the counts were inaccurate. Staff reported that nursing staff had removed controlled substances from the cabinet in anticipation of administering them during the morning medication administration but had not signed out the medications to specific patients. This does not provide real time accountability for controlled substances.

We observed three different nurses administer medications on multiple tiers. Each nurse was very professional in her approach to patients and the medication administration process. Nurses prepared their medication carts in advance, which contained essential items for medication administration (e.g., MARs, hand sanitizer, cups and water, etc.).

During medication administration, tier officers were present and assisted nurses with the medication process by announcing medication administration to inmates and maintaining order. To reduce interruptions and the potential for medication errors, nurses wore green safety vests to alert staff and inmates that they should not be interrupted during the process. On some tiers, officers made inmate identification badges available to nurses to positively identify inmates. When ID badges were not used, the nurse had the inmate state her name, ID number and in some cases their date of birth. Nurses prepared medications and documented onto the MAR at the time of administration.

There are opportunities for improvement. Officers did not uniformly make ID badges available on each tier for nurses to positively identify inmates in accordance with the new procedure. Nurses still report some issues with access to inmates as a result of the "half-in/half-out" security practice in which half the inmates are in their cells and half out of their cells at medication administration. Nurses must often come back later to administer medications to the half-in group. This may be problematic particularly for inmates on three times daily medications. Officer escorts were recently increased but it is not yet uniform, particularly on the weekends.

Nurses still administer some medications (e.g., mental health, antihypertensive, etc.) from large bottles of stock medications kept in the medication cart instead of pharmacy dispensed patient-specific medications. We noted that there are multiple stock bottles of the same drug in different dosages. The use of multiple stock medications, in combination with the

fact that nurses were observed to work very quickly, increases the potential for medication errors.

Another practice that is problematic is that nurses sometimes prepare medications using only the patient's blister-pack medication, rather than comparing each blister-packed medication label to the patient MAR. This is potentially problematic as the MAR may show that the medication dosage has been changed, but the new medication may not yet have arrived. It is also problematic if, for example, the patient has six medications due on the MAR, but only five medication blister packs are available. The nurse may miss a medication that is due the patient. Moreover, nurses were observed to document onto the MAR at the very end of the process, instead of as they prepared each medication. This poses a risk that they will document administration of a medication that was not given.

Finally, neither the nurse nor correctional officers consistently performed oral cavity checks when administering medications.

**Division IX**

This Division houses inmates who are classified maximum custody or who are on segregation status. The morning round of nurse administered medication was observed. The time it takes to administer medication in this building has been reduced, but it still takes two and a half to three hours to complete one tower. Evening medication was reported to take the same amount of time. The nurse administering medication in this unit works a 12 hour shift, so is responsible for both the morning and evening medication rounds.

The nurse did not wear a safety vest as is used in the other Divisions. The nurse did prepare the cart in advance and proceeded to each unit in an expeditious and efficient manner. The nurse was escorted by an officer during medication rounds. Correctional officers on the unit provided responsive and thorough assistance, with the one exception of an officer on 3F who appeared to question whether medication administration would be allowed. This was apparently either an officer newly assigned to the unit or just covering and unfamiliar with the medication administration process.

Verification of inmate identity has not changed since the last site visit. The MARs were used to account for inmates who were not present on the unit to receive medication rather than a list prepared by Cermak. No provision has been made to ensure that inmates receive medication before going out to court or track who will be away from the Division when medication is normally administered. The nurse did administer medication to a few inmates who were encountered while being transported elsewhere, but this was haphazard rather than a planned activity.

Since the last site visit, practice in this unit has changed so that inmates are brought out of their cell to receive medication so that the nurse is able to observe the patient's condition and discuss medication concerns with slightly more privacy than before. Medication safety and efficacy has been improved as a result of these changes.

No issues were found with accountability for controlled substances, storage of medication or documentation of medication on the MAR.

## Division X

This Division provided evidence of efforts to implement and manage medication administration. Two nurses are assigned to administer "dose by dose" medication and the time it takes to complete medication rounds has been reduced to about two and a half hours. Each nurse had an officer assigned to assist with medication administration. Neither officer had received any instruction about what they were to do when assisting with medication administration. Each officer varied in what they did to assist. The inmates also were challenging new rules about how medication was to be administered. We recommend that the Interagency Directive be finalized and the officers trained accordingly. We also recommend ongoing communication by both CCDOC and Cermak with inmates about the changes in how medication is to be administered.

Medication administration is conducted in a manner that resembles the draft Interagency Directive, in that the housing officer assists in getting inmates ready for medication administration and controls unit activity and the medication officer supervises and manages inmates at the medication cart. The nurse and the officer used the inmate's identification card and MAR to independently verify identify before medication administration and each officer checked the inmate's mouth to ensure that the medication had been ingested. The MARs were reviewed by the nurse and housing officer before leaving the unit to account for the presence of every inmate who was to receive medication.

The medication cart contains both stock medication bottles and patient specific medication packaged in unit dose. Searching through various stock bottles for the correct medication and dosage contributes to the time it takes to administer medications and continues to be a potential for medication error and an adverse event.

No issues were found with accountability for controlled substances, storage of medication or documentation of medication on the MAR.

## Division XI

In this Division one nurse was observed delivering KOP medication and another who had just finished nurse administered medication rounds was interviewed. The MAR of an inmate on TID medication was reviewed and when the nurse was asked when the inmate would receive the noon dose, she said that she gave it to him with the am dose to take later. The noon dose was documented as given even though it was before time and in fact the nurse did not observe the inmate ingest the dose. This is a violation of Policy and Procedure E-02.3, Items 10-12 which was posted a month ago. It is a good example of the implementation challenges related to correcting problems with medication administration. We recommend training, verification of knowledge and close supervision of staff as policy and procedure related to medication delivery is put in place.

Inmates who are out to court or away from the Division (work assignment) do not receive their medication if staff is not on duty. We had a lengthy discussion about this and delivery of KOP medication with the two nurses. The normal cycle fill day for Division XI is Thursday. If the inmate works, then he leaves before the nurses are on duty and returns after the nurses leave for the day. In this case the inmate will not receive his KOP medication until Sunday, which is a day that the inmate does not work. The nursing staff was quite candid and conveyed how hard they try to get the medication to the inmates before Sunday. Arrangements need to be made so that inmates receive their medication as ordered. Work hours and or schedules of inmates and/or nurses need to be adjusted or some other arrangement made so that inmates receive medication that is ordered. Continuation of current practice in Division XI is not acceptable.

No issues were found with accountability for controlled substances or storage of medication.

**Division XVII**

In this Division, staff reported issues related to medication continuity. When patients transfer to this Division, if they are on KOP medication there is no problem with medication continuity. However if they are on nurse administered medications then there are delays in receiving medications or MARs and it routinely takes 48-72 hours for medications to arrive at their Division. For example, on 5/28/2011, a pregnant hypertensive patient ordered Nifedipine, but as of 5/31/2011 she had not received her first dose of medication. Although Policy and Procedure E-02.2 allows and instructs nurses on how to give medication before the label arrives, Cermak staff on the unit understood the opposite; that even if the medication were available it cannot be administered without a MAR that has a pharmacy printed label. Policy and Procedure E-02.2 was recently posted in final form (May 2, 2011) and staff are apparently not yet aware of its detail.

As noted above, currently there is no stock supply of prescription medication in Division XVII, although there are stock supplies of medications in other Divisions. We discussed this with pharmacy staff, who reported rapid turnaround time for dispensing prescriptions and an effort to exert greater control over stock supplies of medications as the rationale for not having a stock supply in Division XVII. There are plans to install Pyxis machines in the Divisions later this year to provide timely access to medications. In the meantime, however, some patients with sexually transmitted infections, who could be treated were medications readily available, will be released without treatment. We recommend that until Pyxis machines are installed in each Division, that the standardized list of stock supplies of medication is sufficient to provide medication continuity for patients with serious medical conditions, TB infection/disease and sexually transmitted infections.

**Division I, III, V, and VI**

These Divisions house inmates who receive medication to KOP. These medications are delivered to inmates by RNs, LPNs or CMTs. With the exception of Division VI, documentation of delivery of KOP medication, while improved, is still inconsistent with Policy and Procedure E-02.2 and sometimes was so illegible it was not possible to ascertain what medication had been received.

b. Cermak Accurate Administration and Maintenance of records.

Cermak and CCDOC have developed an interagency directive on medication distribution that at the time of the site visit was still in draft form. The draft was reviewed and is sufficient to guide the agencies in fulfilling their obligation to provide delivery of medication as ordered by the prescriber. It needs to be finalized and implemented. We recommend that the process of medication delivery be audited using an observation tool derived from the Interagency Directive. Successful implementation requires evidence that day to day practice is consistent with the Interagency Directive.

The Pharmacy Director provided the following Cermak policies and procedures for review. Each were approved on 4/20/2011 and posted 5/2/2011.

D-02.1 Medication Orders: Defines how orders are placed within the computerized provider order entry system (CPOE), sets standards for maximum order duration and how medication may be dispensed and generates medication renewal reminders to clinicians.

D-02.2 Order Verification and Medication Dispensing by Pharmacy: Describes the process used to verify prescription orders, prepare labels and package medication for distribution. Provides direction and some suggestions to pharmacists about checking the EHR and other clinical references to identify contraindications and improve safety and efficacy.

Directs when contact or consultation with the prescribing provider is needed prior to dispensing and how verified medication is dispensed.

D-02.3 Medication Distribution: Closely matches the interagency directive on Medication Distribution. Also addresses briefly how keep-on-person and insulin are delivered to the patient. Establishes timeframes for medication delivery and defines roles of Cermak and CCDOC staff.

D-02.4 Medication Administration Record: Provides instructions about how orders are recorded on the Medication Administration Record and how to document receipt of KOP medication and documentation of medication administered by a nurse. Requires retrospective audit of MARS be submitted to the Director of Patient Care Services.

These policies and procedures comply with the content requirements listed in item (b). The observation of "dose-by-dose" and "keep-on-person" medication as well as medication related documentation by the monitors during this site visit found multiple instances where the actual staff performance was not consistent with these newly posted policies and procedures. It is our conclusion that implementation has not yet been sufficient to bring actual performance into compliance with these directives. Policy and procedures will require additional revision to reflect changed procedures resulting from the addition of packaging robots, Pyxis and e-MAR. Additional subjects which should be addressed in policy and procedure but which were not provided or covered in the material reviewed include narcotic control, emergency or back up stock inventory, and control and pharmacy inspection of medication storage.

c. Cermak Hygienic, Appropriate and Concurrently Recorded

Medication administration was observed to be hygienic. During the site visit the Monitor's team found instances where the manner in which the nurse prepared and documented medication administration onto the MAR increased risk of medication error (Division IV). We noted in all Divisions many MARs with two or three blank spaces each month indicating the nurse failed to document an administration status (administered, refused, etc.) for these times. This may be a result of nurses not reconciling the MARs at the end of each medication administration, or the intent to administer the medication at a later time due to the patient being unavailable and failing to do so. These blank spaces are omissions and should be reported as medication errors and monitored under the auspices of the quality improvement program. We also noted in all Divisions that documentation of the delivery of "keep-on-person" medication was inconsistent with the directions in Policy and Procedure E-02.4 or in some cases was illegible.

Medication administration that was not appropriate for the needs of inmates consists of practices that are unsafe or result in inmates not being available, compressed or lengthy dosing

intervals and delays or discontinuity in medication administration. In Division IV, nurses reported that access to inmates on "half-in" is impeded, resulting in medication not being received timely. Access in Division IX has improved, with inmates in segregation or high custody being brought out of their cells for medication administration. This replaces the unacceptable practice of administering medication through the cell window or cuff port.

Formulary management and review of prescribing practices is reducing the complexity and volume of medication to be administered (see Dr. Metzner's report pages 9-10). The amount of time nurses spend preparing to administer medication has been reduced and medication delivery is generally more timely. However in Division II, Dorm 2, medication delivery was delayed the day we observed the process by the volume of new and revised orders that needed to be recorded on the MAR. The result was that morning medication administration was not completed until 11:30-11:45 am. Patients in Division II had noon medications administered too close to the am dose. In Division XI patients on TID medication received their noon dose when they were given their am dose (a clear violation of Policy and Procedure E-02.3).

The following table was developed from a list of TID orders by provider as of 6/9/2011 that was provided by the pharmacy. Patients on TID medication who were housed in the Cermak inpatient units were excluded. We recommend that Cermak examine variation in prescribing patterns and modify practices that do not have clear clinical indication. We also recommend that policy and procedure be revised to clearly instruct staff how to ensure correct dosing intervals when patients must receive medication three or more times a day.

| Number of Patients on TID Medication Prescribed By a Provider | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Division I | Division II | Division III | Division IV | Division IX | Division X | Division XI | Total by Provider |
| Provider 1 | | 2 | | | | | | 2 |
| Provider 2 | | | | 1 | 1 | 2 | | 4 |
| Provider 3 | | | | | | 1 | | 1 |
| Provider 4 | | 1 | | | | | | 1 |
| Provider 5 | | | | | 4 | 1 | | 5 |
| Provider 6 | | | | | | 1 | | 1 |
| Provider 7 | | | | | | | 1 | 1 |
| Provider 8 | | | | | 1 | 1 | | 2 |
| Provider 9 | 1 | | | | | 1 | | 2 |
| Provider 10 | | | | | | 8 | 1 | 9 |
| Provider 11 | | 1 | | | | 1 | 1 | 3 |
| Provider 12 | | | | | | 1 | 1 | 2 |
| Provider 13 | | | | 1 | | | | 1 |
| Provider 14 | | | | | 1 | 17 | | 18 |
| Provider 15 | | 1 | | | | | | 1 |
| Provider 16 | | 1 | | | | 1 | | 2 |
| Provider 17 | | | | 7 | | | | 7 |
| Provider 18 | | | | | | 1 | | 1 |
| Provider 19 | | | 1 | 2 | | | | 3 |
| Provider 20 | 1 | | | | | | | 1 |
| Provider 21 | | | | 2 | | | | 2 |
| Provider 22 | | | | | | 6 | | 6 |
| Provider 23 | | 3 | | | | | | 3 |
| Provider 24 | | | | 1 | | 1 | | 2 |
| Provider 25 | | | | | | 3 | | 3 |
| Provider 26 | | | | | | 1 | | 1 |
| **Total by Division** | **2** | **9** | **1** | **14** | **7** | **47** | **4** | **84** |

Interviews with staff and inmates brought forward concerns about delays in starting medication and lapses in medication continuity (See also Dr. Metzner's report pages 14-16). Review of Medication Administration Records also verified these two concerns.

Lapses in delivery of HIV medication caused nursing coordinators to check that medications were available for every patient on a weekly schedule. Review of health records showed that HIV patients experience multiple lapses in HIV medications, sometimes lasting weeks. In one example, in December 2010 the HIV provider saw a 29-year-old severely immunosuppressed patient who had not received his medications since being transferred from Division VI to Division XI. When the physician saw him again in January 2011, the patient

reported that his medications had lapsed for five days. In February 2011, the patient continued to report lapses between refills of medications. The provider attributed the patient's decline to lapses in HIV therapy. In another example, in April 2011, the HIV physician saw a 28-year-old HIV patient who reported multiple disruptions in HIV medications. In addition, he had been prescribed the combination drug Truvada (which is a combination of Emtriva and Tenofavir) but had only been provided one-half of the combination (Emtriva).

With regard to HIV medication, we recommend expanding the pharmacy approved list of stock medications beyond the two antiretrovirals on the list (Truvada and Kaletra). Given that there are now more than 20 FDA approved HIV medications and that patients should not miss any doses of their medications, the current list is not adequate to provide continuity of medications for HIV patients. This is not to say that all antiretrovirals must be available through stock medications; however, strong consideration should be given to making the medications most commonly prescribed by clinicians at Cermak and Stroger available through stock supply. Nurses/CMTs should be instructed to ensure that these stock supplies are accessed in the event that HIV patients have not received their medication from the pharmacy.

Mr. Blackwell, Process Improvement Project Director, provided a list that is used to audit timeliness from order to first dose administered for Division IV. The longest time from orders written on 5/31/11 to when the nurse gave the first dose was four days. On 6/8/2011 we toured Division V and interviewed a 30-year-old patient who arrived at CCDOC on 6/5/2011; he gave a history of hypertension, which was treated with medication. The record was reviewed and he had yet to receive antihypertensive medications (three days after admission).

Mary Ann Wrobel, Pharmacy Director, states that it is their intent to have the first dose of medication administered before the inmate leaves intake or within 24 hours of entering the order into the CPOE system. We recommend implementing use of the e-Mar and developing a report or flagging system to identify any patient with an order who has not received the first dose within the timeframe established by Cermak leadership.

The Patient Care Services Department Pharmacy Requests Log is used by nurses to document missed medications, MARS, pharmacy labels and as needed (PRN) medications. In Division IV, review of the log for 6/3 and 6/6 showed missing medications, labels, and MARs for a number of mental health medications including Geodon, Risperdal, Trazadone, Effexor, Cogentin, etc. It is not possible from a review of the log to identify the reason for missing medication. These reported lapses may have multiple causes, including lack of coordination between custody and medical staff when inmates are transferred between Divisions, delays in ordering, dispensing, or delivering medications to patients and lack of adequate stock supplies of medications.

We recommend using IMACs to denote any inmate on a "flagged medication" and having correctional staff ensure that "keep-on-person" medications are transferred with the inmate when housing assignments change (see item i. later in this section for discussion of this recommendation). We also recommend that Cermak use root cause analysis to identify causes and contributing factors to delays and lapses in medication continuity and then establish corrective action. Delays and lapses in medication continuity should be a priority area for study by the Continuous Quality Improvement Committee.

### d. Cermak Staffing

Licensed practical nurses and registered nurses are assigned responsibility for medication administration. This is consistent within the scope of practice for both of these types of licensed professionals. Certified medical technicians are responsible for distributing KOP medications to inmates. These prescriptions have been verified by the pharmacy and packaged for the specific patient. The CMT verifies that it is the correct inmate and documents the inmate's receipt of KOP medication on the Medication Administration Record. Distribution of KOP medication may be performed by CMTs and is not in violation of the Agreed Order that only "Qualified Nursing Staff" administer medication.

We understand that the recommendation to evaluate nursing competency in medication administration has been put in place, although we have not reviewed the specific tool or mechanism used to establish competency. We have reviewed a tool that is used by nursing coordinators to observe staff administering medication. This tool is to provide feedback to the nurse and to serve as the basis for performance improvement and corrective action if needed. We did not audit use of this observation tool during this site visit. We did verify that corrective and/or disciplinary action was taken with regard to deficient performance that was observed during the December site visit.

We continue to emphasize the key role of custody staff for inmate supervision, so that delivery and administration of medication is accomplished in a way that does not result in an inmate's possession of medication that is unaccounted for. This role includes managing inmates and inmate movement on the unit during medication administration, conducting mouth checks to ensure medication is ingested and ongoing surveillance for contraband. Progress in improving safety and security to support medically necessary treatment is evident in the draft interagency directive on medication distribution, the interagency agreement and the Interagency Health Care Quality Improvement Committee. It is necessary to finalize and implement the interagency directive on medication distribution.

### e. Cermak Flagged Medication Procedures

Now that all medications can be ordered electronically, it is possible to alert CCDOC when an inmate is placed on or taken off of a flagged medication (prescriptions for medication to treat mental health disorders, HIV and/or thromboembolic disease). As orders are placed by Cermak providers into Cerner, Cermak clerical staff enters alerts into IMAC, the CCDOC inmate management system.

We reviewed the list of alerts provided by Mr. Blackwell and there are none that correspond exactly to the Agreed Order. The list provided includes one alert called "Blood Thinner" and another called "Discharge Medications," but no alerts that are called "flagged medication" or "mental health medication" or "HIV medication". We recommend that use of an alert(s) that corresponds to the Agreed Order be established. We caution against alerts that are so specific as to cause a privacy violation or stigmatization. We also recommend an alert to indicate inmates who have KOP medications so that CCDOC can assist in accounting for KOP medications on the unit and ensure these medications accompany inmates when they are transferred from one location to another.

According to interviews with Richard Blackwell, Project Director, Process Improvement and Michael Puisis, DO, Chief Operating Officer, alerts will take place automatically when the interface between Cerner and IMACS has been completed. Each of the notification requirements included in the Agreed Order (such as this one) has been included in the specifications written for the interface. We recommend establishing the two way interface between the CCDOC jail management system, IMAC, and Cermak's electronic health record, Cerner, so that notifications occur automatically when orders are written or discontinued.

f.  CCDOC Flagged Medication noted on JMS

IMACs is the Jail Management System used by CCDOC. Now that provider orders are entered electronically into the Cerner system, Cermak staff transcribes these notations into IMACs. As described in (e), immediately above alerts provided for review during the site visit do not coincide with the Agreed Order. We recommend that alerts be established that correspond to the Agreed Order and that the interface between IMACs and Cerner be accomplished.

g.  CCDOC Discharge Medication

As stated in paragraph e. above there were no alerts that match completely to the Agreed Order. There is an alert titled "Discharge Medications" that Cerner can place in IMACs. We did not audit actual practice to determine the extent to which this alert is inclusive of the all inmates with the conditions listed in item e. above and included in the Agreed Order.

We reviewed draft Policy and Procedures E-13.1 and E-13.2 that deal respectively with Discharge Planning for Medical Patients and Mental Health patients. There is unnecessary variation in the description of how discharge medications are obtained in these two documents. For example, the policy for patients with medical conditions uses the alert "Discharge Medications" and the policy for patients with mental health conditions uses the alert "Rx Before Release." The medical policy provides direction to ensure that <u>any</u> patient with HIV, active tuberculosis or thromboembolic disease will be escorted to a health care provider to receive a prescription and/or supply of prescription medication prior to discharge. The mental health policy is limited to seriously mentally ill patients who have a discharge date that is known to or can be targeted by the Medical Social Worker. These policies and processes to obtain discharge medication described in these two documents should be standardized.

We interviewed the Pharmacy Director and reviewed the process in place to provide discharge medications. We also reviewed Policy and Procedures D-02.1 and D-02.2 pertaining to writing, verifying and filling prescriptions for discharge medications. The usual process is that Cermak Pharmacy staff receives a handwritten discharge script sometime in advance of the discharge date. Discharge medication and related information is dispensed in tamper proof patient packaging and held in the Pharmacy until the inmate is brought to the window by CCDOC staff at the time of discharge. If an inmate appears at the window and no script for discharge medication has been received, the Pharmacy will contact, in the case of mental health patients, the Mental Health Manager and for medical patients, the health care provider in the discharge area for further direction.

h. Cermak Discharge Medication

Draft policy and procedure E-13.1, Discharge Planning for Medical Patients, directs the health care provider to provide information on community resources at the time the order for discharge medication is written. Further, this information is also provided at intake and is appended to the policy and procedure. It includes contact information on how to obtain legal aide, substance abuse counseling, food, STD testing or results, mental health services including suicide prevention and medical care. Information about prescribed discharge medication is provided verbally and in writing by the prescriber and the pharmacy. We recommend that the written information included in the appendix to P & P E-13.1 be revised to include more specific instructions about getting prescriptions filled if released from Cermak without receiving the 14 day supply of discharge medications.

Draft policy and procedure E-13.2, Discharge Planning for Mental Health Patients, makes the medical social worker responsible for developing the discharge plan and making referrals for ongoing mental health care and treatment through linkage agreements and community

mental health clinics. The Medical Social Worker is responsible for identifying those inmates with serious mental illness and prioritizing them for discharge planning. The policy and procedure does not define serious mental illness. Based upon interviews with the Monitors, it appears that inmates who have received inpatient treatment and those who have known discharge dates are prioritized for discharge planning. According to Dr. Hart, Chief Medical Officer, a discharge script is written in anticipation of an uncertain discharge date if a mental health patient has been prioritized for discharge planning.

Dr. Hart also indicated during interview that Dr. Zawitz, the specialist treating HIV patients at Cermak, instructs patients to attend the Wednesday clinic at the CORE Center the Wednesday following release to ensure ongoing care and treatment in the community.

In addition to medications supplied by the Cermak pharmacy, Policy and Procedure E-13.1 describes two additional avenues for inmates to access prescriptions which continue treatment. These are to provide a written prescription for a 14 day supply that can be filled at any pharmacy operated by CCHHS or call to a private pharmacy of the inmate's choice. These options are not available in Policy and Procedure E-13.2 for mental health patients and should be made available.

i. CCDOC Notification of Flagged Inmates Discharged

In Policy and Procedure E-13.1 the list of compliance indicators includes a check of the list of inmates with "Discharge Medication" alerts against the electronic health record for receipt of prescribed medications. The process currently in place relies upon practitioners writing an alert order for "Discharge Medications" to then be entered into IMACs and is less than the provision described in the Agreed Order, spelled out in i. above. There is no provision for such a double check in Policy and Procedure E-13.2 for mental health patients.

We recommend that Cermak ensure <u>all</u> inmates prescribed medication for mental health conditions and/or HIV and/or thromboembolic disease have an alert placed in CCDOC's IMAC system. We also recommend that CCDOC provide a list daily to Cermak of all inmates with medication flags who were discharged the previous day. Cermak should compare the list provided by CCDOC to the list of patients in Cerner who were issued a discharge prescription from Cermak or had a discharge prescription filled at the Cermak pharmacy. The Continuous Quality Improvement Program should set thresholds for and monitor data on patients who are on flagged medications who are discharged and receive discharge medication or prescriptions. At the next site visit we want to have a report that shows trends for all patients on flagged medications who are discharged and received discharge medication or a prescription for medication. There should also be analysis of patients on flagged medications who were

discharged without receiving medication or a prescriptions and development of corrective action.

j. Cermak Prescription Fill at Stroger

Draft Policy and Procedure E-13.1 includes this fail-safe but it was not included in E-13.2 for mental health patients. We recommend standardizing the process for arranging discharge medications described in these two documents as much as possible. Patients on mental health medication need to have prescriptions available at Stroger pharmacies as per item (j) above.

k., l. & m.

Dr. Hart, Chief Medical Officer, was interviewed about arrangements for continuity of prescription medications and related transfer information when inmates are transferred from one correctional jurisdiction to another. Now that the majority of health information about inmates at Cermak is recorded and kept electronically, compliance with the above items in the Agreed Order is better. The Illinois Department of Corrections has a representative stationed at Cermak who has access to Cerner information. This individual facilitates continuity of care between IDOC and Cermak and will make advance arrangements as necessary to prevent lapses in care resulting from lengthy transfers. When inmates are transferred to other jurisdictions, Cermak will provide summary information and medications to be transported by CCDOC to the next jurisdiction. The Monitor will audit these processes at the next site visit.

**Monitor's Recommendations:**

1. Recommendations to bring medication delivery into compliance with standards of practice are:

   a. Transfer the provision of "OTC" medication and other self-care items to the commissary or another part of the organization so that pharmacy and nursing resources are preserved to carry out prescribed treatment.

   b. Implement the use inmate identification badges for independent verification as stated in policy and procedure.

   c. Purchase and install the Fast Pack robots and Pyxis machines as planned.

   d. House inmates on TID dosing regimens in locations where timely treatment is provided as prescribed. Variation in prescribing patterns should be examined and practices that do not have clear clinical indication modified. Policy and procedure should be revised to clearly instruct staff how to ensure correct dosing intervals when patients must receive medication three or more times a day.

e. Change nurse schedules or make other arrangements so that inmates who work, are out to court or at medical appointments receive medication as prescribed.

f. Fill vacant nursing positions necessary to administer medications. Provide evidence that the staffing necessary to accomplish timely, accurate medication administration is available and staff accordingly.

g. Develop and provide to CCDOC a list of inmates sorted by housing unit who are to receive medication in the morning, at noon and at night.

h. Ensure that other scheduled activities (health care appointments, recreation, etc.) do not interfere with medication administration. Establish the order of housing units the nurse is to follow when administering medication in each Division.

i. Finish refurbishing the area identified to store the medication cart for Division II, dorm 2 on the third floor.

2. With regard to CCDOC's responsibility for medication administration, recommendations are:

a. Use IMACs to denote any inmate on a "flagged medication" and have correctional staff ensure that "keep-on-person" medications are transferred with the inmate when housing assignments change.

b. Finalize and implement the Interagency Directive for Medication Delivery. Provide evidence that medication administration is audited using an observation tool derived from the Interagency Directive.

c. Revise the post order for correctional officers to coincide with the Interagency Directive.

d. Provide evidence that correctional officers have been trained to support and execute their responsibilities as listed in the Interagency Directive and post order.

e. Provide more information and notice to inmates about expectations for how they are to behave while medication is administered.

3. Continue to implement planned improvements in pharmaceutical management:

a. Procure and install the single-dose "urgent" medication administration equipment (i.e. Pyxis-like equipment) that has been budgeted.

b. Create a "real time" interface with IMACs so that appropriate and necessary communication about inmates takes place and results in medication continuity and improved patient safety.

c. Continue the process to report missing medication. Track and trend the incidence of missing medication, establish thresholds, analyze incidents and implement corrective action to reduce or prevent medication being missed.

a. Continue development of policy and procedure to address narcotic control, use and maintenance of emergency and back-up stock and inspection areas for medication storage. Revise policies and procedure to reflect changes resulting from the addition of packaging robots, Pyxis and e-MAR.

b. Expand the number of antiretrovirals and other medications on the pharmacy approved list of stock medications and ensure that supplies of medication stock are sufficient to provide medication continuity for patients with serious medical conditions, TB infection/disease and sexually transmitted infections.

c. Establish a timeframe for delivery of first dose and develop a report or flagging system to identify any patient with an order who has not received the first dose within the timeframe.

d. Provide evidence of root cause analysis to identify causes and contributing factors to delays and lapses in medication continuity and corrective action taken.

4. Supervise and manage performance of nursing staff to be consistent with Policies and Procedures for medication delivery, documentation, storage and accountability.

a. Purchase and install the equipment to accomplish electronic documentation on the MAR.

b. Provide evidence of prompt and definitive action taken in relation to episodes of medication error, omission, failure to perform and professional practice violations.

c. Provide evidence that Patient Care Coordinators observe and supervise medication administration in a random and targeted approach with follow up based upon the results of current and past performance.

5. Provide notifications and arrange for continuity of medication treatment upon discharge according to the Agreed Order. Specific recommendations are:

a. Cermak should ensure that all inmates prescribed medication for mental health conditions and/or HIV and/or thromboembolic disease have an alert placed in CCDOC's IMAC system that corresponds to the Agreed Order.

b. Establish the two way interface between the CCDOC jail management system, IMAC, and Cermak's electronic health record, Cerner, so that notifications occur automatically when orders for these medications are written or discontinued.

c. P & P E-13.1 and 13.2 be standardized and include more specific instructions about getting prescriptions filled if released from Cermak without receiving the 14 day supply of discharge medications.

d. CCDOC provide a list daily to Cermak of all inmates with medication flags who were discharged the previous day. Cermak should compare the list provided by CCDOC to the list of patients in Cerner who were issued a discharge prescription from Cermak or had a discharge prescription filled at the Cermak pharmacy.

e. The Continuous Quality Improvement Program should set thresholds for and monitor data on patients who are on flagged medications who are discharged and receive discharge medication or prescriptions.

## 57. Specialty Care

a. Cermak shall ensure that inmates whose serious medical or mental health needs extend beyond the services available at the Facility shall receive timely and appropriate referral for specialty care to appropriate medical or mental health care professionals qualified to meet their needs.

b. Upon reasonable notification by Cermak, CCDOC will transport inmates who have been referred for outside specialty care to their appointments.

c. Cermak shall ensure that inmates who have been referred for outside specialty care by the medical staff or another specialty care provider are scheduled for timely outside care appointments. Cermak shall provide reasonable notice to CCDOC of such appointments so that CCDOC can arrange transportation. Inmates awaiting outside care shall be seen by Qualified Medical Staff as medically necessary, at clinically appropriate intervals, to evaluate the current urgency of the problem and respond as medically appropriate. If an inmate refuses treatment following transport for a scheduled appointment, Cermak

shall have the inmate document his refusal in writing and include such documentation in the inmate's medical record.

d.      Cermak shall maintain a current log of all inmates who have been referred for outside specialty care, including the date of the referral, the date the appointment was scheduled, the date the appointment occurred, the reason for any missed or delayed appointments, and information on follow-up care, including the dates of any future appointments.

e.      Cermak shall ensure that pregnant inmates are provided adequate pre-natal care. Cermak shall develop and implement appropriate written policies and protocols for the treatment of pregnant inmates, including appropriate screening, treatment, and management of high risk pregnancies.

**Compliance Status:** Partial compliance, near substantial compliance.

**Findings**

   **Status Update:**

   **Monitor's Findings:**

We learned that about a month ago the orthopedist performing his clinic onsite retired. This resulted in an increased demand for offsite orthopedist appointments at Stroger Hospital and the CCDOC was not able to always accommodate this increase in transports. Every effort is being made to restart an orthopedics clinic at Cermak, which will reduce the burden on transportation. The data shows that cancellations due to transport issues increased from 1% to 7.4% between April and May. Last year the overall cancellation rate due to transportation was about 2.1%. In general, we did find that clinic appointments were obtained timely.

We reviewed the log of inmates who have been referred for outside specialty care and there were relatively few cancellations and appointments were obtained timely. The log does not include data on follow up care. However, in the electronic medical record it is not difficult to review whether follow up did occur. We reviewed eight records of patients scheduled for offsite consultations or procedures and through our review we identified that in at least half the patients, there was not an identifiable follow up visit with the primary care clinician in which it was documented that the clinician discussed the findings and plan with the patient. In other records, it appeared likely that the primary care clinician was in fact unaware of the specialty clinic appointment. In one instance, the specialty clinic appointment had been scheduled by a subspecialty that had seen the patient in the hospital. Cermak lacks a procedure

in which a nurse sees the patient on return from the offsite visit and facilitates continuity with the primary care clinician. Currently, almost all of these patients are seen by an emergency room doctor and many of those visits may be unnecessary. We discussed with the medical leadership a more effective strategy of utilizing a nurse in the emergency room to see these patients on return from the offsite and that nurse would review the clinical records and the patient would only be referred to the emergency room doctor if a new order was needed. Otherwise, the nurse could e-mail the primary care clinician or schedule an appointment with the primary care clinician. The medical leadership team indicated that under power notes a template could be created which would require the clinician to document a discussion of findings and plan. This may solve this problem quite effectively.

**Monitor's Recommendations:**

1. Reestablish an orthopedics clinic onsite so as to diminish the transport burden on CCDOC.

2. Develop a procedure utilizing a nurse in the emergency room to facilitate continuity with the primary care clinician.

3. Develop a strategy to insure that the primary care clinician, when seeing the patient in follow up, documents a discussion regarding the findings and plan.

## 58. Dental Care

    a.    Cermak shall ensure that inmates receive adequate dental care, and follow up, in accordance with generally accepted correctional standards of care. Such care should be provided in a timely manner, taking into consideration the acuity of the problem and the inmate's anticipated length of stay. Dental care shall not be limited to extractions.

    b.    Cermak shall ensure that adequate dentist staffing and hours shall be provided to avoid unreasonable delays in dental care.

**Compliance Status:** Partial compliance.

**Findings**

    **Status Update:**

    **Monitor's Findings:**

This element requires that inmates receive adequate dental care and follow up with generally accepted correctional standards of care. The dental care should not be limited to extractions. We had an opportunity to review every dental clinic in each Division and with the exception of Division I where there are clearly major environmental problems, most other clinic spaces were adequate. We learned that because of the breakdown in the collection, triaging and consistency of response to sick call requests, there is an impact felt on the dental program, in that patients whose complaint is dental pain may have their assessment by a nurse delayed for a period of days, thus patients are incurring avoidable suffering. We also attempted to look at timeliness of dental assessment from initiation of request until dental visit. We did our study in Divisions IV and IX. We got conflicting results from Division IV, whereas in Division IX, most patients were seen within two weeks of the request.

With regard to dental staffing, we are aware that there is one dental position yet to be filled, but an applicant has been selected and there should be a start date very soon. This dental presence should have an impact on the timeliness of services. In general, the dental programs seem professionally run, including the infection control aspects, and clearly provide an array of services beyond simple extractions.

**Monitor's Recommendations:**

1. Fill the remaining dental position.

2. The quality improvement program should perform more comprehensive studies within each Division of the timeframe between inmate initiating request and patient being seen for an initial assessment by the dentist.

## 68. Suicide Prevention Training

b. Within 24 months of the effective date of this Agreed Order, CCDOC shall train all CCDOC staff members who work with inmates on the Facility's suicide prevention program. Implementation of such training shall begin as soon as possible following the effective date of this Agreed Order. Staff shall demonstrate competency in the verbal and behavioral cues that indicate potential suicide, and how to respond appropriately. Initial and at least annual training shall be provided in accordance with generally accepted professional standards.

c. Within 12 months of the effective date of this Agreed Order, Cermak shall train all Cermak staff members who work with inmates on the Facility's suicide prevention program. Implementation of such training shall begin as soon as possible following the effective date of this Agreed Order. Staff shall

demonstrate competency in the verbal and behavioral cues that indicate potential suicide, and how to respond appropriately. Initial and at least annual training shall be provided in accordance with generally accepted professional standards.

**Compliance Assessment:** Substantial compliance.

**Findings**

    **Status Update:**

    **Monitor's Findings:**

In all records we reviewed, better than 85% of staff members had received the required training.

**Monitor's Recommendations:** None.

**H.**     **QUALITY MANAGEMENT AND PERFORMANCE MEASUREMENT**

## 86.  Quality Management and Performance Measurement

    a.    Defendants shall each develop and implement written quality management policies and procedures, in accordance with generally accepted correctional standards, to regularly assess, identify, and take all reasonable measures to assure compliance with each of the provisions of this Agreed Order applicable to that Defendant.

    b.    Defendants shall each develop and implement policies to address and correct deficiencies that are uncovered during the course of quality management activities, including monitoring corrective actions over time to ensure sustained resolution, for each of the provisions of this Agreed Order applicable to that Defendant.

    c.    CCDOC shall participate with Cermak and DFM in a jointly established Health Care Quality Improvement Committee, to be charged with developing and implementing a joint quality improvement program. CCDOC shall contribute the time and effort of CCDOC staff members who, by virtue of their authority, current responsibilities, and/or past experience, can provide this committee with needed correctional representation.

d.     Cermak shall participate with CCDOC and DFM in a jointly established Health Care Quality Improvement Committee, to be charged with developing and implementing a joint quality improvement program. Cermak will work with CCDOC and DFM to identify those CCDOC and DFM staff members who, by virtue of their authority, current responsibilities, and/or past experience, can provide this committee with needed correctional representation. Quality management programs related to medical and mental health care will utilize performance measurements to assess quality of care and timely access to care with quantitative and qualitative data analysis and trending over time.

e.     DFM shall participate with CCDOC and Cermak in a jointly established Health Care Quality Improvement Committee, to be charged with developing and implementing a joint quality improvement program. DFM shall contribute the time and effort of DFM staff members who, by virtue of their authority, current responsibilities, and/or past experience, can provide this committee with needed correctional representation.

**Compliance Status:** Partial compliance.

**Findings**

**Status Update:**

**Monitor's Findings:**

The Cermak staff have been finalizing their quality management policies and procedures and they have been meeting on a regular basis to both monitor care and implement improvement strategies. This includes utilizing the mortality review process. However, the quality management program is still relatively new and thus still in a development process.

Currently, there is a process improvement team working on the access to care issues and recently focusing on nursing assessment protocols that will be used in the electronic medical record. There is also a medication management process improvement team that is focusing on the timeliness of medication administration, attempting to insure that the administration is accomplished within the guidelines set by nursing professional standards for initiating and completing medication administration. Recently, competency training and testing was completed for nurses using glucometer machines. In addition, a professional performance enhancement tool for staff working on the opioid treatment program has been completed. In fact, the opioid treatment program has been accredited by the National Commission on Correctional Healthcare. In addition, the facility laboratory services have achieved CLIA waived

certification. Staff are also working on adding an onsite service for monitoring the effects of the blood thinner Coumadin for patients who must be on anticoagulation. There are a series of monthly indicators that are being collected by the quality improvement program. These indicators fall under the categories of access to healthcare services, utilization, which is volumes of activity, negative pressure room usage, critical incidents, grievances, patient/environmental safety, patient care activities, medical records, laboratory services, pharmacy services, communicable diseases, mental health services, dental clinic, opiate treatment program, diabetes and diabetes with hyperlipidemia co-morbidity. Additionally, there are a subset of chronic disease indicators that are monitored by the clinicians. These chronic disease indicators include prevalence rates for the common chronic diseases, such as asthma, congestive heart failure, diabetes, HIV disease, hypertension, seizure disorder as well as patients on anticoagulation. Items currently being measured by this program include percentage of diabetics who had a hemoglobin A1c measured within the last six months and this is used for people who have been incarcerated greater than 45 days. Currently, close to 90% have received a hemoglobin A1c measurement. In addition, the degree of control as determined by the hemoglobin A1c is also being monitored, which shows that approximately 47% of the patients are in good control. Eighty percent of diabetics have had their lipids measured within the last year and 61% of diabetics have their lipid status in good control. Also, close to 80% of patients with congestive heart failure are receiving an indicated ACE inhibitor. There are also data reflecting the status of HIV patients and data on the timeliness for chronic disease visits.

The quality improvement program is also monitoring grievances and grievance appeals. The latest data suggests that about a little less than 10% of grievances result in an appeal. We reviewed some data we had seen with regard to patients being seen for scheduled onsite visits. Overall, the show rate was about 75%, although it did vary somewhat by Division. We believe the committee should look at this data and begin identifying causes for patients not showing for their appointments. When factors that are within the control of the health program are identified, then efforts to mitigate these factors should be developed. Overall, we are impressed with the activity of the quality improvement program but are aware that more needs to be done. Department heads must encourage their staff to get involved in the quality improvement program.

**Monitor's Recommendations:**

1. After the Medical Director identifies and implements solutions for the anomalous pathway intakes, the quality improvement program should begin monitoring the effectiveness of those strategies for electronic monitoring revocaters as well as hospital takeover patients.

2. The quality improvement program should be monitoring the adequacy of medication continuity efforts on intake.

3. The quality improvement program should monitor the adequacy of intake health assessments in patients who are referred to the emergency room.

4. After the nursing and medical leadership implement a procedure for nurses in the emergency room to facilitate primary care continuity, the quality improvement program should monitor the effectiveness of the improvement strategies (looking to see whether findings and plan are documented as having been discussed).

5. After reviewing the adequacy of the current emergency room log, the quality improvement program should monitor the consistency of its use by staff.

6. After the development of substance abuse withdrawal guidelines and training for implementation, the quality improvement program should monitor the compliance with the implementation.

7. The quality improvement program should monitor the timeliness of access to a dental assessment after submission of a health service request by Division.

# Appendix

# Redacted