| Section | Language | 06/10 Visit | 12/10 Visit | 6/11 Visit | 11/11 Visit | Change since last visit |
|---|---|---|---|---|---|---|
| | N/C=Non-compliance; P/C=Partial Compliance; S/C=Substantial Compliance; Status change: X means a change in status from previous visit | | | | | |
| B. | HEALTHCARE SERVICES: ELEMENTS COMMON TO MEDICAL AND MENTAL HEALTH | | | | | |
| 41. | **Inter-Agency Agreement** | P/C | P/C | S/C | S/C | |
| | a. CCDOC Written agreement<br>b. Cermak Written agreement | | | | | |
| 42. | **Policies and Procedures** | P/C | P/C | P/C | P/C | |
| | a. Cermak Medical care<br>b. Cermak Timeliness of response to clinician orders | | | | | |
| 43. | **Medical Facilities** | P/C | P/C | P/C | P/C | |
| | a. CCDOC Clinical space<br>b. Cermak Clinical space<br>c. CCDOC Adjustments to clinical space<br>d. Cermak Cleanliness and adequacy<br>e. Cermak Appropriate medical waste disposal<br>f. CCDOC Patient privacy<br>g. Cermak Patient privacy<br>h. Adjustments to space to provide privacy | | | | | |

| Section | Language | 06/10 Visit | 12/10 Visit | 6/11 Visit | 11/11 Visit | Change since last visit |
|---|---|---|---|---|---|---|
| | i. Construction of new clinical space | | | | | |
| 44. | Staffing, Training, Supervision and Leadership | P/C | P/C | P/C | P/C | |
| | a. Cermak Leadership team | | | | | |
| | b. Cermak Staffing | | | | | |
| | c. Cermak Training | | | | | |
| | d. Cermak Supervision | | | | | |
| | e. Cermak Licensure and certification | | | | | |
| | f. Cermak Training for correctional officers | | | | | |
| | g. CCDOC Mental health training for correctional officers | | | | | |
| | h. Cermak Mental health training for correctional officers | | | | | |
| | i. Cermak Healthcare staff training | | | | | |
| 45. | Intake Screening | P/C | P/C near S/C | P/C near S/C | P/C near S/C | |
| | a. Cermak Intake screens for all patients | | | | | |
| | b. Cermak Appropriate intake screen instrument | | | | | |
| | c. Cermak Appropriate mental health intake screen instrument | | | | | |
| | d. Cermak Proper training for intake screen process | | | | | |
| | e. Cermak Supervision of staff performing intake screen | | | | | |
| | f. Cermak Timeliness of intake screen | | | | | |
| | g. Cermak Comprehensive mental health evaluation based on screen positives | | | | | |
| | h. Timeliness of mental health screen incorporation into medical record | | | | | |
| | i. Medication continuity | | | | | |

| Section | Language | 06/10 Visit | 12/10 Visit | 6/11 Visit | 11/11 Visit | Change since last visit |
|---|---|---|---|---|---|---|
| 46. | **Emergency Care** | P/C | P/C | P/C | P/C | |
| | a. Cermak Healthcare staff training<br>b. CCDOC Correctional officer training<br>c. CCDOC Emergency transport<br>d. Cermak Timely care and/or transport<br>e. CCDOC First responder training for correctional officers | | | | | |
| 47. | **Record Keeping** | N/C | P/C | P/C | P/C | |
| | a. Cermak Adequacy and maintenance of records<br>b. Cermak Accessibility of records<br>c. Cermak Communication with offsite providers<br>d. Cermak Unified medical and mental health records | | | | | |
| 48. | **Mortality Reviews** | P/C | P/C | P/C | S/C | X |
| | a. Cermak Autopsy retrieval<br>b. CCDOC Participate for all inmate deaths while in custody<br>c. Cermak Conduct for all inmate deaths while in custody<br>d. Cermak Quality assurance measures | | | | | |
| 49. | **Grievances** | P/C | P/C | P/C | P/C | |
| | Policies and Procedures | | | | | |
| C. | **MEDICAL CARE** | | | | | |
| 50. | **Health Assessments** | P/C | P/C | P/C near S/C | P/C near S/C | |
| | a. Cermak Medication assessment<br>b. Cermak Mental health positive assessment | | | | | |

| Section | Language | 06/10 Visit | 12/10 Visit | 6/11 Visit | 11/11 Visit | Change since last visit |
|---|---|---|---|---|---|---|
| | c. Cermak Drug/alcohol withdrawal<br>d. CCDOC Observation of new inmates by correctional officers<br>e. Cermak Timeliness of assessment | | | | | |
| 51.a | **Acute Care Urgent** | P/C | P/C | S/C | P/C | X |
| | a. Cermak Provision of adequate and timely care<br>b. Cermak Care guidelines | | | | | |
| 51.b. | **Acute Care Infirmary** | P/C | P/C | P/C | P/C | |
| | a. Cermak Provision of adequate and timely care<br>b. Cermak Care guidelines | | | | | |
| 52. | **Chronic care** | P/C | P/C | P/C | P/C | |
| | a. Cermak Chronic disease management plan<br>b. Cermak Written guidelines<br>c. Cermak Tracking system<br>d. Cermak Regularly scheduled visits<br>e. CCDOC Facilities for special needs patients<br>f. Cermak Medically appropriate care for special needs patients & communication to CCDOC<br>g. Facility modification according to guidelines | | | | | |
| 53. | **Treatment and management of Communicable Disease** | S/C | S/C | S/C | S/C | |
| | a. Cermak Maintenance of testing, monitoring and treatment programs<br>b. CCDOC Compliance with infection control<br>c. Cermak Infection control policies<br>d. Cermak TB testing according to CDC guidelines<br>e. Cermak Ventilation systems | | | | | |

| Section | Language | 06/10 Visit | 12/10 Visit | 6/11 Visit | 11/11 Visit | Change since last visit |
|---|---|---|---|---|---|---|
| | f.  Cermak Notify DFM of maintenance needs<br>g.  Cermak Appropriate wound care<br>h.  Cermak Collection of statistical data regarding all communicable diseases | | | | | |
| 54. | **Access to Health Care** | N/C | N/C | N/C | P/C | X |
| | a.  Jointly provide appropriate accessibility<br>b.  Cermak Timely and adequate<br>c.  Cermak Sick call<br>d.  Cermak Timely response to sick call requests<br>e.  Cermak Prioritizing sick call requests<br>f.  Cermak Sick call response<br>g.  Cermak Daily isolation rounds | | | | | |
| 55. | **Follow up Care** | P/C | S/C | S/C | P/C | X |
| | a.  Cermak Offsite visit follow up<br>b.  Cermak Evaluation and documentation after offsite visit | | | | | |
| 56. | **Medication administration** | N/C | N/C | P/C | P/C | |
| | a.  Cermak Standard of care<br>b.  Cermak Accurate administration and maintenance of records<br>c.  Cermak Hygienic, appropriate and concurrently recorded<br>d.  Cermak Staffing<br>e.  Cermak Flagged medication procedure<br>f.  CCDOC Flagged medication noted on JMS<br>g.  CCDOC Discharge medication<br>h.  Cermak  Discharge medication | | | | S/C | |

| Section | Language | 06/10 Visit | 12/10 Visit | 6/11 Visit | 11/11 Visit | Change since last visit |
|---|---|---|---|---|---|---|
| | i. CCDOC notification of flagged inmates discharged<br>j. Cermak Prescription fill at Stroger<br>k. CCDOC Communicate transfer info to Cermak<br>l. Cermak medication for transit<br>m. CCDOC Record transfer between facilities | | | | | |
| 57. | **Specialty Care** | P/C | P/C near S/C | P/C near S/C | P/C | X |
| | a. Cermak Referrals to specialty care<br>b. CCDOC Transport inmates to appointments<br>c. Cermak Timeliness of scheduling<br>d. Cermak Specialty care log<br>e. Cermak Pregnant inmates | | | | S/C | |
| 58. | **Dental Care** | P/C | P/C | P/C | P/C near S/C | X |
| | a. Cermak Timely, adequate care<br>b. Cermak Sufficiency of staff and hours | | | | | |
| **E.** | **SUICIDE PREVENTION MEASURES** | | | | | |
| 68. | **Suicide Prevention Training** | P/C | P/C | S/C | P/C | X |
| | a. Curriculum<br>b. CCDOC Training<br>c. Cermak Training | | | | | |
| **H.** | **QUALITY MANAGEMENT AND PERFORMANCE MEASUREMENT** | | | | | |

| Section | Language | 06/10 Visit | 12/10 Visit | 6/11 Visit | 11/11 Visit | Change since last visit |
|---|---|---|---|---|---|---|
| 86. | **Quality Management** | P/C | P/C | P/C | P/C | |
| | a. Develop and implement policies and procedures<br>b. Address and correct deficiencies<br>c. CCDOC Participation in healthcare quality improvement committee<br>d. Cermak Participation in healthcare QI committee<br>e. DFM-Healthcare QI committee | | | | | |

B.        HEALTH CARE SERVICES:  ELEMENTS COMMON TO MEDICAL AND MENTAL HEALTH

**41.  Inter-Agency Agreement**

a.      CCDOC shall enter into a written Inter-Agency Agreement with Cermak that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility. The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order.

b.      Cermak shall enter into a written Inter-Agency Agreement with CCDOC that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility. The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order.

**Compliance Status**: Substantial compliance.

**Findings**

   **Status Update:**

   **Monitor's Findings:**

We have continued to review interagency meetings which contain substantive discussions on relevant issues that demonstrate an effort to include major stakeholders in discussions that effect a variety of different entities.

**Monitor's Recommendations:** None.

**42. Policies and Procedures**

Cermak shall provide adequate services to address the serious medical and mental health needs of all inmates, in accordance with generally accepted professional standards. The term "generally accepted professional standards" means those industry standards accepted by a majority of professionals in the relevant field, and reflected in the standards of care such as those published by the National Commission on Correctional Health Care ("NCCHC").

a.      Cermak shall develop and implement medical care policies, procedures and practices to address and guide all medical care and services at the Facility, including, but not limited to the following:

   (1)      access to medical care;
   (2)      continuity of medication;
   (3)      infection control;
   (4)      medication administration;
   (5)      intoxication and detoxification;
   (6)      documentation and record-keeping;
   (7)      disease prevention;
   (8)      sick call triage and physician review;
   (9)      intake screening;
   (10)     chronic disease management;
   (11)     comprehensive health assessments;
   (12)     mental health;
   (13)     women's health;
   (14)     quality management;
   (15)     emergent response;
   (16)     infirmary care;
   (17)     placement in medical housing units;

(18)    handling of grievances relating to health care;

(19)    mortality review; and

(20)    care for patients returning from off-site referrals.

b.    Cermak shall develop and implement policies, procedures and practices to ensure timely responses to clinician orders including, but not limited to, orders for medications and laboratory tests. Such policies, procedures and practices shall be periodically evaluated to ensure timely implementation of clinician orders.

**Compliance Status**:  Partial compliance.

**Findings**

**Status Update:**

**Monitor's Findings:**

Since our last visit, we have been provided with policies on continuity of medication, intoxication and detoxification, documentation and record keeping, disease prevention, sick call triage and physician review, intake screening and comprehensive health assessments. Therefore, all the major policy areas which we have requested have been provided. Most of these policies have been reviewed and approved as written, although there were some additions and modifications suggested. Although the major part of policy promulgation has been completed, it is clear that the next major focus must be on training of staff and implementation, all of which is required in order to achieve substantial compliance in this area.

**Monitor's Recommendations:**

1. Develop a training program that focuses on the relevant disciplines which are involved in carrying out these policies and emphasizes the highlights within the policies that each discipline must accomplish in order to comply with the policy or procedure.

2. After the training, implement the policies.

3. Initiate a strategy within the quality improvement program to monitor aspects of selected policies, the topics of which are referenced in the Agreement.

## 43.  Medical Facilities

a.  CCDOC will work with Cermak to provide sufficient clinical space, as identified by Cermak staff, to provide inmates with adequate health care to meet the treatment needs of detainees, including:

(1)  intake screening;
(2)  sick call;
(3)  medical and mental health assessment;
(4)  acute, chronic, emergency, and specialty medical care (such as geriatric and pregnant inmates); and
(5)  acute, chronic and emergency mental health care.

b.  Cermak staff shall make known to CCDOC and Cook County its needs for sufficient clinical space, with access to appropriate utility and communications capabilities, to provide inmates with adequate health care to meet the treatment needs of detainees, including:

(1)  intake screening;
(2)  sick call;
(3)  medical and mental health assessment;
(4)  acute, chronic, emergency, and specialty medical care (such as geriatric and pregnant inmates); and
(5)  acute, chronic and emergency mental health care.

c.  Cook County shall build out, remodel or renovate clinical space as needed to provide inmates with adequate health care to meet the treatment needs of detainees, as identified by Cermak staff, including:

(1)  intake screening;

(2)     sick call;

(3)     medical and mental health assessment;

(4)     acute, chronic, emergency, and specialty medical care (such as geriatric and pregnant inmates); and

(5)     acute, chronic and emergency mental health care.

d.     Cermak shall ensure that medical areas are adequately clean and maintained, including installation of adequate lighting in medical exam rooms. Cermak shall ensure that hand washing stations in medical areas are fully equipped, operational, and accessible.

e.     Cermak shall ensure that appropriate containers are readily available to secure and dispose of medical waste (including syringes and sharp medical tools) and hazardous waste.

f.     CCDOC shall allow operationally for inmates' reasonable privacy in medical and mental health care, and shall respect the confidentiality of inmates' medical status, subject to legitimate security concerns and emergency situations. Reasonable privacy typically includes sight and hearing privacy from other inmates and hearing privacy from staff that are not providing health care.

g.     Cermak shall make known to CCDOC and Cook County the structural and operational requirements for inmates' reasonable privacy in medical and mental health care. Cermak shall provide operationally for inmates' reasonable privacy in medical and mental health care and shall maintain confidentiality of inmates' medical status, subject to legitimate security concerns and emergency situations. Reasonable privacy typically includes sight and hearing privacy from other inmates and hearing privacy from staff that are not providing health care.

h.     Cook County shall build out, remodel or renovate clinical space as needed to allow structurally for inmates' reasonable privacy in medical and mental health care, as identified by Cermak and CCDOC staff.

Cook County shall begin construction of the new clinical space within three months of the effective date of this Agreed Order. It is expected that the project will be complete within nine months of the effective date of this Agreed Order. Prior to completion of the new clinical space, Cook County and DFM will work with Cermak to address the most serious concerns regarding clinical space, to the extent possible in the current Facility.

**Compliance Status**: Partial compliance.

**Findings**

**Status Update:** The Monitor did not receive a status update for the most recent review period.

**Monitor's Findings:**

Since our last site visit, CCDOC and Cermak continue to make improvements in providing appropriate clinical space for medical, dental and mental health care. However, as noted in previous reports, there is still a need for improvement in standardization across the jail with respect to sanitation, general repair and temperature control. Each area is briefly described, with areas needing improvement highlighted below.

The male intake area provides sufficient space and privacy for its designated purpose. The area was clean, organized, and well-equipped and supplied. The female intake area is cramped, and still in process of minor renovations to create privacy and expand mental health space. A wall has been constructed to provide additional privacy for patient interviews. A room for a psychiatrist has been identified and furniture ordered and delivered. The room was not yet in use due to the need to bolt the furniture to the floor for security reasons. The room was in need of sanitation.

The Cermak emergency room was generally clean, organized and well equipped. It has puncture-resistant sharps containers and red bags to dispose of biohazardous waste. The medication room was cleaner than at the previous site visit, but cabinet fronts were not clean and drawers were in disrepair (e.g. handles were missing from drawer fronts). It contained emergency equipment and supplies including a defibrillator.

Division I is the oldest part of the jail and sanitation and maintenance issues continue to be challenging. The building has a history of ceiling leaks but we did not observe active leaks during our visit. We noted missing ceiling tiles with exposed pipes. The medical clinic has an adequately sized waiting area with benches for the inmates to sit on while awaiting appointments. It has two examination rooms which are properly equipped and supplied, with running sinks, personal protective equipment and biohazardous waste containers. A third room is available and partially equipped, but the sink is inoperable. Emergency response equipment and supplies were available, including an automatic external defibrillator (AED).

Division II, Dorm 1 is a three story building with clinic space on the first floor and detainees housed on floors two and three in a total of eight dorms, with 48 beds per dorm for a total of 384 beds. The building is old and has an extensive amount of foot traffic. The area was reasonably clean but needed painting and is poorly lighted. The clinical space which provides medical services for dorms 1, 3 and 4, consists of a large waiting area, a modest clerical area and three small, appropriately equipped examination rooms and one storage area. On the day of the inspection, it was unusually hot in the clinic area. In each of the examination areas it was noted there were puncture proof containers in use for the disposal of used syringes and needles, sinks with running hot and cold water and soap for hand washing readily available, as well as liquid or foam hand sanitizer, personal protective equipment and supplies and "red" biohazard bags for the disposal of biohazard waste.

Division II, Dorm 2 provides the clinical space on the first floor for all of dorm 2, which is a three story building containing ten dormitory-style living units for a total building population of 448. The clinic space is a large, well-maintained and well-lighted area consisting of a large common area, storage area and four appropriately equipped private examination areas. In the common area and examination rooms it was noted there were puncture proof containers in use for the disposal of used syringes and needles, sinks with running hot and cold water and soap for hand washing readily available, as well as liquid or foam hand sanitizer, personal protective equipment and supplies and red biohazard bags for the disposal of biohazard waste.

In Division II, dorm 2, a medication room was to be built on the third floor to facilitate the timeliness of medication administration; however, the project was cancelled. As a result, medication administration on the third floor is generally outside the acceptable "two-hour" window.

Due to high intake numbers, Division III was reopened, which required the staffing of the clinical area from 7 am to 3 pm. Prior to the inspection, it had been reopened as "overflow intake" housing. Two tiers, with 58 beds each, were being utilized on the

second floor. The area was not staffed 24/7 with medical staff and, as a result, the decision was made to house no inmates who were insulin dependent diabetics, taking psychotropic medication or blood-thinning medication. One EMT was assigned between the hours of 7 am to 3 pm The clinical area, located on the third floor, was a clean, well-lighted area with a nursing station area, two appropriately equipped examination rooms and a separate treatment room. Again, the unit was supplied with puncture proof containers, personal protective equipment and biohazard bags. Hand washing sinks with soap, as well as liquid or foam hand sanitizer were available.

Division IV has a bed capacity of 692 female inmates of all security levels. It is staffed with nurses 24 hours, seven days per week. The medical area is comprised of two separate areas and an inmate waiting room. On one side of the hall are two examination rooms and a bathroom which are used primarily by clinicians. These examination rooms were clean, properly equipped and supplied, including personal protective equipment, sharps and biohazardous waste disposal containers. On the other side of the hallway is a large, single room dispensary where nurses assess inmates, perform treatments, prepare medications and transcribe orders, etc. Although there is an examination table in this area, it is not optimal as it is adjacent to an area where nurses receive and sort prescription medications, thus presenting security concerns. CCDOC and Cermak have identified a room down the corridor that has been designated for conversion to a medical clinic. It is a large room with access to a bathroom and sink. Nurses were using this room during our site visit although it had not yet been cleaned, medically equipped and supplied, and computers installed. When the clinic is completed, it should facilitate access to care in the Division, provided that sufficient correctional officer escorts are available to transport patients to appointments.

Division V has a bed capacity of 986 minimum security male inmates. It is staffed with two RNs on the day shift seven days per week and EMT's on the day shift seven days per week. The dispensary is comprised of a large open area with adjacent examination and storage rooms. In the middle of the room is a desk that an RN occupies and triages patients. It does not provide sufficient privacy for interviews or examinations as correctional staff and inmates are in the immediate area. The dispensary has two examination rooms that are properly equipped and supplied, including sinks, personal protective equipment and biohazardous waste disposal containers. Both of these rooms are typically used for provider's clinics most mornings. There is a third room that was previously occupied by security staff that can be used for interviews, treatments and examinations provided it is properly equipped and supplied. The area was acceptably clean.

Division VI is a general population unit with 992 beds over two floors with twelve tiers per floor. The entire division is very clean, well-maintained and well-lighted. The clinical area is a large, very clean, well-maintained and well-lighted area. There are three well-equipped examination areas. It was noted puncture proof containers were in use, and personal protective equipment and biohazard bags were immediately available. Hand washing sinks with soap, as well as liquid or foam hand sanitizer were available.

Division VIII is the infirmary area and is comprised of Cermak 2nd and 3rd floors. Bed capacity for the two floors was 148. Cermak, floors 2 and 3, each consist of four wings; north, south, east and west. There are a total of 76 beds on second floor and 65 beds on third floor.

Cermak is clean, well-lighted and generally well maintained. Painting is up-to-date, and ceiling tiles are in good condition. There are appropriately sized and equipped nursing stations and treatment areas for each of the wings. In all the Cermak clinical areas, it was noted puncture proof containers for the disposal of used needles and syringes were in use. "Red" biohazard bags for the disposal of medical waste and personal protective equipment were available. Hand washing basins with cold and hot running water and soap were available, as well as liquid or foam hand sanitizer.

During the course of the inspection, it was noted the common areas and nursing station areas were comfortable in regard to temperature; however, there were numerous detainee complaints that the hospital/infirmary patient rooms were cold. Many detainees were observed with blankets wrapped around them when out of bed in their room. This was a common complaint on both floors and throughout the wings of each of the floors. In response to questioning by the inspector as to whether the cold patient room temperatures had been reported, staff stated, "it was easier and better to not complain" but provide detainees additional blankets because the temperatures would be increased to such a degree as to make it unbearably hot and uncomfortable.

Cermak was overcrowded with many patients housed on the floor in "boats" on both floors as follows:

2-North with 20 beds and 26 patients (+ 6)
2-West with 20 beds and 32 patients (+12)
2-South with 24 beds and 22 patients (-2)
2-East with 24 beds and 23 patients (-1)
3-North with 20 beds and 30 patients (+10)

3-West with 20 beds and 31 patients (+11)

3-East with 12 beds and 14 patients (+2)

3-South with 13 beds and 11 patients (-2)

This amounts to 153 total beds with 189 patients, resulting in a 24% over-capacity census. The over-capacity was due to the inability to discharge patients to housing units due to lack of bed space, the housing of general population inmates in the infirmary, the housing of general population inmates with medical equipment, e.g. C-PAP units, which are not permitted in housing units, the housing of inmates confined to wheel chairs, the housing of inmates classified as protective custody and an increase in medical and mental health cases.

Patient privacy, when needed, is generally maintained and provided throughout Cermak. Patient overcrowding compromises privacy to a degree; however, staff has adapted and taken the necessary steps to ensure privacy when the need arises.

Division IX has a bed capacity of 1000 and houses maximum security male inmates. It remains unchanged from our last report with respect to the physical description and housing capacity. Also, the changes in the population housed in Division IX that were being considered at the time of the last site visit have not taken place. Health care coverage is still provided 12 hours each day.

Nurses have been triaging Health Service Requests on the tiers since April 2011; a nurse sick call takes place in the afternoon in the dispensary. Rooms in the hallway between units on each tier have been supplied and equipped to provide medical treatment, but have yet to be used because locks on the doors have not been installed. It also obliges custody staff to transport inmates to the dispensary for clinical evaluation that would not be necessary if the rooms were available.

Problems with transport of inmates to clinical encounters in Division IX, discussed in the last report, appear to have been partially resolved with the use of new handcuffs and some increase in services provided by Cermak within the Division, primarily phlebotomy and extended hours of mental health coverage. The Division is also housing most of the inmates needing medication in the south tower, greatly facilitating delivery of care to this population.

Division X has a bed capacity of 768 and houses intermediate and maximum security male inmates. The physical description and housing capacity of Division X is also unchanged from previous reports. See previous reports describing the inadequacy of clinical space in Division X. There is a proposal under consideration that would create another exam room and perhaps an office,

both of which are needed. Health care coverage is still provided on site 24 hours a day, seven days a week, with resulting concentrations of detainees who have medical and/or psychiatric conditions requiring these services.

Division XI has a bed capacity of 1536 minimum security male inmates. The capacity and description of Division XI is unchanged from previous reports. Now that this Division has begun to use the automated Health Service Request, the number of rooms to conduct the symptom based assessment and computer terminals to enter findings and disposition into the health record is inadequate. It may be that coordinated scheduling of primary care clinics and health service evaluations would resolve the problem.

Division XVII, known as Department of Women's Justice, houses residential females including all pregnant women. The clinic area was clean, organized and well equipped and supplied with personal protective equipment, biohazardous waste containers. We did not note any temperature issues during this visit.

The 900 bed RTU is currently under construction.

**Monitor's Recommendations:**

1. Cermak and CCDOC, through the CQI process, should continue to assess each Division's medical, mental health and dental clinic space with respect to size, general repair and sanitation, lighting, equipment and supplies, privacy, and communications connectivity and address deficiencies cited in this report as well as in their own assessments and inspections. Temperature control is a significant issue in many Divisions.

2. In each Division, examine and revise provider and nurse clinic sick call scheduling to maximize the use of clinical space and to permit both providers and nurses' access to clinical examination rooms throughout the day.

3. In Division II, dorm 2, address space issues that affect the timeliness of medication administration. Reconsider construction of a medication room in this area.

4. CCDOC and Cermak should collaborate to address overcrowding in the Cermak infirmary.

5. In Division IV, ensure that the newly created clinical area is adequately cleaned, equipped and supplies and sufficient computer terminals installed to enable nurses to document in the EMR in real time.

6. Complete renovations in the female intake area.

7. Resolve space issues in the dispensary in Division X.

8. Complete the renovation of exam rooms in Division IX.

## 44.  Staffing, Training, Supervision and Leadership

a.      Cermak shall maintain a stable leadership team that clearly understands and is prepared to move forward toward implementation of the provisions of this Agreed Order, with respect to:

(1)      Medical care; and
(2)      Mental health care.

b.      Cermak shall maintain an adequate written staffing plan and sufficient staffing levels of health care staff to provide care for inmates' serious health needs, including:

(1)      Qualified Medical Staff; and
(2)      Qualified Mental Health Staff.

c.      Cermak shall ensure that all Qualified Medical Staff and Qualified Mental Health Staff are adequately trained to meet the serious health care needs of inmates. All such staff shall receive documented orientation and in-service training on relevant topics, including:

(1)      Provision of health care in a correctional setting and Facility-specific issues; and
(2)      Suicide prevention, and identification and care of inmates with mental illness.

d.      Cermak shall ensure that Qualified Medical Staff receive adequate physician oversight and supervision.

e.   Cermak shall ensure that all persons providing health care meet applicable state licensure and/or certification requirements, and practice only within the scope of their training and licensure. Upon hiring and annually, Cermak shall verify that all health care staff have current, valid, and unrestricted professional licenses and/or certifications for:

(1)   Medical staff; and
(2)   Mental health staff.

f.   Cermak will work with CCDOC to develop and maintain a curriculum for initial and periodic training of correctional officers on recognition and timely referral of inmates with medical urgencies, including drug and alcohol withdrawal. Cermak will provide adequate initial and periodic training on these topics to all Cermak staff who work with inmates.

g.   CCDOC will provide, to all CCDOC staff who work with inmates, adequate initial and periodic training on basic mental health information, including the identification, evaluation, and custodial care of persons in need of mental health care, as well as recognition of signs and symptoms evidencing a response to trauma; appropriately responding to mental illness; proper supervision of inmates suffering from mental illness; and the appropriate use of force for inmates who suffer from mental illness.  Such training shall be conducted by a Qualified Mental Health Professional, registered psychiatric nurse, or other appropriately trained and qualified individual.

h.   Cermak will work with CCDOC to develop and maintain a curriculum for initial and periodic training of correctional officers on basic mental health information, including the identification, evaluation, and custodial care of persons in need of mental health care, as well as recognition of signs and symptoms evidencing a response to trauma; appropriately responding to mental illness; proper supervision of inmates suffering from mental illness; and the appropriate use of force for inmates who suffer from mental illness.  Such training shall be conducted by a Qualified Mental Health Professional, registered psychiatric nurse, or other appropriately trained and qualified individual.

g.      Cermak shall ensure that all health care staff receive adequate training to properly implement the provisions of this Agreed Order, including:

(1)      Medical staff; and
(2)      Mental health staff.

**Compliance Status**: Partial compliance.

**Findings**

    **Status Update:**

    **Monitor's Findings:**

    a. Cermak-Leadership Team

Cermak has in fact maintained a stable leadership that is well credentialed and experienced to move the program forward, the sole exception being the position of Director of Nursing. However, two months prior to our visit a new and hopefully permanent Director of Nursing was hired with excellent experience quite relevant to implementing this Agreement. She has worked in correctional settings and in fact has implemented a nurse sick call program while in her role in a correctional facility. In our discussions with her, we were clearly impressed with her understanding of the changes that remain to be implemented in order to achieve compliance with this Agreement. Additionally, the COO, the Medical Director, the Associate Medical Director, the Dental Director as well as the Pharmacy Director all have had substantial experience in their positions.

    b. Cermak-Staffing

As of December 1, 2011, there are 504 full time equivalent health care positions and 73 vacancies, which equals a 14% vacancy rate. The overall number is within a general target we have set. However, in specific areas, including nursing leadership and in the mental health area, the vacancy rates are higher. With regard to nursing leadership within the overall nursing categories, there are 81 registered nursing positions of which eight are vacant and there are 68 full-time equivalent licensed practical nurse

positions of which seven are vacant. There are also 34 full-time equivalent correctional medical technician positions of which six are vacant. Of the 11 nursing supervisory positions, four are currently vacant. This supervisory deficit impinges on the ability to implement new policies and procedures in certain areas. Data submitted by the administration calculates out to an average of over 300 days of vacancy per position from the time the position has been created until the time of hire. This is in conflict with reporting by the human resources leadership, which suggests hiring generally occurs within 90-120 days. In our meeting with the Bureau of Health Services leadership, we indicated that they must send us an agreed upon definition of when the clock starts ticking after a position is created so that we can reconcile the data we have been provided with any conflicting reports that are provided to us.

At our meeting with the leadership of the Bureau of Health Services, a lengthy period of time was spent discussing mental health staffing and that discussion will be reviewed by the mental health monitor.

c. Cermak-Training

Letter (c) requires that all medical staff are adequately trained to meet the serious health care needs of inmates. This includes both orientation training and inservice training. The topics must include provision of health care in a correctional setting and facility specific issues, as well as suicide prevention and identification and care of inmates with mental illness. With regard to the physicians and Physician Assistants, in general the training requirements have been met. With regard to nursing staff, 100 of the RNs and LPNs are currently up to date with regard to the suicide prevention training. Thus, 60 LPNs and RNs are out of compliance. We found that, in general, the Cermak departments have not set up an automated, Excel type system that would insure that a spreadsheet exists which contains both the required training and the date of last receipt of that training. We strongly encourage each discipline to establish such a tracking system and reach out to staff to insure that their training is up to date. We were informed by the Medical Director that he is in the process of drafting a training policy which will include such a tracking system. We reviewed training records for mental health staff and identified that better than 90% are current with regard to the suicide prevention training as well as the restraint and seclusion training.

d. Cermak-Supervision

We are pleased to report that a review of the work of all physician assistants and almost all of the physicians has been completed. These reviews consist of a structured review of clinical care in which a variety of aspects of assessments including

history, physical exam, synthesis of data into an assessment and development of plan are evaluated. We reviewed some actual worksheets and found that in several there were substantial critiques of the performance. The Associate Medical Director indicated that for those in which there are substantial findings, she personally reviews them with the individual and will then conduct a re-review within the next few months in order to determine whether, as a result of the education received, performance has improved. This clinical performance enhancement review of the clinicians certainly meets the intent of the Agreement. We reviewed the licensure and certification of the nursing program and in fact, all files we reviewed demonstrated current licenses and certification with regard to CPR, etc.

e. Cermak-Licensure and Certification

This paragraph requires that all persons providing health care meet applicable state licensure and/or certification requirements and practice only within the scope of their training and licensure. We met with the Director of the Credentialing Office and randomly selected 10 records from the independently licensed clinicians. Our sample included physicians, physician assistants, dentists and Ph.D. psychologists. All 10 of the credential files contained current licenses, including a search to conclude that there were no restrictions, primary source verification of educational background, Inspector General report, National Practitioner Databank report as well as some peer review documents. We were extremely pleased with the well organized and detailed process that is in place to insure that only appropriately trained and credentialed staff are in fact providing services. We were surprised to find that within the peer review evaluation forms there was no criteria utilized that is related to quality of documentation. Since this has on occasion been problematic, it is now understandable why clinical staff may not appreciate the importance of the quality of their documentation. Overall, the credentialing program was exceedingly well done.

f. Cermak-Training for Correctional Officers

This section required that Cermak will work with CCDOC to develop and maintain a curriculum for initial and periodic training of correctional officers on recognition and timely referral of inmates with medical urgencies, including drug and alcohol withdrawal. This training is to include both initial and periodic training. We were provided an outline for the topics to be covered for the officers at both initial and periodic training. The major headings of the outline include: access to health care; medication distribution; protected health information versus communication of health needs; recognition and referral of some common emergencies and urgencies, including drug and alcohol intoxication and withdrawal; trauma and seizures; infection control, which includes such topics

as MRSA, lice, influenza, gastroenteritis and tuberculosis; special accommodations; refusal of care and withdrawal of request and finally cardiac and respiratory arrest. These eight areas certainly meet the intent of this section. We have learned that this training actually began after the first of the year. When a sufficient percent of officers have received it, substantial compliance will be met.

g. & h. CCDOC and Cermak Mental Health Training for Correctional Officers

g. This section requires that CCDOC will provide training for its staff regarding basic mental health information, including the identification, evaluation and custodial care of persons in need of mental health care as well as recognition of signs and symptoms evidencing a response to trauma and other topics related to mental health. In an effort to identify compliance with this training, we randomly selected 79 officer names from individuals who work in each Division. Of these 79, 47 received the inservice training since being hired. The other 32 have not yet reached their 18 month anniversary by which the inservice training must be provided. We were informed that the plans are to insure the inservice training is provided for these 32 so that they have received the training within the required 18 months. This would achieve substantial compliance.

h. This section restates the requirement for Cermak to assist in the development of a curriculum that deals with mental health issues as well as response to trauma. This training is being provided and of the officer records reviewed, at least 90% have received such training.

As indicated previously, the mental health monitor has reviewed and approved the training curriculum for officers with regard to mental health issues. We reviewed officers who had been assigned to mental health units on particular days, October 15 and November 15. In every instance, the officers who were assigned to those units had received the advanced training. Clearly, custody has been working hard to insure that assignments only include people who have had this training.

i. Cermak-Health Care Staff Training.

This requires that medical staff receive training regarding the provisions of this order. Through town meetings and other discussions it has become clear to us that health care staff are well aware of the Agreement and what needs to be accomplished by the staff in order to achieve substantial compliance.

**Recommendations:**

1. We are to receive from the Bureau of Health Services and Cermak leadership a memo that describes when the clock starts ticking after positions are created or vacated so that there can be no dispute with regard to the number of days it takes to fill these positions.

2. A special effort should be made to fill the vacancies in the nursing leadership positions for nurse managers and tour supervisors.

3. Continue to provide a quarterly tally of the number of positions which have remained vacant for greater than six months.

4. Submit a plan that describes your method for monitoring clinician license restrictions.

5. Mr. Burke should send the Monitor data that demonstrates that the 32 officers not yet employed for 18 months have in fact completed their training before 18 months expire.

6. In April, the Medical Director should send the Monitor a schedule of the medical training provided to officers both initially and ultimately annually.

7. Include quality of documentation as an evaluated criterion for the peer review.

## 45. Intake Screening

a. Cermak shall maintain policies and procedures to ensure that adequate medical and mental health intake screenings are provided to all inmates.

b. Cermak shall ensure that, upon admission to the Facility, Qualified Medical Staff or Licensed Correctional Medical Technicians utilize an appropriate medical intake screening instrument to identify and record observable and non-observable medical needs, shall assess and document the inmate's vital signs, and shall seek the inmate's cooperation to provide information, regarding:

(1)     medical, surgical and mental health history, including current or recent medications, including psychotropic medications;

(2)     history and symptoms of chronic disease, including current blood sugar level for inmates reporting a history of diabetes;

(3)     current injuries, illnesses, evidence of trauma, and vital signs, including recent alcohol and substance use;

(4)     history of substance abuse and treatment;

(5)     pregnancy;

(6)     history and symptoms of communicable disease;

(7)     suicide risk history; and

(8)     history of mental illness and treatment, including medication and hospitalization.

c.     Cermak shall ensure that, upon admission to the Facility, Qualified Mental Health Staff, Qualified Medical Staff, or Licensed Correctional Medical Technicians utilize an appropriate mental health intake screening instrument to identify and record observable and non-observable mental health needs, and seek the inmate's cooperation to provide information, regarding:

(1)     past suicidal ideation and/or attempts;

(2)     current ideation, threat or plan;

(3)     prior mental illness treatment or hospitalization;

(4)     recent significant loss, such as the death of a family member or close   friend;

(5)     previously identified suicide risk during any prior confinement at CCDOC;

(6)     any observations of the transporting officer, court, transferring agency or similar individuals regarding the inmate's potential suicide risk, if such information is communicated to Cermak staff;

(8)     psychotropic medication history; and

(9)     alcohol and other substance use and withdrawal history.

d.      Cermak shall ensure that all Qualified Mental Health Staff, Qualified Medical Staff or Licensed Correctional Medical Technicians who conduct the medical and mental health intake screenings are properly trained on the intake screening process, instrument, and the requirements and procedures for referring all qualifying inmates for further assessment.

e.      If Cermak assigns Licensed Correctional Medical Technicians to perform intake screening, they shall receive appropriate, on-site supervision by on-site Qualified Medical Staff; information obtained on screening for all inmates will be reviewed by Qualified Medical Staff before the inmate departs the intake area.

f.      Cermak shall ensure that a medical assessment based on the symptoms or problems identified during intake screening is performed within two working days of booking at the Facility, or sooner if clinically indicated, by a Qualified Medical Professional for any inmate who screens positively for any of the following conditions during the medical or mental health intake screenings:

(1)     Past history and symptoms of any chronic disease included on a list specified by Cermak's policies and procedures;
(2)     Current or recent prescription medications and dosage, including psychotropic medications;
(3)     Current injuries or evidence of trauma;
(4)     Significantly abnormal vital signs, as defined by Cermak's policies and procedures;
(5)     Risk of withdrawal from alcohol, opioid, benzodiazepine, or other substances;
(6)     Pregnancy;
(7)     Symptoms of communicable disease; and
(8)     History of mental illness or treatment, including medication and/or hospitalization.

g.      Cermak shall ensure that any inmate who screens positively for mental illness or suicidal ideation during the intake process receives a comprehensive mental health evaluation (see provision 59.c, "Mental Health:  Assessment and Treatment") Cermak shall ensure timely access to a Qualified Mental Health Professional for this purpose, based on emergent, urgent, and routine medical or mental health needs.

h.     Cermak shall ensure that the intake health screening information is incorporated into the inmate's medical record in a timely manner.

i.     Cermak shall implement a medication continuity system so that incoming inmates' medication for serious medical and mental needs can be obtained in a timely manner, as medically appropriate. Within 24 hours of an inmate's booking at the Facility, or sooner if medically necessary, a Qualified Medical Professional or Qualified Mental Health Professional, with appropriate prescribing authority, shall decide whether to continue the same or comparable medication for serious medical and mental health needs that an inmate reports during intake screening that she or he has been prescribed. If the inmate's reported medication is discontinued or changed, other than minor dosage adjustments or substitution of a therapeutic equivalent, a Qualified Medical Professional or Qualified Mental Health Professional, with appropriate prescribing authority, shall evaluate the inmate face-to-face as soon as medically appropriate, and within no greater than five working days, and document the reason for the change.

**Compliance Status**: Partial compliance, near substantial.

**Findings**

     **Status Update:**

     **Monitor's Findings:**

In our review of 10 records randomly selected from individuals who entered the system since October 15, 2011 and who had chronic medical problems, all of them received a timely intake screen. In only one of 10 records was there a significant discrepancy between the screen and health assessment. In that particular instance, the medical screen was performed by a correctional medical technician. In the other nine, the screens were all performed by registered nurses. Overall, the quality of the screens was excellent. If, in fact, there were no anomalous entrants into the jail this area would be in substantial compliance. However, from our previous review we knew that the process did not work as well for people who were electronic monitoring returns or violators or for people who were hospital takeovers from outside hospitals. We are pleased to report that a specific study of electronic monitoring returns

demonstrated that all of these individuals had received a timely nurse screen. Our data were consistent with a self study that was performed by the nursing program looking at this category. On the other hand, it was problematic for the group of hospital takeovers to have received a timely medical screen. In fact, four of four records we reviewed of hospital takeovers lacked an intake screen. Therefore, it is incumbent on the program to insure that a process is implemented such that when hospital takeovers are brought to the emergency room an intake screen is completed. Letters a through h are fully complied with for everyone but the hospital takeovers.

With regard to medication continuity, we found a breakdown or delay in receipt of medications when patients were on nurse administered medications. When they were on keep- on-person medications, we did not find this delay. We were told that the delay may be in part related to either nursing or pharmacy procedures. However, additional focus in this area must be provided so that, especially with critical medications where dose continuity is important, the procedures must facilitate receipt of medications in a manner that prevents dose discontinuity.

**Monitor's Recommendations:**

1. Work carefully on insuring that hospital takeovers receive a nurse screen when they are brought to the emergency room.

2. Begin monitoring medication timeliness, especially for patients on critical medications, insuring that whether the patients are on keep on person medications or nurse administered medications, any delay is minimized so that dose continuity is maintained.

## 46. Emergency Care

      a.      Cermak shall train health care staff to recognize and respond appropriately to health care emergencies, including:

         (1)      Medical emergencies;
         (2)      Mental health emergencies; and
         (3)      Drug and alcohol withdrawal.

b.   CCDOC shall train correctional officers to recognize and respond appropriately to health care emergencies, including:

   (1)   Medical emergencies;
   (2)   Mental health emergencies; and
   (3)   Drug and alcohol withdrawal.

c.   CCDOC shall ensure that all inmates with emergency health care needs receive prompt transport, including transport for outside care, for emergencies including:

   (1)   Medical emergencies; and
   (2)   Mental health emergencies.

d.   Cermak shall ensure that all inmates with emergency health care needs receive timely and appropriate care, with prompt referrals for outside care when medically necessary, and shall notify CCDOC when emergency transport is needed inside or outside the Facility compound, for emergencies including:

   (1)   Medical emergencies; and
   (2)   Mental health emergencies.

e.   CCDOC shall train all correctional officers to provide first responder assistance (including cardiopulmonary resuscitation ("CPR") and addressing serious bleeding) in emergency situations. CCDOC shall provide all correctional officers with the necessary protective gear, including masks and gloves, to provide first line emergency response.

**Compliance Status**: Partial compliance.

**Findings**

   **Status Update:**

**Monitor's Findings:**

a. Cermak-Health Care Staff Training

With regard to emergency training, Cermak staff have been trained with regard to medical emergencies. However, the additions on the drug and alcohol withdrawal training syllabus have still not been implemented.

b. CCDOC-Correctional Officer Training

With regard to the training of correctional officers, in general they have had training with regard to health care emergencies. A comprehensive training program began in early January 2012 and when a sufficient percentage of officers have received it, substantial compliance will be achieved.

c. CCDOC-Emergency Transport

We reviewed 11 records of patients transported either onsite or offsite and in none of the records did we find any delays in transport to the onsite emergency room or to Stroger Hospital. This area is in full compliance.

d. Cermak-Timely Care And/or Transport

Once again, we can document that there continues to be a problem with the emergency room log. Not only is it not used assiduously, there being many blanks and columns which do not consistently have the same type of information, but additionally the same log book is used for both emergencies and processing of returning patients. We believe it is advisable that Cermak use two separate logs; one is purely to document patients under non-emergent circumstances returning through the emergency room and the other log is actually an emergency service log which would contain patient demographics, presenting complaint, disposition including how the patient was transported offsite and what time that transport took place.

In all but one instance, patients were responded to timely and appropriately. The one exception was a female who entered the jail on 6/10/11 and was identified as being pregnant. On 9/1, she was sent offsite due to the complaint of contractions. She was at week 39. She was initially seen in the Cermak emergency room before she was sent offsite. She was sent to Stroger Hospital where, in violation of policy, she was returned to the jail because she had not been fully dilated. Patients in labor are to stay at

Stroger Hospital. However, this patient was accepted back at the jail and was sent up to the infirmary; shortly thereafter, she was sent down to the Cermak emergency room where she stayed for almost 12 hours before being sent to Stroger Hospital. She did deliver a healthy baby and returned to Cermak two days later. We were unable to find documentation of any monitoring during the time she was in the Cermak emergency room. In addition, the Cermak staff should have returned this patient to Stroger given their policy of moving any patients in active labor to the hospital. Although the outcome ended up being acceptable, this was a clear violation of policy.

e. CCDOC-First Responder Training for Correctional Officers

Again, better than 90% of the officer staff have received their training and are provided with gloves.

**Monitor's Recommendations:**

1. Insure that both health care staff and CCDOC staff receive any revised training with regard to drug and alcohol withdrawal.

2. Cermak should consider developing a separate log for processing returns through the emergency room and use a very focused emergency service log for patients presenting under emergent conditions.

3. Cermak should work closely with Stroger Hospital emergency room and obstetrics people so that the error of returning a patient in labor to the jail does not occur again.

## 47.  Record Keeping

a.      Cermak shall ensure that medical and mental health records are adequate to assist in providing and managing the medical and mental health needs of inmates at the Facility and are maintained consistent with local, federal, and state medical records requirements.

b.      Cermak shall ensure that medical and mental health records are centralized, complete, accurate, readily accessible and systematically organized. All clinical encounters and reviews of inmates should be documented in the inmates' records.

     c.      To ensure continuity of care, Cermak shall submit appropriate medical information to outside medical providers when inmates are sent out of the Facility for medical care. Cermak shall appropriately request records of care, reports, and diagnostic tests received during outside appointments in a timely fashion and include such records in the inmate's medical record or document the inmate's refusal to cooperate and release medical records.

     d.      Cermak shall maintain unified medical and mental health records, including documentation of all clinical information regarding evaluation and treatment.

**Compliance Status**: Partial compliance.

**Findings:**

    **Status Update:** No status update was provided.

    **Monitor's Findings:**

    a. Cermak-Adequacy and Maintenance of Records

    Cermak continues to make progress according to the plan for the electronic health record. Since the June site visit, electronic entry of Health Service Requests has begun. Issues that have been resolved since the June site visit include ensuring that every health care provider can access all information in the electronic record, reconciliation or close out of incomplete patient care tasks and increasing use of Power Note rather than free text by clinicians.

    Patient care services not yet documented electronically include various patient care logs (close observation, hunger strike, segregation and suicide watch) and medication administration. Monitors report that documentation of care in the EHR continues to be sparse and recommend that clinical management focus attention on the quality and completeness of clinical documentation. Other recommendations from the June site visit are carried over to this report: revise certain existing electronic forms (specifically the intake mental health screening form and initial treatment plan) and develop additional forms or templates (suicide risk assessment, various logs and nursing assessment protocols). Problems with the interface between CCDOC's inmate tracking system,

Intellitech IMAC, and Cerner still have not been resolved. Even with various workarounds, there are delays in care as a result of the inability to communicate timely and accurately between the two systems about changes in inmate status.

b. Cermak-Accessibility of Records

Paper recording of patient care still required at the time of the November site visit included some Health Service Requests, various patient care logs (close observation, hunger strike, segregation and suicide watch) and medication administration. Some of this information is eventually scanned into the electronic record (e.g. HSRs and medication administration records) and other information is documented but not recorded in the health record (e.g. segregation rounds).

Now that virtually all clinicians are using the electronic health record, members of the Monitor's team did observe patient care encounters taking place in areas where there was no computer terminal. Health care staff either made notes by hand and later entered them into the record or went back and forth between the patient and the terminal to record findings. The lack of computer terminals in the locations where patient care takes place is inefficient and increases potential for errors and omissions in the documentation of patient care. Cermak leadership is aware of this problem and there is evidence of efforts to make terminals available to clinicians at the point of care. These efforts include purchase of additional equipment, sharing work spaces, and scheduling.

We recommend automation of the remaining forms, including various patient care logs (close observation, hunger strike, segregation and suicide watch) and medication administration so that this information is readily available to health care providers. We also recommend establishing timeframes for submitting remaining paper documentation so that it is scanned more timely into the electronic record.

c. Cermak-Communication with Offsite Provider

The Monitor continues to recommend that Cermak establish an expectation within policy and procedure that relevant information from previous providers be obtained if it is not available via the EHR or in a transfer summary (see previous reports from June 2010, December 2010 and June 2011).

d. Cermak-Unified Medical and Mental Health Records

We recommend that Cermak eliminate paper documentation and scanning of medication administration and various logs to document segregation rounds, suicide watch, close observation and management of inmates on hunger strike. This recommendation is consistent with Cermak's plan that only consents/refusals, advance directives, and certain off site specialty consults would be maintained as scanned documents in the EHR. Revisions to the intake mental health screening form, the mental health treatment plan and the development of a suicide risk assessment are recommended by Dr. Metzner. We also recommend that the intake medical screen be amended to establish a dedicated section for women's health conditions instead of documenting this information under "Assistive devices."

**Monitor's Recommendations:**

1. Establish a real time, two-way interface between Cerner and IMACS.

2. Continue to install equipment and integrate systems so that monitoring, care and treatment delivered to patients in the housing unit is documented timely in the EHR.

3. Complete implementation of the electronic Health Service Request and develop templates using Power Note for documentation of nursing assessment.

4. Establish regular retrospective and concurrent review of clinical documentation and provide proof via CQI that the results were used to modify systems, revise existing forms, develop new electronic forms and modify clinical practice.

5. Revise the intake mental health screening form and mental health treatment plan.

6. Revise the intake medical screen to include a section for women's health conditions.

7. Eliminate paper documentation and scanning; develop forms or templates to electronically document suicide risk assessment, close observation, hunger strike, segregation and suicide watch.

8. Establish timeframes for submitting other paper documentation so that it is received and scanned into the electronic record timely.

9. Establish policy and procedure to obtain relevant information from previous providers if it is not available via the EHR or in a transfer summary.

## 48. Mortality Reviews

a. Cermak shall request an autopsy, and related medical data, for every inmate who dies while in the custody of CCDOC, including inmates who die following transfer to a hospital or emergency room.

b. Relevant CCDOC personnel shall participate in Cermak's mortality review for each inmate death while in custody, including inmates who die following transfer to a hospital or emergency room, and a morbidity review for all serious suicide attempts or other incidents in which an inmate was at high risk for death. Mortality and morbidity reviews shall seek to determine whether there was a systemic or specific problem that may have contributed to the incident. At a minimum, CCDOC's contribution to mortality and morbidity reviews shall include:

(1)     critical review and analysis of the correctional circumstances surrounding the incident;
(2)     critical review of the correctional procedures relevant to the incident;
(3)     synopsis of all relevant training received by involved correctional staff;
(4)     possible precipitating correctional factors leading to the incident; and
(5)     recommendations, if any, for changes in correctional policy, training, physical plant, and operational procedures.

c. Cermak shall conduct a mortality review for each inmate death while in custody, including inmates who die following transfer to a hospital or emergency room, and a morbidity review for all serious suicide attempts or other incidents in which an inmate was at high risk for death. Cermak shall engage relevant CCDOC personnel in mortality and morbidity reviews and shall seek to determine whether there was a pattern of symptoms that might have resulted in earlier diagnosis and intervention. Mortality and morbidity reviews shall occur within 30 days of the incident or death, and shall be revisited when the final autopsy results are available. At a minimum, the mortality and morbidity reviews shall include:

<ol>
<li>(1)      critical review and analysis of the circumstances surrounding the incident;</li>
<li>(2)      critical review of the procedures relevant to the incident;</li>
<li>(3)      synopsis of all relevant training received by involved staff;</li>
<li>(4)      pertinent medical and mental health services/reports involving the victim;</li>
<li>(5)      possible precipitating factors leading to the incident; and</li>
<li>(6)      recommendations, if any, for changes in policy, training, physical plant, medical or mental health services, and operational procedures.</li>
</ol>

d.      Cermak shall address any problems identified during mortality and morbidity reviews through timely training, policy revision, and any other appropriate measures.

**Compliance Status**: Substantial compliance.

**Findings**

**Status Update:**

**Monitor's Findings:**

On September 16, 2011, the Monitor was able to participate in a mortality review committee meeting. At this meeting, although there were documents prepared by CCDOC there was no representative present. However, there was an additional meeting that day attended by CCDOC representatives during which a thorough discussion took place. The form we suggested is now being used by CCDOC. Additional meetings occurred on 9/30 & 11/3. I have been informed that an interagency order is being drafted which will cover the morbidity and mortality review process. This should be implemented by spring. We have suggested that Cermak create a form that CCDOC can use to document in those areas. Although we did review a critical incident review, this document did not necessarily address all of the areas required in the Agreement. We were impressed with the conscientiousness of the discussion. Clearly, the participants were attempting to identify areas where performance could be improved and some clearly were identified for which implementation of training or other strategies were being planned.

**Monitor's Recommendations:**

1. Insure that the mortality review meeting occurs within 30 days of the death and that a final death summary is created and reported within the next 30 days.

2. Continue to work with the medical examiner's office to obtain more timely receipt of toxicological and other data from that office so that data can be included in the final mortality committee report.

## 49. Grievances

Cermak shall develop and implement policies and procedures for appropriate handling of grievances relating to health care, when such grievances are forwarded from CCDOC.

**Compliance Status**: Partial compliance.

**Findings**

**Status Update:**

**Monitor's Findings:**

The Quality Improvement Coordinator presented year-to-date data with regard to both differing categories of complaints as well as the performance of different disciplines assigned to respond to the grievances. Overall, 23.5% of grievances were closed without the assigned person ever responding. This is a particular problem with regard to nursing and mental health and this needs to be aggressively addressed. For all of the grievances there were 165 in which a face-to-face assessment was requested and of those, 95 were in fact accomplished. Although this is an improvement over prior efforts, it still does not reflect conscientious performance. We still believe that training should be provided to those assigned the task of responses to grievances. The training should include how to investigate grievances, pitfalls about making assumptions based on instincts to be defensive, and the importance of the grievance program being effective since it is an important part of patient satisfaction.

**Monitor's Recommendations:**

1. Substantially reduce the number of grievances which are closed without a response.

2. Provide training for all who are tasked with responding to grievances.

3. That training must include returning the grievance response within 10 days or less.

4. Continue tracking the percent of grievances which results in face-to-face interaction.

5. Track the rate of appeals by Division to determine whether there are differences in the effectiveness of the individuals tasked with responding to the grievances.

**C.    MEDICAL CARE**

**50.  Health Assessments**

    a.    Cermak shall ensure that Qualified Medical Professionals attempt to elicit the amount, frequency and time since the last dosage of medication from every inmate reporting that he or she is currently or recently on medication, including psychotropic medication.

    b.    Cermak shall ensure that incoming inmates who present and are identified by medical personnel as having either a current risk of suicide or other acute mental health needs will be immediately referred for a mental health evaluation by a Qualified Mental Health Professional. Staff will constantly observe such inmates until they are seen by a Qualified Mental Health Professional or Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional. Incoming inmates reporting these conditions will be housed in safe conditions unless and until a Mental Health Professional clears them for housing in a medical unit, segregation, or with the general population.

c.    Cermak shall ensure that all inmates at risk for, or demonstrating signs and symptoms of, drug and alcohol withdrawal are timely identified. Cermak shall provide appropriate treatment, housing, and medical supervision for inmates suffering from drug and alcohol withdrawal.

d.    CCDOC shall maintain a policy that correctional officers supervising newly arrived inmates physically observe the conduct and appearance of these inmates to determine whether they have a more immediate need for medical or mental health attention prior to or following the intake health screening by Qualified Medical Staff.

e.    Cermak shall ensure that the medical assessment performed within two working days of his or her booking at the Facility, or sooner if clinically indicated, for each inmate specified above (provision 45.f, "Intake Screening") shall include a review of the inmate's intake screening form, a medical history, a physical examination, a mental health history, and a current mental status examination. The physical examination shall be conducted by a Qualified Medical Professional. The medical assessment shall also include development or revision of the inmate's problem list and treatment plan to address issues identified during the medical assessment. Records documenting the assessment and results shall become part of each inmate's medical record. A re-admitted inmate or an inmate transferred from another facility who has received a documented medical assessment within the previous six months and whose receiving screening shows no change in the inmate's health status need not receive a new medical assessment. For such inmates, Qualified Medical Staff shall review prior records and update tests and examinations as needed.

**Compliance Status**: Partial compliance, near substantial.

**Findings**

**Status Update:**

**Monitor's Findings:**

Again, we believe that when the process is performed for routine intakes the quality and timeliness of the health assessments is consistent with the requirements of the Agreed Order. The problem occurs when patients enter through an

anomalous pathway, such as hospital takeovers or electronic monitoring returns; the assessment is performed in the emergency room and the brevity of those assessments is such that a large amount of what is required in the Agreement is in fact not addressed. We have discussed this with the Medical Director and strongly encourage that when patients enter by anomalous pathways and are receiving their health assessment in the emergency room, the emergency room clinicians be required to use the electronic record health assessment template. This will force them to provide necessary documentation of data. In general, as we indicated earlier, of the 10 records we reviewed, as long as the intakes were by normal pathways, the assessment notes met the intent of this Agreement.

a. Cermak-Medication Assessment

On the routine intakes, there is an effort to elicit the amount, frequency and time since the last dosage of medication.

b. Cermak-Mental Health Positive Assessment

There is consistent implementation of a procedure to identify patients at risk for suicide and to assure that they receive a more thorough mental health assessment.

c. Cermak-Drug/Alcohol Withdrawal

The guideline on drug and alcohol withdrawal has not yet been fully published, although we have seen a draft. Formal training has still not yet been provided. Individuals at risk are identified and they are monitored, although this monitoring is not yet consistent. Completing the elements of the withdrawal program should be accomplished before our next visit.

d. CCDOC-Observation of New Inmates by Correctional Officers

Officers may, on occasion, identify inmates to be assessed through screening at a higher priority.

e. Cermak-Timeliness of Assessment

Cermak generally performs an advanced level assessment on the same day that the intake screen is completed, usually within a matter of an hour or two. This is performed for all individuals with a positive screen. At this visit, we did not note patients

being referred to the emergency room before a comprehensive assessment was completed. This is an improvement over our prior visit.

We also found a problem in that a patient who is admitted with possible drug withdrawal symptoms had vital signs ordered. The way the nurses documented it in the electronic medical record made it difficult to determine what the results were over a period of time. This means that more training should be provided to nurses on how to use the electronic record when documenting vital signs so as to insure results are easily accessible for review.

**Monitor's Recommendations:**

1. Train the emergency room clinicians that when they perform an intake health assessment on someone entering through an anomalous pathway, they must document utilizing the electronic medical record health assessment note template.

2. Complete the training with regard to alcohol and drug withdrawal for both nurses and clinicians.

3. The quality improvement program should monitor the performance with regard to implementation of the alcohol and drug withdrawal guidelines.

4. The quality improvement program should monitor the comprehensiveness of intake health assessments that are performed in the emergency room.

5. Train the nurses on how to correctly document vital signs in the electronic record and monitor the implementation of that training.

## 51. a Acute care-Urgent

a. Cermak shall provide adequate and timely acute care for inmates with serious and life-threatening conditions, and ensure that such care adequately addresses the serious medical needs of inmates. Adequate care will include timely medical appointments and follow-up medical treatment.

b. Cermak shall maintain guidelines for the scope of care of acutely ill patients in its on-site designated infirmary units and for transfer of patients when appropriate to outside hospitals.

**Compliance Status**: Partial compliance.

**Findings**

    **Status Update:**

    **Monitor's Findings:**

    a. Cermak-Provision of Adequate and Timely Care

We reviewed five records of patients seen onsite for unscheduled urgent care. In general, the care was provided timely and was clinically appropriate. In four out of five records patients were either not seen in follow up by their primary care clinician or were seen more than two weeks after the incident. With regard to urgent care issues, follow up care should occur within a week at the latest. This finding represents a step back with regard to the follow up care received after onsite urgent care is provided. It is not clear why this area has moved back. Due to the inadequacy of the follow up, we have downgraded the compliance status to partial compliance.

    b. Cermak-Care Guidelines

We have seen guidelines that describe the scope of care that would exceed the capability of the Cermak infirmary and must result in transfer to a facility that provides a higher level of care. We found only one case in which a patient in labor was sent to Stroger Hospital and returned still in active labor. This case, as alluded to previously, warrants discussion between OB/GYN and the Stroger emergency room so that this error is not repeated.

**Monitor's Recommendations:**

1. Insure that patients seen urgently in the Cermak emergency room are in fact followed up by their primary care clinician within a week.

2. Meet with the Stroger OB/GYN and ER departments so that they are aware that patients in active labor may not be returned to Cermak until after delivery has been completed.

**51. b  Acute Care-Infirmary**

a. Cermak shall provide adequate and timely acute care for inmates with serious and life-threatening conditions and ensure that such care adequately addresses the serious medical needs of inmates. Adequate care will include timely medical appointments and follow-up medical treatment.

b. Cermak shall maintain guidelines for the scope of care of acutely ill patients in its onsite designated infirmary units and for transfer of patients when appropriate to outside hospitals.

**Compliance Status:** Partial compliance.

**Findings**

**Status Update:**  We did not receive a status report prior to our visit.

**Monitor's Findings:**

a. Cermak-Provision of Adequate and Timely Care

There are an inadequate number of infirmary beds. According to the medical staff, this is largely due to two factors: (1) there are a number of patients housed in the infirmary who do not require an infirmary level of care (such as those requiring medical appliances such as wheelchairs and CPAP machines) and (2) increased census due to increased length of stay from longer sentences. (According to staff, the number of patients in the first category has decreased as housing has been found for some of these patients in other areas of the jail.) As a result of the overcrowding, patients are often placed on the floor in plastic "boats." On November 14, 2011, there were 32 patients on the floor in boats (up from 26 in June 2011). Medical staff informed us that they feel like they are constantly juggling patients and discharging them before they feel they are ready. Staff was not aware of any untoward

consequences that resulted from these early discharges. However, Dr. Mennella did state that the large amount of time the physicians are spending on bed control impacts the time they have to see patients.

Discharge notes are being written for patients who are transferred out of the infirmary to other units. According to medical staff, the system that was implemented prior to our last visit in which alerts are placed in the IMAC system to notify custody staff that certain higher risk patients need to be seen by the physician prior to release to make discharge arrangements is working.

We reviewed the medical records of 25 patients who were housed in the infirmary. The following problems were noted with their care:

i. The admission orders often did not contain required information such as reason for admission, acuity level, criteria for notification of physician, activity level and diet. Prior to our last visit, an electronic *Infirmary Admission Care Set* had been developed and implemented in Cerner. At the time of our current visit, it was not being used by the providers on a consistent basis. In addition, the order set did not include the reason for admission. We discussed this with Dr. Hart and he stated that it would be added.

ii. There were problems related to the adequacy of care in 13 of the cases. (See Appendix, Patients 1, 2, 3-6, 7, 9-12, 15, 18 and 20.)

iii. There were problems related to the timeliness of care in nine of the cases. (See Appendix, Patients 1-3, 6, 9, 14, 15, 17 and 18.) The policy on *Infirmary Care*, Policy G-03, has been revised to define three categories, instead of two, for patients admitted to the medical infirmary: acute, sub-acute and chronic. The policy provides time frames for initial and follow-up notes from the infirmary physician. In addition to these categories, some patients are considered "boarders." The policy needs to be revised to include a definition and timeframes for these patients.

iv. There were problems related to the documentation in two of the cases. (See Appendix, Patients 3 and 4.)

v. There were problems related to monitoring in two of the cases. (See Appendix, Patients 12 and 15.)

vi. Two of the cases we reviewed involved patients admitted to the infirmary for alcohol withdrawal. The care in both cases was not adequate. Cermak does not have a protocol for monitoring and treating alcohol withdrawal.

b. Cermak-Care Guidelines

The infirmary policies, *Infirmary Care*, policy G-03 and *Medical Infirmary*, policy G-03.1, still state that the physician's admission orders will be completed within eight hours of admission. In practice, the orders are being written at the time the patient is admitted to the infirmary. The policy needs to be revised to reflect the actual practice.

There have been no changes to the physical plant since the June 2011 visit. Cermak second and third floors continue to be a generally clean, well maintained, well lighted and organized area. Environmental temperatures in the nursing station areas and common areas were comfortable; however, there were consistent complaints by patients on both the second and third floors that their rooms were cold. Many patients were observed wrapped in a blanket when up in their room. In response to questioning by the Monitor as to whether the cold patient room temperatures had been reported, both nursing and security staff stated it was easier and better to not complain but provide the patients additional blankets, as the temperature would be increased to such a degree as to make it unbearably hot and uncomfortable. Cook County Detention Center (CCDC) infirmary continues to be located on the Cermak second and third floors. The second floor continues to be designated for male and female acute and "step-down" mental health patients, and the third floor continues to be dedicated to male and female acute medical patients, medical isolation patients and those individuals with chronic specialized medical needs. The bedded capacity has not changed since the June 2011 visit. Each of the areas is staffed 24/7 by licensed nursing staff. Physicians are assigned to the units during the day with all other hours covered through "call" or by the Cermak emergency room physician. Nursing staff positions have been increased; however, on specific units, i.e., 2 North and West, 2 East and South and 3 East and South, nursing staff are required to relieve each other for "lunch breaks," leaving the unit unattended by licensed nursing staff. As an example, when Nurse A relieves Nurse B for lunch break, it leaves Nurse A's unit unattended by a licensed nursing professional and the same when Nurse B relieves Nurse A. At the time of the Monitor's visit, during "lunch breaks" units were attended by at least a Patient Care Attendant (PCA).

The electronic medical record (EMR) is now operational on both the second and third floors. Electronic forms for routine activities, such as, "Close Observation," "Suicide Watch," "Hunger Strike" and "Flow Sheets" continue to not be available. During the November 2011 Monitor observation and multiple nursing staff interviews there was shown to be universal nursing staff knowledge regarding the EMR and universal nursing staff ability in competently navigating the system.

Pursuant to the Monitor's recommendation during a previous visit, the "Subjective-Objective-Assessment-Plan" (SOAP) method of nursing documentation continues to be utilized throughout Cermak, which creates consistency in the method/style of

documentation. Monitor interviews with multiple nursing staff indicated no issues in utilizing the SOAP documentation format. Monitor reviews of nursing documentation indicated such.

A review of nursing policies and procedures indicated an effective date of June 30, 2010 with a review date of March 30, 2011, which was not signed-off as having been completed. On each wing of both Cermak second and third floors, Monitor observation indicated policy and procedure manuals were present and current. During the June 2011 visit, the Monitor was informed of a Bureau wide policy in which the charting frequency requirements for both physician and nursing staff had been developed and was awaiting approval, with training to be provided by Stroger Hospital by August 2011; however, completion of this could not be verified.

Random inspections on each wing of both Cermak second and third floors indicated controlled medication logs/counts, needle and syringe logs/counts, tool inventories/counts and medication refrigerator temperature documentation were accurate and being conducted at the appropriate intervals. Observation of nursing medication administration in multiple areas indicated appropriate identification of the patient, appropriate explanation of the medication, appropriate taking of vital signs when warranted, mouth checks for each patient and appropriate documentation.

Cermak was overcrowded, with many patients housed on the floor in "boats" on both floors as follows: 2-North with 20 beds and 26 patients; 2-West with 20 beds and 32 patients; 2-South with 24 beds and 22 patients; 2-East with 24 beds and 23 patients; 3-North with 20 beds and 30 patients; 3-West with 20 beds and 31 patients; 3-East with 12 beds and 14 patients and 3-South with 13 beds and 11 patients. This amounts to 153 beds with 189 patients, resulting in a 24% over-capacity census. The over-capacity was due to the inability to discharge patients to housing units due to lack of bed space, the housing of general population inmates in the infirmary, the housing of general population inmates with medical equipment, e.g. C-PAP units, which are not permitted in the housing units, the  housing of inmates confined to wheel chairs the housing of inmates classified as protective custody and an increase in medical and mental health cases.

Additionally, during the visit, it was learned that admissions to Cermak are generally made through the Cermak emergency room by the physician. Interviews with infirmary staff indicated admissions are ordered with no consultation/input between the emergency room physician and the unit staff physician or nursing "house" supervisor and with no consideration as to unit census, staffing or unit patient acuity level.

Monitor interviews with nursing staff on each unit of both floors indicated staff was knowledgeable regarding the patients under their care; however, there was general inconsistency as to the requirements for the frequency of charting. For example, some staff reported they were required to chart on a patient at least once each shift, others reported a requirement of at least every twenty-four hours while others stated it depended on the "acuity" level, but no written/approved acuity levels with charting requirements could be produced. A random review of patient care nursing notes indicated very brief documentation. In response to questioning by the Monitor, nursing staff indicated they generally relied on the physicians to provide documentation that is more detailed. As a result, the "compliance status" is being downgraded from "substantial" to "partial compliance." A random review of nursing documentation and nursing staff interviews indicated that staff is either not completely informed regarding documentation policy or not following established policy.

**Monitor's Recommendations:**

1. Continue to educate new nursing staff and routinely update existing nursing staff regarding new policies and procedures.

2. Continue to add nursing staff to fill existing vacancies.

3. Continue to monitor and work with the Department of Facilities Management (DFM) to maintain comfortable environmental temperatures throughout the infirmary.

4. Continue to work with Facility Administration for solutions to relocating individuals in the acute care infirmary who are there for housing purposes only.

5. Develop and implement electronic forms for "Close Observation," "Suicide Watch," "Hunger Strike," "Flow Sheets" and all other routine nursing activities requiring documentation.

6. Develop a system/process for emergency room admissions which requires consultation with either the unit staff physician or nursing "house" supervisor and takes into consideration unit census, patient acuity level, staffing level and number of admissions during the shift.

7. From a multi-disciplinary approach, conduct at least one infirmary patient care Continuous Quality Improvement study.

8. Determine patient acuity levels and develop nursing charting frequency requirements specific to the acuity levels.

9. Nursing leadership is to provide training to nursing staff specific to acuity level driven charting requirements.

10. Encourage providers to use the electronic *Infirmary Admission Care Set* when admitting patients to the infirmary.

11. Add the reason for admission to the care set.

12. Revise the infirmary policy to address the problem identified above with the timeframe for admission notes and orders.

13. Revise the infirmary policy to define and set timeframes for boarders.

14. Ensure that the care provided in the infirmary is timely and adequate.

15. Explore other housing options for individuals who require medical appliances such as wheelchairs and CPAP machines.

16. Develop a protocol for monitoring and treating alcohol withdrawal based on the *Clinical Institute Withdrawal Assessment of Alcohol Scale* (CIWA-Ar).

## 52. Chronic care

a. Cermak shall maintain an appropriate, written chronic care disease management plan, which provides inmates with chronic diseases with timely and appropriate diagnosis, treatment, medication, monitoring and continuity of care consistent with the inmates' expected length of stay.

b. Cermak shall maintain appropriate written clinical practice guidelines for chronic diseases, such as HIV, hypertension, diabetes, asthma and elevated blood lipids.

c. Cermak shall maintain an updated registry to track all inmates with serious and/or chronic illnesses and shall monitor this registry to ensure that these inmates receive necessary diagnoses and treatment. Cermak shall keep records of all care provided to inmates diagnosed with chronic illnesses in the inmates' individual medical records.

d.      Cermak shall ensure that inmates with chronic conditions are routinely seen by a physician, physician assistant, or advanced practice nurse to evaluate the status of their health and the effectiveness of the medication administered for their chronic conditions.

e.      CCDOC shall house inmates with disabilities, or who need skilled nursing services or assistance with activities of daily living, in appropriate facilities, as determined by Cermak. CCDOC shall permit inmates with disabilities to retain appropriate aids to impairment, as determined by Cermak.

f.      Cermak shall ensure that inmates with disabilities or who need skilled nursing services or assistance with activities of daily living shall receive medically appropriate care. Cermak shall notify CCDOC of their specific needs for housing and aids to impairment.

g.      Cook County shall build out, remodel, or renovate clinical space as needed to provide appropriate facilities for inmates with disabilities in accordance with the timelines set out in provision 43.i. Prior to completion of the new clinical space, Cook County and DFM will work with Cermak to address the most serious concerns regarding facilities for inmates with disabilities, to the extent possible in the current Facility.

**Compliance Status:** Partial compliance.

**Findings**

**Status Update:** We did not receive a status report prior to our visit.

**Monitor's Findings:**

a.   Cermak-Chronic Disease Management Plan.

Cermak has a chronic disease management plan (Policy G-01, *Chronic Disease Services*) that effectively delineates the goals, components and development of a chronic care program. A policy has been developed and implemented (*Continuity of Care During Incarceration*, E-12) that specifies the recommended timeframes for the initial and follow-up chronic care visits based on degree of control. We found the timeframes to be acceptable except for the one for the initial primary care visit for patients who are determined to be in good control at intake. The policy allows a maximum interval of two months. We recommended that this be shortened to one month. Dr. Avery agreed and stated that he would revise the policy. In addition, the timeframes in the policy are not consistent with some of those in the chronic care guidelines. For example, the guideline on diabetes specifies that patients with diabetes will be seen within two weeks of intake and the guideline on hypertension states that some patients can be seen in four to six weeks.

b. Cermak-Written Guidelines

The clinical practice guidelines for the more common chronic conditions, including asthma, diabetes, hypertension, dyslipidemia, seizure disorders, HIV disease, heart failure, and anti-coagulation therapy, have been finalized, distributed to staff, in-serviced, and posted on the intranet. The guidelines are systematic and comprehensive, and will assist the providers in the management of their patients with chronic illnesses. Each guideline presents specific quality improvement measures which can be used to monitor the quality of care being provided for specific diseases.

c. Cermak-Tracking System

Disease specific registries based on the problem list have been developed. While the large majority of patients with chronic illnesses are in the registries, we did find some patients with chronic diseases whose illness was not documented on the problem list and therefore also not in the corresponding registry.

Cermak has also started to use the registries to monitor the care being provided to patients with chronic illnesses. Reports are currently being generated that document the following clinical parameters:

i. Patients in the chronic disease program who have been incarcerated for more than 90 days and have not been scheduled for a primary care follow-up visit.
ii. Patients with diabetes who have not had an HbA1c and/or LDL blood test within the required time frames.

iii.   Number/% of diabetic patients incarcerated more than 45 days who had their hemoglobin A1c measured within the last 180 days.

iv.   Number/% of diabetic patients incarcerated more than 45 days who had their LDL-cholesterol measured within the last year.

v.   Degree of diabetic control as measured by the hemoglobin A1c for patients incarcerated more than 120 days.

vi.   Degree of LDL-cholesterol control for diabetic patients incarcerated more than 120 days.

vii.   Number/% of HIV patients incarcerated more than 30 days who have had CD4 counts.

viii.   Severity of HIV infection as measured by the CD4 count for patients incarcerated more than 90 days.

ix.   Number/% of patients on Coumadin with INR measured within 48 hours of incarceration.

x.   Number/% of patients incarcerated for more than 45 days who are receiving Coumadin and have an INR in the therapeutic range.

xi.   Number/% of patients with congestive heart failure who are receiving an ACE inhibitor or an ARB.

xii.   Number/% of patients with chronic diseases who are seen for follow-up care within the specified interval.

xiii.   Number/% of patients with chronic diseases who are seen for their initial visit within the specified interval.

d. Cermak-Regularly Scheduled Visits

We reviewed the medical records of 68 patients with chronic medical problems. Many of these patients had multiple chronic illnesses. The problems reviewed included:

i.   Diabetes – 19 patients

ii.   Hypertension – 17 patients

iii.   Seizure Disorder – 11 patients

iv.   HIV Disease – 14 patients

v.   Asthma – 25 patients

vi.   Patients receiving Coumadin – 13 patients

vii.   Hyperlipidemia – 8 patients

The following problems related to timeliness of care were found:

i.  The initial chronic care visit did not take place in a timely manner. (See Appendix, Patients 23, 30, 31, 58, 62, 63 and 66.)
ii. Follow-up visits did not take place in a timely manner. (See Appendix, Patients 24, 31, 32, 35, 43, 51, 52, 54 and 56.)

e.  CCDOC-Facilities for Special Needs Patients

In late January/early February 2011, the Department of Justice's ADA unit visited Cook County Jail and performed a survey to identify any deficiencies. The report of their findings had not been received at the time of our visit. We contacted Mellie Nelson, the DOJ attorney involved in the survey, and she stated that the report was near completion and would be sent to the facility in the near future. During future visits, we will monitor any deficiencies that were identified during the survey.

f.  Cermak-Medically Appropriate Care for Special Needs Patients & Communication to CCDOC

The following problems related to the care of patients with chronic diseases were noted during our review of medical records:

i.   Providers are not performing an adequate assessment (history and/or physical examination) related to the patients' chronic illnesses. (See Appendix, Patients 20-22, 25-27, 29, 34, 37, 38-46, 48-50, 53, 55, 60, 61, and 64-66.)
ii.  While providers are more consistently noting the degree of control of the patients' chronic illnesses, there are still a significant number of cases in which this is not occurring.
iii. Providers are not developing and/or implementing an appropriate plan of care based on the patients' chronic illness and degree of control. (See Appendix, Patients 22-29, 33, 34, 36, 43, 49, 57 and 59.)
iv.  Problems related to clinical monitoring were noted. (See Appendix, Patients 52, 54 and 55.)
v.   Problems related to documentation were noted. (See Appendix, Patients 23, 31, 43, 47, 48 and 63.)

Cermak has developed templates in Cerner that will facilitate implementation of the chronic care program. These disease specific templates serve as reminders about the necessary elements of the history, physical examination, and plan for each chronic disease. At the time of our visit, staff were not using the templates.

Review of the medical records also revealed that while medications for chronic illnesses are being ordered at intake, the patients often do not receive their first dose for two to three days. In addition, providers often documented that patients reported that they were not getting refills of their medications in a timely manner. (See Patient 20)

The care of patients with HIV disease warrants special discussion. In our last report, we noted that, overall, these patients were being seen in a timely manner and are receiving appropriate care. In many cases, however, the HIV provider was not documenting an adequate history (just noting "no complaints"), not obtaining vital signs, and not performing a focused physical examination. In these cases, the patients were also being followed by a primary care provider who is addressing their HIV disease, as well as any other health problems they may have. In these cases, the HIV provider focused primarily on the results of laboratory tests and on medication compliance/side effects, whereas the primary care provider was documenting a complete review of systems and physical examination. This situation has not changed and remains an inefficient use of resources.

Cermak has instituted point of care testing (i-Stat) for monitoring the INR of patients receiving Coumadin. The i-Stat monitors are electronically linked to Cerner so that the results are documented in Cerner. Staff reported that this does not occur on a consistent basis.

**Monitor's Recommendations:**

1. Revise the *Continuity of Care During Incarceration* policy and the chronic care guidelines to state that the initial chronic care visit will occur within one month of entry into the jail. Include references to this policy in the *Chronic Disease Services* policy.

2. Encourage staff to use the templates in Cerner when they see patients for chronic care visits.

3. Continue to reinforce the importance of keeping the problem list up to date with staff. Develop a CQI study to determine what percentage of patients with chronic diseases are listed in the registries.

4. Develop a system to ensure that inmates with chronic diseases receive their medications in a timely manner.

5. Redefine the role of the HIV providers so that they function as the primary care provider for their patients.

6. Ensure that results from i-Stat are in Cerner.

## 53.  Treatment and Management of Communicable Disease

a.  Cermak shall maintain adequate testing, monitoring and treatment programs for management of communicable diseases, including tuberculosis ("TB"), skin infections and sexually transmitted infections ("STIs").

b.  CCDOC shall comply with infection control policies and procedures, as developed by Cermak, that address contact, blood borne, and airborne hazards to prevent the spread of infections or communicable diseases including TB, skin infections and STIs consistent with generally accepted correctional standards of care.

c.  Cermak shall maintain infection control policies and procedures that address contact, blood borne and airborne hazards to prevent the spread of infections or communicable diseases including TB, skin infections and STIs consistent with generally accepted correctional standards of care. Such policies should provide guidelines for identification, treatment and containment to prevent transmission of infectious diseases to staff or inmates.

d.  Pursuant to Center for Disease Control ("CDC") guidelines, Cermak shall continue to test all inmates for TB upon booking at the facility and shall follow-up on test results as medically indicated. Cermak shall follow current CDC guidelines for management of inmates with TB infection, including providing prophylactic medication when medically appropriate and consistent with the inmate's expected length of stay. Inmates who exhibit signs or symptoms consistent with TB shall be isolated from other inmates, evaluated for contagious TB and housed in an appropriate specialized respiratory isolation ("negative pressure") room. Cermak shall notify CCDOC of inmate specific housing requirements and precautions for transportation for the purpose of infection control.

e.  Cermak shall ensure that the negative pressure and ventilation systems function properly. Following CDC guidelines Cermak, shall test daily rooms in-use and monthly for rooms not currently in-use. Cermak shall document results of such testing.

f.  Cermak shall notify DFM in a timely manner of routine and emergency maintenance needs including plumbing, lighting and ventilation problems.

g.   Cermak shall develop and implement adequate guidelines to ensure that inmates receive appropriate wound care. Such guidelines will include precautions to limit the possible spread of Methicillin-resistant Staphylococcus aureus ("MRSA") and other communicable diseases.

h.   Cermak shall adequately maintain statistical information regarding communicable disease screening programs and other relevant statistical data necessary to adequately identify, treat and control infectious diseases.

**Compliance Status**:  Substantial compliance.

**Status Update:**  None Provided

**Findings:**

Since the June 2010 visit, the full-time nurse epidemiologist position has become vacant. As of the June 2011 visit, the position has been filled with the individual starting the same week as the Monitor's visit. The individual continued in the position at the time of the November 2011 Monitor visit. The department continues to be directed by a full-time staff physician credentialed in infectious/communicable diseases. Additional department staff includes the nurse epidemiologist, nurse clinician, data manager and three paramedics each responsible for either:  TB surveillance, TB surveillance and sputum collection and outbreak investigations. The department director indicated policies, procedures and surveillance and screening programs remain in place for TB, HIV, STDs, Hepatitis B and C, Ectoparasites, MRSA and seasonal influenzas including H1N1. It was further reported the department continues to interface with the Chicago Department of Public Health (CDPH), the Illinois Department of Public Health (IDPH) and the Illinois Department of Corrections (IDOC).

As reported to the Monitor during the June 2011 visit, Cermak began interfacing with the Illinois-National Electronic Disease Surveillance System (I-NEDSS) in May 2011; however, it was reported to the Monitor that the program "broke down" at the State level and was of no benefit to Cermak or CCDOC and, as a result, was no longer being utilized at the time of the November 2011 visit.

CCDOC continues the policy and practice of conducting a chest x-ray to rule out active TB on each individual at the time of booking.

The department director reported that new initiatives that have begun since the June 2011 visit are as follows:

1. The "opt-out" program now includes influenza vaccination and influenza vaccine is offered at every clinical encounter.

2. Data bases are being refined to continue to capture relevant statistics for:

- TB surveillance
- Female STI "Opt-Out" program
- Employee testing for TB and Hepatitis B, the number of flu vaccine doses administered and blood exposures to needle sticks and bites
- Skin infections.

3. Tracking of "outbreaks" for:

- Influenza
- Gastroenteritis
- Ectoparasites
- Immunizations
- MRSA (culture proven only)
- Negative air pressure isolation room usage.

4. Weekly tracking from the Cermak emergency room log of any complaints of skin/tissue infection for MRSA.

5. The offering of DPT immunization for all health care providers.

There continues to be no routine or on-going employee health screening at the Training Academy. Additionally, due to budgetary issues, annual TB surveillance will revert back to skin testing rather than the QuantiFERON blood test. The testing will be conducted on the divisional level.

a. Cermak-Maintenance of Testing, Monitoring and Treatment Programs

An infection control/surveillance program is in place which includes testing, monitoring and treatment programs for the management of communicable diseases, including tuberculosis, skin infections, including MRSA, and sexually transmitted diseases.

b. CCDOC-Compliance with Infection Control

Cermak has developed infection control policies, procedures and surveillance programs consistent with the Chicago Department of Public Health and the Illinois Department of Public Health.

c. Cermak-Infection Control Policies

The infection control policies and procedures are specific to the prevention of the spread of infections or communicable diseases, including TB, skin infections and sexually transmitted diseases. The policies provide guidelines for identification, treatment and containment to prevent transmission of infectious diseases to staff and inmates. Policies are consistent with the Chicago Department of Public Health and the Illinois Department of Public Health.

d. Cermak-TB Testing According to CDC Guidelines

At the time of booking, each individual receives a chest x-ray for the purpose of detecting active TB disease. Any individual with a positive chest x-ray or any individual exhibiting signs/symptoms of active disease is isolated from the general population. Isolation takes place in "negative-pressure" isolation rooms located on the third floor of the Cermak infirmary. Annual testing is conducted by PPD skin test.

e. Cermak-Ventilation Systems

The appropriate operation of "negative-pressure" isolation rooms by the "smoke" method is conducted and documented daily by nursing staff, whether or not the room is in use. It was reported that the Department of Facilities Management (DFM) conducts and documents a monthly test. It was observed that each "negative-pressure" isolation room is equipped with an alarm which indicates immediately when negative pressure has been lost. The room alarms consist of both a visual and auditory indicator.

f. Cermak-Notify DFM of Maintenance Needs

Policies and procedures specific to repair and maintenance have been developed. The department director reported problems with DFM performing room monitoring, determining if there is true "negative" air pressure and performing the required filter replacement.

g. Cermak-Appropriate Wound Care

Wound care is the responsibility of each Division physician and nursing staff. The infection control department continues to collect statistics from the Divisions and monitor wound treatment. The director of the department reported the number of wound/skin cultures has decreased as a result of fewer culture/sensitivity tests being conducted. Additionally, the department is tracking all complaints of skin/tissue infection for MRSA from the Cermak emergency room log on a weekly basis.

h. Cermak-Collection of Statistical Data Regarding All Communicable Diseases

Infection control/surveillance statistics are collected and maintained specific to communicable disease screening, identification, treatment and tracking. New databases have been built and monthly data is being collected for TB surveillance, HIV testing and surveillance, Opt-Out male and female STI and HIV tracking, positive MRSA cultures, treated acute gastroenteritis, influenza prophylaxis, Ectoparasites treatment, employee testing for TB and Hepatitis B, influenza vaccine doses administered and blood exposures to needle sticks and bites.

**Monitor's Recommendations:**

1. Continue surveillance, tracking and reporting of all skin/wound infections that are presumptively MRSA to the department Nurse Epidemiologist, with a focus on identification, treatment and containment of potential MRSA infections.

2. Pursue the development of a process/schedule for routinely sanitizing cells.

3. From a multi-disciplinary approach, conduct at least one patient care oriented Infectious Disease Quality Improvement study.

4. Continue to pursue grant studies.

5. Continue to work with the Department of Facilities Management regarding routine maintenance of the respiratory "negative air" isolation room air handling system.

6. Continue and refine the collection of statistical data for communicable diseases.

## 54.  Access to Health Care

a.      CCDOC will work with Cermak to facilitate timely and adequate accessibility of appropriate health care for inmates, as provided by Cermak.

b.      Cermak shall ensure the timely and adequate availability of appropriate health care for inmates.

c.      Cermak shall ensure that the medical request ("sick call") process for inmates is adequate and provides inmates with adequate access to medical care. The sick call process shall include:

(1)      written medical and mental health care slips available in English, Spanish and other languages, as needed;

(2)      opportunity for illiterate inmates and inmates who have physical or cognitive disabilities to access medical and mental health care; and

(3)      opportunity for all inmates, irrespective of primary language, to access medical and mental health care.

d.      Cermak shall ensure that the sick call process includes confidential collection, logging and tracking of sick call requests seven days a week. Cermak shall ensure timely responses to sick call requests by Qualified Medical Staff. The logging procedure shall include documentation of the date and summary of each request for care, the date the inmate was seen, the name of the person who saw him or her, the disposition of the medical or mental health visit (e.g. referral; whether inmate scheduled for acute care visit), and, if follow-up care is necessary, the date and time of the inmate's next appointment. Cermak shall document the reason for and disposition of the medical or mental health care request in the inmate's medical record.

e.   Cermak shall develop and implement an effective system for screening medical requests within 24 hours of submission. Cermak shall ensure that sick call requests are appropriately prioritized based upon the seriousness of the medical issue.

f.   Cermak shall ensure that evaluation and treatment of inmates in response to a sick call request occurs in a clinical setting.

g.   Cermak shall ensure that Qualified Medical Staff make daily rounds in the isolation areas to give inmates in isolation adequate opportunities to contact and discuss medical and mental health concerns with Qualified Medical Staff in a setting that affords as much privacy as reasonable security precautions will allow. During rounds, Qualified Medical Staff will assess inmates for new clinical findings, such as deterioration of the inmate's condition.

**Compliance Status**: Partial compliance.

**Findings**

**Status Update:**

The Monitoring team did not receive a status update regarding access to care for the most recent monitoring period.

**Monitor's Findings:**

We evaluated inmate access to care by reviewing health service request tracking systems; randomly inspecting health care request boxes in each Division; reviewing health service request forms (HSRs) health records and segregation logs; interviewing staff and inmates; and observing the sick call process.

Since the June 2011 monitoring visit, we found some improvement in the collection and triage of HSRs; however, this varied by Division, with some Divisions being noncompliant.

Following the triage of health requests, health care staff does not see patients in a timely manner. We reviewed Unit Manager Reports in Divisions IV and V that showed that the number of HSRs received each day exceeded the number processed and seen. In Division II, nursing staff reported collecting 400-560 HSRs per week, but seeing approximately 165 patients, with a high percentage being referred directly to a provider, often weeks in the future. While not all health service requests require a nursing evaluation, these data suggest that the demand for services exceeds what is provided. Inmate interviews with subsequent record reviews support that in some Divisions patients are not seen in a timely manner. The reasons for delays in access to care appear to be multifactorial, and include insufficient nurse staffing (Division II); inadequate tracking systems; limited nursing access to a medically equipped examination rooms during the workday (Divisions IV, V and X); and lack of adherence to the access to care policy. Lack of adequate patient tracking systems and nursing supervision at the Division level are also contributing factors.

Following triage of health requests, nurses sometimes do not see patients at all, instead making direct referrals to providers; however, the appointments are often scheduled to occur several weeks following the inmate's submission of the health request. In many cases, nurses piggy-back nursing sick call referrals onto previously scheduled provider appointments (e.g. chronic disease management), but there is currently no mechanism to notify the provider of the referral and the provider may or may not address the patients' sick call concern. In Division IV, we found 51 dental requests had accumulated in the dental referral box from Monday 11/10 to Thursday 11/14 without the patients being seen by a nurse or dental staff. These findings were consistent with inmate feedback that it often took weeks to be seen for health service requests.

When nurses do see patients, the quality of nursing assessments is highly variable and in many cases inadequate. This finding is likely related to the lack of training and nursing assessment and treatment protocols.

In September 2011, health care leadership implemented a new process for management of HSRs, initially rolling it out in four Divisions (I, V, VI and XI) and the remaining Divisions in November. At the time of our site visit, some staff was just becoming familiar with the new system. Significant changes from previous practice involved the more systematic use of the electronic medical record (EMR) to track, schedule and document patient evaluations. Limited data from the four Divisions showed that from early October to early November, the average time from the date the form was submitted until staff triaged it decreased from 65 hours to 31 hours, a significant improvement.

While improvements have been made in the collection and triage process, the infrastructure necessary to ensure timely access to care have not been fully implemented, and our review showed that, in general, inmates still do not have timely access to care.

Other key findings include:

- An access to care policy has been developed, but at the time of our visit staff was not sufficiently trained to assure uniform implementation throughout the jail.

- There are insufficient registered nurses to implement the program in all Divisions, which has affected timeliness of care.

- Nursing assessment protocols that are symptom-based (as opposed to diagnosis- based) and that provide guidance to staff have not yet been developed and implemented.

- A nursing assessment/skills training program has been implemented, but not in conjunction with nursing assessment and treatment protocols. Our review found that the quality of nursing assessments needs significant improvement.

- Nurses do not have sufficient access to medically equipped examination rooms that affords patient privacy and computers to document their assessments in the EMR.

- A tracking system for HSRs has been incorporated into the EMR, but as designed, does not permit health care leadership to evaluate each step of the process. Doing so would permit a more complete assessment of root causes of problems with access to care and facilitate the design of appropriate strategies for improvement.

The Monitor is encouraged by improvements noted during this visit; however, significant progress is still required to achieve substantial compliance with this provision.

a. Jointly Provide Appropriate Accessibility and b. Timeliness and Adequacy of Care

In each Division, we conducted random inspection of boxes into which HSRs are placed. Since our last visit, we found improvements in the availability of HSRs, the ability of inmates to confidentially submit their requests and daily collection of forms.

However, as noted above we found inconsistencies in the process across the Divisions. We also found modest improvements in documentation of nursing assessments in some Divisions, with others showing no meaningful improvement. All Divisions were found to be in partial compliance except Division V. Our findings for each Division are described below.

Division I is a maximum-security Division with health care staffing from 0700 to 1600. During our inspection, we found that each randomly inspected tier had health service request forms available to inmates and lockable sick call boxes installed in accessible areas, with the exception of one tier in which the sick call box lock was broken. Correctional officers we interviewed were familiar with the process for making request forms available to inmates and the confidential handling of request forms.

Staff reported no issues with timely access to patients; however, interviews with inmates on the tiers and reviews of health records suggest there are significant access issues. Inmates reported that they are often not seen following submission of their health requests. We reviewed the records of several inmates and found that they were not seen in a timely manner for their complaints, if at all. Inmates also reported that health care staff is unresponsive to patients with urgent complaints. In one case, a correctional officer notified health care staff of an inmate with severe abdominal pain but was told to have the patient take acetaminophen. Later that night the inmate was found unconscious and taken to Cook County Hospital (Stroger) where he underwent emergency abdominal surgery for bowel obstruction at Stroger. Our record review also revealed several progress notes indicating that nurses evaluate inmates on the tier rather than in the medical clinic. Review of pending HSRs showed that they were collected and triaged in a timely manner. However, in some cases, nursing triage decisions resulted in scheduling provider appointments that are weeks in advance and not appropriate to the patient's complaint. For example, one patient submitted an HSR on 11/14/11 complaining of discomfort in his left chest and arm and a CMT scheduled him for an appointment three weeks later on 12/2. Although improvements have been made in collection and triage of HSRs, Division I is noncompliant with Provisions 54 a. and 54 b. due to delays in access to care, cell-front assessments and inappropriate response to emergency complaints.

In Division II, dorms 1, 3 and 4, a random inspection of sick call boxes revealed no forms in the boxes, but there were completed log sheets indicating request forms had been retrieved.

Staff reported that they collect 60-80 forms a day (averaging 420-560 per week) and see approximately 165 inmates in sick call each week. Although not all inmate health requests require a nurse visit, these data suggest that the current volume of patients seen does not meet the demand for services. Additionally, medical staff is only on-duty from 7 A.M. to 3 P.M. which limits the amount

of sick call conducted. During our visit, the Nurse Manager stated, due to staffing shortages, no staff was assigned to the processing of sick call requests. The manager further stated staff will "eyeball" the forms for those having an immediate need but actually processes the forms later. Lastly, the manager stated that no tracking process had been developed to track the forms from collection to patient scheduling and evaluation.

Consultation with nursing staff indicated on the day of the inspection that 70 request forms from the previous day had been collected. A random review of six forms from dorm 1 indicated they had all been triaged within one day of collection. A random review of nine forms from dorm 3 indicated they had all been triaged within three to five days of collection, which is not timely. A random review of two forms from dorm 4 indicated one form had been triaged within two days of collection.

We noted that even when triaged in a timely manner, triage decisions were not consistently appropriate. For example, an inmate submitted a form dated 11/10/11 complaining of chest pain and shortness of breath and staff scheduled him for an appointment on 12/8. We brought this HSR to the attention of the nurse manager, who arranged to have the inmate immediately escorted to the medical unit. In reviewing triaged forms, it was difficult for the Monitor to cross-reference recommended treatment dates to the computerized schedule and the medical record nursing notes. According to nursing staff, it would be difficult to impossible to track a request form from submission to disposition. Nursing staff confirmed there is no practice to notify the inmate as to the receipt or disposition of a form. It appeared to the Monitor that nursing staff, rather than conducting a face-to-face evaluation, were referring 90% of medical related request forms to either the physician or mid-level provider or "tagging" a sick call referral onto to an existing appointment without ensuring that the referral occurs in a timely manner. Although improvements have been made in collection of HSRs, Division I, dorm 1, 3 and 4 are noncompliant with Provisions 54 a. and 54 b. due to inconsistent triage of forms, inadequate tracking systems, delays in initial access to care, and inappropriate response to emergency complaints.

Division II, Dorm 2, is staffed with health care staff 24 hours per day, seven days per week. Sick call is conducted daily, Monday through Friday, with a double sick call on Thursday and Friday. Nursing staff reported approximately 140-160 inmates are evaluated in sick call each week. A sick call request box was positioned on the wall in the vestibule area on all three floors. When checked, the boxes were empty but each contained a completed log sheet indicating request forms had been retrieved that morning. Dorm 2 went "live" entering HSR data into the electronic medical record the week of 11/7/11. Currently, there is no sick call request form-tracking log in use for dorm 2.

On 11/15/11, thirty-seven (37) forms had been collected and all had been date-stamped as received. The Monitor was informed that these forms would be triaged later that day. A further review of pending sick call request forms indicated 19 had been collected between 10/28 and 11/13; all had been date-stamped as received the same day or no later than the next. The "triage nurse" informed the monitor she had only been assigned for one week to review forms and evaluate inmates and, as a result, had a backlog. She further stated she is often "pulled" to perform other duties and when that occurs, the sick call request forms "sit" and are not processed. The monitor attempted to track a random selection of 10 of the 37 forms from 11/15 and 10 of the 19 forms from between 10/28 and 11/13 and was unable to track them from collection to triage to scheduling to evaluation. At this time Division II, dorm 2 is noncompliant with Provisions 54 a. and 54 b. due to lack of timely HSR triage with resulting delays in access to care and lack of adequate patient tracking systems. This finding appears to be in part related to lack of adequate staffing which delays the processing of health service requests.

At the time of our review Division III, Dorm 3 was only being utilized for intake overflow. Newly arriving inmates are housed in the area each evening and the next morning moved to permanent housing. As a result, no sick call was taking place in dorm 3. An EMT was available for emergencies and a very few medication administrations.

In Division IV, in a random inspection of tiers, we found that officers had blank health request forms available to distribute to inmates and sick call boxes contained completed tracking logs. A review of the Unit Managers Daily Report for the week of November 13 showed that from Sunday to Wednesday, there were 20, 31, 43 and 30 health services requests collected respectively, but the number of nurse face-to-face encounters was 12, 11, 20 and 25 respectively. Although not all requests require a nursing encounter, these data suggest that the number of encounters does not meet the demand for services. We also found that 51 dental requests had accumulated in the dental referral box from Monday 11/10 to Thursday 11/14 without the patient being seen by a nurse or dental staff. Several of the requests were from patients complaining of moderate-severe dental pain and/or infection. During interviews inmates reported that nurses do not pick up the forms daily and that they are typically seen two to three weeks after submission of their complaints, if at all. When seen, they report the nurses are professional in their approach. However, several inmates complained that a male physician does not listen to them, is dismissive of their concerns and does not reschedule them to discuss lab or diagnostic test results.

We interviewed a registered nurse who had just been assigned to conduct sick call the week of the site visit. We noted that for some requests she scheduled patients to coincide with a previously scheduled provider appointment two to four weeks in the

future. This is consistent with patient feedback regarding delayed access to care. Although improvements have been made in collection of HSRs, Division IV is noncompliant with Provisions 54 a. and 54 b. due to inconsistent triage of HSRs and scheduling patterns that delay timely access to medical and dental care.

Division V is staffed with registered nurses and CMTs from 7 A.M. to 5 P.M. each day. A random inspection of tiers showed that all had sick call boxes; however, as noted in two previous reports, some boxes were unlabeled as to their purpose. One correctional officer we interviewed did not know the correct procedure for inmate submission of HSRs and we again found completed HSRs placed on top of the grievance box Instead of being placed in the health care box. This does not ensure confidentiality of health service request forms. During random inspection of the boxes, we found that Health Service Tracking Logs from tiers 2D, 2E and 2F showed the same CMT signature from November 1-17, 2011. We interviewed the CMT, who reported that he had worked every day in November. Upon investigation, the Nurse Manager found that the CMT had not worked every day in November and upon discussion with the CMT, he acknowledged that he had falsely filled out the form. It is therefore unknown at what frequency inmates requests forms are collected and triaged in this Division. Review of the Unit Managers Daily Report for the weeks of 10/30 to 11/12 showed that the number of HSRs collected daily far exceeded the number of HSRs processed and patients seen. For example, for the week of 10/30 to 11/2, 223 HSRs were collected and nurses saw 122 patients.

Typically, two providers are scheduled for clinic in the morning, occupying both examination rooms. During this time, nurses see patients at a desk in the middle of the room that does not provide privacy. Nurses are unable to conduct sick call in a medically equipped examination room until the afternoon and are unable to immediately consult with a provider when seeing patients. This is not optimal use of clinic space and does not encourage collaboration. An alternate approach would be to schedule providers for a morning and afternoon clinic that would allow nurses to utilize one of the examination rooms throughout the day. This approach would also increase opportunities for collaboration between nurses and providers.

Inmates we interviewed reported that they are not seen in a timely manner following submission of their health requests. In one case, a patient submitted a request on 11/2 stating that he thought his hand was fractured. A nurse triaged his request on 11/3 and scheduled him for an appointment on 11/8, but at the time of our review, he had not been seen by anyone. At this time, Division V is noncompliant with Provisions 54 a. and 54 b. due to staff falsification of Health Services Request Tracking Logs and lack of timely HSR triage with resulting delays in patient access to care. This finding appears to be related, in part, to lack of nursing access to adequately equipped examination rooms throughout the day. This factor is more accentuated given that the Division is

only staffed during the day shift. Lack of an adequate patient tracking system is also a contributing factor. Increased nursing supervision is required in this Division.

Division VI is staffed on day shift from 7 A.M. to 5 P.M. Nursing sick call is conducted daily, seven days a week. The nurse manager has assigned an individual position and requires all request forms be collected by noon each day, triaged and electronically logged in the afternoon of the same day as collected. A random review of 50% of sick call boxes indicated no request forms but appropriately completed log sheets in each box and there was no backlog of non-triaged request forms. In this Division, it was very easy to track a request form from date of collection to scheduling and/or evaluation.

A random review of 10 health care request forms, written between 11/11 and 11/16, showed that each had been triaged within 24 hours of receipt, with face-to-face inmate contact within 72 hours or less of triage. Additionally, a random review of five sick call encounters on 11/16 indicated each request form had been collected and triaged the same day or no later than the next day of submission, and a face-to-face nursing evaluation was conducted within one day of triage.

For both security and medical reasons, scheduled appointments are not always kept and require rescheduling. Nursing staff reported that security staff limits the number of individuals that can be escorted to the medical waiting area for sick call. Nursing staff reported that if medical staff is not conscientious about checking who is not escorted to clinic for sick call, the individual is "lost" in the system and has to resubmit another HSR in order to be seen in sick call. For example, on 11/16, 64 patients were scheduled to be evaluated but only 54 were escorted to the medical unit by security staff. As a result, 10 individuals would have been "lost" had medical staff not taken notice and automatically rescheduled them for the next sick call. Ideally, the process of identifying patients who did not appear for scheduled appointments should be standardized in all Divisions and schedulers notified so that rescheduling automatically occurs. On 11/17, 13 patients had been triaged and scheduled for primary care clinic, but the medical unit was notified there was no provider available and all the sick call had to be rescheduled. At this time, Division VI is found to be partially compliant with Provisions 54 a. and 54 b.

In Division IX, there have been no issues with collection and logging of HSRs for nearly a year. During this site visit, we did not find any uncollected HSRs and the logs in the box had been signed by staff daily. As observed in two previous reports, inmates in segregation are unable to place the HSR into the box but must give it to an officer or other staff to put into the box. At the time of this site visit, nursing staff collected HSRs from the boxes in the morning. Registered nurses review, evaluate and triage these

requests throughout the day. A nursing sick call clinic is held in the dispensary every afternoon. The problem transporting inmates to the dispensary that was apparent last spring has since been resolved in Division IX.

In Division IX, all registered nurses are responsible for assisting with triage and assessment of HSRs. The CMTs no longer assist in this process. In addition, Pia Gustafson, the Nurse Manager, has developed staff that can perform triage and assessment in either Division IX or XI. Two advantages were observed: one of these was greater collaboration and problem solving in managing the flow of HSRs and the other was the deployment of staff where needed so that HSRs do not accumulate.

Face-to-face evaluation and triage is still taking place in the housing unit as described in the last report. Since the last site visit, a nursing clinic has been scheduled at 4 P.M. in the dispensary. An inmate whose complaint cannot be properly evaluated on the housing unit is scheduled to be seen at this clinic. There were no problems or delays in care reported by nursing staff because appointments were cancelled or inmates not transported to the clinic by security staff. The rooms on each floor that we were shown at the last site visit have been equipped as clinical space, but because they have not been keyed, are not yet operational.

Four HSRs being triaged by nurses on 11/16 were reviewed and all had been dated by the inmate the day before. Each of these complaints had been evaluated by the nurse on the tier and the nurse's assessment was generally appropriate, given that there are no guidelines or protocols for the nurses to use in conducting these evaluations. No HSRs of inmates seen in the afternoon nurse clinic were reviewed. The nursing staff began recording HSRs in the EMR a week before the site visit began. At this time, Division IX is found to be partially compliant with Provisions 54 a. and 54 b.

The process in Division X has been modified so that HSRs are picked up by nursing staff on the night shift. Registered nurses evaluate the HSRs and identify any urgent complaints. The nurse then sees those inmates on the tier to determine where and when a more definitive clinical encounter will take place. The nurse can have the inmate brought to the dispensary for nurse sick call, have the inmate seen by the primary care clinician or send the inmate to the ER. Recording of the HSR into the EMR has not yet been initiated.

All other complaints are reviewed from 7 A.M. until 9 A.M. by two registered nurses who also check the patient's EMR for relevant clinical information. Then one of the nurses goes to the housing unit and sees each patient. Any inmate who needs to be seen in a clinical setting is then scheduled for nurse sick call in the dispensary after the afternoon primary care clinic is finished.

Completed HSRs are scanned into the record at a later date. There is no space on the new HSRs for nursing staff to record their assessment and so these notes are being made in the margins and on the back of the HSR. The Nurse Manager closely monitors the processing of HSRs and takes action as appropriate to manage the flow of HSRs.

We selected four HSRs the nurse had determined were urgent and, in each, the request had been submitted the day before. An additional 25 HSRs that had been completed by nursing staff were reviewed. The average time until seen by a nurse was 6.6 days. Eight requests or nearly a third had been evaluated by a nurse within 72 hours. Four requests took 10 days or more for the nurse's evaluation. The nurse's assessment of health complaints was mostly appropriate given that there are no guidelines or protocols for the nurses to use in conducting these evaluations. The standard for timeliness of nurse triage and evaluation has not yet been met. There is evidence of continued improvement at this site visit as well as the one before. At this time, Division X is found to be partially compliant with Provisions 54 a. and 54 b.

Division XI is one of four that has been recording HSRs in the EMR since September. HSRs are collected by a nurse between 7 A.M. and 8 A.M. The Health Services unit also has initiated a daily huddle at 8:15 A.M., which includes reporting on HSRs from the day prior. All registered nurses review and triage HSRs daily and a nursing clinic is held daily at 10:30 A.M. Problems reported at the last site visit, with officers collecting HSRs which led to delays in triage, have been corrected.

In Division XI, all registered nurses are expected to assist with assessment and triage of HSRs. The CMTs no longer assist in the HSR process. See comments made previously about staffing and collaboration between Divisions IX and XI. Face-to-face nursing evaluation is done in the dispensary in Division XI. Since more nursing encounters are taking place, better access to computer terminals is needed to use the EMR. Statistics reported out by Mr. Blackwell, Process Improvement Project Director, for the weeks in October show average time to triage in Division XI took less than 24 hours in two of the five weeks reported. We recommend that instead of averages, the metric should be the total number of HSRs submitted and the number (and or %) triaged within 24 hours.

Of four inmates seen while we were observing nurse sick call, two had submitted a HSR dated two days prior. One was being seen four days after the date on the request and another 15 days later. The nursing assessment of health complaints was adequate given that there are no guidelines or protocols for the nurses to use in conducting these evaluations. The standard for timeliness of nurse triage and evaluation has not yet been met in Division XI, yet there is evidence of improvement from the last site visit. At this time, Division XI is found to be partially compliant with Provisions 54 a. and 54 b.

c. d. e. f. Sick Call

Health care request forms are written in both English and Spanish

As noted in our previous reports, we observe that paper HSRs are written in both English and Spanish. However, it is not clear that Spanish speaking health care staff is readily available to inmates to translate and address their complaints.

Confidential collection

In most Divisions, inmates are able to confidentially submit their HSRs. Exceptions include Division V, where we found HSRs placed on top of grievance boxes and in Division IX where inmates still hand their forms to officers (Division IX) or place them on top of mail/grievance boxes (Division V).

Logging and tracking seven days a week

At the Division level, there is a Unit Managers Daily Report that tracks the number of HSRs received daily, the number processed and the number pending. These reports showed that in certain Divisions (i.e., II and IV) staff receives a greater number of requests each day than are processed by staff. The Unit Managers Daily Report is a useful tool that provides a weekly snapshot of workload demand and services provided. However, there is no system at the Division level that enables staff to track an individual patient's health care request form from receipt to resolution. Thus, for management purposes, there is no tool to evaluate whether individual patients are seen in a timely manner, other than to search the health record. We strongly recommend that one be developed for use by nursing staff and Nurse Managers. As noted earlier in the report, Cermak leadership has implemented a template for the HSR in the EMR that will ultimately provide aggregate data regarding health service requests. We reviewed the template and found that there are data elements missing from the template (e.g. date inmate wrote the request, date HSR was received, etc.) that would permit more accurate analysis of the root causes of delays in access to care. We discussed this with leadership and made suggestions that would enable more comprehensive analysis of the timeliness and appropriateness of care.

Our review showed improvements in staff logging of the number of forms collected daily. However, in Division V we found that a staff member falsified documentation of collection of HSRs in November, which raises issues regarding the credibility of staff documentation and timeliness of services.

Timely response by qualified medical staff

Our review showed improvements in staff triage of HSRs in selected Divisions. Although HSR triage was timelier, nurses/CMTs did often did not assess the patient the next business day, but instead directly referred patients to a higher-level provider or another service, often delaying patient evaluation for several weeks or even longer. The quality of nursing assessments is better in some Divisions than others are, but overall continues to be poor or minimally adequate. This can be attributed to lack of adequate numbers of registered nurses who have been trained in physical assessment skills and use of nursing assessment protocols.

<u>The reason for the request and disposition is documented in the health record</u>

Historically, nurses have documented in the health record using paper health services request forms. The current HSR has no room for a nurse to document a patient assessment. In September 2011, a new sick call process using an electronic health service request template was rolled out in selected Divisions with other Divisions being rolled out just prior to the site visit. Thus, there is currently a transitioning from paper to an electronic documentation of patient assessments. We found instances in which inmates reported submitting HSRs that were not found in the health record. It was not possible to determine the frequency or cause of these occurrences, but we would anticipate that as the access to care program is developed and refined, the frequency of these events would diminish.

<u>System to screen requests within 24 hours and prioritized</u>

While improvement has been made in collection and triage of HSRs, decisions regarding prioritization of requests were not consistently appropriate, particularly related to urgent complaints such as dental and chest pain.

<u>Cermak-Sick Call Takes Place in a Clinical Setting</u>

We observed some inconsistencies with respect to where nursing sick call is performed. In Division IV, nurses were conducting sick call in a room that had recently been designated for sick call but had not yet been medically equipped and supplied with access to computer terminals. In Division V, the nurse conducts sick call at a desk in the middle of the room without sufficient privacy.

g. Cermak-Daily Isolation Rounds

The Agreement requires that Cermak ensure that Qualified Medical Staff make daily rounds in isolation areas to give inmates in isolation opportunities to discuss medical and mental health concerns with health care staff with privacy. During rounds, health care staff is to assess inmates for new clinical findings, such as deterioration of the inmate's condition. This standard is not met.

In Division IV, segregation rounds are conducted by a CMT on Monday-Wednesday-Friday. We reviewed logs of segregation rounds for the months of September, October and November 2011 and found improvement from our last site visit; however, rounds do not consistently occur three times weekly. We did not observe segregation rounds in Division IV.

We observed segregation rounds in Division IX during this site visit and interviewed the paramedic responsible for this task. The paramedic was observed to engage each inmate in segregation in conversation. The paramedic notes these contacts using a list of inmates on segregation status. This person may gather information on behalf of the inmate (e.g. next primary care appointment), follow up on concerns (e.g. whether medications have been received) or make referrals for care. Referrals for care will be documented in the EMR as a request for an appointment, but other efforts made on behalf of the inmate's health and wellbeing may not be documented. The lists are a record of rounds but there is no provision for keeping or storing them. There also is no documentation of rounds in the health record of individual inmates in segregation. Segregation rounds are not conducted on days that this individual is not present, such as when on days off or another form of leave.

We did not evaluate segregation rounds in Division XI during this site visit.

As noted in our previous reports, the requirement in the Agreed Order exceeds NCCHC requirements (See NCCHC Standards for Health Service in Jails J-E-09, Segregated inmates) in which the frequency of rounds is based upon the degree of isolation. We recommend that the parties reevaluate the requirements of the Order so that the frequency of rounds does not exceed three times weekly unless warranted by the degree of isolation.

**Monitor's Recommendations:**

1. Cermak health care leadership should continue to develop the infrastructure necessary to successfully role out the access to care program.

a. Cermak should establish, hire and train sufficient numbers of registered nurses to conduct sick call daily in each Division.

b. CCDOC and Cermak should ensure that nurses have access to medically equipped examination rooms and real time access to the EMR to document patient assessments.

c. Revise protocols to be symptom or system based rather than diagnosis driven.

d. Train and develop nurses to conduct nursing assessment and use treatment protocols.

e. Incorporate the assessment protocols into the EMR to facilitate compliance with the protocols.

f. Cermak should perform CQI studies regarding the timeliness and quality of nursing assessments and success of nurse to clinician referrals.

g. Revise the electronic medical record HSR template to include all data points required by the Agreement and to permit accurate analysis of root causes of delays in access to care. Key data points include: the date the patient completed the HSR; the date and time the HSR was received; the date and time the HSR was triaged; the disposition of the complaint with respect to urgency and the date and time the patient is seen by nursing staff. If a provider referral is made the urgency of the referral and date and time the referral takes place.

2. CCDOC and Cermak should continue to jointly monitor inmate access to HSRs and the ability to confidentially deposit them in a box accessed only by health care staff. Broken boxes should be repaired and/or replaced. All health care boxes should be labeled.

3. CCDOC and Cermak should train correctional officers in Division V regarding the proper handling of health service requests.

4. CCDOC/Cermak should evaluate the provision to identify inmates who have a need for language interpretation and/or communication assistance and to ensure that there are sufficient mechanisms in place to provide that assistance during each patient care encounter.

5.     CCDOC and Cermak should orient inmates regarding the access to care policy and procedure upon arrival.

6.     Nurse Managers should provide close clinical and programmatic supervision of the nursing staff responsible for assessment and triage of HSRs. Develop tracking logs at the Division level to facilitate supervision of the access to care program.

7.     CCDOC and Cermak should ensure that segregation rounds occur and are electronically documented in the health record. Every inmate in segregation should have contact with a health services professional as part of rounds, not just those inmates with a request. The parties should consider modifying the order to meet NCCHC guidelines regarding the frequency of rounds.

8.     CCDOC and Cermak should resolve impediments to timely requests for health care attention by inmates in segregation.

9.     Establish mechanisms so that each instance of failure to transport is reported and that the patient care encounter takes place within the next 24-48 hours. Each incident, the reason for not transporting and the date of the rescheduled encounter should be reviewed at the Interagency Health Care Quality Improvement Committee.

## 55.  Follow-Up Care

a.     Cermak shall provide adequate care and maintain appropriate records for inmates who return to the Facility following hospitalization or outside emergency room visits.

b.     Cermak shall ensure that inmates who receive specialty, emergency room, or hospital care are evaluated upon their return to the Facility and that, at a minimum, discharge instructions are obtained, appropriate Qualified Medical Staff reviews the information and documentation available from the visit, this review and the outside provider's documentation are recorded in the inmate's medical record, and appropriate follow-up is provided.

**Compliance Status:** Partial compliance.

**Findings**

**Status Update:**

**Monitor's Findings:**

This element requires that Cermak not only maintain appropriate records for inmates' return to the facility following outside emergency room visits, but also that they be reassessed upon reentry to Cermak. We reviewed six records of patients sent offsite on an emergency basis and found problems with three out of those six. One of the cases has already been alluded to as a patient in active labor who was returned mistakenly to Cermak from Stroger Hospital and kept in Cermak for approximately 12 hours while in active labor with no documented monitoring. A second problem case is a patient who was sent out on October 3 complaining of left lower quadrant pain and nausea and vomiting. The pain was 10 out of 10. The patient had a good emergency room exam and was sent to Stroger Hospital. A CT scan revealed bilateral stones in the kidneys but the GI organs showed no abnormalities. The pain seemed to have decreased. However, there is no documented return emergency room visit when returning to Cermak. In fact, the patient was in jail for an additional two weeks but was never seen in follow up. Another patient, according to the emergency room log, was sent out to Stroger as an acute appendicitis. However, in reviewing the electronic record, the patient was sent to Cermak ER because of sinus bradycardia. Thus, there is a total discrepancy between what is in the logbook and what is in the electronic record. Finally, there is one additional case in which the patient initially presented with a flare up of Crohn's disease and was sent to Stroger Hospital. He was discharged on October 8 with a diagnosis of Crohn's flare up and there is a nice discharge summary. He was seen in the ER on return and was scheduled for a colonoscopy and then a GI consult. He received these but has never been followed up by the primary care clinician.

**Monitor's Recommendations:** None.

## 56. Medication Administration

a.    Cermak shall ensure that treatment and administration of medication to inmates is implemented in accordance with generally accepted correctional standards of care.

b.    Cermak shall develop policies and procedures to ensure the accurate administration of medication and maintenance of medication records. Cermak shall provide a systematic physician review of the use of medication to ensure that each inmate's prescribed regimen continues to be appropriate and effective for his or her condition.

c.   Cermak shall ensure that medicine administration is hygienic, appropriate for the needs of inmates and is recorded concurrently with distribution.

d.   Cermak shall ensure that medication administration is performed by Qualified Nursing Staff.

e.   When Cermak prescribes medication to address an inmate's serious mental health needs, HIV or AIDS, or thromboembolic disease, Cermak shall alert CCDOC that the inmate in question is on a flagged medication. If the prescription is terminated during an inmate's stay at the Facility, Cermak will notify CCDOC.

f.   When CCDOC receives notice that an inmate is on a flagged medication, CCDOC shall include notation of a medication flag in the inmate's profile on the Facility's Jail Management System.

g.   When an inmate with a medication flag is processed for discharge at the Facility, CCDOC shall escort the inmate to designated Cermak staff in the intake screening area of the Facility for discharge medication instructions.

h.   When CCDOC escorts an inmate with a medication flag to Cermak staff during discharge processing, Cermak staff shall provide the inmate with printed instructions regarding prescription medication and community resources.

i.   Each morning, CCDOC shall provide Cermak with a list of all inmates with medication flags who were discharged the previous day.

j.   Within 24 hours of discharge of an inmate with a medication flag, Cermak shall call in an appropriate prescription to the designated pharmacy on the Stroger Hospital campus to serve as a bridge until inmates can arrange for continuity of care in the community.

k.   CCDOC shall ensure that information about pending transfers of inmates is communicated to Cermak as soon as it is available.

l.   When CCDOC has advance notice and alerts Cermak of the pending transfer to another correctional facility of inmates with serious medical or mental health needs from detention, Cermak shall supply sufficient medication for the period

of transit. In such cases, Cermak shall prepare and send with transferring inmates a transfer summary detailing major health problems and listing current medications and dosages, as well as medication history while at the Facility.

m.      CCDOC shall ensure that the transfer summary and any other medical records provided by Cermak will accompany inmates, or will be made available electronically or transmitted by facsimile, when they are transferred from the Facility to another institution.

**Compliance Status:** Partial compliance; letter (d) is substantial compliance.

**Findings**

**Status Update:** No status update was provided.

**Monitor's Findings:**

To evaluate medication administration we reviewed the following documents:

- minutes of the Pharmacy & Therapeutics Committee (August, September and October 2011),
- agenda and notes from the Nursing Process Meetings (June 16 through October 31, 2011);
- policies and procedures in draft and final form relating to medication services, controlled substances, medication procurement and storage, access to the Pyxis equipment, continuity of care and discharge planning.

We also inspected medication storage areas, including stock medications and narcotic control; observed the medication administration process (Divisions II, IV, IX, X, XI); reviewed records, reports and logs, including medication administration records; and interviewed staff and inmates.

There is incremental improvement in the medication management and delivery. More apparent this site visit, however, was the delay in implementing medication orders and significant discontinuity in medication treatment. Cermak is procuring and installing equipment, software and electronic interfacing, described in previous reports that will address these problems. We also observed many instances of personnel practice and performance that is not yet consistent with Cermak policies which require continued focus on implementation and supervision by managers and clinical leaders.

a. Cermak-Standard of Care

Medication administration was timely in all Divisions except II and IV. When non-compliance with directives and policy is ongoing, the actions and timeframes being taken to achieve compliance should be discussed at the Interagency Health Care Quality Improvement Committee meetings. Also, Cermak Policy D-02.3 Medication Distribution includes directions for notification and clinical direction if medication cannot be administered in a timely manner. It does not appear that this is taking place and should be implemented.

The following is a description only of changes or progress since the June 2011 report on each Division's implementation of standards for medication administration.

Cermak 2 and 3 are in compliance with generally accepted standards for medication delivery. Cermak 2 has not yet implemented e-Mar, but was expecting this to be initiated in the next few weeks. Cermak will be the first unit to install the Pyxis product (expected December 2011).

Division II

Dorms 1, 3, 4 and Annex: No change from last report.

Dorm 2

Observation of morning medication delivery on floors 1 and 2 indicated improvement over the three previous inspections and was completed close to the two-hour standard. There was appropriate correctional officer involvement. The nurse identified the patient, administered the medication and documented medication administered correctly. The nurse, rather than the officer, checked the inmate's mouth to ensure that medication had been ingested.

Medication administration on the third floor was significantly delayed because correctional officers did not require inmates to get up and get medication when it was time to do so. This is deterioration in performance compared to the June site visit, where security involvement was noted to have contributed to timelier medication administration. The room that was identified during the June 2011 site visit for preparation and storage of the medication cart has not been renovated.

Division IV

A random check of stock medications showed that none were expired. We also reviewed control of narcotics and observed that nurses reconcile and document narcotics each shift. Accountability and proper storage of medication in this Division has improved since the last visit.

We observed three different nurses administer medications on multiple tiers. Medication administration was more orderly than previous visits. Nurses wore the green vests and this has successfully reduced interruptions during medication administration. Each nurse was very professional in her approach to patients and the process of medication administration. Inmates in this Division were also complimentary of the nurses' professionalism.

The identification badge is not consistently used to confirm the patient's identity as called for in Cermak Policy D-02.3 Medication Distribution. Correctional officers did not conduct oral cavity checks as described in the draft Interagency Directive for Medication Distribution. Nurses conducted oral cavity checks, but not consistently.

There was insufficient assistance from correctional officers during medication administration. This is deterioration in performance since the June 2011 site visit. The security practice of having inmates half-in and half-out of tiers has also increased in Division IV. At our last visit, this practice applied only to selected units, but currently the practice exists throughout the Division. As a result, medication administration in Division IV was not accomplished within the two-hour time frame.

We interviewed the Division Superintendent, who confirmed that there are insufficient correctional officers to escort nurses and provide back up during medication rounds. The Superintendent reported that when newly established correctional officer positions are filled, this problem should be resolved. The status at the time of the November 2011 site visit is that inmates who are half-in do not receive medication timely, resulting in prolonged or compressed dosing, which is counter-therapeutic. Not making inmates available when they are supposed to receive their medication results in failure to provide ordered treatment.

Nurses attempt to administer medication later when the inmate is on half-out. When nurses give medication late, they incorrectly document the time the dose was given because the time is pre-printed on the MAR. Cermak Policy D-02.4 Medication

Administration Record gives no direction to nurses about how to document administration of medications that are given "late." This documentation error puts patients at risk of receiving the next dose of medication too soon.

Division IX

Morning medication administration was observed. Since the last site visit, the Division has consolidated inmates who are on medication in one of the two tiers. The time it takes to administer medication in this building has been reduced by an hour and is now within the two-hour standard. Evening medication was reported to take the same or less time.

Officer escort and support during medication administration was professional and timely. A list was provided by the nurse for the officer to use in bringing inmates from the cell to the medication cart. The nurse and officer verified the whereabouts of each inmate on the list. Inmates who did not want to take their medication were brought to the nurse, who discussed the refusal with the inmate. Several inmates chose to take their medication after this communication and a couple others completed the appropriate refusal form before return to their cell. The nurse, rather than the officer, checked the inmate's mouth to ensure that medication had been ingested. Both Cermak Policy D-02.3 and the draft Interagency Directive specify the officer as responsible for this.

This Division is not compliant with Cermak Policy D-02.3 Medication Delivery Item A. 13 which states, "For a patient leaving the tier early for a court appearance or for transfer to another jurisdiction, medications may be administered before the scheduled time window, if necessary to ensure that a scheduled dose is not missed."

Division X

This Division conducts medication administration in a manner that closely resembles the draft Interagency Directive and Cermak Policy D-02.3 Medication Delivery. The standard for timeliness in administration of doses has almost been achieved in this Division. There was some variation from one correctional officer to another in the process they use to manage inmates during medication administration. Neither officer reported having received written instruction; only oral information given at the time of assignment.

Division XI

In this Division, the nurse responsible for dose-by-dose medication administration was observed to practice consistent with agency policy. No escort officer was provided; unit officer assistance varied and was not consistent with the draft interagency directive. Assistance was not provided with inmate verification, mouth checks were not done, inmates were allowed to crowd the cart, and inmate movement to and from the cart was not managed or efficient. This Division is not compliant with Cermak Policy D-02.3 Medication Delivery Item A. 13 which states, "For a patient leaving the tier early for a court appearance or for transfer to another jurisdiction, medications may be administered before the scheduled time window, if necessary to ensure that a scheduled dose is not missed."

Division XVII

Timeliness of medication transfer and refill have improved in this Division.

Division I, III, V and VI

Delivery and documentation of "Keep on Person" (KOP) medication in Divisions I, III and V while improved, is still inconsistent with Cermak Policy D-02.2. In Division VI delivery and documentation of KOP medications is appropriate and consistent with policy.

b. Cermak-Accurate Administration and Maintenance of Records

The draft Interagency Directive on Medication Administration and Delivery has not been finalized due to Cermak's inability to produce a list of inmates who are to receive medication. The Directive needs to be finalized and implemented. The Monitor recommends the list be appended to the document when finalized. Cermak Policy D-02.3 also has sections that are unenforceable because was the interagency directive has not been finished.

The following additional Cermak policies and procedures were provided for review during this site visit.

D-01.3 Medication Procurement: (Approved 8/17/2011) Defines procedures for the safe and timely procurement, storage, and distribution of pharmaceuticals at Cermak Health Services of Cook County consistent with federal and local laws and regulations. Addresses medication shortages. Comment: During observation of medication administration in Division X it was

noted that 100mg tablets of Gabapentin were not in stock. Patients were not provided with an alternative medication, which seems inconsistent with the process described in Policy D-01.3.

D-01.8 Controlled Substances: (Approved 7/20/2011) Provides a uniform process to order, receive, secure, dispense, process and account for controlled substance to avoid drug diversions in accordance with federal and state laws and regulations. Comment: The Monitor's team finds that controlled substances in the Divisions are accounted for but we did not compare actual practice to policy.

D-02.0 Medication Services: (Approved 10/19/2011) Sets standards for clinically appropriate medication services provided in a timely, safe and sufficient manner. Orders are to be implemented within 24 hours of entry. Comment: Observation of medication delivery, review of records and interviews with staff and inmates suggest that the 24-hour standard is not met in most Divisions. Implementation of routine orders appears to take place 48 to 72 hours after entry.

D-02.6 Medication Dispensing in the Absence of a Pharmacist: (Approved 8/17/2011) Establishes policy and procedure for clinicians with prescriptive authority to dispense medication. Comment: None.

Drafts of three procedures relating to Pyxis were also provided, but since it has not been put in place yet, no comparison to the operational reality was done. Medication policy and procedures will require ongoing revision to reflect changed procedures resulting from the addition of packaging robots, Pyxis and e-MAR. It is clear from material provided that ongoing review and revision is being done.

As described throughout this report, actual performance is neither sufficient nor compliant with policy and procedure.

c. Cermak-Hygienic, Appropriate and Concurrently Recorded

Hygiene: Medication administration was observed to be hygienic.

Appropriate: Interviews with staff and inmates brought forward concerns about delays in starting medication and lapses in medication continuity (See also Dr. Metzner's report pages 13-14). Review of Medication Administration Records verified these

concerns. Many inmates were observed to request medication they understood had been prescribed, but upon review, the nurse was unable to give it because the medication, the MAR or the label was not available. In other instances, the medication and records were available but the inmate was not present or not instructed to take the medication.

The Pharmacy Director agreed that the incidence of missing medication had increased, although it is not tracked or reported. The Patient Care Services Department Pharmacy Requests Log is used by nurses to report missed medications, MARS, pharmacy labels and as needed (PRN) medications every day to the pharmacy. The Pharmacy Director indicated that missing medications are tabulated, so agreed to look at the incidence. For the month of October, there were over 2,500 reports of missing medications. Missing medications should be added to the QI metrics, thresholds established and trends monitored.

Delays or lapses in delivery of HIV medication was identified as a problem at the last site visit. Nurse Managers now run a list of inmates on HIV medications every week and check that each patient on the list is receiving medication as prescribed. The treating physician specialist also reports inmates who are missing medication to the action line, which prompts follow up attention to remedy the problem. It appears the number of cases reported to the action line each month has not declined over the time it has been tracked (email dated 11/17/11 from Richard Blackwell to Catherine Knox cc'd to Cynthia Kienlen, Mary Wrobel and Michael Puisis). Neither of the corrective actions Cermak has in place for this problem analyzes or trends root causes.

One of the reasons for medication discontinuity is the transfer of inmates from one housing location to another. The "real time" interface between CCDOC and Cermak has not been completed yet. The same fail-safes that were in place at the time of the last site visit were in place at this site visit.

An interim solution discussed with Mr. Blackwell, Project Director, Process Improvement, during the site visit was running a list before each scheduled medication pass of inmates by receiving location who are on medication and have been transferred or moved within CCDOC. Cermak will determine if nursing staff at each location could use the list to verify that the medication(s), medication administration record and labels corresponding to each inmate have arrived and take corrective action as necessary. This makes it possible to correct the problem before the next dose. We also recommended in the last report that CCDOC have inmates carry their KOP medications with them when housing unit assignments change; Cermak should bring this recommendation to the Interagency Health Care Quality Improvement Committee.

Medication discontinuity also occurs when medication refills and "cycle fill" medications are delivered and nursing staff distribute the medication later than the timeframe designed into the original process. Cermak uses "cycle fill" to dispense medications to each Division on one day each week. When bags of medications arrive from the pharmacy at a Division dispensary on "cycle fill" day, they are sorted and organized for distribution. Developers of this process understood that these new supplies of medication would be distributed to inmates within the next 24 hours. Throughout all Divisions, it was reported to take at least 48 hours to get the medication to the inmate and often took 72 hours. Two reasons for delay identified during the site visit were:

- that staffing at the dispensary site is not supplemented to accomplish the additional work on cycle fill day but instead absorb it into other workload;

- errors (e.g. wrong patient's medications packaged in another patient's bundle), timeliness and cluttered bags of medications take more time to sort and organize than planned.

This workload will be reduced when dose-by-dose medications are packaged by robots and delivered to the Division dispensaries before each medication administration time. Even though "cycle fill" will eventually only be used for KOP medication, the planning assumptions can be reexamined and timeframes adjusted to eliminate gaps in medication continuity. If it takes 72 hours to distribute medication from the time it is received on cycle fill day, then one solution would be to fill 72 hours before rather than 24 hours before the last dose.

Cermak Policy D-02.0 Medication Services, which was approved in October 2011, establishes a 24-hour standard for implementation of prescription changes, including new orders. It appears that there are mechanisms in place to track and monitor to this standard at intake but not so elsewhere. Evidence from observation, interviews and record review indicates that time from prescription to first dose is closer to 72 hours than 24. We recommended in the previous report that Cermak audit timeliness from order to first dose administered, but this has not been accomplished.

Inmates reported that medications they had been prescribed while in the community were continued by Cermak at intake. Mental health patients reported that after intake, their referral to mental health was delayed and as a result, their medications were not renewed timely. Mental health patients also reported that their medications were often changed and if they experienced side effects that they were not referred back to mental health in a timely manner. Finally, several inmates in Division IV reported being

treated for anxiety with Gabapentin, which they did not find effective. This concern was referred to the Mental Health Monitor for review and evaluation.

We did not observe instances of compressed dosing during this site visit. A list of TID and QID orders by provider as of 11/14/2011 was provided by the pharmacy and reviewed (patients housed in the Cermak inpatient units were excluded). The number of TID/QID prescriptions increased 50% from June 2011 and three providers generate 40% of these orders. If medication is delivered within the recommended timeframes, these more frequent dosing patterns are not counter-therapeutic, but we raise the question of whether it is appropriate use of limited clinical resources.

At the last site visit, we recommended expanding the pharmacy-approved list of stock HIV medications because of a problem in Division XVII. This did not take place. In further discussion, this site visit the problem is that initiation of "opt-out HIV testing" creates an obligation to treat. Division XVII had also implemented use of patient specific packaging and eliminated stock supplies of medication. The concern was that inmates newly diagnosed with HIV would be released to the community before the prescription could be filled and treatment initiated. This is a valid concern given the findings that it takes 72 hours from order entry to first dose. Cermak needs to establish the means to implement timely treatment of inmates who undergo "opt out" testing.

Concurrently Recorded: There has been no improvement in documentation on the MARs. There are two to three blank spaces where dose-by-dose medications are documented on most MARs reviewed and the documentation of "Keep-on-Person" medication is still inconsistent in all Divisions. Documentation is also not consistent with Cermak Policy D-02.4 Medication Administration Record. In Division I, a CMT signed her name onto the MAR prior to delivering the medications to the patient. This is falsification of a record. The Nursing Manager was made aware of the individual's deficient performance and practice violation.

d. Cermak-Staffing

Medication administration at Cermak is performed by qualified nursing staff.

e. Cermak-Flagged Medication Procedure

Draft Policy E-13.1 is written to achieve this part of the Agreed Order for inmates with medical conditions but has not yet been finalized and implemented. Policy E-13.2 accomplishes this for inmates with mental health conditions. Each policy uses a

different alert category; E-13.2 uses Rx Before Release and E-13.1 uses Discharge Medications. The Agreed Order refers to Flagged Medications.

The interface between Cerner and IMACS has not been accomplished. We understand that when this is accomplished, alert(s) will correspond to the Agreed Order and take place automatically when entered into Cerner by the prescribing practitioner.

f. CCDOC-Flagged Medication Noted on JMS

See Findings reported for e above. Draft Policy E-13.1 includes instructions for identifying inmates released without medication or a prescription for follow up. It also creates a QI report. These provisions are not included in Policy 13.2 and should be.

g. CCDOC-Discharge Medication

See findings reported in e above. We recommend standardizing the policy and process to obtain discharge medication in Cermak Policy E-13.1 (draft) and E-13.2. See report and recommendations from the June 2011 site visit.

h. Cermak-Discharge Medication

Cermak Policy E-13.0 Discharge Planning (dated as approved May 18, 2011) is consistent with this portion of the Agreed Order. We did not compare actual practice to the Policy during this site visit.

i. CCDOC-Notification of Flagged Inmates Discharged

Draft policy E-13.1 accomplishes this portion of the Agreed Order for inmates with medical conditions. Similar material needs to be incorporated into Policy E-13.2 for inmates with mental health conditions.

j. Cermak-Prescription Fill at Stroger

Cermak Policy E-13.1 includes this fail-safe but it was not included in E-13.2 for mental health patients. We recommended in the last report standardizing the process for arranging discharge medications described in these two documents. Patients on mental health medication need to have prescriptions available at Stroger pharmacies as per item h. above.

k. l. m. Medication and Transfer

The process for compliance with these items was described in the June 2011 report. The Monitor did not audit this processes during the November site visit but will do so in a subsequent visit.

**Monitor's Recommendations:**

1. Recommendations to bring medication delivery into compliance with standards of practice are:

   a. Finalize the Interagency Directive on Medication Administration and Delivery as suggested in this report.

   b. Implement the use of inmate identification badges for independent verification consistent with Interagency Directive and Cermak Policy D-02.

   c. Purchase and install the Fast Pack robots and Pyxis machines as planned.

   d. Policy and procedure should be revised to clearly instruct staff how to ensure correct dosing intervals when patients must receive medication three or more times a day.

   e. Revise Cermak Policy D-02.4 Medication Administration Record to include direction about how to document administration of medications that are given "late."

   f. Make arrangements for inmates who are out to court, at medical appointments or who work to receive medication as prescribed.

   g. Develop and provide to CCDOC a list of inmates, sorted by housing unit, who are to receive medication in the morning, at noon and at night.

   h. Implement requirements for notification and clinical direction if medication cannot be administered in a timely manner contained in Cermak Policy D-02.3 Medication Distribution.

i.   Report episodes of non-compliance with the Interagency Directive at the Interagency Health Care Quality Improvement Committee meetings and review actions and timeframes being taken to achieve compliance.

j.   Finish refurbishing the area identified to store the medication cart for Division II, dorm 2 on the third floor.

2.  With regard to CCDOC's responsibility for medication administration, recommendations are:

a.   Finalize and implement the Interagency Directive on Medication Administration and Delivery as suggested in this report.

b.   Revise the post order for correctional officers to coincide with the Interagency Directive.

c.   Provide evidence that correctional officers have been trained to support and execute their responsibilities as listed in the Interagency Directive and post order.

3.  Continue to implement planned improvements in pharmaceutical management:

a.   Install and put into operation the single-dose "urgent" medication administration equipment (i.e., Pyxis-like equipment).

b.   Create a "real time" interface with IMACs so that appropriate and necessary communication about inmates takes place and results in medication continuity and improved patient safety.

c.   Track and trend the incidence of missing medication, establish thresholds, analyze incidents and implement corrective action to reduce or prevent medication being missed.

d.   Establish the means to initiate timely treatment consistent with the purpose of "opt-out" testing.

e.   Develop a report or flagging system to identify any patient with an order who has not received the first dose within the 24-hour timeframe established in Cermak Policy D-02.

4.  Supervise and manage performance of nursing staff to be consistent with policies for medication delivery, documentation, storage and accountability.

a.   Install the equipment in all Divisions to accomplish electronic documentation on the MAR.

b. Provide evidence of prompt and definitive action taken in relation to episodes of medication error, omission, failure to perform and professional practice violations.

c. Fully implement, coach and supervise personnel to become more compliant with Cermak policies relating to the medication delivery system.

5. Provide notifications and arrange for continuity of medication treatment upon discharge according to the Agreed Order. Specific recommendations are:

a. Cermak should ensure that all inmates prescribed medication for mental health conditions and/or HIV and/or thromboembolic disease have an alert placed in CCDOC's IMAC system that corresponds to the Agreed Order.

b. Establish the two-way interface between the CCDOC jail management system, IMAC, and Cermak's electronic health record, Cerner, so that notifications occur automatically when orders for these medications are written or discontinued.

c. Standardize procedures in Cermak Policy E-13.0, E-13.1 and E-13.2. Revise E-13.2 to include instructions that are consistent with the Agreed Order.

d. CCDOC provide a list daily to Cermak of all inmates with medication flags who were discharged the previous day. Cermak should compare the list provided by CCDOC to the list of patients in Cerner who were issued a discharge prescription from Cermak or had a discharge prescription filled at the Cermak pharmacy. Draft Policy E-13.1 accomplishes this when finalized; E-13.2 needs to be revised to accordingly.

e. The Continuous Quality Improvement Program should set thresholds for and monitor data on patients who are on flagged medications who are discharged and receive discharge medication or prescriptions. Draft Policy E-13.1 accomplishes this when finalized; E-13.2 needs to be revised to accordingly.

## 57. Specialty Care

a.   Cermak shall ensure that inmates whose serious medical or mental health needs extend beyond the services available at the Facility shall receive timely and appropriate referral for specialty care to appropriate medical or mental health care professionals qualified to meet their needs.

b.   Upon reasonable notification by Cermak, CCDOC will transport inmates who have been referred for outside specialty care to their appointments.

c.   Cermak shall ensure that inmates who have been referred for outside specialty care by the medical staff or another specialty care provider are scheduled for timely outside care appointments. Cermak shall provide reasonable notice to CCDOC of such appointments so that CCDOC can arrange transportation. Inmates awaiting outside care shall be seen by Qualified Medical Staff as medically necessary, at clinically appropriate intervals, to evaluate the current urgency of the problem and respond as medically appropriate. If an inmate refuses treatment following transport for a scheduled appointment, Cermak shall have the inmate document his refusal in writing and include such documentation in the inmate's medical record.

d.   Cermak shall maintain a current log of all inmates who have been referred for outside specialty care, including the date of the referral, the date the appointment was scheduled, the date the appointment occurred, the reason for any missed or delayed appointments, and information on follow-up care, including the dates of any future appointments.

e.   Cermak shall ensure that pregnant inmates are provided adequate pre-natal care. Cermak shall develop and implement appropriate written policies and protocols for the treatment of pregnant inmates, including appropriate screening, treatment and management of high-risk pregnancies.

**Compliance Status:** Partial compliance, except letter (e) which is substantial compliance.

**Findings**

   **Status Update:**

**Monitor's Findings:**

During this review, we reviewed data that included percentage of scheduled visits transported to Stroger Hospital for their specialty appointments and well over 90%, in some instances over 95%, were in fact transported to Stroger Hospital for their specialty appointments or procedures. However, in reviewing the data, we learned that approximately 12% of those transported to Stroger Hospital do not attend their specialty appointments. We were told that the reason is insufficient officers assigned to Stroger Hospital available to accompany the patients to their appointments. In fact, one of the records we reviewed supported this observation. In almost all instances, appointments are scheduled timely and clearly as learned from the high rates of transport notification to CCDOC is also in fact timely. Cermak staff do maintain a tracking system to insures there is an understanding of which patients receive their services timely and if not, the reasons why not.

We reviewed 10 records of patients with scheduled offsite services for either consultations or procedures and of those 10 one was a patient who was scheduled to be seen October 17 and was transported but in fact was not seen until rescheduled two weeks later on November 1. Four of the 10 records we reviewed lacked any follow up visit with the primary care clinician during which the findings and plan were discussed. This is an area which clearly needs improvement.

We reviewed one record in which the primary care clinician follow up visit did occur; however, the clinician in that visit reported "per patient, normal colonoscopy exam." In fact, there was a polyp that was removed during the colonoscopy, so clearly the clinician never saw the colonoscopy report.

e. Cermak-Pregnant Inmates

To assess this area we reviewed policies and procedures regarding the management of pregnant women, interviewed staff, and reviewed records of pregnant women at CCJ.

All pregnant women are housed in Division XVII which currently has 160 female residents of whom 25 are pregnant. The physician reports that two or three pregnant women arrive at the jail each day. The process for identification of pregnant women is unchanged from our previous report and is working well. Prenatal care clinic is conducted twice weekly. We reviewed five (20%) of 25 records with Dr. Richardson and found care to be excellent.

Cermak uses the Hollister Prenatal Flow Record to document care and the content of this form has been converted to an electronic format in Cerner. Recommended prenatal labs are obtained and documented on a flow sheet in Cerner including a CBC, Rh antibody, sickle cell trait, VDRL/RPR, hepatitis B antigen, and Chlamydia, gonorrhea and HIV antibody testing. Ultrasound testing is ordered and performed as clinically indicated. In all records we reviewed, patients were prescribed a prenatal vitamin, iron and calcium supplements. Prenatal care interval monitoring was in accordance with the treatment plan or with ACOG recommendations.

All women entering the facility, including pregnant women are now offered opt-out STI testing upon intake which is excellent. Results are typically available 36-48 hours later. Staff check results daily to provide treatment as soon as feasible. However, there is no stock supply of antibiotics in Division XVII that results in treatment delays and in some cases, some obstetric patients with positive STI results have been released prior to notification and treatment.

In addition to STI treatment, issues related to medication continuity were noted at our last visit (See June 2011 Monitor Report) and presumably will be resolved with the installation of Pyxis machines, however until this occurs staff should consider strategies to ensure timely treatment of STIs and to provide medication continuity for other essential medications (e.g. chronic disease and mental health).

**Monitor's Recommendations:**

1. Work with custody to insure that all patients transported to Stroger Hospital for offsite appointments are in fact seen on the scheduled date for their visits. This would entail CCDOC providing sufficient officer staff.

2. Cermak must implement a system that insures that patients seen for scheduled or unscheduled services are in fact followed up timely with their primary care clinician at a visit in which the primary care clinician documents a discussion of the findings and plan.

3. Health care leadership should ensure that the intake process identifies pregnant women in a timely manner and that providers document pregnancy on the Problem List in Cerner. Redundant tracking systems should be incorporated into policy and procedure and not based solely upon the efforts of a single provider.

4. Health care leadership in collaboration with custody should study, quantify, and address interdivision related medication

discontinuity

5. Until Pyxis machines are installed in the Divisions, consideration should be given to establishing a limited stock supply of medications in Division XVII for treatment of STI's mental health conditions, and other chronic conditions.

## 58.  Dental Care

a.  Cermak shall ensure that inmates receive adequate dental care, and follow up, in accordance with generally accepted correctional standards of care. Such care should be provided in a timely manner, taking into consideration the acuity of the problem and the inmate's anticipated length of stay. Dental care shall not be limited to extractions.

b.  Cermak shall ensure that adequate dentist staffing and hours shall be provided to avoid unreasonable delays in dental care.

**Compliance Status:** Partial compliance, near substantial.

**Findings**

**Status Update:**

**Monitor's Findings:**

We learned that within the previous few weeks the dental staffing vacancies have all been filled. The newest dentist has been working with other dentists to understand the system. We were informed that each dentist is able to see patients approximately six and a half hours per day. We were told, in general, that officers are in fact facilitating access to dental services. We were also informed that with the exception of Divisions I and X, routine appointments are generally scheduled within one to two weeks of receipt. However, during the access to care review we learned that in Division IV, the dental slips had not been picked up by the dentist for a week and were found having not yet been addressed for well over a week. Clearly, this is a breakdown that must be avoided. We were also informed that urgent problems for all Divisions are able to access care within a matter of a few days, the exception being Division IX, which may take a week. We are hopeful that with the addition of the new dentist timeliness will in fact

improve. We were also informed that several patients received duplicate appointments and when one of those appointments was cancelled because the patient was already seen at the other appointment, this was treated as a no-show. This scheduling anomaly should be corrected.

**Monitor's Recommendations:**

1. Work with the scheduling people so that duplicate appointments are in fact minimized and when the patient is seen for one of the appointments, the subsequent appointments are not counted as no-shows if they are cancelled.

2. Improve the timeliness of access in Divisions I and X so that routine appointments are able to access care throughout the Divisions within the same timeframe.

3. Insure that dental slips in fact are picked up daily.

4. The quality improvement program should monitor timeliness for both urgent and routine services in each Division.

## 68. Suicide Prevention Training

**Compliance Status:** Partial compliance.

**Findings**

      **Status Update:**

      **Monitor's Findings:**

      We reviewed the suicide prevention training tracking system that is used by CCDOC. In fact, better than 85% of officers are receiving this training according to the timeframes required in the Agreed Order. However, only about 60% of the nursing staff are up to date with their suicide prevention training.

**Monitor's Recommendations:**

1. The nursing department should set up a system that insures that all nursing staff receive their required suicide prevention training within the required timeframes.

**H.    QUALITY MANAGEMENT AND PERFORMANCE MEASUREMENT**

**86.  Quality Management and Performance Measurement**

a.    Defendants shall each develop and implement written quality management policies and procedures, in accordance with generally accepted correctional standards, to regularly assess, identify, and take all reasonable measures to assure compliance with each of the provisions of this Agreed Order applicable to that Defendant.

b.    Defendants shall each develop and implement policies to address and correct deficiencies that are uncovered during the course of quality management activities, including monitoring corrective actions over time to ensure sustained resolution, for each of the provisions of this Agreed Order applicable to that Defendant.

c.    CCDOC shall participate with Cermak and DFM in a jointly established Health Care Quality Improvement Committee, to be charged with developing and implementing a joint quality improvement program. CCDOC shall contribute the time and effort of CCDOC staff members who, by virtue of their authority, current responsibilities, and/or past experience, can provide this committee with needed correctional representation.

d.    Cermak shall participate with CCDOC and DFM in a jointly established Health Care Quality Improvement Committee, to be charged with developing and implementing a joint quality improvement program. Cermak will work with CCDOC and DFM to identify those CCDOC and DFM staff members who, by virtue of their authority, current responsibilities, and/or past experience, can provide this committee with needed correctional representation. Quality management programs related to medical and mental health care will utilize performance measurements to assess quality of care and timely access to care with quantitative and qualitative data analysis and trending over time.

e.     DFM shall participate with CCDOC and Cermak in a jointly established Health Care Quality Improvement Committee, to be charged with developing and implementing a joint quality improvement program. DFM shall contribute the time and effort of DFM staff members who, by virtue of their authority, current responsibilities, and/or past experience, can provide this committee with needed correctional representation.

**Compliance Status:** Partial compliance.

**Findings**

**Status Update:**

**Monitor's Findings:**

The quality management policies and procedures have been finalized and meetings are taking place on a regular basis. These meetings are comprehensive and discuss data that has been collected with regard to many areas. We participated in one of the meetings and were impressed with the amount of data being collected and reviewed on a regular basis. Areas reviewed based on available data include access to care, utilization of services, review of negative pressure rooms, critical incidents, grievances, environment/facilities problems, patient care activities, medical records, laboratory services, pharmacy services, communicable diseases, mental health services, dental services, opiate treatment program services and chronic disease services. The program is quite comprehensive. At the meeting we attended, it appeared that the emphasis was on reporting data as opposed to analyzing causes for trends or changes in data. Among the active studies being performed under the QI program, it was reported that there is an ongoing study looking at the timeliness of receipt of medications at intake. There is also an ongoing study looking at access to discharge medications. One of the problems identified with the discharge medication study is that prescriptions are written too early before release and therefore the timeframe in which those prescriptions can be used runs out and a new prescription must be written. Grievances are also being studied as well as the timeliness of nursing assessments performed within the access to care policy. There are plans to do a study looking at the intake process for patients who enter as hospital takeovers.

**Monitor's Recommendations:**

1. Department heads should be encouraged to report on the analysis of the data within their areas in order to identify causes for trends and/or changes.

2. The QI program should continue to monitor the intake process with regard to patients who enter through anomalous pathways, most especially the hospital takeover group.

3. The program should monitor the use of the electronic intake assessment note by physicians in the emergency room who are performing intake assessments on patients who enter through anomalous pathways.

4. Receipt of medications at the time of intake, especially for patients on critical medications, should be monitored particularly looking at the causes for differences in timeliness of receipt for patients on self-carry meds versus nurse-administered meds.

5. The quality improvement program should work with med/surg staff to implement an effective, hopefully electronic log in the emergency room that tracks presenting complaints as well as dispositions and separates out urgent/emergent clinical conditions from patients who are processed through the emergency room as part of routine processing.

6. After implementation of the substance abuse/withdrawal program, this should be monitored for its comprehensiveness and effectiveness.

7. The QI program should work with the scheduler and CCDOC to resolve the problem of patients transported to Stroger Hospital for scheduled offsite appointments who in fact do not get to those appointments because of insufficient custody staff.

8. The QI program should monitor the follow up by primary care clinician of patients who receive scheduled consultations or procedures offsite in order to insure that there is a documented discussion with the patient regarding findings and plan.

9. The QI program should continue to monitor grievances so that in fact only a minimal number are closed out without a timely response.

10. The QI program should monitor the dental program to insure that access to both urgent and routine services is timely.

11. The dental program, as part of the QI program, should continue to monitor the provision of extraction services by each dentist versus restorative services so that the ratio of restorative services increases.

12. The QI program should continue to monitor access to care in each Division so that reasonable timeframes for access to both nurse and/or clinician are achieved.

13. The QI program should continue to monitor medication administration, insuring that medications are received timely and documentation of this receipt is consistent with nursing practice guidelines.

# APPENDIX

# REDACTED