**UNITED STATES OF AMERICA VS. COOK COUNTY, ET.AL.**

**CIVIL NO. 10 C 2946**

**Fire and Life Safety and Sanitation and Environmental Conditions**

**Report No. V**

**Monitor:  Harry E. Grenawitzke**

**July 20, 2012**

<u>**Executive Summary**</u>

This report is the fifth written assessment of the progress made by Cook County Department of Corrections (CCDOC), Department of Facilities Management (DFM) and Cermak Health Systems (Cermak) to achieve compliance by addressing provisions of the consent agreement between the United States Department of Justice and Cook County, to protect the constitutional rights of inmates detained at the Cook County Jail.

At the outset I again want to recognize the significant progress made in the areas of fire, life safety and environmental health.  When one considers the sheer number of provisions in the entire consent agreement, let alone the severity and the complexity of them, it is remarkable that so many of the provisions under my watch are now in substantial compliance.  The number of employees of Cook County who are significantly responsible for managing the consent agreement while still managing a large and seemingly growing population of inmates makes me appreciate their dedication, their commitment and their diligence to resolve very complex and dynamic issues.   I want to commend the outstanding leadership and mentoring  provided by  Sheriff Dart, CCDOC Executive Director Gary Hickerson and his team for their tireless effort to effectively address the numerous provisions of the consent agreement, not only in the areas of my responsibility, but also those in medical, mental health and security.  It is impressive.  I also want to thank the Department of Justice for their oversight and counsel.

Changes of the magnitude demanded by this agreement and expected by management do not happen without first a commitment to improve and the dedication to purpose of all employees. The management team Director Hickerson has in place is also committed to making CCDOC a safe and secure facility for the inmates being held there.

 I again like to extend my appreciation to the leadership and employees of CCDOC, DFM, and Cermak for their responsiveness to my requests for information and documentation between and during visits, which gave me the information to objectively assess their compliance with the agreed order and provide suggestions for changes and improvements.  The employees of all three parties have been receptive to ideas and alternatives to investigate and resolve complex issues. I am somewhat concerned with the volume of issues that management is trying to address in a reasonably short time frame.

1

This report represents my findings during the facility tour of July 16-20, 2012 and three other one day visits since the December, 2011 facility assessment. Those trips were to focus on sanitation, laundry and food service specifically. The report will demonstrate significant progress in all of these areas.

During this tour, I spent considerably more time touring housing units speaking with inmates and visiting the kitchens and less time in meetings with staff. I also toured the new RCDC building which is expected to be operational in May, 2013. I did meet with the Fire Safety Committee and Weapons Free Committee and the Sherriff's Accountability Meeting. There were several notable positive changes from the previous report. They include:

1. Installation of flammable safe storage cabinet in all maintenance shops, along with a written inventory all chemicals maintained in each.

2. Marked improvement in the cleanliness of housing tiers including the cells, showers, and dayrooms. The success of the compliance team and the leadership of Support Services made this possible. Division Sanitation Officers conducting comprehensive inspections continues to be effective.

3. The implementation of the "Facility Wizard" interface by CCDOC and Cermak make monitoring progress in assuring closure of all work orders especially plumbing and electrical problems simpler and considerably effective.

4. Lack of ventilation blockage issues within the divisions and the success of the vent cleaning program from DFM.

5. The DFM policy and training program on hazardous materials.

6. Eliminating the private contractor for laundry and reinstituting procedures that meet the provision of effective policies to effectively clean and disinfect inmate clothing and linens to reduce the risk of exposure to communicable disease.

7. The significant reduction in laundry being washed in cells by eliminating laundry soap from the commissary and diligent elimination of ropes being allowed in the cells.

8. Significantly less inmate started fires in the cells for "cooking" commissary items.

9. The decision of the Board of Commissioners to move forward with the light replacement project over the next two years will significantly impact reduction in shanks, fewer fires in cells, and safety for inmates and officers.

Of the 39 provisions included in my area of responsibility, this report identifies that 25 are now in substantial compliance, and 14 remain in partial compliance, and no provisions shown as non-compliant. One issue (53e for Cermak) regressed to Partial Compliance. The details are in the report. With training

and oversight this can be reversed once evidence demonstrates progress. The ten provisions gaining substantial compliance since the December, 2012 facility tour are:

C. 53f, F. 73, F. 79, F. 82, G.83d, G. 83f, G. 83k, G. 84e, G. 85b, and G. 85e.

As with any progress in a facility of this size I have some concerns that will need attention. They include:

1. The growing population in the facility will make it difficult to continue implementing effectively many of the provisions in the area of Fire, Life Safety, and Environmental Health.
2. The transition to the new food service contractor. Making sure that the facility maintains a diet meeting dietary guidelines. This is a concern also identified in the previous report.
3. The continual problem of inmates receiving their hot meal cold because of apparent delays in the distribution of the meal trays within the divisions. Hopefully the new contractor, Support Services and Division officers can find a solution to assure hot food as required. The safety and the quality of the food are key factors in maintaining inmate control. This is also a recurring issue from previous reports.
4. The apparent lack of a formal mechanism for CCDOC to schedule and coordinate major repairs with DFM whereby inmates need to be relocated until repairs are completed. An example is the shower ceiling replacement issue in Division III.
5. The inaction by officers and supervisors in housing units to not only recognize rather obvious safety and sanitation issues and effectively address them, but rather choose to ignore them, and only take action upon my raising the issue to the senior management team rather than by the commonly accepted practice of having tier officers and supervisory staff taking the initiative to manage their areas of responsibility. This, I believe is a lack of accountability by officers at all levels in the divisions.

At the December, 2012, visit, I will continue to spend more time in the divisions assessing the implementation of all orders, policies and procedures, on all shifts. More importantly officers, support staff will be asked show their evidence of conformance with provisions of General Orders, monitoring requirements by being to explain processes and show the reports required. Also, staff should anticipate that I will ask to see proof that corrective actions were taken when issues are identified and that the corrective action was effective to resolve the issue both for the immediate fix and long term. I recognize that there will be unexpected and unanticipated issues arise in daily operation and management of a jail. If the time is taken to identify the root cause of the issue, then the corrective action needs to focus on the long term by implementing management systems to assure that they will not reoccur.
I look forward to the continued progress in gaining substantial compliance with all provisions.

Sincerely,

*Harry E. Grenawitzke, RS, MPH, DAAS*

Summary August 20, 2012

| Section | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| **C.** | **Medical Care** | | | |
| **C. 53** | **Treatment and Management of Communicable Disease** | | | |
| C. 53e | Cermak shall ensure that the negative pressure and ventilation systems function properly. Following CDC guidelines, Cermak shall test daily for rooms in-use and monthly for rooms not currently in-use. Cermak shall document results of such testing. | X 3/11<br><br>X 8/11<br><br>12/11 | X 9/10<br><br>**X 7/12** | |
| C. 53f | Cermak shall notify DFM, in a timely manner, of routine and emergency maintenance needs, including plumbing, lighting and ventilation problems. | **X7/12** | X 3/11<br><br>X8/11<br><br>X12/11 | X 9/10 |
| **F.** | **Fire and Life Safety** | | | |
| F. 71 | CCDOC and DFM shall work together to develop and implement a fire safety program and ensure compliance is appropriately documented. The initial Fire Safety Plan shall be approved by the fire prevention authority having jurisdiction. The Fire Safety Plan shall be reviewed thereafter by the appropriate fire prevention authority at least every two years, or within six months of any revisions to the plan, whichever is sooner. Fire safety and emergency procedures shall be standardized across divisions, to the extent possible given differences in physical plant and security levels. | 12/11<br><br>X 7/12 | X 9/10<br><br>X 3/11<br><br>X8/11 | |
| F. 72 | CCDOC shall develop and implement an evacuation plan for inmates and staff and ensure that comprehensive fire drills are conducted every three months on each shift. CCDOC shall document these drills, including start and stop times and the number and location of inmates who were moved as part of the drills. | 12/11<br><br>X7/12 | Not Assessed 9/10<br><br>X 3/11<br><br>X 8/11 | |

4

| Section | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| F. 73 | DFM shall ensure that the Facility has adequate fire and life safety equipment, including installation and maintenance of fire alarms and smoke detectors in all housing areas according to applicable fire codes. Maintenance and storage areas shall be equipped with sprinklers or fire resistant enclosures in accordance with City of Chicago Fire Code (13-76-010). | X 7/12 | X 9/10<br><br>X 3/11<br><br>X8/11<br><br>12/11 | |
| F. 74 | DFM shall ensure that all fire and life safety equipment is properly maintained and routinely inspected. DFM shall develop and implement a program related to the testing, maintenance and inspection of the Life Safety Equipment. | X 3/11<br><br>X 8/11<br><br>12/11<br><br>X 7/12 | X 9/10 | |
| F. 75 | CCDOC shall continue to ensure that emergency keys are appropriately marked and identifiable by touch and consistently stored in a quickly accessible location, and that staff are adequately trained in use of the emergency keys. | | X 9/10<br><br>X 3/11<br><br>X 8/11<br><br>X12/11<br><br>X 7/12 | |
| F. 76 | CCDOC shall ensure that staff are able to manually unlock all doors (without use of the manual override in the event of an emergency in which the manual override is broken), including in the event of a power outage or smoke buildup where visual examination of keys is generally impossible. CCDOC shall conduct and document random audits to test staff proficiency in performing this task on all shifts, a minimum of three times per year. CCDOC shall conduct regular security inspections of all locking mechanisms. CCDOC shall communicate with DFM via the Work Order System regarding lock-related issues and maintenance. | | X 9/10<br><br>X 3/11<br><br>X 8/11<br><br>X12/11<br><br>X 7/12 | |
| F. 77 | DFM shall develop and implement an annual preventative maintenance program concerning security devices such as doors locks, fire and smoke barrier doors, and manual unlocking | X 3/11<br><br>X 8/11 | Not Assessed | |

| Section | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---------|----------|------------------------|--------------------|----------------|
| | mechanisms to ensure these devices function properly in the event of an emergency. | 12/11 X 7/12 | 9/10 | |
| F. 78 | CCDOC shall implement competency-based testing for staff regarding fire and emergency procedures. | X 8/11 12/11 X 7/12 | Not assessed 9/10 X- 3/11 | |
| F. 79 | CCDOC shall promptly notify DFM of all electrical hazards, including maintenance and repair of electrical outlets, devices, and exposed electrical wires. | X7/12 | X 9/10 X 3/11 X 8/11 X12/11 | |
| F. 80 | DFM shall promptly repair all known electrical hazards, including maintenance and repair of electrical outlets, devices, and exposed electrical wires and will document repairs by the Work Order System. | X 3/11 X 8/11 12/11 X7/12 | X 9/10 | |
| F. 81 | CCDOC shall ensure that combustibles are controlled and eliminate hi8ghly flammable materials throughout the facility and inmate living areas (e.g., inmates 'use of paper bags as trash receptacles, ripped fire-retardant mattress covers, improvised cell light covers, blankets on cell floors, and improperly stored and labeled flammable liquids and other chemicals). | | X 3/11 X 8/11 X12/11 X 7/12 | X9/10 |
| F. 82 | CCDOC shall ensure that fire safety officers are trained in fire safety and have knowledge in basic housekeeping, emergency preparedness, basic applicable codes, and use of fire extinguishers and other emergency equipment. | X7/12 | Not Assessed 9/10 X 3/11 | |

| Section | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | | | X 8/11 | |
| **G** | SANITATION AND ENVIRONMENTAL CONDITIONS | | | |
| **G. 83** | Sanitation and Maintenance of Facilities | | | |
| G. 83a | DFM shall maintain an adequate written staffing plan and sufficient staffing levels to provide for adequate maintenance of the Facility. | X 8/11 12/11 X 7/12 | X 9/10 X 3/11 | |
| G. 83b | CCDOC shall revise and implement written housekeeping and sanitation plans to ensure the proper routine cleaning of housing, shower, and medical areas, in accordance with generally accepted correctional standards.  Such policies should include oversight and supervision, including meaningful inspection processes and documentation, as well as establish routine cleaning requirements for toilets, showers, and housing units. | | X 9/10 X 3/11 X 8/11 X12/11 X 7/12 | |
| G.83c | DFM shall implement a preventive maintenance plan to respond to routine and emergency maintenance needs, including ensuring that shower, toilet, and sink units are adequately maintained and installed. | X 3/11 X 8/11 12/11 X 7/12 | X 9/10 | |
| G. 83d | CCDOC shall notify DFM, in a timely manner, of routine and emergency maintenance needs, including plumbing, lighting, and ventilation problems. | X 7/12 | X 8/11 X12/11 | X 9/10 X 3/11 |
| G.83e | DFM shall ensure adequate ventilation throughout the Facility to ensure that inmates receive an adequate supply of air flow and reasonable levels of heating and cooling.  DFM staff shall review and assess compliance with this requirement on a daily basis for automated systems and on and annual basis for non-automated systems. | X 3/11 X 8/11 12/11 X7/12 | X 9/10 | |

| Section | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---------|----------|------------------------|--------------------|----------------|
| G. 83f | CCDOC shall notify DFM of any visible obstructions to the ventilation system. | X 7/12 | X 3/11<br><br>X 8/11<br><br>X12/11 | X 9/10 |
| G. 83g | Cook County shall ensure adequate lighting in all inmate housing and work areas. | | X 9/10<br><br>X 3/11<br><br>X 8/11<br><br>X12/11<br><br>X 7/12 | |
| G. 83h | CCDOC shall ensure adequate pest control throughout the housing units, medical units, RCDC, RTU, and food storage areas.  CCDOC shall maintain a contract for professional exterminator services for each division, food services areas, and the Cermak hospital. Services should provide for routine pest control spraying and additional spraying as needed. | | X 9/10<br><br>X 3/11<br><br>X 8/11<br><br>X12/11<br><br>X 7/12 | |
| G. 83i | CCDOC shall ensure that all inmates have access to needed hygiene supplies. | | Not Assessed 9/10 or 3/11<br><br>X 8/11<br><br>X12/11<br><br>X 7/12 | |
| G. 83j | CCDOC shall develop and implement policies and procedures for cleaning, handling, storing, and disposing of biohazardous materials, in accordance with generally accepted correction standards.  CCDOC shall ensure that any inmate or staff utilized to | | Not Assessed 9/10 | |

| Section | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | clean a biohazardous area are properly trained in universal precautions, are outfitted with protective materials, and receive proper supervision when cleaning a biohazardous area. | | X 3/11<br><br>X8/11<br><br>X12/11<br><br>X7/12 | |
| G. 83k | DFM shall develop a policy on hazardous materials, in accordance with generally accepted correctional standards, and insure that all DFM staff is properly trained on the procedure. | X7/12 | X8/11<br><br>X12/11 | X 9/10<br><br>X 3/11 |
| G. 83l | CCDOC shall provide and ensure the use of cleaning chemicals that sufficiently destroy the pathogens and organisms in biohazard spills. | X 8/11<br><br>12/11<br><br>X7/12 | Not Assessed 9/10<br><br>X 3/11 | |
| G. 83m | CCDOC shall inspect and replace as often as needed all frayed and cracked mattresses. CCDOC shall destroy any mattress that cannot be sanitized sufficiently to kill any possible bacteria. CCDOC shall ensure that mattresses are properly sanitized between uses. | X 8/11<br><br>12/11<br><br>X7/12 | X 3/11 | X 9/10 |
| G. 83n | CCDOC shall ensure adequate control and observation of all housing units, including distribution and collection of razors and cleaning supplies. All cleaning tools and hazardous chemical shall be removed from housing areas after use. | X 8/11<br><br>12/11<br><br>X7/12 | X 9/10<br><br>X 3/11 | |
| G. 83o | CCDOC shall ensure that Facility sanitarians receive training from a relevant state, national, or professional association with emphasis on assessment of environmental health practices and emerging environmental issues in correctional settings. Facility sanitarians should also have training on and access to testing equipment to ensure sanitary conditions. | 12/11<br><br>X7/12 | X 9/10<br><br>X 3/11<br><br>X 8/11 | |

| Section | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| **G. 84** | **Sanitary Laundry Procedures** | | | |
| G. 84a | CCDOC shall develop and implement policies and procedures for laundry procedures to protect inmates from risk of exposure to communicable disease, in accordance with generally accepted correctional standards. To limit the spread of communicable disease, CCDOC shall ensure that clothing and linens returned from off-site laundry facility are clean, sanitized, and dry. | X 8/11 12/11 X7/12 | X 9/10 X 3/11 | |
| G. 84b | CCDOC shall ensure that inmates are provided adequate clean clothing, underclothing and bedding, consistent with generally accepted correctional standards, and that the laundry exchange schedule provides consistent distribution and pickup service to all housing areas. | | X 3/11 X 8/11 X12/11 X 7/12 | X9/10 |
| G. 84c | CCDOC shall train staff and educate inmates regarding laundry sanitation policies. | | X 8/11 X12/11 X7/12 | X9/10 X3/11 |
| G. 84d | CCDOC shall ensure that laundry delivery procedures protect inmates from exposure to communicable diseases by preventing clean laundry from coming into contact with dirty laundry or contaminated surfaces. | 12/11 X7/12 | X 9/10 X 3/11 X 8/11 | |
| G. 84e | CCDOC shall require inmates to provide all clothing and linens for laundering and prohibit inmates from washing and drying laundry outside the formal procedures. | X7/12 | X 9/10 X 3/11 X 8/11 X12/11 | |
| **G. 85** | **Food Service** | | | |

| Section | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---------|----------|------------------------|--------------------|----------------|
| G. 85a | CCDOC shall ensure that all food service at the Facility is operated in a safe and hygienic manner and that foods are served and maintained at safe temperatures. | | X 3/11<br>X 8/11<br>X12/11<br>X 7/12 | X9/10 |
| G. 85b | CCDOC shall ensure that all food service staff, including inmate staff, must be trained in food service operations, safe food handling procedures, and appropriate sanitation. | X7/12 | X 9/10<br>X 3/11<br>X 8/11<br>X12/11 | |
| G. 85c | CCDOC shall ensure that the Central Kitchen and Division XI kitchen are staffed with a sufficient number of appropriately supervised and trained personnel. | | X 9/10<br>X 3/11<br>X8/11<br>X12/11<br>X 7/12 | |
| G. 85d | CCDOC shall ensure that dishes and utensils, food preparation and storage areas, and vehicles and containers used to transport food are appropriately cleaned and sanitized. | | X 9/10<br>X 3/11<br>X 8/11<br>X12/11<br>X 7/12 | |
| G. 85e | CCDOC shall check and record, on a regular basis, the temperatures in the refrigerators, coolers, walk-in-refrigerators, the dishwasher water, and all other kitchen equipment with temperature monitors to ensure proper maintenance of food service equipment. | X7/12 | X 9/10<br>X 3/11<br>X 8/11 | |

| Section | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---------|----------|------------------------|--------------------|----------------|
|         |          |                        | X12/11             |                |

**STATUS REPORT**

**DATE OF STATUS REPORT:  8/20/12**

**PROVISION:  C. MEDICAL CARE**

**53.** Treatment and Management of Communicable Disease

> **e.** Cermak shall ensure that the negative pressure and ventilation systems function properly. Following CDC guidelines, Cermak shall test daily for rooms in-use and monthly for rooms not currently in-use.  Cermak shall document results of such testing.

**July, 2012 COMPLIANCE STATUS:  PARTIAL COMPLIANCE**

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

As of this tour, both the Department of Facilities Management (DFM) staff and Cermak staff continue to monitor negative air pressures once each shift. The procedure includes corrective action when air handling systems demonstrate non-compliance.  Cermak Health Services verifies (by way of a smoke test)that the air flow within the designated units remain negative compared to the air flow outside those rooms.  In Policy B-01.2, Cermak Health Services has established daily and weekly monitoring programs, including observing the monitor vane installed in the anteroom of the "Airborne Infection Isolation Room (AIIR)", and checking the enunciator panel alarm daily.  The monitoring programs include a notification to the Nurse Epidemiologist and the Director of Infectious Disease Services if negative pressures are not found in any room.  If monitoring identifies an issue, Plant Operations and Environmental Services then submit a work order request to Facilities Management.  Weekly, the infection control staff of Cermak uses a smoke wand placed near the floor at the doorway to monitor air flow.  Occupational and Environmental Hygiene Services at the Great Lakes Center for Occupational and Environmental Safety and Health at the University of Illinois, Chicago, conducts a full testing of the ventilation system in the AIIRs annually.  Copies of those reports are provided to the Chief Medical Officer.  Subsequent to the visit, only DFM is currently monitoring negative pressure.  Cermak has discontinued their monitoring.

**Monitor's Assessment:**  At the July 2012 I found that the enunciator panel that is designed to monitor air flow direction within the negative pressure cells was not functioning as some indicator lights were not functioning.   One panel was lit, indicating a positive air pressure in that room.  When a smoke test was conducted on that room, it demonstrated that the air flow in the room was functioning as designed. A work order had been filed.  Apparently the panel has not been working since at least February, 2012. Yet, other than filing a work order with Department of Facilities Management (DFM) there was no follow up by Environmental Services of Cermak to pursue repairs.  Further none of the inmate activated nurse call buttons were functioning.   One light showed that the nurse call button had been activated, when in fact it had not.  I also reviewed the monitoring logs for the negative pressure testing supposedly being done by Cermak employees.  The logs, while completed had no key to explain what the code recordings met.  One day, June 26, 2012 there was no recorded check of negative pressure monitoring.  One staff

person, upon request, demonstrated the monitoring procedure, but completed all rooms in less than 15 seconds. Apparently the person assigned to conduct the monitoring retired on June 26, 2012 and the new person assigned the responsibility has not been effectively trained on how to conduct the monitoring and how to effectively record the findings. It is not clear on how frequently the monitoring is being completed and further I have no confidence that if an issue is identified, staff would know the immediate and long term corrective actions would be necessary. This important monitoring for the safety of both inmates and staff must be conducted as specified in the policy and by a person(s) who understand the correct procedure and can demonstrate it during future visits. As a result of this visit this provision is no longer in "substantial compliance" with the consent agreement and is returned to "partial compliance" status until staff can demonstrate their knowledge of the policy, conducting and recording the results of the monitoring in a way that clearly demonstrates compliance or lack of it for all negative air flow rooms.

**Monitor's Recommendations:**

1. Cermak management staff must review Cermak Policy B-01.2. Provide me with a marked draft of any proposed changes for review and comment before changes are finalized. This must be completed no later than September 15, 2012. In the interim I am requesting that DFM continue to monitor and provide copies of their monitoring to Cermak Environmental Services for review and corrective action when monitoring demonstrates non conformance. I will review the changes to the monitoring program including the process of DFM notifying Cermak of the results of the monitoring on the next tour scheduled for December, 2012 to assure that efficient, responsible and timely reporting is provided.

2. Provide the names of all persons who are assigned the responsibility to conduct the negative pressure monitoring for Cermak. Also provide documented evidence of the training they have received including who provided the training, what makes them competent to conduct the training, and the date the training was completed. The training documentation needed includes a written course syllabus outlining the training skills needed, the training provided and documented evidence validating the effectiveness of the training.

3. The training must include what is monitored, the correct procedure for monitoring and recording the findings, the frequency of monitoring, who completes the monitoring, and the written corrective action plan outlining what will be done when monitoring shows non-conformance, and the person who has the responsibility for taking both the immediate and the long term corrective actions.

4. All monitors must be able to competently perform the monitoring and recording process upon request and demonstrate sustainability for effective recording of the data. Only then will this provision be changed to "Substantial Compliance."

**PROVISION: C. MEDICAL CARE**

**53.** Treatment and Management of Communicable Disease

> **f.** Cermak shall notify DFM, in a timely manner, of routine and emergency maintenance needs, including plumbing, lighting and ventilation problems.

**JULY, 2012 COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE**

Status Update: Briefly describe the actions taken by the Defendants to address the provision:

As of April, 2012 Cermak and CCDOC process work orders through the system utilized by Department of Facilities Management. They process work orders through the facility wide "Facility Wizard" work order processing system for maintenance and repairs by DFM. Cermak Health Services Director or Assistant Director of Plant Operations/ Environmental Services completes an online work order request as necessary and is then able to monitor daily the status and progress made on all outstanding work orders. Work orders are only closed by Cermak the Director of Plant Operations/Environmental Services upon direct knowledge that all work was completed.

**Monitor's Assessment:** Describe the monitor's assessment of the status and documentation for the compliance status.

The new interface for Facility Wizard, the work order processing system used by Facilities Management is installed and has been operating since April, 2012. Cermak can and does now track outstanding work orders through the online database. Mr. Badali provided a demonstration of the system during the July tour. As the system is still somewhat new, he will need some additional training to understand all of the reports available to him through the system. This will allow improved use of the information. As a result, this provision is now in "Substantial Compliance" with Consent Agreement.

**Monitor's Recommendations:**

1. Provide training to more than one person on the "Facility Wizard" system so that there will be no gaps in filing work orders and monitoring the progress of work orders to assure timely closure and demonstrate sustainability of the system within Cermak.

2. Continue daily monitoring of outstanding work orders for maintenance issues and develop a written process for follow up when work orders are not completed within a reasonable time to be determined in conjunction with Department of Facilities Management.

3. Demonstrate sustainability with the provision for the next 18 months.

**PROVISION:  F. FIRE AND LIFE SAFETY**

**71.**  CCDOC and DFM shall work together to develop and implement a fire safety program and ensure compliance is appropriately documented.  The initial Fire Safety Plan shall be approved by the fire prevention authority having jurisdiction.  The Fire Safety Plan shall be reviewed thereafter by the appropriate fire prevention authority at least every two years, or within six months of any revisions to the plan, whichever is sooner.  Fire safety and emergency procedures shall be standardized across divisions, to the extent possible given differences in physical plant and security levels.

**JULY, 2012 COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE**

**Status Update:**

The Fire Safety Committee (FSC) created by the Interagency Committee in August, 2010, continues to meet monthly to address the provisions of the consent agreement regarding fire and life safety.  The committee consists of representatives from the Office of the Sheriff, Department of Corrections, Cermak Health Services, and the Department of Facilities Management.  The CCDOC division specific fire evacuation and emergency plans have been reviewed by the City of Chicago Fire Department.  In a meeting with Walter J. Schroeder, Jr, the Lead Instructor for High Rise Evacuation Training of the City of Chicago, they cannot, for liability issues, provide a written acceptance of the plan.  In that meeting he assured me that he has reviewed the plan, maintain a copy of the plan and has toured the CCDOC campus with the designated fire battalion.  Further they have witnessed several fire drills including the movement of inmates.

The FSC issued the Interagency Directive, 64.5.30.0, effective date of August 19, 2011. The purpose of which is to establish the policy and procedures for Fire Safety Plans, fire emergencies, and evacuations within CCDOC.  It establishes the respective roles and responsibilities of the CCDOC, Cermak, and DFM relating to Fire Safety Plans, emergencies and evacuations.  CCDOC now has a designated fire safety administrator and each division has assigned safety officers for each shift.  Supervisor training on Fire Safety is every other month.  Correction Officer Fire Safety Training is offered weekly at the Moraine Valley Community College.  The classes are taught by Director of Policy and Accountability, Michael Brady who also chairs the Fire Safety Interagency Committee.  The procedures require that divisional Fire Safety Officers conduct weekly fire safety inspections of all housing, administrative, medical clinics, storerooms, maintenance rooms, classrooms, and common areas within their respective divisions and that fire drills be conducted quarterly on each shift in all divisions.

**Monitor's Assessment:**

Since its inception, I have continued to receive the summaries of all meetings of the interagency fire safety committee with an opportunity for input.  I have also reviewed and provided comments to the committee on the initial draft Fire Safety Plan that resulted in several changes and additions to it.  The Interagency Directive continues to be in effect.  As of October, 2011 drills continue to be conducted more frequently than required in the Interagency Directive. There is a post drill review of every drill.

Since the beginning of supervisor and correction officer training in October, 2011, 295 supervisors have successfully completed one hour fire safety training and 1371 correction officers have successfully completed fire safety training through June, 19, 2012. This was verified by reviewing in-service training sign in sheets provided. Officers are required to pass a multiple choice test following the training. The Fire Safety Committee has created two different exams to date that are rotated to assure that officers understand the requirements of Interagency Directive 64.5.30.0. With the schedule provided, it is expected that all officers and supervisors will complete the training by December, 2012.

**Monitor's Recommendations:**

1. Continue the fire safety training for all correction officers. Assure that correction officers assigned to a specific division understand the fire safety plan for that division and know what to do during an emergency.

2. The Interagency Fire Safety Committee should consider and agree on the frequency that current officers, once trained need to receive refresher training.

3. Continue the unannounced fire drills on all shifts as planned, along with a review of each drill completed by the CCDOC Safety Administrator. Document any corrective actions taken for any identified non-conformances. The Interagency Fire Safety Committee should also review quarterly results of fire drills and make adjustments to the Safety Plan as necessary.

4. Assure that, through planning and scheduling, there is always a trained fire safety officer on duty on each shift in each division and that the fire safety officer has received training on that specific division's fire plan and evacuation routes and understands it.

**72.** CCDOC shall develop and implement an evacuation plan for inmates and staff and ensure that comprehensive fire drills are conducted every three months on each shift. CCDOC shall document these drills, including start and stop times and the number and location of inmates who were moved as part of the drills.

**DECEMBER, 2011 COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE**

**Status Update:**

Based on the correspondence referenced in 71 above, the Fire Evacuation and Emergency Plans specific to all divisions have been reviewed and found to be acceptable by the Chicago Fire Department. CCDOC is currently conducting one fire drill per month on each shift including the movement of inmates. While the consent agreement is not clear as to whether the drill frequency is for the entire complex or within each Division, I believe the intent is that all housing units and areas where inmates congregate would be drilled at least annually. Wally Schroeder, trainer from the Chicago Fire Department suggested, and I

17

agree, that there be fewer drills involving the movement of inmates. This will permit more frequent drills, and have less impact on security. He was very confident based on observation that officers know how to effectively move inmates quickly and safely. The Interagency Directive for Fire Safety, Fire Emergency, and Fire Evacuation recently completed will necessitate a review of the each division's plan to assure that it conforms to the new directive.

**Monitor's Assessment:**

On this visit, I did not witness any fire drills as I did in December, 2011. During that drill in Division V, the question that needed response was whether a cell door should be left open or closed once the inmate was evacuated. The Chicago Fire Department reviewed the issue and suggested that the doors remain open. This issue was discussed during my meeting with the Fire Safety Committee which included a representative of the Chicago Fire Department, whose expertise is large high rise complex fire safety. I witnessed one fire drill during my December tour. In future tours, I plan to witness drills in other divisions.

On the next tour, I would like to review a sampling of fire drills from each Division, especially focusing on non-conformities identified and the resulting corrective actions taken. In my view, the important result is that tier officers of each division can demonstrate effectively how to respond to an emergency requiring evacuation or movement of inmates.

**Monitor's Recommendations:**

1. Continue fire drills on the monthly schedule for each shift and Division with documentation that follows the agreed order. Maintain an updated log showing the last date any housing unit has conducted a fire drill to be able to demonstrate that drills are reasonable being spread throughout each Division.

2. Quarterly, provide me a summary of drills completed during the quarter, along with a list of corrective actions taken. I would like to review them and provide comments as necessary. I specifically would like to focus on training issues, equipment failures, and shortcomings in the divisional fire safety plans.

**73.** DFM shall ensure that the Facility has adequate fire and life safety equipment, including installation and maintenance of fire alarms and smoke detectors in all housing areas according to applicable fire codes. Maintenance and storage areas shall be equipped with sprinklers or fire resistant enclosures in accordance with City of Chicago Fire Code (13-76-010).

**JULY, 2012 COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE**

Status Update:

The Department of Facilities Management (DFM) has the responsibility to provide and maintain all fire and life safety equipment within the CCDOC complex. All housing areas kitchens, maintenance facilities etc are provided with fire alarms and smoke detectors in accordance with the City of Chicago Fire Code. Testing and maintenance is conducted annually on all fire and life safety equipment is provided by locally licensed companies under contract with DFM. DFM additionally has documented the location all applicable fire and life safety equipment including fire alarms, smoke detectors, fire extinguishers, fire panels, egress boxes containing keys, flammable cabinets, and a division specific chemical inventory list throughout the facility. DFM has installed flammable cabinets in all maintenance shops where flammables are stored and used. All flammables used by DFM are stored effectively within the cabinets. DFM has established policy (09-03-04) for proper storage of all hazardous materials. They have created a binder that is sorted by division and by floor and have color coded the location of all mechanical shops, mechanical rooms, closets, stairwells, plumbing chases, fire panels, and evacuation key egress boxes. A copy of the binder has been provided to the Chicago Fire Department and the Director of Policy and Accountability, Mike Brady.

**Monitor's Assessment:**

DFM maintains a list of all fire safety and emergency devices including alarms, extinguishers, strobes, pull stations, and extinguishers for each division. I reviewed the binder described above and found it to be well organized and a valuable tool in case of an emergency. If not yet done, assure that each division's fire safety office maintains a copy of their division's floor plan and inventory book.

During the July, 2012 tour, I visited the plumbing and electrical maintenance shops and observed the designated cabinets in each where flammable and hazardous materials are stored. The DFM policy requires that all hazardous materials be stored in clearly marked and effectively stored in a designated safe storage area. It also requires that an inventory of all hazardous materials be maintained showing the name, quantity, hazard and location. Inventories were being maintained in all cabinets of the maintenance areas visited. The two maintenance rooms were organized and reasonably clean with tools color coded and stored effectively. I also visited one mechanical room and found it to also be organized, clean and maintained. In future tours I will visit all DFM maintenance rooms to assure the safe storage of flammables and hazardous materials.

The Chicago Fire Department has observed the flammable cabinet locations and although they will not provide a written acceptance as described in Provision 71 above, their representative stated that the storage facilities were acceptable.

This provision is now in substantial compliance with the consent agreement.

**Monitor's Recommendations:**

1. Assure that a copy of that portion of the binder that is applicable is provided to each division's fire safety officer and/or maintained in the respective superintendent's office.

2. The fire safety and specific room designations, along with the chemical inventory included in the binder need to be dated and the appropriate DFM policy revised to assure at least a semi-annual review for assuring up-to-date information.

3. If updates and/or changes are made to the binder, provide a dated copy of it to the CCDOC Safety Administrator and the Safety Officer of each Division. This will assure that the binder inventory of flammables and hazardous materials remain relevant.

**74.** DFM shall ensure that all fire and life safety equipment is properly maintained and routinely inspected. DFM shall develop and implement a program related to the testing, maintenance and inspection of the Life Safety Equipment.

**JULY, 2012 COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE**

**Status Update:**

Facilities Management has fully implemented their policy #10-01-01, Required Testing, Inspection, and Maintenance of Life Safety Systems. This policy and procedure outline required testing in accordance with NFPA requirements. It includes weekly and monthly generator testing, monthly fire department connections inspection, monthly fire pump churn testing, monthly fire extinguisher inspection, annual fire pump testing, annual fire alarm testing, annual main drain testing, and annual elevator testing. Included in the policy is the requirement for documented corrective action when non-conformities are identified. Required testing, inspection, and maintenance for all life safety systems are scheduled and maintained through the "Facility Wizard" work order system.

**Monitor's Assessment:**

I reviewed the 2012 Testing, Inspection and Maintenance Record (Chart) for Division VI. Annual testing for fire alarm and detection systems was completed in December, 2011 and scheduled for December 2012. Monthly testing of fire extinguishing equipment was completed on time for the first six months of 2012, and the weekly and annual testing for generator and transfer switches were also completed on time with corrective actions taken and recorded when non-conformities were identified. The records were accurate, legible, and complete. Where non-conformities were identified, timely corrective action

was completed in every case. During this tour all fire extinguishers I checked had been inspected as specified.   All fire extinguishers – including those in storage – should be included on the DFM inventory.

**Monitor's Recommendations:**

1.   No further recommendations at this time.

**75.**   CCDOC shall continue to ensure that emergency keys are appropriately marked and identifiable by touch and consistently stored in a quickly accessible location, and that staff are adequately trained in use of the emergency keys.

**JULY, 2012 COMPLIANCE STATUS:  PARTIAL COMPLIANCE**

**Status Update:**

The Security and Key Control Interagency Directive was issued effective January 1, 2012.  It requires that each Division have a "red" emergency key box in the control room.  That box holds the key that opens a second box containing an emergency key for all housing unit doors.  The key box is locked and has a security seal that has to be broken to gain access.  The policy further requires that any time the seal is broken, including during an emergency, the Watch Commander must be notified, an incident report written, and a work order written requiring DFM locksmith to reseal the box.

All emergency egress keys are color coded and have a two inch glow stick attached to the key ring. Restricted keys are those specifically assigned to designated personnel with the authority of the division superintendent or DFM's Deputy Director/OEIV.  These keys are color coded differently than the egress keys.  General keys are keys for everyday use such as for the library, classrooms, recreation rooms, etc., and are also color coded.

Emergency access keys for all DFM maintenance shops and mechanical rooms and closets is currently not addressed or included in the Interagency Directive.  However, they will be on a pilot test in Division XI and, if the pilot proves workable and assures DFM security, they will in the future be stored in the respective division's superintendent's office.  The new plan described below will be tested for the next six months.

**Monitor's Assessment:**

The glow sticks are now installed in all divisions.  This solution is simpler and seemingly more effective than notching each key, considering the number of keys that would have to be notched in a facility this size. I observed the glow sticks during the fire drill conducted in Division V in December.  Training of all control room officers and back-ups on all shifts on the location of the emergency keys is complete.  The issue identified in the December, 2011 report regarding providing CCDOC emergency access to all DFM maintenance shops, mechanical rooms and closets is in the process of being resolved.  Following a discussion of the issue during this tour, DFM and CCDOC have agreed that there will be a pilot project in

21

Division XI.  An access controlled key box, with DFM shop/mechanical space keys located in the Division XI Superintendent's office.  The access control system will be a card reader/magnetic strip with access data reporting to DFM administration.  The system will be installed by Analytical Science Corporation.  If successful, it will be expanded to the other divisions fully resolving this issue.   CCDOC will have full and ready access to DFM shops and mechanical spaces.  DFM, in turn will know who opened the key box.

**Monitor's Recommendations:**

1.  Provide documentation showing who in each division has been trained on the location and use of emergency keys.

2.  Implement the DFM emergency access key pilot, if effective to all divisions.


**76.**  CCDOC shall ensure that staff are able to manually unlock all doors (without use of the manual override in the event of an emergency in which the manual override is broken), including in the event of a power outage or smoke buildup where visual examination of keys is generally impossible.  CCDOC shall conduct and document random audits to test staff proficiency in performing this task on all shifts, at a minimum of three times per year.  CCDOC shall conduct regular security inspections of all locking mechanisms.  CCDOC shall communicate with DFM via the Work Order System regarding lock-related issues and maintenance

**JULY, 2012 COMPLIANCE STATUS:  PARTIAL COMPLIANCE**

**Status Update:**

Emergency keys for each division are stored in a secure control room.  All keys have been equipped with glow sticks that will easily allow staff to identify a specific key in the case where vision is impaired because of smoke or fire.  The Fire Safety Committee explained that on every shift, the officer assigned to the unit or tier inspects all locking mechanisms and reports any issues through the DFM work order system.

**Monitor's Assessment:**

During this visit, I did not assess any division's process for conducting random audits to test staff proficiency in performing easy identification of keys.  This should be a component of each of the quarterly fire drills.  A documented security inspection of all locking mechanisms is included as part of a housing unit officer's rounds.  I will review this during the December, 2012 tour.  My review of open work orders did show examples of work orders filed when locks were found tampered and inoperable.  This is also shown on affected incident reports.

**Monitor's Recommendations:**

**1.**  Continue testing the door locks on all doors in each division.

2.  Provide evidence that the testing of door locks and what to do if a lock fails is included on the correction officer's training syllabus.

**77.**  DFM shall develop and implement an annual preventative maintenance program **concerning security devices such as doors locks, fire and smoke barrier doors, and manual unlocking mechanisms to ensure these devices function properly in the event of an emergency.**

**JULY, 2012 COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE**

**Status Update:**

The annual inspection of door locks, fire and smoke barrier doors, and manual unlocking mechanisms is included on the "Facility Wizard" work order system as a standing order.  The annual inspections are completed by the same contractor that inspects smoke detectors, fire alarms, and smoke detectors.

**Monitor's Assessment:**

Facilities Management is in the process of completing its 2012 annual inspection of all door locks, fire and smoke barrier doors, and manual unlocking mechanisms through the same outside vendor that inspected smoke detectors, fire alarms and smoke detectors. While not yet completed, they are scheduled and will be finished by year end.  I reviewed a sampling of completion records submitted by the vendor for 2011 inspections.  They demonstrate that all were completed.  During the December, 2011 visit I reviewed records of the annual inspection program for what had been completed through October for 2011. DFM provided documentation confirming the testing was completed for last year.

**Monitor's Recommendations:**

1.  Continue the monitoring program as scheduled.

2.  No further recommendations.

**78.**  CCDOC shall implement competency-based testing for staff regarding fire and emergency procedures.

**JULY, 2012 COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE**

**Status Update:**

CCDOC through the Interagency Fire Safety Committee has implemented the competency based safety officer proficiency examination.   It is given to all safety officers.  They have also completed training for most divisional supervisors and shift commanders.  The test is based on the Interagency Directive for Fire Safety, Emergency, and Evacuation.  There are currently two different versions of the test that can be alternated between classes or trainings. The Directive specifically outlines that fire safety orientation for each division is conducted by the Superintendent or designee for any officer new to the division in accordance with the current CCDOC General Order regarding division orientation handbook.  Following

orientation there will be a written test. Any officer failing the test will be required to attend another orientation or receive supplemental training at the Superintendent's discretion.

CCDOC has issued the division specific Orientation Handbook. It is the responsibility for all CCDOC staff to fully understand expectations and responsibilities for a variety of safety and sanitation topics. It includes sections on Safety and Sanitation Inspections of Living Units (General Order #24.9.9.0), Fire Safety (Interagency Directive #64.5.30.0), Egress Keys, Chain of Command, Inmate Count Procedures, and Compound Lockdown Levels. Each handbook includes a floor specific site map identifying key areas specific to safety within the division.

**Monitor's Assessment:**

The competency based fire and emergency evacuation safety officer proficiency exam was initiated in August, 2011. The passing score for the exam is 80%. The first exam scores showed that of the 50 officers who took the test, 39 scored 90% or better with only three not passing. For 2012 the exam was given thus far to 83 representing all divisions except Division III, central kitchen, support services, laundry, External Operations, and RCDC, Facilities Management, and Sanitarian. All participants successfully passed the written exam.

I have reviewed the division specific Orientation Handbooks and find that they are accurate, and complete. Consideration should be given to include the DFM maps in place of the ones currently used. The DFM maps are color coded, and very easy to read.

Further, now that fire drills are being conducted on a regular, but unannounced schedule on every shift, and those drills are video recorded, this is a further opportunity to identify officer weakness in performance and create remedial training for officers who are not able to demonstrate proficiency and most important identify modifications needed to the general fire and life safety training all officers receive.

**Monitor's Recommendations:**

1. Continue training and testing until all divisional fire safety officers for all shifts have completed the training and demonstrated their competency. With the opening of Division III for housing, assure safety officers for all shifts there are also trained. It may also be valuable to train designated individuals representing Cermak as well.

2. Establish a course syllabus (topic outline) for each division's training program and identify the designated trainer responsible providing the training.

3. Continue to identify and maintain documentation of those officers who do not perform up to expectation during regular drills and actual events. Prior to my next visit, please provide evidence of the remedial training and the list of officers who have completed it. While an officer may have successfully passed the written examination, the validation of the training is how they actually perform during drills and actual events. Also, prior to the December, 2012 tour, please provide a

copy of the written summaries of drills conducted during 2012.  Also provide a list of the corrective actions taken as a result of the drill assessments.

**79.**  CCDOC shall promptly notify DFM of all electrical hazards, including maintenance and repair of electrical outlets, devices, and exposed electrical wires.

**JULY, 2012 COMPLIANCE STATUS:   SUBSTANTIAL COMPLIANCE**

**Status Update:**

The Interagency directive for fire safety provides that each division safety officer conduct weekly fire safety inspections of all housing, administrative offices, medical clinics, shops, maintenance rooms, classrooms, and common areas. Each week the inspection is completed by a different shift's safety officer.  For example, week one is first shift, week two is second shift etc.  The weekly completed reports are then submitted to the division's Superintendent by the end of the inspection week.  Any" life safety" deficiencies are reported immediately to the respective division superintendent, an incident report is filed, and DFM is to be notified via their emergency number.  The weekly inspection form  includes monitoring of electrical outlets and covers, electrical cords and plugs, fire extinguishers, assuring sprinklers are unobstructed, exit ways are unobstructed, exit signs are illuminated, garbage and combustible refuse removed, and assurance that flammable materials are stored only in designated fire safe cabinets.

At the end of each month the second shift safety officers are required to complete and submit a copy of the monthly deficiency report to the respective division superintendent noting any unresolved deficiencies.  Further the CCDOC Safety Administrator is required to provide a status report at the following meeting of the Interagency Fire Safety Committee.  All unresolved non-conformances after 30 days are referred to the Executive Directors of CCDOC and DFM for resolution.

CCDOC has completed the interface with the DFM "Facility Wizard" work order tracking system.  As of April, 2012 it is fully functional and used.  A review of the number of work orders filed by each division shows a marked increase in work orders being submitted and work completed by DFM maintenance trades.  This includes electrical problems.

**Monitor's Assessment:**

  During this tour, I visited selected housing units in Divisions II, III, IV, VI, IX, X, and XI. In those, I did not identify any electrical issues with the exception of light fixtures that are in the process of being replaced through a capital project.  See Provision G. 83g.  Since my visit in December to Division XI, CCDOC changed superintendents and have virtually eliminated the in-cell fires that inmates started to "cook" food.  Not only have they significantly reduced flammables within the cells, they have eliminated sources that inmates used to ignite the flammables. Officers in that Division are piloting direct supervision, along with a sound cell inspection program that has and will continue to eliminate the ignition sources and provide a safer environment for inmates and officers.

**Monitor's Recommendations:**

1. Using the experience of Division XI, assure that all divisions are fully implementing and enforcing the Interagency Directive on Fire Safety including all documented weekly inspections with effective and written corrective action follow-up for all outstanding deficiencies.

2. No later than December 1, 2012, provide me with a summary of inspection reviews and implemented corrective actions. I want to review them prior to my next visit.

3. Provide documented evidence that the monthly reports are actually submitted and reviewed by each division's superintendent. This is by signature of the superintendent accepting the report.

4. No later than December 1, 2012, the Safety Administrator is requested to provide me a document identifying all outstanding electrical issues identified since January 1, 2012 that have gone unresolved for over 30 days. This can be relatively easily completed with the "Facility Wizard" tracking system.

**80.** DFM shall promptly repair all known electrical hazards, including maintenance and repair of electrical outlets, devices, and exposed electrical wires and will document repairs by the Work Order System.

**JULY, 2012 COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE**

**Status Update:**

The priority system established by DFM to track and monitor resolution of all maintenance requests has worked successfully since implemented in August, 2010. It has worked effectively to assure timely response to work order requests, including electrical hazards, filed by CCDOC and Cermak. Electrical hazards are a first priority for response by DFM. Ongoing Interagency meetings serve as the vehicle to address any outstanding issues including electrical hazards.

As of April, the DFM "Facility Wizard" system for reporting, processing, and tracking work orders is fully operational within CCDOC and Cermak. Each day CCDOC and Cermak can monitor progress or lack thereof all outstanding work orders and follow up with DFM as necessary to assure timely response and repairs to electrical hazards.

**Monitor's Assessment:**

With CCDOC and Cermak now on the "Facility Wizard" work order system and the enhanced cell inspection program implemented by CCDOC, DFM has been inundated with work orders from all divisions, kitchens, etc. While response time is excellent for electrical and other priority I work orders, it will improve even more once the number of issues levels off. I reviewed work order closure records from Facilities Management, and observed the average time from issuance of the all work orders to

response is about one day. Electrical and fire safety work order requests were addressed either the same day or the next.  Occasionally a weekend or holiday a request may be completed the following day.  "Emergency" orders are typically handled within hours of the request.

The replacement program for lighting fixture which will begin this fall will significantly reduce the number of electrical issues including inmate accessible exposed wires in the fixtures, broken incandescent light bulbs etc.

**Monitor's Recommendation:**

1.  Continue monitoring the time from receipt of a work order to its closure.  I will continue to monitor those reports.

2.  While this is a DFM provision, CCDOC division superintendents and supervisory employees must be diligent and responsive to quickly recognize and report electrical issues and assure that work orders are entered for timely repairs.


**81.**  CCDOC shall ensure that combustibles are controlled and eliminate highly flammable materials throughout the facility and inmate living areas (e.g., inmates' use of paper bags as trash receptacles, ripped fire-retardant mattress covers, improvised cell light covers, blankets on cell floors, and improperly stored and labeled flammable liquids and other chemicals).

**JULY, 2012 COMPLIANCE STATUS:  PARTIAL COMPLIANCE**

**Status Update:**

The revised General Order 11.1.0 "Sanitation Procedure and Inspection" is in effect, as is the CCDOC Master Sanitation Plan.  Division specific sanitation plans for all divisions are also now complete.  Its uniform and consistent implementation, with tier officer enforcement including accountability from supervisory officers will reduce the amount of combustibles within housing units.  Since the December, 2011 tour, CCDOC created a "Compliance Team" with representatives from each division and Support Services and the Sanitarians.  This team, created in January toured other correctional facilities and openly discussed limitations to their success. Their mission from Director Hickerson was to investigate alternatives and come up with workable solutions and methods to address combustibles as well as lack of sanitation in most housing units.  Once they developed a plan, it was quickly accepted by executive management. One solution which is currently being pilot tested in Division XI is to create a positive reward, or incentive for inmates to maintain sanitation in their cells.  Tiers or pods who maintain adequate sanitation and cleanliness are rewarded by having microwaves available in the dayrooms that inmates can use to heat foods from the commissary.  Early indications are that is an effective deterrent. The positive reinforcement aspect is resulting in cleaner cells with fewer combustibles in the housing units.  Coupling that with the piloting of direct supervision in Division XI has made dramatic improvements there.  For success throughout all divisions will take the complete support of not only

CCDOC management, but more important support from divisional command officers. The expectation has been established.

**Monitor's Assessment:**

My assessment of housing units during this tour revealed significantly improved sanitation in most divisions. Most notable was the improvements in Divisions IV, X, and XI. I observed improvements in other divisions I toured as well but not as notable. Division III still had issues with sanitation especially 3rd floor 3-B. I must commend the Superintendents in Divisions IV, X, and XI for their commitment and support to make the dramatic improvement. It was most obvious. They need to share their experience of what worked and what did not with their colleagues. In future visits, I plan to visit more housing units and expect to see wider improvement in all divisions.

DFM now has controls in place for storage of all flammables and maintains an appropriate inventory of all flammables for each of their maintenance shops. Flammables are safely stored inside designated and labeled fire safety cabinets throughout the complex. As discussed in Provision 73, DFM has completed the color-coded map and inventory of all flammable and hazardous chemicals and provided it to CCDOC division safety officers and Safety Administrator.

**Monitor's Recommendations:**

1. The CCDOC Safety Administrator, along with DFM designated management needs to formally monitor the locations where flammables are stored and inventory at least quarterly. In between quarterly inspections, the Division Fire Safety Officers should monitor the locations and inventory during their weekly inspections and document their findings. Any issues with DFM fire issues need to be documented and formally reported to them through the emergency process for work orders.

2. Continue through the "Compliance Audit Team" as well as Sanitarian unannounced inspections on all shifts of the inmate housing units to assure that rules to eliminate and prevent storage of flammables are followed consistently in all divisions. Housing unit correction officers on all shifts must be required to administer the orders as established and supervisors must enforce when necessary.

3. If proved successful, expand the reward system to more tiers and divisions where compliance is achieved.

4. By December 1, 2012 provide me a summary of the improvements made in elimination of combustibles in cells and improved sanitation in each division for my review. I want to highlight that in my next report.

5. CCDOC needs to consider changing inmate supervision to direct supervision where appropriate in dayrooms and cells to monitor inmate activities and have direct contact with the inmates rather than indirect observation from their control room thus allowing opportunities for inmates to create both safety and fire risks to themselves as well as CCDOC employees.

**82.**  CCDOC shall ensure that fire safety officers are trained in fire safety and have knowledge in basic housekeeping, emergency preparedness, basic applicable codes, and use of fire extinguishers and other emergency equipment.

**JULY, 2012 COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE**

The Interagency Directive for Fire Safety, Fire Emergency, and Fire Evacuation was issued effective August 19, 2011.  The policy establishes that all CCDOC employees must receive training and become well-versed in the fire safety, emergency, and evacuation plans of the department and its divisions.  This includes safety officers.  Further, the policy explains that "Communication among and between CCDOC, Cermak, and CCDFM employees is key in assuring a safe facility, and all shall work together to implement this directive."

The Interagency Directive requires the identification and training of all CCDOC divisional safety officers for each division at least annually.  The training must be provided by or with the approval of the Cook County Sheriff's Office Training Institute, through the CCDOC Safety Office and the Chicago Fire Department, and in accordance with a written course syllabus to be reviewed annually by the Fire Safety Committee.

The training of safety officers (fire safety officers) is currently provided by Wally Schroeder of the Chicago Fire Department.  The training has been recorded and is available on DVD.  CCDOC is providing me a copy of the DVD for review.  Following the training, safety officers are required to pass a written proficiency examination.

**Monitor's Assessment:**

The competency based fire and emergency evacuation safety officer proficiency exam was initiated in August, 2011.  The passing score for the exam is 80%.  The first exam scores showed that of the 50 officers who took the test, 39 scored 90% or better with only three not passing. For 2012 the exam was given thus far to 83 representing all divisions except Division III, central kitchen, support services, laundry, External Operations, and RCDC, Facilities Management, and Sanitarian.  All participants successfully passed the written exam.

As explained earlier in this report, the divisional orientation handbooks for divisional safety officers is now complete and issued.  On future tours, I will continue to monitor safety officer knowledge by witnessing drills.

This provision is now in substantial compliance with the consent agreement.

**Monitor's Recommendations:**

1.  The Safety Administrator needs to assure that all designated Safety Officers assigned within the divisions have received the training referenced in the Interagency Directive.  Should a Safety Officer

be transferred or leave CCDOC, the superintendent, prior to the transfer or leave shall provide the name of the replacement Safety Officer to the Safety Administrator. Each division superintendent must assure that there is always a trained Safety Officer within their division at all times. So it may be necessary to train back-up officers for all shifts, holidays, and weekends.

2. The CCDOC Safety Administrator should maintain a master up-to-date register of all trained divisional safety officers. A division specific register should be maintained and available by the superintendent of each division.

**PROVISION: G. SANITATION AND ENVIRONMENTAL CONDITIONS**

**83.** Sanitation and Maintenance of Facilities

    **a.** DFM shall maintain an adequate written staffing plan and sufficient staffing levels to provide for adequate maintenance of the Facility.

**JULY, 2012 COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE**

**Status Update:**

The Department of Facilities Management has a written staffing plan for each trade, including response to work order requests, scheduled maintenance, and emergencies; for engineering, plumbing, electrical, painting, carpentry, and masons. In includes supervisory personnel for each. It is important to note here that DFM are responsible for the maintenance and repairs of all Cook County owned facilities including CCDOC. There are assigned trades that report directly to the CCDOC complex. Others may be brought in to assist, if necessary. DFM has modified its contracts with trades and now provides trades for two shifts. This will allow for more timely coverage and reduce overtime costs for Cook County.

**Monitor's Assessment:**

The staffing plan for the Department of Facilities Management is the same for fiscal year 2012 as it was for 2011. While there were some reductions in their budget, the staff assigned to CCDOC will not change. Currently DFM has budgeted 17 electricians, 7 electrical technicians, 1 mason, 17 plumbers, 6 steam fitters, 45 engineers and mechanicals, 14 painters, 13 carpenters, 3 machinists, 2 tin smiths, 6 iron workers, 2 glazers, 2 laborers, and 3 pipe insulators. DFM administrators continue to work to assure that CCDOC and Cermak maintenance and repairs continue to receive priority response. This is as a result of the Consent Agreement and continuing requirement for maintaining the numerous facilities necessary to house and service over 9,000 inmates. DFM tracks the time from filing to completion for work orders and demonstrates that the average completion time for all repairs at CCDOC average 0.9 days for priority one work orders. That said, DFM has been inundated with a marked increase in work orders as the direct result of increased and significantly more thorough inspections by CCDOC compliance team, Sanitarians, and tier officers and supervisors. Through July 15, 2012 there were 3,621

outstanding work orders. Of those 34% are electrical issues and 24% are plumbing. In six and one half months, DFM has closed 10,478 work orders of the 14,099 that have been entered into the system. Please note that 161 of the electrical work orders are pending for Division XI as they are on hold for Capital Funds appropriation as part of the light replacement project. CCDOC continues to monitor outstanding work orders through the "Facility Wizard" system. I anticipate that once the surge in work orders stabilizes, DFM will begin to reduce the number of pending work orders to a manageable schedule.

**Monitor's Recommendations:**

1. Continue to monitor "Facility Wizard" reports to assure that effective and timely work order processing and resolution is maintained.

2. Consider the need for additional trades to address the work order surge especially plumbing and electrical.

**83.** Sanitation and Maintenance of Facilities

> **b.** CCDOC shall revise and implement written housekeeping and sanitation plans to ensure the proper routine cleaning of housing, shower, and medical areas, in accordance with generally accepted correctional standards. Such policies should include oversight and supervision, including meaningful inspection processes and documentation, as well as establish routine cleaning requirements for toilets, showers, and housing units.

**JULY, 2012 COMPLIANCE STATUS:  PARTIAL COMPLIANCE**

**Status Update:**

The CCDOC General Order 24.11.1.0, Divisional Sanitation Plan became effective in February 29, 2012. This order is in conjunction with General Order 24.9.9.0, Safety and Sanitation of Living Units which became effective December 6, 2011. Each division's specific sanitation plan is completed. However, there needs to be a review as I identified inconsistencies between what is stated in the General Order and what is stated in the divisional sanitation plans. Cermak also has a sanitation and inspection plan for each of the medical clinics. A sanitation video is shown on televisions in each housing unit. The division designated sanitation officers have been trained by the CCDOC Sanitarians on effective cleaning and disinfecting procedures. The chemical supply company, Aztec, provides the safety and effectiveness of cleaning and disinfecting chemicals. In the General Orders, Watch Commanders are responsible for reviewing the completed Daily Inspection Forms from each of the housing units and filing a summary report weekly. The Support Services Superintendent and Sanitarians receive and review the weekly summary reports from each of the divisions. The divisional sanitation plans mandate that sanitation officers observe the cleaning and disinfection of cells, toilet and shower facilities. Since the divisional

sanitation plans became effective, the Sanitarians continue to conduct unannounced inspections of housing units within all divisions.

CCDOC created and continues to use a designated "Compliance Team" to develop and oversee the implementation of the Divisional Sanitation General Order. There is one representative from each division appointed by the divisional Superintendent. They identified two reasons why cleanliness, lack of sanitation, and allowing inmates to maintain flammable materials, excess food, and starting fires (cooking) is allowed to occur. First is of lack of consistency and enforcement by Superintendents, Commanders, Lieutenants, and Sergeants. Second is the lack of direct supervision of inmates, allowing the inmates to decide how frequently and what constituted a clean and sanitary cell. This "culture" has prevailed for virtually an officer's entire career. The Compliance Team identified one way to change the culture was to create an incentive for inmates to comply with sanitation and safety rules by providing a microwave oven to those housing units where the rules are being followed. Further CCDOC began a pilot study in Division XI to manage inmates by direct supervision. In other words CCDOC will transform the existing culture with a very different approach by creating an environment in the housing units to require accountability from both inmates and officers to improve the sanitation and maintenance of the housing areas as well as classrooms, maintenance closets, tunnels, and general areas. While early in its implementation the improvement in most divisions has been remarkable.

**Monitor's Assessment:**

During the visits to housing units in Divisions II, III, IV, VI, X, and XI and limited inspection of Cermak, I observed a significant change in the cleanliness and sanitation in all divisions except Division III and Cermak. Division IV, X and XI were outstanding. In Division III I observed excess food allowed in the cells, missing drain covers in showers with no work orders filed, plugged sink, dirty hallway floors, and drain flies in the shower and hallway. Further the shower ceiling in 1-A is unfinished with exposed drywall that is not sealed allowing water from the showers to damage the new drywall before it is even finished. What is lacking is a formal process from CCDOC to take the imitative to develop a schedule (designated time) to finish major projects in housing areas.

In Division III Annex, I noted some mattresses that needed replacement, ropes in the cells, and several plumbing leaks. (DFM completed a sweep of the Division during the week to address several outstanding maintenance issues). I need to note that Division III has only recently been reopened because of the large increase in population.

Division II Dorm 2-m is a medical housing wing with 48 inmates. Towels were allowed to be hung along the walls, a handrail in the handicapped shower was removed and not replaced, and numerous inmates were sleeping on mattresses on the floor without the use of "boats". Inmates were sleeping on the floor because apparently there were not enough lower bunks to accommodate inmates that could not climb to the upper bunks. Division II dorm 2-n is another area used to house medical designated inmates. There I identified 12 inmates sleeping on the floor for the same reason stated above and at least 15 inmates utilizing wheel chairs. There was only one handicapped shower and toilet and officers apparently were allowing inmates to hang sheets to provide privacy in between showers and toilets. I

received a written letter from one inmate to Department of Justice complaining about several issues. The complaint was forwarded to DOJ and CCDOC Executive Director. He and staff met with the inmate and several changes were made to address the issues identified. Apparently Cermak is releasing inmates to Division II with reusable drinking cups. However, there is no means to effectively clean and sanitize them daily. This needs to be resolved either by developing a method or only permitting the use of single service cups.

What concerns me in Division II is the apparent lack of initiative by officers and supervisory staff to not only recognize rather obvious issues and effectively address them, but rather ignore them, only take action upon my findings and raising the issue to the senior management team rather than by the commonly accepted practice of having tier officers and supervisory staff taking the initiative to manage their areas of responsibility. These are issues that if necessary need to be reported and resolved through the Sheriff's Accountability meeting rather than virtually always, at least as I have observed at all that I have attended, reporting that everything is "going fine." That practice or "culture" must change in order for this provision to become substantially compliant. If an officer recognizes an issue and cannot resolve it at his/her level, he/she has a responsibility and obligation to raise the issue to a higher level, until the issue is resolved satisfactorily.

In Cermak, I only visited the housing units that include the negative pressure rooms. The showers and cells were not clean. In fact in one cell I inspected immediately after it was cleaned, the shower walls and floor still had an accumulation of soap scum. The showers which were stainless steel needed to be cleaned with a cleaner designed for stainless steel. I also noted that not all Material Safety Data Sheets were current and organized in a way that is easy to find in case of an emergency. I will spend considerably more time in Cermak on the next visit. On this tour I did not assess any medical clinics in the divisions.

The cleanliness of common areas including administrative offices, tunnels, hallways, staircases, elevators, classrooms continue to improve on every visit. I now see officers and employees picking up debris when seen rather than just leave it. There appears to be more effective supervision of inmate workers cleaning and maintaining these areas. The work by inmates and their supervision in thoroughly cleaning the kitchens was most notable.

All exceptions noted, the changes in enforcing inmate rules, direct supervision, and a renewed sense of pride among officers, supervisors, and superintendents is remarkable. I expect in future tours that it will continue to improve. I am most interested in the results where direct supervision of inmates is the standard practice. It is in the officer's best health interest to administer and enforce the General Orders as they pertain to their area(s) of responsibility. The new initiative created by the CCDOC Executive Director needs to have a provision to assure that officers understand their personal risks to health, as well as those of the inmates.

While it is the responsibility of the officers to conduct shift specific inspections of all cells, they need to reinforce that they are in charge of the inmates rather than allow the inmates to determine how they will maintain their living space. Superintendents, Watch Commanders, Lieutenants, and Sergeants must

33

take responsibility for assuring sanitary conditions in the housing units. This will make the inspections by sanitation officers more effective.

**Monitor's Recommendations:**

1. Revise the General Order 24.11.1.0, Divisional Sanitation Plan and/or each division's sanitation plans to assure they are consistent.

2. Develop a process to schedule and notify DFM to allow them to complete major repairs and projects such as the one described in this section.

3. Assure inmates are permitted to clean their cells daily including toilet, lavatory, floors, etc.

4. Cermak needs to review their sanitation policies, assure through weekly inspections that all cells under their jurisdiction are effectively clean and maintained clean and in good repair.

5. Cermak environmental services need to make available cleaning supplies that when used according to instructions effectively clean surfaces such as stainless steel.

6. Maintain an effective and timely inspections of sanitation and safety as required under the General Order.

7. Where appropriate expand direct supervision of inmates to assist in assurance that cells and dayrooms are maintained clean and sanitary.

8. Develop and implement a process to effectively clean and sanitize the plastic drinking cups provided to medical inmates housed in Division II dorms or eliminate the use of them and provide single service cups.

9. Assure there are adequate beds allotted for inmates who cannot climb to upper bunks. Eliminate allowing inmates to sleep on the floor.

10. Make necessary repairs to assure inmates with disabilities have access to handicapped accessible showers and toilets. I recognize that the new building scheduled for opening next April will address this issue for the long term. I would expect that more facilities could be made available in the short term for those impacted dorms.

**83.** Sanitation and Maintenance of Facilities

    **c.** DFM shall implement a preventive maintenance plan to respond to routine and emergency maintenance needs, including ensuring that shower, toilet, and sink units are adequately maintained and installed.

**JULY, 2012 COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE**

**Status Update:**

As discussed earlier in this report, DFM uses a management work order tracking system ("Facility Wizard") to track and prioritize all maintenance requests and scheduled preventative maintenance of mechanical and fire safety systems within CCDOC, as well as at all other Cook County facilities. As of April, CCDOC and Cermak are using the same system through an interface to enter work orders and monitor their closure. DFM has designated staff to prioritize work orders and send them to trades' foremen for assignment. DFM is also implementing a phone management program that will monitor trades efficiency in responding and closing out work orders.

Facilities Management operates a 24 hour emergency hot line seven days a week to receive and respond to any facility emergency reported by CCDOC or Cermak.

**Monitor's Assessment:**

DFM continues to meet the requirements of this provision. DFM management continues to investigate different reporting ideas to improve tracking and benchmarking types of work orders and from which division. This data will be beneficial to more effectively budget staff time and positions.

CCDOC has designated specific employees within each division who are trained to create a work order based on information from tier officers. It is my view that DFM promptly responds to work orders following their priority schedule. For all categories of trades, DFM closes an average of 425 work orders weekly and over 1600 per month. As discussed earlier, the number of work orders pending continues to grow as CCDOC is more effective at identifying maintenance issues and entering work orders to get them scheduled.

**Monitor's Recommendations:**

1.  None for Facilities Management

2.  CCDOC and Cermak need to track pending work orders and based on priority. If there are pending work orders that are not being addressed, they need to contact DFM to understand the reason. Above all, they should not submit duplicate work orders, as this will create unnecessary work for DFM and not improve productivity. Ultimately all CCDOC employees are responsible for identifying issues that need repairs.

**83.** Sanitation and Maintenance of Facilities

> **d.** CCDOC shall notify DFM, in a timely manner, of routine and emergency maintenance needs, including plumbing, lighting, and ventilation problems.

**JULY, 2012 COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE**

**Status Update:** As discussed above "Facility Wizard" work order tracking system has been operational for CCDOC and Cermak since April, 2012. The required housing unit inspections specified in the

sanitation General Order 24.11.1.0 became effective in March, 2012. Further General Order 24.9.9.0 established an inspection protocol for sanitation and living unit officer to identify and correct non-conformances. As a result, the Registered Sanitarians have been receiving and monitoring weekly summary reports from each Division. The Watch Commanders in each division are responsible for reviewing the daily inspection reports from the tier officers. Sanitarians are also conducting unannounced inspections of each division as an independent check.

The Sanitarians have also created a Power Point presentation for training tier officers about how to identify plumbing issues. It is used to teach correction officers what key plumbing issues to look for during their routine rounds. It is used at the annual in-service training program taught weekly at the Sheriff's Training Academy. The Sanitarians have also explained the work order entry process to the food service contractor. It will also be shared with the new food service contractor CBM. They will notify the Sanitarian who will enter the work order. The CCDOC Sanitarian in conjunction with the DFM Liaison Officer was recently empowered to generate the electronic DFM work order requests. With the number of buildings on the campus, it may be necessary to permit other officers the same responsibility. Further, a "work order unit" was created in late May to streamline and expedite the work order process.

The 2011 initiative by DFM to clean and maintain vents throughout CCDOC has also had a positive impact. There are significantly less ventilation issues in the housing units as before.

Emergency repairs and the awareness and use of the 24 hour hotline is assuring that emergency maintenance repairs are forwarded to DFM as reasonably fast as necessary.

This multi-faceted approach has resulted in a huge increase in work orders being entered, as discussed in Provision 83.a above.

**Monitor's Assessment:**

During my July tour of housing units in Divisions II, III, IV, IX, X, XI, and Cermak I found positive change in the reporting of plumbing, electrical, and lighting issues in housing units. When I identified issues, officers quickly provided me copies of work orders demonstrating that the previous reluctance to file work orders is over. Officers seem to understand their responsibility to notify the designated employees who in turn submit the work order as necessary. The clear increasing back log of pending work orders, as I predicted is occurring. The training initiative by the Sanitarians that is given at the annual officer in-service training, along with the enhanced inspection and accountability is working. The recently implemented "Compliance Team" approach in each division is also having a positive impact not only in sanitation, but in placing timely work orders for required maintenance.

In assessing the food service kitchens, leaking plumbing fixtures are improved compared with past inspections. I will take a closer look at Cermak on the December, 2012 visit. While I did not visit specific housing areas there, I did find several maintenance issues in the negative pressure cells. While work orders had been filed, there needed to be a much higher priority to follow up when they were not completed in this critical area.

As a result of the changes discussed, this provision is now in substantial compliance with the Consent Agreement.

**Monitor's Recommendations:**

1.  Continue the training program for all housing officers explaining the functionality of all plumbing fixtures. Require accountability of the housing unit officers on all shifts to report issues as they are identified.

2.  Expand the training to include electrical maintenance issues.

3.  Assure that the new food service contractor understands their responsibility to report plumbing and electrical issues immediately to the Sanitarian to assure timely response from DFM.

4.  The Sanitarians need to provide the same training program for Cermak medical clinic personnel to assure they understand what constitutes a maintenance issue and what to do when they identify a plumbing, lighting, ventilation and/or emergency issue requiring maintenance.

**83.** Sanitation and Maintenance of Facilities

> **e.** DFM shall ensure adequate ventilation throughout the Facility to ensure that inmates receive an adequate supply of air flow and reasonable levels of heating and cooling. DFM staff shall review and assess compliance with this requirement on a daily basis for automated systems and on and annual basis for non-automated systems.

**JULY, 2012 COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE**

**Status Update**

This remains unchanged since my previous report. DFM has fully implemented their Policy for Monitoring Temperature Ranges at CCDOC for all divisions. They are utilizing a designated monitoring form and protocol as specified in the Policy. Monitoring is done once on each shift, seven days per week. To complete one Division takes approximately one hour. They continue to meet the provision of the Consent Agreement. Ventilation inspections and cleaning continues whenever a work order from CCDOC or Cermak is entered.

**Monitor's Assessment:**

DFM continues to conduct their "Rounds Monitoring" for all divisions. The monitoring is documented effectively. It includes measuring temperatures of the exhaust and return air fans and temperatures at pre-selected points closest to the exhaust fan and the point farthest from the exhaust fan in the housing units. It also measures the temperature of the hot water heater, checks whether the hot water

circulating pump is functioning along with the sewer pumps, storm pumps, and condensate pumps. Function of the generator is verified, including the oil and fuel level. Measurements of PSI for the high, medium, and low pressure systems, city water pumps, and the chilled water pumps for the fire system, are taken. I reviewed some months of the daily logs for various divisions. Where non-conformance was identified, I verified that work orders had been filed and that work was completed and the work order closed in typically one day. The monitoring forms are typically completed by an engineer and reviewed by a supervising chief or assistant chief engineer. The program is functioning as intended.

The ventilation cleaning program for all divisions started in August, 2010, continued through a second round of inspecting and cleaning of all vents is now complete. Visits to housing units in Divisions III, IV, IX, and XI, show far less blocked vents that found during previous visits. Division XI is improved because of visible and direct supervision by officers, as well as the incentive program discussed earlier. Division XI success reflects my comment from the previous report that as soon as officers are diligent about mandating vents to remain clean and unobstructed, the ventilation throughout all divisions will continue to improve.

The Chart below clearly shows that the number of vents in each division, along with the number cleaned in 2011 and 2012. Virtually all vents needed cleaning during the initial round. The second round demonstrates much improved maintenance. Documentation for Divisions VI that was provided was identical to Division V. The number of vents in Division VI cannot be exactly the same number in Division V. The same misinformation was on the number cleaned in 2011 and 2012. Please provide me with the corrected information.

| DIVISION | NO. OF VENTS | NO. CLEANED 2011 | NO. CLEANED 2012 |
|---|---|---|---|
| I | 1881 | 295 | 661 |
| II Dorm I | 150 | 94 | 77 |
| II Dorm 2 | 165 | 73 | 68 |
| II Dorm 3 | 150 | 98 | 85 |
| II Dorm 4 | 60 | 16 | 0 |
| III | 360 | 145 | 98 |
| IV | 640 | 206 | 241 |
| V | 1320 | 295 | 316 |
| VI  data error | | | |

| VIII | 24 | 24 | 6 |
|------|------|------|------|
| IX | 1100 | 598 | 575 |
| X | 768 | 215 | 211 |
| XI | 1536 | 744 | 753 |
| TOTAL | 6410 | 2803 | 3091 |

**Monitor's Recommendations:**

1.  Please provide me with copies of the missing Division VI vent cleaning data.

2.  Continue the daily rounds inspections on all shifts.

3.  Monitor the number of work orders for obstructed vents to see if another round is necessary.

**83.** Sanitation and Maintenance of Facilities

       **f.** CCDOC shall notify DFM of any visible obstructions to the ventilation system.

**JULY, 2012 COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE**

**Status Update:**

As discussed above, Facilities Management staff completed two rounds of the ventilation cleaning. Once started, sanitation inspections and officer diligence to keep all vents unobstructed will reduce the number of blocked vents and improve ventilation throughout each Division. The Sanitation General Order clearly establishes tier officer accountability but it must be reinforced by supervisory staff and sanitation officers throughout all divisions. The living unit daily inspection form has a designated column (27) for identifying and recording non-conformance. A PowerPoint presentation has been developed by Facilities Management to demonstrate to correction officers how the ventilation systems function and stress the importance of maintaining unobstructed vents. The Sanitarians now show it as part of the annual in-service for officers.

**Monitor's Assessment:**

Based on my unannounced visits to housing units I found far fewer blocked vents than during previous tour.  I recognize that division superintendents were told that I may tour their divisions so they were most likely prepared.  The Master Sanitation Plan requires officers to identify and notify Facilities Management should vents become blocked.  As with sanitation, it will be important that division housing unit managers understand the importance of maintaining the vents to keep them open and functioning.

**Monitor's Recommendations:**

1.  CCDOC support services and division superintendents and supervisor need to reinforce the expectation and take appropriate disciplinary action when necessary.  Living unit officers need to understand that maintaining vents is paramount to assuring effective ventilation throughout each building.

**83.** Sanitation and Maintenance of Facilities

> **g.** Cook County shall ensure adequate lighting in all inmate housing and work areas.

**JULY, 2012 COMPLIANCE STATUS: PARTIAL COMPLIANCE**

**Status Update:**

This issue is being coordinated by DFM.  In July, 2012 the Cook County Board of Commissioners approved a contract with Noresco of Des Plaines, IL to replace lighting within the housing units at Department of Corrections with ones that are more energy efficient and secure.  It is considered an energy conservation measure (ECM).  This is a $34,228,000 initiative for both CCDOC and the Criminal Courts Campus.   It will take two years to complete.  According to an email from John Cooke, of Cook County Capital Planning to Jim D'Amico dated March 2, 2012, the plan is to begin the replacement of lighting fixtures in Divisions I, V, VII, and IX this year and the balance of the fixtures in the remaining divisions in 2013.  Jim D'Amico indicated that work should begin in September, 2012.

**Monitor's Assessment:**

The plan that was approved by the Board of Commissioners in July will resolve the issue of exposed incandescent light in cells as well as the lighting fixtures that inmates continue to damage and use to start fires for cooking food.  The so called "Gorilla Lights" that were installed as a pilot initiative have proven to be very inmate proof thus far.

**Monitor's Recommendation:**

1.  Implement the lighting replacement project.

2.  In the interim only coated bulbs should be used to replace the traditional incandescent bulbs.  They will reduce the exposure of glass to inmates until secure fixtures are installed.  Coated bulbs retain the glass within the coating when the bulb is shattered.

3.  Based on the number of self inflicted incidents involving glass from broken light bulbs in Division IV for female inmates, establish a higher priority to replace them with secure lamps.  In the interim, consider the use of plastic coated shatterproof bulbs.

**83.** Sanitation and Maintenance of Facilities

> **h.** CCDOC shall ensure adequate pest control throughout the housing units, medical units, RCDC, RTU, and food storage areas.  CCDOC shall maintain a contract for professional exterminator services for each division, food services areas, and the Cermak hospital.  Services should provide for routine pest control spraying and additional spraying as needed.

**JULY, 2012 COMPLIANCE STATUS:  PARTIAL COMPLIANCE**

**Status Update:**

Since late 2010 CCDOC contracts with Anderson Pest Solutions for all buildings except Cermak.  Aramark, present food service contractor also utilized Anderson for both food service kitchens.  Because Division II contains the Central Kitchen and Division XI houses its own kitchen, assure consistent pest control monitoring and treatment.  A summary of pest activity monitoring since January, 2011 demonstrate a somewhat reduced rodent activity.  However, rodents continue to be an issue in Divisions IV, VI and IX as evidenced from summary reports and complaints from inmates.

**Monitor's Assessment:**

I reviewed the weekly reports from Anderson from Division XI kitchen from June 21 through July 12, 2012.  Each report showed virtually the same evidence of rodent droppings around the sump pump near the warewasher.  However, there apparently has been no corrective action taken by Aramark to address any of the observations and need to make repairs.  This continues a pattern of general lack of response to maintenance issues that has persisted for some time in cleaning and maintaining kitchen equipment.  I had asked Aramark to provide pest control reports from the Central Kitchen, but they were not provided.  If and when the new food service contract is awarded, the contractor needs to provide weekly a copy of the Anderson reports, (assuming they will be using the same contractor) to the CCDOC for the Sanitarians to review and take appropriate action to resolve any issues identified by Anderson.  The lack of response was not only for rodent issues, but also observations of fruit flies, and lack of repairs to leaks which permit standing water that can be used for breeding areas for insects and water source for rodents.

In reviewing a summary of pest activity put together by Phillip Gnacinski, Sanitarian, he noted that while 309 mice/rats were trapped in the period from 1/1/11 through 6/30/11, only 88 were trapped in the same time period for 2012.  This is a reduction of 72%.  However, his summary does not separate

trappings from inside and outside. It would be helpful to know the numbers captured externally compared to those captured internally. One would expect that as building penetrations are sealed, there would be less trapped inside. With respect to Division XI which had a serious issue 88 were trapped in the first six months of 2011 compared with 46 captured in the first six months of 2012. Thirty or 66% were captured inside. Looking at the remaining divisions, most activity is occurring in Divisions III, V, and X. In my review of a summary report provided by Anderson Pest Control between January, 2011, and November, 2011, a total of 467 mice and/or rats in and around all divisions. All housing units are serviced every two weeks on a schedule. Anderson has placed over 300 exterior bait stations outside of all of the divisions. The stations contain both mouse and rat snap traps.

During this visit I did not tour Division V which had the most complaints from inmates. I did receive some complaints this time from Division III and Division X. At Division XI, significant improvements have been made to clean the refuse compactor area and to effectively seal building penetrations. As indicated in the previous report, cell sanitation and eliminating exposed food in cells and housing areas will have a significant impact to eliminating rodents.

Regarding insects, I heard very few complaints other than drain flies and fruit flies in the housing units. Apparently the regular drain scouring and application of the biocide so far has had a significant impact. It will be helpful for officers to notify Support Services anytime they or inmates complain about pest activity of any kind in each division so that the contractor can be more effective.

 CCDOC has initiated a "pest control hotline" for officers to report pest activity. They have been instructing officers since February, 2012 on how to use it. It is also reinforced at the training academy for all correction officers.    For the pest program to continue being effective, housing unit managers will have to maintain their areas clean and free of excess food, and remove trash and garbage regularly so that it does not accumulate. All food that inmates purchase from commissary must be kept in closed containers and stored at all times in the inmate's personal property boxes. Inmates must not be permitted to store uneaten meals in their cells. Once the meal service is completed, all trays and excess food must be removed.

**Monitor's Recommendations:**

1.  Please provide me quarterly starting with July, 2012 a summary of both insect and rodent trappings, along with a comparison of same time last year. Please include in the report, the same information from the food service contract for both Division V and Division XI.

2.  Provide documentation that corrective actions have been taken for each observation (location specific) noted by the contractor for both interior and exterior of housing units and both food service facilities.

3.  Maintain the reinforcement training at the Sheriff's annual in-service training.

4.  Complete the location map of all external bait stations and a site specific description identifying the location of all internal bait stations.

**83.** Sanitation and Maintenance of Facilities

> **i.** CCDOC shall ensure that all inmates have access to needed hygiene supplies.

**JULY, 2012 COMPLIANCE STATUS:  PARTIAL COMPLIANCE**

**Status Update:**

CCDOC has developed a draft General Order No. 24.11.4.0 (Grooming and Hygiene for Inmates) that according to the OPA Written Directives Committee Status Report dated 7/17/12 is still under review. All inmates are provided with soap, toothpaste and a toothbrush upon admission to CCDOC. Additionally female inmates are provided with feminine hygiene products as necessary.  Further the draft General Order states, "Standard personal hygiene supplies (soap, toothbrush, and toothpaste are to be replaced through the commissary at the inmate's expense and that indigent inmates shall be continuously furnished personal hygiene items at the Department's expense."  However, it does not address how soon after an inmate claims indigent status, the soap, toothbrush and toothpaste are provided.   To qualify for Welfare Fund Care Package and/or a pair of shower shoes, "A detainee must complete and submit to the social worker, a Cook County Department of Corrections Detainee request form, once each month providing the detainees Trust Fund account balance does not exceed $25.00. The Inmate Welfare Care Package consists of thick bar of soap, shampoo, conditioner, deodorant, toothpaste, toothbrush, and lotion. Shower shoes are available in whole sizes 6-16.  While the policy addresses inmate razors usage, it does not currently address the frequency that they are available for shaving.  It needs to be revised accordingly.

**Monitor's Assessment:**

I have reviewed the draft inmate handbook that explains in part the process for claiming indigent designation is going through management review and provided numerous suggestions for changes.  The challenge at this point facing CCDOC is that there are so many General Orders under review and changes occurring as a result of the consent agreement that not everything can be done at once.  As a result, they have created priorities.

  They have also completed an inmate handbook video explaining inmate rules, requirements, and services.  However, the "second cut" copy that came out in August does not contain any information regarding the initial distribution and replenishment of hygiene supplies for either male or female inmates.  It will need a revision so that it is consistent with yet to be released inmate handbook and among other changes include information on access to replacement hygiene supplies and the availability of commissary for supplemental products.  The video should be shown to all inmates upon admission and at least once daily during the day and evening shifts.  As several inmates explained during Division tours, the video is only shown when an inmate changes to the applicable channel.  Officers should document in their shift logs the times that the video is played.

**Monitor's Recommendations:**

1. Complete the Inmate Information Handbook and revise the video to assure that the Handbook and the Video are consistent with CCDOC policy 24.11.4.0 and the Laundry – Bedding, Clothing, and Linen General Order and Inmate Grooming and Hygiene General Order.

2. Provide evidence that all inmates are shown the video upon admission and at least once during the day and evening shifts through documentation in the officer's log.

3. Assure that each division maintains an adequate supply of replacement hygiene articles within housing units for use between weekly distribution and for newly admitted inmates. Assure female inmates have adequate access to feminine hygiene products within the housing units "as needed" in accordance with General Order 24.11.4.0.

4. Revise the General Order reference above to include the frequency of inmate availability of razors.


**83.** Sanitation and Maintenance of Facilities

> **j.** CCDOC shall develop and implement policies and procedures for cleaning, handling, storing, and disposing of biohazardous materials, in accordance with generally accepted correction standards. CCDOC shall ensure that any inmate or staff utilized to clean a biohazardous area are properly trained in universal precautions, are outfitted with protective materials, and receive proper supervision when cleaning a biohazardous area.

**JULY, 2012 COMPLIANCE STATUS:  PARTIAL COMPLIANCE**

**Status Update:**

Biohazardous waste from Cermak's medical and/or dental clinics in specific divisions is securely stored and placed in red bags for daily pick up by designated Cermak staff.  Cermak maintains a contract for collection and final disposal of the waste.  Each division now maintains a supply of biohazardous spill kits within the security office and the sanitation rooms.  They are replaced as needed through Support Services.  A new draft blood-borne Pathogen Decontamination General Order is currently under review. It needs to be finalized and issued as soon as possible. Bruce Schorer, Support Services Sanitarian has created a Power Point training presentation on biohazardous waste handling and cleanup that is now shown to all sanitation officers.  There is a written syllabus for blood-borne Pathogen clean-up training.

**Monitor's Assessment:**

Biohazardous waste from the medical/dental clinics and Cermak is handled appropriately.  CCDOC policy does not allow inmates to clean bio-hazardous spills.  The new Power Point training tool for sanitation officers is very well done.  Training for sanitation officers from each division for effective clean up of biohazardous spills has been completed and will be conducted as needed for new sanitation officers.  I

have reviewed the course syllabus for biohazardous waste and blood-borne pathogen training program for officers and find that it is acceptable. All divisions maintain spill kits in their chemical supply rooms and are replaced by support services as needed.

Once the General Order is finalized, this provision will be in substantial compliance.

**Monitor's Recommendations:**

1. CCDOC needs to finalize and issue the General Order for Universal Precautions Blood-borne Pathogens as soon as possible. CCDOC might consider changing the title and including biohazardous waste as well.

2. Assure that the OSHA Blood-borne Pathogen General Order is being followed by all officers.

3. Designate specific officers in each division who have received blood-borne pathogen training and handling biohazardous waste who can handle a waste clean-up.


**83.** Sanitation and Maintenance of Facilities

> **k.** DFM shall develop a policy on hazardous materials, in accordance with generally accepted correctional standards, and insure that all DFM staff is properly trained on the procedure.

**JULY, 2012 COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE**

**Status Update:**

DFM has policy number 2010 that was revised effective May 15, 2012. It establishes the storage procedure for handling and storage of all hazardous materials. The policy requires OSHA Hazard Communication Standard 29 CFR 1910.1200 for all new hires and annually thereafter for all DFM personnel and that a current record be maintained for all employees required to work with hazardous materials. It requires a list to be developed of all chemicals used and stored and that the inventory and material safety data sheets be provided to designated management employees for distribution to the CCDOC Safety Administrator. Further it requires reports to the CCDOC Safety Administrator of any damage or spill. The policy also mandates the supervisor or designee of each trade to complete quarterly inspections of all shops and rooms used for storage of hazardous materials to verify accuracy of inventory sheets, labeling, and proper storage of all chemicals, along with appropriate corrective action for non-conformances and handling procedures including marking, controlling, labeling, mixing, and safety precautions. DFM management conducts random "mock surveys" of all shops and mechanical rooms as of November 11, 2012. One of the areas audited includes the storage, inventory and maintenance of chemicals.

Regarding training, I received and reviewed the OSHA Hazard Communication Standard PowerPoint training used for employee training. Two documents, Understanding Policies and Procedures for tool, chemical and key control and Fire and Life Safety Duties for Engineering are both required to be displayed in the shops and a copy maintained on maintenance carts at all times.

**Monitor's Assessment:**

During this tour I only visited a couple of maintenance shops to verify the new storage practices and found them to be weld organized, clean and maintained. However in the electrical shop in Division X, I noted one unidentified blue liquid in a spray bottle and no Material Safety Data Sheets for Clorox Bleach and isopropyl alcohol. Neither product was included on the chemical inventory for the shop. DFM has completed division specific maps identifying the location of all flammable cabinets and a list of chemicals stored in each shop and/or mechanical rooms. They are provided to the Safety Administrator and also securely maintained in the respective divisional superintendent's or designee's office. DFM has initiated a series of random "mock surveys" of all shops and mechanical rooms throughout the complex. I did not review any surveys as I did in December. In future visits, I will review the survey forms to confirm whether the suggestions made in the December report were made.

I am pleased to see that flammable cabinets are now located in all shops/rooms where flammable materials are stored and that they are being appropriately used. As mentioned in my previous report, assure that the Division Safety Officer/Superintendent's office (*decide which one*) also maintains a current copy of all Material Safety Data Sheets for any hazardous chemicals stored within that Division in addition to the one prominently stored at the entrance to all shops/rooms. At least quarterly an inventory balance matching the chemicals stored with the chemical list should be completed for all shops where chemicals are stored. The Safety Administrator should assure that the division safety officers know the location of all DFM hazardous and flammable chemicals in case of an emergency.

DFM as discussed earlier in the report is providing a secured set of DFM keys for each shop located in the applicable division for use in case of emergency.

This provision is now in substantial compliance with the consent agreement.

**Monitor's Recommendations:**

1. Implement the documented supervisory visit/inspection to each shop/room with documented corrective actions taken and confirmation follow-up inspections to verify completion and validate the effectiveness of the correction.

2. Implement the trial controlled access key system to all DFM shops and mechanical rooms, and if acceptable complete the key distribution to all divisions.

3. Facility Management needs to provide documented training for all employees on the safe use of chemicals as required by OSHA.

4. DFM needs to provide a copy of the quarterly inventory to the CCDOC Fire Safety Administrator.

5. CCDOC need to assure that respective division fire safety officers are knowledgeable of the location and types of hazardous chemicals stored in the maintenance and storage shops within their respective divisions.

83. Sanitation and Maintenance of Facilities

> **I.** CCDOC shall provide and ensure the use of cleaning chemicals that sufficiently destroy the pathogens and organisms in biohazard spills

**JULY 2012 COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE**

**Status Update:**

CCDOC mixes and dilutes concentrated chemicals from the central supply located in Division V and then distributes daily to the divisions. By centrally controlling the dilution following the chemical manufacturer's directions, the divisions always receive properly diluted cleaning and disinfecting chemicals needed for routine cleaning and sanitizing of floors, toilets, lavatories, showers, etc. and effective cleaning and sanitizing surfaces from biohazard spills. The only two chemicals used for all cleaning and disinfection are Marauder and Terminator. Marauder is an effective cleaning agent and Terminator is an effective disinfectant. Aztec Supply Company, the supplier of all cleaning chemicals conducts regular classes at CCDOC for both CCDOC employees and inmates assigned the responsibility of cleaning cells, showers, toilet facilities, dayrooms, RCDC, classrooms, tunnels, and all administrative areas. These are two hour classes daily, over a period of one week. Each person that takes the class and passes a written test is presented with a certificate of completion.

Sanitation officers spray cleaner and disinfection chemicals in the inmate's cells once per week. Inmates have access to chemicals to clean and disinfect at other times if requested through the divisional sanitation officers or the tier sanitation worker. CCDOC has purchased and is now storing biohazardous spill kits. Sanitation officer have been trained on the contents and how to use them in case of a spill. Spill kits are replaced as needed. Inmates are not permitted to clean up bio-hazardous spills per policy.

**Monitor's Assessment:**

The process to centrally mix chemicals and only distribute diluted chemicals appears to be working as planned. It assures that both sanitation officers in the divisions and inmate are not exposed to concentrated chemicals that, if misused, could result in injuries to both inmates and officers. The training provided by the chemical supplier assures sanitation officers understand how to effectively clean biohazardous spills as well as routine cleaning and disinfection. The Sanitarians have witnessed biohazard clean ups and found that the response and use of the spill kit is effective.

During this tour I observed several divisional chemical storerooms. They are well organized, clean, equipped with applicable Material Safety Data Sheets, and maintain a chemical inventory list and a use log. This is a dramatic improvement from past practice.

**Monitor's Recommendations:**

1. Continue to assure that inmates have access to appropriate chemicals to clean and disinfect their cell facilities and floors as needed.

83. Sanitation and Maintenance of Facilities

> **m.** CCDOC shall inspect and replace as often as needed all frayed and cracked mattresses. CCDOC shall destroy any mattress that cannot be sanitized sufficiently to kill any possible bacteria. CCDOC shall ensure that mattresses are properly sanitized between uses.

**JULY, 2012 COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE**

**Status Update:**

All mattresses are being replaced. CCDOC has replaced virtually all mattresses throughout the complex. The new mattresses include a built in pillow. As a result, inmates are longer provided with separate pillows and pillowcases unless specified by a medical order from Cermak. A designated area and process is place within each division to clean, disinfect, inspect, and repair or replace mattresses as appropriate between inmates. The mattresses are taken from the cell to the clothing and linen storage room of each division for cleaning and disinfection when the inmate leaves using Marauder and Terminator (chemical described in 83.l above). The mattress is then air-dried and returned to the cell.

**Monitor's Assessment:**

The changeover to the new mattresses is virtually complete with the last 2000 mattresses recently purchased. Touring the divisions I observed very few mattresses that needed repair or replacement. Officers assigned to the clothing and linen store rooms correctly were able to describe the procedure for cleaning, disinfecting the mattresses between uses. Each storeroom has designated areas for clean, dirty, mattresses and one designated area for staging mattresses to be returned to central supply for repair or discard.

**Monitor's Recommendations:**

1. Inspect the mattresses being used in Division III to assure that they are not frayed or cracked.

**83.** Sanitation and Maintenance of Facilities

> **n.** CCDOC shall ensure adequate control and observation of all housing units, including distribution and collection of razors and cleaning supplies. All cleaning tools and hazardous chemical shall be removed from housing areas after use.

**JULY, 2012 COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE**

**Status Update:**

A CCDOC special order establishes the requirements for razor exchange. This special order was established in December, 2009 as a pilot program. It is in the process of being revised into General Order 24.11.4.0 that is currently under review. Razors used throughout CCDOC are color coded by division. Razor inventory for use within the divisions are obtained from the Superintendent of Administration located in the General Order Office on weekdays during the day shift. Divisions are issued two biohazard containers with disposable plastic liners; one used to transport unused razors and one for transporting used razors. The date and amount of razors are tracked on a "razor distribution and retrieval log" signed by the officer accepting the razors. The divisions are also issued puncture resistant gloves for officers handling the razors. Used razors are placed in a red biohazard container designated for used razors and transported the following weekday to the General Order office for effective disposal. Unused razors are placed in the biohazard container designated for unused razors and transported to the General Order office for redistribution as necessary. No razors are stored in the housing units. All razors, used and unused, are audited daily to assure complete retrieval. If there is a discrepancy, an incident report is generated. If there are no discrepancies, the specific division is issued additional razors as necessary.

There are only two cleaning solutions used at CCDOC: Marauder and Terminator as discusses earlier. Both are cleaning solutions, but Terminator is also a heavy duty disinfectant. Cleaning supplies are now controlled by policy where all cleaning chemicals are mixed at a central location within the sanitation office of Division V. The diluted chemicals are then delivered to the divisions daily as needed. They are stored in designated cleaning supply rooms within each division. The sanitation officer is responsible to order chemicals as needed to replace exhausted supplies. Once cleaning of housing units and dayrooms is completed, all chemicals are returned to the divisional chemical storerooms along with mops and buckets. Mop heads are sent to the central laundry for cleaning daily.

**Monitor's Assessment:**

The razor exchange program appears to be very effective at controlling safe storage and use of razors within the housing units. It presents one less opportunity for inmates to create shanks. In reviewing incident reports since the last tour I found no incidents of razors being identified as a source of a shank

and only one case of a missing razor, which could have been a miscount. Tier officers are trained and are thorough in tracking razor use in the divisions. The draft General Order 24.11.4.0 does not specify the frequency that razors shall be provided to male inmates.

As discussed in my previous report no undiluted chemicals are available in the divisions. I saw no chemicals or cleaning tools being stored in any housing unit that I visited. Mop heads are now collected after use and sent to the laundry daily for cleaning and drying. As a result wet, dirty mops are no longer stored in housing units or in the divisional supply rooms.

**Monitor's Recommendations:**

1. Establish a frequency of razor use for inmates and include it in the new inmate handbook currently under final review. Also include the razor policy in the inmate video.

83. Sanitation and Maintenance of Facilities

> **o.** CCDOC shall ensure that Facility Sanitarians receive training from a relevant state, national, or professional association with emphasis on assessment of environmental health practices and emerging environmental issues in correctional settings. Facility Sanitarians should also have training on and access to testing equipment to ensure sanitary conditions.

**JULY, 2012 COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE**

**Status Update:**

There is no substantive change from the previous report. CCDOC maintains two full time Registered Sanitarians, Bruce Schroer and Phillip Gnacinski. Both Sanitarians are actively involved in all areas of the consent agreement for environmental and fire and life safety as highlighted in several areas of this report. Both have been provided with measuring and testing equipment as well as initial and ongoing training in correctional issues. One attended and participated in the 2012 National Environmental Health Association annual conference.  Mr. Schroer is providing solid advice and counsel in a number of areas including fire safety, sanitation, biohazardous spills, food service, pest control, and officer training. Because of his outstanding contribution and expertise he was selected by the Sheriff to be the point of contact for all issues relative to the food service contract and oversee the transition to the new contractor.

Both have an integral role in the implementation and monitoring of several CCDOC policies relative to sanitation and provide direction to the divisional sanitation officers. They have trained sanitation officers to assure more effective cleaning and sanitation. As I specified in a previous report, it is a challenge to identify and hire Sanitarians with experience of practicing environmental health in a large institutional environments, especially one with the complexity of issues that CCDOC manages with respect to size, number of buildings, and challenges including sanitation, fire safety, food service, pest control, biohazardous spill response, air handling systems, solid waste, just to name a few.

**Monitor's Assessment:**

As in past tours both Mr. Schroer and Mr. Gnacinski accompanied me on the food service inspection and meeting with Aramark and with the first meeting held with the newly selected food service contractor CBM.  Their experience will be very helpful to both CBM and CCDOC in the transition.  Both participated in sanitation and housing tours of divisions, meetings with pest control, fire safety, and review of chemical control.  Both are dedicated and committed to assist in any way to improve the operation of CCDOC from a public health perspective.  It is my assessment that both are providing outstanding assistance in helping CCDOC address and resolve issues of the consent agreement in their areas of responsibility.

**Monitor's Recommendations:**

The recommendations remain the same from the last report.  Please provide an update as to the acceptance and changes resulting from these recommendations.

1.  Consider a division of responsibilities for both Sanitarians.   It is important that the Sanitarians are able to provide independent, objective audits, analysis, and direction to assure management leadership within CCDOC that issues such as sanitation, food service, pest control, housing density, maintenance, chemical control among others is being effectively managed within the divisions and corporately.

2.  The Sanitarians can be an effective management tool to assure that specific General Orders are being effectively administered within all divisions.  It is critically important for employees working in the divisions understand both the oversight responsibilities and authority that the Sanitarians have to monitor and assure a clean, sanitary, safe, and healthy environment for both inmates and staff.  Although I have not observed any evidence to the contrary during this visit, consideration should be given to their reporting structure assure that the Sanitarian's objectivity is not compromised.

3.  CCDOC, with input from the Sanitarians, should develop specific written directives outlining how they oversee environmental issues with contractors including food service and pest control.  Further CCDOC should also consider their role in assisting Cermak and Facilities Management.

4.  The Sanitarians with oversight should create a CCDOC Sanitarian's Manual that details their responsibilities, authority, and work program so that when replacements are needed, their role in the position is clear.  It may be a good time to review the job description to assure that it reflects their actual responsibilities since it is the first time that CCDOC has utilized professionally trained Sanitarians with experience in Institutional Environmental Health.  As indicated in recommendation 2, employees within the divisions need to understand and respect the role of the Sanitarian in the institutional environment both for routine operations and emergency events.  They should view their expertise as it pertains to public health, their employee health and safety, and inmate requirements to assure a safe and healthy environment during their stay at CCDOC.

**PROVISION: G. SANITATION AND ENVIRONMENTAL CONDITIONS**

**84.** Sanitary Laundry Procedures

> **a.** CCDOC shall develop and implement policies and procedures for laundry procedures to protect inmates from risk of exposure to communicable disease, in accordance with generally accepted correctional standards. To limit the spread of communicable disease, CCDOC shall ensure that clothing and linens returned from off-site laundry facility are clean, sanitized, and dry.

**JULY, 2012 COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE**

**Status Update:**

There is no change from the previous report. CCDOC operates four in-house laundries. The "Central Laundry" for most clothing and linens is located in Division V. There is a laundry located in Division IV to wash personal clothing for women, one in Division III that cleans mop heads and is currently supplementing the Central Laundry, and a laundry located in Division XI. The food service contractor (Aramark) operates a laundry for kitchen inmate worker outer clothing. The main laundry consists of five 150-lb Unimac washers and five 170-lb Unimac dryers. The Division III laundry consists of three Speed Queen 40 lb washers and two 40 lb dryers. Division IV has one washer and one dryer. Division XI has two washers and two dryers. At all laundry facilities, cleaning and disinfecting chemicals are provided through automatic chemical feeders directly into the wash machines. The tubs used to hold and transfer soiled laundry are cleaned and disinfected with Clorox wipes before clean laundry is placed in them. The Central Laundry is operated by US military veteran inmates, through a program operated in conjunction with Roosevelt University. Veteran inmates are supervised by CCDOC staff. CCDOC has developed a written monitoring system that include a report demonstrating which divisions are following the General Order for frequency of inmate personal clothing washing and a report that documents the dates and time that inmate's personal clothing is collected and returned. It further documents the regular washing and drying of mop heads used throughout CCDOC.

**Monitor's Assessment:**

As of March 1, 2012 CCDOC contracted with a Roosevelt University Project Management Team, Practicum. The purpose for having Roosevelt University take over the laundry operations was to ascertain and develop an asset management system of clothing and linens while maintaining two full inmate uniform exchanges a week and to increase the efficiency of the CCDOC laundry operation. The plan was to save money through energy savings, reduced staff, and possibly enhanced revenue by contracting to do non-jail laundry. The contractual arrangement was flawed from the start because there was never an operational plan submitted or accepted that explained the process. Starting in June, CCDOC management staff began demanding the plan and as of this tour the plan submitted had never been accepted. I met with Practicum's site manager and observed the operation. My assessment was that there was never enough Practicum staff onsite to effectively manage the laundry, not only maintain

an effective asset management of clothing. During this tour I again toured the central laundry and found that CCDOC staff were continuing to not only provide security there (the original plan), but also managing the inmates and operating the laundry both there and also in Division III. They also had to operate the laundry on extra shifts to keep up with the demand and the lack of timeliness by Practicum.

As a result of several meetings, before, during and following the July tour, CCDOC terminated the contract with Practicum as of July 31st and CCDOC is now back to operating all laundry facilities as it has for the last two years. The Division III laundry will now do only mop heads. Division IV will continue to do women's personal laundry. Women's outer clothing and linens will be cleaned at the Central Laundry. I have recommended that the Division XI laundry be shut down effective immediately as the dryers are venting internally to a room adjacent to the kitchen, and not outside as I believe building codes require. Chemicals used in the Central Laundry, the Division IV and Division XI laundry are pre-measured and automatically dispensed. Chemicals in the Division III laundry are hand mixed. Eco Lab is in the process of installing an automatic feed system there. Inmates do not have access to the chemicals except Division III, as they are stored in a locked cage. Laundry chemicals used are purchased from Ecolab. They include Ecostar Builder C detergent, Ecostar Destainer (Bleach), and Ecostar Sour (a pH adjusting chemical) to prevent skin irritation and fabric browning. Material Safety Data Sheets (MSDSs) are readily available. The monitoring documents continue to be helpful in identifying which housing units are requiring inmates to use the laundry. With the termination of the contract with Practicum, the laundry continues to be in full compliance with this provision of the consent agreement.

**Monitor's Recommendations:**

1. Eliminate the use of the Division XI laundry until it is effectively vented in compliance with regulations.

2. Establish a process and implement an effective use plan for those laundries that are going to be utilized.

3. Install a mechanical chemical feed system if the Division III laundry is going to continue being utilized.

**84.** Sanitary Laundry Procedures

    **b.** CCDOC shall ensure that inmates are provided adequate clean clothing, underclothing and bedding, consistent with generally accepted correctional standards, and that the laundry exchange schedule provides consistent distribution and pickup service to all housing areas.

**JULY, 2012 COMPLIANCE STATUS:  PARTIAL COMPLIANCE**

**Status Update**

Inmates currently receive clothing exchange two times per week throughout the facility on a predetermined schedule.  The schedule is posted on each tier within each division.  Linen exchange is once per week. Blankets are washed and dried monthly.  However, CCDOC General Order No. 11.3 dated 05/02/07, needs revising to reflect current policy and practice.  For example, the new mattresses come with a raised portion to serve as a pillow.  So a pillow and pillowcase are no longer provided.  Section G needs to be completely rewritten as the schedule has been developed by CCDOC management and not within the division.  As a result, the revised order needs to reflect current practice.  While the laundry program fully operational, not all divisions have directed inmates to make use of the laundry service.

**Monitor's Assessment:**

I noted during the visits to housing units less evidence of inmates doing their own laundry in sinks and personal containers.  As noted in previous reports and observed reviewing laundry use logs, not all divisions are mandating the use of the central laundry.   As a positive step CCDOC is no longer providing laundry soap through the commissary. Therefore inmates have to use their bar soap and use their plastic person property container, cell lavatory, sink and/or toilets to launder personal clothing.  This should be reduced as tier officers and command officers enforce laundry services as the inmate cleaning alternative is unsanitary and unacceptable.  Ineffective washing and drying, as practiced by some inmates allows bacterial organisms such as *Staphylococcus aureus* including MRSA (methicillin-resistant *Staphylococcus aureus*) that does not respond well to some antibiotics.  In touring parts of Divisions IX, X, and XI, I continue to see tier officer allowing inmates to maintain ropes in cells.  The division superintendents, command officers and tier officers need to stress the unhealthy implications to inmates.

CCDOC provides laundry loops to most divisions for inmates to contain their personal laundry and assure that they receive their personal clothing after cleaning.  Inmates' personal laundry is currently washed, dried, and returned to the inmates during the same shift.  This is great service.

**Monitor's Recommendations:**

1. Revise General Order 11.3 dated 5/2/07 to reflect current policy.  The policy should be developed corporately and implemented consistently within all divisions.

2. Each Division need to fully enforce the inmate rule that there shall be no laundering of inmate clothing, bedding or towels in the housing unit showers, sinks or inmate cell sinks and toilets.

3. The order needs to include a mechanism for monthly audits with a report of deficiencies provided to a designated management with the responsibility and accountability to assure compliance by the divisions.  The audit tool is essential to assure the General Order is implemented within all divisions, as intended.

4. The revised General Order should identify the division superintendent's accountability for regular review to assure compliance.

5. Each Division needs to maintain a uniform/linen exchange log book to accurately reflect the inventory of all clothing/linens maintained within their respective division. It should record the actual number and type of returned clothing and linens, along with that newly issued. By maintaining the inventory, correctional staff can assure that inmates to not continue to hold excess clothing and linens within the cells that can and are be converted to ropes, privacy curtains, carpeting, etc. For example, privacy curtains can and are being used to obstruct an officer's vision of cell and showers.

6. Assure women's personal laundry is handled is a similar way to the men's to promote effective cleaning and hygiene. Please provide me with a copy of the laundry review that was conducted by the staff Sanitarians, along with the implementation plan, along with a copy of the email directive sent on June 18, 2012 as noted in the response to report IV submitted prior to the July visit.

**84.** Sanitary Laundry Procedures

    **c.** CCDOC shall train staff and educate inmates regarding laundry sanitation policies.

**JULY, 2012 COMPLIANCE STATUS:  PARTIAL COMPLIANCE**

**Status Update:**

Inmate veterans assigned to the laundry are effectively trained as to their responsibilities by laundry officers.

When speaking with inmates, most understand the laundry schedule. Several indicated correctly that the schedule was posted. However, some tier officers continue to allow inmates to launder their personal clothing and linens in their cells. Apparently the log being maintained by the Laundry Manager is not reviewed by anyone and as a result, there is lack superintendents reinforcement of the General Order requiring all laundry to be cleaned at the central laundry. The revision of General Order 11.3 should address this. Also the plan to develop a video for inmate viewing should clarify for all inmates the procedure to be followed for inmate laundry. The new inmate handbook currently in draft form also addresses the departmental rules and policies regarding effective laundry procedures.

**Monitor's Assessment:**

As of July tour I observed less inmates doing laundry in their cells. This is a direct result of more frequent cell inspections as part of the improved sanitation general order. While the inmates working in the laundry have been trained and understand their responsibilities, inmates need continual reinforcement of the benefits of having their personal laundry cleaned through the central laundry and also the proper use of the laundry loops so that inmates can be assured that their personal are returned. The current practice of permitting inmates to wash personal clothing and linens must stop. There must be consistent accountability by the tier officers and supervisors.

55

**Monitor's Recommendations:**

1. Issue the inmate handbook to reflect the laundry exchange schedule, the list of the clothing and linen provided, and continue to reinforce that inmates must use the CCDOC laundry and no longer permit inmates to launder their personal clothing.

2. Assure that the inmate handbook and General Order 11.3 is consistent.

3. Implement the laundry procedures and expectations in the developing video for inmate viewing within the housing units. It should include an explanation of the health risks for ineffectively laundering personal clothing in their cells. I suggest that the video show the laundry in operation so that inmates see where their laundry is cleaned and the proper use of the laundry loops.

4. Implement reinforcement for those correction officers and supervisors who continue to allow inmates to wash personals in their cells.


**84.** Sanitary Laundry Procedures

> **d.** CCDOC shall ensure that laundry delivery procedures protect inmates from exposure to communicable diseases by preventing clean laundry from coming into contact with dirty laundry or contaminated surfaces.

**JULY, 2012 COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE**

**Status Update:**

Clean inmate laundry is transferred from all laundries in carts that are sanitized between uses with a disinfecting bleach wipe. All carts are thoroughly wiped by laundry workers and allowed to air dry before clean clothing and/or linens are placed into them. There are designated areas within the laundries that separate dirty laundry bins from those that have been cleaned and sanitized between uses. Inmate personal laundry that is cleaned at the central laundry and the women's Division IV laundry are returned to inmates usually within the same shift that it was collected.

**Monitor's Assessment:**

On this tour, I toured the laundries including the central laundry in Division V, the women's laundry in Division IV, the overflow laundry in Division III and the laundry in Division XI. I observed laundry workers effectively using the disinfectant wipes on the laundry carts used to transport both clean and soiled clothing and linens. With CCDOC now operating the laundry operations, they are exploring the most effective and efficient method to collect, maintain and distribute uniforms and linens. That may be a centralized exchange rather than each division being responsible to maintain uniforms and linens in each division's clothing and linens supply rooms. On this tour I did visit the clothing and linen supply

rooms in Divisions IV, IX, and XI currently being used.  All were well organized, clean and effectively maintained.

**Monitor's Recommendations:**

1. Investigate and implement the most effective and efficient method to collect, distribute and maintain clothing and linen inventory either through a central exchange or division specific inventory.


**84.** Sanitary Laundry Procedures

> **e.** CCDOC shall require inmates to provide all clothing and linens for laundering and prohibit inmates from washing and drying laundry outside the formal procedures.

**JULY, 2012 COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE**

**Status Update:**

The General Order and inmate handbook reflect that inmates are no longer permitted to wash their personal laundry and that all clothing and linens are required to be sent to the central laundry and the women's laundry for washing and drying.  This is significantly improved since the last visit.  CCDOC laundry staff have developed and implemented a documented audit that tracks the divisions that are and are not utilizing the central laundry for inmate personal laundry.  They have also just completed a documented audit process that tracks the number of uniforms and linens that are sent from the housing units and the number returned. However, it has yet to be implemented.  If this "logbook calculation form" is uniformly used throughout the divisions, it should identify misuse and abuse of laundry by housing units and create an effective clothing and linen balance sheet.  With CCDOC no longer contracting for laundry services through Practicum, CCDOC will need to revisit the tracking system to demonstrate conformance by the inmates.  Laundry soap is no longer available from the commissary and so the only soap that can be used to clean personals is bar soap.

Monitor's Assessment:

During this tour, I observed much improved use of the central laundry in Divisions II, III, IV, X, and XI. I found only a few instances of inmates washing their personal laundry.  Uniforms and linens are routinely being sent cleaning through the central laundry and the women's laundry.  I also observed less pillows, and less excess blankets and towels throughout all divisions I visited.

As I noted in all four previous reports, efficient and effective laundry service will, when mandated and enforced with accountability, gain increasing acceptance by inmates.  It is clear from this tour that the laundry is being utilized more.  In the divisions where laundry loops are used to contain inmate's personal laundry, there is much improved use.  I suggest that the laundry loops be implemented for all remaining housing units.   While it may be impossible to get 100% conformance by inmates, continual

reinforcement from tier officers will be needed. Having inmates witness that their personal laundry is returned to them clean and dry will further continue to increase utilization of the CCDOC laundry facilities.

**Monitor's Recommendations:**

1.  Complete the inmate video on the established laundry process that explains the process for uniforms, linens, and personal laundry. The video can show that the schedule for inmate laundry pick-up is posted in each housing unit.

2.  The inmate handbook, when finalized, needs to include the current rules and expectations that clearly state that washing and drying personal laundry and linens outside of the CCDOC laundry procedures is expressly prohibited and explain the public health reasons for it.

3.  The housing unit sanitation inspection forms can and should be used consistently to document compliance by the unit officers and inmates regarding the maximum amount of blankets, sheets, and towels permitted in the cells. This should be enforced during cell inspections.

**85.** Food Service

   **a.** CCDOC shall ensure that all food service at the Facility is operated in a safe and hygienic manner and that foods are served and maintained at safe temperatures.

**JULY, 2012 COMPLIANCE STATUS:  PARTIAL COMPLIANCE**

**Status Update:**

The week following the July tour, Cook County Board of Commissioners awarded the three year food service contract to CBM. Aramark, who has had this contract for the last ten years, will no longer be providing food service to inmates or the officer's dining hall. CCDOC continues to serve one hot meal and two cold meals per day, which is permitted with State of Illinois Correction requirements. It is the plan that this be continued. However CBM is working with CCDOC staff to provide a "heart healthy" diet for all inmates. Both the Central Kitchen in Division V and the Division XI kitchen continue to be used to prepare meals. The Division XI kitchen only prepares and serves that division. The Central Kitchen serves all other divisions. CCDOC continues to assess the delivery time of transporting the food from the Central Kitchen to all divisions. CBM has pledged to assist in that effort to improve the quality of the food while assuring its safety. Aramark has not changed the menu for over a year, while waiting for a new contract to be offered, and inmates continue to consistently voice their unhappiness about cold food, quantity, and lack of variety. Bologna sandwiches every day for lunch and sometimes for breakfast and cold meals were the two most repeated complaints. The new contract provides that the contractor

is required to meet regularly with inmates to address food issues. CCDOC will also be a participant in those meetings.

Currently CCDOC provides 22 medical and religious diets which create management issues for the food service contractor. CBM working with Cermak staff and CCDOC are investigating the need for this many specialty diets. Inmates on specialty diets complained frequently about cold food. The reason is that specialty meals are prepared in advance of regular meals and are transported in a separate cart along with the regular meals. As a result, there is at least one extra step sorting the specialty meals by tier once the food reaches each of the divisions. This is also under review. The Sanitarian randomly, but frequently follows and measures the delivery time, and food temperatures to assure that the hot meal is actually served hot.

CCDOC Sanitarians, kitchen security officers and Superintendent Sean Julian meet weekly with the food service contractor to discuss and address issues. However, after reviewing meeting summaries, it is apparent that while the issues are discussed, it seems to take several weeks and even months for changes to be implemented. In the new contract, CCDOC will take over maintenance of all kitchen equipment to assure that it is maintained in accordance with equipment manufacturer's specifications.

Tool control in the kitchen is maintained by CCDOC security staff for large tools and by the contractor for small kitchen utensils. There is current policy and practice to not allow any knives in the kitchen for any purpose.

**Monitor's Assessment:**

As a result of the new food service contract and the change in contractors for food service, it serves no purpose to provide an assessment of the entire operation at this time. At the December visit, I will review and provide an update. On this tour, I did visit both kitchens and found them much improved from equipment maintenance and most importantly from a cleanliness perspective. CCDOC supervisory staff under direction from the Director has thoroughly supervised the cleaning effort of both kitchens. It was the cleanest I have seen since beginning my visits two years ago. This effort was impressive and I expect that it will continue to be well maintained.

Tool control in the kitchens should only be the responsibility of CCDOC staff. During my next visit I will review again the inventory maintenance of all tools and the daily logging of tools formally signed out and their return. This includes both large and small tools in both kitchens.

However, tools not controlled provide an unacceptable security risk both for inmates and corrections staff. As a result, the lack of effective tool control in the kitchen must be addressed immediately.

In a meeting with CBM the week following this tour, I suggested that both CBM and CCDOC staff establish a process to regularly meet with inmates to discuss meal service and menu to help them understand inmate concerns and reduce complaints. Improved menu variety and providing the hot meal hot will have dramatic impact on complaints.

**Monitor's Recommendations:**

1. Establish a working group similar to the one used for fire safety and sanitation to creatively develop new process for meal delivery.  It should include CBM, one of the Sanitarians, transport staff, and divisional representatives.  The current system is still too slow and meal complaints about cold food are not improving.

2. Using the CCDOC Sanitarian, along with CBM staff establish an effective process to monitor food temperatures and times from preparation to delivery of all hot meal to all the inmates to assure that hot food is served hot.

3. Continue to use the CCDOC Sanitarian to conduct at least weekly inspections of both kitchens.  He should create work orders when needed and corrective action plans when any violations of the food code and/or CCDOC policy are found and identify the person responsible for taking the corrective action within CCDOC, DFM, or CBM.  Further the Sanitarian should monitor and document the closure of all corrective actions identified to assure they have been resolved and that the corrective action was effective and sustainable.

4. CBM management should also conduct weekly inspections and provide a copy of the inspection report to CCDOC with a corrective action plan for any deficiencies identified.  CCDOC should as part of its inspection responsibilities monitor and record the completion of all corrective actions taken and work orders completed as a result of CBM's internal inspections.

5. Establish a formal program to assure corrective actions are taken on the issues identified in the monitor's assessment portion of this provision. CCDOC needs to develop and implement an effective written policy and procedure for their officers to assure that all tools used in the kitchens are inventoried at the beginning and end of each shift and the process that tools are controlled through sign out/in logs anytime a tool leaves the shadow board.  Tools, (utensils) both large and small, used in the kitchen pose a security risk and as a result need to be managed by CCDOC security staff and not the food service contractor.  I intend to review this policy when it is completed and observe practice during a subsequent visit.

6. Train the security officers in the kitchen on techniques to observe the effective use of all tools and assure that when finished, are returned to the shadow board and are marked as returned in the tool control log.

7. The tool control policy must contain a detailed process for identifying and locating any tool found to be missing or broken.

**85.** Food Service

**b.** CCDOC shall ensure that all food service staff, including inmate staff, must be trained in food service operations, safe food handling procedures, and appropriate sanitation.

**JULY, 2012 COMPLIANCE STATUS:  PARTIAL COMPLIANCE**

**Status Update:**

Aramark management employees all have documented "Food Manager Certification" certificates that are current.  Aramark provides daily training of inmates using a check list that is signed by Aramark and the inmate kitchen worker demonstrating that they have had food safety training pertaining to their assigned responsibilities.  Under the food service contract, the contractor is responsible to provide food safety training for all employees including supervisors and managers and provide food safety training to inmates assigned to both kitchens.

**Monitor's Assessment:**

The State of Illinois requires food service managers to successfully complete a "State" approved food manager certification program.  In my meeting with CBM, I was assured that their management staff would meet the contract obligations for training and the Illinois approved food manager certification program.  Because of the change in food service contractors, I will assess the effectiveness of the training by observing their practices and assuring they can and do demonstrate their knowledge of foodborne illnesses, personal hygiene, sanitation, etc.

CCDOC Sanitarians meet weekly with the food service contractor to discuss outstanding issues including sanitation, training, preventative maintenance issues, inspection findings, and training.  It is the intent to continue these meetings weekly with the new contractor.

**Monitor's Recommendations:**

1. CCDOC will require documented evidence of Food Manager Certification for all CBM supervisory employees as well as documented training for inmates assigned to both kitchens.

2. CBM and CCDOC need to provide a medical screening for all employees including inmate workers assigned to the kitchen to assure that they are not suffering from any symptoms associated with illness that can be transmitted through food such as sore throat with a fever, vomiting, diarrhea, or food code specified specific foodborne illnesses such as Shigella, Typhoid Fever, E. coli 017:H7, Hepatitis A, and Norovirus.

**85.** Food Service

**c.** CCDOC shall ensure that the Central Kitchen and Division XI kitchen are staffed with a sufficient number of appropriately supervised and trained personnel.

**JULY, 2012 COMPLIANCE STATUS:  PARTIAL COMPLIANCE**

**Status Update:**

As indicated in the provisions above food service for all inmates will be provided by CBM, effective September 10, 2012 under contract with Cook County. As a result the compliance status will remain the same until future visits demonstrate conformance with the provision. The contractor determines how many employees and inmate workers are needed in the kitchen depending on the meal service. The contractor is responsible for supervising their employees and the inmate workers assigned to the kitchen. CCDOC identifies and provides the inmate workers as needed. CCDOC also provides security officers for the kitchen. CCDOC provides staff to for transport the prepared meals to all divisions either by transport truck or by carts through the tunnel system. Training of kitchen staff for security is provided by CCDOC; training for inmate staff on food safety, preparation and clean up is provided by the contractor.

**Monitor's Assessment:**

There is no change from my previous report. As reported in previous reports, CCDOC appears to have a sufficient number of staff to supervise the security for inmates assigned to work in the kitchen and provide tool control. However, depending on the study to reduce the time from preparation to the actual of serving to the inmates, they may need to adjust staffing. CBM will most like need to complete a staffing assessment as part of their operation plan that will include the number of inmate workers necessary on all shifts. I will reassess this provision once the new contractor is in place. In reviewing summaries of meetings with CCDOC Sanitarians and Aramark there have been issues with not enough inmate workers assigned to the kitchen. Because of the new contractor, this too will be reviewed in future visits.

On future visits I will review the health screening tool that will be used by the new contractor, CBM to assure that employees and inmate workers are effectively trained.

**Monitor's Recommendations:**

1.  Review the inmate orientation checklist and revise as necessary to show the purpose of the manager's signature, and list the names of the inmates trained on each shift.

2.  Provide me a copy of the staffing plan for CBM, inmate workers, security staff, and tool control for all shifts prior to my next visit.

3.  Assure that all employees and inmate workers are screened for health issues before beginning work in the kitchens and supporting areas.

**85.** Food Service

> **d.** CCDOC shall ensure that dishes and utensils, food preparation and storage areas, and vehicles and containers used to transport food are appropriately cleaned and sanitized.

**JULY, 2012 COMPLIANCE STATUS: PARTIAL COMPLIANCE**

**Status Update:**

Again, because there is a new food service contractor and contract, the compliance status will remain the same until future visits demonstrate compliance with the provision. The food service contactor using inmate workers continues to clean and maintain insulated carts used to transport meals to the housing units. There are areas within the carts that are virtually impossible to effectively maintain clean such as near the sliding door tracks. CCDOC Sanitarian is continuing to look at alternative equipment, but to date has not identified anything any better than currently being used. The Central Kitchen's inmate handwashing sink near the restrooms has been replaced.

Since my last visit, two of the warewashers are now functional. The third one has been removed. Aramark is only using one, keeping the second one for backup. According to the new contract CCDOC will maintain all equipment within the kitchen that belongs to Cook County. In Division XI, Aramark is now using part of the large walk-in refrigerator for dry food storage. Less than 25% of the available floor space in the walk-in refrigerator is used for either cold storage or dry food storage. It seems that there is considerable waste in energy for maintaining such a large refrigerator for so little refrigerated food. This should be reviewed by the new contractor and CCDOC.

**Monitor's Assessment:**

CCDOC staff is identifying and evaluating the cost of replacing both warewashers, as there seems to be continual issues including leaks. Most, if not all equipment that was not being used, has been removed from both kitchens. All equipment appeared to be adequately maintained. CBM will need to develop and implement effective weekly inspections of both kitchen facilities and provide copies, along with corrective actions they intend to take to address non-conformances. CCDOC will need to develop a written preventative maintenance plan for all equipment under their jurisdiction. For those issues that need DFM response, a work order must be filed for all plumbing leaks, electrical issues etc. I observed far less water leaks from equipment in both kitchens on this visit, and it is clear that DFM's work order system is impacting the maintenance repairs efficiently.

CBM needs to establish and implement a documented cleaning and sanitizing schedule for all equipment, walk-ins, storerooms, laundry, chemical storerooms, floors, offices, and break rooms. This, once implemented will assure the effective cleanliness of all areas under their responsibility

**Monitor's Recommendations:**

1. CBM needs to develop and implement an effective self inspection program of all kitchen areas under their jurisdiction and provide copies of the reports and corrective action plans to the CCDOC Sanitarian for review and follow up where necessary.

2. CCDOC should continue conducting independent inspections of all food service areas.  It is key to effective sanitation that CBM take corrective action when issues are identified so that sanitation, maintenance and food service is acceptable.

3. CBM should develop and implement an effective cleaning and a separate preventative  maintenance plan and schedule for all equipment, dry and refrigerated storage facilities, transportation vehicles, toilet facilities, handwashing stations, employee break areas, storage areas for tools, cleaning equipment, floors, walls, ceilings, light fixtures, and kitchen laundry facilities.  That schedule should be provided to CCDOC and me for review.  Provide CCDOC with regular reports that demonstrate that it is being followed.  The plan and cleaning frequency should identify who is responsible for the cleaning/maintenance, the procedure for cleaning in accordance with the equipment manufacturer's recommendations and a requirement for the CBM employee to verify by signature and date the completed assignments.  The plan should also include a monitoring process to assure that the schedule is being followed.

4. Create a cleaning completion log for all equipment and areas for use by employees overseeing the cleaning and sanitizing program to document that the cleaning and sanitation was completed.

**85.** Food Service

> **e.** CCDOC shall check and record, on a regular basis, the temperatures in the refrigerators, coolers, walk-in-refrigerators, the dishwasher water, and all other kitchen equipment with temperature monitors to ensure proper maintenance of food service equipment.

**JULY, 2012 COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE**

**Status Update:**

The monitoring and recording program in place demonstrates that this provision is currently in substantial compliance.  The current contractor has monitored and recorded temperatures of all refrigerator and freezer equipment at the beginning of the morning shift, as well as warewashing equipment temperatures and pressures daily.  Logs of the temperature measurements are reviewed by the CCDOC Sanitarian during their inspections.  According to the new food service contract, when repairs are needed on any equipment, CCDOC assumes that responsibility.  The Department of Facilities Management will continue responsibility for floors walls, ceilings and all the utilities leading up to the equipment.

**Monitor's Assessment:**

This will need to be reassessed on the next visit.  I did note that when Aramark measured and recorded the temperatures, they were recording the start time of the shift, not the actual recording time. The actual time that the measurement was taken needs to be recorded on the monitoring logs.  The responsibility for maintenance of all equipment including cold and hot food holding and warewashing under the new contract is CCDOC.  However, the contractor will need to assure that issues are quickly identified so that timely repairs may be made

**Monitor's Recommendations:**

1. Record the actual time when documenting temperatures of all refrigeration equipment.  CBM will need a written policy and procedure that assures that temperature monitoring continues throughout all shifts for each day of the week.  The policy also needs to include a review step that assures that when equipment is trending toward non-compliance, it is recognized and immediate corrective action is taken.

2. Provide adequate hot food holding units for use in the kitchens and eliminate the use of the cooking kettles for hot food holding.