# Executive Summary
## Corrections Monitor Susan W. McCampbell's Report #5
## August 31, 2012

**Summary Overview**

It remains my opinion that the Cook County Sheriff's Office (CCSO) and the Cook County Department of Corrections (CCDOC) continue to work diligently to meet the requirements of the consent agreement.   This is an especially challenging effort in the face of jail crowding, and the reluctance of some components of the County's criminal justice system to recognize their responsibilities for contributing to the crowding, and/or failing to take steps to address the crowding.

Jail crowding impacts the ability of the agency to gain and the maintain compliance with many provisions of the consent agreement.  From that perspective, I have offered my assistance to help focus and galvanize both the leadership in the County government and the criminal justice system to develop short-term and long-term initiatives to effectively address jail crowding, and which are, most importantly, sustainable.

This Executive Summary reports on the prisoner release as well as highlighting progress and concerns.

This Executive Summary also includes recommendations regarding paragraphs 33.d – 33.g of the agreed order, to postpone implementation from November 13, 2012 to January 1, 2014.

**On Site Tour – July 16- 20, 2012**

As with all site tours, the July tour required setting priorities in reviewing various component paragraphs of the consent agreement.  In addition to tours of the CCDOC, I met with Justice Anne Burke and President Toni Preckwinkle to learn about the County's plans to address jail crowding.   I also toured the new RCDC facility planned for opening in May 2013.

**Progress**

The areas in which measurable progress has been achieved include:

- Trial implementation of direct supervision in Division XI based on the National Institute of Corrections' (NIC) Inmate Behavior Management model;
- Analyses of use of force data, and recommendations for policy and training amendments;
- Continued progress on completing a revision of the inmate classification process, including the required validation;

- Implementation of a six-week field training program for officers completing pre-service training;
- Installation of 1,200 new cameras through the facilities; and
- Improved cleanliness and sanitation.

## Challenges Ahead

CCDOC's challenges include, but are not limited to:

- Having a single point of data collection regarding uses of force, allegations of excessive force, investigations into allegations of excessive force, and outcomes of these investigations;
- Revising inmate classification system, completing the validation study, and beginning the process for reclassifying the entire inmate population;
- Updating/revising the inmate grievance process using generally accepted correctional practice;
- Evaluating the pilot program of direct inmate supervision in Division XI and expansion of the initiative;
- Providing sufficient resources to the Office of Professional Responsibility to more promptly initiative investigations into allegations of excessive force;
- Addressing jail crowding and the implications for provision of basic inmate services, supervision and sanitation;
- Continuing to collaborate with the partners in the justice system to address crowding;
- Continuing monitoring uses of force data to assure there is not disproportionate uses of force involving inmates who are on the mental health caseload;
- Monitoring uses of force based on locations within the facilities;
- Addressing the increasing number of inmate complaints regarding medical, mental health and dental care.
- Building on improvements to cleanliness of the facilities;
- Holding supervisors accountable for making rounds AND addressing problems regarding the physical plant and the inmates' concerns;
- Reconsidering/refining the roles of CRWs; and
- Completing the staffing plan for CCDOC and assure examination of the span-of-control of supervisors and managers.

## Achievement of Substantial Compliance

Paragraphs for which CCDOC has achieved substantial compliance to date are (with paragraphs achieving substantial compliance since the last report to the Court underlined):

- 31.a.
- 31.b.
- 31.c.
- 31.d.
- 31.e.
- 31.f
- 31.g.
- 31.h.
- 31.i.
- 31.j.
- 31.k.
- 31.l.
- 31.m.
- 31.n.
- 31.o.
- 31.p.
- 31.r.
- 31.s.
- 31.t.
- 32.b.

- 32.h.
- 32.g.
- 32.j.
- 32.k.
- 32.l.
- 32.m.
- 33.a.
- 33.c.i.ii
- 33.i

- 33.j.
- 34.b.
- 34.d.
- 34.g.
- 35.b.
- 35.c.
- 35.d.
- 35.e.
- 35.f.

- 35.g.
- 36.a.
- 36.b.
- 36.c.
- 36.d.
- 36.e.
- 36.f.
- 37.c.
- 38.a.

- 38.b.
- 38.c.
- 38.d.
- 40.
- 41.
- 69.

Paragraphs designated as "substantial" compliance in previous reports to the Court remain in that status.

**Emerging Issues**

Concerns raised in this tour regard the following:

Aggregating Data – There needs to be a single point of "official" data regarding uses of force, allegations of excessive force, and outcomes of investigations into allegations of excessive force. This process is still evolving. There is a good start between IAPro at OPR and the Use of Force Reporting Unit.

Staffing[i] – The consent agreement requires that 30 months following the effective date of the agreed order (November 13, 2012) [paragraphs 33.d. and 33.e.] that the Monitor assess and make a recommendation regarding staffing (correctional officer and supervision levels). Paragraph 33.g. addresses sufficient staff to conduct internal investigations, sufficient staff to provide inmate access to mental and mental health care via supervised movement, as well as movement to outside specialty care; and sufficient staff to monitory security cameras including supervisory viewing.

The consent agreement further provides that if the monitor determines that staffing is inadequate, a recommendation is made. If parties do not agree with the recommendation, an independent study will be undertaken to determine the sufficient number of qualified corrections officers [and supervisors] necessary to operate the facility.

Paragraph 33.f. requires the County to fund positions so identified.

In determining the 30-month target for staffing, it was apparently anticipated that the new RCDC would be open and operational. This is not the case, with a tentative opening date of May 2013. Also, the installation of 1,200 video cameras has also been delayed, now scheduled to begin in September 2012.

CCDOC has produced a credible draft staffing plan, including updating the shift relief factors in the most recent draft report (although additional analysis is needed).

Although the supervisory/management positions are included, I am not aware that there has not been as *assessment* of supervision levels and the span-of-control for supervisory staff. There has been no specific reference to the investigators, medical related functions, or monitors for the security cameras, including supervisors.

As noted elsewhere in this Executive Summary, CCDOC is also preparing to open a new building, for which I have not seen a staffing plan.

Given that the CCDOC has been diligent in producing credible plans, given that the agency has made extraordinary and successful efforts to fill and keep full correctional officers vacancies, and given the current unknown of the staffing for the new RCDC, it is my recommendation that the Court consider delaying the implementation of these paragraphs of the agreed order until January 1, 2014. Sufficient information is not available now to determine whether any staffing analysis completed in November 2012 will provide an adequate picture of need. Postponing implementation gives all parties an opportunity to complete the assessments required, particularly for supervisory staff and those referenced in paragraph 33.g. I further recommend that if at any time between November 13, 2012 and January 1, 2014 that the Monitor believes that the CCDOC has ceased to engage in a good faith effort in these areas, that the Court will be promptly notified, including a recommendation for action.

Inmate Grievance Process – While CCDOC remains in substantial compliance with relevant paragraphs, the process is not working as it should. This is for a variety of reasons noted later in the body of this report but the deficiencies stem from removing the corrections officers from the inmate grievance process, a decision made by CCDOC in good faith in order to address allegations in the findings letter. This matter requires attention, and CCDOC will have a plan of action by September 1 to address the matters I discussed on site.

Of equal concern are Cermak's responsiveness and responses to inmate medical, mental health and dental grievances. In reviewing grievances I found an unacceptable time delay in responding, and in providing services. I referred these findings to Dr. Shansky.

Inmate Medical, Mental Health and Dental Complaints – I was overwhelmed by inmate complaints about these services. I conducted approximately the same number of inmate interviews as during other tours, but this time received many more complaints. I referred this matter to Dr. Shansky. I note that Dr. Puisis, Cermak, reports 58 vacancies at the time of the tour (not including 30 vacant mental health technician positions).

Another concern regarding medical, mental health, dental staff is the ability of Cermak to be flexible in providing additional resources as the inmate population increases. I understand from Dr. Shansky that there is no provision in the consent agreement to require Cermak to conduct a staffing analysis and develop a staffing

plan.  Therefore, it is an unknown if the current staffing for Cermak is sufficient given the medical, mental health, dental needs of even the current population. Additionally, in most jail systems that contract for inmate medical services, there are provisions built into those contracts  to allow the provider to increase (and decrease) their personnel (and other) resources based on the inmate population (and invoice the jurisdiction accordingly).  In other words, as the inmate population reaches certain specified levels, more nurses, physicians, etc. are added., and if the population falls below a specified level, the resources (and invoice) can shrink as well.  This is a safeguard to assure that Constitutional standards are met regardless of the inmate population.  While deferring to Drs. Shansky and Metzner on these matters, I believe it is a worthy exploration of how Cermak staffing matches the needs of the inmate population.

Pre-Release Mental Health Planning/Prescriptions for Inmates on the Mental Health Caseload

When meeting with President Preckwinkle, I mentioned that one way to address recidivism for inmates on the mental health caseload is to insure that when they are released from jail they have a sufficient supply of their medication to make it to their first post-release clinic appointment.  She committed to funding this for Cermak if included in their budget.  I reported this to Dr. Puisis, Dr. Jones, Dr. Mennella, Drs. Shansky and Metzner,  and CCDOC.  This could be a great assistance.  But the help is based on effective pre-release *planning*, which is an accepted tenant of jail operations – knowing when the inmate is to be released, and having a plan in place to address their post-release mental heath needs.

Attention to the Mental Health Units – I remain concerned about what I believe to be higher than should be seen indicators of disorder in the mental health units.  I analyzed reports that document my concerns.  I shared these findings with Dr. Metzner and followed up with CCDOC.  The indicators that concerned me the most were uses of force, inmate/inmate assaults, and contraband.   The reasons for this level of disorder may be multiple, but need to be explored by Cermak and CCDOC. While I know all involved look forward to the opening of the new building in mid-2013, the problems that exist in the Division X will carry over to the new building, if not addressed.  There are some out-of-the box options that the parties can discuss.

Transition Team – Having been involved with the opening of three new jail buildings in my career, I am concerned about the lack of a formal, resourced transition team in Cermak and CCDOC to plan for the operation of the new building, as well as consider options for the space to be abandoned (old RCDC).  My experience is that the formal transition team (full-time staff) need to be working at least 12 months (preferably 18 months) before the building's opening to develop the scenarios for operations, test those hypotheses, and write the policies and procedures.  Staffing and staff training are also priorities.

## Positives

Along with the progress noted early in this summary I want to acknowledge a major, positive shift at CCDOC. This shift is to direct inmate supervision on a trial basis in Division XI. Division XI was built as a direct supervision facility – that is a type of supervision in which the officer works directly in the housing unit. The facility was physically altered to remove the officer workstations. Based on CCDOC's participation in the NIC's Inmate Behavior Management Program, this option was researched and implemented. While direct supervision is not a panacea to all issues in jail operations, it is one strategy that has found documented success in not only creating a safer work environment for staff and inmates, but also increasing workforce satisfaction. I commend the leadership of John Murphy, Gary Hickerson and Carmen deSadier in exploring this option and leading the way.

## Jail Crowding

Because of the impact of jail crowding on the conditions of confinement I spent time exploring the issues and helping to identify solutions. Generally, my conclusion is that there are positive forces working to address crowding, but that the vision of these leaders might not be shared by all criminal justice partners, and with the needed sense of urgency.

While sometime the community or criminal justice system partners may look to the Sheriff to do "something" about crowding, in reality, the Sheriff has the least amount of impact and control over the jail population.

### Cook County Jail Reduction Task Force

This task force is apparently keeping track of data about jail crowding in an effort to inform all stakeholders. They produce a "dashboard" that tracks the jail's population, admissions and discharges to electronic monitoring, and bond amounts/length of stay. While this information and data is interesting it isn't really helpful in drilling down into the causes of the crowding. It is helpful as an attempt to aggregate data, and identify what entities or persons may collect data.

For example, knowing the amount or type of bond, and drawing a conclusion that the detainee should be released may not be a valid assumption. As decisions about whether a detainee is eligible for bond (or EM or other alternatives) are influenced by the person's criminal history record, which is <u>not</u> reported in the Task Force's charts, the focus might be drawn away from the true problem – which may be case processing/management within a variety of criminal justice system agencies. So caution is needed to be sure that the strategies or proposed solutions emerging from the Task Force's work focuses on the central problem, not the symptoms of the problem.

### Need for Criminal Justice System-Wide Initiatives

President Preckwinkle and the Board of Commissioners re-invigorated the Judicial Advisory Council (JAC) in January 2012 with a charge to examine the processes, procedures and practices regarding the issuance of bonds in Cook County and the enhancement of pretrial services at the Cook County Central Bond Court. This initiative is lead by Justice Anne Burke, a most fortuitous selection. She has knowledgeably and aggressively lead this work, which has pointed to other issues that are impacting crowding in the jail. A final report is expected at any time. The JAC's draft report has been a lightening rod for several of the criminal justice system components. Justice Burke continues to press forward with this important strategy to address crowding, but more work remains. The historic political landscape in Cook County presents significant opportunities/barriers in any deliberation of how to change the scope, direction, workload, priorities, and automation, of the criminal justice system agencies.

Among the matters that remain to be addressed include but certainly are not limited to (in addition to those addressed in the JAC's report):

- Examination of the time to trial (for example, reviewing why there are more than 200 inmates in jail more than 5 years pending trial);
- Review of trial delays and continuances (reported that inmates seek delays and trials to postpone their trials so that witnesses, etc. might not be available, as well as delay their transfer to state prison and away from their families);
- Assess why Cook County appears to have above national average number of scheduled jury trials;
- Implementation/updating of case management/tracking systems in the court system, state's attorney's office, public defender's office to help with more prompt decisions regarding prosecutions;
- Integration of criminal justice systems (automation where needed), including automated police reporting and automatic fingerprinting system in all County law enforcement agencies;
- Evaluate the impact of electronic monitoring in terms of whether it constitutes "net widening" and/or any threats to public safety;
- Review options for potential expansion of day reporting programs;
- Seek community re-involvement in the justice system, particularly alternatives to pre-trial incarceration;
- Completion of a physical plant assessment of all CCDOC facilities, engage in projection of the inmate populations for at least until 2025 to determine if and when new construction may be required to support county jail operations based on anticipated population and the condition of some buildings;
- Assure that inmates with charges of parole/probation violation are promptly moved through the system; and
- Explore options to move backlogged criminal cases through the system.

I know that President Preckwinkle is committed to reducing the jail's population. Her commitment is essential. Justice Burke's involvement is also an important key to moving the processes forward. More allies should be on board as it becomes apparent that the status quo, or just merely tweaking the status quo, does not constitute short or long-term

answers to crowding.  But in looking at long-term solutions an inclusive strategy is required that identifies what each criminal justice system component must do to address crowding – in *concrete* terms – and then be provided with the resources.

It may be necessary for the Court to underscore for the County's criminal justice leaders how their commitment and action is required to address the crowding and conditions it causes in the Cook County jail.

## Conclusions – Compliance

There continues to be progress in meeting the terms of the consent agreement. There have been some learning experiences that have, ultimately, contributed to creating a sustainability of these changes within CCDOC.  Internal culture change in an organization the size of CCDOC is a 10-year process (at least), and with strong, stable leadership, the organization is moving in the right direction.  Importantly the leadership at CCDOC is open to suggestions and new ideas to help bring CCDOC back in the mainstream of American jails.

## Prisoner Release Order – Electronic Monitoring (EM)

This is the EM profile as of 7/26/2012

| Profile of Electronic Monitoring (EM) | |
|---|---:|
| EM by Judges | 1078 |
| (SWJP) | 126 |
| (Men's Day Reporting) | 178 |
| (Boot Camp Graduates) | 31 |
| Administrative Release Order | 36 |
| Total on EM | 1114 |

Prior to the Administrative Release Order, judges placed a fewer number of people on EM resulting in an average daily population on EM of close to 400.  A few months following the issuance of the Administrative Release Order, the judges' use of  EM rose substantially, and the average daily population on EM increased from 435  in March of  2011 to 1180 in December 2012, an increase of  271%.   During this same period, the inmate census at the jail on the first day of the month rose 6%.

The Sheriff's Office has developed policies and protocols to implement the Administrative Release Order, including eligibility requirements and priority responses to violations of the individual's release contract.  My understanding is that these processes continue to be refined, considering both the jail crowding and the public's safety.  The eligibility requirements taken into consideration in screening include the Court's concerns about the public's safety as discussed during hearings on this Order.

Since November 2011 and through August 14, 2012 the Sheriff's Office reviewed 8,822 files of individuals who were initially considered an appropriate risk for release on

EM based on bond amount.   Of that number, 700 were referred to the magistrates, and of those 385 were ordered onto EM.  For various reasons, not all of that number (N=385) were placed on the program (e.g., refused, posted bond, no place to stay, case adjudicated).

As noted above, challenge to evaluating a detainee for placement in pre-trial release programs is often that the individual's current charge may be a misdemeanor, or non-violent felony, but the totality of the criminal history record information suggests that the individual is a danger to the community.   From my personal experience managing a large jail system that was under a Federal Court-imposed population cap and was critically crowded, I know that an arrestee's bond amount tells only part of the story.  For example, it may be an erroneous conclusion that just because 40% of inmates in CCDOC have bonds lower than $10,000, they are suitable risks for pre-trial release. To really know how many of these individuals are suitable candidates requires the type of file review that is now done by Sheriff's Office staff, resulting in recommendations to the magistrates.

In conclusion, the Prisoner Release Order appears to have had the effect of focusing the bond court judges on the use of EM, diminishing greatly the number of suitable candidates for release using the mechanics of the Prisoner Release Order.  While this is perhaps an acceptable outcome, keeping pre-trial release in the hands of the judiciary, it has only provided temporary (if any) relief to crowding.

---

[i] A potential staffing related issue unforeseen by the parties during the drafting of the agreement is the impact of the standards promulgated by the U. S. Attorney General on May 17, 2012 pursuant to the Prison Rape Elimination Act of 2003.

**UNITED STATES OF AMERICA VS. COOK COUNTY, ET. AL.**
**Civil No. CV-02946**

# Corrections Monitor Susan W. McCampbell's Report # 4

# 08 31 2012

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| **A.** | **Protection from Harm** | | | |
| **31.** | **Use of Force by Staff** | | | |
| A. 31. a. (16) | CCDOC shall maintain comprehensive and contemporary policies and procedures, in accordance with generally accepted correctional standards, surrounding the use of force and with particular emphasis regarding permissible and impermissible uses of force. | x12/11 x7/12 | x 9/10 x 3/11 x 8/11 | |
| A.31. b. (17) | CCDOC shall maintain use of force policies and pre-service and in-service training programs for correctional officers and supervisors that address the following impermissible uses of force:<br><br>1. use of force as a response to verbal insults or inmate threats where there is no immediate threat to the safety of the institution, inmates, or staff;<br>2. use of force as a response to inmates' failure to follow instructions where there is no immediate threat to the safety of the institution, inmates, or staff, unless CCDOC has attempted a hierarchy of nonphysical alternatives that are documented;<br>3. use of force as punishment or retaliation;<br>4. use of force involving striking, hitting, or punching a restrained and non-combative inmate;<br>5. use of force against an inmate after the inmate has ceased to offer resistance and is under control;<br>6. use of choke holds on an inmate, unless lethal force is justified; and<br>7. use of inappropriate or excessive force. | x12/11 x7/12 | x 9/10 x 3/11 x 8/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| A.31.c. (18) | CCDOC shall maintain a policy to ensure that staff adequately and promptly report all uses of force, in accordance with generally accepted correctional standards. | x12/11 x7/12 | x 9/10 x 3/11 x 8/11 | |
| A.31.d. (19) | CCDOC shall require that use of force reports: 1. be written in specific terms in order to capture the details of the incident 2. contain an accurate account of the events leading to the use of force incident; 3. include a description of the instrument(s) of restraint or control, if any, and the manner in which it was used; 4. note whether an inmate disciplinary report was completed in connection with the incident that prompted the use of force; 5. describe the nature and extent of apparent and reported injuries sustained both by the inmate and staff member; 6. contain the date and time medical attention was actually provided; 7. describe, in detailed, factual terms, the type and amount of force used as well as the precise actions taken in a particular incident; and 8. note whether a use of force was videotaped. If the use of force is not videotaped, the reporting correctional officer and supervisor will provide an explanation as to why it was not videotaped. | x12/11 x7/12 | x 9/10 x 3/11 x 8/11 | |
| A.31.e. (20) | CCDOC shall continue to require prompt review by the shift commander of all use of force reports. The shift commander's review of use of force reports shall include review for completeness and procedural errors, as well as review of the substantive content. If the use of force report does not comply with provision 31.d. of this Agreed Order, the shift commander shall return it to the reporting officer for revision and resubmission until it is compliant. If the shift commander believes a use of force may have been inappropriate or excessive, he or she shall immediately refer the incident for investigation. | x7/12 | x 9/10 x 3/11 x 8/11 x12/11 | |
| A.31.f. (21) | CCDOC shall ensure that senior management review of uses of force includes: 1. a timely review of medical documentation of inmate injuries, if any is submitted, as provided by Qualified Medical Staff, including documentation surrounding the initial medical encounter, an anatomical drawing that depicts the areas of sustained injury, and information regarding any further medical care; 2. the inmate disciplinary report, if any, associated with the use of force; and 3. the incident report, if any, associated with the use of force. | x12/11 x7/12 | x 9/10 x 3/11 x 8/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| A. 31.g. (21) | CCDOC [and Cermak] shall establish criteria that trigger referral for inappropriate or excessive use of force investigations, including but not limited to, documented or known injuries that are extensive or serious; injuries involving fractures or head trauma; injuries of a suspicious nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.); and injuries that require treatment at outside hospitals. | x12/11 x7/12 | x 3/11 x 8/ll | x 9/10 |
| A. 31. h. (22) | When CCDOC review of use of force reports, and supporting records if applicable, reveals that reports of a use of force are materially inconsistent, conflicting, or suspicious, CCDOC shall refer that use of force incident for internal investigation. | x12/11 x7/12 | x 9/10 x 3/11 x 8/11 | |
| A.31.i. (22) | CCDOC shall develop and implement a system to track all incidents of use of force that, at a minimum, includes the following information: 1. a tracking number; 2. the inmate(s) name; 3. housing assignment; 4. date; 5. type of incident; 6. injuries (if applicable); 7. medical care provided (if applicable); 8. staff involved; 9. reviewing supervisor; 10. external reviews and results (if applicable); 11. remedy taken (if appropriate); and 12. administrative sign-off. | x7/12 | x 9/10 x 3/11 x 8/11 x12/11 | |
| A.31.j. (23) | CCDOC shall ensure that, promptly following a use of force incident, video or photographs are taken of any and all reported or apparent injuries sustained by inmates and staff. The video or photographs will be maintained and will be included in the investigation package, if applicable. See 31. F. | x12/11 x7/12 | x 9/10 x 3/11 x 8/11 | |
| A.31.k. (23) | CCDOC shall establish an "early warning system" that will document and track correctional officers who are involved in use of force incidents and any complaints related to the inappropriate or excessive use of force, in order to alert CCDOC administration to any potential need for retraining, discipline, problematic policies, or supervision lapses. Appropriate CCDOC leadership, supervisors, and investigative staff shall have access to this information and monitor the occurrences. CCDOC senior management shall use information from the early warning system to improve quality management practices, identify patterns and trends, and take necessary corrective action both on an individual and systemic level. | x7/12 | x 9/10 x 3/11 x 8/11 x12/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| A.31.l. (24) | CCDOC shall ensure that a supervisor is present during all pre-planned uses of force, such as cell extractions. | x12/11 x7/12 | x 9/10 x 3/11 x 8/11 | |
| A.31.m. (24) | Where there is evidence of staff misconduct related to inappropriate or unnecessary use of force against inmates, CCDOC shall initiate personnel actions and seek disciplinary action appropriately for any correctional officer found to have:<br>1.  engaged in inappropriate or excessive use of force;<br>2.  failed to report or report accurately the use of force;<br>3.  retaliated against an inmate or other staff member for reporting an inappropriate or excessive use of force; or<br>4.  interfered or failed to cooperate with an internal investigation regarding use of force in a manner inconsistent with the staff member's statutory or contractual rights. | x12/11 x7/12 | x 9/10 x 3/11 x 8/11 | |
| A.31.n. (25) | Where there is evidence of staff misconduct related to inappropriate or unnecessary use of force against inmates, CCDOC shall consider, develop, and initiate systemic remedies as appropriate. | x 8/11 x12/11 x7/12 | x 9/10 x 3/11 | |
| A.31.o (25) | CCDOC shall maintain accountability policies and procedures for the effective and accurate maintenance, inventory, and assignment of chemical and other security equipment, in accordance with generally accepted correctional standards. | x12/11 x7/12 | x 9/10 x 3/11 x 8/11 | |
| A.31.p. (26) | CCDOC shall continue to conduct use of force training in accordance with generally accepted correctional standards, including:<br>1.  CCDOC shall maintain an effective and comprehensive use of force training program.<br>2.  CCDOC shall continue to ensure that correctional officers receive adequate training in CCDOC's use of force policies and procedures, including de-escalation and defensive tactics relating to use of force.<br>3.  CCDOC shall continue to ensure that correctional officers receive pre-service and in-service training on reporting use of force and completing use of force reports. | x12/11 x7/12 | x 9/10 x 3/11 x 8/11 | |
| A.31.q. (26) | CCDOC shall provide a process for inmates to report allegations of the inappropriate or excessive use of force orally to any CCDOC staff member; said staff member shall give the inmate the opportunity to reduce his or her report to writing through a grievance or complaint form without discouragement. | | x 9/10 x 3/11 x 8/11 x12/1 1 x7/12 | |
| A.31.r. (27) | Following a use of force, when CCDOC staff transport an inmate to receive medical care by Cermak, as necessary, the CCDOC staff member shall inform the Cermak staff member that the | x 8/11 x12/11 | X 9/10 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | inmate was involved in a use of force. | x7/12 | x 3/11 | |
| A.31.s. (27) | Cermak shall ensure that, when providing medical treatment or assessment to an inmate following a use of force, Qualified Medical Staff document the inmate's injuries, if any, and any medical care provided. Cermak shall provide CCDOC senior management [OPR] with a brief summary documenting the initial medical encounter following a use of force, including an anatomical drawing that depicts the areas of sustained injury, if any, and information regarding any further medical care. See 31.f. | x 8/11 x12/11 x7/12 | x 9/10 x 3/11 | |
| A.31.t. (28) | Cermak shall ensure that Qualified Medical Staff question, outside the hearing of other inmates or correctional officers if appropriate, each inmate who reports for medical care with an injury, regarding the cause of the injury. If, in the course of the inmate's medical encounter, a health care provider suspects staff-on-inmate or inmate-on-inmate abuse, that health care provider shall immediately:<br>1. report the suspected abuse to the Executive Director of the Office of Professional Review or other appropriate CCDOC administrator; and<br>2. adequately document the matter in the inmate's medical record. | x 8/11 x12/11 x7/12 | x 3/11 | x 9/10 |
| **32.** | **Safety and Supervision** | | | |
| 32. a. (28) | CCDOC shall maintain security and control-related policies, procedures, and practices that will result in a reasonably safe and secure environment for all inmates and staff, in accordance with generally accepted correctional standards.<br>Coordinate with Grenawitzke | | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| 32.b. (29) | CCDOC shall maintain policies, procedures, and practices to ensure the adequate supervision of inmate work areas and trustees, in accordance with generally accepted correctional standards.<br>Coordinate with Grenawitzke | x7/12 | x 8/11 x12/11 | x 9/10 x 3/11 |
| 32.c. (29) | CCDOC shall ensure that security staff conduct appropriate rounds with sufficient frequency to provide inmates with reasonable safety. Rounds shall be conducted at least once every half hour, at irregular intervals, inside each housing unit. In the alternative, CCDOC may provide direct supervision of inmates by posting a correctional officer inside the day room area of a housing unit to conduct constant surveillance. More frequent rounds shall be conducted for special management inmates who require more intensive supervision for security and safety reasons. All security rounds shall be documented on forms or logs that do not contain pre- | | x 9/10 x 3/11 X 8/11 x12/11 x7/12 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | printed rounding times.  Video surveillance may be used to supplement, but must not be used to replace, rounds by correctional officers. | | | |
| 32.d. (29) | CCDOC shall ensure that security supervisors conduct daily rounds in the inmate housing units, and document the results of their inspections. | | x 3/11 x 8/11 x12/11 x7/12 | x 9/10 |
| 32.e. (30) | Cook County shall increase the use of overhead video surveillance and recording cameras to provide adequate coverage throughout the common areas of the Facility, including the RCDC, all division intake areas, mental health units, special management units, inmate housing units, and in common areas of the divisions. | | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| 32.f. (30) | CCDOC shall maintain a procedure to prevent inmates from possessing or having access to dangerous contraband, including conducting regular inspections of cells and common areas of the housing units to identify and prevent rule violations by inmates. | | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| 32.g. (31) | CCDOC shall review, and revise as applicable, all General Orders ("GOs"), Standard Operating Procedures ("SOPs"), and Post Orders on an annual basis, or more frequently as needed. | x 8/11 x12/11 x7/12 | x 9/10 x 3/11 | |
| 32.h. (31) | CCDOC shall revise policies, SOPs, and post orders for all armed posts to include proper use and safe handling of weapons and provide specific instructions on use of deadly force and when and under what circumstances such force should be used, in accordance with generally accepted correctional standards. | x12/11 x7/12 | x 9/10 x 3/11 x/8/11 | |
| 32.i. (31) | CCDOC shall standardize security policies, procedures, staffing reports, and post analysis reports across the divisions, to the extent possible, taking into account the different security levels and different physical layouts in the various divisions. | | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| 32.j. (32) | CCDOC shall provide formal training on division-specific SOPs to correctional officers in accordance with their assignments, and shall provide further specialized training for officers assigned to Special Management Units.  Cermak Hospital shall provide Specialized training for officers assigned to psychiatric units. Coordinate with Drs. Shansky and Metzner.  See also 44.f., 44.g., 44.h., 46.b., 46.e.,68. | x7/12 | x 9/10 x 3/11 x 8/11 x12/11 | |
| 32.k. | CCDOC shall maintain in working order all monitoring equipment at the Facility that is under | x7/12 | x 9/10 x 3/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| (32) | CCDOC's direct control, including cameras, alarms, radios (hand held), interior and exterior lighting, x-ray and other screening equipment, and walk-through metal detectors. To the extent that the maintenance of any Facility monitoring equipment is under the control of DFM, CCDOC shall promptly report any maintenance needs and DFM shall prioritize its services to ensure that all monitoring equipment is maintained in working order. Coordinate with Grenawitzke | | x 8/11<br>x12/11 | |
| 32.l. (33) | Absent exigent circumstances, CCDOC: (i) shall house each inmate assigned to a division that is celled to one permanent bed in a cell and shall not house any inmates (including those assigned to dormitory divisions) such that they are sleeping on the floor, on a mattress on the floor, or in any area not designed or redesigned as sleeping quarters; (ii) shall not house more than two inmates to a single cell (triple-bunking); and (iii) shall not hot-bunk any inmates. | x 8/11[1]<br>x12/11<br>x7/12 | | |
| 32.m. (33) | When exigent circumstances give rise to triple-bunking, CCDOC shall provide the third inmate in the triple-bunked cell a "boat," stackable bunk, moveable platform, or cot, so that the inmate is not required to lay down directly on the cell floor or on a mattress on the floor. | x 8/11[2]<br>x12/11<br>x7/12 | | |
| **33.** | **Security Staffing.**<br>**The parties agree that correctional officer staffing and supervision levels at the Facility must be appropriate to adequately supervise inmates, to carry out the requirements of this Agreed Order, and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards. Cook County and CCDOC shall take such actions as shall ensure that correctional officer staffing and supervision at the Facility are sufficient to achieve these purposes. These actions shall include the following:** | | | |
| 33.a. (34) | In the fiscal year 2010 budget, Cook County shall allocate funds sufficient to allow for 210 additional correctional officer positions at the Facility. Consistent with provision 33.c, such funding may occur on a rolling basis, as appropriate in light of the time required to hire, train, and put on duty the additional 210 new correctional officers. | x 8/11<br>x12/11<br>x7/12 | x 9/10<br>x 3/11 | |
| 33.b. (35) | CCDOC shall use its best efforts (through the maintenance of the written staffing plan required by provision 33.h and otherwise) to ensure that the number of correctional officer vacancies is kept to the minimum practicable number at all times, taking into account that the timing of terminations and resignations and the resulting rate of attrition may, in ordinary course, result in there being some vacancies at any given time. | | x 9/10<br>x 3/11<br>x 8/11<br>x12/11<br>x7/12 | |

---

[1] Noted as "NA" in first two reports.

[2] Noted as "NA" in first two reports.

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| 33.c.i.ii (35) | CCDOC shall fill the 210 additional correctional officer slots provided for in provision 33.a; fill the 285 correctional officer vacancies that existed at the Facility as of July 17, 2009; and fill any correctional officer vacancies coming into existence after that date in the following manner: <br> i. By December 31, 2010, CCDOC shall hire, train, and put on duty at the Facility at least 448 [381] newly qualified correctional officers (in addition to those on duty as of December 31, 2009). <br> ii. By March 30, 2011, CCDOC shall hire, train, and put on duty at the Facility at least 174 [107] newly qualified correctional officers (in addition to those on duty as of December 31, 2010). | x 8/11 <br> x12/11 <br> x7/12 | | x 9/10 <br> x 3/11 |
| 33.d. (35) | The parties agree that for 30 months following the effective date of this Agreed Order, Cook County and CCDOC shall not be required to provide additional correctional officer staffing and supervision at the Facility beyond that which is necessary to ensure that correctional officer staffing and supervision are sufficient to achieve the purposes set out in the introductory paragraph of provision 33 and to comply with provisions 33.a-c above. | Due date 11/13/2012 | | |
| 33.e. (36) | Within 30 months of the effective date of this Agreed Order, the CCDOC Monitor shall assess and make a recommendation on whether the correctional officer staffing and supervision levels are appropriate to adequately supervise inmates at the Facility, in accordance with generally accepted correctional standards. If the CCDOC Monitor determines that staffing is inadequate, the CCDOC Monitor will make a recommendation regarding the appropriate number of correctional officer staff. If the parties do not accept the CCDOC Monitor's staffing recommendation, CCDOC and Cook County shall agree to an independent, comprehensive study to determine the appropriate correctional officer staffing and supervision. The parties agree that the results of this staffing study shall provide guidance as to the sufficient number of qualified correctional officers necessary to operate the Facility safely and to carry out the requirements of this Agreed Order. | Due date 11/13/2012 | | |
| 33.f. (37) | If the staffing study requires additional correctional officers, Cook County shall allocate funds sufficient to maintain correctional officer staffing levels necessary to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards. | Due date 11/13/2012 | | |
| 33.g. (37) | If the staffing study requires additional correctional officers, and consistent with Cook County's allocation of funds for security staffing, CCDOC shall hire and train sufficient number of qualified correctional officers and other staff to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards, including: | Due date 11/13/2012 | | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | 1. Investigative staffing sufficient to meet the internal investigation responsibilities outlined in this Agreed Order;<br>2. Correctional officer staffing sufficient to provide inmates requiring treatment with adequate access to appropriate medical and mental health care by providing timely movement of inmates to medical units, transport of inmates who have been referred for outside specialty care, and escort, if necessary, to Qualified Medical and Mental Health Staff on housing units; and  [Coordinate with Shansky, Metzner]<br>3. Qualified staff sufficient to monitor security cameras in real time and allow for supervisory viewing and retrieving at any time. | | | |
| 33.h. (38) | CCDOC shall maintain a written staffing plan that requires sufficient staffing to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards. | | x 8/11<br>x12/11<br>x7/12 | x 9/10<br>x 3/11 |
| 33.i. (38) | Absent exigent circumstances, CCDOC shall maintain a practice that does not allow for scheduled, planned, or expected cross-watching (a CCDOC practice of allowing one correctional officer to simultaneously supervise two housing units from the control center of one of the units) at any time on all maximum security and Special Management Units, and during first and second shifts throughout the Facility. | x 8/11<br>x12/11<br>x7/12 | | |
| 33.j. (39) | CCDOC may permit cross-watching on third shift in housing units that are not maximum security or Special Management Units only if the Monitor does not object after consultation and review. The Monitor's review of the appropriateness of third-shift cross-watching on a particular housing unit shall be guided by the sufficiency of sightlines between the units being cross-watched, the adequacy of video and/or audio technologies in place, and/or other factors that bear on the safety and security of inmates and staff. If the Monitor later objects to any cross-watching that is in effect because of the Monitor's concerns that cross-watching on a particular housing unit presents an undue risk to the safety and security of inmates and staff, CCDOC shall immediately cease such cross-watching. CCDOC may renew cross-watching on that unit again if, after further consultation with and review by the Monitor, the Monitor does not object to such renewal. Although cross-watching is permitted under the limited circumstances described herein, CCDOC will work to eliminate the practice at the Facility. | x 8/11[4]<br>x12/11<br>x7/12 | | |

---

[3] Noted as "NA" in two previous reports.

[4] Noted as "NA" in two previous reports.

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| **34.** | **Incidents and Referrals** | | | |
| 34. a. (39) | CCDOC shall continue to ensure that staff adequately and promptly document all reportable incidents, including inmate fights, rule violations, inmate injuries, suicides and suicide attempts, cell extractions, medical emergencies, contraband, vandalism, escapes and escape attempts, fires, and other incidents causing a disruption to standard CCDOC practice, in accordance with generally accepted correctional standards. | | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| 34.b. (40) | CCDOC shall continue to ensure that correctional officers receive formal pre-service and in-service training on proper incident reporting policies and procedures, in accordance with generally accepted correctional standards. | x 8/11 x12/11 x7/12 | x 9/10 x 3/11 | |
| 34.c. (40) | CCDOC shall maintain a system to track all reportable incidents (as described in provision 34.a) that, at a minimum, includes the following information:<br>1. incident tracking number;<br>2. the inmate(s) name;<br>3. housing assignment;<br>4. date;<br>5. type of incident;<br>6. injuries (if applicable);<br>7. medical care (if applicable);<br>8. primary and secondary staff involved;<br>9. reviewing supervisor;<br>10. external reviews and results (if applicable);<br>11. remedy taken (if appropriate); and<br>12. administrative sign-off. | | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| 34.d. (41) | CCDOC shall require prompt administrative review of incident reports. Such reviews shall include a case-by-case review of individual incidents as well as a systemic review in order to identify patterns of incidents. CCDOC shall incorporate such information into quality management practices and take necessary corrective action. | x 8/11 x12/11 x7/12 | x 9/10 x 3/11 | |
| 34.e. (41) | CCDOC shall ensure that incident reports, use of force reports and inmate grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria, that it is referred for investigation. | | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| 34.f. (41) | CCDOC shall maintain policies, procedures and practices requiring investigations to resolve issues identified during review of incident reports, disciplinary hearings, or inmate grievances, and determine appropriate remedies, in accordance with generally accepted correctional standards.  At a minimum, CCDOC shall require timely and appropriate investigations of all suicides, serious suicide attempts, inmate-on-inmate violence resulting in serious injury, inmate-on-staff violence, inmate injuries requiring treatment by an outside hospital, inmate injuries of a suspicious nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.), sexual misconduct between inmates, sexual misconduct involving staff, fires, escapes, escape attempts, and deaths. | | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| 34.g. (42) | CCDOC [OPR shall ensure that any investigation reports indicating possible criminal behavior will be referred to the appropriate law enforcement authority. | x 8/11 x12/11 x7/12 | x 9/10 x 3/11 | |
| 35. | **Investigations:**<br>**Investigations at the Facility are conducted by independent departments under the Cook County Sheriff's Office, including the Office of Professional Review, the Criminal Investigations Unit, and the Sheriff's Police Department.  The Cook County Sheriff will assume responsibility for requiring these investigatory units to comply with the relevant provisions of this Agreed Order.** | | | |
| 35.a. (43) | CCDOC [OPR] shall maintain comprehensive policies, procedures, and practices for the timely and thorough investigation of alleged staff misconduct, in accordance with generally accepted correctional standards. | | x 9/10 x 3/11 x 8/11 x12/11 x 7/12 | |
| 35.b. (43) | Internal investigations [OPR] shall be conducted by persons who do not have supervisory responsibility for the staff member(s) being investigated. | x 7/12 | x 9/10 x 3/11 x 8/11 x12/11 | |
| 35.c. (44) | CCDOC [OPR] shall ensure that all internal investigations will include timely, thorough, and documented interviews of all relevant staff and inmates who were involved in, or witnessed, the incident in question. | x 9/10 x 3/11 x 8/11 x12/11 x 7/12 | | |
| 35.d. (45) | CCDOC [OPR]  shall ensure that internal investigation reports shall include all supporting evidence, including witness and participant statements, policies and procedures relevant to the | x 9/10 x 3/11 | | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | incident, physical evidence, video or audio recordings, and relevant logs. | x 8/11 x12/11 x 7/12 | | |
| 35.e. (45) | CCDOC [OPR] shall ensure that all investigatory staff will receive pre-service and in-service training on appropriate investigations policies and procedures, the investigations tracking process, investigatory interviewing techniques, and confidentiality requirements. | x 7/12 | x 9/10 x 3/11 x 8/11 x12/11 | |
| 35.f. (45) | CCDOC [OPR] shall provide all investigators who will be assigned to conduct investigations of use of force incidents with specialized training in investigating use of force incidents and allegations. | x7/12 | x 9/10 x 3/11 x 8/11 x12/11 | |
| 35.g. (45) | CCDOC [OPR] shall ensure that the results of each internal investigation shall be documented in an investigation report. CCDOC administration shall review the investigation reports, along with the underlying documentation, and take appropriate action. CCDOC shall implement appropriate remedies based upon the results of internal investigations. | x7/12 | x 9/10 x 3/11 x 8/11 x12/11 | |
| **36.** | **Inmate Disciplinary Process** | | | |
| 36.a. (46) | CCDOC shall maintain policies, procedures, and practices for a formal disciplinary process, including prompt issuance of written disciplinary citations, administrative review and disciplinary reports for alleged minor rule violations, and due process for alleged major rules violations, in accordance with generally accepted correctional standards. | x7/12 | x 9/10 x 3/11 x 8/11 x12/11 | |
| 36.b. (46) | CCDOC shall ensure that inmate disciplinary hearings are conducted in a reasonably private and secure setting. | x 8/11 x12/11 x7/12 | x 9/10 x 3/11 | |
| 36.c. (47) | CCDOC shall ensure that all inmates placed in lock down status are provided with appropriate due process that has been developed and implemented in policies and procedures, in accordance with generally accepted correctional standards.<br><br>In an emergency, the Executive Director of CCDOC may order a lock down of entire areas of the Facility in order to control the situation and address serious security concerns. In such circumstances, it is not necessary to provide disciplinary hearings to each inmate affected by the lock down. However, lock downs of this nature shall be limited to only the time and scope necessary to address the emergency. | x7/12 | x 9/10 x 3/11 x 8/11 x12/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | For the purposes of this Agreed Order, a "lock down" shall not include the routine instances in which inmates are confined to their cells, including periods of count, over night, shift change, movement, and routine contraband sweeps. | | | |
| 36.d. (47) | CCDOC shall ensure that the disciplinary board's written record accurately reflects the testimony and discussion from the disciplinary hearing, including any recommendations from a mental health professional regarding the extent to which disciplinary charges are related to an inmate's serious mental illness or suggestions for minimizing the deleterious effect of disciplinary measure on the mental health status of the inmate. | x 7/12 | x 3/11 x 8/11 x12/11 | x9/10 |
| 36.e. (48) | CCDOC shall alert Cermak when inmates are placed in disciplinary segregation or protective custody. | x7/12 | x 9/10 x 3/11 x 8/11 x12/11 | |
| 36.f. (48) | CCDOC shall permit a Cermak Qualified Mental Health Staff member to serve on the disciplinary board. | x12/11 x7/12 | x 3/11 x 8/11 | x 9/10 |
| **37.** | **Classification** | | | |
| 37.a. (48) | CCDOC shall maintain policies and procedures for an appropriate, objective classification system that separates inmates in housing units by classification levels in order to protect inmates from unreasonable risk of harm. The system shall include consideration of an inmate's security level, severity of current charge, types of prior commitments, suicide risk, history of escape attempts, history of violence, and special needs. CCDOC shall use best efforts to anticipate periods of unusual intake volume and schedule sufficient classification staff to timely classify inmates. | | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| 37.b. (49) | CCDOC shall ensure that classification staff have sufficient access to current information regarding cell availability on each division. | | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| 37.c. (49) | CCDOC shall include information on each inmate's assignment to the Special Incarceration Unit "level system" at the Facility in the new Jail Management System, starting with the date the new Jail Management System becomes operational. | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| 37.d. (49) | CCDOC shall provide training and access to all correctional officer supervisors on the full capabilities of the new Jail Management System's classification and inmate tracking system (or any replacement system). | | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| 37.e. (50) | CCDOC shall provide ongoing internal and external review and validation of the inmate classification system to ensure its reliability and objectivity. | | x7/12 | x 9/10 x 3/11 x 8/11 x12/11 |
| **38.** | **Inmate Grievance Procedure** | | | |
| 38.a. (50) | CCDOC shall maintain policies and procedures to ensure inmates have access to an adequate grievance process and to ensure that grievances may be accessed and filed confidentially, without requiring the intervention of a correctional officer, in accordance with generally accepted correctional standards.   These policies and procedures should be applicable and standardized across all the Facility divisions. | x8/11 x12/11 x7/12 | x 9/10 x 3/11 | |
| 38.b. (52) | CCDOC shall ensure that the grievances receive appropriate follow-up, including informing the grievant of the outcome, providing a timely written response, and tracking implementation of resolutions. | x 8/11 x12/11 x7/12 | x 9/10 x 3/11 | |
| 38.c. (52) | CCDOC shall ensure that grievance forms are available on all units and are available in Spanish. CCDOC shall ensure that there is adequate opportunity for illiterate inmates and inmates who have physical or cognitive disabilities to access the grievance system. | x 8/11 x12/11 x7/12 | x 9/10 x 3/11 | |
| 38.d. (53) | CCDOC shall ensure that inmate grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria, are referred for investigation.  A member of the management staff shall review the grievance tracking system regularly in order to identify areas of concern. | x 8/11 x12/11 x7/12 | x 3/11 | x 9/10 |
| **39.** | **Access to Information** | | | |
| 39.a. (53) | CCDOC shall ensure that newly admitted inmates receive information, through an inmate handbook or orientation video, regarding the following areas:  facility rules and regulations; how to report misconduct; how to report sexual abuse or assault; the process for accessing medical and mental health care; emergency procedures; rules for sending and receiving mail; the visitation process; facility schedule; the disciplinary process; and how to seek redress of | | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | grievances. | | | |
| 39.b. (54) | CCDOC shall ensure that materials on facility rules and services are available for non-literate and non-English speaking inmates. | | x 9/10 x 3/11 x 8/11 x12/11 x7/112 | |
| 40. (55) | CCDOC shall provide training and supervision to all correctional officers and supervisors sufficient to implement the provisions of this Agreed Order. | x 8/11 x12/11 x7/12 | x 9/10 x 3/11 | |
| 41. (54) | Inter-Agency Agreement<br>a.　CCDOC shall enter into a written Inter-Agency Agreement with Cermak that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility.  The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order.<br>b.　Cermak shall enter into a written Inter-Agency Agreement with CCDOC that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility.  The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order. | x 8/11 x12/11 x7/12 | x 3/11 | x 9/10 |
| 69. (54) | CCDOC shall ensure that security staff posts will be equipped, as appropriate, with readily available, safely secured, suicide cut-down tools. *Coordinate with Dr. Metzner | x 8/11 x12/11 x7/12 | | x 9/10 x 3/11 |

31. Use of Force

a. CCDOC shall maintain comprehensive and contemporary policies and procedures, in accordance with generally accepted correctional standards, surrounding the use of force and with particular emphasis regarding permissible and impermissible uses of force.

**July 2012 Status Update:** Substantial Compliance

**Status Update:** All relevant policies were implemented effective 9/19/2011.

**Monitor's Assessment:** CCDOC and CCSO are continually evaluating the implementation issues for the 2011 revisions to the use of force policies. As such, the Use of Force Review Unit (UFRU) has developed recommendations for updating the policies/procedures and for training. CCDOC reports that there has been a 44% decrease in use of force comparing the first six months of 2011 and 2012, and a 42% decrease in the response to resistance in those same time periods (source not identified).

Concern is that there still is not a single source of readily available/accessible data about the number of uses of force, allegations of excessive force, and the outcomes of the investigations. CCDOC is aware of this and is working to develop an effective consolidated approach between the UFRU and the Office of Professional Responsibility (OPR).

For the record, data provided by OPR for the period December 2010 through July 2012 is as follows: 309 investigations into allegations of excessive use of force; 50 unfounded; 25 sustained; 135 not sustained; 19 information only; 11 exonerated; and 69 administratively closed.[5]

OPR reports 15 investigations opened regarding allegations of use of excessive force in CY 2012 (January 25 – June 11, 2012). Data from the UFRU reports 113 use of force events between January and April 2012. What is needed is a report of the data about use of force, and allegations of excessive use of force without having to go to two different sources. Also quality control and auditing should be in place to insure that all events are accounted for in the data.

CCDOC and CCSO are commended for establishing the Use of Force Review

---

[5] CCSO definitions are: <u>Sustained</u>. The preponderance of the evidence developed during the course of the investigation support the allegation(s); <u>Not Sustained</u>. The preponderance of the evidence developed during the course of the investigation does not support the allegation(s); <u>Unfounded</u>. The alleged incident did not happen; <u>Exonerated</u>. The alleged incident occurred but the actions taken were legal and warranted; <u>Information Only</u>: The misconduct alleged did not involve a CCSO employee; <u>Closed Administratively</u>: The investigation is a duplicate of an already existing investigation or is an administrative review of an incident that was conducted by OPR and it was determined that there was no misconduct on the part of a CCSO employee.

Unit within the Office of Policy and Accountability. As the staff assigned to the unit gains experience with monitoring, the recommendations will help the organization analysis the uses of force, and surface issues to policy makers and leaders.

The grievance process is undergoing further review and updating. This process needs to assure that inmate allegations of use of force/excessive force, are promptly reported and logged.

**Monitor's Recommendations:** Continue refining implementation and draft revisions as necessary. Examine the findings and recommendations of the UFRU, evaluating the data presented in their reports. Focus on the data collection about uses of force, locations, witnesses, circumstances, allegations of excessive force, and investigations – and a *single* source/point of data.

## 31. Use of Force

b.      CCDOC shall maintain use of force policies and pre-service and in-service training programs for correctional officers and supervisors that address the following impermissible uses of force:
1.      use of force as a response to verbal insults or inmate threats where there is no immediate threat to the safety of the institution, inmates, or staff;
2.      use of force as a response to inmates' failure to follow instructions where there is no immediate threat to the safety of the institution, inmates, or staff, unless CCDOC has attempted a hierarchy of nonphysical alternatives that are documented;
3.      use of force as punishment or retaliation;
4.      use of force involving striking, hitting, or punching a restrained and  non-combative inmate;
5.      use of force against an inmate after the inmate has ceased to offer resistance and is under control;
6.      use of choke holds on an inmate, unless lethal force is justified; and
7.      use of inappropriate or excessive force.

**July 2012 Status Update:** Substantial compliance.

**Status Update:**

CCDOC continues to train employees. Since the last report to the Court the CCDOC has implemented a field training program which will further assess new officers' understanding regarding use of force. The UFRU has developed recommendations for additional training for supervisors regarding completion of use of force reporting forms and procedures.

The UFRU notes that representatives of the Unit have attended 97% of in-service training to remind/update employees regarding reporting requirements.

The UFRU has also conducted the first remedial training with the topic of use of force for employees (2 supervisors; 3 officers) whose supervisors believed

needed a refresher on documentation. The UFRU reports that they are auditing use of force documentation to identify for themselves any employees they believe can benefit from remedial training.

**Monitor's Assessment:** CCDOC and CCSO is commended for the initial round of training, completed in July 2011 in which all officers were trained regarding the September 2011 use of force policy. CCDOC and CCSO through the UFRU continues to monitor training needs.

I reviewed documentation for eight (8) new employees who are assigned to the CCDOC's new field training program. These Daily Observation Reports indicate that there is close supervision of new officers

**Monitor's Recommendations:** Through the UFRU, CCDOC continues to assess training needs for new employees through the review of the daily and final reports for the field training program. Evaluation of the use of force reports provides the basis for recommendations to improve/update in-service training and supervisory training. In-service training focus should not be just on defensive tactics, but including de-escalation techniques and interpersonal communications (IPC). The IPC training will be increasingly important as CCODC considers further implementation of direct supervision inmate management.

## 31. Use of Force

c.      CCDOC shall maintain a policy to ensure that staff adequately and promptly report all uses of force, in accordance with generally accepted correctional standards.

**July 2012 Compliance Status:**  Substantial Compliance

**Status Update:**  See 31.a.

**Monitor's Assessment:** CCDOC and CCSO continue to work to ensure that reports are generated, and that the process outlined in the policies concerning reporting is followed. This is an on-going process, which will take continued attention. The UFRU is the vehicle to keep the organization focused on compliance with their own directives.

Another concern I raise is the time it takes now to assemble a complete use of force package. It is reported by the UFRU that sometimes this is four weeks. I provide my concern that is not acceptable; and the UFRU reports they are working to have all packages submitted in 7 days. I will follow-up with this in the future. I anticipate that as employees and supervisors gain more experience with the expectations, the time to submit an acceptable/complete package will be more in line with acceptable practice.

As will be discussed in this report, I remain concerned about the inmate grievance process, and assuring that the process is updated and refined to ensure all inmate allegations of excessive use of force are identified and reported.

In the last report to the Court I noted that there was a backlog of use of force packages in CCDOC that were pending leadership review, and that this review process delayed logging the incidents at OPR. At that time, this backlog was approximately 100 use of force incident report packages. Since that time, CCDOC has developed a process with an Executive Director's log sending notification to OPR to log the reports immediately (no more than 24 hours) upon notification via channels in CDOC. When the CCDOC leadership review is completed the entire package is forwarded to OPR. This process is facilitated with an OPR notification form used by the UFRU. At the time of this tour there were fewer than 10 reports pending leadership review in CCDOC, but they were reported as logged by OPR.

The UFRU has recommended revisions to the 2011 policies/procedures, based on the first year of experience with the written directives, to improve/streamline reporting.

It is not clear how IMACS will assist with reporting of uses of force in a subset of the incident-reporting module. Further automating the reporting through a management information system is desirable.

**Monitor's Recommendations:** Continue monitoring the implementation of the use of force directives and specifically the reporting issues.

## 31. Use of Force

d.      CCDOC shall require that use of force reports:

1. Be written in specific terms in order to capture the details of the incident;
2. Contain an accurate account of the events leading to the use of force incident;
3. Include a description of the instrument(s) of restraint or control, if any, and the manner in which it was used;
4. Note whether an inmate disciplinary report was completed in connection with the incident that prompted the use of force;
5. Describe the nature and extent of apparent and reported injuries sustained both by the inmate and staff member;
6. Contain the date and time medical attention was actually provided;
7. Describe, in detailed, factual terms, the type and amount of force used as well as the precise actions taken in a particular incident; and
8. Note whether a use of force was videotaped. If the use of force is not videotaped, the reporting correctional officer and supervisor will provide an explanation as to why it was not videotaped.

**July 2012 Compliance Status:** Substantial compliance.

**Status Update:** See 31.a.

**Monitor's Assessment:** CCDOC and CCSO through the Use of Force Review Unit (UFRU) is monitoring reporting and identifying issues. The policy is in place, and implementation is improving with experience and leadership oversight, and through the work of the UFRU.

**Monitor's Recommendations:** Continue monitoring compliance via the URFU.

I recommended to CCDOC in January 2012 that they monitor/ track uses of force involving mental health clients [as identified by CERMAK]. The URFU provided some of this data in their most recent draft report, but I believe more work is necessary in collaboration with Cermak to assure that this important data is tracked, analyzed, and changes made, if necessary, to staff assignment, supervision, and/or training.

## 31. Use of Force

e.      CCDOC shall continue to require prompt review by the shift commander of all use of force reports. The shift commander's review of use of force reports shall include review for completeness and procedural errors, as well as review of the substantive content. If the use of force report does not comply with provision 31.d. of this Agreed Order, the shift commander shall return it to the reporting officer for revision and resubmission until it is compliant. If the shift commander believes a use of force may have been inappropriate or excessive, he or she shall immediately refer the incident for investigation.

**July 2012 Compliance Status:** Substantial compliance

**Status Update:** Policy requires the review.

**Monitor's Assessment:** See comments under 31.c.

The UFRU provided me with a summary since December 2012 of nine instances where CCDOC leadership (in these instances the superintendent level) identified discrepancies in the use of force reports based on their review of the package. Among the reasons cited by the leadership in returning the package were: statements from the detainee do not reflect the statements made by staff; detainee interview conflicts with the account of incident made by staff, videotape cuts out during incident (2), videotape did not agree with statements, etc. This is documentation that not only is the review taking place, but it is addressing substantive issues. These issues then become the basis for recommendations to further refine policy, training, and supervision related to use of force events.

**Monitor's Recommendations:** Although policy requires this review, and even through supervisors have been trained (and some re-trained), the UFRU notes that there are deficiencies in the process; even when the reports have passed through the supervisors/shift commanders. There is a process in place not only to find discrepancies and non-compliance with policy, but an accountable organizational mechanism to address it. The UFRU will continue to monitor and produce reports.

## 31. Use of Force

f.      CCDOC shall ensure that senior management review of uses of force includes:

1.      A timely review of medical documentation of inmate injuries, if any is submitted, as provided by Qualified Medical Staff, including documentation surrounding the initial medical encounter, an anatomical drawing that depicts the areas of sustained injury, and information regarding any further medical care;
2.      The inmate disciplinary report, if any, associated with the use of force; and
3.      The incident report, if any, associated with the use of force.

**July 2012 Compliance Status:**   Substantial compliance.

**Status Update:**   The change since the last report to the Court is that the CCDOC leadership is assuring that reports are more timely logged at OPR, and not being held up in terms of logging pending the review by senior management.

**Monitor's Assessment:**   Senior management is diligent in these efforts, and their work is supported by the information and data from the UFRU.

**Monitor's Recommendations**:  Continue monitoring by senior management; refine the data included in the report of the Use of Force Review Unit; and respond to the Unit's recommendations.

## 31. Use of Force

g.      CCDOC [and Cermak] shall establish criteria that trigger referral for inappropriate or excessive use of force investigations, including but not limited to, documented or known injuries that are extensive or serious; injuries involving fractures or head trauma; injuries of a suspicious nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.); and injuries that require treatment at outside hospitals.

**July 2012 Compliance Status:**   Substantial compliance.

**Status Update:**  See July 2011 report.

**Monitor's Assessment:** During an interview with Cermak (Puisis, Marshall, Mennella), there were no concerns voiced that their referrals to OPR are not addressed.    As noted in previous reports, Cermak requested, and OPR agreed

to provide formal acknowledgements to Cermak-filed reports of suspicions of excessive use of force.  While this has been done, the last element requested by Cermak was notification by OPR when the investigation was closed. OPR will follow-up with that to be sure notification is provided.

**Monitor's Recommendations**:  Refine the policy that requires that OPR acknowledge Cermak's referrals and case closures in writing.  This notification will not include the incident disposition, other than what is public record.

The UFRU reported that 148 inmates had been sent to the hospital following a use of force since Sept 2011.  I requested more information on this process and the outcomes.  The UFRU staff report this information is not tracked, and the Unit's understanding is that the decision to move an inmate to an outside hospital is a Cermak decision.  More information is needed about the outcomes.

## 31. Use of Force

h.      When CCDOC review of use of force reports, and supporting records if applicable, reveals that reports of a use of force are materially inconsistent, conflicting, or suspicious, CCDOC shall refer that use of force incident for internal investigation.

**July 2012 Compliance Status:**   Substantial Compliance.

**Status Update:**  See July 2011 report.

**Monitor's Assessment:**  See 31.e. The UFRU reports that one of their goals is to follow-up on inconsistencies and conflicts in reports.  If there are material inconsistencies, these matters are often referred to OPR for review as well.

**Monitor's Recommendations**:  The UFRU continue to track the deficiencies in reporting and develop recommendations for training and employee remediation; assure that where inconsistencies are "suspicious" that the matter is referred to OPR for further review.

## 31. Use of Force

i.      CCDOC shall develop and implement a system to track all incidents of use of force that, at a minimum, includes the following information:

1.      a tracking number;
2.      the inmate(s) name;
3.      housing assignment;
4.      date;
5.      type of incident;
6.      injuries (if applicable);
7.      medical care provided (if applicable);
8.      staff involved;
9.      reviewing supervisor;
10.     external reviews and results (if applicable);

11.     remedy taken (if appropriate); and
12.     administrative sign-off.

**July 2012 Compliance Status:**   Substantial compliance.

**Status Update:**   CCDOC reports that the incident reporting module in IMACS was operational in February 2012, and provided screen shot of information that is now captured.  There is no separate "use of force" module in IMACS.  Because of the nature of reports (multiple issues in the same report, for example, a fire that resulted in a medical emergency) it is difficult to pull discrete events from the data base.  More work will need to be done to create an efficient and accurate way to capture the use of force data.

**Monitor's Assessment:**  IMACS is being implemented on an incremental basis with new modules and features being added as the CCDOC defines more of what they need to collect and analyze operational data.

**Monitor's Recommendations**:  Continue to monitor the effective use of IMACS for incident reporting.  Consider other technological means to capture use of force data.

## 31. Use of Force

j.       CCDOC shall ensure that, promptly following a use of force incident, video or photographs are taken of any and all reported or apparent injuries sustained by inmates and staff.  The video or photographs will be maintained and will be included in the investigation package, if applicable.

**July 2012 Compliance Status:**   Substantial compliance

**Status Update:**   See July 2011 report.

**Monitor's Assessmen**t:  The UFRU identified in their last report concerns about the availability of cameras.  On follow-up by me,  the UFRU noted that the matter appears to be resolved.  The important aspect is that the agency is evaluating this on a continuing basis.  As more video cameras are installed, this resource might provide additional supporting documentation.

**Monitor's Recommendations:**  Continue to monitor compliance.

## 31. Use of Force

k.       CCDOC shall establish an "early warning system" that will document and track correctional officers who are involved in use of force incidents and any complaints related to the inappropriate or excessive use of force, in order to alert CCDOC administration to any potential need for retraining, discipline, problematic policies, or supervision lapses.  Appropriate CCDOC leadership, supervisors, and investigative staff shall have access to this information and monitor the occurrences.  CCDOC senior management shall use information from the early

warning system to improve quality management practices, identify patterns and trends, and take necessary corrective action both on an individual and systemic level.

**July 2012 Compliance Status:**   Substantial compliance.

**Status Update:**   CCDOC General Order 24.9.16.0, Use of Force Alert and Early Warning Intervention was effective on January 4, 2012.  The Order addresses the information required in the 31.k.   Three individuals were identified through the early warning system, and provided remedial training (as identified in the UFRU's report).

**Monitor's Assessmen**t:   See also 31.b. A concern, which I expressed to CCDOC is that the CCODC pay attention to employees who may be witnesses to uses of force in one incident, and the involved employee in another.  IAPro should be able to track the number of times the names of individuals are linked to uses of force – even as a witnesses.  In the investigations I reviewed at OPR, this became an apparent need, as even in a review of randomly selected case files, the same individuals were involved.

**Monitor's Recommendations:**  Provide a report during the December 2012 tour regarding the number of referrals, the reason, and outcomes.  Assure that the agency is monitoring all staff involved with uses of force, even as witnesses, and evaluate.

## 31. Use of Force

l.        CCDOC shall ensure that a supervisor is present during all pre-planned uses of force, such as cell extractions.

**July 2012 Compliance Status:**   Substantial compliance

**Status Update:**   See July 2011 report

**Monitor's Assessmen**t:  The relevant written directive has been implemented.

**Monitor's Recommendations:**  Continue to evaluate compliance.

## 31. Use of Force

m.        Where there is evidence of staff misconduct related to inappropriate or unnecessary use of force against inmates, CCDOC shall initiate personnel actions and seek disciplinary action appropriately for any correctional officer found to have:

1.        engaged in inappropriate or excessive use of force;
2.        failed to report or report accurately the use of force;
3.        retaliated against an inmate or other staff member for reporting an inappropriate or excessive use of force; or
4.        interfered or failed to cooperate with an internal investigation regarding use of force in a manner inconsistent with the staff member's statutory or contractual rights.

**July 2012 Compliance Status**:  Substantial compliance

**Status Update:**  Data provided by OPR notes that since September 2010, 25 investigations into allegations of excessive force have been sustained.  Of that number, 2 incidents resulted in separation/termination; 2 in suspensions of 6 – 10 days; 12 in suspensions of 21 – 30 days; 3 in suspensions of 11 – 20 days; 3 in suspensions of 1 – 5 days; and 3 reported as more than 30 days.  This is not optimal data in describing the exact employee discipline, but does point to personal actions taken.

**Monitor's Assessmen**t:  Although I have no comparison data from prior years, CCDOC and CCSO are disciplining employees when the allegations of excessive force are sustained.

**Monitor's Recommendations**: Continue to refine data collection and analysis

### 31. Use of Force

n.       Where there is evidence of staff misconduct related to inappropriate or unnecessary use of force against inmates, CCDOC shall consider, develop, and initiate systemic remedies as appropriate.

**July 2012 Compliance Status:**  Substantial compliance

**Status Update:** CCDOC continues to monitor compliance.

**Monitor's Assessmen**t:  The investigation of inappropriate and/or unnecessary uses of force are reviewed not only by the Office of Professional Responsibility, but also by the Use of Force Review Unit.  In addition to the Sheriff's weekly accountability meeting, this provides multiple systemic levels of review.  As the UFRU refines their data collection and analysis, I recommended including analysis of the specific location of the incidents (housing unit, sally port, hall, elevator, stair way, etc.), which they have agreed to do, in their reporting.  The Unit in its most recent report included data regarding use of force by: the time of day, day of week, staff characteristics, inmate characteristics, division, rank of officer involved, type of force, type of weapon possessed by the inmate, if any, and injuries.   The Unit is also reviewing the uses of force involving mental health clients, including those clients not held in housing designated as mental health.

**Monitor's Recommendations:**  Update reporting by the UFRU to include those items noted above.

### 31. Use of Force

o.       CCDOC shall maintain accountability policies and procedures for the effective and accurate maintenance, inventory, and assignment of chemical and other security equipment,

in accordance with generally accepted correctional standards.

**July 2012 Compliance Status:**   Substantial compliance.

**Status Update:**  The written directives referenced in the July 2011 report have been implemented.

**Monitor's Assessmen**t:  I did not have time to evaluate compliance with the directive during the last tour.  There is no evidence to suggest this is a concern at this time;  will be reviewed in December 2012.

**Monitor's Recommendations:**   None at this time.

## 31. Use of Force

p.       CCDOC shall continue to conduct use of force training in accordance with generally accepted correctional standards, including:

1.       CCDOC shall maintain an effective and comprehensive use of force training program.
2.       CCDOC shall continue to ensure that correctional officers receive adequate training in CCDOC's use of force policies and procedures, including de-escalation and defensive tactics relating to use of force.
3.       CCDOC shall continue to ensure that correctional officers receive pre-service and in-service training on reporting use of force and completing use of force reports.

**July 2012 Compliance Status:**   Substantial compliance.

**Status Update:**  See 31.b.  Training needs to extend to focusing on de-escalation techniques and interpersonal communications training.

**Monitor's Assessmen**t:  CCDOC is providing training and monitoring the impact. This analysis results in recommendations for training from the UFRU.  The field training program has been implemented, and will provide 6 weeks of intensive supervision of new employees.

**Monitor's Recommendations:**  Continue to analyze uses of force and develop training recommendations.  Assure that the CCDOC pays attention to communication skills training as well as defensive tactics.   I suggest that the Academy evaluate the uses of force, including the investigations into allegations of excessive force to attempt to drill down into the triggering event – to determine the extent to which improved communication skills of officers may help avoid uses of force.

## 31. Use of Force

q.       CCDOC shall provide a process for inmates to report allegations of the inappropriate or excessive use of force orally to any CCDOC staff member; said staff member shall give the inmate the opportunity to reduce his or her report to writing through a grievance or complaint

form without discouragement.

**July 2012 Compliance Status:**   Partial compliance.

**Status Update:**  The policies and procedures reported in July 2011 have been implemented.

**Monitor's Assessment:**  Partial compliance is continued since the last report because the CCDOC is still settling the roles and responsibilities of CRWs.   I reviewed inmate grievances and found several instances where the inmate alleged excessive use of force; but the matter had not been referred per policy. See the discussion in the Grievance Section of this report.  I point to my interviews with several CRWs and review of grievance forms.  The policies are in place, but there are issues with implementation.  CCDOC is examining the issues and will have a remedial plan for my review by 9/1/12.

**Monitor's Recommendation:** Reassess options for the grievance process.

## 31. Use of Force

r.        Following a use of force, when CCDOC staff transport an inmate to receive medical care by Cermak, as necessary, the CCDOC staff member shall inform the Cermak staff member that the inmate was involved in a use of force.

**July 2012 Compliance Status:**   Substantial Compliance.

**Status Update:**  See July 2011 report.

**Monitor's Assessment:**  In interviews with Cermak (Puisis, Marshall, Mennella), this was not surfaced as a concern.  The Interagency meetings provide a forum for any concerns.

**Monitor's Recommendation:**  Continue to monitor compliance.  Review the minutes of the interagency meetings to determine if issues emerge.

## 31. Use of Force

s.        Cermak shall ensure that, when providing medical treatment or assessment to an inmate following a use of force, Qualified Medical Staff document the inmate's injuries, if any, and any medical care provided.  Cermak shall provide CCDOC senior management with a brief summary documenting the initial medical encounter following a use of force, including an anatomical drawing that depicts the areas of sustained injury, if any, and information regarding any further medical care.

**July 2012 Compliance Status:**   Substantial compliance.

**Status Update:**  See July 2011 report.

**Monitor's Assessmen**t:  See July 2011 report.  I did not evaluate the treatment space; not interview Cermak about this matter due to time constraints during the tour.  I believe if Drs. Shansky and Metzner heard any concerns, they would have passed them on to me.  The Interagency regularly scheduled meetings provide a forum to surface and discuss problems.

**Monitor's Recommendations:**  Continue to monitor compliance with this paragraph.

## 31. Use of Force

t.       Cermak shall ensure that Qualified Medical Staff question, outside the hearing of other inmates or correctional officers if appropriate, each inmate who reports for medical care with an injury, regarding the cause of the injury.  If, in the course of the inmate's medical encounter, a health care provider suspects staff-on-inmate or inmate-on-inmate abuse, that health care provider shall immediately:
1.       report the suspected abuse to the Executive Director of the Office of Professional Review or other appropriate CCDOC administrator; and
2.       adequately document the matter in the inmate's medical record.

**July 2012 Compliance Status:**   Substantial Compliance

**Status Update:** See 31.s.

**Monitor's Assessmen**t:  See 31.s.

**Monitor's Recommendations:**  Continue to monitor compliance with this paragraph.

## 32.   Safety and Security

a.       CCDOC shall maintain security and control-related policies, procedures, and practices that will result in a reasonably safe and secure environment for all inmates and staff, in accordance with generally accepted correctional standards. Coordinate with Grenawitzke, Shansky, Metzner.

**July 2012 Compliance Status:**  Partial compliance.

**Status Update:**  CCDOC continues to make progress on revising policies and procedures through the Office of Policy and Accountability (OPA).

**Monitor's Assessment:**  OPA provided an update list of written directives at the time of the tour.   On that date when all policies/procedures that have not been updated/revised since the consent agreement have been signed and issued CCDOC will have achieved substantial compliance.  Orders which relate directly to the consent agreement are provided to me for review prior to finalization.

**Monitor's Recommendation:** None at this time. CCDOC is commended for its diligence in this time consuming work.

## 32. Safety and Security

b. CCDOC shall maintain policies, procedures, and practices to ensure the adequate supervision of inmate work areas and trustees, in accordance with generally accepted correctional standards. Coordinate with Grenawitzke.

**July 2012 Compliance Statue:** Substantial Compliance

**Status Update:** The general order has been issued (11.14.1.0 effective 10/14/11) which provides the primary proof of compliance for this paragraph.

**Monitor's Assessment:** This response is in collaboration with Monitor Harry Grenawitzke. Both his and my assessment is that the new processes put in place after the December 2011 tour have resulted in appropriately cleaned facilities, and inmates who were supervised by employees.

**Monitor's Recommendations:** Continue to monitor compliance with the directives.

## 32. Safety and Security

c. CCDOC shall ensure that security staff conduct appropriate rounds with sufficient frequency to provide inmates with reasonable safety. Rounds shall be conducted at least once every half hour, at irregular intervals, inside each housing unit. In the alternative, CCDOC may provide direct supervision of inmates by posting a correctional officer inside the day room area of a housing unit to conduct constant surveillance. More frequent rounds shall be conducted for special management inmates who require more intensive supervision for security and safety reasons. All security rounds shall be documented on forms or logs that do not contain pre-printed rounding times. Video surveillance may be used to supplement, but must not be used to replace, rounds by correctional officers.

**July 2012 Compliance Status:** Partial compliance.

**Status Update:** The directives noted in the July 2011 report have been issued and implemented.

**Monitor's Assessment:** I retain concerns about the timeliness and thoroughness of rounds. I will mark this area for priority review during the December tour.

**Monitor's Recommendations:** No specific recommendations at this time.

## 32. Safety and Security

d. CCDOC shall ensure that security supervisors conduct daily rounds in the inmate housing units, and document the results of their inspections.

**July 2012 Compliance Status:** Partial compliance.

**Status Update:** See 32.c.

**Monitor's Assessmen**t: No specific recommendations at this time.

**Monitor's Recommendations:** See 32.c.

## 32. Safety and Security

e. Cook County shall increase the use of overhead video surveillance and recording cameras to provide adequate coverage throughout the common areas of the Facility, including the RCDC, all division intake areas, mental health units, special management units, inmate housing units, and in common areas of the divisions.

**July 2012 Compliance Status:** Partial Compliance

**Status Update:** The project manager Joan Kunz noted that the contract for the video cameras and recording systems should be awarded by the County on 9/20/12. The total amount of the project is $7.5 million. Once begun it is estimated to take 11 months to complete. Approximately 1,200 cameras will be added throughout CCDOC.

**Monitor's Assessment:** The project has experienced delays for various bureaucratic reasons but now appears to be on track.

**Monitor's Recommendations**: Continue with implementation strategies.

## 32. Safety and Security

f. CCDOC shall maintain a procedure to prevent inmates from possessing or having access to dangerous contraband, including conducting regular inspections of cells and common areas of the housing units to identify and prevent rule violations by inmates.

**July 2012 Compliance Status**: Partial compliance

**Status Update:** CCDOC has been innovative and aggressive at identifying and addressing the sources of contraband. The updated general order (24.7.1.0 – Contraband) will be effective October 4, 2012. An interagency tool control policy (with DFM) was finalized in July 2012, which included a trial period to assess an operational option to have all keys available at all times to security staff. The pilot will be assessed throughout the coming months.

**Monitor's Assessmen**t: Substantial compliance is pending completion the trial period of the pilot program.

**Monitor's Recommendations:** Complete the review of the pilot program from

tool control/tool room access.  Develop the Interagency agreement, refine, and update the relevant CCDOC written directive.

## 32.    Safety and Security

g.        CCDOC shall review, and revise as applicable, all General Orders ("GOs"), Standard Operating Procedures ("SOPs"), and Post Orders on an annual basis, or more frequently as needed.

**July 2012 Compliance Status:**   Substantial Compliance

**Status Update:**  See July 2011 report.

**Monitor's Assessmen**t: See July 2011 report.

**Monitor's Recommendations:**  Process is in place.  No recommendations at this time.   Continue to appropriate resource OPA.

## 32.    Safety and Security

h.        CCDOC shall revise policies, SOPs, and post orders for all armed posts to include proper use and safe handling of weapons and provide specific instructions on use of deadly force and when and under what circumstances such force should be used, in accordance with generally accepted correctional standards.

**July 2012 Compliance Status:**   Substantial Compliance.

**Status Update:**  See February 2012 report.

**Monitor's Assessmen**t:  Proceeding with the annual review process.

**Monitor's Recommendations:** No recommendations at this time.

## 32.    Safety and Security

i.        CCDOC shall standardize security policies, procedures, staffing reports, and post analysis reports across the divisions, to the extent possible, taking into account the different security levels and different physical layouts in the various divisions.

**July 2012 Compliance Status:**   Partial compliance

**Status Update:**   All appropriate policies and procedures have been implemented except for classification/intake – which are in the process of major updating.

**Monitor's Assessmen**t:   Work continuing.  When the classification and intake issues are settled this paragraph will be in substantial compliance.

**Monitor's Recommendations:**   None at this time.

## 32.    Safety and Security

j.        CCDOC shall provide formal training on division-specific SOPs to correctional officers in accordance with their assignments, and shall provide further specialized training for officers assigned to Special Management Units.  Cermak Hospital shall provide specialized training for officers assigned to psychiatric units. [From Consent agreement "Special Management Units" means those housing units of the Facility designated for inmates in administrative or disciplinary segregation, in protective custody, on suicide precautions, or with mental illness."] Coordinate with Drs. Shansky and Metzner.

**July 2012 Compliance Status:** Substantial Compliance.

**Status Update:** See 32.i.  Dr. Shansky and Dr. Metzner are satisfied with the training provided to officers working in Cermak.

**Monitor's Assessmen**t: I assess this paragraph as substantial compliance as the training is provided;  but continue to have concerns about the level of disorder in the mental health units.   There is a disconnect, in my opinion, between what is trained, and how the units are managed, collaboration between Cermak and CCDOC, and how both staffs are supervised. I reviewed several months of reports as provided for the Sheriff's weekly accountability meetings to document the number of incidents.   I spent time in one mental health unit during this tour to assess why this is occurring.  I also requested, and CCDOC provided a first look at uses of force in the MH units; which is disproportionate to the percentage of inmates/uses of force.

**Monitor's Recommendations:** The monitors are meeting in person in October and this is a topic I will propose for the agenda.  I have been conferring with Dr. Metzner about this.  I hear from Cermak that there is insufficient program space in Division X; thus fewer options for improving inmate behavior.  I don't agree with that position, and the Superintendent in Division X notes that space is available.  I understand that 30 of Cermak's current vacancies are mental health workers.   More needs to be done, including transition planning for how the mental health units will be managed in the new RCDC building, slated for opening in May 2013. More coordination, problem-solving and evaluation is necessary.

## 32.    Safety and Security

k.        CCDOC shall maintain in working order all monitoring equipment at the Facility that is under CCDOC's direct control, including cameras, alarms, radios (hand held), interior and exterior lighting, x-ray and other screening equipment, and walk-through metal detectors.  To the extent that the maintenance of any Facility monitoring equipment is under the control of DFM, CCDOC shall promptly report any maintenance needs and DFM shall prioritize its services

to ensure that all monitoring equipment is maintained in working order.  Coordinate with Grenawitzke.

**July 2012 Compliance Status:**  Substantial Compliance.

**Status Update:** DFM has put a work order system in place that includes the equipment referenced in this paragraph.

**Monitor's Assessmen**t:  Monitor Harry Grenawitzke is satisfied that the DFM/CCDOC work order process addresses maintenance needs.

**Monitor's Recommendations:**  Assess the extent to which equipment is not working during tours of the facilities;  review work order records;  determine if additional adjustments to the system or to resources are needed.

## 32.    Safety and Security

l.        Absent exigent circumstances, CCDOC:  (i) shall house each inmate assigned to a division that is celled to one permanent bed in a cell and shall not house any inmates (including those assigned to dormitory divisions) such that they are sleeping on the floor, on a mattress on the floor, or in any area not designed or redesigned as sleeping quarters; (ii) shall not house more than two inmates to a single cell (triple-bunking); and (iii) shall not hot-bunk any inmates.

**July 2012 Compliance Status:**  Substantial Compliance.

**Status Update:**  No update since July 2011 report.  But the crowding being faced by CCDOC will stress this requirement.

**Monitor's Assessmen**t:  I am monitoring the crowding which has forced the re-opening of previously closed units.  CCDOC has a plan for managing the population short term (dated July 16, 2012); but the jail's population management is a criminal justice system issue for Cook County, not solely the Sheriff's issue.

**Monitor's Recommendations:** No other recommendations at this time.  See Executive Summary of this report.

## 32.    Safety and Security

m.        When exigent circumstances give rise to triple-bunking, CCDOC shall provide the third inmate in the triple-bunked cell a "boat," stackable bunk, moveable platform, or cot, so that the inmate is not required to lay down directly on the cell floor or on a mattress on the floor.

**July 2012 Compliance Status:**  Substantial Compliance

**Status Update:**  See 32. l.

**Monitor's Assessmen**t:  See 32.1.

**Monitor's Recommendations:** See 32.l.

**33.    Security Staffing.** The parties agree that correctional officer staffing and supervision levels at the Facility must be appropriate to adequately supervise inmates, to carry out the requirements of this Agreed Order, and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards.  Cook County and CCDOC shall take such actions as shall ensure that correctional officer staffing and supervision at the Facility are sufficient to achieve these purposes. These actions shall include the following:

a.    In the fiscal year 2010 budget, Cook County shall allocate funds sufficient to allow for 210 additional correctional officer positions at the Facility.  Consistent with provision 33.c, such funding may occur on a rolling basis, as appropriate in light of the time required to hire, train, and put on duty the additional 210 new correctional officers.

**July 2012 Compliance Status:**  Substantial Compliance

**Status Update:**  The CCDOC is, for all intents and purposes, fully staffed based on the current staffing activities, to include the projected civilian and sworn hiring.

**Monitor's Assessment:**  On December 1, 2009, CCDOC reported 495 vacancies; on July 18, 2012, they reported 15 vacancies; including 48 recruits in the pre-service academy.  There are plans to accommodate up to 397 additional new hires in the pre-service academy through early 2104.   This is commendable and remarkable progress that has by all accounts resulted in a higher quality of new hire as measured by academic success at the academy and the results of the probationary year.

The challenge for hiring will remain competition with law enforcement positions as hiring opportunities improve in the region (e.g. CPD), as well as pending retirements (possibly as many as 48).

There are 27 employees on disability, which will be appropriately permit these positions to be filled.

The CCSO has been monitoring use of sick leave and absenteeism and the centralized roster management allows for more effective deployment of employees.  CCDOC estimates that since its inception in 2011, the centralized roster management system has saved close to $2.5 million in overtime (as of May 28,2012).  These overtime savings are diminishing because of the staffing required by the current critical crowding.

**Monitor's Recommendation:**  Continue monitoring hiring and attrition.  Pay attention to the need for leadership development as supervisors, managers and leaders retire.

**33.    Security Staffing.**

b.        CCDOC shall use its best efforts (through the maintenance of the written staffing plan required by provision 33.h and otherwise) to ensure that the number of correctional officer vacancies is kept to the minimum practicable number at all times, taking into account that the timing of terminations and resignations and the resulting rate of attrition may, in ordinary course, result in there being some vacancies at any given time.

**July 2012 Compliance Status:**  Partial compliance

**Status Update:**  CCDOC updated their staffing plan, dated July 2012, and included updated shift relief factors.  The formula used for computation of the shift relief factor requires updating to use all the factors considered accepted practice in a jail setting.  This information has been provided to CCDOC.

The proposed draft includes an additional 273 officers.   The plan does not include the staffing plan for the new RCDC, or any subsequent reallocation of the physical plant in the old RCDC.

**Monitor's Assessmen**t:   CCDOC knows what needs to be done to complete the staffing plan.

**Monitor's Recommendations**:  Refine the proposal; finalize.

## 33.     Security Staffing.

c.        CCDOC shall fill the 210 additional correctional officer slots provided for in provision 33.a; fill the 285 correctional officer vacancies that existed at the Facility as of July 17, 2009; and fill any correctional officer vacancies coming into existence after that date in the following manner:
        i.        By December 31, 2010, CCDOC shall hire, train, and put on duty at the Facility at least 448 [381] newly qualified correctional officers (in addition to those on duty as of December 31, 2009).
        ii.        By March 30, 2011, CCDOC shall hire, train, and put on duty at the Facility at least 178 [107] newly qualified correctional officers (in addition to those on duty as of December 31, 2010).

**July 2012 Compliance Status:**  Substantial Compliance.

**Status Update:**   See 33.a.

**Monitor's Assessmen**t:  See 33.a.

**Monitor's Recommendations:**  See 33. a. and 33.b.

## 33.     Security Staffing.

d.        The parties agree that for 30 months following the effective date of this Agreed Order, Cook County and CCDOC shall not be required to provide additional correctional officer staffing and supervision at the Facility beyond that which is necessary to ensure that correctional

officer staffing and supervision are sufficient to achieve the purposes set out in the introductory paragraph of provision 33 and to comply with provisions 33.a-c above.

**July 2012 Compliance Status:**   This provision will be in effect on November 13, 2012.  There is not now a finalized plan from CCDOC.  The plan examines and proposed staffing, but does not analyze the span-of-control – that is, officer/supervisor ratios, or provide rationale to support the current supervisory/management deployment.

**Monitor's Assessmen**t:  This matter needs resolution in the face of some daunting challenges, which include the current crowding; the need for a transition plan/staffing for the new RCDC; the change to direct supervision in Division XI; and the unknown use of the old RCDC.   At the same time – there is a need for flexibility and recognition of the fiscal issues facing the County.  I believe that the current thinking at the County-level is that no new staff will be needed.  There is no document that supports that, and in the absence of a written, vetted transition plan on how the new RCDC will operate from both Cermak and CCDOC, this could be an erroneous assumption.

I have seen no analysis of the requirements of paragraph 33.g. 2. as related to security staffing to accommodate medical and mental health.

CCDOC is capable of producing a staffing analysis and plan that is consistent with accepted correctional practice.  It is imperative, however, that the County's budget office understand this process and collaborate with CCDOC on future budget requests for staffing.

**Monitor's Recommendations:  <u>See recommendations in the Executive Summary of this report.</u>**

## 33.    Security Staffing.

e.      Within 30 months of the effective date of this Agreed Order, the CCDOC Monitor shall assess and make a recommendation on whether the correctional officer staffing and supervision levels are appropriate to adequately supervise inmates at the Facility, in accordance with generally accepted correctional standards.  If the CCDOC Monitor determines that staffing is inadequate, the CCDOC Monitor will make a recommendation regarding the appropriate number of correctional officer staff.  If the parties do not accept the CCDOC Monitor's staffing recommendation, CCDOC and Cook County shall agree to an independent, comprehensive study to determine the appropriate correctional officer staffing and supervision.  The parties agree that the results of this staffing study shall provide guidance as to the sufficient number of qualified correctional officers necessary to operate the Facility safely and to carry out the requirements of this Agreed Order.

**July 2012 Compliance Status:**  See 33.d.

**Monitor's Assessment:**      See 33.d.

**Monitor's Recommendation:**    See 33.d.

## 33.    Security Staffing.

f.        If the staffing study requires additional correctional officers, Cook County shall allocate funds sufficient to maintain correctional officer staffing levels necessary to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards.

**July 2012 Compliance Status:**   See 33. d.

**Monitor's Assessment:**    See 33.d.

**Monitor's Recommendation:**    See 33.d.

## 33.    Security Staffing.

g.        If the staffing study requires additional correctional officers, and consistent with Cook County's allocation of funds for security staffing, CCDOC shall hire and train sufficient number of qualified correctional officers and other staff to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards, including:
1.        Investigative staffing sufficient to meet the internal investigation responsibilities outlined in this Agreed Order;
2.        Correctional officer staffing sufficient to provide inmates requiring treatment with adequate access to appropriate medical and mental health care by providing timely movement of inmates to medical units, transport of inmates who have been referred for outside specialty care, and escort, if necessary, to Qualified Medical and Mental Health Staff on housing units; and
3.        Qualified staff sufficient to monitor security cameras in real time and allow for supervisory viewing and retrieving at any time.

**July 2012 Compliance Status:**   See 33.d.

**Monitor's Assessment:**      See 33.d.   Regarding paragraph 1 of 33.g., I am concerned that there are vacancies at OPR that do hinder the timely investigation of allegations of excessive force.  In May 2010 there were 1200 cases backlogged in OPR, not all use of force cases, but reflective of past practices.  Since that tie, the backlog of cases is 901 (of those 651 are attendance/non-attendance cases) with  686 for than 121 days in OPR.  While this represents an improvement in the backlog, when I reviewed case files I found a number of use of force investigations approaching 12 months in OPR.

There is some disagreement about how many vacancies there are in OPR.  This is because staff are often detailed to OPR bringing their encumbered position with them, not filling a vacancy slotted and/or budgeted to OPR.  So depending on the perspective there may be as few as 4 or as many as 12 vacancies.

However the staffing is allocated to OPR, it needs to be allocated based on the

needs as expressed by the Director, based on the caseload, with the goal of timely investigations of allegations of excessive use of force.

Regarding paragraph 2 of 33.g. CCDOC's Executive Director notes that he has allocated staff to assist with inmate movement to and from medical, and to assure that no outside appointments are missed. He notes that often Cermak is short of staff, making medical administration and other functions difficult. Dr. Puisis reported that Cermak has at least 58 vacancies (not including 30 mental health technicians). It is reported that there is also a challenge in adherence to attendance policy by some Cermak employees, further straining services and raising frustration levels.

**Monitor's Recommendation:**

In regard to paragraph 1 - I recommend that there be a definitive staffing plan established for OPR. The CCSO can allocate staff to OPR based on the best way for CCSO, but insuring that there are always suitable staffing levels of qualified and trained investigators.

In regard to paragraph 2- I recommend this matter for consideration at the Interagency meeting with the goal of defining the security staff needed; and the options for when it appears that either security staff or Cermak staff fall below those levels. Dr. Shansky, Dr. Metzner and I can then evaluate the issues and make recommendations.

### 33.    Security Staffing.

h.       CCDOC shall maintain a written staffing plan that requires sufficient staffing to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards.

**July 2012 Compliance Status:**    Partial compliance.

**Status Update:**  See 33.b.

**Monitor's Assessmen**t:  See 33.b.

**Monitor's Recommendation:**  See 33.b.

### 33.    Security Staffing.

i.       Absent exigent circumstances, CCDOC shall maintain a practice that does not allow for scheduled, planned, or expected cross-watching (a CCDOC practice of allowing one correctional officer to simultaneously supervise two housing units from the control center of one of the units) at any time on all maximum security and Special Management Units, and during first and second shifts throughout the Facility.

**July 2012 Compliance Status:**   Substantial Compliance

**Status Update:**  See July 2011 report.

**Monitor's Assessmen**t:  There have been no deficiencies reported.  The collective bargaining units know how to contact me; and I've received no information from them that the mandates of this paragraph are not being carried out.

**Monitor's Recommendation:**  CCDOC continue to monitor staffing and inmate safety when and if cross watching is used.

## 33.    Security Staffing.

j.        CCDOC may permit cross-watching on third shift in housing units that are not maximum security or Special Management Units only if the Monitor does not object after consultation and review.  The Monitor's review of the appropriateness of third-shift cross-watching on a particular housing unit shall be guided by the sufficiency of sightlines between the units being cross-watched, the adequacy of video and/or audio technologies in place, and/or other factors that bear on the safety and security of inmates and staff.  If the Monitor later objects to any cross-watching that is in effect because of the Monitor's concerns that cross-watching on a particular housing unit presents an undue risk to the safety and security of inmates and staff, CCDOC shall immediately cease such cross-watching.  CCDOC may renew cross-watching on that unit again if, after further consultation with and review by the Monitor, the Monitor does not object to such renewal.  Although cross-watching is permitted under the limited circumstances described herein, CCDOC will work to eliminate the practice at the Facility.

**July 2012 Compliance Status:**   Substantial Compliance

**Status Update:**  See 33.i.

**Monitor's Assessmen**t:  See 33.i.

**Monitor's Recommendation:**  Continue to assess the implementation of the paragraph's requirements.

## 34.    Incidents and Referrals

a.        CCDOC shall continue to ensure that staff adequately and promptly document all reportable incidents, including inmate fights, rule violations, inmate injuries, suicides and suicide attempts, cell extractions, medical emergencies, contraband, vandalism, escapes and escape attempts, fires, and other incidents causing a disruption to standard CCDOC practice, in accordance with generally accepted correctional standards.

**July 2012 Compliance Status:**  Partial compliance

**Status Update:**   See July 2011 report.

The incident reporting module in IMACS is not fully operational, currently in the

test phase and is being used on a "beta" – trial basis.

**Monitor's Assessmen**t  This paragraph will be in substantial compliance with the incident reporting in IMACS is fully implemented.

**Monitor's Recommendation:**  Continue implementation of incident reporting module in IMACS.

### 34.    Incidents and Referrals

b.        CCDOC shall continue to ensure that correctional officers receive formal pre-service and in-service training on proper incident reporting policies and procedures, in accordance with generally accepted correctional standards.

**July 2012 Compliance Status:**  Substantial compliance

**Status Update:**  See July 2011 report.

**Monitor's Assessmen**t:   See comments in the use of force paragraphs about the role of the Use of Force Review Unit, as well as implementation of the field training program.

**Monitor's Recommendations:**  See comments in the use of force paragraphs.

### 34.    Incidents and Referrals

c.        CCDOC shall maintain a system to track all reportable incidents (as described in provision 34.a) that, at a minimum, includes the following information:
  1. incident tracking number;
  2. the inmate(s) name;
  3. housing assignment;
  4. date;
  5. type of incident;
  6. injuries (if applicable);
  7. medical care (if applicable);
  8. primary and secondary staff involved;
  9. reviewing supervisor;
  10. external reviews and results (if applicable);
  11. remedy taken (if appropriate); and
  12. administrative sign-off.

**July 2012 Compliance Status:**   Partial Compliance

**Status Update:**  See July 2011 report.

**Monitor's Assessment:**  See 34.a. Awaiting the incident reporting module in IMACS to be implemented.

**Monitor's Recommendation:**  Implementation of the IMACS module.

## 34.    Incidents and Referrals

d.    CCDOC shall require prompt administrative review of incident reports. Such reviews shall include a case-by-case review of individual incidents as well as a systemic review in order to identify patterns of incidents. CCDOC shall incorporate such information into quality management practices and take necessary corrective action.

**July 2012 Compliance Status:**  Substantial Compliance.

**Status Update:**  All relevant policies are in place.

**Monitor's Assessment:**  See comments under the use of force paragraphs.

**Monitor's Recommendation:**  Continue to UFRU's assessment and analysis of uses of force in making relevant management decisions; along with the Sheriff's weekly accountability meetings.

## 34.    Incidents and Referrals

e.    CCDOC shall ensure that incident reports, use of force reports and inmate grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria, that it is referred for investigation.

**July 2012 Compliance Status:**  Partial Compliance.

**Status Update:**  CCDOC has implemented the policies references in the July 2011 report.

**Monitor's Assessment:** I reviewed grievances from several months and found allegations of excessive uses of force that were not reported by CRWs. Apparently the same trend was identified by the supervisors, who in early May 2012 retrained staff as well as began to document when grievances containing use of force allegations were forwarded to OPR. The log provided to me showed 49 inmate grievances forwarded between May 8 – July 20, 2012.
In my interviews with CRWs I found their understanding of their roles in reporting allegations to be insufficient.

See also comments under paragraphs 31.a. as well as the grievance section of this report.

**Monitor's Recommendation:**  Review options for revising the grievance process. Develop/amend policies/procedures. Retrain staff/supervisors.

## 34.    Incidents and Referrals

f.    CCDOC [OPR] shall maintain policies, procedures and practices requiring investigations to resolve issues identified during review of incident reports, disciplinary hearings, or inmate grievances, and determine appropriate remedies, in accordance with generally accepted

correctional standards.  At a minimum, CCDOC shall require timely and appropriate investigations of all suicides, serious suicide attempts, inmate-on-inmate violence resulting in serious injury, inmate-on-staff violence, inmate injuries requiring treatment by an outside hospital, inmate injuries of a suspicious nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.), sexual misconduct between inmates, sexual misconduct involving staff, fires, escapes, escape attempts, and deaths.

**July 2012 Compliance Status:**  Partial compliance

**Status Update:**   OPR's operational practices are within generally accepted correctional practice; however there are several operational issues and the need for further clarification of roles, responsibilities and timelines.

**Monitor's Assessment:** There has been re-thinking of the role of "department head" investigations for use of force allegations and other serious incidents.  This policy revision is being updated and therefore this paragraph remains in partial compliance.  For example, OPR in 2012 to date has forwarded a total of 107 (7 of which were use of force incidents) "correspondences" to the CCDOC with the goal of collecting more information to inform decisions on how the investigation proceeds. The evolution of the investigative processes for allegations of use of force, and excessive force, is healthy and will ultimately result in solid policies and practices.

**Monitor's Recommendation:**  Continue to refine policy and operational practice regarding what investigations require a full OPR review, and which reviews can be appropriately delegated to the CCDOC.

## 34.    Incidents and Referrals

g.      CCDOC [OPR] shall ensure that any investigation reports indicating possible criminal behavior will be referred to the appropriate law enforcement authority.

**July 2012 Compliance Status:**  Substantial compliance

**Status Update:**  See July 2011 report.

**Monitor's Assessment:**  See July 2011 report.

In interviews at OPR and through file reviews, I see that cases are referred for prosecution, but sometimes prosecution is declined.  In a recent widely reported incident of what appears to be excessive force, initially the prosecutor declined prosecution, even though there was clear visual evidence of a crime (in my opinion).  After my tour, it appears from news reports that a prosecution will occur.

In another file I reviewed, the OPR investigation sustained inappropriate use of force when an officer used an open hand to slap the face of a handcuffed

inmate.  It was referred for prosecution and was declined.  The officer received a 30 day suspension.

**Monitor's Recommendation:**  All OPR can do is conduct credible investigations and refer for prosecution.  CCSO must work with the prosecutors to develop a relationship that will enhance acceptance of cases, and hopefully successful prosecutions.  If a case is not accepted for prosecution, written documentation to the file from the prosecutor is desirable.  OPR should also work with the prosecutor to identify if there were any investigative or circumstantial shortfalls that resulted in the case being declined.

**35.    Investigations** - Investigations at the Facility are conducted by independent departments under the Cook County Sheriff's Office, including the Office of Professional Review, the Criminal Investigations Unit, and the Sheriff's Police Department.  The Cook County Sheriff will assume responsibility for requiring these investigatory units to comply with the relevant provisions of this Agreed Order.

a.      CCDOC [OPR] shall maintain comprehensive policies, procedures, and practices for the timely and thorough investigation of alleged staff misconduct, in accordance with generally accepted correctional standards.

**July 2012 Compliance Status:**   Partial Compliance

**Status Update:** (See 35.e.)

**Monitor's Assessmen**t: The process is evolving in terms of the responsibilities of OPR and CCDOC for use of force incidents and review of allegations of excessive force.  The barrier to substantial compliance is the absence of a single report that addresses the number of allegations of use of force, the allegations of excessive force, and the outcomes.

**Monitor's Recommendations:**  Develop the data reporting system.

**35.    Investigations**

b.      Internal investigations shall be conducted by persons who do not have supervisory responsibility for the staff member(s) being investigated.

**July 2012 Compliance Status**:   Substantial compliance.

**Status Update:**   Since internal investigations are the purview of only OPR, there will not be a circumstance in which an internal investigation (defined as such) will be conducted by any persons who have a supervisory relationship with the employee under investigation.

**Monitor's Assessmen**t:   As defined by CCSO and CCDOC, only OPR will

conduct internal investigations. As such, there will be no supervisory relationship between the investigator and the employee under investigation.

**Monitor's Recommendations:** None at this time.

## 35. Investigations

c.      CCDOC [OPR] shall ensure that all internal investigations will include timely, thorough, and documented interviews of all relevant staff and inmates who were involved in, or witnessed, the incident in question.

**July 2012 Compliance Status**:  Substantial compliance.

**Status Update:** I reviewed 19 files randomly selected in OPR.

**Monitor's Assessmen**t:   The files were in order, organized and documented per OPR's directives.  My concerns were: about the timeliness of investigations, the need to track the names of employee witnesses in use of force investigations, and the instance, noted above, in which, initially, prosecution was declined for an excessive use of force incident.   The source of the allegations included inmate grievance, inmate complaint to OPR, via lawsuits, via an inmate's family member, via citizen complaint, via the CPD Independent Police Review Authority, and one incident in which a supervisor initiated an OPR investigation because of discrepancies he saw in the use of force package/statements.   An investigation was conducted in one citizen initiated complaint in which the complainant had substantial mental illness and the allegations were quite outrageous.   OPR expanded it's investigation in one use of excessive force incident based on an employee's statement during the initial investigation that "it is common practice for  . . . corrections officers assigned to RCDC to slap detainees in order to maintain control . . ."

The employee-related outcomes of incidents from my file review included among others:  immediate suspension, exoneration, 30 day suspension, and recommendation for termination.

**Monitor's Recommendations:**   I have no recommendations for the OPR process other than the unit be appropriately resourced so that the backlog of excessive use of force allegations can be managed, and new cases promptly investigated.

## 35. Investigations

d.      CCDOC [OPR] shall ensure that internal investigation reports shall include all supporting evidence, including witness and participant statements, policies and procedures relevant to the incident, physical evidence, video or audio recordings, and relevant logs.

**July 2012 Compliance Status**:   Substantial compliance.

**Status Update:**  No change since last report.  All in order.

### 35.    Investigations

e.         CCDOC [OPR] shall ensure that all investigatory staff will receive pre-service and in-service training on appropriate investigations policies and procedures, the investigations tracking process, investigatory interviewing techniques, and confidentiality requirements.

**July 2012 Compliance Status**:   Substantial compliance.

**Status Update:**  See 35.a.   As the process is being refined, the staff designated as "investigatory staff" is that assigned/employed in OPR.  They have received training in the past.  Partial compliance was noted in earlier reports as there was a time in which the commanders assigned to each division were to be part of the investigation cadre.  That has changed.  Therefore this paragraph is in substantial compliance.

**Monitor's Assessmen**t:  See 35.a.

**Monitor's Recommendations:**  None at this time.

### 35.    Investigations

f.         CCDOC shall provide all investigators who will be assigned to conduct investigations of use of force incidents with specialized training in investigating use of force incidents and allegations.

**July 2012 Compliance Status**:   Substantial compliance.

**Status Update:**  See 35.a.,e.

**Monitor's Assessmen**t:  No change to previous reports – see status update in 35.e.

**Monitor's Recommendations:**  None at this time.

### 35.    Investigations

g.         CCDOC [OPR] shall ensure that the results of each internal investigation shall be documented in an investigation report.  CCDOC administration shall review the investigation reports, along with the underlying documentation, and take appropriate action.  CCDOC shall implement appropriate remedies based upon the results of internal investigations.

**July 2012 Compliance Status:**   Substantial Compliance.

**Status Update:**   In reviewing OPR policy and 19 files I find that the reports are

documented as required by accepted practice, this paragraph of the consent agreement, and OPR policy.

**Monitor's Assessmen**t:  Reports are in compliance.  The only concerns I have are about the backlog of use of force investigations, staffing and timeliness of investigations.

**Monitor's Recommendations:**  None at this time.

## 36.    Inmate Disciplinary Process

a.       CCDOC shall maintain policies, procedures, and practices for a formal disciplinary process, including prompt issuance of written disciplinary citations, administrative review and disciplinary reports for alleged minor rule violations, and due process for alleged major rules violations, in accordance with generally accepted correctional standards.

**July 2012 Compliance Status:**   Substantial compliance

**Status Update:** Written directive [11.14.8.0] was effective 12/22/11.

**Monitor's Assessmen**t:  This new directive has been in effect for six months.  Due to the time constrains I was not able to assess the impact or view a disciplinary board hearing.  The CCDOC's Monthly Statistics report, a comprehensive summary of operational data, tracks inmate discipline.  This summary is an excellent tool to easily view data about trends and identify issues and concerns.

**Monitor's Recommendations:**  No recommendations at this time.  The inmate handbook is still undergoing revision.  So this process in toto will be complete when that is produced for the inmate population.

## 36.    Inmate Disciplinary Process

b.       CCDOC shall ensure that inmate disciplinary hearings are conducted in a reasonably private and secure setting.

**July 2012 Compliance Status:**   Substantial compliance

**Status Update:**   Directive 11.14.8.0 provides in Section IX. C. 4. that "All inmate disciplinary hearings shall be conducted in a reasonably private and secure setting."

**Monitor's Assessmen**t: I was unable to evaluate the location of hearings on this tour due to time constraints.  I will evaluate in the December 2012 tour. There is no reason to believe there is currently any variance from policy.

**Monitor's Recommendations:**  I will assess compliance with CCDOC's written directive during the next tour.

## 36.     Inmate Disciplinary Process

c.        CCDOC shall ensure that all inmates placed in lock down status are provided with appropriate due process that has been developed and implemented in policies and procedures, in accordance with generally accepted correctional standards.

In an emergency, the Executive Director of CCDOC may order a lock down of entire areas of the Facility in order to control the situation and address serious security concerns.  In such circumstances, it is not necessary to provide disciplinary hearings to each inmate affected by the lock down.  However, lock downs of this nature shall be limited to only the time and scope necessary to address the emergency.  For the purposes of this Agreed Order, a "lock down" shall not include the routine instances in which inmates are confined to their cells, including periods of count, over night, shift change, movement, and routine contraband sweeps.

**July 2012 Compliance Status:**   Substantial compliance.

**Status Update:** Written directive [11.14.8.0] was effective 12/22/11.

**Monitor's Assessmen**t: I was unable to evaluate the inmate disciplinary process on this tour due to time constraints.

**Monitor's Recommendations:** I will assess compliance with this written directive during the next tour.

## 36.     Inmate Disciplinary Process

d.        CCDOC shall ensure that the disciplinary board's written record accurately reflects the testimony and discussion from the disciplinary hearing, including any recommendations from a mental health professional regarding the extent to which disciplinary charges are related to an inmate's serious mental illness or suggestions for minimizing the deleterious effect of disciplinary measure on the mental health status of the inmate.

**July 2012 Compliance Status:**   Substantial compliance

**Status Update:**  The written directive 11.14.8.0 was effective 12/22/11.

**Monitor's Assessmen**t:  General Order 11.14.8.0, Inmate Discipline:  Disciplinary Reports and Hearing Procedures - Section IX. H. 2 outlines the documentation that must be prepared following each disciplinary hearing.  The process is in place within this same directive to alert Cermak of those inmates charged with violations of discipline and providing Cermak the opportunity to provide any information regarding the inmate's mental health status.

This is now done with faxes to the mental health staff in Cermak.  It is hoped in the future that IMACS can provide those alerts.

**Monitor's Recommendations:**  Continue to monitor the effectiveness of the process for mental health clients.

## 36.    Inmate Disciplinary Process

e.      CCDOC shall alert Cermak when inmates are placed in disciplinary segregation or protective custody.

**July 2012 Compliance Status:**   Substantial compliance.

**Status Update:**  The written directive governing inmate discipline Section IX. H. 4 requires the Watch Commander to notify Cermak of inmates sentenced to time in disciplinary segregation.  Section IX. B. 4. a – g. provides procedures for CCDOC to notify Cermak of inmates placed in pre-hearing detention.

A draft Cermak policy E -09, Segregated inmates was provided for review that addresses Cermak's procedures when notified of an inmate placed in segregation or protective custody.

**Monitor's Assessmen**t:  If the directive had been in effect at the time of my December tour, it is likely substantial compliance would be noted for this paragraph, if CCDOC can identify the written directive that provides that Cermak be notified of inmates placed in protective custody.  The Cermak companion policy (E09) is still in draft.

**Monitor's Recommendations:**  Assess compliance with the new directive; amend directives as necessary to address protective custody.  Complete the companion Cermak policy

## 36.    Inmate Disciplinary Process

f.      CCDOC shall permit a Cermak Qualified Mental Health Staff member to serve on the disciplinary board.

**July 2012 Compliance Status:**  Substantial Compliance

**Status Update:**  Cermak has declined to place a qualified mental health staff on the disciplinary board.

## 37.    Classification

a.      CCDOC shall maintain policies and procedures for an appropriate, objective classification system that separates inmates in housing units by classification levels in order to protect inmates from unreasonable risk of harm.  The system shall include consideration of an inmate's security level, severity of current charge, types of prior commitments, suicide risk, history of escape attempts, history of violence, and special needs.  CCDOC shall use best efforts to anticipate periods of unusual intake volume and schedule sufficient classification staff to timely classify inmates.

**July 2012 Compliance Status:**   Partial compliance

**Status Update:**  The process of updating the system is on-going

**Monitor's Assessmen**t:

**Monitor's Recommendations:**

### 37.    Classification

b.       CCDOC shall ensure that classification staff have sufficient access to current information regarding cell availability on each division.

**July 2012 Compliance Status**:    Partial compliance.

**Status Update:**  See 37.a.

**Monitor's Assessment:**  See 37. a. Staffing is a consideration in the work plan.

**Monitor's Recommendation:**  See 37.a.

### 37.    Classification

c.       CCDOC shall include information on each inmate's assignment to the Special Incarceration Unit "level system" at the Facility in the new Jail Management System, starting with the date the new Jail Management System becomes operational.

**July 2012 Compliance Status**:    Substantial compliance.

**Status Update:** I note that there is consideration being given to abandoning the level system as policies are updated governing administrative segregation, disciplinary segregation, protective custody, and the special incarceration unit.

### 37.    Classification

d.       CCDOC shall provide training and access to all correctional officer supervisors on the full capabilities of the new Jail Management System's classification and inmate tracking system (or any replacement system).

**July 2012 Compliance Status:**    Partial compliance.

**Status Update:**  There remains work not only to complete the updated classification system, but to be able to access the information on IMACS.

**Monitor's Assessment:**  The intent of the paragraph is met in terms of a process to provide training as the modules are rolled out and the classification system is updated and in place.

**Monitor's Recommendation:**  This is a challenging process with many moving

parts.  CCDOC's classification committee is overseeing the process and has a wide range of involved staff, which will benefit implementation and training initiatives.

## 37.    Classification

e.        CCDOC shall provide ongoing internal and external review and validation of the inmate classification system to ensure its reliability and objectivity.

**July 2012 Compliance Status:**    Partial compliance.

**Status Update:**  I'm moving this paragraph to partial compliance in recognition of the substantial work that is underway to conduct the validation study.

**Monitor's Assessment:**  CCDOC has made a full commitment to the validation work and it is proceeding.

**Monitor's Recommendation:**  Continue the work to complete the validation study and move toward implementation.

## 38.    Inmate Grievance Process

a.        CCDOC shall maintain policies and procedures to ensure inmates have access to an adequate grievance process and to ensure that grievances may be accessed and filed confidentially, without requiring the intervention of a correctional officer, in accordance with generally accepted correctional standards.   These policies and procedures should be applicable and standardized across all the Facility divisions.

**July 2012 Compliance Status:**    Substantial Compliance.

**Status Update:**   There was a change in the grievance process after my last tour, to divide work among the CRWs - those working only on grievances and those assigned to handle inmate requests.  Organizationally, the grievance function was moved from CCDOC to Risk Management. I don't believe any of these changes has enhanced the grievance process, and in fact collectively have been negatives.  The grievance function has been restored to corrections/security, but the process is not achieving the goals of an inmate grievance process.

So while CCDOC remains technically in substantial compliance with all the paragraphs under the Inmate Grievance Process section because of policies and procedures, the practices and outcomes are deficient.

**Monitor's Assessmen**t:  As noted in earlier comments, CCDOC decided to remove corrections officers from the grievance process.  This is not accepted correctional practice.  Also as previously noted, this was most likely done to respond to allegations during the investigative phase of this litigation that

officers were derailing the grievance process.  Rather than addressing that cause with effective policy, training and supervision, the unusual step of removing the officers and assigning CRWs was done.  This has not "fixed" the problem, and in fact has created other more serious issues, in my view, the least of which is undermining the role of an officer to be a problem solver in his/her assigned unit.  Without that role, and with accountability through supervisory and leadership tours/involvement, the officer has little left to do but "watch" inmates.

Also the positive potential role of CRWs is undermined by this strategy so that they now are administrative "paper-pushers", not interacting with inmates, and thus creating more problems than they solve.  For example, in the program Services Central Office report of May 2012 logging the work of the CRWs in the various divisions, the breakdown of their work was as follows (N=19,917): 76% for inmate trust account information/detainee payroll inquiries and requests for write-outs (mail).  Of the remaining 24%, none of the measures looked at actual communication with inmates, although one might presume there was some conversation rather than just an inmate request slip.  One CRW described her job to me this way . . . I pick up the inmate request forms for my assigned units; I go to my office and research their inquiry and write that down;  log with I do for the supervisor; then return to the inmate housing units, stand in the doorway and call inmates up one by one to get their inmate request form written response. . . This is something fundamentally deficient about that process from a variety of levels.  While not disagreeing that the information provided is important to inmates, in this "information age", many jails use other strategies to answer basic questions, and use their trained/skilled counseling staff to actually communicate with and solve inmate problems to support the officer assigned to the housing unit.  The CRWs' job satisfaction is jeopardized as well.  There is not a positive working relationship between officers and CRWs, inmates don't understand the roles, CRWs are nonresponsive on important inmate concerns, and this confluence of circumstances results in more dangerousness, not less in the inmate living units.  If CCDOC is to be successful in re-instituting direct supervision management, these roles, as well as an effective informal and formal grievance process is necessary.

I was asked how the effectiveness of a grievance process might be measured, if the officers were involved.  The questions were: what if the officers resumed their alleged former practices of not providing grievance forms, destroying grievances, discouraging inmates from filing grievances, retaliating against inmates for filing grievances and/or generally undermining the process?  The answer comes in several parts.  First, if there is regular/daily "management by walking around" in each inmate housing unit by the superintendent, commander, lieutenant and/or sergeant  - it will be clearly apparent if the officers are effectively managing the population.  Second, if there are no grievances coming from units, the process has been derailed.  Thirdly, proxy indicators of disorder will evolve – violence, tension, etc. that will indicate inmate

management deficiencies.  But to attempt to fix the perceived "problems" by removing the officers from am informal and formal roles that should be theirs, has not been effective, nor will be it be effective in moving CCDOC to a sustainable level of accepted correctional practice.

**Monitor's Recommendations:** See 38.a.

## 38.  Inmate Grievance Process

b.      CCDOC shall ensure that the grievances receive appropriate follow-up, including informing the grievant of the outcome, providing a timely written response, and tracking implementation of resolutions.

**July 2012 Compliance Status:**   Substantial Compliance.

**Status Update:**  See 38.a.

**Monitor's Assessmen**t: See 38.a.  The revised process was put in place at the beginning of 2012 to track  grievances, collect data to assist in actual problem-solving, and improve communication between staff and inmates.  Too much emphasis has been put on tracking and counting and not enough on fixing problems and communicating.

Another indication that the grievance process had moved from problem-solving to number crunching is the change in the topics of grievances.  It has been my experience that about 70% (or more) of inmate grievances have to do with medical care, mental health care, or dental care.  Since the CCDOC grievance process was revised in early 2012, the numbers of medical-related grievances dropped to 32% (from 78% previously).  This decrease is reflective of increases in other categories, not declines in grievances about medical.  I reviewed several months of grievances and found substantial deficiencies in Cermak related responses and timeliness to inmate grievances, which I have reported to Dr. Shansky.

**Monitor's Recommendations:**  See 38.a.   A plan of action will be provided to me by 9/1/2012.

## 38.    Inmate Grievance Process

c.      CCDOC shall ensure that grievance forms are available on all units and are available in Spanish.  CCDOC shall ensure that there is adequate opportunity for illiterate inmates and inmates who have physical or cognitive disabilities to access the grievance system.

**July 2012 Compliance Status:**   Substantial Compliance

**Status Update:**  See 38.a.

**Monitor's Assessmen**t:  See 38.a.  The forms are available, which is the easy part. If officers were directed to manage their inmate housing units, grievances may be resolved, communication increased, and problems avoided.

**Monitor's Recommendations:**  See 38.a.

## 38.    Inmate Grievance Process

d.       CCDOC shall ensure that inmate grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria, are referred for investigation.  A member of the management staff shall review the grievance tracking system regularly in order to identify areas of concern.

**July 2012 Compliance Status:**   Substantial Compliance

**Status Update:**  See 38.a.

**Monitor's Assessmen**t: See 38.a.

**Monitor's Recommendations:**  See 38.a.

## 39.    Access to Information

a.       CCDOC shall ensure that newly admitted inmates receive information, through an inmate handbook or orientation video, regarding the following areas:  facility rules and regulations; how to report misconduct; how to report sexual abuse or assault; the process for accessing medical and mental health care; emergency procedures; rules for sending and receiving mail; the visitation process; facility schedule; the disciplinary process; and how to seek redress of grievances.

**July 2012 Compliance Status:**   Partial compliance.

**Status Update:**  Remains under development.

**Monitor's Assessmen**t:  Process remains underway.  I recently provided a review and suggestions for the inmate handbook.

**Monitor's Recommendations:**  Continue to work on inmate handbook and videos, updating as policies/procedures revised.

## 39.    Access to Information

b.       CCDOC shall ensure that materials on facility rules and services are available for non-literate and non-English speaking inmates.

**July 2012 Compliance Status:**   Partial compliance.

**Status Update:**  See 39. a.

**Monitor's Assessmen**t:  See 39.a.

**Monitor's Recommendations:**  See 39.a.

**40.    CCDOC shall provide training and supervision to all correctional officers and supervisors sufficient to implement the provisions of this Agreed Order.**

**July 2012 Compliance Status**: Substantial Compliance.

**Status Update:**  See July 2011 report.

**Monitor's Assessmen**t:  See July 2011 report

**Monitor's Recommendations:** Monitor on-going compliance to determine what other information is needed to implement provisions of the Agreed Order.

**41.    Inter-Agency Agreement**

a.    CCDOC shall enter into a written Inter-Agency Agreement with Cermak that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility.  The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order.

b.    Cermak shall enter into a written Inter-Agency Agreement with CCDOC that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility.  The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order.

**July 2012 Compliance Status**:  Substantial compliance.

**Status Update:**  The agreement is in effect and the CCDOC provided minutes of the meetings held pursuant to the agreement.

**Monitor's Assessmen**t:  There are several issues identified in this report that would benefit from more discussion at the interagency meetings between CCDOC and Cermak.

**Monitor's Recommendations:**  It is trite to say that building a level of trust and cooperation between all three of the agencies involved here is a marathon not a sprint.  But it is true.  There will be ups and downs in the relationships – and if there not these fluctuations, then we can assume nothing meaningful was surfaced, debated, and decided.

**69.    CCDOC shall ensure that security staff posts will be equipped, as appropriate, with readily available, safely secured, suicide cut-down tools.** Coordinate with Dr. Metzner

**July 2012 Compliance Status**:   Substantial Compliance

**Status Update:**  CCDOC reports that the suicide cut-down tool has been used 55 times since the beginning of 2012.

**Monitor's Assessmen**t:   The policy is in place and effective in saving lives.

**Monitor's Recommendations:**   Continue to monitor and evaluate situations where the cut-down tool is used;  address any training issues that may be presented.