# Executive Summary
## Corrections Monitor Susan W. McCampbell's Report #6
## April 11, 2013

**Summary Overview**

The Cook County Sheriff's Office (CCSO), Cook County Department of Corrections (CCDOC) with the assistance of Cook County government continues to work conscientiously, with excellent organization and leadership to meet the requirements of the agreed order.   As I noted in my last several reports, the crowding in the facilities jeopardized long-term sustainability of the changes made.  This is particularly critical, as the County's criminal justice system seems unwilling to accept their responsibilities to address crowding.  The person who has the least control of the jail's population is the Sheriff, who, in my view, has done all he can do.   In the absence of cogent leadership in developing and implementing short-and-long-term plans for crowding, only the expensive, construction alternatives may remain.

This Executive Summary reports on the Administrative Release Program.

**On Site Tour – February 11 – 15, 2013**

I toured the complex during the week of February 11 – 15, 2013; interviewed staff and inmates, reviewed document, and consulted with CCDOC regarding compliance issues.  The CCDOC continues to make progress and has importantly maintained compliance in the vast majority of requirements previously assessed as being in "substantial compliance."  There has been a setback in the requirements for the inmate grievance process that is addressed in the body of this report.

**Progress**

The areas in which measurable progress has been achieved include:

- Expansion of implementation of the inmate behavior management model/direct supervision, with plans to implement in other divisions;
- Appropriate uses of force, well documented, and analyzed;
- Continued progress toward implementing a totally new inmate classification process, including the required validation and appropriate staffing level;
- Attention to inmate disciplinary processes;
- Continued hiring of qualified applicants; and
- Organizational changes and consolidation for improved accountability.

**Remaining Challenges**

CCDOC's challenges continue as follows, although not meant to be an exhaustive list:

- Addressing jail crowding and the implications for provision of basic inmate services, supervision and sanitation;
- Replacing of the retired Executive Director;
- Identifying a single source of data for uses of force, and allegations of excessive force (outcomes);
- Implementing the new inmate classification system, completing the validation study, and beginning the process for reclassifying the entire inmate population;
- Updating/revising the inmate grievance process and assuring that operations match policy/procedure;
- Opening of the new building with operational plans and adequate security and medical/mental health staffing;
- Expanding the pilot program of direct inmate supervision in Division XI while gaining and maintaining staff buy-in;
- Sustaining appropriate levels of staffing in the Office of Professional Responsibility;
- Continuing to improve collaboration between mental health and security regarding the safety of mental health clients;
- Addressing coordination with Cermak so that inmate medical, mental health and dental care grievances are promptly handled;
- Continuing to hold supervisors accountable for making rounds AND addressing problems regarding the physical plant and the inmates' concerns;
- Redefining the roles of the roles of Correctional Rehabilitation Workers (CRWs); and
- Completing the staffing plan for CCDOC and examining the span-of-control of supervisors and managers.

**Compliance Report**

The Agreed Order regarding corrections operations (A. Protection from Harm) includes 77 provisions. Here is a summary of compliance as of the tour in February 2013.

**Maintenance of Substantial Compliance (18 months) (N=21)**

The CCDOC has maintained substantial compliance with the following provisions of the Agreed Order for at least 18 months, and as such, will no longer be a primary focus of my monitoring, although these sections remain an active part of the Order (see Section VII.C.). These paragraphs are highlighted in light green in the full report.

- 31.n.
- 31.r.
- 31.s.
- 31.t.
- 32.g.
- 32.l.
- 32.m.

- 33.a.
- 33.c.i.ii.
- 33.i.
- 33.j.
- 34.b.
- 34.d.
- 34.g.

- 35.c.
- 35.d.
- 36.b.
- 37.c.
- 40.
- 41.
- 69.

## Substantial Compliance (N=39)

Paragraphs for which CCDOC has achieved substantial compliance (excluding the paragraphs referenced above) are as follows.  (Paragraphs achieving substantial compliance since the report of August 31, 2012 to the Court are underlined):

- 31.a.
- 31.b.
- 31.c.
- 31.d.
- 31.e.
- 31.f
- 31.g.
- 31.h.
- 31.i.
- 31.j.

- 31.k.
- 31.l.
- 31.m.
- 31.o.
- 31.p.
- 32.a.
- 32.b.
- 32.c.
- 32.d.
- 32.f.

- 32.h.
- 32.i.
- 32.j.
- 32.k.
- 34.a.
- 34.c.
- 35.a.
- 35.b.
- 35.e.
- 35.f.

- 35.g.
- 36.a.
- 36.c.
- 36.d.
- 36.e.
- 36.f.
- 37.d.
- 39.a.
- 39.b.

## Change from Substantial Compliance to Partial Compliance (N=4)

The following paragraphs regarding the inmate grievance process have moved from Substantial Compliance to Partial Compliance.  As noted in the report, this is because practice and policy do not now match.

- 38.a.
- 38.b.
- 38.c.
- 38.d.

## Partial Compliance (N=13)

There are eleven paragraphs in partial compliance.

- 31.q.
- 32.e.
- 33.b.
- 33.d.

- 33.e.
- 33.f.
- 33.g.
- 33.h

- 34.e.
- 34.f.
- 37.a.
- 37.b.

- 37.e.

## Non-Compliance (N=0)

There are no paragraphs in non-compliance at this time.

**Jail Crowding**

As of March 25, 2013, there were 9,899 detainees housed in CCDOC.  This is perilously close to an all-time high during the life of this Agreed Order.  This is a 3.4% increase in population from August 2012.  It is very difficult to *overstate* how this upward population spiral jeopardizes the accomplishments of CCDOC to reach compliance with the consent agreement, threatens Constitutional conditions of confinement, strains resources, costs real dollars, and potentially derails many of the initiatives to adopt currently accepted correctional practice in the organization.

In previous reports to the Court, I have addressed jail crowding and I continue to identify it as the most serious threat to gaining and maintaining compliance with provisions I am charged with monitoring.  Most concerning is that the Sheriff, County government, and the criminal justice system (judges, clerk, public defender, state's attorney) are not working collaboratively (in a non-hierarchal framework) to find short and long-term responses.

The history of politics in Cook County aside, the failure to develop meaningful, achievable systemic solutions will cost the County more in the long term, and will not enhance public safety.  There has been little action regarding any of the recommendations on alternatives to address crowding contained in my previous reports to the Court, which I will not repeat here.  And most importantly there is no vehicle or strategy to develop effective strategies.  President Preckwinkle's appointed Judicial Advisory Council (JAC), with the Honorable Anne M. Burke chairing, is a positive step.  But it is not inclusive of all necessary stakeholders, including the community.   This is not, in my view, because President Preckwinkle and the JAC haven't tried to be inclusive, but the "politics" of stakeholders have not allowed them to participate for a variety of reasons that they need to articulate.[1]

There has been much written and discussed in the last six months about increased use of electronic monitoring (EM) as a means to address crowding.  Different stakeholders, depending on their advocacy for different scenarios, have advanced various data.   And during these arguments the jail population increases.  Nothing happens to address the crowding.

I do not comment on the EM dispute; but do observe that even if there was an immediate resolution to this matter, EM is only a short-term interim measure – not a long-term solution to crowding.   The data collection, analysis, trust building, solutions' identification (construction and non-construction), strategy development, implementation, and evaluation work ALL remains to be done.  The crowding contributes to conditions that the Sheriff has worked hard to alleviate.  Crowding jeopardizes the impact of the long awaited revised inmate classification system, and the goal to close older inmate housing units.

---

[1] On February 25, 2013, President Preckwinkle's office reported these activities are priorities of the JAC: focusing on jail admissions via invigorated pre-trial services and increased public defender advocacy; examining arrest policies of the Chicago Police Department; and assessing the length of stay data for inmates in terms of court activities.  However, none of the activities have any timelines or metrics associated.

It is an axiomatic in the corrections business that a jurisdiction "can't build its way out of jail crowding", but construction options can only be avoided if the jail infrastructure meets the level of Constitutional conditions for the detainee population it holds. Taxpayers are never excited about spending scarce public funds on constructing new jails. President Preckwinkle has commissioned a Real Estate Asset Strategic Realignment Plan, which has included a physical plant assessment of all the jail buildings. The report is due to be issued in April 2013. While the consultants' final recommendations await the review of the President, early indications are that half of the jail facilities are in need of serious overhaul, renovation, and/or replacement. If the plan goes forward as preliminarily reported, it gives the Sheriff/County an opportunity to plan for construction of facilities that are most staff-efficient to operate and safer for inmates. Even if there are significant inroads to non-construction crowding alternatives and dramatic changes to how the criminal justice system operates, the County may still be faced with new jail construction to assure that inmates are held in conditions meeting Constitutional requirements.

In summary, there are many opportunities for effective collaborations to address crowding, short and long term and insure Constitutional conditions of confinement. It is my opinion that the parties have not reached the point where even preliminary talks can begin to identify issues and start to fix problems.

## Prisoner Release Order – Electronic Monitoring (EM)

I am charged with reviewing the use of the Administrative Release Order. The Administrative Release Program (ARP) provides the authority for the Sheriff to place detainees on EM under certain conditions.

Since the program's inception in November 2011, the ARP has reviewed almost 15,000 inmates to determine their eligibility for release. Of that number, 1,342 (about 9%) did not have disqualifying charges or criminal activity; 788 were ordered to EM by the retired judges (Wasilewski and Frossard) who conducted the final file review.

As I noted in my last report to the Court, an arrestee's charge at time of arrest may suggest that he/she is a good candidate for EM. Review of the arrestee's past criminal activity, current release status, outstanding court orders, and/or homelessness might suggest that the individual is not an acceptable risk. Taking the simplistic approach of only examining the current charge as the single indicator for EM eligibility is inadequate to ensure the public's safety.

I conclude that the Sheriff's Office operation of the EM program under the ARP proceeds in a manner to address public safety concerns.

**UNITED STATES OF AMERICA VS. COOK COUNTY, ET. AL.**
**Civil No. CV-02946**

# Corrections Monitor 6th Report

# April 11, 2013

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| **A.** | **Protection from Harm** | | | |
| **31.** | **Use of Force by Staff** | | | |
| A. 31. a. (16) | CCDOC shall maintain comprehensive and contemporary policies and procedures, in accordance with generally accepted correctional standards, surrounding the use of force and with particular emphasis regarding permissible and impermissible uses of force. | x12/11 x7/12 x2/13 | x 9/10 x 3/11 x 8/11 | |
| A.31. b. (16) | CCDOC shall maintain use of force policies and pre-service and in-service training programs for correctional officers and supervisors that address the following impermissible uses of force:<br><br>1. use of force as a response to verbal insults or inmate threats where there is no immediate threat to the safety of the institution, inmates, or staff;<br>2. use of force as a response to inmates' failure to follow instructions where there is no immediate threat to the safety of the institution, inmates, or staff, unless CCDOC has attempted a hierarchy of nonphysical alternatives that are documented;<br>3. use of force as punishment or retaliation;<br>4. use of force involving striking, hitting, or punching a restrained and non-combative inmate;<br>5. use of force against an inmate after the inmate has ceased to offer resistance and is under control;<br>6. use of choke holds on an inmate, unless lethal force is justified; and<br>7. use of inappropriate or excessive force. | x12/11 x7/12 x2/13 | x 9/10 x 3/11 x 8/11 | |
| A.31.c. (17) | CCDOC shall maintain a policy to ensure that staff adequately and promptly report all uses of force, in accordance with generally accepted correctional standards. | x12/11 x7/12 x2/13 | x 9/10 x 3/11 x 8/11 | |
| A.31.d. (17) | CCDOC shall require that use of force reports:<br>1. be written in specific terms in order to capture the details of the incident<br>2. contain an accurate account of the events leading to the use of force incident; | x12/11 x7/12 x2/13 | x 9/10 x 3/11 x 8/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | 3.    include a description of the instrument(s) of restraint or control, if any, and the manner in which it was used;<br>4.    note whether an inmate disciplinary report was completed in connection with the incident that prompted the use of force;<br>5.    describe the nature and extent of apparent and reported injuries sustained both by the inmate and staff member;<br>6.    contain the date and time medical attention was actually provided;<br>7.    describe, in detailed, factual terms, the type and amount of force used as well as the precise actions taken in a particular incident; and<br>8.    note whether a use of force was videotaped. If the use of force is not videotaped, the reporting correctional officer and supervisor will provide an explanation as to why it was not videotaped. | | | |
| A.31.e. (18) | CCDOC shall continue to require prompt review by the shift commander of all use of force reports. The shift commander's review of use of force reports shall include review for completeness and procedural errors, as well as review of the substantive content. If the use of force report does not comply with provision 31.d. of this Agreed Order, the shift commander shall return it to the reporting officer for revision and resubmission until it is compliant. If the shift commander believes a use of force may have been inappropriate or excessive, he or she shall immediately refer the incident for investigation. | x7/12<br>x2/13 | x 9/10<br>x 3/11<br>x 8/11<br>x12/11 | |
| A.31.f. (18) | CCDOC shall ensure that senior management review of uses of force includes:<br>1.    a timely review of medical documentation of inmate injuries, if any is submitted, as provided by Qualified Medical Staff, including documentation surrounding the initial medical encounter, an anatomical drawing that depicts the areas of sustained injury, and information regarding any further medical care;<br>2.    the inmate disciplinary report, if any, associated with the use of force; and<br>3.    the incident report, if any, associated with the use of force. | x12/11<br>x7/12<br>x2/13 | x 9/10<br>x 3/11<br>x 8/11 | |
| A. 31.g. (19) | CCDOC [and Cermak] shall establish criteria that trigger referral for inappropriate or excessive use of force investigations, including but not limited to, documented or known injuries that are extensive or serious; injuries involving fractures or head trauma; injuries of a suspicious nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.); and injuries that require treatment at outside hospitals. | x12/11<br>x7/12<br>x2/13 | x 3/11<br>x 8/ll | x 9/10 |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| A. 31. h. (19) | When CCDOC review of use of force reports, and supporting records if applicable, reveals that reports of a use of force are materially inconsistent, conflicting, or suspicious, CCDOC shall refer that use of force incident for internal investigation. | x12/11 x7/12 x/2/13 | x 9/10 x 3/11 x 8/11 | |
| A.31.i. (20) | CCDOC shall develop and implement a system to track all incidents of use of force that, at a minimum, includes the following information: 1.  a tracking number; 2.  the inmate(s) name; 3.  housing assignment; 4.  date; 5.  type of incident; 6.  injuries (if applicable); 7.  medical care provided (if applicable); 8.  staff involved; 9.  reviewing supervisor; 10. external reviews and results (if applicable); 11. remedy taken (if appropriate); and 12. administrative sign-off. | x7/12 x2/13 | x 9/10 x 3/11 x 8/11 x12/11 | |
| A.31.j. (20) | CCDOC shall ensure that, promptly following a use of force incident, video or photographs are taken of any and all reported or apparent injuries sustained by inmates and staff.  The video or photographs will be maintained and will be included in the investigation package, if applicable.  See 31. F. | x12/11 x7/12 x2/13 | x 9/10 x 3/11 x 8/11 | |
| A.31.k. (21) | CCDOC shall establish an "early warning system" that will document and track correctional officers who are involved in use of force incidents and any complaints related to the inappropriate or excessive use of force, in order to alert CCDOC administration to any potential need for retraining, discipline, problematic policies, or supervision lapses.  Appropriate CCDOC leadership, supervisors, and investigative staff shall have access to this information and monitor the occurrences.  CCDOC senior management shall use information from the early warning system to improve quality management practices, identify patterns and trends, and take necessary corrective action both on an individual and systemic level. | x7/12 x2/13 | x 9/10 x 3/11 x 8/11 x12/11 | |
| A.31.l. (21) | CCDOC shall ensure that a supervisor is present during all pre-planned uses of force, such as cell extractions. | x12/11 x7/12 x2/13 | x 9/10 x 3/11 x 8/11 | |
| A.31.m. (21) | Where there is evidence of staff misconduct related to inappropriate or unnecessary use of force against inmates, CCDOC shall initiate personnel actions and seek disciplinary action | x12/11 x7/12 | x 9/10 x 3/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | appropriately for any correctional officer found to have:<br>1. engaged in inappropriate or excessive use of force;<br>2. failed to report or report accurately the use of force;<br>3. retaliated against an inmate or other staff member for reporting an inappropriate or excessive use of force; or<br>4. interfered or failed to cooperate with an internal investigation regarding use of force in a manner inconsistent with the staff member's statutory or contractual rights. | x2/13 | x 8/11 | |
| A.31.n. (22) | Where there is evidence of staff misconduct related to inappropriate or unnecessary use of force against inmates, CCDOC shall consider, develop, and initiate systemic remedies as appropriate. | x 8/11 x12/11 x7/12 x2/13 | x 9/10 x 3/11 | |
| A.31.o (22) | CCDOC shall maintain accountability policies and procedures for the effective and accurate maintenance, inventory, and assignment of chemical and other security equipment, in accordance with generally accepted correctional standards. | x12/11 x7/12 x2/13 | x 9/10 x 3/11 x 8/11 | |
| A.31.p. (22) | CCDOC shall continue to conduct use of force training in accordance with generally accepted correctional standards, including:<br>1. CCDOC shall maintain an effective and comprehensive use of force training program.<br>2. CCDOC shall continue to ensure that correctional officers receive adequate training in CCDOC's use of force policies and procedures, including de-escalation and defensive tactics relating to use of force.<br>3. CCDOC shall continue to ensure that correctional officers receive pre-service and in-service training on reporting use of force and completing use of force reports. | x12/11 x7/12 x2/13 | x 9/10 x 3/11 x 8/11 | |
| A.31.q. (23) | CCDOC shall provide a process for inmates to report allegations of the inappropriate or excessive use of force orally to any CCDOC staff member; said staff member shall give the inmate the opportunity to reduce his or her report to writing through a grievance or complaint form without discouragement. | | x 9/10 x 3/11 x 8/11 x12/11 x7/12 x2/13 | |
| A.31.r. (23) | Following a use of force, when CCDOC staff transport an inmate to receive medical care by Cermak, as necessary, the CCDOC staff member shall inform the Cermak staff member that the inmate was involved in a use of force. | x 8/11 x12/11 x7/12 x2/13 | X 9/10 x 3/11 | |
| A.31.s. (24) | Cermak shall ensure that, when providing medical treatment or assessment to an inmate following a use of force, Qualified Medical Staff document the inmate's injuries, if any, and any | x 8/11 x12/11 | x 9/10 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | medical care provided.  Cermak shall provide CCDOC senior management [OPR] with a brief summary documenting the initial medical encounter following a use of force, including an anatomical drawing that depicts the areas of sustained injury, if any, and information regarding any further medical care.   See 31.f. | x7/12 x2/13 | x 3/11 | |
| A.31.t. (24) | Cermak shall ensure that Qualified Medical Staff question, outside the hearing of other inmates or correctional officers if appropriate, each inmate who reports for medical care with an injury, regarding the cause of the injury.  If, in the course of the inmate's medical encounter, a health care provider suspects staff-on-inmate or inmate-on-inmate abuse, that health care provider shall immediately: <br> 1.  report the suspected abuse to the Executive Director of the Office of Professional Review or other appropriate CCDOC administrator; and <br> 2.  adequately document the matter in the inmate's medical record. | x 8/11 x12/11 x7/12 x2/13 | x 3/11 | x 9/10 |
| **32.** | **Safety and Supervision** | | | |
| 32. a. (25) | CCDOC shall maintain security and control-related policies, procedures, and practices that will result in a reasonably safe and secure environment for all inmates and staff, in accordance with generally accepted correctional standards. <br> Coordinate with Grenawitzke | x2/13 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| 32.b. (25) | CCDOC shall maintain policies, procedures, and practices to ensure the adequate supervision of inmate work areas and trustees, in accordance with generally accepted correctional standards. <br> Coordinate with Grenawitzke | x7/12 x 2/13 | x 8/11 x12/11 | x 9/10 x 3/11 |
| 32.c. (25) | CCDOC shall ensure that security staff conduct appropriate rounds with sufficient frequency to provide inmates with reasonable safety.  Rounds shall be conducted at least once every half hour, at irregular intervals, inside each housing unit.  In the alternative, CCDOC may provide direct supervision of inmates by posting a correctional officer inside the day room area of a housing unit to conduct constant surveillance.  More frequent rounds shall be conducted for special management inmates who require more intensive supervision for security and safety reasons.  All security rounds shall be documented on forms or logs that do not contain pre-printed rounding times.  Video surveillance may be used to supplement, but must not be used to replace, rounds by correctional officers. | x2/13 | x 9/10 x 3/11 X 8/11 x12/11 x7/12 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| 32.d. (26) | CCDOC shall ensure that security supervisors conduct daily rounds in the inmate housing units, and document the results of their inspections. | X2/13 | x 3/11 x 8/11 x12/11 x7/12 | x 9/10 |
| 32.e. (26) | Cook County shall increase the use of overhead video surveillance and recording cameras to provide adequate coverage throughout the common areas of the Facility, including the RCDC, all division intake areas, mental health units, special management units, inmate housing units, and in common areas of the divisions. | | x 9/10 x 3/11 x 8/11 x12/11 x7/12 x2/13 | |
| 32.f. (27) | CCDOC shall maintain a procedure to prevent inmates from possessing or having access to dangerous contraband, including conducting regular inspections of cells and common areas of the housing units to identify and prevent rule violations by inmates. | X2/13 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| 32.g. (27) | CCDOC shall review, and revise as applicable, all General Orders ("GOs"), Standard Operating Procedures ("SOPs"), and Post Orders on an annual basis, or more frequently as needed. | x 8/11 x12/11 x7/12 x2/13 | x 9/10 x 3/11 | |
| 32.h. (28) | CCDOC shall revise policies, SOPs, and post orders for all armed posts to include proper use and safe handling of weapons and provide specific instructions on use of deadly force and when and under what circumstances such force should be used, in accordance with generally accepted correctional standards. | x12/11 x7/12 x2/13 | x 9/10 x 3/11 x/8/11 | |
| 32.i. (28) | CCDOC shall standardize security policies, procedures, staffing reports, and post analysis reports across the divisions, to the extent possible, taking into account the different security levels and different physical layouts in the various divisions. | 2/13 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| 32.j. (28) | CCDOC shall provide formal training on division-specific SOPs to correctional officers in accordance with their assignments, and shall provide further specialized training for officers assigned to Special Management Units. Cermak Hospital shall provide Specialized training for officers assigned to psychiatric units. Coordinate with Drs. Shansky and Metzner. See also 44.f., 44.g., 44.h., 46.b., 46.e., 68. | x7/12 x2/13 | x 9/10 x 3/11 x 8/11 x12/11 | |
| 32.k. (29) | CCDOC shall maintain in working order all monitoring equipment at the Facility that is under CCDOC's direct control, including cameras, alarms, radios (hand held), interior and exterior | x7/12 | x 9/10 x 3/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | lighting, x-ray and other screening equipment, and walk-through metal detectors. To the extent that the maintenance of any Facility monitoring equipment is under the control of DFM, CCDOC shall promptly report any maintenance needs and DFM shall prioritize its services to ensure that all monitoring equipment is maintained in working order. Coordinate with Grenawitzke | x2/13 | x 8/11 x12/11 | |
| 32.l. (29) | Absent exigent circumstances, CCDOC: (i) shall house each inmate assigned to a division that is celled to one permanent bed in a cell and shall not house any inmates (including those assigned to dormitory divisions) such that they are sleeping on the floor, on a mattress on the floor, or in any area not designed or redesigned as sleeping quarters; (ii) shall not house more than two inmates to a single cell (triple-bunking); and (iii) shall not hot-bunk any inmates. | x 8/11[1] x12/11 x7/12 x2/13 | | |
| 32.m. (30) | When exigent circumstances give rise to triple-bunking, CCDOC shall provide the third inmate in the triple-bunked cell a "boat," stackable bunk, moveable platform, or cot, so that the inmate is not required to lay down directly on the cell floor or on a mattress on the floor. | x 8/11[2] x12/11 x7/12 x2/13 | | |
| 33. | **Security Staffing.** **The parties agree that correctional officer staffing and supervision levels at the Facility must be appropriate to adequately supervise inmates, to carry out the requirements of this Agreed Order, and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards. Cook County and CCDOC shall take such actions as shall ensure that correctional officer staffing and supervision at the Facility are sufficient to achieve these purposes. These actions shall include the following:** | | | |
| 33.a. (30) | In the fiscal year 2010 budget, Cook County shall allocate funds sufficient to allow for 210 additional correctional officer positions at the Facility. Consistent with provision 33.c, such funding may occur on a rolling basis, as appropriate in light of the time required to hire, train, and put on duty the additional 210 new correctional officers. | x 8/11 x12/11 x7/12 x2/13 | x 9/10 x 3/11 | |
| 33.b. (30) | CCDOC shall use its best efforts (through the maintenance of the written staffing plan required by provision 33.h and otherwise) to ensure that the number of correctional officer vacancies is kept to the minimum practicable number at all times, taking into account that the timing of terminations and resignations and the resulting rate of attrition may, in ordinary course, result in there being some vacancies at any given time. | | x 9/10 x 3/11 x 8/11 x12/11 x7/12 x2/13 | |

[1] Noted as "NA" in first two reports.
[2] Noted as "NA" in first two reports.

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| 33.c.i.ii (31) | CCDOC shall fill the 210 additional correctional officer slots provided for in provision 33.a; fill the 285 correctional officer vacancies that existed at the Facility as of July 17, 2009; and fill any correctional officer vacancies coming into existence after that date in the following manner: <br> i. By December 31, 2010, CCDOC shall hire, train, and put on duty at the Facility at least 448 [381] newly qualified correctional officers (in addition to those on duty as of December 31, 2009). <br> ii. By March 30, 2011, CCDOC shall hire, train, and put on duty at the Facility at least 174 [107] newly qualified correctional officers (in addition to those on duty as of December 31, 2010). | x 8/11 <br> x12/11 <br> x7/12 <br> x2/13 | | x 9/10 <br> x 3/11 |
| 33.d. (31) | The parties agree that for 30 months following the effective date of this Agreed Order, Cook County and CCDOC shall not be required to provide additional correctional officer staffing and supervision at the Facility beyond that which is necessary to ensure that correctional officer staffing and supervision are sufficient to achieve the purposes set out in the introductory paragraph of provision 33 and to comply with provisions 33.a-c above. Due date 11/13/2012 | | x2/13 | |
| 33.e. (32) | Within 30 months of the effective date of this Agreed Order, the CCDOC Monitor shall assess and make a recommendation on whether the correctional officer staffing and supervision levels are appropriate to adequately supervise inmates at the Facility, in accordance with generally accepted correctional standards. If the CCDOC Monitor determines that staffing is inadequate, the CCDOC Monitor will make a recommendation regarding the appropriate number of correctional officer staff. If the parties do not accept the CCDOC Monitor's staffing recommendation, CCDOC and Cook County shall agree to an independent, comprehensive study to determine the appropriate correctional officer staffing and supervision. The parties agree that the results of this staffing study shall provide guidance as to the sufficient number of qualified correctional officers necessary to operate the Facility safely and to carry out the requirements of this Agreed Order. Due date 11/13/2012 | | X2/13 | |
| 33.f. (32) | If the staffing study requires additional correctional officers, Cook County shall allocate funds sufficient to maintain correctional officer staffing levels necessary to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards. Due date 11/13/2012 | | x2/13 | |
| 33.g. (33) | If the staffing study requires additional correctional officers, and consistent with Cook County's allocation of funds for security staffing, CCDOC shall hire and train sufficient number of qualified correctional officers and other staff to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards, including: | | x2/13 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | 1. Investigative staffing sufficient to meet the internal investigation responsibilities outlined in this Agreed Order; <br> 2. Correctional officer staffing sufficient to provide inmates requiring treatment with adequate access to appropriate medical and mental health care by providing timely movement of inmates to medical units, transport of inmates who have been referred for outside specialty care, and escort, if necessary, to Qualified Medical and Mental Health Staff on housing units; and [Coordinate with Shansky, Metzner] <br> 3. Qualified staff sufficient to monitor security cameras in real time and allow for supervisory viewing and retrieving at any time. Due date 11/13/2012 | | | |
| 33.h. (33) | CCDOC shall maintain a written staffing plan that requires sufficient staffing to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards. | | x 8/11 <br> x12/11 <br> x7/12 <br> x2/13 | x 9/10 <br> x 3/11 |
| 33.i. (33) | Absent exigent circumstances, CCDOC shall maintain a practice that does not allow for scheduled, planned, or expected cross-watching (a CCDOC practice of allowing one correctional officer to simultaneously supervise two housing units from the control center of one of the units) at any time on all maximum security and Special Management Units, and during first and second shifts throughout the Facility. | x 8/11[3] <br> x12/11 <br> x7/12 <br> x2/13 | | |
| 33.j. (34) | CCDOC may permit cross-watching on third shift in housing units that are not maximum security or Special Management Units only if the Monitor does not object after consultation and review. The Monitor's review of the appropriateness of third-shift cross-watching on a particular housing unit shall be guided by the sufficiency of sightlines between the units being cross-watched, the adequacy of video and/or audio technologies in place, and/or other factors that bear on the safety and security of inmates and staff. If the Monitor later objects to any cross-watching that is in effect because of the Monitor's concerns that cross-watching on a particular housing unit presents an undue risk to the safety and security of inmates and staff, CCDOC shall immediately cease such cross-watching. CCDOC may renew cross-watching on that unit again if, after further consultation with and review by the Monitor, the Monitor does not object to such renewal. Although cross-watching is permitted under the limited circumstances described herein, CCDOC will work to eliminate the practice at the Facility. | x 8/11[4] <br> x12/11 <br> x7/12 <br> x2/13 | | |

[3] Noted as "NA" in first two reports.
[4] Noted as "NA" in first two reports.

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| **34.** | **Incidents and Referrals** | | | |
| 34. a. (34) | CCDOC shall continue to ensure that staff adequately and promptly document all reportable incidents, including inmate fights, rule violations, inmate injuries, suicides and suicide attempts, cell extractions, medical emergencies, contraband, vandalism, escapes and escape attempts, fires, and other incidents causing a disruption to standard CCDOC practice, in accordance with generally accepted correctional standards. | x21/3 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| 34.b. (35) | CCDOC shall continue to ensure that correctional officers receive pre-service and in-service training on proper incident reporting policies and procedures in accordance with generally accepted correctional standards. | x 8/11 x12/11 x7/12 x2/13 | x 9/10 x 3/11 | |
| 34.c. (35) | CCDOC shall maintain a system to track all reportable incidents (as described in provision 34.a) that, at a minimum, includes the following information:<br>1. incident tracking number;<br>2. the inmate(s) name;<br>3. housing assignment;<br>4. date;<br>5. type of incident;<br>6. injuries (if applicable);<br>7. medical care (if applicable);<br>8. primary and secondary staff involved;<br>9. reviewing supervisor;<br>10. external reviews and results (if applicable);<br>11. remedy taken (if appropriate); and<br>12. administrative sign-off. | x2/13 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| 34.d. (36) | CCDOC shall require prompt administrative review of incident reports. Such reviews shall include a case-by-case review of individual incidents as well as a systemic review in order to identify patterns of incidents. CCDOC shall incorporate such information into quality management practices and take necessary corrective action. | x 8/11 x12/11 x7/12 x2/13 | x 9/10 x 3/11 | |
| 34.e. (36) | CCDOC shall ensure that incident reports, use of force reports and inmate grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria, that it is referred for investigation. | | x 9/10 x 3/11 x 8/11 x12/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | | | x7/12 x2/13 | |
| 34.f. (36) | CCDOC shall maintain policies, procedures and practices requiring investigations to resolve issues identified during review of incident reports, disciplinary hearings, or inmate grievances, and determine appropriate remedies, in accordance with generally accepted correctional standards.  At a minimum, CCDOC shall require timely and appropriate investigations of all suicides, serious suicide attempts, inmate-on-inmate violence resulting in serious injury, inmate-on-staff violence, inmate injuries requiring treatment by an outside hospital, inmate injuries of a suspicious nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.), sexual misconduct between inmates, sexual misconduct involving staff, fires, escapes, escape attempts, and deaths. | | x 9/10 x 3/11 x 8/11 x12/11 x7/12 x2/13 | |
| 34.g. (37) | CCDOC (OPR) shall ensure that any investigation reports indicating possible criminal behavior will be referred to the appropriate law enforcement authority. | x 8/11 x12/11 x7/12 x2/13 | x 9/10 x 3/11 | |
| 35. | **Investigations:** <br> **Investigations at the Facility are conducted by independent departments under the Cook County Sheriff's Office, including the Office of Professional Review, the Criminal Investigations Unit, and the Sheriff's Police Department.  The Cook County Sheriff will assume responsibility for requiring these investigatory units to comply with the relevant provisions of this Agreed Order.** | | | |
| 35.a. (37) | CCDOC [OPR] shall maintain comprehensive policies, procedures, and practices for the timely and thorough investigation of alleged staff misconduct, in accordance with generally accepted correctional standards. | x2/13 | x 9/10 x 3/11 x 8/11 x12/11 x 7/12 | |
| 35.b. (38) | Internal investigations [OPR] shall be conducted by persons who do not have supervisory responsibility for the staff member(s) being investigated. | x 7/12 x2/13 | x 9/10 x 3/11 x 8/11 x12/11 | |
| 35.c. (38) | CCDOC [OPR] shall ensure that all internal investigations will include timely, thorough, and documented interviews of all relevant staff and inmates who were involved in, or witnessed, the incident in question. | x 9/10 x 3/11 x 8/11 x12/11 | | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | | x 7/12 x2/13 | | |
| 35.d. (39) | CCDOC [OPR] shall ensure that internal investigation reports shall include all supporting evidence, including witness and participant statements, policies and procedures relevant to the incident, physical evidence, video or audio recordings, and relevant logs. | x 9/10 x 3/11 x 8/11 x12/11 x 7/12 x2/13 | | |
| 35.e. (39) | CCDOC [OPR] shall ensure that all investigatory staff will receive pre-service and in-service training on appropriate investigations policies and procedures, the investigations tracking process, investigatory interviewing techniques, and confidentiality requirements. | x 7/12 x2/13 | x 9/10 x 3/11 x 8/11 x12/11 | |
| 35.f. (39) | CCDOC [OPR] shall provide all investigators who will be assigned to conduct investigations of use of force incidents with specialized training in investigating use of force incidents and allegations. | x7/12 x2/13 | x 9/10 x 3/11 x 8/11 x12/11 | |
| 35.g. (40) | CCDOC [OPR] shall ensure that the results of each internal investigation shall be documented in an investigation report. CCDOC administration shall review the investigation reports, along with the underlying documentation, and take appropriate action. CCDOC shall implement appropriate remedies based upon the results of internal investigations. | x7/12 x2/13 | x 9/10 x 3/11 x 8/11 x12/11 | |
| **36.** | **Inmate Disciplinary Process** | | | |
| 36.a. (40) | CCDOC shall maintain policies, procedures, and practices for a formal disciplinary process, including prompt issuance of written disciplinary citations, administrative review and disciplinary reports for alleged minor rule violations, and due process for alleged major rules violations, in accordance with generally accepted correctional standards. | x7/12 x2/13 | x 9/10 x 3/11 x 8/11 x12/11 | |
| 36.b. (41) | CCDOC shall ensure that inmate disciplinary hearings are conducted in a reasonably private and secure setting. | x 8/11 x12/11 x7/12 x2/13 | x 9/10 x 3/11 | |
| 36.c. (41) | CCDOC shall ensure that all inmates placed in lock down status are provided with appropriate due process that has been developed and implemented in policies and procedures, in accordance with generally accepted correctional standards. | x7/12 x2/13 | x 9/10 x 3/11 x 8/11 x12/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | In an emergency, the Executive Director of CCDOC may order a lock down of entire areas of the Facility in order to control the situation and address serious security concerns.  In such circumstances, it is not necessary to provide disciplinary hearings to each inmate affected by the lock down.  However, lock downs of this nature shall be limited to only the time and scope necessary to address the emergency.  For the purposes of this Agreed Order, a "lock down" shall not include the routine instances in which inmates are confined to their cells, including periods of count, over night, shift change, movement, and routine contraband sweeps. | | | |
| 36.d. (41) | CCDOC shall ensure that the disciplinary board's written record accurately reflects the testimony and discussion from the disciplinary hearing, including any recommendations from a mental health professional regarding the extent to which disciplinary charges are related to an inmate's serious mental illness or suggestions for minimizing the deleterious effect of disciplinary measure on the mental health status of the inmate. | x7/12 x2/13 | x 3/11 x 8/11 x12/11 | x9/10 |
| 36.e. (42) | CCDOC shall alert Cermak when inmates are placed in disciplinary segregation or protective custody. | x7/12 x2/13 | x 9/10 x 3/11 x 8/11 x12/11 | |
| 36.f. (42) | CCDOC shall permit a Cermak Qualified Mental Health Staff member to serve on the disciplinary board. | x12/11 x7/12 x2/13 | x 3/11 x 8/11 | x 9/10 |
| **37.** | **Classification** | | | |
| 37.a. (42) | CCDOC shall maintain policies and procedures for an appropriate, objective classification system that separates inmates in housing units by classification levels in order to protect inmates from unreasonable risk of harm.  The system shall include consideration of an inmate's security level, severity of current charge, types of prior commitments, suicide risk, history of escape attempts, history of violence, and special needs.  CCDOC shall use best efforts to anticipate periods of unusual intake volume and schedule sufficient classification staff to timely classify inmates. | | x 9/10 x 3/11 x 8/11 x12/11 x7/12 x2/13 | |
| 37.b. (43) | CCDOC shall ensure that classification staff have sufficient access to current information regarding cell availability on each division. | | x 9/10 x 3/11 x 8/11 x12/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | | | x7/12 x2/13 | |
| 37.c. (43) | CCDOC shall include information on each inmate's assignment to the Special Incarceration Unit "level system" at the Facility in the new Jail Management System, starting with the date the new Jail Management System becomes operational. | x 9/10 x 3/11 x 8/11 x12/11 x7/12 x2/13 | | |
| 37.d. (43) | CCDOC shall provide training and access to all correctional officer supervisors on the full capabilities of the new Jail Management System's classification and inmate tracking system (or any replacement system). | 2/13 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| 37.e. (43) | CCDOC shall provide ongoing internal and external review and validation of the inmate classification system to ensure its reliability and objectivity. | | x7/12 x2/13 | x 9/10 x 3/11 x 8/11 x12/11 |
| **38.** | **Inmate Grievance Procedure** | | | |
| 38.a. (44) | CCDOC shall maintain policies and procedures to ensure inmates have access to an adequate grievance process and to ensure that grievances may be accessed and filed confidentially, without requiring the intervention of a correctional officer, in accordance with generally accepted correctional standards.  These policies and procedures should be applicable and standardized across all the Facility divisions. | x8/11 x12/11 x7/12 | x 9/10 x 3/11 x2/13 | |
| 38.b. (45) | CCDOC shall ensure that the grievances receive appropriate follow-up, including informing the grievant of the outcome, providing a timely written response, and tracking implementation of resolutions. | x 8/11 x12/11 x7/12 | x 9/10 x 3/11 x2/13 | |
| 38.c. (45) | CCDOC shall ensure that grievance forms are available on all units and are available in Spanish. CCDOC shall ensure that there is adequate opportunity for illiterate inmates and inmates who have physical or cognitive disabilities to access the grievance system. | x 8/11 x12/11 x7/12 | x 9/10 x 3/11 x2/13 | |
| 38.d. (45) | CCDOC shall ensure that inmate grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria, are referred for investigation.  A | x 8/11 x12/11 | x 3/11 x2/13 | x 9/10 |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | member of the management staff shall review the grievance tracking system regularly in order to identify areas of concern. | x7/12 | | |
| **39.** | **Access to Information** | | | |
| 39.a. (46) | CCDOC shall ensure that newly admitted inmates receive information, through an inmate handbook or orientation video, regarding the following areas: facility rules and regulations; how to report misconduct; how to report sexual abuse or assault; the process for accessing medical and mental health care; emergency procedures; rules for sending and receiving mail; the visitation process; facility schedule; the disciplinary process; and how to seek redress of grievances. | X2/13 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| 39.b. (46) | CCDOC shall ensure that materials on facility rules and services are available for non-literate and non-English speaking inmates. | X2/13 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| 40. (47) | CCDOC shall provide training and supervision to all correctional officers and supervisors sufficient to implement the provisions of this Agreed Order. | x 8/11 x12/11 x7/12 x2/13 | x 9/10 x 3/11 | |
| 41. (47) | Inter-Agency Agreement<br>a. CCDOC shall enter into a written Inter-Agency Agreement with Cermak that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility. The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order.<br>b. Cermak shall enter into a written Inter-Agency Agreement with CCDOC that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility. The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order. | x 8/11 x12/11 x7/12 x2/13 | x 3/11 | x 9/10 |
| 69. (47) | CCDOC shall ensure that security staff posts will be equipped, as appropriate, with readily available, safely secured, suicide cut-down tools. *Coordinate with Dr. Metzner | x 8/11 x12/11 x7/12 x2/13 | | x 9/10 x 3/11 |

31. Use of Force

a.      CCDOC shall maintain comprehensive and contemporary policies and procedures, in accordance with generally accepted correctional standards, surrounding the use of force and with particular emphasis regarding permissible and impermissible uses of force.

**February 2013 Status Update:**  Substantial Compliance

**Status Update:**  All relevant policies were implemented effective 9/19/2011.

**Monitor's Assessment:**  I reviewed the most recent report regarding uses of force from the Use of Force Review Unit (UFRU), as well as reviewing data provided by OPR.  CCDOC is forwarding reports that contain any issues that may be perceived (or actually are) excessive force to Office of Professional Responsibility (OPR).  Of the 394 responses to resistance/use of force reports for CY 2012, the UFRU, and 15 by CCDOC forwarded 45 to OPR.   Forty-four of these cases involved an inmate's allegation of excessive force.

Importantly, UFRU has streamlined the review process to a one to two week period.  Also recommendations made by the UFRU in their annual report regarding resource and training are being addressed.

**Monitor's Recommendations:**  Continue refining implementation; continue updating data collection.  Assure collaboration with the Office of Professional Responsibility.

## 31. Use of Force

b.      CCDOC shall maintain use of force policies and pre-service and in-service training programs for correctional officers and supervisors that address the following impermissible uses of force:
1.      use of force as a response to verbal insults or inmate threats where there is no immediate threat to the safety of the institution, inmates, or staff;
2.      use of force as a response to inmates' failure to follow instructions where there is no immediate threat to the safety of the institution, inmates, or staff, unless CCDOC has attempted a hierarchy of nonphysical alternatives that are documented;
3.      use of force as punishment or retaliation;
4.      use of force involving striking, hitting, or punching a restrained and  non-combative inmate;
5.      use of force against an inmate after the inmate has ceased to offer resistance and is under control;
6.      use of choke holds on an inmate, unless lethal force is justified; and
7.      use of inappropriate or excessive force.

**February 2013 Status Update:**  Substantial compliance.

**Status Update:**   Remains in compliance.

**Monitor's Assessment:** As noted in previous reports, the CCSO's commitment to a Use of Force Review Unit demonstrates their commitment to use of force and all peripheral issues.

**Monitor's Recommendations:** See 31.a.

## 31. Use of Force

c.        CCDOC shall maintain a policy to ensure that staff adequately and promptly report all uses of force, in accordance with generally accepted correctional standards.

**February 2013 Compliance Status:**    Substantial Compliance

**Status Update:**   Remains in compliance. See 31.a.

**Monitor's Assessment:**   Use of force reports are improving in terms of the incident that resulted in a use of force, including efforts to deescalate. The USRU returns reports for clarification if the elements of this paragraph are not met. My review of the incident reports produced for the Sheriff's weekly accountability meeting demonstrate to me the changes. When I ask questions about uses of force, I receive prompt responses. See Investigations section for outcomes of review of investigative files relating to allegations of excessive force,

**Monitor's Recommendations:** See 31.a.

## 31. Use of Force

d.        CCDOC shall require that use of force reports:

  1.  Be written in specific terms in order to capture the details of the incident;
  2.  Contain an accurate account of the events leading to the use of force incident;
  3.  Include a description of the instrument(s) of restraint or control, if any, and the manner in which it was used;
  4.  Note whether an inmate disciplinary report was completed in connection with the incident that prompted the use of force;
  5.  Describe the nature and extent of apparent and reported injuries sustained both by the inmate and staff member;
  6.  Contain the date and time medical attention was actually provided;
  7.  Describe, in detailed, factual terms, the type and amount of force used as well as the precise actions taken in a particular incident; and
  8.  Note whether a use of force was videotaped. If the use of force is not videotaped, the reporting correctional officer and supervisor will provide an explanation as to why it was not videotaped.

**February 2013 Compliance Status:** Substantial compliance is maintained

**Status Update:** Remains in compliance See 31.a.

**Monitor's Assessment:** There are several layers of review of incident reports from the immediate supervisor, the commanders and superintendent in each facility, the UFRU and the CCDOC's leadership team. Refinements are being made, such as having the UFRU's review earlier in the process, all designed to address the elements of this paragraph.

**Monitor's Recommendations:** Continue monitoring compliance via the URFU.

I recommended to CCDOC in January 2012 that they monitor/ track uses of force involving mental health clients [as identified by CERMAK]. The URFU provided some of this data in their most recent draft report, but I believe more work is necessary in collaboration with Cermak to assure that this important data is tracked, analyzed, and changes made, if necessary, to staff assignment, supervision, and/or training.

## 31. Use of Force

e.      CCDOC shall continue to require prompt review by the shift commander of all use of force reports. The shift commander's review of use of force reports shall include review for completeness and procedural errors, as well as review of the substantive content. If the use of force report does not comply with provision 31.d. of this Agreed Order, the shift commander shall return it to the reporting officer for revision and resubmission until it is compliant. If the shift commander believes a use of force may have been inappropriate or excessive, he or she shall immediately refer the incident for investigation.

**February 2013 Compliance Status:**      Substantial compliance

**Status Update:** Remains in substantial compliance. See 31.d.

**Monitor's Assessment:**

**Monitor's Recommendations:** Continue refining the role of the UFRU and assure that training is provided to newly promoted supervisors regarding these requirements.

## 31. Use of Force

f.      CCDOC shall ensure that senior management review of uses of force includes:

    1.      A timely review of medical documentation of inmate injuries, if any is submitted, as provided by Qualified Medical Staff, including documentation surrounding the initial medical encounter, an anatomical drawing that depicts the areas of sustained injury, and information regarding any further medical care;
    2.      The inmate disciplinary report, if any, associated with the use of force; and
    3.      The incident report, if any, associated with the use of force.

**February 2013 Compliance Status:**      Substantial compliance.

**Status Update:** Remains in substantial compliance

**Monitor's Assessment:** Senior management are reviewing reports and have refined the process so that the logging of the reports is not delayed at OPR (the keepers of the source data).

**Monitor's Recommendations:** Continue refining the processes as more experience with the process is gained.

### 31. Use of Force

g.      CCDOC [and Cermak] shall establish criteria that trigger referral for inappropriate or excessive use of force investigations, including but not limited to, documented or known injuries that are extensive or serious; injuries involving fractures or head trauma; injuries of a suspicious nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.); and injuries that require treatment at outside hospitals.

**February 2013 Compliance Status:**    Substantial compliance.

**Status Update:** Remains in substantial compliance.

**Monitor's Assessment:** I interviewed Cermak's leadership regarding this matter. They are satisfied that any allegations they have are heard and that they feel there is good cooperation between Cermak and OPR. This was echoed by OPR. The Interagency Coordinating Committee is reviewing updates to procedures to improve the referral form based on experience.

**Monitor's Recommendations:** Continue refining the process via the Interagency Coordinating Committee.

### 31. Use of Force

h.      When CCDOC review of use of force reports, and supporting records if applicable, reveals that reports of a use of force are materially inconsistent, conflicting, or suspicious, CCDOC shall refer that use of force incident for internal investigation.

**February 2013 Compliance Status:**    Substantial Compliance.

**Status Update:** Remains in substantial compliance

**Monitor's Assessment:** See 31.a., c. The UFRU is part of this process and so is the leadership of CCDOC. The UFRU reports that they do send to OPR for their review incidents where inconsistencies are noted. These are then noted in the OPR records as the complainant being the commander of the Office of Policy and Accountability (OPA).

**Monitor's Recommendations:** Continue refinements.

## 31. Use of Force

i.      CCDOC shall develop and implement a system to track all incidents of use of force that, at a minimum, includes the following information:

1.      a tracking number;
2.      the inmate(s) name;
3.      housing assignment;
4.      date;
5.      type of incident;
6.      injuries (if applicable);
7.      medical care provided (if applicable);
8.      staff involved;
9.      reviewing supervisor;
10.     external reviews and results (if applicable);
11.     remedy taken (if appropriate); and
12.     administrative sign-off.

**February 2013 Compliance Status:**     Substantial compliance.

**Status Update:**   Remains in substantial compliance.

**Monitor's Assessment:**  IMACS will continue to be updated and refined, and the system is operational for the purposes of this paragraph.

**Monitor's Recommendations**:  Continue refinements.

## 31. Use of Force

j.      CCDOC shall ensure that, promptly following a use of force incident, video or photographs are taken of any and all reported or apparent injuries sustained by inmates and staff.  The video or photographs will be maintained and will be included in the investigation package, if applicable.

**February 2013 Compliance Status:**     Substantial compliance

**Status Update:**   Remains in substantial compliance.

**Monitor's Assessmen**t:  Investigations I reviewed at OPR included these materials. UFRU reported no issues in their quarterly report regarding the requirements of this paragraph.

**Monitor's Recommendations:**  Continue to monitor compliance, and refine processes

## 31. Use of Force

k.        CCDOC shall establish an "early warning system" that will document and track correctional officers who are involved in use of force incidents and any complaints related to the inappropriate or excessive use of force, in order to alert CCDOC administration to any potential need for retraining, discipline, problematic policies, or supervision lapses.  Appropriate CCDOC leadership, supervisors, and investigative staff shall have access to this information and monitor the occurrences.  CCDOC senior management shall use information from the early warning system to improve quality management practices, identify patterns and trends, and take necessary corrective action both on an individual and systemic level.

**February 2013 Compliance Status:**      Substantial compliance.

**Status Update:**  Remains in substantial compliance.

**Monitor's Assessmen**t:   The First Assistant Executive Director receives these alerts from IAPro and takes action as appropriate.  There have been individuals mandated for remedial training.  The UFRU notes that when the alerts are generated in IAPro, the staff member is interviewed.  Some of the interviews are not as timely as the department wishes, and they are working to shorten the time between the alert and when the staff person is interviewed.  Since July 2012, IAPro alerts identified165 CCDOC employees.  Not all were deemed to need remedial training.  The remedial training is conducted by the UFRU.

**Monitor's Recommendations:**  Continue to refine the process.  Track alerts, referrals and outcomes.  Work to shorten the time between alerts and interviews.

## 31. Use of Force

l.        CCDOC shall ensure that a supervisor is present during all pre-planned uses of force, such as cell extractions.

**February 2013 Compliance Status:**      Substantial compliance

**Status Update:**   Remains in substantial compliance.

**Monitor's Assessmen**t:  Compliance is monitored by URFU.  No issues reported.

**Monitor's Recommendations:**  Continue to monitor compliance.

## 31. Use of Force

m.        Where there is evidence of staff misconduct related to inappropriate or unnecessary use of force against inmates, CCDOC shall initiate personnel actions and seek disciplinary action appropriately for any correctional officer found to have:

1.        engaged in inappropriate or excessive use of force;
2.        failed to report or report accurately the use of force;
3.        retaliated against an inmate or other staff member for reporting an inappropriate or

excessive use of force; or

4.      interfered or failed to cooperate with an internal investigation regarding use of force in a manner inconsistent with the staff member's statutory or contractual rights.

**February 2013 Compliance Status**:      Substantial compliance

**Status Update:** Remains in substantial compliance.

**Monitor's Assessmen**t:  This continues to be a high priority for the CCDOC leadership.

**Monitor's Recommendations**: None at this time.

## 31. Use of Force

n.      Where there is evidence of staff misconduct related to inappropriate or unnecessary use of force against inmates, CCDOC shall consider, develop, and initiate systemic remedies as appropriate.

**February 2013 Compliance Status**:      Substantial compliance

**Status Update:**  Has remained in substantial compliance for 18 months.

**Monitor's Assessmen**t: Nothing at this time.

**Monitor's Recommendations:**  Nothing at this time.

## 31. Use of Force

o.      CCDOC shall maintain accountability policies and procedures for the effective and accurate maintenance, inventory, and assignment of chemical and other security equipment, in accordance with generally accepted correctional standards.

**February 2013 Compliance Status**:      Substantial compliance.

**Status Update:**  Remains in substantial compliance

**Monitor's Assessmen**t: Nothing at this time.

**Monitor's Recommendations:** Nothing at this time.

## 31. Use of Force

p.      CCDOC shall continue to conduct use of force training in accordance with generally accepted correctional standards, including:

1.      CCDOC shall maintain an effective and comprehensive use of force training program.
2.      CCDOC shall continue to ensure that correctional officers receive adequate training in CCDOC's use of force policies and procedures, including de-escalation and defensive

tactics relating to use of force.

3.      CCDOC shall continue to ensure that correctional officers receive pre-service and in-service training on reporting use of force and completing use of force reports.

**February 2013 Compliance Status:**      Substantial compliance.

**Status Update:** Remains in substantial compliance.

**Monitor's Assessmen**t:  As more attention is paid to uses of force involving mental health clients, improved collaboration with Cermak and more stable staffing, outcomes will improve.

**Monitor's Recommendations:**  Continue work to identify how best to manage inmates with mental illness and update/monitor uses of force for this population.

## 31. Use of Force

q.      CCDOC shall provide a process for inmates to report allegations of the inappropriate or excessive use of force orally to any CCDOC staff member; said staff member shall give the inmate the opportunity to reduce his or her report to writing through a grievance or complaint form without discouragement.

**February 2013 Compliance Status:**      Partial compliance.

**Status Update:** This paragraph remains in partial compliance as refinements continue to the inmate grievance process.

**Monitor's Assessment:**  The grievance process is identifying allegations of staff misconduct and uses of force, as CCDOC reports that between 8/2102 and 1/2013 64 grievances were referred to OPR.  I also noted during my review of investigative files at OPR inmate grievances had triggered investigations. I believe CCDOC is committed to refining the inmate grievance operational practices.

**Monitor's Recommendation:** Continue refinements under newly appointed Director Olson.  See also 38 a – d.

## 31. Use of Force

r.      Following a use of force, when CCDOC staff transport an inmate to receive medical care by Cermak, as necessary, the CCDOC staff member shall inform the Cermak staff member that the inmate was involved in a use of force.

**February 2013 Compliance Status:**      Substantial Compliance.

**Status Update:** Remains in substantial compliance.

**Monitor's Assessment:** Both Cermak and CCDOC report compliance. Records of uses of force indicate prompt medical attention. Cermak notes that their staff is trained/skilled in identifying injuries that are consistent with a use of force.

**Monitor's Recommendation:** Nothing at this time.

## 31. Use of Force

s.        Cermak shall ensure that, when providing medical treatment or assessment to an inmate following a use of force, Qualified Medical Staff document the inmate's injuries, if any, and any medical care provided. Cermak shall provide CCDOC senior management with a brief summary documenting the initial medical encounter following a use of force, including an anatomical drawing that depicts the areas of sustained injury, if any, and information regarding any further medical care.

**February 2013 Compliance Status:**     Substantial compliance.

**Status Update:** Remains in substantial compliance

**Monitor's Assessment:** As noted earlier in this report, Cermak's leadership is satisfied with compliance with this matter. OPR reports that after some initial challenges to receiving reports, there are no problems at this time.

**Monitor's Recommendations:** Continue to use the Interagency Coordinating Council to address how to enhance operations.

## 31. Use of Force

t.        Cermak shall ensure that Qualified Medical Staff question, outside the hearing of other inmates or correctional officers if appropriate, each inmate who reports for medical care with an injury, regarding the cause of the injury. If, in the course of the inmate's medical encounter, a health care provider suspects staff-on-inmate or inmate-on-inmate abuse, that health care provider shall immediately:
1.        report the suspected abuse to the Executive Director of the Office of Professional Review or other appropriate CCDOC administrator; and
2.        adequately document the matter in the inmate's medical record.

**February 2013 Compliance Status:**     Substantial Compliance

**Status Update:** Remains in substantial compliance

**Monitor's Assessment:** Neither ORP, Cermak nor CCDOC report any issues. The Interagency Coordinating Committee is the vehicle to surface and address any concerns. Minutes of these meeting are maintained.

**Monitor's Recommendations:** Nothing at this time.

## 32.    Safety and Security

a.      CCDOC shall maintain security and control-related policies, procedures, and practices that will result in a reasonably safe and secure environment for all inmates and staff, in accordance with generally accepted correctional standards. Coordinate with Grenawitzke, Shansky, Metzner.

**February 2013 Compliance Status:**  Substantial compliance.

**Status Update:**  The Office of Policy and Accountability (OPA) continues to update written directives and draft new orders.  OPA and CCDOC have demonstrated that they have an effective process in place to do this work.  As such, even though all directives on their list have not been updated, the process is working and therefore, I find CCDOC in substantial compliance.

**Monitor's Assessment:** An update dated February 12, 2013 was provided listing all orders issues in the previous six months, orders awaiting final sign-off, orders in draft, and completed audits.  OPA has a list of all components of CCDOC's written directive system and the dates when actions will be taken.  The unit if fully and appropriately staffed.

**Monitor's Recommendation:**  None at this time.

## 32.    Safety and Security

b.      CCDOC shall maintain policies, procedures, and practices to ensure the adequate supervision of inmate work areas and trustees, in accordance with generally accepted correctional standards.  Coordinate with Grenawitzke.

**February 2013 Compliance Statue:**    Substantial Compliance

**Status Update:**   Remains in substantial compliance

**Monitor's Assessment:**  No issues at this time.

**Monitor's Recommendations:**  Nothing at this time.

## 32.    Safety and Security

c.      CCDOC shall ensure that security staff conduct appropriate rounds with sufficient frequency to provide inmates with reasonable safety.  Rounds shall be conducted at least once every half hour, at irregular intervals, inside each housing unit.  In the alternative, CCDOC may provide direct supervision of inmates by posting a correctional officer inside the day room area of a housing unit to conduct constant surveillance.   More frequent rounds shall be conducted for special management inmates who require more intensive supervision for security and safety reasons.  All security rounds shall be documented on forms or logs that do not contain pre-printed rounding times.  Video surveillance may be used to supplement, but must not be used to replace, rounds by correctional officers.

**February 2013 Compliance Status:** Substantial compliance.

**Status Update:** General Order 24.9.9.0, effective December 6, 2011, incorporates the language required in this paragraph.

**Monitor's Assessmen**t: CCDOC has a process in place to audit housing unit logs to assess their own compliance with many of the requirements of the consent agreement. I reviewed the audit for a sample of housing units in all divisions for the period December 2012 – February 2013. I am satisfied that the written directive is appropriate and that the CCDOC has the systems in place to monitor compliance and take actions as needed.

**Monitor's Recommendations:** Continue the audits and any required corrective action plans.

## 32. Safety and Security

d.	CCDOC shall ensure that security supervisors conduct daily rounds in the inmate housing units, and document the results of their inspections.

**February 2013 Compliance Status:** Substantial Compliance

**Status Update:** See 32.c.

**Monitor's Assessmen**t: See 32.c.

**Monitor's Recommendations:** Continue the audits and any required corrective action plans.

## 32.	Safety and Security

e.	Cook County shall increase the use of overhead video surveillance and recording cameras to provide adequate coverage throughout the common areas of the Facility, including the RCDC, all division intake areas, mental health units, special management units, inmate housing units, and in common areas of the divisions.

**February 2013 Compliance Status:**	Partial Compliance

**Status Update:** There have been challenges in awarding the contract to complete the work on the cameras. The award was expected in September 2012, but due to no bidder meeting the County's broad requirements, work has not continued. CCDOC has installed cameras since DOJ's initial tours of the facilities, so work has been done.

**Monitor's Assessment:** CCDOC will continue to work with County government to install cameras. CCDOC reports that they will have alternative plans for my review in the next tour scheduled for September 2013.

**Monitor's Recommendations**: CCDOC continue to work with the County to acquire the vendors needed to complete the work.  Prepare any alternative plans for review in September 2013

## 32.    Safety and Security

f.        CCDOC shall maintain a procedure to prevent inmates from possessing or having access to dangerous contraband, including conducting regular inspections of cells and common areas of the housing units to identify and prevent rule violations by inmates.

**February 2013 Compliance Status**:     Substantial compliance

**Status Update:**  CCDOC has a model program for other jails and prisons to follow in aggressively examining the source of weapons/contraband and working with DFM to fix the problem.  DFM and the County have responded with funds to replace lighting to security grade, thus ending one source of dangerous weapons.  The issue that held up substantial compliance for this paragraph was DFM's refusal to allow CCDOC access to keys that opened all doors/other locked areas inside the security perimeter.  The pilot program for access to keys has ended with a positive report from CCDOC and DFM.

**Monitor's Assessmen**t:  CCDOC is commended for their innovative approaches to prevention, identification, and stopping contraband.  DFM is commended for their cooperation and resources to retrofit the jail to prevent contraband from being manufactured. The County is applauded for providing the funding needed to replace the non-security grade lighting with appropriate lighting.

**Monitor's Recommendations:**  Monitor expansion of the key control pilot program.  Continue work on monitoring the source of contraband.

## 32.    Safety and Security

g.        CCDOC shall review, and revise as applicable, all General Orders ("GOs"), Standard Operating Procedures ("SOPs") and Post Orders on an annual basis, or more frequently as needed.

**February 2013 Compliance Status**:     Substantial Compliance

**Status Update:**  Remains in substantial compliance.

**Monitor's Assessmen**t: OPA continues to produce the lists of written directives for the annual review process, as well as new directives.

**Monitor's Recommendations:**  None at this time.  OPA is commended for their diligence and commitment to the task.

**32.    Safety and Security**

h.    CCDOC shall revise policies, SOPs, and post orders for all armed posts to include proper use and safe handling of weapons and provide specific instructions on use of deadly force and when and under what circumstances such force should be used, in accordance with generally accepted correctional standards.

**February 2013 Compliance Status:**    Substantial Compliance.

**Status Update:**  Remains in substantial compliance

**Monitor's Assessmen**t:  See 32.g.

**Monitor's Recommendations:** See 32.g.

**32.    Safety and Security**

i.    CCDOC shall standardize security policies, procedures, staffing reports, and post analysis reports across the divisions, to the extent possible, taking into account the different security levels and different physical layouts in the various divisions.

**February 2013 Compliance Status:**    Substantial compliance.

**Status Update:**  CCDOC has produced a handbook for all divisions, including RCDC, laundry operations, and external operations.

**Monitor's Assessmen**t:   CCDOC is commended on completing this important work

**Monitor's Recommendations:**   When the handbooks are annually reviewed, it would be helpful to include dates on initial approval and subsequent review dates, so all employees are clear that they have the most recent handbook.

**32.    Safety and Security**

j.    CCDOC shall provide formal training on division-specific SOPs to correctional officers in accordance with their assignments, and shall provide further specialized training for officers assigned to Special Management Units.  Cermak Hospital shall provide specialized training for officers assigned to psychiatric units. [From Consent agreement "Special Management Units" means those housing units of the Facility designated for inmates in administrative or disciplinary segregation, in protective custody, on suicide precautions, or with mental illness."] Coordinate with Drs. Shansky and Metzner.

**February 2013 Compliance Status:**  Substantial Compliance.

**Status Update:**  Remains in substantial compliance

**Monitor's Assessment:** As the changes at CCDOC evolve, more attention is being paid to how inmates with mental illness are managed. Dr. Metzner and I proposed a strategy to assign interested, trained, and committed security staff to mental health units. This proposal was well received and continue to be evaluated in light of collective bargaining agreements. With the new RTU building these changes will be a positive approach to improved management. Dr. Jones reports more use of team approaches – that is mental health and security staff – to help specific units better manage their inmates with mental illness.

**Monitor's Recommendations:** Continue refining and implement the proposal for specially trained security staff working in mental health units.

## 32.    Safety and Security

k.      CCDOC shall maintain in working order all monitoring equipment at the Facility that is under CCDOC's direct control, including cameras, alarms, radios (hand held), interior and exterior lighting, x-ray and other screening equipment, and walk-through metal detectors. To the extent that the maintenance of any Facility monitoring equipment is under the control of DFM, CCDOC shall promptly report any maintenance needs and DFM shall prioritize its services to ensure that all monitoring equipment is maintained in working order. Coordinate with Grenawitzke.

**February 2013 Compliance Status:**    Substantial Compliance.

**Status Update:** Remains in substantial compliance

**Monitor's Assessment:** No further assessment was undertaken by me regarding DFM's work order system. Monitor Grenawitzke is monitoring this aspect of the agreement.

**Monitor's Recommendations:** None at this time.

## 32.    Safety and Security

l.      Absent exigent circumstances, CCDOC: (i) shall house each inmate assigned to a division that is celled to one permanent bed in a cell and shall not house any inmates (including those assigned to dormitory divisions) such that they are sleeping on the floor, on a mattress on the floor, or in any area not designed or redesigned as sleeping quarters; (ii) shall not house more than two inmates to a single cell (triple-bunking); and (iii) shall not hot-bunk any inmates.

**February 2013 Compliance Status:**    Substantial Compliance.

**Status Update:** Remains in substantial compliance.

**Monitor's Assessment:** Crowding will jeopardize compliance. See the Executive Summary to this report.

**Monitor's Recommendations:** Nothing further at this time.

**32.    Safety and Security**

m.    When exigent circumstances give rise to triple-bunking, CCDOC shall provide the third inmate in the triple-bunked cell a "boat," stackable bunk, moveable platform, or cot, so that the inmate is not required to lay down directly on the cell floor or on a mattress on the floor.

**February 2013 Compliance Status:    Substantial Compliance**

**Status Update:** See 32. l.

**Monitor's Assessmen**t:  See 32.1.

**Monitor's Recommendations:** See 32.l.

**33.    Security Staffing.** The parties agree that correctional officer staffing and supervision levels at the Facility must be appropriate to adequately supervise inmates, to carry out the requirements of this Agreed Order, and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards.  Cook County and CCDOC shall take such actions as shall ensure that correctional officer staffing and supervision at the Facility are sufficient to achieve these purposes. These actions shall include the following:

a.    In the fiscal year 2010 budget, Cook County shall allocate funds sufficient to allow for 210 additional correctional officer positions at the Facility.  Consistent with provision 33.c, such funding may occur on a rolling basis, as appropriate in light of the time required to hire, train, and put on duty the additional 210 new correctional officers.

**February 2013 Compliance Status:    Substantial Compliance**

**Status Update:** Remains in substantial compliance

**Monitor's Assessment:** CCDOC reported that as of 1/31/13 there were 47 vacancies and they anticipated all would be filled by 2/28/13.

**Monitor's Recommendation:** None at this time.

**33.    Security Staffing.**

b.    CCDOC shall use its best efforts (through the maintenance of the written staffing plan required by provision 33.h and otherwise) to ensure that the number of correctional officer vacancies is kept to the minimum practicable number at all times, taking into account that the timing of terminations and resignations and the resulting rate of attrition may, in ordinary course, result in there being some vacancies at any given time.

**February 2013 Compliance Status:** Partial compliance

**Status Update:** As noted in August 2012 the staffing plan remains in draft. The staffing plan for the new division is not complete. This paragraph will be in substantial compliance when this is completed.

**Monitor's Assessmen**t: Work is continuing. A Workforce Utilization Committee is evaluating staffing in all divisions and all posts. This effort should include supervisory span-of-control. The Workforce Utilization Committee will continue after these plans are produced as a means to most effectively use staffing resources.

**Monitor's Recommendations**: Complete the plan, compute the shift relief factor. CCDOC should examine the span-on-control especially for first line supervisors.

## 33. Security Staffing.

c.    CCDOC shall fill the 210 additional correctional officer slots provided for in provision 33.a; fill the 285 correctional officer vacancies that existed at the Facility as of July 17, 2009; and fill any correctional officer vacancies coming into existence after that date in the following manner:
   i.    By December 31, 2010, CCDOC shall hire, train, and put on duty at the Facility at least 448 [381] newly qualified correctional officers (in addition to those on duty as of December 31, 2009).
   ii.    By March 30, 2011, CCDOC shall hire, train, and put on duty at the Facility at least 178 [107] newly qualified correctional officers (in addition to those on duty as of December 31, 2010).

**February 2013 Compliance Status:** Substantial Compliance.

**Status Update:** Remains in substantial compliance,

**Monitor's Assessmen**t: See 33.a.

**Monitor's Recommendations:** See 33. a. and 33.b.

## 33. Security Staffing.

d.    The parties agree that for 30 months following the effective date of this Agreed Order, Cook County and CCDOC shall not be required to provide additional correctional officer staffing and supervision at the Facility beyond that which is necessary to ensure that correctional officer staffing and supervision are sufficient to achieve the purposes set out in the introductory paragraph of provision 33 and to comply with provisions 33.a-c above.

**February 2013 Compliance Status:**    Partial Compliance

**Status Update:** At this time CCDOC has not completed the staffing plan, including the shift relief factor, nor examined supervisory staffing levels. CCODC is diligently and systematically working of these initiatives. The staffing plan for the new division is not completed. As such, I am not yet in a position to assess

and make a recommendation as t0 whether the correctional officer staffing and supervision levels are appropriate.

**Monitor's Assessmen**t:  The work is progressing.  The process is credible, and the involvement of representatives of all divisions provides appropriate input.   Not having the data and information available at this time for my response to this paragraph is more a matter of timing than any lack of action by CCDOC.

**Monitor's Recommendations:**  I recommend that any conclusions by me for the provisions of this paragraph, as well as paragraphs 33.f., and 33.g. be deferred until the next tour (September 2013).

## 33.    Security Staffing.

e.      Within 30 months of the effective date of this Agreed Order, the CCDOC Monitor shall assess and make a recommendation on whether the correctional officer staffing and supervision levels are appropriate to adequately supervise inmates at the Facility, in accordance with generally accepted correctional standards.  If the CCDOC Monitor determines that staffing is inadequate, the CCDOC Monitor will make a recommendation regarding the appropriate number of correctional officer staff.  If the parties do not accept the CCDOC Monitor's staffing recommendation, CCDOC and Cook County shall agree to an independent, comprehensive study to determine the appropriate correctional officer staffing and supervision.  The parties agree that the results of this staffing study shall provide guidance as to the sufficient number of qualified correctional officers necessary to operate the Facility safely and to carry out the requirements of this Agreed Order.

**February 2013 Compliance Status:**   Partial Compliance

**Status Update:**  See 33.d.

**Monitor's Assessment:**    See 33.d.

**Monitor's Recommendation:**    See 33.d.

## 33.    Security Staffing.

f.      If the staffing study requires additional correctional officers, Cook County shall allocate funds sufficient to maintain correctional officer staffing levels necessary to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards.

**February 2013 Compliance Status:**    Partial compliance.

**Status Update:**  See 33.d.

**Monitor's Assessment:**    See 33.d.

**Monitor's Recommendation:**    See 33.d.

**33.    Security Staffing.**

g.    If the staffing study requires additional correctional officers, and consistent with Cook County's allocation of funds for security staffing, CCDOC shall hire and train sufficient number of qualified correctional officers and other staff to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards, including:
1.    Investigative staffing sufficient to meet the internal investigation responsibilities outlined in this Agreed Order;
2.    Correctional officer staffing sufficient to provide inmates requiring treatment with adequate access to appropriate medical and mental health care by providing timely movement of inmates to medical units, transport of inmates who have been referred for outside specialty care, and escort, if necessary, to Qualified Medical and Mental Health Staff on housing units; and
3.    Qualified staff sufficient to monitor security cameras in real time and allow for supervisory viewing and retrieving at any time.

**February 2013 Compliance Status:**    Partial compliance.

**Status Update:** See 33.d.  All OPR positions were filled, except for the soon-to-be Director's position in February 2013.

**Monitor's Assessment:**    See 33.d.

**Monitor's Recommendation:**  See 33.d.

**33.    Security Staffing.**

h.    CCDOC shall maintain a written staffing plan that requires sufficient staffing to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards.

**February 2013 Compliance Status:**    Partial compliance.

**Status Update:** See 33.b.

**Monitor's Assessment:** See 33.b.

**Monitor's Recommendation:** See 33.b.

**33.    Security Staffing.**

i.    Absent exigent circumstances, CCDOC shall maintain a practice that does not allow for scheduled, planned, or expected cross-watching (a CCDOC practice of allowing one correctional officer to simultaneously supervise two housing units from the control center of one of the units) at any time on all maximum security and Special Management Units, and during first and second shifts throughout the Facility.

**February 2013 Compliance Status:**    Substantial Compliance

**Status Update:**  CCDOC reports no deficiencies.

**Monitor's Assessmen**t:  Nothing at this time.   The vertical cross-watching pilot program in Division I was not continued based on assessment of outcomes.

**Monitor's Recommendation:**  None at this time.

**33.    Security Staffing.**

j.        CCDOC may permit cross-watching on third shift in housing units that are not maximum security or Special Management Units only if the Monitor does not object after consultation and review.  The Monitor's review of the appropriateness of third-shift cross-watching on a particular housing unit shall be guided by the sufficiency of sightlines between the units being cross-watched, the adequacy of video and/or audio technologies in place, and/or other factors that bear on the safety and security of inmates and staff.  If the Monitor later objects to any cross-watching that is in effect because of the Monitor's concerns that cross-watching on a particular housing unit presents an undue risk to the safety and security of inmates and staff, CCDOC shall immediately cease such cross-watching.  CCDOC may renew cross-watching on that unit again if, after further consultation with and review by the Monitor, the Monitor does not object to such renewal.  Although cross-watching is permitted under the limited circumstances described herein, CCDOC will work to eliminate the practice at the Facility.

**February 2013 Compliance Status:**     Substantial Compliance

**Status Update:**  See 33.i.

**Monitor's Assessmen**t:  See 33.i.

**Monitor's Recommendation:**  Nothing at this time.

**34.    Incidents and Referrals**

a.        CCDOC shall continue to ensure that staff adequately and promptly document all reportable incidents, including inmate fights, rule violations, inmate injuries, suicides and suicide attempts, cell extractions, medical emergencies, contraband, vandalism, escapes and escape attempts, fires, and other incidents causing a disruption to standard CCDOC practice, in accordance with generally accepted correctional standards.

**February 2013 Compliance Status:**  Substantial Compliance.

**Status Update:**  With the complete implementation of IMACS this paragraph is satisfied.

**Monitor's Assessment:** OPR received 269 complaints regarding excessive force in CY 2012. Of those 49 investigations were completed. The Use of Force Review Unit assessed 394 responses to resistance/uses of force, not all of which contained any allegation of excessive force. OPR's investigations lead to a recommendation of one employee termination. Between August 2012 and January 2013, 64 inmate grievances containing allegations of excessive force were sent to OPR by the CCDOC Program Services staff.

**Monitor's Recommendation:** Continue to improve the collaboration between the Use of Force Review Unit and OPR. As previously agreed, OPR is the single point of data for use of force reports and allegations of excessive force.

**34.     Incidents and Referrals**

b.      CCDOC shall continue to ensure that correctional officers receive formal pre-service and in-service training on proper incident reporting policies and procedures, in accordance with generally accepted correctional standards.

**February 2013 Compliance Status:** Substantial compliance

**Status Update:** See July 2011 report.

**Monitor's Assessment:** See comments in the use of force paragraphs about the role of the Use of Force Review Unit, as well as implementation of the field training program.

**Monitor's Recommendations:** See comments in the use of force paragraphs.

**34.     Incidents and Referrals**

c.      CCDOC shall maintain a system to track all reportable incidents (as described in provision 34.a) that, at a minimum, includes the following information:
  1.  incident tracking number;
  2.  the inmate(s) name;
  3.  housing assignment;
  4.  date;
  5.  type of incident;
  6.  injuries (if applicable);
  7.  medical care (if applicable);
  8.  primary and secondary staff involved;
  9.  reviewing supervisor;
  10. external reviews and results (if applicable);
  11. remedy taken (if appropriate); and
  12. administrative sign-off.

**February 2013 Compliance Status:** Substantial compliance

**Status Update:** See 34.a.

**Monitor's Assessment:** See 34.a.

**Monitor's Recommendation:** Nothing at this time.

## 34.    Incidents and Referrals

d.    CCDOC shall require prompt administrative review of incident reports. Such reviews shall include a case-by-case review of individual incidents as well as a systemic review in order to identify patterns of incidents. CCDOC shall incorporate such information into quality management practices and take necessary corrective action.

**February 2013 Compliance Status:** Substantial Compliance.

**Status Update:** Remains in substantial compliance.

**Monitor's Assessment:** There are redundant systems for risk management, quality control, and management alerts in CCDOC.

**Monitor's Recommendation:** Nothing at this time.

## 34.    Incidents and Referrals

e.    CCDOC shall ensure that incident reports, use of force reports and inmate grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria, that it is referred for investigation.

**February 2013 Compliance Status:** Partial Compliance.

**Status Update:** As referenced in this report, the refinements to inmate grievance process continue.

**Monitor's Assessment:** Demonstrated operational practice for the grievance process will bring this paragraph into substantial compliance.

**Monitor's Recommendation:** Continue refinements.

## 34.    Incidents and Referrals

f.    CCDOC [OPR] shall maintain policies, procedures and practices requiring investigations to resolve issues identified during review of incident reports, disciplinary hearings, or inmate grievances, and determine appropriate remedies, in accordance with generally accepted correctional standards. At a minimum, CCDOC shall require timely and appropriate investigations of all suicides, serious suicide attempts, inmate-on-inmate violence resulting in serious injury, inmate-on-staff violence, inmate injuries requiring treatment by an outside hospital, inmate injuries of a suspicious nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.), sexual misconduct between inmates, sexual misconduct involving staff, fires, escapes, escape attempts, and deaths.

**February 2013 Compliance Status:** Partial compliance

**Status Update:**  See 34.e.

**Monitor's Assessment:** See 34. e.

**Monitor's Recommendation:**  See 34.e.

**34.    Incidents and Referrals**

g.       CCDOC [OPR] shall ensure that any investigation reports indicating possible criminal behavior will be referred to the appropriate law enforcement authority.

**February 2013 Compliance Status:**  Substantial compliance

**Status Update:**  Remains in substantial compliance.

**Monitor's Assessment:**  I reviewed ten investigative files in OPR, selected at random.  Of those, two were triggered by an inmate grievance.   Even during this period where the inmate grievance process is experiencing implementation issues, supervisors are clear about referrals of allegations to OPR, and have been doing so.  As noted earlier, from August 2012 – January 2013, CCDOD referred 64 grievances to OPR.

**Monitor's Recommendation:**  Refine, implement, and assess inmate grievance process.

**35.    Investigations** - Investigations at the Facility are conducted by independent departments under the Cook County Sheriff's Office, including the Office of Professional Review, the Criminal Investigations Unit, and the Sheriff's Police Department.  The Cook County Sheriff will assume responsibility for requiring these investigatory units to comply with the relevant provisions of this Agreed Order.

a.       CCDOC [OPR] shall maintain comprehensive policies, procedures, and practices for the timely and thorough investigation of alleged staff misconduct, in accordance with generally accepted correctional standards.

**February 2013 Compliance Status:**     Substantial Compliance

**Status Update:** On November 15, 2012, General Order 25.5.70.0, Correctional Information and Investigations Division (CIID) was effective.  This new

organizational components brings together the investigative function of CCDOC with gang intelligence. From November 2012 – January 2013, CIID was assigned 675 cases, including allegations of criminal activities. All allegations of sexual assault and misconduct are referred to the Cook County Sheriff's Police. Of the 675 cases referred during this time period, 239 remain open.

**Monitor's Assessmen**t: The process of determining how best to meet the mandates of this section with accepted correctional practice have resulted in the formation of this new unit. I believe this is the correct step, and will review operations and data in September 2013.

**Monitor's Recommendations:** When this order is revised, it needs to include how collaboration/consultation is done with OPR. Similarly, when OPR's SOP is updated, the interface with CIID needs to be addressed. Finally, when all PREA policies are in place, they need to be integrated into all relevant written directives.

## 35.    Investigations

b.      Internal investigations shall be conducted by persons who do not have supervisory responsibility for the staff member(s) being investigated.

**February 2013 Compliance Status**:     Substantial compliance.

**Status Update:**   Remains in substantial compliance

**Monitor's Assessmen**t:   Nothing at this time.

**Monitor's Recommendations:**  None at this time.

## 35.    Investigations

c.      CCDOC (OPR) shall ensure that all internal investigations will include timely, thorough, and documented interviews of all relevant staff and inmates who were involved, or witnessed, the incident in question.

**February 2013 Compliance Status**:     Substantial compliance.

**Status Update:**  Remains in substantial compliance. I reviewed 10 files randomly selected investigative files.

**Monitor's Assessmen**t:   As with previous file reviews, all files were in order. All files concerned allegations of excessive force. The sources of the complaints

included: complaint register – inmate talking with OPR (3); referral by CCDOC (2); inmate grievance (2); law suit (2); and one not noted. The outcomes of the investigation were: exonerated (5); not sustained (2); recommended termination (1); and pending (2). There were shorter time periods between when the investigation was opened/closed than during previous reviews, indicating more attention to resourcing investigations.

**Monitor's Recommendations:** Nothing at this time.

**35.     Investigations**

d.      CCDOC [OPR] shall ensure that internal investigation reports shall include all supporting evidence, including witness and participant statements, policies and procedures relevant to the incident, physical evidence, video or audio recordings, and relevant logs.

**February 2013 Compliance Status:**     Substantial compliance.

**Status Update:** Remains in substantial compliance. See 35.c.

**35.     Investigations**

e.      CCDOC [OPR] shall ensure that all investigatory staff will receive pre-service and in-service training on appropriate investigations policies and procedures, the investigations tracking process, investigatory interviewing techniques, and confidentiality requirements.

**February 2013 Compliance Status:**     Substantial compliance.

**Status Update:** Remains in substantial compliance

**Monitor's Assessmen**t: Nothing at this time.

**Monitor's Recommendations:** None at this time.

**35.     Investigations**

f.      CCDOC shall provide all investigators who will be assigned to conduct investigations of use of force incidents with specialized training in investigating use of force incidents and allegations.

**February 2013 Compliance Status:**     Substantial compliance.

**Status Update:** Remains in substantial compliance.

**Monitor's Assessmen**t: Nothing at this time.

**Monitor's Recommendations:** None at this time.

## 35.    Investigations

g.    CCDOC [OPR] shall ensure that the results of each internal investigation shall be documented in an investigation report.  CCDOC administration shall review the investigation reports, along with the underlying documentation, and take appropriate action.  CCDOC shall implement appropriate remedies based upon the results of internal investigations.

**February 2013 Compliance Status:**    Substantial Compliance.

**Status Update:**  Remains in substantial compliance.

**Monitor's Assessmen**t:  Nothing at this time.

**Monitor's Recommendations:**  None at this time.

## 36.    Inmate Disciplinary Process

a.    CCDOC shall maintain policies, procedures, and practices for a formal disciplinary process, including prompt issuance of written disciplinary citations, administrative review and disciplinary reports for alleged minor rule violations, and due process for alleged major rules violations, in accordance with generally accepted correctional standards.

**February 2013 Compliance Status:**    Substantial compliance

**Status Update:** Written directive [11.14.8.0] was effective 12/22/11.

**Monitor's Assessmen**t:  There were assignments in June 2012 of new management staff to an Inmate disciplinary Unit to oversee this function. Among the duties include collection and analysis of data.    As the process moves forward, this data integrity will improve.  The Unit reported that in CY 2012, there were a total of 8,987 disciplinary reports written, with 7,255 adjudications. Of the adjudications, in 1,365 cases the inmate was found not guilty.  Of the disciplinary reports not adjudicated, reasons included expiration of the time frame for hearings, invalid reports, and/or detainee was discharged/transferred. The Unit is following up with Superintendents regarding the non-adjudicated reporting to improve reporting and investigations.    The Unit also reports the number of psychological reviews conducted as part of the process (N=187 in CY 2012).

**Monitor's Recommendations:**  Update the written directive to better define an "invalid report", continue monitoring the process, and improve data integrity.

## 36.    Inmate Disciplinary Process

b.    CCDOC shall ensure that inmate disciplinary hearings are conducted in a reasonably private and secure setting.

**February 2013 Compliance Status:**    Substantial compliance

**Status Update:**  Remains in substantial compliance.

**Monitor's Assessmen**t: OPA produced a memorandum dated February 12, 2013 listing the specific areas in each division that the disciplinary hearing teams should use to address this paragraph.

**Monitor's Recommendations:**  Nothing at this time.

## 36.    Inmate Disciplinary Process

c.    CCDOC shall ensure that all inmates placed in lock down status are provided with appropriate due process that has been developed and implemented in policies and procedures, in accordance with generally accepted correctional standards.

In an emergency, the Executive Director of CCDOC may order a lock down of entire areas of the Facility in order to control the situation and address serious security concerns.  In such circumstances, it is not necessary to provide disciplinary hearings to each inmate affected by the lock down.  However, lock downs of this nature shall be limited to only the time and scope necessary to address the emergency.  For the purposes of this Agreed Order, a "lock down" shall not include the routine instances in which inmates are confined to their cells, including periods of count, over night, shift change, movement, and routine contraband sweeps.

**February 2013 Compliance Status:**    Substantial compliance.

**Status Update:**  Remains in substantial compliance

**Monitor's Assessmen**t: Nothing at this time.

**Monitor's Recommendations:** None at this time.

## 36.    Inmate Disciplinary Process

d.    CCDOC shall ensure that the disciplinary board's written record accurately reflects the testimony and discussion from the disciplinary hearing, including any recommendations from a mental health professional regarding the extent to which disciplinary charges are related to an inmate's serious mental illness or suggestions for minimizing the deleterious effect of disciplinary measure on the mental health status of the inmate.

**February 2013 Compliance Status:**    Substantial compliance

**Status Update:**  Remains in substantial compliance

**Monitor's Assessmen**t:  See 36.a.

**Monitor's Recommendations:** See 36.a.

## 36. Inmate Disciplinary Process

e.      CCDOC shall alert Cermak when inmates are placed in disciplinary segregation or protective custody.

**February 2013 Compliance Status:**      Substantial compliance.

**Status Update:** The Interagency Coordinating Committee continues to work for improved ways for these notifications.

**Monitor's Assessment:** Nothing at this time.

**Monitor's Recommendations:** Continue to evaluate improved processes.

## 36. Inmate Disciplinary Process

f.      CCDOC shall permit a Cermak Qualified Mental Health Staff member to serve on the disciplinary board.

**February 2013 Compliance Status:** Substantial Compliance

**Status Update:** Remains in substantial compliance.

## 37. Classification

a.      CCDOC shall maintain policies and procedures for an appropriate, objective classification system that separates inmates in housing units by classification levels in order to protect inmates from unreasonable risk of harm.  The system shall include consideration of an inmate's security level, severity of current charge, types of prior commitments, suicide risk, history of escape attempts, history of violence, and special needs.  CCDOC shall use best efforts to anticipate periods of unusual intake volume and schedule sufficient classification staff to timely classify inmates.

**February 2013 Compliance Status:**      Partial compliance

**Status Update:** The schedule is to have the new, validated, inmate classification system in place by Fall 2013.

**Monitor's Assessment:** I am very concerned that crowding will jeopardize the impact of this very long term and heavily resourced project.

**Monitor's Recommendations:**   Continue implementation efforts.

## 37. Classification

b.      CCDOC shall ensure that classification staff have sufficient access to current information regarding cell availability on each division.

**February 2013 Compliance Status**:      Partial compliance.

**Status Update:**   See 37.a.

**Monitor's Assessment:**  See 37. a.

**Monitor's Recommendation:**  See 37.a.

**37.      Classification**

c.      CCDOC shall include information on each inmate's assignment to the Special Incarceration Unit "level system" at the Facility in the new Jail Management System, starting with the date the new Jail Management System becomes operational.

**February 2013 Compliance Status**:      Substantial compliance.

**Status Update:** No change from last report

**37.      Classification**

d.      CCDOC shall provide training and access to all correctional officer supervisors on the full capabilities of the new Jail Management System's classification and inmate tracking system (or any replacement system).

**February 2013 Compliance Status:**      Partial compliance.

**Status Update:**  There remains work not only to complete the updated classification system, but also to be able to access the information on IMACS.

**Monitor's Assessment:**  The intent of the paragraph is met in terms of a process to provide training as the modules are rolled out and the classification system is updated and in place.

**Monitor's Recommendation:**  This is a challenging process with many moving parts.  CCDOC's classification committee is overseeing the process and has a wide range of involved staff, which will benefit implementation and training initiatives.

**37.      Classification**

e.      CCDOC shall provide ongoing internal and external review and validation of the inmate classification system to ensure its reliability and objectivity.

**February 2013 Compliance Status:**      Partial compliance.

**Status Update:** See 37.a.

**Monitor's Assessment:** See 37.a.

**Monitor's Recommendation:** See 37.a.

## 38. Inmate Grievance Process

a.  CCDOC shall maintain policies and procedures to ensure inmates have access to an adequate grievance process and to ensure that grievances may be accessed and filed confidentially, without requiring the intervention of a correctional officer, in accordance with generally accepted correctional standards.   These policies and procedures should be applicable and standardized across all the Facility divisions.

**February 2013 Compliance Status:**     Partial Compliance.

**Status Update:** The CCDOC has policies in place governing the inmate grievance process; but the procedures and implementation are lacking at this time.

**Monitor's Assessmen**t:   As noted in the last report, CCDOC made changes to the process that did not enhance inmates' access to the grievance process.  I kept the paragraph in substantial compliance due to the discussions about how the process would be amended to meet the goals of this paragraph and the CCDOC's corresponding written directive.

Although there has been substantial discussion and reassessment and reassignment of staffing responsibilities around grievances, the process is not "fixed".  Because the grievance process is critical to inmate welfare and safety, I have moved this compliance status back to partial compliance.   While I recognize the work that has been done, including a pilot program in Division VI, I expected a more complete procedural overhaul by this tour.  I believe the process in which CCDOC is now engaged regarding revision/implementation of the grievance process will result in an effective outcomes.

Additionally, due to understaffing in Cermak the logging and response to medical grievances remains insufficient in terms of generally accepted practices.  I believe that CCDOC is doing their part, but Cermak is not able to do their part in terms of timely response.  This is critical as most of the grievances are medical/mental health/dental.  The inability of Cermak to respond on a timely basis will potentially undermine the entire inmate grievance process.

**Monitor's Recommendations:**   Continue the pilot program roll-out;  assess the impact – both process and through inmate interviews.  Provide documentation at the time of the next tour about the procedural implementation, staff training, etc.

## 38.    Inmate Grievance Process

b.    CCDOC shall ensure that the grievances receive appropriate follow-up, including informing the grievant of the outcome, providing a timely written response, and tracking implementation of resolutions.

**February 2013 Compliance Status:**    Partial compliance

**Status Update:**  See 38.a.

**Monitor's Assessmen**t: See 38.a.

**Monitor's Recommendations:**  See 38.a.

## 38.    Inmate Grievance Process

c.    CCDOC shall ensure that grievance forms are available on all units and are available in Spanish.  CCDOC shall ensure that there is adequate opportunity for illiterate inmates and inmates who have physical or cognitive disabilities to access the grievance system.

**February 2013 Compliance Status:**    Partial Compliance

**Status Update:**  See 38.a.

**Monitor's Assessmen**t:  See 38.a.

**Monitor's Recommendations:**  See 38.a.

## 38.    Inmate Grievance Process

d.    CCDOC shall ensure that inmate grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria, are referred for investigation.  A member of the management staff shall review the grievance tracking system regularly in order to identify areas of concern.

**February 2013 Compliance Status:**    Partial Compliance

**Status Update:**  See 38.a.

**Monitor's Assessmen**t: See 38.a.   I believe that the current process does evaluate the grievances content for the issues noted in this paragraph, this reverts to partial compliance for the reasons noted in 38.a.

**Monitor's Recommendations:**  See 38.a.


## 39.    Access to Information

a.      CCDOC shall ensure that newly admitted inmates receive information, through an inmate handbook or orientation video, regarding the following areas:  facility rules and regulations; how to report misconduct; how to report sexual abuse or assault; the process for accessing medical and mental health care; emergency procedures; rules for sending and receiving mail; the visitation process; facility schedule; the disciplinary process; and how to seek redress of grievances.

**February 2013 Compliance Status:**      Substantial compliance

**Status Update:**  The written directive regarding Interpretation services was effective February 21, 2011 (11.5.95.0). The language line is available through the CRWs.  CCDOC reports that last year 289 minutes were used.   I reviewed the English language version of the inmate orientation video. The Spanish version will be in production in the near future.  I reviewed the inmate handbook in English and Spanish.

**Monitor's Assessmen**t:  The processes are almost completely in place; and policy guidance is in place.

**Monitor's Recommendations:**  Complete the Spanish language version of the inmate orientation video.  Continue to assess the effectiveness of these two strategies by examining inmate request forms and inmate grievances.

## 39.      Access to Information

b.      CCDOC shall ensure that materials on facility rules and services are available for non-literate and non-English speaking inmates.

**February 2013 Compliance Status:**      Substantial compliance.

**Status Update:**  Written directive 11.5.95.0, Interpretation Service, is aimed at assuring that this requirement is met.  The policy requires staff to identify and help inmates who are non-literate or non-English speaking.  The CCDOC maintains a contract with telephone translation services and the use of that contract to assist inmates is documented in the billing for those services.  There is also a consular notification procedure in place for detainees of non-US citizenship.  The current inmate orientation video plays in each housing tier, and is now being translated into Spanish.  The inmate handbook is in English and Spanish.   The Correction Rehabilitation Workers (CRWs) are the persons helping to broker services.

**Monitor's Assessmen**t:  CCDOC's policy meets the requirements of this paragraph.  I remain concerned about the number and frequency of visits by the CRWs to housing units.  Since they are the broker of the services their role is critical.

**Monitor's Recommendations:**  Assure that CRWs are deployed on a regular basis

to each housing area.  Capture information and data about the assistance provided in this requirement.

**40.    CCDOC shall provide training and supervision to all correctional officers and supervisors sufficient to implement the provisions of this Agreed Order.**

**February 2013 Compliance Status**:  Substantial Compliance.

**Status Update:**   Continuing compliance

**Monitor's Assessmen**t:   There are no issues with continuing compliance.

**Monitor's Recommendations:**  Nothing at this time.

**41.    Inter-Agency Agreement**

a.    CCDOC shall enter into a written Inter-Agency Agreement with Cermak that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility.  The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order.

b.    Cermak shall enter into a written Inter-Agency Agreement with CCDOC that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility.  The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order.

**February 2013 Compliance Status**:    Substantial compliance.

**Status Update:**  The agreements will be refined as time and experience with these issues matures.  Minutes are produced of meetings.

**Monitor's Assessmen**t:  Process is in place and appears to be working to resolve issues in a timely fashion.

**Monitor's Recommendations:** None at this time.

**69.    CCDOC shall ensure that security staff posts will be equipped, as appropriate, with readily available, safely secured, suicide cut-down tools. Coordinate with Dr. Metzner**

**February 2013 Compliance Status**:    Substantial Compliance

**Status Update:**  The Suicide Prevention Committee continues to meet.  One area of concern was wear and tear on the cutting tools.  After examination, 9 were replaced.

**Monitor's Assessmen**t:   The Suicide Prevention Committee appropriately monitors this important issue.  I reviewed their latest report.

**Monitor's Recommendations:**   None at this time.