UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

COOK COUNTY, ILLINOIS;
THOMAS DART, COOK COUNTY
SHERIFF (in his official capacity);
TONI PRECKWINKLE, COOK COUNTY
BOARD PRESIDENT (in her official capacity);
COOK COUNTY BOARD OF
COMMISSIONERS (in their official capacity),

Defendants,

No. 10 C 2946

Judge Virginia Kendall

# Monitor Ronald Shansky, M.D.'s Report No. 7

Ronald Shansky, M.D.
1441-G North Cleveland
Chicago, IL 60610

## B. HEALTH CARE SERVICES: ELEMENTS COMMON TO MEDICAL AND MENTAL HEALTH

### 41. Inter-Agency Agreement

a. CCDOC shall enter into a written Inter-Agency Agreement with Cermak that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility. The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order.

b. Cermak shall enter into a written Inter-Agency Agreement with CCDOC that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility. The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order.

**Compliance Status:** Substantial compliance.

**Findings**

**Status Update:** Received and reviewed.

**Monitor's Findings:**

Through minutes of meetings and discussion with staff and Monitor's attendance at a pre-accountability meeting with staff representing each of the agencies, it is clear that there is an organized framework under which the parties are cooperatively participating. This is, as viewed by the Monitor, consistent with the intent of the Agreement.

**Monitor's Recommendations:** None.

### 42. Policies and Procedures

Cermak shall provide adequate services to address the serious medical and mental health needs of all inmates, in accordance with generally accepted professional standards. The term "generally accepted professional standards" means those industry standards accepted by a majority of professionals in the relevant field, and reflected in the standards of care such as those published by the National Commission on Correctional Health Care ("NCCHC").

a.  Cermak shall develop and implement medical care policies, procedures and practices to address and guide all medical care and services at the Facility, including, but not limited to the following:

(1)   access to medical care;
(2)   continuity of medication;
(3)   infection control;
(4)   medication administration;
(5)   intoxication and detoxification;
(6)   documentation and record keeping;
(7)   disease prevention;
(8)   sick call triage and physician review;
(9)   intake screening;
(10)  chronic disease management;
(11)  comprehensive health assessments;
(12)  mental health;
(13)  women's health;
(14)  quality management;
(15)  emergent response;
(16)  infirmary care;
(17)  placement in medical housing units;
(18)  handling of grievances relating to health care;
(19)  mortality review; and
(20)  care for patients returning from off-site referrals.

b.  Cermak shall develop and implement policies, procedures and practices to ensure timely responses to clinician orders including, but not limited to, orders for medications and laboratory tests. Such policies, procedures and practices shall be periodically evaluated to ensure timely implementation of clinician orders.

**Compliance Status**: Partial compliance.

**Findings**

**Status Update:**  Received and reviewed.

**Monitor's Findings:**

All of the policies have been completed, although we requested and received last minute additions to two of the policies. One was the infirmary policy, which lacked the definitions of acuity status referenced in the body of the policy, and these were provided by the associate Medical Director. In addition, with regard to the non-emergent (access to care) policy, although there is a description of timeframes within which follow up is to occur, the terminology used may have created some confusion for the schedulers, since different services utilize the same terminology for different timeframes. This is to be reviewed and improved by the group working on the implementation of the access to care program. Additionally, although the intoxication and detoxification policy has been available, the full implementation of it cannot occur until the move into the new RTU building. This most certainly should begin well prior to our next visit and we would hope that it has been completed by the time of the next visit; this would move the compliance status into substantial compliance. The absence of implementation of the detoxification policy for people with mild to moderate withdrawal symptoms is the major obstacle to substantial compliance.

**Monitor's Recommendations:**

1. Prepare staff not only for the move but also time the training so that it occurs just prior to the move so that the implementation of the remainder of the detoxification policy can occur smoothly.

### 43. Medical Facilities

    a.    CCDOC will work with Cermak to provide sufficient clinical space, as identified by Cermak staff, to provide inmates with adequate health care to meet the treatment needs of detainees, including: [i]

        (1)    intake screening;

        (2)    sick call;

        (3)    medical and mental health assessment;

        (4)    acute, chronic, emergency, and specialty medical care (such as geriatric and pregnant inmates); and

        (5)    acute, chronic and emergency mental health care.

    b.    Cermak staff shall make known to CCDOC and Cook County its needs for sufficient clinical space, with access to appropriate utility and communications capabilities, to provide inmates with adequate health care to meet the treatment needs of detainees, including:

      (1)     intake screening;

      (2)     sick call;

      (3)     medical and mental health assessment;

      (4)     acute, chronic, emergency, and specialty medical care (such as geriatric and pregnant inmates); and

      (5)     acute, chronic and emergency mental health care.

c.     Cook County shall build out, remodel or renovate clinical space as needed to provide inmates with adequate health care to meet the treatment needs of detainees, as identified by Cermak staff, including:

      (1)     intake screening;

      (2)     sick call;

      (3)     medical and mental health assessment;

      (4)     acute, chronic, emergency, and specialty medical care (such as geriatric and pregnant inmates); and

      (5)     acute, chronic and emergency mental health care.

d.     Cermak shall ensure that medical areas are adequately clean and maintained, including installation of adequate lighting in medical exam rooms. Cermak shall ensure that hand washing stations in medical areas are fully equipped, operational, and accessible.

e.     Cermak shall ensure that appropriate containers are readily available to secure and dispose of medical waste (including syringes and sharp medical tools) and hazardous waste.

f.     CCDOC shall allow operationally for inmates' reasonable privacy in medical and mental health care, and shall respect the confidentiality of inmates' medical status, subject to legitimate security concerns and emergency situations. Reasonable privacy typically includes sight and hearing privacy from other inmates and hearing privacy from staff that are not providing health care.[ii]

g.     Cermak shall make known to CCDOC and Cook County the structural and operational requirements for inmates' reasonable privacy in medical and mental health care. Cermak shall provide operationally for inmates' reasonable privacy in medical and mental health care and shall maintain confidentiality of inmates' medical status, subject to legitimate security concerns and emergency situations.

Reasonable privacy typically includes sight and hearing privacy from other inmates and hearing privacy from staff that are not providing health care.

h.     Cook County shall build out, remodel or renovate clinical space as needed to allow structurally for inmates' reasonable privacy in medical and mental health care, as identified by Cermak and CCDOC staff.

Cook County shall begin construction of the new clinical space within three months of the effective date of this Agreed Order. It is expected that the project will be complete within nine months of the effective date of this Agreed Order. Prior to completion of the new clinical space, Cook County and DFM will work with Cermak to address the most serious concerns regarding clinical space, to the extent possible in the current Facility.

**Compliance Status**: Partial compliance.

**Findings**

**Status Update:**  Cermak leadership provided the Monitors a status update dated January 2013; however, it does not appear to have been updated since October 2012.

**Monitor's Findings:**

Since our last site visit, CCDOC and Cermak continue to make improvements in providing appropriate clinical space for medical, dental and mental health care. Improvements were made in organization and sanitation of clinical areas throughout the facility. However, there are no schedules of sanitation and disinfection activities, or logs documenting that these activities occur on a routine basis. There continue to be ongoing maintenance problems in the older parts of the jail. Division I continues to experience periodic ceiling leaks, and had flooding with recent heavy rains. In addition, twice in the past three months, backup of sewage pipes resulted in sewage spillage in the Division V dental clinic.

In addition, overcrowding on the third floor of the Cermak inpatient unit continues to result in patients with high medical acuity being assigned to plastic boats on the floor. Even with the completion of the RTU in sight, it is inappropriate for the sickest patients in the jail to be housed on the floor and CCDOC and Cermak should address this as soon as possible.

The RTU is scheduled to open in June 2013; however, an adequate plan has not been developed to show how health care services will be operationalized in the RTU. With the opening of the RTU, it was anticipated that some Divisions would close and health care staff would be relocated to the RTU. However, with population increases, no Divisions will be closed, and there is inadequate health care staff to fully open the RTU. The budget for new staff is not

available until December 2013. It may be possible to open some units (e.g., the intake) with existing health care staff; however, delays in the purchase of medical equipment (e.g., x-ray machine) will result in delayed installation beyond the scheduled June 2013 date.

In summary, the original plan to open and operationalize health care services in the RTU has been negatively impacted by the increasing jail population. Currently, there is inadequate staff and medical equipment to safely open and operate the RTU. We strongly recommend that Cermak and CCDOC develop such a plan, in accordance with available staffing and medical equipment.

Each area is briefly described with areas needing improvement highlighted below.

a. CCDOC -Clinical Space and
c. CCDOC Adjustments to Clinical Space

Our findings in the male and female intake areas are unchanged relative to our last report. The male intake area provides sufficient space and privacy for its designated purpose. The area was clean, organized and well equipped and supplied. The female intake area is cramped and suboptimal despite renovations to create privacy. A separate room is used by mental health staff to conduct mental health screening. The room accommodates two mental health staff and two patients simultaneously and we did not evaluate the room while in use to determine impact upon privacy. Sanitation in the female and mental health clinic rooms is not optimal.

The dental clinic adjacent to the intake area (Division V) was inspected while not in use. The area is extremely cramped with equipment and supplies, making sanitation and infection control challenging. Staff reported that twice in the past three months a sewage pipe backed up, resulting in leakage all over the floor. This necessitated that the clinic be closed down. There is a high demand for dental services at the jail so clinic cancellations, regardless of the reason, adversely affects patient access to care.

We found that the Cermak emergency room is well equipped and supplied. However, sanitation and maintenance are in need of improvement. There is no schedule of sanitation and disinfection activities that are implemented on a routine basis. It was apparent that medical equipment (e.g., patient beds, portable lights, etc.) were not routinely cleaned. Stainless steel trays were covered with Chux pads where staff performs glucose and urine testing. These Chux pads may become contaminated at any time, presenting infection control risks. The Chux pads were typically only changed once a shift, whereas the stainless steel tray can be readily disinfected after each use.

In the medication room, excessive dust had collected on the medication refrigerator and three cabinet drawer handles were missing and in need of replacement. The missing drawer handles have been a repeated finding.

At the last visit, one of the cubicle walls was damaged and posed a hazard.[1]  A work order was submitted but the wall was not adequately repaired. A chair cushion is in disrepair, with duct tape covering exposed cushion foam. The chair cannot be adequately cleaned and presented an infection control issue.

Emergency equipment was functional and logs reflect that it was not checked on 4/28/2013 and 4/29/2013. Crash cart tools were not checked on 4/22/13. All examination rooms contained personal protective equipment, and sharps and biohazardous waste disposal containers.

Division I is a maximum-security unit with a capacity of 1,245 inmates and current population of 1,247. It is the oldest part of the jail. The clinic was clean and well organized, and examination rooms were adequately equipped and supplied. A Pyxis machine in the medication room is not in operation. Emergency response equipment and supplies were available, including an automatic external defibrillator (AED). Logs show that emergency equipment is checked daily and no emergency medications were found to be expired. All examination rooms contained personal protective equipment, and sharps and biohazardous waste disposal containers.

However, as noted in all previous reports, maintenance issues remain challenging in Division I. Staff reported ceiling leaks since our visit last November as well as flooding during recent heavy rains. In addition, staff reported that a ceiling vent in the medication room still emits large chunks of soot on a daily basis, which presents infection control issues as well as a respiratory hazard to staff and inmates. This is a repeated finding that should be immediately corrected.

Division II, Dorm I is a three-story building with clinic space on the first floor. Detainees are housed on floors two and three in eight dormitories. Each dormitory has 48 beds for a total capacity of 384 beds. On the day of the inspection, the population count was 382. Due to significantly high population numbers throughout the facility, Dorm 1 continues to be at maximum capacity and continues to serve as the intermediate medical overflow from Dorm 2. The building is old and has an extensive amount of foot traffic. The area was reasonably clean but needed general painting and is poorly lighted. The clinical space which provides medical

---

[1] The drywall metal corner bead was torn away from the wall, posing a risk of injury to staff or patients walking by it.

services for the Annex, Dorms 1, 3, 4 and Division III consists of a large waiting area, a small reception/clerical area and two small examination rooms. The area was cluttered and significantly under-sized for the population it is now required to serve. Inspection of the clinical space and the dormitories on the second and third floors indicated the building is in need of general maintenance, i.e., painting, ceiling tile replacement and additional lighting. However, there were no reported immediate structural, electrical or plumbing concerns. The clinical area is scheduled to be painted. Detainees reported sufficient hot water for showering and hand washing, and soap is available. There were no complaints concerning toilet facilities.

Nurse sick call occurs in one of the examination rooms while the other is used for primary care clinics. Emergency response as well as personal protective equipment is available. Documentation was present indicating equipment was operational and necessary supplies were present. Per practice, the contents of the emergency bag are inventoried only when the bag has been opened, then it is restocked and retagged. Inventories of sharps and medical tools were accurate. Refrigerator temperatures are monitored daily and noted as operating within the normal range. There were no outdated medications in the refrigerator or medication carts.

Division II, Dorm 2 is a "step-down," outpatient medical/mental health housing unit consisting of three floors with ten dormitory-style living units for a total building capacity of 464. On the day of the inspection, the population was 459 detainees. Clinic space for dorm 2 is located on the first floor. Due to high foot traffic, the need for painting walls and floors is frequent, and is on a routine maintenance schedule. The area is generally clean and well lighted. Cleaning of the inmate dorms on each floor is performed by detainees.

On the day of the inspection, environmental temperatures were comfortable throughout the building, and there were no noticeable or reported structural, electrical or plumbing concerns. The clinical space appeared very clean, organized and well lighted and had been repainted the week prior to the Monitor's visit.

Detainees on all three floors reported adequate hot water for showering and hand washing, with soap available. There were no reported complaints concerning toilet facilities.

Emergency response and personal protective equipment is available in the clinic area. Documentation was present indicating equipment was operational and necessary supplies were present. Currently, staff inventories the contents of the emergency bag only when the bag has been opened, then it is restocked and retagged. Refrigerator temperatures are monitored daily and noted as operating with the normal ranges. There were no outdated medications in the refrigerator or medication carts. Inventories of sharps and medical tools were accurate.

Division II, Annex has been designated as a minimum-security "non-gang" unit. It is a dormitory style unit with multiple dormitories. On the day of the inspection, the population was

428 detainees. Detainees perform all the cleaning within both the dormitories and common areas. The dormitories were clean and well lighted. The common areas appeared less clean. There were stained and missing ceiling tile but no noticeable or reported structural, plumbing or electrical problems. Detainees reported sufficient hot water for showering and hand washing, and soap was available. There were no complaints concerning toilet facilities.

There is no dispensary in the building. All medical services are provided by dorm 1 or the Cermak ER. All medications are KOP and delivered by the medication delivery team.

Division II, dorm 3 is a general population, minimum and medium security area consisting of three floors with three tiers per floor. There is a capacity of 428 beds and on the day of inspection, there were 428 detainees.

The area was generally clean and well lighted with all housekeeping performed by the detainees. There were no noticeable or reported structural, electrical or plumbing concerns. Detainees reported a sufficient amount of hot water for showering and hand washing, and available soap. There were no complaints concerning toilet facilities.

There is no dispensary in this dorm. All medical services are provided by dorm 1 or Cermak ER. All medications are KOP and delivered by the medication delivery team.

Division II, dorm 4 is a minimum-security general population and detainee dietary worker housing area consisting of two very large dormitory-style living units. The bed capacity of each unit is 334 and 350 beds, respectively, for a total of 684. On the day of the inspection, the total population count was 671. All housekeeping and cleaning is performed by the detainees.

The units are in need of continual general maintenance, i.e., painting and ceiling tile replacement, and the toilet/shower area needs a thorough cleaning; however, there were no reported electrical or plumbing problems. Detainees in both dorms reported sufficient hot water for showering and hand washing, and available soap. Observation indicated functioning toilets.

There is no dispensary in this building. All medical services are provided by dorm 1 or Cermak ER. All medications are KOP and delivered by the medication delivery team.

Division IV has a bed capacity of 704 female inmates of all security levels and a current population of 701. It is staffed with nurses 24 hours, 7 days per week. The medical area is comprised of three separate clinical areas and two inmate waiting rooms. Since our last visit, additional improvements have been made in sanitation and organization of the nurse's dispensary where nurses perform treatments and prepare medications. Emergency response

9

equipment and supplies were available, including an automatic external defibrillator (AED). Logs show that emergency equipment is checked daily, with one lapse and no emergency medications were found to be expired.

Improvements have also been made in the room where nurses conduct sick call. The walls had been painted and floors were clean. The room is more adequately equipped and supplied than at the last visit, with personal protective equipment and biohazardous waste containers.

Two nurses perform nursing sick call in this area; however, as noted in the previous report the layout of the room is not conducive to auditory or visual privacy. There are two examination tables in the room; however, they are in close proximity to one another and the arrangement does not provide sufficient patient privacy. In addition, the electrical outlet for one of the oto-ophthalmoscopes is still not functional.

Division V has a bed capacity of 992 minimum-security male inmates and a current population of 980. Improvements in clinic organization and sanitation since our last visit have been maintained. The clinic was properly equipped and supplied and contained personal protective equipment and biohazardous waste containers. Emergency response equipment and supplies were available, including an automatic external defibrillator (AED). Logs show that emergency equipment is checked daily and no emergency medications were found to be expired.

Division VI is a general population unit consisting of two floors with twelve tiers per floor. There is a capacity of 992 beds and, on the day of the inspection, there were 951 detainees. Division VI previously was a minimum/medium security unit until March 8, 2013, when 80 segregation and 160 protective custody detainee were moved into the Division.

The dispensary was previously staffed 7 a.m. to 5 p.m. with one RN, one ERT and two CMTs. Staffing now consists of three RNs and two CMTs. With the addition of the segregation and protective custody detainees and the need for dose-by-dose medication administration, the dispensary is staffed from 7 a.m. to 8:30 p.m. Thereafter, medical services are provided by the Cermak ER.

There are 48 detainees receiving dose-by-dose medication, and all others are on KOP which are delivered by the medication delivery team.

The Division continues to appear clean and well maintained with no noticeable or reported structural, electrical or plumbing concerns. The clinical area is a large, clean, organized and well-lighted unit. The hallways, common areas and dorms are clean and well maintained.

There were no detainee complaints concerning sufficient hot water for showering and hand washing, soap being available or functioning toilets.

Personal protective equipment is available in the clinic area. Emergency response equipment is available. Documentation was present indicating equipment was operational and necessary supplies were present. Per practice, the contents of the emergency bag are inventoried only when the bag has been opened, then it is restocked and retagged.

Refrigerator temperatures are monitored daily and noted as operating with the normal temperature ranges. There were no outdated medications in either the refrigerator or the medication cart. Inventories of sharps and medical tools were accurate.

Division IX has capacity to house 1010 inmates and when toured on Thursday morning, May 2, 2013 housed 952. The physical description of the population, housing units and the clinic space remains unchanged from the previous reports. Health care coverage is still provided 12 hours each day.

Nursing sick call takes place in examination rooms in the hallway between units on each tier. The examination rooms have upper and lower cabinets with a sink along one wall. In three of the exam rooms we visited, there was either no water or no hot water running from the tap at the sink. The room is equipped with an examination table, interview chair and a desk. A terminal which provides access to the electronic health record is in each of these examination rooms. Nurses conducting face-to-face evaluations use carts that are specifically equipped and supplied for their use. The carts still do not have oto-ophthalmoscopes, although we were told at the time of the last site visit that they were to have been provided.

The emergency response equipment was reviewed. All items were present, in working order and in date. The process recommended in the last report has been implemented in Division IX. Documentation indicates that the contents of the bag are inventoried only when the bag has been opened, then restocked and re-tagged. A suggestion for improvement is to revise the inventory sheet to coincide with the items kept in each section of the bag and that there be clearer documentation that the equipment is not just present but tested and in working condition (O2, AED, etc.).

Division X has capacity of 768 inmates and on Tuesday April 30, 2013, the day of the tour, housed 750. The physical description and housing capacity of Division X is unchanged from previous reports. The inadequacies of clinical space are unchanged from previous reports.

There are no privacy curtains in the room used by nurses to see inmates. This condition was noted last visit and is a significant impediment to clinically appropriate examinations. Nurses are scheduling patient appointments for evaluation of health service requests as

11

recommended in the last report. There was no evidence during this site visit that inmates are delayed access to health care because of a limit on waiting room capacity as discussed in the last report. Since the last visit, the dental waiting room has been made into a private office but it serves no clinical purpose. Cermak leadership should re-evaluate whether this is the best use of the space.

The emergency response equipment was reviewed. Improvements since the last site visit are that the equipment is reviewed and signed off every day of the week although the revised procedure for documentation has not been correctly implemented yet.

Division XI has capacity to house 1536 inmates and when toured on Wednesday morning, May 1, 2013, housed 1530. The physical description of the housing units in the Division is unchanged from previous reports. Since the last visit, transgender inmates and those in protective custody have been moved to Division VI. There is no dose-by-dose medication delivery in Division IX now and so one health care position was transferred to Division VI. Coverage in Division XI is reduced from 12 to eight hours each day. Clinic space and equipment is sufficient to support the operation of the program.

The emergency response equipment was reviewed. The new procedure for verification and documentation has not been implemented; staff continues to document that the contents of the bag have been inventoried when only the tag is being checked. A clerical transposition resulting in two documentation errors was found when comparing the forms for April and May. There were no outdated medications and all equipment and supplies accounted for.

Division XVII, known as Department of Women's Justice, houses residential females including all pregnant women. Examination rooms were clean, organized, and adequately equipped and supplied. Staff did not report problems related to maintaining comfortable temperatures.

    b. Cermak-Clinical space and
    d. Cleanliness and Adequacy

Cermak, floors 2 & 3

Cermak 2 and 3 both consist of four wings; north, south, east and west. The areas are all large, clean and well lighted. Environmental temperatures were comfortable on both floors with no excessively cold or warm areas. Interviews with multiple patients and inspection of their rooms confirmed comfortable temperatures. There were no areas requiring immediate maintenance. General wall painting appeared up-to-date and ceiling tiles were in good condition. Staff interviews confirmed there were no immediate structural, plumbing or

electrical issues. Patients reported sufficient hot water for hand washing and showering. Soap was available. There were no complaints concerning toilet facilities.

Although we did not find sanitation issues in Cermak during this visit, Harry Grenawitzke, Monitor for sanitation and environmental conditions, noted significant sanitation issues in Cermak during his December 2012 and February 2013 site visits. His findings are noted below:

"However, in Cermak, I found a considerable lack of sanitation in the rooms used to house medical patients both in individual cells and in rooms housing multiple inmates. Many floors, walls, toilets, showers and sinks had a significant accumulation of dust, dirt, soap residue and debris. The lack of cleanliness was also noted during the December 2012 tour, and apparently not addressed effectively. During my tour of Cermak, I also identified that many inmate mattresses were cracked, torn, and generally not clean, again indicating a lack of formal cleaning and disinfecting program. Some inmates were allowed to sleep in plastic "boats" where there is a lack of bed space. Many of the "boats" located in the storeroom had an accumulation of dried liquids, dust and dirt on them indicating a lack of an effective cleaning program between inmates. Some of the beds that inmates were using in multiple patient rooms had an accumulation of food debris along the gap between the mattress and the bed frame. In the acute psychological ward and in the medical ward, many of the ceiling ventilation vents had a significant accumulation of dust and were in need of cleaning; again indicating a lack of policy and schedule for routine cleaning."

The findings of the environmental monitor emphasize the importance of developing and implementing schedules of sanitation and infection control activities, and documenting that these activities have been performed. At our next site visit, we will request that Cermak demonstrate that these important patient safety activities are being performed regularly, and that deficiencies are addressed in a timely manner.

There continues to be overcrowding on both floors. On April 29, there were a total of eight (8) patients placed on the floor in "boats" on second floor, and twenty-two (22) placed on the floor in "boats" on the third floor. 3-North, the acute care medical wing, had the highest number on the floor at ten (10).

Emergency response equipment is available on each unit. Inspection of each indicated equipment was in good working order, supplies were available and each is being routinely checked. Personal protective equipment is available on each unit.

Refrigerator temperatures were all within the normal operating range, and there was documentation of daily checks. There were no outdated drugs in any refrigerator or medication carts. Inventories of sharps and tools were accurate on each unit.

### f. CCDOC-Patient Privacy

As noted in previous reports, the clinic space in Divisions I, II, dorm 1, dorm 2, Division III, V, VI, IX and XI provides sufficient numbers of appropriately equipped examination rooms to provide patient privacy as needed. There is not sufficient privacy in the women's intake area, Division IV and X.

### g. Cermak-Patient Privacy

This provision is unchanged since our last report. Patient privacy, especially on 3-North, continues to be compromised due to significant overcrowding. Privacy is provided for showering and special procedures which occur in an examination/procedure room immediately adjacent to the 3-North dayroom.

### h. Adjustments to Space to Provide Privacy

This provision is unchanged since our last report. Some improvements have been made to enhance privacy. However, until all Divisions have adequate clinical examination space and are designed and utilized in a manner that ensures privacy (e.g., not having two examination tables immediately adjacent to one another, etc.), substantial compliance will not be met. We also note that since the last visit a waiting room in Division X has been converted into a private office when it should be used instead for clinical purposes. Moreover, overcrowding in Cermak infirmary areas has been detrimental to the provision of privacy. The opening of the RTU is anticipated to alleviate overcrowding and enhance privacy.

### i. Construction of New Clinical Space

The 900-bed Reception and Treatment Unit (RTU) is near completion and due to be opened in June 2013. The most significant concern regarding the RTU is that delays in the purchase of medical equipment (e.g., x-ray machine etc.) will result in installation delays beyond the scheduled opening in June 2013. In addition, it was originally anticipated that the opening of the RTU would enable closure of other Divisions and that health care staff relocated from those Divisions to the RTU would enable the building to open on time. However, the jail population has increased during the past year, and we understand that no Divisions will be closed when the RTU opens. Cermak is not budgeted for new staff until December 2013, posing challenges to the timely opening of the RTU.

**Monitor's Recommendations:**

14

1. Cermak and CCDOC should develop and implement a schedule of sanitation and infection control activities for medical and mental health clinic and bed space areas throughout the jail. There should be an accompanying log that documents completion of the scheduled sanitation and disinfection duties.

2. Cermak and CCDOC, through the CQI process, should continue to assess each Division's medical, mental health and dental clinic space with respect to size, general repair and sanitation, lighting, equipment and supplies, privacy, communications and connectivity and address deficiencies cited in this report as well as in their own assessments and inspections.

3. CCDOC and Cermak should collaborate to effectively address overcrowding in the Cermak infirmary as soon as possible. Health care staff should have control over all medical beds.

4. Continue to schedule nursing sick call in all Divisions. Assess and revise provider and nurse clinic sick call scheduling in each Division to maximize the use of clinical space and to permit both providers and nurses access to clinical examination rooms throughout the day.

5. In the emergency room, develop and implement a schedule of sanitation and disinfection activities and repair the damaged wall.

6. In the dental area in Division V, clean and reorganize clinic to facilitate sanitation and infection control. Evaluate sanitation and infection control practices.

7. In Division I, correct ventilation problems and ceiling leaks.

8. In Division IV, repair broken electrical outlet. Reorganize the room to provide privacy when two patients are in the room at the same time. Develop a sanitation and disinfection schedule and monitor implementation.

9. In Division IX, equip the nurses' examination carts with oto-ophthalmoscopes to enable nurses to efficiently and properly perform patient evaluations. Repair sinks in examination rooms.

10. Division X: The use of each room in the dispensary in Division X should be evaluated again by Cermak leadership and space allocated according to priorities for delivery of clinical care and management of health care operations.

11. All Divisions: Revise the inventory sheet to coincide with the items kept in each section of the bag.

12. Once the RTU is opened, retrofitting selected rooms in the RTU with electrical outlets to accommodate patients with C-PAP machines.

## 44. Staffing, Training, Supervision and Leadership

a.   Cermak shall maintain a stable leadership team that clearly understands and is prepared to move forward toward implementation of the provisions of this Agreed Order, with respect to:

    (1)   Medical care; and

    (2)   Mental health care.

b.   Cermak shall maintain an adequate written staffing plan and sufficient staffing levels of health care staff to provide care for inmates' serious health needs, including:

    (1)   Qualified Medical Staff; and

    (2)   Qualified Mental Health Staff.

c.   Cermak shall ensure that all Qualified Medical Staff and Qualified Mental Health Staff are adequately trained to meet the serious health care needs of inmates. All such staff shall receive documented orientation and in-service training on relevant topics, including:

    (1)   Provision of health care in a correctional setting and Facility-specific issues; and

    (2)   Suicide prevention, and identification and care of inmates with mental illness.

d.   Cermak shall ensure that Qualified Medical Staff receive adequate physician oversight and supervision.

e.   Cermak shall ensure that all persons providing health care meet applicable state licensure and/or certification requirements, and practice only within the scope of their training and licensure. Upon hiring and annually, Cermak shall verify that all health care staff have current, valid, and unrestricted professional licenses and/or certifications for:

    (1)   Medical staff; and

    (2)   Mental health staff.

f.   Cermak will work with CCDOC to develop and maintain a curriculum for initial and periodic training of correctional officers on recognition and timely referral of

16

inmates with medical urgencies, including drug and alcohol withdrawal. Cermak will provide adequate initial and periodic training on these topics to all Cermak staff who work with inmates.

g.  CCDOC will provide, to all CCDOC staff who work with inmates, adequate initial and periodic training on basic mental health information, including the identification, evaluation, and custodial care of persons in need of mental health care, as well as recognition of signs and symptoms evidencing a response to trauma; appropriately responding to mental illness; proper supervision of inmates suffering from mental illness; and the appropriate use of force for inmates who suffer from mental illness. Such training shall be conducted by a Qualified Mental Health Professional, registered psychiatric nurse, or other appropriately trained and qualified individual.

h.  Cermak will work with CCDOC to develop and maintain a curriculum for initial and periodic training of correctional officers on basic mental health information, including the identification, evaluation, and custodial care of persons in need of mental health care, as well as recognition of signs and symptoms evidencing a response to trauma; appropriately responding to mental illness; proper supervision of inmates suffering from mental illness; and the appropriate use of force for inmates who suffer from mental illness. Such training shall be conducted by a Qualified Mental Health Professional, registered psychiatric nurse, or other appropriately trained and qualified individual.

g.  Cermak shall ensure that all health care staff receive adequate training to properly implement the provisions of this Agreed Order, including:

(1)  Medical staff; and

(2)  Mental health staff.

**Compliance Status**: Partial compliance.

**Findings**

**Status Update:** Received and reviewed.

**Monitor's Findings:**

a. Cermak Leadership Team

17

Since our last visit, the Chief Operational Officer has retired and the Medical Director position remains vacant. A candidate was selected but a successful negotiation for compensation was not concluded. In addition, the psychiatric director has departed. All other leadership positions remain in place. The administrator working for the Chief Operating Officer has assumed acting leadership in the Chief Operating Officer position. We are told there is also a candidate for the Psychiatric Director and the search for a new Medical Director continues with the Associate Medical Director accepting both position responsibilities.

b. Cermak Staffing

At the time of our last visit, we were discouraged to report that in the prior six months there had been no significant gains in employment. Since that time, key people, including the Director of Human Resources and counsel for the defendants have worked conscientiously to expedite the hiring process. This has really begun to bear fruit since the first of the year and most especially in the last two months. What follows are a list of changes made to expedite the hiring process for Cermak.

1. Request to hires (RTH) no longer have to go through the position justification committee. The RTH group now goes straight downtown to be posted.

2. If positions are identified prior to and while interviews are being conducted, the PID's are being added to the current posting, instead of reposting the position, requiring an additional two weeks.

3. Hiring managers are identifying alternative candidates during the interview process in order to move forward quickly if their first applicant of choice declines the position. What this means is during the interview process a ranking system is utilized so that if the top rank finds an alternative source of employment, the number two ranked candidate can be contacted.

4. One person on the recruitment team oversees all Cermak positions to insure a single point of contact. I might add that there is universal agreement that this human resources employee has really stepped up to the plate and has had a major hand in expediting the additional hires.

5. Weekly meetings are being held every Monday at 7:30 a.m. between the acting COO at Cermak and the Chief of HR along with the Bureau Chief of HR and the above listed senior HR coordinator. This is to insure that this group stays abreast of pending issues.

6. The acting COO and the senior HR coordinator are in daily contact to resolve any developing issues.

7. And finally, the Bureau Chief of HR and the Chief of HR and the senior HR coordinator conduct a Friday conference call and go over each position on the tracker to insure the most current information is being report on a weekly basis.

The defendants are clearly to be commended for responding to the overwhelming personnel problem. Since January, the effects of these changes have begun to be felt. As of April 1, 2013, when you subtract the hires from the losses there was a net of five. However, within this month, 41 additional people will be starting, mostly in mental health, and that is a substantial leap forward. It is my hope that with these revisions to the process, the filling of nursing and mental health positions will continue apace. As Medical Monitor I am most concerned about the filling of primary care clinician positions of which there are seven still vacant. One of the problems for the primary care positions is the loss of the National Health Service Corp Loan Forgiveness program for which working in correctional facilities no longer qualifies. Additionally, with the expansion of demand for primary care through the implementation of the Affordable Care Act, there will be much greater competition for a limited number of primary care resources. The County must be creative in recruiting not just in the jail but also in its other primary care facilities. As of April 1 There were 531 total positions of which 80 (this includes nine pharmacy positions) are vacant. Therefore, the current staff vacancy rate is 13.2 percent. This is a significant decrease since our last report.[2]

When the plans for the new building were developed, there was an expectation that staffing the new building would come from closing other units and just moving staff into the new building. Thus, there was no specific request for additional staffing during the current fiscal year. However, there has been an increase in the population of the jail of between 1000 and 1500 inmates. Thus, the current plan is for no units to close, with the exception of medical intake, which will move in its entirety from the existing space to the new space in the new RTU building. The Cermak leadership has developed a budget request of new staff for the new building and the total number of new staff requested is 77 positions. We are also aware that the sheriff has indicated that the new building will begin occupation on June 3. We are aware that unless the IT component is implemented, it will be impossible to locate patients in the new building. We are also aware that much medical equipment will not have arrived by June 3 and of course, no additional staffing will be available until some time in December at the earliest when the new fiscal year begins. It is mandatory that medical not be asked to provide services to a population where the IT capability is not sufficient, the equipment is not sufficient or the personnel quantities are not sufficient.

---

[2] Beginning in May 2012, we have utilized six-month intervals to track staff vacancies. In the text of other sections, there may be allusions to fewer vacancies than described as of April 1, 2013. This is explained by hirings which occurred between April 1 and the beginning of our visit.

19

c. Cermak Training

With the completion of suicide prevention training for the nursing staff, of whom more than 95% have completed the training, all of the Cermak staff as well as the Department of Corrections staff have met the training requirements.

d. Cermak Supervision

This area remains in partial compliance because, with the Associate Medical Director performing both Medical Director and Associate Medical Director responsibilities, it has been impossible to complete the annual professional performance enhancement review. We would hope that the Medical Director hiring will occur soon, thus freeing up the Associate Medical Director to complete this critical task.

e. Cermak Licensure and Certification

This area remains in substantial compliance. Once again, we met with the leadership of the credentials program for the Bureau of Health Services and were impressed with the completeness of the documentation regarding credentials, evaluations, licenses, CPR certification, databank reviews, etc. During this visit, we reviewed credential files of physicians, PAs, dentists, psychiatrists and psychologists and every single file contained the required documentation.

f. Cermak Training for Correctional Officers

Three or four of the Cermak staff provide training for the officers on agreed upon medical topics. By and large, they utilize a slide presentation prepared by the former Medical Director. This program appears to work quite well.

g. and h. CCDOC and Cermak Mental Health Training for Correctional Officers

These areas are both in substantial compliance, as officers continue to receive the required training at a rate of greater than 90%. In addition, the snapshot we took of the training received by officers working on the mental health unit demonstrated that all of them had received the required advanced training.[iii]

i. Training Regarding the DOJ Agreement

This area continues to be in substantial compliance and the training is accomplished by use of town hall meetings that facilitate staff understanding of the progress regarding the Agreement.

**Monitor's Recommendations:**

1. All of the seven strategies utilized as described earlier in the findings should continue to be applied. This should enable remarkable achievements by the time of our next visit.
2. The County should consider utilizing creative strategies to recruit primary care clinicians, such as a countywide loan repayment system or some other attractive strategy.
3. Cermak staff must refrain from attempting to provide services in the new building without adequate IT support, equipment and other capital resources, or sufficient staffing.
4. The detoxification program procedure training should be timed to immediately precede the move into the detoxification housing area so that implementation can occur simultaneously with the opening of the detoxification unit.

When the new Medical Director begins taking over, the clinician performance enhancement review program should be a major goal of the medical leadership team.

## 45. Intake Screening

a. Cermak shall maintain policies and procedures to ensure that adequate medical and mental health intake screenings are provided to all inmates.

b. Cermak shall ensure that, upon admission to the Facility, Qualified Medical Staff or Licensed Correctional Medical Technicians utilize an appropriate medical intake screening instrument to identify and record observable and non-observable medical needs, shall assess and document the inmate's vital signs, and shall seek the inmate's cooperation to provide information, regarding:

(1) medical, surgical and mental health history, including current or recent medications, including psychotropic medications;
(2) history and symptoms of chronic disease, including current blood sugar level for inmates reporting a history of diabetes;
(3) current injuries, illnesses, evidence of trauma, and vital signs, including recent alcohol and substance use;
(4) history of substance abuse and treatment;
(5) pregnancy;
(6) history and symptoms of communicable disease;
(7) suicide risk history; and
(8) history of mental illness and treatment, including medication and hospitalization.

c.    Cermak shall ensure that, upon admission to the Facility, Qualified Mental Health Staff, Qualified Medical Staff, or Licensed Correctional Medical Technicians utilize an appropriate mental health intake screening instrument to identify and record observable and non-observable mental health needs, and seek the inmate's cooperation to provide information, regarding:

(1)    past suicidal ideation and/or attempts;

(2)    current ideation, threat or plan;

(3)    prior mental illness treatment or hospitalization;

(4)    recent significant loss, such as the death of a family member or close friend;

(5)    previously identified suicide risk during any prior confinement at CCDOC;

(6)    any observations of the transporting officer, court, transferring agency or similar individuals regarding the inmate's potential suicide risk, if such information is communicated to Cermak staff;

(8)    psychotropic medication history; and

(9)    alcohol and other substance use and withdrawal history.

d.    Cermak shall ensure that all Qualified Mental Health Staff, Qualified Medical Staff or Licensed Correctional Medical Technicians who conduct the medical and mental health intake screenings are properly trained on the intake screening process, instrument, and the requirements and procedures for referring all qualifying inmates for further assessment.

e.    If Cermak assigns Licensed Correctional Medical Technicians to perform intake screening, they shall receive appropriate, on-site supervision by on-site Qualified Medical Staff; information obtained on screening for all inmates will be reviewed by Qualified Medical Staff before the inmate departs the intake area.

f.    Cermak shall ensure that a medical assessment based on the symptoms or problems identified during intake screening is performed within two working days of booking at the Facility, or sooner if clinically indicated, by a Qualified Medical Professional for any inmate who screens positively for any of the following conditions during the medical or mental health intake screenings:

(1)    Past history and symptoms of any chronic disease included on a list specified by Cermak's policies and procedures;

22

(2)     Current or recent prescription medications and dosage, including psychotropic medications;

(3)     Current injuries or evidence of trauma;

(4)     Significantly abnormal vital signs, as defined by Cermak's policies and procedures;

(5)     Risk of withdrawal from alcohol, opioid, benzodiazepine, or other substances;

(6)     Pregnancy;

(7)     Symptoms of communicable disease; and

(8)     History of mental illness or treatment, including medication and/or hospitalization.

g.     Cermak shall ensure that any inmate who screens positively for mental illness or suicidal ideation during the intake process receives a comprehensive mental health evaluation (see provision 59.c, "Mental Health:   Assessment and Treatment") Cermak shall ensure timely access to a Qualified Mental Health Professional for this purpose, based on emergent, urgent, and routine medical or mental health needs.

h.     Cermak shall ensure that the intake health screening information is incorporated into the inmate's medical record in a timely manner.

i.     Cermak shall implement a medication continuity system so that incoming inmates' medication for serious medical and mental needs can be obtained in a timely manner, as medically appropriate. Within 24 hours of an inmate's booking at the Facility, or sooner if medically necessary, a Qualified Medical Professional or Qualified Mental Health Professional, with appropriate prescribing authority, shall decide whether to continue the same or comparable medication for serious medical and mental health needs that an inmate reports during intake screening that she or he has been prescribed. If the inmate's reported medication is discontinued or changed, other than minor dosage adjustments or substitution of a therapeutic equivalent, a Qualified Medical Professional or Qualified Mental Health Professional, with appropriate prescribing authority, shall evaluate the inmate face-to-face as soon as medically appropriate, and within no greater than five working days, and document the reason for the change.

**Compliance Status**: Substantial compliance.

**Findings**

23

**Status Update:** Received and reviewed.

**Monitor's Findings:**

We reviewed 12 records of patients who entered the jail within the past month and a half and were known to have chronic medical problems, such as hypertension, diabetes, HIV disease and seizure disorder. In our review of the records, every patient received an appropriate history and an appropriate assessment. We also pulled records of patients who entered through an anomalous pathway, such as a hospital takeover or a revocation of electronic monitoring. Again, in each instance, the patient received both the nursing screen and the health assessment. The issue of medication availability will be dealt with under the assessment description. It is clear that Cook County Jail now has a relatively consistent process for insuring that regardless of how patients enter the jail they nonetheless receive the required screening. The quality of the screening remains high and the performance is consistent with expectations.

**Monitor's Recommendations:** None.

## 46. Emergency Care

a. Cermak shall train health care staff to recognize and respond appropriately to health care emergencies, including:

   (1) Medical emergencies;
   (2) Mental health emergencies; and
   (3) Drug and alcohol withdrawal.

b. CCDOC shall train correctional officers to recognize and respond appropriately to health care emergencies, including:

   (1) Medical emergencies;
   (2) Mental health emergencies; and
   (3) Drug and alcohol withdrawal.

c. CCDOC shall ensure that all inmates with emergency health care needs receive prompt transport, including transport for outside care, for emergencies including:

   (1) Medical emergencies; and
   (2) Mental health emergencies.

d.    Cermak shall ensure that all inmates with emergency health care needs receive timely and appropriate care, with prompt referrals for outside care when medically necessary, and shall notify CCDOC when emergency transport is needed inside or outside the Facility compound, for emergencies including:

(1)    Medical emergencies; and

(2)    Mental health emergencies.

e.    CCDOC shall train all correctional officers to provide first responder assistance (including cardiopulmonary resuscitation ("CPR") and addressing serious bleeding) in emergency situations. CCDOC shall provide all correctional officers with the necessary protective gear, including masks and gloves, to provide first line emergency response.

**Compliance Status**: Substantial compliance.

**Findings**

    **Status Update:**  Received and reviewed.

    **Monitor's Findings:**

We again toured the emergency room and we were impressed that the maintenance of the emergency room log had improved significantly. There were still some blank spaces in areas that should have been completed. However, the use of the log appeared to be more consistently completed than before. We found one major problem in that patients may spend a significant amount of time in the emergency room or, for instance when referred from intake, may be unable to eat because of the intake process. When they are moved from intake to the ER, there is no available food resource in the area to meet their nutrition needs. We strongly recommend that Cermak staff request custody to provide bag lunches in sufficient numbers to meet the nutrition needs of patients who are not able to receive nutrition during intake or because of a prolonged ER visit.

    a. Cermak Health Care Staff Training

Both medical and mental health staff have been trained with regard to medical and mental health emergencies. However, some of the procedures with regard to drug and alcohol withdrawal have not yet been included in the training, in part because the implementation is not to occur until the new RTU, which has a special housing area for detoxification, has become operational. Therefore, this part is partially compliant but since the sickest detox patients are well treated, this entire section is in substantial compliance.

25

b. CCDOC Correctional Officer Training

With regard to the training of correctional officers, they have completed training with regard to medical emergencies, mental health emergencies as well as drug and alcohol withdrawal. Therefore, this area is in substantial compliance.

c. Emergency Transport

With regard to the transport of medical emergencies, we reviewed approximately 10 records and found in each instance transport was timely. There do not appear to be any problems with emergency response times related to transport. Therefore, this area is substantially compliant.

d. Timely Care and Transport

We reviewed 10 records which resulted in patients either being sent to the emergency room and returned or sent to the emergency room and admitted to the hospital for medical conditions. In each instance, the response by the medical staff was both timely and clinically appropriate. Therefore, this area is substantially compliant.

e. CCDOC First Responder Training for Correctional Officers

This requires training of correctional officers in both CPR and first responder assistance and again we found this area to be substantially compliant.

This section, although substantially compliant in all other areas, still requires the training and implementation of the alcohol withdrawal protocols, which should occur when the detoxification unit is opened in the new building.

**Monitor's Recommendations:**

1. Work with custody to insure that bags containing sandwiches or some other nutrition are available in sufficient numbers in the emergency room to insure that patients nutrition needs are adequately met.
2. Continue to work on improving the conscientiousness with which the emergency room log is maintained.
3. Provide the training to nursing staff and implement the policy of nurse monitoring for patients with mild and moderate withdrawal symptoms, timing the training to occur just prior to movement into the new building.

## 47. Record Keeping

a.   Cermak shall ensure that medical and mental health records are adequate to assist in providing and managing the medical and mental health needs of inmates at the Facility and are maintained consistent with local, federal, and state medical records requirements.

b.   Cermak shall ensure that medical and mental health records are centralized, complete, accurate, readily accessible and systematically organized. All clinical encounters and reviews of inmates should be documented in the inmates' records.

c.   To ensure continuity of care, Cermak shall submit appropriate medical information to outside medical providers when inmates are sent out of the Facility for medical care. Cermak shall appropriately request records of care, reports, and diagnostic tests received during outside appointments in a timely fashion and include such records in the inmate's medical record or document the inmate's refusal to cooperate and release medical records.

d.   Cermak shall maintain unified medical and mental health records, including documentation of all clinical information regarding evaluation and treatment.

**Compliance Status**: Partial compliance.

**Findings:**

**Status Update:** A status report dated January 2013 was provided in advance of the site visit.

**Monitor's Findings:**

a. Cermak-Adequacy and Maintenance of Records

Cermak has nearly completed the installation and implementation of an electronic clinical record. FastPak, the daily medication packaging program, had just been implemented before the last site visit and since then has proven itself to be reliable and accurate. Accuflow, the electronic medication administration record, was put in place two weeks before this visit and, at the time of the site visit, is used only to document delivery of KOP medications. There are application and interface issues yet to be resolved before it can be used to document administration of dose-by-dose medications.

One problem with the electronic health information system is that it does not allow a provider to order laboratory tests on a schedule to coincide with future chronic care and

27

psychiatry appointments. Currently, orders for laboratory tests disappear if not performed within two weeks. The result is that an extra and clinically unnecessary provider visit must be scheduled just to order the appropriate labs, or the provider sees the patient without having recent lab results. The electronic health information system needs to be modified so that laboratory tests are ordered in advance of chronic care and psychiatry appointments and the results are available to the provider at the time of the patient encounter.

Segregation rounds remain an aspect of patient care that is not documented in the inmate health record and should be. At the time of this site visit, the only required documentation when rounds take place is a notation in the unit officers' log. If a clinical assessment or care is provided, a progress note is made by health care staff in the electronic health record. Previously, documentation of rounds was noted by the name of each inmate on a printed roster of those in segregation and protective custody. It is unclear what becomes of the lists when the dispensary no longer keeps them. Neither of these methods meets the NCCHC Standard E-09 for Segregated Inmates. Compliance indicator #3 (page 75) requires that rounds are documented on "individual logs or cell cards, or in an inmate's health record, and includes: a. the date and time of the contact, and b. the signature or initials of the health staff member making the rounds." The fifth paragraph in the discussion section (page 76) describes further notations that are recommended and states that individual logs or cell cards are filed in the inmate's health record. Cermak should align their policy and practices with the documentation requirements of NCCHC and decide whether this documentation is accomplished electronically or on paper and scanned in after the fact.

Nursing staff were observed in Division X manually charting glucometer readings into each inmate's electronic record even though this information is downloaded into the electronic record when the glucometer is placed in the docking station. Apparently, this duplicate documentation is necessary because the information was not being correctly downloaded to the electronic record. It is unclear whether this problem has been resolved and no longer requires a manual entry. It is noted here to emphasize the ongoing importance of maintaining adequate and responsive IT support to maintain the integrity of the electronic health record.

As of May 2013, positions for training, data analysis and network support have been filled. Bob Bliese has been hired as the IT Project Manager. Other staff includes a process analyst, 3 CCL Programmers, and network and desktop support. In addition, Patient Care Services has filled a nursing position to provide ongoing training and support for automation. Mr. Bliese and Richard Blackwell, Quality Assurance Director, expressed their opinion that the current positions are sufficient to provide ongoing system support and change management through the next year. The roll out of Accuflow has required diversion of staff from other IT

projects. This has resulted in delays in the development of other necessary data, various reports and revisions to the electronic record. See also Dr. Metzner's report.

There has been no progress resolving the problem described in the last report involving the interface between the inmate tracking system, Intellitech IMAC and Cerner. The inability to resolve these problems in information sharing is a significant obstacle to patient safety and in meeting the requirements of the Agreed Order. See also Dr. Metzner's report.

b. Cermak-Accessibility of Records

Paper recording of patient care includes dose by medication administration (MAR), various patient care logs (close observation, hunger strike, and suicide watch) and signed consent forms. Electronic documentation of medication administration will be accomplished when Accuflow is fully installed. There is a feature in Accuflow which is being considered as a means to document this information in flow sheet format.

We recommended in the last report that Cermak establish in policy and procedure timeframes for submitting paper documentation so that it is received and scanned into the electronic record timely. In response, Ms. Kampe, Director of HMID has drafted a document that describes how soon paper documentation is to be sent to the records department for scanning. This instruction, proposed as Forms Turnaround Times, would be attached to Policy H-01.2 Organization of the Health Record. When the draft is adopted, implementation would ensure that paper documentation is accessible to other clinicians as part of the electronic record.

Access to computers and/or paper records was adequate and supported clinical care.

c. Cermak-Communication with Offsite Providers

Appropriate medical information is made available to outside medical providers when inmates are sent out of the facility for medical care. Adequate provisions are in place to gather clinical information from previous providers.

d. Cermak-Unified Medical and Mental Health Records

Previous reports have identified the need to include suicide risk screening and suicide assessment forms in the electronic record and this has yet to be accomplished. The Monitors have also recommended revisions and automated documentation of other forms (segregation, suicide watch and hunger strike) in previous reports, but these have yet to be accomplished. A potential methodology has been identified but cannot be put into place until after Accuflow is implemented. The last report recommended that Cermak revise the electronic format of the

nursing assessment of HSRs to better resemble problem oriented charting. This has not yet been accomplished and compromises communication of clinical information about the patient.

Ms. Kampe, Director of HMID, expressed the opinion that staffing to maintain the unified health record was adequate to manage the expansion of services to the new RTU. She commented that rotation of responsibility among clerical support and administrative assistants has added capacity and strengthened performance of the health information department. Current health information issues she is addressing include retention of electronic records, "downtime" procedures and practice drills as well as limitations of the Medical Record Publish feature used to produce records required for litigation proceedings.

**Monitor's Recommendations:**

1. Establish a satisfactory interface between Cerner and IMACS to communicate changes regarding inmate status.
2. Fully implement electronic documentation of medication administration.
3. Align policy and practices regarding documentation of segregation rounds with the requirements of NCCHC.
4. Establish timeframes in policy and procedure for submitting other paper documentation so that it is received and scanned into the electronic record timely.
5. Revise the electronic forms to better track and display clinical information as described here and in previous reports.
6. Modify the electronic health information system so that laboratory tests are ordered in advance of chronic care and psychiatry appointments and the results are available to the provider at the time of the patient encounter.

## 48. Mortality Reviews

a.  Cermak shall request an autopsy, and related medical data, for every inmate who dies while in the custody of CCDOC, including inmates who die following transfer to a hospital or emergency room.

b.  Relevant CCDOC personnel shall participate in Cermak's mortality review for each inmate death while in custody, including inmates who die following transfer to a hospital or emergency room, and a morbidity review for all serious suicide attempts or other incidents in which an inmate was at high risk for death. Mortality and morbidity reviews shall seek to determine whether there was a systemic or specific problem that may have contributed to the incident. At a minimum, CCDOC's contribution to mortality and morbidity reviews shall include:

(1)     critical review and analysis of the correctional circumstances surrounding the incident;

(2)     critical review of the correctional procedures relevant to the incident;

(3)     synopsis of all relevant training received by involved correctional staff;

(4)     possible precipitating correctional factors leading to the incident; and

(5)     recommendations, if any, for changes in correctional policy, training, physical plant, and operational procedures.

c.      Cermak shall conduct a mortality review for each inmate death while in custody, including inmates who die following transfer to a hospital or emergency room, and a morbidity review for all serious suicide attempts or other incidents in which an inmate was at high risk for death. Cermak shall engage relevant CCDOC personnel in mortality and morbidity reviews and shall seek to determine whether there was a pattern of symptoms that might have resulted in earlier diagnosis and intervention. Mortality and morbidity reviews shall occur within 30 days of the incident or death, and shall be revisited when the final autopsy results are available. At a minimum, the mortality and morbidity reviews shall include:

(1)     critical review and analysis of the circumstances surrounding the incident;

(2)     critical review of the procedures relevant to the incident;

(3)     synopsis of all relevant training received by involved staff;

(4)     pertinent medical and mental health services/reports involving the victim;

(5)     possible precipitating factors leading to the incident; and

(6)     recommendations, if any, for changes in policy, training, physical plant, medical or mental health services, and operational procedures.

d.      Cermak shall address any problems identified during mortality and morbidity reviews through timely training, policy revision, and any other appropriate measures.

**Compliance Status**: Substantial compliance.

**Findings**

   **Status Update:** Received and reviewed.

31

**Monitor's Findings:**

We had the opportunity to sit in on the mortality review for the one patient who died since our last visit. The meeting consisted of representatives both of the sheriff's department and of the medical and nursing programs. The case reviewed was a gentleman who presented to custody while in outpatient housing and nursing was called. Shortly thereafter, he collapsed. Nursing responded without the equipment that turned out to be needed, given his collapse. There was a productive discussion, which may not have affected this case because of the nature of the sudden collapse, but could be very useful in the future. The emergency bag which the nurses are to bring in "man down" situations is quite heavy. Currently, there is no differentiating code for calls from custody in which resuscitation may be needed, such as in man down situations versus all other situations. The discussion led to the conclusion that it would be useful for the group to work out a common understanding for having possibly two different code calls which would alert the nursing staff as to whether emergency equipment used to facilitate resuscitation might be necessary. In addition, there was discussion about the requirement to obtain an EKG when any complaint of chest pain arises. There was also a discussion about the need to insure that all who respond document both content and timeframes within the medical record. Overall, the purposes of this item in the agreement were all addressed. Therefore, the compliance status is substantial compliance.

**Monitor's Recommendations:**

1. The QI program should track the implementation of improvement strategies discussed at the mortality review committee meeting.

### 49. Grievances

Cermak shall develop and implement policies and procedures for appropriate handling of grievances relating to health care, when such grievances are forwarded from CCDOC.

**Compliance Status**: Partial compliance.

**Findings**

**Status Update:** Received and reviewed.

**Monitor's Findings:**

The data from December through March demonstrates a significant reduction in the total number of grievances. The March data reveals that there were a total of 262 grievances. This compares quite favorably with what was found during the months preceding our last

report, when almost invariably there were more than 300 grievances per month. Continuing to be of concern and one of the reasons for partial compliance is the fact that 25 of the 262 grievances were closed without a review and response. This is about nine and a half percent, which of course means that one out of ten grievances will not have a response regarding their grievance. The problem of no response is particularly troubling with regard to Division V grievances since 40% of the no response category come from Division V.

It is also encouraging that the number of appeals has decreased to 17 in the month of March and this represents an appeal rate of approximately 6%. Also, there has been significant improvement in the timeframe between receipt by custody and receipt by Cermak Health Services. Although there is not data from all Divisions, from five of the Divisions it appears that this timeframe which is the custody turnaround timeframe is on average about five days.

**Monitor's Recommendations:**

1. The Sheriff's Department should continue to monitor the timeliness from custody receipt of grievance until its arrival at Cermak Health Service's grievance coordinator.
2. The goal remains zero grievances closed out without a response.
3. Cermak Health Services should focus its attention particularly on Division V to insure that all grievances are reviewed and a response submitted within the required timeframe.

## C.    MEDICAL CARE

## 50. Health Assessments

a.    Cermak shall ensure that Qualified Medical Professionals attempt to elicit the amount, frequency and time since the last dosage of medication from every inmate reporting that he or she is currently or recently on medication, including psychotropic medication.

b.    Cermak shall ensure that incoming inmates who present and are identified by medical personnel as having either a current risk of suicide or other acute mental health needs will be immediately referred for a mental health evaluation by a Qualified Mental Health Professional. Staff will constantly observe such inmates until they are seen by a Qualified Mental Health Professional or Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional. Incoming inmates reporting these conditions will be housed in safe

conditions unless and until a Mental Health Professional clears them for housing in a medical unit, segregation, or with the general population.

c.  Cermak shall ensure that all inmates at risk for, or demonstrating signs and symptoms of, drug and alcohol withdrawal are timely identified. Cermak shall provide appropriate treatment, housing, and medical supervision for inmates suffering from drug and alcohol withdrawal.

d.  CCDOC shall maintain a policy that correctional officers supervising newly arrived inmates physically observe the conduct and appearance of these inmates to determine whether they have a more immediate need for medical or mental health attention prior to or following the intake health screening by Qualified Medical Staff.

e.  Cermak shall ensure that the medical assessment performed within two working days of his or her booking at the Facility, or sooner if clinically indicated, for each inmate specified above (provision 45.f, "Intake Screening") shall include a review of the inmate's intake screening form, a medical history, a physical examination, a mental health history, and a current mental status examination. The physical examination shall be conducted by a Qualified Medical Professional. The medical assessment shall also include development or revision of the inmate's problem list and treatment plan to address issues identified during the medical assessment. Records documenting the assessment and results shall become part of each inmate's medical record. A re-admitted inmate or an inmate transferred from another facility who has received a documented medical assessment within the previous six months and whose receiving screening shows no change in the inmate's health status need not receive a new medical assessment. For such inmates, Qualified Medical Staff shall review prior records and update tests and examinations as needed.

**Compliance Status**: Substantial compliance.

**Findings**

> **Status Update:** Received and reviewed.

> **Monitor's Findings:**

We reviewed 12 records of patients who entered the jail in the month of March or early April and who had one or more common chronic diseases. In particular, the records we

reviewed consisted of patients with diabetes, hypertension, HIV disease and seizure disorder. In each record, we reviewed both a timely nursing screen as well as a timely health assessment. However, when the health assessment was performed in the emergency room and completed on paper (which is the routine in the emergency room), there was a substantial discrepancy between the completeness of the assessment and documentation between performance in intake area versus the ER. The majority of health assessments were completed in the intake area utilizing a computer and these were invariably complete and conscientious in attention to the requirements of the health assessment. The assessments performed in the emergency room were very narrowly focused on the identified problem which formed the basis of the referral from the nurse screen to the clinician. In that sense, they were much less complete and thorough. This was also true with regard to the physical examination as documented in the records. We also looked at whether patients received critical medications timely and certainly, with the use of the Pyxis machines, this was consistently documented in the record. The patients with HIV disease were also referred to and seen by the HIV clinician as well as being followed by the primary care clinician. As described in the last report and earlier in this report, patients were assessed with regard to substance withdrawal and those with severe symptoms were admitted to the infirmary. On the other hand, those with mild to moderate symptoms were provided treatment but will not be able to be monitored on a consistent basis in a manner that is congruent with the policy until the detox ward is opened up in the new RTU building.

**Monitor's Recommendations:**

1. As soon as possible, transition to use of the computerized primary care note for intake health assessment conducted in the emergency room. The narrow focus of the handwritten ER performed health assessments is not consistent with performance in the intake area using the computerized format.
2. The QI program should continue to monitor the documentation of timely receipt of medications which are deemed critical.

## 51. a Acute care

a. Cermak shall provide adequate and timely acute care for inmates with serious and life-threatening conditions, and ensure that such care adequately addresses the serious medical needs of inmates. Adequate care will include timely medical appointments and follow-up medical treatment.

**Compliance Status**: Substantial compliance.

**Findings**