**Status Update:** Received and reviewed.

**Monitor's Findings:**

We reviewed six records of patients who presented onsite for unscheduled urgent care. Overall, care was consistently timely and clinically appropriate. There was one case of a patient who presented with conjunctivitis who was not followed up by the primary care clinician. However, in general, follow up was appropriate. The major problem identified in the emergency area was that there is no capability to provide a bag lunch or even just a sandwich for those patients who miss either lunch or dinner. This should be addressed by Cermak with custody.

**Monitor's Recommendations:**

1. Cermak leadership should meet with custody and arrange for a sufficient number of bag lunches or snacks in order to eliminate the substantial delays occurring among patients in the emergency room with regard to access to nutritional resources.

## 51.b  Acute Care-Infirmary

b. Cermak shall maintain guidelines for the scope of care of acutely ill patients in its on-site designated infirmary units and for transfer of patients when appropriate to outside hospitals.

**Compliance Status:** Partial compliance (nursing).

**Status Update:** A status update was received and reviewed.

**Monitor's Findings:**

b. Cermak-Care Guidelines

There have been no changes to the physical plant since the November 2012 visit. Cermak second and third floors continue to be a generally clean, well maintained, well lighted and organized area. Environmental temperatures in the nursing station areas, common areas and patient rooms were comfortable. There were no complaints from patients concerning the temperature of their room. There were no noticeable or reported structural, electrical, plumbing or life safety issues. Cook County Detention Center (CCDC) infirmary continues to be located on the Cermak second and third floors. The second floor continues to be designated for male and female acute and "step-down" medical and mental health patients, and the third floor continues to be dedicated to male and female acute medical patients, medical isolation patients and those individuals with chronic specialized medical needs. The bed capacity on

Cermak second floor has not changed since the November 2012 visit. Cermak third floor, particularly 3-North, has been designated for the sickest detainees in the entire jail, yet Cermak third floor is the only area of CCDC that requires individuals to sleep on the floor. Additionally, Cermak is not in control of infirmary bed space, as many detainees who have no medical need are placed in Cermak by non-medical personnel. The patient census on Cermak second floor has improved from Monitor visit to visit; however, the third floor census continues quite high. During the Monitor visit, the patient census in each of the areas was as follows:

2-North – 24 beds and 31 patients
2-South – 24 beds and 17 patients
2-West – 24 beds and 30 patients; down to 25 by end of day shift
2-East – 12 beds and 12 patients
2-Southeast – 11 beds and 9 patients
3-North – 20 beds and 30 patients
3-South – 12 beds (all negative-air pressure isolation rooms) and 9 protective custody detainees and 1 suicide precaution detainee
3-West – 20 beds and 28 patients
3-East – 10 beds and 14 patients

Since the November 2012 Monitor visit, a nursing manager position has been added to Cermak. As a result, at the time of the May 2013 visit, there were two nursing managers in Cermak; one dedicated to second floor and one dedicated to third floor.

Each of the areas is staffed 24 hours a day, seven days a week by licensed nursing staff. Physicians are assigned to the units during the day, with all other hours covered through "call" or by the Cermak emergency room physician.

Due to physician separations from Cermak employment since the November 2012 Monitor visit, consistent physician coverage/oversight on third floor, particularly 3-North, has decreased while use of the Cermak emergency room has increased. Since the November 2012 Monitor visit, a significant number of vacant nursing positions have been filled. While routine "call-offs" continue to be a problem, at the time of the Monitor visit, it was reported that staffing had improved to the point that nursing staff is no longer required to relieve each other for lunch breaks, which previously resulted in units being unattended by licensed nursing staff during the period of the lunch break. As an example, it was reported Nurse A is no longer required to relieve Nurse B for lunch break, which resulted in Nurse A's unit being unattended by a licensed nursing professional and the same when Nurse B relieved Nurse A. Interviews with nursing staff indicated that staffing has significantly improved, but call-offs continue to create holes in the schedule that sometimes are filled and sometimes not. Additionally, staff reported,

due to improved staffing, tasks are consistently completed. On the day of the inspection, a review of the electronic health record (EHR) task list on each of the units on Cermak third floor confirmed there were no uncompleted or overdue patient tasks.

The electronic health record (EHR) is operational on both the second and third floors. Electronic forms for routine activities, such as, "Close Observation," "Suicide Watch," "Hunger Strike" and "Flow Sheets" continue to not be available which has not changed since the EMR became operational. The "status update" to the June 2012 visit indicated that these forms would, more than likely, never be available in electronic form due to their specificity to a correctional setting and the Stroger Hospital IT department being limited in its ability to create the forms in an electronic format. This issue has been discussed with the Monitor reviewing record keeping and is included as an issue under 47-Record Keeping in this Monitor's report. Multiple nursing staff interviews throughout Cermak confirmed continued universal nursing staff knowledge regarding the EMR and universal nursing staff ability to competently navigate the system.

The Pyxis automated medication management dispensing systems are in operation on each nursing unit. The Pyxis units provide automated control, accounting and perpetual inventorying of all prescription and controlled medication, as well as syringes, needles and sharps. At the time of the inspection, nursing management reported that a nurse had, over a period of days, removed narcotic pain patches from the Pyxis but never documented administration of the patches. These incidents were investigated, and the nurse was terminated. Interviews with nursing staff indicated an issue with Pyxis in terms of reconciliation of errors. For example, if the medication order required two pills to be administered and the nurse only retrieved one, the controlled medication count is inaccurate and continues to be inaccurate until reconciled by pharmacy staff. It was reported this situation can occur over several shifts which means on-coming nursing staff are accepting responsibility from off-going nursing staff for an inaccurate controlled medication inventory. This issue was shared with the Monitor reporting on item 56—Medication Administration. Demonstrations by 100% of the day-shift nursing staff on third floor and 100% of the evening shift nursing staff on second floor confirmed full knowledge and competency in the operation of the Pyxis units. Inspections on each unit of both Cermak second and third floors indicated needle and syringe counts, tool counts and medication refrigerator temperature documentation were accurate and being conducted at the appropriate intervals. Observation of nursing medication administration in multiple areas indicated appropriate identification of the patient, appropriate explanation of the medication, appropriate taking of vital signs when warranted, mouth checks for each patient and appropriate documentation utilizing a patient specific electronic medication administration record (E-MAR) which is a part of the EMR.

As recommended during the first visit in June 2010, the "Subjective-Objective-Assessment-Plan" (SOAP) method of nursing documentation continues to be utilized throughout Cermak, which creates consistency in the method/style of documentation. Monitor interviews with multiple nursing staff indicated no issues in utilizing the SOAP documentation format. Monitor reviews of nursing documentation indicated such.

Cermak second and third floors were overcrowded, with 35 patients housed on the floor in "boats." Again, despite a significant increase in population throughout CCDC, the hospital is the only area where detainees who are also patients are without a bed. At the time of the visit, 2-North was housing seven patients in boats; 2-West was housing six patients in boats; 3-North was housing 10 patients in boats; 3-West was housing eight patients in boats and 3-East was housing four patients in boats, for a total of 35 patients in boats between the two floors. The over-capacity on third floor continues to be attributed to the inability to discharge patients to housing units due to lack of bed space, the housing of general population inmates in the infirmary, the housing of general population inmates with medical equipment, i.e. C-PAP units, which are not permitted in the housing units, the housing of inmates confined to wheel chairs and the housing of inmates classified as protective custody. CCDOC administrative staff reports they are confident this issue will correct itself with the opening of the new RTU building.

As reported since the June 2010 Monitor visit, admissions to Cermak are made through the Cermak emergency room. Interviews with infirmary physician and nursing staff indicated admissions continue to be ordered with no consultation/input between the emergency room physician and the unit staff physician or nursing "house" supervisor and with no consideration as to unit census, staffing or unit patient acuity level. The status update reports continue to indicate no action has been or is being taken to address this issue.

Since the November 2012 Monitor visit, nursing administration reported an infirmary policy and procedure was developed, approved and implemented and staff have been trained. As has been recommended in previous reports, patient acuity levels and charting requirements have been established. Monitor interviews with nursing staff on each unit of both floors indicated staff was knowledgeable regarding the patients under their care. Nursing staff on 3-North were requested to identify the three sickest patients, which took some time. Once identified, the Monitor reviewed the medical records of those three patients and, strictly from the documentation, could determine no difference in acuity as compared to other patients on the unit. While staff knows patients by name and can recite their medical issues, there continue to be inconsistencies when it comes to identifying those patients who are the most ill, who require the most resources and who require the most documentation. The addition of the infirmary policy and procedure and training should help correct this issue. Additionally, the nursing quality improvement coordinator has developed a monitoring/audit instrument for the

routine review of infirmary medical records as to completeness and quality of documentation. The audit tool had just been developed prior to the Monitor visit and, as a result, no data was available for review. A review of the patients housed on 3-North indicated there were no acutely ill patients but generally convalescent patients, and detainees placed on the unit for housing purposes.

Interviews with multiple patients in the day room on 3-North indicated general satisfaction with the health care provided. Several of the patients were complimentary toward nursing staff. During the November 2012 visit, the only complaints cited were the need for a more stable shower chair, the shower area needed to be cleaned more frequently and, specific to mobility challenged patients, the ability to have a "worn-out" air mattress replaced. On inspection during this visit, there was an ADA compliant shower chair that appeared to be new since the November inspection. Inspection of the shower area did not indicate an unclean area. In regard to replacement of air mattresses, the Monitor was informed by a physician that a physician order for replacement is still required. During this visit and following questioning by the Monitor, there were no complaints concerning air mattresses, equipment or the physical plant. It is the continued opinion of the Monitor that once a physician orders a patient specific piece of equipment, that order is in effect until discontinued by the physician, and that original order covers replacement of the equipment if required.

**Monitor's Recommendations:**
1. Continue to educate new nursing staff and routinely update existing nursing staff regarding new policies and procedures. (Status update report indicated no action has been taken, which is the same response as the last report.)
2. Aggressively fill existing nursing vacancies. (Ongoing but improved.)
3. Continue to monitor and work with the Department of Facilities Management (DFM) to maintain comfortable environmental temperatures throughout the infirmary. (Ongoing, but no issues the last three visits; significantly improved.)
4. Continue to work with Facility Administration for solutions to relocating, from the acute care infirmary, individuals there for housing purposes only. (Status update report continues to push this issue into the future when the new RTU opens.)
5. Develop and implement electronic forms for "Close Observation," "Suicide Watch," "Hunger Strike," "Flow Sheets" and all other routine nursing activities requiring documentation. (This item is being removed from the recommendations.)
6. Develop a system/process for emergency room admissions which requires consultation with either the unit staff physician or nursing "house" supervisor and takes into consideration unit census, patient acuity level, staffing level and number of admissions during the shift. (Status update report indicated no action has been taken.)

7. From a multi-disciplinary approach, conduct at least one infirmary patient-care Continuous Quality Improvement study per quarter. (Status update report indicated no action has been taken.)

8. Determine patient acuity levels and develop nursing charting frequency requirements specific to the acuity levels. (Status update report indicated no action has been taken; however, a new policy and procedure has been implemented which addresses acuity levels and charting requirements. Will continue to Monitor for compliance with policy.)

9. Nursing leadership is to provide training to nursing staff specific to acuity level driven charting requirements. (Status update report indicated no action has been taken; however, a new policy and procedure has been implemented which addresses acuity levels and charting requirements and infirmary staff have received training. Will continue to Monitor for compliance with policy.)

10. Develop and implement a system to ensure patients who are out of their unit but who remain in Cermak for a specialized treatment receive their medication at the appropriate times as directed by the attending physician. (Status update report indicated no action has been taken.)

11. Assure physician ordered medical equipment is provided for the duration of the order. (Issue not addressed on the status update report.)

12. Establishment of a wound care nursing specialist position to interface with physician, nursing and infectious disease staff. (Issue not addressed on the status update report.)

## 52. Chronic care

a. Cermak shall maintain an appropriate, written chronic care disease management plan, which provides inmates with chronic diseases with timely and appropriate diagnosis, treatment, medication, monitoring and continuity of care consistent with the inmates' expected length of stay.

b. Cermak shall maintain appropriate written clinical practice guidelines for chronic diseases, such as HIV, hypertension, diabetes, asthma and elevated blood lipids.

c. Cermak shall maintain an updated registry to track all inmates with serious and/or chronic illnesses and shall monitor this registry to ensure that these inmates receive necessary diagnoses and treatment. Cermak shall keep records of all care provided to inmates diagnosed with chronic illnesses in the inmates' individual medical records.

d.   Cermak shall ensure that inmates with chronic conditions are routinely seen by a physician, physician assistant, or advanced practice nurse to evaluate the status of their health and the effectiveness of the medication administered for their chronic conditions.

e.   CCDOC shall house inmates with disabilities, or who need skilled nursing services or assistance with activities of daily living, in appropriate facilities, as determined by Cermak. CCDOC shall permit inmates with disabilities to retain appropriate aids to impairment, as determined by Cermak.

f.   Cermak shall ensure that inmates with disabilities or who need skilled nursing services or assistance with activities of daily living shall receive medically appropriate care. Cermak shall notify CCDOC of their specific needs for housing and aids to impairment.

g.   Cook County shall build out, remodel, or renovate clinical space as needed to provide appropriate facilities for inmates with disabilities in accordance with the timelines set out in provision 43.i. Prior to completion of the new clinical space, Cook County and DFM will work with Cermak to address the most serious concerns regarding facilities for inmates with disabilities, to the extent possible in the current Facility.

**Compliance Status**: Partial compliance.

**Findings**

**Status Update:** No update provided.

**Monitor's Findings:**

a.   Chronic Disease Management Plan

Cermak has a chronic disease management plan (Policy G-01, *Chronic Disease Services*) that effectively delineates the goals, components and development of a chronic care program. A policy has been developed and implemented (*Continuity of Care During Incarceration*, E-12) that specifies the recommended timeframes for the initial and follow-up chronic care visits based on degree of control. We found the timeframes to be acceptable, except for the one for the initial primary care visit for patients who are determined to be in good control at intake. The policy allows a maximum interval of two months. We recommended that this be shortened

to one month. Prior to his departure in 2012, Dr. Hart had agreed and stated that he would revise the policy. As of 5/2/13, the policy had not been revised.

b. Cermak-Written Guidelines

The clinical practice guidelines for the more common chronic conditions, including asthma, diabetes, hypertension, dyslipidemia, seizure disorders, HIV disease, heart failure and anti-coagulation therapy, have been finalized, distributed to staff, in-serviced and posted on the intranet. The guidelines are systematic and comprehensive, and will assist the providers in the management of their patients with chronic illnesses. Each guideline presents specific quality improvement measures which can be used to monitor the quality of care being provided for specific diseases.

c. Cermak-Tracking System

Disease specific registries based on the problem list have been developed. While the large majority of patients with chronic illnesses are in the registries, we did find some patients with chronic diseases whose illness was not documented on the problem list and therefore not in the corresponding registry. In addition, when patients who were initially thought to have a chronic disease are subsequently found not to have that disease, the disease is frequently not removed from the problem list.

Cermak also uses the registries to monitor the care being provided to patients with chronic illnesses. Reports are being generated that look at important clinical parameters that are associated with the various chronic diseases.

d. Cermak-Regularly Scheduled Visits

We reviewed the medical records of 42 patients with chronic medical problems. Many of these patients had multiple chronic illnesses. The problems reviewed included:

i.      Diabetes – 23 patients
ii.     Hypertension – 21 patients
iii.    HIV Disease – 9 patients
iv.     Asthma – 10 patients
v.      Patients receiving Coumadin – 6 patients

The following problems related to timeliness of care were found:

i.      Chronic care visit did not take place in a timely manner in fifteen cases. (See Appendix, Patients 4-6, 8, 10, 12, 13, 14, 16, 17, 119, 23 and 26.)

ii.      Laboratory tests were not obtained in a timely manner in five cases. (See Appendix, Patients 3, 7, 14, 21 and 24.)

On a monthly basis, Cermak tracks the timeliness of initial and follow-up chronic care visits. As of 4/2/13, approximately 91% of patients had been seen for a follow-up visit in a timely manner. (This had been 92% on 11/1/12.) As of 4/2/13, 45% of patients had been seen for their initial chronic care visit within 30 days and 30% had not been seen within two months of their admission. (These numbers on 11/1/12 were 42% and 38%, respectively.)

One possible explanation for these problems with timely care is that Cermak still has not been able to fill all the vacant provider positions. (See section on staffing)

Another issue contributing to the delay in care is the frequent movement of inmates from one facility to another. Cerner is not able to update housing locations, so when inmate patients transfer, their appointments still show up as being in their old housing unit. In order for the appointment to be rescheduled, staff must determine that the inmate patient has been transferred and reschedule the appointment for the new housing unit. If this does not happen, the appointment does not get rescheduled. Even if it does happen, the new appointment is often not timely.

e. CCDOC-Facilities for Special Needs Patients

In late January/early February 2011, the Department of Justice's (DOJ) ADA unit visited Cook County Jail and performed a survey to identify any deficiencies. During our June 2012 visit, we were given a copy of a letter from DOJ Senior Investigator Toni Pochucha and Supervising Attorney Mellie Nelson to the Cook County Sheriff's Office documenting the findings of their survey. They noted that the 2010 Standards for Accessible Design require:

1. A minimum of 3% of the total number of cells need to be accessible
2. Cells with mobility features must be provided for each classification and special housing area
3. Each inmate with a disability must be housed in a cell with the accessible elements necessary to afford the inmate access to safe, appropriate housing.

They went on to note that their review determined that the Cook County Jail was in violation of the following standards and regulations:

1. There were a number of architectural violations that result in inaccessible elements throughout the facility. The letter states that these were documented in Appendix A, which we have not received.

2. Cook County Jail lacks comprehensive housing policies, including physical modifications to additional cells in accordance with the Standards, that ensure each inmate with a disability is housed in a cell or dormitory with the accessible elements necessary to afford such inmates access to safe, appropriate housing, in the most integrated setting appropriate to the individual inmate's needs and at the appropriate classification level.

3. Some inmates with disabilities are housed in the medical unit although they are not receiving medical care or treatment. Inmates with disabilities shall not be housed in designated medical areas unless they are actually receiving medical care or treatment.

4. In the medical unit, at least 10% of the rooms must be accessible.

5. Accessible medical examination and treatment tables and chairs, accessible scales, accessible radiological diagnostic equipment, etc. needs to be available to provide patients with disabilities equal access to services.

6. Cook County Jail must: (1) designate a responsible employee to coordinate efforts to comply with and carry out the facility's ADA responsibilities and to ensure that each program, service and activity, when viewed in its entirety, is readily accessible to and usable by inmates with disabilities; and (2) establish a written grievance procedure for resolving inmate ADA complaints.

Most of these deficiencies will be addressed with the opening of the new facility. At the time of our current visit, the deficiencies that were identified during the survey had not been addressed. During future visits, we will continue to monitor these deficiencies and report on the progress towards resolution.

f. Cermak-Medically Appropriate Care for Special Needs Patients & Communication to CCDOC

The following problems related to the care of patients with chronic diseases were noted during our review of medical records:

i. Providers did not perform an adequate assessment (history and/or physical examination) related to the patients' chronic illnesses in five cases. (See Appendix, Patients 10, 14, 19, 23 and 26.)

ii. Providers did not develop and/or implement an appropriate plan of care based on the patient's chronic illness and degree of control in eleven cases. (See Appendix, Patients 4, 5, 9-13, 16, 17, 22 and 23.)

iii. There were problems related to documentation in three cases. (See Appendix, Patients 8, 19 and 25.)

A number of the care related problems involved patients with diabetes who required insulin. We discussed this issue with Dr. Mansour, who was aware of the problem and stated that they were going to hold in-services on the management of diabetic patients.

Cermak has developed templates in Cerner that will facilitate implementation of the chronic care program. These disease specific templates serve as reminders about the necessary elements of the history, physical examination and plan for each chronic disease. At the time of our visit, the providers were not using the templates.

The care of patients with HIV disease warrants special discussion. In our prior reports, we noted that while the HIV providers had started documenting an appropriate evaluation for many of their patients, there were still a significant number of patients for whom that was not occurring. We further noted that these patients were still being followed by a primary care provider who was addressing their HIV disease, as well as any other health problems they may have. This situation has not changed since our last visit. This continues to be an inefficient use of resources.

The glucometers can be synchronized with Cerner so that the results of the FSBGs go directly into the electronic flow sheet. During our last visit, medical staff reported that the nursing staff still does not consistently synchronize the glucometers. Because of this, the results of the FSBGs were not filed in a consistent manner and the providers had to look in different sections of the medical record for the results. While this is still an occasional problem, the glucometers are now being synchronized most of the time.

Our review revealed two other problems related to laboratory testing: (1) it is not possible to order laboratory tests to be done on a future date; and (2) if a laboratory test is not performed within two weeks, it falls off the list of tests that need to be done. As a result, current laboratory results are not available at the time the provider is seeing a patient for chronic care. The provider will order necessary tests at the time that the patient is being seen and follow-up on the results at the next visit. This often results in a delay in needed care. The HIV provider deals with this issue by scheduling his patients to be seen and using that visit to draw the laboratory tests. He then schedules the patient for a follow-up visit in 3-4 weeks to review the laboratory tests. This system is an inefficient use of resources. Dr. Mennella informed us that Cerner is being modified so that it will allow the ordering of tests in the future and will not cancel orders for tests until they are done.

Review of the medical records continued to reveal that in many cases, required vaccinations, such as Pneumovax and annual flu vaccines for patients with diabetes and asthma, are not being ordered.

**Monitor's Recommendations:**

1. Revise the *Continuity of Care During Incarceration* policy to state that the initial chronic care visit will occur within one month of entry into the jail. Include references to this policy in the *Chronic Disease Services* policy.
2. Encourage staff to use the templates in Cerner when they see patients for chronic care visits.
3. Continue to reinforce the importance of keeping the problem list up to date with staff. Develop a CQI study to determine what percentage of patients with chronic diseases are listed in the registries.
4. Redefine the role of the HIV providers so that they function as the primary care provider for their patients.
5. Continue efforts to ensure that staff correctly synchronizes the glucometers so that the results are consistently filed in Cerner.
6. Provide in-services with the providers on the management of diabetic patients receiving insulin.
7. Modify Cerner to allow the ordering of laboratory tests on a future date and to not delete orders for laboratory tests that are not done within two weeks.
8. Provide in-services with the providers on necessary vaccinations for patients with chronic illnesses. Develop a CQI study to investigate this issue.
9. Identify and resolve scheduling issues that result in delays in patient care.

## 53. Treatment and Management of Communicable Disease

a. Cermak shall maintain adequate testing, monitoring and treatment programs for management of communicable diseases, including tuberculosis ("TB"), skin infections, and sexually transmitted infections ("STIs").

b. CCDOC shall comply with infection control policies and procedures, as developed by Cermak, that address contact, blood borne, and airborne hazards, to prevent the spread of infections or communicable diseases, including TB, skin infections, and STIs, consistent with generally accepted correctional standards of care.

c. Cermak shall maintain infection control policies and procedures that address contact, blood borne, and airborne hazards, to prevent the spread of infections or communicable diseases, including TB, skin infections and STIs, consistent with generally accepted correctional standards of care. Such policies should provide guidelines for identification, treatment and containment to prevent transmission of infectious diseases to staff or inmates.

    d.       Pursuant to Centers for Disease Control ("CDC") Guidelines, Cermak shall continue to test all inmates for TB upon booking at the Facility and shall follow up on test results as medically indicated. Cermak shall follow current CDC guidelines for management of inmates with TB infection, including providing prophylactic medication when medically appropriate and consistent with the inmate's expected length of stay. Inmates who exhibit signs or symptoms consistent with TB shall be isolated from other inmates, evaluated for contagious TB and housed in an appropriate, specialized respiratory isolation ("negative pressure") room. Cermak shall notify CCDOC of inmates' specific housing requirements and precautions for transportation for the purpose of infection control.

    e.       Cermak shall ensure that the negative pressure and ventilation systems function properly. Following CDC guidelines, Cermak shall test daily for rooms in-use and monthly for rooms not currently in-use. Cermak shall document results of such testing.

    f.       Cermak shall notify DFM, in a timely manner, of routine and emergency maintenance needs, including plumbing, lighting and ventilation problems.

    g.       Cermak shall develop and implement adequate guidelines to ensure that inmates receive appropriate wound care. Such guidelines will include precautions to limit the possible spread of Methicillin-resistant Staphylococcus aureus ("MRSA") and other communicable diseases.

    h.       Cermak shall adequately maintain statistical information regarding communicable disease screening programs and other relevant statistical data necessary to adequately identify, treat, and control infectious diseases.

**Compliance Status:** Partial compliance.

**Findings**

    **Status Update:** Status update received and reviewed.

    **Monitor's Findings:**

To date this section has been found to be in substantial compliance; however, as a result of statistical information provided during this review, this section is being downgraded to "partial compliance."

In 2012, the decision was made to decentralize the infection control/communicable disease program and transfer to the Divisions the responsibility for testing, monitoring, tracking, treating and reporting of communicable diseases. While a decentralized program seems more difficult to manage, it is not the Monitor's position to critique the type of program but to critique outcomes.

Prior to the decentralization, the infectious disease department was responsible for conducting detainee annual TB skin testing. Skin tests were administered during the detainee's birth month, and the program was in 100% compliance. Now that this responsibility has been shifted to the divisional level, compliance is 80%. Another example is the significant noncompliance at the divisional level to report skin and soft tissue infections. As a result, infectious disease staff began, on a weekly basis, to review the Cermak ER log for cases of skin or soft tissue infections. During March 2013, 73 soft tissue infections were identified and treated through the ER with only nine (9) of the cases reported to the infectious disease department by the respective Divisions. Additionally, when identified at the divisional level, cultures are only conducted on 20% of the cases.

Both of these examples point directly to poor outcomes and provide the rationale for a downgrade in compliance status. If the decentralized model is going to be used, systems must be in place to monitor and hold accountable individuals at the divisional level.

The Infectious Disease department has been reduced from seven full-time staff to two staff with a full-time staff physician credentialed in infectious/communicable diseases as the department chairperson. Department staff now consists of one nurse epidemiologist and one nurse clinician. Since the November 2012 Monitor visit, the department clerk position was removed and, as was reported in June, the data manager and three paramedics who were responsible for TB surveillance, sputum collection and outbreak investigations are no longer in the department. The department director reported policies and procedures remain in place, and new policies have been developed and implemented or are in the process of being developed. Facility wide staff training continues on an on-going basis. Due to the Infectious Disease staff reduction, surveillance and screening programs remain in place for TB, HIV, STDs, Hepatitis B and C, Ectoparasites, MRSA and seasonal influenzas; however, the process is now decentralized and occurs in each of the Divisions under the responsibility of the assigned physician. As a result of this decentralization, the department director re-emphasized the same concerns he had voiced at the time of the June 2012 Monitor visit.

1. The administration and reading of detainee annual TB skin tests (approx. 400 per month) would not occur.

2. There would be under-reporting of cultures and soft-tissue infections.

3. Divisional physician staff would not use the Infection Control/Infectious Disease electronic notification system.

At the time of the November 2012 Monitor visit, the department director confirmed all three of his concerns came true, and these same concerns remain at the time of the May 2013 Monitor visit. Significant monitoring and follow-up by the nurse epidemiologist and nurse clinician is required to insure all TB skin tests are administered and read. As an example, there is only 80% compliance with annual TB skin testing at the divisional level, while prior to decentralization of this process there was 100% compliance. It was reported that one full-time staff person could accomplish the monthly testing. The total number of cultures and reported soft-tissue infections is down, and divisional physician staff is not fully using the Infection Control/Infectious Disease electronic notification system. Additionally, it was reported that physicians across the Divisions are not consistently reporting boils and other skin infections. Infectious disease staff checks the Cermak emergency room weekly for cases of soft-tissue infections. During the month of March 2013, 73 soft-tissue infections were identified and treated through the ER with only nine (9) of the cases reported to the Infectious Disease department by the respective Divisions. Additionally, when identified at the divisional level, cultures are only performed on 20% of the cases.

The department continues to interface with the Chicago Department of Public Health (CDPH), the Illinois Department of Public Health (IDPH) and the Illinois Department of Corrections (IDOC). It was reported the Illinois-National Electronic Disease Surveillance System (I-NEDDS) continues to function as an effective statewide surveillance reporting system and is being fully utilized by the department.

CCDOC continues the policy and practice of conducting a chest x-ray on each detainee at the time of booking to rule out active TB. Detainee annual TB testing remains in place but is now conducted at the divisional level. Due to cost considerations, annual testing is now being conducted by PPD skin test rather than QuantiFERON.

The department director reported, despite significant staff reductions, the following initiatives remain in place:

1. The "opt-out" program now includes influenza vaccination and influenza vaccine is offered at every clinical encounter.

2. Data bases are being refined to continue to capture relevant statistics for:
- TB surveillance
- Male and Female STI "Opt-Out" program

- Employee testing for TB and Hepatitis B, the number of flu vaccine doses administered, and blood exposures to needle sticks and bites
- Skin infections

3. Tracking of "outbreaks" for:
- Influenza
- Gastroenteritis
- Ectoparasites
- Immunizations
- MRSA
- Negative air pressure isolation room usage

4. Weekly tracking from the Cermak emergency room log of any complaints of skin/tissue infection for MRSA.

5. The offering of T-Dap immunization for all health care providers.

6. Grant participation and expansion

During the November 2012 inspection, it was learned CCDC had made the decision to no longer issue detainees soap. As of the May 2013 inspection, it was reported this issue had been corrected.

Throughout the Divisions, it was noted that personal protective equipment, i.e., disposable gloves and masks, were readily available to staff. Disposable gowns were not available except in Cermak. Sinks with hot and cold water, soap, paper towels and had sanitizer were readily available.

Since the November 2012 Monitor visit, the department was required to manage two separate "outbreaks." An "influenza like illness" (ILI) occurred in December 2012. Two female detainees from Division IV were identified through the Cermak ER. During the period of December 2012 through March 2013, 198 patients were identified, isolated and treated.

In January 2013, four detainee food workers housed in Division II, dorm 4 were identified with an acute gastroenteritis (AGE), again, through the Cermak ER. An investigation launched by the Infectious Disease department identified two significant areas of concern and failure to comply with established policy and procedure.

1. Food workers were not being appropriately screened daily for "fitness" to work.

2. Detainees in Division II, dorm 4 could not wash their hands prior to meals due to soap not being available.

    a. Cermak-Maintenance of Testing, Monitoring and Treatment Programs

An infection control/surveillance program is in place which includes testing, monitoring and treatment programs for the management of communicable diseases, including tuberculosis, skin infections, including MRSA, and sexually transmitted diseases.

    b. CCDOC-Compliance with Infection Control[i]

Cermak has developed infection control policies, procedures and surveillance programs consistent with the Chicago Department of Public Health and the Illinois Department of Public Health. New policies continue to be developed with staff training occurring as new policies are introduced and implemented.

    c. Cermak-Infection Control Policies

The infection control policies and procedures are specific to the prevention of the spread of infections or communicable diseases, including TB, skin infections and sexually transmitted diseases. The policies provide guidelines for identification, treatment and containment to prevent transmission of infectious diseases to staff and inmates. Policies are consistent with the Chicago Department of Public Health and the Illinois Department of Public Health.

    d. Cermak-TB Testing According to CDC Guidelines

At the time of booking, each detainee receives a chest x-ray for the purpose of detecting active TB disease. Any detainee with a positive chest x-ray or any detainee exhibiting signs/symptoms of active disease is isolated from the general population. Isolation takes place in "negative-pressure" isolation rooms located on the third floor of the Cermak infirmary. Annual TB testing for both detainees and employees is conducted by PPD skin test.

    e. Cermak-Ventilation Systems

Previously, the appropriate operation of "negative-pressure" isolation rooms by the "smoke" method had been conducted and documented daily, Monday through Friday, by the Infectious Disease department nurse clinician whether or not the room was in use. The Department of Facilities Management (DFM) now conducts and documents daily testing of the "negative-pressure" isolation rooms and performs Hepa-filter replacement. Each "negative-pressure" isolation room is equipped with an audible and visual alarm which immediately indicates when negative pressure has been lost.

f. Cermak-Notify DFM of Maintenance Needs

Policy and procedure specific to repair and maintenance are in place. DFM is now performing daily room monitoring to determine if there is true "negative" air pressure and performing the required filter replacements. The appropriate number of air exchanges per hour is not measured.

g. Cermak-Appropriate Wound Care

Wound care has been decentralized and is now the responsibility of each Division physician and nursing staff. The Infection Control department continues to collect statistics from the Divisions and monitor wound treatment. The number of reported wound and skin cultures has decreased due to fewer culture and sensitivity tests being performed. Physicians across the Divisions are not consistently reporting boils and other skin infections. The department is tracking weekly from the Cermak emergency room log all complaints of skin/tissue infection for MRSA. For example, during March 2013, 73 soft tissue infections were treated through the Cermak ER, and only nine (9) were reported at the divisional level to the infectious disease department. The department medical director continued to report that only positive cultures for MRSA, rather than all skin/wound infections that are presumptively MRSA, are tracked. It was reported that culture and sensitivity testing is only being conducted on 20% of the cases. Additionally, despite all physicians and PAs having signed-off as reading the reporting requirements, the Infection Control/Infectious Disease electronic referral notification system is not consistently utilized by the divisional physicians. The Monitor is strongly urging administrative steps be taken to ensure all cases of presumptive MRSA is reported from each Division.

h. Cermak-Collection of Statistical Data Regarding All Communicable Diseases

Infection control/surveillance statistics are collected and maintained specific to communicable disease screening, identification, treatment and tracking. Data bases have been built and monthly data is being collected for TB surveillance, HIV testing and surveillance, Opt-Out male and female STI and HIV tracking, positive MRSA cultures, treated acute gastroenteritis, influenza prophylaxis, ectoparasite treatment, employee testing for TB and Hepatitis B, influenza vaccine doses administered and blood exposures to needle sticks and bites.

**Monitor's Recommendations:**

1. Implement a system that requires divisional medical staff to report all boils and other skin infections, and all cases of presumptive, as well as culture proven MRSA to the department Nurse Epidemiologist with a focus on identification, treatment and

containment of potential MRSA infections. (Status update report indicated on track; however, that is inconsistent with findings.)

2. Pursue the development of a process/schedule for routinely sanitizing cells. (Status update report indicated issues exist; same response as from the November 2012 inspection.)

3. From a multi-disciplinary approach, conduct at least one patient care oriented Infectious Disease Quality Improvement study per quarter. (Status update report continues to indicate no action yet taken.)

4. Continue to pursue grant studies. (Not addressed in status update report.)

5. Continue to work with the Department of Facilities Management regarding routine maintenance and testing of the respiratory "negative air" isolation room air handling system. Additionally, air exchanges should be tested and monitored. Provide a copy of all testing and results to the department of nursing and the department of infectious disease. (Status update report indicated DFM now monitoring; issues exist as a result of improperly working control systems and no testing of hourly air exchanges.)

6. Continue with the collection of statistical data for communicable diseases. (Status update report indicated on track.)

7. The addition of two full-time staff to administer and read monthly detainee TB skin tests and monitor divisional soft tissue/skin infection reporting. (Status update report continues to indicate on-track.)

8. Urge CCDC to continue the practice of issuing soap. (Resolved.)[ii]

9. Addition of a wound care nurse specialist to interface with physician, nursing and infectious disease staff. (Not addressed in status update report.)

## 54. Access to Health Care

a. CCDOC will work with Cermak to facilitate timely and adequate accessibility of appropriate health care for inmates, as provided by Cermak.

b. Cermak shall ensure the timely and adequate availability of appropriate health care for inmates.

c. Cermak shall ensure that the medical request ("sick call") process for inmates is adequate and provides inmates with adequate access to medical care. The sick call process shall include:

(1) written medical and mental health care slips available in English, Spanish and other languages, as needed;

(2)     opportunity for illiterate inmates and inmates who have physical or cognitive disabilities to access medical and mental health care; and

(3)     opportunity for all inmates, irrespective of primary language, to access medical and mental health care.

d.      Cermak shall ensure that the sick call process includes confidential collection, logging and tracking of sick call requests seven days a week. Cermak shall ensure timely responses to sick call requests by Qualified Medical Staff. The logging procedure shall include documentation of the date and summary of each request for care, the date the inmate was seen, the name of the person who saw him or her, the disposition of the medical or mental health visit (e.g., referral; whether inmate scheduled for acute care visit), and, if follow-up care is necessary, the date and time of the inmate's next appointment. Cermak shall document the reason for and disposition of the medical or mental health care request in the inmate's medical record.

e.      Cermak shall develop and implement an effective system for screening medical requests within 24 hours of submission. Cermak shall ensure that sick call requests are appropriately prioritized based upon the seriousness of the medical issue.

f.      Cermak shall ensure that evaluation and treatment of inmates in response to a sick call request occurs in a clinical setting.

g.      Cermak shall ensure that Qualified Medical Staff make daily rounds in the isolation areas to give inmates in isolation adequate opportunities to contact and discuss medical and mental health concerns with Qualified Medical Staff in a setting that affords as much privacy as reasonable security precautions will allow. During rounds, Qualified Medical Staff will assess inmates for new clinical findings, such as deterioration of the inmate's condition.

**Compliance Status**: Partial compliance.

**Findings**

**Status Update:**

**Monitor's Findings:**

We evaluated inmate access to care by reviewing Health Service Request (HSR) form tracking systems, randomly inspecting health care request form availability and collection, reviewing HSR forms, electronic health records, segregation logs, access to care data and interviewing staff and inmates.

At the November 2012 monitoring visit, we found persistent problems related to access to care. A major factor inhibiting progress was Cermak's ongoing inability to hire health care staff in a timely manner. As a result, there were insufficient numbers of nurses available to perform nurse sick call on a consistent basis. This was exacerbated by nurse call-ins that resulted in nurses being reassigned from nurse sick call to medication administration, delaying access to care. Unsurprisingly, health care data showed that care was not timely. Moreover, there was inconsistency in implementation of access to care policy throughout the jail.

Another impediment to health care access was that although nursing protocols had been developed, published and implemented, health care leadership had been unable to agree on the packaging for over-the-counter (OTC) medications that nurses would deliver to patients in accordance with the protocols. Consequently, even when nurses saw patients, they were often unable to adequately treat the patients' condition, necessitating a referral to a provider, further delaying access to meaningful treatment.

Since the last visit, Cermak is now able to fill health care positions in a timelier manner, including Nurse Coordinator positions. Although there are occasions in which nurses are still reassigned from nurse sick call to medication administration, it occurs less frequently and Nurse Coordinators in each Division are working to standardize access to care throughout the jail in accordance with policy and procedure. The Nursing Department is to be commended for having its Nurse Managers/Coordinators perform sick call themselves. They then had the nursing QA Coordinator review with each respective Nursing Manager/Coordinator their sick call work, including what was done well and what could be improved. Through this teaching strategy, they learned the appropriate handling of different symptoms as well as how to best teach their line staff how to improve their performance.

Acknowledging these improvements, we found that inmates still do not have timely access to health care. A contributing factor is that CCDOC population has continued to increase. In March 2012, the average daily population was 9,128 and in March 2013, it was 9,796, an increase of 7%.[1] On April 29, 2013, the first day of our site visit, the population was 9,981, an increase of 9% in the past 13 months. This has resulted not only in an increase in the demand

---

[1] CCDOC Monthly Statistics March 2013.

for services but changes in custody practices that have impacted access to care. In some Divisions, CCDOC custody staff changed the times that inmates are escorted to court. In the past, inmates were escorted to court on the night shift, at approximately 4 a.m., which did not interfere with access to health appointments. However, custody now escorts inmates to court during the day shift at approximately 8 a.m. and no other movement is permitted at this time. In some Divisions, staff reports that this has increased the number of missed appointments.

Health care leadership presented access to care data for the past six months. In March 2013, data showed that the average time from staff reception of the patient's HSR until being seen by a nurse was 4.8 days; however, timeframes varied greatly by Division. For example, in Divisions I, II, IV, V, XI, and XIV, the average time it took for a nurse to see the patient was 8.6 days, 6.0 days, 4.4 days, 6.75 days, 5.0 days and 7.0 days, respectively. In Divisions VI, IX, X, and XVII, the average time it took for nurses to see patients following receipt of the HSR was 3 days, 0.8 days, 2.2 days and 1.45 days.[2]

As noted in previous reports, we support the use of data to evaluate progress; however, we continue to have concerns about the completeness, accuracy and validity of the data, and its interpretation. For example, in March 2013 patients submitted over 6,000 HSRs; however, only 973 (16%) were ultimately included in the analysis of timeliness of patient access to care from the time staff received the HSR until the patient was seen by a nurse.[3] This is because with each step of the process, data points were absent from the forms.

In March 2013 of approximately 6,000 HSRs submitted, only 3035 (50%) contained both the date the patient wrote the request and the date that staff received it, and the remaining HSRs were eliminated from data analysis. Of the 3,035 HSRs, only 2,684 forms contained the date it was received and the date the nurse triaged the form, thus eliminating HSRs without both data points, and so on. With each step of the process, there were fewer HSRs that contained data points to permit measurement of timeliness of care. In the final analysis, it is unknown whether data obtained from 16% of the forms is representative of the other 84% not included in the analysis.

With respect to how consistently and how well each step of access to care is being implemented at the jail we found the following:

- Inmates generally have timely access to HSR forms; however, we found that on some housing tiers there were either no HSRs or very few available. (Divisions I and IV).
- Inmates are generally able to confidentially submit HSRs, except in Division IX.

---

[2] We believe that the data for these Divisions does not accurately represent the time from health care staff receipt of the HSR until a nurse/provider sees the patient.

[3] According to Richard Blackwell, inmates who had been released from the jail were not included in data analysis.

- Staff does not consistently date and time HSRs immediately following collection. This problem is exacerbated by staff not ensuring that date stamp machines are accurate or functional (Divisions IV and VI).
- Nurses generally triage HSRs in a timely manner; however, staff vacancies and/or call-ins often result in staff reassignment and delayed HSR triage. Nurses do not document the urgency of the triage decision (e.g., routine, urgent) on the HSR.
- Nurses do not consistently use the EHR to schedule patients for nurse sick call in all Divisions.
- Nurses do not consistently schedule symptomatic patients to be seen for nurse sick call when clinically appropriate; instead, they refer patients directly to a provider.
- Nurses have increased the frequency of use of EHR nursing protocol templates; however, in some cases choose the wrong protocol template or do not thoroughly evaluate the patient in accordance with the template. As a result, the quality of nursing assessments is in need of improvement (All Divisions).
- The EHR format for nursing protocols is disjointed and confusing and does not result in a SOAP[4] format that clearly and concisely communicates clinical information (See Provision 47 Record Keeping).

Inmates are ineffectively treated in nurse sick call because OTC medications are not available to nurses to deliver to the patient in accordance with the protocol. Health care leadership has not resolved the issue of OTC packaging. Treatment options must enable nurses to provide a course of therapy consistent with the expected duration of the patient's complaint. Otherwise, there is no point in having nurses perform evaluations, because they cannot provide meaningful treatment to the patient.

Nurses referring patients to a provider still "piggyback" appointment requests onto the future appointment. However, there is no effective clinical communication between the nurse and the provider about the reason for the nurse referral. In some records reviewed, the provider was unaware and did not address the patient's concern in the HSR.

a. Jointly Provide Appropriate Accessibility and b. Timeliness and Adequacy of Care

To evaluate timeliness of care, in each Division we conducted random inspection of housing units and health request boxes to evaluate the supply of HSR forms and timely collection of HSRs. We found that in most, but not all Divisions were HSRs readily available and inmates able to confidentially submit their health requests. Our findings for each Division are described below.

---

[4] SOAP is an acronym meaning Subjective, Objective, Assessment and Plan.

Division I is a maximum-security Division with a capacity of 1,245 inmates and a current population of 1,247.[5] The Division has health care staff present from 0700 to 1600. After 1600 when health care staff is no longer in the clinic, inmates obtain access to care by contacting a correctional officer who then notifies the Cermak emergency department for clinical guidance.

Access to care is problematic in Division I. Access to care data for March 2013 showed that the average length of time for a patient to be seen following receipt of an HSR was 7.6 days. The Nurse Coordinator personally conducted nurse sick call and determined that she could easily see 20 patients per day. She also noted that nursing staff on the unit was not as productive. She established a requirement that nurses see 20 patients a day and plans to reassess this in the near future. The Nurse Coordinator is able to view nurse sick call backlogs in the scheduling queue to monitor progress. She also stated that if a patient has submitted multiple HSRs with the same or various complaints, the nurse closes out only the most recent entry in the EHR, and that other HSR entries are not closed out.[6]

Review of April and March 2013 HSR tracking logs showed that, with rare exception, staff checked the sick call boxes daily to collect HSRs. We also noted, however, that there were stretches of days in which no HSRs were collected from the box. For example, on one tier there were no HSRs collected for 12 days, from March 18 to March 29, 2013. On another tier there were no HSRs collected from March 3 to March 14, 2013. In our experience, it is unusual to see such lengths of time without any submitted HSRs and raises questions about the availability of HSR forms on the tiers, and or timely collection.

We randomly inspected seven of 32 tiers and found that all tiers had lockable sick call boxes that were properly labeled for health care request forms. One tier had no HSRs available on the unit at the time of our tour. The remaining tiers had numbers ranging from 1 to >15 forms. We interviewed correctional officers about the process to obtain HSRs and the officers we spoke to indicated that it is health care staff's responsibility to make the forms available, and not an officer responsibility. One officer stated that each day health care staff brings forms but that inmates take them and hoard them in their cells to ensure that they have one when they need it. The hoarding of HSRs suggests that inmates do not feel confident that they can obtain an HSR form when they need them. We interviewed inmates in the tiers whose primary concern was that once they submitted an HSR, it took weeks to be seen. Many inmates also complained about lack of timely access to dental services. This is consistent with health care access data that we reviewed for Division I. At the time of the tour, the Nurse Coordinator reported that 203 patients that submitted HSRs were pending to be seen.

---

[5] See Cook County Jail Daily Count Sheet, 4/29/13.

[6] The failure to address or close out other HSRs that have been entered into the EHR adversely affects health care leadership's ability to collect and accurately evaluate access to care data.

Division II consists of dorms 1, 2, 3, 4 and the annex. The medical services for dorms 1, 3, 4 and the annex are provided on the first floor of dorm 1. Additionally, dorm 1 serves Division III, dorm 3. Dorm 1 health care staff collect HSRs for dorms 1, 3, 4, the annex and Division III, dorm 3. Interviews with staff indicated it requires approximately two hours daily to collect HSRs from the multiple locked drop-boxes located in these areas. Dorm 1 is now staffed on 7 a.m. to 3 p.m. and 3 p.m. to 11 p.m. shifts.

Medical services for dorm 2 are provided on the first floor. Division II dorm 2 medical staff collects the HSRs for dorm 2 only.

Since the November 2012 Monitor visit, an additional Nurse Coordinator was assigned part-time to assist the full-time Nurse Coordinator for Division II. The two Nurse Coordinators implemented the following changes to improve the overall operation of the Division.

- Both participate in a morning "huddle" consisting of the Division Superintendents, nursing administration, a rotating nursing manager, physicians, mental health, Cermak Director, pharmacy and Information Technology (IT).
- On April 1, 2013, nursing staff has begun using the electronic health record to schedule nurse sick call appointments.
- Nurse Coordinators have personally conducted nurse sick call.
- Nurse Coordinators have established an expectation that nurses assigned to sick call will evaluate 20 inmates per day.
- Nurse Coordinators monitor daily the number of inmates evaluated in nurse sick call.

Access to care data in Division II for March 2013 showed that the average length of time for a patient to be seen following receipt of an HSR was 6.0 days.

Dorm 1

Dorm 1 health care staff reported they collect a total of approximately 100 requests per day, which has increased approximately 20 per day from the November 2012 visit. This totals approximately 700 HSRs per week. Based upon this volume, even if 25% of the inmates did not require a nursing evaluation, nurses would still need to evaluate 575 inmates per week to not develop a backlog. Put another way, nurses would have to evaluate 75 inmates per day, seven days a week to remain current. Based upon an expectation of each nurse seeing 20 patients, this would require almost four registered nurses to perform sick call each day. On the day of the inspection, the Monitor was informed the backlog was 168.

The Monitor planned to interview nurses regarding the sick call process; however, two nurses called in sick. A nurse originally assigned to conduct sick call was reassigned to administer medication, which resulted in only one nurse to conduct sick call. As a result, when

the Monitor arrived at Dorm 1 at approximately 8:45 a.m., HSRs had not been collected from the other four buildings and sick call had not started. The charge nurse had reassigned staff to begin collecting HSRs but a second nurse had not yet been reassigned to conduct sick call.

Twenty-nine (29) detainees were scheduled for sick call. Both Nurse Coordinators assisted in reassigning a second nurse to conduct sick call in dorm 1.

A random review of five health service requests from April 29, 2013 showed that each had been date-stamped as received. The complaint and disposition of each was as follows:

- A patient with a mental health request that the nurse referred to mental health who evaluated the patient the same day.
- A patient with a genital rash that the nurse requested a provider appointment for 4/30 and the patient was scheduled for 5/2.
- A patient with Athlete's feet that the nurse requested a provider appointment for 4/30 and the patient was scheduled for 5/2.
- A patient with a dental complaint that the nurse referred to dental and the appointment was scheduled for 6/19/13.
- A patient with left arm numbness that the nurse piggybacked onto a provider appointment for 5/28/13. We referred this inmate to the Nurse Coordinator.

Thus in each case, the nurse did not schedule the patient for nurse sick call, but either referred the patient to mental health, dental or a medical provider.

Dorm 2

In dorm 2, the Monitor checked the Health Service Request box located on each of the three floors. None of the boxes contained any HSRs, but all had appropriately completed log sheets. The Nurse Coordinator reported approximately 50 HSRs per day are collected in dorm 2, and there was a backlog of 26 requests.

The Monitor met with the nurse assigned full-time to conducting nurse sick call. The nurse was new to CCJ and had only been on the job two weeks. As a result of the nurse being new, she was in the process of developing her own system to conduct and complete sick call per protocol. The nurse was computer literate and had no difficulty navigating the EHR.

A random review of six HSRs from March and April showed that all had been date-stamped as received. The complaint and disposition of each was as follows:

- A patient with complaint of a toothache of two weeks duration. On 4/15/13, the nurse evaluated the patient and requested a dental appointment for 5/2/13; however, the patient was scheduled for an appointment on 6/6/13.

- A patient with a mental health complaint who was referred to mental health on 4/29/13 and evaluated the same day.
- A patient with a mental health complaint on 4/16/13 that the nurse referred to mental health and who was evaluated the same day.
- A patient complaining of dry, itchy skin and requesting lotion. The HSR was received 3/20/13; the nurse evaluated the patient on 3/21/13 and provided lotion.
- A patient requested to see the optometrist. The HSR was date-stamped 4/29/13; the nurse requested an optometry appointment that was scheduled for 5/10/13.
- A patient requested medication for a burn on his hand on 4/29/13. The nurse piggybacked an appointment onto an existing provider appointment for 5/3/2013. The same patient requested mental health services on 4/30 and was evaluated the same day.

In these cases, inmates received timely mental health services; however, the nurse did not evaluate a patient with a burn on his hand, which should have taken place because of the high risk of infection. In this case, instead of evaluating the patient, the nurse piggybacked a referral onto a future provider appointment. This is a flawed approach because currently there is no reliable communication system for the provider to be aware of the nurse referral.

Division IV houses female inmates and has a capacity of 704 and current population of 701 inmates. Access to care data for March 2013 showed that the average length of time for a patient to be seen following submission of an HSR was 4.4 days.

Random tier inspection showed that with the exception of one tier, we found that HSR forms were available to inmates. We randomly checked HSR boxes and did not find any pending HSRs. We interviewed inmates who complained that once they submitted HSRs it took weeks to be seen.

We interviewed the Division Nurse Coordinator and two registered nurses assigned to conduct sick call. The process for handling HSRs has undergone slight changes from the last visit and is intended to make the process more efficient. Night shift staff collects HSRs, and a day shift staff person enters the HSR into the EHR.

We noted that some HSRs had an incorrect date of receipt (e.g. March 33, 2013, etc.) because staff did not adjust the date stamp machine at the end of the month. A review of five HSRs from April 2013 showed that the nurse did not document the date of triage or sign the HSR. This has been a consistent finding from previous visits.

We also met with one of the physicians who conducts an STD clinic once weekly. She reported a problem with the timely treatment of patients with STDs, many of whom require

only a single dose of medication for cure.[7] The issue with delayed treatment is that one-third to one-half of patients do not receive treatment because of rapid jail turnover. In some male Divisions, stock medications are immediately available to treat patients with STDs; however, in Division IV, the medication must be obtained through Pyxis. In order for nurses to obtain a medication from Pyxis, the provider must call the pharmacy and pharmacy staff must verify and enter the order into the system. The exception to this process is when pharmacy permits an override of Pyxis. Currently, override is only permitted in the Cermak emergency department.

Staff reported that the normal process for obtaining a medication from Pyxis results in not being able to treat the patient prior to leaving the clinic, and increases the number of patients released from the jail without treatment. Pharmacy staff has assured the physician that the pharmacy will expedite these medication orders; however, staff reports that there are still delays in being able to retrieve a dose from Pyxis. A contributing issue is that custody limits the number of patients that can be in the clinic waiting room and with the current demand for provider appointments, patients needing STD treatment cannot be held in the clinic waiting for the medication order to be processed. Currently, staff are trying to mitigate the situation by having one of the nurses deliver medications to patients in the housing units after the medication has been retrieved from Pyxis or the pharmacy; however, by this time some patients have been released without treatment.

This is a significant issue that must be resolved to ensure that patients receive timely access to treatment for sexually transmitted infections. We recommend that medical, nursing, pharmacy and custody leadership collaborate to develop acceptable strategies to resolve this issue.

Division V is a minimum-security unit with a capacity of 992 inmates and population of 980 at the time of our review. It is staffed with registered nurses and CMTs from 7 a.m. to 5 p.m. each day. We interviewed both nurses who conduct sick call who appear to be very conscientious. A review of 15 HSR forms from March 2013 showed that nurses signed and dated the forms when they were received and triaged.

Access to care data in Division V for March 2013 showed that the average length of time for a patient to be seen following submission of an HSR was 6.5 days.

At previous monitoring visits, cancellation of provider clinics was a frequent occurrence and delayed access to care. The physician assigned to the Division had called in sick the day prior to our visit, but was present on the day of the tour.

---

[7] As an example, the week of our tour, 15 of 42 patients required a single dose of medications.

We reviewed HSR tracking logs for the month of April 2013 that showed that HSRs were collected daily. However, in three of the housing tiers, we noted many days in April when zero HSRs were collected, and the total number of forms for the month was low. For example, on tier 2-B there were 15 days in which no HSRs were collected and a total of 34 for the month, averaging one per day; on tier 2-C there were 12 days in which zero HSRs were collected and a total of 30 forms for the month, averaging one per day; and on tier 2-J, there were 18 days in which zero HSRs were collected and a total of 27 forms for the month, or less than one per day.

The significance of the these data is unclear; however, when we interviewed a group of inmates in the waiting room regarding access to care, several inmates complained bitterly regarding the length of time to be seen by a health care provider that could address their health condition.

Division VI is now staffed daily from 7 a.m. to 8:30 p.m. rather than 7 a.m. to 3:30 p.m. This staffing is a change from previous inspections and the result of 80 segregation and 160 protective custody detainees being moved to the Division on March 8, 2013. Previously, all medications had been designated KOP while, at the time of the inspection, 48 detainees were receiving dose-by-dose medication.

Access to care data in Division VI for March 2013 showed that the average length of time for a patient to be seen following submission of an HSR was 3.0 days; however, this does not appear to be consistent with information obtained during the visit. The Division has 24 sick call request slip boxes. A random review of 50% of the boxes indicated no request slips but appropriately completed log sheets in each box. Staff reported collecting approximately 70-80 slips a day.

Nursing staff are required to manually write the date and time on each HSR as the manager reported the date-stamp has been broken in excess of one year and efforts to have it repaired or to obtain a new stamp have been unsuccessful.

On May 1, 2013, the date of the Monitor visit to Division VI, staff reported that 30 detainees were scheduled for nurse sick call. Additionally on May 1, 2013, 76 HSRs were collected. The manager reported the Division was current on sick call except for the HSRs collected that day; however, this does not necessarily mean that patients are seen in a timely manner.

Sixty-eight HSRs were collected on April 30, with scheduling for nurse sick call as follows:

- 30 scheduled on 5/1
- 22 scheduled on 5/2
- 1 scheduled on 5/3

- 15 scheduled on 5/4

The rationale for scheduling patients four days out is unclear; however, nursing staff reported security staff limits the number of individuals that can be escorted to the medical waiting area for sick call. As a result, those scheduled are not always evaluated. Nursing staff stated, if staff is not conscientious about checking who is not escorted for sick call, the individual is "lost" in the system and has to resubmit another Health Services Request in order to be seen in sick call.

The Nurse Coordinator has assigned a position to ensure that all HSRs to be collected by noon each day, triaged, and electronically logged in the afternoon of the same day. In this Division, it was very easy to track a HSR from date of collection to scheduling and/or evaluation. A random review of 10 request slips collected May 1, indicated they had all been triaged and electronically logged.

In Division IX, the method for handling HSRs is unchanged from the June 2012 report. Access to care data in Division IX for March 2013 showed that the average length of time for a patient to be seen following submission of an HSR was 20 hours, or 0.8 days. We learned that nurses do not enter the HSR into the EHR until the patient is seen, thus this timeframe does not accurately represent the time elapsed from HSR collection until the nurse sees the patient.

According to the Manager's Daily Report for the month of April, HSRs were collected every day. The number collected each day varies widely; the least collected on a single day was 12 and the most collected was 61. An average of 35 HSRs was collected each day. HSRs were addressed every day and 13 times HSRs were pending at the end of the day. It is not clear if the pending numbers are added into the next day's count. Twice during the month not all urgent/emergent referrals were seen the day the HSR was collected.

There is no change since the last report in how nursing staff in Division IX evaluate symptomatic complaints. Two nurses were observed and both used the examination rooms on the floor in the housing tower to see five inmates. The Patient Care Services Manager also saw an inmate in an examination room. The carts still do not have an oto-ophthalmoscope. We understood this equipment would be provided some time ago. The water to the sinks in three examination rooms either did not run or was not hot. This finding was also noted in the report of the June 2012 site visit.

Of seven HSRs reviewed, two were not seen by nurses within a day of collection. Nurses in this Division delay entering the inmate's complaint until the inmate is seen and a nursing note entered. Nurses made appropriate decisions about scheduling nursing sick call in six of the seven requests. The one outlier was from an inmate who had been assaulted 10 days earlier;

the nurse did not examine him but referred him to an existing primary care appointment, which took place 12 days later. The nurse should have assessed this inmate.

Assessments of an inmate's complaints were very limited, consisting of the patient's description of the problem, vital signs and interview questions from the protocols. Almost no physical examination took place. Nurses did provide information about self-care and how to navigate the health care program as well as offer OTCs for symptom relief. For example, the nurse assessing an inmate with a complaint of a head cold did not listen to chest sounds, feel for lymph nodes or sinus swelling and did not look at the inmate's ears or nose. The nurse did use a flashlight to briefly look in the inmate's mouth but did not use tongue depressor or other method to examine the throat. Another inmate complained of a stomachache for two weeks related to the food that was served. The nurse asked him what had worked before and then gave him a cup of Maalox to take back to his cell. Other than vital signs there was no examination and no self-care advice was provided (choose bland foods, increase fluids, decrease intake of caffeine etc.). Two of the nurses were observed to use an extra-large blood pressure cuff when the regular size cuff should have been used. Finally, a nurse assessing an inmate for multiple complaints resulting from an injury failed to remark, inquire or take any action with regard to an inmate's elevated blood pressure.

The disposition of the seven HSRs resulted in eight provider appointments. Two of these were previously scheduled appointments that had yet to take place, and only one was a timely wait period. There is no documentation or other evidence that the nurse communicated to the provider that a referral was made to a previously scheduled appointment or the reason for the referral.

In Division X, the method for handling HSRs is unchanged from the June 2012 report. According to the Manager's Daily Report for the month of April 2013, HSRs were collected every day. Most days 35 to 45 HSRs are collected; the least collected on a single day was eight and the most collected was 59. An average of 36 HSRs was collected each day. In the 31 days prior to the site visit, there were five days (16%) that no HSRs were completed; all took place on a Saturday or Sunday. In the month prior to the November site visit, no HSRs were completed 20% of the time. HSRs were pending at the end of 22 days in April. Early in the month, pending HSRs were as high as 125 and by 4/17/13 had been eliminated. The average number of pending HSRs was 59, down from over 100 at the time of the last site visit. It appears that the pending numbers are accounted for in the next day's count. All but three urgent/emergent referrals were seen the day the HSR was collected.

In Division X, HSRs are collected and triaged in the same manner as described in the June 2012 report. The room the nurses use to complete patient evaluations does not have a privacy screen around the exam table. This problem was identified in the November 2012

report. The lack of privacy screening reduces the nurses' efficiency, reduces the number of inmates who can be seen and inhibits effective clinical care.

A sample of 11 HSRs and the patient's corresponding electronic health record regarding that complaint were reviewed. All but one had been triaged within a day of the request. The other was triaged one day later than the timeframe. All 11 of the HSRs should have resulted in a nursing assessment but the nursing triage decision resulted in only seven inmates being seen. Of the four not assessed by nurses, two were already scheduled for an appointment that took place within a clinically appropriate time and two were referred for appointments. One of these referrals was appropriate and accomplished within a reasonable timeframe; the other referral was neither an appropriate referral nor timely. Nursing evaluation was timely for five of the seven HSRs. The two that were not timely were because the appointment was made for a date later than the nurse requested. One appointment was scheduled five days later and the other six days later than was requested.

Nursing protocols were used in all but one of the seven nursing assessments. Five of the nursing assessments were the most thoughtful, comprehensive and decisive of any reviewed thus far. Appropriate nursing actions were taken in each of these encounters to treat the problem, offer symptomatic relief or educate the patient. Two were inadequate, containing a subjective assessment but very limited objective findings. In one of these the nurse completely failed to note, inquire, or take action regarding a patient with a moderately severe blood pressure measurement (BP= 159/109 mm/hg).

The disposition of the seven face-to-face encounters resulted in six provider appointments. Three of these were previously scheduled appointments that had yet to take place and would be considered timely wait periods. There is no documentation or other evidence that the nurse communicated to the provider that a referral was made to a previously scheduled appointment or the reason for the referral. Nurses requested three new appointments and two were appropriate and timely. The other was for a same day appointment to the primary care provider to address a condition that should have been handled by nurses with a protocol.

In Division XI, the population no longer includes transgender or protective custody groups, and staffing has been reduced; health care coverage is now 8½ hours. Specific nurses are assigned to collect HSRs first thing in the morning, seven days a week. The registered nurses (usually two are on duty) triage and assess HSRs daily. According to the Manager's Daily Report, there were three days in the month of April that no HSRs were collected. Most days, 30 to 40 HSRs are collected; the least collected on a single day was 16 and the most collected was 69. An average of 37 HSRs was collected each day. All urgent/emergent referrals were seen the day

the HSR was collected. There were four days that no HSRs were completed and five days when HSRs were pending. These pending numbers are not added into the next day's count.

There has been no change since the last report in how Division XI handles the collection, triage and assessment of HSRs. Two nursing assessments were observed on Wednesday May 1, 2013. Both HSRs had been triaged timely. One was dated several days before the date of triage and the nurse challenged the inmate about not dating the HSR correctly. In essence, the nurse was blaming the inmate, which is counter to a therapeutic nurse-patient interaction. The primary focus of the nurse should be addressing the concern of the patient once the HSR is received. One of the nursing assessments was done timely; the other was one day outside the timeframe.

Clinically appropriate nursing protocols were used in both of the nursing assessments. The examinations were adequate. Nursing actions were taken in both encounters to treat the problem, offer symptomatic relief or educate the patient. The disposition of both of these nursing encounters resulted in three provider appointments. One was a previously scheduled appointment that had yet to take place and was timely. Two new appointments were requested and were appropriate and timely.

c. d. e. f. Sick Call

- <u>Health care request forms are written in both English and Spanish</u> We observed that paper HSR forms are written in both English and Spanish. Cermak has added two devices for hearing impaired patients to communicate with health care staff. These internet-based devices allow sign interpreters remotely to communicate in sign language to detainees in their health care requests. We did not confirm use of these devices during this visit.

- <u>Confidential collection</u> In most Divisions, inmates are able to confidentially submit their HSR forms. The exception is Division IX where inmates still hand their forms to officers.

- <u>Logging and tracking seven days a week</u> This area is unchanged from our previous report. At the Division level, there are tracking logs maintained in Health Care boxes, and a Unit Manager's Daily Report that tracks the number of HSRs received daily. In addition, HSRs are entered into the EHR that also serves as a tracking system. As previously noted, the Unit Manager's Daily Report is a potentially useful tool that provides a weekly snapshot of workload demand and services provided. It would be more useful if it were redesigned to show if all patients scheduled for an evaluation were actually seen and how many had to be rescheduled. There is no system at the HSR form from receipt to resolution. Thus, for management purposes there is no tool to

evaluate whether individual patients are seen in a timely manner, other than to search the health record. We strongly recommend that one be developed for use by nursing staff and Nurse Coordinators.

- <u>Timely response by qualified medical staff</u>   Although our anecdotal review showed improvements in staff triage of HSRs, health care data show that patients are not seen timely by health care personnel.

- <u>The reason for the request and disposition is documented in the health record</u> We found that nurses more consistently documented the reason for the patient request in the EHR; in addition, patient HSRs are scanned into the record.

- <u>System to screen requests within 24 hours and prioritized</u>   As noted above, improvements have been made in the timeliness of triage; however, it is not consistent across the jail due to staff call-ins and reassignment of nurses to medication administration.

- <u>Sick Call takes place in a clinical setting</u>   This area has improved since our last visit; however, in Division IX nurses do not have appropriate equipment or water.

g. Cermak-Daily Isolation Rounds

The Agreement requires that Cermak ensure that Qualified Medical Staff make daily rounds in isolation areas to give inmates in isolation opportunities to discuss medical and mental health concerns with health care staff with privacy. During rounds, health care staff is to assess inmates for new clinical findings, such as deterioration of the inmate's condition.

Since our last visit, the policy on Segregated Inmates E-09 was revised. In reviewing the policy, we note that the Cermak Chief Psychologist was the lead author with approval by the Interim Chief Executive Officer (CEO) and Chief Medical Officer (CMO). Although Nursing services have a critical role in implementation of the policy, there is no sign-off by the Patient Care Services Manager and in fact, when we discussed the policy with her, she indicated that she had not seen the policy prior to our visit.

The revised policy requires rounds by nursing are staff twice weekly and by mental health staff weekly. Nurses are to document completion of the rounds in the officers logbook.[8]

The revised policy is not in compliance with either the Agreement or the National Commission on Correctional Health Care (NCCHC) standards, although the standards are cited as a reference. The applicable NCCHC standard requires rounds three times a week for inmates

---

[8] Segregated Inmates. Policy E-09. Dated 4/5/2013.

in segregated settings as described in the Cermak policy and procedure. The policy is not compliant with respect to documentation of segregation of rounds, as it does not require documentation that is entered into the health record.

We support revising the Agreement and applicable policy to be in compliance with NCCHC standards for the frequency of rounds and documentation requirements. We recommend that all disciplines affected by the policy, including nursing, are included in the review and revision of the policy from the outset and have sign-off authority.

In Division IV, nurses document rounds on segregation housing rosters. These rosters reflect that rounds are taking place three times a week. Documentation of rounds is not included in the EHR.

In Division IX, the process and documentation of segregation rounds was reviewed with the Patient Care Services Manager. A member of the health care staff makes verbal contact with every inmate in segregation and may gather information on behalf of the inmate (i.e. next primary care appointment), follow up on concerns (i.e. whether medications have been received) or make referrals for care. The staff person notes if the inmate had no complaint (NC) on the list of inmates in segregation. No entry is made in the EHR unless the inmate is brought to the clinic to be seen. The lists are a record of rounds but there is no provision for keeping or storing them. There also is no documentation of rounds kept in the health record.

In Division XI, segregation rounds are no longer done since inmates in protective custody have been moved to Division VI.

**Monitor's recommendations:**

1. Cermak health care leadership should continue to develop the infrastructure necessary to successfully role out the access to care program.
   a. Health care leadership should review the access to care policy and procedure to ensure that it still reflects performance expectations. At previous visits, we have reviewed the policy and made suggestions to make the policy more operationally clear.
   b. Cermak should establish, hire and train sufficient numbers of registered nurses to conduct sick call daily in each Division. Nurses should not be redirected from access to care to other functions.
   c. Nurse Coordinators should continue to periodically perform nurse sick call and, when necessary, fill-in when nursing vacancies and call-ins occur.
   d. Nursing protocols have been developed but are too limited in the use of over-the-counter (OTC) medications. Revise the protocols to ensure that nurses may provide an adequate course of therapy for the patient's condition.

    e. Health care leadership (i.e., nursing, pharmacy, medicine, etc.,) should resolve the issue of OTC packaging by our next visit.

    f. Revise the manner in which nursing protocol templates and entries are viewed in the electronic health record so that it is clear, concise and in SOAP format.

    g. Health care leadership should reevaluate access to care data collection to ensure that it is complete, valid and reliable.

2. Nurse Coordinators should continue to closely monitor staff compliance with the Agreed Order regarding access to care requirements with particular attention to the following:

    a. Ensuring adequate supply and daily collection of HSRs

    b. Staff dating and timing of HSRs

    c. Staff entry of HSRs into the electronic health record

    d. Scheduling patients for nursing evaluations in the EHR in accordance with the urgency of the complaint and policy requirements

    e. Documenting vital signs and assessments utilizing nursing protocol templates in the EHR

    f. Scheduling patients to see a provider using the EHR and not piggybacking patients onto a future appointment (unless the appointment is timely and the provider is aware of the reason for the referral)

    g. Supervising staff to ensure that patients are seen in a timely manner and that the nursing assessment is clinically appropriate.

3. In Division IV, health care and custody leadership should collaborate to ensure that patients with sexually transmitted infections are treated prior to release from the jail. Ideally, patients would be treated prior to leaving the clinic.

4. CCDOC and Cermak should continue to jointly monitor inmate access to HSR forms and the ability to confidentially deposit them in a box accessed only by health care staff. All health care boxes should be labeled.[iii]

5. CCDOC and Cermak should collaborate to ensure that custody functions such as escorting inmates to court does not interfere with access to care for other inmates.

6. Establish mechanisms so that each instance of failure to transport is reported and that the patient care encounter takes place within the next 24-48 hours. For each incident, the reason for not transporting and the date of the rescheduled encounter should be reviewed at the Interagency Health Care Quality Improvement Committee.

7. CCDOC/Cermak should implement the use of hearing devices for inmates who have a need for language interpretation and/or communication assistance and to ensure that

there are sufficient mechanisms in place to provide that assistance during each patient care encounter.

8. CCDOC and Cermak should orient inmates regarding the access to care policy and procedure upon arrival.[iv]

9. Nurse Coordinators should provide close clinical and programmatic supervision of the nursing staff responsible for assessment and triage of Health Services Requests. Revise Unit Manager Daily Reports to facilitate supervision of the access to care program.

10. Nurse Coordinators should perform peer review to evaluate the quality of nursing evaluations and compliance with the nursing protocols and/or sound nursing judgment.

11. CCDOC and Cermak should ensure that the segregation policy is consistent with NCCHC standards. The parties should consider modifying the order to meet NCCHC guidelines regarding the frequency of rounds.

## 55. Follow-Up Care

a. Cermak shall provide adequate care and maintain appropriate records for inmates who return to the Facility following hospitalization or outside emergency room visits.

b. Cermak shall ensure that inmates who receive specialty, emergency room, or hospital care are evaluated upon their return to the Facility and that, at a minimum, discharge instructions are obtained, appropriate Qualified Medical Staff reviews the information and documentation available from the visit, this review and the outside provider's documentation are recorded in the inmate's medical record, and appropriate follow-up is provided.

**Compliance Status:** Substantial compliance.

**Findings**

**Status Update:** Received and reviewed.

**Monitor's Findings:**

We reviewed five records of patients seen urgently and sent offsite who then returned to Cermak. In each instance, the patient was seen on return by both a nurse and clinician. The visits in the emergency room were both appropriately focused and timely. The use of the electronic medical record does provide seamless availability of all inpatient and outpatient encounters at John Stroger Hospital. This has greatly facilitated Cermak's ability to meet this requirement.

**Monitor's Recommendations:** None.

## 56. Medication Administration

a.   Cermak shall ensure that treatment and administration of medication to inmates is implemented in accordance with generally accepted correctional standards of care.

b.   Cermak shall develop policies and procedures to ensure the accurate administration of medication and maintenance of medication records. Cermak shall provide a systematic physician review of the use of medication to ensure that each inmate's prescribed regimen continues to be appropriate and effective for his or her condition.

c.   Cermak shall ensure that medicine administration is hygienic, appropriate for the needs of inmates and is recorded concurrently with distribution.

d.   Cermak shall ensure that medication administration is performed by Qualified Nursing Staff.

e.   When Cermak prescribes medication to address an inmate's serious mental health needs, HIV or AIDS, or thromboembolic disease, Cermak shall alert CCDOC that the inmate in question is on a flagged medication. If the prescription is terminated during an inmate's stay at the Facility, Cermak will notify CCDOC.

f.   When CCDOC receives notice that an inmate is on a flagged medication, CCDOC shall include notation of a medication flag in the inmate's profile on the Facility's Jail Management System.

g.   When an inmate with a medication flag is processed for discharge at the Facility, CCDOC shall escort the inmate to designated Cermak staff in the intake screening area of the Facility for discharge medication instructions.

h.   When CCDOC escorts an inmate with a medication flag to Cermak staff during discharge processing, Cermak staff shall provide the inmate with printed instructions regarding prescription medication and community resources.

i.   Each morning, CCDOC shall provide Cermak with a list of all inmates with medication flags who were discharged the previous day.

j.   Within 24 hours of discharge of an inmate with a medication flag, Cermak shall call in an appropriate prescription to the designated pharmacy on the Stroger Hospital campus to serve as a bridge until inmates can arrange for continuity of care in the community.

k.   CCDOC shall ensure that information about pending transfers of inmates is communicated to Cermak as soon as it is available.

l.   When CCDOC has advance notice and alerts Cermak of the pending transfer to another correctional facility of inmates with serious medical or mental health needs from detention, Cermak shall supply sufficient medication for the period of transit. In such cases, Cermak shall prepare and send with transferring inmates a transfer summary detailing major health problems and listing current medications and dosages, as well as medication history while at the Facility.

m.   CCDOC shall ensure that the transfer summary and any other medical records provided by Cermak will accompany inmates, or will be made available electronically or transmitted by facsimile, when they are transferred from the Facility to another institution.

**Compliance Status:** Partial compliance.

**Findings**

   **Status Update:** A status report dated January 2013 was provided in advance of the site visit.

   **Monitor's Findings:**

In addition to the status report, the following documents were reviewed in preparation of this report:

- Minutes of the meeting of the Pharmacy & Therapeutics Committee (September 2012, January, April 2013)
- Agenda and notes from the Nursing Process Meetings (November 7, 2012 – April 16, 2013)
- Minutes of the Inter-Agency Health Care Quality Improvement Committee (November, 2012 – March 2013)
- Minutes of the Cermak Continuous Quality Improvement Committee (November 2012 – March 2013)
- The Cermak Quality Improvement Indicator Report (January 2012 – December 2012, January 2013-March 2013)
- Interagency Directive 64.5.45.0 Medication Administration and Distribution issued 4/26/2013
- Staffing recommendations for the new building made by the Department of Pharmacy Services, dated 3/22/2012
- Cook County Health and Hospital Systems: Management of Controlled Substances Policy draft.

We also inspected medication storage areas including stock medications and narcotic control; observed the medication administration process (Cermak, Divisions II, IV, X, XI); reviewed records, reports and logs, including medication administration records; and interviewed staff and inmates.

a. Cermak-Standard of Care

Medication Dispensing and Packaging for Delivery: The robotized packaging system, Fastpak, was detailed in the November 2012 report and functioned in essentially the same way at the time of this site visit. The evening delivery includes all dose-by-dose medications to be administered after 9 p.m. that day until 9 p.m. the following day. The delivery also includes medication administration records (MARS) and bulk items. The pharmacy is able to fill orders written later in the afternoon (up until 4:30 p.m.) for evening delivery. Fastpak is proving to be robust, reliable and very efficient.

Medication Administration: The process for medication administration was detailed in the November 2012 report and is unchanged at this site visit. Timeliness of nurse-administered medications in Division II was timely as it has been in all other Divisions since June 2012. During this site visit, as in all previous visits, we observed errors in documentation as well as performance that was inconsistent with policy and procedure on medication administration and documentation. When the electronic medication administration record, Accuflow, comes on-line, many of these errors will be preventable and variation in practice will be readily identifiable for supervisory follow up and personnel action.

Keep on Person (KOP) Medication Delivery and the Medication Delivery Team: Keep on Person (KOP) medications are provided to inmates in every Division except the Cermak 2 and 3. Divisions I, III and V only provide medications to inmates KOP. Therefore, comments made here about KOP medication delivery apply to all Divisions except Cermak 2 and 3.

The Medication Administration Team has been expanded from six to 12 CMTs plus a supervisor. This team now delivers all KOP "cycle fill" medications, all new KOP medications and all KOP bulk items to inmates in each Division. Deliveries take place twice a day, every day of the week. In mid-April, the Medication Administration Team began using Accuflow to document delivery of KOP medications. Use of Accuflow should resolve problems identified previously of variance in KOP documentation and illegibility. However, one member of the team was observed during the site visit to deliver medication without using the inmate's identification card to verify identity, so deviation from established procedure continues. The Interagency Directive has been revised to reflect the current process for delivery and documentation of KOP medications and was issued April 19, 2013. Cermak Policy and Procedure D-2.3 and D-2.4 need to be revised accordingly.

Pyxis MedStations: Pyxis was installed nearly a year ago in all Divisions that deliver dose-by-dose medications. There are also Pyxis machines located in the Divisions where all medication is delivered as KOP, but they are not operational. The Pyxis MedStations that are not operational should be activated to support administration of one time and stat doses. With the opening of the new RTU building, there will be many more Pyxis machines to support and no pharmacy positions have been added. While vacant positions noted at the last site visit have almost all been filled, a concern is raised that the additional workload associated with the new building cannot be absorbed by existing positions.

Management of Controlled Substances: Both the Nursing and Pharmacy Directors noted that improving accountability and reconciliation of narcotics is a target area. A focus study by the Director of Quality Improvement last year found the majority of errors occurred in the mechanics of how medications are selected and returned to Pyxis. However, a routine audit of controlled substances in the inpatient unit identified a nurse who failed on numerous occasions to document administration of narcotics that had been removed from Pyxis. This individual was terminated and reported to the professional practice review board.

The problem of controlled substance discrepancies was discussed at the January 2013 meeting of the Pharmacy and Therapeutics Committee and the April 2013 minutes reflect distribution of a draft policy and procedure on the management of controlled substances with an addendum specific to Cermak Health Services. The draft is consistent with and improves on Policy # D-07.3 Pyxis Medication Access for Controlled Substances. Improvements include use of the GMERS event reporting system, timeframes for resolution of discrepancies and

independent audit of nurse administered controlled substances. The current version of Policy # D-07.3 and D-01.8 should be eliminated when the draft is finalized.

The Pharmacy provides a weekly listing of all controlled substance transactions in each Division to the Patient Care Service Managers who are expected to use it to identify suspicious transactions and investigate. In Division X for the week of April 22-28, this was an Excel spreadsheet of 30 pages. In addition, the Pharmacy produces another report that lists only the transactions that require follow-up. For the week of April 15-21, 2013 the number of transactions requiring follow-up investigation by the Division Patient Services Manager is in the table below. The time and attention to detail necessary to follow up these transactions is considerable.

| Division II | Division IV | Cermak 2nd floor | Cermak 3rd floor | Division X |
|---|---|---|---|---|
| 24 | 32 | 4 | 54 | 31 |

The process to monitor transactions and resolve discrepancies is cumbersome. By the end of the site visit and further review of documentation in preparation of this report, it seems that direct visualization of the controlled substance bins in the Pyxis does not offer any additional value. It is clear that a reliable, accurate and efficient process for reconciliation of controlled substances is a priority for both Nursing and Pharmacy, but there is concern that these two professional disciplines are working alongside each other in separate silos, rather than collaboratively. The draft policy and procedure on the management of controlled substances reinforces their separate responsibilities for tracking, investigation, follow up and audit as well. The process, knowledge and tools used to resolve controlled substance discrepancies needs to be worked on collaboratively and in a forum that meets more frequently than P & T and CQI. It should be added to the agenda of the Nursing Process Meeting or another appropriate work group.

The following is a description only of changes or progress since the November 2012 report on each Division's implementation of standards for medication administration.

<u>Cermak 2 and 3:</u> Observation of medication administration on four separate units indicated administration at the appropriate times with proper identification of the patient, explanation of the medication was provided and, if necessary, the taking of vital signs prior to administration and appropriate documentation on the electronic medication administration record. One nurse has been terminated since the last site visit for failure to document administration of controlled substances. On the day of the visit, all controlled substances were accounted for. Medication refrigerator temperatures were recorded and accurate on each unit. No outdated medications were identified.

Division I:  In Division I, The Medication Administration Team delivers keep on person (KOP) medications. One of the Medication Administration team members was observed to deliver KOP medications. He did not use the inmate's identification cards to positively identify the inmate but instead had the inmate recite his CCDOC number. The inmate identification cards were posted on the wall directly opposite where the Medication Team Member was delivering medications and so were readily available. This practice is not consistent with Interagency Directive 64.5.45.0 Medication Administration and Distribution issued 4/26/2013. The staff member was observed to document delivery of the medication in the Accuflow system.

There has been a Pyxis machine in Division I for over a year but it has not been operationalized by the pharmacy. The Pyxis MedStation should be activated to provide one time and/or immediate doses.

Division II:  Inmates in this Division reported intermittently not receiving prescribed medications (see Dr. Metzner's report).

- Dorms 3, 4 and Annex:  Inmates housed in these units receive medications weekly to "Keep on Person" or KOP.
- Dorm 1:  This dorm provides "overflow beds" and is designated as having capability to house "intermediate medical inmates" from Dorm 2. Inmate census has remained sufficiently high to require continued use of Dorm 1. The number of inmates requiring dose-by-dose medication administration in this dorm has increased because of the population housed here. Inmates who receive "critical medications" (psychotropic, anticoagulants or insulin) are routinely assigned to this area in spite of an administrative decision not house inmates with these needs in Dorm 1. Medication administration was observed; correctional officer support was provided and the process used by the nurse to administer and document medication was consistent with the Interagency Directive and Cermak policy. A new nurse was being oriented to this procedure; even with this additional responsibility, medication administration was completed timely. The addition of the medication delivery team has greatly improved the availability and documentation of KOP medications to detainees. There are two Pyxis units located and operational in Dorm 1.
- Dorm 2: Medication administration was observed and completed in two hours. There was appropriate correctional officer involvement in preparing and managing inmates during medication administration. The nurse identified the patient, administered the medication and documented medication administration. Inmates on the third floor are still required to line up in the stairway to receive medication at the cart on the second floor. The status report provided by Cermak indicates that funding to renovate a

medication room for the third floor will be requested in the next budget if revaluation after opening of the new building indicates it is needed.

<u>Division III:</u>  This Division was slated to close but due to high intake numbers, detainees are temporarily placed in the Division each evening and moved to permanent housing the next morning. On the day of area was inspected, there were 45 inmates housed here and by noon all had been moved. None of the 45 inmates housed here temporarily were taking medication.

<u>Division IV:</u>  We observed three different nurses administer medications and found no major departures from standards of nursing practice; however, not all the aspects of medication administration are consistently implemented by each nurse. All three nurses used the MAR to determine what medications were due for the patient, administered the medication and documented administration of medication at the time the medication was administered to the patient. Nurses conducted oral cavity checks but not consistently. Officers were not involved conducting oral cavity checks.

Staff reported that several weeks prior to the monitoring visit, correctional officers advised the nurses that they would only provide two of the four officers necessary to accompany each nurse on medication rounds. The Patient Care Services Manager referenced the interagency agreement with a correctional supervisor who advised her that the agreement was only a Cermak policy and compliance was optional. This particular situation was corrected, but raises concerns about CCDOC staff training and/or enforcement of the interagency agreement.

On the day medication administration was observed, correctional officers accompanied nurses during medication rounds and made inmate identification cards available to nurses. In addition, nurses often asked the inmate for their date of birth and CCDOC ID number. On one tier, an inmate reported that nurses and correctional officers typically do not use the inmate identification cards when the Monitors are not present.

Two inmates reported that they were newly arrived at the jail and had not received their mental health medications, one for five days following her arrival. Interviews of inmates on a tier stated that there were no systemic issues with medications at the jail once they were prescribed.

We reviewed MARs and noted that they were generally neat and legible. Some contained blank spaces in which nurses did not indicate the status of medication administration (e.g., administered, refused, etc.). These blank spaces should be reported as errors of omission studied under the auspices of the CQI program to identify systemic and/or staff performance issues.

To assess reconciliation of narcotics from Pyxis with documentation on the MAR, we reviewed a pharmacy Excel spread sheet showing all doses of narcotics taken from Pyxis from the period of 4/15 to 4/28/2013. We randomly selected names from the pharmacy printout and compared what was removed from Pyxis with what was documented on the MAR. We found MAR discrepancies with four of approximately 25 narcotic doses. In most cases, we found that a nurse removed the medication from Pyxis, but there was no documentation on the MAR for the respective dose. In each case, the medication was not returned to Pyxis. This is an area that requires focused attention of the Patient Care Services Manager.

Division V:  See findings and recommendations regarding the Medication Administration Team and KOP medications in the system-wide comments above. We did not observe the Medication Team administer KOP medications in the Division. Division V has a Pyxis machine that is deactivated; it should be activated to provide one time and/or immediate doses.

Division VI:  On March 8, 2013, this Division began housing 80 inmates on segregation status and 160 in protective custody. The dispensary staffing was increased and the hours of service are now extended (8 a.m. to 8:30 p.m.) to provide the health care required by the population, including delivery of dose-by-dose medications. A Pyxis MedStation is in place and used for one time and/or immediate doses and accountability of controlled substances. On the day of the visit, there were 48 protective custody inmates receiving dose-by-dose medication. Observation of medication administration revealed several issues. Inmates were not required to line-up for medication administration and the nurse had to wait until each inmate presented himself or herself, appropriately dressed with something to drink. Security staff did not keep the inmates quiet, did not have inmate identification cards in-hand and did not appear to know how to perform "mouth checks." Even though a list of inmates on dose-by-dose medication had been provided to security, they seemed unaware of which inmates needed to report for medication administration. The nurse appropriately identified each inmate, administered and documented the medication. Dose-by-dose medication was administered timely even though management by the CCDOC officer was negligible to non-existent.

Division IX:  Medication administration was not observed during this site visit.

Division X:  Four nurses are needed to administer medication on the day and evening shifts. There is one nurse responsible for medication administration on the night shift. During this site visit, two nurses were observed administering morning medications. The other two nurses were briefly interviewed in the medication preparation and storage area. Morning medication administration meets the standard for timeliness in this Division.

The first nurse observed administering medication was accompanied by an officer. This team's performance was consistent with the Interagency Directive 64.5.45.0 Medication

Administration and Distribution issued 4/26/2013. The second nurse was administering medication without escort. An officer did arrive eventually but only after the Monitor began observing the medication pass. Several inmates challenged the requirement that they identify themselves and another inmate commented that the identification cards were only being used because they were being observed.

There were no medications for four of the 16 inmates observed to approach the cart for morning medication. Upon further inquiry, one of the four, who thought he was missing a morning dose of risperidone, actually only had an order for the medication to be administered in the evening. The nurse did not provide this information to the inmate and not doing so reinforced the inmate's opinion that the medication was delayed.

The other three inmates without medication reported that they had been moved into Division X the day before. Two of these were admitted the day before (4/29/2013) and their medications were filled by the pharmacy the next day for doses beginning that evening. Later review of the electronic health record indicated that one of these inmates received the morning medications out of Pyxis. This is one of the reasons for the Pyxis MedStation and is a good description of how the pharmacy delivery system is intended to work.

The last inmate had been discharged from the inpatient psychiatric unit on 4/29/2013. The inpatient units administer all medications from the Pyxis. When inmates are discharged from these units, information must be provided to the pharmacy that so that Fastpak can be directed to fill the order for delivery out to the Division. The morning transfer report is used to identify these moves. The information about this inmate's new location was not put into the packaging program so none of the inmate's medications were delivered on 4/30/2013. The missing medication was reported that evening and medications were delivered the next evening. This inmate had a 48-hour period with no medication after discharge from the inpatient psychiatric unit. See also Dr. Metzner's report that inmates reported delays in receiving medication following moves.

One of the nurses was observed to give an OTC without charting on the back of the MAR. No other administration or documentation errors were observed. It was noted that because of the way the MAR is set up with pre-printed times (9 a.m., 1 p.m., 5 p.m. and 9 p.m.) it creates a documentation error whenever doses must be given at other times. For example, an inmate with a prescription for medication that is given before breakfast is charted as having been administered at 9 a.m. Accuflow will correct this problem; the actual time the drug is ordered to be given will be reflected on the MAR. It will also be possible to identify medications that are not given timely.

Each of the nurses observed administering medication managed accountability of controlled substances slightly differently in the time period from when the dose was removed from Pyxis until administered to the patient. It is suggested that Cermak Nursing and Pharmacy evaluate the practices that nurses use, select one as a "best practice" and incorporate it into Cermak Policy # 02.3 Medication Distribution or another more appropriate Cermak Policy.

Division XI:  No inmates requiring medication administered dose-by-dose are housed in Division XI at this time. Only inmates on KOP medications are housed in this Division. The Pyxis MedStation has been deactivated, although the Patient Care Services Manager indicated that it might be reactivated to provide one time and stat doses, which is one of its intended uses. See findings and recommendations regarding the Medication Administration Team and KOP medications in the system-wide comments above.

Division XVII:  Medication administration was observed this site visit.

b. Cermak-Accurate Administration and Maintenance of Records

On April 25, 2013, Cermak and CCDOC finalized the interagency directive on medication distribution. The final version reflects revisions made to describe the current processes used to administer, deliver and document receipt of medication. We understood from a meeting with CCDOC in December 2010 (see Monitor's report) that when the interagency directive was finalized that a post order would be issued that described the officer's responsibilities. A post order has not yet been provided. The minutes of the Inter-Agency Health Care Quality Improvement Committee (March 2013) document discussion about training but only mentions that it will cover mouth checks. We recommend that the training cover all aspects of the officer's responsibilities regarding the delivery of medication, not just mouth checks.

We recommend that medication delivery be audited (including the role of CCDOC officers) using an observation tool derived from the Interagency Directive. Correctional officers' participation has improved; however, there is variation from officer to officer in understanding their responsibilities and how the tasks are accomplished. Successful implementation requires evidence that day-to-day practice is consistent with the Interagency Directive.

The draft CCHHS policy on controlled substance management discussed earlier in this section of the report was the only new or revised policy provided for review. When it is completed, D-01.8 and D-07.3 would seem to be obsolete. Policy #D-02.3 Medication Distribution needs to be revised to reflect the process used by the Medication Delivery Team and could be more consistent with the Interagency Directive now that it is finalized. Policy # D-0.2.4 needs revision to include electronic documentation of medication delivery or administration.

There were several observations of actual practice during the site visit that did not comply with established policy and procedure or the interagency directive. Actual performance needs to demonstrate more consistent and reliant adherence to the directive, policy and procedure.

c. Cermak-Hygienic, Appropriate and Concurrently Recorded

<u>Hygiene:</u>  Medication administration was observed to be hygienic.

<u>Appropriate:</u>  Lapses in medication continuity still occur regularly. It is evident that Cermak and CCDOC have worked to resolve these problems and as a result, the frequency is less compared to the last site visit. Medication lapses now are primarily the result of inmate transfers. Interviews with inmates also indicated there is concern about delays once medication is prescribed.

Since last November, Cermak IT has prepared a list of inmates who are on "critical medications" and have been transferred in the last 24 hours. These transfers are reviewed at the morning huddle which includes the medical, mental health and nursing managers as well as a representative from CCDOC. If the inmate is appropriately housed, the Patient Care Services Quality Improvement Manager or house supervisor on weekends will notify the nursing staff that an inmate on critical medications has been received in their Division and make sure that they have a MAR and medications to administer. If the inmate is not housed in an appropriate location, arrangements for transfer take place and receiving nursing staff notified. This process has reduced delays and discontinuity in treatment as described in the November 2012 report.

Improved communication between CCDOC and Cermak would reduce the frequency of inappropriate housing and resulting risk to the health of inmates; it would also save the extensive effort in man-hours each day that it takes to identify, arrange for medication continuity and if necessary, transfer these individuals. Improved communication will be possible when CCDOC refurbishes IMACS, the inmate information management system.

The volume of medications reported as missing on the QI indicators report has decreased through calendar year 2012 from nearly 3000 in January to 347 for the month of December. No data has been provided yet for calendar year 2013. A quality improvement study was done on missing medications in January 2013 and reported at the February Cermak Quality Improvement Committee. Recommendations were:

1. To centralize medication delivery to the Medication Delivery Team created by Patient Care Services
2. Staff education on the various ways that medications are requested

3.  Collaboration between Patient Care Services and Pharmacy to identify gaps and opportunities for improvement in the medication distribution process.

The metric of time from the medication order to first dose has been added to the 2013 Cermak Quality Indicators but no data is available yet. The IT staff has begun work to create this report using the e-Mar in place on the Cerner inpatient units. The threshold set by Cermak is to have less than 24 hours from the time the order is written to the first dose.

<u>Concurrently Recorded:</u> There is minimal or no improvement in documentation on the MARs. There continue to be blank spaces on MARs reviewed where dose-by-dose medications should have been given or refusal documented. Medications were observed to be given and not documented. Since the last site visit, one nurse has been terminated for the failure to document administration of controlled substances. A review by the Monitor of four medication administration records and the controlled substance transaction report in Division X found three with errors in documentation. Implementation of the electronic medication administration record, Accuflow, is expected to prevent some of these problems with documentation and will identify others for corrective action.

d. Cermak-Staffing

Appropriately qualified nursing staff administers or deliver medication. This finding has been consistent since the June 2011 report.

e. Cermak-Flagged Medication Procedure

The interface between Cerner and IMACS has not been accomplished. At the last site visit, we met with CCDOC and Cermak and left with an understanding that an interim solution for effective communication would be put in place until the interface has been accomplished sometime later this calendar year or next. Although the issue is on the agenda for discussion at every meeting of the Inter-Agency Health Care Quality Improvement Committee, no substantive progress has been made to improve the flow of information between CCDOC and Cermak other than the workarounds described earlier in this section of the report.

f. CCDOC-Flagged Medication Noted on JMS

See findings reported for (e) above related to the communication between CCDOC and Cermak. We met with Terre Marshall, Mental Health Services Director, to discuss the recommendations (made since the June 2011 report) for revisions to Policy E-13.2 Discharge Planning for Mental Health Patients.

g. CCDOC-Discharge Medication

See findings reported for (e) and (f) above.

h. Discharge Medication

Cermak Policy E-13.0 Discharge Planning (dated as approved 5/18/11) is consistent with this portion of the Agreed Order. We did not compare actual practice to the Policy during this site visit.

i. CCDOC - Notification of Flagged Inmates Discharged

Cermak and CCDOC need to establish the means to produce the list required by the Agreed Order or revise the order. We met with Terre Marshall to discuss the recommendations that have been made to revise Policy E-13.2 Discharge Planning for Mental Health Patients so that it is consistent with this portion of the Agreed Order.

j. Cermak-Prescription Fill at Stroger

See findings reported in sections (e) and (f).

k. CCDOC-Communicate Transfer Information to Cermak
l. Cermak-Medication for Transit
m. CCDOC-Record Transfer Between Facilities

See findings reported in section (e) about communication between CCDOC and Cermak. The two-way interface between CCDOC and Cermak needs to provide notice of pending transfers.

**Monitor's Recommendations:**

1. Recommendations to bring medication delivery into compliance with standards of practice are:
   a. Establish a collaborative work group to define the process to be used, develop the knowledge and devise the tools to monitor and manage controlled substances more effectively and efficiently. This needs to be accomplished within the next 90 days.
   b. Request funding to refurbish the area identified to store the medication cart for Division II, dorm 2 on the third floor if revaluation after opening of the new building indicates it is needed.

2. With regard to CCDOC's responsibility for medication administration, recommendations are:[v]
   a. Issue a post order for correctional officers to coincide with the Interagency Directive.

    b. Provide audit evidence that correctional officers have been trained to support and execute their responsibilities as listed in the Interagency Directive and post order.

3. Continue to implement planned improvements in pharmaceutical management:

    a. Create a two-way interface with IMACs so that appropriate and necessary communication about inmates takes place and results in medication continuity and improved patient safety.

    b. Continue to track the incidence of missing medication, establish thresholds and trend results, analyze incidents and implement corrective action to reduce or prevent medication being missed.

    c. Standardize medication for urgent and one-time doses, especially between the inpatient units and intermediate care Divisions.

    d. The Pyxis MedStations that are not operational should be activated to support administration of one time and stat doses.

    e. Develop a report or flagging system to identify any patient with an order who has not received the first dose within the 24-hour timeframe established in Cermak Policy D-02.

4. Supervise and manage performance of nursing staff to be consistent with policies for medication delivery, documentation, storage and accountability.

    a. Install the equipment in all Divisions to accomplish electronic documentation on the MAR.

    b. Provide evidence of prompt and definitive action taken in relation to episodes of medication error, omission, failure to perform and professional practice violations.

    c. Fully implement, coach and supervise personnel to become more compliant with Cermak policies relating to the medication delivery system.

5. Provide notifications and arrange for continuity of medication treatment upon discharge according to the Agreed Order. Specific recommendations are:

    a. Ensure that all inmates prescribed medication for mental health conditions and/or HIV and/or thromboembolic disease have alerts in CCDOC's IMAC system that correspond to the Agreed Order.

    b. Establish the two-way interface between the CCDOC jail management information system and Cermak's electronic health record so that notifications occur automatically when orders for these medications are written or discontinued.

    c. Revise E-13.2 Discharge Planning for Mental Health Patients to include instructions that are consistent with the Agreed Order.

    d. CCDOC to provide a list daily to Cermak of all inmates with medication flags who were discharged the previous day. Cermak should compare the list provided by

CCDOC to the list of patients who were issued a discharge prescription from Cermak or had a discharge prescription filled at the Cermak pharmacy.

e. The Continuous Quality Improvement Program should set thresholds for and monitor data on patients who are on flagged medications who are discharged and receive discharge medication or prescriptions.

## 57. Specialty Care

a. Cermak shall ensure that inmates whose serious medical or mental health needs extend beyond the services available at the Facility shall receive timely and appropriate referral for specialty care to appropriate medical or mental health care professionals qualified to meet their needs.

b. Upon reasonable notification by Cermak, CCDOC will transport inmates who have been referred for outside specialty care to their appointments.

c. Cermak shall ensure that inmates who have been referred for outside specialty care by the medical staff or another specialty care provider are scheduled for timely outside care appointments. Cermak shall provide reasonable notice to CCDOC of such appointments so that CCDOC can arrange transportation. Inmates awaiting outside care shall be seen by Qualified Medical Staff as medically necessary, at clinically appropriate intervals, to evaluate the current urgency of the problem and respond as medically appropriate. If an inmate refuses treatment following transport for a scheduled appointment, Cermak shall have the inmate document his refusal in writing and include such documentation in the inmate's medical record.

d. Cermak shall maintain a current log of all inmates who have been referred for outside specialty care, including the date of the referral, the date the appointment was scheduled, the date the appointment occurred, the reason for any missed or delayed appointments, and information on follow-up care, including the dates of any future appointments.

e. Cermak shall ensure that pregnant inmates are provided adequate pre-natal care. Cermak shall develop and implement appropriate written policies and protocols for the treatment of pregnant inmates, including appropriate screening, treatment and management of high-risk pregnancies.

**Compliance Status:** Substantial compliance.

**Findings**

> **Status Update:** Received and reviewed.

> **Monitor's Findings:**

We reviewed five records of patients sent offsite for specialty consultation and in addition, six records of patients sent offsite for procedures. In both instances, the scheduling was timely, the clinical documentation was available and in general, timely follow-up occurred. There was one procedure in which after returning through the emergency room there was no primary care follow-up and a second in which the primary care follow-up was ordered but the patient was documented as being in court and there was no rescheduling. Therefore, this is an area that warrants continued attention but the performance in 9 out of 11 records was consistent with the goals.

**Monitor's Recommendations:**

1. The QI program should monitor the primary care follow-up of patients who receive scheduled offsite consultations and procedures. This should be reported on a quarterly basis to the quality improvement committee.

   e. Cermak-Pregnant Inmates

**Compliance Status**: Substantial Compliance.

**Findings**

> **Status Update:** There was no County response to this provision.

> **Monitor's Findings:**

To assess this area we reviewed health records of pregnant women or within six weeks post-partum at CCJ. This area remains in substantial compliance.

All pregnant women are housed in Division XVII, which currently has 176 female residents of whom 33 are pregnant. The process for identification of pregnant women is unchanged from our previous report and is working well. Prenatal care clinic is conducted twice weekly. We reviewed four (12%) of 33 records with Dr. Richardson and found care to be excellent.

Cermak uses the Hollister Prenatal Flow Record to document care and the content of this form has been converted to an electronic format in Cerner. Recommended prenatal labs

are obtained and documented on a flow sheet in Cerner including a CBC, Rh factor, sickle cell trait, VDRL/RPR, hepatitis B antigen, and Chlamydia, gonorrhea and HIV antibody testing. Ultrasound testing is ordered and performed as clinically indicated. In all records we reviewed, patients were prescribed a prenatal vitamin, iron and calcium supplements. Prenatal care interval monitoring was in accordance with the treatment plan or with ACOG recommendations. Women are treated for sexually transmitted infections and enrolled and/or continued in methadone maintenance programs as clinically indicated.

We found minor delays in the performance of clinic visits but overall there were no significant issues. Due to continued physician shortages, Dr. Richardson has been assigned other clinical responsibilities that have impacted the frequency of quality improvement reviews.

**Monitor's Recommendations:**

1. Continue to perform ongoing continuous quality improvement reviews for pregnant women.

## 58. Dental Care

a. Cermak shall ensure that inmates receive adequate dental care, and follow up, in accordance with generally accepted correctional standards of care. Such care should be provided in a timely manner, taking into consideration the acuity of the problem and the inmate's anticipated length of stay. Dental care shall not be limited to extractions.

b. Cermak shall ensure that adequate dentist staffing and hours shall be provided to avoid unreasonable delays in dental care.

**Compliance Status:** Partial compliance.

**Findings**

**Status Update:** Received and reviewed.

**Monitor's Findings:**

The good news is that dental staffing for the existing housing areas is finally complete. There is onsite a Dental Director plus six dentists and two hygienists as well as seven dental assistants. There is a proposal for an additional dentist and two dental assistants for the December budget to provide services in the new RTU. I was able to meet with several of the

dentists who indicated that the use of the metric of ratios of restorations to extractions for all Divisions does not take into account the fact that length of stay in some Divisions is significantly longer than others and in those with shorter stays, for many patients, it may be difficult if not impossible to implement a treatment plan that includes restorations. I am sensitive to this concern and therefore will ask that with the continued monitoring of these ratios of restorations to extractions, I be provided with, by Division, the average length of stay. This will influence the assessment of the performance of each Division.

We again, with the dental leadership, went through several dental requests and identified many opportunities for improvement. The first one is that although some Divisions time and date stamp the receipt of the requests, other Divisions do not. This should be a universal process. Secondly, we found the language of urgent appointments not consistent with the way it is being used. In fact, we came across a case in which a patient deemed urgent was scheduled for two weeks later. This is particularly problematic, in that under the current arrangement, patients with dental pain are ordinarily supposed to see a nurse within one day of receipt by nursing of the request. However, the nurses are still not able to provide temporary analgesic relief for these patients who are describing pain. This is completely unacceptable. We had a meeting with all of the stakeholders, including the pharmacy director, and clearly indicated that this problem of timely access to analgesia for patients waiting to be seen for dental or any other pains must be resolved prior to our next visit. We were informed of a strategy of providing the newly packaged meds through the in-house pharmacy or by contracting with an outside vendor. The mechanism is unimportant to us; this problem must be resolved. We also believe that the current language used for urgency of scheduling is inconsistent with normal language use. "Urgent" might be within a few days but certainly not within a week or two. We discussed the possibility of instead of titles such as "urgent," using "within one week" or "two weeks" or "four weeks," as the language to be used by the schedulers and the dental service.

We have to comment on one case in which a patient submitted his request and it was received on 4/20/13. This patient described his face being swollen and his tooth decayed to the root. The patient's request slip apparently went directly to dental without a nurse face-to-face visit and with this description on the slip, the patient was scheduled for 5/9, almost three weeks later. This also is unacceptable. There is a substantial journey that the dental program and nursing have to take before these problems are resolved.

**Monitor's Recommendations:**

1. Continue to monitor the ratio of restorations to extractions but indicate by Division the average length of stay.

2. Resolve the language use associated with the scheduling urgency in a manner that is not inconsistent with normal language usage.
3. The dental QI program should begin monitoring a sample of health service requests from each Division from beginning to end, looking at requests that were received approximately 30 days prior to the review.
4. The nursing staff approach to analgesia relief must insure that during the face-to-face, the patient receives treatment sufficient to provide relief for several days. If resolution of this problem is delayed beyond our next visit, noncompliance will be assessed for this area.

## 68. Suicide Prevention Training

**Compliance Status:** Substantial compliance.

**Findings**

    **Status Update:** Received and reviewed.

    **Monitor's Findings:**

Greater than 90% of nurses and officers have received the required training. This is the first report in which the nursing staff portion of this requirement has been achieved. Therefore, it moves to substantial compliance since all other staff are also in compliance

    **Monitor's Recommendations:**

1. The nursing training coordinator should report on a quarterly basis to the QI committee the rates of required training that have been met.

**H.** **QUALITY MANAGEMENT AND PERFORMANCE MEASUREMENT**

## 86. Quality Management and Performance Measurement

    a.      Defendants shall each develop and implement written quality management policies and procedures, in accordance with generally accepted correctional standards, to regularly assess, identify, and take all reasonable measures to assure compliance with each of the provisions of this Agreed Order applicable to that Defendant.

    b.      Defendants shall each develop and implement policies to address and correct deficiencies that are uncovered during the course of quality management

activities, including monitoring corrective actions over time to ensure sustained resolution, for each of the provisions of this Agreed Order applicable to that Defendant.

c.  CCDOC shall participate with Cermak and DFM in a jointly established Health Care Quality Improvement Committee, to be charged with developing and implementing a joint quality improvement program. CCDOC shall contribute the time and effort of CCDOC staff members who, by virtue of their authority, current responsibilities, and/or past experience, can provide this committee with needed correctional representation.[vi]

d.  Cermak shall participate with CCDOC and DFM in a jointly established Health Care Quality Improvement Committee, to be charged with developing and implementing a joint quality improvement program. Cermak will work with CCDOC and DFM to identify those CCDOC and DFM staff members who, by virtue of their authority, current responsibilities, and/or past experience, can provide this committee with needed correctional representation. Quality management programs related to medical and mental health care will utilize performance measurements to assess quality of care and timely access to care with quantitative and qualitative data analysis and trending over time.

e.  DFM shall participate with CCDOC and Cermak in a jointly established Health Care Quality Improvement Committee, to be charged with developing and implementing a joint quality improvement program. DFM shall contribute the time and effort of DFM staff members who, by virtue of their authority, current responsibilities, and/or past experience, can provide this committee with needed correctional representation.

**Compliance Status:** Partial compliance.

**Findings**

**Status Update:**

**Monitor's Findings:**

The quality improvement program continues to modify its collection of quality indicators. As of this visit, the list of areas reviewed on a monthly or quarterly basis include quarterly studies of multidisciplinary approaches to infectious disease patients and quarterly multidisciplinary studies of infirmary patients, a monthly review of patients with regard to TB

screening and also the percentage of patients receiving TB screening within one month of their anniversary. Monthly monitoring of patients who enter through the anomalous pathway (this has probably led to the elimination of this as a significant problem), the quarterly monitoring of health assessments in patients referred to the emergency room, monthly monitoring of compliance with medication room procedures, quarterly monitoring of chronic disease patients who have had the necessary vaccinations, monthly monitoring of chronic disease patients listed in the chronic disease registry, monthly monitoring of patients with a medical flag receiving medications at discharge, several mental health items that are monitored regularly, monthly monitoring of health service requests triaged within 24 hours of receipt, the average number of hours from receipt of HSR to nursing face-to-face, percent of grievances closed without a response within seven days, primary and subspecialty care show rates and of course mortalities and serious suicide response. All of this work is important and contributory to improvements. I am concerned that when performance has not reached the target, whether there are strategies to analyze, using data, the reasons for the less than satisfactory performance. Only after that analysis has been concluded, should improvement strategies be designed. Overall, the quality improvement program clearly has matured during the implementation of these systems; however, much remains to be done.

**Monitor's Recommendations:**

1. Perform a study looking at intakes and time of receipt of meds post order, looking at a sample of both nurse-administered medications and a separate sample of patients receiving keep-on-person meds.
2. Look at the professional performance of health assessments especially performed in the ER as part of the annual professional performance enhancement program and while doing that study, look at the timeliness of receipt of intake meds.
3. Have the nurses document the locations of their assessments in their notes so that we can be confident they are not performing cell-side face-to-face triage and documenting in a way that creates the impression that it is a health assessment.
4. Work with the nursing department clinicians and schedulers so that nurses begin designating a timeframe for the clinician follow-up visit to occur and if the schedulers find there are no earlier dates and that date is booked, have them contact the nurse to determine what is an acceptable timeframe or must it be scheduled as an overbook.
5. Continue monitoring the nursing professional performance enhancement program with regard to sick call assessments.
6. With regard to urgent care, perform studies that look at the completeness of the vital signs recorded and whether the nurses appropriately address the presenting problems and whether or not the primary care follow-up occurs within a five-day period.

7. Perform the same studies with regard to patients sent offsite urgently and also regarding primary care clinician follow-up after they return to the jail.

8. Continue to monitor for both timeliness and appropriateness the primary care follow-up encounters after patients received scheduled offsite services.

9. Monitor care in the infirmary by determining whether the frequency of clinician and nurse assessments is in sync with the acuity designations. The appropriateness of these designations should also be monitored.

10. Monitor the timeframe with regard to patients who submit slips indicating pain to determine the timeliness with which they are seen as well as the timeliness with which they receive symptom relief.

*Subject to FRE 504*

---

[i] This is another area where Sheriff's Office should be separated from Cermak under Section VII (C) of the Agreed Order, as the Sheriff's Office has done everything it has been requested to do.

[ii] The monitor has noted that this deficiency has been resolved, therefore, the recommendation should be removed from the report.

[iii] This recommendation lacks specificity and direction. The Sheriff's Office has made great progress, but the ambiguity of the recommendation will make substantial compliance difficult to attain.

[iv] This recommendation has already been accomplished through the inmate handbook and the orientation video that is played on the living units every day. Notably, Cermak helped develop the section of the inmate handbook that addresses this issue.

[v] The Sheriff's Office has prepared mouth check video concerning the administration of medications and shows it to the correctional officers at roll call.

[vi] The Sheriff's has performed its duties under this provision and should be deemed to be in substantial compliance.