## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

**UNITED STATES OF AMERICA,**

          **Plaintiff,**

**v.**

**COOK COUNTY, ILLINOIS;**           No. 10 C 2946
**THOMAS DART, COOK COUNTY**
**SHERIFF (in his official capacity);**      Judge Virginia
Kendall
**TONI PRECKWINKLE, COOK COUNTY**
**BOARD PRESIDENT (in her official capacity);**
**COOK COUNTY BOARD OF**
**COMMISSIONERS (in their official capacity),**

          **Defendants,**

---

### Monitor Susan W. McCampbell's Report No. 7

---

Susan W. McCampbell
McCampbell and Associates, Inc.
1880 Crestview Way
Naples, Florida 34119-3302
Email: susanmccampbell@mccampbellassociates.com

# Executive Summary
## Corrections Monitor Susan W. McCampbell's Report #7
## October 29, 2013

**Summary Overview**

The Cook County Sheriff's Office (CCSO), Cook County Department of Corrections (CCDOC) and Cook County government continue to work toward achieving compliance with the correctional practices' paragraphs of the Agreement. In this summary I also discuss several critical issues and bring those to the attention of the Court. These matters potentially jeopardize substantial compliance and sustainability of the elements of this Agreement.

**On Site Tour – September 16 – 20, 2013**

I toured CDOC during the week of September 16 – 20, 2013; interviewed staff and inmates, reviewed document, and consulted with CCDOC regarding compliance issues. The CCDOC continues to make progress and has importantly maintained compliance in the majority of requirements previously assessed as being in "substantial compliance."

**Progress**

The areas in which measurable progress has been achieved include:

- Expansion of implementation of the inmate behavior management (IBM) model/direct supervision, with plans to implement IBM in other divisions, thus increasing inmate safety;
- Appropriate uses of force, well documented, and analyzed, and corrective actions, if needed, taken;
- Continued progress toward implementing a totally new inmate classification process, including the required validation and appropriate staffing levels of the classification unit;
- Attention to inmate disciplinary processes;
- Continued hiring of qualified applicants as correctional officers, in the face of hiring by local law enforcement and a slightly improving economy; and
- Organizational changes and consolidation for improved accountability.

**Remaining Challenges**

CCDOC's challenges continue as follows, although this not meant to be an exhaustive list:

- Addressing jail crowding and the implications for provision of basic inmate services, classification/housing, supervision and sanitation;

- Identifying a single, accurate, source of data for uses of force, and allegations of excessive force (outcomes);
- Implementing the new inmate classification system, completing the validation study, and beginning the process for reclassifying the inmate population, and adjusting the housing plan;
- Updating/revising the inmate grievance process and assuring that operations match policy/procedure;
- Managing the issues in the new Division 8 relating to security and inmate safety;
- Addressing the backlog of use of force allegations/investigations in the Office of Professional Responsibility;
- Continuing to improve collaboration between mental health and security regarding the safety of mental health clients; and
- Completing the staffing plan for CCDOC and examining the span-of-control of supervisors and managers.

## **Compliance Report**

The Agreed Order regarding corrections operations (A. Protection from Harm) includes 77 provisions.  Here is a summary of CCDOC's compliance as of the tour in September 2013.

## **Maintenance of Substantial Compliance (18 months)**

The CCDOC has maintained substantial compliance with the following provisions of the Agreed Order for at least 18 months, and as such, are no longer are a primary focus of my monitoring, although these sections remain an active part of the Order (see Section VII.C.). These paragraphs are highlighted in light green in the full report.

## **Maintenance of Substantial Compliance  (N= 35)**
(Paragraphs maintaining substantial compliance *added* since the report of April 2013 to the Court are underlined):

- 3.1a.
- 31.b.
- 31.c.
- 31.d.
- 31.f.
- 31.g.
- 31.h.
- 31.j.
- 31.l.

- 31.m.
- 31.n.
- 31.o.
- 31.p.
- 31.r.
- 31.s.
- 31.t.
- 32.g.
- 32.h.

- 32.l.
- 32.m.
- 33.a.
- 33.c.i.ii.
- 33.i.
- 33.j.
- 34.b.
- 34.d.
- 34.g.

- 35.c.
- 35.d.
- 36.b.
- 36.f.
- 37.c.
- 40.
- 41.
- 69.

## Substantial Compliance (N=31)

Paragraphs for which CCDOC has achieved substantial compliance (excluding the paragraphs referenced above) for less than 8 months, are as follows.   (Paragraphs gaining substantial compliance since the April 2013 report to the Court are underlined):

- 31.e.
- 31.i.
- 31.k.
- 31.q.
- 32.a.
- 32.b.
- 32.c.
- 32.d.
- 32.e.
- 32.f.
- 32.i.
- 32.j.
- 32.k.
- 34.a.
- 34.c.
- 34.e.
- 34.f.
- 35.a.
- 35.b.
- 35.e.
- 35.f.
- 35.g.
- 36.a.
- 36.c.
- 36.d.
- 36.e.
- 37.d.
- 38.c.
- 38.d.
- 39.a.
- 39.b.

## Partial Compliance (N=11)

Seventeen paragraphs are in partial compliance.

- 33.b.
- 33.d.
- 33.e.
- 33.f.
- 33.g.
- 33.h
- 37.a.
- 37.b.
- 37.e.
- 38.a.
- 38.b.

## Non-Compliance (N=0)

There are no paragraphs in non-compliance at this time.

## Update Issues and Concerns About Achieving and Maintaining Substantial Compliance

**Update:  Information System** – CCDOC is implementing a new jail information management/incident reporting system – replacing IMAC.  The new jail management information system (JMS) is from the vendor, Tribridge (the same provider as IDOC).   The system is targeted to be live in July 2014.  I do not anticipate that this project will impact, negatively, any paragraphs in this Agreement, and may, in fact, enhance long-term compliance and sustainability.  Regrettably, as the County has not explored an integrated criminal justice information system, the various information systems cannot "talk" to each other (e.g., courts, clerk, state's attorney, public defender, pre-trial services).  But newer technologies do provide opportunities for interfaces among willing stakeholders to help with better data flow and management.

**Investigations into Allegations of Use of Force/Excessive Force** – CCSO's Office of Professional Responsibility maintains a concerning level of backlogged investigations into allegations of excessive force.  CCSO has recently acted to provide the resources and leadership necessary to address these cases.  I will evaluate progress on the next tour, and

am hopeful that a strategy will be in place to credibility manage these reviews/investigations.

**Video Surveillance –** Paragraph 32.e. provides "Cook County shall increase the use of overhead video surveillance and recording cameras to provide adequate coverage throughout the common areas of the Facility, including the RCDC, all division intake areas, mental health units, special management units, inmate housing units, and in common areas of the divisions." This paragraph has been in partial compliance since monitoring was initiated. Funding and contracting to install the additional cameras is dependent on the County government. There have been several rounds of request for proposals since 2011, but some bureaucratic or contractual issues have prevented the award. The County Commission has awarded the contract.

CCODC is prepared to work with the County-selected vendor. The delay in this initiative is not the fault of CCDOC. As such, I am going to move this paragraph into substantial compliance based on the pending award, and the CCDOC's plans for installation of increased overhead video surveillance. If there are further delays in this work, I will consider moving this paragraph back to partial compliance.

**Tracking Use of Force Data** – There remain issues in tracking/accountability for use of force events in CCDOC. During the first three years of monitoring, it was agreed that OPR would maintain the data base, so when the question is asked about use of force events, OPR's data is "official". As CCDOC has matured in the review of use of force reports, prior to forwarding those to OPR for logging, there is a backlog, currently 40 incidents. OPR attempts to capture use of force events from the daily incident reports. So while there is a credible effort to "count" the events, the results are still scattered. While the process evolved, CCODC and CCSO need to pay attention to timely review and accurate reporting. This status does not move any paragraphs out of substantial compliance, I will be looking for a resolution of this matter during the next tour.

## Continued Jail Crowding, Little Tangible Action

As I noted in my last several reports, the crowding in the facilities jeopardizes current and long-term sustainability of the progress to achieve constitutional levels of confinement. While various County agencies have voiced their concern, there is insufficient action. CCDOC's average inmate population for August 2013 was 10,017, up from August 2012's population of 9,586 (5%).

President Preckwinkle has taken the unprecedented step of asking for the help of the Illinois Supreme Court. It is my understanding that this meeting between Cook County's criminal justice leadership and the Supreme Court has been scheduled for November 14, 2013.[1]

---

[1] President Preckwinkle asked the Court to: appoint an external judge to begin to process long-delayed cases and alleviate the backlog of matters in the County, convene a Reform Commission, headed by a Justice of the Supreme Court, to authorize and oversee an externally performed audit of the Cook County Courts, and seek data on the pre-trial, trial, and probation systems for release to the pubic, including courtroom-specific data and other data collected by the Cook County Courts through the CourTools program. http://articles.chicagotribune.com/2013-09-

The Executive Director of the Cook Count Justice Advisory Council reports four initiatives to address crowding.[2]  Additionally, the Sheriff's Office is analyzing data to help identify the underlying systemic issues pushing jail crowding.  For example, staff are examining of time to trial by judge, continuances requested, jury trial length in comparison to national averages, jail population projections, review of options for pre-trial detention, and evaluating the impact on public safety of electronic monitoring.

None of these initiatives, noted above, are part of a coordinated effort to address the issues; and they lack focus and sustainability. At the end of the day, the stakeholders cannot yet even agree on the data that describes the circumstances in which they find themselves. [3]

The collective sum of all these "activities" is no progress at all.  (See also below, Unsustainable/Unsafe Buildings and Infrastructure:  Failure to Act.)   In the absence of a collaborative effort, and good will among stakeholders to address crowding, and related dysfunction in the courts, probation, and pre-trial services, more time has passed, crowding has increased, and there is no solution in sight.  There are interim solutions, not as drastic as asking for the help of the Supreme Court, that can guide efforts.  No stakeholder seems, in my opinion, to have the ability to take a leadership role and address crowding.


**Unsustainable/Unsafe Buildings and Infrastructure[4]**

Another threat to the continued sustainability of progress and inmate safety is CCDOC's physical plant itself.  Many of the structures are more than half a century old, which is way past obsolese in the jail world.   The County has assessed the buildings, and infrastructure but has not released the report, completed in April 2013.  The "Cook County Real Estate Asset Strategic Realignment

---

19/opinion/ct-edit-courts-0919-jm-20130919_1_illinois-supreme-court-case-backlog-preckwinkle accessed October 2, 2013

[2] These are:  asking Chief Judge Evans for additional court calls at the Leighton Courthouse before the holidays; asking a Judge at the Maywood Branch of the Circuit to share her efforts regarding efficiencies of case management with her peers;  contracting with a national expert on prosecution and court processing to analyze data from the Illinois Sentencing Policy Advisory Commission and issue quarterly reports;  using a $450,000 award from the MacArthur Foundation for personnel to interview defendants; and also fund the Center for Public Safety and Justice, Institute of Government and Public Affairs, University of Illinois to evaluate the initiative.  Email to me from Juliana Stratton, Executive Director, Cook County Justice Advisory Council, dated September 13, 2013.  Additionally, the County Attorney reports that Dr. Stemen released his first report which indicates that the number of cases resolved within 60 days and six months has steadily and significantly declined.  As such, lower level felony cases are proceeding more slowly over time, and are contributing to lengthening jail stays and, hence, overcrowding.  Not only will Prof. Stemen release quarterly reports, but the County  recently hosted representatives of all of the stakeholders for Prof. Stemen to present his research.  Most stakeholders have agreed to provide additional research for him to expand his research on this issue and help pinpoint the cause of delays.  I have requested copies of the initial report, and hope to receive the quarterly updates.

[3] See also as examples:  http://www.dailyherald.com/article/20131010/news/710109839/?interstitial=1 accessed on October 11, 2013  http://www.wbez.org/news/dart-court-records-cook-county-shameful-108890 accessed on October 11, 2013

[4] See also Report # 6 to the Court.

Plan", conducted for President Preckwinkle by U.S. Equities Reality, during 2012 and 2013 includes substantial recommendations regarding the CCDOC physical plant.[5]

I attended two meetings with the County's consultants, on July 19, 2012, in which the project was explained, and on February 14, 2013 in which the preliminary findings were reported to the Undersheriff. During the February 2013 briefing, the consultant's principals reported that half the buildings on the CCDOC campus have reached their life expectancy.[6] Translated, this means that the buildings are not longer worth the cost of repairing. It is generally accepted in the corrections field, that 30 years is the life span of a jail (if appropriately funded for preventive maintenance – not the case in CCDOC's history)– given its type of use, 24/7. Importantly from my perspective, correctional management and operational principles have dramatically changed since the older buildings were constructed (and that is an understatement) not only rendering them less safe for inmates, but very staff intensive (costly) to run.

On June 19, 2013, the County's consultants provided a briefing to Sheriff Dart. While indicating a final report will not be forthcoming until the end of 2013, the information (in draft) provided for CCDOC documented: $25 million estimated allocated yearly operational expense; and $749 million in current deferred maintenance, estimated to grow to $1.1 billion over the next decade. The overview states "A significant number of buildings on Campus are old, functionally obsolete and costly to operate."[7] The presentation provided this assessment to current structures: Division I – D+, Division II, Dorm 1 – D-, Division II – Dorm 2, D-, Division II – Dorm 3, D-, Division II – Dorm 4 – D-, Division III – C-, Division III Annex – D+, and Division XVII – D+. This represents a total of 4,164 beds and more than 767,000 square feet. The consultants estimate bed replacement costs at more than $144.08 million. Of course, these estimates are, in my view, spurious as the consultants did not take into account the inmate classification initiative, and the impact reclassifying the entire inmate population will have on actual needed beds (e.g. maximum, medium, specialized).

The County, and certainly the Sheriff, is aware that 50% of the buildings (and perhaps as many as 6,250 beds – Divisions 1, 2, 3, 4, 5 and 6, for example) are past their life span. As seen in the construction of the new Division 9, the costs of inadequate planning in the design and construction of a jail has both short and long term consequences.[8]

Capital planning for construction of new jails is a long-term process (five years at least). It is abundantly clear that new buildings are necessary; yet there is no public action to move in this

---

[5] According to CCDOC, the construction dates of the buildings are (inmate capacity): Division 1- 1929 (1,250), Division 2 -1955 (1,959), Division 3 Annex – 1955 (353), Division 4 -1975 (female – 704), Division 5-1978 (992), Division 6 - 1979 (992), Division 9-1992 (1,056), Division 10 Cermak-1992 (148), Division 11-1995 (1536), and Division 8 (RTU) (979)- 2012

[6] Suzanne Kahle, Vice President, U. S. Equities Realty, Bill Proctor, Project Manager, Parsons.

[7] Cook County Real Estate Asset Strategic Realignment Project DRAFT June 19, 2013, page 17.

[8] The Sheriff requested, and received, technical assistance from two nationally known jail experts, funded through the National Institute of Corrections, to evaluate the structure and operation of the new Division 8. Their report details the failures to involve corrections professionals in the design of the building that has resulted in safety issues for inmates, and will, because of the inefficient design, have long term staffing costs, which would have been avoided if planning had followed accepted (and well-known) practice.

direction. So this means that between funding/planning and construction, and moving inmates into appropriately safe housing is most likely 10 years away. In the interim, to maintain the conditions required by this agreement will require the County to continue to expend funds on these old buildings (e.g. roofing, plumbing, HVAC, electric).

The President's proposed budget for 2014 does not include any new jail construction for the next 10 years. [9],[10]

## Conclusions

While not wishing to frustrate the Court by providing only problems, and no solutions in this report, I respectfully suggest the Court's on-going attention to the County's inability and/or unwillingness to address these issues. My previous reports to the Court have provided many suggestions and examples of work that can be done, none of which, to my knowledge, have been implemented.

## Administrative Release Program (ARO)

This Executive Summary reports on the Administrative Release Program. The Sheriff's Office repots that during the last year they have reviewed every inmate admitted to CCDOC. Of those about 1,905 have qualified for release. The limiting factors were the charges and criminal background. About 1,039 were released on EM by the Sheriff's office, the difference in the numbers attributed to those released on bond prior to EM.

The Sheriff's Office and the Office of the President are working on alternatives to the current ARO which would move the responsibility to the Office of the President for program implementation, with the Sheriff's Office providing criminal history record information. This alternative has not yet been finalized.

---

[9] http://home.cookcountyil.gov/budget/wp-content/uploads/sites/2/2013/10/14-Vol-I-Capital-Improvement-Programs-Pres-Rec.pdf accessed on 10/29/2013

[10] See also http://blog.cookcountygov.com/2013/10/25/president-preckwinkle-announces-plan-to-consolidate-modernize-county-real-estate/, accessed on 10/29/2013

**UNITED STATES OF AMERICA VS. COOK COUNTY, ET. AL.**
**Civil No. CV-02946**

# Corrections Monitor 7th Report
# October 29, 2013

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| **A.** | **Protection from Harm** | | | |
| **31.** | **Use of Force by Staff** | | | |
| A. 31. a. (17) | CCDOC shall maintain comprehensive and contemporary policies and procedures, in accordance with generally accepted correctional standards, surrounding the use of force and with particular emphasis regarding permissible and impermissible uses of force. | x12/11 x7/12 x2/13 x9/13 | x 9/10 x 3/11 x 8/11 | |
| A.31. b. (17) | CCDOC shall maintain use of force policies and pre-service and in-service training programs for correctional officers and supervisors that address the following impermissible uses of force: <br> 1. use of force as a response to verbal insults or inmate threats where there is no immediate threat to the safety of the institution, inmates, or staff; <br> 2. use of force as a response to inmates' failure to follow instructions where there is no immediate threat to the safety of the institution, inmates, or staff, unless CCDOC has attempted a hierarchy of nonphysical alternatives that are documented; <br> 3. use of force as punishment or retaliation; <br> 4. use of force involving striking, hitting, or punching a restrained and non-combative inmate; <br> 5. use of force against an inmate after the inmate has ceased to offer resistance and is under control; <br> 6. use of choke holds on an inmate, unless lethal force is justified; and <br> 7. use of inappropriate or excessive force. | x12/11 x7/12 x2/13 x9/13 | x 9/10 x 3/11 x 8/11 | |
| A.31.c. (18) | CCDOC shall maintain a policy to ensure that staff adequately and promptly report all uses of force, in accordance with generally accepted correctional standards. | x12/11 x7/12 x2/13 x9/13 | x 9/10 x 3/11 x 8/11 | |
| A.31.d. (18) | CCDOC shall require that use of force reports: <br> 1. be written in specific terms in order to capture the details of the incident <br> 2. contain an accurate account of the events leading to the use of force incident; <br> 3. include a description of the instrument(s) of restraint or control, if any, and the manner in | x12/11 x7/12 x2/13 x9/13 | x 9/10 x 3/11 x 8/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | which it was used;<br>4.   note whether an inmate disciplinary report was completed in connection with the incident that prompted the use of force;<br>5.   describe the nature and extent of apparent and reported injuries sustained both by the inmate and staff member;<br>6.   contain the date and time medical attention was actually provided;<br>7.   describe, in detailed, factual terms, the type and amount of force used as well as the precise actions taken in a particular incident; and<br>8.   note whether a use of force was videotaped. If the use of force is not videotaped, the reporting correctional officer and supervisor will provide an explanation as to why it was not videotaped. | | | |
| A.31.e. (19) | CCDOC shall continue to require prompt review by the shift commander of all use of force reports. The shift commander's review of use of force reports shall include review for completeness and procedural errors, as well as review of the substantive content. If the use of force report does not comply with provision 31.d. of this Agreed Order, the shift commander shall return it to the reporting officer for revision and resubmission until it is compliant. If the shift commander believes a use of force may have been inappropriate or excessive, he or she shall immediately refer the incident for investigation. | x7/12<br>x2/13<br>x9/13 | x 9/10<br>x 3/11<br>x 8/11<br>x12/11 | |
| A.31.f. (19) | CCDOC shall ensure that senior management review of uses of force includes:<br>1.  a timely review of medical documentation of inmate injuries, if any is submitted, as provided by Qualified Medical Staff, including documentation surrounding the initial medical encounter, an anatomical drawing that depicts the areas of sustained injury, and information regarding any further medical care;<br>2.  the inmate disciplinary report, if any, associated with the use of force; and<br>3.  the incident report, if any, associated with the use of force. | x12/11<br>x7/12<br>x2/13<br>x9/13 | x 9/10<br>x 3/11<br>x 8/11 | |
| A. 31.g. (20) | CCDOC [and Cermak] shall establish criteria that trigger referral for inappropriate or excessive use of force investigations, including but not limited to, documented or known injuries that are extensive or serious; injuries involving fractures or head trauma; injuries of a suspicious nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.); and injuries that require treatment at outside hospitals. | x12/11<br>x7/12<br>x2/13<br>x9/13 | x 3/11<br>x 8/ll | x 9/10 |
| A. 31. h. (20) | When CCDOC review of use of force reports, and supporting records if applicable, reveals that reports of a use of force are materially inconsistent, conflicting, or suspicious, CCDOC shall refer that use of force incident for internal investigation. | x12/11<br>x7/12<br>x/2/13<br>x9/13 | x 9/10<br>x 3/11<br>x 8/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| A.31.i. (20) | CCDOC shall develop and implement a system to track all incidents of use of force that, at a minimum, includes the following information:<br>1. a tracking number;<br>2. the inmate(s) name;<br>3. housing assignment;<br>4. date;<br>5. type of incident;<br>6. injuries (if applicable);<br>7. medical care provided (if applicable);<br>8. staff involved;<br>9. reviewing supervisor;<br>10. external reviews and results (if applicable);<br>11. remedy taken (if appropriate); and<br>12. administrative sign-off. | x7/12<br>x2/13<br>x9/13 | x 9/10<br>x 3/11<br>x 8/11<br>x12/11 | |
| A.31.j. (20) | CCDOC shall ensure that, promptly following a use of force incident, video or photographs are taken of any and all reported or apparent injuries sustained by inmates and staff. The video or photographs will be maintained and will be included in the investigation package, if applicable. See 31. F. | x12/11<br>x7/12<br>x2/13<br>x9/13 | x 9/10<br>x 3/11<br>x 8/11 | |
| A.31.k. (21) | CCDOC shall establish an "early warning system" that will document and track correctional officers who are involved in use of force incidents and any complaints related to the inappropriate or excessive use of force, in order to alert CCDOC administration to any potential need for retraining, discipline, problematic policies, or supervision lapses. Appropriate CCDOC leadership, supervisors, and investigative staff shall have access to this information and monitor the occurrences. CCDOC senior management shall use information from the early warning system to improve quality management practices, identify patterns and trends, and take necessary corrective action both on an individual and systemic level. | x7/12<br>x2/13<br>x9/13 | x 9/10<br>x 3/11<br>x 8/11<br>x12/11 | |
| A.31.l. (22) | CCDOC shall ensure that a supervisor is present during all pre-planned uses of force, such as cell extractions. | x12/11<br>x7/12<br>x2/13<br>x9/13 | x 9/10<br>x 3/11<br>x 8/11 | |
| A.31.m. (22) | Where there is evidence of staff misconduct related to inappropriate or unnecessary use of force against inmates, CCDOC shall initiate personnel actions and seek disciplinary action appropriately for any correctional officer found to have:<br>1. engaged in inappropriate or excessive use of force; | x12/11<br>x7/12<br>x2/13<br>x9/13 | x 9/10<br>x 3/11<br>x 8/11 | |

3

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | 2. failed to report or report accurately the use of force;<br>3. retaliated against an inmate or other staff member for reporting an inappropriate or excessive use of force; or<br>4. interfered or failed to cooperate with an internal investigation regarding use of force in a manner inconsistent with the staff member's statutory or contractual rights. | | | |
| A.31.n. (23) | Where there is evidence of staff misconduct related to inappropriate or unnecessary use of force against inmates, CCDOC shall consider, develop, and initiate systemic remedies as appropriate. | x 8/11<br>x12/11<br>x7/12<br>x2/13<br>x9/13 | x 9/10<br>x 3/11 | |
| A.31.o (23) | CCDOC shall maintain accountability policies and procedures for the effective and accurate maintenance, inventory, and assignment of chemical and other security equipment, in accordance with generally accepted correctional standards. | x12/11<br>x7/12<br>x2/13<br>x9/13 | x 9/10<br>x 3/11<br>x 8/11 | |
| A.31.p. (23) | CCDOC shall continue to conduct use of force training in accordance with generally accepted correctional standards, including:<br>1. CCDOC shall maintain an effective and comprehensive use of force training program.<br>2. CCDOC shall continue to ensure that correctional officers receive adequate training in CCDOC's use of force policies and procedures, including de-escalation and defensive tactics relating to use of force.<br>3. CCDOC shall continue to ensure that correctional officers receive pre-service and in-service training on reporting use of force and completing use of force reports. | x12/11<br>x7/12<br>x2/13<br>x9/13 | x 9/10<br>x 3/11<br>x 8/11 | |
| A.31.q. (24) | CCDOC shall provide a process for inmates to report allegations of the inappropriate or excessive use of force orally to any CCDOC staff member; said staff member shall give the inmate the opportunity to reduce his or her report to writing through a grievance or complaint form without discouragement. | x9/13 | x 9/10<br>x 3/11<br>x 8/11<br>x12/11<br>x7/12<br>x2/13 | |
| A.31.r. (24) | Following a use of force, when CCDOC staff transport an inmate to receive medical care by Cermak, as necessary, the CCDOC staff member shall inform the Cermak staff member that the inmate was involved in a use of force. | x 8/11<br>x12/11<br>x7/12<br>x2/13<br>x9/13 | X 9/10<br>x 3/11 | |
| A.31.s. (25) | Cermak shall ensure that, when providing medical treatment or assessment to an inmate following a use of force, Qualified Medical Staff document the inmate's injuries, if any, and any | x 8/11<br>x12/11 | x 9/10<br>x 3/11 | |

4

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | medical care provided.  Cermak shall provide CCDOC senior management [OPR] with a brief summary documenting the initial medical encounter following a use of force, including an anatomical drawing that depicts the areas of sustained injury, if any, and information regarding any further medical care.    See 31.f. | x7/12 x2/13 x9/13 | | |
| A.31.t. (25) | Cermak shall ensure that Qualified Medical Staff question, outside the hearing of other inmates or correctional officers if appropriate, each inmate who reports for medical care with an injury, regarding the cause of the injury.  If, in the course of the inmate's medical encounter, a health care provider suspects staff-on-inmate or inmate-on-inmate abuse, that health care provider shall immediately:<br>1.  report the suspected abuse to the Executive Director of the Office of Professional Review or other appropriate CCDOC administrator; and<br>2.  adequately document the matter in the inmate's medical record. | x 8/11 x12/11 x7/12 x2/13 x9/13 | x 3/11 | x 9/10 |
| **32.** | **Safety and Supervision** | | | |
| 32. a. (25) | CCDOC shall maintain security and control-related policies, procedures, and practices that will result in a reasonably safe and secure environment for all inmates and staff, in accordance with generally accepted correctional standards.<br>Coordinate with Grenawitzke | x2/13 x9/13 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| 32.b. (26) | CCDOC shall maintain policies, procedures, and practices to ensure the adequate supervision of inmate work areas and trustees, in accordance with generally accepted correctional standards.<br>Coordinate with Grenawitzke | x7/12 x 2/13 x9/13 | x 8/11 x12/11 | x 9/10 x 3/11 |
| 32.c. (26) | CCDOC shall ensure that security staff conduct appropriate rounds with sufficient frequency to provide inmates with reasonable safety.  Rounds shall be conducted at least once every half hour, at irregular intervals, inside each housing unit.   In the alternative, CCDOC may provide direct supervision of inmates by posting a correctional officer inside the day room area of a housing unit to conduct constant surveillance.   More frequent rounds shall be conducted for special management inmates who require more intensive supervision for security and safety reasons.  All security rounds shall be documented on forms or logs that do not contain pre-printed rounding times.  Video surveillance may be used to supplement, but must not be used to replace, rounds by correctional officers. | x2/13 x9/13 | x 9/10 x 3/11 X 8/11 x12/11 x7/12 | |
| 32.d. (27) | CCDOC shall ensure that security supervisors conduct daily rounds in the inmate housing units, and document the results of their inspections. | x2/13 x9/13 | x 3/11 x 8/11 | x 9/10 |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | | | x12/11 x7/12 | |
| 32.e. (27) | Cook County shall increase the use of overhead video surveillance and recording cameras to provide adequate coverage throughout the common areas of the Facility, including the RCDC, all division intake areas, mental health units, special management units, inmate housing units, and in common areas of the divisions. | x9/13 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 x2/13 | |
| 32.f. (28) | CCDOC shall maintain a procedure to prevent inmates from possessing or having access to dangerous contraband, including conducting regular inspections of cells and common areas of the housing units to identify and prevent rule violations by inmates. | x2/13 x9/13 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| 32.g. (28) | CCDOC shall review, and revise as applicable, all General Orders ("GOs"), Standard Operating Procedures ("SOPs"), and Post Orders on an annual basis, or more frequently as needed. | x 8/11 x12/11 x7/12 x2/13 x9/13 | x 9/10 x 3/11 | |
| 32.h. (28) | CCDOC shall revise policies, SOPs, and post orders for all armed posts to include proper use and safe handling of weapons and provide specific instructions on use of deadly force and when and under what circumstances such force should be used, in accordance with generally accepted correctional standards. | x12/11 x7/12 x2/13 x9/13 | x 9/10 x 3/11 x/8/11 | |
| 32.i. (29) | CCDOC shall standardize security policies, procedures, staffing reports, and post analysis reports across the divisions, to the extent possible, taking into account the different security levels and different physical layouts in the various divisions. | x2/13 x9/13 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| 32.j. (29) | CCDOC shall provide formal training on division-specific SOPs to correctional officers in accordance with their assignments, and shall provide further specialized training for officers assigned to Special Management Units. Cermak Hospital shall provide Specialized training for officers assigned to psychiatric units. Coordinate with medical monitor and Dr. Metzner. See also 44.f., 44.g., 44.h., 46.b., 46.e., 68. | x7/12 x2/13 x9/13 | x 9/10 x 3/11 x 8/11 x12/11 | |
| 32.k. (30) | CCDOC shall maintain in working order all monitoring equipment at the Facility that is under CCDOC's direct control, including cameras, alarms, radios (hand held), interior and exterior | x7/12 x2/13 | x 9/10 x 3/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | lighting, x-ray and other screening equipment, and walk-through metal detectors. To the extent that the maintenance of any Facility monitoring equipment is under the control of DFM, CCDOC shall promptly report any maintenance needs and DFM shall prioritize its services to ensure that all monitoring equipment is maintained in working order. Coordinate with Grenawitzke | x9/13 | x 8/11 x12/11 | |
| 32.l. (30) | Absent exigent circumstances, CCDOC: (i) shall house each inmate assigned to a division that is celled to one permanent bed in a cell and shall not house any inmates (including those assigned to dormitory divisions) such that they are sleeping on the floor, on a mattress on the floor, or in any area not designed or redesigned as sleeping quarters; (ii) shall not house more than two inmates to a single cell (triple-bunking); and (iii) shall not hot-bunk any inmates. | x 8/11[11] x12/11 x7/12 x2/13 x9/13 | | |
| 32.m. (30) | When exigent circumstances give rise to triple-bunking, CCDOC shall provide the third inmate in the triple-bunked cell a "boat," stackable bunk, moveable platform, or cot, so that the inmate is not required to lay down directly on the cell floor or on a mattress on the floor. | x 8/11[12] x12/11 x7/12 x2/13 x9/13 | | |
| 33. | **Security Staffing.** **The parties agree that correctional officer staffing and supervision levels at the Facility must be appropriate to adequately supervise inmates, to carry out the requirements of this Agreed Order, and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards. Cook County and CCDOC shall take such actions as shall ensure that correctional officer staffing and supervision at the Facility are sufficient to achieve these purposes. These actions shall include the following:** | | | |
| 33.a. (31) | In the fiscal year 2010 budget, Cook County shall allocate funds sufficient to allow for 210 additional correctional officer positions at the Facility. Consistent with provision 33.c, such funding may occur on a rolling basis, as appropriate in light of the time required to hire, train, and put on duty the additional 210 new correctional officers. | x 8/11 x12/11 x7/12 x2/13 x9/13 | x 9/10 x 3/11 | |
| 33.b. (31) | CCDOC shall use its best efforts (through the maintenance of the written staffing plan required by provision 33.h and otherwise) to ensure that the number of correctional officer vacancies is kept to the minimum practicable number at all times, taking into account that the timing of terminations and resignations and the resulting rate of attrition may, in ordinary course, result in there being some vacancies at any given time. | | x 9/10 x 3/11 x 8/11 x12/11 x7/12 x2/13 | |

---

[11] Noted as "NA" in first two reports.
[12] Noted as "NA" in first two reports.

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | | | x9/13 | |
| 33.c.i.ii (32) | CCDOC shall fill the 210 additional correctional officer slots provided for in provision 33.a; fill the 285 correctional officer vacancies that existed at the Facility as of July 17, 2009; and fill any correctional officer vacancies coming into existence after that date in the following manner:<br>i. By December 31, 2010, CCDOC shall hire, train, and put on duty at the Facility at least 448 [381] newly qualified correctional officers (in addition to those on duty as of December 31, 2009).<br>ii. By March 30, 2011, CCDOC shall hire, train, and put on duty at the Facility at least 174 [107] newly qualified correctional officers (in addition to those on duty as of December 31, 2010). | x 8/11<br>x12/11<br>x7/12<br>x2/13<br>x9/13 | | x 9/10<br>x 3/11 |
| 33.d. (32) | The parties agree that for 30 months following the effective date of this Agreed Order, Cook County and CCDOC shall not be required to provide additional correctional officer staffing and supervision at the Facility beyond that which is necessary to ensure that correctional officer staffing and supervision are sufficient to achieve the purposes set out in the introductory paragraph of provision 33 and to comply with provisions 33.a-c above. Due date 11/13/2012 | | x2/13<br>x9/13 | |
| 33.e. (33) | Within 30 months of the effective date of this Agreed Order, the CCDOC Monitor shall assess and make a recommendation on whether the correctional officer staffing and supervision levels are appropriate to adequately supervise inmates at the Facility, in accordance with generally accepted correctional standards. If the CCDOC Monitor determines that staffing is inadequate, the CCDOC Monitor will make a recommendation regarding the appropriate number of correctional officer staff. If the parties do not accept the CCDOC Monitor's staffing recommendation, CCDOC and Cook County shall agree to an independent, comprehensive study to determine the appropriate correctional officer staffing and supervision. The parties agree that the results of this staffing study shall provide guidance as to the sufficient number of qualified correctional officers necessary to operate the Facility safely and to carry out the requirements of this Agreed Order. Due date 11/13/2012 | | x2/13<br>x9/13 | |
| 33.f. (33) | If the staffing study requires additional correctional officers, Cook County shall allocate funds sufficient to maintain correctional officer staffing levels necessary to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards. Due date 11/13/2012 | | x2/13<br>x9/13 | |
| 33.g. (33) | If the staffing study requires additional correctional officers, and consistent with Cook County's allocation of funds for security staffing, CCDOC shall hire and train sufficient number of qualified correctional officers and other staff to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional | | x2/13<br>x9/13 | |

8

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | standards, including:<br>1. Investigative staffing sufficient to meet the internal investigation responsibilities outlined in this Agreed Order;<br>2. Correctional officer staffing sufficient to provide inmates requiring treatment with adequate access to appropriate medical and mental health care by providing timely movement of inmates to medical units, transport of inmates who have been referred for outside specialty care, and escort, if necessary, to Qualified Medical and Mental Health Staff on housing units; and   [Coordinate with medical monitor and  Dr. Metzner]<br>3. Qualified staff sufficient to monitor security cameras in real time and allow for supervisory viewing and retrieving at any time.  Due date 11/13/2012 | | | |
| 33.h. (34) | CCDOC shall maintain a written staffing plan that requires sufficient staffing to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards. | | x 8/11<br>x12/11<br>x7/12<br>x2/13<br>x9/13 | x 9/10<br>x 3/11 |
| 33.i. (34) | Absent exigent circumstances, CCDOC shall maintain a practice that does not allow for scheduled, planned, or expected cross-watching (a CCDOC practice of allowing one correctional officer to simultaneously supervise two housing units from the control center of one of the units) at any time on all maximum security and Special Management Units, and during first and second shifts throughout the Facility. | x 8/11[13]<br>x12/11<br>x7/12<br>x2/13<br>x9/13 | | |
| 33.j. (34) | CCDOC may permit cross-watching on third shift in housing units that are not maximum security or Special Management Units only if the Monitor does not object after consultation and review. The Monitor's review of the appropriateness of third-shift cross-watching on a particular housing unit shall be guided by the sufficiency of sightlines between the units being cross-watched, the adequacy of video and/or audio technologies in place, and/or other factors that bear on the safety and security of inmates and staff.  If the Monitor later objects to any cross-watching that is in effect because of the Monitor's concerns that cross-watching on a particular housing unit presents an undue risk to the safety and security of inmates and staff, CCDOC shall immediately cease such cross-watching.  CCDOC may renew cross-watching on that unit again if, after further consultation with and review by the Monitor, the Monitor does not object to such renewal.  Although cross-watching is permitted under the limited circumstances described herein, CCDOC will work to eliminate the practice at the Facility. | x 8/11[14]<br>x12/11<br>x7/12<br>x2/13<br>x9/13 | | |

---

[13] Noted as "NA" in first two reports.

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| **34.** | **Incidents and Referrals** | | | |
| 34. a. (35) | CCDOC shall continue to ensure that staff adequately and promptly document all reportable incidents, including inmate fights, rule violations, inmate injuries, suicides and suicide attempts, cell extractions, medical emergencies, contraband, vandalism, escapes and escape attempts, fires, and other incidents causing a disruption to standard CCDOC practice, in accordance with generally accepted correctional standards. | x2/13 x9/13 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| 34.b. (36) | CCDOC shall continue to ensure that correctional officers receive pre-service and in-service training on proper incident reporting policies and procedures in accordance with generally accepted correctional standards. | x 8/11 x12/11 x7/12 x2/13 x9/13 | x 9/10 x 3/11 | |
| 34.c. (36) | CCDOC shall maintain a system to track all reportable incidents (as described in provision 34.a) that, at a minimum, includes the following information:<br>1. incident tracking number;<br>2. the inmate(s) name;<br>3. housing assignment;<br>4. date;<br>5. type of incident;<br>6. injuries (if applicable);<br>7. medical care (if applicable);<br>8. primary and secondary staff involved;<br>9. reviewing supervisor;<br>10. external reviews and results (if applicable);<br>11. remedy taken (if appropriate); and<br>12. administrative sign-off. | x2/13 x9/13 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| 34.d. (36) | CCDOC shall require prompt administrative review of incident reports. Such reviews shall include a case-by-case review of individual incidents as well as a systemic review in order to identify patterns of incidents. CCDOC shall incorporate such information into quality management practices and take necessary corrective action. | x 8/11 x12/11 x7/12 x2/13 x9/13 | x 9/10 x 3/11 | |
| 34.e. (37) | CCDOC shall ensure that incident reports, use of force reports and inmate grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established | x9/13 | x 9/10 x 3/11 | |

[14] Noted as "NA" in first two reports.

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | criteria, that it is referred for investigation. | | x 8/11 x12/11 x7/12 x2/13 | |
| 34.f. (37) | CCDOC shall maintain policies, procedures and practices requiring investigations to resolve issues identified during review of incident reports, disciplinary hearings, or inmate grievances, and determine appropriate remedies, in accordance with generally accepted correctional standards.  At a minimum, CCDOC shall require timely and appropriate investigations of all suicides, serious suicide attempts, inmate-on-inmate violence resulting in serious injury, inmate-on-staff violence, inmate injuries requiring treatment by an outside hospital, inmate injuries of a suspicious nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.), sexual misconduct between inmates, sexual misconduct involving staff, fires, escapes, escape attempts, and deaths. | x9/13 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 x2/13 | |
| 34.g. (37) | CCDOC (OPR) shall ensure that any investigation reports indicating possible criminal behavior will be referred to the appropriate law enforcement authority. | x 8/11 x12/11 x7/12 x2/13 x9/13 | x 9/10 x 3/11 | |
| 35. | Investigations:<br>Investigations at the Facility are conducted by independent departments under the Cook County Sheriff's Office, including the Office of Professional Review, the Criminal Investigations Unit, and the Sheriff's Police Department.  The Cook County Sheriff will assume responsibility for requiring these investigatory units to comply with the relevant provisions of this Agreed Order. | | | |
| 35.a. (38) | CCDOC [OPR] shall maintain comprehensive policies, procedures, and practices for the timely and thorough investigation of alleged staff misconduct, in accordance with generally accepted correctional standards. | x2/13 x9/13 | x 9/10 x 3/11 x 8/11 x12/11 x 7/12 | |
| 35.b. (38) | Internal investigations [OPR] shall be conducted by persons who do not have supervisory responsibility for the staff member(s) being investigated. | x 7/12 x2/13 | x 9/10 x 3/11 x 8/11 x12/11 | |
| 35.c. | CCDOC [OPR] shall ensure that all internal investigations will include timely, thorough, and | x 9/10 | | |

11

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| (39) | documented interviews of all relevant staff and inmates who were involved in, or witnessed, the incident in question. | x 3/11 x 8/11 x12/11 x 7/12 x2/13 x9/13 | | |
| 35.d. (39) | CCDOC [OPR] shall ensure that internal investigation reports shall include all supporting evidence, including witness and participant statements, policies and procedures relevant to the incident, physical evidence, video or audio recordings, and relevant logs. | x 9/10 x 3/11 x 8/11 x12/11 x 7/12 x2/13 x9/13 | | |
| 35.e. (39) | CCDOC [OPR] shall ensure that all investigatory staff will receive pre-service and in-service training on appropriate investigations policies and procedures, the investigations tracking process, investigatory interviewing techniques, and confidentiality requirements. | x7/12 x2/13 x9/13 | x 9/10 x 3/11 x 8/11 x12/11 | |
| 35.f. (40) | CCDOC [OPR] shall provide all investigators who will be assigned to conduct investigations of use of force incidents with specialized training in investigating use of force incidents and allegations. | x7/12 x2/13 x9/13 | x 9/10 x 3/11 x 8/11 x12/11 | |
| 35.g. (40) | CCDOC [OPR] shall ensure that the results of each internal investigation shall be documented in an investigation report. CCDOC administration shall review the investigation reports, along with the underlying documentation, and take appropriate action. CCDOC shall implement appropriate remedies based upon the results of internal investigations. | x7/12 x2/13 x9/13 | x 9/10 x 3/11 x 8/11 x12/11 | |
| 36. | **Inmate Disciplinary Process** | | | |
| 36.a. (40) | CCDOC shall maintain policies, procedures, and practices for a formal disciplinary process, including prompt issuance of written disciplinary citations, administrative review and disciplinary reports for alleged minor rule violations, and due process for alleged major rules violations, in accordance with generally accepted correctional standards. | x7/12 x2/13 x9/13 | x 9/10 x 3/11 x 8/11 x12/11 | |
| 36.b. (41) | CCDOC shall ensure that inmate disciplinary hearings are conducted in a reasonably private and secure setting. | x 8/11 x12/11 x7/12 x2/13 x9/13 | x 9/10 x 3/11 | |

12

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| 36.c. (41) | CCDOC shall ensure that all inmates placed in lock down status are provided with appropriate due process that has been developed and implemented in policies and procedures, in accordance with generally accepted correctional standards.<br><br>In an emergency, the Executive Director of CCDOC may order a lock down of entire areas of the Facility in order to control the situation and address serious security concerns.  In such circumstances, it is not necessary to provide disciplinary hearings to each inmate affected by the lock down.  However, lock downs of this nature shall be limited to only the time and scope necessary to address the emergency.<br><br>For the purposes of this Agreed Order, a "lock down" shall not include the routine instances in which inmates are confined to their cells, including periods of count, over night, shift change, movement, and routine contraband sweeps. | x7/12<br>x2/13<br>x9/13 | x 9/10<br>x 3/11<br>x 8/11<br>x12/11 | |
| 36.d. (41) | CCDOC shall ensure that the disciplinary board's written record accurately reflects the testimony and discussion from the disciplinary hearing, including any recommendations from a mental health professional regarding the extent to which disciplinary charges are related to an inmate's serious mental illness or suggestions for minimizing the deleterious effect of disciplinary measure on the mental health status of the inmate. | x7/12<br>x2/13<br>x9/13 | x 3/11<br>x 8/11<br>x12/11 | x9/10 |
| 36.e. (42) | CCDOC shall alert Cermak when inmates are placed in disciplinary segregation or protective custody. | x7/12<br>x2/13<br>x9/13 | x 9/10<br>x 3/11<br>x 8/11<br>x12/11 | |
| 36.f. (42) | CCDOC shall permit a Cermak Qualified Mental Health Staff member to serve on the disciplinary board. | x12/11<br>x7/12<br>x2/13<br>x9/13 | x 3/11<br>x 8/11 | x 9/10 |
| 37. | **Classification** | | | |
| 37.a. (42) | CCDOC shall maintain policies and procedures for an appropriate, objective classification system that separates inmates in housing units by classification levels in order to protect inmates from unreasonable risk of harm.  The system shall include consideration of an inmate's security level, severity of current charge, types of prior commitments, suicide risk, history of escape attempts, history of violence, and special needs.  CCDOC shall use best efforts to anticipate periods of unusual intake volume and schedule sufficient classification staff to timely classify | | x 9/10<br>x 3/11<br>x 8/11<br>x12/11<br>x7/12<br>x2/13 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | inmates. | | x9/13 | |
| 37.b. (43) | CCDOC shall ensure that classification staff have sufficient access to current information regarding cell availability on each division. | | x 9/10<br>x 3/11<br>x 8/11<br>x12/11<br>x7/12<br>x2/13<br>x9/13 | |
| 37.c. (43) | CCDOC shall include information on each inmate's assignment to the Special Incarceration Unit "level system" at the Facility in the new Jail Management System, starting with the date the new Jail Management System becomes operational. | x 9/10<br>x 3/11<br>x 8/11<br>x12/11<br>x7/12<br>x2/13<br>x9/13 | | |
| 37.d. (44) | CCDOC shall provide training and access to all correctional officer supervisors on the full capabilities of the new Jail Management System's classification and inmate tracking system (or any replacement system). | x2/13<br>x9/13 | x 9/10<br>x 3/11<br>x 8/11<br>x12/11<br>x7/12 | |
| 37.e. (44) | CCDOC shall provide ongoing internal and external review and validation of the inmate classification system to ensure its reliability and objectivity. | | x7/12<br>x2/13<br>x9/13 | x 9/10<br>x 3/11<br>x 8/11<br>x12/11 |
| **38.** | **Inmate Grievance Procedure** | | | |
| 38.a. (45) | CCDOC shall maintain policies and procedures to ensure inmates have access to an adequate grievance process and to ensure that grievances may be accessed and filed confidentially, without requiring the intervention of a correctional officer, in accordance with generally accepted correctional standards.   These policies and procedures should be applicable and standardized across all the Facility divisions. | x8/11<br>x12/11<br>x7/12 | x 9/10<br>x 3/11<br>x2/13<br>x9/13 | |
| 38.b. (45) | CCDOC shall ensure that the grievances receive appropriate follow-up, including informing the grievant of the outcome, providing a timely written response, and tracking implementation of resolutions. | x 8/11<br>x12/11<br>x7/12 | x 9/10<br>x 3/11<br>x2/13 | |

14

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| 38.c. (46) | CCDOC shall ensure that grievance forms are available on all units and are available in Spanish. CCDOC shall ensure that there is adequate opportunity for illiterate inmates and inmates who have physical or cognitive disabilities to access the grievance system. | x 8/11 x12/11 x7/12 x9/13 | x 9/10 x 3/11 x2/13 | |
| 38.d. (46) | CCDOC shall ensure that inmate grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria, are referred for investigation. A member of the management staff shall review the grievance tracking system regularly in order to identify areas of concern. | x 8/11 x12/11 x7/12 x9/13 | x 3/11 x2/13 | x 9/10 |
| **39.** | **Access to Information** | | | |
| 39.a. (46) | CCDOC shall ensure that newly admitted inmates receive information, through an inmate handbook or orientation video, regarding the following areas: facility rules and regulations; how to report misconduct; how to report sexual abuse or assault; the process for accessing medical and mental health care; emergency procedures; rules for sending and receiving mail; the visitation process; facility schedule; the disciplinary process; and how to seek redress of grievances. | x2/13 x9/13 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| 39.b. (47) | CCDOC shall ensure that materials on facility rules and services are available for non-literate and non-English speaking inmates. | X2/13 x9/13 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| 40. (47) | CCDOC shall provide training and supervision to all correctional officers and supervisors sufficient to implement the provisions of this Agreed Order. | x 8/11 x12/11 x7/12 x2/13 x9/13 | x 9/10 x 3/11 | |
| 41. (47) | Inter-Agency Agreement<br>a.   CCDOC shall enter into a written Inter-Agency Agreement with Cermak that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility. The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order.<br>b.   Cermak shall enter into a written Inter-Agency Agreement with CCDOC that delineates the mutual responsibilities of each party, relative to the provision of health care to | x 8/11 x12/11 x7/12 x2/13 x9/13 | x 3/11 | x 9/10 |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | inmates at the Facility.  The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order. | | | |
| 69. (48) | CCDOC shall ensure that security staff posts will be equipped, as appropriate, with readily available, safely secured, suicide cut-down tools. *Coordinate with Dr. Metzner | x 8/11 x12/11 x7/12 x2/13 x9/13 | | x 9/10 x 3/11 |

31. Use of Force

a.    CCDOC shall maintain comprehensive and contemporary policies and procedures, in accordance with generally accepted correctional standards, surrounding the use of force and with particular emphasis regarding permissible and impermissible uses of force.

**September 2013 Status Update:**  Substantial Compliance

**Status Update:**  All relevant policies were implemented effective 9/19/2011. CCDOC is updating the Use of Force policies based on their experience, and recommendations from the Use of Force Monitor.

**Monitor's Assessment:**  CCDOC's commitment to designating a Use of Force Monitor in the Use of Force Review Unit, Office of Policy and Accountability, is clear evidence of the priority of use of force in CCDOC.  The Use of Force Monitor evaluates the implementation of the response to resistance directives and makes recommendations for policy, training, and supervisory changes to further enhance oversight.

Data provided by the Use of Force Unit in their quarterly report

**Monitor's Recommendations:**  Continue refinements.

## 31. Use of Force

b.    CCDOC shall maintain use of force policies and pre-service and in-service training programs for correctional officers and supervisors that address the following impermissible uses of force:
1.    use of force as a response to verbal insults or inmate threats where there is no immediate threat to the safety of the institution, inmates, or staff;
2.    use of force as a response to inmates' failure to follow instructions where there is no immediate threat to the safety of the institution, inmates, or staff, unless CCDOC has attempted a hierarchy of nonphysical alternatives that are documented;
3.        use of force as punishment or retaliation;
4.    use of force involving striking, hitting, or punching a restrained and  non-combative inmate;
5.    use of force against an inmate after the inmate has ceased to offer resistance and is under control;
6.        use of choke holds on an inmate, unless lethal force is justified; and
7.        use of inappropriate or excessive force.

**September 2013 Status Update:**  Substantial compliance.

**Status Update:**  Remains in compliance; see 31.a.

**Monitor's Assessment:**  As noted in previous reports, the CCSO's commitment to a Use of Force Review Unit demonstrates their commitment to use of force and

all peripheral issues.

**Monitor's Recommendations:** See 31.a.

## 31. Use of Force

c.      CCDOC shall maintain a policy to ensure that staff adequately and promptly report all uses of force, in accordance with generally accepted correctional standards.

**September 2013 Compliance Status:** Substantial Compliance

**Status Update:** Remains in compliance. See 31.a.

**Monitor's Assessment:** The latest report from CCDOC's Use of Force Monitor identifies issues with the quality of reporting; not the absence of reporting. There is evidence that officers are timely reporting uses of force. The Use of Force monitor works with the training academy to use examples of insufficient reports as examples.

**Monitor's Recommendations:** See 31.a.

## 31. Use of Force

d.      CCDOC shall require that use of force reports:

1. Be written in specific terms in order to capture the details of the incident;
2. Contain an accurate account of the events leading to the use of force incident;
3. Include a description of the instrument(s) of restraint or control, if any, and the manner in which it was used;
4. Note whether an inmate disciplinary report was completed in connection with the incident that prompted the use of force;
5. Describe the nature and extent of apparent and reported injuries sustained both by the inmate and staff member;
6. Contain the date and time medical attention was actually provided;
7. Describe, in detailed, factual terms, the type and amount of force used as well as the precise actions taken in a particular incident; and
8. Note whether a use of force was videotaped. If the use of force is not videotaped, the reporting correctional officer and supervisor will provide an explanation as to why it was not videotaped.

**September 2013 Compliance Status:** Substantial compliance is maintained

**Status Update:** Remains in compliance. See 31.c. The Use of Force monitor specifically looks for the elements of these requirements, and not only return reports for clarification, but also makes recommendations for supervisory training and officer training.

**Monitor's Assessment:**  As noted in previous reports, there are multiple layers of review of incident reports regarding use of force/response to resistance.  These redundancies are having the desired effect of assuring that if there are deficiencies, they are identified and addressed, and training modified.

**Monitor's Recommendations:**  Continue monitoring compliance via the URFU.

I recommended in my previous report that the Use of Force Review Unit track uses of force involving inmates on the mental health caseload.  They are doing that with the assistance of Cermak.

## 31. Use of Force

e.        CCDOC shall continue to require prompt review by the shift commander of all use of force reports.  The shift commander's review of use of force reports shall include review for completeness and procedural errors, as well as review of the substantive content.  If the use of force report does not comply with provision 31.d. of this Agreed Order, the shift commander shall return it to the reporting officer for revision and resubmission until it is compliant.  If the shift commander believes a use of force may have been inappropriate or excessive, he or she shall immediately refer the incident for investigation.

**September 2013 Compliance Status:** Substantial compliance

**Status Update:**  Remains in substantial compliance.  See 31.d.

**Monitor's Assessment:**  If the any superintendent, or the Use of Force monitor identifies any discrepancies in reporting, the incident is referred to OPR.

**Monitor's Recommendations:**  None at this time.

## 31. Use of Force

f.        CCDOC shall ensure that senior management review of uses of force includes:
1.        A timely review of medical documentation of inmate injuries, if any is submitted, as provided by Qualified Medical Staff, including documentation surrounding the initial medical encounter, an anatomical drawing that depicts the areas of sustained injury, and information regarding any further medical care;
2.        The inmate disciplinary report, if any, associated with the use of force; and
3.        The incident report, if any, associated with the use of force.

**September 2013 Compliance Status:** Substantial compliance.

**Status Update:**  Remains in substantial compliance

**Monitor's Assessment:**  See 31.d., and e.

19

**Monitor's Recommendations**: CCDOC is in the process of revising the directive regarding response to resistance to incorporate lessons learned through their internal monitoring.

## 31. Use of Force

g.      CCDOC [and Cermak] shall establish criteria that trigger referral for inappropriate or excessive use of force investigations, including but not limited to, documented or known injuries that are extensive or serious; injuries involving fractures or head trauma; injuries of a suspicious nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.); and injuries that require treatment at outside hospitals.

**September 2013 Compliance Status:** Substantial compliance.

**Status Update:** Remains in substantial compliance.

**Monitor's Assessment:** I met with Cermak's leadership and discussed the referral process. They are satisfied that the procedures are working well. The CCDOC can rely on the evaluations of the use of force investigations conducted by the Use of Force Review Unit and OPR as redundant warning systems. When the grievance process is implemented, this will represent a third check.

**Monitor's Recommendations**: See also paragraphs in 38. Inmate Grievance Procedures.

## 31. Use of Force

h.      When CCDOC review of use of force reports, and supporting records if applicable, reveals that reports of a use of force are materially inconsistent, conflicting, or suspicious, CCDOC shall refer that use of force incident for internal investigation.

**September 2013 Compliance Status:**      Substantial Compliance.

**Status Update:** Remains in substantial compliance

**Monitor's Assessment:** See 31.g.

**Monitor's Recommendations**: See 31.g.

## 31. Use of Force

i.      CCDOC shall develop and implement a system to track all incidents of use of force that, at a minimum, includes the following information:
1.      a tracking number;
2.      the inmate(s) name;
3.      housing assignment;

4.      date;
5.      type of incident;
6.      injuries (if applicable);
7.      medical care provided (if applicable);
8.      staff involved;
9.      reviewing supervisor;
10.     external reviews and results (if applicable);
11.     remedy taken (if appropriate); and
12.     administrative sign-off.

**September 2013 Compliance Status:** Substantial compliance.

**Status Update:** Remains in substantial compliance.

**Monitor's Assessment:** CCDOC is replacing the IMAC software/incident reporting system (as noted in the Executive Summary). The new incident reporting system will include these elements.

**Monitor's Recommendations**: Continue refinements.

## 31. Use of Force

j.      CCDOC shall ensure that, promptly following a use of force incident, video or photographs are taken of any and all reported or apparent injuries sustained by inmates and staff. The video or photographs will be maintained and will be included in the investigation package, if applicable.

**September 2013 Compliance Status:** Substantial compliance

**Status Update:** Remains in substantial compliance.

**Monitor's Assessment:** I reviewed 10 investigations in OPR. All had photographs, or CD with digital recordings, as a appropriate. CCDOC uses a separate SD card for each use of force to preserve the integrity of the information.

**Monitor's Recommendations:** None at this time. The Use of Force Review Unit will monitor the use, and quality of the photographs/recordings.

## 31. Use of Force

k.      CCDOC shall establish an "early warning system" that will document and track correctional officers who are involved in use of force incidents and any complaints related to the inappropriate or excessive use of force, in order to alert CCDOC administration to any potential need for retraining, discipline, problematic policies, or supervision lapses. Appropriate CCDOC leadership, supervisors, and investigative staff shall have access to this information and monitor the occurrences. CCDOC senior management shall use information from the early warning system to improve quality management practices, identify patterns and trends, and take necessary corrective action both on an individual and systemic level.

**September 2013 Compliance Status:** Substantial compliance.

**Status Update:** Remains in substantial compliance.

**Monitor's Assessmen**t: The Use of Force Review Unit reports in their latest report (covering the first half of CY 2013) that 28 officers were provided remedial training: 20 regarding their report writing; 5 regarding the appropriateness of the application of force; and 3 based on policy violations (failure to document the incident; failing to follow supervisory instructions to complete documentation).

**Monitor's Recommendations:** Continue to refine the process. Track alerts, referrals and outcomes.

### 31. Use of Force

l.        CCDOC shall ensure that a supervisor is present during all pre-planned uses of force, such as cell extractions.

**September 2013 Compliance Status:** Substantial compliance

**Status Update:** Remains in substantial compliance.

**Monitor's Assessmen**t: Compliance is monitored by URFU. No issues reported.

**Monitor's Recommendations:** Continue to monitor compliance.

### 31. Use of Force

m.        Where there is evidence of staff misconduct related to inappropriate or unnecessary use of force against inmates, CCDOC shall initiate personnel actions and seek disciplinary action appropriately for any correctional officer found to have:

1.        engaged in inappropriate or excessive use of force;
2.        failed to report or report accurately the use of force;
3.        retaliated against an inmate or other staff member for reporting an inappropriate or excessive use of force; or
4.        interfered or failed to cooperate with an internal investigation regarding use of force in a manner inconsistent with the staff member's statutory or contractual rights.

**September 2013 Compliance Status**: Substantial compliance

**Status Update:** Remains in substantial compliance.

**Monitor's Assessmen**t: The barrier to prompt action is the prosecutor, who doesn't see these cases as a priority, given their caseload. There is one case pending trial for an excessive use of force by staff in the 'old' RTU. CCDOC and CCSO do all they to advance these cases.

**Monitor's Recommendations**: Continue to educate the prosecutor about the need to make decisions on prosecutions.

### 31. Use of Force

n.     Where there is evidence of staff misconduct related to inappropriate or unnecessary use of force against inmates, CCDOC shall consider, develop, and initiate systemic remedies as appropriate.

**September 2013 Compliance Status:** Substantial compliance

**Status Update:** Has remained in substantial compliance for 24 months.

**Monitor's Assessmen**t: Employees continue to be aware of the high priority placed on appropriate uses of force.

**Monitor's Recommendations:** Nothing at this time.

### 31. Use of Force

o.     CCDOC shall maintain accountability policies and procedures for the effective and accurate maintenance, inventory, and assignment of chemical and other security equipment, in accordance with generally accepted correctional standards.

**September 2013 Compliance Status:** Substantial compliance.

**Status Update:** Remains in substantial compliance

**Monitor's Assessmen**t: Nothing at this time.

**Monitor's Recommendations:** Nothing at this time.

### 31. Use of Force

p.     CCDOC shall continue to conduct use of force training in accordance with generally accepted correctional standards, including:

1.     CCDOC shall maintain an effective and comprehensive use of force training program.
2.     CCDOC shall continue to ensure that correctional officers receive adequate training in CCDOC's use of force policies and procedures, including de-escalation and defensive tactics relating to use of force.
3.     CCDOC shall continue to ensure that correctional officers receive pre-service and in-service training on reporting use of force and completing use of force reports.

**September 2013 Compliance Status:** Substantial compliance.

**Status Update:**  Remains in substantial compliance.

**Monitor's Assessmen**t:  The training academy continues to refine use of force training, and use of force reporting based on the recommendations of the Use of Force Review Unit. Attention continues to be needed for training for staff working with inmates with mental illness.

**Monitor's Recommendations:**  As noted in the last report, CCDOC should continue work to identify how best to manage inmates with mental illness.

## 31. Use of Force

q.      CCDOC shall provide a process for inmates to report allegations of the inappropriate or excessive use of force orally to any CCDOC staff member; said staff member shall give the inmate the opportunity to reduce his or her report to writing through a grievance or complaint form without discouragement.

**September 2013 Compliance Status:**   Substantial compliance.

**Status Update:**   The CCDOC reports that there are not currently impediments to inmates' access to grievance forms.  While the grievance process is currently being refined, the responsibility for monitoring inmate grievances rests with Inmate Services, who is tracking this data.  The information is now also reported as part of the Sheriff's weekly accountability meeting.  Additionally, Inmate Services reports that since 1/1/13, 202 grievances with allegations of excessive force, failure to protect, verbal/profanity, disrespect/unbecoming conduct, inattention/neglect of duty, denial of medical care, staff misconduct, and sexual misconduct have been forwarded to OPR.

**Monitor's Assessment:**  The inmate grievance process, included in written directive 11.14.5.0, effective July 14, 2011, continues to be refined through the pilot program in two divisions.  The work to improve the grievance system does not undermine compliance with this provision.

**Monitor's Recommendation:**  Continue wider implementation of the grievance process pilot program. Continue monitoring inmate grievance flow.  In future tours, I will focus attention in inmate interviews about access to the grievance process.

## 31. Use of Force

r.      Following a use of force, when CCDOC staff transport an inmate to receive medical care by Cermak, as necessary, the CCDOC staff member shall inform the Cermak staff member that the inmate was involved in a use of force.

**September 2013 Compliance Status:** Substantial Compliance.

**Status Update:** Remains in substantial compliance.

**Monitor's Assessment:** Both Cermak and CCDOC report compliance..

**Monitor's Recommendation:** Nothing at this time.

## 31. Use of Force

s.        Cermak shall ensure that, when providing medical treatment or assessment to an inmate following a use of force, Qualified Medical Staff document the inmate's injuries, if any, and any medical care provided.  Cermak shall provide CCDOC senior management with a brief summary documenting the initial medical encounter following a use of force, including an anatomical drawing that depicts the areas of sustained injury, if any, and information regarding any further medical care.

**September 2013 Compliance Status:** Substantial compliance.

**Status Update:** Remains in substantial compliance

**Monitor's Assessmen**t:  As noted earlier in this report, Cermak's leadership is satisfied with compliance with this matter. OPR continues to no problems obtaining medical information from Cermak in support of their investigations.

**Monitor's Recommendations:** Continue to use the Interagency Coordinating Council to enhance operations.

## 31. Use of Force

t.        Cermak shall ensure that Qualified Medical Staff question, outside the hearing of other inmates or correctional officers if appropriate, each inmate who reports for medical care with an injury, regarding the cause of the injury.  If, in the course of the inmate's medical encounter, a health care provider suspects staff-on-inmate or inmate-on-inmate abuse, that health care provider shall immediately:
1.        report the suspected abuse to the Executive Director of the Office of Professional Review or other appropriate CCDOC administrator; and
2.        adequately document the matter in the inmate's medical record.

**September 2013 Compliance Status:** Substantial Compliance

**Status Update:** Remains in substantial compliance

**Monitor's Assessmen**t:  Neither ORP, Cermak nor CCDOC report any issues. The Interagency Coordinating Committee is the vehicle to surface and address any concerns.  Minutes of these meeting are maintained.

**Monitor's Recommendations:** Nothing at this time.

## 32. Safety and Security

a.      CCDOC shall maintain security and control-related policies, procedures, and practices that will result in a reasonably safe and secure environment for all inmates and staff, in accordance with generally accepted correctional standards. Coordinate with Grenawitzke, medical monitor and Dr. Metzner.

**September 2013 Compliance Status:** Substantial compliance.

**Status Update:** The Office of Policy and Accountability (OPA) is responsible for updating written directives on a regular schedule.

**Monitor's Assessment:** OPA has a credible and resourced process in place to maintain written directives.

**Monitor's Recommendation:** None at this time.

## 32. Safety and Security

b.      CCDOC shall maintain policies, procedures, and practices to ensure the adequate supervision of inmate work areas and trustees, in accordance with generally accepted correctional standards. Coordinate with Grenawitzke.

**September 2013 Compliance Statue:** Substantial Compliance

**Status Update:** Remains in substantial compliance

**Monitor's Assessment:** See 32.a.

**Monitor's Recommendations:** See 32.a.

## 32. Safety and Security

c.      CCDOC shall ensure that security staff conduct appropriate rounds with sufficient frequency to provide inmates with reasonable safety.  Rounds shall be conducted at least once every half hour, at irregular intervals, inside each housing unit.   In the alternative, CCDOC may provide direct supervision of inmates by posting a correctional officer inside the day room area of a housing unit to conduct constant surveillance.   More frequent rounds shall be conducted for special management inmates who require more intensive supervision for security and safety reasons.  All security rounds shall be documented on forms or logs that do not contain pre-printed rounding times.  Video surveillance may be used to supplement, but must not be used to replace, rounds by correctional officers.

**September 2013 Compliance Status:** Substantial compliance.

**Status Update:** As noted in the last report, General Order 24.9.9.0, effective December 6, 2011, incorporates the language required in this paragraph.
**Monitor's Assessmen**t: While there may be some gaps in rounds, these are the exceptions. The Sheriff has created a new Inspection's Unit, reporting directly to the Chief of Staff. This Unit will be responsible for evaluating compliance with directives, such as this General Order. The Unit will be fully operational in the several months, and already has developed the SOP to guide operations.

**Monitor's Recommendations:** Superintendents should continue to periodically monitor the conduct of rounds through review of logs during their facility inspections. The new Inspections Unit should place these requirements among those to be evaluated in their first year.

## 32. Safety and Security

d.      CCDOC shall ensure that security supervisors conduct daily rounds in the inmate housing units, and document the results of their inspections.

**September 2013 Compliance Status:** Substantial Compliance

**Status Update:** See 32.c.

**Monitor's Assessmen**t: See 32.c.

**Monitor's Recommendations:** Continue to place responsibilities to assess compliance on facility superintendents. Continue the audits and any required corrective action plans.

## 32.      Safety and Security

e.      Cook County shall increase the use of overhead video surveillance and recording cameras to provide adequate coverage throughout the common areas of the Facility, including the RCDC, all division intake areas, mental health units, special management units, inmate housing units, and in common areas of the divisions.

**September 2013 Compliance Status:** Substantial Compliance

**Status Update:** Bids for the increased surveillance were opened on 9/16/13 and ranged from $11.5 to $17.6 million. Scope: Install approximately 1,350 cameras at the DOC campus. Bid opening 9/20/13 three responses, with low bid of $11.5M. County Board approval scheduled for 10/24/13. Anticipated start date: 12/1/13. Project duration: 10 months or 300 productivity days.

**Monitor's Assessment:** This paragraph has been in partial compliance since monitoring was initiated. Contracting to install the additional cameras is

dependent on the County government. There have been several rounds of request for proposals from contractors since 2011, but some bureaucratic or contractual issues has prevented the award. Bids were opened on September 20, 2013, and CCDOC is optimistic that this time the work will begin.

CCODC is prepared to work with the County-selected vendor. The delay in this initiative is not the fault of CCDOC. As such, I am going to move this paragraph into substantial compliance based on the pending award, and the CCDOC's plans for installation of increased overhead video surveillance. If there are further delays in this work, I will consider moving this paragraph back to partial compliance.

**Monitor's Recommendations**: None at this time.

## 32.    Safety and Security

f.        CCDOC shall maintain a procedure to prevent inmates from possessing or having access to dangerous contraband, including conducting regular inspections of cells and common areas of the housing units to identify and prevent rule violations by inmates.

**September 2013 Compliance Status**: Substantial compliance

**Status Update:** CCDOC continues to use the consolidated resource of the Weapons Free Committee to review all contraband, and take swift action as needed. With the installation of new lighting fixtures throughout the campus, inmates are finding it more difficult to manufacture contraband, but continue to do so, as expected. Some examples of inmate ingenuity include manufacturing of weapons from plastic "sporks", glass, vent covers, tweezers, and eyeglass frames. CCDOC is on top of this issue.

**Monitor's Assessmen**t: Excellent work.

**Monitor's Recommendations:** None at this time.

## 32.    Safety and Security

g.        CCDOC shall review, and revise as applicable, all General Orders ("GOs"), Standard Operating Procedures ("SOPs") and Post Orders on an annual basis, or more frequently as needed.

**September 2013 Compliance Status:** Substantial Compliance

**Status Update:** Remains in substantial compliance.

**Monitor's Assessmen**t: See 32.a. and 32. B.

**Monitor's Recommendations:** None at this time.

## 32. Safety and Security

h.      CCDOC shall revise polices, SOPS, and Post orders for all armed posts to include proper use of and safe handling of weapons and provide specific instructions on use of deadly force and when and under what circumstances such force should be used, in accordance with generally accepted correctional standards.

**September 2013 Compliance Status:** Substantial Compliance.

**Status Update:** Remains in substantial compliance

**Monitor's Assessmen**t: See 32.g.

**Monitor's Recommendations:** See 32.g.

## 32. Safety and Security

i.      CCDOC shall standardize security policies, procedures, staffing reports, and post analysis reports across the divisions, to the extent possible, taking into account the different security levels and different physical layouts in the various divisions.

**September 2013 Compliance Status:** Substantial compliance.

**Status Update:** Remains in Substantial Compliance

**Monitor's Assessmen**t: Appropriate procedures in place for each Division.

**Monitor's Recommendations:** As there is more experience with the procedures, adjust, update as necessary.

## 32. Safety and Security

j.      CCDOC shall provide formal training on division-specific SOPs to correctional officers in accordance with their assignments, and shall provide further specialized training for officers assigned to Special Management Units.  Cermak Hospital shall provide specialized training for officers assigned to psychiatric units. [From Consent agreement "Special Management Units" means those housing units of the Facility designated for inmates in administrative or disciplinary segregation, in protective custody, on suicide precautions, or with mental illness."] Coordinate with medical monitor and  Dr. Metzner.

**September 2013 Compliance Status:** Substantial Compliance.

**Status Update:** Remains in substantial compliance

**Monitor's Assessmen**t:  Recommendations made by Dr. Metzner and me for improving outcomes and safety in the mental health units is evolving.  Cermak reports better collaboration with security staff in the mental health units. Cermak and security staff have a "morning huddle" lasting a few minutes to review issues and inmates of concern.  This is especially important as the mental health units are experiencing crowding.

Regarding notification to Cermak when clients are placed in disciplinary holding, Cermak reports that the communication is improving with the adoption of a standardized form.  Cermak is implementing electronic medical records; and CCDOC is implementing a new information system.  There have been discussions with the project leaders about what information needs to be shared on a real time basis and how to do that.

**Monitor's Recommendations:** Continue refining improved collaboration in the units housing special management inmates.

## 32.    Safety and Security

k.        CCDOC shall maintain in working order all monitoring equipment at the Facility that is under CCDOC's direct control, including cameras, alarms, radios (hand held), interior and exterior lighting, x-ray and other screening equipment, and walk-through metal detectors.  To the extent that the maintenance of any Facility monitoring equipment is under the control of DFM, CCDOC shall promptly report any maintenance needs and DFM shall prioritize its services to ensure that all monitoring equipment is maintained in working order. Coordinate with Grenawitzke.

**September 2013 Compliance Status:**  Substantial Compliance.

**Status Update:** Remains in substantial compliance

**Monitor's Assessmen**t:  No further assessment was undertaken by me regarding DFM's work order system.  Monitor Grenawitzke is monitoring this aspect of the agreement.

**Monitor's Recommendations:**  None at this time.

## 32.    Safety and Security

l.        Absent exigent circumstances, CCDOC:  (i) shall house each inmate assigned to a division that is celled to one permanent bed in a cell and shall not house any inmates (including those assigned to dormitory divisions) such that they are sleeping on the floor, on a mattress on the floor, or in any area not designed or redesigned as sleeping quarters; (ii) shall not house more than two inmates to a single cell (triple-bunking); and (iii) shall not hot-bunk any inmates.

**September 2013 Compliance Status:**     Substantial Compliance.

**Status Update:** Remains in substantial compliance.

**Monitor's Assessmen**t:  Crowding is jeopardizing compliance.  See the Executive Summary to this report.

**Monitor's Recommendations:** Nothing further at this time.

## 32.     Safety and Security

m.     When exigent circumstances give rise to triple-bunking, CCDOC shall provide the third inmate in the triple-bunked cell a "boat," stackable bunk, moveable platform, or cot, so that the inmate is not required to lay down directly on the cell floor or on a mattress on the floor.

**September 2013 Compliance Status:**     Substantial Compliance

**Status Update:**  See 32. l.

**Monitor's Assessmen**t:  See 32.1.

**Monitor's Recommendations:**  See 32.l.

## 33.     Security Staffing.  The parties agree that correctional officer staffing and supervision levels at the Facility must be appropriate to adequately supervise inmates, to carry out the requirements of this Agreed Order, and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards.  Cook County and CCDOC shall take such actions as shall ensure that correctional officer staffing and supervision at the Facility are sufficient to achieve these purposes. These actions shall include the following:

a.     In the fiscal year 2010 budget, Cook County shall allocate funds sufficient to allow for 210 additional correctional officer positions at the Facility. Consistent with provision 33.c, such funding may occur on a rolling basis, as appropriate in light of the time required to hire, train, and put on duty the additional 210 new correctional officers.

**September 2013 Compliance Status:** Substantial Compliance

**Status Update:** Remains in substantial compliance

**Monitor's Assessment:** By way of update; CCDOC hiring process continues to provide a sufficient number of qualified candidates.  Changes have been made in the recruitment and screening processes at the Merit Board to speed up the process, and eliminate redundant steps in the process.  A challenge to staffing at CCDOC is the potential hiring of several hundred police officers by the City of Chicago.

There were 127 vacancies reported as of 9/23/13. In addition there were at that time, 10 employees on suspension with/out pay (but encumbering a position), 15 employees on disability leave; and 45 employees on leaves of absences – indicating they were employed by another agency but still encumbering a funded position in CCDOC. CCDOC indicates that they anticipate zero vacancies as of 12/31/13 (depending on the speed of CPD's hiring).

CCDOC reports that there will be 192 correctional officers graduating from the pre-service academy in CY 2013.

**Monitor's Recommendation:** None at this time.

## 33. Security Staffing.

b.      CCDOC shall use its best efforts (through the maintenance of the written staffing plan required by provision 33.h and otherwise) to ensure that the number of correctional officer vacancies is kept to the minimum practicable number at all times, taking into account that the timing of terminations and resignations and the resulting rate of attrition may, in ordinary course, result in there being some vacancies at any given time.

**September 2013 Compliance Status:** Partial compliance

**Status Update:** CCDOC continues to update and refine a draft plan.

**Monitor's Assessmen**t: As noted in the previous report, the approach of involving a Workforce Utilization Committee is an effective means to involve decision makers and stakeholders campus-wide. The issue now is to validate the shift relief factor given the number of new employees who potentially skew the data.

**Monitor's Recommendations**: Complete the plan.

## 33. Security Staffing.

c.      CCDOC shall fill the 210 additional correctional officer slots provided for in provision 33.a; fill the 285 correctional officer vacancies that existed at the Facility as of July 17, 2009; and fill any correctional officer vacancies coming into existence after that date in the following manner:
        i.      By December 31, 2010, CCDOC shall hire, train, and put on duty at the Facility at least 448 [381] newly qualified correctional officers (in addition to those on duty as of December 31, 2009).
        ii.      By March 30, 2011, CCDOC shall hire, train, and put on duty at the Facility at least 178 [107] newly qualified correctional officers (in addition to those on duty as of December 31, 2010).

**September 2013 Compliance Status:**  Substantial Compliance.

**Status Update:**  Remains in substantial compliance,

**Monitor's Assessmen**t:  See 33.a.

**Monitor's Recommendations:**  See 33. a. and 33.b.

## 33.    Security Staffing.

d.      The parties agree that for 30 months following the effective date of this Agreed Order, Cook County and CCDOC shall not be required to provide additional correctional officer staffing and supervision at the Facility beyond that which is necessary to ensure that correctional officer staffing and supervision are sufficient to achieve the purposes set out in the introductory paragraph of provision 33 and to comply with provisions 33.a-c above.

**September 2013 Compliance Status:** Partial Compliance

**Status Update:**  See 33.c.

**Monitor's Assessmen**t:  See 33.c.   I am assigning this as "partial compliance" because CCDOC is actively and credibly involved in the staffing analysis, and has yet to come to a final conclusions.

**Monitor's Recommendations:**  As noted in the last report, I recommend evaluation of this paragraph until the staffing analysis is completed.

## 33.    Security Staffing.

e.      Within 30 months of the effective date of this Agreed Order, the CCDOC Monitor shall assess and make a recommendation on whether the correctional officer staffing and supervision levels are appropriate to adequately supervise inmates at the Facility, in accordance with generally accepted correctional standards.  If the CCDOC Monitor determines that staffing is inadequate, the CCDOC Monitor will make a recommendation regarding the appropriate number of correctional officer staff.  If the parties do not accept the CCDOC Monitor's staffing recommendation, CCDOC and Cook County shall agree to an independent, comprehensive study to determine the appropriate correctional officer staffing and supervision.  The parties agree that the results of this staffing study shall provide guidance as to the sufficient number of qualified correctional officers necessary to operate the Facility safely and to carry out the requirements of this Agreed Order.

**September 2013 Compliance Status:**  Partial Compliance

**Status Update:**  See 33.d.

**Monitor's Assessment:**    See 33.d.

**Monitor's Recommendation:**     See 33.d.

**33.     Security Staffing.**

f.     If the staffing study requires additional correctional officers, Cook County shall allocate funds sufficient to maintain correctional officer staffing levels necessary to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards.

**September 2013 Compliance Status:**     Partial compliance.

**Status Update:**  See 33.d.

**Monitor's Assessment:**     See 33.d.

**Monitor's Recommendation:**     See 33.d.

**33.     Security Staffing.**

g.     If the staffing study requires additional correctional officers, and consistent with Cook County's allocation of funds for security staffing, CCDOC shall hire and train sufficient number of qualified correctional officers and other staff to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards, including:
1.     Investigative staffing sufficient to meet the internal investigation responsibilities outlined in this Agreed Order;
2.     Correctional officer staffing sufficient to provide inmates requiring treatment with adequate access to appropriate medical and mental health care by providing timely movement of inmates to medical units, transport of inmates who have been referred for outside specialty care, and escort, if necessary, to Qualified Medical and Mental Health Staff on housing units; and
3.     Qualified staff sufficient to monitor security cameras in real time and allow for supervisory viewing and retrieving at any time.

**September 2013 Compliance Status:**     Partial compliance.

**Status Update:** See 33.d.  All OPR positions were filled, except for the soon-to-be Director's position in February 2013.

**Monitor's Assessment:**     See 33.d.

**Monitor's Recommendation:**     See 33.d.

**33.     Security Staffing.**

h.     CCDOC shall maintain a written staffing plan that requires sufficient staffing to carry out

the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards.

**September 2013 Compliance Status:** Partial compliance.

**Status Update:** See 33.b.

**Monitor's Assessmen**t: See 33.b.

**Monitor's Recommendation:** See 33.b.

## 33. Security Staffing.

i.      Absent exigent circumstances, CCDOC shall maintain a practice that does not allow for scheduled, planned, or expected cross-watching (a CCDOC practice of allowing one correctional officer to simultaneously supervise two housing units from the control center of one of the units) at any time on all maximum security and Special Management Units, and during first and second shifts throughout the Facility.

**September 2013 Compliance Status:** Substantial Compliance

**Status Update:** CCDOC reports no deficiencies.

**Monitor's Assessmen**t: Nothing at this time.

**Monitor's Recommendation:** None at this time.

## 33. Security Staffing.

j.      CCDOC may permit cross-watching on third shift in housing units that are not maximum security or Special Management Units only if the Monitor does not object after consultation and review. The Monitor's review of the appropriateness of third-shift cross-watching on a particular housing unit shall be guided by the sufficiency of sightlines between the units being cross-watched, the adequacy of video and/or audio technologies in place, and/or other factors that bear on the safety and security of inmates and staff. If the Monitor later objects to any cross-watching that is in effect because of the Monitor's concerns that cross-watching on a particular housing unit presents an undue risk to the safety and security of inmates and staff, CCDOC shall immediately cease such cross-watching. CCDOC may renew cross-watching on that unit again if, after further consultation with and review by the Monitor, the Monitor does not object to such renewal. Although cross-watching is permitted under the limited circumstances described herein, CCDOC will work to eliminate the practice at the Facility.

**September 2013 Compliance Status:** Substantial Compliance

**Status Update:** See 33.i.

**Monitor's Assessmen**t: See 33.i.

**Monitor's Recommendation:** Nothing at this time.

## 34.    Incidents and Referrals

a.      CCDOC shall continue to ensure that staff adequately and promptly document all reportable incidents, including inmate fights, rule violations, inmate injuries, suicides and suicide attempts, cell extractions, medical emergencies, contraband, vandalism, escapes and escape attempts, fires, and other incidents causing a disruption to standard CCDOC practice, in accordance with generally accepted correctional standards.

**September 2013 Compliance Status:** Substantial Compliance.

**Status Update:** CCDOC will be implementing a new information system/incident reporting system, but this does not impact continued substantial compliance with this paragraphs.

**Monitor's Assessment:** CCDOC produces monthly reports that capture this data in a usual form for the Sheriff and all of CCDOC's leadership. This information informs the Sheriff's weekly accountability meetings, as well as tracks trends.

The improvement I recommend is better collaboration between the Use of Force Review Unit and OPR regarding capturing use of force data. By agreement, OPR is currently the source of data. CCDOC may wish to propose a change to this as the UFRU improves and upgrades its resources. I am amendable to that change provided there are written directives governing the data collection.

**Monitor's Recommendation:** None at this time; awaiting a proposal regarding data collection regarding use of force.

## 34.    Incidents and Referrals

b.      CCDOC shall continue to ensure that correctional officers receive formal pre-service and in-service training on proper incident reporting policies and procedures, in accordance with generally accepted correctional standards.

**September 2013 Compliance Status:** Substantial compliance

**Status Update:** The Use of Force Review Unit provides quarterly data and recommendations to the training academy regarding improvements needed to reporting-related lesson plans and instructions

**Monitor's Assessmen**t:   There is a process in place to give feedback to the training academy for pre-service training, as well are provisions to provide remedial training to staff, based on the work of the UFRU.

**Monitor's Recommendations:**  None at this time.

## 34.    Incidents and Referrals

c.       CCDOC shall maintain a system to track all reportable incidents (as described in provision 34.a) that, at a minimum, includes the following information:
   1.  incident tracking number;
   2.  the inmate(s) name;
   3.  housing assignment;
   4.  date;
   5.  type of incident;
   6.  injuries (if applicable);
   7.  medical care (if applicable);
   8.  primary and secondary staff involved;
   9.  reviewing supervisor;
   10. external reviews and results (if applicable);
   11. remedy taken (if appropriate); and
   12. administrative sign-off.

**September 2013 Compliance Status:**  Substantial compliance

**Status Update:**  See 34.a.

**Monitor's Assessment:**  See 34.a.

**Monitor's Recommendation:**  Nothing at this time.

## 34.    Incidents and Referrals

d.        CCDOC shall require prompt administrative review of incident reports.  Such reviews shall include a case-by-case review of individual incidents as well as a systemic review in order to identify patterns of incidents.  CCDOC shall incorporate such information into quality management practices and take necessary corrective action.

**September 2013 Compliance Status:**  Substantial Compliance.

**Status Update:**  Remains in substantial compliance.

**Monitor's Assessment:**  See also 34.a.

**Monitor's Recommendation:**  Nothing at this time.

37

## 34.    Incidents and Referrals

e.    CCDOC shall ensure that incident reports, use of force reports and inmate grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria, that it is referred for investigation.

**September 2013 Compliance Status:**  Substantial Compliance.

**Status Update:**  See 31.q. regarding the grievances forwarded to OPR since 1/1/13.

**Monitor's Assessment:**  See 31.q.

**Monitor's Recommendation:**  See 31.q.

## 34.    Incidents and Referrals

f.    CCDOC [OPR] shall maintain policies, procedures and practices requiring investigations to resolve issues identified during review of incident reports, disciplinary hearings, or inmate grievances, and determine appropriate remedies, in accordance with generally accepted correctional standards.  At a minimum, CCDOC shall require timely and appropriate investigations of all suicides, serious suicide attempts, inmate-on-inmate violence resulting in serious injury, inmate-on-staff violence, inmate injuries requiring treatment by an outside hospital, inmate injuries of a suspicious nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.), sexual misconduct between inmates, sexual misconduct involving staff, fires, escapes, escape attempts, and deaths.

**September 2013 Compliance Status:**  Substantial compliance

**Status Update:**  See  31.q.

**Monitor's Assessment:** See 331.q

**Monitor's Recommendation:**  See 31.q.

## 34.    Incidents and Referrals

g.    CCDOC [OPR] shall ensure that any investigation reports indicating possible criminal behavior will be referred to the appropriate law enforcement authority.

**September 2013 Compliance Status:**  Substantial compliance

**Status Update:**  Remains in substantial compliance.

**Monitor's Assessment:**  I again reviewed 10 files in OPR, including those of my choosing based on recent allegations.  I find that OPR appropriately refers

allegations.  See previous note regarding willingness and promptness of the prosecutor to address referrals.

**Monitor's Recommendation:**  None at this time.  (See 31.m.)

**35.     Investigations** - Investigations at the Facility are conducted by independent departments under the Cook County Sheriff's Office, including the Office of Professional Review, the Criminal Investigations Unit, and the Sheriff's Police Department.  The Cook County Sheriff will assume responsibility for requiring these investigatory units to comply with the relevant provisions of this Agreed Order.

a.      CCDOC [OPR] shall maintain comprehensive policies, procedures, and practices for the timely and thorough investigation of alleged staff misconduct, in accordance with generally accepted correctional standards.

**September 2013 Compliance Status:** Substantial Compliance

**Status Update:**  Remains in substantial compliance.

**Monitor's Assessmen**t:  A concern regarding investigations is the backlog of use of force allegations that remain to be concluded; and the length of time to conclude the investigations.  This backlog threatens the credibility of OPR investigations in the eyes of some employees.    CCSO is aware of this issue and has assigned a counsel to review the outstanding cases, prioritize, and move forward.

I will evaluate the case backlog during the next tour, and anticipate progress.  If there is no progress, this may jeopardize the substantial compliance of this paragraph.

**Monitor's Recommendations:**  Implement a plan to address the backlog of cases.

**35.     Investigations**

b.      Internal investigations shall be conducted by persons who do not have supervisory responsibility for the staff member(s) being investigated.

**September 2013 Compliance Status**: Substantial compliance.

**Status Update:**   Remains in substantial compliance

**Monitor's Assessmen**t:   Nothing at this time.

**Monitor's Recommendations:** None at this time.

## 35.    Investigations

c.    CCDOC (OPR) shall ensure that all internal investigations will include timely, thorough, and documented interviews of all relevant staff and inmates who were involved, or witnessed, the incident in question.

**September 2013 Compliance Status**: Substantial compliance.

**Status Update:** Remains in substantial compliance.

**Monitor's Assessmen**t:  See 35.a. I'd like to see the backlog appropriately addressed, and more timely completions of investigations.  Will evaluate during next tour.

**Monitor's Recommendations:**  See 35.a.

## 35.    Investigations

d.    CCDOC [OPR] shall ensure that internal investigation reports shall include all supporting evidence, including witness and participant statements, policies and procedures relevant to the incident, physical evidence, video or audio recordings, and relevant logs.

**September 2013 Compliance Status**: Substantial compliance.

**Status Update:** Remains in substantial compliance.

## 35.    Investigations

e.    CCDOC [OPR] shall ensure that all investigatory staff will receive pre-service and in-service training on appropriate investigations policies and procedures, the investigations tracking process, investigatory interviewing techniques, and confidentiality requirements.

**September 2013 Compliance Status**: Substantial compliance.

**Status Update:** Remains in substantial compliance

**Monitor's Assessmen**t:  Nothing at this time.

**Monitor's Recommendations:** None at this time.

## 35.    Investigations

f.      CCDOC shall provide all investigators who will be assigned to conduct investigations of use of force incidents with specialized training in investigating use of force incidents and allegations.

**September 2013 Compliance Status**:  Substantial compliance.

**Status Update:**  Remains in substantial compliance.

**Monitor's Assessmen**t:  Nothing at this time.

**Monitor's Recommendations:**  None at this time.

### 35.      Investigations

g.      CCDOC [OPR] shall ensure that the results of each internal investigation shall be documented in an investigation report.  CCDOC administration shall review the investigation reports, along with the underlying documentation, and take appropriate action.  CCDOC shall implement appropriate remedies based upon the results of internal investigations.

**September 2013 Compliance Status:**        Substantial Compliance.

**Status Update:**   Remains in substantial compliance.

**Monitor's Assessmen**t:  Nothing at this time.

**Monitor's Recommendations:**  None at this time.

### 36.      Inmate Disciplinary Process

a.      CCDOC shall maintain policies, procedures, and practices for a formal disciplinary process, including prompt issuance of written disciplinary citations, administrative review and disciplinary reports for alleged minor rule violations, and due process for alleged major rules violations, in accordance with generally accepted correctional standards.

**September 2013 Compliance Status:** Substantial compliance

**Status Update:** Written directive [11.14.8.0] was effective 12/22/11.

**Monitor's Assessmen**t:   In addition to the directives noted above, CCDOC is finalizing a directive/Immediate notification that will provide further guidance for disciplinary reports.  I reviewed and commented on a draft dated 9/13/13.  I will evaluate the implementation of this directive during the next tour.

**Monitor's Recommendations:**  Continue to review the procedures associated with the inmate disciplinary process.

### 36.    Inmate Disciplinary Process

b.      CCDOC shall ensure that inmate disciplinary hearings are conducted in a reasonably private and secure setting.

**September 2013 Compliance Status:**  Substantial compliance

**Status Update:**   Remains in substantial compliance.

**Monitor's Assessmen**t: I was unable to observe any hearings during this tour and will do so during the next tour to assure on-going compliance with this order. CCDOC is also considering the use of real time digital video for hearings so that the hearing board can remain in one place, and the inmates brought to a single location in a division for their hearing.  Such an approach will speed up the process.

**Monitor's Recommendations:**  Superintendents assure compliance.  If CCDCO does decide to use real-time digital, develop evaluation criteria to assess effectiveness.

### 36.    Inmate Disciplinary Process

c.      CCDOC shall ensure that all inmates placed in lock down status are provided with appropriate due process that has been developed and implemented in policies and procedures, in accordance with generally accepted correctional standards.

In an emergency, the Executive Director of CCDOC may order a lock down of entire areas of the Facility in order to control the situation and address serious security concerns.  In such circumstances, it is not necessary to provide disciplinary hearings to each inmate affected by the lock down.  However, lock downs of this nature shall be limited to only the time and scope necessary to address the emergency.  For the purposes of this Agreed Order, a "lock down" shall not include the routine instances in which inmates are confined to their cells, including periods of count, over night, shift change, movement, and routine contraband sweeps.

**September 2013 Compliance Status:**  Substantial compliance.

**Status Update:**   Remains in substantial compliance

**Monitor's Assessmen**t: Nothing at this time.

**Monitor's Recommendations:** None at this time.

### 36.    Inmate Disciplinary Process

d.      CCDOC shall ensure that the disciplinary board's written record accurately reflects the testimony and discussion from the disciplinary hearing, including any recommendations from a

mental health professional regarding the extent to which disciplinary charges are related to an inmate's serious mental illness or suggestions for minimizing the deleterious effect of disciplinary measure on the mental health status of the inmate.

**September 2013 Compliance Status:** Substantial compliance

**Status Update:** Remains in substantial compliance

**Monitor's Assessmen**t:  See 36.a., b.  I will evaluate a sampling of disciplinary reports during the next tour.

**Monitor's Recommendations:**  See 36.a., b.

**36.    Inmate Disciplinary Process**
e.        CCDOC shall alert Cermak when inmates are placed in disciplinary segregation or protective custody.

**September 2013 Compliance Status:** Substantial compliance.

**Status Update:** I asked Cermak's leadership regarding notification.   As noted earlier in this report, Cermak reports that the systems are improving.

**Monitor's Assessmen**t:  Nothing at this time.

**Monitor's Recommendations:**  Continue to evaluate processes.

**36.    Inmate Disciplinary Process**
f.        CCDOC shall permit a Cermak Qualified Mental Health Staff member to serve on the disciplinary board.
**September 2013 Compliance Status:** Substantial Compliance.

**Status Update:** Cermak has declined to have a staff member sit on the disciplinary board.  Cermak reports that they have input, most of time, regarding mental health clients, help in pre-hearing segregation, prior to sentencing, and during their time in disciplinary segregation.

**Status Update:** Remains in substantial compliance.

**Monitor's Assessmen**t:  Nothing at this time.

**Monitor's Recommendations:**  Continue to evaluate processes.

**37.    Classification**

a.        CCDOC shall maintain policies and procedures for an appropriate, objective

classification system that separates inmates in housing units by classification levels in order to protect inmates from unreasonable risk of harm. The system shall include consideration of an inmate's security level, severity of current charge, types of prior commitments, suicide risk, history of escape attempts, history of violence, and special needs. CCDOC shall use best efforts to anticipate periods of unusual intake volume and schedule sufficient classification staff to timely classify inmates.

**September 2013 Compliance Status:** Partial compliance

**Status Update:** Dr. Hardyman has produced her final report in September 2013. The CCDOC needs to review that report, secure staffing, and set an implementation date (now projected for January 2014).

**Monitor's Assessmen**t: As I noted in my last report, I remain concerned that crowding will jeopardize the positive impact of the classification system. I am, overall, very impressed by CCDOC's initiative and strategy for this really massive and far reaching initiative.

Additionally, the system has been finalized to allow classification staff to access inmate disciplinary actions in prior incarcerations, an important element of determining the inmate's classification. This took an incredible amount of effort and technology and is now complete. This one action alone will make inmates and staff safer.

**Monitor's Recommendations:** Continue implementation efforts; focus on securing experienced staff to work in the classification unit; and assure training. CCDOC is planning to implement a classification unit, which will require development of policies/procedures, as well a looking at re-engineering the intake process.

## 37. Classification

b. CCDOC shall ensure that classification staff have sufficient access to current information regarding cell availability on each division.

**September 2013 Compliance Status**: Partial compliance.

**Status Update:** See 37.a.

**Monitor's Assessment:** See 37.a.

**Monitor's Recommendation:** See 37.a.

## 37. Classification

c.      CCDOC shall include information on each inmate's assignment to the Special Incarceration Unit "level system" at the Facility in the new Jail Management System, starting with the date the new Jail Management System becomes operational.

**September 2013 Compliance Status**:  Substantial compliance.

**Status Update:** No change from last report

**Monitor's Assessment:**  The CCDOC, as it implements the new classification system may phase out the Level system.

**Monitor's Recommendation:**  None at this time.

**37.      Classification**

d.      CCDOC shall provide training and access to all correctional officer supervisors on the full capabilities of the new Jail Management System's classification and inmate tracking system (or any replacement system).

**September 2013 Compliance Status:**  Substantial Compliance.

**Status Update:**  As noted in the Executive Summary, CCDOC will be implementing a new information management system.

**Monitor's Assessment:**  I am confident after meeting with the project team for soon-to-be-implemented information system that there will be adequate training for all employees.  A bonus is that now staff are accustomed to working with technology to the jump to the new system will not be as large as the IMAC implementation.

**Monitor's Recommendation:**  Assure that the new system builds in sufficient time for staff training, as well as a mechanism for identifying additional training needs, once implemented.

**37.      Classification**

e.      CCDOC shall provide ongoing internal and external review and validation of the inmate classification system to ensure its reliability and objectivity.

**September 2013 Compliance Status:**  Partial compliance.

**Status Update:**  See 37.a.

**Monitor's Assessment:**  See 37.a.  CCDOC will have a system validated using current data when implemented in January 2014.  CCDOC needs to develop

the process for future validation of the instruments.

**Monitor's Recommendation:** Develop the written plan/funding/resourcing for how CCDOC will periodically validate the new classification system. There is no reason that a jail system as large as Cook County can't do their own periodic validation, especially as the new information system will capture the indicators. The Sheriff may wish to have an outside entity periodically review internal data to confirm validity and/or make recommendations for modifications.

## 38.   **Inmate Grievance Process**

a.       CCDOC shall maintain policies and procedures to ensure inmates have access to an adequate grievance process and to ensure that grievances may be accessed and filed confidentially, without requiring the intervention of a correctional officer, in accordance with generally accepted correctional standards.   These policies and procedures should be applicable and standardized across all the Facility divisions.

**September 2013 Compliance Status:** Partial Compliance.

**Status Update:** The CCDOC has policies in place governing the inmate grievance process.    There have been issues regarding coordination between the CRWs and assurances that the grievance process works as needed in all divisions.

**Monitor's Assessmen**t:  CCDOC continues to devote resources to implementing an inmate grievance process that assures there are no barriers to inmates filing grievances; and that grievances are promptly reviewed for serious allegations, logged, provided to the appropriate entity for response, and responses returned to the inmates within the time lines.

CCDOC has been engaged in a pilot program in Divisions 5 and 6 to use CRWs to collect and process grievances.  An expansion of the pilot program is in place, looking to divisions 4 and 11 next.

**Monitor's Recommendations:** Continue the pilot program roll-out;  assess the impact – both process and through inmate interviews. Accepted correctional practice does not exclude security/custodial officers from being part of the grievance process, or handling grievances.  Ultimately, CCDOC may wish to involve officers, especially with the expansion of Inmate Behavior Management.

## 38.   **Inmate Grievance Process**

b.       CCDOC shall ensure that the grievances receive appropriate follow-up, including informing the grievant of the outcome, providing a timely written response, and tracking implementation of resolutions.

**September 2013 Compliance Status:** Partial compliance

**Status Update:** See 38.a.

**Monitor's Assessmen**t: See 38.a.

**Monitor's Recommendations:** See 38.a.

## 38.    Inmate Grievance Process

c.      CCDOC shall ensure that grievance forms are available on all units and are available in Spanish.  CCDOC shall ensure that there is adequate opportunity for illiterate inmates and inmates who have physical or cognitive disabilities to access the grievance system.

**September 2013 Compliance Status:** Substantial Compliance

**Status Update:** Written directive 11.14.5.0, Inmate Grievance Procedure, effective July 14, 2011 provides that the forms are available on all housing units, and assigned CRWs with the responsibility to assist inmates described in this above paragraph (VI.B.5.a)

**Monitor's Assessmen**t:   CCDOC is refining the grievance process, but is in compliance with this paragraph.

**Monitor's Recommendations:** Continue to monitor the effectiveness of the grievance process.  This current written directive needs to be amended to meet the grievance requirements of the Prison Rape Elimination Act of 2003 (relating to the length of time an inmate has to file a grievance).

## 38.    Inmate Grievance Process

d.      CCDOC shall ensure that inmate grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria, are referred for investigation.  A member of the management staff shall review the grievance tracking system regularly in order to identify areas of concern.

**September 2013 Compliance Status:** Substantial Compliance

**Status Update:** See 31.q.  Grievances are screened and allegations forwarded to OPR.  Not only does CCDOC's data indicate such, but I observed grievance forms in investigative folders.

**Monitor's Assessmen**t:   See 31.q.

**Monitor's Recommendations:** See 31.q.

### 39. Access to Information

a.      CCDOC shall ensure that newly admitted inmates receive information, through an inmate handbook or orientation video, regarding the following areas: facility rules and regulations; how to report misconduct; how to report sexual abuse or assault; the process for accessing medical and mental health care; emergency procedures; rules for sending and receiving mail; the visitation process; facility schedule; the disciplinary process; and how to seek redress of grievances.

**September 2013 Compliance Status:** Substantial compliance

**Status Update:** The written directive regarding Interpretation services was effective February 21, 2011 (11.5.95.0). The language line is available through the CRWs.

**Monitor's Assessmen**t: The new RTU provides a different venue for orientation, and improved workspace for interviewers. The PREA sexual safety instruments are not yet completed.

**Monitor's Recommendations:** Assess how the new RTU is assisting (or not) inmate orientation.

### 39. Access to Information

b.      CCDOC shall ensure that materials on facility rules and services are available for non-literate and non-English speaking inmates.

**September 2013 Compliance Status:** Substantial compliance.

**Status Update:** Substantial Compliance maintained

**Monitor's Assessmen**t: I did not have an opportunity to assess the frequency of CRW availability to non-English speakers, and will do that via interviews and log reviews during the next tour.

**Monitor's Recommendations:** Facility superintendents should assess how non-English speakers housed in their divisions are receiving information and services.

### 40. CCDOC shall provide training and supervision to all correctional officers and supervisors sufficient to implement the provisions of this Agreed Order.

**September 2013 Compliance Status**: Substantial Compliance.

**Status Update:** Continuing compliance

48

**Monitor's Assessmen**t:   There are no issues with continuing compliance.

**Monitor's Recommendations:**  Nothing at this time.

41.     **Inter-Agency Agreement**

a.      CCDOC shall enter into a written Inter-Agency Agreement with Cermak that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility.  The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order.

b.      Cermak shall enter into a written Inter-Agency Agreement with CCDOC that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility.  The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order.

**September 2013 Compliance Status**: Substantial compliance.

**Status Update:**  The agreements will be refined as time and experience with these issues matures.  Minutes are produced of meetings.

**Monitor's Assessmen**t:  Process is in place and appears to be working to resolve issues in a timely fashion.

**Monitor's Recommendations:** None at this time.

69.     CCDOC shall ensure that security staff posts will be equipped, as appropriate, with readily available, safely secured, suicide cut-down tools. Coordinate with Dr. Metzner

**September 2013 Compliance Status**: Substantial Compliance

**Status Update:**  The Suicide Prevention Committee continues to meet.  One area of concern was wear and tear on the cutting tools.  After examination, 9 were replaced.

**Monitor's Assessmen**t:  CCDOC reported the use of the cut down tool 16 times since the January 1, 2013.

**Monitor's Recommendations:**   None at this time.