**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**


**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**V.**

**COOK COUNTY, ILLINOIS;**              No. 10 C 2946
**THOMAS DART, COOK'COUNTY**
**SHERIFF (in his official capacity);**       Judge Virginia Kendall
**TONI PRECKWINKLE, COOK COUNTY**
**BOARD PRESIDENT (in her official capacity);**
**COOK COUNTY BOARD OF**
**COMMISSIONERS (in their official capacity),**

   **Defendants,**


# Monitor Harry E. Grenawitzke's Report No. 7

Harry E. Grenawitzke, RS, MPH, DAAS
Grenawitzke & Associates, LLC
50 Sheridan Drive
Monroe, MI 48162
E-mail: harry.grenawitzke@gmail.

# Executive Summary

## Corrections Monitor Harry E. Grenawitzke's Report #7
## November 8, 2013

This report represents the seventh assessment of continual progress made by Cook County Department of Corrections (CCDOC), Department of Facilities Management (DFM) and Cermak Health Systems (Cermak) to comply with the consent agreement between the United States Department of Justice Civil Rights Division and Cook County, to protect the constitutional rights of detainees housed at the Cook County Jail complex. The report reflects the findings during the September 16-20 onsite visit and information provided prior to and immediately following the tour provisions for fire, life safety and environmental conditions.

This report continues to demonstrate improvement by all parties to address the fire, life safety and environmental health provisions since the last visit in February, 2013. Based on observations and review of documents now 35 of the 39 provisions are now in "substantial compliance" and only four provisions remain in "partial compliance." Those 35 provisions are and will continue to be monitored to assure that they continue to be substantially compliant and sustainable over time. The leadership of the Sheriff, CCDOC management, and Department of Facilities Management continue to work collaboratively to identify and resolve issues. Paramount to the success of meeting the provisions is the culture change that continues to occur by the correction officers and support staff to change the way they manage the facilities and the inmates. Culture change grows slowly and steadily as one improvement leads to the next. The number of employees of Cook County who are significantly responsible for managing the consent agreement while still directing a large and seemingly ever increasing population of diverse detainees deserves recognition in this report. I continue to be impressed by the committed and dedicated leadership and mentoring provided by Sheriff Dart, CCDOC Interim Executive Director John Murphy and his team for their tireless efforts to seek solutions to continually improve the conditions within CCDOC. The leadership within the Department of Facilities Management to continue to make improvements and work cooperatively with CCDOC is one reason for the improvements reflected in this report. I also want to thank the Department of Justice for their oversight, counsel and trust in our work as budget issues have reduced their ability to be a part of the tours. Their presence is missed.

The management team of all departments including Director Murphy of CCDOC, Director D'Amico, and Interim Director Jesus Estrada at Cermak have in place are all committed to making CCDOC a safe and secure facility for the detainees being held there. Their leadership makes a difference. In many areas they are not only meeting minimum constitutional standards, they are far exceeding them.

I again want to thank employees of CCDOC, DFM, and Cermak for their responsiveness to my many requests for policy changes, reports, and documentation to demonstrate implementation and

sustainability of changes. The employees of all three organizations continue to be receptive to new ideas and alternatives to manage and resolve complex issues.

On this visit, I was able to spend considerably more time touring divisions, meeting and speaking with employees and inmates throughout the complex. Touring the kitchens demonstrated how well the new food service contractor has adapted their operations to CCDOC and has made significant positive changes to the entire feeding operation, again in many areas exceeding what would be minimal constitutional standards. The new RCDC facility is now operational; although there have been numerous issues as a result of less than acceptable planning and design. There are several notable positive changes from the previous report. They include:

1. All provisions of the consent agreement for food service are now in substantial compliance. CCDOC and CBM, the food service contractor, has worked diligently and cooperatively to improve food service sanitary conditions, provide a "heart-healthy" diet to all inmates, documented and effective training of employees and inmate workers, and environmental conditions in both kitchens.

2. There is continual improvement in laundry services throughout the facility. However, the laundry General Order needs to be revised to reflect current practice. Usage of the laundry service for personal laundry by inmates continues to improve, albeit slowly. CCDOC officers and supervisors are enforcing the no ropes and no washing of clothes in the cells and common showers. The hard plastic personal property boxes have been replaced by a soft-side bag that makes it extremely difficult for inmates to use to wash clothes.

3. The lighting replacement project is well ahead of schedule. DFM and its contractor have completed the re-lighting and fixture replacement in Divisions II, III, X, and XI. Divisions I is 95% complete and Division IV, VI, and IX are 75% complete. Division V is the only division where work has yet to commence. That should start soon once they receive and interpretation from Illinois Corrections Department.

4. Fire safety as demonstrated by drills, training records, reduced incidents of "cooking fires," controlled storage of flammable chemicals, and observation of significantly less flammable material being stored in cells demonstrate effective enforcement within the divisions and the dedication of the Fire Safety Committee who are now in the process of revising the two-year old existing General Order to assure it reflects current practice and address the new RCDC emergency evacuation procedures.

5. Of the 39 provisions included in my area of responsibility, this report identifies 35 are now in substantial compliance. Of those, 16 provisions have continued to be maintained in "substantial compliance for 18 months or longer and will no longer be a "primary" focus for future monitoring tours even though they are still active provisions of the Order. They include:

| **C-53e** | F-74 | F-80 | G-83e | G-83n | **G-84d** |
|-----------|------|------|-------|-------|-----------|
| **F-71** | F-77 | G-83a | **G-83l** | **G-83o** | |
| **F-72** | F-78 | G-83c | G-83m | G-84a | |

The six provisions that are bolded in the above chart have maintained "substantial compliance" for 18 months of this visit. These will be highlighted in "green" in the final report narrative.

There are 19 provisions in "substantial compliance". However, they have not yet been maintained in that status for 18 months. They include:

| C-53f | F-76 | F-82 | G-83g | G-83k | G-85b | G-85e |
|-------|------|------|-------|-------|-------|-------|
| F-73 | F-79 | G-83d | G-83h | **G-84e** | G-85c | |
| F-75 | **F-81** | G-83f | G-83j | **G-85a** | G-85d | |

The three provisions that are bolded in the above chart achieved "substantial compliance" as a result of this visit.

There remain four provisions that are designated "partial compliance". They include: G-83b, G-83i, G-84b, and G-84c.

As a result of this tour no provisions were lowered and there continue to be no provisions that are in "non-compliance."

During this visit, I identified several major concerns that need immediate attention by the County, Cermak, and CCDOC. They include:

1. As stated in the previous report, the ever increasing detainee population in the facility will make it challenging to effectively maintain "substantial compliance" for many of the provisions in the consent agreement. Overcrowding was clearly occurring in Cermak medical facility. Specifically medically compromised inmates in the existing Cermak facility are forced to live in rooms that are severely overcrowded. For example, in one cell (2261) there were 9 inmates living in one room that measured 16' by 18'. The "American Correctional Association Performance-Based Standards for Adult Local Detention Facilities", fourth edition Section 4-ALDF-1-A-10 states:

   "Multiple-occupancy rooms/cells house between two and 64 occupants and provide 25 square feet of unencumbered space per occupant. Where confinement exceeds 10 hours per day, at least 35 square feet of unencumbered space is provided for each occupant." Unencumbered space" is usable space that is not encumbered by

furnishings or fixtures. At least one dimension of the unencumbered space is no less than seven feet. In determining the unencumbered space, the total square footage is obtained and the square footage of the fixtures is subtracted. All fixtures must be in operational position for these calculations."

When you subtract 193 square feet of space for the four bunks located there plus the five "boats", only 95 square feet of unencumbered space is available for the nine occupants. In other words, there is only 10.5 square feet of unencumbered space per inmate. I observed conditions similar to the one described in at least 10 rooms on this tour. Time did not permit me to tour all housing rooms at Cermak.

2. The lack of any written effective sanitation plan for the existing Cermak medical facility continues to be the key factor for documenting compliance with provision G-83b. This is a repeat concern identified during the February tour. In the seven months since the last visit, little or no progress has been made. There is an apparent lack of leadership to address this issue to date even though responsibility for the plan was assigned. Additionally, during the tour it was clear that there continues to be an unresolved issue of whether Cermak or CCDOC is responsible for changing out, cleaning and maintaining mattresses, replacing those that are no longer serviceable for the hospital beds, bunks, and those used in boats. Cermak claims it is CCDOC's responsibility and CCDOC claim it is Cermak's responsibility. Yet there is no written directive from either CCDOC or Cermak that accepts the responsibility. To provide for accountability and sustainability, one organization needs to be responsible for administering the all-encompassing sanitation plan (once it is written) for the entire facility. Subsequent to the tour, I understand from CCDOC that Cermak will be assuming all responsibility for cleaning, sanitation, mattress cleaning, and replacement/repair. I stated in my previous report that as a medical facility, one would expect that the rooms, common areas, storerooms, toilets and showers must <u>always</u> be maintained clean, disinfected, well organized, and in good repair. This will continue to be a key focus of review and assessment between and during the next tour.

3. The continuing issue of an ever increasing jail population makes it imperative that efforts be taken to quickly begin a planning initiative to construct at least one new facility that should also include replacement for structures that are outdated and overly costly to maintain. A draft assessment has been prepared, but not yet released by the County

4. There is an extreme urgent need for Cermak to occupy the new RCDC facility to eliminate the overcrowding at the existing Cermak as discussed above. Apparently there was a considerable delay in procuring the medical equipment and Cermak made the decision not to move existing equipment and wait for the new equipment before occupying it. Further both Cermak and the Sheriff developed a list of design flaws that needed to be resolved before they would agree to occupy the facility and house the intended medical and mental health inmates for which it was designed, along with inmate intake and release

5. There continues to be a significant backlog in open work orders especially for plumbing and electrical trades. Additional staff has been allocated by DFM subsequent to the tour. However, that additional staff has not yet reduced the number of open work orders. In fact the number of open work orders has increased. CCDOC and DFM need to work cooperatively to assure timely repairs. If unresolved by the next tour substantial compliance with the provision will be lowered.

6. The entire Division X is in need of a major building initiative to clean and paint cells and dayrooms along with repairs to plumbing and electrical fixtures as necessary. Cells in tiers 4B and 4C are mostly covered in dried soot, are black. One inmate reported that he wash his own walls using bar soap to try to remove the soot. The result was dingy gray walls. This will most likely need to be expanded to include the entire Division once a complete assessment can be made by CCDOC management and DFM.

7. Considerable maintenance needs to be completed in Division XVII, Women's Justice to repair and/or replace windows, replace glazing compound on most windows, clean or replace window screens, thorough clean floors in rooms and common areas and assess to assure that adequate air flow and ventilation is provided. The laundry serving this Division needs to be cleaned and organized, eliminate electrical hazards, and assure laundry chemicals are secured.

8. Ongoing construction on the complex is resulting in increased rodent activity. Additionally a new contractor will be taking over pest control services beginning November 1, 2013. Support services will need to be diligent to assure there is no fallback in service considering the significant improvements observed over the last two years by CCDOC and the previous contractor..

For the March, 2014 tour, I will continue touring divisions, this time unannounced to monitor continual compliance with the provisions and effective implementation of General Orders and policies. I expect that there will be significant improvement in documented sanitation plan for Cermak and that there be marked improvement in overcrowding especially within Cermak facilities. Continue to make sure that improvements that are made will be sustainable over the long term and not merely a short term fix. As I explained in the exit interview, you will know you are where you want to be when you do not need to prepare for a monitor's visit.

Sincerely,

Harry E. Grenawitzke, RS, MPH, DAAS

**Summary September 20, 2013**

| Section | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| **C.** | **Medical Care** | | | |
| **C. 53** | **Treatment and Management of Communicable Disease** | | | |
| C. 53e | Cermak shall ensure that the negative pressure and ventilation systems function properly. Following CDC guidelines, Cermak shall test daily for rooms in-use and monthly for rooms not currently in-use. Cermak shall document results of such testing. | X 3/11<br>X 8/11<br>12/11<br>X2/13<br>**X9/13** | X 9/10<br><u>X 7/12</u> | |
| C. 53f | Cermak shall notify DFM, in a timely manner, of routine and emergency maintenance needs, including plumbing, lighting and ventilation problems. | <u>X7/12</u><br><u>X2/13</u><br>**X9/13** | X 3/11<br>X8/11<br>X12/11 | X 9/10 |
| **F.** | **Fire and Life Safety** | | | |
| F. 71 | CCDOC and DFM shall work together to develop and implement a fire safety program and ensure compliance is appropriately documented. The initial Fire Safety Plan shall be approved by the fire prevention authority having jurisdiction. The Fire Safety Plan shall be reviewed thereafter by the appropriate fire prevention authority at least every two years, or within six months of any revisions to the plan, whichever is sooner. Fire safety and emergency procedures shall be standardized across divisions, to the extent possible given differences in physical plant and security levels. | 12/11<br>X 7/12<br>X2/13<br>**X9/13** | X 9/10<br>X 3/11<br>X8/11 | |
| F. 72 | CCDOC shall develop and implement an evacuation plan for inmates and staff and ensure that comprehensive fire drills are conducted every three months on each shift. CCDOC shall document these drills, including start and stop times and the number and location of | 12/11<br>X7/12<br>X2/13 | Not Assessed 9/10 | |

| Section | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---------|----------|------------------------|--------------------|----------------| 
| | inmates who were moved as part of the drills. | **X9/13** | X 3/11<br>X 8/11 | |
| F. 73 | DFM shall ensure that the Facility has adequate fire and life safety equipment, including installation and maintenance of fire alarms and smoke detectors in all housing areas according to applicable fire codes. Maintenance and storage areas shall be equipped with sprinklers or fire resistant enclosures in accordance with City of Chicago Fire Code (13-76-010). | X 7/12<br>X2/13<br>**X9/13** | X 9/10<br>X 3/11<br>X8/11<br>12/11 | |
| F. 74 | DFM shall ensure that all fire and life safety equipment is properly maintained and routinely inspected. DFM shall develop and implement a program related to the testing, maintenance and inspection of the Life Safety Equipment. | X 3/11<br>X 8/11<br>12/11<br>X 7/12<br>X2/13 | X 9/10 | |
| F. 75 | CCDOC shall continue to ensure that emergency keys are appropriately marked and identifiable by touch and consistently stored in a quickly accessible location, and that staff are adequately trained in use of the emergency keys. | X2/13<br>**X9/13** | X 9/10<br>X 3/11<br>X 8/11<br>X12/11<br>X 7/12 | |
| F. 76 | CCDOC shall ensure that staff are able to manually unlock all doors (without use of the manual override in the event of an emergency in which the manual override is broken), including in the event of a power outage or smoke buildup where visual examination of keys is generally impossible. CCDOC shall conduct and document random audits to test staff proficiency in performing this task on all shifts, a minimum of three times per year. CCDOC shall conduct regular security inspections of all locking mechanisms. CCDOC shall communicate with DFM via the Work Order System regarding lock- | X2/13<br>**X9/13** | X 9/10<br>X 3/11<br>X 8/11<br>X12/11<br>X 7/12 | |

FINAL REPORT #VII

| Section | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | related issues and maintenance. | | | |
| F. 77 | DFM shall develop and implement an annual preventative maintenance program concerning security devices such as doors locks, fire and smoke barrier doors, and manual unlocking mechanisms to ensure these devices function properly in the event of an emergency. | X 3/11 <br> X 8/11 <br> 12/11 <br> X 7/12 <br> X2/13 <br> **X9/13** | Not Assessed 9/10 | |
| F. 78 | CCDOC shall implement competency-based testing for staff regarding fire and emergency procedures. | X 8/11 <br> 12/11 <br> X 7/12 <br> X2/13 <br> **X9/13** | Not assessed 9/10 <br> X- 3/11 | |
| F. 79 | CCDOC shall promptly notify DFM of all electrical hazards, including maintenance and repair of electrical outlets, devices, and exposed electrical wires. | X7/12 <br> X2/13 <br> **X9/13** | X 9/10 <br> X 3/11 <br> X 8/11 <br> X12/11 | |
| F. 80 | DFM shall promptly repair all known electrical hazards, including maintenance and repair of electrical outlets, devices, and exposed electrical wires and will document repairs by the Work Order System. | X 3/11 <br> X 8/11 <br> 12/11 <br> X7/12 <br> X2/13 | X 9/10 | |

| Section | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | | **X9/13** | | |
| F. 81 | CCDOC shall ensure that combustibles are controlled and eliminate hi8ghly flammable materials throughout the facility and inmate living areas (e.g., inmates 'use of paper bags as trash receptacles, ripped fire-retardant mattress covers, improvised cell light covers, blankets on cell floors, and improperly stored and labeled flammable liquids and other chemicals). | **X9/13** | X 3/11<br>X 8/11<br>X12/11<br>X 7/12<br>X2/13 | X9/10 |
| F. 82 | CCDOC shall ensure that fire safety officers are trained in fire safety and have knowledge in basic housekeeping, emergency preparedness, basic applicable codes, and use of fire extinguishers and other emergency equipment. | X7/12<br>X2/13<br>**X9/13** | Not Assessed 9/10<br>X 3/11<br>X 8/11 | |
| **G** | SANITATION AND ENVIRONMENTAL CONDITIONS | | | |
| **G. 83** | Sanitation and Maintenance of Facilities | | | |
| G. 83a | DFM shall maintain an adequate written staffing plan and sufficient staffing levels to provide for adequate maintenance of the Facility. | X 8/11<br>12/11<br>X 7/12<br>X2/13<br>**X9/13** | X 9/10<br>X 3/11 | |
| G. 83b | CCDOC shall revise and implement written housekeeping and sanitation plans to ensure the proper routine cleaning of housing, shower, and medical areas, in accordance with generally accepted correctional standards. Such policies should include oversight and supervision, including meaningful inspection processes and documentation, as well as establish routine cleaning requirements | | X 9/10<br>X 3/11<br>X 8/11<br>X12/11 | |

FINAL REPORT #VII

| Section | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | for toilets, showers, and housing units. | | X 7/12<br>X2/13<br>**X9/13** | |
| G.83c | DFM shall implement a preventive maintenance plan to respond to routine and emergency maintenance needs, including ensuring that shower, toilet, and sink units are adequately maintained and installed. | X 3/11<br>X 8/11<br>12/11<br>X 7/12<br>X2/13<br>**X9/13** | X 9/10 | |
| G. 83d | CCDOC shall notify DFM, in a timely manner, of routine and emergency maintenance needs, including plumbing, lighting, and ventilation problems. | X 7/12<br>X2/13<br>**X9/13** | X 8/11<br>X12/11 | X 9/10<br>X 3/11 |
| G.83e | DFM shall ensure adequate ventilation throughout the Facility to ensure that inmates receive an adequate supply of air flow and reasonable levels of heating and cooling. DFM staff shall review and assess compliance with this requirement on a daily basis for automated systems and on and annual basis for non-automated systems. | X 3/11<br>X 8/11<br>12/11<br>X7/12<br>X2/13<br>**X9/13** | X 9/10 | |
| G. 83f | CCDOC shall notify DFM of any visible obstructions to the ventilation system. | X 7/12<br>X2/13<br>**X9/13** | X 3/11<br>X 8/11<br>X12/11 | X 9/10 |

FINAL REPORT #VII

| Section | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| G. 83g | Cook County shall ensure adequate lighting in all inmate housing and work areas. | X2/13 **X9/13** | X 9/10 X 3/11 X 8/11 X12/11 X 7/12 | |
| G. 83h | CCDOC shall ensure adequate pest control throughout the housing units, medical units, RCDC, RTU, and food storage areas.  CCDOC shall maintain a contract for professional exterminator services for each division, food services areas, and the Cermak hospital. Services should provide for routine pest control spraying and additional spraying as needed. | X2/13 **X9/13** | X 9/10 X 3/11 X 8/11 X12/11 X 7/12 | |
| G. 83i | CCDOC shall ensure that all inmates have access to needed hygiene supplies. | | Not Assessed 9/10 or 3/11 X 8/11 X12/11 X 7/12 X2/13 **X9/13** | |
| G. 83j | CCDOC shall develop and implement policies and procedures for cleaning, handling, storing, and disposing of biohazardous materials, in accordance with generally accepted correction standards.  CCDOC shall ensure that any inmate or staff utilized to clean a biohazardous area are properly trained in universal precautions, are outfitted with protective materials, and receive | X2/13 **X9/13** | Not Assessed 9/10 | |

FINAL REPORT #VII

| Section | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | proper supervision when cleaning a biohazardous area. | | X 3/11 X8/11 X12/11 X7/12 | |
| G. 83k | DFM shall develop a policy on hazardous materials, in accordance with generally accepted correctional standards, and insure that all DFM staff is properly trained on the procedure. | X7/12 X2/13 **X9/13** | X8/11 X12/11 | X 9/10 X 3/11 |
| G. 83l | CCDOC shall provide and ensure the use of cleaning chemicals that sufficiently destroy the pathogens and organisms in biohazard spills. | X 8/11 12/11 X7/12 X2/13 **X9/13** | Not Assessed 9/10 X 3/11 | |
| G. 83m | CCDOC shall inspect and replace as often as needed all frayed and cracked mattresses. CCDOC shall destroy any mattress that cannot be sanitized sufficiently to kill any possible bacteria. CCDOC shall ensure that mattresses are properly sanitized between uses. | X 8/11 12/11 X7/12 X2/13 **X9/13** | X 3/11 | X 9/10 |
| G. 83n | CCDOC shall ensure adequate control and observation of all housing units, including distribution and collection of razors and cleaning supplies. All cleaning tools and hazardous chemical shall be removed from housing areas after use. | X 8/11 12/11 X7/12 | X 9/10 X 3/11 | |

| Section | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---------|----------|------------------------|--------------------|----------------|
| | | X2/13 **X9/13** | | |
| G. 83o | CCDOC shall ensure that Facility sanitarians receive training from a relevant state, national, or professional association with emphasis on assessment of environmental health practices and emerging environmental issues in correctional settings. Facility sanitarians should also have training on and access to testing equipment to ensure sanitary conditions. | 12/11 X7/12 X2/13 **X9/13** | X 9/10 X 3/11 X 8/11 | |
| **G. 84** | **Sanitary Laundry Procedures** | | | |
| G. 84a | CCDOC shall develop and implement policies and procedures for laundry procedures to protect inmates from risk of exposure to communicable disease, in accordance with generally accepted correctional standards. To limit the spread of communicable disease, CCDOC shall ensure that clothing and linens returned from off-site laundry facility are clean, sanitized, and dry. | X 8/11 12/11 X7/12 X2/13 **X9/13** | X 9/10 X 3/11 | |
| G. 84b | CCDOC shall ensure that inmates are provided adequate clean clothing, underclothing and bedding, consistent with generally accepted correctional standards, and that the laundry exchange schedule provides consistent distribution and pickup service to all housing areas. | | X 3/11 X 8/11 X12/11 X 7/12 X2/13 **X9/13** | X9/10 |
| G. 84c | CCDOC shall train staff and educate inmates regarding laundry sanitation policies. | | X 8/11 X12/11 | X9/10 X3/11 |

| Section | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
|  |  |  | X7/12<br><br>X2/13<br><br>**X9/13** |  |
| G. 84d | CCDOC shall ensure that laundry delivery procedures protect inmates from exposure to communicable diseases by preventing clean laundry from coming into contact with dirty laundry or contaminated surfaces. | 12/11<br><br>X7/12<br><br>X2/13<br><br>**X9/13** | X 9/10<br><br>X 3/11<br><br>X 8/11 |  |
| G. 84e | CCDOC shall require inmates to provide all clothing and linens for laundering and prohibit inmates from washing and drying laundry outside the formal procedures.<br><br>(* In the Monitor Report #V dated July 20, 2012; this provision was inadvertently recorded "substantial compliance." The provision should have been recorded "partial compliance.") | **X9/13** | X 9/10<br><br>X 3/11<br><br>X 8/11<br><br>X12/11<br><br>X7/12*<br><br>X2/13 |  |
| **G. 85** | **Food Service** |  |  |  |
| G. 85a | CCDOC shall ensure that all food service at the Facility is operated in a safe and hygienic manner and that foods are served and maintained at safe temperatures. | **X9/13** | X 3/11<br><br>X 8/11<br><br>X12/11<br><br>X 7/12<br><br>X2/13 | X9/10 |
| G. 85b | CCDOC shall ensure that all food service staff, including inmate staff, must be trained in food service operations, safe food handling | X7/12 | X 9/10 |  |

| Section | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | procedures, and appropriate sanitation. | X2/13 **X9/13** | X 3/11 X 8/11 X12/11 | |
| G. 85c | CCDOC shall ensure that the Central Kitchen and Division XI kitchen are staffed with a sufficient number of appropriately supervised and trained personnel. | X2/13 **X9/13** | X 9/10 X 3/11 X8/11 X12/11 X 7/12 | |
| G. 85d | CCDOC shall ensure that dishes and utensils, food preparation and storage areas, and vehicles and containers used to transport food are appropriately cleaned and sanitized. | X2/13 **X9/13** | X 9/10 X 3/11 X 8/11 X12/11 X 7/12 | |
| G. 85e | CCDOC shall check and record, on a regular basis, the temperatures in the refrigerators, coolers, walk-in-refrigerators, the dishwasher water, and all other kitchen equipment with temperature monitors to ensure proper maintenance of food service equipment. | X7/12 X2/13 **X9/13** | X 9/10 X 3/11 X 8/11 X12/11 | |

**STATUS REPORT**

**DATE OF STATUS REPORT:  9/20/13**

**PROVISION:  C. MEDICAL CARE**

**53.** Treatment and Management of Communicable Disease

   e. Cermak shall ensure that the negative pressure and ventilation systems function properly.
Following CDC guidelines, Cermak shall test daily for rooms in-use and monthly for rooms not currently
in-use.  Cermak shall document results of such testing.

**SEPTEMBER, 2013 COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE**

**Status Update:**  Briefly describe the actions taken by the Defendants to address the provision:

Since the July, 2012 tour the Department of Facilities Management (DFM) monitors and documents
negative air pressures for the 18 negative pressure cells and enunciator panel in Cermak once each shift.
A work order is entered and corrective action completed anytime air handling systems demonstrate
non-compliance.  Occupational and Environmental Hygiene Services at the Great Lakes Center for
Occupational and Environmental Safety and Health at the University of Illinois, Chicago, conducts a full
testing of the ventilation system in the AIIRs annually.  Copies of those reports are provided to the Chief
Medical Officer of Cermak.

**Monitor's Assessment:**   On this tour I verified that there was negative pressure in all negative pressure
cells.  The pressure testing by DFM is included on their Preventative Maintenance Schedule.  The checks
are documented in logs maintained by DFM. DFM provided a letter dated 1/16/13 from CEPro Inc.
stating that the repair recommendations from the Certification report have been completed and all
AIIR's meet the latest compliance requirements from CDC, Illinois Department of Health and ASHRAE.
The next scheduled certification is scheduled for January, 2014.  I reviewed selected monitoring data
provided by DFM to verify that regular monitoring was being performed as specified.

 **Monitor's Recommendations:**

   1.   No further recommendations.  This provision continues to be in substantial compliance.

**PROVISION:  C. MEDICAL CARE**

**53.** Treatment and Management of Communicable Disease

   f. Cermak shall notify DFM, in a timely manner, of routine and emergency maintenance needs,
including plumbing, lighting and ventilation problems.

**SEPTEMBER, 2013 COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE**

Status Update: Briefly describe the actions taken by the Defendants to address the provision:

Cermak, like CCDOC continues to process work orders through the "Facility Wizard" work order system utilized by Department of Facilities Management.   This includes all routine repairs and scheduled maintenance.  Cermak Environmental Services Director or Assistant Director of Plant Operations/Environmental Services submit all online work order requests as necessary and has the capability to monitor the status and progress made on all outstanding work orders daily.

**Monitor's Assessment:**  Describe the monitor's assessment of the status and documentation for the compliance status.

There has been no change since the last visit.  The interface for "Facility Wizard" has been operating effectively since April, 2012. Cermak can and does now track outstanding work orders through the online database.  As a result, this provision continues to be in "Substantial Compliance" with Consent Agreement.

**Monitor's Recommendations:**

1.  No further recommendations at this time.  Continue to demonstrate sustainability with the provision.

**PROVISION:  F. FIRE AND LIFE SAFETY**

**71.**  CCDOC and DFM shall work together to develop and implement a fire safety program and ensure compliance is appropriately documented.  The initial Fire Safety Plan shall be approved by the fire prevention authority having jurisdiction.  The Fire Safety Plan shall be reviewed thereafter by the appropriate fire prevention authority at least every two years, or within six months of any revisions to the plan, whichever is sooner.  Fire safety and emergency procedures shall be standardized across divisions, to the extent possible given differences in physical plant and security levels.

**SEPTEMBER, 2013 COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE**

**Status Update:**

The Interagency Committee created the Fire Safety Committee (FSC) in August, 2010, continues to meet monthly to address the provisions of the consent agreement regarding fire and life safety and do discuss improvements to the emergency system.  The committee consists of representatives from the Office of the Sheriff, Department of Corrections, Cermak Health Services, and the Department of Facilities Management.  The CCDOC division specific fire evacuation and emergency plans have been reviewed by the City of Chicago Fire Department. The Chicago Fire Department in correspondence dated Dec. 24, 2012 has accepted the CCDOC Fire Evacuation and Emergency plans and the General Orders as written. Further the City of Chicago completed an inspection of CCDOC and found either full compliance with previously identified violations or that they were in the process of being corrected.   Currently a fire prevention inspector from the
Chicago Bureau of Fire Prevention visits the complex and alerts the personnel to common problems

related to fire safety. Unannounced fire drill are conducted regularly on a schedule and attended by an inspector from the Fire Prevention Bureau.

CCDOC, DFM, and Cermak issued the Interagency Directive, 64.5.30.0, effective date of August 22, 2011. The purpose of which is to establish the policy and procedures for Fire Safety Plans, fire emergencies, and evacuations within CCDOC. It establishes the respective roles and responsibilities of the CCDOC, Cermak, and DFM relating to Fire Safety Plans, emergencies and evacuations. CCDOC now has a designated fire safety administrator and each division has safety officers assigned for each shift including weekends and holidays. Supervisor training on Fire Safety is every other month. Correction Officer Fire Safety Training is offered weekly at the Moraine Valley Community College. The classes are taught by Director of Policy and Accountability, Michael Brady, who also chairs the Fire Safety Interagency Committee. The procedures require that divisional Safety Officers conduct weekly fire safety inspections of all housing, administrative, medical clinics, storerooms, maintenance rooms, classrooms, and common areas within their respective divisions and that fire drills be conducted quarterly on each shift in all divisions.

**Monitor's Assessment:**

Since its inception, I have continued to receive and review the summaries of all meetings of the Interagency Fire Safety Committee with an opportunity for input. I have also reviewed and provided comments to the committee on the initial draft Fire Safety Plan that resulted in several changes and additions to it. The Interagency Directive continues to be in effect. Since October, 2011 drills continue to be conducted throughout the entire complex more frequently than required in the Interagency Directive. There is a post drill review of every drill.

In March, 2013, the Chicago Fire Department completed and gave occupancy permission for the new RCDC.

Since April, 2013 the Fire Safety Committee, along with the CCDOC Director and division superintendents are now monitoring and investigating fires in all divisions and providing a written report. This includes all "cooking" fires started by inmates. Inmates "cooking" in cells formerly were occurring in most divisions housing male inmates in most divisions. With stricter enforcement and the implementation of the microwaves incentive program, the only Division IX continues to have fires. However, rather than a daily occurrence on most floors, since May, it has been reduced to less than 10 per month throughout the entire division. This Division houses higher classification inmates who have little regard for rules. Some commissary items that could be heated and that were previously available to inmates there have been eliminated. While still not acceptable, it is a marked improvement. Reinforcing the no "cooking" ban and effective supervision will reduce this even further. Division XI which formerly had numerous daily fires that were considered "acceptable" by officers, has, as of this visit eliminated "cooking" related fires through the introduction of microwaves.

There is always a designated and trained fire safety officer on duty in each division on all shifts.

As General Order 64.5.30.0, Fire Safety, Fire Emergency, and Fire Evacuation Interagency Directive was effective August, 2011, is currently under revision as it has been in effect for two years and needs to be updated to reflect changes including the new RCDC emergency procedures.

The fire safety and evacuation plan for the new RCDC facility is now complete and the building now includes painted "red" arrows throughout the facility marking evacuation routes to "safe" zones.

While there will always be recommendations to continue maintaining and improving the system, the provision continues to be in substantial compliance.

**Monitor's Recommendations:**

1. Continue the fire safety training for all correction officers. Assure that correction officers assigned to a specific division understand the fire safety plan for that division and substantially demonstrate effective implementation of it during an emergency.

2. Complete the formal review of the Interagency Directive for Fire Safety, Fire Emergency, and Fire Evacuation General Order 64.5.30.0 during this calendar year and at least every two years thereafter in accordance with the consent agreement.

3. Continue the unannounced fire drills on all shifts as planned, along with a review of each drill completed by the CCDOC Safety Administrator. Document any corrective actions taken for any identified non-conformances. The Interagency Fire Safety Committee should also review quarterly results of fire drills and make adjustments to the Safety Plan as necessary.

4. Add floor numbers on the pillars so that in case of smoke or fire, the staff will know the floor they are on as the upper floors are virtually identical in layout.

**72.** CCDOC shall develop and implement an evacuation plan for inmates and staff and ensure that comprehensive fire drills are conducted every three months on each shift. CCDOC shall document these drills, including start and stop times and the number and location of inmates who were moved as part of the drills.

**SEPTEMBER, 2013 COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE**

**Status Update:**

Based on the correspondence referenced in Provision 71 above, the Fire Evacuation and Emergency Plans specific to all divisions have been reviewed and found to be acceptable by the Chicago Fire Department. CCDOC is currently conducts one fire drill per month on each shift including the movement of inmates for each division. While the consent agreement is not clear as to whether the drill frequency is for the entire complex or within each Division, the intent is that all divisions are drilled 12 times annually over all three shifts. Wally Schroeder, trainer from the Chicago Fire Department was very confident based on his witnessing of several drills that officers know how to effectively move inmates

quickly and safely.  The Interagency Directive for Fire Safety, Fire Emergency, and Fire Evacuation is complete.  This provision is clearly being met.

**Monitor's Assessment:**

On this visit, I did not witness any fire drills.  I did review a report summary of drills that identified the strengths and weakness identified during the drills.  Strengths include that divisions are moving detainees rather than conducting mock drills with no movement and are conducted in various locations of each division.  Extinguishers are brought to the drill locations.  Weaknesses identified include an inconsistency in announcing inmate counts over the radio and divisions not notifying External Operations to contact the City of Chicago and Cermak Medical.  The summaries continue to demonstrate the effectiveness of the training provided to officers.

**Monitor's Recommendations:**

1.  Continue fire drills on the monthly schedule for each shift and Division with documentation that follows the agreed order.  Maintain an updated record showing the last date any housing unit has conducted a fire drill to be able to demonstrate that drills are reasonable being spread throughout each Division.

2.  Maintain and provide me with a list of dates and locations of all fire drills completed for  2013 in January, as evidence of drill completion.

---

**73.** DFM shall ensure that the Facility has adequate fire and life safety equipment, including installation and maintenance of fire alarms and smoke detectors in all housing areas according to applicable fire codes.  Maintenance and storage areas shall be equipped with sprinklers or fire resistant enclosures in accordance with City of Chicago Fire Code (13-76-010).

**SEPTEMBER, 2013 COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE**

Status Update:

The Department of Facilities Management (DFM) has the responsibility to provide and maintain all fire and life safety equipment within the CCDOC complex.  All housing areas, kitchens, maintenance facilities etc. are provided with fire extinguishers, fire alarms and smoke detectors in accordance with the City of Chicago Fire Code.  Testing and maintenance is conducted annually on all fire and life safety equipment and is provided by locally licensed companies under contract with DFM.  DFM additionally has documented the location all applicable fire and life safety equipment including fire alarms, smoke detectors, fire extinguishers, fire panels, egress boxes containing keys, flammable cabinets, and a division specific chemical inventory list throughout the complex.  They have installed flammable cabinets in all maintenance shops where flammables are stored and used.  All flammables used by DFM are stored effectively within those designated cabinets. DFM has established policy (09-03-04) for safe

and effective storage of all hazardous materials.  They have created a binder that is sorted by division and by floor and have color coded the location of all mechanical shops, mechanical rooms, closets, stairwells, plumbing chases, fire panels, and evacuation key egress boxes.  This includes the new RCDC. A copy of the binder has been provided to the Chicago Fire Department, each division's fire safety office, and the Director of Policy and Accountability, Mike Brady.  DFM provides updates at the Fire Safety Committee meetings and the Sanitarian provides the updates to the Superintendents.

**Monitor's Assessment:**

The only change since the previous tour is that a binder has been completed for the new RCDC.   The provision continues to be in substantial compliance.  DFM maintains an up-to-date list of all fire safety and emergency devices including alarms, extinguishers, strobes, pull stations, and extinguishers for each division.  I reviewed the binder described above and found it to be well organized and a valuable tool in case of an emergency.   Each division's fire safety office maintains a copy of their division's floor plan and inventory book.  Between June and August, 2013, Engineering Security & Sound Inc. and Door Systems Inc. have completed the annual fire alarm testing and annual fire door inspections for CCDOC as required by the City of Chicago and overseen by DFM.

The DFM policy requires that all hazardous materials be stored in clearly marked, safely and effectively stored in a designated storage area.  It also requires that an inventory of all hazardous materials be maintained showing the name, quantity, hazard and location.

The Chicago Fire Department has observed the placement of flammable cabinet locations and although they will not provide a written acceptance as described in Provision 71 above, their representative stated that the storage locations were acceptable.

I did review the "Testing, Inspection and Maintenance Record" for all fire and life safety required testing.  It shows the dates of completion for annual testing for fire alarms and detection, monthly testing of fire pumps, weekly and annual testing of generator and transfer switches, and elevators. Required testing was completed as required.

This provision continues to in substantial compliance with the consent agreement.

**Monitor's Recommendations:**

1.   No further recommendations at this time.

**74.**  DFM shall ensure that all fire and life safety equipment is properly maintained and routinely inspected.  DFM shall develop and implement a program related to the testing, maintenance and inspection of the Life Safety Equipment.

**SEPTEMBER, 2013 COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE**

**Status Update:**

Facilities Management continues to implement their policy #10-01-01, "Required Testing, Inspection, and Maintenance of Life Safety Systems." This policy and procedure outline required testing in accordance with NFPA requirements. It includes weekly and monthly generator testing, monthly fire department connections inspection, monthly fire pump churn testing, monthly fire extinguisher inspection, annual fire pump testing, annual fire alarm testing, annual main drain testing, and annual elevator testing. Included in the policy is the requirement for documented corrective action when non-conformities are identified. Required testing, inspection, and maintenance for all life safety systems are scheduled and maintained through the "Facility Wizard" work order system as part of the preventative maintenance program.

DFM is in the process of implementing a bar code system for all existing fire extinguishers. Through the bar code, staff assessing the fire extinguishers can utilize handheld devices to document the time and date when any extinguisher is checked.

**Monitor's Assessment:**

I did not observe any issues during this tour. All fire extinguishers I checked throughout the complex had been inspected and the tags updated as required. The annual inspection of the fire alarms and fire door inspections, fire pumps, generators, and elevators are referenced in Provision 73 above.

**Monitor's Recommendations:**

1.  No further recommendations at this time.

**75.** CCDOC shall continue to ensure that emergency keys are appropriately marked and identifiable by touch and consistently stored in a quickly accessible location, and that staff are adequately trained in use of the emergency keys.

**SEPTEMBER, 2013 COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE**

**Status Update:**

The Security and Key Control Interagency Directive was issued effective January 1, 2012. It requires that each Division have a "red" emergency key box in the control room. That box holds the key that opens a second box containing an emergency key for all housing unit doors. The key box is locked and has a security seal that has to be broken to gain access. The policy further requires that any time the seal is broken, including during an emergency, the Watch Commander must be notified, an incident report written, and a work order written requiring DFM locksmith to reseal the box.

All emergency egress keys are color coded and have a two inch glow stick attached to the key ring. Restricted keys are those specifically assigned to designated personnel with the authority of the respective division superintendent or DFM's Deputy Director/OEIV. These keys are color coded differently than the egress keys. General keys are specific designated keys for everyday use such as for

the library, classrooms, recreation rooms, etc., and are also color coded. Emergency access keys for all DFM maintenance shops and mechanical rooms and closets are currently maintained in the Superintendent's office of Division XI. As of this tour emergency keys for DFM shops for Divisions I, II, III, IV and V are housed in the Superintendent's office in Division V. Emergency keys for Divisions VI, IX, X and the new RCDC are housed in the Superintendent's office in Division IX. Division XI will continue to maintain the keys for shops in Division XI.

**Monitor's Assessment:**

The glow sticks are currently installed in all divisions. In monitoring emergency key boxes on this tour I found in a few instances that the glow sticks were missing and needed replacement. This includes Division III and X. Further in only in Division III, I found that the emergency flash lights were not functioning. Other division checked including I, IV, X, and XI were functioning. Staff in all divisions with the exception of Division III effectively demonstrated to me what they would do if a fire was detected or a fire alarm pulled. In Division III were several staff who do not work there regularly that did not know the emergency procedures for the area or division they were assigned. I noted that there needs to be regular documented training for any officer who is temporarily assigned to any division because of staff shortages on any given day. During the tour of Division XI, I found that the DFM emergency key box was not accessible. It was repaired the following day. That said, the inspection program for each division needs to include a check of glow sticks, flashlights, and emergency keys

**Monitor's Recommendations:**

1.  Develop and implement effective divisional specific fire safety training for officers who are temporarily assigned to any division of what to do in case of a fire or emergency and the location of emergency keys.

2.  DFM needs to check on a prescribed frequency the accessibility of DFM emergency boxes. I would suggest quarterly, as part of DFM fire and life safety inspections.

3.  Include as part of the divisional documented fire safety inspections an assessment for functional operation of all flashlights, the color coded key tags, and assure glow sticks are on each ring. The fire safety committee needs to assure that an effective process is in place.

**76.** CCDOC shall ensure that staff are able to manually unlock all doors (without use of the manual override in the event of an emergency in which the manual override is broken), including in the event of a power outage or smoke buildup where visual examination of keys is generally impossible. CCDOC shall conduct and document random audits to test staff proficiency in performing this task on all shifts, at a minimum of three times per year. CCDOC shall conduct regular security inspections of all locking mechanisms. CCDOC shall communicate with DFM via the Work Order System regarding lock-related issues and maintenance

**SEPTEMBER, 2013 COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE**

**Status Update:**

Emergency keys for each division are stored in a secure control room. All keys have been equipped with glow sticks that will easily allow staff to identify a specific key in the case where vision is impaired because of smoke or fire. The Fire Safety Committee explained that on every shift, the officer assigned to the unit or tier inspects all locking mechanisms and reports any issues through the DFM work order system. The Fire Safety Committee has implemented an "Egress Key Exercise for each Division on all shifts by all personnel.. Egress keys are also part of the routine fire drills that have been conducted as described above.

**Monitor's Assessment:**

During this visit, I did test staff proficiency of what to do in case of an emergency including the availability of accessing the emergency key box, emergency keys in Divisions III, IV, and X. With the exception of Division III as noted above, all demonstrated effective knowledge. This provision will be reassessed during the first 2014 tour. In a couple of instances, glow sticks were missing from the rings.

**Monitor's Recommendations:**

1. Continue testing the egress key exercise for all divisions. This should be done at least as part of all fire drills to assure effective implementation in case of an emergency.

2. Implement a program for temporary assignment of staff to cover shortages of regular staff.

3. Provide evidence that the testing of door locks and what to do if a lock fails is included on the correction officer's training syllabus.

**77.** DFM shall develop and implement an annual preventative maintenance program concerning security devices such as doors locks, fire and smoke barrier doors, and manual unlocking mechanisms to ensure these devices function properly in the event of an emergency.

**SEPTEMBER, 2013 COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE**

**Status Update:**

The annual inspection of door locks, fire and smoke barrier doors, and manual unlocking mechanisms is included on the "Facility Wizard" work order system as a standing order. The annual inspections are completed by the same contractor that inspects smoke detectors, fire alarms, and smoke detectors.

**Monitor's Assessment:**

Between June and August, Door Systems Inc. completed its 2013 annual inspection of all door locks, fire and smoke barrier doors, and manual unlocking mechanisms through the same outside vendor that inspected smoke detectors, fire alarms and smoke detectors. I will continue to monitor compliance with this provision.

**Monitor's Recommendations:**

1.    Continue the monitoring program as scheduled.

2.    No further recommendations.

**78.**  CCDOC shall implement competency-based testing for staff regarding fire and emergency procedures.

**SEPTEMBER, 2013 COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE**

**Status Update:**

CCDOC through the Interagency Fire Safety Committee has implemented the competency based safety officer proficiency examination.   It is given to all safety officers.  They have also completed training for most divisional supervisors and shift commanders.  The test is based on the Interagency Directive for Fire Safety, Emergency, and Evacuation.  There are currently two different versions of the test that can be alternated between classes or trainings. The Directive specifically outlines that fire safety orientation for correction officer during the annual training program in accordance with the current CCDOC General Order.  CCDOC has issued the division specific Orientation Handbook.  It is the responsibility for all CCDOC staff to fully understand expectations and responsibilities for a variety of safety and sanitation topics.  It includes sections on Safety and Sanitation Inspections of Living Units (General Order #24.9.9.0), Fire Safety (Interagency Directive #64.5.30.0), Egress Keys, Chain of Command, Inmate Count Procedures, and Compound Lockdown Levels. Each handbook includes a floor specific site map identifying key areas specific to safety within the division.

**Monitor's Assessment:**

The competency based fire and emergency evacuation safety officer proficiency exam was initiated in August, 2011.  The passing score for the exam is 80%.  Safety classes were most recently held in January and September 2013.  142 officers successfully passed the written exam and are recognized as safety officers. This is in addition to the 83 provided training earlier in 2012. Further all officers receive fire safety training as part of their annual training program.  DFM and representatives of Cermak and the Central Kitchen have been included in the training. There are questions of the annual training test that address fire safety.

One issue identified during this tour involved the lack of training provided to Administrative Relief Team (ARTs).  These are officers who are assigned to housing units within Divisions to cover for absentee officers as necessary.  The Fire Safety Committee has recognized the issue and will be adding a division specific training provision for ARTs whenever they are assigned to a specific division.

**Monitor's Recommendations:**

1.    Continue training and testing until all divisional fire safety officers for all shifts have completed the training and demonstrated their competency

2.  Develop and implement a division specific training program for ARTs. Provide me with a copy of the training outline, the assigned responsibility for the training and the time frame for the training (upon each assignment, weekly, etc.)

3.  Establish a course syllabus (topic outline) for each division's training program and identify the designated trainer responsible providing the training.

4.  Continue to identify and maintain documentation of those officers who do not perform up to expectation during regular drills and actual events. Prior to my next visit, please provide evidence of the remedial training and the list of officers who have completed it. While an officer may have successfully passed the written examination, the validation of the training is how they actually perform during drills and actual events

**79.** CCDOC shall promptly notify DFM of all electrical hazards, including maintenance and repair of electrical outlets, devices, and exposed electrical wires.

**SEPTEMBER, 2013 COMPLIANCE STATUS:   SUBSTANTIAL COMPLIANCE**

**Status Update:**

There is no change from the previous report. The Interagency directive for fire safety provides that each division safety officer conduct weekly fire safety inspections of all housing, administrative offices, medical clinics, shops, maintenance rooms, classrooms, and common areas. Each week the inspection is completed by a different shift's safety officer. For example, week one is first shift, week two is second shift etc. The weekly completed reports are then submitted to the division's Superintendent by the end of the inspection week. Any "life safety" deficiencies are reported immediately to the respective division superintendent, an incident report is filed, and DFM is notified via their emergency number. The weekly inspection form includes monitoring of electrical outlets and covers, electrical cords and plugs, fire extinguishers, assuring sprinklers are unobstructed, exit ways are unobstructed, exit signs are illuminated, garbage and combustible refuse removed, and assurance that flammable materials are stored only in designated fire safe cabinets.

At the end of each month the second shift safety officers are required to complete and submit a copy of the monthly deficiency report to the respective division superintendent noting any unresolved deficiencies. Further the CCDOC Safety Administrator is required to provide a status report at the following meeting of the Interagency Fire Safety Committee. All unresolved non-conformances after 30 days are referred to the Executive Directors of CCDOC and DFM for resolution.

CCDOC is fully integrated with the DFM "Facility Wizard" work order system. A review of the number of work orders filed by each division shows a marked increase in timely work orders being submitted and work completed by DFM maintenance trades. This includes electrical problems.

**Monitor's Assessment:**

During this tour, I visited housing units in Divisions I, III, IV, X, XI, XVII and Cermak.   I did not identify any electrical issues with the exception of light fixtures that are in the process of being replaced through a capital project and excess extension cords being used in the Division XVII laundry.  See Provision G.  I did note in my meetings with DFM that there continue to be a significant number of open electrical work orders at the end of each month (For the week of Sept. 16, 2013 there were 390 open or pending work orders for electrician and electrician technicians).  In response, DFM has increased the number of electricians by two to address the backlog.  This same backlog has existed for some time and represents roughly 25% of the open and pending work orders.  This should have an immediate impact. However this provision is for CCDOC to report electrical issues and as such is in compliance.

**Monitor's Recommendations:**

1.  DFM needs to continue to monitor progress in resolving electrical work orders to assure that the backlog is reduced and decide if the number of electricians and techs need to be increased permanently.

2.   Continue to monitor and investigate all fires in all Divisions.  Inmate "cooking" must be strictly prohibited.

3.   No later than February 1, 2014, provide me with either a summary of inspection reviews and implemented corrective actions or copies of the reports from each division.  I want to review them prior to my next visit.

4.  Continue to provide me with monthly reports that demonstrate whether the continuing backlog is being reduced, as anticipated with the additional trade staff assigned to CCDOC.

**80.**  DFM shall promptly repair all known electrical hazards, including maintenance and repair of electrical outlets, devices, and exposed electrical wires and will document repairs by the Work Order System.

**SEPTEMBER, 2013 COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE**

**Status Update:**

The priority system established by DFM to track and monitor resolution of all maintenance requests has worked successfully since implemented in August, 2010.  It assures timely response to work order requests, including electrical hazards, filed by CCDOC and Cermak.  Electrical hazards are a first priority for response by DFM.  Ongoing Interagency meetings serve as the vehicle to address any outstanding issues including electrical hazards.

The DFM "Facility Wizard" system for reporting, processing, and tracking work orders monitors completed and pending work orders by facility and/or trade. Daily CCDOC and Cermak can monitor

progress or lack thereof for all outstanding work orders and follow up with DFM as necessary to assure timely response and repairs to electrical hazards.

**Monitor's Assessment:**

The only change since the last report is that there continues to be a backlog in completing electrical work orders. As I reported in the previous section as of September 8 there were 398 pending electrical work orders which represent approximately 22% of all pending work orders (1823). To put that in perspective, the total number of work orders completed year-to-date for all trades are 39,969, of which 10,969 (27%) represent completed electrical jobs. Electrical issues are considered a first priority within the DFM priority system. Electrical and fire safety work order requests are typically addressed either the same day or the next unless there is a delay for ordering parts. Occasionally a weekend or holiday a request may be completed the following day. "Emergency" orders are typically handled within hours of the request.

As a result of our discussion during the tour DFM management has reallocated 2 electrical positions to CCDOC until the backlog is significantly reduced and the current staff assigned is able to maintain timely closures. As I have indicated in past reports, the replacement of the lighting fixtures will reduce the number of electrical issues as inmates will no longer have access to exposed wires and sockets from the old incandescent bulbs and inmate broken fixtures. I will continue to monitor the backlog each month on reports provided. As of this tour, the provision will remain in substantial compliance as DFM has taken proactive steps to address the backlog.

**Monitor's Recommendation:**

1. Continue monitoring the backlog each month and reallocate electricians and electrical technicians as necessary to assure timely correction of electrical issues.

2. At least monthly DFM management need to review the time from receipt of a work order to its closure to assure that all electrical work orders are addressed as a first priority. I will continue to monitor those reports.

---

**81.** CCDOC shall ensure that combustibles are controlled and eliminate highly flammable materials throughout the facility and inmate living areas (e.g., inmates' use of paper bags as trash receptacles, ripped fire-retardant mattress covers, improvised cell light covers, blankets on cell floors, and improperly stored and labeled flammable liquids and other chemicals).

---

**SEPTEMBER, 2013 COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE**

**Status Update:**

The revised General Order 11.1.0 "Sanitation Procedure and Inspection" is in effect, as is the CCDOC Master Sanitation Plan. Division specific sanitation plans for all divisions are also now complete. Its uniform and consistent implementation, with tier officer enforcement including accountability from

supervisory officers will reduce the amount of combustibles within housing units. The efforts of the "Compliance Team" to reduce the amount of combustibles and flammable materials, and improve overall sanitation within the housing units have been effective. The replacement program for new lighting fixtures has also contributed to less improvised light covers, as incandescent light bulbs are in most cases eliminated.

DFM has significantly improved the storage of flammables in their shops by maintaining them in designated secure cabinets. As discussed in Provision 73, DFM has completed the color-coded map and inventory of all flammable and hazardous chemicals and provided it to CCDOC division safety officers and Safety Administrator. So within each division, there is an up-to-date inventory of all flammables being stored in that specific division. The inventory is maintained by DFM and is readily available to first responders in case of an emergency.

**Monitor's Assessment:**

My assessment of housing units during this tour revealed significantly less flammable materials in the cells and dayrooms. I observed far less "extra" blankets, paper bags (only one is allowed per inmate for waste from commissary, and they are emptied daily.) I suggest that only one paper bag be allowed per cell, not per inmate throughout all divisions. I will continue to monitor progress in other divisions in subsequent tours. Division IX continues to have some issues with unauthorized fires used for cooking food by inmates. However, it is now being tracked and is significantly reduced over the last couple of months. Superintendents are now required to report weekly about fires and "cooking" at the pre-accountability meetings.

This provision is now in substantial compliance with the provision.

**Monitor's Recommendations:**

1. Continue to track fires within all housing units of all divisions. Investigate the root cause and implement a corrective action plan to include strict discipline for offending inmates.

2. Continue to enforce the General Order on how much linens, blankets, and paper bags are allowed in cells. I suggest that throughout the facility, there be one bag allowed per cell, not one per inmate.

3. Investigate alternatives to flammable paper bags for inmates to collect refuse.

**82.** CCDOC shall ensure that fire safety officers are trained in fire safety and have knowledge in basic housekeeping, emergency preparedness, basic applicable codes, and use of fire extinguishers and other emergency equipment.

**SEPTEMBER, 2013 COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE**

**Status Update:**

The Interagency Directive for Fire Safety, Fire Emergency, and Fire Evacuation was issued effective August 19, 2011.  The policy establishes that all CCDOC employees must receive training and become well-versed in the fire safety, emergency, and evacuation plans of the department and its divisions.  This includes safety officers.  Further, the policy explains that "Communication among and between CCDOC, Cermak, and CCDFM employees is key in assuring a safe facility, and all shall work together to implement this directive."

The Interagency Directive requires the identification and training of all CCDOC divisional safety officers for each division at least annually.  The training must be provided by or with the approval of the Cook County Sheriff's Office Training Institute, through the CCDOC Safety Office and the Chicago Fire Department, and in accordance with a written course syllabus to be reviewed annually by the Fire Safety Committee.

The training of safety officers (fire safety officers) is currently provided by the CCDOC Safety Administrator, using the video of one of the courses previously provided by the Chicago Fire Department.  Following the training, safety officers are required to pass a written proficiency examination.

**Monitor's Assessment:**

The competency based fire and emergency evacuation safety officer proficiency exam was initiated in August, 2011.  The competency based fire and emergency evacuation safety officer proficiency exam was initiated in August, 2011.  The passing score for the exam is 80%.  Safety classes were most recently held in January and September 2013.  142 officers successfully passed the written exam and are recognized as safety officers. This is in addition to the 83 provided training earlier in 2012. Further all correction officers receive fire safety training as part of their annual training program.  DFM and representatives of Cermak and the Central Kitchen have been included in the training. There are questions of the annual training test that address fire safety.  Sign in sheets are maintained as evidence that the training was provided.

As explained earlier in this report, the divisional orientation handbooks for divisional safety officers are now complete and issued.  On future tours, I will continue to monitor safety officer knowledge by witnessing drills and questioning housing officers.

This provision continues to be in substantial compliance with the consent agreement.

**Monitor's Recommendations:**

1.  The Safety Administrator needs to assure that all designated Safety Officers assigned within the divisions have received the training referenced in the Interagency Directive.  Should a Safety Officer be transferred or leave CCDOC, the superintendent, prior to the transfer or leave shall provide the name of the replacement Safety Officer to the Safety Administrator.  Each division superintendent must assure that there is always a trained Safety Officer within their division at all times.  It may be necessary to train back-up officers for all shifts, holidays, and weekends.

**PROVISION:  G. SANITATION AND ENVIRONMENTAL CONDITIONS**

**83.** Sanitation and Maintenance of Facilities

    **a.** DFM shall maintain an adequate written staffing plan and sufficient staffing levels to provide for adequate maintenance of the Facility.

**SEPTEMBER, 2013 COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE**

**Status Update:**

The Department of Facilities Management has a written staffing plan for each trade, including response to work order requests, scheduled maintenance, and emergencies; for engineering, plumbing, electrical, painting, carpentry, and masons.  In includes supervisory personnel for each.  It is important to note here that DFM are responsible for the maintenance and repairs of all Cook County owned facilities including CCDOC.  There are assigned trades that report directly to the CCDOC complex.  Others may be brought in to assist, if necessary.  DFM has modified its contracts with trades and now provides trades for two shifts.  This will allow for more timely coverage and reduce overtime costs for Cook County.

As of June, DFM has stated issuing handheld monitoring devices to tradesmen to track in real time work order assignments and completion by supervisors.  This may improve tracking, performance and efficiency by the tradesmen.

**Monitor's Assessment:**

The staffing plan for the Department of Facilities Management for fiscal year 2014 budget has not been completed as of this tour.  Although as a result of use of the handheld devices at non CCDOC facilities, three electricians, three painters, one plumber, and two carpenters have been reassigned to CCDOC.  In addition, following this tour, two more electricians and two more plumbers have been reassigned to address the ongoing backlog in "open" plumbing and electrical work orders.  As of September 9, 2013 there were 1380 total "open" work orders.  As of October 15, 2013 the number of pending work orders has grown to 1617 or 17.2% increase.  The following chart shows the number of open and completed work orders year-to-date by each job type:

| JOB TYPE | PENDING WORK ORDERS 9/9/2013 | COMPLETED WORK ORDERS 9/9/2013 | PENDING WORK ORDERS 15-Oct | COMPLETED WORK ORDERS 15-Oct | DIFFERENCE |
|---|---|---|---|---|---|
| ASBESTOS | 3 | 45 | 0 | 49 | -3 |
| BRICKLAYER | 37 | 958 | 52 | 973 | 15 |
| CARPENTER | 51 | 1,772 | 59 | 2,002 | 8 |
| ELEC TECH | 134 | 2,231 | 217 | 2,554 | *83 (13.4%) |
| ELECTRIC | 192 | 8,738 | 171 | 9,440 | -21 |
| ENGINEER | 29 | 1,266 | 46 | 1,395 | 17 |
| GENERAL | 0 | 0 | 0 | 0 | 0 |
| GLAZIER | 53 | 752 | 62 | 811 | 9 |
| IRONWORKER | 67 | 2,826 | 81 | 3,405 | 14 |
| LABORER | 30 | 3 | 34 | 3 | 4 |
| MACHINIST | 1 | 10 | 1 | 15 | 0 |
| MECH ASST. | 0 | 70 | 0 | 71 | 0 |
| PAINTER | 15 | 2,958 | 104 | 3,276 |  |
| PLASTERER | 54 | 42 | 65 | 54 | 89 |
| PLUMBING | 574 | 16,516 | 687 | 18,309 | *113 (42.4%) |
| SIGNPAINTER | 1 | 1 | 0 | 20 | -1 |
| STEAMFITTER | 10 | 10 | 10 | 507 | 0 |
| TINSMITH | 29 | 29 | 18 | 602 | -11 |
| WINDOW WASHER | 0 | 0 | 0 | 0 | 0 |
| **TOTAL** | **1,380** | **39,261** | **1,617** | **43,476** | **237** |

There continues to be a significant increase in total "open" work orders especially for plumbing and electrical jobs. As of September 9, 2013 there were 574 pending plumbing work orders which represent approximately 42% of all pending work orders (1380). To put that in perspective, the total number of work orders completed year-to-date for all trades are 39,261, of which 16,516 (42%) represent completed plumbing jobs. but there has been a 19% increase in "open" plumbing work orders and a 3% increase in electrical and electrical technician work orders. While there will most likely continue to be "open" work orders from month to month because of parts not available or staffing shortage, DFM needs to monitor this continually and make staffing adjustments as necessary. Keep in mind the back log has increased even though two more electricians and two more plumbers have been assigned to CCDOC effective September 23, 2013 albeit a short time to have a significant impact. Progress should be significant over the next two months.

I will continue to monitor the monthly reports for future tours. This provision continues to be in substantial compliance as long as the backlog continues to be managed effectively.

**Monitor's Recommendations:**

1. Continue to monitor work order pending and completion data to determine staffing needs and make reallocations as necessary to meet DFM work order priorities and assure timely response.

---

**83.** Sanitation and Maintenance of Facilities

**b.** CCDOC shall revise and implement written housekeeping and sanitation plans to ensure the proper routine cleaning of housing, shower, and medical areas, in accordance with generally accepted correctional standards. Such policies should include oversight and supervision, including meaningful inspection processes and documentation, as well as establish routine cleaning requirements for toilets, showers, and housing units.

---

**SEPTEMBER, 2013 COMPLIANCE STATUS: PARTIAL COMPLIANCE**

**Status Update:**

The CCDOC General Order 24.11.1.0, Divisional Sanitation Plan became effective in February 29, 2012. This order is in conjunction with General Order 24.9.9.0, Safety and Sanitation of Living Units which became effective December 6, 2011. There is also a draft Divisional Sanitation Plan, 24.11.1.0 that is nearing final form that outlines the procedures for each division sanitation schedule, documented logs, inspection reports, deficiency plan of action and requisition forms for supplies. It is key that the divisional plans including Cermak be consistent with General Order 24.11.0. As of this tour, there continues to be no written or implemented sanitation plan for Cermak or any of the clinics that they operate in each of the CCDOC divisions. As a result, cleanliness and sanitation is done but it is not and cannot be assessed effectively against any standard. Cermak is a working healthcare facility and as such an effective sanitation plan with effective implementation needs to be instituted just as it would in a hospital or clinical setting.

 A sanitation video has been developed and can be shown on televisions in each housing unit throughout the day, if the televisions are turned to that channel. The division designated sanitation officers have been trained by the CCDOC Sanitarians on effective cleaning and disinfecting procedures. In the General Orders, Watch Commanders are responsible for reviewing the completed Daily Inspection Forms from each of the housing units and filing a summary report weekly. The Support Services Superintendent and Sanitarians receive and review the weekly summary reports from each of the divisions. The divisional sanitation plans mandate that sanitation officers observe the cleaning and disinfection of cells, toilet and shower facilities. Since the divisional sanitation plans became effective, the Sanitarians continue to conduct unannounced inspections of housing units within all divisions.

CCDOC created and continues to use a designated "Compliance Team" to develop and oversee the implementation of the Divisional Sanitation General Order. There is one representative from each division appointed by the divisional Superintendent. As a result of their efforts, CCDOC has

implemented an incentive for cleanliness by permitting microwave ovens to those housing units where the rules are being followed.  In other words CCDOC will transform the existing culture with a very different approach by creating an environment in the housing units to require accountability from both inmates and officers to improve the sanitation and maintenance of the housing areas as well as classrooms, maintenance closets, tunnels, and general areas.  While early in its implementation, the improvement in those divisions where microwaves have been provided is positive.

 **Monitor's Assessment:**

Touring divisions on this tour, I generally observed continued improvement in cleanliness with the exception of Cermak and Division III.  However, In Cermak, I found a considerable lack of sanitation in the rooms used to house medical patients both in individual cells and in rooms housing multiple inmates.  One reason for this may be that the rooms holding multiple patients (inmates) were generally severely overcrowded. While cleanliness has improved somewhat, both inmates and staff of Cermak knew when I would be there, and there was an apparent effort to "clean up" before my arrival.

  Since the previous tour in February, Cermak has created a "Sanitation Committee."  However, it did not include anyone representing infection control from Cermak, nor did it have significant management oversight.  As a result, it took almost five months before the mission of the committee was completed, and that was dictated by Environmental Services with little, if any input by the participants or management.

On June 10, I sent correspondence with recommendations to Environmental Services director of Cermak once again outlining my concerns with not only lack of progress, and the fact that CCDOC had not even had the opportunity to review a new draft Cermak General Order that included directives for CCDOC before it was released.  In fact the Sanitation Committee had not even seen it.  I noted in my correspondence that the General Order had not been authorized and as a result was just a draft. A copy of the June 10, 2013 correspondence can be found in Appendix I on page 64 of this report.  If employees do not know or understand the expectation or their responsibility to meet it, and there is no accountability, there is little chance of a consistent and sustainable outcome.  As a medical facility, one should expect a high level of cleanliness and effective disinfection to prevent complicating medical issues such as Staphylococcus or MRSA to inmate patients already compromised by medical issues including open wounds.

Three days prior to this tour, I was again provided with a draft "Environmental Care" plan.  It was woefully inadequate with lack of detail, lack of consistency, inconsistent terminology, and lack of definitions, inadequate cleanliness procedures and no standards.  The packet included a number of logs and schedule forms, with no responsibility assigned for their completion. It also did not include a process for oversight or way to document and assure sustainable corrective actions for issues identified during inspections.  Further it did not identify who was responsible for monitoring or inspecting the entire facility.

On a positive note, Cermak is now requiring inmates to maintain all personal items including commissary in their personal property boxes.  This is further necessitated by the lack of room with many inmates sleeping in portable beds (boats) because of lack of effective beds.   I, once again, identified that many inmate mattresses were cracked, torn, and generally not clean, again indicating a lack of formal cleaning and disinfecting program. Many of the mattresses there did were too small for the bed frames and many, if not most, of the mattresses on the hospital beds were cracked and torn and in need of replacement. Some inmates are allowed to sleep in plastic "boats" because there is a lack of bed space. Many of the "boats" being used had an accumulation of dried liquids, dust and dirt on them indicating a lack of an effective cleaning program between inmates. Cermak Environmental Services claim this is CCDOC's responsibility.  However, this is a Cermak operation.  CCDOC and Cermak need to resolve this issue, along with who is responsible to cleaning mattresses and "boats" between inmates.  As a result, they are not being cleaned by anyone.  Keep in mind this is a medical facility.

In the CCDOC divisions, I continue to see improved cleanliness. However, the cleanliness of common areas including administrative offices, tunnels, hallways, staircases, elevators, classrooms seemed to be lacking on this visit. Sanitation in Division III needs significant improvement.  I believe here CCDOC needs to decide if Division III is going to be open, and as a result, maintained regularly just like all other divisions.  The Superintendent of Division II is also assigned to III when that division is opened.  As a result, there is limited supervision available to assure sustainable cleanliness.  When there are period when tiers are closed, a thorough cleaning and disinfecting needs to be completed in each cell and common areas so that if and when it needs to be re-opened, it is ready to accept inmates

All exceptions noted, the changes in enforcing inmate rules, direct supervision, and a renewed sense of pride among officers, supervisors, and superintendents continues to be.  It is in the officer's best health interest to administer and enforce the General Orders as they pertain to their area(s) of responsibility.

CCDOC may want to review the frequency of divisional inspections for cleanliness.  Daily inspections may be too time consuming and providing little data.  Consider a more comprehensive weekly inspection where sanitation continues to be effective.  I will continue to monitor this provision on future visits.  As a result of the issues identified in Cermak, this provision continues to be in "partial compliance."

**Monitor's Recommendations:**

1. Revise the General Order 24.11.1.0, Divisional Sanitation Plan and/or each division's sanitation plans to assure they are consistent.

2. Decide who is responsible for cleaning and sanitation at Cermak.  Unless agreed to by both Cermak and CCDOC, I suggest that only one party take full responsibility and that includes routine cleaning and disinfection of mattresses, bed cleaning and disinfection, and general cleaning of rooms, storage closets, common areas, and cells.

3. Either CCDOC or Cermak needs to develop and implement an effective written sanitation plan with measurable objectives.  The plan needs to identify who is responsible for cleaning and maintaining patient rooms, common areas, storerooms, and closets. It should have a formal schedule for each room, common area etc. and a method of inspection and oversight to assure accountability and effectiveness.   The policy needs to include all medical clinics located in the divisions.  Once the plan is developed, Cermak must provide documented and effective training to all responsible.

4. Cermak management may want to consider turning the responsibility of sanitation to CCDOC and allow Cermak to focus on medical care rather than environmental issues for the medical areas and all clinics.

5. Cermak needs to develop a cleaning policy and schedule for routine effective cleaning of vents, lighting fixtures, floors, walls, etc. to assure effective sanitation.

6. Cermak environmental services need to make available cleaning supplies that when used according to instructions effectively clean surfaces such as stainless steel.

7. Assure inmates are permitted to clean their cells daily including toilet, lavatory, floors, etc. at least daily.  In Cermak decide who is responsible for cleaning multiple inmate housing units.  In some cases, because of medical conditions of inmates, it is necessary for environmental services to effectively and regularly clean rooms.

8. Maintain effective and timely inspections of sanitation and safety as required under the General Order.

9. Where appropriate expand direct supervision of inmates to assist in assurance that cells and dayrooms are maintained clean and sanitary.

10. Develop and implement a process to effectively clean and sanitize the plastic drinking cups provided to medical inmates housed in Division II dorms or eliminate the use of them and provide single service cups.

**83.** Sanitation and Maintenance of Facilities

     c. DFM shall implement a preventive maintenance plan to respond to routine and emergency maintenance needs, including ensuring that shower, toilet and sink units are adequately maintained and installed.

**SEPTEMBER, 2013 COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE**

**Status Update:**

As highlighted in previous reports, DFM uses a work order tracking system ("Facility Wizard") to manage and prioritize all maintenance requests from anywhere in the complex.  It also is used to schedule and assure completion of preventative maintenance needs of all mechanical and fire safety systems within

CCDOC, as well as at all other Cook County facilities.  Both CCDOC and Cermak use the same system through an interface to enter work orders and monitor pending and closed work orders.  DFM has designated staff to prioritize work orders as received and send them to trades' foremen for assignment. DFM is also implementing an interactive voice response system through digital handheld devices to management program to monitor trade workers progress and efficiency in responding to and completing work orders.

Facilities Management operates a 24 hour emergency hot line seven days a week to receive and respond to any facility emergency reported by CCDOC or Cermak.

**Monitor's Assessment:**

DFM continues to meet the requirements of this provision.  DFM management continues to investigate different reporting ideas to improve tracking and benchmarking types of work orders and from which division.  This data will be beneficial to more effectively budget staff time and positions.  The full implementation of the Interactive Voice Response System is an example that will provide an excellent management tool to improve efficiency and effectiveness of processing and closing work orders.

CCDOC has designated specific employees within each division who are trained to create a work order based on information from tier officers.  It is my view that DFM promptly responds to work orders following their priority schedule.   For all categories of trades, year-to-date DFM management reports show that they close an average of 1102 work orders each week and over 4840 per month.

**Monitor's Recommendations:**

1.   None at this time.  Continue to demonstrate sustainability with the provision.

**83.**  Sanitation and Maintenance of Facilities

   **d.** CCDOC shall notify DFM, in a timely manner, of routine and emergency maintenance needs, including plumbing, lighting, and ventilation problems.

**SEPTEMBER, 2013 COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE**

**Status Update:**  The DFM "Facility Wizard" work order tracking system has been operational for both CCDOC and Cermak since April, 2012.  The required housing unit inspections specified in the sanitation General Order 24.11.1.0 became effective in March, 2012.  Further General Order 24.9.9.0 established an inspection protocol for sanitation and living unit officer to identify and correct non-conformances.  As a result, the Registered Sanitarians receive and monitor weekly summary reports from each Division. Watch Commanders in each division are responsible for reviewing the daily inspection reports from the tier officers.  Sanitarians also conduct unannounced inspections of each division as an independent verification.

The Sanitarians have also created a Power Point presentation for training tier officers about how to identify plumbing issues.  It is can be used to teach correction officers what key plumbing issues to look

for during their routine rounds. It can be used at the annual in-service training program taught weekly at the Sheriff's Training Academy. As a result of the number of topics that need to be addressed, the PowerPoint presentation will not be shown this year, but will be shown in 2014. The food service contractor CBM also has access to file work orders through Support Services. The CCDOC Sanitarian in conjunction with the DFM Liaison Officer was recently empowered to generate the electronic DFM work order requests. With the number of buildings on the campus, it may be necessary to permit other officers the same responsibility. Further, a "work order unit" was created to streamline and expedite the work order process.

The 2011 initiative by DFM to clean and maintain vents throughout CCDOC has also had a positive impact. Based on direct observation, there are significantly less blocked ventilation vents in the housing units as housing and tier officers are not permitting inmates to block the vents.

Emergency repairs and the awareness and use of the 24 hour hotline is assuring that emergency maintenance repairs are forwarded to DFM as reasonably fast as necessary.

**Monitor's Assessment:**

During my September, 2013 tour of housing units in Divisions I, III, IX, X, XI, XVII and Cermak I noted that when plumbing or electrical issues or non-functioning equipment identified, work orders had been entered into the system. In fact, staff accompanying me on the tours brought with them a binder of all outstanding work orders. Officers seem to understand their responsibility to notify the designated employees who in turn submit the work order as necessary. That said, based on a limited survey in Division III where 27 plumbing issues were identified in two tiers, I believe that either officers are not checking for acceptable functionality faucets, or toilets in individual cells as part of their inspections or they do not recognize what constitutes an acceptable flow or pressure. As a result, I believe that needs to be a complex wide survey of all plumbing fixtures in cells and common areas to assess the need for maintenance. Further the training slides that depict acceptable and non-acceptable flows and pressures or other needed repairs need to be shared with officers of all divisions on a schedule. Further, the inspections completed in each division including Cermak and Women's Justice need to formally assess all fixtures on an appropriate schedule, possibly monthly or quarterly. A schedule is appropriate for the first time through so as not to overwhelm the ability of DFM to provide timely response.

This provision was moved to substantial compliance last February. If the number of maintenance issues continues to be undetected, the provision will go back to partial compliance.

**Monitor's Recommendations:**

1. Re-establish the visual enhanced training program for all housing officers explaining the functionality of all ventilation, plumbing and electrical fixtures and to demonstrate what constitutes acceptable and unacceptable fixtures and vents.

2. Conduct a complete assessment of vents, plumbing and electrical fixtures throughout the entire complex including Cermak on an established schedule. That assessment, not only will identify needed maintenance, but the effectiveness of the training tool used.

3.   Require accountability of the housing unit officers on all shifts to look for maintenance issues and report them as they are identified through the work order system. Decide whether Cermak or CCDOC staff is to assess fixtures and vents and implement the same inspection program there. This includes assuring training for Cermak employees to assure they understand their responsibility to contact Environmental Services immediately as they identify any needed maintenance repairs from routine inspections.

**83.** Sanitation and Maintenance of Facilities

   **e.** DFM shall ensure adequate ventilation throughout the Facility to ensure that inmates receive an adequate supply of air flow and reasonable levels of heating and cooling. DFM staff shall review and assess compliance with this requirement on a daily basis for automated systems and on and annual basis for non-automated systems.

**SEPTEMBER, 2013 COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE**

**Status Update**

This remains unchanged since my previous report. DFM has fully implemented their Policy for Monitoring Temperature Ranges at CCDOC for all divisions. They are utilizing a designated monitoring form and protocol as specified in the Policy. Monitoring is done once on each shift, seven days per week. To complete one Division takes approximately one hour. They continue to meet the provision of the Consent Agreement. Ventilation inspections and cleaning continues whenever a work order from CCDOC or Cermak is entered.

**Monitor's Assessment:**

DFM continues to conduct their "Rounds Monitoring" for all divisions. The monitoring is documented effectively. It includes measuring temperatures of the exhaust and return air fans and temperatures at pre-selected points closest to the exhaust fan and the point farthest from the exhaust fan in the housing units. It also measures the temperature of the hot water heater, checks whether the hot water circulating pump is functioning along with the sewer pumps, storm pumps, and condensate pumps. Function of the generator is verified, including the oil and fuel level. Measurements of PSI for the high, medium, and low pressure systems, city water pumps, and the chilled water pumps for the fire system, are taken. I reviewed some months of the daily logs for various divisions. Where non-conformances were identified, I verified that work orders had been filed and that work was completed and the work order closed in typically one day. The monitoring forms are typically completed by an engineer and reviewed by a supervising chief or assistant chief engineer. The program is functioning as intended.

The ventilation cleaning program for all divisions started in August, 2010 has been completed by DFM. They now respond to ventilation issues as identified through work orders filed from the divisions. DFM management continues to monitor the number of work orders filed each month for blocked vents to determine whether another complete round is necessary. So far this year, there have been few work orders. Further as DFM conducts scheduled "Building Initiative" tier painting and repairs, they assess and clean vents as part of the refurbishing of the cells. On this tour I visited selected housing units and found very few blocked vents. Housing unit officers seem to be monitoring vents effectively.

**Monitor's Recommendations:**

1. Continue the daily rounds inspections on all shifts.

2. Monitor the number of work orders for obstructed vents.

---

**83.** Sanitation and Maintenance of Facilities

**f.** CCDOC shall notify DFM of any visible obstructions to the ventilation system.

---

**SEPTEMBER, 2013 COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE**

**Status Update:**

As discussed above, Facilities Management staff completed two rounds of the ventilation cleaning. Since the completion of the DFM program, support services staff and housing unit staff conducting cell by cell inspections are required to assess the need for vent cleaning and file a work order. The Sanitation General Order clearly establishes tier officer accountability. The living unit daily inspection form has a designated column (27) for identifying and recording non-conformance. A PowerPoint presentation has been developed by Facilities Management to demonstrate to correction officers how the ventilation systems function and stress the importance of maintaining unobstructed vents.

**Monitor's Assessment:**

Based on my announced visits to housing units I identified very few blocked vents than during previous tours. I recognize that division superintendents were told that I may tour their divisions so they were most likely prepared. The Master Sanitation Plan requires officers to identify and notify Facilities Management should vents become blocked. As discussed in Provision 83e, DFM will clean vents as part of their cell refurbishment program and work orders filed by CCDOC. This year reports show very few issues identified.

**Monitor's Recommendations:**

1. No further recommendations at this time.

**83.** Sanitation and Maintenance of Facilities

> **g.** Cook County shall ensure adequate lighting in all inmate housing and work areas.

**SEPTEMBER, 2013 COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE**

**Status Update:**

This provision is the responsibility of the Department of Facilities Management.  In July, 2012 the Cook County Board of Commissioners approved a contract with Noresco of Des Plaines, IL to replace lighting within the housing units at Department of Corrections with ones that are more energy efficient and secure either through retrofitting and existing fixture or replacing the entire fixture to a secure fixture. It is an energy conservation measure (ECM).   The CCDOC project is split into two phases:  For the CCDOC campus, Divisions II, III, IV, IX, X and XI will be completed in 2013 and Divisions I and V will be completed in 2014.  The contract for both phases has been approved and authorized. It will take two years to complete.   The new lights will provide not only more light intensity, but also be significantly more secure than the current fixtures and incandescent bulbs.

**Monitor's Assessment:**

As of this tour the retrofit and replacements are completed in Division II, III, X, and XI.  Completion rates for Division I is 95%, Division IV is 75%, Division VI is 75%, and Division IX is 75% and Division V is at 0%. DFM is waiting for a variance for cell fixtures lighting levels from American Correction Association for Divisions IX and XI.  The project is currently ahead of the projected schedule.
Division IX project is currently on hold pending a resolution of a sizing issue.  Six sample fixtures are being installed as a test to assure they will meet the size and lighting requirements necessary.  Once approved, the replacement program will be completed.  It is clear from the before and after pictures and visual observation during housing unit tours that the areas completed have significantly improved lighting intensity and the fixtures are significantly more secure.  DFM reports virtually no work orders for destruction.

**Monitor's Recommendation:**

1.   Continue with the scheduled implementation plan.

**83.** Sanitation and Maintenance of Facilities

> **h.** CCDOC shall ensure adequate pest control throughout the housing units, medical units, RCDC, RTU, and food storage areas.  CCDOC shall maintain a contract for professional exterminator services for each division, food services areas, and the Cermak hospital.  Services should provide for routine pest control spraying and additional spraying as needed.

**SEPTEMBER, 2013 COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE**

**Status Update:**

Since late 2010 CCDOC maintains a contract with Anderson Pest Solutions for all buildings.  Effective November 1, 2013, Quality and Excellence Inc. will be the new contractor.  Cermak presently used Anderson and the food service contractor, CBM, use Anderson, but will most likely moving to Quality and Excellence.  The new contract requires that they be onsite 7.5 hours per day 5 days per week for the first six months of the contract and then 5.5 hours per day.  This does not include the time in the kitchen should CBM contract with them.  They will provide a map showing the location of all traps, and provide a comprehensive inspection and "Integrated Pest Management" plan within one month of the commencement of the contract.   They are required to conduct the floor drain cleaning procedure a minimum of twice per year, and will provide a 24 hour response time for complaint response.   Further they will provide a quarterly statistical report, along with electronic reports of their inspections and recommendations.

Anderson Pest Control completed the compound wide drain cleaning and treatment project in February, 2013.  This will need to be continued "as needed" when officers and/or inmates observe drain fly presence.

CCDOC continues to operate a "pest control hotline" for officers to report pest activity.  Pest control is also reinforced at the training academy for all correction officers.

**Monitor's Assessment:**

I met with CCDOC Support Services staff and Quality and Excellence Inc., the new pest control contractor.  We reviewed with them the pest control provision and they assured us there would be no decrease in service; in fact CCDOC can expect increased number of traps both internally and externally. We discussed the types of baits that they will be using both for roaches, and drain flies.  They will use only Licensed Pest Control Contractors onsite.   They will also control geese as part of the contract. Further, DFM and CCDOC have worked cooperatively to identify and repair building penetrations at all buildings that the rodents were using to gain access.  The cleanliness of the garbage and refuse compactor areas continues to be well maintained.  While touring housing areas, inmates in Division I complained about rodent activity.  It is most likely attributed to construction projects near the area. This is also true around the kitchen area in Division V, again because of ongoing construction of new guard posts.  I did observe a problem with drain flies in Division III in 1-A.  I continue to see considerably less refuse and excess food from meals and commissary being stored within cells in all divisions visited. Inmates in most division have been provided with soft side property bags to replace the hard plastic one.  Officers are now requiring inmates to keep all commissary items in those bags and not on the floor or on window sills.  This is much improved since previous tours.  Correction officers need to continue to be vigilant in maintaining cells and common areas clean and free of food and breeding areas for insects and rodents.  .   Officers must remove all trays and excess food at the end of meal service.

**Monitor's Recommendations:**

1. Provide me with a copy of the Pest Management plan once it is completed, along with the bait and trap maps.

2. Please provide me quarterly reports for 2013. I will review them prior to my next visit.

3. Maintain the reinforcement during routine inspections.

4. Complete the location map of all external bait stations and a site specific description identifying the location of all internal bait stations. (This recommendation is being addressed by the new contract.

83. Sanitation and Maintenance of Facilities

    i. CCDOC shall ensure that all inmates have access to needed hygiene supplies.

**SEPTEMBER, 2013 COMPLIANCE STATUS: PARTIAL COMPLIANCE**

**Status Update:**

CCDOC has developed two draft General Orders No. 24.11.4.0 (Grooming and Hygiene for Inmates) and 24.11.6.0 Distribution of Inmate Basic Hygiene Supplies. They have not been given an effective date. Once implemented, all inmates as appropriate will be provided with soap, toothpaste, and undergarments toothbrush upon admission to CCDOC. Additionally female inmates are provided with feminine hygiene products as necessary. Further the draft General Order will provide that a stock of basic hygiene supplies will be available on the living unit and will be supplied to inmates upon request. Car packages which consist minimally of underwear, shower shoes, shampoo, conditioner, deodorant and lotion are available for all inmates through the commissary. It is proposed that indigent inmates may request care packages through the Correctional Rehabilitation "Worker (CRW) who will verify the status of inmate trust fund to determine qualification of indigence.

**Monitor's Assessment:**

Since the previous tour CCDOC staff continues to refine the draft policies. I have reviewed the policies and provided comments. The key issue that remains to be resolved is establishing an inventory monitoring system that is simple so that CCDOC can assure meeting inventory needs. A second issue is how the tier officers will access a supply inventory to be able to provide basic hygiene supplies upon request while limiting hoarding by inmates.

They have also completed an inmate handbook video explaining inmate rules, requirements, and services. Once the General Orders are completed, the inmate handbook video will be revised to include information regarding the initial distribution and replenishment of hygiene supplies for either male or female inmates. It will need a revision so that it is consistent with yet to be released inmate handbook and among other changes include information on access to replacement hygiene supplies and the

availability of commissary for supplemental products. The video is anticipated to be shown to all inmates upon admission and at least once daily during the day and evening shifts.

**Monitor's Recommendations:**

1. Complete the General Orders pertaining to inmate hygiene supplies, and provide the training plan to both officers and inmates.

2. Assure that each division maintains an adequate supply of replacement hygiene articles within housing units for use between weekly distribution and for newly admitted inmates. Assure female inmates have adequate access to feminine hygiene products within the housing units "as needed" in accordance with General Order 24.11.4.0.

3. Revise the General Order reference above to include the frequency of inmate availability of razors.

---

**83.** Sanitation and Maintenance of Facilities

   **j.** CCDOC shall develop and implement policies and procedures for cleaning, handling, storing, and disposing of biohazardous materials, in accordance with generally accepted correction standards. CCDOC shall ensure that any inmate or staff utilized to clean a biohazardous area are properly trained in universal precautions, are outfitted with protective materials, and receive proper supervision when cleaning a biohazardous area.

---

**SEPTEMBER, 2013 COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE**

**Status Update:**

Biohazardous waste from Cermak's medical and/or dental clinics in specific divisions is the responsibility of Cermak, not CCDOC. Biohazardous waste in Cermak is securely stored and placed in red bags for daily pick up by designated Cermak staff. Cermak maintains a contract for collection and final disposal of the waste. Each division now maintains a supply of biohazardous spill kits within the security office and the sanitation rooms. They are replaced as needed through Support Services. A new blood-borne Pathogen Decontamination General Order was issued in January, 2013. Bruce Schorer, Support Services Sanitarian has created a Power Point training presentation on biohazardous waste handling and cleanup that is now shown to all sanitation officers. There is a written syllabus for blood-borne Pathogen clean-up training. Cermak teaches blood-borne pathogen training at the Academy and during in-service

**Monitor's Assessment:**

Biohazardous waste from the medical/dental clinics and Cermak is handled appropriately. CCDOC policy does not allow inmates to clean bio-hazardous spills. The new Power Point training tool for sanitation officers is very well done. Training for sanitation officers from each division for effective clean-up of biohazardous spills has been completed and is conducted as needed for new sanitation officers. I have reviewed the course syllabus for biohazardous waste and blood-borne pathogen training program for

officers and find that it is acceptable.  All divisions maintain spill kits in their chemical supply rooms and are replaced by support services as needed.

**Monitor's Recommendations:**

1.   None further at this time.

---

**83.**  Sanitation and Maintenance of Facilities

**k.** DFM shall develop a policy on hazardous materials, in accordance with generally accepted correctional standards, and insure that all DFM staff is properly trained on the procedure.

---

**SEPTEMBER, 2013 COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE**

**Status Update:**

DFM has policy number 2010 that was revised effective May 15, 2012.  It establishes the storage procedure for handling and storage of all hazardous materials.  The policy requires OSHA Hazard Communication Standard 29 CFR 1910.1200 for all new hires and annually thereafter for all DFM personnel and that a current record be maintained for all employees required to work with hazardous materials.  It requires a list be developed of all chemicals used and stored and that the inventory and material safety data sheets be provided to designated management employees for distribution to the CCDOC Safety Administrator.  Further it requires reports to the CCDOC Safety Administrator of any damage or spill.  The policy also mandates the supervisor or designee of each trade to complete quarterly inspections of all shops and rooms used for storage of hazardous materials to verify accuracy of inventory sheets, labeling, and proper storage of all chemicals, along with appropriate corrective action for non-conformances and handling procedures including marking, controlling, labeling, mixing, and safety precautions.  DFM management conducts random "mock surveys" of all shops and mechanical rooms as of November 11, 2012. One of the elements of the audit includes monitoring the effective storage, inventory and maintenance of chemicals.

Regarding training, I received and reviewed the OSHA Hazard Communication Standard PowerPoint training used for employee training.  Two documents, Understanding Policies and Procedures for tool, chemical and key control and Fire and Life Safety Duties for Engineering are both required to be displayed in the shops and a copy maintained on maintenance carts at all times.

CCDOC now has emergency access to all DFM maintenance rooms via  secure keys located in Divisions V, VI and IX.  Division XI emergency box is complete and installed.  The emergency boxes for the other two locations are installed; however the programing to monitor access is incomplete as of the tour.

**Monitor's Assessment:**

During this tour I did not visit any maintenance hops to verify storage practices.  I did visit the mechanical room in Division XI which contains all the ventilation equipment for that division.  The floor was now painted.  The room was clean, filter supplies were maintained orderly and there was no clutter.  DFM has completed division specific maps identifying the location of all flammable cabinets and a list of chemicals stored in each shop and/or mechanical rooms.  This now includes Division VIII.  They are provided to the Safety Administrator and also securely maintained in the respective divisional superintendent's or designee's office. DFM has continues random "mock surveys" of all shops and mechanical rooms throughout the complex.  Since January 11 surveys have been completed. DFM provided a summary of the survey findings.  In all cases where issues were identified, corrective action via the work order system were made and documented.

Flammable cabinets are located in all shops/rooms where flammable materials are stored and that they are being appropriately used. The Division Safety Officer/Superintendent's office also maintains a current copy of all Material Safety Data Sheets for any hazardous chemicals stored within that Division in addition to the one prominently stored at the entrance to all shops/rooms. At least quarterly an inventory balance matching the chemicals stored with the chemical list should be completed for all shops where chemicals are stored. The Safety Administrator should assure that the division safety officers know the location of all DFM hazardous and flammable chemicals in case of an emergency.  DFM is also investigating if the MSDS format that they use is compatible with the Chicago Fire Department and the Hazardous Materials Team.  If it is, that would allow them access to the MSDSs prior to arrival on site in case of an accident or spill.

I asked the Superintendent of Division XI to access the DFM emergency box and found that it would not open.  DFM witnessed the attempt and also tried without success to open it.  A work order was initiated for repair.  It will be assessed during the next tour

This provision continues to be in substantial compliance with the consent agreement.

**Monitor's Recommendations:**

1.  Complete the installation and make operable the key boxes in Divisions V and VI.

2.  Repair the key box in Division XI.

3.

**83.** Sanitation and Maintenance of Facilities

**I.** CCDOC shall provide and ensure the use of cleaning chemicals that sufficiently destroy the pathogens and organisms in biohazard spills.

**SEPTEMBER, 2013 COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE**

**Status Update:**

CCDOC mixes and dilutes concentrated chemicals following the chemical manufacturer's specifications from the central supply located in Division V and distributes them daily to the divisions as requested. By centrally controlling the dilution and following the chemical manufacturer's directions, the divisions always receive properly diluted cleaning and disinfecting chemicals needed for routine cleaning and sanitizing of floors, toilets, lavatories, showers, etc. and effective cleaning and sanitizing surfaces from biohazard spills. The chemicals used for all cleaning and disinfection are available for distribution to Divisional Sanitation Officers from the Division V Central Chemical Room. They include peroxide cleaner, Q-64 Disinfectant, glass cleaner, stainless-steel cleaner, deodorizer, bleach, and Symmetry Personal Hand Sanitizer, along with empty spray bottles and labels. Floor stripper, floor wax, Equity Floor Cleaner, and Lemon Quat Floor Sanitizer are available for distribution to Divisional Sanitation Officers from the CCDOC warehouse. Also available from the CCDOC warehouse are mop heads, mop sticks, vacuum, power washer brooms, dust pans and squeegees, along with buckets brushes, Tyvec suits, vinyl gloves, garbage bags and eyewash stations. The training for inmates and CCDOC employees on the safe use of cleaning chemicals and effective sanitation that was conducted by the chemical supplier initially and is currently being taught by the Sanitarians. Training is provided to those assigned the responsibility of cleaning cells, showers, toilet facilities, dayrooms, RCDC, classrooms, tunnels, and all administrative areas. These are two hour classes daily, over a period of one week. Each person that takes the class and passes a written test is presented with a certificate of completion.

CCDOC maintains a supply of biohazardous spill kits. Sanitation officer have been trained on the contents and how to use them in case of a spill. Spill kits are replaced as needed. Inmates are not permitted to clean up bio-hazardous spills per policy.

**Monitor's Assessment:**

On this visit, inmates mostly in Division IX complained about the lack of availability of chemicals for routine cleaning within cells. Showers, lavatories, and toilets in dayrooms of all divisions were generally clean and maintained. In response, CCDOC Sanitarians are investigating the alternative of maintain a supply of those chemicals in the control room of each tier. They would be replenished each night and inmates under supervision depending on classification would have access to only dilute chemicals. The process to centrally mix chemicals and only distribute diluted chemicals works well to eliminate misuse. It assures that both sanitation officers in the divisions and inmate are not exposed to concentrated chemicals that, if misused, could result in injuries to both inmates and/or officers. I did observe spill kits in each division's chemical and cleaning supply room.

**Monitor's Recommendations:**

1.  Investigate alternatives to assure inmates have regular access to cleaning and disinfection chemicals to clean in cell toilets and lavatories.

**83.** Sanitation and Maintenance of Facilities

> **m.** CCDOC shall inspect and replace as often as needed all frayed and cracked mattresses. CCDOC shall destroy any mattress that cannot be sanitized sufficiently to kill any possible bacteria. CCDOC shall ensure that mattresses are properly sanitized between uses.

**SEPTEMBER, 2013 COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE**

**Status Update:**

Mattresses are replaced as needed throughout the divisions when they become no longer cleanable or beyond repair. CCDOC has replaced virtually all mattresses throughout the complex. Each division maintains a small surplus of mattresses and more are available from Central Supply. The new mattresses include a built in pillow. As a result, inmates are longer provided with separate pillows and pillowcases unless specified by a medical order from Cermak. A designated area and process is place within each division to clean, disinfect, inspect, and repair or replace mattresses as appropriate between inmates. The mattresses are taken from the cell to the clothing and linen storage room of each division for cleaning and disinfection when the inmate leaves using Marauder and Terminator (chemical described in 83.l above). The mattress is then air-dried and returned to the cell.

Mattresses in Cermak were in need of repair and replacement. Many of the beds in the medical dorms were too small for the bed. Further, because of severe overcrowding in the dorms, several inmates were sleeping in plastic boats, again with mattresses that did not fit the boat. There seems to be an issue as to who is responsible for replacing, repairing, and cleaning mattresses there. Neither Cermak nor CCDOC could provide evidence of who has the responsibility. As a result, the issue remains. The issue will need to be resolved through the interagency process.

**Monitor's Assessment:**

The changeover to the new mattresses is complete with the exception of Cermak. Several of the mattresses there continue to be in need of replacement, especially on hospital beds located in medical cells and dorms. Other than that area, I found only a couple of mattresses in need of replacement during tours of the division. Upon questioning inmates in all divisions, I did not receive any complaints except from Cermak   Officers assigned to the clothing and linen store rooms correctly are able to describe the procedure for effective cleaning, disinfecting the mattresses between uses. Each storeroom has designated areas for clean, dirty, mattresses and one designated area for staging mattresses to be returned to central supply for repair or discard.

While this provision is currently in substantial compliance, it will revert back to partial compliance if the mattress issue in Cermak is not favorably resolved.

**Monitor's Recommendations:**

1. Establish the responsibility for replacing, repairing, sizing and cleaning mattresses for all of Cermak. This will now also include mattresses used by Cermak in Division VIII.

2. Inspect the mattresses being used in Cermak and replace those found to be no longer cleanable or beyond effective repair and assure that the replacement mattresses are designed for the type of beds.

**83.** Sanitation and Maintenance of Facilities

**n.** CCDOC shall ensure adequate control and observation of all housing units, including distribution and collection of razors and cleaning supplies. All cleaning tools and hazardous chemical shall be removed from housing areas after use.

**SEPTEMBER, 2013 COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE**

**Status Update:**

A CCDOC special order establishes the requirements for razor exchange. This special order was established in December, 2009 as a pilot program. It is in the process of being revised into General Order 24.11.4.0 that is currently under review. Razors used throughout CCDOC are color coded by division. Razor inventory for use within the divisions are obtained from the Superintendent of Administration located in the General Order Office on weekdays during the day shift. Divisions are issued two biohazard containers with disposable plastic liners; one used to transport unused razors and one for transporting used razors. The date and amount of razors are tracked on a "razor distribution and retrieval log" signed by the officer accepting the razors. The divisions are also issued puncture resistant gloves for officers handling the razors. Used razors are placed in a red biohazard container designated for used razors and transported the following weekday to the General Order office for effective disposal. Unused razors are placed in the biohazard container designated for unused razors and transported to the General Order office for redistribution as necessary. No razors are stored in the housing units. All razors, used and unused, are audited daily to assure complete retrieval. If there is a discrepancy, an incident report is generated. If there are no discrepancies, the specific division is issued additional razors as necessary. There is not a provision that identifies the frequency that inmates are permitted to shave.

There are only two cleaning solutions used at CCDOC: Marauder and Terminator as discusses earlier. Both are cleaning solutions, but Terminator is also a heavy duty disinfectant. Cleaning supplies are now controlled by policy where all cleaning chemicals are mixed at a central location within the sanitation office of Division V. The diluted chemicals are then delivered to the divisions daily as needed. They are stored in designated cleaning supply rooms within each division. The sanitation officer is responsible to

order chemicals as needed to replace exhausted supplies.  Once cleaning of housing units and dayrooms is completed, all chemicals are returned to the divisional chemical storerooms along with mops and buckets.  Mop heads are sent to the central laundry for cleaning daily.

**Monitor's Assessment:**

The razor exchange program appears to be very effective at controlling safe storage and use of razors within the housing units.  It presents one less opportunity for inmates to create shanks. In reviewing incident reports since the last tour I found no incidents of razors being identified as a source of a shank and only one case of a missing razor, which could have been a miscount.  Tier officers are trained and are thorough in tracking razor use in the divisions.  The draft General Order 24.11.4.0 does not specify the frequency that razors shall be provided to male inmates.  This order needs to be completed and issued.

No undiluted chemicals are available for storage or use in any housing unit of any division.  I saw no chemicals or cleaning tools being stored in any housing unit that I visited.  Mop heads are collected after use and sent to the laundry daily for cleaning and drying.  As a result wet, dirty mops are no longer stored in housing units or in the divisional supply rooms.

CCDOC is considering a policy change to allow a daily supply of diluted cleaning and disinfecting chemicals to be store in the officer's control room of the tier.  This would allow inmates to clean their individual cells more frequently.  Inmates on this tour especially in Division IX complained about the inability to clean their cells daily.

**Monitor's Recommendations:**

1. Review the policy to determine the feasibility to store a controlled and limited amount of diluted chemicals within each housing tier for use by inmates.  The need for supervision of the inmates needs to be assessed as part of the review.

2. Establish a frequency of razor use for inmates and include it in the new inmate handbook currently under final review.  Also include the razor policy in the inmate video.

3. Investigate the reason that inmates are apparently required to shave only on the 11PM to 7AM shift and change this procedure unless there are no other alternative.

**83.** Sanitation and Maintenance of Facilities

**o.** CCDOC shall ensure that Facility Sanitarians receive training from a relevant state, national, or professional association with emphasis on assessment of environmental health practices and emerging environmental issues in correctional settings.  Facility Sanitarians should also have training on and access to testing equipment to ensure sanitary conditions.

**SEPTEMBER, 2013 COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE**

**Status Update:**

There is no change from the previous report.  CCDOC maintains two full time Registered Sanitarians, Bruce Schroer and Phillip Gnacinski.  Both Sanitarians continue to be actively involved in all areas of the consent agreement for environmental issues including chemical control, sanitation, laundry, and fire and life safety. Both have been provided with measuring and testing equipment as well as initial and ongoing training in correctional issues.  One again attended and participated in the 2013 National Environmental Health Association annual conference and will attend again and is trying to present educational programs on institutional environmental health issues based on their experience in 2014.   They continue to research issues, conduct independent audits, provide documented training, seek solutions and alternatives and provide objective counsel in most, if not all provisions of Fire, Life Safety and environmental health. They meet regularly with CBM, the food service contractor, pest control contractor, division superintendents, CCDOC management, Cermak, and DFM to discuss and resolve issues.  As part of their inspections they regularly interview inmates and staff to identify issues that may need resolution.  They have been a key participant in the preparation for the opening of the new intake and release center, Division VIII, by developing specific cleaning and sanitation programs and assuring effective food service. They have had an integral role in the implementation and monitoring of several CCDOC policies relative to sanitation and provide direction to the divisional sanitation officers.  They have trained sanitation officers to assure more effective cleaning and sanitation.  As I have stated in previous reports, CCDOC is fortunate to have found Sanitarians who understand correction issues and are able to interpret and find solutions to assist in creating and maintaining a clean and sanitary complex.  While there continues to be more to do as there are always new issues to resolve, Support Services staff are committed to not only meeting the provisions of the consent agreement but in most cases far exceeding it.

**Monitor's Assessment:**

Both Mr. Schroer and Mr. Gnacinski, along with Support Services Superintendent Sean Julian accompanied me on most of the tour of the divisions, Cermak, and kitchens.  They participated in an introductory meeting with the new pest control company.  They also spoke with inmates and with correction officers explaining necessary procedure and more importantly explaining why the procedures are what they are.  I find their dedication to purpose and their insight valuable as they work to solve many issues including sanitation in the divisions and especially Cermak.  They are able to develop effective monitoring of issues such as laundry use by inmates to measure improvement in use.  They have weighed samples of clothing to come up with an expected amount of laundry that each division should be submitting each week.  They have created draft sanitation plans for Cermak for, created the sanitation plan for the intake and release center, and worked with division sanitation officers and superintendents to create and help implement improved sanitation there.  They have developed training videos and PowerPoint presentations on specific topics, and offer scientific and common sense advice to resolve day to day issues.  I continue to be impressed with their work on each visit.

**Monitor's Recommendations:**

1. None at this time.

**PROVISION: G. SANITATION AND ENVIRONMENTAL CONDITIONS**

**84.** Sanitary Laundry Procedures

**a.** CCDOC shall develop and implement policies and procedures for laundry procedures to protect inmates from risk of exposure to communicable disease, in accordance with generally accepted correctional standards. To limit the spread of communicable disease, CCDOC shall ensure that clothing and linens returned from off-site laundry facility are clean, sanitized, and dry.

**SEPTEMBER, 2013 COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE**

**Status Update:**

. CCDOC operates four in-house laundries. The "Central Laundry" for most clothing and linens is located in Division V. There is a laundry located in Division IV to wash personal clothing for women, one in Division XVII, Women's Justice, and one in Division III that is currently supplementing the Central Laundry and cleans all clothing from Cermak. The former laundry located in Division XI has been disconnected and is no longer used. CBM maintains and operates a washer and dryer in the Central Kitchen to clean inmate worker uniforms. The main laundry consists of five 150-lb Unimac washers and five 170-lb Unimac dryers. The Division III laundry consists of three Speed Queen 40 lb. washers and two 40 lb. dryers. . Division IV has one washer and one dryer. The Division XVII consists of one washer and one dryer and is used to wash all laundry from that division including uniforms and personals. Laundry chemicals including bleach, detergent, and sour are automatically dispensed into the machines at all locations through a feed system. However, the chemicals in Division XVII are not secured. The tubs used to hold and transport soiled clothing from the divisions and clean clothing back to the divisions are cleaned and disinfected at each laundry with Clorox wipes before clean laundry is placed in them. The Central Laundry is operated by US military veteran inmates. Veteran inmates are supervised by CCDOC staff. CCDOC has developed a written monitoring system that include a report demonstrating which divisions are following the General Order for frequency of inmate personal clothing washing and a report that documents the dates and time that inmate's personal clothing is collected and returned. It further documents the regular washing and drying of mop heads used throughout CCDOC. The laundry supervisor tracks and reports the amount by weight of laundry received from each division including linens, uniforms, and personal laundry.

**Monitor's Assessment:**

CCDOC operates all laundries with the exception of the kitchen which is operated by CBM. No laundry is contracted out to an independent contractor. Division III laundry is cleaning all of the Cermak's clothing and linens. Division IV continues to do women's personal laundry. Women's outer clothing and linens

will be cleaned at the Central Laundry.  The Division XVII laundry is used to clean all clothes including uniforms, linens, and personals of the inmates housed there.  Further that laundry was disorganized, not clean, and was being used to store recyclable cardboard.  It has a leak in the ceiling; extension cords are used to connect a computer, the black floor mats were coated with dirt and debris, the eyewash station was not secured.  It could not be explained why uniforms and linens from that Division could not be washed in the central laundry located in Division V.  The Division XI laundry is not being utilized as the dryers are not venting to the outside as required by code.

Laundry chemicals used are purchased from Ecolab. They include Ecostar Builder C detergent, Ecostar Destainer (Bleach), and Ecostar Sour (a pH adjusting chemical) to prevent skin irritation and fabric browning.  Material Safety Data Sheets (MSDSs) are readily available.  However, I did not see any MSDS for chemicals in the Division XVII laundry.  The monitoring documents continue to be helpful in identifying which housing units are requiring inmates to use the laundry.  With the exception of Division XVII, the laundry continues to be in full compliance with this provision of the consent agreement.  A plan needs to be developed for the laundering of clothing and linens from the new building.  While currently in substantial compliance, it will revert to partial compliance if the Division XVII laundry is not fully complying with the provision.

**Monitor's Recommendations:**

1. Investigate the need for continuing the laundry in Division XVII.  If necessary, the only laundry that could be done there is personals which is the same procedure as Division IV.

2. Clean and reorganize the Division XVII laundry and eliminate all leaks, electrical and fire hazards.  It must be maintained clean and organized.  Secure all chemicals stored in this laundry.

**84.** Sanitary Laundry Procedures

    **b.** CCDOC shall ensure that inmates are provided adequate clean clothing, underclothing and bedding, consistent with generally accepted correctional standards, and that the laundry exchange schedule provides consistent distribution and pickup service to all housing areas

**SEPTEMBER, 2013 COMPLIANCE STATUS:  PARTIAL COMPLIANCE**

**Status Update**

There is no change from the previous report.  CCDOC General Order No. 11.3, dated 05/02/07 needs to be revised to reflect the current process and practice. Inmates receive clothing exchange two times per week throughout the facility on a predetermined schedule.  For example, the new mattresses come with a raised portion to serve as a pillow.  So a pillow and pillowcase are no longer provided.  Section G needs to be completely rewritten as the schedule has been developed by CCDOC management and not within the division.  As a result, the revised order needs to reflect current practice.   The schedule is posted on each tier within each division.  Linen exchange is once per week. Blankets are washed and dried

monthly.  While the laundry program fully operational, not all divisions have directed inmates to make use of the laundry service.

**Monitor's Assessment:**

CCDOC tracks the amount of laundry by weight that is cleaned by Division.  They are able to calculate the percentage of uniforms, linen and personal laundry that inmates exchange each week. Additionally division superintendents are required to include in their monthly reports, whether laundry service for uniforms, linens, blankets, personals are available in accordance with the schedule for each division. They have developed a chart that measures over time the amount of personal laundry by weight that is cleaned in the Central Laundry.  However it does not include the personals from Division IV or XVII. CCDOC uses laundry loops for personal laundry. CCDOC has already taken steps to eliminate laundry detergent from the commissary; so inmates only can use bar soap or shampoo to wash clothes.  Housing unit officers need to continually reinforce the laundry policy to the inmates and be able to explain the health ramifications to inmates who fail to effectively clean and disinfect personal laundry.  Ineffective washing and drying, as practiced by many inmates allows bacterial organisms such as *Staphylococcus aureus* including MRSA (methicillin-resistant *Staphylococcus aureus*) that does not respond well to some antibiotics.  In touring parts of Divisions, I observed far less ropes in cells than in previous visits.  The division superintendents, command officers and tier officers need to stress the unhealthy implications to inmates.

**Monitor's Recommendations:**

1. Revise General Order 11.3 dated 5/2/07 to reflect current policy.  The policy should be developed corporately and implemented consistently within all divisions.  The Order should also make clear the division superintendent's and housing officer's responsibility and accountability for compliance.

2. Establish a more informative measurement tool to demonstrate over time the percentage of uniforms, blankets, linens, and personals laundered on a weekly schedule.

3. Modify the monthly report from the division superintendents to show when laundry exchange has not been provided and include a requirement to provide the reason(s) why the schedule was not followed.

4. Continue to require all inmates to use the laundry service and not allow inmates to do their own laundry.

5. Each Division needs to maintain a uniform/linen exchange log book to accurately reflect the inventory of all clothing/linens maintained within their respective division.  It should record the actual number and type of returned clothing and linens, along with that newly issued.  By maintaining the inventory, correctional staff can assure that inmates to not continue to hold excess clothing and linens within the cells that can and are be converted to ropes, privacy curtains, carpeting, etc.  For example, privacy curtains can and are being used to obstruct an officer's vision of cell and showers.

**84.** Sanitary Laundry Procedures

    **c.** CCDOC shall train staff and educate inmates regarding laundry sanitation policies.

**SEPTEMBER, 2013 COMPLIANCE STATUS:  PARTIAL COMPLIANCE**

**Status Update:**

Inmate veterans assigned to the laundry are effectively trained as to their responsibilities by laundry officers.  However, the laundry General Order 11.3 dated 5/2/07 needs to be revised as well as the inmate handbook to reflect that Order.

When speaking with inmates, most understand the laundry schedule.  It is posted in each housing tier. However, some tier officers continue to allow inmates to launder their personal clothing and linens in their cells.

**Monitor's Assessment:**

It was clear on this visit that inmates understand the laundry service.  CCDOC through the Sanitarians and superintendents continue to reinforce the need to use the central laundry service provided. However, some inmates for a number of reasons including past experience or lack of trust refuse to utilize the central laundry especially for personal laundry.  CCDOC should continue to investigate new methods of tracking inmate use or lack of use of the laundry by inmates.  By tracking use and implementing a video on the laundry service, it could be improved.

**Monitor's Recommendations:**

1.  Assure that the inmate handbook and General Order 11.3 is consistent.

2.  Implement the laundry procedures and expectations in the developing video for inmate viewing within the housing units.  It should include an explanation of the health risks for ineffectively laundering personal clothing in their cells.  I suggest that the video show the laundry in operation so that inmates see where their laundry is cleaned and the proper use of the laundry loops.

3.  Implement enforcement for those correction officers and supervisors who continue to allow inmates to wash personals in their cells.

**84.** Sanitary Laundry Procedures

    **d.** CCDOC shall ensure that laundry delivery procedures protect inmates from exposure to communicable diseases by preventing clean laundry from coming into contact with dirty laundry or contaminated surfaces.

**SEPTEMBER, 2013 COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE**

**Status Update:**

Clean inmate laundry is transferred from all laundries in carts that are sanitized between uses with a disinfecting bleach wipe.  All carts are thoroughly wiped by laundry workers and allowed to air dry before clean clothing and/or linens are placed into them. There are designated areas within the laundries that separate dirty laundry bins from those that have been cleaned and sanitized between uses.  Inmate personal laundry that is cleaned at the central laundry and the women's Division IV AND xvii laundry are returned to inmates usually within the same shift that it was collected.

**Monitor's Assessment:**

On this tour, I toured the laundries including the central laundry in Division V, the women's laundry in Division IV, the overflow laundry in Division III and the laundry in Division XVII. I observed laundry workers effectively using the disinfectant wipes on the laundry carts used to transport both clean and soiled clothing and linens.

**Monitor's Recommendations:**

1.   None at this time.

**84.** Sanitary Laundry Procedures

> **e.** CCDOC shall require inmates to provide all clothing and linens for laundering and prohibit inmates from washing and drying laundry outside the formal procedures.

**SEPTEMBER, 2013 COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE**

**Status Update:**

The General Order and inmate handbook reflect that inmates are no longer permitted to wash their personal laundry and that all clothing and linens are required to be sent to the central laundry and the women's laundry for washing and drying.  However, while uniforms, linens, and blankets laundering has improved dramatically, many inmates continue to wash personal clothing outside the system. CCDOC laundry staff have developed and implemented a documented audit that tracks the divisions that are and are not utilizing the central laundry for inmate personal laundry.  They have also just completed a documented audit process that tracks the number of uniforms and linens that are sent from the housing units and the number returned. Laundry soap is no longer available from the commissary and so the only soap that can be used to clean personals is bar soap.

**Monitor's Assessment:**

The monitoring data provided during this tour clearly shows significant progress in getting inmates to use the laundry for linens and uniforms.  Personal laundry continues to be the significant issue not allowing this provision to be in substantial compliance.  During tours of housing units, I continue to see inmate personal clothing hanging in showers in Division *XI (it was taken down by the officer while I was there).*  I did see far less ropes in the cells on this trip.  I believe there continues to be an issue here of compliance.  I suspect that because the touring schedule was well known among staff and inmates based on comments made by both during visits to the divisions.  That said, as a result of little observation of ropes and hanging clothes, this provision is now in substantial compliance with the provision.  Future visits will determine, if, in fact, there has been significant improvement.

As I noted in all six previous reports, efficient and effective laundry service will, when mandated and enforced with accountability, gain increasing acceptance by inmates.   While it may be impossible to get 100% conformance by inmates, continual reinforcement from tier officers is needed.

**Monitor's Recommendations:**

1.  Continue to regularly monitor and track the use of the laundry and as discussed above include a discussion and expectations as regular agenda topic at Divisional Superintendent's meeting.  Division Superintendents need to reinforce this issue within their divisions and housing officers need to know that they are responsible and accountable.

2.  Modify the weekly superintendent's report to show which housing units did not meet the laundry schedule, along with an explanation as to why the laundry service was not offered.

3.  Complete the inmate video on the established laundry process that explains the process for uniforms, linens, and personal laundry.  The video can show that the schedule for inmate laundry pick-up is posted in each housing unit.

4.  The inmate handbook and laundry policy, when finalized, needs to include the current rules and expectations that clearly state that washing and drying personal laundry and linens outside of the CCDOC laundry procedures is expressly prohibited and explain the public health reasons for it.

5.  The housing unit sanitation inspection forms can and should be used consistently to document compliance by the unit officers and inmates regarding drying laundry in the cells.

**85.** Food Service

**a.** CCDOC shall ensure that all food service at the Facility is operated in a safe and hygienic manner and that foods are served and maintained at safe temperatures.

**SEPTEMBER, 2013 COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE**

**Status Update:**

CBM Premier Management began providing food service at CCDOC on September 14, 2012.  In the first year, they, along with CCDOC staff have and continue to make significant improvements in the preparation and delivery of meals to the inmates.  Most, if not all of the broken and/or unused equipment has been removed from both the Central Kitchen and the Division XI kitchen.  The warewashing machines have been refurbished and are working well.  New cooking and hot holding equipment are on order and should be installed before the next visit.

CCDOC continues to provide one hot meal and two cold meals per day, as permitted by the State of Illinois Department of Corrections.  They continue to provide a "heart healthy" diet to the detainees in cooperation with Cermak's medical staff and CBM's nutrition specialists.  This has resulted in some complaints about the food lacking taste.  However, salt is available through commissary, if inmates request it.  The new menu, that was effective June, 2013, streamlined the existing meal types and eliminated others.  As a result, CBM, along with Cermak and CCDOC have reduced the number of medical and religious meals from twenty-two to eight medical and two religious diet plans.  Other than the regular diet, medical diets now consist of the following: Dental soft; clear liquid; full liquid, food hypersensitivity/allergies; pregnancy, nutrition support, 2400 calorie diet, and renal diet.  Medical diets are only provided, if prescribed by Cermak medical staff. The only religious diets provided include Kosher and Vegan.  The religious meals may be ordered by CCDOC or social worker.  However, when these meals are requested, detainees are also limited in the type of commissary foods they may purchase.  The menu continues on a four week cycle that repeats and has been developed and approved by a Registered Dietician employed by CBM.

CBM has all responsibility for maintenance of equipment and sanitation.  They have two maintenance technicians who work on a schedule that allows for weekend coverage as needed. Sanitation is done by inmate workers under the training and supervision of CBM employees and CCDOC security staff. Currently both the Central Kitchen in Division V and the Division XI kitchen continue to be used to prepare detainee meals.  The Division XI kitchen is only used to prepare the hot meal for that division. The Central Kitchen serves all other divisions.  CBM is in the planning stage to prepare all meals in the central kitchen and utilize the Division XI kitchen for a specialized meal service called "Fresh Express" whereby inmates can actually order foods other than the standard diet and pay for it through their inmate commissary account. CCDOC along with CBM continue to assess and make changes to reduce the delivery time of transporting the food from the Central Kitchen to all divisions.  Considerable progress has been made by simply reducing the number of specialty diets which reduces the sorting time once the meals reach the Divisions.  CBM is currently considering converting par of one walk-in refrigeration room into a hot holding room where meal trays will be maintained hot.  Then when the hot food is placed in the tray, it would hold the heat longer resulting in meals being warmer than now. CCDOC Sanitarians, kitchen security officers and Superintendent Sean Julian meet weekly with CBM to discuss and address issues.  A meeting summary is provided following each meeting.  It includes a punch list of outstanding issues including a resolution explanation.

Tool control in the kitchen is maintained by CCDOC security staff for large tools and by the contractor for small kitchen utensils.  There is current policy and practice to not allow any knives in the kitchen for any purpose.  All tools, along with all chemicals are now routinely inventories, and there is a sign in/sign out log maintained in both kitchens.

CCDOC Sanitarians conduct routine inspections of both food service facilities and provide reports back to CBM when issues are identified.

**Monitor's Assessment:**

CBM has and continues to work closely with CCDOC Support Services to identify and resolve issues related to food service.  Inmate complaints are down significantly from previous tours.  In interviewing inmates, some complained about bland food, food not warm enough, and delays in having meals delivered.  This was especially true in the Women's Justice Division XVII.  It would be beneficial for CBM and CCDOC to establish face to face meetings rotating divisions so that CBM can understand the issues from an inmate perspective.

As of this tour, CBM implemented all of the issues identified in the February, 2013 Monitor's Report #VI for both kitchens.  They have purchased and are using new self-draining racks to store dinner trays between meals that actually allow the tray to air dry between uses.  They have ordered the same racks for Division XI.  CBM has created a "training room" with AV capabilities that is used to train both CBM staff and detainee workers on food safety and CBM procedures.  Further, they have developed and implemented documented employee and inmate worker training programs, an internal inspection program, temperature monitoring program, formal staffing plans for employees and detainee workers, weekly cleaning schedules, a number of Standard Operating Procedures, security standard and procedures, inmate kitchen worker orientation checklist,  health screening, emergency evacuation plan in compliance with the fire safety committee, emergency contingency plans, just to highlight a few.

During tours of the housing units, inmate's opinions continue to be mixed with respect to meals. However, the number of complaints was less than I have heard in previous tours. Previously inmates complained about too much peanut butter. As a result CBM now provides a chocolate based spread that has been accepted quite well.   Inmates also complained about too many beans and casseroles.  Both kitchens were maintained clean, well-organized and effectively supervised during my tour.  While complaints from inmates will never be eliminated and that new equipment needs to be received and installed, the provision is being met at the present time.  The following was identified during the brief inspection. Please address those that need to be addressed within the Central Kitchen:

1. The loading docks need to be repaired so that the overhead door can close completely to eliminate an entry point for rodents.

2.  The cleaning logs need to be maintained current in the inmate washrooms

3. The on/off switch for the lights under the ventilation hoods in the diet room and the main kitchen need to be interfaced with the vent fans so that when the light is turned on or off, so is the ventilation fan. Currently the fans are always on.

4. Once CCDOC employee working in the control room was not aware that all tools had to be signed in and out.

5. Key control in the main kitchen was effectively maintained.

6. CBM employees completing temperature monitoring logs need to record the actual temperature of the wash water and the sanitizing rinse. The wash temperature was always recorded as 160°F and the sanitizing rinse temperature was recorded as 200°F. For effective sanitizing, the final rinse temperature should be between 180°F and 194°F.

**Monitor's Recommendations:**

1. Establish and complete inmate meetings regarding food service.

2. Continue to use the CCDOC Sanitarian to conduct at least bi-weekly inspections of both kitchens. Please continue to provide me with copies of the meeting summaries.

3. CBM management should continue to conduct weekly inspections and provide a copy of the inspection report to CCDOC with a corrective action plan for any deficiencies identified. CCDOC should as part of its inspection responsibilities monitor and record the completion of all corrective actions taken and work orders completed.

4. Provide evidence that training is or has been provided for security officers and CBM employees in the kitchen responsible for tool control. It should include techniques to observe the effective use of all tools and assure that when finished, all tools are returned to the shadow board and accounted for before the end of any shift, and are marked as returned in the tool control log. The training needs to also include the procedure to be followed when any tool is found to be missing or broken.

5. Continue to find ways to reduce the time from when hot food meals are trayed till they are served to inmates or other alternatives to assure hot meals are served hot.

6. Correct issues identified during the inspection.

**85.** Food Service

    **b.** CCDOC shall ensure that all food service staff, including inmate staff, must be trained in food service operations, safe food handling procedures, and appropriate sanitation.

**SEPTEMBER, 2013 COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE**

**Status Update:**

All CBM management employees are Certified Food Safety Managers through the accredited Serv-Safe program and documentation is maintained showing that "Food Manager Certification" certificates that are current.  CBM has developed written job descriptions for all employees that include responsibilities and tasks.  CBM provides regular training of inmates using a check list that is signed by CBM staff and the inmate kitchen worker demonstrating that they have had food safety training pertaining to their assigned responsibilities.  CCDOC Sanitarians developed an inmate training video that addresses health issues and personal hygiene that is shown to all potential inmate workers before they are assigned to work in the kitchens.

**Monitor's Assessment:**

The State of Illinois requires food service managers to successfully complete a "State" approved food manager certification program.  CBM posts the Serv-Safe Food Manager Certification Certificates for those employees who have successfully completed the training in the employee break room.  Of the approximately 57 positions shown on their staffing plan, 34 have successfully completed and maintain current Serv-Safe Certification.    CBM provided a copy of their employee training matrix which includes formal training programs for diets, utensils and thermometers, tool control, dish machine operation, work orders security, handling leftovers, food safety, labeling of foods etc.  CBM staff have developed written cleaning procedures for specific equipment and each area of the kitchen including coolers, kettle areas, ovens, ceiling vents, mixers, drains, sinks etc. This is accompanied by cleaning logs that document whether the cleaning has been completed, the frequency for cleaning and a place for the worker's initials and date.  It is being used currently in all kitchens.

This provision is currently being met.

**Monitor's Recommendations:**

1.   None at this time.

---

**85.** Food Service

> **c.** CCDOC shall ensure that the Central Kitchen and Division XI kitchen are staffed with a sufficient number of appropriately supervised and trained personnel.

---

**SEPTEMBER, 2013 COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE**

**Status Update:**

There has been no change since the previous report. CBM maintains a staff of 57 employees either full or part time with schedules to assure adequate coverage daily and including weekdays.  They have a documented food service staffing guide that outlines the starting and ending times for all employees. Their schedules are established to start as early as 2:30AM through 1:00AM depending on whether they are preparing food, doing maintenance, sanitation, or receiving foods.  Additionally they utilize

approximately 232 detainees scheduled over three six to eight hour shifts just in the central kitchen to work in a variety of food service operations including preparation, filling meal trays, sanitation, warewashing, etc. Division XI inmate workers are assigned to work in that Division's kitchen to prepare and tray the dinner hot meal. The contractor is responsible for supervising their employees and the inmate workers assigned to the kitchen. CCDOC identifies and provides the inmate workers as needed. CCDOC also provides security officers for the kitchen. CCDOC provides staff to for transport the prepared meals to all divisions either by transport truck or by carts through the tunnel system. Training of kitchen staff for security is provided by CCDOC; training for inmate staff on food safety, preparation and cleanup is provided by the contractor and by CCDOC. As mentioned earlier in this report, CCDOC has developed a training video for initial training for inmate workers.

**Monitor's Assessment:**

Based on my observations during the tour and discussions with CCDOC qualified, trained and adequate number of staff is on hand at all times to assure timely preparation and service of meals to detainees. The regular weekly meetings between CCDOC staff including the staff sanitarians, security staff, management and CBM will include discussions of adequate staffing should it become an issue. As reported in previous rep orts, CCDOC appears to have a sufficient number of staff to supervise the security for inmates assigned to work in both kitchens and provide effective tool control. During this tour there was an issue with inmate workers because of an apparent viral outbreak among inmate kitchen workers. CCDOC worked effectively with Cermak to identify other workers and appropriately using Center for Disease Control recommendations to determine how soon inmate workers could return.

**Monitor's Recommendations:**

1. None at this time.

---

**85.** Food Service

D. CCDOC shall ensure that dishes and utensils, food preparation and storage areas, and vehicles and containers used to transport food are appropriately cleaned and sanitized.

---

**SEPTEMBER, 2013 COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE**

**Status Update:**

This provision continues to be in substantial compliance with the consent agreement. CBM has developed written cleaning procedures and a cleaning checklist/log for both kitchens along with a daily and weekly cleaning schedule for each room and the equipment in the kitchens such as the meat/packing room, wet room, bakery/packing room, dock, dry storage areas, and the main kitchens. It identifies what is to be cleaned, the frequency and who is responsible for the cleaning. CBM trains, uses, and supervises inmate workers to clean and sanitize all areas identified on the cleaning schedule. Once completed, the supervisor initials the form and the records are maintained and are available for

the Sanitarians to review during inspections.  The trays used for the hot meal each day are washed and sanitized after the dinner meal and the clean trays are now stored on new racks designed to allow water to drain and the trays to dry between meals.  Breakfast and lunch meals are served on single service trays that are collected and disposed.  As a result trays are now completely dry when they are filled at each meal.

**Monitor's Assessment:**

Since the previous tour the warewasher is the Central Kitchen and Division have undergone a complete refurbishing to the manufacturer's specification.  Cleaning and sanitizing SOPs are now complete and a checklist developed and implemented. During my tour of both kitchens I found that all rooms and equipment were cleaned and maintained.  All equipment no longer used has been removed and some new equipment is currently ordered.   All equipment appeared to be adequately maintained.

**Monitor's Recommendations:**

1.  CBM needs to continue monitoring warewashers and sanitizing solution concentrations to assure effective sanitization/disinfection of all food contact surfaces and non-food contact surfaces.  Also CBM supervisors and Support Services staff assure that inmate workers and CBM employees are following cleaning procedures for all equipment and areas.

2.  CCDOC should continue conducting independent inspections of all food service areas to assure that this provision continues to be met.

**85.** Food Service

>   **e.** CCDOC shall check and record, on a regular basis, the temperatures in the refrigerators, coolers, walk-in-refrigerators, the dishwasher water, and all other kitchen equipment with temperature monitors to ensure proper maintenance of food service equipment.

**SEPTEMBER, 2013 COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE**

**Status Update:**

This provision continues to be in substantial compliance with the consent agreement.  The monitoring and recording program in place demonstrates that this provision is currently in substantial compliance. CBM has implemented an effective monitoring program for all refrigerators, freezers, and warewasher equipment.   Logs of the temperature measurements are not only reviewed by CBM management, but also provided to the CCDOC Sanitarians for review weekly.  Any repairs deemed necessary as a result of monitoring is completed by CBM staff maintenance workers.  CCCOC Support Services Sanitarians continue to measure and record temperatures during unannounced inspections of both kitchens.

**Monitor's Assessment:**

I reviewed temperature logs for most refrigerators and freezers in both kitchens during this tour.  The logs were up-to-date, legible and maintained.

**Monitor's Recommendations:**

1.  None at this time.

APPENDIX I

JUNE 10 CORRESPONDENCE REGARDING CERMAK SANITATION (correspondence attachments not included):

 Good morning Dave:

I am responding to our meeting last Monday regarding the status of the Cermak Sanitation Committee and the progress that you are making.  As we discussed, I did not receive any response to my email regarding the first meeting of the committee.  I am still expecting a formal response.  As I stated in that email, I am still concerned that there is no formal goal for the committee.  I firmly believe that the goal needs to be established by the committee to assure that all members agree on what that goal is.  As you know I questioned also whether or not the goal includes both the old and new Cermak.  I believe it needs to include both.   So please review my earlier correspondence from the first meeting and send me a response.


On a second note, I did a limited review of the Cermak Policy identified as G-03 that shows no approval date or posting date.  It is titled Infirmary Care-Appendix A.  You stated that this was a General Order from the Interagency group.  I confirmed with CCDOC that it is not, and in fact John Murphy and Matt Burke had not seen it. I typically receive drafts of all Interagency Orders or policies and the first time I saw this was when I was with you on Monday. I provided them a copy.  Further, being that it is not signed nor have an "approval date", I consider it still a draft.  In it under sections 1.2, 1.3,1.5, 2.2.4, 6.1, 6.36.5, 6.6, 6.7, 7.310.412.1, 14, 16.1.1.617, 19.126,27.5, and 31all in some way refer to CCDOC.  If this is a Cermak policy, it should only reflect responsibilities of Cermak and no other organization.  If you believe the policy does need to include these identified provisions or if there is a need for these responsibilities to be memorialized, it needs to be through a written and approved Interagency General Order.  Please provide a response as to how you will proceed on the draft from this point.


You also provided me a copy of the "Environmental Service Department Continued Training In-Service". (Copy attached.) In it there are procedures for janitor car set up, Cleaning requirements

for bathroom/locker room, patient showers, exam rooms, patient room cleaning, day room cleaning, and office cleaning, along with a DJB initialed "Environmental Service Cleaning Standards document. This document should first be drafted as a formal Cermak Policy, that is correct, detailing specific requirements, ("not mix 2 oz. of soap per gallon of water (approximately 2/3 coffee cup)" for example. What is the source of the two ounces of soap? Is it, as it should be, from the manufacturer's instructions? Is the soap mixture the only item on the cart? I suspect not. What are you presently using glass cleaner or vinegar and water for stainless steel? I thought you were using a designated stainless steel cleaning product that came in an aerosol can. What is the "non-acid bowl cleaner? Is there a mixture here as well? It should be specified. In the patient showers, the directions say to "spot clean walls with non-acid bowl cleaner. How do you spot clean a shower wall that is most likely coated with soap scum? For that matter, why would you use a non-acid bowl cleaner to spot clean walls in the room? I suggest that walls be cleaned on a specific schedule that is included in the sanitation policy using a cleaning compound that is appropriate for task.

In the exam rooms, you again reference using the non-acid bowl cleaner on the exam tables and counters. In fact these need to be cleaned and disinfected? Does the manufacturer make a disinfectant claim on the bowl cleaner that destroys MRSA among other bacteria and viruses?

In several of the areas, the instructions say to "dust-mop the floor; at what frequency do you wet mop the floor and what detergent and what disinfectant do you use? The disinfectant usually has to be used either as a second step or again as specified by the chemical manufacturer. I did note that the only area that is to be "mopped" is the office cleaning. That does not make any sense to me.

In the Environmental Service Cleaning Standards (Copy attached.) document you state that "sinks and toilet bowls, all parts including underneath should be visibly clean with no blood and body substances, dust, dirt, or spillages." However it does not specify the frequency, who is responsible, the procedure, or how often for example do you clean the rooms with a machine? How often to you wet mop and with what detergent and disinfectant? In the same document, it states that if the walls are unable to be cleaned, please notify management so that painters can be called. Who is management in this case? Do you paint the walls or is that done by DFM?

So in summary of this document, I would like to see the MSDSs for all chemicals used, a copy of the chemical inventory for all store rooms, a written sanitation policy that includes what is to be cleaned, the written procedures, frequency, who is responsible, on what form the cleaner documents that the cleaning was completed, who is responsible to monitor the cleaners, and at what frequency. If it is not documented, how do you know the sanitation actually happened?

That sanitation log should be signed by the cleaner and by a responsible supervisor who attests that the cleaning actually occurred. "Say what you do; Do what you say; and be able to prove it". Once you have a formal sanitation policy and procedure, then you can train your cleaners to correct policy and there should be no question as to what is acceptable and what is not acceptable. I believe the current "training in-service and Environmental Service Cleaning Standards are considerably too general with no accountability. I also would like to review the new draft written sanitation policy and procedure once it is completed. Having reviewed this document, I now understand why the lack of cleanliness and sanitation exists at this facility. I also want to be sure that either this policy or a separate policy and procedure be developed for the new RCDC.

I also reviewed the "Sanitation Level System" (copy attached.) document that is also not authorized or dated. Where did this come from? This document identifies the cleaning frequency. I believe that its provisions need to be included in the formal sanitation policy. As far as the frequency for each level, who made the decision as to the frequency and what is the basis for it? Is this customary cleaning schedule for a hospital or medical/dental clinic? If so, I would like to see the documentation that supports the frequency. Someone has made hand written edits to it. Who and what is the basis for that? Why do we need five different "Sanitation Levels'? You see, I do not just commonly accept a document without some either scientific basis or evidence of adequacy. Please provide it.

I also reviewed a document titled "Cook County Department of Corrections Cermak Detainee's Rules of Conduct Responsibilities" (copy attached.) Again this document references CCDOC and as such needs to be an interagency general order, if agreed to by the other members. If not, this should be a formal Cermak policy of the rules of Cermak, and not make any reference to CCDOC. The copy I am attaching has considerable markings that I made with you during our meeting. But I wanted CCDOC to have a copy so they can review and decide the appropriate direction for it.

During our meeting on Monday I reviewed with you the meeting summaries that you did not send. They included the meeting summaries of 3/15/13, 4/2/13, 4/23/13 and 5/13/13. Generically, I noted to you that in most, if not all of the meetings, a member would make a comment, but there was never an assignment to investigate it or to resolve it; nor was there any mention of it again at the next meeting for follow-up. In other words, the issue was never addressed nor was it even included on the next meeting's agenda. Why? For example in the meeting summary of 3/15/13 "D. Badali informed attendees that food is being served in the

rooms on 3 North/West. Commander Hudik is running into difficulty replacing the mattresses, and will continue to reinforce no food in the rom policy.  The second floor has improved. (Improved in what???)  However, there was no mention of the issue in the April 2 meeting summary.  You indicated to me during our meeting that apparently CCDOC does not have enough staff.  Why did this not get taken up the chain to Manny to be discussed at the Inter-Agency Meeting?  It seems to me that would be the appropriate next step.  I suggest that as a first step, you review all of the five meeting summaries to identify the announced issues and specifically each item under a new section on the agenda as "old business."  It should also include the person's name who is going to formally address and seek the solution to the issue. They include cleaning and disinfection of boats, the inspection form, overcrowding, Environmental inspection rounds, inmates use of chemicals, inmates cleaning their own rooms and cells, etc.

In the next meeting summary, please include the results of those discussions and more importantly the resolution of those issues.

Please let me know if you have any questions regarding my email or the attachments.