UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>COOK COUNTY, ILLINOIS;<br>THOMAS DART, COOK COUNTY<br>SHERIFF (in his official capacity);<br>TONI PRECKWINKLE, COOK COUNTY<br>BOARD PRESIDENT (in her official capacity);<br>COOK COUNTY BOARD OF<br>COMMISSIONERS (in their official capacity),<br><br>    Defendants, | No. 10 C 2946<br><br>Judge Virginia Kendall |

# Monitor Jeffrey L. Metzner, M.D.'s Report No. 9

Jeffrey L. Metzner, M.D., P.C.
3300 East First Avenue
Suite 590
Denver, CO
E-mail: Jeffrey.metzner@ucdenver.edu

**Executive Summary—Ninth Monitoring Report (Mental Health Provisions)**

Since the November 2013 site visit, some progress has occurred in the context of implementing relevant provisions of the Agreed Order. However, the rate of progress has decreased since the last site assessment related to significant vacancies in the psychiatrist, psychologist and nursing positions as well as issues due to current leadership vacancies.

New areas of progress since the November 2013 site assessment include the following:

1. An increase in the staffing allocations for psychiatrists' (6.5 FTE), psychologists' (4.0 FTE) and social workers' (1.0 FTE) positions were funded through the 2014 budgetary process. When these positions are filled, the psychiatrists and psychologists allocations should be adequate.
2. Relocation of the women's intermediate mental health care units to the new RTU.
    a. An increase in the quality of structured therapeutic activities within the women's intermediate mental health care units within the RTU.
3. The QI process continues to evolve in a positive manner.
4. The discharge process from CCDOC for mental health caseload inmates has been enhanced via a "discharge lounge" process and implementation e-prescribing.

Areas of progress that have continued to improve since the November 2013 site assessment included the following:

1. An increase in the number of hours of structured therapeutic activities and the quality of these activities within the Cermak mental health units (i.e., the 2nd floor units). A behaviorally based incentive program has recently been implemented that appears to be very promising from a clinical perspective.
2. The leadership of Kenya Key (Acting Chief Psychologist) and David Kelner, M.D. (Chief Psychiatrist).
3. Improvement is noted re: completion of treatment plans. However, the treatment team planning process remains hampered by lack of access to computers in the Cermak conference rooms.
4. Maintenance in the number of hours of structured therapeutic activities and the quality of these activities within the Division X intermediate mental health care units.

Areas of progress maintained since the November 2013 assessment included the following:

1. The improved working relationships between CCDOC and Cermak staffs, which has been facilitated by Nneka Jones, Psy.D. (First Assistant Executive Director).
2. Within the context (and significant limitations) of the current psychiatrists' filled positions, reasonable access to the mental health clinicians, including the

      psychiatrists, has been maintained for inmates in the intermediate care mental health units and in Cermak.
3. The mental healthcare input into the disciplinary process continues to work well.
4. All twelve of the provisions of the Agreed Order found in substantial compliance during November 2013 remain in substantial compliance.

The most significant problem areas continue to include the following:

1. The continued psychiatrists, psychologists and nursing vacancies, which are related to the hiring process and salary issues (at least for the psychiatrist and nursing positions).
2. Inadequate programming space and programming for the intermediate care mental health units, which will be remedied by the opening of the RTU/RCDC and increased staffing allocations..

Other problems include the following;

1. The treatment team planning process within Cermak does not have access to the EMR during the actual treatment team meeting due to lack of access to a computer.
2. There are significant barriers to the use of involuntary psychotropic medications on a non-emergency basis despite such a process being clinically indicated in selected cases.

As noted during prior site visits, the obstacles to implementing provisions of the Agreed Order continue to include the following:

1. staffing vacancies and allocation issues,
2. physical plant limitations,
3. institutional cultural issues.

During the site visit, key administrative and clinical staff from both Cermak and CCHHS presented a recently implemented plan that was designed to streamline the hiring process and improve the recruitment process. Changes included more direct appointments in the key leadership positions, increased salaries for nurses and psychiatrists, and plans for outsourcing aspects of the validation and interviewing procedures. A more stringent internal monitoring of this process has also been implemented.

It is very encouraging that the RTU is now operational for female inmates and has, as expected, significantly improved the therapeutic milieu. There were many problems that occurred during

the transition from Division IV that can be avoided in the context of the Division X move to RTU.

**Summary of Compliance Findings**

All of the twelve provisions of the Agreed Order found in substantial compliance during April 2013 remain in substantial compliance. Provision 61 (a, b & c) and Provision 64 (a & b) was assessed to now be in substantial compliance.

All the mental health provisions of the Agreed Order assessed by this monitor were found to be in partial compliance except for the following eleven provisions that were assessed to be in substantial compliance (with the initial date of substantial compliance noted in parenthesis):

**Substantial compliance**

59. **Assessment and Treatment**

    a. **Results of mental health intake screenings (see provision 45.c, "Intake Screening") will be reviewed by Qualified Mental Health Staff for appropriate disposition. (6/12)**

    b. **Cermak shall develop and implement policies and procedures to assess inmates with mental illness; and to evaluate inmates' mental health needs. Said policies shall include definitions of emergent, urgent, and routine mental health needs, as well as timeframes for the provision of services for each category of mental health needs. (10/12)**

    i. **Cermak shall provide the designated CCDOC official responsible for inmate disciplinary hearings with a mental health caseload roster listing the inmates currently receiving mental health care. (6/12)**

    j. **When CCDOC alerts Cermak that an inmate is placed in lock down status for disciplinary reasons, a Qualified Mental Health Professional will review the disciplinary charges against inmate to determine the extent to which the charge was related to serious mental illness. The Qualified Mental Health Professional will make recommendations to CCDOC when an inmate's serious mental illness should be considered as a mitigating factor when punishment is imposed on an inmate with a serious mental illness and to minimize any deleterious effect of disciplinary measures on an inmate's mental health status. (10/12)**

3

    m.    Cermak shall maintain an updated log of inmates receiving mental health services, which shall include both those inmates who receive counseling and those who receive medication. Cermak shall create such a log within six months of the date this Agreed Order is executed. The log shall include each inmate's name, diagnosis or complaint, and next scheduled appointment. Each clinician shall have ready access to a current log listing any prescribed medication and dosages for inmates on psychotropic medications. In addition, inmate's medical records shall contain current and accurate information regarding any medication changes ordered in at least the past year. (6/12)

61. **Suicide Prevention Policy**

    a. CCDOC shall participate with Cermak in a jointly established Suicide Prevention Committee charged with developing policies and procedures to ensure the appropriate management of suicidal inmates and with implementing and monitoring a suicide prevention program in accordance with generally accepted correctional standards of care.

    b. Cermak shall participate with CCDOC in a jointly established Suicide Prevention Committee charged with developing policies and procedures to ensure the appropriate management of suicidal inmates and with implementing and monitoring a suicide prevention program in accordance with generally accepted correctional standards of care.

    c. The suicide prevention policy shall include, at a minimum, the following provisions:
       (1) an operational description of the requirements for both pre-service and annual in-service training;
       (2) intake screening/assessment;
       (3) communication;
       (4) housing;
       (5) observation;
       (6) intervention; and
       (7) mortality and morbidity review. (11/13)

63.     Cermak shall ensure that Qualified Mental Health Staff assess and interact with (not just observe) inmates on Suicide Precautions, and document the assessment and interaction on a daily basis. (11/10)

64.     **Suicide Risk Assessments**

    a.     Cermak shall ensure that any inmate showing signs and symptoms of suicide is assessed by a Qualified Mental Health Professional using an appropriate, formalized suicide risk assessment instrument within an appropriate time not to exceed 24 hours of the initiation of Suicide Precautions.

    b.     Cermak shall ensure that the risk assessment shall include the following:

        (1) description of the antecedent events and precipitating factors;
        (2) mental status examination;
        (3) previous psychiatric and suicide risk history;
        (4) level of lethality;
        (5) current medication and diagnosis; and
        (6) recommendations or treatment plan. Findings from the risk assessment shall be documented on both the assessment form and in the inmate's medical record. (11/13)

66. **Suicide Prevention Policies**

    a.     CCDOC shall ensure that suicide prevention policies established jointly with Cermak include procedures to ensure the safe housing and supervision of inmates based on the acuity of their mental health needs, in accordance with generally accepted correctional standards.

    b.     Cermak shall ensure that suicide prevention policies established jointly with CCDOC include procedures to ensure the safe housing and supervision of inmates based on the acuity of their mental health needs, in accordance with generally accepted correctional standards. (6/12)

67.     DFM shall ensure that cells designated by CCDOC or Cermak for housing suicidal inmates shall be retrofitted to render them suicide-resistant (e.g., elimination of protrusive shower heads, unshielded lighting or electrical sockets). Inmates known to be suicidal shall not be housed in cells with exposed bars. (6/12)

68. **Suicide Prevention Training**

    a. Cermak shall ensure that the Facility's suicide prevention curriculum for health care staff members, jointly established with CCDOC, addresses the following topics:

    (1)    the suicide prevention policy as revised consistent with this Agreed Order;

    (2)    why facility environments may contribute to suicidal behavior;

    (3)    potential predisposing factors to suicide;

    (4)    high risk suicide periods;

    (5)    warning signs and symptoms of suicidal behavior;

    (6)    observation techniques;

    (7)    searches of inmates who are placed on Suicide Precautions;

    (8)    case studies of recent suicides and serious suicide attempts (Serious suicide attempts are typically considered to be those that either were potentially life-threatening or that required medical attention);

    (9)    mock demonstrations regarding the proper response to a suicide attempt; and

    (10)    the proper use of emergency equipment, including suicide cut-down tools. (12/10)

70. Cermak shall document inmate suicide attempts at the Facility, as defined by the Suicide Prevention Committee's policies and procedure in accordance with generally accepted correctional standards, in the inmate's correctional record in CCDOC's new Jail Management System, in order to ensure that both correctional and health care staff will be aware at future intakes of past suicide attempts, if an inmate with a history of suicide attempts is admitted to the Facility again in the future. Cermak will begin to document this information within six months after execution of this Agreement. (6/12)