UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | |
| COOK COUNTY, ILLINOIS;<br>THOMAS DART, COOK COUNTY<br>SHERIFF (in his official capacity);<br>TONI PRECKWINKLE, COOK COUNTY<br>BOARD PRESIDENT (in her official capacity);<br>COOK COUNTY BOARD OF<br>COMMISSIONERS (in their official capacity), | No. 10 C 2946<br><br>Judge Virginia Kendall |
| Defendants, | |

# Monitor Esmaeil Porsa's Report No. 8
# May 2014

Esmaeil Porsa, MD, MPH, CCHP
Associate Chief Medical Officer
Senior Vice President
Professional and Academic Affairs
5201 Harry Hines Boulevard
Dallas, Texas 75235-7746
esmaeil.porsa@phhs.org

## Executive Summary

On May 19th through 23rd, the Monitoring Team visited Cook County Jail. The team included: Dr. Esmaeil Porsa, Dr. Muthusamy Anandkumar, Madeleine LaMarre FNP-BC, Catherine Knox, MN, RN, CCHP-A and Linda Pansulla, RN, MBA. The Monitoring Team interviewed various Cermak and CCDOC leadership and front line staff as well as Cook County Jail inmates. We also toured Cook County Jail medical facilities and housing units. We would like to extend our most sincere thanks to all the leadership and staff for their hospitality and generosity with their time and resources. Cook County Jail and Cermak staff were completely cooperative and helpful in this monitoring visit.

Our monitoring visit began with an introductions meeting that included top executive leadership of the Cook County Health and Hospital System (CCHHS). This meeting served to set the tone for the rest of the week and impressed upon the Monitoring Team the degree of dedication of the CCHHS leadership to the success of Cermak Correctional Health during the remainder of our visit, we received every courtesy and cooperation and had unhindered access to the facilities and health care records in order to synthesize an accurate report.

There has been continued progress in some areas. In the medical program, all areas of substantial compliance remained in substantial compliance with the exception of the mortality review and follow-up care. Areas of excellence such as Ob care and intake screening remain highly functional and reliable.

There are however, persistent issues that have not demonstrated improvement or have actually worsened since monitoring began; staffing and access to care. With respect to staffing, Cermak has 135 vacant health positions and has been virtually unable to hire any staff in the past six months due to a bureaucratic hiring process and lack of adequate support from CCHHS. Staff vacancies have had negative impacts in a number of clinical areas, but none more apparent than access to care. Inmates currently do not have timely access to care which increases their risk of harm. On any given day, staff vacancies result in redeployment of nurses to medication administration and inmate health requests are not processed. Access to care and medication administration are two critical areas and Cermak health care leadership collectively must develop strategies to ensure that both occur in a timely manner.

As noted above, we are encouraged by CCHHS leadership's renewed commitment to filling Cermak's vacant positions and anticipate that the vacancy rate will be significantly reduced at our next site visit. Staffing remains partially compliant due to significant vacancies in all health care disciplines (nursing, medical and mental health providers). If significant progress is not made in filling vacancies by our next monitoring visit, this provision will move to noncompliance.

Other areas that require focused attention include infirmary care, use of alcohol/benzodiazepine detox protocols, basic sanitation and infection control, and management of communicable diseases and staff training. The partial compliance rating in the dental care section is related to the difficulty with accurate measuring and reporting of dental wait times.

The hiring of health care staff is critical to occupying the Residential Treatment Unit (RTU) and reducing overcrowding in the Cermak infirmary and will facilitate other areas moving from partial to full compliance.).

## Introduction and Facility Outline

On the first day of our visit, May 19, 2014, the population of Cook County Jail was reported as 9346 which included 639 pre-release inmates and 114 inmates at Boot Camp. There were 11 inmates at Stroger Hospital. There were at total of 254 new Inmates processed at Cook County Jail intake (221 males and 33 females). The distribution of inmates among the various "Divisions" is reported in the body of this report.

## Definitions and Organization

This report is formatted in the manner requested by the Department of Justice and closely follows the Agreed Order. The report includes four parts for each section of the Agreed Order.

In part one; we rewrite verbatim the pertinent portion of the Agreed Order. This first part is labeled Remedial Measure of Agreed Order.

The second part is the compliance rating labeled Compliance Assessment. This is the assessment that Experts make based on judgment, data, and chart reviews. The Compliance Assessment has three possible scores: substantial compliance, partial compliance, and noncompliance. Substantial compliance means that the Experts determine that Cook County Jail has satisfactorily met minimum standards of care for the area in question. Partial compliance means that some remaining problems exist. Non-compliance means that much work needs to be done before compliance is met. The third part is the factual basis for forming the opinion in the Compliance Assessment. This will be as data driven as possible. For patient care areas, chart reviews form a substantial portion of this review. Touring, interviews, and reviewing data sources is also an important means of making assessments. The fourth part is recommendations. These recommendations are our view of what needs to be accomplished to attain compliance. Finally patient chart review material is provided as a separate confidential document. These chart review documents will be sent to Cermak Health Care leadership. If the Department of Justice or CCHHS desires these documents they will be sent upon request.

Report

## B. HEALTH CARE SERVICES: ELEMENTS COMMON TO MEDICAL AND MENTAL HEALTH

### 41. Inter-Agency Agreement

    a. CCDOC shall enter into a written Inter-Agency Agreement with Cermak that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility. The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order.

    b. Cermak shall enter into a written Inter-Agency Agreement with CCDOC that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility. The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order.

**Compliance Status**: This provision remains in substantial compliance.

**Status Update:** Received and reviewed.

**Monitor's Findings:**

The Medical Monitor reviewed minutes of interagency meetings. We additionally discussed this interagency relationship with medical and operational leadership who described the interaction as cooperative and conducive to advancing the mission and vision of the Cermak Health Services. In particular, there are monthly meetings between Cermak leadership and the Sheriff as well as weekly meeting with CCDOC leadership and Cermak leadership. There is also a recurring daily morning huddle with medical, administrative, custody, pharmacy and nursing leadership to verify and correct housing assignments for acute medical/mental health inmates and to verify that inmates on high acuity medications are in the correct housing unit to receive dose by dose medications. This is, as viewed by the Medical Monitor, consistent with the intent of the Agreement.

**Monitor's Recommendations:** None.

### 42. Policies and Procedures

Cermak shall provide adequate services to address the serious medical and mental health needs of all inmates, in accordance with generally accepted professional standards. The term "generally accepted professional standards" means those industry standards accepted by a majority of professionals in the relevant field, and reflected in the standards of care such as those published by the National Commission on Correctional Health Care ("NCCHC").

a. Cermak shall develop and implement medical care policies, procedures and practices to address and guide all medical care and services at the Facility, including, but not limited to the following:

    (1) access to medical care
    (2) continuity of medication
    (3) infection control
    (4) medication administration
    (5) intoxication and detoxification
    (6) documentation and record keeping
    (7) disease prevention
    (8) sick call triage and physician review
    (9) intake screening
    (10) chronic disease management
    (11) comprehensive health assessments
    (12) mental health
    (13) women's health
    (14) quality management
    (15) emergent response
    (16) infirmary care
    (17) placement in medical housing units
    (18) handling of grievances relating to health care
    (19) mortality review
    (20) care for patients returning from off-site referrals

b. Cermak shall develop and implement policies, procedures and practices to ensure timely responses to clinician orders including, but not limited to, orders for medications and laboratory tests. Such policies, procedures and practices shall be periodically evaluated to ensure timely implementation of clinician orders

**Compliance Status**: This provision remains in partial compliance.

**Status Update:** Received and reviewed.

**Monitor's Findings:**

Cermak health care and administrative leadership have completed many policies and have posted them on the CCHHS intranet. Most policy and procedures are outdated and even the current policies are not being practiced by healthcare staff. The most recent effective dates for the many policy and procedures were 2010 and 2011. Further practices, especially those relating to mediation administration and documentation in the electronic record don't reflect what staff are currently required to do, several of which heavily involve nursing services. We note that the approving authorities for Cermak policies and procedures are administrative and medical leadership but do not include nursing leadership, even for those policies that are predominantly nursing driven. In addition, changes in clinical, administrative and mental health policies often have an impact on nursing services that warrants nursing leadership involvement in policy decision and approval process.

Other policies and procedures have been revised but not posted to the intranet and when posted do not inform staff that there has been a change or what the change is. This is an alarming practice! Following are a few examples:

1. We noted at least five different approaches to maintaining of the crash bag and AED log by the nursing staff. This ranged from every day (correct approach), to once a week, once a month and never ("only look to see if it is there").
2. The Monitoring Team confirmed the infirmary nurses, including the nursing manager, lack of knowledge about the acuity levels of infirmary patients in face-to-face interviews with the staff. Currently, the infirmary patients are scheduled to see the infirmary provider based on "what the provider decides" rather than an established acuity based frequency of visits.
3. The Monitoring Team also notes that while the detoxification policy has been available, the full implementation of it continues to be postponed until the move into the new RTU building. The Monitoring Team sees no reason for this delay. The use of detox protocols should begin in accordance with the current policy and well prior to our next visit in November 2014 considering the proposed opening of the RTU in August of 2014.

**Monitor's Recommendations:**

1. Include Nursing Leadership as one of the approving authorities for Cermak policies and procedures, including mental health.
2. Review and update all policy and procedures to match the expected practices. Focus on the following policy and procedures:
   a. Access to care (sick call)
   b. Acute care (infirmary)
   c. Chronic disease management
   d. Medication administration and documentation
3. Train all staff with regard to current and new policies to ensure that policies are followed regardless of the location. Document this training so that leadership can later demand accountability.
4. Develop a policy to establish an acuity based provider visit frequency for the infirmary patients to ensure that all patients are evaluated by the infirmary providers on a routine basis instead of an "as needed" basis.
5. Begin to treat asymptomatic alcohol/benzodiazepine detox patients using Cermak's currently established detox protocol. Detox protocol should be initiated without any delay and as soon as the information about chronic use of alcohol and/or benzodiazepine is available.
6. Include routine and frequent use of CIWA-Ar and COWS nursing assessment as part of Cermak's policy and procedures on alcohol/benzodiazepine and opiate detox.

## 43. Medical Facilities

    a.  CCDOC will work with Cermak to provide sufficient clinical space, as identified by Cermak staff, to provide inmates with adequate health care to meet the treatment needs of Inmates, including:

        (1)  intake screening;

        (2)  sick call;

        (3)  medical and mental health assessment;

        (4)  acute, chronic, emergency, and specialty medical care (such as geriatric and pregnant inmates); and

        (5)  acute, chronic and emergency mental health care.

    b.  Cermak staff shall make known to CCDOC and Cook County its needs for sufficient clinical space, with access to appropriate utility and communications capabilities, to provide inmates with adequate health care to meet the treatment needs of Inmates, including:

        (1)  intake screening;

        (2)  sick call;

        (3)  medical and mental health assessment;

        (4)  acute, chronic, emergency, and specialty medical care (such as geriatric and pregnant inmates); and

        (5)  acute, chronic and emergency mental health care.

    c.  Cook County shall build out, remodel or renovate clinical space as needed to provide inmates with adequate health care to meet the treatment needs of Inmates, as identified by Cermak staff, including:

        (1)  intake screening;

        (2)  sick call;

        (3)  medical and mental health assessment;

        (4)  acute, chronic, emergency, and specialty medical care (such as geriatric and pregnant inmates); and

        (5)  acute, chronic and emergency mental health care.

    d.  Cermak shall ensure that medical areas are adequately clean and maintained, including installation of adequate lighting in medical exam rooms. Cermak shall ensure that hand washing stations in medical areas are fully equipped, operational, and accessible.

    e.  Cermak shall ensure that appropriate containers are readily available to secure and dispose of medical waste (including syringes and sharp medical tools) and hazardous waste.

    f.  CCDOC shall allow operationally for inmates' reasonable privacy in medical and mental health care, and shall respect the confidentiality of inmates' medical status, subject to legitimate security concerns and emergency situations. Reasonable privacy typically includes sight and hearing privacy from other inmates and hearing privacy from staff that are not providing health care.

    g.  Cermak shall make known to CCDOC and Cook County the structural and operational requirements for inmates' reasonable privacy in medical and mental health care. Cermak shall provide operationally for inmates' reasonable privacy in

medical and mental health care and shall maintain confidentiality of inmates' medical status, subject to legitimate security concerns and emergency situations. Reasonable privacy typically includes sight and hearing privacy from other inmates and hearing privacy from staff that are not providing health care.

h. Cook County shall build out, remodel or renovate clinical space as needed to allow structurally for inmates' reasonable privacy in medical and mental health care, as identified by Cermak and CCDOC staff.

Cook County shall begin construction of the new clinical space within three months of the effective date of this Agreed Order. It is expected that the project will be complete within nine months of the effective date of this Agreed Order. Prior to completion of the new clinical space, Cook County and DFM will work with Cermak to address the most serious concerns regarding clinical space, to the extent possible in the current Facility.

**Compliance Status**: Cermak leadership provided the Monitoring Team a status update dated May 2014. We reviewed the update in preparation of this report.

**Status Update:** This provision remains in partial compliance.

**Monitor's Findings:**

Since our last site visit in May 2013, CCDOC and Cermak continue to make improvements in providing appropriate clinical space for medical, dental and mental health care.
However, Division VIII (RTU) which was originally planned to open in June 2013 is not fully occupied and operational. Cermak did not receive funding for staff until December 2013, and most of these positions are unfilled. Unless Cermak is able to fill a significant number of staff vacancies, it places the projected RTU occupancy date of August 2014 at risk.

Delayed opening of the RTU combined with jail overcrowding has resulted in persistent, overcrowding on the second and third floors of Division VII (Cermak) inpatient units. These are the sickest medical and mental health patients in the jail. Harry Grenawitzke, Sanitation Monitor continues to note the impact of jail overcrowding in the infirmary along with poor sanitation in his reports.

Overcrowding has also delayed implementation of the detoxification policy; however due to the risks to patient safety, the Monitoring Team believes that this policy should be implemented immediately and not be delayed until the opening of the RTU.

In general, clinics are more uniformly equipped and supplied, but basic sanitation and disinfection procedures are not consistently performed across the jail and deficiencies are not addressed and corrected in a timely manner.

To improve access to care, health care leadership should attempt to schedule nurse and provider sick call clinics so that there is increased communication and collaboration between the professional disciplines, and reduce the need for nurse to provider referral. Each area is briefly described with areas needing improvement highlighted below.

a. CCDOC Clinical Space and
b. CCDOC Adjustments to Clinical Space

Division I is a maximum-security unit with a capacity of 1,250 inmates and current population of 1,247. It is the oldest part of the jail. The clinic was clean and well organized, and examination rooms were adequately equipped and supplied. A Pyxis machine in the medication room is now operational. Emergency response equipment and supplies were available, including an automatic external defibrillator (AED). Logs show that emergency equipment is checked daily and no emergency medications were expired. All examination rooms contained personal protective equipment and sharps and bio hazardous waste disposal containers.

Previous reports describe clinic ceiling leaks, flooding from heavy rains, and ventilation issues in the medication room. However, staff reported no further clinic ceiling leaks or flooding and that ventilation issues in the medication room has been corrected.

Division II, Dorm I is a three-story building with clinic space on the first floor. Inmates are housed on floors two and three in eight dormitories. Each dormitory has 48 beds for a total capacity of 384 beds. Monitoring was conducted on 5/20/14, the population count was 384. Due to significantly high population numbers throughout the facility, Dorm 1 continues to be at maximum capacity. The building is old and has an extensive amount of foot traffic. The area was clean but needed general painting and is poorly lighted. The clinic space which provides medical services for the Annex, Dorms 1, 3, 4 and Division 3 consists of a large waiting area, a small reception/clerical area and two small examination rooms. The area was cluttered and significantly under-sized for the population it is now required to serve. Inspection of the clinic space and the dormitories on the second and third floors indicated the building is in need of general maintenance, i.e., painting, ceiling tile replacement and additional lighting; however, there were no reported immediate structural, electrical or plumbing concerns. Inmates reported sufficient hot water for showering and hand washing, and soap is available. There were no complaints concerning toilet facilities. However, the inmates reported increased mold in the showers. This area was unable to be observed on the day of the visit due to it being in use.

Nurse sick call is performed in one of the examination rooms while the other is used for primary care clinics. Those areas are in need of disinfection. Nurses were asked the procedure for disinfection between patients. Staff provided answers that were inadequate and not in accordance with standard infection control procedure. Emergency response bags as well as personal protective equipment are available. Documentation was present indicating equipment was operational and necessary supplies were present. Per practice, the contents of the emergency bag are inventoried only when the bag has been opened, then it is restocked and retagged. Inventory documentation indicated there was no outdated items in the bag however inspection showed that a few medications were outdated and un-inventoried items were stored in the bag. Inventories of sharps and medical tools were accurate. There is not an inventory of lancets or count sheets. Refrigerator temperatures are monitored daily and noted as operating within the normal range. There were no outdated medications in the refrigerator or medication carts.

Division II, Dorm 2 is a "step-down", outpatient medical/mental health housing unit consisting of three floors with ten dormitory-style living units for a total building capacity of 464. On the day of the inspection the population was 459 Inmates. Clinic space for dorm 2 is located on the first floor. Due to high foot traffic, the need for painting walls and floors is frequent, and is on a

routine maintenance schedule. Additionally stairwells were dirty and had significant debris. The area is adequately clean and well-lighted. Cleaning of the inmate dorms on each floor is performed by Inmates.

On the day of the inspection, environmental temperatures were warm throughout the building. Inmates were observed without shirts on due to the temperature in the dorm area. This was due to the rapid temperature change outside the building. There were no noticeable or reported structural, electrical or plumbing concerns. Inmates on all three floors reported adequate hot water for showering and hand washing with soap available. There were reported complaints concerning toilet facilities and mold in the showers.

Emergency response and personal protective equipment is available in the clinic area. Documentation was present indicating equipment was operational and necessary supplies were present. Currently, staff inventories the contents of the emergency bag only when the bag has been opened, then it is restocked and retagged. Refrigerator temperatures are monitored daily and noted as operating with the normal ranges. There were no outdated medications in the refrigerator or medication carts. Inventories of sharps and medical tools were accurate.

Division II, Annex has been designated as a minimum security "non-gang" unit. It is a dormitory style unit with multiple dormitories. On the day of the inspection, the population was 428 Inmates. Inmates perform all the cleaning both within the dormitories and common areas. The dormitories were clean and well lighted. The common areas appeared cluttered with inmates' personal items and overcrowded. Inmates reported sufficient hot water for showering and hand washing, and soap was available. Interviews with Inmates reported overcrowding in the bathroom facilities and mold in the showers.

There is no dispensary in the building. All medical services are provided by dorm 1 or the Cermak Urgent Care. All medications are KOP and delivered by the medication delivery team. Division II, dorm 3 is a general population, minimum and medium security area consisting of three floors with three tiers per floor. There is a capacity of 428 beds and on the day of inspection, there were 428 Inmates.

The area was generally clean and well-lighted with all housekeeping performed by the inmates. There were no noticeable or reported structural, electrical or plumbing concerns. Inmates reported a sufficient amount of hot water for showering and hand washing, and available soap. There were no complaints concerning bathroom facilities.

There is no dispensary in this dorm. All medical services are provided by dorm 1 or Cermak Urgent Care. All medications are KOP and delivered by the medication delivery team.
Division II, dorm 4 is a minimum security general population and housing for inmate dietary worker consisting of two very large dormitory-style living units. The bed capacity of each unit is 334 and 350 beds, respectively for a total of 684. On the day of the inspection, the total population count was 671. All housekeeping and cleaning is performed by the inmates.
The units are in need of continual general maintenance, i.e. painting and ceiling tile replacement, and the toilet/shower area needs a thorough cleaning; however, there were no reported electrical or plumbing problems. Inmates in both dorms reported sufficient hot water for showering and

hand washing, and available soap. Inmates reported the bathrooms were operational but showers had mold.

There is no dispensary in this building. All medical services are provided by dorm 1 or Cermak Urgent Care. All medications are KOP and delivered by the medication delivery team. Inmates stated their medications are delivered timely and in pre-packed packages.

Division III Annex is a single floor building with multiple dorm style areas being utilized since the closing of Division III. It is a minimum security housing assignment for 639 inmates. The dispensary is located in the back of the building. The dispensary is opened during day time hours and is staffed with one RN and CMT. The nurse is new and currently in orientation. On 5/22/14 when we toured the building the temperature was uncomfortably hot. All dorms and offices had electrical fans running to circulate the air however Inmates were noticeably uncomfortable.

Emergency response equipment is available in the Dispensary. Staff indicated that in case of emergencies they immediately send the inmate to the Cermak Urgent Care Center for treatment. Inspection of emergency equipment revealed it was in working order and supplies were available however it is not routinely checked. Personal protective equipment is available. Refrigerator temperatures were all within the normal operating range, and there was documentation of daily checks when the RN was available. There were no outdated drugs in any refrigerator or medication carts. Inventories of sharps and tools were not accurate. Lancets are not counted and there were additional sharps in the cabinet that were not accounted for.

The dorms are in need of continual general maintenance, i.e. painting and ceiling tile replacement, and the toilet/shower area needs a thorough cleaning; however, there were no reported electrical or plumbing problems. Inmates in all dorms reported sufficient hot water for showering and hand washing, and available soap. Inmates reported the bathrooms were operational.

Division IV has a bed capacity of 704 female inmates of all security levels and a current population of 325. Clinic space is essentially unchanged from the 7th report.

Division V has a bed capacity of 992 and was closed for renovations.

Division VI is a general population unit consisting of two floors with twelve tiers per floor. There is a capacity of 992 beds and, on the day of the inspection 5/21/14, there were 789 inmates.

The dispensary was previously staffed 8:30 a.m. to 5 p.m. with one RN, one EMT and two CMTs. Staffing now consists of two RNs and two CMTs and one EMT. With the addition of the segregation and protective custody inmates and the need for dose-by-dose medication administration, the dispensary is staffed from 7 a.m. to 8:30 p.m. Thereafter, medical services are provided by the Cermak Urgent Care.

There are 48 inmates receiving dose-by-dose medication, and all others are on KOP which are delivered by the medication delivery team.

The division continues to appear very clean and well maintained with no noticeable or reported structural, electrical or plumbing concerns. The clinical area is a large, clean, organized and well-lighted unit. The hallways, common areas and dorms are clean and well-maintained.
There were no inmate complaints concerning sufficient hot water for showering and hand washing, soap being available or functioning toilets.

Personal protective equipment is available in the clinic area. Emergency response equipment is available. Documentation was present indicating equipment was operational and necessary supplies were present. Per practice, the contents of the emergency bag are inventoried only when the bag has been opened, then it is restocked and retagged. All logs were up to date and checked per policy.

Refrigerator temperatures are monitored daily and noted as operating with the normal temperature ranges. There were no outdated medications in either the refrigerator or medication cart. Inventories of sharps and medical tools were accurate.

Division VIII RTU is partially occupied and operational. Since our last visit, CCDOC/Cermak moved intake services into the ground floor. This area provides adequate space and privacy to perform intake activities and is adequately equipped and supplied. We checked emergency equipment and found that it worked properly and logs reflected that staff checked equipment daily. The area appeared to be clean and well-organized. However, the floors are unfinished concrete with cracks in some areas. There was no obvious debris, but cleanliness of the floors was difficult to discern due to the unfinished floors. Sharps containers are not adequately secured to the walls.

Female inmates with high medical and mental health acuity were relocated from Division IV to the RTU fifth floor. There appears to be adequate health and mental health space to provide services. Nurse and provider clinics were clean, well-equipped and supplied. Logs reflected that the emergency cart was not checked daily. The EKG machine should also be checked daily but the most recent strip run was about a week before our visit on 5/10/14. Sharps containers are not adequately secured to the walls. Health service request boxes have not been installed in the housing units and inmates submit their requests by attempting to slide them through the medication window or placing them into an open folder near the correctional officer station. This does not provide adequate patient confidentiality.

Division IX has capacity to house 1000 inmates and had a population of 937 on 5/19/2014. Nursing staff are on duty for 16 hours each day. The physical description of the population, housing units and the clinic space remains unchanged from previous reports. Three of the sick call examination rooms on the tiers were visited and remain as described in the seventh report. Improvements noted were that sinks ran both hot and cold water at the time of this visit and oto-ophthalmoscopes have been mounted on the examination carts. The emergency response equipment was reviewed. All items were present, in working order and in date. There is documentation daily that emergency equipment is present. As recommended previously the contents of the bag are inventoried monthly or after any other time the bag has been opened, then

restocked and re-tagged. The inventory sheet coincides with the items kept in each section of the bag.

Division X has capacity of 768 inmates and had a population of 738 on 5/19/2014. Nursing staff are on duty 24 hours, seven days a week. The physical description and housing capacity of the Division is unchanged from previous reports. On the day of the tour only 6 of 16 housing units were on a half in/half out activity schedule. The Superintendent is phasing in a behavioral incentive program that eliminates the use of half in/ half out. We toured two of the housing units and found no issues with safety, sanitation or temperature regulation. One inmate approached us with a concern about mold growing on the cell wall and in the window crevices. Both inmates occupying the cell noted that the wall had been cleaned after one of them had filed a grievance and has not been a problem since. It was obvious that the wall had been cleaned. Later that day Mr. Gnacinski, a CCDOC sanitarian, followed up with the inmates in this cell and provided further explanation about how to take care of the problem in the future.

The inadequacies of clinical space are unchanged with the exception that a privacy screen and second exam table have been added to the room used for nursing sick call. A more appropriate utilization of scarce space would be to switch the offices used by the Nurse Coordinator and part time dentist. This change would have the dentist use the anteroom off the dental operatory and give the Nurse Coordinator better access to patients and a private area to meet with staff.
The emergency response equipment was reviewed. Equipment is reviewed and signed off every shift, every day. The contents of the bag are inventoried monthly or after any other time the bag has been opened, then restocked and re-tagged. The inventory sheet coincides with the items kept in each section of the bag. The documentation does not reflect the date new tags have been applied; solutions to this were discussed with the Nursing Coordinator.

Division XI has capacity to house 1536 inmates and had a population of 1506 on 5/19/2014. Nursing staff are on duty eight hours each day. The physical description of the housing units in the Division is unchanged from the last report. We toured two of the housing units and found no issues with safety, sanitation or temperature regulation. This Division successfully employs a behavioral incentive program that emphasizes cleanliness and orderly use of space. Clinic space and equipment is sufficient to support the operation of the program with the exception that Room 117H has been locked by environmental services. This room was previously used to store hazardous waste and should not have been removed from use without sufficient discussion with the Nursing Coordinator to resolve potential problems in advance; in this case appropriate storage of hazardous waste.

The emergency response equipment was reviewed. This unit has ACLS supplies and equipment and is staffed by two paramedics. The emergency equipment is reviewed and signed every day. The contents of the bag are inventoried monthly or after any other time the bag has been opened, then restocked and re-tagged. The inventory sheet coincided with the items kept in each section of the bag. The AED pads were outdated and not documented as such on the daily log. New pads were obtained before the visit to Division XI was completed. New tags had been applied but were not listed on the daily log although they were recorded elsewhere. The need to focus on the accuracy of daily checks as well as the means to document new tag numbers on the monthly record were discussed with the paramedic on duty and Nursing Coordinator.

13

Division XVII, known as Department of Women's Justice, houses residential females including all pregnant women. We did not tour this area during this visit.

c. Cermak-Clinical space and
d. Cleanliness and Adequacy

Cermak floors 2 and 3 both consist of four wings; north, south, east and west. The areas are all large, and well-lighted. Cermak third floor which houses the medical Inmates on the day of the inspection was unacceptably dirty and in need of a higher level of sanitation both in the common areas as well as the cells. However the second floor which houses the psychiatric patients was clean with no sanitation issues noted. Environmental temperatures were comfortable on both floors with no excessively cold or warm areas. Interviews with multiple patients and inspection of their rooms confirmed comfortable temperatures. General wall painting appeared up-to-date and ceiling tiles were in good condition. Staff interviews confirmed there were no immediate structural, plumbing or electrical issues. Patients reported sufficient hot water for hand washing and showering and soap was available. On both floors excessive mold in the showers was noted. Inmates' on the third floor were noted to have foot issues which could be exacerbated by showering with facilities that are not properly disinfected.

We concur with Harry Grenawitzke's report of Cermak during his visit of November 2013 that there is a lack of sanitation in the room used to house medical patients. These issues haves not been adequately addressed since the findings noted in the last two monitoring reports. The unit has a sanitation schedule but clearly it is inadequate. Additionally, on the third floor Inmates are still placed in plastic boats due to lack of bed space. The unit contains a large room at the end of the hall which could accommodate many beds however it had 6 boats on the floor. The third floor patient cells were noticeably cluttered with bed bound patients utilizing loose red biohazard for waste that should be contained in a hard bio- waste container.

The findings of the environmental monitor emphasize the importance of developing and implementing schedules of sanitation and infection control activities, and documenting that these activities have been performed. At our next site visit, we will request that Cermak demonstrate that these important patient safety activities are being performed adequately regularly, and that deficiencies are addressed in a timely manner.

There continues to be overcrowding on both floors. On 5/21/14, there were a total of six patients placed on the floor in "boats" on the third floor. 3-North, the acute care medical wing, had the highest number on the floor at eight. The nursing coordinator acknowledged the census was down on this unit and often there are many more boats to accommodate the number of patients needing to be housed on the unit.

Automatic External Defibrillators (AED) are available on the units. Crash bags (emergency response bags), however, are not available on these units. Staff indicated that in the case of emergencies they immediately send the Inmate to the Cermak Urgent Care for treatment since it is the same building. Inspection of each AED indicated equipment is in good working order and AED pads are available. Inspection logs for the AED machines are incomplete, however. Personal protective equipment is available on each unit.

Refrigerator temperatures were all within the normal operating range, and there was documentation of daily checks. There were no outdated drugs in any refrigerator or medication carts. Inventories of sharps and tools were accurate on each unit. However lancets are not counted or logged on either floor.

The Cermak Emergency Room is well-equipped and supplied. However, sanitation and maintenance of this area is poor and there is no indication that disinfection practices are consistently implemented. We found that medical equipment (e.g. stretchers, etc.) were dirty with visible debris. There was dust and grime on the floors and floorboards of examination rooms. A plastic water pitcher used to provide patients water to take medications was inspected and found to have scum inside of it. The metal tray it was placed on was also not clean. The fabric of a chair was torn to the extent that staff used duct tape to keep it intact. This does not permit adequate infection control of equipment and furniture.

HVAC vents had accumulated black debris. A wall that was damaged by movement of a stretcher had been repaired but the quality of the work was poor. Several of these findings have been reported in previous reports and not adequately addressed.

At our last visit the Dental clinic that serves Division V reported sewage backups in months prior to our visit. This apparently is still an issue.

e. CCDOC-Patient Privacy
As noted in previous reports, the clinic space in Divisions I, II, dorm 1, dorm 2, Division III, V, VI, IX and XI provides sufficient numbers of appropriately equipped examination rooms to provide patient privacy as needed. There is now sufficient privacy in the women's intake area.

f. Cermak-Patient Privacy
This provision is unchanged since our last report. Patient privacy, especially on 3-North, continues to be compromised due to significant overcrowding. Privacy is provided for showering and special procedures which occur in an examination/procedure room immediately adjacent to the 3-North dayroom.

g. Adjustments to Space to Provide Privacy
Improvements have been made to enhance privacy. Overcrowding in Cermak infirmary areas has been detrimental to the provision of privacy. The opening of the RTU is anticipated to alleviate overcrowding and enhance privacy.

h. Construction of New Clinical Space
As noted above, construction of the 900-bed Reception and Treatment Unit (RTU) is completed but not fully occupied and operational due to lack of health care staffing. Cermak must fill health care positions in order for the RTU to become fully operationalized.

**Monitor's Recommendations:**

1. Fill staff vacancies so that the RTU is fully occupied and operational.

2. Develop and implement a schedule of sanitation and infection control activities for medical and mental health clinic and bed space areas throughout the jail. Document on an accompanying log completion of the scheduled sanitation and disinfection duties.
3. Assess each Division's medical, mental health and dental clinic space using the QI process for size, general repair and sanitation, lighting, equipment and supplies, privacy, communications and connectivity.
4. Develop Cermak's internal capacity to assess, inspect and correct deficiencies.
5. Reduce overcrowding in the Cermak infirmary as soon as possible. Health care staff should have control of all medical and mental health beds.
6. Assess and revise provider and nurse clinic sick call scheduling in each Division to maximize the use of clinical space and to permit both providers and nurses' access to clinical examination rooms throughout the day.
7. Retrofit selected rooms in the RTU with electrical outlets to accommodate patients with C-PAP machines.
8. A crash bag must be added to each floor in Cermak.

## 44. Staffing, Training, Supervision and Leadership

    a. Cermak shall maintain a stable leadership team that clearly understands and is prepared to move forward toward implementation of the provisions of this Agreed Order, with respect to:
        (1)   Medical care; and
        (2)   Mental health care

    b. Cermak shall maintain an adequate written staffing plan and sufficient staffing levels of health care staff to provide care for inmates' serious health needs, including:
        (1)   Qualified Medical Staff; and
        (2)   Qualified Mental Health Staff.

    c. Cermak shall ensure that all Qualified Medical Staff and Qualified Mental Health Staff are adequately trained to meet the serious health care needs of inmates. All such staff shall receive documented orientation and in-service training on relevant topics, including:
        (1)   Provision of health care in a correctional setting and Facility-specific issues; and
        (2)   Suicide prevention, and identification and care of inmates with mental illness.

    d. Cermak shall ensure that Qualified Medical Staff receive adequate physician oversight and supervision.

    e. Cermak shall ensure that all persons providing health care meet applicable state licensure and/or certification requirements, and practice only within the scope of their training and licensure. Upon hiring and annually, Cermak shall verify that all health care staff have current, valid, and unrestricted professional licenses and/or certifications for:

<blockquote>

(1) Medical staff; and
(2) Mental health staff

f. Cermak will work with CCDOC to develop and maintain a curriculum for initial and periodic training of correctional officers on recognition and timely referral of inmates with medical urgencies, including drug and alcohol withdrawal. Cermak will provide adequate initial and periodic training on these topics to all Cermak staff who work with inmates.

g. CCDOC will provide, to all CCDOC staff who work with inmates, adequate initial and periodic training on basic mental health information, including the identification, evaluation, and custodial care of persons in need of mental health care, as well as recognition of signs and symptoms evidencing a response to trauma; appropriately responding to mental illness; proper supervision of inmates suffering from mental illness; and the appropriate use of force for inmates who suffer from mental illness. Such training shall be conducted by a Qualified Mental Health Professional, registered psychiatric nurse, or other appropriately trained and qualified individual.

h. Cermak will work with CCDOC to develop and maintain a curriculum for initial and periodic training of correctional officers on basic mental health information, including the identification, evaluation, and custodial care of persons in need of mental health care, as well as recognition of signs and symptoms evidencing a response to trauma; appropriately responding to mental illness; proper supervision of inmates suffering from mental illness; and the appropriate use of force for inmates who suffer from mental illness. Such training shall be conducted by a Qualified Mental Health Professional, registered psychiatric nurse, or other appropriately trained and qualified individual.

i. Cermak shall ensure that all health care staff receive adequate training to properly implement the provisions of this Agreed Order, including:

(1) Medical staff; and
(2) Mental health staff.

</blockquote>

**Compliance Status**: This provision remains in partial compliance.

**Status Update:** Received and reviewed.

**Findings:**

1) Cermak Leadership staff

During the initial introductory meeting on Monday May 19, 2014, the Monitoring Team learned the recruiting efforts for Cermak healthcare personnel has been identified as an enterprise priority by the top executive leadership. Additionally we learned of new recruiting efforts that have been put in place that aimed at jump-starting the recruiting of Cermak health care staff and put this process into high gear. These include:

a) "Direct Appointment" for key leadership positions
b) "Active Recruitment" for key provider and nursing staff
c) Routine Recruitment for the support staff

We welcome these efforts and look forward to seeing their results in our future visits. During this visit, we also learned that Dr. Concetta Mennella has accepted the position of Chair of Correctional Health. The Monitoring Team applauds this decision and looks forward to working with Dr. Mennella. There are still key leadership positions that remain vacant particularly the positions of Medical Director, Associate Medical Director, Director of Mental Health services as well as the Director of Nursing. We learned after the visit that the current acting Chief Operating Officer has accepted a position at a jail in another state. We also understand that an interim replacement COO has been appointed. While we understand fully the issues of recruiting and welcome the new concerted efforts for recruiting leadership and non-leadership positions, it goes without saying that without stable and engaged leadership, the processes that have been initiated or are planned to begin in the near future are at great risk of failure.

2) Cermak healthcare staff

During the previous 6 months, there have been 20 new hires. At the time of our visit, there were 135 total vacancies with an overall vacancy rate of 22% with the following breakdown:

- Administration      25%
- Medical             32%
- Mental Health       17%
- Nursing             26%

Total of 55 potential new hires were reported to be in "validation" phase and 25 new hires are expected before the end of June 2014.

The last monitoring report indicated that 7 new initiatives had been put in place to improve the recruiting/staffing success. The recommendation was made to continue these processes. These processes continue to be in practice today or have been improved upon.

a) Request to hires (RTH) no longer have to go through the position justification committee. The RTH group now goes straight downtown to be posted.

Note: This was stopped for a while and has now been resurrected and put back into practice.

b) If positions are identified prior to and while interviews are being conducted, the (Position Identification Descriptor) PID's are being added to the current posting, instead of reposting the position, requiring an additional two weeks.

Note: Continues to be the current practice

c) Hiring managers are identifying alternative candidates during the interview process in order to move forward quickly if their first applicant of choice declines the position. What this means is during the interview process a ranking system is utilized so that if the top rank finds an alternative source of employment, the number two ranked candidate can be contacted.

Note: Continues to be the current practice.

d) One person on the recruitment team oversees all Cermak positions to insure a single point of contact.

Note: This has been expanded to include a team of four.

e) Weekly meetings are being held every Monday at 7:30 a.m. between the acting COO at Cermak and the Chief of HR along with the Bureau Chief of HR and the above listed senior HR coordinator. This is to insure that this group stays abreast of pending issues.

 Note: This meeting still occurs but the participants have changed to acting COO, Senior HR Specialist and two recruiters.

f) The acting COO and the senior HR coordinator are in daily contact to resolve any developing issues.

 Note: Continues to be the current practice.

g) And finally, the Bureau Chief of HR and the Chief of HR and the senior HR coordinator conduct a Friday conference call and go over each position on the tracker to insure the most current information is being report on a weekly basis.

 Note: This process has stopped. The process now is performed at the level of CCHHS and Cermak.

3) Training

Based on the records presented to the Monitoring Team, it appears that majority of current Cermak health care staff have undergone suicide prevention training. Health care staff, in particular nursing, is severely lacking adequate orientation to the provision of health care in a correctional setting and to their facility based settings.

4) Physician supervision

Even though the number of physician vacancies has created a severe shortage of clinical staff, the current physician staff are providing adequate supervision to the midlevel staff.

5) Licensure and certification

a) Ten credentialing records (5 physicians, 2 psychiatrists, 2 physician assistants) were reviewed with the CCHHS Director of the Medical Staff Services. These files were in very good shape with the exception on one chart missing initial FFP indication.

b) Training of CCDOC officers

Based on presented data, nearly all CCDOC officers have recently received training on recognition and timely referral of inmates with medical urgencies including recognition of inmates with detox symptoms.

c) Training of CCDOC officers

Based on presented data, nearly all CCDOC officers have recently received training on recognition and timely referral of inmates with mental health urgencies.

d) Training of CCDOC officers

Based on presented data, nearly all CCDOC officers have recently received training on recognition and timely referral of inmates requiring mental health services.

e) Education on agreed order

Based on presented data, it appears that nearly all current Cermak healthcare staff recently participated in town hall meetings in which the DOJ agreed order items were discussed.

**Monitor's Recommendations:**

1. All recruiting activities introduced during this visit should continue to be applied with the expectation of achieving remarkable outcomes by the time of our next visit.

2. County should continue to use creative strategies to recruit primary care clinicians, such as a countywide loan repayment system or some other attractive strategy.
3. Cermak must ensure training of all health care staff and in particular nursing staff with regard to the provision of health care in a correctional setting.
4. When the new Medical Director, Mental Health Director and Nursing Director are recruited, the clinician and nursing performance enhancement review program should be a major goal of the leadership team.
5. Monthly staffing productivity statistics must be measured in order to ensure and encourage high efficiency.

## 45. Intake Screening

1. Cermak shall maintain policies and procedures to ensure that adequate medical and mental health intake screenings are provided to all inmates.
2. Cermak shall ensure that, upon admission to the Facility, Qualified Medical Staff or Licensed Correctional Medical Technicians utilize an appropriate medical intake screening instrument to identify and record observable and non-observable medical needs, shall assess and document the inmate's vital signs, and shall seek the inmate's cooperation to provide information, regarding:
   a. medical, surgical and mental health history, including current or recent medications, including psychotropic medications;
   b. history and symptoms of chronic disease, including current blood sugar level for inmates reporting a history of diabetes;
   c. current injuries, illnesses, evidence of trauma, and vital signs, including recent alcohol and substance use;
      1. history of substance abuse and treatment;
      2. pregnancy;
      3. history and symptoms of communicable disease;
      4. suicide risk history; and
   d. history of mental illness and treatment, including medication and hospitalization.
3. Cermak shall ensure that, upon admission to the Facility, Qualified Mental Health Staff, Qualified Medical Staff, or Licensed Correctional Medical Technicians utilize an appropriate mental health intake screening instrument to identify and record observable and non-observable mental health needs, and seek the inmate's cooperation to provide information, regarding:
   a. past suicidal ideation and/or attempts;
   b. current ideation, threat or plan;
   c. prior mental illness treatment or hospitalization;
   d. recent significant loss, such as the death of a family member or close friend;
   e. previously identified suicide risk during any prior confinement at CCDOC;
   f. any observations of the transporting officer, court, transferring agency or similar individuals regarding the inmate's potential suicide risk, if such information is communicated to Cermak staff;
   g. psychotropic medication history; and

      h. alcohol and other substance use and withdrawal history.

4. Cermak shall ensure that all Qualified Mental Health Staff, Qualified Medical Staff or Licensed Correctional Medical Technicians who conduct the medical and mental health intake screenings are properly trained on the intake screening process, instrument, and the requirements and procedures for referring all qualifying inmates for further assessment.

5. If Cermak assigns Licensed Correctional Medical Technicians to perform intake screening, they shall receive appropriate, on-site supervision by on-site Qualified Medical Staff; information obtained on screening for all inmates will be reviewed by Qualified Medical Staff before the inmate departs the intake area.

6. Cermak shall ensure that a medical assessment based on the symptoms or problems identified during intake screening is performed within two working days of booking at the Facility, or sooner if clinically indicated, by a Qualified Medical Professional for any inmate who screens positively for any of the following conditions during the medical or mental health intake screenings:

      a. Past history and symptoms of any chronic disease included on a list specified by Cermak's policies and procedures;

      b. Current or recent prescription medications and dosage, including psychotropic medications;

      c. Current injuries or evidence of trauma;

      d. Significantly abnormal vital signs, as defined by Cermak's policies and procedures;

      e. Risk of withdrawal from alcohol, opioid, benzodiazepine, or other substances;

      f. Pregnancy;

      g. Symptoms of communicable disease; and

      h. History of mental illness or treatment, including medication and/or hospitalization.

7. Cermak shall ensure that any inmate who screens positively for mental illness or suicidal ideation during the intake process receives a comprehensive mental health evaluation (see provision 59.c, "Mental Health: Assessment and Treatment") Cermak shall ensure timely access to a Qualified Mental Health Professional for this purpose, based on emergent, urgent, and routine medical or mental health needs.

8. Cermak shall ensure that the intake health screening information is incorporated into the inmate's medical record in a timely manner.

9. Cermak shall implement a medication continuity system so that incoming inmates' medication for serious medical and mental needs can be obtained in a timely manner, as medically appropriate. Within 24 hours of an inmate's booking at the Facility, or sooner if medically necessary, a Qualified Medical Professional or Qualified Mental Health Professional, with appropriate prescribing authority, shall decide whether to continue the same or comparable medication for serious medical and mental health needs that an inmate reports during intake screening that she or he has been prescribed. If the inmate's reported medication is discontinued or changed, other than minor dosage adjustments or substitution of a therapeutic equivalent, a Qualified Medical Professional or Qualified Mental Health Professional, with appropriate prescribing authority, shall evaluate the inmate face-to-face as soon as medically

appropriate, and within no greater than five working days, and document the reason for the change.

**Compliance Status**: This provision remains in substantial compliance.

**Status Update:** Received and reviewed.

**Findings:**

Observation of the intake process took place on 5/20/14. Intake was adequately staffed in all areas to receive newly committed Inmates. The electronic record has fields to include all areas of assessment required in provision 45. Record review of 12 charts indicated appropriate referrals for mental health, chronic care and urgent care. The Nurse Coordinator for Intake has an adequate process for follow up when inmate is fast tracked to a higher level of care. Additional record review of anomalous pathways was also conducted. Records of all active inmates with "not found x-ray as of 4/30" were reviewed (9) records indicated chest x-rays for TB could not be completed because the Inmate was released or currently in another medical facility. The intake Nurse Coordinator has developed a daily report to capture essential statistics and to ensure all Inmates receive a chest x-ray while in the CCDOC.

**Monitor's Recommendations:**

1. Develop CQI indicators for intake.
2. Develop electronic process for tracking inmates who are fast tracked and their disposition within the facility. Currently the only report available is the "hospital intakes". It is currently manually tracked by intake stickers that are placed on a hand written form.

### 46. Emergency Care

a. Cermak shall train health care staff to recognize and respond appropriately to health care emergencies, including:
      (1) Medical emergencies;
      (2) Mental health emergencies; and
      (3) Drug and alcohol withdrawal

b. CCDOC shall train correctional officers to recognize and respond appropriately to health care emergencies, including:
      (1) Medical emergencies;
      (2) Mental health emergencies; and
      (3) Drug and alcohol withdrawal.

c. CCDOC shall ensure that all inmates with emergency health care needs receive prompt transport, including transport for outside care, for emergencies including:
      (1) Medical emergencies; and
      (2) Mental health emergencies.

d. Cermak shall ensure that all inmates with emergency health care needs receive timely and appropriate care, with prompt referrals for outside care when medically necessary, and shall notify CCDOC when emergency transport is needed inside or outside the Facility compound, for emergencies including:

        (1) Medical emergencies; and

        (2) Mental health emergencies.

e. CCDOC shall train all correctional officers to provide first responder assistance (including cardiopulmonary resuscitation ("CPR") and addressing serious bleeding) in emergency situations. CCDOC shall provide all correctional officers with the necessary protective gear, including masks and gloves, to provide first line emergency response.

**Compliance Status**: This provision remains in substantial compliance.

**Status Update:** Received and reviewed.

**Findings:**

a. Based on the records presented to the Medical Monitor, Cermak health care staff has received training on recognition and response to medical and mental health emergencies. Staff needs training on the detox programs once implemented.

b. Based on the records presented to the Monitoring Team, CCDOC staff have received training on recognition and response to medical and mental health emergencies.

c. With regard to the transport of medical emergencies, we reviewed approximately 10 records and found in each instance transport was timely. There do not appear to be any problems with emergency response times related to transport. Therefore, this area is substantially compliant.

d. Chart review of patients who were seen for emergencies were transported to the Urgent care and seen by the provider in a timely manner. The patients were evaluated and sent to the emergency room by the right mode of transport. One patient was kept in the Urgent care longer than necessary because there was delay in the results of the lab tests needed for the provider to make the decision if the patient needed to go to the ER.

e. The Medical Monitor carried out a mock code using a CPR mannequin in Division 3 Annex. Several CCDOC officers responded to the mock code within 20 second of the call. They performed effective chest compression and mouth-to-mouth resuscitation while they awaited the arrival of the health care staff (90 seconds into the call). The first health care staff on the scene was Bernard McNutt, CMT. Mr. McNutt immediately took over the CPR activities. He failed, however, to bring the crash bag and the AED with him and had to send for them. The CCDOC officers were able to supply their own AED and were able to apply the AED pads correctly.

This section, although substantially compliant in all other areas, still requires the training and implementation of the withdrawal protocols.

**Monitor's Recommendations:**

1. Continue to work toward transitioning to electronic record keeping at the urgent care area.
2. Continue to work on improving the validity of the emergency room log.
3. Develop and implement the policy of nurse monitoring for patients with mild and moderate withdrawal symptoms. This must occur irrespective of the opening of the RTU.
4. Document the handoff process when a patient is sent from the units to the urgent care, from urgent care to ED, and from Urgent care to the Infirmary.
5. Create Emergency response templates in the EMR for nurses and providers so that the details of the incident, pertinent positives and negatives, disposition, mode of transport, time of call received, time of response, reason for visit, location of evaluation, etc. are clearly documented in the EMR.
6. All documentation is done directly in the EMR except for downtime.
7. Establish guidelines for use of neck braces and back boards and educate the nursing and custody staff.
8. Lab to notify the provider when the stat labs are resulted so there is no delay in care
9. Self-Monitoring:
   a. Manager to review emergency log daily to check to make sure it's complete, to identify and review the emergencies that happened in their floor/unit.
   b. Audit at least 10 charts per month to ensure appropriateness and timeliness of response by Nurse and Provider.
   c. Use the audit information to make necessary improvements by sharing the findings with the specific staff on their individual performance and the group to address group performance.
   d. Track the unscheduled/urgent care visits required for Chronic Disease/detox patients to monitor the effectiveness of the treatment plan and make improvements to the program as needed.
   e. Monitor the turnaround time for stat labs.
   f. Monitor the timeliness and appropriateness of communication and response to critical lab results

## 47. Record Keeping

a. Cermak shall ensure that medical and mental health records are adequate to assist in providing and managing the medical and mental health needs of inmates at the Facility and are maintained consistent with local, federal, and state medical records requirements.

g. Cermak shall ensure that medical and mental health records are centralized, complete, accurate, readily accessible and systematically organized. All clinical encounters and reviews of inmates should be documented in the inmates' records.

h. To ensure continuity of care, Cermak shall submit appropriate medical information to outside medical providers when inmates are sent out of the Facility for medical care. Cermak shall appropriately request records of care, reports, and diagnostic tests received during outside appointments in a timely fashion and

include such records in the inmate's medical record or document the inmate's refusal to cooperate and release medical records.

i. Cermak shall maintain unified medical and mental health records, including documentation of all clinical information regarding evaluation and treatment.

**Compliance Status**: This provision remains in partial compliance.

**Status Update:** Received and reviewed.

**Findings:**

a. Cermak-Adequacy and Maintenance of Records

The original plan for installation and implementation of an electronic medical record (EMR) has nearly been fulfilled. Accuflow selected for use in electronic documentation of medication administration has been implemented in all Divisions except intake for Keep on Person (KOP) medications and is nearly 90% complete for Dose by Dose medication administration. Divisions XIV and XVII are the only ones not yet rolled out. However implementation of Accuflow requires diversion of IT staff from other projects. At the current time one full time staff person is required to support use of this single program. This has resulted in delays in the development of other necessary data, various reports and revisions to the electronic record.

A continuing problem with the electronic health information system is that laboratory and diagnostic tests cannot be ordered to coincide with chronic care and follow up psychiatry appointments scheduled more than two weeks in the future. The Cerner program needs to be modified so that laboratory tests may be ordered 30 to 90 days in advance so that results are available to the provider at the next routine follow up appointment.

Documentation of the care of diabetics is also problematic. Nurses document insulin orders, serial blood glucose results and insulin administration on a two-sided diabetic flow sheet which is scanned into the EMR. The nursing staff also enter glucometer readings manually into another section of the inmate's electronic record even though this information can be downloaded into the electronic record when the glucometer is placed in the docking station. Thus there are three types of entries made into the EMR for daily diabetic care. Problems with this process are 1. the hand writing on the diabetic flow sheet was illegible and therefore not useful clinically 2. duplicate documentation on the flow sheet and again entered into the EMR increases likelihood of transcription error and potential for adverse patient outcomes 3. equipment that automatically enters clinical information needs to be reliable and accurate so duplicate documentation is unnecessary.

Documentation of care delivered in Cermak urgent care is handwritten and scanned into the EMR the next business day. This approach compromises patient care in two ways; first clinical information about an urgent care encounter is not available to providers responsible for the patient immediately after discharge from urgent care and second the handwriting is so illegible that it does not inform subsequent care.

The Monitoring Team observed several examples of electronic information that is not effectively tracked to ensure providers attend to patient care needs. Examples include not flagging x-ray and lab results in the EMR so that the attending provider can review them in planning ongoing treatment and plans for blood pressure monitoring that are either not effectively ordered in the EMR, not noted in the task cue for nursing staff or that are not charted, if done.

There is an ongoing workgroup responsible for automation of the response to health care requests which includes revision of the form for electronic documentation. This work is not yet completed. See also Item 54.

These problems underscore the ongoing importance of maintaining adequate and responsive IT support to train staff in use of new programs and increase documentation capacity, to maintain the day to day operability of the system, to revise existing systems and practices to support work flow and to address problems with the integrity of the electronic health record such as those described in the preceding paragraphs.

Three policy and procedures related to the health record were provided for review. These were H-02 Confidentiality of Health Records, H-02.4 Other Release of Health Information and H-04 Management of health Records. Minor revisions were made to each since the November 2013 consultation visit but the effective date and approving signatures were not changed nor had the revised documents been posted to the organization's intranet. These revisions are appropriate and necessary however the process for approval and notification of updated policies and procedures is ineffective. See also Item 42.

CCDOC and Cermak have achieved a solution to the interface between the electronic jail management system and Cerner which is expected to become operational this summer. Problems with information sharing described in earlier reports should be resolved by the next site visit.

b. Cermak-Complete, accurate and accessible records

Cermak policy and procedure H-04 was revised to establish timeframes for submitting paper documentation so that it is received and scanned into the electronic record timely. At the time of the site visit the revised policy and procedure had not been posted to the intranet nor did it indicate within that a revision had been made. Additionally, in Division I, we found that staff did not forward documents to health records in a timely manner. We found an accordion file of multiple health service requests dating back to February 2014. Staff reported that the requests were for patients yet to be assessed by a nurse. When we explored this further we found that some patients had indeed been seen, and others had not. We also found HSRs in Cermak that were held in a log but not documented or scanned into the EMR.

Scanning does not provide timely enough access to clinical information such as urgent care and anomalous intakes. Scanning of handwritten clinical information (such as insulin and blood glucose readings) is also not adequate if it does not communicate accurate and legible information. Efforts to automate all clinical information and reduce the amount of content scanned into the record should be continued.

Segregation rounds by nurses remain an aspect of patient care that is not documented in the inmate health record and should be. At the time of this site visit documentation consisted of a notation on a log or population sheet next to the names of inmates in segregation; if a clinical assessment or care is provided, a progress note is to be made by health care staff in the electronic health record. In Division VI two nurses stated that they have never needed to assess or provide clinical care as a result of rounding in segregation and the documentation on the logs was consistent with this statement. This does not meet NCCHC Standard E-09 for Segregated Inmates which is cited as a reference in Cermak's policy and procedure. Compliance indicator #3 (page 87) requires that rounds are documented on "individual logs or cell cards, or in an inmate's health record, and includes: a. the date and time of the contact, and b. the signature or initials of the health staff member making the rounds." The fifth paragraph in the discussion section (page 88) states that when filled individual logs or cell cards are filed in the inmate's health record. The policy and practices of Cermak need to be aligned with the documentation requirements of NCCHC and a determination made as to whether this documentation is accomplished electronically or on paper and scanned in after the fact.

Except for the room where treatment team meetings for mental health take place in Cermak access to computers and/or paper records was adequate and supported clinical care. The absence of a computer to view the patient's health record and to document treatment team decisions on the mental health inpatient unit was noted as a problem by Dr. Metzner during the November 2013 site visit. The room used by the treatment team still does not have a computer to view or record information in the treatment of individual mental health patients and should be addressed promptly.

c. Cermak-Communication with Offsite Providers

Appropriate medical information is made available to outside medical providers when inmates are sent out of the facility for medical care. Adequate provisions are in place to gather clinical information from previous providers. Automation of the health record has greatly facilitated rapid transfer of information between outside providers and Cermak.

d. Cermak-Unified Medical and Mental Health Records

The Monitoring Team has recommended revisions to forms and methods used in maintaining health records (segregation, suicide watch and hunger strike) in previous reports but these have yet to be accomplished. A potential methodology has been identified but cannot be put into place until after Accuflow is implemented. We also continue to recommend that Cermak revise the electronic format of the nursing assessment of HSRs to better resemble problem oriented charting and include guidelines from the nursing protocols. See item 54 for discussion of this recommendation. This has not yet been accomplished and compromises communication of clinical information about the patient.

**Monitor's Recommendations:**

1. Modify the Cerner program so that laboratory tests are ordered in advance and results are available to the provider at the time of routine follow up appointments.
2. Conduct a focused review of the documentation of diabetic care to ensure standardized, accurate, legible recording of patient monitoring and treatment. Eliminate unnecessary duplicate documentation as well.
3. Use the electronic health record to document health status and treatment initiated for urgent care and anomalous admissions.
4. Establish a method to notify the treating provider of diagnostic results (lab, radiology, specialist consults).
5. Fully implement the interface between Cerner and CCDOC to communicate changes regarding inmate status.
6. Finish implementation of Accuflow.
7. Align policy and practices regarding documentation of segregation rounds with the requirements of NCCHC.
8. Revise the electronic forms to better display clinical information during nursing sick call encounters and include guidelines from the nursing protocols.
9. Install a computer in the room used by the mental health treatment team in Cermak so that clinical information can be accessed.

## 48. Mortality Reviews

a. Cermak shall request an autopsy, and related medical data, for every inmate who dies while in the custody of CCDOC, including inmates who die following transfer to a hospital or emergency room.
b. Relevant CCDOC personnel shall participate in Cermak's mortality review for each inmate death while in custody, including inmates who die following transfer to a hospital or emergency room, and a morbidity review for all serious suicide attempts or other incidents in which an inmate was at high risk for death. Mortality and morbidity reviews shall seek to determine whether there was a systemic or specific problem that may have contributed to the incident. At a minimum, CCDOC's contribution to mortality and morbidity reviews shall include:
   (1) critical review and analysis of the correctional circumstances surrounding the incident;
   (2) critical review of the correctional procedures relevant to the incident;
   (3) synopsis of all relevant training received by involved correctional staff;
   (4) possible precipitating correctional factors leading to the incident; and
   (5) recommendations, if any, for changes in correctional policy, training, physical plant, and operational procedures.
c. Cermak shall conduct a mortality review for each inmate death while in custody, including inmates who die following transfer to a hospital or emergency room, and a morbidity review for all serious suicide attempts or other incidents in which an inmate was at high risk for death. Cermak shall engage relevant CCDOC personnel in mortality and morbidity reviews and shall seek to determine whether there was a pattern of symptoms that might have resulted in earlier diagnosis and intervention. Mortality and morbidity reviews shall occur within 30 days of the

incident or death, and shall be revisited when the final autopsy results are available. At a minimum, the mortality and morbidity reviews shall include:
  (1) critical review and analysis of the circumstances surrounding the incident;
  (2) critical review of the procedures relevant to the incident;
  (3) synopsis of all relevant training received by involved staff;
  (4) pertinent medical and mental health services/reports involving the victim;
  (5) possible precipitating factors leading to the incident; and
  (6) recommendations, if any, for changes in policy, training, physical plant, medical or mental health services, and operational procedures.
  d. Cermak shall address any problems identified during mortality and morbidity reviews through timely training, policy revision, and any other appropriate measures.

**Compliance Status**: This provision is in partial compliance (previously substantial compliance).

**Status Update:** Received and reviewed.

**Findings:**

- The Medical Monitor reviewed five most recent deaths in custody cases. We found that mortality review is occurring in accordance to current policy and procedures. All death in custody (DIC) cases have resulted in an autopsy unless the autopsy was not indicated (death after prolong hospitalization); relevant CCDOC staff have participated in the mortality review of all DIC cases; all DIC cases have undergone formal mortality review or Root Cause Analysis within 30 days of the event (the two most recent DIC cases have not undergone formal review but remain within the allowed 30 day window). We also found, however, that mortality review is not being utilized to identify areas for improvement (while 3 out of 5 most recent DIC cases involve either ETOH or Benzodiazepine detox or both, detox protocols are still not being ordered/started in asymptomatic inmates with these conditions). Identifying and correcting potential problems in the care of Cook County Jail inmates is the sole purpose for performing mortality review.

**Monitor's Recommendations:**

1. The QI program should track the implementation of improvement strategies discussed at the mortality review committee meeting.


## 49. Grievances

Cermak shall develop and implement policies and procedures for appropriate handling of grievances relating to health care, when such grievances are forwarded from CCDOC.

**Compliance Status**: This provision remains in partial compliance.

**Status Update:** A status report current through May 2014 was received and reviewed in advance of the site visit.

**Findings:**

With the departure of the QI coordinator, Linda Murakami, the management and monitoring of grievances has languished. This responsibility has recently been assigned to Linda Kampe, Director, Health Information Management. No data was available for review at the time of the site visit other than the minutes of the quality improvement committee for November 2013, January, February and March, 2014. These minutes reflect continuing problems with failure to respond or untimely responses to grievances. Discussion at the March meeting indicated grievances for February were almost double the number received a year ago however no trending or analysis has been done or has been made available to the Monitoring Team.

Policy and Procedure A-11 Grievance Mechanism for Health Complaints has not been reviewed or updated since June 2011. It describes a lengthy process that grievances go through before responses are received by inmates. Recently a pilot was initiated in Divisions 5 and 6 that anecdotally is reported to have streamlined the process. See also Item 58 Dental Care and the work done by the dental department to respond to and reduce grievances. Consideration should be given to implementing positive results of these pilots in other service areas and Divisions. The policy and procedure does not provide any guidance to staff in answering grievances except to attempt to speak to the patient directly. Training that has been provided by CCDOC does provide this guidance and gives specific suggestions for responses to certain issues. This material should be incorporated into the P & P or an appendix. The policy and procedure gives a detailed description of how grievance patterns are to be analyzed and trended but there was no evidence that this is being done at the present time.

**Monitor's Recommendations:**
1. Implement changes that streamline the distribution and tracking of grievances and improve response times.
2. Analyze and trend grievances as described in Policy and Procedure A-11 with a dual focus of compliance with the CCDOC grievance process and identification of issues for quality improvement.
3. Review and revise Policy and Procedure A-11 to incorporate changes made per recommendation # 1 above.

## C.   MEDICAL CARE

### 50. Health Assessments

   a. Cermak shall ensure that Qualified Medical Professionals attempt to elicit the amount, frequency and time since the last dosage of medication from every inmate

reporting that he or she is currently or recently on medication, including psychotropic medication.

b.  Cermak shall ensure that incoming inmates who present and are identified by medical personnel as having either a current risk of suicide or other acute mental health needs will be immediately referred for a mental health evaluation by a Qualified Mental Health Professional. Staff will constantly observe such inmates until they are seen by a Qualified Mental Health Professional or Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional. Incoming inmates reporting these conditions will be housed in safe conditions unless and until a Mental Health Professional clears them for housing in a medical unit, segregation, or with the general population.

c.  Cermak shall ensure that all inmates at risk for, or demonstrating signs and symptoms of, drug and alcohol withdrawal are timely identified. Cermak shall provide appropriate treatment, housing, and medical supervision for inmates suffering from drug and alcohol withdrawal.

d.  CCDOC shall maintain a policy that correctional officers supervising newly arrived inmates physically observe the conduct and appearance of these inmates to determine whether they have a more immediate need for medical or mental health attention prior to or following the intake health screening by Qualified Medical Staff.

e.  Cermak shall ensure that the medical assessment performed within two working days of his or her booking at the Facility, or sooner if clinically indicated, for each inmate specified above (provision 45.f, "Intake Screening") shall include a review of the inmate's intake screening form, a medical history, a physical examination, a mental health history, and a current mental status examination. The physical examination shall be conducted by a Qualified Medical Professional. The medical assessment shall also include development or revision of the inmate's problem list and treatment plan to address issues identified during the medical assessment. Records documenting the assessment and results shall become part of each inmate's medical record. A re-admitted inmate or an inmate transferred from another facility who has received a documented medical assessment within the previous six months and whose receiving screening shows no change in the inmate's health status need not receive a new medical assessment. For such inmates, Qualified Medical Staff shall review prior records and update tests and examinations as needed.

**Compliance Status**: This provision remains in substantial compliance

**Status Update:** Received and reviewed.

**Findings:**

Record review of 12 patients indicated timely assessments with appropriate documentation. However there were inconsistencies noted within the medical record if an inmate was fast tracked. The urgent care findings and the unit in which the patient are transferred to did not acknowledge new orders or conduct any additional assessments. Nursing assessments were

performed in the intake area were complete and timely. Assessments which were conducted on the units due to fast tracking often lacked documentation and follow up. Additionally the assessments that were consistently completed timely in some cases had positive findings on the screens with no follow up by a provider. Records were also reviewed for medication orders and transcription into Pyxis as well as Accuflow. In two cases, the medications reported by history and documented in the Health Assessment were not made available to the inmate. This was concerning due to the type of the chronic disease diagnosis. Health Assessments that revealed a substance abuse problem did not utilize the CIWA or COW to further assess for acute withdrawal. Interviews conducted with inmates indicated that a HSR needed to be filled out if their detox symptoms were not being managed.

**Monitor's Recommendations:**

1. As recommended in the seventh monitoring report there should be computerized notes available in the urgent care assessment. Additionally Detox assessment tools should also be available and utilized within the electronic record.
2. Nursing staff need to be trained on how to review the entire health assessment area of the EMR.
3. CQI screens need to be developed to monitor this area and identify inconsistencies.

## 51. a Acute care

a. Cermak shall provide adequate and timely acute care for inmates with serious and life-threatening conditions, and ensure that such care adequately addresses the serious medical needs of inmates. Adequate care will include timely medical appointments and follow-up medical treatment.

**Compliance Status:** This provision remains in substantial compliance.

**Status Update:** Received and reviewed.

**Findings:**

Twelve records were reviewed. Inmates were provided with timely urgent medical care. This area is staffed 24 hours a day. There was adequate equipment to provide emergency care for a life threatening condition. Some areas of concern were noted in the follow up medical treatment and referrals. Logs are kept on paper and the Urgent care information needed by the divisions' medical staff is scanned into the chart. Staff interviews were conducted randomly in the divisions to ascertain if staff could identify follow up treatment or referrals after an Inmate returned from Urgent care. 3 out of 3 nursing staff had difficulty identifying the Urgent Care scans to transcribe necessary follow up care.

**Monitor's Recommendations:**

1. Logs for Acute Care need to be electronic.

2. Nursing staff require training on linking scanned documents to their treatment plans to ensure proper follow up.

## 51.b Acute Care-Infirmary

    a. Cermak shall maintain guidelines for the scope of care of acutely ill patients in its on-site designated infirmary units and for transfer of patients when appropriate to outside hospitals.

**Compliance Status:** This provision remains in partial compliance.

**Status Update:** Received and reviewed.

**Monitor's Recommendations:**

Chart reviews, patient and staff interviews were conducted to evaluate the care in the Infirmary.

The Infirmaries are used to house acutely ill patients, patients with special needs and other patients who do not require infirmary level of care. The Infirmary is not fully functional as intended due to overcrowding issues. The new building (RTU) is not being used as intended due to staffing issues so they are not able to move the sub-acute and non-acute patients out of the Infirmary.

The nursing staff in the Infirmary are providing prn (as needed care). The patients are expected to report to the nurses on any issues and they are placed on providers list to be seen. In the female Infirmary the nurse is able to talk to the patient by bringing them to the nurse station since the volume is lower for the nurse to assess the patient.

There is no Infirmary admission process to check in the patient to assess the reason for admission, condition of the patient upon acceptance so a plan of care can be created.
The patients are not assigned a level of acuity that would drive nurse and provider follow-up. The patients do not have a nursing care plan which should be developed based on their health condition and level of acuity and periodically adjusted based on the patient's response.

The nursing assessments performed on patients use the SOAP format and are very minimal and do not contain all pertinent negatives and positives regarding the patient's conditions. The notes do not address all the major health issues of the patient but focused on any complaint that the patient might have.
Patients with wound care needs are housed in the Infirmary and get periodic wound care. The nursing assessment of the wound is not consistent. The patients with large wounds did not have notes from the wound care nurse.

The staff verbalized that they are not able to provide scheduled assessments on the patients due to overcrowding and staffing shortages.

The medication pass was done using a small window in the nursing station and does not allow for any privacy. The nurse was trying to address a patients concern about a medication during medication pass with other staff around them. Hand hygiene was not always practiced during med pass.

All medications in the Infirmary were administered by registered nurses using the Pyxis. Since most patients are on multiple medications, the nurse has to take each medication out of Pyxis to administer which leads to shortcuts. The process needs to be reevaluated to make it more efficient and safe.

The Infirmary housing areas were unacceptably dirty.

The high risk detox patients were housed in the Infirmary and there were no scheduled nursing assessments for Detox patients housed in the infirmary. The Staff responded that the do not see a reason for proactive checks and that the patient will let us know if there are any issues. The Staff we interviewed did not have training in managing detox patients. The providers were evaluating the patients upon admission and during their stay in the Infirmary.

The Infirmaries did not have jump bag for emergencies and the staff did not see a need for an emergency bag since the Urgent care was in the same building.

**Monitor's Recommendations:**

1. Implement an admission assessment process so all patients are accepted and appropriate clinical management is initiated timely.
2. Implement Infirmary Provider Initial Evaluation and follow-up requirements based on patient's acuity level and condition.
3. Implement Infirmary Nursing Initial and follow-up assessments based on patients' acuity level and condition.
4. Implement patient specific nursing care plans to appropriately manage the patients and periodically update them in consultation with the care team.
5. Implement Detox assessments so that the patients are periodically monitored to avoid emergencies.
6. Consider supplying oral or IV fluids to detox patients based on their condition and not rely on patients increasing oral fluid intake themselves.
7. Evaluate opportunities to improve the medication pass process in the Infirmary to make it efficient, safe and private.
8. Establish a discharge process and documentation that requires provider orders and nurse assessment and handoff.
9. Establish a multidisciplinary staff huddle to periodically discuss treatment plan for patients in the Infirmary
10. Implement a nurse handoff during shift change
11. Place an emergency response bag in each infirmary area
12. Self-Monitoring:

a. Audit 10 charts per month per Infirmary to ensure, timely admission assessment, initial provider evaluation, routine follow-up by nurse and provider per acuity level guidelines, use of care plans as appropriate, etc.
b. Conduct environmental audits once a week to check for issues to address
c. Monitor length of stay for patients various acuity levels in the Infirmary (e.g.: Detox patients - to see if they can be transferred out when they have completed their treatment and are stable.) This process will help reduce overcrowding and will make the infirmary care process more efficient.
d. Evaluate patients sent to the urgent care and ER to see if there were any process breakdown and opportunities for improvement
e. Perform an audit of the medication administration process to monitor compliance with established procedure.

## 52. Chronic Care

a. Cermak shall maintain an appropriate, written chronic care disease management plan, which provides inmates with chronic diseases with timely and appropriate diagnosis, treatment, medication, monitoring and continuity of care consistent with the inmates' expected length of stay.
b. Cermak shall maintain appropriate written clinical practice guidelines for chronic diseases, such as HIV, hypertension, diabetes, asthma and elevated blood lipids.
c. Cermak shall maintain an updated registry to track all inmates with serious and/or chronic illnesses and shall monitor this registry to ensure that these inmates receive necessary diagnoses and treatment. Cermak shall keep records of all care provided to inmates diagnosed with chronic illnesses in the inmates' individual medical records.
d. Cermak shall ensure that inmates with chronic conditions are routinely seen by a physician, physician assistant, or advanced practice nurse to evaluate the status of their health and the effectiveness of the medication administered for their chronic conditions.
f. CCDOC shall house inmates with disabilities, or who need skilled nursing services or assistance with activities of daily living, in appropriate facilities, as determined by Cermak. CCDOC shall permit inmates with disabilities to retain appropriate aids to impairment, as determined by Cermak.
g. Cermak shall ensure that inmates with disabilities or who need skilled nursing services or assistance with activities of daily living shall receive medically appropriate care. Cermak shall notify CCDOC of their specific needs for housing and aids to impairment.
h. Cook County shall build out, remodel, or renovate clinical space as needed to provide appropriate facilities for inmates with disabilities in accordance with the timelines set out in provision 43.i. Prior to completion of the new clinical space, Cook County and DFM will work with Cermak to address the most serious concerns regarding facilities for inmates with disabilities, to the extent possible in the current Facility.

**Compliance Status**: This provision remains in partial compliance.

**Status Update:** Received and reviewed.

**Monitor's Recommendations:**

a. Chronic Disease Management Plan

Chart review and patient interviews were conducted on patients with chronic disease. The chronic disease patients were seen timely upon arrival to the facility at intake by nurses and providers. Most of the patients had a detailed initial evaluation note in the EMR. The appropriate medication and labs were usually ordered during the visit. The first dose of medications were given timely.

b. Cermak-Written Guidelines

The clinical practice guidelines for chronic diseases have been established. Compliance with use of the guidelines is not consistent. Staffing and IT issues need to be resolved to ensure consistent practice of the guidelines. The leadership is working on the requirements for the chronic diseases templates and needs IT resources to help build the templates in the EMR. The consistency of compliance is a challenge but can be greatly improved with the templates being considered.

We interviewed the HIV provider and reviewed six records of patients with HIV infection or AIDS. We found that patients are not seen timely by the HIV provider following arrival at the facility. The average time from arrival until seen by the provider was 26 days (range=8-44 days).[1] HIV labs are not ordered at the time of admission so they are available for the initial visit, and the Cerner electronic medical record does not allow scheduling of labs beyond two weeks. Cerner is programmed so that labs that are not performed in two weeks drop off the system as being cancelled. This is a significant impediment to the coordination of care.

At initial visits, we found that the HIV provider does not consistently document past medical history, HIV review of systems, admission labs (e.g. STD screening or chest x-ray results) and HIV labs. In some cases the provider documents "Patient well known to me" as the justification for not documenting a pertinent history and noting labs. However, thorough documentation serves to provide the rationale for the treatment plan as well as communication with other health care professionals.

The provider also does not consistently explore significant symptoms reported by the patient. In two of six records, patients reported 30 pound weight loss that the provider did not explore, although one patient had a history of latent TB infection.[2] In another case, an AIDS patient with a CD4 count of 7 at risk for CMV retinitis reported that she was going blind. The HIV provider noted the patient's symptoms and requested an ophthalmology consultation that was not scheduled until mid-July. This is not an appropriate time frame for a patient presenting with symptoms of possible CMV retinitis.

When we discussed this with the provider he reported that whether he requested the consultation urgently or routinely, the consultation was not likely to occur any sooner. He reported that following my discussion of the patient, he evaluated her and said that she exaggerated her symptoms. However, given her severe immunosuppression and

---

[1] The six patients were seen on day 44, 10, 8, 31, 30 and one had not been seen but was scheduled for an initial visit 34 days following arrival.

[2] Patients #3 and #4.

symptoms, evaluation by an ophthalmologist should be performed urgently.[3] According to the record, this patient had never had a mammogram and had not had a Pap smear for 5-6 years. The HIV provider indicated that another provider was responsible for preventive care.

In another case, an HIV patient on dialysis missed three hemodialysis treatments in three weeks (one prior to admission) due to being out to court. Two of the missed treatments occurred while he was housed in the infirmary. In each case, the patient developed fluid overload and was hospitalized. There was no provider documentation in the record of actions taken to prevent this from happening again. When we discussed the patient with the HIV provider, he responded that because the patient was housed in the infirmary, it was "not his patient".[4]

These cases reflect fragmented care. The HIV provider reported that he disagreed with the Monitor's previous recommendations that he be responsible for the overall care of HIV patient's including treatment of other chronic diseases. However, because HIV and antiretroviral therapy has an impact on other chronic diseases (e.g. independently increases cardiovascular risk, increases lipids, as well as drug interactions, etc.) it is appropriate for the HIV provider to manage the patient holistically, including immunizations and preventive services. Although the HIV provider does not necessarily have to perform care routinely performed by other providers (e.g. gynecological services, etc.) the HIV provider can coordinate care and ensure that it takes place.

With respect to medication continuity, we reviewed medication administration records for HIV patients from Divisions I, II, IV and VIII (RTU). We found that for nurse administered medications, MARs showed that although patients generally received their medications, there were instances in which nurses documented not administering medications because the "medication was not available" or the patient was "not on the tier", or it was simply recorded as a missed dose. We also found that a nurse on the RTU was administering hour of sleep doses of HIV medications at noon or early afternoon. Missed doses and medication errors should be explored through the quality improvement programs.

c. Cermak-Tracking System

Disease specific registries based on the problem list are available via the IT group. This, however, is not readily available to the healthcare staff via Cerner. While the large majority of patients with chronic illnesses are in the registries, we did find some patients with chronic diseases whose illness was not documented on the problem list and therefore not in the corresponding registry. The registries have to be accessible to the care teams so they can use the information to manage the patient groups. The registries should also be used to monitor compliance with established clinical practice guidelines.

d. Cermak-Regularly Scheduled Visits

---

[3] Patient #3.

[4] Patient #2.

The follow-up visits were not consistently timely due to staffing issues and the providers being redeployed to intake, urgent care and infirmaries to meet the demands of high risk areas. The team is doing their best with the given constraints and compliance should improve with hiring of new providers.

Frequent movements of patients and EMR issues affect the scheduling of the follow-up visits. The new RTU will probably help consolidate patients with chronic disease for more efficient management.

e. CCDOC-Facilities for Special Needs Patients f. Cermak-Medically Appropriate Care for Special Needs Patients & Communication to CCDOC

The patients with special needs are housed in the infirmary even though they don't have medical issues that require infirmary level of care. Beds on the floor are being used for housing these patients. Most of these deficiencies will be addressed when the new RTU is staffed to house the right type patients as planned.

The nursing care for special needs patients is episodic and as needed and currently does not include scheduled care based on nursing care plans.

The compliance with established clinical practice guidelines is not consistent. The treatment plan has to include scheduled nursing care based on the level of disease control and complexity.

While there is a process to address patients who have court scheduled on the day of their dialysis we found a patient who had missed multiple dialysis visits due to court visits inconsistent with established process.

HIV visits were focused and did not address other medical issues as part of the visit. The labs and X-rays ordered were not checked to see if they were completed or why they were not completed. HIV patients sometimes did not get their labs or X-ray done but this problem was not identified and addressed during the provider visit.

A patient with history of chronic disease that was previously identified and treated during his last incarceration was not identified as such during the initial visits of next incarceration. Review of notes/ problem list/ medications in the EMR would have helped identify and address the condition during the initial visit of this incarceration.

## Monitor's Recommendations:

1. Implement clinical practice guidelines and ensure consistent practice
2. Create chronic disease templates to guide the provider to document pertinent positives and negatives, history specific to the condition, remind them of any recommended tests, medications, referrals, level of disease control (good ctrl, poor ctrl, etc.), level of change from previous visit (i.e.: improved, worsened, no change), follow-up specific to the condition.
3. Create expectation for documentation for initial chronic care, follow-up chronic care, and urgent care visits and title the documents to identify the type of visit.
4. Document medication reconciliation at each encounter.
5. Continue to reinforce the importance of keeping the problem list up to date
6. Get INR results before initiating Coumadin
7. Add INR order in EMR to allow clinicians to order follow-up INR as indicated

8. Add capability to EMR to allow future date orders for Labs, etc.
9. Document acknowledgement of recent lab results and actions taken if needed as well as the reason for no action taken on an abnormal lab result.
10. Identify IT resources to work with the physician and nursing leadership to create the EMR templates
11. Create a referral process for clinicians to refer patients to the Pharm-D Clinical Specialist who can be valuable in managing complex patients.
12. Consider shared medical appointments for chronic diseases (i.e.: Diabetes, Hypertension, etc.) where patients can be educated by the various disciplines on disease management. (Self-testing blood sugar, diet, etc.)
13. Documentation of all medication administration including insulin should be standardized and available in the EMR so the provider can review the MAR for compliance with medications
14. Accuflo (eMAR) has to be supported by the IT department like the EMR and other applications.
15. Improve documentation of routine and episodic care provided to patients with special care and ADLs
16. Staff the chronic care clinics (provider and nursing) to ensure patients have needed chronic care.
17. Encourage staff to use the templates in Cerner when they see patients for chronic care follow-up visits based on their level of disease control.
18. Review order sets in the EMR and make updates as needed.
19. Continue efforts to house patients in the appropriate housing locations for efficient clinical management.
20. Identify high risk chronic disease patients and establish a review process to manage their care more efficiently.
21. Establish a disease registry folder inside Cerner to allow real time identification of chronically ill inmates according to their chronic disease (for example list of all hypertensive inmates, diabetic inmates, epilepsy inmates, etc.). Without a central and inclusive disease registry, the risk of chronically ill inmates not receiving a timely provider evaluation remains very high.
22. Access for care teams to view the registries to help them manage patient population.
23. Address all complaints and conditions during scheduled visits including HIV visits.
24. Review ordered tests to see if they were completed
25. Review episodic/unscheduled visits by chronic disease patients to identify opportunities for prevention.
26. HIV patients should be scheduled to see the HIV provider within 7 days of arrival.
27. The HIV provider should be the primary care provider for the patient's care, including chronic disease and the coordination of care with other providers including HIV patients in the infirmary care and preventive services. We suggest that as part of the initial evaluation the provider reference routinely performed labs and diagnostic tests as part of his assessment, including STD testing and chest-ray results.
28. The HIV provider should adequately document the patient's past medical history and review of systems and address significant findings such as weight loss.
29. Cerner should be reprogrammed to permit future scheduling of labs and none that are automatically dropped off.

30.    Missed medications should be the subject of study through the quality improvement program.
31.    Self-Monitoring:
   a. Ensure all patient on chronic medications are in the appropriate registries (match registry to medications and medication to registry to identify miss matches)
   b. Monitor compliance with dialysis visits
   c. Audit at least 5 charts per provider per month to monitor for compliance with established clinical practice guidelines. Provide individual and group feedback for continuous improvement.
   d. Continue monitoring the compliance of initial and follow-up visits for chronic disease patients and a standard process to improve compliance.
   e. Establish metrics to monitor compliance of patients on anticoagulation.
      i. Time to first visit
      ii. Time to first dose
      iii. INR before 1st dose
      iv. Time to therapeutic level
      v. Management plan for difficult patients
      vi. Compliance with INR check as ordered
      vii. Compliance with follow-up as indicated
   f. Review all Hypoglycemic episodes to identify opportunities for prevention
   g. Compliance with recommended vaccinations

## 53. Treatment and Management of Communicable Disease

   h. Cermak shall maintain adequate testing, monitoring and treatment programs for management of communicable diseases, including tuberculosis ("TB"), skin infections, and sexually transmitted infections ("STIs").
   i. CCDOC shall comply with infection control policies and procedures, as developed by Cermak, that address contact, blood borne, and airborne hazards, to prevent the spread of infections or communicable diseases, including TB, skin infections, and STIs, consistent with generally accepted correctional standards of care.
   j. Cermak shall maintain infection control policies and procedures that address contact, blood borne, and airborne hazards, to prevent the spread of infections or communicable diseases, including TB, skin infections and STIs, consistent with generally accepted correctional standards of care. Such policies should provide guidelines for identification, treatment and containment to prevent transmission of infectious diseases to staff or inmates.
   k. Pursuant to Centers for Disease Control ("CDC") Guidelines, Cermak shall continue to test all inmates for TB upon booking at the Facility and shall follow up on test results as medically indicated. Cermak shall follow current CDC guidelines for management of inmates with TB infection, including providing prophylactic medication when medically appropriate and consistent with the inmate's expected length of stay. Inmates who exhibit signs or symptoms consistent with TB shall be isolated from other inmates, evaluated for contagious TB and housed in an appropriate, specialized respiratory isolation ("negative

pressure") room. Cermak shall notify CCDOC of inmates' specific housing requirements and precautions for transportation for the purpose of infection control.

l. Cermak shall ensure that the negative pressure and ventilation systems function properly. Following CDC guidelines, Cermak shall test daily for rooms in-use and monthly for rooms not currently in-use. Cermak shall document results of such testing.

m. Cermak shall notify DFM, in a timely manner, of routine and emergency maintenance needs, including plumbing, lighting and ventilation problems.

n. Cermak shall develop and implement adequate guidelines to ensure that inmates receive appropriate wound care. Such guidelines will include precautions to limit the possible spread of Methicillin-resistant Staphylococcus aureus ("MRSA") and other communicable diseases.

o. Cermak shall adequately maintain statistical information regarding communicable disease screening programs and other relevant statistical data necessary to adequately identify, treat, and control infectious diseases.

**Compliance Status:** This provision remains in partial compliance.

**Status Update:** Status update received and reviewed.

**Findings:**

a. Based on the documents reviewed by the Monitoring Team, Cermak appears to have screening, monitoring and treatment programs for management of communicable diseases, including tuberculosis ("TB"), skin infections, and sexually transmitted infections ("STIs"). This activity, however, needs to be improved (see below for recommendations).

b. The Monitoring Team noted numerous examples of torn mattresses, leaking plumbing in residential areas and general dirty living areas during our visit. These deficiencies will undoubtedly hinder the infection control practices that may be in place and poses a potentially serious risk of communicable disease outbreaks.

c. The Monitoring Team noted numerous examples of unclean clinical surfaces (exam tables, chairs, trays, etc.) as well as generally poor sanitation of many patient care areas.

d. The Medical Monitor reviewed the previous several months of TB screening data. Cermak has discontinued tuberculin skin testing (TST) screening for latent TB infection (LTBI) at intake (inmates undergo symptom screening but TST or Interferon-Gamma Release Assay (IGRA) testing is no longer being performed at intake). Inmates are instead screened for pulmonary TB disease via symptom screen and chest x-ray (CXR) examination. The Monitoring Team confirmed that the process of CXR screening at intake is very strong but we also learned that occasionally, new inmates miss their initial CXR screening. Even though great majority of these undergo their CXR screening within the next 24 to 48 hours, we found at least two cases in which a CXR was never performed.

Cermak screens inmates for TB infection during the annual health screening using IGRA blood test (QFT-GOLD). Lack of tuberculin skin testing at intake makes it impossible to determine the true TB conversion rate among Cermak inmates.

e. The Medical Monitor reviewed the daily negative pressure isolation room logs for the past 5 months. These were complete. Weekly smoke tests, however, are not being performed at this time. Staff interviews reveal that Cermak staff continues to report maintenance problems to DFM, but response time from report to correction is highly variable. At this visit, we did not verify time frames for DFM responding to Cermak ventilation, plumbing and lighting problems but will at the next site visit.

f. Cermak's Outbreak Prevention and Control Policy (B-01.6) dated 4/26/13 addresses reporting and management of outpatient skin and soft tissue infections (SSTI). The policy is very thorough with respect to what Divisional staff should do to assess and report skin infections. However, we found that Cermak physicians are to report skin infections in Cerner, but nurses do not refer all patients with skin infections to the physician and there is no other mechanism for nurses to directly report skin infections. In addition, although the policy indicates that providers should culture wounds with purulent drainage, the Infection Control Medical Director stated that few wound cultures are being performed because providers presumptively treat wounds for methicillin-resistant Staphylococcus Aureus (MRSA). Yet only those infections that are MRSA culture positive are reported as MRSA cases for statistical purposes. Cermak also collects data regarding cases referred to the Cermak ER but not all skin infections are referred to the Cermak ER. As noted earlier in this report wound care has been decentralized and is the responsibility of each division physician and nurse staff. It is unclear what oversight if any, is being performed to ensure that division staff report all skin infections. With respect to inpatient wound care, we found that documentation of wounds care was infrequent and inadequate.

g. The Monitoring Team reviewed a comprehensive report regarding communicable disease screening programs and other relevant statistical data necessary to adequately identify, treat, and control infectious diseases.

**Monitor's Recommendations:**

1. Report all boils and other skin infections with a focus on identification, treatment and containment of potential MRSA infections.
2. Achieve 100% compliance with intake CXR screening.
3. The follow up of abnormal CXRs suggestive of possible pulmonary TB has been assigned to the infirmary provider who may or may not obtain an IGRA or TST as part of his "TB rule out" process. This is not consistent with best practice. TST or IGRA testing must be included as part of every TB rule out process.
4. Develop a process/schedule for routinely sanitizing cells and clinical areas.
5. Conduct at least one patient care oriented Infectious Disease Quality Improvement study per quarter.
6. Continue with the collection of statistical data for communicable diseases. (Status update report indicated on track.)

## 54. Access to Health Care

a. CCDOC will work with Cermak to facilitate timely and adequate accessibility of appropriate health care for inmates, as provided by Cermak.
b. Cermak shall ensure the timely and adequate availability of appropriate health care for inmates.
c. Cermak shall ensure that the medical request ("sick call") process for inmates is adequate and provides inmates with adequate access to medical care. The sick call process shall include:
   1. written medical and mental health care slips available in English, Spanish and other languages, as needed;
   2. opportunity for illiterate inmates and inmates who have physical or cognitive disabilities to access medical and mental health care; and
   3. opportunity for all inmates, irrespective of primary language, to access medical and mental health care.
d. Cermak shall ensure that the sick call process includes confidential collection, logging and tracking of sick call requests seven days a week. Cermak shall ensure timely responses to sick call requests by Qualified Medical Staff. The logging procedure shall include documentation of the date and summary of each request for care, the date the inmate was seen, the name of the person who saw him or her, the disposition of the medical or mental health visit (e.g., referral; whether inmate scheduled for acute care visit), and, if follow-up care is necessary, the date and time of the inmate's next appointment. Cermak shall document the reason for and disposition of the medical or mental health care request in the inmate's medical record.
e. Cermak shall develop and implement an effective system for screening medical requests within 24 hours of submission. Cermak shall ensure that sick call requests are appropriately prioritized based upon the seriousness of the medical issue.
f. Cermak shall ensure that evaluation and treatment of inmates in response to a sick call request occurs in a clinical setting.
g. Cermak shall ensure that Qualified Medical Staff make daily rounds in the isolation areas to give inmates in isolation adequate opportunities to contact and discuss medical and mental health concerns with Qualified Medical Staff in a setting that affords as much privacy as reasonable security precautions will allow. During rounds, Qualified Medical Staff will assess inmates for new clinical findings, such as deterioration of the inmate's condition.

**Compliance Status**: This provision remains in partial compliance.

**Status Update:** Cermak provided a status report dated May 2014 that the Monitor reviewed in preparation of this report. We find that the status report lacks meaningful information regarding the issues affecting access to care and measures being taken to address them.

**Monitor's Findings:**

We evaluated inmate access to care by reviewing health service request tracking systems; randomly inspecting health care request form availability and collection; reviewing health service request (HSR) forms , electronic health records, segregation logs; access to care data; and interviewing staff and inmates.

Since the last formal monitoring site visit in May 2013, access to care has deteriorated. During the site visit, leadership presented health care access data from December 2013 through April 2014. These reports evaluated timeliness of access from the time the patient completed a health service request form until a nurse and/or provider evaluated the patient. Although the data represents the best aggregate information available regarding access to care, the data is flawed because at each step of the process, the number of evaluable health service requests decreases.

To illustrate, for the month of April 2014, data showed that the time frame across all Divisions from patient submission of the health request until it was date stamped was approximately 2 days (49:38 hours). The average time frame from when the health service request was date stamped until a staff member scheduled the patient in the EMR was approximately 1 day (20:50 hours). The average time frame from when staff scheduled the patient in the EMR until a nurse saw the patient was approximately 3 days (70:03 hours). Thus, the data suggests that overall, the time from when the patient submits a request until he/she is seen is about 6 days.

However, data includes only 1610 (21%) evaluable health care requests out of 7606, so information regarding the timeliness of care for 79% of health requests is missing and includes patients that were never seen. This is due to several factors, including missing data points (e.g. HSR not date stamped when received, etc.) use of flawed surrogates to represent a nursing encounter (i.e., vital signs), nurses entering incorrect dates that the inmate submitted the HSR in the EMR, and inclusion of walk-ins that skews data toward being more timely. We recommend that health care leadership take measures to correct data that will allow root cause analysis of delays in access to care. With respect to measuring nursing encounters we recommend that the electronic medical record is amended so that a radial button can be selected to designate a nursing encounter with the patient.

In addition to delays in initial access to care, data regarding nurse to provider referrals also show delayed or no access to care. In April 2014, 448 (59%) of 753 nurse to provider referrals were successfully completed within 30 days. In 237 (31%) cases a provider did not see the patient at all.

The major factor for delays in access to care at Cook County Jail is the inability to hire nurses. Cermak has been unable to hire nurses due to a bureaucratic hiring process and lack of support from the Cook County Hospital System. This has been a recurrent issue throughout the monitoring period.

As noted in previous reports, nurse coordinators indicated that staffing shortages (e.g. vacancies and call-ins), result in nurses being reassigned from access to care to medication administration duties, resulting in delays in access.

When nurses evaluate patients, the quality of nursing assessments is highly variable and often inadequate as reflected by lack of subjective and objective data, use of nursing diagnoses and plan of care. Compounding this are nurse protocol templates in the electronic medical record which are cumbersome to use and do not result in a cohesive and integrated progress note. In some cases nurses do not examine the patient at all, but simply refer the patient to a provider by piggybacking onto an existing provider appointment. There is no documentation of communication between the nurse and provider to indicate that the provider is aware of the nurse referral in order to address the inmates' complaints.

Inadequate training regarding physical assessment and nurse protocols is another factor contributing to an inadequate system, as well as lack of monitoring and supervision of nurse performance by nurse coordinators.

And although the nurse protocols now include over-the-counter (OTC) medications, OTC medications are so limited in type and quantity that it is likely to result in insufficient treatment of the patient's complaint increasing the likelihood that patients will submit duplicate health requests for the same problem or require the nurse to refer the patient to a provider to receive adequate treatment. For example, for patients with dental pain the nurse may only give ibuprofen 200 mg three times daily for two days which for many patients is insufficient dosing and not long enough to last until the dentist can see the patient. In another, treatment of hay fever does not include an OTC antihistamine, a cornerstone of treatment of allergic conditions. Ultimately, if the nurse cannot adequately treat commonly occurring minor conditions, there is really no point in having nurses perform sick call.

In summary, CCJ does not provide inmates timely access to a professional who can render a clinical judgment, placing inmates at risk of harm. Improving access to care requires more focused and sustained support from health care and custody leadership. One strategy that we recommend for consideration is centralizing the collection and triage of health service requests and deploying nursing resources so that access to care and medication administration receive equal priority.

Unless significant improvements are made by the next site visit, this area will be in noncompliance.

        a.  Jointly Provide Appropriate Accessibility and
        b.  Timeliness and Adequacy of Care.

To evaluate timeliness of care, in each Division we conducted random inspection of housing units and health request boxes to evaluate adequacy of HSR forms and timely collection of HSRs. We found that in most, but not all Divisions HSRs were available and inmates able to confidentially submit their health requests. Our findings for each Division are described below.

**Division I** is a maximum security division with a capacity of 1,250 inmates and a current population of 1,247.[5] The Division has health care staff present from 0700 to 1600. After 1600

---

[5] See Cook County Jail Daily Count Sheet, 5/19/14

when health care staff is no longer in the clinic, inmates obtain access to care by contacting a correctional officer who then notifies the Cermak emergency department.

We randomly inspected 8 of 32 tiers and found that all tiers had lockable sick call boxes that were properly labeled for health care request forms. Three of eight tiers had no HSR's available on the unit at the time of our tour. The remaining five tiers had numbers ranging from 1 to >10 forms. On tiers in which no forms were available, correctional officers reported that they had given out all the request forms that morning. We asked officers when the tier would next receive HSR's they reported that when health care staff made rounds the next morning or they could go to the clinic and retrieve more forms, however this did not occur on the day of our tour.

In each health service request box we found tracking logs for May 2014 that showed that staff checked the box and collected request forms daily.

In Division I, health care access to care data for April 2014 showed that the average time from when a patient dated a health request form until the patient was seen was 3.91 days. Although this would appear to reflect timely care, only 239 (25%) of 952 Division I health requests forms were evaluable. In addition, review of health records showed that nurses did not accurately input the date the patient submitted the request, which skews data towards timelier access to care. The data also included 225 walk-ins which also skews data toward timelier services than in actual practice. Almost as many patients were seen as walk-ins (225) as were seen as scheduled patients (239). Data regarding walk-ins should be collected, but not included in the assessment of timeliness for access to care. In addition, health care leadership should explore why Division I has so many walk-ins.

During our tour we found an accordion folder in the Division I clinic with health service request forms dating from February to May 2014. Staff initially reported that these patients were scheduled to be seen. Upon further discussion, staff reported that many of these patients had already been seen but they were not sure which ones. This reflects disorganization in the operation of the clinic.

We reviewed five records of health requests and noted the following:
- On 2/17/14 a patient submitted a health request complaining of dental pain. It was received the following day. On 3/4/14 a nurse saw the patient and provided him ibuprofen 200 mg three times a day for two days in accordance with the protocol and referred him to dental. On 3/27/14 the dentist saw the patient. The original HSR form was still in the clinic and not scanned into the record.
- On 4/10/14 a patient submitted a health request for dental pain. On 4/11/14 a nurse saw the patient and treated him with Ibuprofen 200 mg three times daily for two days and referred him to the dentist. On 4/29/14 the dentist saw the patient and placed him on antibiotics with plans to see him the following day. This did not occur. On 5/2/14 the dentist saw the patient and extracted #16. The original HSR form was still in the clinic and not scanned into the record.
- On 4/16/14 a patient submitted a health request form complaining of pain in his private parts. The form was not date stamped or legibly signed. On 4/20/14 a staff member entered the HSR into the EMR but indicated that the patient submitted the form the same

day and not on 4/16/14. A RN saw the patient the same day but did not examine the patient. The nurse referred the patient to a provider but this did not take place.

- On 3/20/14 a patient submitted a HSR form complaining of back and left leg pain. It was date stamped the following day. On 3/23/14 a staff member entered the form into the computer indicating that the patient submitted it the same day, instead of 3/20/14. The nurse saw the patient the same day but did not examine the patient. The nurse referred the patient to a provider for the following day; however primary care clinics were cancelled on 3/24, 3/25, and 4/1/14.
- On 3/5/14 a patient submitted a HSR form complaining of back and dental pain and depression. It was received on 3/7/14. A staff member entered all problems into the EMR. A nurse did not see the patient for back and dental pain. On 3/7/14 mental health saw the patient, and on 3/24/14 dental staff saw the patient.

Issues noted in these five records include:
- staff not entering correctly the date the patient submitted his request;
- nurses not seeing patients timely if at all;
- inadequate nursing assessments;
- inadequate treatment of dental pain and delayed access to dental services; and
- failed provider referrals.

**Division II** consists of dorms 1, 2, 3, 4 and the annex. At the time of our visit, the capacity of Division II was 1960 and population was 1956.

Monitoring for Access to Care was conducted on 5/20/14 in all four dorms. At the time of visit a new nurse coordinator was being oriented. She has been a staff nurse in Division 2 and was promoted in April of 2014.
HSR's are collected daily by 9 am in all dorms. The Nurse Coordinator could not provide an accurate number of daily requests. However it was clear that there was a significant backlog of request. Additionally during random interviews with inmates there were many examples of inmates waiting more than a week to be seen by a nurse. In review of the available HSR's that day 87 were collected in dorm 1 and only 20 were scheduled to be seen. Furthermore the nurse conducting the nurse sick call was interviewed with a patient using a tracer method to ensure the policy and procedure was being adhered to. The nurse was found to be defensive with the inmate who had stated he dropped 3 slips and it had been 10 days since his first slip. The nurse further did not fully assess the inmate's complaint of a seizure on the tier. This inmate had a confirmed history of a seizure disorder on intake.

During the monitoring of November 2012 the monitor reported the nurse coordinators had implemented viable interventions to improve the overall operation of the division. These interventions are no longer in practice. The current Nurse Coordinator attributes this to the shortage in nursing staff. Without intervention the backlog of HSR's in all dorms will continue to increase to excess.

III Annex housed 639 male inmates. This building houses the overflow of Division II. All inmates are on KOP's to be housed in this annex building. During the visit on 5/21/14 the HSR box was observed unsecured on the floor of the dorm mixed with other custody requests. There

were 5 HSR's in the box that had not been picked up that day. There appeared to be adequate copies to be utilized by the inmates if needed.

Inmates are taken to Division II dorm 1 for health services. During interviews with five inmates the following issues were noted. First inmates need to complete new HSR's when they are transferred into this building. Four out of five inmates stated they put their requests in over seven days ago and still had not been seen. In this building there is concern about inmates being denied access to care due the perception that they are supposed to be more medically stable than the other divisions. The nurse working three annex was new to the unit and still in orientation; she stated there aren't always nursing staff to conduct nursing sick call. On the day of the visit provider sick call had been cancelled. If inmates become acutely ill they are sent to the urgent care center.

**Division IV** houses female inmates and has a capacity of 704 and current population of 325 inmates. In April 2014 female inmates with higher medical and mental health acuity were transferred to Division VIII (RTU), fifth floor. At that time, nurse staffing associated with medication administration was also transferred to the RTU. Also, a Division IV registered nurse who performed nurse sick call retired around the same time and has not been replaced. This left the nurse coordinator, one registered nurse and two correctional medical technicians to perform nurse sick call, medication administration, chaperone and assist providers during clinics, and to respond to patients with urgent complaints. This is clearly inadequate staffing for 325 female patients.

Access to care data for April 2014 showed that the average length of time for a patient to be seen following submission of an HSR was 6.5 days, an increase from 4.4 days in March 2013. However, further review of the data shows that only 25 (10%) of 256 request forms were evaluable.

We reviewed the sick call log book and found that nurse sick call clinics had only been conducted on six of 28 eligible days (weekends excluded) from April 10 to May 16, 2014. In addition, we reviewed the health care request tracking log on tier I-1 and found that health care request forms had been collected on only six of 20 days in May 2014. Inmates on this tier reported significant problems with access to care.

We interviewed the Nurse Coordinator who reported that Division IV was completely up to date regarding access to care because she took the HSRs and went to the tiers to interview inmates and address their complaints. The nurse coordinator reported that she did not document these interviews in the medical record. This reflects a lack of understanding and compliance with nursing practice standards, Cermak policies and procedures, and is not acceptable performance. We find that Division IV is in noncompliance with respect to access to care.

**Division V** was closed for renovations at the time of our site visit.

**Division VI** is now staffed daily from 7 a.m. to 8:30 p.m. Access to care data in Division VI for April 2014 showed that of 99 (23%) of 422 evaluable health care requests the average length of

time for a patient to be seen following submission of an HSR was 5.2 days, which is an increase from 3.0 days in March 2013.

Division VI is now staffed daily from 7 a.m. to 8:30 p.m. Access to care data in Division VI for April 2014 showed that of 99 (23%) of 422 evaluable health care requests the average length of time for a patient to be seen following submission of an HSR was 5.2 days, which is an increase from 3.0 days in March 2013.

The monitoring visit took place on 5/22/14. The dispensary was conducting nursing sick call and was staffed with 2 RN's. HSR's had been triaged and scheduled on an excel spreadsheet maintained by the CMT. Provider sick call was also being conducted. Scheduled for the provider on that day were 8 patients and 20 for nurse sick call. Random interviews with inmates acknowledged they are seen in sick call approximately five days after they turn in the HSR. The HSR boxes are located outside the units locked with an adequate number of HSR slips for inmates to access care.

**Division VIII** (RTU) is not fully occupied except for intake and women housed on the 5th floor. We toured the fifth floor and found that health requests boxes were not installed. Instead, inmates were either told to place the requests through a slot on the medication window, or put the requests in an unsecured folder in the open unit. This does not allow confidentiality of inmate health requests. The acting Chief Executive Officer advised the Monitor that health care boxes were "on order", but given the long lead time for opening the RTU, the lack of preparation is disturbing.

There is no registered nurse assigned to the RTU at this time and this is reflected in access to care reports that show the average length of time from when patients submit health requests until they are seen is approximately 8.5 days. However, these data include only 97 (11%) evaluable requests of 914 submitted.

**In Division IX** the method for handling HSRs is unchanged from the sixth report. According to the data provided by Cermak from November 2013 through April 2014 an average of 21 HSRs are collected daily in Division IX. The time from the date of the request to the time stamped at the dispensary is two days. Of eleven HSRs reviewed, seven had been triaged by registered nurses the day after the date the inmate put on the request. Observations made during the tour of the housing units were that HSR forms were available in the officer's area, the boxes in the vestibule were emptied by health services staff and the log was in place.

Two nurses were observed conducting five patient assessments. Each nurse used an examination rooms located on the floor in the housing towers. The carts have now been equipped with oto-ophthalmoscopes. The sinks in three of the examination rooms we visited had running hot and cold water.

According to Cermak's data only an average of 26% of patients making a request for care via a HSR are assessed by a nurse. Of eleven HSRs reviewed, nurses performed assessments of nine patients within a day of collection and the remaining two did not require an assessment. Nurses

in this Division delay entering the inmates' complaint into the electronic medical record until the inmate is seen and a nursing note entered. Assessments of inmate's complaints were very limited, consisting of the patient's description of the problem, vital signs, and sometimes interview questions from the protocols. Almost no physical examination took place. Nurses did provide information about self-care as well as offer OTCs for symptom relief.

The disposition of the nine HSRs seen for a clinical assessment by a nurse resulted in six provider appointments. All of these were previously scheduled appointments that had yet to take place and only one was a timely wait period. There is no documentation or other evidence that the nurse communicated to the provider that a referral was made to a previously scheduled appointment or the reason for the referral.

**In Division X** HSRs are picked up by night shift nursing staff and evaluated the next morning by a registered nurse to identify any urgent complaints. Inmates are scheduled to be seen using the automated scheduling system, an improvement since the seventh report. There have been no issues with nurses' having access to inmates now that the scheduling system is being used.

According to the Nurse Coordinator, there are two to three occasions every week when because of short staffing HSRs are not picked up or the nursing clinical assessment is not accomplished. Indeed according to Cermak's data only an average of 14% of patients making a request for care are ever assessed by a nurse and in February only 7% of the inmates submitting an HSR were assessed by nurses. This Division currently has three vacancies, all on the evening shift. The Master Assignment Sheet for seven days from 5/13/14 to 5/20/14 was reviewed and two out of seven days Health Service Request (HSR) forms were not addressed at all. The day shift was consistently staffed with 5 licensed nurses, 4 to administer medications and one nurse to handle everything else including HSRs. Evening shift was only staffed to administer medication (4 positions). Night shift staffing is a minimum of two licensed nurses and in the sample of actual staffing reviewed there were only two shifts staffed above the minimum level.

According to the data provided by Cermak from November 2013 through April 2014 an average of 19 HSRs are collected daily in Division X. The time from the date of the request to the time stamped at the dispensary is three days. Of eight HSRs reviewed, five had been triaged more timely than the data indicated (the next day). Observations made during the tour of the housing units were that HSR forms were readily available in the officer's area, the boxes in the vestibule were emptied by health services staff and the log was in place.

Failure to collect and triage or to assess symptomatic complaints results in a backlog and perpetuates untimely sick call access. Staffing is insufficient in Division X to provide inmates with access to care. A minimum of three additional registered nurse positions are necessary (two on days and one on evening) to manage the workload associated with access to care.

In Division X, eight HSRs from patients with chronic disease were reviewed, two of which did not require a clinical assessment by a registered nurse. Of the six remaining, four were seen for an assessment and it was completed timely. The two not seen for an assessment had a previously scheduled provider appointment that took place within 48 hours of the nurse's triage.

Nursing protocols were used in only one of the four nursing assessments. The other three encounters documented no assessment information. One of the HSRs notes that the inmate was

seen by the nurse and Nurse Coordinator but there is no documentation of a corresponding encounter in the health record. Another HSR documents the patient's transfer to Cermak ER for treatment of a migraine headache but there is no documentation of the nurse's assessment that led to the disposition decision. The third HSR was from a diabetic patient who 48 hours after admission to the jail was requesting an ADA diet. In this case the nurse did not assess the patient's health status (glycemic control) but instead ensured the patient he would be seen by his primary care provider later that week.

A previously scheduled appointment was the disposition for six of eight HSRs reviewed. Five of these were timely; the one that was not was for migraine headache and took place 25 days later. There is no documentation or other evidence that the nurse communicated to the provider that a referral was made to a previously scheduled appointment or the reason for the referral. Of the remaining HSRs one disposition was to Cermak ER and no disposition was documented for another. No new appointments were requested as a result of nursing triage or assessment.

We interviewed the registered nurse assigned to do HSRs on Tuesday 5/20/2014. She has been employed by Cermak less than a year and beginning next month will take another position in the Cook County Health and Hospital Systems. Her reason for leaving Cermak is frustration with the HSR process and inadequate staffing to keep up with the requests. That day she was the only registered nurse on duty for a population of 768 M2 and P2 patients. Her other responsibilities included managing the PCC clinic, responding to emergencies, care of the diabetics and supervision of six other nursing staff, one of whom was from an agency. There were stacks of HSRs on her desk that had yet to be triaged and scheduled for face to face assessments. The day before she had been the only RN and also required to administer medication so no HSRs were dealt with.

According to the data provided by Cermak from November 2013 through April 2014 the average time from the request's receipt to the face to face nursing encounter is six days. Overall the time from when the inmate initiated the request to the nursing encounter averages nine days.

**In Division XI** the method for handling HSRs is unchanged from the seventh report. According to the data provided by Cermak from November 2013 through April 2014 an average of 35 HSRs are collected daily in Division XI. The time from the date of the request to the time stamped at the dispensary is 2.5 days. Both of the HSR records that were reviewed had been triaged more timely than the data indicated (the next day). Observations made during the tour of the housing units were that HSR forms were readily available at the officer's desk, the boxes outside each unit were emptied by health services staff and the log was in place.

Two HSRs from Division XI were reviewed. At the time of triage both HSRs noted an existing provider appointment was scheduled. The nurse should have assessed each of these patients in a clinical encounter and did not. In one of the two HSRs reviewed the disposition to a previously scheduled appointment was inappropriate and untimely.

According to the data provided by Cermak from November through April the average time from the request's receipt to the nursing encounter is six days. Overall the time from when the inmate initiated the request to the nursing encounter averages eight days. Nursing staff see an average of 35% of those patients making a request for care via a HSR.

c. d. e. f. Sick Call

- Health care request forms are written in both English and Spanish. We observed that paper health service request forms are written in both English and Spanish. Cermak has added two devices for hearing impaired to communicate with health care staff. These Internet based devices allow sign interpreters remotely to communicate in sign language to Inmates in their health care requests. We did not observe use of these devices during this visit.
- Confidential collection. In most Divisions, inmates are able to confidentially submit their health service request forms. The exception is Division VIII where inmates place their requests in unsecure folder on the unit and Division IX.
- Logging and tracking seven days a week. There are tracking logs maintained in health care boxes, and a Unit Managers Daily Report that tracks the number of health service requests received daily. In addition, HSRs are entered into the EMR that also serves as a link in the tracking system. However, aggregate data regarding access to care collected from these tracking systems is flawed and inaccurate.
- Timely response by qualified medical staff. Health care data show that patients are not seen timely by health care personnel.
- The reason for the request and disposition is documented in the health record. Health care staff more consistently enters the health request into the EMR to schedule the patient for an appointment._ However we found that on Division IV the Nurse Coordinator was seeing patients on the tiers and not documenting findings in the EMR.
- System to screen requests within 24 hours and prioritized. As noted above timeliness of triage has deteriorated and is not consistent across the jail due to staff call-ins and reassignment of nurses to medication administration.
- Sick Call takes place in a clinical setting. At this visit we found noncompliance in Division IV.

Cermak-Daily Isolation Rounds

The Agreement requires that Cermak ensure that Qualified Medical Staff make daily rounds in isolation areas to give inmates in isolation opportunities to discuss medical and mental health concerns with health care staff in privacy. During rounds, health care staff is to assess inmates for new clinical findings, such as deterioration of the inmate's condition.

There has been no change since the seventh report in how segregation rounds are conducted in IX. A member of the health care staff makes verbal contact with every inmate in segregation and may gather information on behalf of the inmate (i.e. next primary care appointment), follow up on concerns (i.e. whether medications have been received) or make referrals for care. The staff person notes if the inmate had no complaint (NC) on the list of inmates in segregation. No entry is made in the EMR unless the inmate is brought to the clinic to be seen. The lists are a record of rounds but there is no provision for keeping or storing them. There also is no documentation of rounds kept in the patient's health record.

In Division VI segregation rounds are conducted daily by nursing staff providing the dose-by dose medications. These rounds are noted on a population sheet and initialed by the nurse.

There were no inmate complaints noted in the log for months. This is an inappropriate way to document segregation rounds. The document lacks accountability and the ability to document compliance with rounds in the EMR. Random interviews with 4 inmates indicated that there was an adequate present of nursing staff when needed.

Segregation rounds are no longer conducted in Division IV due to the transfer of female inmate to Division VIII (RTU). We requested documentation of segregation rounds for the past two months. Segregation logs show that nurses do not make daily rounds as required by the agreement and for some weeks less than three times weekly.

In April 2013 Cermak revised the policy on Segregated Inmates E-09. The revised policy requires rounds by nursing staff care staff twice weekly and mental health staff weekly. Nurses are to document completion of the rounds in the officers log book.[6] The revised policy is not in compliance with either the Agreement or NCCHC standards, although the standards are cited as a reference.

Although not in compliance with the Agreement, NCCHC standards only require rounds three times a week for segregated settings as described in the Cermak policy and procedure. It is not compliant with respect to documentation of segregation of rounds.

As noted in previous reports, we support revising the Agreement to be in compliance with NCCHC standards for the frequency of rounds and documentation requirements.

**Monitor's Recommendations:**

1. Fill staff vacancies to improve access to care.
2. Develop the infrastructure necessary to provide access to care.
   a. Revise the policy and procedure for access to care so that it is operationally clear.
   b. Establish, hire and train sufficient numbers of registered nurses to conduct sick call daily in each Division and stop the practice of redirecting nurses from access to care to other functions.
   c. Revise the protocols to ensure that nurses may provide an adequate course of therapy for the patient's condition.
   d. Train nursing staff regarding use of nursing protocols. Revise the manner in which nursing protocol templates and entries are viewed in the electronic health record so that it is clear, concise and in SOAP format.
   e. Fix access to care data collection to ensure that it is complete, valid and reliable.
3. Monitor staff compliance with access to care requirements with particular attention to the following:
   a. Daily collection of HSRs
   b. Date stamping HSRs at the time of collection
   c. Timeliness and appropriateness of nurse triage
   d. Staff entry of HSRs into the electronic health record

---

[6] Segregated Inmates. Policy E-09. Dated 4/5/2013.

  e. Scheduling patients for timely nursing evaluations in the EMR in accordance with the urgency of the complaint and policy requirements

  f. Clinically appropriate assessments utilizing nursing protocol templates with documentation in the EMR

  g. Scheduling patients to see a provider using the EMR and not piggybacking patients onto a future appointment (unless the appointment is timely and the provider is aware of the reason for the referral)

4. Jointly monitor inmate access to health service request forms and the ability to confidentially deposit them in a box accessed only by health care staff. All health care boxes should be labeled.

5. Orient inmates regarding the access to care policy and procedure upon arrival.

6. Provide close clinical and programmatic supervision of the nursing staff responsible for assessment and triage of Health Services Requests. Evaluate the quality of nursing evaluations and compliance with the nursing protocols and/or sound nursing judgment using peer review by Nurse Coordinators.

7. Revise the segregation policy consistent with NCCHC standards. Modify the Agreed Order to meet NCCHC guidelines regarding the frequency of rounds.

## 55. Follow-Up Care

  a. Cermak shall provide adequate care and maintain appropriate records for inmates who return to the Facility following hospitalization or outside emergency room visits.

  b. Cermak shall ensure that inmates who receive specialty, emergency room, or hospital care are evaluated upon their return to the Facility and that, at a minimum, discharge instructions are obtained, appropriate Qualified Medical Staff reviews the information and documentation available from the visit, this review and the outside provider's documentation are recorded in the inmate's medical record, and appropriate follow-up is provided.

**Compliance Status:** This provision is now in partial compliance (previously in substantial compliance)

**Status Update:** Received and reviewed.

**Findings:**

Chart audits were conducted on patients returning from the hospital. A hospital list is being maintained in the EMR to track these patients. The patients at the hospital are tracked by the Medical Director and their team for care coordination. The patients coming back from the Hospital ER and Inpatient are brought to the Urgent Care clinic to be seen by the provider before sent to their housing. The established processes was being followed for the ER and Inpatient returns but not consistently for patients returning from specialty clinic visits or procedure returns from the hospital.

The hospital paperwork is brought back to the urgent care and reviewed by the clinical staff to see if the patient needs to be seen by the provider and carry out any recommendations from the hospital. This process is not always followed. A patient returning from same day surgery missed this process and was later seen by the floor provider. A patient sent to the ER was seen in the urgent care by the medical provider and was appropriately referred to the mental health team since the patient was diagnosed with a new mental health condition at the hospital. The mental health team saw the patient but did not review the discharge summary from the hospital so did not initiate the new medication recommended by the hospital.

**Monitor's Recommendations:**

1. Reconcile patients sent to the hospital for scheduled and unscheduled visits periodically but not less than once a shift by an assigned team so that all patients returning from the hospital are seen and discharge instructions are followed.
2. Create a documentation template in the EMR for Hospital return visits for nursing and provider staff so pertinent information is captured in the note. Documentation to include:
   a. Reason for hospital visit, condition of patient upon return, discharge diagnosis, add new problems to problem list, medication reconciliation, plan of action for discharge instructions, in house nurse & provider follow-up, hospital follow-up visit needed?, notification to the provider who sent the patient to the hospital, etc.
3. Self-Monitoring:
   a. Maintain a database of all send outs by type (ER, Inpatient)
   b. In the database, capture the mode of transport, whether seen by provider before send out, name of the provider who sent out, reason for send out, discharge diagnosis, was patient seen on return, date and time of seen on return
   c. Audit at least five ER and five inpatient send out charts to review if they were seen upon return, reason for send out, timeliness of send out, appropriateness of mode of transport, appropriateness of emergency response provided by in-house staff, was the patient seen upon return, appropriateness of documentation, were hospital records reviewed, documentation of implementing discharge instructions (if not reason documented), medication reconciliation, problem list updated, appropriateness of post discharge housing in the jail, patient educated on the plan of care, etc. The documentation templates will help make this audit easy to do and improve staff compliance.
   d. Use this database and audit to monitor performance and identify improvement activities for each housing area/ service.

**56. Medication Administration**

   a. Cermak shall ensure that treatment and administration of medication to inmates is implemented in accordance with generally accepted correctional standards of care.
   b. Cermak shall develop policies and procedures to ensure the accurate administration of medication and maintenance of medication records. Cermak shall provide a systematic physician review of the use of medication to ensure that

each inmate's prescribed regimen continues to be appropriate and effective for his or her condition.

c. Cermak shall ensure that medicine administration is hygienic, appropriate for the needs of inmates and is recorded concurrently with distribution.

d. Cermak shall ensure that medication administration is performed by Qualified Nursing Staff.

e. When Cermak prescribes medication to address an inmate's serious mental health needs, HIV or AIDS, or thromboembolic disease, Cermak shall alert CCDOC that the inmate in question is on a flagged medication. If the prescription is terminated during an inmate's stay at the Facility, Cermak will notify CCDOC.

f. When CCDOC receives notice that an inmate is on a flagged medication, CCDOC shall include notation of a medication flag in the inmate's profile on the Facility's Jail Management System.

g. When an inmate with a medication flag is processed for discharge at the Facility, CCDOC shall escort the inmate to designated Cermak staff in the intake screening area of the Facility for discharge medication instructions.

h. When CCDOC escorts an inmate with a medication flag to Cermak staff during discharge processing, Cermak staff shall provide the inmate with printed instructions regarding prescription medication and community resources.

i. Each morning, CCDOC shall provide Cermak with a list of all inmates with medication flags who were discharged the previous day.

j. Within 24 hours of discharge of an inmate with a medication flag, Cermak shall call in an appropriate prescription to the designated pharmacy on the Stroger Hospital campus to serve as a bridge until inmates can arrange for continuity of care in the community.

k. CCDOC shall ensure that information about pending transfers of inmates is communicated to Cermak as soon as it is available.

l. When CCDOC has advance notice and alerts Cermak of the pending transfer to another correctional facility of inmates with serious medical or mental health needs from detention, Cermak shall supply sufficient medication for the period of transit. In such cases, Cermak shall prepare and send with transferring inmates a transfer summary detailing major health problems and listing current medications and dosages, as well as medication history while at the Facility.

m. CCDOC shall ensure that the transfer summary and any other medical records provided by Cermak will accompany inmates, or will be made available electronically or transmitted by facsimile, when they are transferred from the Facility to another institution.

**Compliance Status:** Partial compliance.

**Status Update:** A status report dated May 2014 was provided and reviewed in advance of the site visit.

**Monitor's Findings:**

In addition to the status report, the following documents were reviewed in preparation of this report:

- Minutes of the meeting of the Pharmacy & Therapeutics Committee that took place December 17, 2013. No minutes were provided for P & T meetings that took place on 2/20/14, 4/10/14 or 5/15/14.
- Agenda and notes from the Nurse/Meds Process Meetings (1/28, 2/18, 3/11, 3/25, and 4/8).
- Minutes of the Cermak Continuous Quality Improvement Committee (November 2013 – March 2014). Quality Improvement Reports on the Turnaround Time for New KOP Orders and Pyxis Controlled Substance Discrepancies.
- Cermak Quality Indicator Report (January 2014 – April 2014).
- Cook County Health and Hospital Systems: Management of Controlled Substances Policy 7.10.01 effective 8/13/13.
- Cermak Health Services Policy and Procedure
  - o B-02.1 Medication Errors
  - o D-02   Medication Services
  - o D-02.3 Medication Distribution
  - o D-07   Pyxis User Access

We also inspected medication storage areas including stock medications and narcotic control; observed the medication administration process (Cermak, Divisions II, IV, VI, VIII, IX, X); reviewed records, reports and logs, including medication administration records; and interviewed staff and inmates.

Information on funded positions, vacancies and new positions was requested in advance of the site visit but was not included in the material provided. This information was eventually obtained during the site visit from the Pharmacy Director. Pharmacy positions need to be integrated into the organizational structure and position control consistent with other operational components of Cermak.

a.  Cermak-Standard of Care

Medication Dispensing and Packaging for Delivery: The robotized packaging system, Fastpak was detailed in the November 2012 report and functions in essentially the same way at the time of this site visit. With phasing in of the electronic Medication Administration Record (MAR) the pharmacy no longer has to print and deliver paper MARs. Another pharmacy has been designed into the new RTU, Division IIIV but no additional positions were authorized for 2014. These positions have been requested again for funding in 2015 and should be authorized to staff the workload associated with the new building.

Medication Administration: With implementation of Accuflow, the process for medication administration in the Divisions has changed. Now instead of carrying binders with paper medication administration records (MAR) the nurse uses a laptop mounted on the cart to bring up the patient by name or identification number and the medication that they are scheduled to receive at that time appears on the screen. The nurse scans the bar code on the dose of medication packaged for the patient and then tears the package open and drops the medication

into a cup which is handed to the inmate to ingest. The nurse taps on the screen to indicate which medications were administered. This information loads into an electronic MAR for the current month. If the patient refuses to take the medication, is not present, or otherwise the dose is not administered this is also documented on the MAR. In Division VIII and Cermak 2 and 3 medications are administered from the Pyxis med station and documented in the Cerner E-Mar. Observations of the Monitoring Team are that this process is too time consuming and takes nursing time away from other necessary care that is not being provided now. A focused review of this process by a multidisciplinary team (pharmacy, nursing, medicine and QI) should take place with the goal of reducing the time spent in medication administration.

Patient identification is still done manually by having the patient state their name and identification number or birthdate and comparing it to their identification card and the data in Accuflow. In some instances staff did not use the identification card at all and relied on just the comparison of name or id number to the record. The last step in eliminating errors in correctly identifying the inmate-patient is to require staff to scan the identification card to bring up the patient and their medication orders.

Availability of support from correctional officers varies from unit to unit and based on interviews with nursing staff, varies over time as well. Nurse-administered medications were however observed to be timely in all Divisions. Factors that impact timeliness now include functionality of Accuflow and the E-Mar as well as staff that are not yet familiar with either Pyxis or the electronic documentation. For example in Division X, Accuflow was down the weekend before the site visit and it took three hours to print paper MARs. In Division IX the movement from screen to screen was slower than the nurse's actions. Apparently the problem is corrected with periodic maintenance from a remote help desk but the nurse did not know this and accepted the slow performance. Staff familiarity with new processes for medication delivery will improve over time. Performance issues with Accuflow need to be made more readily identifiable and reviewed retrospectively to determine necessary corrections or improvements. In interview with Joshua Rafinski and Bob Bliese these processes are informal now. We suggest developing methods to identify program performance issues and de-briefing to include feedback from and to end users to avoid counterproductive staff work-arounds in the future.

Inmates were allowed to refuse medications to correctional officers, rather than nurses in Divisions IX and X. This practice is not compliant with Interagency Directive 64.5.45.0 Medication Administration and Distribution (issued 4/26/2013). In Division X, Unit 3 D nine inmates refused to the officer. We interviewed four and three said that they did not want to get out of bed; the fourth was experiencing a side effect from the medication and had scheduled a provider appointment. In Division IX, Unit 3 G, four inmates refused to the officer. We insisted that each be escorted from the cell to the medication cart for refusal; of those only one refused because he was fasting. When inmates indicate to the officer that they choose to refuse medications they still need to see the nurse so that if there is a problem it can be taken care of promptly. Compliance with the Interagency Directive needs to be supported by Cermak and the County.

Court Medications: Recently permission has been given to employ a nurse from 4 am to 8 am to administer scheduled dose by dose medications before leaving for court but this had not been put

in place at the time of the site visit. At the present time medications are administered only to those inmates who have a judge's order.

Keep on Person (KOP) Medication Delivery and the Medication Delivery Team: Keep on Person (KOP) medications are provided to inmates in every Division except Cermak 2 and 3. The Medication Administration Team has increased to three deliveries a day to each of the Divisions. This team delivers all new KOP medications, all KOP "cycle fill" medications, and all KOP bulk items to inmates in each Division. Accuflow has been used to document delivery of KOP medications for the last year and has provided data for quality improvement. Chart review and inmate interviews indicate that the medication delivery team has greatly improved availability and documentation of KOP medication.

Automated Dispensing Cabinets: Pyxis automated dispensing cabinets were installed nearly a year ago in all Divisions that deliver dose by dose medications, including now the new RTU or Division VIII. With the opening of the new Division there are many more Pyxis machines to support and no pharmacy positions were added. The additional workload associated with the new building cannot be absorbed by existing positions.

Management of Controlled Substances: This continues to be an area of close scrutiny. A new policy and procedure regarding controlled substances went into effect last August. Improvements include use of an event reporting system, time frames for resolution of discrepancies and independent audit of nurse administered controlled substances. In addition the Cermak leadership team meets weekly to review reported discrepancies and follow up on their investigation or resolution. Compliance with the policy and procedure is reported at the monthly Quality Improvement Meetings. The Pharmacy completed a quality improvement study that looked at all controlled substance discrepancies in a three month period and identified need for more timely investigation, re-education about proper use of the Pyxis med stations and documentation of the resolution of discrepancies. The Pharmacy recently began a weekly audit of controlled substances that includes accounting for all incoming orders, pharmacy refills, nurse returns and removals and audit against the E-MAR. This audit identifies medication that is not documented and missing from the Pyxis, as well as poor practices such as failure to document refusals and having a nurse other than the one who prepared the medication administer it. Cermak has established an adequate system to account for controlled substances and is actively monitoring to achieve compliance with policy and procedure.

b. Cermak-Accurate Administration and Maintenance of Records

A videotape of the training to inform officers about their responsibilities during medication delivery was reviewed. It provides instruction that is consistent with the interagency directive that went into effect last year. Policy # D- 02.3 Medication Distribution is not current or consistent with the interagency directive and needs to be revised to reflect both the dose by dose and keep on person processes used now. Policy # D-0.2.4 also needs revision to include electronic documentation of medication delivery or administration. The CCHHS policy on controlled substance management that was in draft form at the time of the seventh report has since been implemented and Appendix 3 includes a detailed description of how controlled substances are managed at Cermak.

There were several observations of actual practice during the site visit that did not comply with existing policy and procedure or the interagency directive. These included not properly checking identification before administration, giving dose by dose medication to take later in the day, administering HS (Hour of Sleep) medications during the daytime (e.g., 1400 hours), failure to sanitize hands between patients, allowing patients to crowd the window while medication was administered, not following up on medication refusals, failure to document medication onto the eMAR at the time of administration and failure to correct documentation errors. Internal reports and meeting minutes reflect that non-adherence to policy and procedure is identified. However actual performance needs to demonstrate more consistent and reliant adherence to the directive, policy and procedure. Medication delivery needs to be audited (including the role of CCDOC officers) regularly using an observation tool derived from the interagency directive and results reported at Cermak quality improvement meetings.

c. Cermak-Hygienic, Appropriate and Concurrently Recorded

Hygiene: Hygiene practices varied. In Division VIII (RTU) nurses were not observed to wash their hands when moving from medication room to medication room..

Appropriate: The volume of medications reported as missing on the QI indicators report has decreased by two thirds from rates a year ago. Fewer inmates expressed on interview concern about late or missing medications. The morning huddle is used to review a list of inmates who are inappropriately housed and arrangements are made for transfer to appropriate housing later that day. Medication lapses for this reason are infrequent now although it is a very staff intensive process to maintain. When the interface between the new CCDOC jail management system and Cermak is established later this summer, the person-hours necessary to ensure safe housing of inmates with medical and mental health problems can be directed to addressing other clinical issues.

The metric of time from the medication order to first dose was added to the 2013 Cermak Quality Indicators. Since full implementation of Accuflow for KOP medications, Pharmacy Services has used the quality improvement process to complete two excellent studies of turnaround time. The threshold set by Cermak is less than 24 hours from the time the order is written to the first dose. Ninety-one percent of KOP orders were delivered to the patient in 24 hours and the average turnaround time was seven and a half hours. Process improvements were to increase the number of deliveries from one to three a day and to reduce the number of orders without documentation of delivery (in Urgent Care). Now that Accuflow is nearing full implementation it will be possible to do the same examination of timeliness of dose by dose orders.

Use of Accuflow and Cerner electronic MARs will improve documentation and the ability to generate reports which can be used to monitor staff performance. There are no blank spaces on the electronic MARs now. However, among MARs reviewed there were many entries that indicated medication was not given. The reasons seemed to vary in ways that cause questions about whether terms are well defined and used consistently. For instance the symbol an "Ø" that medication was not administered and the reason is listed on the last page of the MAR and "/" indicates a missed dose but no reason must be given. For example on one of the MARs reviewed

the patient missed 40% of prescribed doses, half were that the dose was missed and the other half because the patient was not on tier, the patient refused or was not present or the medication was not available. We found this same pattern when reviewing MARs of HIV patients. Given current pharmacy operations and rapid turn-around time, it is unlikely these commonly ordered HIV medications are not available. The various reasons why a medication is not given is contained in a drop down menu on Accuflow. There is, however, no currently policy and procedure that defines the use of these terms.

The electronic MARs provide much more complete and timely information on adherence to prescribed treatment. Clinical leadership should set benchmarks for documentation of administration which support adherence and begin including this review in clinical care as well as quality improvement. At the end of medication administration on each housing unit or tier the nurse also needs to reconcile those patients who missed their medication and make a plan to deliver it at a later but clinically acceptable time if possible.

We observed a nurse document medication as given to patients who ultimately refused the dose. The nurse did not correct the documentation entry to record the refusal but instead wrote the patient name down to correct later. She demonstrated to the Monitor how the correction is done. This seemed very time consuming and potentially a cause for error. Weekly reviews by Cermak Pharmacy are finding controlled substances removed from Pyxis which are not documented as given on the MAR. Now that electronic documentation of medication administration is accomplished, management staff need to review documentation practices to ensure that they can be done concurrent with administration, that documentation is defined and practices standardized. Procedures need to be revised to reflect expected practices. Implementation of the electronic medication administration record is preventing some of the problems with documentation discussed in earlier reports and is also identifying others that require corrective action.

d. Cermak-Staffing

Appropriately qualified nursing staff administers or deliver medication. This finding has been consistent since the June 2011 report.

e. Cermak-Flagged Medication Procedure

The interface between Cerner and CCDOC is expected to be completed this summer. Cermak and CCDOC have worked collaboratively to reconcile alerts in the two systems and to establish an interface that meets the requirements of the Agreed Order. Since different terminology is used we asked Cermak to identify for each of the alerts required by the Agreed Order the corresponding alert that will be used in the new interface. This was not provided during the site visit so it will be a document expected for review at the next site visit.

f. CCDOC-Flagged Medication Noted on JMS

Beginning May 6, 2014 the CCDOC and Cermak implemented a process to ensure that inmates receive medications after discharge. This process is referred to as "Discharge Meds Before Release". When inmates are being released CCDOC gives instructions about how to obtain

medications after release. The inmate completes and signs a form that indicates if they want to their prescriptions sent to one of two local pharmacies. The inmate can also elect not to have the prescription sent. This form is collected at the time of discharge, scanned and sent to a special email address set up for this purpose at Cermak. This notification generates production of the patient's medication profile which is matched to the "Discharge Meds Before Release" form and given to the patient's provider to E-prescribe orders before 11 am to the selected pharmacy. The medications can be picked up by the patient at the pharmacy they selected after 12 noon. The completed patient form is scanned into the health record. The medical executive team keeps the forms and the patient's profile in a binder so that it is now possible to track the number of patients with medical or mental health medication flags who receive medication on discharge. We toured the Discharge Lounge where this takes place, interviewed the correctional officers and reviewed the records of discharged inmates they were handling and verified the process takes place as described. We also reviewed the information about discharged patients that Cermak received and the actions taken that same day to review the patient profile and E-prescribe. It also took place as described. Full and consistent implementation of this process will address items g - j of the Agreed Order. Revise Cermak policy and procedure E-13 Discharge Planning and E-13.2 Discharge Planning for Mental Health Patients to reflect this new process.

g. CCDOC-Communicate Transfer Information to Cermak
h. Cermak-Medication for Transit
i. CCDOC-Record Transfer Between Facilities

The much anticipated interface between CCDOC and Cermak will provide notice of pending transfers when implemented this summer. Since June 2011 the Illinois Department of Corrections has had a representative stationed at Cermak with access to Cerner information. This individual facilitates continuity of care between IDOC and Cermak and makes arrangements in advance to prevent lapses in care resulting from lengthy transfers. When inmates are transferred to other jurisdictions Cermak provides summary information and medications to be transported by CCDOC to the next jurisdiction. With the EMR Cermak is able to respond to requests for health information within 24 hours.

**Monitor's Recommendations:**

1. Pharmacy positions need to be integrated into Cermak's position control information consistent with other operational components of the organization and monitored for retention and timeliness of filling vacancies.
2. Additional positions to operate the pharmacy in Division VIII and manage workload associated with the increased population and geographic layout of CCDOC should be evaluated for funding in 2015.
3. Implement scanning of the identification card to positively identify the inmate as part of the process for medication delivery and administration.
4. Develop methods to document performance issues with automated pharmacy programs and institute routine de-briefing to include feedback from and to end users to avoid counterproductive staff work-arounds in the future.

5. Revise Policy # D-02.3 Medication Distribution so that it is consistent with the interagency directive and reflects both the dose by dose and keep on person processes used now.
6. Review documentation practices using the electronic system to ensure that it can be done concurrent with administration and revise Policy # D-02.4 to define terms and guide practices in electronic documentation of medication delivery or administration.
7. Set benchmarks which support medication adherence and begin including this review of documentation in clinical care as well as quality improvement.
8. Audit medication delivery to demonstrate compliance with the interagency directive, including the role of CCDOC officers as well as concurrent documentation by nurses and report results at Cermak quality improvement meetings.
9. Audit time from order for dose by dose medication to first dose against the 24 hour benchmark and report results to quality improvement.
10. Identify each of the alerts used in the new interface to correspond with each of the flags required in Item 56 e. of the Agreed Order.
11. Revise Cermak policy and procedure E-13 Discharge Planning and E-13.2 Discharge Planning for Mental Health Patients to reflect the new discharge process.
12. Set thresholds for and monitor data on patients who are on flagged medications who are discharged and receive discharge medication or prescriptions.

Self-monitoring:
- Missing medications
- Controlled substance discrepancies and procedural compliance
- Time from order to first dose
- Patients on flagged medications who receive discharge prescriptions
- Compliance with procedure for medication delivery and administration
- Patient adherence with dose by dose medication
- Automation downtime and program performance
- Pharmacy retention and vacancy rate

## 57. Specialty Care

a. Cermak shall ensure that inmates whose serious medical or mental health needs extend beyond the services available at the Facility shall receive timely and appropriate referral for specialty care to appropriate medical or mental health care professionals qualified to meet their needs.
b. Upon reasonable notification by Cermak, CCDOC will transport inmates who have been referred for outside specialty care to their appointments.
c. Cermak shall ensure that inmates who have been referred for outside specialty care by the medical staff or another specialty care provider are scheduled for timely outside care appointments. Cermak shall provide reasonable notice to CCDOC of such appointments so that CCDOC can arrange transportation. Inmates awaiting outside care shall be seen by Qualified Medical Staff as medically necessary, at clinically appropriate intervals, to evaluate the current urgency of the problem and respond as medically appropriate. If an inmate refuses treatment following transport for a scheduled appointment, Cermak shall have the

inmate document his refusal in writing and include such documentation in the inmate's medical record.

d. Cermak shall maintain a current log of all inmates who have been referred for outside specialty care, including the date of the referral, the date the appointment was scheduled, the date the appointment occurred, the reason for any missed or delayed appointments, and information on follow-up care, including the dates of any future appointments.

e. Cermak shall ensure that pregnant inmates are provided adequate pre-natal care. Cermak shall develop and implement appropriate written policies and protocols for the treatment of pregnant inmates, including appropriate screening, treatment and management of high-risk pregnancies.

**Compliance Status:** This provision remains in substantial compliance

**Status Update:** Received and reviewed.

**Monitor's Findings:**

Process review and chart reviews were performed on patients who were sent to the Hospital for specialty clinics visits and procedures. The patients who needed specialty clinic referral were identified and tracked by an assigned staff at Cermak. She manages the scheduling process to ensure that patients are scheduled in a timely manner, rescheduled if needed, communicates with the hospital and the referring provider, picks up the envelope of patients returning from their visits that contains the discharge instructions and schedules follow-up visits with the clinic if needed.

The return envelope from the hospital with discharge instructions are not consistently reviewed by the Urgent care staff so the discharge instructions may not be carried out in a timely manner. This may be due to issues with staffing and unfilled supervisor position leading to inconsistent practice.

**Monitor's Recommendations:**

1. Maintain a database for scheduled visits by type (specialty and procedures)
   a) Capture the referral date, clinic name, appointment date, status of a patient, was patient seen on return, date and time of patient seen on return, referring provider notified (of appointment date, if refused, rescheduled or cancelled).
2. Create a Template for Hospital Return Note as recommended in item 55 to help document all relevant information.
3. Self-Monitoring:
   a) Perform audits on at least 5 Specialty Clinic referrals and 5 Procedure referrals per month to check if the patient was seen on return, appropriateness of documentation, were hospital records reviewed, documentation of implementing discharge instructions (if not reason documented), medication reconciliation, problem list updated (if needed),

appropriateness of housing in the jail, patient educated on the plan of care, test results, etc. (the documentation templates will help make this audit easy to do and improve compliance)

b)    Use the database and audit to monitor performance and identify improvement activities

### e. Cermak-Pregnant Inmates

**Compliance Status**: This provision remains in substantial compliance.

**Status Update:** Received and reviewed.

**Findings:**

To assess this area, the Medical Monitor reviewed health records of eight pregnant women currently housed at CCJ.

Pregnant women are identified and referred for prenatal care clinic from intake. The prenatal care clinic is conducted twice weekly on Tuesdays and Thursdays. The Monitor found all records reviewed with Dr. Richardson to be excellent.

Recommended prenatal labs are obtained and documented on a flow sheet in Cerner including a CBC, Rh factor, sickle cell trait, VDRL/RPR, hepatitis B antigen, and Chlamydia, gonorrhea and HIV antibody testing. Ultrasound testing is ordered and performed as clinically indicated (including a non-stress test or a stress test if indicated). In all records, pregnant women were prescribed a prenatal vitamin, floate, iron and calcium supplements from intake. Prenatal care interval monitoring was in accordance with the treatment plan or with ACOG recommendations. Women are treated for sexually transmitted infections as clinically indicated. There was zero refusal of treatment for women treated by Dr. Richardson.

**Monitor's Recommendations:**

1. Continue to perform ongoing continuous quality improvement reviews for pregnant women.

### 58. Dental Care

a. Cermak shall ensure that inmates receive adequate dental care, and follow up, in accordance with generally accepted correctional standards of care. Such care should be provided in a timely manner, taking into consideration the acuity of the problem and the inmate's anticipated length of stay. Dental care shall not be limited to extractions.

b. Cermak shall ensure that adequate dentist staffing and hours shall be provided to avoid unreasonable delays in dental care.

**Compliance Status:** This provision remains in partial compliance.

**Status Update:** Received and reviewed.

**Findings:**

Since the last visit, nursing has been made able to dispense OTC analgesic medications (Ibuprofen and Acetaminophen) for dental pain complaints while Inmates wait for their dental clinic appointments.

The Medical Monitor met with Dr. Ronald Townsend, Director of Cermak Dental Services and Dr. Jorelle Alexander, System Director of Oral Health. The current staffing pattern is as following:

- 7 dental assistants (0 vacancy)
- 2 dental hygienists (0 vacancy)
- 7 dentists (0 vacancy)
- 1 oral surgeon (vacant)

The dentist workforce and the dental chairs are distributed according to the following schedule:

- Division 1     1 chair      1 dentist
- Division 2     2 chairs     1 dentist
- Division 6     2 chairs     1 dentist
- Division 9     2 chairs     1 dentist
- Division 10    1 chair      1 dentist
- Division 11    4 chairs     2 dentists

Inmates from divisions without dental clinic space are transported to other divisions for the provision of dental care. The dentists provide about 1,100 to 1,200 encounters per month or about 11-12 patient encounters per dentists per day. Dental services leadership estimates the total number of urgent and routine dental HSRs to be about 200 and 500 respectively. The rest of the dental encounters is from callbacks and follow-ups as well as annual dental examinations. The proportion of extractions vs. restorative activities was reported to be about 70/30. A recent self-monitoring of the dental grievances performed by the dental services leadership showed that the total number of dental related grievances has dropped dramatically:

| **Dental Grievances** | Related to Access to Care | Related to Quality of Care | Total |
|---|---|---|---|
| January 2014 | 60 | 7 | 67 |
| February 2014 | 46 | 8 | 54 |
| March 2014 | 30 | 5 | 35 |
| April 2014 | 26 | 2 | 28 |

The above has been attributed to the following interventions:
1. Responding to 100% dental grievance within seven days
2. Allowing the nursing staff to treat symptomatic dental HSR with OTC analgesic medications

3. Designating the afternoon dental clinic sessions entirely to treating urgent care and grievance response.
4. Improved communication with the nursing staff by encouraging the nursing staff to contact the dental clinic staff directly by phone in cases of urgent and emergent dental issues.

The Monitoring Team would like to recognize the Cermak dental service for their independent QI activities that undoubtedly has helped to reduce their overall grievances.

The current dental wait time for immediate and urgent HSRs is one to three days. Routine dental HSR wait time is reported to be about 30 days. It unfortunately remains true ,however, that it is extremely difficult in not impossible to verify the dental wait time due to inherent EHR rigidity with regard to the ability to locate the HSR form that resulted in the dental clinic visit. All scanned documents including the HSR forms revert to the book in date. One has to search every scanned document to locate the document in question.

We also visited the dental clinic in Division 5 on Tuesday May 20, 2014. The clinic was found to be generally clean but rather small and cramped. The dental equipment appeared old and outdated. One of the two dental chairs was cracked at the base. The autoclave machine's engineering tag was dated 1/2013. All healthcare equipment is supposed to be evaluated by engineering annually.

**Monitor's Recommendations:**

1. Continue to monitor the ratio of restorations to extractions but indicate by Division the average length of stay. The Medical Monitor asked the dental service leadership to identify restoration vs. extraction procedures in the dental clinic appointment book to allow for easy tracking of the ratio.
2. Ensure the terminology used in the dental clinic encounter notes matches that used in the HSR form.
3. The dental QI program should begin monitoring a sample of health service requests from each Division from beginning to end, looking at requests that were received approximately 30 days prior to the review. The Monitor asked the dental service leadership to add the "HSR" as an indication for dental clinic visits in addition to the date of the HSR so that determining the wait time for dental clinic visits become transparent.
4. Ensure that engineering visits all dental clinics to evaluate and certify the equipment in use.

## 68. Suicide Prevention Training

a. Cermak shall ensure that the Facility's suicide prevention curriculum for health care staff members, jointly established with CCDOC, addresses the following topics:

1. the suicide prevention policy as revised consistent with this Agreed Order;
2. why facility environments may contribute to suicidal behavior;

    3. potential predisposing factors to suicide;
    4. high risk suicide periods;
    5. warning signs and symptoms of suicidal behavior;
    6. observation techniques;
    7. searches of inmates who are placed on Suicide Precautions;
    8. case studies of recent suicides and serious suicide attempts (Serious suicide attempts are typically considered to be those that either were potentially life-threatening or that required medical attention);
    9. mock demonstrations regarding the proper response to a suicide attempt; and
    10. the proper use of emergency equipment, including suicide cut-down tools.

b. Within 24 months of the effective date of this Agreed Order, CCDOC shall train all CCDOC staff members who work with inmates on the Facility's suicide prevention program. Implementation of such training shall begin as soon as possible following the effective date of this Agreed Order. Staff shall demonstrate competency in the verbal and behavioral cues that indicate potential suicide, and how to respond appropriately. Initial and at least annual training shall be provided in accordance with generally accepted professional standards.

c. Within 12 months of the effective date of this Agreed Order, Cermak shall train all Cermak staff members who work with inmates on the Facility's suicide prevention program. Implementation of such training shall begin as soon as possible following the effective date of this Agreed Order. Staff shall demonstrate competency in the verbal and behavioral cues that indicate potential suicide, and how to respond appropriately. Initial and at least annual training shall be provided in accordance with generally accepted professional standards.

**Compliance Status:** This provision remains in substantial compliance.

**Status Update:** Received and reviewed.

**Findings:**

Based on presented data, nearly all CCDOC officers and Cermak staff have received training on suicide prevention and recognition and timely referral of inmates with suicide attempts. Detailed evaluation of the effectiveness of this training and program will be conducted in the mental health services evaluation portion of the monitoring.

**Monitor's Recommendations:**

1. Report a comprehensive quarterly listing of all Cermak and CCDOC staff undergoing this training.

## H.    QUALITY MANAGEMENT AND PERFORMANCE MEASUREMENT

### 86. Quality Management and Performance Measurement

    a. Defendants shall each develop and implement written quality management policies and procedures, in accordance with generally accepted correctional standards, to regularly assess, identify, and take all reasonable measures to assure compliance with each of the provisions of this Agreed Order applicable to that Defendant.

    b. Defendants shall each develop and implement policies to address and correct deficiencies that are uncovered during the course of quality management activities, including monitoring corrective actions over time to ensure sustained resolution, for each of the provisions of this Agreed Order applicable to that Defendant.

    c. CCDOC shall participate with Cermak and DFM in a jointly established Health Care Quality Improvement Committee, to be charged with developing and implementing a joint quality improvement program. CCDOC shall contribute the time and effort of CCDOC staff members who, by virtue of their authority, current responsibilities, and/or past experience, can provide this committee with needed correctional representation.

    d. Cermak shall participate with CCDOC and DFM in a jointly established Health Care Quality Improvement Committee, to be charged with developing and implementing a joint quality improvement program. Cermak will work with CCDOC and DFM to identify those CCDOC and DFM staff members who, by virtue of their authority, current responsibilities, and/or past experience, can provide this committee with needed correctional representation. Quality management programs related to medical and mental health care will utilize performance measurements to assess quality of care and timely access to care with quantitative and qualitative data analysis and trending over time.

    e. DFM shall participate with CCDOC and Cermak in a jointly established Health Care Quality Improvement Committee, to be charged with developing and implementing a joint quality improvement program. DFM shall contribute the time and effort of DFM staff members who, by virtue of their authority, current responsibilities, and/or past experience, can provide this committee with needed correctional representation.

**Compliance Status:** Received and reviewed.

**Status Update:** This provision remains in partial compliance.

**Monitor's Findings:**

The Quality Improvement program does not currently have a structure since the Director resigned. The staff have been re-tasked for other activities due to staffing challenges.

The leadership is using the internal IT staff to create reports to help monitor the processes. The internal IT team has been very valuable to the program and are comfortable in creating reports

from the EMR system. They do not have the ability to run reports from the pharmacy and eMAR system (Accuflo system).

The Nurse Quality Improvement Nurse has been recently asked to start working on creating and performing audits.

The Quality Metrics have not been identified or measured for all the services/ programs as required by the Policy and Procedure.

The leadership is conducting, case reviews, M&M and review of the errors/near miss reported by staff using their error reporting website.

The persons responsible for continuing education need to identify the needs of the staff to conduct focused education. The staff were not familiar with their procedures when interviewed during the visit. The leadership team is conducting continuous education opportunities for the clinical staff.

The daily huddle includes health care and custody staff to review standing agenda items critical to the program. This meeting has been very helpful to the system.

Performance Improvement projects are not in place due to lack of staffing.

**Monitor's Recommendations:**

1. Hire a well-qualified Director and the needed support staff for the Quality Program.
2. Create a balance scorecard for each of the services/locations to monitor their performance and a balance scorecard for the system to monitor the overall progress.
3. Metrics should include
   a. process and quality measures to ensure compliance with policies and procedures
   b. Professional performance measures of clinical staff based on their functions (quality of care and productivity)
4. Managers to do daily rounding is their areas to ensure completion of tasks, quality of service, environmental check, address any patient or staff issues.
5. Create action plans for each of the non-compliant items and track the status periodically during the quality meetings.
6. Share the data with the staff during the staff meetings and document minutes.
7. Check to see if the action plans helped fix the problem if not make necessary changes to the action plan and implement.
8. Review the quality scorecards for each of the services/locations during the Quality meetings on a rotating schedule so each area/ service gets reviewed at least once every 3 months.
9. Consider creating multidisciplinary work groups to periodically review major activities like medication administration, sick call, infirmary care, intake process, emergency care, etc. The team can review current performance and challenges and identify opportunities for continuous improvement. The recommendations can be reviewed during the quality meeting by the Leadership team and considered for implementation.

10. Initiate Performance Improvement Projects for the system that will help improve safety, quality and efficiency.