## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

**v.**

| | |
|---|---|
| **COOK COUNTY, ILLINOIS;** | No. 10 C 2946 |
| **THOMAS DART, COOK COUNTY** | |
| **SHERIFF (in his official capacity);** | Judge Virginia Kendall |
| **TONI PRECKWINKLE, COOK COUNTY** | |
| **BOARD PRESIDENT (in her official capacity);** | |
| **COOK COUNTY BOARD OF** | |
| **COMMISSIONERS (in their official capacity),** | |

      **Defendants,**

---

### Corrections Monitor Susan W. McCampbell's Report No. 9
### November 4, 2014

---

Susan W. McCampbell
McCampbell and Associates, Inc.
1880 Crestview Way
Naples, Florida 34119-3302
**Email:** susanmccampbell@mccampbellassociates.com

# Executive Summary
## Corrections Monitor Susan W. McCampbell's Report #9
## November 4, 2014

**<u>Summary Overview</u>**

This document reports on the compliance in the Cook County Dept. of Corrections (CCDOC) for the 77 paragraphs in the Agreed Order related to inmate protection from harm. CCDOC is now in substantial compliance with all provisions of the Agreed Order.

I toured CCDOC from September 29 - October 3, 2014. At the start of that week there were 8,928 inmates in custody (on the campus). During this tour I interviewed staff and inmates, reviewed documents, and consulted with CCDOC regarding compliance issues. Prior to this tour, all four of the independent monitors met in Chicago on September 15, 2014, for the first time since the appointment of a new medical monitor. The monitors met with Judge Kendall on September 16, 2014.

The draft of this compliance report was provided to the parties on October 16, 2014, requesting all comments by October 31, 2014. I considered all comments in the preparation of this report.

**<u>Progress</u>**

Progress has been achieved in the following areas:

- Implementation of the updated inmate classification system;
- Continued refinement of process to monitor uses of force;
- Addressing the backlog of investigations of allegations of use of excessive force;
- Implementation of a revised inmate grievance system, compound-wide;
- Continued hiring;
- Pending implementation of an updated jail management information system (CCOMs) providing an increased capacity for accountability and using data to manage the organization;
- Record keeping and analysis of data regarding inmate disciplinary reports;
- Discussion of expansion of the inmate behavior management techniques to other divisions; and
- On-going maintenance of compliance with 71 paragraphs of the Agreed Order found previously to be in compliance.

**Remaining Challenges**

Continuing challenges include, but are not limited to:

- Systemic, sustainable strategies to solve jail crowding; although jail population is down, the endemic issues remain, including development and sustainability of a collaborative justice system;
- Completing the updating of the investigative hierarchy for use of force incidents;
- Developing the work plan and data collection to validate the updated classification system after one year of operation;
- With DFM and the County, plan new jail facilities that assure inmate safety, including bed space/designation consistent with data gained from the classification system, and designed for efficient staffing patterns;
- Providing oversight and training to officers working in the direct supervision units in Division 8 relating to security and inmate safety;
- Collaborating with Cermak regarding the placement and operation of cameras inside Cermak Hospital – to preserve patient confidentiality and assure safety of staff and inmates;
- Fully staff Cermak and mitigate the impact of Cermak vacancies on CCDOD and inmate harm;
- Continuing vigilance regarding reviews of uses of force and investigation of allegations of excessive force, as well as continuing to work to prevent inmate/inmate altercations (e.g. classification, inmate behavior management, mental health resources);
- Continuing to highlight the need for provision of community-based mental health services as a way to avoiding incarceration of individuals who are manifesting their untreated mental illness;
- Continuing to improve collaboration between mental health and security regarding the safety of mental health clients, including recommendations for staffing; and
- Maintaining correctional officer hiring based on the staffing analysis process endorsed by the Dept. of Justice.

**Progress**

This chart summarizes the progress made by CCDOC since my first report of September 20, 2010.

| Report # | Sustained Compliance | Substantial Compliance | Partial Compliance | Non-Compliance | Not Applicable | Total |
|---|---|---|---|---|---|---|
| 1 | | 3 | 62 | 12 | 8 | 77 |
| 2 | | 1 | 63 | 5 | 8 | 77 |
| 3 | | 22 | 55 | 0 | 4 | 77 |
| 4 | | 39 | 34 | 0 | 4 | 77 |
| 5 | | 53 | 20 | 0 | 4 | 77 |
| 6 | 21 | 39 | 17 | 0 | 0 | 77 |
| 7 | 35 | 31 | 11 | 0 | 0 | 77 |
| 8 | 50 | 17 | 10 | 0 | 0 | 77 |
| 9 | 68 | 9 | 0 | 0 | 0 | 77 |

**Compliance Report**

The Agreed Order regarding corrections operations (A. Protection from Harm) includes 77 provisions. All provisions are in substantial compliance at the conclusion of this tour.

**Maintenance of Substantial Compliance (18 months) (N= 68)**

The CCDOC has maintained substantial compliance with the following provisions of the Agreed Order for at least 18 months, and as such, are no longer a primary focus of my monitoring, although these sections remain an active part of the Order (see Section VII.C.) and my reviews. Paragraphs maintaining substantial compliance *added* since the Report # 8 to the Court are underlined.

- 31.a.
- 31.b.
- 31.c.
- 31.d.
- 31.e.
- 31.f.
- 31.g.
- 31.h.
- 31.i.
- 31.j.
- 31.k.
- 31.l.
- 31.m.
- 31.n.

- 31.o.
- 31.p.
- 31.q.
- 31.r.
- 31.s.
- 31.t.
- 32.a.
- 32.b.
- 32.c.
- 32.d.
- 32.e.
- 32.f.
- 32.g.
- 32.h.

- 32.i.
- 32.j.
- 32.k.
- 32.l.
- 32.m.
- 33.a.
- 33.c.i.ii.
- 33.i.
- 33.j.
- 34.a.
- 34.b.
- 34.c.
- 34.d.
- 34.e.

- 34.f.
- 34.g.
- 35.a.
- 34.b.
- 35.c.
- 35.d.
- 35.e.
- 35.f.
- 35.g.
- 36.a.
- 36.b.
- 36.c.
- 36.d.
- 36.e.

- 36.f.
- 37.c.
- 37.d.

- 38.a.
- 38.b.
- 38.c.

- 38.d.
- 39.a.
- 39.b.

- 40.
- 41.
- 69.

## Substantial Compliance (N=9)

Paragraphs for which CCDOC has achieved substantial compliance since the tour of March 2014: (Paragraphs gaining substantial compliance since Report # 8 report to the Court are underlined):

- 33.b.
- 33.d.
- 33.e.

- 33.f.
- 33.g.
- 33.h

- 37.a.
- 37.b.
- 37.e

## Partial Compliance (N=0)

There are no paragraphs in partial compliance.


## Non-Compliance (N=0)

There are no paragraphs in non-compliance.

## Updates: Issues and Concerns About Achieving and Sustaining Substantial Compliance

**Compliance with the Agreed Order/Cermak** – While I have not addressed Cermak's compliance with the Agreed Order in previous reports, I must now note that the absence of compliance in critical areas is negatively impacting inmate safety and CCDOC's operations.

The vacancies in the required number of mental health providers are contributing factors to inmate harm and disorder in the facilities. Correctional staff are having to respond to situations which may have been avoided by more intervention by mental health professionals (e.g. proactive rather than reactive). Additionally, CCDOC is unable to determine its final staffing allocation without Cermak being staffed at an adequate level. I cite that the Use of Force Review Unit found for the first six months of 2014 that 50% of uses of force involved inmates on the mental health caseload. While not an unusually high number from my experience working in other large jails, it does suggest the need for more extensive mental health provider presence and intervention.

I have advised the medical and mental health monitors of my concerns and findings, and provided details for their review on their next tour in November 2014.

CCDOC and DFM have made extraordinary strides to comply with the Agreed Order. President Preckwinkle committed to achieving compliance with the Agreed Order for agencies over which the County had control by January 1, 2013. This has not occurred; and while perhaps an optimistic target date, Cermak is the component of the Agreed Order that is holding back overall compliance.

There are many very dedicated professionals working in Cermak. Correctional medicine is a tough job. I urge that attention be paid to providing immediate resources to Cermak so that inmates and staff will be safer.

Specifically, what I recommend needs to be addressed in addition to staffing and camera locations inside Cermak are:
- the implementation of a crisis intervention team to respond to incidents involving inmates with mental illness (CIT),
- clarification of policies regarding involuntary psychotropic medications,
- clarification of the operational practices regarding the safety, and/or perceived safety, of Cermak staff,
- focus on specialization for corrections staff assigned and/or volunteering to work with inmates with mental illness, and
- timely provision of documentation (anatomical charts) and medical records to facilitate CCDOC's investigation into allegations of use of excessive force.

**Update:  Information System** – The new jail management information system, CCOMs is scheduled to go on-line on October 18, 2014.

**Investigations into Allegations of Use of Force/Excessive Force** – CCDOC has the most robust investigative process regarding uses of force than most likely any large, or small jail, in the United States, in my opinion and experience. Jails are coming to CCDOC to learn how to investigate and analyze uses of force, and develop strategies to minimize use of force. Recently, the Sheriff has hired a new Inspector General, and reorganized investigative functions, including bringing the Use of Force Review Unit (not required by the Agreed Order) under the Inspector General. More investigators are being hired, and data refined.

Uses of force and inmate/inmate fights are, regrettably, part of everyday life in all jails (see comments below regarding jails as the mental health facility for most American communities). The critical issue is whether there are systems in place to respond, analyze, correct, and monitor such instances.  I am confident about the systems in place in the Cook County Sheriff's Office and CCDOC. I have this confidence based on the following:
- leadership and management commitment;
- the policies and procedures currently in place;
- the annual process to review and update all directives;
- the pre-service and in-service training of employees;
- the level of professionalism and experience of the investigators;
- the training of investigators;

- the camera installations throughout the inmate living spaces, hallways, etc.;
- protocols that govern investigations – including acceptance and investigation of complaints filed by those outside the jail (e.g. families of inmates);
- the inmate disciplinary process;
- inmate education process and the absence of any identifiable barriers to inmate reporting of allegations (including, and other than, grievances);
- the remedial training provided to employees as a result of comprehensive reviews of uses of force;
- the Early Warning System and remediation processes;
- the employee discipline process;
- the data developed by the Use of Force Review Unit that informs all of the systems overseeing uses of force;
- the incident reporting system; and
- the inmate grievance process, referral process, early warning system and data analysis.

This wide safety net, along with collaboration with Cermak, provides multiple opportunities for events to be identified, reported, and investigated. Additionally, CCDOC has a record of implementing and expanding evidence-based practices identified across the country – such as adoption of inmate behavior management strategies.

**Video Surveillance –** As noted in this report, 1,086 of the planned 1,259 cameras have been installed. The remaining issues, as alluded to above, includes working with Cermak on location of cameras inside Cermak Hospital. Training for staff, and maintenance responses to cameras needing adjustment and repair will be viewed in future tours.

**Classification Implementation Progress –** The revised inmate classification system, scheduled for full implementation on October 18, 2014 will be an on-going asset to inmate and staff safety. The delay in implementation was due to the information system, not the nuts and bolts, staffing, or training for the classification system.

**New Jail Facilities/Renovation of Existing Jail Facilities** – I was briefed by County staff regarding potential plans for construction and renovation of jail facilities. As noted in previous reports, the County's decision hinges on determining when it is no longer cost effective to repair old, inefficiently designed and staff intensive buildings, with new structures. Additionally, it is my opinion, that the County's efforts should assure that new construction does <u>not</u> replicate decisions which resulted in the design of the new RTU- Division 8 which is poorly designed, staff intensive to operate, and less desirable for inmate safety. While CCDOC has developed operational responses to mitigate the design shortfalls, the lesson should be clear about involving corrections professionals in building design. The County and CCDOC should begin collaborative efforts now to plan for new buildings. The newly implemented classification system will provide valuable data about what

types of beds are needed (e.g. minimum, medium, maximum custody) including special use beds (e.g. mental health, medical, segregation).

**Jail Beds/Crowding/Inmates with Mental Illness** – The County has yet to develop a cogent, consolidated, or future oriented plan to address the underlying causes of jail crowding.  The jail's population is down from highs in2013, but there is not an evidence-based reason why that happened, nor if the trends will start upward.  The Sheriff has the least control over the admissions to the jail than any of the criminal justice system members (e.g., police, courts, prosecution, defense bar, public defender, probation, etc.).  The long-term sustainability of the improvements made in the physical plant and in correctional operations under this Agreed Order is perilous unless there is a clear plan forward to address crowding.   And the option of doing nothing will be expensive to the taxpayers; and dangerous for staff and inmates.

I applaud Sheriff Dart's continued focus on the gross inappropriateness of having the jail become the community's de facto mental health facility.  This deplorable situation is shared with jails around the country.  The result of continuing to use jails to replace community mental health treatment beds is high cost, danger to inmates and staff, high risk of recidivism, and community harm.   As with crowding, the absence of meaningful and good-faith planning will have long term implications for maintaining a constitutional jail in Cook County.

**Staffing** – As noted in this report, CCDOC continues to fill vacancies.  For example, there are concurrently three pre-service training classes in session at the time of the tour.   CCDOC has memorialized the on-going staffing strategy in General Order 24.1.20.0, Centralized Roster Management Staffing Analysis.  This directive, approved by the Department of Justice, requires an annual staffing review.   This strategy will include three levels of review focusing on:  (1) reducing overtime; (2) identifying barriers to achieving staffing objectives; and (3) responses to the barriers and challenges of staffing.

## Conclusions

CCDOC has achieved 100% substantial compliance with all paragraphs of the Agreed Order for which I am responsible for monitoring.  As with all major reform efforts, progress has not always been a straight line, but rather has incorporated and embraced lesson learned, responses to resource availability, and identification of best practices.

CCDOC is commended and congratulated on reaching this milestone.  Monitoring will continue for 18 months to assure that reforms are sustainable.

November 4, 2014

## Administrative Release Program (ARP)

This Executive Summary also reports on the Administrative Release Program, designed to limit jail crowding.  This program is undergoing review, with potential changes to its organization under consideration by the Court.   The following data was provided by the Cook County Sheriff's Office regarding their review of candidates for release through this program.

| | 2011 | 2012 | 2013 | 2014 YTD* |
|---|---|---|---|---|
| Number Reviewed | 2375 | 10061 | 21879 | 14039 |
| To Magistrates | 237 | 859 | 3967 | 2442 |
| Ordered | 78 | 572 | 2503 | 1319 |
| Males Placed | 22 | 246 | 945 | 449 |
| Females Placed | 13 | 85 | 377 | 171 |
| NPTS | 130 | | 662 | 445 |
| Refused | 25 | | 62 | 24 |
| Case Adjudicated | 40 | | 189 | 47 |
| Bond Out | 89 | | 215 | 72 |
| Medical | | | 53 | 63 |

* September 21, 2014

UNITED STATES OF AMERICA VS. COOK COUNTY, ET. AL.  Civil No. CV-02946

# Corrections Monitor's 9th Report

Based on the Tour Week of September 29, 2014

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| **A.** | **Protection from Harm** | | | |
| **31.** | **Use of Force by Staff** | | | |
| A. 31. a. (20) | CCDOC shall maintain comprehensive and contemporary policies and procedures, in accordance with generally accepted correctional standards, surrounding the use of force and with particular emphasis regarding permissible and impermissible uses of force. | x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 | x 9/10 x 3/11 x 8/11 | |
| A.31. b. (20) | CCDOC shall maintain use of force policies and pre-service and in-service training programs for correctional officers and supervisors that address the following impermissible uses of force: 1. use of force as a response to verbal insults or inmate threats where there is no immediate threat to the safety of the institution, inmates, or staff; 2. use of force as a response to inmates' failure to follow instructions where there is no immediate threat to the safety of the institution, inmates, or staff, unless CCDOC has attempted a hierarchy of nonphysical alternatives that are documented; 3. use of force as punishment or retaliation; 4. use of force involving striking, hitting, or punching a restrained and  non-combative inmate; 5. use of force against an inmate after the inmate has ceased to offer resistance and is under control; 6. use of choke holds on an inmate, unless lethal force is justified; and 7. use of inappropriate or excessive force. | x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 | x 9/10 x 3/11 x 8/11 | |
| A.31.c. (20) | CCDOC shall maintain a policy to ensure that staff adequately and promptly report all uses of force, in accordance with generally accepted correctional standards. | x12/11 x7/12 x2/13 x9/13 | x 9/10 x 3/11 x 8/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | | x3/14 x9/14 | | |
| A.31.d. (21) | CCDOC shall require that use of force reports:<br>1. be written in specific terms in order to capture the details of the incident<br>2. contain an accurate account of the events leading to the use of force incident;<br>3. include a description of the instrument(s) of restraint or control, if any, and the manner in which it was used;<br>4. note whether an inmate disciplinary report was completed in connection with the incident that prompted the use of force;<br>5. describe the nature and extent of apparent and reported injuries sustained both by the inmate and staff member;<br>6. contain the date and time medical attention was actually provided;<br>7. describe, in detailed, factual terms, the type and amount of force used as well as the precise actions taken in a particular incident; and<br>8. note whether a use of force was videotaped. If the use of force is not videotaped, the reporting correctional officer and supervisor will provide an explanation as to why it was not videotaped. | x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 | x 9/10 x 3/11 x 8/11 | |
| A.31.e. (21) | CCDOC shall continue to require prompt review by the shift commander of all use of force reports. The shift commander's review of use of force reports shall include review for completeness and procedural errors, as well as review of the substantive content. If the use of force report does not comply with provision 31.d. of this Agreed Order, the shift commander shall return it to the reporting officer for revision and resubmission until it is compliant. If the shift commander believes a use of force may have been inappropriate or excessive, he or she shall immediately refer the incident for investigation. | x7/12 x2/13 x9/13 x3/14 x9/14 | x 9/10 x 3/11 x 8/11 x12/11 | |
| A.31.f. (22) | CCDOC shall ensure that senior management review of uses of force includes:<br>1. a timely review of medical documentation of inmate injuries, if any is submitted, as provided by Qualified Medical Staff, including documentation surrounding the initial medical encounter, an anatomical drawing that depicts the areas of sustained injury, and information regarding any further medical care;<br>2. the inmate disciplinary report, if any, associated with the use of force; and<br>3. the incident report, if any, associated with the use of force. | x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 | x 9/10 x 3/11 x 8/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| A. 31.g. (22) | CCDOC [and Cermak] shall establish criteria that trigger referral for inappropriate or excessive use of force investigations, including but not limited to, documented or known injuries that are extensive or serious; injuries involving fractures or head trauma; injuries of a suspicious nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.); and injuries that require treatment at outside hospitals. | x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 | x 3/11 x 8/ll | x 9/10 |
| A. 31. h. (23) | When CCDOC review of use of force reports, and supporting records if applicable, reveals that reports of a use of force are materially inconsistent, conflicting, or suspicious, CCDOC shall refer that use of force incident for internal investigation. | x12/11 x7/12 x/2/13 x9/13 x3/14 x9/14 | x 9/10 x 3/11 x 8/11 | |
| A.31.i. (23) | CCDOC shall develop and implement a system to track all incidents of use of force that, at a minimum, includes the following information:<br>1. a tracking number;<br>2. the inmate(s) name;<br>3. housing assignment;<br>4. date;<br>5. type of incident;<br>6. injuries (if applicable);<br>7. medical care provided (if applicable);<br>8. staff involved;<br>9. reviewing supervisor;<br>10. external reviews and results (if applicable);<br>11. remedy taken (if appropriate); and<br>12. administrative sign-off. | x7/12 x2/13 x9/13 x3/14 x9/14 | x 9/10 x 3/11 x 8/11 x12/11 | |
| A.31.j. (24) | CCDOC shall ensure that, promptly following a use of force incident, video or photographs are taken of any and all reported or apparent injuries sustained by inmates and staff. The video or photographs will be maintained and will be included in the investigation package, if applicable. See 31. F. | x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 | x 9/10 x 3/11 x 8/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| A.31.k. (24) | CCDOC shall establish an "early warning system" that will document and track correctional officers who are involved in use of force incidents and any complaints related to the inappropriate or excessive use of force, in order to alert CCDOC administration to an potential need for retraining, discipline, problematic policies, or supervision lapses. Appropriate CCDOC leadership, supervision, and investigative staff shall have access to the information and monitor the occurrences. CCDOC senior management shall use information from the early warning system to improve quality management practices, identify patterns and trends, and take necessary corrective action both on an individual and systemic level. | x7/12 x2/13 x9/13 x3/14 x9/14 | x 9/10 x 3/11 x 8/11 x12/11 | |
| A.31.l. (25) | CCDOC shall ensure that a supervisor is present during all pre-planned uses of force, such as cell extractions. | x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 | x 9/10 x 3/11 x 8/11 | |
| A.31.m. (25) | Where there is evidence of staff misconduct related to inappropriate or unnecessary use of force against inmates, CCDOC shall initiate personnel actions and seek disciplinary action appropriately for any correctional officer found to have:<br>1. engaged in inappropriate or excessive use of force;<br>2. failed to report or report accurately the use of force;<br>3. retaliated against an inmate or other staff member for reporting an inappropriate or excessive use of force; or<br>4. interfered or failed to cooperate with an internal investigation regarding use of force in a manner inconsistent with the staff member's statutory or contractual rights. | x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 | x 9/10 x 3/11 x 8/11 | |
| A.31.n. (26) | Where there is evidence of staff misconduct related to inappropriate or unnecessary use of force against inmates, CCDOC shall consider, develop, and initiate systemic remedies as appropriate. | x 8/11 x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 | x 9/10 x 3/11 | |
| A.31.o (26) | CCDOC shall maintain accountability policies and procedures for the effective and accurate maintenance, inventory, and assignment of chemical and other security equipment, in accordance with generally accepted correctional standards. | x12/11 x7/12 x2/13 | x 9/10 x 3/11 x 8/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | | x9/13<br>x3/14<br>x9/14 | | |
| A.31.p. (26) | CCDOC shall continue to conduct use of force training in accordance with generally accepted correctional standards, including:<br>1. CCDOC shall maintain an effective and comprehensive use of force training program.<br>2. CCDOC shall continue to ensure that correctional officers receive adequate training in CCDOC's use of force policies and procedures, including de-escalation and defensive tactics relating to use of force.<br>3. CCDOC shall continue to ensure that correctional officers receive pre-service and in-service training on reporting use of force and completing use of force reports. | x12/11<br>x7/12<br>x2/13<br>x9/13<br>x3/14<br>x9/14 | x 9/10<br>x 3/11<br>x 8/11 | |
| A.31.q. (27) | CCDOC shall provide a process for inmates to report allegations of the inappropriate or excessive use of force orally to any CCDOC staff member; said staff member shall give the inmate the opportunity to reduce his or her report to writing through a grievance or complaint form without discouragement. | x9/13<br>x3/14<br>x9/14 | x 9/10<br>x 3/11<br>x 8/11<br>x12/11<br>x7/12<br>x2/13 | |
| A.31.r. (27) | Following a use of force, when CCDOC staff transport an inmate to receive medical care by Cermak, as necessary, the CCDOC staff member shall inform the Cermak staff member that the inmate was involved in a use of force. | x 8/11<br>x12/11<br>x7/12<br>x2/13<br>x9/13<br>x3/14<br>x9/14 | X 9/10<br>x 3/11 | |
| A.31.s. (28) | Cermak shall ensure that, when providing medical treatment or assessment to an inmate following a use of force, Qualified Medical Staff document the inmate's injuries, if any, and any medical care provided. Cermak shall provide CCDOC senior management [OPR] with a brief summary documenting the initial medical encounter following a use of force, including an anatomical drawing that depicts the areas of sustained injury, if any, and information regarding any further medical care.   See 31.f. | x 8/11<br>x12/11<br>x7/12<br>x2/13<br>x9/13<br>x3/14<br>x9/14 | x 9/10<br>x 3/11 | |
| A.31.t. (28) | Cermak shall ensure that Qualified Medical Staff question, outside the hearing of other inmates or correctional officers if appropriate, each inmate who reports for medical care with an injury, | x 8/11<br>x12/11 | x 3/11 | x 9/10 |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | regarding the cause of the injury.  If, in the course of the inmate's medical encounter, a health care provider suspects staff-on-inmate or inmate-on-inmate abuse, that health care provider shall immediately:<br>1. report the suspected abuse to the Executive Director of the Office of Professional Review or other appropriate CCDOC administrator; and<br>2. adequately document the matter in the inmate's medical record. | x7/12<br>x2/13<br>x9/13<br>x3/14<br>x9/14<br>x9/14 | | |
| 32. | **Safety and Supervision** | | | |
| 32. a. (29) | CCDOC shall maintain security and control-related policies, procedures, and practices that will result in a reasonably safe and secure environment for all inmates and staff, in accordance with generally accepted correctional standards.<br>Coordinate with Grenawitzke | x2/13<br>x9/13<br>x3/14<br>x9/14 | x 9/10<br>x 3/11<br>x 8/11<br>x12/11<br>x7/12 | |
| 32.b. (29) | CCDOC shall maintain policies, procedures, and practices to ensure the adequate supervision of inmate work areas and trustees, in accordance with generally accepted correctional standards.<br>Coordinate with Grenawitzke | x7/12<br>x 2/13<br>x9/13<br>x3/14<br>x9/14 | x 8/11<br>x12/11 | x 9/10<br>x 3/11 |
| 32.c. (30) | CCDOC shall ensure that security staff conduct appropriate rounds with sufficient frequency to provide inmates with reasonable safety.  Rounds shall be conducted at least once every half hour, at irregular intervals, inside each housing unit.  In the alternative, CCDOC may provide direct supervision of inmates by posting a correctional officer inside the day room area of a housing unit to conduct constant surveillance.   More frequent rounds shall be conducted for special management inmates who require more intensive supervision for security and safety reasons.  All security rounds shall be documented on forms or logs that do not contain pre-printed rounding times.  Video surveillance may be used to supplement, but must not be used to replace, rounds by correctional officers. | x2/13<br>x9/13<br>x3/14<br>x9/14 | x 9/10<br>x 3/11<br>X 8/11<br>x12/11<br>x7/12 | |
| 32.d. (30) | CCDOC shall ensure that security supervisors conduct daily rounds in the inmate housing units, and document the results of their inspections. | x2/13<br>x9/13<br>x3/14<br>x9/14 | x 3/11<br>x 8/11<br>x12/11<br>x7/12 | x 9/10 |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| 32.e. (30) | Cook County shall increase the use of overhead video surveillance and recording cameras to provide adequate coverage throughout the common areas of the Facility, including the RCDC, all division intake areas, mental health units, special management units, inmate housing units, and in common areas of the divisions. | x9/13<br>x3/14<br>x9/14 | x 9/10<br>x 3/11<br>x 8/11<br>x12/11<br>x7/12<br>x2/13 | |
| 32.f. (31) | CCDOC shall maintain a procedure to prevent inmates from possessing or having access to dangerous contraband, including conducting regular inspections of cells and common areas of the housing units to identify and prevent rule violations by inmates. | x2/13<br>x9/13<br>x3/14<br>x9/14 | x 9/10<br>x 3/11<br>x 8/11<br>x12/11<br>x7/12 | |
| 32.g. (31) | CCDOC shall review, and revise as applicable, all General Orders ("GOs"), Standard Operating Procedures ("SOPs"), and Post Orders on an annual basis, or more frequently as needed. | x 8/11<br>x12/11<br>x7/12<br>x2/13<br>x9/13<br>x3/14<br>x9/14 | x 9/10<br>x 3/11 | |
| 32.h. (32) | CCDOC shall revise policies, SOPs, and post orders for all armed posts to include proper use and safe handling of weapons and provide specific instructions on use of deadly force and when and under what circumstances such force should be used, in accordance with generally accepted correctional standards. | x12/11<br>x7/12<br>x2/13<br>x9/13<br>x3/14<br>x9/14 | x 9/10<br>x 3/11<br>x/8/11 | |
| 32.i. (32) | CCDOC shall standardize security policies, procedures, staffing reports, and post analysis reports across the divisions, to the extent possible, taking into account the different security levels and different physical layouts in the various divisions. | x2/13<br>x9/13<br>x3/14<br>x9/14 | x 9/10<br>x 3/11<br>x 8/11<br>x12/11<br>x7/12 | |
| 32.j. (32) | CCDOC shall provide formal training on division-specific SOPs to correctional officers in accordance with their assignments, and shall provide further specialized training for officers assigned to Special Management Units.  Cermak Hospital shall provide Specialized training for | x7/12<br>x2/13<br>x9/13<br>x3/14 | x 9/10<br>x 3/11<br>x 8/11<br>x12/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | officers assigned to psychiatric units. Coordinate with medical monitor and Dr. Metzner. See also 44.f., 44.g., 44.h., 46.b., 46.e., 68. | x9/14 | | |
| 32.k. (32) | CCDOC shall maintain in working order all monitoring equipment at the Facility that is under CCDOC's direct control, including cameras, alarms, radios (hand held), interior and exterior lighting, x-ray and other screening equipment, and walk-through metal detectors. To the extent that the maintenance of any Facility monitoring equipment is under the control of DFM, CCDOC shall promptly report any maintenance needs and DFM shall prioritize its services to ensure that all monitoring equipment is maintained in working order. Coordinate with Grenawitzke | x7/12 x2/13 x9/13 x3/14 x9/14 | x 9/10 x 3/11 x 8/11 x12/11 | |
| 32.l. (33) | Absent exigent circumstances, CCDOC: (i) shall house each inmate assigned to a division that is celled to one permanent bed in a cell and shall not house any inmates (including those assigned to dormitory divisions) such that they are sleeping on the floor, on a mattress on the floor, or in any area not designed or redesigned as sleeping quarters; (ii) shall not house more than two inmates to a single cell (triple-bunking); and (iii) shall not hot-bunk any inmates. | x 8/11[1] x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 | | |
| 32.m. (33) | When exigent circumstances give rise to triple-bunking, CCDOC shall provide the third inmate in the triple-bunked cell a "boat," stackable bunk, moveable platform, or cot, so that the inmate is not required to lay down directly on the cell floor or on a mattress on the floor. | x 8/11[2] x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 | | |
| 33. | **Security Staffing.** **The parties agree that correctional officer staffing and supervision levels at the Facility must be appropriate to adequately supervise inmates, to carry out the requirements of this Agreed Order, and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards. Cook County and CCDOC shall take such actions as shall ensure that correctional officer staffing and supervision at the Facility are sufficient to achieve these purposes. These actions shall include the following:** | | | |

---

[1] Noted as "NA" in first two reports.
[2] Noted as "NA" in first two reports.

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| 33.a. (34) | In the fiscal year 2010 budget, Cook County shall allocate funds sufficient to allow for 210 additional correctional officer positions at the Facility. Consistent with provision 33.c, such funding may occur on a rolling basis, as appropriate in light of the time required to hire, train, and put on duty the additional 210 new correctional officers. | x 8/11 x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 | x 9/10 x 3/11 | |
| 33.b. (34) | CCDOC shall use its best efforts (through the maintenance of the written staffing plan required by provision 33.h and otherwise) to ensure that the number of correctional officer vacancies is kept to the minimum practicable number at all times, taking into account that the timing of terminations and resignations and the resulting rate of attrition may, in ordinary course, result in there being some vacancies at any given time. | X9/14 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 x2/13 x9/13 x3/14 | |
| 33.c.i.ii (35) | CCDOC shall fill the 210 additional correctional officer slots provided for in provision 33.a; fill the 285 correctional officer vacancies that existed at the Facility as of July 17, 2009; and fill any correctional officer vacancies coming into existence after that date in the following manner: i. By December 31, 2010, CCDOC shall hire, train, and put on duty at the Facility at least 448 [381] newly qualified correctional officers (in addition to those on duty as of December 31, 2009). ii. By March 30, 2011, CCDOC shall hire, train, and put on duty at the Facility at least 174 [107] newly qualified correctional officers (in addition to those on duty as of December 31, 2010). | x 8/11 x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 | | x 9/10 x 3/11 |
| 33.d. (35) | The parties agree that for 30 months following the effective date of this Agreed Order, Cook County and CCDOC shall not be required to provide additional correctional officer staffing and supervision at the Facility beyond that which is necessary to ensure that correctional officer staffing and supervision are sufficient to achieve the purposes set out in the introductory paragraph of provision 33 and to comply with provisions 33.a-c above. Due date 11/13/2012 | x9/14 | x2/13 x9/13 x3/14 x9/14 | |
| 33.e. (35) | Within 30 months of the effective date of this Agreed Order, the CCDOC Monitor shall assess and make a recommendation on whether the correctional officer staffing and supervision levels are appropriate to adequately supervise inmates at the Facility, in accordance with generally accepted correctional standards. If the CCDOC Monitor determines that staffing is inadequate, | X9/14 | x2/13 x9/13 x3/14 x9/14 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | the CCDOC Monitor will make a recommendation regarding the appropriate number of correctional officer staff.  If the parties do not accept the CCDOC Monitor's staffing recommendation, CCDOC and Cook County shall agree to an independent, comprehensive study to determine the appropriate correctional officer staffing and supervision.  The parties agree that the results of this staffing study shall provide guidance as to the sufficient number of qualified correctional officers necessary to operate the Facility safely and to carry out the requirements of this Agreed Order.  Due date 11/13/2012 | | | |
| 33.f. (36) | If the staffing study requires additional correctional officers, Cook County shall allocate funds sufficient to maintain correctional officer staffing levels necessary to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards.  Due date 11/13/2012 | x9/14 | x2/13 x9/13 x3/14 | |
| 33.g. (36) | If the staffing study requires additional correctional officers, and consistent with Cook County's allocation of funds for security staffing, CCDOC shall hire and train sufficient number of qualified correctional officers and other staff to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards, including:<br>1. Investigative staffing sufficient to meet the internal investigation responsibilities outlined in this Agreed Order;<br>2. Correctional officer staffing sufficient to provide inmates requiring treatment with adequate access to appropriate medical and mental health care by providing timely movement of inmates to medical units, transport of inmates who have been referred for outside specialty care, and escort, if necessary, to Qualified Medical and Mental Health Staff on housing units; and   [Coordinate with medical monitor and  Dr. Metzner]<br>3. Qualified staff sufficient to monitor security cameras in real time and allow for supervisory viewing and retrieving at any time.  Due date 11/13/2012 | x9/14 | x2/13 x9/13 x3/14 | |
| 33.h. (37) | CCDOC shall maintain a written staffing plan that requires sufficient staffing to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards. | x9/14 | x 8/11 x12/11 x7/12 x2/13 x9/13 x3/14 | x 9/10 x 3/11 |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| 33.i. (37) | Absent exigent circumstances, CCDOC shall maintain a practice that does not allow for scheduled, planned, or expected cross-watching (a CCDOC practice of allowing one correctional officer to simultaneously supervise two housing units from the control center of one of the units) at any time on all maximum security and Special Management Units, and during first and second shifts throughout the Facility. | x 8/11[3]<br>x12/11<br>x7/12<br>x2/13<br>x9/13<br>x3/14<br>x9/14 | | |
| 33.j. (37) | CCDOC may permit cross-watching on third shift in housing units that are not maximum security or Special Management Units only if the Monitor does not object after consultation and review. The Monitor's review of the appropriateness of third-shift cross-watching on a particular housing unit shall be guided by the sufficiency of sightlines between the units being cross-watched, the adequacy of video and/or audio technologies in place, and/or other factors that bear on the safety and security of inmates and staff. If the Monitor later objects to any cross-watching that is in effect because of the Monitor's concerns that cross-watching on a particular housing unit presents an undue risk to the safety and security of inmates and staff, CCDOC shall immediately cease such cross-watching. CCDOC may renew cross-watching on that unit again if, after further consultation with and review by the Monitor, the Monitor does not object to such renewal. Although cross-watching is permitted under the limited circumstances described herein, CCDOC will work to eliminate the practice at the Facility. | x 8/11[4]<br>x12/11<br>x7/12<br>x2/13<br>x9/13<br>x3/14<br>x9/14 | | |
| **34.** | **Incidents and Referrals** | | | |
| 34. a. (38) | CCDOC shall continue to ensure that staff adequately and promptly document all reportable incidents, including inmate fights, rule violations, inmate injuries, suicides and suicide attempts, cell extractions, medical emergencies, contraband, vandalism, escapes and escape attempts, fires, and other incidents causing a disruption to standard CCDOC practice, in accordance with generally accepted correctional standards. | x2/13<br>x9/13<br>x3/14<br>x9/14 | x 9/10<br>x 3/11<br>x 8/11<br>x12/11<br>x7/12 | |
| 34.b. (38) | CCDOC shall continue to ensure that correctional officers receive pre-service and in-service training on proper incident reporting policies and procedures in accordance with generally accepted correctional standards. | x 8/11<br>x12/11<br>x7/12 | x 9/10<br>x 3/11 | |

---

[3] Noted as "NA" in first two reports.

[4] Noted as "NA" in first two reports.

November 4, 2014

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | | x2/13 x9/13 x3/14 x9/14 | | |
| 34.c. (38) | CCDOC shall maintain a system to track all reportable incidents (as described in provision 34.a) that, at a minimum, includes the following information: 1. incident tracking number; 2. the inmate(s) name; 3. housing assignment; 4. date; 5. type of incident; 6. injuries (if applicable); 7. medical care (if applicable); 8. primary and secondary staff involved; 9. reviewing supervisor; 10. external reviews and results (if applicable); 11. remedy taken (if appropriate); and 12. administrative sign-off. | x2/13 x9/13 x3/14 x9/14 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| 34.d. (39) | CCDOC shall require prompt administrative review of incident reports. Such reviews shall include a case-by-case review of individual incidents as well as a systemic review in order to identify patterns of incidents. CCDOC shall incorporate such information into quality management practices and take necessary corrective action. | x 8/11 x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 | x 9/10 x 3/11 | |
| 34.e. (39) | CCDOC shall ensure that incident reports, use of force reports and inmate grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria, that it is referred for investigation. | x9/13 x3/14 x9/14 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 x2/13 | |
| 34.f. (40) | CCDOC shall maintain policies, procedures and practices requiring investigations to resolve issues identified during review of incident reports, disciplinary hearings, or inmate grievances, | x9/13 x3/14 | x 9/10 x 3/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | and determine appropriate remedies, in accordance with generally accepted correctional standards.  At a minimum, CCDOC shall require timely and appropriate investigations of all suicides, serious suicide attempts, inmate-on-inmate violence resulting in serious injury, inmate-on-staff violence, inmate injuries requiring treatment by an outside hospital, inmate injuries of a suspicious nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.), sexual misconduct between inmates, sexual misconduct involving staff, fires, escapes, escape attempts, and deaths. | x9/14 | x 8/11 x12/11 x7/12 x2/13 | |
| 34.g. (40) | CCDOC (OPR) shall ensure that any investigation reports indicating possible criminal behavior will be referred to the appropriate law enforcement authority. | x 8/11 x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 | x 9/10 x 3/11 | |
| **35.** | **Investigations:** **Investigations at the Facility are conducted by independent departments under the Cook County Sheriff's Office, including the Office of Professional Review, the Criminal Investigations Unit, and the Sheriff's Police Department.  The Cook County Sheriff will assume responsibility for requiring these investigatory units to comply with the relevant provisions of this Agreed Order.** | | | |
| 35.a. (40) | CCDOC [OPR] shall maintain comprehensive policies, procedures, and practices for the timely and thorough investigation of alleged staff misconduct, in accordance with generally accepted correctional standards. | x2/13 x9/13 x3/14 x9/14 | x 9/10 x 3/11 x 8/11 x12/11 x 7/12 | |
| 35.b. (41) | Internal investigations [OPR] shall be conducted by persons who do not have supervisory responsibility for the staff member(s) being investigated. | x 7/12 x2/13 x9/13 x3/14 x9/14 | x 9/10 x 3/11 x 8/11 x12/11 | |
| 35.c. (41) | CCDOC [OPR] shall ensure that all internal investigations will include timely, thorough, and documented interviews of all relevant staff and inmates who were involved in, or witnessed, the incident in question. | x 9/10 x 3/11 x 8/11 x12/11 | | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | | x 7/12 x2/13 x9/13 x3/14 x9/14 | | |
| 35.d. (41) | CCDOC [OPR] shall ensure that internal investigation reports shall include all supporting evidence, including witness and participant statements, policies and procedures relevant to the incident, physical evidence, video or audio recordings, and relevant logs. | x 9/10 x 3/11 x 8/11 x12/11 x 7/12 x2/13 x9/13 x3/14 x9/14 | | |
| 35.e. (41) | CCDOC [OPR] shall ensure that all investigatory staff will receive pre-service and in-service training on appropriate investigations policies and procedures, the investigations tracking process, investigatory interviewing techniques, and confidentiality requirements. | x7/12 x2/13 x9/13 x3/14 x9/14 | x 9/10 x 3/11 x 8/11 x12/11 | |
| 35.f. (42) | CCDOC [OPR] shall provide all investigators who will be assigned to conduct investigations of use of force incidents with specialized training in investigating use of force incidents and allegations. | x7/12 x2/13 x9/13 x3/14 x9/14 | x 9/10 x 3/11 x 8/11 x12/11 | |
| 35.g. (42) | CCDOC [OPR] shall ensure that the results of each internal investigation shall be documented in an investigation report. CCDOC administration shall review the investigation reports, along with the underlying documentation, and take appropriate action. CCDOC shall implement appropriate remedies based upon the results of internal investigations. | x7/12 x2/13 x9/13 x3/14 x9/14 | x 9/10 x 3/11 x 8/11 x12/11 | |
| **36.** | **Inmate Disciplinary Process** | | | |
| 36.a. (43) | CCDOC shall maintain policies, procedures, and practices for a formal disciplinary process, including prompt issuance of written disciplinary citations, administrative review and disciplinary | x7/12 x2/13 | x 9/10 x 3/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | reports for alleged minor rule violations, and due process for alleged major rules violations, in accordance with generally accepted correctional standards. | x9/13 x3/14 x9/14 | x 8/11 x12/11 | |
| 36.b. (43) | CCDOC shall ensure that inmate disciplinary hearings are conducted in a reasonably private and secure setting. | x 8/11 x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 | x 9/10 x 3/11 | |
| 36.c. (44) | CCDOC shall ensure that all inmates places in lock down status are provided with appropriate due process that has been developed and implemented in policies and procedures, in accordance with generally accepted correctional standards.<br><br>In an emergency, the Executive Director of CCDOC may order a lock down of entire areas of the Facility in order to control the situation and address serious security concerns. In such circumstances, it is not necessary to provide disciplinary hearings to each inmate affected by the lock down. However, lock downs of this nature shall be limited to only the time and scope necessary to address the emergency.<br><br>For the purposes of this Agreed Order, a "lock down" shall not include the routine instances in which inmates are confined to their cells, including periods of count, over night, shift change, movement, and routine contraband sweeps. | x7/12 x2/13 x9/13 x3/14 x9/14 | x 9/10 x 3/11 x 8/11 x12/11 | |
| 36.d. (44) | CCDOC shall ensure that the disciplinary board's written record accurately reflects the testimony and discussion from the disciplinary hearing, including any recommendations from a mental health professional regarding the extent to which disciplinary charges are related to an inmate's serious mental illness or suggestions for minimizing the deleterious effect of disciplinary measure on the mental health status of the inmate. | x7/12 x2/13 x9/13 x3/14 x9/14 | x 3/11 x 8/11 x12/11 | x9/10 |
| 36.e. (45) | CCDOC shall alert Cermak when inmates are placed in disciplinary segregation or protective custody. | x7/12 x2/13 x9/13 x3/14 | x 9/10 x 3/11 x 8/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | | x9/14 | x12/11 | |
| 36.f. (45) | CCDOC shall permit a Cermak Qualified Mental Health Staff member to serve on the disciplinary board. | x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 | x 3/11 x 8/11 | x 9/10 |
| **37.** | **Classification** | | | |
| 37.a. (46) | CCDOC shall maintain policies and procedures for an appropriate, objective classification system that separates inmates in housing units by classification levels in order to protect inmates from unreasonable risk of harm. The system shall include consideration of an inmate's security level, severity of current charge, types of prior commitments, suicide risk, history of escape attempts, history of violence, and special needs. CCDOC shall use best efforts to anticipate periods of unusual intake volume and schedule sufficient classification staff to timely classify inmates. | x9/14 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 x2/13 x9/13 x3/14 | |
| 37.b. (46) | CCDOC shall ensure that classification staff have sufficient access to current information regarding cell availability on each division. | x9/14 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 x2/13 x9/13 x3/14 | |
| 37.c. (47) | CCDOC shall include information on each inmate's assignment to the Special Incarceration Unit "level system" at the Facility in the new Jail Management System, starting with the date the new Jail Management System becomes operational. | x 9/10 x 3/11 x 8/11 x12/11 x7/12 x2/13 x9/13 x3/14 | | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | | x9/14 | | |
| 37.d. (47) | CCDOC shall provide training and access to all correctional officer supervisors on the full capabilities of the new Jail Management System's classification and inmate tracking system (or any replacement system). | x2/13 x9/13 x3/14 x9/14 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| 37.e. (47) | CCDOC shall provide ongoing internal and external review and validation of the inmate classification system to ensure its reliability and objectivity. | x3/14 x9/14 | x7/12 x2/13 x9/13 | x 9/10 x 3/11 x 8/11 x12/11 |
| **38.** | **Inmate Grievance Procedure** | | | |
| 38.a. (48) | CCDOC shall maintain policies and procedures to ensure inmates have access to an adequate grievance process and to ensure that grievances may be accessed and filed confidentially, without requiring the intervention of a correctional officer, in accordance with generally accepted correctional standards.   These policies and procedures should be applicable and standardized across all the Facility divisions. | x8/11 x12/11 x7/12 x9/14 | x 9/10 x 3/11 x2/13 x9/13 x3/14 | |
| 38.b. (49) | CCDOC shall ensure that the grievances receive appropriate follow-up, including informing the grievant of the outcome, providing a timely written response, and tracking implementation of resolutions. | x 8/11 x12/11 x7/12 x9/14 | x 9/10 x 3/11 x2/13 x9/13 x3/14 | |
| 38.c. (49) | CCDOC shall ensure that grievance forms are available on all units and are available in Spanish. CCDOC shall ensure that there is adequate opportunity for illiterate inmates and inmates who have physical or cognitive disabilities to access the grievance system. | x 8/11 x12/11 x7/12 x9/13 x9/13 x3/14 x9/14 | x 9/10 x 3/11 x2/13 | |
| 38.d. (50) | CCDOC shall ensure that inmate grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria, are referred for investigation.  A member of the management staff shall review the grievance tracking system regularly in order | x 8/11 x12/11 x7/12 | x 3/11 x2/13 | x 9/10 |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | to identify areas of concern. | x9/13 x3/14 x9/14 | | |
| **39.** | **Access to Information** | | | |
| 39.a. (50) | CCDOC shall ensure that newly admitted inmates receive information, through an inmate handbook or orientation video, regarding the following areas: facility rules and regulations; how to report misconduct; how to report sexual abuse or assault; the process for accessing medical and mental health care; emergency procedures; rules for sending and receiving mail; the visitation process; facility schedule; the disciplinary process; and how to seek redress of grievances. | x2/13 x9/13 x3/14 x9/14 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| 39.b. (51) | CCDOC shall ensure that materials on facility rules and services are available for non-literate and non-English speaking inmates. | X2/13 x9/13 x3/14 x9/14 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| 40. (51) | CCDOC shall provide training and supervision to all correctional officers and supervisors sufficient to implement the provisions of this Agreed Order. | x 8/11 x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 | x 9/10 x 3/11 | |
| 41. (41) | Inter-Agency Agreement<br>a. CCDOC shall enter into a written Inter-Agency Agreement with Cermak that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility. The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order.<br>b. Cermak shall enter into a written Inter-Agency Agreement with CCDOC that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility. The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order. | x 8/11 x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 | x 3/11 | x 9/10 |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| 69. (52) | CCDOC shall ensure that security staff posts will be equipped, as appropriate, with readily available, safely secured, suicide cut-down tools. *Coordinate with Dr. Metzner | x 8/11<br>x12/11<br>x7/12<br>x2/13<br>x9/13<br>x3/14<br>x9/14 | | x 9/10<br>x 3/11 |

## 31. Use of Force

a.   CCDOC shall maintain comprehensive and contemporary policies and procedures, in accordance with generally accepted correctional standards, surrounding the use of force and with particular emphasis regarding permissible and impermissible uses of force.

**September 2014 Status Update:**  Substantial Compliance

**Status Update:**  All relevant policies were implemented effective 9/19/2011.   An update to the directive is anticipated prior to the next tour (April 2015).

**Monitor's Assessment:**  Policies are consistent with generally accepted correctional practice.  The work of the Office of Professional Responsibility, the Inspector General and the Use of Force Review Unit inform changes to both policy and training.

**Monitor's Recommendations:**  Continue refinements and updating

b.   CCDOC shall maintain use of force policies and pre-service and in-service training programs for correctional officers and supervisors that address the following impermissible uses of force:
1. use of force as a response to verbal insults or inmate threats where there is no immediate threat to the safety of the institution, inmates, or staff;
2. use of force as a response to inmates' failure to follow instructions where there is no immediate threat to the safety of the institution, inmates, or staff, unless CCDOC has attempted a hierarchy of nonphysical alternatives that are documented;
3. use of force as punishment or retaliation;
4. use of force involving striking, hitting, or punching a restrained and  non-combative inmate;
5. use of force against an inmate after the inmate has ceased to offer resistance and is under control;
6. use of choke holds on an inmate, unless lethal force is justified; and
7. use of inappropriate or excessive force.

**September 2014 Status Update:**  Substantial compliance.

**Status Update:**  Remains in compliance; see 31.a.

**Monitor's Assessment:**  see 31.a.

**Monitor's Recommendations:**  See 31.a.

c.   CCDOC shall maintain a policy to ensure that staff adequately and promptly report all uses of force, in accordance with generally accepted correctional standards.

**September 2014 Compliance Status:**  Substantial Compliance

**Status Update:**  Remains in compliance. See 31.a.

**Monitor's Assessment:**  If CCDOC learns that reports have not been filed regarding a use of force, immediate action is taken to not only report the incident, but to take investigative and correction action.  The multiple ways in which CCDOC's supervisor and leadership staff can learn of incidents provides a reasonable system to assure reporting; and action if reporting is not done.

**Monitor's Recommendations:**  Continue investigating any allegations that a use of force was not reported.

d.      CCDOC shall require that use of force reports:

   1. Be written in specific terms in order to capture the details of the incident;
   2. Contain an accurate account of the events leading to the use of force incident;
   3. Include a description of the instrument(s) of restraint or control, if any, and the manner in which it was used;
   4. Note whether an inmate disciplinary report was completed in connection with the incident that prompted the use of force;
   5. Describe the nature and extent of apparent and reported injuries sustained both by the inmate and staff member;
   6. Contain the date and time medical attention was actually provided;
   7. Describe, in detailed, factual terms, the type and amount of force used as well as the precise actions taken in a particular incident; and
   8. Note whether a use of force was videotaped.  If the use of force is not videotaped, the reporting correctional officer and supervisor will provide an explanation as to why it was not videotaped.

**September 2014 Compliance Status:**  Substantial compliance is maintained

**Status Update:** The Use of Force Review Unit analyzes and critiques reports to assure compliance with this paragraph.

**Monitor's Assessment:**  The Use of Force Review Unit reported that in the first six months of 2014, 60 CCDOC staff members were referred for remedial training as a result of review of incident reports (21) from incidents in 2013, and 39 in incidents in 2014).  This remedial training focuses on prevention, report working, strategies and tactics.  Supervisors are included in remedial training.  The Unit also tracks whether an employee needs to be provided remedial training more than once.

**Monitor's Recommendations:**  Continue monitoring of reports, and provide remedial training.   Assure that pre-service and in-service training includes exercises in which officers are required to capture the details of the incidents, including descriptions of the actions of other/all parties involved in the incident (e.g. peers, supervisors).

e.     CCDOC shall continue to require prompt review by the shift commander of all use of force reports.  The shift commander's review of use of force reports shall include review for completeness and procedural errors, as well as review of the substantive content.  If the use of force report does not comply with provision 31.d. of this Agreed Order, the shift commander shall return it to the reporting officer for revision and resubmission until it is compliant.  If the shift commander believes a use of force may have been inappropriate or excessive, he or she shall immediately refer the incident for investigation.

**September 2014 Compliance Status:** Substantial compliance

**Status Update:**  See also 33.d.

**Monitor's Assessment:**  The Use of Force Review Unit reports that for the first six months of 2014, a total of 54 incidents were referred to the Office of Professional Responsibility for further investigation.  The criteria for referral included suspicious injuries, treatment at an outside hospital, provision of medical treatment, absence of battery charges against an officer, allegations of excessive force, and/or other policy violations.

**Monitor's Recommendations:**  Continue to refine processes, data analysis, and actions plans related to findings.

f.     CCDOC shall ensure that senior management review of uses of force includes:
    1.     A timely review of medical documentation of inmate injuries, if any is submitted, as provided by Qualified Medical Staff, including documentation surrounding the initial medical encounter, an anatomical drawing that depicts the areas of sustained injury, and information regarding any further medical care;
    2.     The inmate disciplinary report, if any, associated with the use of force; and
    3.     The incident report, if any, associated with the use of force.

**September 2014 Compliance Status:** Substantial compliance.

**Status Update:**  Remains in substantial compliance

**Monitor's Assessment:**  See 31.d., and e.

**Monitor's Recommendations**: Continue to refine processes, data analysis, and actions plans related to findings.

g.     CCDOC [and Cermak] shall establish criteria that trigger referral for inappropriate or excessive use of force investigations, including but not limited to, documented or known injuries that are extensive or serious; injuries involving fractures or head trauma; injuries of a suspicious nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.); and injuries that require treatment at outside hospitals.

**September 2014 Compliance Status:** Substantial compliance.

**Status Update:** Remains in substantial compliance.

**Monitor's Assessment:** I met with Cermak to review issues related to this paragraph. Cermak leadership reports that they have refer incidents to OPR and collaborate to assure that the reporting is logged and an acknowledgement provided. There are no issues at this time.

**Monitor's Recommendations**: Continue to discuss at the inter-agency meetings.

h.    When CCDOC review of use of force reports, and supporting records if applicable, reveals that reports of a use of force are materially inconsistent, conflicting, or suspicious, CCDOC shall refer that use of force incident for internal investigation.

**September 2014 Compliance Status:**    Substantial Compliance.

**Status Update:** Remains in substantial compliance

**Monitor's Assessment:** See 31.e. and 31g.

**Monitor's Recommendations**: See 31.e. and 31g.

i.    CCDOC shall develop and implement a system to track all incidents of use of force that, at a minimum, includes the following information:
   1.    a tracking number;
   2.    the inmate(s) name;
   3.    housing assignment;
   4.    date;
   5.    type of incident;
   6.    injuries (if applicable);
   7.    medical care provided (if applicable);
   8.    staff involved;
   9.    reviewing supervisor;
   10.    external reviews and results (if applicable);
   11.    remedy taken (if appropriate); and
   12.    administrative sign-off.

**September 2014 Compliance Status:** Substantial compliance.

**Status Update:** Remains in substantial compliance.

**Monitor's Assessment:** The CCOMs information system will continue where IMACs left off to provide this information.

**Monitor's Recommendations**: Use of Force Review Unit examine reporting in CCOMs to assure on-going compliance with this paragraph.

j.      CCDOC shall ensure that, promptly following a use of force incident, video or photographs are taken of any and all reported or apparent injuries sustained by inmates and staff.  The video or photographs will be maintained and will be included in the investigation package, if applicable.

**September 2014 Compliance Status:**  Substantial compliance

**Status Update:**  Remains in substantial compliance.

**Monitor's Assessmen**t: I reviewed several videos where the camera didn't show the full incident. I believe this is more related to where the camera was placed (for example on a shoulder) rather than any intention to not record the incident. CCDOC is experimenting with newer technology – such as "glasses" with cameras affixed to the temple of the glasses to help insure that recordings are more useful.

Video evidence is included in OPR investigative files.

The large number of cameras in the facilities will assist with providing video evidence.

**Monitor's Recommendations:** Use of Force Review Unit continue to monitor the quality of video evidence, and as necessary provide remedial training.  CCDOC should continue its evaluation of other technology options.  UFRU should also assess if incidents of use of force occur in areas not covered by the overhead video system, where evidence from handheld cameras is insufficient, or where staff need retraining in the use of the technology.

k.      CCDOC shall establish an "early warning system" that will document and track correctional officers who are involved in use of force incidents and any complaints related to the inappropriate or excessive use of force, in order to alert CCDOC administration to any potential need for retraining, discipline, problematic policies, or supervisory lapses.  Appropriate CCDOC leadership, supervisors, and investigatory staff shall have access to this information and monitor the occurrences. CCDOC senior management shall use information from the early warning system to improve quality management practices, identify patterns and trends, and take necessary corrective action both on an individual and systemic level.

**September 2014 Compliance Status:**  Substantial compliance.

**Status Update:**  Remains in substantial compliance.

**Monitor's Assessmen**t: See 33.d. and 33.e.

**Monitor's Recommendations:**  The enhances and reorganized investigative function with the Inspector General, OPR and the Use of Force Review Unit work

collaboratively to identify officers needing intervention, and assure the intervention is completed as well as monitor effectiveness of the remediation.

l.      CCDOC shall ensure that a supervisor is present during all pre-planned uses of force, such as cell extractions.

**March 2014 Compliance Status:**      Substantial compliance

**Status Update:** Remains in substantial compliance.

**Monitor's Assessmen**t:  Reports are reviewed by the Use of Force Review Unit.   In 2015 more specific supervisory training is planned for implementation.

**Monitor's Recommendations:**  Continue reviews of supervisory presence during planned uses of force.

m.      Where there is evidence of staff misconduct related to inappropriate or unnecessary use of force against inmates, CCDOC shall initiate personnel actions and seek disciplinary action appropriately for any correctional officer found to have:
   1.      engaged in inappropriate or excessive use of force;
   2.      failed to report or report accurately the use of force;
   3.      retaliated against an inmate or other staff member for reporting an inappropriate or excessive use of force; or
   4.      interfered or failed to cooperate with an internal investigation regarding use of force in a manner inconsistent with the staff member's statutory or contractual rights.

**September 2014 Compliance Status**: Substantial compliance

**Status Update:** Remains in substantial compliance.

**Monitor's Assessmen**t:  Regarding allegations of excessive use of force, OPR has, as reported in the March 2014 report, dealt with the backlog of cases noted in my report of September 2013.  Data available at the time of the tour provides the following information.  OPR reports for 2012 the remaining 154 cases involving 277 officers were reviewed, with 1 open case; for 2013, 208 cases involving 37 officers were reviewed, and 15 open; and for year to date 2014, 25 cases involving 37 officers were reviewed.  The personnel actions resulting from these reviews are reported as a total of 21 separations, 50 suspensions ranging from 180 days to less than 29 days.  Additionally there were 7 employee reprimands.  For those investigations, 17 of the total of 387 excessive use of force allegations were sustained, 122 were not sustained, 23 were exonerated, and 30 were unfounded.

**Monitor's Recommendations**: Continue to work to appropriately come to a final conclusion cases.  Work to shorten the time to bring cases to conclusion; shorten

the time for command channel reviews.  Continue to work with the prosecutor to refine cases and reach conclusion on any pending criminal prosecution.

n.      Where there is evidence of staff misconduct related to inappropriate or unnecessary use of force against inmates, CCDOC shall consider, develop, and initiate systemic remedies as appropriate.

**September 2014 Compliance Status:** Substantial compliance

**Status Update:**  Remains in compliance.

**Monitor's Assessmen**t:  The multiple strategies that CCDOC uses to track uses of force, especially the analysis of the UFRU, assures that CCDOC can initiate and evaluated systemic remedies.

**Monitor's Recommendations:**  None at this time.

o.      CCDOC shall maintain accountability policies and procedures for the effective and accurate maintenance, inventory, and assignment of chemical and other security equipment, in accordance with generally accepted correctional standards.

**September 2014 Compliance Status:** Substantial compliance.

**Status Update:**  Remains in substantial compliance

**Monitor's Assessmen**t: Nothing further this time.  Will review during April 2015 tour.

**Monitor's Recommendations:** None at this time.

p.      CCDOC shall continue to conduct use of force training in accordance with generally accepted correctional standards, including:
      1.      CCDOC shall maintain an effective and comprehensive use of force training program.
      2.      CCDOC shall continue to ensure that correctional officers receive adequate training in CCDOC's use of force policies and procedures, including de-escalation and defensive tactics relating to use of force.
            CCDOC
      3.      shall continue to ensure that correctional officers receive pre-service and in-service training on reporting use of force and completing use of force reports.

**September 2014 Compliance Status:** Substantial compliance.

**Status Update:**  Remains in substantial compliance.

**Monitor's Assessmen**t:  I'll review the training in April 2015 when the revised directive should be in effect.  I reiterate my concern regarding uses of force

involving inmates on the mental health caseload, and will work with CCDOC and Dr. Metzner and Cermak to find solutions, including at crisis team (see Executive Summary).

**Monitor's Recommendations:** CCDOC and Cermak should continue to work toward the implementation of a crisis intervention team. The Training Academy should assure that trainees are as skilled as possible in de-escalation techniques, especially for inmates with mental illness.

q.     CCDOC shall provide a process for inmates to report allegations of the inappropriate or excessive use of force orally to any CCDOC staff member; said staff member shall give the inmate the opportunity to reduce his or her report to writing through a grievance or complaint form without discouragement.

**September 2014 Compliance Status:** Substantial compliance.

**Status Update:** The revised grievance process has been implemented. The directive complies with this paragraph.

**Monitor's Assessment:** Data reported by the Inmate Services Department for the first 8 months of 2014, notes inmates used the grievance system to report 718 instances of non-physical staff misconduct; 250 grievances regarding physical staff misconduct, and 93 grievances regarding failure to protect. These grievances (20%) were out of a total of 5,232 total grievances filed. OPR also accepts complaints from individuals who have left custody, who are transferred to other facilities, and from family members.

Additionally Correctional Rehabilitation Workers perform rounds each business day in assigned housing units, and facilities' leadership also make rounds.

See also paragraph 38.

**Monitor's Recommendation:** Continue to monitor how inmates report allegations.

r.     Following a use of force, when CCDOC staff transport an inmate to receive medical care by Cermak, as necessary, the CCDOC staff member shall inform the Cermak staff member that the inmate was involved in a use of force.

**September 2014 Compliance Status:** Substantial Compliance.

**Status Update:** Remains in substantial compliance.

**Monitor's Assessment:** No issues reported by Cermak or CCDOC.

**Monitor's Recommendation:** None at this time.

s.      Cermak shall ensure that, when providing medical treatment or assessment to an inmate following a use of force, Qualified Medical Staff document the inmate's injuries, if any, and any medical care provided. Cermak shall provide CCDOC senior management with a brief summary documenting the initial medical encounter following a use of force, including an anatomical drawing that depicts the areas of sustained injury, if any, and information regarding any further medical care.

**September 2014 Compliance Status:** Substantial compliance.

**Status Update:** Remains in substantial compliance; but action is required.

**Monitor's Assessmen**t: Cermak has not been providing "anatomical drawings" as part of their record production; and this practice is no longer part of their protocols. Cermak, the County and CCDOC need to agree on an amendment to this paragraph to insure a substantial compliance rating in the future. OPR is able to extract the information they nee to pursue investigations from the medical records; but communication and collaboration on this issue will enhance operations for the partners.

**Monitor's Recommendations:** Continue to use the Interagency Coordinating Council to enhance operations.

t.      Cermak shall ensure that Qualified Medical Staff question, outside the hearing of other inmates or correctional officers if appropriate, each inmate who reports for medical care with an injury, regarding the cause of the injury. If, in the course of the inmate's medical encounter, a health care provider suspects staff-on-inmate or inmate-on-inmate abuse, that health care provider shall immediately:
  1.      report the suspected abuse to the Executive Director of the Office of Professional Review or other appropriate CCDOC administrator; and
  2.      adequately document the matter in the inmate's medical record.

**September 2014 Compliance Status:** Substantial Compliance

**Status Update:** Remains in substantial compliance; but action is required.

**Monitor's Assessmen**t: There are issues emerging about whether Cermak staff want to have correctional staff out of hearing during provider encounters. In my meeting with Cermak leadership there were concerns raised on behalf of Cermak staff that volatile inmates (including those NOT on the mental health caseload) are perceived as threats to the providers' personal safety. Cermak leadership reported that some providers don't feel that correctional officers are responding fast enough when an inmate's behavior is a threat to the provider. The dilemma, of course is if the correctional officer is close enough to hear the interaction as a protection to the provider, this paragraph is violated. In the

past, Cermak has also expressed concerns about correctional officers overhearing too much and a potential HIPPA violation.

I have referred this matter to Drs. Metzner and Porsa to review on their tours, and alerted CCDOC to this concern.

Regarding sections t.1. and t.2 – there are no issues reported.

**Monitor's Recommendations:** See 32.s. Also develop a revised protocol to address the perception by some Cermak providers that inmates pose a threat to their personal safety. Reach an agreement regarding any revision to this paragraph to assure a finding of substantial compliance in the April 2015 tour.

## 32.  Safety and Security

a.      CCDOC shall maintain security and control-related policies, procedures, and practices that will result in a reasonably safe and secure environment for all inmates and staff, in accordance with generally accepted correctional standards. Coordinate with Grenawitzke, medical monitor and Dr. Metzner.

**September 2014 Compliance Status:**  Substantial compliance.

**Status Update:**  The Office of Policy and Accountability (OPA) provided an updated list of directives completed/revised since March 2014, and those pending review/re-issue.

**Monitor's Assessment:**  There is a process in place to update all policies and procedures to provide as safe an environment as possible. Training is based on these directives.

**Monitor's Recommendation:**  None at this time.

b.      CCDOC shall maintain policies, procedures, and practices to ensure the adequate supervision of inmate work areas and trustees, in accordance with generally accepted correctional standards. Coordinate with Grenawitzke.

**September 2014 Compliance Statue:** Substantial Compliance

**Status Update:**  Remains in substantial compliance

**Monitor's Assessment:**  See 32.a.

**Monitor's Recommendations:** None at this time.

c.      CCDOC shall ensure that security staff conduct appropriate rounds with sufficient frequency to provide inmates with reasonable safety.  Rounds shall be conducted at least once every half hour, at irregular intervals, inside each housing unit.   In the alternative, CCDOC may provide direct supervision of inmates by posting a correctional officer inside the day room area of a housing unit to conduct constant surveillance.   More frequent rounds shall be conducted for special management inmates who require more intensive supervision for security and safety reasons.  All security rounds shall be documented on forms or logs that do not contain pre-printed rounding times.  Video surveillance may be used to supplement, but must not be used to replace, rounds by correctional officers.

**September 2014 Compliance Status:**  Substantial compliance.

**Status Update:**  Continue in substantial compliance.

**Monitor's Assessmen**t:  Audited logs in March 2014, will re-audit housing unit logs in April 2015.

**Monitor's Recommendations:**  CCDOC may consider providing random checks of logs (similar that Commander Howell did in 2013) to assure compliance with this paragraph.  I can then use that document to re-audit in April 2015.

d.      CCDOC shall ensure that security supervisors conduct daily rounds in the inmate housing units, and document the results of their inspections.

**September 2014 Compliance Status:**  Substantial Compliance

**Status Update:**  See 32. C.

**Monitor's Assessmen**t: See 32.c.

**Monitor's Recommendations:** See 32.c.

e.      Cook County shall increase the use of overhead video surveillance and recording cameras to provide adequate coverage throughout the common areas of the Facility, including the RCDC, all division intake areas, mental health units, special management units, inmate housing units, and in common areas of the divisions.

**September 2014 Compliance Status:**  Substantial Compliance

**Status Update:**  Substantial compliance.

**Monitor's Assessment:**   A total of 1,086 cameras of the total number of 1,259 have been installed.  I viewed a demonstration of the cameras.  The remaining 173 cameras to be installed are in Cermak (34), Division 1 (70), and in tunnels, etc. (68).  These are anticipated to be installed by 9/29/14.  This massive County funded capital project will ultimately install almost 1900 cameras in courthouses and the jail facilities.

An unresolved issue are the cameras to be installed in Cermak.  Cermak is objective to cameras that they believe will violate client confidentiality and/or intrude on group activities.  This matter needs to be resolved as soon as possible so this project can be complete.  I have advised Drs. Metzner and Porsa about this dispute so perhaps they can help resolve it.  My recommendations that the cameras be installed as this protects inmates and staff, and in my viewing of the locations has little change to violate client confidentiality.  Safeguards are in place regarding the use of the video from these cameras.

**Monitor's Recommendations**:  Complete the camera installation;  conclude discussions with Cermak regarding installations in the facility.  Assure there is training of staff assigned to monitor cameras.

f.       CCDOC shall maintain a procedure to prevent inmates from possessing or having access to dangerous contraband, including conducting regular inspections of cells and common areas of the housing units to identify and prevent rule violations by inmates.

**March 2014 Compliance Status**:       Substantial compliance

**Status Update:**  Maintain substantial compliance.

**Monitor's Assessmen**t:  I reviewed the "weapons free" data for the past two years.  The analysis of contraband seized resulted in a project to change out light fixtures in many divisions.  The committee tracks the type of contraband seized and in which divisions.  Feedback is provided to Cermak, for example, when contraband has been fashioned from medical devices (e.g. asthma pumps, eye glasses, medical devices) and DFM (e.g. electrical wires, drill bits, light fixtures, pipe brackets).

**Monitor's Recommendations:**  Continue to share information with Cermak and DFM regarding findings of contraband; examine and address trends.

g.       CCDOC shall review, and revise as applicable, all General Orders ("GOs"), Standard Operating Procedures ("SOPs") and Post Orders on an annual basis, or more frequently as needed.

**September 2014 Compliance Status:** Substantial Compliance

**Status Update:**  Remains in substantial compliance.

**Monitor's Assessmen**t: See 32.a. and 32. B.

**Monitor's Recommendations:**  None at this time.

November 4, 2014                                                                                         31

h.      CCDOC shall revise polices, SOPS, and Post orders for all armed posts to include proper use of and safe handling of weapons and provide specific instructions on use of deadly force and when and under what circumstances such force should be used, in accordance with generally accepted correctional standards.

**September 2014 Compliance Status:** Substantial Compliance.

**Status Update:** Remains in substantial compliance

**Monitor's Assessmen**t: See 32.g.

**Monitor's Recommendations:** See 32.g.

i.      CCDOC shall standardize security policies, procedures, staffing reports, and post analysis reports across the divisions, to the extent possible, taking into account the different security levels and different physical layouts in the various divisions.

**September 2014 Compliance Status:** Substantial compliance.

**Status Update:** Maintains Substantial Compliance

**Monitor's Assessmen**t: I reviewed the updated information for Division 9.

**Monitor's Recommendations:** Continue to evaluate on an annual basis.

j.      CCDOC shall provide formal training on division-specific SOPs to correctional officers in accordance with their assignments, and shall provide further specialized training for officers assigned to Special Management Units. Cermak Hospital shall provide specialized training for officers assigned to psychiatric units. [From Consent agreement "Special Management Units" means those housing units of the Facility designated for inmates in administrative or disciplinary segregation, in protective custody, on suicide precautions, or with mental illness."] Coordinate with medical monitor and Dr. Metzner.

**September 2014 Compliance Status:** Substantial Compliance.

**Status Update:** Remains in substantial compliance

**Monitor's Assessmen**t: See assessment and recommendation paragraph 31.p.

**Monitor's Recommendations:** Review opportunities to improve training and assignment of staff to supervise inmates on the mental health caseload.

k.      CCDOC shall maintain in working order all monitoring equipment at the Facility that is under CCDOC's direct control, including cameras, alarms, radios (hand held), interior and exterior lighting, x-ray and other screening equipment, and walk-through metal detectors. To the extent that the maintenance of any Facility monitoring equipment is under the control of DFM, CCDOC shall promptly report any maintenance needs and DFM shall prioritize its services

to ensure that all monitoring equipment is maintained in working order. Coordinate with Grenawitzke.

**September 2014 Compliance Status:** Substantial Compliance.

**Status Update:** Remains in substantial compliance

**Monitor's Assessmen**t: See monitor Grenawitzke' s report

**Monitor's Recommendations:** See monitor Grenawitzke' s report

l.       Absent exigent circumstances, CCDOC: (i) shall house each inmate assigned to a division that is celled to one permanent bed in a cell and shall not house any inmates (including those assigned to dormitory divisions) such that they are sleeping on the floor, on a mattress on the floor, or in any area not designed or redesigned as sleeping quarters; (ii) shall not house more than two inmates to a single cell (triple-bunking); and (iii) shall not hot-bunk any inmates.

**September 2014 Compliance Status:**        Substantial Compliance.

**Status Update:** Remains in substantial compliance.

**Monitor's Assessmen**t: Nothing at that time.

**Monitor's Recommendations:** Nothing at this time.

m.       When exigent circumstances give rise to triple-bunking, CCDOC shall provide the third inmate in the triple-bunked cell a "boat," stackable bunk, moveable platform, or cot, so that the inmate is not required to lay down directly on the cell floor or on a mattress on the floor.

**September 2014 Compliance Status:**        Substantial Compliance

**Status Update:** See 32. l.

**Monitor's Assessmen**t: See 32.1.

**Monitor's Recommendations:** See 32.l.

## 33.     Security Staffing

**33.     Security Staffing.** The parties agree that correctional officer staffing and supervision levels at the Facility must be appropriate to adequately supervise inmates, to carry out the requirements of this Agreed Order, and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards. Cook County and CCDOC shall take such actions as shall ensure that correctional officer staffing and supervision at the Facility are sufficient to achieve these purposes. These actions shall include the following:

a.    In the fiscal year 2010 budget, Cook County shall allocate funds sufficient to allow for 210 additional correctional officer positions at the Facility.  Consistent with provision 33.c, such funding may occur on a rolling basis, as appropriate in light of the time required to hire, train, and put on duty the additional 210 new correctional officers.

**March 2014 Compliance Status:**        Substantial Compliance

**Status Update:**  Remains in substantial compliance.

CCDOC data indicates there are 40 vacancies as of August 11, 2014.  For CY 2014 year to date, 288 correctional officers have been hired.  At the time of the tour, there were three pre-service academies in session (N= 162).  There is a goal of hiring 105 new officers before the end of 2014.  For CY 2014, CCDOC report that there were 106 vacancies as a result of promotions (38%);  retirements (14%); resignations (38%); terminations (7%); and deaths (4%). CCDOC is planning on an increased level of attrition as law enforcement/police jobs open in the region.

**Monitor's Assessment:**   CCDOC continues to demonstrate that it can hire, train, and deploy corrections staff.

**Monitor's Recommendation:**  Continue to monitor attrition as law enforcement agencies in the region hire.

b.    CCDOC shall use its best efforts (through the maintenance of the written staffing plan required by provision 33.h and otherwise) to ensure that the number of correctional officer vacancies is kept to the minimum practicable number at all times, taking into account that the timing of terminations and resignations and the resulting rate of attrition may, in ordinary course, result in there being some vacancies at any given time.

**September 2014 Compliance Status:** Substantial compliance

**Status Update:**   See also Executive summary.  Given the agreement concerning the language of the Agreement Order regarding staffing, this paragraph is now in substantial compliance.

**Monitor's Assessmen**t:   General Order 24.1.10.0, Centralized Roster Management Staffing Analysis incorporates the requirements of paragraphs 33.b, e, f, g. and h.  As noted in the Executive Summary, CCDOC has memorialized the on-going staffing strategy in General Order 24.1.20.0, Centralized Roster Management Staffing Analysis.  This directive, approved by the Department of Justice, requires an annual staffing review.   This strategy will include three levels of review focusing on:  (1) reducing overtime; (2) identifying barriers to achieving staffing objectives; and (3) responses to the barriers and

challenges of staffing. The compliance with, and outcomes of staffing will be reviewed in subsequent tours. CCDOC must remain compliant for 18 months.

**Monitor's Recommendations**: CCDOC must track compliance with the GO 24.1.10.0, Centralized Roster Management Staffing Analysis that includes providing periodic reports to the monitor, and production of the annual review.

c.      CCDOC shall fill the 210 additional correctional officer slots provided for in provision 33.a; fill the 285 correctional officer vacancies that existed at the Facility as of July 17, 2009; and fill any correctional officer vacancies coming into existence after that date in the following manner:

   i.      By December 31, 2010, CCDOC shall hire, train, and put on duty at the Facility at least 448 [381] newly qualified correctional officers (in addition to those on duty as of December 31, 2009).

   ii.     By March 30, 2011, CCDOC shall hire, train, and put on duty at the Facility at least 178 [107] newly qualified correctional officers (in addition to those on duty as of December 31, 2010).

**September 2014 Compliance Status:** Substantial Compliance.

**Status Update:** Remains in substantial compliance,

**Monitor's Assessmen**t: See 33.a.

**Monitor's Recommendations:** See 33. a.

d.      The parties agree that for 30 months following the effective date of this Agreed Order, Cook County and CCDOC shall not be required to provide additional correctional officer staffing and supervision at the Facility beyond that which is necessary to ensure that correctional officer staffing and supervision are sufficient to achieve the purposes set out in the introductory paragraph of provision 33 and to comply with provisions 33.a-c above.

**September 2014 Compliance Status:** Substantial Compliance

**Status Update:** See 33.b.

**Monitor's Assessmen**t: See 33.b.

**Monitor's Recommendations:** See 33.b.

e.      Within 30 months of the effective date of this Agreed Order, the CCDOC Monitor shall assess and make a recommendation on whether the correctional officer staffing and supervision levels are appropriate to adequately supervise inmates at the Facility, in accordance with generally accepted correctional standards. If the CCDOC Monitor determines that staffing is inadequate, the CCDOC Monitor will make a recommendation regarding the appropriate number of correctional officer staff. If the parties do not accept the CCDOC Monitor's staffing recommendation, CCDOC and Cook County shall agree to an independent, comprehensive study to determine the appropriate correctional officer staffing and supervision. The parties

agree that the results of this staffing study shall provide guidance as to the sufficient number of qualified correctional officers necessary to operate the Facility safely and to carry out the requirements of this Agreed Order.

**September 2014 Compliance Status:**   Substantial compliance

**Status Update:**  See 33.b.

**Monitor's Assessment:**     See 33.b.

**Monitor's Recommendation:**   See 33.b.

f.        If the staffing study requires additional correctional officers, Cook County shall allocate funds sufficient to maintain correctional officer staffing levels necessary to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards.

**September 2014 Compliance Status:**   Substantial compliance

**Status Update:**   See 33.b.

**Monitor's Assessment:**     See 33.b.

**Monitor's Recommendation:**   See 33.b.

g.        If the staffing study requires additional correctional officers, and consistent with Cook County's allocation of funds for security staffing, CCDOC shall hire and train sufficient number of qualified correctional officers and other staff to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards, including:
   1. Investigative staffing sufficient to meet the internal investigation responsibilities outlined in this Agreed Order;
   2. Correctional officer staffing sufficient to provide inmates requiring treatment with adequate access to appropriate medical and mental health care by providing timely movement of inmates to medical units, transport of inmates who have been referred for outside specialty care, and escort, if necessary, to Qualified Medical and Mental Health Staff on housing units; and
   3. Qualified staff sufficient to monitor security cameras in real time and allow for supervisory viewing and retrieving at any time.

**September 2014 Compliance Status:**  Substantial compliance.

**Status Update:**    The Inspector General is evaluating staffing needs of a revised investigative function.  In the interim, this paragraph remains in substantial compliance.

**Monitor's Assessment:**     Based on the Inspector General's review of staffing, the

November 4, 2014                                                                      36

CCDOC should work expeditiously to fill those positions with qualified and experienced personnel.

**Monitor's Recommendation:** Complete the review process; fill positions identified to enhance operations and functions..

h.      CCDOC shall maintain a written staffing plan that requires sufficient staffing to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards.

**September 2014 Compliance Status:**  Substantial compliance

**Status Update:**  See 33.b.

**Monitor's Assessmen**t:   See 33.b.

**Monitor's Recommendation:**     See 33.b.

i.      Absent exigent circumstances, CCDOC shall maintain a practice that does not allow for scheduled, planned, or expected cross-watching (a CCDOC practice of allowing one correctional officer to simultaneously supervise two housing units from the control center of one of the units) at any time on all maximum security and Special Management Units, and during first and second shifts throughout the Facility.

**March 2014 Compliance Status:**  Substantial Compliance

**Status Update:**  CCDOC reports no deficiencies.

**Monitor's Assessmen**t:  I hear, but rarely any longer, from time to time from employees concerned about cross-watching.  When any issues are presented by individual officers or by the unions, I confer with CCDOC.

**Monitor's Recommendation:**  I recommend that facility superintendents assigned where cross-watching can occur monitor on a random basis compliance with this paragraph.

j.      CCDOC may permit cross-watching on third shift in housing units that are not maximum security or Special Management Units only if the Monitor does not object after consultation and review.  The Monitor's review of the appropriateness of third-shift cross-watching on a particular housing unit shall be guided by the sufficiency of sightlines between the units being cross-watched, the adequacy of video and/or audio technologies in place, and/or other factors that bear on the safety and security of inmates and staff.  If the Monitor later objects to any cross-watching that is in effect because of the Monitor's concerns that cross-watching on a particular housing unit presents an undue risk to the safety and security of inmates and staff, CCDOC shall immediately cease such cross-watching.  CCDOC may renew cross-watching on that unit again if, after further consultation with and review by the Monitor, the Monitor does not object to such renewal.  Although cross-watching is permitted under the limited circumstances described

herein, CCDOC will work to eliminate the practice at the Facility.

**September 2014 Compliance Status:** Substantial Compliance

**Status Update:** See 33.i.

**Monitor's Assessmen**t: See 33.i.

**Monitor's Recommendation:** See 33.i.

## 34. Incidents and Referrals

a.      CCDOC shall continue to ensure that staff adequately and promptly document all reportable incidents, including inmate fights, rule violations, inmate injuries, suicides and suicide attempts, cell extractions, medical emergencies, contraband, vandalism, escapes and escape attempts, fires, and other incident causing a disruption to standard CCDOC practice, in accordance with generally accepted correctional standards.

**September 2014 Compliance Status:** Substantial Compliance.

**Status Update:** The new jail management information system CCOMs will be implemented on October 18, 2014.

**Monitor's Assessment:** I previewed this system during the March 2014 tour.

**Monitor's Recommendation:** None at this time.

b.      CCDOC shall continue to ensure that correctional officers receive formal pre-service and in-service training on proper incident reporting policies and procedures, in accordance with generally accepted correctional standards.

**September 2014 Compliance Status:** Substantial compliance

**Status Update:** Maintains Substantial Compliance

**Monitor's Assessmen**t: The Use of Force Review units continues to provide feedback and conduct training regarding incident reporting and uses of force. All other training is consistent with accepted correctional practice.

**Monitor's Recommendations:** None at this time.

c.   CCDOC shall maintain a system to track all reportable incidents (as described in provision 34.a) that, at a minimum, includes the following information:
1.   incident tracking number;
2.   the inmate(s) name;
3.   housing assignment;

4. date;
5. type of incident;
6. injuries (if applicable);
7. medical care (if applicable);
8. primary and secondary staff involved;
9. reviewing supervisor;
10. external reviews and results (if applicable);
11. remedy taken (if appropriate); and
12. administrative sign-off.

**September 2014 Compliance Status:**  Substantial compliance

**Status Update:**  See 34.a.

**Monitor's Assessment:**  See 34.a.

**Monitor's Recommendation:**  None at this time.

d.        CCDOC shall require prompt administrative review of incident reports.  Such reviews shall include a case-by-case review of individual incidents as well as a systemic review in order to identify patterns of incidents.  CCDOC shall incorporate such information into quality management practices and take necessary corrective action.

**September 2014 Compliance Status:**  Substantial Compliance.

**Status Update:**  Remains in substantial compliance.

**Monitor's Assessment:**  See also 34.a.   The reorganization of the investigative functions under the Inspector General has updated/shortened the time to review critical incidents.

**Monitor's Recommendation:**  None at this time.

e.        CCDOC shall ensure that incident reports, use of force reports and inmate grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria, that it is referred for investigation.

**September 2014 Compliance Status:**  Substantial Compliance.

**Status Update:**  See 31.q.  See the data provided in 38.d.

**Monitor's Assessment:**  See 31.q. See the data provided in 38.d.

**Monitor's Recommendation:**  Continue to monitor the effectiveness of the inmate grievance process.

f.        CCDOC [OPR] shall maintain policies, procedures and practices requiring investigations to resolve issues identified during review of incident reports, disciplinary hearings, or inmate grievances, and determine appropriate remedies, in accordance with generally accepted correctional standards.  At a minimum, CCDOC shall require timely and appropriate investigations of all suicides, serious suicide attempts, inmate-on-inmate violence resulting in serious injury, inmate-on-staff violence, inmate injuries requiring treatment by an outside hospital, inmate injuries of a suspicious nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.), sexual misconduct between inmates, sexual misconduct involving staff, fires, escapes, escape attempts, and deaths.

**September 2014 Compliance Status:**  Substantial compliance

**Status Update:**  Maintain Substantial Compliance

**Monitor's Assessment:** See 331.q

**Monitor's Recommendation:**  See 31.q.

g.        CCDOC [OPR] shall ensure that any investigation reports indicating possible criminal behavior will be referred to the appropriate law enforcement authority.

**March 2014 Compliance Status:**  Substantial compliance

**Status Update:**  Remains in substantial compliance.

**Monitor's Assessment:**  I reviewed a small sample of OPR files as well as data provided regarding referrals for prosecution- two indictments, one sentence pending, seven charged, and nine cases presented and declined.

**Monitor's Recommendation:**  None at this time.

**35.      Investigations** - Investigations at the Facility are conducted by independent departments under the Cook County Sheriff's Office, including the Office of Professional Review, the Criminal Investigations Unit, and the Sheriff's Police Department.  The Cook County Sheriff will assume responsibility for requiring these investigatory units to comply with the relevant provisions of this Agreed Order.

a.        CCODC (OPR) shall maintain comprehensive policies, procedures, and practices for the timely and thorough investigation of alleged staff misconduct, in accordance with generally accepted correctional standards.

**September 2014 Compliance Status:**  Substantial Compliance

**Status Update:**  Remains in substantial compliance.

**Monitor's Assessmen**t:  See previous comments regarding OPR successfully resourcing the actions to address the backlog of cases.

**Monitor's Recommendations:**  Continue to monitor timelines of investigations and resources needed for the work.

b.       Internal investigations shall be conducted by persons who do not have supervisory responsibility for the staff member(s) being investigated.

**September 2014 Compliance Status**:  Substantial compliance.

**Status Update:** Remains in substantial compliance

**Monitor's Assessmen**t:  Nothing has changed.

**Monitor's Recommendations:**  None at this time.

c.       CCDOC (OPR) shall ensure that all internal investigations will include timely, thorough, and documented interviews of all relevant staff and inmates who were involved, or witnessed, the incident in question.

**September 2014 Compliance Status**:  Substantial compliance.

**Status Update:**  Remains in substantial compliance.

**Monitor's Assessmen**t:  See 35.a.

**Monitor's Recommendations:**  See 35.a.

d.       CCDOC [OPR] shall ensure that internal investigation reports shall include all supporting evidence, including witness and participant statements, policies and procedures relevant to the incident, physical evidence, video or audio recordings, and relevant logs.

**September 2014 Compliance Status**:  Substantial compliance.

**Status Update:**  Remains in substantial compliance.

**Monitor's Assessmen**t:  I reviewed a small sample of case files and found them in order.

**Monitor's Recommendations:**  None at this time.

e.       CCDOC (OPR) shall ensure that all investigatory staff will receive pre-service and in-service training on appropriate investigative policies and procedures, the investigative tracking process, investigatory interviewing techniques and confidentiality requirements.

**September 2014 Compliance Status**:  Substantial compliance.

**Status Update:**  Remains in substantial compliance

**Monitor's Assessmen**t:  The Inspector General is identifying training programs to enhance the knowledge and skills of staff currently assigned to investigations as well as those assigned in the future.  Unfortunately there are few, if any, training programs regarding investigations in institutional settings.  There are options for trained individuals to conduct the training.  I also recommended training for employees who will be interviewing inmates with mental illness.

**Monitor's Recommendations:**  Continue to identify training options.  Consider CIT training for investigators.  Training regarding gender responsive and trauma informed strategies may also be helpful to investigators.

f.       CCDOC shall provide all investigators who will be assigned to conduct investigations of use of force incidents with specialized training in investigating use of force incidents and allegations .

**September 2014 Compliance Status**:  Substantial compliance.

**Status Update:**  Remains in substantial compliance.

**Monitor's Assessmen**t:  See 35.e.

**Monitor's Recommendations:**  See 35.e.

g.       CCDOC [OPR] shall ensure that the results of each internal investigation shall be documented in an investigation report.  CCDOC administration shall review the investigation reports, along with the underlying documentation, and take appropriate action.  CCDOC shall implement appropriate remedies based upon the results of internal investigations.

**September 2014 Compliance Status:**          Substantial Compliance.

**Status Update:**  Maintains substantial compliance.

**Monitor's Assessmen**t:  CCDOC administration reviews investigative files through the command channel review process.

**Monitor's Recommendations:**  None at this time.

## 36.     Inmate Disciplinary Process

a.      CCDOC shall maintain policies, procedures, and practices for a formal disciplinary process, including prompt issuance of written disciplinary citations, administrative review and disciplinary reports for alleged minor rule violations, and due process for alleged major rules violations, in accordance with generally accepted correctional standards.

**September 2014 Compliance Status:**  Substantial compliance

**Status Update:**  Maintaining substantial compliance.

**Monitor's Assessmen**t:  The inmate disciplinary process meets the requirements of this Agreed Order.  I reviewed samples of inmate disciplinary reports for the divisions (1, 3, 4, 5, 8RTU, 9, 10, 11, 17).  I sat in on several inmate disciplinary hearings.

CCDOC's use of civilian hearing officers, sitting with the facility's discipline coordinator and CCDOC uniformed discipline coordinator brings professionalism, consistency, and objectivity to the process.  Hearings are held in space consistent with the requirements of the Agreed Order, and/or through the use of real-time video.

Data provided by the Disciplinary Hearing Unit indicates there were 6,373 adjudicated disciplinary write-ups in the first eight months of 2014 (annualized to 9,560).  Compared to CY 2013, this represents an increase of 12%.  Indicators of an improvement in the processing of discipline is a drop of 1% in reports that expired before adjudication, and a drop of 3% in "invalid" reports.  The data indicates a 4% change in the number of reports "not adjudicated" downward from CY 2013 to the annualized CY 2014 data.  An indication of the objectivity of the process is that the percentage of those found not guilty changed from 81% in CY 2012, 82% in CY 2013 to 79% (annualized) for CY 2014.

**Monitor's Recommendations:**   Continue to monitor the trends in the data to not only assess the effectiveness of the process, but also inform inmate behavior management and employee training.

b.      CCDOC shall ensure that inmate disciplinary hearings are conducted in a reasonably private and secure setting.

**September 2014 Compliance Status:**  Substantial compliance

**Status Update:**  Remains in substantial compliance.

**Monitor's Assessmen**t: Space is identified in each division and/or video is used.

**Monitor's Recommendations:** None at this time.

c. CCDOC shall ensure that all inmates placed in lock down status are provided with appropriate due process that has been developed and implemented in policies and procedures, in accordance with generally accepted correctional standards.

In an emergency, the Executive Director of CCDOC may order a lock down of entire areas of the Facility in order to control the situation and address serious security concerns. In such circumstances, it is not necessary to provide disciplinary hearings to each inmate affected by the lock down. However, lock downs of this nature shall be limited to only the time and scope necessary to address the emergency. For the purposes of this Agreed Order, a "lock down" shall not include the routine instances in which inmates are confined to their cells, including periods of count, over night, shift change, movement, and routine contraband sweeps.

**March 2014 Compliance Status:** Substantial compliance.

**Status Update:** Substantial compliance

**Monitor's Assessmen**t: During this tour I did not interview inmates held in Special Incarceration; but did interview inmates in Division 9 protective custody.

I know of no circumstance in which a "lock down" was ordered by the Executive Director, or designee.

**Monitor's Recommendations:** None at this time.

d. CCDOC shall ensure that the disciplinary board's written record accurately reflects the testimony and discussion from the disciplinary hearing, including any recommendations from a mental health professional regarding the extent to which disciplinary charges are related to an inmate's serious mental illness or suggestions for minimizing the deleterious effect of disciplinary measures on the mental health status of the inmate.

**September 2014 Compliance Status:** Substantial compliance

**Status Update:** Remains in substantial compliance

**Monitor's Assessmen**t: As noted above, I reviewed several hundred reports, and sat in on disciplinary hearings. The hearing officer's record is clear. Any statements during the hearing are recorded, and read back to the inmate to assure it is an accurate statement. The inmate is then asked to sign the page indicating he/she agrees with the testimony provided. The hearing officer also tells the inmate if there are additional hearings (for more than one inmate in an incident) that are required, and when the inmate may anticipate a finding.

**Monitor's Recommendations:** See 36.a.

e.    CCDOC shall alert Cermak when inmates are placed in disciplinary segregation or protective custody.

**September 2014 Compliance Status:** Substantial compliance.

**Status Update:** Remains in substantial compliance

**Monitor's Assessmen**t: Cermak is concerned about tracking inmates as they are moved. The new jail management information system (CCOMS), which is scheduled to go live this month, will facilitate the process of identifying the inmates' location.

**Monitor's Recommendations:** Continue to use interagency meetings to identify and problem-solve regarding location issues for inmates.

f.    CCDOC shall permit a Cermak Qualified Mental Health Staff member to serve on the disciplinary board.

**September 2014 Compliance Status:** Substantial Compliance.

**Status Update:** Cermak has declined to have a staff member sit on the disciplinary board. Cermak reports that they have input, most of time, regarding mental health clients, help in pre-hearing segregation, prior to sentencing, and during their time in disciplinary segregation.

**Status Update:** Remains in substantial compliance.

**Monitor's Assessmen**t: Nothing at this time.

**Monitor's Recommendations:** Nothing at this time.

## 37.    Classification

a.    CCDOC shall maintain policies and procedures for an appropriate, objective classification system that separates inmates in housing units by classification levels in order to protect inmates from unreasonable risk of harm. The system shall include consideration of an inmate's security level, severity of current charge, types of prior commitments, suicide risk, history of escape attempts, history of violence, and special needs. CCDOC shall use best efforts to anticipate periods of unusual intake volume and schedule sufficient classification staff to timely classify inmates.

**September 2014 Compliance Status:** Substantial Compliance

**Status Update:** Classification is due to go "live" on October 18, 2014. Although that date is after this tour, the delay in implementation had nothing to do with the Classification Unit, but rather the final stages of the information system

CCOMS). As such, and given the high quality of work, I feel comfortable placing this in substantial compliance.

**Monitor's Assessmen**t: The instruments, manuals, and training is completed. The information regarding the authority and role of Classification is clear. In an unexpected confirmation of this, several of the inmate disciplinary hearings to which I listened were about inmates trying to move to recently vacated cells, being told by officers that they (the officers) didn't have the authority to do that, and hence the inmates disciplinary write-up. So the message has clearly been received by housing unit officers that only Classification can authorize inmate moves.

CCDOC has also designated classification housing in several divisions, making the screening and assessment consolidated and, hopefully, less staff intensive. A question facing jails implementing a new classification system is whether to start over and re-classify inmates, and adjust housing as needed; or wait for the natural movement of inmates in and out of facilities, and also wait for the reclassification that is scheduled. CCDOC has decided to try to review the classification of about 100 inmates per day (hopefully) more – to assure that inmates are housed appropriately. In preparation for this work CCDOC did a "paper exercise" of scoring inmates using the new system, and determining the potential impact on the housing plan. Preliminary data suggest that there will be fewer inmates classified as maximum custody, as would be anticipated with a validated classification system.

**Monitor's Recommendations:** Monitor the implementation of the system. Begin the process of data collection to validate the effect of the system on targets behaviors such as inmate/inmate violence, and other disorder. Use as a template the data collected in the initial validation by Dr. Hardyman. Regularly advise Cermak about the impact of any re-housing so they can anticipate adjust their staffing and medication administration plan.

b.      CCDOC shall ensure that classification staff have sufficient access to current information regarding cell availability on each division.

**September 2014 Compliance Status**: Substantial compliance.

**Status Update:**   CCOMS will provide the data.

**Monitor's Assessment:**  Not only will data be real-time but also Classification will be the nerve center for making housing changes.

**Monitor's Recommendation:**  See 37.a.

c.      CCDOC shall include information on each inmate's assignment to the Special Incarceration Unit "level system" at the Facility in the new Jail Management System, starting with the date the new Jail Management System becomes operational.

**September 2014 Compliance Status**: Substantial compliance.

**Status Update:** Remains in substantial compliance. CCOMS will provide the data.

**Monitor's Assessment:** The Superintendent in Division 9 provided documentation regarding his regular review of inmates in the level system.

**Monitor's Recommendation:** Continue the monitoring of inmates in the level system and in special incarceration.

d.      CCDOC shall provide training and access to all correctional officer supervisors on the full capabilities of the new Jail Management System's classification and inmate tracking system (or any replacement system).

**September 2014 Compliance Status:** Substantial Compliance.

**Status Update:** When the Agreed Order was signed, IMACs was the information system planned for CCDOC. Events have overtaken IMACS and CCOM will be implemented on 10/18/14.

**Monitor's Assessment:** "Super users" were trained to provide a resource to all employees. Pre-service training will include information about CCOMs. As these system evolve, they become more "user-friendly" especially for the younger generation of employees who grew up computer savvy and literate. I saw an overview of this system in March 2014 and was impressed with it's flexibility and ability to provide meaningful management information in real-time.

**Monitor's Recommendation:** Evaluate any issues during implementation and address in pre-service and in-service training.

e.      CCDOC shall provide ongoing internal and external review and validation of the inmate classification system to ensure its reliability and objectivity.

**March 2014 Compliance Status:**      Substantial compliance.

**Status Update:** The initial validation report was provided in March 2014. The challenge for CCDOC is to develop it's own capacity to periodically re-validate the classification system.

**Monitor's Assessment:** For a system as large as CCDOC, the re-validation of the

classification system should take place every 3 – 2 years.  CCOMs may provide the ability for on-going assessment and adjustments based on the outcomes.

**Monitor's Recommendation:** I told CCDOC that when I am touring in September/October 2015 I will want to see their validation plan, plus any results of preliminary reviews.  This will include an assessment of changes to the housing plan for the organization.

## 38.    Inmate Grievance Process

a.        CCDOC shall maintain policies and procedures to ensure inmates have access to an adequate grievance process and to ensure that grievances may be accessed and filed confidentially, without requiring the intervention of a correctional officer, in accordance with generally accepted correctional standards.   These policies and procedures should be applicable and standardized across all the Facility divisions.

**September 2014 Compliance Status:** Substantial Compliance

**Status Update:**  CCDOC has implemented the compound wide the revised grievance process.  There are multiple layers of quality control and review of not only inmate individual grievances, but also staffing, and the trends.   An early warning system has also been established.

**Monitor's Assessmen**t:  CCDOC has implemented recommendations contained in previous monitoring reports along with their own on-going refinements to the inmate grievance process.   CCDOC has revised CRW staffing, including supervision, at the facility level, and is collecting and analyzing data to inform management decisions.  Facility superintendents are involved in reviewing grievances, including emergency grievances.  Documentation from division level meetings between CRWs and superintendents were provided that discussed the types of grievances received and remedies.  Employees are counseled regarding their interactions with inmates if a review of the grievance indicates remediation is necessary.  The Sheriff's Office of Legal Council reviews a sample of grievances and provides specific analysis and recommendations to the Inmate Services Department.  An "early warning" system has been created to identify employees who are disproportionally involved in grievances, as well as highlight emerging issues.  Other quality control includes review of average response times.  Inmate Services also has a system for collecting grievances including using facility staff if for some reason the Correctional Rehabilitation Worker (CRW) is not available.  This collection is also monitored.

Division 9 is proactively keeping in-depth data regarding grievances in that Division.  The leadership reports that their counseling sessions with staff who are identified as needing remediation has been effective in improving inmate/staff

interactions.

I reviewed a sample of grievances to assess compliance with CCDOC's directive and generally accepted correctional practice and was satisfied with the result of the review.

A concern was raised by Cermak that there are grievances forwarded for their response which are not medically related – for example, diets. They are concerned that this will skew the data. CCDOC and Cermak will discuss how to handle these grievances and increase quality control. In 2013, CCDOC's data indicates about 53.7% of grievances were related to medical, mental health and/or dental care; increasing to 60% year to date for 2014. Cermak is devoting additional resources to respond to grievances, and is working to decrease response time.

CCDOC's data indicates that there may be approximately a 50% increase in the number of inmate grievances filed from 2013 to 2014 (5599 for CY 2013 and an annualized number of 8695 for CY 2014). While continued analysis of the trends is needed, the increase in grievances filed may be the result of the full roll-out of the revised system, and, perhaps inmates' level of confidence that a response will be provided if a grievance is filed. In fact, in my interviews with inmates almost all indicated that they had not problem receiving an inmate grievance form; and none had any issues with receiving responses (while some did not agree with the response).

**Monitor's Recommendations:** Continue to monitor inmate grievances, quality control, and trend analysis of issues. Work with Cermak to develop a process to identify incorrectly or inappropriately referred grievances.

b.      CCDOC shall ensure that the grievances receive appropriate follow-up, including informing the grievant of the outcome, providing a timely written response, and tracking implementation of resolutions.

**September 2014 Compliance Status:** Substantial Compliance

**Status Update:** See 38.a.

**Monitor's Assessmen**t: See 38.a.

**Monitor's Recommendations:** See 38.a.

c.      CCDOC shall ensure that grievance forms are available on all units and are available in Spanish. CCDOC shall ensure that there is adequate opportunity for illiterate inmates and inmates who have physical or cognitive disabilities to access the grievance system.

November 4, 2014                                                                                                    49

**September 2014 Compliance Status:** Substantial Compliance

**Status Update:** Remains in substantial compliance

**Monitor's Assessmen**t:  I found grievance forms readily available in the housing units I toured.

**Monitor's Recommendations:** See 38.a.

d.        CCDOC shall ensure that inmate grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria, are referred for investigation.  A member of the management staff shall review the grievance tracking system regularly in order to identify areas of concern.

**September 2014 Compliance Status:** Substantial Compliance

**Status Update:** See 31.q.  Maintains Substantial Compliance

**Monitor's Assessmen**t:  The Inmate Services Department reports that in the first 8 months of 2014, a total of 343 grievances were referred to OPR regarding allegations of staff physical misconduct or failure to protect.  This is 6.5% of all grievances filed during this time period.  In CY 2013, the Department reported that 277 grievances were referred to OPR, or 4.4% of all grievances. See also 31.q.

**Monitor's Recommendations:** See 31.q.

### 39.     Access to Information

a.        CCDOC shall ensure that newly admitted inmates receive information, through an inmate handbook or orientation video, regarding the following areas:  facility rules and regulations; how to report misconduct; how to report sexual abuse or assault; the process for accessing medical and mental health care; emergency procedures; rules for sending and receiving mail; the visitation process; facility schedule; the disciplinary process; and how to seek redress of grievances.

**September 2014 Compliance Status:** Substantial compliance

**Status Update:** Substantial compliance

**Monitor's Assessmen**t: I was not able to ask every inmate I interviewed if they had an inmate handbook.  The women just moved to RTU- fifth floor didn't have a handbook, which I advised the Superintendent.   I'll reevaluate next tour.

**Monitor's Recommendations:** CCDOC conduct their own audit of whether

November 4, 2014                                                                         50

inmates have handbooks, and develop action plans, if necessary.

b.      CCDOC shall ensure that materials on facility rules and services are available for non-literate and non-English speaking inmates.

**September 2014 Compliance Status:** Substantial compliance.

**Status Update:** Substantial Compliance maintained

**Monitor's Assessmen**t: I will assess again during the April 2015 tour.

**Monitor's Recommendations:** Routinely, facility superintendents should assess how non-English speakers housed in their divisions are receiving information and services.

**40.**     CCDOC shall provide training and supervision to all correctional officers and supervisors sufficient to implement the provisions of this Agreed Order.

**September 2014 Compliance Status**: Substantial Compliance.

**Status Update:** Continuing compliance

**Monitor's Assessmen**t: There are no issues with continuing compliance.

**Monitor's Recommendations:** Nothing at this time.

**41.     Inter-Agency Agreement**

a.      CCDOC shall enter into a written Inter-Agency Agreement with Cermak that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility. The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order.
b.      Cermak shall enter into a written Inter-Agency Agreement with CCDOC that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility. The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order.

**March 2014 Compliance Status**:        Substantial compliance.

**Status Update:** Substantial Compliance

**Monitor's Assessmen**t: The inter-agency meetings have evolved so that there are more discrete working groups, who meet more often.   According to CCDOD the current inter-agency meetings include: Mental Health, Suicide Prevention, Compound Housing, Morning "Huddle", Jail Management, Level

November 4, 2014                                                                    51

System/SI Review; and a Cermak/CCDOC committee to address sanitation in Cermak.

**Monitor's Recommendations:** Update the relevant written directive regarding inter-agency meetings;  assure that summary minutes/notes are taken at each meeting that are shared with the members and relevant staff – and that also measure progress.

**69.**     CCDOC shall ensure that security staff posts will be equipped, as appropriate, with readily available, safely secured, suicide cut-down tools. Coordinate with Dr. Metzner

**September 2014 Compliance Status**:  Substantial Compliance

**Status Update:**  Substantial Compliance

**Monitor's Assessmen**t:  Data provided by CCDOD indicates that for the period 1/1/14 – 9/14/14 the rescue tool was employed 60 times.  The distribution of reported uses are:  1.67% Division 2; 1.67% Division 4; 6.67% Division 6;  8.33% Division 8;  38.33% Division 9;  31.67% Division 10; 5% Division 11; 5% Cermak; and 1.67% unspecified location.

**Monitor's Recommendations:**  No recommendations at this tine.  Continue monitoring through the Suicide Prevention Committee.