UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.

COOK COUNTY, ILLINOIS;
THOMAS DART, COOK COUNTY
SHERIFF (in his official capacity);
TONI PRECKWINKLE, COOK COUNTY
BOARD PRESIDENT (in her official capacity);
COOK COUNTY BOARD OF
COMMISSIONERS  (in their official capacity),

        Defendants,

No. 10 C 2946

Judge Virginia Kendall

---

# Monitor Esmaeil Porsa's Report No. 9
# February 3, 2015

---

Esmaeil Porsa, MD, MPH, CCHP
Associate Chief Medical Officer
Senior Vice President
Professional and Academic Affairs
5201 Harry Hines Boulevard
Dallas, Texas 75235-7746
esmaeil.porsa@phhs.org

# Cook County Jail
## Ninth Monitoring Report

## Esmaeil Porsa, MD, MPH, CCHP

## November 2014

## Executive Summary

During the week of November 3rd, 2014, the Monitoring Team visited Cook County Jail. The team included: Dr. Esmaeil Porsa, MD, MPH, CCHP, Dr. Muthusamy Anandkumar, MD, MBA, Madeleine LaMarre FNP-BC, Catherine Knox, MN, RN, CCHP-RN and Linda Pansulla, RN, MBA, CCHP. The Monitoring Team visited the majority of the Cook County Jail medical facilities and housing units with special focus on the recently occupied RTU 4th and 3rd floors. We also interviewed various Cermak and Cook County Department of Corrections (CCDOC) leadership and front line staff as well as Cook County Jail inmates. We would like to extend our most sincere thanks to all the Cermak and CCDOC leadership and staff for their hospitality and generosity with their time and resources. Cook County Jail Cermak and CCDOC personnel were completely cooperative and helpful in this monitoring visit. The Monitoring Team enjoyed full and unhindered access to all areas and staff.

Our monitoring visit began on Monday November 3rd, with a short introductions meeting that included the top executive leadership of the Cook County Health and Hospital System (CCHHS) including a member of the Cook County Health and Hospital System's Board of Managers Quality Committee. This meeting was followed by a visit to the new RTU floors

There has been continued progress in some areas, none more noticeable than the general cleanliness of the clinical areas, in particular the third floor of Cermak (medical infirmary). Further, opening and occupation of the RTU 4th and 3rd floors has allowed for reduced crowding of the medical infirmary as well as other divisions. This in turn has allowed Cermak to convert to nearly 100% hospital bed housing for the medical infirmary patients. For the first time ever during a monitoring visit, there was no "boat" housing of the medical infirmary patients. As mentioned previously, there was also a very real and noticeable improvement in the overall cleanliness of other patient care areas and housing units. Some cleanliness issues persist and will be detailed in this report. In the medical program, all areas of substantial compliance remained in substantial compliance. However three areas of substantial compliance are at risk of downgrading to partial compliance if certain conditions that are detailed below are again observed in our next monitoring visit in April 2015. These areas are Intake Screening, Health Assessments and Urgent Care. There were new areas that moved up to substantial compliance. These included the Mortality Review and Grievances. Obstetrics care and intake screening remain highly functional and reliable and serve as models of excellence for the rest of the health system.

Staffing, while gradually improving, continues to challenge the day to day operations of the Cook County Jail Health programs and is contributing to the difficulty that the system is facing in initiating/maintaining process improvement plans. This area, however, has steadily improved. Cermak currently has its lowest overall vacancy rate since December of 2013 when the new staffing plans were put in place.

There were unfortunately two areas that were downgraded to non-compliance from partial compliance. These were Access to Care and Infirmary Care. In these areas, the Monitoring Team observed persistent health care delivery issues that have not demonstrated improvement or have actually worsened since our last monitoring visit in May of this year. Access to care remains the biggest challenge. This is due to staffing, training, and supervision issues. Inmates continue to lack timely access to care which increases their risk of harm. The infirmary care issues included a general lack of timely and consistent nursing assessments and lack of a comprehensive detoxification program. These will be discussed in detail in this report. During this visit, the Monitoring Team found Cermak and Cook County Health and Hospital System's leadership to be open to the Monitoring Team's overall findings and recommendations.

The Dental program was highlighted during this visit as the most improved aspect of health care at Cook County Jail. The Monitoring Team was presented with a detailed and thoughtful response to our May 2014 report and recommendations. This report also included various action plans that have been put into practice and refined over the past several months. These will be discussed in detail in the body of this report. This area, unfortunately, remains in partial compliance, mainly due to time delays that currently plague the health services request process (see the section on Access to Care) at Cermak.

The Monitoring Team believes that the delivery of effective, efficient, safe and high quality care requires the following elements:

1) Leadership that is committed to this ideal

2) Policy and procedures that can clearly and concisely articulate the vision and mission of the organization to its staff

3) Training to ensure that:
   a) Staff adhere to the policy and procedures
   b) Functions are performed uniformly across the system

4) Self-monitoring and continuous program improvement to:
   a) Create accountability
   b) Identify variance and respond to challenges that are sure to occur
   c) Establish best practices

Cermak has faced tremendous challenges in the recent past related to its ability to meet the health care needs of the Cook County Jail inmates. These included a lack of appropriate infrastructure and staffing issues in all areas of Cook County Jail health particularly leadership positions, front

line nursing and provider staff in both medical and mental health. Cermak now enjoys the following:

a. The RTU is now almost fully open and is expected to be completely open and operational in the next few weeks.
b. A leadership team is almost entirely in place. This includes a new Director of Patient Care Services, a new Director of Mental Health Services and a new Director of Quality Improvement.
c. A significant number of new nurses and providers have been on boarded

Based on these recent changes and our interactions with Cermak health care and leadership staff, the Monitoring Team sincerely believes that Cermak is poised to enjoy a period of rapid improvement. We remain optimistic and look forward to learn about the various achievements and quality improvement milestones that Cermak is sure to achieve in the next 3 to 6 months.

### Introduction and Facility Outline

On the first day of our visit, November 3, 2014, the population of Cook County Jail was reported as 8,575 plus 474 inmates in the drug treatment program and 160 female inmates in Women's Residential Program and 35 in the VRIC Boot Camp. There were 17 inmates at Stroger Hospital. The distribution of inmates among the various "Divisions" is reported in the body of this report.

### Definitions and Organization

This report is formatted in the manner requested by the Department of Justice and closely follows the Agreed Order. The report includes four parts for each section of the Agreed Order.

In part one we rewrite verbatim the pertinent portion of the Agreed Order. This first part is labeled Remedial Measure of Agreed Order.

The second part is the overall compliance rating labeled Compliance Assessment. This is the assessment that the Monitoring Team experts make based on judgment, data, and chart reviews. The Compliance Assessment has three possible scores: substantial compliance, partial compliance, and noncompliance. Substantial compliance means that the Monitoring Team experts determine that Cook County Jail has satisfactorily met most or all components of the standards of care for the particular provision. Partial compliance means that some remaining problems exist. Non-compliance means that much work needs to be done before compliance is met.

**New:** When indicated, the Monitoring Team will additionally assess the various components (sub-bullet points) of certain areas of the Agreed Order. Our goal is to highlight areas of success and bring focus to areas that need further refining and attention.

The third part is the factual basis for forming the opinion in the Compliance Assessment. This will be as data driven as possible. For patient care areas, chart reviews form a substantial portion of this review. Touring, interviews, and reviewing data sources is also an important means of making assessments.

The fourth part is recommendations. These recommendations are our view of what needs to be accomplished to attain compliance. This will include the Monitoring Team's recommendations for self-monitoring activities and audits.

Finally patient chart review material is provided as a separate confidential document. These chart review documents will be sent to Cermak Health Care leadership. If the Department of Justice or CCHHS desires these documents they will be sent upon request.

## B. HEALTH CARE SERVICES: ELEMENTS COMMON TO MEDICAL AND MENTAL HEALTH

### 41. Inter-Agency Agreement

a. CCDOC shall enter into a written Inter-Agency Agreement with Cermak that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility. The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order.

b. Cermak shall enter into a written Inter-Agency Agreement with CCDOC that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility. The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order.

**Compliance Status**: This provision remains in substantial compliance.

**Status Update:** Received and reviewed.

**Monitor's Findings:**

The Monitoring Team reviewed minutes of interagency meetings. We additionally discussed this interagency relationship with Cermak and CCDOC leadership who described the interaction as cooperative and conducive to advancing the mission and vision of the Cermak Health Services. We also solicited the views of the front line healthcare and correctional staff with regard to their mutual working relationship. Healthcare personnel were specifically asked about the following elements related to their daily work:

a. Do you feel safe while rendering care?
b. Do you have enough clinical space to render care?
c. Do you have enough privacy while rendering care?
d. Do you have adequate support from the correctional officers to render care?

The Monitoring Team received positive responses to almost all of these questions from nearly all personnel. There were also a few negative reports related to slow response/inaction or hostile behavior by the correctional officers. These reports, however, are actively discussed and pursued in the joint leadership meetings. The interval meetings between Cermak leadership and the Sheriff, as well as the meeting with CCDOC leadership and Cermak leadership, continue to occur. There is also a recurring daily morning huddle with medical, administrative, custody, pharmacy and nursing leadership to verify and correct housing assignments for acute medical/mental health inmates and to verify that inmates on high acuity medications are in the

correct housing unit to receive dose by dose medications. This is, as viewed by the Medical Monitor, consistent with the intent of the Agreement.

This area has been in substantial compliance for more than 18 months and as such will no longer be actively monitored by the Monitoring Team in our future visits until and unless we receive information to negatively impact our general impression of this area.

**Monitor's Recommendations:** None.

## 42. Policies and Procedures

Cermak shall provide adequate services to address the serious medical and mental health needs of all inmates, in accordance with generally accepted professional standards. The term "generally accepted professional standards" means those industry standards accepted by a majority of professionals in the relevant field, and reflected in the standards of care such as those published by the National Commission on Correctional Health Care ("NCCHC").

a. Cermak shall develop and implement medical care policies, procedures and practices to address and guide all medical care and services at the Facility, including, but not limited to the following:
   i.    access to medical care
   ii.   continuity of medication
   iii.  infection control
   iv.   medication administration
   v.    intoxication and detoxification
   vi.   documentation and record keeping
   vii.  disease prevention
   viii. sick call triage and physician review
   ix.   intake screening
   x.    chronic disease management
   xi.   comprehensive health assessments
   xii.  mental health
   xiii. women's health
   xiv.  quality management
   xv.   emergent response
   xvi.  infirmary care
   xvii. placement in medical housing units
   xviii. handling of grievances relating to health care
   xix.  mortality review
   xx.   care for patients returning from off-site referrals

b. Cermak shall develop and implement policies, procedures and practices to ensure timely responses to clinician orders including, but not limited to, orders for medications and laboratory tests. Such policies, procedures and practices shall be periodically evaluated to ensure timely implementation of clinician orders.

**Compliance Status**: This provision remains in partial compliance.

**Status Update:** Received and reviewed.

**Monitor's Findings:**

Cermak has hired consultants to aid with the writing/updating of the policy and procedures. While we applaud this effort, the Monitoring Team asks that policy and procedures take into consideration the elements of the agreed order so that the two do not conflict. While some of the policy and procedures are still pending review and update, most of the policy and procedures have been updated. Most of the updates, however, have been within 10 days prior to our visit and as such have not been widely distributed among the staff nor has there been adequate training on the new policies. This limited the ability of the Monitoring Team to assess the healthcare staff's knowledge of the policy and procedures. The Monitoring Team would like to acknowledge that Cermak policies and procedures now include the approval of the nursing leadership, particularly for those policies that are predominantly nursing driven. The lack of updated policy and procedures that can serve as the training manual for the staff has the deleterious outcome of allowing variability across the different clinical areas even with regard to the same activities. This will be discussed further in the Staffing and Training section of this report. The absence of current policy and resulting variation in practice is also discussed in Section 53. Treatment and Management of Communicable Disease and Section 56 Medication Administration of this report; please see those sections for specific recommendations regarding policy development or revision.

**Monitor's Recommendations:**

1. Review and update all policy and procedures to match the expected practices and the elements of the Agreed Order. The Monitoring Team specifically asks for focused attention on refining the following policy and procedures:
   a. Access to care (sick call)
   b. Acute care (infirmary)
   c. Detoxification
   d. Chronic disease management

e. Medication administration

2. Train all staff with regard to current and new policies to ensure that policies are followed facility wide. Document this training so that leadership can later demand accountability.

3. Develop a policy to establish an acuity based provider visit frequency for the infirmary patients to ensure that all patients are evaluated by the infirmary providers on a routine basis instead of an "as needed" basis.

4. Revise Intake Screening and Health Assessment policies and procedures to identify inmates at risk of alcohol and drug withdrawal and initiate clinical monitoring.

5. Include routine and frequent use of CIWA-Ar and COWS in the nursing assessment as part of Cermak's policy and procedures on alcohol/benzodiazepine and opiate detoxification. Monitoring detoxification should occur regardless of the housing location of the inmate.

6. Begin to treat asymptomatic alcohol/benzodiazepine detoxification patients using Cermak's currently established detoxification protocol. The detoxification protocol should be initiated without any delay and as soon as the information about chronic use of alcohol and/or benzodiazepine is available.

7. Develop and/or revise other policies as discussed more specifically in other sections of this report.

## 43. Medical Facilities

a. CCDOC will work with Cermak to provide sufficient clinical space, as identified by Cermak staff, to provide inmates with adequate health care to meet the treatment needs of detainees, including: intake screening; sick call; medical and mental health assessment; acute, chronic, emergency and specialty medical care (such as geriatric and pregnant inmates); and acute, chronic and emergency mental health care.

b. Cermak shall make known to CCDOC and Cook County its needs for sufficient clinical space, with access to appropriate utility and communications capabilities, to provide inmates with adequate health care to meet the treatment needs of inmates including: intake screening; sick call; medical and mental health assessment; acute, chronic, emergency and specialty medical care (such as geriatric and pregnant inmates); and acute, chronic and emergency mental health care.

c. Cook County shall build out, remodel, or renovate clinical space as needed to provide inmates with adequate health care to meet the treatment needs of detainees as identified by Cermak staff including: intake screening; sick call; medical and mental health assessment; acute, chronic, emergency and specialty medical care (such as geriatric and pregnant inmates); and acute, chronic and emergency mental health care.

d. Cermak shall ensure that medical areas are adequately clean and maintained, including installation of adequate lighting in examination rooms. Cermak shall ensure that hand washing stations in medical care areas are fully, equipped, operational and accessible.

e. Cermak shall ensure that appropriate containers are readily available to secure and dispose of medical waste (including syringes and medical tools) and hazardous waste.

f. CCDOC shall allow operationally for inmates reasonable privacy in medical and mental health care, and shall respect the confidentiality of inmates' medical status, subject to legitimate security concerns and emergency situations. Reasonable privacy typically includes sight and hearing privacy from other inmates, and hearing privacy from staff that are not providing care.

g. Cermak shall make known to CCDOC and Cook County the structural and operational requirements for inmates' reasonable privacy in medical and mental health care. Cermak shall provide operationally for inmates' reasonable privacy in medical and mental health care and shall respect the confidentiality of inmates' medical status, subject to legitimate security concerns and emergency situations. Reasonable privacy typically includes sight and hearing privacy from other inmates, and hearing privacy from staff that are not providing care.

h. Cook County shall build out, remodel or renovate clinic space as needed to allow structurally for inmates' reasonable privacy in medical and mental health care, as identified by Cermak and CCDOC staff.

i. Cook County shall begin construction of the new clinical space within 3 months of the effective date of this Agreed Order. It is expected that the project will be completed within nine months of the effective date of this Agreed Order. Prior to the completion of the new clinical space, Cook County and DFM will work with Cermak to address the most serious concerns regarding clinical space, to the extent possible in the current facility.

**Compliance Status**: This provision remains in partial compliance.
   a. Substantial compliance
   b. Substantial compliance
   c. Substantial compliance
   d. Non-compliant
   e. Partial compliance
   f. Partial compliance
   g. Substantial compliance
   h. Substantial compliance
   i. Substantial compliance

**Status Update:** Cermak leadership provided the Monitors with a status update dated 10/27/2014. We reviewed the update in preparation of this report.

**Monitor's Findings:**

Since our last site visit in May 2014, CCDOC and Cermak continue to make improvements in providing appropriate clinical space for medical, dental and mental health care. Division VIII (RTU) is now fully occupied which has reduced overcrowding in Cermak medical and mental health infirmaries. This is a significant improvement since our last visit.

Previous reports have noted lack of uniformity in clinic operations including procedures for checking emergency equipment as well as sanitation and disinfection practices. This was apparent when we toured the RTU and noted that different floors had different types of equipment (e.g., crash cart versus emergency response bag), and methodology for documenting checks of emergency equipment. Likewise, we noted lack of uniformity with respect to clinic operations such as sharps control and checking medication expiration dates.

While we found that sanitation has modestly improved in some Divisions and clinical areas, we also found many areas that were unsanitary. We are particularly concerned with lack of sanitation in the Cermak Urgent Care and dialysis unit. These findings are due to the absence of a system to maintain adequate sanitation and disinfection in the Cermak facilities and medical clinics. This has been identified repeatedly in reports by Harry Grenawitzke, the Monitor for Fire, Life Safety and Environmental Health, most recently in his 10/20/14 report. In previous reports, he identified a lack of leadership and accountability for addressing poor sanitation and disinfection at Cermak and medical clinics.

Following his report, CCDOC issued directives related to sanitation that were provided to the Monitoring Team during this site visit (e.g., General Order 24.9.9.0 Sanitation, Fire, Health, and Life Safety Inspections and 24.11.1.1 Sanitation, Fire, Health and Life Safety Plans and Reporting). These orders define how safety and sanitation is addressed in the areas for which CCDOC is responsible. Concerns about sanitation brought forward by inmates and observations made by the monitoring team about lack of sanitation in the housing areas are correctable with full implementation of these general orders. Cermak should use these directives as examples to develop the procedural guidance and tools specific to the clinical areas.

During this site visit, Mr. Grenawitzke met with Cermak and CCDOC to discuss his findings and recommendations about moving the program forward.

Our findings by Division are described below.

**Division I** is a maximum-security unit with a bed capacity of 1,242 inmates and current census of 1,212.[1] It is the oldest part of the jail. The clinic was clean and well organized, and examination rooms were well-lighted, and adequately equipped and supplied. Each examination room had a functional sink with soap and disposable hand towels. All examination rooms contained personal protective equipment and sharps and biohazardous waste disposal containers.

---

[1] All bed capacity and census counts were obtained from the Sheriff's Daily Report dated 10/31/14.

There is an inmate waiting room that consists of benches. A correctional officer sits at a desk in the waiting room to maintain order and facilitate clinic flow. Adjacent to this area, a CMT sits at another desk. The CMT takes vital signs and preps patients for their appointments. Although we did not observe breaches of privacy and confidentiality, this arrangement should be reevaluated to determine whether additional privacy safeguards can be provided. We also observed a provider seeing a patient in an examination room, noting that adequate auditory privacy was provided. Staff expressed no concerns about their safety or custody cooperation.

Emergency response equipment and supplies were available, including an automatic external defibrillator (AED). The monitoring team reviewed emergency equipment logs from August through October 2014. The August log showed that emergency equipment was not checked 10 of 31 days; in September it was not checked 3 days; and in October not checked 2 days. All emergency medications were current.

Previous reports described clinic ceiling leaks, flooding from heavy rains, and ventilation issues in the medication room. However, staff reported no further clinic ceiling leaks or flooding and that ventilation issues in the medication room has been corrected.

**Division II**, Dorm I is a three-story building with clinic space on the first floor. Detainees are housed on floors two and three in eight dormitories. The bed capacity of Dorm 1 is 384 and current census is 342.

All clinical areas located in dorm I had adequate working lighting and sinks. In addition, there was waterless hand sanitizer located in each of the exam rooms and nursing areas. During this visit the monitoring team noted expired stock supplies in the closet. Additionally, per practice, the contents of the emergency response bag are inventoried only when the bag has been opened, then it is restocked and retagged. The plastic tags had inventory numbers. The emergency response bag did not have an accompanying log that documented staff checked it daily. Upon inspection of the bag there were no expired supplies noted.

Infection control practices were observed to be deficient. For instance, both nursing staff and providers interviewed were not able to demonstrate knowledge of procedures for disinfection of exam rooms between patients.

Division II, Dorm 2 is a "step-down", outpatient medical/mental health housing unit consisting of three floors with ten dormitory-style living units for a total bed capacity of 464 and current census of 461 detainees.

Clinic space for dorm 2 is located on the first floor. Due to high foot traffic, the need for painting walls and floors is frequent, and is on a routine maintenance schedule. Additionally stairwells were dirty and had significant debris. There were no noticeable or reported structural, electrical or plumbing concerns.

All exam rooms in this dorm were visibly clean with working medical equipment. Staff monitors refrigerator temperatures daily and all measurements were within normal ranges. There were no outdated medications in the refrigerator. Inventories of sharps and medical tools were not accurate. According to the log these inventories were incorrect for months and picked up by the Monitoring Team. Additionally, the AED pads were outdated for over 6 months but the log reflected that dates were current.

Division II, Annex has been designated as a minimum security "non-gang" unit. It is a dormitory style unit with multiple dormitories. On the day of the inspection, the census was 428 detainees. There is no medical clinic in the building. All medical services are provided in dorm 1 or Cermak Urgent Care Center.

Division II, dorm 3 is a general population, minimum and medium security area consisting of three floors with three tiers per floor. The bed capacity is 428 beds and current census is 420 detainees.

All clinical areas located in dorm 3 were adequately lighted with functioning sinks.

The general cleanliness was poor. There were numerous fly strips hanging in the officer's station. Staff was not aware of any cleaning schedules. Moreover, infection control practices were observed to be deficient. For instance, both nursing staff and providers interviewed were not able to demonstrate knowledge of disinfection procedures in exam rooms between patients.

In dorm 3 rugs were worn and posed a fall risk for both staff and inmates.

Expired supplies were identified on the stock shelves. Examples of items found both in stock and in use were iodoform and saline. Sharps counts were correct; the refrigerator temperature log was accurate and checked daily. There were no outdated medications in the refrigerator.

Division II, dorm 4 is a minimum security general population and detainee dietary worker housing area consisting of two very large dormitory-style living units. The bed capacity is 684 and current census is 673. There is no medical clinic in this building. All medical services are provided to inmates in Dorm 1 or Cermak Urgent Care.

3 Annex is a single floor building with multiple dormitory style housing areas. It is a minimum security housing unit with a current census of 216. The medical clinic is open 8 hours per day and is staffed with one RN and CMT. The medical clinic is a large area with three exam rooms. The clinic area was clean and physical examination equipment was functional and in good condition.

The health care personnel interviewed were knowledgeable about disinfection practices to be performed between each patient encounter. Personal protective equipment was available to staff.

With respect to emergencies, staff indicated that patients are transported immediately to the Cermak Urgent Care Center for treatment. Emergency response equipment was available in the clinic and found to be in working order. Supplies were available and routinely checked per policy.

There were no outdated medications in the refrigerator. No temperature log was available for review; nursing staff reported the pharmacy is responsible for keeping the log. This is not currently in policy and procedure.

On the day of the visit, environmental temperatures were uncomfortably hot throughout the building. Inmates were observed without shirts on due to the temperature in the dorm area. The number of fans and cords in the medical and dorm areas posed a hazard. This was also noted in the Eighth report.

**Division III** was closed at the last site visit. It now houses female inmates that were transferred from Division IV several months prior to the site visit. Division III has a capacity of 326 and a current population of 301 inmates. On the day of our tour neither the Nurse Coordinator or registered nurse that normally works in the clinic were present and we were unable to interview them about clinic practices.

The clinic waiting room was small, accommodating approximately six inmates. The Monitoring Team turned on the sink in the clinic waiting room and brown water came out.

The clinic contained a medication room and exam room. As the nurse was not present we deferred further monitoring until the next visit.

**Divisions IV and V** are closed.

**Division VI** has a bed capacity of 984 and the census at the time of the site visit was 890. This Division houses medium custody inmates, a segregation unit, and a unit for transgender inmates. The clinic is staffed daily from 7:00 am to 8:30 pm by four registered nurses and two certified medical technicians. Dr. Ledvora is the sole provider and is scheduled to provide primary care three and a half days a week.

During the Monitoring Teams' tour of one of the segregation units; we observed cells to be dirty with accumulated matter on the floors; however the day room was clean.

The clinic consists of a large waiting room, a treatment room, a reception alcove, several exam rooms, a room for medical equipment and supplies, and a break room with staff lavatory. There is only one functional exam room available for nurse sick call; a second room is too isolated and currently is used for storage. A second exam area should be established closer to the front of the clinic. Also, the exam table in this second room is torn and should be recovered. Personal protective equipment (PPE) and hazardous waste containers were available and appropriately

mounted in the clinic. Nursing staff were observed not to replace the paper used on the exam table between patients.

Emergency response equipment was present and operational and there is documentation that staff check equipment daily. The contents of the emergency bag are inventoried on the first of the month and any time the bag has been used. Numbered red tags are used to secure the contents in the bag and these are documented as intact on a daily basis. After the bag is opened new tags are placed and the numbers recorded in the log. Expiration dates are listed for those medications kept in the emergency bag and these were up to date. Not all medications are available since the decision has been made to eliminate medication from the emergency response equipment.

The inventory of medical tools and needles was accurate and well organized. No outdated medications, medical or laboratory supplies were found. Daily temperatures in the refrigerator are monitored and no deviations from the recommended range recorded.

The physician and two registered nurses were interviewed. No concerns were expressed about their safety. Instead they described a collaborative and respectful relationship, especially with the officers who staff the clinic on a regular basis. No one expressed a need for better or more appropriate clinical space or equipment.

**Division VIII** (RTU) consists of four floors with a maximum bed capacity of 977 inmates and current census of 921 inmates. All housing units are direct observation, and three of four floors contain high acuity medical and mental health populations. The second floor is currently occupied by general population inmates but in the future will house inmates requiring monitoring for alcohol and drug withdrawal. The 3rd floor houses high medical acuity male inmates; the 4th floor houses high mental health acuity male inmates; and the 5th floor houses high medical and/or mental health acuity female inmates.

On the first day of the site visit, the Monitoring Team toured health care clinics on the 3rd, 4th and 5th floors. There were three examination rooms on each floor, two are typically used by providers and one used by nurses for nurse sick call and phlebotomy. Each examination room was adequately lighted, equipped and supplied with access to a sink, soap and disposable hand towels. The exception was on the 4th floor there were no oto-ophthalmoscope heads in the examination room used by the nurse. These were located and installed later in the day.

All rooms had personal protective equipment, sharps and biohazard waste containers; however on the 5th floor, a large sharps container was not secured when we entered the exam room. On the 3rd floor a sharps disposal container secured to the wall was over ¾ full and needed to be replaced.

The Monitoring Team noted variations in clinic practices in emergency response equipment, sharps and needle control practices, medication room management, and sanitation and disinfection.

Some, but not all clinics had emergency response bags. The 5th floor had a crash cart, but not an emergency response bag. This may present logistical transport issues for staff when responding to emergencies. Medications in the crash cart were current, but at least one medication was due to expire at the end of November. Staff reported that nurses, rather than pharmacy staff are responsible for removing expired medications from the crash cart and emergency response bags. Cermak health care leadership advised the Monitoring Team that all emergency medications will be removed from the emergency response bags and made available through Pyxis instead. The Monitoring Team has concerns about the ability of health care staff to respond to certain types of medical emergencies (e.g., severe hypoglycemia, anaphylaxis, etc.) if all medications are removed from the emergency response bag.

For clinics with emergency response bags, the method of securing the bags (plastic locks) and documentation of how bags were checked varied significantly. On the 4th floor, plastic locks for the bag did not have inventory control numbers. The emergency bag on the 3rd floor was secured with a numbered plastic lock. The logs staff use to document checks of the emergency response bag and equipment also varies and should be standardized.

With respect to needle and sharps control, on the 3rd floor, the sharps cabinet was unlocked when we entered the medication room. Lancet and syringe counts were not accurate. The team found a syringe that had fallen behind the refrigerator.

Medication vials were dated when they were opened but not when they would expire. We discussed with health care leadership the use of labels designed specifically for this purpose. There was also some confusion among nurses about who was responsible for checking for expired medications in the refrigerator. This should be clarified in policy and procedure and staff trained. Nurses should always check the date on medication vials and never administer medications that have expired.

There is no published schedule of sanitation and disinfection schedules in the clinics.

In previous reports the Monitoring Team became aware that electrical outlets that should have been installed in housing units for inmates with C-PAP machines were removed from construction plans. The current plan is to install cages containing rechargeable batteries to power C-PAP machines. The Monitoring Team will follow-up on this at the next visit.

**Division IX** has a bed capacity of 1000 inmates and a current census of 948. Nursing staff are on duty for 16 hours each day. The clinic is staffed by four different providers and primary care is available three full days and two half days.

The physical description of the population, housing units and the clinic space remains unchanged from previous reports. We visited two of the sick call examination rooms on the tiers in the North tower. These rooms are properly equipped for examination of inmates during sick call. However neither room had a dispenser for paper towels, instead they were stacked on the

counter. One exam room had no soap for hand washing and a cabinet drawer was damaged. The sink in the other exam room was corroded and one of the wall electrical outlets was not working. Staff uses alcohol solution in a spray bottle to clean the exam table and change the paper between patients.

The emergency response equipment was reviewed. All items were present, in working order and up to date. Staff documents daily that emergency equipment is present and operational. The contents of the bag are inventoried monthly or after any other time the bag has been opened, then restocked and re-tagged. Numbered red tags are used to secure the contents in the bag and these are documented as intact on a daily basis. Expiration dates are listed for those medications kept in the emergency bag and were up to date. Not all medications are available since the decision has been made to eliminate these from the emergency response equipment.

The inventory of medical tools and needles was accurate and well organized. No outdated medications or medical supplies were found. Daily temperatures in the refrigerator are monitored and no deviations from the recommended range recorded. Outdated specimen tubes were found in the lab and the sink had no hot water. Other equipment in the clinic area was in working condition. None of the staff expressed a need for better or more appropriate clinical space or equipment.

Three registered nurses were interviewed about their safety. One particular inmate in the high custody unit regularly threatens nursing staff particularly when medications are administered. These nurses reported that correctional staff provides assistance as necessary to subdue the inmate. Each incident is reported via the electronic Medical Event Reporting System (eMERS). However the nurses expressed concern that even after reporting the behavior continues on a daily basis. The Nurse Coordinator or one of the registered nurses participates in the weekly meeting of the interdisciplinary committee that oversees this inmate's behavior management plan.

Division X has a bed capacity of 768 inmates and current census of 616 inmates. Since the last site visit the number of inmates with chronic medical or mental health conditions housed in Division X has decreased with the opening of Division VIII/RTU. Even though the total numbers are decreased inmates classified as M-2 and P-2 are still housed in Division X. Therefore nursing staff are on duty in this division 24 hours a day, seven days a week. Primary care clinics are scheduled three and a half days a week, staffed by two providers. Dental care is now provided in Division X five days a week and is staffed by a dentist and dental assistant. The physical description of Division X is otherwise unchanged from previous reports.

The Nurse Coordinator's office has been relocated to Division XI. No coordination or advance arrangements were made to ensure that she had a computer set up and access to a printer. Furthermore she does not have a cell phone, radio or pager to send and receive information when away from the office. The Nursing Coordinator has not been provided the technical support, space or equipment necessary to carry out her responsibilities with regard to Division X.

The dental clinic was clean and well organized. The dentist and dental assistant said that they have good support from the correctional officers and receive help promptly when requested. Spore counts, equipment checks and daily sharps inventory were accurate and up to date. The dentist said that when equipment breaks down productivity is affected because repair or replacements are not readily available. The dental assistant keeps a log of equipment repair requests. The autoclave was reported as not operable on 10/21/14; it was a week before a replacement was provided. The x-ray processor has required repair four times this calendar year. The plastic cover over the light on the dental chair has melted and yet the equipment is documented as checked last month.

The exam table in the clinic had not been cleaned since the last patient was seen the day before. The table itself was dirty and there was debris on the floor of the exam room. The Nurse Coordinator did not know that the medical areas were cleaned by Cermak, the schedule or any performance expectations for cleaning by environmental services staff. The inventory of medical tools and needles was accurate but not well organized. No outdated medications or medical supplies were found. One large bottle of juice was found open but not dated; the explanation was that it would be used up that morning during medication rounds. Daily temperatures in the refrigerator are monitored and no deviations from the recommended range recorded.

The emergency response equipment was reviewed. The presence and operability of equipment is reviewed and signed off every shift, every day. The contents of the bag are inventoried monthly or after any other time the bag has been opened, then restocked and re-tagged. The inventory sheet coincides with the items kept in each section of the bag. Numbered red tags are used to secure the contents in the bag and are documented as intact on a daily basis. Expiration dates are listed for those medications kept in the emergency response bag and were up to date. Not all medications are available since the decision has been made to eliminate these from the emergency response equipment.

A correctional officer was using a desk in the same room as the nurse conducting sick call. He was later joined by the Superintendent for a lengthy period of time while patients were being seen by the nurse. Neither auditory nor visual privacy was provided and no one re-directed the officer to use another location. The Nurse Coordinator offered as explanation that the desk is usually used by the CMT and the officer was a fill in for the one regularly assigned. In circumstances like these, the nurse and/or Nurse Coordinator should be expected to request privacy and ask the officer to leave the area.

**Division XI** has a bed capacity of 1536 inmates and had a current census of 1488. Nursing staff are on duty eight hours each day. Primary care clinics are scheduled three full days and two half days each week, staffed by two providers.

The physical description of the housing units in the Division is unchanged from the last report. We toured two of the housing units and found no issues with safety or temperature regulation. However, housing units were unsightly, with water on the floor from the canister delivered for lunch, debris on the floor and the showers and toilets were dirty. When asked about the sanitation schedule we were told by officers and inmate workers that they are provided cleaning supplies for a housing unit only two or three times each week. The hallway on the second floor was being mopped with what smelled like a mildewed mop head. The correctional officer explained that there is a shortage of mop heads. This information is not consistent with the sanitation process described in General Order 24.11.1.1.

Room 117H in the dispensary has been locked by environmental services. This room was previously used to store hazardous waste and should not have been removed from use by the clinic without sufficient discussion to resolve potential problems in advance. Arrangements need to be made for appropriate storage of hazardous waste and it is recommended that room 117H be made available. One of the two rooms used by nurses for sick call does not have an exam table or oto-ophthalmoscope. The lack of proper equipment hampers the examination of inmates and reduces the productivity of nursing staff and needs to be provided to support timely nurse sick call.

The emergency response equipment was reviewed. This unit has ACLS supplies and equipment; the Division is staffed by two paramedics. Staff documents daily review of the presence and operability of emergency equipment. The contents of the bag are inventoried monthly or after any other time the bag has been opened, then restocked and re-tagged. The inventory sheet coincided with the items kept in each section of the bag except some of medication is no longer available per the decision to eliminate these particular supplies. . The inventory of medical tools and needles was accurate and well organized. No outdated medications or medical supplies were found. Daily temperatures in the refrigerator are monitored and no deviations from the recommended range recorded.

The dental clinic had three chairs in operation the day the Division was visited. All chairs and equipment were in working order and in good condition. The dental equipment had been serviced in September. Spore counts, equipment checks and daily sharps inventory were accurate and up to date.

**Cermak Infirmary**

Cermak infirmary floors 2 and 3 both consist of four wings; north, south, east and west. The areas are all large, and well-lighted.

2nd floor Mental Health

There is a small exam room on each of the units; the space was clean, appeared neat and orderly. Basic medical equipment was in working order. Sharps counts were correct, however there were expired supplies found in the exam room (e.g., saline and dressings).

3rd Floor Medical Infirmary

Each infirmary unit has small medical exam rooms which are adequate to perform physical examinations. However, the rooms in each area had noted deficiencies in basic cleanliness. For example, exam tables and floors were visibly dirty.

In the 3 East nurse's station there was visible dirt on cabinetry. Also on 3 East a fetal monitor had not been checked by Facilities to ensure it was functional and did not require maintenance. In addition, the nurses on the unit were not able to demonstrate competency in use of this equipment. A baby was delivered during our tour, demonstrating the importance of having current nursing competencies in the care of pregnant women.

In the male infirmary, staff did not document checking the operability of the AED on a log. Staff stated they only conducted visual checks of the AED light to determine that the battery was charged. In addition, to the verification of battery power staff should demonstrate that the AED equipment is operational and the pads not expired before documenting that the AED is functional on the log.

With respect to medications, we found multi-use insulin vials were not correctly labeled with the date the vial was opened and when it would expire. There is a sticker designed for this purpose that is used in other clinical areas and should be used in the infirmary as well. We also found two multi-use insulin vials in use 40 and 45 days after they were opened although the policy specifies that multi-use injectable vials must be discarded after 28 days. We interviewed a nurse about this who stated it is "not my job to remove old insulin bottles. Pharmacy is supposed to do it". Although it may be pharmacy's responsibility nurses have a professional obligation for patient safety not to administer medication from expired medication vials.

On both the 2nd and 3rd floors of the Cermak building no emergency response bags were available as recommended in the Eighth monitoring report. The Policy dated 11/4/14 states that emergency response bags will be located on these floors. Cermak leadership reported to the monitoring team that the emergency response bags had been ordered and received but not placed on the unit.

**Cermak Urgent Care**

Clinical space in the urgent care department appeared neat and orderly and appropriate for emergency care of inmates. The Monitoring Team found many deficiencies in basic infection control practices. For example, exam tables were visibly dirty and debris was on the floor in the triage area. During the tour of the unit the team also identified an expired ET tube and no AED

log. Additionally, nursing staff was observed in street clothes without a lab coat. Wearing street clothes alone puts staff at risk for blood borne pathogen exposure. Because medical procedures are performed in this area it is recommended that all nursing staff wear scrubs or lab coats to protect themselves from potential exposure.

**Dialysis Clinic**

During a tour of the hemodialysis unit the Monitoring Team observed poor infection control practices and environmental issues that could present a risk in patient safety. These observations included a dirty chair, a cracked dialysis chair with debris on the arm of the chair, a dirty bucket on top of a staff desk. Rusty scissors, dirty trash receptacles and generally poor sanitation in the area. There is no indication that disinfection practices are consistently carried out. The team is concerned about these findings since this is an area that treats inmates that are already at high risk for infections.

**Monitor's Recommendations:**

General:

1. Develop and implement a schedule of sanitation and infection control activities for medical and mental health clinical areas throughout the jail. Document on an accompanying log completion of the scheduled sanitation and disinfection duties.
2. Cermak healthcare leadership should develop and implement a schedule to assess each Division's medical, mental health and dental clinic space using the QI process for size, general repair and sanitation, lighting, furniture, equipment and supplies, privacy, communications and connectivity.
3. Develop Cermak's internal capacity to assess, inspect and correct deficiencies.
4. Fully implement the revised process to document the status of emergency equipment and supplies. Audit implementation of revisions to ensure that standardization is achieved.
5. Reconsider decision to remove all emergency medications from the emergency response bags.
6. Educate Nurse Coordinators about sanitation, fire, health and life safety in CCDOC General Orders 24.9.9.0 and 24.11.1.1. Do the same when these are developed for Cermak Environmental Services areas.
7. Provide Nurse Coordinators cell phones consistent with other managers. Ensure each Nurse Coordinator has timely access to a computer, program and printer near their office.

Division Specific:

8. Division I: Relocate the CMT's desk to provide greater auditory and visual privacy from other inmates.
9. Cermak: Place emergency response bags on each floor.

10. Division VI: Establish a second room for nurse sick call closer to the front of the dispensary.
11. Division IX: Correct deficiencies in the exam rooms on the tiers (e.g., towel dispensers, electrical outlet, corroded sinks, broken cabinet drawer) and in the lab (e.g. hot water).
12. Division X: Put dental x-ray processor on a preventative maintenance schedule. Reduce delays in providing replacement equipment. Establish replacement schedule for equipment.
13. Division XI: Provide access to Room 117H to store hazardous waste. Install an exam table and oto-ophthalmoscope in the room for sick call that is missing this equipment.

## 44. Staffing, Training, Supervision and Leadership

a. Cermak shall maintain a stable leadership team that clearly understands and is prepared to move forward toward implementation of the provisions of this Agreed Order, with respect to:
   i.   Medical care; and
   ii.  Mental health care

b. Cermak shall maintain an adequate written staffing plan and sufficient staffing levels of health care staff to provide care for inmates' serious health needs, including:
   i.   Qualified Medical Staff; and
   ii.  Qualified Mental Health Staff.

c. Cermak shall ensure that all Qualified Medical Staff and Qualified Mental Health Staff are adequately trained to meet the serious health care needs of inmates. All such staff shall receive documented orientation and in-service training on relevant topics, including:
   i.   Provision of health care in a correctional setting and Facility-specific issues; and
   ii.  Suicide prevention, and identification and care of inmates with mental illness.

d. Cermak shall ensure that Qualified Medical Staff receive adequate physician oversight and supervision.

e. Cermak shall ensure that all persons providing health care meet applicable state licensure and/or certification requirements, and practice only within the scope of their training and licensure. Upon hiring and annually, Cermak shall verify that all health care staff have current, valid, and unrestricted professional licenses and/or certifications for:
   i.   Medical staff; and
   ii.  Mental health staff

f.  Cermak will work with CCDOC to develop and maintain a curriculum for initial and periodic training of correctional officers on recognition and timely referral of inmates with medical urgencies, including drug and alcohol withdrawal. Cermak will provide adequate initial and periodic training on these topics to all Cermak staff who work with inmates.

g.  CCDOC will provide, to all CCDOC staff who work with inmates, adequate initial and periodic training on basic mental health information, including the identification, evaluation, and custodial care of persons in need of mental health care, as well as recognition of signs and symptoms evidencing a response to trauma; appropriately responding to mental illness; proper supervision of inmates suffering from mental illness; and the appropriate use of force for inmates who suffer from mental illness. Such training shall be conducted by a Qualified Mental Health Professional, registered psychiatric nurse, or other appropriately trained and qualified individual.

h.  Cermak will work with CCDOC to develop and maintain a curriculum for initial and periodic training of correctional officers on basic mental health information, including the identification, evaluation, and custodial care of persons in need of mental health care, as well as recognition of signs and symptoms evidencing a response to trauma; appropriately responding to mental illness; proper supervision of inmates suffering from mental illness; and the appropriate use of force for inmates who suffer from mental illness. Such training shall be conducted by a Qualified Mental Health Professional, registered psychiatric nurse, or other appropriately trained and qualified individual.

     i.  Cermak shall ensure that all health care staff receive adequate training to properly implement the provisions of this Agreed Order, including:
   a. Medical staff; and
   b. Mental health staff.

**Compliance Status**: This provision remains in partial compliance.

a.  Partial Compliance
b.  Partial Compliance
c.  Partial Compliance
d.  Substantial Compliance
e.  Substantial Compliance
f.  Substantial Compliance
g.  Substantial Compliance.
h.  Substantial Compliance
i.  Partial Compliance

**Status Update:** Received and reviewed.

**Monitor's Findings:**

1. Cermak has experienced significant turnover in key leadership positions including the Chief Operating Officer (COO), Director of Patient Care Services , Director of Mental Health and Director of Quality Improvement. With the exception of an interim COO, these positions are now filled. There are still key leadership positions that remain vacant particularly the positions of Associate Medical Directors.

2. As already mentioned, Cermak currently has the lowest overall position vacancy level since December of 2013 when the new staffing plan was put in place. The great majority of new personnel are nurses. While the medical and mental health services are continuing to add additional staff, these important services still have high vacancy rates.

3. Training for the health care staff on uniform processes remains a challenge. The Monitoring Team observed different approaches to the same process at different divisions or even between different floors of the same division. Some examples include:
   i. sharp counts
   ii. temperature logs for medications refrigerators
   iii. daily monitoring of life safety equipment such as the AED and emergency response bags

   The Monitoring Team observed at least one example of how a process is followed perfectly and according to established policy and /or agreed order indicating that at least some of the staff is currently exercising best practice.

4. The Monitoring Team observed adequate physician supervision for the non-physician clinical providers and nursing staff.

5. The Monitoring Team reviewed the credentialing files of nine randomly selected provider staff including dentists, physicians, psychiatrists and physician assistants. All files were complete including primary source verification of pertinent licensures and certificates. Evidence of Focused and Ongoing Professional Practice Evaluations were present in all files. Likewise, we were able to verify current licensure for the nursing staff, including training in basic life support.

6. The Monitoring Team met with Dr. Jones, First Assistant Executive Director CCDOC, and reviewed the currently established and ongoing initial and interval training of all CCDOC officers. The initial training consists of 17 weeks. On the third week all new officers receive eight hours of training on "Mental Health and Suicide" and one hour of introduction to the medical services. In week six, all officers receive training on "First Aid". This is followed by several more hours of training on blood borne pathogens, MRSA, sexual abuse and sexual assault on inmates, autism, schizophrenia and cognitive functioning, psychopharmacology and mental illness and major psychiatric illnesses. The annual interval training includes the following topics: sexual harassment, PREA, blood

borne pathogens, MRSA, H1N1, CPR and first aid, suicide identification and prevention. Training records for ten randomly selected CCDOC officers were audited to verify the training.

7. As mentioned previously, the policy and procedures that should form the basis of the training of all health care staff, including the medical and mental health personnel, are either still pending review or are too new to allow for training of the staff with the provisions of the Agreed Order.

**Monitor's Recommendations:**

1. While the Monitoring Team is encouraged with the recent gains in all levels of staffing, including leadership positions, we hope to see a continued effort to fill the remaining positions.

2. All recruiting activities introduced during our last visit should continue to be applied with the expectation of achieving remarkable outcomes in the next few months.

3. Cermak must ensure training of all health care staff and in particular, nursing staff, with regard to the provision of health care in a correctional setting. Additionally, Cermak must strive to standardize its processes across all divisions and floors as much as possible. This can be accomplished through routine audits of various procedures, identification of best practices and replication of such practices across the entire system.

4. Routine, monthly staff productivity statistics must be measured in order to ensure and encourage high efficiency in all areas of health care delivery including nursing, medical and mental health provider staff.

## 45. Intake Screening

a. Cermak shall maintain policies and procedures to ensure that adequate medical and mental health intake screenings are provided to all inmates.

b. Cermak shall ensure that, upon admission to the Facility, Qualified Medical Staff or Licensed Correctional Medical Technicians utilize an appropriate medical intake screening instrument to identify and record observable and non-observable medical needs, shall assess and document the inmate's vital signs, and shall seek the inmate's cooperation to provide information, regarding:

   (1) medical, surgical and mental health history, including current or recent medications, including psychotropic medications;

   (2) history and symptoms of chronic disease, including current blood sugar level for inmates reporting a history of diabetes;

     (3) current injuries, illnesses, evidence of trauma, and vital signs, including recent alcohol and substance use;

     (4) history of substance abuse and treatment;

     (5) pregnancy;

     (6) history and symptoms of communicable disease;

     (7) suicide risk history; and

     (8) history of mental illness and treatment, including medication and hospitalization

c. Cermak shall ensure that, upon admission to the Facility, Qualified Mental Health Staff, Qualified Medical Staff, or Licensed Correctional Medical Technicians utilize an appropriate mental health intake screening instrument to identify and record observable and non-observable mental health needs, and seek the inmate's cooperation to provide information, regarding:

     (1) past suicidal ideation and/or attempts;

     (2) current ideation, threat or plan;

     (3) prior mental illness treatment or hospitalization;

     (4) recent significant loss, such as the death of a family member or close friend;

     (5) previously identified suicide risk during any prior confinement at CCDOC;

     (6) any observations of the transporting officer, court, transferring agency or similar individuals regarding the inmate's potential suicide risk, if such information is communicated to Cermak staff;

     (7) psychotropic medication history; and

     (8) alcohol and other substance use and withdrawal history.

d. Cermak shall ensure that all Qualified Mental Health Staff, Qualified Medical Staff or Licensed Correctional Medical Technicians who conduct the medical and mental health intake screenings are properly trained on the intake screening process, instrument, and the requirements and procedures for referring all qualifying inmates for further assessment.

e. If Cermak assigns Licensed Correctional Medical Technicians to perform intake screening, they shall receive appropriate, on-site supervision by on-site Qualified Medical Staff; information obtained on screening for all inmates will be reviewed by Qualified Medical Staff before the inmate departs the intake area.

f. Cermak shall ensure that a medical assessment based on the symptoms or problems identified during intake screening is performed within two working days of booking at the Facility, or sooner if clinically indicated, by a Qualified Medical Professional for any inmate who screens positively for any of the following conditions during the medical or mental health intake screenings:

(1) Past history and symptoms of any chronic disease included on a list specified by Cermak's policies and procedures;

(2) Current or recent prescription medications and dosage, including psychotropic medications;

(3) Current injuries or evidence of trauma;

(4) Significantly abnormal vital signs, as defined by Cermak's policies and procedures;

(5) Risk of withdrawal from alcohol, opioid, benzodiazepine, or other substances;

(6) Pregnancy;

(7) Symptoms of communicable disease; and

(8) History of mental illness or treatment, including medication and/or hospitalization.

g. Cermak shall ensure that any inmate who screens positively for mental illness or suicidal ideation during the intake process receives a comprehensive mental health evaluation (see provision 59.c, "Mental Health: Assessment and Treatment") Cermak shall ensure timely access to a Qualified Mental Health Professional for this purpose, based on emergent, urgent, and routine medical or mental health needs.

h. Cermak shall ensure that the intake health screening information is incorporated into the inmate's medical record in a timely manner.

i. Cermak shall implement a medication continuity system so that incoming inmates' medication for serious medical and mental needs can be obtained in a timely manner, as medically appropriate. Within 24 hours of an inmate's booking at the Facility, or sooner if medically necessary, a Qualified Medical Professional or Qualified Mental Health Professional, with appropriate prescribing authority, shall decide whether to continue the same or comparable medication for serious medical and mental health needs that an inmate reports during intake screening that she or he has been prescribed. If the inmate's reported medication is discontinued or changed, other than minor dosage adjustments or substitution of a therapeutic equivalent, a Qualified Medical Professional or Qualified Mental Health Professional, with appropriate prescribing authority, shall evaluate the inmate face-to-face as soon as medically appropriate, and within no greater than five working days, and document the reason for the change.

**Compliance Status**: This provision is in substantial compliance. In order to remain in substantial compliance; however, Cermak health care leadership should address provision f. of Intake Screening immediately so that at the next monitoring visit, Cermak can document compliance with this provision.

a. Substantial compliance
b. Substantial compliance
c. Substantial compliance
d. Not evaluated
e. Substantial compliance
f. Partial compliance
g. Substantial compliance
h. Substantial compliance
i. Substantial compliance

**Status Update:** The Monitoring Team received and reviewed Cermak's 10/27/14 status report.

**Monitor's Findings:**

We reviewed Cermak's Intake Health Screening policy (E-02) dated 10/31/11. The policy includes elements of the Agreed Order and provides sufficient operational detail to staff to implement the policy.

Upon admission, health care staff performs medical screening using an instrument that contains all medical and mental health elements required by the Agreed Order. A Nurse Coordinator is available to provide direction and supervision to staff performing medical screening.

We selected 10 records of patients who entered the jail within the past four months; but later excluded one record from the sample for being outside the review period. The sample included inmates with chronic diseases, those with mental health conditions, and those at risk or exhibiting symptoms of alcohol or drug withdrawal.

Our review showed that eight of nine records contained an intake screening form. For one record in which we were unable to locate the form, we requested assistance from a Cermak physician who was also unable to find the form.[2] Of the remaining eight records, staff performing intake screening completed all sections of the form and made appropriate secondary referrals to medical and mental health providers that occurred timely. Intake staff documented the reasons for secondary referral so that medical and mental health providers would be aware of the reasons for referral.

Medical providers conducted appropriate assessments, identified patients exhibiting signs and symptoms of alcohol and/or drug withdrawal and initiated treatment using standardized order sets. Providers also initiated treatment for patients with chronic diseases. Records show that patients received the first dose of medication while still in the intake area. With one exception noted above, intake screening forms were integrated into the electronic health record.

---

[2] Intake Screening/Health Assessment Patient #2.

Sexually transmitted infection testing (i.e., syphilis, chlamydia, gonorrhea and HIV) is performed on an opt-out basis for female inmates; abnormal lab results were treated in a timely manner.

Tuberculosis screening is conducted by performing chest x-rays. We found one case in which a chest x-ray report could not be located in the record.[3]

The intake screening process is generally going well; however, there is one significant area of concern. Although healthcare personnel performing intake screening identify patients exhibiting symptoms of alcohol and drug withdrawal in a timely manner, staff does not adequately identify patients at risk of alcohol and drug withdrawal but not exhibiting symptoms. This is necessary in order to make secondary referrals to medical providers who can initiate monitoring using screening instruments such as the Clinical Institute Withdrawal Assessment for Alcohol-Revised (CIWA-Ar) and Clinical Opiate Withdrawal Scale (COWS).

In order to maintain substantial compliance in this area, the monitoring team expects that Cermak leadership will immediately put a system in place to identify inmates at risk of alcohol and drug withdrawal for the purposes of making secondary medical referrals.

**Monitor's Recommendations:**

1. Cermak health care leadership should update the Intake Health Screening policy dated 10/31/2011. Revisions should include:
   - Clinical or medical history criteria for making secondary medical and mental health referrals, including identifying patients at risk of alcohol and drug withdrawal.
   - Following policy revision, staff should be trained regarding the revised policy.
   - Conduct periodic CQI studies to ensure adherence to the policy.
2. Continue to track and identify inmates who did not receive the medical screening and/or chest x-rays upon arrival to ensure that these required elements are completed as soon as feasible.

## 46. Emergency Care

   a. Cermak shall train health care staff to recognize and respond appropriately to health care emergencies, including:
      (1) Medical emergencies;
      (2) Mental health emergencies; and
      (3) Drug and alcohol withdrawal.

   b. CCDOC shall train correctional officers to recognize and respond appropriately to health care emergencies, including:

---

[3] Intake Screening/Health Assessment Patient #4.

(1) Medical emergencies;

(2) Mental health emergencies; and

(3) Drug and alcohol withdrawal.

c. CCDOC shall ensure that all inmates with emergency health care needs receive prompt transport, including transport for outside care, for emergencies including:

(1) Medical emergencies; and

(2) Mental health emergencies.

d. Cermak shall ensure that all inmates with emergency health care needs receive timely and appropriate care, with prompt referrals for outside care when medically necessary, and shall notify CCDOC when emergency transport is needed inside or outside the Facility compound, for emergencies including:

(1) Medical emergencies; and

(2) Mental health emergencies.

e. CCDOC shall train all correctional officers to provide first responder assistance (including cardiopulmonary resuscitation ("CPR") and addressing serious bleeding) in emergency situations. CCDOC shall provide all correctional officers with the necessary protective gear, including masks and gloves, to provide first line emergency response.

**Compliance Status**: This provision remains in substantial compliance. This section, although substantially compliant, is at risk of sliding back if the identified issues are not corrected.

a. Partial Compliance

b. Partial Compliance

c. Partial Compliance

d. Partial Compliance

e. Substantial Compliance

**Status Update:** The Monitoring Team received and reviewed Cermak's 10/27/14 status report.

**Monitor's Findings:**

a. Cermak Health Care Staff Training
Both medical and mental health staff has been trained with regard to medical and mental health emergencies. The staff need training on the detoxification programs once implemented.

b. CCDOC Correctional Officer Training

With regard to the training of correctional officers, they have completed training related to medical emergencies and mental health emergencies. They will need training on the detoxification procedure once finalized.

c. Emergency Transport

There were two patients who needed neck braces and back boards. These were not applied on time. This issue was identified in our last visit as well and still has still not been corrected.

Patients with hypoglycemia (low blood sugar) were not treated per Cermak protocol by the nursing staff. The physicians were not addressing hypoglycemic events during the patients' regularly scheduled visits. This is a high risk condition for patients and has to be addressed immediately.

d. Timely Care and Transport

Chart reviews indicated that patients, who were seen for emergencies at the Urgent Care, were seen by the provider in a timely manner. The patients were evaluated and sent to the emergency room by the right mode of transport. There is not adequate documentation at the Urgent Care by the clinical staff to show that patients were getting continuous monitoring while in the Urgent Care facility.

The critical lab results are not always addressed in a timely manner by the providers. This may be due to results not getting to the providers or when the providers are off.

e. CCDOC First Responder Training for Correctional Officers

This requires training of correctional officers in both CPR and first responder assistance and again we found this area to be substantially compliant.

**Monitor's Recommendations:**

1. Implement detoxification protocols and educate health care and custody staff.
2. Document the handoff process when a patient is sent from one of the units to the Urgent Care, from Urgent Care to ED and from Urgent Care to the Infirmary.
3. Create emergency response templates in the EMR for nurses and providers so that the details of the incident, pertinent positives and negatives, disposition, mode of transport, time of call received, time of response, reason for visit, location of evaluation, etc. are clearly documented in the EMR.
4. All documentation should be done directly in the EMR, except for downtime.
5. Establish the guidelines for use of neck braces and back boards and educate the nursing and custody staff in their proper application.
6. The Lab should notify the provider when the results of stat labs are received so there is no delay in care.

7. Documentation should demonstrate that continuous care is provided to the patient while in Urgent Care.
8. Establish a process to ensure that all critical labs are reviewed and addressed on time.
9. Educate staff on the management of hypoglycemia.
10. Providers should review blood sugars during each visit to identify and address reasons for hypoglycemia.
11. Add clinical pharmacist involvement in management of brittle diabetics.
12. Self-Monitoring:
    a. Nurse Coordinator to review emergency log daily to ensure completion, identify and review the emergencies that happened in their floor/unit.
    b. Audit at least 10 charts per month to ensure appropriateness and timeliness of response by nurse and provider.
    c. Audit all critical lab results response times.
    d. Audit management of hypoglycemic events.
    e. Audit management of detoxification patients.
    f. Use the audit information to make necessary improvements by sharing the findings with the specific staff on their individual performance and the group to address group performance.
    g. Track the unscheduled/urgent care visits required for chronic disease/detox patients to monitor the effectiveness of the treatment plan and make improvements to the program as needed.
    h. Monitor the turnaround time for stat labs.
    i. Monitor the timeliness and appropriateness of communication and response to critical lab results.

## 47. Record Keeping

a. Cermak shall ensure that medical and mental health records are adequate to assist in providing and managing the medical and mental health needs of inmates at the Facility and are maintained consistent with local, federal, and state medical records requirements.

b. Cermak shall ensure that medical and mental health records are centralized, complete, accurate, readily accessible and systematically organized. All clinical encounters and reviews of inmates should be documented in the inmates' records.

c. To ensure continuity of care, Cermak shall submit appropriate medical information to outside medical providers when inmates are sent out of the Facility for medical care. Cermak shall appropriately request records of care, reports, and diagnostic tests received during outside appointments in a timely fashion and include such records in the inmate's medical record or document the inmate's refusal to cooperate and release medical records.

d. Cermak shall maintain unified medical and mental health records, including documentation of all clinical information regarding evaluation and treatment.

**Compliance Status**: This provision remains in partial compliance.
   a. Partial compliance
   b. Partial compliance
   c. Substantial compliance (June 2012)
   d. Partial compliance

**Status Update:** A status report current through October 27, 2014 was received and reviewed in advance of the site visit. Five of nine recommendations from the Eighth Report had some action reported in the status report. A plan to act on two additional recommendations was reported and the remaining two recommendations continue to be discussed.

**Monitor's Findings:**

a. Cermak-Records adequate to provide care

The new interface between CCDOC's electronic jail management system and Cerner was implemented the week before the site visit and is expected to greatly assist in managing clinical care. Since the connection is so recent there were implementation problems still being addressed and staff training that has yet to take place. The timeliness and accuracy of the interface in sharing necessary information about inmates should be assessed by Cermak by the time of the next site visit.

During this visit, the monitoring team observed several occasions when the EMR operated very slowly and this observation was confirmed by the IT staff. At the last site visit we observed the speed of Accuflo delaying the nurse administering medication. Maintaining adequate and responsive IT support to ensure day to day access and operability of the system as well as addressing problems with the integrity of the electronic health record is necessary to sustain improvements made in Item 47 Record Keeping.

Accuflo, the program selected to document medication administration in general population has been implemented in all Divisions, except VIII (RTU) and Cermak which use the Cerner medication administration record (MAR). One problem with having two different programs to document medication administration is that nursing personnel were familiar with only one, rather than both programs. One nurse was observed being trained just prior to a shift assignment in a Division which uses the Accuflo program. She

expressed such distress and concern about proper documentation that preparations were being made for her to use a paper MAR which would be scanned in at a later date. Fortunately another staff member familiar with Accuflo was assigned instead. In addition some providers are also unfamiliar with Accuflo and either do not know how to access this information or find it inconvenient to use because it is not part of the Cerner system. Continued training, mentoring and supervision of personnel in use of these two systems is necessary to ensure that clinical information is documented correctly and that all personnel know how to access information for clinical decision making.

Modifications were made in the Cerner program so that laboratory tests may be ordered up to 12 months in advance. Unfortunately this new feature had not been communicated to the psychiatry staff and at the time of the site visit they were still struggling to obtain timely labs to monitor their patients' clinical care. We hope that by now information about how to order future labs has been communicated to all providers. Another improvement has been the completion of templates for documentation and tracking of diabetic care in relation to clinical guidelines. Documentation of blood glucose readings still needs to be improved so that this information is used in managing hypoglycemic episodes.

According to Cermak's status report and confirmed by the monitoring team the majority of care delivered in Urgent Care is not documented electronically. The continuing practice is that providers choose instead to handwrite their notes and have these scanned into the EMR the next business day. Not using the EMR compromises patient care in three ways: first, clinical information about an urgent care encounter is not available immediately after discharge from Urgent Care to providers for continuity of care; second, the handwriting is so illegible that it does not inform subsequent care; and third, the scanned document is very cumbersome to find once it gets scanned into the EMR. Cermak reports plans to use the EMR to document urgent care provided between 8:00 and 19:00 however the monitoring team recommends that all urgent care visits be documented in the EMR.

Delays in forwarding completed health services request forms to the health records department has been reported as a problem in previous reports. At this visit the opposite was found; health service requests (HSRs) were forwarded to health records so quickly that the nurse only had second hand documentation in the EMR about the patient's health complaints at the time of assessment (Divisions I, III, and VIII (RTU)). Since documentation in the EMR does not typically include a verbatim account of the patient's request(s), the HSR should be retained until the nurse evaluates the patient to ensure that all of the patient's complaints are addressed.

The HSR form has been revised to document when staff collected, triaged, and entered the request into the electronic medical record (EMR). The form also contains a signature line indicating when a nurse assessed the patient. These timeline notations and signatures are to ensure the HSR process is completed per policy and procedure. This information was often incomplete on the HSRs reviewed by the monitoring team and many were blank (all Divisions). Also in Division I and II, the date stamp was not reset at the end of the month resulting in inaccurate dates on the HSRs (e.g. October 34, 2014). This problem has been reported previously and not yet corrected.

Flagging x-ray and lab results in the EMR for review by the attending provider was given as an example in the Eighth Report of electronic information that is not effectively tracked to ensure providers attend to patient care needs. While these results are now printed and put in the ordering provider's box for review, the problem still exists because the next appointment may be with another provider. Thus the next provider, who is responsible for determining a patient's clinical care, is still without notification of the diagnostic results. Another type of flagging system needs to be developed that will alert the patient's next provider of pending diagnostic results.

a. Cermak-All encounters are documented and the record is complete, accurate and accessible

Cermak has made much progress implementing electronic records since the first site visit but now the various options for documentation have resulted in disorganization of the clinical record. Examples include the option to handwrite a patient encounter and scan the note into the EMR later, the use of a power form vs. free text to document in the progress note, use of the flow sheet or narrative note for vital signs or other serial assessments.

As an example during this site visit, documentation of wound care could not be retrieved from the EMR by physicians or nurses. In one patient's record the documentation of care for soft tissue injury was found in multiple places, on multiple forms, not uniformly accessible by all clinicians. A new form and recommendations to standardize documentation were developed by Cermak in response to this finding but more immediate direction needs to be provided to the staff responsible for this patient's care. A similar problem with inconsistent documentation of blood glucose was described in the Eighth Report but no corrective action was described in the status report provided by Cermak. The problem as previously described is repeated again here:

*"Thus there are three types of entries made into the EMR for daily diabetic care. Problems with this process are 1. the hand writing on the diabetic flow sheet was*

*illegible and therefore not useful clinically 2. duplicate documentation on the flow sheet and again entered into the EMR increases likelihood of transcription error and potential for adverse patient outcomes 3. equipment that automatically enters clinical information needs to be reliable and accurate so duplicate documentation is unnecessary."*

Based upon data reviewed during this site visit (see Item 52 Chronic Care) the result of these documentation practices is that hypoglycemic control is insufficient and there is increased risk of adverse patient outcomes. Documentation of blood glucose readings needs to be standardized to a single location, accurately recorded, available and its use demonstrated in managing hypoglycemic episodes.

These two examples demonstrate the need to standardize the format and location for documentation of similar types of clinical information in the EMR. When this is accomplished the record can be characterized as systematically organized.

Reducing the amount of scanned content in the EMR has been recommended in each of the monitoring reports. During this site visit the Monitoring Team observed and experienced problems with the quality and access to scanned information in the EMR, particularly HSRs and urgent care. Cermak's own monitoring efforts have identified problems with incomplete documentation, particularly treatment orders resulting from practices that rely upon scanning of documentation into the EMR[4]. The extent of scanned documentation and its organization in the EMR results in health records that are not sufficiently accessible to comply with this part of the Agreed Order.

The Agreed Order also requires that all clinical encounters and reviews are documented in the inmate's health record. One aspect of clinical care not documented in the individual inmate's record is nursing rounds of inmates in segregation. This has been noted as a problem in all previous reports. Cermak reports that a screen is being developed to document these rounds in the EMR but it has not yet been piloted or implemented. Unless the EMR can be taken with the nurse while making rounds consideration should be given to a tool that does not depend upon memory or require nurses to document these encounters twice.

Cermak indicated in the status report that a computer terminal would be placed in the room where mental health treatment team meetings take place. Having the terminals is necessary for the documentation of patient treatment plans in the EMR. This has been noted as a problem by Dr. Metzner since November 2013 but has not been accomplished yet.

---

[4] Appendix IV, Metzner 9th monitoring report, page 18

[4] Minutes of the Pharmacy and Therapeutics Committee, April 10, 2014

Cermak's own continuous quality improvement audits[5] have identified clinical encounters that are not consistently documented. These include nurses' monitoring of inmates while in seclusion or restraint, consultation by qualified mental health providers with psychiatry in the disposition of inmates referred for evaluation of suicidal ideation, and daily contact by psychiatry with inmates who are on suicide observation. Audits such as those completed by Mental Health and Pharmacy appear to be effective in improving documentation in the clinical record.

   b. Cermak-Communication with Offsite Providers-
     This item has been in substantial compliance since June 2012.

   c. Cermak-Unified Medical and Mental Health Records –
     We have recommended since the Sixth report that Cermak revise the electronic format of the nursing assessment of HSRs to better resemble problem oriented charting. This has not yet been accomplished and compromises communication of clinical information about the patient.

     The documentation of segregation rounds has been recommended since the initial report. These are clinical encounters that need to be included in the unified health record. Use of flow sheets has been recommended in previous reports for documentation of serial assessments. Consistent documentation of blood glucose, soft tissue injury, and patient status while in seclusion and restraint, all of which are problematic now, would be facilitated if this information were recorded in a flow sheet format.

**Monitor's Recommendations:**

1. Assess the timeliness and accuracy of the new interface with CCDOC in sharing necessary information about inmates.
2. Continue training, mentoring and supervision of Cermak personnel to ensure that correct documentation as well as the ability to navigate the EMR to access information can be uniformly demonstrated.
3. Use the electronic health record to document health status and treatment initiated for all urgent care visits.
4. Audit HSRs and take corrective action to ensure that these forms are completely and accurately filled out and correctly date stamped when received.
   a. Purchase date stamps that do not require monthly maintenance.
   b. Retain HSRs so that the form is reviewed by the nurse when evaluating the patient's complaint; then nurses should promptly submit HSRs to health records.

---

[5] Appendix IV, Metzner 9th monitoring report

5. Establish a method which effectively communicates results of lab, radiology, and specialist consults to the provider in advance of the next scheduled visit.
6. Standardize the format and location for documentation of similar categories of clinical information, monitor that it is accurately recorded and demonstrate that information contained in the record is used in managing care. Specific examples include documentation soft tissue injury, recording of blood glucose readings and subsequent actions to address hypoglycemic episodes.
7. Document segregation rounds by nurses in the health record.
8. Install a computer in the room used by the mental health treatment team in Cermak so that clinical information can be accessed.
9. Revise the electronic forms to better display clinical information during nursing sick call encounters and include guidelines from the nursing protocols.

## 48. Mortality Reviews

a. Cermak shall request an autopsy, and related medical data, for every inmate who dies while in the custody of CCDOC, including inmates who die following transfer to a hospital or emergency room.
b. Relevant CCDOC personnel shall participate in Cermak's mortality review for each inmate death while in custody, including inmates who die following transfer to a hospital or emergency room, and a morbidity review for all serious suicide attempts or other incidents in which an inmate was at high risk for death. Mortality and morbidity reviews shall seek to determine whether there was a systemic or specific problem that may have contributed to the incident. At a minimum, CCDOC's contribution to mortality and morbidity reviews shall include:
   I. Critical review and analysis of the correctional circumstances surrounding the incident;
   II. Critical review of the correctional procedures relevant to the incident;
   III. Synopsis of all relevant training received by involved correctional staff;
   IV. Possible precipitating correctional factors leading to the incident; and
   V. Recommendations, if any, for changes in correctional policy, training, physical plant, and operational procedures.
c. Cermak shall conduct a mortality review for each inmate death while in custody, including inmates who die following transfer to a hospital or emergency room, and a morbidity review for all serious suicide attempts or other incidents in which an inmate was at high risk for death. Cermak shall engage relevant CCDOC personnel in mortality and morbidity reviews and shall seek to determine whether there was a pattern of symptoms that might have resulted in earlier diagnosis and intervention. Mortality and morbidity reviews shall occur within 30 days of the incident or death, and shall be

revisited when the final autopsy results are available. At a minimum, the mortality and morbidity reviews shall include:

    I.    Critical review and analysis of the circumstances surrounding the incident;

    II.    Critical review of the procedures relevant to the incident;

    III.    Synopsis of all relevant training received by involved staff;

    IV.    Pertinent medical and mental health services/reports involving the victim;

    V.    Possible precipitating factors leading to the incident; and

    VI.    Recommendations, if any, for changes in policy, training, physical plant, medical or mental health services, and operational procedures.

d. Cermak shall address any problems identified during mortality and morbidity reviews through timely training, policy revision, and any other appropriate measures.

**Compliance Status**: This provision is now in substantial compliance (previously in partial compliance).

**Status Update:** Received and reviewed.

**Monitor's Findings:**

a. There have been five deaths in custody (DIC) cases since our last visit in May of 2014. The Monitoring Team reviewed all five most recent DIC cases. We found that mortality review is occurring in accordance to current policy and procedures. All DIC cases have resulted in an autopsy; relevant CCDOC personnel have participated in the mortality review of all DIC cases; all DIC cases have undergone formal mortality review or root cause analysis (RCA) within 30 days of the event. The two most recent DIC cases (both suicide by hanging) have not undergone formal review but remain within the allowed 30 day window. One DIC was directly related to an advanced end stage metastatic cancer. Another DIC case occurred in a patient with advanced diffuse scleroderma and a multitude of other medical conditions including congestive heart failure, interstitial lung disease and chronic renal insufficiency. This patient was receiving palliative care. Another death in custody case involved an inmate with history of ETOH and opiate abuse.

**Monitor's Recommendations:**

1. The Quality Improvement (QI) program should track the implementation of improvement strategies identified during the mortality review committee meeting.

2. Asymptomatic, at risk inmates for ETOH/Benzodiazepine/Opiate detoxification must be identified at intake so that they may:

    I.    undergo initial and interval CIWA-Ar and COWS assessments;

II.    start detoxification protocol medications as indicated;

III.    be transferred to higher acuity housing (RTU or infirmary) to avoid loss to follow up

## 49. Grievances

Cermak shall develop and implement policies and procedures for appropriate handling of grievances relating to health care, when such grievances are forwarded from CCDOC.

**Compliance Status:** This provision is now in substantial compliance.

**Status Update:** A status report current through October 27, 2014 was received and reviewed in advance of the site visit.

**Monitor's Findings:**

Cermak has responded to 100% of all grievances within seven days of receipt for the past three months and is in compliance with the organization's policy regarding the grievance process. Since the last site visit the process for tracking and responding to grievances has been streamlined and redundancies in record keeping eliminated. Grievances concerning dental, nursing and mental health issues are received directly by each respective discipline. All other medical related grievances are addressed at the Medical Director's morning huddle. Dental has reserved five appointment slots per clinic per day to see patients with grievances about dental care. Carol Boyd, Nursing Coordinator shared the results of the pilot project in Division VI with the other divisions and the Department of Corrections offered training in the grievance process in July. Cermak Policy A-11 Grievances has been revised to correspond with the current process that is in place.

Grievance analysis and trending has not identified any opportunities to improve health care according to a review of the minutes of the Cermak CQI committee. The fact that no trends or opportunity for improvement have been identified may be a result of using categories that are too broad to produce meaningful analysis. Methods to categorize and review grievances to identify trends in health care services that merit consideration for improvement were discussed and additional material to supplement the discussion was provided. In addition to timeliness of response, there needs to be evidence that the grievance process provides information used to improve quality of services and care provided.

The total number of health related grievances received each month remains slightly higher than reported two years ago. However since July, when streamlined methods to track and respond to grievances were implemented, the number has reduced each month. According to Linda Kampe,

Director of Health Information and responsible for Cermak's grievance process, the number of appeals have decreased as well. A sample of 27 grievances responded to in the previous three weeks were reviewed. All responses met the timeframes and addressed the inmate's complaint consistent with training provided by CCDOC. Several grievances involved multiple departments and all but one referred the remaining problem to the appropriate department for additional action.

**Monitor's Recommendations:**

1. Demonstrate use of grievance analysis to identify opportunities to improve health care services per Policy A-11.

## C.  MEDICAL CARE

### 50. Health Assessments

a. Cermak shall ensure that Qualified Medical Professionals attempt to elicit the amount, frequency and time since the last dosage of medication from every inmate reporting that he or she is currently or recently on medication, including psychotropic medication.

b. Cermak shall ensure that incoming inmates who present and are identified by medical personnel as having either a current risk of suicide or other acute mental health needs will be immediately referred for a mental health evaluation by a Qualified Mental Health Professional. Staff will constantly observe such inmates until they are seen by a Qualified Mental Health Professional or Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional. Incoming inmates reporting these conditions will be housed in safe conditions unless and until a Mental Health Professional clears them for housing in a medical unit, segregation, or with the general population.

c. Cermak shall ensure that all inmates at risk for, or demonstrating signs and symptoms of, drug and alcohol withdrawal are timely identified. Cermak shall provide appropriate treatment, housing, and medical supervision for inmates suffering from drug and alcohol withdrawal.

d. CCDOC shall maintain a policy that correctional officers supervising newly arrived inmates physically observe the conduct and appearance of these inmates to determine whether they have a more immediate need for medical or mental health attention prior to or following the intake health screening by Qualified Medical Staff.

e. Cermak shall ensure that the medical assessment performed within two working days of his or her booking at the Facility, or sooner if clinically indicated, for each inmate specified above (provision 45.f, "Intake Screening") shall include a review of the inmate's intake screening form, a medical history, a physical examination, a mental

health history, and a current mental status examination. The physical examination shall be conducted by a Qualified Medical Professional. The medical assessment shall also include development or revision of the inmate's problem list and treatment plan to address issues identified during the medical assessment. Records documenting the assessment and results shall become part of each inmate's medical record. A re-admitted inmate or an inmate transferred from another facility who has received a documented medical assessment within the previous six months and whose receiving screening shows no change in the inmate's health status need not receive a new medical assessment. For such inmates, Qualified Medical Staff shall review prior records and update tests and examinations as needed.

**Compliance Status**: This provision remains in substantial compliance. In order to remain in substantial compliance; however, Cermak health care leadership should address items c and d of Health Assessment provision immediately so that at the next monitoring visit, Cermak can document compliance with this provision.

  a. Substantial compliance
  b. Not evaluated
  c. Partial compliance
  d. Noncompliance
  e. Substantial compliance

**Status Update:** The Monitor received and reviewed Cermak's 10/27/14 status report.

**Monitor's Findings:**

We reviewed Cermak's Initial Health Assessment policy (E-04) dated 10/31/11. The policy is consistent with the Agreed Order and provides sufficient operational detail to staff to implement the policy. The policy also includes criteria for referral to the Cermak Urgent Care Center following secondary medical referral, which is excellent.

We selected 10 records of patients who entered the jail within the past four months, but later excluded one record from the sample for being outside the review period, and a second record that did not contain an intake screening form or health assessment.[6]

The remaining sample included inmates with chronic diseases and mental health conditions, and symptoms of alcohol or drug withdrawal. The sample did not include any inmates who entered the jail through an anomalous pathway (e.g., hospital takeover, etc.) and were evaluated in the Cermak Urgent Care Center.

---

[6] Patient #2.

Medical providers document health assessments electronically, except when patients are admitted through the Cermak Urgent Care Center. In these cases providers document assessments on paper records that are scanned into the electronic medical record. In previous reports, the monitoring team found that assessments documented on paper records resulted in less than adequate assessments, and recommended that Cermak leadership require providers to document all health assessments directly into Cerner. This is not yet occurring. During this site visit, none of the records included inmates admitted through the Urgent Care Center so we were unable to assess whether documentation of assessments performed in this area had improved in for this group of patients.

Our record review showed that medical providers conducted appropriate assessments, identified patients exhibiting signs and symptoms of alcohol and/or drug withdrawal and initiated treatment using standardized order sets. Providers also initiated treatment for patients with chronic diseases. Records show that patients received the first dose of medication while still in the intake area.

As noted in the Intake Screening section of this report, the current intake screening process adequately identifies inmates exhibiting signs and symptoms of alcohol or drug withdrawal, but does not identify those at risk of withdrawal based upon their history of alcohol or drug use. This is necessary in order to make secondary referrals to medical providers who can initiate monitoring using screening instruments such as the Clinical Institute Withdrawal Assessment for Alcohol-Revised (CIWA-Ar) and Clinical Opiate Withdrawal Scale (COWS); and arrange an appropriate housing assignment where monitoring and medical supervision can take place. In order to remain in substantial compliance, Cermak health care leadership should address this immediately so that at the next monitoring visit, Cermak can document compliance with this provision (50.c.)

We requested of Cermak staff a copy of the CCDOC policy that requires correctional officers to observe newly arriving inmates' conduct and appearance to determine whether they have an immediate need for medical or mental health referral before or after intake screening. Cermak contacted CCDOC staff and reported to the monitoring team that no CCDOC policy contained this specific language. In order for this area to remain in substantial compliance, this Cermak or CCDOC should provide this policy to the monitoring team at our next visit.

**Monitor's Recommendations:**

1. Cermak leadership should revise the Initial Health Assessment policy to include identification and secondary referral of inmates at risk of alcohol and drug withdrawal, to include housing assignment and medical monitoring.

2. Cermak leadership should require providers to document all health assessments directly into Cerner and refrain from paper documentation except when Cerner is down. The quality of health assessments performed in Cermak Urgent Center should match the quality of assessments performed when inmates arrive through normal channels.
3. CCDOC should develop and implement a policy meeting the requirements of provision (50.d.).
4. The QI program should continue to monitor the documentation of timely receipt of medications that are deemed critical.

## 51. Acute care

a. Cermak shall provide adequate and timely acute care for inmates with serious and life-threatening conditions, and ensure that such care adequately addresses the serious medical needs of inmates. Adequate care will include timely medical appointments and follow-up medical treatment.

**Compliance Status**: This provision remains in substantial compliance.

**Status Update:** Received and reviewed.

**Monitor's Findings:**

Twelve records were reviewed. Inmates were provided with timely urgent medical care. This area is staffed 24 hours a day. There was adequate equipment to provide emergency care for a life threatening condition. An area of concern, which was also noted in our Eighth Report and remains unchanged, is in the follow up medical treatment and referrals. Logs are kept on paper and the urgent care information needed by the divisions' medical staff is scanned into the chart. Staff interviews were conducted randomly in the divisions to ascertain if staff could identify follow up treatment or referrals after an inmate returned from urgent care. Four out of six nursing staff had difficulty identifying the scanned urgent care documentation in order to implement necessary follow up care.

**Monitor's Recommendations:**

1. Logs for Urgent Care/Acute Care need to be electronic.
2. Nursing staff require training on linking scanned documents to include discharge information in subsequent treatment plans to ensure proper follow up.
3. Nursing staff on the receiving unit need to complete documentation in the EMR when an inmate returns from urgent care with follow up instructions or referrals to ensure communication is complete.

4. In cases where urgent care follow up is required a verbal communication from nurse to nurse should be conducted to ensure the continuum of care.

**Self-Monitoring**
1. Conduct quarterly random chart audits to ensure follow up is completed per the recommendations from Urgent Care.

## b. Acute Care-Infirmary

b. Cermak shall maintain guidelines for the scope of care of acutely ill patients in its on-site designated infirmary units and for transfer of patients when appropriate to outside hospitals.

**Compliance Status:** This provision is now in non- compliance (previously in partial compliance).

**Monitor's Findings:**

Record reviews, patient and staff interviews were conducted to evaluate the care in the Infirmary. The boats have been replaced with hospital beds. The patients who did not require infirmary level of care were moved to the new RTU facility which helped address the overcrowding.

The level of care provided in the infirmary has not changed. No process changes have been made since the last visit of the Monitoring Team. The nursing staff in the infirmary are providing PRN (as needed) care and not scheduled care. The patients are expected to report to the nurses on any issues and they are then placed on the providers list to be seen. There is no documentation to show that nursing assessments were performed.

The admission note used by nursing does not document relevant information. The staff was just clicking the boxes and this was reflected by documentation of normal neurological exam on a patient with stroke. The patients are not assigned a level of acuity that would drive nurse and provider follow-up. The patients do not have a nursing care plan, which should be developed based on their health condition and level of acuity and then periodically adjusted based on the patient's response.

The nursing documentation is very minimal and does not contain all pertinent negatives and positives regarding the patient's conditions. The documentation regarding the wound care provided to a patient was minimal and does not have any information regarding the condition of

the wound, size, presence of any infection, location, progress, etc. A patient with bilateral large leg ulcers did not have any documentation from the wound care nurse for several months. The medication pass is still done through a small window in the nursing station and does not provide privacy for the patient. The medication administration process needs to be reevaluated to make it efficient and safe.

The infirmary houses the highest acuity patients and yet did not have an emergency response bag. The patients who are at high risk during detoxification are not receiving scheduled nursing assessments. The staff we interviewed had not received training in managing patients while undergoing withdrawal from alcohol or other drugs.

The detoxification program for alcohol and benzodiazepine functions exceedingly well but only when these issues are identified at intake in symptomatic patients (usually with referral to Urgent Care unit). In such cases, patients are promptly started on detoxification medications and referred to infirmary housing. They are then seen by the infirmary provider at appropriate intervals and transferred to GP when indicated. The management of withdrawal, however, does not work well or at all when the use of alcohol or benzodiazepine is under reported by the patient or goes unnoticed by the intake providers. In these situations, patients go without any interventions (medications, vital signs, etc.). The result of this approach is increased morbidity among such patients. Contribution of this approach (lack of treatment or close monitoring of these patients) leading to serious adverse outcomes remains a concern for the monitoring team.

Additionally, the Monitoring Team strongly advises against the current practice of allowing inmates to keep on person (KOP) medications to manage symptoms of opiate withdrawal. The current protocol allows for delivery of the following medications all at once:
- Prochlorperazine 30 mg
- Loperamide 24 mg
- Hydroxyzine 150 mg
- Dicyclomine 90 mg

Patients are then trusted to self-administer these medications on an as needed basis. This medication profile has a very high potential for causing serious harm among inmates who are clearly identified as those with the highest medication abuse potential among the Cook County Jail inmates.

**Monitor's Recommendations:**

1. Update the description of the standard of care for the infirmary based on the recent changes in patient population due to the opening of the new RTU.
2. Implement use of an admission order set to address all aspects of care management.

3. Establish expectations for a provider initial evaluation upon admission to the infirmary and follow-up requirements based on patients' acuity level and condition.
4. Establish expectations for initial and follow-up nursing assessments based on patients' acuity level and condition while in the infirmary.
5. Establish patient specific nursing care plans to appropriately manage the patients and periodically update them in consultation with the care team.
6. Implement detoxification assessments (CIWA-Ar and COWS) so that the patients are periodically monitored to avoid emergencies.
7. Establish a discharge process and documentation that requires provider orders and nursing assessment and handoff to receiving health care staff.
8. Establish a multidisciplinary treatment team meeting to periodically discuss treatment plans for patients in the infirmary.
9. Begin to identify asymptomatic patients with history of alcohol, , benzodiazepine, and or opiate abuse (self-reported or by past medical history) and using currently available evidence based tools, assign acuity levels that will easily and predictably determine for the healthcare staff the approach that is best suited for the management of the individual patient including: no intervention, monitoring only (regular nursing follow up and vital signs) and dose by dose medication therapy using currently established detoxification protocols.
10. Begin the routine use of CIWA-Ar and COWS as soon as possible and no later than 30 days from the date of this report.
11. Consider supplying oral or IV fluids for patients in detoxification based on their condition and not rely on patients increasing oral fluid intake themselves.
12. Discontinue the use of the KOP opiate detoxification protocol.
13. Self-Monitoring:
    a) Audit 10 charts per month per unit to ensure, timely admission assessment, initial provider evaluation, routine follow-up by the nurse and provider per acuity level guidelines, use of care plans as appropriate, etc.
    b) Monitor length of stay for the various acuity levels of patients in the Infirmary on a daily basis (e.g.: Patients in withdrawal - to see if they can be transferred out when they have completed their treatment and are stable.) This process will help reduce overcrowding and make it efficient.
    c) Evaluate patients sent to the Urgent Care and ER from the infirmary to see if there were any process breakdowns and opportunities for improvement.
    d) Audit medication administration to monitor compliance with relevant policies and procedures.

## 52. Chronic care

a. Cermak shall maintain an appropriate, written chronic care disease management plan, which provides inmates with chronic diseases with timely and appropriate diagnosis, treatment, medication, monitoring and continuity of care consistent with the inmates' expected length of stay.

b. Cermak shall maintain appropriate written clinical practice guidelines for chronic diseases, such as HIV, hypertension, diabetes, asthma and elevated blood lipids.

c. Cermak shall maintain an updated registry to track all inmates with serious and/or chronic illnesses and shall monitor this registry to ensure that these inmates receive necessary diagnoses and treatment. Cermak shall keep records of all care provided to inmates diagnosed with chronic illnesses in the inmates' individual medical records.

d. Cermak shall ensure that inmates with chronic conditions are routinely seen by a physician, physician assistant, or advanced practice nurse to evaluate the status of their health and the effectiveness of the medication administered for their chronic conditions.

e. CCDOC shall house inmates with disabilities, or who need skilled nursing services or assistance with activities of daily living, in appropriate facilities, as determined by Cermak. CCDOC shall permit inmates with disabilities to retain appropriate aids to impairment, as determined by Cermak.

f. Cermak shall ensure that inmates with disabilities or who need skilled nursing services or assistance with activities of daily living shall receive medically appropriate care. Cermak shall notify CCDOC of their specific needs for housing and aids to impairment.

g. Cook County shall build out, remodel, or renovate clinical space as needed to provide appropriate facilities for inmates with disabilities in accordance with the timelines set out in provision 43.i. Prior to completion of the new clinical space, Cook County and DFM will work with Cermak to address the most serious concerns regarding facilities for inmates with disabilities, to the extent possible in the current Facility.

**Compliance Status**: This provision remains in partial compliance.
   a. Partial Compliance
   b. Partial Compliance
   c. Partial Compliance
   d. Partial Compliance
   e. Substantial Compliance

f. Partial Compliance

g. Substantial Compliance

**Monitor's Findings:**

The Monitoring Team reviewed health records of chronic disease patients during the visit. We requested remote electronic medical record access following the site visit to review additional records (e.g. HIV) however this request was not granted.

a. Chronic Disease Management Plan

Chart review and patient interviews were conducted for patients with chronic disease. The chronic disease patients were seen timely upon arrival to the facility by nurses and providers. Most of the patients have detailed initial evaluation notes in the EMR. The appropriate medication and labs were ordered during the visit. The first doses of medications were given timely.

b. Cermak-Written Guidelines

The clinical practice guidelines for chronic diseases are being updated by the clinical team. The plan is to train the providers on the updated clinical practice guidelines once they are approved. The clinical team is getting help from IT to make changes to the templates in the electronic medical record and a diabetes clinical practice template is being piloted. Once the initial and follow-up visit templates for the various chronic diseases are established, these will help ensure adherence to the clinical practice guidelines. This initiative will help ensure that the compliance of use of the guidelines is a challenge.

c. Cermak-Tracking System

Disease specific registries based on the problem list have been developed. The registries are now accessible to the care teams so they are able to use the information to manage the patient groups. The team has to continue adding other chronic diseases to the registry.

d. Cermak-Regularly Scheduled Visits

The clinical practice guidelines will help determine the frequency of follow-up based on the type of condition and level of control. The new RTU will probably help consolidate patients with chronic disease for efficient management. The treatment plan has to include scheduled nursing care based on the level of disease control and complexity. Nursing continues to provide only episodic care.

The team has established a process to ensure all dialysis patients are getting their treatment timely.

We reviewed two records of patients with HIV infection. Patients are not always seen in a timely manner following performance of lab tests. One newly diagnosed HIV patients' laboratory tests showed that he was severely immunocompromised, but a provider did not see the patient until one month later to discuss the lab results and initiate prophylactic and antiretroviral therapy.[7] The patient was started on antiretroviral therapy at the end of September but had no follow-up by the time of our review in November. Newly diagnosed HIV/AIDS patients should be seen regularly following their diagnosis to educate the patient, assess their response to their disease, and monitor medication adherence. In late October this patient submitted a health request stating that he was upset and crying due to his circumstances, but he was not seen by nurses or a provider.

In another case, a provider saw an AIDS patient in June and labs were drawn in July showing modest improvement in his immune status.[8] However, as of the time of our monitoring visit the patient had not been seen again for HIV care. In September the patient was sent to Cermak Urgent Care for difficulty breathing with recommendation for follow-up in 12 days, however this did not occur and the patient was not seen again until the end of October.

For patients undergoing anticoagulation therapy, INR is being checked at Cermak Urgent Care before initiating treatment when the current dose is not known. There is no way for the providers to order INR as a Point of Care Test (POCT) for recheck after a dose change, etc. The clinical pharmacist is managing patients on anticoagulation treatment except for patients in the infirmary due to clinic space constraints. The team is discussing a plan to include this population. The anticoagulation treatment plan needs to be discussed with the primary care provider (PCP) on an ongoing schedule, established by the clinical practice guidelines, based on the level of control and complexity. The clinical team is planning to add more clinical pharmacist time to support chronic disease management which will be very helpful to the care team.

The test results are communicated to the patients at their next appointment if the results are negative. In some cases there may be a delay making the patient anxious about their results leading to multiple sick call requests requesting their results. The monitoring team identified multiple sick call requests from patients for test results.

The nursing care for special needs is episodic and as needed and currently does not include scheduled care based on nursing care plans. The clinical team should consider including nursing representatives and establish nursing care plans for chronic diseases in addition to the clinical practice guidelines being revised.

---

[7] HIV Patient #1

[8] HIV Patient #2.

e. The patients with special needs have been moved to the RTU freeing up the infirmary for high acuity patients.

f. There is not adequate documentation to show that patients who need assistance with ADLs are receiving appropriate care.

g. Cermak has adequate clinical space to take care of patients with disabilities.

## Monitor's Recommendations:

1. Continue updating and implementing the clinical practice guidelines and ensure practice is consistent with these.
2. Continue to create chronic disease templates to guide the provider to document pertinent positives, history specific to the condition, remind them of any recommended tests, medications, referrals, level of disease control (good control, poor control, etc.), level of change from previous visit (i.e. improved, worsened, no change), follow-up specific to the condition.
3. Create expectations for documentation on initial chronic care visit, follow-up chronic care, urgent care visits and title the documents to identify the type of visit.
4. Continue to reinforce the importance of keeping the problem list up to date with staff.
5. Get INR results before initiating Coumadin.
6. Add an INR point of care order in EMR to allow clinicians to order follow-up INR as indicated.
7. The clinical pharmacist should also participate in care for patients on anticoagulation in the infirmary
8. The clinical pharmacist should document their discussion with the PCP on the plan of care for each of the patients.
9. Communicate positive and negative lab results to the patient timely.
10. Document acknowledgement of recent lab results and actions taken, if needed, or document reason for no action taken on an abnormal lab result.
11. Create a referral process for clinicians to refer patients to the Pharm D who can be valuable in managing complex patients.
12. Consider shared medical appointments for chronic diseases (i.e.: diabetes, hypertension, etc.) where patients can be educated by the various disciplines on disease management (diet, self-testing, diet, etc.).
13. Documentation of all medication administration, including insulin, should be standardized and available in the EMR so the provider can review the MAR for compliance with medications.
14. Improve documentation of routine and episodic care provided to patients with special care and needs for assistance with ADLs.

15. Continue efforts of housing patients in the appropriate housing locations for efficient management.
16. Identify high risk chronic disease patients and establish a review process to effectively manage their care.
17. Address all complaints and conditions during scheduled visits including HIV visits.
18. At intake providers should order labs for known HIV patients to be performed 7-10 days after admission so that labs will be available when the HIV provider conducts the initial visit.
19. At each HIV visit, order labs to be performed at clinically appropriate intervals. Following completion of labs, schedule appointment with the patient in a timely manner to discuss lab results and provide patient education.
20. For newly diagnosed HIV patients, schedule regular appointments in the first few months of diagnosis for patient education and to assess their coping skills. Consider involving mental health for case management.
21. Following initiation of antiretroviral therapy, providers should schedule timely follow-up visits to assess medication adherence, side effects and determine if patients have any adherence related concerns.
22. Ensure that follow-up HIV appointments occur as noted in provider plans.
23. Review ordered tests to see if they were completed.
24. Self-Monitoring:
    a) Ensure all patients on chronic medications are in the appropriate registries (match registry to medications and medication to registry to identify any inappropriate mismatch).
    b) Monitor compliance with dialysis visits.
    c) Audit at least 5 charts per provider per month to monitor for compliance with established clinical practice guidelines. Provide both individual and group feedback for continuous improvement.
    d) Establish quality metrics to monitor adherence of patients on anticoagulation medication.
        i. Time to first visit
        ii. Time to first dose
        iii. INR before first dose
        iv. Time to therapeutic level
        v. Management plan for difficult patients
        vi. Compliance with INR check as ordered
        vii. Compliance with follow-up as indicated

    e) Monitor compliance with recommended vaccinations that are identified in the clinical practice guidelines.
    f) Review compliance with addressing critical lab results timely.

g) Review episodic/nonscheduled visits by chronic disease patients to identify opportunities for prevention.

h) Review all hypoglycemic episodes to identify opportunities for prevention.

## 53. Treatment and Management of Communicable Diseases

a. Cermak shall maintain adequate testing, monitoring and treatment programs for management of communicable diseases, including tuberculosis ("TB"), skin infections, and sexually transmitted infections ("STIs").

b. CCDOC shall comply with infection control policies and procedures, as developed by Cermak, that address contact, blood borne, and airborne hazards, to prevent the spread of infections or communicable diseases, including TB, skin infections, and STIs, consistent with generally accepted correctional standards of care.

c. Cermak shall maintain infection control policies and procedures that address contact, blood borne, and airborne hazards, to prevent the spread of infections or communicable diseases, including TB, skin infections and STIs, consistent with generally accepted correctional standards of care. Such policies should provide guidelines for identification, treatment and containment to prevent transmission of infectious diseases to staff or inmates.

d. Pursuant to Centers for Disease Control ("CDC") Guidelines, Cermak shall continue to test all inmates for TB upon booking at the Facility and shall follow up on test results as medically indicated. Cermak shall follow current CDC guidelines for management of inmates with TB infection, including providing prophylactic medication when medically appropriate and consistent with the inmate's expected length of stay. Inmates who exhibit signs or symptoms consistent with TB shall be isolated from other inmates, evaluated for contagious TB and housed in an appropriate, specialized respiratory isolation ("negative pressure") room. Cermak shall notify CCDOC of inmates' specific housing requirements and precautions for transportation for the purpose of infection control.

e. Cermak shall ensure that the negative pressure and ventilation systems function properly. Following CDC guidelines, Cermak shall test daily for rooms in-use and monthly for rooms not currently in-use. Cermak shall document results of such testing.

f. Cermak shall notify DFM, in a timely manner, of routine and emergency maintenance needs, including plumbing, lighting and ventilation problems.

g. Cermak shall develop and implement adequate guidelines to ensure that inmates receive appropriate wound care. Such guidelines will include precautions to limit the possible spread of Methicillin-resistant Staphylococcus aureus ("MRSA") and other communicable diseases.

h. Cermak shall adequately maintain statistical information regarding communicable disease screening programs and other relevant statistical data necessary to adequately identify, treat, and control infectious diseases.

**Compliance Status:** This provision remains in partial compliance.

a. Substantial Compliance
b. Partial Compliance
c. Partial Compliance
d. Substantial Compliance
e. Substantial Compliance
f. Partial Compliance
g. Partial Compliance.
h. Substantial Compliance

**Status Update:** Status update received and reviewed.

**Monitor's Findings:**

a. Intake TB screening in the form of chest radiograph screening is ongoing and proving very efficient and effective in identifying potential TB suspects including the only case of active TB this calendar year.
b. The status report dated 10/30/14 states the policy and procedures for skin infections was updated as of 10/27/14. The Monitoring Team evaluated procedures during our visit 11/3/14 and was referred instead to a policy and procedure for Stroger Hospital dated effective 7/1/11. This procedure is comprehensive but is clearly written for an acute care inpatient setting. The policy discusses collaboration with a wound care team and the use of a multi-disciplinary team approach. This clearly is not the approach utilized by Cermak. Furthermore, the wound care nurse identified by Cermak to care for patients with impaired skin integrity and wounds was unable to provide clear direction to nursing staff regarding current policy and procedure.

Cermak was able to produce an updated policy and procedure as of 10/24/14 with regard to Infection Control and Exposure Control Plans. These policies appear to have all the functional elements of an effective infection control program but have not received final approval and have not been published for staff. The Monitoring Team has concerns regarding the staff competency to apply the procedures identified throughout the policy without reinforcement from the leadership team. This was very apparent throughout our visit; the Monitoring Team noted many infection control deficiencies throughout the Divisions.

c. Cermak has established policy and procedures for all areas of Infection Control, Exposure Control, Sexually Transmitted Infections (STI), and wounds; however these policies need to be further revised to meet the needs of a jail environment not a hospital environment. In addition, although policy and procedure does exist, the order states "Such policies should provide guidelines for identification, treatment and containment to prevent transmission of infectious diseases to staff or inmates". The Monitoring Team noted numerous examples of unclean clinical surfaces (exam tables, chairs, trays, etc.) as well as generally poor sanitation of many patient care areas, including exam rooms. These deficiencies put both inmates and staff at risk for transmission of infectious disease.

d. The Monitoring Team reviewed all "TB suspect" cases since May 21, 2014 (9 total cases). In all but one case the TB rule out process followed the best practice recommendations. In one case, the TB suspect patient reported past treatment for active pulmonary TB many years ago. The treating physician released patient to general population based on self-report by the patient.

e. The Monitoring Team reviewed the only Cook County Jail active TB case during the calendar year 2015. The diagnosis of pulmonary TB in this case was complicated by multiple negative initial sputum AFB smears and cultures including an initially negative bronchoscopic alveolar lavage (BAL) sample for AFB smear. The culture of this sample, however, confirmed the diagnosis of pulmonary TB. Even though this patient was initially placed in respiratory isolation after the active TB disease diagnosis was confirmed, he was transferred to general population less than 24 hours later as he started the four drug dose by dose RIPE therapy. The current CDC guidelines require at least one week of respiratory isolation for AFB smear negative, culture positive pulmonary TB cases. The Monitoring Team believes that this is particularly important in a congregate setting such as a jail.

f. The Monitoring Team audited all negative pressure room logs for the past 3 months and found them to be complete. Staff interviews reveal that Cermak staff continues to report maintenance problems to DFM, but response time from report to correction continues to be highly variable. Most staff interviewed, including nursing leadership, did not use paper notification or email to report plumbing, lighting or ventilation issues. The DFM reported tracking of requests and correction; however, staff is unaware of the tracking or scheduling of maintenance requests. The Monitoring Team identified a repair issue with the alarm panel for room 3121 that is more than 90 days old. We have asked for proof of work order and an estimated time to completion of repair.

g. Cermak is currently utilizing the Stroger policy and procedure for wound care. This policy is very comprehensive; however, the nursing personnel on the units responsible for wound care were not knowledgeable of proper interventions or procedures as sited in policy preventing, in most cases, appropriate wound care. There are guidelines within the policy to prevent MRSA or at least minimize transmission and risk to other inmates and

staff. However, in at least one case during the Monitoring Team visit an inmate was hospitalized and placed on contact isolation at Stroger for a MRSA wound infection. The Monitoring Team is very concerned regarding the staff knowledge to effectively implement procedures as currently written in policy.

h. The Monitoring Team reviewed a comprehensive report regarding communicable disease screening programs and other relevant statistical data necessary to adequately identify, treat, and control infectious diseases. Based on the documents reviewed by the Monitoring Team, Cermak appears to have adequate screening, monitoring and treatment programs for management of communicable diseases, including tuberculosis ("TB"), and sexually transmitted infections ("STIs").

**Monitor's Recommendations:**

1. The Monitoring Team strongly recommends that Cook County Jail providers make every attempt to verify all self-reported cases of treatment for active TB. In cases where it is not possible to verify self-reported treatment, patients should undergo a basic TB rule out procedure (three sputum samples for AFB smears) prior to GP housing.

2. The Monitoring Team strongly recommends that all new cases of pulmonary TB be placed in respiratory isolation for at least seven days after RIPE therapy has been initiated. This period will be more extensive if the initial sputum AFB smears are positive.

3. Develop a process/schedule for routine cleaning and sanitization of clinical areas in Cermak and post these schedules.

4. Develop an electronic request form for DFM to improve tracking and access by the divisions.

5. Conduct at least one patient care oriented Infectious Disease Quality Improvement study per quarter. This study should focus on an identified patient care issue such as MRSA or soft tissue infections.

6. Further delineate procedures for soft tissue infections and wound care specifically for the infirmary. Procedures should not exceed the scope of the Cermak infirmary.

7. Develop training on wound care for all nursing staff working on Cermak infirmary. Complete training by April 2015.

## 54. Access to Health Care

a. CCDOC will work with Cermak to facilitate timely and adequate accessibility of appropriate health care for inmates, as provided by Cermak.

b. Cermak shall ensure the timely and adequate availability of appropriate health care for inmates.

c. Cermak shall ensure that the medical request ("sick call") process for inmates is adequate and provides inmates with adequate access to medical care. The sick call process shall include:
  i. written medical and mental health care slips available in English, Spanish and other languages, as needed;
  ii. opportunity for illiterate inmates and inmates who have physical or cognitive disabilities to access medical and mental health care; and
  iii. opportunity for all inmates, irrespective of primary language, to access medical and mental health care.
d. Cermak shall ensure that the sick call process includes confidential collection, logging and tracking of sick call requests seven days a week. Cermak shall ensure timely responses to sick call requests by Qualified Medical Staff. The logging procedure shall include documentation of the date and summary of each request for care, the date the inmate was seen, the name of the person who saw him or her, the disposition of the medical or mental health visit (e.g., referral; whether inmate scheduled for acute care visit), and, if follow-up care is necessary, the date and time of the inmate's next appointment. Cermak shall document the reason for and disposition of the medical or mental health care request in the inmate's medical record.
e. Cermak shall develop and implement an effective system for screening medical requests within 24 hours of submission. Cermak shall ensure that sick call requests are appropriately prioritized based upon the seriousness of the medical issue.
f. Cermak shall ensure that evaluation and treatment of inmates in response to a sick call request occurs in a clinical setting.
g. Cermak shall ensure that Qualified Medical Staff make daily rounds in the isolation areas to give inmates in isolation adequate opportunities to contact and discuss medical and mental health concerns with Qualified Medical Staff in a setting that affords as much privacy as reasonable security precautions will allow. During rounds, Qualified Medical Staff will assess inmates for new clinical findings, such as deterioration of the inmate's condition.

**Compliance Status**: This provision is now in noncompliance.

a. Substantial compliance
b. Noncompliance
c. Noncompliance
d. Partial compliance
e. Noncompliance
f. Partial compliance
g. Partial compliance

**Status Update:** Cermak provided a status report dated 10/27/14 that the Monitoring Team reviewed in preparation of this report. As noted in our last report, we find that the status report lacks meaningful information regarding measures taken to address access to care during the intervening six months.

**Monitor's Findings:**

We evaluated inmate access to care by reviewing health service request tracking systems; randomly inspecting health care request form availability and collection; reviewing health service request (HSR) forms, electronic health records, segregation logs; and interviewing staff and inmates. During the site visit, we requested aggregate access to care data for three months prior to our visit, but it was not presented to us prior to our departure.

In the Eighth Monitoring report, the Monitoring Team noted that access to care had deteriorated since the prior visit in May 2013. The major contributing factor for delays in access to care was Cermak's inability to hire nurses and prioritization of medication administration over access to care. In our report, we indicated that unless substantial improvement was made by this visit, this area would be found in noncompliance.

We are encouraged to note that CCHHS/Cermak has made significant progress in hiring nurses in the past six months; however, this has not translated into improvements in access to care across the jail. While progress in access to care was sustained or slightly improved in some Divisions (Divisions VI, IX, X and XI), we observed lack of progress or deterioration in others (Divisions I, II, III, III Annex and the RTU). In these latter Divisions, Cermak continues to struggle with fundamental elements of access to care.

For example, the Monitoring Team noted six months ago that health service request boxes had not been installed in the RTU for inmates to confidentially submit their health requests. These boxes were not installed until the week of our site visit. We also found that although health care staff were collecting HSRs daily, registered nurses in these Divisions often did not sign and date the forms as being triaged. We found many HSRs were completely blank with respect to when they were received, triaged and patients seen.

We also found that nurses did not schedule patients to be seen, or see patients when scheduled even when the patient's condition was urgent. This is of particular concern in Division III and the RTU which now houses patients with the highest medical and mental health acuity in the jail. It is also where most of the new nurses have been assigned. This combination of high medical and mental health acuity and new nurses should be the focus of intensive staff training and supervision; but this is not adequately taking place.

The Monitoring Team notes that Cermak leadership contacted us in early October to propose a new model for access to care in which a registered nurse would not schedule all patients with symptoms to be seen in a clinical setting, but have the option of sending a Correctional Medical Technician (CMT) to deliver treatment to patients who allegedly had minor complaints and then document treatment provided in the record.

We strongly advised against this proposed model. The model, in and of itself, is not compliant with the requirements of provision 54 (f). of the Agreed Order which states that Cermak will "ensure that evaluation and treatment of inmates in response to a sick call request occurs in a clinical setting"; nor is it compliant with NCCHC standards. However, we learned that following our recommendation against this model, Cermak leadership implemented it as a pilot in Divisions I and the RTU 4th and 5th floors from October 21 to 31, 2014.

Cermak leadership presented pilot data to the monitoring team that showed that 100% of HSRs in Divisions I and the RTU were sorted and reviewed during the study period. However our review of HSRs during the same time period did not validate this finding. In fact, we found that a significant number of HSRs from these Divisions were not signed by a nurse as being triaged, and patients with symptoms were not seen timely, if at all. Many of the forms were completely blank with respect to staff action and disposition. We discussed our findings with health care leadership who indicated that the data was self-reported and not validated. Although the pilot study has been completed, according to staff interviews and HSR tracking logs in Division I, the model is still in effect.

In Division III which houses female inmates, we found severe problems with access to care, as noted for this population at the last site visit. Our review showed that nurses saw patients in only one of 16 HSRs reviewed.

The Monitoring Team recognizes that the influx of new nurses, many of whom have not worked in a correctional setting, presents challenges to adequately orient, train and supervise performance. In order to improve access to care, Nurse Coordinators must monitor staff performance related to access to care on a daily basis to provide feedback and support to nurses under their direction. The Monitoring Team has emphasized the importance of daily supervision in this and previous reports; however, this is not adequately taking place.

On a positive note, nurse protocols have been implemented that include sufficient amounts of over-the-counter (OTC) medications to treat the patient's condition, decreasing the likelihood that inmates will submit duplicate HSRs for the same complaint.

In summary, despite increases in nurse staffing, access to care in several Divisions has not improved, rendering patients are at risk of harm. Due to these findings access to care is being downgraded from partial to noncompliance.

We discussed our findings and recommendations extensively with health care leadership. We recommended that the pilot access to care model be immediately discontinued. Furthermore, we recommended that health care leadership and staff focus on the fundamental elements of access to care: confidential and timely collection and triage of HSRs, and evaluating patients in a timely manner in an appropriate clinical setting.

> a. CCDOC works with Cermak to facilitate timely access to health care and b. Cermak shall ensure timely and adequate availability of appropriate health care.

During our monitoring visit we found that CCDOC is in substantial compliance with respect to facilitating timely access to health care. Additionally we found that Cermak is in noncompliance with respect to ensuring timely and adequate availability of appropriate health care.

To evaluate access to care in each Division we conducted random inspection of housing units and health request boxes to evaluate availability of HSR forms; and the process for confidential and timely collection of HSRs. We also evaluated whether nurses triaged HSR's timely, made appropriate triage dispositions, and evaluated patients in a timely manner following triage of their complaints. Our findings are noted below.

**Division I** Staffing for Division I normally includes two registered nurses, unless one is pulled to another Division. There is a correctional officer in the clinic at all times. We found no problems with custody cooperation related to access to care.

Division I was included in the access to care pilot. We reviewed the Health Services Tracking Log for the period of 10/21/14 to 11/3/14. The log showed that HSRs were collected daily except Thursday, 10/30/14, when there was "no RN in the Division." The number of HSRs collected during this period averaged 42 per day with 20 per day containing symptoms.

During this same period, the number of patients seen by a registered nurse for a scheduled sick call appointment ranged from two to 25 per day and averaged 9.5 per day. Therefore, on average, nurses saw 10 of the 20 patients with symptoms per day. It is notable that during this same time period, nurses saw an average of 12 patients each day as walk-ins; and on six of 12 days nurses saw more walk-ins than scheduled patients. This requires further exploration, but a possible explanation is that due to lack of routine access to care, patients are being seen on an urgent basis.

We requested a sample of HSRs from Heath Records for the period in which the pilot study was conducted. We found that some HSRs had improper dates from the date stamp machine that had not been calibrated to reflect the month of November. Therefore, some HSR's contained dates such as "October 34, 2014". The person who had possession of the date stamp key was on vacation and no one else was able or was inclined to change it to the month of November.

Although many HSRs were signed by staff that collected the forms, in most cases a registered nurse did not sign and date the forms as having been triaged. The HSR form currently in use has been revised to include a signature line for when the RN sees the patient; however, nurses are sending the HSR's to health records before seeing the patient. This does not enable the nurse to review the patient's HSR and ensure that all health complaints have been addressed.

Review of HSRs showed that RN triage decisions were not appropriate. In one case a patient complained of dental pain. The nurse sent the CMT to the tier to provide two ibuprofen tablets and did not have the patient brought to the clinic for evaluation. The HSR noted that the patient had a dental appointment on 12/4/14, approximately a month later, which is not timely.

**Division II** On 11/4/14 the Monitoring Team toured all four Division II dormitories. To help assess whether access to care was timely in Division II we requested HSR statistics from the Nurse Coordinator, however she was not able to provide this information for our review. However, during random interviews inmates reported waiting more than a week to be seen by a nurse.

In Dorm I we found that a nurse had not triaged HSRs from two days prior (11/2 and 11/3/14). Of 42 HSRs collected 11/2/14 there were 4 urgent requests that had not been addressed. On 11/3/14 a registered nurse had not triaged 29 of 35 HSRs. We interviewed the nurse who did not seem knowledgeable regarding the purpose and importance of the triage process. We reviewed one HSR in which a patient submitted a mental health request with suicidal thoughts. The nurse failed to see the importance of addressing this request urgently by stating "he was seen 5 days ago for the same thing".

In Dorm 2 staff does not consistently collect HSRs timely. On the day of our tour, Dorm 2 staff reported that a registered nurse called in sick and therefore they were unable to collect HSRs. However, there was a CMT working in the clinic that theoretically should have collected the HSRs. When we asked the Nurse Coordinator about this she did not have a direct response.

On the day of the visit the nurse had 10 patients scheduled for sick call and the provider was scheduled to see 13 patients during a six hour schedule. This is a light schedule given the demand for services in the Division. The methodology for nurse and provider scheduling may

contribute to delays in access by not scheduling enough appointments to keep up with the demand for services.

In Dorm 3, Health Request boxes were secure and HSRs readily available. Inmates were knowledgeable regarding the process for accessing care. Interviews with inmates from this dorm were consistent with the findings of the other dorms in Division II. Inmates stated they wait more than a week or two to be seen if an officer doesn't intervene by calling the dispensary.

In Dorm 4, confidentiality issues became apparent when officers openly admitted to collecting the HSRs even though there are locked HSR boxes in the dorm. This raises the question as to why health care staff is not collecting HSRs.

The problems with access to care noted in Division II require increased supervision by the Nurse Coordinator.

**Division III Annex** houses overflow from Division II. At the time of our visit, the population was 216. The Division has health care staff assigned eight hours per day. Therefore, after normal business hours any patient requiring urgent care is sent to Cermak Urgent Care. The Annex houses a high number of medically stable, chronic disease patients. To be eligible for housing in the annex, inmates must be prescribed keep on person (KOP) medication instead of nurse administered.

On 11/5/14 we toured the annex and found that the HSR box was adequately secured and HSR forms were available. Division III Annex inmates are taken to Division II dorm 1 clinic for routine health services. We interviewed eight inmates who reported that HSRs get lost when changing housing locations. Five out of eight inmates stated they put their requests in over seven days ago and still had not been seen. One inmate stated he had been waiting over three weeks to be seen. In this building there is concern about inmates being denied access to care due the perception that they are supposed to be more medically stable than the other divisions. In fact, inmates reported they use the HSR system to renew prescription medications due to a backlog for provider appointments.

**Division III** was closed at the last site visit. It now houses female inmates that were transferred from Division IV several months prior to the site visit. Division III has a capacity of 326 and current population of 301 inmates.

The Nurse Coordinator assigned to Division III went out on medical leave the week prior to our site visit, and we were accompanied by another Nurse Coordinator. On the day of our tour, the registered nurse who normally works at Division III was off and a nurse from Division I was assigned to administer medications. The Monitoring Team spoke with a group of six inmates in

the waiting room who reported extensive delays in being seen following submission of a health request. We also met with a large group of inmates in the recreation area who also reported delays in access to care.

We reviewed records of five inmates. Four of the five records contained 16 HSRs submitted between 7/28/14 to 10/29/14. The types of complaints included breast rash, dysuria, dental pain, upper respiratory infection symptoms and vaginal bleeding. Most HSRs lacked documentation of when the forms were collected, triaged by a registered nurse, and entered into the computer. We found that nurses saw the patient in only one of 16 cases.

As noted in our last report, in April 2014 female inmates with higher medical and mental health acuity were transferred to Division VIII (RTU), fifth floor. At that time, nurse staffing associated with medication administration was also transferred to the RTU. Also, a registered nurse who performed nurse sick call retired around the same time and has not been replaced. This left the Nurse Coordinator, one registered nurse and two correctional medical technicians to perform nurse sick call, medication administration, chaperone and assist providers during clinics, and respond to patients with urgent complaints. Moreover, the Nurse Coordinator for this Division did not adequately supervise nurse performance with respect to access to care. We find this to be the case at this visit as well. This is clearly inadequate staffing for 300 female patients.

**Division IV** was closed at the time of our site visit.

**Division V** was closed at the time of our site visit.

**In Division VI** on Wednesday 11/5/2014 the Monitoring Team observed that Health Service Request (HSR) forms were available in the housing areas, a tracking log was in the HSR box that showed that staff collected HSRs daily. That same day one nurse was observed conducting two sick call encounters. Both HSRs were date stamped 10/30/2014 and should have seen by the nurse no later than end of business Monday to be within the timeframe.

The nurse took an appropriate patient history, vital signs and then conducted a focused examination that was appropriate to the chief complaint. The nurse did not change the exam table paper between patients. The nurse provided an over-the-counter (OTC) medication to each of the inmates and scheduled each patent for a return appointment with the nurse. The nurse's disposition decision in each case was appropriate.

**Division VIII** (RTU) is now fully occupied and three of four floors contain high acuity medical and mental health populations. The second floor is currently occupied by general population inmates but in the future will house inmates requiring monitoring for alcohol and drug withdrawal. The 3rd floor houses high medical acuity male inmates; the 4th floor houses high

mental health acuity male inmates; and the 5th floor houses high medical and/or mental health acuity female inmates. Each housing unit is direct observation by a correctional officer enabling inmates to readily communicate their medical and mental health needs to staff. We found no issues related to custody cooperation and escort,

We interviewed the RN on the 5th floor who was recently hired. She described how she had been oriented and trained to provide access to care, however when we asked about what guidelines she used to conduct assessments and determine treatments, she was unaware of the nursing protocols.

The RTU 4th and 5th floors were included in the access to care pilot that permitted a registered nurse to make a determination regarding whether inmates who submit HSRs with symptoms will be evaluated in a clinical setting. We requested a sample of HSRs from the health records department for the period in which the pilot was formally conducted (10/21/14 to 10/31/14). We found many (>20) HSRs that were incompletely filled out with respect to date of collection, nurse triage and entry into the computer; and some HSRs were completely blank.

We reviewed 13 HSR requests in three records; two records were from the 5th floor and one from the second floor. A nurse saw the patient in one of 13 cases. One patient was a woman with Crohn's disease who submitted seven HSRs from 9/30 to 10/26/14 and was never seen by a nurse.[9] During this time she was twice sent to the Cermak Urgent Center for evaluation and was briefly admitted to the infirmary. She was also not seen by a primary care provider for a month after arrival despite these urgent events. Another patient submitted five HSRs including two complaints of facial swelling and severe dental pain (8 of 10 in severity) but a nurse did not see the patient.[10] On 10/30/14 a 58 year-old patient on the 2nd floor submitted a HSR complaining of recurrent chest pain and shortness of breath.[11] A nurse did not see the patient and on 11/4/14 he was urgently referred to the Cermak Urgent Care for evaluation.

These findings indicate that patients in Division VIII do not have adequate access to care and are at risk of harm. We shared our findings with health care leadership during the site visit so that the problems here could be addressed immediately.

**In Division IX** the method for handling HSRs is unchanged from the sixth report. Observations made during the tour of the housing units were that HSR forms were available from both the officers and the nurses, the boxes in the vestibule were emptied by health services staff each day and the log was in place. Inmates in Division IX must hand the completed HSR to either an

---

[9] Access to Care Patient #7.

[10] Access to Care Patient #6.

[11] Access to Care Patient #8.

officer or a nurse to put in the HSR box that is mounted on the wall in the vestibule outside the cell block.

The Monitoring Team observed a nurse in North Tower seeing three inmates. Nurses in this Division delay entering the inmates' complaint into the EMR until the inmate is seen and a nursing note entered. On 11/5/14 the nurse saw patients for whom the HSRs were dated the end of October; therefore these nursing assessments were not timely. The nurse's assessments of inmates' complaints were limited, consisting of the patient's description of the problem, vital signs, and interview questions from the protocols. In two of the three encounters a physical examination should have been completed but was not. The nurse did provide information about self-care and offer OTCs for symptom relief to both patients.

The disposition of the three HSRs seen for a face to face assessment by a nurse resulted in no provider appointments. In one case the nurse checked on an order the physician had indicated would be written for the patient. In another case the nurse followed up to ensure that medications were available for an inmate who had been transferred from Division X. In the third case the nurse examined the healing of a gunshot wound and changed the dressing. An OTC for pain was provided for one of the patients. While the disposition decisions made by the nurse were all appropriate they were based upon an assessment that was too limited.

**In Division X** the method for handling HSRs is unchanged from the eighth report. At the present time three nurses, one on day shift and two on swing shift, are assigned to address HSRs. A total of 26 health assessments were scheduled to take place on 11/6/14. Three random HSRs were selected for review. All three met timeframes for access to care; they had been date stamped as received and triaged on 11/4/14 and the nursing assessment scheduled for 11/6/14. Timeliness in addressing HSRs in Division X has improved substantially since the last visit.

We observed a nurse during two sick call encounters. Each inmate had multiple complaints including dry skin and difficulty sleeping. The nurse did a very brief, unfocused assessment in each encounter. Each patent received education about staying hydrated and skin cream was provided to both. The nurse provided information about how to improve sleep to one inmate complaining of insomnia but did not provide the "Sleep Sheet" or log as described in the nursing protocol. The nurse did not schedule any provider appointments or return visits to the nurse.

A correctional officer was sitting at a desk in the same room where nurse sick call took place. The Superintendent also sat in the room and conversed with the correctional officer while an inmate was being seen by the nurse. Neither the nurse nor the Nurse Coordinator asked correctional personnel to leave the area to provide patient privacy per Item 43. F. of the Agreed Upon Order.

**In Division XI** the method for handling HSRs is unchanged from the seventh report. Of thirteen HSRs reviewed, all were timely. A registered nurse saw ten of these inmates the day after the date on the request; one was seen the same day as the date on the HSR; and two were seen two days after the date on the HSR. Timeliness from the date the HSR is received until seen by a nurse has improved since the last visit and nearly meets the standard. Monitoring Team observations made during the tour of the housing units were that HSR forms were available in the officer's area, the boxes in the vestibule contained HSR tracking logs and health care staff collected HSR's daily.

On 11/4/14 the Monitoring team observed four nursing sick call encounters. Prior to seeing the patient, the nurse reviewed the complaint and the electronic medical record for the most recent encounters and current medications. The nurse took an appropriate patient history, vital signs and then conducted a focused examination. One of the nurses uses a room that does not have an oto-ophthalmoscope or exam table. She must take the inmate into the treatment room to use this equipment which is time consuming and inefficient. The room she uses should be properly equipped.

The previous practice of piggy-backing onto existing provider appointments was not evident in the encounters that were observed or in charts reviewed (N=6). The nurse made three appointments for follow up with the primary care provider and all were timely. The nurse also scheduled one inmate for a return visit to the nurse to ensure his cold symptoms had resolved; a practice not seen before. Other referrals were to optometry and dental. An OTC was provided in five of six completed encounters reviewed; acetaminophen was provided in three encounters for pain, ibuprofen in another and fiber in one encounter for constipation.

54. c. Cermak shall ensure that the medical request (sick call) process is adequate and provides inmates with adequate access to medical care.

As noted above, the medical request (i.e., health service request) process is not adequate and does not provide inmates adequate access to medical care; therefore overall this area is in noncompliance.

However, elements noted below are in substantial or partial compliance.

54. c. 1. Health care request forms are written in both English and Spanish.

This area continues to be in substantial compliance. We observed that paper health service request forms are written in both English and Spanish.

54. c. 2. Opportunity for illiterate inmates and inmates with physical or cognitive disabilities to access medical and mental health care.

This element is in substantial compliance. Cermak Policy # E-07 Non-Emergency Health Care Requests and Services provides instruction for staff in assisting inmates who need assistance with completing a health services request. Inmates with physical and cognitive disabilities have been moved to the RTU and placed in direct observation housing units which allow inmates to communicate health concerns directly to staff and theoretically increases access to care.

54. c. 3. Opportunity for all inmates, irrespective of primary language to access medical and mental health care.

Cermak has added two devices for hearing impaired to communicate with healthcare staff. These Internet based devices allow sign interpreters remotely to communicate in sign language to detainees in their health care requests. We did not observe use of these devices during this visit (Not Evaluated).

54. d. Cermak shall ensure that the sick call process includes confidential collection, logging, and tracking of sick call requests seven days a week. Cermak shall ensure timely response by Qualified Medical Staff. The logging procedure shall include documentation of the date and summary of each request for care, the date the inmate was seen, the name of the person who saw the inmate, the disposition of the medical or mental health visit, and if follow-up is necessary, the date and time of the next appointment. Cermak shall document the reason for and disposition of the mental health request in the inmates' medical record.

This area is in partial compliance. Cermak Policy E-07 Nonemergency Health Care Requests and Services outline the process for confidential collection, logging and tracking of health service requests. However, the policy does not include all elements required by the Agreed Order to be logged and tracked, including documentation of the date and summary (complaint or service) of each request, the date the inmate was seen, the name of the person who saw the inmate, the disposition of the request, and date and time of the next appointment, as needed. By policy, all health care encounters are to be documented in the health record including disposition. Actual practice shows that there is a system for logging how many HSRs are collected and triaged each day and the number of patients nurses see each day, but the information is not tracked per patient, as required by the Agreed Order.

54. e. Cermak shall develop an effective system for ensuring medical requests are screened within 24 hours of submission. Cermak shall ensure that sick call requests are appropriately prioritized based upon the seriousness of the medical issue.

This area is in noncompliance. This is due to tour findings in Division I, II, III, and the RTU that showed that HSRs are not screened (i.e., triaged) within 24 hours of admission and appropriately prioritized. The total population for these Divisions is over 4300 inmates and includes the highest acuity inmates in the jail.

54. f. Cermak shall ensure that evaluation and treatment of inmates in response to a sick call request occurs in a clinical setting.

This area is in partial compliance. This is due to the pilot project in Divisions I and the RTU 4th and 5th floors, that does not ensure that evaluation and treatment of inmates in response to a sick call request occurs in a clinical setting.

54. g. Cermak shall ensure that Qualified Medical Staff (QMS) make daily rounds in the isolation areas to give inmates in isolation adequate opportunities to contact and discuss medical and mental health concerns with QMS in a setting that affords as much privacy as reasonable security precautions will allow. During rounds, QMS will assess inmates for new clinical findings, such as deterioration of the inmates' condition.

This area is in partial compliance. As noted in previous reports, the Agreed Order requires that Cermak ensure that Qualified Medical Staff make daily rounds in isolation areas to give inmates opportunities to discuss medical and mental health concerns with health care staff in privacy. During rounds, health care staff is to assess inmates for new clinical findings, such as deterioration of the inmate's condition.

As noted in previous reports, in April 2013 Cermak revised Policy E-09 Segregated Inmates. The revised policy requires rounds by nursing staff care staff twice weekly and mental health staff weekly. Nurses are to document completion of the rounds in the officers' log book.[12] The revised policy is not in compliance with either the Agreed Order or NCCHC standards, although the standards are cited as a reference.

In Division VI segregation rounds are conducted as described in the Eighth report. In Division VIII (RTU) segregation logs show that nurses do not make daily rounds as required by the agreement and are not documented in the EMR. There has been no change since the seventh report in how segregation rounds are conducted in Division IX.

Although not in compliance with the Agreed Order, NCCHC standards only require rounds three times a week for segregated settings as described in the Cermak policy and procedure. The policy is not compliant with respect to documentation of segregation of rounds. We support

---

[12] Segregated Inmates. Policy E-09. Dated 4/5/2013.

revising the Agreed Order to be in compliance with NCCHC standards for the frequency of rounds and documentation requirements. This was discussed with DOJ counsel during this visit.

**Monitor's Recommendations:**

1. Discontinue the pilot access to care project immediately.
2. Continue to fill staff vacancies to improve access to care.
3. Develop the infrastructure necessary to provide access to care.
   a. Revise the policy and procedure for access to care so that it complies with the Agreed Order.
   b. Ensure that nurses receive adequate orientation and training, including physical assessment skills, triage and nurse protocols to perform nurse sick call.
   c. Ensure that nurse sick call takes place daily in every Division; stop the practice of redirecting nurses from access to care to other functions.
   d. Revise the manner in which nursing protocol templates and entries are viewed in the electronic health record so that it is clear, concise and in SOAP format.
   e. Fix access to care data collection to ensure that it is complete, valid and reliable.
4. Health care leadership should monitor staff compliance with access to care requirements by conducting monthly monitoring in each Division. Each month Nurse Coordinators and Process Improvement staff should monitor 25 records in each Division with particular attention to the following:
   a. Daily collection of HSRs.
   b. Date stamping HSRs at the time of collection.
   c. Timeliness and appropriateness of nurse triage.
   d. Staff entry of HSRs into the electronic health record.
   e. Scheduling patients for timely nursing evaluations in the EMR in accordance with the urgency of the complaint and policy requirements.
   f. Clinically appropriate assessments utilizing nursing protocol templates with documentation in the EMR.
   g. Scheduling patients to see a provider using the EMR and not piggybacking patients onto a future appointment (unless the appointment is timely and the provider is aware of the reason for the referral).
5. Develop and implement a Health Service Request Logging and Tracking system that is fully compliant with the Agreed Order (54. F.).
6. CCDOC and Cermak should jointly monitor inmate access to health service request forms and the ability to confidentially deposit them in a box accessed only by health care staff. All health care boxes should be labeled.
7. Provide close clinical and programmatic supervision of the nursing staff responsible for assessment and triage of Health Services Requests. Nurse Coordinators should audit 10 HSRs in every Division daily to ensure that staff is following policy and procedure.

8. Nurse Coordinators should evaluate the quality of nursing evaluations and compliance with the nursing protocols and/or sound nursing judgment using peer review.
9. Revise the segregation policy consistent with NCCHC standards. Modify the Agreed Order to meet NCCHC guidelines regarding the frequency of rounds.

## 55. Follow-Up Care

a. Cermak shall provide adequate care and maintain appropriate records for inmates who return to the Facility following hospitalization or outside emergency room visits.

b. Cermak shall ensure that inmates who receive specialty, emergency room, or hospital care are evaluated upon their return to the Facility and that, at a minimum, discharge instructions are obtained, appropriate Qualified Medical Staff reviews the information and documentation available from the visit, this review and the outside provider's documentation are recorded in the inmate's medical record, and appropriate follow-up is provided.

**Compliance Status:** This provision remains in partial compliance.
      a.     Partial Compliance
      b.     Partial Compliance

**Monitor's Findings:**

Chart audits were conducted on patients returning from the hospital visits. Patients who are sent to the hospital from the jail are brought back to the Urgent Care center at Cermak. The patients who return wait in the Urgent Care center while their paperwork is reviewed by the nurse and the provider. The providers also review the EMR notes from the hospital to ensure continuity of care.

Patients who return from the emergency room and inpatient services are seen upon return by the urgent care provider. The patients who return from specialty clinic visits or special procedures are supposed to have paperwork reviewed to initiate any medications and orders. However there is no documentation by the nurse to show that the review of the paper work was done. The manager at the Urgent Care center is establishing a process to ensure that the patient's paperwork is reviewed upon return.

Recent change has been made to ensure that the patients returning from same day surgery also get seen at the urgent care. During our chart review we identified that a patient who returned from day surgery did not get seen by medical staff on return and was finally seen by a provider

two days later but for a pre-existing appointment. The patient was not seen by the nurse upon return, delaying initiation of medications. A similar issue was noted in our previous visit.

There is no reconciliation process to ensure all patients who were sent to the hospital get seen upon return.

**Monitor's Recommendations:**

1. Establish a reconciliation process not less than once a shift for patients sent to the hospital for scheduled and unscheduled visits, by an assigned team so that all patients returning from the hospital are seen and discharge instructions are followed.
2. Create a template for hospital return visits for nursing and providers so pertinent information is captured in the note (i.e. reason for hospital visit, condition of patient upon return, discharge diagnosis, any new problems that must be added to problem list, medication reconciliation, plan of action for discharge instructions, in house nurse/provider follow-up or hospital follow-up, notification to the provider who sent the patient to the hospital, etc.).

3. Self-Monitoring:
   a. Maintain a database of all send outs by type (ER, Inpatient, Clinics, Same Day Surgery, Procedures, etc.). The data base should include: the mode of transport, seen by provider before send out, name of the provider who sent the patient out, reason for send out, discharge diagnosis, was patient seen on return, date and time of patient seen on return.
   b. Review at least five ER and five inpatient send out charts to audit if they were seen upon return, reason for send out, timeliness of send out, appropriateness of mode of transport, appropriateness of emergency response provided by in house staff, appropriateness of documentation, were hospital records reviewed, documentation of implementing discharge instructions, and if not, the reason documented, medication reconciliation, problem list updated, appropriateness of post discharge housing in the jail, patient educated on the plan of care, etc. (the documentation templates will help make this audit easy to do).
   c. Use this database to monitor performance and identify improvement activities.

**56. Medication Administration**

   a. Cermak shall ensure that treatment and administration of medication to inmates is implemented in accordance with generally accepted correctional standards of care.
   b. Cermak shall develop policies and procedures to ensure the accurate administration of medication and maintenance of medication records. Cermak shall provide a systematic

physician review of the use of medication to ensure that each inmate's prescribed regimen continues to be appropriate and effective for his or her condition.

c. Cermak shall ensure that medicine administration is hygienic, appropriate for the needs of inmates and is recorded concurrently with distribution.

d. Cermak shall ensure that medication administration is performed by Qualified Nursing Staff.

e. When Cermak prescribes medication to address an inmate's serious mental health needs, HIV or AIDS, or thromboembolic disease, Cermak shall alert CCDOC that the inmate in question is on a flagged medication. If the prescription is terminated during an inmate's stay at the Facility, Cermak will notify CCDOC.

f. When CCDOC receives notice that an inmate is on a flagged medication, CCDOC shall include notation of a medication flag in the inmate's profile on the Facility's Jail Management System.

g. When an inmate with a medication flag is processed for discharge at the Facility, CCDOC shall escort the inmate to designated Cermak staff in the intake screening area of the Facility for discharge medication instructions.

h. When CCDOC escorts an inmate with a medication flag to Cermak staff during discharge processing, Cermak staff shall provide the inmate with printed instructions regarding prescription medication and community resources.

i. Each morning, CCDOC shall provide Cermak with a list of all inmates with medication flags who were discharged the previous day.

j. Within 24 hours of discharge of an inmate with a medication flag, Cermak shall call in an appropriate prescription to the designated pharmacy on the Stroger Hospital campus to serve as a bridge until inmates can arrange for continuity of care in the community.

k. CCDOC shall ensure that information about pending transfers of inmates is communicated to Cermak as soon as it is available.

l. When CCDOC has advance notice and alerts Cermak of the pending transfer to another correctional facility of inmates with serious medical or mental health needs from detention, Cermak shall supply sufficient medication for the period of transit. In such cases, Cermak shall prepare and send with transferring inmates a transfer summary detailing major health problems and listing current medications and dosages, as well as medication history while at the Facility.

m. CCDOC shall ensure that the transfer summary and any other medical records provided by Cermak will accompany inmates, or will be made available electronically or transmitted by facsimile, when they are transferred from the Facility to another institution.

**Compliance Status:** This provision remains in partial compliance.

- Partial compliance

- Partial compliance
- Partial compliance
- Substantial compliance (June 2011)
- Substantial compliance (November 2014)
- Substantial compliance (November 2014)
- Substantial compliance (November 2014)
- Substantial compliance (November 2014)
- Substantial compliance (November 2014)
- Substantial compliance (November 2014)
- Substantial compliance (November 2014)
- Substantial compliance (June 2011)
- Substantial compliance (November 2014)

**Status Update:** A status report dated 10/27/2014 was provided and reviewed in advance of the site visit. Of 12 recommendations made regarding medication delivery, four have been accomplished, two partially accomplished, two are still being considered and four were either misunderstood, or the reported action was non-responsive or missing.

**Monitor's Findings:**

In addition to the status report, the following documents were reviewed in preparation of this report:
   a. Minutes of the meeting of the Pharmacy & Therapeutics Committee that took place April 10, 2014 and on September 22, 2014. No minutes were provided for the P & T meeting that took place on 7/17/14.
   b. Minutes of the Cermak Continuous Quality Improvement Committee (June 18, August 20, and September 17, 2014). Quality Improvement Reports on Discharge Medications and Medication Delivery.
   c. The Cermak Quality Indicator Report (January 2014 – September 2014).
   d. Cermak Health Services Policy and Procedure
        1. D-02.3 Medication Distribution (Approved 10/27/14)
        2. D-02.4 Medication Administration Record (Approved 10/27/14)
        3. E-13 Discharge Planning (draft)
        4. E-13.2 Discharge Planning for Mental Health Patients (Approved 10/27/14)
   e. Incident reports (eMERS) on narcotic discrepancies for the month of October 2014.
   f. Incident reports (eMERS) on medication errors since mid-June 2014.
   g. FY 2014 Cermak RTH Tracking Status Detail as of 10/25/14 and Cermak Health Services Pharmacy Position Vacancy List.
   h. List of Cermak Health Services 2014 Training for nursing personnel.

Since the last site visit Cermak has integrated Pharmacy positions into the position control system and now monitors retention and timeliness in filling pharmacy vacancies. During the site visit the Monitoring Team inspected medication storage areas, including stock medications and narcotic control, observed medication administration, and reviewed medication administration records. We interviewed staff and inmates in all Divisions about the medication system.

a. Cermak-Standard of Care- Partial Compliance

Medication Dispensing and Packaging for Delivery: The Pharmacy fills between 250,000 and 300,000 prescriptions a month. The robotized packaging system Fastpak has been in place for two years and has proved to be a very reliable system. In addition, Pharmacy staff delivers and fills the Pyxis machines in the Cermak inpatient units. This includes verification of the medication against the Cerner MAR before it is placed in the drawer. Pharmacy staff also delivers and stocks the Pyxis machines that are used for one time and starter doses in all of the other Divisions. The Pharmacy also packages medications for inmates to self-administer which are delivered by the Medication Delivery Team. Finally the Pharmacy provides floor stock medication for the dentists to dispense and over-the-counter medications for use by nurses in sick call.

A satellite pharmacy was built in the new Division VIII/RTU but it has not opened yet because no additional positions were authorized for 2014. These positions have been requested again for funding in 2015. Pyxis machines have been installed in every medication room in Division VIII/RTU for administration of urgent, one-time and controlled substance doses and are serviced by existing Pharmacy staff.

Medication Administration:
Medication administration was observed to be completed timely and inmate interviews generally indicated that medication was received when expected. However, in Cermak's status update to Dr. Metzner, lengthy medication administration on the Women's Unit in Division VIII is noted to have impacted treatment programming (page 8 of Appendix IV). Cermak expects that as new nursing personnel become familiar with the facility's practices regarding medication administration, timeliness will improve and this issue will resolve.

Patient identification is still done manually by having the patient state their name and identification number or birthdate and comparing it to their identification card and the identifying information on the MAR. In Division IX, this two-step identification was done correctly (consistent with the Interagency Directive). However the monitoring team observed that in Cermak two-step identification was not completed on either floor. When one of the nurses was questioned as to the reason, she stated it was because she knew the patient. In Division VIII inmates were not asked to give their name but were asked to state their date of

birth and/or ID number and this was compared to the identification badge and MAR. The eMERS report lists two instances of inmates receiving the wrong medication because two part identification was not done by nursing staff. One of these occurred in Cermak in June, the other was in Division IX in August. Scanning the identification card has been recommended in previous reports; Cermak indicated in the 10/27/14 status report that the logistics of doing this are being reviewed.

Availability of support from correctional officers continues to vary from unit to unit. In Cermak officers were not in close proximity to the medication line to ensure inmates were spaced adequately. Inmates lining up at the window were able to hear the interaction between the nurse and inmate in front of them. The same practice was observed on a unit in Division IX; several inmates crowded the cart and could overhear the interaction between the nurse and the inmate receiving a medication. Correctional officers were unaware and did not intervene to manage access to the medication cart. When correctional officers fail to monitor the line inmates are not provided adequate privacy during medication administration. Finally, officers did not assist with oral or hand checks in any of the Divisions where medication administration was observed (Cermak, Divisions VIII/RTU and IX).

Inmates who refused medications were brought to the nurse, an improvement from the last report. Refusals that were observed during the site visit were most often because the inmate did not want to get up in the morning or because the medication was crushed.

Keep on Person (KOP) Medication Delivery and the Medication Delivery Team: Inmate interviews revealed no concerns about the availability of KOP medication except for refilling "as needed" medications which take longer because a Health Services Request (HSR) form must be submitted. Also inmates in Division III Annex were confused about the process and submitted HSRs to request routine refills. In Division VIII (RTU) this problem was resolved when health care staff met with inmates on each of the units to teach them how refills are handled.

A study on the turnaround time of KOP orders was done in May and reported out at the September quality improvement meeting. Six percent of new orders for KOP medications took more than 24 hours to deliver to the patient. Also there was an increase in the number of KOP orders dispensed that had no corresponding documentation of delivery on the eMAR. Actions reported in the QI minutes were to develop a procedure and provide training for the medication delivery team. However no changes were made in the 10/27/14 revision of Policy # D-02.3 related to the delivery of KOP medications and Policy D-02.4 has not been revised to reflect the expected documentation on Accuflo for KOP medications.

Medication Continuity: Medication continuity at Cook County Jail is disrupted for three primary reasons: 1. an inmate is transferred; 2. inmates' prescriptions require administration of doses at

times when there is no nursing staff on duty; and 3. an inmate goes to court from a Division that does not have 24/7 nurse staffing.

With regard to transfers, the most common complaint from inmates who were interviewed about medication was that it was not available when they are moved for several days afterward. The Pharmacy Director stated that medication will arrive at the new location the next day in the evening. Further cohorting of remaining inmates (not already in Division VIII) classified as M2 and P2 into one Division would further reduce discontinuity resulting from transfer.

In an illustration of the second reason, Division IX is staffed twelve hours a day. On 11/4/14 there were five inmates in Division IX scheduled to receive medication at times when there are no nursing staff scheduled. In reviewing the MARs it is clear that nurses variably decide to give the medication later and outside the two hour window or do not give the dose at all. Reviewing the orders for two of the five inmates suggested that perhaps the order could be changed to accommodate available staffing.

In terms of the last reason, court appearances, Cermak has not implemented the plan described in the Eighth Report to administer scheduled dose by dose medications to inmates before leaving. The incidence of missed doses could be reduced if this plan was implemented and it may be possible for the nurse to administer early doses in Division IX as well.

The Eighth Monitoring Report recommended that Cermak set benchmarks for medication adherence and include expectations for review of the MAR in clinical care and QI. The Cermak status report only addresses refusals, which is insufficient. Medication adherence is not limited to refusals but includes consideration and remediation of all reasons for missed doses.

Automated Dispensing Cabinets: Pyxis automated dispensing cabinets have been in place nearly 18 months now. Twenty-five of 48 medication related errors and narcotic discrepancies reviewed on eMERS involve mistakes removing and returning medication to the Pyxis cabinets. According to the material provided by Ms. Christmas, Nurse Educator, use of the Pyxis was covered in the annual competency evaluation done in January 2014. In addition to the annual review, it is recommended that a demonstration of the nurse's competency with Pyxis take place as part of the nurse coordinator's review of these errors so that specific corrections can be made immediately.

Management of Controlled Substances: Cermak has established an adequate system to account for controlled substances and is actively monitoring to achieve compliance with policies related to controlled substances. Controlled substance counts performed by the monitoring team during the site visit were accurate (Cermak, Divisions IX, X).

b. Cermak- Policies and procedures and systematic physician review–Partial Compliance

Revisions of policies related to discharge planning were provided for review and are discussed in sections e-j.

Policy # D-02.3 Medication Distribution was revised and approved 10/27/2014. A further revision of this policy is suggested to match actual expectations. The newly revised policy still does not refer to the eMAR even though this has been universally implemented; it requires that nursing staff wear a distinctive vest during medication administration and they have not for at least 18 months; also nurses do not carry a caddy up to the second tier as described in Method II, instead inmates are brought one by one to the cart in the vestibule; and there is no instruction to submit an eMERS report if medication cannot be administered in a timely manner. In addition, the definition of "medication distribution" differs from the definition of the same term used in the Interagency Directive 64.5.45.0 and should be revised to coincide. Further revise Policy # D-02.3 to reflect actual expectations for medication administration and coincide with the Interagency Directive.

The policy is also nearly silent about infection control during medication administration and practices vary greatly from nurse to nurse. Infection control concerns were raised by the monitoring team and include how inmates are provided water or juice to take with oral medication, how used cups are thrown away and hand hygiene during medication administration. Standardized approaches to these issues should be outlined in the policy.

Several deviations from facility policies for medication administration were observed during this site visit. These deviations in practice have been observed at every prior site visit and have been documented in each report. More focused effort to monitor and supervise medication administration will be necessary to ensure that actual practices become consistent with the agency's written directives.

Practices on the part of CCDOC which are not consistent with the Interagency Directive observed during this site visit were: 1. officers did not manage the environment or the flow of inmates to and from the medication cart or window; and 2. did not assist with oral or hand checks to ensure ingestion of medication.

Practices which are inconsistent on the part of nursing staff with revised policy D-02.3 that were observed during the site visit in Cermak and Division VIII include: 1. not using the two part identification check,;2. not comparing the medication label to the eMAR,; and 3. failure to document medication onto the eMAR at the time of administration. Further the eMERS report

identified three instances in Division II when the nurse who documented administration of medication was different from the nurse who prepared the medication.

A revision of Policy # D-0.2.4 Medication Administration Record was provided, also dated as approved 10/27/14, but it only applied to use of the paper MAR. Since all sites now are using an eMAR, this policy is not relevant. The Pharmacy Director indicated that it would be renamed the downtime procedure. We recommend that nursing staff that have used the paper MAR when the eMAR was down, review the draft downtime procedure to ensure that the procedure is realistic in an actual situation.

There is no procedure for documentation and use of Accuflo or the Cerner eMAR. Nurses were observed in Cermak and Division VIII (RTU) not to document on the Cerner eMAR at the time medication was administered, an extremely unsafe practice. The eMERS report on medication related incidents lists many instances of incorrect or inaccurate documentation on the electronic MAR (8 out of 41). There also was extensive discussion about documentation on the eMAR in the Eighth report, portions of which are repeated again here so that the issues that have been raised can be addressed when the policy is revised.

> *...on the electronic MARs reviewed there were many entries that indicated medication was not given. The reasons seemed to vary in ways that cause questions about whether terms are well defined and used consistently. There is a drop down menu on Accuflo that indicated the symbol "Ø" means that medication was not administered and the reason is listed on the last page of the MAR and "/" indicates a missed dose but no reason must be given. Given current pharmacy operations and rapid turn-around time, it is unlikely commonly ordered medications are not available. It is unclear whether each of these reasons has been defined and because documentation procedures have not been updated there is unexplained variance.*

We have recommended since the Seventh Monitoring Report (May 2013) that medication delivery be audited regularly (including the role of CCDOC officers) using an observation tool derived from the interagency directive and results reported at Cermak quality improvement meetings. In the October status report Cermak states that no action has been taken because this recommendation is still being considered. Before substantial compliance can be achieved with the Agreed Order Cermak must demonstrate performance that more consistently and reliantly adheres to the Interagency Directive and Cermak policies. Regular audits and documented efforts to improve are essential to achieve the desired performance as well as obtain substantial compliance.

There is no evidence that treatment is disrupted because of expired orders. Ten days in advance of order expiration the Pharmacy distributes information about inmates' prescriptions to

providers so that new orders can be generated after their review. A request has been submitted to IT to automate this notification system.

    c. Cermak-Hygienic, Appropriate and Concurrently Recorded- Partial Compliance

Hygiene: Hygiene practices varied and infection control concerns have been raised by the monitoring team. See discussion and recommendations in section b. for revision and additions to Policy # D- 02.3 Medication Distribution.

Appropriate: The volume of medications reported as missing on the QI indicators report has increased slightly from the Eighth Report however few inmates expressed concern about late or missing medications. The problems associated with inappropriate housing appear to be largely resolved now that Division VIII (RTU) has opened and the new CCDOC jail management system is installed.

The metric of time from the medication order to first dose was added to the 2013 Cermak Quality Indicators. Now that use of Accuflo and the Cerner eMAR is fully implemented timeliness of dose by dose orders needs to be tracked in addition to KOP orders. One suggestion is to initiate this study by tracking "critical medications" first.

Concurrently Recorded: Accuflo has been fully implemented in all of the Divisions where it was intended to be used. A description of Accuflo is in the Eighth Report (May 2014). Accuflo is not integrated into the EMR and requires a health care provider to exit the EMR to access the information in Accuflo about patient's medication adherence. It is an improvement over the use of a handwritten record that is later scanned into the EMR, but is still awkward and cumbersome to use in monitoring continuity of care and treatment effectiveness.

Another eMAR is used in Cermak and Division VIII (RTU) which is integrated with the Cerner EMR. There is some consideration being given to cohorting the remaining P-2 and M-2 inmates in one Division (XI) and installing drops to support use of the Cerner eMAR. If this is accomplished the documentation of nearly all dose by dose medications will be made in the Cerner eMAR (except Divisions VI & IX) which will better facilitate clinical management of patient treatment.

While availability of the electronic MAR has greatly facilitated documentation there were instances observed in Cermak and Division VIII during the site visit when medication was not documented at the time it was administered. One of these nurses was observed to do the same during the last site visit. This suggests lack of timely supervision and effective corrective action.

    d. Cermak-Staffing: Substantial Compliance (June 2011)

Appropriately qualified nursing staff administers or deliver medication. This finding has been in substantial compliance since the June 2011 report.

    e. Cermak-Flagged Medication Procedure –Substantial Compliance (November 2014)

The interface between Cerner and CCDOC was completed the week prior to the Monitoring Team's site visit. Cermak is using the term "Discharge Medications" to alert CCDOC of inmates who are prescribed "flagged medications" as listed in the Agreed Order to treat psychiatric disorders, HIV or AIDS, or thromboembolic disease.

    f. CCDOC-Flagged Medication Noted on JMS-Substantial Compliance (November 2014)
    g. CCDOC-Discharge medication instructions-Substantial Compliance (November 2014)
    h. Cermak- Provides printed instructions- Substantial Compliance (November 2014)
    i. CCDOC- List of inmates discharged -Substantial Compliance (November 2014)
    j. Cermak- Prescription within 24 hours of discharge -Substantial Compliance (November 2014)

The process developed by CCDOC and Cermak referred to as "Discharge Meds Before Release" was implemented last May and described in the Eighth Report. This process is still in place with some additional improvements made since then.

A copy of the working draft of Policy # E-13 Discharge Planning was reviewed. As drafted, it complies with the Agreed Order and matches actual practices. A copy of revised Policy # E-13.2 Discharge Planning for Mental Health Patients as approved 10/27/14 was also provided for review. It needs further revision to correct the terminology used for alerts and change the reference to the IMACS system which has been replaced by another jail management system. It should also cross reference E-13 as a related policy.

Cermak monitors the percent of patients who pick up their discharge medications on the Quality Indicators Report. A review of discharge medications picked up since the new process has been in place showed no change in the rate of prescriptions filled. While Provident Pharmacy had many fewer prescriptions the pick-up rate has been over 60 % compared to the BC Pharmacy (average of 29%). No specific plan for improvement has been developed although intent to continue the collaboration between prescribers and pharmacy staff was noted. Unless the reason is obvious, it may be worth examining further why the Provident rate is higher to see if there are practices that can be replicated or improved upon at BC.

k. CCDOC- Transfer Information to Cermak- Substantial Compliance (November 2014)

The new interface between CCDOC and Cermak which was just completed provides notice of pending transfers.

l. Cermak-Medication for Transit- Substantial Compliance (June 2011)

Since June 2011, an employee of the Illinois Department of Corrections (IDOC) has been stationed at Cermak to facilitate continuity of care between Cermak and IDOC. When inmates are transferred to other jurisdictions Cermak provides summary information and medications to be transported by CCDOC to the next jurisdiction.

m. CCDOC-Record Transfer Between Facilities-Substantial Compliance (May 2014)

In addition to the summary information routinely provided, Cermak is able to respond to additional requests for health information within 24 hours now that the medical record is kept electronically.

**Monitor's Recommendations:**

1. Additional pharmacy positions should be established to operate the satellite pharmacy in Division VIII (RTU).
2. Implement scanning of the identification card or demonstrate consistent use of two identifiers to ensure the right inmate receives medication.
3. Audit medication delivery to demonstrate compliance with the interagency directive, including the role of CCDOC officers and report results at Cermak quality improvement meetings.
4. Address medication discontinuity by implementing the plan to provide court medications and eliminate prescribing doses to be administered at times when nursing staff are not on duty.
5. Set benchmarks for medication adherence (more than refusals) and begin including review of this documentation in clinical care as well as quality improvement.
6. Evaluate an individual nurse's competency with Pyxis as part of the Nurse Coordinator's review of medication errors and narcotic discrepancies that concern removal and return of medication to the Pyxis. Demonstrate that corrective action is taken to improve performance.
7. Revise Policy # D-02.3 Medication Distribution so that it is consistent with the Interagency Directive, reflects the current expectations regarding dose by dose and keep on person processes, and addresses the infection control issues discussed in this report.

8. Revise Policy # D-02.4 to define terms and guide practices in electronic documentation of medication delivery or administration.
9. Audit nursing practice using Cermak policies # D-02.3 and D-02.4. Demonstrate that corrective action is taken to address deviations between actual performance and the policy.
10. Audit time from order for dose by dose medication to first dose against the 24 hour benchmark and report results to quality improvement.
11. Complete revisions to Cermak Policy E-13 Discharge Planning to reflect the new discharge process and make minor revisions to E-13.2 Discharge Planning for Mental Health Patients as discussed in this report.
12. Set thresholds for the percentage of inmates who are on flagged medications and pick up discharge medication. Examine the possible factors related to the pick-up rate at Provident pharmacy to see if there are factors that can improve the rate at BC pharmacy.

Self-monitoring recommendations and status:

(1) Missing medications-monitored currently
(2) Controlled substance discrepancies and compliance with policy- monitored currently
(3) Time from order to first dose for KOP and dose by dose medications- monitoring only KOP
(4) Patients on flagged medications who receive discharge prescriptions- monitored currently
(5) Compliance with policies for medication delivery, administration and documentation-not monitored
(6) Patient adherence with dose by dose medication- not monitored
(7) Automation downtime and program performance-not monitored
(8) Pharmacy retention and vacancy rate- monitored currently

## 57. Specialty Care

a. Cermak shall ensure that inmates whose serious medical or mental health needs extend beyond the services available at the Facility shall receive timely and appropriate referral for specialty care to appropriate medical or mental health care professionals qualified to meet their needs.
b. Upon reasonable notification by Cermak, CCDOC will transport inmates who have been referred for outside specialty care to their appointments.
c. Cermak shall ensure that inmates who have been referred for outside specialty care by the medical staff or another specialty care provider are scheduled for timely outside care appointments. Cermak shall provide reasonable notice to CCDOC of such appointments so that CCDOC can arrange transportation. Inmates waiting outside care shall be seen by Qualified Medical Staff as medically necessary, at clinically appropriate intervals, to

evaluate the current urgency of the problem and respond as medically appropriate. If an inmate refuses treatment following transport for a scheduled appointment, Cermak shall have the inmate document his refusal in writing and include such documentation in the inmate's medical record.

d.  Cermak shall maintain a current log of all inmates who have been referred for outside specialty care, including the date of the referral, the date the appointment was scheduled, the date the appointment occurred, the reason for any missed or delayed appointments, and information on follow-up care, including the dates of any future appointments.

e.  Cermak shall ensure that pregnant inmates are provided adequate pre-natal care. Cermak shall develop and implement appropriate written policies and protocols for the treatment of pregnant inmates, including appropriate screening, treatment and management of high-risk pregnancies.

**Compliance Status:** This provision remains in substantial compliance

**Status Update:** Received and reviewed.

**Monitor's Findings:**

Chart reviews and the process review were performed on patients who were sent to the hospital for specialty clinics and procedures. The patients who needed a specialty clinic referral were identified and tracked by an assigned staff at Cermak. The staff manages the scheduling process to ensure that patients are scheduled in a timely manner, rescheduled if needed, communicates with the hospital and the referring provider, picks up the envelope that contains the discharge instructions and schedules follow-up visits with the clinic if needed.

a.  Patients are transported to their appointments at the hospital.

b.  The return envelope from the hospital with discharge instructions are not consistently reviewed by the urgent care staff so the discharge instructions may not be carried out. The manager at the urgent care center is establishing a process to ensure that the patient's paperwork gets reviewed upon return and documented in the EMR. The transportation team does not notify medical regarding the status of the scheduled visits i.e. visit completed, patient refused, cancelled, etc. The medical staff has to use alternate methods to identify the status of the visit there by delaying follow-up action i.e.: rescheduling, etc.

c.  The scheduling staff has a complex paper process of tracking the appointments and the status of the appointments. There is no one place/report to track all the requested appointments and its status. This makes it hard to monitor and cross cover.

d.  To assess this area, the Monitoring Team reviewed health records of several pregnant women currently housed at CCJ. Pregnant women are identified and referred from intake for prenatal care clinic. The prenatal care clinic is conducted twice weekly on Tuesdays and Thursdays. The Monitoring Team found all records reviewed with Dr. Richardson to

be complete and the care provided to be timely. This area has now remained in substantial compliance for more than 18 months and is an example of how a solid foundation and a clear policy and procedure can lead to high quality and sustainable results.

**Monitor's Recommendations:**

1. Maintain a database for scheduled visits by type (specialty and procedures) (Include the referral date, clinic name, appointment date, status of appointment, if the patient was seen on return, date and time seen on return, referring provider notified of appointment date, if refused, rescheduled or cancelled.).
2. Create a template for a hospital return note for providers and nurses to help document all relevant information.
3. Establish a process for the officers to communicate back to medical on the status of the scheduled visits for reconciliation and follow-up.
4. Self-Monitoring:
    a. Continue to perform ongoing continuous quality improvement reviews for pregnant women.
    b. Perform at least five specialty clinic referrals and five procedure referrals to check if the patient was seen on return, appropriateness of documentation, were hospital records reviewed, documentation of implementing discharge instructions, and if not, was the reason documented, medication reconciliation, problem list updated, appropriateness of housing in the jail, patient educated on the plan of care, test results, etc. (the documentation templates will help make this audit easy to do).
    c. Use this database to monitor performance and identify improvement activities.

## 58. Dental Care

a. Cermak shall ensure that inmates receive adequate dental care, and follow up, in accordance with generally accepted correctional standards of care. Such care should be provided in a timely manner, taking into consideration the acuity of the problem and the inmate's anticipated length of stay. Dental care shall not be limited to extractions.

b. Cermak shall ensure that adequate dentist staffing and hours shall be provided to avoid unreasonable delays in dental care.

**Compliance Status:** This provision remains in partial compliance.

**Status Update:** Received and reviewed.

**Monitors' findings:**

Since the last visit, nursing has been made able to dispense OTC analgesic medications (Ibuprofen and Acetaminophen) for dental pain complaints for 21 days while inmates wait for their dental clinic appointments.

The Medical Monitor met with Dr. Ronald Townsend, Director of Cermak Dental Services and Dr. Jorelle Alexander, System Director of Oral Health. The following staffing pattern remains unchanged:

1) 7 dental assistants (0 vacancy)
2) 2 dental hygienists (0 vacancy)
3) 7 dentists (0 vacancy)
4) 1 oral surgeon  (vacant)

The dentist workforce and the dental chairs are distributed according to the following schedule:

| | | |
|---|---|---|
| 1) Division 1 | 1 chair | 1 dentist |
| 2) Division 2 | 2 chairs | 1 dentist |
| 3) Division 6 | 2 chairs | 1 dentist |
| 4) Division 9 | 2 chairs | 1 dentist |
| 5) Division 10 | 1 chair | 1 dentist |
| 6) Division 11 | 4 chairs | 2 dentists |

The Monitoring Team received a comprehensive self-assessment and process improvement plan from Dr. Alexander that included action plan items and audit results for the past 6 months. Included in this document was monthly encounter numbers as well as a breakdown of extractions vs. restorative procedures. The following are excerpts from this report:

| | |
|---|---|
| • Average monthly dental clinic encounters | 1082 |
| • Average monthly encounters per dentist | 155 |
| • Average monthly Restoration/Extraction ratio | 90% |
| • % dental HSRF that are symptomatic (pain, swelling, etc.) | 76% |
| • % dental HSRF that are routine (need cleaning) | 24% |
| • % symptomatic HSRF that are seen by dental within 72 hours | 50% |

Interventions that have been put in place as a result of continuous program improvement efforts:

a) Clinic cleaning schedules are posted inside the clinics.
b) Additional morning clinic time has been allocated to reduced wait time.

c) Dental voice mail has been created to expedite dental clinic appointments. This voice mail is checked three times a day and all activities are tracked via a log book.
d) Scheduling center and sick call nurses have been trained on the acuity of dental complaints to establish a scheduling procedure that is logical, reproducible and effective.

The end result of these activities has been a continuous drop in the dental grievances:

| **Dental Grievances** | Related to Access to Care | Related to Quality of Care | Total |
|---|---|---|---|
| January 2014 | 60 | 7 | 67 |
| February 2014 | 46 | 8 | 54 |
| March 2014 | 30 | 5 | 35 |
| April 2014 | 26 | 2 | 28 |
| May 2014 | 31 | 2 | 33 |
| June 2014 | 29 | 0 | 29 |
| July 2014 | 26 | 1 | 27 |
| August 2014 | 84 | 9 | 93* |
| September 2014 | 43 | 8 | 51 |
| October 2014 | 39 | 6 | 45 |

*precipitous increase in jail population

The current dental wait time for immediate and urgent HSRs is about 10 days. Routine dental HSR wait time is reported to be about 30 days. Dr. Alexander believes that allowing the dental clinic staff to schedule the dental clinics' appointments will further reduce the wait time and will allow for more appropriate and acuity based scheduling of Cook County Jail inmates with dental complaints.

**Monitor's Recommendations:**

1. Allow the dental clinic staff to schedule the dental clinic appointment.
2. Begin a manual log of all dental clinic appointments to track the following information
   a. Date of actual HSRF
   b. Date the HSRF is emailed to the dental clinic
   c. Date of dental clinic appointment
   d. Gender of inmate with dental complaint
   e. Reason for visit (symptomatic vs. asymptomatic)

**68. Suicide Prevention Training**

a. Cermak shall ensure that the Facility's suicide prevention curriculum for health care staff members, jointly established with CCDOC, addresses the following topics:
    i. the suicide prevention policy as revised consistent with this Agreed Order;
    ii. why facility environments may contribute to suicidal behavior;
    iii. potential predisposing factors to suicide;
    iv. high risk suicide periods;
    v. warning signs and symptoms of suicidal behavior;
    vi. observation techniques;
    vii. searches of inmates who are placed on Suicide Precautions;
    viii. case studies of recent suicides and serious suicide attempts (Serious suicide attempts are typically considered to be those that either were potentially life-threatening or that required medical attention);
    ix. mock demonstrations regarding the proper response to a suicide attempt; and
    x. The proper use of emergency equipment, including suicide cut-down tools.
b. Within 24 months of the effective date of this Agreed Order, CCDOC shall train all CCDOC staff members who work with inmates on the Facility's suicide prevention program. Implementation of such training shall begin as soon as possible following the effective date of this Agreed Order. Staff shall demonstrate competency in the verbal and behavioral cues that indicate potential suicide, and how to respond appropriately. Initial and at least annual training shall be provided in accordance with generally accepted professional standards.
c. Within 12 months of the effective date of this Agreed Order, Cermak shall train all Cermak staff members who work with inmates on the Facility's suicide prevention program. Implementation of such training shall begin as soon as possible following the effective date of this Agreed Order. Staff shall demonstrate competency in the verbal and behavioral cues that indicate potential suicide, and how to respond appropriately. Initial and at least annual training shall be provided in accordance with generally accepted professional standards.

**Compliance Status:** This provision remains in substantial compliance.

**Status Update:** Received and reviewed.

**Monitor's Findings:**

Based on presented data, nearly all CCDOC officers and Cermak staff have received training on suicide prevention and recognition and timely referral of inmates with suicide attempts. Detailed evaluation of the effectiveness of this training and program will be conducted in the mental health services evaluation portion of the monitoring.

**Monitor's Recommendations:**

None.

## 86. Quality Management and Performance Measurement

a. Defendants shall each develop and implement written quality management policies and procedures, in accordance with generally accepted correctional standards, to regularly assess, identify, and take all reasonable measures to assure compliance with each of the provisions of this Agreed Order applicable to that Defendant.

b. Defendants shall each develop and implement policies to address and correct deficiencies that are uncovered during the course of quality management activities, including monitoring corrective actions over time to ensure sustained resolution, for each of the provisions of this Agreed Order applicable to that Defendant.

c. CCDOC shall participate with Cermak and DFM in a jointly established Health Care Quality Improvement Committee, to be charged with developing and implementing a joint quality improvement program. CCDOC shall contribute the time and effort of CCDOC staff members who, by virtue of their authority, current responsibilities, and/or past experience, can provide this committee with needed correctional representation.

d. Cermak shall participate with CCDOC and DFM in a jointly established Health Care Quality Improvement Committee, to be charged with developing and implementing a joint quality improvement program. Cermak will work with CCDOC and DFM to identify those CCDOC and DFM staff members who, by virtue of their authority, current responsibilities, and/or past experience, can provide this committee with needed correctional representation. Quality management programs related to medical and mental health care will utilize performance measurements to assess quality of care and timely access to care with quantitative and qualitative data analysis and trending over time.

e. DFM shall participate with CCDOC and Cermak in a jointly established Health Care Quality Improvement Committee, to be charged with developing and implementing a joint quality improvement program. DFM shall contribute the time and effort of DFM staff members who, by virtue of their authority, current responsibilities, and/or past experience, can provide this committee with needed correctional representation.

**Compliance Status:** This provision remains in partial compliance.

**Monitor's Findings:**

The Director of the Quality Improvement Program has been hired and was in orientation during our visit. The Director of Risk Management has also been hired recently. The Quality Improvement Nurse is now being allowed to work on quality improvement activities.

The monthly Quality Improvement meetings were being conducted. Detailed meeting minutes are being kept for the meetings. The leadership team is using the internal IT staff to create reports to help monitor the processes.

Quality metrics have not been identified or measured for all the services/ programs. There is no established process for conducting and supporting process improvement activities. The leadership team and Quality Director are planning to start developing a Quality Improvement Program once the Quality Director has completed her orientation.

The daily huddle between the medical and custody staff is continuing and is very helpful for identifying and addressing day to day issues.

The leadership team is conducting case reviews, M&M and review of the errors/near miss reported by staff using their error reporting website.

Performance improvement projects have not been identified.

The staff responsible for professional education has to identify the needs by reviewing performance results, manager and staff interviews and develop education plan based on them. The team should also periodically assess the impact of the education being offered. The staff was not familiar with their procedures when interviewed during the visit.

**Monitor's Recommendations:**

1. Develop a comprehensive Quality Program to monitor and improve all aspects of operations including processes, clinical outcomes, professional performance, safety, risk and efficiency.
2. Create a collaborative team with standard meetings where Quality, Risk, Nursing, Medical, Mental Health and the Sherriff's department staff work as a team to improve process and quality of care.
3. Create a balanced scorecard for each of the services/locations to monitor their performance and a balanced scorecard for the system to monitor the overall progress.
4. Metrics should include
   a. process and outcome measures to ensure compliance with policies and procedures
   b. professional performance measures of clinical staff based on their functions (quality of care and productivity)
5. All Managers should do daily rounding in their areas to ensure completion of tasks, quality of service, environmental checks, and address any patient or staff issues.

6. Create action plans for each of the non-compliant items and track the status periodically during the quality meetings.
7. Share the data with the staff during the staff meetings and document minutes.
8. Check to see if the action plans helped fix the problem, if not, make necessary changes to the action plan and implement.
9. Review the balanced scorecards for each of the services/locations during the quality meetings on a rotating schedule, so each area/ service gets reviewed at least once every 3 months.
10. Establish multidisciplinary work groups to periodically review major activities like medication administration, sick call, infirmary care, intake processes, emergency care, etc. The work group should review current performance, challenges and identify opportunities for continuous improvement. The recommendations of the work group should be reviewed during the quality meeting by the leadership team and considered for implementation.
11. Initiate performance improvement projects for the system that will help improve safety, quality and efficiency.