# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | |
| **COOK COUNTY, ILLINOIS;** | No. 10 C 2946 |
| **THOMAS DART, COOK COUNTY** | |
| **SHERIFF (in his official capacity);** | Judge Virginia Kendall |
| **TONI PRECKWINKLE, COOK COUNTY** | |
| **BOARD PRESIDENT (in her official capacity);** | |
| **COOK COUNTY BOARD OF** | |
| **COMMISSIONERS (in their official capacity),** | |
| **Defendants,** | |

---

## Corrections Monitor Susan W. McCampbell's Report No. 10
## May 27, 2015

---

Susan W. McCampbell, President
McCampbell and Associates, Inc.
1880 Crestview Way
Naples, Florida 34119-3302
(239) 597-5906
Email:  susanmccampbell@mccampbellassoc.com

# Executive Summary
## Corrections Monitor Susan W. McCampbell's Report #10
## DRAFT 5/7/15

**Summary Overview**

This document reports on the compliance in the Cook County Dept. of Corrections (CCDOC) for the 77 paragraphs in the Agreed Order related to inmate protection from harm. CCDOC is now in substantial compliance with all provisions of the Agreed Order.

I toured CCDOC from April 13 – 16, 2015. At the start of that week there were 8,928 inmates in custody (on the campus). During this tour I interviewed staff and inmates, reviewed documents, and consulted with CCDOC regarding compliance issues. I also participated in a briefing for the Honorable Virginia Kendall regarding compliance and progress.

The draft of this compliance report was provided to the parties on May 7, 2015, requesting all comments by May 21, 2015. I considered all comments in the preparation of this report.

**Progress and Sustainability**

Progress is achieved in the following areas:

- Implementation of the inmate classification system;
- Continued improvement and refinements to monitor uses of force, including data collection, analysis, and staff resources;
- Continued hiring;
- Designation of an inmate population manager to track inmates whose pre and post trial incarceration clog the jail and identify and advocate for those who serve more time in the jail awaiting trial than the maximum sentence allowable for the charge on which the inmate will ultimately be sentenced;[1]
- Implementation of a much enhanced incident reporting system (CCOMS); and
- On-going maintenance of compliance with 69 paragraphs of the Agreed Order found previously to be in compliance.

Notable is that CCDOC has develop internal monitoring and review systems that provide the department with the ability to collect and analyze data about all areas of operations

---

[1] http://wgntv.com/2014/06/11/stuck-in-cook-county-jail/ accessed on 4/18/15; http://www.chicagotribune.com/news/watchdog/ct-jail-prison-turnaround-met-20150412-story.html#page=1 accessed 4/18/15; http://www.chicagotribune.com/news/local/ct-cook-jail-beating-death-met-20150216-story.html#page=1 accessed 4/18/15; http://www.cookcountysheriff.com/MentalHealth/MentalHealth_main.html accessed on 4/18/15.

(e.g., inmate discipline, inmate grievances, uses of force) and take actions to address any emerging trends. This is the philosophy and operational practice that assures *sustainability* of the improvements made during the source of the Agreed Order.

**Remaining Challenges**

Continuing challenges include, but are not limited to:

- Systemic, sustainable strategies to solve jail crowding; although jail population is down, the endemic issues remain, including development and sustainability of a collaborative justice system;
- Developing the work plan and data collection to validate the updated classification system by the next monitor's tour in December 2015.
- A funded *plan* to replace outdated, maintenance-expensive, and staff-intensive facilities;
- Providing oversight and training to officers working in the direct supervision units in RTU/Div 8 relating to security and inmate safety;
- Fully staff Cermak's mental health staff and mitigate the impact of Cermak mental health vacancies on CCDOD and inmate harm; and
- Continuing vigilance regarding reviews of uses of force and investigation of allegations of excessive force

**Progress**

This chart summarizes the progress made by CCDOC since my first report of September 20, 2010.

| Report # | Sustained Compliance (more than 18 months) | Substantial Compliance | Partial Compliance | Non-Compliance | Not Applicable | Total |
|---|---|---|---|---|---|---|
| 1 | | 3 | 62 | 12 | 8 | 77 |
| 2 | | 1 | 63 | 5 | 8 | 77 |
| 3 | | 22 | 55 | 0 | 4 | 77 |
| 4 | | 39 | 34 | 0 | 4 | 77 |
| 5 | | 53 | 20 | 0 | 4 | 77 |
| 6 | 21 | 39 | 17 | 0 | 0 | 77 |
| 7 | 35 | 31 | 11 | 0 | 0 | 77 |
| 8 | 50 | 17 | 10 | 0 | 0 | 77 |
| 9 | 68 | 9 | 0 | 0 | 0 | 77 |
| 10 | 69 | 8 | 0 | 0 | 0 | 77 |

## Compliance Report

The Agreed Order regarding corrections operations (A. Protection from Harm) includes 77 provisions. All provisions are in substantial compliance as of the tour in late September 2014.

## Maintenance of Substantial Compliance (18 months) (N= 69)

The CCDOC has maintained substantial compliance with the following provisions of the Agreed Order for at least 18 months, and as such, are no longer a primary focus of my monitoring, although these sections remain an active part of the Order (see Section VII.C.). The paragraph maintaining substantial compliance *added* since the Report # 9 to the Court is underlined.

| | | | |
|---|---|---|---|
| • 31.a. | • 31.s. | • 33.j. | • 36.d. |
| • 31.b. | • 31.t. | • 34.a. | • 36.e. |
| • 31.c. | • 32.a. | • 34.b. | • 36.f. |
| • 31.d. | • 32.b. | • 34.c. | • 37.c. |
| • 31.e. | • 32.c. | • 34.d. | • 37.d. |
| • 31.f. | • 32.d. | • 34.e. | • 37.e. |
| • 31.g. | • 32.e. | • 34.f. | • 38.a. |
| • 31.h. | • 32.f. | • 34.g. | • 38.b. |
| • 31.i. | • 32.g. | • 35.a. | • 38.c. |
| • 31.j. | • 32.h. | • 34.b. | • 38.d. |
| • 31.k. | • 32.i. | • 35.c. | • 39.a. |
| • 31.l. | • 32.j. | • 35.d. | • 39.b. |
| • 31.m. | • 32.k. | • 35.e. | • 40. |
| • 31.n. | • 32.l. | • 35.f. | • 41. |
| • 31.o. | • 32.m. | • 35.g. | • 69. |
| • 31.p. | • 33.a. | • 36.a. | |
| • 31.q. | • 33.c.i.ii. | • 36.b. | |
| • 31.r. | • 33.i. | • 36.c. | |

## Substantial Compliance (N=8)

Paragraphs for which CCDOC has maintained substantial compliance since the tour of September 2014 (e.g. 6 months):

| | | |
|---|---|---|
| • 33.b. | • 33.f. | • 37.a. |
| • 33.d. | • 33.g. | • 37.b. |
| • 33.e. | • 33.h | |

## Partial Compliance (N=0)

There are no paragraphs in partial compliance.

<u>**Non-Compliance (N=0)**</u>

There are no paragraphs in non-compliance.

<u>**Updates: Issues and Concerns About Achieving and Sustaining Substantial Compliance**</u>

<u>**Compliance with the Agreed Order/Cermak**</u> – I reiterate my concern that mental health staffing continues to fall short of the needs of the jail's inmate population. As noted by the psychiatric monitor, the Cermak mental health staff in place are doing the best they can. However, Cermak's inability to hire and retain mental health staff,, in my opinion, negatively impacts the safety of inmates and staff.

As I noted in my last report I recommend:
- the implementation of a crisis intervention team to respond to incidents involving inmates with mental illness (CIT),
- clarification of policies regarding involuntary psychotropic medications,
- clarification of the operational practices regarding the safety, and/or perceived safety, of Cermak staff,
- focus on specialization for corrections staff assigned and/or volunteering to work with inmates with mental illness, and
- timely provision of documentation (anatomical charts) and medical records to facilitate CCDOC's Office of Professional Responsibility's investigations into allegations of use of excessive force.

While it is more than unfortunate that the jail has ended up as the mental health hospital for the County, this does not relieve the CCDOC from providing trained officers to oversee and supervise this population. Prior reports have urged CCODC to (1) implement system for assigning officers based on their interest and skill at working with mental health clients (as opposed to the system now where officers bid to posts with more of an eye toward days off and shifts than assignment responsibilities), (2) providing specialized training, and (3) actively including officers as part of the treatment team. This, in my view, remains an unresolved priority. While not specifically part of the Agreed Order, such ambitious and aggressive staffing protocols will benefit the mental health clients, officer safety and continuity of care.

<u>**Update: Information System**</u> – The new jail management information system, Cook County Offender Management System (CCOMS) was operational on October 26, 2014.

<u>**Investigations into Allegations of Use of Force/Excessive Force**</u> – An unintended outcome of the Hudson litigation has been continued priority on the investigative processes in the Cook County Sheriff's Office. This level of scrutiny, which most jails in my opinion would be unable to withstand, demonstrated that the systems in place

work.  That is not to say that continuous focus and improvements are not beneficial, but the systems are in place.

**Classification Implementation Progress** – The revised inmate classification system was implemented on October 26, 2014.  While the process rollout was mostly without issues, as expected a few tweaks to the software were required.  The next step in the process is to gather and analyze data to determine if the system is ensuring inmate and staff safety.  This review should be ready for the tour in December 2015.

**New Jail Facilities/Renovation of Existing Jail Facilities** – In January 2015 eight staff from CCDOC and the County's Capital Planning attended the program Planning for New Institutions (PONI) offered by the National Institute of Corrections.  This was a critical step to identifying HOW the next facility(ies) will be planned to avoid another RTU.  In my opinion, the RTU is poorly designed for a number of reasons – such as no floor drains or electric outlets to facilitate daily cleaning of holding cells, cells in which there is insufficient sight lines, bars placed inside glazing, over-engineering of sally ports, and lack of program space and square footage in housing units.  The poor design results in higher staffing needs, the most expensive part of jail operations.

The County has indicated it wishes to demolish some of the existing aging infrastructure.  While perhaps a positive step, recognizing that some physical plants are not worth the expensive of repair/refurbishing, the lack of a plan for what might replace these structures is glaringly absent.  The newly implemented inmate classification system will inform the process of design by clearly indicating the type of beds and architecture needed (e.g. minimum, medium, max custody).   If Cermak is properly staffed, the medical and mental health needs of inmates can be identified, expanded specialized housing can also be identified.

Whatever the County and Sheriff decide is the next construction needed, the lessons learned from the RTU need to be a priority, with a joint commitment to collaborative planning between corrections professionals and County staff, and incorporation of use of best practices. Additionally, if direct supervision is the architecture selected, attention needs to be paid to the number of inmate beds per unit, allowance for programming, and privacy in toilet and shower areas.  Training for both line officers and supervisors on the concepts and management philosophy needs to be in the forefront of operations.

Jails across the country are experiencing lower inmate populations.  While this is good news for a variety of reasons, research can't explain why the numbers went down, so the numbers can easily go back up.  Focused planning on reforming local justice system will have positive effect on alternatives to pre-trial detention, but at the same time, responsible leaders are planning for what challenges are ahead.  As it takes about 10 years to plan and design a new jail, this is a process I recommend to Cook County.

**Jail Beds/Crowding/Inmates with Mental Illness** – The Sheriff continues to educate the public, stakeholders and criminal justice partners of the critical need to address the impact of those with mental illness in the community who end up in jail. Data provided by CCDOC to decision-makers about the number of "dead days" – those spent by inmates needlessly caught in the justice system, and the documentation about individuals held longer in custody awaiting trial than if they had been sentences for their crimes are compelling reasons for a cogent community response.

## Conclusions

CCDOC has achieved 100% substantial compliance with all paragraphs of the Agreed Order for which I am responsible for monitoring.  As with all major reform efforts, progress has not always been a straight line, but rather has incorporated and embraced lesson learned, responses to resource availability, and identification of best practices.

CCDOC is commended and congratulated on reaching this milestone.  Per the Agreed Order's provision ,monitoring will continue for 12 months to assure that reforms are sustainable.

**Administrative Release Program (ARP)**

This Executive Summary reports on the Administrative Release Program, designed to limit jail crowding when the population is more than 85% of capacity.  The program is operated by the Sheriff's Office.  The following data was provided by the Cook County Sheriff's Office regarding their review of candidates for release through this program.

| | *2011* | *2012* | *2013* | *2014* | *2015 YTD\** |
|---|---|---|---|---|---|
| Number Reviewed | 2375 | 10061 | 21879 | 14039 | 3861 |
| To Magistrates | 237 | 859 | 3967 | 2442 | 502 |
| Ordered | 78 | 572 | 2503 | 1319 | 245 |
| Males Placed | 22 | 246 | 945 | 449 | 98 |
| Females Placed | 13 | 85 | 377 | 171 | 29 |
| NPTS | 130 | | 662 | 445 | 77 |
| Refused | 25 | | 62 | 24 | 10 |
| Case Adjudicated | 40 | | 189 | 47 | 10 |
| Bond Out | 89 | | 215 | 72 | 20 |
| Medical | | | 53 | 63 | 11 |

 * May 4, 2015

**UNITED STATES OF AMERICA VS. COOK COUNTY, ET. AL.  Civil No. CV-02946**

# Corrections Monitor's 10th Report

### Based on the Tour Week of April 13, 2015

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| **A.** | **Protection from Harm** | | | |
| **31. (21)** | **Use of Force by Staff** | | | |
| A. 31. a. | CCDOC shall maintain comprehensive and contemporary policies and procedures, in accordance with generally accepted correctional standards, surrounding the use of force and with particular emphasis regarding permissible and impermissible uses of force. | x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 | x 9/10 x 3/11 x 8/11 | |
| A.31. b. | CCDOC shall maintain use of force policies and pre-service and in-service training programs for correctional officers and supervisors that address the following impermissible uses of force: <br> 1. use of force as a response to verbal insults or inmate threats where there is no immediate threat to the safety of the institution, inmates, or staff; <br> 2. use of force as a response to inmates' failure to follow instructions where there is no immediate threat to the safety of the institution, inmates, or staff, unless CCDOC has attempted a hierarchy of nonphysical alternatives that are documented; <br> 3. use of force as punishment or retaliation; <br> 4. use of force involving striking, hitting, or punching a restrained and non-combative inmate; <br> 5. use of force against an inmate after the inmate has ceased to offer resistance and is under control; <br> 6. use of choke holds on an inmate, unless lethal force is justified; and <br> 7. use of inappropriate or excessive force. | x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 | x 9/10 x 3/11 x 8/11 | |
| A.31.c. | CCDOC shall maintain a policy to ensure that staff adequately and promptly report all uses of force, in accordance with generally accepted correctional standards. | x12/11 x7/12 x2/13 | x 9/10 x 3/11 x 8/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | | x9/13 x3/14 x9/14 x4/15 | | |
| A.31.d. | CCDOC shall require that use of force reports: <br> 1. be written in specific terms in order to capture the details of the incident <br> 2. contain an accurate account of the events leading to the use of force incident; <br> 3. include a description of the instrument(s) of restraint or control, if any, and the manner in which it was used; <br> 4. note whether an inmate disciplinary report was completed in connection with the incident that prompted the use of force; <br> 5. describe the nature and extent of apparent and reported injuries sustained both by the inmate and staff member; <br> 6. contain the date and time medical attention was actually provided; <br> 7. describe, in detailed, factual terms, the type and amount of force used as well as the precise actions taken in a particular incident; and <br> 8. note whether a use of force was videotaped. If the use of force is not videotaped, the reporting correctional officer and supervisor will provide an explanation as to why it was not videotaped. | x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 | x 9/10 x 3/11 x 8/11 | |
| A.31.e. | CCDOC shall continue to require prompt review by the shift commander of all use of force reports. The shift commander's review of use of force reports shall include review for completeness and procedural errors, as well as review of the substantive content. If the use of force report does not comply with provision 31.d. of this Agreed Order, the shift commander shall return it to the reporting officer for revision and resubmission until it is compliant. If the shift commander believes a use of force may have been inappropriate or excessive, he or she shall immediately refer the incident for investigation. | x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 | x 9/10 x 3/11 x 8/11 x12/11 | |
| A.31.f. | CCDOC shall ensure that senior management review of uses of force includes: <br> 1. a timely review of medical documentation of inmate injuries, if any is submitted, as provided by Qualified Medical Staff, including documentation surrounding the initial medical encounter, an anatomical drawing that depicts the areas of sustained injury, and information regarding any further medical care; <br> 2. the inmate disciplinary report, if any, associated with the use of force; and | x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 | x 9/10 x 3/11 x 8/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | 3.  the incident report, if any, associated with the use of force. | | | |
| A. 31.g. | CCDOC [and Cermak] shall establish criteria that trigger referral for inappropriate or excessive use of force investigations, including but not limited to, documented or known injuries that are extensive or serious; injuries involving fractures or head trauma; injuries of a suspicious nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.); and injuries that require treatment at outside hospitals. | x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 | x 3/11 x 8/ll | x 9/10 |
| A. 31. h. | When CCDOC review of use of force reports, and supporting records if applicable, reveals that reports of a use of force are materially inconsistent, conflicting, or suspicious, CCDOC shall refer that use of force incident for internal investigation. | x12/11 x7/12 x/2/13 x9/13 x3/14 x9/14 x4/15 | x 9/10 x 3/11 x 8/11 | |
| A.31.i. | CCDOC shall develop and implement a system to track all incidents of use of force that, at a minimum, includes the following information: 1.  a tracking number; 2.  the inmate(s) name; 3.  housing assignment; 4.  date; 5.  type of incident; 6.  injuries (if applicable); 7.  medical care provided (if applicable); 8.  staff involved; 9.  reviewing supervisor; 10. external reviews and results (if applicable); 11. remedy taken (if appropriate); and 12. administrative sign-off. | x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 | x 9/10 x 3/11 x 8/11 x12/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| A.31.j. | CCDOC shall ensure that, promptly following a use of force incident, video or photographs are taken of any and all reported or apparent injuries sustained by inmates and staff. The video or photographs will be maintained and will be included in the investigation package, if applicable. See 31. F. | x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 | x 9/10 x 3/11 x 8/11 | |
| A.31.k. | CCDOC shall establish an "early warning system" that will document and track correctional officers who are involved in use of force incidents and any complaints related to the inappropriate or excessive use of force, in order to alert CCDOC administration to an potential need for retraining, discipline, problematic policies, or supervision lapses. Appropriate CCDOC leadership, supervision, and investigative staff shall have access to the information and monitor the occurrences. CCDOC senior management shall use information from the early warning system to improve quality management practices, identify patterns and trends, and take necessary corrective action both on an individual and systemic level. | x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 | x 9/10 x 3/11 x 8/11 x12/11 | |
| A.31.l. | CCDOC shall ensure that a supervisor is present during all pre-planned uses of force, such as cell extractions. | x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 | x 9/10 x 3/11 x 8/11 | |
| A.31.m. | Where there is evidence of staff misconduct related to inappropriate or unnecessary use of force against inmates, CCDOC shall initiate personnel actions and seek disciplinary action appropriately for any correctional officer found to have: <br> 1. engaged in inappropriate or excessive use of force; <br> 2. failed to report or report accurately the use of force; <br> 3. retaliated against an inmate or other staff member for reporting an inappropriate or excessive use of force; or <br> 4. interfered or failed to cooperate with an internal investigation regarding use of force in a manner inconsistent with the staff member's statutory or contractual rights. | x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 | x 9/10 x 3/11 x 8/11 | |
| A.31.n. | Where there is evidence of staff misconduct related to inappropriate or unnecessary use of force against inmates, CCDOC shall consider, develop, and initiate systemic remedies as | x 8/11 x12/11 | x 9/10 x 3/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | appropriate. | x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 | | |
| A.31.o | CCDOC shall maintain accountability policies and procedures for the effective and accurate maintenance, inventory, and assignment of chemical and other security equipment, in accordance with generally accepted correctional standards. | x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 | x 9/10 x 3/11 x 8/11 | |
| A.31.p. | CCDOC shall continue to conduct use of force training in accordance with generally accepted correctional standards, including: 1. CCDOC shall maintain an effective and comprehensive use of force training program. 2. CCDOC shall continue to ensure that correctional officers receive adequate training in CCDOC's use of force policies and procedures, including de-escalation and defensive tactics relating to use of force. 3. CCDOC shall continue to ensure that correctional officers receive pre-service and in-service training on reporting use of force and completing use of force reports. | x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 | x 9/10 x 3/11 x 8/11 | |
| A.31.q. | CCDOC shall provide a process for inmates to report allegations of the inappropriate or excessive use of force orally to any CCDOC staff member; said staff member shall give the inmate the opportunity to reduce his or her report to writing through a grievance or complaint form without discouragement. | x9/13 x3/14 x9/14 x4/15 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 x2/13 | |
| A.31.r. | Following a use of force, when CCDOC staff transport an inmate to receive medical care by Cermak, as necessary, the CCDOC staff member shall inform the Cermak staff member that the inmate was involved in a use of force. | x 8/11 x12/11 x7/12 x2/13 x9/13 x3/14 | X 9/10 x 3/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | | x9/14 x4/15 | | |
| A.31.s. | Cermak shall ensure that, when providing medical treatment or assessment to an inmate following a use of force, Qualified Medical Staff document the inmate's injuries, if any, and any medical care provided. Cermak shall provide CCDOC senior management [OPR] with a brief summary documenting the initial medical encounter following a use of force, including an anatomical drawing that depicts the areas of sustained injury, if any, and information regarding any further medical care. See 31.f. | x 8/11 x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 | x 9/10 x 3/11 | |
| A.31.t. | Cermak shall ensure that Qualified Medical Staff question, outside the hearing of other inmates or correctional officers if appropriate, each inmate who reports for medical care with an injury, regarding the cause of the injury. If, in the course of the inmate's medical encounter, a health care provider suspects staff-on-inmate or inmate-on-inmate abuse, that health care provider shall immediately: <br> 1. report the suspected abuse to the Executive Director of the Office of Professional Review or other appropriate CCDOC administrator; and <br> 2. adequately document the matter in the inmate's medical record. | x 8/11 x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 | x 3/11 | x 9/10 |
| 32. (23) | **Safety and Supervision** | | | |
| 32. a. | CCDOC shall maintain security and control-related policies, procedures, and practices that will result in a reasonably safe and secure environment for all inmates and staff, in accordance with generally accepted correctional standards. <br> Coordinate with Grenawitzke | x2/13 x9/13 x3/14 x9/14 x4/15 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| 32.b. | CCDOC shall maintain policies, procedures, and practices to ensure the adequate supervision of inmate work areas and trustees, in accordance with generally accepted correctional standards. <br> Coordinate with Grenawitzke | x7/12 x 2/13 x9/13 x3/14 x9/14 x4/15 | x 8/11 x12/11 | x 9/10 x 3/11 |
| 32.c. | CCDOC shall ensure that security staff conduct appropriate rounds with sufficient frequency to provide inmates with reasonable safety. Rounds shall be conducted at least once every half | x2/13 x9/13 | x 9/10 x 3/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | hour, at irregular intervals, inside each housing unit.  In the alternative, CCDOC may provide direct supervision of inmates by posting a correctional officer inside the day room area of a housing unit to conduct constant surveillance.  More frequent rounds shall be conducted for special management inmates who require more intensive supervision for security and safety reasons.  All security rounds shall be documented on forms or logs that do not contain pre-printed rounding times.  Video surveillance may be used to supplement, but must not be used to replace, rounds by correctional officers. | x3/14 x9/14 x4/15 | X 8/11 x12/11 x7/12 | |
| 32.d. | CCDOC shall ensure that security supervisors conduct daily rounds in the inmate housing units, and document the results of their inspections. | x2/13 x9/13 x3/14 x9/14 x4/15 | x 3/11 x 8/11 x12/11 x7/12 | x 9/10 |
| 32.e. | Cook County shall increase the use of overhead video surveillance and recording cameras to provide adequate coverage throughout the common areas of the Facility, including the RCDC, all division intake areas, mental health units, special management units, inmate housing units, and in common areas of the divisions. | x9/13 x3/14 x9/14 x4/15 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 x2/13 | |
| 32.f. | CCDOC shall maintain a procedure to prevent inmates from possessing or having access to dangerous contraband, including conducting regular inspections of cells and common areas of the housing units to identify and prevent rule violations by inmates. | x2/13 x9/13 x3/14 x9/14 x4/15 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| 32.g. | CCDOC shall review, and revise as applicable, all General Orders ("GOs"), Standard Operating Procedures ("SOPs"), and Post Orders on an annual basis, or more frequently as needed. | x 8/11 x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 | x 9/10 x 3/11 | |
| 32.h. | CCDOC shall revise policies, SOPs, and post orders for all armed posts to include proper use and | x12/11 | x 9/10 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | safe handling of weapons and provide specific instructions on use of deadly force and when and under what circumstances such force should be used, in accordance with generally accepted correctional standards. | x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 | x 3/11 x/8/11 | |
| 32.i. | CCDOC shall standardize security policies, procedures, staffing reports, and post analysis reports across the divisions, to the extent possible, taking into account the different security levels and different physical layouts in the various divisions. | x2/13 x9/13 x3/14 x9/14 x4/15 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| 32.j. | CCDOC shall provide formal training on division-specific SOPs to correctional officers in accordance with their assignments, and shall provide further specialized training for officers assigned to Special Management Units.  Cermak Hospital shall provide Specialized training for officers assigned to psychiatric units. Coordinate with medical monitor and Dr. Metzner.  See also 44.f., 44.g., 44.h., 46.b., 46.e., 68. | x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 | x 9/10 x 3/11 x 8/11 x12/11 | |
| 32.k. | CCDOC shall maintain in working order all monitoring equipment at the Facility that is under CCDOC's direct control, including cameras, alarms, radios (hand held), interior and exterior lighting, x-ray and other screening equipment, and walk-through metal detectors.  To the extent that the maintenance of any Facility monitoring equipment is under the control of DFM, CCDOC shall promptly report any maintenance needs and DFM shall prioritize its services to ensure that all monitoring equipment is maintained in working order. Coordinate with Grenawitzke | x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 | x 9/10 x 3/11 x 8/11 x12/11 | |
| 32.l. | Absent exigent circumstances, CCDOC:  (i) shall house each inmate assigned to a division that is celled to one permanent bed in a cell and shall not house any inmates (including those assigned to dormitory divisions) such that they are sleeping on the floor, on a mattress on the floor, or in any area not designed or redesigned as sleeping quarters; (ii) shall not house more than two inmates to a single cell (triple-bunking); and (iii) shall not hot-bunk any inmates. | x 8/11[2] x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 | | |

---

[2] Noted as "NA" in first two reports.

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| 32.m. | When exigent circumstances give rise to triple-bunking, CCDOC shall provide the third inmate in the triple-bunked cell a "boat," stackable bunk, moveable platform, or cot, so that the inmate is not required to lay down directly on the cell floor or on a mattress on the floor. | x 8/11[3] x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 | | |
| 33. | **Security Staffing.** **The parties agree that correctional officer staffing and supervision levels at the Facility must be appropriate to adequately supervise inmates, to carry out the requirements of this Agreed Order, and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards. Cook County and CCDOC shall take such actions as shall ensure that correctional officer staffing and supervision at the Facility are sufficient to achieve these purposes. These actions shall include the following:** | | | |
| 33.a. (25) | In the fiscal year 2010 budget, Cook County shall allocate funds sufficient to allow for 210 additional correctional officer positions at the Facility. Consistent with provision 33.c, such funding may occur on a rolling basis, as appropriate in light of the time required to hire, train, and put on duty the additional 210 new correctional officers. | x 8/11 x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 | x 9/10 x 3/11 | |
| 33.b. (25) | CCDOC shall use its best efforts (through the maintenance of the written staffing plan required by provision 33.h and otherwise) to ensure that the number of correctional officer vacancies is kept to the minimum practicable number at all times, taking into account that the timing of terminations and resignations and the resulting rate of attrition may, in ordinary course, result in there being some vacancies at any given time. | X9/14 x4/15 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 x2/13 x9/13 x3/14 | |
| 33.c.i.ii | CCDOC shall fill the 210 additional correctional officer slots provided for in provision 33.a; fill the | x 8/11 | | x 9/10 |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| (26) | 285 correctional officer vacancies that existed at the Facility as of July 17, 2009; and fill any correctional officer vacancies coming into existence after that date in the following manner: <br> i. By December 31, 2010, CCDOC shall hire, train, and put on duty at the Facility at least 448 [381] newly qualified correctional officers (in addition to those on duty as of December 31, 2009). <br> ii. By March 30, 2011, CCDOC shall hire, train, and put on duty at the Facility at least 174 [107] newly qualified correctional officers (in addition to those on duty as of December 31, 2010). | x12/11 <br> x7/12 <br> x2/13 <br> x9/13 <br> x3/14 <br> x9/14 <br> x4/15 | | x 3/11 |
| 33.d. (26) | The parties agree that for 30 months following the effective date of this Agreed Order, Cook County and CCDOC shall not be required to provide additional correctional officer staffing and supervision at the Facility beyond that which is necessary to ensure that correctional officer staffing and supervision are sufficient to achieve the purposes set out in the introductory paragraph of provision 33 and to comply with provisions 33.a-c above. Due date 11/13/2012 | x9/14 <br> x4/15 | x2/13 <br> x9/13 <br> x3/14 <br> x9/14 | |
| 33.e. (27) | Within 30 months of the effective date of this Agreed Order, the CCDOC Monitor shall assess and make a recommendation on whether the correctional officer staffing and supervision levels are appropriate to adequately supervise inmates at the Facility, in accordance with generally accepted correctional standards. If the CCDOC Monitor determines that staffing is inadequate, the CCDOC Monitor will make a recommendation regarding the appropriate number of correctional officer staff. If the parties do not accept the CCDOC Monitor's staffing recommendation, CCDOC and Cook County shall agree to an independent, comprehensive study to determine the appropriate correctional officer staffing and supervision. The parties agree that the results of this staffing study shall provide guidance as to the sufficient number of qualified correctional officers necessary to operate the Facility safely and to carry out the requirements of this Agreed Order. Due date 11/13/2012 | X9/14 <br> x4/15 | x2/13 <br> x9/13 <br> x3/14 <br> x9/14 | |
| 33.f. (27) | If the staffing study requires additional correctional officers, Cook County shall allocate funds sufficient to maintain correctional officer staffing levels necessary to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards. Due date 11/13/2012 | x9/14 <br> x4/15 | x2/13 <br> x9/13 <br> x3/14 | |
| 33.g. (28) | If the staffing study requires additional correctional officers, and consistent with Cook County's allocation of funds for security staffing, CCDOC shall hire and train sufficient number of qualified correctional officers and other staff to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional | x9/14 <br> x4/15 | x2/13 <br> x9/13 <br> x3/14 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | standards, including:<br>1. Investigative staffing sufficient to meet the internal investigation responsibilities outlined in this Agreed Order;<br>2. Correctional officer staffing sufficient to provide inmates requiring treatment with adequate access to appropriate medical and mental health care by providing timely movement of inmates to medical units, transport of inmates who have been referred for outside specialty care, and escort, if necessary, to Qualified Medical and Mental Health Staff on housing units; and [Coordinate with medical monitor and Dr. Metzner]<br>3. Qualified staff sufficient to monitor security cameras in real time and allow for supervisory viewing and retrieving at any time. Due date 11/13/2012 | | | |
| 33.h. (28) | CCDOC shall maintain a written staffing plan that requires sufficient staffing to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards. | x9/14<br>x4/15 | x 8/11<br>x12/11<br>x7/12<br>x2/13<br>x9/13<br>x3/14 | x 9/10<br>x 3/11 |
| 33.i. (28) | Absent exigent circumstances, CCDOC shall maintain a practice that does not allow for scheduled, planned, or expected cross-watching (a CCDOC practice of allowing one correctional officer to simultaneously supervise two housing units from the control center of one of the units) at any time on all maximum security and Special Management Units, and during first and second shifts throughout the Facility. | x 8/11[4]<br>x12/11<br>x7/12<br>x2/13<br>x9/13<br>x3/14<br>x9/14<br>x4/15 | | |
| 33.j. (28) | CCDOC may permit cross-watching on third shift in housing units that are not maximum security or Special Management Units only if the Monitor does not object after consultation and review. The Monitor's review of the appropriateness of third-shift cross-watching on a particular housing unit shall be guided by the sufficiency of sightlines between the units being cross-watched, the adequacy of video and/or audio technologies in place, and/or other factors that bear on the | x 8/11[5]<br>x12/11<br>x7/12<br>x2/13<br>x9/13 | | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | safety and security of inmates and staff. If the Monitor later objects to any cross-watching that is in effect because of the Monitor's concerns that cross-watching on a particular housing unit presents an undue risk to the safety and security of inmates and staff, CCDOC shall immediately cease such cross-watching. CCDOC may renew cross-watching on that unit again if, after further consultation with and review by the Monitor, the Monitor does not object to such renewal. Although cross-watching is permitted under the limited circumstances described herein, CCDOC will work to eliminate the practice at the Facility. | x3/14 x9/14 x4/15 | | |
| 34. (29) | **Incidents and Referrals** | | | |
| 34. a. | CCDOC shall continue to ensure that staff adequately and promptly document all reportable incidents, including inmate fights, rule violations, inmate injuries, suicides and suicide attempts, cell extractions, medical emergencies, contraband, vandalism, escapes and escape attempts, fires, and other incidents causing a disruption to standard CCDOC practice, in accordance with generally accepted correctional standards. | x2/13 x9/13 x3/14 x9/14 x4/15 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| 34.b. | CCDOC shall continue to ensure that correctional officers receive pre-service and in-service training on proper incident reporting policies and procedures in accordance with generally accepted correctional standards. | x 8/11 x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 | x 9/10 x 3/11 | |
| 34.c. | CCDOC shall maintain a system to track all reportable incidents (as described in provision 34.a) that, at a minimum, includes the following information:<br>1. incident tracking number;<br>2. the inmate(s) name;<br>3. housing assignment;<br>4. date;<br>5. type of incident;<br>6. injuries (if applicable);<br>7. medical care (if applicable);<br>8. primary and secondary staff involved; | x2/13 x9/13 x3/14 x9/14 x4/15 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | 9. reviewing supervisor;<br>10. external reviews and results (if applicable);<br>11. remedy taken (if appropriate); and<br>12. administrative sign-off. | | | |
| 34.d. | CCDOC shall require prompt administrative review of incident reports. Such reviews shall include a case-by-case review of individual incidents as well as a systemic review in order to identify patterns of incidents. CCDOC shall incorporate such information into quality management practices and take necessary corrective action. | x 8/11<br>x12/11<br>x7/12<br>x2/13<br>x9/13<br>x3/14<br>x9/14<br>x4/15 | x 9/10<br>x 3/11 | |
| 34.e. | CCDOC shall ensure that incident reports, use of force reports and inmate grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria, that it is referred for investigation. | x9/13<br>x3/14<br>x9/14<br>x4/15 | x 9/10<br>x 3/11<br>x 8/11<br>x12/11<br>x7/12<br>x2/13 | |
| 34.f. | CCDOC shall maintain policies, procedures and practices requiring investigations to resolve issues identified during review of incident reports, disciplinary hearings, or inmate grievances, and determine appropriate remedies, in accordance with generally accepted correctional standards. At a minimum, CCDOC shall require timely and appropriate investigations of all suicides, serious suicide attempts, inmate-on-inmate violence resulting in serious injury, inmate-on-staff violence, inmate injuries requiring treatment by an outside hospital, inmate injuries of a suspicious nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.), sexual misconduct between inmates, sexual misconduct involving staff, fires, escapes, escape attempts, and deaths. | x9/13<br>x3/14<br>x9/14<br>x4/15 | x 9/10<br>x 3/11<br>x 8/11<br>x12/11<br>x7/12<br>x2/13 | |
| 34.g. | CCDOC (OPR) shall ensure that any investigation reports indicating possible criminal behavior will be referred to the appropriate law enforcement authority. | x 8/11<br>x12/11<br>x7/12<br>x2/13<br>x9/13<br>x3/14 | x 9/10<br>x 3/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | | x9/14 x4/15 | | |
| 35. (30) | **Investigations:** **Investigations at the Facility are conducted by independent departments under the Cook County Sheriff's Office, including the Office of Professional Review, the Criminal Investigations Unit, and the Sheriff's Police Department. The Cook County Sheriff will assume responsibility for requiring these investigatory units to comply with the relevant provisions of this Agreed Order.** | | | |
| 35.a. | CCDOC [OPR] shall maintain comprehensive policies, procedures, and practices for the timely and thorough investigation of alleged staff misconduct, in accordance with generally accepted correctional standards. | x2/13 x9/13 x3/14 x9/14 x4/15 | x 9/10 x 3/11 x 8/11 x12/11 x 7/12 | |
| 35.b. | Internal investigations [OPR] shall be conducted by persons who do not have supervisory responsibility for the staff member(s) being investigated. | x 7/12 x2/13 x9/13 x3/14 x9/14 x4/15 | x 9/10 x 3/11 x 8/11 x12/11 | |
| 35.c. | CCDOC [OPR] shall ensure that all internal investigations will include timely, thorough, and documented interviews of all relevant staff and inmates who were involved in, or witnessed, the incident in question. | x 9/10 x 3/11 x 8/11 x12/11 x 7/12 x2/13 x9/13 x3/14 x9/14 x4/15 | | |
| 35.d. | CCDOC [OPR]  shall ensure that internal investigation reports shall include all supporting evidence, including witness and participant statements, policies and procedures relevant to the incident, physical evidence, video or audio recordings, and relevant logs. | x 9/10 x 3/11 x 8/11 x12/11 x 7/12 | | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | | x2/13 x9/13 x3/14 x9/14 x4/15 | | |
| 35.e. | CCDOC [OPR] shall ensure that all investigatory staff will receive pre-service and in-service training on appropriate investigations policies and procedures, the investigations tracking process, investigatory interviewing techniques, and confidentiality requirements. | x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 | x 9/10 x 3/11 x 8/11 x12/11 | |
| 35.f. | CCDOC [OPR] shall provide all investigators who will be assigned to conduct investigations of use of force incidents with specialized training in investigating use of force incidents and allegations. | x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 | x 9/10 x 3/11 x 8/11 x12/11 | |
| 35.g. | CCDOC [OPR] shall ensure that the results of each internal investigation shall be documented in an investigation report. CCDOC administration shall review the investigation reports, along with the underlying documentation, and take appropriate action. CCDOC shall implement appropriate remedies based upon the results of internal investigations. | x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 | x 9/10 x 3/11 x 8/11 x12/11 | |
| **36. (31)** | **Inmate Disciplinary Process** | | | |
| 36.a. | CCDOC shall maintain policies, procedures, and practices for a formal disciplinary process, including prompt issuance of written disciplinary citations, administrative review and disciplinary reports for alleged minor rule violations, and due process for alleged major rules violations, in accordance with generally accepted correctional standards. | x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 | x 9/10 x 3/11 x 8/11 x12/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| 36.b. | CCDOC shall ensure that inmate disciplinary hearings are conducted in a reasonably private and secure setting. | x 8/11 x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 | x 9/10 x 3/11 | |
| 36.c. | CCDOC shall ensure that all inmates places in lock down status are provided with appropriate due process that has been developed and implemented in policies and procedures, in accordance with generally accepted correctional standards.<br><br>In an emergency, the Executive Director of CCDOC may order a lock down of entire areas of the Facility in order to control the situation and address serious security concerns. In such circumstances, it is not necessary to provide disciplinary hearings to each inmate affected by the lock down. However, lock downs of this nature shall be limited to only the time and scope necessary to address the emergency.<br><br>For the purposes of this Agreed Order, a "lock down" shall not include the routine instances in which inmates are confined to their cells, including periods of count, over night, shift change, movement, and routine contraband sweeps. | x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 | x 9/10 x 3/11 x 8/11 x12/11 | |
| 36.d. | CCDOC shall ensure that the disciplinary board's written record accurately reflects the testimony and discussion from the disciplinary hearing, including any recommendations from a mental health professional regarding the extent to which disciplinary charges are related to an inmate's serious mental illness or suggestions for minimizing the deleterious effect of disciplinary measure on the mental health status of the inmate. | x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 | x 3/11 x 8/11 x12/11 | x9/10 |
| 36.e. | CCDOC shall alert Cermak when inmates are placed in disciplinary segregation or protective custody. | x7/12 x2/13 x9/13 x3/14 x9/14 | x 9/10 x 3/11 x 8/11 x12/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | | x4/15 | | |
| 36.f. | CCDOC shall permit a Cermak Qualified Mental Health Staff member to serve on the disciplinary board. | x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 | x 3/11 x 8/11 | x 9/10 |
| **37.** | **Classification** | | | |
| 37.a. (32) | CCDOC shall maintain policies and procedures for an appropriate, objective classification system that separates inmates in housing units by classification levels in order to protect inmates from unreasonable risk of harm.  The system shall include consideration of an inmate's security level, severity of current charge, types of prior commitments, suicide risk, history of escape attempts, history of violence, and special needs.  CCDOC shall use best efforts to anticipate periods of unusual intake volume and schedule sufficient classification staff to timely classify inmates. | x9/14 x4/15 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 x2/13 x9/13 x3/14 | |
| 37.b. (32) | CCDOC shall ensure that classification staff have sufficient access to current information regarding cell availability on each division. | x9/14 x4/15 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 x2/13 x9/13 x3/14 | |
| 37.c. (33) | CCDOC shall include information on each inmate's assignment to the Special Incarceration Unit "level system" at the Facility in the new Jail Management System, starting with the date the new Jail Management System becomes operational. | | x 9/10 x 3/11 x 8/11 x12/11 x7/12 x2/13 x9/13 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | | x3/14 x9/14 x4/15 | | |
| 37.d. (33) | CCDOC shall provide training and access to all correctional officer supervisors on the full capabilities of the new Jail Management System's classification and inmate tracking system (or any replacement system). | x2/13 x9/13 x3/14 x9/14 x4/15 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| 37.e. (33) | CCDOC shall provide ongoing internal and external review and validation of the inmate classification system to ensure its reliability and objectivity. | x3/14 x9/14 x4/15 | x7/12 x2/13 x9/13 | x 9/10 x 3/11 x 8/11 x12/11 |
| 38. (33) | **Inmate Grievance Procedure** | | | |
| 38.a. | CCDOC shall maintain policies and procedures to ensure inmates have access to an adequate grievance process and to ensure that grievances may be accessed and filed confidentially, without requiring the intervention of a correctional officer, in accordance with generally accepted correctional standards. These policies and procedures should be applicable and standardized across all the Facility divisions. | x8/11 x12/11 x7/12 x9/14 x4/15 | x 9/10 x 3/11 x2/13 x9/13 x3/14 | |
| 38.b. | CCDOC shall ensure that the grievances receive appropriate follow-up, including informing the grievant of the outcome, providing a timely written response, and tracking implementation of resolutions. | x 8/11 x12/11 x7/12 x9/14 x4/15 | x 9/10 x 3/11 x2/13 x9/13 x3/14 | |
| 38.c. | CCDOC shall ensure that grievance forms are available on all units and are available in Spanish. CCDOC shall ensure that there is adequate opportunity for illiterate inmates and inmates who have physical or cognitive disabilities to access the grievance system. | x 8/11 x12/11 x7/12 x9/13 x9/13 x3/14 x9/14 x4/15 | x 9/10 x 3/11 x2/13 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| 38.d. | CCDOC shall ensure that inmate grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria, are referred for investigation. A member of the management staff shall review the grievance tracking system regularly in order to identify areas of concern. | x 8/11 x12/11 x7/12 x9/13 x3/14 x9/14 x4/15 | x 3/11 x2/13 | x 9/10 |
| **39. (36)** | **Access to Information** | | | |
| 39.a. | CCDOC shall ensure that newly admitted inmates receive information, through an inmate handbook or orientation video, regarding the following areas: facility rules and regulations; how to report misconduct; how to report sexual abuse or assault; the process for accessing medical and mental health care; emergency procedures; rules for sending and receiving mail; the visitation process; facility schedule; the disciplinary process; and how to seek redress of grievances. | x2/13 x9/13 x3/14 x9/14 x4/15 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| 39.b. | CCDOC shall ensure that materials on facility rules and services are available for non-literate and non-English speaking inmates. | X2/13 x9/13 x3/14 x9/14 x4/15 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| 40. (36) | CCDOC shall provide training and supervision to all correctional officers and supervisors sufficient to implement the provisions of this Agreed Order. | x 8/11 x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 | x 9/10 x 3/11 | |
| 41. (37) | Inter-Agency Agreement<br>a.     CCDOC shall enter into a written Inter-Agency Agreement with Cermak that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility. The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order. | x 8/11 x12/11 x7/12 x2/13 x9/13 | x 3/11 | x 9/10 |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | b.    Cermak shall enter into a written Inter-Agency Agreement with CCDOC that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility.  The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order. | x3/14 x9/14 x4/15 | | |
| 69. (37) | CCDOC shall ensure that security staff posts will be equipped, as appropriate, with readily available, safely secured, suicide cut-down tools. *Coordinate with Dr. Metzner | x 8/11 x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 | | x 9/10 x 3/11 |

**31. Use of Force**

**April 2015 –** There are twenty (20) paragraphs in the Agreed Order regarding use of force.  All these paragraphs have remained in substantial compliance for 18 months.  While not citing each paragraph individually, below is provided an update on CCDOC's progress in this critical area since the last tour.

In assessing CCDOC's on-going compliance for these requirements I:
- continued to review a weekly sample of use of force reports/videos;
- interviewed inmates in Divisions 9, 1, and 3;
- assessed the Use of Force Review Units' statistics, analysis of uses of force, recommendations and actions;
- reviewed the Inspector General's report of the investigative process, organizational structure and chain of command;
- examined several use of force investigative reports at the Office of Professional Responsibility (OPR);
- read the updated/draft of revisions to the use of force policy;
- reviewed the use of force lesson plans and incident reporting lesson plans and found it to be consistent with the Agreed Order and accepted practice;
- assessed planned uses of force;
- evaluated the number of pending use of force investigations in OPR;
- met with Cermak, the Inspector General, and OPR staff regarding a reviewed process for insuring prompt production of inmate medical records;
- reviewed workers' compensation reports to compare the information to a sample of use of force reports;
- examined staffing for the OPR and Use of Force Review Unit;
- assessed "supplemental" training provided to employees identified through the early warning system re: uses of force, reporting, actions;
- Data summary of inmate/inmate allegations for the last 15 months;
- confirmed the progress of the video system throughout CCDOC facilities;
- reviewed a list of training provided to OPR staff from September 2014 to present;
- Review of UFRU findings for monitor-selected incidents;
- Division 9 data regarding management of inmates;
- examined the process and outcomes for the "early warning system";
- reviewed the process for leadership and management review of trends and remedies regarding uses of force; and
- reviewed logs for chemical and other security equipment.

I will soon have real time access to CCOMS to review reports, videos, and related materials regarding incidents in the jail. This opportunity to view the information in CCOMS is a means to systems check from the monitor without having to ask CCDOC staff to gather and transmit the information. My questions arise from my reading of the weekly summaries of incidents, which I have done since December 2010.

An outcome of the Hudson litigation[6] is that CCDOC was able to assess, outside of the specific provisions of the Agreed Order, if their internal processes were insuring inmate safety. This was an examination that was not ever contemplated and an inadvertent systems' check.

Judge Kendall found in her March 31, 2015 opinion that "The evidence presented at hearing demonstrated the Defendants have worked diligently – and with marked success in many areas – at combating the danger that exists at the Jail."[7] Judge Kendall also wrote "Plaintiffs have simply failed to supply evidence to support their claims that the Defendants have engaged in a pattern and custom of failing to investigate cases of excessive force or have investigated them in such a way that officers are intentionally exonerated."[8]

It has been my experience that even in the best-managed jails when a process is "repaired" often attention and resources are diverted to other priorities – of which there are unfortunately many. In the Cook County Sheriff's Office, because of the leadership's commitment, the Office of Professional Responsibility and the Use of Force Review Unit have continued to be high priority activities. In fact, several processes put in place not required by the Agreed Order – for example the Use of Force Review Unit – as I noted in other reports, are now being replicated in other jails – large and small.

My conclusion is that while investigative processes continue to be refined, there is sufficient focus on preventing, reporting, investigating, and as necessary, correcting employees that sustainability can be anticipated. For example, two refinements to the systems are:
- The designation of "Squad 3" charged with preliminarily reviewing all allegations of excessive uses of force – no matter the source of the report – within 72 hours; and
- Placement of the Use of Force Review Unit placed under the chain

---

[6] Tylon Hudson, et. al., v. Toni Preckwinkle, et. al. 1:13-cv-08752.
[7] Case 1:13-cv-08752 Document #328 filed 3/31/15, Page 42.
[8] IBID, Page 43.

of command of the Inspector General (rather than previously under CCDOC) with the provision of additional staff resources.

Recommendations regarding this section of the Agreed Order are as follows:
- Continue to monitor the investigative caseload to insure the timeliness of completion of the work, and assess if additional staffing resources are needed;
- Place a priority on filling vacant positions in OPR whether through outside hiring or detailing qualified internal candidates;
- Monitor employee discipline related to allegations of use of excessive force to identify opportunities to expeditiously handle discipline;
- Continue to evaluate the use of supplemental training and its impact on the work related behavior of employees identified via the early warning system;[9]
- Continue to refine the data that evolves from the Use of Force Review Unit to inform all related aspects of correctional operations including, but not limited to employee training, supervision, and on-going inmate training/orientation;
- Develop plans of action identified through any trend analysis;  and
- Monitor uses of force involving inmates on the mental health caseload, and development, as needed, of collaborative approaches to managing this inmate population and provision of the required staffing of mental health professionals in Cermak.

It is regrettably true that jails are dangerous places due to a variety of reasons including the prevalence of serious mental illness among the inmate population; and, in a few instances, there are employees who engage in unacceptable practices and behavior.  CCSO has developed *systems* to prevent, identify, report and investigate instances of allegations of serious staff misconduct no matter the source.  All such systems require continual focus to insure ongoing refinements and success in the mission of preventing harm to staff and inmates.

## 32.    Safety and Security

**April 2015 -** There are thirteen (13) paragraphs in the Agreed Order, which address safety and security.  All of these paragraphs have remained in substantial compliance for 18 months.  While not addressing each paragraph individually, the following is a summary of CCDOC's work since the tour of September 2014.

---

[9] For 2014, the majority of supplemental training for a total of 113 staff involved working with employees on improving report writing.

In assessing CCDOC's on-going compliance for these requirements I:

- reviewed the status of the on-going annual updating process for written policies and procedures;
- reviewed logs from each division regarding conduct of rounds;
- was updated regarding the 1,800+ video cameras located throughout the jail system;
- reviewed the "weapons free" reports regarding the detection, identification and prevention of contraband;
- review of logs for equipment, radios, etc.; and
- followed inmate population data trends.

CCDOC has consistently demonstrated the ability to provide updated policies and procedures and link those to in-service training.  This includes both at the department and the divisional level.

CCDOC continues to have a robust procedure in place for finding and identifying, thus preventing introduction and fabrication of contraband.  The introduction of contraband and fabrication by inmates of contraband is an on-going struggle in every penal institution.  Even paperclips present opportunities for inmates to fashion keys and weapons.  Particularly where there are old buildings, such as in the CCDOC system, contraband can be fashioned from unlikely sources.  This can be seen in the data from CCDOC, for example, the prevalence of seizures in Division I.  Also, the discovery of contraband in a medical setting is also evidenced by the number of recoveries in Cermak.  CCDOC does a credible job of managing, educating, and coordinating especially with medical providers.

The current reduction in the inmate population has made the issue of bed space manageable.  Division V remains closed.    There is some inmate crowding in Cermak that should be addressed by appropriate management of the inmate's medical housing options.

During the next tour I will reexamine the divisional level related training.

## 33.  Security Staffing

**33.   Security Staffing.**  The parties agree that correctional officer staffing and supervision levels at the Facility must be appropriate to adequately supervise inmates, to carry out the requirements of this Agreed Order, and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards.  Cook County and CCDOC shall take such actions as shall ensure that correctional officer staffing and supervision at the Facility are sufficient to achieve these purposes. These actions shall

include the following:

a.    In the fiscal year 2010 budget, Cook County shall allocate funds sufficient to allow for 210 additional correctional officer positions at the Facility.  Consistent with provision 33.c, such funding may occur on a rolling basis, as appropriate in light of the time required to hire, train, and put on duty the additional 210 new correctional officers.

**April 2015 Compliance Status:**   Substantial Compliance

**Status Update:**   Remains in substantial compliance.

CCDOC data indicated there are 142 vacancies as of March 31, 2015, with 42 new hires anticipated by April 30th.  An updated report documented 100 vacancies as of 5/1/15 with 55 hires planned by June 29, 2015.  The projected hiring through the end of CY 2015 is 220.   A schedule for pre-service training was provided through 5/9/16.   For CY 2015 year to date, CCDOC report that vacancies (N=89) were as a result of promotions/transfers (46%);  retirements (13%); resignations (18%); terminations (15%); leaves of absence (most likely pending taking jobs in other law enforcement agencies)(6%), and deaths (2%).   With some improvements in the economy, local law enforcement agencies are increasing hiring, impacting both the attrition of CCDOC and recruitment efforts.[10]  It appears in spite of increasing competition, CCDOC is able to attract, hire, train and deploy staff consistent with the approved staffing plan.

A review of the most recent budget submission to the County indicates that CCDOC is requesting a substantial increase in overtime funds (more than 100%) and an approximate 8% increase in total personnel spending.  These funds will provide flexibility to CCDOD in terms of determining the point at which overtime is a better, or worse, option than hiring.

**Monitor's Assessment:**   As noted in the previous 9 reports, CCDOC is able to sustain hiring as required by the Agreed Order.

**Monitor's Recommendation:**  None at this time.

b.    CCDOC shall use its best efforts (through the maintenance of the written staffing plan required by provision 33.h and otherwise) to ensure that the number of correctional officer vacancies is kept to the minimum practicable number at all times, taking into account that the timing of terminations and resignations and the resulting rate of attrition may, in ordinary course, result in there being some vacancies at any given time.

---

[10] http://patch.com/illinois/beverly-mtgreenwood/100-new-officers-added-chicago-police-force-0 accessed on 4/27/15, http://www.chicagotribune.com/news/ct-chicago-police-budget-hearing-met-1031-20141030-story.html accessed 4/27/15.

**April 2015 Compliance Status:** Substantial compliance

**Status Update:** Remains in Substantial Compliance.

**Monitor's Assessmen**t: As noted in Report # 9 CCDOC memorialized the organization's on-going staffing strategy in General Order 24.1.20.0, Centralized Roster Management Staffing Analysis. This directive, approved by the Department of Justice, requires an annual staffing review. This strategy will include three levels of review focusing on: (1) reducing overtime; (2) identifying barriers to achieving staffing objectives; and (3) responses to the barriers and challenges of staffing.

**Monitor's Recommendations**: I will evaluate this paragraph during the next tour to assure the results of the three-step process are documented.

c.       CCDOC shall fill the 210 additional correctional officer slots provided for in provision 33.a; fill the 285 correctional officer vacancies that existed at the Facility as of July 17, 2009; and fill any correctional officer vacancies coming into existence after that date in the following manner:
        i.       By December 31, 2010, CCDOC shall hire, train, and put on duty at the Facility at least 448 [381] newly qualified correctional officers (in addition to those on duty as of December 31, 2009).
        ii.      By March 30, 2011, CCDOC shall hire, train, and put on duty at the Facility at least 178 [107] newly qualified correctional officers (in addition to those on duty as of December 31, 2010).

**April 2015 Compliance Status:** Substantial Compliance.

**Status Update:** Remains in substantial compliance,

**Monitor's Assessmen**t: See 33.a.

**Monitor's Recommendations:** See 33. a.

d.       The parties agree that for 30 months following the effective date of this Agreed Order, Cook County and CCDOC shall not be required to provide additional correctional officer staffing and supervision at the Facility beyond that which is necessary to ensure that correctional officer staffing and supervision are sufficient to achieve the purposes set out in the introductory paragraph of provision 33 and to comply with provisions 33.a-c above.

**April 2015 Compliance Status:** Substantial Compliance

**Status Update:** See 33.b.

**Monitor's Assessmen**t: See 33.b.

**Monitor's Recommendations:** See 33.b.

e.	Within 30 months of the effective date of this Agreed Order, the CCDOC Monitor shall assess and make a recommendation on whether the correctional officer staffing and supervision levels are appropriate to adequately supervise inmates at the Facility, in accordance with generally accepted correctional standards.  If the CCDOC Monitor determines that staffing is inadequate, the CCDOC Monitor will make a recommendation regarding the appropriate number of correctional officer staff.  If the parties do not accept the CCDOC Monitor's staffing recommendation, CCDOC and Cook County shall agree to an independent, comprehensive study to determine the appropriate correctional officer staffing and supervision.  The parties agree that the results of this staffing study shall provide guidance as to the sufficient number of qualified correctional officers necessary to operate the Facility safely and to carry out the requirements of this Agreed Order.

## April 2015 Compliance Status:	Substantial compliance

## Status Update:	See 33.b.

## Monitor's Assessment:	See 33.b.

## Monitor's Recommendation:	See 33.b.

f.	If the staffing study requires additional correctional officers, Cook County shall allocate funds sufficient to maintain correctional officer staffing levels necessary to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards.

## April 2015 Compliance Status:	Substantial compliance

## Status Update:	See 33.b.

## Monitor's Assessment:	See 33.b.

## Monitor's Recommendation:	See 33.b.

g.	If the staffing study requires additional correctional officers, and consistent with Cook County's allocation of funds for security staffing, CCDOC shall hire and train sufficient number of qualified correctional officers and other staff to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards, including:
1. Investigative staffing sufficient to meet the internal investigation responsibilities outlined in this Agreed Order;
2. Correctional officer staffing sufficient to provide inmates requiring treatment with adequate access to appropriate medical and mental health care by providing timely movement of inmates to medical units, transport of inmates who have been referred for outside specialty care, and escort, if necessary, to Qualified Medical and Mental Health Staff on housing units; and
3. Qualified staff sufficient to monitor security cameras in real time and allow for supervisory viewing and retrieving at any time.

## April 2015 Compliance Status:	Substantial compliance.

**Status Update:**    The Inspector General is evaluating staffing needs of a revised investigative function.  In the interim, this paragraph remains in substantial compliance.

**Monitor's Assessment:**    Based on the Inspector General's review of staffing, the CCDOC should work expeditiously to fill those positions with qualified and experienced personnel.

**Monitor's Recommendation:**  Complete the review process; fill positions identified to enhance operations and functions..

h.      CCDOC shall maintain a written staffing plan that requires sufficient staffing to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards.

**April 2015 Compliance Status:**    Substantial compliance

**Status Update:**  See 33.b.

**Monitor's Assessmen**t:   See 33.b.

**Monitor's Recommendation:**     See 33.b.

i.      Absent exigent circumstances, CCDOC shall maintain a practice that does not allow for scheduled, planned, or expected cross-watching (a CCDOC practice of allowing one correctional officer to simultaneously supervise two housing units from the control center of one of the units) at any time on all maximum security and Special Management Units, and during first and second shifts throughout the Facility.

**April 2015 Compliance Status:**  Substantial Compliance

**Status Update:**  CCDOC reports no deficiencies.

**Monitor's Assessmen**t:  I have received no complaints from employees and/or unions regarding cross watching.  Division 5 has been closed for some time, and this had been the source of complaints.

**Monitor's Recommendation:**  None at this time

j.      CCDOC may permit cross watching on third shift in housing units that are not maximum security or Special Management Units only if the Monitor does not object after consultation and review.  The Monitor's review of the appropriateness of third-shift cross-watching on a particular housing unit shall be guided by the sufficiency of sightlines between the units being cross-watched, the adequacy of video and/or audio technologies in place, and/or other factors that bear on the safety and security of inmates and staff.  If the Monitor later objects to any cross-watching that is in effect because of the Monitor's

concerns that cross-watching on a particular housing unit presents an undue risk to the safety and security of inmates and staff, CCDOC shall immediately cease such cross-watching.  CCDOC may renew cross-watching on that unit again if, after further consultation with and review by the Monitor, the Monitor does not object to such renewal.  Although cross-watching is permitted under the limited circumstances described herein, CCDOC will work to eliminate the practice at the Facility.

**April 2015 Compliance Status:**  Substantial Compliance

**Status Update:**  See 33.i.

**Monitor's Assessmen**t:  See 33.i.

**Monitor's Recommendation:**  See 33.i.

## 34.   Incidents and Referrals

**April 2015 -** There are seven (7) paragraphs in the Agreed Order that address incidents and referrals.  All of these paragraphs have remained in substantial compliance for 18 months.  While not addressing each paragraph individually, the following is a summary of CCDOC's work since the tour of September 2014.

In assessing CCDOC's on-going compliance for these requirements I:
- reviewed samples of incident reports;
- review of summary reports regarding inmate/inmate violence;
- review of weekly reports of incidents and follow-up with CCDOC concerning questions;
- examined the current policy; and
- reviewed the existing lesson plans for pre-service training.

Regarding paragraph 34.d., there is at least a two-step system for identifying incidents requiring further review – the work of the Use of Force Review Unit and the grievance process.  Additionally, CCDOC is updating the process by there is weekly management review of incidents, trends, action plans, etc. (Jail Management Meeting draft General Order dated 4/1/2015). Implementation of this revised General Order will be assessed during the next tour. The Cook County Sheriff's Office also has a relatively new Office of Research that is providing analysis of agency data to provide the basis for data driven decisions.  For example, the Office is even engaged in consideration of a prediction model for use of force to further work to prevent inappropriate or excessive uses of force.  This approach – both the existence of an Office of Research and modeling is very cutting-age for a jail system.

There is a new jail management and recordkeeping system as of October 2014, CCOMS replacing IMACs. This new system was the capacity to go beyond what is required in the Agreed Order to provide a wide-range of data, and the ability to collect and analyze information almost real-time.

I reviewed evidence that indicates OPR investigations are being initiated through inmate grievances, and that that inmate grievances are forwarded to OPR. Additionally, OPR provided information regarding referrals of cases involving possible criminal misconduct to the prosecutor. For CY 2014 and through the first quarter of 2015, the Inspector General reports that eight cases involving allegations of excessive force were presented to and declined by the prosecutor; and two cases were presented which are pending. Cases were also presented involving employee introduction of contraband, custodial sexual misconduct, theft, and filing flaw police reports. For the eight employees referred for use of excessive force and declined: one is pending command channel review (discipline); four are pending Merit Board action; one was exonerated by the Merit Board; and two are pending disciplinary committee review. [See also 35. Investigations.]

**35. Investigations** - Investigations at the Facility are conducted by independent departments under the Cook County Sheriff's Office, including the Office of Professional Review, the Criminal Investigations Unit, and the Sheriff's Police Department. The Cook County Sheriff will assume responsibility for requiring these investigatory units to comply with the relevant provisions of this Agreed Order.

There are seven (7) paragraphs in the Agreed Order which investigations. All of these paragraphs have remained in substantial compliance for 18 months. While not addressing each paragraph individually, the following is a summary of CCDOC's work since the tour of September 2014.

In assessing CCDOC's on-going compliance for these requirements I:
- Met with Inspector General and OPR leadership;
- Reviewed the organizational structure and assignment of staff;
- Reviewed a limited number of case files and sample documents for different investigative milestones;
- Examined data for the system including assigned cases and weekly reports;
- Reviewed staffing;
- Reviewed employee training; and
- Examined cases referred for prosecution.

With every monitoring tour I find that the level of attention to detail and professionalism grows within the Cook County Sheriff's Office's investigative

functions.  My only concerns are: that the staffing continue to be a priority, and that the employee discipline systems now in place are appropriately accelerated to insure swifter sanctions for employee misconduct in cases where discipline is indicated.

## 36.    Inmate Disciplinary Process

**April 2015 -** There are six (6) paragraphs in the Agreed Order that address the inmate disciplinary process.  All of these paragraphs have remained in substantial compliance for 18 months.  While not addressing each paragraph individually, the following is a summary of CCDOC's work since the tour of September 2014.

In assessing CCDOC's on-going compliance for these requirements I:
- met with the staff assigned to manage the inmate disciplinary procedures;
- spoke with inmates about their experiences with the disciplinary process; and
- reviewed the data provided regarding the process.

In reviewing the data I requested additional information regarding inmate disciplinary write-ups that were invalid/expired (11% of the total charges for the first three months of 2015, up from 5% for the previous calendar year). CCDOC's review indicated that the spike in invalid reports was due to several circumstances in which the entire living area received a discipline infraction rather than the individual inmate(s) involved in the violation (in this case reported as "compliance violations" such as obstruction of air vents, washing clothes in a cell, or possession of a clothes line.)  CCDOC reported with the implementation of the new jail records system in October 2014 (CCOMS) the number of expired discipline reports are decreasing.  CCDOC reports that the matter that resulted in the spike in invalid reports in February will be addressed through training.

Inmates did not report any issues regarding the inmate disciplinary process. CCDOC continues to review civilian hearing officers.

For the calendar year 2014, CCDOC reports where were 11,038 inmate violations written for serious (300+violations).  Ninety-one percent of the total reports written were valid.   Of those. 80% of the inmates were found guilty, and 20% not guilty.     Less than 10% of reports were expired, invalid, or the inmate was no longer in custody.  Data supplied by the Inmate Disciplinary Unit also includes reviews done by Cermak's mental health staff for inmates on the mental health caseload pending disciplinary action (N=408).  For the first quarter of 2015, 2,535 inmate disciplinary reports

have been written (annualized 10,140). Of those, 12% were expired, invalid, or the inmate discharged; 87% of inmates were found guilty of charges, and 13% not guilty.

## 37. Classification

a.    CCDOC shall maintain policies and procedures for an appropriate, objective classification system that separates inmates in housing units by classification levels in order to protect inmates from unreasonable risk of harm.  The system shall include consideration of an inmate's security level, severity of current charge, types of prior commitments, suicide risk, history of escape attempts, history of violence, and special needs.  CCDOC shall use best efforts to anticipate periods of unusual intake volume and schedule sufficient classification staff to timely classify inmates.

**April 2015 Compliance Status:**   Substantial Compliance

**Status Update:**  The revised classification was implemented on October 26, 2014.  The new jail management information system (October 2014), Cook County Offender Management System (CCOM)s manages the classification processes.

**Monitor's Assessmen**t:   It was anticipated that the updated/revised inmate classification system would result in fewer inmates classified as "maximum" custody.   Through March 29, 2015, the trend is as was anticipated, with a decrease in the number of inmate classified as maximum custody and an increase in inmates classified as medium and minimum.  A slight downward trend is also noticed in the classifications of female inmates.

**Monitor's Recommendations:** Prepare for the completion of a validation study in the fall of 2015.  Assure that moves of inmates completing their sentences in disciplinary segregation are reported to the Classification unit.

b.    CCDOC shall ensure that classification staff have sufficient access to current information regarding cell availability on each division.

**April 2015 Compliance Status**:   Substantial compliance.

**Status Update:**   CCOMS will provide the data.

**Monitor's Assessment:**  System has been implemented.

**Monitor's Recommendation:**  See 37.a.

c.    CCDOC shall include information on each inmate's assignment to the Special Incarceration Unit "level system" at the Facility in the new Jail Management System, starting with the date the new Jail Management System becomes operational.

**April 2015 Compliance Status**:   Substantial compliance.

**Status Update:**  Remains in substantial compliance.  CCOMS provides the data.

**Monitor's Assessment:**  Nothing further at this time.

**Monitor's Recommendation:**  Continue the monitoring of inmates in special incarceration and protective custody

d.      CCDOC shall provide training and access to all correctional officer supervisors on the full capabilities of the new Jail Management System's classification and inmate tracking system (or any replacement system).

**April 2015 Compliance Status:**   Substantial Compliance.

**Status Update:**  CCOMS implemented on 10/26/14.

**Monitor's Assessment:** Nothing further at this time.

**Monitor's Recommendation:**  NA

e.      CCDOC shall provide ongoing internal and external review and validation of the inmate classification system to ensure its reliability and objectivity.

**April 2015 Compliance Status:**   Substantial compliance.

**Status Update:**  Pending system being operational for one year.

**Monitor's Assessment:**  At least a preliminary validation of the new system is anticipated for review at the time of the next tour.  This validation should be able to document that the new system has resulted in fewer indicators of disorder – inmate/inmate fights, uses of force, etc. because better information has been used to house inmates.

**Monitor's Recommendation:** CCDOC should be prepared at the time of the next monitor's tour to share the preliminary validation data.

## 38.    Inmate Grievance Process

**April 2015 -** There are four (4) paragraphs in the Agreed Order that address the inmate grievance process.  All of these paragraphs have remained in substantial compliance for 18 months.  While not addressing each paragraph individually, the following is a summary of CCDOC's work

since the tour of September 2014.

In assessing CCDOC's on-going compliance for these requirements I:
- met with the Inmate Service Department staff who oversee and manage the inmate grievance process;
- reviewed the CCDOC grievance data;
- interviewed inmates regarding the grievance process;
- reviewed grievance forms;
- read the "FAQs" available to assist inmates developed by the grievance unit;
- read the review by counsel of the analysis of a sample of grievance responses (quality control);
- reviewed Cermak's grievance data;
- reviewed the number of grievances referred for allegations of misconduct to OPR;[11]
- reviewed housing unit logs to assure CRWs have signed in; and
- assessed the "early warning" system that the grievance staff maintains.

One of the more evident and important accomplishments for CCDOC during the course of the monitoring has been the creation and maintenance of a credible inmate grievance process. I interviewed close to 200 inmates in three different divisions and virtually no inmate had an issue with getting a grievance form, turning in a grievance form, or receiving responses. While not all inmates were happy with the response they received, they are receiving responses. I was able to view many, many pages of grievances shown to me by the inmate's with whom I spoke.

Data is maintained, analyzed and reviewed with the CCDOC leadership team regarding inmate grievances. More than 7,500 grievances were received and processed in 2014, and more than 1,700 for the first three months of 2015. As would be expected, medical grievances accounted for 58% of grievances in 2014, and 44% of grievances for the first quarter of this calendar year. The next largest category of inmate grievances was: 15% staff misconduct (non-physical) in 2014 and year to date in 2015.

Although not required by the Agreed Order, the grievance section also monitors staff actions alleged by an inmate to determine any needed changes in staff counseling, training, and/or policy. Inmate Services

---

[11] OPR data indicates for 2014: 100 grievances were referred regarding allegations of excessive force, and 43 inmate grievance for failure to protect. For the first quarter of 2015; 2015 65 grievances alleging excessive force and 13 alleging failure to protect have been forwarded to OPR.

reports that since the system began 64 staff members have been identified in 3 or more grievances as benefiting from counseling regarding their actions that may have resulted in an inmate grievance.

Additionally, CCDOC counsel reviews a sample of grievance each month and produces an audit report regarding the grievances reviewed. For example, the audit may note that the process and response was timely and acceptable, or that the response was not on point, or that time limit was not adhered to. The audit also addresses any grievance appeal. I reviewed the audit findings for January/February 2015. These two systems are innovative and assure that the inmate grievance process is reviewed from various perspectives not only to address inmate issues, but emerging staff/supervisor issues as well.

Since November 2014 CCDOC is also tracking "emergency grievances" and the outcomes. This is another inmate safety and quality control issue.

A previous concern about CRW staffing and their presence in the housing units seems to have been adequately addressed. There are several vacancies in the CRW positions that are being recruited/processed at this time. In the absence of CRWs the divisional superintendents know what to do to retrieve grievances. Staffing has been addressed also by dealing with paperwork flow.

My review of housing unit logs indicates that the CRWs are signing in and out of units, documenting their presence. Inmates told me that they had access to the CRW and I heard no complaints about access to either the grievance process or the CRW – and this included Division IX inmates. I identified only one instance where a non-English speaker needed assistance (Division I) and a Spanish speaking officer quickly arrived. Other LEP inmates I spoke with in Division IX were able to use the grievance process.

Another innovation is the creation of "FAQs" derived from inmates' grievances and designed to provide basic information for officers and inmates. It is anticipated that there may be a drop in the number of grievances as officers can give consistent answers and inmates have answers to frequently asked questions. The next initiative for the Inmate Services Department is to work with the small number of inmates (N=102) who are responsible for 28% of the grievances.

The focus on grievances by the CCDOC leadership accentuates the importance of superintendents knowing their numbers of grievances, the issues, and urging them to work on the underlying conditions.

An area that remains to be resolved is the medical grievance issue.  While on-site I was provided with a grievance report from Cermak for November 2014– February 2015.  The information had not previously been seen by CCDOC's Inmate Services Department, and the numbers presented were not consistent with CCDOC's data.  The definitions used by Cermak also were unclear.  As a result, CCODC will work with Cermak to assure a unified procedure and recordkeeping for medical/mental health/ dental data.

I commend the Inmate Services Department for their incredibly hard work and single-minded determination to meet and exceed the requirements of the Agreed Order.  Inmate Services has also developed several innovative procedures that should be shared with jails nationally.

## 39.   Access to Information

**April 2015 -** There are two (2) paragraphs in the Agreed Order that address access to information.  All of these paragraphs have remained in substantial compliance for 18 months.  While not addressing each paragraph individually, the following is a summary of CCDOC's work since the tour of September 2014.

In assessing CCDOC's on-going compliance for these requirements I:
  • reviewed the current inmate handbook in English/Spanish.

My recommendation is to assure that the inmate handbooks are updated as needed, and that a date be added to each revised production to assure version control.  I also recommend that CCDOC continue to implement alternatives to distributing written handbooks to inmates, including but not limited to use of kiosks, single laminated copies at officer workstations, and periodic inmate housing unit briefings by CRWs.

## 40.   CCDOC shall provide training and supervision to all correctional officers and supervisors sufficient to implement the provisions of this Agreed Order.

**April 2015 -** There is one (1) paragraph in the Agreed Order that address training.  This paragraph has remained in substantial compliance for 18 months.  The following is a summary of CCDOC's work since the tour of September 2014.

In assessing CCDOC's on-going compliance for these requirements I:
  • reviewed the in-service training schedule.

I will review training information and documentation during the next tour.

**41.    Inter-Agency Agreement**

**April 2015 -** There is one (1) paragraph in the Agreed Order that addresses the Inter-Agency Agreement.  This paragraph has remained in substantial compliance for 18 months. The following is a summary of CCDOC's work since the tour of September 2014.

In assessing CCDOC's on-going compliance for these requirements I:
- reviewed minutes of meeting.

I urge the parties to continue to meet regularly and produce solutions to issues.  This practice should continue long after compliance with the Agreed Order is achieved.

**69.**    CCDOC shall ensure that security staff posts will be equipped, as appropriate, with readily available, safely secured, suicide cut-down tools. Coordinate with Dr. Metzner

**April 2015 -** There is one (1) paragraph in the Agreed Order that addresses the availability of cut-down tools.  According to CCDOC the tool was used 95 times in 2014 and from 1/1/15 – 5/5/15, 45 times.

In assessing CCDOC's on-going compliance for these requirements I:
- Reports by incident number for 2014 and 2015 YTD.

I recommend that CCDOC analyze the data by housing unit, mental health status of the inmate, significance of the attempt, and training and/or policy implications, if any.