**Cook County Jail**
**Tenth Monitoring Report**

**Esmaeil Porsa, MD, MPH, CCHP**

**April 2015**

**Executive Summary**

During the week of April 13, 2015, the Monitoring team visited Cook County Jail. The team included: Dr. Esmaeil Porsa, MD, MPH, CCHP, Dr. Muthusamy Anandkumar, MD, MBA, Madeleine LaMarre FNP-BC, Catherine Knox, MN, RN, CCHP-RN and Linda Pansulla, RN, MBA, CCHP. The Monitoring Team visited the majority of the Cook County Jail medical facilities and housing units with special focus on the recently opened Residential Treatment Unit (RTU) male and female detox floors. We also interviewed various Cermak and Cook County Department of Corrections (CCDOC) leadership and front line staff as well as Cook County Jail inmates. We extend our most sincere thanks to all the Cermak and CCDOC leadership and staff for their hospitality and generosity with their time and resources. Cook County Jail Cermak and CCDOC personnel were completely cooperative and helpful in this monitoring visit. The Monitoring Team enjoyed full and unhindered access to all areas and staff. During this visit, the Monitoring Team found Cermak and Cook County Health and Hospital System's leadership to be open to the Monitoring Team's overall findings and recommendations.

Our monitoring visit began on Monday April 13th, with a short introductions meeting that included the top executive leadership of the Cook County Health and Hospital System (CCHHS) as well as CCDOC and Cermak leadership and key front line staff.

Improvement in general cleanliness of all clinical areas was once again noticeable in nearly all areas, but particularly impressive in the Urgent Care area and the dialysis unit. There has been continued progress in almost all health processes. The following areas, however, were significant stand outs and deserve special mention: the new detox protocol for identification and treatment of at-risk detox patients; the newly revamped access to care process that has vastly improved the timeliness and documentation of health service requests; the new wound care protocol and documentation using iView nursing templates.

In the medical program, the two remaining non-compliant sections were moved to partial compliance (Infirmary Care and Access to Care). All areas of substantial compliance remained in substantial compliance except for Emergency Care which was moved to partial compliance. Two new sections moved from partial compliance to substantial compliance (Follow-Up Care and Dental Services). Glycemic management of diabetics was identified as an at-risk area that will require focused attention prior to our next visit the first week of November 2015. If glycemic management issues detailed in this report are observed at our next monitoring visit, Chronic Care will be placed in non-compliant status.

Obstetrics care remains highly functional and reliable and serve as a model of excellence for the rest of the health system. This section has now been in substantial compliance for more than 18 months and subsequently will no longer be monitored unless issues are identified during future visits.

Staffing, while gradually improving, continues to challenge the day to day operations of Cook County Jail health programs and is contributing to the difficulty that the system is facing in initiating/maintaining process improvement plans. We were pleased to learn that up to three new positions are in various stages of offering, hiring and on-boarding. A new Cermak COO, fills the last vacant Cermak leadership position. The Monitoring Team had the opportunity to meet with the new COO as a group and also individually. We are extremely pleased with Cermak's choice and look forward to working with this person who brings a wealth of knowledge and experience in the arena of process improvement.

As mentioned above, Emergency Care was downgraded from substantial compliance to partial compliance. The Monitoring Team observed persistent health care delivery issues in this area that have not demonstrated improvement or have actually worsened since our last monitoring visit in November 2014. These issues are discussed in detail in this report.

The Dental program was once again highlighted during this visit as the most improved aspect of health care at Cook County Jail. The Monitoring Team was presented with a detailed and thoughtful response to our November 2014 report and recommendations. This report also included various action plans that have been put into practice and refined over the past several months. These are discussed in detail in the body of this report. While this area still does not meet all the timeliness requirements that have been agreed upon, the Monitoring Team has decided based upon general improvements in access to care, including dental, to move this section to provisional substantial compliance with the full expectation that the timeliness requirements will be met by the time of our next monitoring visit in November of this year. Otherwise, the section will transition back to partial compliance.

Based on our findings in this visit and our interactions with Cermak health care and leadership staff, the Monitoring Team believes that Cermak is at the cusp of a rapid improvement trajectory that will result in more sections of the Agreed Order moving to substantial compliance as early as our next monitoring visit. Cermak and CCDOC are to be congratulated for progress noted in this report.

**Introduction and Facility Outline**

On the first day of our visit, April 13, 2014, the population of Cook County Jail was reported as 8,575 plus 474 inmates in the drug treatment program, 160 female inmates in Women's Residential Program and 35 in the VRIC Boot Camp. There were 17 inmates at Stroger Hospital. The distribution of inmates among the various "Divisions" is reported in the body of this report.

**Definitions and Organization**

This report is formatted in the manner requested by the Department of Justice and closely follows the Agreed Order. The report includes four parts for each section of the Agreed Order.

In part one, we rewrite verbatim the pertinent portion of the Agreed Order. This first part is labeled Remedial Measure of Agreed Order.

The second part is the overall compliance rating labeled Compliance Assessment. This is the assessment that the Monitoring Team experts make based on judgment, data, and chart reviews. The Compliance Assessment has three possible scores: substantial compliance, partial compliance, and noncompliance. Substantial compliance means that the Monitoring Team experts determine that Cook County Jail has satisfactorily met most or all components of the standards of care for the particular provision. Partial compliance means that some remaining problems exist. Non-compliance means that much work needs to be done before compliance is met. When indicated, the Monitoring Team will additionally assess the various components (sub-bullet points) of certain sections of the Agreed Order. Our goal is to highlight areas of success and bring focus to areas that need further refining and attention.

The third part is the factual basis for forming the opinion in the Compliance Assessment. This will be as data driven as possible. For patient care areas, chart reviews form a substantial portion of this review. Touring, interviews, and reviewing data sources is also an important means of making assessments.

The fourth part is our recommendations. These recommendations are our view of what needs to be accomplished to attain compliance. This will include the Monitoring Team's recommendations for self-monitoring activities and audits.

**B.      HEALTH CARE SERVICES:  ELEMENTS COMMON TO MEDICAL AND
          MENTAL HEALTH**

**41. Inter-Agency Agreement**

   a. CCDOC shall enter into a written Inter-Agency Agreement with Cermak that delineates
      the mutual responsibilities of each party, relative to the provision of health care to
      inmates at the Facility.  The Inter-Agency Agreement shall be finalized within 60 days of
      the effective date of this Agreed Order.
   b. Cermak shall enter into a written Inter-Agency Agreement with CCDOC that delineates
      the mutual responsibilities of each party, relative to the provision of health care to
      inmates at the Facility.  The Inter-Agency Agreement shall be finalized within 60 days of
      the effective date of this Agreed Order.

**Compliance Status**: This provision remains in substantial compliance.

   a. Substantial Compliance.
   b. Substantial Compliance.

The joint meetings between CCDOC leadership and Cermak leadership continue to occur.  There
also continues to be a recurring daily morning huddle with medical, administrative, custody,
pharmacy and nursing leadership to verify and correct housing assignments for acute
medical/mental health inmates and to verify that inmates on high acuity medications are in the
correct housing unit to receive dose by dose medications.  This is, as viewed by the Medical
Monitor, consistent with the intent of the Agreement. This provision has remained in substantial
compliance for over 18 months and will not be on the active monitoring list during our next visit
in November 2015. The Monitoring Team will continue to assess the CCDOC's support and
cooperation with the health care staff by asking the following questions during our monitoring
visits:

   1. Do you feel safe while rendering care?
   2. Do you have enough clinical space to render care?
   3. Do you have enough privacy while rendering care?
   4. Do you have adequate support from the correctional officers to render care?

**Monitor's Recommendations:** None.

**42. Policies and Procedures**

Cermak shall provide adequate services to address the serious medical and mental health needs
of all inmates, in accordance with generally accepted professional standards.  The term

"generally accepted professional standards" means those industry standards accepted by a majority of professionals in the relevant field, and reflected in the standards of care such as those published by the National Commission on Correctional Health Care ("NCCHC").

    a. Cermak shall develop and implement medical care policies, procedures and practices to address and guide all medical care and services at the Facility, including, but not limited to the following:
        i. access to medical care
        ii. continuity of medication
        iii. infection control
        iv. medication administration
        v. intoxication and detoxification
        vi. documentation and record keeping
        vii. disease prevention
        viii. sick call triage and physician review
        ix. intake screening
        x. chronic disease management
        xi. comprehensive health assessments
        xii. mental health
        xiii. women's health
        xiv. quality management
        xv. emergent response
        xvi. infirmary care
        xvii. placement in medical housing units
        xviii. handling of grievances relating to health care
        xix. mortality review
        xx. care for patients returning from off-site referrals

    b. Cermak shall develop and implement policies, procedures and practices to ensure timely responses to clinician orders including, but not limited to, orders for medications and laboratory tests.  Such policies, procedures and practices shall be periodically evaluated to ensure timely implementation of clinician orders.

**Compliance Status**: This provision remains in partial compliance.

    a. Partial Compliance.
    b. Substantial Compliance.

**Status Update:**  Received and reviewed.

**Monitor's Findings:**

The status tracker that the Monitoring Team received three days prior to our visit reports that "125 P&Ps have been reviewed and/ or revised (45 posted to date), 18 rescinded, and 23 are in various stages of review". As indicated in this document, while most of the policy and procedures have been updated, some of the policy and procedures are still pending review and update.

The issue of wide distribution of policy and procedures among the Cermak staff and training of staff based on established policy and procedures persists. For example, one of the infirmary nurses interviewed during this visit was not aware of the recently updated detox policy and did not know how to access this policy on Cermak intranet. Other nursing staff throughout Cermak had similar reactions when asked about specific policies.

While the same status tracker mentioned above reports that medication distribution and administration policies have been revised and posted, the Monitoring Team was not able to locate the policy for electronic documentation of medication administration even after meeting with the Chief Nursing Officer and the Director of Pharmacy. The lack of updated policy and procedures that can serve as the training manual for the staff has the deleterious outcome of allowing variability across the different clinical areas even with regard to the same activities.

**Monitor's Recommendations:**

1. Review and update all policy and procedures to match the expected practices and the elements of the Agreed Order. The Monitoring Team specifically asks for focused attention on refining the following policy and procedures:
   a. medication administration
   b. electronic documentation of medication administration and delivery
2. Train all staff with regard to current and new policies to ensure that policies are followed facility wide. Document this training so that leadership can later demand accountability.
3. Update the chronic disease policy to allow for acuity based patient referral to chronic care clinics after intake. The current four week follow up expectation will not meet the need of inmates with special diseases such as HIV or those who are more acutely ill but do not qualify for infirmary housing.
4. Develop and/or revise other policies as discussed more specifically in other sections of this report.
5. Provide the Monitoring Team with a complete set of **all** current and recently updated policy and procedures (as appear on Cermak's intranet) by September 1, 2015. Ideally, the Monitoring Team should be provided with electronic access to Cermak's intranet so that the presence of these policy and procedures can be independently verified. This will provide Cermak with ample opportunity to train all the healthcare staff regarding the most pertinent policy and procedures (the twenty policy and procedures listed above)

prior to the next Monitoring visit in November 2015. Once the Monitoring Team can verify that staff has been trained to all the current and pertinent policy and procedures, this provision will move into substantial compliance.

## 43. Medical Facilities

a.      CCDOC will work with Cermak to provide sufficient clinical space, as identified by Cermak staff, to provide inmates with adequate health care to meet the treatment needs of detainees, including: intake screening; sick call; medical and mental health assessment; acute, chronic, emergency and specialty medical care (such as geriatric and pregnant inmates); and acute, chronic and emergency mental health care.

b.      Cermak shall make known to CCDOC and Cook County its needs for sufficient clinical space, with access to appropriate utility and communications capabilities, to provide inmates with adequate health care to meet the treatment needs of inmates including: intake screening; sick call; medical and mental health assessment; acute, chronic, emergency and specialty medical care (such as geriatric and pregnant inmates); and acute, chronic and emergency mental health care.

c.      Cook County shall build out, remodel, or renovate clinical space as needed to provide inmates with adequate health care to meet the treatment needs of detainees as identified by Cermak staff including:  intake screening; sick call; medical and mental health assessment; acute, chronic, emergency and specialty medical care (such as geriatric and pregnant inmates); and acute, chronic and emergency mental health care.

d.      Cermak shall ensure that medical areas are adequately clean and maintained, including installation of adequate lighting in examination rooms.  Cermak shall ensure that hand washing stations in medical care areas are fully, equipped, operational and accessible.

e.      Cermak shall ensure that appropriate containers are readily available to secure and dispose of medical waste (including syringes and medical tools) and hazardous waste.

f.      CCDOC shall allow operationally for inmates reasonable privacy in medical and mental health care, and shall respect the confidentiality of inmates' medical status, subject to legitimate security concerns and emergency situations.  Reasonable privacy typically includes sight and hearing privacy from other inmates, and hearing privacy from staff that are not providing care.

g.      Cermak shall make known to CCDOC and Cook County the structural and operational requirements for inmates' reasonable privacy in medical and mental health care.  Cermak shall provide operationally for inmates' reasonable privacy in medical and mental health care and shall respect the confidentiality of inmates' medical status, subject to legitimate security concerns and emergency situations.  Reasonable privacy typically includes sight and hearing privacy from other inmates, and hearing privacy from staff that are not providing care.

h.      Cook County shall build out, remodel or renovate clinic space as needed to allow structurally for inmates' reasonable privacy in medical and mental health care, as identified by Cermak and CCDOC staff.

i.      Cook County shall begin construction of the new clinical space within 3 months of the effective date of this Agreed Order.  It is expected that the project will be completed within nine months of the effective date of this Agreed Order.  Prior to the completion of the new clinical space, Cook County and DFM will work with Cermak to address the most serious concerns regarding clinical space, to the extent possible in the current facility.

Compliance Status: This provision remains in partial compliance.
a.      Substantial compliance
b.      Substantial compliance
c.      Substantial compliance
d.      Partial compliance
e.      Substantial compliance
f.      Substantial compliance
g.      Substantial compliance
h.      Substantial compliance
i.      Substantial compliance

Status Update: Cermak leadership provided the Monitors with a status update dated 4/13/15.  We reviewed the update in preparation of this report.

Monitor's Findings:

Improvements in medical facilities continue to take place. Previous reports have noted lack of uniformity in clinic operations, including procedures for checking emergency equipment as well as sanitation and disinfection practices. There is now a substantial amount of uniformity and consistency between the different clinical areas with respect to their overall operations, cleanliness, handling of sharps and biohazardous waste, and medication refrigerators. New emergency response (jump) bags were placed in all clinical areas and contain appropriate medications for emergency response. These improvements have been recently implemented and will require staff vigilance to maintain.

There are opportunities for improvement. Sanitation throughout the facility has improved, however there is lack of uniformity in clinic disinfection procedures. In addition, a recently implemented environmental inspection program in ambulatory clinic areas that tracks open work orders and action items showed wide variation in compliance.

Another concern is that the Monitoring Team found infirmary patients in 'boats' when there were none the previous visit. According to Cermak staff, many of these patients were considered boarders ready for discharge, but the infirmary physician had been out on leave and no discharges had taken place during his absence resulting in the number of patients exceeding

available medical beds and use of boats. Cermak health care leadership should ensure that there is a system in place for daily admission and discharge of infirmary patients to prevent overcrowding, even when key staff is on leave.

Our findings by Division are described below.

**Division I** is a maximum-security unit housing inmates medically classified as P-1 and M-1. The bed capacity is 1250 and current census is 915 inmates. The clinic is as described in the Ninth Report.

Health care staffing includes two registered nurses (RN), one paramedic and two CMT who are on duty from 7 am to 3 pm daily. One RN has been on sick leave the last month; her vacant shifts may be filled via overtime or registry. The day the Monitoring Team visited Division I two RNs were on duty, one regular RN and one registry RN. Primary care clinics take place in the morning and afternoon on Monday, Tuesday and Friday; and take place either in the morning or afternoon on Wednesday and Thursday.

Since the last visit the desk of the CMT has been moved so that patient privacy has improved. Auditory and visual privacy in the clinic is now adequate. Telephones in the exam rooms do not facilitate use of the language line; the receiver must be disinfected each time it is passed between staff and the inmate. Telephones with two receivers or a speaker phone should be made available. Staff expressed no concerns about their safety or custody cooperation.

The new emergency response bag was present as well as an automatic external defibrillator (AED), oxygen, cervical collar, backboard, gurney, and wheelchair. The log reflects that emergency equipment and supplies are checked daily, however the CMT was not yet familiar with the new process for replacement of a used jump bag. The sharps count was accurate and there were no outdated medications or supplies found in the clinic.

On 1/21/15 an environmental inspection was conducted and identified the clinic non-compliant with a "D" rating which indicates that there are three to five outstanding work orders and/or five to nine actionable items. On 3/31/15 they were re-inspected and there was no improvement. The Sanitation Service Checklist mounted on the wall was not up to date. The Nurse Coordinator was not aware of how work orders were placed or the number of outstanding work orders.

**Division II** consists of four dormitory style buildings with a bed capacity of 1960 and current census of 1507 inmates. This Division houses inmates who are medically classified P-2 and M-2.

There are two clinics that service the Division, one of these is in Dorm 1 and the other in Dorm 2. Nursing staff are on duty in Dorm 1 eight hours a day, seven days a week; and in Dorm 2

coverage is available 24 hours a day, seven days a week. In Dorm 1 primary care clinics take place in the morning and afternoon Monday, Wednesday and Friday. On Tuesday and Thursday primary care is available in either the morning or afternoon. In Dorm 2 primary care clinics take place both morning and afternoon Monday through Wednesday and are scheduled for a half day on Thursday and Friday.

In both of the clinics the new emergency response bag was present as well as an automatic external defibrillator (AED), oxygen, backboard, gurney, and wheelchair. A cervical collar is not kept with the emergency equipment but could be obtained from the medical supply cabinet. The logs reflect that emergency equipment and supplies are checked daily. When staff responds to a medical emergency they take only the emergency bag and AED. Once the patient's condition is triaged, nursing staff send someone back to the clinic to get other equipment if necessary. Cermak should consider providing a smaller, more portable source of oxygen than the tanks that are in Division II so that it can be taken as part of the first response. The sharps count was accurate in both clinics and we found no outdated medications or supplies.

On 1/21/15 Division II clinics were inspected for environmental safety and sanitation and received a "C" rating denoted as "partially compliant" which means that there were three or fewer work orders and/or three to five actionable items. On 3/31/15 they were re-inspected and there had been no improvement. The Sanitation Service Checklists were not reviewed.

**3 Annex** is a minimum security, general population dormitory style housing unit. The census at the time of our visit was 282. It houses overflow from Division II and has a high number of medically stable, chronic disease patients. To be eligible for housing in the annex, inmates must be prescribed keep on person (KOP) medication instead of nurse administered. The clinic is staffed 8 hours per day with two registered nurses and a CMT. This is an increase of one RN since our last visit. After the day shift, any patient requiring urgent care is sent to Cermak Urgent Care.

The clinic is a large area with three exam rooms. The overall appearance of the unit was neat, clean and well-organized. During the Monitoring Teams' visit both nurses were conducting nurse sick call. Medical exam rooms were clean with medical equipment functional and in good condition. Both nurses were knowledgeable about disinfection practices to be performed between each patient encounter. Personal protective equipment was available to staff.

Emergency response equipment was available in the clinic and found to be checked daily. Supplies were available and routinely checked per policy. The medication cart and supply cabinet were neat and orderly. No expired items were found. All inventory and sharps counts were correct.

On 2/3/13 an environmental inspection was performed and identified the 3 Annex was 'partially compliant' with a "C" rating which indicates that there are more than three outstanding work orders and/or three to five actionable items. As of April 2015 the Annex has not been re-inspected.

**Division III** houses female inmates with a bed capacity of 354 and a current census of 233 inmates. The division is old and the physical plant difficult to maintain. The medical area consists of a small patient waiting area, two examination rooms, a medication room, and two small offices. On the day of the Monitoring Team's visit the clinic area was well organized and reasonably clean. Examination rooms were adequately equipped and supplied, including a microscope. There is no procedure or schedule of disinfection activities for the staff to implement between each patient, each shift, or on a daily basis.

The medical clinic is operated 16 hours per day. On the day shift the clinic is staffed with two registered nurses and a CMT. A medical provider was conducting a clinic on the day of the tour.

A new emergency response bag was present as well as an automatic external defibrillator (AED), oxygen, cervical collar, backboard, gurney, and wheelchair. The log reflects that emergency equipment and supplies are checked daily. The sharps count was accurate and we found no outdated medications or supplies in the clinic. Personal protective equipment (PPE), sharps containers and hazardous waste containers were also available in the clinic.

On 2/3/15 an environmental inspection was conducted and it was determined to be non-compliant with a "D" rating which indicates that there are three to five outstanding work orders and/or five to nine actionable items. As of April 2015 Division III has not been re-inspected.

**Divisions IV and V are closed.**

**Division VI** houses medium custody inmates, a segregation unit, and a unit for transgender inmates. The bed capacity is 984 and current census is 669. The clinic is staffed daily from 7:00 am to 8:30 pm by four registered nurses and two certified medical technicians. The medical provider is scheduled to provide primary care three and a half days a week.

During the Monitoring Teams' tour the building was found to be clean. Inmates had minor complaints regarding the bathrooms. However the deficiencies identified in the last report were addressed and found to be resolved.

The clinic consists of a large waiting room, a treatment room, a reception alcove, several exam rooms, a room for medical equipment and supplies, and a break room with staff lavatory. There are three exam rooms available for nurse sick call. Personal protective equipment (PPE) and

hazardous waste containers were available and appropriately mounted in the clinic. Nursing staff were observed utilizing infection control techniques between patients.

Emergency response equipment was present and operational and there is documentation that staff checks equipment daily. Staff is knowledgeable of the new procedure regarding the jump bags. Logs are required to ensure the bag was not opened and contents removed. The inventory of medical tools and needles was accurate and well organized. We found no outdated medications, medical or laboratory supplies. Daily temperatures in the refrigerator are monitored and no deviations from the recommended range recorded.

The Monitoring team interviewed the two registered nurses on topics of safety, infection control, health request process and clinic procedures. We found the nurses to be knowledgeable in all topics and procedures.

A sanitation checklist was found mounted to the wall but not signed off by the supervisor. This log had gaps of missing signatures.

On 2/17/15 an environmental inspection was conducted in Division VI and it was determined to be non-compliant with a "D" rating which indicates that there are to five outstanding work orders and/or five to nine actionable items. On 4/10/15 the division was re-inspected and found to be substantially compliant with a "B" rating.

**Division VIII (RTU)** consists of the reception center/medical intake on the first floor and four floors that house inmates. All housing units are direct observation, and all four floors contain high acuity medical and/or mental health populations, including patients being detoxed from drugs and/or alcohol. The bed capacity is 971 and current census 861 inmates.

The Reception Center/Medical Intake is located on the first floor of the RTU. The area is organized to correspond to the flow of the corrections, medical and mental health intake process. Rooms are color coded by function for medical and mental health screening, laboratory testing and physical examinations. The area also contains rooms for radiology equipment, storage of equipment and supplies, and correctional officer stations. Overall, interview or examination rooms were clean, organized and contained equipment and supplies appropriate to their function. Personal Protective Equipment (PPE) sharps and biohazardous waste containers were available in all clinical areas. Emergency equipment was available but logs showed recent lapses in emergency equipment being checked. Staff reported that a new log had been put into place and lapses in documentation were related to staff confusion about which log should be completed.

On 1/15/15 an environmental inspection was conducted and intake was determined to be substantially compliant with a "B" rating which indicates that there were no work orders and/or less than three actionable items. The area has not been re-inspected since January 2015.

On 2/20/15 an environmental inspection performed in the RCDC male and female storage areas and identified as non-compliant with a "D" rating which indicates that there are three to five outstanding work orders and/or five to nine actionable items. On 3/24/15 the areas were re-inspected and found to be partially compliant with a "B" rating.

The 2nd floor houses inmates being monitored and treated for alcohol and drug withdrawal; and has a segregation unit. It is staffed by a charge nurse, a registered nurse, two licensed practical nurses and a CMT.

The Monitoring team inspected one of two examination rooms as the second room was in use. We found the exam room to be clean, well-organized and adequately equipped and supplied. It contained emergency equipment including the new jump bag, defibrillator, and EKG. Logs showed that the equipment was checked daily. Personal protective equipment (PPE) and sharps containers were available. The refrigerator was clean and contained no expired medications. Syringe and sharps counts were correct. There is no schedule of disinfection activities that staff should perform between patients, and on a daily or weekly schedule.

We also toured the segregation area and found that a shower head was broken and water ran continuously. The officer reported that he needed to submit a work order to have it corrected.

On 3/17/15 an environmental inspection was conducted of the second floor and it was determined to be substantially compliant with a "B" rating which indicates that there were no work orders and/or less than three actionable items. On 4/7/15 the area was re-inspected and maintained the rating.

The 3rd floor houses high medical acuity male inmates. It is staffed by 1 or 2 registered nurses and 4 licensed practical nurses. The Monitoring Team inspected one of two examination rooms as the second room was in use. The examination room was clean, well-organized and properly equipped and supplied except that it did not have an automatic external defibrillator (AED) and there was no corresponding log book to demonstrate that it was checked daily. Personal protective equipment (PPE), sharps containers and hazardous waste containers were available in the clinic. There is no schedule of disinfection activities that staff should perform between patients, and on a daily or weekly schedule.

The medication room was clean and well-organized. Sharps and syringe counts were correct; however bulk syringes were stored on top of cabinets and not double-locked because there was no storage space. The refrigerator contained no expired medications or outdated vials in use.

On 1/15/15 an environmental inspection was conducted on the third floor and it was determined to be substantially compliant with a "B" rating which indicates that there were no work orders and/or less than three actionable items. Two subsequent inspections in March and April 2015 sustained this compliance level.

The 4th floor houses high acuity mental health male inmates. Examination rooms were clean, well-organized and adequately medically equipped and supplied. An emergency response bag was present as well as an automatic external defibrillator (AED), oxygen, cervical collar, backboard, gurney, and wheelchair. Emergency equipment log showed that staff checked equipment daily. Personal protective equipment (PPE), sharps containers and hazardous waste containers were also available in the clinic. There is no schedule of disinfection activities that staff should perform between patients, and on a daily or weekly schedule.

The medication room was clean and contained no expired medications or outdated vials in use. Sharps and syringe counts were accurate.

On 1/15/15 an environmental inspection was conducted on the fourth floor and it was determined to be substantially compliant with a "B" rating which indicates that there were no work orders and/or less than actionable items. Two subsequent inspections in March and April 2015 found that compliance decreased from substantial to partial with a "C" rating.

The 5th floor houses high acuity medical and/or mental health female inmates. One of two examination rooms was inspected as the second one was in use. The examination room was clean, organized and adequately equipped and supplied. Emergency equipment including jump bag was available. Personal protective equipment (PPE), sharps and biohazardous waste containers were available. There is no schedule of disinfection activities that staff should perform between patients, and on a daily or weekly schedule.

The medication room was clean and contained no expired medication or outdated medication vials. Syringe and sharps counts were correct. In the main clinic area there was a refrigerator with a temperature log showing that on 4/13/15 which temperature ($50^0$F) exceeded the permissible range. The log did not reflect that any action was taken.

On 3/17/15 an environmental inspection was conducted on the fifth floor and it was determined to be noncompliant with a "D" rating which indicates that there were three to five work orders

and/or five to nine actionable items. On 4/7/15 the area was re-inspected and determined to be partially compliant with a "B" rating.

**Division IX** has a bed capacity of 1000 inmates and a current census of 903. Nursing staff are on duty for 16 hours each day. The clinic is staffed by two physicians who provide primary care three full days and two half days.

The physical description of the population, housing units and the clinic space remains unchanged from previous reports. Two of the sick call examination rooms on the tiers in the North tower and one sick call room in the South tower were visited. These rooms are properly equipped for examination of inmates. However none of the rooms has soap dispensers or soap. Paper towel dispensers were on the walls but were empty in all rooms. Staff uses alcohol solution in a spray bottle to clean the exam table and change the paper between patients.

The emergency response equipment was signed off and logged daily. Staff was knowledgeable of the new procedure for replacing jump bags once they were opened. We noted that the inventory list needed to be updated to include a cervical collar. Staff was aware it was in the bag however it was not on the inventory. The inventory of medical tools and needles was accurate and well organized. We found no outdated medications or medical supplies. Daily temperatures in the refrigerator are monitored and no deviations from the recommended range recorded. Outdated specimen tubes were found in the lab and the sink had no hot water. Other equipment in the clinic area was in working condition. None of the staff expressed any concerns regarding the clinical space or equipment.

The two registered nurses were interviewed during the visit on topics of safety, infection control, and HSR process and clinic procedures. We found the nurses to knowledgeable in all topics and procedures.

On 2/17/15 an environmental inspection was conducted and it was determined to be noncompliant with a "D" rating which indicates that there were three to five work orders and/or five to nine actionable items. There is a discrepancy between the compliance rating and color code in the table so it's unclear what the status is of the Division's compliance with environmental safety standards.

**Division X** has a bed capacity of 766 inmates and current census of 689 inmates including those with P-2 and M-2 medical classifications. Nursing staff are on duty 24 hours a day, seven days a week. Primary care clinics are scheduled three and a half days a week, staffed by three providers. The physical description of Division X is otherwise unchanged from previous reports.

The new emergency response bag was present as well as an automatic external defibrillator (AED), oxygen, backboard, gurney, and wheelchair. A cervical collar is not kept with the emergency equipment but could be obtained from the medical supply cabinet. The log reflects that emergency equipment is checked daily. The Nurse Coordinator has conducted emergency response drills for staff in the building. The inventory of medical tools and needles was accurate and we found no outdated medications or medical supplies.

The correctional officer responsible for inmate traffic to education, mental health and nurse sick call was stationed in the hallway affording adequate visual and auditory privacy. When the officer stepped into the nurse's examination area the nurse stopped her interaction with the inmate until the officer left the area. No issues with patient privacy were observed.

On 3/4/15 an environmental inspection identified the clinic as non-compliant with an "F" rating which indicates that there are more than five outstanding work orders and/more than 10 actionable items.  The clinic has not been re-inspected since March 2015.

**Division XI** has a bed capacity of 1534 inmates and current census of 1512.  Nursing staff are on duty eight hours each day.  Primary care clinics are scheduled three full days and two half days each week, staffed by three providers. The clinic area is the same as described in previous reports.

While an exam table and oto-ophthalmoscope were installed in one of the two rooms used by nurses presently for sick call, the other room is still without this equipment. If nursing sick call is to take place in specifically designated rooms out in the housing areas we understand that these rooms will contain the proper equipment (an exam table, equipment, oto-ophthalmoscope, computer, etc.) to support timely and effective assessment of patient health complaints.

The new emergency response bag was present as well as an automatic external defibrillator (AED), oxygen, backboard, gurney, and wheelchair. The log reflects that emergency equipment is checked daily. The inventory of medical tools and needles was accurate and no outdated medications or medical supplies were found.

On 3/4/15 an environmental inspection performed identified the clinic as non-compliant with an "F" rating which indicates that there are more than five outstanding work orders and/more than 10 actionable items.  The clinic has not been re-inspected since March 2015. Also the Sanitation Service Checklist mounted on the wall was not up to date.

**Division XVII** houses female inmates in the Sheriff's Women's Justice Program. The current census is 137 inmates.  The Division also houses all pregnant women.  The medical area contains two examination rooms, a medication room and a nurse's station.  The examination rooms were

clean and adequately equipped and supplied, including microscopes. Personal protective equipment, sharps and biohazardous containers were available, as well as emergency equipment and supplies. There is no schedule of disinfection activities that staff should perform between patients, and on a daily or weekly schedule.

**Cermak Infirmary**

Cermak infirmary floors 2 and 3 both consist of four wings; north, south, east and west. The areas are all large, and well-lighted. During The Monitoring Team's visit both floors were found to be overcrowded with "boats" utilized as beds on the floor.

2nd floor Mental Health

There is a small exam room on the main unit accessible to staff for patient examinations. The space was clean and well-organized. Basic medical equipment was in working order. Sharps counts were correct, however there were expired supplies found in the exam room (e.g., saline and creams). There has been one jump bag placed in the common area of the units. Staff was found to be knowledgeable regarding the new procedure for replacing the bag following use.

On 2 North there was an infection control deficiency and a safety concern regarding a large multi-use soap container. Staff was pouring single use portions into drinking cups for the patients to pick up for their ADL's. Additionally there was a larger quantity of soap in a juice container. The container still had the label on it. These items were left unsupervised in the day room area. The CMA was interviewed regarding this practice and stated the area is never left unattended however; she needed to be called to the area in order to answer questions. In addition to the issue with the soap, toothpaste was left uncapped and used on multiple patients.

On 2 West the unit was found to be clean and neat. The sanitation log was signed off daily. There was a small exam room on the unit with a broken scale and microscope that were removed during our visit. Staff stated they very rarely utilize that room for clinical care but for storage instead.

3rd Floor Medical Infirmary

Each infirmary unit has small medical exam rooms which are adequate to perform physical examinations. Each room was found to be neat, clean and orderly. All equipment was found to be in working order and checked by maintenance. No outdated supplies were found and the sharps counts were correct. AED's were checked and logged daily. A jump bag was located in the common area of the units. Staff was knowledgeable of the new process regarding the emergency equipment.

With respect to medications, we found an expired syringe of heparin in the medication cart. The vial was immediately removed and the patient list was checked for any patient needing heparin. The nursing staff was interviewed regarding safety, medication practices, and new procedures put in place since our last visit. Some staff was more knowledgeable than others. Overall the unit has made great strides to improving both patient care and physical cleanliness since our last visit.

**Cermak Urgent Care**

Clinical space in the Cermak Urgent Care Department appeared neat and orderly and appropriate for emergency care of inmates. The Monitoring Team found significant improvement in basic infection control practices and the cleanliness of the unit since the last monitoring visit. However the sanitation log was incomplete between 4/11/15 and 4/14/15 and no signatures were present by either the person assigned to complete the cleaning or the supervisor to inspect the cleaning. Upon return the next day all signatures were completed including the dates that had already passed. Additionally, a patient was occupying the isolation room due to medical necessity; however no cleaning log was located outside the door to identify when the room was cleaned.

All sharps counts were correct. However, it was recommended that the cabinet have better organization of sharps to prevent miscounts during emergencies. This can be accomplished with a working stock and a bulk stock. Staff was receptive to this suggestion. No other medical facility deficiencies were noted during this visit.

**Dialysis**

At the time of our visit there was only one dialysis patient at Cermak. The Monitoring Team found the unit to be vastly cleaner than our previous visit. All dialysis chairs had been re-upholstered and new arm rests had been installed. All door frames had been painted. A couple of areas on the floor that require replacing of tile had been designated for repair prior to our next visit.

**Dental Clinics**

The Monitoring Team toured two dental clinics and found both clinics to be clean and well organized. All dental equipment had recent biomed tags and was in working order. The dentist and dental assistant said that they have good support from the correctional officers and receive help promptly when requested. The intermittent sewer back up into the dental clinic in Division 5 has not occurred since before our last monitoring visit in November 2014.

**Monitor's Recommendations:**

General:

1. Maintain the improvements in clinic organization and sanitation.
2. Develop a schedule of disinfection practices to be implemented in clinical areas throughout the facility. Maintain documentation of scheduled sanitation and disinfection practices in the clinics.
3. Corrective action plans should be required when clinics are non-compliant with environmental inspections and re-inspection should take place within shorter intervals that currently scheduled
4. Cervical collars should be included with the emergency equipment, preferably in the "jump bag" and listed on the contents for the bag.
5. Cermak leadership should ensure that daily infirmary physician rounds are conducted to discharge patients who no longer need infirmary care.

Division Specific:

6. Correct infection control issues related to soap dispensers in Cermak.
7. Division VIII RTU 3rd floor: Place AED on the floor with corresponding logs.
8. Division XI: Install an exam table and oto-ophthalmoscope in the room for sick call that is missing this equipment.

## 44. Staffing, Training, Supervision and Leadership

    a. Cermak shall maintain a stable leadership team that clearly understands and is prepared to move forward toward implementation of the provisions of this Agreed Order, with respect to:
        i. Medical care; and
        ii. Mental health care

    b. Cermak shall maintain an adequate written staffing plan and sufficient staffing levels of health care staff to provide care for inmates' serious health needs, including:
        i. Qualified Medical Staff; and
        ii. Qualified Mental Health Staff.

    c. Cermak shall ensure that all Qualified Medical Staff and Qualified Mental Health Staff are adequately trained to meet the serious health care needs of inmates.  All such staff shall receive documented orientation and in-service training on relevant topics, including:
        i. Provision of health care in a correctional setting and Facility-specific issues; and

ii.      Suicide prevention, and identification and care of inmates with mental illness.

d.  Cermak shall ensure that Qualified Medical Staff receive adequate physician oversight and supervision.

e.  Cermak shall ensure that all persons providing health care meet applicable state licensure and/or certification requirements, and practice only within the scope of their training and licensure.  Upon hiring and annually, Cermak shall verify that all health care staff have current, valid, and unrestricted professional licenses and/or certifications for:
  i.     Medical staff; and
  ii.    Mental health staff

f.  Cermak will work with CCDOC to develop and maintain a curriculum for initial and periodic training of correctional officers on recognition and timely referral of inmates with medical urgencies, including drug and alcohol withdrawal.  Cermak will provide adequate initial and periodic training on these topics to all Cermak staff who work with inmates.

g.  CCDOC will provide, to all CCDOC staff who work with inmates, adequate initial and periodic training on basic mental health information, including the identification, evaluation, and custodial care of persons in need of mental health care, as well as recognition of signs and symptoms evidencing a response to trauma; appropriately responding to mental illness; proper supervision of inmates suffering from mental illness; and the appropriate use of force for inmates who suffer from mental illness.  Such training shall be conducted by a Qualified Mental Health Professional, registered psychiatric nurse, or other appropriately trained and qualified individual.

h.  Cermak will work with CCDOC to develop and maintain a curriculum for initial and periodic training of correctional officers on basic mental health information, including the identification, evaluation, and custodial care of persons in need of mental health care, as well as recognition of signs and symptoms evidencing a response to trauma; appropriately responding to mental illness; proper supervision of inmates suffering from mental illness; and the appropriate use of force for inmates who suffer from mental illness.  Such training shall be conducted by a Qualified Mental Health Professional, registered psychiatric nurse, or other appropriately trained and qualified individual.

i.  Cermak shall ensure that all health care staff receive adequate training to properly implement the provisions of this Agreed Order, including:
  a.  Medical staff; and
  b.  Mental health staff.

**Compliance Status**: This provision remains in partial compliance.

a. Partial Compliance
b. Partial Compliance
c. Partial Compliance
d. Substantial Compliance
e. Substantial Compliance
f. Substantial Compliance
g. Substantial Compliance.
h. Substantial Compliance
i. Substantial Compliance

**Status Update:** Received and reviewed.

**Monitor's Findings:**

1. With the recent on boarding of the new COO as the permanent COO and the promotion of a new Associate Medical Director, all Cermak key leadership positions have now been filled. This provision will gain substantial compliance if in our next visit all leadership positions remain filled with permanent staff.
2. Cermak has continued to hire more staff mostly in the nursing area. According to the latest vacant position tracker provided to the Monitoring Team, Cermak now has 11 more vacant positions than our visit in November 2014. This is due to high number of staff turnover that currently outpaces Cermak's hiring and onboarding activities. The Monitoring Team welcomed the news that up to three new medical providers (MD and PAs) have been or will soon be offered full time positions at Cermak including one nephrologist who will contribute to general medicine chronic care as well as providing back up to the current contracted nephrologist. Cermak continues to have a significant vacancy rate for medical and mental health professionals (around 20% each) as well as nursing (around 15%). This provision will be considered in substantial compliance once all area vacancy rates fall to an acceptable level of about 10 to 12%.
3. As stated above under section 42 (Policy and Procedures), the issue of consistent staff performance with regard to various healthcare tasks was again a finding during this monitoring visit. The training of staff in providing health care in a correctional setting depends largely on established policy and procedures for providing such care. Cermak staff cannot be held accountable to uniformly and consistently perform a task until and unless such policy and procedures have been devised, posted and used for the training of the staff.
4. The Monitoring Team met with Dr. Jones, First Assistant Executive Director CCDOC, and reviewed the currently established and ongoing initial and interval training of all CCDOC

officers.  Fifteen CCDOC officers were randomly selected during the Monitoring Team's tour of the various divisions. Dr. Jones was able to validate date of the annual in-service training for each officer within one year of our monitoring visit.

**Monitor's Recommendations:**

1. Maintain the current level of filled leadership positions. This action will bring this provision to substantial compliance in our next visit in November 2015.
2. While the Monitoring Team is encouraged with the recent gains in all levels of staffing, we hope to see a continued effort to fill the remaining positions.  Again, a vacancy rate of around 10 to 12 percent is considered aligned with industry standards.
3. Cermak must ensure training of all health care staff with regard to the provision of health care in a correctional setting.  Additionally, Cermak must strive to standardize its processes across all divisions and floors as much as possible.  This can be accomplished through routine audits of various procedures, identification of best practices and replication of such practices across the entire system.
4. Routine, monthly staff productivity statistics must be measured and shared with the front line staff in order to ensure and encourage high efficiency in all areas of health care delivery including nursing, medical and mental health provider staff.

## 45. Intake Screening

    a.      Cermak shall maintain policies and procedures to ensure that adequate medical and mental health intake screenings are provided to all inmates.

    b.      Cermak shall ensure that, upon admission to the Facility, Qualified Medical Staff or Licensed Correctional Medical Technicians utilize an appropriate medical intake screening instrument to identify and record observable and non-observable medical needs, shall assess and document the inmate's vital signs, and shall seek the inmate's cooperation to provide information, regarding:

        (1)      medical, surgical and mental health history, including current or recent medications, including psychotropic medications;
        (2)      history and symptoms of chronic disease, including current blood sugar level for inmates reporting a history of diabetes;
        (3)      current injuries, illnesses, evidence of trauma, and vital signs, including recent alcohol and substance use;
                (4)      history of substance abuse and treatment;
                (5)      pregnancy;
                (6)      history and symptoms of communicable disease;

        (7)     suicide risk history; and

    (8)     history of mental illness and treatment, including medication and hospitalization.

c.      Cermak shall ensure that, upon admission to the Facility, Qualified Mental Health Staff, Qualified Medical Staff, or Licensed Correctional Medical Technicians utilize an appropriate mental health intake screening instrument to identify and record observable and non-observable mental health needs, and seek the inmate's cooperation to provide information, regarding:

    (1)     past suicidal ideation and/or attempts;

    (2)     current ideation, threat or plan;

    (3)     prior mental illness treatment or hospitalization;

    (4)     recent significant loss, such as the death of a family member or close friend;

    (5)     previously identified suicide risk during any prior confinement at CCDOC;

    (6)     any observations of the transporting officer, court, transferring agency or similar individuals regarding the inmate's potential suicide risk, if such information is communicated to Cermak staff;

    (8)     psychotropic medication history; and

    (9)     alcohol and other substance use and withdrawal history.

d.      Cermak shall ensure that all Qualified Mental Health Staff, Qualified Medical Staff or Licensed Correctional Medical Technicians who conduct the medical and mental health intake screenings are properly trained on the intake screening process, instrument, and the requirements and procedures for referring all qualifying inmates for further assessment.

e.      If Cermak assigns Licensed Correctional Medical Technicians to perform intake screening, they shall receive appropriate, on-site supervision by on-site Qualified Medical Staff; information obtained on screening for all inmates will be reviewed by Qualified Medical Staff before the inmate departs the intake area.

f.      Cermak shall ensure that a medical assessment based on the symptoms or problems identified during intake screening is performed within two working days of booking at the Facility, or sooner if clinically indicated, by a Qualified Medical Professional for any inmate who screens positively for any of the following conditions during the medical or mental health intake screenings:

       (1)    Past history and symptoms of any chronic disease included on a list specified by Cermak's policies and procedures;

       (2)    Current or recent prescription medications and dosage, including psychotropic medications;

       (3)    Current injuries or evidence of trauma;

       (4)    Significantly abnormal vital signs, as defined by Cermak's policies and procedures;

       (5)    Risk of withdrawal from alcohol, opioid, benzodiazepine, or other substances;

       (6)    Pregnancy;

       (7)    Symptoms of communicable disease; and

       (8)    History of mental illness or treatment, including medication and/or hospitalization.

g.     Cermak shall ensure that any inmate who screens positively for mental illness or suicidal ideation during the intake process receives a comprehensive mental health evaluation (see provision 59.c, "Mental Health: Assessment and Treatment") Cermak shall ensure timely access to a Qualified Mental Health Professional for this purpose, based on emergent, urgent, and routine medical or mental health needs.

h.     Cermak shall ensure that the intake health screening information is incorporated into the inmate's medical record in a timely manner.

i.     Cermak shall implement a medication continuity system so that incoming inmates' medication for serious medical and mental needs can be obtained in a timely manner, as medically appropriate. Within 24 hours of an inmate's booking at the Facility, or sooner if medically necessary, a Qualified Medical Professional or Qualified Mental Health Professional, with appropriate prescribing authority, shall decide whether to continue the same or comparable medication for serious medical and mental health needs that an inmate reports during intake screening that she or he has been prescribed. If the inmate's reported medication is discontinued or changed, other than minor dosage adjustments or substitution of a therapeutic equivalent, a Qualified Medical Professional or Qualified Mental Health Professional, with appropriate prescribing authority, shall evaluate the inmate face-to-face as soon as medically appropriate, and within no greater than five working days, and document the reason for the change.

**Compliance Status**: This provision remains in substantial compliance.

a.     Substantial compliance

b.      Substantial compliance
c.      Substantial compliance
d.      Substantial compliance
e.      Substantial compliance
f.      Substantial compliance
g.      Substantial compliance
h.      Substantial compliance
i.      Substantial compliance

**Status Update:**  The Monitoring Team received and reviewed Cermak's 4/13/15 status report.

**Monitor's Findings:**
a. We reviewed Cermak's Intake Health Screening policy and procedure (E-02) approved 11/5/14 and posted 1/30/15.  The policy includes elements of the Agreed Order and provides sufficient operational detail for staff to implement the policy.

b. and c. We reviewed 13 records of patients who entered the jail within the past three months. The sample included inmates with chronic diseases, mental health conditions; and those at risk or exhibiting symptoms of alcohol or drug withdrawal. Upon admission, health care staff performed medical screening using an instrument that contains all medical and mental health elements required by the Agreed Order.  Staff completed all sections of the form including those related to drug and alcohol use and risk of withdrawal.  When drug and alcohol questions elicited positive responses, staff appropriately performed initial COWS and CIWA screening.

d. and e. Staff in the intake area have been trained and a Nurse Coordinator is available to provide direction and supervision to staff performing medical screening.

f. and g. Screening staff made appropriate secondary referrals to medical and mental health providers that occurred timely.  Intake staff documented the reasons for secondary referral so that medical and mental health providers would be aware of the reasons for referral.  Medical providers conducted appropriate assessments, identified patients exhibiting signs and symptoms of alcohol and/or drug withdrawal and initiated treatment using standardized order sets. Providers also initiated treatment for patients with chronic diseases.

h. The intake screening form is incorporated into the electronic health record in real time.

i. Cermak has developed a system for timely continuation of medications. When inmates are prescribed chronic disease or mental health medications, a green band is placed on the inmate's wrist to indicate that he or she is not to leave the area until the first medication dose(s) is administered.

Intake screening is performing well. The Monitoring Team, however, did find an opportunity for improvement. We found one case in which a chest x-ray was not performed for a newly arriving HIV positive inmate in February 2015.

**Monitor's Recommendations:**

1. Continue to track and identify inmates who did not receive a chest x-ray upon arrival to ensure that it is completed as soon as feasible.
2. Health care leadership should perform periodic CQI studies regarding the overall appropriateness, timeliness and continuity of care at intake.

## 46. Emergency Care

a. Cermak shall train health care staff to recognize and respond appropriately to health care emergencies, including:
    (1) Medical emergencies;
    (2) Mental health emergencies; and
    (3) Drug and alcohol withdrawal.

b. CCDOC shall train correctional officers to recognize and respond appropriately to health care emergencies, including:
    (1) Medical emergencies;
    (2) Mental health emergencies; and
    (3) Drug and alcohol withdrawal.

c. CCDOC shall ensure that all inmates with emergency health care needs receive prompt transport, including transport for outside care, for emergencies including:
    (1) Medical emergencies; and
    (2) Mental health emergencies.

d. Cermak shall ensure that all inmates with emergency health care needs receive timely and appropriate care, with prompt referrals for outside care when medically necessary, and shall notify CCDOC when emergency transport is needed inside or outside the Facility compound, for emergencies including:
    (1) Medical emergencies; and
    (2) Mental health emergencies.

e. CCDOC shall train all correctional officers to provide first responder assistance (including cardiopulmonary resuscitation ("CPR") and addressing serious bleeding) in emergency situations. CCDOC shall provide all correctional officers with the necessary protective gear, including masks and gloves, to provide first line emergency response.

**Compliance Status**: This provision is moved to Partial Compliance.

a. Partial Compliance
b. Substantial Compliance
c. Substantial Compliance
d. Partial Compliance
e. Substantial Compliance

**Status Update:** Received and reviewed.

**Monitor's Findings:**

a. Cermak Health Care Staff Training
   Both medical and mental health staff has been trained with regard to medical and mental health emergencies. The staff needs additional training on the procedures once updated

b. CCDOC Correctional Officer Training
   With regard to the training of correctional officers, they have completed training related to medical emergencies and mental health emergencies.

c. CCDOC Emergency Transport
   The monitoring team observed at least one case of delay in taking patients to the urgent care. CCDOC officers will need additional training once the procedure for the transfer to urgent care is updated by Cermak.

d. Cermak Timely Care and Transport
   A patient with fall was transported to the urgent care clinic and the provider applied the neck brace once the patient arrived to the clinic. There is no consistency in practice of use of neck braces. Additional clarification and education is needed. Patients with serious emergencies are transported quickly but other patients who still need urgent provider evaluation are not transferred to the urgent care clinic in a timely manner. There is not consistent hand off between the sending and receiving clinical staff. There is no documentation by the sending nurse to describe the event, findings of the assessment, treatment provided and reason for sending them to the urgent care. Due to this issue, the urgent care clinic sometime does not address the issue that the patient was sent for.

   The nurses have received training and weekly monitoring process has been established to identify hypoglycemic episodes. There is no documentation in the charts to show that the patients with hypoglycemia (low blood sugar) were treated per Cermak protocol by the nursing staff. The providers were not aware of recent hypoglycemic events so there is no evaluation and adjustment of medications or care plan to avoid further events. This is a high risk condition for patients and has to be addressed immediately. These findings were

identified and reported as high risk in our last visit. There is not adequate triage for patients sent to urgent care clinic. The current triage process is not adequate since high risk patients are not identified and seen timely. Chart reviews show that patients are not prioritized appropriately thereby causing serious delays for high risk patients. A patient with chest pain who was assessed by a provider and sent for further evaluation to the urgent care was not seen for several hours. There was not documentation of monitoring during this time. A patient who was identified to have signs and symptoms of stroke was not sent to urgent care immediately for further evaluation.

A board has been established to track patients in the urgent care clinic so that the care team can continue to monitor the patient but there is not adequate documentation by the clinical staff to show that patients were getting continuous monitoring while in the urgent care facility.

The critical lab results are now addressed in a timely manner by the providers. A report has been established to monitor the process.

e. CCDOC First Responder Training for Correctional Officers
   This requires training of correctional officers in both CPR and first responder assistance and again we found this area to be substantially compliant.

**Monitor's Recommendations:**

1. Document the handoff process when a patient is sent from one of the units to the Urgent Care, from Urgent Care to ED and from Urgent Care to the Infirmary or other housing units.
2. Establish the acuity level for patients sent to urgent care so they can be transported and evaluated timely in the order of priority.
3. Floor clinical team has to follow-up on patients sent to the urgent care.
4. When patients return to the floor they should check in with the clinical team on return so they can follow-up on the patient and modify the care plan as ordered.
5. Create emergency response templates in the EMR for nurses and providers so that the details of the incident, pertinent positives and negatives, disposition, mode of transport, time of call received, time of response, reason for visit, location of evaluation, etc. are clearly documented in the EMR.
6. All documentation should be done directly in the EMR, except for downtime.
7. Establish the guidelines for use of neck braces and back boards and educate the nursing and custody staff in their proper application.
8. Stop using the terminology stat labs for "draw sample now" since it may be confused with real stat labs.
9. Use EMR to place all orders (now and future orders) so they can be tracked
10. Documentation should demonstrate that continuous care is provided to the patient while in Urgent Care.

11. Reevaluate the blood sugar management procedure and update as needed. Educate staff on the management of hypoglycemia.
12. Establish a process for the Providers to learn about the emergencies in their areas so they can modify the plan of care as appropriate. (can use the huddle concept)
13. Add clinical pharmacist involvement in management of brittle diabetics.
14. Re-educate CCDOC officers regarding the importance of timely transport of inmate with urgent/ emergent medical conditions to the Urgent Care clinic.
15. Self-Monitoring:
    a. Nurse Coordinator to review emergency log daily to ensure completion, identify and review the emergencies that happened in their floor/unit.
    b. Audit at least 10 charts per month to ensure appropriateness and timeliness of response by nurse and provider.
    c. Audit management of hypoglycemic events.
    d. Audit management of detoxification patients.
    e. Use the audit information to make necessary improvements by sharing the findings with the specific staff on their individual performance and the group to address group performance.
    f. Track the unscheduled/urgent care visits required for chronic disease/detox patients to monitor the effectiveness of the treatment plan and make improvements to the program as needed.
    g. Continue to monitor the timeliness and appropriateness of communication and response to critical lab results.
    h. Review all hypoglycemic episodes to identify opportunities for prevention

**47. Record Keeping**

a. Cermak shall ensure that medical and mental health records are adequate to assist in providing and managing the medical and mental health needs of inmates at the Facility and are maintained consistent with local, federal, and state medical records requirements.

b. Cermak shall ensure that medical and mental health records are centralized, complete, accurate, readily accessible and systematically organized. All clinical encounters and reviews of inmates should be documented in the inmates' records.

c. To ensure continuity of care, Cermak shall submit appropriate medical information to outside medical providers when inmates are sent out of the Facility for medical care. Cermak shall appropriately request records of care, reports, and diagnostic tests received during outside appointments in a timely fashion and include such records in the inmate's medical record or document the inmate's refusal to cooperate and release medical records.

d. Cermak shall maintain unified medical and mental health records, including documentation of all clinical information regarding evaluation and treatment.

**Compliance Status**: This provision remains in partial compliance.
   a. Partial compliance
   b. Partial compliance
   c. Substantial compliance (June 2012)
   d. Partial compliance

**Status Update:** A status report current through 4/9/2015 was received and reviewed in advance of the site visit. Substantive progress was reported on seven of nine recommendations in the Ninth Report.

**Monitor's Findings:**

a. Cermak-Adequate to Provide Care. The interface between CCDOC's electronic jail management system (CCOMS) and Cerner was implemented in October 2014. The knowledge and skill of staff in using CCOMS is still being developed; the social workers are the most facile with it at the present time. Training classes are offered by Cook County and are open to Cermak staff.

Since the October implementation there have been problems with the interface that have required the dedication of nearly one full time member of the Cermak IT staff. These problems include:

Discharges-When an inmate is released from a sentence or a charge is dropped CCOMS enters a release date. This information transfers to Cerner as a discharge and the inmate's health record is inactivated. Some inmates have multiple sentences, warrants or charges and remain incarcerated at CCDOC at the time a discharge and release date is entered. The result is that all orders for medication, treatment, diagnostic work, follow-up appointments, specialty care and so forth for an inmate are inactivated even though the inmate is still in custody. To preserve the safety of patients needing ongoing care, Cermak IT staff compare the two systems daily to identify discharges of inmates who still are in CCDOC custody. IT staff then notify medical records that a health record must be created and notify the provider who must retrieve and enter all of the information necessary to continue the inmate's treatment. CCDOC should revise the process used to discharge a sentence, warrant or charge so that it does not send a release date to Cerner.

Inaccurate locations- when CCDOC moves an inmate from one location to another the new location does not transfer to Cerner. This affects delivery of care and could harm the patient. Until this issue is resolved Cermak IT staff compares the two

systems daily to identify missed locations and make corrections so the proper location is in Cerner.

New admits or bookings- when someone is received at CCDOC a booking number and profile are created in CCOMS but the information does not transfer to Cerner and a health record is not initiated. This affects delivery of care and could harm the patient. Until this issue is resolved Cermak IT staff compares the two systems daily to identify missed bookings and have the inmate number and profile entered into Cerner so a health record can be initiated.

Medical alerts- Cermak uses a medical alert system to inform CCDOC of medical or mental health conditions that affect such things as the inmate's housing assignment, bunk placement, property, meals, and discharge preparations. These alerts are placed by the prescribing provider into Cerner and then are transferred to CCDOC via the interface with CCOMS. When the new interface does not sync with Cerner inaccurate alerts result. This affects inmate and staff safety. Frequent meetings are taking place between Cerner IT staff, CCDOC IT staff and the CCOMS vendor to identify and fix errors in the interface.

Security alerts- CCDOC uses an alert system to communicate information via CCOMS about inmates that affects how health care may be delivered (escape risk, aggressive etc.). The alerts placed by CCDOC into CCOMS do not always transfer to the Cerner system. Therefore a health care provider may not be aware of an important issue concerning an inmate and this lack of information may result in unwarranted safety risk. A change order is being processed to fix this problem.

Efforts on both the part of CCDOC IT and Cermak IT have reduced the frequency of problems with the new interface however they rely on manual processes that are time consuming to monitor and correct. Of these problems the most significant are the discharges with the resulting loss of the patient record in the Cerner system because it also requires clinical time to recreate the treatment plan and it undermines the confidence clinical staff have in the electronic record. Correcting this problem should be a high priority for CCDOC and Cermak because of its significant impact on patient care and safety.

According to Cermak's status report, documentation of care being provided in the Urgent Care is being transitioned to the EMR. The Monitoring Team's observation is that the majority of care is still not documented electronically. Documentation that is scanned into the record from Urgent Care is often illegible and therefore not useful in delivering subsequent care which is dangerous to the patient. See Item 51 for a full description of the problem. Cermak has created a work around until transition to electronic record keeping is accomplished. All discharges from urgent care to the infirmary have a verbal handoff to the nursing staff followed by a copy of the discharge orders. However this process is not in place for inmates returning to the divisions.

However if no one is in the infirmary dispensary at the time the handoff does not take place. All urgent care visits need to be documented concurrently in the EMR.

Problems with the timeliness and functionality of Accuflo continue as described in the Eighth Report and are discussed in more detail in Item 56 of this report. Further, primary care providers commented during this site visit that reviewing medication adherence is difficult because the data is not integrated into the Cerner eMAR. Cermak leadership should pursue alternative methods to document medications administration and delivery that better support clinical care of patients. In the meantime, adequate and responsive IT support to ensure day to day access and operability of the Accuflo system must be maintained so that accomplishments with regard to Item 47 Record Keeping are sustained.

With regard to documentation on the HSRs, an audit was initiated in November immediately after the site visit to improve documentation of dates, times and signatures. Responsibility and accountability for documentation regarding HSRs was subsequently addressed in the training provided to the RNs in January 2015. Nurse Coordinators audit HSRs weekly to ensure that HSRs are completed correctly. Also, digital date stamp machines have been installed in all Divisions to improve documentation of when HSRs are received. The process for nursing sick call has been modified and timeliness improved so that nurses have the HSR at the time the patient is seen for a nursing assessment. It appears that the process in place now ensures that the nurse has the HSR when the patient is seen and that following completion of nurse assessments, HSR forms are picked up daily for Health Records to scan into the electronic record.

The problem discussed in previous reports of having diagnostic results available for review by providers when seeing patients is being addressed by developing proxy groups. In this way when the provider who next sees the patient is different from the provider who ordered the diagnostic test, the results will be available to both providers. This system appears successful in alerting the patient's next provider of pending diagnostic results. Furthermore audits have been initiated recently to monitor providers' documentation of review and action taken after receiving diagnostic results.

Cermak generates weekly reports of abnormal glucose levels intended to assist providers in managing the care of diabetic patients. However, nurse and provider documentation of the actions taken when patient's blood glucose readings are low still needs to be improved (See Item 52 Chronic Care).

b. Cermak-All encounters are documented and the record is complete, accurate and accessible

Improvements in documentation have been demonstrated in HSRs, wound care, and segregation rounds. Documentation in the Infirmary has also improved but nurses continue to

have challenges with the use of SOAP format, particularly documentation of assessments related to the problem statement. Use of "iView" to improve documentation of wound care is applauded however providers interviewed during the site visit did not know how to access it on the Cerner system. Documentation of care concerning hypoglycemic episodes continues to be an area of focus for improvement as discussed in Item 52 Chronic Care.

Cermak has expanded the use of chart audit to ensure that encounters are documented and that the record is complete and accurate. These include but are not limited to audits on documentation of chronic care, return from off-site services, review and action taken on diagnostic results, wound care, treatment planning, inpatient rounds, suicide, segregation rounds and HSRs. The audits address not just timeliness but clinical appropriateness and quality of care.

The Monitoring Team continues to recommend reducing the amount of scanned content in the EMR. The extent of scanned documentation and its organization in the EMR results in health records that are not sufficiently accessible to comply with this part of the Agreed Order.

Since the last site visit segregation rounds are now documented in the inmate's health record. In addition a tool was developed for nursing staff to document on paper since rounds are done without a computer. The tool matches the information on the screen exactly and facilitates accurate documentation in the electronic record. Mental Health currently uses the same screen to document rounds electronically but plans to develop one that matches more closely the mental health assessment that is done. This is a significant improvement from previous visits; however some issues were noted. It is unclear from the EMR when the patient was admitted and released from segregation. Therefore it is not possible to know when segregation rounds should begin and when they should end. It would be useful to develop an alert or flag as to when segregation rounds begin and end. Secondly, in some cases we found blank segregation notes that were signed by a nurse. Thus, it's unclear if the round was actually made or not. Third, some nurses cut and pasted notes that were exactly the same for multiple patients, raising questions about the quality of the interaction and credibility of the notes.

Computer terminals are now in place in each of the mental health conference rooms on Cermak 2nd floor which greatly improves the documentation of patient treatment plans in the EMR.

c. Cermak-Communication with Offsite Providers
   This item has been in substantial compliance since June 2012.

d. Cermak-Unified Medical and Mental Health Records

We have recommended since the Sixth report that Cermak revise the electronic format of the nursing assessment of HSRs to better resemble problem oriented charting. We were told that there are plans to revise the documentation templates to better support the nurse's use of the nursing protocols, which are written in the problem oriented format.

Cermak provided additional training for staff in the use of the Cerner EMR in March and this training is now included in new staff orientation. There was a demonstrable improvement in Cermak staffs' ability to navigate the health record this site visit. It also was apparent that staff is held accountable for proper use of the electronic record in the interest of patient care.

**Monitor's Recommendations:**

1. Continue monitoring and correcting the timeliness and accuracy of the new interface with CCDOC in sharing necessary information about inmates.
2. Correct the problem with discharges resulting in a notification to Cerner that the inmate has been released when the inmate is still incarcerated at CCDOC.
3. Resolve problems with documentation of medication administration and delivery where Accuflo is used.
4. Continue monitoring, mentoring and supervision of Cermak personnel to ensure that correct documentation can be uniformly demonstrated.
5. Use the electronic health record to document health status and treatment initiated for all urgent care visits.
6. Revise the electronic forms to better display clinical information during nursing sick call encounters and include guidelines from the nursing protocols.
7. Consider developing an alert or flag in the EMR that indicates when patients are admitted and released from segregation. Staff should document their interactions with patients in segregation on the designated EMR form.
8. Monitor to identify and coach staff not to cut and paste documentation particularly in progress notes, segregation and other logs.

## 48. Mortality Reviews

a. Cermak shall request an autopsy, and related medical data, for every inmate who dies while in the custody of CCDOC, including inmates who die following transfer to a hospital or emergency room.
b. Relevant CCDOC personnel shall participate in Cermak's mortality review for each inmate death while in custody, including inmates who die following transfer to a hospital or emergency room, and a morbidity review for all serious suicide attempts or other

incidents in which an inmate was at high risk for death. Mortality and morbidity reviews shall seek to determine whether there was a systemic or specific problem that may have contributed to the incident. At a minimum, CCDOC's contribution to mortality and morbidity reviews shall include:

    I. Critical review and analysis of the correctional circumstances surrounding the incident;

    II. Critical review of the correctional procedures relevant to the incident;

    III. Synopsis of all relevant training received by involved correctional staff;

    IV. Possible precipitating correctional factors leading to the incident; and

    V. Recommendations, if any, for changes in correctional policy, training, physical plant, and operational procedures.

c. Cermak shall conduct a mortality review for each inmate death while in custody, including inmates who die following transfer to a hospital or emergency room, and a morbidity review for all serious suicide attempts or other incidents in which an inmate was at high risk for death. Cermak shall engage relevant CCDOC personnel in mortality and morbidity reviews and shall seek to determine whether there was a pattern of symptoms that might have resulted in earlier diagnosis and intervention. Mortality and morbidity reviews shall occur within 30 days of the incident or death, and shall be revisited when the final autopsy results are available. At a minimum, the mortality and morbidity reviews shall include:

    I. Critical review and analysis of the circumstances surrounding the incident;

    II. Critical review of the procedures relevant to the incident;

    III. Synopsis of all relevant training received by involved staff;

    IV. Pertinent medical and mental health services/reports involving the victim;

    V. Possible precipitating factors leading to the incident; and

    VI. Recommendations, if any, for changes in policy, training, physical plant, medical or mental health services, and operational procedures.

d. Cermak shall address any problems identified during mortality and morbidity reviews through timely training, policy revision, and any other appropriate measures.

**Compliance Status**: This provision remains in substantial compliance.

**Status Update:** Received and reviewed.

**Monitor's Findings:**

The mortality review for the last death in custody case that occurred just prior to the last monitoring visit was reviewed and was found to be in compliance with the agreed order. The following table summarizes the total number of death in custody (DIC) cases over the past three years:

|              | **2013** | **2014** | **2015 (to date)** |
|--------------|----------|----------|--------------------|
| **Total**    | 17       | 12       | 2                  |

While it may still be too soon to consider this downward trend a success, it is our belief that the reduced number of DIC cases point directly to the overall improvement in the delivery of health care at the CCJ. The most significant improvement is perhaps the initiation of early and comprehensive management of inmates "at risk" for drug and alcohol detox instead of treating only the inmates with overt detox symptoms. The Monitoring Team was pleased to learn that all three of the recommendations from prior monitoring visit have been operationalized. Specifically, these recommendations were:

1. All inmates with reported history of drug and alcohol detox at intake to undergo initial and interval CIWA-Ar and COWS assessments;
2. All inmates identified at risk of drug and alcohol detox to begin detoxification protocol medications as indicated;
3. All inmates identified at risk of drug and alcohol detox to be transferred to higher acuity housing (RTU or infirmary) to avoid loss to follow up

As a result there have been no detox related deaths in custody since the initiation of this new practice several months ago. There have been only two DIC cases since the last monitoring visit in November 2014. The two deaths Root Cause Analysis (RCA) were also reviewed by the monitoring team. We found the RCAs to be comprehensive and multidisciplinary with succinct action plan items. While the overall decreased number of DIC cases is a welcome sign of improved overall healthcare, the Monitoring Team remains concerned about suicide deaths.

**Monitor's Recommendations:**

1. All death in custody cases due to unexpected deaths should undergo a Root Cause Analysis (RCA). Expected deaths can continue to undergo a mortality review.
2. Continue to apply the new process of identifying and treating all asymptomatic, at risk inmates for ETOH/Benzodiazepine/Opiate detoxification and housing such inmates in higher acuity level housing.

## 49. Grievances

Cermak shall develop and implement policies and procedures for appropriate handling of grievances relating to health care, when such grievances are forwarded from CCDOC.

**Compliance Status:** Substantial compliance (November 2014).

**Status Update:** The status report dated 4/9/2015 reported that a CQI on grievances was done since the last site visit and will be further refined.

**Monitor's Findings:**

The number of grievances filed each month has been declining steadily. This reduction is no doubt due to Cermak's emphasis on timeliness and quality in responding to grievances. The number of grievances not responded to within timeframes has increased after several months of 100% compliance. Rates of non-response approach those reported as a problem in previous reports[1]. Improving non-response rates to meet the goal of 100% compliance should be a priority for the next several months so that correction can be demonstrated by the next site visit.

A grievance analysis done for the months of November 2014 through January 2015 was presented at the CQI meeting that took place on 2/25/2015. The discussion of results did not identify any opportunities for improvement. We met with Cermak staff involved in managing grievances and CQI to discuss Cermak's plan for analysis and trending of grievances. Methods to categorize and review grievances to identify trends in health care services that merit consideration for improvement were discussed. One area not discussed during the meeting, but is suggested now, is to look into the process Dental uses to review and track grievances for quality improvement. There is evidence that grievance review has been used to improve access and quality of care (see Monitor's Findings for Item 58 in this report) and there may be some best practices that can be incorporated into Cermak's plan. It is also noted that Dental reports more grievances than were identified in the CQI committee analysis of grievances in November 2014 through January 2015. This discrepancy should be addressed in developing Cermak's plan for grievance analysis and trending.

**Monitor's Recommendations:**

1. Demonstrate use of grievance analysis to identify opportunities to improve health care services per Policy A-11.

**C.     MEDICAL CARE**

**50. Health Assessments**

---

[1] Fifth Report-12%
   Sixth Report-10%
   Seventh Report-9.5%

a.     Cermak shall ensure that Qualified Medical Professionals attempt to elicit the amount, frequency and time since the last dosage of medication from every inmate reporting that he or she is currently or recently on medication, including psychotropic medication.

b.     Cermak shall ensure that incoming inmates who present and are identified by medical personnel as having either a current risk of suicide or other acute mental health needs will be immediately referred for a mental health evaluation by a Qualified Mental Health Professional. Staff will constantly observe such inmates until they are seen by a Qualified Mental Health Professional or Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional. Incoming inmates reporting these conditions will be housed in safe conditions unless and until a Mental Health Professional clears them for housing in a medical unit, segregation, or with the general population.

c.     Cermak shall ensure that all inmates at risk for, or demonstrating signs and symptoms of, drug and alcohol withdrawal are timely identified. Cermak shall provide appropriate treatment, housing, and medical supervision for inmates suffering from drug and alcohol withdrawal.

d.     CCDOC shall maintain a policy that correctional officers supervising newly arrived inmates physically observe the conduct and appearance of these inmates to determine whether they have a more immediate need for medical or mental health attention prior to or following the intake health screening by Qualified Medical Staff.

e.     Cermak shall ensure that the medical assessment performed within two working days of his or her booking at the Facility, or sooner if clinically indicated, for each inmate specified above (provision 45.f, "Intake Screening") shall include a review of the inmate's intake screening form, a medical history, a physical examination, a mental health history, and a current mental status examination. The physical examination shall be conducted by a Qualified Medical Professional. The medical assessment shall also include development or revision of the inmate's problem list and treatment plan to address issues identified during the medical assessment. Records documenting the assessment and results shall become part of each inmate's medical record. A re-admitted inmate or an inmate transferred from another facility who has received a documented medical assessment within the previous six months and whose receiving screening shows no change in the inmate's health status need not receive a new medical assessment. For such inmates, Qualified Medical Staff shall review prior records and update tests and examinations as needed.

**Compliance Status**: This provision continues to be in substantial compliance.

a.     Substantial compliance
b.     Substantial compliance
c.     Substantial compliance
d.     Substantial compliance
e.     Substantial compliance

**Status Update:**  The Monitoring Team received and reviewed Cermak's 4/13/15 status report.

**Monitor's Findings:**

a. We reviewed Cermak's Initial Health Assessment policy and procedure (E-04) dated 11/25/14 and posted 1/30/15.  The policy is consistent with the Agreed Order and provides sufficient operational detail for staff to implement the policy, including eliciting information and continuing medications. The policy also includes criteria for referral to the Cermak Urgent Care Center following secondary medical referral, which is excellent.

We selected 13 records of patients who entered the jail within the past three months. The sample included inmates with chronic diseases and mental health conditions; and symptoms of alcohol or drug withdrawal. The sample did not include any inmates who entered the jail through an anomalous pathway (e.g., hospital takeover, etc.) and evaluated in the Cermak Urgent Care Center.

b. Intake screening staff immediately refers patients with acute mental health symptoms including risk of suicide to a mental health provider.  Patients may then be referred to the Cermak psychiatric infirmary on 2 North.

c. Our record review showed that medical providers conducted appropriate assessments, identified patients at risk of, or exhibiting signs and symptoms of alcohol and/or drug withdrawal and initiated treatment using standardized order sets.  Providers now refer patients to be monitored for alcohol or drug withdrawal to the Cermak infirmary or Residential Treatment Unit.

d. Cermak intake screening policy (E-02) dated 11/5/14 includes language required by the Agreed Order for correctional officers to monitor new arrivals in holding cells and immediately refer inmates with signs or symptoms of acute medical or mental health illness.

e. Record review showed that intake screening staff refers newly arriving inmates with positive medical screens to a medical provider the same day for evaluation.  The quality of medical assessments is excellent. Providers update the problem list, initiate medications and referrals for follow-up.

Medical providers document health assessments electronically, except when patients are admitted through the Cermak Urgent Care Center. In these cases providers document assessments on paper records that are scanned into the electronic medical record. In previous reports, the monitoring team found that assessments documented on paper records resulted in less than adequate assessments, and recommended that Cermak leadership require providers to document all health assessments directly into Cerner. This is not yet occurring.

The health assessment process is working well, however there are opportunities for improvement. One HIV patient who was referred for secondary mental health assessment upon arrival decompensated and was transferred to 2 North before he received a secondary medical assessment. Once on 2 North staff did not arrange for him to have a medical evaluation within 2 days as required by the Agreed Order. A physician did not see the patient for 8 days after his arrival. We found another case in which a provider ordered a patient's cancer medication, but the patient did not receive the medication for almost a week after her arrival. We also found a case in which intake staff referred a patient without known medical conditions to mental health for evaluation. The patient reported to mental health that she had chest pain, palpitations and shortness of breath. MH staff attributed the patient's symptoms to a panic attack and did not refer the patient to the Cermak Urgent Care Department for medical evaluation. The following day the patient presented urgently with chest pain and hypertensive urgency. In this case, mental health staff should have immediately referred the patient to a medical provider.

**Monitor's Recommendations:**

1. Cermak leadership should conduct periodic CQI studies assessing the appropriateness, timeliness and quality of care.
2. Cermak leadership should require providers to document all health assessments directly into Cerner and refrain from paper documentation except when Cerner is down. The quality of health assessments performed in Cermak Urgent Center should match the quality of assessments performed when inmates arrive through normal channels.
3. The QI program should continue to monitor the documentation of timely receipt of medications that are deemed critical.

## 51.a Acute care

a. Cermak shall provide adequate and timely acute care for inmates with serious and life-threatening conditions, and ensure that such care adequately addresses the serious medical needs of inmates. Adequate care will include timely medical appointments and follow-up medical treatment.

**Compliance Status**: This provision remains in substantial compliance.

**Status Update:** Received and reviewed.

**Monitor's Findings:**

The Cermak Urgent Care department is staffed 24 hours a day, 7 days a week, by nurses and paramedics. There is also a physician on-call 24 hours per day. There is adequate equipment to provide emergency care for a life threatening condition. On 4/14/15 the department triaged and treated 32 patients.

To assess acute care the Monitoring Team reviewed 15 records. We found that patients were provided with timely medical care. An area of concern continues to be timely follow-up medical treatment and referrals related to Urgent Care staff not concurrently documenting clinical findings directly into the EMR. This remains unchanged from our last report.

Current practice is that a log is kept on paper in the Urgent Care Department; information needed by the divisions' medical staff is scanned into the health record the following day. The Urgent Care Department has attempted to address this by adding two procedures. First, the order sheet is copied and placed in an envelope and sent to the division or infirmary with the patient and secondly, a phone report to nursing is completed for all infirmary patients. Nursing staff in the infirmary were interviewed to validate the procedures were implemented and all staff verified the procedures. A concern remains in the divisions when there is not 24 hour nursing on site.

**Monitor's Recommendations:**

1. Documentation of Urgent Care services needs to be in the EMR.
2. In non 24 hour divisions document in the EMR acknowledgement of the patients visit to the urgent care. Follow up recommendations should also be documented.


## 51b. Acute Care-Infirmary

a. Cermak shall maintain guidelines for the scope of care of acutely ill patients in its on-site designated infirmary units and for transfer of patients when appropriate to outside hospitals.

**Compliance Status:** This provision is now in Partial Compliance

**Status Update:** Received and reviewed.

**Monitor's Findings:**

Record reviews, patient and staff interviews were conducted to evaluate the care in the Infirmary. The Infirmary staff are conducting a daily huddle with the care team to discuss their patients.

Reports have been established to use in the huddles to help manage their patients effectively. It's a new process and has not been completely implemented.

The Medical Infirmary Policy is still being updated which should help establish a standard of practice for both providers and nurses. The Mental health patients housed in the Mental Health Infirmary who have medical problems are not seen timely. This delay is due to process issues that are in practice. The process for notifying the medical provider for the patients in this housing location is different from the rest of the system. The providers at Intake are not entering referrals for chronic care visits in the EMR when the patient is set to go to the mental health housing and expect the sick call process to address it. The nursing staff enter the medical complaint in a sick call book for the medical provider but routine chronic medical conditions do not get notified automatically. The staffs agree that using the same process of entering referrals in the EMR like the rest of the system should work and reduce delays in care.

Both second and third floor of Cermak infirmary were once again using CCDOC issued "boats" for housing the infirmary overflow patients a great number of whom are considered "boarders". We did not find any boats in our last visit. There may be opportunities to transfer some patients to the new RTU to manage the lower acuity patients.

The admission notes are not documenting relevant information. The care plan process is being implemented and needs more work. Even though the care plans are created, they are not being used for managing their patients.

The nursing documentation has improved but still remains minimal and does not contain all pertinent negatives and positives regarding the patient's conditions. The team is working on creating nursing documentation templates to help improve.

The documentation of wound care has improved drastically. The wound care Wednesday program seems to work well. There is now a crash bag on the second and third floor of Cermak infirmary.

The medication pass is still done through a small window in the nursing station and does not provide privacy for the patient. The medication administration process needs to be reevaluated to make it efficient and safe.

At the time of our visit there was only one dialysis patient at Cermak. Dialysis unit was surveyed and was found to be vastly cleaner than our previous visit. All dialysis chairs had been re-upholstered and new arm rests had been installed. All door frames had been painted. A couple of areas on the floor that require replacing of tile have been designated for repair prior to our next visit. All ER referral cases involving hemodialysis patients over the past three months were

reviewed (three cases total). One case was due to patient's intentional non-reporting of his dialysis dependence until the patient began to suffer from fatigue and shortness of breath and had to be transferred to Stroger hospital for acute dialysis. The other two cases were ER referrals from intake for acute evaluation of dialysis need for newly arriving patients.

On April 15th infirmary census, there were 64 infirmary patients with the following acuity designation:

| | |
|---|---|
| Total | 64 |
| Acute | 0 |
| Sub-acute | 12 |
| Chronic | 19 |
| Boarder | 23 |
| Not Found | 10 |

These numbers indicate that more than a third of patients on the medical infirmary floor do not have a medical reason for being on that floor and are directly responsible for the recurrent use of boat housing. Additionally since the designated acuity of infirmary patients are supposed to direct the interval provider visits, it is imperative that all infirmary patients have an acuity assignment as soon as possible after they arrive in the infirmary and never beyond their initial provider visit. Five of the patients with no assigned acuity, however, had arrived in the infirmary more than three days prior to April 15th.

The Monitoring Team found the new detox protocol to be robust and in full use. The identification of at risk patients at intake by nursing staff followed by intake providers is going well with occasional issues where either intake nursing or provider fails to solicit a drug and alcohol use history from the same patient. There is also an issue with soliciting history of abuse of prescription medications which Dr. Richardson is tracking and addressing with individual staff. The Monitoring Team discovered good compliance with the detox protocol with regard to twice daily vital signs and CIWA/ COWS in the infirmary and female RTU floor. This activity was, however, inconsistent at best on the male RTU floor where up to 50% of the time the Monitoring Team could not find any documentation of such activities.

**Monitor's Recommendations:**

1. Every infirmary patient must be assigned an acuity level as soon as possible and never beyond 48 hours of admission to the infirmary to ensure timely evaluation of these patients. The admitting provider can assign the acuity level at the time of transfer to the

infirmary. This acuity can then be adjusted by the infirmary providers after their initial visit.

2. Implement use of an admission order set to address all aspects of care management.
3. Establish expectations for a provider initial evaluation upon admission to the Infirmary and follow-up requirements based on patients' acuity level and condition.
4. Establish expectations for initial and follow-up nursing assessments based on patients' acuity level and condition while in the infirmary.
5. Establish patient specific nursing care plans to appropriately manage the patients and periodically update them in consultation with the care team.
6. Establish a discharge process and documentation that requires provider orders and nursing assessment and handoff to receiving health care staff.
7. Establish a multidisciplinary treatment team meeting to periodically discuss treatment plans for patients in the Infirmary.
8. Establish a care coordination team to review patients at the hospital and plan for their appropriate transfer
9. Address the issue of boarders in the infirmary to avoid the recurrent use of boats.
10. The current monitoring of the detox protocol must continue until this process has been well established and consistent adherence to this policy can be demonstrated. The twice daily vital signs and CIWA/ COWS must be enforced and tracked for successful implementation.
11. Self-Monitoring:
    a) Audit 10 charts per month per unit to ensure timely admission assessment, timely assignment of acuity levels, initial provider evaluation, routine follow-up by the nurse and provider per acuity level guidelines, use of care plans as appropriate, etc.
    b) Monitor length of stay for the various acuity levels of patients in the Infirmary on a daily basis. This process will help reduce overcrowding and make it efficient.
    c) Evaluate patients sent to the Urgent Care and ER from the Infirmary to see if there were any process breakdowns and opportunities for improvement.
    d) Audit medication administration to monitor compliance with relevant policies and procedures.
    e) Monitor the timeliness of medical care of inmates in the mental health infirmary with medical conditions.

## 52. Chronic Care

a. Cermak shall maintain an appropriate, written chronic care disease management plan, which provides inmates with chronic diseases with timely and appropriate diagnosis, treatment, medication, monitoring and continuity of care consistent with the inmates' expected length of stay.

b. Cermak shall maintain appropriate written clinical practice guidelines for chronic diseases, such as HIV, hypertension, diabetes, asthma and elevated blood lipids.

c. Cermak shall maintain an updated registry to track all inmates with serious and/or chronic illnesses and shall monitor this registry to ensure that these inmates receive necessary diagnoses and treatment. Cermak shall keep records of all care provided to inmates diagnosed with chronic illnesses in the inmates' individual medical records.

d. Cermak shall ensure that inmates with chronic conditions are routinely seen by a physician, physician assistant, or advanced practice nurse to evaluate the status of their health and the effectiveness of the medication administered for their chronic conditions.

e. CCDOC shall house inmates with disabilities, or who need skilled nursing services or assistance with activities of daily living, in appropriate facilities, as determined by Cermak. CCDOC shall permit inmates with disabilities to retain appropriate aids to impairment, as determined by Cermak.

f. Cermak shall ensure that inmates with disabilities or who need skilled nursing services or assistance with activities of daily living shall receive medically appropriate care. Cermak shall notify CCDOC of their specific needs for housing and aids to impairment.

g. Cook County shall build out, remodel, or renovate clinical space as needed to provide appropriate facilities for inmates with disabilities in accordance with the timelines set out in provision 43.i. Prior to completion of the new clinical space, Cook County and DFM will work with Cermak to address the most serious concerns regarding facilities for inmates with disabilities, to the extent possible in the current Facility.

**Compliance Status**: This provision remains in partial compliance.
a. Partial Compliance
b. Partial Compliance
c. Substantial Compliance
d. Partial Compliance
e. Substantial Compliance

      f.   Partial Compliance
      g.  Substantial Compliance

**Status Update:** Received and reviewed.

**Monitor's Findings:**

The Monitoring Team reviewed health records of chronic disease patients during the visit.

a. Chronic Disease Management Plan
    The chronic disease patients were seen timely upon arrival to the facility by nurses and providers. Most of the patients have detailed initial evaluation notes in the EMR. The appropriate medication and labs were ordered during the visit. The first doses of medications were given timely. The providers are not consistently documenting the level of disease control and status of the condition which drives the management plans and frequency of visits. The Chronic Disease Management plan is still being updated.

    With respect to HIV care, we interviewed one of two HIV providers, reviewed HIV data and 7 health records. In general we found that patients were receiving appropriate care. Data presented to the Monitoring Team indicated that patients taking antiretroviral therapy at the facility greater than 120 days were well controlled. We did find opportunities for improvement. We found that in 5 of 6 applicable records patients were seen timely following their arrival at the jail (0 to 5 days). In one case however, a psychotic HIV patient was routed to Cermak 2 North before he had a medical evaluation and he was not seen by a physician for medical evaluation for 8 days after his arrival. At initial HIV visits, clinicians did not consistently order recommended tests or review results of those recently performed (e.g., chest x-ray). This sometimes resulted in clinicians failing to note when recommended tests were not performed (e.g., one patient did not have a chest x-ray ). In addition, HIV patients TB infection status is not evaluated upon arrival through Quantiferon or tuberculin skin testing; and sexually transmitted infection testing is not consistently performed in accordance with NIH and Cermak Clinical Guidelines.

    However, one of the relatively new HIV providers does an excellent job of importing and referencing current labs into her notes including HIV genotype test results, which supports the provider's  rationale for the patient's treatment  plan.

b. Cermak-Written Guidelines
    The clinical practice guidelines and chronic care templates for chronic diseases are being updated by the clinical team. Once they are established the staff will need training.

With respect to HIV disease, we reviewed HIV/AIDS Clinical Practice Guidelines revised in November 2014. The guidelines appropriately reference the National Institutes of Health guidelines for use of antiretroviral agents in HIV infected adults and adolescents. The Cermak clinical guidelines do not indicate time frames for evaluation of known HIV patients following arrival at the facility, which we recommends takes place within 7 calendar days of arrival and sooner as clinically indicated.

c.  Cermak-Tracking System

Disease specific registries based on the problem list have been developed. The registries are now accessible to the care teams so they are able to use the information to manage the patient groups. The team has to continue adding other chronic diseases to the registry.

d.  Cermak-Regularly Scheduled Visits

Patients with chronic disease are seen at intake and followed-up by the providers in their housing locations. The chronic disease management plan and the clinical practice guidelines will drive the frequency and requirements of the visits. There is a different process to identify and schedule chronic disease patients in the mental health Infirmary that is causing delays in care. Changes to correct this problem were discussed during the site visit. The orders have to be manually transferred to the new location if a patient transfers.

INR testing is still not being done before administering Coumadin. The team has purchased machines and is establishing the procedure to address this issue. Follow-up INR testing is not ordered in the EMR but uses the clinic appointment list to identify patients who need INR tested. The anticoagulation treatment plan is now being discussed with the primary care provider. The clinical pharmacist is now participating in management of patients on anticoagulation in the infirmary. The clinical team is planning to add more clinical pharmacist time to support chronic disease management which will be very helpful.

Documentation of insulin administration and blood sugars are done in the EMR. The providers should review the MAR for compliance with medications and address compliance in their notes. Laboratory test results are communicated to the patients at their next appointment if the results are negative. In some cases the patient may be released before the next appointment. The patients are using the sick call process to find out the results of their lab work.

With respect to HIV infection, interval visits do not consistently take place in accordance with physician orders and clinicians do not see patients' timely following performance of labs. Some patients were noted to be intermittently non-adherent with medications, but this did not result in intervention by more frequent monitoring. Consideration should be given to interval nurse monitoring and counseling to assess and address reasons for non-adherence.

Although Cerner has been reprogrammed to permit clinicians to order lab tests beyond two weeks, clinicians we spoke with do not yet have confidence in the reliability of Cerner and schedule patients solely for lab tests without an accompanying clinical visit. This is inefficient with respect to scheduling and provider productivity. Consider scheduling patients to have labs drawn 2 weeks in advance of the clinical visit so that results are available to the clinician for patient counseling.

e. The inmates with disabilities, or who need skilled nursing services or assistance with activities of daily living, are appropriately housed and allowed to retain appropriate aids to impairment as recommended by Cermak.

f. Documentation to show that patients who need assistance with ADLs are receiving appropriate care is inadequate. The nursing care for patients with special needs is identified in the care plans but they are not being used. Once the care planning process is completely rolled out documentation should improve.

g. Cermak has adequate clinical space to take care of patients with disabilities.

**Monitor's Recommendations:**
1. Establish a chronic care management plan
2. Continue updating and implementing the clinical practice guidelines and ensure practice is consistent with these.
3. Continue to create chronic disease templates to guide the provider to document pertinent positives, history specific to the condition, remind them of any recommended tests, medications, referrals, level of disease control (good control, poor control, etc.), level of change from previous visit (i.e. improved, worsened, no change), follow-up specific to the condition.
4. Create expectations for documentation on initial chronic care visit, follow-up chronic care, urgent care visits and title the documents to identify the type of visit.
5. Continue to reinforce with staff the importance of keeping the problem list up to date.
6. Get INR results before initiating Coumadin.
7. Add an INR point of care order in EMR to allow clinicians to order follow-up INR as indicated.
8. Communicate positive <u>and negative</u> lab results to the patient timely.
9. Continue to document the provider's acknowledgement of recent lab results and actions taken, if needed, or document reason for no action taken on an abnormal lab result.
10. Create a process for clinicians to refer patients to the Pharm D who can be valuable in managing complex patients.

11. Consider shared medical appointments for chronic diseases (i.e.: diabetes, hypertension, etc.) where patients can be educated by the various disciplines on disease management (diet, self-testing, diet, etc.).
12. Improve documentation of routine and episodic care provided to patients with special needs including patients who needs assistance with ADLs.
13. Continue efforts to house patients in the appropriate housing locations for efficient management.
14. Identify high risk chronic disease patients and establish a review process to effectively manage their care.
15. For HIV patients:
    a. Ensure that the initial HIV visit takes place within 7 calendar days of arrival or sooner if clinically indicated.
    b. Provide medication continuity as clinically indicated.
    c. At the initial HIV visit, providers should order recommended baseline labs or reference labs completed during a recent admission, including STI's.
    d. Evaluate and treat HIV patients for TB infection in accordance with recommendations.
    e. Ensure that interval visits occur as scheduled and that patients are timely counseled following the availability of labs results.
    f. Consider increasing frequency of monitoring for patients with adherence issues.
    g. To increase provider efficiency, avoid scheduling patients for provider visits simply to obtain labs. Improve the reliability of Cerner scheduling.
16. Review ordered tests (high priority tests) to see if they were completed.
17. Self-Monitoring:
    a) Ensure all patients on chronic medications are in the appropriate registries (match registry to medications and medication to registry to identify any inappropriate miss match).
    b) Continue to monitor compliance with dialysis visits.
    c) Audit at least 5 charts per provider per month to monitor for compliance with established chronic care management plan and clinical practice guidelines. Provide both individual and group feedback for continuous improvement.
    d) Establish quality metrics to monitor adherence of patients on anticoagulation.
        i. Time to first visit
        ii. Time to first dose
        iii. INR before first dose
        iv. Time to therapeutic level
        v. Management plan for difficult patients
        vi. Compliance with INR check as ordered
        vii. Compliance with follow-up as indicated

e) Monitor compliance with recommended vaccinations that are identified in the clinical practice guidelines.
f) Continue to review compliance with addressing critical lab results timely.
g) Review episodic/nonscheduled visits by chronic disease patients to identify opportunities for prevention.

## 53. Treatment and Management of Communicable Diseases

a. Cermak shall maintain adequate testing, monitoring and treatment programs for management of communicable diseases, including tuberculosis ("TB"), skin infections, and sexually transmitted infections ("STIs").

b. CCDOC shall comply with infection control policies and procedures, as developed by Cermak, that address contact, blood borne, and airborne hazards, to prevent the spread of infections or communicable diseases, including TB, skin infections, and STIs, consistent with generally accepted correctional standards of care.

c. Cermak shall maintain infection control policies and procedures that address contact, blood borne, and airborne hazards, to prevent the spread of infections or communicable diseases, including TB, skin infections and STIs, consistent with generally accepted correctional standards of care. Such policies should provide guidelines for identification, treatment and containment to prevent transmission of infectious diseases to staff or inmates.

d. Pursuant to Centers for Disease Control ("CDC") Guidelines, Cermak shall continue to test all inmates for TB upon booking at the Facility and shall follow up on test results as medically indicated. Cermak shall follow current CDC guidelines for management of inmates with TB infection, including providing prophylactic medication when medically appropriate and consistent with the inmate's expected length of stay. Inmates who exhibit signs or symptoms consistent with TB shall be isolated from other inmates, evaluated for contagious TB and housed in an appropriate, specialized respiratory isolation ("negative pressure") room. Cermak shall notify CCDOC of inmates' specific housing requirements and precautions for transportation for the purpose of infection control.

e. Cermak shall ensure that the negative pressure and ventilation systems function properly. Following CDC guidelines, Cermak shall test daily for rooms in-use and monthly for rooms not currently in-use. Cermak shall document results of such testing.

f. Cermak shall notify DFM, in a timely manner, of routine and emergency maintenance needs, including plumbing, lighting and ventilation problems.

g. Cermak shall develop and implement adequate guidelines to ensure that inmates receive appropriate wound care. Such guidelines will include precautions to limit the possible spread of Methicillin-resistant Staphylococcus aureus ("MRSA") and other communicable diseases.

h. Cermak shall adequately maintain statistical information regarding communicable disease screening programs and other relevant statistical data necessary to adequately identify, treat, and control infectious diseases.

**Compliance Status:** This provision remains in partial compliance.

a. Substantial Compliance
b. Substantial Compliance
c. Partial Compliance
d. Substantial Compliance
e. Substantial Compliance
f. Partial Compliance
g. Partial Compliance.
h. Substantial Compliance

**Status Update:** Status update received and reviewed.

**Monitor's Findings:**

a. Intake TB screening in the form of chest radiograph screening is ongoing and proving efficient and effective in identifying potential TB suspects. Cermak collects monthly data and reports on TB, STI's, and skin infections.

b. The Monitoring Team evaluated draft procedures to address the prevention and management of wounds dated 4/13/15. These procedures were comprehensive and specific to Cermak. The draft procedures adequately address wound care management and prevention but have not been approved. Our review showed that care has improved but there is not yet an approved policy. CCDOC was found to be compliant with the currently established infection control policy and procedures.

c. Cermak's policy and procedure with regard to Infection Control and Exposure Control Plans appears to have all the functional elements of an effective infection control program. However the policy and procedure has not received final approval and has not been posted for staff. The Monitoring Team found that there is a lack of standardized procedures and documentation related to disinfection practices in clinical areas (e.g., wiping down exam tables, otoscopes and other regularly used medical equipment, etc.). There is also a need for health care leadership to supervise the implementation of procedures once they have been developed, approved, published and implemented. We identified deficiencies were identified in the divisions and well as administrative areas, (e.g. lack of soap in exam rooms). Cermak has also established policy and procedures for Sexually Transmitted Infections (STI), and wounds. These policies have also not been

approved therefore we are unable to evaluate the effective implementation of these policies.

d.  All TB suspect cases since our last monitoring visit (14 cases total) were reviewed. None of the cases proved to be pulmonary TB. All cases were treated according to currently established national guidelines.

e.  The Monitoring Team audited all negative pressure room logs for the past 3 months and found them to be complete.  DFM has posted cleaning schedules and duties with a signature page to sign when the duties are completed and checked by a supervisor.  In theory this is a good process however there were many sign-off sheets that were not signed and dated.

f.  Cermak has a process in place to report routine and emergency maintenance needs to DFM. Furthermore, Cermak conducts periodic environmental inspection rounds and monitors each clinical area to ensure that physical plant problems are reported and addressed within adequate timeframes.

g.  Cermak has created a policy titled Prevention of and Management of chronic wounds and pressure ulcers.  This policy is dated 4/13/2015 and has not been approved by leadership. However, Cermak has made significant improvement with caring for patients with chronic and acute wounds.  Currently there are solid practices in place to measure, grade, assess, and manage wounds. Staff was knowledgeable of the expected wound care practices and stated they had been recently trained.  Currently all wounds are documented as ordered on iVew, an application on the EMR. Furthermore, there are guidelines within the policy to prevent MRSA or at least minimize transmission and risk to other inmates and staff.

h.  The Infection Control Department continues to map MRSA on a division-by-division spreadsheet to identify any clustering.  As a result the CCDOC, Environmental Services and the Medical Department are regularly notified of such areas for enhanced disinfection.

i.  The Monitoring Team reviewed a comprehensive report regarding communicable disease screening programs and other relevant statistical data necessary to adequately identify, treat, and control infectious diseases.  Based on the documents reviewed by the Monitoring Team, Cermak appears to have adequate screening, monitoring and treatment programs for management of communicable diseases, including tuberculosis ("TB"), and sexually transmitted infections ("STIs").

**Monitor's Recommendations:**

1. Develop a process/schedule for routine cleaning and sanitization of clinical areas in Cermak and post these schedules. Schedules should be followed as posted.
2. Develop an electronic request form for DFM to improve tracking and access by the divisions' requests for work orders and sanitation.
3. Conduct at least one patient care oriented Infectious Disease Quality Improvement study per quarter. This study should focus on an identified patient care issue such as MRSA or soft tissue infections.
4. Continue training on wound care for providers and all nursing staff working on Cermak infirmary.
5. Conduct iView training for all medical providers.

## 54. Access to Health Care

a. CCDOC will work with Cermak to facilitate timely and adequate accessibility of appropriate health care for inmates, as provided by Cermak.

b. Cermak shall ensure the timely and adequate availability of appropriate health care for inmates.

c. Cermak shall ensure that the medical request ("sick call") process for inmates is adequate and provides inmates with adequate access to medical care. The sick call process shall include:

    i. written medical and mental health care slips available in English, Spanish and other languages, as needed;

    ii. opportunity for illiterate inmates and inmates who have physical or cognitive disabilities to access medical and mental health care; and

    iii. opportunity for all inmates, irrespective of primary language, to access medical and mental health care.

d. Cermak shall ensure that the sick call process includes confidential collection, logging and tracking of sick call requests seven days a week. Cermak shall ensure timely responses to sick call requests by Qualified Medical Staff. The logging procedure shall include documentation of the date and summary of each request for care, the date the inmate was seen, the name of the person who saw him or her, the disposition of the medical or mental health visit (e.g., referral; whether inmate scheduled for acute care visit), and, if follow-up care is necessary, the date and time of the inmate's next appointment. Cermak shall document the reason for and disposition of the medical or mental health care request in the inmate's medical record.

e. Cermak shall develop and implement an effective system for screening medical requests within 24 hours of submission. Cermak shall ensure that sick call requests are appropriately prioritized based upon the seriousness of the medical issue.

f. Cermak shall ensure that evaluation and treatment of inmates in response to a sick call request occurs in a clinical setting.

g.      Cermak shall ensure that Qualified Medical Staff make daily rounds in the isolation areas to give inmates in isolation adequate opportunities to contact and discuss medical and mental health concerns with Qualified Medical Staff in a setting that affords as much privacy as reasonable security precautions will allow. During rounds, Qualified Medical Staff will assess inmates for new clinical findings, such as deterioration of the inmate's condition.

Compliance Status: This provision is partial compliance.

a.      Substantial compliance
b.      Partial compliance
c.      Partial compliance
d.      Partial compliance
e.      Partial compliance
f.      Partial compliance
g.      Partial compliance

Status Update:  Cermak provided a status report dated 4/13/15 that the Monitoring Team reviewed in preparation for the site visit and report.

The Monitoring Team evaluated inmate access to care by reviewing health service request tracking systems; randomly inspecting health care request form availability; reviewing health service request (HSR) forms, health records, segregation logs; observing nursing sick call encounters and interviews with staff and inmates.  In addition, Cermak health care leadership presented data regarding recently conducted CQI studies related to health service request (HSR) collection, date-stamping, and staff signatures.

Since the last monitoring visit, health care leadership and staff have focused intensively on access to care with meaningful progress. Cermak leadership has focused on the fundamental components of access to care: availability of heath service request forms, daily HSR collection, nurse triage and HSR disposition, and timely patient evaluations. In January 2015, intensive 40 hour training was conducted that included outlining roles and responsibilities for access to care and developing physical assessment skills needed to successfully implement the program. Health care leadership engaged the expertise of Linda Follenweider, a nurse practitioner and consultant to lead quality improvement efforts for the access to care program and we are impressed with the contribution she has made to the program in only a few weeks.

A series of studies have been conducted from November 2014 to April 2015 to establish the baseline status of the access to care program and measure progress over time.  As noted in previous reports, these efforts are hampered by difficulty using the electronic health record to

generate accurate reports. Nevertheless, Cermak leadership was able to identify positive trends from January to March 2015.  These included:

- Increase  in the number of HSRs that had both time stamp and documented disposition
- Increase  in the number of HSRs entered into the electronic health record
- Increase in the numbers of patient HSR's classified as Urgent that a nurse saw in one day
- Increase in the number of patient HSR's classified as Routine that a nurse saw in one day

The studies did not assess the quality of nurse evaluations or timeliness of provider referrals. Nevertheless, these positive trends serve as a foundation for future progress.

In addition, nursing leadership revised the Unit Manager Sick Call Report, a tool used by Nurse Coordinators to monitor the status of access to care on a daily basis and which allow managers to mobilize nursing resources in areas with high sick call volume and/or staffing vacancies.

These initiatives signify an important culture change, which is that access to care is no longer secondary to other aspects of health care delivery such as medication administration.   Nursing leadership has provided the tools to implement the program and now hold nurse managers and line staff accountable for implementing the program.

The improvements found during this visit represent a foundation for future progress. Much work remains to be done to provide adequate access to care in each service area (e.g., medical, mental health and dental). Nevertheless, we commend health care leadership and staff for progress since the last site visit.  Specific findings of our visit are described below.

a. During tours of housing units and staff and inmate interviews, we found no significant issues with CCDOC cooperation related to access to care.
b. Overall, access to care has improved (Items b.-f. of the Agreed Order). Individual Division findings are described below.

**Division I** To facilitate access to care, each day one of the CMTs assigned to the Division makes rounds in the housing units and picks up HSRs at the beginning of the shift. On 4/14/15 the Monitoring Team visited five housing units. Each HSR box had an up-to-date tracking log and tier officers had forms available.

The collected HSRs are given to the RN for paper triage. On the day that the Monitor toured Division I the two RNs had just completed triaging the forms picked up that morning. Each nurse hand writes the names of inmates to be called down for a nursing assessment on a form and gives it to the officer who manages traffic to and from the clinic. A nurse reported that there was only one HSR backlogged from the day before and this was because the inmate had been out to court.

He was to be seen the next day. While waiting for inmates to arrive the nurses work on the requests for optometry, mental health, dental and pharmacy services. This involves:

- checking to see if the inmate has an appointment already scheduled for optometry and if not, scheduling one;
- checking to see if the inmate has a current prescription for refill and if not, scheduling the patient with a primary care provider,
- faxing HSRs to dental and mental health to prioritize and schedule appointments.

With regard to dental requests the nurses stated that in addition to faxing the HSR to Dental for scheduling they will see the inmate to assess for infection and treat pain. Once inmates start arriving for nurse sick call the nurse delegates the remaining HSRs to the CMT to verify prescriptions, make appointments and fax referrals to other services.

We reviewed twenty HSRs; thirteen were from March and seven had been collected the morning of the site visit. All were date stamped and had been paper triaged by a registered nurse the same day.  Only one was not signed by the nurse completing paper triage. Seven of the 20 HSRs reviewed were considered asymptomatic and not scheduled for a nursing assessment.  However, one of the HSRs was for a complaint of toothache and the nurse should have assessed the patient but did not. Only 11 of the HSRs were prioritized as Now, Today or Routine. Three of the 11 were incorrectly prioritized.  Two were considered Routine when they should have been seen that same day[2]. One was prioritized as Today and should have been Routine.[3]  Thirteen of the HSRs reviewed resulted in the inmate being seen by a nurse. Eight were seen the same day the request was triaged and all of the others were seen the next day. Therefore all HSRs reviewed had been seen by a nurse for an assessment within 24 hours of triage.  Appropriately, the nurse consulted the medical provider during one patient encounter. Two of the nursing dispositions resulted in piggybacking on a previously scheduled primary care appointment. One appointment had yet to take place; the other addressed the complaint in the orders (moist heat prn) but the provider note does not reflect any examination of the problem during the chronic care visit.

The Nurse Coordinator reported that the much improved timeliness of nurse sick call has been accomplished by emphasizing its importance. Strategies used to support access to care included assigning two registered nurses including use of overtime if necessary, and frequent communication to quickly identify and solve problems. The Monitoring Team reviewed the Unit Manager Sick Call Report with the registered nurses. It was clear that both RNs understood the importance of timely access to care and knew how the daily workflow was being addressed.

We observed three nursing assessments. Each nurse had access to a nursing protocol book in the exam room. For each assessment the nurse inquired about the patient's concerns, eliciting a

---

[2] Patients 12 and 13.

[3] Patient 17.

description of symptoms and taking vital signs. All three assessments were done with the patient in the chair rather than on the exam table. Each of the three patients had a skin condition that the nurse addressed without describing the size or appearance of the lesion or injury per the nursing protocol. In two of the three assessments the nurse relied solely on visual inspection when it would have been more thorough to touch the patient and use a light source. One patient had an elevated blood pressure (137/90 mmHg) but the nurse did not re-take vital signs, check the record or discuss the condition with the patient.

One patient could not speak English and the nurse attempted to get an officer or another inmate to translate until the Nurse Coordinator intervened and provided the number for the language line. The nurse terminated the call before the patient received instructions on how to take the two over the counter medications that she provided.

**Division II** According to the Nurse Coordinator the first staff member arriving in the morning goes to the housing units to collect HSRs for their respective clinic. The Monitoring Team inspected HSR boxes in Dorms 1, 2 and 4 and each contained a tracking log that was up to date. HSRs were available at the officers' desk, except in Dorm 4. The officers there stated that they had just run out that morning, had requested additional forms from Health Services and expected to receive them in the afternoon.

Two registered nurses are assigned to address HSRs in Dorm 1 and two RNs in Dorm 2. However, on 4/15/15 there was only one RN on duty in Dorm 1 and one in Dorm 2. Between 25 and 50 HSRs are collected daily. Twenty five HSRs from March and one from April were reviewed (N=26). Of these, only one had not been date stamped and one was not triaged the same day as date stamped. Fifteen HSRs were referred to MH, Optometry, Pharmacy or Dental. In some cases, we noted that patients were not seen timely. A nurse triaged a HSR for tooth pain and forwarded it to dental on 3/21, but as of 4/15/15 no appointment had been scheduled. In another case, on 3/22/15 a nurse referred a complaint for severe depression to MH but as of 4/14/15 the patient had not been seen. Fourteen of 26 HSRs were prioritized; two had been designated Routine and should have been prioritized Today.[4]

Thirteen of the 26 HSRs reviewed resulted in a nursing assessment. None of the patients were seen more than 48 hours after triage. Six were seen the day the HSR was triaged, four were seen within 24 hours of triage, and three were seen within 48 hours of triage. Therefore, for the majority of patients, nurses performed a nursing assessment within 24 hours of triage. During one of the assessments the nurse conferred with the medical provider who ordered prescription medication; providing timely treatment and avoiding the need for another appointment. Another nursing assessment for evaluation of numbness in the hand resulted in piggybacking on a

---

[4] Patients 22 and 41.

previously scheduled primary care appointment. However the primary care provider did not address this problem at the time he saw the patient for follow up of a non-healing hip fracture.

Three nursing assessments were observed. All three included inquiring about the patient's concerns, eliciting a description of symptoms and taking vital signs. All three assessments were done with the patient in the chair rather than on the exam table. In two of the three assessments the nurse relied solely on the patient's description of the chief complaint and a brief visual inspection. One patient had a toothache and the nurse used the otoscope to visually examine it but did not use a tongue blade to move the cheek or tongue aside. The nurse's assessment did not include inquiry into all of the areas listed in the protocol for Toothache nor did she educate the patient on the issues listed in the protocol. The nurse conferred with the medical provider who ordered medication. The same patient was also treated for tinea cruris but the assessment was not as thorough as outlined in the protocol.

**III Annex** On 4/15/15 the Monitoring Team toured the annex. Nurses conduct sick call on a daily basis and we found no back log of HSRs. We inspected a health request box and found that it was adequately secured and HSR forms were available. We interviewed six inmates who reported that they have been seen within 2 days of putting in an HSR. Other inmates interviewed stated they felt their medical needs were being met. The one issue that was identified was the length of time it takes to see a provider. Inmates continue to use the HSR system to renew prescription medications due to a backlog for provider appointments.

**Division III** At the last monitoring visit, the Monitoring Team found widespread problems with access to care. Patients reported submitting repeated requests with no response.

As noted above, health care leadership conducted an access to care study from November 2014 to January 2015 which primarily assessed staff documentation (e.g., signatures) on HSRs. In Division III, the compliance of four nurses with the signature requirements varied from 70-96%. However signatures on nursing triage declined from 84% in December 2014 to 64% in January 2015.

On 4/15/15 we toured the Division and inspected two health service request boxes and found tracking logs that showed, with some exceptions, staff picked up forms daily. Correctional officers demonstrated that they had an adequate supply of health service request forms. The Monitoring Team reviewed a sample of HSR's that had been collected the day before and found that all were correctly dated stamped. Most, but not all forms were signed by a registered nurse as being triaged.

We interviewed inmates who reported that when the nurse saw them, the nurse did not take meaningful action to address their complaints. We inspected the medication cart that contained

over-the-counter medications for the nurse to give patients, and noted that there was no ibuprofen or acetaminophen in the cart. The nurse reported that she had run out of these OTC medications the previous week and had submitted refill request from the pharmacy the previous Friday but had not yet received the medication. This finding supports inmate complaints that the nurse does not effectively address their conditions.

Limited record review supported these findings. One record showed three instances in which a nurse did not meaningfully respond to the patient's condition. The patient was a 24 year old that on 3/28/15 submitted a HSR complaining of dental pain that was 10 of 10 in severity. On 3/30/15 the form was received. On 3/30/15 an RN saw the patient and performed an assessment noting no facial swelling or redness. The nurse did not examine the patient's oral cavity. The nurse gave the patient Tylenol and told the patient to report facial swelling or increase in temperature. The nurse did not refer the patient to dental.

On 4/2/15 the same patient submitted a HSR complaining of dental pain. On 4/3/15 the form was received and the nurse saw the patient the same day. The nurse gave the patient Tylenol and told the patient to report facial swelling or increase in temperature. The nurse gave the patient Tylenol referred the patient to the PCC clinic on 4/9/15.

On 4/15/15 during our inspection of the health request boxes, we found another request from the same patient complaining of severe dental pain and begging to see the dentist. We forwarded this form to the RN and requested that she call the dental clinic to facilitate the patient being seen.[5]

On 4/10/15 another patient submitted a HSR complaining of dysuria and vaginal discharge x 6 days. On 4/13/15 the request was received and a nurse saw the patient. The nurse took vital signs but performed no other assessment. The patient was afebrile. The nurse's plan was that the patient was scheduled for an STD clinic. However we noted no STD clinic appointment in the patient's record. The nurse did not perform an abdominal examination to palpate for signs of a pelvic infection or obtain a urine specimen to assess the patient for a urinary tract infection.

On 4/13/15 the patient submitted another HSR with multiple complaints including frequent urination, lower left side discomfort, elevated liver enzymes, headaches, blood in her stool and depression. On 4/14/15 the form was received and on 4/15/15 a nurse saw the patient. The nurse took a brief history of each complaint but the evaluations were not adequate. The nurse referred to a future appointment that we did not find in the record.

In summary, although the fundamental components of access to care have improved (e.g., collection and triage of forms; and a timely nurse encounter), in the cases noted above, a nursing encounter resulted in no meaningful care for the patient.

---

[55] Division III Patient #1.

It should be noted that women utilize health care resources more than men, both in the community and corrections. Their health issues tend to be more complicated due to gynecological complaints. Given this, Cermak leadership should assess and ensure that adequate provider resources are available in Women's Divisions to ensure timely and appropriate access to care.

**Division IV and V are Closed**

Division VI On 4/14/2015 the Monitoring Team inspected health request boxes noting that tracking logs showed that staff collected Health Service Request (HSR) forms daily and forms were available in the housing areas. Staff date stamped the forms when received and nurses signed the forms when they saw the patient.

We observed nurses conducting sick call. During each encounter the nurse took a patient history, vital signs, and conducted a focused examination of the patient that was appropriate to the chief compliant. The nurse's disposition decision in each case was appropriate. In one case a nurse used a peak flow meter and assessed breath sounds for a complaint of asthma. The patient was seeking an inhaler but did not have physical findings to support it. The nurse referred the patient to a provider for a further evaluation. Nurses performed appropriate disinfection practices between patients.

**Division VIII (RTU)** The Monitoring Team toured each floor of the RTU and randomly inspected several housing tiers. We found that in each area, health service request boxes were securely installed to the front of the correctional officer station. Health Service Request forms were available in each unit except for the second floor segregation unit. The officer stated that he had run out of forms earlier in the day.

We interviewed nurses on each floor regarding access to care. Each of the nurses was able to describe the new process that emphasizes seeing patients in a timely manner. During the tour, each registered nurse was either preparing for, or conducting sick call. On the 4th floor we reviewed a HSR that was written in Spanish and we asked the nurse how she would handle the HSR. She stated that she would have the officer translate or another inmate. The Nurse Coordinator intervened to advise the nurse about telephone translation services; however these telephones are not readily available in examination rooms.

While planning to observe sick call on the 5th floor we observed an emergency in progress in the clinic. A nurse responded to the housing unit where a woman complained of chest pain and was brought to the clinic where the Monitoring Team was located. While on the unit the patient's

blood pressure was severely elevated. The nurse did not document her pulse, respirations and temperature. The patient told the nurse she had a history of panic attacks. While in the clinic 2 nurses and a paramedic were present. The nurse's did not take any other history from the patient or repeat vital signs. All three staff was focused on obtaining an EKG. After staff performed the EKG she was taken to Cermak ED. The EKG was abnormal but the physician did not address the finding and she was sent back to the Division. We had concerns about staff not taking a history of the patient's chest pain, performing a review of systems, performing serial vital signs and delaying transporting the patient to the Cermak until the EKG was performed (which could have been done at the ED). We debriefed this event with the nurse manager and staff.

**Division IX** The process of access to care has changed significantly since our last report. RN's conduct sick call daily based on triage. We toured the housing units and found that HSR forms are available from officers and nurses. Health request tracking logs showed staff checked the health request boxes in the vestibule daily. A confidentiality issue is that Division IX inmates must hand the completed HSR either to an officer or a nurse to place in the HSR box that is mounted on the wall in the vestibule. Staff date-stamp forms when collected; nurses triage the forms and plan to see patients the same day.

The Monitoring Team observed a nurse in North Tower seeing two patients. The nurse entered the complaint into the EMR but did not perform an adequate physical assessment to address the concern identified on the HSR. The nurse provided over-the-counter medication as approved by protocol. The Monitoring Team also observed a nurse perform sick call in the South Tower. The nurse triaged the HSRs and began seeing patients within a few minutes. The nurse was knowledgeable of the procedure and stated she completes all the HSR's before she leaves for the day. Disposition of observed sick call encounters was appropriate.

**In Division X** there are two registered nurses on dayshift whose primary responsibility is to manage HSRs. On the day of the site visit (4/16/15) only one nurse was on duty (the other nurse was on vacation). According to the Nurse Coordinator this nurse is assisted by the swing shift registered nurse if there are any HSRs left over from day shift. The Nurse Coordinator also handles HSRs as necessary to prevent a backlog, which occurred on Monday (4/13/15) during the site visit. In addition the Nurse Coordinator has established clear expectations that medication administration cannot subsume the nurse's accountability for access to care.

Eight HSRs from March were reviewed. Of these all had been date stamped and triaged the same day. However two of these HSRs had not been signed by the nurse and one did not indicate the disposition. Five of the eight were referred to MH, Optometry, Pharmacy or Dental. We noted two referrals to MH made the last week in March that as of 4/15/15 had yet to be seen. Only three of the eight HSRs were prioritized, but we agreed with the priority decision on all three. One of the patients whose HSR was prioritized Today was not seen for 48 hours. The other two,

which were prioritized Routine were seen within 24 hours of paper triage. There were no HSRs responded to outside the established timeframes for timeliness. Twice the nurse's action after assessment was to piggyback on a previously scheduled primary care appointment but there is no way to indicate to the provider that the nurse has made a referral.  During the site visit on 4/16/15 we observed the nurse confer with the primary care provider about patients seen in nursing sick call.

We observed a nurse perform two sick call encounters for patients with complaints of dry skin. The assessment consisted of vital signs, confirmation of the patient's stated complaint and a visual inspection by the nurse.  The nurse inquired about onset and duration of symptoms and fluid intake but not past history of dry skin, environmental exposure, or current medications as listed in the nursing protocol.  One of the inmates also complained of pain related to a healed gunshot wound and dandruff.  The nurse did a visual examination of the patient's scalp and his chest but interaction was very brief because the patient did not speak English well. The nurse did not use the language line preferring to use gestures and a few words of Spanish. The nurse used a blood pressure cuff that was too large for one of the patients.  For another patient, the nurse retook the patient's pulse manually because the initial measurement was low. Neither assessment was done on the exam table or made use of tools other than vital sign equipment.

A correctional officer sits on a chair outside the exam room used by the nurse. During the visit the officer entered the room once during a nursing encounter but the nurse stopped her examination until the officer left the area so the patient's privacy was maintained. A CMT was stationed at the other desk in the room. The nurse had delegated checking HSR refill requests to the CMT. The CMT also assisted the nurse with patient flow to and from the exam room. This was a very good example of differentiated practice and the valuable assistance CMTs provide to support access to care.

In **Division XI** the method for handling HSRs is unchanged from the seventh report. Five HSRs from March were reviewed; all were date stamped and triaged the same day. Only three of the five had been prioritized; we agreed with the decisions of those that had been prioritized.  Only one of the five was referred; and this was to the primary care provider for a same day appointment.  Of the four patients to be seen in nursing sick call; two were seen the same day the request was triaged, one was seen the next day and one within 48 hours. There were no HSRs responded to outside the established timeframes for timeliness. There were no instances of piggybacking on previously scheduled primary care appointments.

On 4/16/15 we observed two nursing assessments. One patient was seen because his eyeglasses had not yet arrived; the other patient had multiple requests. Both also complained of dry skin and were given hydrophilic cream after a brief visual exam. The nurse told the first patient that she would follow up on the eyeglass prescription and call him back down with the information. The

other patient was examined on the table and an otoscope used to visualize the nares (complaint was sinus congestion) as well as a painful tooth. A tongue blade was not used to hold the cheek or tongue to examine the gum area. The nurse did not examine the patient's eyes for conjunctivitis or sinus areas for swelling per the nursing protocol.

Two inmates in the waiting area were interviewed privately. Each reported being seen by the nurse within two days of submitting an HSR. Each of them thought that what the nurse did to address their health complaint was satisfactory. Each of them stated that HSR forms are available at the officer's desk and that they have had no problem filling one out and being seen timely.

**Cermak Infirmary** Access to care in the infirmary for both the 2nd and 3rd floors continues to be by verbal request. Nurses receive the request and place it in a huddle book. These patients are then discussed in a morning huddle with the nurses and the provider. It is not clear from this process how timely the complaint is addressed. There has been improvement identified with nursing documentation in the EMR regarding patient requests. However nursing assessments of patients' complaint are lacking as well as documentation of any follow up of a complaint.

g. Segregation Rounds

With respect to segregation rounds, the Agreed Order still requires that health care staff conduct daily rounds which is not currently taking place. Until this occurs, or the Agreed Order is changed by agreement of the parties, this area will remain in partial compliance. Records of inmates in segregation were reviewed from Division X and RTU.

Staff have now initiated documentation of rounds in the electronic health record however it is unclear from the record when the inmate was admitted and discharged from segregation, therefore measurement of compliance is challenging. In addition, sometimes medical and mental health staff conducts rounds on the same day which may lead to gaps in monitoring, and some segregation notes were blank. This was brought to the attention of nursing leadership.

Recommendations:

1. Health care leadership and staff should continue to focus on the fundamental components of access to care by performing ongoing CQI studies and improve the quality of data used to make decisions.
2. Health care leadership should evaluate and provide feedback to nurses regarding the appropriateness of nursing evaluations and dispositions.
3. Conduct ongoing training in physical assessment and nurse protocols.
4. Evaluate the timeliness of nurse to provider referrals and whether the provider addressed the reason for referral.

5. Health care leadership should develop the primary care model in the Divisions by increasing communication and collaboration between nurses and providers.
6. Improve the availability of translation services with respect to phone placement in the clinic and staff training.
7. Develop the capacity to identify when inmates are admitted and discharged from segregation.
8. Medical and mental health rounds should be spaced out during the week.

## 55. Follow-Up Care

a. Cermak shall provide adequate care and maintain appropriate records for inmates who return to the Facility following hospitalization or outside emergency room visits.

b. Cermak shall ensure that inmates who receive specialty, emergency room, or hospital care are evaluated upon their return to the Facility and that, at a minimum, discharge instructions are obtained, appropriate Qualified Medical Staff reviews the information and documentation available from the visit, this review and the outside provider's documentation are recorded in the inmate's medical record, and appropriate follow-up is provided.

**Compliance Status:** This provision moves to Substantial Compliance. (The team has to establish adequate documentation requirements and a tight monitoring process for ER and hospital returns before the next visit to stay in Substantial Compliance)

a. Substantial Compliance
b. Substantial Compliance

**Status Update:** Received and reviewed.

**Monitor's Findings:**

Chart audits were conducted on patients returning from hospital and emergency room visits. Patients who were sent to the emergency room or are discharged from inpatient hospital care are seen at the Urgent care clinic on return. Urgent care providers are reviewing the hospital records and addressing the care recommendations.

The patients who return from specialty clinic visits or special procedures are now returning to the urgent care clinic. The paperwork is reviewed and the nurse ensures that the orders are entered in the EMR. They refer the patient to the urgent care provider as appropriate.

Recent change has been made to ensure that patients returning from same day surgery also get seen at the urgent care. Multiple chart reviews were performed and indicated that all patients were following the established process.

There is a reconciliation process to ensure all patients who were sent to the specialty clinic and for other procedures are seen upon return. The monitoring process is identifying and addressing any issues that may have been missed. The ED and inpatient hospital returns need to also be reconciled daily to catch any process breakdowns since they are high risk patients.

**Monitor's Recommendations:**

1. Establish a reconciliation process not less than once a shift for patients sent to the hospital for scheduled and unscheduled visits, by an assigned team so that all patients returning from the hospital are seen and discharge instructions are followed.
2. Create a template for hospital return visits for nursing and providers so pertinent information is captured in the note (i.e. reason for hospital visit, condition of patient upon return, discharge diagnosis, any new problems that must be added to problem list, medication reconciliation, plan of action for discharge instructions, in house nurse/provider follow-up or hospital follow-up, notification to the provider who sent the patient to the hospital, etc.).

3. Self-Monitoring:
   a. Maintain a database of all patient send outs by type (ER, Inpatient, Clinics, Same Day Surgery, Procedures, etc.). The data base should include: the mode of transport, seen by provider before send out, name of the provider who sent the patient out, reason for send out, discharge diagnosis, was patient seen on return, date and time of patient seen on return.
   b. Audit at least five charts of patients sent to the ER and for inpatient services for documentation that includes: if they were seen upon return, reason for send out, timeliness of send out, appropriateness of mode of transport, appropriateness of emergency response provided by in house staff, appropriateness of documentation, were hospital records reviewed, documentation of implementing discharge instructions, and if not, the reason documented, medication reconciliation, problem list updated, appropriateness of post discharge housing in the jail, patient educated on the plan of care, etc. (the documentation templates will help make this audit easy to do).

Use this database to monitor performance and identify improvement activities.

## 56. Medication Administration

a. Cermak shall ensure that treatment and administration of medication to inmates is implemented in accordance with generally accepted correctional standards of care.

b. Cermak shall develop policies and procedures to ensure the accurate administration of medication and maintenance of medication records.  Cermak shall provide a systematic physician review of the use of medication to ensure that each inmate's prescribed regimen continues to be appropriate and effective for his or her condition.

c. Cermak shall ensure that medicine administration is hygienic, appropriate for the needs of inmates and is recorded concurrently with distribution.

d. Cermak shall ensure that medication administration is performed by Qualified Nursing Staff.

e. When Cermak prescribes medication to address an inmate's serious mental health needs, HIV or AIDS, or thromboembolic disease, Cermak shall alert CCDOC that the inmate in question is on a flagged medication.  If the prescription is terminated during an inmate's stay at the Facility, Cermak will notify CCDOC.

f. When CCDOC receives notice that an inmate is on a flagged medication, CCDOC shall include notation of a medication flag in the inmate's profile on the Facility's Jail Management System.

g. When an inmate with a medication flag is processed for discharge at the Facility, CCDOC shall escort the inmate to designated Cermak staff in the intake screening area of the Facility for discharge medication instructions.

h. When CCDOC escorts an inmate with a medication flag to Cermak staff during discharge processing, Cermak staff shall provide the inmate with printed instructions regarding prescription medication and community resources.

i. Each morning, CCDOC shall provide Cermak with a list of all inmates with medication flags who were discharged the previous day.

j. Within 24 hours of discharge of an inmate with a medication flag, Cermak shall call in an appropriate prescription to the designated pharmacy on the Stroger Hospital campus to serve as a bridge until inmates can arrange for continuity of care in the community.

k. CCDOC shall ensure that information about pending transfers of inmates is communicated to Cermak as soon as it is available.

l. When CCDOC has advance notice and alerts Cermak of the pending transfer to another correctional facility of inmates with serious medical or mental health needs from detention, Cermak shall supply sufficient medication for the period of transit. In such cases, Cermak shall prepare and send with transferring inmates a transfer summary detailing major health problems and listing current medications and dosages, as well as medication history while at the Facility.

m. CCDOC shall ensure that the transfer summary and any other medical records provided by Cermak will accompany inmates, or will be made available electronically or transmitted by facsimile, when they are transferred from the Facility to another institution.

**Compliance Status:** This provision remains in partial compliance.

- Partial compliance
- Partial compliance
- Partial compliance
- Substantial compliance (June 2011)
- Substantial compliance (November 2014)
- Substantial compliance (November 2014)
- Substantial compliance (November 2014)
- Substantial compliance (November 2014)
- Substantial compliance (November 2014)
- Substantial compliance (November 2014)
- Substantial compliance (November 2014)
- Substantial compliance (June 2011)
- Substantial compliance (November 2014)

**Status Update:** The status report dated 4/9/2015 provided information that was responsive to 9 of 12 recommendations as well as the self-monitoring recommendations. Information concerning the recommendation to evaluate nurse competency in use of Pyxis as part of the investigation of controlled substance discrepancies and two recommendations to audit nursing practice as well as compliance with the interagency directive regarding medication administration were not responsive.

**Monitor's Findings:**

In addition to the status report, the following documents were reviewed in preparation of this report:
   a. Minutes of the meetings of the Pharmacy & Therapeutics Committee that took place January 22, 2015 and on April 1, 2015.
   b. Minutes of the Cermak Continuous Quality Improvement Committee (October 22, 2014, November 19, 2014, December 17, 2014, January 22, 2015 and February 25, 2015).
   c. Inter-Agency Quality Improvement Committee Minutes (12/5/14 – 2/26/15).
   d. Quality Improvement Report on Discharge Medications (March 2015).
   e. Cermak Monthly Statistics (September 2014 – March 2015).
   f. Cermak Health Services Policy and Procedure

1. D-02 Medication Services (Approved 10/31/2014).
2. D-02.3 Medication Distribution (Approved 11/24/2014).
3. D-02.4 Electronic Medication Administration Record (eMAR) (Approved 11/3/14).
4. E-13 Discharge Planning (Approved 11/4/2014).
5. E-13.2 Discharge Planning for Mental Health Patients (Approved 11/17/2014).
6. H-01.1 Information Systems Downtime Contingency Plan (Approved 11/4/2014).

g. Cermak Staffing Plan – Vacant vs. Filled (2/27/2015).
h. List of positions requested and approved for 2015.
i. List of Cermak training and continuing education provided.
j. eMERS reports from November to 4/13/2015 related to controlled substance discrepancies and medication issues.
k. List of prescriptions with dosing schedules greater than twice a day as discussed at the April 1, 2015 Pharmacy & Therapeutics Committee.
l. RTU Pharmacy Positions Update (March 2015)

During the site visit the Monitoring Team inspected medication storage areas, including stock medications and narcotic control, observed medication administration, and reviewed medication administration records. We interviewed staff and inmates in all Divisions about the medication system.

a. Cermak-Standard of Care- Partial Compliance

Medication Dispensing and Packaging for Delivery: The Pharmacy filled an average of 8,167 prescriptions each day between November 2014 and April 2015. The Pharmacy operation remains as described in the Ninth Report. No additional pharmacy positions were budgeted for 2015 and as a result the satellite pharmacy in VIII/RTU is not yet operational.

Medication Administration:
Medication administration was observed to be completed timely and inmate interviews generally indicated that medication was received when expected. Inmates did report some difficulty in timely refilling "as needed" medications and getting orders renewed when there were no more refills.

Patient identification is still done manually by having the patient state their name and identification number and/or birthdate, comparing it to their identification card and the identifying information on the MAR. In Division X which uses the Accuflo system the nurses do not scan the ID card. After the patient states his last name the nurse scans the medication package which brings up the patient's medication list. The nurse then asks the patient his identification number and birthdate. This same process was observed in Division II. Accuflo is

not used to scan the identification card as stated in Cermak's status report. One of two correctional officers observed assisting with medication pass in Division X did not get the identification cards out until the Nurse Coordinator asked for them. In Division III just prior to medication administration, a correctional officer asked a Sergeant if inmate ID's were needed for medication administration and the Sergeant said they were not. The nurse therefore did not use ID's nor were two patient identifiers consistently used to properly identify the inmate. Nurses who were observed administering medication do not appear to rely on the officers to assist with patient identification.

Since the last site visit there have been four reports in eMERS of inmates receiving the wrong medication because two part identification was not done by nursing staff compared to two errors which occurred prior to the November 2014 site visit. In none of the four instances is use of the identification described as part of the process. Scanning the identification card has been recommended in previous reports; Cermak indicated in the 4/9/2015 status report that the logistics and decision whether to purchase scanning capability for the Cerner eMAR were being reviewed. It does not appear that throughout the jail campus that the patient's identification card is meaningfully used to ensure the right patient is receiving medication.

Availability of support from correctional officers continues to vary from unit to unit. In Cermak and Division III officers were not in close proximity to the medication line to ensure inmates were spaced adequately. Inmates lining up at the window were able to hear the interaction between the nurse and inmate in front of them. When this occurred none of the nurses asked the officers to establish better control of the inmates. When correctional officers fail to monitor the line inmates are not provided adequate privacy during medication administration. Also failure to monitor the medication line contributed to one of the medication errors discussed in the preceding paragraph. In Cermak or Division III officers did not assist with oral or hand checks as required by the General Order.

In Divisions III and VIII/RTU the Monitoring Team observed that the water container stored on top of the medication cart from which inmates fill their water cups leaks, resulting in water accumulating on top of the medication cart. It appears that these containers are not well-designed and should be replaced.

There was a concerted effort between the officer and the nurse at the end of every medication pass observed to account for all inmates who were on the list to receive medication. Obtaining refusals in Division II took as long to accomplish as the time spent administering medication. Refusals that were observed during the site visit were most often because the inmate did not want to get up in the morning or because the medication was crushed.

We recommend that Cermak examine reasons for refusals and consider ways the program could reduce the incidence given its contribution to lack of timeliness in medication delivery. For example, refusals because patients do not want to get out of bed in the morning could be addressed by changing standard dosage times. Also prescribing providers may need additional avenues developed than those readily available now in order to address the patient's lack of agreement with or commitment to the treatment plan (i.e. involuntary psychotropic medication).

<u>Medication Continuity:</u>  Disruption in medication continuity at Cook County Jail was described at length in the Ninth Report. We support the plan to further cohort inmates (not already in Division VIII) classified as M2 and P2 into one Division and assigning a specific nursing position to administer medications to inmates going to court from Divisions without 24 hour nursing coverage.

In Division III inmates reported that they were not consistently receiving their medications before they went out to court. Nurses stated that this occurred because the inmates left for court before they arrived in the morning. However the superintendent reported that inmates did not depart until about 7:30 am and so the nurses should be able to give medications.  This discrepancy should be explored further so that inmates consistently receive medication when going to court.

Finally inmates should not be prescribed medications on dosing schedules (every 6 hours or every 8hours) that are not possible to administer correctly because staff are not scheduled to be on duty.  The Pharmacy & Therapeutics Committee (P&T) has begun to address this problem. Possible solutions include changing the dose, using a different preparation, changing the medication or transferring the inmate to a location where the dosing schedule can be met. Another suggestion is to place an alert for providers in Cerner that appears when ordering more than twice a day dosing. Based upon the data provided for the 4/1/2015 P & T meeting there were 14 orders in Division IX and two in Division VI that could not be given according to schedule because of staffing. These included orders for amoxicillin, gabapentin, mesalamine, acetaminophen, and ibuprofen.

<u>Medication storage:</u>  Pyxis automated dispensing cabinets have been in place nearly 24 months now.  Additional automated dispensing cabinets are being installed in all of the Divisions to handle over the counter medications and for Dental to use in dispensing initial doses. In Cermak the Pyxis automated dispensing cabinet is used to store all prescription medications, except non-formulary items. Nurses store non-formulary items with the sharps and expressed concern that they could not be stored in the Pyxis. This was discussed with the Pharmacy Director who agreed to assist the nursing staff identify a more appropriate location to store non-formulary medication. The majority of count discrepancies involving use of the Pyxis automated dispensing cabinets involve mistakes removing and returning medication.

Lack of practice uniformity was a widespread issue during our last monitoring visit in November of 2014. Although improved from the last site visit, the Monitoring Team encountered a couple of instances of multiuse medication vials with a strip of tape and a date on it instead of the pharmacy issued sticker that has the notation "This medication will expire 30 days from the following date". One unit manager stated that she was not aware that they were supposed to use a "special" sticker on the multiuse vials while another unit blamed this issue on "running out" of the designated stickers while several stickers were openly available on the unit near or inside the medication refrigerator.

<u>Management of Controlled Substances</u>: Cermak has established what appears to be a robust system to account for controlled substances and is actively monitoring to achieve compliance with policies related to controlled substances. Controlled substance counts performed by the monitoring team during the site visit were accurate (Cermak, Divisions II, IX, X).

> b. Cermak- Policies and procedures and systematic physician review–Partial Compliance

Revisions of policies related to discharge planning were provided for review and are discussed in section e-j.

The Monitoring Team met with the Chief Nursing Officer and Pharmacy Director to discuss further revisions that are necessary to Policy # D-02.3 Medication Distribution (approved 11/24/2014) and Policy D-02.4 Electronic Medication Administration Record (eMAR) (approved 11/3/14). Additional revisions that are needed include:

- Reconciling Appendix B to the definition of medication administration time
- Adding instructions about the use of two identifiers in determining the right patient
- Instructions about when and to whom to report inmate refusals
- Instructions for hand hygiene, sanitation of the cart and how drinking water is to be provided including sanitation of pitchers or jugs and how cups are to be disposed
- Directions for documenting on the electronic MAR (see discussions related to this in the Eighth and Ninth Reports).

We also discussed the possibility of establishing a separate and more comprehensive policy on adherence that would replace the simplified instructions to report to the provider after three refusals that was in previous versions of the policy on medication distribution.

Several deviations from facility policies for medication administration were observed during this site visit. Practices on the part of CCDOC which were not consistent with the Interagency Directive observed during this site visit were: 1. officers did not manage the environment or the flow of inmates to and from the medication cart or window and 2. officers did not assist with oral

or hand checks to ensure ingestion of medication. Observation and data on medication errors suggest also that inmate identification cards are often not provided to the nurse or used by the officer to identify the right patient. Practices on the part of nursing staff were more consistent with policy D-02.3 than ever before. However nurses in Cermak were not checking patients for cheeking or hoarding medication as required by policy. Nurses in Cermak and Division III allowed patients to crowd the medication area.

We have recommended since the Seventh Monitoring Report (May 2013) that medication delivery be audited regularly (including the role of CCDOC officers) using an observation tool derived from the interagency directive and results reported at Cermak quality improvement meetings. To date no action has been taken on this recommendation by either CCDOC or Cermak. The Cermak status report for this item is that nurse managers monitor the medication administration process and yet no audit results were presented during the site visit or are recorded in the CQI minutes. Before substantial compliance can be achieved with the Agreed Order performance must demonstrate more consistently that actual practices adhere to the Interagency Directive and Cermak policies. Regular audits and documented efforts to improve are essential to achieve the desired performance as well as obtain substantial compliance.

Ten days in advance of order expiration providers are notified so they can generate new orders after their review.  Except for an occasional inmate interview to the contrary there is no evidence that treatment is disrupted because of expired orders.

   c.  Cermak-Hygienic, Appropriate and Concurrently Recorded- Partial Compliance

Hygiene:  See discussion and recommendations in section b. for revision and additions to Policy # D- 02.3 Medication Distribution. Hygiene practices have improved since the last site visit.

Appropriate: Few inmates expressed concern about late or missing medications.  The volume of medication reported to be missing continues to trend downward. The problems associated with inappropriate housing appear to be largely resolved now with the opening of Division VIII/RTU and installation of the new CCDOC jail management system.

Tracking of time from order to first dose of medication that is administered has yet to be accomplished. The suggestion made in the last report was to initiate this study by tracking "critical medications" first. Since that is proving difficult another suggestion is to narrow the focus to just one medication as a starting point.

Concurrently Recorded: There are two electronic record systems in use to document medication administration or delivery. One is an eMAR that is used in Cermak and Division VIII/RTU. It is integrated with the Cerner EMR.  The other system, Accuflo, has been used to document

delivery of KOP medications since April 2013. For almost a year now it also has been used to document administration of dose by dose medications given by nurses in Divisions II, III, VI, IX, and X.

A major problem with the Accuflo system is that it is too slow to support staff as they are dealing with medications. For example, a member of the Medication Delivery Team was observed in Division II to deliver medication to an inmate without checking the inmate's identification on the computer and not charting it at the time it was delivered. Upon further investigation the Monitoring Team found that staff on the Medication Delivery Team makes a handwritten list of inmates whose medications they are to deliver. The list includes the inmate's identification number and the name of the medication to be received. As each inmate receives their KOP medication the staff crosses their name off the list. When they return to their office they use the WYSE terminals to document delivery. The opportunity for error in delivering medication to the patient is at least six fold with this work around compared to the process that was designed originally. The result was that medication delivery was not being recorded concurrently as required by the Agreed Order. Nurses administering dose by dose medication also complain about the slow speed of Accuflo as well as missing patients and orders. The Monitoring Team has observed these problems as well in Divisions II, III, IX and X the last two site visits.

In addition, review of medication administration records for patients receiving HIV medications showed "missed" doses that staff reported were due to problems with Accuflo being down. We did not investigate whether hand-written medication administration records were created when Accuflo was not functional. Consequently we were not able to assess medication continuity for these patients.

Corrective action taken by Cermak IT includes migrating Accuflo to a larger server and having the vendor rebuild the database. These two actions have improved speed recently. The laptops used by the Medication Administration Team also will have memory cards replaced by the end of the month. The Cermak IT Director also recently established a means to track problems with Accuflo through eMERS where they will be discussed weekly.

The Cerner eMAR is clearly preferred by nurses and providers and has not experienced the problems or required the maintenance that Accuflo requires. There is some consideration being given to cohorting the remaining P-2 and M-2 inmates in one Division (XI) and installing drops to support use of the Cerner eMAR. If this is accomplished the documentation of nearly all dose by dose medications will be made in the Cerner eMAR which will better facilitate clinical management of patient treatment. The only other Divisions that will remain to be brought over then to Cerner are VI and IX. Another method to document receipt of KOP delivery is being considered and should be pursued.

    d.   Cermak-Staffing: Substantial Compliance (June 2011)

Appropriately qualified nursing staff administers or deliver medication.  This finding has been in substantial compliance since the June 2011 report.

    e.   Cermak-Flagged Medication Procedure –Substantial Compliance (November 2014)

Cermak is using the term "Discharge Medications" to alert CCDOC, via an interface with CCOMS, of inmates who are prescribed "flagged medications" as listed in the Agreed Order. The issues that have been encountered with the new interface are discussed in section a.

    f.   CCDOC-Flagged Medication Noted on JMS-Substantial Compliance (November 2014)
    g.   CCDOC-Discharge medication instructions-Substantial Compliance (November 2014)
    h.   Cermak- Provides printed instructions- Substantial Compliance (November 2014)
    i.   CCDOC- List of inmates discharged -Substantial Compliance (November 2014)
    j.   Cermak- Prescription within 24 hours of discharge -Substantial Compliance (November 2014)

The process described in the Eighth Report referred to as "Discharge Meds Before Release" is still in place and functioning as intended.

Policy # E-13 Discharge Planning (approved 11/4/2014) and Policy # E-13.2 Discharge Planning for Mental Health Patients (approved 11/17/2014) were reviewed and largely coincide with the Agreed Order. We recommend that at the next review that they be revised to include language from the Agreed Order to monitor discharges with prescriptions on a daily basis and to track trends. This is being done now but the process is not included in either policy.

A quality improvement study was done on the timeliness of discharge orders written in March 2015. The study identified both errors and omissions in the process used for notification. While the majority of orders were written within a day of notification, there were many outliers.  . Efforts to reduce variation and meet the standard in the Agreed Order that prescriptions are available within 24 hours of discharge are being made.

    k.   CCDOC- Transfer Information to Cermak- Substantial Compliance (November 2014)

Since the October implementation there have been problems with the interface that have required the dedication of nearly one full time member of the Cermak IT staff. These problems include the alerts used to identify an inmate who requires medication upon release do not always transfer

to CCOMS and discharge notification may be erroneous. Frequent meetings are taking place between Cerner IT staff, CCDOC IT staff and the CCOMS vendor to identify and fix errors in the interface as well as the discharge notification process. In the meantime time consuming work-arounds are necessary. At the next site visit we hope to see a more reliable interface and discharge notification process.

l. Cermak-Medication for Transit- Substantial Compliance (June 2011)

Since June 2011, an employee of the Illinois Department of Corrections (IDOC) has been stationed at Cermak to facilitate continuity of care between Cermak and IDOC. When inmates are transferred to other jurisdictions Cermak provides summary information and medications to be transported by CCDOC to the next jurisdiction.

m. CCDOC-Record Transfer Between Facilities-Substantial Compliance (May 2014)

In addition to the summary information routinely provided, Cermak is able to respond to additional requests for health information within 24 hours now that the medical record is kept electronically.

**Monitor's Recommendations:**

1. Additional pharmacy positions should be established to operate the satellite pharmacy in Division VIII (RTU).
2. Implement scanning of the identification card or demonstrate consistent use of two identifiers to ensure the right inmate receives medication.
3. Audit medication delivery to demonstrate compliance with the interagency directive, including the role of CCDOC officers and report results at Cermak quality improvement meetings.
4. Use the same pharmacy issued "expiration" sticker on multiuse medication vials to avoid confusion and potential patient safety issues.
5. Ensure that medication administration and delivery is documented concurrently.
6. Replace leaking water containers used during medication administration.
7. Address medication discontinuity by implementing the plan to provide court medications and eliminate prescribing doses to be administered at times when nursing staff are not on duty.
8. Set benchmarks for medication adherence (more than refusals) and begin including review of this documentation in clinical care as well as quality improvement.
9. Revise Policy # D-02.3 Medication Distribution as discussed in this report.

10. Revise Policy # D-02.4 Electronic Medication Administration Record (eMAR) to define terms and guide practices in electronic documentation of medication delivery or administration.
11. Audit nursing practice using Cermak policies # D-02.3 and D-02.4. Demonstrate that corrective action is taken to address deviations between actual performance and the policy.
12. Audit time from order to first dose for <u>dose by dose</u> medication against the 24 hour benchmark and report results to quality improvement.
13. Improve the accuracy of the interface between Cerner and CCOMS and correct the problem with discharge notifications when inmates are not discharged.
14. Monitor timeliness of prescribed discharge medications.

Self-monitoring recommendations and status:

(1)   Missing medications-monitored currently
(2)   Controlled substance discrepancies and compliance with policy- monitored currently
(3)   Time from order to first dose for KOP <u>and</u> dose by dose medications- monitoring only KOP
(4)   Patients on flagged medications who receive discharge prescriptions- monitored currently
(5)   Compliance with policies for medication delivery, administration and documentation-not monitored
(6)   Patient adherence with dose by dose medication- not monitored
(7)   Automation downtime and program performance-not monitored
(8)   Pharmacy retention and vacancy rate- monitored currently


## 57. Specialty Care

a. Cermak shall ensure that inmates whose serious medical or mental health needs extend beyond the services available at the Facility shall receive timely and appropriate referral for specialty care to appropriate medical or mental health care professionals qualified to meet their needs.
b. Upon reasonable notification by Cermak, CCDOC will transport inmates who have been referred for outside specialty care to their appointments.
c. Cermak shall ensure that inmates who have been referred for outside specialty care by the medical staff or another specialty care provider are scheduled for timely outside care appointments. Cermak shall provide reasonable notice to CCDOC of such appointments so that CCDOC can arrange transportation. Inmates waiting outside care shall be seen by Qualified Medical Staff as medically necessary, at clinically appropriate intervals, to evaluate the current urgency of the problem and respond as medically appropriate. If an inmate refuses treatment following transport for a scheduled appointment, Cermak shall

have the inmate document his refusal in writing and include such documentation in the inmate's medical record.

d. Cermak shall maintain a current log of all inmates who have been referred for outside specialty care, including the date of the referral, the date the appointment was scheduled, the date the appointment occurred, the reason for any missed or delayed appointments, and information on follow-up care, including the dates of any future appointments.

e. Cermak shall ensure that pregnant inmates are provided adequate pre-natal care. Cermak shall develop and implement appropriate written policies and protocols for the treatment of pregnant inmates, including appropriate screening, treatment and management of high-risk pregnancies.

**Compliance Status:** This provision remains in substantial compliance

**Status Update:** Received and reviewed.

**Monitor's Findings:**

Chart reviews and the process review were performed on patients who were sent to the hospital for specialty clinics and procedures.

a. Patients who need specialty clinic referrals are being referred by the provider and receive an appointment as needed. The providers are calling the specialist to make arrangements for high risk patients.

b. Patients are being transported to their appointments at the hospital unless the patient refuses or has a court visit. The appointments are rescheduled in a timely manner if the visit is missed.

c. CCDOC is notifying the scheduler regarding any refusals or cancellations so that the scheduler can reschedule and/or notify the provider for appropriate intervention. Patients are monitored by the clinical team while waiting for an appointment with the offsite clinic. When patients refuse specialty services or diagnostic procedures (e.g., colonoscopy, etc.) there should be a system to notify the provider and schedule the patient for follow-up so that the reasons for refusal can be determined and the patient counseled regarding the risks of refusal.

d. The scheduling staff has a database to monitor the patients who have a referral. Additional data elements are needed to track the referrals and their status effectively.

e. Obstetrics care remains highly functional, reliable and serves as a model of excellence for the rest of the health system. This section has now been in substantial compliance for more than 18 months and subsequently will no longer be monitored unless issues are identified during future visits.

**Monitor's Recommendations:**

1. Add the additional data elements as discussed to the database for scheduled visits (Include the referral date, clinic name, appointment date, status of appointment, if the patient was seen on return, date and time seen on return, referring provider notified of appointment date, if refused, rescheduled or cancelled.).
2. Create a template for a hospital return note for providers and nurses to help document all relevant information.
3. Self-Monitoring:
   a. Continue to perform ongoing continuous quality improvement reviews for pregnant women.
   b. Audit at least five specialty clinic referrals and five procedure referrals each month to check if the patient was seen on return, appropriateness of documentation, were hospital records reviewed, documentation of implementing discharge instructions, and if not, was the reason documented, medication reconciliation, problem list updated, appropriateness of housing in the jail, patient educated on the plan of care, test results, etc. (the documentation templates will help make this audit easy to do).

Use this database to monitor performance and identify improvement activities.

## 58. Dental Care

a. Cermak shall ensure that inmates receive adequate dental care, and follow up, in accordance with generally accepted correctional standards of care. Such care should be provided in a timely manner, taking into consideration the acuity of the problem and the inmate's anticipated length of stay. Dental care shall not be limited to extractions.

b. Cermak shall ensure that adequate dentist staffing and hours shall be provided to avoid unreasonable delays in dental care.

**Compliance Status:** This provision has been provisionally raised to substantial compliance.

**Status Update:** Received and reviewed.

**Monitors' findings:**

Nursing continues to dispense OTC analgesic medications (Ibuprofen and Acetaminophen) for dental pain complaints for 21 days while inmates wait for their dental clinic appointments.

The Monitoring team met with Director of Cermak Dental Services and System Director of Oral Health. The following staffing pattern remains unchanged:

1) 7 dental assistants (0 vacancy)
2) 2 dental hygienists (0 vacancy)
3) 7 dentists (0 vacancy)

Cermak dental services has acquired the following new positions:

1. 1 oral surgeon  (interviewing)
2. 1 dental assistant (offer made)
3. 1 dentist (interviewing)

The dentist workforce and the dental chairs have remained stable and unchanged from the last monitoring visit:

| | | | |
|---|---|---|---|
| 1) | Division 1 | 1 chair | 1 dentist |
| 2) | Division 5 | 2 chairs | 1 dentist |
| 3) | Division 6 | 2 chairs | 1 dentist |
| 4) | Division 9 | 2 chairs | 1 dentist |
| 5) | Division 10 | 1 chair | 1 dentist |
| 6) | Division 11 | 4 chairs | 2 dentists |

The Monitoring Team received a comprehensive self-assessment and process improvement plan that included action plan items and audit results for the past 6 months. Included in this document were monthly encounter numbers as well as a breakdown of extractions vs. restorative procedures.

Interventions that have been put in place as a result of continuous program improvement efforts include:

a) Dental now makes 67% of all of their own appointments based on the HSRF received. The rest of the appointments are scheduled through the scheduling center (consults, provider referrals, etc.)
b) Dental services began implementing a manual log of all dental clinic appointments to track the following information:
   - Date of actual HSRF
   - Date the HSRF is emailed to the dental clinic
   - Date of dental clinic appointment
   - Gender of inmate with dental complaint
   - Reason for visit (symptomatic vs. asymptomatic

This log was used by the monitoring team to audit the timeliness of dental services. Ten records were selected at random that included both male and female inmates with both "Urgent" and

"Priority" assigned dental complaints. Cermak dental services have designated the following timelines for the various dental acuities:

- Urgent within 3 business days
- Priority within 7 days
- Routine within 14 days

Overall, dental services were able to meet/exceed their timelines for the delivery of dental services 80% of the time. The two cases that fell out of the designated timelines did not result in adverse outcomes for the patients.

During this audit, the Monitoring team also discovered that the long time gap that previously existed between the time inmates were submitting their HSRFs and the time these would be submitted to dental services has drastically decreased from more than two or three weeks to less than 3 days in most instances. This is a positive change resulting in significantly reduced dental clinic wait times. This finding further confirms that the process of access to care has improved. Additionally, the dental services continue to track the number and nature of inmate grievances that deal with dental issues.

The current average dental wait time for immediate and urgent HSRs is about 10 days. Routine dental HSR wait time is reported to be about 30 days. Cermak dental services believes that the addition of the new dentist, oral surgeon and dental assistant will further allow for reducing the wait time and will allow for more appropriate and acuity based scheduling of Cook County Jail inmates with dental complaints.

**Monitor's Recommendations:**

1. Continue to expand the dental services to allow for decreased wait time.
2. Continue with the manual log until you are able to replace it with an automated electronic tool.
3. As previously mentioned, this section has been provisionally raised to substantial compliance based on the understanding that all dental wait times will fall at or below the agreed upon wait times by the next monitoring visit in November 2015.

## 68. Suicide Prevention Training

a. Cermak shall ensure that the Facility's suicide prevention curriculum for health care staff members, jointly established with CCDOC, addresses the following topics:
    i. the suicide prevention policy as revised consistent with this Agreed Order;
    ii. why facility environments may contribute to suicidal behavior;

      iii.     potential predisposing factors to suicide;

      iv.     high risk suicide periods;

      v.     warning signs and symptoms of suicidal behavior;

      vi.     observation techniques;

      vii.     searches of inmates who are placed on Suicide Precautions;

      viii.     case studies of recent suicides and serious suicide attempts (Serious suicide attempts are typically considered to be those that either were potentially life-threatening or that required medical attention);

      ix.     mock demonstrations regarding the proper response to a suicide attempt; and

      x.     The proper use of emergency equipment, including suicide cut-down tools.

b. Within 24 months of the effective date of this Agreed Order, CCDOC shall train all CCDOC staff members who work with inmates on the Facility's suicide prevention program. Implementation of such training shall begin as soon as possible following the effective date of this Agreed Order. Staff shall demonstrate competency in the verbal and behavioral cues that indicate potential suicide, and how to respond appropriately. Initial and at least annual training shall be provided in accordance with generally accepted professional standards.

c. Within 12 months of the effective date of this Agreed Order, Cermak shall train all Cermak staff members who work with inmates on the Facility's suicide prevention program. Implementation of such training shall begin as soon as possible following the effective date of this Agreed Order. Staff shall demonstrate competency in the verbal and behavioral cues that indicate potential suicide, and how to respond appropriately. Initial and at least annual training shall be provided in accordance with generally accepted professional standards.

**Compliance Status:** This provision remains in substantial compliance.

**Status Update:** Received and reviewed.

**Monitor's Findings:**

Based on presented data, nearly all CCDOC officers and Cermak staff have received training on suicide prevention as well as recognition and timely referral of inmates with suicide ideations or attempts. Evaluation of the effectiveness of this training and program will be addressed in the mental health services monitoring report. The Monitoring Team once again raises the concern that since our last monitoring visit there have been five death-in-custody cases, all of which have been due to suicide.

**Monitor's Recommendations:**

None.

## 86. Quality Management and Performance Measurement

a. Defendants shall each develop and implement written quality management policies and procedures, in accordance with generally accepted correctional standards, to regularly assess, identify, and take all reasonable measures to assure compliance with each of the provisions of this Agreed Order applicable to that Defendant.

b. Defendants shall each develop and implement policies to address and correct deficiencies that are uncovered during the course of quality management activities, including monitoring corrective actions over time to ensure sustained resolution, for each of the provisions of this Agreed Order applicable to that Defendant.

c. CCDOC shall participate with Cermak and DFM in a jointly established Health Care Quality Improvement Committee, to be charged with developing and implementing a joint quality improvement program. CCDOC shall contribute the time and effort of CCDOC staff members who, by virtue of their authority, current responsibilities, and/or past experience, can provide this committee with needed correctional representation.

d. Cermak shall participate with CCDOC and DFM in a jointly established Health Care Quality Improvement Committee, to be charged with developing and implementing a joint quality improvement program. Cermak will work with CCDOC and DFM to identify those CCDOC and DFM staff members who, by virtue of their authority, current responsibilities, and/or past experience, can provide this committee with needed correctional representation. Quality management programs related to medical and mental health care will utilize performance measurements to assess quality of care and timely access to care with quantitative and qualitative data analysis and trending over time.

e. DFM shall participate with CCDOC and Cermak in a jointly established Health Care Quality Improvement Committee, to be charged with developing and implementing a joint quality improvement program. DFM shall contribute the time and effort of DFM staff members who, by virtue of their authority, current responsibilities, and/or past experience, can provide this committee with needed correctional representation.

**Compliance Status:** This provision remains in partial compliance.

a. Partial Compliance
b. Partial Compliance
c. Substantial Compliance
d. Partial Compliance
e. Partial Compliance

**Status Update:** Received and reviewed.

**Monitor's Findings:**

Cermak quality department recently lost their Director. Cermak has hired a consultant to help establish a quality program. The consultant has been able to initiate projects to address the sick call process, detoxification process and wound care procedures. CCDOC is found to be in substantial compliance with the intent of this order.

Cermak quality management policy and procedure is under development. Projects have been initiated to address major services like sick call and infirmary care. Monitoring reports are being established and are being used to identify and address issues. The quality improvement plan will help drive the programs activities. CCDOC is found to be in substantial compliance with the intent of this order.

The quality improvement nurse and the IT analytics staff are starting to be used effectively.

**Monitor's Recommendations:**

1. Develop a comprehensive Quality Program to monitor and improve all aspects of operations including processes, clinical outcomes, professional performance, safety, risk and efficiency.
2. Create a collaborative team with standard meetings where Quality, Risk, Nursing, Medical, Mental Health and the Sherriff's department staff work as a team to improve process and quality of care.
3. Create a balanced scorecard for each of the services/locations to monitor their performance and a balanced scorecard for the system to monitor the overall progress.
4. Metrics should include
   a. process  and outcome measures to ensure compliance with policies and procedures
   b. professional performance measures of clinical staff based on their functions (quality of care and productivity)
5. All Managers should do daily rounding in their areas to ensure completion of tasks, quality of service, environmental checks, and address any patient or staff issues.
6. Create action plans for each of the non-compliant items and track the status periodically during the quality meetings.
7. Share the data with the staff during the staff meetings and document minutes.
8. Check to see if the action plans helped fix the problem, if not, make necessary changes to the action plan and implement.
9. Review the balanced scorecards for each of the services/locations during the quality meetings on a rotating schedule, so each area/ service gets reviewed at least once every 3 months.

10. Establish multidisciplinary work groups to periodically review major activities like medication administration, sick call, infirmary care, intake processes, emergency care, etc. The work group should review current performance, challenges and identify opportunities for continuous improvement. The recommendations of the work group should be reviewed during the quality meeting by the leadership team and considered for implementation.
11. Initiate performance improvement projects for the system that will help improve safety, quality and efficiency.