## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA,

        **Plaintiff,**

   v.

COOK COUNTY, ILLINOIS;
THOMAS DART, COOK COUNTY
SHERIFF (in his official capacity);
TONI PRECKWINKLE, COOK COUNTY
BOARD PRESIDENT (in her official capacity);
COOK COUNTY BOARD OF
COMMISSIONERS (in their official capacity),

        **Defendants,**

No. 10 C 2946

Judge Virginia Kendall

---

# Monitor Jeffrey L. Metzner, M.D.'s Report No. 11

---

Jeffrey L. Metzner, M.D., P.C.
3300 East First Avenue
Suite 590
Denver, CO
E-mail: Jeffrey.metzner@ucdenver.edu

**JEFFREY L. METZNER, M.D., P.C.**
**3300 EAST FIRST AVENUE**
**SUITE 590**
**DENVER, COLORADO**
———
**TELEPHONE (303) 355-6842**
**FACSIMILE (303) 322-2155**

# MEMORANDUM

**TO:**     Donald J. Pechous, Esq.
Cook County State's Attorney's Office
500 Richard J. Daley Center
Chicago, Illinois 60610

Paul O'Grady, Esq.
Peterson Johnson& Murray
233 South Wacker, 84th Floor
Chicago, Illinois 60606

Kerry Dean, Esq.
U.S. Department of Justice
P.O. Box 66400
Washington, DC 20035-6400

**FROM:**   Jeffrey L. Metzner, M.D.

**DATE:**   December 4, 2015

**RE:**      *U.S.A. v Cook County, et al*
No. 10C2946

I have completed my assessment of the mental health services offered at the Cook County Department of Corrections (CCDOC) through Cermak Health Services of Cook County (CHSCC). I site visited CCDOC from November 2-6, 2015.

Sources of information utilized in compiling this report included the following:

1. review of documents provided in response to my written request for pre-site information, which included the following documents:
   a. status update to the Agreed Order,
   b. Mental Health Quality Improvement Committee meeting minutes,
   c. Suicide Prevention Committee meeting minutes,
   d. mental healthcare quality improvement studies,
   e. two revised root cause analysis reports re: recent suicides within CCDOC,
2. interviews with many inmates in group settings in Division 8 (RTU), Division 2 and Division X,

3. observation of treatment activities in Division 8,
4. information obtained from key administrative and clinical staff that included, but was not limited to, the following persons:

   a. Jay Shannon, M.D. (Acting CEO, Cook County Health and Hospitals System),
   b. Christopher Wurth (Chief Operating Officer Hospital Based Services),
   c. Connie Mennella, M.D. (Chair, Department of Correctional Health Services),
   d. Nneka Jones, Psy.D. (First Assistant Executive Director),
   e. Kenya Key, Psy.D. (Chief of Psychology),
   f. David Kelner, M.D. (Chief of Psychiatry), and
   g. Carlos Gomez, Psy.D. (Mental Health Director).

I also met with the psychologists and psychiatrists in a group settings during November 5, 2015.

As always, I found the staff from CHSCC and CCDOC to be courteous and helpful throughout my five-day site visit.

In this report the term "inmate" will be used in contrast to "detainee" in order to be consistent with the Agreed Order's terminology, although the vast majority of persons admitted to CCDOC are pre-trial detainees.

**Overview**

The Cook County Department of Corrections consists of 9 main divisions in a group of buildings covering over 100 acres. The inmate count during November 3, 2015 was 8,765.

Reference should be made to Appendix I for a more detailed summary of population and capacity information.

**Findings**

As per the June 3, 2010 memorandum regarding the June 2, 2010 meeting that included attorneys from the Department of Justice, attorneys and representatives of the Defendants, and the monitors, my findings relevant to the Mental Health Care section of the Agreed Order are summarized in Appendix IV (5-13-10 Agreed Order Mental Health provisions). Appendix IV includes excerpts from prior site assessment reports if they provide relevant contextual information. Consistent with the June 2, 2010 meeting, I have forwarded my input to the other monitors who have primary responsibility for sections that overlap with various mental health provisions as summarized in the June 3, 2010 memorandum.

Appendix II summarizes the twelve mental health provisions of the Agreed Order that have been in substantial compliance for at least 18 months. My assessment during this site visit did not raise any concerns that these provisions were no longer in substantial compliance. Appendix III summarizes mental health provisions of the Agreed Order monitored by other monitors.

Appendix V provides the current organizational chart regarding the Cermak Health Services.

**Information Requests**

Appendix VI summarizes my revised document request for my next site assessment scheduled for April 18-22, 2016

Please do not hesitate to contact me if I can answer any further questions.

Sincerely,

Jeffrey L. Metzner, M.D.

**Executive Summary—Eleventh Monitoring Report (Mental Health Provisions)**

Since the April 2015 site visit, the most significant progress has occurred in the following six areas:

1. Continued improvement in the mental health programming (both in quantity and quality) for inmates in the RTU and Special Care Unit.
2. Continued improvement in the quality improvement process, which is now in substantial compliance.
3. A significant increase in the salary for psychiatrists and an exemption relevant to the Shakman hiring requirements.
4. Initial implementation of out of cell correctional rehabilitation programming for segregation inmates in Division IX.
5. Initial implementation of out of cell structured therapeutic programming for RTU segregation inmates.
6. Initial implementation of the Intensive Management Unit (IMU) in the RTU.

There is a total of 118 FTE mental health positions with 20 vacancies that represents 16.94% vacancy rate. The vacancy rate has significantly decreased although the vacancy rate for psychiatrists and psychologists remain problematic. However, I am optimistic that recruitment of psychiatrists and psychologists will significantly improve in the near future with the change in the salary structure for psychiatrists and the modified Shakman hiring requirements.

The leadership of Kenya Key (Chief Psychologist, Ph.D.), David Kelner, M.D. (Chief Psychiatrist) and Carlos Gomez, Psy.D., Christopher Wirth M.D. and Connie Mennella, M.D. remains impressive. The working relationships between CCDOC and Cermak staffs continues to be good.

Two additional provisions of the Agreed Order are now in substantial compliance for at least 18 months, which means a total of 12 provisions have now been in compliance for at least 18 months.

Five (5) provision previously in partial compliance are now in substantial compliance.

A total of nine (9) provisions were currently in partial compliance.

**Summary of Compliance Findings**

The following provisions were assessed to be in substantial compliance (with the initial date of substantial compliance noted in parenthesis):

**Substantial compliance**

**59.    Assessment and Treatment**

       **a.    Results of mental health intake screenings (see provision 45.c, "Intake Screening") will be reviewed by Qualified Mental Health Staff for appropriate disposition.** (6/12)

b. Cermak shall develop and implement policies and procedures to assess inmates with mental illness; and to evaluate inmates' mental health needs. Said policies shall include definitions of emergent, urgent, and routine mental health needs, as well as timeframes for the provision of services for each category of mental health needs. (10/12)

i. Cermak shall provide the designated CCDOC official responsible for inmate disciplinary hearings with a mental health caseload roster listing the inmates currently receiving mental health care. (6/12)

j. When CCDOC alerts Cermak that an inmate is placed in lock down status for disciplinary reasons, a Qualified Mental Health Professional will review the disciplinary charges against inmate to determine the extent to which the charge was related to serious mental illness. The Qualified Mental Health Professional will make recommendations to CCDOC when an inmate's serious mental illness should be considered as a mitigating factor when punishment is imposed on an inmate with a serious mental illness and to minimize any deleterious effect of disciplinary measures on an inmate's mental health status. (10/12)

k. In the case of mentally ill inmates in segregation, CCDOC shall consult with Cermak to determine whether continued segregation is appropriate or whether the inmate would be appropriate for graduated alternative based on Cermak's assessment. (11/15)

l. Cermak shall ensure that mentally ill inmates in segregation receive timely and appropriate treatment, including completion and documentation of regular rounds in the segregation units at least once per week by adequately trained Qualified Mental Health Professionals or by Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional, in order to assess the serious mental health needs of inmates in segregation. Inmates who are placed in segregation shall be evaluated within 24 hours of placement and thereafter regularly evaluated by a Qualified Mental Health Professional, or by a Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional to determine the inmate's mental health status, which shall include an assessment of the potential effect of segregation on the inmate's mental health. During these regular evaluations, Cermak shall provide CCDOC with its recommendation regarding whether continued segregation is appropriate or whether the inmate would be appropriate for graduated alternative based on the assessment of the Qualified Mental Health Professional, or Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional. (11/15)

m. Cermak shall maintain an updated log of inmates receiving mental health

services, which shall include both those inmates who receive counseling and those who receive medication. Cermak shall create such a log within six months of the date this Agreed Order is executed. The log shall include each inmate's name, diagnosis or complaint, and next scheduled appointment. Each clinician shall have ready access to a current log listing any prescribed medication and dosages for inmates on psychotropic medications. In addition, inmate's medical records shall contain current and accurate information regarding any medication changes ordered in at least the past year. (6/12)

61. Suicide Prevention Policy

    a. CCDOC shall participate with Cermak in a jointly established Suicide Prevention Committee charged with developing policies and procedures to ensure the appropriate management of suicidal inmates and with implementing and monitoring a suicide prevention program in accordance with generally accepted correctional standards of care.

    b. Cermak shall participate with CCDOC in a jointly established Suicide Prevention Committee charged with developing policies and procedures to ensure the appropriate management of suicidal inmates and with implementing and monitoring a suicide prevention program in accordance with generally accepted correctional standards of care.

    c. The suicide prevention policy shall include, at a minimum, the following provisions:
        (1) an operational description of the requirements for both pre-service and annual in-service training;
        (2) intake screening/assessment;
        (3) communication;
        (4) housing;
        (5) observation;
        (6) intervention; and
        (7) mortality and morbidity review. (11/13)

62. Suicide Precautions

    a. CCDOC shall ensure that, where suicide prevention procedures established jointly with Cermak involve correctional personnel for constant direct supervision of actively suicidal inmates or close supervision of special needs inmates with lower levels of risk (e.g., 15 minute checks), correctional personnel perform and document their monitoring and checks.

    b. Cermak shall ensure that, where suicide prevention procedures established jointly with CCDOC involve health care personnel for constant direct supervision of actively suicidal inmates or close supervision of special needs

inmates with lower levels of risk (e.g., 15 minute checks), health care personnel perform and document their monitoring and checks.

c. CCDOC shall ensure that when an inmate is identified as suicidal, the inmate shall be searched and monitored with constant direct supervision until the inmate is transferred to appropriate Cermak staff.

d. Cermak shall develop and implement policies and procedures for suicide precautions that will set forth the conditions of the watch, including but not limited to allowable clothing, property, and utensils, in accordance with generally accepted correctional standards of care. These conditions shall be altered only on the written instruction of a Qualified Mental Health Professional, except under emergency circumstances. (11/15)

63. Cermak shall ensure that Qualified Mental Health Staff assess and interact with (not just observe) inmates on Suicide Precautions, and document the assessment and interaction on a daily basis. (11/10)

64. Suicide Risk Assessments

a. Cermak shall ensure that any inmate showing signs and symptoms of suicide is assessed by a Qualified Mental Health Professional using an appropriate, formalized suicide risk assessment instrument within an appropriate time not to exceed 24 hours of the initiation of Suicide Precautions.

b. Cermak shall ensure that the risk assessment shall include the following:
   (1) description of the antecedent events and precipitating factors;
   (2) mental status examination;
   (3) previous psychiatric and suicide risk history;
   (4) level of lethality;
   (5) current medication and diagnosis; and
   (6) recommendations or treatment plan. Findings from the risk assessment shall be documented on both the assessment form and in the inmate's medical record. (11/13)

65. Cermak shall ensure that inmates will only be removed from Suicide Precautions after a suicide risk assessment has been performed and approved by a Qualified Mental Health Professional, in consultation with a psychiatrist. A Qualified Mental Health Professional shall write appropriate discharge orders, including treatment recommendations and required mental health follow-up. (11/15)

66. Suicide Prevention Policies

a. CCDOC shall ensure that suicide prevention policies established jointly with Cermak include procedures to ensure the safe housing and supervision of inmates based on the acuity of their mental health needs, in accordance with

generally accepted correctional standards.

    b.    **Cermak shall ensure that suicide prevention policies established jointly with CCDOC include procedures to ensure the safe housing and supervision of inmates based on the acuity of their mental health needs, in accordance with generally accepted correctional standards. (6/12)**

67.    **DFM shall ensure that cells designated by CCDOC or Cermak for housing suicidal inmates shall be retrofitted to render them suicide-resistant (e.g., elimination of protrusive shower heads, unshielded lighting or electrical sockets). Inmates known to be suicidal shall not be housed in cells with exposed bars. (6/12)**

68.    **Suicide Prevention Training**

    a.    **Cermak shall ensure that the Facility's suicide prevention curriculum for health care staff members, jointly established with CCDOC, addresses the following topics:**

        (1)    **the suicide prevention policy as revised consistent with this Agreed Order;**

        (2)    **why facility environments may contribute to suicidal behavior;**

        (3)    **potential predisposing factors to suicide;**

        (4)    **high risk suicide periods;**

        (5)    **warning signs and symptoms of suicidal behavior;**

        (6)    **observation techniques;**

        (7)    **searches of inmates who are placed on Suicide Precautions;**

        (8)    **case studies of recent suicides and serious suicide attempts (Serious suicide attempts are typically considered to be those that either were potentially life-threatening or that required medical attention);**

        (9)    **mock demonstrations regarding the proper response to a suicide attempt; and**

        (10)    **the proper use of emergency equipment, including suicide cut-down tools. (12/10)**

70.    **Cermak shall document inmate suicide attempts at the Facility, as defined by the Suicide Prevention Committee's policies and procedure in accordance with generally accepted correctional standards, in the inmate's correctional record in CCDOC's new Jail Management System, in order to ensure that both correctional and health care staff will be aware at future intakes of past suicide attempts, if an inmate with a history of suicide attempts is admitted to the Facility again in the future. Cermak will begin to document this information within six months after execution of this Agreement. (6/12)**

86.    **Quality Management and Performance Measurement**

     a.    **Defendants shall each develop and implement written quality management policies and procedures, in accordance with generally accepted correctional standards, to regularly assess, identify, and take all reasonable measures to assure compliance with each of the provisions of this Agreed Order applicable to that Defendant.**

     b.    **Defendants shall each develop and implement policies to address and correct deficiencies that are uncovered during the course of quality management activities, including monitoring corrective actions over time to ensure sustained resolution, for each of the provisions of this Agreed Order applicable to that Defendant. (11/15)**

The complete list of provisions that were in partial compliance were as follows:

59.    **Assessment and Treatment**

     c.    **Cermak shall ensure that any inmate who screens positively for mental illness or suicidal ideation during the intake screening process, through a mental health assessment, or who is otherwise referred for mental health services, receives a clinically appropriate mental health evaluation in a timely manner, based on emergent, urgent, and routine mental health needs, from a Qualified Mental Health Professional, or Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional. Such mental health evaluation shall include a recorded diagnosis section on Axis I, II, and III, using the DSM-IV-TR, or subsequent Diagnostic and Statistical Manual of the American Psychiatric Association. If a Qualified Mental Health Professional, or a Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional, finds a serious mental illness, they shall refer the inmate for appropriate treatment. Cermak shall request and review available information regarding any diagnosis made by the inmate's community or hospital treatment provider, and shall account for the inmate's psychiatric history as a part of the assessment. Cermak shall adequately document the mental health evaluation in the inmate's medical record.**

     d.    **Cermak shall ensure clinically appropriate and timely treatment for inmates, whose assessments reveal serious mental illness or serious mental health needs, including timely and regularly scheduled visits with Qualified Mental Health Professionals or with Qualified Mental Health Staff, with appropriate, on-site supervision by a Qualified Mental Health Professional.**

     e.    **Cermak shall ensure that treatment plans adequately address inmates' serious mental health needs and that the plans contain interventions specifically tailored to the inmates' diagnoses.**

f.     Cermak shall provide 24-hour/7-day psychiatric coverage to meet inmates' serious mental health needs and ensure that psychiatrists see inmates in a timely manner.

g.    Cermak shall ensure timely provision of therapy, counseling, and other mental health programs for all inmates with serious mental illness.    This includes adequate number of Qualified Mental Health Staff to provide treatment, and an adequate array of structured therapeutic programming.  Cermak will develop and implement policies and procedures defining the various levels of care and identifying the space, staffing, and programming that are appropriate to each identified level of care.

h.     Inmates shall have access to appropriate infirmary psychiatric care when clinically appropriate.

m.    In the case of mentally ill inmates in segregation, CCDOC shall consult with Cermak to determine whether continued segregation is appropriate or whether the inmate would be appropriate for graduated alternative based on Cermak's assessment.

n.    Cermak shall ensure that mentally ill inmates in segregation receive timely and appropriate treatment, including completion and documentation of regular rounds in the segregation units at least once per week by adequately trained Qualified Mental Health Professionals or by Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional, in order to assess the serious mental health needs of inmates in segregation. Inmates who are placed in segregation shall be evaluated within 24 hours of placement and thereafter regularly evaluated by a Qualified Mental Health Professional, or by a Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional to determine the inmate's mental health status, which shall include an assessment of the potential effect of segregation on the inmate's mental health.  During these regular evaluations, Cermak shall provide CCDOC with its recommendation regarding whether continued segregation is appropriate or whether the inmate would be appropriate for graduated alternative based on the assessment of the Qualified Mental Health Professional, or Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional.

n.     Cermak shall ensure that a psychiatrist, physician or licensed clinical psychologist conducts an in-person evaluation of an inmate prior to a seclusion or restraint order, or as soon thereafter as possible.  An appropriately credentialed registered nurse may conduct the in-person evaluation of an inmate prior to a seclusion or restraint order that is limited to two hours in duration. Patients placed in medically-ordered seclusion or restraints shall be

7

       evaluated on an on-going basis for physical and mental deterioration. Seclusion or restraint orders should include sufficient criteria for release.

o.      Cermak shall ensure an adequate array of crisis services to appropriately manage the psychiatric emergencies that occur among inmates. Crisis services shall not be limited to administrative segregation or observation status.

p.      Cermak shall ensure that inmates have access to appropriate acute infirmary care, comparable to in-patient psychiatric care, within the Cermak facility.

60.    Psychotherapeutic Medication Administration

a.      Cermak shall ensure that psychotropic medication orders are reviewed by a psychiatrist on a regular, timely basis for appropriateness or adjustment. Cermak shall ensure that changes to an inmate's psychotropic medications are clinically justified and documented in the inmate's medical record.

b.      Cermak shall ensure timely implementation of physician orders for medication and laboratory tests. Cermak shall ensure that inmates who are being treated with psychotropic medications are seen regularly by a physician to monitor responses and potential reactions to those medications, including movement disorders, and provide treatment where appropriate.

**Appendix I**




# COOK COUNTY SHERIFF'S OFFICE
## BUREAU OF INFORMATION AND TECHNOLOGY
### BUSINESS INTELLIGENCE UNIT

## Sheriff's Daily Report
## 11/3/2015

| Under the Custody of the Sheriff | |
|---|---|
| TOTAL MALE AND FEMALE | 10,886 |
| Jail Population | 8,765 |
| Community Corrections | 2,121 |

| Jail Population | |
|---|---|
| TOTAL MALE AND FEMALE | 8,765 |
| General Population (Male) | 7,385 |
| General Population (Female) | 520 |
| VRIC (Court Ordered) | 46 |
| PRC (Court Ordered Drug Treatment Program) | 553 |
| Women's Residential (Court Ordered Drug Treatment Program) | 149 |
| Outside Counties | 98 |
| Hospital | 14 |

| Community Corrections Population | |
|---|---|
| TOTAL MALE AND FEMALE | 2,121 |
| Electronic Monitoring (Court Ordered) | |
| Men | 1,785 |
| Women | 282 |
| Electronic Monitoring (Admin Ordered) | |
| Men | 0 |
| Women | 0 |
| Day Reporting (Court Ordered) | 31 |
| M.O.M.s Program (Court Ordered) | 7 |
| VRIC Post Release (Court Ordered) | 16 |

## Cook County Department of Corrections Executive Directors Log

| Date: | TUESDAY, NOVEMBER 3, 2015 | Prepared by: OFC. DENNIS |
|---|---|---|

| Division | | Available Bed Capacity | Actual Count |
|---|---|---|---|
| Division One | | 1246 | 957 |
| Division Two | Dorm One | 384 | 375 |
| | Dorm Two | 464 | 456 |
| | Dorm Three | 428 | 0 |
| | Dorm Four | 684 | 677 |
| Division Two Total: | | 1960 | 1508 |
| Division Three | | 347 | 263 |
| Cermak | 2nd Floor | 110 | 60 |
| | 3rd Floor | 66 | 49 |
| Cermak Total: | | 176 | 109 |
| Division Four | | 704 | 0 |
| Division Five | | 992 | 0 |
| Division Six | | 982 | 930 |
| Division Eight/RTU | | 979 | 878 |
| Division Nine | | 1042 | 964 |
| Division Ten | | 764 | 662 |
| Division Eleven | | 1524 | 1509 |
| Division Totals: | | 10,716 | 7,780 |
| PRC population at Division 2, Dorm 2 & Division 6 | | | 138 |
| Total General Population Divisional Population | | | 7,642 |

| Alternative Programs | |
|---|---|
| Men's Day Reporting | 31 |
| Electronic Monitoring | 1785 |
| PRC at 3-Annex | 415 |
| Alternative Programs Total: | 2231 |
| General population at 3-Annex | 263 |

| Sheriff's Women's Justice Program | |
|---|---|
| SWJP Residential | 149 |
| Sheriff's Female Furlough | 277 |
| Sheriff's Female Furlough Reporting | 5 |
| M.O.M.S. Program | 7 |
| SWJP Total: | 438 |

| CCDOC Hospital Count | |
|---|---|
| Stroger Hospital | 12 |
| Outlying Hospitals | 2 |
| Other | 0 |
| Hospital Total: | 14 |

| Shipments to IDOC Totals | | Outside Counties | |
|---|---|---|---|
| Males | 52 | DeWitt County | 8 |
| Females | 0 | Kankakee County | 50 |
| Total Shipments: | 52 | Livingston County | 25 |
| VRIC Post Release: | 16 | Mercer County | 0 |
| VRIC Camp: | 46 | Moultrie County | 0 |
| VRIC Sentenced: | 0 | Piatt County | 15 |
| Intake Information | | Henry County | 0 |
| Date: | 11/2/2015 | Jefferson County | 0 |
| Males | 275 | Marion County | 0 |
| Females | 50 | Rock Island County | 0 |
| Intake Total: | 325 | Total Housed Offsite: | 98 |

| | |
|---|---|
| - | Division Nine North Tower converted to speciality tiers, such as Disciplinary Segregation, Level System, Protective Custody and Administrative Segregation completed 12/07. |
| - | Division Nine's capacity to 1012. |
| - | Division Four's capacity to 704. |

| Division | | Count Under Available Beds Per Division | Count Over Available Beds Per Division |
|---|---|---|---|
| Division One | | 289 | 0 |
| Division Two | Dorm One | 9 | 0 |
| | Dorm Two | 8 | 0 |
| | Dorm Three | 428 | 0 |
| | Dorm Four | 7 | 0 |
| Division Two Total | | 452 | 0 |
| Division Three | | 84 | 0 |
| Cermak | 2nd Floor | 50 | 0 |
| | 3rd Floor | 17 | 0 |
| Cermak Total | | 67 | 0 |
| Division Four | | 704 | 0 |
| Division Five | | 992 | 0 |
| Division Six | | 52 | 0 |
| Division Eight/RTU | | 101 | 0 |
| Division Nine | | 78 | 0 |
| Division Ten | | 102 | 0 |
| Division Eleven | | 15 | 0 |
| | | Beds Not Used: | 2936 |
| | | Bed Count Over Divisional Capacities: | 0 |

| | Available Beds | | Tiers Closed | Number of Beds |
|---|---|---|---|---|
| Division One | Maximum | 10 | 7 | 264 |
| Division Two | Minimum | 1 | 9 | 428 |
| Division Three | Female Detainees | 37 | 1 | 60 |
| Division Four | | 0 | 17 | 704 |
| Division Five | | 0 | 24 | 992 |
| Division Six | Medium | 44 | 0 | 0 |
| Cermak | Medical | 23 | 0 | 0 |
| Division Eight/RTU | | 90 | 0 | 0 |
| Division Nine | Maximum/Specialty | 29 | 2 | 54 |
| Division Ten | Medical/Psych Tier | 33 | 0 | 0 |
| Division Eleven | Medium | 0 | 0 | 0 |

| | Totals for Tiers Closed and Number of Cells: | 60 | 2502 |
|---|---|---|---|

| | |
|---|---|
| Beds not available due to them being female detainees only | 704 |
| Beds not available due to them being medical detainees only | 98 |
| Beds not available due to them being on specialty tiers (Division Nine) | 21 |
| Beds not available due to them being Maximum security | 23 |
| School tier beds | 51 |
| Worker tier beds | 4 |
| Unassigned beds to be filled with Minimum and Medium General Population | 171 |
| Total: | 975 |

**Appendix II**

## 59.     Assessment and Treatment

**a.     Results of mental health intake screenings (see provision 45.c, "Intake Screening") will be reviewed by Qualified Mental Health Staff for appropriate disposition.**

**Compliance Assessment: Substantial compliance (since June 2012).**

**Factual Findings:**

**May 2014 Metzner assessment:** Little change from November 2013. Still concerned re: likely false positive screening numbers.

**November 2014 Cermak Status Update**

From intake referrals by nursing personnel (female intake = RN; male intake = RN or other nursing designees) conducting screening upon all incoming inmates in RCDC, to the secondary mental health assessments, the following referral numbers represent the percentage of referrals to mental health by month from May 2014 through September 2014, which show that the male intake and secondary mental health referrals are remaining essentially constant at this point, while there is a marked increase in female referrals to secondary mental health assessment. Further investigation by the way of a QI study of the Initial Intake Evaluation will need to be conducted.

SECONDARY MENTAL HEALTH REFERRALS GENERATED BY INTAKE NURSING:

| Male % | Referral | Total | Female% | Referral | Total | |
|---|---|---|---|---|---|---|
| May_2014 | 23.37% | 832 | 3560 May_2014 | 57.08% | 246 | 431 |
| Jun_2014 | 22.41% | 762 | 3401 Jun_2014 | 64.30% | 272 | 423 |
| Jul_2014 | 24.82% | 865 | 3485 Jul_2014 | 63.79% | 273 | 428 |
| Aug_2014 | 22.48% | 918 | 4083 Aug_2014 | 65.46% | 290 | 443 |
| Sep_2014 | 22.17% | 774 | 3491 Sep_2014 | 79.42% | 274 | 345 |

The chart below looks at the data from all new admissions to the mental health caseload, by month and gender.   The charts reflect those inmates identified and classified as P-2, P-3, or P-4 during the secondary mental health assessment at intake or within the three days following admission versus those who were placed on the mental health caseload at some later point during incarceration. The inter-rater reliability study has not yet been conducted for the Mental Health Specialists within RCDC due to staffing levels and other competing priorities. The data reflects continual improvements in identifying mentally ill inmates at the onset of incarceration.

MENTAL HEALTH CASELOAD GENERATED BY INTAKE V. DURING INCARCERATION:

| Admit Month | Male Mental Health Classification within 3 day after Admit | Mental Health Classification During Incarceration |
|---|---|---|
| 9_2014 | 95.28% | 4.72% |
| 8_2014 | 92.32% | 7.68% |

| 7_2014 | 90.12% | 9.88% |
| 6_2014 | 89.37% | 10.63% |
| 5_2014 | 87.22% | 12.78% |

Admit Month Female
          Mental Health Classification within 3 day after Admit          Mental Health Classification
During Incarceration

| 9_2014 | 93.68% | 6.32% |
| 8_2014 | 88.09% | 11.91% |
| 7_2014 | 83.73% | 16.27% |
| 6_2014 | 87.20% | 12.80% |
| 5_2014 | 81.95% | 18.05% |

**November 2014 Metzner assessment:** Substantial compliance remains.

**b.     Cermak shall develop and implement policies and procedures to assess inmates with mental illness; and to evaluate inmates' mental health needs. Said policies shall include definitions of emergent, urgent, and routine mental health needs, as well as timeframes for the provision of services for each category of mental health needs.**

**Assessment:** Substantial compliance (since October 2012)

> **i.     Cermak shall provide the designated CCDOC official responsible for inmate disciplinary hearings with a mental health caseload roster listing the inmates currently receiving mental health care.**

**Assessment:** Substantial compliance (since June 2012)

**Factual Findings:**

**October 2012 Cermak Status Update**

- Cerner is now able to generate a patient roster for the mental health caseload to provide to the CCDOC; however, it does not yet include the level of care/mental health classification as this is being built within the alert system.

**November 2013 Metzner assessment:** Substantial compliance continues.

**November 2014 Cermak Status Updates**

Cerner and CCOMS now have a fully operational, direct interface which makes mental health classification/level of care immediately and accurately available to CCDOC by midnight each day.

**November 2014 Metzner assessment:** No change

> **j.     When CCDOC alerts Cermak that an inmate is placed in lock down status for disciplinary reasons, a Qualified Mental Health Professional will review the**

disciplinary charges against inmate to determine the extent to which the charge was related to serious mental illness. The Qualified Mental Health Professional will make recommendations to CCDOC when an inmate's serious mental illness should be considered as a mitigating factor when punishment is imposed on an inmate with a serious mental illness and to minimize any deleterious effect of disciplinary measures on an inmate's mental health status.

**Assessment:** Substantial compliance continues (since October 2012).

**Factual Findings:**

**November 2015 Metzner assessment:** Substantial compliance continues

m. **Cermak shall maintain an updated log of inmates receiving mental health services, which shall include both those inmates who receive counseling and those who receive medication. Cermak shall create such a log within six months of the date this Agreed Order is executed. The log shall include each inmate's name, diagnosis or complaint, and next scheduled appointment. Each clinician shall have ready access to a current log listing any prescribed medication and dosages for inmates on psychotropic medications. In addition, inmate's medical records shall contain current and accurate information regarding any medication changes ordered in at least the past year.**

**Compliance Assessment:** Substantial compliance (since June 2012)

**Factual Findings:**

**June 2012 Metzner assessment:** In addition to the above update section, staff demonstrated a capacity to also include dosages of the psychotropic medications in the required log.

**October 2012 Cermak Status Update**

- The mental health roster has been updated. The roster is being updated routinely. Any inmate on the roster who is identified as missing an ICD 9 code as the result of data entry of a free text or another issue in Cerner is subsequently referred to a psychiatrist for entry of a diagnosis and problem in correspondence to any prescription of a psychotropic medication.

**November 2014 Metzner assessment:** No change.

61. **Suicide Prevention Policy**
    a. **CCDOC shall participate with Cermak in a jointly established Suicide Prevention Committee charged with developing policies and procedures to ensure the appropriate management of suicidal inmates and with implementing and monitoring a suicide prevention program in accordance with generally accepted correctional standards of care.**

b. **Cermak shall participate with CCDOC in a jointly established Suicide Prevention Committee charged with developing policies and procedures to ensure the appropriate management of suicidal inmates and with implementing and monitoring a suicide prevention program in accordance with generally accepted correctional standards of care.**

c. **The suicide prevention policy shall include, at a minimum, the following provisions:**
   (1) **an operational description of the requirements for both pre-service and annual in-service training;**
   (2) **intake screening/assessment;**
   (3) **communication;**
   (4) **housing;**
   (5) **observation;**
   (6) **intervention; and**
   (7) **mortality and morbidity review.**

**Compliance Assessment:** Substantial compliance (11/13)

**Factual Findings:**

**November 2013 Metzner Assessment:** Significant improvement is noted in the Mortality & Morbidity Review reports, which are now using a root cause analysis format.

As described elsewhere in this report, problems remain relevant to the intake screening/assessment process, especially in the context of priority referrals and segregation admissions screening. These issues are addressed elsewhere in this report.

**November 2015 Metzner assessment:** My April 2015 recommendations were implemented. Substantial compliance continues.

63. **Cermak shall ensure that Qualified Mental Health Staff assess and interact with (not just observe) inmates on Suicide Precautions, and document the assessment and interaction on a daily basis.**

**Compliance Assessment:** Substantial compliance (since November 2010)

**Factual Findings:**

**November 2013 Metzner Assessment:** The EMRs of 10 inmates on suicide observation status were reviewed. Documentation was present in the EMR that mental health staff interacted with (not just observed) these inmates on Suicide Precautions and documented their assessment and interaction on a daily basis with one exception. A patient on 2N while on suicide precautions only received nursing notes one day, 10/20/13, which was a Sunday. There were no mental health assessment notes documented that day.

November 2014 Metzner assessment: No change.

64.    Suicide Risk Assessments

    a.    **Cermak shall ensure that any inmate showing signs and symptoms of suicide is assessed by a Qualified Mental Health Professional using an appropriate, formalized suicide risk assessment instrument within an appropriate time not to exceed 24 hours of the initiation of Suicide Precautions.**

    b.    **Cermak shall ensure that the risk assessment shall include the following:**
        (1)  **description of the antecedent events and precipitating factors;**
        (2)  **mental status examination;**
        (3)  **previous psychiatric and suicide risk history;**
        (4)  **level of lethality;**
        (5)  **current medication and diagnosis; and**
        (6)  **recommendations or treatment plan. Findings from the risk assessment shall be documented on both the assessment form and in the inmate's medical record. (11/13)**

66.    Suicide Prevention Policies

    a.    **CCDOC shall ensure that suicide prevention policies established jointly with Cermak include procedures to ensure the safe housing and supervision of inmates based on the acuity of their mental health needs, in accordance with generally accepted correctional standards.**

    b.    **Cermak shall ensure that suicide prevention policies established jointly with CCDOC include procedures to ensure the safe housing and supervision of inmates based on the acuity of their mental health needs, in accordance with generally accepted correctional standards.**

**Compliance Assessment:** Substantial compliance (since June 2012)

**Factual Findings:**

November 2014 Metzner assessment: No change

67.    **DFM shall ensure that cells designated by CCDOC or Cermak for housing suicidal inmates shall be retrofitted to render them suicide-resistant (e.g., elimination of protrusive shower heads, unshielded lighting or electrical sockets). Inmates known to be suicidal shall not be housed in cells with exposed bars.**

**Compliance Assessment:** Substantial compliance (since June 2012)

**Factual Findings:**

**October 2012 Cermak Status Update:**

- Inmates known to be suicidal are not housed in cells with exposed bars; rather, they are transported under 1:1 observation by a CO to Cermak and placed into a suicide resistant cell, as ordered by a psychiatrist, when deemed to be a suicide risk, and placed on close or constant observation, as ordered in Cerner.

**November 2014 Metzner assessment:** No change.

**68. Suicide Prevention Training**

    a. **Cermak shall ensure that the Facility's suicide prevention curriculum for health care staff members, jointly established with CCDOC, addresses the following topics:**

        (1) **the suicide prevention policy as revised consistent with this Agreed Order;**

        (2) **why facility environments may contribute to suicidal behavior;**

        (3) **potential predisposing factors to suicide;**

        (4) **high risk suicide periods;**

        (5) **warning signs and symptoms of suicidal behavior;**

        (6) **observation techniques;**

        (7) **searches of inmates who are placed on Suicide Precautions;**

        (8) **case studies of recent suicides and serious suicide attempts (Serious suicide attempts are typically considered to be those that either were potentially life-threatening or that required medical attention);**

        (9) **mock demonstrations regarding the proper response to a suicide attempt; and**

        (10) **the proper use of emergency equipment, including suicide cut-down tools.**

**Compliance Assessment:** Substantial compliance (since December 2010)

**Factual Findings:**

**April 2013 Metzner assessment:** Relevant training continues to be provided to staff by the mental health staff.

**November 2013 Metzner assessment:** No change.

**May 2014 Cermak Status Update**

**DOC Advanced Mental Health Training for In-Service:** The DOC has now initiated its second of many scheduled two-week in-service training courses for existing DOC tenured Correctional Officers in Advanced Mental Health Training to include Crisis Intervention Training (CIT) and Cermak Health Services participates in the CIT component through a Correctional Psychologist who describes the Cermak mental health delivery system and the mental health classification

procedure as well. This program is provided at the jail on-site in training facilities within the compound although it is from the Academy curriculum.

**Cermak Suicide Prevention Training:** The Cermak mental health training in Suicide Prevention for mental health, nursing and medical professionals is ongoing and is offered routinely to ensure that all staff maintain their current status in suicide training according to policy requirements. A Correctional Psychologist provides this training at least twice annually to assure ongoing adherence to requirements in training and also offers Restraint Training as well.

## November 2014 Cermak Status Updates

Same as above, training continues for all disciplines as described in May 2014 Cermak Status Update.

**November 2014 Metzner assessment:** No change

**70.** **Cermak shall document inmate suicide attempts at the Facility, as defined by the Suicide Prevention Committee's policies and procedure in accordance with generally accepted correctional standards, in the inmate's correctional record in CCDOC's new Jail Management System, in order to ensure that both correctional and health care staff will be aware at future intakes of past suicide attempts, if an inmate with a history of suicide attempts is admitted to the Facility again in the future. Cermak will begin to document this information within six months after execution of this Agreement.**

**Compliance Assessment:** Substantial compliance (since June 2012)

**Factual Findings:**

**October 2012 Cermak Status Update:**
- All inmate serious suicide attempts are monitored and reported at the Suicide Prevention Committee that occurs on the fourth Friday of each month in Cermak, conducted by the Chief Psychologist, with an agenda and minutes maintained. A detailed report of each serious suicide is completed and reviewed by a Correctional Psychologist at the committee meeting following the attempt and it is treated as a morbidity review for the learning experience. CCDOC incident reports and Cermak medical records as well as court reports are included in the morbidity review. Serious suicide attempts are also reported to the monthly overall CQI committee and to the Sheriff's Office. Any serious suicide attempt also receives an alert in Cerner and in IMACS which is now also passed on to the Courts so that they are aware of any history as well. There had been two instances of serious attempts in court, where the court was not aware of prior attempts. As a result, the Court now participates in the monthly suicide prevention meeting and is now aware of these alerts in Cerner and IMACS, a notable improvement directly attributable to a serious suicide attempt.

**October 2012 Metzner assessment:** Substantial compliance continues.

**May 2014 Cermak Status Update:**

**Suicide Prevention Committee Review:** The Suicide Prevention Committee attempts to meet on the fourth Friday each month and the agenda has a standing item to review any and all serious suicide attempts for patterns that could identify areas for improvement to prevent future occurrences from repeating events. Meeting minutes reflect review of individual cases and ongoing efforts to prevent recurrence by efforts to correct any deficiencies identified. DOC, Cermak, the Sheriff's Office and the Court Officials all participate in this multi-disciplinary meeting.

**November 2014 Cermak Status Updates**

**Suicide Prevention Committee Review:** The Suicide Prevention Committee attempts to meet on the fourth Friday each month and the agenda has a standing item to review any and all serious suicide attempts for patterns that could identify areas for improvement to prevent future occurrences from repeating events. Meeting minutes reflect review of individual cases and ongoing efforts to prevent recurrence by efforts to correct any deficiencies identified. DOC, Cermak, the Sheriff's Office and the Court Officials all participate in this multi-disciplinary meeting. Full Root Cause Analyses are completed during these meetings for any completed suicides occurring in the 30 days prior. Root Cause Analyses are also used for other sentinel events as determined by administration. RCAs for two completed suicides since last site visit provided as password protected files under separate cover.

**November 2014 Metzner assessment:** Substantial compliance continues

**Appendix III**

## Appendix III

**Mental health provisions of the Agreed Order monitored by other monitors**

H.    **QUALITY MANAGEMENT AND PERFORMANCE MEASUREMENT**

c.    **CCDOC shall participate with Cermak and DFM in a jointly established Health Care Quality Improvement Committee, to be charged with developing and implementing a joint quality improvement program. CCDOC shall contribute the time and effort of CCDOC staff members who, by virtue of their authority, current responsibilities, and/or past experience, can provide this committee with needed correctional representation.**

d.    **Cermak shall participate with CCDOC and DFM in a jointly established Health Care Quality Improvement Committee, to be charged with developing and implementing a joint quality improvement program. Cermak will work with CCDOC and DFM to identify those CCDOC and DFM staff members who, by virtue of their authority, current responsibilities, and/or past experience, can provide this committee with needed correctional representation.  Quality management programs related to medical and mental health care will utilize performance measurements to assess quality of care and timely access to care with quantitative and qualitative data analysis and trending over time.**

e.    **DFM shall participate with CCDOC and Cermak in a jointly established Health Care Quality Improvement Committee, to be charged with developing and implementing a joint quality improvement program.  DFM shall contribute the time and effort of DFM staff members who, by virtue of their authority, current responsibilities, and/or past experience, can provide this committee with needed correctional representation.**

**Compliance Assessment:** Refer to the report by Dr. Shansky (initially found to be in substantial compliance during 2011 and again during 2013)

69.    **CCDOC shall ensure that security staff posts will be equipped, as appropriate, with readily available, safely secured, suicide cut-down tools.**

**Compliance Assessment:** Refer to the report by Susan McCampbell.

**Appendix IV**

AGREED ORDER

## D.   MENTAL HEALTH CARE

### 59.   Assessment and Treatment

**c.**   **Cermak shall ensure that any inmate who screens positively for mental illness or suicidal ideation during the intake screening process, through a mental health assessment, or who is otherwise referred for mental health services, receives a clinically appropriate mental health evaluation in a timely manner, based on emergent, urgent, and routine mental health needs, from a Qualified Mental Health Professional, or Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional. Such mental health evaluation shall include a recorded diagnosis section on Axis I, II, and III, using the DSM-IV-TR, or subsequent Diagnostic and Statistical Manual of the American Psychiatric Association. If a Qualified Mental Health Professional, or a Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional, finds a serious mental illness, they shall refer the inmate for appropriate treatment. Cermak shall request and review available information regarding any diagnosis made by the inmate's community or hospital treatment provider, and shall account for the inmate's psychiatric history as a part of the assessment. Cermak shall adequately document the mental health evaluation in the inmate's medical record.**

**Compliance Assessment:**

Partial compliance with paragraph c.

**Factual Findings:**

**November 2015 Cermak Status Update**

Cermak has begun tracking responses from other facilities and providers in response to Request for Medical Records. Dr. Gomez requested that Medical Records add another metric to the collectable data- length of time that takes responses to arrive, further updates to follow. The rate of return is insufficient and a plan to "personalize" data collection will be formulated through speaking with the Medical Records Departments of the main "feeder" institutions including Chicago Read, the VA system and large community hospitals to facilitate the said exchange of information.

|          | **Mental Health** | **Med/ Surg** |  |
|----------|-------------------|----------------|--|
| **June 15** | **Sent 63 Recvd 22** | **Sent 33 Recvd 10** |  |

| | 34.9% | 30.3% | |
|---|---|---|---|
| July 15 | Sent 49 Recvd 27 | Sent 38 Recvd 19 | |
| | 55.1% | 50.0% | |
| August 15 | Sent 39 Recvd 17 | Sent 47 Recvd 17 | |
| | 43.6% | 36.2% | |
| September 15 | Sent 29 Recvd 9 | Sent39 Recvd 15 | |
| | 31.0% | 38.5% | |

All Providers, Psychologists, MSW and MHS have received their personalized access to the Jail Data Link database allowing them to source data about previous admissions to municipal and state institutions receiving federal grants or directly administered by the State of IL. All Providers, Psychologists, MSW and MHS have personalized access to the Jail Management System (CCOMS) allowing them to review charges, legal and disciplinary history in real time. All the WYSE terminals and desktops that Cermak utilizes across the compound (including RCDC) permit CCOMS access.

Since the April 2015 visit Cermak has reviewed, revised and updated relevant policies by October 1, 2015. Drs. Kelner and Key participated in the revision process of the relevant policies. Updated policies are currently posted on Cermak's Intranet and available for review. Unit Directors continued with annual policy reviews for MHS/ MSW during group supervisions in respective clinical areas. The following policies have been reviewed with Cermak's doctoral level Providers and Mental Health Specialists/Social Workers/Art Therapists: :

1. In person on 09/10/2015: D-02.1, E-05, E-06.1, E-08, E-09, E- 13.2, E-13.2, E-15, I-01, I-02, I-02.1, I-04, I-05, I-05.1, G-04, G-04.1.
2. On Cermak Intranet: G-03, G-05, G-12, D-01.8.

Unit Directors have continued with annual policy reviews for MHS/ MSW during group supervisions in respective clinical areas. In October 2015, all staff received overviews of the Cermak policies most affecting MHS operations and staff, including: A-01, A-11, B-02, B-03, B-04, B-06, B-08, D-08, E-02, E-05, E-07, E-08, E-09, E-12.2, E-14, G-02, G-03, G-04, G-05, G-06, G-12, H-01, H-02, I-02, I-05 and I-07. Training in Suicide Prevention and Intervention was completed in Sept and October 2015 with 97% of all MHS completing the training. All MHS staff can access all policies via the Cermak intranet.

Mental Health Caseload: October 2015

Total Jail Population as of 10/01/2015: 8,751

| | | | |
|---|---|---|---|
| P2-Outpatient Mental Health | 1571 | 17.94% (of total) | 77.6% (of MH load) |
| P3- Intermediate Mental Health | 382 | 4.36% (of total) | 18.8% (of MH load) |
| P4- Infirmary Mental Health | 69 | 0.78% (of total) | 3.4 % (of MH load) |

Total                            2022        23.08%

The percentage of P3 detainees has decreased from 23% to 18.8% even though the MH caseload has increased by 466 detainees. Aside from intrinsic/system specific factors (analyzed below) there is a general consensus that the demographics of the detainees entering the CCDOC campus, in spite of robust jail diversion efforts by CCDOC and the expansion of alternative programs, reflect to some degree the state of affairs in local communities where massive closure of city clinics serving Cook County residents has taken place. Out of 12 clinics, 6 have been closed between 2012 and 2014 with the resultant worsening of access to care for hundreds of the mentally ill residents. Furthermore, community trends point in the direction of snowballing difficulties in terms of access to Mental Health Care.

As a result, we have been witnessing that the mentally ill enter the jail, in many cases, with untreated or undertreated conditions and contribute to the pool of patients requiring higher levels of care. Secondary mental health intake assessments completed during July – September 2015 resulted in 20% of males being placed on the mental health caseload at the intermediate level of care and 15% resulting in special care unit admissions. For female admissions during the same time frame, 22% were placed on the caseload at the intermediate level of care and 9%resulted in special care unit admissions. The intake mental health staff continues to identify the seriously mental ill at a rate of above 90% for male detainees and approximately 88% for female detainees. See Excel Appendix.

The psychologist supervising the staff in the RCDC/Intake unit conducted a CQI audit of the charts of 101 detainees with a completed MH assessment (aka secondary assessment) to examine the quality of dispositions during Secondary Mental Health Assessments as well as rates of referrals for Secondary MH Screening in RCDC is attached in the appendix. In 94% of the cases reviewed the supervisor agreed with the clinical disposition of the QMHP.

Mental Health Leadership met with Director of Patient Care Services to discuss ways of improving the Initial Screening process in RCDC (the rate of referrals to Secondary MH Assessment/ the rate of false positives remains lower than expected). It was decided to analyze the existing instrument used by screeners in terms of sensitivity and balance it out against other imperatives during the screening process. It was decided to maintain the screen in its current form for the time being and instead focus on the process and fidelity of the screening assessment to Cermak policies and procedures. Next, the tool will be examined regarding any potential changes that may be indicated.

In the meantime, primary screeners were presented with an overview/refresher of the procedure. It was emphasized that the cut off score of 13 is important but not the only trigger to warrant further referral to mental health. There was a misconception that the total score on the 6-question screen is the only thing that matters when considering referrals to mental health following the initial CHS initial health screen. Any positive response to a mental health related question AND/OR a score of 13 or more on the 6-question screen results in an automatic referral to

mental health for an assessment. Screeners should be asking for lifetime use of mental health services. A detainee is to be referred to mental health for assessment at intake if the 6-question screen is positive AND / OR the detainee responds affirmatively to any of the other MH screening questions. We would expect to see a higher number of referrals going forward with clarifications provided.

Dr. Kelner reviewed psychiatry referrals originating in the intake process as per below. Chart review of patients identified as not seen was also conducted and can be found in the Appendix.

| Psychiatry Referrals from Intake | Emergency | | Urgent | | ROUTINE | |
|---|---|---|---|---|---|---|
| <4 Hrs | 138 | 80.23% | | | | |
| <24 Hrs | 11 | 6.40% | 140 | 87.50% | 27 | 5.09% |
| >24 Hrs but< 72 Hrs | 3 | 1.74% | 3 | 1.88% | 45 | 8.49% |
| >72 Hrs but< 14 days | 3 | 1.74% | 3 | 1.88% | 165 | 31.13% |
| >14 Days | 4 | 1.74% | 3 | 1.88% | 39 | 7.36% |
| D/C Before Range limit | | 0.00% | 1 | 0.63% | 178 | 33.58% |
| Not Seen | 10 | 5.81% | 10 | 6.25% | 76 | 14.34% |
| Total | 172 | | 160 | | 530 | |

To account for the previously noted high rate of referrals to the Special Care Unit (formerly referred to as the Infirmary) from RCDC the following may be relevant. Traditionally, certain charges have commanded increased scrutiny and clinical caution:

1. Alleged victim is very young (younger then 8yo)
2. Alleged victim is very old
3. Cases of incest
4. Cases of unusual, grotesque and wanton cruelty and deviant behavior (sexual sadism and mutilation of victims....i.e. dismemberment)
5. When HIV/ AIDS transmission is involved
6. High profile subjects (high ranking and or notable public officials, politicians, clergy, community activists, prominent businesspeople, heirs to fortunes, local celebrities)

These particular circumstances alone in many cases produce extraordinarily high levels of shame /guilt and leads to family disruption and withdrawal of support from detainees in turn leading to heightened vulnerability and suicide risk. The same gender situations can be even more damaging to family relationships due to acknowledged and unacknowledged feelings of homophobia in certain communities and deserve more scrutiny in terms of their impact on detainees. Traditionally, the cases that made it on the Chicago Breaking News were treated as high profile. Attempts were made to formalize Special Care Unit Admission criteria and the staff were instructed not to consider automatic Special Care Unit admissions for the above charges in

the absence of any prior MH history or current mental status findings. Some exceptions have been made and Predatory Criminal Sexual Assault charges qualify for Special Care Unit admission. Clinical caution in high profile cases causes a tendency to admit to Psychiatric Infirmary aggressively instead of collaborating with CCDOC seeking safer arrangements in PC, for instance.

Furthermore, as noted earlier, the psychologist supervising the MH staff in the RCDC/Intake unit that conduct the comprehensive MH assessment conducted an audit of 101 of charts. She concurred 100% with all dispositions from Intake to the Special Care Unit (SCU).

**November 2015 Metzner assessment:** My April 2015 recommendations were adequately addressed in the status update section.

Partial compliance remains relevant to referrals being seen by psychiatrists in the timeframe required by the Agreed Order. Based on the new data provided via the changes in the management information system, I think it is likely that the partial compliance is not due to staffing vacancies but related to detainees being transferred to the Special Care Unit (formerly referred to as the Infirmary) prior to being seen by a psychiatrist. I discussed with staff ways to further clarify this area in order to better assess the level of compliance.

The most problematic area was the percentage of routine referrals not being seen, which appeared to be related to tracking and scheduling issues that need to be handled via IT revisions. A work order has been recently placed to do so.

**Recommendations:** As above.

    **d.    Cermak shall ensure clinically appropriate and timely treatment for inmates, whose assessments reveal serious mental illness or serious mental health needs, including timely and regularly scheduled visits with Qualified Mental Health Professionals or with Qualified Mental Health Staff, with appropriate, on-site supervision by a Qualified Mental Health Professional.**

**Compliance Assessment:** Partial compliance

**Factual Findings:**
**November 2015 Cermak Status Update**

All programming hours and statistics relative to this provision can be found in the Mental Health Monthly Statistics Report (attached).

COMPOUND HOUSING PLAN BY MENTAL HEALTH LEVELS OF CARE (as of October 28, 2015)

Cermak- P4 (Psychiatric Special Care Unit)- 2N acute male, 2W-acute and chronic female, 2S/2SE- male subacute, 2E- male chronic, P4 can also be housed on the third floor in Medical Special Care Unit under special circumstances. Housing on 3S for Mental Health reasons requires Tx orders from PCC/ Dr. Mennella. Patients with M4 and P4 can be housed on the Medical Special Care unit based in interdisciplinary decision.

- Division I: NO MENTAL HEALTH HOUSING
- Division II: MALE MENTAL HEALTH HOUSING
  - Dorm 2: Mental Health Outpatient P2; **if any Mental Health Intermediates (P3) are placed there, Dr. Gary works transferring them to RTU; Westcare tiers - O/P/R (substance abuse, court ordered treatment program); Inmates on the mental health caseload require clearance from psychology and psychiatry prior to transfer to Westcare; CCDOC continues to house detainees that attend MHTC (Mental Health Transition Center) in Division II Dorm 2
  - Dorm 1: NO MENTAL HEALTH HOUSING
  - Dorm 3: NO MENTAL HEALTH HOUSING
  - Dorm 4: NO MENTAL HEALTH HOUSING
- Division III: Female MENTAL HEALTH HOUSING, P2, 3rd floor on 3A and 3B; there was a seg. unit on the 1ST floor for P2s and GPs until 10/30/15
- Division IV: No MENTAL HEALTH HOUSING
- Division V: NO MENTAL HEALTH HOUSING
- Division VI: MALE MENTAL HEALTH HOUSING
  - o Protective Custody: 2A, 2B and 2C
    - Mental Health Outpatient P2 (only require mental health clearance prior to placement/ within 24 h if restricted housing rules apply) **No Mental Health Intermediates P3 should be cleared by mental health to transfer to PC in Division VI; they should only be cleared for PC in Division VIII RTU
  - o Segregation: Tiers 1N and 1P, 2D- PC/seg.
    - Mental Health Outpatient P2 (require mental health clearance prior to placement/within 24 h) **No Mental Health Intermediates P3 should be cleared by mental health to transfer to segregation in Division VI; they should only be cleared for segregation in Division VIII RTU
- Division VIII RTU: MENTAL HEALTH HOUSING
  - o 5th floor Females
    - Mental Health Intermediates P3 (tiers B, F) Mental Health Outpatients P2 and DETOX (all other tiers)
    - Segregation (tier A) Protective Custody (tier E) (restrictive housing require mental health clearance prior to placement/within 24 h)
  - o 4th floor Males
    - Mental Health Intermediates P3 (all tiers)
    - Segregation (tier A) Protective Custody (tier E)

- Mental Health Intermediates P3 (restrictive housing require mental health clearance prior to placement/within 24 h)
  - o 3rd floor Males
    - Medical Intermediate M3s (may also be P2s) with overflow Mental Health Intermediate P3s
  - o 2nd floor Males
    - Mental Health Intermediate Overflow P3 (tier 2B)
    - Intensive Management Unit (tier 2A)
- Division IX: MALE MENTAL HEALTH HOUSING
  - o Protective Custody (Tiers 3E, 3F, 3G house alone/out alone/ admin. segregation, 3H PC)
    - Mental Health Outpatient P2 (restrictive housing require mental health clearance prior to placement/within 24h) **No Mental Health Intermediates P3 should be cleared by mental health to transfer to PC in Division IX; they should only be cleared for segregation in Division VIII RTU
  - o Segregation- non-administrative segregation (Tiers 1H and 1G as needed)
    - Mental Health Outpatient P2 (require mental health clearance prior to placement/within 24h) **No Mental Health Intermediates P3 should be cleared by mental health to transfer to segregation in Division IX; they should only be cleared for segregation in Division VIII - RTU
  - o Level System –Division 9 1E
    - Mental Health Outpatient P2 (require mental health clearance prior to placement/within 24h) **No Mental Health Intermediates P3 should be cleared by mental health to transfer to segregation in Division IX; they should only be cleared for segregation in Division VIII-RTU
  - o Special Incarceration (Tier SI)
    - Mental Health Outpatient P2 (require mental health clearance prior to placement/within 24h) **No Mental Health Intermediates P3 should be cleared by mental health to transfer to segregation in Division IX; they should only be cleared for segregation in Division VIII – RTU; Cermak Mental Health Leadership provides a higher level of review for detainees at P2 level admitted to SI during their 3 day stay there.

      Inmates may be in the level system for extended periods of time but DOC has made a commitment to have a 72 hour limit on anyone placed in SI barring extreme circumstances. If mental health leadership determine that someone is too ill to handle SI they are pulled out sooner than the 72 hours or prevented from going in at all. Deployment of safety garments in SI is recommended to CCDOC by QMHP's.

  - o General Population (all other tiers in the division)
    - Mental Health Outpatient P2

- Division X: MALE MENTAL HEALTH HOUSING: Mental Health Outpatient P2 **if any Mental Health Intermediates (P3) are placed there, Dr. Gary works on transferring them to RTU
    - )
    - Disciplinary Segregation– 1A; 1D (require mental health clearance prior to placement/within 24 h or preplacement)
    - Protective Custody -1C (clean) and 2C
        - **No Mental Health Intermediates should be cleared by mental health to transfer to segregation/PC in Division X; they should only be cleared for segregation in Division VIII RTU
- Division XI: NO MENTAL HEALTH HOUSING
- Division XIV: NO MENTAL HEALTH HOUSING
- Division XVI (Boot Camp): NO MENTAL HEALTH HOUSING
- Division XVII (Women's Justice): FEMALE MENTAL HEALTH HOUSING
    - Mental Health Intermediates P3 (requires clearance from DWJS staff)
    - Mental Health Outpatients P2 (requires clearance from DWJS staff)

## Compound Housing Discussions

Following several walk around tours and strategic meetings between CCDOC and Cermak, there has been no further development on the Division XI project and plans to relocate P2 detainees from Divisions II, VI, IX and X have been tabled indefinitely.

Mental Health Transition Center: A letter was written by Sheriff Dart to CCHHS Leadership asking for assistance in the transition to the residential MHTC in July 2015. A series of meetings took place between agencies to assess the work needed to facilitate MHTC's transition to its residential form. In order to maximize available human and equipment resources, as well as access to the program by the greatest number of P2 detainees, Cermak suggested Div. 2 Dorm 2 be entirely relocated to the MHTC Program. It was decided that the planned transition would have to be pushed back following the completion of other ongoing housing plan projects on the compound. CCHHS seeded 3 million dollars for additional hiring to staff the transition center program.

Proposed movement to Division 4, which was intended to merge Division III and Division XVII (SWJP), has been pushed back following the completion of other ongoing housing projects on the compound.

In September 2015 CCDOC Leadership proposed to move SMU tiers from Divisions X and IX to Division V. A series of interagency meetings were held to identify clinical and programming space and to develop staffing and programming plans for Cermak and CCDOC staff. No decision has been made to finalize that plan.

RTU staffing levels.

|  | RTU 5th floor females (also cover Div. 3) | RTU 4th floor (+ 2nd and 3rd floors) |
|---|---|---|
| Psychiatrist | 1.2 | 1.4 |
| Psychologist/Unit Director | 1.0 | 1.0 |
| Social workers | 1.0+ 1.0 Expressive therapist | 1.0+1.0 Expressive therapist |
| Mental Health Specialists | 2MHS III +4MHS II on AM 2MHS III + 2MHSII on PM | 4MHS III + 4MHS II on AM 4MHS III + 1MHS II on PM 1MHS III + 1 MHS II on Midnight Shift ( for the whole RTU) |
| Population | P3 78   P2 114 ( 192) | P3 264   P2 3 ( 267) |

RTU total population 637
P2 200
P3 378
Detainees with medical alerts/detox on the second and third floors 178

**MALE RTU**

RTU 4th floor has implemented several changes since April of 2015 to increase treatment programming, individualize mental health services, and enhance the treatment milieus. In the past, other divisions held P3 overflow while detainees awaited bed space. Mental Health and CCDOC in RTU worked together to create an overflow dorm on the second floor to house P3s in one building. MH staff from the 4th floor provide on tier group sessions and brief individual follow up to assess and monitor patients. In addition to the P3 overflow dorm on 2B, the second floor of RTU will house the Intensive Management Unit (IMU), which will provide a structured program for high risk detainees in CCDOC. Selected personnel from mental health, CCDOC, nursing, and correctional rehabilitation services will collaborate to develop and implement individualized treatment plans for detainees housed on this unit. Mental health staff will provide individual and group sessions to address the social, emotional, psychological, and psychiatric needs of the patients.

During the DOJ visit in April of 2015, the poor hygiene of some detainees was observed to disrupt the treatment milieu on RTU dorms. Many of the identified individuals were chronically mentally ill, noncompliant with psychotropic medication, and noncompliant with treatment groups. Mental health staff and CCDOC subsequently collaborated to develop a "low functioning dorm" on tier 4B. In general, individuals housed on this dorm are chronically mentally ill and/or cognitively delayed. Several higher functioning detainees remain on the unit to model and encourage positive behaviors. Mental health staff identifies appropriate candidates for this dorm during weekly multidisciplinary team meetings (MDT's). Treatment programming

for this tier was adjusted to address patient needs. Specifically, additional on tier groups were added to facilitate participation and monitoring on the dorm. Mental health staff focuses strongly upon hygiene, self-care, and medication compliance. Patients on this tier collectively developed a list to document showers of all detainees on the dorm to assess daily self-care. Individuals who have severe and ongoing problems with hygiene/grooming are placed on a self-care behavioral plan that is kept in the tier blue book for input from both mental health and security staff. Following an interagency decision to provide "assisted hygiene interventions" for detainees with SMI refusing basic hygiene in RTU and in the Psychiatric Special Care Units, changes were made in the handling of detainees with poor hygiene. An understanding was reached between Public Defenders' Office, CCDOC, ASA, Cermak, and other interested parties that "the Warden" has a duty to provide hygiene over the objections of detainees when public health is at stake. The appropriate legal body of work is available elsewhere. Presently, detainees in need of hygienic procedures (excluding, thus far, haircutting) are to be admitted in a preplanned way to the psychiatric special care unit where Dr. Key and the Superintendent have developed the hygiene protocol allowing for the coordinated administration of hygienic services. When warranted, detainees displaying disorganization of behavior (along with the other salient criteria) are considered and petitioned for the nonemergency administration of psychotropic medications.

In August of 2015, mental health staff and Commander Dominguez conducted community meetings on each tier of the fourth floor to encourage participation in the treatment milieu. At that time, each tier was introduced to the specific mental health specialists assigned to their dorm for day and evening shifts. Expectations for treatment participation, medication compliance, and general conduct were reviewed. Detainees were informed they could earn incentives with appropriate behavior and treatment compliance including participation in a morning walking group off the tier as well as outside recreation in the yard. Mental health staff recommends patients for the walking group and for outside yard each week to reward individuals who have attended groups, complied with medication, and demonstrated effective self-control on the tiers. Since 9/23, selected detainees have been able to participate in the yard incentive on three occasions. Periodically, the incentive has been cancelled due to CCDOC staffing issues and/or problems within the jail that necessarily prohibited such movement.

In terms of treatment programming, mental health staff have been providing at least 10 hours of treatment groups per detainee per week, including both on tier and off tier groups. Currently, mental health staff provide off tier groups from 9am until 12 on all days of the week. In addition, several on tier groups are held during the day to encourage self-care (Rise and Shine) and to promote communication about relevant issues (Community Meeting). An on tier "Reflection Group" was added during the evening to provide detainees with the opportunity to discuss personal goals and potential barriers to success. Detainees are also encouraged to participate in on tier movie discussion groups as well as off tier expressive therapy groups. While most groups have been conducted by bed number, a few mental health staff have experimented with voluntary "sign up" groups. The following topics were offered to certain dorms: Healthy Relationships, Grief and Loss, Employment, and Book Club. Mental health staff

and detainees provided positive feedback regarding the voluntary groups. Consequently, the 4th floor will aim to provide more voluntary sign-up groups as we implement the individualized treatment card program that has already started on the 5th floor.

P3 detainees continue to have individual contacts with MH staff through 1 to1 follow up with assigned clinicians, use of Health Service Request Forms (HSRF's), and crisis intervention or "psych evals." P2 detainees access mental health services through HSRF's and crisis intervention as needed.

DOJ has recommended increased out of cell time for detainees on segregation units. In July 25, 2015, tables on the segregation unit of the 4th floor (4A) were fitted with rings to safely shackle detainees. In August of 2015, treatment groups began on this tier with selected staff from mental health and CCDOC. To date, mental health staff has co-facilitated groups on Tuesday, Wednesday, and Thursday mornings. This schedule intended to acclimate staff and participants to general procedures. Mental health staff will begin conducting groups from Monday through Friday during both day and evening shifts to eventually provide approximately 10 hours of group on the tier per week. The Superintendent and Commander requested no treatment programming on the weekends due to staffing issues and potential conflicts with detainee visits. In addition to group programming, mental health staff conducts segregation rounds once per week. Detainees are also seen for individual follow up.

Regarding challenges, mental health staff absences and staff having to be pulled to cover other clinical areas continue to impact programming, as do shortages in CCDOC staffing. To illustrate, off tier groups have been reduced on multiple evenings and weekends since July due to "lockdowns," lack of movement officers, and periods of essential movement. Staff is encouraged to make up groups that are missed whenever possible and to follow up with their individual caseloads as regularly as possible. Limited space and computers make it difficult to conduct all clinical activities and charting before 2pm when CCDOC conducts count. Further, motivating detainees to participate in treatment often remains a struggle. Staff attempt to provide incentives and encouragement as much as possible. Ideally, the treatment cards will provide added incentive for detainees. Mental Health staff, nursing, and CCDOC continue to collaborate on identifying and addressing dangerous behaviors on the dorms. Medication misuse has been a frequent issue. Whenever possible, mental health staff remains on the dorms for medication distribution to encourage compliance. It has been difficult to consistently coordinate with nursing for all 8 tiers on the 4th floor due to staffing issues and due to the schedule for group programming (starts at 9am).

## Intensive Management Unit (IMU)

A series of collaborative meetings between agencies took place since the last site visit. Active participation in this project reflects the importance and rising visibility of non-suicidal injury on the compound, frequently accompanied with additional stress on Cermak and CCDOC's operational capacity. This Unit is designed to house the detainees who would otherwise be

housed on 2S/2SE. The location was chosen as RTU-2A. Appropriate physical plant modifications were carried out in order to safely secure detainees to stationary objects during structured on the tier programming and allow for safe Psychiatry/Psychology sessions as well as the dispensation of medications. Reinforcement menus/graduation schedules/programming materials/ criteria for admission and graduation have been prepared. (See Appendix). Proposed CCDOC staff names were tendered by CCDOC on September 28, 2015. Previously, it was suggested that Cermak interviews CCDOC candidates/ holds the informational meetings as a part of the vetting process. Cermak was informed that Cermak would not be able to individually interview identified candidates. Cermak's initial methodology for the vetting of CCDOC candidates was subsequently modified following suggestions from CCDOC Leadership. The staff's ejection from the program (predeployment and postdeployment) will be conducted by the team following individual performance review. The pool of back up officers should also be stable and vetted. Staff training/ team building exercises for the core multidisciplinary team on each shift were conducted on: Tuesday, October 20, 2015 and Wednesday, October 21, 2015.

Pending the hiring of additional Psychologists, Drs. Key, Kelner, and Sillitti will assume joint responsibility for overseeing the clinical operation of this unit. The IMU Management Team met on October 26th, 2015 to identify the initial candidates for admission to the unit. Those candidates were interviewed on October 27, 2015 and transitioned to the unit on October 28, 2015. Joint team training and team building do not replace basic MH training and were merely designed to strengthen team cohesion and effective communications, all for the sake of consistency and elimination of splitting.

It was concluded that it would be probably best to handle acting out behaviors and infractions as clinical issues but up to a certain threshold. Given reinforcement menus, most of the acting out behaviors would trigger certain predictable clinical response and would not result in the issuance of discipline. The tally of infractions will be kept, however will not automatically result in disciplinary tickets. Up to a certain point detainees do not incur additional discipline but staff assault (projection of bodily fluids or direct aggression) should trigger charges of battery and assault. Less violent offenses (throwing food or Styrofoam trays at staff), it is suggested, are to be dealt with via clinical pathways. Further input was to be sought on this subject. Treatment refusals would not automatically lead to the expulsion from the program but detainees' ability to participate in the program would be periodically evaluated in terms of clinical benefits that they are likely to derive from the program. The admission criteria/ graduation criteria of each referral/ participant will be collaboratively examined by the group during regular meetings. Weekly team meetings will take place weekly on Thursdays from 2:00 PM until 3:00 Pm in RTU to allow both shifts to participate. There will be additional daily huddles conducted on each shift to increase consistency of communications and facilitate hand offs. Its location is to be determined (off the tier or in close proximity). Both meetings are to be accompanied by appropriate documentation.

**Women's Services:**
-Facilitating individualized group treatment by staffing each P3 patient regularly and using the

treatment cards (also to motivate patients). Patients are involved in the treatment planning process and create a "problem list" with the tier mental health specialist who is familiar with her. Treatment plans are nearing 100% timely completion and the quality of treatment plans drastically improved.

- P3 patients do receive the 10 hours of group on a regular basis. P2 average 3-4 hours of group per month.

-HSR are completed by policy - patients receive a face to face assessment within 24-48 hours or receipt of the HSR by a MHS III. All MH clinics in div. 3 and RTU are completed by a MHS III.

-SMU rounds are completed twice per week in both divisions. Patients are assessed by MH within 24 hours of placement in segregation. PC receives 2 hours of group per week.
-Improving consultation with CCDOC to refer appropriate psych evaluations, which are completed in a timely manner. RTU is now able to provide 24 hour on-site evaluations and consultation with eth addition of staff on the overnight shift.

-There is more accountable for monthly individual sessions for P3 with specific assignments.

-Improvement with patients who have poor hygiene. Rise and shine occurs 5 days per week and hygiene supplies and encouragement are provided. Patients displaying ongoing, serious hygiene concerns (generally psychotic) are admitted to the psychiatric special care unit for increased support and therapeutic shower. Incentives are offered as needed for hygiene compliance.

-Overall there is a very low self-harm rate, however a spike was seen in the past month primarily in SMU.

-P2s are regularly transferred between the RTU and div. 3. This impacts appointments, scheduling, and medication pass. Cermak will continue to work with corrections to ensure the list of transfers from the divisions to ensure appointments are in place are provided consistently and within a timeframe that maximizes opportunity to reschedule clinical activities. Patients also complain about the movement, specifically those who have been moved on more than one occasion. Some women are moved back and forth which is very problematic for the patient and the staff. Several patients have become very demanding and challenging about their housing and are frequently under the impression that mental health is responsible for their movements between divisions.

-Patient motivation remains a challenge. Mental health facilitates a movie discussion group to treatment compliant patients every two weeks. Patients are provided incentive items (t-shirts, bras, panties) randomly to those attending the most groups, takings meds, and following CCDOC rules. We are also providing a standardized letter of participation monthly for patients attending 75% of recommended treatment groups.

-Cermak will continue to work with CCDOC to ensure patients are provided recreation during hours that do not conflict with group times.

-There are ongoing efforts and collaboration between Cermak and CCDOC to concentrate P2 detainees on certain tiers as opposed to housing them throughout the building. This has been an ongoing challenge which Dr. Briney will continue to address with Supt. Currie and divisional shift commanders. Psychiatry FTE 0.3. P2-120

**Division II Dorm 2/P2:** No major changes. Houses O, R and P continue to house Westcare patients. MHTC detainees are housed in the V house. Overflow P3 are still housed in Division II Dorm 2 until a bed opens in RTU and Cermak staff transfers them immediately using bed control tools. Within the past few months there has been a concerted effort to conduct community groups in all ten tiers on a weekly basis. At times, these groups have not occurred due to security issues, employee absence, and employee vacation. There is a MHS III assigned during the evening (3-11) shift on Tuesday, Wednesday, and Thursday. Adler School of Professional Psychology partnered with CCDOC to provide individual therapy to some of the detainees in Division II Dorm 2 to decrease the amount of idle time through off tier activity. The amount of therapy hours, patient selection, CQI, and level of supervision can be provided by CCDOC. Telepsychiatry Clinic continues to provide reliable coverage for this Division. The initiative is going well, along with Dr. Marri's clinic in the morning on Tuesday, Wednesday, and Thursday. Thus, medications are up-to-date, new detainees are being seen fairly quickly, and all other complaints (e.g., side effects, lack of efficacy) are being addressed without delay. The mental health staff is working well with security. Supt. Martinez has been very open to the needs of mental health. As mentioned elsewhere, Dr. Kaniuk functions as a Unit Director for Divisions X and II. FTE for Psychiatry is 1.2. Population: P2-390, P3-2.

**Division VI/P2:** No changes. Psychiatry FTE 0.1. P2-50.

**Division IX/P2**

The Level II of the Administrative Segregation was moved to Division X in the spring of 2015. The remaining tiers of SMU's house Special Incarceration Unit and Level II (1E). Tiers 1F and 1H house Disciplinary Segregation. In October 2015 CCDOC moved detainees from Level II of the Levels System back to Division IX (1E). Level III has been liquidated. Protective Custody tiers remain on 3E, F, G, H. Segregation rounds have improved a result of staff reassignments, which has resulted in staff having better attitudes at the task and who want to work in the division. Challenges have been noted with clinic start times on both the day and evening shifts. Cermak staff is working with corrections to understand the role differentiation of Cermak Mental Health providers and Sheriff's Mental Health staff. Ongoing role clarification will assist in smooth coordination of patient care when differing clinical opinions exist between the two agencies. Psychiatry FTE 0.2. P2-175.

**Division X/P2**

Division Ten has some challenges, which are being addressed. There are now four staff members assigned there during the day shift to deal with the many emergencies which arise on a daily basis, mostly from 1-A and 1-D ( as of October 30th, 2015 both are disciplinary segregation). There have been difficulties with mental health staff absenteeism, which impacts clinical care. In general, it is more difficult to see patients because of the cell setting milieu. HSRF are now being addressed in a timely manner because there is a MHS III on both the day and evening shift. The goal is to have community meetings on all 14 tiers (excluding 1-A and 1-D) on a monthly basis. The relationship between security and mental health is good. Mental health has meetings with Supt. Walsh on a weekly basis and he is very open to the needs of mental health. The mental health staff will be rotated every three months between divisions (2 and 10) to avoid burnout.

Div. X received Level II detainees in March 2015 (housed on 1A) and in May 2015 a new Disciplinary Segregation Unit on 1D was opened. The movement took place in part due to the fact that many detainees in the Level II were launching themselves off the second tier or used rails to attach sheets to the railing and the other end have wrapped around their necks to lower themselves. Trends suggest that the numbers of non-suicidal self-injury has picked up significantly in those housing locations. Cermak's Suicide Prevention Committee Minutes suggest that one of the main contributing factors fueling high rates of non-suicidal self-injury is detainees' efforts to achieve movement off the SMU tiers and, consequently, avoid conditions of confinement on the said units. The Level II detainees were relocated back to Div. IX in late September or Early October, returning 1D to disciplinary segregation.

Due to the high utilization of Cermak and CCDOC resources in Division X, the idea to relocate SMU to Division V (currently vacant) has gained momentum. Presently discussions are underway. Following the implementation of the new PC criteria by CCDOC, Division X now houses two PC tiers – 1C (clean, where more stringent criteria are applied for entry) and 2C (where criteria are not as stringent). Dr. Kaniuk (Unit Director) still manages Division II Dorm 2 and Division X (both housing P2) and his workload is substantial due in part to the distance between those two divisions and overall patient population. Overflow P3 are still housed in Division X when necessary until a bed opens in RTU and Cermak staff transfers them immediately using established bed control tools. FTE for Psychiatry is 0.9. MH population: P2-553, P3-1. Utilization of Division X as P3 overflow should decrease with the opening of RTU 2B opening as a P3 overflow tier in September 2015.

**Division XVII/ Sheriff's Female Justice Program/P2/P3**: No changes, however psychiatric coverage is even more fragmented after the resignation of PA in July 2015. Now, Drs. Kelner, Howard, Paschos and PA Balawender provide combined coverage (FTE-0.3) to 81 P2 and 13 P3.

### Additional information from CCDOC

Inmates in Division 08 RTU have had access to patio recreation. On the 5th floor (females) focus is placed primarily on the outpatient tiers to increase their level of activity, thereby decreasing

the amount of idle time on the unit. Intermediate tiers are recreated outside of the programming hours, allowing for approximately 1-2 times weekly. As an incentive for positive behavior, mental health and DOC select a number of inmates from the 4th and 5th floors to recreate in the Division 4 outdoor yard.

In Division 08 RTU, we retrofitted the dayroom tables in the segregation units to allow the inmates to be secured during programming hours. Male segregated inmates in RTU receive programming on the 7am-3pm shift on Tuesdays, Wednesdays and Thursdays. Inmates in Protective Custody are allowed out of their cells in a similar manner as general population inmates and are escorted to the patio for recreational activities.

In Division 08 RTU, sanitation kits are maintained on the tiers to allow for daily use. Sanitation solutions have not been replaced as it is believed that they are sufficient to manage the daily cleaning of the units. As recommended by Mr. Grenawitzke, we have instead increased the power washing of the tiers to manage the soap scum in the shower areas.

### Inmate Programming

The Sheriff's Office, in partnership with Adler University and the Chicago School of Professional Psychology, provides individual and group therapy to detainees housed in Division 2 Dorm 2 (male P2 population) as well as Division 3 (female P2 population). The Sheriff's Office supervises 5 Master's Level and Doctoral Level students, and each have a caseload of 3-12 clients based on acuity and internship hours required by the school. Anger Management groups for female detainees housed in disciplinary segregation started October 2015. Individual counseling sessions for male inmates housed in disciplinary segregation in Division 10 began August 2015. Additionally, those detainees will receive mindfulness and meditation classes. We started a pilot program, Malachi Dads, in Division 9 with a group of offenders that had engaged in sexually and behaviorally assaultive behaviors. The program is based on spiritual principles and teaches the detainees how to become better men and better fathers. Since starting the program in September 2015, there have been no incidents on the unit.

**Pre-bond initiative:** CCSO mental health personnel staff RCDC Monday through Friday and flag individuals that self-report mental illness prior to bond court.

**Intake:** Classification Officers will ask screening questions to identify individuals that self-report mental illness and drug/alcohol use that may lead to withdrawal.

**In custody:** Mental Health Transition Center: A community reentry program for higher functioning mentally ill detainees charged with lower-level offenses. Detainees receive mental health programming, educational services, job-readiness programming and linkage services.

**Coordinated Releases:** Any individual identified by DOC, Cermak or Court personnel as needing added support at the time of release is flagged by our [i.e., Sheriff's Office] Records

staff with a hand-to-hand transfer of the individual from our custody to their loved one or a treatment program. DOC staff members contact the detainee's loved one or the receiving treatment program to coordinate the release/pick-up. If transportation is necessary, External Operations staff provide transportation of the detainee.

Discharge Lounge is a centralized location where all detainees on the mental health caseload receive information on community-based services prior to discharge. Although many have established comprehensive plans while in custody, the Lounge allows the CCSO to ensure everyone is released with knowledge of resources. The Lounge is staffed with personnel from TASC and an Officer trained in Advanced Mental Health.

**Family support:** A family support group is provided on a weekly basis for approved visitors that have a loved one detained in our custody and diagnosed with a mental illness.

Care Line (674-CARE) Mental health hotline operated by Executive staff 24/7 as a resource for former inmates seeking mental health assistance and resources after release from jail and the family and friends of currently incarcerated inmates who are in need of special treatment/medication while at the jail.

### November 2015 Metzner assessment:

### *RTU*

During the morning of November 3, 2015 I observed a community meeting in housing unit 4B, which was a minimum-medium RTU male housing unit. The community meeting was very well run by a licensed mental health specialist. Several inmates reported medication continuity issues following housing unit transfers. However, medication continuity issues were generally not present. Inmates provided information relevant to access to group therapies and in the outdoor patio that was consistent with the section entitled "current status" and pre-site information received from Cermak and CCDOC. Specifically, they reported at least weekly access to the outdoor patio. Group therapies were reported to be helpful. Access to the psychiatrist was reasonable.
I also interviewed inmates in a community meeting in housing unit 4F, which was a male medium-maximum custody RTU. These inmates also uniformly described good access to group therapies, which were described as being very beneficial. Medication management issues did not appear to be present. Inmates reported generally being seen by the psychiatrist on a monthly basis. Access to the outdoor patio was described to be weekly.

I observed a structured therapeutic group activity, involving three inmates, on Unit 4 A, which is a RTU segregation unit. Inmates were engaged in the group process which included a mental health specialist and a correctional officer as co-facilitators.

I also interviewed inmates in 5B (a female minimum/medium RTU) and in 5F (a female

maximum RTU) using a community meeting-like format. These inmates also described good access to group therapies, which again were described as being very beneficial. Inmates in the female units described less than weekly access to the outdoor patio, which was generally not consistent with custody records reviewed. Medication management issues did not appear to be present. Several inmates reported that they were not seen on a monthly basis by psychiatrist, which was consistent with review of the records. These inmates had not been scheduled to be seen on a monthly basis.

Inmates in all of the units that I visited described reasonable access to discharge planning.

As described in the current status section, issues related to personal hygiene are now being adequately addressed within the RTU, which includes transfer to the Special Care Unit as needed.

RTU inmates are being offered at least 10 hours per week of out of cell structured activity with a reported 40% refusal rate. Segregation inmates are refusing out of cell time approximately 70% of the time. The increased allocations of psychiatric time in the RTU is a positive step.

It is encouraging that a beginning has been made in implementing increased out of cell time for RTU inmates in segregation. There are 20 male segregation beds and 20 female segregation beds located that are located in the RTU. Equally encouraging is the very early implementation of the Intensive Management Unit within the RTU.

A solution has been found, since last site visit, relevant to cleaning fluids available to inmates to use within the RTU.

### *Divisions IX and X*

The changes in the level system for the Special Incarceration Units were described as resulting in a less punitive environment. The changes referenced in my April 2015 report relevant to protective custody status appear to have resulted in improvements from a safety perspective. During the afternoon of November 3, 2015 I observed mental health rounds being performed in units 1H within Division IX. The quality of these rounds was very good.

The correctional rehabilitation programs provided by the Sheriff's office as referenced in the additional information obtained from CCDOC is a very welcomed programming available to mental health caseload inmates. The additional support services provided by CCDOC that have been previously summarized are also very helpful and impressive.

During the morning of November 5, 2015 I met with P2 inmates in a community setting within units 3D and 4A, which were medium-maximum security housing units within Division X. These inmates complained about lack of access to mental health programming. Although several inmates in each unit complained about access issues to the psychiatrist and continuity of

medication issues, review of healthcare records were not consistent with their complaints. Inmates reported access to the recreational area on a once per week basis although such access was reportedly scheduled three times per week.

## *Division II*

During the morning of November 4, 2015, I interviewed male inmates classified as P2 in Division II (S House) in a community like group setting. Inmates in S House reported dissatisfaction with the mental health services related to lack of access to group therapies and limited access to outdoor recreation. They described their psychiatric treatment via the telepsychiatry process to be problematic due to access issues although most indicated they were seen monthly. Continuity of medication issues were reported but not verified via healthcare record reviews. As in the past, many inmates were dissatisfied with the Cermak formulary.

I also interviewed P2 inmates on the third floor (U House) in a community setting. These inmates reported not receiving groups from Cermak staff and generally not having access to outdoor recreation or access to the gym. Some medication continuity issues were reported by several inmates.

Inmates in a Westcare dormitory on the second floor were interviewed in a community meeting setting. They enthusiastically described the benefits of this therapeutic (substance abuse treatment) program and were complimentary of the mental health services provided (e.g., medication management).

## *The Transitions Unit*

Progress has been made relevant to provide mental health services to the Sheriff Department's operated Transition Program as summarized in the current status section regarding a three million dollars funding request. The Sheriff's department has also hired mental health staff to provide services to segregation inmates in Division X. The staff have been providing out of cell programming on a weekly basis which has used a cognitive behavioral approach. I discussed with key correctional and mental health staff concerns about role issues among the two different mental health staffs. I specifically recommended that the programming provided by the mental health clinicians hired by the Sheriff's Department be conceptualized as correctional rehabilitation programming in contrast to mental health treatment. This programming should significantly help improve the conditions of confinement within the segregation housing units.

Partial compliance continues although significant improvements are noted with specific reference to the beginning implementation of out of cell structured therapeutic programming for segregation inmates and the intensive management unit. It is also very encouraging that the hygiene issues noted during the last site visit have been appropriately managed and that inmates were not complaining about issues related to cleaning supplies.

Now that the vacancy rate has significantly decreased, except for psychiatrists and psychologists, a staffing analysis should occur with regards to the accuracy of the other current mental health staffing allocations.

**Recommendations:** Continue with implementation of programming in the IMU and RTU segregation units. Joint planning will obviously be needed relevant to the mental health services to be provided in the transitions unit once funding has been approved.

The need for close monitoring regarding access to outdoor recreation and the gymnasium continues based on some discrepant reports from inmates as compared to information obtained from CCDOC.

The frequency and the quality of the group programming available to P2 inmates needs to be more closely monitored/supervised.

> **e.** **Cermak shall ensure that treatment plans adequately address inmates' serious mental health needs and that the plans contain interventions specifically tailored to the inmates' diagnoses.**

**Compliance Assessment:** Partial compliance

**Factual Findings:**

**November 2015 Cermak Status Update**

Psychiatric Providers are tasked with the formulation of treatment plans for P2 (out patients). Given existing vacancies and staffing shortages for Psychiatry, compliance with the timetables may be an issue. A random audit of 30 patients classified as P2 (Outpatient) in Division 10 found that 7 of the patients did not yet need a treatment plan completed as they were admitted to that unit/level of care within 90 days. Of the remaining 23 charts, 12 contained the required elements (medication management, access to 1:1 contact with MH staff for crisis and individual counseling as needed, and participate in community meetings). The chart below summarizes the findings. (See Appendix).

| Audit of Random Charts in Div. 10 for Outpatient Treatment Plans | | |
|---|---|---|
| Treatment Plan Not Yet Due | 7 | 23% |
| Outpatient Tx Plan contains required elements | 12 | 40% |
| Tx Plan Does not contain required elements | 11 | 37% |
| Totals | 30 | 100% |

Women's services continue to produce timely treatment plans and have now shifted focus to improving the quality of each individualized plan. The treatment team is now facilitating

individualized group treatment by staffing each P3 patient regularly and using the new treatment card program to motivate patients (see Appendix). This involves offering patients a letter of attendance that can be taken to court dates on a monthly basis. Patients are involved in the treatment planning process and create a problem list with the tier mental health specialist who is familiar with her. Treatment plans are nearing 100% timely completion and the quality of treatment plans drastically improved.

Male services in RTU will initiate the treatment card program in the near future. Treatment plans in the special care units continue to be produced timely, as they are initiated as part of the admission assessment process. The overall quality of treatment plans and timeliness of updates during clinical staffings will improve greatly with the oversight of the new unit director.

Additionally, comprehensive interagency management plans have been developed by the chief psychologist or respective unit director, in concert with the full multidisciplinary team, when needed for more complex or difficult cases.

**November 2015 Metzner assessment:** As per current status. Continued supervision is required relevant to outpatient treatment plans. Residential treatment plan QI's are focusing on quality of the treatment plans since they have been found to be timely during previous site assessments.

**Recommendations:** As above.

> **f.** **Cermak shall provide 24-hour/7-day psychiatric coverage to meet inmates' serious mental health needs and ensure that psychiatrists see inmates in a timely manner.**

**Compliance Assessment:** Partial compliance

**Factual Findings:**

**November 2015 Cermak Status Update**

| 7/1/2015-Psychiatrists | | |
|---|---|---|
| Chair (1) | 1.0 | (D. Kelner) |
| Attending Psychiatrists (15) | 6.8 | (Advani, Howard, Marri 0.8, McNeal, Menezes, Paschos, Ward) |
| Psychiatric PA's (2) | 1.1 | (Balawender, Locums Bastidas 0.1) |
| Psychiatrist's Overtime | 0.2 | (Howard, Moreno) |
| Psychiatrists (Account 133) | 1.1 | (Kartan, Lassen 0.1, Ramic, Chinweze on maternity leave) |
| Total Functional FTE | 10.2 | |
| 10/8/2015-Psychiatrists | | |
| Chair (1) | 1.0 | (D. Kelner) |

| | | |
|---|---|---|
| Attending Psychiatrists (15) | 6.8 | (Advani, Howard, Marri 0.8, McNeal, Menezes, Paschos, Ward) |
| Psychiatric PA (2) | 1.1 | (Balawender, Locums Bastidas 0.1) |
| Psychiatrist's Overtime | 0.2 | (Howard, Moreno) |
| Psychiatrists (Account 133) | 1.3 | (Kartan, Ramic, Lassen 0.1, Chinweze,Chavlayohan has **ASD** around November 2nd) |
| **Total Functional FTE** | 10.4 | (10.7 if Chavlayohan starts in November) |
| | | |
| 7/1/2015-Psychologists | | |
| Chief Psychologist (1) | 1.0 | (K. Key) |
| Psychologists (10) | 5.0 | (Briney, Sillitti, Kaniuk, Nunez, Rogers) |
| **Total Functional FTE** | 6.0 | |
| | | |
| 10/8/2015-Psychologists | | |
| Chief Psychologist (1) | 1.0 | (K. Key) |
| Psychologists (10) | 6.0 | (Briney, Sillitti, Kaniuk, Nunez, Rogers, Waxler) |
| **Total Functional FTE** | 7.0 | |

There are 16 FTE for Psychiatrists, 2 FTE for Psychiatric PA. Current vacancy rate for this group is 49%.

There are 5 part-time Psychiatrists and in that group all the vacancies have been filled (Dr. Chavlayohan has been credentialed and her ASD is in November). The majority of part time (Account 133) Psychiatrists are committed to working between 8 (Lassen) to under 20 hours (Dr. Kartan and Ramic) while Dr. Chinweze has returned from maternity leave in October to provide 4 hours every other week. There two part-time equivalents of Consulting Physicians, both remained vacant (those positions were originally created for Rush residents but eventually CCHHS funded them at a much higher rate to make it attractive to Psychiatric Attendings). RCDC coverage remains rather fragmented after Dr. Lassen pulled out and services of full time attendings are sought (on a voluntary basis) to provide evening coverage at the moonlighting rate while their daytime clinics are intended to be covered by JSH providers via Telepsychiatry.

In June 2015 Cermak Mental Health submitted paperwork necessary for the creation of the new non-union position of the Associate Chairman/Director of Psychiatric Infirmary to assist the Chief of Psychiatry in clinical and administrative duties. As of October 2015 this position has not been cleared by Budget.

Total net loss for Psychiatry since April 2015 is 1.3. The net changes in vacant positions for Psychiatry graph is available in the Appendix.

Significant human effort, time and resources have been expended (mostly by Drs. Gomez and

Kelner) to coordinate the Hiring of the Locums Tenens Providers through outside vendors. At this point in time, there is one Locums PA who provides FTE 0.1 mostly in RTU 5th floor and RCDC. Numerous candidates provided by the three County vendors have been interviewed since November 2014. The possibility of mentoring of new Locums PA's without any MH background, in spite of initial interest, has been ruled out as untenable due to the fact that Stroger's attendings do not work past 4:40 PM and Locums PA's (so far two of them have been submitted by the vendors) were only available during afternoon and evening hours. One of these PA's was hired but Dr. Kelner did not keep him following a lengthy period of training at Cermak due to lack of theoretical knowledge and insufficient clinical skills. The Telepsychiatry option has been added to Locums' contracts in 08/2015 and it did lead to a significant increase in Locums candidates interested in working at CCJ via Telepsychiatry. SEIU's grievance re: The Hiring of Locums Providers is still ongoing. Cermak Mental Health Leadership was informed by CCHHS Labor to continue interviewing Locums candidates.

Telepsychiatry: Current Telepsychiatry Clinic functions well in Division II Dorm 2. CQI conducted revealed that Dr. Ward's performance meets expectations (see Appendix). Cermak was prepared to launch a new Telepsychiatry clinic in Division X. Stroger Psychiatrists (and Locums Providers when hired) were supposed to provide tele-psychiatry outpatient support for the detainees. The support was supposed to be provided on an equitable rotation by the Stroger Psychiatrists. Stroger Psychiatrists were to maintain their current work schedule and work load while providing Tele-psychiatry. CCHHS will provide the equipment needed for the Stroger Psychiatrists to perform Tele-psychiatry. The opening of this clinic has been complicated by several factors; one of them was the identification/training/deployment of Clinic Attendants. CCHHS Corporate Compliance Office offered an interpretation of who qualifies to work as an attendant which disqualifies clerks and administrative assistants. Furthermore, these categories of workers would require additional training for "patient contact related tasks" as they are not trained to perform patient care related duties. At this time, using the definition of qualifications provided by the Corporate Compliance, we are planning to deploy MHS II. Another factor in the opening of the clinic is the hardware installation (it was completed on the receiving site (JSH) as of the week of October 9th). The originating site installation will proceed forward according to the plan. As of October 20th, 2015, Telepsychiatry project in Division X is nearing completion. 2 daytime clinics and one afternoon clinics will be staffed by JSH providers following their orientation (November 11th). RCDC Telepsychiatry Clinic is scheduled to have a test run on November 3rd. SEIU continues to be involved even after the MOA was signed and a series of meetings with SEIU members/ CCHHS Labor representative are scheduled for November 12th.

New rates: CCHHS and SEIU executed a Memorandum of Agreement (MOA) on October 2nd, 2015 in connection with changing the salaries of the Psychiatrists – which will become effective the beginning of the pay period: Cermak Psychiatrists will be placed at Grade K10; Step 2 – an annual salary of $216,661; and the Cermak differential for Psychiatrists will increase by $4,600 to a total of $15K. These new rates are expected to attract new candidates and retain already present staff. The salaries of existing attendings and the incoming staff have been given parity and no seniority considerations have been factored in. The signing of the MOA was coupled with

the provision of Telepsychiatry services by the JSH Psychiatrists. In Cermak FY 2016 budget request, Cermak did not request any reduction in positions or their funding. Cermak has not heard from CCHHS regarding the reduction of any of our positions as a salary funding solution either. However, we won't know the detail of the CCHHS budget until it is released to us.

Shakman: It was proposed on many levels that the hiring of Providers at Cermak be outside of the purview of Shakman's Monitors. On October 8th, 2015 CCHHS informed Cermak leadership that the County will be piloting a new process for recruitment and hiring of Advanced Clinical Providers. The project is under development. This should allow a more effective approach to hiring psychiatrists for Cermak. This is the first step in the decoupling of Psychiatric hiring from the Monitors. The Advanced Clinical Position (ACP) Hiring Process was unrolled in October 2015. Psychiatry, Psychology and PA Positions at Cermak are eligible. The main points include: the reduction of steps necessary to follow before a job offer is made from 9 to 4; being able to request an indefinite posting period until the position is filled; applicants may apply via the CCHHS job site or the designated email address; daily updates of applications on the job site; applications may be reviewed while the posting is still active; allowed more contact with prospective candidates ( off and on site ); the manger will be able to determine whom to pursue for the position while still reviewing additional applications or at the end of the posting period.

Cermak continues to advocate for the expansion of the recruitment outreach through professional organizations (Job Board during the AAPL Convention, October 22nd – 25th.) New rates will be offered. HR is calling candidates who previously rejected job offers based on compensation. Otherwise, CCHHS runs recurring ads in 88 various publications.

There is a total of 11.0 FTE psychologist positions (including the chief psychologist position) with a current vacancy rate of 37% (4 FTE). Dr. Waxler was hired as Acute Male and Female Units Director and joined Cermak in September 2015. Cermak has lost several candidates in later stages of their hiring process due to the fact that their internships were not APA approved. Efforts are made to vet candidates early on to identify candidates whose internships would disqualify them from receiving clinical privileges at Cermak.

There is a total of 70 MHS Specialist Positions with a current vacancy rate of 2.8 % (2FTE for MHS III). Currently we 16 unlicensed staff (3 recently achieved licensure and are awaiting reclassification), 52 licensed staff (1 currently on administrative leave). We are currently working with Labor Relations to upgrade the staff who recently achieved their licensure in their respective disciplines.

There is a total of 7 Medical Social Workers Positions with a vacancy rate 14.28% (1FTE).

Positions of the Chief of Psychiatry, Chief Psychologist and Mental Health Director are filled.

The October 26, 2015 Cermak position status tracker indicated that eleven mental health clinicians had been hired since the April 2015 site visit. These 11 clinicians were not necessarily

all hired into 11.0 FTE positions.

There is a total of 118 FTE mental health positions with 20 vacancies that represents 16.94% vacancy rate. See Appendix.

**November 2015 Metzner assessment:** During July 2014 there were a total of 9.70 functional FTE psychiatrists working at CCDOC as compared to the 11.7 FTE psychiatrists during April 2015. There were 2.0 PA's employed at Cermak during April 2015.

There is now a total of 16.0 FTE psychiatrist positions (including the chief psychiatrist position) and 2.0 FTE psychiatric physician assistant positions with 10.4 FTE psychiatrists and 1.0 FTE PA currently employed at Cermak. The current vacancy rate is 49% for psychiatrists/physician assistant positions. There are now 1.3 FTE more psychiatrist/physician assistant vacancies as compared to 2015. However, there are the equivalent of 4.0 FTE locum tenens psychiatrists who are currently in the credentialing process. The locum tenens contract was recently modified to include telepsychiatry, which significantly increase the applicant pool. In addition, two psychiatrists working at Stroger Hospital will be providing a morning per week of Telepsychiatrist clinic time in the near future.

There is a total of 11.0 FTE psychologist positions (including the chief psychologist position) with a current vacancy rate of 37% as compared to 45% vacancy rate during April 2015. In other words, there is an additional 1.0 FTE psychologist employed at Cermak as compared to the last site visit.

The recently approved salary increase and the Shakman pilot hiring project summarized in the current status section are very positive signs and should significantly assist in recruiting psychiatrists.

During the April 2015 site visit, I reported the following:

> There is a total of 118 FTE mental health positions with 25 FTE vacancies that represents a 21% vacancy rate

As of the November 1, 2015 site visit there was total of 20 vacancies, which represents a 16.94% vacancy rate.

I am significantly encouraged that appropriate steps have been taken that should now make a significant dent in the psychiatrists' vacancies. I discussed with appropriate staff the importance of advertising through the American Psychiatric Association in their publications entitled "Psychiatric News" and "Psychiatric Services."

**Recommendations:** Continue the aggressive recruiting efforts and advertise in the above referenced publications.

    g. **Cermak shall ensure timely provision of therapy, counseling, and other mental health programs for all inmates with serious mental illness. This includes adequate number of Qualified Mental Health Staff to provide treatment, and an adequate array of structured therapeutic programming. Cermak will develop and implement policies and procedures defining the various levels of care and identifying the space, staffing, and programming that are appropriate to each identified level of care.**

**Compliance Assessment:** Partial compliance

**Factual Findings:**

**November 2015 Cermak Status Update** There is a total of 70 filled MHS Specialist Positions (8 more as compared to April 2015) with a current vacancy rate of 2.8 % (2 FTE for MHS III). Currently we 16 unlicensed staff (3 recently achieved licensure and are awaiting reclassification), 52 licensed staff (1 currently on administrative leave). We are currently working with Labor Relations to upgrade the staff who recently achieved their licensure in their respective disciplines.

Cermak reported the following during the April 2015 site visit:

> We also need additional MHS III coverage in Division IX where we have 2 MHS III (previously 3, but due to increased intake numbers the 3rd had to be returned to the RCDC), 3 evenings per week and also added 1 FTE, Tuesday through Saturday, to provide support for the growing mental health caseload. The population of P-2 inmates in Division IX has averaged 140-150, maximum security individuals in general population, segregation, protective custody, and various Level Systems of segregation as well.

It was too late in the budget cycle to request the additional MHS III coverage for 2015-2016.

**Recommendations:** Re-assess staffing needs for the next budget cycle.

    h. **Inmates shall have access to appropriate infirmary psychiatric care when clinically appropriate.**

**Compliance Assessment:** Partial compliance

**Factual Findings:**

*Cermak Male Acute, Subacute and Chronic Mental Health Unit Descriptions*

The Cermak male psychiatric units are comprised of 60 beds distributed among 3 units – 2North

(acute unit), 2South (subacute unit) and 2East (chronic unit). The purpose of the units is to provide extended observation, stabilization and structured/unstructured therapeutic activities. Services are provided by a multidisciplinary team, which includes psychology, psychiatry, mental health specialists, nursing, social workers, correctional rehabilitation workers and custody staff.

Male detainees may be admitted to 2North, the 24-bed acute psychiatric unit, from intake, general population or other mental health units. Primary reasons for admission include an acute risk for harm to self or others, acute psychosis, and an inability to care for self or marked decompensation that poses as a risk for victimization in other living units. While on the unit, detainees receive at least 11 - 13.9 hours per week of structured and unstructured therapeutic activity. Detainees housed on 2North are scheduled to see a psychiatrist 5-7 times per week. Detainees are typically housed on 2North for a brief period of time before transitioning to a less restrictive setting.

The subacute mental health unit, 2South, is a 26-bed unit for detainees that have demonstrated a decrease in the severity of psychiatric symptoms but continue to evidence symptoms that cannot safely and adequately be treated in a division with mental health services. Some detainees exhibit chronically severe symptoms that necessitate long term sheltered housing. They may be housed on 2South or 2East, a 12-bed unit that houses detainees that demonstrate severe negative symptoms of psychosis, chronically severe depression and/or significant cognitive delays. Detainees housed on 2South receive 8-8.5 hours per week of structured and unstructured therapeutic activity and 2East receive 5.5-6 hours per week of similar activities.

Discharge Planning

Cermak male mental health units are staffed with 1 Medical Social Worker who maintains regular contact with detainees diagnosed with serious mental illness to coordinate post-release treatment services in the community. Due to the severity of their mental illness, all detainees released to the community from these units must be assessed by a Qualified Mental Health Professional prior to discharge to determine the need for hospitalization. If community hospitalization is not warranted based on the clinical assessment, the Medical Social Worker can assist the detainee with referrals to community agencies for continued treatment and shelters for housing. The Medical Social Worker can also arrange for the detainee to be given a 2-week supply of his current medications.

Staff reported that the video cameras used to supplement the monitoring of the observation cells in 2N have not been working for about three months. A work order reportedly was initiated.

**Cermak Female Acute and Chronic Mental Health Unit Description**

The Cermak female acute and chronic mental health unit, 2West, is a 20-bed unit devoted to the psychiatric stabilization of detainees whose presentation warrant stabilization and/or extended

observation. Detainees may be admitted to 2West from intake, general population or other mental health units. Primary reasons for admission include an acute risk for harm to self or others, acute psychosis, and an inability to care for self or marked decompensation that poses as a risk for victimization in other living units. Detainees housed on 2West are scheduled to see a psychiatrist 5-7 times per week. Detainees are typically housed on 2West for a brief period of time before transitioning to a less restrictive setting unless they present with symptoms that warrant chronic care services. Chronically mentally ill detainees that require continued housing on 2West demonstrate severe negative symptoms of psychosis, chronically severe depression and/or significant cognitive delays that cannot safely and adequately be treated in a division with mental health services.

## Discharge Planning

The Cermak female mental health unit is staffed with 1 Medical Social Worker who maintains regular contact with detainees diagnosed with serious mental illness to coordinate post-release treatment services in the community. Due to the severity of their mental illness, all detainees released to the community from this unit must be assessed by a Qualified Mental Health Professional prior to discharge to determine the need for hospitalization. If community hospitalization is not warranted based on the clinical assessment, the Medical Social Worker can assist the detainee with referrals to community agencies for continued treatment and shelters for housing. The Medical Social Worker can also arrange for the detainee to be given a 2-week supply of her current medications.

## Additional information from CCDOC

Inmates in Cermak (excluding 2N, the acute male unit) are recreated on Thursdays, Fridays, Saturdays outside of programming hours. For the months of July, August and September inmates were recreated approximately 1-2 times each week.

### 2 North

The General Population detainees/patients receive time out of cell for a minimum of 7-8 hours per day. Due to the census and high turnover it is hard to state with accuracy how many hours a day Out alone/Housed alone detainee/patients receive. Many refuse, are being interviewed or are at court. Due to the damage the some inmates cause to the rooms, hours may be minimized by the need to complete facility repairs. At minimum, they receive 1 hour out of cell each day.

All activities in regards to security are notated in the Officers Log Books.

### 2 South

The General Population detainee/patients along with Protective Custody and Housed Alone detainees/patients are out of their cells for a minimum of 7-8 hours per day. Detainees are

monitored for disruption. If they become too disruptive, the isolation room may be utilized upon a Cermak staff person's orders. Detainees/patients that are Housed Alone may be secured back inside their cell.

At any given time there may be 5-7 detainees that are Housed alone. Some refuse to come out for their hour during different shifts. Some may refuse an hour out for the whole day then want to come out in a group the next day (we will allow them to come out of their cell for programming). Some will only come out by themselves, and are very vocal about being in fear of coming out with others.

All activities in regards to security are notated in the Officers Log Books.

### 2 East

The census of General Population detainee/patients is usually 8-12 detainees/patients. All but two come out of their cells for a minimum of 8-10 hours a day. Some of the detainees/patients don't want to come out on both shifts all the time, and some want to come out only for a few hours. A few eat and want to go back to their cells. We allow them the freedom to return to their cells.

2 East is able to get more participation during sessions due to the detainee/patient census.

All activities in regards to security are notated in the Officers Log Books.

### 2 West

The census of General Population detainee/patients fluctuates considerable on this living unit but usually houses 14-21 detainee/patients. All detainees/patients except two come out of their cells for a minimum of 7-8 hours a day.

All activities in regards to security are notated in the Officers Log Books.

### Inmate Hygiene

DOC, nursing, environmental services and mental health staff have been proactive with managing inmates with poor hygiene in Cermak. Once a humanitarian shower is requested, all staff work together to accomplish the task.

### November 2015 Cermak Status Update

Programming hours and statistics relative to this section can also be found in the Mental Health Monthly Statistics Report

Psychiatric coverage of the Infirmary has been modified. Previously existing rotation of divisional attendings through 2N has been cancelled. 2N is covered by 1 FTE Psychiatrist and 1 FTE Psychiatric PA. 2W/2S/2SE are covered by 1 FTE. 2E is covered by 01.FTE. Given the acuity and clinical needs on 2W and 2S it was decided to deploy a dedicated Psychiatrist there so Dr. Howard does not have other clinical assignments (aside from 2 hours in Division XVII on Tuesday) outside of the Psychiatric Infirmary which was designed to lead to more coverage, staff supervision and availability. 2S/2SE traditionally have been units where most of the treatment resistant and unwell patients were concentrated. The presence of a dedicated provider (1 FTE sharing 2W and 2S/SE) is supposed to increase the quality of care and lead to improvements in therapeutic milieu. Reestablishment of the Treatment Compliance Incentive Program has also positively impacted the overall milieu. Dr. Waxler, Psy.D. was hired in September 2015 as 2N/2W Unit Director (1 FTE). With these realignments the amount of supervision available to staff allowed Chief Psychologist and Chief Psychiatrist to spend less time on direct staff supervision. However, an unexpected absence of another Unit Director resulted in the Chief Psychologist assuming direct responsibility and oversight of the mental health staff in the remaining of the special care units.

In July 2015 730 ILCS 125/14 the County Jail act has been amended. It provides that any prisoner transferred to the custody of the Department of Human Services, the Warden shall supply the Department with all the necessary information regarding the prisoner. The above amendment and meetings between CCDOC and DMH has led to further rightsizing of the transfer and further increase in efficiency of the removal of the detainees found UST (Unfit to Stand Trial) from the CCDOC compound. Increase in efficiency and better adherence to the statutory deadlines for UST removal to the DMH has led to fewer delays for 2S/2SE detainees awaiting their turn to go to the DMH.

Detainees meeting criteria for involuntary admission by petition and certificate are transported to one of two area hospitals (Mt. Sinai and St. Anthony) upon release from Cermak by the court system. In 2014, an average of four patients per month were transported for involuntary admission by petition and certificate upon release. For 2015, this rate held for Q1 and Q2, but has dropped for Q3 to about one per month. There is no obvious explanation for the current decline in referrals, other than that it is based on the fact that no patients were hospitalized upon release in July. Since involuntary admission upon release has been in effect as Cermak policy for only a few years, it is not possible to rule out 'normal variation' as the simplest explanation. All Cermak psychiatric inpatients are evaluated at the moment of court release, and those anticipated to meet criteria for involuntary admission in the community are also 'flagged' ahead of time to ensure that their need for continued inpatient treatment is not overlooked if they are released in the overnight hours. There has been no indication of 'missed' evaluations at discharge recently, and the program is viewed by Cermak staff as one of the more stable and successful initiatives in recent years. Involuntary admission upon release will continue to be monitored on an ongoing basis to ensure that the reduction this quarter does not mean that some patients might not be 'slipping through the cracks' at the time of release.

| INVOLUNTARY HOSPITALIZATION BY PETITION & CERTIFICATE UPON RELEASE 2014-15 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| YEAR | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | TOTAL |
| 2015 | 3 | 7 | 2 | 2 | 3 | 10 | 0 | 3 | 2 | | | | 32 |
| 2014 | 3 | 5 | 4 | 4 | 4 | 5 | 5 | 4 | 3 | 4 | 3 | 4 | 48 |

| INVOLUNTARY HOSPITALIZATION Q1-Q4 2014-15 | | | | |
|---|---|---|---|---|
| YEAR | Q1 | Q2 | Q3 | Q4 | TOTAL |
| 2015 | 12 | 15 | 5 | | 32 |
| 2014 | 12 | 13 | 12 | 11 | 48 |

Inpatient programming hours have, with some variation, been maintained at a relatively stable level over the course of 2015. 2 West has been offered the most weekly programming, averaging 25 hours per patient per week over the course of the year. 2 South has been maintained at about 18 hours per week. As noted below, 2 South had the highest rate of canceled dayroom time by environmental services and CCDOC staff, averaging about canceled three dayroom shifts per week. This has meant a loss of about six to nine programming hours weekly during Q2 and Q3, loss of personal hygiene and phone privileges, and missed recreation and unstructured dayroom activity totaling about another three to six hours per week. 2 East has had the lowest programming averages, at about 12 hours per week. This unit offers programming on day and evening shifts five days per week rather than seven days due to staffing shortages, and 2 East is the unit designated to provide staff coverage in the event of absences in areas deemed high priority.

Programming on 2 North is calculated on a daily rather than weekly basis, and has averaged four hours per day throughout the year. The use of daily calculation is justified by the fact that this unit is designed for brief stays of 48 hours. It is rare for a patient to spend a full week on the unit. Regarding concerns over the number of programming hours offered on 2 North, for Q3, staff began documenting the amount of time patients were actually permitted out of their rooms to participate in unit programming. For July, August, and September, patients in 2 North were out of their rooms an average of 5, 5, and 5.3 hours per day, respectively. The quarterly average of dayroom time was 5.1 hours per day. Because patients spent approximately four hours a day in group, they were involved in programming about 80% of the time they were permitted out of their rooms.

In addition, for the past two quarters, all units have tracked the rate at which dayroom time and programming are canceled. To accomplish this, unit staff members have been instructed to complete and submit forms detailing the circumstances leading to cancelation. This has been monitored for the past two quarters in both Cermak and RTU. As indicated above, in Cermak, canceled programming generally means that patients are denied dayroom access for the entire shift. This includes cancelation of two to three hours of group programming, access to showers and phone service, and denial of recreation and unstructured dayroom time for that shift. Clinical staff members complete cell front rounds in these instances, since patients are not permitted out of their cells.

| INPATIENT WEEKLY PROGRAMMING HOURS BY UNIT 2015 | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LOC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | AVE |
| 2N* | 4.5* | 4.5* | 3.9* | 3.3* | 3.7* | 4.2* | 4.5* | 4.7* | 3.9* | | | | 4.1* |
| 2S | 14.3 | 14.8 | 15.6 | 23.1 | 21.8 | 19.8 | 18.0 | 11.7 | 19.1 | | | | 17.6 |
| 2E | 13.9 | 12.8 | 11.7 | 15.2 | 14.1 | 12.2 | 7.1 | 7.5 | 14.1 | | | | 12.1 |
| 2W | 23.0 | 26.0 | 22.5 | 27.7 | 26.2 | 25.0 | 23.6 | 21.8 | 29.5 | | | | 25.0 |

*Calculated as DAILY PROGRAMMING HOURS

| INPATIENT SMALL GROUP PERCENTAGE BY UNIT 2015 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LOC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
| 2N | 5% | 10% | 5% | 4% | 5% | 4% | 11% | 10% | 10% | | | |
| 2S | 20% | 10% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | | | |
| 2E | 75% | 80% | 80% | 70% | 80% | 85% | 80% | 80% | 80% | | | |
| 2W | 4% | 10% | 10% | 5% | 3% | 16% | 25% | 26% | 10% | | | |

| INPATIENT CANCELED PROGRAMMING SHIFTS Q2-Q3 2015 | | | | | |
|---|---|---|---|---|---|
| REASONS | 2N | 2S | 2E | 2W | TOTAL |
| CLINICAL STAFF CANCELED | 0 | 0 | 5 | 2 | 7 |
| SECURITY CANCELED | 39 | 38 | 7 | 19 | 103 |
| SCHEDULE CONFLICTS | 0 | 1 | 1 | 0 | 2 |
| ENVIRONMENTAL ISSUES | 16 | 36 | 5 | 15 | 72 |
| PT REFUSALS | 0 | 0 | 0 | 7 | 7 |
| TOTAL CANCELED | 55 | 75 | 18 | 43 | 191 |
| AVE CANCELED PER WEEK* | 2.2 | 3.0 | 0.7 | 1.7 | 7.6 |

*Average canceled programming per week for the 25 weeks of Q2 & Q3

| 2 NORTH CANCELED PROGRAMMING SHIFTS 2015 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| REASONS | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | TOTAL |
| CLINICAL STAFF CANCELED | 0 | 0 | 0 | 0 | 0 | 0 | | | | 0 |
| SECURITY CANCELED | 4 | 7 | 2 | 6 | 7 | 13 | | | | 39 |
| SCHEDULE CONFLICTS | 0 | 0 | 0 | 0 | 0 | 0 | | | | 0 |
| ENVIRONMENTAL ISSUES | 3 | 0 | 2 | 6 | 3 | 2 | | | | 16 |
| PT REFUSALS | 0 | 0 | 0 | 0 | 0 | 0 | | | | 0 |
| TOTAL CANCELED | 7 | 7 | 4 | 12 | 10 | 15 | | | | 55 |

| 2 SOUTH CANCELED PROGRAMMING SHIFTS 2015 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| REASONS | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | TOTAL |
| CLINICAL STAFF CANCELED | 0 | 0 | 0 | 0 | 0 | 0 | | | | 0 |
| SECURITY CANCELED | 8 | 10 | 5 | 7 | 6 | 2 | | | | 38 |
| SCHEDULE CONFLICTS | 1 | 0 | 0 | 0 | 0 | 0 | | | | 1 |
| ENVIRONMENTAL ISSUES | 3 | 2 | 4 | 16 | 5 | 6 | | | | 36 |
| PT REFUSALS | 0 | 0 | 0 | 0 | 0 | 0 | | | | 0 |
| TOTAL CANCELED | 12 | 12 | 9 | 23 | 11 | 8 | | | | 75 |

| 2 EAST CANCELLED PROGRAMMING SHIFTS 2015 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| REASONS | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | TOTAL |
| CLINICAL STAFF CANCELED | 1 | 0 | 0 | 2 | 0 | 2 | | | | 5 |
| SECURITY CANCELED | 1 | 2 | 0 | 1 | 1 | 2 | | | | 7 |
| SCHEDULE CONFLICTS | 0 | 1 | 0 | 0 | 0 | 0 | | | | 1 |
| ENVIRONMENTAL ISSUES | 0 | 0 | 0 | 1 | 1 | 3 | | | | 5 |
| PT REFUSALS | 0 | 0 | 0 | 0 | 0 | 0 | | | | 0 |
| TOTAL CANCELED | 2 | 3 | 0 | 4 | 2 | 7 | | | | 18 |

| 2 WEST CANCELLED PROGRAMMING SHIFTS 2015 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| REASONS | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | TOTAL |
| CLINICAL STAFF CANCELED | 0 | 2 | 0 | 0 | 0 | 0 | | | | 2 |
| SECURITY CANCELED | 3 | 2 | 3 | 6 | 4 | 1 | | | | 19 |
| SCHEDULE CONFLICTS | 0 | 0 | 0 | 0 | 0 | 0 | | | | 0 |
| ENVIRONMENTAL ISSUES | 3 | 0 | 3 | 8 | 0 | 1 | | | | 15 |
| PT REFUSALS | 0 | 1 | 2 | 4 | 0 | 0 | | | | 7 |
| TOTAL CANCELED | 6 | 5 | 8 | 18 | 4 | 2 | | | | 43 |

Cermak Mental Health wrote to Executive Leadership of CCJ in April 2015 and June 2015 to ask for their assistance and advocacy in mounting a legislative effort to develop a more efficient Administrative Review (as opposed to the Judicial Process) for pretrial detainees on the campus of CCJ. Further effort to review the feasibility of such changes in our jurisdiction was to be examined.

In July 2015 the IL Mental Health and Developmental Disabilities Code is amended by changing Sections 3-100 as follows: (405 ILCS 5/3-100)

Bill HB 2673; 7/29/2015 enacted – "The circuit court has jurisdiction over all persons alleged to be in need of treatment under section 2-107.1 of this Code, whether or not they are charged with a felony". Technically, in this Jurisdiction any judge can order meds, but they have to still have a hearing under the IL mental health code. The criminal judges don't generally want to do the hearings because the County Division has judges who do it already.

This provision only clarifies what we already know, that persons charged with a felony can get involuntary meds.

The Mental Health Code stipulates if you are a person charged with a felony you can't be subjected subject to involuntary admission to a mental health facility. Prior to this amendment, there was an interpretation of the above by some people asserting that you can't involuntarily medicate persons charged with a felony. So, this amendment clarifies what we already know that detainees charged with felonies CAN BE treated involuntarily. There have been no substantive changes in the Code to facilitate the administration of involuntary medications (non-emergency basis) to pre-trial detainees.

The audit of frequency of contact between providers / quality of documentation in EMR was undertaken. See the Appendix.

On October 14, 2015 the CCSO facilitated a 7 hour CIT training overview for Cermak clinical staff and custody staff. Staff persons selected for this initial training are currently assigned to the psychiatric care units or the residential treatment unit. Staff selected to attend reported finding the training extremely useful.

Medical social workers continue to provide linkage and aftercare planning for SMI detainees and a selected group of P2 detainees. The Medical Social Workers also continue to be an integral part

of the response to calls received by the Sheriff's Care Line. All information related to mental health issues continues to be forwarded to our two senior medical social workers for follow up and/or delegation to divisional social workers if indicated. Since the last visit, our social work staff has addressed 73 calls/referrals. Of those referrals, (78%) had already been identified, evaluated, placed on the MH caseload and were receiving treatment. (8%) of the referrals yielded new additions to the MH caseload, and the remaining (14%) referrals were determined to not be in need of continued follow up from the MH department. This collaborative community outreach effort has resulted in increased access to collateral information and opportunity for improved care and clarification of needs.

**November 2015 Metzner assessment:** Significant improvement since the April 2015 site visit include increased and consistent psychiatry coverage within the Special Care Unit and the hiring of the unit director position as summarized in the status update section. Programming has increased within the Unit SE related to, in part, the opening of the Intensive Management Unit within the RTU that now houses several inmates formerly housed in Unit SE.

During the afternoon of November 3, 2015 I attended the afternoon staff meeting on 2W. There was very good interdisciplinary discussion among mental health and custody staff, which included Superintendent Jones. I also met with female detainees on 2W. Of note, inmates in all the units within the mental health infirmary continue to be locked in the rooms from about 1 PM-4 PM, except for those being seen in individual sessions by a psychiatrist and those on special management status. I also observed group activities on 2W during the morning of November 4, 2015, which were directed in a competent manner by the mental health specialists.

I also interviewed inmates in a group setting on Unit 2S. They continued to report that they were essentially restricted to sitting in their chairs during dayroom time although this information was not consistent with information provided by CCDOC staff or my observations via video monitoring. They described their group programming to generally be helpful. I also observed group activities on 2S during the morning of November 4, 2015, which were also directed in a competent manner by the mental health specialists.

During the morning of November 4, 2015, I also observed group activities on 2N, which were well structured by the mental health specialist.

I remain impressed with the leadership demonstrated by Superintendent Jones and the continued evolving working relationship between custody and mental health staffs.

Attachment I summarizes statistics relevant to the Special Care Unit.

I am concerned about the number of canceled activities as summarized in the current status section. This issue needs to be jointly monitored by CCDOC and Cermak staff. CCDOC reported that security-related cancellations were due in part to compound lockdowns. As a remedy, CCDOC will allow inmates housed on the 2nd floor of Cermak

to engage in unit programming during such lockdowns. CCDOC has provided post orders for their staff indicating increased out of cell time for inmates housed on the 2nd floor of Cermak. Additionally, the Cermak Superintendent will meet regularly with Cermak mental health leadership to review reasons for programming cancellations and determine ways to minimize such cancellations.

Partial compliance remains related, in part, to the psychiatrist's vacancies and the need to provide more adequate treatment for the current maximum-security inmates, which is hampered by the involuntary medication process. I am encouraged by the opening of the intensive management unit (IMU) and the programming hours that are being offered. I remain concerned by the limited out of cell hours offered to most inmates between 12:30 pm - 4 pm, which is related to the need to provide out of cell hours to "house alone" inmates.

CCDOC has met the requirements of this provision, understanding that ongoing collaboration with Cermak regarding program cancellations and increasing the out of cell hours offered to most inmates between 12:30 pm - 4 pm is required.

Significant improvement is noted as compared to the previous site assessment.

**Recommendations:** Address the above issues.

> **i.    Cermak shall provide the designated CCDOC official responsible for inmate disciplinary hearings with the mental health caseload roster listing the inmates currently receiving mental health care.**

**Assessment:** Substantial compliance (since June 2012)

**Factual Findings:**

**October 2012 Cermak Status Update**

- Cerner is now able to generate a patient roster for the mental health caseload to provide to the CCDOC; however, it does not yet include the level of care/mental health classification as this is being built within the alert system.

**November 2013 Metzner assessment:** Substantial compliance continues.

**November 2015 Cermak Status Update** Communication between the two systems continues to work well. A new segregation alert has been built in CCOMS to assist in readily identifying all detainees in segregated housing at any point in time.

**November 2015 Metzner assessment:** Substantial compliance continues.

j.      **When CCDOC alerts Cermak that an inmate is placed in lock down status for disciplinary reasons, a Qualified Mental Health Professional will review the disciplinary charges against inmate to determine the extent to which the charge was related to serious mental illness. The Qualified Mental Health Professional will make recommendations to CCDOC when an inmate's serious mental illness should be considered as a mitigating factor when punishment is imposed on an inmate with a serious mental illness and to minimize any deleterious effect of disciplinary measures on an inmate's mental health status.**

**Assessment:** Substantial compliance continues (since October 2012).

**Factual Findings:**

**November 2015 Cermak Status Update**

Based on the results of interagency collaboration, the 14 day stipulation was removed, DOC understands that if mitigating factors are identified and there is no contraindication for continued placement in disciplinary segregation they will limit disciplinary segregation time to 14 days or less. The form was updated to reflect recommendations from the previous monitoring visit and interagency discussions.

The creation of a separate huddle meeting for Disciplinary Segregation analogous to The Levels System Meeting (for Administrative Segregation) or perhaps expanding the Levels System format to include Disciplinary Segregation was discussed with CCDOC during Suicide Prevention Committee Meeting. It was decided that these discussions would occur at the divisional level during the local management meetings with the Unit Director, Superintendent, CRW, Nursing, and the Assistant Executive Director.

Cermak MH Leadership (Drs. Key and Kelner) continue reviewing the SI cases of detainees housed in Special Incarceration Unit (for P2 routinely and GP cases upon additional request from DOC ) to provide the higher level of review.

It was understood that Mental Health staff's role is limited to assessing whether inmates who are classified as either P3 or P4 and have been charged with a major infraction meet criteria for mitigation. Specifically, the mental health assessment should address the following questions:

a. Does the inmate have a mental illness?
b. If the inmate has a mental illness, were the symptoms of the mental illness directly related to the behavior resulting in the infraction?
c. If the answer to a and b is yes, does the clinician have any recommendations specific to how the disposition should be mitigated?

d. Additionally, in June 2015 the following was incorporated – Whether or not there are current clinical contraindications for housing in segregation?

It is understood that it is not within Cermak MH staff purview to determine whether or not a major infraction has occurred. It is also implied that detainees without major infractions will NOT be referred for mitigation.

**November 2015 Metzner assessment:** Substantial compliance continues

> **k. In the case of mentally ill inmates in segregation, CCDOC shall consult with Cermak to determine whether continued segregation is appropriate or whether the inmate would be appropriate for graduated alternative based on Cermak's assessment.**

> **l. Cermak shall ensure that mentally ill inmates in segregation receive timely and appropriate treatment, including completion and documentation of regular rounds in the segregation units at least once per week by adequately trained Qualified Mental Health Professionals or by Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional, in order to assess the serious mental health needs of inmates in segregation. Inmates who are placed in segregation shall be evaluated within 24 hours of placement and thereafter regularly evaluated by a Qualified Mental Health Professional, or by a Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional to determine the inmate's mental health status, which shall include an assessment of the potential effect of segregation on the inmate's mental health. During these regular evaluations, Cermak shall provide CCDOC with its recommendation regarding whether continued segregation is appropriate or whether the inmate would be appropriate for graduated alternative based on the assessment of the Qualified Mental Health Professional, or Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional.**

**Compliance Assessment:** Substantial compliance (11/15)

**Factual Findings:**

**November 2015 Cermak Status Update**

Dr. Metzner's suggestion dating back to March 2015 about creating mental health segregation tiers where Cermak can deliver therapeutic program and where the amount of out of cell time exceeds that of what is ordinarily available on regular segregation tiers was shared at the Suicide Prevention Committee Meeting (October 23rd, 2015). The idea is to (reliably) separate the

mentally ill requiring segregation from the ones w/out identifiable DSM pathology (or the ones that are kept on the Mental Health case load due to self-injurious and disruptive behavior) and provide different services on different tiers.

There have been notable improvements in the consistency of receipt of segregation notifications from CCDOC. In instances where notifications have not been received, each Unit Director is able to address with the divisional superintendent during the divisional meetings. As such greater consistency in compliance with pre-/within 24 hours placement screens can be seen across divisions. See Appendix. Additionally, a new segregation alert was created in CCOMS in October that will allow Cermak staff to print reports reflecting all admissions to disciplinary segregated housing.

Mental Health staff continues to conduct rounds minimally weekly in all segregation tiers. Shortly after the last site visit a new power form to document segregation rounds was launched in the EMR. Staff is now able to formally document completion of rounds on each detainee in the medical record. Completion of rounds has been a great challenge to staff due to the behavior of some of the detainee's housed in disciplinary segregation. Increases in sexual acting out, projection of bodily fluids, and verbally threatening behavior by detainees who are not severely mentally ill have added to the difficulty in completing this task.

**November 2015 Metzner assessment:** Review of the Special Management Housing Screen review log documented 93%-100% compliance with this provision.

Substantial compliance continues.

   n.    **Cermak shall ensure that a psychiatrist, physician or licensed clinical psychologist conducts an in-person evaluation of an inmate prior to a seclusion or restraint order, or as soon thereafter as possible. An appropriately credentialed registered nurse may conduct the in-person evaluation of an inmate prior to a seclusion or restraint order that is limited to two hours in duration. Patients placed in medically-ordered seclusion or restraints shall be evaluated on an on-going basis for physical and mental deterioration. Seclusion or restraint orders should include sufficient criteria for release.**

**Compliance Assessment:** Partial compliance

**Factual Findings:**

**November 2015 Cermak Status Update**

An audit regarding Notifications to the Facility Director was undertaken and can be found in the Appendix.

Restraint audit QI report to be provided by nursing. Presence of the new psychiatric special care Unit Director, Dr. B. Waxler will provide the opportunity for onsite supervision of the mental health responsibilities relative to the deployment of restraints, including de-escalation and patient and team debriefing. This should result in consistency of compliance with all policies and procedures.

**November 2015 Metzner assessment:** I reviewed with nursing and mental health staff leadership an audit completed by nursing staff relevant to the restraint/seclusion policy and procedure. About 22 inmates had been restrained during the third quarter of 2015. This audit clearly demonstrated improvement relevant to implementation of the pertinent policies and procedures since the April 2015 site visit. However, there were some methodological issues relevant to this particular quality improvement activity which were discussed and will be corrected when the next audit is performed.

I discussed with the Cermak nurse manager, Madonna Mikaitis, R.N. my recommendation that a concurrent audit be performed at the end of each day when an inmate has been placed in restraints.

**Recommendations:** As above.

      o.    **Cermak shall ensure an adequate array of crisis services to appropriately manage the psychiatric emergencies that occur among inmates. Crisis services shall not be limited to administrative segregation or observation status.**

      p.    **Cermak shall ensure that inmates have access to appropriate acute infirmary care, comparable to in-patient psychiatric care, within the Cermak facility.**

**Compliance Assessment:** Partial compliance

**Factual Findings:**

**November 2015 Cermak Status Update**

The collection of the HSRF response data was revised to reflect face to face evaluations conducted by mental health specialists by level of ordered priority (see APPENDIX). Compliance with responding to all HSRF with a face-to-face evaluation within the required timeframes has shown some improvements, but continues to fall below expectations. One known factor continues to be delayed scheduling of appointments related to staff allocation and staff attendance. A second full-time mental health specialist was assigned to Div. 9, one of the problematic areas, in the evening to assist with timely response to HSRF. Other areas are impacted by staff absenteeism and sheer volume of HSRF submitted. There are just far more patient requests for services than we have the staff to respond to in the required time frames. As

such, clinics fill up quickly and appointments are scheduled further and further back. We expect to see improvements in response time as we increase our staff numbers. As a department we continue to discuss ways in which to address the challenges associated with responding to repetitive and misused requests (i.e. detainees who fill out numerous requests for secondary gain). We also expect that as the protocols and procedures for the processing of HSRF becomes more fluid within Cermak as a whole; the mental health response time will improve. Nursing staff were reeducated regarding the handling of HSRF for mental health services through the development of triage flow chart (see Appendix). Cermak leadership is engaged in ongoing efforts to improve the system protocols in this regard.

Of concern was the number of HSRF that were not responded to as evidenced by absence of documentation reflecting an evaluation in the medical record. An analysis of root cause of HSRF not responded to for the month of September was conducted by Dr. Key. 41 charts identified as "Not DC'd, Not Seen" were audited (see Appendix). Findings indicate that the most significant causes were related to scheduling issues, patient refusals, and erroneous referrals to mental health that were not mental health related and did not warrant a mental health evaluation. Mental health staff will continue to work with the Scheduling department to determine a plan of action to address the scheduling issues. The Chief Psychologist will monitor "Not Seen" patients to ensure access to care is provided.

To expand the availability of crisis response to divisions, additional telehealth equipment was requested and installed in the urgent care. With this additional equipment, once operational, when there are two mental health providers scheduled to the urgent care, divisional services will have increased access. This will assist in addressing the often high numbers of individuals that enter segregation on a daily basis.

**November 2015 Metzner assessment:** The relevant policy and procedure requires that mental health HSRFs be triaged by mental health staff within 72 hours. However, there is a misunderstanding among mental health staff relevant to this policy and procedure and confusion in the context of the definitions of priority and routine referrals. Consequently, a significant proportion of HSRFs are not being triaged within 72 hours.

Staff need to be trained regarding this policy and procedure and a QI should be performed relevant to implementation following the training.

**Recommendations:** As above.

60. **Psychotherapeutic Medication Administration**

   a. **Cermak shall ensure that psychotropic medication orders are reviewed by a psychiatrist on a regular, timely basis for appropriateness or adjustment. Cermak shall ensure that changes to an inmate's psychotropic medications are clinically justified and documented in the inmate's medical record.**

   b. **Cermak shall ensure timely implementation of physician orders for medication and laboratory tests. Cermak shall ensure that inmates who are being treated with psychotropic medications are seen regularly by a physician to monitor responses and potential reactions to those medications, including movement disorders, and provide treatment where appropriate.**

**Compliance Assessment:** Partial compliance

**Factual Findings:**

**November 2015 Cermak Status Update**

Information regarding recommendation above regarding the careset was shared with the IT team. No further updates at this time.

**November 2015 Metzner assessment:** An October 14, 2015 QI study demonstrated continue compliance issues relevant to obtaining pertinent laboratory tests, especially relevant to the use of risperidone, Zyprexa, Geodon.

**Recommendations:** Develop and implement the previously referenced careset.

**E.**  **SUICIDE PREVENTION MEASURES**

**61.**  **Suicide Prevention Policy**

   a. **CCDOC shall participate with Cermak in a jointly established Suicide Prevention Committee charged with developing policies and procedures to ensure the appropriate management of suicidal inmates and with implementing and monitoring a suicide prevention program in accordance with generally accepted correctional standards of care.**

   b. **Cermak shall participate with CCDOC in a jointly established Suicide Prevention Committee charged with developing policies and procedures to ensure the appropriate management of suicidal inmates and with implementing and monitoring a suicide prevention program in accordance with generally accepted correctional standards of care.**

   c. **The suicide prevention policy shall include, at a minimum, the following provisions:**
    **(1) an operational description of the requirements for both pre-service and annual in-service training;**
    **(2) intake screening/assessment;**
    **(3) communication;**

      **(4) housing;**
      **(5) observation;**
      **(6) intervention; and**
      **(7) mortality and morbidity review.**

**Compliance Assessment:** Substantial compliance (November 2013)

**Factual Findings:**

**November 2013 Metzner Assessment:** Significant improvement is noted in the Mortality &
Morbidity Review reports, which are now using a root cause analysis format.

As described elsewhere in this report, problems remain relevant to the intake
screening/assessment process, especially in the context of priority referrals and segregation
admissions screening. These issues are addressed elsewhere in this report.

**November 2015 Cermak Status Update**

Three reports were submitted for review following initial RCAs, prior to and since the last site
visit. Following the initial RCA completion and recommendation from Dr. Metzner, Cermak
created narratives with a summary of relevant findings for the three completed suicides. The
narratives were created before receipt of CCSO reports.

As of the submission of this report the following data has been received following three RCAs
secondary to completed suicides conducted in 2015.
#1. –J.A.– Critical Incident Review; CCSPD Report/ Autopsy Results were received by Cermak
on October 23

#2T.T. - Detainee Expiration Memorandum, Data Collection Packet/Witness Statements

#3J.C. – Critical Incident Review. On September 30th, 2015 the CCSO (Sheriff's Police) Report /
Autopsy Results were was received by Cermak. The case was discussed during the Suicide
Prevention Committee. All the case above are at least 4-5 months old at the time of this report.

Autopsy results for TT were unavailable at the time of the report.

The initial RCAs were conducted according to the timetables (10 days) stipulated in the Policy
with the participation of representatives from Cermak and CCDOC (#1 and #3) with the
exception of one case, #2 TT.

#1 and #3 were discussed during the most recent Suicide Prevention Committee with follow up
on previously identified Action Items. Revised versions of these two RCAs reflecting updated
documentation received and status of each action plan was sent for review in encrypted files.

Of note, the result of the action plan below is likely related to an observed high rate of special care unit admissions:

Cermak provided CCDOC a list of high risk charges. CCDOC will explore the possibility of having an alert on the dashboard of CCOMS or some other means (i.e. an internal email referral system) of red flagging detainees with high risk charges. The idea is to identify the charges that lead to intense guilt, shame and similar feelings that increase the risk of suicide:
Predatory Criminal Sexual Assault
Abuse of a corpse
Sexual relations within families
Dismembering a human body
Conspiracy to commit murder/solicitation to commit murder
Intentional homicide of an unborn child
First degree murder when the following aggravating factors are present: killing of a peace officer, murdering two or more individuals, murdered individual was less than 12 years of age, matricide, patricide, the murder involved infliction of a torture, death resulted from exceptionally brutal or heinous behavior or wanton cruelty. These charges result in an admission to the psychiatric special care unit for observation, even in the absence of past or present psychiatric symptoms.

Two RCA's following staff assault in Cermak were conducted with CCDOC participation according to the timeframes (10 days).

**November 2015 Metzner assessment:** My April 2015 recommendations were implemented. Substantial compliance continues.

62. **Suicide Precautions**

   a. **CCDOC shall ensure that, where suicide prevention procedures established jointly with Cermak involve correctional personnel for constant direct supervision of actively suicidal inmates or close supervision of special needs inmates with lower levels of risk (e.g., 15 minute checks), correctional personnel perform and document their monitoring and checks.**

   b. **Cermak shall ensure that, where suicide prevention procedures established jointly with CCDOC involve health care personnel for constant direct supervision of actively suicidal inmates or close supervision of special needs inmates with lower levels of risk (e.g., 15 minute checks), health care personnel perform and document their monitoring and checks.**

   c. **CCDOC shall ensure that when an inmate is identified as suicidal, the inmate shall be searched and monitored with constant direct supervision until the inmate is transferred to appropriate Cermak staff.**

   d. **Cermak shall develop and implement policies and procedures for suicide**

> **precautions that will set forth the conditions of the watch, including but not limited to allowable clothing, property, and utensils, in accordance with generally accepted correctional standards of care. These conditions shall be altered only on the written instruction of a Qualified Mental Health Professional, except under emergency circumstances.**

**Compliance Assessment:** Substantial compliance (11/15)

**Factual Findings:**

**November 2015 Cermak Status Update**

See APPENDIX for Suicide Detection and Prevention QI Report Qtr. 2 2015 and Qtr. 3 2015

**November 2015 Metzner assessment:** Review of the relevant CQI studies indicated that all but one of the provisions of the relevant policies and procedures were with greater than 90% compliance. The one provision not in compliance, which involved posting of the observation status instructions on the cell door, has since been corrected.

Substantial compliance is now present.

**Recommendations:**

64.     **Suicide Risk Assessments**

a.      **Cermak shall ensure that any inmate showing signs and symptoms of suicide is assessed by a Qualified Mental Health Professional using an appropriate, formalized suicide risk assessment instrument within an appropriate time not to exceed 24 hours of the initiation of Suicide Precautions.**

b.      **Cermak shall ensure that the risk assessment shall include the following:**
(1)   **description of the antecedent events and precipitating factors;**
(2)   **mental status examination;**
(3)   **previous psychiatric and suicide risk history;**
(4)   **level of lethality;**
(5)   **current medication and diagnosis; and**
(6)   **recommendations or treatment plan. Findings from the risk assessment shall be documented on both the assessment form and in the inmate's medical record.**

**Compliance Assessment:** Substantial compliance (11/13)

**Factual Findings:**

**November 2013 Metzner assessment:**

The 15 charts in the EMR of patients, who had screened positive on the suicide screen, were reviewed by my fellow in forensic psychiatry. These charts were randomly selected among approximately 40 patients who had screened positive on the suicide screen. Every patient chart reviewed had a secondary suicide risk assessment completed. In 12 of the 15 assessments, the form was completed and the narrative summary was consistent with the checked items. In three of the assessments, the narrative summary was thorough, but risk factors highlighted in the narrative summary were not checked as risk factors in the body of the assessment form. This was likely an error because the narrative summary assessed those patients as a risk for suicide.

**November 2015 Metzner assessment:** Substantial compliance continues

**65. Cermak shall ensure that inmates will only be removed from Suicide Precautions after a suicide risk assessment has been performed and approved by a Qualified Mental Health Professional, in consultation with a psychiatrist. A Qualified Mental Health Professional shall write appropriate discharge orders, including treatment recommendations and required mental health follow-up.**

**Compliance Assessment:** Substantial compliance (11/15)

**Factual Findings:**

**April 2015 Cermak Status Update**

Current protocol of only a psychiatrist being able to remove a patient from suicide precaution continues. Cermak policy is being updated to reflect this practice, which was adopted prior to November 2014 site visit.

As reported in paragraph #62, QI report relevant to suicide detection and prevention were reviewed. The overall compliance rate for the January 2015 audit was 92%. Of the 14 key indicators, four had a compliance rate below the target of 90%, which included the following:

1. QMHP documented consultation with psychiatrist for disposition of suicidal detainee.
2. Documentation of daily psychiatry contact while in observation status
3. Observation log completed
4. Observation status instructions completed

**November 2015 Cermak Status Update**

Please refer to QI report referenced in provision #62.

**November 2015 Metzner assessment:** Review of the relevant QI results were consistent with

the presence of substantial compliance.

## H. QUALITY MANAGEMENT AND PERFORMANCE MEASUREMENT

**86.** **Quality Management and Performance Measurement**

    **a.** **Defendants shall each develop and implement written quality management policies and procedures, in accordance with generally accepted correctional standards, to regularly assess, identify, and take all reasonable measures to assure compliance with each of the provisions of this Agreed Order applicable to that Defendant.**

    **a.** **Defendants shall each develop and implement policies to address and correct deficiencies that are uncovered during the course of quality management activities, including monitoring corrective actions over time to ensure sustained resolution, for each of the provisions of this Agreed Order applicable to that Defendant.**

**Compliance Assessment:** Substantial compliance (11/15)

**Factual Findings:**

**November 2015 Cermak Status Update**

The following Quality Improvement audits have been initiated and can be found in the Appendix:

Telepsychiatry Utilization and chart audit
Intake Psychiatry Referrals chart audit
Facility Director Notifications chart audit
CQI Frequency of contact with Providers in Cermak
2S Psychiatry Contact visits chart audit
Quality of RCDC Mental Health Assessments
Health Service Request Not Seen

**November 2015 Metzner assessment:** The pre-site information packet which included the QI appendix, was well done and very helpful.

Substantial compliance is present.

**Recommendations:** Continue with the QI process.

**Additional Information**

During the afternoon of November 4, 2015, Susan McCampbell and myself met with key leadership staff from CCDOC and Cermak medical/mental health services to discuss issues relevant to the use of force involving mentally ill inmates which has been increasing during the past year. Reference should be made to the reports by Mr. McCampbell for a summary of the trends specific to this issue.

Two different populations were discussed relevant to this increasing use of force issue. The use of OC spray within the second floor of Cermak often involved inmates who were in need of involuntary administered psychotropic medications although the OC spray was not being used to involuntarily medicate them. The psychiatrists' vacancies, difficulties obtaining court orders for the use of nonemergency involuntary medications, and the amount of out of cell time provided to these inmates were among the issues discussed.

The second population involved inmates in segregation units within Divisions IX and X who were threatening suicide and/or engaging in dangerous and/or self harming behaviors. These inmates were noted to have predominantly personality disorders and did not meet the usual definition of a serious mental illness. At the time of this discussion it was unclear how many of these inmates were on the mental health caseload.

Recent efforts by CCDOC to change the conditions of confinement by implementing out of cell structured correctional rehabilitative programs on these units were described and acknowledged as being extremely beneficial. There was agreement that these inmates needed to have an individualized behavioral management plan developed jointly by mental health and custody staffs. Positive incentives were also briefly addressed (e.g. increased out of cell time, access to televisions, suspension of time in segregation, etc.). The need to discuss issues related to additional mental health staff for a behavioral management unit for some of these inmates was also discussed. There was agreement that CCDOC and Cermak would need to meet on a regular basis to begin to address and discuss developing a correctional rehabilitative program and/or mental health programming that would be cognitively behaviorally based for these inmates.

**Appendix V**



# Correctional Health
## Cermak Health Services / JTDC

*System Administration

1/16/15

**Appendix VI**

**Please have the following information available in hard copy at the time of the site visit, and sent to me one week prior to the site visit in electronic form (but not in PDF) unless indicated otherwise. *Each* piece of information should cover the period since the last site visit.**

**Note: If any of the requests are too burdensome to produce, please contact me before attempting to produce such information.**

### Appendix I Agreed Order 5/13/10 MH provisions revised

Using the word version of Appendix IV in my last submitted report, after each of the "recommendations" section add the following section: **[date of site visit] Cermak status update:** and complete a narrative with proof of practice as available. This document request is the most crucial document. *Please do not delete my November 2015 findings or recommendations except for provisions that have been found in substantial compliance for at least 18 months..*

Some of the following requests may be in the above document and only need to be referenced—it does not have to be provided twice.

### Mental Health System

1. The mental health system organization chart (with both position and name of person filling the position and his/her credentials- e.g., degree).

2. Any new policies and procedures relevant to mental health services.

3. Any new program descriptions of the current mental health system.

4. Any other reports (i.e., internal or external reviews) relevant to the mental health system at CCDOC.

### Institutional Program Status

1. Narrative summary of program status

### Staffing

1. List authorized mental health staff positions by discipline (psychiatrists, psychologists, social workers, nursing staff, clerical staff, etc.) and by program/area (intake, crisis stabilization, mental health housing units, etc.). For each position, indicate the person's name, professional degree, start date, and percent of FTE if not full-time. If the position is vacant, provide the date it became vacant. For any staff on leave, indicate the date the leave began.

2. List any newly allocated mental health positions and the dates they were established.

## Census/Mental Health Roster

1. The total number of inmates in the jail, total number in segregation units, total number of mental health caseload inmates, and total number of inmates in each program area (crisis observation, mental health housing, general population, etc.).

2. Statistical information pertinent to the reception center screening of inmates (i.e., number of persons on a daily, weekly, or monthly basis for the past six months, percentage of inmates who have positive screens from a mental health perspective, percentage of inmates with positive screens who enter the continuum of mental health services, percentage of all newly admitted inmates who enter the continuum of mental health services).

## Access to Higher Levels of Care

1. Number of inmates admitted to the infirmary on a monthly basis and the median length of stay in such beds.

2. List of names of inmates admitted to the infirmary more than twice during the last six months, including the admission and discharge dates.*

## Disciplinary Reports

1. The total number of disciplinary reports written in the jail.

2. The total number of disciplinary reports written for mental health caseload inmates in the jail. Please list by mental health housing wings by Division.

3. The percentage of disciplinary reports that assessed mitigating circumstances to be present.

4. An analysis of the impact of positive mental health assessments re: mitigation.

## Quality Improvement

1. Agenda and minutes of all CQI meetings.
2. Agenda and minutes of all Mental Health Subcommittee of the CQI meetings
3. A copy of each relevant QA/QI audit conducted, preferably in electronic forms. For each audit provided, a description of:

    a. Statement of the issue being studied
    b. Methodology used
    c. Results

    d.  Assessment of results
    e.  Plan of action based on the assessment

## Medication management

1. List of inmates and/or logs or other documentation of inmates receiving medications on an involuntary basis.*
2. Audits or other documentation of timeliness of medication delivery to inmates who arrived at the institution with current psychotropic medication orders or adequate verification of current psychotropic medication usage.
3. Audits or other documentation of timeliness of medication delivery upon expiration of prior psychotropic order.
4. Audits or other documentation of practices identifying patients noncompliant with their psychotropic medication (as defined in policy), timeliness of referral to mental health, and timeliness and adequacy of psychiatric response.
5. Audits or other documentation of laboratory testing orders as per standards for psychotropic medications, timeliness of results, timely notice regarding abnormal results, and appropriate medication adjustments.
6. The total number of mental healthcare caseload inmates prescribed medication.

## Suicide Prevention

1. For any completed suicide, a copy of the mortality and review report.

2. Agenda and minutes of  Suicide Prevention team meetings

## Additional Items

1. Schedule of group therapies/structured out of cell therapeutic activities offered to inmates in the mental health housing units.*

2. Logs showing the use of restraints and seclusion, including the dates and times the orders were initiated, renewed, and discontinued, and the timing of nursing checks conducted.*

3. Audits relevant to the mental health screening and rounds in the segregation units.

4. Description of the status of any new construction or remodeling for mental health treatment space.

*Does not need to be sent in advance of site visit.*

# APPENDIX

# CERMAK MENTAL HEALTH DOJ SITE VISIT

# NOVEMBER 2015

# TABLE OF CONTENTS

| | |
|---|---|
| **59. B - E** | **3-13** |
| | |
| QI: REFERRALS TO SECONDARY MENTAL HEALTH ASSESSMENT/QUALITY OF DISPOSITIONS | 3 |
| INTAKE PSYCHIATRY REFERRALS | 5 |
| INTENSIVE MANAGEMENT UNIT | 7 |
| TREATMENT PLAN/CARD PROGRAM | 22 |
| | |
| **59. F-L** | **28-38** |
| | |
| FUNCTIONAL FTES | 28 |
| TELEPSYCHIATRY UTILIZATION | 31 |
| RATES OF PSYCHIATRY INPATIENT CONTACTS IN CERMAK | 32 |
| SPECIAL MANAGEMENT HOUSING SCREEN REVIEW | 38 |
| | |
| **59. N – 65.** | **39-48** |
| | |
| NOTIFICATION TO FACILITY DIRECTOR | 39 |
| PARETO CHART: HSRF NOT SEEN | 40 |
| NURSING HSRF FLOW CHART | 41 |
| SUICIDE DETECTION AND PREVENTION | 43 |

# Cermak Health Services of Cook County Quality Improvement Report



**Indicator/Project Name: 1. Referrals to Secondary Mental Assessments by primary screeners in RCDC and 2. Quality of dispositions by Mental Health Specialists in RCDC (secondary screeners)**

**Reporting period: 08/27/2015-08/31/2015**

| Executive Summary |
| --- |

**DEFINE**   1.Quality of Secondary Mental Health Assessments in RCDC was analyzed. 2. To analyze low level of referrals for Secondary MH Screening in RCDC.

**MEASURE**

- Between 08/28/2015 and 08/31/2015- 604 Initial CHS Screenings took place in RCDC (176,159,114, and 155 respective to the above dates). Out of those 89 have been referred to Secondary Mental Health Assessments performed by QMHP's in RCDC- 15%.

  When separated by gender the following data has been obtained: out of 513 males 63 have been referred to Secondary MH Assessment (12.2%), out of 91 females, 26 have been referred to Secondary MH Assessment (28.5%).

- An additional study of 102 charts was conducted by Unit Director between 8/27/2015 and 8/30/2015. Total 102 patients were seen for Secondary Mental Health Assessment. Following the Secondary Mental Health Assessments, the following dispositions have been obtained: General Population 39 (38%), P2- 41(40%), P3-14(14%) and P4-8(8%).

  The chart audit revealed that in 12 cases (9%), the Unit Director disagreed with the original disposition made by MHS III/QMHP.

| LOC Disposition | Number | % of total | Concurrence by Supervisor | % of agreement | LOC by Supervisor |
| --- | --- | --- | --- | --- | --- |
| GP | 39 | 38% | 34 | 87% | P2 |
| P2 | 41 | 40% | 41 | 100% | |
| P3 | 14 | 14% | 13 | 93% | P2 |
| P4 | 8 | 8% | 8 | 100% | |
| Totals | 102 | 100% | 96 | 94% | |

All information provided in these appended materials is compiled at the director of the Cermak Department of Quality and Patient Safety and is privileged and confidential. They are to be used solely in the course of quality control and for the purpose of reducing morbidity and mortality and improving the quality of patient care. This confidential Patient Safety Work Product is protected under the Federal Patient Safety and Quality Improvement Act and the Illinois Medical Studies Act.

# Cermak Health Services of Cook County
# Quality Improvement Report



- Another study was conducted between 8/27/2015 and 8/31/2015. 132 charts were analyzed by Chief of Psychiatry. Questionable dispositions have been made by 7 different QMHP's.

| 1 | 8% |
|---|-----|
| 1 | 8% |
| 1 | 8% |
| 3 | 25% |
| 2 | 16.6% |
| 3 | 25% |
| 1 | 8% |

**ANALYZE**
The rate of male referrals form Initial Screening remains low. The rate of female referrals to Secondary MH screening is acceptable.

The presence of outliers (albeit with low statistical power) has been identified.

MH Leadership met with Director of Nursing and discussed ways of improving the Initial Screening process in RCDC (the rate of referrals to Secondary MH Assessment/ the rate of False Positives remains lower than expected). It was decided to continue using the existing instrument used by screeners in terms of sensitivity and balance it out against other imperatives during the screening process. In the meantime, primary screeners were presented with an overview/refresher of the procedure. It was emphasized that the cut off score of 13 is important but not the only trigger to warrant further referral to MH. There was a misconception that the total score on the 6-question screen is the only thing that matters when considering MH referrals following the initial CHS screen. Any positive response to a MH related question AND/OR a score of 13 or more on the 6-question screen results in an automatic referral to MH for an assessment. Screeners should be asking for lifetime use of MH services. A detainee is to be referred to MH for assessment at intake if the 6-question screen is positive AND / OR the detainee responds affirmatively to any of the other MH screening questions.

**IMPROVE**
1. Cermak MH Leadership has met with Nursing Leadership and clarified expectations and the methodology used when applying initial screening in RCDC. Further studies assessing interrater variability between primary screeners will have to be conducted by the Patient Care/ Nursing Department.
2. RCDC Unit Director will continue addressing quality of assessments in group and individual supervisions with Mental health Specialists working in RCDC.

All information provided in these appended materials is compiled at the director of the Cermak Department of Quality and Patient Safety and is privileged and confidential. They are to be used solely in the course of quality control and for the purpose of reducing morbidity and mortality and improving the quality of patient care. This confidential Patient Safety Work Product is protected under the Federal Patient Safety and Quality Improvement Act and the Illinois Medical Studies Act.

# Cermak Health Services of Cook County
# Quality Improvement Report



## Indicator/Project Name: Intake Psychiatry referrals chart audit

## Reporting period: 09/1/2016-09/30/015

Executive Summary. Chart audit revealed that some Intake Psychiatry referrals are not seen within the required timeframes and some are not seen outside of the timeframes.

1. Psychiatrists in RCDC see detainees before MH specialists put in Emergency Psychiatry referral and the logic does register this evaluation as No Note-Not Seen.
2. In some cases detainees are rushed to Urgent Care (medical conditions, withdrawal reactions, and drug/ETOH toxidromes) and then to MSCU (Medical Special Care Unit ) /Detoxification Units by Primary Care and before Psychiatrists can assess in RCDC. Then they are to be seen as Consultations in MSCU and RTU on the 2nd and 3 rd floors but with resultant delays in the timeframe for Emergent Referrals.
3. When detainees who were referred for Urgent and Routine Psychiatry referrals enter Detoxification Units or admitted to MSCU (and/or sent to JSH), and remain there, there is no separate mental health Clinic Template in Cerner for those non mental health locations and the identification of these appointments is dependent on the communication between Nursing/Medical Providers and Psychiatric providers so that Psychiatry is notified of detainees' appointments. This communication is not always efficient as it calls for review of pending orders by Nursing and Medical staff. Frequent movement of patients with high acuity between detoxification /medical and mental housing also contributes to the fact that appointments are missed and then rescheduled outside of timeframes.
4. Schedulers/AA do not work during weekends/holidays and those referrals to Psychiatry made on Fridays/Saturdays/Sundays/Holidays are scheduled for Urgent Consultations with delays.
5. SP IDOC( parole ), EM and Outlying County shipments remain active in Cerner and therefore are captured by its logic as not seen.
6. It was discovered that the CHS Mental Health Assessment form used by MHS in RCDC was programmed to generate Urgent (and not Emergent) Psychiatry Referrals when detainees were referred to Intake Psychiatry.

**DEFINE** To study the pattern of referrals to Psychiatry using Emergent, Urgent and Routine timeframes and factors impeding compliance with the requisite time frames, an audit of charts with 77 Urgent and 77 Routine Intake referrals to Psychiatry was conducted.

## MEASURE

Some of the reasons that led up to inefficiencies in seeing referrals in a timely fashion were multifactorial and most of the reasons fell in the following categories:

All information provided in these appended materials is compiled at the director of the Cermak Department of Quality and Patient Safety and is privileged and confidential. They are to be used solely in the course of quality control and for the purpose of reducing morbidity and mortality and improving the quality of patient care. This confidential Patient Safety Work Product is protected under the Federal Patient Safety and Quality Improvement Act and the Illinois Medical Studies Act.

# Cermak Health Services of Cook County
# Quality Improvement Report



| Process issues | 36% |
| Cerner hardwiring issues | 35% |
| Scheduling issues | 16% |
| Human factors/errors | 13% |

## ANALYZE
Solutions will require a multidisciplinary approach including IT Department and collaboration with the Process and Flow Analysts as well as the Patient Care Department. What was discovered reflects further need for creating a new sustainable process to eliminate delays in Psychiatric referrals.

## IMPROVE
1. **Staff will be directed to enter Psychiatry Referral orders before charts are handed off to Psychiatrists**
2. **This may be a poorly modifiable factor using our current process (Patient Care Department notifies Chief of Psychiatry of pending Psychiatric Referrals in Medical SCU) but Mental Health will continue working with Patient Care Department to identify those Referrals through the development of a new process.**
3. **Related to #3. Cermak is engaged in conversations with the Scheduling Department's supervisor and Patient Care Department.**
4. **Mental Health will work with the Scheduling Department trying to resolve the issue. To address this particular issue Cermak Administration will build a new Urgent Referrals for Psychiatry Clinic/Template in Cerner so Providers covering weekends and holidays will be able to see those Urgent Psychiatry referrals made (most of them are either in Psychiatric Infirmary or in Medical Infirmary ) but only if AA's are assigned to limited coverage on Saturdays and Sundays.**
5. **Work order to IT has been generated to address the issue.**
6. **The issue has been addressed and Cerner is reprogrammed to generate Emergency Psychiatry referrals for Intake.**

## CONTROL

All information provided in these appended materials is compiled at the director of the Cermak Department of Quality and Patient Safety and is privileged and confidential. They are to be used solely in the course of quality control and for the purpose of reducing morbidity and mortality and improving the quality of patient care. This confidential Patient Safety Work Product is protected under the Federal Patient Safety and Quality Improvement Act and the Illinois Medical Studies Act.

# CERMAK MENTAL HEALTH

# INTENSIVE MANAGEMENT UNIT – RTU 2A

# PLANNING OVERVIEW





## CERMAK MENTAL HEALTH INTENSIVE MANAGEMENT UNIT – RTU 2A

1. Staffing Plan
    1.1. Psychology
    1.2. Psychiatry
    1.3. Mental Health Specialists
    1.4. Nursing
    1.5. Custody
    1.6. Expressive Art Therapist
    1.7. Medical Social Worker
    1.8. Correctional Rehabilitation Worker
2. Mission: To utilize evidence based practices and interventions to assist detainees in reducing identified target behaviors that often result in significant harm to self, others, or damage to the institution.
3. Philosophy: To provide management and mental health treatment appropriate to the detainee's diagnosis, risk, acuity, behavioral presentation, and ability to self-regulate. The focus is detainee and staff safety and reduction of overall risk behaviors. All disciplines collaborate to coach, redirect, reinforce, and manage the behaviors and progress of the inmates on the unit.
4. Admission Criteria
    4.1. Serious Mental Illness
    4.2. Severe Functional Deficits/Cognitive Disability
    4.3. Any of the above in conjunction with Administrative Segregation Status
    4.4. Elevated score on the Maladaptive Behavior Screen
    4.5. Exclusionary Criteria – Acute psychosis, acute medical concerns,
5. Functions of the Treatment Team
    5.1. Meet regularly to review and plan for new admissions, referrals, discharges, and transitions
    5.2. To determine the level and structure of support the detainee needs, privilege levels, what activities can be safely engaged in
    5.3. To review treatment progress
    5.4. To analyze and address engagement in target behaviors on the unit
    5.5. To discuss and problem solve any unit or program issues and needs
6. Contingency Management – Collaboration with CCDOC
7. Curriculum
8. Discharge Criteria – Individualized based upon reduction in frequency/intensity/severity of targeted behaviors per the Maladaptive Behavior Screening





- To utilize evidence based practices and interventions to assist detainees in reducing identified target behaviors that often result in significant harm to self, others, or damage to the institution





- Serious Mental Illness
- Severe Functional/Cognitive Disability
- Any of the above in conjunction with Administrative Segregation Status
- Elevated Score on the Maladaptive Behavior Screen
- Exclusionary Criteria: Acute Psychosis or Acute Medical Concerns

- Stage 1: Admission (2 weeks)
  - Safety garments
  - Finger food
  - No commissary
  - Restricted phone (1 call per week)
  - No program opt outs
  - No recreation

- Stage 2:
  - Uniform
  - Regular Diet
  - No commissary
  - 2 phone calls
  - Restricted Visits
  - 1 program opt out/week
  - On unit recreation eligible

- Stage 3:
  - Uniform
  - Regular Diet
  - Restricted commissary (hygiene only)
  - 3 phone calls/week
  - Restricted visits
  - 3 program opt outs/week
  - Off unit recreation available
  - Expressive art therapy eligible





- Meet regularly to review and plan for new admissions, referrals, discharges, and transitions
- To determine the level and structure of support the detainee needs, privilege levels, activities
- To review Treatment progress
- To analyze and address engagement in target behaviors
- To discuss and problem solve unit issues and needs



- Morning huddle before group with security and mental health staff to review significant incidents, ideas of who should participate in group, relevant strategies, etc.
- Weekly staffings to review admissions, pt progress, potential changes in management plans, pt transition to next phase, discharge, etc.
- Potential day and time for staffing: Thursdays at 2pm



- Maladaptive Behavior Screening
  - Examines the frequency (never to very frequently) and severity (does not occur to life-threatening) of behaviors
  - Rating will be used to assess pt's progress and eligibility for discharge

- Management Housing Plan
  - Collaborative plan for team to identify general precautions, diet, materials, movement, and searches



- Self-Directed
- Other Directed
- Property Directed
- Symptomatic Behavior
- Compliance Issues



- Self-Directed= 0
- Other Directed= 22
- Property Directed= 7
- Symptomatic Behavior= 0
- Compliance Issues= 17
- TOTAL= 46
- Team Decision: IMU housing recommended or not recommended

□ All team members have a copy to ensure consistent understanding and provision of:
- General Precautions/Interventions
- Diet
- Property
- Hygiene
- Movement
- Cell Search



- Individualized and based upon tx plan and tx needs
  - Stage 1 Groups: Psycho-education (Orientation to group, Symptom Identification and Mental Illness)
  - Stage 2 Groups: Skill building (Cognitive Reframing, Thinking for a Change, Communication, Meditation, Chair Yoga)
  - Stage 3 Groups: Self-Awareness, Insight, Planning (Healthy living, Positive Psychology, Grief and Loss,



- Increased time in the day room
- Extended visits
- TV privileges
- Art therapy
- Movies
- Music
- Reading materials
- Can be decided by the team on a case by case basis (e.g. being out with a peer)



# MALADAPTIVE BEHAVIOR SCREENING

| | | | | |
|---|---|---|---|---|
| **Offender Name** | **DOC #** | | **Classification** | **Division/Cell** |
| Staff making referral:: _____ Date: _____ | | QMHP:_____ Received Date: _____ | | |

The following criteria are to be used in rating the frequency of behavior:

- 0     Never
- 1     Rarely – less than once per month
- 2     Occasionally – one to three time per month
- 3     Regularly – one to seven times per week
- 4     Frequently – two to ten times per day
- 5     Very Frequently – more than ten times per day

The following criteria are to be used in rating severity or intensity:

- 0     Does not occur or not maladaptive – behavior does not occur or its occurrence does not represent a problem as it does not interfere with other adaptive behavior.
- 1     Insignificant – behavior is without adaptive value in a given setting and is incompatible with other more adaptive activities.
- 2     Mild – behavior occurs with force but no injury results. If property destruction, there is no permanent change in the quality or function of the object. For stereotypic behavior and violations, sometimes interferes with programming.
- 3     Moderate – behavior occurs with sufficient force to cause reddening of the skin and/or contusions. If behavior is property destructions, one occurrence will produce repairable change in the quality of the object. For stereotypic behavior and violations, frequently interferes with or prevents program participation.
- 4     Severe – behavior occurs with force sufficient to cause bleeding, lesions and/or medically diagnosable internal injury (e.g., broken limbs, distended muscles which results in temporary loss of function). If property destruction, behavior produces loss of the objects function on either a short or long term basis.
- 5     Life Threatening – behavior occurs with force sufficient to induce permanent injury to self or others or to produce death if left unabated.

### SELF DIRECTED

| | | FREQUENCY | SEVERITY |
|---|---|---|---|
| 1. | Hit self or hits self against object | 0 1 2 3 4 5 | 0 1 2 3 4 5 |
| 2. | Scratches self, cuts, reopens wounds | 0 1 2 3 4 5 | 0 1 2 3 4 5 |
| 3. | Bites self | 0 1 2 3 4 5 | 0 1 2 3 4 5 |
| 4. | Digs/inserts items in body openings (ears, eyes, nose, rectum, vagina) | 0 1 2 3 4 5 | 0 1 2 3 4 5 |
| 5. | Induces regurgitation | 0 1 2 3 4 5 | 0 1 2 3 4 5 |
| 6 | Ingests inedible objects such as rocks, metal, feces | 0 1 2 3 4 5 | 0 1 2 3 4 5 |

### OTHER DIRECTED

| | | FREQUENCY | SEVERITY |
|---|---|---|---|
| 1. | Hits, kicks, bites, scratches, shoves, chokes others | 0 1 2 3 4 5 | 0 1 2 3 4 5 |
| 2. | Threatens, insults, teases, curses or otherwise provokes others | 0 1 2 3 4 5 | 0 1 2 3 4 5 |
| 3. | Throws urine, feces, etc. | 0 1 2 3 4 5 | 0 1 2 3 4 5 |
| 4. | Disrupts with loud noise, tantrums, etc. | 0 1 2 3 4 5 | 0 1 2 3 4 5 |
| 5. | Sexual acting out, inappropriate touching, exposures | 0 1 2 3 4 5 | 0 1 2 3 4 5 |
| 6. | Pesters, nags, begs, or tattles to others | 0 1 2 3 4 5 | 0 1 2 3 4 5 |

### PROPERTY DIRECTED

| | | FREQUENCY | SEVERITY |
|---|---|---|---|
| 1. | Throws objects | 0 1 2 3 4 5 | 0 1 2 3 4 5 |
| 2. | Breaks objects | 0 1 2 3 4 5 | 0 1 2 3 4 5 |
| 3. | Marks, scratches, peels, or soils objects | 0 1 2 3 4 5 | 0 1 2 3 4 5 |
| 4. | Steals property belonging to others | 0 1 2 3 4 5 | 0 1 2 3 4 5 |
| 5. | Moves, disposes, or conceals property | 0 1 2 3 4 5 | 0 1 2 3 4 5 |

### SYMPTOMATIC BEHAVIOR

| | | FREQUENCY | SEVERITY |
|---|---|---|---|
| 1. | Highly repetitive words or phrases | 0 1 2 3 4 5 | 0 1 2 3 4 5 |
| 2. | Talks with self with no one near | 0 1 2 3 4 5 | 0 1 2 3 4 5 |
| 3. | Other | 0 1 2 3 4 5 | 0 1 2 3 4 5 |

### COMPLIANCE ISSUES

| | | FREQUENCY | SEVERITY |
|---|---|---|---|
| 1. | Fails to follow directives | 0 1 2 3 4 5 | 0 1 2 3 4 5 |
| 2. | Refuses medications consistently/misuses medications | 0 1 2 3 4 5 | 0 1 2 3 4 5 |
| 3. | Refuses to attend/participate in programming | 0 1 2 3 4 5 | 0 1 2 3 4 5 |
| 4. | Other: | 0 1 2 3 4 5 | 0 1 2 3 4 5 |

Total points_____

☐ Intensive Management Housing Plan Recommended
☐ Intensive Management Housing Plan Not Recommended

Notes: _____

_____
Referral Source Signature

_____
QMHP Signature

## Management Housing Plan

| | | | | |
|---|---|---|---|---|
| **Detainee Name:** | | **DOC #** | **DOC Classification** | **MH Classification** |
| Date Plan Initiated: _____ | | | Date of Review: _____ | |

In order to assist the detainee in avoiding behaviors which negatively impact their progress, the following environmental restrictions will be used, in addition to the expectations associated with intensive management status:

### I. General Precautions / Interventions (*Check All That Apply*):

| A. Precautions | B. Interventions | |
|---|---|---|
| ☐ Not Applicable | ☐ Not Applicable | ☐ Clinical Restraints |
| ☐ 15-Minute Watch | ☐ Safety Garments | ☐ Safety Helmet |
| ☐ Constant Watch | ☐ Modified Stripped Cell | ☐ Utensil Restriction |
| ☐ Other: _____ | ☐ Stripped Cell | ☐ Clinical Precautionary Diet |
| | ☐ Other: | |

☐ **II. Clinical Precautionary Diet:** Will remain on CPD until a QMHP authorizes a regular diet. To prevent any use of food utensils for self-harm, the Detainee will receive a Clinical Precautionary Diet, and will not be given use of any type of utensil or plastic food tray. If the Detainee abuses food, such as throwing or smearing it, use of Nutra Loaf will be considered by the treatment team.

    ☐ Additional Instructions: _____

☐ **III. Personal Property/Legal Materials** (*Check All That Apply*): No personal property will be permitted in the cell, except for mail from which any staples will be removed, unless the Detainee misuses their mail for purposes of self-injury. The Detainee will also be permitted to borrow one (1) book or magazine at a time from the Detainee library, at a frequency consistent with housing unit procedures, unless the Detainee damages such reading materials, upon which any library privilege will be terminated. If the Detainee uses correspondence/reading materials to cover a cell camera or viewing window, or to flood their cell, or is found to secret contraband items in them, all such materials will be removed for a period of up to 30 days.

☐ Detainee is authorized to have **ONLY** the following:

| A. Bedding | | B. Clothing | | |
|---|---|---|---|---|
| ☐ Mattress | ☐ Safety Blanket | ☐ Boxers | | ☐ Jump Suit/Uniform |
| ☐ Blanket | | ☐ T-Shirt | | ☐ Safety Smock |
| ☐ Sheet | | ☐ Socks | | ☐ Shower Shoes/DOC Shoes |
| ☐ Other: | | ☐ Other: | | |

☐ **C. Other/Legal Materials:** Detainee will be given a Detainee pen temporarily for signing legal documents, etc. The Detainee will be directly observed when using a Detainee pen for these purposes, and is to return the pen to the Officer afterwards.

☐ Detainee is authorized to have **ONLY** the following:

| ☐ Writing Paper | ☐ Safety Pen | ☐ Reading Material | ☐ Mail (Screened) |
|---|---|---|---|
| ☐ Reading Material | ☐ Failure to return the pen will result in cell entry to recover it. | ☐ Other: | ☐ Other: |

☐ **D. Hygiene Items:** No personal hygiene items will be permitted in the cell. Instead, hygiene items will be placed into a bag which is kept in the tier office or on the Detainee cell door. Officers will give the Detainee one (1) hygiene item to be used at a time, after removing any cap from the item. Use of the hygiene item will be directly observed/supervised, until it is returned to the officer. A toothbrush will be dispensed to the Detainee from outside of the cell, with toothpaste on it, to be immediately returned after observed use. Failure to return the item will result in cell entry to recover it. The only occasion for the Detainee to receive shampoo will be when it is placed onto his hand from a container and a single bar of soap, upon entering the shower. Detainee is to return soap, wash cloth and towel upon leaving the shower. Detainee may have no more than (1) roll of toilet paper at a time.

| ☐Detainee is authorized to have **ONLY** the following hygiene items. | | | | |
|---|---|---|---|---|
| ☐ Towel | ☐ Wash Cloth | ☐ Soap | ☐ Deodorant | ☐ Toilet Paper |
| ☐ Toothbrush | ☐ Toothpaste | ☐ Lotion | ☐ Other: | |

☐ **IV. Detainee Movement:** For required movement, such as showers, placement in a different cell, exercise, and medical appointments, the Detainee will be restrained and escorted in accordance with Intensive Management procedures. If the Detainee needs to be transported outside of the facility, such as to Court, or to a medical appointment, method of transport will be determined by custody, unless a medical procedure requires otherwise.

☐ **V. Cell Search:** The cell shall be searched for contraband prior to the Detainee being placed into the cell or returning to the cell. This may occur when the Detainee is out for exercise, showers, or for some appointment. In addition the cell will be thoroughly searched for contraband at unannounced times **at least twice** each week or more often if indicated by the treatment team and/or Security Supervisor.
☐ Additional Instructions:

☐ **VI: : Additional instructions (which may include terms of behavioral contract):**

**VII: Acts of Self Harm:** If, despite these precautions, the Detainee is observed in the act of harming himself, such as cutting themselves with some unsecured item, or scratching himself or banging himself against a hard surface so as to cause blood to flow, or swallowing or inserting foreign objects, Officers will take emergency measures to prevent additional self-harm. This may include use of pepper spray from outside of the cell, and/or cell entry and use of restraints as needed. Upon all such incidents, a QMHP will be contacted to check on the status of the Detainee and intervene/provide post-incident debriefing as necessary.

| | | | |
|---|---|---|---|
| Qualified Mental Health Professional | Date | Unit Director/Designee | Date |

| | | | |
|---|---|---|---|
| Superintendent or Designee | Date | Detainee | Date: |
| | | ☐ Detainee Refused to Sign | |

## Intensive Management Unit

|  | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|---|
| 8 am | Vanduan On call | Vanduan: Rise and Shine/ Medication | Caputo: Rise and Shine | Vanduan: Rise and Shine/ Medication | Vanduan: Rise and Shine/ Medication | Young: Rise and Shine | Young on call |
| 9 am |  | Vanduan: Tx Group | Caputo: Tx Group | Vanduan: Tx Group | Vanduan: Tx Group | Young: Tx Group |  |
| 10 am |  | Vanduan: Tx Group | Caputo: Tx Group | Vanduan: Tx Group | Vanduan: Tx Group | Young: Tx Group |  |
| 11 am |  | Dr. Key: Tx Group | Dr. Nunez Tx Group |  |  |  |  |
| 12 pm |  |  |  |  |  |  |  |
| 1 pm |  |  |  |  |  |  |  |
| 2 pm |  |  |  |  |  |  |  |
| 3 pm |  |  |  |  |  |  |  |
| 4 pm | Paul on call | Paul: Tx Group | Branch: Group 1 | Dr. Sillitti: Tx Group | Branch: Group 1 | Branch on call | Branch on call |
| 5 pm |  |  | Branch: Group 2 |  | Branch: Group 2 |  |  |
| 6 pm |  |  |  |  |  |  |  |
| 7 pm |  |  |  |  |  |  |  |
| 8 pm |  |  |  |  |  |  |  |
| 9 pm |  |  |  |  |  |  |  |
| 10 pm |  |  |  |  |  |  |  |

Day Shift 12-4pm: Time for CRW, Law Library, CCDOC activities (hygiene, phone calls, tv, etc)

Afternoon Shift 6pm on: Time for CCDOC activities

# Plan for specialized female mental health treatment services

- Each P3 patient will be presented in MDT clinical staffing to re-assess specific treatment needs and the treatment plans will be updated as needed.
- Treatment staff will follow the group treatment schedule to ensure every patient receives the services deemed necessary.
- Each patient will receive a monthly treatment card, highlighted with their specific treatment recommendations to follow the treatment plan.
- Each patient must attend 75% of all treatment groups on her treatment plan to receive a certificate of treatment attendance each month. Each patient is responsible for attending groups to meet the treatment goal.
- Mental health staff will date and initial in colored ink for each group each patient attends. The treatment cards will be maintained by the assigned mental health specialists in a binder for each tier. Patients are encouraged to keep track of their own group attendance.
- Make-up groups will be facilitated by specific staff to ensure all groups are offered. If a group cannot be facilitated, it will not count against the patient.
- Patients will be informed by the tier MHS and Dr. Briney in community groups in September. Information will be posted on P3 tiers to remind patients of all of these points.
- Patients who achieve the 75% goal will receive **one** certificate per month during the first week of the month. Extra certificates will not be printed prior to the following month. Patients are responsible for maintaining their certificates.
- Start date of 10/1/15

Treatment Card: _____ Month:_____

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Healthy Living**<br><br>3/4 | | | | | | | |
| **Managing Feelings**<br><br>3/4 | | | | | | | |
| **Substance Abuse & Co-occurring Disorders**<br><br>3/4 | | | | | | | |
| **Community Re-entry**<br><br>3/4 | | | | | | | |
| **Psychoeducation**<br><br>6/8 | | | | | | | |
| **Coping Skills**<br><br>6/8 | | | | | | | |
| **Mental Health Group**<br><br>6/8 | | | | | | | |
| *Community Gp/Linkage*<br><br>*Expressive Arts*<br><br>*Rise & Shine/Med Compliance* | | | | | | | |

*I understand this is a reflection of my group attendance for the month. _____

# Problem list for treatment plans – women's services

- Domestic violence
- Substance Abuse
- Anger
- Anxiety
- Behavior issues
- Communication skills
- Criminal vs. responsible behavior
- Depression
- Eating disorders
- Expressing Feelings
- Relationship issues
- Grief and loss
- Harm to self or others
- Health issues/ physical health issues
- Medication Management
- Mood Management
- Personal Hygiene and self care
- Self-image
- Sleep issues
- Social skills
- Stress management
- Thought Disorder
- Trauma
- Community Re-entry
- Coping Skills
- Knowledge/insight of mental illness

# Group Topics for Women's Services

**Healthy Living** – Living a balanced lifestyle, personal hygiene, sleep hygiene, exercise, Cleaning the tier and rooms, respect for self and others, self-esteem, sitting yoga, and nutrition. *{Health handouts, sleep resources, self-esteem binder} - 4*

**Managing Feelings** – Managing feelings of anger, anxiety, depression, self-harm. *{Anger management modules, depression & anxiety binders, thoughts & feelings module} - 4*

**Coping Skills** – Utilizing coping skills, managing stress, relaxation. *{Stress management module, stress journal, mindfulness, meditation, progressive muscle relaxation handouts} - 8*

**Substance Abuse and Co-Occurring Disorders**– Educate and discuss issues related to substance abuse and issues related to having a substance abuse problem and mental illness. Discuss the consequences of substance abuse and treatment options. *{12 step module; Hazelden workbook modules, psychoeducational videos} - 4*

**Community Re-entry** – Discuss issues related to re-entering the community, including finding housing, jobs, mental health treatment, etc. Provide referral handouts. Engage in helpful activities that would be useful to re-engaging with the community (i.e. discuss job interviews, child care, etc.) - 4

**Psychoeducation Groups** – Provide information and discuss mental health disorders and issues, medication issues and encourage compliance, better decision making, provide support *{Depression & anxiety modules, paranoia and thought disorder handouts, thinking for a change module, psychoeducation videos, choices in recovery game, mental health jeopardy} - 8*

**Mental Health Topical Group** – Various topics related to mental health, including but not limited to: Domestic violence, responsible behavior vs. criminal behavior, improving relationships/parenting, positive/assertive communication, eating disorders, self-image, social skills, and grief/loss *{Communication module, goal-setting, personal journals, topical handouts} - 8*

**Community Meeting (on tier)** – Address tier concerns and issues. Reiterate the rules of the tier and establish the tone as a mental health tier. Promote unity and a positive atmosphere. Encourage treatment compliance.

**\*Rise & Shine/ Medication Compliance and management/Linkage to be completed during morning and evening shifts on the intermediate mental health tiers.**

**\*Expressive Arts** – Art therapy, music therapy, poetry, creative writing, sitting yoga

# COOK COUNTY HEALTH & HOSPITALS SYSTEM

**Toni Preckwinkle**
President
Cook County Board of Commissioners

**John Jay Shannon, MD**
Chief Executive Officer
Cook County Health & Hospitals System



**Cook County Health & Hospitals System**
**Board Members**

M. Hill Hammock • Chairman
Commissioner Jerry Butler • Vice Chairman
Lewis Collens
Ric Estrada
Ada Mary Gugenheim
Emilie N. Junge
Wayne M. Lerner, DPH, FACHE
Carmen Velasquez
Dorene P. Wiese, EdD

DATE: _____

NAME: _____

DOC#: _____


To Whom It May Concern,


This letter serves to affirm that the above named patient has attended 75% or more of the recommended clinical therapeutic programs available to them and recommended as part of their individual mental health treatment plan. Cermak Mental Health Services Department affirms attendance. This letter reflects program attendance between the dates of _____ and

_____.


Signed,


_____

Unit Director/Licensed Clinical Psychologist

*Please note original copy of letter is signed in non-black ink to preserve authenticity of document

**Psychiatrists and Psychiatric PA**

| | | |
|---|---|---|
| Chair (1) | 1.0 | (D. Kelner) |
| Attending Psychiatrists | 6.8 | (Advani, Howard, Marri 0.8, Menezes, Paschos, Ward) |
| Psychiatric PA (2) | 1.1 | (Balawender, Bastidas 0.1) |
| Psychiatrists Overtime | 0.2 | (Howard, Moreno) |
| Psychiatrists (133 acct) 11/2/2015 | 1.3 | (Kartan, Lassen, Chinweze, Ramic); Chavlayohan's ASD |
| Total Functional FTE | 10.4 | |

11/1/2015-Psychologists

| | | |
|---|---|---|
| Chief Psychologist (1) | 1.0 | (K. Key) |
| Psychologists (10) | 6.0 | (Rogers, Briney, Kaniuk, Waxler, Sillitti, Nunez) |
| Total Functional FTE | 7.0 | |

**Psychiatrists and Psychiatric PA** (18 positions)

**7/1/14**

| | | |
|---|---|---|
| Chair (1) | 1.0 | (D. Kelner) |
| Attending Psychiatrists (15) | 6.0 | (Howard, Marri, McNeal, Menezes, Moreno, Paschos) |
| Psychiatric PA (2) | 1.0 | (Kalman) |
| Salaried Psychiatrist OT | 0.2 | (Howard) |
| Psychiatrists (133 acct-3) | 1.5 | (Kartan, Lassen, Ramic) |
| Total Functional FTE | 9.7 | |

**1/1/15**

| | | |
|---|---|---|
| Chair (1) | 1.0 | (D. Kelner) |
| Attending Psychiatrists (15) | 6.8 | (Advani, Howard, Marri, McNeal, Menezes, Paschos, Ward) |
| Psychiatric PA (2) | 1.0 | (Kalman) |
| Psychiatrist's Overtime | 0.2 | (Howard, Moreno) |
| Psychiatrists (133 acct #3) | 1.5 | (Kartan, Lassen, Ramic) |
| Total Functional FTE | 10.5 | |

**4/1/2015**

| | | |
|---|---|---|
| Chair (1) | 1.0 | (Kelner) |
| Attending psychiatrists | 6.8 | (Advani, Howard, Marri 0.8, Mcneal, Menezes, Paschos, Ward) |
| Psychiatric PA | 2.0 | (Balawender, Kalman) |
| Psychiatric Overtime | 0.2 | (Howard 0.1, Moreno 0.1) |
| Psychiatrists Part Time | 1.7 | (Kartan 0.5, Lassen 0.5, Ramic 0.5, Chinweze 0.2) |
| Total Functional FTE | 11.7 | |

**7/1/15**

| | | |
|---|---|---|
| Chair (1) | 1.0 | (D. Kelner) |
| Attending Psychiatrists (15) | 6.8 | (Advani, Howard, Marri 0.8, McNeal, Menezes, Paschos, Ward) |
| Psychiatric PA (2) | 1.1 | (Kalman, Balawender, Locums 0.1) *Kalman resigned effective: |
| 7/8/15, but has called in daily | | |
| Psychiatrist's Overtime | 0.2 | (Howard, Moreno) |
| Psychiatrists (133 acct #3) | 1.1 | (Kartan, Lassen, Ramic, Chinweze) *Chinweze on maternity |

leave, Lassen withdrew from 0.5 weekday intake coverage to 0.1 alternating weekends

| | | |
|---|---|---|
| Total Functional FTE | 10.2 | |

**Psychologists** (11 positions)

**7/1/14**

| | | |
|---|---|---|
| Chief Psychologist (1.0) | 1.0 | (K. Key) |

| Psychologists (10) | 5.0 | (Briney, Gomez, Kaniuk, Nunez, Rogers) |
|---|---|---|
| Total Functional FTE | 6.0 | |

**1/1/15**

| Chief Psychologist (1) | 1.0 | (K. Key) |
|---|---|---|
| Psychologists (10) | 5.0 | (Briney, Gomez, Kaniuk, Nunez, Rogers) |
| Total Functional FTE | 6.0 | |

**7/1/15**

| Chief Psychologist (1.0) | 1.0 | (K. Key) |
|---|---|---|
| Psychologists (10) | 5.0 | (Briney, Sillitti, Kaniuk, Nunez, Rogers) |
| Total Functional FTE | 6.0 | |

Activity Updates:

- One of the two Locums hired will be released, decreasing the Locums from 0.2 to 0.1
- 1 FTE Psychiatric PA has resigned
- 2 psychologists are in the credentialing process
- Dr. Lassen pulled out of RCDC coverage during the week
- Dr. Chinweze is on maternity leave; did not give a date of anticipated return
- Dr. Chavlajohan ( Part time ) has just submitted her credentialing application
- Dr. Gomez transitioned to the position of Mental Health Director

# Tele-Psychiatry Utilization and Productivity Audit

| Documentation | 11/2014 | 12/2014 | 1/2015 | 2/2015 | 3/2015 | 4/2015 | 5/2015 | 6/2015 | 7/2015 | 8/2015 | 9/2015 | 10/2035 | 11/2015 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of 4 hour sessions | 6 | 28 | 34 | 27 | 40 | 37 | 32 | 36 | 30 | 37 | 29 | | |
| Number of Follow-up visits | 57 | 274 | 295 | 167 | 239 | 230 | 139 | 181 | 124 | 161 | 133 | | |
| Number of New patients seen | 0 | 0 | 16 | 43 | 55 | 62 | 101 | 87 | 92 | 109 | 92 | | |
| Total Patient Visits | 57 | 274 | 311 | 210 | 294 | 292 | 240 | 268 | 216 | 270 | 225 | | |
| Patient visits per 4 hour session | 9.5 | 9.8 | 9.2 | 7.8 | 7.4 | 7.9 | 7.5 | 7.4 | 7.2 | 7.3 | 7.2 | | |

"Privileged and Confidential under the Illinois Medical Studies Act"

# Cermak Health Services of Cook County
# Quality Improvement Report



**Indicator/Project name: RATES OF PSYCHIATRY INPATIENT CONTACT ON CERMAK UNITS**

**Reporting period: All inpatients on Cermak units on May 26, 28, and June 1, 2015**

**Executive Summary** *(Give a brief but complete description of the purpose of your study, methods used, results, and conclusions)*

*This study reviewed the frequency of psychiatry contacts with inpatients in Cermak to study compliance with policy guidelines. The median ratio of days per visit per patient was calculated for each of the four Cermak units. Results found 2 North and 2 West to be compliant with policy guidelines. The median number of days per visit per patient were 2.0 and 1.6 respectively for these units. 2 East, which is a chronic care setting where patients are to be seen monthly, was found to be about one week below expectation, at 38.5 days. 2 South, at 23.8 days, was farthest from compliance. Further review gave indication that a number of 2 South patients waited a month or more to be seen for a first visit once transferred there.*

*Limited psychiatry staff has been an issue on 2 South, and this issue is being addressed with two new contract physician assistants who are starting this week. It is planned that they provide additional coverage on 2 South. Compliance will be reviewed again next quarter.*

**DEFINE** *(Briefly state the purpose of the study)*

The purpose of this study was to review the frequency of psychiatry contacts with inpatients housed on the four psychiatric units in Cermak Health Services. Current policy outlines the frequency of psychiatry contact as follows: On the acute care units of 2 North and 2 West, patients are expected to be seen daily with the exception of weekends and holidays, which would be expected to average out to one visit per patient every 1.5 days. On 2 South, which is designated as a subacute setting, patients are to be seen three times per week, holidays excepted, or once every 2.5 days, unless otherwise ordered. On 2 East, which is designated as a chronic care unit, patients are to be seen once a month. This study reviewed compliance with current policy.

**MEASURE** *(Describe what is being measured, attach data)*

On the date each unit was reviewed, Length of Stay (LOS) for each patient was calculated based on the transfer date posted in CCOMS. The number of psychiatry visits documented in Cerner between the admission and review dates was then calculated for all patients on each of the four units.

An index of 'days per visit per patient' was calculated as a 'median ratio' of median LOS divided by median number of visits per patient. This method was used in order to reduce the

# Cermak Health Services of Cook County
# Quality Improvement Report



disproportional influence of the 'outliers', the few patients who had been housed in Cermak for prolonged periods. Lastly, a table of provider contacts was created for each unit *(See Appendix)*.

## ANALYZE *(Summarize analysis of the data, identify opportunities to improve)*

**2 North:** Census on 2 North at 7am on June 1, 2015 was 25, and the review included all patients on the unit on that date. Length of Stay for these patients ranged from 1 to 20 days, with a median LOS of 4 days. Number of psychiatry visits per patient ranged from 0 to 14, with a median of 2. A median ratio of median LOS divided by median number of visits per patient yielded a ratio of 2.0 days per visit per patient.

**2 West:** Census on 2 West at 7am on June 1, 2015 was 12. Length of Stay ranged from 1 to 80 days, with a median LOS of 18 days. Number of psychiatry visits per patient ranged from 1 to 34, with a median of 11.5. The median ratio for 2 West was 1.6 days per visit per patient.

**2 South:** Census on 2 South at 7am on May 26th was 26. Length of Stay ranged from 6 to 425 days, with a median LOS of 47.5 days. Number of psychiatry visits totaled 87, and ranged from 0 to 25, with a median of 2. The median ratio for 2 South was 23.8 days per visit per patient.

**2 East:** Census on 2 East at 7am on May 28th was 12. Length of Stay ranged from 1 to 521 days, with a median LOS of 38.5 days. Number of psychiatry visits totaled 31, and ranged from 1 to 9, with a median of 1. The median ratio for 2 East was 38.5 days per visit per patient.

### TABLE 1:  RATIO MEDIAN LOS & PSYCHIATRY VISITS

|     | PTS | LOS RANGE | LOS MEDIAN | VISITS RANGE | VISITS MEDIAN | MEDIAN RATIO* | CERMAK POLICY |
|-----|-----|-----------|------------|--------------|---------------|---------------|---------------|
| 2N  | 25  | 1-20      | 4.0        | 0-14         | 2.0           | 2.0           | 1.5           |
| 2W  | 12  | 1-80      | 18.0       | 1-34         | 11.5          | 1.6           | 1.5           |
| 2S  | 26  | 6-425     | 47.5       | 0-25         | 2.0           | 23.8          | 2.5           |
| 2E  | 12  | 1-521     | 38.5       | 1-9          | 1.0           | 38.5          | 30.0          |

Based on unit census on review date for each unit.
*Median Ratio is 'number of days per visit per patient'.

On the issue of compliance, 2 North and 2 West yielded median ratios which were very close to the 1.5 day per visit per patient average identified in the Cermak policy guidelines. The 2 North and 2 West median rates were 2.0 and 1.6 days per visit per patient, respectively. The ratio for 2 East was about one week below expectation, at 38.5 days, rather than 30 days. 2 South compliance, at 23.8 days per visit per patient, was well below the 2.5 day average. Due to staffing shortages in psychiatry, this area has been understaffed.

## IMPROVE *(Actions taken/benefits realized)*

Of particular importance in improving the rate of psychiatric contact with 2 South patients is the wait for the first visit. Of those within the first five weeks of their stay on 2 South, five of twelve patients, or 42% had not yet seen a psychiatrist, and an additional five patients had only seen the

# Cermak Health Services of Cook County
## Quality Improvement Report



psychiatrist once. A number of patients on 2 South do remain on the unit for very long periods of time, which would justify a less intensive level of care once these patients have stabilized. However, all patients need to be seen one or more times during their first month on the unit, a policy standard which is in effect for 2 East, which is considered a chronic care setting.

**TABLE 2: 2S PSYCHIATRY CONTACTS BY LENGTH OF STAY***

| DAYS | # PTS | UNSEEN | 1X | 2X | 3X | 4X+ |
|------|-------|--------|-----|-----|-----|-----|
| 1-35 | 12 | 42% | 42% | 8% | 8% | 0% |
| 36-426 | 14 | 0% | 7% | 12% | 29% | 50% |

*On May 26, 2015 (N=26)

It is recommended that psychiatry and physician assistant staffing patterns be modified to provide greater coverage, particularly for new patients on 2 South. Currently, two new contract physician assistants are starting at Cermak, and it is planned that they will help provide coverage in Cermak, including 2 South.

**CONTROL** *(Plan to maintain improvement)*

Review compliance again next quarter.

# Cermak Health Services of Cook County
# Quality Improvement Report



## APPENDIX

### 2N PSYCHIATRY VISITS*

| ATTENDING | # VISITS |
|---|---|
| SP | 27 |
| JH | 15 |
| AB | 14 |
| LF | 8 |
| RM | 6 |
| KF | 4 |
| EL | 3 |
| TA | 2 |
| TOTAL | 79 |

*June 1, 2015 Census; N=25

### 2W PSYCHIATRY VISITS*

| ATTENDING | # VISITS |
|---|---|
| DK | 122 |
| EC | 21 |
| TA | 6 |
| AR | 5 |
| MM | 5 |
| SP | 2 |
| AB | 1 |
| JH | 1 |
| JM | 1 |
| TOTAL | 164 |

*June 1, 2015 Census; N=12

### 2S PSYCHIATRY VISITS*

| ATTENDING | # VISITS |
|---|---|
| JH | 66 |
| MK | 14 |
| DK | 3 |
| JM | 2 |
| AR | 1 |
| AB | 1 |
| TOTAL | 87 |

*May 26, 2015 Census; N=26

### 2E PSYCHIATRY VISITS*

| ATTENDING | # VISITS |
|---|---|
| MM | 29 |
| SP | 1 |
| JH | 1 |
| TOTAL | 31 |

*May 28, 2015 Census; N=12

# 2 SOUTH PSYCHIATRY PATIENT VISITS: MAY 26, 2015 CENSUS

The purpose of this review was to evaluate the frequency of psychiatry visits with patients admitted to 2 South Cermak. Census on 2 South on May 26, 2015 was 26, and the evaluation included all patients on the unit on that date.

Method involved determining the number of days each patient had been housed on the unit up to the May 26th date. Length of Stay (LOS) for each patient was calculated based on the transfer date posted in CCOMS. Next, the number of psychiatry visits documented in Cerner between the admission date and May 26, 2015 was determined for each patient. Length of stay ranged from 6 to 425 days, with a median LOS of 47.5 days. Number of psychiatry visits totaled 87, and ranged from 0 to 25, with a median of 2.

An index of 'patient days per visit' was calculated in two ways to determine a method which might be most reliable given the broad variability in Length of Stay between patients. A 'median ratio' of median LOS divided by median number of visits per patient yielded a ratio of 47.5 divided by 2, or 23.8 days per visit per patient. Calculated using the total number of patient days for all 26 patients (1,973 total patient days) divided by the total number of psychiatry visits (87), yielded an average of 22.7 days per visit per patient. The two ratios (23.8 and 22.7) are quite similar to each other, and suggest a reliable conclusion of '23 days per visit per patient'.

The length of time it took to be seen for a first visit on 2 South was of interest. On May 26th, five patients had not been seen by psychiatry since their transfer to the unit, although they had been seen on the day of transfer. The LOS for these five patients ranged from 6 to 35 days, with a median of 14 days. Of the 21 patients who had been seen at least once by psychiatry since their arrival on the unit, the median wait was four days. The average wait for first visit for all patients seen was 8 days.

Finally, although the average patient on the unit was seen by psychiatry every 23 days, this varied widely as noted in the table immediately below.

2S PSYCHIATRY CONTACTS BY LENGTH OF STAY*

| DAYS | # PTS | UNSEEN | 1X | 2-3X | 4-5X | 6-7X | 8X+ |
|------|-------|--------|-----|------|------|------|-----|
| 6-15 | 8 | 50% | 50% | 0% | 0% | 0% | 0% |
| 19-56 | 7 | 14% | 14% | 72% | 0% | 0% | 0% |
| 65-79 | 6 | 0% | 17% | 33% | 50% | 0% | 0% |
| 120-425 | 5 | 0% | 0% | 20% | 20% | 40% | 20% |

*On May 26, 2015 (N=26)

Lastly, a listing of the providers who had seen patients housed on 2 South on May 26th is provided below.

VISITS BY PROVIDER

| ATTENDING | # VISITS |
|-----------|----------|
| JH | 66 |
| MK | 14 |
| DK | 3 |
| JM | 2 |
| AR | 1 |
| AB | 1 |
| TOTAL | 87 |

## Special Management Housing Screen Review:
### September 2015

| | Segregation | Pre/24hr-Placement MH Screen | % |
|---|---|---|---|
| Division 3/RTU | 47 | 46 | 98% |
| RTU MALES | 18 | 17 | 94% |
| Division 6 | 167 | 167 | 100% |
| Division 9 | 169 | 139 | 82% |
| Division 10 | 55 | 55 | 100% |
| **Totals** | **456** | **424** | **93%** |

### August 2015

| | Segregation | Pre/24hr-Placement MH Screen | % |
|---|---|---|---|
| Division 3/RTU | 20 | 20 | 100% |
| RTU MALES | 22 | 21 | 95% |
| Division 6 | 203 | 203 | 100% |
| Division 9 | 143 | 135 | 94% |
| Division 10 | 80 | 70 | 88% |
| **Totals** | **468** | **449** | **96%** |

### July 2015

| | Segregation | Pre/24hr-Placement MH Screen | % |
|---|---|---|---|
| Division 3/RTU | 23 | 23 | 100% |
| RTU MALES | 20 | 20 | 100% |
| Division 6 | 194 | 194 | 100% |
| Division 9 | 112 | 105 | 94% |
| Division 10 | 53 | 53 | 100% |
| **Totals** | **402** | **395** | **98%** |

### June 2015

| | Segregation | Pre/24hr-Placement MH Screen | % |
|---|---|---|---|
| Division 3/RTU | 13 | 12 | 92% |
| RTU MALES | 17 | 17 | 100% |
| Division 6 | 163 | 163 | 100% |
| Division 9 | 101 | 101 | 100% |
| Division 10 | | | #DIV/0! |
| **Totals** | **294** | **293** | **100%** |

### May 2015

| | Segregation | Pre/24hr-Placement MH Screen | % |
|---|---|---|---|
| Division 3/RTU | 25 | 25 | 100% |
| RTU MALES | 28 | 27 | 96% |
| Division 6 | 194 | 194 | 100% |
| Division 9 | 159 | 159 | 100% |
| Division 10 | | | #DIV/0! |
| **Totals** | **406** | **405** | **100%** |

# Cermak Health Services of Cook County Quality Improvement Report



## Indicator/Project Name: Notification to Facility Director of Patient Placement in restraints

## Reporting period: 04/01/2015-08/24/2015

### Executive Summary

During the said period of 2015 there were 63 total FLR deployments at Cermak. All of the deployments took place on 2N (acute male housing unit) and 2W (acute and subacute female unit). 51 deployments took place on 2N and 12 on 2W. Facility Director was notified 27 times (42.85% of total number of deployments). Out those 27 notifications, 2 (7%) were reported to him within a day, 6 (22%) were reported within 2 days, 3 (11%) were reported within 3 days, and 16 (59%) were reported outside of the 4 day window.

### DEFINE

### MEASURE

### ANALYZE

According to Cermak Seclusion and Restraint Policy I-01: " Once restraint or seclusion has been deployed during one 24 hour period, it may not be used again with the same patient during the next 48 hour period without the written authorization of the Chief of Psychiatry pursuant to the IMHMDC ( 405 ILCS 5/2-08, Ch. 91 ½, part 2-108) ". This particular notification is a part of a number of indicators monitored in the Restraints and Seclusion Audit conducted by the Department of Nursing. When Department of Nursing does not notify the Chief of Psychiatry of these events timely it precludes him from reviewing cases defined under the policy's provision. On 03/03/2015 Nursing was presented with the updated current form "Notification of Facility Director" – Form # 86815. This issue has been discussed multiple times in e-communications with the Nursing Leadership. The cited numbers reflect poor adherence to the Policy provisions.

### IMPROVE

Further dialogue with Nursing Leadership about the importance of timely Notifications will continue.

### CONTROL

All information provided in these appended materials is compiled at the director of the Cermak Department of Quality and Patient Safety and is privileged and confidential. They are to be used solely in the course of quality control and for the purpose of reducing morbidity and mortality and improving the quality of patient care. This confidential Patient Safety Work Product is protected under the Federal Patient Safety and Quality Improvement Act and the Illinois Medical Studies Act.

| Unique Reason | Count | Percentage | Cumalative |
|---|---|---|---|
| Scheduling Process Issue | 11 | 26.83% | 26.83% |
| Pt refused | 8 | 19.51% | 46.34% |
| Scheduling Issue Unknown | 4 | 9.76% | 56.10% |
| Wrong Referral Type | 4 | 9.76% | 65.85% |
| Outlying County | 3 | 7.32% | 73.17% |
| Unknown | 2 | 4.88% | 78.05% |
| Process Discrepancy MH | 2 | 4.88% | 82.93% |
| Canceled by MHS | 1 | 2.44% | 85.37% |
| No Show | 1 | 2.44% | 87.80% |
| Scheduling Issue No Show | 1 | 2.44% | 90.24% |
| Pt Discharged | 1 | 2.44% | 92.68% |
| Patient Discharged | 1 | 2.44% | 95.12% |
| Seen | 1 | 2.44% | 97.56% |
| Duplicate Order | 1 | 2.44% | 100.00% |



Pareto Chart for 9_2015

**RN paper triages Health Service Request Form (HSRF) and determines MH service need**

**Division 2D2**
**RTU**
**Division 10**

**Division 6** (T, W, Th: PM only)
**Division 3** (T-Sat 7AM-10PM)
**Division 9** (T-Sat 7-3PM and Sun-Th: 3-11PM)

**Division 1**
**Division 2D1**
**Division 3 Annex**
**Division 11**
**Division 17**

**Scanned on days staff not present**
**And every Monday and Sunday in 6 & 3**

7 days per week

Whoever triages gives to onsite MH worker

Nurse or medic scans to mhreferral@cookcountyhhs.org

**Sees detainee**
**When present**

Must be scanned by 11 AM

MH staff checks for scanned HSRFs between 11 and 12

MH staff schedules to clinic for next day appointment

Urgents seen same day. Call division.

**If you don't see MH staff you should scan the referral**
**please use a cover sheet with your Division**

- Above times are only guidelines. Staffing can change due to call-ins or emergencies. **If you don't see MH staff you should scan the referral**
- Before you scan
    - o Clarify entry into Cerner document if F2F:sometimes nurse documentation does not always reflect what was done
    - o Forms are not always complete when scanned
        - ▪ Nurses check for completeness
        - ▪ Some documents don't have DOC numbers
- Nurses should see MH urgent and document the F2F visit
    - o suicidality and or homicidality = immediate referral to psych
    - o new voices, severely depressed, severe change from baseline Nurse does F2F then disposition
    - o need my medications (tease this out may be non-urgent...do they have an active prescription?)
    - o Physical symptoms chest pain , short of breath, headaches need medical clearance first
    - o can't sleep is not treated with medication by MH providers provide sleep hygiene materials
    - o Anxious and can't cope complaints usually can be scanned if they are not urgent to receive a next day appointment. Be sure to assess.

# Cermak Health Services of Cook County
# Quality Improvement Report



## Indicator/Project Name: Suicide Detection and Prevention

## Reporting period: January 2015 – September 2015

### Executive Summary

*The Chief Psychologist with the assistance of a MHS III conducted the quarterly audits, reviewing a total of thirty charts per quarter. The goal of the study is to determine staff compliance with the Interagency Suicide Detection and Prevention directive. The audit tool consists of fourteen quality indicators taken directly from the interagency directive's procedure for Cermak staff. CCDOC staff inform of compliance with Indicator #8 Completion of Observation Log & Form by CCDOC.*

*The overall compliance rate for the April audit was 93%. Of the fourteen key indicators specific to Cermak staff, 3 had a compliance rate below the target of 90%. They included:*
  *-QMHP documented consultation with the psychiatrist for disposition of suicidal detainee*
  *-Documentation of daily psychiatric contact while on observation status*
  *-Individual treatment plan identifies a schedule for follow up*

*Following the audit, Unit Directors were convened and directed to continue to address policy-specific issues in group supervision. Staff continues to verbalize having consulted with psychiatry for the disposition of detainees with suicide risk, yet they continue to remain inconsistent in documenting the consultation. Additionally, staff will be reminded that completion of the suicide risk assessment and subsequent referral to intake psychiatry do not replace documenting psychiatry consultation.*

*Policy-specific discussions will continue to occur in the weekly psychiatry/psychology meetings to educate the treatment team leaders. Unit Directors will continue to review and retrain all staff on the applicable policies and facilitated policy-specific discussions during group supervision meetings with mental health specialists. Individual staff that remains noncompliant with policy directives will be identified and disciplined as appropriate.*

*The vacant positions currently within psychiatry continue to adversely impact compliance. The workload created on weekends by the census and acuity of new patients results in unintentional missed contacts. Additionally, the psychiatry team has had to rely upon a rotation for coverage of the infirmary units. Consequently, staff covering the units has less frequent opportunity to engage this policy resulting in compliance challenges. The Chief Psychiatrist will provide oversight of the infirmary psychiatry staff to increase compliance with daily psychiatric contact for those on close and constant observation status.*

*The overall compliance rate for the July audit was 96.5%. Of the fourteen key indicators specific to Cermak staff, 2 had a compliance rate below the target of 90%. They included:*
  *-QMHP documented consultation with the psychiatrist for disposition of suicidal detainee*
  *-Documentation of daily psychiatric contact while on observation status*

All information provided in these appended materials is compiled at the director of the Cermak Department of Quality and Patient Safety and is privileged and confidential. They are to be used solely in the course of quality control and for the purpose of reducing morbidity and mortality and improving the quality of patient care. This confidential Patient Safety Work Product is protected under the Federal Patient Safety and Quality Improvement Act and the Illinois Medical Studies Act.

# Cermak Health Services of Cook County
# Quality Improvement Report

While not 100%, the second quarter audit reflects improvement in compliance since the first quarter. Following the audit, individual staff members not in compliance with the expectation to document consultation with psychiatry were identified and addressed by the Chief Psychologist.

The daily contact with close observation status patients has improved this quarter, however vacant positions currently within psychiatry continue to adversely impact full compliance. The workload created on weekends by the census and acuity of new patients results in unintentional missed contacts. Additionally, the psychiatry team has had to rely upon a rotation for coverage of the infirmary units. Consequently, staff covering the units has less frequent opportunity to engage this policy resulting in compliance challenges. The Chief Psychiatrist will provide oversight of the infirmary psychiatry staff to increase compliance with daily psychiatric contact for those on close and constant observation status.

The overall compliance rate for the October audit was 88%. Of the fourteen key indicators specific to Cermak staff, only one had a compliance rate below the target of 90%:

    -Observation Status Instructions Completed

While the overall compliance percentage for the third quarter dropped, this was solely due to non-compliance of the one indicator. There were noted improvements in compliance in every other indicator since the first quarter. Following the audit, the Chief Psychologist was able to determine that this noncompliance was due to a cross departmental miscommunication regarding the presence and active utilization of an electronic version of the Observation Status Instructions. All mental health and nursing staff were immediately instructed to resume use of the paper document that will later be scanned into the medical record until the EMR issues are rectified.

## DEFINE

The purpose of the study was to determine staff compliance with the Interagency Suicide Detection and Prevention directive.

## MEASURE

Fourteen quality indicators were identified from the Interagency Suicide Detection and Prevention directive. Chart reviews are completed for thirty detainees each quarter, specifically assessing compliance with the identified indicators.

All information provided in these appended materials is compiled at the director of the Cermak Department of Quality and Patient Safety and is privileged and confidential. They are to be used solely in the course of quality control and for the purpose of reducing morbidity and mortality and improving the quality of patient care. This confidential Patient Safety Work Product is protected under the Federal Patient Safety and Quality Improvement Act and the Illinois Medical Studies Act.

# Cermak Health Services of Cook County
# Quality Improvement Report

### January-March 2015

| | Quality Indicators | Yes | No | N/A | % Compliance |
|---|---|---|---|---|---|
| **A** | **Identification and Referral** | | | | |
| 1 | Suicide risk screen completed by a Qualified Mental Health Staff (QMHS) person. | 30 | | | 100% |
| 2 | If detainee had a positive suicide risk screen, he/she has a suicide risk assessment completed by a Qualified Mental Health Professional (QMHP). | 30 | | | 100% |
| 3 | QMHP documented consultation with Psychiatrist for disposition of suicidal detainee. | 18 | 12 | | 60% |
| 4 | Suicidal detainee has an order for constant or close observation. | 28 | 2 | | 93% |
| 5 | Admission care set is completed by Psychiatrist. | 30 | | | 100% |
| 6 | Observation Status Instructions completed. | 29 | 1 | | 97% |
| 7 | Observation Log completed Nursing. | 29 | 1 | | 97% |
| 8 | Observation Log completed by CCDOC. | 30 | | | 100% |
| 9 | Documentation of daily psychiatric contact while on observation status. | 23 | 7 | | 77% |
| 10 | Observation status discontinued by physician or psychologist. | 30 | | | 100% |
| 11 | Patient referred for follow up mental health care within 90 days of discontinuation of observation status. | 22 | 1 | 7 | 96% |
| **B** | **Follow up** | | | | |
| 1 | If identified as a serious suicide attempt, patient has an IMACS alert for "History of Serious Suicide Attempt" | 2 | | 28 | 100% |
| 2 | If identified as a serious suicide attempt, morbidity review completed within 30 days of incident. | | | 30 | |
| 3 | Individual treatment plan identifies a schedule for follow up | 22 | 3 | 5 | 88% |

All information provided in these appended materials is compiled at the director of the Cermak Department of Quality and Patient Safety and is privileged and confidential. They are to be used solely in the course of quality control and for the purpose of reducing morbidity and mortality and improving the quality of patient care. This confidential Patient Safety Work Product is protected under the Federal Patient Safety and Quality Improvement Act and the Illinois Medical Studies Act.

# Cermak Health Services of Cook County
# Quality Improvement Report



| | Quality Indicators | Yes | No | N/A | % Compliance |
|---|---|---|---|---|---|
| | **April - June 2015** | | | | |
| **A** | **Identification and Referral** | | | | |
| 1 | Suicide risk screen completed by a Qualified Mental Health Staff (QMHS) person. | 30 | | | 100% |
| 2 | If detainee had a positive suicide risk screen, he/she has a suicide risk assessment completed by a Qualified Mental Health Professional (QMHP). | 27 | | 3 | 100% |
| 3 | QMHP documented consultation with Psychiatrist for disposition of suicidal detainee. | 21 | 7 | 2 | 75% |
| 4 | Suicidal detainee has an order for constant or close observation. | 29 | 1 | | 97% |
| 5 | Admission care set is completed by Psychiatrist. | 30 | | | 100% |
| 6 | Observation Status Instructions completed. | 29 | | 1 | 100% |
| 7 | Observation Log completed Nursing. | 29 | | 1 | 100% |
| 8 | Observation Log completed by CCDOC. | 30 | | | 100% |
| 9 | Documentation of daily psychiatric contact while on observation status. | 25 | 3 | 2 | 89% |
| 10 | Observation status discontinued by physician or psychologist. | 29 | | 1 | 100% |
| 11 | Patient referred for follow up mental health care within 90 days of discontinuation of observation status. | 29 | | 1 | 100% |
| **B** | **Follow up** | | | | |
| 1 | If identified as a serious suicide attempt, patient has an IMACS alert for "History of Serious Suicide Attempt" | | | 30 | #DIV/0! |
| 2 | If identified as a serious suicide attempt, morbidity review completed within 30 days of incident. | | | 30 | #DIV/0! |
| 3 | Individual treatment plan identifies a schedule for follow up | 29 | | 1 | 100% |

All information provided in these appended materials is compiled at the director of the Cermak Department of Quality and Patient Safety and is privileged and confidential. They are to be used solely in the course of quality control and for the purpose of reducing morbidity and mortality and improving the quality of patient care. This confidential Patient Safety Work Product is protected under the Federal Patient Safety and Quality Improvement Act and the Illinois Medical Studies Act.

# Cermak Health Services of Cook County
# Quality Improvement Report

July - September 2015

|   | Quality Indicators | Yes | No | N/A | % Compliance |
|---|---|---|---|---|---|
| **A** | **Identification and Referral** | | | | |
| 1 | Suicide risk screen completed by a Qualified Mental Health Staff (QMHS) person. | 22 | 1 | 7 | 96% |
| 2 | If detainee had a positive suicide risk screen, he/she has a suicide risk assessment completed by a Qualified Mental Health Professional (QMHP). | 18 | 2 | 10 | 90% |
| 3 | QMHP documented consultation with Psychiatrist for disposition of suicidal detainee. | 24 | 1 | 5 | 96% |
| 4 | Suicidal detainee has an order for constant or close observation. | 30 | | | 100% |
| 5 | Admission care set is completed by Psychiatrist. | 29 | 1 | | 97% |
| 6 | Observation Status Instructions completed. | 1 | 29 | | 3% |
| 7 | Observation Log completed Nursing. | 28 | 2 | | 93% |
| 8 | Observation Log completed by CCDOC. | | | | #DIV/0! |
| 9 | Documentation of daily psychiatric contact while on observation status. | 27 | 3 | | 90% |
| 10 | Observation status discontinued by physician or psychologist. | 28 | | 2 | 100% |
| 11 | Patient referred for follow up mental health care within 90 days of discontinuation of observation status. | 30 | | | 100% |
| **B** | **Follow up** | | | | |
| 1 | If identified as a serious suicide attempt, patient has an IMACS alert for "History of Serious Suicide Attempt" | 0 | | 30 | #DIV/0! |
| 2 | If identified as a serious suicide attempt, morbidity review completed within 30 days of incident. | 0 | | 30 | #DIV/0! |
| 3 | Individual treatment plan identifies a schedule for follow up | 30 | | | 100% |

All information provided in these appended materials is compiled at the director of the Cermak Department of Quality and Patient Safety and is privileged and confidential. They are to be used solely in the course of quality control and for the purpose of reducing morbidity and mortality and improving the quality of patient care. This confidential Patient Safety Work Product is protected under the Federal Patient Safety and Quality Improvement Act and the Illinois Medical Studies Act.

# Cermak Health Services of Cook County
# Quality Improvement Report



## ANALYZE

The overall compliance rate for the October 2015 audit was 88%. However, the decline in overall compliance was a direct result of noncompliance on one key indicator as described above which is being addressed.

There is an ongoing need for continued supervision, including targeted individual supervision, and discipline when applicable, with non-compliant staff, in addition to administrative oversight to achieve absolute compliance in this area.

## IMPROVE

The formal suicide risk screen and assessment tools were finalized at the end of September 2013. Staff received initial training on the tools in October 2013. They were put into practice immediately following the initial training. Ongoing supervision will be needed to ensure the tools are used as outlined in policy.

Staff assignments are rotated as needed to minimize staff burnout and complacency due to the high demands of the various clinical areas and the toll taken by addressing chronic crisis situations.

The formal suicide risk screen and assessment are formatted/embedded within the clinical note to make completion mandatory.

All mental health specialists have received an annual review and training on this policy.

Current protocol involves only psychiatrists being permitted to discontinue a patient's observation status.

Licensed mental health staff has been availed to intensive re-training regarding responsibilities associated with disposition of suicidal detainees in Urgent Care and RCDC "Boot Camp" trainings March 2015.

The Chief Psychiatrist provides clinical oversight of psychiatric assessment, treatment and documentation.

The new Psychiatric Special Care Unit Director for 2 North and 2 West has been hired and is in place. The unit director's role is to assist in supervision of the staff and will increase oversight of policy compliance.

The Chief Psychologist will work with IT regarding the Observation Status Instructions form.

## CONTROL

The Chief Psychologist and the Chief Psychiatrist will provide regular clinical oversight of compliance with the directive. Audits will continue to be completed quarterly to continue to document progress.

All information provided in these appended materials is compiled at the director of the Cermak Department of Quality and Patient Safety and is privileged and confidential. They are to be used solely in the course of quality control and for the purpose of reducing morbidity and mortality and improving the quality of patient care. This confidential Patient Safety Work Product is protected under the Federal Patient Safety and Quality Improvement Act and the Illinois Medical Studies Act.

**Attachment 1**

## 2ND FLOOR - PSYCHIATRY -

| MONTH | CENSUS | AVG | ADMISSIONS | TRANSFERS | DISCHARGES | TOTAL PAT, DAYS | AVG LENGTH OF STAY |
|---|---|---|---|---|---|---|---|
| DEC(14) | 2195 | 70.81 | 175 | 85 | 174 | 2195 | 12.61 |
| JAN | 2175 | 70.16 | 204 | 70 | 165 | 2175 | 13.18 |
| FEB | 2064 | 73.71 | 164 | 48 | 147 | 2064 | 14.04 |
| MARCH | 2456 | 79.23 | 224 | 93 | 191 | 2456 | 12.86 |
| APRIL | 2453 | 81.77 | 245 | 87 | 258 | 2453 | 9.51 |
| MAY | 2318 | 74.77 | 214 | 82 | 179 | 2318 | 12.95 |
| JUNE | 1876 | 62.53 | 184 | 94 | 176 | 1876 | 10.66 |
| JULY | 2084 | 67.23 | 218 | 87 | 184 | 2084 | 11.33 |
| AUG | 1996 | 64.39 | 202 | 85 | 190 | 1996 | 10.51 |
| SEPT | 1927 | 64.23 | 202 | 125 | 149 | 1927 | 12.93 |
| OCT | 0 | 0.00 | 0 | 0 | 0 | 0 | |
| NOV | 0 | .0.00 | 0 | 0 | 0 | 0 | |
| YTD | 21544 | 141.77 | 2032 | 856 | 1813 | 21544 | 11.88 |
| 1ST QTR | 6434 | 71.56 | 543 | 203 | 486 | 6434 | 13.28 |
| 2ND QTR | 7227 | 78.59 | 683 | 262 | 628 | 7227 | 11.51 |
| 3RD QTR | 6647 | 64.72 | 604 | 266 | 550 | 6647 | 10.83 |
| 4TH QTR | 1927 | 21.41 | 202 | 125 | 149 | 1927 | |

## 2 NORTH -

| MONTH | CENSUS | AVG | ADMISSIONS | TRANSFERS | DISCHARGES | TOTAL PAT, DAYS | AVG LENGTH OF STAY |
|---|---|---|---|---|---|---|---|
| DEC(14) | 692 | 22.32 | 140 | 51 | 99 | 692 | 6.99 |
| JAN | 682 | 22.00 | 157 | 48 | 101 | 682 | 6.75 |
| FEB | 644 | 23.00 | 129 | 30 | 94 | 644 | 6.85 |
| MARCH | 827 | 26.68 | 192 | 60 | 127 | 827 | 6.51 |
| APRIL | 729 | 24.30 | 205 | 38 | 170 | 729 | 4.29 |
| MAY | 712 | 22.97 | 178 | 56 | 118 | 712 | 6.03 |
| JUNE | 634 | 21.13 | 156 | 61 | 105 | 634 | 6.04 |
| JULY | 683 | 22.03 | 171 | 49 | 108 | 683 | 6.32 |
| AUG | 625 | 20.16 | 165 | 46 | 104 | 625 | 6.01 |
| SEPT | 610 | 20.33 | 163 | 86 | 73 | 610 | 8.36 |
| OCT | | 0.00 | | | | 0 | |
| NOV | | 0.00 | | | | 0 | |
| YTD | 6838 | 44.99 | 1656 | 525 | 1099 | 6838 | 6.22 |
| 1ST QTR | 2018 | 22.44 | 426 | 129 | 294 | 2018 | 6.86 |
| 2ND QTR | 2268 | 24.65 | 575 | 154 | 415 | 2268 | 5.61 |
| 3RD QTR | 1942 | 21.11 | 492 | 156 | 317 | 1942 | 6.12 |
| 4TH QTR | 610 | 6.78 | 163 | 86 | 73 | 610 | |

## 2 WEST - FEMALE

| MONTH | CENSUS | AVG | ADMISSIONS | TRANSFERS | DISCHARGES | TOTAL PAT, DAYS | AVG LENGTH OF STAY |
|---|---|---|---|---|---|---|---|
| DEC(14) | 298 | 9.61 | 35 | | 36 | 298 | 8.28 |
| JAN | 331 | 10.68 | 47 | | 50 | 331 | 6.62 |
| FEB | 271 | 9.68 | 35 | | 36 | 271 | 7.53 |
| MARCH | 358 | 11.55 | 32 | | 32 | 358 | 11.19 |
| APRIL | 435 | 14.50 | 40 | | 42 | 435 | 10.36 |
| MAY | 441 | 14.23 | 36 | | 33 | 441 | 13.36 |
| JUNE | 389 | 12.97 | 28 | | 30 | 389 | 12.97 |
| JULY | 486 | 15.68 | 47 | | 43 | 486 | 11.30 |
| AUG | 446 | 14.39 | 37 | | 44 | 446 | 10.14 |
| SEPT | 372 | 12.40 | 39 | | 38 | 372 | 9.79 |
| OCT | | 0.00 | | | | 0 | |
| NOV | | 0.00 | | | | 0 | |
| YTD | 3827 | 25.13 | 376 | 0 | 384 | 3827 | 9.97 |
| 1ST QTR | 900 | 9.99 | 117 | 0 | 122 | 900 | 7.48 |
| 2ND QTR | 1234 | 13.42 | 108 | 0 | 107 | 1234 | 11.64 |
| 3RD QTR | 1321 | 14.34 | 112 | 0 | 117 | 1321 | 11.47 |
| 4TH QTR | 372 | 4.13 | 39 | 0 | 38 | 372 | |

# NURSING DEPARTMENT -CENSUS REPORT
## FY 2015

### 2 SOUTH

| MONTH | CENSUS | AVG | ADMISSIONS | RECEIVED BY TRANSFER | DISCHARGES | TOTAL PAT, DAYS | AVG LENGTH OF STAY |
|---|---|---|---|---|---|---|---|
| DEC (14) | 577 | 18.61 | | 29 | 28 | 577 | 20.61 |
| JAN | 539 | 17.39 | | 17 | 11 | 539 | 49.00 |
| FEB | 577 | 20.61 | | 17 | 16 | 577 | 36.06 |
| MARCH | 684 | 22.06 | | 29 | 26 | 684 | 26.31 |
| APRIL | 657 | 21.90 | | 31 | 30 | 657 | 21.90 |
| MAY | 557 | 17.97 | | 16 | 20 | 557 | 27.85 |
| JUNE | 376 | 12.53 | | 23 | 26 | 376 | 14.46 |
| JULY | 438 | 14.13 | | 27 | 20 | 438 | 21.90 |
| AUG | 415 | 13.39 | | 28 | 32 | 415 | 12.97 |
| SEPT | 457 | 15.23 | | 25 | 24 | 457 | 19.04 |
| OCT | | 0.00 | | | | 0 | |
| NOV | | 0.00 | | | | 0 | |
| YTD | 5277 | 34.76 | 0 | 242 | 233 | 5277 | 22.65 |
| 1ST QTR | 1693 | 18.87 | 0 | 63 | 55 | 1693 | 35.22 |
| 2ND QTR | 1898 | 20.64 | 0 | 76 | 76 | 1898 | 25.35 |
| 3RD QTR | 1229 | 13.35 | 0 | 78 | 78 | 1229 | 16.44 |
| 4TH QTR | 457 | 5.08 | 0 | 25 | 24 | 457 | |

### 2 SE

| MONTH | CENSUS | AVG | ADMISSIONS | RECEIVED BY TRANSFER | DISCHARGES | TOTAL PAT, DAYS | AVG LENGTH OF STAY |
|---|---|---|---|---|---|---|---|
| DEC(14) | 286 | 9.23 | | 1 | 5 | 286 | 57.20 |
| JAN | 276 | 8.90 | | 1 | 1 | 276 | 276.00 |
| FEB | 252 | 9.00 | | 0 | 0 | 252 | 0.00 |
| MARCH | 279 | 9.00 | | 2 | 2 | 279 | 139.50 |
| APRIL | 266 | 8.87 | | 6 | 7 | 266 | 38.00 |
| MAY | 270 | 8.71 | | 3 | 3 | 270 | 90.00 |
| JUNE | 247 | 8.23 | | 8 | 9 | 247 | 27.44 |
| JULY | 261 | 8.42 | | 8 | 8 | 261 | 32.63 |
| AUG | 262 | 8.45 | | 8 | 7 | 262 | 37.43 |
| SEPT | 250 | 8.33 | | 10 | 10 | 250 | 25.00 |
| OCT | | 0.00 | | | | 0 | |
| NOV | | 0.00 | | | | 0 | |
| YTD | 2649 | 17.43 | 0 | 47 | 52 | 2649 | 50.94 |
| 1ST QTR | 814 | 9.04 | 0 | 2 | 6 | 814 | 111.07 |
| 2ND QTR | 815 | 8.86 | 0 | 11 | 12 | 815 | 89.17 |
| 3RD QTR | 770 | 8.37 | 0 | 24 | 24 | 770 | 32.50 |
| 4TH QTR | 250 | 2.78 | 0 | 10 | 10 | 250 | |

### 2 EAST

| MONTH | CENSUS | AVG | ADMISSIONS | RECEIVED BY TRANSFER | DISCHARGES | TOTAL PAT, DAYS | AVG LENGTH OF STAY |
|---|---|---|---|---|---|---|---|
| DEC(14) | 342 | 11.03 | | 4 | 6 | 342 | 57.00 |
| JAN | 347 | 11.19 | | 4 | 2 | 347 | 173.50 |
| FEB | 320 | 11.43 | | 1 | 1 | 320 | 320.00 |
| MARCH | 308 | 9.94 | | 2 | 4 | 308 | 77.00 |
| APRIL | 366 | 12.20 | | 12 | 9 | 366 | 40.67 |
| MAY | 338 | 10.90 | | 7 | 5 | 338 | 67.60 |
| JUNE | 230 | 7.67 | | 2 | 6 | 230 | 38.33 |
| JULY | 216 | 6.97 | | 3 | 5 | 216 | 43.20 |
| AUG | 248 | 8.00 | | 3 | 3 | 248 | 82.67 |
| SEPT | 238 | 7.93 | | 4 | 4 | 238 | 59.50 |
| OCT | | 0.00 | | | | 0 | |
| NOV | | 0.00 | | | | 0 | |
| YTD | 2953 | 19.45 | 0 | 42 | 45 | 2953 | 65.62 |
| 1ST QTR | 1009 | 11.22 | 0 | 9 | 9 | 1009 | 183.50 |
| 2ND QTR | 1012 | 11.01 | 0 | 21 | 18 | 1012 | 61.76 |
| 3RD QTR | 694 | 7.54 | 0 | 8 | 14 | 694 | 54.73 |
| 4TH QTR | 238 | 2.64 | 0 | 4 | 4 | 238 | |