## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

  v.

COOK COUNTY, ILLINOIS;
THOMAS DART, COOK COUNTY
SHERIFF (in his official capacity);
TONI PRECKWINKLE, COOK COUNTY
BOARD PRESIDENT (in her official capacity);
COOK COUNTY BOARD OF
COMMISSIONERS  (in their official capacity),

        Defendants,

No. 10 C 2946

Judge Virginia Kendall

# Monitor Esmaeil Porsa's Report No. 11

Esmaeil Porsa, MD, MPH, CCHP
Associate Chief Medical Officer
Senior Vice President
Professional and Academic Affairs
5201 Harry Hines Boulevard
Dallas, Texas 75235-7746
esmaeil.porsa@phhs.org

**Cook County Jail**
**Eleventh Monitoring Report**

**Esmaeil Porsa, MD, MPH, CCHP-P, CCHP-A**

**November 2015**

**Executive Summary**

During the week of November 2, 2015, the Monitoring team visited Cook County Jail.  The team included: Esmaeil Porsa, MD, MPH, CCHP-P, Muthusamy Anandkumar, MD, MBA, Madeleine LaMarre FNP-BC, Catherine Knox, MN, RN, CCHP-RN and Linda Pansulla, RN, MBA, CCHP. The Monitoring Team visited the majority of the Cook County Jail medical facilities and housing units. We also interviewed various Cermak and Cook County Department of Corrections (CCDOC) leadership and front line staff as well as Cook County Jail inmates.  We extend our most sincere thanks to all the Cermak and CCDOC leadership and staff for their hospitality and generosity with their time and resources.  We additionally thank Cermak and CCDOC leadership and staff for their openness to the Monitoring Team suggestions and our critical appraisal of Cermak's processes and activities over the past six months. Cook County Jail Cermak and CCDOC personnel were completely cooperative and helpful in this monitoring visit. The Monitoring Team enjoyed full and unhindered access to all areas and staff.

Our monitoring visit began on Monday November 2nd. Improvement in general cleanliness of all clinical areas continues and it is even more evident now than ever before. This was inclusive of all areas visited by the Monitoring Team during this visit.

With the exception of Access to Care, continued progress in every health care process has been sustained. This has been more evident in some areas than others. None is more significant or impactful than the overall improvement in the capability and performance of Cermak's QI division under the current leadership.

In the medical program, all provisions are now either in partial or substantial compliance. All areas of substantial compliance remained in substantial compliance. Dental Care remains in provisional substantial compliance pending the delivery of improved dental wait times during the Monitoring Team's next visit in April 2016. Three new provisions were moved from partial compliance to substantial compliance. These include Medical Facilities, Treatment and Management of Communicable Diseases and Medication Administration. Infirmary care (now Special Care Unit) has a new policy and procedure with new "levels of care". It is too early to determine the efficacy of the new system in improving the overall quality and frequency of care delivered by providers and nursing staff in this area.

Staffing continues to be a challenge. For the first time in the past two years, Cermak has a positive balance of 13 FTEs (new hires minus attrition) with a current vacancy of 88 FTEs. The existing vacancy rate has a significant negative impact on the ability of Cermak to move toward overall substantial compliance with all the provisions of the Agreed Order. New hiring strategies and incentives have been created that will be discussed in the body of this report. The Monitoring Team was pleased to note that for the first time, the leadership team for Cermak has

2

remained intact during the six month period between our visits. In fact, new leadership positions have been created and filled (without losing any of the previously existing leaders).

Based on our findings in this visit and our interactions with Cermak health care and leadership staff, the Monitoring Team believes that Cermak has now "turned the corner" and is well on its way to continued rapid improvement. The Monitoring Team considers Cermak to be at about 60% compliant with the elements of the Agreed Order. While we congratulate Cermak for achieving this milestone, we would also like to caution Cermak to maintain continued vigilance and dedication to moving forward. The next step in the evolution of Cermak is "Standardization" of its practices in every level of care and documentation so that every staff, every time adheres to the highest quality of correctional health care delivery regardless of the division, the floor or the service line. Cermak and CCDOC are to be congratulated for progress noted in this report and take time to celebrate these achievements.

**Introduction and Facility Outline**

On October 30th, 2015, the population of Cook County Jail was reported as 8,727 including 7,346 male and 528 female general population, 553 inmates in the court ordered drug treatment program,148 female inmates in Women's Residential Program and 46 in the VRIC Boot Camp. There were 20 inmates at Stroger Hospital. 86 inmates were listed under "Outside Counties". The distribution of inmates among the various "Divisions" is reported in the body of this report.

**Definitions and Organization**

This report is formatted in the manner requested by the Department of Justice and closely follows the Agreed Order.  The report includes four parts for each section of the Agreed Order.

In part one; we rewrite verbatim the pertinent portion of the Agreed Order.  This first part is labeled Remedial Measure of Agreed Order.

The second part is the overall compliance rating labeled Compliance Assessment.  This is the assessment that the Monitoring Team experts make based on judgment, data, and chart reviews. The Compliance Assessment has three possible scores: substantial compliance, partial compliance, and noncompliance.  Substantial compliance means that the Monitoring Team experts determine that Cook County Jail has satisfactorily met most or all components of the standards of care for the particular provision. Partial compliance means that some remaining problems exist. Non-compliance means that much work needs to be done before compliance is met. When indicated, the Monitoring Team will additionally assess the various components (sub-bullet points) of certain sections of the Agreed Order.  Our goal is to highlight areas of success and bring focus to areas that need further refining and attention.

The third part is the factual basis for forming the opinion in the Compliance Assessment. This will be as data driven as possible. For patient care areas, chart reviews form a substantial portion of this review. Touring, interviews, and reviewing data sources is also an important means of making assessments.

The fourth part is our recommendations. These recommendations are our view of what needs to be accomplished to attain and maintain compliance. This will include the Monitoring Team's recommendations for self-monitoring activities and audits.

**B.      HEALTH CARE SERVICES:  ELEMENTS COMMON TO MEDICAL AND MENTAL HEALTH**

**41. Inter-Agency Agreement**

   a.  CCDOC shall enter into a written Inter-Agency Agreement with Cermak that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility.  The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order.
   b.  Cermak shall enter into a written Inter-Agency Agreement with CCDOC that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility.  The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order.

**Compliance Status**: This provision remains in substantial compliance.

   a.  Substantial Compliance
   b.  Substantial Compliance

This provision has remained in substantial compliance for more than 18 months and as such will no longer be monitored unless new issues arise. The Monitoring Team did not observe anything to suggest a deterioration of collaborative and collegiate relationship between Cermak, CCDOC and Facilities. The strength of this collaboration is supported by the list of interagency meetings including the following:

- Daily Huddle
- Monthly Interagency QI meetings
- Monthly Cermak Medical and MH QI Committees
- Monthly Cermak Suicide Prevention Committee
- Weekly Jail Management meetings
- Weekly executive meetings (DOC Executive Director, Chief of Staff, Cermak COO, Director Risk Management, etc.)
- Use of Force Task Force
- Interagency CIT introduction course
- Interagency Intensive Management Unit training and roll out
- Quarterly Infection Control Committee
- Monthly Interagency Accommodation Committee
- Interagency emergency response drills
- Interagency Diabetes Management

**Monitor's Recommendations:** None.

## 42. Policies and Procedures

Cermak shall provide adequate services to address the serious medical and mental health needs of all inmates, in accordance with generally accepted professional standards. The term "generally accepted professional standards" means those industry standards accepted by a majority of professionals in the relevant field, and reflected in the standards of care such as those published by the National Commission on Correctional Health Care ("NCCHC").

a. Cermak shall develop and implement medical care policies, procedures and practices to address and guide all medical care and services at the Facility, including, but not limited to the following:
   i. access to medical care
   ii. continuity of medication
   iii. infection control
   iv. medication administration
   v. intoxication and detoxification
   vi. documentation and record keeping
   vii. disease prevention
   viii. sick call triage and physician review
   ix. intake screening
   x. chronic disease management
   xi. comprehensive health assessments
   xii. mental health
   xiii. women's health
   xiv. quality management
   xv. emergent response
   xvi. infirmary care
   xvii. placement in medical housing units
   xviii. handling of grievances relating to health care
   xix. mortality review
   xx. care for patients returning from off-site referrals

b. Cermak shall develop and implement policies, procedures and practices to ensure timely responses to clinician orders including, but not limited to, orders for medications and laboratory tests. Such policies, procedures and practices shall be periodically evaluated to ensure timely implementation of clinician orders.

**Compliance Status**: This provision remains in partial compliance.

6

    a. Partial Compliance
    b. Substantial Compliance

**Status Update:** Received and reviewed.

**Monitor's Findings:**

A lot of work has gone into developing or improving existing policy and procedures including a great deal of effort in educating the staff on these policies. Specifically, 35 policies have recently been revised and communicated to staff in town hall meetings. Top 5 important policy and procedures were highlighted. To aid with educating and engaging the staff about the new changes, "scavenger hunt games" were conducted. There are, however several relatively new policy and procedures such as infirmary care (now Special Care Unit) for example which was posted only six weeks prior to this monitoring visit. This diminishes the ability of the Monitoring Team to assess the effectiveness of these policy and procedure. Additionally, there were a few policy and procedures that were found to be missing or incomplete. For example, the Monitoring Team discovered that Cermak does not currently have a policy with regard to discarding multi-use juice bottles from inmates' refrigerators. Additionally, Cermak's policy with regard to expiring medications and supplies is silent on the timing of removal of such items from storage (best practice requires removal of all expiring items 30 days prior to the expiration date). The Monitoring Team has every confidence that this provision will move to Substantial Compliance during our next visit in April 2016.

The Monitoring Team reviewed a new and extensive database that contains all current Cermak policy and procedures including the initial approval date, last revision date, due date for next revision and the owner of the policy and procedure. This is a great step in ensuring that review and potential revision of policy and procedures are hardwired into all future change processes.

**Monitor's Recommendations:**

1. Continue to review and update all policy and procedures to match the expected practices and the elements of the Agreed Order. The Monitoring Team specifically asks for focused attention on refining the following policy and procedures:
    a. Removal of expiring medications and supplies
    b. Inmate nutrition
    c. Minimal frequency of visits for inmates with chronic illness
2. Train all staff with regard to current and new policies to ensure that policies are followed facility wide (standardization). Document this training so that leadership can later demand accountability.

3. Develop and/or revise other policies as discussed more specifically in other sections of this report.

4. Provide the Monitoring Team with a complete set of **all** current and recently updated policy and procedures (as appear on Cermak's intranet) by February 1, 2016. This will provide Cermak with ample opportunity to train all the healthcare staff regarding the most pertinent policy and procedures or those with recent updates prior to the next Monitoring visit in April 2016. Once the Monitoring Team can verify that staff has been trained to all the current and pertinent policy and procedures, this provision will move into substantial compliance.

## 43. Medical Facilities

a. CCDOC will work with Cermak to provide sufficient clinical space, as identified by Cermak staff, to provide inmates with adequate health care to meet the treatment needs of detainees, including: intake screening; sick call; medical and mental health assessment; acute, chronic, emergency and specialty medical care (such as geriatric and pregnant inmates); and acute, chronic and emergency mental health care.

b. Cermak shall make known to CCDOC and Cook County its needs for sufficient clinical space, with access to appropriate utility and communications capabilities, to provide inmates with adequate health care to meet the treatment needs of inmates including: intake screening; sick call; medical and mental health assessment; acute, chronic, emergency and specialty medical care (such as geriatric and pregnant inmates); and acute, chronic and emergency mental health care.

c. Cook County shall build out, remodel, or renovate clinical space as needed to provide inmates with adequate health care to meet the treatment needs of detainees as identified by Cermak staff including:  intake screening; sick call; medical and mental health assessment; acute, chronic, emergency and specialty medical care (such as geriatric and pregnant inmates); and acute, chronic and emergency mental health care.

d. Cermak shall ensure that medical areas are adequately clean and maintained, including installation of adequate lighting in examination rooms.  Cermak shall ensure that hand washing stations in medical care areas are fully, equipped, operational and accessible.

e. Cermak shall ensure that appropriate containers are readily available to secure and dispose of medical waste (including syringes and medical tools) and hazardous waste.

f. CCDOC shall allow operationally for inmates reasonable privacy in medical and mental health care, and shall respect the confidentiality of inmates' medical status, subject to legitimate security concerns and emergency situations.  Reasonable privacy typically includes sight and hearing privacy from other inmates, and hearing privacy from staff that are not providing care.

g. Cermak shall make known to CCDOC and Cook County the structural and operational requirements for inmates' reasonable privacy in medical and mental health care.  Cermak shall provide operationally for inmates' reasonable privacy in medical and mental health care and

shall respect the confidentiality of inmates' medical status, subject to legitimate security concerns and emergency situations. Reasonable privacy typically includes sight and hearing privacy from other inmates, and hearing privacy from staff that are not providing care.

h. Cook County shall build out, remodel or renovate clinic space as needed to allow structurally for inmates' reasonable privacy in medical and mental health care, as identified by Cermak and CCDOC staff.

i. Cook County shall begin construction of the new clinical space within 3 months of the effective date of this Agreed Order. It is expected that the project will be completed within nine months of the effective date of this Agreed Order. Prior to the completion of the new clinical space, Cook County and DFM will work with Cermak to address the most serious concerns regarding clinical space, to the extent possible in the current facility.

Compliance Status: This provision is now in substantial compliance.

a.      Substantial compliance
b.      Substantial compliance
c.      Substantial compliance
d.      Substantial compliance
e.      Substantial compliance
f.      Substantial compliance
g.      Substantial compliance
h.      Substantial compliance
i.      Substantial compliance

Status Update: Cermak leadership provided the Monitors with a status update dated 9/30/15. We reviewed the update in preparation of this report.

**Monitor's Findings:**

Since the last Monitoring visit CCDOC, DFM and Cermak have continued to make improvements in repair and maintenance of the physical plant, sanitation, and clinic operations. Cermak maintains an environmental checklist for clinics that documents environmental issues (e.g., sink broken, dirty vents) and tracks work order submission and completion. Cermak has instituted a system to promote uniformity in clinic operations by instituting a nursing Daily Assignment Sheet that includes checking sharp counts and functionality of emergency response equipment; maintaining clinic organization; and disinfection of exam tables and medical equipment. Inspection of individual divisions revealed isolated lapses in performance of the Daily Assignment Sheet.

Improvement in Special Care Unit (SCU) bed management has resulted in no patients having to sleep in 'boats' as was noted in the last Monitoring visit.

There are opportunities for improvement. Although sanitation throughout the facility has improved, we found that environmental services failed to perform daily sanitation services in some Divisions and Cermak Administrative areas. Some divisions were not maintaining glucometer quality check logs and iStat quality checks were not consistently being performed monthly.

CCDOC and Cermak are to be congratulated for achieving substantial compliance.

Our findings by Division are described below.

**Division I** is a maximum-security unit housing inmates medically classified as P-1 and M-1. The bed capacity is 1246 and current census is 918 inmates or ¾ of its total bed capacity. The clinic is as described in the Ninth Report. The clinic layout is unchanged, providing adequate space and privacy. Health care staffing includes two registered nurses (RN), one paramedic and two CMT who are on duty from 7 am to 3 pm daily. Morning and afternoon primary care clinics take place Monday, Tuesday and Friday. On Wednesday and Thursday primary care is available in either the morning or afternoon.

All of the required emergency response equipment and supplies, including the cervical collar, was present and the log reflects that these are checked daily. Over the counter (OTC) medications that nurses can access to treat patients according to the nursing protocols are now stored securely in a Pyxis Med Station. The more time consuming processes of signing out OTCs from the storage cabinet and maintaining PAR levels has been eliminated now. The sharps count was accurate. Two EKG pads and two culture test tubes were found to be outdated. The Sanitation Service Checklist mounted on the wall was up to date.

**Division II** consists of four buildings that have the capacity to house 1960 minimum custody inmates in dormitories. At the time of the site visit this Division housed 1517 inmates; just over ¾ of its capacity. This Division houses inmates who are medically classified P-2 and M2. There are two clinics that service the Division, one of these is in Dorm 1 and the other in Dorm 2. Nursing staff are on duty in Dorm 1 eight hours a day, seven days a week and in Dorm 2 coverage is available 24 hours a day, seven days a week. In Dorm 1 primary care clinics take place in the morning and afternoon Monday, Wednesday and Friday. On Tuesday and Thursday primary care is available in either the morning or afternoon. In Dorm 2 primary care clinics take place both morning and afternoon Monday through Wednesday and are scheduled for a half day on Thursday and Friday.

All of the required emergency response equipment and supplies, including the cervical collar, was present and the log reflects that these are checked daily. Over the counter (OTC) medications that nurses can access to treat patients according to the nursing protocols are now

10

stored securely in a Pyxis Med Station. The sharps count was accurate however the nurses only conduct a daily count of insulin syringes and lancets. While a declining inventory is kept of other "sharps" there was no daily count documented. The Nurse Manager checked with one of her colleagues, obtained the correct count sheet and should have instituted a daily count of all sharps by the time this report is completed. No outdated drugs or supplies were found in the refrigerator or storage shelves.

The Sanitation Service Checklist mounted on the wall was up to date. A Daily Assignment Sheet is used by the Charge Nurse to assign duties throughout the shift, including cleaning the nurses' station, exam rooms and medication carts.

**3 Annex** is a minimum security, general population dormitory style housing unit. The census at the time of our visit was 415. To be eligible for housing in the annex, inmates must be medically and psychiatrically stable with the ability to be prescribed keep on person (KOP) medication instead of nurse administered. The clinic is staffed 8 hours per day with two registered nurses and a CMT.

The clinic is a large area with three exam rooms. The overall appearance of the unit was neat, clean and well-organized. During the Monitoring Teams' visit both nurses were conducting nurse sick call. Medical exam rooms were clean with medical equipment functional and in good condition. Personal protective equipment was available to staff.

**Division III** houses female inmates with a bed capacity of 324 and current census of 280 inmates. As noted in previous reports, the division is old and the physical plant difficult to maintain. On the day of the Monitoring Team's visit the clinic area was well organized and clean. Examination rooms were adequately equipped and supplied, including a microscope. There is now Daily Assignment Sheet that includes disinfection activities for the staff to implement each shift.

An emergency response bag was present as well as an automatic external defibrillator (AED), oxygen, cervical collar, backboard, gurney, and wheelchair. The log reflects that emergency equipment and supplies are checked daily. There were no outdated medications or supplies found in the clinic. Personal protective equipment (PPE), sharps containers and hazardous waste containers were also available in the clinic.

**Divisions IV** and **V** are closed.

**Division VI** houses medium custody inmates, a segregation unit, and a protective custody unit for many of the transgender inmates. The bed capacity is 986 and current census is 930. The clinic is staffed daily from 7:00 am to 8:30 pm by four registered nurses and two certified

medical technicians. During the Monitoring Teams' tour the building was found to be clean. The clinic consists of a large waiting room, a treatment room, a reception alcove, several exam rooms, a room for medical equipment and supplies, and a break room with staff lavatory. There three exam rooms available for nurse sick call. Personal protective equipment (PPE) and hazardous waste containers were available and appropriately mounted in the clinic. Nursing staff were observed utilizing infection control techniques between patients.

Emergency response equipment was checked per policy and logged daily. The inventory of medical tools and needles was accurate and well organized. No outdated medications, medical or laboratory supplies were found. Daily temperatures in the refrigerator are monitored and no deviations from the recommended range recorded. Sanitation log was present and signed off daily.

The nursing staff was interviewed during the visit regarding the new procedure for communicating information from the Urgent Care to the division. The procedure although newly introduced appears to be effective. We found the nurses to be knowledgeable in policy and procedures for conducting HSR, infection control and new policies and procedures.

**Division VIII (RTU)** consists of the reception center/medical intake on the first floor and four floors that house inmates. All housing units are direct observation, and all four floors contain high acuity medical and mental health populations, including patients being detoxed from drugs and/or alcohol. The bed capacity is 979 and current census 847 inmates.

The Reception Center/Medical Intake is located on the first floor of the RTU. The area is organized to correspond to the flow of the corrections, medical and mental health intake process. Rooms are color coded by function for medical and mental health screening, laboratory testing and physical examinations. The area also contains rooms for radiology equipment, storage of equipment and supplies, and correctional officer stations. Overall, interview and examination rooms were clean, organized and contained equipment and supplies appropriate to their function. We did find that in two examination rooms the oto/ophthalmoscopes had inoperable light bulbs that were immediately replaced. Personal Protective Equipment (PPE) sharps and biohazardous waste containers were available in all clinical areas. Emergency equipment was available but as noted at the last Monitoring visit, logs showed lapses in staff checking emergency equipment. The emergency response equipment log showed that staff had not checked the equipment from 11/1/15 to 11/4/15.

The 2nd floor houses inmates being monitored and treated for alcohol and drug withdrawal. The Monitoring team inspected one of two examination rooms. We found the exam room to be clean, well-organized and adequately equipped and supplied. The clinic has emergency equipment including the new jump bag, defibrillator, and EKG. Logs showed that the equipment

was checked daily; however staff was not placing EKG test strips in a log book to demonstrate that it was checked. Personal protective equipment (PPE) and sharps containers were available. The refrigerator was clean but contained an expired insulin vial. Over the counter (OTC) medications that nurses can access to treat patients according to the nursing protocols are now stored securely in a Pyxis Med Station.

A concern is that the 2nd floor environmental services log showed that sanitation had not been performed for five days (10/30 to 11/3/15). This reflects lack of supervision of environmental services.

The 3rd floor houses high medical acuity male inmates. The examination rooms were clean, well-organized and properly equipped and supplied. Personal protective equipment (PPE), sharps containers and hazardous waste containers were available in the clinic. The medication room was also clean and well-organized. Over the counter (OTC) medications that nurses can access to treat patients according to the nursing protocols are now stored securely in a Pyxis Med Station. Sharps and syringe counts were correct. The refrigerator contained no expired medications or outdated vials in use. One piece of equipment contained an outdated engineering sticker. The glucometer quality check log was not present.

The 4th floor houses high acuity mental health male inmates. Examination rooms were clean, well-organized and adequately medically equipped and supplied. Emergency response equipment was present and the log showed that staff checked equipment daily. Personal protective equipment (PPE), sharps containers and hazardous waste containers were also available in the clinic. The medication room was clean and contained no expired medications or outdated vials in use. Over the counter (OTC) medications that nurses can access to treat patients according to the nursing protocols are now stored securely in a Pyxis Med Station. Sharps and syringe counts were accurate. The glucometer quality check log was in use.

The Environmental Services Log showed that daily sanitation was not consistently performed, with lapses on 10/24, 10/25, 10/31 and 11/2/2015.

The 5th floor houses high acuity medical and/or mental health female inmates. One of two examination rooms was inspected and was clean, organized and adequately equipped and supplied. Emergency equipment including jump bag was available. Personal protective equipment (PPE) sharps and biohazardous waste containers were available. The medication room was clean and contained no expired medication or outdated medication vials, however the nutrition refrigerator had an expired engineering tag and a bottle of juice that was open for more than 48 hours. Over the counter (OTC) medications that nurses can access to treat patients according to the nursing protocols are now stored securely in a Pyxis Med Station. Syringe and sharps counts were correct. The glucometer quality check log was not present.

**Division IX** has a bed capacity of 1042 inmates and a current census of 971. The physical description of the population, housing units and the clinic space remains unchanged from previous reports. Two of the sick call examination rooms on the tiers in the North tower and one sick call room in the South tower were visited. These rooms are properly equipped for examination of inmates. Rooms contained proper infection control supplies to conduct sick call.

The emergency response equipment was signed off and logged daily. Staff was knowledgeable of the procedure for checking and logging emergency equipment. The inventory of medical tools and needles was accurate and well organized. No outdated medications or medical supplies were found. Daily temperatures in the refrigerator are monitored and no deviations from the recommended range recorded. Outdated specimen tubes were found in the lab. The specimen tubes were removed immediately. Other equipment in the clinic area was in working condition. None of the staff expressed any concerns regarding the clinical space or equipment.

The two registered nurses were interviewed during the visit regarding the new procedure for communicating information from the Urgent Care to the division. The procedure although newly introduced appears to be effective. We found the nurses to be knowledgeable in policy and procedures for conducting HSR, infection control and new policies and procedures.

**Division X** has a bed capacity of 764 inmates and current census of 672 inmates including those with P-2 and M-2 medical classifications. Nursing staff are on duty 24 hours a day, seven days a week. Primary care clinics are scheduled three and a half days a week, staffed by four providers. The physical description of Division X is otherwise unchanged from previous reports. All of the required emergency response equipment and supplies, including the cervical collar, was present and the log reflects that these are checked daily. Over the counter (OTC) medications that nurses can access to treat patients according to the nursing protocols are now stored securely in a Pyxis Med Station. The sharps count was accurate. No outdated medications or supplies were found. A thermometer had an expired engineering tag. The Sanitation Service Checklist mounted on the wall was up to date.

**Division XI** has a bed capacity of 1526 inmates and current census of 1511. Nursing staff are on duty eight hours each day. Primary care clinics are scheduled three full days and two half days each week, staffed by two providers. The clinic area is the same as described in previous reports. As recommended in previous reports, an exam table and oto-ophthalmoscope are now in place in both rooms used by nurses for sick call.

All of the required emergency response equipment and supplies, including the cervical collar, was present and the log reflects that these are checked daily. Over the counter (OTC) medications that nurses can access to treat patients according to the nursing protocols are now

stored securely in a Pyxis Med Station. The inventory of medical tools and needles was accurate and no outdated medications or medical supplies were found.  The Sanitation Service Checklist mounted on the wall was up to date.

**Division XVII** houses female inmates in the Sheriff's Women's Justice Program. The current census is 148 inmates.  The Division also houses all pregnant women.  The medical area contains two examination rooms, a medication room and a nurse's station.  The examination rooms were clean and adequately equipped and supplied, including microscopes. Personal protective equipment, sharps and biohazardous containers were available, as well as emergency equipment and supplies. Over the counter (OTC) medications that nurses can access to treat patients according to the nursing protocols are now stored securely in a Pyxis Med Station.

**Cermak Infirmary/Special Care Unit**

Cermak infirmary floors 2 and 3 both consist of four wings; north, south, east and west.  The areas are all large, and well-lighted.   All patient areas were found to be clean, neat and organized. Sanitation schedules are posted and signed off daily as per policy.

2nd floor Mental Health Unit
There is a small exam room on the main unit accessible to staff for patient examinations.
The space was clean and well-organized. Basic medical equipment was in working order.  Sharps counts were correct. There has been one jump bag placed in the common area of the units.  The Monitoring Team toured all wings on the second floor and found no deficiencies.

3rd Floor Medical Unit
Each infirmary unit has small medical exam rooms which are adequate to perform physical examinations. Each room was found to be neat, clean and orderly.  All equipment was found to be in working order and checked by maintenance. No outdated supplies were found and the sharps counts were correct. However we did find outdated engineering tags on some equipment. This deficiency was corrected before we left the floor.  AED's were checked and logged daily. A jump bag was located in the common area of the units.

With respect to medications, we found two vials in insulin in the sharps drawer that the nurse said she had been placed there to secure while she finished with a patient.  Sanitation logs were completed daily.

**Cermak Urgent Care**

Clinical space in the Cermak Urgent Care Department appeared neat and orderly and appropriate for emergency care of inmates.  The Monitoring Team continues to find significant improvement

in infection control practices and the cleanliness of the unit since the last monitoring visit. Sanitation logs were completed daily. All sharps counts were correct. No medical facility deficiencies were noted during this visit.

**Dialysis**

At the time of our visit there were eight dialysis patients at Cermak. All except two patients had permanent HD access (shunts or fistulas). The Monitoring Team interviewed one HD patient while he was receiving dialysis. This patient was overall very happy with his treatment. His only complaint was that he was not being allowed to purchase potato chips from commissary. This unit continues to be very clean and organized. The infection prevention practices of the dialysis unit were reviewed with a technician from Davita Dialysis who is contracted to provide dialysis at Cermak. Infection practices were determined to be adequate and timely. One of the machines had failed the routine micro bacterial count test. The corrective actions put in place were swift and consistent with best practices. There were no expired or unlabeled medications and no expired supplies. The dialysis services provided self-monitoring data with regard to missed dialysis opportunities. For the past 7 months, 93% of all scheduled HD sessions were completed (low of 88.9% in April 2015 to a high of 98% in September 2015). Other self-monitoring quality metrics included number of missed dialysis sessions due to court, refusal, hospitalization or release. Timely and effective communication between the Urgent Care and infirmary nursing staff and HD unit were also monitored and reported.

Five random charts for inmates on HD who had been referred to Stroger hospital in the previous three months were reviewed. None of the referrals were determined to be due to suspected or proven bacteremia.

**Dental Clinics**

The Monitoring Team toured two dental clinics and found both clinics to be clean and well organized. All dental equipment had recent biomed tags and was in working order. The dentist and dental assistant said that they have good support from the correctional officers and receive help promptly when requested.

**Monitor's Recommendations:**

General:

1. Continue to maintain the improvements in clinic organization and sanitation.
Ensure that environmental cleaning takes place as scheduled in the Divisions and Cermak administrative areas.
2. Medication policy should address dating and expiration of juice bottles.

3. Ensure that staff maintains quality check logs for glucometers and iStat machines.

Division Specific:
1. Intake Area: Increase supervision to ensure that staff checks emergency response bags.
2. RTU Second Floor: Place test EKG strips in the log book.

## 44. Staffing, Training, Supervision and Leadership

a. Cermak shall maintain a stable leadership team that clearly understands and is prepared to move forward toward implementation of the provisions of this Agreed Order, with respect to:
    i. Medical care; and
    ii. Mental health care

b. Cermak shall maintain an adequate written staffing plan and sufficient staffing levels of health care staff to provide care for inmates' serious health needs, including:
    i. Qualified Medical Staff; and
    ii. Qualified Mental Health Staff.

c. Cermak shall ensure that all Qualified Medical Staff and Qualified Mental Health Staff are adequately trained to meet the serious health care needs of inmates. All such staff shall receive documented orientation and in-service training on relevant topics, including:
    i. Provision of health care in a correctional setting and Facility-specific issues; and
    ii. Suicide prevention, and identification and care of inmates with mental illness.

d. Cermak shall ensure that Qualified Medical Staff receive adequate physician oversight and supervision.

e. Cermak shall ensure that all persons providing health care meet applicable state licensure and/or certification requirements, and practice only within the scope of their training and licensure. Upon hiring and annually, Cermak shall verify that all health care staff have current, valid, and unrestricted professional licenses and/or certifications for:
    i. Medical staff; and
    ii. Mental health staff

f. Cermak will work with CCDOC to develop and maintain a curriculum for initial and periodic training of correctional officers on recognition and timely referral of inmates with medical urgencies, including drug and alcohol withdrawal. Cermak will provide adequate initial and periodic training on these topics to all Cermak staff who work with inmates.

17

g.  CCDOC will provide, to all CCDOC staff who work with inmates, adequate initial and periodic training on basic mental health information, including the identification, evaluation, and custodial care of persons in need of mental health care, as well as recognition of signs and symptoms evidencing a response to trauma; appropriately responding to mental illness; proper supervision of inmates suffering from mental illness; and the appropriate use of force for inmates who suffer from mental illness. Such training shall be conducted by a Qualified Mental Health Professional, registered psychiatric nurse, or other appropriately trained and qualified individual.

h.  Cermak will work with CCDOC to develop and maintain a curriculum for initial and periodic training of correctional officers on basic mental health information, including the identification, evaluation, and custodial care of persons in need of mental health care, as well as recognition of signs and symptoms evidencing a response to trauma; appropriately responding to mental illness; proper supervision of inmates suffering from mental illness; and the appropriate use of force for inmates who suffer from mental illness. Such training shall be conducted by a Qualified Mental Health Professional, registered psychiatric nurse, or other appropriately trained and qualified individual.

i.  Cermak shall ensure that all health care staff receive adequate training to properly implement the provisions of this Agreed Order, including:
      a.  Medical staff; and
      b.  Mental health staff.

**Compliance Status**: This provision remains in partial compliance.

a.  Substantial Compliance
b.  Partial Compliance
c.  Substantial Partial Compliance
d.  Substantial Compliance
e.  Substantial Compliance
f.  Substantial Compliance
g.  Substantial Compliance.
h.  Substantial Compliance
i.  Substantial Compliance

**Status Update:**  Received and reviewed.

**Monitor's Findings:**

18

1. There have been 16 new positions requested and approved for 2015 many of which have already been filled. These include the following:
    a. 10 part time in house registry nurse positions
    b. 1 full time dentist
    c. 1 full time dental assistant
    d. 2 part time physician consultant positions
    e. 1 full time Chair of Division of Correctional Health
    f. 1 full time Clinical Performance Improvement Analyst

2. Cermak has maintained its leadership staff and has in fact added new clinical leadership positions (Division Director and Associate Director of Nursing). This provision is now in substantial compliance.

3. Cermak has continued to hire more staff mostly in the nursing area. There have been 69 new hires since our last monitoring visit. Unfortunately, there have also been 55 positions lost to attrition for various reasons during the same period. As a result and according to the latest vacant position tracker provided to the Monitoring Team, Cermak now has 88 vacant positions compared to 101 vacant positions at the time of our last visit in April 2015. The vacancy rates for Med/Surg and Mental Health provider staff remain above 25%. Several new initiatives have been put in place to address the high vacancy rates for medical and mental health provider staff including significant increase the base salary for psychiatrist staff and modified Shakman Oversight process allowing for hiring managers in Cermak Mental Health and Med/Surg departments to actively engage provider staff candidates outside of the Taleo posting and recruitment process. The vacancy rate for nursing staff is currently at about 12%. This provision will be considered in substantial compliance once all area vacancy rates fall to an acceptable level of about 10 to 12%.

4. As stated above under section 42 (Policy and Procedures), the issue of consistent staff performance with regard to various healthcare tasks was again a finding during this monitoring visit. The training of staff in providing health care in a correctional setting depends largely on established policy and procedures for providing such care. Cermak staff cannot be held accountable to uniformly and consistently perform a task until and unless such policy and procedures have been devised, posted and used for the training of the staff.

5. The Monitoring Team reviewed the credentialing files of five Cermak professional staff and found the files to be compliant with all Joint Commission required regulatory mandates.

6. The Monitoring Team reviewed the training logs for ten random Cermak credentialed staff (five from medical and five from mental health services) and found them to be complaint with the annual training requirement.

7. The Monitoring Team met with First Assistant Executive Director CCDOC and reviewed the currently established and ongoing initial and interval training of all CCDOC officers. The amount of training offered to CCDOC officers is impressive as described below to the Monitoring Team. This training includes: 16 weeks of general pre-service training, 80 hours

of general mental health training to all new officers, additional 40 hours of Crisis Intervention Training (CIT) for all officers assigned to Cermak 2nd floor and RTU mental health floors and three day annual training. Below is a complete list of the three-day training that all officers receive on an annual basis. This training includes specific education on suicide prevention, first aid and CPR.

| *CURRICULUM (40) HOURS* |
| --- |
| Administration Time |
| Use of Force |
| Cermak Health Services |
| Lunch |
| Defensive Tactics |
| |
| Firearms Poss., Authorization, Registration & Locking Devices |
| Securing Department Authorized Firearms/Weapon Orientation |
| Nomenclature Familiarization & Shooting Fundamentals |
| Chap.. 720/Review of State Requal./Civil Liability/SEAM |
| Range Safety Briefing & Re-Qualification |
| Lunch |
| Range Safety Briefing & Re-Qualification |
| |
| Suicide/Prison Rape (PREA) |
| Lunch |
| CPR Re-Certification/First Aid |

Ten CCDOC officers were randomly selected from the list all CCDOC staff. The Monitoring Team was able to validate the date of the annual in-service training for each officer within one year of our monitoring visit.

**Monitor's Recommendations:**

1. Maintain the current level of filled leadership positions. This action will bring this provision to substantial compliance in our next visit in November 2015.
2. While the Monitoring Team is encouraged with the recent gains in all levels of staffing, we hope to see a continued effort to fill the remaining positions. Again, a vacancy rate of around 10 to 12 percent is considered aligned with industry standards.
3. Cermak must ensure training of all health care staff with regard to the provision of health care in a correctional setting. Additionally, Cermak must strive to standardize its processes across all divisions and floors as much as possible. This can be accomplished through routine audits of various procedures, identification of best practices and replication of such practices across the entire system.

**45. Intake Screening**

    a.    Cermak shall maintain policies and procedures to ensure that adequate medical and mental health intake screenings are provided to all inmates.

    b.    Cermak shall ensure that, upon admission to the Facility, Qualified Medical Staff or Licensed Correctional Medical Technicians utilize an appropriate medical intake screening instrument to identify and record observable and non-observable medical needs, shall assess and document the inmate's vital signs, and shall seek the inmate's cooperation to provide information, regarding:

        (1)    medical, surgical and mental health history, including current or recent medications, including psychotropic medications;

        (2)    history and symptoms of chronic disease, including current blood sugar level for inmates reporting a history of diabetes;

        (3)    current injuries, illnesses, evidence of trauma, and vital signs, including recent alcohol and substance use;

            (4)    history of substance abuse and treatment;

            (5)    pregnancy;

            (6)    history and symptoms of communicable disease;

            (7)    suicide risk history; and

        (8)    history of mental illness and treatment, including medication and hospitalization.

    c.    Cermak shall ensure that, upon admission to the Facility, Qualified Mental Health Staff, Qualified Medical Staff, or Licensed Correctional Medical Technicians utilize an appropriate mental health intake screening instrument to identify and record observable and non-observable mental health needs, and seek the inmate's cooperation to provide information, regarding:

        (1)    past suicidal ideation and/or attempts;

        (2)    current ideation, threat or plan;

        (3)    prior mental illness treatment or hospitalization;

        (4)    recent significant loss, such as the death of a family member or close friend;

        (5)    previously identified suicide risk during any prior confinement at CCDOC;

        (6)    any observations of the transporting officer, court, transferring agency or similar individuals regarding the inmate's potential suicide risk, if such information is communicated to Cermak staff;

        (8)    psychotropic medication history; and

21

(9)     alcohol and other substance use and withdrawal history.

d.      Cermak shall ensure that all Qualified Mental Health Staff, Qualified Medical Staff or Licensed Correctional Medical Technicians who conduct the medical and mental health intake screenings are properly trained on the intake screening process, instrument, and the requirements and procedures for referring all qualifying inmates for further assessment.

e.      If Cermak assigns Licensed Correctional Medical Technicians to perform intake screening, they shall receive appropriate, on-site supervision by on-site Qualified Medical Staff; information obtained on screening for all inmates will be reviewed by Qualified Medical Staff before the inmate departs the intake area.

f.      Cermak shall ensure that a medical assessment based on the symptoms or problems identified during intake screening is performed within two working days of booking at the Facility, or sooner if clinically indicated, by a Qualified Medical Professional for any inmate who screens positively for any of the following conditions during the medical or mental health intake screenings:

(1)     Past history and symptoms of any chronic disease included on a list specified by Cermak's policies and procedures;
(2)     Current or recent prescription medications and dosage, including psychotropic medications;
(3)     Current injuries or evidence of trauma;
(4)     Significantly abnormal vital signs, as defined by Cermak's policies and procedures;
(5)     Risk of withdrawal from alcohol, opioid, benzodiazepine, or other substances;
(6)     Pregnancy;
(7)     Symptoms of communicable disease; and
(8)     History of mental illness or treatment, including medication and/or hospitalization.

g.      Cermak shall ensure that any inmate who screens positively for mental illness or suicidal ideation during the intake process receives a comprehensive mental health evaluation (see provision 59.c, "Mental Health: Assessment and Treatment") Cermak shall ensure timely access to a Qualified Mental Health Professional for this purpose, based on emergent, urgent, and routine medical or mental health needs.

h.     Cermak shall ensure that the intake health screening information is incorporated into the inmate's medical record in a timely manner.

i.     Cermak shall implement a medication continuity system so that incoming inmates' medication for serious medical and mental needs can be obtained in a timely manner, as medically appropriate. Within 24 hours of an inmate's booking at the Facility, or sooner if medically necessary, a Qualified Medical Professional or Qualified Mental Health Professional, with appropriate prescribing authority, shall decide whether to continue the same or comparable medication for serious medical and mental health needs that an inmate reports during intake screening that she or he has been prescribed. If the inmate's reported medication is discontinued or changed, other than minor dosage adjustments or substitution of a therapeutic equivalent, a Qualified Medical Professional or Qualified Mental Health Professional, with appropriate prescribing authority, shall evaluate the inmate face-to-face as soon as medically appropriate, and within no greater than five working days, and document the reason for the change.

**Compliance Status**: This provision remains in substantial compliance.

a.     Substantial compliance
b.     Substantial compliance
c.     Substantial compliance
d.     Substantial compliance
e.     Substantial compliance
f.     Substantial compliance
g.     Substantial compliance
h.     Substantial compliance
i.     Substantial compliance

**Status Update:**  The Monitoring Team received and reviewed Cermak's 9/30/15 status report.

**Monitor's Findings:**

a. We reviewed Cermak's Intake Health Screening policy and procedure (E-02) approved 11/5/14 and posted 1/30/15.  The policy includes elements of the Agreed Order and provides sufficient operational detail to staff to implement the policy.

b. and c. We reviewed 11 records of patients who entered the jail within the past four months. The sample included inmates with chronic diseases, mental health conditions; and those at risk or exhibiting symptoms of alcohol or drug withdrawal. Upon admission, health care staff performed

medical screening using an instrument that contains all medical and mental health elements required by the Agreed Order. Staff completed all sections of the form including those related to drug and alcohol use and risk of withdrawal. When drug and alcohol questions elicited positive responses, staff appropriately performed initial COWS and CIWA screening and referred patients to a provider for secondary medical assessment.

d. and e. These provisions have been in substantial compliance and were not assessed at this visit.

f. and g. Screening staff made appropriate secondary referrals to medical and mental health providers that occurred timely. Intake staff documented the reasons for secondary referral so that medical and mental health providers would be aware of the reasons for referral. Medical providers conducted appropriate assessments, identified patients exhibiting signs and symptoms of alcohol and/or drug withdrawal and initiated treatment using standardized order sets. Providers also initiated treatment for patients with chronic diseases.

h. The intake screening form is incorporated into the electronic health record in real time.

i. Cermak has developed a system for timely continuation of medications. When inmates are prescribed chronic disease or mental health medications, a green band is placed on the inmate's wrist to indicate that he or she is not to leave the area until the first medication dose(s) is administered.

Although intake screening is performing well, we did find opportunities for improvement. We found one case in which a chest x-ray was abnormal and neither the primary care nor HIV provider noted that chest x-ray report and implemented recommended follow-up. In the case of a hospital takeover, the secondary medical assessment was not performed until the following morning. Although compliant with the Agreed Order, this patient was hospitalized for symptoms of methadone withdrawal and side effects related to HIV medications.

Monitor's Recommendations:

1. Perform periodic CQI studies to ensure that patients continue to receive timely and appropriate care at intake.

### 46. Emergency Care

    a. Cermak shall train health care staff to recognize and respond appropriately to health care emergencies, including:
        (1) Medical emergencies;
        (2) Mental health emergencies; and

(3) Drug and alcohol withdrawal.

b. CCDOC shall train correctional officers to recognize and respond appropriately to health care emergencies, including:
   (1) Medical emergencies;
   (2) Mental health emergencies; and
   (3) Drug and alcohol withdrawal.

c. CCDOC shall ensure that all inmates with emergency health care needs receive prompt transport, including transport for outside care, for emergencies including:
   (1) Medical emergencies; and
   (2) Mental health emergencies.

d. Cermak shall ensure that all inmates with emergency health care needs receive timely and appropriate care, with prompt referrals for outside care when medically necessary, and shall notify CCDOC when emergency transport is needed inside or outside the Facility compound, for emergencies including:
   (1) Medical emergencies; and
   (2) Mental health emergencies.

e. CCDOC shall train all correctional officers to provide first responder assistance (including cardiopulmonary resuscitation ("CPR") and addressing serious bleeding) in emergency situations. CCDOC shall provide all correctional officers with the necessary protective gear, including masks and gloves, to provide first line emergency response.


**Compliance Status**: This provision remains in Partial Compliance.

a. Substantial Compliance
b. Substantial Compliance
c. Substantial Compliance
d. Partial Compliance
e. Substantial Compliance


**Status Update:** Received and reviewed.

**Monitor's Findings:**

a. Both medical and mental health staff has been trained with regard to medical and mental health emergencies. The level of priorities is being updated. The staff needs additional training on the procedures once updated.

25

b. With regard to the training of correctional officers, they have completed training related to medical emergencies and mental health emergencies. The level of priorities is being updated. The CCDOC staff needs training on the procedures that are updated by Cermak.

c. The level of priority for transport to the urgent care and ED has not yet been completed by Cermak therefore patient care may be delayed even when CCDOC transports promptly. Cermak needs to establish a priority designation for transport and train CCDOC on the procedure once established.

d. Cermak is in the process of establishing levels of care, priority levels for transport, triage levels for prioritization of provider evaluation, etc. Currently these processes are not in place potentially leading to delay in patients getting seen for urgent conditions.

The method of transport of patients to the urgent care from the units, use of neck brace and back board are inconsistently followed. There is no documentation by the EMT team when they respond to emergencies in the divisions. There is improvement in hand off from the division nurse to the urgent care nurse. The urgent care nurses are now using a book to document the hand off. The urgent care staff is not tracking the patients when they get report to see if they arrived at urgent care timely.

A board that was established to track patients in the urgent care clinic so that the care team can continue to monitor the patient while in the urgent care is currently not is use. There is no process to ensure that the patients are getting continuous monitoring and assessments by clinical staff while in the urgent care facility waiting to be seen, waiting for lab results, waiting for transport to the hospital ED, etc.

Cermak is in the process of implementing a Cerner module that will help track patients from referral to urgent care through all steps of the process to ensure timeliness and continuity of care. In addition to the application, a solid work flow process, training and monitoring for compliance with the established process will also be needed.

A report has now been established to inform the divisions on any needed follow-up for patients seen in the urgent care. The nurses are using this report effectively. Patients who may need additional follow-up after discharge from the urgent care are sometimes sent back to the divisions where there is no nursing staff at night. The providers are not aware of the urgent care and un-scheduled visits when they follow-up patients in the Primary care clinic.

The critical lab results are now addressed in a timely manner by the providers. A report has been established to monitor the process. The urgent care provider still has to check the EMR frequently when stat or urgent labs are ordered.

Patients with routine sick call needs like URI are being brought to the urgent care from the division where there is no nurse at night. This is overwhelming the urgent care staff and delays care for sicker patients.

e. CCDOC First Responder Training for Correctional Officers: This requires training of correctional officers in both CPR and first responder assistance and again we found this area to be substantially compliant.

**Monitor's Recommendations:**

1. Consider reducing the volume at the urgent care to focus on sicker patients.
   a. Nurses in urgent care should use nursing guidelines to manage patients brought in directly by officers from the divisions for non-urgent conditions. The nurse can consult or refer the patient to the provider as needed.
   b. Implement some simple criteria to help officers to decide when they should bring the patient to the urgent care vs. when the patient can be assessed in the morning by the clinical team in the division (error in the side of caution). Consider using video conferencing.
   c. Identify alternate pathways for not urgent care related visits that urgent care is currently serving.
   d. Evaluate the reasons when a patient is sent to urgent care provider from secondary medical at Intake.
2. Provide adequate nurse and provider staffing at the urgent care to ensure timeliness of service especially during busy hours.
3. Establish expectations for elements of documentation of the assessments and reassessments by providers and nursing to help ensure compliance and continuity of care.
4. All Provider and Nurse Documentation should be done directly in the EMR, except for downtime.
5. Documentation should demonstrate that continuous care is provided to the patient while in Urgent Care.
6. Implement the Cerner module to track patients sent to the urgent care. Ensure solid work flow, training and monitoring is established as part of the implementation.
7. Create emergency response templates in the EMR for nurses and providers so that the details of the incident, pertinent positives and negatives, disposition, mode of transport, time of call received, time of response, reason for visit, location of evaluation, etc. are clearly documented in the EMR.
8. Document the handoff process when a patient is sent from the divisions to the Urgent Care, from Urgent Care to ED and from Urgent Care to the Infirmary or other housing units.

27

9. Complete implementation of the acuity level for patients sent to urgent care so they can be transported and evaluated timely in the order of priority.
10. Educate the CCDOC officers regarding the priorities for timely transport once the procedure is completed of timely transport of inmate with urgent/ emergent medical conditions to the Urgent Care clinic.
11. During the PCC visits, have the Providers review the chart to identify un-scheduled visits, urgent care visits, ED visits, sick call visits.
12. Evaluate the current practice of housing location recommendations when patients are discharged from urgent care to standardize the practice and ensure safety and continuity of care.
13. When patients return to the division they should check in with the clinical team on return so they can follow-up on the patient and modify the care plan as ordered.
14. Establish a division level huddle for the providers, nurses and officers to discuss overnight issues, etc.
15. Ensure practice of the established guidelines for use of neck braces, back boards, response to falls, mode of transport, etc.
16. The Lab should notify the provider of the results of any Stat labs ordered
17. Use EMR to place all orders (now and future orders) so they can be tracked for completion and timeliness.
18. Continue to educate staff on the management of hypoglycemia. Nurses working in the RTU were not fully aware of the established guidelines.
19. Self-Monitoring:
    a. As part of standard work for the managers, they should review the appropriateness and timeliness of response to emergencies in their division.
    b. Quality team should audit at least 10 charts per month to ensure appropriateness and timeliness of response by the nurse and provider.
    c. Continue auditing the management of detoxification patients.
    d. Use the audit information to make necessary improvements by sharing the findings with the specific staff on their individual performance and the group to address group performance.
    e. Track the unscheduled/urgent care visits required for chronic disease/detox patients to monitor the effectiveness of the treatment plan and make improvements to the program as needed.
    f. Continue to monitor the timeliness and appropriateness of communication and response to critical lab results.
    g. Continue to review all hypoglycemic episodes to identify opportunities for prevention.


**47. Record Keeping**

a. Cermak shall ensure that medical and mental health records are adequate to assist in providing and managing the medical and mental health needs of inmates at the Facility and are maintained consistent with local, federal, and state medical records requirements.

b. Cermak shall ensure that medical and mental health records are centralized, complete, accurate, readily accessible and systematically organized. All clinical encounters and reviews of inmates should be documented in the inmates' records.

c. To ensure continuity of care, Cermak shall submit appropriate medical information to outside medical providers when inmates are sent out of the Facility for medical care. Cermak shall appropriately request records of care, reports, and diagnostic tests received during outside appointments in a timely fashion and include such records in the inmate's medical record or document the inmate's refusal to cooperate and release medical records.

d. Cermak shall maintain unified medical and mental health records, including documentation of all clinical information regarding evaluation and treatment.

**Compliance Status**: This provision remains in partial compliance.

    a. Partial compliance
    b. Partial compliance
    c. Substantial compliance (June 2012)
    d. Substantial compliance (April 2015)

**Status Update:** A status report was received and reviewed in advance of the site visit. The report provided information on all eight of the recommendations made in the Ninth Report.

**Monitor's Findings:**

a. Cermak-Adequate to Provide Care. Since the October 2014 implementation of the interface between CCDOC's electronic jail management system and Cerner there have been specific problems with the interface. According to an excellent summary provided the Cermak IT Department the frequency of problem occurrences has lessened as a result of the daily diligence and collaboration between Cermak IT staff, CCDOC IT staff and the vendor. The following paragraphs summarize each problem, the workaround, and the extent of improvement since the last report (*improvements are italicized*).

        <u>Discharges</u>-When an inmate is released from a sentence or a charge is dropped a release date is entered. This information transfers to the medical information system as a discharge and the inmate's health record is inactivated. Some inmates have

29

multiple sentences, warrants or charges and remain incarcerated at CCDOC at the time a discharge and release date is entered. The result is that all orders for medication, treatment, diagnostic work, follow-up appointments, specialty care and so forth for an inmate are inactivated even though the inmate is still in custody. To preserve the safety of patients needing ongoing care, Cermak IT staff compare the two systems daily to identify discharges of inmates who still are in CCDOC custody. IT staff then notify medical records that a health record must be created and notify the provider who must retrieve and enter all of the information necessary to continue the inmate's treatment. *At the site of the last site visit this problem occurred daily. The frequency of erroneous discharges has decreased to less than ten episodes a month.* Treatment discontinuity because of an erroneous discharge, even if infrequent, is a significant patient safety problem. CCDOC should reconcile staff workflow to sync with CCOMS so that a release date is not sent to Cermak's medical information system.

Inaccurate locations- when CCDOC moves an inmate from one location to another the new location does not transfer to Cermak's information system. This affects delivery of care and could harm the patient. Until this issue is resolved Cermak IT staff compares the two systems daily to identify missed locations and make corrections so the proper location is in the medical information system. *Currently location mismatches occur less than five times a month compared to daily location errors previously.*

New admits or bookings- when someone is received at CCDOC a booking number and profile are created in the jail management system but the information does not transfer to Cerner and a health record is not initiated. This affects delivery of care and could harm the patient. Until this issue is resolved Cermak IT staff compares the two systems daily to identify missed bookings and have the inmate number and profile entered into Cerner so a health record can be initiated. *There have been no episodes of a new admit or booking not transferring to Cerner for six months. Daily monitoring continues.*

Medical alerts- Cermak uses a medical alert system to inform CCDOC of medical or mental health conditions that affect such things as the inmate's housing assignment, bunk placement, property, meals, and discharge preparations. These alerts are placed by the prescribing provider into the medical information system and then are transferred to CCDOC via the interface with the jail management system. When the new interface does not sync inaccurate alerts result. This affects inmate and staff safety. Cermak IT staff compare the two systems daily to identify and correct discrepancies. *Collaboration between Cerner IT staff, CCDOC IT staff and the vendor have eliminated errors completely the last two months and were 99% correct the past six months.*

According to Cermak's status report, the majority of providers in Urgent Care are documenting in the EMR (80%). However when it gets busy in Urgent Care providers will revert to paper documentation in a belief that it is faster than the EMR. Next spring Cermak plans to implement a software program (First Net) that is compatible with Cerner and used in other emergency rooms with the intent that 100% of the Urgent Care documentation will be documented concurrently in the EMR.

Problems with the timeliness and functionality of the stand-alone medication administration record have been addressed as described in Item 56 of this report. Cermak leadership has selected another software package, Care Admin that will replace Accuflo in the spring of 2016. In the meantime, Cermak IT and the vendor ensure day to day access and operability of the electronic medication administration record is maintained.

Problems with establishing orders for laboratory testing prior to chronic care visits or initiation of anticoagulation therapy continue. Furthermore, review of chronic disease records by the Monitoring Team shows that primary care providers do not consistently document review of intake labs (e.g., STD tests) and diagnostic tests (chest x-ray).  In one instance, providers missed and an abnormal chest x-ray in an HIV patient. See Item 52 of this report.

b. Cermak-All encounters are documented and the record is complete, accurate and accessible

Cermak continues to make improvements in documentation, with regards to HSRs, wound care, and segregation rounds. Documentation in the Infirmary has also improved but nurses continue to have challenges with the use of SOAP format, particularly documentation of assessments related to the problem statement. Additionally, Cermak has implemented a new policy on the Level of Care and Assessment Frequency. The nursing staff is aware of the system but not able to effectively implement the documentation frequency. Nursing administration is in the process of writing specific procedures for nursing staff. Nursing staff continue to document wound care in "iView and documentation continues to improve in this area.  Providers caring for patients with wounds also utilized iView to track wound care and monitor patient progress.

Cermak provided documentation of continued efforts to audit charts and ensure that encounters are documented and that the record is complete and accurate (chronic care, return from off-site services, review and action taken on diagnostic results, treatment planning, inpatient rounds, suicide, segregation rounds and HSRs).

Since the last site visit segregation rounds are now documented in the inmate's health record.  In October 2015 CCDOC classification implemented an alert in CCOMS to indicate admission and release from segregation but we did not determine whether this information is used by Cerner to establish when segregation rounds begin and end. While iView is the preferred location to document segregation rounds discussion with staff suggests that rounds are documented in more than one location in the chart.

c. Cermak-Communication with Offsite Providers
This item has been in substantial compliance since June 2012.

d. Cermak-Unified Medical and Mental Health Records
This item is in substantial compliance.

**Monitor's Recommendations:**

1. Continue monitoring and correcting the timeliness and accuracy of the new interface with CCDOC in sharing necessary information about inmates.
2. Correct the problem with discharges resulting in a notification to Cermak that the inmate has been released when the inmate is still incarcerated at CCDOC.
3. Use the electronic health record to document health status and treatment initiated for all urgent care visits.
4. Revise the electronic forms to better display clinical information during nursing sick call encounters and include guidelines from the nursing protocols.
5. Verify that the segregation alert is used to indicate when segregation rounds begin and end.
6. Segregation rounds should be documented in only one location in the electronic medical record.
7. At chronic disease visits and other clinical encounters, providers should document review of laboratory and diagnostic tests, including intake labs and chest x-rays.

## 48. Mortality Reviews

a. Cermak shall request an autopsy, and related medical data, for every inmate who dies while in the custody of CCDOC, including inmates who die following transfer to a hospital or emergency room.
b. Relevant CCDOC personnel shall participate in Cermak's mortality review for each inmate death while in custody, including inmates who die following transfer to a hospital or emergency room, and a morbidity review for all serious suicide attempts or other incidents in which an inmate was at high risk for death. Mortality and morbidity reviews shall seek to determine whether there was a systemic or specific problem that may have contributed to the incident. At a minimum, CCDOC's contribution to mortality and morbidity reviews shall include:
    I. Critical review and analysis of the correctional circumstances surrounding the incident;
    II. Critical review of the correctional procedures relevant to the incident;
    III. Synopsis of all relevant training received by involved correctional staff;
    IV. Possible precipitating correctional factors leading to the incident; and

     V.    Recommendations, if any, for changes in correctional policy, training, physical plant, and operational procedures.

c.  Cermak shall conduct a mortality review for each inmate death while in custody, including inmates who die following transfer to a hospital or emergency room, and a morbidity review for all serious suicide attempts or other incidents in which an inmate was at high risk for death. Cermak shall engage relevant CCDOC personnel in mortality and morbidity reviews and shall seek to determine whether there was a pattern of symptoms that might have resulted in earlier diagnosis and intervention. Mortality and morbidity reviews shall occur within 30 days of the incident or death, and shall be revisited when the final autopsy results are available. At a minimum, the mortality and morbidity reviews shall include:

     I.    Critical review and analysis of the circumstances surrounding the incident;

     II.    Critical review of the procedures relevant to the incident;

     III.    Synopsis of all relevant training received by involved staff;

     IV.    Pertinent medical and mental health services/reports involving the victim;

     V.    Possible precipitating factors leading to the incident; and

     VI.    Recommendations, if any, for changes in policy, training, physical plant, medical or mental health services, and operational procedures.

d.  Cermak shall address any problems identified during mortality and morbidity reviews through timely training, policy revision, and any other appropriate measures.

**Compliance Status**: This provision remains in substantial compliance.

**Status Update:** Received and reviewed.

**Monitor's Findings:**

The mortality review/ root cause analysis (RCA) for all death in custody cases were reviewed by the Monitoring Team. We found the RCAs to be comprehensive and multidisciplinary with succinct action plan items. Cermak has had 7 death-in-custody cases since our last visit (total of nine death in custody cases for 2015 calendar year). One of the seven new deaths in custody cases was due to suicide.

**Monitor's Recommendations:**

1.  Continue to place focused attention on prevention of suicide deaths.

## 49. Grievances

Cermak shall develop and implement policies and procedures for appropriate handling of grievances relating to health care, when such grievances are forwarded from CCDOC.

**Compliance Status:** Substantial compliance (November 2014).

**Status Update:** Received and reviewed.

**Monitor's Findings:**

The only recommendation in the last report concerning the grievance process was for Cermak to demonstrate use of grievance analysis to identify opportunities to improve health care services per Policy A-11. This has been accomplished. Since the last site visit Cermak has established a more meaningful categorization of the various types of grievances received which aids analysis. The CQI committee reviews grievance trends by the type of complaint, the inmate's housing location and timeliness in responding. This same analysis is repeated for those grievances that had foundation. In addition to the identification of trends each response is reviewed by CQI for the quality of the response. The CCDOC participates with Cermak in the review of grievances. A recent result of this collaboration has been to establish a clinical team of CCDOC social workers and a Cermak clinician to visit one of the units with high grievance rates on a regular basis and see if their interventions will reduce rates.

The number of grievances filed in 2015 is 40% less than 2014, continuing the steady decline reported previously. We did not review the number of grievances not responded to within timeframes at this site visit. However according to data provided by Cermak the average amount of time from receipt to response is six days. This performance data is within the seven-day response period specified in Policy A-11.

**Monitor's Recommendations:** None

## C.    MEDICAL CARE

## 50. Health Assessments

a.      Cermak shall ensure that Qualified Medical Professionals attempt to elicit the amount, frequency and time since the last dosage of medication from every inmate reporting that he or she is currently or recently on medication, including psychotropic medication.

b.      Cermak shall ensure that incoming inmates who present and are identified by medical personnel as having either a current risk of suicide or other acute mental health needs will be immediately referred for a mental health evaluation by a Qualified Mental Health Professional. Staff will constantly observe such inmates until they are seen by a Qualified Mental Health Professional or Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional. Incoming inmates reporting these conditions will be housed in safe conditions unless and until a Mental Health Professional clears them for housing in a medical unit, segregation, or with the general population.

c.      Cermak shall ensure that all inmates at risk for, or demonstrating signs and symptoms of, drug and alcohol withdrawal are timely identified. Cermak shall provide appropriate treatment, housing, and medical supervision for inmates suffering from drug and alcohol withdrawal.

d.      CCDOC shall maintain a policy that correctional officers supervising newly arrived inmates physically observe the conduct and appearance of these inmates to determine whether they have a more immediate need for medical or mental health attention prior to or following the intake health screening by Qualified Medical Staff.

e.      Cermak shall ensure that the medical assessment performed within two working days of his or her booking at the Facility, or sooner if clinically indicated, for each inmate specified above (provision 45.f, "Intake Screening") shall include a review of the inmate's intake screening form, a medical history, a physical examination, a mental health history, and a current mental status examination. The physical examination shall be conducted by a Qualified Medical Professional. The medical assessment shall also include development or revision of the inmate's problem list and treatment plan to address issues identified during the medical assessment. Records documenting the assessment and results shall become part of each inmate's medical record. A re-admitted inmate or an inmate transferred from another facility who has received a documented medical assessment within the previous six months and whose receiving screening shows no change in the inmate's health status need not receive a new medical assessment. For such inmates, Qualified Medical Staff shall review prior records and update tests and examinations as needed.

Compliance Status: This provision continues to be in substantial compliance.

a.    Substantial compliance
b.    Substantial compliance
c.    Substantial compliance
d.    Substantial compliance
e.    Substantial compliance

**Findings**

Status Update:  The Monitoring Team received and reviewed Cermak's 9/30/15 status report.

**Monitor's Findings:**

We selected 11 records of patients who entered the jail within the past four months. The sample included inmates with chronic diseases and mental health conditions; and symptoms of alcohol or drug withdrawal. The sample included one patient who entered the jail through an anomalous pathway (e.g., hospital takeover, etc.).

a. We reviewed Cermak's Initial Health Assessment policy and procedure (E-04) dated 11/25/14 and posted 1/30/15.  The policy is consistent with the Agreed Order and provides sufficient operational detail to staff to implement the policy, including eliciting information and continuing medications. The policy also includes criteria for referral to the Cermak Urgent Care Center following secondary medical referral, which is excellent.

b. Intake screening staff immediately refers patients with acute mental health symptoms including risk of suicide to a mental health provider.

c. Record review showed that medical providers generally conducted appropriate assessments, identified patients at risk of, or exhibiting signs and symptoms of alcohol and/or drug withdrawal and initiated treatment using standardized order sets.  Providers refer patients to be monitored for alcohol or drug withdrawal to the Cermak infirmary or Residential Treatment Unit.  In two cases the provider did not perform an independent assessment for alcohol and drug use but in one case documented "as noted in the intake screen" and in the other case did not independently address alcohol and drug use.

d. Cermak intake screening policy (E-02) dated 11/5/14 includes language required by the Agreed Order for correctional officers to monitor new arrivals in holding cells and immediately refer inmates with signs or symptoms of acute medical or mental health illness.

e. Record review showed that intake screening staff refers newly arriving inmates with positive medical screens to a medical provider the same day for evaluation.  The quality of medical

36

assessments is excellent. Providers update the problem list, initiate medications and referrals for follow-up.

As noted in previous reports, medical providers document health assessments electronically except when patients are admitted through the Cermak Urgent Care Center. In these cases providers document assessments on paper records that are scanned into the electronic medical record. We continue to find that the legibility and thoroughness of hand-written secondary assessments to be inadequate. Cermak has a plan to implement a new system for documenting urgent care visits electronically in the next six months.

We find opportunities for improvement. Intake providers did not order labs appropriate to patients' chronic diseases. In one case, an HIV patient gave an unclear history of hyper/hypothyroidism but neither the intake nor HIV provider ordered thyroid lab tests. HIV patients are not routinely tested for TB infection (e.g., Quantiferon or tuberculin skin test). Patients with HIV/AIDS were not scheduled for initial appointments in accordance with their disease severity. An asthma patient was admitted to the hospital in August for a week and to the emergency department in September the night before admission to CCJ but PCP follow-up was scheduled more than two weeks later.

Monitor's Recommendations:

1. Intake providers should perform independent assessments of patient's drug and alcohol use.
2. Intake providers should schedule primary care follow-ups in accordance with the patient's medical history and/or clinical status. Providers should consider priority appointments for patients with recent emergency department visits or hospitalizations.
3. Primary care, infirmary and HIV providers should document review of all intake labs and diagnostic tests.
4. Cermak leadership should conduct periodic CQI studies assessing the appropriateness, timeliness and quality of care.
5. Cermak leadership should require providers to document all health assessments directly into Cerner and refrain from paper documentation except when Cerner is down. The quality of health assessments performed in Cermak Urgent Center should match the quality of assessments performed when inmates arrive through normal channels.
6. The QI program should continue to monitor the documentation of timely receipt of medications that are deemed critical.

## 51.a Acute care

a. Cermak shall provide adequate and timely acute care for inmates with serious and life-threatening conditions, and ensure that such care adequately addresses the serious

medical needs of inmates. Adequate care will include timely medical appointments and follow-up medical treatment.

**Compliance Status:** This provision remains in substantial compliance.

**Status Update:** Received and reviewed.

**Monitor's Findings:**

The Cermak Urgent Care department is staffed 24 hours a day, 7 days a week, by nurses and paramedics. There is a physician on-call 24 hours per day. The Monitoring Team found adequate equipment to provide emergency care for a life threatening condition.

To assess acute care the Monitoring Team reviewed 15 records. We found that patients were provided with timely medical care. Log documentation includes the time the patient arrives in the unit and the time of discharge.

Since our last visit a new communication process has been implemented to ensure documentation from the inmate's urgent care visit is received in the divisions with non 24 hour nursing care. The process occurs after a patient is discharged back to the housing division. A division specific form is faxed to the dispensary then picked up when the dispensary re-opens in the morning. All charts reviewed under this new process were followed up appropriately by the division the next day. Communication to the Cermak building Special Care Units remains unchanged.

## 51b. Acute Care-Infirmary

    a. Cermak shall maintain guidelines for the scope of care of acutely ill patients in its on-site designated infirmary units and for transfer of patients when appropriate to outside hospitals.

**Compliance Status:** This provision is in Partial Compliance

    a. Partial Compliance

**Status Update:** Received and reviewed.

**Monitor's Findings:**
Record reviews, patient and staff interviews were conducted to evaluate the care in the Special Care unit.

There is a new "Special Care Unit" (SCU, previously infirmary) policy and procedure which establishes acuity based (level of care) nursing and provider visit frequencies for inmates housed in Cermak 3rd floor. The levels of care are as following:

| Level of care Required | Description | Minimum Physician Assessment Frequency | Minimum Nursing Assessment Frequency |
|---|---|---|---|
| High | Condition requiring frequent assessments | 5 times per week | Daily |
| Medium | Stable but needs intermittent observation or review | 1 time per week | 1 time per week |
| Low | Stable with complex problems or boarder (stable but not able to be managed in the RTU) | 1 time per Month | Every 2 Weeks |

While the Monitoring Team applauds Cermak for developing this policy and procedure, there is still work to be done in this area. The Monitoring Team asked several nurses in the SCU how they decide on any given day which inmates are assessed by a nurse or provider. We were given different responses. Additionally and even though every inmate housed in the SCU is supposed to have a level of care assignment, inmates who are considered "boarders" currently do not. It was explained to us that these inmates do not routinely stay in the SCU long enough to warrant the assignment of a level of care. The Monitoring Team strongly encourages Cermak to standardize the SCU care by assigning every inmate, including the boarders a level of care. This level can be set low thus minimizing the nurse/provider encounter with these patients but setting a minimum standard for boarders who may have an unanticipated lengthy stay in the SCU.

The Monitoring Team also noted other minor issues with the SCU Operational Procedures:
- Section 1.7 of this procedure states: "A designated SCU provider completes an admission history and physical examination, along with admission orders, if this has not been done already by a referring provider". This statement does not clarify the time period before which this examination and note is required (within 24 hours of admission for example).
- In several places in the procedure the frequency of actions to be taken by nursing or provider staff is described as "at least once … or as otherwise ordered by …". The issue with these statements is that the ordering person (provider or nurse) can chose to disregard the minimum frequency requirement. A better approach would be to replace these statements with " at least once … or more frequently as ordered by …"

The minimum frequency of nursing assessments should be increased from once a day for high acuity patients and high risk detox patients. When patients arrive to the unit without an assigned acuity level the default acuity was supposed to be high until the unit provider assigns acuity but the practice did not match the default acuity level.

39

Since the policy is new, the staff is not fully aware of the changes and the procedures are not consistently in practice. The leadership state that the staff have been trained on the procedure and should be following the established process.

Documentation templates for nurses and providers, order sets, daily provider and nursing work flow should be evaluated and adjusted to match the new procedure.

The documentation of wound care has improved drastically. The wound care Wednesday program is working well. The medication pass is still done through a small window in the nursing station with other patients standing around and does not provide privacy for the patient. Patients with sick call requests were still being placed on the providers list without nursing assessments.

The nursing care plans are created upon admission but they are not being used to manage patients. The leadership team is working on moving the care plans to the EMR to make it more usable for the nursing staff in the delivery of care.

**Monitor's Recommendations:**

1. Assign a level of care to all SCU patients including boarders.
2. Clearly state the period of time within which the SCU patients must have their first SCU provider encounter.
3. Ensure the minimum frequency of services as set forth by SCU Operational Procedures cannot be overridden by the staff.
4. The admission orders should address all aspects of care management.
5. Establish patient specific nursing care plans to appropriately manage the patients and periodically update them in consultation with the care team.
6. Ensure the practice of the established admission and discharge process.
7. Review the documentation templates for nurses and providers, order sets, daily provider and nursing work flow and update to match the new procedure.
8. The SCU staff needs to be reeducated on the new policy and procedures. Include competency validation to assess their knowledge of the new procedure.
9. Establish a standard agenda for the Provider/Nurse huddles so all items are discussed.
10. Establish a multidisciplinary treatment team meeting to periodically discuss treatment plans for patients in the SCU.
11. Involve the SCU team in the care coordination to review patients at the hospital and plan for their appropriate transfer.
12. SCU nursing staff should use the nursing guidelines to assess patients with sick call requests before consulting or referring patients to the provider. The process should be same in the mental health SCU too.

13. Consider use of Fastpak for administration of medications in the SCU or pilot other solutions to increase privacy, nurse efficiency and reduce error."

14. Ensure that the detox reference value in the EMR matches the policy and procedures.

15. Establish a hand off process when patients get discharged from medical and mental health SCU to other divisions to ensure continuity of care.

16. Self-Monitoring:
    a) Monitor compliance with all aspects of the newly established procedures: ensure timely admission assessment, assignment of acuity levels, initial provider evaluation, routine follow-up by the nurse and provider per acuity level guidelines, use of care plans as appropriate, etc.
    b) Monitor length of stay for the various acuity levels of patients in the SCU on a daily basis.
    c) Evaluate patients sent to the Urgent Care and ER from the Infirmary to see if there were any process breakdowns and opportunities for improvement.
    d) Monitor the timeliness of medical care of inmates in the mental health SCU with medical conditions.

## 52. Chronic Care

a. Cermak shall maintain an appropriate, written chronic care disease management plan, which provides inmates with chronic diseases with timely and appropriate diagnosis, treatment, medication, monitoring and continuity of care consistent with the inmates' expected length of stay.

b. Cermak shall maintain appropriate written clinical practice guidelines for chronic diseases, such as HIV, hypertension, diabetes, asthma and elevated blood lipids.

c. Cermak shall maintain an updated registry to track all inmates with serious and/or chronic illnesses and shall monitor this registry to ensure that these inmates receive necessary diagnoses and treatment. Cermak shall keep records of all care provided to inmates diagnosed with chronic illnesses in the inmates' individual medical records.

d. Cermak shall ensure that inmates with chronic conditions are routinely seen by a physician, physician assistant, or advanced practice nurse to evaluate the status of their health and the effectiveness of the medication administered for their chronic conditions.

e. CCDOC shall house inmates with disabilities, or who need skilled nursing services or assistance with activities of daily living, in appropriate facilities, as determined by Cermak. CCDOC shall permit inmates with disabilities to retain appropriate aids to impairment, as determined by Cermak.

41

f. Cermak shall ensure that inmates with disabilities or who need skilled nursing services or assistance with activities of daily living shall receive medically appropriate care. Cermak shall notify CCDOC of their specific needs for housing and aids to impairment.

g. Cook County shall build out, remodel, or renovate clinical space as needed to provide appropriate facilities for inmates with disabilities in accordance with the timelines set out in provision 43.i. Prior to completion of the new clinical space, Cook County and DFM will work with Cermak to address the most serious concerns regarding facilities for inmates with disabilities, to the extent possible in the current Facility.

**Compliance Status**: This provision remains in partial compliance.
a. Partial Compliance
b. Partial Compliance
c. Substantial Compliance
d. Partial Compliance
e. Substantial Compliance
f. Partial Compliance
g. Substantial Compliance

**Status Update:** Received and reviewed.

**Monitor's Findings:**

The Monitoring Team reviewed health records of chronic disease patients and process during the visit.

a. Cermak has made progress in the Chronic Disease management plan but is still under development and implementation. In most cases, patients with chronic disease are seen timely upon intake by the nurse and the providers. The patients have the initial visit by the primary care clinic. There is delay in scheduling appointments for the follow-up visits. The providers are not consistently documenting the level of disease control and status of the condition which drives the management plans and frequency of visits.

To evaluate HIV care, we reviewed 5 health records of patients with HIV/AIDS, reviewed internal HIV data and interviewed one of two HIV providers. In general, we found that patients HIV disease was well controlled from a virologic perspective. However we found opportunities for improvement in the clinical management of patients.

In four of five records reviewed, patients arrived through the normal intake process and the remaining case as a hospital takeover. Cermak staff performed intake screening upon arrival for all patients and referred patients for secondary medical assessment. In four of

42

five cases a medical provider immediately saw the patient, but in the case of the hospital takeover, a provider did not see the patient until the following morning. Intake providers ordered HIV medications at intake if reliable information was available, and 4 of 5 patients received a first dose at intake.

An HIV provider performed a record review of newly arriving HIV patients within 24-48 hours. Initial visits took place in an average of 11.8 days (range 3-30 days); and in two cases patients were seen in 20 and 30 days, respectively. This average time frame for visits does not comply with new Cermak HIV treatment guidelines that indicate that patients with advanced disease (CD4=<200 cells) will generally be seen within 7 days.

HIV labs are not typically ordered to be available at the initial visit and providers do not routinely review intake screening labs and chest x-ray results. This can result in important clinical information being missed. In one case, a patient had an abnormal chest x-ray that was not addressed until the monitoring visit. In addition, providers do not routinely incorporate key elements of current HIV treatment guidelines, such as evaluation and treatment of TB infection. Positively, the HIV provider is developing an initial and follow-up HIV infection EMR template that incorporates current HIV guidelines and should help ensure consistency in initial and follow-up visits. HIV therapy was initiated or continued for all patients, as well as appropriate prophylaxis for opportunistic infections.

Although patients' HIV disease was generally well controlled, we found clinical issues that reflected fragmented care. In one case, a medically complicated patient had an elevated bilirubin that was most likely related to his HIV medications, but neither the PCP nor HIV provider noted this finding. The patient was subsequently hospitalized twice for GI symptoms that were thought to be associated with methadone withdrawal but also with increased bilirubin and it was only after the second hospitalization that the patient's HIV regimen was changed. This case raised the question as to who has primary ownership of HIV patients: the primary care, infirmary, or HIV provider. We noted other clinical issues (e.g., work-up of anemia and hyperthyroidism) that were discussed with providers during the visit.

Internal studies show high degree of medication adherence for HIV patients, however the studies included only patients on keep on person (KOP) medications, and measurement of adherence was by self-report. Moreover, one patient's labs showed increasing HIV viral load when the patient was taking KOP medications, which warranted consideration of changing the patient to nurse administered medications to more accurately assess adherence.

Review of medication administration records for patients receiving nurse administered medications showed missed doses due to: the medication not being available, patient not on the tier, no show, not present and refused. We encourage Cermak to study missed doses of these critical medications to determine the frequency, root causes and develop strategies to minimize missed doses. Since most HIV regimens are administered once daily, for patients not on tier during medication administration, there should be a procedure for nurses administering medications to follow-up and ensure that patients receive their medications once they return to the tier. With respect to medications not being available, we suggest that the most commonly prescribed HIV medications are available through Pyxis. Finally, it's important that providers assess medication adherence at each visit, and address reasons for non-adherence. The patient referenced above with an increasing viral load also had nausea and abdominal cramping, but the provider did not address the patient's medication adherence and whether it was related to his GI symptoms.

b. The clinical practice guidelines and chronic care templates for chronic diseases are being updated. The staff will need training on the new guidelines as they are established. The documentation templates for chronic disease visits to help providers address all aspects of the visit and enable compliance with the guidelines are under development.

Cermak has revised HIV/AIDS Clinical Practice Guidelines as of September 2015 based upon the Department of Health and Human Services (DHHS) Guidelines for the Use of Antiretroviral Agents in HIV-1 Infected Adults and Adolescents 2014. We incidentally note that the guidelines have since been revised in March 2015. We suggest that Cermak's guidelines also reference the companion DHHS Guidelines for Prevention and Treatment of Opportunistic Infections, November 2015.

The Cermak HIV/AIDS Clinical Practice guidelines appropriately describe criteria for timeliness of initial appointments in accordance with the patient's clinical status condition: priority appointments are to take place with 7 days for patients with severe immunosuppression and routine appointments for patients with stable disease within 30 days. However, criteria for follow-up appointments are vague and do not reflect monitoring based on the patient's disease severity and control. This is important as most incarcerated patients have comorbidities such as substance abuse and mental illness that impact their understanding of their disease and adherence to their treatment plan.

c. Cermak has an effective way of tracking chronic disease patients. The tool is used by the Providers to enable their work. The team needs to identify ways for nursing staff to also use the information for their care.

d.   Patients with chronic disease are seen at intake and followed-up by the providers in their housing locations. The chronic disease management plan and the clinical practice guidelines will drive the frequency and requirements of the visits. There is a different process to identify and schedule medical chronic disease patients in the mental health Infirmary that is causing delays in care. The Infirmary Provider has created their own way of identifying and tracking the patients due to this issue. The patients moved out of the Infirmary require a manual process to ensure continuity of care. There are improvement efforts to change the process. Referrals to PCC are not always scheduled on time by the scheduling team. The orders and appointments have to be manually transferred to the new location if a patient transfers. There is an effort to move to a different process to track/ use visit requests from the current scheduling process that will help overcome the challenge.

The labs orders are still automatically canceled after certain days. The POCT for INR is still not added as an order in the EMR.

INR testing is still not being done before administering Coumadin. Follow-up INR testing is not ordered in the EMR but uses the clinic appointment list to identify patients who need INR tested. The anticoagulation treatment plan is now being discussed with the primary care provider. The clinical pharmacist is now participating in management of patients on anticoagulation in the infirmary, the detoxification program and insulin management. The clinical team is planning to add more clinical pharmacist time to support chronic disease management which will be very helpful.

Documentation of insulin administration and blood sugars are done in the EMR. The RTU team has established a good program to effectively track and manage patients on Insulin. Hypoglycemic management by nurses is improving but still needs a tighter compliance with the nursing procedures.

With respect to HIV infection, as noted in previous reports, interval visits do not consistently take place in accordance with disease control and timely following performance of labs.  A patient described earlier in the report was hospitalized in July 2015 and was scheduled to be seen in late October, which seemed to be a long interval given his comorbidities. The visit did not take place allegedly due to patient refusal.

Some patients were noted to be intermittently non-adherent with medications, but this did not result in intervention by more frequent monitoring. Consideration should be given to interval nurse monitoring and counseling to assess and address reasons for non-adherence.  We recommend that Cermak consider scheduling patients to have labs 2

weeks in advance of the clinical visit so that results are available to the clinician for patient counseling.

e. The inmates with disabilities, or who need skilled nursing services or assistance with activities of daily living, are appropriately housed and allowed to retain appropriate aid to impairment as recommended by Cermak.

f. Documentation to show that patients who need assistance with ADLs are receiving appropriate care is inadequate. The nursing care plans are currently being updated. This will help drive the frequency, management and documentation of the care for the patients.

g. Cermak has adequate clinical space to take care of patients with disabilities.

**Monitor's Recommendations:**

1. Continue updating and implementing the clinical practice guidelines and ensure practice is consistent with these.
2. Continue to create chronic disease templates to guide the provider to document pertinent positives, history specific to the condition, remind them of any recommended tests, medications, referrals, level of disease control (good control, poor control, etc.), level of change from previous visit (i.e. improved, worsened, no change), follow-up plan specific to the condition.
3. Create expectations for documentation on initial and follow-up chronic care and urgent care visits. Title the documents to identify the type of visits.
4. Create a standard appointment system that will follow the patients within the jail automatically.
5. Create appointment types by type of visits, and urgency of visits, etc. to easily track the volume and timeliness of service.
6. Get INR results before initiating Coumadin.
7. Add an INR point of care order in EMR to allow clinicians to order follow-up INR as indicated.
8. Communicate positive lab results to the patient timely. Monitor using an exception report.
9. Continue to document the provider's acknowledgement of recent lab results and actions taken, if needed, or document reason for no action taken on an abnormal lab result.
10. Review the lab order process to make it efficient - from order entry to sample collection.
11. Fix the auto-deletion of lab order issue.
12. Continue to expand the shared medical appointments model for chronic diseases (i.e.: diabetes, hypertension, etc.) where patients can be educated by the various disciplines on disease management (diet, self-testing, diet, etc.).

46

13. Improve nursing documentation of routine and episodic care provided to patients with special needs including patients who needs assistance with ADLs.

14. Continue efforts to house patients in the appropriate housing locations for efficient management.

15. Continue to identify high risk chronic disease patients and establish a review process to effectively manage their care.

16. For HIV patients:

   a. Incorporate DHHS Guidelines regarding Prevention and Treatment of Opportunistic Infections into Cermak Guidelines.

   b. Ensure that for immunosuppressed patients the initial HIV visit takes place within 7 calendar days of arrival or sooner if clinically indicated.

   c. At the initial HIV visit, providers should perform standardized past medical history, review of systems, review labs and routine intake tests, including chest x-ray and sexually transmitted infection (STI) results.

   d. To improve efficiency and timeliness of care, coordinate labs to be available at initial and follow-up visits.

   e. Evaluate and treat HIV patients for TB infection in accordance with recommendations.

   f. Ensure that interval visits occur as scheduled and that patients are timely counseled following the availability of labs results.

   g. Consider increasing frequency of monitoring for patients with adherence issues. For inmates with suspected adherence issues, place on nurse administered medications.

   h. To increase provider efficiency, avoid scheduling patients for provider visits simply to obtain labs. Improve the reliability of Cerner scheduling.

   i. Improve coordination of care between primary care, infirmary and HIV providers.

17. Self-Monitoring:

   a) Ensure all patients on chronic medications are in the appropriate registries (match registry to medications and medication to registry to identify any inappropriate miss match).

   b) Review ordered tests (high priority tests) to see if they were completed timely.

   c) Continue to monitor compliance with dialysis visits.

   d) Audit at least 5 charts per provider per month to monitor for compliance with established chronic care management plan and clinical practice guidelines. Provide both individual and group feedback for continuous improvement.

   e) Establish quality metrics to monitor adherence of patients on anticoagulation.

      i. Time to first visit

      ii. Time to first dose

      iii. INR before first dose

      iv. Time to therapeutic level

      v.    Management plan for difficult patients

      vi.    Compliance with INR check as ordered

      vii.    Compliance with follow-up as indicated

f) Monitor compliance with recommended vaccinations that are identified in the clinical practice guidelines.

g) Continue to review compliance with addressing critical lab results timely.

h) Review episodic/nonscheduled visits by chronic disease patients to identify opportunities for prevention.

## 53. Treatment and Management of Communicable Diseases

a. Cermak shall maintain adequate testing, monitoring and treatment programs for management of communicable diseases, including tuberculosis ("TB"), skin infections, and sexually transmitted infections ("STIs").

b. CCDOC shall comply with infection control policies and procedures, as developed by Cermak, that address contact, blood borne, and airborne hazards, to prevent the spread of infections or communicable diseases, including TB, skin infections, and STIs, consistent with generally accepted correctional standards of care.

c. Cermak shall maintain infection control policies and procedures that address contact, blood borne, and airborne hazards, to prevent the spread of infections or communicable diseases, including TB, skin infections and STIs, consistent with generally accepted correctional standards of care. Such policies should provide guidelines for identification, treatment and containment to prevent transmission of infectious diseases to staff or inmates.

d. Pursuant to Centers for Disease Control ("CDC") Guidelines, Cermak shall continue to test all inmates for TB upon booking at the Facility and shall follow up on test results as medically indicated. Cermak shall follow current CDC guidelines for management of inmates with TB infection, including providing prophylactic medication when medically appropriate and consistent with the inmate's expected length of stay. Inmates who exhibit signs or symptoms consistent with TB shall be isolated from other inmates, evaluated for contagious TB and housed in an appropriate, specialized respiratory isolation ("negative pressure") room. Cermak shall notify CCDOC of inmates' specific housing requirements and precautions for transportation for the purpose of infection control.

e. Cermak shall ensure that the negative pressure and ventilation systems function properly. Following CDC guidelines, Cermak shall test daily for rooms in-use and monthly for rooms not currently in-use. Cermak shall document results of such testing.

f. Cermak shall notify DFM, in a timely manner, of routine and emergency maintenance needs, including plumbing, lighting and ventilation problems.

g. Cermak shall develop and implement adequate guidelines to ensure that inmates receive appropriate wound care. Such guidelines will include precautions to limit the possible spread of Methicillin-resistant Staphylococcus aureus ("MRSA") and other communicable diseases.

h. Cermak shall adequately maintain statistical information regarding communicable disease screening programs and other relevant statistical data necessary to adequately identify, treat, and control infectious diseases.

**Compliance Status:** This provision is now in substantial compliance.

a. Substantial Compliance
b. Substantial Compliance
c. Substantial Compliance
d. Substantial Compliance
e. Substantial Compliance
f. Substantial Compliance
g. Substantial Compliance.
h. Substantial Compliance

**Status Update:** Status update received and reviewed.

**Monitor's Findings:**

Cermak has an infection control program which establishes procedures for infection control practices and patient care. Staff receives annual training on this policy. The Special Care Units continue to make progress with wound care prevention and management; there are solid practices in place to measure, grade, assess, and manage wounds. Staff was knowledgeable of the expected wound care practices and there is evidence that staff have been trained on assessment and documentation. Wound care is documented in iView and there is evidence that all staff including providers utilize iView to track the progress of wounds. Establishing "Wound Care Wednesdays" has been a success. This practice has since been carried out of the Special Care Units into other divisions. Furthermore, there are guidelines within the policy to prevent MRSA or at least minimize transmission and risk to other inmates and staff.

The Infection Control Department continues to map MRSA on a division-by-division spreadsheet to identify any clustering. The Monitoring Team found evidence in the data that these practices are ongoing and effective. As a result, the CCDOC, Environmental Services and the Medical Department are regularly notified of such areas need for enhanced disinfection. Sanitation schedules reflect regular cleaning schedules by building sanitation in addition to unit specific schedules carried out by unit staff.

The Monitoring Team reviewed Cermak's TB screening procedures. There has been an average of 3802 intake chest x-ray screening studies per month from March thru June 2015 for males and 591 per month for females. There have been 18 total TB suspect cases during this period based on abnormal CXR, signs and symptoms or refusing TB screening process. All charts related to these inmates were reviewed. There was 100% compliance with TB rule out procedure according to established national guidelines.

The Monitoring Team audited all negative pressure room logs for the past six months and found them to be complete.

The Monitoring Team also reviewed a comprehensive report regarding communicable disease screening programs and other relevant statistical data necessary to adequately identify, treat, and control infectious diseases. Based on the documents reviewed by the Monitoring Team, Cermak appears to have adequate screening, monitoring and treatment programs for management of communicable diseases, including tuberculosis ("TB"), MRSA and sexually transmitted infections ("STIs"). There has been an average of 29 male and 17 female inmates with positive RPR results. Several inmate charts were reviewed at random. There was 100% compliance with RPR follow up and treatment when indicated.

The Monitoring Team reviewed several random infection prevention files for Cermak staff. These records were 100% compliant with annual TB testing policy as well as the flu vaccination policy.

Quarterly Infection Control meeting minutes were reviewed from June, April and July of 2015. The IC meeting in October was folded into the town hall meeting that was conducted in that month. The participation in this meeting is robust and inclusive and includes: pharmacy, administration, Med/Surg, Core services, Dental, IC, Radiology, JTDC, QI, Environmental services, lab, CCDOC, HIM, MH, IT, Store room.

**Monitor's Recommendations:**
Continue self-monitoring of the IP practices.

## 54. Access to Health Care

a.      CCDOC will work with Cermak to facilitate timely and adequate accessibility of appropriate health care for inmates, as provided by Cermak.
b.      Cermak shall ensure the timely and adequate availability of appropriate health care for inmates.
c.      Cermak shall ensure that the medical request ("sick call") process for inmates is adequate and provides inmates with adequate access to medical care. The sick call process shall include:

      i.     written medical and mental health care slips available in English, Spanish and other languages, as needed;

      ii.     opportunity for illiterate inmates and inmates who have physical or cognitive disabilities to access medical and mental health care; and

      iii.     opportunity for all inmates, irrespective of primary language, to access medical and mental health care.

d.     Cermak shall ensure that the sick call process includes confidential collection, logging and tracking of sick call requests seven days a week. Cermak shall ensure timely responses to sick call requests by Qualified Medical Staff. The logging procedure shall include documentation of the date and summary of each request for care, the date the inmate was seen, the name of the person who saw him or her, the disposition of the medical or mental health visit (e.g., referral; whether inmate scheduled for acute care visit), and, if follow-up care is necessary, the date and time of the inmate's next appointment. Cermak shall document the reason for and disposition of the medical or mental health care request in the inmate's medical record.

e.     Cermak shall develop and implement an effective system for screening medical requests within 24 hours of submission. Cermak shall ensure that sick call requests are appropriately prioritized based upon the seriousness of the medical issue.

f.     Cermak shall ensure that evaluation and treatment of inmates in response to a sick call request occurs in a clinical setting.

g.     Cermak shall ensure that Qualified Medical Staff make daily rounds in the isolation areas to give inmates in isolation adequate opportunities to contact and discuss medical and mental health concerns with Qualified Medical Staff in a setting that affords as much privacy as reasonable security precautions will allow. During rounds, Qualified Medical Staff will assess inmates for new clinical findings, such as deterioration of the inmate's condition.

Compliance Status: This provision is partial compliance.

a.     Substantial compliance
b.     Partial compliance
c.     Partial compliance
d.     Partial compliance
e.     Partial compliance
f.     Substantial compliance
g.     Partial compliance

**Status Update:**  Cermak provided a status report dated 9/30/15 that the Monitoring Team reviewed in preparation for the site visit and report.

**Monitor's Findings:**

The Monitoring Team evaluated inmate access to care by reviewing health service request tracking systems; randomly inspecting health care request form availability; reviewing health service request (HSR) forms, health records, segregation logs; observing nursing sick call encounters and interviews with staff and inmates. In addition, Cermak health care leadership presented data regarding timeliness of HSR triage across the jail, as well as dashboards reflecting HSR volume and staff productivity for each division. The dashboards also reflect the number of days per month that a registered nurse was not available to perform nurse sick call and daily patient backlogs.

Since the last monitoring visit, although the access to care system is becoming more firmly rooted in clinic operations, significant progress remains to become substantially compliant. Positively, health care leadership is conducting CQI studies to measure access to care performance that should assist them in focusing improvement efforts.

Health care data suggest that health care request forms are being collected and triaged in a timely manner. However, we found that nursing triage decisions were not consistently appropriate, and although patients are generally being seen more timely, we found numerous instances in which patients were not seen timely, if at all. When seen, nurse assessments are often inadequate and referrals to providers do not consistently take place.

The policy related to access to care, Non-Emergency Health Care Requests (J-E-07) was revised in March 2015 and meets requirements of the Agreed Order. Cermak Nursing Guidelines were revised and distributed to staff in September 2015. These guidelines are improved from previous versions; however the Monitoring Team has some concerns about organization and content of the Guidelines. For example, there is a guideline for Chest Pain-Urgent/Emergent and one for Chest Pain-Non Emergent; however this requires the nurse to make a determination in advance of assessing the patient as to whether the patient's chest pain is urgent or not. In addition, the Chest Pain-Non Emergent guideline is actually a guideline for musculoskeletal pain but is located in the cardiovascular section of the guidelines. This is likely to be confusing to nurses using the guidelines. The Guidelines include nursing diagnoses that are incomplete or not approved by NANDA, such as "alteration in comfort" without linking it to a cause. In some cases the treatment is not appropriately targeted to the condition. For example, the only over the counter option for treatment of cough is a saline nasal spray, which is not likely to be effective for most patients presenting with cough. Finally, nursing guidelines assessment protocols have not been incorporated into the EMR which is likely to result in nurses not adhering to the guidelines.

In summary and as evidenced by the data from the past six months, access to care should remain a focus point for Cermak Making and sustaining improvements requires a collaborative effort of

the Cermak leadership team, including nursing, medicine, mental health, dental and quality improvement services.

Compliance with the Agreed Order is further described below.

a.      During tours of housing units and staff and inmate interviews, staff anecdotally reported that sometimes there were issues with correctional officer availability to escort inmates for sick call. These reports do not result in a change of compliance status, but should be monitored during the next six months.

b.      The Monitoring Team observed an increase in the daily back log of HSRs in some divisions related to unavailability of RN staff. This has led to some delays in access to care. This trend is a concern, and even more so if there is no back up procedure for triage of HSRs on the days that an RN is not available to conduct sick call.

Some divisions appear to have greater daily back logs and data as well as Monitor findings show that sick call back logs are particularly high in Divisions III Annex, X and XI. In discussions with leadership with staff, contributing factors to delays in access include nursing vacancies, nurses being pulled to perform medication administration, shorter hours in which to conduct sick call (Division X), lack of officers to escort patients or monitor the waiting area (Division X), and lack of access to patients during officer shift changes.

c.      Inmates continue to have access to HSRs in English and Spanish.  We found greater access and documented instances of use of telephone translation services during this visit.

d.      The Monitoring Team found that HSRs are collected and date stamped timely. However nurses do not consistently sign, date and time HSRs at the time of triage.  Nurses do not consistently see patients in a timely manner following receipt of HSRs. The quality of assessments is often poor and in some cases the nurse performs no examination at all, but simply refers the patient to a provider.  When nurses do perform assessments, we found instances in which the nurse documented clinical findings onto the HSR instead of the directly into the electronic medical record.  In these cases, the nurse is not following assessment templates in the EMR and evaluations are often lacking.  In addition, the recently revised Nursing Guidelines do not match EMR assessment protocols which do not facilitate adequate assessments.

e.      Cermak data shows high levels of staff compliance conducting paper triage of health requests within 24 hours.  However, during this site visit the Monitoring Team anecdotally did not find this same level of compliance of paper triage across the jail.

f.      Nurse sick call is being conducted in adequately equipped and supplied examination rooms.

g. Segregation Rounds

The Monitoring Team conducted record review of patients in segregation housing units. There was evidence within the documentation that some inmates have requested medical attention and received an HSR with immediate triage. Documentation regarding segregation rounds was evident in the electronic health record however there is still a lack of documentation of completed rounds in Division IX. Staff reported that some inmates' segregation rounds were suspended due to aggressive behavioral issues of the inmates. Once the rounds were suspended there is no evidence of any attempts to re- round those inmates to initiate access to care. Current practices in both Division VI and IX are to conduct segregation rounds by nursing staff on Monday and Friday. Mental Health conducts their rounds on Wednesday.

With respect to frequency of segregation rounds, the Agreed Order requires that health care staff conduct daily rounds which are not currently taking place. The parties have agreed to change the Agreed Order to be consistent with the NCCHC Standards for Health Services in Jails regarding Segregated Inmates (J-E-09) which bases the frequency of rounds upon the degree of isolation. This requires that Cermak in partnership with CCDOC draft a proposed amendment to this provision identifying those units or inmates that are subject to extreme isolation (as described by the above NCCHC standard) and require daily segregation rounds, versus those unit or inmates that have greater staff and inmate interaction and require less frequent rounds. The Segregation policy will require revision following this assessment.

CCDOC has initiated Alerts for inmates placed into and released from segregation. Health care staff documents in the electronic health record however it is still unclear from the record when the inmate was admitted and discharged from segregation,

Recommendations:

1. Health care leadership and staff should continue to focus on the fundamental components of access to care by performing ongoing CQI studies and improve the quality of data used to make decisions. Components to be included in CQI studies include the following:

a. Date of inmate submission to date of collection
b. Date of collection to date of triage
c. Staff compliance with signing and dating collection and triage of HSRs
d. Appropriateness of nurse triage decisions
e. Timeliness of nurse encounter by type of disposition (e.g., urgent, routine)
f. Adequacy of nurse assessments and treatment
g. Appropriateness of nurse to provider referrals

54

h.      Timeliness of nurse referral to provider appointment

2.      Health care leadership should study and identify root causes of delays in access to care to include consideration of nurse vacancies, staff reassignments, lack of officers or custody/nurse or provider scheduling.

3.      Health care leadership should review and revise the Nursing Guidelines to ensure they are appropriately organized and enable the nurse to adequately treat the patient's presenting complaint. Ensure that the guidelines include approved NANDA nursing diagnoses.

4.      Develop a system to provide feedback to nurses regarding the appropriateness of nursing evaluations and dispositions.

5.      Conduct ongoing training in physical assessment and nurse protocols.

6.      Health care leadership should continue develop the primary care model in the Divisions by increasing communication and collaboration between nurses and providers.

7.      Revise the segregation policy to ensure compliance with the applicable NCCHC standard and include which segregation units require daily versus three times weekly rounds.

8.      Monitor nursing compliance with segregation rounds including how rounds are documented in the EMR.


## 55. Follow-Up Care

a.  Cermak shall provide adequate care and maintain appropriate records for inmates who return to the Facility following hospitalization or outside emergency room visits.

b.  Cermak shall ensure that inmates who receive specialty, emergency room, or hospital care are evaluated upon their return to the Facility and that, at a minimum, discharge instructions are obtained, appropriate Qualified Medical Staff reviews the information and documentation available from the visit, this review and the outside provider's documentation are recorded in the inmate's medical record, and appropriate follow-up is provided.

**Compliance Status:** This provision is in Substantial Compliance.

a.      Substantial Compliance
b.      Substantial Compliance (needs attention)

**Status Update:** Received and reviewed.

**Monitor's Findings:**

Chart audits and process review were conducted on patients returning from hospital and emergency room visits.

a. Patients who were sent to the emergency room or are discharged from inpatient hospital care are seen at the Urgent care clinic on return. Urgent care providers are reviewing the hospital records and addressing the care recommendations. Recent change has been made to ensure that patients returning from same day surgery also get seen at the urgent care. Multiple chart reviews were performed and indicated that all patients were following the established process. The documentation by the Cermak Providers is still on paper and does not reflect all aspects of visit.

b. There is a reconciliation process to ensure all patients who were sent to the specialty clinic and for other procedures are seen upon return. The monitoring process is identifying and addressing any issues that may have been missed. The ED and inpatient hospital returns need to also be reconciled daily to catch any process breakdowns since they are high risk patients.

There is no standard documentation by nurses and providers for patients returning form Inpatient, ED and Scheduled off site visits. Some key information of the visit that can help with continuity of care is missing in the documentation. A recommendation was made to setup templates for the nurses and providers so they can document all relevant information. The recommendation has not been implemented.

**Monitor's Recommendations:**

1. Establish a reconciliation process not less than once a shift for patients sent to the hospital for scheduled and unscheduled visits, by an assigned team so that all patients returning from the hospital are seen and discharge instructions are followed.

2. Create a template for hospital return visits for nursing and providers so pertinent information is captured in the note (i.e. reason for hospital visit, condition of patient upon return, discharge diagnosis, any new problems that must be added to problem list, medication reconciliation, plan of action for discharge instructions, in house nurse/provider follow-up or hospital follow-up, notification to the provider who sent the patient to the hospital, etc.).

3. Self-Monitoring:

a. Maintain a database of all patient send outs by type (ER, Inpatient, Clinics, Same Day Surgery, Procedures, etc.). The data base should include: the mode of transport, seen by provider before send out, name of the provider who sent the patient out, reason for send out, discharge diagnosis, was patient seen on return, date and time of patient seen on return. Use this database to monitor performance and identify improvement activities.

b. Audit at least five charts per month of patients sent to the ER and for inpatient services for documentation that includes: if they were seen upon return, reason for send out, timeliness of send out, appropriateness of mode of transport, appropriateness of emergency response provided by in house staff, appropriateness of documentation, were hospital records reviewed, documentation of implementing discharge instructions, and if not, the reason documented, medication reconciliation, problem list updated, appropriateness of post discharge housing in the jail, patient educated on the plan of care, etc. (the documentation templates will help make this audit easy to do).

## 56. Medication Administration

a. Cermak shall ensure that treatment and administration of medication to inmates is implemented in accordance with generally accepted correctional standards of care.

b. Cermak shall develop policies and procedures to ensure the accurate administration of medication and maintenance of medication records. Cermak shall provide a systematic physician review of the use of medication to ensure that each inmate's prescribed regimen continues to be appropriate and effective for his or her condition.

c. Cermak shall ensure that medicine administration is hygienic, appropriate for the needs of inmates and is recorded concurrently with distribution.

d. Cermak shall ensure that medication administration is performed by Qualified Nursing Staff.

e. When Cermak prescribes medication to address an inmate's serious mental health needs, HIV or AIDS, or thromboembolic disease, Cermak shall alert CCDOC that the inmate in question is on a flagged medication. If the prescription is terminated during an inmate's stay at the Facility, Cermak will notify CCDOC.

f. When CCDOC receives notice that an inmate is on a flagged medication, CCDOC shall include notation of a medication flag in the inmate's profile on the Facility's Jail Management System.

g. When an inmate with a medication flag is processed for discharge at the Facility, CCDOC shall escort the inmate to designated Cermak staff in the intake screening area of the Facility for discharge medication instructions.

h. When CCDOC escorts an inmate with a medication flag to Cermak staff during discharge processing, Cermak staff shall provide the inmate with printed instructions regarding prescription medication and community resources.

i. Each morning, CCDOC shall provide Cermak with a list of all inmates with medication flags who were discharged the previous day.

j. Within 24 hours of discharge of an inmate with a medication flag, Cermak shall call in an appropriate prescription to the designated pharmacy on the Stroger Hospital campus to serve as a bridge until inmates can arrange for continuity of care in the community.

k. CCDOC shall ensure that information about pending transfers of inmates is communicated to Cermak as soon as it is available.

l. When CCDOC has advance notice and alerts Cermak of the pending transfer to another correctional facility of inmates with serious medical or mental health needs from detention, Cermak shall supply sufficient medication for the period of transit. In such cases, Cermak shall prepare and send with transferring inmates a transfer summary detailing major health problems and listing current medications and dosages, as well as medication history while at the Facility.

m. CCDOC shall ensure that the transfer summary and any other medical records provided by Cermak will accompany inmates, or will be made available electronically or transmitted by facsimile, when they are transferred from the Facility to another institution.

**Compliance Status:** This provision is in substantial compliance.

- Substantial compliance (November 2015)
- Substantial compliance (November 2015)
- Substantial compliance (November 2015)
- Substantial compliance (June 2011)
- Substantial compliance (November 2014)
- Substantial compliance (November 2014)
- Substantial compliance (November 2014)
- Substantial compliance (November 2014)
- Substantial compliance (November 2014)
- Substantial compliance (November 2014)
- Substantial compliance (November 2014)
- Substantial compliance (June 2011)
- Substantial compliance (November 2014)

**Status Update:** The status report provided information that was responsive to nearly all of the recommendations including those related to self-monitoring.

**Monitor's Findings:**

In addition to the status report, the following documents were reviewed in preparation of this report:

    a. Minutes of the meetings of the Pharmacy & Therapeutics Committee that took place July 22, 2015 and on October 14, 2015.

    b. Quality Improvement Report on Discharge Medications (July 1-31, 2015).

    c. Cermak Monthly Statistics (September 2014 – September 2015).

    d. Cermak Pharmacy Monthly Statistics (December 2014-September 2015)

    e. Cermak Health Services Policy and Procedures

        1). D-02.3 Medication Distribution (Approved 9/14/2015).

        2). D-02.4 Electronic Medication Administration Record (eMAR) (Approved 9/11/15).

        3). E-13 Discharge Planning (Approved 11/4/2014).

        4). E-13.2 Discharge Planning for Mental Health Patients (Approved 11/17/2014).

        5). D-07.2 Pyxis for Non-Controlled Substances (Approved 9/10/2015)

        6). C-05 Medication Administration Training (Approved 8/31/2015)

        7). E-11 Nursing Assessment Protocols (Approved 11/17/2014).

        8). CCHHS 7.01.01 Comprehensive Medication Vial Management (Approved 9/3/2015).

    h. List of pharmacy positions requested for 2016.

    i. eMERS reports from May through October 2015 related to controlled substance discrepancies and medication issues.

    j. List of prescriptions with dosing schedules greater than twice a day prepared as of 11/2/2015.

    k. CQI data including audits of nurse administered medication, a study on medication that is not administered and a study on the time to first dose after a new order is written.

    l. List of grievances about medications and the response.

During the site visit the Monitoring Team inspected medication storage areas, including stock medications and narcotic control, observed medication administration, and reviewed medication administration records. We interviewed staff and inmates in all Divisions about the medication system.

      a. Cermak-Standard of Care- Substantial Compliance

Medication Dispensing and Packaging for Delivery: The Pharmacy filled an average of 8,372 prescriptions each day from May 2015 through September 2015; a 2.4% increase in the rate reported for the previous six months.  The Pharmacy operation remains as described in the Ninth Report. Additional pharmacy positions were requested for 2016 to open the satellite pharmacy in VIII/RTU. The Monitoring Team suggests that support for the planned expansion of pharmacy services may be found in the data on timeliness to first dose, reasons for missed medications, grievances and eMERS reports.

Medication Administration: While medication administration was observed during the site visit to be completed timely there were numerous reports in the eMERS data reviewed since the last site visit of medications given late or not at all because of short staffing, inmate disturbance or lack of cooperation by correctional officers.  The list of inmate grievances regarding medications was another source that verified instances when medications were administered untimely or not at all. CCDOC recently revised their audit tool to include observation of the timeliness of the start and stop times for medication administration. This should provide information in addition to eMERS and grievances about untimely medication administration for the Medication Administration subcommittee to consider in developing corrective action.

Barcode scanning of the ID card is now possible with the Cerner eMAR as well as Accuflo but it has not been completely implemented in all units (Special Care and RTU Detox to implement in early 2016). The Monitoring Team did not observe consistent use of the barcode scanner by nurses in the divisions which have this capacity. Since the last site visit there have been no reports in eMERS of inmates receiving the wrong medication because two part identification was not done by nursing staff and Cermak's  own audit results show increased compliance with the requirement to use a two-part identification system to properly identify the inmate.  Continued auditing is recommended since one nurse/correctional officer team was observed by the Monitoring Team administering medications

without using inmate identifications cards at all. We suggest revising Policy and Procedure D-02.3 to include use of the barcode scanner when it is fully operational and modify the audit tool to include use of the bar code scanner so that full implementation of this important patient safety measure is ensured.

We recommended in the last report that Cermak examine reasons for refusals and consider systematic ways the program could reduce the incidence. Refusals are the most common reason for medications not being administered. Refusals take a significant amount of time during medication administration and contribute to the problem of untimely administration. Policy and Procedure D-02.3 requires that providers be notified after three consecutive refusals but there are no expectations set forth about what the provider is to do with the information. For example, providers should enter a clinical note indicating how the patient's disagreement with the treatment plan (refusal) was addressed.

Medication Continuity:

Since April 16, 2015 inmates from Divisions III, VI, and IX are able to receive their medications before going to court. There are inmates who are on medications with dosing schedules that exceed the availability of staff to administer medication in certain Divisions (I, III, VI, IX, XI). This is not a problem as long as these inmates are able to keep their medication on person but if the medication must be administered by nursing staff, the inmate must be transferred to a Division with staffing sufficient to carry out the order or the order changed. We could not identify any inmates who were on nurse administered medication with frequent dosing housed in Divisions that have more limited staffing.

Medication storage: Pyxis automated dispensing cabinets have been installed in all of the Divisions to handle over the counter medications. These cabinets have also been placed in the Dental clinics (except Division I because of space and wiring) for dispensing initial doses. Policy and Procedure D-07.2 Pyxis for Non-Controlled Substances and E-11 Nursing Assessment Protocols need to be revised to include instructions on use of Pyxis for over the counter medications. Similar revisions need to be made in the Dental procedures regarding how initial doses are dispensed.

61

Labels were found on all medication vials and were being used correctly in all Divisions. The Pharmacy and Therapeutics Committee is developing a policy on the management of medication vials.

In Cermak, the Pyxis automated dispensing cabinet is used to store all prescription medications, except non-formulary items. The Monitoring Team suggests using Fastpak packaging rather than Pyxis in the Special Care Unit to facilitate more efficient use of nursing time in medication administration.  If Fastpak packaging is not an option, other ways to streamline medication administration in the Special Care Unit need to be considered.

Management of Controlled Substances: The majority of count discrepancies are mistakes removing and returning medication to the Pyxis automated dispensing cabinets.  To remedy this, the Pharmacy has begun training all new nursing staff in the use of Pyxis as part of new employee orientation.

> b. Cermak- Policies and procedures and systematic physician review–Substantial Compliance

Policy D-02.3 Medication Distribution (approved 9/14/2015) was revised to

- Reconcile the appendix with the policy on times for medication administration

- Require use of two identifiers in determining the right patient

- Direct when and to whom inmate refusals are reported

- Include directions for hand hygiene, sanitation of the cart and how drinking water is to be provided including sanitation of pitchers or jugs and how cups are to be disposed.

This policy includes all of the items that have been recommended in previous reports. Now that barcode scanning is in use, the policy will need to be revised to include instructions about its use in patient identification.

Policy D-02.4 Electronic Medication Administration Record (eMAR) (approved 9/11/2015) was also revised. Currently the policy sets forth an expectation for electronic charting of medication that has been distributed or administered but does not give any procedural instructions about how to chart in either Cerner or Accuflo.  Therefore Policy D-02.4 needs further revision to include procedural steps

for documentation on the electronic MAR (see discussions related to this in the Eighth, Ninth and Tenth Reports).

Since the last site visit Cermak and CCDOC have begun auditing medication administration to bring actual practice into conformance with policy and procedure. Nurse Managers are expected to audit ten medication passes each month using a tool with seven criteria derived from D-02.3. Audit results for August and September were reviewed at CQI and a presentation was made to the Medical Monitor. Two of the measures that did not meet goals originally did show improvement when re-audited. One was below goal on re-audit. The Monitor will review these audit results at subsequent site visits.

We also met with CCDOC leadership and discussed the audit tool they have developed based upon the General Order. This tool has been distributed to all Division Directors with the expectation that ten audits are completed each month. With the opening of RTU and the on-boarding of new officers, the audit helped focus areas where training in the officers' role in medication administration was needed. The Monitor will review these audit results at subsequent site visits. CCDOC also participates in the Interagency QI meetings and the Medication Administration subcommittee where the results of audits by nurse managers and those completed by CCDOC are discussed.

Several deviations from facility policies for medication administration were observed during this site visit. These include not using the inmate identification cards (Division II), failing to complete oral cavity checks or doing so cursorily (Divisions II, III and VIII), not using or providing a list of inmates to receive medication (Division X) and not preventing inmates from crowding the medication cart or window (Divisions IX, X and Cermak). Continued auditing will be necessary to demonstrate the ability of CCDCOC and Cermak to identify and correct practice deviation in medication administration over the next 18 months.

Ten days in advance of order expiration providers are notified so they can generate new orders after their review. There were numerous examples found during review of HSRs, records, grievances, and eMERS reports that medications were not renewed timely. The lack of sequencing between medication end dates and primary care provider visits seems to be contributing to medication discontinuity, frequent HSR requests and other complaints from inmates and should be examined further to understand and eliminate lapses in treatment.

c. Cermak-Hygienic, Appropriate and Concurrently Recorded- Substantial Compliance

Hygiene:  Policy D-02.3 has been revised to include specific directions for cleanliness, hygiene and infection control during medication administration and hygiene practices have improved significantly since the last site visit.

Appropriate: Late or missing medications are still prevalent according to grievances reviewed as well as various reports provided  by Cermak.  Cermak is to be applauded for beginning to examine, via CQI, reasons why inmates do not receive or take prescribed medication. Besides refusals, large numbers of inmates are not receiving medication because they are not present or do not show up at the time the medication is to be administered. A review of the medication administration records of five HIV patients on nurse administered medication showed a number of missed doses due to refusal, the medication not being available or the patient not being present. The chart review findings support Cermak's own data and suggest that further improvement opportunities could target critical medications. In addition, now that it is possible to extract data on missed doses, a daily report of critical medication doses that are missed should be developed by IT and provided to the Nurse Managers and Medical Director daily for immediate corrective action.

An initial study of the timeliness from orders written at intake for critical medications to first dose was completed in August 2015 and the results reviewed with the Monitor's Team. Studies of timeliness to first dose should be repeated periodically and expanded to include new orders written for critical medications at times other than intake and to include psychotropic medication if these have not yet been considered. Since the study is limited to critical medications, the benchmark of 80% should also be reconsidered.  We recommend the benchmark for critical medication adherence be set higher than 90%.

Concurrently Recorded: There are two electronic record systems in use to document medication administration or delivery. One is an eMAR that is used in Cermak and Division VIII/RTU. It is integrated with the Cerner EMR.  The other system, Accuflo, has been used to document delivery of KOP medications since April 2013. For more than a year now it also has been used to document administration of dose by dose medications given by nurses in Divisions II, III, VI, IX, and X.

Cermak IT has completed corrective actions identified in the last report and Accuflo performance has improved. Cermak intends to phase out use of Accuflo and replace it with a program called Care Admin in the spring of 2016. An interview with the supervisor of the Medication Delivery Team verified that problems with Accuflo have largely been resolved however there are delays relaying information (new orders) from Cerner to Accuflo such that on a frequent basis medication is available for delivery before the order appears in Accuflo.

       d. Cermak-Staffing: Substantial Compliance (June 2011)

 Appropriately qualified nursing staff administers or deliver medication.  This item has been in substantial compliance since the June 2011 report.

       e. Cermak-Flagged Medication Procedure –Substantial Compliance (November 2014)

Cermak is using the term "Discharge Medications" to alert CCDOC, via an interface with CCOMS, of inmates who are prescribed "flagged medications" as listed in the Agreed Order.

       f. CCDOC-Flagged Medication Noted on JMS-Substantial Compliance (November 2014)

       g. CCDOC-Discharge medication instructions-Substantial Compliance (November 2014)

       h. Cermak- Provides printed instructions- Substantial Compliance (November 2014)

       i. CCDOC- List of inmates discharged -Substantial Compliance (November 2014)

       j. Cermak- Prescription within 24 hours of discharge -Substantial Compliance (November 2014)

The process described in the Eighth Report referred to as "Discharge Meds Before Release" is still in place and functioning as intended.

Policy # E-13 Discharge Planning (approved 11/4/2014) and Policy # E-13.2 Discharge Planning for Mental Health Patients (approved 11/17/2014) were reviewed and largely coincide with the Agreed Order. We recommend at the next review each policy be revised to include language from the Agreed Order to monitor discharges with prescriptions on a daily basis and to track trends. This is being done now but the process is not included in either policy.

Cermak studies the timeliness of discharge orders written and has identified both errors and omissions in the process used for notification. However, prescriptions are available within 24 hours of notification for nearly all inmates who have alerts for medications on discharge.

k. CCDOC- Transfer Information to Cermak- Substantial Compliance (November 2014)

Problems described in the last report concerning the interface between CCOMS and Cerner EMR are being resolved. To ensure that Medical Alerts are reflected correctly in CCOMS Cerner IT staff monitor the interface, identify and correct discrepancies, and notify the CCOMS vendor and the Cook County Sherriff's IT staff. The two systems have been 99% in sync the last six months with no errors the last two months. Discharge information is monitored daily and manually corrected while CCDOC is working to reconcile differences between staff workflow and the CCOMS system. The number of errors has decreased from daily occurrences to less than 10 a month. This work around is still a labor intensive process for IT staff and clinicians as well. Losing active treatment orders because of erroneous discharges is also a significant patient safety issue and permanent system correction needs to take place.

l. Cermak-Medication for Transit- Substantial Compliance (June 2011)

Since June 2011, an employee of the Illinois Department of Corrections (IDOC) has been stationed at Cermak to facilitate continuity of care between Cermak and IDOC. When inmates are transferred to other jurisdictions Cermak provides summary information and medications to be transported by CCDOC to the next jurisdiction.

m. CCDOC-Record Transfer Between Facilities-Substantial Compliance (May 2014)

In addition to the summary information routinely provided, Cermak is able to respond to additional requests for health information within 24 hours now that the medical record is kept electronically.

**Monitor's Recommendations:**

1.  Continue to examine reasons why inmates do not receive or take medications, set

benchmarks for medication adherence, identify opportunities and implement systematic changes to improve adherence.

2. Develop a daily report of critical medication doses that are missed and provide it to the Nurse Managers and Medical Director for immediate corrective action.

3. Establish expectations for providers to take in acting on notification of patient medication refusal and incorporate these into policy.

4. CCDOC and Cermak continue to audit medication administration practices and demonstrate the ability to identify problems and take corrective action to improve conformance with the Interagency Directive, General Order and Cermak Policy D-02.3.

5. Revise Policy D-02.4 to include procedural steps for documentation on the electronic MAR.

6. Revise Policy D-02.3 to include use of the barcode scanner when it is fully operational and modify the nursing audit tool to include use of the bar code scanner.

7. Revise Policy D-07.2 Pyxis for Non-Controlled Substances and E-11 Nursing Assessment Protocols to include instructions on use of Pyxis for over the counter medications.

8. Examine options to streamline medication administration in the Special Care Unit such as use of Fastpak packaging.

9. Continue to monitor periodically the timeliness to first dose and expand it to include other critical medications and orders written at times other than intake.

10. Establish the benchmark for adherence with critical medications at 90% or above.

11. Revise Policy # E-13 Discharge Planning (approved 11/4/2014) and Policy # E-13.2 Discharge Planning for Mental Health Patients (approved 11/17/2014) to include language from the Agreed Order to monitor discharges with prescriptions on a daily basis and to track trends.

12. CCDOC should continue working to reconcile differences between staff workflow and the CCOMS system to prevent erroneous discharges.

Self-monitoring recommendations and status:

(1) Missing medications-monitored currently

(2) Controlled substance discrepancies and compliance with policy- monitored currently

67

(3) Time from order to first dose for KOP and dose by dose medications- monitored currently

(4) Patients on flagged medications who receive discharge prescriptions- monitored currently

(5) Compliance with policies for medication delivery, administration and documentation- monitored currently

(6) Patient adherence with dose by dose medication- monitored currently

(7) Automation downtime and program performance- monitored currently

(8) Pharmacy retention and vacancy rate- monitored currently

## 57. Specialty Care

a. Cermak shall ensure that inmates whose serious medical or mental health needs extend beyond the services available at the Facility shall receive timely and appropriate referral for specialty care to appropriate medical or mental health care professionals qualified to meet their needs.

b. Upon reasonable notification by Cermak, CCDOC will transport inmates who have been referred for outside specialty care to their appointments.

c. Cermak shall ensure that inmates who have been referred for outside specialty care by the medical staff or another specialty care provider are scheduled for timely outside care appointments. Cermak shall provide reasonable notice to CCDOC of such appointments so that CCDOC can arrange transportation. Inmates waiting outside care shall be seen by Qualified Medical Staff as medically necessary, at clinically appropriate intervals, to evaluate the current urgency of the problem and respond as medically appropriate. If an inmate refuses treatment following transport for a scheduled appointment, Cermak shall have the inmate document his refusal in writing and include such documentation in the inmate's medical record.

d. Cermak shall maintain a current log of all inmates who have been referred for outside specialty care, including the date of the referral, the date the appointment was scheduled, the date the appointment occurred, the reason for any missed or delayed appointments, and information on follow-up care, including the dates of any future appointments.

e. Cermak shall ensure that pregnant inmates are provided adequate pre-natal care. Cermak shall develop and implement appropriate written policies and protocols for the treatment of pregnant inmates, including appropriate screening, treatment and management of high-risk pregnancies.

**Compliance Status:** This provision remains in Substantial Compliance

a. Substantial Compliance
b. Substantial Compliance

    c.  Substantial Compliance
    d.  Substantial Compliance (needs attention)
    e.  Substantial Compliance

**Status Update:** Received and reviewed.

**Monitor's Findings:**

Chart reviews and the process review were performed on patients who were sent to the hospital for specialty clinics and procedures.

    a.  Patients who need specialty clinic referrals are being referred timely by the provider to the appropriate specialty and receive an appointment as needed. The providers call the specialist to make arrangements for high risk patients to be seen timely as indicated.

    b.  CCDOC is transporting patients to their appointments at the hospital unless the patient refuses or has a court visit. The appointments are rescheduled in a timely manner if the visit is missed.

    c.  CCDOC is notifying the scheduler regarding any refusals or cancellations so that the scheduler can reschedule and/or notify the provider for appropriate intervention. Patients are monitored by the clinical team while waiting for an appointment with the offsite clinic. The refusals for the specialty clinics are signed after counseling from the clinical team. When patients refuse specialty services or diagnostic procedures (e.g., colonoscopy, etc.) there should be a system to notify the provider and schedule the patient for follow-up so that the reasons for refusal can be determined and the patient counseled regarding the risks of refusal.

       The patients who return from specialty clinic visits or special procedures are returning to the urgent care clinic. The paperwork is reviewed and the nurse ensures that the orders are entered in the EMR. They refer the patient to the urgent care provider as appropriate.

    d.  The scheduling staff has a database to monitor the patients who have a referral but needs additional data elements to track the referrals and their status effectively. The recommendations have not been implemented to track the referrals. The current process is very person dependent and needs a written process of the work flow and the standard work established to sustain all aspects of the practice.

69

When patients return from their visit to the UCC, the UCC nurses are not documenting adequately regarding the reason for the visit, recommended plan of care, medications reordered, follow-up with the PCC, etc. A template for hospital return visit that can be used by the provider and nurse was recommended to capture all these relevant information and it has not been established.

e. Obstetrics care remains highly functional, reliable and serves as a model of excellence for the rest of the health system. This section has now been in substantial compliance for more than 18 months and subsequently will no longer be monitored unless issues are identified during future visits.

**Monitor's Recommendations:**

1. Create a template for a hospital return note for providers and nurses to help document all relevant information.
2. Add the additional data elements as discussed to the database for scheduled visits (Include the referral date, clinic name, appointment date, status of appointment, if the patient was seen on return, date and time seen on return, referring provider notified of appointment date, if refused, rescheduled or cancelled.). Use this database to monitor performance and identify improvement activities.

3. Self-Monitoring:
   a. Continue to perform ongoing continuous quality improvement reviews for pregnant women.
   b. Audit at least five specialty clinic referrals and five procedure referrals each month to check if the patient was seen on return, appropriateness of documentation, were hospital records reviewed, documentation of implementing discharge instructions, and if not, was the reason documented, medication reconciliation, problem list updated, appropriateness of housing in the jail, patient educated on the plan of care, test results, etc. (the documentation templates will help make this audit easy to do).

## 58. Dental Care

a. Cermak shall ensure that inmates receive adequate dental care, and follow up, in accordance with generally accepted correctional standards of care.  Such care should be provided in a timely manner, taking into consideration the acuity of the problem and the inmate's anticipated length of stay.  Dental care shall not be limited to extractions.

b. Cermak shall ensure that adequate dentist staffing and hours shall be provided to avoid unreasonable delays in dental care.

**Compliance Status:** This provision remains in provisional substantial compliance.

**Status Update:** Received and reviewed.

**Monitors' findings:**

Nursing continues to dispense OTC analgesic medications (Ibuprofen and Acetaminophen) for dental pain complaints for 21 days while inmates wait for their dental clinic appointments. The Monitoring Team, however, found several examples of where nursing face to face encounters did not occur while patients with dental pain complaints waited for their dental appointments.

The Monitoring team met with Director of Cermak Dental Services and System Director of Oral Health.  The following staffing pattern remains unchanged:

1)  8 dental assistants
2)  2 dental hygienists
3)  7 dentists

Cermak dental has acquired the following new positions:

1.  1 oral surgeon  (awaiting start date)
2.  1 dental assistant (started in June 2015)
3.  1 dentist (starting on Jan 19th)

The dentist workforce and the dental chairs have remained stable and unchanged from the last monitoring visit:

| | | | |
|---|---|---|---|
| 1) | Division 1 | 1 chair | 1 dentist |
| 2) | Division 5 | 2 chairs | 1 dentist |
| 3) | Division 6 | 2 chairs | 1 dentist |
| 4) | Division 9 | 2 chairs | 1 dentist |
| 5) | Division 10 | 1 chair | 1 dentist |
| 6) | Division 11 | 4 chairs | 2 dentists |

The Monitoring Team received a comprehensive self-assessment and process improvement plan that included action plan items and audit results for the past 6 months. Included in this document were monthly encounter numbers as well as a breakdown of extractions vs. restorative procedures.

71

Interventions that continue to be in place as a result of continuous program improvement efforts include:

a) Dental continues to make 67% of all of their own appointments based on the HSRF received (all HSRF regardless of acuity, all follow up appointments). The rest of the appointments are scheduled through the scheduling center (annual exams, consults, provider referrals, etc.)

b) Dental services continues to utilize a manual log of all dental clinic appointments to track the following information:

- Date of actual HSRF
- Date the HSRF is emailed to the dental clinic
- Date of dental clinic appointment
- Gender of inmate with dental complaint
- Reason for visit (symptomatic vs. asymptomatic

This log was used by the monitoring team to audit the timeliness of dental services. Six records were selected at random that included both male and female inmates with both "Urgent" and "Priority" assigned dental complaints.

Cermak dental services have designated the following timelines for the various dental acuities:

- Urgent within 3 business days
- Priority within 30 days
- Routine within 90 days

Cermak dental performed a self-audit of 100 HSR requests randomly selected from the manual log mentioned above. The breakdown of the HSR requests was 76% Urgent, 13% Priority and 11% Routine. The six month timeliness compliance report for different divisions and acuities, was not uniformly as good as the overall compliance in the sample audit described above and indicated several opportunities for improvement.

A new item in the self-monitoring report was a patient satisfaction survey that Cermak dental has rolled out in all CCHHS sites including Cermak. This survey is conducted in three languages. The Monitoring Team applauds this effort.

The dental services continue to track the number and nature of inmate grievances that deal with dental issues. This number continues to trend downward.

**Monitor's Recommendations:**

1. Continue to expand the dental services to allow for decreased wait time. Opening of the new RTU dental clinic will greatly assist the dental services in achieving their wait time goals. This must a point of emphasis for the system.
2. Request assistance from IT to replace the manual log with an automated electronic tool in Cerner EMR.
3. Separate the wait times associated with annual exams from all other HSR wait times to better reflect dental service's ability to respond to acute dental issues. The Monitoring Team suggests the following wait times:

       a. Emergent           same day
       b. Urgent             within 3 business days
       c. Priority           within 14 days
       d. Routine          within 30 days
       e. Annual exam    within 90 days

4. This section remains in provisional substantial compliance based on the understanding that all dental wait times will fall at or below the agreed upon wait times by the next monitoring visit in April 2016.

## 68. Suicide Prevention Training

a. Cermak shall ensure that the Facility's suicide prevention curriculum for health care staff members, jointly established with CCDOC, addresses the following topics:
   i. the suicide prevention policy as revised consistent with this Agreed Order;
   ii. why facility environments may contribute to suicidal behavior;
   iii. potential predisposing factors to suicide;
   iv. high risk suicide periods;
   v. warning signs and symptoms of suicidal behavior;
   vi. observation techniques;
   vii. searches of inmates who are placed on Suicide Precautions;
   viii. case studies of recent suicides and serious suicide attempts (Serious suicide attempts are typically considered to be those that either were potentially life-threatening or that required medical attention);
   ix. mock demonstrations regarding the proper response to a suicide attempt; and
   x. The proper use of emergency equipment, including suicide cut-down tools.
b. Within 24 months of the effective date of this Agreed Order, CCDOC shall train all CCDOC staff members who work with inmates on the Facility's suicide prevention program. Implementation of such training shall begin as soon as possible following the

effective date of this Agreed Order.   Staff shall  demonstrate competency in the verbal and behavioral cues that indicate potential  suicide, and how to respond appropriately. Initial and at least annual training  shall be provided in accordance with generally accepted professional standards.

c.   Within 12 months of the effective date of this Agreed Order, Cermak shall train  all Cermak staff members who work with inmates on the Facility's suicide  prevention program.   Implementation of such training shall begin as soon as  possible following the effective date of this Agreed Order.   Staff shall  demonstrate competency in the verbal and behavioral cues that indicate potential  suicide, and how to respond appropriately. Initial and at least annual training shall be provided in accordance with generally accepted professional standards.

**Compliance Status:** This provision remains in substantial compliance.

**Status Update:** Received and reviewed.

**Monitor's Findings:**

CCDOC officers receive 80 hours of general mental health training during their 16 weeks of pre-service education. Additionally, officers who are assigned to Cermak 2nd floor and RTU 4th and 5th floors undergo additional 40 hours of Crisis Intervention Training. Annually, each CCDOC office also receives 3 days of annual training that includes identification and appropriate intervention when faced with acute mental health or medical conditions. Evaluation of the effectiveness of this training and program will be addressed in the mental health services monitoring report. The Monitoring Team once again raises the concern that since our last monitoring visit there has been one more death-in-custody case due to suicide.

**Monitor's Recommendations:**

None.

## 86. Quality Management and Performance Measurement

a.   Defendants shall each develop and implement written quality management policies and procedures, in accordance with generally accepted correctional standards, to regularly assess, identify, and take all reasonable measures to assure compliance with each of the provisions of this Agreed Order applicable to that Defendant.

b.   Defendants shall each develop and implement policies to address and correct deficiencies that are uncovered during the course of quality management activities, including

74

monitoring corrective actions over time to ensure sustained resolution, for each of the provisions of this Agreed Order applicable to that Defendant.

c. CCDOC shall participate with Cermak and DFM in a jointly established Health Care Quality Improvement Committee, to be charged with developing and implementing a joint quality improvement program. CCDOC shall contribute the time and effort of CCDOC staff members who, by virtue of their authority, current responsibilities, and/or past experience, can provide this committee with needed correctional representation.

d. Cermak shall participate with CCDOC and DFM in a jointly established Health Care Quality Improvement Committee, to be charged with developing and implementing a joint quality improvement program. Cermak will work with CCDOC and DFM to identify those CCDOC and DFM staff members who, by virtue of their authority, current responsibilities, and/or past experience, can provide this committee with needed correctional representation. Quality management programs related to medical and mental health care will utilize performance measurements to assess quality of care and timely access to care with quantitative and qualitative data analysis and trending over time.

e. DFM shall participate with CCDOC and Cermak in a jointly established Health Care Quality Improvement Committee, to be charged with developing and implementing a joint quality improvement program. DFM shall contribute the time and effort of DFM staff members who, by virtue of their authority, current responsibilities, and/or past experience, can provide this committee with needed correctional representation.

**Compliance Status:** This provision remains in partial compliance.

a. Partial Compliance
b. Partial Compliance
c. Substantial Compliance
d. Substantial Compliance
e. Substantial Compliance

**Status Update:** Received and reviewed.

**Monitor's Findings:**

a. CCDOC is in substantial compliance with this order. Cermak is in partial compliance. Cermak has developed the quality management policy and procedures. The Policy and Procedures are in the process of being implemented. Cermak has hired a consultant to help establish a quality program. The consultant has been able to initiate multiple projects to address the sick call process, detoxification process and wound care procedures, etc. They are in the process of hiring a Director for the Quality Program. Implementation of the Monitor's recommendations listed below will bring this item into substantial compliance

b.  CCDOC is in substantial compliance with this order. Cermak is in partial compliance. Cermak is in the process of identifying metrics to monitor for compliance of the various processes. The monitoring will help the program identify any deficiencies for intervention. The current monitors are being used very effectively. Implementation of the Monitor's recommendations listed below will bring this item into substantial compliance.

c.  CCDOC is participating actively with Cermak and DFM in a jointly established Health Care Quality Improvement Committee. The team has been very successful in addressing improvement opportunities.

d.  Cermak is participating actively with CCDOC and DFM in a jointly established Health Care Quality Improvement Committee. Quality management programs related to medical and mental health care is starting to use performance measurements to assess quality of care and timely access to care with quantitative and qualitative data analysis and trending over time.

e.  DFM Cermak is participating with CCDOC and Cermak in a jointly established Health Care Quality Improvement Committee

**Monitor's Recommendations:**

1.  Develop a comprehensive Quality Program to monitor and improve each aspect of operations including processes, clinical outcomes, professional performance, safety, risk and efficiency.
2.  Create a balanced scorecard for each of the services/locations to monitor their performance and a balanced scorecard for the system to monitor the overall progress
3.  Use standard schedule based on the level of compliance and severity, to review the metrics and performance of each service/ process during the collaborative team meeting where Quality, Risk, Nursing, Medical, Mental Health and the Sherriff's department staff work as a team to improve process and quality of care.
4.  Metrics should include
    a.  process  and outcome measures to ensure compliance with policies and procedures
    b.  professional performance measures of clinical staff based on their functions (quality of care and productivity)
5.  All Managers should do daily rounding in their areas to ensure completion of tasks, quality of service, environmental checks, and address any patient or staff issues.

6. Create action plans for each of the non-compliant items and track the status periodically during the quality meetings.

7. Share the data with the staff during the staff meetings and document minutes.

8. Check to see if the action plans helped fix the problem, if not, make necessary changes to the action plan and implement.

9. Review the balanced scorecards for each of the services/locations during the quality meetings on a rotating schedule, so each area/ service gets reviewed at least once every 3 months.

10. Establish multidisciplinary work groups to periodically review major activities like medication administration, sick call, infirmary care, intake processes, emergency care, etc. The work group should review current performance, challenges and identify opportunities for continuous improvement. The recommendations of the work group should be reviewed during the quality meeting by the leadership team and considered for implementation.

11. Initiate and track performance improvement projects for the system that will help improve safety, quality and efficiency.