## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

**UNITED STATES OF AMERICA,**

       **Plaintiff,**

**v.**

**COOK COUNTY, ILLINOIS;**
**THOMAS DART, COOK COUNTY**
**SHERIFF (in his official capacity);**
**TONI PRECKWINKLE, COOK COUNTY**
**BOARD PRESIDENT (in her official capacity);**
**COOK COUNTY BOARD OF**
**COMMISSIONERS (in their official capacity),**

       **Defendants**

No. 10 C 2946

Judge Virginia Kendall

---

## Report No. 11
## Corrections Monitor Susan W. McCampbell
## May 17, 2016

---

Susan W. McCampbell, President
McCampbell and Associates, Inc.
1880 Crestview Way
Naples, Florida 34119-3302
(239) 597-5906
Email:  susanmccampbell@mccampbellassoc.com

# Executive Summary

**Report No. 11**

## Corrections Monitor Susan W. McCampbell

**Summary**

Compliance Report # 11 reviews compliance of the seventy-seven (77) paragraphs in the Agreed Order related to inmate protection from harm. Cook County Department of Corrections (CCDOC) was in substantial compliance with all provisions of the Agreed Order based on the tour in March 2015, as reflected in Compliance Report No. 10. This document provides an update of compliance for five of those sub-paragraphs.

I toured CCDOC from March 7 – 9, 2016. This was a delayed tour. I was scheduled to tour December 7 – 9, 2015. I determined just prior to that tour that CCDOC had not provided a sufficient amount of requested information; therefore making the tour not an effective use of the time and resources of the parties. The information that CCDOC had not provided timely to me included videos of incidents and responses to the questions I asked regarding the weekly summary of incident. The first available time after that postponement I was available was the March timeframe, noted above.

The March 2016 tour focused on the documented *processes* and the outcomes of those *processes* to ensure sustainable compliance with provisions of the Agreed Order. Single incidents and events were reviewed and assessed to inform whether the *processes* are effective in providing early identification of trends, and plans of action for any identified deficiencies. An integral part of sustainable compliance is the commitment to and ability for self-critical analysis of jail operations. I also reviewed CCDOC's compliance with their internal policies and procedures as an additional measure of sustainability. During this tour I interviewed staff and inmates, reviewed documents, and consulted with CCDOC and Cermak regarding compliance issues.

CCDOC has continued to refine their work related to compliance with the Agreed Order, however, there are deficiencies noted in Compliance Report Number 11. I consider these to be lapses of importance as they related to *processes* and *outcomes*; but am confident that CCDOC will work diligently to restore the achievement of their strategies and my confidence in CCDOC's work. I do not see a lessening of commitment to the task of maintaining compliance, and rather urge focus and establishing a wider view of sustainability of reforms for the organization, not for the compliance monitoring.

**Status of Compliance**

This chart summarizes the progress made by CCDOC since my first report of September 20, 2010.

| Report # | Sustained Compliance (more than 18 months) | Substantial Compliance | Partial Compliance | Non-Compliance | Not Applicable | Total |
|---|---|---|---|---|---|---|
| 1 | | 3 | 62 | 12 | 8 | 77 |
| 2 | | 1 | 63 | 5 | 8 | 77 |
| 3 | | 22 | 55 | 0 | 4 | 77 |
| 4 | | 39 | 34 | 0 | 4 | 77 |
| 5 | | 53 | 20 | 0 | 4 | 77 |
| 6 | 21 | 39 | 17 | 0 | 0 | 77 |
| 7 | 35 | 31 | 11 | 0 | 0 | 77 |
| 8 | 50 | 17 | 10 | 0 | 0 | 77 |
| 9 | 68 | 9 | 0 | 0 | 0 | 77 |
| 10 | 69 | 8 | 0 | 0 | 0 | 77 |
| 11 | 72 | 0 | 5 | 0 | 0 | 77 |

Following this tour, five sub-paragraphs were returned to the status of partial compliance. The other paragraphs remain in compliance. The sub-paragraphs with changed compliance are:

- 31.e. – Review of reporting (page 27)
- 31.f. – Review of incidents (page 27)
- 34.d – Administrative review (page 38)
- 34.f. – Investigations (page 39)
- 38.d. – Grievance analysis (page 44)

I want to be clear that CCDOC continues to perform the activities required in these paragraphs. The shortfalls in compliance for the purpose of monitoring are primarily regarding needed refinements in *processes* and updating written directives. As will be discussed throughout this report, CCDOC's analysis of available data, and use of that to inform operations requires focus, implementation, and documentation.

I do not make these changes in status in a vacuum. The parties and I anticipated the monitoring of the Agreed Order would end in mid-2016. I strongly believe that the changes in compliance status are essential to the integrity of the monitoring process. As a result of this modification, and per the agreement of the parties, the monitoring of paragraphs 31, 34, and 38 will continue at least through the next tour, scheduled for the week of October 11, 2016. After that tour, the parties and the Monitor will assess the status of these provisions as to the need for further monitoring. The monitoring of the paragraphs that have remained in substantial compliance for 18 months (32, 33, 35, 36, 37, 39, 40, 41, and

69 will cease after this Compliance Report. There is one additional sub-paragraph that will be re-evaluated in October (32.f. – see below).

This report lists specific activities and actions needed to maintain compliance with a number of other paragraphs. In addition to the five sub-paragraphs listed above, I am most concerned about paragraphs 31.k, the Early Warning System, and 32.f. Weapons Free/contraband. I expect to see plans of action to address identified deficiencies in these two paragraphs before the October 2016 tour.

The parties have entered into a new agreement regarding monitoring of this Agreed Order. This revised Agreement will be filed with the Court.

**Review of Drafts**

The first draft of this compliance report was provided to the parties on April 1, 2016 requesting all comments by April 18, 2016. To facilitate the process, I sent the draft report noting there were several areas for which I had yet to receive the data and/or information I requested. As that information was provided, I reassessed compliance with several paragraphs and discussed these with DOJ and the defendants. As a result of updating the draft report an conversations among the parties, a second draft of the report was provided to the parties to assure maximum transparency and opportunity to correct any information or data. Although this was unprecedented in this history of this monitoring, I believed it furthered the goals to allow for this extra review step. The second draft of the report was provided to all parties on April 23, 2016, with a required response date of the close of business on April 29, 2016. The parties did not provide any substantive changes to the draft.

Following a conference with The Honorable Virginia Kendall on May 4, 2016 regarding the findings of the draft report, an additional draft (third) was provided to the defendants for their review on April 30, 2016, with a request for review and comment by May 9, 2016. Additional conversations were held, and a fourth draft was prepared and provided to the parties for review on May 14, 2016. The final of Compliance Report # 11 was completed on May 17, 2016.

**The Data**

On March 7, 2016, there were 8,142 inmates in custody (on the campus) and 2,379 inmates in community corrections (total of 10,521).

The data provided by CCDOC indicates that while the in-custody population is decreasing (down 11% from CY 2014 to CY 2015), the number of reported inmate altercations are increasing (23%); reported batteries to staff up 24%; and reported uses of force up 66% during the two year time period. Other process data such as inmate disciplinary reports are also up 19%; and what appears to be a drop in inmate grievances in some divisions. The increases in uses of force and inmate/inmate altercations may be attributable to a number of factors including the dangerousness and propensity for violence of the inmates

who remain in custody after the County's courts' initiatives to reduce population; and/or that inmates with mental illness are increasingly being caught up in the criminal justice system with more serious charges; and/or that the number of cameras inside the facilities are identifying more incidents than before that might have escaped staff notice (for example inmate/inmate fights in indirect supervision housing units).[1]

Regardless of the possible causes of these trends, CCDOC, partnering with Cermak, must drill down into the data and develop objective, measurable strategies to address these changes.    This is the self-critical work that is referenced above.

**Sustainability**

As the monitoring of the Agreed Order reaches an important threshold of assuring *sustainability* of maintaining policies and practices that ensure Constitutional standards for jail operations, I focused on how the defendants developed and implemented self-assessment and internal auditing processes.

In spite of the past progress achieved by the defendants, I identify the following areas of concern regarding sustainability of the compliance with the Agreed Order:

1.    Critical Incident Review and Plans of Action[2] – The defendants must have timely and robust processes to identify emerging trends, data, incidents, etc., and respond with data driven and effective solutions (plans of action).  CCDOC performs a cursory review of critical incidents.  I find that these reviews are insufficient at the five-year mark.  Examples of the need for more in-depth critical internal reviews include, but are not limited to: examination of uses of force involving inmates on the mental health caseload, emerging and on-going incidents attributed to the "Savage Life" jail "gang", analyses of use of force data, coordination of use of force assessment strategies between the Inspector General (IG), Use of Force Review Unit (UFRU), and the Office of Professional Review (OPR), staffing of the use of force review unit, and analysis and action regarding the operational changes that may be necessary gleaned from inmate grievances.

2.    Quality Improvement/Quality Assessment – There is no written directive regarding how the CCDOC plans to maintain sustainability of progress made in the course of this litigation.   The Sheriff's Offices recognizes many of these sustainability and process issues described in this report, and has contracted with a criminal justice professional to manage the on-going relevant initiatives -- to keep the jail system on track, through data collection and analysis, accountability, and application of emerging trends in jail administration.  This is a potentially effective strategy but will require, again, rethinking how the jail envisions the way forward, using the data available to identify trends, develop solutions, evaluate responses, and refine

---

[1] CCDOC notes that that some of the increase might be attributable to CCODC's refinements in data capturing and collection, which, along with the development of data dashboards derived from the information system, has been part of CCDOC's efforts to develop a state of the art data collection and analysis system.
[2] Agreed Order Paragraphs 31.f., 31.h., 31.n., 34.d., 34.f.

initiatives.  This work of the defendants is to inform *their* decision-making, not at all solely for the use of the monitor.

3.  <u>Use of Force Reviews</u> – CCDOC was the first large jail system in the United States to implement a process aimed at analyzing the uses of force outside of a purely investigative function.  Not required by the Agreed Order, the Sheriff's emphasis on identifying, analyzing, and remediating uses of force has been a model for other correctional systems.  As the utility of this approach has been confirmed, the function has grown from the work of one individual to a unit of 19, organizationally placed under the Inspector General.  This Unit has faced staffing issues over the last year, which has impacted the workflow of case review and referral.  The systems and written directives are developed.  Perhaps a victim of its own success, more attention needs to be paid to assuring that the resources – human, support, and data, are adequate to assure compliance with the Agreed Order, and the goals of the organization beyond the litigation.

4.  <u>Leadership Changes/Continuity</u> – Since the initiation of the monitoring to comply with the Agreed Order, CCDOC has had five executive directors, and Cermak has had several interim and permanent leadership changes.  While I am certainly not critical of those who retire, there has not be sufficient consistency of operations during these transitions, and other related organizational changes (e.g. change in the organizational structure).  Continuity is critical as is leadership development and succession planning to achieve sustainability.

5.  <u>Staffing for Classification</u> – The revised classification system, implemented in 2014, needs to be fully staffed to assign <u>all</u> inmate housing decisions (absent exigent circumstances).   This situation may be an example of how the long-term view of what is needed gets lost in the organizational changes that are made.[3]

6.  <u>Continue Examining Uses of Force</u> – To prepare for the December tour, I asked to review videos of uses of force and inmate/inmate altercations, a representative sample from the weekly reports I review provided to me by CCODC.  I acknowledge that as a observer not present during an incident I may, most likely, always have additional questions about the incidents; which I did.  The concern for me is that it took CCDOC too long to respond to my concerns (more than six weeks in several cases), and I remain pending receipt of information as this report is prepared.  The questions I asked, and the information I requested is data that must be readily available to CCDOC for internal leadership and management use.  I want to be clear that I am not suggesting that there are unreported and/or uninvestigated uses of force, or inmate/inmate altercations; but what I am urging is more attention to *timely* processes.

7.  <u>Inmate Management</u> – Since before the opening of the RTU/Division 8, I have been recommending preparing staff (line staff and first line supervisors) to manage inmates in a direct supervision housing environment.  Skills to work in direct supervision are different than managing inmates who are housed "behind bars".  The deficiencies, in my opinion, of the physical design of the RTU also present issues for inmate management.  CCDOC needs to aggressively engage in supplemental

---

[3] CCDOC reports that the Unit will have full staffing in May 2016.  I will rely also on the professional engaged to validate the classification to also assess staffing of the Unit.

training of staff to better manage RTU's units. The RTU houses inmates with mental illness and the staff are challenged with managing direct supervision with this population.

8. <u>Planned Inmate Disorder</u> - In the last year, there have been significant challenges to CCDOC to manage a small group of inmates, who have self-named themselves "Savage Life", who are intent on disrupting some housing units in the jail system, resulting in harm to themselves, other inmates, and staff. CCDOC is commended for analyzing the incidents with an eye toward determining root cause analysis. This is a model that needs to be applied to other issues that will continue to emerge.

9. <u>Collaboration</u> – A theme of past monitoring reports is the continuing need to improve collaboration between CCDOC and Cermak. The leadership of CCDOC and Cermak each espouse collaboration, emphasis needs to continue to be placed on refining this relationship.

10. <u>Validation of the Classification System</u> - Completing a validation study of the classification system with the outside expert is a requirement of the Agreed Order. This is planned for the next six months, and should be done in such a way to provide the capacity for CCDOC to replicate the validation in the future.

11. <u>New Jail Beds</u> - A challenge for the defendants is planning for **new** jail beds. There is a need for a cogent plan to replace beds in the system. As with many other jail systems, the jail population is down, allowing the closure of Divisions 1, 3, and 17. The trend to fewer jail inmates, while most welcome, is not widely understood. This means that jail systems need to be prepared for responding to potential population increases. There is planning to initiate new construction. New jails beds also provide the opportunity for improvements in inmate safety based on architectural design and more cost effective operations in terms of staffing.

**Next Steps**

As noted above, five paragraphs are moved from substantial compliance to partial compliance. In addition to working to gain substantial compliance with the relevant paragraphs, this unanticipated interim period provides CCDOC with an opportunity to engage in a thoughtful review of operations. There have been so many positive, outstanding changes, and others which seemed perhaps good on paper, but not in operational practice.

Given, however, the issues that prompted the postponement in the December 2015 tour and the current pending status of requests, I now postpone this next scheduled tour until the week of October 11th. Prior to that tour, the following will be required of the defendants:

1. Address compliance status of the five paragraphs now in partial compliance, and the several others that need attention.

2. Quality Improvement/Quality Assessment directives need to be development and implemented. This is not a specific requirement of the Agreed Order but is directly related to my assessment of the life-span of changes made. The improvements of the jail's management information system (CCOMS) make it, in

my view, one of the best in the country and present the enviable dilemma of how to use the data that can be mined from it. The challenge is to determine what is the most relevant data, how to use the data in internal assessment processes.

3. CCDOC must refine the internal organizational issues to streamline responses to critical incidents, analyze information, and prepare, implement and evaluate plans of actions to address shortcomings and deficiencies. This must take the form of:

    a. An updated written directive;
    b. Training for management and leadership staff to conduct reviews;
    c. Development of plans of action for any identified deficiencies; and
    d. Oversight of the implementation of plans of action, documentation of outcomes, and mid-course corrections if the initial plan does not solve the deficiency(ies).

4. CCDOC needs to assure that the Use of Force Review Unit is staffed to provide timely review of incidents. The Unit is preparing to draft written operating procedures to guide the work, as well as developing an available data "dash board" to immediately spotlight critical data. As this work is important to sustaining compliance with the Agreed Order, priority needs to be placed on these activities and resources to improve operations of the UFRU.

5. The parties must continue to focus on the use of force involving inmates on the mental health caseload, with the goal of improving prevention and response collaboratively with CCDOC and Cermak. This may be done by improving collaboration between the parties, evaluation of effectiveness of mental health staffing, increasing reliance on Cermak's mental health staff for programming for inmates in the jail system (rather than use of CCDOC's resources), and joint assessment of incidents.

6. Up-to-date responses to questions raised by me about the weekly incident reports.

7. Up-to-date responses regarding questions from viewing a sample of inmate/inmate altercations and uses of force.

8. Current analysis of inmate grievance data, including development and implementation of plans of action indicated by the data.

9. Current analysis of inmate disciplinary data, including development and implementation of plans of action indicated by the data.

10. Current analysis of inmate use of force data, including development and implementation of plans of action indicated by the data

11. Assurance of full staffing to conduct the required work of the Classification Unit.

12. Assurance of full staffing for the use of force review unit and the related functions of the Office of Professional Responsibilities.

13. Completion of the validation of the inmate classification system.

14. Current analysis of inmate incident data (e.g. Savage Life), including development and implementation of plans of action indicated by the data.

15. Current analysis of contraband findings, including development and implementation of plans of action indicated by the data.

16.    CCDOC must develop, fund, and implement enhanced supplemental training for officers assigned to work on direct supervision tiers in RTU/Division 8. This training:
    a.    Must be consistent with the principles of direct supervision;
    b.    Blended with CIT/mental health strategies;
    c.    Must be "hand-on", with practical exercises and demonstrated competencies;
    d.    Provisions of staff assignment to permit only staff who have completed both CIT/mental health and direct supervision training; and
    e.    Maintenance and analysis of data regarding the outcomes of the enhanced supplemental training.

17.    Assessment, and as necessary, amendment of the policy related to the conduct of criminal incident reviews, and provision of sample reports.[4]  Assurance that the CCDOC and CCSO policies reflect this new statute.

18.    While not required by the Agreed Order, CCDOC should consider the development and implementation of a funded, staffed leadership development initiative.  This is not just "training" but a process that prepares emerging leaders and provides continuity of leadership.

As always, if needed, I am available for technical assistance.  The CCDOC has contacts with other large jails and can also explore options from those agencies as CCDOC moves forward.

## Conclusions

After all the hard work, resources and commitment to achieving compliance with a very comprehensive Agreed Order, the defendants need to focus on refining the systems that achieved compliance, and assuring sustainability.   This current small set-back in compliance should allow CCDOC a re-thinking of the path toward again achieving compliance and importantly the sustainability of processes.  As I have noted previously, there are ebbs and flows in reform of this magnitude.  The next steps will be critical to completing this important work as well as assuring a Constitutional jail, safe for staff and inmates, into the foreseeable future.

---

[4] I learned on March 28, 2016 of a change in Illinois statute regarding having the Illinois State Police investigate in-custody deaths.  I recommend that CCDOC and ISP develop a written memorandum of agreement/understanding guiding these investigations.  Particular attention should be to assure that the review of any in-custody death from the perspective of the ISP (criminal) does not diminish the need to examine the security and/or medical perspectives to the incident.

## 31. Use of Force – Change in Compliance For Sub-Paragraphs 31.e. and 31.f.

**March 2016 -** There are twenty (20) paragraphs in the Agreed Order regarding use of force. With this report I am changing to partial compliance for sub-paragraph 31. e. and 31.f. (see below) The remaining 18 paragraphs remain in substantial compliance.

To assess CCDOC's on-going compliance for these requirements I:

- Viewed more than 100 videos of incidents (intended as a sample) involving either use of force and/or inmate/inmate altercations for the period 3/15/15 to 1/3/16; and viewed videos for the period through mid-March 2016.
- Continued to review all weekly incident reports and requested information on average 10 incidents per week (along with requesting videos as noted above;
- Assessed the Use of Force Review Units' statistics, analysis of uses of force, recommendations and actions;
- Examined staffing for the OPR and Use of Force Review Unit;
- Reviewed summary of incidents for CY 2015;
- Reviewed a list of training provided to OPR staff from September 2014 to present;
- Reviewed a list of filed litigation regarding allegations of excessive use of force and officer misconduct for 2014 and 2015; and
- Reviewed the process for leadership and management review of trends and remedies regarding uses of force.

A change to partial compliance is made in this report regarding paragraph 31.e., "CCDOC shall continue to require prompt review by the shift commander of all use of force reports. The shift commander's review of use of force reports shall include review for completeness and procedural errors, as well as review of the substantive content. If the use of force report does not comply with provision 31.d. of this Agreed Order, the shift commander shall return it to the reporting officer for revision and resubmission until it is compliant. If the shift commander believes a use of force may have been inappropriate or excessive, he or she shall immediately refer the incident for investigation;" and 31.f. "CCDOC shall ensure that senior management review of uses of force includes:

1.    A timely review of medical documentation of inmate injuries, if any is submitted, as provided by Qualified Medical Staff, including documentation surrounding the initial medical encounter, an anatomical drawing that depicts the areas of sustained injury, and information regarding any further medical care;
2.    The inmate disciplinary report, if any, associated with the use of force; and
3.    The incident report, if any, associated with the use of force."

The basis for these change is my concern that reviews by shift commanders and by others who need to be involved in the process, are not bringing prompt action. Also, in comparing incident reports to the actual incidents, I found in some of the narratives I reviewed that the incident report was not sufficiently thorough. One of the unintended consequences of

establishing the UFRU may be that the shift commanders knows there will be another layer of review, and hence their reviews are not as in-depth as needed. The specific incidents and processes that prompt me to change the status of compliance with these two paragraphs are:

- An incident where there is possible staff misconduct in a use of force that was not re-classified until after I asked for a review of the video, including the inmate interviews (along with several of videos I viewed).
- A use of force incident occurring in Cermak in which the officer was not removed from inmate contact until four months after the incident.
- The lack of timeliness in completion of reviews by UFRU; although this may be improving with the CCDOC's assurance that additional staffing has been provided to the unit.
- The lack of documentation regarding when the recommended remedial training following the UFRU's findings took place.
- Employee lack of attention to their responsibilities that resulted in an inmate/inmate altercation for which no initial review recommended counseling, re-training, or any other remedial action; and/or not following security procedures or the use of de-escalation techniques; and/or interview techniques.
- Incidents where gang violence is identified, without recommendation for further action.
- Insufficient details in incident reports.
- Insufficient critical incident reviews.
- Capturing of trends.

Additionally, I find that the time frame for the initial review by the UFRU until a decision is made about nature of the incident (e.g. possible excessive use of force and/or staff misconduct) is too long. The process must be amended to provide an initial review of the incident so if action is needed regarding a staff person's conduct, for example, changing their assignment, it can be taken immediately.

Although it was intended that I have real time access to the incident reporting system (CCOMS) after the April 2015 tour, various issues regarding remote access meant that I didn't have access until December 2015; and then after that, intermittently until just before the March '16 tour. When I have access, which I now do, I can see all inmate records, dashboards that summarize critical data, and the incident reports. The video that accompanies incidents is not imbedded in the reports and is provided separately, upon my request, by CCDOC delivered to the laptop.

Data maintained by the Use of Force Review Unit indicates a concerning increasing reported uses of force in CY 2016 compared to CY 2015. Although there is some attempt to identify possible causes, more work needs to be done by CCDOC, partnering with Cermak, to identify causes, not symptoms, of the increase, and develop plans of action to resolve issues. As noted in the Executive Summary of this Compliance Report, CCDOC has access to much data and the challenge is to identify what is the most important data, and then track,

analyze and use the information to fix problems. The issues facing all jails are not static, and the application of data and use of accountability based management needs to evolve as well.

CCDOC is working to develop systems to assure on-going operation based on Constitutional conditions of confinement, case law, and accepted correctional practices. To do this (See Also Executive Summary), they have identified these reporting and monitoring systems:

- Daily Intelligence Bulletin
- Daily Overview
- Fence Line Review
- Critical Incident reports (34. d.)
- High Risk/Extremist Inmates
- Gang Free Housing Units
- "ADO" Blast (to specifically provide notifications throughout the organization on a daily basis, since the tour, before that it was the process for notification on weekends)
- Security Review Team (34. d.)
- Security Enhancement Tiers (see 32.)
- Security Monitoring and Security Checks
- Investigator's Weekly Report
- Weekly CIID (Correctional Information and Investigations Division) Report
- Superintendent's Body Camera Follow-Up
- Officer Test System Checks (Tunnels)
- Minutes of CIID Weekly Meetings
- Drug Investigations on Visitors
- Lockdown Report
- Weekly Summary Reports (by division)
- Weapons Free Assessment and Reporting (Contraband)

As of this tour, the majority of these initiatives/strategies had not been included in a written directive. This raises concerns about continuity and sustainability of the work. While not meant to limit the flexibility of the CCDOC's leadership in terms of lessons learned and evolving ideas, committing the processes to writing ensures consistency, as well as is a way to alleviate redundant reports or processes. It also names the individuals/posts/positions accountable for the work.

As noted in Paragraph 32., below, CCDOC now has deployed more than 3,000 cameras with a Video Monitoring Unit with almost 20 staff assigned. This certainly helps the agency to identify incidents that are not reported or seen by staff, particularly uses of force.

The challenges to the effectiveness of these systems designed to be checks and balances on uses of force, inmate/inmate violence, and staff misconduct is a single entity to oversee it all. I have addressed this in previous compliance reports. The responsibilities to identify, manage, investigate, report, and act on these critical incidents (and findings) are spread

from the first line supervisor, the facility superintendent, the Inspector General (including Office of Professional Review (OPR) and the Use of Force Review Unit (UFRU), Employee Discipline Unit, and the Video Monitoring Unit), Cermak, CIID, Training, Inter-Agency Coordinating Committee, Mental Health Interagency Quality Improvement Committee, Suicide Prevention Committee, Merit Review Board, CCDOC leadership – as examples. While each entity, in my view, is genuinely working hard to achieve the goal of reporting and accountability, the moving parts are too many.  Organizationally, some of these units work for CCDOC, some are independent.  There almost does not seem to be enough hours in the day for the collaboration and data sharing needed to make this work.  The enhanced CCOMS and dashboards created to integrate critical information are very impressive and very important.

A second concern is linking the data that is now collected to problem-solving, including development, implementation, and evaluation of any needed plans of action.  For example, the Weapons Free committee continues to collect data about what contraband is found and where throughout the facilities, but how the appropriate decision-makers use that data – whether they are in Cermak or DFM continues to need to be refined.

Emphasis is continually needed in reviewing the uses of force involving inmates on the mental health caseload.  In the summer of 2015, I identified incidents in which inmates housed in Cermak were involved in uses of force, sometimes related to attempts to administer medications.  This matter was surfaced by me, and after four months, addressed by the parties.  All agreed it was a critical issue, but it took too long for a coordinated analysis and response.  There was, in my view and experience, an opportunity, for example, to examine the data maintained by the Use of Force Review Unit (UFRU) with Cermak's mental health professionals, to look for root causes and potential solutions – including longer-term strategies.  There is ample data, but inadequate analysis and development of actions plans.

My review of the fifty-seven videos allowed me to see how staff responded to inmate/inmate altercations, as well as spontaneous events that result in uses of force. Among the issues discussed with CCDOC following these reviews were:  timeliness of referrals of incidents to the UFRU and/or OPR, timeliness of referrals of staff for supplemental training; timeliness of completion of reviews by the UFRU;  the need for after after-action/critical incident reviews/recommendations/actions;  attention by supervisors to staff behavior that could have avoided/contributed to uses of force;  consistency of incident reports to the videos;  application of accepted practice in operations (e.g. handcuffing, supervision of inmates during moves) representing training and re-training opportunities; and the leadership oversight and review of the various processes.  Generally, I found the operations within parameters of acceptable practice, but there were, in my view some outliers that caused me concern.

The CCDOC has continued to refine their accountability based management system with weekly Jail Management meetings (General Order 24.1.30.0, issuance date 9/23/15). These meetings replace the meetings held with all division heads and the Sheriff.  These

meetings require review of the Weekly Summary Reports[5] submitted by the division head (facility superintendent). (31.f., m., n., o., 34.e.,f.)

**Monitor's Recommendations:**

31-1   Refine the process, timelines, and if needed additional resources to make the initial reviews contemporaneous with the event.  If necessary, redefine the role of the first line supervisor or shift commander in the review process. (paragraph 31.a.)

31-2   Specifically regarding paragraph 31.a., update relevant policies and procedures with attention to the processes, and provide to me no later than August 15, 2016.

31-3   Continue to evaluate the use of supplemental training and its impact on the work related behavior of employees identified via the early warning system.[6]

31-4   Continue to refine the data that evolves from the Use of Force Review Unit to inform all related aspects of correctional operations and Cermak's operations including, but not limited to employee training, supervision, and on-going inmate training/orientation.

31-5   Assure appropriate staffing for the UFRU, using other than persons temporarily detailed, to keep levels where there can be expeditious review of incidents and allegations.

31-6   Develop plans of action identified through trend analysis, as indicated by negative, or potential negative outcomes.

31-7   Continue to monitor uses of force involving inmates on the mental health caseload, and develop, as needed, collaborative approaches to managing this inmate population and provision of the required staffing of Cermak's mental health professionals.

31-8   Track employees referred for training and/or other remedial actions, the dates the training was held, the content of the training and the outcomes (e.g. did the employee's behavior change?).  Assess the timeliness of the intervention – that is – the closer the training to the event, the more impactful the training.

31-9   Develop and implement a policy directive incorporating systems to assure on-going compliance with CCDOC's directives, early warning systems, trend analysis, plans of action, and examination of emerging issues.

31-10  Determine how the use of force review unit and OPR will coordinate data collection and analysis regarding uses of force, early-warning systems, and employee remedial training (see previous compliance reports).

31-11  Continue to update training to assure that employees' reporting of uses of force

---

[5] These reports include:  all use of force incidents, all serious incidents, unusual occurrences, sexual assaults, fights, suicides, mental health incidents, contraband recovered, major rule violations by inmates, serious inmate injuries, cell extractions, medical emergencies, vandalism, escapes and escape attempts, fires, emergency grievances and steps taken to address these. Additional data reviewed include the total number of unauthorized absence hours; list of all discipline initiatives against all sown and non-sworn employees, including the nature of the violations; discipline outcomes, overtime, and trends.

[6] Data was requested but not provided for the outcomes of the Early Warning System (paragraph 31.k.) If supportive document is not provided prior to the next scheduled tour, this paragraph's compliance rating may change.

is materially consistent with the incident as reviewed on the videos. (paragraph 31h.)

## 32. Safety and Security – Substantial Compliance

**March 2016 -** There are thirteen (13) paragraphs in the Agreed Order, which address safety and security. All of these paragraphs have remained in substantial compliance since at least February 2013.

Since the tour in April 2015:

- CCDOC is using a contractor to write and update written directives. The goal of this revised process is to create directives that are more clear and "user-friendly" for the employees. (32.a., b., g., h, i.)
- I reviewed a sample of logs from housing units in all divisions and am satisfied that there are rounds conducted as prescribed by the Agreed Order. (32.c., d.)
- There are more 3,000 video cameras throughout all divisions. Two thousand of there are currently integrated into one system, with requests made for funding to integrate the remaining cameras. The Video Monitoring Unit created to be pro-active in reviewing live cameras, as well as reviewing incidents, and referring these to appropriate investigators has a staff of 18, with two additional personnel planned. The Video Monitoring Unit reports to CCDOC's Inspector General. (32.e.) (33.i.3.)
- There continue to be sufficient strategies to address contraband in CCDOC. Since the last tour, there have been increased reports of "hooch" being made by inmates, which present a need for increased searches of individual cells, and collaboration for the food service provider to limit the source items needed to make the "hooch". (32.f)
- The Weapons Free Committee's work continues with collaboration with officers and supervisors, as well as the investigators, gang officers, and the emergency response team. Not only is the Committee engaged in identifying shanks and other weapons that inmates can manufacture, but also contraband that can be brought into secure areas by employees, contractors, volunteers and visitors. Of particular concern is the contraband found in the possession of arrestees – who presumably have been searched by the arresting agency, and some of whom have been held for several days in those agencies' lock-ups. The CCDOC facilities do not experience inmate injuries from weapons manufactured by inmates, and in fact inmates want to turn over potential weapons as negotiation points for improved living conditions. (32.f)
- I did not evaluate the specific formal training on division-specific SOPs on this tour. (32. j.) Dr. Metzner and I conferred regarding the training for Cermak and inmates on the mental health caseload.
- I did not observe any malfunction of security equipment. (32.k.)
- I did not observe any inmate housing in violation of 32.l or 32.m. As noted in the Executive Summary, Divisions 1, 17 and 3 are now closed. In Division 4 where

the women are all now housed, there were units in which no inmates were assigned.  In Division 5, no inmates are presently housed.

Paragraph 32.f. provides "CCDOC shall maintain a procedure to prevent inmates from possessing or having access to dangerous contraband, including conducting regular inspections of cells and common areas of the housing units to identify and prevent rule violations by inmates."   CCDOC has been an innovator in dealing with the contraband found in the jail – that contraband that finds it way inside the jail, and that which is manufactured inside.  The work of the Weapons Free Committee was instrumental in a change to the overhead lighting to prevent pieces of the lighting from being manufactured into weapons.   The written directive governing the Weapons Free initiative calls for reporting regarding the analysis.  The last report submitted to me was insufficient in terms of both analysis and action planning.

For paragraph 32.f., prior to the next tour I request that the analysis of contraband/weapons be done that is more thorough and if action plans to address the recoveries are needed, these plans are objective, time sensitive and have accountability.  Otherwise, the compliance rating for this paragraph may change.

A significant issue for CCDOC since the last tour has been the management of a small group of inmates, who have named themselves "Savage Life".  These young, male inmates, engage in activities to cause substantial disorder including:  suicide and self-harm attempts, manufacture of ligatures, jumping/rolling from second levels of housing units, setting fires, overt sexual displays, including masturbation in front of female officers, program and medical staff, spraying urine and feces on staff and other inmates, fighting with other inmates, vandalism, self-mutilation, ingestion of nuts, bolts, screws, alleged medications, verbal threats, and hunger "strikes".  After reviewing the individual inmates, it was determined that most were not on, nor needed to be on the mental health caseload.  This group of inmates also contributed to an uptick in uses of force during CY 2015.  (32.i) This is a very difficult circumstance which challenges the most creative problem-solvers.

In order to address this disorder, CCDOC compiled data not only about the inmates involved, but also the units, time of day, etc. to develop a plan of action.  The actions to address this small group of inmates have been successful in diminishing, but not eliminating the behaviors.  The actions to address the behaviors included:  increasing programming in the units for inmates not on the mental health caseload by CCDOC staff, providing more on-site medical triage care to prevent having to take inmates out of the building (one of the inmates' goals), establishing special incarceration tiers for these inmates to better manage their behaviors; placing plastic covers over open slots in doors to keep inmates from projecting liquids, locking the feeding tray areas between feeding, increasing out-of-cell time, having staff clearly set behavioral expectations, and increasing programming for inmates on the mental health caseload by Cermak.

The expected outcomes of this approach are:  to decrease the number and severity of incidents, decrease grievances, decrease movement to outside hospitals, decrease staff and inmate injuries, decrease uses of force, reduce the number of inmates in segregation,

improve employee job satisfactions, and increase programming hours.[7]

**Monitor's Recommendations (See also Executive Summary):**

32–1    Assure that training curricula are updated as new written directives are issued.

32-2    Assure that division-specific SOPs are updated as needed based on changes in policy and changes to the inmate population/ classifications held in the divisions.

32-3    Assure that the sources of contraband continued to be identified, analysis conducted, and plans of action developed for significant findings.  Continue to work with area law enforcement agencies regarding adequacy of arrestee searches, and notification to the agency head (not just a shift supervisor) when contraband is found on arrestees that had previously been in that agency's custody.

32-4    As part of the annual staffing review, assure that the Video Monitoring Unit has the staff and supervisors necessary for their functions.

32-5    Train staff who are working in direct supervision housing.

32-6    Assure that the County is developed appropriate jail construction plans to prevent crowding and build in accordance with the classification of inmates.

32-7    Continue to monitor inmate sub-groups presenting security issues, and develop plans of action as necessary; evaluate impact of plans of action.

## 33.    Security Staffing - Substantial Compliance

There are ten (10) paragraphs that address the staffing needs of CCDOC.  All ten paragraphs have remained in substantial compliance at least since September of 2014.

As noted in the Executive Summary, CCDOC has closed Divisions 1, 3, and 17 allowing deployment of staff throughout the compound.  CCDOC is monitoring the assignment of staff, and particularly the use of overtime to assess immediate needs to hire staff.

To summarize findings from this most recent tour:

- CCDOC reports that as of 1/11/2016 there were 30 correctional officer vacancies. (33. a., b., c.)
- A class of 53 new corrections officer began on 2/15/16.
- There are pre-service training classes tentatively scheduled through the end of 2016 to accommodate training for needed vacant positions.
- CCDOC reports that they are filling supervisory vacancies (which creates vacancies at the officer rank) more promptly than in previous years.

---

[7] CCDOC reports it has identified these small groups of offenders and implemented proactive measures to address future concerns.  CCDOC believes that the changes to the ADO Blasts and AO blasts, Daily Snapshots, and CIID weekly meetings have aided CCDOC in identifying these offenders and groups.  In furtherance, CCDOC believes it has taken a more creative approach than before September 2015 to organizing programs like Men's Wellness, Second Chance, Psalms 1, and Malachi Dads to high-risk offenders.  The data indicates these measures have been successful, in part, in reducing incidents among the targeted populations.

- CCDOC reports that they have revamped their field training officer program for newly hired correctional officers, including an increased in the number of field training officers from approximately 15 to 50. This is a significant improvement for not only retention of newly hired employees, but also assures that they can perform their job based on the policies and procedures.
- CCDOC has initiated Crisis Intervention Training (CIT) for not only those staff who are assigned to work with inmates on the mental health caseload, but also throughout the compound to diffuse, deescalate, and manage volatile inmates.
- CCDOC's Office of Research has provided an annual staffing study to assess what staff, and at what rank are needed to operate a Constitutional jail system. This was conducted for each division. I have reviewed the draft dated March 1, 2016, and have suggested that the work be re-evaluated to assure that the shift relief factor is accurate (based on 5 and/or 7 day posts) and that staff who are detailed to functions outside of their assigned position (e.g. someone assigned to a division and detailed to the Video Monitoring Unit) are accounted for, and that the on-going staffing needs of the units to which staff are detailed are adequately staffed. It appears from the preliminary analysis that the hiring process will accommodate the present and anticipated vacancies in CCDOC through the end of 2016. (33.d., e., f., g.2., h.)
- Staffing has increased in areas such as the Use of Force Review Unit to 19; and as noted above in the Video Monitoring Unit to 18 (and 20 in the near future). (33.i.3.).
- Staffing for investigations is reported as satisfactory, reported in OPR (33.i.1.).
- There are no reports of "cross-watching". (33.i., j.).

**Monitor's Recommendations:**

33-1    Review the staffing analysis for the accuracy of the shift relief factor and the accounting for use of staff assigned to details on the staffing of the units to which details are assigned.

33-2    Continue to evaluate staffing against overtime costs, and fluctuations in jail population.

33-3    Review the recommendation of the medical monitor, Dr. Emil Porsa's November 2015 report regarding CCDOC  providing sufficient staff to transport inmates for internal and external transports of emergency health needs (page 25). Determine if this finding is the result of amount of  staffing resources, supervision, and/or deployment.

33-4    Assure that there is sufficient staffing in the classification unit to oversee and manage ALL bed placements in all divisions (and not have the bed assignments managed in the division absent exigent circumstances). See also paragraph 37.

## 34.    Incidents and Referrals – Change in Compliance For Sub-Paragraphs 34.d. and 34.f.

**March 2016 -** There are seven (7) paragraphs in the Agreed Order that address incidents

and referrals. All of these paragraphs have remained in substantial compliance at least since February 2013. Following this compliance tour, sub-paragraphs 34.d. and 34.f. is moved to partial compliance

To assess the process for incidents and referrals, I review each week's summary reports, and then send any questions to CCDOC. These questions ask for retention of video for my review, request more information about an event or an inmate, or inquire about trends. As I have access to CCOMS I can review many of the source documents (e.g. incident reports, use of force reports, subject and witness statements). As noted in the Executive Summary, CCDOC has not always provided timely responses to questions, and in early March 2016 finally caught up with responses and videos from April 2015 forward.

Specific findings:

- I have found that staff are reporting as required. There are on-going issues with the quality of reports; but not with the act of reporting itself. (34.a.).
- Training continues to be provided, and is being updated by the new administration at the training academy (34.b.).
- CCOMS includes all elements required by the Agreed Order (34.c.).
- CCDOC provides for daily review of reports including by the supervisors, superintendents, and Video Monitoring Unit. Grievance reports are also reviewed for allegations of misconduct and/or use of force. (34.d. and e.).
- Policies and procedures are in place to accomplish the requirements of the Agreed Order in terms of investigations. See also 35. Investigations. (34.f.).
- OPR refers incidents to the prosecutor. OPR's report for CY 2015 indicates: (34.g.)
  - 15 CCDOC officers or contract employees charged/arrested with criminal acts;
  - 13 cases presented for prosecution and declined; and
  - 3 cases presented and pending.

Paragraph 34.d. provides: "CCDOC shall require prompt administrative review of incident reports. Such reviews shall include a case-by-case review of individual incidents as well as a systemic review in order to identify patterns of incidents. CCDOC shall incorporate such information into quality management practices and take necessary corrective action." Findings from this tour indicate that the processes to support this provision continue to evolve, and are not concluded either in policy or in operation. CCDOC has made enormous strides in working on the requirements of this provision.

Paragraph 34.f. provides: "CCDOC shall maintain policies, procedures and practices requiring investigations to resolve issues identified during review of incident reports, disciplinary hearings, or inmate grievances, and determine appropriate remedies, in accordance with generally accepted correctional standards. At a minimum, CCDOC shall require timely and appropriate investigations of all suicides, serious suicide attempts, inmate-on-inmate violence resulting in serious injury, inmate-on-staff violence, inmate

injuries requiring treatment by an outside hospital, inmate injuries of a suspicious nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.), sexual misconduct between inmates, sexual misconduct involving staff, fires, escapes, escape attempts, and deaths."

To achieve compliance with paragraphs 34.d. and 34.f. CCDOC must develop their quality assurance/quality insurance directives, and demonstrate as much as possible seamless coordination. The work is evolving, but because of the critical nature of this provision, I need to see more concrete outcomes. As noted earlier in this report, this expectation does not suggest that reports are ignored or are not acted upon, but rather that refinements are needed.

**Monitor's Recommendations:**

34-1   Implement changes to regain compliance for paragraphs 34.d., and 34.f.

302    Complete the written directives and processes governing critical self-analysis (quality assessment/quality improvement) and demonstrate this process through reporting.

34-2   Continue to monitor employee reporting for documentation of additional remedial training needed for an employee, and trends for pre-service and/or in-service training.

## 35.    Investigations – Substantial Compliance

There are seven (7) paragraphs in the Agreed Order governing investigations that have remained in substantial compliance since February 2013.

To assess on-going compliance for this tour I:

- Reviewed the annual report provided by OPR; and
- Reviewed staffing for OPR.
- OPR also provided a table of contents for their SOP that I find acceptable (35.a.).

I did not review individual case files as I have done this for the previous 10 tours and not found any deficiencies. (35.c. d., and g.) OPR provided the listing of training in staff participated in CY 2015 (35.e., f.) I will review investigative files during the next tour.

**Monitor's Recommendations:**

35-1   Assure continued evaluation of staffing needs for OPR. (see also paragraph 33).[8]

## 36.    Inmate Disciplinary Process – Substantial Compliance

---

[8] The completion of these activities and provision to me by mid-August is necessary to assure that the compliance rating for paragraph 35.a. will not change.

**March 2016 -** There are six (6) paragraphs in the Agreed Order that address the inmate disciplinary process that have all been in substantial compliance since at least July 2012.

To assess CCDOC's on-going compliance for these requirements I:

- Reviewed the data for 2015, and in comparison to 2014 to examine trends and issues.

I did not observe during this tour the actual hearings as I did in previous tours. I also did not hear any inmates expressing concerns regarding the disciplinary process; although I did hear confusion from some inmates in segregation as to whether they were serving disciplinary sanctions or, in my view, been reclassified.

Approximately the same number of disciplinary reports were written in 2014 and 2015, with an increase in guilty findings, and invalid disciplinary write-ups. Fewer disciplinary citations expired, indicating the time lines in due process were managed on time. CCDOC explains that the increase in guilty findings is attributable to improved employee report writing, along with the ability of hearing officers to view video of the incident. (36.a.,b., c., d. ) Data provided by CCDOC notes the number of instances where an inmate on the mental health case load was referred to Cermak for additional information (36.e.) There is some confusion about regarding how inmates on the mental health caseload should serve disciplinary sanctions and for how long. I defer to Dr. Metzner's up-coming tour to confer with CCDOD and Cermak. Previously Cermak determined that they did not want to participate on a hearing panel (36.f.)

   **Monitor's Recommendations:**

36-1   Work with Dr. Metzner to clarify how time limits are established for inmates on various mental health levels in segregation pursuant to a guilty finding. Commit this to policy and monitor.
36-2   Conduct analyses, examine the trends in disciplinary data (guilty, not guilty, expired, invalid, discharged, transfer to other custody) and develop plans of action, as needed, to address deficiencies.
36-3   Assure that inmates who are reclassified to segregation are provided this information so they are clear it was not a disciplinary process, and they should not expect a disciplinary hearing.

## 37.   Classification – Substantial Compliance

**March 2016  -** There are five (5) paragraphs in the Agreed Order that address the inmate classification process that have all been in substantial compliance since at least September 2014.

The revised classification process was implemented in October 2014, and is now in the process of having an external validation study conducted. This study will assess whether the elements of the system are resulting in safe housing of inmates based on incidents and

disciplinary actions. (37.a., b.) The Unit is conducting self-audits of the process for both initial and re-classification.

Three areas of concern: first, CCDOC should consider the establishment of classification housing – that is, secure housing for newly arriving inmates, in a place that facilitates medical, mental health and classification. With the available space in Division 5, this may be possible, if supported by the data, and Cermak can provide staff. Data supporting a classification unit would show that there are a high percentage of incoming inmates who are released between 72-96 hours of arriving in CCDOC. A classification housing unit can safety accommodate these newly arriving inmates, and save resources for re-housing the inmate, only to have them released.

Secondly, the Classification Unit MUST assign, absent exigent circumstances, all bed space in all division at CCDOC. This required system requirement is apparently hampered by staffing in the Unit. The staffing to perform this function must be provided.[9]

Thirdly, an jail the size of CCDOC needs to be able to conduct it's own periodic validation study of inmate classification. The leadership may want an outside validation from time-to-time, but in the interim, adjustments to the various factors and weights should be able to be made, and documented internally. (37.e.)

The level system is no longer in use in CCDOC per the Executive Director. (37.c.)

The new information system, much more robust than that planned at the time of the Agreed Order, e.g. CCOMS, has fully functional capabilities and tailored dashboards to support classification ((37.b., d.)

**Monitor's Recommendations:**

37-1    Provide the staffing for the Classification Unit so that the unit can manage ALL bed assignments (changes, re-classifications, etc.) for ALL divisions, absent exigent circumstances.

37-1    Provide the resources after working with the external consultant to conduct periodic (no less than every 18 months) validation studies of the classification system.

### 38.    Inmate Grievance Process – Change in Compliance For Sub-Paragraph 38.d.

**March 2016 -** There are four (4) paragraphs in the Agreed Order that address the inmate grievance process and all have been in substantial compliance since at least August 2011. This particular section of the Agreed Order was one of the last to gain compliance as CCDOC re-thought how the grievance process would work.

---

[9] CCDOC reports that the staffing of the Classification Unit was increased with the closure of Divisions 1, 3, and 17, and expects to have Centralized Classification control all classification, housing, and bed assignment decisions by May 2016.

At this time, I find that sub-paragraph 38. d. is now in partial compliance: "CCDOC shall ensure that inmate grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria, are referred for investigation. *A member of the management staff shall review the grievance tracking system regularly in order to identify areas of concern* (emphasis added)." This change in compliance is based on a review of the last sentence of the paragraph.

Written Directive 24.15.5.0 provides in Section XI. E. "Inmate Services shall conduct an annual audit of the grievance system and collected grievance data. The findings of the audit, as well as recommendations for improvement to the system, shall be shared with the CCDOC Executive Director." There was no report provided.

The written directive governing grievances includes this provision, practically, I am unable to identify that the work has been done. Inmate grievance systems are essential to alerting leadership of emerging trends, as well as longer standing issues of the inmate population. CCDOC has struggled, but finally developed a process to assure there are few impediments to inmates filing grievances, but the last step of analyzing data and developing remedial plans has not been accomplished. (See also the discussion in the Executive Summary regarding quality assessment/quality improvement.)

The other three paragraphs in this section remain in substantial compliance.

To assess CCDOC's compliance for paragraph 38.:

- Received an oral overview of the grievance system by the person in charge;
- Reviewed the CCDOC grievance data including the self-audits of the system; and
- Asked inmates about the grievance process. I heard no complaints from inmates (primarily those in segregation units) about the grievance process or access to grievance forms. (38.c.)

I reviewed the aggregate grievance data and noted trends for which no specific analysis or plans of action were noted. I asked questions of CCDOC regarding these items: with population down, has there been a corresponding assessment of the trends regarding inmate grievances; potential duplicative data in the body of the report; a large increase in grievances in two divisions with no explanation; self-reported increases in medical grievances; impact of facility leadership on grievance numbers; numbers of grievances regarding religious diets; and the overall clarity of the reporting. The responses received were insufficient. CCDOC's response agreed with me that the information was sometimes difficult to interpret and analyze and that no in-depth analysis has been conducted in most of the specific areas I noted.

Each weekly report from CCDOC begins with a data report of the grievances by type and Division from the previous week. This indicates to me that, generally, there is a level of importance placed on these numbers. However, there is no analysis of the data. While the

data is collected, and quality review of the responses, along with an assessment of the timeliness of responses based on the policy, I find that the most important part of the process – looking at what the data is telling the leadership is not done.

A commendable element of the grievance process is an "early warning system" that flags staff who may need help with their communication skills with inmates. Since the program started in November 2014, 120 early warning alerts have been issued, with 20 of those individuals receiving more than one alert. Staff assigned to the Grievance process offer the staff person the opportunity to discuss the issues (non-disciplinary). To date, no staff have received 2 alerts have received another alert.

Regarding the self-audit process in which 5% of all grievances are reviewed (369 grievances for CY 2015), 82% were determined to have timely and acceptable responses; 4% were determined to have been addressed timely but had unacceptable responses; and 15% were now managed timely, but contained acceptable responses. (38.b.)

The summary of grievances for each division, by topic, is provided to CCDOC leadership each week. (38.a.,d)

**Monitor's Recommendations:**

38-1    Assure that there is collaboration between the "early warning" system for grievance system and other employee-based misconduct reporting.

38-2    Review, and update as necessary, the analyses and reporting provisions of the written directive governing grievances. Assure that there is adequate staffing, resources, and oversight for the reporting and analysis requirements, along with the development and implementation of objectively measurable plans of action.

### 39.    Access to Information – Substantial Compliance

**March 2016 -** There are two (2) paragraphs in the Agreed Order that address access to information all of which has been in substantial compliance since at least February 2013.

I did not review specific compliance with these two provisions on this tour. I did hear inmates tell me that they had access to the inmate handbook because they were disputing their treatment based on the specific provisions. I will reassess my previous recommendations on the next tour.

### 40.    Agreed Order – Substantial Compliance

**March 2016 -** There is one (1) paragraph in the Agreed Order that address training which has been in substantial compliance since at least August 2011.

I have access to a CCDOC laptop for use in accessing CCOMS and can see the Agreed Order is on the system, allowing access by any employee wanting to see the information.

## 41. Inter-Agency Agreement – Substantial Compliance

**March 2016 -** There is one (1) paragraph in the Agreed Order that addresses the Inter-Agency Agreement that has been in substantial compliance since August 2011.

As the end of the monitoring for the Agreed Order is approaching the parties are urged to reconsider the original document with an eye toward sustainability of the achievements toward a Constitutional jail. Much has changed in CCDOC, Cermak and DFM since this process began. The parties should incorporate the lessons-learned as well as assure on-going documentation of the expected continued improvements.

### Monitor's Recommendations:

41-1   Update the Inter-Agency Agreement to refine it, assure sustainability, and address identified issues since it's adoption.

## 69. Cut –Down Tool – Substantial Compliance
Coordinate with Dr. Metzner

**March 2016 -** There is one (1) paragraph in the Agreed Order that addresses the availability of cut-down tools that has been in substantial compliance since at least August 2011.

Data supplied by CCDOC indicates (via the dashboard) that the tool was used 203 times in CY 2015 (as compared to 95 uses in CY 2014), with the most use in Division 10 and 9 due to inmate management challenges there[10], in Division 6, and in the Division 8/RTU. The data has been analyzed by event type, time of day and day of week, as well as by quarter.

### Monitor's Recommendations:

69-1   CCDOC continues to analyze the data by housing unit, mental health status of the inmate, significance of the attempt, and training and/or policy implications, if any.

---

[10] http://wgntv.com/2016/02/01/cook-county-jail-inmates-accused-of-harassing-female-guards-attorneys/ accessed 3/12/16

UNITED STATES OF AMERICA VS. COOK COUNTY, ET. AL.  Civil No. CV-02946

# Summary of Compliance Corrections Monitor's 11ᵗʰ Report

Based on the Tour Week of March 7, 2016

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| **A.** | **Protection from Harm** | | | |
| **31. (21)** | **Use of Force by Staff** | | | |
| A. 31. a. | CCDOC shall maintain comprehensive and contemporary policies and procedures, in accordance with generally accepted correctional standards, surrounding the use of force and with particular emphasis regarding permissible and impermissible uses of force. | x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | x 9/10 x 3/11 x 8/11 | |
| A.31. b. | CCDOC shall maintain use of force policies and pre-service and in-service training programs for correctional officers and supervisors that address the following impermissible uses of force: <br>1. use of force as a response to verbal insults or inmate threats where there is no immediate threat to the safety of the institution, inmates, or staff; <br>2. use of force as a response to inmates' failure to follow instructions where there is no immediate threat to the safety of the institution, inmates, or staff, unless CCDOC has attempted a hierarchy of nonphysical alternatives that are documented; <br>3. use of force as punishment or retaliation; <br>4. use of force involving striking, hitting, or punching a restrained and non-combative inmate; <br>5. use of force against an inmate after the inmate has ceased to offer resistance and is under control; <br>6. use of choke holds on an inmate, unless lethal force is justified; and | x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | x 9/10 x 3/11 x 8/11 | |
| A.31. c. | CCDOC shall maintain a policy to ensure that staff adequately and promptly report all uses of force, in | x12/11 | x 9/10 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | accordance with generally accepted correctional standards. | x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | x 3/11 x 8/11 | |
| A.31.d. | CCDOC shall require that use of force reports: <br>1. be written in specific terms in order to capture the details of the incident <br>2. contain an accurate account of the events leading to the use of force incident; <br>3. include a description of the instrument(s) of restraint or control, if any, and the manner in which it was used; <br>4. note whether an inmate disciplinary report was completed in connection with the incident that prompted the use of force; <br>5. describe the nature and extent of apparent and reported injuries sustained both by the inmate and staff member; <br>6. contain the date and time medical attention was actually provided; <br>7. describe, in detailed, factual terms, the type and amount of force used as well as the precise actions taken in a particular incident; and <br>8. note whether a use of force was videotaped. If the use of force is not videotaped, the reporting correctional officer and supervisor will provide an explanation as to why it was not videotaped. | x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | x 9/10 x 3/11 x 8/11 | |
| A.31.e. | CCDOC shall continue to require prompt review by the shift commander of all use of force reports. The shift commander's review of use of force reports shall include review for completeness and procedural errors, as well as review of the substantive content. If the use of force report does not comply with provision 31.d. of this Agreed Order, the shift commander shall return it to the reporting officer for revision and resubmission until it is compliant. If the shift commander believes a use of force may have been inappropriate or excessive, he or she shall immediately refer the incident for investigation. | x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 | x 9/10 x 3/11 x 8/11 x12/11 x3/16 | |
| A.31.f. | CCDOC shall ensure that senior management review of uses of force includes: <br>4. a timely review of medical documentation of inmate injuries, if any is submitted, as provided by Qualified Medical Staff, including documentation surrounding the initial medical encounter, an anatomical drawing that depicts the areas of sustained injury, and information regarding any further medical care; <br>5. the inmate disciplinary report, if any, associated with the use of force; and | x12/11 x7/12 x2/13 x9/13 x3/14 | x 9/10 x 3/11 x 8/11 x3/16 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | 6.   the incident report, if any, associated with the use of force. | x9/14 x4/15 | | |
| A. 31.g. | CCDOC [and Cermak] shall establish criteria that trigger referral for inappropriate or excessive use of force investigations, including but not limited to, documented or known injuries that are extensive or serious; injuries involving fractures or head trauma; injuries of a suspicious nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.); and injuries that require treatment at outside hospitals. | x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | x 3/11 x 8/ll | x 9/10 |
| A. 31. h. | When CCDOC review of use of force reports, and supporting records if applicable, reveals that reports of a use of force are materially inconsistent, conflicting, or suspicious, CCDOC shall refer that use of force incident for internal investigation. | x12/11 x7/12 x/2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | x 9/10 x 3/11 x 8/11 | |
| A.31.i. | CCDOC shall develop and implement a system to track all incidents of use of force that, at a minimum, includes the following information: 1.   a tracking number; 2.   the inmate(s) name; 3.   housing assignment; 4.   date; 5.   type of incident; 6.   injuries (if applicable); 7.   medical care provided (if applicable); 8.   staff involved; 9.   reviewing supervisor; 10. external reviews and results (if applicable); 11. remedy taken (if appropriate); and 12. administrative sign-off. | x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | x 9/10 x 3/11 x 8/11 x12/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| A.31.j. | CCDOC shall ensure that, promptly following a use of force incident, video or photographs are taken of any and all reported or apparent injuries sustained by inmates and staff. The video or photographs will be maintained and will be included in the investigation package, if applicable. See 31. F. | x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | x 9/10 x 3/11 x 8/11 | |
| A.31.k. | CCDOC shall establish an "early warning system" that will document and track correctional officers who are involved in use of force incidents and any complaints related to the inappropriate or excessive use of force, in order to alert CCDOC administration to an potential need for retraining, discipline, problematic policies, or supervision lapses. Appropriate CCDOC leadership, supervision, and investigative staff shall have access to the information and monitor the occurrences. CCDOC senior management shall use information from the early warning system to improve quality management practices, identify patterns and trends, and take necessary corrective action both on an individual and systemic level. | x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | x 9/10 x 3/11 x 8/11 x12/11 | |
| A.31.l. | CCDOC shall ensure that a supervisor is present during all pre-planned uses of force, such as cell extractions. | x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | x 9/10 x 3/11 x 8/11 | |
| A.31.m. | Where there is evidence of staff misconduct related to inappropriate or unnecessary use of force against inmates, CCDOC shall initiate personnel actions and seek disciplinary action appropriately for any correctional officer found to have:<br>1. engaged in inappropriate or excessive use of force;<br>2. failed to report or report accurately the use of force;<br>3. retaliated against an inmate or other staff member for reporting an inappropriate or excessive use of force; or<br>4. interfered or failed to cooperate with an internal investigation regarding use of force in a manner inconsistent with the staff member's statutory or contractual rights. | x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | x 9/10 x 3/11 x 8/11 | |
| A.31.n. | Where there is evidence of staff misconduct related to inappropriate or unnecessary use of force against | x 8/11 | x 9/10 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | inmates, CCDOC shall consider, develop, and initiate systemic remedies as appropriate. | x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | x 3/11 | |
| A.31.o | CCDOC shall maintain accountability policies and procedures for the effective and accurate maintenance, inventory, and assignment of chemical and other security equipment, in accordance with generally accepted correctional standards. | x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | x 9/10 x 3/11 x 8/11 | |
| A.31.p. | CCDOC shall continue to conduct use of force training in accordance with generally accepted correctional standards, including: 1. CCDOC shall maintain an effective and comprehensive use of force training program. 2. CCDOC shall continue to ensure that correctional officers receive adequate training in CCDOC's use of force policies and procedures, including de-escalation and defensive tactics relating to use of force. 3. CCDOC shall continue to ensure that correctional officers receive pre-service and in-service training on reporting use of force and completing use of force reports. | x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | x 9/10 x 3/11 x 8/11 | |
| A.31.q. | CCDOC shall provide a process for inmates to report allegations of the inappropriate or excessive use of force orally to any CCDOC staff member; said staff member shall give the inmate the opportunity to reduce his or her report to writing through a grievance or complaint form without discouragement. | x9/13 x3/14 x9/14 x4/15 x3/16 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 x2/13 | |
| A.31.r. | Following a use of force, when CCDOC staff transport an inmate to receive medical care by Cermak, as necessary, the CCDOC staff member shall inform the Cermak staff member that the inmate was involved in a use of force. | x 8/11 x12/11 x7/12 x2/13 | X 9/10 x 3/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | | x9/13 x3/14 x9/14 x4/15 x3/16 | | |
| A.31.s. | Cermak shall ensure that, when providing medical treatment or assessment to an inmate following a use of force, Qualified Medical Staff document the inmate's injuries, if any, and any medical care provided. Cermak shall provide CCDOC senior management [OPR] with a brief summary documenting the initial medical encounter following a use of force, including an anatomical drawing that depicts the areas of sustained injury, if any, and information regarding any further medical care.   See 31.f. | x 8/11 x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | x 9/10 x 3/11 | |
| A.31.t. | Cermak shall ensure that Qualified Medical Staff question, outside the hearing of other inmates or correctional officers if appropriate, each inmate who reports for medical care with an injury, regarding the cause of the injury. If, in the course of the inmate's medical encounter, a health care provider suspects staff-on-inmate or inmate-on-inmate abuse, that health care provider shall immediately:<br>1. report the suspected abuse to the Executive Director of the Office of Professional Review or other appropriate CCDOC administrator; and<br>2. adequately document the matter in the inmate's medical record. | x 8/11 x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | x 3/11 | x 9/10 |
| 32. (23) | **Safety and Supervision** | | | |
| 32. a. | CCDOC shall maintain security and control-related policies, procedures, and practices that will result in a reasonably safe and secure environment for all inmates and staff, in accordance with generally accepted correctional standards.<br>Coordinate with Grenawitzke | x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| 32.b. | CCDOC shall maintain policies, procedures, and practices to ensure the adequate supervision of inmate work | x7/12 | x 8/11 | x 9/10 |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | areas and trustees, in accordance with generally accepted correctional standards. Coordinate with Grenawitzke | x 2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | x12/11 | x 3/11 |
| 32.c. | CCDOC shall ensure that security staff conduct appropriate rounds with sufficient frequency to provide inmates with reasonable safety.  Rounds shall be conducted at least once every half hour, at irregular intervals, inside each housing unit.   In the alternative, CCDOC may provide direct supervision of inmates by posting a correctional officer inside the day room area of a housing unit to conduct constant surveillance. More frequent rounds shall be conducted for special management inmates who require more intensive supervision for security and safety reasons.  All security rounds shall be documented on forms or logs that do not contain pre-printed rounding times.  Video surveillance may be used to supplement, but must not be used to replace, rounds by correctional officers. | x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | x 9/10 x 3/11 X 8/11 x12/11 x7/12 | |
| 32.d. | CCDOC shall ensure that security supervisors conduct daily rounds in the inmate housing units, and document the results of their inspections. | x2/13 x9/13 x3/14 x9/14 x4/15x 3/16 | x 3/11 x 8/11 x12/11 x7/12 | x 9/10 |
| 32.e. | Cook County shall increase the use of overhead video surveillance and recording cameras to provide adequate coverage throughout the common areas of the Facility, including the RCDC, all division intake areas, mental health units, special management units, inmate housing units, and in common areas of the divisions. | x9/13 x3/14 x9/14 x4/15 x3/16 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 x2/13 | |
| 32.f. | CCDOC shall maintain a procedure to prevent inmates from possessing or having access to dangerous contraband, including conducting regular inspections of cells and common areas of the housing units to identify and prevent rule violations by inmates. | x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| 32.g. | CCDOC shall review, and revise as applicable, all General Orders ("GOs"), Standard Operating Procedures ("SOPs"), and Post Orders on an annual basis, or more frequently as needed. | x 8/11 x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | x 9/10 x 3/11 | |
| 32.h. | CCDOC shall revise policies, SOPs, and post orders for all armed posts to include proper use and safe handling of weapons and provide specific instructions on use of deadly force and when and under what circumstances such force should be used, in accordance with generally accepted correctional standards. | x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | x 9/10 x 3/11 x/8/11 | |
| 32.i. | CCDOC shall standardize security policies, procedures, staffing reports, and post analysis reports across the divisions, to the extent possible, taking into account the different security levels and different physical layouts in the various divisions. | x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| 32.j. | CCDOC shall provide formal training on division-specific SOPs to correctional officers in accordance with their assignments, and shall provide further specialized training for officers assigned to Special Management Units. Cermak Hospital shall provide Specialized training for officers assigned to psychiatric units. Coordinate with medical monitor and Dr. Metzner.  See also 44.f., 44.g., 44.h., 46.b., 46.e., 68. | x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | x 9/10 x 3/11 x 8/11 x12/11 | |
| 32.k. | CCDOC shall maintain in working order all monitoring equipment at the Facility that is under CCDOC's direct control, including cameras, alarms, radios (hand held), interior and exterior lighting, x-ray and other screening equipment, and walk-through metal detectors.  To the extent that the maintenance of any Facility | x7/12 x2/13 x9/13 x3/14 | x 9/10 x 3/11 x 8/11 x12/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | monitoring equipment is under the control of DFM, CCDOC shall promptly report any maintenance needs and DFM shall prioritize its services to ensure that all monitoring equipment is maintained in working order. Coordinate with Grenawitzke | x9/14 x4/15 x3/16 | | |
| 32.l. | Absent exigent circumstances, CCDOC:  (i) shall house each inmate assigned to a division that is celled to one permanent bed in a cell and shall not house any inmates (including those assigned to dormitory divisions) such that they are sleeping on the floor, on a mattress on the floor, or in any area not designed or redesigned as sleeping quarters; (ii) shall not house more than two inmates to a single cell (triple-bunking); and (iii) shall not hot-bunk any inmates. | x 8/11[11] x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | | |
| 32.m. | When exigent circumstances give rise to triple-bunking, CCDOC shall provide the third inmate in the triple-bunked cell a "boat," stackable bunk, moveable platform, or cot, so that the inmate is not required to lay down directly on the cell floor or on a mattress on the floor. | x 8/11[12] x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | | |
| 33. | **Security Staffing.** **The parties agree that correctional officer staffing and supervision levels at the Facility must be appropriate to adequately supervise inmates, to carry out the requirements of this Agreed Order, and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards.  Cook County and CCDOC shall take such actions as shall ensure that correctional officer staffing and supervision at the Facility are sufficient to achieve these purposes. These actions shall include the following:** | | | |
| 33.a. (25) | In the fiscal year 2010 budget, Cook County shall allocate funds sufficient to allow for 210 additional correctional officer positions at the Facility.  Consistent with provision 33.c, such funding may occur on a rolling basis, as appropriate in light of the time required to hire, train, and put on duty the additional 210 new | x 8/11 x12/11 x7/12 | x 9/10 x 3/11 | |

[11] Noted as "NA" in first two reports.
[12] Noted as "NA" in first two reports.

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | correctional officers. | x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | | |
| 33.b. (25) | CCDOC shall use its best efforts (through the maintenance of the written staffing plan required by provision 33.h and otherwise) to ensure that the number of correctional officer vacancies is kept to the minimum practicable number at all times, taking into account that the timing of terminations and resignations and the resulting rate of attrition may, in ordinary course, result in there being some vacancies at any given time. | X9/14 x4/15 x3/16 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 x2/13 x9/13 x3/14 | |
| 33.c.i.ii (26) | CCDOC shall fill the 210 additional correctional officer slots provided for in provision 33.a; fill the 285 correctional officer vacancies that existed at the Facility as of July 17, 2009; and fill any correctional officer vacancies coming into existence after that date in the following manner: i. By December 31, 2010, CCDOC shall hire, train, and put on duty at the Facility at least 448 [381] newly qualified correctional officers (in addition to those on duty as of December 31, 2009). ii. By March 30, 2011, CCDOC shall hire, train, and put on duty at the Facility at least 174 [107] newly qualified correctional officers (in addition to those on duty as of December 31, 2010). | x 8/11 x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | | x 9/10 x 3/11 |
| 33.d. (26) | The parties agree that for 30 months following the effective date of this Agreed Order, Cook County and CCDOC shall not be required to provide additional correctional officer staffing and supervision at the Facility beyond that which is necessary to ensure that correctional officer staffing and supervision are sufficient to achieve the purposes set out in the introductory paragraph of provision 33 and to comply with provisions 33.a-c above. Due date 11/13/2012 | x9/14 x4/15 x3/16 | x2/13 x9/13 x3/14 x9/14 | |
| 33.e. (27) | Within 30 months of the effective date of this Agreed Order, the CCDOC Monitor shall assess and make a recommendation on whether the correctional officer staffing and supervision levels are appropriate to adequately supervise inmates at the Facility, in accordance with generally accepted correctional standards. If the CCDOC Monitor determines that staffing is inadequate, the CCDOC Monitor will make a recommendation regarding the appropriate number of correctional officer staff. If the parties do not accept the CCDOC | X9/14 x4/15 x3/16 x3/16 | x2/13 x9/13 x3/14 x9/14 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | Monitor's staffing recommendation, CCDOC and Cook County shall agree to an independent, comprehensive study to determine the appropriate correctional officer staffing and supervision. The parties agree that the results of this staffing study shall provide guidance as to the sufficient number of qualified correctional officers necessary to operate the Facility safely and to carry out the requirements of this Agreed Order. Due date 11/13/2012 | | | |
| 33.f. (27) | If the staffing study requires additional correctional officers, Cook County shall allocate funds sufficient to maintain correctional officer staffing levels necessary to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards. Due date 11/13/2012 | x9/14 x4/15 x3/16 | x2/13 x9/13 x3/14 | |
| 33.g. (28) | If the staffing study requires additional correctional officers, and consistent with Cook County's allocation of funds for security staffing, CCDOC shall hire and train sufficient number of qualified correctional officers and other staff to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards, including:<br>　1.　Investigative staffing sufficient to meet the internal investigation responsibilities outlined in this Agreed Order;<br>　2.　Correctional officer staffing sufficient to provide inmates requiring treatment with adequate access to appropriate medical and mental health care by providing timely movement of inmates to medical units, transport of inmates who have been referred for outside specialty care, and escort, if necessary, to Qualified Medical and Mental Health Staff on housing units; and　[Coordinate with medical monitor and  Dr. Metzner]<br>　3.　Qualified staff sufficient to monitor security cameras in real time and allow for supervisory viewing and retrieving at any time. Due date 11/13/2012 | x9/14 x4/15 x3/16 | x2/13 x9/13 x3/14 | |
| 33.h. (28) | CCDOC shall maintain a written staffing plan that requires sufficient staffing to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards. | x9/14 x4/15 x3/16 | x 8/11 x12/11 x7/12 x2/13 x9/13 x3/14 | x 9/10 x 3/11 |
| 33.i. | Absent exigent circumstances, CCDOC shall maintain a practice that does not allow for scheduled, planned, or | x 8/11[13] | | |

---

[13] Noted as "NA" in first two reports.

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| (28) | expected cross-watching (a CCDOC practice of allowing one correctional officer to simultaneously supervise two housing units from the control center of one of the units) at any time on all maximum security and Special Management Units, and during first and second shifts throughout the Facility. | x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | | |
| 33.j. (28) | CCDOC may permit cross-watching on third shift in housing units that are not maximum security or Special Management Units only if the Monitor does not object after consultation and review. The Monitor's review of the appropriateness of third-shift cross-watching on a particular housing unit shall be guided by the sufficiency of sightlines between the units being cross-watched, the adequacy of video and/or audio technologies in place, and/or other factors that bear on the safety and security of inmates and staff. If the Monitor later objects to any cross-watching that is in effect because of the Monitor's concerns that cross-watching on a particular housing unit presents an undue risk to the safety and security of inmates and staff, CCDOC shall immediately cease such cross-watching. CCDOC may renew cross-watching on that unit again if, after further consultation with and review by the Monitor, the Monitor does not object to such renewal. Although cross-watching is permitted under the limited circumstances described herein, CCDOC will work to eliminate the practice at the Facility. | x 8/11[14] x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | | |
| 34. (29) | **Incidents and Referrals** | | | |
| 34. a. | CCDOC shall continue to ensure that staff adequately and promptly document all reportable incidents, including inmate fights, rule violations, inmate injuries, suicides and suicide attempts, cell extractions, medical emergencies, contraband, vandalism, escapes and escape attempts, fires, and other incidents causing a disruption to standard CCDOC practice, in accordance with generally accepted correctional standards. | x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| 34.b. | CCDOC shall continue to ensure that correctional officers receive pre-service and in-service training on proper incident reporting policies and procedures in accordance with generally accepted correctional standards. | x 8/11 x12/11 x7/12 x2/13 | x 9/10 x 3/11 | |

---

[14] Noted as "NA" in first two reports.

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | | x9/13 x3/14 x9/14 x4/15 x3/16 | | |
| 34.c. | CCDOC shall maintain a system to track all reportable incidents (as described in provision 34.a) that, at a minimum, includes the following information:<br>1. incident tracking number;<br>2. the inmate(s) name;<br>3. housing assignment;<br>4. date;<br>5. type of incident;<br>6. injuries (if applicable);<br>7. medical care (if applicable);<br>8. primary and secondary staff involved;<br>9. reviewing supervisor;<br>10. external reviews and results (if applicable);<br>11. remedy taken (if appropriate); and<br>12. administrative sign-off. | x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| 34.d. | CCDOC shall require prompt administrative review of incident reports. Such reviews shall include a case-by-case review of individual incidents as well as a systemic review in order to identify patterns of incidents. CCDOC shall incorporate such information into quality management practices and take necessary corrective action. | x 8/11 x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 | x 9/10 x 3/11 x3/16 | |
| 34.e. | CCDOC shall ensure that incident reports, use of force reports and inmate grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria, that it is referred for investigation. | x9/13 x3/14 x9/14 x4/15 x3/16 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | | | x2/13 | |
| 34.f. | CCDOC shall maintain policies, procedures and practices requiring investigations to resolve issues identified during review of incident reports, disciplinary hearings, or inmate grievances, and determine appropriate remedies, in accordance with generally accepted correctional standards. At a minimum, CCDOC shall require timely and appropriate investigations of all suicides, serious suicide attempts, inmate-on-inmate violence resulting in serious injury, inmate-on-staff violence, inmate injuries requiring treatment by an outside hospital, inmate injuries of a suspicious nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.), sexual misconduct between inmates, sexual misconduct involving staff, fires, escapes, escape attempts, and deaths. | x9/13 x3/14 x9/14 x4/15 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 x2/13 x3/16 | |
| 34.g. | CCDOC (OPR) shall ensure that any investigation reports indicating possible criminal behavior will be referred to the appropriate law enforcement authority. | x 8/11 x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | x 9/10 x 3/11 | |
| 35. (30) | **Investigations:** **Investigations at the Facility are conducted by independent departments under the Cook County Sheriff's Office, including the Office of Professional Review, the Criminal Investigations Unit, and the Sheriff's Police Department. The Cook County Sheriff will assume responsibility for requiring these investigatory units to comply with the relevant provisions of this Agreed Order.** | | | |
| 35.a. | CCDOC [OPR] shall maintain comprehensive policies, procedures, and practices for the timely and thorough investigation of alleged staff misconduct, in accordance with generally accepted correctional standards. | x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | x 9/10 x 3/11 x 8/11 x12/11 x 7/12 | |
| 35.b. | Internal investigations [OPR] shall be conducted by persons who do not have supervisory responsibility for the staff member(s) being investigated. | x 7/12 x2/13 x9/13 x3/14 x9/14 | x 9/10 x 3/11 x 8/11 x12/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | | x4/15 x3/16 | | |
| 35.c. | CCDOC [OPR] shall ensure that all internal investigations will include timely, thorough, and documented interviews of all relevant staff and inmates who were involved in, or witnessed, the incident in question. | x 9/10 x 3/11 x 8/11 x12/11 x 7/12 x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | | |
| 35.d. | CCDOC [OPR] shall ensure that internal investigation reports shall include all supporting evidence, including witness and participant statements, policies and procedures relevant to the incident, physical evidence, video or audio recordings, and relevant logs. | x 9/10 x 3/11 x 8/11 x12/11 x 7/12 x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | | |
| 35.e. | CCDOC [OPR] shall ensure that all investigatory staff will receive pre-service and in-service training on appropriate investigations policies and procedures, the investigations tracking process, investigatory interviewing techniques, and confidentiality requirements. | x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | x 9/10 x 3/11 x 8/11 x12/11 | |
| 35.f. | CCDOC [OPR] shall provide all investigators who will be assigned to conduct investigations of use of force incidents with specialized training in investigating use of force incidents and allegations. | x7/12 x2/13 | x 9/10 x 3/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | | x9/13 x3/14 x9/14 x4/15 x3/16 | x 8/11 x12/11 | |
| 35.g. | CCDOC [OPR] shall ensure that the results of each internal investigation shall be documented in an investigation report. CCDOC administration shall review the investigation reports, along with the underlying documentation, and take appropriate action. CCDOC shall implement appropriate remedies based upon the results of internal investigations. | x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | x 9/10 x 3/11 x 8/11 x12/11 | |
| **36. (31)** | **Inmate Disciplinary Process** | | | |
| 36.a. | CCDOC shall maintain policies, procedures, and practices for a formal disciplinary process, including prompt issuance of written disciplinary citations, administrative review and disciplinary reports for alleged minor rule violations, and due process for alleged major rules violations, in accordance with generally accepted correctional standards. | x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | x 9/10 x 3/11 x 8/11 x12/11 | |
| 36.b. | CCDOC shall ensure that inmate disciplinary hearings are conducted in a reasonably private and secure setting. | x 8/11 x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | x 9/10 x 3/11 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| 36.c. | CCDOC shall ensure that all inmates places in lock down status are provided with appropriate due process that has been developed and implemented in policies and procedures, in accordance with generally accepted correctional standards.<br><br>In an emergency, the Executive Director of CCDOC may order a lock down of entire areas of the Facility in order to control the situation and address serious security concerns. In such circumstances, it is not necessary to provide disciplinary hearings to each inmate affected by the lock down. However, lock downs of this nature shall be limited to only the time and scope necessary to address the emergency.<br><br>For the purposes of this Agreed Order, a "lock down" shall not include the routine instances in which inmates are confined to their cells, including periods of count, over night, shift change, movement, and routine contraband sweeps. | x7/12<br>x2/13<br>x9/13<br>x3/14<br>x9/14<br>x4/15<br>x3/16 | x 9/10<br>x 3/11<br>x 8/11<br>x12/11 | |
| 36.d. | CCDOC shall ensure that the disciplinary board's written record accurately reflects the testimony and discussion from the disciplinary hearing, including any recommendations from a mental health professional regarding the extent to which disciplinary charges are related to an inmate's serious mental illness or suggestions for minimizing the deleterious effect of disciplinary measure on the mental health status of the inmate. | x7/12<br>x2/13<br>x9/13<br>x3/14<br>x9/14<br>x4/15<br>x3/16 | x 3/11<br>x 8/11<br>x12/11 | x9/10 |
| 36.e. | CCDOC shall alert Cermak when inmates are placed in disciplinary segregation or protective custody. | x7/12<br>x2/13<br>x9/13<br>x3/14<br>x9/14<br>x4/15<br>x3/16 | x 9/10<br>x 3/11<br>x 8/11<br>x12/11 | |
| 36.f. | CCDOC shall permit a Cermak Qualified Mental Health Staff member to serve on the disciplinary board. | x12/11<br>x7/12<br>x2/13<br>x9/13<br>x3/14 | x 3/11<br>x 8/11 | x 9/10 |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | | x9/14 x4/15 x3/16 | | |
| **37.** | **Classification** | | | |
| 37.a. (32) | CCDOC shall maintain policies and procedures for an appropriate, objective classification system that separates inmates in housing units by classification levels in order to protect inmates from unreasonable risk of harm. The system shall include consideration of an inmate's security level, severity of current charge, types of prior commitments, suicide risk, history of escape attempts, history of violence, and special needs. CCDOC shall use best efforts to anticipate periods of unusual intake volume and schedule sufficient classification staff to timely classify inmates. | x9/14 x4/15 x3/16 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 x2/13 x9/13 x3/14 | |
| 37.b. (32) | CCDOC shall ensure that classification staff have sufficient access to current information regarding cell availability on each division. | x9/14 x4/15 x3/16 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 x2/13 x9/13 x3/14 | |
| 37.c. (33) | CCDOC shall include information on each inmate's assignment to the Special Incarceration Unit "level system" at the Facility in the new Jail Management System, starting with the date the new Jail Management System becomes operational. | | x 9/10 x 3/11 x 8/11 x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | |
| 37.d. | CCDOC shall provide training and access to all correctional officer supervisors on the full capabilities of the | x2/13 | x 9/10 | |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| (33) | new Jail Management System's classification and inmate tracking system (or any replacement system). | x9/13 x3/14 x9/14 x4/15 x3/16 | x 3/11 x 8/11 x12/11 x7/12 | |
| 37.e. (33) | CCDOC shall provide ongoing internal and external review and validation of the inmate classification system to ensure its reliability and objectivity. | x3/14 x9/14 x4/15 x3/16 | x7/12 x2/13 x9/13 | x 9/10 x 3/11 x 8/11 x12/11 |
| **38. (33)** | **Inmate Grievance Procedure** | | | |
| 38.a. | CCDOC shall maintain policies and procedures to ensure inmates have access to an adequate grievance process and to ensure that grievances may be accessed and filed confidentially, without requiring the intervention of a correctional officer, in accordance with generally accepted correctional standards.  These policies and procedures should be applicable and standardized across all the Facility divisions. | x8/11 x12/11 x7/12 x9/14 x4/15 x3/16 | x 9/10 x 3/11 x2/13 x9/13 x3/14 | |
| 38.b. | CCDOC shall ensure that the grievances receive appropriate follow-up, including informing the grievant of the outcome, providing a timely written response, and tracking implementation of resolutions. | x 8/11 x12/11 x7/12 x9/14 x4/15 x3/16 | x 9/10 x 3/11 x2/13 x9/13 x3/14 | |
| 38.c. | CCDOC shall ensure that grievance forms are available on all units and are available in Spanish.  CCDOC shall ensure that there is adequate opportunity for illiterate inmates and inmates who have physical or cognitive disabilities to access the grievance system. | x 8/11 x12/11 x7/12 x9/13 x9/13 x3/14 x9/14 x4/15 x3/16 | x 9/10 x 3/11 x2/13 | |
| 38.d. | CCDOC shall ensure that inmate grievances are screened for allegations of staff misconduct and, if the incident | x 8/11 | x 3/11 | x 9/10 |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | or allegation meets established criteria, are referred for investigation.  A member of the management staff shall review the grievance tracking system regularly in order to identify areas of concern. | x12/11 x7/12 x9/13 x3/14 x9/14 x4/15 | x2/13 x3/16 | |
| **39. (36)** | **Access to Information** | | | |
| 39.a. | CCDOC shall ensure that newly admitted inmates receive information, through an inmate handbook or orientation video, regarding the following areas:  facility rules and regulations; how to report misconduct; how to report sexual abuse or assault; the process for accessing medical and mental health care; emergency procedures; rules for sending and receiving mail; the visitation process; facility schedule; the disciplinary process; and how to seek redress of grievances. | x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| 39.b. | CCDOC shall ensure that materials on facility rules and services are available for non-literate and non-English speaking inmates. | X2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| 40. (36) | CCDOC shall provide training and supervision to all correctional officers and supervisors sufficient to implement the provisions of this Agreed Order. | x 8/11 x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | x 9/10 x 3/11 | |
| 41. (37) | Inter-Agency Agreement<br>a.      CCDOC shall enter into a written Inter-Agency Agreement with Cermak that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility.  The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order. | x 8/11 x12/11 x7/12 x2/13 | x 3/11 | x 9/10 |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | b.    Cermak shall enter into a written Inter-Agency Agreement with CCDOC that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility.  The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order. | x9/13 x3/14 x9/14 x4/15 x3/16 | | |
| 69. (37) | CCDOC shall ensure that security staff posts will be equipped, as appropriate, with readily available, safely secured, suicide cut-down tools. *Coordinate with Dr. Metzner | x 8/11 x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | | x 9/10 x 3/11 |