**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
|         **Plaintiff,** | |
|   **v.** | |
| **COOK COUNTY, ILLINOIS;** | **No. 10 C 2946** |
| **THOMAS DART, COOK COUNTY** | |
| **SHERIFF (in his official capacity);** | **Judge Virginia Kendall** |
| **TONI PRECKWINKLE, COOK COUNTY** | |
| **BOARD PRESIDENT (in her official capacity);** | |
| **COOK COUNTY BOARD OF** | |
| **COMMISSIONERS (in their official capacity),** | |
|         **Defendants,** | |

---

# Monitor Esmaeil Porsa's Report No. 12

---

Esmaeil Porsa, MD, MPH, CCHP
Associate Chief Medical Officer
Senior Vice President
Professional and Academic Affairs
5201 Harry Hines Boulevard
Dallas, Texas 75235-7746
esmaeil.porsa@phhs.org

# Cook County Jail

# Twelfth Monitoring Report

# Esmaeil Porsa, MD, MPH, CCHP-P, CCHP-A

# April 2016

**Executive Summary**

During the week of April 18, 2016, the Medical Monitoring Team (Monitoring Team) visited Cook County Jail. The team included: Esmaeil Porsa, MD, MPH, CCHP-P, CCHP-A, Muthusamy Anandkumar, MD, MBA, Madeleine LaMarre FNP-BC, Catherine Knox, MN, RN, CCHP-RN and Linda Pansulla, RN, MBA, CCHP. The Monitoring Team visited many of the Cook County Jail medical facilities and housing units. We also interviewed various Cermak and Cook County Department of Corrections (CCDOC) leadership and front line staff as well as Cook County Jail inmates. We extend our most sincere thanks to all the Cermak and CCDOC leadership and staff for their hospitality and generosity with their time and resources. We additionally thank Cermak and CCDOC leadership and staff for their openness to the Monitoring Team suggestions and our critical appraisal of Cermak's processes and activities over the past six months. Cook County Jail Cermak and CCDOC personnel were completely cooperative and helpful in this monitoring visit. The Monitoring Team enjoyed full and unhindered access to all areas and staff.

Once again the Monitoring Team was impressed with the overall achievements by Cook County Jail Health staff and leadership over the past few months since our last visit in November 2015. The results of these efforts are profound and palpable in just about every area of care delivery audited by our team. These results were particularly impressive in the following areas: Policy and Procedures, Emergency Care, Acute Care-Infirmary (now Special Care Unit), Medication Administration and Dental. Consequently, all of these areas have now moved to substantial compliance. All provisions previously in substantial compliance remained in substantial compliance. The provisions remaining in partial compliance (Staffing, Record Keeping, Chronic Care, Access to Health Care and Quality Management) have also improved since our last visit. These areas, however, need further improvement to achieve substantial compliance status. We believe this to be within the reach of Cermak. This means that Cermak currently has 16 provisions of the Agreed Order in substantial compliance and only five provisions remaining in partial compliance and none in non-compliance. We congratulate Cermak for this achievement.

2

As was mentioned in our last report, Cermak has done an outstanding job in successfully addressing high risk/high impact areas (detox, acute care, intake screening, etc.). Cermak is now past the point of "putting out fires" and can subsequently focus on the area of process improvement and quality assurance. What remains, in our judgement, is the streamlining and standardization of best practices across the entire Cermak healthcare delivery system. We learned from Cermak leadership that moving forward; a project management approach will be utilized to continue improving in substantially compliant areas while addressing deficiencies in areas that remain in partial compliance. We wholeheartedly endorse this approach and believe it to be the right tool at the right time.

As a testament to the achievements highlighted above and in the body of this report and our trust in Cermak's commitment and ability to continue down the path of rapid improvement, the Monitoring Team in consultation with the Department of Justice has decided to reduce our number of monitoring visit days to four days instead of five starting with our next visit in November 2016.

**Introduction and Facility Outline**

On April 15th, 2016, the population of Cook County Jail was reported as 8,330 including 6,972 general population male and 519 general population female, 582 inmates in the court ordered drug treatment program,116 female inmates in Women's Residential Program and 21 in the VRIC Boot Camp. There were 22 inmates at Stroger Hospital. 98 inmates were listed under "Outside Counties".

**Definitions and Organization**

This report is formatted in the manner requested by the Department of Justice and closely follows the Agreed Order. The report includes four parts for each section of the Agreed Order.

In part one; we rewrite verbatim the pertinent portion of the Agreed Order. This first part is labeled Remedial Measure of Agreed Order.

3

The second part is the overall compliance rating labeled Compliance Assessment. This is the assessment that the Monitoring Team experts make based on judgment, data, and chart reviews. The Compliance Assessment has three possible scores: substantial compliance, partial compliance, and noncompliance. Substantial compliance means that the Monitoring Team experts determine that Cook County Jail has satisfactorily met most or all components of the standards of care for the particular provision. Partial compliance means that some remaining problems exist. Non-compliance means that much work needs to be done before compliance is met. When indicated, the Monitoring Team will additionally assess the various components (sub-bullet points) of certain sections of the Agreed Order. Our goal is to highlight areas of success and bring focus to areas that need further refining and attention.

The third part is the factual basis for forming the opinion in the Compliance Assessment. This will be as data driven as possible. For patient care areas, chart reviews form a substantial portion of this review. Touring, interviews, and reviewing data sources is also an important means of making assessments.

The fourth part is our recommendations. These recommendations are our view of what needs to be accomplished to attain and maintain compliance. This will include the Monitoring Team's recommendations for self-monitoring activities and audits.

**B. HEALTH CARE SERVICES: ELEMENTS COMMON TO MEDICAL AND MENTAL HEALTH**

**41. Inter-Agency Agreement**

a. CCDOC shall enter into a written Inter-Agency Agreement with Cermak that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility. The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order.

b. Cermak shall enter into a written Inter-Agency Agreement with CCDOC that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility. The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order.

**Compliance Status**: This provision has remained in substantial compliance for more than 18 months and as such will be subject to only spot check monitoring.

**Monitor's Recommendations:** None.

**42. Policies and Procedures**

Cermak shall provide adequate services to address the serious medical and mental health needs of all inmates, in accordance with generally accepted professional standards. The term "generally accepted professional standards" means those industry standards accepted by a majority of professionals in the relevant field, and reflected in the standards of care such as those published by the National Commission on Correctional Health Care ("NCCHC").

a. Cermak shall develop and implement medical care policies, procedures and practices to address and guide all medical care and services at the Facility, including, but not limited to the following:

    i. access to medical care

    ii.     continuity of medication

    iii.    infection control

    iv.    medication administration

    v.     intoxication and detoxification

    vi.    documentation and record keeping

    vii.    disease prevention

    viii.   sick call triage and physician review

    ix.    intake screening

    x.     chronic disease management

    xi.    comprehensive health assessments

    xii.    mental health

    xiii.   women's health

    xiv.    quality management

    xv.    emergent response

    xvi.    infirmary care

    xvii.   placement in medical housing units

    xviii.  handling of grievances relating to health care

    xix.    mortality review

    xx.    care for patients returning from off-site referrals

b.  Cermak shall develop and implement policies, procedures and practices to ensure timely responses to clinician orders including, but not limited to, orders for medications and laboratory tests.  Such policies, procedures and practices shall be periodically evaluated to ensure timely implementation of clinician orders.

**Compliance Status**: This provision is now in substantial compliance.

a.  Substantial Compliance

b.  Substantial Compliance

**Monitor's Findings:**

6

A great deal of work continues to go into updating and revising Cermak policy and procedures and training the staff to these policy and procedures. In our last visit, the Monitoring Team had identified four policy and procedures that either needed to be created or revised. These included the policy and procedure on Segregation Rounds, Removal of expiring medications and supplies, Inmate nutrition and Minimal frequency of visits for inmates with chronic illness. The Monitoring Team reviewed all these policy and procedures and found them to be adequate in addressing the issues that were identified in our last visit. More importantly, the Monitoring Team was able to confirm that Cermak personnel have all been trained on the new policy and procedures well in advance of our visit.

The last report also recommended revisions in several policies related to medication administration which have not been revised yet. One policy, E-11, did go through annual review and revision but an obvious change in procedure was not included (use of Pyxis in lieu of the OTC log). These are listed here to more clearly identify the revisions that are needed:

- D-02.4 revision needs to include procedural steps for documentation on the electronic MAR.
- D-02.3 revision needs to include use of the barcode scanner and to include an expectation that the provider enters a clinical note indicating how the patient's disagreement with the treatment plan (refusal) was addressed.
- D-07.2 Pyxis for Non-Controlled Substances revision needs to include instructions on use of Pyxis for over the counter medications.
- E-11 Nursing Assessment Protocols revision needs to include instructions on use of Pyxis for over the counter medications.

The Monitoring Team reviewed the existing policy and procedure database that contains all current Cermak policy and procedures including the initial approval date, last revision date, due date for next revision and the owner of the policy and procedure. We found two policy and procedures that were overdue for review. One policy was being rewritten at the time of our visit.

**Monitor's Recommendations:**

7

1. Continue to review and update all policy and procedures to match the expected practices and the elements of the Agreed Order.

2. Continue to train all staff with regard to current and new policies to ensure that policies are followed facility wide (standardization). Document this training so that leadership can later demand accountability.

## 43. Medical Facilities

a. CCDOC will work with Cermak to provide sufficient clinical space, as identified by Cermak staff, to provide inmates with adequate health care to meet the treatment needs of detainees, including: intake screening; sick call; medical and mental health assessment; acute, chronic, emergency and specialty medical care (such as geriatric and pregnant inmates); and acute, chronic and emergency mental health care.

b. Cermak shall make known to CCDOC and Cook County its needs for sufficient clinical space, with access to appropriate utility and communications capabilities, to provide inmates with adequate health care to meet the treatment needs of inmates including: intake screening; sick call; medical and mental health assessment; acute, chronic, emergency and specialty medical care (such as geriatric and pregnant inmates); and acute, chronic and emergency mental health care.

b. Cook County shall build out, remodel, or renovate clinical space as needed to provide inmates with adequate health care to meet the treatment needs of detainees as identified by Cermak staff including:  intake screening; sick call; medical and mental health assessment; acute, chronic, emergency and specialty medical care (such as geriatric and pregnant inmates); and acute, chronic and emergency mental health care.

c. Cermak shall ensure that medical areas are adequately clean and maintained, including installation of adequate lighting in examination rooms.  Cermak shall ensure that hand washing stations in medical care areas are fully, equipped, operational and accessible.

d. Cermak shall ensure that appropriate containers are readily available to secure and dispose of medical waste (including syringes and medical tools) and hazardous waste.

8

e. CCDOC shall allow operationally for inmates reasonable privacy in medical and mental health care, and shall respect the confidentiality of inmates' medical status, subject to legitimate security concerns and emergency situations. Reasonable privacy typically includes sight and hearing privacy from other inmates, and hearing privacy from staff that are not providing care.

f. Cermak shall make known to CCDOC and Cook County the structural and operational requirements for inmates' reasonable privacy in medical and mental health care. Cermak shall provide operationally for inmates' reasonable privacy in medical and mental health care and shall respect the confidentiality of inmates' medical status, subject to legitimate security concerns and emergency situations. Reasonable privacy typically includes sight and hearing privacy from other inmates, and hearing privacy from staff that are not providing care.

g. Cook County shall build out, remodel or renovate clinic space as needed to allow structurally for inmates' reasonable privacy in medical and mental health care, as identified by Cermak and CCDOC staff.

h. Cook County shall begin construction of the new clinical space within 3 months of the effective date of this Agreed Order. It is expected that the project will be completed within nine months of the effective date of this Agreed Order. Prior to the completion of the new clinical space, Cook County and DFM will work with Cermak to address the most serious concerns regarding clinical space, to the extent possible in the current facility.


Compliance Status: This provision moved from partial to substantial compliance in November 2015.

a. Substantial compliance

b. Substantial compliance

c. Substantial compliance

d. Substantial compliance

e. Substantial compliance

f. Substantial compliance

g. Substantial compliance

      h.  Substantial compliance

      i.  Substantial compliance

**Monitor's Findings:**

At the November 2015 monitoring tour this provision came into and remains in substantial compliance. Notable changes are that Divisions I, III and XVII have permanently closed and their populations distributed to other parts of the jail. Women housed in Divisions III and XVII were moved to Division IV. Division V also remains closed but may be reopened at a later date.

The Monitoring Team found that clinics were uniformly clean and well-organized. Medical equipment and supplies were present in all clinical areas with access to handwashing, sharps and medical waste disposal containers. Equipment was functional, contained current biomedical inspection stickers, and staff reported that equipment was timely monitored and repaired. Clinic refrigerators were clean and we found no expired opened or unopened medication vials. Staff perform sharps counts daily and random inspections showed that counts were accurate.

Emergency response equipment and supplies including cervical collars and gurneys were available in all clinics except RTU 4th floor which did not have a stretcher or backboard. Emergency response bags contained emergency medications that were labeled with expiration dates for timely replacement by pharmacy. Logs showed that staff checked emergency equipment daily, with the exception that Zoll defibrillators were not checked daily (see Urgent Care section below).

Nurses were observed to follow sanitation guidelines while administering medication and when assessing patients in examination areas.

CCDOC and Cermak have continued to make improvements in repair and maintenance of the physical plant, sanitation, and clinic operations. However, there are still opportunities for improvement. Although sanitation throughout the facility has improved, we found lapses in the

performance of daily environmental services in some Divisions and Cermak Administrative areas.

In addition, although interviews with clinic staff suggest that disinfection practices take place (e.g., cleaning examination tables, otoscopes, and countertops), there are no disinfection procedures posted in clinics with documentation that disinfection practices are performed at a minimum frequency (e.g. per shift, after each patient, etc.)

**Cermak Infirmary/Special Care Unit**

The Medical Special Care Units sanitation was documented as completed daily on all four wings. The unit was found to be clean in all areas including patient cells. Exam rooms were found to be stocked with proper infection control and sanitation items. Nurses were observed to follow sanitation guidelines while administering medication and when assessing patients in the examination areas. All sharp counts were accurate. Emergency equipment was found to be checked daily. There were no patient boats on any of the units.

With regards to the Psychiatric Special Care Units all wings were found to be clean and all sanitation logs were signed off daily. Patient cells appeared clean for general sanitation purposes. Sharp counts were accurate. Staff was found to be knowledgeable of disinfection practices and infection control procedures. All medical equipment was found to be in working order. Emergency equipment was checked daily and logged.

**Cermak Urgent Care**

Clinical space in the Cermak Urgent Care Department appeared neat and orderly and appropriate for emergency care of inmates. The only deficiency noted was that Zoll defibrillators were not checked daily. Cermak staff reports that at times when agency personnel are scheduled, this task gets overlooked. The process for checking the Zoll defibrillator while agency staff are on duty is as follows; both Zoll defibrillators (the defibrillator on the gurney and the one in the unit) become the responsibility of the charge nurse. If the charge nurse is also an agency nurse, the

11

monitor does not get checked that shift. The Monitoring Team found a number of unchecked days on both logs. In all other divisions the required emergency response equipment and supplies, including the cervical collar, was present and the log reflects that these are checked daily.

**Dialysis**

At the time of our visit there were six dialysis patients at Cermak. All except two patients had permanent HD access (shunts or fistulas). This unit continues to be very clean and organized except for the floor in the storage and water treatment area. The Monitoring Team was informed that the entire floor of the dialysis unit is scheduled for replacement. The infection prevention practices of the dialysis unit were reviewed with a technician from Davita Dialysis who is contracted to provide dialysis at Cermak. Infection practices were determined to be adequate and timely. Specifically, the endotoxin counts for one HD machine that is being used for one HIV infected HD patient was reviewed for the past 6 months. All records were in place and verified monthly scheduled endotoxin testing.

Five random charts for inmates on HD who had been referred to Stroger hospital in the previous three months were reviewed. One of the referrals was determined to be due to bacteremia. This patient, however, had many co-morbidities and had previously been hospitalized several times for repeated bacteremia episodes prior to incarceration.

**Dental Clinics**

The Monitoring Team toured one dental clinic and found the clinic to be clean and well organized. All dental equipment had recent biomed tags and was in working order except for the autoclave machine. Evidence of recent inspection, however, was obtained and the appropriate biomed tag was affixed to this machine during our visit.

**Monitor's Recommendations:**

**General:**

1. Sustain improvements in clinic organization and sanitation. Ensure that environmental cleaning takes place as scheduled in the Divisions and Cermak administrative areas.
2. Develop and implement clinic disinfection procedures and a system to ensure that staff perform these duties at a minimum frequency.

**Division Specific:**

1. RTU 4th Floor: Obtain a backboard and gurney.
2. Urgent Care: Check Zoll Defibrillators daily.

## 44. Staffing, Training, Supervision and Leadership

a. Cermak shall maintain a stable leadership team that clearly understands and is prepared to move forward toward implementation of the provisions of this Agreed Order, with respect to:
    i. Medical care; and
    ii. Mental health care

b. Cermak shall maintain an adequate written staffing plan and sufficient staffing levels of health care staff to provide care for inmates' serious health needs, including:
    i. Qualified Medical Staff; and
    ii. Qualified Mental Health Staff.

c. Cermak shall ensure that all Qualified Medical Staff and Qualified Mental Health Staff are adequately trained to meet the serious health care needs of inmates. All such staff shall receive documented orientation and in-service training on relevant topics, including:
    i. Provision of health care in a correctional setting and Facility-specific issues; and
    ii. Suicide prevention, and identification and care of inmates with mental illness.

d. Cermak shall ensure that Qualified Medical Staff receive adequate physician oversight and supervision.

e.  Cermak shall ensure that all persons providing health care meet applicable state licensure and/or certification requirements, and practice only within the scope of their training and licensure.  Upon hiring and annually, Cermak shall verify that all health care staff have current, valid, and unrestricted professional licenses and/or certifications for:

  i.  Medical staff; and

  ii.  Mental health staff

f.  Cermak will work with CCDOC to develop and maintain a curriculum for initial and periodic training of correctional officers on recognition and timely referral of inmates with medical urgencies, including drug and alcohol withdrawal.  Cermak will provide adequate initial and periodic training on these topics to all Cermak staff who work with inmates.

g.  CCDOC will provide, to all CCDOC staff who work with inmates, adequate initial and periodic training on basic mental health information, including the identification, evaluation, and custodial care of persons in need of mental health care, as well as recognition of signs and symptoms evidencing a response to trauma; appropriately responding to mental illness; proper supervision of inmates suffering from mental illness; and the appropriate use of force for inmates who suffer from mental illness.  Such training shall be conducted by a Qualified Mental Health Professional, registered psychiatric nurse, or other appropriately trained and qualified individual.

h.  Cermak will work with CCDOC to develop and maintain a curriculum for initial and periodic training of correctional officers on basic mental health information, including the identification, evaluation, and custodial care of persons in need of mental health care, as well as recognition of signs and symptoms evidencing a response to trauma; appropriately responding to mental illness; proper supervision of inmates suffering from mental illness; and the appropriate use of force for inmates who suffer from mental illness.  Such training shall be conducted by a Qualified Mental Health Professional, registered psychiatric nurse, or other appropriately trained and qualified individual.

i.  Cermak shall ensure that all health care staff receive adequate training to properly implement the provisions of this Agreed Order, including:

  i.  Medical staff; and

  ii.  Mental health staff.

14

**Compliance Status**: This provision remains in partial compliance.

a. Substantial Compliance
b. Partial Compliance
c. Substantial Compliance
d. Substantial Compliance
e. Substantial Compliance
f. Substantial Compliance
g. Substantial Compliance.
h. Substantial Compliance
i. Substantial Compliance

**Monitor's Findings:**

1. Cermak has maintained its leadership staff and has added a new director of Quality Improvement. There have been 34 new hires since October 24, 2015. Unfortunately, two positions have been eliminated and there have also been 36 positions lost to attrition for various reasons during the same period. As a result and according to the latest vacant position tracker provided to the Monitoring Team, Cermak continues to have 88 vacant positions. This is exactly the same number of vacancies on October 24, 2015. More importantly, the vacancy rates for Med/Surg and Mental Health provider staff remain above 25%. The Monitoring Team learned about a hiring freeze that had been in effect until recently. Cermak hopes that the next few months will prove productive in the hiring area including at least two psychiatrists and several nurses. We additionally learned about a new physician liaison position focusing on the hiring of physician and physician assistant personnel.

2. The Monitoring Team was presented with data indicative of greater than 98% compliance with annual training as well as training on newly revised and newly created policy and procedures. We were able to verify this by assessing the annual training for 10 randomly

15

selected staff including physician, physician assistants, psychiatrists, nursing and clerical staff.

3. The Monitoring Team reviewed the credentialing files of five Cermak professional staff and found the files to be compliant with all Joint Commission required regulatory mandates.

4. The Monitoring Team met with First Assistant Executive Director CCDOC and reviewed the currently established and ongoing initial and interval training of all CCDOC officers. Ten CCDOC officers were randomly selected from the list all CCDOC staff. The Monitoring Team was able to validate the date of the annual in-service training for each officer within one year of our monitoring visit.

**Monitor's Recommendations:**

1. Maintain the current level of filled leadership positions.

2. Consider hiring staff other than the current vacancy slots. For example hiring pharm-D clinical specialists or physician assistants instead of physicians. This will bring in the much needed additional staffing. Again, a vacancy rate of less than 15% is considered aligned with industry standards.

3. Cermak must strive to standardize its processes across all divisions and floors as much as possible. This can be accomplished through routine audits of various procedures, identification of best practices and replication of such practices across the entire system.

4. We urge the credentialing office at Stroger Hospital to create and maintain an up to date database indicating the wait times for the credentialing process for physicians and non-physician clinical providers (physician assistants and nurse practitioners) to include the following time intervals:
   a. time from job offer to mailing/emailing of credentialing application

16

    b.   time from mailing/emailing credentialing application to having a complete application

    c.   time from complete application to presentation to the credentialing committee

    d.   time from presentation to credentialing committee to approval to the Medical Executive Committee (MEC)

    e.   time from presentation to the MEC to approval by the Board of Managers (BOM)

    f.   time from approval by the BOM to orientation

    g.   and finally the total time from job offer to orientation

## 45. Intake Screening

a. Cermak shall maintain policies and procedures to ensure that adequate medical and mental health intake screenings are provided to all inmates.

b. Cermak shall ensure that, upon admission to the Facility, Qualified Medical Staff or Licensed Correctional Medical Technicians utilize an appropriate medical intake screening instrument to identify and record observable and non-observable medical needs, shall assess and document the inmate's vital signs, and shall seek the inmate's cooperation to provide information, regarding:

    i.   medical, surgical and mental health history, including current or recent medications, including psychotropic medications;

    ii.   history and symptoms of chronic disease, including current blood sugar level for inmates reporting a history of diabetes;

    iii.   current injuries, illnesses, evidence of trauma, and vital signs, including recent alcohol and substance use;

    iv.   history of substance abuse and treatment;

    v.   pregnancy;

    vi.   history and symptoms of communicable disease;

    vii.   suicide risk history; and

    viii.   history of mental illness and treatment, including medication and hospitalization.

c.  Cermak shall ensure that, upon admission to the Facility, Qualified Mental Health Staff, Qualified Medical Staff, or Licensed Correctional Medical Technicians utilize an appropriate mental health intake screening instrument to identify and record observable and non-observable mental health needs, and seek the inmate's cooperation to provide information, regarding:

   i.  past suicidal ideation and/or attempts;

   ii.  current ideation, threat or plan;

   iii.  prior mental illness treatment or hospitalization;

   iv.  recent significant loss, such as the death of a family member or close friend;

   v.  previously identified suicide risk during any prior confinement at CCDOC;

   vi.  any observations of the transporting officer, court, transferring agency or similar individuals regarding the inmate's potential suicide risk, if such information is communicated to Cermak staff;

   vii.  psychotropic medication history; and

   viii.  alcohol and other substance use and withdrawal history.

d.  Cermak shall ensure that all Qualified Mental Health Staff, Qualified Medical Staff or Licensed Correctional Medical Technicians who conduct the medical and mental health intake screenings are properly trained on the intake screening process, instrument, and the requirements and procedures for referring all qualifying inmates for further assessment.

e.  If Cermak assigns Licensed Correctional Medical Technicians to perform intake screening, they shall receive appropriate, on-site supervision by on-site Qualified Medical Staff; information obtained on screening for all inmates will be reviewed by Qualified Medical Staff before the inmate departs the intake area.

f.  Cermak shall ensure that a medical assessment based on the symptoms or problems identified during intake screening is performed within two working days of booking at the Facility, or sooner if clinically indicated, by a Qualified Medical Professional for any inmate who screens positively for any of the following conditions during the medical or mental health intake screenings:

   i.  Past history and symptoms of any chronic disease included on a list specified by Cermak's policies and procedures;

18

      ii.     Current or recent prescription medications and dosage, including psychotropic medications;

     iii.     Current injuries or evidence of trauma;

     iv.     Significantly abnormal vital signs, as defined by Cermak's policies and procedures;

      v.     Risk of withdrawal from alcohol, opioid, benzodiazepine, or other substances;

     vi.     Pregnancy;

    vii.     Symptoms of communicable disease; and

   viii.     History of mental illness or treatment, including medication and/or hospitalization.

g.     Cermak shall ensure that any inmate who screens positively for mental illness or suicidal ideation during the intake process receives a comprehensive mental health evaluation (see provision 59.c, "Mental Health:  Assessment and Treatment") Cermak shall ensure timely access to a Qualified Mental Health Professional for this purpose, based on emergent, urgent, and routine medical or mental health needs.

h.     Cermak shall ensure that the intake health screening information is incorporated into the inmate's medical record in a timely manner.

i.     Cermak shall implement a medication continuity system so that incoming inmates' medication for serious medical and mental needs can be obtained in a timely manner, as medically appropriate. Within 24 hours of an inmate's booking at the Facility, or sooner if medically necessary, a Qualified Medical Professional or Qualified Mental Health Professional, with appropriate prescribing authority, shall decide whether to continue the same or comparable medication for serious medical and mental health needs that an inmate reports during intake screening that she or he has been prescribed. If the inmate's reported medication is discontinued or changed, other than minor dosage adjustments or substitution of a therapeutic equivalent, a Qualified Medical Professional or Qualified Mental Health Professional, with appropriate prescribing authority, shall evaluate the inmate face-to-face as soon as medically appropriate, and within no greater than five working days, and document the reason for the change.

**Compliance Status**: This provision remains in substantial compliance.

a. Substantial compliance

b. Substantial compliance

c. Substantial compliance

d. Substantial compliance

e. Substantial compliance

f. Substantial compliance

g. Substantial compliance

h. Substantial compliance

i. Substantial compliance

**Findings**

**Monitor's Findings:**

a. We reviewed Cermak's Intake Health Screening policy and procedure (E-02) approved 1/25/16 and posted 1/30/16. The policy includes elements of the Agreed Order and provides sufficient operational detail to staff to implement the policy.

b. and c. We reviewed 10 records of patients who entered the jail within the past four months including 2 records of patients identified as having missed the initial intake screening. The sample included inmates with chronic diseases, mental health conditions; and those at risk or exhibiting symptoms of alcohol or drug withdrawal. Upon admission, health care staff performed medical screening using an instrument that contains all medical and mental health elements required by the Agreed Order. Staff completed all sections of the form including those related to drug and alcohol use and risk of withdrawal. When drug and alcohol questions elicited positive responses, staff appropriately performed initial COWS and CIWA screening and referred patients to a provider for secondary medical assessment.

d.  and e. These provisions have been in substantial compliance and were not assessed at this visit.

f.  and g. Intake screening staff made appropriate secondary referrals to medical and mental health providers that occurred timely.  Intake staff documented the reasons for secondary referral so that medical and mental health providers would be aware of the reasons for referral.

h.  The intake screening form is incorporated into the electronic health record in real time.

i.  Cermak has developed a system for timely continuation of medications. When inmates are prescribed chronic disease or mental health medications, a green band is placed on the inmate's wrist to indicate that he or she is not to leave the area until the first medication dose(s) is administered. We did not evaluate the percentage of patients who received first dose medications during this monitoring tour.

**Monitor's Recommendations:**

1.  Perform periodic CQI studies to ensure that patients continue to receive timely and appropriate care, including medications at intake.

2.  This provision has been in substantial compliance for 18 months and will no longer be formally monitored.

## 46. Emergency Care

a.  Cermak shall train health care staff to recognize and respond appropriately to health care emergencies, including:
    i.   Medical emergencies;
    ii.  Mental health emergencies; and
    iii. Drug and alcohol withdrawal.

b. CCDOC shall train correctional officers to recognize and respond appropriately to health care emergencies, including:

    i. Medical emergencies;

    ii. Mental health emergencies; and

    iii. Drug and alcohol withdrawal.

c. CCDOC shall ensure that all inmates with emergency health care needs receive prompt transport, including transport for outside care, for emergencies including:

    i. Medical emergencies; and

    ii. Mental health emergencies.

d. Cermak shall ensure that all inmates with emergency health care needs receive timely and appropriate care, with prompt referrals for outside care when medically necessary, and shall notify CCDOC when emergency transport is needed inside or outside the Facility compound, for emergencies including:

    i. Medical emergencies; and

    ii. Mental health emergencies.

e. CCDOC shall train all correctional officers to provide first responder assistance (including cardiopulmonary resuscitation ("CPR") and addressing serious bleeding) in emergency situations. CCDOC shall provide all correctional officers with the necessary protective gear, including masks and gloves, to provide first line emergency response.

**Compliance Status**: This provision is moved to Substantial Compliance. (5/2016)

a. Substantial Compliance

b. Substantial Compliance

c. Substantial Compliance

d. Substantial Compliance

e. Substantial Compliance

**Monitor's Findings:**

1. Cermak Health Care Staff Training

Both medical and mental health staff has been trained with regard to medical and mental health emergencies. The staff need additional training on the procedures once updated.

2. CCDOC Correctional Officer Training

   With regard to the training of correctional officers, they have completed training related to medical emergencies and mental health emergencies.

3. Emergency Transport

   The new module in the electronic medical record helps track patients sent from various divisions. The clinical staff are able to monitor this list and alert the correction officers regarding any delays in transport. The nurses now have a template that they fill out when they send patients to the Urgent care clinic. There is a hand off process where the sending nurse communicates to the receiving nurse in the Urgent care. The reason for sending the patient to Urgent care is now clearly documented and addressed.

   The management of hypoglycemic events has improved. The physician assigned to the RTU and the clinical pharmacist routinely review the hypoglycemic events and identify opportunities for prevention.

4. Timely Care and Transport

   The patients sent to the Urgent care clinic are risk stratified using the ESI score. The score and the guidelines tool help determine the level of urgency. Each level has a target timeframe for referral to a provider. The plan is to measure compliance with the target timeframes for each of the ESI scores. The new patient tracker in the Urgent care clinic helps the staff keep track of the patients. The list includes patients on their way to the Urgent care, patients waiting for either triage, the provider, the nurse, or for EMS. Any new orders are flagged in the tracker to alert the nurse. The patients in the Urgent care are continuously monitored and reassessed by the nurse based on the set criteria.

   The documentation of the notes, orders and medication administration by the nurse and the provider is done directly in the electronic medical record. This is a major improvement.

The critical lab results are now addressed in a timely manner by the providers. A report has been established to monitor the process.

5. CCDOC First Responder Training for Correctional Officers
   This requires training of correctional officers in both CPR and first responder assistance and again we found this area to be substantially compliant.

**Monitor's Recommendations:**

1. Create emergency response templates for paramedics so that the details of the incident, pertinent positives and negatives, disposition, mode of transport, time of call received, time of response, reason for visit, location of evaluation, etc. are clearly documented.

2. Create templates for the nurses and providers in the Urgent care clinic to document initial assessment and reassessment.

3. Assign a nurse specifically to assess lower acuity referrals to Urgent care as in sick call clinic. Focus the remaining Urgent care resources on higher acuity patients.

4. Self-Monitoring:
   a) Track time from referral to provider assessment.
   b) Track time from arrival to triage for patients who don't have an ESI assigned upon arrival.
   c) Track compliance with reassessment guidelines.
   d) Review the reasons for referral and provide feedback to referring staff.
   e) Review the triage practices and provide feedback to the triaging staff.
   f) Establish a daily critical labs report to monitor compliance.

## 47. Record Keeping

a. Cermak shall ensure that medical and mental health records are adequate to assist in providing and managing the medical and mental health needs of inmates at the Facility and are maintained consistent with local, federal, and state medical records requirements.

b. Cermak shall ensure that medical and mental health records are centralized, complete, accurate, readily accessible and systematically organized. All clinical encounters and reviews of inmates should be documented in the inmates' records.

c. To ensure continuity of care, Cermak shall submit appropriate medical information to outside medical providers when inmates are sent out of the Facility for medical care. Cermak shall appropriately request records of care, reports, and diagnostic tests received during outside appointments in a timely fashion and include such records in the inmate's medical record or document the inmate's refusal to cooperate and release medical records.

d. Cermak shall maintain unified medical and mental health records, including documentation of all clinical information regarding evaluation and treatment.

**Compliance Status**: This provision remains in partial compliance.

     a. Partial compliance

     b. Partial compliance

     c. Substantial compliance (June 2012)

     d. Substantial compliance (April 2015)

**Monitor's Findings:**

1. Cermak-Adequate to Provide Care.

Issues with the interface between CCDOC's electronic jail management system and Cerner were described in the last report. These problems have not been resolved, the frequency of occurrence is the same and work-arounds are still necessary.

Cermak implemented the FirstNet Urgent Care Tracking System in March 2016 and report that all urgent care encounters are documented concurrently in the electronic

health record. This now eliminates problems described in past reports with paper documentation that is scanned into the record later.  We observed the use of FirstNet in Urgent Care and concur that it resolves problems with timely documentation of patient care and has improved the availability of clinical information for the purpose of promoting continuity of patient care.

Problems with laboratory orders falling off the record before specimens are collected have not been corrected electronically. The problem is being resolved now by collecting laboratory specimens from patients out in the Division where the patient is housed rather than scheduling the patient to be escorted to the lab. Cermak IT is also working with the scheduling system to identify and resolve sources of delayed episodes of care. A number of reports are now being generated to assist Cermak staff in providing timely patient care (INR labs and results, missed intake screens, detoxification, segregation, daily trackers for the Special Care Unit, and bed control).

Cermak has begun the process of revising documentation related to inmate requests for medical attention (HSRs) and nursing assessment of the patient's condition and disposition. This problem has been discussed in prior reports. The current documentation template does not match the nursing protocols and the display of information does not adequately communicate the findings or conclusion of the nurse's encounter.

2. Cermak-All encounters are documented and the record is complete, accurate and accessible

The Special Care Unit Daily Tracker provides information to providers about the needs of patients in this unit to help ensure documentation requirements for assessment, evaluation and monitoring of current status are met.  A similar type of report is in development for the mental health unit and for nursing care. Similarly, "Power Forms" and "Care Sets" are being developed to assist providers in the timely and comprehensive management and documentation of patient care.

Issues with the design of both the paper HSR form and the nurse protocol templates in the electronic medical record (EMR) contribute to inadequate nursing documentation in the health record of triage decisions, nursing assessments, and nursing actions taken to address patients' health care requests. For example, on the HSR form there is a space that is intended to reflect the triage decision of the nurse (e.g., urgent, routine) but because it is labeled "referral" nurses use this to document a referral to a provider rather than their triage decision. Another example are the nurse protocol templates in the EMR which do not allow nurses to document pertinent negative findings, making it unclear whether the assessment was incomplete or the patient was without symptoms. A final example is that unless the nurse makes a separate progress note entry, the selections available online to document the nurse's disposition of a face to face encounter do not capture some their actions to address patient's health care needs, such as collaboration with the provider. Each of these descriptions are examples of patient care that was provided but not documented. Design revisions to the HSR paper form and the nurse protocol templates used in the EMR need to be accomplished so that all aspects of the nursing process in triage, assessment and disposition of patient requests for health care are documented in the patient health record.

Since the last site visit segregation rounds are now documented in the inmate's health record. In October 2015 CCDOC classification implemented an alert in CCOMS to indicate admission and release from segregation. However, Cermak has discovered that definitions of segregation used by CCDOC differ and resulted in not being alerted to one individual requiring daily checks by medical staff. Once there is a clear understanding and reliable process in place to notify Cermak of those inmates needing monitoring as well as when monitoring can be discontinued documentation in iView should be reviewed to determine compliance with documentation requirements.

3. Cermak-Communication with Offsite Providers

This item has been in substantial compliance since June 2012.

4. Cermak-Unified Medical and Mental Health Records

This item is in substantial compliance.

**Monitor's Recommendations:**

1. Continue monitoring and correcting the timeliness and accuracy of the interface with CCDOC to share necessary information about inmates.

2. Correct the problem with discharges resulting in a notification to Cermak that the inmate has been released when the inmate is still incarcerated at CCDOC.

3. Revise the paper and electronic medical record forms to include nurse triage decisions, better display clinical information during nursing sick call encounters, and match nursing protocol guidelines.

4. Verify that the segregation alert accurately indicates when segregation rounds begin and end and documentation takes place as required.

## 48. Mortality Reviews

a. Cermak shall request an autopsy, and related medical data, for every inmate who dies while in the custody of CCDOC, including inmates who die following transfer to a hospital or emergency room.

b. Relevant CCDOC personnel shall participate in Cermak's mortality review for each inmate death while in custody, including inmates who die following transfer to a hospital or emergency room, and a morbidity review for all serious suicide attempts or other incidents in which an inmate was at high risk for death. Mortality and morbidity reviews shall seek to determine whether there was a systemic or specific problem that may have

contributed to the incident. At a minimum, CCDOC's contribution to mortality and morbidity reviews shall include:

     i.    Critical review and analysis of the correctional circumstances surrounding the incident;

     ii.    Critical review of the correctional procedures relevant to the incident;

     iii.    Synopsis of all relevant training received by involved correctional staff;

     iv.    Possible precipitating correctional factors leading to the incident; and

     v.    Recommendations, if any, for changes in correctional policy, training, physical plant, and operational procedures.

c.  Cermak shall conduct a mortality review for each inmate death while in custody, including inmates who die following transfer to a hospital or emergency room, and a morbidity review for all serious suicide attempts or other incidents in which an inmate was at high risk for death. Cermak shall engage relevant CCDOC personnel in mortality and morbidity reviews and shall seek to determine whether there was a pattern of symptoms that might have resulted in earlier diagnosis and intervention. Mortality and morbidity reviews shall occur within 30 days of the incident or death, and shall be revisited when the final autopsy results are available. At a minimum, the mortality and morbidity reviews shall include:

     i.    Critical review and analysis of the circumstances surrounding the incident;

     ii.    Critical review of the procedures relevant to the incident;

     iii.    Synopsis of all relevant training received by involved staff;

     iv.    Pertinent medical and mental health services/reports involving the victim;

     v.    Possible precipitating factors leading to the incident; and

     vi.    Recommendations, if any, for changes in policy, training, physical plant, medical or mental health services, and operational procedures.

d.  Cermak shall address any problems identified during mortality and morbidity reviews through timely training, policy revision, and any other appropriate measures.

**Compliance Status**: This provision remains in substantial compliance.

**Monitor's Findings:**

There have been five deaths in custody cases since our last visit in November 2015. The mortality review/ root cause analysis (RCA) for all death in custody cases were reviewed by the Monitoring Team. We found the RCAs to be comprehensive and multidisciplinary with succinct action plan items. Two of the five new deaths in custody cases was due to suicide.

**Monitor's Recommendations:**

1. Continue to place focused attention on prevention of suicide deaths.

## 49. Grievances

**Compliance Status:** Substantial compliance (November 2014).

**Monitor's Findings:**

Cermak has an established policy and procedure for responding to grievances which is reviewed and updated annually. One individual is assigned responsibility for review and responding to grievances consistent with the policy and procedure. The CQI committee reviews grievance trends by the type of complaint, the inmate's housing location and timeliness in responding. This same analysis is repeated for those grievances that were founded. The CCDOC participates with Cermak in the review of grievances. Information from review and trending of grievances is used to inform decisions about areas to focus improvement efforts. During the site visit we discussed the possible use of focused patient satisfaction surveys to provide information and feedback about service improvements. The grievance response system is working as it should and can be considered a model for other correctional health care systems to learn from. This item has been in substantial compliance for 18 months now and to the extent that current performance continues will only be reviewed briefly during future site visits.

**Monitor's Recommendations:** None

## C.    MEDICAL CARE

## 50. Health Assessments

a. Cermak shall ensure that Qualified Medical Professionals attempt to elicit the amount, frequency and time since the last dosage of medication from every inmate reporting that he or she is currently or recently on medication, including psychotropic medication.

b. Cermak shall ensure that incoming inmates who present and are identified by medical personnel as having either a current risk of suicide or other acute mental health needs will be immediately referred for a mental health evaluation by a Qualified Mental Health Professional. Staff will constantly observe such inmates until they are seen by a Qualified Mental Health Professional or Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional. Incoming inmates reporting these conditions will be housed in safe conditions unless and until a Mental Health Professional clears them for housing in a medical unit, segregation, or with the general population.

c. Cermak shall ensure that all inmates at risk for, or demonstrating signs and symptoms of, drug and alcohol withdrawal are timely identified. Cermak shall provide appropriate treatment, housing, and medical supervision for inmates suffering from drug and alcohol withdrawal.

d. CCDOC shall maintain a policy that correctional officers supervising newly arrived inmates physically observe the conduct and appearance of these inmates to determine whether they have a more immediate need for medical or mental health attention prior to or following the intake health screening by Qualified Medical Staff.

e. Cermak shall ensure that the medical assessment performed within two working days of his or her booking at the Facility, or sooner if clinically indicated, for each inmate specified above (provision 45.f, "Intake Screening") shall include a review of the inmate's intake screening form, a medical history, a physical examination, a mental health history, and a current mental status examination. The physical examination shall be conducted by a Qualified Medical Professional. The medical assessment shall also include development or revision of the inmate's problem list and treatment plan to address issues identified during the medical assessment. Records documenting the

31

assessment and results shall become part of each inmate's medical record. A re-admitted inmate or an inmate transferred from another facility who has received a documented medical assessment within the previous six months and whose receiving screening shows no change in the inmate's health status need not receive a new medical assessment. For such inmates, Qualified Medical Staff shall review prior records and update tests and examinations as needed.

**Compliance Status**: This provision continues to be in substantial compliance.

    a.  Substantial compliance

    b.  Substantial compliance

    c.  Substantial compliance

    d.  Substantial compliance

    e.  Substantial compliance

**Monitor's Findings:**

We selected 10 records of patients who entered the jail within the past four months. The sample included inmates with chronic diseases and mental health conditions; and symptoms of alcohol or drug withdrawal. The sample included two patients identified as having missed intake screening.

1. We reviewed Cermak's Initial Health Assessment policy and procedure (E-04) dated 1/25/16 and posted 1/30/16. The policy is consistent with the Agreed Order and provides sufficient operational detail to staff to implement the policy, including eliciting information and continuing medications. The policy also includes criteria for referral to the Cermak Urgent Care Center following secondary medical referral, which is excellent.

2. Intake screening staff immediately refers patients with acute mental health symptoms including risk of suicide to a mental health provider.

3. Record review showed that medical providers generally conducted appropriate assessments, identified patients at risk of, or exhibiting signs and symptoms of alcohol and/or drug withdrawal and initiated treatment using standardized order sets. Providers refer patients to be monitored for alcohol or drug withdrawal to the Cermak infirmary or Residential Treatment Unit

4. Cermak's intake screening policy (E-02) dated 1/25/16 includes language required by the Agreed Order for correctional officers to monitor new arrivals in holding cells and immediately refer inmates with signs or symptoms of acute medical or mental health illness.

5. Record review showed that intake screening staff refers newly arriving inmates with positive medical screens to a medical provider the same day for evaluation. In 8 of 10 records, medical providers conducted a timely secondary medical assessment. In one case an HIV patient was admitted to the mental health Special Care Unit and did not receive a secondary medical assessment. Although HIV medications were renewed at that time, the patient was not referred to the HIV clinic and an HIV provider did not see the patient for a month after arrival. Another patient who missed intake screening, refused it when staff followed up the next day. The quality of medical assessments is excellent. Providers update the problem list, initiate medications and made primary care referrals when appropriate.

**Monitor's Recommendations:**

1. Cermak leadership should continue to conduct periodic CQI studies assessing the appropriateness, timeliness and quality of care.

2. The CQI program should continue to collect data and address root causes of missed intake screenings/secondary health assessments.

3. The CQI program should continue to monitor the documentation of timely receipt of medications that are deemed critical.

4. This provision has been in substantial compliance for 18 months and will no longer be formally monitored.

## 51.a Acute care

a. Cermak shall provide adequate and timely acute care for inmates with serious and life-threatening conditions, and ensure that such care adequately addresses the serious medical needs of inmates. Adequate care will include timely medical appointments and follow-up medical treatment.

**Compliance Status:** This provision has remained in substantial compliance for 18 months.

**Monitor's Findings:**

The Cermak Urgent Care department is staffed 24 hours a day, 7 days a week, by nurses, paramedics and a doctor. The Monitoring Team found adequate equipment to provide emergency care for life threatening conditions.

Since our last visit, the implantation of First Net Urgent Care Tracking system provides the ability to document Urgent Care encounters in the EHR. This system tracks all inmate movement throughout the Urgent Care Unit to ensure timely access and appropriate triage for services. The First Net system allows medical staff the ability to track inmates accessing Urgent Care and follow up care ordered once the inmate is returned to the housing units.

In divisions without 24 hour nursing, a division specific form is faxed to the dispensary then picked up when the dispensary re-opens in the morning after a patient is discharged back to the housing division. A follow up "well check" is conducted by an RN within 24 hours. All charts reviewed under this new process were followed up appropriately by the division the next day.

This system continues to be effective in ensuring all inmates who are seen in the Urgent Care receive timely follow-up.

**Recommendations:**

1. Health Care Leadership should conduct periodic monitoring of Divisions without 24 hour nursing coverage to ensure compliance with the notification and follow up process.

## 51b. Acute Care-Infirmary

a. Cermak shall maintain guidelines for the scope of care of acutely ill patients in its on-site designated infirmary units and for transfer of patients when appropriate to outside hospitals.

**Compliance Status:** This provision is now in Substantial Compliance (5/2016)

**Monitor's Findings:**

Record reviews, patient and staff interviews were conducted to evaluate the care in the Infirmary.

All patients admitted to the infirmary have an admission order that includes the reason for admission, acuity level and the orders. The patients admitted to the infirmary receive an admission assessment by the nurse and an evaluation by the provider in a timely manner.

The staff conduct a huddle to review all the patients care and make changes to the care plan as needed. The nursing staff have a new tool to keep track of their patients and use it for handoff between shifts. This tool is used consistently and has improved the communication between staff and continuity of care for the patients. We did not find any boats being used in the Infirmary.

The patients are routinely followed up by the providers and nurses per their set guidelines. The nurses are using the sick call guidelines to assess any medical complaints and appropriately refer the patients to the urgent care clinic or to the Infirmary provider.

The patients in the mental health Infirmary are also following the same process as the medical infirmary. The medical provider is notified of all patients admitted to the mental health infirmary with a medical condition. The patients are seen by the nurses and the providers in a timely manner. There is good communication between the medical and mental health staff.

The nursing documentation has improved but still remains minimal. It does not contain all pertinent negatives and positives regarding the patient's conditions. The team is working on creating nursing documentation templates to help improve. The wound care program continues to be working well.

**Monitor's Recommendations:**

1. Create specific nursing and provider templates for initial and follow-up encounters.

2. The completion of vital signs and CIWA/ COWS must be enforced and monitored.

3. Self-Monitoring:
   a) Audit 10 charts per month per unit to ensure timely admission assessment, timely assignment of acuity levels, initial provider evaluation, routine follow-up by the nurse and provider per acuity level guidelines, use of care plans as appropriate, etc.
   b) Monitor length of stay for the various acuity levels of patients in the Infirmary on a daily basis. This process will help reduce overcrowding and improve efficiency.
   c) Evaluate patients sent to the Urgent Care and ER from the Infirmary to see if there were any process breakdowns and opportunities for improvement.
   d) Monitor the timeliness of medical care of inmates in the mental health infirmary with medical conditions.

**52. Chronic Care**

    a.  Cermak shall maintain an appropriate, written chronic care disease management plan, which provides inmates with chronic diseases with timely and appropriate diagnosis, treatment, medication, monitoring and continuity of care consistent with the inmates' expected length of stay.

    b.  Cermak shall maintain appropriate written clinical practice guidelines for chronic diseases, such as HIV, hypertension, diabetes, asthma and elevated blood lipids.

    c.  Cermak shall maintain an updated registry to track all inmates with serious and/or chronic illnesses and shall monitor this registry to ensure that these inmates receive necessary diagnoses and treatment. Cermak shall keep records of all care provided to inmates diagnosed with chronic illnesses in the inmates' individual medical records.

    d.  Cermak shall ensure that inmates with chronic conditions are routinely seen by a physician, physician assistant, or advanced practice nurse to evaluate the status of their health and the effectiveness of the medication administered for their chronic conditions.

    e.  CCDOC shall house inmates with disabilities, or who need skilled nursing services or assistance with activities of daily living, in appropriate facilities, as determined by Cermak. CCDOC shall permit inmates with disabilities to retain appropriate aids to impairment, as determined by Cermak.

    f.  Cermak shall ensure that inmates with disabilities or who need skilled nursing services or assistance with activities of daily living shall receive medically appropriate care. Cermak shall notify CCDOC of their specific needs for housing and aids to impairment.

    g.  Cook County shall build out, remodel, or renovate clinical space as needed to provide appropriate facilities for inmates with disabilities in accordance with the timelines set out in provision 43.i. Prior to completion of the new clinical space, Cook County and DFM will work with Cermak to address the most serious concerns regarding facilities for inmates with disabilities, to the extent possible in the current Facility.

**Compliance Status**: This provision remains in Partial Compliance.

    a.  Partial Compliance

    b.  Substantial Compliance

    c.   Substantial Compliance

    d.   Partial Compliance

    e.   Substantial Compliance

    f.   Substantial Compliance

    g.   Substantial Compliance

**Monitor's Findings:**

The Monitoring Team reviewed health records of chronic disease patients and the process to manage chronic care during the visit.

Cermak has a Chronic Disease management plan. The patients with chronic disease are seen timely at intake by a nurse and referred to the intake provider to initiate care. The patients have the initial chronic care visit with the primary care clinic in their housing location for a comprehensive evaluation and continuity of care. There are issues related to scheduling patients for their appointments due to various reasons including technology.

The templates for chronic diseases are being created in Power Notes. These are expected to help the providers address all aspects of the visit including medication reconciliation, level of disease control, follow-up plan, etc. and enable compliance with the guidelines.

Cermak has an effective way of tracking chronic disease patients. The tool is being used by the Providers to manager their patients.

Referrals to providers are not always scheduled on time by the scheduling team. The orders and appointments have to be manually transferred to the new location if a patient transfers. Cermak has a Performance Improvement project developed to address the scheduling issue. The labs orders are still automatically canceled after 14 days. This has been a long standing problem. Cermak has recently initiated a Process Improvement project to address this issue. Intake is performing point of care test-INR before initiating Coumadin. This is a great improvement that has been accomplished through collaboration between Nursing, Pharmacy and the Physicians.

With respect to HIV care, record review showed that in 7 of 7 admissions the patient received an intake medical screening. In 6 of 7 admissions the patient received a secondary medical assessment. In 6 of 7 admissions an HIV provider performed a record review within 24-48 hours and made a determination regarding appointment priority. Except for the patient who did not receive a secondary medical assessment, in all cases an HIV provider evaluated patients within 7 days of arrival at CCJ. If a patient was unavailable due to being out to court the HIV provider quickly rescheduled the visit. At the initial HIV appointment, clinicians performed a history and physical examination in accordance with current guidelines. HIV providers ordered HIV, sexually transmitted infection (STI) and Quantiferon (for TB infection) lab tests. Providers assessed patients' readiness to begin or restart antiretroviral therapy and ordered medications accordingly with 2 week follow-up appointments to assess patients' medication tolerance and adherence. Prophylaxis for opportunistic infections was initiated when clinically indicated. Medication administration Records (MAR's) generally show that patients are adherent with occasional missed doses due to refusals or being off the tier. At follow-up visits, HIV providers reviewed and addressed HIV, STI, Quantiferon, and other lab test results. In one case, due to timely labs, a patient was diagnosed and treated for syphilis initiated before he was released from CCJ. Overall, HIV care is excellent.

The inmates with disabilities, or who need skilled nursing services or assistance with activities of daily living, are appropriately housed and allowed to retain appropriate aid to impairments as recommended by Cermak.

The patients who need assistance with ADLs are receiving appropriate care. Cermak is notifying CCDOC of any specific needs for housing and aids to impairment. Nursing is continuing to develop more templates to help improve the nurse documentation.

Cermak has adequate clinical space to take care of patients with disabilities.

**Monitor's Recommendations:**

39

1. Continue to create chronic disease templates to guide the provider to document pertinent positives, history specific to the condition; remind them of any recommended tests, medications, or referrals which should be ordered; to specify the level of disease control (good control, poor control, etc.) and direction of change from previous visit (i.e. improved, worsened, no change), and to delineate a follow-up plan specific to the condition.

2. Create expectations for documentation on initial and follow-up chronic care visits. Title the documents to identify the type of visits.

3. Create a standard appointment system that will follow the patients within the jail automatically.

4. Create appointment types by type of visits, and urgency of visits, etc. to easily track the volume and timeliness of service.

5. Continue to perform timely labs for HIV patients including STI and Quantiferon testing.

6. Communicate positive lab results to the patient timely. Monitor using an exception report.

7. Continue to document the provider's acknowledgement of recent lab results.

8. Review the lab order process to make it efficient - from order entry to sample collection.

9. Fix the auto-deletion of lab order.

10. Improve nursing documentation by developing easy to use templates that serve a guideline or reminder of the topics which should be addressed in nursing encounters for chronic disease care.

11. Self-Monitoring:

  a) Ensure all patients on chronic medications are in the appropriate registries (match registry to medications and medication to registry to identify any inappropriate miss match).

  b) Review ordered tests (high priority tests) to see if they were completed timely.

  c) Continue to monitor compliance with dialysis visits.

  d) Audit at least 5 charts per provider per month to monitor for compliance with established chronic care management plan and clinical practice guidelines. Provide both individual and group feedback for continuous improvement.

  e) Establish quality metrics to monitor adherence of patients on anticoagulation.

    I. Time to first visit

    II. Time to first dose

    III. INR before first dose

    IV. Time to therapeutic level

    V. Management plan for difficult patients

    VI. Compliance with INR check as ordered

    VII. Compliance with follow-up as indicated

  f. Monitor compliance with recommended vaccinations that are identified in the clinical practice guidelines.

  g. Continue to review compliance with addressing critical lab results timely.

  h. Review episodic/nonscheduled visits by chronic disease patients to identify opportunities for prevention.


**53. Treatment and Management of Communicable Diseases**

 a. Cermak shall maintain adequate testing, monitoring and treatment programs for management of communicable diseases, including tuberculosis ("TB"), skin infections, and sexually transmitted infections ("STIs").

 b. CCDOC shall comply with infection control policies and procedures, as developed by Cermak, that address contact, blood borne, and airborne hazards, to prevent the spread of

infections or communicable diseases, including TB, skin infections, and STIs, consistent with generally accepted correctional standards of care.

c. Cermak shall maintain infection control policies and procedures that address contact, blood borne, and airborne hazards, to prevent the spread of infections or communicable diseases, including TB, skin infections and STIs, consistent with generally accepted correctional standards of care. Such policies should provide guidelines for identification, treatment and containment to prevent transmission of infectious diseases to staff or inmates.

d. Pursuant to Centers for Disease Control ("CDC") Guidelines, Cermak shall continue to test all inmates for TB upon booking at the Facility and shall follow up on test results as medically indicated. Cermak shall follow current CDC guidelines for management of inmates with TB infection, including providing prophylactic medication when medically appropriate and consistent with the inmate's expected length of stay. Inmates who exhibit signs or symptoms consistent with TB shall be isolated from other inmates, evaluated for contagious TB and housed in an appropriate, specialized respiratory isolation ("negative pressure") room. Cermak shall notify CCDOC of inmates' specific housing requirements and precautions for transportation for the purpose of infection control.

e. Cermak shall ensure that the negative pressure and ventilation systems function properly. Following CDC guidelines, Cermak shall test daily for rooms in-use and monthly for rooms not currently in-use. Cermak shall document results of such testing.

f. Cermak shall notify DFM, in a timely manner, of routine and emergency maintenance needs, including plumbing, lighting and ventilation problems.

g. Cermak shall develop and implement adequate guidelines to ensure that inmates receive appropriate wound care. Such guidelines will include precautions to limit the possible spread of Methicillin-resistant Staphylococcus aureus ("MRSA") and other communicable diseases.

h. Cermak shall adequately maintain statistical information regarding communicable disease screening programs and other relevant statistical data necessary to adequately identify, treat, and control infectious diseases.

**Compliance Status:**  This provision is now in substantial compliance.

    a.  Substantial Compliance
    b.  Substantial Compliance
    c.  Substantial Compliance
    d.  Substantial Compliance
    e.  Substantial Compliance
    f.  Substantial Compliance
    g.  Substantial Compliance.
    h.  Substantial Compliance

**Monitor's Findings:**

The Monitoring Team reviewed Cermak's TB screening procedures. There has been an average of 2,919 intake chest x-ray screening studies per month from December 2015 thru February 2016 for males and 507 intake chest x-ray screening per month for females. There have been 13 total TB suspect cases since the last monitoring visit. The Monitoring Team reviewed all of these cases and found them to be 100% compliant with TB rule out procedure according to established national guidelines. One TB suspect case could have been placed in respiratory isolation sooner. The Monitoring Team audited all negative pressure room logs for the past six months and found them to be complete.

Cermak's infection control program has established procedures for infection control practices and patient care. Staff receives annual training on this policy. The Special Care Units continue to make progress with wound care management; there is evidence of solid practices in place to measure, grade, assess, and manage wounds. Wound care is documented in iView and there is evidence that all staff including providers utilize iView to track the progress of wounds.  A chart audit supported the documentation procedure. This practice has since been carried out of the Special Care Units into other divisions to track inmates with wound care orders.

The Infection Control Department continues to map MRSA on a division-by-division spreadsheet to identify any clustering. The Monitoring Team found evidence in the data that these practices are ongoing and effective. There was evidence of DFM notification for areas requiring additional sanitation and disinfections.

The Monitoring Team also reviewed a comprehensive report regarding communicable disease screening programs and other relevant statistical data necessary to adequately identify, treat, and control infectious diseases. Based on the documents reviewed by the Monitoring Team, Cermak appears to have adequate screening, monitoring and treatment programs for management of communicable diseases, including tuberculosis ("TB"), MRSA and sexually transmitted infections ("STIs").

The Monitoring Team reviewed several random infection prevention files for Cermak staff. These records were 100% compliant with annual TB testing policy as well as the flu vaccination policy.

## 54. Access to Health Care

a. CCDOC will work with Cermak to facilitate timely and adequate accessibility of appropriate health care for inmates, as provided by Cermak.

b. Cermak shall ensure the timely and adequate availability of appropriate health care for inmates.

c. Cermak shall ensure that the medical request ("sick call") process for inmates is adequate and provides inmates with adequate access to medical care. The sick call process shall include:

    i. written medical and mental health care slips available in English, Spanish and other languages, as needed;

    ii. opportunity for illiterate inmates and inmates who have physical or cognitive disabilities to access medical and mental health care; and

    iii. opportunity for all inmates, irrespective of primary language, to access medical and mental health care.

d.  Cermak shall ensure that the sick call process includes confidential collection, logging and tracking of sick call requests seven days a week. Cermak shall ensure timely responses to sick call requests by Qualified Medical Staff. The logging procedure shall include documentation of the date and summary of each request for care, the date the inmate was seen, the name of the person who saw him or her, the disposition of the medical or mental health visit (e.g., referral; whether inmate scheduled for acute care visit), and, if follow-up care is necessary, the date and time of the inmate's next appointment. Cermak shall document the reason for and disposition of the medical or mental health care request in the inmate's medical record.

e.  Cermak shall develop and implement an effective system for screening medical requests within 24 hours of submission. Cermak shall ensure that sick call requests are appropriately prioritized based upon the seriousness of the medical issue.

f.  Cermak shall ensure that evaluation and treatment of inmates in response to a sick call request occurs in a clinical setting.

g.  Cermak shall ensure that Qualified Medical Staff make daily rounds in the isolation areas to give inmates in isolation adequate opportunities to contact and discuss medical and mental health concerns with Qualified Medical Staff in a setting that affords as much privacy as reasonable security precautions will allow. During rounds, Qualified Medical Staff will assess inmates for new clinical findings, such as deterioration of the inmate's condition.

Compliance Status: This provision is partial compliance.

a.  Substantial compliance **but needs attention**

b.  Partial compliance

c.  Partial compliance

d.  Partial compliance

e.  Partial compliance

f.  Substantial compliance **but needs attention**

g.  Partial compliance

**Monitor's Findings:**

The Monitoring Team evaluated inmate access to care by reviewing health service request tracking systems; randomly inspecting health care request form availability; reviewing health service request (HSR) forms, health records, nurse protocols, observing nursing sick call encounters, and interviews with staff and inmates. In addition, Cermak health care leadership presented data regarding timeliness of HSR collection and triage across the jail, as well as data regarding appointment backlogs in each division.

As noted in our last report, access to care processes are becoming more firmly rooted in clinic operations and we found areas of demonstrable improvement. However, obstacles to substantial compliance remain. These obstacles include nurse and custody staff available to perform access to care duties.

Data indicates an increase in back logs of patients to be seen following submission of health services requests, reflecting worsening access to care. Nurse hiring freeze has contributed to ongoing backlogs with some Divisions more adversely affected than others. Inmate disturbances have resulted in lockdowns and decreased custody officers available to escort patients for medical appointments, resulting in further appointment backlogs.  In some locations,  limited availability of custody escort has forced nursing staff into  reviewing inmates' medical records for any information that might be helpful in addressing patient complaints first and then seeing patients in the visiting room on the tier. While the nurse's effort to see the patient under these conditions is intended to minimize the risk of harm, it is not compliant with the agreed order that patients be examined in a clinical setting (f.).  Access to care is impeded when correctional officer staffing is insufficient or not prioritized to escort patients to the dispensary to be assessed by a nurse. Unit lock downs should not displace other essential operations such as access to care and medication administration. We noted in the last report that officer escort for HSRs is limited to morning clinic hours in some divisions which is insufficient to meet the demand for access to care.

With respect to access to care processes, we found that with some exceptions, health care request forms were available on housing units; staff collected forms and completed HSR tracking logs daily; and nurses' timely triaged HSR's. Staff is to be commended for the standardization of these processes across divisions.

However, we found variability across Divisions in the appropriateness of nurse triage decisions (e.g., urgent, routine), patient dispositions (i.e., for the nurse to evaluate or refer the patient to another service), quality of nurse assessments and related EMR documentation.

With respect to nurse triage and disposition decisions we found that nurses typically review the EMR to determine whether a provider has recently seen the patient or is scheduled for a future appointment. This information appears to bear on the nurse's decision whether to see the patient or to refer the patient to a provider at some point in the future. Unless a medical provider can see the patient in the same time frame required by policy for nurses (48 hours, 72 hours for weekends), the nurse should see all patients with symptoms, including those with dental pain. In one Division, mental health leadership reported delays in forwarding HSR referrals from nursing to mental health staff.

We randomly observed nurses performing sick call. In some Divisions, the nurse assessed patients in a clinical setting by taking the initial history, having the patient undress to perform examinations, using medical equipment to examine the patient, and contemporaneously documenting clinical findings in the electronic medical record. Assessments were much improved from previous visits. In two instances, we compared the nurses' assessment to the applicable nursing protocol and found it compliant. In one case the nurse conferred with a provider at the time to initiate analgesia and antibiotics. In one Division, we observed a nurse and reviewed related EMR documentation and found that it accurately reflected what occurred during the encounter. In another Division, a nurse did not perform a meaningful assessment of the patient's complaint and did not contemporaneously document findings in the electronic medical record. Instead the nurse made scant notes onto the HSR that did not include physical assessment findings and then later documented a note in the medical record. We reviewed some of the nurses' notes and found the quality of the assessment to be inadequate. We believe that

improvements in nursing assessments and patient outcomes will be achieved with continued standardization, auditing and competency evaluations by nurse clinicians and managers.

Cermak health care leadership is in process of revising the design of the Health Services Request form to reflect the types of complaints most frequently submitted by inmates. The plan is to incorporate this same template into the EMR. We have some concerns about this approach and would like to collaborate with Cermak on the revision of the HSR to facilitate its progress toward substantial compliance. As noted in previous reports, we also have concerns about nurse protocol templates in the EMR. The current design does not facilitate documentation of subjective and objective data into a coherent nursing assessment and plan.

As noted in the previous report, Cermak Nursing Guidelines were revised and distributed to staff in September 2015. These guidelines are improved from previous versions; however, the Monitoring Team has some concerns about organization and content of the Guidelines. For example, there is a guideline for Chest Pain-Urgent/Emergent and one for Chest Pain-Non Emergent; but this requires the nurse to make a determination in advance of assessing the patient as to whether the patient's chest pain is urgent or not. In addition, the Chest Pain-Non Emergent guideline is actually a guideline for musculoskeletal pain but is located in the cardiovascular section of the guidelines. This is likely to be confusing to nurses using the guidelines. The Guidelines include nursing diagnoses that are incomplete or not approved by NANDA[1], such as "alteration in comfort" without linking it to a cause. In some cases, the treatment is not appropriately targeted to the condition. For example, the only over the counter option for treatment of cough is a saline nasal spray, which is not likely to be effective for most patients presenting with cough. Finally, nursing guidelines assessment protocols have not been incorporated into the EMR which contributes to nurses not adhering to the guidelines.

Compliance with the Agreed Order is further described below.

a. As noted above, due to lockdowns, there have been problems with custody escorting patients to the clinic for two consecutive monitoring visits, resulting in persistently high

---

[1] North American Nursing Diagnosis Association.

backlogs .  If this issue is not resolved by the next Monitoring Tour, the compliance assessment will be downgraded from substantial to partial compliance.

b.  While Cermak data shows  that access to care backlogs have declined in recent months, backlogs continue to exist  in 6 of 12 Divisions.

c.  Inmates continue to have access to HSRs in English and Spanish.  We did not observe use of language translation phones during this visit.

d.  We found that housing tiers generally contained adequate supplies of Health Services Request forms, however some randomly inspected housing tiers did not have health service request forms available to inmates when Monitors toured the units (RTU 2E and 2G, Division IV, N1-01).  Staff collects HSR forms daily and contemporaneously maintains HSR tracking logs. Nurses triage HSR forms daily and more consistently sign and date the form at the time of triage.

e.  Nurse triage decisions are inconsistent with respect to the urgency of the complaint (e.g., urgent, routine) and patient dispositions. For example, in a sample of 30 HSRswe found that nurses did not directly address the patient's complaint or did not see the patient in more than 50% of the cases.  In cases in which the nurse did not directly address the patient's complaint the nursing HSR disposition was most often to refer the patient to another provider (PCC, dental, MH) or piggy-back the HSR referral onto a previously scheduled provider appointment. This is problematic because patients are not seen timely and the provider is not aware that the nurse has made the referral.

f.  The quality of nursing assessments is improving but is inconsistent across Divisions. As noted above, we observed nurses that documented clinical findings onto the HSR instead of the directly into the electronic medical record.  In these cases, the nurse is not following assessment templates in the EMR and evaluations are often lacking.  In addition, the recently revised Nursing Guidelines do not match EMR assessment protocols which do not facilitate adequate assessments.

g.  Cermak data shows high levels of staff compliance conducting paper triage of health requests within 24 hours.

h.  Nurse sick call is generally being conducted in adequately equipped and supplied examination rooms. However, where custody escort officers availability is an issue, , nurses are assessing patients in visiting rooms Unless improved at the next monitoring

49

visit, this places this provision at risk of being downgraded from substantial to partial compliance.

   i.   Segregation Rounds

The Agreed Order originally required that health care staff conduct daily rounds for all inmates in segregation. The parties have agreed to change the Agreed Order to be consistent with the NCCHC Standards for Health Services in Jails regarding Segregated Inmates (J-E-09) which bases the frequency of rounds upon the degree of isolation. Cermak health care leadership posted the revised policy on segregated inmates on 1/30/16.

The practical effect of this change is that health care staff makes daily rounds only for inmates in extreme isolation. This requires that Cermak and CCDOC identify those units or inmates that are subject to extreme isolation and during this monitoring tour, Cermak reported to the Monitoring Team that only one inmate met the criteria for extreme isolation.

Remaining operational challenges are that CCDOC has multiple locations throughout the jail that are designated as segregated housing presenting logistical challenges to health care staff making rounds. Moreover, CCDOC and Cermak have different definitions of segregation for the purposes of identifying inmates requiring rounds. For example, CCDOC has designated some two-man cells for segregation purposes that likely would not meet NCCHC requirements to perform medical rounds. In addition, CCDOC has initiated Alerts for inmates placed into and released from segregation, however inmates are not always moved into segregated housing contemporaneously to the Alert due to lack of a segregation bed. Therefore, medical rounds will not begin on the date the Segregation Alert is posted and which may appear as a lapse in segregation rounds when that is not the case.

CCDOC has proposed consolidating segregation into fewer housing areas which will facilitate the identification and classification of inmates requiring rounds (e.g., extreme, etc.). This will likely facilitate progress toward compliance.

**Recommendations:**

1. Health care leadership should continue to address nurse staffing issues that interfere with performance of access to care duties.

2. CCDOC leadership should ensure that adequate custody staff is provided and prioritization is given to escort inmates for medical appointments.

3. Health care leadership and nurse managers should continue to perform CQI studies to collect and analyze data to improve access to care. Components to be included in CQI studies include the following:

   a) Date of inmate submission to date of collection;
   b) Date of HSR collection to date of HSR triage;
   c) Staff compliance with signing and dating collection and triage of HSRs;
   d) Appropriateness of nurse triage disposition (e.g., urgent, routine);
   e) Timeliness of nurse encounter by type of disposition (e.g., urgent, routine);
   f) Adequacy of nurse assessments and treatment;
   g) Appropriateness of nurse to provider referral; and
   h) Timeliness of nurse referral to provider appointment.
      The Monitoring team requests that CQI studies with these data points be provided for the period from August through October 2016.

4. Health care leadership should study and identify root causes of delays in access to care to include consideration of nurse vacancies, staff reassignments, lack of officers or custody/nurse or provider scheduling.

5. Health care leadership should review and revise the Nursing Guidelines to ensure they are appropriately organized and enable the nurse to adequately treat the patient's presenting complaint. Ensure that the guidelines include approved NANDA nursing diagnoses. The Monitors offer their assistance with the revision process.

6. Revise the HSR form and electronic medical record to facilitate nursing documentation of patient evaluations. The Monitors offer their assistance with the revision process.

7. Develop a system to provide feedback to nurses regarding the appropriateness of nurse triage decisions (urgent, routine), patient dispositions (nurse evaluation versus referral) and quality of nurse evaluations and related EMR documentation.

8. Conduct ongoing training in physical assessment and nurse protocols.

9. Health care leadership should continue develop the primary care model in the Divisions by increasing communication and collaboration between nurses and providers.

10. CCDOC and Cermak should resolve operational definitions of segregation for the purposes of identifying inmates requiring medical rounds.

11. CCDOC should consolidate inmates in segregation to the extent possible to facilitate the performance of medical rounds.

12. Monitor nursing compliance with segregation rounds including how rounds are documented in the EMR.

## 55. Follow-Up Care

a. Cermak shall provide adequate care and maintain appropriate records for inmates who return to the Facility following hospitalization or outside emergency room visits.

b. Cermak shall ensure that inmates who receive specialty, emergency room, or hospital care are evaluated upon their return to the Facility and that, at a minimum, discharge instructions are obtained, appropriate Qualified Medical Staff reviews the information and documentation available from the visit, this review and the outside provider's documentation are recorded in the inmate's medical record, and appropriate follow-up is provided.

**Compliance Status:** This provision stays in Substantial Compliance **but needs attention**. (11/2015)

a. Substantial Compliance
b. Substantial Compliance

**Monitor's Findings:**

Chart audits were conducted on patients returning from hospital and emergency room visits. Patients returning from the emergency department or inpatient services are brought to the urgent care clinic and seen by a provider. The provider reviews the hospital records and orders

appropriate housing, medications, follow-up, etc. An audit has been established to monitor the process.

The patients who return from specialty clinic visits or special procedures are also returning to the urgent care clinic. The hospital paperwork is supposed to be reviewed by the nurse, who notifies the provider if there are any orders. The provider is expected to place orders in the EMR as recommended or document an alternate plan of care. This process is not consistently followed. The recommended reconciliation process has not been established yet. An audit tool has been implemented to monitor performance.

To remain in substantial compliance, Cermak must demonstrate consistent reconciliation of reviewing recommendations made as a result of hospitalization, specialty consultation or a procedure and initiating follow up care in a timely manner.

**Monitor's Recommendations:**

1. Establish a reconciliation process not less than once a shift for patients sent to the hospital for scheduled and unscheduled visits, by an assigned nurse so that all patients returning from the hospital are seen and discharge instructions are followed.

2. Create a template for hospital return visits for nurses and providers so pertinent information is captured in the health record (i.e. reason for hospital visit, condition of patient upon return, discharge diagnosis, any new problems that must be added to problem list, medication reconciliation, plan of action for discharge instructions, in house nurse/provider follow-up or hospital follow-up, notification to the provider who sent the patient to the hospital, etc.).

3. Self-Monitoring:
   a) Maintain a database of all patient send outs by type (ER, Inpatient, Clinics, Same Day Surgery, Procedures, etc.). The data base should include: the mode of transport, seen by provider before send out, name of the provider who sent

53

the patient out, reason for send out, discharge diagnosis, was patient seen on return, date and time of patient seen on return.

b) Use the database to monitor performance and identify improvement activities.

c) Audit at least five charts of patients sent to the ER and for inpatient services for documentation that includes: if they were seen upon return, reason for send out, timeliness of send out, appropriateness of mode of transport, appropriateness of emergency response provided by in house staff, appropriateness of documentation, were hospital records reviewed, documentation of implementing discharge instructions, and if not, the reason documented, medication reconciliation, problem list updated, appropriateness of post discharge housing in the jail, patient educated on the plan of care, etc. (the documentation templates will help make this audit easy to do).

## 56. Medication Administration

a. Cermak shall ensure that treatment and administration of medication to inmates is implemented in accordance with generally accepted correctional standards of care.

b. Cermak shall develop policies and procedures to ensure the accurate administration of medication and maintenance of medication records. Cermak shall provide a systematic physician review of the use of medication to ensure that each inmate's prescribed regimen continues to be appropriate and effective for his or her condition.

c. Cermak shall ensure that medicine administration is hygienic, appropriate for the needs of inmates and is recorded concurrently with distribution.

d. Cermak shall ensure that medication administration is performed by Qualified Nursing Staff.

e. When Cermak prescribes medication to address an inmate's serious mental health needs, HIV or AIDS, or thromboembolic disease, Cermak shall alert CCDOC that the inmate in question is on a flagged medication. If the prescription is terminated during an inmate's stay at the Facility, Cermak will notify CCDOC.

f.  When CCDOC receives notice that an inmate is on a flagged medication, CCDOC shall include notation of a medication flag in the inmate's profile on the Facility's Jail Management System.

g.  When an inmate with a medication flag is processed for discharge at the Facility, CCDOC shall escort the inmate to designated Cermak staff in the intake screening area of the Facility for discharge medication instructions.

h.  When CCDOC escorts an inmate with a medication flag to Cermak staff during discharge processing, Cermak staff shall provide the inmate with printed instructions regarding prescription medication and community resources.

i.  Each morning, CCDOC shall provide Cermak with a list of all inmates with medication flags who were discharged the previous day.

j.  Within 24 hours of discharge of an inmate with a medication flag, Cermak shall call in an appropriate prescription to the designated pharmacy on the Stroger Hospital campus to serve as a bridge until inmates can arrange for continuity of care in the community.

k.  CCDOC shall ensure that information about pending transfers of inmates is communicated to Cermak as soon as it is available.

l.  When CCDOC has advance notice and alerts Cermak of the pending transfer to another correctional facility of inmates with serious medical or mental health needs from detention, Cermak shall supply sufficient medication for the period of transit. In such cases, Cermak shall prepare and send with transferring inmates a transfer summary detailing major health problems and listing current medications and dosages, as well as medication history while at the Facility.

m. CCDOC shall ensure that the transfer summary and any other medical records provided by Cermak will accompany inmates, or will be made available electronically or transmitted by facsimile, when they are transferred from the Facility to another institution.

**Compliance Status:** This provision has been in substantial compliance since November 2015.

**Monitor's Findings:**

1. Cermak-Standard of Care- Substantial Compliance

   <u>Medication Dispensing and Packaging for Delivery:</u> The Pharmacy filled an average of 8,677 prescriptions each day from October 2015 through February 2016; an increase of 3.5% in the rate cited in the last report. Additional pharmacy positions were requested for 2016 to open the satellite pharmacy in VIII/RTU and expand clinical pharmacy services but not approved.

   <u>Medication Administration:</u> In the last six months of Cermak's own data which was reviewed for this report, there were 15 reports of medications given late or not at all because of short staffing, inmate disturbance or lack of correctional officers. The majority of these were on Division X (nine instances) and were due to either lack of nursing staff or inmate disturbances. During the site visit to Division X on April 20, morning medications were administered late because of a unit lockdown. Although CCDOC's audit tool includes observation of the timeliness of the start and stop times for medication administration this data was not reported. While Cermak has a system of notification when medication is delayed or not administered there is no documentation of actions taken to prevent patient harm, especially when there are repeated.

   The Monitoring Team observed inconsistent use of two-part identification, use of hand sanitizer and oral cavity checks by nurses and officers. These observations are consistent with the results of nursing audits we were provided. Also there were two incidents of patients not being properly identified and receiving the wrong medication as a result. Both took place in Division VII/RTU 5th floor (12/2015 and 2/2016). These may have occurred before the bar code scanning devices were provided. Policy and Procedure D-02.3 needs revision to include use of the barcode scanner and the audit tool should be modified as well.

   We applaud the initial efforts made by Cermak to examine reasons for refusals and urge consideration of systematic ways to reduce the incidence. Refusals take as much time to address as medication administration itself and contribute to the problem of untimely administration. Policy and Procedure D-02.3 requires that providers be notified after

three consecutive refusals but there are no expectations set forth about what the provider is to do with the information. At a minimum the Monitoring Team recommends that when notified of a refusal, the provider enters a clinical note indicating how the patient's disagreement with the treatment plan (refusal) was addressed. Given the volume of medications prescribed the Monitoring team suggests focusing data analysis on those medications where compliance is most important (chronic disease, other critical medications and antibiotics). Another suggestion is to focus analysis on those Divisions where refusals are highest (refusals appear highest in 2D2, Divisions X and XVII).

Medication Continuity:

Since April 16, 2015 inmates from Divisions III, VI, and IX are able to receive their medications before going to court (Division VI closed in February 2016). An average of 336 inmates a month receive medications now before going to court who would not if this process was not in place.

Upon review of a report listing patients on medications requiring more than twice daily dosing we could not identify any inmates who were on nurse administered medication with dosing schedules that exceed the availability of staff in the Division. This problem appears to have been solved.

Medication storage:  Labels were found on all medication vials and were being used correctly in all Divisions. Pyxis automated dispensing cabinets have been installed in all of the Divisions to handle over the counter medications. These cabinets have also been placed in the Dental clinics for dispensing initial doses. Related policies and procedures have not been revised to reflect the use of use of Pyxis. See section b. below.

Management of Controlled Substances: The Pharmacy monitors controlled substances closely and reports discrepancies internally. Internal discrepancy reports are reviewed and discussed in weekly patient safety meetings with appropriate action and follow up and action as necessary. The majority of count discrepancies are mistakes removing and returning medication to the Pyxis automated dispensing cabinets.  To remedy this, the

57

Pharmacy is re-training those nurses who are identified as making errors as well as initial training of all new nursing employees. The Pharmacy and Patient Care Services work closely to follow up on information about controlled substance discrepancies.

2. Cermak- Policies and procedures and systematic physician review–Substantial Compliance

The following policies and procedures need revision because of changes in how medications are accounted for and managed at Cermak.

- Policy D-02.3 Medication Distribution (approved 9/14/2015) needs revision to include instructions about the use of scanners to perform patient identification.
- Policy D-02.4 Electronic Medication Administration Record (eMAR) (approved 9/11/2015) does not give any procedural instructions about how to chart in either Cerner or Accuflo and should be revised to do so.
- D-07.2 Pyxis for Non-Controlled Substances which is due for annual review September 2016 needs revision to include use of OTCs in all Divisions and initial dosing in the Dental Clinics.
- E-11 Nursing Assessment Protocols (posted 1/30/2016). Part C. 4. Items c. and d. needs to be revised to include instructions on use of Pyxis rather than the OTC log, which is no longer kept. This should have been accomplished in the January 2016 revision.

Cermak and CCDOC each audit medication administration to bring actual practice into conformance with policy and procedure. The results of these audits are reviewed by the effected organizational units and are presented for review and discussion at the Cermak CQI Committee. There is some discussion of combining audit efforts and incorporating use of existing cameras to observe medication administration unobtrusively. Both are good ideas. In addition to the items already identified, auditing should include whether bar scanning was used as part of the two identifiers and whether medication administration starts and stops on time. It is also suggested that in locations where compliance is achieved that monitoring be done less frequently. Areas that are not

58

compliant with policy and procedure should be subject to more frequent monitoring. The Monitor will review these audit results at the next site visit. Continued auditing will be necessary to demonstrate the ability of CCDCOC and Cermak to identify and correct practice deviation in medication administration over the next 12 months.

3. Cermak-Hygienic, Appropriate and Concurrently Recorded- Substantial Compliance

Hygiene:   Cleanliness, hygiene and infection control during medication administration have improved significantly.

Appropriate: When medication is ordered there is an expectation that it is provided. Compliance or adherence rates in the general medical literature do not exclude refusals and neither should Cermak. Besides refusals (6% of all doses), inmates are not receiving medication because they are not present or do not show up at the time the medication is to be administered (7%). In another 3% of doses the medication is not available, not given or not documented. The monitoring team recommends narrowing the focus of inquiry to adherence with certain medications (for chronic diseases, critical medications and antibiotics). Also rates of adherence (or lack of adherence) should be proportionate to the population in each Division. Once this more narrowly focused information is available, root cause analysis should identify areas for rapid improvement using the PDSA (Plan Do Study Act) cycle.

A repeat study of the timeliness from orders written at intake for critical medications to first dose was completed in February 2016 and the results reviewed with the Monitor's Team. Findings were that of 17 orders for critical medications 88% were administered within 24 hours. The timeframe for initiating HIV medications was determined on a case-by-case basis based on the patient and found to be appropriate. Record review showed that once prescribed, patients timely received HIV medications. Since the study is limited to critical medications the benchmark of 80% should also be reconsidered.   We recommend the benchmark for critical medication adherence be set at 90%.   When

automation can support more data analysis, monitoring of timeliness to first dose needs to be expanded to include new orders written for patients while in population and other important medications.

Concurrently Recorded Medication administration or delivery is documented in either the Cerner EMR or Accuflo. Based upon the data Cerner provided on medication not administered for the months October 2015 through March 2016 it appears that failure to document accounts for 20% of the instances. The Monitoring team will be interested in seeing if documentation improves as a result of Cermak's efforts to drill down on why patients do not receive prescribed medication. Also missing documentation on the electronic record should be reconciled to see if a paper MAR was used.

4. Cermak-Staffing: Substantial Compliance (June 2011)
   Appropriately qualified nursing staff administers or deliver medication.  This finding has been in substantial compliance since the June 2011 report.

5. Cermak-Flagged Medication Procedure –Substantial Compliance (November 2014)
   Cermak is using the term "Discharge Medications" to alert CCDOC, via an interface with CCOMS, of inmates who are prescribed "flagged medications" as listed in the Agreed Order.

6. CCDOC-Flagged Medication Noted on JMS-Substantial Compliance (November 2014)

7. CCDOC-Discharge medication instructions-Substantial Compliance (November 2014)

8. Cermak- Provides printed instructions- Substantial Compliance (November 2014)

9. CCDOC- List of inmates discharged -Substantial Compliance (November 2014)

10. Cermak- Prescription within 24 hours of discharge -Substantial Compliance (November 2014)

60

The process described in the Eighth Report referred to as "Discharge Meds before Release" is still in place and functioning as intended.

Policy # E-13 Discharge Planning and # E-13.2 Discharge Planning for Mental Health Patients were revised to coincide with the Agreed Order and the process used now to provide medications to inmates at the time of discharge.

A repeat study on the timeliness of discharge orders written in February 2016 was completed. The study identified both errors and omissions in the process used for notification. There were 32 patients included who should not have been and eleven patients who had a discharge medication alert in the system but Cermak did not receive notice of the discharge from CCDOC. Prescriptions were available within 24 hours of notification for 93% of the inmates who have alerts for medications on discharge. Cermak's goal is to have 100% of prescriptions available within 24 hours of notification of discharge. Continued monitoring of the process for discharge prescriptions is planned.

11. CCDOC- Transfer Information to Cermak- Substantial Compliance (November 2014)

Discharge information is still being monitored daily by Cerner IT staff and manually corrected while CCDOC is working to reconcile differences between staff workflow and the CCOMS system. This work around is still a labor intensive process for IT staff and clinicians as well. Losing active treatment orders because of erroneous discharges is also a significant patient safety issue and permanent correction needs to take place.

12. Cermak-Medication for Transit- Substantial Compliance (June 2011)
This section has been in compliance since June 2011.

13. CCDOC-Record Transfer Between Facilities-Substantial Compliance (May 2014)
This section has been in compliance since May 2014.

**Monitor's Recommendations:**

61

1. Continue to examine reasons why inmates do not receive or take medications, set benchmarks for medication adherence, identify opportunities and implement systematic changes to improve adherence. Reduce the incidence of no documentation on the electronic MAR.

2. Revise procedure D-02.3 to include an expectation that the provider enters a clinical note indicating how the patient's disagreement with the treatment plan (refusal) was addressed.

3. Develop a daily report of critical medication doses that are missed and provide it to the Nurse Managers and Medical Director for immediate corrective action.

4. Establish expectations for providers to take in acting on notification of patient medication refusal and incorporate these into policy.

5. CCDOC and Cermak continue to audit medication administration practices and demonstrate the ability to identify problems and take corrective action to improve conformance with the Interagency Directive, General Order and Cermak Policy D-02.3.

6. Revise Policy D-02.4 to include procedural steps for documentation on the electronic MAR.

7. Revise Policy D-02.3 to include use of the barcode scanner when it is fully operational and modify the nursing audit tool to include use of the bar code scanner.

8. Revise Policy D-07.2 Pyxis for Non-Controlled Substances and E-11 Nursing Assessment Protocols to include instructions on use of Pyxis for over the counter medications.

9.  Continue to monitor periodically the timeliness to first dose and expand it to include other critical medications and orders written at times other than intake.

10. Establish the benchmark for adherence with critical medications at 90% or above.

11. CCDOC should continue working to reconcile differences between staff workflow and the CCOMS system to prevent erroneous discharges.

12. Self-monitoring recommendations and status:

    a)  Missing medications-monitored currently

    b)  Controlled substance discrepancies and compliance with policy- monitored currently

    c)  Time from order to first dose for KOP and dose by dose medications- monitored currently

    d)  Patients on flagged medications who receive discharge prescriptions- monitored currently

    e)  Compliance with policies for medication delivery, administration and documentation- monitored currently

    f)  Patient adherence with dose by dose medication- monitored currently

    g)  Automation downtime and program performance- monitored currently

    h)  Pharmacy retention and vacancy rate- monitored currently

## 57. Specialty Care

a.  Cermak shall ensure that inmates whose serious medical or mental health needs extend beyond the services available at the Facility shall receive timely and appropriate referral for specialty care to appropriate medical or mental health care professionals qualified to meet their needs.

b.  Upon reasonable notification by Cermak, CCDOC will transport inmates who have been referred for outside specialty care to their appointments.

c.  Cermak shall ensure that inmates who have been referred for outside specialty care by the medical staff or another specialty care provider are scheduled for timely outside care appointments. Cermak shall provide reasonable notice to CCDOC of such appointments so that CCDOC can arrange transportation. Inmates waiting outside care shall be seen by Qualified Medical Staff as medically necessary, at clinically appropriate intervals, to evaluate the current urgency of the problem and respond as medically appropriate. If an inmate refuses treatment following transport for a scheduled appointment, Cermak shall have the inmate document his refusal in writing and include such documentation in the inmate's medical record.

d.  Cermak shall maintain a current log of all inmates who have been referred for outside specialty care, including the date of the referral, the date the appointment was scheduled, the date the appointment occurred, the reason for any missed or delayed appointments, and information on follow-up care, including the dates of any future appointments.

e.  Cermak shall ensure that pregnant inmates are provided adequate pre-natal care. Cermak shall develop and implement appropriate written policies and protocols for the treatment of pregnant inmates, including appropriate screening, treatment and management of high-risk pregnancies.

**Compliance Status:** This provision remains in Substantial Compliance **but needs attention**

- Substantial Compliance
- Substantial Compliance
- Substantial Compliance (needs attention)
- Substantial Compliance (needs attention)
- Substantial Compliance

**Monitor's Findings:**

Chart reviews, as well as the process for specialty care, was reviewed on a sample of patients who were sent to the hospital for specialty clinics and procedures.

Patients are referred timely by the provider to the specialty clinic and received an appointment as needed. The providers call the specialist and expedite the visit for any high risk patients.

The patients are transported to their appointment by CCDOC unless the patient refuses or has a court visit. The appointments are being rescheduled by the coordinator in a timely manner if the visit is missed.

The patient is required to meet with the medical staff if they refuse their specialty clinic visit. The CCDOC is notifying the scheduler regarding any refusals or cancellations so that the scheduler can reschedule. There is no systematic process to notify the provider of any cancellations or refusals and it needs to be more efficient and timely. The patients are monitored by the primary care provider while waiting for an appointment with the specialty clinic. The patients who return from specialty clinic visits or special procedures are returning to the urgent care clinic. There is a process breakdown that is explained in the follow-up visit section of this report.

The scheduler is not aware of all the referrals made from the Jail. There are multiple ways that a referral can be accomplished. The scheduling staff has a database to monitor the patients who have a referral but the database needs additional data elements to track the referrals and their status effectively. The past recommendations have not been implemented yet. The current process is very person dependent and needs a written process to describe the flow and standardization of work to be accomplished. IT staff have developed a project to address the above issues.

Obstetrics care remains in substantial compliance.

**Monitor's Recommendations:**

1. Track all referrals requests to specialty clinics.

2. Create a template for a hospital return note for providers and nurses to help document all relevant information.

3. Add the additional data elements as discussed to the database for scheduled visits (include the referral date, clinic name, appointment date, status of appointment, if the patient was seen on return, date and time seen on return, referring provider notified of appointment date, if refused, rescheduled or cancelled.). Use this database to monitor performance and identify improvement activities.

4. Self-Monitoring:
   a) Continue to perform ongoing continuous quality improvement reviews for pregnant women.
   b) Audit at least five specialty clinic referrals and five procedure referrals each month to check if the patient was seen by the specialty clinic timely, was the patient provided adequate care while waiting for the offsite visit, seen on return, appropriateness of documentation, were hospital records reviewed, documentation of implementing discharge instructions, and if not, was the reason documented, medication reconciliation, problem list updated, appropriateness of housing in the jail, patient educated on the plan of care, test results, etc. (the documentation templates will help make this audit easy to do).

## 58. Dental Care

a. Cermak shall ensure that inmates receive adequate dental care, and follow up, in accordance with generally accepted correctional standards of care. Such care should be provided in a timely manner, taking into consideration the acuity of the problem and the inmate's anticipated length of stay. Dental care shall not be limited to extractions.

b. Cermak shall ensure that adequate dentist staffing and hours shall be provided to avoid unreasonable delays in dental care.

**Compliance Status:** This provision is now in substantial compliance.

**Monitors' findings:**

The Monitoring team met with Director of Cermak Dental Services. We were able to find evidence of nursing face to face encounters in 80% of the cases audited. There has been one additional full time dentist added to Cermak dental staff. Unfortunately, there has also been one departure thus keeping the overall dental staffing pattern unchanged:

1) 8 dental assistants
2) 2 dental hygienists
3) 7 dentists

Again, the Monitoring Team received a comprehensive self-assessment and process improvement plan that included action plan items and audit results for the past 6 months. Included in this document were monthly encounter numbers as well as a breakdown of extractions vs. restorative procedures. Dental services now handle the majority of their own appointments based on the HSRF received (all HSRF regardless of acuity, all follow up appointments). The rest of the appointments are scheduled through the scheduling center (annual exams, consults, provider referrals, etc.). Dental services has provided additional training for the central scheduling staff to improve the accuracy and timeliness of the dental referrals.

a) Dental services continues to utilize a manual log of all dental clinic appointments to track the following information:
   - Date of actual HSRF
   - Date the HSRF is emailed to the dental clinic
   - Date of dental clinic appointment
   - Gender of inmate with dental complaint
   - Reason for visit (symptomatic vs. asymptomatic

This log was used by the monitoring team to audit the timeliness of dental services. Ten records were selected at random that included both male and female inmates with both "Urgent" and "Priority" assigned dental complaints. This audit confirmed the overall self-assessment report that was presented to the Monitoring Team by Cermak dental services. This report was based on 100% of all dental encounters over the past several months! The timeliness compliance report for different divisions and acuities was for the most part in compliance with the wait times set according to the revised dental policy:

a) Emergent                same day
b) Urgent                  within 3 business days
c) Priority                 within 14 days
d) Routine                 within 30 days
e) Annual exam        within 90 days

**Monitor's Recommendations:**

1. Continue to expand the dental services with the additional dentist and oral surgeon positions that continue to be vacant.

2. Continue to pursue the opening of the new RTU dental clinic that will greatly assist the dental services in reducing the dental services wait times.

3. Request assistance from IT to replace the manual log with an automated electronic tool in Cerner EMR.

## 68. Suicide Prevention Training

a. Cermak shall ensure that the Facility's suicide prevention curriculum for health care staff members, jointly established with CCDOC, addresses the following topics:
    i. the suicide prevention policy as revised consistent with this Agreed Order;
    ii. why facility environments may contribute to suicidal behavior;

iii.     potential predisposing factors to suicide;

iv.     high risk suicide periods;

v.     warning signs and symptoms of suicidal behavior;

vi.     observation techniques;

vii.     searches of inmates who are placed on Suicide Precautions;

viii.     case studies of recent suicides and serious suicide attempts (Serious suicide attempts are typically considered to be those that either were potentially life-threatening or that required medical attention);

ix.     mock demonstrations regarding the proper response to a suicide attempt; and

x.     The proper use of emergency equipment, including suicide cut-down tools.

b.   Within 24 months of the effective date of this Agreed Order, CCDOC shall train all CCDOC staff members who work with inmates on the Facility's suicide prevention program. Implementation of such training shall begin as soon as possible following the effective date of this Agreed Order. Staff shall demonstrate competency in the verbal and behavioral cues that indicate potential suicide, and how to respond appropriately. Initial and at least annual training shall be provided in accordance with generally accepted professional standards.

c.   Within 12 months of the effective date of this Agreed Order, Cermak shall train all Cermak staff members who work with inmates on the Facility's suicide prevention program. Implementation of such training shall begin as soon as possible following the effective date of this Agreed Order. Staff shall demonstrate competency in the verbal and behavioral cues that indicate potential suicide, and how to respond appropriately. Initial and at least annual training shall be provided in accordance with generally accepted professional standards.

**Compliance Status:** This provision remains in substantial compliance.

**Monitor's Findings:**

The Monitoring Team audited 10 random records for CCDOC officers and was able to verify annual suicide prevention training for nine officers (one office has been on leave of absence). We

were additionally able to verify suicide prevention training for the CCDOC officers who were assigned to the area where the most recent death in custody case occurred. The Monitoring Team once again raises the concern that since our last monitoring visit there has been two more death-in-custody case due to suicide.

**Monitor's Recommendations:**

None.

## 86. Quality Management and Performance Measurement

a. Defendants shall each develop and implement written quality management policies and procedures, in accordance with generally accepted correctional standards, to regularly assess, identify, and take all reasonable measures to assure compliance with each of the provisions of this Agreed Order applicable to that Defendant.

b. Defendants shall each develop and implement policies to address and correct deficiencies that are uncovered during the course of quality management activities, including monitoring corrective actions over time to ensure sustained resolution, for each of the provisions of this Agreed Order applicable to that Defendant.

c. CCDOC shall participate with Cermak and DFM in a jointly established Health Care Quality Improvement Committee, to be charged with developing and implementing a joint quality improvement program. CCDOC shall contribute the time and effort of CCDOC staff members who, by virtue of their authority, current responsibilities, and/or past experience, can provide this committee with needed correctional representation.

d. Cermak shall participate with CCDOC and DFM in a jointly established Health Care Quality Improvement Committee, to be charged with developing and implementing a joint quality improvement program. Cermak will work with CCDOC and DFM to identify those CCDOC and DFM staff members who, by virtue of their authority, current responsibilities, and/or past experience, can provide this committee with needed correctional representation. Quality management programs related to medical and mental

health care will utilize performance measurements to assess quality of care and timely access to care with quantitative and qualitative data analysis and trending over time.

e. DFM shall participate with CCDOC and Cermak in a jointly established Health Care Quality Improvement Committee, to be charged with developing and implementing a joint quality improvement program. DFM shall contribute the time and effort of DFM staff members who, by virtue of their authority, current responsibilities, and/or past experience, can provide this committee with needed correctional representation.

**Compliance Status:** This provision remains in Partial Compliance.

- Partial Compliance
- Partial Compliance
- Substantial Compliance
- Substantial Compliance
- Substantial Compliance

**Monitor's Findings:**

Cermak is developing a quality management plan. The draft of the plan was reviewed and found to be comprehensive. However, the plan needs to include the departmental performance metrics. Cermak is in the process of establishing the departmental level performance metrics for each of the provisions. Cermak will finalize the plan and the departmental performance metrics and present it to the CQI committee. The plan will be implemented once it's approved by the CQI committee. CCDOC is found to be in compliance with the intent of this order.

Cermak is creating a standard action plan format to address and correct deficiencies that are uncovered through various monitoring activities. The action plans will be tracked, updated and reviewed periodically to ensure completion and its impact on performance. Project charters have been developed for major initiatives and approved by the CQI committee. A

weekly multi-disciplinary safety meeting has been established to review the recent safety events and grievances. CCDOC is found to be in compliance with the intent of this order.

CCDOC is participating actively with Cermak and DFM in a jointly established Health Care Quality Improvement Committee. The team has been very successful in addressing improvement opportunities.

Cermak is participating actively with CCDOC and DFM in a jointly established Health Care Quality Improvement Committee. The quality management program is starting to use performance measurements to assess quality of care and timely access to care with quantitative and qualitative data analysis and trending over time.

DFM Cermak is participating with CCDOC and Cermak in a jointly established Health Care Quality Improvement Committee

**Monitor's Recommendations:**

1. Continue the weekly safety meetings and the monthly CQI meetings to discuss opportunities for improvement.

2. Identify departmental/service level metrics to measure performance of process, quality and outcomes.

3. Metrics should include
   a) process  and outcome measures to ensure compliance with policies and procedures
   b) professional performance measures of clinical staff based on their functions (quality of care and productivity)

4. All Managers should do daily rounding in their areas to ensure completion of tasks, quality of service, environmental checks, and address any patient or staff issues.

5. Create action plans for each of the non-compliant items and track the status periodically during the quality meetings.

6. Share the data with the staff during the staff meetings and document minutes.

7. Check to see if the action plans helped fix the problem, if not, make necessary changes to the action plan and implement.

8. Review the departmental performance metrics for each of the services/locations during the quality meetings on a rotating schedule, so each area/ service gets reviewed at least once every three months.

9. Establish multidisciplinary work groups to periodically review major activities like medication administration, sick call, infirmary care, intake processes, emergency care, etc.  The work group should review current performance, challenges and identify opportunities for continuous improvement.  The recommendations of the work group should be reviewed during the quality meeting by the leadership team and considered for implementation.

10. Continue to work on the system level Performance Improvement Projects that will help improve safety, quality and efficiency.