# UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

**UNITED STATES OF AMERICA,**

       **Plaintiff,**

**v.**

**COOK COUNTY, ILLINOIS;**           No. 10 C 2946
**THOMAS DART, COOK COUNTY**
**SHERIFF (in his official capacity);**    Judge Virginia Kendall
**TONI PRECKWINKLE, COOK COUNTY**
**BOARD PRESIDENT (in her official capacity);**
**COOK COUNTY BOARD OF**
**COMMISSIONERS (in their official capacity),**

       **Defendants**

---

## Report No. 12
## Corrections Monitor Susan W. McCampbell
## November 21, 2016

---

Susan W. McCampbell, MCRP, CJM, President
McCampbell and Associates, Inc.
1880 Crestview Way
Naples, Florida 34119-3302
(239) 597-5906
Email: susanmccampbell@mccampbellassoc.com

# Independent Monitoring Report No. 12

Corrections Monitor Susan W. McCampbell

## Summary

Compliance Report # 11 documented five paragraphs in the Agreed Order that required attention by the Defendants.  The findings of the tour of March 2016 found those paragraphs moved from substantial to partial compliance and outlined Defendant's activities needed to regain compliance and assure sustainability of important initiatives.  These five paragraphs are:

- 31.e. – Use of Force - Review of reporting
- 31.f. – Use of Force - Review of incidents
- 34.d – Incidents and Referrals - Administrative review
- 34.f. – Incidents and Referrals - Investigations
- 38.d. – Inmate Grievance Procedures - Grievance analysis

Two additional paragraphs were identified as needing  attention to prevent them from moving out of substantial compliance; but these were found to remain in substantial compliance.

- 31.k. – Use of force – Early Warning System
- 32.f. – Safety and Supervision - Contraband

The Defendants are commended for their hard work to address the issues identified in Compliance Report # 11.  It is clear the Defendants, although suffering a setback with the results of the Compliance Report # 11, have used this as an opportunity to significantly improve and enhance their operations.

## Focus of this Report

All Agreed Order provisions that were monitored by me, except those paragraphs in Paragraphs 31, 34, and 38[1] and Sub-paragraph 32.f, were terminated and no longer subject to monitoring based on a Stipulated Agreement to the Agreed Order filed with the Court on May 20, 2016.  Therefore, this report addresses the paragraphs noted above.   Compliance Report # 11 also outlined suggested attention to other issues, and included recommendations.  The Defendants have addressed those since the on-site tour in March, and hence this Report provides the responses.

The Stipulated Agreement to the Agreed Order provides that I immediately notify the Defendants if I believe there is a potential that a paragraph might fail to meet the continuing criteria for Substantial Compliance.  Accordingly, I notified the Defendants on

---

[1] These are Paragraphs 31.a-t, 34.a-g, and 38.a-d.  This means Agreed Order Paragraphs 32 (except Sub-paragraph 32.f), 33, 35, 36, 37, 39, 40, 41 and 69 were terminated.

July 21, 2016 regarding concerns about compliance with paragraphs in Security Staffing section of the Agreed Order: 33.b., 33.f., 33.g. and 33.h. The issues regarded adequate custody staffing and were included in Esmaeil Porsa, MD's, Compliance Report # 12.[2] Since July, I have conferred with the parties, with DOJ and with Dr. Porsa. The compliance with these paragraphs will be assessed by Dr. Porsa's during his upcoming tour. If any additional concerns emerge from Dr. Porsa's tour, Paragraph 54. of the Agreed Order, Access to Health Care, can be the vehicle to address any documented issues regarding custody staff and access to care through Dr. Porsa's monitoring.

The draft of this report was provided to all parties on October 28, 2016, requesting comments, corrections, etc. by November 18, 2016. The comments received from the defendants were carefully considering as this report was finalized.

**Findings – Substantial Compliance**

I toured the Cook County Dept. of Corrections and met with staff on August 31, 2016 and October 11 – 14, 2016. Based on those tours, meetings, and telephone calls, as well as a through review of materials provided to me since Compliance Report # 11 was published on May 17, 2016, I find that the five paragraphs, identified on page 1, have regained the status of Substantial Compliance. The two additional paragraphs recommended for the Defendants' attention have yielded updated policies and renewed priority focus.

This report will address the work of the Defendants to obtain this status, and the results of those efforts. This report will also present concerns about several topics, as well as discussion of the sustainability of the initiatives.

**Defendants' Work Activities, Products, Outcomes**

The Defendants' response to Compliance Report # 11, and the provisions of the Stipulated Agreement to the Agreed Order (May 2016) were to develop a plan(s) of action for each of the six provisions. These plans, shared with me and DOJ, outlined:

- The issue(s) to be addressed (from Compliance Report # 11);
- Goals;
- Specific activities (including target dates and persons responsible);
- Evaluative results/process;
- How the changes are embedded in the organization, proofs of compliance/products; and
- Responsibilities for on-going compliance.

This report is not intended to identify <u>all</u> of the initiatives accomplished by the Defendants, but rather highlight the most critical work. It appears to me that as the Defendants reviewed the issues raised in Compliance Report # 11, they did not limit their response

---

[2] Dr. Porsa's 12th Compliance Report was filed on June 23, 2016.

narrowly to those findings, but rather took a wider, inclusive approach to all potential elements of strategies to enhance operations. I recognize and acknowledge the more than good faith efforts, all, I believe, targeted toward sustainable improvements.

Here, I examine both (1) what are new initiatives have been implemented since Compliance Report # 11, and (2) the expansion of activities in place prior to the tour in March 2016. These are the initiatives implemented with the action planning process that lead me to my findings of substantial compliance with the five paragraphs.

**New Initiatives**

1.   Case Review Unit (31.e. and f.)

The Case Review Unit was formed in July 18, 2016 and organizationally placed outside CCDOC[3] in the Bureau of Intelligence and Investigations (BII). The objectives of the CRU are to assure a systematic review of all reported incidents in CCDOC, each day. Three Assistant Executive Directors (AEDs) from CCDOC were transferred to this Unit. This level of leadership was established to clearly underline the critical nature of this work. After reviewing reports, the Unit refers incidents for follow-up as necessary in terms of both the quality and completeness of reporting to the issues involved in the incident itself. There are now 13 individuals assigned to this unit, with more possibility to be added. The written directive (# 231) governing this unit was effective on October 3, 2016.

The work of the CRU does not replace or supplant investigations that are, by policy, under the purview of either the Office of Professional Review (OPR) or the Use of Force Review Unit (UFRU). The CRU is intended to focus primarily on administrative issues, working closely with OPR and UFRU.

One of my work activities for the past several years has been to review CCDOC's weekly incident reports summaries and pose questions to CCDOC about the *processes* and *systems* that the incidents revealed. For example, questions about: when the last time a unit was searched when "hooch" is discovered, circumstances surrounding the use of force involving an inmate on the mental health caseload and, what were staff activities in direct supervision units just prior to an inmate altercation, etc.? Periodically I requested video of the incident. CCDOC provided written responses and videos. In addition to my questions, I have the ability, with a CCDOC-issued laptop to access incident reports and/or inmate information.

In August, when I visited with the new Case Review Unit and spoke with the three AEDs assigned to the unit, I subsequently suspended my weekly reviews, as I believed, based on those interviews that the questions I asked over the years were

---

[3] The Unit ultimately reports to Bureau Chief Bradley Curry of the Bureau of Intelligence and Investigations. The BII and CCDOC are both part of the Cook County Sheriff's Office.

now being consistently asked and issues reviewed. No longer die CCDOC need to formulate responses to "susan" questions (as captioned by CCDOC).

Another feature of the Case Review Unit is the process labeled "panel reviews" in which the data about a specific division is shared and discussed between the BII leadership and the relevant facility's superintendent. The review also includes any Bureau of Analytics and Research (BAR) reports about the division's operations and/or the findings of the Case Review Unit.[4] This "panel review" process has not yet been included in policy, although there is a plan to include this process in the Quality Improvement (QI) policy.[5]

Expected Impact: While the Case Review Unit is not intended to usurp the thorough reviews needed at the facility level (both supervisory and leadership), their work will provide quality control to the process, identify broader policy and/or safety emerging issues, inform facility leadership of potential weaknesses, mentor emerging leaders, advise the training unit of areas for future work, and transmit to the organization the degree of seriousness about the requirements to accurately report incidents.

Concerns: The initiative is new. There is preliminary data to describe the impact and workflow of the unit. A spreadsheet was provided indicating the totality of the Unit's work, but no summary data.[6] At the end of the day, the evaluation of the Unit's effectiveness will need to rely on objectives measures plotted against anticipated improvement outcomes.

2.     Quality Improvement Initiatives/Committee (34.d. and f).

The policy governing the Quality Improvement (QI) Committee was issued on August 8, 2016. The Director of Quality Improvement and Accountability (DQIA) oversees the process, including agenda and meeting minutes. The work of the Committee is supplemented and informed by BAR reports on the topics on the agenda. Additionally, the DQIA reports she conducts quarterly audits to insure that the work is at the expected quality and sustainable. QI Committee meeting minutes were provided for the period since May 13th. Three "control reports" were provided for review, all from September 2016. The topics of these minutes reflect the current matters of concern in the jail system – health care issues, contraband, and critical incidents.

Expected Impact: A robust quality improvement process is essential to any high functioning organization. Respectful and professional self-critical analysis is also important. Open dialogue about what went right, and what didn't before moving to

---

[4] See page 6 for more information on Bureau of Analytics and Research (BAR).

[5] Defendants indicate the policy was finalized on 11/1/16.

[6] The defendants note that a summary was prepared following the tour, covering the period since the unit began in July 18th – through October 27th.

consider other options, along with documentation of the initiative will assure forward progress.  Quality improvement is not a straight line, nor is it expected to be so.  The process needs to allow for re-assessing issues, admitting that strategies didn't achieve the expected outcome, and engagement in mid-course corrections.

Concerns:  This initiative is new.  The directive has been in place for two months. The minutes demonstrate an improving documentation of work and who is responsible in what time frame.   There is as of now, no "track record" of the outcomes of this initiative.

## Expanded Initiatives

These are the expanded initiatives that will inform the processes established to assure on-going and sustainable compliance.

3.    Engagements/Notifications

To assure that the leadership is notified of incidents, including use of force incidents, notification redundancies have been created to assure relevant parties up and down the chain-of-command are notified.

Expected Impact:  Increasing notifications expands the opportunities to assure that incidents are not missed.

Concerns:  I have no concerns about the expanded notification systems, and trust that the agency will evaluate its effectiveness in the future.

4.    Cook County Sheriff's Office of Research, Bureau of Analytics and Research (BAR)[7]

CCDOC is benefiting from expansion of analytical activities related to operational practices, and data-driven review of options.  There were several BAR reports provided to demonstrate how the currently available data can be viewed to further define a problem, or assess possible solutions.  As described by CCDOC – BAR takes on the "hot button" issues.  Among the topics provided as examples were analyses of:  serial inmate filers of grievances, batteries of officers, locations of inmate altercations, impact of notifications to arresting agencies about findings of contraband on arriving arrestees; and effectiveness of use of force supplemental training.  The goal is not to produce research-heavy documents, but rather to provide snap shots, data based, that provide usable information to guide operational decisions and deployments.

---

[7] Organizationally this unit falls under the Chief Performance Officer in the Cook County Sheriff's Executive Office.

Expected Impact:  The objective analysis of available data, drilling down into the data, and evaluating outcomes is essential to effective operations.  BAR staff are clearly committed to their work, and with more experience, will enhance the unit's methodologies and strength of findings.  This is positive, and practically an unknown resource for most jails, especially jails the size of CCDOC.

Concerns:  The level of sophistication of the reports will improve as the staff become more comfortable with the expertise needed for effective reviews.  There are models of national research that can be applied.  Additionally, there are no written directives approved at this time guiding the work. While no doubt CCSO wants to continue this work, there is no evidence of sustainability via a written directive at this time.

5.    Data Management

As reported in previous compliance reports, CCDOC has a very robust incident reporting and data collection system.  This has been internally developed, providing the advantage of flexibility and responsiveness to the users.  The question in the past posed by compliance reports is if and how CCDOC is using the data it has available to keep inmates and staff safe.  Through the design of "dashboards" developed with end-users, the system now is responsive to the daily and emerging needs of the decision-makers.  The Defendants have spent considerable time orienting users to the system, as well as taking their advice about how to modify the end product.  The organization is making it clear to current and emerging leaders that their competency in using the data is important to their success.

Examples were provided, both in hard copy, and via live data, of the way in which data is displayed in the dashboards to enable better decisions.  For example, the data displays incidents by time of day and day of week, which easily allows managers to identify the "hot spots" and immediately deploy staff.   This work is leading-edge in this field in terms of format (dashboards) and importantly in the ability of operational staff to apply it to everyday challenges.

Expected Impact:  It is apparent that the decision-makers at the facility level are using the data to inform their decisions.   This will allow initiatives to be data driven and able to be evaluated.  The multiple dashboards created, including those to be discussed later in this report regarding uses of force, will have a tremendous positive impact, and if used, will generate their own sustainability.

Concerns:  I have few concerns about this excellent work – other than the hope that the data will drive decisions, and that it is not data for data's sake.  This means that there needs to be periodic review of the scope of the work and refinements as needed.

6.    Weapons/Contraband Free Committee (32.f.)

This Committee expands on the excellent work previously done in CCDOC.  A revised policy has an effective date of August 8, 2016.   At the initiation of the monitoring of the Agreed Order in 2010, one of the innovative and impactful initiatives of CCDOC was the weapons free facilities work – given the amount of contraband, often manufactured/created by the inmates literally taking buildings apart.   A dashboard has been created to capture relevant data on seizures and noted trends.   Copies of minutes of the Committee meetings were also supplied.  BAR also adds to the dialogue by providing monthly reports.

Expected Impact:  In a system as large as CCDOC and with the number of aging facilities, there is continual opportunity to create contraband/weapons, and/or the multiple ways for introduction through visitors, employees and arrestees requires careful, regular assessment.  This work was on-going at the start of the monitoring of the Agreed Order and now appears to have a renewed sense of priority.  There is also integration between with Committee and the QI Committee.

Concerns:  This was a priority at the initiation of the Agreed Order - to assure inmates and staff are protected from harm, but for some reason the work was trending toward ineffective and/or ignored.  With the emphasis on contraband and weapons, with the leadership, and the audits to assure ongoing compliance with policy, I have no concerns about this work at this time.

7.    Early Intervention System (EIS) (31.k)

The EIS is intended to alert leadership if staff are involved in multiple incidents, such as uses of force.  The Defendants' system has been operational for several years, and has been enhanced by the inmate grievance early warning system (which identifies staff names in grievances).  Whether or not the EIS was achieving its goals of remediating/disciplining/terminating employees was the unanswered question.  The Use of Force Review Unit (UFRU) provides remedial training for staff identified as needing re-training involving that issue.   New to CCDOC is the integration of the Employee Intervention Coordinator for the Early Intervention System (EIS)[8] who introduced his proactive philosophy during one of the recent meetings in October.  Collaboration and focused actions among these three entities – UFRU, grievances and Employee Intervention is intended to result in a safer jail environment.

Expected Impact:  Focusing on alerts before an employee is injured and/or violates policy(ies) specific to use of force is the goal.  But the alerts have to trigger an action that is in turn measurable (e.g. staff not involved again, incidents lower).

Concerns:  Measuring human interaction in the difficult jail environment is challenging.  Addressing each employee individually in a remedial rather than punitive setting appears to be working for CCDOC.  My concerns about this initiative are the recent implementation of some components, and the lack of a "track record."

---

[8] The revised EIS directive was effective August 8, 2016.

I am pleased to see that the measurement of outcomes has been started through BAR.

8. <u>Application of Inmate Grievance Data to Facility Decision - Making</u> (38.d.)

The inmate grievance process has transitioned since the beginning of monitoring the Agreed Order in 2010. It is now used as a means of tracking trends and inmate issues, it is not just not just about the grievance. How this information was being used, and the associated documentation of the use by leadership is the reason the paragraph was placed in partial compliance in March. Since that time, there are initiatives to inform the divisions with meetings among the leadership and the grievance staff. The idea is for the facility's management to "connect the dots" between the data gleaned from looking at grievances and other issues or incidents happening in the facility. The focus is, according to the AED in charge of this work, to get to the "root cause" of the grievances. To that end, the grievance staff have nine (9) active action plans to address issues identified in the process described above. [9] The Defendants provided BAR reports of detainee grievance trends, and minutes of Interagency and other meetings indicating collaborative problem-solving.[10] Focus groups were also held in June with inmates to further inform revisions/updating to the inmate grievance process.

Another innovation that results from listening to inmates, and considering options, is the pilot program in Division 6 establishing a call-in line for inmates to make verbal grievances. This is very unique in the jail world and should provide interesting information in terms of how quickly inmate issues can be resolved versus the "traditional" written grievances.

Expected Impact: The change in philosophy over time at CCDOC from just counting and responding to inmate grievances, to capturing the data by facility, examining trends, integrating with the QI Committee, and helping staff who may be specifically named in grievances, provides an good approach to assuring facility and inmate safety. Rather than just counting the number of grievances, the focus on problem-identification and resolutions, assisted by BAR reports is commendable.

Concerns: The integration of these processes is relatively recent. I have no concerns about the philosophy, or the commitment of the Defendants. Not much

---

[9] I reviewed the Interagency Action Plan to Reduce Grievance Volume dated 8/24/26, and the Facilities Management Action Plan to Reduce Grievance Volume. These documents are commendable for their approach to problem-solving, and the Facilities Management Action Plan may benefit from more accountability measures/time lines included the documents to keep the parties on track.

[10] The relevant BAR reviews included: Relationship between incidents and serial grievance writes in CCDOC (8/26/16), and Relationship between Grievances and Programming (9/6/16 and 9/19/16). As noted elsewhere in this report, these are good reports to guide operations, but there is not a "track record" of the outcome of the work via an action plan and/or related activities. A report from May 4, 2016 provided an analysis of data for grievances filed "between 2013 and 2015". Also provide was a report from June 6,2 016 entitled "A Second Look at Detainee Grievances."

time has passed since these initiatives were expanded, prioritized, and action plans developed and implemented.

9.    Office of Professional Review (OPR) (31.f.)

OPR reorganized staff resources in 2015 and as a result there is no backlog of cases awaiting investigation.   Data provided by OPR indicates for each month the cases opened and closed, as well as the high priority allegations under review (e.g. excessive force, failure to protect, denial of medical care, and sexual assault/abuse). For the first nine months of CY 2016, OPR reports there are 391 open investigations, including 111 open excessive force investigations, as well as 131 completed excessive force investigations, the results of which were:  4 closed administratively, 8 exonerated, 58 not sustained, 49 sustained and 11 unfounded.  OPR reports that for 2014 through the first nine months of 2016, 51 cases were referred for prosecution, of these 18 cases were declined, 14 are pending a prosecutorial decision, and 19 arrests were made.

BAR has also provided analysis of data from OPR, for example, a review of excessive force cases opened between May 2016 and the end of September.  The involvement of an entity outside OPR to review information is another positive element of the redundant systems being created within CCSO.

Expected Outcome:  Timely, credible, and thorough investigation into allegations of excessive force and staff misconduct are critical to inmate safety.  The growth of OPR has included better allocation of staff resources to clear the backlog of cases.

Concerns:  I have no concerns about the leadership, direction and/or management of OPR.  I have watched the section grow over the last six years, and address the backlog of cases, and the establishment of its reputation with both inmates and staff. I believe their work is a model for other jail systems.

10.    Critical Incident Review (CIR) (31.e. and f.)

Philosophically, public agencies grow and evolve into the ability to do self-critical reviews, root cause analyses, etc. when the internal culture supports an environment where critiques which may reveal troubling findings can be conducted without silence, retaliation, or raised voices.  The level of professional trust at CCDOC, in my view, has improved dramatically, but still retains challenges.

As noted above in the discussion of QI, the ability to engage in responsible and meaningful critical self-assessment, especially following a critical incident, is crucial to jail safety and violence prevention.  Prior to March 2016, CCDOC had a critical incident process in place that I critiqued (in April 2016) as needing strengthening. This policy was updated, effective August 8, 2016.

Since the March tour, one CIR was conducted, following an incident on July 28, 2016 in Division 10.  I reviewed that CIR and provided comments to the Defendants.  At this point we have, respectfully, agreed to disagree about the sufficiency of that CIR.  It is a maturation process on the part of the organization to conduct an organized, objective, critical, in-depth review, where names are named, and blemishes revealed.

Expected Impact:  CIR provides the basis for continuous improvement, learning, training and transformational activities.  It is not a process for the thin-skinned or insecure.  The process needs to uncover and objectively present all data and information, in one document, as well as mandate plans of action as necessary, and then critique and assessment of plans of action.[11]

Concerns:  On a positive note, there has been the need for only one CIR since March, and one hopes that critical incidents don't often happen in jails.  However, my concerns about the application of the policy, adopted August 8, 2016, cause me to remain skeptical about the quality and completeness of future CIRs.   CCDOC indicates that they have reviewed all my concerns regarding the August CIR and will consider my suggestions if, and when, a CIR is required.  Given that quality CIRs impact directly inmate health and welfare, I hope to have opportunity to see the application of my comments and recommendations in any CIR for an event occurring in the sustainability period for this monitoring.[12]

I note that my review of the required *response* to the CIR for the July incident raised my same concerns about detail, objectivity, and effectiveness implementation of sustainable changes.

11.    Use of Force (31.e. and f.)[13]

The Defendants' work in gaining reporting of uses of force, responses, investigations, and training is, in my view, a model for other jails.   The Sheriff's decision to create a Use of Force Review Unit (UFRU), that has developed from a staff of one to a staff of 28, is forward thinking and highlights the concern for this high liability area.

---

[11] For examples of thorough, organized and inclusive critical incident reviews see: https://www.policefoundation.org/critical-incident-review-library/ and https://osig.virginia.gov/media/5749/2016-bhds-002-hrrj-death-final-sig-approved.pdf accessed October 27, 2016

[12] An incident reported in the media on October 26, 2016 may provide an opportunity for a further review of a CIR.  http://chicago.suntimes.com/news/2-injured-at-cook-county-jail/ accessed on October 26, 2016, http://www.chicagotribune.com/news/local/breaking/ct-multiple-battery-victims-reported-at-county-jail-20161025-story.html, accessed October 27, 2016.

[13] See also the discussion on page 15, regarding uses of force involving inmates on the mental health caseload.

Compliance Report # 11 provided eleven recommendations for improving the Defendants' response to uses of force.[14]  These included process refinements, including contemporaneous review of incidents, assuring staffing resources, reviewing uses of force against inmates on the mental health caseload, integration with the EIS, and enhanced training.[15]

Since Compliance Report # 11, CCDOC has refined the data collection instruments, including those in the agency's jail management system (CCOMS), met with supervisors to convey the seriousness of the need to oversee use of force reporting, and added staffing to the UFRU.  The UFRU developed a standard operating procedure to guide operations,[16] assist in training newly assigned staff, and to affirm sustainability of the work.   Training lesson plans are is reported as having been revised, with more scenario-based activities to enhance and measure learning.

Internal monitoring systems, such as IAPro's EIS have also been made available to more of the agency's leadership so that the interventions can occur sooner, if needed.

Expected Impact:  Focus on the uses of force reaffirms the language of the Agreed Order and the commitment of the agency.  As discussed below, there is a reported increase in uses of force from 2012 through the first six months of 2016.  This was discussed at the on-site meetings on August 31st.  CCDOC was requested to provide their views of why this increase is noted.

Concerns:  I have consistently commended the concept and operations of the UFRU.  I believe with the changes made to institutionalize practices since March, for example the unit's SOP, this work will continue to be incredibly valuable to the agency, and contribute to facility and inmate safety.   The focus on collaboration between OPR, Quality Improvement, and Cermak with the integration of data from BAR should continue to help improve not only the investigations into uses of force, but prevention activities.

CCSO has been transparent about the increasing reported uses of force in CCDOC.  The reported uses of force have increased  - an estimated 267% since 2012 to mid-year 2016, using a projected annualized 1,466 incidents for CY 2016.  The projected 2016 number is a 28% increase over CY 2015.

---

[14] See page 14 of Compliance Report # 11.

[15] A significant improvement in the timeliness of investigation of use of force incidents is the absence of a backlog in requests for an inmate's medical history.   This is evidence of collaboration between Cermak and the UFRU, aided by a tracking log maintained by the UFRU.

[16] I recommend that this document be dated for version control and tracking purposes.  It was provided on August 3, 2016, but I am unclear as to the effective date.  Defendants have subsequently reported that the SOP was effective on 8/3/16, with this date included on the document.

A draft BAR report dated July 12, 2106 recognized these trends and recommended the "cause of the increase be further explored."[17]  This report was primarily focused on reporting and referrals for investigations as well as looking at location, time of day, etc.  On August 8, 2016, BAR produced a review that reviewed category 3 uses of force investigations for the period January 1, 2015 – through April 20, 2016[18].  In that report data is presented, there is a conclusion that category 3 has increased, but there is a deferral of discussion of causation and recommendations.

This issue of increased uses of force was discussed at my on-site tour of August 31, 2016 when I asked if CCDOC had postulated why there were these increases?  There was no official reasoning provided then.  I asked again at the on-site the week of October 11th as to why?  Although the UFRU's semi-annual report included various hypotheses as possible causes for the increase, there was no official response at that time.[19]  CCDOC provided a response on October 27, 2016.  While I am not suggesting that the agency didn't consider this matter a priority, the significant increases should have been dictated an in-depth analysis of this when the early CY 2016 data indicated a clear upward trend.  I am concerned that in spite of all parties recognizing the trends, there was not any official reasons given, nor a plan to address the increases to date.[20]

I appreciate that the multiple social phenomena resulting in the level of violence in the community is not easily deciphered, understood, remedied, and/or translated to jail operations.  With the resources available to the Defendants, more analysis is urged to understand why there is a substantial increase in uses of force, and how it relates to the Defendants' hypotheses.  Additionally, the Defendants have asserted that there has not been a high level of underreporting of uses of force in the last several years, and I'm concerned that the Defendants are offering that is, a possibility.

---

[17] Draft Use-of-Force in CCDOC, trends and reporting 2016.07.12., page 1.

[18] Class 3 uses of force:  subject sent to hospital;  subject sustains serious injuries; allegations that warrant a timely review; tactics – after viewing videos - that warrant a timely review; and/or request made by exempt member or other.

[19] Use of Force Review Unit draft report (page 4) for the period January – June 2016 highlights these possible reasons for the increases:  UFRU ensures that incidents which are possible uses of force are classified as a use of force in order to utilize the comprehensive review system; enhanced training and reporting of use of force incidents;  increase in incidents initiated by the Savage Life gang;  the one-on-one supplemental training format that allowed the UFRU to meet the staff members individually and clear up any misconceptions surrounding when a report should be completed;  familiarity and increased ease with utilizing the CCOMS reporting procedures; and observations of uses of force from a number of sources (e.g., Video monitoring Unit, Business Intelligence Unit, Case Management Review.

[20] The Defendants' hypotheses are that the violence in the community is spilled over into the jail, with staff needing to break up more inmate/inmate altercations; the disintegration of the gang structure; and contributing to increases are proactive strategies such as accountability, training, more than 2,000 cameras. Hypotheses Regarding UOF Increases October 27, 2016: Deliberative Process Privileged.  NOTE, I'm not suggesting that I include this as a cite in the final, but wanted to document the source for this draft.

This section of Compliance Report # 12 is intended to document substantial compliance for the five paragraphs identified on page 1. In addition to those areas of concern, Compliance Report # 11 asked the Defendants to examine subsidiary, priority issues.

**Addressing Priority Issues**

In Compliance Report # 11, I raised eighteen (18) issues that I recommended the Defendants consider as they planned how to address the six paragraphs noted on page one of this report. The Defendants provided a response to all eighteen areas during the most recent tour.

To summarize the issues identified in Compliance Report # 11, the Defendants' responses:

| # | Compliance Report # 11 – Monitor's Statement | Defendants' Response |
|---|---|---|
| 1 | Address compliance status of the five paragraphs now in partial compliance, and the several others that need attention. | • Action plans and proofs of compliance provided. |
| 2 | Quality Improvement/Quality Assessment directives need to be development and implemented. This is not a specific requirement of the Agreed Order but is directly related to my assessment of the life span of changes made. The improvements of the jail's management information system (CCOMS) make it, in my view, one of the best in the country and present the enviable dilemma of how to use the data that can be mined from it. The challenge is to determine what is the most relevant data, how to use the data in internal assessment processes. | • QI policy prepared; QI meeting minutes provided;<br>• BAR reports provided. |
| 3 | CCDOC must refine the internal organizational issues to streamline responses to critical incidents, analyze information, and prepare, implement and evaluate plans of actions to address shortcomings and deficiencies. This must take the form of:<br>a. An updated written directive;<br>b. Training for management and leadership staff to conduct reviews;<br>c. Development of plans of action for any identified deficiencies; and<br>d. Oversight of the implementation of plans of action, documentation of outcomes, and mid-course corrections if the initial plan does not solve the deficiency(ies). | • Case Review Unit<br>• Critical Incident Review training<br>• Training agenda<br>• Action Plans from QI meetings<br>• QI Meeting Minutes<br>• QIA Audits<br>• UFRU budgeted positions<br>• UFRU Org Chart<br>• UFRU Workflow Chart<br>• Finalized SOPs<br>• UOF Dashboards |
| 4 | CCDOC needs to assure that the Use of Force Review Unit is staffed to provide timely review of incidents. The Unit is preparing to draft written operating procedures to guide the work, as well as developing an available data "dash board" to immediately spotlight critical data. As this work is important to sustaining compliance with the Agreed Order, priority needs to be placed on these activities and resources to improve operations of the UFRU. | • Case Review Unit policy;<br>• Critical Incident Review procedures.<br>• See #4. |
| 5 | (See below) The parties must continue to focus on the use of force involving inmates on the mental health caseload, with the goal of improving prevention and response collaboratively with CCDOC and Cermak. This may be done by improving collaboration between the parties, evaluation of effectiveness of mental health staffing, | • Interagency mh meeting notes<br>• Monthly MH meetings minutes<br>• Tracking format |

| # | Compliance Report # 11 – Monitor's Statement | Defendants' Response |
|---|---|---|
| | increasing reliance on Cermak's mental health staff for programming for inmates in the jail system (rather than use of CCDOC's resources), and joint assessment of incidents. | |
| 6 | Up-to-date responses to questions raised by me about the weekly incident reports. | Completed |
| 7 | Up-to-date responses regarding questions from viewing a sample of inmate/inmate altercations and uses of force. | Completed |
| 8 | Current analysis of inmate grievance data, including development and implementation of plans of action indicated by the data. | Completed (see above discussion of the inmate grievance process). |
| 9 | Current analysis of inmate disciplinary data, including development and implementation of plans of action indicated by the data. | Inmate discipline data report |
| 10 | Current analysis of inmate use of force data, including development and implementation of plans of action indicated by the data | • UOF Dashboard<br>• Action plan<br>• Semi-Annual Report |
| 11 | Assurance of full staffing to conduct the required work of the Classification Unit. | Fully staffed per CCDOC |
| 12 | Assurance of full staffing for the use of force review unit and the related functions of the Office of Professional Review (OPR). | • 28 FTE – UFRU<br>• 40 FTE – OPR |
| 13 | Completion of the validation of the inmate classification system. | Provided. See discussion, below. |
| 14 | Current analysis of inmate incident data (e.g. Savage Life), including development and implementation of plans of action indicated by the data. | • BAR reports and analyses<br>• QI Meeting Minutes |
| 15 | Current analysis of contraband findings, including development and implementation of plans of action indicated by the data. | • Revised procedures<br>• Meeting minutes |
| 16 | CCDOC must develop, fund, and implement enhanced supplemental training for officers assigned to work on direct supervision tiers in RTU/Division 8. This training:<br>a. Must be consistent with the principles of direct supervision;<br>b. Blended with CIT/mental health strategies;<br>c. Must be "hands-on", with practical exercises and demonstrated competencies;<br>d. Provisions of staff assignment to permit only staff who have completed both CIT/mental health and direct supervision training; and<br>e. Maintenance and analysis of data regarding the outcomes of the enhanced supplemental training. | • Direct supervision training for trainers<br>• Implementation plan |
| 17 | Assessment, and as necessary, amendment of the policy related to the conduct of criminal incident reviews, and provision of sample reports.[21] Assurance that the CCDOC and CCSO policies reflect this new statute. | • Policy<br>• ISP Letter<br>• Draft interagency agreement |
| 18 | While not required by the Agreed Order, CCDOC should consider the development and implementation of a funded, staffed leadership development initiative. This is not just "training" but a process that prepares emerging leaders and provides continuity of leadership. | • Finalizing |

[21] March 28, 2016 I learned of a change in Illinois statute regarding having the Illinois State Police investigate in-custody deaths. I recommend that CCDOC and ISP develop a written memorandum of agreement/understanding guiding these investigations. Particular attention should be to assure that the review of any in-custody death from the perspective of the ISP (criminal) does not diminish the need to examine the security and/or medical perspectives to the incident.

Expected Impact:       For the eighteen points, I am satisfied with all but <u>three</u> of the responses.  I am assuming that CCSO can negotiate an interagency agreement with the Illinois State Police governing death investigations.  I am also convinced that an organization of this size recognizes the urgency of leadership development, and has the resources to accomplish this.    CCDOC also appears to acknowledge that there needs to be more relevant training for staff who will work in the direct supervision units in the RTU, and how these skills are relevant to inmate management generally, creating a safer work environment for staff and inmates.

- o   <u>Use of Force and Inmates on the Mental Health Caseload</u>

The Defendants provided a document, "P-3 and P-4 Use of Force Update", September 13, 2016, Interagency Meeting minutes dated August 5, 2016, and a spreadsheet labeled Cermak MH Caseload Tracking.   The documents reference future critical activities, for example, providing custody staff with Crisis Intervention Training (CIT); gender-response training; and a staffing plan to CCHHS for increased mental health staffing.

Concerns:  The commitments of CCDOC and Cermak are clearly in the direction to provide for on-going engagement to address this critical issue.  Data provided in the Use of Force Review Unit Semi-Annual report, notes that for the first six months of 2016 51% (N=374) of uses of force involved inmates on the mental health caseload (69% P-2 Outpatient, 17% P-3 Intermediate, 14% P-4 Acute/Sub-Acute/Chronic).[22]  Documenting the data and gaining the commitment of those involved are critical first steps to addressing the issues.  The tracking data is critical as well, but it is unclear how this information is used, analyzed, etc. to guide operations.  The CIT training proposal does not include information that will allow evaluation – for example the dates of training, the number of staff to be trained, etc.   The minutes of the mental health meeting did not include action items for the proposals discussed.

In totality, there needs to be a more coherent, organized plan to address uses of force involving inmates on the mental health caseload.  This may include:  a more robust plan with objective, measurable activities (or an action plan);  a directive governing the activities for CCDOC and Cermak; the assessment of what additional mental health staffing is needed and the plan to acquire those resources; and the use of BAR to conduct more in-depth analysis.[23]

---

[22] The draft Use of Force Review Unit 2015 Summary Report indicates that for the first half of CY 2015, 56%, 562, of uses of force involved inmates on the mental health caseload (57% P2, 20% P3, and 23% P4).

[23] See previous discussion regarding increases in the use of force.

o   <u>Validation of the CCDOC Classification System</u>[24]

Previous Compliance Reports have noted that the CCDOC revised classification
system was implemented in October 2014, and that an external validation was
scheduled for 2016.  The contractor to CCDOC submitted this validation report
on August 31, 2016.  The report includes recommendations regarding:
modifying the individual risk factors and custody scales for the system, review of
the mandatory overrides that require placement of detainees in medium
custody; updating of the initial and reclassification handbooks and associated
CCDOC policies to reflect the approved updates to the classification system;
provide on-going comprehensive training to CCDOC classification staff on the
classification policies, procedures, classification handbook, and revised
instruments; and update the CCDOC information system to fully automate the
scoring of the revised classification forms, approving the custody assessments,
and tracking key classification-related statistics.

Expected Impact:  The classification system is essential to the safety of staff and
inmates.  CCDOC has been engaged with the contractor to develop and
implement a credible system, including the validation report.  It has been my
position that an agency the size of CCDOC should ultimately have the internal
capacity to conduct it's own periodic (and on-going) validation of the system.
This external review provides the proof of compliance for  paragraph 37.e.,
except for response to the findings and recommendations.

Concerns:  In considering the schedule for completion of monitoring activities, I
had anticipated that the required external validation report would take place
after the conclusion of this engagement.  Because of CCDOC's commitment to the
revised classification system, I was confident that the process would be
concluded, and did not want to hold up substantial compliance.

Now that the schedule has resulted in the validation report being delivered
before the conclusion of monitoring, I believe it is beneficial to ask that CCDOC
provide the following:  (1) whether the Defendants' agree with the findings and
recommendations, and if not, why not; and (2) the action plan(s) for
implementing the recommendations.

Finally on the issue of uses of force and inmate safety, the Defendants
hypothesize that the increase in uses of force are related to the impact of
housing detainees who have ". . . histories of violence and exhibit aggressive
behavior. . . " [25] Not disputing that, I suggest that if this is resulting in harm to
inmates then the classification system should be re-examined to assure that

---

[24] Paragraph 37.e. states: "CCDOC shall provide ongoing internal and external review and validation of the
inmate classification system to ensure its reliability and objectivity."

[25] Defendants provided hypothesis as to the reasons for the changes in the data.

these inmates are accurately classified and housed. If the closure of facilities has somehow contributed to the Defendants not being able to adequately separate inmates, then this suggests the need for continual review of housing plans, and adjustments.

o   <u>Inmate Incidents</u>  (34.d and f.)

CCDOC has engaged all their brainpower and resources to address a small number of inmates who cause disorder, primarily in Division 9, but often in the housing unit to which they are subsequently assigned. I commend the creativity of these approaches that have been employed, changes to both management of these inmates, and physical plant changes, and "invented" solutions such as food delivery systems. This is a long-term challenge. Not all strategies have had the hoped for outcomes. On August 30, 2016 a preliminary analysis of the indicator of inmate batteries on staff in the SMART housing units (replacing administrative segregation housing) was completed. BAR also analyzed key features in the time of batteries to staff (8/24/16). No specific recommendation resulted, but the impact of the use of the ERT in one of the units provided possible strategies for keeping staff and inmates safe.

Expected Outcomes: The focus on finding solutions to address the disorder and danger posed by this small number of inmates has produced, as noted above, creative solutions. There is not an easy answer to the mayhem these inmates cause. The use of data and the willingness to engage the inmates as individuals and in group settings to identify improvements is a realistic approach. Constant assessment and innovation will be needed.

Concerns: I have some concerns about CCDOC's approaches to finding unique, and legal, ways to manage this difficult group of inmates. The patience of line staff and supervisors is remarkable and admirable. The creativity of the leadership is also acknowledged, with the hopes that as more information is developed, it can be shared with the many other jails having similar issues.[26] My concerns are raised regarding the Defendants' hypotheses about increases in uses of force (and by inference increases in inmate/inmate altercations), and the limitations reported regarding housing options. Other options, such as application of the principles of direct supervision, should be assessed.

## Summary of Current Issues/Concerns

Based on the above findings, the following are the concerns I retain regarding the work of the Defendants since the issuance of Compliance Report # 11.

1.      Sustainability

---

[26] See also http://www.chicagotribune.com/news/local/breaking/ct-multiple-battery-victims-reported-at-county-jail-20161025-story.html, accessed on October 27, 2016.

Very clearly the Defendants have engaged in credible work to regain substantial compliance with the five paragraphs identified in Compliance Report # 11 as falling out of substantial compliance. This work has been thoughtful, resourced, and prioritized. Much of this work, as noted herein, has effective dates of August/September 2016, resulting in limited contemporaneous documentation of compliance.[27]

I do not have a focus or expectation that the new and expanded initiatives undertaken since Compliance Report # 11 are born fully completed or without the need for re-thinking or reappraisal. This organizational reckoning is part of a credible and sustainable process. I acknowledge the Defendants' description of some "back-to-the-drawing-board" realizations that occurred since May as evidence of this. I do not expect "perfect"; I do expect self-critical review and analysis, and moving forwarded to documented other options.

2.     Uses of Force/Data Analysis/Plans of Action.

I am not concerned about, nor suggesting, there is an increase in inappropriate or excessive uses of force. I am concerned about the substantial increase and the absence of timely explanation of the increases. The Defendants' hypotheses about why there are substantial increases in uses of force needs refinement, including analysis, application of research protocols, development and implementation of a plan(s) of action, and review of options.

The ability of the Defendants to accurately identify contributors to this substantial increase in uses of force is essential to developing solutions. This effective problem-solving is related directly to inmate and staff safety, and protection from harm.

3.     Uses of Force/Inmates Mental Health Caseload

This issue has been front and center for a number of years. There is a strong commitment by CCDOC and Creak to address it; but there appears to be to be an absence of an objective, measurable plan to do the work. As noted above, proposals for CIT training, and proposals for more mental health staff from the CCHHS are undefined. Whether there is a sufficient level of mental health practitioners I will

---

[27] For example, policies effective August 8, 2016: 229 Early Intervention System, 328 Critical and Major Incident Notification, PR401 Critical Incident Review, PR502 Weapons and Contraband-Free Committee Procedures, 516 Reporting In-Custody Deaths, 612 Smart Housing. The updated QI policy has an effective date of 11/1/16. Additionally, the BAR reports referenced herein have these dates: Undated Analysis of Detainee Grievances (9/27/16), OPR Excessive Force Cases Opened May 2016 – September 27, 2016 9/28/16, Effectiveness of Supplemental Training, Preliminary Analysis 9/30/16, Updated Analysis of Detainee Grievances (1/1/13 – 6/27/16) 9/27/16, Relationship Between Incidents and Serial Grievance Writers in CCDOC 8/26/16, Relationship between Grievances and Programming 9/6/16, Analysis of Batteries to Staff – All Divisions 1/1/16 – 8/31/16 9/23/16.

defer to Dr. Metzger; I'm focused on the outcomes – inmate/inmate assaults, inmate assaults of staff, and related indicators or facility disorder.  [See above # 2.]

4.      Classification Validation

CCDOC's contractor has completed the required external validation of the system.  I do not have any information on whether the Defendants agree or not with the findings and recommendations, and/or the action plans to implement the recommendations.

5.      Case Review Unit

This approach, as part of the quality control system, will have its impact measured in the future, providing that evaluation data is identified now, and collected for analysis.  The CRU is a significant investment of high ranking individuals, as well as other staffing resources.  A significant positive result of this initiative is the goal of cycling through the unit line managers/superintendents so they can see the purpose of the work in order for the individuals to lead their facilities and mentor and coach their subordinates.  Responding to the question – how did this unit contribute to effective and accountable operations remains unanswered.

6.      Replacement Jail Beds

While clearly not part of this litigation, the long-term maintenance of Constitutional conditions of confinement relies on the construction of replacement beds given the age and conditions of most of the facilities (as documented by the County).  No community wants to divert scarce public dollars to building jail replacement beds.  Public dollars will be spent in the next year on demolition of some of the facilities on the campus; and planning is underway for what's next.  Nationally, there is a trend, although not for every large jail system in the country, of lower jail populations.  This is a positive development; but since researchers and practitioners don't know why the trend is down, an upward trend is possible.  The County is urged to expeditiously examine options and move forward on the next phases of improving the system.

**Next Steps**

To insure the integrity in the monitoring process as we come toward the conclusion of  this work, I recommend that materials be provided for assessment over a to-be-agreed-upon period of time to support the sustainability of the new and/or revised initiatives since the release of Compliance Report # 11.

Specifically, the materials, reports, reviews, minutes I believe are necessary to review and confirm sustainability in this section addressing Protection from Harm are:

1.  Critical Incident Reviews
    a.  Any revisions to the directive governing CIRs.
    b.  Any CIRs produced for incidents occurring during the sustainability review period.
    c.  Any responses and/or action plans produced to comply with the CIR policy regarding finding of the CIR.

2.  Classification – Regarding the validation study dated August 31, 2016:
    a.  Information from CCDOC as to whether the Defendants' agree with the findings and recommendations, and if not, why not; and
    b.  An action plan(s) for implementing the recommendations.
    c.  Examination of the Defendants' hypotheses regarding increased uses of force and the relationship to the classification system.
    d.  Examination of alternatives for the housing plan for all levels of classification.

3.  Use of Force involving Inmates on the Mental Health Caseload
    a.  Plan of action to address any issues that may be identified in a BAR review that can mitigate the uses of force involving inmates on the mental health caseload.
    b.  Plan of action to train custody staff in the CIT model.
    c.  Plan of action to evaluate the current adequacy of mental health staffing, including initiatives with the CCHHS to achieve any increased staffing so identified.
    d.  Copies of meeting minutes (Interagency and otherwise) documenting initiatives to address use of force involving inmates on the mental health caseload.
    e.  Involvement of Dr. Metzger in the planning and implementation of the matters 3.a. -d., above.

4.  Use of Force
    a.  Analysis of why the substantial increase in uses of force.
    b.  Plan of action to address any issues that may be identified in a BAR review that can mitigate the uses of force.

5.  Copies of minutes of the QI Committee for the period of time determined to document sustained compliance.

6.  Panel Reviews
    a.  Revisions to the QI policy that document inclusion of the panel reviews (or the agreed upon version of that process) as part of sustainability
    b.  Documentation from panel reviews, topics reviewed, outcomes, measures, follow-up, and evaluation of impact.

7. Case Review Unit
   a. The evaluation plan for the Unit, including identification of the data to be collected and proposed outcome measures needs to be developed.

I reiterate my very positive impression of the credible work done since the March 2016 tour, as well as the resources devoted by the Defendants to regain compliance for the subject five paragraphs and their recognition of how this work has contributed to the organization's betterment, including to the safety of staff and inmates. I believe to support the integrity of the monitoring process, the review of sustainability noted above, is, in my opinion, needed to conclude this monitoring process.

The Counsel for the parties are discussing the best manner to address the sustainability of these recent changes/refinements with the goal of achieving a final resolution of the paragraphs in the Protection from Harm section of the Agreed Order.

**Conclusions**

Thank you to the CCSO and the hard-working and visionary staff of CCDOC. I commend not only the work of the last six months, but also the work since I became involved in 2010. Sometimes we may fail to fully appreciate and acknowledge the amount of change that has come to CCDOC. I look forward to documenting sustainability as a way to successful close this section of the Agreed Order.

## Agreed Orders Paragraphs Remaining Under Monitoring[28]

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| **A.** | **Protection from Harm** | | | |
| **31.** | **Use of Force by Staff** | | | |
| A.31.e. | CCDOC shall continue to require prompt review by the shift commander of all use of force reports. The shift commander's review of use of force reports shall include review for completeness and procedural errors, as well as review of the substantive content. If the use of force report does not comply with provision 31.d. of this Agreed Order, the shift commander shall return it to the reporting officer for revision and resubmission until it is compliant. If the shift commander believes a use of force may have been inappropriate or excessive, he or she shall immediately refer the incident for investigation. | x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 x10/16 | x 9/10 x 3/11 x 8/11 x12/11 x3/16 | |
| A.31.f. | CCDOC shall ensure that senior management review of uses of force includes: 1. a timely review of medical documentation of inmate injuries, if any is submitted, as provided by Qualified Medical Staff, including documentation surrounding the initial medical encounter, an anatomical drawing that depicts the areas of sustained injury, and information regarding any further medical care; 2. the inmate disciplinary report, if any, associated with the use of force; and 3. the incident report, if any, associated with the use of force. | x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 x10/16 | x 9/10 x 3/11 x 8/11 | |
| A.31.k. | CCDOC shall establish an "early warning system" that will document and track correctional officers who are involved in use of force incidents and any complaints related to the inappropriate or excessive use of force, in order to alert CCDOC administration to an potential need for retraining, discipline, problematic policies, or supervision lapses. Appropriate CCDOC leadership, supervision, and investigative staff shall have access to the information and monitor the occurrences. CCDOC senior management shall use information from the early warning system to improve quality management practices, identify patterns and trends, and take necessary corrective action both on an individual and systemic level. | x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | x 9/10 x 3/11 x 8/11 x12/11 | |

---

[28] Excluding 31.k., 32.f. See page 1.

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| **32.** | **Safety and Supervision** | | | |
| 32.f. | CCDOC shall maintain a procedure to prevent inmates from possessing or having access to dangerous contraband, including conducting regular inspections of cells and common areas of the housing units to identify and prevent rule violations by inmates. | x2/13 x9/13 x3/14 x9/14 x4/15 x3/16 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 | |
| **34.** | **Incidents and Referrals** | | | |
| 34.d. | CCDOC shall require prompt administrative review of incident reports. Such reviews shall include a case-by-case review of individual incidents as well as a systemic review in order to identify patterns of incidents. CCDOC shall incorporate such information into quality management practices and take necessary corrective action. | x 8/11 x12/11 x7/12 x2/13 x9/13 x3/14 x9/14 x4/15 x10/16 | x 9/10 x 3/11 | |
| 34.f. | CCDOC shall maintain policies, procedures and practices requiring investigations to resolve issues identified during review of incident reports, disciplinary hearings, or inmate grievances, and determine appropriate remedies, in accordance with generally accepted correctional standards. At a minimum, CCDOC shall require timely and appropriate investigations of all suicides, serious suicide attempts, inmate-on-inmate violence resulting in serious injury, inmate-on-staff violence, inmate injuries requiring treatment by an outside hospital, inmate injuries of a suspicious nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.), sexual misconduct between inmates, sexual misconduct involving staff, fires, escapes, escape attempts, and deaths. | x9/13 x3/14 x9/14 x4/15 x10/16 | x 9/10 x 3/11 x 8/11 x12/11 x7/12 x2/13 | |
| **38.** | **Inmate Grievance Procedure** | | | |
| 38.d. | CCDOC shall ensure that inmate grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria, are referred for investigation. A member of the management staff shall review the grievance tracking system regularly in order to identify areas of concern. | x 8/11 x12/11 x7/12 x9/13 | x 3/11 x2/13 | x 9/10 |

| Section (Page) | Language | Substantial Compliance | Partial Compliance | Non-compliance |
|---|---|---|---|---|
| | | x3/14<br>x9/14<br>x4/15<br>x10/16 | | |