**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| | ) | **No. 10 C 2946** |
| **COOK COUNTY, ILLINOIS;** | ) | |
| **THOMAS DART, COOK COUNTY** | ) | **Judge Virginia Kendall** |
| **SHERIFF (in his official capacity);** | ) | |
| **TONI PRECKWINKLE, COOK COUNTY** | ) | |
| **BOARD PRESIDENT (in her official capacity);** | ) | |
| **COOK COUNTY BOARD OF** | ) | |
| **COMMISSIONERS (in their official capacity),** | ) | |
| | ) | |
| **Defendants,** | ) | |

# Monitor Jeffrey L. Metzner, M.D.'s Report No. 15 November 13-15, 2017

**Jeffrey L. Metzner, M.D., P.C.**
**3300 East First Avenue**
**Suite 590**
**Denver, CO**
**E-mail: Jeffrey.metzner@ucdenver.edu**

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 2 of 86

**JEFFREY L. METZNER, M.D., P.C.**
**3300 EAST FIRST AVENUE**
**SUITE 590**
**DENVER, COLORADO**
———

**TELEPHONE (303) 355-6842**
**FACSIMILE (303) 322-2155**

# MEMORANDUM

**TO:**     Anthony E. Zecchin, Esq.
Cook County State's Attorney's Office
500 Richard J. Daley Center
Chicago, Illinois  60610

Paul O'Grady, Esq.
Peterson Johnson& Murray
233 South Wacker, 84th Floor
Chicago, Illinois  60606

Kerry Dean, Esq.
U.S. Department of Justice
P.O. Box 66400
Washington, DC 20035-6400

**FROM:**     Jeffrey L. Metzner, M.D.
**DATE:**     December 7, 2017
**RE:**     *U.S.A. v Cook County, et al*
No. 10C2946

I have completed my assessment of the mental health services offered at the Cook County Department of Corrections (CCDOC) through Cermak Health Services of Cook County (CHSCC). I site visited CCDOC from November 13-15, 2017.

Sources of information utilized in compiling this report included the following:

1. review of documents provided in response to my written request for pre-site information, which included the following documents:
   a. status update to the Agreed Order,
   b. numerous mental healthcare quality improvement studies,
2. interviews with many inmates in group settings in Division 8 (RTU and the Cermak units) Division 2, Division 6 and Division 10,
3. observation of treatment activities in Divisions 6, 8 and 10,

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 3 of 86

4. information obtained from key administrative and clinical staff that included, but was not limited to, the following persons:
    a. Linda Follenweider, R.N., N.P. (Chief Operating Officer Hospital Based Services),
    b. Connie Mennella, M.D. (Chair, Department of Correctional Health Services),
    c. Nneka Jones Tapia, Psy.D. (First Assistant Executive Director),
    d. Kenya Key, Psy.D. (Chief of Psychology),
    e. David Kelner, M.D. (Chief of Psychiatry),
    f. Jane Gubser (CCDOC Chief of Programs),
    g. Brian Thomas, M.D. (Associate Chair for Infirmary Care),
    h. Romica Sillitti, Psy.D.,
    i. Pierre Nunez, Ph.D. (QI coordinator),
    j. Kimberley Briny, Psy.D. (PSCU Director),
    k. Brian Waxler, Psy.D. (Male RTU unit director), and
    l. Gary Kaniuk, Psy.D. (Female RTU director).

As always, I found the staff from CHSCC and CCDOC to be courteous and helpful throughout my five-day site visit.

In this report the term "inmate" will be used in contrast to "detainee" in order to be consistent with the Agreed Order's terminology, although the vast majority of persons admitted to CCDOC are pre-trial detainees.

**Overview**

The Cook County Department of Corrections consists of 8 main divisions in a group of buildings covering over 100 acres. The inmate count during November 15, 2017 was 7620.

Reference should be made to Appendix I for a more detailed summary of population and capacity information.

**Findings**

As per the June 3, 2010 memorandum regarding the June 2, 2010 meeting that included attorneys from the Department of Justice, attorneys and representatives of the Defendants, and the monitors, my findings relevant to the Mental Health Care section of the Agreed Order are summarized in Appendix IV (5-13-10 Agreed Order Mental Health provisions). Consistent with the June 2, 2010 meeting, I have forwarded my input to the medical monitors who have primary responsibility for sections that overlap with various mental health provisions as summarized in the June 3, 2010 memorandum.

Appendix II summarizes the seventeen mental health provisions of the Agreed Order that have been in substantial compliance for at least 18 months, which includes one new provision being in this category. My assessment during this site visit did not raise any concerns that any of these provisions were no longer in substantial compliance. Appendix III summarizes mental health provisions of the Agreed Order monitored by other monitors.

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 4 of 86

Significant accomplishments since the April 2017 site assessment include the following:

1. An additional three provisions have now been in compliance for at least 18 months, which means a total of 20 provisions have been in compliance for at least 18 months.

2. One (1) provision previously in partial compliance is now in substantial compliance, which means there are now five (5) provisions that have been in substantial compliance for less than 18 months.

   The provision previously in partial compliance that is now in substantial compliance is as follows:

   **o. Cermak shall ensure an adequate array of crisis services to appropriately manage the psychiatric emergencies that occur among inmates. Crisis services shall not be limited to administrative segregation or observation status.**

   **p. Cermak shall ensure that inmates have access to appropriate acute infirmary care, comparable to in-patient psychiatric care, within the Cermak facility. (6/17)**

A major achievement has been accomplished in the context of hiring psychiatrists (currently no vacancies), beginning to hire additional mental health specialists, and decreasing the psychologist's vacancies. Decreasing the overall mental health staff vacancies has resulted in improved mental health services at every level of care. This assessment is supported by a comprehensive set of quality improvement studies.

Please refer to the executive summary for a brief synopsis of my findings.

The leadership of Kenya Key (Chief Psychologist, Ph.D.), David Kelner, M.D. (Chief Psychiatrist) and Carlos Gomez, Psy.D., Linda Follenweider, R.N., N.P (Chief Operating Officer Hospital Based Services), and Connie Mennella, M.D. remains very impressive. The working relationships between CCDOC and Cermak staffs continues to improve and is very good. The leadership demonstrated by Director Nneka Jones, Psy.D. remains impressive.

**Information Requests**

Appendix V summarizes my revised document request for my next site assessment scheduled for April 30-May 2, 2018.

Please send me your comments, if any, by December 5, 2017.

Please do not hesitate to contact me if I can answer any further questions.

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 5 of 86

Sincerely,

Jeffrey L. Metzner, M.D.

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 6 of 86

**Executive Summary—Fifteenth Monitoring Report (Mental Health Provisions)**

Significant accomplishments since the April 2017 site assessment include substantial compliance being achieved with the following provisions:

**q.** Cermak shall ensure an adequate array of crisis services to appropriately manage the psychiatric emergencies that occur among inmates. Crisis services shall not be limited to administrative segregation or observation status.

**r.** Cermak shall ensure that inmates have access to appropriate acute infirmary care, comparable to in-patient psychiatric care, within the Cermak facility. (6/17)

All provisions of the Agreed Order are now in substantial compliance.

CCDOC has continued to implement a plan for increased out of cell time for all inmates in segregation units as part of the CCDOC plan to gradually increase the recreational time for segregation inmates to at least three to six hours per day. In addition, the custody staff is providing increased correctional rehabilitation programming to a portion of the mental health outpatient level of care caseload inmates.

A major achievement has been accomplished in the context of hiring psychiatrists (currently no vacancies), beginning to hire additional mental health specialists, and decreasing the psychologist's vacancies. Decreasing the overall mental health staff vacancies has resulted in improved mental health services at every level of care. This assessment is supported by a comprehensive set of quality improvement studies.

The leadership of Kenya Key (Chief Psychologist, Ph.D.), David Kelner, M.D. (Chief Psychiatrist) and Carlos Gomez, Psy.D., Linda Follenweider, R.N., N.P (Chief Operating Officer Hospital Based Services), and Connie Mennella, M.D. remains very impressive. The working relationships between CCDOC and Cermak staffs continues to improve and is very good. The leadership demonstrated by Director Nneka Jones, Psy.D. remains impressive.

An additional three provisions have now been in compliance for at least 18 months, which means a total of 20 provisions have been in compliance for at least 18 months.

One (1) provision previously in partial compliance is now in substantial compliance, which means there are now five (5) provisions that have been in substantial compliance for less than 18 months.

There are no provisions in either partial compliance or non-compliance.

**Summary of Compliance Findings**

The following provisions were assessed to be in substantial compliance (with the initial date of substantial compliance noted in parenthesis):
**Bolded provisions** indicate that the provisions have been in substantial compliance for more than

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 7 of 86

18 months.

59.  **Assessment and Treatment**

a.  **Results of mental health intake screenings (<u>see</u> provision 45.c, "Intake Screening") will be reviewed by Qualified Mental Health Staff for appropriate disposition. (6/12)**

b.  **Cermak shall develop and implement policies and procedures to assess inmates with mental illness; and to evaluate inmates' mental health needs. Said policies shall include definitions of emergent, urgent, and routine mental health needs, as well as timeframes for the provision of services for each category of mental health needs. (10/12)**

c.  **Cermak shall ensure that any inmate who screens positively for mental illness or suicidal ideation during the intake screening process, through a mental health assessment, or who is otherwise referred for mental health services, receives a clinically appropriate mental health evaluation in a timely manner, based on emergent, urgent, and routine mental health needs, from a Qualified Mental Health Professional, or Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional. Such mental health evaluation shall include a recorded diagnosis section on Axis I, II, and III, using the DSM-IV-TR, or subsequent Diagnostic and Statistical Manual of the American Psychiatric Association. If a Qualified Mental Health Professional, or a Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional, finds a serious mental illness, they shall refer the inmate for appropriate treatment. Cermak shall request and review available information regarding any diagnosis made by the inmate's community or hospital treatment provider, and shall account for the inmate's psychiatric history as a part of the assessment. Cermak shall adequately document the mental health evaluation in the inmate's medical record. (11/16)**

d.  Cermak shall ensure clinically appropriate and timely treatment for inmates, whose assessments reveal serious mental illness or serious mental health needs, including timely and regularly scheduled visits with Qualified Mental Health Professionals or with Qualified Mental Health Staff, with appropriate, on-site supervision by a Qualified Mental Health Professional. (4/17)

e.  Cermak shall ensure that treatment plans adequately address inmates' serious mental health needs and that the plans contain interventions specifically tailored to the inmates' diagnoses. (4/17)

f.  **Cermak shall provide 24-hour/7-day psychiatric coverage to meet inmates'**

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 8 of 86

    **serious mental health needs and ensure that psychiatrists see inmates in a timely manner. (11/16)**

g.    Cermak shall ensure timely provision of therapy, counseling, and other mental health programs for all inmates with serious mental illness. This includes adequate number of Qualified Mental Health Staff to provide treatment, and an adequate array of structured therapeutic programming. Cermak will develop and implement policies and procedures defining the various levels of care and identifying the space, staffing, and programming that are appropriate to each identified level of care. (4/17)

h.    **Inmates shall have access to appropriate infirmary psychiatric care when clinically appropriate. (11/16)**

i.    **Cermak shall provide the designated CCDOC official responsible for inmate disciplinary hearings with a mental health caseload roster listing the inmates currently receiving mental health care. (6/12)**

j.    **When CCDOC alerts Cermak that an inmate is placed in lock down status for disciplinary reasons, a Qualified Mental Health Professional will review the disciplinary charges against inmate to determine the extent to which the charge was related to serious mental illness. The Qualified Mental Health Professional will make recommendations to CCDOC when an inmate's serious mental illness should be considered as a mitigating factor when punishment is imposed on an inmate with a serious mental illness and to minimize any deleterious effect of disciplinary measures on an inmate's mental health status. (10/12)**

k.    **In the case of mentally ill inmates in segregation, CCDOC shall consult with Cermak to determine whether continued segregation is appropriate or whether the inmate would be appropriate for graduated alternative based on Cermak's assessment.**

l.    **Cermak shall ensure that mentally ill inmates in segregation receive timely and appropriate treatment, including completion and documentation of regular rounds in the segregation units at least once per week by adequately trained Qualified Mental Health Professionals or by Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional, in order to assess the serious mental health needs of inmates in segregation. Inmates who are placed in segregation shall be evaluated within 24 hours of placement and thereafter regularly evaluated by a Qualified Mental Health Professional, or by a Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional to determine the inmate's mental health status, which shall include an assessment of the potential effect of segregation on the inmate's mental health. During these regular**

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 9 of 86

evaluations, Cermak shall provide CCDOC with its recommendation regarding whether continued segregation is appropriate or whether the inmate would be appropriate for graduated alternative based on the assessment of the Qualified Mental Health Professional, or Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional. (11/15)

m. Cermak shall maintain an updated log of inmates receiving mental health services, which shall include both those inmates who receive counseling and those who receive medication. Cermak shall create such a log within six months of the date this Agreed Order is executed. The log shall include each inmate's name, diagnosis or complaint, and next scheduled appointment. Each clinician shall have ready access to a current log listing any prescribed medication and dosages for inmates on psychotropic medications. In addition, inmate's medical records shall contain current and accurate information regarding any medication changes ordered in at least the past year. (6/12)

n. Cermak shall ensure that a psychiatrist, physician or licensed clinical psychologist conducts an in-person evaluation of an inmate prior to a seclusion or restraint order, or as soon thereafter as possible. An appropriately credentialed registered nurse may conduct the in-person evaluation of an inmate prior to a seclusion or restraint order that is limited to two hours in duration. Patients placed in medically-ordered seclusion or restraints shall be evaluated on an on-going basis for physical and mental deterioration. Seclusion or restraint orders should include sufficient criteria for release. (4/16)

o. Cermak shall ensure an adequate array of crisis services to appropriately manage the psychiatric emergencies that occur among inmates. Crisis services shall not be limited to administrative segregation or observation status.

p. Cermak shall ensure that inmates have access to appropriate acute infirmary care, comparable to in-patient psychiatric care, within the Cermak facility. (6/17)

60. Psychotherapeutic Medication Administration

a. Cermak shall ensure that psychotropic medication orders are reviewed by a psychiatrist on a regular, timely basis for appropriateness or adjustment. Cermak shall ensure that changes to an inmate's psychotropic medications are clinically justified and documented in the inmate's medical record.

b. Cermak shall ensure timely implementation of physician orders for medication and laboratory tests. Cermak shall ensure that inmates who are being treated with psychotropic medications are seen regularly by a physician to monitor responses and potential reactions to those medications, including movement disorders, and

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 10 of 86

provide treatment where appropriate.  (4/17)

**61.     Suicide Prevention Policy**

> **a.  CCDOC shall participate with Cermak in a jointly established Suicide Prevention Committee charged with developing policies and procedures to ensure the appropriate management of suicidal inmates and with implementing and monitoring a suicide prevention program in accordance with generally accepted correctional standards of care.**
>
> **b.  Cermak shall participate with CCDOC in a jointly established Suicide Prevention Committee charged with developing policies and procedures to ensure the appropriate management of suicidal inmates and with implementing and monitoring a suicide prevention program in accordance with generally accepted correctional standards of care.**
>
> **c.  The suicide prevention policy shall include, at a minimum, the following provisions:**
>
> (1)   an operational description of the requirements for both pre-service and annual

in-service training;

> > **(2)   intake screening/assessment;**
> > **(3)   communication;**
> > **(4)   housing;**
> > **(5)   observation;**
> > **(6)   intervention; and**
> > **(7)   mortality and morbidity review. (11/13)**

62.     **Suicide Precautions**
> **a.   CCDOC shall ensure that, where suicide prevention procedures established jointly with Cermak involve correctional personnel for constant direct supervision of actively suicidal inmates or close supervision of special needs inmates with lower levels of risk (e.g., 15 minute checks), correctional personnel perform and document their monitoring and checks.**
> **b.   Cermak shall ensure that, where suicide prevention procedures established jointly with CCDOC involve health care personnel for constant direct supervision of actively suicidal inmates or close supervision of special needs inmates with lower levels of risk (e.g., 15 minute checks), health care personnel perform and document their monitoring and checks.**
> **c.   CCDOC shall ensure that when an inmate is identified as suicidal, the inmate shall be searched and monitored with constant direct supervision until the inmate is transferred to appropriate Cermak staff.**
> **d.   Cermak shall develop and implement policies and procedures for suicide**

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 11 of 86

> precautions that will set forth the conditions of the watch, including but not limited to allowable clothing, property, and utensils, in accordance with generally accepted correctional standards of care. These conditions shall be
>
> altered only on the written instruction of a Qualified Mental Health Professional, except under emergency circumstances. **(11/15)**

63. Cermak shall ensure that Qualified Mental Health Staff assess and interact with (not just observe) inmates on Suicide Precautions, and document the assessment and interaction on a daily basis. **(11/10)**

64. **Suicide Risk Assessments**
    a. Cermak shall ensure that any inmate showing signs and symptoms of suicide is assessed by a Qualified Mental Health Professional using an appropriate, formalized suicide risk assessment instrument within an appropriate time not to exceed 24 hours of the initiation of Suicide Precautions.

    b. Cermak shall ensure that the risk assessment shall include the following:
       (1) description of the antecedent events and precipitating factors;
       (2) mental status examination;
       (3) previous psychiatric and suicide risk history;
       (4) level of lethality;
       (5) current medication and diagnosis; and
    (6) recommendations or treatment plan. Findings from the risk assessment shall be documented on both the assessment form and in the inmate's medical record. (11/13)

65. Cermak shall ensure that inmates will only be removed from Suicide Precautions after a suicide risk assessment has been performed and approved by a Qualified Mental Health Professional, in consultation with a psychiatrist. A Qualified Mental Health Professional shall write appropriate discharge orders, including treatment recommendations and required mental health follow-up. **(11/15)**

66. **Suicide Prevention Policies**

    a. CCDOC shall ensure that suicide prevention policies established jointly with Cermak include procedures to ensure the safe housing and supervision of inmates based on the acuity of their mental health needs, in accordance with generally accepted correctional standards.
    b. Cermak shall ensure that suicide prevention policies established jointly with CCDOC include procedures to ensure the safe housing and supervision of inmates based on the acuity of their mental health needs, in accordance with generally accepted correctional standards. **(6/12)**

67. DFM shall ensure that cells designated by CCDOC or Cermak for housing

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 12 of 86

suicidal inmates shall be retrofitted to render them suicide-resistant (e.g., elimination of protrusive shower heads, unshielded lighting or electrical sockets). Inmates known to be suicidal shall not be housed in cells with exposed bars. (6/12)

68.  **Suicide Prevention Training**

   a.  **Cermak shall ensure that the Facility's suicide prevention curriculum for health care staff members, jointly established with CCDOC, addresses the following topics:**

      (1)  **the suicide prevention policy as revised consistent with this Agreed Order;**
      (2)  **why facility environments may contribute to suicidal behavior;**
      (3)  **potential predisposing factors to suicide;**
      (4)  **high risk suicide periods;**
      (5)  **warning signs and symptoms of suicidal behavior;**
      (6)  **observation techniques;**
      (7)  **searches of inmates who are placed on Suicide Precautions;**
      (8)  **case studies of recent suicides and serious suicide attempts (Serious suicide attempts are typically considered to be those that either were potentially life-threatening or that required medical attention);**
      (9)  **mock demonstrations regarding the proper response to a suicide attempt; and**
      (10) **the proper use of emergency equipment, including suicide cut-down tools. (12/10)**

70.  **Cermak shall document inmate suicide attempts at the Facility, as defined by the Suicide Prevention Committee's policies and procedure in accordance with generally accepted correctional standards, in the inmate's correctional record in CCDOC's new Jail Management System, in order to ensure that both correctional and health care staff will be aware at future intakes of past suicide attempts, if an inmate with a history of suicide attempts is admitted to the Facility again in the future. Cermak will begin to document this information within six months after execution of this Agreement. (6/12)**

86.  **Quality Management and Performance Measurement**

   a.  **Defendants shall each develop and implement written quality management policies and procedures, in accordance with generally accepted correctional standards, to regularly assess, identify, and take all reasonable measures to assure compliance with each of the provisions of this Agreed Order applicable to that Defendant.**
   b.  **Defendants shall each develop and implement policies to address and correct deficiencies that are uncovered during the course of quality management**

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 13 of 86

**activities, including monitoring corrective actions over time to ensure sustained resolution, for each of the provisions of this Agreed Order applicable to that Defendant. (11/15)**

**Appendix I**

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 14 of 86



Re: Mental Health Services at CCDOC
*USA v. Cook County, et al.*
Page 1

# Sheriff's Daily Report
## 4/10/2017

| Under the Custody of the Sheriff | |
|---|---:|
| **TOTAL MALE AND FEMALE** | **9,811** |
| Jail Population | 7,620 |
| Community Corrections | 2,191 |
| | |
| **Jail Population** | |
| **TOTAL MALE AND FEMALE** | **7,620** |
| Division 2, Division 3 Annex, Division 6, Cermak, Division 08 RTU, Division 9, Division 10, Division 11 - Male Population | 6,794 |
| Division 4, Cermak, Division 08 RTU - Female Popu lation | 481 |
| Division 15 - Outside Counties | 103 |
| Division 15 - Hospital | 26 |
| **Court-Ordered Programming Within Jail Custody** | |
| Division 16 - VRIC (Court Ordered) - Male Population | 22 |
| Division 3 Annex, Division 2, Division 6, Division 08 RTU - PRC (Court Ordered Drug Treatment Program) - Male Population | 141 |
| Division 4 - Women's Residential (Court Ordered Drug Treatment Program) | 53 |
| | |
| **Community Corrections Population** | |
| **TOTAL MALE AND FEMALE** | **2,191** |
| Electronic Monitoring (Court Ordered) | |
| Men | 1,930 |
| Women | 245 |
| M.O.M.s Program (Court Ordered) | 0 |
| VRIC Post Release (Court Ordered) | 16 |



| Cook County Department of Corrections Executive Director's Log | | | | |
|---|---|---|---|---|

Monday, April 10, 2017 — Prepared By: F. Khan

| Totals: | | 7,620 | 100% | |
|---|---|---|---|---|
| Male | | 7,086 | 93% | |
| Female | | 534 | 7% | |

| | Male | Female | Total | Capacity | No Place To Stay |
|---|---|---|---|---|---|
| Div 1 | 0 | - | 0 | 1,250 | 0 |
| Div 2 | 1,758 | - | 1,758 | 1,960 | 64 |
| Div 3 | 0 | - | 0 | 360 | 0 |
| 3 Annex | 481 | - | 481 | 768 | 18 |
| Cermak | 120 | 17 | 137 | 148 | 6 |
| Div 4 | - | 301 | 301 | 552 | 5 |
| Div 5 | 0 | - | 0 | 992 | 0 |
| Div 6 | 904 | - | 904 | 992 | 12 |
| Div 08 | 646 | 163 | 809 | 979 | 40 |
| Div 9 | 812 | - | 812 | 1,066 | 0 |
| Div 10 | 724 | - | 724 | 768 | 7 |
| Div 11 | 1,490 | - | 1,490 | 1,536 | 4 |
| Div 17 W. Residential | - | 53 | 53 | 152 | 0 |
| Div 15 - HP | 26 | - | 26 | - | 2 |
| VRIC In Camp | 22 | - | 22 | - | 0 |
| Outlying Counties | 103 | - | 103 | - | 0 |
| Totals: | 7,086 | 534 | 7,620 | 11,523 | 158 |



### Sheriff's Daily Report
### 4/10/2017

| Under the Custody of the Sheriff | |
|---|---|
| **TOTAL MALE AND FEMALE** | **9,811** |
| Jail Population | 7,620 |
| Community Corrections | 2,191 |



Q. What does Behind the Walls mean?

A. The behind the walls jail population is physically housed under the Sheriff's custody 24 hours a day/7 days a week. This includes all the populations listed on the key above and pie chart to the left - Divisional populations male & female, Outside Counties, Hospital, PRC, Women's Residential, & VRIC. Detainees in court-ordered treatment programs (PRC, Women's Residential, VRIC) are housed at CCDOC 24 hours a day/7 days week.

**Appendix II**

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 5 of 86

**59.     Assessment and Treatment**

a.      Results of mental health intake screenings (see provision 45.c, "Intake Screening") will be reviewed by Qualified Mental Health Staff for appropriate disposition.

Compliance Assessment: Substantial compliance (since June 2012).

b.      Cermak shall develop and implement policies and procedures to assess inmates with mental illness; and to evaluate inmates' mental health needs.  Said policies shall include definitions of emergent, urgent, and routine mental health needs, as well as timeframes for the provision of services for each category of mental health needs.

Assessment: Substantial compliance (since October 2012)

**c.     Cermak shall ensure that any inmate who screens positively for mental illness or suicidal ideation during the intake screening process, through a mental health assessment, or who is otherwise referred for mental health services, receives a clinically appropriate mental health evaluation in a timely manner, based on emergent, urgent, and routine mental health needs, from a Qualified Mental Health Professional, or Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional.  Such mental health evaluation shall include a recorded diagnosis section on Axis I, II, and III, using the DSM-IV-TR, or subsequent Diagnostic and Statistical Manual of the American Psychiatric Association.  If a Qualified Mental Health Professional, or a Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional, finds a serious mental illness, they shall refer the inmate for appropriate treatment. Cermak shall request and review available information regarding any diagnosis made by the inmate's community or hospital treatment provider, and shall account for the inmate's psychiatric history as a part of the assessment.  Cermak shall adequately document the mental health evaluation in the inmate's medical record.**

**Compliance Assessment:** Substantial Compliance (since 11/16)

**f.     Cermak shall provide 24-hour/7-day psychiatric coverage to meet inmates' serious mental health needs and ensure that psychiatrists see inmates in a timely manner.**

**Compliance Assessment:** Substantial compliance (since 11/16)

**h.     Inmates shall have access to appropriate infirmary psychiatric care when**

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 6 of 86

**clinically appropriate.**

**Compliance Assessment:** Substantial compliance (11/16)

k.   Cermak shall provide the designated CCDOC official responsible for inmate disciplinary hearings with a mental health caseload roster listing the inmates currently receiving mental health care.

Assessment: Substantial compliance (since June 2012)

l.   When CCDOC alerts Cermak that an inmate is placed in lock down status for disciplinary reasons, a Qualified Mental Health Professional will review the disciplinary charges against inmate to determine the extent to which the charge was related to serious mental illness. The Qualified Mental Health Professional will make recommendations to CCDOC when an inmate's serious mental illness should be considered as a mitigating factor when punishment is imposed on an inmate with a serious mental illness and to minimize any deleterious effect of disciplinary measures on an inmate's mental health status.

Assessment: Substantial compliance continues (since October 2012).

m.   In the case of mentally ill inmates in segregation, CCDOC shall consult with Cermak to determine whether continued segregation is appropriate or whether the inmate would be appropriate for graduated alternative based on Cermak's assessment.

n.   Cermak shall ensure that mentally ill inmates in segregation receive timely and appropriate treatment, including completion and documentation of regular rounds in the segregation units at least once per week by adequately trained Qualified Mental Health Professionals or by Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional, in order to assess the serious mental health needs of inmates in segregation. Inmates who are placed in segregation shall be evaluated within 24 hours of placement and thereafter regularly evaluated by a Qualified Mental Health Professional, or by a Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional to determine the inmate's mental health status, which shall include an assessment of the potential effect of segregation on the inmate's mental health. During these regular evaluations, Cermak shall provide CCDOC with its recommendation regarding whether continued segregation is appropriate or whether the inmate would be appropriate for graduated alternative based on the assessment of the Qualified Mental Health Professional, or Qualified Mental

Health Staff with appropriate, on-site supervision by a Qualified Mental Health

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 7 of 86

Professional.

Compliance Assessment: Substantial compliance (11/15)

    m. Cermak shall maintain an updated log of inmates receiving mental health services, which shall include both those inmates who receive counseling and those who receive medication. Cermak shall create such a log within six months of the date this Agreed Order is executed. The log shall include each inmate's name, diagnosis or complaint, and next scheduled appointment. Each clinician shall have ready access to a current log listing any prescribed medication and dosages for inmates on psychotropic medications. In addition, inmate's medical records shall contain current and accurate information regarding any medication changes ordered in at least the past year.

Compliance Assessment: Substantial compliance (since June 2012)

    n. Cermak shall ensure that a psychiatrist, physician or licensed clinical psychologist conducts an in-person evaluation of an inmate prior to a seclusion or restraint order, or as soon thereafter as possible. An appropriately credentialed registered nurse may conduct the in-person evaluation of an inmate prior to a seclusion or restraint order that is limited to two hours in duration. Patients placed in medically-ordered seclusion or restraints shall be evaluated on an on-going basis for physical and mental deterioration. Seclusion or restraint orders should include sufficient criteria for release.

Compliance Assessment: Substantial compliance (since 4/16)

**61.**    **Suicide Prevention Policy**

    d. CCDOC shall participate with Cermak in a jointly established Suicide Prevention Committee charged with developing policies and procedures to ensure the appropriate management of suicidal inmates and with implementing and monitoring a suicide prevention program in accordance with generally accepted correctional standards of care.

    e. Cermak shall participate with CCDOC in a jointly established Suicide Prevention Committee charged with developing policies and procedures to ensure the appropriate management of suicidal inmates and with implementing and monitoring a suicide prevention program in accordance with generally accepted correctional standards of care.

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 8 of 86

      f.   The suicide prevention policy shall include, at a minimum, the following provisions:

      (1)   an operational description of the requirements for both pre-service and annual

in-service training;

      (2)   intake screening/assessment;
      (3)   communication;
      (4)   housing;
      (5)   observation;
      (6)   intervention; and
      (7)   mortality and morbidity review.

Compliance Assessment: Substantial compliance (11/13)

**62.**    **Suicide Precautions**

      e.    CCDOC shall ensure that, where suicide prevention procedures established jointly with Cermak involve correctional personnel for constant direct supervision of actively suicidal inmates or close supervision of special needs inmates with lower levels of risk (e.g., 15 minute checks), correctional personnel perform and document their monitoring and checks.

      f.    Cermak shall ensure that, where suicide prevention procedures established jointly with CCDOC involve health care personnel for constant direct supervision of actively suicidal inmates or close supervision of special needs inmates with lower levels of risk (e.g., 15 minute checks), health care personnel perform and document their monitoring and checks.

      g.    CCDOC shall ensure that when an inmate is identified as suicidal, the inmate shall be searched and monitored with constant direct supervision until the inmate is transferred to appropriate Cermak staff.

      h.    Cermak shall develop and implement policies and procedures for suicide precautions that will set forth the conditions of the watch, including but not limited to allowable clothing, property, and utensils, in accordance with generally accepted correctional standards of care. These conditions shall be altered only on the written instruction of a Qualified Mental Health Professional, except under emergency circumstances.

Compliance Assessment: Substantial compliance (11/15)

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 9 of 86

63.     Cermak shall ensure that Qualified Mental Health Staff assess and interact with (not just observe) inmates on Suicide Precautions, and document the assessment and interaction on a daily basis.

Compliance Assessment: Substantial compliance (since November 2010)

64.     **Suicide Risk Assessments**

a.      Cermak shall ensure that any inmate showing signs and symptoms of suicide is assessed by a Qualified Mental Health Professional using an appropriate, formalized suicide risk assessment instrument within an appropriate time not to exceed 24 hours of the initiation of Suicide Precautions.

b.      Cermak shall ensure that the risk assessment shall include the following:
(1)   description of the antecedent events and precipitating factors;
(2)   mental status examination;
(3)   previous psychiatric and suicide risk history;
(4)   level of lethality;
(5)   current medication and diagnosis; and
(6)   recommendations or treatment plan.  Findings from the risk assessment shall be documented on both the assessment form and in the inmate's medical record.  (11/13)

65.     Cermak shall ensure that inmates will only be removed from Suicide Precautions after a suicide risk assessment has been performed and approved by a Qualified Mental Health Professional, in consultation with a psychiatrist.  A Qualified Mental Health Professional shall write appropriate discharge orders, including treatment recommendations and required mental health follow-up.

Compliance Assessment: Substantial compliance (11/15)

66.     **Suicide Prevention Policies**

a.      CCDOC shall ensure that suicide prevention policies established jointly with Cermak include procedures to ensure the safe housing and supervision of inmates based on the acuity of their mental health needs, in accordance with generally accepted correctional standards.

b.      Cermak shall ensure that suicide prevention policies established jointly with CCDOC include procedures to ensure the safe housing and supervision of inmates based on the

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 10 of 86

acuity of their mental health needs, in accordance with generally accepted correctional standards.

Compliance Assessment: Substantial compliance (since June 2012)

**67.** DFM shall ensure that cells designated by CCDOC or Cermak for housing suicidal inmates shall be retrofitted to render them suicide-resistant (e.g., elimination of protrusive shower heads, unshielded lighting or electrical sockets). Inmates known to be suicidal shall not be housed in cells with exposed bars.

Compliance Assessment: Substantial compliance (since June 2012)

**68. Suicide Prevention Training**

b. Cermak shall ensure that the Facility's suicide prevention curriculum for health care staff members, jointly established with CCDOC, addresses the following topics:
   (1) the suicide prevention policy as revised consistent with this Agreed Order;
   (2) why facility environments may contribute to suicidal behavior;
   (3) potential predisposing factors to suicide;
   (4) high risk suicide periods;
   (5) warning signs and symptoms of suicidal behavior;
   (6) observation techniques;
   (7) searches of inmates who are placed on Suicide Precautions;
   (8) case studies of recent suicides and serious suicide attempts (Serious suicide attempts are typically considered to be those that either were potentially life-threatening or that required medical attention);
   (9) mock demonstrations regarding the proper response to a suicide attempt; and
   (10) the proper use of emergency equipment, including suicide cut-down tools.

Compliance Assessment: Substantial compliance (since December 2010)

**70.** Cermak shall document inmate suicide attempts at the Facility, as defined by the Suicide Prevention Committee's policies and procedure in accordance with generally accepted correctional standards, in the inmate's correctional record in CCDOC's new Jail Management System, in order to ensure that both correctional and health care staff will be aware at future intakes of past suicide attempts, if an inmate with a history of suicide attempts is admitted to the Facility again in the future. Cermak will begin to document this information within six months after execution of this Agreement.

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 11 of 86

Compliance Assessment: Substantial compliance (since June 2012)

## H. QUALITY MANAGEMENT AND PERFORMANCE MEASUREMENT

### 86. Quality Management and Performance Measurement

a. Defendants shall each develop and implement written quality management policies and procedures, in accordance with generally accepted correctional standards, to regularly assess, identify, and take all reasonable measures to assure compliance with each of the provisions of this Agreed Order applicable to that Defendant.

b. Defendants shall each develop and implement policies to address and correct deficiencies that are uncovered during the course of quality management activities, including monitoring corrective actions over time to ensure sustained resolution, for each of the provisions of this Agreed Order applicable to that Defendant.

Compliance Assessment: Substantial compliance (11/15)

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 12 of 86

**Appendix III**

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 13 of 86

**Mental health provisions of the Agreed Order monitored by other monitors**

**H.      QUALITY MANAGEMENT AND PERFORMANCE MEASUREMENT**

   **c.      CCDOC shall participate with Cermak and DFM in a jointly established Health Care Quality Improvement Committee, to be charged with developing and implementing a joint quality improvement program.  CCDOC shall contribute the time and effort of CCDOC staff members who, by virtue of their authority, current responsibilities, and/or past experience, can provide this committee with needed correctional representation.**

   **d.      Cermak shall participate with CCDOC and DFM in a jointly established Health Care Quality Improvement Committee, to be charged with developing and implementing a joint quality improvement program. Cermak will work with CCDOC and DFM to identify those CCDOC and DFM staff members who, by virtue of their authority, current responsibilities, and/or past experience, can provide this committee with needed correctional representation.  Quality management programs related to medical and mental health care will utilize performance measurements to assess quality of care and timely access to care with quantitative and qualitative data analysis and trending over time.**

   **e.      DFM shall participate with CCDOC and Cermak in a jointly established Health Care Quality Improvement Committee, to be charged with developing and implementing a joint quality improvement program.  DFM shall contribute the time and effort of DFM staff members who, by virtue of their authority, current responsibilities, and/or past experience, can provide this committee with needed correctional representation.**

**Compliance Assessment:** Refer to the report by Dr. Shansky (initially found to be in substantial compliance during 2011 and again during 2013)

**69.      CCDOC shall ensure that security staff posts will be equipped, as appropriate, with readily available, safely secured, suicide cut-down tools.**

**Compliance Assessment:** Refer to the report by Susan McCampbell.

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 14 of 86

**Appendix IV**

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 15 of 86

P: AGREED ORDER

## D.   MENTAL HEALTH CARE

**59.   Assessment and Treatment**

    **c.   Cermak shall ensure that any inmate who screens positively for mental illness or suicidal ideation during the intake screening process, through a mental health assessment, or who is otherwise referred for mental health services, receives a clinically appropriate mental health evaluation in a timely manner, based on emergent, urgent, and routine mental health needs, from a Qualified Mental Health Professional, or Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional. Such mental health evaluation shall include a recorded diagnosis section on Axis I, II, and III, using the DSM-IV-TR, or subsequent Diagnostic and Statistical Manual of the American Psychiatric Association. If a Qualified Mental Health Professional, or a Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional, finds a serious mental illness, they shall refer the inmate for appropriate treatment. Cermak shall request and review available information regarding any diagnosis made by the inmate's community or hospital treatment provider, and shall account for the inmate's psychiatric history as a part of the assessment. Cermak shall adequately document the mental health evaluation in the inmate's medical record.**

**Compliance Assessment:** Substantial Compliance (11/16)

**Factual Findings:**

**November 2017 Cermak Status Update**

October 2017
Total Jail Population as of 10/06/2017: 7,128

| | | |
|---|---|---|
| P2-Outpatient Mental Health | 1633- 22% (of total) | 78% (of MH load) |
| P3-Intermediate Mental Health | 385-5.4% (of total) | 18.4% (of MH load) |
| P4-Psych. Special Care Units | 73-1.02% (of total) | 3.4% (of MH load) |
| Mental Health Case Caseload | **2,091 (29%)** | |

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 16 of 86

April 2017
Total Jail Population as of 3/23/2017: 7,598

| | | | | |
|---|---|---|---|---|
| P2-Outpatient Mental Health | 1679 | 22 % (of total) | 78% | (of MH load) |
| P3-Intermediate Mental Health | 394 | 5.1% (of total) | 18.35% | (of MH load) |
| P4-Psych. Special Care Units | 74 | 0.97% (of total) | 3.4% | (of MH load) |
| Mental Health Case Caseload | 2,147 (29%) | | | |

The number of patients on Mental Health Caseload has not significantly changed Furthermore, the proportion of detainees in Psychiatric Special Care Units, Intermediate Level of Care, and Outpatient Level of Care– P4, P3 and P2, respectively, has remained constant. Various diversion programs have not, seemingly, diminished the proportion of the seriously mentally ill and the violent offenders.

All Providers, Psychologists, MSW and MHS continue to use their personalized access to the Jail Data Link database allowing them to source data about previous admissions to municipal and state institutions receiving federal grants or directly administered by the State of IL. All Providers, Psychologists, MSW and MHS have personalized access to the Jail Management System (CCOMS) allowing them to review charges, legal and disciplinary history in real time. All the WYSE terminals and desktops that Cermak utilizes across the compound (including RCDC) permit CCOMS access.

The process to secure Releases of Information to obtain community treatment records remains an area of important focus. Mental health staff are routinely seeking releases of information for community providers during the intake process and post intake when needed. Cermak present process has been modified:

1. Cermak staff utilizes an updated ROI form (can also be accessed from the Mental Health folder in the intranet—under "Frequently Used Forms" or "RCDC Specific Information").  The new form has the MH fax number (instead of the medical records fax).
2. The request is faxed to community providers using the list of MH providers that our patients report most frequently (the list can also be accessed via the intranet under RCDC Specific Information)
3. The original ROI form and the fax confirmation are placed in the "Community ROI forms" inbox located in the MHS administration, the RCDC Unit Director retrieves them for review of completeness, then provides them to the department Administrative Assistant.
4. Administrative Assistant logs the date the request is faxed out.
5. Collateral records are faxed to the MHS fax; AA logs receipt and distributes the records to Providers deployed in the patient's clinical area.

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 17 of 86

      6.  Providers review records and enter a brief summary in EMR. Then medical records are submitted to HIMD

During the 3-month period between July 1, 2017 and September 30, 2017, Intake/RCDC staff executed 382 releases to obtain records from community mental health providers.   This equates to an average of four (4.2) per day.  The length of time from the date the release was executed to the date the records were received ranged from the same day (0 days) to 36 days, with an average of 9.5 days for receipt of the records.

Dr. Butler assumed leadership over the RCDC area as a Unit Director. During RCDC group supervisions case conferences, including peer review, are conducted to address the quality of secondary mental health assessments and identify outliers among staff. The main focus is to discuss quality of dispositions and risk assessments. Dr. Butler conducted an audit and analysis of assessments and dispositions made by the Intake QMHP staff. The double blind audit of intake mental health assessments reflected a high level of concurrence between the supervisor and individual assessors' dispositions. See PDF Appendix.

On average more than 47% of female detainees and approximately 26% of male detainees are referred for secondary mental health assessment from the initial health screening.  Additionally, appropriate identification of mental illness and placement on the mental health caseload at intake is consistently more than 91%. Please see Excel Appendix for Intake Referral data.

The Mental Health team in RCDC continues to be dedicated to working collaboratively with the Initial Intake Screeners, CCDOC staff, and Medical staff to ensure thorough and efficient assessment of the patients we serve. Particular focus has been given to ongoing improvement in the quality of the charting, appropriate dispositioning of patients, processing Releases of Information (ROIs) in a timely manner and addressing staffing and coverage needs.

Coverage for the RCDC has largely been supported by assignment of overtime staff. This need will decrease with the hiring of new MHS staff for this area, with one addition to the team taking place since the last site visit. Additionally, Dr. Mary-Ellen Butler accepted the RCDC Unit Director position in March of 2017; thus, there is now a fulltime supervisor onsite in the evenings to provide onsite direct supervision of the workflow in RCDC. To this end, there has been an increased focus on the quality of the charting for the Mental Health Assessments (MHAs) conducted by Mental Health Specialists in RCDC and accuracy in P-level disposition. Dr. Butler routinely audits the charting and provides feedback to RCDC staff. Onsite supervision allows for real time consultation and reinforces the expectation that charting is to provide a comprehensive snapshot of the patient's current functioning. Dr. Butler meets with RCDC mental health staff monthly for individual supervision and weekly for group supervision.

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 18 of 86

Dr. Butler ensures that all referrals for Intake Mental Health Assessments are completed timely by closely monitoring the queue for patients that may have had to bypass the routine intake processes due to acute mental and/or medical distress. These patients are sent directly to Cermak Urgent care and will have the assessment completed there after stabilization of acute presentation. Periodically, mental health assessments are completed in the patients' assigned housing unit. The RCDC Unit Director shares the information from the queue with the divisional Unit Directors daily so that they are able to assign divisional Mental Health Specialist staff to complete the assessments in a timely manner.

The Mental Health team in RCDC also continues to work in concert with Medical and Intake staff to ensure fluidity and process improvement in RCDC. When patients are may not forthcoming with providing initial intake screening staff accurate and/or thorough information about their psychiatric history the potential for false negatives on the screening increases. The previous cutoff threshold for an automatic referral for a secondary mental health assessment, 13 was formally lowered to 1. This results in any patient answering affirmatively to any mental health related question on the initial screen being referred for a secondary mental health assessment. Furthermore, Dr. Butler and the Nurse Manager over Intake, Nurse Reed, are in constant communication to assure that the staff are provided with appropriate guidance to maintain efficient and effective work flow. An Intake work group was also convened to provide a forum for discussion related to ongoing process improvements.

**Psychiatry Face to Face visits:**

|  | June | July | August | September |
|---|---|---|---|---|
| Psychiatrists | 2133 | 2112 | 2578 | 2540 |
| Physician Assistants | 589 | 485 | 364 | 479 |

Dr. Kelner reviewed psychiatry referrals originating in the intake process as per below (also see Excel Appendix for data):

**Psychiatry Emergent Intake Referrals**:

| Status | Seen | | Not Seen | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|
| Month | # | % | 2) Over 4hrs | | 4) No Note | | # | % | |
| | | | # | % | # | % | | | |
| 2017_03 | 129 | 95.56% | 4 | 2.96% | 2 | 1.48% | 6 | 4.44% | 135 |

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 19 of 86

| 2017_04 | 154 | 97.47% | 2 | 1.27% | 2 | 1.27% | 4 | 2.53% | 158 |
|---------|-----|--------|---|-------|---|-------|---|-------|-----|
| 2017_05 | 141 | 96.58% | 3 | 2.05% | 2 | 1.37% | 5 | 3.42% | 146 |
| 2017_06 | 164 | 96.47% | 6 | 3.53% |   | 0.00% | 6 | 3.53% | 170 |
| 2017_07 | 147 | 98.00% | 3 | 2.00% |   | 0.00% | 3 | 2.00% | 150 |
| 2017_08 | 115 | 95.04% | 5 | 4.13% | 1 | 0.83% | 6 | 4.96% | 121 |
| 2017_09 | 115 | 91.27% | 5 | 4.03% | 4 | 3.23% | 9 | 7.26% | 124 |

Charts were audited for August. In August 2017 95.04% detainees were seen within 4 hours (in keeping with the timeframe) when referred with Psychiatry Emergent Referral. Out of the 6- 4.96% that were not seen timely, 5- 4.13% were still seen in RCDC (Intake) but outside of the 4 hour timeframe. 1- 0.83% was not seen in Intake, as they were either fast tracked, given acuity, prior to Psychiatrists being able to see them, to PSCU and MSCU/detoxification units. Additionally, and in keeping with prior data, a small proportion of that cohort had orders for Psychiatry Intake placed in EMR when it was assumed by MHS that Psychiatry would be present on site, but then, due to call offs Psychiatrists did not show up and original orders were not cancelled.

**Psychiatry Urgent Intake Referrals:**

| Urgent(P4) | 1) Within 24 hrs | | 2) Over 24 hrs | | No Note | | Total |
|-----------|------|-------|------|-------|------|-------|-------|
| 3_2017 | 95 | 90.% | 8 | 8.% | 3 | 3.% | 106 |
| 4_2017 | 69 | 91.% | 6 | 8.% | 1 | 1.% | 76 |
| 5_2017 | 98 | 91.% | 8 | 7.% | 2 | 2.% | 108 |
| 6_2017 | 95 | 92.% | 6 | 6.% | 2 | 2.% | 103 |
| 7_2017 | 83 | 92.% | 6 | 7.% | 1 | 1.% | 90 |
| 8_2017 | 68 | 94.% | 2 | 3.% | 2 | 3.% | 72 |
| 9_2017 | 99 | 90.% | 7 | 6.% | 4 | 4.% | 110 |

Charts were audit for August. In August 2017 94% of detainees referred for Urgent Psychiatry Referral were seen within 24 hours (in keeping with the timeframe). 3 % of detainees that were not seen within the next 24 hours were mostly detainees that fell into one of the following categories: a. Admitted on Fridays and weekends. Psychiatrists saw them later in the day and detainees who were assigned P4 level (were "slated" for PSCU admission) and then were diverted to MSCU and detoxification Units, thus delaying their contact with Psychiatry. Daily PSCU Mental Health Level of Care Tracker continues to allow Psychiatric Providers review lists of patients with P-alerts in MSCU( identification of these detainees with P4 alerts admitted from RCDC to MSCU is critical since there are no scheduling templates in PSCU and MSCU). b. Transferred to John Stroger Hospital (and other hospitals) due to medical problems and detoxification protocols requiring inpatient care and observation and could not be seen within 24 hours by Cermak Psychiatrists. An internal system of notifications between JSH Consultation and

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 20 of 86

Liaison Psychiatrists and Cermak Providers serves to alert JSH C/L Service to CCDOC detainees' arrival. Dr. Thomas has taken over consultative services in MSCU.

**Psychiatry Routine Intake Referrals:**

| Routine( P2/P3) | 1) Within 14 days | | 2) Between 15-21 days | | 3) Between 22-30 days | | 4) D/C within 15 days | | 5) D/C over 15 days without Note | | 6) No Note | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3_2017 | 370 | 62.% | 15 | 3.% | 2 | 0.% | 176 | 29.% | 28 | 5.% | 9 | 2.% | 600 |
| 4_2017 | 371 | 64.% | 7 | 1.% | 6 | 1.% | 154 | 26.% | 36 | 6.% | 10 | 2.% | 584 |
| 5_2017 | 425 | 60.% | 25 | 4.% | 14 | 2.% | 181 | 26.% | 33 | 5.% | 25 | 4.% | 703 |
| 6_2017 | 334 | 53.% | 26 | 4.% | 13 | 2.% | 188 | 30.% | 46 | 7.% | 21 | 3.% | 628 |
| 7_2017 | 333 | 53.% | 31 | 5.% | 6 | 1.% | 206 | 33.% | 28 | 4.% | 20 | 3.% | 624 |
| 8_2017 | 366 | 59.% | 24 | 4.% | 8 | 1.% | 187 | 30.% | 18 | 3.% | 21 | 3.% | 624 |
| 9_2017 | 362 | 56.% | 17 | 3.% | 3 | 0.% | 192 | 30.% | 18 | 3.% | 53 | 8.% | 645 |

Charts were audited for August and September. In August 2017 366 (59%) detainees referred for Routine Psychiatry referral, and remaining on campus, were seen within 14 days (in keeping with the timeframe). 187(30%) of detainees were discharged within 14 days and were not able to be seen by Psychiatry. 24 (4%) detainees who were seen by Psychiatry outside of the timeframe were seen between 15th but under 22nd day. Chart audit for the cases that did not have Providers' notes in EMR in August 2017 revealed that, when all the false positives and discharges from custody are subtracted, the actual number of detainees not seen as Routine Psychiatry Referrals was much smaller.



Thus, out of 39 patients who were captured by Cerner as not having notes within the 14 timeframe, 26 were not on the compound by the end of the timeframe period, 7 missed their appointments

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 21 of 86

related to various scheduling issues mostly related to schedulers scheduling detainees outside of timeframe ( see the corresponding chart above), and other various reasons. *The resultant calculation is that 90.8% of Routine Referrals in August had notes written within the appropriate timeframe.*

In September 2017 362 (56%) detainees referred for Routine Psychiatry referral, and remaining on campus, were seen within 14 days (in keeping with the timeframe). 192 (30%) of detainees were discharged within 14 days and were not able to be seen by Psychiatry. 17 (3%) detainees who were seen by Psychiatry outside of the timeframe were seen between 15th and but under 22nd day. Further audit of 71 charts of those who did not have notes in their charts within the required timeframe revealed the following:



| | SPIDOC/EM/SPFF/Discharge/extradition | Scheduling Issue | Movement/Lock Down | Refused | PT not on Case Load/No Plevel | No Show | No Note |
|---|---|---|---|---|---|---|---|
| Count | 39 | 19 | 6 | 2 | 2 | 1 | 1 |
| Accumulation | 55.71% | 82.86% | 91.43% | 94.29% | 97.14% | 98.57% | 100.00% |

*The data indicates that, when false positives (discharges, lockdowns, court movements, refusals, not on caseload, no shows) are factored in, the rate of compliance with the timeframe is 93%.* Scheduling process continues to contribute to missed assessments. Additionally, in August /September 2017 Cook County has changed the bond system. A set of new rules was introduced that mandates Bond Court Judges to set bail for felonious offenders in the amount that they can afford, that is a more in depth view of detainees' financial assets accompanies detainees when they go to their bond court hearing. Similar rules are to be introduced for misdemeanants in the fall of 2017. The said process has led to an increase in releases from custody to various court supervised diversion programs, including electronic monitoring.

Two major recurring trends have been identified as a result of 110 chart audit/review for August/September 2017:

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 22 of 86

- Cerner continues to capture many IDOC transfers (most of them were parole holds upon admission to CCDOC)/Electronic Monitoring releases/Furloughs/15SFFP/, and extraditions as being physically on campus and, therefore, they are seen as "never having contacts with Psychiatry".
- Scheduling related errors remain an area of vulnerability. COO took over the scheduling Department. The new system increases accountability and yet the transition between the old system and the new centralized process affected the numbers to some extent. The new process relies on real time frequent updates going to clinical areas from the centralized computer generated data bank regarding patient movement to the clinics across the compound. Additional information is available in the PDF appendix.



Detainees seen between 15 and 21st day- 4% and 3%

Compliance rates 90.8% and 93%

**Figure 1Compliance rates with Routine Psychiatry Assessments in August/September 2017**

Daily reports for P Level detainees returning on the compound after hospital stays (15HP) are automatically generated, translated into an automated report, and become available to staff.

Outlying County returns reenter the compound after undergoing a Medical Mini screening as well as MH evaluation in RCDC. Their appointments with Psychiatry are rescheduled by a MHS. Medications are restarted once their housing is determined.

CCDOC continues to utilize the CCOMS DOC Intake Referral to Mental Health alerts that crosses the interface with Cerner EMR and serves to facilitate referral of SMI detainees flagged by CCSO staff during the booking process in RCDC.

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 23 of 86

**November 2017 Metzner assessment:** Substantial compliance continues. The percentage of the total population on the mental health caseload as well as the percentages specific to the various levels of mental health care being used are consistent with national averages. The quality improvement studies relevant to the mental health screening process continues to be a very useful supervisory/peer review process as do the other audits relevant to this provision. Compliance with urgent and emergent psychiatric referral timelines continues to be maintained as does compliance with obtaining release of information consent forms when clinically appropriate.

**Recommendations:** Continue to self-monitor.

> **d.      Cermak shall ensure clinically appropriate and timely treatment for inmates, whose assessments reveal serious mental illness or serious mental health needs, including timely and regularly scheduled visits with Qualified Mental Health Professionals or with Qualified Mental Health Staff, with appropriate, on-site supervision by a Qualified Mental Health Professional.**

**Compliance Assessment:** Substantial compliance (4/17)

**November 2017 Cermak Status Update**

**COMPOUND HOUSING PLAN BY MENTAL HEALTH LEVELS OF CARE (as of October 2017)**

- Cermak- P4 (Psychiatric Special Care Unit)- 2N acute male, 2W-acute and chronic female, 2S/2SE- male subacute, 2E- male chronic, P4 can also be housed on the third floor in Medical Special Care Unit under special circumstances. Housing on 3S for Mental Health reasons requires transfer orders from PCC/ Dr. Mennella. Patients with M4 and P4 can be housed on the Medical Special Care unit based on interdisciplinary decision.
- Division II: MALE MENTAL HEALTH HOUSING
  - Dorm 2: Mental Health Outpatient P2; **if any Mental Health Intermediates (P3) are placed there, MH staff works on transferring them to RTU; CCDOC houses detainees that attend MHTC (Mental Health Transition Center) in Division II Dorm 2
  - Dorm 1: NO MENTAL HEALTH HOUSING
  - Dorm 3: NO MENTAL HEALTH HOUSING
  - Dorm 4: NO MENTAL HEALTH HOUSING
- Division IV FEMALE MENTAL HEALTH HOUSING
  - Mental Health Outpatient P2- 1st and 2nd floors
- Division V: NO MENTAL HEALTH HOUSING
- Division VI: MALE MENTAL HEALTH HOUSING

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 24 of 86

- o Westcare tier –2C (substance abuse, court ordered treatment program), Mental Health Outpatient P2
  - o Protective Custody: 1K, 1J and 1N
  - o Therapeutic Tier –P2 1K; detainees area vetted for admission by MH ( non P3)
- Division VIII RTU: MENTAL HEALTH HOUSING
  - o 5th floor Females
    - ▪ Mental Health Intermediates P3 (tiers B, F) Mental Health Outpatients P2 and DETOX (all other tiers), Pre/postnatal
    - ▪ SMU (tier A) Protective Custody (tier E) (restrictive housing require mental health clearance prior to placement/within 24 h)
  - o 4th floor Males
    - ▪ Mental Health Intermediates P3 (all tiers)
    - ▪ SMU (tier A) Protective Custody (tier E)
      - Mental Health Intermediates P3 (restrictive housing require mental health clearance prior to placement/within 24 h)
  - o 3rd floor Males
    - ▪ Medical Intermediate M3s (may also be P2s) with overflow Mental Health Intermediate P3s
  - o 2nd floor Males
    - ▪ Mental Health Intermediate Overflow P3
    - ▪ Intensive Management Unit (tier 2A)-P3
    - ▪ DETOX
- Division IX: MALE MENTAL HEALTH HOUSING
- Protective Custody (Tiers 3G, 3H )
  - If conditions of confinement are more restrictive than GP, Mental Health Outpatient P2 require mental health clearance prior to placement/within 24h **No Mental Health Intermediates P3 should be cleared by mental health to transfer to PC in Division IX; they should only be cleared for SMU in Division VIII RTU
- SMU- non-administrative SMU (Tier 1E, 1G, 1H; 1F- enhanced security tier); 1G houses only those detainees who have P2 alerts.
  - Mental Health Outpatient P2 (require mental health clearance prior to placement/within 24h) **No Mental Health Intermediates P3 should be cleared by mental health to transfer to SMU in Division IX; they should only be cleared for SMU in Division VIII - RTU
- General Population (all other tiers in the division)
  - Mental Health Outpatient P2
- Division X: MALE MENTAL HEALTH HOUSING: Mental Health Outpatient P2 **if any Mental Health Intermediates (P3) are placed there, MH staff works on transferring them to RTU
  - o Protective Custody -1C (meeting criteria of SMU housing) and 2C
    - ▪ **No Mental Health Intermediates should be cleared by mental health to transfer to SMU/PC in Division X; they should only be cleared for SMU in Division VIII RTU

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 25 of 86

- 2B- Therapeutic Tier ( non P3)
- Division XI: NO MENTAL HEALTH HOUSING
- Division XVI (Boot Camp): NO MENTAL HEALTH HOUSING; detainees on dose by dose medications cannot be in Boot Camp (and that excludes any patient on psychotropics)

**Compound Wide Psychiatry Updates**

**Cermak**

Dr. Brian Thomas (Associate Chair for Infirmary Care) assumed supervisory authority over PSCU in August 2017. Psychiatric coverage of the Psychiatric Special Care Units has been largely unchanged: 2N is covered by 3 Psychiatrists and 1 Psychiatric PA (Balawender). 2W covered by 2 Psychiatrists. 2S/2SE is covered by two Psychiatrists. 2E is covered by on Psychiatrists. All the Psychiatrists combine PSCU coverage with some divisional clinics. 5.8 FTE's (included is relief factor) are assigned to PSCU and provision of psychiatric consultative services in MSCU. Section 59f. contains detailed descriptions of Psychiatric allocations within the PSC Units. Please see PDF Appendix for QI related to frequency of contact of PSCU patients.

**Residential Treatment Unit**

Average daily Population is 400 P3's and 190 P2's. Average SMU/IMU population with census18 and 6 respectively. Of note, that there are no P3 patients housed outside of RTU and the need to create more P3 tiers to accommodate P3 overflow previously housed in Division X has significantly diminished. RTU males are housed on the second, third and fourth floor of the RTU building. RTU females are housed on the fifth floor of the building. The number of detainees with P3 alert averages 20 for the second and third floors of RTU. 1FTE is assigned to P2 /SMU/IMU. 5.2FTE's are assigned to provide services to P3's in RTU.

Psychiatric services in Male RTU have been expanded. Staffing levels in this high priority area (RTU) remain a focus for Psychiatry Administration. Present Psychiatric allocations in RTU are outlined in the staffing section of this Status Update report, see 59f.

Psychiatric allocations absorb Special Management Units with average daily census 18 (mixed Classification Units within the building housing detainees with various combinations of P3,P2, and M- Alerts) + Intensive Management Unit with average daily census 6 (housing SMI detainees with P3 Level of Care).

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 26 of 86

**Division II Dorm 2.**

Two Psychiatrists provide Psychiatric services in this division that houses minimum and medium security P2 detainees. One Provider continues to provide Telepsychiatric services on full time basis. The other Provider is on site. Patient population is 378.

**Division IV.**

Psychiatric services are provided by one Psychiatric Physician Assistant. He continues to exceed expectations and provides reliable coverage to minimum, medium and maximum security P2 female detainees. There are no P3 detainees left in Division IV. Physician assistants are assigned to lower acuity areas. Patient population is 134.

**Division VI.**

Psychiatric services are provided by Two Psychiatrists. Division VI has experienced expansions and recent contraction of medium and minimum security P2 detainees. There are no P3 detainees are housed in this division. Telepsychiatric services in Division VI have been eliminated and presently Psychiatry coverage is provided only by on site Providers. Patient population is 216.

**Division IX.**

Psychiatric services are provided by one onsite Psychiatrist. There are no P3 detainees in this division. Division IX continues to be a very high acuity area with four SMU units and 4 Protective Custody Units accompanied with concentrated levels of institutionally disruptive predominantly maximum security P2 detainees. Institutional challenges related to the nature of SMU units and maximum security predictably lessen access to mental health services. Frequent rotation of Division IX Providers will be carried out (annually) in order to prevent burn out. Patient population is 311.

**Division X.**

Psychiatric services to P2 detainees are provided by two on site Psychiatrists. Division X houses no P3 detainees. Telepsychiatric services have been eliminated from this division. Presently additional clinical space is being modified in the basement of Division X to accommodate recent expansion of Psychiatry clinics. Patient population 383.

**Cermak Basement Clinic** continues to provide services to detainees from divisions XI and Division II Dorms 1, 3, 4. Patient movement to this clinical location has been declining since the

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 27 of 86

introduction of a new policy which prescribes to transfer detainees to Mental Health Housing and give them a corresponding P level alert after triage by MHS, when it is decided that these detainees need a consultation with Psychiatry.

**FTE allocations for P2 detainees** are 5.1
Physician /patient ratio for maximum security detainees is 1:291
Physician /patient ration for minimum security detainees is 1:284
Medium security detainees are absorbed in these calculations.

**Women's Services (RTU-5th Floor & Div. 4) Updates**

Cermak Health Services of Cook County provides mental health services to the mix of P3, P2, and SMU populations on the 5th floor of RTU and Division Four. All of the pregnant females in the institution are housed on 5-C in the RTU. Dr. Kaniuk is the Unit Director of RTU-5 and Division Four. In addition to psychiatry and psychology staff, there are 15 employees assigned to the two female divisions, including mental health specialists, medical social workers, and an expressive therapist.

Division Four houses P-2 detainees in a celled setting. There are 23 (as of October 9, 2017) P-2 detainees enrolled in the THRIVE (Women's Residential) Program (court ordered), which is facilitated by the CCSO's Office of Programmatic Services and the Office of Mental Health and Advocacy. There is one P-3 detainee (as of October 9, 2017) being transferred from RTU on a daily basis to attend group in the THRIVE Program. Cermak and CCSO staff continue to work together to address the challenges of sharing the same caseload. Mutual roles and expectations are in the process of being defined. Agreements have been confirmed in terms of access to DHCRF process, along with routine and emergent services provided by Cermak Health Services staff. Staff in both agencies continue to work to minimize confusion regarding who is providing linkage-re-entry services. One such solution has been the introduction of a "mental health linkage" alert that Cermak medical social work staff enter into the EMR which populates to the CCOMS system making CCSO staff aware that the patient is working with Cermak clinical staff to develop a discharge plan. In general, mental health staff have a good working relationship with security in both RTU-5 and Division Four. Supt. Yoksoulian and Supt. Baker are both supportive of clinical programming services and open to the concerns of mental health. There

are weekly divisional meetings that serve as a venue to maintain open communication, collaboration, and problem-solving for the entire multidisciplinary team.

*Division 4 -* There are approximately 140, P-2 patients in Division Four, as well as general population and M-2 detainees. Division Four is staffed with two mental health specialists who

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 28 of 86

complete mental health clinic (Monday through Thursday mornings) and evaluations (IAHI and HSRF). They also facilitate two groups on a monthly basis for five tiers that house the most P-2 detainees. P-2 detainees are currently housed in approximately seven different tiers. Enrichment programs have been implemented for P2 and GP patients (book club, theater group, yoga, legal aid, knitting, painting, literacy, pride group, substance abuse). Superintendent Baker has been instrumental in improving multidisciplinary communications and increasing enrichment programs. There is also a Mental Health Therapeutic Library to allow patients access to books to utilize as a coping skill.

*P3 intermediate MH groups* – Each mental health worker assigned to a tier (5-B and 5-F) run three groups daily (Rise and Shine and two therapeutic groups) in the mornings (five days weekly) and three groups (five days weekly) in the evening (two therapeutic groups and medication pass observation). Another mental health worker runs groups on 5-C, 5-D, and 5-H on a weekly basis. Additionally, all mental health specialists were rotated on 10/1/17 requiring a transition and training period, which briefly impacts programming on the floor. A CQI study was conducted for the months of July, August, and September 2017, in order to learn how many P3 patients were receiving group attendance certificates in 5-B and 5-F. The data includes:

July 2017      B = 18 (46% of tier census)   F = 10 (26% of tier census)

August 2017   B = 17 (44%)                   F = 11 (28%)

September      B = 14 (36%)                   F = 13 (33%)

Comparing the audit conducted in December 2016-January 2017, where approximately 15% of the detainees on average were receiving a letter, there is a marked increase in group participation. The plan to further increase group participation is as follows:

1. Emphasize the importance of group therapy to the mental health staff during individual and group supervision.
2. Mental health staff will emphasize the importance of group therapy in community groups on the tier.
3. Mental health staff will use different materials, topics, and formats to enhance the group experience.
4. Mental health staff will meet with detainees who frequently refuse to attend groups.

*Special Management Unit (SMU) and Protective Custody* – Mental health rounds are completed once per week on each tier. Patients are assessed by MH within 24 hours of placement in the SMU (5-A). The number of detainees brought for an evaluation before entering SMU housing is as follows:

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 29 of 86

| | |
|---|---|
| July 2017 | 88% (37/42) |
| August 2017 | 84% (37/44) |
| September 2017 | 78% (38/49) |

SMU and PC (5-E) are assigned a mental health specialist. SMU and PC patients receive approximately ten hours of mental health groups per week. Additionally, long term P3 patients receive individual therapy session and treatment planning.

*Treatment Plans* – Patients meet with their tier mental health specialist to create a "treatment goal list." Each P3 patient is discussed in MDT staffing on a regular basis. Both the patients and the entire treatment team are involved in the treatment planning process, resulting in individualized treatment plans for each P3 patient. A CQI project was conducted on the roster of patients housed in RTU-5 on October 5, 2017. Nearly all (98%) of P3 treatment plans are initiated within the first thirty days and updated every 90 days thereafter (96%) on time. The quality of treatment plans has remained consistent. There are challenges when patients move to another tier on the floor because it is unclear who will complete the treatment plan. Outpatient (P2) treatment plans are created by the treating psychiatrist during clinic appointments.

*Outpatient mental health (P2) Treatment Groups/ Community Groups*- P-2 detainees in RTU-5 receive groups approximately four times per month (C-House, D-House, and H-House).
*Health Service Requests* - Completed according to policy with most patients receiving a face to face assessment generally within 48 hours of receipt of the HSR by a MHS III. Patients sometimes abuse the HSR process by submitting multiple requests within a short period of time. Many of these requests relate to psychotropic medications and sleep disturbance. These issues are addressed at community groups and individual HSRF/IAHI evaluations in order to educate the patients about the process and to increase coping skill behavioral repertoire.

*Mental Health and Psychology Clinic* – Many patients receive individual therapy services in RTU and in Div. 4 during mental health and psychology clinics for more personalized treatment.

*Mental Health Evaluations* – The RTU provides 24 hour on-site mental health evaluations (IAHI) and consultation. We are trying to improve consultation with CCDOC to refer appropriate mental health evaluations according to policy (emergent issues, use of force, placement in special management unit, and suspected or confirmed physical or sexual abuse). The unit director brings up any salient issues with CCDOC command staff at the weekly divisional meetings.

*Individual Contacts* – Each P3 patient is assigned to meet with her tier mental health specialist minimally monthly for an individual mental health contact. One challenge in the consistency of these sessions has been security moving patients to different tiers.

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 30 of 86

*Linkage and Expressive Arts* - We continue to focus expressive arts on P-3 detainees. There is a full-time expressive therapist assigned to RTU-5. Linkage services and discharge medications are provided for P-2 and P-3 patients by two medical social workers.

*Hygiene* – Hygiene is an ongoing concern with P-3 patients. Rise and shine program occurs five days per week on 5-B and 5-F. Patients displaying ongoing, serious hygiene concerns (generally psychotic) are discussed in MDT clinical staffing and if necessary, are admitted to the psychiatric special care unit (PSCU) for increased support and/or a humanitarian shower.

*Self-Harm* – Women's Services continues to have a very low self-harm rate. Self-injuries that do occur are often by detainees housed in segregation. Some of these injuries occur in order to get transferred to another tier.

**Challenges:**

*Groups in RTU*--Mental health has expressed concerns to CCDOC administration about the availability of officers to monitor group, creating safety concerns that pose potential barriers to providing mental health treatment.

*Mental Health Evaluations Prior to Entering SMU Housing*-- Command staff in RTU and Division Four will continue to be reminded about the policy related to mental health evaluation for patients entering SMU housing.

*Housing in Division Four*--Housing all of the P-2 detainees together with increase the efficiency or mental health treatment provision. When the patients are housed among approximately seven tiers, facilitating community meetings for the population is more challenging.

*Abusing/Refusing Medications* -–In this population, there is always a concern about patients hoarding and abusing the medications. Nursing staff, mental health staff, and correctional staff work together to try to prevent this. Also, patients refusing medications are an ongoing concern as well. The psychiatrist is informed whenever a problem occurs.

Periodically, there is an issue with space availability during the morning shift (on Tuesdays, Wednesdays, and Thursdays), when all staff are present. Also, employees are occasionally reassigned to other clinical areas when operationally necessary, which impacts programming.

**RTU Male Services Updates**

Patients receiving Intermediate Level of Care (P3) are housed on the second, third and fourth floor

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 31 of 86

of the Residential Treatment Unit (RTU) building. Both psychiatric and mental health services in Male RTU have either maintained or slightly increased productivity over the last six months. Dr. Waxler became the Unit Director of RTU male services in June 2017 and coordinates mental health services for males housed in the RTU.RTU Male Services continues to focus on maintaining programming hours offered for P3 detainees, expanding services to the protective custody and SMU tiers, maintaining compliance with treatment plan timelines for intermediate care, addressing P3 overflow, and coordinating with CCDOC to minimize group cancellations. The following overview provides a summary of these efforts.

RTU male services currently has eleven MHS III staff and one MHS II staff. Based on current staffing and required programming for the ten aforementioned tiers, RTU detainees are offered at least 10 hours of group therapy sessions per patient per week.

Detainees attend the following core groups by bed number: Emotional Management, Interpersonal Skills, and Problem Solving. These sessions review relevant skills for all detainees in intermediate care. Voluntary groups are also offered to address the individual needs of patients. MH staff meet individually with detainees for orientation upon their admission to RTU to discuss the treatment program, review behavioral expectations, and identify treatment goals. At that time, detainees rank order their preferences for voluntary groups and are included in those sessions. The orientation document is used to generate each patient's individualized treatment plan.

Mental health staff absences as well as safety-related concerns remain the predominant reasons for group cancellations. Scheduled programming hours will continue to increase for intermediate care with the addition of mental health specialists. CCDOC and mental health teams continue to collaborate closely to address the most significant obstacles to group programming. The joint schedule that was developed prior to the last DOJ visit to account for group programming as well as recreation continues to be followed and group programming is rarely cancelled due to scheduling conflicts such as barber shop or recreation.

The two most common reasons for a cancelled groups continue to be: 1) MHS staff duty conflict, and 2) availability of supervision. MHS staff duty conflicts occur for a range of reasons. RTU is a dynamic treatment environment, and staff often have to prioritize competing clinical responsibilities, such as providing a mental health assessment to a patient in crisis instead of conducting a group session. Availability of supervision by two officers to conduct on-tier services has also been a challenge. Further, in order to conduct an off-tier group, there needs to be an officer present to monitor the group outside the group room. There are not always enough officers present on the floor to provide this monitoring. Nevertheless, group hours offered continue to be above the necessary 10 hours per patient per week despite these challenges (see attached MH CQI for detailed data on group cancellations).

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 32 of 86


Programming on the Protective Custody tier (4E) continues to be well received by detainees. MH staff generally provide on tier sessions, but have conducted off tier groups when space is available and CCDOC approves movement. Initially, medium and maximum detainees were being seen more frequently due to the timing of the groups and "hours out" for those classifications. After realizing this disparity, MH staff have put forth increased effort to coordinate with tier officers and provide equal opportunity for minimum status detainees. Apart from staff absences, the most frequent barrier to programming on this tier has been staff attention to other clinical duties including mental health clinic, interagency evaluations, crisis intervention, and health service request forms. Programming on 4E will increase as mental health staff are added to the team.

There continues to be more P3 patients than available bed space on the Fourth Floor of RTU. P3 patients who are not on the Fourth Floor are considered "P3 overflow." Generally, these are new patients who are waiting for bed space to open on the main treatment tiers. Assigned MH staff conduct weekly rounds as well as community meetings for P3 patients on the second and third floor. Patients are consistently reminded in these meetings to utilize Health Service Request Forms (HSRF's) in order to access mental health services while on the second or third floor. A standing item on the weekly MDT agenda is to discuss P3 overflow patients. This discussion is geared to assessing whether there are patients that would benefit from the additional monitoring and access to mental health staff on the fourth floor. The team works to ensure that the length of time a patient spends in "P3 overflow" overflow status is minimal. The number of overflow patients has remained relatively low since the last site visit.

The Special Management Unit (SMU) has posed the greatest challenge for group programming. Whereas Division 8 previously allotted two tiers (3A and 4A) for disciplinary housing, all males in RTU currently serve disciplinary time on 4A. Consequently, detainees who are general population and/or P2 level of care complete disciplinary time on the same unit with detainees in intermediate care. Groups have been repeatedly cancelled as a result of unsafe detainee behaviors, as tier officers needed to respond to the situations or lock down the unit. Other institutional factors contributing to group cancellations on this tier have included a lack of handcuffs, conflicts with "hours out," and medication pass. These issues continue to be discussed in interagency meetings, where potential solutions are considered. CCDOC recommended the installation of rings to the bullpen in order for the space to become a viable option for group sessions. MH staff continue to collaborate with nursing and tier officers to avoid scheduling conflicts.

Treatment verification letters continue to serve as an incentive for participants. The criteria for earning a treatment verification letter was modified in August 2017 from requiring patients to attend at least 75% of their available groups to requiring patients to participate in the recommended clinical services outlined in their individual treatment plan. For P3 patients, this equates to 10 hours of clinical programming per week. The percentage of patients earning treatment verification letters

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 33 of 86

has increased for between 17-30% (during last DOJ reporting period) to consistently above 30% over the past three months (see the attached CQI for Treatment Verification Letters).

In terms of treatment plans, each dorm has an assigned MHS III who conducts a core group for the tier and develops a 30-day treatment plan based upon the detainees' mental health diagnosis and self-report during the initial orientation session. The mental health team then aims to review the treatment plan within 90 days to discuss patient progress, clinical concerns, and recommendations for level of care. Weekly multidisciplinary (MDT) meetings are held on both day and evening shifts to facilitate team collaboration on treatment plans. The clinical team on the evening shift has also added group supervision sessions to meet with patients, discuss clinical goals, and offer feedback to increase the opportunity for the patients to interface directly with the full treatment team. According to MH staff, this time has been especially useful to reinforce concepts discussed in groups and to address clinical issues with detainees as a team.
Each tier has an assigned MHS III that has time built into their weekly schedule to monitor, review, and update individual treatment plans on their assigned tier. Compliance with both 30-day and 90-day P3 treatment plans has been maintained since the last DOJ reporting period (see attached CQI for Treatment Plan Compliance). The MH team will continue to monitor and complete treatment plans within specified periods.

Treatment plan review during weekly MDT meetings serves as the primary method by which the team monitors the P3 population in attempt to reduce overflow on other floors. Each week, MH staff place names on the MDT list for review due to an upcoming treatment plan revision or due to the patient's clinical presentation during treatment sessions. All detainees in SMU, PC, and overflow units are reviewed briefly to alert the team of clinical concerns. In addition, the team typically identifies an average of 9 to 10 individuals who are stable for outpatient care each week. MH staff observe many detainees to be highly motivated to remain in the dorm setting. Currently, CCDOC does not have dorm housing for P2/Maximum detainees. As a result, a portion of detainees often attempt to obtain preferential housing in RTU by exaggerating symptoms, requesting mental health treatment, and /or engaging in problematic behaviors.

In January 2017, Cermak administration proposed a therapeutic tier in Division 10 to provide additional support and monitoring for P2/Maximum and Medium detainees. The tier was approved to be started in mid-March. The addition of this tier has increased mental health services for higher functioning detainees while decreasing the number of patients who intentionally return to intermediate care. In September of 2017 a similar programming tier was opened in Division 6 for P2/Minimum detainees. Patients identified as stable for P2 level of care, but appropriate for continued access to programming services are referred to either program depending on security classification.

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 34 of 86

Goals for the next six months in RTU Male include: 1) maintaining more than 10 hours of offered programming services per patient per week, 2) continuing to increase percentage of treatment plan compliance from 84% to above 90%, 3) continue to monitor and increase percentage of patients earning treatment verification letters, and 4) maintaining compliance with HSRF response.

**Intensive Management Unit Updates**

The Intensive Management Unit (IMU) remains on the second floor of RTU (tier 2A). This specialized program was initially designed at the recommendation of DOJ to provide increased structure and support for seriously mentally ill detainees who have demonstrated significant problems in their functioning. The IMU tier houses a maximum of 10 detainees, each of whom reside in a single cell and are encouraged to progress through three successive phases (Assessment and Admission Phase-minimum 2 weeks; Stage 1- minimum 4 weeks; and Stage 2-minimum 4 weeks). Following team discussion, a 4th Phase (Residential) was introduced to accommodate program graduates who would likely deteriorate in a less structured setting. All of the detainees selected for the program have had significant difficulty maintaining safe behavior in other mental health housing locations. Behavioral problems prompting admission to IMU include aggression against self or others, property damage, sexual misconduct, threats of harm, noncompliance, coprophagia, insertion of foreign objects, and ingestion of foreign objects. In the past, the Unit Director and at least one member from CCDOC leadership interviewed prospective detainees prior to admission. Coordinating schedules for the interviews and discussing patients' subsequent team meetings occasionally caused delay. The team therefore decided to admit detainees immediately after initial discussion, with close monitoring during the two week Assessment and Admission Stage.

At the time of their intake to the IMU program, detainees are presented with initial behavioral plans. Treatment and behavioral expectations of the program are reviewed as well as projected dates of potential advancement through stages. Participants are informed that completion of the program could result in absolution of earned time for previous disciplinary tickets. Additionally, they earn a Letter of Completion, which is addressed to the Court Judge and is signed by the Superintendent as well as the Unit Director of the program. To date, 10 of 26 participants have graduated. Of those graduates, 8 detainees had no further incidents of significant aggression or behavioral problems while housed in CCDOC. Two of the graduates did exhibit problematic behaviors (self-injury and/or aggression towards others). Of the total participants admitted to the program since November of 2015: 11 were discharged to the community or to IDOC prior to completion of the program; 4 were transferred to Cermak due to medication noncompliance or deterioration; and 1 was transferred to a maximum security mental health division due to poor progress.

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 35 of 86

Currently, 9 detainees are participating on the IMU program, which is the largest number of members thus far. Three of the detainees are in the Residential Stage, 1 detainee is in Stage 2, 1 detainee is in Stage 1, and four detainees are being monitored in the Assessment and Admission Stage. The program continues to provide more than 10 weekly hours of structured out of cell therapeutic programming. In addition to the groups held in previous years (positive psychology, anger management, substance abuse, communication skills, and coping skills), IMU detainees now have the opportunity to participate in on tier art therapy several times per week. Detainees often continue to work on the drawings, letters, and projects they started in art therapy during unstructured time out of their cell. Officers provide participants with materials located on the unit (markers, colored pencils, etc.) and monitor as they complete tasks.

Feedback regarding the structure and programming of the tier was solicited via "Satisfaction Surveys" administered in September of 2017. The four detainees on the tier at the time identified the following strengths of the program: the small size of the unit, having "undivided" attention of officers and MH staff, snack incentives, and group sessions. They recommended more "activities" and creative methods for reviewing material in sessions. During on tier meetings with the team, participants also requested access to commissary, as several of the detainees were either in or nearing the residential stage. Based upon the feedback of IMU participants, mental health staff have attempted to continue and/or incorporate various activities during group sessions including games and book discussions of reading material patients choose. Commissary has also been added to the specific stages of the program. Detainees in the Assessment Stage and Stage 1 are not permitted to obtain food commissary; however, participants can purchase a total of twenty dollars of food and hygiene products in Stage 2 and can earn full commissary in the Residential Stage.

The treatment team continues to meet weekly in a multidisciplinary team (MDT) staffing to review patient progress and to discuss relevant tier issues. Over the past six months, the team has addressed questions related to commissary, use of the treatment binder on the tier, consistency across shifts, and logistical issues (hours out, mail distribution, incentive schedule, etc.). Individual treatment plans are developed and revised each week based upon staff observations as well as patient self-report. In terms of strengths, the team has put forth concerted effort to individualize treatment plans whenever possible. To illustrate, the members of the team identify patient interests and incorporate those interests into the weekly treatment plan to incentivize progress. Examples of incentives have included: juice from nursing staff with medication compliance, information about sports teams for every day of group attendance, as well as copies of poems or activities with safe behavior. Treatment plans and expectations are reviewed with detainees during weekly MDT meetings held on the tier. At those sessions, detainees meet individually with available team members and are encouraged to express questions or concerns. Team members utilize the on tier MDT to provide feedback to detainees and to review individual treatment goals.

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 36 of 86

In the past, consistency of tier officers and implementation of program tenets was a challenge. To address these issues, specific officers were solicited by the team and placed on the tier if they agreed to join. These officers are typically scheduled for the IMU program on predictable days and times, which has been beneficial for detainees as well as mental health staff. On occasion, the officers assigned to this tier are placed on other units and switched with officers who are not normally assigned the tier. Several incentives were posed for the IMU tier officers, but have not been consistently implemented to date. The Superintendent has distributed special certificates to officers at an awards ceremony to recognize their ongoing support of the tier and the IMU patients.


The placement of overflow detainees on the tier has remained problematic. Detainees cited this issue on their satisfaction surveys, noting that groups feel less confidential when overflow patients are present on the unit. Moreover, tier officers have repeatedly cited difficulties managing "hours out" with overflow detainees. The clinical team therefore actively recruited referrals from P2, P3, and P4 placements. In October of 2017, four detainees were admitted to the program and one residential detainee was returned to IMU due to concerns about his potential behavior on a dorm setting. The admission of these detainees will minimize disruption of overflow detainees, but will require careful treatment planning due to challenges posed by the increased census. In particular, seating limitations in the day room will not allow for all detainees to participate in a single group session. Currently, the tier has six tables, with only one detainee cuffed to the table for group sessions. This design was implemented to avoid unsafe behaviors between group participants (e.g spitting, kicking, etc.). The team has discussed the possibility of adding a table as well as a bench with additional seating. Further, the team is in the process of examining the program schedule to separate sessions for Residential Stage participants and to potentially divide groups into multiple sections based on stage in the program and/or treatment need.

The most common interruptions to group programming on IMU include, but are not limited to: absences amongst mental health staff (both planned and unplanned), overflow detainees, shortage of handcuffs, and environmental issues (flooding, plumbing, etc.). The IMU program continues to utilize mental health staff from RTU 4th floor. Covering missed groups and adding treatment services may therefore become more feasible as IMU gains a dedicated staff. Toward this end, two mental health specialist positions were added to the 3 to 11 shift within the past month.

**Division 2 Dorm 2/minimum and medium Treatment Team Updates**

Division Two – Dorm Two houses P2 and M2 (outpatient level of care) patients within a dorm setting. There are ten dorms over three floors, with a census of approximately 44-48 detainees in each tier. Per DOJ recommendations for outpatient care, each dorm is scheduled for at least one on tier group per week. Mental health specialists in the division have assigned tiers and lead groups on varied topics (coping skills, relaxation techniques, communication, psychoeducation, grief and loss, etc.). Staff enter the tier, announce group topics, and facilitate sessions in the day room with willing participants. Group size ranges from two participants to almost twenty,

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 37 of 86

depending largely on the dorm as well as the time of group. Several dorms house detainees in the MHTC program, which reduces the number of participants available for some group sessions on the 7 to 3 shift.

Detainees in Division Two, Dorm 2 are additionally offered weekly on tier art therapy sessions. The newly hired staff conducts small groups in the day room of each dorm. These sessions have been well received by participants, who express appreciation for the music and art activities offered. The number of detainees allowed to participate must be limited in order to safely monitor the art supplies. At times, conducting on tier group sessions has been challenging. Detainees and tier officers occasionally resist turning the television off and clearing the day room for sessions. MH staff have requested use of the recreation room on the first floor to conduct off tier groups, however custody has indicated this is not a possibility. Currently, there are no other available spaces for off tier programming in the division. MH staff therefore continue to focus upon providing on tier group sessions.

The medical social worker assigned to the division co-facilitates on tier group sessions for each dorm approximately once per month. In these sessions, the MH staff and MSW collaborate to provide an overview of linkage services and address frequently asked questions. Additionally, the MSW meets individually with detainees to obtain releases of information, plan for discharge medications, and facilitate placements in the community for identified patients who are not participants in CCSO programming (those patient receive discharge planning services from the CCSO discharge planners).

Apart from on tier group sessions, MH staff meet with detainees individually during MH clinics, to address HSRF's, and for crisis intervention. The clinical team agreed to identify and closely monitor patients with increased clinical need. Those detainees are referred for weekly or biweekly individual sessions with MH staff for additional support.

The MH team in Division Two, Dorm Two has been able to consistently provide on tier group sessions over the past few months. Currently, one staff is assigned to each shift, which is challenging when MH staff are absent or must attend to multiple crises, walk-ins, and HSRF's. Due to present staffing allocations, services have to be referred to the Urgent Care when MH staff are not assigned to this division. When available, overtime staff has been helpful, but does not provide regular coverage. Another challenge has been times during which MH staff on the second floor conduct individual sessions, MH clinic, and telepsychiatry clinics with supervision being provided by tier officers located near the MH offices while they are also supervising their assigned dorms. Officers in the dispensary are assigned to supervise mental health, psychology, and psychiatry clinics, which has been helpful. Issues related to officer supervision and needed

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 38 of 86

assistance with on tier programming during the 3 to 11 shift have been discussed in weekly interagency meetings.

**Division 6/Minimum and Medium Treatment Team Updates**

Division Six houses P2 patients, along with GP (General Population) detainees, and transgender detainees. In the past, three tiers were dedicated for Protective Custody (PC) housing while one tier was designated for a Special Management Unit (SMU). Within the last three months, the SMU tier was removed from the building and the PC tiers were consolidated to a single tier (1L).
Other tiers in the building are designated for the Westcare substance abuse program, the school PACE program, and the VRIG boot camp program.

In June of 2017, approximately 230 P2 detainees were housed over twenty different dorms throughout the building. All tiers were primarily populated with general population detainees, with less than twenty P2 detainees on each tier. Two MH staff were assigned to the building on the 3 to 11 shift, with one staff scheduled to conduct approximately six community meetings for P2 detainees each week. At that time, MH staff were not conducting any off tier groups. Consequently, the MH staff would count the number of P2 detainees on each dorm and select the six tiers with the highest population of P2 detainees. During the on tier community meetings, the P2 detainees were called to the front table of the day room area, where MH staff would conduct a community meeting on various topics. Officers muted the television, which caused significant resistance amongst general population detainees who were also present in the day room. Their use of the microwave and telephones continued throughout the meeting. MH staff expressed safety concerns with this persistent movement in the day room area. In addition, the community meetings were difficult to conduct due to the loud noise of the general population detainees talking and socializing in the shared space. These meetings were discontinued in July of 2017 following consultation with Cermak MH leadership due to the environment not being conducive to effective service delivery and safety concerns.

In effort to provide more effective mental health support in Division Six, the mental health team requested development of outpatient dorms to house all P2 detainees together. CCDOC leadership expressed concerns regarding safety and logistical issues that could arise with the immediate creation of six P2 tiers. However, initial movements were made to create a P2 tier with randomly selected P2 detainees. The detainees placed on the unit were upset about the transfer, expressing concerns they were "singled out" due to their mental health issues. Following further collaboration, Cermak and CCDOC teams agreed to develop one pilot therapeutic tier in Division Six. The tier proposed was modeled after the therapeutic tier in Division Ten and is intended to provide increased support for selected P2 detainees on the mental health caseload. With support of CCDOC, the Therapeutic Tier in Division Six was opened on unit 1K in September of 2017.

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 39 of 86

Most of the detainees currently housed on the tier were identified and interviewed by MH staff. However, the tier is also populated with new P2 detainees who have no knowledge of the program and did not necessarily express interest in group treatment. MH staff review the tier list and attempt to meet with these detainees shortly after their placement on 1K to assess their appropriateness for the unit. Occasionally, general population detainees are also placed on the unit when other participants are discharged. Maintaining the therapeutic tier with willing and compliant detainees is a primary concern to preserve the integrity of the program. A weekly list is sent to CCDOC leadership in classification to identify selected program participants as well as those awaiting transfer to and from 1K. MH staff and CCDOC continue to collaborate on the most effective methods to communicate regarding detainee movements on and off the tier.

Two mental health specialists are currently assigned to Division Six on the 3 to 11 shift. Recently, two new staff members were hired on the 3 to 11 shift, which will help to provide increased coverage in the building. The therapeutic tier is offered approximately eight hours of on tier and off tier group programming based upon current staffing with mental health specialists, an art therapist, and the assistance of two Unit Directors and a Cermak volunteer who facilitates chair yoga. MH staff have additionally collaborated with the Supervisor of Enrichment Services for CCDOC to increase opportunities for volunteer programming. Specifically, volunteers from the community have agreed to lead the following groups for the therapeutic tier: AA/NA, parenting, and story-telling.

The MH team is currently working on improving the consistency of programming for the therapeutic tier as well as for the community meetings for P2 detainees in the division. MH staff have inquired about use of classrooms during the evening shift, however these rooms could not be secured for off tier P2 groups. The multipurpose room is the only space available for P2 community meetings/group sessions given the elimination of community meetings on predominantly GP tiers. This room is frequently used by volunteer groups and therefore has limited accessibility. CCDOC thus agreed to create a second P2 tier (1J) in October of 2017, which will facilitate the provision of on tier community meetings. The MH team will collaborate with CCDOC to either create additional P2 tiers or to secure at least six time slots in the multipurpose room for weekly group sessions with the remaining detainees on the mental health caseload (over 100).

In addition to the development of the therapeutic tier and the P2 tier in Division Six, MH staff have been increasing support for the Protective Custody tier (1L). At least one MH specialist is assigned to conduct rounds and one on tier group session weekly. The art therapist has also been working on providing at least one off tier group session for these P2 detainees.

Apart from group sessions, MH staff meet with detainees individually to address HSRF's, during scheduled clinics (Sunday through Thursday evenings), and for crisis intervention. Movement in

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 40 of 86

the dispensary area can be challenging at times due to CCDOC staffing, unplanned behavioral incidents, volume of detainees being seen by multiple disciplines, and delays when both GP and PC detainees need to be seen. Despite these challenges, MH staff report strong support from officers in the dispensary who help to facilitate access to patient care. The MH team recently agreed to add two multidisciplinary meetings per month to facilitate communication regarding patient care, behavioral treatment plans, and potential step downs to general population.

**Maximum Security Treatment Team Updates**

Divisions 9 and 10 house the maximum security outpatient mental health and medical population, as well as CCDOC Special management Units (Div. 9), and general population detainees. The clinical team consists of 9 Mental Health Specialist, 5 assigned to the day shift and 4 to the evening shift. All patient services needed on the overnight shift are handled by the Urgent Care staff.

Since the last site visit the following services continue to be provided by Mental Health Specialists and psychologist for the outpatient mental health population: evaluations for mental health conditions, psychological evaluations and assessments for suicidal risks and assessments of detainees to determine if there are psychiatric concerns regarding placement in Special Management Units by CCDOC. This clinical team also provides therapeutic services which includes mental health and psychology clinics, group therapy, behavior management treatment plans, community meetings, weekly Special Management Unit rounds, crisis intervention, and service response to submitted Health Service Requests and Inter-Agency Health Inquiry forms.

Groups for SMU detainees on Division 9/1E are conducted weekly by Dr. Briney and Dr. Augustine. Mental Health Specialists in Division 9 now have designated clinical office space which allows the treatment team full autonomy in scheduling clinics. Since the last site visit there has been continued increase in number of groups and number of detainees served in groups in Division 10. Over 200 groups were held from May to September and over 6,000 patients served in groups.

Mental Health leadership and staff submitted a proposal for an enhanced services Therapeutic Tier in Division 10 on January 20th, 2017 and CCDOC approved the Therapeutic Tier during the week of March 13th. One of the day shift Mental Health Specialist on Division 10 has primary responsibility for the Therapeutic Tier, 2B Division. The psychologist coordinates with other providers to schedule, facilitate and enhance services to the Therapeutic Tier and Mental Health Staff began providing services on the Therapeutic Tier on March 19th, 2017. The program schedule can be found in the PDF appendix.

The detainees on the Therapeutic Tier completed a survey in September which marked the six month anniversary of the establishment of the Tier. The results indicate that the majority of

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 41 of 86

participants who were on the Tier at the time of the survey are very satisfied with the programs offered 30/35, 86%, 3 were somewhat satisfied 8% and 2 were neutral, 6%. The three detainees who were somewhat satisfied listed the following reasons: one was on the Tier for only a week and did not have the opportunity to participate in all groups, one wants to lock up early-after groups and one gave no reason. Of the two neutral results, one wanted the Tier to be like RTU and one did not like the Art Group schedule. The detainees also provided feedback on Yoga indicated that participating has aided with sleep and bodily aches. These results can be found in the PDF Appendix. Additionally, the statistics show a significant post-6 month decrease in self-injuries and disciplinary incidents for detainees admitted to the Therapeutic Tier when compared to pre-admission incidents of self-injury and disciplinary infractions. Please refer to PDF Appendix. The detainees on the Therapeutic Tier also decided to represent their commitment to the goals of the Tier by choosing the symbol of a phoenix rising from the ashes and by adding the following saying to the symbol "We will rise up and make a change".

The clinical team continues to work to address a number of challenges in order to increase the efficiency and effectiveness of service delivery. The clinical office space available for provision of Mental Health services on Division 10 continues to pose a potential risk due to the room layout that results in physically close proximity between staff and detainee. The goal of achieving 100% compliance in Special Management Units (SMU) pre-placement/within 24 hour evaluations poses some challenges. The following factors continue to impact this compliance: instances of no movement of detainees due to safety concerns, detainees refusing to be seen, MHS staff are not always informed in real time when a detainee is being placed in SMU or when the detainee is removed and returned after 30 days/24 hours out, and detainees are sometimes not referred as being SMU bound when they are returned from outlying counties and hospitals.

In Division 9 several detainees present a challenge with their chronic pattern of self-injurious behaviors and suicidal gestures and threats. Assessment of the identified patients indicated that the detainees do not present with serious mental illness but engage in disruptive behaviors due to difficulty controlling impulses and achieving identifiable goals (i.e. movement out of SMU, changes in housing location, visits to offsite hospitals, etc.). Several multidisciplinary meetings were held and Mental Health Leadership and staff in Division 9 submitted a draft proposal for a Behavior Management Unit Pilot Project on February 7th, 2017 for CCDOC's approval which is still pending. The purpose of the proposed unit would be to provide a structured therapeutic setting for patients with institutionally disruptive behaviors that are unrelated to serious mental illness.

A collaborative project related to clinical scheduling and patient movement was launched div. 9 in April 2017. All Cermak scheduled clinics are automated to produce an electronic movement list for custody. The project was recently expanded to Division 10. This has had a positive impact on access to care challenges, as it has enabled both agencies to identify and correct barriers in real time.

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 42 of 86

**Compound Special Management Units:**

Compound SMU housing was assessed on 10/18/2017 with the following data captured:

- Compound Census as of 10/18/2017: **6,939**
- RTU SMU and PC Census 10/18/2017: **62** (23 in disciplinary SMU, 39 of them are in Protective Custody )
- Out of **23** Disciplinary SMU RTU detainees- **14** are P3's (0.2% of total jail population) and are 9 P2's.
- Division IX Non PC SMU Census ( all P2's)- **77**
- Total SMU P2 and P3 population on the compound – **100** (excluding Protective Custody Population) ( 1.4% of the detainee population and 4.79% of the Mental Health caseload population)
- Average Non PC SMU population on Mental Health caseload (P2 and P3) from June 2017 until October 2017 - **81.**
- Average Non PC SMU population percentage of Mental Health caseload (P2 and P3) from June 2017 until October 2017- **3.82%.**
- The number of P2 and P3 patients in SMU housing as a percentage of the total mental health caseload has declined from about 5% to about 3% from September 2016 until October 2017.

| *P2 & P3 PTS IN SMU BY MONTH   [SEP 2016-OCT 2017]* | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TIER | SEP | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | AVE |
| RTU 4A | 13 | 9 | 11 | 6 | 6 | 9 | 9 | 9 | 11 | 6 | 8 | 8 | 5 | 7 | 8.4 |
| RTU 5A | 10 | 12 | 9 | 12 | 11 | 12 | 8 | 6 | 13 | 11 | 8 | 12 | 10 | 10 | 10.3 |
| 9 1E | 10 | 7 | 8 | 10 | 8 | 9 | 8 | 6 | 4 | 6 | 1 | 5 | 4 | 4 | 6.4 |
| 9 1F | 11 | 12 | 13 | 10 | 8 | 10 | 9 | 12 | 11 | 9 | 9 | 9 | 8 | 9 | 10.0 |
| 9 1G | 39 | 34 | 39 | 37 | 32 | 27 | 29 | 27 | 32 | 34 | 32 | 29 | 30 | 27 | 32.0 |
| 9 1H | 17 | 20 | 18 | 13 | 16 | 18 | 15 | 16 | 11 | 13 | 15 | 11 | 10 | 12 | 14.6 |
| TOTAL | 100 | 94 | 98 | 88 | 81 | 85 | 78 | 76 | 82 | 79 | 73 | 74 | 67 | 69 | 81.7 |
| MH CASELOAD | 2087 | 2091 | 2137 | 2159 | 2155 | 2138 | 2135 | 2103 | 2093 | 2095 | 2106 | 2124 | 2129 | 2153 | 2121 |
| *AVE %* | *4.8%* | *4.5%* | *4.6%* | *4.1%* | *3.7%* | *3.9%* | *3.6%* | *3.6%* | *3.9%* | *3.7%* | *3.4%* | *3.4%* | *3.1%* | *3.2%* | *3.8%* |

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 43 of 86



- SMU settings: DOC and Cermak staff work together on overcoming inherently lower accessibility of patients to care; the overriding principle remains being able to provide essential psychiatric and mental health services regardless of housing. Very helpful was the establishment of the Compound wide Access to Care Workgroup with the participation of the Cermak operational leadership and most senior CCDOC executive leadership with the focus ( as the first priority on further improving access to care in Division IX which houses significant behaviorally problematic/institutionally disruptive P2 detainees in various SMU units). CCDOC concentrated most of the P2's in SMU in Division IX on the same tier – 1G –with the goal of improving security and supervision as well as access to essential mental health services. CCDOC moved all SMU (Non Protective custody) to Division IX and presently there are no Non PC SMU tiers remaining in Division VI. The same movement took place in Division IV and all SMU detainees are housed on the fifth floor of RTU.
- SMU for P3's Programming statistics can be found in elsewhere in this report.
- Cermak staff continues to work on modifying conditions of confinement for SMI populations housed in SMU setting in RTU 5A (Female Special Management Unit). GP and P2 classified female detainees both averaged 10.4 days in SMU. Female P3 patients averaged 3.6 days in SMU across review dates. There was only a single outlier among the women; she was a P2 classified detainee who had been housed in SMU for 63 days on October 19th, and had been released from SMU by October 24th. Aside from this individual, no other outliers were identified. RTU 5A CQI SMU Length of Stay Study can be found in the PDF Appendix.
- Cermak continues to strive to modify conditions of confinement for those who are housed on 4A (SMU male tier). According to the results of a randomized sampling, overall, P2 patients had an average LOS in SMU of 17.6 days, and P3 patients had a LOS of 6.1 days. The average LOS for both groups falls well within federal guidelines. There were no male RTU SMU outliers identified for those dates. RTU 4A CQI SMU Length of Stay Study can be found in the PDF Appendix.
- Modification of conditions of confinement for those individuals with Serious Mental Illness whose time in SMU exceeds 14 days (provided that they serve consecutive, and not concurrent, disciplinary tickets) would consist of providing more out of cell time and additional therapeutic programming to them. DOC Disciplinary Unit continues to issue

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 44 of 86

tickets for P3's that do not exceed 14 days. Tickets do not always run concurrently. Cermak continues to provide structured therapeutic programming for SMI detainees in SMU 4A, described elsewhere in the Cermak October 2017 updates. Detainees remain tethered to stationary furniture during out of cell group structured therapy/activities. Cermak will continue to target 10 hours of structured activities weekly/10 hours unstructured activities weekly provided to these detainees. Programming activities on the male tier have been at times affected by institutionally disruptive detainees. RTU SMU houses detainees with M3 and P2/No P alerts and many of these detainees are high functioning and do not have Diagnosis of SMI. Detainees with higher level of functioning, when introduced into the milieu with more regressed poorly functioning patients, have a tendency to adversely influence more regressed individuals. The importance of not introducing potentially predatory detainees into the RTU SMU environment is recognized.

- Cermak MH Department furnishes SMU detainees with the following services:
  - SMU rounds weekly ( in addition to weekly PCS rounds)
  - Psychiatry appointments ( regularly scheduled and walk ins)
  - Individual Behavioral Management Treatment Plans
  - Other essential services –individual supportive counseling , access to emergency and routine care as per DHSR process, crisis intervention, etc. (commensurate with their level of care)

In Division IX new clinical space was dedicated on 1S. A storage room was repurposed to allow seeing detainees for MH and Psychiatry appointments. A desk with EMR computer, patient chair, a wall ring (to tether detainees to) were all installed to enhance security during sessions. Significant effort is made to reduce SMU patients' movement within the building and, even more importantly, outside the building. What causes self-injury and acting out is multifactorial and, yet, it is believed that many detainees engage in acts of self-harm and other acting out in order to secure movement and break the monotony of SMU confinement. Telehealth services continue to be utilized in order to minimize the incentive that movement to appointments represents to many

detainees in SMU. Additionally, reducing the frequency and length of movement reduces the number of incidents of the use of force which happens to increase during transit.

**November 2017 Metzner assessment:** It is also encouraging that another "therapeutic" housing unit has been opened in Division 6 to serve as a transition for inmates being discharged from the RTU. This housing unit was opened during September 2017. During the morning of November 14, 2017 I interviewed inmates in a community meeting like-setting within this housing unit. Inmates reported receiving at least 2 to 3 group treatments per week, which they described as being very useful. There clearly was a therapeutic milieu established within this housing unit. I also observed parts of an art therapy group. All the inmates on the unit actively participated in this group, which was performed in a very competent fashion by the art therapist.

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 45 of 86

The RTU patio has significantly been improved from the perspective of equipment being located within the patio such as basketball hoops and a ping-pong table for both male and female inmates. The winterization of several of these patios has not yet occurred. An outside exercise yard is in its early phases of construction.

During the afternoon of November 13, 2017, I interviewed inmates in a community meeting-like setting in RTU units 5F (a medium-maximum security female dormitory), 5B (a minimum-medium security female dormitory) 4D (a minimum-medium security male dorm), 4F (a medium-maximum security male dormitory) and 4B (a minimum-medium security male dormitory). Inmates were generally in agreement that the offered mental health groups were very beneficial to them with many of these groups being offered in a group room off the unit. Access to groups in Unit D was problematic related to cancellations, which was in the process of being remedied. With few exceptions, RTU inmates were being offered at least 10 hours per week of out of cell structured therapeutic activities.

Access to outdoor patios was problematic in the male dormitory units, which was also going to be remedied in a timely manner. Medication continuity issues were not present.

The male inmates described issues related to lice and reportedly bedbugs. This issue was discussed with both correctional and medical staff, with appropriate interventions taking place.
Other issues voiced by inmates again related to conditions of confinement, such as access to cleaning supplies and the quality of the food. However, these issues did not appear to be much different from previous site visits. Specifically, complaints about access to reasonable cleaning supplies in the past were not substantiated when consultation was obtained with the monitor for sanitation.

Some RTU inmates complained about lack of access to a toothbrush, which appeared to be confirmed related to inventory issues.

During the morning of November 15, 2017, I attended parts of 2 group therapies being offered to male RTU inmates and 2 group therapies being offered to female RTU inmates. The inmates were actively engaged in these sessions, which were competently directed by the mental health therapists.

The male Intensive Management Unit (IMU) is located on the second floor of the RTU. This specialized 10 bed capacity program, designed to provide increased structure and support for mentally ill detainees who have demonstrated significant problems in their functioning, continues to evolve in a very positive manner. I interviewed four of the eight inmates in this unit, who all

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 46 of 86

described the programming and out of cell time (3-6 hours per day) to be very beneficial to them. The correctional officers and mental health staff clearly had good working relationships with each other as well as with the IMU inmates.

My previous concerns relevant to psychiatric staffing in the RTU have been adequately addressed.

P2 level of care inmates in Division II, Housing Unit S, verbalized many complaints regarding access to mental health services on this unit, which were similar to complaints reported during prior site visits. They included reported poor access to the psychiatrist and medication continuity issues. However, these complaints in the past were not substantiated by reviewing healthcare records and/or talking healthcare staff.

During the morning of November 14, 2017 I observed the mental health rounding process within the SMU located within Division 9, which was done in a competent manner by the mental health specialist.

I also observed inmates in a community meeting-like setting within Division 10 in Unit 2B, which is the "therapeutic" P2 housing unit during a psychoeducational group that reviewed issues relevant to obsessive-compulsive disorder. This unit clearly had a therapeutic milieu established. Inmates were actively participating in the psychoeducational group.

**Recommendations:** As resources allow, create other therapeutic mental health housing units. The mental health transitions center (MHTC) continues to provide an important re-entry program for mental health caseload inmates.

> **e. Cermak shall ensure that treatment plans adequately address inmates' serious mental health needs and that the plans contain interventions specifically tailored to the inmates' diagnoses.**

**Compliance Assessment:** Substantial compliance (4/17)

**Factual Findings:**

**November 2017 Cermak Status Update**
Please see Appendix for Treatment Plan QI Audits for each level of care.

Intensive Management Unit (IMU) staff generates Multidisciplinary Treatment Plans called Self-Management Housing Plans for each individual patient housed in IMU with weekly updates.

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 47 of 86

Interagency Behavioral Management Plans continue to be developed as needed by Unit Directors in concert with Chief Psychologist, Chief Psychiatrist, and the full multidisciplinary team for more complex or difficult cases throughout the compound.

- P4 (Psychiatric Special Care Units): Psychiatric Special Care Units patients have completed treatment plans within 72 hours of admission to the Psychiatric Special Care Unit (PSCU) by QMHP and the Treatment Team with a review and update triggered by changes in acuity (such as placement in therapeutic restraints or administration of emergency medications) and failure to achieve goals, but no less frequently than weekly.
- Once patients within PSCU's are determined to require subacute level of care, with regard to the frequency of Treatment Plan reviews, they will have their Plans reviewed by QMHP and the Treatment Team every 30 days for two months. After that, patients within PSCU's requiring chronic level of care will have their treatment plans reviewed no less frequently then every 90 days by QMHP and the Treatment Team from that point forward.
- P3(Intermediate Care): Mental Health Intermediate/residential level of care patients have completed treatment plans by a QMHP within 30 days of admission to that Level of Care, with review and update at least every 90 days thereafter.
- P2(Outpatient Care): Mental Health Outpatient level of care patients have completed treatment plans by a QMHP ( Psychiatrists) within 45 days of admission to that Level of Care, with review and update at least annually thereafter. New individualized free standing Master Treatment Plan Templates were introduced in Cerner in January 2017. The new Master Treatment Plans allow to create more individualized and focused plans as they incorporate: reflection of collaboration with the inmate, frequency of follow up for evaluation and adjustment of treatment modalities, referrals for lab work for medication monitoring, instructions about adaptation to the correctional environment, documentation of treatment goals and objectives, notations of clinical progress. It is still allowable to supplement that Template with the Rx plan pertaining entries within the power notes. The ultimate goal remains is to create individualized Master Treatment Plans for every patient in P2 Level of care within the requisite time frame while addressing detainees' mental health needs and have them updated three times a year/when goals are failed ( current Policy requires annual updates).
- Although the Policy dictates that treatment plan updates/revisions are undertaken annually, Providers are encouraged to do so more frequently, as clinical needs dictate, or when goals fail. The aggregate data demonstrates that Providers generate (new Treatment Plans) and revise (existing Treatment Plans) 390 times a month on average with P2 monthly population averaging 1661 across the compound since February 2017. The data also reflects that a significant number of treatment plans is being generated in Division 2 Dorm 2 (less acute area of the jail where many low security misdemeanants with high turnover rates are housed) and Division X (high security detainees with P2 level of care). Raw data collected suggests that Providers and PA's have been creating and revisiting template Treatment Plans with increasing frequency since the template was introduced in

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 48 of 86

> January 2017. The fact that numbers are decreasing in most of the areas, but Division II, is a reflection that most of the pt already have had initial treatment plans generated ( the burst following the start of the template in February 2017 ) and now most of the activity in that domain is due to updates and revisions.

- Care Level specific CQI studies for Treatment Plans can be found in the PDF appendix.
- Additionally, Cermak collected data on the number of P2 Level of Care Detainees who receive no medications. It is recognized that the time expenditure and complexity of treatment management is decreased for these detainees. Aggregate data shows that 319 (19%) P2 Level of Care patients receive no psychotropic medication. Total number of P2 patients as of 09/14/2017 is 1,670.

**November 2017 Metzner assessment:** Treatment plans are being completed within the policy and procedures' required timeframes as confirmed by QI studies.

**Recommendations:** Continue to self-monitor.

> **f.** **Cermak shall provide 24-hour/7-day psychiatric coverage to meet inmates' serious mental health needs and ensure that psychiatrists see inmates in a timely manner.**

**Compliance Assessment:** Substantial compliance (11/16)

**Factual Findings:**

**November 2017 Cermak Status Update**

*Mental Health Department Vacancies. October 2017*

|  | ACCOUNT # | VACANT | FILLED | SUM | % VACANT |
|---|---|---|---|---|---|
| Divisional Chief of Psychiatry | 110 | 0 | 1 | 1 | 0.00% |
| Associate Director of Correctional Psychiatry | 110 | 0 | 1 | 1 | 0% |
| FT Psychiatrist | 110 | 0 | 15 | 15 | 0.00% |
| PT Psychiatrist | 133 | 3 | 2 | 5 | 60.00% |
| PT Consultant | 155 | 2 | 1 | 3 | 66.70% |
| Chief Psychologist | 110 | 0 | 1 | 1 | 0.00% |
| Psychologist | 110 | 3 | 7 | 10 | 30.00% |
| Physician Assistant | 110 | 0 | 2 | 2 | 0% |
| Social Worker | 110 | 1 | 6 | 7 | 15% |
| Mental Health Director | 110 | 0 | 1 | 1 | 0.00% |

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 49 of 86

| | | | | | |
|---|---|---|---|---|---|
| Art Therapist | 110 | 0 | 4 | 4 | 0.00% |
| MHS | 110 | 17 | 67 | 84 | 20.20% |
| Administrative Assistant | 110 | 0 | 1 | 1 | 0.00% |
| Medical Assistant | 110 | 0 | 1 | 1 | 0.00% |
| | | | | | |
| Total | | 26 | 110 | 136 | 19.12% |

### *FTE's Psychiatry October 2017*

| | | |
|---|---|---|
| Chair (1) | 1.0 | (Kelner) |
| Associate Chair (1) | 1.0 | (Thomas) |
| Attending Psychiatrists | 14.8 | (Advani, Howard, Marri 0.8, Menezes, Paschos, Ward, Bednarz, McNeal, Haq, Miller, Kartan, Canelas, Libeu, Garbharran, Mason) |
| Psychiatric PA (2) | 2.0 | (Balawender, Greiner) |
| Psychiatrists (133 acct) | 0.8 | (Ramic, Friedman) |
| Consulting Psychiatrist | 0.3 | (Binius) |

Total Functional FTE      **_19.9_**

### *FTE's Psychology October 2017*

| | | |
|---|---|---|
| Chief Psychologist (1) | 1.0 | (K. Key) |
| Psychologists (10) | 7.0 | (Briney, Kaniuk, Waxler, Sillitti, Nunez, Augustine, Butler) |

Total Functional FTE      **_8.0_**

### *Psychiatric Vacancies for Full Time Psychiatrists October 2017*

| | Total | Filled | Vacancy Rate |
|---|---|---|---|
| Psychiatry Full Time | 15 | 15 | 0% |

As of September 2017 Functional Vacancy Rate(FVR): # of fulltime positions/FTE's – # filled full time positions/FTE's – hours paid Acct. 133 ( part time) - hours paid Acct. 155( part time) - hours paid vendors( Locums) – hours paid overtime/moonlight – supplement by mgmt. =0.0%

Locums Psychiatrists are separated from Cermak in August 2017

**Summary for Psychiatry.**

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 50 of 86

Direct service hours and participation in MDT meetings constitute 100% of FTE's hours.

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 51 of 86

| Psychiatry Staffing -October 2017 | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | Oct-17 |
| | | | | | | |
| **PSYCHIATRY** | | | | | | |
| **Psychiatric Special Care Units** | | | | | | |
| **Psychiatry Allocations:** | | | | | | FTE |
| | 2 North: 3 Psychiatrist+PA with 7-day Coverage(RFX1.7) | | | | | 3.3 |
| | 2 South/Southeast: 2 Psychiatrist with 5-day Coverage | | | | | 0.9 |
| | 2 West: 2 Psychiatrists with 7 day coverage(RFX1.7) | | | | | 1.7 |
| | 2 E: 1 Psychiatrist Once a month coverage | | | | | 0.1 |
| | | | | | Total | 5.8 |
| | Physician /patient ratio on acute units> 1:15 | | | | | |
| | Physician /patient ratio on subacute units> 1:30 | | | | | |
| **Divisions with P2Housing/OutPatient** | | | | | | |
| **Psychiatry Allocations:** | | | | | | |
| | 797 daily average population in Min /Med Security Divisions ( II,IV,VI) | | | | | 2.8 |
| | 670 daily average detainees in Maximum security Divisions X and IX | | | | | 2.3 |
| | 175 daily average detainees in SMU, including PC ( Division IV,VI,IX,X)are absorbed into P2 population | | | | | |
| | | | | | Total | 5.1 |
| | Physician/patient ratio for maximum security P2-1:291 | | | | | |
| | Physician/patient ratio for minimum security P2-1:284 | | | | | |
| | | | | | | |
| **Residential Treatment Unit** | | | | | | |
| **Psychiatry Allocations:** | | | | | | |
| | Absorbs SMU P3 and P2 Populations( daily average 18) | | | | | |
| | Absorbes Intensive Management Unit ( average daily census 6 ) | | | | | |
| | Male and Female(average daily population is 400 P3 and 190 P2) | | | | | |
| | RTU P2 population is concentrated on the 2nd,3rd and 5th floors | | | | | |
| | 1 FTE is assigned to P2, SMU, and IMU combined | | | | | 1 |
| | RTU P3 population is concentrated on the 2nd,3rd,4th and 5th floors | | | | | |
| | 5.2 FTE assigned to P3 | | | | | 5.2 |
| | Physician/Patient ratio for P2 -1:214 | | | | | |
| | Physician/Patient ratio for P3 -1:76 | | | | | |
| | | | | | Total | 6.2 |
| | | | | | | |
| **RCDC** | Monday, Tuesday, Wednesday,Thursday, Friday** | | | | | |
| **Psychiatry Allocations** | | | | | | 1.8 |
| | NOTE:* RCDC has shortened shifts- 5hours | | | | | |
| | NOTE:** 2 Psychiatrists (1 for Male RCDC, 1 for Female RCDC) | | | | | |
| | | | | | Total | 1.8 |
| | | | | | | |
| | 1FTE onsite hours =52 weeks=2080hours per year | | | | | |
| | Chief Psychiatrist does not provide direct service hours | | | | | |
| | Psychiatrists do not perform administartive duties | | | | | |
| | Associate Chief of Psychiatry provides direct patient care | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | Grand Total | 18.9 |

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 52 of 86

- o The main accomplishment is the hiring of 4 additional Full time correctional Psychiatrists to fill all the available 15PID's and elimination of vacancies for this group.

- o One Part time Psychiatrist was recruited and hired. He provides weekend coverage in PSCU. One Part time Psychiatrists is being recruited.

- o One Part time Psychiatrist resigned and present vacancy rate in that category is 60%. The majority of part-time (Account 133) Psychiatrists are committed to working between 8 and 20 direct service hours. There is one (and one remains vacant) filled position of a Consulting Psychiatrist. The rate of compensation for this position has been made sufficiently attractive.

- o Even though Telepsychiatry has undergone contraction on the compound, in addition to flex time arrangements, it continues to be an important recruitment and retention instrument. Telepsychiatry clinics function successfully in RCDC and Division D2D. The rate limiting step in the maintenance of Telepsychiatry on the compound remains the availability of Telepsychiatry Clinic Attendants. One permanent full time Attendant was hired and works on campus. Many Providers request increased Telepsychiatry shifts availability and are interested in providing Telepsychiatry services. Strategic view of Telepsychiatry at Cermak should accommodate such requests and afford expanded Telepsychiatry opportunities to staff, even if previously Telepsychiatry was seen primarily as a temporary solution to attract Locums providers to alleviate staffing shortages.

- o With the ultimate goal of creating physician/patient ratios affording detainees adequate and timely evaluations, treatment, and follow up consistent with standards of correctional care.

- o Coupled with new staff availability, is the project to open additional Psychiatry assignments in RCDC on the weekends. A proposal was submitted to Labor to vet with SEIU in term of its impact on present staff. Senior Cermak Leadership has been supportive with regard to making Psychiatry available in RCDC on Saturdays and Sundays. These new shifts would enable Psychiatrists to work in Intake via Telepsychiatry links.

- o 2 Physician Assistants are employed. Two MH PA's exceed Departmental expectations in terms of productivity and quality. PA's deployments have been diverted to less acute area and not PSCU.

- o As a future direction, Chief of Psychiatry collaborates with Cermak CCO to augment current staffing with Pharm. D's and potentially expand the lines of services where PA's are deployed. Position had been reposted.

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 53 of 86

- o A position of the Associate Director of Correctional Psychiatry was filled. Dr. Thomas brought with him vast correctional and leadership experience and remains a major asset for the Department.

- o Contracts for three locum tenens agencies have been extended into 2017. However, based on recent hiring trends and successful recruitment, Cermak Mental Health Department, in the short run will not need to rely on Locums Providers. Both Locums Providers and two Locums Telepsychiatry Clinic Attendants were separated, while contracts remain active.

- o Ongoing current advertisement efforts by CCHHS involved postings in industry publications, including the AAPL quarterly letter, communication with the local feeder schools, and participation in local Psychiatry Job Fairs.

- o Additional staff hired in the CCHHS's Credentialing office provides increased support to engage applicants and expedite processing. Cermak's Finance Department facilitates monthly conference calls with HR and Credentialing Department to coordinate onboarding and hiring issues.

- o "Advanced Clinical Process (ACP)" at Cermak has been in place since November 2015. The Advanced Clinical Process was created to assist Cermak in filling hard to fill credentialed positions. The ACP process has helped enhance the recruitment process by allowing for the participation of departments to solicit candidates to submit resumes / CVOs to a centralized mailbox, which allows for the expedited review and determination of candidates meeting minimum requirements. Due to success of this pilot, the ACP process is now implemented CCHHS wide.

- o As an important recruitment tool Cermak Psychiatry continues to support student and Psychiatry residents' rotations/training on site from nearby medical schools (Rush+ UIC's). University of Chicago signed a Programmatic agreement (in addition to previously existed Master Education Agreement) and the first 4th year resident in expected to start his rotation in October-November 2017.

- o **RTU staffing**

| | RTU 5th floor females | RTU 4th floor(+ 2nd and 3rd floors) |
|---|---|---|
| Psychiatry | 6.2 ( 5.2 for P3 and 1 for P2) | |
| Psychology/Unit Director | 1.0 | 1.0 |
| Social workers | 1.2+ 1.0 Expressive therapist | 1.0+ 1.0 Expressive therapist |
| Mental Health Specialists (cover RTU | 4 MHS III + 2 MHS II in am 3 MHS III in pm | 6 MHS III + 1 MHS II in am 5 MHS III's in pm |

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 54 of 86

| | | |
|---|---|---|
| 5th floor and Div. 4 for female services) | (1 MHS III on Overnight for RTU) | |
| Population as of 9/22/2017 | P3 96   P2  66 (162) | P3 231  P2 111  (342) |

- A scheduling Pilot started in the spring of 2017 in Division VI. It was designed to ensure that the amount of prescribing clinician time was sufficient and led to thorough clinical encounters. It allots 40 minutes for an Initial Assessment and 20 minutes for follow up sessions. The amount of time allotted to initial psychiatric examinations was sufficient to conduct thorough initial evaluations, conduct medical records review, and enter documentation in EMR. CQI was conducted to assess the results and further expansion of the Scheduling Pilot was recommended for implementation in the rest of Divisional Clinics across the compound. In the meantime, the Access to Care Collaborative DOC/Cermak Pilot had been expanded from Division IX to all divisional clinics in CCDOC. Information about the projects effectiveness is available elsewhere outside of this report. CQI study is available in PDF appendix.

- The Access to Care Collaborative DOC/Cermak Pilot in Division IX was expanded in July 2017 to the whole CCDOC compound. It automated communications related to patient movement and is likely to increase movement to clinic efficiency.  Patient movement to clinics is being addressed at the most senior levels of CCDOC and Cermak Leadership. The Access to Care group convenes twice a month to study trends and find solutions to compound wide access to care issues.

- Clinical Performance and Enhancement Peer Review Process was developed by the Chief of Psychiatry and the CQI study in March 2017 allowed to identify some outliers in terms of their adherence to safe practices. The results of the secondary analysis indicated that Providers who did not adhere to the standards of evaluation and documentation in many cases did have sufficient time to meet expectations and further in training and individual supervision will be used as corrective interventions. Additional supervision and explanations/training were provided. A repeat study was conducted in June 2017. CQI study results reflective of the 'post intervention' clinical practices is available in the PDF Appendix.

- Frequency of contact with Providers study was undertaken in all the Levels of Care to address concerns that patients are dealing with unreasonably high waiting times. The results of this CQI study are available in the PDF Appendix.

- Issues pertaining to quality of psychiatric practice have been addressed in two CQI studies addressing readmissions to PSCU and polypharmacy with second generation antipsychotics. Both studies reflect statistical trends consistent with best community national practices. Lack of published data did not allow to directly compare rates of

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 55 of 86

readmissions and polypharmacy for SGA with best correctional practices. CQI studies are available in PDF appendix.

**Summary for Psychology:** There is a total of 10.0 FTE psychologist positions (excluding the Chief Psychologist position) with a current vacancy rate of 30% (3 FTE). Cermak has lost several candidates in later stages of their hiring process due to the fact that their internships were not APA approved. Cermak MH Leadership has worked with the CCHHS Credentialing Committee/Executive Medical Staff, and SEIU to modify previously existing minimum job qualifications from having APA certified predoctoral internship to the APPIC accredited training. The CCHHS Credentialing Committee approved a request to modify the minimum qualifications for this job title and now the minimum job description for Correctional Psychology includes the following language: "Completion of a pre-doctoral internship at a program accredited by the American Psychological Association or listed with the Association of Psychology Post-Doctoral & Internship Centers (APPIC)".This step is designed to expand the pool of prospective candidates, while deferring to MH Leadership to vet deserving candidates and further strengthening the post-hiring Professional Evaluation Process. Two Correctional Psychologists are in credentialing under the set of eligibility criteria. Cermak has submitted a request to fund 2 post-doctoral Psychology Fellows to work under the supervision of the Chief of Psychology, to provide diagnostic assessment, crisis intervention, intake evaluations, group and individual therapy, consultation with multidisciplinary treatment team, projective and objective psychological testing, security and civilian staff training, and supervision of practicum students. Unit Directors/ Psychologists have been rotated in the end of May 2017. Said rotations serve to prevent burn out and fatigue among Psychologists as some areas of CCDOC present heightened acuity of pathology and increased demands in terms of providing coverage and addressing MHS discipline.

**Summary for Mental Health Specialists:**

As of October 27, 2017, there are 62 Masters-degreed mental health specialists, 5 Bachelors-degreed mental health specialists (all are expected to complete their Master's degree and obtain licensure on or about December 2017). Beginning in February 2017, the department initiated a mandated overtime process for mental health specialists. The psychologists managing the various teams established minimum staffing levels needed to perform at least 80% of all activities for each shift. When staffing levels fall below this threshold, volunteers are sought to cover the open shifts. However, when there are no volunteers, staff working an existing shift are mandated to work the next shift. To date, the department has spent 237% of the amount budgeted for OT in FY2017. Almost all of the overtime was incurred by mental health specialists. Out of the 14, 269.4 hours of overtime worked between December 1, 2016 and October 14, 2017, mental health specialists worked 13,385.3 hours. This is about 94% of the total overtime hours—or the equivalent of 7.6 full time mental health specialists. It is expected that overtime costs will be drastically cut once the existing 17 vacancies are filled by the end of calendar year 2017.In addition to overtime pay

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 56 of 86

for hourly employees, psychiatrists are able to receive additional pay for working hours above their regularly scheduled shift hours.

**Summary for Art Therapists and Social Workers:**
One additional PID was created and filled in the summer of 2017 bringing the number of activity therapists to four (the highest in Cermak history). There is currently one vacant medical social work position that is in the process of being filled.

**November 2017 Metzner assessment:** A major achievement has been accomplished in the context of hiring psychiatrists (currently no vacancies), beginning to hire additional mental health specialists, and decreasing the psychologist's vacancies. Decreasing the overall mental health staff vacancies has resulted in improved mental health services at every level of care. This assessment is supported by a comprehensive set of quality improvement studies.

**Recommendations:** Continue with the aggressive recruitment and retention process.

> **g. Cermak shall ensure timely provision of therapy, counseling, and other mental health programs for all inmates with serious mental illness. This includes adequate number of Qualified Mental Health Staff to provide treatment, and an adequate array of structured therapeutic programming. Cermak will develop and implement policies and procedures defining the various levels of care and identifying the space, staffing, and programming that are appropriate to each identified level of care.**

**Compliance Assessment:** Substantial compliance (4/17)

**Factual Findings:**

**November 2017 Cermak Status Update**

Please see Update in 59f.

> **h. Inmates shall have access to appropriate infirmary psychiatric care when clinically appropriate.**

**Compliance Assessment:** Substantial compliance (11/16)

**Factual Findings:**

**November 2017 Cermak Status Update**

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 57 of 86

2N (males) and 2W (females) are the Psychiatric Special Care Units within Cermak Health Services that provide psychiatric/mental health services to a population of acute, sub-acute, and chronic individuals. A psychiatrist meets with each patient within 24-hours of admission and then daily thereafter. Structured group programming is delivered daily to patients, which range from a "Rise and Shine" group focusing on hygiene/ADLs, to "Community Meeting/Unit Orientation," as well as more clinically focused groups such as "Self-Esteem" and "Symptom Management." Patients on PSCU have access to a Mental Health Specialist III (licensed clinical staff) 24-hours a day, 7 days a week. Structured programming is delivered 7 days a week on both the 7-3 and 3-11 shifts. Additionally, patients have frequent contact with medical social workers and an expressive therapist.

## **Programming**
Clinical groups and expressive therapy take place both in the day room and in the small group room and generally engage patients in discussing topics such as Anger Management, Coping Skills, Symptoms Management, Understanding Mental Illness, etc.

Patients housed on the Special Care Units are seen by a Mental Health Specialist during rounds on each shift, and they have access to a licensed Mental Health Specialist 24 hours a day. Patients are engaged in the milieu or cell front, if necessary for security reasons. Patients typically meet with a psychiatrist or physician's assistant 5-7 days per week. Patients in need of additional support meet individually with the psychologist, expressive therapist, or mental health specialists.

A QI Project was initiated in May 2016 to ensure the accuracy of the reported dayroom hours. The QI entitled "Cermak Dayroom Hours" provides detailed information comparing the hours recorded by Mental Health staff with video footage of the dayrooms on 2N and 2W. The unit schedules aspire to provide 12 hours of open dayroom time every day where patients have access to care and are provided with 6- 8 hours of structured programming. For this reporting period, 2N patients were in the dayroom an average of 10.3 hours per day.

Group programming hours on 2N and 2W have remained consistent at 6.2 hours every day (2W = 43.1 hours per week/ 6.2 hours per day). The Mental Health department has worked with CCDOC leadership to decrease and/or prevent groups from being cancelled. This has increased access to care in terms of psychiatry, nursing, as well as group programming. Both units have experienced a higher than usually acuity level, high profile patients, and aggressive patients, which limits the patients allowed in the group room.

Several approaches/solutions have been implemented to prevent dayroom closure including: 1) placing a newly admitted patient who requires a single cell in a room while group takes place and

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 58 of 86

then after the dayroom hours return the patient to the dayroom, 2) placing the patient in the back hallway in a chair or "boat" bed and provide security supervision, and 3) boarding more stable patients on other second floor units if there is available space. There has also been an effort to increase programming offered in the small group room. This provides increased confidentiality and a more intimate setting for patients to engage in group therapy.

**Treatment Planning**

Procedures have been initiated on both 2 North and 2 West to ensure that treatment plans are updated within the specified timeframes of Cermak policy. The "Treatment Plan CQI" looks at treatment plans for P4's since the last site visit. The overall compliance percentage of 95% suggests that consistency has been maintained in terms of the development, review, and updating of treatment plans. Continued assessment of quality and effectiveness of the treatment plan should continue during the next reporting period to better understand the impact our services have on our patients' mental health and wellbeing. The treatment plan audit and summary will be provided in a separate Appendix document analyzing treatment plans across the department.

**Additional Activities**

In addition to providing assessment/treatment planning, milieu therapy, rounds, individual sessions, and group sessions, the mental health staff also meets daily in a "morning huddle" to discuss new admissions and any concerns or questions from the previous day(s). Staff will also regularly engage in multidisciplinary treatment team meetings held twice per week on both units to discuss patient progress, update the patients' treatment plans, and address any other pertinent items/issues. The restraint and seclusion log for the previous week is reviewed weekly during staffing, and staff is given the opportunity to discuss any issues or questions they have with the process of utilizing therapeutic restraint/seclusion. Multidisciplinary Treatment Team (MDT) meetings are scheduled regularly and invited parties include psychiatrists, psychologists, physician's assistants, mental health specialists, nurses, and correctional officers.

With regards to the milieu and therapeutic environment on the psychiatric special care units, staff work towards developing rapport with each patient and providing a sense of physical and emotional safety. This is especially the case on 2 West (females), where staff provides a more trauma-informed approach to working with patients. Staff encourages patient compliance with treatment while also respecting patients' rights. Patients are assessed upon admission to the units by licensed mental health staff, as well as prior to discharge.

The daily incentive program is utilized on 2 West to encourage patients to participate in health-promoting activities, such as hygiene, group therapy, medication compliance, and displaying safe and appropriate behaviors. Mental health staff modify the incentive program for patients with special circumstances (such as out alone/house alone status) to make it possible for all patients to participate in the program.

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 59 of 86

An ongoing area of improvement is cooperation/collaboration across disciplines. This has traditionally been a challenge, but has been moving in a positive direction. Mental health specialists are more likely to communicate/collaborate with medical, nursing, and the officers. This collaboration can be challenging at times due to discrepancies between professional perspectives and opinions. We will continue to hold multidisciplinary clinical staffings to ensure that all disciplines are represented and that all varying perspectives are taken into account.

**Improvement since 5/29/17 (2W, 2N, UC):**
1. Increased quantity of small group room programming, thereby increasing the quality of mental health treatment provided.  On average, 2W patients received 5 small groups per week (mental health and expressive arts) and 2N patients received 3 small groups per week.
2. Increased adherence to treatment plan policy (overall compliance 95%).
3. The 2W incentive plan has been revamped.  The incentive plan has been simplified for staff and patients.  The incentives are earned daily so patients receive timely cause and effect feedback.  Incentives are focused on promoting hygiene and self-esteem (deodorant, scented lotion, and socks), contact with loved ones (stamped envelope), prosocial group activities (movie day, coloring sheets), and positive coping, and food incentives.
4.  MDT staffing notes are now entered in patient charts to reflect the multidisciplinary team discussion to promote effective communication regarding patient progress and future treatment goals.
5. A specialty Cerner list was developed for patients in need of sleep monitoring as well as a sleep log.  Sleep monitoring assists staff with monitoring symptoms in real time Psychiatrists, psychologist, and mental health specialists have access to the list.  The midnight shift mental health staff routinely monitor the list and document hourly sleep habits of patients on the list.
6. In the past, bed space was problematic due to discharged patients remaining on the unit. This delay resulted in lack of bed space for newly admitted patients and increased acting out behaviors from discharged patients. Since the last site visit, the unit director sent daily movement lists to CCDOC classification and Cermak movement to ensure rapid movement of discharged patients.  The wait time for discharges decreased significantly from approximately 3 days to less than 6 hours, resulting in admissions spending less time waiting in the urgent care for a bed.
7. The expressive therapist facilitated mural painting groups.  The unit murals provide a vibrant, uplifting environment.  The patients are able to express their feelings in a therapeutic manner and feel proud of the contribution made to the unit.
8. More aggressive and disruptive patients can spend more time out-of-cell with the installation of secured television sets and secured 'watching stations' in the hallway.
9. Due to the increased number of chronically mentally ill patients, hygiene issues remain a concern and are reflected as needed in treatment plans. Humanitarian showers are routinely occurring to promote improved personal hygiene and sanitary conditions on the

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 60 of 86

      unit.
10. There has been a strong effort by Psychiatry to increase the number of cases petitioned for involuntary court-ordered medications.
11. The number of patients P&C when released from CCDOC custody continues to rise (average of 2 per week). Patients are more readily identified by adding names to the Cerner P&C list after the morning huddle, which is reviewed prior to each P4 patient being released from custody

**Areas Needing Improvement:**
1) Continue improving multidisciplinary communications and a team-oriented approach to treatment.
2) Continue to regularly evaluate group quality through conducting random structured evaluations and providing feedback to mental health staff.
3) Improve the quality of documentation by mental health staff, specifically group notes and comprehensive, individualized treatment plans for the acute population.
4) New treatment materials would be beneficial, particularly for lower functioning, chronically/ seriously mentally ill patients.
5) A monetary budget for the incentive program is needed in order for it to remain robust and with a variety of available incentive items.

2 South, 2 Southeast, and 2 East serve as step-down units for 2 North patients who are in need of longer term care. 2 South has 17 beds, including three four-person rooms, and serves as a mainstream male psychiatric unit. 2 Southeast and 2 East are smaller units serving more specialized populations. 2 Southeast has nine beds, all in single housing, and serves patients who are more severely psychiatrically impaired (often refusing treatment), with recent histories of aggression against staff or other detainees. Patients on this unit generally cannot be managed in other settings, and may be under consideration for petitioning for involuntary court ordered medications. 2 East is a 12 bed unit with a mix of individual and four-person rooms, and serves as a chronic care setting for the most fragile patients, often older individuals with cognitive impairments, in a protective setting.

All units are staffed with 24-hour nursing care, fulltime mental health staff on two shifts and a midnight shift staff member covering the floor, and fulltime psychiatry, physician assistant, psychology, and medical social work services.

The 2 South offers up to eight hours of structured group programming and unstructured dayroom activity per day, seven days per week. Due to current staffing allocations, 2 East currently offers group programming on one shift per day. ; As additional staff are hired programming will be expanded to the evening shift. Patients housed on 2 Southeast who are able to participate in group programming and milieu activities join these events on 2 South. 2 Southeast patients who are not able to tolerate the stimulation of group activity are given individual time out alone or in twos or threes. Some patients require restraint when in the dayroom to ensure safety of others.

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 61 of 86

Programming includes daily 'Rise and Shine' group, a morning hygiene group, Community Meeting, Medication Management Group, Coping Skills, Anger Management, Current Events, Art Therapy, and Community Reintegration, Chair Yoga, and other topics. Daily scheduling of programming follows the same timeframe as that of 2 North and 2 West. As on 2 West, all three male units utilize the incentive program to promote participation in hygiene, group programming, and compliance with medications.

## **Developments in the Last 6 Months**

1. Separation of 2 Southeast from 2 South has continued to promote a more therapeutic milieu on both units. More aggressive and disruptive patients have been better managed in the smaller, less stimulating environment of 2 Southeast. In addition, modifications have been made to the physical plant to promote safety. Aggressive, highly impulsive patients can spend more time out-of-cell with the installation of secured television sets and secured 'watching stations' in the dayroom. 2 South patients are able to participate in programming with reduced risk of disruptive, aggressive, or predatory behavior by more severely impaired, treatment-refusing individuals.

2. There has also been increased effort to ensure that all court-discharged patients who meet criteria for involuntary admission by petition and certificate for continued treatment in an area hospital are sent by ambulance when released. In the past four years, we have averaged about 50 patients per year. This year, we expect to send about 75 patients to the hospital for involuntary admission on petition and certificate.

3. Recent hiring of additional Mental Health Specialist positions has provided seven-day coverage on 2 East for day shift and eliminated the need to 'pull' staff to provide needed coverage when staff members call in sick. Hiring of additional MHSs is expected to provide fulltime evening shift coverage for 2 East as well.

4. We have worked with Ferguson Safety Products to design a safety jumpsuit which is more dignified, durable, and tamper resistant. We have used several prototypes with our patients to beneficial effect. In addition, beds on the units are being replaced by newer and safer 'moduform' beds.

5. Along with the newer model 'moduform' beds, we have switched to newer model polypropylene restraints to replace the old leather restraints. The new restraints are easier to use, safer, and easier to clean. All Cermak nursing and mental health staff have been trained in the use of the new restraints.

6. With these improvements in staffing and the physical milieu, there have been increases in programming hours, staff and patient safety, and successful management of the most severely mentally ill patients in the CCDOC system. This has meant that patients can be maintained in Cermak with less movement off-tier due to extreme disruptive and

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 62 of 86

> aggressive behavior. Overall we are increasingly more successful in managing and
> stabilizing our most challenging patients.

Detainees meeting criteria for involuntary admission by petition and certificate are transported to one of two area hospitals (Mt. Sinai and St. Anthony) upon release from Cermak by the court system. All detainees with P4 alert are evaluated at the moment of court release, and those anticipated to meet criteria for involuntary admission in the community are also 'flagged' ahead of time in EMR to ensure that their need for continued inpatient treatment is not overlooked if they are released in the overnight hours. There has been no indication of 'missed' evaluations at discharge recently, and the program continues to be efficient.

| INVOLUNTARY HOSPITALIZATION BY PETITION & CERTIFICATE UPON RELEASE 2014-17 | | | | | |
|---|---|---|---|---|---|
| YEAR | Q1 | Q2 | Q3 | Q4 | TOTAL |
| 2017 | 16 | 18 | 21 | | 55 |
| 2016 | 10 | 13 | 11 | 15 | 49 |
| 2015 | 12 | 15 | 5 | 13 | 45 |
| 2014 | 12 | 13 | 11 | 11 | 47 |

Detainees meeting criteria for the administration of involuntary medications (non –emergency basis) continue to be evaluated for filing of the Petition. Some patients refuse to accept psychotropic medications, sometimes even in cases when their safety and survival depends on their receiving treatment. In those cases, judges are petitioned to authorize involuntary treatment. Typically our petitions for the administration of involuntary treatments are heard by the judges at the Circuit Court of Cook County. Cermak's petitions for the involuntary administration of psychotropic medications undergo vigorous judicial review and are not afforded the administrative review process. Following a Circuit Court Resolution permitting the use of Teleequipment to conduct court hearings from remote sites, Circuit Court Judges began conducting hearing remotely, allowing respondents, lawyers, witnesses, and Psychiatrists to be present at the Leighton Center, which substantially reduced Cermak's travel and time expenditures. Additionally, in order to improve efficiency and continuity of care between Department of Mental Health Facilities where detainees are remanded for the restoration of fitness, a reciprocal process has been developed, allowing for the modifications of Court Orders for Involuntary Medications ( non-emergency basis) to other counties when detainees leave CCDOC campus for DMH facilities and, conversely, detainees returning from DMH following the restoration of fitness have their court orders for involuntary medications "domesticated" to Cook County. The CCHHS Office of General Counsel has been responsive to Cermak's needs and coordinated various aspects of the

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 63 of 86

said process. There has been an increase in petitions filed, as compared with other years. The table before summarizes some of the recent trends.



| Involuntary medications by court order( nonemergency basis)/AOT petitions FILED/ORDERED  [QUARTERLY 2014-17] | | | | | |
|---|---|---|---|---|---|
| *YEAR* | *Q1* | *Q2* | *Q3* | *Q4* | *TOTAL* |
| *2017* | 6/3 | 7/7 | 10/4 | | *23/17* |
| *2016* | 3/2 | 1/1 | 3/3 | 7/6 | *14/12* |
| *2015* | 3/1 | 1/1 | 1/1 | 2/2 | *7/5* |
| *2014* | 1/1 | 2/1 | 1/1 | 2/2 | *6/5* |

Cermak periodically updates CCDOC Leadership on complex management cases. CCDOC Leadership discusses these cases with ASA and the Office of PD Leadership trying to establish priorities in streamlining cases and coordination between multiple parties. Cermak PCC and MH files petitions for Guardianship, when needed. CCHHS Office of general Counsel assists in gathering information and setting up hearings.

AOT (Assisted Outpatient Treatment, a.k.a Outpatient Commitment):  CCHHS received a SAMSHA grant for the implementation of the AOT program. 4-year pilot program is intended to implement and evaluate new AOT programs and identify evidence-based practices in order to reduce the incidence and duration of psychiatric hospitalization, homelessness, incarcerations, and interactions with the criminal justice system while improving the health and social outcomes of

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 64 of 86

individuals with a serious mental illness (SMI). Various part of the CCHHS, ASA, Guardianship and Advocacy Commission, Judiciary, and local community mental health centers collaborate. Cermak Chief of Psychiatry is on the CCHS AOT steering committee. This program is designed to work with families and courts, to allow these individuals to obtain treatment while continuing to live in the community and their homes. AOT is intended to facilitate the delivery of community-based outpatient mental health treatment services to individuals with SMI that are under court order as authorized by state mental health statutes. Cermak staff assists Project Advisors and Project Managers in identifying and vetting potential AOT candidates. Providers file Petitions and Certificates for AOT with court and attend hearings. The treatment aspect of the AOT petition is similar to the traditional Involuntary Medication Petition by court order (nonemergency basis). AOT agreements/court orders compel detainees with SMI previously known for noncompliance with outpatient and inpatient treatment, comply with outpatient treatments in the community. Detainees are rehospitalized, and not re incarcerated, when compliance with AOT treatments is breached. It is emphasized that the AOT program is not a diversion program and the outcome of AOT hearings has no bearing on their criminal cases.

The Medical Social Workers also continue to be an integral part of the response to calls received by the Sheriff's Care Line. All information related to mental health issues continues to be forwarded to the identified medical social workers for follow up and/or delegation to divisional social workers if indicated. Since the last visit, our social work staff has addressed 40 calls/referrals. Of those referrals, (73%) had already been identified, evaluated, placed on the MH caseload and were receiving treatment. None of the referrals yielded new additions to the MH caseload or yielded information that Cermak providers did not yet have access to, and the remaining (27%) referrals were determined to not be in need of continued follow up from the MH department. This collaborative community outreach effort contributes to access to collateral information and opportunity for improved care and clarification of needs.

**November 2017 Metzner assessment:** The significant improvements in the therapeutic milieu noted during the previous site assessment have been maintained and the numbers of hours of structured out of cell therapeutic activities being offered to detainees in the PSCU has increased.

During the morning of November 13, 2017, I observed therapeutic activities occurring on each of the housing units within the PSCU. Detainees were actively participating in these groups.

I also attended morning huddles for Units 2W and 2N during November 14, 2017. During the afternoon of November 14, 2017, I observed a treatment planning meeting on Unit 2W, which was attended by all the appropriate staff with very good multidisciplinary input. As in the past, clinical staff observed were very competent in performing their tasks.

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 65 of 86

**Recommendations:** Continue to self-monitor.

    m.    **Cermak shall provide the designated CCDOC official responsible for inmate disciplinary hearings with the mental health caseload roster listing the inmates currently receiving mental health care.** (included in this Appendix for formatting purposes only)

**Assessment:** Substantial compliance (since June 2012)

    n.    **When CCDOC alerts Cermak that an inmate is placed in lock down status for disciplinary reasons, a Qualified Mental Health Professional will review the disciplinary charges against inmate to determine the extent to which the charge was related to serious mental illness. The Qualified Mental Health Professional will make recommendations to CCDOC when an inmate's serious mental illness should be considered as a mitigating factor when punishment is imposed on an inmate with a serious mental illness and to minimize any deleterious effect of disciplinary measures on an inmate's mental health status.**

**Assessment:** Substantial compliance continues (since October 2012). (included in this Appendix for formatting purposes only)

    o.    **Cermak shall ensure an adequate array of crisis services to appropriately manage the psychiatric emergencies that occur among inmates. Crisis services shall not be limited to administrative segregation or observation status.**

    p.    **Cermak shall ensure that inmates have access to appropriate acute infirmary care, comparable to in-patient psychiatric care, within the Cermak facility.**

**Compliance Assessment:** Substantial compliance (6/17)

**Factual Findings:**

**November 2017 Cermak Status Update**

There has been tremendous improvement in the response to and compliance with timeliness in responding HSRF since the last site visit. The approved revision to pertinent policy and procedure has been the main driver of these improvements. Additionally, increased staffing and resulting increased number of available clinics to respond to requests has positively influenced compliance. Please see PDF Appendix for expanded QI.

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 66 of 86

| NonUrgent HSR | | JUNE 2017 | JULY 2017 | AUGUST 2017 |
|---|---|---|---|---|
| Compliance | Patients Seen | 95.60% | 98.11% | 94.57% |
| Timeliness | Patients Seen on Time | 87.47% | 88.45% | 88.37% |

| Urgent HSR | | JUNE 2017 | JULY 2017 | AUGUST 2017 |
|---|---|---|---|---|
| Compliance | Patients Seen | 97.92% | 100.00% | 97.67% |
| Timeliness | Patients Seen on Time | 89.58% | 94.34% | 88.37% |

**November 2017 Metzner assessment:** My April 2016 assessment included the following: QI data documents issues in meeting timelines for responses to routine mental health referrals related to the current policy and procedure that requires a face to face triage for routine referrals within 72 hours and periodic delays in receiving the referral from nursing staff in a timely manner. I discussed with staff potential revisions to the pertinent policy and procedure that will significantly decrease the lack of compliance. In addition, the process involved with the sending of the mental health referrals from the nursing staff to mental health services needs to be improved.

Specifically, it remains my recommendation that timeframes for HSRFs specific to mental health services that have been triaged as routine referrals be changed to and appropriate clinical mental health response to 10 business days.

The above recommendations were implemented during June 2017. Scheduling issues were directly related to the 12% of nonurgent HSR's not meeting required timeframes, which have subsequently been corrected. Compliance since June 2017 is noted.

**Recommendations:** Repeat the QI relevant to this provision.

60. **Psychotherapeutic Medication Administration**

    c. **Cermak shall ensure that psychotropic medication orders are reviewed by a psychiatrist on a regular, timely basis for appropriateness or adjustment. Cermak shall ensure that changes to an inmate's psychotropic medications are clinically justified and documented in the inmate's medical record.**

    d. **Cermak shall ensure timely implementation of physician orders for medication and laboratory tests. Cermak shall ensure that inmates who are being treated with psychotropic medications are seen regularly by a physician to monitor responses and potential reactions to those medications, including movement disorders, and provide treatment where appropriate.**

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 67 of 86

**Compliance Assessment:** Substantial compliance (4/17)

**Factual Findings:**

**November 2017 Cermak Status Update**

| As of 10_05_2017 | # of Medication Orders | # of Laboratory Orders | Compliance rate |
|---|---|---|---|
| Lithium | 23 | 23 | 100.00% |
| Divalproex Sodium/ Valproic Acid | 156 | 154 | 98.72% |
| Risperidone/ Ziprasddone/ Olanzapine | 526 | 509 | 96.77% |

Periodic monitoring of blood levels of Lithium and Depakote is important for the safe administration of the said medications. It is suggested that blood levels are checked at least every 6 months, even if a patient remains asymptomatic and the dosage remains unchanged. A new Cerner alert continues to prompt Providers if medication level check is due (If no Li and VPA levels had been ordered over the past 6 months, it prompts to order Li, and VPA levels). Similarly, the new rule automatically fires with the tests for Non-fasting Lipids, Hb A1C, and weight measurement, if the said tests had not been performed over the past 6 months. As demonstrated by the chart, the frequency of medication monitoring has reached levels well above 90%.

Critical Medications Missing Alert functions in Cerner. A list of patients who have missed 2 or more critical meds in the last 7 days is generated (including Clozapine and long acting Decanoate/Consta formulations). This report triggers a request for review by Providers. Additionally, Nurses report refusal of three or more doses to the provider and followed by a eMERS (patient care/safety report).

Prescription of Diphenhydramine and similar antihistamine medications, when prescribed for idiopathic insomnia, is limited to one time prescription to 2 weeks' worth of the medicine ( unless detainees are prescribed these medications to alleviate medications' side effects) followed by the Sleep Hygiene training conducted by Mental Health Specialists.

Neuroleptic polypharmacy reflective of providers' practice has been studied. Polypharmacy rates are below of what is expected in the community setting. Please refer to Polypharmacy in Severe Mental Illness and Antipsychotic Polypharmacy QI studies in the APPENDIX.

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 68 of 86


**November 2017 Metzner assessment:** As per update section. Substantial compliance continues.

**Recommendations:** Continue to monitor via QI studies.


**Appendix V**

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 69 of 86

**Please have the following information available in hard copy at the time of the site visit, and sent to me one week prior to the site visit in electronic form (but not in PDF) unless indicated otherwise. *Each* piece of information should cover the period since the last site visit.**

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 70 of 86

**Note: If any of the requests are too burdensome to produce, please contact me before attempting to produce such information.**


**Appendix I Agreed Order 5/13/10 MH provisions revised**

Using the word version of Appendix IV in my last submitted report, after each of the "recommendations" section add the following section: **April 2018 Cermak status update:** and complete a narrative with proof of practice as available. <u>This document request is the most crucial document.</u> *Please do not delete my November 2017 findings or recommendations except for provisions that have been found in substantial compliance for at least 18 months.*

Some of the following requests may be in the above document and only need to be referenced—it does not have to be provided twice.

**Mental Health System**

1. *The mental health system organization chart (with both position and name of person filling the position and his/her credentials- e.g., degree).*

2. *Any new policies and procedures relevant to mental health services.*

3. *Any new program descriptions of the current mental health system.*

4. *Any other reports (i.e., internal or external reviews) relevant to the mental health system at CCDOC.*

***Institutional Program Status***

1. *Narrative summary of program status*



***Staffing***

1. *List authorized mental health staff positions by discipline (psychiatrists, psychologists, social workers, nursing staff, clerical staff, etc.) and by program/area (intake, crisis stabilization, mental health housing units, etc.). For each position, indicate the person's name, professional degree, start date, and percent of FTE if not full-time. If the position*

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 71 of 86

*is vacant, provide the date it became vacant. For any staff on leave, indicate the date the leave began.*

*2. List any newly allocated mental health positions and the dates they were established.*

**Census/Mental Health Roster**

1. The total number of inmates in the jail, total number in segregation units, total number of mental health caseload inmates, and total number of inmates in each program area (crisis observation, mental health housing, general population, etc.).

2. Statistical information pertinent to the reception center screening of inmates (i.e., number of persons on a daily, weekly, or monthly basis for the past six months, percentage of inmates who have positive screens from a mental health perspective, percentage of inmates with positive screens who enter the continuum of mental health services, percentage of all newly admitted inmates who enter the continuum of mental health services).

**Quality Improvement**

1. A copy of each relevant QA/QI audit conducted, preferably in electronic forms. For each audit provided, a description of:

   a. Statement of the issue being studied
   b. Methodology used
   c. Results
   d. Assessment of results
   e. Plan of action based on the assessment

**Suicide Prevention**

1. For any completed suicide, a copy of the mortality and review report.

**Additional Items**

1. Schedule of group therapies/structured out of cell therapeutic activities offered to inmates in the mental health housing units.*

2. Logs showing the use of restraints and seclusion, including the dates and times the orders were initiated, renewed, and discontinued, and the timing of nursing checks conducted.*

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 72 of 86


***\*Does not need to be sent in advance of site visit.***