**JEFFREY L. METZNER, M.D., P.C.**
**3300 EAST FIRST AVENUE**
**SUITE 590**
**DENVER, COLORADO**
——
**TELEPHONE (303) 355-6842**
**FACSIMILE (303) 322-2155**

# MEMORANDUM

**TO:**     Anthony E. Zecchin, Esq.
Cook County State's Attorney's Office
500 Richard J. Daley Center
Chicago, Illinois 60610

Paul O'Grady, Esq.
Peterson Johnson& Murray
233 South Wacker, 84th Floor
Chicago, Illinois 60606

Kerry Dean, Esq.
U.S. Department of Justice
P.O. Box 66400
Washington, DC 20035-6400

**FROM:**   Jeffrey L. Metzner, M.D.
**DATE:**   May 10, 2018
**RE:**     *U.S.A. v Cook County, et al*
No. 10C2946

I have completed my assessment of the mental health services offered at the Cook County Department of Corrections (CCDOC) through Cermak Health Services of Cook County (CHSCC). I site visited CCDOC from April 30-May 1, 2018.

Sources of information utilized in compiling this report included the following:

1.  review of documents provided in response to my written request for pre-site information, which included the following documents:
    a.  status update to the Agreed Order,
    b.  numerous mental healthcare quality improvement studies,
2.  interviews with many inmates in group settings in Division 8 (RTU), Division 9 and in the therapeutic tier in Division 6,
3.  observation of out of cell and/or treatment activities in Divisions 6, 8 and 9 and the Cermak Unit,
4.  information obtained from key administrative and clinical staff that included, but was not

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 2 of 4

limited to, the following persons:

a. Kenya Key, Psy.D. (Chief of Psychology),
b. David Kelner, M.D. (Chief of Psychiatry),
c. Jane Gubser (CCDOC Chief of Programs),
d. Brian Thomas, M.D. (Associate Chair for Infirmary Care),
e. Romica Sillitti, Psy.D.,
f. Pierre Nunez, Ph.D. (QI coordinator),
g. Kimberley Briny, Psy.D. (PSCU Director),
h. Brian Waxler, Psy.D. (Male RTU unit director), and
i. Gary Kaniuk, Psy.D. (Female RTU director).

I also met with psychology and psychiatric staff in a group setting during the afternoon of May 1, 2018.

As always, I found the staff from CHSCC and CCDOC to be courteous and helpful throughout my three-day site visit.

In this report the term "inmate" will be used in contrast to "detainee" in order to be consistent with the Agreed Order's terminology, although the vast majority of persons admitted to CCDOC are pre-trial detainees.

**Overview**

The Cook County Department of Corrections consists of 8 main divisions in a group of buildings covering over 100 acres. The inmate count during April 30, 2018 was 6028.

Reference should be made to Appendix I for a more detailed summary of population and capacity information.

**Findings**

As per the June 3, 2010 memorandum regarding the June 2, 2010 meeting that included attorneys from the Department of Justice, attorneys and representatives of the Defendants, and the monitors, my findings relevant to the Mental Health Care section of the Agreed Order are summarized in Appendix IV (5-13-10 Agreed Order Mental Health provisions). Consistent with the June 2, 2010 meeting, I have forwarded my input to the medical monitors who have primary responsibility for sections that overlap with various mental health provisions as summarized in the June 3, 2010 memorandum.

Appendix III summarizes mental health provisions of the Agreed Order monitored by other monitors.

Significant accomplishments since the November 2017 site assessment include substantial compliance for at least 18 months having been achieved with the following provisions:

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 3 of 4

59.     Assessment and Treatment

    d.  Cermak shall ensure clinically appropriate and timely treatment for inmates, whose assessments reveal serious mental illness or serious mental health needs, including timely and regularly scheduled visits with Qualified Mental Health Professionals or with Qualified Mental Health Staff, with appropriate, on-site supervision by a Qualified Mental Health Professional.

    e.  Cermak shall ensure that treatment plans adequately address inmates' serious mental health needs and that the plans contain interventions specifically tailored to the inmates' diagnoses.

    o.  Cermak shall ensure an adequate array of crisis services to appropriately manage the psychiatric emergencies that occur among inmates.  Crisis services shall not be limited to administrative segregation or observation status.

    p.  Cermak shall ensure that inmates have access to appropriate acute infirmary care, comparable to in-patient psychiatric care, within the Cermak facility.

60.     Psychotherapeutic Medication Administration

    a.  Cermak shall ensure that psychotropic medication orders are reviewed by a psychiatrist on a regular, timely basis for appropriateness or adjustment.  Cermak shall ensure that changes to an inmate's psychotropic medications are clinically justified and documented in the inmate's medical record.

    b.  Cermak shall ensure timely implementation of physician orders for medication and laboratory tests.  Cermak shall ensure that inmates who are being treated with psychotropic medications are seen regularly by a physician to monitor responses and potential reactions to those medications, including movement disorders, and provide treatment where appropriate.

***All provisions of the Agreed Order have now been in substantial compliance for at least 18 months*** (see Appendix V). The leadership and line staffs of medical, nursing and mental health as well as the custody staff are congratulated for their long-standing efforts that have resulted in compliance with the Agreed Order and establishment of a very good medical, nursing and mental health system at the CCDOC.

I made specific recommendations re: the current treatment planning process in the RTU that included the inmates attending part of the team process in addition to allowing more time per inmate in the meeting. Five to 10 minutes per inmate is not sufficient for the treatment planning process.

Appendix II provides a summary of staffing allocations and vacancies, which were not significantly different than the prior site assessment.

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*
Page 4 of 4

I also learned during this site visit that since about November 2018 many mental health caseload inmates are handcuffed behind their back during clinical encounters with mental health clinicians. This practice was implemented related to litigation initiated by staff in the context of being exposed to inappropriate sexual behaviors by a minority of inmates. There was lack of clarity among staff (both line and leadership) re: the basis for such a practice although a court order apparently is in effect that has led to this practice. It is not clinically appropriate to be handcuffing mental health caseload inmates on a "default basis" during individual mental health clinical encounters with clinicians. This issue is exacerbated by handcuffing such inmates behind their backs. It is my understanding that Ms. Dean and Mr. Burke will jointly address this issue.

The leadership of Kenya Key (Chief Psychologist, Ph.D.), David Kelner, M.D. (Division Chief of Correctional Psychiatry) and Carlos Gomez, Psy.D. (Director of Mental Health), Linda Follenweider, R.N., N.P (Chief Operating Officer Hospital Based Services), and Connie Mennella, M.D. remains very impressive. The working relationships between CCDOC and Cermak staffs continues to improve and is very good, which clearly had been facilitated by Nneka Jones, Psy.D. during her recent tenure as Executive Director.

Although I will be in North Carolina on vacation from June 10-23, 2018, I can be available by phone if needed for testimony. Dates during June and July that I cannot be available are as follows:

    June 4-6, 27-28.

    July 2-3, 9-11, 16-20, 23-26.

Please do not hesitate to contact me if I can answer any further questions.

Sincerely,

Jeffrey L. Metzner, M.D.

**Executive Summary—Sixteenth Monitoring Report (Mental Health Provisions)**

Significant accomplishments since the April 2017 site assessment include substantial compliance for at least 18 months having been achieved with the following provisions:

59.     Assessment and Treatment

      d.   Cermak shall ensure clinically appropriate and timely treatment for inmates, whose assessments reveal serious mental illness or serious mental health needs, including timely and regularly scheduled visits with Qualified Mental Health Professionals or with Qualified Mental Health Staff, with appropriate, on-site supervision by a Qualified Mental Health Professional.

      e.   Cermak shall ensure that treatment plans adequately address inmates' serious mental health needs and that the plans contain interventions specifically tailored to the inmates' diagnoses.

      o.   Cermak shall ensure an adequate array of crisis services to appropriately manage the psychiatric emergencies that occur among inmates. Crisis services shall not be limited to administrative segregation or observation status.

      p.   Cermak shall ensure that inmates have access to appropriate acute infirmary care, comparable to in-patient psychiatric care, within the Cermak facility.

60.     Psychotherapeutic Medication Administration

      a.   Cermak shall ensure that psychotropic medication orders are reviewed by a psychiatrist on a regular, timely basis for appropriateness or adjustment. Cermak shall ensure that changes to an inmate's psychotropic medications are clinically justified and documented in the inmate's medical record.

      b.   Cermak shall ensure timely implementation of physician orders for medication and laboratory tests. Cermak shall ensure that inmates who are being treated with psychotropic medications are seen regularly by a physician to monitor responses and potential reactions to those medications, including movement disorders, and provide treatment where appropriate.

***All provisions of the Agreed Order have now been in substantial compliance for at least 18 months.***

In the RTU, inmates do not attend their treatment plan team meeting. The amount of time each inmate is reviewed during these meeting is too short. I made specific recommendations re: the current treatment planning process in the RTU that included the inmates attending part of the team process in addition to allowing more time per in the meeting per inmate. Five to 10 minutes per inmate is not sufficient for the treatment planning process.

Executive Summary
Eleventh Monitoring Report (Mental Health Provisions)
Page 2 of 2


I also learned during this site visit that since about November 2018 many mental health caseload inmates are handcuffed behind their back during clinical encounters with mental health clinicians. This practice was implemented related to litigation initiated by staff in the context of being exposed to inappropriate sexual behaviors by a minority of inmates. There was lack of clarity among staff (both line and leadership) re: the basis for such a practice although a court order in this case apparently is in effect that has led to this practice. It is not clinically appropriate to be handcuffing mental health caseload inmates on a "default basis" during individual mental health clinical encounters with clinicians. This issue is exacerbated by handcuffing such inmates behind their backs.

The leadership of Kenya Key (Chief Psychologist, Ph.D.), David Kelner, M.D. (Chief Psychiatrist) and Carlos Gomez, Psy.D. (Director of Mental Health) Linda Follenweider, R.N., N.P (Chief Operating Officer Hospital Based Services), and Connie Mennella, M.D. remains very impressive. The working relationships between CCDOC and Cermak staffs continues to improve and is very good.

2

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*

**Appendix I**



### Sheriff's Daily Report
### 4/30/2018

| Under the Custody of the Sheriff | |
| --- | --- |
| **TOTAL MALE AND FEMALE** | **8,121** |
| Jail Population | 6,028 |
| Community Corrections | 2,093 |



**Jail Population Behind the Walls**

- 🔵 Division 4, Division 4 Dorm 4, Division 6, Cermak, Division 08 RTU, Division 9, Division 10, Division 11 - Male Population
- 🔴 RTU Annex, Cermak, Division 08 RTU - Female Population
- 🟢 Division 15 - Outside Counties
- ⚫ Division 15 - Hospital

**Court-Ordered Programming within Jail Custody**

- 🟣 RTU Annex - Women's Residential (Court Ordered Drug Treatment Program)
- 🟡 Division 6, Division 08 RTU - PRC (Court Ordered Drug Treatment Program) - Male Population
- 🟥 Division 16 - VRIC (Court Ordered) - Male Population

Pie chart values: 15 / 0.2%; 57 / 0.9%; 129 / 2.1%; 102 / 1.7%; 15 / 0.2%; 393 / 6.5%; 5,317 / 88.2%

Q. What does Behind the Walls mean?
A. The behind the walls jail population is physically housed under the Sheriff's custody 24 hours a day/7 days a week. This includes all the populations listed on the key above and pie chart to the left - Divisional populations male & female, Outside Counties, Hospital, PRC, Women's Residential, & VRIC. Detainees in court-ordered treatment programs (PRC, Women's Residential, VRIC) are housed at CCDOC 24 hours a day/7 days week.



Sheriff's Daily Report
4/30/2018

# CCSO Population Demographics



Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*

**Appendix II**

## Appendix II

| Psychiatry Staffing -April 2018 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Apr-18 |
| | | | | | | | | | |
| **PSYCHIATRY** | | | | | | | | | |
| **Psychiatric Special Care Units** | | | | | | | | | |
| **Psychiatry Allocations:** | | | | | | | | | FTE |
| | 2 North: 3 Psychiatrist+PA with 7-day Coverage(RFX1.7) | | | | | | | | 3.3 |
| | 2 South/Southeast: 2 Psychiatrist with 5-day Coverage | | | | | | | | 0.9 |
| | 2 West: 2 Psychiatrists with 7 day coverage(RFX1.7) | | | | | | | | 1.7 |
| | 2 E: 1 Psychiatrist Once a month coverage | | | | | | | | 0.1 |
| | | | | | | | | Total | 5.8 |
| | Physician /patient ratio on acute units> 1:15 | | | | | | | | |
| | Physician /patient ratio on subacute units> 1:30 | | | | | | | | |
| **Divisions with P2Housing/OutPatient** | | | | | | | | | |
| **Psychiatry Allocations:** | | | | | | | | | |
| | 580 daily average population in Min /Med Security Divisions (IV,V,VI) | | | | | | | | 2.2 |
| | 720 daily average detainees in Maximum/Medium security Divisions X and IX | | | | | | | | 2.9 |
| | 45 daily average detainees in SMU, exclusing PC ( Divisions IX and X)are absorbed into P2 population | | | | | | | | |
| | | | | | | | | Total | 5.1 |
| | Physician/patient ratio for maximum security P2-1:248 | | | | | | | | |
| | Physician/patient ratio for minimum security P2-1:263 | | | | | | | | |
| | | | | | | | | | |
| **Residential Treatment Unit** | | | | | | | | | |
| **Psychiatry Allocations:** | | | | | | | | | |
| | Absorbs SMU P3 and P2 Populations( daily average 18) | | | | | | | | |
| | Absorbes Intensive Management Unit ( average daily census 6 ) | | | | | | | | |
| | Male and Female(average daily population is 400 P3 and 190 P2) | | | | | | | | |
| | RTU P2 population is concentrated on the 2nd,3rd and 5th floors | | | | | | | | |
| | 1 FTE is assigned to P2, SMU, and IMU combined | | | | | | | | 1 |
| | RTU P3 population is concentrated on the 2nd,3rd,4th and 5th floors | | | | | | | | |
| | 5.2 FTE assigned to P3 | | | | | | | | 5.2 |
| | Physician/Patient ratio for P2 -1:214 | | | | | | | | |
| | Physician/Patient ratio for P3 -1:76 | | | | | | | | |
| | | | | | | | | Total | 6.2 |
| | | | | | | | | | |
| **RCDC** | Monday, Tuesday, Wednesday, Thursday, Friday** | | | | | | | | |
| **Psychiatry Allocations** | | | | | | | | | 1.8 |
| | NOTE:* RCDC has shortened shifts- 5hours | | | | | | | | |
| | NOTE:** 2 Psychiatrists (1 for Male RCDC, 1 for Female RCDC) | | | | | | | | |
| | | | | | | | | Total | 1.8 |
| | | | | | | | | | |
| | 1FTE onsite hours =52 weeks=2080hours per year | | | | | | | | |
| | Chief Psychiatrist does not provide direct service hours | | | | | | | | |
| | Psychiatrists do not perform administartive duties | | | | | | | | |
| | Associate Chief of Psychiatry provides limited direct patient care | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | Grand Total | 18.9 |

**Summary for Psychiatry**:

- o 15 Full time Correctional Psychiatrist vacancies are all filled.

- o Two Part time Psychiatrists have been credentialed (Drs. Perry and Salik) and await final onboarding. Expected/estimated arrival on the compound is May 2018. One Part time Psychiatrist is being recruited. One Part time Psychiatrist resigned, and so did a Consultant Physician.

- o The remaining Part-time (Account 133) Psychiatrist is committed to working in excess of 20 direct service hours. The rate of compensation for this position is sufficiently attractive.

- o Even though Telepsychiatry has undergone contraction on the compound, in addition to flex time arrangements, it continues to be an important recruitment and retention instrument. The only location where Telepsychiatry has expanded was RCDC (Intake). Not having to rely on the Telepsychiatry Clinic Attendant in RCDC, due to wide availability of MHS, as opposed to Division IV, and other divisional clinics, makes it much easier to operate, as the availability of clinic attendants remains the main rate limiting step for the operations of these clinics. Telepsychiatry clinics function successfully in RCDC and Division IV.

- o Coupled with new staff's availability, there is a project to open additional Psychiatry assignments in RCDC on the weekends. A proposal was submitted to Labor to vet with SEIU in term of its impact on present staff. Senior Cermak Leadership has been supportive with regard to making Psychiatry available in RCDC on Saturdays and Sundays. Partial weekend shifts in RCDC have been to open to Telepsychiatrists and some of the weekends are now covered. The goal remains the expansion of Psychiatric Coverage in Intake to 7 days per week.

- o 2 Physician Assistants are employed. Two MH PA's exceed departmental expectations in terms of productivity and quality. PA's deployments have been diverted to less acute area and not PSCU/RTU.

- o As a future direction, Chief of Psychiatry collaborates with Cermak CCO to augment current staffing with Pharm. D's( with the specialization in Mental Health and Inpatient settings) and potentially expand the lines of services where PA's are deployed. Position had been reposted, after one candidate was interviewed and declined the position.

- o A position of the Associate Director of Correctional Psychiatry is filled.

- o Ongoing current advertisement efforts by CCHHS involved postings in industry publications, including the AAPL quarterly letter, communication with the local feeder schools, and participation in local Psychiatry Job Fairs.

- o Additional staff hired in the CCHHS's Credentialing office provides increased support to engage applicants and expedite processing. Cermak's Finance Department facilitates

monthly conference calls with HR and Credentialing Department to coordinate onboarding and hiring issues.

o "Advanced Clinical Process (ACP)" at Cermak has been in place since November 2015. The Advanced Clinical Process was created to assist Cermak in filling hard to fill credentialed positions. The ACP process has helped enhance the recruitment process by allowing for the participation of departments to solicit candidates to submit resumes / CVOs to a centralized mailbox, which allows for the expedited review and determination of candidates meeting minimum requirements. Due to success of this pilot, the ACP process is now implemented CCHHS wide.

o As an important recruitment tool Cermak Psychiatry continues to support student and Psychiatry residents' rotations/training on site from nearby medical schools (Rush+ UIC's). Additional programmatic and MEA contracts have been developed with the University of Chicago. Presently there is aPGY-4 from the University of Chicago is being precepted for the forensic Psychiatry elective. MH Administration is in the process of vetting the programmatic agreement with Loyola University's Psychiatry residency for PGY-2 forensic psychiatry rotation, as well as PGY-4 electives.

o A scheduling Pilot started in the spring of 2017 in Division VI. It was designed to ensure that the amount of prescribing clinician time was sufficient and led to thorough clinical encounters. It allots 40 minutes for an Initial Assessment and 20 minutes for follow up sessions. The amount of time allotted to initial psychiatric examinations was sufficient to conduct thorough initial evaluations, conduct medical records review, and enter documentation in EMR. CQI was conducted to assess the results and further expansion of the Scheduling Pilot was recommended for implementation in the rest of Divisional Clinics across the compound. In the meantime, the Access to Care Collaborative DOC/Cermak Pilot had been expanded from Division IX to all divisional clinics in CCDOC, including RTU. The new scheduling template allowing for the above allotments of time is estimated to be unrolled together with the new Cerner Behavioral Health Module, which goes live in May 2018. Several integration tests have been conducted throughout the year

o The Access to Care Collaborative Scheduling DOC/Cermak Pilot in Division IX was expanded in July 2017 to the whole CCDOC compound. It automated communications related to patient movement and increases movement to clinic efficiency, while proactively capturing those detainees whose housing location has changed since the original order for a divisional clinic's appointment was entered. Patient movement to clinics is being addressed at the most senior levels of CCDOC and Cermak Leadership. The Access to Care group convenes twice a month to study trends and find solutions to compound wide access to care issues.

o Clinical Performance and Enhancement Peer Review Process was developed by the Chief of Psychiatry. This study is ongoing. A repeat study was conducted in February 2018. CQI study results reflective of clinical practices is available in the PDF Appendix.

o Frequency of contact with Providers study was undertaken in all the Levels of Care to address concerns that patients are dealing with unreasonably high waiting times. The results of this CQI study are available in the PDF Appendix.

o Issues pertaining to quality of psychiatric practice have been addressed in two CQI studies addressing readmissions to PSCU and polypharmacy with second generation antipsychotics. Both studies reflect statistical trends consistent with best community national practices. CQI studies are available in PDF appendix.

**Summary for Psychology**: There is a total of 10.0 FTE psychologist positions (excluding the Chief Psychologist position) with a current vacancy rate of 10% (1 FTE). Cermak MH Leadership has worked with the CCHHS Credentialing Committee/Executive Medical Staff, and SEIU to modify previously existing minimum job qualifications from having APA certified predoctoral internship to the APPIC accredited training. The CCHHS Credentialing Committee approved a request to modify the minimum qualifications for this job title and now the minimum job description for Correctional Psychology includes the following language: "Completion of a pre-doctoral internship at a program accredited by the American Psychological Association or listed with the Association of Psychology Post-Doctoral & Internship Centers (APPIC)".This step is designed to expand the pool of prospective candidates, while deferring to MH Leadership to vet deserving candidates and further strengthening the post-hiring Professional Evaluation Process. Presently, CCHHS is expanding the said criteria to Juvenile Temporary Detention Center and the rest of the System. One remaining position is posted. The two new Correctional Psychologists added since October 2017 were hired still under the old set of eligibility criteria. Cermak has submitted a request to fund 2 post-doctoral Psychology Fellows to work under the supervision of the Chief of Psychology, to provide diagnostic assessment, crisis intervention, intake evaluations, group and individual therapy, consultation with multidisciplinary treatment team, projective and objective psychological testing, security and civilian staff training, and supervision of practicum students. Periodic rotations serve to prevent burn out and fatigue among Psychologists as some areas of CCDOC present heightened acuity of pathology and increased demands in terms of providing coverage and addressing MHS discipline. Increased staffing among this group allowed to dedicate Dr. Nunez to conducting CQI studies and focus on staff development within the department, as his clinical duties on 2S/SE/2E were absorbed by Dr. Stress who is expected to give only direct service hours.

**Summary for Mental Health Specialists**: The department is budgeted for 84 mental health specialists positions (MHS). Table #1 below summarizes the status of the positions. There are 68 mental health specialists on board as of the first week in April 2018. Five positions are classified as MHS II/Sr. Of these five, four have received their Masters degrees and taken the licensure exam. Two of them are being processed by the CCHHS Labor/HR department to upgrade their positions to MHS III. Once they are transferred to the new positions as MHS III, their current positions will be posted and upgraded. The other two MHS II/Sr staff are waiting for documentation of their licensing exams. The fifth MHS II/Sr, is scheduled to complete a Master's degree and take the licensing exam at the end of the Spring 2018 term.

At the start of April 2018, a MHS III was released from employment during her probationary period. The department is submitting a request to post the vacancy. At the end of March 2018, a

MHS III candidate accepted a position and is being processed to begin employment at the end of April 2018. The department has been conducting interviews for the remaining 12 positions.

**Table #1: Status of MH Specialists Positions as of April 6, 2018**

| Job Title and Status | Number |
|---|---|
| Mental Health Specialist II/Sr on board* | 5 |
| Mental Health Specialist III on board | 63 |
| Mental Health Specialist III positions being used to upgrade MHS II/Sr positions | 2 |
| Mental Health Specialist III in the process of being posted due to recent termination | 1 |
| Mental Health Specialist III in the on-boarding process | 1 |
| Mental Health Specialist III positions posted/being interviewed | 12 |
| Total | 84 |

The department is budgeted for seven Medical Social Worker V positions, six of which are filled and the seventh is posted. The department has been conducting interviews for the past 6 months but has not identified a viable candidate.

The department is also budgeted for four Activity Therapist positions, all of which are filled. The 4th person was hired in July 2017. She is focusing primarily on the P2 population.

| | ACCOUNT # | VACANT | FILLED | SUM | % VACANT |
|---|---|---|---|---|---|
| Divisional Chief of Psychiatry | 110 | 0 | 1 | 1 | 0.00% |
| Associate Director of Correctional Psychiatry | 110 | 0 | 1 | 1 | 0% |
| FT Psychiatrist | 110 | 0 | 15 | 15 | 0.00% |
| PT Psychiatrist | 133 | 4 | 1 | 5 | 80.00% |
| PT Consultant | 155 | 3 | 0 | 3 | 100% |
| Chief Psychologist | 110 | 0 | 1 | 1 | 0.00% |
| Psychologist | 110 | 1 | 9 | 10 | 10.00% |
| Physician Assistant | 110 | 0 | 2 | 2 | 0% |
| Social Worker | 110 | 1 | 6 | 7 | 15% |
| Mental Health Director | 110 | 0 | 1 | 1 | 0.00% |
| Art Therapist | 110 | 0 | 4 | 4 | 0.00% |
| MHS | 110 | 16 | 68 | 84 | 19.04% |
| Administrative Assistant | 110 | 0 | 1 | 1 | 0.00% |
| Medical Assistant | 110 | 0 | 1 | 1 | 0.00% |
| | | | | | |
| Total | | 25 | 110 | 136 | 18.38% |

*Table 6. Mental Health Department's vacancy rates*

*FTE's Psychiatry April 2018*

Psychiatric Vacancies for Full Time Psychiatrists in April 2018 remains 0.

| Chair(1) | 1.0 | Kelner |
|---|---|---|
| Associate Chair(1) | 1.0 | Thomas |
| Attending Psychiatrists (15) | 15.0 | Advani, Howard, Marri 0.8, Menezes, Paschos, Ward, Bednarz, McNeal, Haq, Miller, Kartan, Canelas, Libeu, Garbharran, Mason |
| Psychiatric PA's | 2.0 | Balawender, Greiner |
| Psychiatrists (133 acct) | 0.6 | Ramic |
| *Total Functional FTE* | *19.6* | |

*Table 7. Psychiatry FTE's.*

**FTE's Psychology April 2018**

| Chief Psychologist(1) | 1.0 | Key |
|---|---|---|
| Correctional Psychologists | 9.0 | Briney, Kaniuk, Waxler, Sillitti, Nunez, Augustine, Butler, Stress, Liebowitz |
| *Total Functional FTE* | *10.0* | |

*Table 8. Psychology FTE's.*

As of April 2018, Functional Vacancy Rate(FVR): # of fulltime positions/FTE's – # filled full time positions/FTE's – hours paid Acct. 133 ( part time) - hours paid Acct. 155( part time) - hours paid vendors( Locums) – hours paid overtime/moonlight – supplement by mgmt. =0.0% Direct service hours and participation in MDT meetings constitute 100% of FTE's hours.

**RTU staffing**

| | RTU 5th floor females | RTU 4th floor(+ 2nd and 3rd floors) |
|---|---|---|
| Psychiatry | 6.2 ( 5.2 for P3 and 1 for P2) | |
| Psychology/Unit Director | 1.0 | 1.0 |
| Social workers | 1.2+ 1.0 Expressive therapist | 1.0+ 1.0 Expressive therapist |
| Mental Health Specialists | 4 MHS III + 2 MHS II in am 3 MHS III in pm (2 MHS III on Overnight for RTU) | 6 MHS III + 1 MHS II in am 5 MHS III's in pm |

*Table 9. RTU staffing*

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*

**Appendix III**

**Appendix III**

**Mental health provisions of the Agreed Order monitored by other monitors**

**H.      QUALITY MANAGEMENT AND PERFORMANCE MEASUREMENT**

   **c.      CCDOC shall participate with Cermak and DFM in a jointly established Health Care Quality Improvement Committee, to be charged with developing and implementing a joint quality improvement program. CCDOC shall contribute the time and effort of CCDOC staff members who, by virtue of their authority, current responsibilities, and/or past experience, can provide this committee with needed correctional representation.**

   **d.      Cermak shall participate with CCDOC and DFM in a jointly established Health Care Quality Improvement Committee, to be charged with developing and implementing a joint quality improvement program. Cermak will work with CCDOC and DFM to identify those CCDOC and DFM staff members who, by virtue of their authority, current responsibilities, and/or past experience, can provide this committee with needed correctional representation.   Quality management programs related to medical and mental health care will utilize performance measurements to assess quality of care and timely access to care with quantitative and qualitative data analysis and trending over time.**

   **e.      DFM shall participate with CCDOC and Cermak in a jointly established Health Care Quality Improvement Committee, to be charged with developing and implementing a joint quality improvement program.  DFM shall contribute the time and effort of DFM staff members who, by virtue of their authority, current responsibilities, and/or past experience, can provide this committee with needed correctional representation.**

**Compliance Assessment:** Refer to the report by Dr. Shansky (initially found to be in substantial compliance during 2011 and again during 2013)

**69.      CCDOC shall ensure that security staff posts will be equipped, as appropriate, with readily available, safely secured, suicide cut-down tools.**

**Compliance Assessment:** Refer to the report by Susan McCampbell.

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*

**Appendix IV**

## Appendix IV

**D.     MENTAL HEALTH CARE**

**59.     Assessment and Treatment**

> **d.     Cermak shall ensure clinically appropriate and timely treatment for inmates, whose assessments reveal serious mental illness or serious mental health needs, including timely and regularly scheduled visits with Qualified Mental Health Professionals or with Qualified Mental Health Staff, with appropriate, on-site supervision by a Qualified Mental Health Professional.**

**Compliance Assessment:** Substantial compliance (4/17)

**April 2018 Cermak Status Update:**

**COMPOUND HOUSING PLAN BY MENTAL HEALTH LEVELS OF CARE (as of April 2018)**

- Cermak- P4 (Psychiatric Special Care Unit)- 2N acute male, 2W-acute and chronic female, 2S/2SE- male subacute, 2E- male chronic, P4 can also be housed on the third floor in Medical Special Care Unit under special circumstances. Housing on 3S for Mental Health reasons requires transfer orders from PCC/ Dr. Mennella. Patients with M4 and P4 can be housed on the Medical Special Care unit based on interdisciplinary decision.
- Division IV: MALE MENTAL HEALTH HOUSING
  - Mental Health Outpatient P2; **if any Mental Health Intermediates (P3) are placed there, MH staff works on transferring them to RTU
- Division V FEMALE MENTAL HEALTH HOUSING
  - Division V: Mental Health Outpatient P2
- Division VI: MALE MENTAL HEALTH HOUSING
  - Westcare tier, Safe Program, MHTC tiers –Mental Health Outpatient P2
  - Therapeutic Tier –2P, Mental Health Outpatient P2; detainees area vetted for admission by MH (non P3)
- Division VIII RTU: MENTAL HEALTH HOUSING
  - 5th floor Females
    - Mental Health Intermediates P3 (tiers B, F) Mental Health Outpatients P2 and DETOX (all other tiers), Pre/postnatal
    - SMU (tier A) Protective Custody (tier E) (restrictive housing require mental health clearance prior to placement/within 24 h)
  - 4th floor Males
    - Mental Health Intermediates P3 (all tiers)
    - SMU (tier A) Protective Custody (tier E)
      - Mental Health Intermediates P3 (restrictive housing require mental

     health clearance prior to placement/within 24 h)
- o 3rd floor Males
  - ▪ Medical Intermediate M3s (may also be P2s) with overflow Mental Health Intermediate P3s
- o 2nd floor Males
  - ▪ Mental Health Intermediate Overflow P3
  - ▪ Intensive Management Unit (tier 2A)-P3
  - ▪ DETOX
- • Division IX: MALE MENTAL HEALTH HOUSING
  - o Protective Custody (Tiers 2E,2F,2G,2H)
    - ▪ If conditions of confinement are more restrictive than GP, Mental Health Outpatient P2 require mental health clearance prior to placement/within 24h **No Mental Health Intermediates P3 should be transferred to PC in Division IX; they should only be housed on PC tiers in Division VIII RTU
  - o SMU- non-administrative SMU (Tier 1E, 1G, 1H; 1F- enhanced security tier); 1G houses only those detainees who have P2 alerts.
    - ▪ Mental Health Outpatient P2 (require mental health clearance prior to placement/within 24h) **No Mental Health Intermediates P3 should be cleared by mental health to transfer to SMU in Division IX; they should only be cleared for SMU in Division VIII - RTU
  - o Mental Health Outpatient P2 (all other tiers in the division)
- • Division X: MALE MENTAL HEALTH HOUSING: Mental Health Outpatient P2
  - o Protective Custody (Tier 1C)
    - ▪ If conditions of confinement are more restrictive than GP, Mental Health Outpatient P2 require mental health clearance prior to placement/within 24h **No Mental Health Intermediates P3 should be transferred to PC in Division IX; they should only be housed on PC tiers in Division VIII RTU
  - o Therapeutic Tier-2B, Mental Health Outpatient P2; detainees area vetted for admission by MH (non P3)
- • Division XI: NO MENTAL HEALTH HOUSING
- • Division XVI (Boot Camp): NO MENTAL HEALTH HOUSING; detainees on dose by dose medications cannot be in Boot Camp (and that excludes any patient on psychotropics)

**Compound Wide Psychiatry Updates**

**Cermak building (Psychiatric Special Care Units, Urgent Care, Medical Special Care Units)**

Dr. Brian Thomas (Associate Chair for Infirmary Care) has been in a leadership position over PSCU since August 2017. Psychiatric coverage of the Psychiatric Special Care Units has been largely unchanged: 2N is covered by 3 Psychiatrists and 1 Psychiatric PA (Balawender). 2W covered by 2 Psychiatrists. 2S/2SE is covered by two Psychiatrists. 2E is covered by on Psychiatrists. All the Psychiatrists combine PSCU coverage with some divisional clinics. 5.8

Appendix IV
The Agreed Order Status Update
Page 3 of 27

FTE's (included is relief factor) are assigned to PSCU and provision of psychiatric consultative services in MSCU. Section 59f. contains detailed descriptions of Psychiatric allocations within the PSC Units. Please see PDF Appendix for QI related to frequency of contact of PSCU patients.

**Residential Treatment Unit**

Average daily Population is 400 P3's and 190 P2's with absorbed SMU/IMU populations. Of note, that there are no P3 patients housed outside of RTU and the need to create more P3 tiers to accommodate P3 overflow previously housed in Division X has significantly diminished. RTU males are housed on the second, third and fourth floor of the RTU building. RTU females are housed on the fifth floor of the building. The number of detainees with P3 alert averages 50 for the second and third floors of RTU. 1FTE is assigned to P2 /SMU/IMU. 5.2FTE's are assigned to provide services to P3's in RTU.

Psychiatric services in Male RTU have been expanded. Staffing levels in this high priority area (RTU) remain a focus for Psychiatry Administration. Present Psychiatric allocations in RTU are outlined in the staffing section of this Status Update report, see 59f.

Psychiatric allocations absorb Special Management Units with average daily census 18 (mixed Classification Units within the building housing detainees with various combinations of P3, P2, and M- Alerts) + Intensive Management Unit with average daily census 6 (housing SMI detainees with P3 Level of Care).

**Division IV.**

Following the closure of Division II Dorm 2, most of the male detainees were transferred to Division IV, while female detainees from Division IV were transferred to Division V. Two Full Time Psychiatrists provide Psychiatric services in this division that houses minimum and medium security P2 detainees. One Provider continue to provide Telepsychiatric services on full time basis. The other Provider is on site. CCDOC shared plans to completely close Division 4 to housing in the beginning of May. CCDOC is open to keeping the Div. 4 dispensary and other spaces open for clinics and programs. If the population remains static, CCDOC plans to divide the remaining Div. 4 inmates among Divisions 6, 10, and 11. As population in Division IV continues to decrease through preplanned and coordinated transfers to other Divisions, Providers from are gradually receiving new assignments in other clinical areas (Division VI and Division X). The rate limiting factor for the opening of new clinics is the identification of additional office space in these divisions. Patient population is 151.

**Division V.**

Previously Division IV female detainees were moved to Division V. Psychiatric services are provided by one Psychiatric Physician Assistant. He continues to exceed expectations and provides reliable coverage to minimum, medium and maximum security P2 female detainees.

Appendix IV
The Agreed Order Status Update
Page 4 of 27

There are no P3 detainees housed in Division V. Physician assistants are assigned to lower acuity areas. Patient population is 88.

**Division VI.**

Psychiatric services are provided by three Psychiatrists. Division VI has experienced an expansion of P2 detainees. There are no P3 detainees housed in this division. Telepsychiatric services in Division VI have been eliminated and presently Psychiatry coverage is provided only by on site Providers. Cermak Administration is working on identifying new clinical space to absorb Providers from Division IV, which is scheduled to close in the beginning of May 2018. Psychiatrists continue to provide services to the therapeutic tier (2P) detainees. Special Management and Protective Custody have been moved out of Division VI. Patient population is 348.

**Division IX.**

Psychiatric services are provided by two onsite Psychiatrists. There are no P3 detainees in this division. Division IX continues to be a very high acuity area with four SMU units and four Protective Custody Units accompanied with concentrated levels of institutionally disruptive, predominantly, maximum security P2 detainees. Institutional challenges related to the nature of SMU units and maximum security predictably lessen access to mental health services. Cermak proposed to create a Behavioral Management Unit/Therapeutic Tier to house and address the needs of P2 detainees without SMI who utilize a lot of resources due to disruptive, self-injurious, and aggressive behaviors. The first meeting dedicated to the creation of such Unit took place in March 2018. Frequent rotation of Division IX Providers will be carried out (annually) in order to prevent burn out. Psychiatry is using repurposed clinical space on the second floor of the South Tower, in addition to the dedicated office space in the Dispensary. Patient population is 336.

**Division X.**

Psychiatric services to P2 detainees are provided by two on site Psychiatrists. Division X houses no P3 detainees. Telepsychiatric services have been eliminated from this division. Presently additional clinical space has been modified in the basement of Division X to accommodate recent expansion of Psychiatry clinics. Psychiatrists continue to provide services to the therapeutic tier (2B) detainees. The only remaining Protective Custody tier (1C) houses average 15 detainees. Patient population 388.

**Cermak Basement Clinic** continues to provide services to detainees from divisions XI. Patient movement to this clinical location has been declining since the introduction of a new policy which prescribes to transfer detainees to Mental Health Housing and give them a corresponding P level alert after triage by MHS, when it is decided that these detainees need a consultation with Psychiatry.

**RCDC (Intake).** No significant changes. Most of the shifts, now including some weekend shifts, are staffed by Full Time Providers who see patients telepsychiatrically there. As Telepsychiatry contracted elsewhere on the compound, in Intake up to 5 Providers now participate telepsychiatrically during evening hours, mostly through moonlighting arrangements.

**Compound Special Management Units:**

Compound SMU housing was assessed on 04/10/2018 with the following data captured:
- Compound Census as of 04/10/2018: **6,061**
- Compound MH Caseload as of 04/10/2013**: 2,013**
- Total compound SMU Non PC population 04/10/2018 on MH caseload: **69**
- RTU SMU Non PC Census 04/10/2018: **21**
- Out of 21 SMU RTU detainees- **11** are P3's (0.18% of total jail population).
- Division IX Non PC SMU P2 population- **48**
- The number of P2 and P3 patients in SMU housing as a percentage of the total mental health caseload has declined from 4.8% (September 2016) to **3.4%** (April 2018).

| TIER | 16-Sep | 16-Dec | 17-May | 17-Oct | 18-Apr |
|------|--------|--------|--------|--------|--------|
| RTU 4A | 13 | 6 | 11 | 7 | 13 |
| RTU 5A | 10 | 12 | 13 | 10 | 8 |
| 9 1E | 10 | 10 | 4 | 4 | 7 |
| 9 1F | 11 | 10 | 11 | 9 | 10 |
| 9 1G | 39 | 37 | 32 | 27 | 19 |
| 9 1H | 17 | 13 | 11 | 12 | 12 |
| TOTAL | 100 | 88 | 82 | 69 | 69 |
| MH CASELOAD | 2087 | 2159 | 2093 | 2153 | 2013 |
| AVE % | 4.80% | 4.10% | 3.90% | 3.20% | 3.40% |

*Table 4. SMU census*

- SMU settings: DOC and Cermak staff work together on overcoming inherently lower accessibility of patients to care; the overriding principle remains being able to provide essential psychiatric and mental health services regardless of housing. Very helpful was the establishment of the Compound wide Access to Care Workgroup with the participation of the Cermak operational leadership and most senior CCDOC executive leadership with the focus, as the first priority, on further improving access to care in Division IX which houses significant behaviorally problematic/institutionally disruptive P2 detainees in various SMU units. CCDOC concentrated most of the P2's non administrative disciplinary status in SMU in Division IX on the same tier – 1G –with the goal of improving security and supervision as well as access to essential mental health services. CCDOC moved all male P2's SMU (Non Protective custody) to Division IX and presently there are no Non PC SMU tiers remaining in Division VI. All Non

Protective Custody SMU P2 and P3 female detainees are housed on the fifth floor of RTU (5A).

- SMU for P3's Programming statistics can be found in elsewhere in this report.
- Cermak staff continues to work on modifying conditions of confinement for SMI populations housed in SMU setting in RTU 5A (Female Special Management Unit). According to the results of a randomized sampling from 5A, GP averaged 13.43 days, P2 classified female detainees averaged 5.92 days, and P3 averaged 5.81 days in SMU across all review dates. RTU 5A CQI SMU Length of Stay Study can be found in the PDF Appendix. Modification of conditions of confinement for those individuals with Serious Mental Illness whose time in SMU exceeds 14 days (provided that they serve consecutive, and not concurrent, disciplinary tickets) consists of providing more out of cell time and additional therapeutic programming to them. DOC Disciplinary Unit continues to issue tickets for P3's that do not exceed 14 days. Tickets do not always run concurrently. Cermak continues to provide structured therapeutic programming for SMI detainees in SMU 5A (Sunday through Thursday). However, the detainees often refuse to participate in group programming or there are detainees having their time out of the cell (if unit is crowded), preventing groups from occurring. On 5-A, there is no hardware to tether detainees to the tables during group due to concerns about trauma informed care and gender sensitive treatments to female detainees.
- Cermak continues to strive to modify conditions of confinement for those who are housed on RTU 4A (SMU male tier). According to the results of a randomized sampling, overall, P2 patients had an average LOS in SMU of 12 days (only one P2 patient was in SMU during the 4 days that were randomly selected), and P3 patients had a LOS of 3.7 days. The average LOS for both groups falls well within the federal guidelines. There were no male RTU SMU outliers identified for those dates. Male detainees remain tethered to stationary furniture during out of cell group structured therapy/activities on RTU 4A and IMU. RTU 4A CQI SMU Length of Stay Study can be found in the PDF Appendix.
- Cermak continues to provide structured therapeutic programming for SMI detainees in SMU, as described elsewhere in the Cermak April 2018 updates. Cermak will continue to target 10 hours of structured activities weekly/10 hours unstructured activities weekly provided to these detainees. Programming activities on the male tier have been at times affected by institutionally disruptive detainees, as well as, scheduling conflicts with CCDOC (running hours out) and lack of necessary security equipment (handcuffs). RTU SMU houses detainees with M3 and P2/No P alerts and many of these detainees are high functioning and do not have Diagnosis of SMI. Detainees with higher level of functioning, when introduced into the milieu with more regressed poorly functioning patients, have a tendency to adversely influence more regressed individuals. The importance of not introducing potentially predatory detainees into the RTU SMU environment is recognized.
- Cermak MH Department furnishes SMU detainees with the following services:
  - SMU rounds weekly (in addition to weekly PCS rounds)
  - Psychiatry appointments (regularly scheduled and walk ins)
  - Individual Behavioral Management Treatment Plans
  - Other essential services –individual supportive counseling, access to emergency

and routine care as per DHSR process, crisis intervention, etc. (commensurate with their level of care)

Significant effort is made to reduce SMU patients' movement within the building and, even more importantly, outside the building. What causes self-injury and acting out is multifactorial and, yet, it is believed that many detainees engage in acts of self-harm and other acting out in order to secure movement and break the monotony of SMU confinement. Telehealth services and seeing detainees in a dedicated off-the SMU tiers clinical space on 1S continue to be utilized in order to minimize the incentive that movement to appointments represents to many detainees in SMU. Additionally, reducing the frequency and length of movement reduces the number of incidents of the use of force which happens to increase during transit.

### Women's Services for RTU-5 and Division Five

Cermak Health Services of Cook County provides psychiatric services to the mix of P3, P2, and SMU populations on the 5th floor of RTU and Division Five. The P-3 detainees are housed on 5-B and 5-F. The P-2 detainees are housed on 5-D, 5-G, and 5-H. SMU (Special Management Unit) detainees are housed on 5-A and Protective Custody detainees on 5-E. The detox units are designated 5-D and 5-H. All of the pregnant and post-partum females in the institution are housed on 5-C. Dr. Kaniuk is the Unit Director of RTU-5 and Division Five. In addition to psychiatry and psychology staff, there are 15 employees assigned to the two female divisions, including mental health specialists, medical social workers, and an expressive therapist. At times, there is an issue with space during the morning shift (on Tuesdays, Wednesdays, and Thursdays) in RTU, when interview rooms and/or computers are not available. Also, employees are occasionally reassigned to other clinical areas which impacts programming.

Division Five houses P-2 (87 as of April 4, 2018) detainees in a celled setting, on five tiers (5-D, 5-E, 5-F, 5-L, and 5-M), as well as general population and M-2 detainees. Division Five is staffed with one mental health specialist who completes mental health clinic (Monday through Thursday mornings) and evaluations (IAHI and HSRF). Groups are not being conducted at this point due to lack of space. There are approximately 29 P-2 (as of April 4, 2018) detainees enrolled in the THRIVE (Women's Residential) Program (court ordered), which is facilitated by the CCSO's Office of Programmatic Services and the Office of Mental Health and Advocacy. There are a small number of P-3 detainees being transferred from RTU on a daily basis to attend group in the THRIVE Program. Enrichment programs have been implemented for P2 and GP patients (book club, theater group, yoga, legal aid, knitting, painting, literacy, pride group, substance abuse). Superintendent Yoksoulian has been instrumental in improving multidisciplinary communications and increasing enrichment programs. The importance of sharing the same workload against the challenges of not sharing the same EMR remains a challenge. Mutual roles and expectations are in the process of being defined. Agreements have been confirmed in terms of access to the "Health Service Request Form" (HSRF) process, along with routine and emergent services provided by Cermak Health Services staff. Also, there can be some confusion at times regarding who is providing linkage-re-entry services. In general, mental health staff have a good working relationship with security in both RTU-5 and Division

Appendix IV
The Agreed Order Status Update
Page 8 of 27

Five.  Supt. Yoksoulian is open to the concerns of mental health.  There are bi-weekly divisional meetings to discuss any concerns.

*RTU Housing –* There are 92 P-3 detainees and 94 P-2 detainees housed on RTU-5 (as of April 4, 2018).  Most of the P-3 detainees are housed on 5-B and 5-F.  Patients seem to generally prefer dorm housing.  Housing units in RTU are being regularly power washed.  No recent temperature complaints have been raised.  Access to hygiene products and undergarments is reported to be consistent.  CCDOC assumes responsibility for distribution of hygiene products to all patients in RTU, including P-3 level of care.  Ongoing religious services are provided and CCDOC provides weekly enrichment groups for P2 patients.  There is a Mental Health Therapeutic Library to allow patients access to books to utilize as a coping skill.

*P3 intermediate MH groups –* Each mental health worker assigned to a tier (5-B and 5-F) run three groups daily (Rise and Shine and two therapeutic groups) in the mornings (five days weekly) and three groups (five days weekly) in the evening (two therapeutic groups and medication pass observation).  Another mental health worker runs groups on 5-C, 5-D, and 5-H on a weekly basis, where most of the P-2 detainees are housed.  A CQI study was conducted for the months from October2017 through March 2018, in order to learn how many detainees were receiving group attendance certificates in 5-B and 5-F, the main P-3 tiers.  The data includes:

| | | |
|---|---|---|
| October 2017 | B = 18 (46% of tier census) | F = 10 (26% of tier census) |
| November 2017 | B = 17 (44%) | F = 11 (28%) |
| December 2017 | B = 14 (36%) | F = 13 (33%) |
| January 2018 | B = 5   (13%) | F = 5   (13%) |
| February 2018 | B = 11  (28%) | F = 12 (31%) |
| March 2018 | B = 16 (41%) | F = 22 (56%) |

According to an audit conducted from October 2017-March 2018, the numbers of detainees who were receiving a letter has been decreasing, though there was a significant increase in March 2018.  The decrease is due partly to transfers on and off the tier.  The plan to increase group participation is as follows:

1.  Emphasize the importance of group therapy to the mental health staff during individual and group supervision.
2.  Mental health staff will emphasize the importance of group therapy in community groups on the tier.
3.  Mental health staff will use different materials (especially evidence-based), topics, and formats to enhance the group experience.
4.  Mental health staff will meet with detainees who frequently refuse to attend groups.
5.  Mental health staff will discuss group therapy with new detainees who enter the tier, and in individual sessions.

*Special Management Unit (SMU) and Protective Custody –* Mental health rounds are completed once per week on each tier.  Patients are assessed by MH within 24 hours of placement in the

Appendix IV
The Agreed Order Status Update
Page 9 of 27

SMU (5-A). The number of detainees brought for an evaluation before entering SMU housing is as follows:

| October 2017 | 88% (37/42) |
| November 2017 | 84% (37/44) |
| December 2017 | 78% (38/49) |
| January 2018 | 90% (27/30) |
| February 2018 | 95% (35/37) |
| March 2018 | 77% (34/44) |

Command staff is reminded at bi-weekly divisional meeting about the need for an evaluation prior to entering SMU housing. SMU and PC (5-E) are assigned a mental health specialist. SMU and PC patients receive approximately ten hours of mental health groups per week. Long term P3 patients receive a monthly individual therapy session and treatment planning.

A CQI study was conducted in March 2018 regarding the average length of stay in SMU (5-A) for detainees with various designations: P3, P2, M3, and GP.

*Treatment Plans* – Patients meet with their tier mental health specialist to create a "treatment goal list." Each P3 patient is discussed in MDT staffing on a regular basis. Both the patients and the entire treatment team are involved in the treatment planning process, resulting in individualized treatment plans for each P3 patient. A CQI project was conducted on the roster of patients housed in RTU-5 on March 28, 2018. 99% of the P3 treatment plans were initiated within the first thirty days and 94% were updated every 90 days thereafter. The quality of treatment plans has remained consistent. There are challenges when patients move to another tier on the floor because it is unclear who will complete the treatment plan. Outpatient (P2) treatment plans are created by the treating psychiatrist during clinic appointments.

*Outpatient mental health (P2) Treatment Groups/ Community Groups*- P-2 detainees in RTU-5 receive groups approximately four times (or more) per month (C-House, D-House, G-House, and H-House). P3 pregnant patients on C-House receive monthly individual mental health contacts.

*Health Service Requests* - Patients are seen face to face within 24 hours if HSR if urgent and within 14 calendar days if HSR is non-urgent. Patients sometimes abuse the HSR process by submitting multiple requests within a short period of time. Many of these requests relate to psychotropic medications and sleep disturbance. These issues are addressed at community groups and individual HSRF/IAHI evaluations in order to educate the patients about the process and to increase coping skill behavioral repertoire.

*Mental Health and Psychology Clinic* – Some P3 and P2 patients receive individual therapy services in RTU and in Div. 5 for more personalized treatment.

*Mental Health Evaluations* – The RTU provides 24-hour coverage for on-site mental health evaluations (IAHI) and consultation. We are trying to improve consultation with CCDOC to

Appendix IV
The Agreed Order Status Update
Page 10 of 27

refer appropriate mental health evaluations according to policy (emergent issues, use of force, placement in special management unit, and suspected or confirmed physical or sexual abuse). The unit director brings up any salient issues with CCDOC command staff at the bi-weekly divisional meetings.

_Individual Contacts_ – Each P3 patient is assigned to meet with her tier mental health specialist monthly for an individual mental health contact. One challenge in the consistency of these sessions has been security moving patients to different tiers.

_Linkage and Expressive Arts_ - We continue to focus expressive arts on P-3 detainees. There is a full-time expressive therapist assigned to RTU-5. Linkage services and discharge medications are provided for P-2 and P-3 patients by two medical social workers.

_Hygiene_ – Hygiene is an ongoing concern with P-3 patients. Rise and shine program occurs five days per week on 5-B and 5-F. Patients displaying ongoing, serious hygiene concerns (generally psychotic) are discussed in MDT clinical staffing and if necessary, are admitted to the psychiatric special care unit (PSCU) for increased support and/or a humanitarian shower.

_Self-Harm_ – Womens' Services has a very low self-harm rate. Self-injuries that do occur are often by detainees housed in segregation. Some of these injuries occur in order to get transferred to another tier.

**Additional Challenges:**

_Groups in RTU_—Mental Health Divisional leadership continues to notify DOC Divisional leadership, when necessary, when groups are delayed due to officers' availability.

_Mental Health Evaluations Prior to Entering SMU Housing_-- The Unit Director will continue to remind command staff in RTU and Division Five about the need for a mental health evaluation before entering SMU housing.

_Housing in Division Five_--It would be most efficient for mental health service delivery if the P-2 detainees could be housed together. Currently, they are scattered among approximately five tiers.

_Groups in Division Five_-We have not started groups in Division Five due to lack of space. Sunday is the ideal day for groups to occur because there is no mental health clinic scheduled. The unit director continues to work with Supt. Yoksoulian to find open times.

_Abusing/Refusing Medications_ -– Nursing staff, mental health staff, and correctional staff work together to try to monitor the dispensation of medication. The psychiatrist is informed whenever patients consistently refuse their medications.

**RTU Male Services**

Patients receiving Intermediate Level of Care (P3) are housed on the second, third and fourth floor of the Residential Treatment Unit (RTU) building. Mental health services in Male RTU have maintained productivity over the last six months. A designated psychologist unit director (Dr. Sillitti) and psychiatry provider (Dr. Howard) exists to provide administrative oversight and psychiatric care for the IMU population (see section on IMU for further detail). Dr. Waxler became the Unit Director of RTU male services in June 2017 and coordinates mental health services for males housed in the RTU.

RTU Male Services continues to focus on maintaining programming hours offered for P3 detainees, expanding services to the protective custody and SMU tiers, maintaining compliance with treatment plan timelines for intermediate care, addressing P3 overflow, and coordinating with CCDOC to minimize group cancellations. The following overview provides a summary of these efforts.

RTU male services currently has eleven MHS III staff and one MHS II staff. One position remains vacant due to the illness and extended recovery of one MHS. Based on current staffing and required programming for the ten aforementioned tiers, RTU detainees are provided access to at least 10 hours of group therapy sessions per patient per week. Please see MH CQI section of this report for detailed data on monthly offered programming totals. Detainees attend the following core groups by bed number: Emotional Management, Interpersonal Skills, and Problem Solving. These sessions review relevant skills for all detainees in intermediate care. Voluntary groups are also offered to address the individual needs of patients. MH staff meet individually with detainees for orientation upon their admission to RTU to discuss the treatment program, review behavioral expectations, and identify treatment goals. At that time, detainees rank order their preferences for voluntary groups and are included in those sessions. The orientation document is used to generate each patient's individualized treatment plan.

Mental health staff absences and safety-related concerns remain the predominant reasons for group cancellations. Scheduled programming hours will continue to increase for intermediate care with the addition of mental health specialists, particularly when the IMU program gains a separate and dedicated staff. CCDOC and mental health teams continue to collaborate closely to address the most significant obstacles to group programming. The joint schedule that was developed prior to the last DOJ visit to account for group programming as well as recreation continues to be followed and group programming is rarely cancelled due to scheduling conflicts, such as barber shop or recreation.

The two most common reasons for a cancelled groups continue to be: 1) MHS staff duty conflict, and 2) lack of CCDOC officers. MHS staff duty conflicts occur for a range of reasons, despite careful planning and attention to detail in the creation of each MHS' daily schedule. RTU is a dynamic treatment environment, and staff often have to prioritize competing clinical responsibilities, such as providing a mental health assessment to a patient in crisis instead of conducting a group session. The expectations of availability of CCDOC officers to monitor on tier structured therapeutic activity is defined as one officer on tier and one officer directly outside the tier.. Further, in order to conduct an off-tier group, there needs to be an officer present to

monitor the group outside of the group room. Since the previous DOJ visit the officer schedule has changed on the fourth floor to 12-hour shifts which appears to provide greater availability of supervision. Since the last visit, the number of offered group hours continues to be above the required 10 hours per patient per week (see attached MH CQI for detailed data on group cancellations).

Programming on the Protective Custody tier (4E) continues to be well received by detainees. MH staff generally provide on-tier sessions, but have conducted off tier groups when space is available and CCDOC approves movement. Initially, medium and maximum detainees were being seen more frequently due to the timing of the groups and "hours out" for those classifications. After realizing this disparity, MH staff have put forth increased effort to coordinate with tier officers and provide equal opportunity for minimum status detainees. Apart from staff absences, the most frequent barrier to programming on this tier has been staff attention to other clinical duties including mental health clinic, interagency evaluations, crisis intervention, and health service request forms. Programming on 4E will increase as mental health staff are added to the team.

There continues to be more P3 patients than available bed space on the Fourth Floor of RTU. P3 patients who are not on the Fourth Floor are considered "P3 overflow." Generally, these are new patients who are waiting for bed space to open on the main treatment tiers. Assigned MH staff conduct weekly rounds as well as community meetings for P3 patients on the second and third floor. Patients are consistently reminded in these meetings to utilize Health Service Request Forms (HSRF's) in order to access mental health services while on the second or third floor. A standing item on the weekly MDT agenda is to discuss P3 overflow patients. This discussion is geared toward assessing whether there are patients that would benefit from the additional monitoring and access to mental health staff on the fourth floor. The length of stay in "overflow" status averages less than 1 week.

The Special Management Unit (SMU) has posed the greatest challenge for group programming. Whereas Division 8 previously allotted two tiers (3A and 4A) for disciplinary housing, all males in RTU currently serve disciplinary time on 4A. Consequently, detainees who are general population and/or P2 level of care complete disciplinary time on the same unit with detainees in intermediate care. Groups have been repeatedly cancelled as a result of unsafe detainee behaviors, as tier officers needed to respond to the situations or lock down the unit. Other institutional factors contributing to group cancellations on this tier have included a lack of handcuffs, conflicts with "hours out," and medication pass. These issues continue to be discussed in interagency meetings, where potential solutions are considered. CCDOC recommended the installation of rings to the bullpen in order for the space to become a viable option for group sessions. MH staff continue to collaborate with nursing and tier officers to avoid scheduling conflicts.

Treatment verification letters continue to serve as an incentive for participants. The criteria for earning a treatment verification letter was modified in August 2017 from requiring patients to attend at least 75% of their groups to requiring patients to participate in the recommended

Appendix IV
The Agreed Order Status Update
Page 13 of 27

clinical services outlined in their individual treatment plan. For P3 patients, this equates to 10 hours of clinical programming per week. The percentage of patients earning treatment verification letters has remained consistently above 30% over the past six months (see the attached CQI for Treatment Verification Letters).

In terms of treatment plans, each dorm has an assigned MHS III who conducts a core group for the tier and develops a 30-day treatment plan based upon the detainees' mental health diagnosis and self-report during the initial orientation session. The mental health team then aims to review the treatment plan within 90 days to discuss patient progress, clinical concerns, and recommendations for level of care. Weekly multidisciplinary (MDT) meetings are held on both day and evening shifts to facilitate team collaboration on treatment plans. Oftentimes, the number of people reviewed during the MDT does not allow time for direct contact with detainees discussed.

Each tier has an assigned MHS III that has time built into their weekly schedule to monitor, review, and update individual treatment plans on their assigned tier. Compliance with both 30-day and 90-day P3 treatment plans has been improved since the last DOJ reporting period (see attached CQI for Treatment Plan Compliance). The MH team will continue to monitor and complete treatment plans within specified periods.

Treatment plan review during weekly MDT meetings serves as the primary method by which the team monitors the P3 population in attempt to reduce overflow on other floors. Each week, MH staff place names on the MDT list for review due to an upcoming treatment plan revision or due to the patient's clinical presentation during treatment sessions. All detainees in SMU, PC, and overflow units are reviewed briefly to alert the team of clinical concerns. In addition, the team typically identifies an average of 10 to 15 individuals who are stable for outpatient care each week. MH staff observe many detainees to be highly motivated to remain in the dorm setting. Currently, CCDOC does not have dorm housing for P2/Maximum detainees. As a result, a portion of detainees often attempt to obtain preferential housing in RTU by exaggerating symptoms, requesting mental health treatment, and /or engaging in problematic behaviors.

In January 2017, Cermak administration proposed a therapeutic tier in Division 10 to provide additional support and monitoring for P2/Maximum and Medium detainees. The tier was approved to be started in mid-March 2017. The addition of this tier has increased mental health services for higher functioning detainees while decreasing the number of patients who intentionally return to intermediate care. In September of 2017 a similar programming tier was opened in Division 6 for P2/Minimum detainees. Patients identified as stable for P2 level of care, but appropriate for continued access to programming services are referred to either program depending on security classification.

Goals for the next six months in RTU Male include: 1) maintain more than 10 hours of offered programming services per patient per week, 2) maintain percentage of treatment plan compliance above 90%, 3) continue to monitor and increase percentage of patients earning treatment verification letters, and 4) maintain compliance with HSRF response.

## Intensive Management Unit

The Intensive Management Unit (IMU) remains on the second floor of RTU (tier 2A).  This specialized program was initially designed at the recommendation of DOJ to provide increased structure and support for mentally ill detainees who have demonstrated significant problems in their functioning.  The IMU tier houses a maximum of 10 detainees, each of whom reside in a single cell and are encouraged to progress through three successive phases (Assessment and Admission Phase-minimum 2 weeks; Stage 1- minimum 4 weeks; and Stage 2-minimum 4 weeks).  Following team discussion, a 4th Phase (Residential) was introduced to accommodate program graduates who would likely deteriorate in a less structured setting.  All of the detainees selected for the program thus far have had significant difficulty maintaining safe behavior in other divisions.  Oftentimes, detainees are referred to the IMU program due to their ongoing behavioral problems despite repeated transfers between divisions and/or levels of care.  Behavioral problems prompting admission to IMU include aggression against self or others, property damage, sexual misconduct, threats of harm, noncompliance, coprophagia, insertion of foreign objects, and ingestion of foreign objects.  In the past, the Unit Director and at least one member from CCDOC leadership interviewed prospective detainees prior to admission.  Coordinating schedules for the interviews and discussing patients' subsequent team meetings occasionally caused delay.  The team therefore decided to admit detainees immediately after initial discussion, with close monitoring during the two-week Assessment and Admission Stage.

At the time of their intake to the IMU program, detainees are presented with initial behavioral plans.  Treatment and behavioral expectations of the program are reviewed as well as projected dates of potential advancement through stages.  Historically, participants are informed that completion of the program could result in absolution of segregation time for previous disciplinary tickets.  Currently, this incentive is being reviewed by the team, as DOC partners expressed concern about mitigating sanctions for previous staff assaults.  Many of the detainees admitted to the IMU have history of staff assaults, which ultimately contributed to their referrals to the program.  The IMU team supports disciplinary action for harm to staff, yet recognizes the potential impact that changes or elimination of incentives may have upon participants.  In particular, some detainees admittedly lose motivation to comply with behavioral expectations in CCDOC after accruing months or years of disciplinary time in Special Management Units.  The prospect of starting with a "clean slate" upon completion of the IMU program seemed to encourage cooperation and advancement amongst participants with extensive behavioral problems.  CCDOC leadership has indicated that they are open to reviewing each participant on a case by case basis and counting any time spent in the IMU program towards accumulated SMU time.

Since October of 2017, the IMU team has admitted sixteen detainees, nine of whom are currently participating on the program.  Two of those participants were readmitted to the IMU, one of whom graduated in the past.  This detainee resumed self-injurious threats and gestures while housed in maximum divisions and was recommended for return to IMU after his admission to Cermak.  The other participant who was readmitted was referred following stabilization on Cermak 2S.  Four of the detainees admitted since October, including the previous graduate, were

discharged from IMU prior to completion of the program. The majority of these detainees were referred from Divisions 9 and 10 for significant behavioral problems. During the course of their participation, these individuals were observed by security and mental health staff to engage in predatory behaviors towards lower functioning detainees. Per tier officers, some of the more vulnerable participants began refusing groups and day room time in order to avoid interaction with the higher functioning detainees. The team ultimately agreed to discharge the four detainees, as their behaviors were interfering with the progress and treatment of others. Nevertheless, many of those higher functioning detainees had demonstrated improvement in their behavior. Namely, they collectively exhibited reduction in overt aggression and dangerous incidents, which originally contributed to their placement on IMU. Although these detainees displayed more characterological pathology, they did respond to the structure and support of the program. However, their antisocial behaviors could not be managed on a unit with seriously mentally ill patients. Consequently, the team recommended the reconsideration of a separate behavioral unit for higher functioning detainees with histories of functional impairment. This proposal was subsequently discussed during interagency collaboration.

With respect to programming, detainees continue to participate in group sessions largely focused upon problem solving skills, emotional management, communication, and art therapy. The current schedule provides approximately fourteen hours of programming per week. When the census on the tier is above six, the detainees are offered group according to their stages as the unit only has individual seating for six detainees. Although multiple participants have been placed at the same table on occasion, MH staff and tier officers allow this arrangement with caution to minimize potential for aggression (spitting, kicking, etc). The team has reviewed options for additional seating on the unit in the MDT meetings.

In accordance with previous reports, the most common interruptions to group programming on IMU involve staff absences (both planned and unplanned), overflow detainees, shortage of handcuffs, and environmental issues (flooding, plumbing, etc). Although two additional staff were added to 3 to 11 shift, the minimum/medium P2 clinical team frequently offers coverage for other areas on the compound when needed. As a result, MH staff assigned to IMU were often pulled from group sessions due to institutional need. In effort to resolve this issue, Cermak administration added overtime positions for the IMU program in March of 2018. This assistance helped to maintain consistency of programming over the past month. Based upon projected assignments, the IMU will have increased staff by May of 2018.

Following the addition of two mental health staff, the IMU program began offering weekly individual sessions to participants in November of 2017. Each detainee is assigned to a mental health specialist, who typically utilizes the nurses' station on the unit to conduct individual sessions. The IMU team and participants identify treatment goals for the focus of these sessions. In addition, detainees utilize sessions to complete "Resiliency Plans," which outline specific sections to be completed for advancement to the next stage. To illustrate, detainees in the Assessment and Admission Stage must successfully complete a safety plan identifying "warning signs" for problematic behaviors and potential copings skills or self-statements they can use to self-soothe. Participants in Stage 1 complete Anger Management and Emotional Management

Plans whereas Stage 2 participants are encouraged to apply cognitive behavioral skills they have reviewed in group and individual sessions. The sections of the plan are reviewed by the team in weekly multidisciplinary meetings and must be approved in order for the detainee to progress to the next stage. Detainees are encouraged to share portions of their Resiliency Plan at the time of their graduation. Participants in the Residential Stage must complete "Transition Plans" to identify the triggers they may encounter and coping skills they can realistically implement in other housing environments. The Transition Plan was developed by the clinical team to better prepare graduates for less restrictive settings. At the time of graduation, participants continue to receive certificates of completion and Behavioral Custody Letters. In addition, the team began encouraging periodic use of "affirmation cards" during group and individual sessions. These cards are randomly used by program participants, mental health staff, and tier officers to recognize positive actions or attributes of detainees. The affirmation cards are compiled during the course of a detainee's participation and are given to him at the time of graduation. Six detainees have successfully completed the program since October of 2017 and have expressed appreciation for the "graduation folder" with the certificate, Behavioral Custody Letter, and affirmation cards. The team recently received approval to create a mural on the wall and has discussed the possibility of incorporating a ritual for each IMU graduate to add to the mural upon completion of the program.

The treatment team continues to meet weekly in multidisciplinary team (MDT) staffings to review patient progress and to discuss relevant tier issues. In March of 2018, many of the officers originally selected for the IMU program were removed from the tier due to changes in the shift assignments within RTU. These changes initially caused significant anxiety amongst IMU participants and mental health staff. However, the unit has benefitted from the consistency of officers assigned to 12 hour shifts. The team seems to communicate more effectively with only two shifts per day for both security and mental health staff. Moreover, the CCDOC assignments allow for three officers on the tier, which increases safety as well as the potential for detainee movement to the patio or the 4th floor when necessary. Tier officers are now able to join weekly meetings with mental health staff to provide input and observations from security. To illustrate, officer feedback helped to influence recent adjustments to commissary distribution and development of electronic folders on the tier for daily checklists, treatment plans, and detainee status changes. Immediately following the weekly staffing, available team members meet with some or all detainees on the tier to review their weekly participation in the program. Team members will continue to focus upon improving the format and use of treatment plans to include communication of treatment goals, identifiable triggers, detainee strengths, and effective strategies or statements to encourage patient progress.

Although the placement of overflow detainees on the unit has remained challenging at times, the team has put forth effort to keep at least seven or eight participants in the program to minimize problems. In recent months, the team has focused upon admitting detainees who are seriously mentally ill as opposed to detainees with functional impairments related to character pathology and behavioral misconduct. As noted earlier, the milieu is negatively impacted when higher functioning detainees take advantage of more vulnerable participants. Additionally, higher functioning detainees who advance in the program have limited housing options upon

graduation.  The therapeutic tier in Division 10 offers the type of structure and support that could facilitate ongoing compliance amongst many of these detainees; however, there are no other options for maximum P2 detainees who are not eligible for the therapeutic tier due to previous behavioral issues (i.e. having a green jumpsuit for prior sexual misconduct).   In the past, some of the higher functioning detainees have remained in the residential stage for an extended period of time while the team seeks optimal housing.  Mental health staff and tier officers observe that higher functioning participants are prone to exhibit increased entitlement and decreased motivation with prolonged placements in the residential stage.  For these combined reasons, the team agreed to focus upon IMU referrals of SMI patients from RTU and Cermak in the future.

## Division 4 (minimum and medium security)

Division Two, Dorm Two was closed in November of 2017.  Transitioning from dorm tiers to a cell setting was particularly challenging for detainees, many of whom had been residing in Dorm Two for extended periods of time.  Requests for emergency evaluations increased significantly for several months.  Initially, MH staff attempted to maintain presence on the tiers to facilitate detainee adjustment.  Specifically, community groups were scheduled for on tier sessions, similar in format to those conducted in Division Two.  However, following several safety incidents, the MH team advocated to conduct off tier group sessions.  Securing officers to supervise group sessions was difficult, yet gradually became more feasible with continued communication and collaboration with CCDOC.

Although the relocation to Division Four was challenging in many aspects, the building offered increased options for programming space.  In particular, one room on the second floor was secured for off tier art therapy sessions.  The excess furniture in the room was removed over the first few weeks, allowing the space to open for group sessions in January of 2018.  At that time, all eight tiers were scheduled for at least one week ly on tier or off tier group session as well as one off tier art therapy session per week.  The MH team in Division Four has been able to consistently offer on tier and off tier group sessions despite occasional interruptions due to safety issues, staff absences, and DOC related issues.  The majority of group cancellations have been due to detainee refusals when commissary or recreation are simultaneously offered during scheduled group times.  The MH team worked to communicate and resolve these conflicts in real time whenever possible.

Apart from on tier group sessions, MH staff meet with detainees individually during MH clinics, to address HSRF's, and for crisis intervention.  The clinical team agreed to identify and closely monitor patients with increased clinical need.  Those detainees are referred for weekly or biweekly individual sessions with MH staff for additional support.

In March of 2018, CCDOC announced the impending closing of Division Four.  Adjustments in staff schedules have been made to address population changes between Divisions Four and Six.

## Division 6/Minimum and medium security

Appendix IV
The Agreed Order Status Update
Page 18 of 27

Division Six houses P2 patients, along with GP (General Population) detainees.  In the past, three tiers were dedicated for Protective Custody (PC) housing while one tier was designated for a Special Management Unit (SMU).  The SMU tier was removed from the building prior to October of 2017 and the PC tiers were consolidated to a single tier, which was moved from the division in March of 2018.  Other tiers in the building are designated for the Westcare substance abuse program, the school PACE program, the Mental Health Transition Center (MHTC) program, the SAVE program, and the VRIG boot camp program.

In June of 2017, approximately 230 P2 detainees were housed in over twenty different dorms throughout the building.  All tiers were primarily populated with general population detainees, with less than twenty P2 detainees on each tier.  Two MH staff were assigned to the building on the 3 to 11 shift, with one staff scheduled to conduct approximately six on tier community meetings for P2 detainees each week.  As noted in the previous summary, mental health staff expressed concern about the effectiveness of these group sessions due to the chaotic environment of the mixed P2/GP tiers.  Consequently, the mental health team collaborated with CCDOC and volunteer programing to secure officers and room space for off tier group programming in Division 6.  At the present time, there are 350 P2 detainees residing in twenty one dorms in the division.  Mental health staff are now scheduled to provide fifteen off tier group sessions per week, primarily during the evening shift.  Dorms with fewer than 10 P2 detainees are combined in a single group session so that all tiers are offered the opportunity to attend weekly groups.  MH staff are instructed to offer group sessions to all P2 detainees within the course of a month.  However, staff report that many tiers have the same volunteers opting for group sessions while others refuse.

A therapeutic tier in Division Six was developed to provide increased support for P2 detainees who either request or are referred by mental health and security staff for increased support.  This tier is one of four predominantly P2 tiers in Division 6.  A referral list was created on Cerner for unit directors and psychiatrists to refer potential candidates to the therapeutic tier.  Those detainees are provided with written guidelines and questions to assess their appropriateness for the tier.  In general, the team approves of detainees who are interested in attending group sessions and have minimal behavioral problems.  P2 overflow placed on the unit by CCDOC are similarly assessed to determine if they should remain on the tier.  General population overflow are removed via daily or weekly requests to CCDOC and Cermak Bed Control.  Mental health staff attempt to identify and remove problematic detainees as soon as possible to maintain the integrity of the tier.  Currently, the therapeutic tier is scheduled for six on tier/off tier groups per week given current staffing and space issues.  Detainees on the therapeutic tier have requested additional on tier and off tier programming throughout the week.  In part, many of the participants are interested in remaining active and occupied throughout the day.  The detainees are also motivated to receive treatment verification letters, which are currently offered every three months.  The tier has partially advocated for increased programming in effort to obtain letters more frequently.  Additional mental health staff may become available to Division Six with the closing of Division Four.  At that time, the therapeutic tier may gain dedicated staff, who can provide more group sessions on both shifts.  Overall, the tier has had minimal behavioral incidents and has expressed appreciation for the safe community they have been able

to create.  A few altercations occurred when detainees were predatory toward others or involved in gang affiliated activities.  Mental health and CCDOC staff collaborated to remove noncompliant individuals as quickly as possible.

Two to three mental health specialists are assigned to Division Six on the 3 to 11 shift throughout the week.  At times, mental health specialists assigned for group programming to both P2 and therapeutic tiers often have to delay or cancel groups in order to complete Interagency evaluations or emergency Health Service Request Forms (HSRF's).  Other interruptions to group programming include: DOC related issues (no available officer, limited movement), mental health staff being pulled to other divisions, and conflicts arising with room or group space.  As mentioned earlier, mental health staff share allotted spaces with volunteer and religious services.  If a mental health staff starts group later than anticipated due to clinical duties or department meetings, the designated room may no longer be available for all group sessions scheduled.  Although the transfer of mental health staff from Division Four to Division Six will be beneficial, securing space for groups, mental health clinics, and documentation will be challenging.  Cermak administration and CCDOC leadership have consulted to determine potential options to address the increased mental health staffing needed in Division 6. Two-day shift mental health staff are projected to begin in Division 6 and IMU at the end of April.  These staff will help to reduce the burden placed on evening shift and will assist with group programming.  The MH team will continue to improve the consistency of group programming as space issues are resolved.

Apart from group sessions, MH staff meet with detainees individually to address HSRF's, during scheduled clinics (Sunday through Thursday evenings), and for crisis intervention.  Movement in the dispensary area can be challenging at times due to CCDOC staffing, unplanned behavioral incidents, and the volume of detainees being seen by multiple disciplines.  Despite these challenges, MH staff report strong support from officers in the dispensary who help to facilitate access to patient care.

### Division 9/10: Maximum security outpatient

Since the last summary the following services continue to be provided by Mental Health Specialists and one psychologist on Division 9 and Division 10, Maximum Security P2 housing: evaluations for mental health conditions, psychological evaluations and assessments for suicidal risks and assessments of detainees to determine if there are concerns regarding placement in Special Management Units by CCDOC. This clinical team also provides therapeutic services which includes mental health specialist clinics, group therapy, treatment plans, community meetings, weekly Special Management Unit Rounds, crisis intervention and processing of detainees mental health needs submitted via Health Service Requests and Inter-Agency Health Inquiries forms.

Division 9 has one MHS on the am shift, (7 am -3 pm) and two on the 3-11 pm shift. They provide services to 24 Tiers. Currently, there are six Mental Health Specialists in Division 10, four on the 7 am -3 pm shift and two on the 3 pm -11 pm shift. They provide services to 16 Tiers.

Appendix IV
The Agreed Order Status Update
Page 20 of 27

Services on the 11p-7a shift are provided by the Urgent care staff.

Accomplishments are reflected in weekly provision of the above listed services and weekly clinics. Mental Health Specialist Clinics six days per week in Division 10 and seven days per week in Division 9, Psychology Clinics are conducted on Mondays in Division 9 and on Tuesdays in Division 10.

Groups for SMU detainees on Division 9/1E are conducted weekly by Psychologists, Dr. Briney (twice per month) and Dr. Augustine who assumed responsibility for Dr. Waxler's group twice per month.

Groups/Community Meetings: Since the last summary, October 2017, Mental Health staff continues to provide weekly groups to detainees on all Tiers in Division 10.  Almost 300 groups were held from November 2017 to March 2018 reflecting 6,000 patient contacts in groups. Additionally, Mental Health staff began offering an evening shift group twice per month in Division 9 by the assigned mental health specialist.

In Division 9 there has been improvement in the challenge of access to Mental Health care. The electronic movement system for clinic appointments that was implemented on April 3rd,  2017 has resulted in improved access to care.

Mental Health leadership and staff established a Therapeutic Tier in Division 10 on March 21st, 2017.  One Mental Health Specialist from the am shift on Division 10 has primary assignment for the Therapeutic Tier, 2B Division. The psychologist coordinates with other mental health specialist staff and other providers to schedule, facilitate and enhance services to the Therapeutic Tier. In the Appendix is a program schedule, a summary of the one year data for detainees' disciplinary tickets and self-injury pre and during their stay on the Therapeutic Tier and a one year patient satisfaction survey completed by detainees.

The detainees on the Therapeutic Tier, "Phoenix Rising", (the participants selected the name Phoenix Rising for the Tier to capture the essence of their commitment "We will rise up and make a change") completed a one year survey on March 21st, 2018.  The results indicate that the majority of participants who were on the Tier at the time of the survey 41/45, 91.1% are very satisfied with the Tier and programs offered. Three detainees were somewhat satisfied 6.7% and 1 was neutral, 2.2%.  The three detainees who were somewhat satisfied listed the following reasons: one was on the Tier for only one month, one wanted substance abuse and creative writing groups and one stated "It's what I signed up for its what I expected".  The one neutral result was only on the Tier for days. The detainees also provided feedback on Yoga and indicated that participating has aided with sleep and bodily aches. Services on the Therapeutic Tier have also been enhanced by TV/DVD which allows therapeutic movies, videos, multi-modal presentation of educational information on mental illness, medication management, etc.

Challenges:

The following challenges continue to impact the delivery of Mental Health services on Divisions 9 and 10:
In Division 9 there has been significant improvement toward achieving 100% compliance in seeing detainees who are placed in Special Management Units (SMU) by CCDOC. From previous percentages of 60's and 70's, since October 2017 compliance has been above 80%: October 83%, November 89%, December 95%, January 96%, February 92% and March 96%. The following factors currently impact 100% compliance:  MHS staff are not always informed in real time when a detainee is being placed in SMU or when the detainee is removed and returned after 30 days/24 hours out compliance, detainees are not referred when they are returned from outlying counties and hospitals and wrong DOC ID #.

In regards to the Therapeutic Tier in Division 10 the following challenges continue:
- Consistency of officers Potential disruption by non-program detainees placed as overflow housing on the Tier (disrupts Tier, at times results incidents)
- Detainees admitted to the program waiting for available bed space at times refuse because of adjustment to their temporary placement.

Recommendations:
An increase in staff will help to enhance provision of mental health services in Divisions 9 and 10. There is a need for one additional am Shift (7am-3pm) staff in Division 9 to ensure coverage.  There is also a need for one additional am shift MHS on Division 10 to assist with providing Groups/Community Meetings to all 16 Tiers. (Currently, the psychologist shares the responsibility for the Tiers with three am MHS). The current risk posed by the close proximity of staff to patient in Division 10 dispensary's MH office can be minimized when a more appropriate office space is identified.

**April 2018 Metzner assessment:** The recent changes in the various Divisions are well summarized in the Cermak status update section. Mental health caseload inmates in Division IV will soon be transferred to Divisions VI and X. Most of the female mental health caseload inmates in Division V are part of the Thrive program, which is a court mandated substance abuse treatment program provided by mental health staff employed by the Sheriff's Office. Since the November 2017 site visit, another "therapeutic tier", which essentially serves as a transition unit for P3 inmates discharged from the RTU, has been opened in Division VI.

The small percentage of mental health caseload inmates in the SMU is very encouraging, which appears to be a result of a number of factors that include the mental health input process into the disciplinary process, good working relationships between custody and mental health staffs and training/experience of the custody staff re: mental health issues. Equally encouraging is the short length of stay for mental health caseload inmates in a SMU setting.

The IMU concept has been successfully implemented, which is another reflection of the good working relationship between custody and mental health staffs. At times, programming has been disruptive due to non-caseload inmates being admitted to the IMU due to reported bed space

Appendix IV
The Agreed Order Status Update
Page 22 of 27

issues within the compound. It is strongly recommended that only mental health caseload inmates requiring placement in the IMU be admitted to this housing unit.

During the afternoon of April 30, 2018, I met with inmates in a community-like setting in units 5B (female minimum-medium security), 5F (female medium-maximum-security), 5D (male medium-maximum-security) and 4C male-medium security). Female inmates uniformly described access to at least 10 hours per week of out of cell structured therapeutic activities, which they described as being very helpful. They had numerous complaints regarding conditions of confinement (e.g., lack of jobs, complaints about the food, and maintenance issues in the bathroom). The women did not verbalize specific complaints regarding custody staff.

The male inmates complained not only about conditions of confinement but the quantity and quality of the out of cell structured therapeutic activities being offered to them. The male inmates did have complaints regarding interactions with various custody staff in the context of not being respected.

Both male and female inmates indicated that continuity of medications (i.e., medications were received in a timely manner once prescribed) was not an issue. Many inmates indicated that the sick call process did not work well.

Custody leadership confirmed that maintenance issues were not being addressed in a timely fashion by the Facilities Division.

The indoor/outdoor patios have recently been winterized. Inmates were reported to have access to the patios on a twice per week basis. Basketball hoops have been installed within the patios.

Inmates were not present during treatment planning team meetings. Discussion with key staff indicated that 3 to 8 minutes per patient were allotted for treatment plan development. A large number of inmates reported not being able to describe their treatment plan.

Although substantial compliance has been present for at least 18 months, I have significant concerns regarding the treatment planning process. Treatment planning per inmate requires 15-30 minutes per inmate in order to ensure an adequate treatment planning process. Inmates should be invited to attend part of the treatment team planning process with the entire treatment team present.

There was a significant discrepancy between what male inmates reported in the context of access to treatment groups in contrast to the information obtained from staff. The dynamics behind such a discrepancy should be further explored in community meetings.

   **e. Cermak shall ensure that treatment plans adequately address inmates' serious mental health needs and that the plans contain interventions specifically tailored to the inmates' diagnoses.**

Appendix IV
The Agreed Order Status Update
Page 23 of 27

**Compliance Assessment:** Substantial compliance (4/17)

**Factual Findings:**
**April 2018 Cermak Status Update:**

Please see Appendix for Treatment Plan QI Audits for each level of care.

Intensive Management Unit (IMU) staff generates Multidisciplinary Treatment Plans called Self-Management Housing Plans for each individual patient housed in IMU with weekly updates.

Interagency Behavioral Management Plans continue to be developed as needed by Unit Directors in concert with Chief Psychologist, Associate Director of Psychiatry, and the Chief Psychiatrist, and the full multidisciplinary team for more complex or difficult cases throughout the compound.

- P4 (Psychiatric Special Care Units): Psychiatric Special Care Units patients have completed treatment plans within 72 hours of admission to the Psychiatric Special Care Unit (PSCU) by QMHP and the Treatment Team with a review and update triggered by changes in acuity (such as placement in therapeutic restraints or administration of emergency medications) and failure to achieve goals, but no less frequently than weekly.
- Once patients within PSCU's are determined to require subacute level of care, with regard to the frequency of Treatment Plan reviews, they will have their Plans reviewed by QMHP and the Treatment Team every 30 days for two months. After that, patients within PSCU's requiring chronic level of care will have their treatment plans reviewed no less frequently then every 90 days by QMHP and the Treatment Team from that point forward.
- P3(Intermediate Care): Mental Health Intermediate/residential level of care patients have completed treatment plans by a QMHP within 30 days of admission to that Level of Care, with review and update at least every 90 days thereafter.
- P2(Outpatient Care): Mental Health Outpatient level of care patients have completed treatment plans by a QMHP (Psychiatrists) within 45 days of admission to that Level of Care, with review and update at least annually thereafter. New individualized free standing Master Treatment Plan Templates were introduced in Cerner in January 2017. The new Master Treatment Plans allow to create more individualized and focused plans as they incorporate: reflection of collaboration with the inmate, frequency of follow up for evaluation and adjustment of treatment modalities, referrals for lab work for medication monitoring, instructions about adaptation to the correctional environment, documentation of treatment goals and objectives, notations of clinical progress. It is still allowable to supplement that Template with the Rx plan pertaining entries within the power notes. The ultimate goal remains is to create individualized Master Treatment Plans for every patient in P2 Level of care within the requisite time frame while addressing detainees' mental health needs and have them updated three times a year/when goals are failed (current Policy requires annual updates).

Appendix IV
The Agreed Order Status Update
Page 24 of 27

- Although the Policy dictates that treatment plan updates/revisions are undertaken annually, Providers are encouraged to do so more frequently, as clinical needs dictate, or when goals fail. The aggregate raw data demonstrates that Providers (including Psychiatric PA's) generate (new Treatment Plans) and revise (existing Treatment Plans) for P2 patients average 417 times a month with P2 monthly population averaging 1507 across the compound since January 2018. The data also reflects that a significant number of treatment plans is being generated in Division IV(less acute area of the jail where many low security misdemeanants with high turnover rates are housed) and Division VI( which shares many population characteristics with Division IV- rapid turnover/short stays. Division X (high security detainees with P2 level of care) now has a modest decrease in the number of treatment plans which reflects the fact that the population in that division has been relatively stabilized after Protective Custody and SMU tiers have been moved to Division IX.  Raw data collected suggests that Providers and PA's have been creating and revisiting/revising template Treatment Plans with increasing frequency since the template was introduced in January 2017. Relatively few changes in other P2 areas is a reflection of the fact that most of the pt already have had initial treatment plans generated (the burst followed the start of the template in February 2017) and now most of the activity in that domain is due to updates and revisions in "more stable P2 settings".

- Care Level specific CQI studies for Treatment Plans can be found in the PDF appendix. The studies reflect ongoing maintenance of compliance.
- Additionally, Cermak collected data on the number of P2 Level of Care Detainees who receive no medications. It is recognized that the time expenditure and complexity of treatment management is decreased for these detainees. Aggregate data shows that 22(1.4%) P2 Level of Care patients receive no psychotropic medication. Total number of P2 patients as of 04/12/2018 is 1,550.

**April 2018 Metzner assessment:** Treatment plans are being completed within the policy and procedures' required timeframes as confirmed by QI studies.

Cerner is implementing a new treatment plan module (IPOC--- interdisciplinary plan of care) that will be implemented in the near future. I discussed with leadership staff various recommendations regarding the planned module.

In the RTU, inmates do not attend their treatment plan team meeting. The amount of time each inmate is reviewed during these meeting is too short. I made specific recommendations re: the current treatment planning process in the RTU that included the inmates attending part of the team process in addition to allowing more time per in the meeting per inmate. Five to 10 minutes per inmate is not sufficient for the treatment planning process.

Substantial compliance has been present for at least 18 months. The treatment plan team process needs to be remedied as previously referenced.

   o.   **Cermak shall ensure an adequate array of crisis services to appropriately**

Appendix IV
The Agreed Order Status Update
Page 25 of 27

        **manage the psychiatric emergencies that occur among inmates. Crisis services shall not be limited to administrative segregation or observation status.**

    p.    **Cermak shall ensure that inmates have access to appropriate acute infirmary care, comparable to in-patient psychiatric care, within the Cermak facility.**

**Compliance Assessment:** Substantial compliance (6/17)

**Factual Findings:**

**April 2018 Cermak Status Update:**

There continues to be consistent improvement in the response to and compliance with timeliness in responding HSRF since the last site visit. The approved revision to pertinent policy and procedure enacted prior to the last site visit has been the main driver of these improvements. Additionally, increased staffing and resulting increased number of available clinics to respond to requests has positively influenced compliance. A third contributory factor is the new system of automated patient clinic appointment lists. This new process has improved access to care in that patients scheduled for appointments remain on a notification list which is updated every 30 minutes until there is a disposition of their appointment. The outlier reflected in the January Urgent HSR is representative of 2 out of a total of 14 Urgent HSR for the month. In one instance, a non-mental health discipline entered the HSR as urgent, however the clinician who ultimately triaged the form did not agree that an urgent clinical symptom was present and patient was seen the following day. In the second case, the patient was mistakenly scheduled in the routine time frame instead of with 24 hours. Please see Excel Appendix for expanded QI.

| Urgent HSR | | DEC 2017 | JAN 2018 | FEB 2018 |
|---|---|---|---|---|
| Compliance | Patients Seen | 100.00% | 100.00% | 100.00% |
| Timeliness | Patients Seen on Time | 100.00% | 87.50% | 100.00% |
| | | | | |
| NonUrgent HSR | | DEC 2017 | JAN 2018 | FEB 2018 |
| Compliance | Patients Seen | 99.38% | 98.60% | 97.26% |
| Timeliness | Patients Seen on Time | 94.39% | 92.29% | 92.33% |

Please see Excel Appendix for QI

**April 2018 Metzner assessment:** As per current Cermak update status section. Substantial compliance has been present for at least 18 months.

**60.**    **Psychotherapeutic Medication Administration**

    a.  **Cermak shall ensure that psychotropic medication orders are reviewed by a**

        **psychiatrist on a regular, timely basis for appropriateness or adjustment. Cermak shall ensure that changes to an inmate's psychotropic medications are clinically justified and documented in the inmate's medical record.**

    b.   **Cermak shall ensure timely implementation of physician orders for medication and laboratory tests. Cermak shall ensure that inmates who are being treated with psychotropic medications are seen regularly by a physician to monitor responses and potential reactions to those medications, including movement disorders, and provide treatment where appropriate.**

**Compliance Assessment:** Substantial compliance (4/17)

**Factual Findings:**
**April 2018 Cermak Status Update:**

| Lithium, VPA AS of 03_23_2018: Lipid as of 04_04_2018 | # of Med Order(person) | # of Lab Order | Percentage |
|---|---|---|---|
| Lithium | 24 | 22 | 91.67% |
| Divalproex Sodium/ Valproic Acid | 168 | 161 | 95.83% |
| Risperidone/ Ziprasddone/ Olanzapine/aripiprazole | 523 | 494 | 94.46% |

*Table 11. Monitoring of psychotropics*

Periodic monitoring of blood levels of Lithium and Depakote is important for the safe administration of the said medications. It is suggested that blood levels are checked at least every 6 months, even if a patient remains asymptomatic and the dosage remains unchanged. A new Cerner alert continues to prompt Providers if medication level check is due (If no Li and VPA levels had been ordered over the past 6 months, it prompts to order Li, and VPA levels). Similarly, the new rule automatically fires with the tests for Non-fasting Lipids, Hb A1C, and weight measurement, if the said tests had not been performed over the past 6 months. As demonstrated by the chart, the frequency of medication monitoring has reached levels well above 90%.

Critical Medications Missing Alert functions in Cerner. A list of patients who have missed 2 or more critical meds in the last 7 days is generated (including Clozapine and long acting Decanoate/Consta formulations). This report triggers a request for review by Providers.

Appendix IV
The Agreed Order Status Update
Page 27 of 27

Additionally, Nurses report refusal of three or more doses to the provider and followed by a eMERS (patient care/safety report).

Prescription of Diphenhydramine and similar antihistamine medications, when prescribed for idiopathic insomnia, is limited to one time prescription to 2 weeks' worth of the medicine ( unless detainees are prescribed these medications to alleviate medications' side effects) followed by the Sleep Hygiene training conducted by Mental Health Specialists.

Neuroleptic polypharmacy reflective of providers' practice has been studied. Polypharmacy rates are below of what is expected in the community setting. Please refer to Polypharmacy in Severe Mental Illness QI in the APPENDIX.

**April 2018 Metzner assessment:** As per Cermak update section. Substantial compliance has been present for at least 18 months.

Re: Mental Health Services at CCDOC
*USA v Cook County, et al.*

**Appendix V**

**Appendix V**

**Provisons in sustained compliance for at least 18 months**

**59.    Assessment and Treatment**

  a.  Results of mental health intake screenings (see provision 45.c, "Intake Screening") will be reviewed by Qualified Mental Health Staff for appropriate disposition.

Compliance Assessment: Substantial compliance (since June 2012).

b.  Cermak shall develop and implement policies and procedures to assess inmates with mental illness; and to evaluate inmates' mental health needs.  Said policies shall include definitions of emergent, urgent, and routine mental health needs, as well as timeframes for the provision of services for each category of mental health needs.

Assessment: Substantial compliance (since October 2012)

 **c.**  **Cermak shall ensure that any inmate who screens positively for mental illness or suicidal ideation during the intake screening process, through a mental health assessment, or who is otherwise referred for mental health services, receives a clinically appropriate mental health evaluation in a timely manner, based on emergent, urgent, and routine mental health needs, from a Qualified Mental Health Professional, or Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional.  Such mental health evaluation shall include a recorded diagnosis section on Axis I, II, and III, using the DSM-IV-TR, or subsequent Diagnostic and Statistical Manual of the American Psychiatric Association.  If a Qualified Mental Health Professional, or a Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional, finds a serious mental illness, they shall refer the inmate for appropriate treatment.  Cermak shall request and review available information regarding any diagnosis made by the inmate's community or hospital treatment provider, and shall account for the inmate's psychiatric history as a part of the assessment.  Cermak shall adequately document the mental health evaluation in the inmate's medical record.**

**Compliance Assessment:** Substantial Compliance (since 11/16)

**f.**  **Cermak shall provide 24-hour/7-day psychiatric coverage to meet inmates' serious mental health needs and ensure that psychiatrists see inmates in a timely manner.**

**Compliance Assessment:** Substantial compliance (since 11/16)

  **h.**  **Inmates shall have access to appropriate infirmary psychiatric care when clinically appropriate.**

**Compliance Assessment:** Substantial compliance (11/16)

      i.      Cermak shall provide the designated CCDOC official responsible for inmate disciplinary hearings with a mental health caseload roster listing the inmates currently receiving mental health care.

Assessment: Substantial compliance (since June 2012)

      j.     When CCDOC alerts Cermak that an inmate is placed in lock down status for disciplinary reasons, a Qualified Mental Health Professional will review the disciplinary charges against inmate to determine the extent to which the charge was related to serious mental illness. The Qualified Mental Health Professional will make recommendations to CCDOC when an inmate's serious mental illness should be considered as a mitigating factor when punishment is imposed on an inmate with a serious mental illness and to minimize any deleterious effect of disciplinary measures on an inmate's mental health status.

Assessment: Substantial compliance continues (since October 2012).

      k.    In the case of mentally ill inmates in segregation, CCDOC shall consult with Cermak to determine whether continued segregation is appropriate or whether the inmate would be appropriate for graduated alternative based on Cermak's assessment.

      l.    Cermak shall ensure that mentally ill inmates in segregation receive timely and appropriate treatment, including completion and documentation of regular rounds in the segregation units at least once per week by adequately trained Qualified Mental Health Professionals or by Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional, in order to assess the serious mental health needs of inmates in segregation. Inmates who are placed in segregation shall be evaluated within 24 hours of placement and thereafter regularly evaluated by a Qualified Mental Health Professional, or by a Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional to determine the inmate's mental health status, which shall include an assessment of the potential effect of segregation on the inmate's mental health. During these regular evaluations, Cermak shall provide CCDOC with its recommendation regarding whether continued segregation is appropriate or whether the inmate would be appropriate for graduated alternative based on the assessment of the Qualified Mental Health Professional, or Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional.

Compliance Assessment: Substantial compliance (11/15)

      m. Cermak shall maintain an updated log of inmates receiving mental health services,

which shall include both those inmates who receive counseling and those who receive medication. Cermak shall create such a log within six months of the date this Agreed Order is executed. The log shall include each inmate's name, diagnosis or complaint, and next scheduled appointment. Each clinician shall have ready access to a current log listing any prescribed medication and dosages for inmates on psychotropic medications. In addition, inmate's medical records shall contain current and accurate information regarding any medication changes ordered in at least the past year.

Compliance Assessment: Substantial compliance (since June 2012)

     n.     Cermak shall ensure that a psychiatrist, physician or licensed clinical psychologist conducts an in-person evaluation of an inmate prior to a seclusion or restraint order, or as soon thereafter as possible. An appropriately credentialed registered nurse may conduct the in-person evaluation of an inmate prior to a seclusion or restraint order that is limited to two hours in duration. Patients placed in medically-ordered seclusion or restraints shall be evaluated on an on-going basis for physical and mental deterioration. Seclusion or restraint orders should include sufficient criteria for release.

Compliance Assessment: Substantial compliance (since 4/16)

## 61. Suicide Prevention Policy

     a.     CCDOC shall participate with Cermak in a jointly established Suicide Prevention Committee charged with developing policies and procedures to ensure the appropriate management of suicidal inmates and with implementing and monitoring a suicide prevention program in accordance with generally accepted correctional standards of care.

     b.     Cermak shall participate with CCDOC in a jointly established Suicide Prevention Committee charged with developing policies and procedures to ensure the appropriate management of suicidal inmates and with implementing and monitoring a suicide prevention program in accordance with generally accepted correctional standards of care.

     c.     The suicide prevention policy shall include, at a minimum, the following provisions:
        (1)   an operational description of the requirements for both pre-service and annual in-service training;
        (2)   intake screening/assessment;
        (3)   communication;
        (4)   housing;
        (5)   observation;
        (6)   intervention; and
        (7)   mortality and morbidity review.

Compliance Assessment: Substantial compliance (11/13)

**62.  Suicide Precautions**

    a.    CCDOC shall ensure that, where suicide prevention procedures established jointly with Cermak involve correctional personnel for constant direct supervision of actively suicidal inmates or close supervision of special needs inmates with lower levels of risk (e.g., 15 minute checks), correctional personnel perform and document their monitoring and checks.

    b.    Cermak shall ensure that, where suicide prevention procedures established jointly with CCDOC involve health care personnel for constant direct supervision of actively suicidal inmates or close supervision of special needs inmates with lower levels of risk (e.g., 15 minute checks), health care personnel perform and document their monitoring and checks.

    c.    CCDOC shall ensure that when an inmate is identified as suicidal, the inmate shall be searched and monitored with constant direct supervision until the inmate is transferred to appropriate Cermak staff.

    d.    Cermak shall develop and implement policies and procedures for suicide precautions that will set forth the conditions of the watch, including but not limited to allowable clothing, property, and utensils, in accordance with generally accepted correctional standards of care.  These conditions shall be altered only on the written instruction of a Qualified Mental Health Professional, except under emergency circumstances.

Compliance Assessment: Substantial compliance (11/15)

**63.**  Cermak shall ensure that Qualified Mental Health Staff assess and interact with (not just observe) inmates on Suicide Precautions, and document the assessment and interaction on a daily basis.

Compliance Assessment: Substantial compliance (since November 2010)

**64.  Suicide Risk Assessments**

    a.    Cermak shall ensure that any inmate showing signs and symptoms of suicide is assessed by a Qualified Mental Health Professional using an appropriate, formalized suicide risk assessment instrument within an appropriate time not to exceed 24 hours of the initiation of Suicide Precautions.

    b.    Cermak shall ensure that the risk assessment shall include the following:
        (1)   description of the antecedent events and precipitating factors;
        (2)   mental status examination;
        (3)   previous psychiatric and suicide risk history;
        (4)   level of lethality;
        (5)   current medication and diagnosis; and
        (6)   recommendations or treatment plan.  Findings from the risk assessment

shall be documented on both the assessment form and in the inmate's medical record.  (11/13)

65.   Cermak shall ensure that inmates will only be removed from Suicide Precautions after a suicide risk assessment has been performed and approved by a Qualified Mental Health Professional, in consultation with a psychiatrist.  A Qualified Mental Health Professional shall write appropriate discharge orders, including treatment recommendations and required mental health follow-up.

Compliance Assessment: Substantial compliance (11/15)

66.   **Suicide Prevention Policies**

a.  CCDOC shall ensure that suicide prevention policies established jointly with Cermak include procedures to ensure the safe housing and supervision of inmates based on the acuity of their mental health needs, in accordance with generally accepted correctional standards.

b.  Cermak shall ensure that suicide prevention policies established jointly with CCDOC include procedures to ensure the safe housing and supervision of inmates based on the acuity of their mental health needs, in accordance with generally accepted correctional standards.

Compliance Assessment: Substantial compliance (since June 2012)

67.   DFM shall ensure that cells designated by CCDOC or Cermak for housing suicidal inmates shall be retrofitted to render them suicide-resistant (e.g., elimination of protrusive shower heads, unshielded lighting or electrical sockets).  Inmates known to be suicidal shall not be housed in cells with exposed bars.

Compliance Assessment: Substantial compliance (since June 2012)

68.  **Suicide Prevention Training**

a.  Cermak shall ensure that the Facility's suicide prevention curriculum for health care staff members, jointly established with CCDOC, addresses the following topics:
(1)  the suicide prevention policy as revised consistent with this Agreed Order;
(2)  why facility environments may contribute to suicidal behavior;
(3)  potential predisposing factors to suicide;
(4)  high risk suicide periods;
(5)  warning signs and symptoms of suicidal behavior;
(6)  observation techniques;
(7)  searches of inmates who are placed on Suicide Precautions;
(8)  case studies of recent suicides and serious suicide attempts (Serious suicide attempts are typically considered to be those that either were potentially life-threatening or that required medical attention);

      (9)     mock demonstrations regarding the proper response to a suicide attempt; and

      (10)    the proper use of emergency equipment, including suicide cut-down tools.

Compliance Assessment: Substantial compliance (since December 2010)

**70.**     Cermak shall document inmate suicide attempts at the Facility, as defined by the Suicide Prevention Committee's policies and procedure in accordance with generally accepted correctional standards, in the inmate's correctional record in CCDOC's new Jail Management System, in order to ensure that both correctional and health care staff will be aware at future intakes of past suicide attempts, if an inmate with a history of suicide attempts is admitted to the Facility again in the future. Cermak will begin to document this information within six months after execution of this Agreement.

Compliance Assessment: Substantial compliance (since June 2012)

## H. QUALITY MANAGEMENT AND PERFORMANCE MEASUREMENT

**86.**     **Quality Management and Performance Measurement**

     a.   Defendants shall each develop and implement written quality management policies and procedures, in accordance with generally accepted correctional standards, to regularly assess, identify, and take all reasonable measures to assure compliance with each of the provisions of this Agreed Order applicable to that Defendant.

     b.   Defendants shall each develop and implement policies to address and correct deficiencies that are uncovered during the course of quality management activities, including monitoring corrective actions over time to ensure sustained resolution, for each of the provisions of this Agreed Order applicable to that Defendant.

Compliance Assessment: Substantial compliance (11/15)